PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adv. Proc. Nos. 21-3005; 21-3006; 21-3007 |
| vs. | § § | Case No. 3:21-cv-00881 |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § § | |
| Defendant. | § § | |

**APPENDIX IN SUPPORT OF HIGHLAND CAPITAL MANAGEMENT,
L.P.'S OBJECTION AND RESPONSE TO OBJECTIONS TO ORDER DENYING
MOTIONS TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

| <u>Ex.</u> | <u>Description</u> | <u>Appx. #</u> |
|---|---|---|
| 1. | NexPoint Advisors, L.P. Promissory Note in the amount of $30,746,812.33 dated May 31, 2017 | 1-4 |
| 2. | *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* against NexPoint Advisors, L.P., Adv. Pro. No. 21-3005, D.I. 1 (Bankr. N.D. Tex. January 22, 2021) | 5-32 |
| 3. | *Defendant's Original Answer*, Adv. Pro. No. 21-3005, D.I. 6 (Bankr. N.D. Tex. March 1, 2021) | 33-41 |
| 4. | *Defendant's First Amended Answer*, Adv. Pro. No. 21-3005, D.I. 50 (Bankr. N.D. Tex. August 9, 2021) | 42-50 |
| 5. | *Defendant NexPoint Advisors, L.P.'s Answer to Amended Complaint*, Adv. Pro. No. 21-3005, D.I. 64 (Bankr. N.D. Tex. September 1, 2021) | 51-64 |
| 6. | *Amended and Restated Shared Services Agreement* effective as of January 1, 2018 | 65-84 |
| 7. | *Amended Complaint For (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty* against NexPoint Advisors, L.P., *et al.*, Adv. Pro. No. 21-3005, D.I. 63 (Bankr. N.D. Tex. August 27, 2021) | 85-158 |
| 8. | *Defendant's Motion to Withdraw the Reference*, Adv. Pro. No. 21-3005, D.I. 19 (Bankr. N.D. Tex. April 13, 2021) | 159-162 |
| 9. | *Report and Recommendation to District Court Proposing that it: (A) Grant Defendant's Motion to Withdraw the Reference at Such Time as Bankruptcy Court Certifies that Action is Trial Ready; and (B) Defer Pretrial Matters to Bankruptcy Court*, Adv. Pro. No. 21-3005, D.I. 40 (Bankr. N.D. Tex. July 8, 2021) | 163-175 |
| 10. | *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues*, Adv. Pro. No. 21-3005, D.I. 70 (Bankr. N.D. Tex. September 7, 2021) | 176-185 |
| 11. | Frank Waterhouse 10/19/21 Deposition Transcript | 186-316 |
| 12. | *Defendant Highland Capital Management Services, Inc.'s Motion to Extend Expert Disclosure and Discovery Deadlines*, Adv. Pro. No. 21-3006, D.I. 91 (Bankr. N.D. Tex. October 29, 2021) | 317-767 |
| 13. | *Defendant HCRE Partners, LLC's Motion to Extend Expert Disclosure and Discovery Deadlines*, Adv. Pro. No. 21-3007, D.I. 86 (Bankr. N.D. Tex. October 29, 2021) | 768-1218 |

| Ex. | Description | Appx. # |
|-----|-------------|---------|
| 14. | *Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines*, Adv. Pro. No. 21-3005, D.I. 86 (Bankr. N.D. Tex. October 29, 2021) | 1219-1664 |
| 15. | *Reply of Defendant NexPoint Advisors, L.P. in Support of Motion to Extend Expert Disclosure and Discovery Deadlines*, Adv. Pro. No. 21-3005, D.I. 115 (Bankr. N.D. Tex. December 8, 2021) | 1665-1709 |
| 16. | *Highland's Memorandum of Law in Support of Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines*, Adv. Pro. No. 21-3005, D.I. 105 (Bankr. N.D. Tex. December 1, 2021) | 1710-1733 |
| 17. | Transcript of December 13, 2021 Hearing | 1734-1772 |
| 18. | *Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*, Adv. Pro. No. 21-3005, D.I. 138 (Bankr. N.D. Tex. December 22, 2021) | 1773-1776 |

Dated:  January 31, 2022.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 1

## PROMISSORY NOTE

**$30,746,812.33**                                                        **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

      2.    <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

      2.1    <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

      2.2    <u>Final Payment Date</u>.    The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.   <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.   <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

     7.   <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

     8.   <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

     9.   <u>Prior Notes</u>. The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

**EXHIBIT A**

**PRIOR NOTES**

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

3

# EXHIBIT 2

Case 3:21-cv-00881-X  Document 39  Filed 01/31/22  Page 10 of 1780  PageID 4340
Case 21-03005-sgj Doc 1 Filed 01/22/21  Entered 01/22/21 17:59:27  Page 1 of 9
Docket #0001  Date Filed: 1/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | _____ |
| | § | |
| NEXPOINT ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



Appx. 00006

## COMPLAINT FOR (I) BREACH OF CONTRACT
## AND (II) TURNOVER OF PROPERTY OF THE DEBTOR'S ESTATE

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its complaint (the "Complaint") against defendant NexPoint Advisors, L.P. ("NPA" or "Defendant"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

### PRELIMINARY STATEMENT

1.      The Debtor brings this action against NPA arising from NPA's default under a promissory note executed by NPA in favor of the Debtor in the original principal amount of $30,746,812.33 and payable in annual installments.  NPA has failed to pay amounts when due under the note, the note is in default, and the amounts due under the note have been accelerated pursuant to the terms of the note.

2.      Through this Complaint, the Debtor seeks (a) damages from NPA in an amount equal to (i) the outstanding principal due under the Note (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the Note) for NPA's breach of its obligations under the Note, and (b) turnover by the NPA to the Debtor of the foregoing amounts.

### JURISDICTION AND VENUE

3.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

Appx. 00007

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

5.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

7.      The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

8.      Upon information and belief, NPA is a limited partnership with offices located in Dallas, Texas and organized under the laws of the state of Delaware.

## CASE BACKGROUND

9.      On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

10.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis LP and Acis GP.

Appx. 00008

11.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

12.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

### STATEMENT OF FACTS

**A.     The NPA Note**

13.     NPA is the maker under a promissory note in favor of the Debtor.

14.     Specifically, on May 31, 2017, NPA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $30,746,812.33 (the "Note").  A true and correct copy of the Note is attached hereto as **Exhibit 1**.

15.     Section 2 of the Note provides: "**Payment of Principal and Interest**.  Principal and interest under this Note shall be due and payable as follows:

**2.1     Annual Payment Dates.**   During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this note.

**2.2     Final Payment Date**.   The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

16.     Section 3 of the Note provides:

**Prepayment Allowed: Renegotiation Discretionary**.     Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

---

[2] All docket numbers refer to the main docket for the Debtor's Case maintained by this Court.

17.     Section 4 of the Note provides:

**Acceleration Upon Default**.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.    No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

18.     Section 6 of the Note provides:

**Attorneys' Fees**.    If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.      NPA's Default under the Note**

19.     NPA failed to make the payment due under the Note on December 31, 2020 in the amount of $1,406,111.92.

20.     By letter dated January 7, 2021, the Debtor made demand on NPA for immediate payment under the Note (the "Demand Letter").    A true and correct copy of the Demand Letter is attached hereto as **Exhibit 2**.    The Demand Letter provides:

Because of Maker's failure to pay, the Note is in default.    Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.    The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due immediately.**

Demand Letter (emphasis in the original).

21.     On January 14, 2021, in an apparent attempt to cure its default, NPA paid the Debtor the $1,406,111.92 that was due on December 31, 2020 (the "Partial Payment").

Appx. 00010

22.     The Note does not contain a cure provision. Therefore, the Partial Payment did not cure NPA's default.  Accordingly, on January 15, 2021, the Debtor sent NPA a follow-up letter to its Demand Letter (the "Second Demand Letter"), a true and correct copy of which is attached hereto as **Exhibit 3**, stating:

> [T]he Partial Payment will be applied as payment against the amounts due under the Note in accordance with Section 3 thereof.  **The Note remains in default, and all amounts due thereunder are due immediately**.
>
> After adjusting for the Partial Payment and the continued accrual of interest, the amount due under the Note as of January 15, 2021, is $23,071,195.03 (which amount does not include expenses incurred to date in collecting the Note).

Second Demand Letter (emphasis in original).

23.     Despite the Debtor's demands, NPA did not pay the amount demanded by the Debtor on January 7, 2021, or at any time thereafter.

24.     As of January 15, 2021, the total outstanding principal and accrued but unpaid interest due under the Note was $23,071,195.03

25.     Pursuant to Section 4 of the Note, the Note is in default and is currently due and payable.

### FIRST CLAIM FOR RELIEF
**(For Breach of Contract)**

26.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

27.     The Note is a binding and enforceable contract.

28.     NPA breached the Note by failing to pay all amounts due to the Debtor upon NPA's default and acceleration.

29.     Pursuant to the Note, the Debtor is entitled to damages from NPA in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and

Appx. 00011

unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for NPA's breach of its obligations under the Note.

30.     As a direct and proximate cause of NPA's breach of the Note, the Debtor has suffered damages in the amount of at least $23,071,195.03 as of January 15, 2021, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**(Turnover by NPA Pursuant to 11 U.S.C. § 542(b))**

</div>

31.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

32.     NPA owes the Debtor an amount equal to (i) the aggregate outstanding principal due under the Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for NPA's breach of its obligations under the Note.

33.     The Note is property of the Debtor's estate that is matured and payable upon default and acceleration.

34.     NPA has not paid the amount due under the Note to the Debtor.

35.     The Debtor has made demand for the turnover of the amount due under the Note.

36.     As of the date of filing of this Complaint, NPA has not turned over the amount due under the Note.

37.     The Debtor is entitled to the amount due under the Note.

Appx. 00012

WHEREFORE, the Debtor prays for judgment as follows:

(i)      On its First Claim for Relief, damages in an amount to be determined at trial, including, among other things, (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by NPA to the Debtor of an amount equal to (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses); and

(iii)    Such other and further relief as this Court deems just and proper.

Appx. 00013

Dated:  January 22, 2021.                  **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
              ikharasch@pszjlaw.com
              jmorris@pszjlaw.com
              gdemo@pszjlaw.com
              hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

9

**Appx. 00014**

# EXHIBIT 1

**EXHIBIT 1**

**PROMISSORY NOTE**

**$30,746,812.33**                                                                                   **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below.  All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.       <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.       <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

2.1       <u>Annual Payment Dates</u>.  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2       <u>Final Payment Date</u>.       The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.       <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.       <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.    Prior Notes.   The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

## EXHIBIT A

### PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

3

**Appx. 00018**

# EXHIBIT 2

**EXHIBIT 2**

# HIGHLAND CAPITAL MANAGEMENT, L.P.

January 7, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James Dondero

   Re:  Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year.  Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due <u>immediately</u>.**  Payments on the Note must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41916.2 36027/002

**Appx. 00020**

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

## Appendix A

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

# EXHIBIT 3

EXHIBIT 3

Appx. 00023

<div align="center">HIGHLAND CAPITAL MANAGEMENT, L.P.</div>

January 15, 2021


NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James Dondero

      Re:  Partial Payment on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, ("Maker"), entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").  A copy of the Note is attached hereto as **Appendix A**.

On January 7, 2021, Payee notified you that because of Maker's failure to make the payment due on December 31, 2020 (the "Default"), the Note was in default and that all principal, interest, and any other amounts due on the Note were immediately due and payable.  The amount due and payable on the Note as of January 8, 2021, was $24,471,804.98; however, interest continues to accrue under the Note.

On January 14, 2021, Payee received a wire from Maker in the amount of $1,406,111.92 (the "Partial Payment").  To reiterate, the amount due under the Note as of January 8, 2021, was $24,471,804.98.  The Partial Payment will be applied as payment against the amounts due under the Note pursuant to Section 3 thereof.  **The Note remains in default, and all amounts due thereunder are due underlined immediately.**

After adjusting for the Partial Payment and the continued accrual of interest, the amount due under the Note as of January 15, 2021, is $23,071,195.03 (which amount does not include expenses incurred to date in collecting the Note).  Payment of such amount is due immediately. Payments on the Note must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix B**.


Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved, including the right to recover Payee's expenses incurred in collecting the Note.  Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter
       A.  Lee Hogewood III

Appx. 00025

# Appendix A

<div align="center">

**PROMISSORY NOTE**

</div>

**$30,746,812.33**                                                                      **May 31, 2017**

      THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below.  All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

      2.    Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

      2.1    Annual Payment Dates.  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

      2.2    Final Payment Date.    The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

      3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.     Prior Notes.   The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

## EXHIBIT A

### PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

3

Appx. 00029

Case 21-03005-sgj Doc 1-3 Filed 01/22/21   Entered 01/22/21 17:59:27   Page 8 of 8

## Appendix B

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Highland Capital Management, L.P. | **DEFENDANTS**<br>NexPoint Advisors, L.P. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | **ATTORNEYS** (If Known)<br>Munsch Hardt Kopf & Harr, P.C.<br>500 N. Akard Street, Suite 3800<br>Dallas, Texas 75201  Tel.: (214) 855-7500 |
| **PARTY** (Check One Box Only)<br>☑ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Count 1:  Breach of contract; Count 2:  Turnover pursuant to 11 U.S.C. 542

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- [2] 11-Recovery of money/property – §542 turnover of property
- [ ] 12-Recovery of money/property – §547 preference
- [ ] 13-Recovery of money/property – §548 fraudulent transfer
- [ ] 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- [ ] 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- [ ] 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- [ ] 41-Objection / revocation of discharge – §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- [ ] 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- [ ] 66-Dischargeability – §523(a)(1),(14),(14A) priority tax claims
- [ ] 62-Dischargeability – §523(a)(2), false pretenses, false representation, actual fraud
- [ ] 67-Dischargeability – §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- [ ] 61-Dischargeability – §523(a)(5), domestic support
- [ ] 68-Dischargeability – §523(a)(6), willful and malicious injury
- [ ] 63-Dischargeability – §523(a)(8), student loan
- [ ] 64-Dischargeability – §523(a)(15), divorce or separation obligation (other than domestic support)
- [ ] 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- [ ] 71-Injunctive relief – imposition of stay
- [ ] 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- [ ] 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- [ ] 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- [ ] 01-Determination of removed claim or cause

**Other**
- [ ] SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- [1] 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $23,071,195.03 plus interest, fees, and expenses |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>January 22, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# EXHIBIT 3

Case 3:21-cv-00881-X   Document 39   Filed 01/31/22   Page 38 of 1780   PageID 4368
Case 21-03005-sgj Doc 6 Filed 03/01/21   Entered 03/01/21 15:39:24   Page 1 of 8

Docket #0006  Date Filed: 3/1/2021

K&L GATES LLP
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for NexPoint Advisors, L.P.*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

*Counsel for NexPoint Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03005 |
| v. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S ORIGINAL ANSWER

COMES NOW NexPoint Advisors, L.P. (the "Defendant"), the defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), and files this its *Defendant's Original Answer* (the "Answer"), responding to the *Complaint for (I) Breach of Contract and (II) Turnover of Property*

*of the Debtor's Estate* (the "Complaint").  Where an allegation in the Complaint is not expressly

admitted in this Answer, it is denied.

## PRELIMINARY STATEMENT

1.      The first sentence of ¶ 1 sets forth the Plaintiff's objective in bringing the Complaint

and does not require a response.  To the extent it contains factual allegations, they are denied.  The

second sentence contains a legal conclusion that does not require a response.  To the extent it

contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require

a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's

bankruptcy case but denies any implication that this fact confers Constitutional authority on the

Bankruptcy Case to adjudicate this dispute.   Any allegations in ¶ 3 not expressly admitted are

denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional)

jurisdiction to hear this Adversary Proceeding.  Any allegations in ¶ 4 not expressly admitted are

denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies

that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt.  The

Defendant admits that a  § 542(b) turnover proceeding is statutorily core but denies that it is

Constitutionally core under *Stern v. Marshall*.  The Defendant does not consent to the Bankruptcy

Court entering final orders or judgment in this Adversary Proceeding.  Any allegations in ¶ 5 not

expressly admitted are denied.

6.      The Defendant admits ¶ 6 of the Complaint.

## THE PARTIES

7.      The Defendant admits ¶ 7 of the Complaint.

8.      The Defendant admits ¶ 8 of the Complaint.

## CASE BACKGROUND

9.      The Defendant admits ¶ 9 of the Complaint.

10.     The Defendant admits ¶ 10 of the Complaint.

11.     The Defendant admits ¶ 11 of the Complaint.

12.     The Defendant admits ¶ 12 of the Complaint.

## STATEMENT OF FACTS

**A.      The NPA Notes**

13.     The Defendant admits that it has executed at least one promissory note under which
the Debtor is the payee.  Any allegations in ¶ 13 not expressly admitted are denied.

14.     The Defendant admits ¶ 14 of the Complaint.

15.     The Defendant denies ¶ 15 of the Complaint.  The document speaks for itself and
the quote set forth in ¶ 15 is not verbatim.

16.     The Defendant admits ¶ 16 of the Complaint.

17.     The Defendant denies ¶ 17 of the Complaint.  The document speaks for itself and
the quote set forth in ¶ 17 is not verbatim.

18.     The Defendant admits ¶ 18 of the Complaint.

**B.      NPA's Default under the Note**

19.     The Defendant lacks knowledge or information sufficient to form a belief about the
truth of the allegations in ¶ 19 of the Complaint and therefore denies the same.

20.     The Defendant admits that Exhibit 2 to the Complaint (the "Demand Letter") is a
true and correct copy of what it purports to be and that the document speaks for itself.  To the

DEFENDANT'S ORIGINAL ANSWER

extent ¶ 20 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, ¶ 20 of the Complaint is denied.

21.     The Defendant admits that it paid the Debtor $1,406,111.92 on January 14, 2021. To the extent not expressly admitted, paragraph 21 of the Complaint is denied.

22.     The Defendant admits that Exhibit 3 to the Complaint (the "<u>Second Demand Letter</u>") is a true and correct copy of what it purports to be and that the document speaks for itself. To the extent ¶ 22 of the Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, ¶ 22 of the Complaint is denied.

23.     To the extent ¶ 23 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits ¶ 23 of the Complaint.

24.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 24 of the Complaint and therefore denies the same.

25.     The Defendant denies ¶ 25 of the Complaint.

### FIRST CLAIM FOR RELIEF
**(For Breach of Contract)**

26.     Paragraph 26 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

27.     Paragraph 27 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 27 of the Complaint and therefore denies the same.

28.     Paragraph 28 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient

to form a belief about the truth of the allegations in ¶ 28 of the Complaint and therefore denies the same.

29.     Paragraph 29 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 29 of the Complaint and therefore denies the same.

30.     The Defendant denies ¶ 30 of the Complaint.

## SECOND CLAIM FOR RELIEF
### (Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))

31.     Paragraph 31 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

32.     Paragraph 32 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 32 of the Complaint and therefore denies the same.

33.     Paragraph 33 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 33 of the Complaint and therefore denies the same.

34.     The Defendant denies ¶ 34 of the Complaint.

35.     Paragraph 35 of the Complaint states a legal conclusion that does not require a response.  The Defendant admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.  To the extent ¶ 35 alleges other facts,

the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 35 of the Complaint and therefore denies the same.

36.　　The Defendant denies ¶ 36 of the Complaint.

37.　　Paragraph 37 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 37 of the Complaint and therefore denies the same.

38.　　The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including parts (i), (ii), and (iii).

## AFFIRMATIVE DEFENSES

39.　　Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

40.　　Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

41.　　Furthermore, the Plaintiff was waived the right to accelerate the note and/or the Plaintiff is estopped to enforce the alleged acceleration.

## JURY DEMAND

42.　　The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

43.　　The Defendant does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

DEFENDANT'S ORIGINAL ANSWER

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that, following a trial on the merits, the Court enter a judgment that the Plaintiff take noting on the Complaint and provide the Defendant such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

**K&L GATES LLP**

Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 1st day of March, 2021, a true and correct copy of this document was electronically served by the Court's ECF system on parties entitled to notice thereof, including counsel for the Plaintiff.

/s/  Davor Rukavina
    Davor Rukavina, Esq.

# EXHIBIT 4

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

COUNSEL FOR NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03005 |
| v. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S FIRST AMENDED ANSWER

COMES NOW NexPoint Advisors, L.P. (the "Defendant"), the defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), and files this its *Defendant's First Amended Answer* (the "Answer"), responding to the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (the "Complaint").  Where an allegation in the Complaint is not expressly admitted in this Answer, it is denied.

---

## PRELIMINARY STATEMENT

1.      The first sentence of ¶ 1 sets forth the Plaintiff's objective in bringing the Complaint and does not require a response.  To the extent it contains factual allegations, they are denied.  The second sentence contains a legal conclusion that does not require a response.  To the extent it contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Case to adjudicate this dispute.  Any allegations in ¶ 3 not expressly admitted are denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding.  Any allegations in ¶ 4 not expressly admitted are denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt.  The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does <u>not</u> consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding.  Any allegations in ¶ 5 not expressly admitted are denied.

6.      The Defendant admits ¶ 6 of the Complaint.

## THE PARTIES

7.      The Defendant admits ¶ 7 of the Complaint.

DEFENDANT'S FIRST AMENDED ANSWER—Page 2

8.      The Defendant admits ¶ 8 of the Complaint.

## CASE BACKGROUND

9.      The Defendant admits ¶ 9 of the Complaint.

10.     The Defendant admits ¶ 10 of the Complaint.

11.     The Defendant admits ¶ 11 of the Complaint.

12.     The Defendant admits ¶ 12 of the Complaint.

## STATEMENT OF FACTS

### A.      The NPA Notes

13.     The Defendant admits that it has executed at least one promissory note under which the Debtor is the payee.  Any allegations in ¶ 13 not expressly admitted are denied.

14.     The Defendant admits ¶ 14 of the Complaint.

15.     The Defendant denies ¶ 15 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 15 is not verbatim.

16.     The Defendant admits ¶ 16 of the Complaint.

17.     The Defendant denies ¶ 17 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 17 is not verbatim.

18.     The Defendant admits ¶ 18 of the Complaint.

### B.      NPA's Default under the Note

19.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 19 of the Complaint and therefore denies the same.

20.     The Defendant admits that Exhibit 2 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent ¶ 20 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, ¶ 20 of the Complaint is denied.

21.     The Defendant admits that it paid the Debtor $1,406,111.92 on January 14, 2021. To the extent not expressly admitted, paragraph 21 of the Complaint is denied.

22.     The Defendant admits that Exhibit 3 to the Complaint (the "Second Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself. To the extent ¶ 22 of the Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, ¶ 22 of the Complaint is denied.

23.     To the extent ¶ 23 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits ¶ 23 of the Complaint.

24.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 24 of the Complaint and therefore denies the same.

25.     The Defendant denies ¶ 25 of the Complaint.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**(For Breach of Contract)**

</div>

26.     Paragraph 26 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

27.     Paragraph 27 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 27 of the Complaint and therefore denies the same.

28.     Paragraph 28 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 28 of the Complaint and therefore denies the same.

DEFENDANT'S FIRST AMENDED ANSWER—Page 4

29.     Paragraph 29 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 29 of the Complaint and therefore denies the same.

30.     The Defendant denies ¶ 30 of the Complaint.

## SECOND CLAIM FOR RELIEF
### (Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))

31.     Paragraph 31 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

32.     Paragraph 32 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 32 of the Complaint and therefore denies the same.

33.     Paragraph 33 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 33 of the Complaint and therefore denies the same.

34.     The Defendant denies ¶ 34 of the Complaint.

35.     Paragraph 35 of the Complaint states a legal conclusion that does not require a response.  The Defendant admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.  To the extent ¶ 35 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 35 of the Complaint and therefore denies the same.

36.     The Defendant denies ¶ 36 of the Complaint.

Appx. 00047

37.     Paragraph 37 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 37 of the Complaint and therefore denies the same.

38.     The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including parts (i), (ii), and (iii).

## AFFIRMATIVE DEFENSES

39.     Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

40.     Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

41.     Furthermore, the Plaintiff was waived the right to accelerate the note and/or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

42.     Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent.  Specifically, sometime between December of the year in which each Note was made and February of the following year, Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed with Mr. James Dondero, acting for Defendant, that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Mr. Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant believes there may be testimony or email correspondence that

DEFENDANT'S FIRST AMENDED ANSWER—Page 6

discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

## **JURY DEMAND**

43.     The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

44.     The Defendant does <u>not</u> consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Complaint and provide the Defendant such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 9th day of August, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/  Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas  75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    drukavina@munsch.com
    jvasek@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 9th day of August, 2021, a true and correct copy of this document was served electronically via the Court's CM/ECF system on the following recipients:

**Zachery Z. Annable**
Hayward PLLC
10501 N. Central Expressway
Suite 106
Dallas, TX 75231
Email: zannable@haywardfirm.com

**Melissa S. Hayward**
Hayward PLLC
10501 N. Central Expry, Ste. 106
Dallas, TX 75231
Email: MHayward@HaywardFirm.com

**Juliana Hoffman**
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Email: jhoffman@sidley.com

**Paige Holden Montgomery**
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Email: pmontgomery@sidley.com

/s/  Davor Rukavina
    Davor Rukavina, Esq.

DEFENDANT'S FIRST AMENDED ANSWER—Page 8
4819-4723-3518v.2 019717.00001

# EXHIBIT 5

Appx. 00051

Docket #0064  Date Filed: 9/1/2021

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Defendant NexPoint Advisors, L.P.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT NEXPOINT ADVISORS, L.P.'S
ANSWER TO AMENDED COMPLAINT**

Defendant NexPoint Advisors, L.P. ("NexPoint"), a defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the *Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "Amended Complaint"). Where an allegation in the Amended Complaint is not expressly admitted in this Answer, it is denied.

¨1¤}HV5!    "0«
1934054210901000000000002

Appx. 00052

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Defendant NexPoint admits that NPA's First Amended Answer speaks for itself. To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.      Defendant NexPoint denies the allegations in paragraph 3 of the Amended Complaint.

4.      Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6.      Defendant NexPoint admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.      Defendant NexPoint admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.      Defendant NexPoint denies the allegations contained in paragraph 8 of the Amended Complaint.  Defendant NexPoint does not consent to any trial before, or final order entered by, the Bankruptcy Court.  Defendant NexPoint demands a trial by jury of all issues so triable.

9.      Defendant NexPoint admits the allegations in paragraph 9 of the Amended Complaint.

## THE PARTIES

10.      Defendant NexPoint admits the allegations in paragraph 10 of the Amended Complaint.

11.      Defendant NexPoint admits the allegations in paragraph 11 of the Amended Complaint.

12.      Defendant NexPoint admits the allegations in paragraph 12 of the Amended Complaint.

13.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15.      Defendant NexPoint admits the allegations in paragraph 15 of the Amended Complaint.

16.      Defendant NexPoint admits the allegations in paragraph 16 of the Amended Complaint.

17.     Defendant NexPoint admits the allegations in paragraph 17 of the Amended Complaint.

18.     Defendant NexPoint admits the allegations in paragraph 18 of the Amended Complaint.

19.     Defendant NexPoint admits the allegations in paragraph 19 of the Amended Complaint.

## STATEMENT OF FACTS

20.     Defendant NexPoint admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.     Defendant NexPoint admits the allegations in paragraph 21 of the Amended Complaint.

22.     Defendant NexPoint denies paragraph 22 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 22 is not verbatim.

23.     Defendant NexPoint admits the allegations in paragraph 23 of the Amended Complaint.

24.     Defendant NexPoint denies paragraph 24 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 24 is not verbatim.

25.     Defendant NexPoint admits the allegations in paragraph 25 of the Amended Complaint.

26.     Defendant NexPoint admits that it did not make a payment under the Note on December 31, 2020. Defendant NexPoint denies that any payment was due under the Note on December 31, 2020.  To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.     Defendant NexPoint admits that Exhibit 2 to the Amended Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.   To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.   To the extent not expressly admitted, paragraph 27 of the Amended Complaint is denied.

28.     Defendant NexPoint admits that it paid the Debtor $1,406,111.92 on January 14, 2021, but denies that any payment was due on December 31, 2020 or that this was an attempt to cure a default.  To the extent not expressly admitted, paragraph 28 of the Amended Complaint is denied.

29.     Defendant NexPoint admits that Exhibit 3 to the Amended Complaint (the "Second Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 29 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.   To the extent not expressly admitted, paragraph 29 of the Amended Complaint is denied.

30.     To the extent paragraph 30 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits paragraph 30 of the Amended Complaint.

31.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.     Defendant NexPoint denies the allegations in paragraph 32 of the Amended Complaint.

33.     Defendant NexPoint admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 33 of the Amended

Complaint. Defendant NexPoint denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34.     Defendant NexPoint admits the allegations in paragraph 34 of the Amended Complaint.

35.     Defendant NexPoint admits the allegations in paragraph 35 of the Amended Complaint.

36.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 36 contradicts the First Amended Answer, it is denied.

37.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 37 contradicts the First Amended Answer, it is denied.

38.     Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no answer is required.  To the extent of any factual allegation, Defendant NexPoint admits that Mr. Dondero controlled NPA and denies that he controlled the Debtor at the time of the Alleged Agreement.

39.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Amended Complaint and therefore denies the same.

40.     Defendant NexPoint denies the allegations in paragraph 40 of the Amended Complaint.

41.     Defendant NexPoint admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and

it is denied.  To the extent not expressly admitted, paragraph 41 of the Amended Complaint is denied.

42.     Paragraph 42 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

43.     Paragraph 43 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

## FIRST CLAIM FOR RELIEF
### (against NexPoint)
### (for Breach of Contract)

44.     Paragraph 44 of the Amended Complaint is a sentence of incorporation that does not require a response.  All prior responses are incorporated herein by reference.

45.     Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

46.     Paragraph 46 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

47.     Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

48.     Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## SECOND CLAIM FOR RELIEF
### (against NexPoint)
### (Turnover by NexPoint Pursuant to 11 U.S.C. § 542(b))

49.     Paragraph 49 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

---

50.     Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

51.     Paragraph 51 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

52.     Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

53.     Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  Defendant NexPoint admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.

54.     Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

55.     Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## THIRD CLAIM FOR RELIEF
### (Against NexPoint)
**(Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58.     Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

59.     Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

60.     Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

61.     Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### FOURTH CLAIM FOR RELIEF
**(Against NexPoint)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

62.     Paragraph 62 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

63.     Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

64.     Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

65.     Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

66.     Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### FIFTH CLAIM FOR RELIEF
**(Against Dugaboy Investment Trust and Nancy Dondero)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

67.     Paragraph 67 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

68.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

69.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

70.     Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### SIXTH CLAIM FOR RELIEF
**(Against Dugaboy Investment Trust and Nancy Dondero)**
**(Breach of Fiduciary Duty)**

71.     Paragraph 71 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

72.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

73.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

74.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

### SEVENTH CLAIM FOR RELIEF
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

75.     Paragraph 75 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

76.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

77.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

78.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

79.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

Defendant NexPoint denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## AFFIRMATIVE DEFENSES

80.     Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

81.     Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

82.     Furthermore, the Plaintiff has waived the right to accelerate the note and /or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

83.     Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant NexPoint believes there may be testimony or email correspondence that discusses the

existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

84.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because NexPoint acted in good faith, without knowledge of any alleged avoidability, and because reasonably equivalent value was provided for any alleged transfer or obligation.

85.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because no transferor or transferee, or obligor or obligee, was insolvent.

86.     To the extent of any avoidance, NexPoint asserts a lien under 11 U.S.C. § 548(c) to the extent that NexPoint gave value, and a similar preference lien under any applicable provision of the Texas Uniform Fraudulent Transfer Act.

## JURY DEMAND

87.     Defendant NexPoint demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

88.     Defendant NexPoint does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant NexPoint respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant NexPoint such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of September, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
  Davor Rukavina, Esq.
  Texas Bar No. 24030781
  Julian P. Vasek, Esq.
  Texas Bar No. 24070790
  3800 Ross Tower
  500 N. Akard Street
  Dallas, Texas  75201-6659
  Telephone: (214) 855-7500
  Facsimile: (214) 855-7584
  Email: drukavina@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

    /s/ Davor Rukavina
    Davor Rukavina

Appx. 00064

# EXHIBIT 6

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

### R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows.

### ARTICLE I

### DEFINITIONS

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

Appx. 00067

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02   Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01   General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)   *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

3

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

        (b)    *Legal/Compliance/Risk Analysis.*  Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

        (c)    *Tax.*  Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

        (d)    *Management of Clients and Accounts.*  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

        (e)    *Valuation.*  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

        (f)    *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

        (g)    *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

        (h)    *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

4

(i)     *Administrative Services.*   The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

(j)     *Shared Employees.*   To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

(k)     *Ancillary Services.*   Assistance and advice on all things ancillary or incidental to the foregoing; and

(l)     *Other.*   Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Section 2.03   Shared Employees.

(a)     The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.   Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.   To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.   The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

5

(b)     Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.   To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

6

(i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)     The Staff and Services Provider shall require that each Shared Employee:

(i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)     to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)     Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04   Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05   Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the

7

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    Authority.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.   The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07    Third Parties.

(a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    Management Company to Cooperate with the Staff and Services Provider.  In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    Power of Attorney.  If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

8

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).  Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01   Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02   Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03   Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01   Representations. Each of the Parties hereto represents and warrants that:

(a)   It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)   this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)   no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)   neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

9

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01   Compliance; Advisory Restrictions.

(a)      The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)      This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof.  It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02   Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

10

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01  Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

11

Appx. 00076

Section 6.02   Exculpation. To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages. To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement. The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03   Indemnification by the Management Company. The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

12

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04   Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05   <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 6.03</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   <u>Reliance</u>. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

<div align="center">

**ARTICLE VII**

**TERMINATION**

</div>

Section 7.01   <u>Termination</u>. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

<div align="center">

**ARTICLE VIII**

**MISCELLANEOUS**

</div>

Section 8.01   <u>Amendments</u>. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   <u>Assignment and Delegation</u>.

(a)      Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)      Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)      The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

<div align="center">14</div>

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    Non-Recourse; Non-Petition.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)    The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

15

Section 8.04    Governing Law.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    Severability.    The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    No Waiver.    The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    Counterparts.    This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

16

Section 8.09 <u>Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10 <u>No Partnership or Joint Venture</u>. Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties. Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11 <u>Independent Contractor</u>. Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12 <u>Written Disclosure Statement</u>. The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13 <u>Headings</u>. The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15 <u>Notices</u>. Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

        (a)    If to the Management Company:

            NexPoint Advisors, L.P.
            200 Crescent Court
            Suite 700
            Dallas, TX 75201

Appx. 00082

    (b)     If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

18

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

**NEXPOINT ADVISORS, L.P.**

By:  NexPoint Advisors GP, LLC, its
General Partner

By:_____
Name: Frank Waterhouse
Title: Treasurer

**HIGHLAND CAPITAL
MANAGEMENT, L.P.**

By:  Strand Advisors, Inc., its General
Partner

By:_____
Name: Frank Waterhouse
Title: Treasurer

# EXHIBIT 7

Docket #0063  Date Filed: 8/27/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005 |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_NY:41984.9 36027/002

¨1¤}HV5(:     .P«

1934054210827000000000012

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding") by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants NexPoint Advisors, L.P. ("NPA"), James Dondero ("Mr. Dondero"), Nancy Dondero ("Ms. Dondero"), and The Dugaboy Investment Trust ("Dugaboy" and together with NPA, Mr. Dondero, and Ms. Dondero, the "Defendants"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor brings this action against Defendants in connection with NPA's default under a promissory note executed by NPA in favor of the Debtor in the original principal amount of $30,746,812.33, and payable in annual installments.  NPA has failed to pay amounts when due under the Note (as defined below), the Note is in default, and the amounts due under the Note have been accelerated pursuant to the terms of the Note.

2.      In paragraph 42 of NPA's *First Amended Answer* [Docket No. 34-3], NPA contends that the Debtor orally agreed to relieve it of the obligations under the notes upon fulfillment of "conditions subsequent" (the "Alleged Agreement").  NPA further contends that the Alleged Agreement was entered into between James Dondero, acting on behalf of NPA, and his sister, Nancy Dondero, as representative of a majority of the Class A shareholders of the Plaintiff, including Dugaboy (the "Representative"), acting on behalf of the Debtor.  At the time Mr.

2

D-CNL002936

**Appx. 00087**

Dondero entered into the Alleged Agreement on behalf of NPA, he controlled both NPA and the Debtor and was the lifetime beneficiary of Dugaboy.

3.       Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the Note.

4.       Nevertheless, the Debtor amends its Complaint to add certain claims and name additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable.  Specifically, in addition to pursuing claims against NPA for breach of its obligations under the Note and for turnover, the Debtor adds alternative claims (a) against NPA for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5.       As remedies, the Debtor seeks (a) damages from NPA in an amount equal to (i) the outstanding principal due under the Note (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the Note), for NPA's breach of its obligations under the Note, (b) turnover by NPA to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, NPA pursuant to the Note; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

3

D-CNL002937

Appx. 00088

## JURISDICTION AND VENUE

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10.      The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.      Upon information and belief, NPA is a limited partnership with offices located in Dallas, Texas, and organized under the laws of the state of Delaware.

12.      Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled NPA; Mr. Dondero also controlled the Debtor until January 9, 2020.

13.      Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

4

14.     Upon information and belief, Nancy Dondero is an individual residing in the state of Florida and who is Mr. Dondero's sister, and a trustee of Dugaboy.

## CASE BACKGROUND

15.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

16.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

17.     On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

18.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

19.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[2] All docket numbers refer to the main docket for the Debtor's Case maintained by this Court.

5

D-CNL002939

**Appx. 00090**

## STATEMENT OF FACTS

**A.    The NPA Note**

20.    NPA is the maker under a promissory note in favor of the Debtor.

21.    Specifically, on May 31, 2017, NPA executed a promissory note in favor

of the Debtor, as payee, in the original principal amount of $30,746, 812.33 (the "Note").  A true

and correct copy of the Note is attached hereto as **Exhibit 1**.

22.    Section 2 of the Note provides: "**Payment of Principal and Interest**.

Principal and interest under this Note shall be due and payable as follows:

> **2.1    Annual Payment Dates.**  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this note.

> **2.2    Final Payment Date**.    The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

23.    Section 3 of the Note provides:

> **Prepayment Allowed: Renegotiation Discretionary**.    Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

24.    Section 4 of the Note provides:

> **Acceleration Upon Default**.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

6

D-CNL002940

25.     Section 6 of the Note provides:

> **Attorneys' Fees**.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.     NPA's Default Under the Note**

26.     NPA failed to make the payment due under the Note on December 31, 2020 in the amount of $1,406,111.92.

27.     By letter dated January 7, 2021, the Debtor made demand on NPA for immediate payment under the Note (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 2**.  The Demand Letter provides:

> Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.
>
> **The Note is in default, and payment is due immediately.**

Demand Letter (emphasis in the original).

28.     On January 14, 2021, in an apparent attempt to cure its default, NPA paid the Debtor the $1,406,111.92 that was due on December 31, 2020 (the "Partial Payment").

29.     The Note does not contain a cure provision. Therefore, the Partial Payment did not cure NPA's default.  Accordingly, on January 15, 2021, the Debtor sent NPA a follow-up letter to its Demand Letter (the "Second Demand Letter"), a true and correct copy of which is attached hereto as **Exhibit 3**, stating:

> [T]he Partial Payment will be applied as payment against the amounts due under the Note in accordance with Section 3 thereof.  **The Note remains in default, and all amounts due thereunder are due immediately**.

7

After adjusting for the Partial Payment and the continued accrual of interest, the amount due under the Note as of January 15, 2021, is $23,071,195.03 (which amount does not include expenses incurred to date in collecting the Note).

Second Demand Letter (emphasis in original).

30.     Despite the Debtor's demands, NPA did not pay the amount demanded by the Debtor on January 7, 2021, or at any time thereafter.

31.     As of January 15, 2021, the total outstanding principal and accrued but unpaid interest due under the Note was $23,071,195.03

32.     Pursuant to Section 4 of the Note, the Note is in default, and is currently due and payable.

**C.      The Debtor Files the Original Complaint**

33.     On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "Original Complaint").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for NPA's breach of its obligations under the Note and (ii) turnover by NPA for the outstanding amounts under the Note, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

**D.      NPA's Affirmative Defenses**

34.     On March 1, 2021, NPA filed *Defendant's Original Answer* [Docket No. 6] (the "Original Answer").  In its Original Answer, NPA asserted three affirmative defenses: (i) the claims are barred because the Plaintiff caused NPA to default, (ii) the claims are barred because the Plaintiff caused NPA to delay in making payment, and (iii) waiver and estoppel. *See id.* ¶¶39-41.

35.     On June 9, 2021, NPA filed *Defendant's First Amended Answer* [Docket No. 35-3] (the "Amended Answer"), that asserted a new affirmative defense; namely, that the

8

Debtor previously agreed that it would not collect on the Notes "upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶42.

36.   According to NPA, the Alleged Agreement was orally entered into "sometime between December of the year each note was made and February of the following year."

37.   According to NPA, Mr. Dondero, acting on its behalf, entered into the Alleged Agreement with his sister, Nancy Dondero, acting as the Representative.

38.   Mr. Dondero controlled both NPA and the Debtor at the time he entered into the Alleged Agreement on behalf of NPA.

39.   Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**E.   Dugaboy Lacked Authority to Act on Behalf of the Debtor**

40.   Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 4**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

41.   Section 4.2(b) of the Limited Partnership Agreement states:

> Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 4**, § 4.2(b).

42.   No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

D-CNL002943

43.     Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor

## FIRST CLAIM FOR RELIEF
### (Against NPA)

### (For Breach of Contract)

44.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

45.     The Note is a binding and enforceable contract.

46.     NPA breached the Note by failing to pay all amounts due to the Debtor upon NPA's default and acceleration.

47.     Pursuant to the Note, the Debtor is entitled to damages from NPA in an amount equal to (i) the aggregate outstanding principal due under the Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for NPA's breach of its obligations under the Note.

48.     As a direct and proximate cause of NPA's breach of the Note, the Debtor has suffered damages in the amount of at least $23,071,195.03, as of January 15, 2021, plus an amount equal to all accrued buy unpaid interest from that date, plus the Debtor's cost of collection.

## SECOND CLAIM FOR RELIEF
### (Against NPA)
### (Turnover by NPA Pursuant to 11 U.S.C. § 542(b))

49.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

50.     NPA owes the Debtor an amount equal to (i) the aggregate outstanding principal due under the Note, plus (ii) all accrued and unpaid interest thereon until the date of

D-CNL002944

Appx. 00095

payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for NPA's breach of its obligations under the Note.

51.     The Note is property of the Debtor's estate that is matured and payable upon default and acceleration.

52.     NPA has not paid the amount due under the Note to the Debtor.

53.     The Debtor has made demand for the turnover of the amount due under the Note.

54.     As of the date of filing of this Complaint, NPA has not turned over the amount due under the Note.

55.     The Debtor is entitled to the amount due under the Note.

### THIRD CLAIM FOR RELIEF
### (Against NPA)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)

56.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

57.     The Debtor made the transfer pursuant to the Alleged Agreement within two years of the Petition Date.

58.     Mr. Dondero entered into the Alleged Agreement on behalf of NPA with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfer was made to, or for the benefit of, NPA, an insider of the Debtor.

(b) Mr. Dondero entered into the Alleged Agreement on behalf of NPA with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

11

D-CNL002945

**Appx. 00096**

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfer was not reasonably equivalent in value.

59.     The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt NPA incurred under the Note demonstrates a scheme of fraud.

60.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfer made pursuant to the Alleged Agreement from NPA.

61.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer made thereunder, and (ii) recovering from NPA an amount equal to all obligations remaining under the Note.

### FOURTH CLAIM FOR RELIEF
**(Against NPA)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

62.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

63.     The Debtor made the transfers pursuant to the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

64.     Mr. Dondero entered into the Alleged Agreement on behalf of NPA with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfer was made to, or for the benefit of, NPA, an insider of the Debtor.

12

(h) Mr. Dondero entered into the Alleged Agreement on behalf of NPA with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfer was not reasonably equivalent in value.

65.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from NPA.

66.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer made thereunder, and (ii) recovering from NPA an amount equal to all obligations remaining under the Notes.

**FIFTH CLAIM FOR RELIEF**
**(Against Dugaboy and Ms. Dondero)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

67.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

68.     A bona fide, actual, present dispute exists between the Debtor, on the one hand, and Dugaboy and Ms. Dondero on the other hand, concerning whether Dugaboy and/or Ms. Dondero, acting as the Representative, were authorized to enter into the Alleged Agreement on the Debtor's behalf.

D-CNL002947

Appx. 00098

69.     A judgment declaring the parties' respective rights and obligations will resolve their dispute.

70.     Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

- (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

### SIXTH CLAIM FOR RELIEF
#### (Against Dugaboy and Ms. Dondero)
#### (Breach of Fiduciary Duty)

71.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

72.     If Dugaboy, as a limited partner, or Ms. Dondero, as Representative, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero would owe the Debtor a fiduciary duty.

14

D-CNL002948

73.     If Dugaboy or Ms. Dondero (as Representative) had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero breached their fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

74.     Accordingly, the Debtor is entitled to recover from Dugaboy and Ms. Dondero (a) actual damages that the Debtor suffered as a result of their breach of fiduciary duty, and (b) for punitive and exemplary damages.

<div align="center">

**SEVENTH CLAIM FOR RELIEF**
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

</div>

75.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

76.     James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

77.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

78.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

79.     Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages

WHEREFORE, the Debtor prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to

<div align="center">15</div>

D-CNL002949

**Appx. 00100**

the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by NPA to the Debtor of an amount equal to (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(iii)    On its Third Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement arising from actual fraudulent transfer under section 548 of the Bankruptcy Code;

(iv)    On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under Tex. Bus. & C. Code § 24.005(a)(1);

(v)     On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged

16

Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)     On its Sixth Claim for Relief, actual damages from Dugaboy and Ms. Dondero, in an amount to be determined at trial, that Debtor suffered as a result of their breach of fiduciary duty, and for punitive and exemplary damages;

(vii)     On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and exemplary damages and

(iii)     Such other and further relief as this Court deems just and proper.

17

Dated:  As of July 13, 2021                     PACHULSKI STANG ZIEHL & JONES LLP
                                                Jeffrey N. Pomerantz (CA Bar No.143717)
                                                Ira D. Kharasch (CA Bar No. 109084)
                                                John A. Morris (NY Bar No. 2405397)
                                                Gregory V. Demo (NY Bar No. 5371992)
                                                Hayley R. Winograd (NY Bar No. 5612569)
                                                10100 Santa Monica Blvd., 13th Floor
                                                Los Angeles, CA 90067
                                                Telephone: (310) 277-6910
                                                Facsimile: (310) 201-0760
                                                E-mail:    jpomerantz@pszjlaw.com
                                                           ikharasch@pszjlaw.com
                                                           jmorris@pszjlaw.com
                                                           gdemo@pszjlaw.com
                                                           hwinograd@pszjlaw.com

                                                -and-

                                                */s/ Zachery Z. Annable*
                                                HAYWARD PLLC
                                                Melissa S. Hayward
                                                Texas Bar No. 24044908
                                                MHayward@HaywardFirm.com
                                                Zachery Z. Annable
                                                Texas Bar No. 24053075
                                                ZAnnable@HaywardFirm.com
                                                10501 N. Central Expy, Ste. 106
                                                Dallas, Texas 75231
                                                Tel: (972) 755-7100
                                                Fax: (972) 755-7110

                                                *Counsel for Highland Capital Management, L.P.*

D-CNL002952

Appx. 00103

# EXHIBIT 1

D-CNL002953

**Appx. 00104**

## PROMISSORY NOTE

**$30,746,812.33**                                                                                   **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below.  All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify in writing from time to time.

1.     <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.     <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

2.1     <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2     <u>Final Payment Date</u>.        The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.     <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.     Prior Notes.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

D-CNL002955
**Appx. 00106**

## EXHIBIT A

### PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

3

D-CNL002956

**Appx. 00107**

# EXHIBIT 2

D-CNL002957

**Appx. 00108**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

January 7, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James Dondero

       Re:  Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year.  Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due <u>immediately</u>.**  Payments on the Note must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41916.2 36027/002

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

D-CNL002959

**Appx. 00110**

**Appendix A**

| | |
|---|---|
| ABA #: | 322070381 |
| Bank Name: | East West Bank |
| Account Name: | Highland Capital Management, LP |
| Account #: | 5500014686 |

# EXHIBIT 3

D-CNL002961

**Appx. 00112**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

January 15, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James Dondero

      Re:  Partial Payment on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, ("Maker"), entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").  A copy of the Note is attached hereto as **Appendix A**.

On January 7, 2021, Payee notified you that because of Maker's failure to make the payment due on December 31, 2020 (the "Default"), the Note was in default and that all principal, interest, and any other amounts due on the Note were immediately due and payable.  The amount due and payable on the Note as of January 8, 2021, was $24,471,804.98; however, interest continues to accrue under the Note.

On January 14, 2021, Payee received a wire from Maker in the amount of $1,406,111.92 (the "Partial Payment").  To reiterate, the amount due under the Note as of January 8, 2021, was $24,471,804.98.  The Partial Payment will be applied as payment against the amounts due under the Note pursuant to Section 3 thereof.  **The Note remains in default, and all amounts due thereunder are due underlined immediately.**

After adjusting for the Partial Payment and the continued accrual of interest, the amount due under the Note as of January 15, 2021, is $23,071,195.03 (which amount does not include expenses incurred to date in collecting the Note).  Payment of such amount is due immediately.  Payments on the Note must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix B**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved, including the right to recover Payee's expenses incurred in collecting the Note.  Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41991.1 36027/002

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter
       A.  Lee Hogewood III

D-CNL002963

**Appx. 00114**

# Appendix A

## PROMISSORY NOTE

**$30,746,812.33**                                                    **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below.  All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.      Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

2.1      Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2      Final Payment Date.        The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.      Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.     Prior Notes.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

D-CNL002966
**Appx. 00117**

## EXHIBIT A

### PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

3

D-CNL002967

Appx. 00118

**Appendix B**

| | |
|---|---|
| ABA #: | 322070381 |
| Bank Name: | East West Bank |
| Account Name: | Highland Capital Management, LP |
| Account #: | 5500014686 |

# EXHIBIT 4

D-CNL002969

Appx. 00120

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

**FOURTH AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP
OF
HIGHLAND CAPITAL MANAGEMENT, L.P.**

TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE 1 | GENERAL | 1 |
| 1.1. | Continuation | 1 |
| 1.2. | Name | 1 |
| 1.3. | Purpose | 1 |
| 1.4. | Term. | 1 |
| 1.5. | Partnership Offices; Addresses of Partners. | 1 |
| ARTICLE 2 | DEFINITIONS | 2 |
| 2.1. | Definitions | 2 |
| 2.2. | Other Definitions | 6 |
| ARTICLE 3 | FINANCIAL MATTERS | 6 |
| 3.1. | Capital Contributions | 6 |
| 3.2. | Allocations of Profits and Losses | 8 |
| 3.3. | Allocations on Transfers | 9 |
| 3.4. | Special Allocations | 9 |
| 3.5. | Curative Allocations | 10 |
| 3.6. | Code Section 704(c) Allocations | 10 |
| 3.7. | Capital Accounts | 11 |
| 3.8. | Distributive Share for Tax Purpose | 12 |
| 3.9. | Distributions | 12 |
| 3.10. | Compensation and Reimbursement of General Partner | 14 |
| 3.11. | Books, Records, Accounting, and Reports | 14 |
| 3.12. | Tax Matters | 14 |
| ARTICLE 4 | RIGHTS AND OBLIGATIONS OF PARTNERS | 15 |
| 4.1. | Rights and Obligations of the General Partner | 15 |
| 4.2. | Rights and Obligations of Limited Partners | 19 |
| 4.3. | Transfer of Partnership Interests | 19 |
| 4.4. | Issuances of Partnership Interests to New and Existing Partners | 21 |
| 4.5. | Withdrawal of General Partner | 21 |
| 4.6. | Admission of Substitute Limited Partners and Successor General Partner | 21 |
| ARTICLE 5 | DISSOLUTION AND WINDING UP | 22 |
| 5.1. | Dissolution | 22 |
| 5.2. | Continuation of the Partnership | 23 |
| 5.3. | Liquidation | 23 |
| 5.4. | Distribution in Kind | 24 |
| 5.5. | Cancellation of Certificate of Limited Partnership | 24 |
| 5.6. | Return of Capital | 24 |
| 5.7. | Waiver of Partition. | 24 |
| ARTICLE 6 | GENERAL PROVISIONS | 24 |
| 6.1. | Amendments to Agreement | 24 |

i

| | | |
|---|---|---|
| 6.2. | Addresses and Notices | 25 |
| 6.3. | Titles and Captions | 25 |
| 6.4. | Pronouns and Plurals | 25 |
| 6.5. | Further Action | 25 |
| 6.6. | Binding Effect | 25 |
| 6.7. | Integration | 25 |
| 6.8. | Creditors | 25 |
| 6.9. | Waiver | 25 |
| 6.10. | Counterparts | 25 |
| 6.11. | Applicable Law | 25 |
| 6.12. | Invalidity of Provisions | 25 |
| 6.13. | Mandatory Arbitration | 26 |

D-CNL002972

Appx. 00123

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in <u>Article 2</u>.

## ARTICLE 1

## GENERAL

1.1.     **Continuation**.  Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act.  Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

1.2.     **Name.**  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P.  The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

1.3.     **Purpose.**  The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act.  Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

1.4.     **Term.**  The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

1.5.     **Partnership Offices; Addresses of Partners**.

(a)     <u>Partnership Offices</u>.  The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate.  The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate.  The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)     <u>Addresses of Partners</u>.  The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201.  The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership.  Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

D-CNL002973

**Appx. 00124**

## ARTICLE 2

## DEFINITIONS

**2.1.** **Definitions.** The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in Section 3.1(b) of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 3.7 and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to Section 3.7(a).

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

D-CNL002974

**Appx. 00125**

"*Class B Limited Partner*" means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

"*Class B Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

"*Class B NAV Ratio Trigger Period*" means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

"*Class C Limited Partner*" means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

"*Class C Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

"*Class C NAV Ratio Trigger Period*" means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

"*Code*" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"*Contribution Note*" means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

"*Default Loan*" has the meaning set forth in Section 3.1(c)(i).

"*Defaulting Partner*" has the meaning set forth in Section 3.1(c).

"*Delaware Act*" means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

"*Effective Date*" means the date first recited above.

"*Fiscal Year*" has the meaning set forth in Section 3.11(b).

3

D-CNL002975

Appx. 00126

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

4

D-CNL002976

Appx. 00127

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in <u>Section 3.9(b)</u>.

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

D-CNL002977

Appx. 00128

"*Record Date*" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"*Second Amended Buy-Sell and Redemption Agreement*" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"*Securities*" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"*Securities Act*" means the Securities Act of 1933, as amended, and any successor to such statute.

"*Substitute Limited Partner*" has the meaning set forth in Section 4.6(a).

"*Transfer*" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"*Treasury Regulations*" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

    **2.2.**　　**Other Definitions**. All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

## ARTICLE 3

### FINANCIAL MATTERS

    **3.1.**　　**Capital Contributions**.

        (a)　　Initial Capital Contributions. The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

        (b)　　Additional Capital Contributions.

D-CNL002978

**Appx. 00129**

       (i)      The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

       (ii)     Any failure by a Partner to make an Additional Capital Contribution requested under <u>Section 3.1(b)(i)</u> on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

       (c)    <u>Consequences to Defaulting Partners</u>.  In the event a Partner is in default under <u>Section 3.1(b)</u> (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

       (i)     <u>Default Loans</u>.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to <u>Section 3.9(a)</u> or <u>Section 5.3</u> or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

D-CNL002979

**Appx. 00130**

(ii)     Reduction of Percentage Interest.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to Section 3.1(c)(i), the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

> The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this Section 3.1(c)(ii), any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

**3.2.     Allocations of Profits and Losses**.

(a)     Allocations of Profits.  Except as provided in Sections 3.4, 3.5, and 3.6, Profits for any Fiscal Year will be allocated to the Partners as follows:

(i)     First, to the Partners until cumulative Profits allocated under this Section 3.2(a)(i) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(iii) for all prior periods in the inverse order in which such Losses were allocated; and

(ii)     Next, to the Partners until cumulative Profits allocated under this Section 3.2(a)(ii) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(ii) for all prior periods in the inverse order in which such Losses were allocated; and

(iii)     Then, to all Partners in proportion to their respective Percentage Interests.

(b)     Allocations of Losses.  Except as provided in Sections 3.4, 3.5, and 3.6, Losses for any Fiscal Year will be will be allocated as follows:

(i)     First, to the Partners until cumulative Losses allocated under this Section 3.2(b)(i) for all prior periods equal the cumulative Profits allocated to the Partners under Section 3.2(a)(iii) for all prior periods in the inverse order in which such Profits were allocated; and

(ii)     Next, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

(iii)     Then, to all Partners in proportion to their respective Percentage Interests.

8

D-CNL002980

**Appx. 00131**

(c)    <u>Limitation on Loss Allocations</u>.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

**3.3.    Allocations on Transfers**.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

**3.4.    Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)    <u>Partnership Minimum Gain Chargeback</u>.  Notwithstanding any other provision of this <u>Article 3</u>, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This <u>Section 3.4(a)</u> is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)    <u>Partner Nonrecourse Debt Minimum Gain Chargeback</u>.  Notwithstanding any other provision of this <u>Article 3</u> (other than <u>Section 3.4(a)</u>), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This <u>Section 3.4(b)</u> is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)    <u>Qualified Income Offset</u>.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(c)</u> shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Article 3</u> have been tentatively made without considering this <u>Section 3.4(c)</u>.

(d)    <u>Gross Income Allocation</u>.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(d)</u> shall be made if and only to

9

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this <u>Article 3</u> have been tentatively made without considering <u>Section 3.4(c)</u> or <u>3.4(d)</u>.

(e)    <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

(f)    <u>Partner Nonrecourse Deductions</u>.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(g)    <u>Section 754 Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

(h)    <u>Section 481 Adjustments</u>.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

3.5.    **Curative Allocations.**  The "***Basic Regulatory Allocations***" consist of (i) the allocations pursuant to <u>Section 3.2(c)</u>, and (ii) the allocations pursuant to <u>Sections 3.4</u>.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this <u>Section 3.5</u> shall be made with respect to allocations pursuant to <u>Section 3.4 (g) and (h)</u> only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

3.6.    **Code Section 704(c) Allocations.**  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this <u>Section 3.6</u> are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

10

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

### 3.7. Capital Accounts.

(a) Maintenance of Capital Accounts. The Partnership shall establish and maintain a separate capital account ("*Capital Account*") for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this Section 3.7.

(i) The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections 3.4 and 3.5; and

(ii) The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 3.2, 3.4 and 3.5.

The provisions of this Section 3.7 and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions. The General Partner may modify the manner in which the Capital Accounts are maintained under this Section 3.7 in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b) Negative Capital Accounts. If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c) Interest. No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d) No Withdrawal. No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in Section 3.9 and Article 5.

(e) Loans From Partners. Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f) Revaluations. The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

D-CNL002983

**Appx. 00134**

**3.8.    Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion.  Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.    Distributions**.

(a)    <u>General</u>.  The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f).  The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)    <u>Priority Distributions</u>.  Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)    No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

12

D-CNL002984

**Appx. 00135**

(iii)   No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)   No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)   Tax Distributions.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such Partners (a "*Tax Distribution*").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under Section 3.9(b).

(d)   Payments Not Deemed Distributions.   Any amounts paid pursuant to Sections 4.1(e) or 4.1(h) shall not be deemed to be distributions for purposes of this Agreement.

(e)   Withheld Amounts.  Notwithstanding any other provision of this Section 3.9 to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution. To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this Section 3.9(d) shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)   Special Tax Distributions.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)   Tolling of Priority Distributions.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under Section 3.9(b), to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

       3.10.   **Compensation and Reimbursement of General Partner**.

       (a)   <u>Compensation</u>.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

       (b)   <u>Reimbursement for Expenses</u>.  In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

       3.11.   **Books, Records, Accounting, and Reports**.

       (a)   <u>Records and Accounting</u>.  The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

       (b)   <u>Fiscal Year</u>.  The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

       (c)   <u>Other Information</u>.  The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

       (d)   <u>Distribution Reporting to Class B Limited Partner and Class C Limited Partner</u>.  Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under <u>Section 3.9</u> to Partners other than the Partner requesting the information.

       3.12.   **Tax Matters**.

       (a)   <u>Tax Returns</u>.  The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes.  The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

D-CNL002986

Appx. 00137

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion. The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

     (b)    Tax Elections. Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

     (c)    Tax Controversies. Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

     (d)    Taxation as a Partnership. No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

    **4.1.**    **Rights and Obligations of the General Partner.** In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

     (a)    Management. The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership. Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership. In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)     Certificate of Limited Partnership.  The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)     Reliance by Third Parties.     Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.  Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing.  In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.  In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)     Partnership Funds.  The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner.  The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership.  The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

(e)    Loans to or from General Partner: Contracts with Affiliates; Joint Ventures.

(i)    The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; provided, however, the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

(ii)    The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

(iii)    The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

(f)    Outside Activities' Conflicts of Interest.  The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

(g)    Resolution of Conflicts of Interest.  Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

(h)    Indemnification.  The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

17

D-CNL002989

the "*GP Party*"*),* against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the General Partner acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this Section 4.1(h) or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this Section 4.1(h) unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

       (i)     Liability of General Partner.

          (i)     Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

          (ii)     The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

       (j)     Reliance by General Partner.

          (i)     The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

          (ii)     The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

       (k)     The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

D-CNL002990

until such Person shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner. Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby. Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

**4.2.** **Rights and Obligations of Limited Partners**. In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

(a) <u>Limitation of Liability</u>. Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

(b) <u>Management of Business</u>. No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

(c) <u>Return of Capital</u>. No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

(d) <u>Second Amended Buy-Sell and Redemption Agreement</u>. Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

(e) <u>Default on Priority Distributions</u>. If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; <u>provided, however</u>, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>. In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

**4.3.** **Transfer of Partnership Interests**.

(a) <u>Transfer</u>. No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement. Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void. An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books. The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

19

D-CNL002991

(b)       Transfers by General Partner.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this Section 4.3(b) to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under Section 4.5(a), Section 5.1(b), or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to Section 5.2.

(c)       Transfers by Limited Partners.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)       Distributions and Allocations in Respect of Transferred Partnership Interests.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of Article 4 and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under Section 3.4.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; *provided, however,* if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.3(d), whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)       Forfeiture of Partnership Interests Pursuant to the Contribution Note.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this Section 4.3(e) over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)       Transfers of Partnership Interests Pursuant to the Purchase Notes.  Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes.  Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest.  The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

**4.4.**   **Issuances of Partnership Interests to New and Existing Partners**.

(a)   Issuance of Partnership Interests to New Limited Partners.  The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner.  All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests.  No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)   Issuance of an Additional Partnership Interest to an Existing Partner.  The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion.  Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately.  Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

**4.5.**   **Withdrawal of General Partner**.

(a)   Option.  In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "**Departing Partner**") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)   Conversion.  If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

**4.6.**   **Admission of Substitute Limited Partners and Successor General Partner**.

(a)   Admission of Substitute Limited Partners.  A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest.  To become a substitute Limited Partner (a "**Substitute Limited Partner**"),

21

D-CNL002993

**Appx. 00144**

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.  Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)     Admission of Successor General Partner.  A successor General Partner selected pursuant to Section 5.2 or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to Section 4.3(b) shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)     Action by General Partner.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of Exhibit A and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

**5.1.     Dissolution.**  The Partnership shall be dissolved upon:

(a)     The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to Section 4.3(b));

(b)     An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)     Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this Section 5.1, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

22

D-CNL002994

**Appx. 00145**

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2. Continuation of the Partnership**. Upon the occurrence of an event described in Section 5.1(a), the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event. If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs. If an election to continue the Partnership is made upon the occurrence of an event described in Section 5.1(a), then:

(a) Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b) The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this Article 5;

(c) The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d) All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3. Liquidation**. Upon dissolution of the Partnership, unless the Partnership is continued under Section 5.2, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in Section 5.1), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator. The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest. The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest. Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein. Except as expressly provided in this Article 5, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein. The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

D-CNL002995

Appx. 00146

    (a)     To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

    (b)     To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

    (c)     To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

    (d)     To the Partners in proportion to their respective Percentage Interests.

    **5.4.**    **Distribution in Kind.**  Notwithstanding the provisions of Section 5.3 that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of Section 5.3, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation.  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time.  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

    **5.5.**    **Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in Sections 5.3 and 5.4, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

    **5.6.**    **Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

    **5.7.**    **Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

<div align="center">

**ARTICLE 6**

**GENERAL PROVISIONS**

</div>

    **6.1.**    **Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

<div align="center">24</div>

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

**6.2.    Addresses and Notices.**  Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

**6.3.    Titles and Captions.**  All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof.  Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement.  All Exhibits hereto are incorporated herein by reference.

**6.4.    Pronouns and Plurals.**  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

**6.5.    Further Action.**  The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**6.6.    Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

**6.7.    Integration.**  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**6.8.    Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

**6.9.    Waiver.**  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

**6.10.   Counterparts.**  This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

**6.11.   Applicable Law.**  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

**6.12.   Invalidity of Provisions.**  If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

D-CNL002997

**Appx. 00148**

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

**6.13.    General Partner Discretion.**  Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

**6.14.    Mandatory Arbitration.**    In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.  All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

26

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

27

D-CNL002999

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
James D. Dondero,
President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:   Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:   Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:   Trustee

**MARK K. OKADA**
_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated Agreement of Limited Partnership*

D-CNL003000
**Appx. 00151**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
     James D. Dondero,
     President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:     Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:     Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:     Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

D-CNL003001
**Appx. 00152**

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:      President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

**EXHIBIT A**

| CLASS A PARTNERS | Percentage Interest | |
| --- | --- | --- |
| | By Class | Effective % |
| _GENERAL PARTNER:_ | | |
| Strand Advisors | 0.5573% | 0.2508% |
| _LIMITED PARTNERS:_ | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

D-CNL003003

Appx. 00154

**EXHIBIT B**

**ADDENDUM**
**TO THE**
**FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ____ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____

Name: _____

Title: _____

NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

D-CNL003005

Appx. 00156

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>NexPoint Advisors, L.P., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | ATTORNEYS (If Known)<br>Munsch Hardt Kopf & Harr, P.C. (for NexPoint); Stinson LLP (for Nancy Dondero); Heller, Draper, & Horn, L.L.C. (for The Dugaboy Investment Trust) |
| PARTY (Check One Box Only)<br>☑ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Breach of Contract; Turnover Pursuant to 11 USC 542(b); Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 548(a)(1)(A) and 550; Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 544(b) and 550 and Tex. Bus. & C. Code 24.005(a)(1); Declaratory Relief; Breach of Fiduciary Duty; Aiding & Abetting Breach of Fiduciary Duty

| NATURE OF SUIT |
|---|
| (Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.) |

| | |
|---|---|
| **FRBP 7001(1) – Recovery of Money/Property**<br>☑2 11-Recovery of money/property - §542 turnover of property<br>☐ 12-Recovery of money/property - §547 preference<br>☑3 13-Recovery of money/property - §548 fraudulent transfer<br>☑4 14-Recovery of money/property - other | **FRBP 7001(6) – Dischargeability (continued)**<br>☐ 61-Dischargeability - §523(a)(5), domestic support<br>☐ 68-Dischargeability - §523(a)(6), willful and malicious injury<br>☐ 63-Dischargeability - §523(a)(8), student loan<br>☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation<br>   (other than domestic support)<br>☐ 65-Dischargeability - other |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien**<br>☐ 21-Validity, priority or extent of lien or other interest in property | |
| **FRBP 7001(3) – Approval of Sale of Property**<br>☐ 31-Approval of sale of property of estate and of a co-owner - §363(h) | **FRBP 7001(7) – Injunctive Relief**<br>☐ 71-Injunctive relief – imposition of stay<br>☐ 72-Injunctive relief – other |
| **FRBP 7001(4) – Objection/Revocation of Discharge**<br>☐ 41-Objection / revocation of discharge - §727(c),(d),(e) | **FRBP 7001(8) Subordination of Claim or Interest**<br>☐ 81-Subordination of claim or interest |
| **FRBP 7001(5) – Revocation of Confirmation**<br>☐ 51-Revocation of confirmation | **FRBP 7001(9) Declaratory Judgment**<br>☑5 91-Declaratory judgment |
| **FRBP 7001(6) – Dischargeability**<br>☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims<br>☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,<br>   actual fraud<br>☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny<br><br>**(continued next column)** | **FRBP 7001(10) Determination of Removed Action**<br>☐ 01-Determination of removed claim or cause<br><br>**Other**<br>☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.<br>☑1 02-Other (e.g. other actions that would have been brought in state court<br>   if unrelated to bankruptcy case) |

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ Damages in an amount to be determined at trial |

Other Relief Sought   Turnover of amounts due under note, avoidance of transfers to defendants, declaratory relief, punitive and exemplary damages, costs, attorneys' fees

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

SIGNATURE OF ATTORNEY (OR PLAINTIFF)

| DATE<br>August 27, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable |
|---|---|

**INSTRUCTIONS**

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

D-CNL003007

**Appx. 00158**

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03005 |
| | § | |
| NEXPOINT ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |
| | § | |

**DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE**

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Ste. 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

### DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

COMES NOW NexPoint Advisors, L.P., the defendant (the "Defendant") in the above styled and numbered adversary proceeding (the "Adversary Proceeding"), and files this its *Defendant's Motion to Withdraw the Reference* (the "Motion"), respectfully stating as follows:

This Adversary Proceeding was automatically referred to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a) and District Court Miscellaneous Order No. 33, *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc*.

Pursuant to 28 U.S.C. § 157(d), and for the reasons given in the accompanying *Brief in Support of the Defendant's Motion to Withdraw the Reference*, as supported by the *Appendix In Support of Defendant's Motion to Withdraw the Reference*, filed contemporaneously herewith and all of which is incorporated herein by reference, the Defendant requests that the Court withdraw from the Bankruptcy Court the reference (*i.e.*, the referral) of the Adversary Proceeding, in which case the Adversary Proceeding will continue as a Civil Action in the District Court.

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully requests that the District Court enter an order: (i) granting the Motion; (ii) withdrawing from the Bankruptcy Court the reference of this Adversary Proceeding; and (iii) granting the Defendant such other and further relief to which it shows itself to be entitled.

RESPECTFULLY SUBMITTED this 13th day of April, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
_____

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that he discussed the relief requested herein with Jeff Pomerantz, Esq., counsel for record for the Plaintiff, who informed the undersigned that the Plaintiff opposes said relief.

/s/  Davor Rukavina
_____
Davor Rukavina

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 13th day of April, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on the Plaintiff through its counsel of record.

/s/  Davor Rukavina
_____
Davor Rukavina

# EXHIBIT 9

Case 3:21-cv-00881-X   Document 39   Filed 01/31/22   Page 168 of 1780   PageID 4498
Case 21-03005-sgj Doc 40 Filed 07/08/21   Entered 07/08/21 17:21:37   Page 1 of 12
Docket #0040 Date Filed: 7/8/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 8, 2021**

_____
**United States Bankruptcy Judge**
_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | CASE NO. 19-34054-SGJ-11 |
| L.P., | § | (CHAPTER 11) |
|     DEBTOR. | § | |
| _____ | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| L.P., | § | ADVERSARY NO. 21-03005 |
|     PLAINTIFF, | § | (CIV. ACTION #3:21-CV-00880-C) |
| | § | |
| VS. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., | § | |
|     DEFENDANT. | § | |

**REPORT AND RECOMMENDATION TO DISTRICT COURT PROPOSING THAT IT:**
**(A) GRANT DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE AT SUCH**
**TIME AS BANKRUPTCY COURT CERTIFIES THAT ACTION IS TRIAL READY;**
**AND (B) DEFER PRETRIAL MATTERS TO BANKRUPTCY COURT**



1934054210708000000000015

**Appx. 00164**

## I.   INTRODUCTION

The above-referenced adversary proceeding (the "Adversary Proceeding") is related to the bankruptcy case of Highland Capital Management, L.P. (the "Bankruptcy Case").[1] Highland Capital Management, L.P. (the "Debtor" or "Highland") filed a voluntary Chapter 11 petition on October 16, 2019 in the United States Bankruptcy Court of Delaware.  That court subsequently entered an order transferring venue to the Northern District of Texas, Dallas Division, on December 4, 2019.  A Chapter 11 plan was confirmed by the bankruptcy court on February 22, 2021.  The chapter 11 plan has been appealed by the Defendant in this action, NexPoint Advisors ("NPA-Defendant"), and certain parties related to it. The appeal of the plan is now pending before the Fifth Circuit, but no stay pending appeal has been granted.

On January 22, 2021, shortly before its Chapter 11 plan was confirmed, the Debtor, as Plaintiff, brought this Adversary Proceeding against NPA-Defendant.  The Adversary Proceeding pertains to a promissory note (the "Note") executed by NPA-Defendant in favor of the Debtor in 2017. The Note was a term note. On December 31, 2020, NPA-Defendant failed to make the payment due under the Note in the amount of $1,406,111.92. On January 7, 2021, following NPA-Defendant's failure to pay, the Debtor accelerated the Note, under its terms, and demanded full payment on $24,471,804.98 outstanding and due under the Note.  On January 14, 2021, NPA-Defendant attempted to cure its default by paying $1,406,111.92, an amount equal to the payment due on December 31, 2020. However, there was no cure provision under the Note and the Debtor seeks to collect all outstanding principal and interest on the Note.  The Debtor's Chapter 11 plan

---

[1] Bankruptcy Case No. 19-34054.

contemplates collection on the Note (as well as several other notes of parties related to NPA-Defendant) as part of its funding to pay creditors.

Under the United States District Court for the Northern District of Texas' standing order of reference[2], proceedings arising in, or related to, a case under Title 11 are automatically referred to the bankruptcy court.  NPA-Defendant submitted a *Motion for Withdrawal the Reference*[3] (the "Motion") and *Brief in Support of Motion to Withdraw the Reference*[4] (the "Brief in Support") seeking to have the reference withdrawn, such that this Adversary Proceeding would be adjudicated in the District Court. The bankruptcy court conducted a status conference concerning the Motion, pursuant to Local Bankruptcy Rule 5011-1, on May 25, 2021.

The bankruptcy court submits the following report and recommendation to the District Court, ultimately recommending that the Motion be granted, ***but only at such time as the bankruptcy court certifies to the District Court that the lawsuit is trial ready***. The bankruptcy court further recommends that the District Court ***defer to the bankruptcy court the handling of all pretrial matters***.

## II.   NATURE OF THE ADVERSARY PROCEEDING

### a.  The Complaint and Procedural History

The Debtor commenced this Adversary Proceeding by filing its *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate*[5] on January 22, 2021. The Debtor's Complaint asserts two causes of action: (1) a breach of contract claim ("Count 1") and (2) a turnover action under 11 U.S.C. § 542(b) for the amounts owed on the Note ("Count 2"). The principal amount of the Note was originally $30,746,812.33. The Debtor now seeks monetary

---

[2] Misc. Order No. 33.
[3] Adversary Case No. 21-03005, Dkt. 19.
[4] Adversary Case No. 21-03005, Dkt. 20.
[5] Adversary Case No. 21-03005, Dkt. 1.

damages totaling $23,071,195.03, plus accrued but unpaid interest and cost of collection. Because the Debtor alleges the amount due on the Note are property of its estate, it argues that turnover pursuant to 11 U.S.C. § 542(b) is appropriate.

After being served with summons on January 25, 2021, NPA-Defendant filed its *Original Answer*[6] on March 1, 2021.

NPA-Defendant filed two proofs of claim in the Bankruptcy Case, Proof of Claim Nos. 104 and 108. Proof of Claim No. 104 was based on alleged overpayments made by NPA-Defendant to the Debtor under a payroll reimbursement agreement. Proof of Claim No. 108 was based on alleged overpayments made by NPA-Defendant to the Debtor under a shared services agreement. On October 9, 2020, the bankruptcy court entered a *First Supplemental Order Sustaining First Omnibus Claims Objection*[7], which disallowed both of NPA-Defendant's proofs of claim. The NPA-Defendant filed an application for an administrative expense claim on January 24, 2021, relating to services it alleges the Debtor did not perform under a shared services agreement. The Debtor has since filed an objection to the application and the matter is set for trial on September 28, 2021. ***The administrative expense claim does not directly relate to the causes of action for collection under the Note. Similarly, the disallowed proofs of claim did not relate to the Note.***

**b. The Motion to Withdraw the Reference, Response Opposed, and Reply**

On April 15, 2021, NPA-Defendant filed the Motion. As a result, the above-captioned civil action was created in the District Court. On May 4, 2021, the Debtor filed its *Response Opposed to Defendant's Motion to Withdraw the Reference*[8] (the "Response Opposed"). On May 18, 2021,

---

[6] Adversary Case No. 21-03005, Dkt. 6.
[7] Bankruptcy Case No. 19-34054, Dkt. 1155.
[8] Adversary Case No. 21-03004, Dkt. 28.

NPA-Defendant filed its *Reply in Support of the Motion to Withdraw the Reference*[9] (the "Reply"). The bankruptcy court held a status conference, as required by Local Bankruptcy Rule 5011-1, on May 25, 2021, to assist in the bankruptcy court's preparation of this Report and Recommendation.

    *i.   The Movant's Position*

NPA-Defendant argues there is cause shown for permissive withdrawal of the reference because: (1) the contract claim is a purely state law, non-core claim; (2) the turnover claim, under the Bankruptcy Code, is wholly derivative of the contract claim, as the amount to be turned over is based on the resolution of the contract claim; and (3) efficiency, uniformity and forum shopping factors all favor withdrawal.[10]

Further, NPA-Defendant contends it has made a demand for a jury trial and has not consented, expressly or impliedly, to the equitable jurisdiction of the bankruptcy court to enter final orders in the Adversary Proceeding or hold a jury trial. NPA-Defendant further argues it has never filed a proof of claim related to the Note, thus negating any argument it has consented to the bankruptcy court having jurisdiction over the litigation of the Note.

Finally, NPA-Defendant alleges that permissive withdrawal as proper, because the turnover claim is being used as an to attempt to relabel a non-core breach of contract claim to place jurisdiction within the bankruptcy court.[11]

As far as timing, NPA-Defendant requests that the District Court immediately withdraw the reference and hear all pre-trial matters until the parties are trial-ready.

---

[9] Adversary Case No. 21-03005, Dkt. 25.
[10] Adversary Case No. 21-03004, Dkt. 20 at 5-11.
[11] *Id.* at 8-9; *see Granfinanciera, Granfinanciera. S.A. v. Nordberg*, 492 U.S. 33, 61 (1989).

ii.  *The Debtor-Plaintiff's Position*

The Debtor argues that there is no cause shown for permissive withdrawal because a turnover action under Section 542(b) of the Bankruptcy Code is an inherently core claim. The Note, as argued, are already property of the bankruptcy estate, as matured and payable on December 11, 2020, and the turnover action only concerns federal bankruptcy law.[12] The Debtor argues that the defenses and disputes raised by NPA-Defendant do not restrict the Debtor's ability to collect property of the estate under 11 U.S.C. § 542(b).[13]

The Debtor does not directly, in its Response, address whether jury trial rights exist for NPA-Defendant. Rather, the Debtor focuses on the core nature of the turnover action and the forum shopping attempts by NPA-Defendant.

As far as timing, the Debtor argues that, if the court finds permissive withdrawal of the reference is appropriate, the reference should not be withdrawn until after the parties are trial-ready, and all pretrial matters should be handled by the bankruptcy court until such time.

## III.   THE BREACH OF CONTRACT CLAIMS AT THE CENTER OF THE ADVERSARY PROCEEDING ARE NONCORE CLAIMS, AND THE PENDING ADMINISTRATIVE EXPENSE CLAIM OF NPA-DEFENDANT IS UNRELATED TO THEM

Permissive withdrawal of the reference is described in 28 U.S.C. § 157(d) as follows: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." The Bankruptcy Code does not define "cause shown," but the United States Court of Appeal for the Fifth Circuit, interpreting

---

[12] *See Tow v. Park Lake Cmtys., LP*, 2018 U.S. Dist. LEXIS 1720, at *3-*5 (S.D. Tex. Jan. 4, 2018); *see also Porretto v. Nelson (In re Porretto)*, 2012 Bankr. LEXIS 4919, at *11-*12 (Bankr. S.D. Tex. Oct. 18, 2012); *see also Romo v. Monetmayor (In re Montemayor)*, 547 B.R. 684, 692 (Bankr. S.D. Tex. 2016) (bankruptcy court had authority under *Stern* to issue a final order in an action brought pursuant to Section 542(b), because an action "to turnover assets belonging to the bankruptcy estate [is] a matter which solely concerns federal bankruptcy law").
[13] *See Tow*, 2018 U.S. Dist. LEXIS 1720, at *3-*5; *see also Shaia v. Taylor (In re Connelly)*, 476 B.R. 223, 230 (Bankr. E.D. Va. 2012).

the Supreme Court case of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, has identified a number of factors for courts to consider in determining whether permissive withdrawal of the reference is appropriate: (1) whether the matter is core or noncore; (2) whether the matter involves a jury demand; (3) whether withdrawal would further uniformity in bankruptcy administration; (4) whether withdrawal would reduce forum-shopping and confusion; (5) whether withdrawal would foster economical use of debtors' and creditors' resources; and (6) whether withdrawal would expedite the bankruptcy process.[14] Courts in this District have placed an emphasis on the first two factors.[15]

As explained by the Supreme Court in *Stern v. Marshall*, Congress has divided bankruptcy **proceedings** (*i.e.,* adversary proceedings or contested matter within a bankruptcy case)—over which there is bankruptcy subject matter jurisdiction—into three different categories: (a) those that "aris[e] under" Title 11; (b) those that "aris[e] in" a Title 11 case; and (c) those that are "related to" a case under Title 11.[16]  Further, those that arise under Title 11 or arise in a Title 11 case are defined as "core" matters[17] and those that are merely "related to" a Title 11 case are defined as "noncore" matters. The significance of the "core"/"noncore" distinction is that bankruptcy courts may statutorily enter final judgments in "core" proceedings in a bankruptcy case, while in "noncore" proceedings, the bankruptcy courts instead may only (absent consent from all of the parties) submit proposed findings of fact and conclusions of law to the district court, for that court's review and issuance of final judgment. This is the statutory framework collectively set forth in 28 U.S.C. § 1334 and 28 U.S.C. § 157.  But while a proceeding may be "core" in nature, under 28

---

[14] *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-99 (5th Cir. 1985); *Mirant Corp. v. The Southern Co.*, 337 B.R. 107, 115-23 (N.D. Tex. 2006); 458 U.S. 50 (1982).

[15] See *Mirant*, 337 B.R. at 115-122.

[16] 28 U.S.C. § 1334(b); *Stern v. Marshall*, 564 U.S. 462, 473-474 (2011).

[17] *Stern*, 564 U.S. at 473-474.  Core proceedings include, but are not limited to, 16 different types of matters, including "counterclaims by [a debtor's] estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C).

U.S.C. § 157(b)(2), and the bankruptcy court, therefore, has the *statutory* power to enter a final judgment on the claim under 28 U.S.C. § 157(b)(1), *Stern* instructs that any district court, in evaluating whether a bankruptcy court has the ability to issue final orders and judgments, must resolve not only: (a) whether the bankruptcy court has the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment on a particular claim; but also (b) whether the conferring of that authority on an Article I bankruptcy court is *constitutional* (and this turns on whether "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process").[18]

With respect to the claims asserted against NPA-Defendant, it might be argued that both counts asserted against it are *statutorily* core in nature.[19] While Count 1 is a breach of contract claim for collection of amounts due under promissory notes—one of the simplest forms of a state law lawsuit—it might be argued that Count 1 is statutorily core under the catchall provision of 28 U.S.C. § 157(b)(2)(O), as the resolution of the claim would be "affecting the liquidation of the assets of the estate." However, this position would not pass constitutional muster. The cause of action does not stem from the bankruptcy itself (*i.e.,* it stems from alleged defaults on pre-petition notes) and would not be resolved through the claims allowance process (*since no pending proof of claim exists and the administrative expense claim is not directly related to the Note*). In other words, the resolution of Count 1 is not so inextricably intertwined with the resolution of NPA-Defendant's still-remaining administrative expense claim so as to confer constitutional authority on the bankruptcy court to enter a final judgment on the breach of contract claims.

Count 2, the turnover cause of action, is brought pursuant to 11 U.S.C. § 542(b) and is listed as statutorily core under 28 U.S.C. § 157(b)(2)(E). If Count 2 were freestanding and the debts due

---

[18] *Stern*, 564 U.S. at 499.
[19] 28 U.S.C. § 157(b)(2)(E), (O).

under the Note were undisputed, it is unrefuted by NPA-Defendant that a turnover action under 11 U.S.C. § 542(b) would be both a statutory and constitutional core claim. ***The issue is whether a turnover action to collect on a disputed pre-petition promissory note can be viewed as a core claim***. There is a split in authority on this issue. The Debtor cites authority that a turnover action is a core claim when collecting ***matured*** debts, as property of the estate, regardless of whether the indebtedness is ***disputed***.[20] In contrast, NPA-Defendant cites authority that the scope of turnover claims under the Bankruptcy Code should not be expanded to encompass debts in dispute that arose outside of bankruptcy, including authority from this court.[21]

This court views the turnover claim as derivative of the breach of contract claims. The breach of contract claims are clearly non-core, and the bankruptcy court lacks constitutional authority to confer jurisdiction over them (absent consent—which does not exist here). A turnover action under 11 U.S.C. § 542(b) cannot be tacked onto a complaint so as to confer authority in the bankruptcy court to adjudicate an otherwise non-core claim. To hold otherwise would run counter to the dictates of the Supreme Court in *Marathon*.

In summary, this court believes that the turnover claim in the Complaint, to collect on a disputed indebtedness under the Note, "do[es] not fall within the scope of turnover actions as

---

[20] *Shaia*, 476 B.R. at 230 ("To properly constitute a core proceeding under § 157(b)(2)(E), the debt must be 'matured, payable on demand, or payable on order.' 'Matured' refers to 'debts that are presently payable, as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event.' …. While the Defendants assert they are not indebted to the Trustee, it is simply not relevant that the Defendants dispute liability on the instrument. The presence of a dispute does not preclude a debt from being matured. … A cause of action is a turnover proceeding under § 542(b) of the Bankruptcy Code where it seeks collection rather than creation or liquidation of a matured debt."); *see also In re Willington Convalescent Home, Inc.*, 850 F.2d at 52 n.2 ("The mere fact that Connecticut denies that it owes the matured debt for Willington's services because of a recoupment right 'does not take the trustee's action outside the scope of section 542(b)'").

[21] *In re Se. Materials, Inc.*, 467 B.R. 337, 354 (Bankr. M.D.N.C. 2012)( The distinction is when "an adversary proceeding presents a bona fide dispute as to liability, the matter cannot be viewed as a turnover proceeding"); *In re Satelco, Inc.*, 58 B.R. 781, 789 (Bankr. N.D. Tex. 1986) ("[T]his Court holds that actions to collect accounts receivable based upon state law contract principles do not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E), absent a final judgment from a court of competent jurisdiction, a stipulation, or some other binding determination of liability.").

contemplated by § 542 and § 157(b)(2)(E)," absent a judgment or stipulation resolving the dispute as to the indebtedness.[22]   Thus, the turnover claim, as brought, is not a core claim that the bankruptcy court can finally adjudicate, absent the consent of all parties.

## IV.  JURY TRIAL RIGHTS AND DEMAND

Pursuant to 28 U.S.C. § 157(e), if a litigant has the right to a jury trial under applicable non-bankruptcy law, a bankruptcy court may conduct the jury trial only if: (a) the matters to be finally adjudicated fall within the scope of bankruptcy subject matter jurisdiction; (b) the district court of which the bankruptcy court is a unit authorizes the bankruptcy court to do so; and (c) all of the parties consent.[23]

Starting first with whether a right to a jury trial even exists, the Seventh Amendment, of course, provides a jury trial right in cases in which the value in controversy exceeds twenty dollars and the cause of action is to enforce statutory rights that are at least analogous to rights that were tried at law in the late 18th century English courts.[24] Suits "at law" refers to "suits in which legal rights were to be ascertained and determined" as opposed to "those where equitable rights alone were recognized and equitable remedies were administered."[25] This analysis requires two steps: (1) a comparison of the "statutory action to 18th century actions brought in the courts of England prior to the merger of the courts of law and equity"; and (2) whether the remedy sought is "legal or equitable in nature . . . [t]he second stage of this analysis" being "more important than the first."[26]

---

[22] *Satelco*, 58 B.R. at 789.
[23] "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." 28 U.S.C. § 157(e) (West 2019).
[24] *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 708 (1999).
[25] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).
[26] *See Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 205 (S.D. Tex. 2008) (quoting *Granfinanciera*, 492 U.S. at 42).

It is well established that the act of filing a proof of claim can operate to deprive a creditor of a jury trial right, by subjecting a claim, that would otherwise sound only in law, to the equitable claims allowance process.[27] Thus, if both of NPA-Defendant's proofs of claims were ***pending***, it would have consented to the bankruptcy court's equitable jurisdiction and waived its right to a jury trial as to the subject matter of the ***pending*** proofs of claim.[28] However, as earlier noted, prior to the commencement of this Adversary Proceeding on January 22, 2021, NPA-Defendant had both of its proofs of claim disallowed on October 9, 2020. The pending trial over the administrative expense claim sought by NPA-Defendant is separate from the collection under the Note. Without a pending claim related to the Note, the breach of contract claims is precisely the kind of action that would sound in law rather than in equity. By not having a filed proof of claim related to the Note, NPA-Defendant never subjected the Note to the claims allowance process of the bankruptcy court and preserved its right to a jury trial on the Note.[29]

To reiterate, NPA-Defendant's remaining administrative expense claim is not directly related to the collection on the Note, and it has not otherwise consented to the jurisdiction of the bankruptcy court for claims related to the Note. NPA-Defendant has also not consented to the bankruptcy court conducting a jury trial pursuant to 11 U.S.C. § 157(e).

In summary, NPA-Defendant's lack of waiver of its jury trial rights, expressly or impliedly, is further reason why the bankruptcy court does not believe it can finally adjudicate the claims in the Adversary Proceeding.

---

[27] *See Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990).

[28] *Id.*

[29] *Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995) ("[T]he successful withdrawal of a claim pursuant to Fed. R. Bankr. P. 3006 prior to the trustee's initiation of an adversarial proceeding renders the withdrawn claim a legal nullity and leaves parties as if the claim had never been brought."); *In re Goldblatt's Bargain Stores, Inc*., No. 05 C 03840, 2005 WL 8179250, at *5 (N.D. Ill. Dec. 6, 2005) (claims withdrawn before adversary proceeding are as if never filed); *see generally, In re Manchester, Inc.*, No. 08-30703-11-BJH, 2008 WL 5273289, at *3-6 (Bankr. N.D. Tex. Dec. 19, 2008) (permissible to withdraw a claim to preserve jury trial right).

## V.   PENDING MATTERS

No dispositive motions, or any other motions, remain pending at this time. The court has not granted a stay pending resolution of the Motion in the Adversary Proceeding.[30] At this point, the parties are not trial-ready.

## VI.   RECOMMENDATION

In light of: (a) the noncore, related-to claims in the Complaint; (b) the lack of a proof of claim or any other claim related to the Note asserted by NPA-Defendant; and (c) the lack of any other consent by NPA-Defendant to the equitable jurisdiction of the bankruptcy court related to the Note, the bankruptcy court recommends the District Court: refer all pre-trial matters to the bankruptcy court, and grant the Motion upon certification by the bankruptcy court that the parties are trial-ready.

With regard to such pretrial matters, the bankruptcy court further recommends that, to the extent a dispositive motion is brought that the bankruptcy court determines should be granted and would finally dispose of claims in this Adversary Proceeding, the bankruptcy court should submit a report and recommendation to the District Court for the District Court to adopt or reject.

**\*\*\*END OF REPORT AND RECOMMENDATION\*\*\***

---

[30] The court did grant a stay pending resolution of the motion to withdraw the reference in the related case of *Highland Capital Management, L.P.  v. Dondero* (Adversary Case No. 21-03003).

# EXHIBIT 10

Docket #0070  Date Filed: 9/7/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 6, 2021**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Reorganized Debtor. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

### ORDER APPROVING STIPULATION AND AGREED ORDER GOVERNING
### DISCOVERY AND OTHER PRE-TRIAL ISSUES

Upon consideration of the *Stipulation and Agreed Order Governing Discovery and Other
Pre-Trial Issues* [Docket No. 62] (the "Stipulation")[1] entered into between Highland Capital

---

[1] Capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them in the Stipulation.

CORE/3522697.0002/168702727
DOCS_NY:43951.2 36027/002

¨1¤}HV5)'     &1«

1934054210907000000000006

Appx. 00177

Management, L.P., the reorganized debtor[2] ("Highland") in the above-captioned chapter 11 case ("Bankruptcy Case") and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), and NexPoint Advisors, L.P. ("NexPoint", and together with Highland, the "Parties"), it is **HEREBY ORDERED THAT**:

1.      The Stipulation, a copy of which is attached hereto as **Exhibit A**, is **APPROVED**.

2.      The Stipulation supersedes any prior stipulation or scheduling order governing the Adversary Proceeding.

3.      The Parties shall abide by the following pretrial schedule (the "Joint Pretrial Schedule") pursuant to the Stipulation:

- NexPoint will have until August 30, 2021 to answer or otherwise respond to the First Amended Complaint.

- The Parties will serve written discovery demands (limited to new claims and allegations in the First Amended Complaint) by September 3, 2021.

- The Parties will respond to discovery requests by September 27, 2021 and will also be substantially complete with document production by September 27, 2021.

- Fact depositions will take place between October 1 and October 22, 2021.

- Expert designations and disclosures of all opinions, and the bases therefor, will be made by October 29, 2021, and experts will be deposed between October 29, 2021 and November 8, 2021.

4.      The Parties agree that discovery taken in this case will be consolidated with discovery taken in the following adversary proceedings, and all discovery in each of the adversary proceedings will be treated as if it was taken in all of the adversary proceedings listed below so

---

[2] On February 22, 2021, the Bankruptcy Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order") which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital* Management*, L.P.*, as modified (the "Plan"). The Plan went Effective (as defined in the Plan) on August 11, 2021, and Highland is the Reorganized Debtor (as defined in the Plan) since the Effective Date. *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 2700].

that each witness will only need to be deposed once and documents produced in any of the proceedings are usable as if received in every other proceeding:

- *Highland Capital Management, L.P. v. James D. Dondero*, Adv. Pro. No. 21-03003;

- *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.*, Adv. Pro. No. 21-03004;

- *Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.*, Adv. Pro. No. 21-03006; and

- *Highland Capital Management, L.P. v. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)*, Adv. Pro. No. 21-03007.

5.      The Joint Pretrial Schedule set forth in this Order shall only be modified in writing signed by the Parties or upon entry of an order of the Court entered upon notice to the Parties.

6.      The Court shall retain jurisdiction over all disputes arising out of or otherwise governing the interpretation and enforcement of this Order.

###End of Order###

CORE/3522697.0002/168702727
DOCS_NY:43951.2 36027/002

**Appx. 00179**

# EXHIBIT A

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
*Counsel for Defendant NexPoint Advisors, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03005-sgj** |
| **NEXPOINT ADVISORS, L.P.** | § | |
| | § | |
| Defendant. | § | |

**STIPULATION AND AGREED ORDER GOVERNING DISCOVERY**
**AND OTHER PRE-TRIAL ISSUES**

This stipulation and agreed order (the "Stipulation") is entered into between Highland

Capital Management, L.P. (the "Debtor") and NexPoint Advisors, L.P. ("NexPoint"). The Debtor

and NexPoint are collectively referred to herein as the "Parties."

**RECITALS**

WHEREAS, on **April 13, 2021**, NexPoint filed a Motion to Withdraw the Reference.

WHEREAS, on **July 8, 2021**, the Bankruptcy Court filed its *Report and*

*Recommendation to District Court Proposing that it (A) Grant Defendant's Motion to Withdraw*

CORE/3522697.0002/168702727

*the Reference at Such Time as Bankruptcy Court Certifies that Action is Trial Ready; and (B)*

*Defer Pretrial Matters to Bankruptcy Court* [**Docket No. 40**] (the "Report").

WHEREAS, the Debtor has indicated that it intends to file a First Amended Complaint, asserting additional claims against NexPoint, as well as claims against new defendants, Nancy Dondero and The Dugaboy Investment Trust.

WHEREAS, the Parties intend to complete fact and expert discovery in this adversary proceeding as governed by this Stipulation.

## STIPULATION

**NOW, THEREFORE, IN CONSIDERATION OF THE FOREGOING, THE PARTIES HEREBY AGREE AND STIPULATE AS FOLLOWS:**

1.    This Stipulation supersedes any prior stipulation or scheduling order governing the above-referenced adversary proceeding.

2.    The Parties agree to the following deadlines regarding discovery and other pre-trial deadlines:

- The Parties agree that the Debtor will file and NexPoint will not oppose a Motion for Leave to File First Amended Complaint by August 17, 2021, a copy of which has previously been provided by the Debtor to NexPoint.  Counsel for NexPoint will accept service of the First Amended Complaint on behalf of NexPoint and the additional defendants named in the First Amended Complaint.

- NexPoint will have until August 30, 2021, to answer or otherwise respond to the First Amended Complaint.

- The Parties will serve written discovery demands (limited to new claims and allegations in the First Amended Complaint) by September 3, 2021.

- The Parties will respond to discovery requests by September 27, 2021 and will also be substantially complete with document production by September 27, 2021.

- Fact depositions will take place between October 1 and October 22, 2021.

- Expert designations and disclosures of all opinions and the bases therefor, will be made by October 29, 2021, and experts will be deposed between October 29, 2021 and November 8, 2021.

3.      The Parties agree that discovery taken in this case will be consolidated with discovery taken in the following adversary proceedings and all discovery in each of the adversary proceedings will be treated as if it was taken in all of the adversary proceedings listed below, so that each witness will only need to be deposed once and documents produced in any of the proceedings are usable as if received in every other proceeding:

- *Highland Capital Management, L.P. v. James D. Dondero*, Adv. Pro. No. 21-03003;

- *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.*, Adv. Pro. No. 21-03004;

- *Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.*, Adv. Pro. No. 21-03006; and

- *Highland Capital Management, L.P. v. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)*, Adv. Pro. No. 21-03007.

IT IS SO STIPULATED.

- 3 -

Dated:  August 17, 2021

CONSENTED AND AGREED TO BY:

*/s/ Davor Rukavina*
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
Email:  drukavina@munsch.com
Email:  jvasek@munsch.com

**ATTORNEYS FOR DEFENDANT
NEXPOINT ADVISORS, L.P.**

*/s/ John A. Morris*
John A. Morris
NY Bar No. 266326
(*pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Email: jmorris@pszjlaw.com

**ATTORNEYS FOR DEBTOR
HIGHLAND CAPITAL MANAGEMENT,
L.P.**

*/s/ Michael P. Aigen*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email:  deborah.deitschperez@stinson.com
Email:  michael.aigen@stinson.com

**ATTORNEYS FOR NANCY DONDERO**

*/s/ Douglas S. Draper*
Douglas S. Draper
LA Bar No. 5073
(*pro hac vice*)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Email:  ddraper@hellerdraper.com

**ATTORNEYS FOR THE DUGABOY
INVESTMENT TRUST**

- 4 -

Appx. 00184

## CERTIFICATE OF SERVICE

I certify that on August 17, 2021, a true and correct copy of the foregoing document was served via the Court's Electronic Case Filing system to the parties that are registered or otherwise entitled to receive electronic notices in this case.

*/s/ Julian P. Vasek*
Julian P. Vasek

CORE/3522697.0002/168702727

**Appx. 00185**

# EXHIBIT 11

Page 1

1                WATERHOUSE - 10-19-21

2       IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
3                DALLAS DIVISION
   ------------------------------
4   IN RE:

5                      Chapter 11
     HIGHLAND CAPITAL
6    MANAGEMENT, L.P.,        CASE NO.
                      19-34054-SGI11
7
         Debtor.
8   ------------------------------
     HIGHLAND CAPITAL MANAGEMENT, L.P.,
9
         Plaintiff,
10   vs.                      Adversary
                         Proceeding No.
11   HIGHLAND CAPITAL MANAGEMENT      21-03000-SGI
     FUND ADVISORS, L.P.; NEXPOINT
12   ADVISORS, L.P.; HIGHLAND
     INCOME FUND; NEXPOINT
13   STRATEGIC OPPORTUNITIES FUND;
     NEXPOINT CAPITAL, INC.; and
14   CLO HOLDCO, LTD.,

15         Defendants.
   ------------------------------
16

17         REMOTE VIDEOTAPED DEPOSITION OF

18            FRANK WATERHOUSE

19            October 19, 2021

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No: 201195

Page 2

1      WATERHOUSE - 10-19-21
2
3
4          October 19, 2021
5          9:30 a.m.
6
7
8
9      Remote Deposition of FRANK WATERHOUSE,
10   held before Susan S. Klinger, a Registered
11   Merit Reporter and Certified Realtime Reporter
12   of the State of Texas.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          WATERHOUSE - 10-19-21
2    A P P E A R A N C E S:
3    (All appearances via Zoom.)
4    Attorneys for the Reorganized Highland Capital
5    Management:
6        John Morris, Esq.
7        Hayley Winograd, Esq.
8        PACHULSKI STANG ZIEHL & JONES
9        780 Third Avenue
10       New York, New York  10017
11   Attorneys for the Witness:
12       Debra Dandeneau, Esq.
13       Michelle Hartmann, Esq.
14       BAKER McKENZIE
15       1900 North Pearl Street
16       Dallas, Texas  75201
17   Attorneys for NexPoint Advisors, LP and
18   Highland Capital Management Fund Advisors,
19   L.P.:
20       Davor Rukavina, Esq.
21       An Nguyen, Esq.
22       MUNSCH HARDT KOPF & HARDD
23       500 North Akard Street
24       Dallas, Texas  75201-6659
25

Page 4

1          WATERHOUSE - 10-19-21
2    Attorneys for Jim Dondero, Nancy Dondero, HCRA,
3    and HCMS:
4        Deborah Deitsch-Perez, Esq.
5        Michael Aigen, Esq.
6        STINSON
7        3102 Oak Lawn Avenue
8        Dallas, Texas  75219
9
10   Attorneys for Dugaboy Investment Trust:
11       Warren Horn, Esq.
12       HELLER, DRAPER & HORN
13       650 Poydras Street
14       New Orleans, Louisiana 70130
15
16   Attorneys for Marc Kirschner as the trustee for
17   the litigation SunTrust:
18       Deborah Newman, Esq.
19       QUINN EMANUEL URQUHART & SULLIVAN
20       51 Madison Avenue
21       New York, New York  10010
22
23   Also Present:
24       Ms. La Asia Canty
25

Page 5

1          WATERHOUSE - 10-19-21
2              I N D E X
3
4    WITNESS                          PAGE
5    FRANK WATERHOUSE
6    EXAMINATION BY MR. MORRIS            10
7    EXAMINATION BY MR. RUKAVINA          256
8    EXAMINATION BY MS. DEITSCH-PEREZ     352
9    EXAMINATION BY MR. MORRIS            377
10   EXAMINATION BY MR. RUKAVINA          387
11   EXAMINATION BY MS. DEITSCH-PEREZ     393
12
13           E X H I B I T S
14   No.                      Page
15   Exhibit 2  NPA et al Amended Complaint    142
16   Exhibit 33 6/3/19 Management       91
17       Representation
18   Exhibit 34 HCMLP Consolidated Financial    94
19       Statements
20   Exhibit 35 HCMFA Incumbency Certificate    151
21   Exhibit 36 Email string re 15(c)      170
22   Exhibit 39 HCMLP Operating Results 2/18    226
23   Exhibit 40 Summary of Assets and      236
24       Liabilities
25   Exhibit 41 12/19 Monthly Operating Report  258

Page 6

```
1          WATERHOUSE - 10-19-21
2   Exhibit 45 HCMFA Consolidated Financial      135
3        Statements
4   Exhibit 46 NexPoint 2019 Audited          218
5        Financials
6
7   Exhibit A1 Emails 11/25              328
8   Exhibit A2 Emails 12/31              338
9   Exhibit A6 Emails 1/12              341
10  Exhibit A7 Promissory Notes          297
11  Exhibit A9 Email, 8/31            307
12  Exhibit A10 Acknowledgment from HCMLP        302
13  Exhibit A11 HCMLP Schedule 71A        309
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
1          WATERHOUSE - 10-19-21
2        P R O C E E D I N G S
3       VIDEOGRAPHER:  Good morning,
4   Counselors.  My name is Scott Hatch.  I'm a
5   certified legal videographer in association
6   with TSG Reporting, Inc.
7       Due to the severity of COVID-19 and
8   following the practice of social
9   distancing, I will not be in the same room
10  with the witness.  Instead, I will record
11  this videotaped deposition remotely.  The
12  reporter, Susan Klinger, also will not be
13  in the same room and will swear the witness
14  remotely.
15      Do all parties stipulate to the
16  validity of this video recording and remote
17  swearing, and that it will be admissible in
18  the courtroom as if it had been taken
19  following Rule 30 of the Federal Rules of
20  Civil Procedures and the state's rules
21  where this case is pending?
22      MR. HORN:  Yes.
23      MS. DANDENEAU:  Yes.
24      MR. MORRIS:  Yes.  John Morris.  I
25  would just try to do a negative notice
```

Page 8

```
1          WATERHOUSE - 10-19-21
2   here, as we did yesterday.  If anybody has
3   a problem with what was just stated, can
4   you state your objection now?
5       Okay.  No response, so everybody
6   accepts the stipulation and the instruction
7   that was just given.
8       VIDEOGRAPHER:  Thank you.  This is
9   the start of media labeled Number 1 of the
10  video recorded deposition of Frank
11  Waterhouse In Re: Highland Capital
12  Management, L.P., in the United States
13  Bankruptcy Court for the Northern District
14  of Texas, Dallas Division, Case Number
15  21-03000-SGI.
16      This deposition is being held via
17  video conference with participants
18  appearing remotely due to COVID-19
19  restrictions on Tuesday, October 19th, 2021
20  at approximately 9:32 a.m.  My name is
21  Scott Hatch, legal video specialist with
22  TSG Reporting, Inc. headquartered at 228
23  East 45th Street, New York, New York.  The
24  court reporter is Susan Klinger in
25  association with TSG Reporting.
```

Page 9

```
1          WATERHOUSE - 10-19-21
2       Counsel, please introduce
3   yourselves.
4       MR. MORRIS:  John Morris, Pachulski
5   Stang Ziehl & Jones for the reorganized
6   Highland Capital Management, L.P., the
7   plaintiff in these actions.
8       MS. DANDENEAU:  Deborah Dandeneau
9   from Baker McKenzie.  My partner, Michelle
10  Hartmann, is also in the room with me,
11  representing Frank Waterhouse individually.
12      MS. DEITSCH-PEREZ:  Deborah
13  Deitsch-Perez from Stinson, LLP,
14  representing Jim Dondero, Nancy Dondero,
15  HCRA, and HCMS.
16      MR. HORN:  Warren Horn with Heller,
17  Draper & Horn in New Orleans representing
18  Dugaboy Investment Trust.
19      MR. RUKAVINA:  Davor Rukavina with
20  Munsch Hardt Kopf & Harr in Dallas
21  representing NexPoint Advisors, LP and
22  Highland Capital Management Fund Advisors,
23  L.P.
24      MR. AIGEN:  Michael Aigen from
25  Stinson, and I represent the same parties
```

Page 10

1          WATERHOUSE - 10-19-21
2    as Deborah Deitsch-Perez.
3          MS. NEWMAN:  This is Deborah Newman
4    from Quinn Emanuel.  We represent the
5    litigation -- Marc Kirschner as the trustee
6    for the litigation SunTrust.
7          MR. MORRIS:  I think that is
8    everybody.
9          VIDEOGRAPHER:  Thank you.  Will the
10   court reporter please swear in the witness.
11          FRANK WATERHOUSE,
12   having been first duly sworn, testified as
13   follows:
14          EXAMINATION
15   BY MR. MORRIS:
16   Q.   Please state your name for the
17   record.
18   A.   My name is Frank Waterhouse.
19   Q.   Good morning, Mr. Waterhouse.  I'm
20   John Morris, as you know, from Pachulski Stang
21   Ziehl & Jones.  You understand that my firm and
22   I represent Highland Capital Management, L.P.;
23   is that right?
24   A.   Yes.
25   Q.   Okay.  And do you understand that

Page 11

1          WATERHOUSE - 10-19-21
2    we're here today for your deposition in your
3    individual capacity?
4    A.   Yes.
5    Q.   Did you review and -- did you
6    receive and review a subpoena that Highland
7    Capital Management, L.P., served upon you?
8    A.   Yes.
9    Q.   You have been deposed before; right?
10   A.   Yes.
11   Q.   How many times have you been
12   deposed?
13   A.   About three or four times.
14   Q.   Okay.  And I defended you in one
15   deposition; isn't that right?
16   A.   That is correct.
17   Q.   So the general ground rules for this
18   deposition are largely the same as the
19   depositions you have given before.  And that is
20   I will ask you a series of questions, and it is
21   important that you allow me to finish my
22   question before you begin your answer; is that
23   fair?
24   A.   Yes.
25   Q.   And it is important that I allow you

Page 12

1          WATERHOUSE - 10-19-21
2    to finish your answers before I begin a
3    question, but if I fail to do that, will you
4    let me know?
5    A.   I can certainly do that.
6    Q.   Okay.  Do you understand that this
7    deposition is being videotaped?
8    A.   Yes.
9    Q.   You understand that I may seek to
10   use portions of the videotape in a court of
11   law?
12   A.   I did not know that, until you just
13   said that.
14   Q.   Okay.  And you are aware of that now
15   before the deposition begins substantively; is
16   that right?
17   A.   Yes.
18   Q.   So unlike I think the other
19   depositions that you have given, this one is
20   being given remotely.  So that presents some
21   unique challenges, at least as compared to a
22   deposition that is taken in-person.
23          From time to time we're going to put
24   documents up on the screen, Mr. Waterhouse.
25   And it is important that I give you the

Page 13

1          WATERHOUSE - 10-19-21
2    opportunity to review any portion of the
3    document that you think you need in order to
4    fully and completely answer the question.
5          So I would ask you to let me know if
6    there is a portion of a document that you need
7    to see in order to fully and completely answer
8    the question.  Can you do that for me?
9    A.   Yes.
10          MS. DANDENEAU:  Mr. Morris, I would
11   just note that we do have hard copies of
12   the documents that you sent, so if you can
13   just refer to the exhibit number as
14   reflected in the documents that you sent,
15   Mr. Waterhouse will be able to look at the
16   hard copies of those documents.
17          MR. MORRIS:  I appreciate that,
18   and -- and I will encourage him to do so.
19   There will be other documents that we did
20   not send to you that we'll be using today
21   though.
22   Q.   Okay.  With that as background, if
23   there is anything that I ask you, sir, that you
24   don't understand, will you let me know?
25   A.   Yes.

Page 14

WATERHOUSE - 10-19-21

1
2  Q.  Okay.  Are you currently employed?
3  A.  Yes.
4  Q.  By whom?
5  A.  The Skyview Group.
6  Q.  When did you become employed by the
7  Skyview Group?
8  A.  I believe March 1st of 2021.
9  Q.  Do you have a title at Skyview?
10  A.  Yes.
11  Q.  What is your title?
12  A.  My title is chief financial officer.
13  Q.  Do you report to anybody in your
14  role as CFO?
15  A.  I don't, no.
16  Q.  No.  Is there a president or a CEO
17  of Skyview?
18  A.  Yes.
19  Q.  Who is that?
20  A.  That is Scott Ellington.
21  Q.  But you don't report to
22  Mr. Ellington; is that right?
23  A.  I don't think so.
24  Q.  Does Skyview Group --
25       MS. DANDENEAU:  Excuse me, we --

Page 15

WATERHOUSE - 10-19-21

1
2  A.  I -- I -- I might.  I just -- I
3  don't recall.
4  Q.  Okay.  Does Skyview Group provide
5  any services to any entity directly or
6  indirectly owned or controlled by Jim Dondero?
7  A.  Yes.
8  Q.  Can you name -- is that pursuant to
9  written contracts?
10  A.  Yes.
11  Q.  And do you know how many contracts
12  exist?
13  A.  Approximately six or so.
14  Q.  And is the Skyview Group made up of
15  individuals who were formerly employees of
16  Highland Capital Management, L.P.?
17  A.  No.
18  Q.  Do you know how many -- how many --
19  how many employees does Skyview have?
20  A.  Approximately 35.
21  Q.  And can you tell me how many of
22  those 35 are former officers, directors, or
23  employees of Highland Capital Management, L.P.?
24  A.  I don't know the exact number.
25  Q.  Is it more than 20?

Page 16

WATERHOUSE - 10-19-21

1
2  A.  Yes.
3  Q.  Is it more than 30?
4  A.  I don't know.
5  Q.  Can you tell me what portion of
6  Skyview -- Skyview's revenue is derived from
7  entities that are directly or indirectly owned
8  or controlled by Jim Dondero?
9       MS. DANDENEAU:  Mr. Morris, I mean,
10  you called Mr. Waterhouse here individually
11  for purposes of his testimony in connection
12  with the noticed litigation.  I have given
13  you some leeway to ask him some background
14  information about Skyview Group, but this
15  is not a substitute for a deposition in
16  connection with any other pending disputes
17  that exist.  And -- and we agreed to accept
18  the subpoena on the basis of he -- this is
19  testimony that he is giving in connection
20  with the noticed litigation.
21       I really think that you are now
22  going a little bit far afield from the
23  purpose of this deposition.
24       MR. MORRIS:  Okay.  It is -- I'm not
25  intending to use these -- the answers to

Page 17

WATERHOUSE - 10-19-21

1
2  these questions for any purpose other than
3  this litigation.  I think you understand
4  fully why I'm asking the questions, and I
5  just have a couple more, if you will bear
6  with me.
7       MS. DANDENEAU:  Okay.
8       MS. DEITSCH-PEREZ:  Can we have an
9  agreement that an objection by one is an
10  objection for any other party here?
11       MR. MORRIS:  Sure.  I would -- I
12  would encourage that, sure.
13       MS. DEITSCH-PEREZ:  Thank you.
14       MR. MORRIS:  It can't be sustained
15  or overruled more than one time, so...
16  Q.  Mr. Waterhouse, can you answer my
17  question, please.
18       MS. DANDENEAU:  Do you want to
19  repeat it, Mr. Morris, for his benefit?
20       MR. MORRIS:  Sure.
21  Q.  Can you -- can you tell me the
22  approximate portion of Skyview's revenue that
23  is derived from entities that are directly or
24  indirectly owned or controlled by Mr. Dondero?
25  A.  I don't know the exact number.

Appx. 00191

Page 18

```
1              WATERHOUSE - 10-19-21
2    Q.   Is it more than 75 percent?
3    A.   Yes.
4    Q.   Is it more than 90 percent?
5    A.   I don't know.
6    Q.   Okay.  Can I refer to Highland
7  Capital Management, L.P., as Highland?
8    A.   Yes.
9    Q.   All right.  And you previously
10 served as Highland's CFO; correct?
11   A.   Yes.
12   Q.   When did you join Highland?
13   A.   I don't recall the exact date.
14   Q.   Can you tell me what year?
15   A.   2006.
16   Q.   When did you -- in what year did you
17 become Highland's CFO?
18   A.   I don't recall the exact date.
19   Q.   I'm not asking you for the exact
20 date.  I'm asking you if you recall the year in
21 which you were appointed CFO.
22   A.   I don't recall the exact year.
23   Q.   Can you tell me which years it is
24 possible that you were appointed to CFO of
25 Highland?
```

Page 19

```
1              WATERHOUSE - 10-19-21
2    A.   2011 or 2012.
3    Q.   Did you serve as Highland's CFO on a
4  continuous basis from in or around 2011 or 2012
5  until early 2021?
6    A.   Yes.
7    Q.   During that entire time you reported
8  directly to Jim Dondero; correct?
9    A.   I -- I don't know.
10   Q.   Is there anybody else you reported
11 to -- withdrawn.
12        Did you report to Mr. Dondero for
13 some portion of the time that you served as
14 CFO?
15   A.   Yes.
16   Q.   Is there a portion of time that you
17 don't recall who you reported to?
18   A.   Yes.
19   Q.   What portion of time do you have in
20 your mind when you can't recall who you
21 reported to?
22   A.   From the 2011 to -- for
23 approximately a year or two.
24   Q.   Okay.  So is it fair to say that you
25 reported to Mr. Dondero in your capacity as CFO
```

Page 20

```
1  from at least 2014 until the time you left
2  Highland?
3        MS. DANDENEAU:  Objection to form.
4    A.   I don't want to speculate the exact
5  or what year that changed or -- so I would like
6  to stick with my testimony.
7    Q.   Can you recall when you began
8  reporting to Mr. Dondero?
9    A.   I don't recall.
10   Q.   Can you -- can you give me an
11 estimate of what year you think you might have
12 began reporting to Mr. Dondero?
13   A.   I will go back to my prior
14 testimony.
15   Q.   Okay.  There is no -- you have no
16 ability to tell me when you began reporting to
17 Mr. Dondero.
18        Do I have that right?
19        MS. DANDENEAU:  Objection to form.
20   A.   I don't recall.
21   Q.   Okay.  Do you recall who you might
22 have reported to before you began reporting to
23 Mr. Dondero?
24   A.   Yes.
```

Page 21

```
1              WATERHOUSE - 10-19-21
2    Q.   Who might you have reported to in
3  your capacity as CFO before you started
4  reporting to Mr. Dondero?
5    A.   That would have been Patrick Boyce.
6    Q.   Are you aware that Highland filed
7  for bankruptcy on October 19th, 2019?
8    A.   Yes.
9    Q.   And we refer to that as the petition
10 date?
11   A.   Yes.
12   Q.   Okay.  Do you hold any professional
13 licenses, sir?
14   A.   Yes.
15   Q.   Can you tell me what professional
16 licenses you hold?
17   A.   I'm a certified public accountant.
18   Q.   Okay.  Anything else?
19   A.   No.
20   Q.   Do you have any other professional
21 licenses or certificates?
22   A.   When you say "professional license,"
23 that is not education?
24   Q.   Tell me -- sure.  Anything other
25 than a driver's license.
```

Page 22

WATERHOUSE - 10-19-21

1           WATERHOUSE - 10-19-21
2           Do you have any other license or
3    certificate or certification?
4       A.   Are you asking, like, where I went
5    to school and the --
6       Q.   I am not.  I am not.  I didn't say
7    education.  I didn't ask about degrees.
8           Do you know what a license is?
9       A.   Well, yeah, I mean, a license is
10   something you get after you receive a certain
11   level of proficiency.
12      Q.   Do you have any licenses or
13   certifications other than your CPA?
14          MS. DANDENEAU:  Objection, form.
15      I assume you mean professional
16      licenses, Mr. Morris; correct?
17      Q.   Can you answer my question, sir?
18      A.   Mr. Morris, I'm thinking.  I
19   don't -- I don't think I have any others.
20      Q.   Are you familiar with an entity
21   called Highland Capital Management Fund
22   Advisors?
23      A.   Yes.
24      Q.   Were you ever -- can we refer to
25   that entity as HCMFA?

Page 23

1           WATERHOUSE - 10-19-21
2       A.   Yes.
3       Q.   Were you ever employed by HCMFA?
4       A.   Not that I recall.
5       Q.   Were you ever -- did you ever hold
6    the title of an officer or director of HCMFA?
7       A.   Yes.
8       Q.   What title did you hold?
9       A.   Treasurer.
10      Q.   When did you become the treasurer of
11   HCMFA?
12      A.   I don't recall.
13      Q.   Can you tell me the year?
14      A.   I don't -- I don't know the year.
15      Q.   Can you approximate the year in
16   which you became the treasurer of HCMFA?
17      A.   I don't know.
18      Q.   Can you tell me if it was before or
19   after 2016?
20      A.   I don't recall.
21      Q.   Are you still the -- do you know if
22   you're still the treasurer of HCMFA today?
23      A.   Today, I am the acting treasurer for
24   HCMFA.
25      Q.   Is there a distinction between

Page 24

1           WATERHOUSE - 10-19-21
2    treasurer and acting treasurer?
3       A.   I said "acting treasurer" as I am an
4    employee of Skyview, as you previously
5    stated -- or asked.
6       Q.   But you are the treasurer of HCMFA
7    today; correct?
8       A.   I am -- I am the acting treasurer
9    for HCMFA.
10      Q.   How did you become the treasurer of
11   HCMFA?
12      A.   Are you asking how I became the
13   treasurer of HCMFA today?
14      Q.   How did you become appointed to
15   serve as the treasurer of HCMFA?
16      A.   Well, in -- in -- in what time
17   capacity?
18      Q.   The first time that you were
19   appointed.
20      A.   First time.  I believe I was asked
21   to serve as treasurer for HCMFA the first time.
22      Q.   By who?  Who asked you to do that?
23      A.   I don't recall.
24      Q.   Is there anything that would refresh
25   your recollection as to who appointed you as

Page 25

1           WATERHOUSE - 10-19-21
2    the treasurer of CF- -- HCMFA for the first
3    time?
4       A.   I don't -- I mean, there would be
5    some documents, some legal documents.  I don't
6    know where those are.
7       Q.   How many times have you been
8    appointed the treasurer of HCMFA?
9       A.   I don't know.
10      Q.   Was it more than once?
11      A.   I don't know.
12      Q.   Can you tell me any period of time
13   since 2016 that you did not hold the title of
14   treasurer of HCMFA?
15          MS. DANDENEAU:  Objection to form.
16      A.   I don't recall.
17      Q.   What are your duties and
18   responsibilities as the treasurer of HCMFA?
19      A.   My duties are to do the best job
20   that I can as the -- as an accountant and
21   finance guy.
22      Q.   What specific duties and
23   responsibilities do you have as the treasurer
24   of HCMFA?
25      A.   My duties are to do the best job

Page 26

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2  that I can as the accounting and finance person
3  for HCMFA.
4        Q.    As the accounting and finance person
5  for HCMFA, do you have any particular areas of
6  responsibility?
7        A.    Yeah, it is to manage the accounting
8  and finance function for HCMFA.
9        Q.    Would that include -- do you have
10  responsibility for overseeing HCMFA's annual
11  audit?
12        A.    Can I please elaborate on my prior
13  question?
14        Q.    Of course.  You -- you are giving
15  answers.  I'm asking questions.
16        A.    Okay.  Yes, so the -- it -- like I
17  said, it is to manage the accounting finance
18  aspect, but I am, as we discussed, the
19  treasurer.  That is -- being treasurer is what
20  gives me that -- that management function.
21        Q.    Does anybody report to you in your
22  capacity as treasurer of HCMFA?
23        A.    I don't believe so.
24        Q.    Does HCMFA have a chief financial
25  officer?

Page 27

1        WATERHOUSE - 10-19-21
2        A.    I don't -- I don't know.
3        Q.    You don't know?
4        You're the treasurer of HCMFA but
5  you don't know if HCMFA has a chief financial
6  officer.
7        Do I have that right?
8        A.    That's right.
9        Q.    Okay.  Have you heard of a company
10  called NexPoint Advisors?
11        A.    Yes.
12        Q.    We will refer to that as NexPoint.
13  Okay?
14        A.    Okay.
15        Q.    Were you ever employed by NexPoint?
16        A.    I don't recall.
17        Q.    Did you ever hold any title with
18  respect to the entity known as NexPoint?
19        A.    Yes.
20        Q.    What titles have you held in
21  relation to NexPoint?
22        A.    Treasurer.  I think it was only
23  treasurer.
24        Q.    Can you tell me the approximate year
25  you became the treasurer of NexPoint?

Page 28

1        WATERHOUSE - 10-19-21
2        A.    I don't know.
3        Q.    Are you still the treasurer of
4  NexPoint today?
5        A.    I am the acting treasurer for
6  NexPoint.
7        Q.    When did your title change from
8  treasurer to acting treasurer?
9        A.    I don't know.
10        Q.    Did your duties and responsibilities
11  change at all when your title was changed from
12  treasurer to acting treasurer?
13        A.    I don't -- I don't believe so.
14        Q.    Why did --
15        A.    I still manage the finance and
16  accounting function for NexPoint.
17        Q.    Why did your title change from
18  treasurer to acting treasurer?
19        A.    I don't -- I'm using the term
20  "acting treasurer" as I'm a Skyview employee.
21  I don't -- I don't know -- again, I am a -- as
22  I am the Skyview employee.
23        Q.    Okay.
24        A.    And we -- we provide officer
25  services.

Page 29

1        WATERHOUSE - 10-19-21
2        Q.    And you serve as an officer of
3  HCMFA; correct?
4        A.    I think we went over that with my
5  testimony.  Yes, I'm the acting treasurer for
6  HCMFA.
7        Q.    And you are an officer of NexPoint;
8  correct?
9        A.    I think -- I am the acting treasurer
10  for NexPoint Advisors.
11        Q.    And -- and who appointed you acting
12  treasurer of NexPoint Advisors?
13        A.    I don't recall specifically.
14        Q.    Do you have any recollection of who
15  might have appointed you the treasurer of
16  NexPoint?
17        A.    I mean, it -- it -- I don't recall
18  exactly who it was.
19        Q.    Who were the possibilities?
20        MS. DEITSCH-PEREZ:  Object to the
21  form.
22        Q.    You can answer.
23        A.    Someone in the legal group for
24  NexPoint.  The other officers as well.
25        Q.    Have you heard of a company called

Page 30

WATERHOUSE - 10-19-21

1
2  Highland Capital Management Services, Inc.?
3      A.   Yes.
4      Q.   We will refer to that as HCMS.
5  Okay?
6      A.   HCMS.  Okay.
7      Q.   Were you ever employed by HCMS?
8      A.   No.
9      Q.   Have you ever held any titles in
10  relation to HCMF -- I apologize -- HCMS?
11      A.   Yes.
12      Q.   What titles have you held in
13  relation to HCMS?
14      A.   Treasurer and acting treasurer.
15      Q.   When did you first become treasurer
16  or acting treasurer of HCMS?
17      A.   I don't recall the exact dates.
18      Q.   Can you recall -- can you
19  approximate the year that you became the
20  treasurer of HCMS?
21      A.   I don't -- I don't know.
22      Q.   Are you still the treasurer of HCMS
23  today?
24      A.   I am the acting treasurer for HCMS.
25      Q.   And are your duties and

Page 31

WATERHOUSE - 10-19-21

1
2  responsibilities as the acting treasurer for
3  HCMS and the acting treasurer for NexPoint the
4  same as your duties and responsibilities in
5  your role as the acting treasurer of HCMFA?
6      A.   More or less.
7      Q.   Have you ever heard of a company
8  called HCRE Partners, LLC?
9      A.   Yes.
10      Q.   And do you understand that that
11  entity is now known today as NexPoint Real
12  Estate Partners?
13      A.   I did not know that.
14      Q.   All right.  Can we refer to HCRE
15  Partners as HCRE?
16      MS. DANDENEAU:  Objection to form.
17      Did you mean NexPoint Real Estate
18  Partners, Mr. Morris?
19      MR. MORRIS:  No.
20      MS. DANDENEAU:  Oh.
21      MR. MORRIS:  He said he wasn't
22  familiar that it was succeeded by that
23  entity.  So --
24      MS. DANDENEAU:  Okay.
25      MR. MORRIS:  -- let's go with what

Page 32

WATERHOUSE - 10-19-21

1
2      the witness knows.
3      Q.   You're familiar with an entity
4  called HCRE Partners, LLC; correct?
5      A.   Yes.
6      Q.   Okay.  So that is the entity that we
7  will refer to as HCRE.  If you're aware of any
8  successor, that is great.  If not, let's just
9  define it as such.
10      Have you ever been employed by HCRE
11  or any entity that you know to have succeeded
12  HCRE?
13      A.   No.
14      Q.   Did you ever serve as an officer or
15  director of HCRE or any successor?
16      A.   Not that I recall.
17      Q.   Okay.  Can we refer to NexPoint and
18  HCMFA as the advisors?
19      A.   Yes.
20      Q.   In general, the advisors provided
21  investment advisory services to certain retail
22  funds; correct?
23      A.   Yes.
24      Q.   And we will refer to the retail
25  funds that are served by the advisors

Page 33

WATERHOUSE - 10-19-21

1
2  collectively as the retail funds; is that okay?
3      A.   Okay.
4      Q.   Each of the retail funds is governed
5  by a board; correct?
6      A.   Yes.
7      Q.   And do you know the people who serve
8  on the boards of the retail funds?
9      MS. DANDENEAU:  Objection to form.
10      A.   I don't know all of them.
11      Q.   Do you know whether the same people
12  serve on the board of each of the retail funds
13  as we've defined that term?
14      A.   Which -- so when you say "retail
15  funds" -- again, I want to be -- what retail
16  funds are you referring to, because there are
17  -- there are several distinctions?
18      What retail funds are you using when
19  you refer to them?
20      Q.   That is why -- that is why I tried
21  to define the terms.  So let me do it again.
22      Retail funds for the purposes of
23  this deposition means any retail fund to which
24  either of the advisors provides advisory
25  services.  Okay?

Page 34

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     A.   Okay.
3     Q.   Okay.  So do you know whether the
4  same people serve on the board of each of the
5  retail funds?
6     A.   I don't know.
7     Q.   Were you ever employed by any of the
8  retail funds?
9     A.   No.
10    Q.   No?
11    A.   No.
12    Q.   Okay.  Do you have any title with
13  respect to any of the retail funds?
14    A.   Yes.
15    Q.   What titles do you hold --
16  withdrawn.
17         Do you have the same titles with
18  respect to all of the retail funds or do
19  they -- or just something else?
20         MS. DANDENEAU:  Objection to form.
21    Q.   Withdrawn.
22         Do you have the same title with
23  respect to each of the retail funds?
24    A.   No.
25    Q.   Tell me which title you have with

Page 35

1  respect to each retail fund.
2         Actually, let's do it a different
3  way.  I withdraw the question.
4         Can you give me one title you have
5  in relation to any retail fund?
6     A.   Yes.
7     Q.   What title -- what title can you
8  give me?
9     A.   Principal executive officer.
10    Q.   Do you serve as principal executive
11  officer for each of the retail funds?
12    A.   No.
13    Q.   Can you identify for me the retail
14  funds in which you serve as the principal
15  executive officer?
16    A.   Yes.  Highland Funds 1, Highland
17  Funds 2, Highland Income Fund, Highland Global
18  Allocation Fund.
19    Q.   I'm sorry, you said "Global
20  Allocation Fund"?
21    A.   Yes.
22         VIDEOGRAPHER:  Excuse me,
23  Mr. Morris.  This is the videographer.  I'm
24  concerned about the lighting in the
25

Page 36

1          WATERHOUSE - 10-19-21
2  witness' camera.
3         Do you want to go off the record and
4  make some adjustments?
5         MR. MORRIS:  Sure, but just for this
6  purpose.  I don't want to take a break.  We
7  just started.
8         MS. DANDENEAU:  Yeah, that is fine.
9  That is fine.  We're going to put you on
10  mute.
11         MR. MORRIS:  All right.
12         MS. DANDENEAU:  I'm going to try to
13  open up some of the shades.
14         VIDEOGRAPHER:  We're going off the
15  record at 10:08 a.m.
16         (Recess taken 10:08 a.m. to 10:11 a.m.)
17         VIDEOGRAPHER:  We are back on the
18  record at 10:11 a.m.
19    Q.   Mr. Waterhouse, when did you become
20  the principal executive officer of the four
21  retail funds that you just identified?
22    A.   I don't recall.
23    Q.   Do you recall the approximate year
24  that you became the principal executive officer
25  of the four funds?

Page 37

1          WATERHOUSE - 10-19-21
2     A.   2021.
3     Q.   Did you ever hold any title with
4  respect to any of the four funds you have just
5  identified other than principal executive
6  officer?
7     A.   I don't recall.
8     Q.   Is it possible that you held a
9  position or a title with the four funds you
10  just identified prior to 2021?
11    A.   Yes.
12    Q.   But you don't recall if you did or
13  not; do I have that right?
14    A.   No.  You -- I thought you asked, did
15  I hold other titles.
16    Q.   Did you hold any title at the four
17  retail funds for which you now serve as
18  principal executive officer at any time prior
19  to 2021?
20    A.   Yes.
21    Q.   What titles did you hold?
22    A.   I don't recall all the titles.
23    Q.   Do you recall any of the titles?
24    A.   Yes.
25    Q.   What titles do you recall holding at

Page 38

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2    those four retail funds before 2021?
3        A.   Principal executive officer.
4        Q.   Were you the principal executive
5    officer of the four retail funds that you have
6    identified?
7        A.   Sorry, could you repeat the
8    question?
9        Q.   Were you the principal executive
10   officer for each of the four retail funds that
11   you have identified?
12       A.   Yes.
13       Q.   When did you become the principal
14   executive -- withdrawn.
15            Can you give me the approximate year
16   that you became the principal executive officer
17   for each of the four retail funds you've
18   identified?
19       A.   I don't recall.
20       Q.   What are your duties and
21   responsibilities as the principal executive
22   officer of these four retail funds?
23       A.   It is to manage the finance and
24   accounting positions.
25       Q.   So at the same time you serve as the

Page 39

1        WATERHOUSE - 10-19-21
2    treasurer of the advisors, you also serve as
3    the principal executive officer of these four
4    retail funds; correct?
5        A.   Yes.
6        Q.   Did you ever hold any title with
7    respect to any other retail fund?
8        A.   Not that I recall.
9        Q.   During the period that you served as
10   Highland's CFO, from time to time Highland
11   loaned money to certain of its officers and
12   employees; correct?
13       A.   Yes.
14       Q.   During the period that you served as
15   Highland's CFO, from time to time Highland
16   loaned money to certain --
17       A.   Let me -- let me retract that,
18   sorry, that -- you asked during the time I was
19   CFO, Highland loaned moneys to employees.  I
20   don't -- I don't recall that during my tenure
21   of CFO.
22       Q.   You have no recollection during the
23   time that you were the CFO of Highland of
24   Highland ever loaning any money to any officer
25   or director of Highland?

Page 40

1        WATERHOUSE - 10-19-21
2        A.   I don't recall during my tenure of
3    Highland or my -- as CFO of Highland -- yeah,
4    if there are any loans as CFO of Highland.
5        Q.   I'm just talking about officers and
6    employees right now.  You have no recollection
7    of Highland ever making a loan to any of its
8    officers or employees during the time that you
9    served as CFO.  Do I have that right?
10           MS. DANDENEAU:  Objection to form.
11       A.   So I thought you were saying
12   officers and employees as CFO, right, so there
13   were -- I mean, okay, yes.
14       Q.   I would ask you to listen carefully
15   to my question.  If I -- if I'm not clear, let
16   me know, but I'm really trying to be as clear
17   as I can.
18       A.   I'm listening as carefully as I can,
19   and you are asking very specific questions in a
20   timeline.  And I'm trying to answer your
21   questions as specifically as I can, and I
22   apologize if -- if I'm going back.  I am -- you
23   are asking very specific questions.  Thank you.
24       Q.   During the period that you served as
25   Highland's CFO, from time to time Highland

Page 41

1        WATERHOUSE - 10-19-21
2    loaned money to certain corporate affiliates;
3    correct?
4            MS. DANDENEAU:  Objection to form.
5        A.   What are corporate affiliates?
6        Q.   How about the ones that are in
7    Highland's audited financial statements under
8    the section entitled Loans to Affiliates.  Why
9    don't we start with those.  Do you have any
10   understanding of what the phrase "affiliates"
11   means?
12           MS. DANDENEAU:  Objection to form.
13       A.   I understand what affiliates are,
14   yet affiliates can have different meanings in
15   different contexts, so...
16       Q.   Why don't -- why don't you tell
17   me what your understanding of the term
18   "affiliate" is in relation to Highland Capital
19   Management, L.P.
20       A.   Is that a -- it depends on the
21   context.
22       Q.   How about the context of making
23   loans?
24           MS. DANDENEAU:  Objection to form.
25       A.   I didn't make the determination of

Page 42

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2   who an affiliate was or is at the time those --
3   I didn't -- that wasn't my job to make a
4   determination of who an affiliate is.
5        Q.   All right.  So as the CFO of
6   Highland, do you have any ability right now to
7   tell me which companies that were directly or
8   indirectly owned and/or controlled by
9   Mr. Dondero in whole or in part received loans
10  from Highland Capital Management, L.P.?
11       MS. DANDENEAU:  Objection to form.
12       MS. DEITSCH-PEREZ:  Objection, form.
13       A.   Yes.
14       Q.   Okay.  Identify every entity that
15  you can think of that was directly or
16  indirectly owned and/or controlled by
17  Mr. Dondero in whole or in part that received a
18  loan from Highland Capital Management, L.P.
19       MR. RUKAVINA:  Objection, legal
20       conclusion.
21       A.   NexPoint Advisors, Highland Capital
22  Management Fund Advisors, HCM Services,
23  Dugaboy.  Sorry, I don't think -- Dugaboy
24  doesn't fit that definition.  You said owned
25  and controlled.  I don't think that that

Page 43

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2   definition --
3        Q.   I said owned and/or controlled.
4        A.   I don't -- again, I'm not -- I'm not
5   the legal expert.  I don't think it controls --
6   he controls Dugaboy, so again, I'm not the
7   legal person.
8        Q.   I'm not asking you for a legal
9   conclusion, sir.  I'm asking you for your
10  knowledge, okay, as the CFO -- the former CFO
11  of Highland Capital Management, other than
12  NexPoint, HCMFA, and HCMF -- HCMS, can you
13  think of any other entities that were owned
14  and/or controlled directly or indirectly in
15  whole or in part by Jim Dondero who received a
16  loan from Highland Capital Management, L.P.?
17       MS. DANDENEAU:  Objection to form.
18       A.   HCRE.
19       Q.   Any others?
20       A.   That is -- that is all I can think
21  of.
22       Q.   And you're aware that from time to
23  time while you were the CFO, Highland loaned
24  money to Jim Dondero; correct?
25       A.   Yes.

Page 44

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2        Q.   Okay.  Can we refer to the four
3   entities that you just named and Mr. Dondero as
4   the affiliates?
5        A.   So that would be Jim Dondero,
6   NexPoint Advisors, Highland Capital Management
7   Fund Advisors, and HCRE.
8        Q.   And HCMS?
9        A.   And HCMS, okay.
10       Q.   And can we refer to the loans that
11  were given to each of those affiliates as the
12  affiliate loans?
13       A.   Yes.
14       Q.   And is it fair to say that each of
15  the affiliates were the borrowers under the
16  affiliate loans as we're defining the term?
17       MR. RUKAVINA:  Objection, legal
18       conclusion.
19       A.   The borrowers are whoever were on
20  the notes.  I don't -- I don't know.  I'm not
21  the legal person.
22       Q.   But you --
23       A.   I don't know.
24       Q.   You do know, as Highland's former
25  CFO, that each of the affiliates that you have

Page 45

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2   identified tendered notes to Highland; correct?
3        MR. RUKAVINA:  Hey, John, will you
4        just give me a running objection to legal
5        conclusion to HCM --
6        MR. MORRIS:  No.  No, if you want to
7        object --
8        MR. RUKAVINA:  I will object every
9        time.  Object to legal conclusion.
10       MR. MORRIS:  That is fine.
11       A.   Sorry, can you repeat the question?
12       Q.   Are you aware that each of the --
13  that each of the affiliates, as we have defined
14  the term, gave to Highland a promissory note in
15  exchange for the loans?
16       MR. RUKAVINA:  Objection to the
17       extent that calls for a legal conclusion.
18       A.   I don't.
19       Q.   No, you don't know that?
20       A.   No, they didn't -- you said they
21  exchanged a promissory note for a loan.  I
22  don't -- I don't understand that question, so I
23  said no.
24       Q.   At the time of the bankruptcy
25  filing, did Highland have in its possession

WATERHOUSE - 10-19-21

1
2  promissory notes that were signed by each of
3  the affiliates?
4      A.   Yes.
5      Q.   To the best of your knowledge,
6  during the time that you served as Highland's
7  CFO, did Highland disclose to its outside
8  auditors all of the loans that were made to
9  affiliates?
10     MR. RUKAVINA:  Objection, that calls
11 for a legal conclusion.
12     MS. DEITSCH-PEREZ:  I also couldn't
13 hear you, John, because there was some
14 garbling on -- on the -- on the call.
15     MR. MORRIS:  Folks, I've got to tell
16 you this is not going well, and I'm
17 reserving my right --
18     MS. DANDENEAU:  John, it was just
19 the end of that question.  It was just the
20 end of that question.  I couldn't hear it
21 either.  Sorry, if you could repeat it,
22 please.
23     MR. MORRIS:  That is less than an
24 hour into this, but folks are trying to run
25 out the clock, and so I'm just going to

WATERHOUSE - 10-19-21

1
2  state that now.
3      MS. DANDENEAU:  You know, and,
4  Mr. Morris, I really object to that.  I
5  mean --
6      MR. MORRIS:  Okay.
7      MS. DANDENEAU:  -- Mr. Waterhouse
8  just told you he's trying to listen to your
9  questions and answer them carefully, and
10 you have no basis for saying that.
11     MR. MORRIS:  Okay.
12     MS. DANDENEAU:  This does not --
13 this is not an experienced witness, so he's
14 trying to do the best he can.
15     Q.   Mr. Waterhouse, during the time that
16 you served as Highland's CFO, did Highland
17 disclose to its outside auditors all of the
18 loans that it made to each of the affiliates
19 that you have identified?
20     MR. RUKAVINA:  Objection, legal
21 conclusion.
22     A.   Yes.
23     Q.   To the best of your knowledge, while
24 you were Highland's CFO, were all of the
25 affiliate loans described in Highland's audited

WATERHOUSE - 10-19-21

1
2  financial statements?
3      MR. RUKAVINA:  Objection, legal
4  conclusion.
5      A.   When an audit was performed, any
6  loans that were made by Highland to the
7  affiliates were disclosed to auditors.
8      Q.   Are you aware of any loan that was
9  made to any affiliate that was not disclosed to
10 the auditors?
11     A.   I'm not aware.
12     Q.   To the best of your knowledge, did
13 each of the affiliates who were --
14 (inaudible) -- loaned from Highland execute a
15 promissory note in connection with that loan?
16     MR. RUKAVINA:  Objection, legal
17 conclusion.
18     A.   Sorry, you -- halfway through the
19 question it got muffled.
20     Can you repeat that again?
21     Q.   To the best of your knowledge, did
22 every affiliate execute a promissory note in
23 connection with each loan that it obtained from
24 Highland?
25     MR. RUKAVINA:  Objection, legal

WATERHOUSE - 10-19-21

1
2  conclusion.
3      A.   Yes.
4      Q.   You are not aware of any loan that
5  any affiliate ever obtained from Highland where
6  the affiliate did not give a promissory note in
7  return; is that fair?
8      A.   Yes, I'm not aware.
9      Q.   And to the best of your knowledge,
10 did Highland loan to each affiliate an amount
11 of money equal to the principal amount of each
12 promissory note?
13     MR. RUKAVINA:  Objection, legal
14 conclusion.
15     A.   Yes.
16     Q.   During the time that you served as
17 CFO, did Highland ever loan money to
18 Mark Okada?
19     A.   I -- I don't recall.
20     Q.   Did you ever see any promissory
21 notes executed by Mark Okada?
22     A.   I don't recall.
23     Q.   Do you know if Highland ever forgave
24 any loan that it ever made to Mr. Okada?
25     A.   I don't recall.

Page 50

```
1           WATERHOUSE - 10-19-21
2     Q.   Do you recall if Mr. Okada paid back
3  all principal and interest due and owing under
4  any loan he obtained from Highland?
5           MS. DEITSCH-PEREZ:  Objection to
6  form.
7           MS. DANDENEAU:  Objection to form.
8     A.   I don't recall.
9     Q.   Do you recall whether -- during your
10 time as CFO, whether Highland ever loaned money
11 to Jim Dondero?
12    A.   Yes.
13    Q.   To the best of your knowledge, did
14 Mr. Dondero sign and deliver to Highland a
15 promissory note in connection with each loan
16 that he obtained from Highland?
17    A.   If you are referring to the
18 promissory notes that, you know, part of
19 Highland's records, yes.
20    Q.   Okay.  You're not aware of any loan
21 that Mr. Dondero took from Highland that wasn't
22 backed up by -- by a promissory note with a
23 face -- with a principal amount equal to the
24 amount of the loan; correct?
25    A.   Am I aware that Jim Dondero took a
```

Page 51

```
1           WATERHOUSE - 10-19-21
2  loan?
3     Q.   Without giving a -- let me ask a
4  better question.  I'm sorry, Mr. Waterhouse.
5           Are you aware of any loan that
6  Mr. Dondero obtained from Highland where he
7  didn't give a promissory note in return?
8     A.   I'm not aware.
9     Q.   During the time that you served as
10 Highland's CFO, did Highland ever forgive any
11 loans, in whole or in part, that it made to
12 Mr. Dondero?
13    A.   Not that I'm aware.
14    Q.   At the time that you served as
15 Highland's CFO, did Highland ever forgive any
16 loan, in whole or in part, that it made to any
17 affiliate as we've defined the term today?
18    A.   Not that I'm aware.
19    Q.   During the time that you served as
20 Highland's CFO, did Highland ever forgive, in
21 whole or in part, any loan that it ever made to
22 any officer or employee?
23    A.   Highland forgave loans to officers
24 and employees.  It may not have been at the
25 time when my title was CFO.
```

Page 52

```
1           WATERHOUSE - 10-19-21
2     Q.   Okay.  And so I appreciate the
3  distinction.
4           Is it fair to say that, to the best
5  of your knowledge, Highland did not forgive a
6  loan that it made to an officer or employee
7  after 2013?
8           MS. DANDENEAU:  Objection to form.
9     A.   I don't recall.
10    Q.   To the best of your knowledge, did
11 Highland disclose to its auditors every
12 instance where it forgave, in whole or in part,
13 a loan that it had made to one of its officers
14 or employees?
15    A.   No.
16    Q.   Can you think of -- can you -- can
17 you identify any loan to an officer or employee
18 that was forgiven by Highland, in whole or in
19 part, that was not disclosed to Highland's
20 outside auditors?
21    A.   Look, I don't recall all of the
22 loans and the loan forgiveness.  I just know as
23 part of the audit process there is a
24 materiality concept.
25          So if there were loans to employees
```

Page 53

```
1           WATERHOUSE - 10-19-21
2  that were of -- you know, that were deemed
3  immaterial, those items may not have been
4  disclosed by the team to the auditors.
5     Q.   I appreciate that.
6           Do you have an understanding as to
7  what the level of materiality was?
8     A.   I don't recall.
9     Q.   As the CFO of Highland, to the best
10 of your knowledge, did Highland disclose to its
11 outside auditors every loan that was forgiven,
12 in whole or in part, that was material as that
13 term was defined by the outside auditors?
14    A.   Yes.
15    Q.   And do you recall where -- do you
16 recall where the definition of materiality can
17 be found for -- for this particular purpose?
18          MS. DANDENEAU:  Objection to form.
19    A.   No.  You -- I don't determine
20 materiality.
21    Q.   Okay.  I'm just asking you if you
22 can help me understand where it is, but I think
23 we will find it in a few minutes.
24          You are aware that Highland has
25 commenced lawsuits against each of the
```

Appx. 00200

Page 54

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2    affiliates, as we've defined the term, to
3    collect under certain promissory notes; is that
4    right?
5        A.   Yes.
6        Q.   And are you familiar with the notes
7    that are issue -- at issue in the lawsuits?
8            MS. DANDENEAU:  Objection to form.
9        A.   Generally familiar.
10       Q.   Can we refer to the lawsuits that
11   Highland has commenced against the affiliates
12   collectively as the lawsuits?
13       A.   Yes.  And, again, the affiliates are
14   NexPoint, HCMFA, HCMS, and HCRE.
15       Q.   And Mr. Dondero?
16       A.   Okay.  See, that is a new -- and now
17   Mr. Dondero is included in your affiliate
18   definition.
19       Q.   I just --
20       A.   I thought affiliates -- I thought
21   affiliates were just the four prior entities,
22   so I just want to be clear.
23       Q.   I appreciate that.  So let's --
24   let's keep them separate and let's refer to the
25   four corporate entities as the affiliates, and

Page 55

1          WATERHOUSE - 10-19-21
2    Mr. Dondero we will call Mr. Dondero.  Okay?
3        A.   Okay.  Thank you.  As you can see,
4    Mr. Morris, there is a lot of entities -- a lot
5    here.  I just want to be clear.
6        Q.   Okay.  Now, the affiliates of
7    Mr. Dondero signed promissory notes that are
8    not subject to the lawsuit.
9            Do you understand that?
10           MS. DANDENEAU:  Objection to form.
11       A.   The affiliates and Mr. Dondero
12   signed --
13       Q.   You know what?  I will skip it.
14   That is okay.  Okay.
15           From time to time while you were
16   Highland's CFO, payments were applied against
17   principal and interests that were due under the
18   notes that were tendered by the affiliates and
19   Mr. Dondero; correct?
20           MR. RUKAVINA:  Objection to the
21       extent that calls for a legal conclusion.
22       A.   Yes.
23       Q.   Did Highland have a process where --
24   whereby payments would be applied against
25   principal and interest against the notes that

Page 56

1          WATERHOUSE - 10-19-21
2    were given by the affiliates and Mr. Dondero?
3        A.   Yes.
4        Q.   Can you describe the process for me?
5        A.   The process, payment should be
6    applied as laid out in the -- in the promissory
7    note.
8        Q.   From time to time were payments made
9    that were not required under the promissory
10   notes?
11           MS. DANDENEAU:  Objection to form.
12       A.   Yes.
13       Q.   Who was responsible for deciding
14   when and how much the payments would be made
15   with respect to each of the notes that were
16   issued by the affiliates and Mr. Dondero?
17       A.   Who was responsible for deciding how
18   much was paid prior to the due date?
19       Q.   Yes.
20       A.   I don't know.
21       Q.   Did you approve of each payment that
22   was made against principal and interest on the
23   notes that were given by the affiliates and
24   Mr. Dondero?
25           MS. DANDENEAU:  Objection to form.

Page 57

1          WATERHOUSE - 10-19-21
2        A.   Did I approve the payments?  I
3    approve -- I approve -- if there was cash -- if
4    there was cash being repaid on a note payment,
5    yes, I approved in the general sense of being
6    made aware of the payment and the amount.
7        Q.   And are you the person who
8    authorized Highland's employees to effectuate
9    those payments?
10       A.   Yes.
11       Q.   When you gave the instruction to
12   effectuate the payment, did you obtain
13   Mr. Dondero's prior approval?
14       A.   I mean, it -- I mean, it -- it
15   depends.
16       Q.   Can you think of any instance where
17   you directed Highland's employees to make a
18   payment of principal or interest against any
19   note that was tendered by an affiliate or
20   Mr. Dondero that Mr. Dondero did not approve of
21   in advance?
22       A.   I can't recall specifically.
23       Q.   Can you identify -- withdrawn.
24           Did Mr. Dondero ever tell you that a
25   payment that was made against principal and

Page 58

WATERHOUSE - 10-19-21

1    interest due under one of the notes that was
2    tendered by an affiliate or himself should not
3    have been made?
4        A.   Yes.
5        Q.   Can you identify the payment for me?
6        A.   It would be for -- for NexPoint
7    Advisors.
8        Q.   Okay.  And when did Mr. Dondero tell
9    you that a payment that you had initiated on
10   behalf of NexPoint should not have been made?
11       A.   I wasn't initiating payment.  It was
12   in the context of the -- I think you used this
13   term, "the advisors," so NexPoint Advisors and
14   Highland Capital Management Fund Advisors had
15   overpaid on certain agreements with Highland
16   Capital Management, L.P.  And as a part of that
17   process, the advisors -- what I was told at the
18   time were in talks and negotiations and
19   discussions with Highland Capital Management,
20   L.P., on offsets in relation to those
21   overpayments.
22       Q.   When did this conversation take
23   place?
24           MS. DANDENEAU:  Objection to form.

Page 59

WATERHOUSE - 10-19-21

1        A.   I don't recall specifically.
2        Q.   Do you recall what year it was?
3        A.   Yes.
4        Q.   What year did the conversation with
5    Mr. Dondero take place that you just described?
6        A.   2020.
7        Q.   Okay.  Do you remember if it was
8    December 2020?
9        A.   It -- it -- I don't -- I don't
10   recall what month specifically, but it would
11   have been November or December.
12       Q.   And we're talking here about a
13   payment of principal and/or interest that was
14   due -- withdrawn.
15           We're talking here about a payment
16   of principal and interest that was applied
17   against NexPoint's note; correct?
18           MS. DANDENEAU:  Objection to form.
19       A.   I don't recall what that payment
20   consisted of.
21       Q.   Is it possible that the payment you
22   have in mind related to the shared services
23   agreement?
24           MS. DANDENEAU:  Objection to form.

Page 60

WATERHOUSE - 10-19-21

1        A.   No.
2        Q.   Are you certain that the payment --
3    that the payment that you have in mind related
4    to the promissory note that NexPoint issued in
5    favor of Highland?
6            MS. DANDENEAU:  Objection to form.
7        A.   Yes.
8        Q.   Okay.  Other than that one payment,
9    can you identify any other instance where
10   Mr. Dondero told you that a payment should not
11   have been applied against principal and
12   interest under any promissory note tendered by
13   any affiliate or Mr. Dondero?
14           MS. DANDENEAU:  Objection to form.
15           MS. DEITSCH-PEREZ:  Objection to
16   form.
17       A.   Not that I recall.
18       Q.   Thank you very much.
19           Do you know if Mr. Dondero approved
20   in advance of each loan made to each affiliate
21   and himself during the time that you were the
22   CFO?
23           MS. DEITSCH-PEREZ:  Object to the
24   form.

Page 61

WATERHOUSE - 10-19-21

1        A.   Yes, generally.
2        Q.   Can you identify any loan that was
3    ever made to an affiliate or to Mr. Dondero
4    that Mr. Dondero did not approve of in advance?
5        A.   Other than the ones that are in
6    dispute, I'm not aware.
7        Q.   Do you believe that Mr. Dondero did
8    not approve of each of the loans that are in
9    dispute in advance of the time that the loan
10   was made?
11           MS. DANDENEAU:  Objection to form.
12       A.   Given what is in the dispute, you
13   know, and -- and -- and the way things might --
14   yeah, I mean...
15       Q.   I am not asking about the dispute,
16   and it was probably my mistake to follow you
17   there.
18           Were you aware of every loan made by
19   Highland to each of its affiliates and
20   Mr. Dondero while you were the CFO at the time
21   each loan was made?
22       A.   I was aware of every loan, yes.
23       Q.   Okay.  And if you put yourself back
24   in time, do you recall that any of the loans

Page 62

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2   that were made to one of the affiliates or
3   Mr. Dondero during the time that you were the
4   CFO was made without Mr. Dondero's prior
5   knowledge and approval?
6       A.   Not that I recall.
7       Q.   Thank you.  In fact, do you -- as
8   the CFO, would you have allowed Highland to
9   loan money to an affiliate or to Mr. Dondero
10  without obtaining Mr. Dondero's prior approval?
11          MS. DANDENEAU:  Objection to form.
12      A.   I can't -- there was so many times
13  over the years, I can't speak for every single
14  one, but generally, yes, I -- I spoke to him.
15      Q.   You -- you never -- you never --
16  withdrawn.  I will just take that.
17          Can you recall any payment that was
18  ever made against principal and interest on a
19  note that was issued in favor of Highland by an
20  affiliate or Mr. Dondero that you personally
21  did not know about in advance?
22      A.   There are so many through the years,
23  I don't -- I don't -- I don't recall every
24  single one.
25      Q.   Okay.  Can you identify any payment

Page 63

1          WATERHOUSE - 10-19-21
2   that was made against principal and interest on
3   any note tendered by any affiliate or
4   Mr. Dondero that you didn't know about in
5   advance?
6       A.   I don't recall.
7       Q.   Other than Mr. Dondero -- withdrawn.
8          Did anybody at Highland have the
9   authority to make a payment against principal
10  and interest due under a loan given to the
11  affiliates and Mr. Dondero without your
12  knowledge and approval?
13          MS. DANDENEAU:  Objection to form.
14      A.   Sorry, there was -- to make a
15  payment on an affiliate loan, what you are
16  saying would it require my knowledge and
17  approval, yes.
18      Q.   Okay.  I appreciate that.  Thank
19  you.
20          Did anybody at Highland have the
21  authority, to the best of your knowledge, to
22  effectuate a loan to an affiliate without
23  Mr. Dondero's prior knowledge and approval?
24          MS. DANDENEAU:  Objection to form.
25      A.   I can't speak for all, but

Page 64

1          WATERHOUSE - 10-19-21
2   generally, yes.
3       Q.   Did you personally communicate with
4   Mr. Dondero to let him know each time a payment
5   of principal or interest was being made against
6   any note that was tendered by an affiliate or
7   Mr. Dondero to Highland?
8       A.   I don't -- are you saying, did I let
9   Mr. Dondero know if a payment was made on any
10  affiliate or loan to Mr. Dondero?  I mean,
11  not -- not every -- no.
12      Q.   Let me ask it this way:  Did you
13  have a practice of informing Mr. Dondero when
14  payments were made against principal and
15  interest on any note that was tendered by an
16  affiliate or Mr. Dondero?
17          MS. DEITSCH-PEREZ:  Objection to
18  form.
19          MS. DANDENEAU:  Objection to form.
20      A.   No, I did not.
21      Q.   Did Mr. Dondero ever tell you that a
22  payment of principal or interest had been made
23  against a note that was tendered by an
24  affiliate or himself that he had been unaware
25  of?

Page 65

1          WATERHOUSE - 10-19-21
2       A.   Not that I recall.
3       Q.   Are you aware that Mr. Dondero and
4   the affiliates -- withdrawn.
5          Are you aware that Mr. Dondero
6   NexPoint, HCRE, and HCMS all contend that they
7   do not have to pay on any of the notes they
8   issued because they are subject to an oral
9   agreement between Mr. Dondero and Nancy
10  Dondero, in her capacity as the trustee of the
11  Dugaboy Investment Trust?
12          MS. DANDENEAU:  Objection to form.
13      A.   I didn't -- I didn't -- I didn't
14  know that it was all notes.
15      Q.   Okay.  Are you -- did you ever learn
16  that there was an oral agreement between Jim
17  Dondero and Nancy Dondero pertaining to any
18  notes issued by any affiliate or Mr. Dondero?
19          MS. DEITSCH-PEREZ:  Object to the
20  form.
21      A.   Yes.
22      Q.   Do you have any understanding as to
23  the terms of that agreement?
24      A.   Yes.
25      Q.   What is your understanding of the

Page 66

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2    terms of the agreement?
3       A.   That there were certain milestones
4    that had to be reached.
5       Q.   Do you have any understanding of the
6    terms of the agreement between Mr. Dondero and
7    Nancy Dondero concerning any of the notes
8    issued by the affiliates or Mr. Dondero other
9    than that there have to be milestones reached?
10         MS. DEITSCH-PEREZ:  Object to the
11      form.
12      A.   There are milestones, I found out
13   yesterday, or there was some --
14         MS. DANDENEAU:  Okay.  I'm just
15      going to object to the extent that you
16      learned anything in conversations with
17      counsel, please don't reveal -- that is
18      privileged, and don't reveal any privileged
19      communications.
20         THE WITNESS:  Okay.
21      A.   So I'm not aware of anything else.
22      Q.   Do you know what the milestones
23   were?
24         MS. DANDENEAU:  Objection to form.
25      A.   I don't.

Page 67

1          WATERHOUSE - 10-19-21
2       Q.   Do you know anything about -- do you
3    know what promissory notes the agreement
4    covered?
5       A.   I don't.
6       Q.   Do you know if -- if Jim and Nancy
7    Dondero entered into one agreement or more than
8    one agreement?
9          MS. DEITSCH-PEREZ:  Object to the
10      form.
11      A.   I don't know.
12      Q.   Do you know if the agreement is in
13   writing?
14      A.   I don't know.
15      Q.   How did you learn of the existence
16   of the agreement?
17         MS. DANDENEAU:  Objection to form.
18      Again --
19      A.   I don't -- I don't recall who told
20   me.
21      Q.   You have no recollection of who told
22   you about this agreement between Jim and Nancy
23   Dondero?
24         MS. DEITSCH-PEREZ:  Object to the
25      form.

Page 68

1          WATERHOUSE - 10-19-21
2       A.   I don't recall.
3       Q.   Do you recall how you learned of the
4    agreement?
5          Was it in a meeting?  Was it in a
6    phone call?  Was it in an email?
7       A.   I don't recall.
8       Q.   Do you recall when you learned of
9    the agreement?
10      A.   Not specifically.
11      Q.   Do you recall what year you learned
12   of the agreement?
13      A.   In -- look, I mean, there are so
14   many notes.  I may be getting -- I believe it
15   was 2020.
16      Q.   All right.  I'm not asking about
17   notes, sir.  I'm asking about the agreement
18   that you testified you knew about between Jim
19   and Don-- Nancy Dondero.  Okay.
20         Do you understand my question now?
21   Should I ask my question again?
22      A.   Yeah, sure.  Go ahead.
23      Q.   I'm going to use the word
24   "agreement" to refer to the agreement that
25   Mr. Dondero and Nancy Dondero entered into

Page 69

1          WATERHOUSE - 10-19-21
2    where you understood that certain milestones
3    had to be reached.  Okay?
4       A.   Uh-huh.
5          MS. DANDENEAU:  Objection.
6          MS. DEITSCH-PEREZ:  Object to the
7    form.
8          MR. MORRIS:  Just defining a term,
9      what is the objection.
10         MS. DEITSCH-PEREZ:  The objection --
11         MR. MORRIS:  I will move on.  I will
12      move on.
13         MS. DEITSCH-PEREZ:  John --
14      Q.   Sir, are you okay with that
15   definition of agreement?
16      A.   Okay.
17      Q.   Okay.  So you don't recall who --
18   who informed you of the existence of the
19   agreement; is that right?
20      A.   I don't recall.
21      Q.   You don't recall who told you the
22   terms of the agreement.
23         Do I have that right?
24      A.   Correct.
25      Q.   And you don't recall if you learned

**Appx. 00204**

Page 70

WATERHOUSE - 10-19-21

1    about the agreement in a meeting, through an
2    email, or through a phone call.
3        Do I have that right?
4    A.    I don't recall.
5    Q.    Can you tell me when you learned of
6    the agreement?
7    A.    I don't -- I don't -- I don't
8    remember specifically.
9    Q.    Can you tell me if you learned of
10   the agreement before or after the petition
11   date?
12   A.    It would have been -- it would have
13   been after.
14   Q.    Can you tell me if you learned of
15   the agreement before or after January 9th,
16   2020?
17   A.    It would have been after.
18   Q.    Can you tell me if you learned of
19   the agreement before or after you left Highland
20   Capital Management in February of 2021?
21   A.    I don't -- I don't -- I don't know.
22   Q.    It is possible that you learned of
23   it while you were a Highland employee.
24       Do I have that right?
25

Page 71

WATERHOUSE - 10-19-21

1    A.    I don't remember the -- I mean, it
2    was sometime in 2021.  I don't remember when.
3    Q.    All right.  So to the best of your
4    recollection, it was in 2021 but you don't
5    recall if it was before or after you ceased to
6    be a Highland employee.
7        Do I have that right?
8    A.    Yeah, I mean, it was -- it was
9    likely after I was -- after I left Highland
10   because, if I put myself back into the last
11   days of -- of 2021, it was -- you know, the
12   communications with Mr. Dondero were -- were --
13   were -- there weren't as many communications
14   because of the circumstances.
15   Q.    And so based on that you believe
16   that it is most likely that you learned of this
17   agreement sometime after you left Highland
18   employment?
19   A.    I wouldn't use the term "most
20   likely."  I don't recall specifically.  I don't
21   recall.
22   Q.    Do you recall ever telling Jim Seery
23   about this agreement?
24   A.    No, I don't -- I didn't tell
25

Page 72

WATERHOUSE - 10-19-21

1    Jim Seery.
2    Q.    Did you tell anybody at DSI about
3    this agreement?
4    A.    No.
5    Q.    Did you tell any of Highland's
6    independent directors about this agreement?
7    A.    No.
8    Q.    Did you tell anybody at Pachulski
9    Stang Ziehl & Jones about this agreement?
10   A.    No.
11   Q.    Did you tell any employee of
12   Highland about this agreement?
13   A.    No.
14       MS. DANDENEAU:  Mr. Morris, it has
15       been an hour and a half.  Is this a good
16       time for a break?
17       MR. MORRIS:  Sure.
18   Q.    Mr. Waterhouse, I will just remind
19   you that during the break please don't speak
20   with anybody about the deposition, the
21   substance of your testimony or anything else
22   concerning the deposition.  Okay?
23   A.    Yes.
24       MR. MORRIS:  So it is 11:02.  We're
25

Page 73

WATERHOUSE - 10-19-21

1    at 11:02 your time.  Let's come back, I
2    guess, at 15 -- 11:15 your time.
3        VIDEOGRAPHER:  We're going off the
4    record at 11:02 a.m.
5    (Recess taken 11:02 a.m. to 11:20 a.m.)
6        VIDEOGRAPHER:  We are back on the
7    record at 11:20 a.m.
8    Q.    Mr. Waterhouse, did you speak with
9    anybody during the break about this deposition?
10   A.    No.
11       MS. DANDENEAU:  Other than -- other
12       than his counsel.
13   Q.    Did you speak to your counsel about
14   the substance of your deposition today?
15   A.    No, I didn't bring it up.
16   Q.    I didn't ask you if you brought it
17   up.  I asked you if you had any conversation
18   with your lawyer about the substance of your
19   deposition.
20       MS. DANDENEAU:  Yes, he did.
21   Q.    Can you tell me what the -- you
22   discussed?
23       MS. DANDENEAU:  No, I object to
24       that.  He's not going to answer.  That is a

Page 74

WATERHOUSE - 10-19-21

1     privileged conversation.
2     MR. MORRIS: So I just want to make
3     sure that I understand. During the break
4     you spoke with your client about the
5     substance of this deposition; is that
6     right?
7     MS. DANDENEAU: Yes, John.
8     MR. MORRIS: And you refuse -- you
9     refuse to let your client tell me what was
10    discussed; is that right?
11    MS. DANDENEAU: That's correct.
12    MR. MORRIS: You know, I had given
13    the instruction prior to the break not to
14    speak with counsel. I would have
15    appreciated --
16    MS. DANDENEAU: No, you didn't --
17    actually, that is not true, Mr. Morris.
18    You said not to speak with anyone. We
19    never have interpreted that to mean
20    conversations with counsel. That's never
21    been -- I have never, ever heard that
22    instruction.
23    MR. MORRIS: Okay. We will -- we
24    will -- we will deal with it when and if we

Page 75

WATERHOUSE - 10-19-21

1     have to.
2     Q.   Mr. Waterhouse, after learning about
3     the agreement, did you ask anybody if the
4     agreement was reflected in a writing?
5     MS. DANDENEAU: Objection to form.
6     A.   No.
7     Q.   Did you ask anybody if the terms of
8     the agreement were memorialized anywhere?
9     MS. DANDENEAU: Objection to form.
10    MR. MORRIS: What is the --
11    A.   No.
12    MS. DANDENEAU: Well, because you
13    keep talking about this agreement and I --
14    I -- I think, Mr. Morris, that is really
15    not clear what you mean by "the agreement."
16    And maybe you can just go back and restate
17    what that is.
18    MR. MORRIS: Okay. Your client has
19    agreed with me twice on the definition, but
20    I will try one more time.
21    Q.   Mr. Waterhouse, do you understand
22    that when I use the term "agreement," I'm
23    referring to the agreement between Jim and
24    Nancy Dondero concerning certain promissory

Page 76

WATERHOUSE - 10-19-21

1     notes where you learned that one of the terms
2     of the agreement was milestones reached?
3     A.   Okay.
4     Q.   And did you understand that that was
5     the -- the agreement that we were referring to
6     every time we used the word "agreement" in this
7     deposition?
8     A.   I don't know anything about this
9     agreement. So, look, I do -- it -- I don't
10    know whether --
11    Q.   Let's -- let's try this again.
12    A.   Yeah. Look, I don't know what this
13    agreement relates.
14    MS. DEITSCH-PEREZ: John, John --
15    Q.   Let me try --
16    MS. DEITSCH-PEREZ: John, please let
17    the witness finish.
18    MR. MORRIS: Please stop. Please
19    stop. Please stop talking.
20    MS. DEITSCH-PEREZ: No, you stop.
21    Let the witness --
22    MR. MORRIS: Stop talking.
23    MS. DEITSCH-PEREZ: -- finish -- you
24    interrupted him.

Page 77

WATERHOUSE - 10-19-21

1     MR. MORRIS: You know what, you
2     guys, this is really wrong. It is really,
3     really wrong. Okay?
4     I had the witness agree not once,
5     but twice to the definition of agreement.
6     Okay? I'm going to try and do it a third
7     time.
8     MS. DANDENEAU: No, but, please,
9     John, really --
10    MR. MORRIS: No, please stop
11    talking. Please. It is my deposition.
12    Object to questions.
13    MS. DANDENEAU: No, but also you
14    instructed him that -- that if you were
15    going -- if you were interrupting him, that
16    he should remind you that you're
17    interrupting him and -- and --
18    MR. MORRIS: Let him do that. Let
19    him do that.
20    MS. DANDENEAU: Okay. Well, you --
21    MR. MORRIS: Please stop talking.
22    A.   Okay. I don't know any of the
23    details of these agreements. I don't know
24    anything about them. I heard -- someone -- I

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  don't know who, I don't know when, as you
3  asked, sometime in '21, someone told me about
4  this -- or I don't honestly know -- I don't
5  even recall exactly how I was made aware of
6  this, but I was. I don't know -- I don't know
7  any of these details, and I'm getting -- again,
8  there is, you know, I -- I -- I had a passing
9  conversation with -- with Jim at some point
10  on -- on some -- on the executive comp, and I'm
11  getting confused of what is what, because
12  again, I don't know any of these details.
13      Q.  Okay. Let me try again,
14  Mr. Waterhouse, and I apologize.
15          Are you aware of any agreement
16  between Jim Dondero and Nancy Dondero
17  concerning any promissory note that was given
18  to Highland by any affiliate or Mr. Dondero?
19          MS. DEITSCH-PEREZ: Object to the
20      form.
21      A.  I've heard of an agreement. That
22  is -- that is -- I mean, if you are using aware
23  as heard, sure.
24      Q.  And you understand that one of the
25  terms of the agreement is that it was based on

1  WATERHOUSE - 10-19-21
2  milestones that had to be reached; is that
3  right?
4          MS. DANDENEAU: Objection to form.
5      A.  That was one of the words that was
6  used when I heard about it, yes.
7      Q.  And when you heard about this
8  agreement that had a term in it concerning
9  milestones reached, did you ask the person who
10  was telling you about the agreement whether or
11  not it was in writing?
12      A.  I did not.
13      Q.  Did you ask any questions at all?
14          MS. DANDENEAU: Objection to form.
15      A.  Not that I recall.
16      Q.  But do you understand that going
17  forward, we're going to refer to the agreement
18  as the agreement that you just described that
19  you were --
20          MS. DANDENEAU: Object to the form.
21      A.  Yes.
22      Q.  Okay. You don't have any personal
23  knowledge concerning the terms of the
24  agreement; correct?
25          MS. DEITSCH-PEREZ: Object to the

1  WATERHOUSE - 10-19-21
2      form.
3      Q.  You can answer.
4      A.  I don't -- I heard about the
5  agreement. I don't know anything -- I heard
6  there was an agreement. That is -- again, as I
7  testified before -- I said before, heard about
8  it, don't know the details. I believe it was
9  sometime this year.
10      Q.  Do you have any personal knowledge
11  about the terms of the agreement, sir?
12          MS. DANDENEAU: Objection to form.
13      A.  Other than what I have previously
14  discussed, I don't -- I don't know.
15      Q.  Did -- did Mr. Dondero tell you
16  about the existence of the agreement?
17      A.  I don't recall.
18      Q.  Do you recall the source of your
19  information when you learned about the
20  agreement?
21      A.  No, I don't -- I don't recall. I
22  don't remember. I just -- I heard about it
23  generally. I don't remember -- I don't
24  remember who, how, if, how. I don't remember.
25      Q.  You know, Mr. Waterhouse, I just

1  WATERHOUSE - 10-19-21
2  want to be clear that I never would have asked
3  you to appear at this deposition if your name
4  hadn't been included in responses to discovery
5  as to somebody with knowledge about the -- who
6  was told about the existence of the agreement.
7          That is what prompted me do this,
8  and I really do feel compelled to tell you that
9  I otherwise would never have called you as a
10  witness. So I regret that you're being put
11  through today. I had no intention of
12  burdening or taking your time, but that is
13  the reason that we issued the subpoena is
14  because certain of the defendants identified
15  you as somebody --
16          MS. DEITSCH-PEREZ: Mr. Morris, you
17      are here to ask questions, not to have --
18          MR. MORRIS: I feel badly for the
19      guy. I really do.
20          MS. DEITSCH-PEREZ: I'm sure you do.
21          MR. MORRIS: I do. Stop.
22          MS. DEITSCH-PEREZ: You stop.
23          MR. MORRIS: I'm allowed.
24          MS. DEITSCH-PEREZ: No, you're not
25      allowed to have a chat with the witness.

Page 82

WATERHOUSE - 10-19-21

1
2     Q.   Okay.  Well, I hope that you
3  appreciate what I'm saying here,
4  Mr. Waterhouse.
5         MS. DANDENEAU:  All right.  Let's go
6     ahead and ask questions, and again, you're
7     entitled to probe his -- his knowledge
8     of -- whatever knowledge he has about
9     this -- this agreement and --
10        MR. MORRIS:  That is what I'm doing.
11        MS. DANDENEAU:  -- he will answer
12    the questions to the best that he can.
13        MR. MORRIS:  That is what I'm doing.
14    Q.   Mr. Waterhouse, I take it you do not
15  know which promissory notes issued by which
16  affiliates or Mr. Dondero are the subject of
17  this agreement; do I have that right?
18    A.   Yes, I don't -- I don't know.
19    Q.   Do you know of any way to determine
20  which promissory notes issued by the affiliates
21  and Mr. Dondero are the subject of this
22  agreement other than asking Jim or Nancy
23  Dondero?
24        MS. DANDENEAU:  Objection to form.
25    A.   I don't know.

Page 83

WATERHOUSE - 10-19-21

1
2     Q.   Did you ever make --
3     A.   I don't know anything about these
4  agreements.
5     Q.   Did you ever make any effort to
6  determine which promissory notes are subject to
7  this agreement?
8     A.   No.
9     Q.   Did you ever ask anybody which
10  promissory notes are subject to this agreement?
11    A.   No.
12    Q.   Do you know if there is a list
13  anywhere of the promissory notes that are
14  subject to this agreement?
15    A.   I'm not aware.
16    Q.   Have you ever seen the terms of the
17  agreement written down anywhere?
18    A.   No.
19    Q.   Have you ever asked anybody whether
20  the terms of the agreement were written down
21  anywhere?
22    A.   I have not.
23    Q.   Did learning about the agreement
24  cause you to do anything in response?
25        MS. DANDENEAU:  Objection to form.

Page 84

WATERHOUSE - 10-19-21

1
2     A.   No.
3     Q.   Did anybody ever describe to you the
4  nature of the milestones that you referred to
5  earlier?
6     A.   No, I don't -- I don't have any
7  details of this.
8     Q.   That is fine.
9         PricewaterhouseCoopers served as
10  Highland's outside auditors prior to the
11  petition date; correct?
12    A.   Yes.
13    Q.   You refer to PricewaterhouseCoopers
14  as PwC?
15    A.   Yes.
16    Q.   PricewaterhouseCoopers audited
17  Highland's financial statements on an annual
18  basis; correct?
19    A.   During my -- during my time as -- as
20  CFO, yes, PricewaterhouseCoopers was the
21  auditor.
22    Q.   Do you know why Highland had its
23  annual financial statements audited each year?
24    A.   Generally.
25    Q.   Tell me your general understanding

Page 85

WATERHOUSE - 10-19-21

1  as to the reason why Highland had its annual
2  financial statements audited each year.
3     A.   From -- from time to time, they were
4  used -- or asked for, as part of diligence or
5  transactions or -- or things of that nature.
6     Q.   And were they given to third parties
7  for purposes of diligence or transactions from
8  time to time?
9     A.   As far as I'm aware, yes.
10    Q.   And was it your understanding as the
11  CFO that the third parties who received the
12  financial statements in diligence or
13  transactions was going to rely on those?
14        MS. DANDENEAU:  Objection to form.
15    A.   I don't know -- I don't know gen --
16  I don't know specifically what they were going
17  to rely on.  You know, we would get requests
18  for audited financial statements.  I don't know
19  what they were relying on.
20    Q.   And --
21    A.   You would have to ask them.
22    Q.   Did you personally play a role in
23  PwC's annual audit and the conduct of the
24  audit?

Page 86

WATERHOUSE - 10-19-21

1
2     MS. DANDENEAU:  Objection to form.
3     A.   During my tenure as CFO, I played a
4  very minimal role.
5     Q.   What was the minimal role that you
6  played?
7     A.   You know, again, it was -- it was to
8  check in with the team, to make sure that, you
9  know, audit -- the deadlines were being hit,
10  information was being presented to the auditors
11  in a -- in a timely fashion, but, you know,
12  other than that, it was a very capable team
13  that are still current employees of Highland
14  and, you know, they -- they conducted 99
15  percent of -- look, I don't want to give
16  percentages.  I mean, this is -- but I -- I -
17  I played a minimal role towards the end.
18          Before during my earlier years as
19  CFO, I did more, and then as time went on, I
20  did less in it.
21     Q.   Okay.  Was there a person at
22  Highland who was responsible for overseeing
23  Highland's participation in PwC's audit during
24  the time that you were the CFO?
25     A.   Yeah.  I mean, there was -- there

Page 87

WATERHOUSE - 10-19-21

1
2  was a -- there was a point -- it varies.  It
3  varies by year, in function, in time and, you
4  know, depending on the request, but yes, I
5  mean, there is -- there is -- there is
6  generally a point person of communication.
7     Q.   And who was the point person from
8  2016 until the time you left Highland?
9     A.   I don't -- I don't know
10  specifically, but it would have been, you
11  know -- you know, someone on the corporate
12  accounting team.
13     Q.   And was there a head of the
14  corporate accounting team?
15     A.   Yes, so -- yes.
16     Q.   Who was the head of corporate
17  accounting for the five years prior to the time
18  you left Highland?
19     A.   I don't -- if you're asking from
20  2016 on, I don't -- it was Dave Klos, but,
21  again, there was -- there was changes to the
22  team and the reporting structure.  I don't
23  remember exactly when that happened during --
24  you know, over the last -- since 2016.
25     Q.   Did the folks who participated and

Page 88

WATERHOUSE - 10-19-21

1
2  ran the audit all report to you, directly or
3  indirectly?
4     A.   Yes.
5     Q.   And did you have any responsibility
6  for making sure that the audit report was
7  accurate before it was finalized?
8     A.   Yeah.  I mean, you know, that --
9  that is -- my responsibility to the auditors
10  was -- again, is -- and the CFO is to -- we are
11  providing accurate financial statements; right?
12          And -- and -- and as part of any
13  audit, we disclose all relevant information as
14  part of any audit.
15     Q.   Okay.  And as the CFO, did you take
16  steps to make sure that the audit report was
17  accurate?
18     A.   I mean, I would say in a general
19  sense, yes.  But, again, I mean, I had a
20  very -- I had a very capable and competent
21  team.  I wasn't managing them.
22          You know, part of what I do is I let
23  the team -- I want managers to grow.  I want
24  managers to have rope.  And that is -- you
25  know, I'm not a stand-behind-you type of guy.

Page 89

WATERHOUSE - 10-19-21

1
2  If you -- if you talk to my team members, I'm
3  not micromanaging people.  I want people to
4  learn and grow in their function so they can go
5  on and do bigger and better things with their
6  careers.
7          And so, yes, generally I was
8  responsible for it, but I wanted the team to
9  learn and grow and be responsible for the bulk
10  of the audit.
11     Q.   Did you personally review each audit
12  report before it was finalized to satisfy
13  yourself that it was accurate?
14     A.   I don't -- I don't recall, you know,
15  for every single -- we're talking 2016, there
16  would have been three years, 2016 to '17, '18.
17  I don't -- we're -- we're going back
18  five years-plus.  I don't -- you know, I don't
19  recall.
20     Q.   Did you have a practice that you
21  employed to make sure that you were satisfied
22  that Highland's audit reports were true and
23  accurate to the best of your knowledge?
24     A.   I mean, our -- the practice was set
25  up with our -- the -- the practice to put

1      WATERHOUSE - 10-19-21
2  together accurate audited or accurate financial
3  statements is to your control environment.
4      So, you know, the -- so the practice
5  was to maintain a stable control environment
6  which then the output is -- is accurate
7  financial statements.
8      So -- so, you know, if I was
9  comfortable that the control environment was
10  operating, then, you know, that would dictate
11  how I would -- you know, what I might or might
12  not do in a given year.
13    Q.  Okay.  Do you recall ever being
14  uncomfortable with the control environment
15  during the period that you served as CFO?
16    A.  Yeah.  I mean, look, yes, there are
17  times -- you know, nothing is perfect.  So
18  there were -- there were times when, yes, you
19  know -- there are times I learned I was
20  uncomfortable with the control environment, and
21  that is part of the management of the process
22  and having, you know -- and -- and working
23  through whatever obstacles present themselves.
24    Q.  Okay.  Were you ever uncomfortable
25  with the control process as it related to

1      WATERHOUSE - 10-19-21
2  reporting and disclosures of loans to
3  affiliates and Mr. Dondero?
4      MS. DANDENEAU:  Objection to form.
5    A.  I don't -- I don't recall --
6    Q.  So you don't recall --
7    A.  -- the --
8      MS. DANDENEAU:  Mr. Morris --
9    A.  I don't recall being uncomfortable.
10  But, again, we're going back several years.  I
11  don't -- you know, the practice in an audit is
12  to disclose all information to the auditors.
13  And I don't -- I don't recall.
14    Q.  As part of the process of the audit,
15  did you sign what is sometimes referred to as a
16  management representation letter?
17    A.  Yes.
18      MR. MORRIS:  Can we put up on the
19  screen a document that we have premarked as
20  Exhibit 33.
21      (Exhibit 33 marked.)
22      MS. DANDENEAU:  Mr. Morris, that is
23  not in the binder; correct?
24      MR. MORRIS:  Correct.
25    Q.  So you will see, Mr. Waterhouse,

1      WATERHOUSE - 10-19-21
2  this is a letter dated June 3rd.  And if we
3  could go to the signature page.
4      And do you see that you and
5  Mr. Dondero signed this document?
6    A.  Yes.
7    Q.  That is your signature; right?
8    A.  Yes.
9      MR. MORRIS:  Okay.  Can you go back
10  to the top.
11      MS. DANDENEAU:  Mr. Morris, can you
12  have somebody post this in the chat so that
13  we have can have a copy of this, please.
14      MR. MORRIS:  Yeah, sure.  Asia, can
15  you do that, please.
16    Q.  Okay.  Do you see at the bottom of
17  the second paragraph there is a reference to
18  materiality?
19    A.  Yes.
20    Q.  Okay.  It says, Materiality used for
21  purposes of these representations is
22  $1.7 million.
23      Do you see that?
24    A.  I do.
25    Q.  And did PwC set that level of

1      WATERHOUSE - 10-19-21
2  materiality?
3    A.  Yes.
4    Q.  And for purposes of the audit, did
5  PwC set the level of materiality each year?
6    A.  Yes.
7    Q.  Did that number change over time?
8    A.  I'm not aware of what materiality is
9  every single year, so -- but, you know, this
10  number would likely fluctuate.
11    Q.  Okay.  I'm going to go back to a
12  question I asked you earlier today.  And that
13  is in connection -- this letter is issued in
14  connection with the audit for the period ending
15  12/31/2018; correct?
16    A.  Yes.
17    Q.  Okay.  And is it fair to say that if
18  any -- actually, withdrawn.  I'm going to take
19  it outside of this.
20      If Highland ever forgave the loan to
21  any affiliate or any of its officers or
22  employees, in whole or in part, to the best of
23  your knowledge, would that forgiveness have
24  been disclosed in the audited financial
25  statements if it exceeded the level of

WATERHOUSE - 10-19-21

1
2 materiality that PwC established?
3        MS. DANDENEAU:  Objection to form.
4    A.   So, again, during my tenure as CFO,
5 and -- Highland -- it was -- it is required to
6 disclose any affiliate loans that are in excess
7 of materiality.
8        Now, the forgiveness of those loans
9 may or may not -- I mean, since materiality
10 fluctuates every year, a -- you know, if a loan
11 was forgiven, it may or may not, you know --
12 and, look, I may want to consult the guidance
13 around this.
14        It is not something we do -- you
15 know, it is not -- you know, GAAP can be and
16 disclosures can be very specialized so, again,
17 we want to consult the guidance.  But we would
18 see if and what would need to be disclosed if
19 it were deemed immaterial.
20    Q.   Did you and Mr. Dondero sign
21 management representation letters of this type
22 in each year in which you served as Highland's
23 CFO?
24    A.   I -- I -- I will speak for myself.
25 I signed them.  There may have been others that

WATERHOUSE - 10-19-21

1
2 signed as well.  I don't -- I don't recall.
3    Q.   But to the best of your knowledge,
4 you, personally, signed a management
5 representation letter in connection with
6 Highland's audit each year that you served as
7 the CFO; correct?
8    A.   I would say generally speaking,
9 Mr. Morris.  I don't recall for every single
10 year, you know, generally, but I would want to
11 refer to all the rep letters and see who signed
12 them.
13    Q.   Do you recall Highland having its
14 financial statements audited in any year during
15 the period that you were a CFO where you didn't
16 sign the management representation letter?
17    A.   I don't recall.  But, John, we're
18 going back five, six, seven, eight, nine,
19 decade.  I don't -- I don't remember.
20    Q.   I don't want to go back that many
21 decades, but I'm just asking you if you recall
22 that there was you didn't sign it?
23    A.   I -- I -- I don't, but my memory
24 is -- again, I -- I -- I can't tell you what I
25 did in 2012.  I mean, I think generally, yes,

WATERHOUSE - 10-19-21

1
2 but I don't -- I don't know for sure, and I
3 would want to rely on the document.
4    Q.   Let me ask the question a little bit
5 differently then.
6        Do you have any reason to believe
7 that Highland had its annual financial audit
8 and you did not sign a management
9 representation letter in connection with that
10 audit?
11        MS. DANDENEAU:  Objection to form.
12    A.   I don't believe it would, but,
13 again, I would want to -- I don't recall and I
14 would want to confirm it to -- to make, you
15 know, an affirmative -- to give an affirmative
16 answer.
17    Q.   Do you know whether PwC required
18 management to sign management representation
19 letters?
20        MS. DANDENEAU:  Objection to form.
21    A.   Yes.  I mean, it -- management
22 representation letters are signed by
23 management.
24    Q.   Okay.  And do you know -- do you
25 have any understanding as to why PwC requires

WATERHOUSE - 10-19-21

1
2 management to sign management representation
3 letters?
4        MS. DEITSCH-PEREZ:  Object to the
5 form.
6    A.   I don't know why PwC's -- what PwC's
7 specific practice is.  I know generally what
8 management representation letters are.
9    Q.   Okay.  Do you personally -- I'm not
10 asking about PwC.  I'm asking for you -- I'm
11 asking about you, do you have an understanding
12 as to why the auditor asks for management
13 representation letters?
14    A.   Okay.  So you're asking me in my
15 personal capacity, yes, I have a general
16 understanding of why.
17    Q.   Can you give me the general
18 understanding that you have as to why
19 management representation letters are required?
20    A.   They are -- they are required to --
21 they are -- they are one of the items required
22 in an audit to help verify completeness.
23    Q.   Do you have any -- any other
24 understanding as to why management
25 representation letters are required?

WATERHOUSE - 10-19-21

1
2    A.   That is -- that is -- other than
3    what I said, it is -- it is -- it is required
4    so -- to ensure that the -- you know, there
5    is -- there is completeness in what is being
6    audited.
7    Q.   Did you -- did you have a practice
8    whereby you and Mr. Dondero conferred about the
9    management representation letters before you
10   signed them?
11   A.   No.
12   Q.   Did you have a practice --
13   withdrawn.
14       Do you see just the next sentence
15   after the materiality, there is a sentence that
16   states:  We confirm, to the best of our
17   knowledge and belief, as of June 3rd, 2019, the
18   date of your report, the following
19   representations made to you during your audit.
20       Do you see that sentence?
21   A.   Yes.
22   Q.   Okay.  Did you understand when you
23   signed this letter that you were confirming the
24   representations that followed?
25   A.   When I signed this management

WATERHOUSE - 10-19-21

1
2    letter -- representation letter, yes.
3    Q.   Okay.  Did you discuss this letter
4    with Mr. Dondero before you signed it?
5    A.   I don't recall.
6    Q.   Do you recall if Mr. Dondero asked
7    you any questions before he signed the letter?
8    A.   I don't recall.
9    Q.   Do you recall if you asked
10   Mr. Dondero any questions before you signed
11   this letter?
12   A.   I don't recall.
13   Q.   Is it fair to say that Mr. Dondero
14   did not disclose to you the existence of the
15   agreement that we have -- as we've defined that
16   term prior to the time you signed this letter?
17       MS. DANDENEAU:  Objection to form.
18   A.   I don't think I understand the
19   question.  So, again, you are saying, did
20   Mr. Dondero not disclose to me the existence of
21   this letter?
22   Q.   No, I apologize.
23       Did Mr. Dondero disclose to you the
24   existence of the agreement prior to the time
25   you signed this letter on June 3rd, 2019?

WATERHOUSE - 10-19-21

1
2    A.   The agreement -- the agreement that
3    we talked about earlier?
4    Q.   Correct.
5    A.   Look, as I said earlier, the first
6    time I heard of this agreement was sometime
7    this year.
8    Q.   Okay.  Can we turn -- let's just
9    look at a couple of items on the list.  If we
10   can go to page 33416.  Do you see in Number 35
11   it talks about the proper recording or
12   disclosure in the financial statements of ND
13   relationships and transactions with related
14   parties.
15       Do you see that?
16   A.   I do.
17   Q.   As the CFO, do you have any
18   understanding as to whether Dugaboy is a
19   related party?
20   A.   I don't recall.
21   Q.   Do you know whether any of the
22   affiliates are related parties?
23   A.   If -- if it was NexPoint, HCMFA,
24   HCMS, HCRE, yeah, if -- if that is the
25   affiliate definition, and there.  In ASC 850 --

WATERHOUSE - 10-19-21

1
2    again, I mean, I haven't looked at ASC 850 in
3    quite some time, but, you know, if -- if there
4    is a control language, you know, ASC 850, would
5    that -- that section in GAAP would -- would
6    pick up and define what are related parties.
7        So, you know, like I said, if -- one
8    of the four entities I just described, if -- if
9    they are in that control definition of ASC 850,
10   they would be picked up in 35D.
11   Q.   Do you -- do you have any reason to
12   believe that they would be picked up in that
13   definition, based on your knowledge and
14   experience?
15   A.   I -- I believe that entities
16   controlled under GAAP are -- are affiliates.
17   Q.   Okay.  Would Mr. Dondero also
18   qualify as a related party for purposes of
19   Section 35D, to the best of your knowledge?
20   A.   Yeah, I don't -- I don't know.  I
21   would think -- I would have to read the code
22   section to see if someone personally -- is it
23   talking about related parties.  So, look, if
24   your own in control, yeah, I mean, I would have
25   to read the section.

Page 102

WATERHOUSE - 10-19-21

2    Q.   To the best of your knowledge, was
3  the existence of the agreement ever disclosed
4  to PwC?
5    A.   I'm not -- I'm not aware.
6    Q.   Do you recall if the agreement was
7  ever disclosed in Highland's audited financial
8  statements?
9    A.   I don't -- I don't remember if it
10  was in every Highland's audited financial
11  statements during my tenure.  We would have to
12  read the financial statements to see what was
13  disclosed, but I'm not -- I mean, as I sit here
14  today, I'm not aware.
15    Q.   That is all I'm asking for.
16    A.   I'm not aware.
17    Q.   Can we go to the next page, please,
18  and look at 36.  36 says, we have disclosed to
19  you the identity of the partnership's related
20  party relationships and all the related party
21  relationships and transactions of which we are
22  aware.
23        Do you see that?
24    A.   Yes.
25    Q.   To the best of your knowledge, as of

Page 103

WATERHOUSE - 10-19-21

2  June 3rd, 2019, did Highland disclose to PwC
3  the identity of the partnership's related
4  parties and all the related party relationships
5  and transactions of which it was aware?
6    A.   I mean, I can speak for myself as
7  signer of this representation letter.  I
8  disclosed what -- what, you know, what --
9  what -- what I knew.  Sorry, look, yes, so I --
10  I disclosed what I knew.
11    Q.   Okay.  Can we go to page 419.  Do
12  you see at the end there is a reference to
13  events that occurred since the end of the
14  fiscal year and the date of the letter?
15    A.   Yes.
16    Q.   And were you aware of that -- of
17  that provision of the management representation
18  letter before you signed the document?
19    A.   Yes.
20    Q.   Do you have an understanding as to
21  why PwC asked for that confirmation of that
22  particular part of the management
23  representation letter?
24    A.   It is -- it is -- it is just -- it
25  is a typical audit request.

Page 104

WATERHOUSE - 10-19-21

2    Q.   And do you understand -- do you have
3  an understanding that PwC wanted to know that
4  as of the date of the audit whether any
5  material changes had occurred since the end of
6  the fiscal year, using the definition of
7  materiality that is in this particular
8  management representation letter?
9    A.   It -- it is -- it is -- it is a --
10  it is as described.  It is just a poorly worded
11  question, so it is hard for me to say yes.
12    Q.   If I asked you this, I apologize,
13  but did you ever learn when the agreement was
14  entered into?
15    A.   I don't -- I don't -- like I said
16  before, I don't know or have any details of the
17  agreement.
18    Q.   Okay.  Did you ever ask anybody when
19  the agreement was entered into?
20    A.   I did not.
21    Q.   Let's look at the audited financial
22  statements.  We will put up on the screen a
23  document that has been premarked as Exhibit 34.
24        (Exhibit 34 marked.)
25        MS. DANDENEAU:  And again, if Ms. La

Page 105

WATERHOUSE - 10-19-21

2  Canty could please put that in the chat
3  room, that would be great.
4        MR. MORRIS:  I will assure you we
5  will put every document in the chat room.
6    Q.   Now, I'm just going to ask you
7  questions that are related to the provisions of
8  this report that concern the affiliate loans,
9  but again, Mr. Waterhouse, if there is any part
10  of the document that you need to see or that
11  you think you might need to see in order to
12  refresh your recollection to answer any of my
13  questions, will you let me know that?
14    A.   Yes.
15    Q.   Because this is a pretty lengthy
16  document, but do you see that the cover page
17  here is the Highland consolidated financial
18  statements for the period ending December 31st,
19  2018?
20    A.   Yes.
21    Q.   If we can go to -- I think it is the
22  next one, looking for PwC's signature line.
23        MS. CANTY:  I'm sorry, John, did you
24  say something?
25        MR. MORRIS:  Yes, can we turn the

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2   page. I think it is 215. Yes, stop right
3   there, just above -- I'm sorry, I want to
4   see just the date of the report.
5     Q.  Okay. Do you see at the bottom of
6   that page there, Mr. Waterhouse,
7   PricewaterhouseCoopers has signed this audit
8   report?
9     A.  Yes, I see their signature.
10     Q.  Okay. And it is the dated same day
11   as your management representation letter; is
12   that right?
13     A.  It is -- yes, it is the same day.
14     Q.  Was that the practice to sign the
15   management representation letter on the same
16   day that the audit report was signed?
17     A.  Yes, that is typical in every audit.
18     Q.  Can we just scroll down to the
19   balance sheet on the next page.
20     Do you see that there is a line
21   there that says, Notes and Other Amounts Due
22   from Affiliates?
23     A.  Yes.
24     Q.  Does that line, to the best of your
25   knowledge, include the amounts that were due

1        WATERHOUSE - 10-19-21
2   under the affiliate under the notes signed by
3   the affiliates and Mr. Dondero?
4     MR. RUKAVINA:  Objection to the
5   extent that calls for a legal conclusion.
6     A.  I mean, I would want to see the
7   detail and the build to this $173,398,000, but,
8   yes, I mean, if -- if -- given what we
9   discussed before, you know, it -- it should
10   capture that.
11     Q.  And -- and while you were the CFO of
12   Highland, were all notes held by Highland that
13   were issued by an affiliate or Mr. Dondero
14   carried as assets on Highland's balance sheets?
15     MS. DANDENEAU:  Objection to form.
16     MS. DEITSCH-PEREZ:  Object to form.
17     A.  I don't -- I don't know how else
18   they would be carried.
19     Q.  Okay. Can you think of any -- are
20   you aware of any promissory note issued by an
21   affiliate or Mr. Dondero that was not carried
22   on Highland's audited financial balance sheets?
23     A.  I'm -- I'm -- I'm not aware.
24     Q.  Okay. Are you aware of any category
25   of asset on Highland's balance sheet in which

1        WATERHOUSE - 10-19-21
2   any of the promissory notes issued by an
3   affiliate or Mr. Dondero would have been
4   included?
5     MS. DANDENEAU:  Objection to form.
6     A.  Sorry, am I aware of any asset of an
7   affiliate being included --
8     Q.  That -- let me -- let me try again.
9     Do you see there is a number of
10   different assets that are described on this
11   balance sheet?
12     A.  Yes.
13     Q.  One of the assets that is described
14   is Notes and Other Amounts Due from Affiliates;
15   right?
16     A.  Yes.
17     Q.  And it is reasonable to conclude
18   that the notes from the affiliates and
19   Mr. Dondero are included in that line item;
20   right?
21     A.  Yes, based on this description.
22   Again, I would want to see a build of this to
23   100 percent confirm, but based on the
24   description, the asset description, it is -- it
25   is likely.

1        WATERHOUSE - 10-19-21
2     Now, does that mean absolute? I
3   don't know.
4     Q.  Do you have any reason to believe
5   that the promissory notes would have been
6   carried on the balance sheet in a category
7   other than Notes and Other Amounts Due from
8   Affiliates?
9     A.  If they were deemed -- no. If they
10   were deemed an affiliate, you know, under GAAP,
11   they should be carried in that line.
12   Otherwise, it would go into another line.
13     Q.  Okay. And do you see the total
14   asset base as of December 31st, 2018, was
15   approximately $1.04 billion?
16     A.  Yes.
17     Q.  Is my math correct that the Notes
18   and Other Amounts Due from Affiliates
19   constituted approximately 17 percent of
20   Highland's assets as of the end of 2018?
21     A.  Well, so how are you defining
22   Highland?
23     Q.  Highland Capital Management, L.P.,
24   the entity that this audit is subject to -- or
25   the subject of.

Page 110

WATERHOUSE - 10-19-21

2    A.   On a consolidated or unconsolidated
3  basis?
4    Q.   I'm looking at the balance sheet.
5  It is a consolidated balance sheet.  Okay?
6         Does the Notes and Other Amounts Due
7  from Affiliates constitute approximately
8  17 percent of the total assets of Highland
9  Capital Management, L.P., on a consolidated
10  basis?
11       MS. DANDENEAU:  Objection to form.
12    A.   I don't have a calculator in front
13  of me but I will take your math, if you are
14  taking the 173 divided by the billion.
15    Q.   Okay.
16    A.   If that is accurate, yes.  But,
17  again, on a consolidated basis.
18    Q.   And on an unconsolidated basis the
19  percentage would be higher; correct?
20    A.   I -- no.  I don't know.
21    Q.   Well, okay.  That is fair.
22       MR. MORRIS:  Can we turn to
23  page 241, please.
24    Q.   Do you see that this is a section of
25  the audit report that is entitled Notes and

Page 111

WATERHOUSE - 10-19-21

2  Other Amounts Due from Affiliates?
3    A.   Sorry, I can't see the -- the --
4    Q.   It is at the top.
5    A.   Notes and Other Amounts Due from
6  Affiliates, yes, I see that.  I don't -- I
7  don't have a page number, but I'm on a page
8  that says at the top:  Notes and Other Amounts
9  Due from Affiliates.
10    Q.   Okay.  And that is the same title of
11  the line item on the balance sheet that we just
12  looked at; right?  Notes and Other Amounts Due
13  from Affiliates?
14    A.   Yes.
15    Q.   And is it your understanding, based
16  on your experience and knowledge as the CFO,
17  that this is the section of the narrative that
18  ties into the line item that we just looked at?
19    A.   Yes.
20    Q.   And is this section of the audit
21  report intended to describe and disclose all of
22  the material facts concerning the Notes and
23  Other Amounts Due from Affiliates?
24       MS. DANDENEAU:  Objection, form.
25    A.   This -- these notes -- these notes

Page 112

WATERHOUSE - 10-19-21

2  of the financial statements are -- the purpose
3  is to disclose any material items in relation
4  to that balance sheet line item.
5    Q.   Okay.  And all of the information,
6  to the best of your knowledge, that is set
7  forth in this section of the audit report was
8  provided by Highland; correct?
9    A.   Yes, it would have been provided by
10  the corporate accounting team.
11    Q.   Okay.  And the corporate accounting
12  team, did that team report to you in the
13  organizational structure?
14    A.   Yes.
15    Q.   And did you have any concerns about
16  the controls that were in place to make sure
17  that the information provided with respect to
18  Notes and Other Amounts Due from Affiliates was
19  accurate and complete?
20       MS. DANDENEAU:  Objection to form.
21    A.   Not that I recall.
22    Q.   Okay.  Do you recall ever being
23  concerned that any portion of the Notes and
24  Other Amounts Due from Affiliates in any audit
25  report was inaccurate, incomplete, or not

Page 113

WATERHOUSE - 10-19-21

2  reliable?
3    A.   I didn't -- I had concerns about,
4  you know, like I talked about before, of there
5  were -- there were potentially issues in the
6  control environment.  But as far as it relates
7  to the audited financial statements, any -- the
8  team would work with the auditors to disclose
9  all -- all notes in Highland's possession.
10       And any -- any notes that were
11  deemed material by the auditor, right, these
12  were disclosed in these -- in this section, you
13  know, in -- in the notes to the consolidated
14  financial statements as you presented.
15    Q.   Do you recall ever having a
16  conversation with anybody at any time
17  concerning the accuracy of the section of audit
18  reports that relates to Notes and Other Amounts
19  Due from Affiliates?
20       MS. DANDENEAU:  Objection to form.
21    A.   You know, as -- as -- I didn't have
22  direct conversations with
23  PricewaterhouseCoopers as I had, you know --
24  I -- I had the team that managed this.
25       Again, I wasn't anywhere chose to

Page 114

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  being the point person of this audit. And I
3  can't recall, you know, when -- you know, I
4  don't even know if I was ever the point person
5  during my tenure as CFO.
6      I don't know if PwC had any concerns
7  when they were performing those audit
8  procedures. They may have and they may have --
9  and it may not have been communicated to me. I
10 don't know.
11     MR. MORRIS: All right. I move to
12 strike.
13     Q.  And I'm going to ask you to listen
14 carefully to my question.
15     Did you -- do you recall ever having
16 a conversation with anybody at any time
17 concerning the accuracy of the reporting
18 provided in the audited financial statement on
19 the topic of Notes and Other Amounts Due?
20     MS. DANDENEAU: Objection to form.
21     A.  I don't recall for this, but that
22 doesn't mean that it didn't exist.
23     Q.  Okay. But you have no reason to
24 believe, as you sit here right now, that you
25 ever discussed with anybody concerns over the

Page 115

1  WATERHOUSE - 10-19-21
2  accuracy of the section of the audit reports
3  called Notes and Other Amounts Due from
4  Affiliates; correct?
5      MS. DANDENEAU: Object to the form.
6      MS. DEITSCH-PEREZ: Objection to
7  form.
8      A.  I don't recall having any
9  conversations. But, again, I mean, this is --
10 this is two years ago.
11     Q.  I'm just asking for your
12 recollection, sir.
13     A.  Yes.
14     Q.  If you don't recall, this will --
15     A.  Yeah.
16     Q.  (Overspeak) -- if you don't
17 recall --
18     A.  Yeah, I don't -- I don't recall.
19     Q.  Do you know who was responsible for
20 drafting the audit report?
21     A.  Are you asking the actual Highland
22 employee responsible? I mean, it was
23 Highland's responsibility, so, I mean, that
24 is --
25     Q.  Right.

Page 116

1  WATERHOUSE - 10-19-21
2      A.  -- Highland's responsibility.
3  Highland's responsibility.
4      Q.  Who, at Highland, was responsible
5  for drafting this section of the audit report?
6      A.  I -- I don't know the answer to
7  that. Again, there was a team who worked on
8  this. And I don't know, you know, whether it
9  was the staff or the manager.
10     Again, this is where I let the teams
11 manage. And, you know, there may be a
12 corporate accountant who worked on this. I
13 just -- you know, I wasn't part of that process
14 to give that person experience. I don't know.
15     Q.  Do you recall having any
16 communications with anybody at any time
17 concerning this section of the report?
18     A.  Yeah, I don't recall.
19     Q.  Do you recall whether you ever told
20 anybody at any time that any aspect of this
21 section of the report was inaccurate or
22 incomplete?
23     A.  I don't recall.
24     Q.  As you sit here today, do you have
25 any reason to believe that this section of the

Page 117

1  WATERHOUSE - 10-19-21
2  audit report is incomplete or inaccurate in any
3  way?
4      And I'm happy to give you a moment
5  to -- to look at it, if you would like.
6      MS. DANDENEAU: Objection to form.
7      MS. DEITSCH-PEREZ: Same.
8      A.  I mean, I would have to look at -- I
9  would have to look at the bill to the note
10 schedule to make sure I know you presented me
11 with materiality, but again, there might be a
12 note as of 12/31/18 that somehow was -- was
13 under materiality not disclosed. I don't -- I
14 don't know. I would need more information.
15     Q.  Okay. But without more information,
16 you have no reason to believe anything this
17 section is inaccurate; correct?
18     MS. DANDENEAU: Objection to form.
19     A.  I don't. I mean, you know, this was
20 part of the audit.
21     Q.  Thank you. Now, you will see if we
22 could scroll just a little bit more that each
23 of the first five paragraphs concerns
24 specifically the four affiliates that we've
25 been discussing and Mr. Dondero.

Appx. 00216

Page 118

WATERHOUSE - 10-19-21

1    MR. MORRIS:  If we could go the
2    other way, La Asia.  We don't need Okada.
3    We're going to have to thread the needle.
4    Okay.  Good, perfect.
5    Q.   Do you see those five paragraphs
6    certain the four affiliates and Mr. Dondero as
7    we've been referring to today?
8    A.   Yes.
9    Q.   Okay.  And do you see at the end of
10   every paragraph it states, quote:  A fair value
11   of a partnership's outstanding notes receivable
12   approximates the carrying value of the notes
13   receivable?
14   A.   Yes, I see that.
15   Q.   Do you have an understanding of what
16   that means?
17   A.   Yes.
18   Q.   What is your understanding of that
19   sentence?
20   A.   It is the -- again, the -- the fair
21   value, right, which is -- which is what the --
22   what Highland could sell that asset for.  This
23   statement is comparing the fair value of the
24   notes to the carrying value, so the carrying
25

Page 119

WATERHOUSE - 10-19-21

1    value is the line item that you showed me
2    earlier that is in Notes and Other Amounts Due
3    from Affiliates.
4    Q.   Okay.  Is another way to say this is
5    that the fair market value of the notes equals
6    the principal amount and -- withdrawn.
7    Is the fair way to interpret this
8    that the fair market value of the notes equals
9    all remaining unpaid principal and interest due
10   under the notes?
11   MS. DANDENEAU:  Object to the form.
12   MS. DEITSCH-PEREZ:  Objection, form.
13   A.   I don't know the answer to that,
14   because I don't recall where -- where any --
15   where -- in what line item was the interest
16   component reported.
17   Q.   All right.  Well, if we look in this
18   audit report, you will see in the middle of the
19   first paragraph, for example, it states that as
20   of December 31st, 2018, total interest and
21   principal due on outstanding promissory notes
22   was approximately $5.3 million.
23   Do you see that?
24   A.   I do.
25

Page 120

WATERHOUSE - 10-19-21

1    Q.   Is that the carrying value or the
2    fair value?
3    A.   That would be the carrying value --
4    Q.   And is the last --
5    A.   -- in my opinion.
6    Q.   Okay.  And it is in your opinion as
7    the chief financial officer of Highland during
8    the period of time that you described; right?
9    It is an educated opinion?
10   A.   I'm reading this at face value.  I'm
11   taking that as that is carrying value.
12   Q.   Okay.  And does the last sentence
13   say that the carrying value is roughly
14   approximate the fair market value?
15   MS. DANDENEAU:  Objection to form.
16   MS. DEITSCH-PEREZ:  Objection, form.
17   A.   Again, this note to the financial
18   statement is specific to notes and other
19   amounts due from affiliates.
20   Q.   Correct.
21   A.   If the interest component is
22   reported elsewhere on the balance sheet, you
23   know, it -- it -- it could be off.  Again, I
24   don't have the detail.  I don't know, but yes,
25

Page 121

WATERHOUSE - 10-19-21

1    look, I mean, if you -- I mean, if you are
2    saying the 5.3 million is in the notes and
3    other amounts due from affiliates, then the
4    last statement is saying the fair value
5    approximates 5.3 million.  That is what that
6    last sentence is saying.
7    Q.   Do you see in the middle of the
8    first paragraph -- not in the middle, the next
9    to last sentence there is a statement that the
10   partnership will not demand payment on amounts
11   that exceed HCMFA's excess cash availability
12   prior to May 31st, 2021.
13   Do you see that?
14   A.   I do.
15   Q.   Do you know when Highland agreed not
16   to demand payment as described in that
17   sentence?
18   A.   I don't know specifically.
19   Q.   Do you know why Highland agreed not
20   to demand payment on HCMFA's notes until May
21   2021?
22   A.   Yes.
23   Q.   Why was that decision made?
24   A.   You know, well, it -- it -- that
25

**Appx. 00217**

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2   decision was made as to not put HCMFA into a
3   position where it didn't have sufficient assets
4   to pay for the demand note.
5       Q.   And at the time the agreement was
6   entered into, pursuant to which the partnership
7   wouldn't demand payment, did HCMFA have
8   insufficient assets to satisfy the notes if a
9   demand had been made?
10      MS. DANDENEAU:  Objection to form.
11      A.   I don't have HCMFA's financial
12  statements in front of me as of 12/31/18.
13      Q.   Was there a concern that HCMFA would
14  be unable to satisfy its demands under the
15  notes if demand was made?
16      MS. DANDENEAU:  Objection to form.
17      A.   Well, there is -- I don't recall --
18  I mean, there is something, right, in place to
19  basically not demand payment until May 31, 2021
20  as detailed here.
21      Q.   And who made the decision to enter
22  into -- who made the decision on behalf of
23  Highland not to demand payment until May 31st,
24  2021?
25      A.   I'm trying to remember.  I don't

1       WATERHOUSE - 10-19-21
2   remember exactly -- I don't remember if it was
3   myself or -- or Jim Dondero who -- who -- there
4   was -- there was something signed, from what I
5   recall, that -- that -- that backed up this
6   line item in the -- in the notes I'm -- look,
7   I'm, I'm --
8       Q.   We will get to that.
9       A.   You --
10      Q.   I'm just --
11      A.   You have -- I mean --
12      Q.   We're going to give that to you.
13  I'm going to give that to you.
14      A.   You -- you -- you have all the
15  documents.  I don't have the documents, and
16  that is what makes it so hard.  I don't have
17  any documents to prepare for this deposition;
18  right?  You have all -- I don't -- I don't -- I
19  don't remember, but, you know, again, it would
20  probably be myself or Jim.
21      Q.   Do you know if Highland received
22  anything in return for its agreement not to
23  make a demand for two years?
24      A.   I don't -- I don't think it referred
25  anything.

1       WATERHOUSE - 10-19-21
2       Q.   And did you and Mr. Dondero discuss
3   HCMFA's ability to satisfy the notes if a
4   demand was made at the time this agreement was
5   entered into?
6       MS. DANDENEAU:  Objection to form.
7       A.   I don't -- I don't -- I don't recall
8   having a specific conversation, if I did, or --
9   or David Klos.
10      Q.   Okay.  I'm just asking if you recall
11  any conversations that you had.
12      A.   I don't recall.
13      Q.   Okay.  Do you know why Highland
14  loaned the money to HCMFA that is the subject
15  of the notes described in this paragraph?
16      A.   I don't remember specifically why
17  5.3 million was loaned.  I mean, I -- it would
18  have to be put in the context.
19      Q.   Do you have any recollection at all
20  as to why Highland ever loaned any money to
21  HCMFA?
22      A.   Yes.
23      MS. DANDENEAU:  Objection to form.
24      Q.   What do you remember about that?
25      A.   There was a Highland Global

1       WATERHOUSE - 10-19-21
2   Allocation Fund, which was a -- a fund managed
3   by Highland Capital Management Fund Advisors.
4   There was a -- we -- I'm just telling you,
5   there was -- there was -- there was a -- a
6   ultimately a NAV error found in this fund while
7   it was an open-ended fund and, you know, there
8   were amounts owed by the advisor in -- in
9   relation to that NAV error.
10          There were also, for the same fund,
11  that same fund was ongoing an
12  open-end-to-close-end conversion, and as part
13  of that proposal, shareholders who voted for
14  the conversion received compensation from the
15  advisor.
16      Q.   All right.  Now, the events that
17  you're describing occurred in the spring of
18  2019; right?
19      A.   These started back -- I think, I
20  mean --
21      Q.   I apologize.
22      A.   -- that -- I mean, the answer to
23  that is no.
24      Q.   I apologize, the loans that were
25  made in connection with the events that you're

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2  describing occurred in May 2019; right?
3        MR. RUKAVINA:  Objection to the
4    extent that calls for a legal conclusion.
5        A.  I don't recall specifically what
6  amounts of money were moved when, for what
7  purpose.
8        Q.  Okay.  Fair enough.  Going to the
9  next paragraph, do you recall that NexPoint
10  Advisors had obtained a number of loans from
11  Highland, and they rolled up those loans into
12  one note in approximately 2017?
13       A.  This is for NexPoint Advisors?
14       Q.  Yes.
15       A.  I -- I mean, I don't -- I don't
16  recall the NexPoint Advisors loan being a
17  roll-up loan, but --
18       Q.  Do you know why?
19       A.  But, look, if you have documents
20  that show -- I mean, look, I just don't recall.
21       Q.  Okay.  That is fair.  Do you know
22  why -- do you have any recollection as to why
23  Highland loaned money to NexPoint?
24       A.  Yes.
25       Q.  Why did High -- why do you recall --

1    WATERHOUSE - 10-19-21
2  what is the reason you recall Highland lending
3  money to NexPoint?
4        A.  I mean, I was just -- I just -- I
5  just recall.  I mean, I just -- I don't
6  remember why.
7        Q.  I understand.  And I'm asking you if
8  you recall --
9        A.  Oh, why -- I thought you say --
10  NexPoint Advisors was launching a fund which
11  is -- I believe that the legal name is NexPoint
12  Capital, Inc.  And it -- it provided a
13  co-invest into that fund.
14           And, from what I remember, the --
15  the -- that NexPoint borrowed money from
16  Highland at the time to make that co-invest.
17       Q.  So this was an investment that
18  NexPoint was required to make; is that right?
19       MS. DANDENEAU:  Objection to form.
20       A.  I don't know if it was required to
21  make, I don't recall that, or if it just made
22  it.
23       Q.  Okay.  But your recollection is that
24  NexPoint made an investment and they borrowed
25  money from Highland to finance the investment.

1    WATERHOUSE - 10-19-21
2        Do I have that right?
3        A.  Yes.
4        Q.  How about HCRE?  Do you know why
5  HCRE borrowed money from Highland?
6        A.  I don't remember specifically.
7        Q.  Do you remember generally?
8        A.  Generally, yeah -- I mean, yes.
9        Q.  Can you tell me your general
10  recollection as to why Highland loaned money to
11  HCRE?
12       A.  For -- for -- for investment
13  purposes.
14       Q.  So HCRE made the investment and it
15  obtained a loan, or loans, from Highland in
16  order to finance that investment or those
17  investments.
18           Do I have that right?
19       A.  I mean, I -- you know, generally.
20       Q.  Okay.  How about Highland Management
21  Services, Inc.?
22           Do you have any recollection as to
23  why HCMS borrowed money from Highland?
24       A.  Generally.
25       Q.  What is your general recollection as

1    WATERHOUSE - 10-19-21
2  to why HCMS borrowed money from Highland?
3        A.  For -- for investment purposes.
4        Q.  So it is the same thing, HCMS wanted
5  to make investments and it borrowed money from
6  Highland in order to finance those investments;
7  is that right?
8        A.  I mean, yes, generally.  I mean, I
9  can't -- I don't -- on the services, there --
10  there are several loans in these schedules.
11  You know, I can't remember why every single one
12  of these were made, but I would say, yeah, I
13  mean, generally.
14       Q.  Okay.  I appreciate that.
15       MR. MORRIS:  Let's go to the page
16  with Bates No. 251.  La Asia, are you
17  there?
18       MS. CANTY:  Sorry, John.  It went
19  out for a minute.  Can you say that again.
20  I don't know what is going on.
21       MR. MORRIS:  The page with Bates
22  No. 251, can we go to that.
23       MS. CANTY:  Yes, sorry.
24       MR. MORRIS:  Keep going to the
25  bottom.  Yeah, there you go.

Page 130

WATERHOUSE - 10-19-21

1
2  Q.   Do you see, Mr. Waterhouse, that
3  there is a section there called Subsequent
4  Events?
5  A.   I do.
6  Q.   And does this relate to the last
7  sentence above the signature line on the
8  management representation letter that we talked
9  about earlier where you made the representation
10 that you disclosed subsequent events?
11 A.   I mean, it relates to it, but not in
12 its entirety.
13 Q.   Okay.
14    MR. MORRIS:  If we can scroll up to
15 capture the entirety of this section right
16 here.
17 Q.   And what do you mean by that, sir?
18    MR. MORRIS:  Yeah, right there.
19 Perfect.
20 A.   There are -- there are different
21 subsequent events in -- under GAAP.  So there
22 are -- and -- and -- so what we see in the
23 notes to the financial statements are one type
24 of subevent.
25 Q.   Okay.  And -- and would the type of

Page 131

WATERHOUSE - 10-19-21

1
2  subsequent event relating to affiliate loans be
3  captured in this section if they were -- if
4  they were made after the end of the fiscal year
5  and prior to the issuance of the audit report?
6  A.   Yes, if they were deemed material or
7  disclosable.
8  Q.   Okay.  I appreciate that.
9     Do you see the next to the last
10 entry there?  It says, Over the course of 2019
11 through the report date, HCMFA issued
12 promissory notes to the partnership in the
13 aggregate amount of $7.4 million?
14 A.   Yes.
15 Q.   And does that refresh your
16 recollection that those are the notes that
17 related to the NAV error that you mentioned
18 earlier?
19 A.   I don't -- I don't remember the
20 exact.  Again, there are -- I mentioned two
21 line items; right?
22 Q.   Yes.
23 A.   I mean, it was the GAAP conversion
24 process plus the -- the NAV error.  I don't
25 have the details.  I don't recall specifically

Page 132

WATERHOUSE - 10-19-21

1
2  if -- you know, what -- if that 7.4 million was
3  solely attributable to the NAV error.
4  Q.   Okay.  But there is no question that
5  Highland told PricewaterhouseCoopers that over
6  the course of 2019 HCMFA issued promissory
7  notes to the partnership in the aggregate
8  amount of $7.4 million; correct?
9  A.   In the course of the audit, we would
10 have produced all promissory notes in our
11 possession, including the ones that are
12 detailed here.
13 Q.   Do you recall that you signed the
14 two promissory notes that are referenced in
15 that provision?
16    MS. DANDENEAU:  Objection to form.
17 A.   I didn't recall initially but I've
18 been reminded.
19 Q.   Okay.  And -- and do you recall that
20 those notes are dated May 2nd and May 3rd,
21 2019?
22 A.   Yes.
23 Q.   So that was just a month before the
24 audit was completed; correct?
25 A.   Yes.  I think we had a June 3rd

Page 133

WATERHOUSE - 10-19-21

1
2  date, right, if -- if my memory serves me
3  right.
4  Q.   Yes, I will represent to you that
5  your memory is accurate in that regard.
6     Did anybody ever instruct you as the
7  CFO to correct this statement that we're
8  looking at in subsequent events?
9  A.   So let me understand.  You're saying
10 when I was CFO at Highland Capital did anyone
11 ever ask me to correct the -- over the course
12 of 2019 through the report date HCMFA issued
13 promissory notes, this statement?
14 Q.   Right.
15 A.   Not that I'm aware.
16 Q.   While you were the CFO of Highland,
17 did anybody ever tell you that sentence
18 was wrong?
19 A.   Not that I'm aware.
20 Q.   Highland -- withdrawn.
21    HCMFA disclosed these notes in its
22 own audited financial statements; right?
23    MR. RUKAVINA:  Objection, form.
24 A.   I assume that these would be
25 material -- if these are material financial

Page 134

WATERHOUSE - 10-19-21

1  
2  statements, yes, they -- they -- they should be
3  and they were likely disclosed.
4      Q.  Now, there is no statement
5  concerning the 2019 notes about the forbearance
6  that we looked at in the affiliated note
7  section of the report; right?
8      MS. DANDENEAU:  Objection to form.
9      Q.  I'll withdraw.  That was bad.
10      Do you recall when we were looking
11  at the paragraph concerning HCMFA earlier it
12  had that disclosure about the agreement whereby
13  Highland wouldn't ask for demand on the -- on
14  the HCMFA notes?
15      A.  Yes.
16      Q.  That forbearance disclosure is not
17  made with respect to the 2019 notes; right?
18      A.  Not -- look, not that I can recall,
19  unless -- unless it was done at a subsequent
20  day.
21      Q.  Right.  And it is not in the
22  subsequent event section that we're looking at
23  right now where the 2019 notes are described;
24  right?
25      A.  Right.  But this is through

Page 135

WATERHOUSE - 10-19-21

1  June 3rd.  It could have been done on June 4th.
2  I don't -- I don't -- I don't recall.
3  
4      Q.  Okay.
5      MR. MORRIS:  Can we put up on the
6  screen the HCMFA audit report.  And while
7  we're --
8      MS. DANDENEAU:  What exhibit is
9  this?
10      MR. MORRIS:  La Asia, what number is
11  that?
12      MS. CANTY:  45.
13      MR. MORRIS:  So this will be marked
14  as Exhibit 45.
15      (Exhibit 45 marked.)
16      MS. CANTY:  Yeah, and I will put it
17  in the chat.
18      MS. DANDENEAU:  Thank you.
19      Q.  Okay.  All right.  Do you see that
20  this is the consolidated financial statements
21  for HCMFA for the period ending 12/31/18?
22      A.  Yes.
23      Q.  As the treasurer of HCMFA at the
24  time, did you have to sign a management
25  representation letter similar to the one that

Page 136

WATERHOUSE - 10-19-21

1  
2  we looked at earlier for Highland?
3      A.  I would imagine I would have been
4  asked to.  I don't recall if I did.
5      Q.  Do you recall ever being asked by an
6  auditor to sign a management representation
7  letter and then not doing it?
8      A.  No.
9      MR. MORRIS:  Can we just scroll down
10  again.  I just want to see the date of the
11  document.
12      A.  I mean, let me -- you know, there
13  are different versions to management
14  representation letters I will qualify.
15      Yes, there are certain -- from time
16  to time auditors can make representations
17  that -- in the rep letter that is being
18  proposed that are inaccurate or out of scope or
19  things like that and they've asked for
20  signature.
21      In that context, yes.  I mean, you
22  know -- I mean, if I have been asked to sign
23  and make those representations and those
24  representations are invalid, yes, I would not,
25  I mean, I -- I wouldn't sign that.

Page 137

WATERHOUSE - 10-19-21

1  
2      Q.  Okay.  PricewaterhouseCoopers served
3  as HCMFA's outside auditors as well; correct?
4      A.  Yes.
5      Q.  Do you see that this audit report is
6  signed on June 3rd, 2019, just like the
7  Highland audit report?
8      A.  That is correct.
9      Q.  And did the process of -- of
10  preparing HCMFA's audit report, was that the
11  same process that Highland followed when it did
12  its audit report at this time?
13      A.  I mean, it is a different entity.
14  There are different assets.  You know, it --
15  it -- it is -- as you saw, Highland's
16  financials are on a consolidated basis.  This
17  is different, so it is under the same control
18  environment and team.
19      Q.  Okay.  I appreciate that.  So the
20  same control environment and team participated
21  in the preparation of the audit for Highland
22  and for HCMFA at around the same time; correct?
23      A.  Yes.
24      MR. MORRIS:  Can we go to page 17 of
25  the report.  I don't have the Bates number.

Page 138

WATERHOUSE - 10-19-21

1
2    Q.    Okay.  Do you see that just like
3  Highland's audited financial report, HCMFA's
4  audited financial report also has a section
5  related to subsequent events?
6        A.    Yes.
7    Q.    And am I reading this correctly that
8  just as Highland had done, HCMFA disclosed in
9  its audited financial report a subsequent event
10  that related to the issuance of promissory
11  notes to Highland in the aggregate amount of
12  $7.4 million in 2019?
13        A.    That is what I see in the report.
14    Q.    And you were the treasurer of HCMFA
15  at the time; right?
16        A.    Yes, to the best of my knowledge.
17    Q.    And did anybody ever tell you prior
18  to the time of the issuance of this audit
19  report that that sentence relating to HCMFA's
20  2019 notes was inaccurate or wrong in any way?
21        A.    Not that I recall.
22    Q.    As you sit here right now, has
23  anybody ever told you that that sentence is
24  inaccurate or wrong in any way?
25        A.    Not that I recall.

Page 139

WATERHOUSE - 10-19-21

1
2    Q.    I apologize if I asked you this
3  already, but has anybody ever told you at any
4  time that you are not authorized to sign the
5  promissory notes that are the subject of the
6  sentence we're looking at?
7        A.    Not that I recall.
8    Q.    Did anybody ever tell you at any
9  time that you had made a mistake when you
10  signed the promissory notes that are the
11  subject of this sentence?
12        A.    Say that again.  Did anyone ever say
13  that I made a mistake?
14    Q.    Let me ask the question again.
15        Did anybody ever tell you at any
16  time that you made a mistake when you signed
17  the two promissory notes in Highland's favor on
18  behalf of HCMFA in 2019?
19        A.    Not that I recall.
20        MR. MORRIS:  Let's just look at the
21  promissory notes quickly.  Can we please
22  put up Document Number 1, and so this is in
23  the pile that y'all have.  We'll just go
24  for a few more minutes and we can take our
25  lunch break.

Page 140

WATERHOUSE - 10-19-21

1
2    Q.    All right.  So I don't know if you
3  have seen this before, sir.  Do you see that
4  this is a complaint against HCMFA?
5        A.    Yes, I am looking at it on the
6  screen.
7    Q.    Okay.  And have you ever seen this
8  document before?
9        A.    I went through some of these
10  documents with my counsel here yesterday.
11        MR. MORRIS:  All right.  Can we go
12        to Exhibit 1 of this document.
13    Q.    Do you see Exhibit 1 is a
14  $2.4 million promissory note back in 2019?
15        A.    Yeah, I found it in the book.  Yes,
16  I have it here in front of me.
17    Q.    And this is a demand note, right, if
18  you look at Paragraph 2?
19        A.    Yes.
20    Q.    And this is a note where the maker
21  is HCMFA, and Highland is the payee; right?
22        A.    Yes.
23        MR. MORRIS:  And if we can scroll
24        down, can we just see Mr. Waterhouse's
25        signature.

Page 141

WATERHOUSE - 10-19-21

1
2    Q.    Is that your signature, sir?
3        A.    Yes, it is.
4    Q.    And did you sign this document on or
5  around May 2nd, 2019?
6        A.    I don't recall specifically signing
7  this, but this is my signature.
8    Q.    Okay.  And do you recall that
9  Highland transferred $2.4 million to HCMFA at
10  or around the time you signed this document?
11        A.    I don't recall specifically.  I
12  would want to, as I sit here today, go back and
13  confirm that, but again, presumably that --
14  that -- that did happen.
15    Q.    You wouldn't have signed this
16  document if you didn't believe that HCMFA
17  either received or was going to receive
18  $2.4 million from Highland; is that fair?
19        A.    I mean, it -- if -- if -- if there
20  wasn't a transfer of value, yeah, I mean, you
21  know, I would have no reason to -- to sign a
22  note.
23    Q.    And -- and Highland wouldn't have
24  given this note to PricewaterhouseCoopers if --
25  withdrawn.

Page 142

WATERHOUSE - 10-19-21

2 HCMFA wouldn't have given this note
3 to PricewaterhouseCoopers if it hadn't received
4 the principal value of -- of the note in the
5 form of a loan; correct?
6 MR. RUKAVINA: Objection, legal
7 conclusion, speculation and form.
8 A. Again, we -- what we provided to PwC
9 were, as part of the audit, any promissory
10 notes executed and outstanding. You know, as a
11 part of the audit, they, you know, they -- they
12 have copies of all the bank statements,
13 things -- things of that sort.
14 MR. MORRIS: Okay. Can we go to
15 Exhibit 2.
16 (Exhibit 2 marked.)
17 Q. Do you see that this is a promissory
18 note dated May 3rd, 2019 in the amount of
19 $5 million?
20 A. Yes.
21 Q. Do you believe this is also a demand
22 note if you look at Paragraph 2?
23 A. Yes.
24 Q. And do you see that HCMFA is the
25 maker, and Highland is the payee?

Page 143

WATERHOUSE - 10-19-21

2 A. Yes.
3 Q. And if we go to the bottom, can we
4 just confirm that that is your signature?
5 A. Yes.
6 Q. And together these notes are the
7 notes that are referred to both in Highland and
8 HCMFA's audited financial reports in the
9 subsequent event sections; correct?
10 MS. DANDENEAU: Objection to form.
11 A. They -- they -- they totaled
12 $7.4 million, so presumably, yes.
13 Q. Okay. And you were authorized to
14 sign these two notes; correct?
15 MR. RUKAVINA: Objection, legal
16 conclusion.
17 A. Yeah. I mean, I'm -- I was the
18 officer of -- of HCMFA. You know, I -- I'm not
19 the legal expert on -- on what that -- what
20 that confers to me or what it doesn't. I mean,
21 that is my signature on the notes.
22 Q. And you believed you were authorized
23 to sign the notes; is that fair?
24 A. I signed a lot of documents in my
25 capacity, just because it is operational in

Page 144

WATERHOUSE - 10-19-21

2 nature. So, you know, to me this was just
3 another document, to be perfectly honest.
4 Q. Sir, would you have signed
5 promissory notes with the principal amount of
6 $7.4 million if you didn't believe you were
7 authorized to do so?
8 MS. DANDENEAU: Objection to form.
9 Q. Are you frozen?
10 A. No. I'm just -- you know, it is --
11 you know, again, I typically don't sign
12 promissory notes, and I don't recall why I
13 signed these, but -- you know, but I did.
14 Q. All right. So listen carefully to
15 my question. Would you have ever signed
16 promissory notes with a face amount of
17 $7.4 million without believing that you were
18 authorized to do so?
19 A. No. I mean, I'm -- I'm putting my
20 signature on there, so no.
21 Q. Okay. And would you have signed two
22 promissory notes obligating HCMFA to pay
23 Highland $7.4 million without Mr. Dondero's
24 prior knowledge and approval?
25 MS. DEITSCH-PEREZ: Object to the

Page 145

WATERHOUSE - 10-19-21

2 form.
3 A. You know, from -- from what I recall
4 around these notes, you know, I don't recall
5 specifically Mr. -- Mr. Dondero saying to -- to
6 make this a loan.
7 So my conversation with Mr. Dondero
8 around the culmination of the NAV error as
9 related to TerreStar which was a -- a -- I
10 think it was a year and a half process. I
11 don't know, it was a multi-month process, very
12 laborious, very difficult.
13 When we got to the end, I had a
14 conversation with Mr. Dondero on where to, you
15 know, basically get the funds to reimburse the
16 fund, and I recall him saying, get the money
17 from Highland.
18 Q. And so he told you to get the money
19 from Highland; is that right?
20 A. That is what I recall -- in my
21 conversation with him, that is -- that is what
22 I can recall.
23 Q. Do you know who drafted these notes?
24 A. I don't.
25 Q. Did you ask somebody to draft the

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2  notes?
3     A.  I didn't ask -- I don't specifically
4  ask people to draft notes really.  I mean,
5  again, you know, the legal group at Highland is
6  responsible and has always been responsible for
7  drafting promissory notes.
8     Q.  So based on your -- based on the
9  practice, you believe that somebody from the
10  Highland's legal department would have drafted
11  these notes.  Do I have that right?
12     MS. DEITSCH-PEREZ:  Object to the
13     form.  John, I also asked you for the Word
14     versions of these notes so we could look at
15     the properties, and you have not provided
16     them.  Are you intending to?
17     MR. MORRIS:  No.
18     Q.  Can you answer my question, sir?
19     A.  Again, I --
20     MS. DANDENEAU:  Do you want him to
21     repeat it?
22     A.  Yeah, why don't you repeat it?
23     Q.  Sure.  Mr. Waterhouse, based on the
24  practice that you have described in your
25  understanding, do you believe that these notes

1        WATERHOUSE - 10-19-21
2  would have been drafted by somebody in the
3  legal department?
4     MS. DEITSCH-PEREZ:  Object to the
5     form.
6     A.  Yes.
7     Q.  Okay.  And do you know who would
8  have instructed -- do you have any knowledge as
9  to who would have instructed the legal
10  department to draft these notes?
11     MS. DEITSCH-PEREZ:  Object to the
12     form.
13     A.  It was whoever was working -- I
14  mean, it was likely someone on the team.  I
15  mean, I don't remember exactly on every note or
16  every document, but, again, a lot of these
17  things of this nature -- they're operational in
18  nature -- were handled by the team.
19     The team knows to -- I mean, we
20  don't draft documents.  We're not lawyers.
21  We're not attorneys.  It is not what I do or
22  accountants do.
23     So they are always instructed to go
24  and -- and go to the legal team to get
25  documents like this drafted.  Also, when you go

1        WATERHOUSE - 10-19-21
2  to the legal team, the -- you know, we always
3  loop in compliance.  And compliance -- when you
4  go to the legal team, compliance is part of
5  legal team.  They're made aware of -- of -- of
6  these types of transactions.
7     Q.  And do you believe that you had
8  the -- withdrawn.
9     Did you ever tell Mr. Dondero --
10  (inaudible) -- did you see those?
11     A.  Sorry.
12     MS. DEITSCH-PEREZ:  I did not hear
13     the end of that question.
14     Q.  Did you ever tell Mr. Dondero that
15  you signed these two notes?
16     A.  I don't recall ever -- no, I don't
17  recall having a conversation with him.
18     Q.  Did you ever discuss these two notes
19  with him at any time?
20     A.  The conversation, I recall, was what
21  I described earlier.  And that is the only time
22  I recall ever discussing this.
23     Q.  Okay.  But the corporate accounting
24  group had a copy of this -- of these two notes.
25  And pursuant to the audit process, the

1        WATERHOUSE - 10-19-21
2  corporate accounting group gave the two notes
3  to PricewaterhouseCoopers in connection with
4  the audit; correct?
5     MS. DANDENEAU:  Objection to form.
6     A.  Yes.  I mean, that is -- yeah, I
7  mean, they -- unless the legal team can also
8  retain copies of items like this.  I mean, I
9  don't know everything that they would retain as
10  well.
11     The legal team would also, if they
12  had documents as part of audits, turn that over
13  to the auditors as well.  So it could have been
14  the corporate accounting team.  It could be
15  someone on the legal team.
16     Q.  All right.  So you didn't -- you
17  didn't draft this note; right?
18     A.  I -- I -- I did not.
19     Q.  But somebody at Highland did; is
20  that fair?
21     MS. DEITSCH-PEREZ:  Object to the
22     form.
23     A.  I don't know.  I mean, we can go to
24  the legal team.  I don't -- I'm not sitting
25  behind someone in legal.  Maybe they went to

Page 150

```
 1          WATERHOUSE - 10-19-21
 2  outside counsel. I have no idea.
 3      Q.   Did you have any reason to believe
 4  you weren't authorized to sign this note,
 5  either of these two notes?
 6      A.   I think I have already answered that
 7  question.
 8      Q.   Okay. You didn't give these notes
 9  to PricewaterhouseCoopers; correct?
10          MS. DANDENEAU: Objection to form.
11      A.   I don't recall giving these to
12  PricewaterhouseCoopers.
13      Q.   And in the practice that you have
14  described, somebody in the corporate accounting
15  group would have given these two notes to
16  PricewaterhouseCoopers; correct?
17          MS. DANDENEAU: Objection to form.
18      A.   I think I've answered that. I said
19  either the corporate accounting team or maybe
20  the legal team.
21          MR. MORRIS: Okay. Why don't we
22  take our lunch break here.
23          VIDEOGRAPHER: We're going off the
24  record at 1:04 p.m.
25          (Recess taken 1:04 p.m. to 1:49 p.m.)
```

Page 151

```
 1          WATERHOUSE - 10-19-21
 2          VIDEOGRAPHER: We are back on the
 3  record at 1:49 p.m.
 4      Q.   Mr. Waterhouse, did you speak with
 5  anybody during the break about the substance of
 6  this deposition?
 7      A.   I spoke to -- to Deb and Michelle.
 8      Q.   About the substance of the
 9  deposition?
10      A.   Yes.
11      Q.   Can you tell me what you talked
12  about?
13          MS. DANDENEAU: No. We object on
14  the basis of privilege.
15      Q.   Okay. You are going to follow your
16  counsel's objection here?
17      A.   Yes.
18      Q.   Okay.
19          MR. MORRIS: Can we put up on the
20  screen Exhibit 35.
21          (Exhibit 35 marked.)
22      Q.   Are you able to see that document,
23  sir?
24      A.   Yes.
25      Q.   Have you ever seen an incumbency
```

Page 152

```
 1          WATERHOUSE - 10-19-21
 2  certificate before?
 3      A.   I have.
 4      Q.   Do you have a general understanding
 5  of what an incumbency certificate is?
 6      A.   I have a general understanding.
 7      Q.   What is your general understanding?
 8      A.   You know, those -- my general
 9  understanding is that the incumbency
10  certificate basically lists folks that can --
11  are like authorized signers.
12      Q.   Okay. And do you see that this is
13  an incumbency certificate for Highland Capital
14  Management Fund Advisors, L.P.?
15      A.   Yes.
16      Q.   Okay. And if we could scroll down
17  just a little bit, do you see that it's dated
18  effective as of April 11th, 2019?
19      A.   Yes, I see that.
20      Q.   Okay. And is that your signature in
21  the middle of the signature block?
22      A.   Yes, it is.
23      Q.   And by signing it, did you accept
24  appointment as the treasurer of HCMFA effective
25  as of April 11th, 2019?
```

Page 153

```
 1          WATERHOUSE - 10-19-21
 2      A.   Again, I'm not the legal -- I don't
 3  know if this makes me the treasurer or the
 4  appointment. I don't know -- I don't know
 5  that, so I don't -- I don't know if that
 6  document -- again, I think -- again, I'm not
 7  the legal expert. I think isn't there --
 8  aren't there other legal documents that detail
 9  who the officers are that could be incorporated
10  or things like that? Again, I don't want to
11  play armchair attorney here.
12      Q.   I'm not asking you for a legal
13  conclusion. I'm asking you for your knowledge
14  and understanding. When you signed this
15  document, did you understand that you were
16  accepting an appointment as the treasurer of
17  HCMFA?
18          MS. DANDENEAU: Objection to form.
19          MS. DEITSCH-PEREZ: Objection, form.
20      A.   Again, I don't think this -- that
21  wasn't my understanding. I don't think this
22  makes -- this document makes me the treasurer.
23      Q.   What do you think this document --
24  why did you sign this document?
25          MS. DEITSCH-PEREZ: Objection to
```

WATERHOUSE - 10-19-21

1    form.
2
3        MR. MORRIS:  You're objecting to the
4    form of the question when I asked him why
5    did you sign the document?  What is the
6    basis for the objection?
7        MS. DEITSCH-PEREZ:  Because, John, I
8    think that it does call for a legal
9    conclusion other than -- with him saying
10   because somebody told me to sign this
11   document.  But if you want to go there,
12   that is fine.
13       MR. MORRIS:  Okay.
14       MS. DANDENEAU:  I don't think --
15   he's already said he's not a lawyer.
16       MR. MORRIS:  I'll allow the witness
17   to answer this question.
18   Q.   Why did you sign this document, sir?
19   A.   I mean, our -- our legal group would
20   bring by these incumbency certificates from
21   time to time.  I have no idea why they're being
22   updated, and I was asked to sign.
23   Q.   Did you ask anybody, what is this
24   document?
25   A.   No.

WATERHOUSE - 10-19-21

1
2    Q.   Did anybody tell you why they needed
3    you to sign the document?
4    A.   Not that I can recall.
5    Q.   You testified earlier that you
6    understood that you served as the acting
7    treasurer for HCMFA; correct?
8    A.   Yes.
9    Q.   How did you become the acting
10   treasurer of HCMFA?
11       MS. DANDENEAU:  Objection to form.
12   A.   I don't -- I don't know the legal --
13   I don't know the legal mechanic of how I became
14   the acting treasurer.
15   Q.   I'm not asking for the legal
16   mechanic.  I'm asking you as the person who
17   is --
18       MS. DANDENEAU:  John, you said --
19       MR. MORRIS:  Stop.
20       MS. DANDENEAU:  -- how did you
21   become the treasurer.  That is --
22       MR. MORRIS:  Please stop.
23       MS. DANDENEAU:  That is a legal
24   question.
25       MR. MORRIS:  I am not asking any

WATERHOUSE - 10-19-21

1
2    legal questions, to be clear.  I'm asking
3    for this witness' understanding as to how
4    he became the acting treasurer of HCMFA.
5    If he doesn't know, he can say he doesn't
6    know, but this legal stuff is nonsense, and
7    I really object to it.
8    Q.   Sir, I'm asking you a very simple
9    question.
10       MS. DANDENEAU:  Argumentative.
11   Q.   You testified -- you testified that
12   you became the acting treasurer of HCM --
13   HCMFA; correct?
14   A.   Yes.
15   Q.   How did that happen?
16       MS. DANDENEAU:  Again, object to
17   form.
18       MR. MORRIS:  I can't wait to do this
19   in a courtroom.  Good God.
20   Q.   Go ahead, sir.
21   A.   I don't know the exact process of
22   how that happened.
23   Q.   Do you have any idea whether signing
24   this document was part of the process?
25       MR. MORRIS:  You know what --

WATERHOUSE - 10-19-21

1
2        MS. DANDENEAU:  Objection.
3        MR. MORRIS:  -- withdrawn.  You guys
4    want to do this, I can't wait.  I can't
5    wait.  This is the craziest stuff ever.
6        MS. DANDENEAU:  John, he said he's
7    not a lawyer, and you are asking him for a
8    legal conclusion, and he says he doesn't
9    know, and you persist.
10       MR. MORRIS:  Okay.
11       MS. DANDENEAU:  So you can ask these
12   questions --
13       MR. MORRIS:  Did anyone -- please
14   stop talking.
15       MS. DANDENEAU:  -- at another
16   point -- no, no, no, I'm entitled to talk,
17   too; right?  If you're going to make these
18   accusations as if we're trying to stonewall
19   you, this is not the witness to ask that
20   question.
21       MR. MORRIS:  I can't -- I can't
22   wait -- I can't wait to do this in a
23   courtroom.  I will just leave it at that.
24       MS. DANDENEAU:  That's right, I'm
25   sure you can't.

Page 158

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     Q.   Did anyone ever tell you, sir, that
3  even though you were the acting treasurer of
4  HCMFA, that you were not authorized to sign the
5  two promissory notes that we looked at before
6  lunch?
7     A.   I'm not sure I understand the
8  question.  I wasn't -- I mean, I'm -- I'm the
9  current acting treasurer.
10    Q.   Did anybody ever tell you at any
11 time that even though you were the acting
12 treasurer of HCMFA, that you were not
13 authorized to sign the two promissory notes
14 that we looked at before lunch?
15         MS. DANDENEAU:  Objection to form.
16    A.   Not that I recall.
17    Q.   Did anybody ever tell you at any
18 time that you were not authorized to sign the
19 two promissory notes that we looked at before
20 lunch?
21    A.   Not that I recall.
22    Q.   Did anybody ever tell you at any
23 time that you should not have signed the two
24 promissory notes that we looked at before
25 lunch?

Page 159

1          WATERHOUSE - 10-19-21
2     A.   Not that I recall.
3     Q.   Did you ever tell anybody at any
4  time that you weren't authorized to sign the
5  two promissory notes that we looked at before
6  lunch?
7     A.   Not that I recall.
8     Q.   Did you ever tell anybody at any
9  time that you made a mistake when you signed
10 the two promissory notes that we looked at
11 before lunch?
12    A.   Not that I recall.
13    Q.   As you sit here right now, do you
14 have any reason to believe that you were not
15 authorized to sign the two documents that we
16 looked at before lunch?
17         MS. DANDENEAU:  Objection to form.
18    A.   If -- if this is the -- the valid
19 incumbency certificate, I mean, this does --
20 this does detail who the signers are.
21    Q.   Okay.  And looking at that document,
22 does that give you comfort that you were
23 authorized to sign the two promissory notes
24 that we looked at before lunch?
25         MS. DEITSCH-PEREZ:  Object to the

Page 160

1          WATERHOUSE - 10-19-21
2  form.
3          MS. DANDENEAU:  Objection, form.
4     A.   Yes.
5     Q.   As of October 20th -- withdrawn.
6          I'm trying to take your mind back to
7  a year ago, October 2020.  Do you recall at
8  that time that the boards of the retail funds
9  were making inquiries about obligations that
10 were owed by the advisors to Highland in
11 connection with their 15(c) review?
12         MS. DANDENEAU:  Objection to form.
13    A.   I don't -- I don't recall.
14    Q.   As of October 2020, you had no
15 reason to believe you weren't authorized to
16 sign the two promissory notes that we just
17 looked at; correct?
18         MS. DANDENEAU:  Objection, form.
19         MS. DEITSCH-PEREZ:  Objection to
20 form.
21    A.   I didn't think about it in October
22 of 2020, but I mean --
23    Q.   Did you have any reason to believe
24 at that time that you weren't authorized to
25 sign the two notes that we just looked at?

Page 161

1          WATERHOUSE - 10-19-21
2     A.   Not that I'm aware, no.
3     Q.   Did you have any reason to believe a
4  year ago that you made a mistake when you
5  signed those two notes?
6     A.   Not that I'm aware.
7     Q.   A year ago you believed that HCMFA
8  owed Highland the unpaid principal amounts that
9  were due under those two notes; correct?
10    A.   They're -- they're promissory notes
11 that were -- as you presented, that were --
12 that were executed.  Whether they're valid or
13 if there's other reasons, I didn't -- I don't
14 know.
15    Q.   I'm not asking you whether they're
16 valid or not.  I'm asking you for your state of
17 mind.  A year ago you believed that HCMFA
18 was -- was obligated to pay the unpaid
19 principal amount under the two notes that you
20 signed; correct?
21    A.   Yeah, I'm -- I'm -- yes.
22    Q.   Thank you.  Are you aware -- you're
23 aware that -- that in 2017, NexPoint issued a
24 note in favor of Highland in the approximate
25 amount of $30 million; correct?

Page 162

WATERHOUSE - 10-19-21

1
2    A.   I'm -- I'm -- I'm generally aware.
3    Q.   Okay.  And are you generally aware
4    that from time to time, after the note was
5    issued by NexPoint, that moneys were applied to
6    principal and interest that were due under the
7    NexPoint note?
8    A.   Yes, I'm generally aware.
9    Q.   Okay.  And did anybody ever tell you
10   that the payments that were made against the
11   NexPoint notes were made by mistake?
12   A.   Yes.
13   Q.   And is it the one payment that we
14   talked about earlier today?
15   A.   We talked about a lot of things
16   today.  What payment are we talking about?
17   Q.   Okay.  Who told you that any payment
18   made against the NexPoint note was made by
19   mistake?
20   A.   D.C. Sauter.
21   Q.   When did Mr. Sauter tell you that?
22   A.   I don't -- I don't remember
23   specifically.
24   Q.   Do you remember what payments --
25   A.   Sometime -- sometime this year.

Page 163

WATERHOUSE - 10-19-21

1
2    Q.   Sometime in 2021?
3    A.   Yes.
4    Q.   Do you remember what payment he was
5    referring to?
6    A.   It was the -- the payment made in
7    January of 2021 or -- yeah, January of -- of
8    this -- January of 2021.
9    Q.   Okay.  So did anybody ever tell you
10   at any time that any payment that was made
11   against principal --
12   A.   And -- and -- and -- hold on, and it
13   may have been other -- again, it may have been
14   that payment or -- or there may have been what
15   he was explaining, a misapplication of prior
16   payments as well.
17   Q.   Can you -- can you give me any
18   specificity -- withdrawn.
19        Withdrawn.  Can you tell me
20   everything that Mr. Sauter told you about --
21   about errors in relation to payments made
22   against principal and interest due under the
23   NexPoint note?
24   MS. DANDENEAU:  Can I just --
25   MR. RUKAVINA:  Hold on.  Hold on.

Page 164

WATERHOUSE - 10-19-21

1
2    I'm going to object here, and I'm going to
3    instruct the witness not to answer
4    depending on the discussion that you had --
5    Mr. Waterhouse, I'm the lawyer for
6    NexPoint, and as everyone here knows, D.C.
7    Sauter is in-house counsel.
8        So if you and Mr. Sauter were having
9    a factual discussion and him preparing his
10   affidavit, et cetera, then go ahead and
11   answer that.  But if you were having a
12   discussion as to our legal strategy in this
13   lawsuit, or anything having to do with
14   that, then do not answer that.
15       And if you need to talk to either
16   your counsel or me about that, then we need
17   to have that discussion now.
18   A.   Okay.  Yeah, I don't -- I don't
19   really know how to make that distinction, so
20   maybe I need to talk to counsel before I
21   answer, or if I can answer.
22   Q.   Let me just ask you this question:
23   Did -- did you have any conversation with
24   Mr. Sauter about any payment of principal and
25   interest prior to the time that you left

Page 165

WATERHOUSE - 10-19-21

1
2    Highland's employment, or did it happen after
3    you left Highland's employment?
4    A.   I don't -- I don't recall if -- I
5    don't recall.  I mean, it was sometime in 2021.
6    I don't remember if it was before or after I
7    was let go from Highland.
8    Q.   Okay.  So -- so nobody told you
9    prior to 2021 that any error or mistake was
10   made in the application of payments against
11   principal and interest due on the NexPoint
12   note.  Do I have that right?
13   A.   Yeah, I don't -- I don't recall this
14   being in 2020.
15   Q.   Okay.  And it didn't happen in 2019;
16   correct?
17   A.   I don't recall that happened.
18   Q.   And it didn't happen in 2018;
19   correct?
20   A.   I don't -- I don't recall that
21   happening.
22   Q.   And it didn't happen in 2017;
23   correct?
24   A.   I don't recall.
25   Q.   But -- but you believe the

Page 166

WATERHOUSE - 10-19-21

1  conversation took place in 2021.  You just
2  don't remember if it was before or after you
3  left Highland's employment.  Do I have that
4  right?
5      A.  It was sometime this year.  I
6  don't -- I don't remember.
7      Q.  Okay.  Did you report this
8  conversation to Mr. Seery at any point?
9      A.  I don't believe so.
10      Q.  Did you report this conversation to
11  anybody at DSI at any time?
12      A.  I don't recall.
13      Q.  Do you have -- you don't have a
14  recollection of ever doing that; correct?
15      A.  Yeah, that's right.  I don't recall
16  doing that.
17      Q.  Do you recall telling anybody at
18  Pachulski Stang about the conversation you
19  recall with Mr. Sauter?
20      A.  No, I don't -- I don't recall.
21      Q.  Did you tell any of the independent
22  board members about your conversation with
23  Mr. Sauter?
24      A.  I don't recall.

Page 167

WATERHOUSE - 10-19-21

1      Q.  Did you tell any of the employees at
2  Highland before you left Highland's employment
3  about this call that you had with Mr. Sauter?
4      MS. DANDENEAU:  Objection to form.
5      A.  No, I don't -- no, I don't recall.
6      Q.  NexPoint -- to the best of your
7  knowledge, did NexPoint ever file a proof of
8  claim against Highland to try to recover moneys
9  that were mistakenly paid against the principal
10  and interest due under the note?
11      A.  Okay.  Hold on.  You are saying did
12  NexPoint Advisors file a proof of claim to
13  Highland for errors related to payments under
14  the NexPoint note to Highland?
15      Q.  Correct.
16      A.  I'm -- I'm -- I'm not -- I'm not
17  aware.
18      Q.  Are you aware --
19      A.  I'm not the legal person here, I
20  don't know.
21      Q.  I'm just asking for your knowledge,
22  sir.
23      A.  Yeah, I don't know.  I'm not aware.
24      Q.  Are you aware of any claim of any

Page 168

WATERHOUSE - 10-19-21

1  kind that NexPoint has ever made to try to
2  recover the amounts that it contends were -- or
3  that Mr. Sauter contend were mistakenly applied
4  against principal and interest due under the
5  NexPoint note?
6      A.  I'm not aware.
7      MS. DANDENEAU:  Objection to form.
8      Q.  Okay.  The advisors' agreements with
9  the retail funds are subject to annual renewal;
10  correct?
11      A.  Yes.
12      Q.  And do you participate in the
13  renewal process each year?
14      A.  Yes.
15      Q.  What role do you play in the renewal
16  process?
17      A.  I'm -- I'm asked by the retail board
18  to walk-through the advisors financials.
19      Q.  And do you do that in the context of
20  a board meeting?
21      A.  Yes, it is -- yes, it is typically
22  done in a board meeting.
23      Q.  And do you recall the time --
24  does -- does the renewal process happen around

Page 169

WATERHOUSE - 10-19-21

1  the same time each year?
2      A.  Yes, it is -- it is around the same
3  time every year.
4      Q.  And what -- what time period of the
5  year does the renewal process occur?
6      A.  Approximately the September
7  timeframe.
8      Q.  During that process, in your
9  experience, does the board typically conduct
10  its own diligence and ask for information?
11      A.  Does the board ask for lots of -- I
12  mean, just -- I mean, lots of information as a
13  part of that -- that -- as part of that board
14  meeting and that process.
15      Q.  Okay.  And do you recall that the
16  process in 2020 spilled into October?
17      A.  Yes.  Yes.
18      Q.  Okay.  And as part of the process in
19  2020, the retail board asked -- asked what are
20  referred to as 15(c) questions; right?
21      A.  I guess I don't want to be -- they
22  asked 15(c) -- are you saying they asked 15(c)
23  questions and this is why it went into October
24  or --

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2    Q.  No, I apologize.
3      Do you have an understanding of
4  what -- of what 15(c) refers to in the context
5  of the annual renewal process?
6    A.  Yes, generally.
7    Q.  All right.  What is your general
8  understanding of the term "15(c)" in the
9  context of the annual renewal process?
10    A.  I -- I think 15(c) is the section
11  that -- that -- you know, that -- that the
12  board has to evaluate every year, the retail
13  board.  They have to, you know, go through,
14  evaluate, and go through that approval process
15  on a yearly basis.
16    Q.  Okay.
17      MR. MORRIS:  Can we put up on the
18  screen Exhibit 36, please.
19      (Exhibit 36 marked.)
20      MR. MORRIS:  I guess let's just
21  start at the bottom so Mr. Waterhouse can
22  see what is here.
23    Q.  You see this begins with an email
24  from Blank Rome to a number of people.
25      MR. MORRIS:  And if we can scroll

1       WATERHOUSE - 10-19-21
2  up -- keep going just a little bit.
3    Q.  You will see that there is an email
4  from Lauren Thedford to Thomas Surgent and
5  others where she reports that she was attaching
6  and reproducing below additional 15(c)
7  follow-up questions from the board.
8      Do you see that?
9    A.  Yes.
10    Q.  And do you see Question No. 2 asks
11  whether there are any material outstanding
12  amounts currently payable or due in the future
13  (e.g., notes) to HCMLP by HCMFA or NexPoint
14  Advisors or any other affiliate that provides
15  services to the funds?
16      Do you see that?
17    A.  Yes.
18    Q.  And -- and did you -- do you recall
19  that in -- in October of 2020 the retail boards
20  were asking for that information?
21    A.  I don't recall it, but there --
22  they're obviously asking in this email.
23    Q.  Okay.
24      MR. MORRIS:  Can we scroll up a
25  little bit, please.

1       WATERHOUSE - 10-19-21
2    Q.  And then do you see that
3  Ms. Thedford includes you on the email string
4  on Tuesday, October 6th, at 5:52?
5    A.  Yes.
6    Q.  And she asks you and Dave Klos and
7  Kristin Hendrix for advice on that particular
8  Request No. 2 that I have just read; right?
9    A.  Yes.
10    Q.  Okay.  Can you tell me who
11  Ms. Thedford is?
12    A.  She was an attorney that was in the
13  legal group.
14    Q.  At Highland Capital Management,
15  L.P.?
16    A.  I'm -- I'm -- I'm -- I don't
17  remember if she was an employee of Highland or
18  any of the advisors.
19    Q.  Okay.  Do you know if she served as
20  the corporate secretary for both HCMFA and
21  NexPoint?
22    A.  Yes.
23    Q.  And -- okay.
24      Do you know whether Ms. Thedford
25  held any positions in relation to the retail

1       WATERHOUSE - 10-19-21
2  funds as we defined that term?
3    A.  Yes.
4    Q.  What is your understanding of the
5  positions that Ms. Thedford held at the retail
6  funds?
7    A.  I -- I recall her being an officer.
8  I don't recall her title.
9    Q.  Okay.  Is still an officer at
10  any of the retail funds today?
11    A.  No.
12    Q.  Do you know when she ceased to be an
13  officer of the retail funds?
14    A.  Approximately.
15    Q.  And when did she approximately cease
16  to be an officer of the retail funds?
17    A.  It was in -- it was in early of
18  2021.
19    Q.  Okay.  Do you know when she became
20  an officer of the retail funds?
21    A.  I don't recall.
22    Q.  To the best of your recollection,
23  was she an officer of the retail funds in
24  October of 2020?
25    A.  I believe so.

Page 174

```
 1            WATERHOUSE - 10-19-21
 2      Q.   Okay.  Do you know what title she
 3  held in her capacity as an officer, if any?
 4      A.   I told you I don't remember.
 5      Q.   Okay.  So she sends this email to
 6  you at 5:52 p.m. on October 6th.
 7           And if we can scroll up to the
 8  response, you responded a minute later with a
 9  one-word answer:  Yes.
10           Do you see that?
11      A.   Yes.
12      Q.   And -- and yes is -- yes was in
13  response to the retail board's Question No. 2,
14  right, whether there are any material
15  outstanding amounts currently payable or due in
16  the future?
17      A.   Yes.
18           MR. MORRIS:  And can we scroll up to
19  see what happened next.
20      Q.   So Ms. Thedford writes back to you a
21  few minutes later and she asks whether you
22  could provide the amounts.
23           Do you see that?
24      A.   Yes.
25      Q.   And then you respond further and you
```

Page 175

```
 1            WATERHOUSE - 10-19-21
 2  refer her to the balance sheet that was
 3  provided to the board as part of the 15(c)
 4  materials.
 5           Do you see that?
 6      A.   Yes.
 7      Q.   And -- and did the advisors provide
 8  to the board certain balance sheets in 2020 in
 9  connection with the 15(c) review?
10      A.   Yes, they did.
11      Q.   Okay.  And were the amounts that
12  were outstanding or that were to be due in the
13  future by the advisors to Highland included in
14  the liability section of the balance sheet that
15  was given to the retail board?
16      A.   Yes.  Notes would be reflected as
17  liabilities.
18      Q.   Okay.  And --
19      A.   If I'm understanding your question
20  correctly.
21      Q.   You are.  And -- and -- and those
22  liabilities you -- you were -- you believed
23  were responsive to the retail board's question;
24  correct?
25      A.   Yes.
```

Page 176

```
 1            WATERHOUSE - 10-19-21
 2      Q.   Okay.  And then if we can scroll up,
 3  you see Ms. Thedford responds to you
 4  nine minutes later with a draft response.
 5           Do you see that?
 6      A.   Yes.
 7      Q.   And she says that she is taking from
 8  the 6/30 financials certain information about
 9  amounts that were due to HCMLP and affiliates
10  as of June 30th, 2020.
11           Do you see that?
12      A.   I do.
13      Q.   Okay.  And did you believe, as the
14  treasurer of NexPoint and HCMFA and as the CFO
15  of Highland, that the information that
16  Ms. Thedford obtained from the 6/30 financials
17  was accurate and responsive in relation to the
18  retail fund board's question?
19      A.   I just want to make sure I
20  understand the question.
21           Are you saying that the financial
22  information provided to the retail board as
23  part of the 15(c) process, which included
24  financial statements as of June 30th of 2021,
25  did I feel like those were responsive to their
```

Page 177

```
 1            WATERHOUSE - 10-19-21
 2  questions?
 3      Q.   Yes.
 4      A.   Yes.
 5      Q.   Thank you.
 6           MS. DEITSCH-PEREZ:  John, it is not
 7  in the chat yet.  Can you just make sure it
 8  gets put in there.
 9           MR. MORRIS:  Sure.
10           MS. CANTY:  I put it in there.  I
11  think maybe I just sent it directly, so let
12  me make sure it says to everyone.  But I
13  did put it in there.  I will try again.
14           MR. MORRIS:  Thank you, La Asia.
15           MS. DANDENEAU:  What number is it.
16           MR. MORRIS:  What, the Bates number?
17           MS. DEITSCH-PEREZ:  No, the --
18  this -- yeah, 36 is not in the chat.
19           MR. MORRIS:  Okay.  We'll get it.
20           MS. DANDENEAU:  I think that
21  Ms. Canty just sent it to me originally.
22  Sorry.
23           MR. MORRIS:  Okay.  We will get it
24  there.
25           MS. CANTY:  Okay.  It is there now
```

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    for everyone.
3        MS. DEITSCH-PEREZ:  Got it.  Thank
4    you.
5        Q.   Do you recall if the proposed
6    response that Ms. Thedford crafted was
7    delivered to the retail board with the -- with
8    the yellow dates having been completed?
9        A.   I don't know.
10       MR. MORRIS:  Davor, I'm going to ask
11   that the advisors and -- the advisors of
12   both HCMFA and NexPoint produce to me any
13   report that was given to the retail board
14   concerning the promissory notes at issue,
15   including the obligations under the notes.
16       Q.   Do you know -- do you know if
17   ultimately NexPoint informed the retail board
18   in response to its question that NexPoint owed
19   Highland approximately 23 or $24 million?
20       MS. DANDENEAU:  Objection to the
21   form.
22       A.   Sorry, are you asking, did NexPoint
23   tell the retail board that it owed Highland?
24       Q.   Let me ask a better question,
25   Mr. Waterhouse.

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2        Did -- do you know if anybody ever
3    answered the retail board's question that was
4    Number 2?
5        A.   I don't -- I can't say for sure.
6        Q.   Okay.  Do you recall -- I think you
7    testified earlier that you walked through the
8    advisors' financials with the retail board;
9    correct?
10       A.   Yes.
11       Q.   And as part of that process, did you
12   disclose to the retail board the obligations
13   that NexPoint and HCMFA had to Highland under
14   promissory notes?
15       A.   The retail board, as I stated
16   earlier, receives financial information,
17   balance sheet, income statement information
18   from the advisors.  That information is
19   provided to the retail board in connection with
20   the 15(c) process.
21       So any notes between the advisors
22   and the Highland would be -- anything would be
23   detailed in those financial statements.
24       Q.   Do you recall in 2020 ever speaking
25   with the retail board about the advisors'

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    obligations under the notes to Highland?
3        MS. DANDENEAU:  Objection to form.
4        MS. DEITSCH-PEREZ:  Object to the
5    form.
6        A.   I don't recall specifically.
7        Q.   Do you have any general recollection
8    of discussing with the retail board the
9    advisors' obligations to Highland under the
10   notes that they issued?
11       MS. DANDENEAU:  Object to the form.
12       MS. DEITSCH-PEREZ:  Object to the
13   form.
14       A.   I just recall generally just -- it
15   is just -- I present the financial statements,
16   and if they have questions, I answer their
17   questions and walk them through.
18       I don't recall what they asked.  I
19   don't recall where the discussion went.  I
20   don't recall anything of that nature.
21       Q.   Okay.  Do you know if anybody on
22   behalf of HCMF -- HCMFA ever told the retail
23   board that HCMFA had no obligations under the
24   two 2019 notes that you signed?  Withdrawn.
25       Do you know whether anybody on

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    behalf of HCMFA ever told the retail boards
3    that you weren't authorized to sign either of
4    the two 2019 notes?
5        MS. DANDENEAU:  Objection to form.
6        A.   I'm not aware.
7        Q.   Are you aware of anybody on behalf
8    of HCMFA ever telling the retail boards that
9    your execution of the two 2019 notes was a
10   mistake?
11       MS. DANDENEAU:  Objection to form.
12       A.   I'm not aware.
13       Q.   Are you aware of anybody on behalf
14   of HCMFA ever telling the retail boards that
15   HCMFA did not have to pay the amounts reflected
16   in the two notes that you signed in 2019?
17       A.   I'm not aware.
18       Q.   Do you know whether anybody ever
19   told the retail boards -- withdrawn.
20       Do you know whether anybody ever
21   told the retail boards that Highland has
22   commenced a lawsuit to recover on the two notes
23   that you signed in 2019?
24       A.   I'm not aware.
25       Q.   Are you aware of anybody informing

Page 182

WATERHOUSE - 10-19-21

2 the retail boards that Highland has sued to
3 recover on the NexPoint note?
4    A.   I'm not aware.
5    Q.   Do you know whether anybody ever
6 told the retail board that Highland had
7 declared a default with respect to the two
8 HCMFA notes that you signed in 2019?
9    A.   I'm not aware.
10    Q.   Are you aware of anybody ever
11 informing the retail boards that Highland had
12 declared a default under the NexPoint note?
13    A.   I'm not aware.
14    Q.   Are you aware of anybody telling the
15 retail board that Highland made a demand for
16 payment under the 2019 notes that you signed on
17 behalf of HCMFA?
18    A.   I'm not aware.
19    Q.   Let's -- let's see if there is a
20 response to Ms. Thedford's email, if we can
21 scroll up.
22          Do you see you responded to
23 Ms. Thedford five minutes after she provided
24 the draft response to you?
25    A.   Yes.

Page 183

WATERHOUSE - 10-19-21

2    Q.   Okay.  And do you see that Dustin
3 Norris is copied on this email?
4    A.   Yes, he is.
5    Q.   Great.  Do you know whether
6 Mr. Norris held any positions at either of the
7 advisors as of October 6, 2020?
8    A.   I will go back to -- I'm not the
9 legal expert of what appoints you or how or
10 why, but you did see Dustin's name on the
11 incumbency certificate that you produced
12 earlier.
13    Q.   Do you know what his title was in
14 October of 2020?
15    MS. DANDENEAU:  Objection to form.
16    A.   I don't -- I don't recall.
17    Q.   Was he -- did he have a title with
18 each of the advisors, to the best of your
19 recollection?
20    A.   I don't recall.
21    Q.   Do you know why he is included on
22 this email string?
23    A.   I didn't add Dustin.  It looks like
24 Lauren did.  I don't know why she added him or
25 not.  You would have to ask her.

Page 184

WATERHOUSE - 10-19-21

2    Q.   Does Mr. Norris play a role in
3 formulating the advisors' responses to the
4 questions asked by the retail board in
5 connection with the 15(c) annual review?
6    MS. DANDENEAU:  Objection to form.
7    A.   He -- Dustin Norris is there in the
8 board meetings.  But -- so he has a role, yes.
9    Q.   Okay.  And does Mr. Norris hold any
10 positions, to the best of your knowledge, in
11 relation to any of the retail funds?
12    A.   I don't -- I don't believe he does.
13    Q.   How about Mr. Post, do you know
14 whether Mr. Post holds any position in either
15 of the advisors?
16    A.   I mean, he -- he -- yes.
17    Q.   What is your understanding of the
18 positions that Mr. Post holds in relation to
19 the advisors?
20    MS. DANDENEAU:  Objection to form.
21    A.   He is an employee of NexPoint
22 Advisors.  He is also the chief compliance
23 officer for -- for NexPoint.
24    Q.   Who is the chief compliance officer
25 for HCMFA, if you know?

Page 185

WATERHOUSE - 10-19-21

2    MS. DANDENEAU:  Objection to form.
3    A.   That would be Jason as well.
4    Q.   Okay.  Now, looking at your
5 response, you noted initially that nothing was
6 owed under shared services.  Do I have that
7 right in substance?
8    A.   Yeah.  I think I'm being responsive
9 to Lauren's question here, whether any of the
10 shared service invoices are outstanding.
11    Q.   Right.
12    A.   Yes.
13    Q.   And that is because -- and that is
14 because the retail the retail board has asked
15 for the disclosure of all material obligations
16 that were owed to HCMLP either then or in the
17 future; isn't that right?
18    MS. DANDENEAU:  Objection to form.
19    Q.   We can go back down and look.
20    A.   Look, I don't know if that's a
21 material item, I mean, again, but sure.
22    Q.   Okay.  But there were no shared
23 services outstanding; correct?
24    MS. DANDENEAU:  Objection to form.
25    A.   That is what this email seems to

Page 186

WATERHOUSE - 10-19-21

1
2  indicate.
3      Q.   And you wouldn't have written it if
4  you didn't believe it to be true at the time;
5  correct?
6      A.   Correct.
7      Q.   And when you referred to shared
8  services outstanding, what you meant there was
9  that neither NexPoint nor HCMFA owed Highland
10  any money under the shared services agreements
11  that they had with Highland as of October 6th,
12  2020; right?
13      A.   I don't know if it is as of October
14  6, 2020 or if it was from -- like through the
15  financials -- through the date of the
16  financials as of June 30.
17      Q.   Okay. And then you noted that
18  HCMA -- the HCMFA note is a demand note; right?
19      A.   Yes.
20      Q.   And then you referred Ms. Thedford
21  to Kristin Hendrix for the term of the NexPoint
22  note. Do I have that right?
23      A.   Yes.
24      Q.   And then you refer to that agreement
25  that is referenced in the 2018 audited

Page 187

WATERHOUSE - 10-19-21

1
2  financials about Highland's agreement not to
3  make demand upon HCMFA until May 2021; correct?
4      A.   Correct.
5      Q.   And then -- and then the next thing
6  you write is that the attorneys think that BK
7  doesn't change that, but don't know for sure at
8  the end of the day.
9          Do you see that sentence?
10      A.   Yes.
11      Q.   Which attorneys were you referring
12  to?
13      A.   I don't remember.
14      Q.   Did you have a conversation with
15  attorneys concerning whether the bankruptcy
16  would change or alter in any way the agreement
17  not to make a demand under the HCMFA note?
18      A.   Look, yeah, I mean, I don't
19  specifically remember, but generally, I mean,
20  it is in this email. I don't -- I don't -- I
21  don't -- I don't remember who I talked to or,
22  you know, was it inside counsel, outside
23  counsel, but obviously I talked to somebody.
24      Q.   Do you have any recollection --
25      A.   Well, I don't even know if it's --

Page 188

WATERHOUSE - 10-19-21

1
2  actually, it may not even have been me. I say
3  the attorneys in, you know, a lot of -- like I
4  talked about the team.
5          It could have been someone on the
6  team, like, hey, we need to run this down, and
7  maybe they talked to attorneys again and
8  relayed that information to me.
9          So I really don't know if I spoke or
10  someone else did or -- or, I mean, and maybe it
11  wasn't even from corporate accounting. Maybe
12  it was, you know, other -- I'm kind of
13  summarizing, you know, again, so I don't really
14  know -- I can't really say for sure. I don't
15  remember how I came about of this knowledge.
16      Q.   I appreciate your efforts,
17  Mr. Waterhouse, but I will just tell you that
18  if I ask a question and you don't know the
19  answer or you don't recall, I'm happy to accept
20  that. I don't -- I don't want you to
21  speculate, so I want to be clear about that.
22  So I appreciate it.
23          Let me just ask you simply: Do you
24  know what attorneys -- can you identify any of
25  the attorneys who thought that the bankruptcy

Page 189

WATERHOUSE - 10-19-21

1
2  process didn't change the agreement?
3      A.   I don't recall.
4      Q.   Okay. Perfect.
5          And then let's look at the last
6  sentence. It says, quote: The response should
7  include, as I covered in the board meeting,
8  that both entities have the full faith and
9  backing from Jim Dondero, and to my knowledge
10  that hasn't changed.
11          Do you see that?
12      A.   Yes.
13      Q.   Okay. Prior to October 6th, 2020,
14  had you told the retail board that HCMFA and
15  NexPoint have the full faith and backing from
16  Jim Dondero?
17      A.   Yes.
18      Q.   Do you remember in the context in
19  which you told the retail board that?
20      A.   I mean, generally, yes.
21      Q.   Tell me what you recall.
22      A.   So we were walking through the
23  financials from the advisors; right? So as I
24  described to you, you have got HCMFA and NPA.
25  And these -- the financials, you know, show

Page 190

WATERHOUSE - 10-19-21

2  they have liabilities on them that exceed
3  assets.
4        So the retail board has asked, okay,
5  you know, how -- you know, if -- if these
6  liabilities come due or they're payable, you
7  know, how does that come about?
8        And, you know, the response is,
9  well, the advisors have the -- the full faith
10  and backing from -- from Jim Dondero.
11    Q.   And how did you know that the
12  advisors had the full faith and backing from
13  Jim Dondero?  What was the basis for that
14  statement that you made to the retail board?
15    A.   I talked to Jim about it at some
16  point in the past.
17    Q.   And did you tell Mr. Dondero that
18  you were going to inform the retail board that
19  the advisors had his full faith and backing
20  before you actually told that to the retail
21  board?
22    A.   I don't recall having that
23  conversation.
24    Q.   Do you recall if you ever informed
25  Mr. Dondero that you had disclosed or told the

Page 191

WATERHOUSE - 10-19-21

2  retail board that the advisors had the full
3  faith and backing of Mr. -- Mr. Dondero?
4        MS. DEITSCH-PEREZ:  Object to the
5  form.
6    A.   I don't recall discussing that with
7  him at the time.
8    Q.   When you told this to the board, was
9  Mr. Dondero participating in the discussion?
10    A.   Not that I recall.
11    Q.   Withdrawn.  Was it not -- withdrawn.
12        Do you recall whether -- when you
13  covered this issue with the board, was that in
14  a -- Zoom call or a Webex call?  Was it a
15  telephone call?  Was it in-person?  Like where
16  were you physically in relation to the board?
17    A.   I believe I was at home.
18    Q.   Okay.  Can you identify every person
19  that you recall who was present for this
20  disclosure other than -- other than the board
21  members themselves?
22        MS. DEITSCH-PEREZ:  Object to the
23  form.
24    A.   I don't recall everyone on the call.
25    Q.   Can you identify anybody who was on

Page 192

WATERHOUSE - 10-19-21

2  the call?
3    A.   Other than the board members?
4    Q.   Yes.
5    A.   Lauren Thedford.  I mean, there
6  are -- there are many -- my section is just one
7  of many sections that are just -- you know, as
8  you can appreciate, this is a long board
9  meeting.
10        I can't recall specifically, really
11  even generally, or who was on when this was
12  discussed.  But Lauren was typically on for the
13  entire time.
14    Q.   I apologize if I asked you this, but
15  do either of Mr. Norris or Mr. Post hold any
16  positions relative to the retail funds?
17    A.   I think you asked me this already,
18  John.
19    Q.   Okay.  I just don't recall.  Can you
20  just refresh my recollection if I did, in fact,
21  ask you the question?
22    A.   I don't believe -- if we can go
23  back.  I don't believe Mr. Norris has a title
24  at the retail funds.  Mr. -- and Mr. Post is
25  the CCO of the advisor, the advisors.

Page 193

WATERHOUSE - 10-19-21

2    Q.   Okay.  Do you know if either of them
3  have a position with the retail board -- with
4  the retail funds?
5    A.   I don't believe Mr. Norris has a
6  position with the retail funds.
7    Q.   All right.  What about Mr. Post?
8    A.   Mr. Post is the CCO of the advisors.
9    Q.   Okay.  Does he hold any position --
10    A.   I don't believe so.
11    Q.   -- with the retail funds?
12    A.   I don't believe so.
13    Q.   Okay.
14    A.   I don't know if being the CCO for
15  the advisor conveys something for the retail
16  funds.  Again, I am not -- that is the legal
17  compliance part of it.  I don't know.
18    Q.   Why did you tell the retail board
19  that the advisors have the full faith and
20  backing from Mr. Dondero?
21        MS. DANDENEAU:  Objection to form.
22    A.   It is -- it is -- it is what has
23  been discussed with them prior.
24    Q.   And were you -- were you trying to
25  give them comfort that even though the

Page 194

1          WATERHOUSE - 10-19-21
2   liabilities exceeded the assets that the
3   advisors would still be able to meet their
4   obligations as they become due?
5          MS. DANDENEAU: Objection to form.
6          MS. DEITSCH-PEREZ: Object form.
7      A.   I -- I can't -- I don't remember
8   specifically the conversation, but generally --
9   you know, generally, yes. And that is why --
10  but, you know, again in this email saying, you
11  know, I am sure I qualified it with the retail
12  board, you know, as I said I like -- you know,
13  to my knowledge, that hasn't changed. But,
14  again, generally -- generally that is what I
15  remember.
16     Q.   Okay. Do you recall if in the
17  advisors' response to the retail board's
18  question if the response included any statement
19  concerning Mr. Dondero and -- and the full
20  faith and backing that he was giving to the
21  advisors?
22         MS. DEITSCH-PEREZ: Object to the
23  form.
24     A.   I don't -- I don't remember
25  specifically what was provided.

Page 195

1          WATERHOUSE - 10-19-21
2      Q.   Okay.
3      A.   And I don't really -- I don't really
4   remember generally either.
5      Q.   Okay.
6          MR. MORRIS: So -- so, again, I'm
7   just going to ask Mr. Rukavina if your
8   clients can produce as soon as possible the
9   15(c) response, the written response that
10  the advisors made, if any, to the board's
11  Question No. 2.
12         I'm not looking for the whole
13  response, but I certainly want the response
14  to Question No. 2.
15     Q.   Do you have a general understanding
16  as to the amount by which -- withdrawn.
17         Did -- did the assets of --
18  withdrawn.
19         Did the liabilities of HCMFA exceed
20  its assets in 2020?
21         MS. DANDENEAU: Objection to form.
22         MS. DEITSCH-PEREZ: Objection, form.
23     A.   I believe I have already answered
24  that question earlier, I think. I believe I
25  said yes.

Page 196

1          WATERHOUSE - 10-19-21
2      Q.   Okay. And did the liabilities of
3   NexPoint exceed its assets in 2020?
4          MS. DEITSCH-PEREZ: Objection to
5   form.
6      A.   I don't believe so.
7      Q.   Okay. So -- so it was only one of
8   the two advisors who had liabilities that
9   exceeded the value of the assets.
10         Do I have that right?
11         MS. DEITSCH-PEREZ: Objection to
12  form.
13         MS. DANDENEAU: Form.
14     A.   Yes.
15     Q.   And do you know, ballpark, the
16  amount by which the value of HCMFA's
17  liabilities exceeded their assets in 2020?
18         MS. DANDENEAU: Objection to form.
19     A.   I don't -- I don't recall.
20         MR. MORRIS: I had specifically
21  requested in discovery the audited
22  financial reports for both advisors and
23  NexPoint. I think I may have gotten one
24  for NexPoint but I'm still waiting for the
25  balance. And I'm going to renew my request

Page 197

1          WATERHOUSE - 10-19-21
2   for those documents too.
3      Q.   Let's go to the next exhibit, which
4   is Number 10. So I think it is in your stack,
5   Mr. Waterhouse.
6          MR. MORRIS: And we can take the one
7   down from the screen and put up Number 10
8   for everybody.
9          (Exhibit 10 marked.)
10     Q.   And I don't know if you have ever
11  seen this before, but I'm really putting it up
12  on the screen for purposes of turning to the
13  very last page of the document.
14         So this is a document that we have
15  been -- that we premarked as Exhibit 10. And
16  we're turning to the last page of the document,
17  which is a document that was filed in the
18  adversary proceeding 21-3004. And -- no, I
19  apologize, I think we -- right there. Perfect.
20         And it is page 31 of 31.
21         MR. MORRIS: I think there may have
22  been some something erroneously stapled to
23  the hard copy that I gave you folks, but
24  I'm looking for page 31 of 31 in the
25  document that begins with the first page of

Page 198

WATERHOUSE - 10-19-21

1    Exhibit 10.
2    Q.    Do you have that, Mr. Waterhouse?
3    A.    I don't have it yet. I'm looking.
4    Q.    All right. If you look at the top
5    right-hand corner, you will see it says page
6    hopefully something of 31?
7    A.    Yes, I've got it now.
8    Q.    Okay. You have got 31 of 31. You
9    can take a moment to read that, if you would
10    like.
11    A.    (Reviewing document.) Okay.
12    Q.    Have you ever seen this before?
13    A.    I don't know if I have seen this
14    specific document, but, you know, I've --
15    I'm -- I'm aware of it.
16    Q.    And is this the document that you
17    had in mind when you sent that email to
18    Ms. Thedford that we just looked at where you
19    said that Highland had agreed not to make a
20    demand upon HCMFA until May 2021?
21    A.    Honestly, I don't -- it wasn't this
22    document. I mean, it's something like this,
23    yes. I mean, yes.
24    Q.    Well --
25

Page 199

WATERHOUSE - 10-19-21

1    A.    It is something like this, but I
2    don't think it was this specific document.
3    Q.    Well, but this document does say in
4    the last sentence that Highland agreed not to
5    seek -- not to demand payment from HCMFA prior
6    to May 31, 2021; right?
7    A.    Yes.
8    Q.    And are you aware of any other
9    document that was ever created pursuant to
10    which Highland agreed not to demand payment on
11    amounts owed by HCMFA before May 31, 2021?
12    A.    Hold on. Are you asking, am I aware
13    of a document that by HCMFA that basically says
14    otherwise?
15    Q.    No. Let me try again.
16    Are you aware of any other document
17    pursuant to which -- pursuant to which Highland
18    agreed not to make a demand on HCMFA until May
19    31st, 2021?
20    A.    I'm -- I think there was something
21    in connection with -- with the -- with the
22    audit that basically says the same thing.
23    Q.    Okay. And do you think that the
24    audit is referring to this particular document?
25

Page 200

WATERHOUSE - 10-19-21

1    A.    I don't know.
2    Q.    All right. This document is dated
3    April 15, 2019. Do you see that?
4    A.    I do.
5    Q.    And do you remember that the audit
6    was completed on June 3rd, 2019?
7    A.    Yes.
8    Q.    And do you recall that the audited
9    financials -- and I'm happy to pull them up if
10    you would like, but do you recall that the
11    audited financials included a reference to the
12    agreement pursuant to which Highland agreed not
13    to make a demand until May 31st, 2021?
14    A.    Yes, I remember.
15    Q.    And as part of the process, would
16    you have expected the corporate accounting team
17    to have provided a copy of this document to
18    PwC?
19    MS. DANDENEAU:  Objection to form.
20    A.    Yes, I would have expected something
21    like this, or again, you know, some document
22    that basically states -- states the deferral
23    till May 31 of 2020.
24    Q.    Okay.
25

Page 201

WATERHOUSE - 10-19-21

1    A.    May 31 of 2021, excuse me.
2    Q.    And this document states the
3    deferral that you just described; correct?
4    A.    It does.
5    Q.    And this document states the
6    deferral that was described in the audited
7    financial statements that we looked at before;
8    correct?
9    A.    It does.
10    MR. MORRIS:  Okay. Can we scroll
11    down just a little bit to see who signed on
12    behalf of the acknowledgment there.
13    Q.    Okay. So Mr. Dondero signed this
14    document on behalf of both HCMFA and Highland;
15    do you see that?
16    A.    I do.
17    Q.    Okay. Did you discuss this document
18    or the -- withdrawn.
19    Did you discuss the concept of the
20    deferral with Mr. Dondero in the spring of
21    2019?
22    A.    I think I testified I don't recall.
23    Q.    Okay. Do you know whose idea it was
24    to issue the acknowledgment in this form?
25

Page 202

WATERHOUSE - 10-19-21

1
2    A.   I don't recall.
3        MR. MORRIS:  Can we scroll back up
4    to the document, please.
5    Q.   Do you see in the beginning it says,
6    reference is made to certain outstanding
7    amounts loaned from Highland to HCMFA for
8    funding ongoing operations.
9        Do you see that?
10   A.   Yes.
11   Q.   And were you aware as the CFO of
12   Highland and as the treasurer of HCMFA that as
13   of April 15, 2019, Highland had made certain
14   loans to HCMFA to fund HCMFA's ongoing
15   operations?
16   A.   Yes.
17   Q.   And were you aware that those loans
18   were payable on demand and remained outstanding
19   as of December 31st, 2018?
20   A.   Yes.
21   Q.   And were you aware that those
22   amounts were payable on demand, and they
23   remained outstanding as of April 15, 2019?
24       MS. DEITSCH-PEREZ:  Object to the
25   form.

Page 203

WATERHOUSE - 10-19-21

1
2    A.   Well, this -- this document dated
3    April 15, 2019 says they have been deferred to
4    May 31, 2021.
5    Q.   Right.  But I'm just sticking to the
6    first paragraph where they refer to the
7    outstanding amounts.  And in the end it says
8    the -- it remained outstanding on December
9    31st, 2018, and I think you told me that you
10   understood that, and then I'm just trying to
11   capture the last piece of it.
12       Did you understand that there were
13   amounts outstanding from the loan that Highland
14   made to HCMFA to fund ongoing operations as of
15   April 15th, 2019?
16   A.   Yes.
17   Q.   Thank you.  Let's look at the next
18   sentence.  HCMFA expects that it may be unable
19   to repay such amounts should they become due
20   for the period commencing today and continuing
21   through May 31st, 2021.
22       Do you see that?
23       MS. DANDENEAU:  Objection to form.
24   A.   I do.
25   Q.   As the CFO -- withdrawn.

Page 204

WATERHOUSE - 10-19-21

1
2        As the treasurer of HCMFA, did you
3    believe that -- do you believe that statement
4    was true and accurate at the time it was
5    rendered?
6    A.   I mean, it -- it -- the answer to
7    that is I really didn't have any -- I didn't
8    have an opinion really.
9    Q.   Did you do anything to educate
10   yourself in April of 2019 on the issue of
11   whether HCMFA could repay the amounts that it
12   owed to Highland should they become due?
13   A.   I don't believe so.
14   Q.   Did you at any time form any
15   opinions as to HCMFA's ability to repay all
16   amounts due to Highland should they become due?
17   A.   Not really.  I guess I don't...
18   Q.   Well, you told the retail board that
19   HCMFA's liabilities exceeded their assets in
20   2020; correct?
21   A.   Yes.
22   Q.   Based on the work that you did to
23   prepare for the retail board, did you form any
24   view as to whether HCMFA would be unable to
25   repay the amounts that it owed to Highland

Page 205

WATERHOUSE - 10-19-21

1
2    should they become due?
3        MS. DANDENEAU:  Objection to form.
4    A.   I mean, I -- when you look at that,
5    to answer you, completely, you know, again,
6    if -- the response I gave the retail board was,
7    you know, the -- the advice -- HCMFA advisors
8    have the -- have the full faith and backing of
9    Jim Dondero.  So I didn't form an opinion of
10   whether the advisor could pay it or not.
11   Q.   Did you form any view as to whether
12   the advisors could repay the amounts that it
13   owed to Highland should they become due without
14   the full faith and backing of Mr. Dondero?
15       MS. DANDENEAU:  Objection to form.
16       MS. DEITSCH-PEREZ:  Form.
17   A.   I mean, if you -- if you -- if you
18   take that last statement out, I mean, it would
19   be difficult for HCMFA to pay back demand notes
20   at that time.
21   Q.   And it was precisely for that reason
22   that you told the retail board that -- that the
23   retail -- that the advisors had the full faith
24   and backing of Mr. Dondero; correct?
25       MS. DANDENEAU:  Objection to form.

Page 206

WATERHOUSE - 10-19-21

1
2    A.   I mean, yes, as the mouthpiece, I
3    was relaying information.
4    Q.   Okay.  And you relayed that
5    information with the knowledge and approval of
6    Mr. Dondero; correct?
7         MS. DEITSCH-PEREZ:  Object to the
8    form.
9    A.   As I stated in the email, I don't
10   believe, and I think I testified I don't
11   believe I had conversations with Mr. Dondero at
12   the time of that board meeting.
13   Q.   Did you tell the retail board that
14   the advisors had the full faith and backing of
15   Mr. Dondero without Mr. Dondero's prior
16   approval?
17   A.   Yeah, I -- I -- yes, I'm -- like I
18   said, I think I testified earlier, I'm sure I
19   qualified it as well.
20   Q.   What do you mean by that?
21        MS. DANDENEAU:  Objection to form.
22   A.   Again -- again, like I said in the
23   email, it has the full faith and backing of Jim
24   Dondero unless that has changed.
25   Q.   Actually that is not what you said,

Page 207

WATERHOUSE - 10-19-21

1    so let's put the email back up.
2    A.   It is -- it is -- it is in the
3    email.
4    Q.   Let's put the email back up.  You
5    didn't say unless it has changed.  You said you
6    believe it hasn't changed; right?
7    A.   Okay.  And to my knowledge that
8    hasn't changed, that is what it says.
9    Q.   That's right.
10   A.   But, again, I mean, that is -- I
11   don't know everything.  And I'm not in every
12   conversation.  I'm not -- to presume that I am,
13   is -- and you have to put myself -- as you
14   started this out, Mr. Morris, I was at home in
15   October of 2020 with COVID -- or, you know,
16   under these COVID times that we described is
17   very difficult.
18        We have all been working at home for
19   really the first time ever, undergoing
20   processes, procedures, control environments
21   that have been untested, and there is poor
22   communication.
23        So I am relaying, as I'm telling you
24   now, what is in the email.  And unless

Page 208

WATERHOUSE - 10-19-21

1
2    something has changed -- to my knowledge, it
3    hasn't changed, but it could have changed.
4    Q.   When you say that the advisors have
5    the full faith and backing from Mr. Dondero,
6    did you intend to convey that, to the extent
7    the advisors were unable to satisfy their
8    obligations as they become due, Mr. Dondero
9    would do it for them?
10        MS. DANDENEAU:  Object to the form.
11        MS. DEITSCH-PEREZ:  Object to the
12   form.
13        And, John, we have given you a lot
14   of leeway here but this does not seem
15   relevant to this case.  You seem sort of
16   taking a complete sort of diversion into
17   the allegations and the complaint just
18   filed on Friday, and so I would ask you to
19   move on because --
20        MR. MORRIS:  And I will tell you --
21   I will tell you that I have never read that
22   complaint cover-to-cover.  I have nothing
23   to do with the prosecution of those claims.
24   And this issue that we're talking about
25   right now is related solely to the

Page 209

WATERHOUSE - 10-19-21

1
2    promissory notes that your clients refuse
3    to pay.
4         So I'm going to continue to ask my
5    questions, and I would ask the court
6    reporter to read back my last question.
7         (Record read.)
8         MS. DEITSCH-PEREZ:  And then I
9    believe there were objections to form.
10   Q.   You can answer the question.
11   A.   Yes.
12   Q.   Thank you very much, sir.
13        MR. MORRIS:  Can we go back to the
14   other document, please?
15   Q.   Mr. Waterhouse, do you know if this
16   document was ever shared with the retail board?
17   A.   I don't recall.
18   Q.   Did you ever share it with the
19   retail board?
20   A.   I don't recall.
21   Q.   Did you ever tell the retail board
22   about the substance of this document?
23   A.   I don't recall.
24   Q.   Did you ever tell the retail board
25   that Highland had agreed not to make a demand

Page 210

```
1            WATERHOUSE - 10-19-21
2  against HCMFA until May 2021?
3      A.   I don't recall.
4      Q.   Do you know whether anybody on
5  behalf of the advisors ever informed the retail
6  board that Highland had agreed on April 15,
7  2019, not to make a demand against HCMFA under
8  the promissory notes?
9      A.   I don't recall.
10     Q.   Did you instruct Ms. Thedford or
11 anybody else responding to the retail board's
12 15(c) inquiry to disclose this document?
13     A.   Did I instruct Ms. Thedford or
14 anyone else to -- to -- to produce this, to
15 disclose this document?  Is that what you -- I
16 just want to make sure.
17     Q.   Uh-huh.
18     A.   Yeah, I don't -- I don't recall.
19     Q.   Did you instruct anybody to inform
20 the retail board, in response to their question
21 as part of the 15(c) process, to -- to tell the
22 retail board about Highland's agreement not to
23 make a demand until 2021?
24          MS. DANDENEAU:  Objection to form.
25     A.   I don't recall.
```

Page 211

```
1            WATERHOUSE - 10-19-21
2      Q.   Did you ever inform PwC that HCMFA's
3  liabilities exceeded its assets?
4          MS. DANDENEAU:  Object to the form.
5      A.   I don't -- I don't think I told
6  them.  I mean, they -- they audited the
7  financial statements.
8      Q.   Did -- do you know if anybody on
9  behalf of Highland ever informed
10 PricewaterhouseCoopers that HCMFA may be unable
11 to repay amounts owing to Highland, should they
12 become due?
13          MS. DANDENEAU:  Objection to form.
14     A.   Yes.  Again, I think I testified
15 earlier that -- that this was communicated to
16 the auditors.
17     Q.   Ideally --
18     A.   I don't know who exactly did that.
19 I don't recall doing it, but, yeah, it was --
20 it was communicated.  And that is why -- I
21 mean, there is a disclosure in the financial
22 statements; right?
23     Q.   There is, and that disclosure
24 relates to the last sentence of this document;
25 correct?
```

Page 212

```
1            WATERHOUSE - 10-19-21
2      A.   Yes.
3      Q.   Do you recall looking in the
4  document and seeing anything that was disclosed
5  with respect to the sentence above that?
6      A.   No.
7      Q.   Do you know whether anybody on
8  behalf of Highland ever informed
9  PricewaterhouseCoopers that HCMFA expects that
10 it may be unable to repay amounts due and owing
11 to Highland should they become due?
12          MS. DEITSCH-PEREZ:  Object to the
13     form.  I think that is the third time.
14     A.   I don't recall.  Again, as I said,
15 we -- all of this was given to the auditors.
16     Q.   Do you know if Highland received
17 anything of value in exchange for its agreement
18 not to demand payment on amounts owed by HCMFA
19 prior to May 31st, 2021?
20          MS. DEITSCH-PEREZ:  Object to the
21     form.  That is the second time.
22          MS. DANDENEAU:  Object to the form.
23     A.   I have answered this question.
24          MR. RUKAVINA:  Hold on.  Object to
25     legal conclusion.  Go ahead.
```

Page 213

```
1            WATERHOUSE - 10-19-21
2      A.   I have answered this question
3  before.
4      Q.   And the answer was no?
5      A.   I'm not aware.
6      Q.   Now, this acknowledgment can't
7  possibly apply to the two notes that you signed
8  on behalf of HCMFA because those notes were
9  signed on May 2nd and May 3rd, 2019; is that
10 right?
11          MS. DANDENEAU:  Objection to form.
12     A.   Unless there is a drafting error.
13     Q.   Okay.  Are you aware of a drafting
14 error?
15     A.   I'm not aware.  I didn't -- I wasn't
16 part of -- I didn't sign this note or this
17 acknowledgment.  I didn't draft it.
18     Q.   But you do see it is dated April 15,
19 2019; right?
20     A.   Yes.
21     Q.   And this was a document that was
22 actually included by the advisors in a pleading
23 they filed with the Court; right?
24          MR. RUKAVINA:  Well, I don't know
25     that so I object to form.
```

Page 214

```
1              WATERHOUSE - 10-19-21
2    Q.   Okay.  Let's go to the first page of
3  the document and just confirm that.
4         MR. AIGEN:  Mr. Morris, I just note
5  that you already said there was some error
6  with the document that is listed as
7  exhibit --
8         MR. MORRIS:  No.  No, no, no.
9         MS. DEITSCH-PEREZ:  Oh, okay.
10        MR. MORRIS:  What I said is that
11 there is a few pages that were mistakenly
12 stapled to the end of the document.
13        MS. DEITSCH-PEREZ:  Okay.
14        MR. MORRIS:  There is no problem
15 with this document.
16        MS. DEITSCH-PEREZ:  And just so
17 we're clear that the document -- the pages
18 that start with defendant's amended answer
19 are not intended to be part of this
20 document?
21        MR. MORRIS:  That's correct.
22        MS. DEITSCH-PEREZ:  And that the --
23 but it is your representation that the rest
24 of the document is -- is -- is correct
25 because we don't -- we don't have any way
```

Page 215

```
1  of verifying that, we're just --
2         MR. MORRIS:  You do, actually.  You
3  could just go to Docket No. 21-3004.
4         MS. DEITSCH-PEREZ:  If you want to
5  stop this deposition so we can go and pull
6  that document up, we're happy to do it.  So
7  I am just asking you for your
8  representation.
9         MR. MORRIS:  Sure.  I gave that.
10        MS. DEITSCH-PEREZ:  Okay.
11    Q.   So do you see that this is a
12 document that was actually filed with the Court
13 by Highland Capital Management Fund Advisors?
14    A.   No.  I get with the first page in
15 the section.  Maybe I'm looking at the wrong
16 thing.  It says, Highland Capital Management.
17    Q.   Don't worry about it.  Don't worry
18 about it.
19    A.   Maybe I went back -- okay.
20        MR. MORRIS:  All right.  Can we put
21 up on the screen Exhibit 2.
22        (Exhibit 2 marked.)
23        MR. MORRIS:  I think it is
24 Exhibit 1.
25
```

Page 216

```
1              WATERHOUSE - 10-19-21
2         MS. DANDENEAU:  I'm sorry, John, did
3  you say Exhibit 2 or Exhibit 1?
4         MR. MORRIS:  It is Exhibit 2 in the
5  binders so it is premarked Exhibit 2.  And
6  now I'm asking -- right there -- going to
7  Exhibit 1 to the document that was marked
8  as Exhibit 2.
9         MS. DANDENEAU:  Got it.  In the
10 binder there is no --
11        MS. DEITSCH-PEREZ:  There is no
12 Exhibit 1.
13        MR. MORRIS:  All right.  So look at
14 the one on the screen.
15    Q.   Do you see, Mr. Waterhouse, that
16 this is a promissory note dated May 31st, 2017,
17 in the approximate amount of $30.7 million?
18    A.   Yes.
19    Q.   And do you see that the maker of the
20 note is NexPoint?
21    A.   Yes.
22    Q.   And that Highland is the payee; is
23 that right?
24    A.   Yes.
25    Q.   Okay.  And do you see in Paragraph 2
```

Page 217

```
1              WATERHOUSE - 10-19-21
2  this is an annual installment note?
3     A.   Can you scroll down.
4     Q.   Sure.
5         MR. MORRIS:  Can we scroll down --
6  yeah, there you go.
7     A.   Right there, yeah.  Yes.
8         MR. MORRIS:  And can we scroll down
9  to the signature line.
10    Q.   And do you recognize that as
11 Mr. Dondero's signature?
12    A.   Yes.
13    Q.   And is this the promissory note that
14 we talked about earlier where NexPoint had made
15 certain payments in the aggregate amount of
16 about 6 to $7 million against principal and
17 interest?
18    A.   I don't recall discussing the
19 aggregate principal amounts of 6 to $7 million,
20 but -- so I don't -- I don't recall that prior
21 discussion with those amounts.
22    Q.   All right.  Let's take a look.
23 NexPoint always included this promissory note
24 as a liability on its audited financial
25 statements; right?
```

Page 218

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | A.   Yes. |
| 3 | Q.   And NexPoint had its financial |
| 4 | statements audited; isn't that correct? |
| 5 | A.   Yes. |
| 6 | Q.   And was the process of NexPoint's |
| 7 | audit similar to the process you described |
| 8 | earlier for Highland and HCMFA? |
| 9 | A.   Yes, it is similar. |
| 10 | Q.   Okay. |
| 11 | MR. MORRIS:   Can we put up |
| 12 | NexPoint's audited financials and let |
| 13 | everybody know what exhibit number it is, |
| 14 | La Asia? |
| 15 | MS. CANTY:   It is going to be |
| 16 | Exhibit 46. |
| 17 | (Exhibit 46 marked.) |
| 18 | Q.   And do you see, sir, that we've put |
| 19 | up NexPoint Advisors' consolidated financial |
| 20 | statements and supplemental information for the |
| 21 | period ending December 31st, 2019? |
| 22 | A.   Yes. |
| 23 | Q.   Did you participate in the process |
| 24 | whereby these audited financial statements were |
| 25 | issued? |

Page 219

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | A.   I didn't participate directly, as |
| 3 | I've described before, about the -- the team |
| 4 | performing the audit. |
| 5 | Q.   Do you recall when the audit of |
| 6 | NexPoint's financial statements for the period |
| 7 | ending December 31st, 2019 was completed? |
| 8 | A.   Yes. |
| 9 | Q.   And when do you recall it being |
| 10 | completed? |
| 11 | A.   In January of 2021. |
| 12 | Q.   Do you know why the 2019 audit |
| 13 | report wasn't completed until January of 2021? |
| 14 | A.   Yes. |
| 15 | Q.   Why was the NexPoint audit report |
| 16 | for the period ending 12/31/19 not completed |
| 17 | until January 2021? |
| 18 | A.   Because we had to deal with working |
| 19 | from home from -- with COVID, and on top of all |
| 20 | of our daily responsibilities and job duties |
| 21 | at -- at providing -- at Highland providing |
| 22 | services to NexPoint, we had to do all of this |
| 23 | extra work for a bankruptcy that was filed in |
| 24 | October of 2019. |
| 25 | MR. MORRIS:   Can we go to the |

Page 220

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | balance sheet on page 3?  Okay.  Stop right |
| 3 | there. |
| 4 | Q.   Do you see under the liabilities |
| 5 | section, the last item is note payable to |
| 6 | affiliate? |
| 7 | A.   Yes. |
| 8 | Q.   And is that the note that we just |
| 9 | looked at? |
| 10 | MS. DANDENEAU:   Objection to form. |
| 11 | Q.   Withdrawn. |
| 12 | Is that the approximately |
| 13 | $30 million note that we just looked at that |
| 14 | was dated from 2017? |
| 15 | MS. DANDENEAU:   Objection to form. |
| 16 | A.   I believe no. |
| 17 | Q.   Okay.  You're not aware of any other |
| 18 | note that was outstanding from NexPoint to |
| 19 | Highland as of the end of the year 2019, other |
| 20 | than that one $30 million note; right? |
| 21 | A.   I don't recall. |
| 22 | Q.   And as of the end of 2019, the |
| 23 | principal amount that was due on the note was |
| 24 | approximately $23 million; right? |
| 25 | MS. DEITSCH-PEREZ:   Object to the |

Page 221

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | form. |
| 3 | A.   Approximately. |
| 4 | Q.   And does that refresh your |
| 5 | recollection that between the time the note was |
| 6 | executed and the end of 2019, that NexPoint had |
| 7 | paid down approximately $7 million? |
| 8 | A.   Yes.  If we are just doing the math, |
| 9 | yes. |
| 10 | Q.   Okay.  Did NexPoint complete its |
| 11 | audit from 2020? |
| 12 | A.   Sorry, you kind of broke up.  Do |
| 13 | NexPoint complete? |
| 14 | Q.   The audit of its financial |
| 15 | statements for the period ending December 31st, |
| 16 | 2020? |
| 17 | A.   No. |
| 18 | Q.   No, it's not complete? |
| 19 | A.   No, it is not complete. |
| 20 | Q.   Did HCMFA complete its audit for the |
| 21 | year ending December 31st, 2020? |
| 22 | A.   No. |
| 23 | MR. MORRIS:   Can we go to page 15, |
| 24 | please, the paragraph at the bottom. |
| 25 | Q.   Do you see that NexPoint has |

Page 222

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2  included under notes payable to Highland a
3  reference to the amounts that were outstanding
4  as of the year-end 2019 under the note that we
5  looked at just a moment ago?
6      A.   Yes.  Are you talking about the
7  second paragraph?
8      Q.   I'm actually talking about first
9  paragraph.  Do you understand that the first
10  paragraph is a reference to the 2017 note, and
11  the amounts that were -- the principal amount
12  that was outstanding as of the end of 2019?
13      MS. DANDENEAU:  Objection to form.
14  John, do you mean the first paragraph of
15  that page?
16      MR. MORRIS:  No, the first paragraph
17  under notes payable to Highland.
18      A.   Yeah, I see the paragraph, and
19  again, this is what I answered earlier.  I
20  believe so, just because I don't -- again, this
21  is a number in a balance sheet, and without
22  matching it up and seeing the detail with the
23  schedule like I kind of talked about for
24  Highland's financial statements, it is a little
25  bit more difficult to tie everything in

Page 223

1      WATERHOUSE - 10-19-21
2  perfectly together.
3      Q.   Okay.  But you're not aware of any
4  note that was outstanding at the end of 2019
5  from NexPoint to Highland other than whatever
6  principal was still due and owing under the
7  $30 million note issued in 2017; correct?
8      A.   Well, it -- I don't -- there is
9  reference in the second paragraph.  I don't --
10  I don't -- I don't recall what that is
11  referring to, so I don't -- I don't know.
12      Q.   Well, if you listen carefully to my
13  question, right, I'm asking about notes that
14  were outstanding at the end of 2019, and if we
15  look at the paragraph you just referred to, it
16  says that during the year there were new notes
17  issued totaling $1.5 million, but by the end of
18  the year, no principal or interest was
19  outstanding on the notes.
20      Do you see that?
21      A.   Oh, I do, yes.
22      Q.   So does that refresh your
23  recollection that there were no notes
24  outstanding from NexPoint to Highland other
25  than the principal remaining under the original

Page 224

1      WATERHOUSE - 10-19-21
2  $30 million 2017 note that we looked at a
3  moment ago?
4      A.   Well, we're at the bottom of the
5  page.  Is there anything on page 16?
6      Q.   That is a fair question, sure.  That
7  is it.
8      A.   Okay.  So it appears that that is
9  the only note that is detailed in the notes in
10  the financial statement.
11      Q.   And you don't have any memory of any
12  other note other than the 2017 note, right,
13  being outstanding as of the end of the year?
14      A.   I deal with thousands of
15  transactions every year.  I don't really have a
16  very specific memory for what exactly was
17  outstanding.
18      MR. MORRIS:  Why don't we take a
19  break now.  We've been going for a little
20  while.  It's 3:26.  Let's come back at
21  3:40.
22      VIDEOGRAPHER:  We're going off the
23  record at 3:26 p.m.
24      (Recess taken 3:26 p.m. to 3:39 p.m.)
25      VIDEOGRAPHER:  We are going back on

Page 225

1      WATERHOUSE - 10-19-21
2  the record at 3:39 p.m.
3      Q.   All right.  Mr. Waterhouse, we -- I
4  don't think we have a lot more here.
5      To the best of your knowledge and
6  recollection, were all affiliate loans and all
7  loans made to Mr. Dondero recorded on
8  Highland's books and records as assets of
9  Highland?
10      MS. DANDENEAU:  Object to the form,
11  asked and answered.
12      A.   To my knowledge, yes.
13      Q.   Okay.  Can you recall any loan to
14  any affiliate or Mr. Dondero that was not
15  recorded on Highland's books and records as an
16  asset?
17      A.   Like during my time as CFO?  I don't
18  recall.
19      Q.   How about after the time that you
20  were CFO?  Did you recall that there was a loan
21  by Highland to an affiliate or to Mr. Dondero
22  that hadn't been previously recorded on
23  Highland's books as an asset?
24      MS. DANDENEAU:  Objection to form.
25      A.   I guess I don't understand the

Page 226

WATERHOUSE - 10-19-21

1 question. I left Highland as of -- I'm not
2 aware of -- I left Highland in February --
3 probably the last day of February of 2021.
4     Q.   Okay.
5     A.   I'm not -- I'm not aware of any --
6 I'm not aware of anything past that date.
7     Q.   Okay.  While you were the CFO at
8 Highland, did Highland prepare in the ordinary
9 course of business a document that reported
10 operating results on a monthly basis?
11     A.   Yes.
12     Q.   And are you generally familiar with
13 the monthly operating reports?
14     A.   Yeah.  You are referring to the
15 reports that we filed to the Court every month?
16     Q.   I apologize, I'm not.  I'm taking
17 you back to the pre-petition period.  There was
18 a report that I have seen that I'm going to
19 show you, but I'm just asking for your
20 knowledge.
21         MR. MORRIS:  Let's put it up on the
22 screen, Exhibit 39.
23         (Exhibit 39 marked.)
24     Q.   Do you see this is a document that

*(line 1 header, lines numbered 1-25)*

Page 227

WATERHOUSE - 10-19-21

1 is called operating results?
2     A.   Yeah, that's the title of it.
3     Q.   Okay.  And was a report of operating
4 results prepared by Highland on a monthly basis
5 during the time that you served as CFO?
6     A.   No.
7     Q.   Are you familiar with a document of
8 this type?  And we can certainly look at the
9 next page or two to refresh your recollection.
10     A.   I'm just looking at the title.  I
11 don't really -- again, as I discussed before, I
12 don't have any records or documents or emails
13 or appointments or anything that I was able to
14 use prior to -- prior to this deposition, so
15 I'm doing the best I can.
16     Q.   Okay.  You don't need to apologize.
17 I'm just asking you if you are familiar with
18 the document called Operating Results that was
19 prepared on a monthly basis at Highland?
20         MS. DEITSCH-PEREZ:  Object to the
21 form.
22     Q.   If you're not, you're not.
23     A.   I don't believe this was prepared on
24 a monthly basis.

Page 228

WATERHOUSE - 10-19-21

1     Q.   Okay.  Do you see that this one
2 is -- is dated February 2018?
3     A.   Yes.
4     Q.   Do you have -- do you believe --
5 have you ever seen a document that was
6 purporting to report operating results for
7 Highland?
8         MS. DANDENEAU:  Objection to form.
9     A.   Yes.
10     Q.   Okay.  And when you say that you
11 don't believe it was produced on a monthly
12 basis, was it produced on any periodic bases to
13 the best of your recollection?
14     A.   I believe it was -- it was prepared
15 on an annual basis.
16     Q.   Okay.
17         MR. MORRIS:  Can we look at the next
18 page.
19     Q.   Do you see that there is a statement
20 here called:  Significant items impacting
21 HCMLP's balance sheet?
22         And it is dated February 2018.
23     A.   Yes.
24     Q.   Do you recall that there was a

Page 229

WATERHOUSE - 10-19-21

1 report that Highland prepared that identified
2 significant items impacting the balance sheet?
3     A.   A report that was prepared.
4     Q.   Let me ask a better question:  Did
5 Highland prepare reports to the best of your
6 recollection that identified significant items
7 that impacted its balance sheet?
8     A.   Well, so Highland prepared a -- a
9 monthly close package.  And maybe I'm
10 getting -- and -- and maybe change names at one
11 time or maybe I'm just -- again, just
12 misremembering -- but in that, yes, there is a
13 page that would detail just changes in -- you
14 know, just changes month over month on the
15 balance sheet.
16     Q.   Okay.  And maybe it is my fault.
17 Maybe I didn't know the proper name for it.
18 But let's use the phrase "monthly close
19 package."
20         Did Highland prepare a monthly close
21 package in the ordinary course of business
22 during the time that you served as CFO?
23         MS. DANDENEAU:  Objection to form.
24     A.   Yes.

Appx. 00244

Page 230

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     Q.   And did the monthly close package
3  that Highland prepared include information
4  concerning significant items that impacted
5  Highland's balance sheet?
6     A.   Yes, it had a page like that is --
7  that is on the screen that detailed items
8  like -- of that nature.
9     Q.   And do you know who -- was there
10  anybody at Highland who was responsible for
11  overseeing the preparation of the monthly
12  reporting package?
13     A.   That would have been -- again, it
14  varies over time during my tenure as CFO.
15  It -- it varied over -- over time, but -- but
16  typically a -- a corporate accounting manager.
17     Q.   And who were the corporate
18  accounting managers during your tenure as CFO?
19     A.   It would have been Dave Klos and
20  Kristin Hendrix.
21     Q.   And did the corporate accounting
22  manager deliver to you drafts of the monthly
23  close package before it was finalized?
24     A.   Sometimes.
25     Q.   Was that the practice even if there

Page 231

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  were exceptions to the practice?
3     A.   The practice meaning that they
4  sometimes lured them to me?
5     Q.   That that was the expectation even
6  if circumstances prevented that from happening
7  from time to time.
8          MS. DEITSCH-PEREZ:  Object to the
9     form.
10     A.   I -- I would say it started out that
11  way but over the years it -- it wasn't
12  enforced.
13     Q.   Okay.  So you were -- you reviewed
14  and approved monthly -- monthly reporting
15  packages for a certain period of time and then
16  over time you stopped doing that.
17          Do I have that right?
18          MS. DANDENEAU:  Objection to form.
19     A.   Yes, I mean, if you're talking about
20  a formal meeting where we sit down and go
21  through and approve it.  I would say that was
22  standard practice a decade -- you know, early
23  on.  And as time went on that -- that -- that
24  practice wasn't followed.
25     Q.   Okay.

Page 232

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     A.   And, quite frankly, I don't even
3  know if these were -- these were sent to me
4  even in any capacity.
5     Q.   What was the purpose of preparing
6  the monthly reporting package -- withdrawn.
7          What was the purpose of preparing
8  the monthly close package?
9          MS. DEITSCH-PEREZ:  Object to the
10     form.
11     A.   The -- the original purpose was so
12  that it would just -- it would be a report that
13  was reviewed monthly with senior management.
14     Q.   Who was included in the idea of
15  senior management?
16     A.   You know, I think originally when
17  this was conceived that would have been like
18  Jim Dondero and Mark Okada.
19     Q.   Were monthly reporting -- withdrawn.
20          Were monthly close packages prepared
21  to the best of your knowledge until the time
22  you left Highland?
23     A.   To my knowledge -- I don't know,
24  actually.  I mean, to my knowledge, I believe
25  it was being -- that was still being done.  I

Page 233

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  don't know because, again, I wasn't reviewing
3  them.  I hadn't reviewed a close package for --
4  for a long time.  But I believe the standard
5  practice that was still being carried out.
6     Q.   Did you ever have any discussions
7  with the debtor's independent board concerning
8  any promissory notes that were issued by any of
9  the affiliates or Mr. Dondero?
10     A.   I can't -- I can't -- I can't recall
11  specifically.
12     Q.   Did you speak with the independent
13  board from time to time?
14     A.   Yes, from -- from -- from time to
15  time I had discussions with the independent
16  board members, you know, either -- either, you
17  know, by themselves or wholly, you know, as --
18  as a -- as a combined work.
19     Q.   Okay.  Before we talk about
20  Mr. Seery, do you recall ever having a
21  conversation with Mr. Nelms or Mr. Dubel
22  concerning any promissory note that was
23  rendered by one of the affiliates or
24  Mr. Dondero to Highland?
25     A.   I don't recall any conversations

Page 234

WATERHOUSE - 10-19-21

1 specifically.
2    Q.   Do you know if the topic was ever
3 discussed, even if you don't remember it
4 specifically?
5        MS. DANDENEAU:  Objection to form.
6    A.   It -- it -- it may have.  I don't
7 know.  I don't recall.
8    Q.   Do you recall ever discussing any
9 promissory note issued by any of the affiliates
10 or Mr. Dondero with James Seery?
11    A.   I don't -- I don't recall
12 specifically.
13    Q.   Do you recall generally ever
14 discussing the topic of promissory notes issued
15 by any of the affiliates or Mr. Dondero to
16 Highland with Mr. Seery?
17    A.   Nothing -- nothing is really jumping
18 out at me.
19    Q.   Do you recall if you ever told
20 Mr. Seery that any of the affiliates or
21 Mr. Dondero didn't have an obligation to pay
22 all amounts due and owing under their notes?
23    A.   I don't recall having that
24 conversation.

Page 235

WATERHOUSE - 10-19-21

1    Q.   Did you ever tell Mr. Seery that you
2 had any reason to believe that the amounts
3 reflected in the notes issued by the affiliates
4 and Mr. Dondero were invalid for any reason?
5    A.   I don't -- I don't recall.
6    Q.   Did you tell Mr. Dondero -- did you
7 tell Mr. Seery that you thought the promissory
8 notes issued by the advisors and Mr. Dondero
9 that were outstanding as of the petition date
10 were assets of the estate?
11    A.   I don't recall having a specific
12 conversation about those -- you know, those
13 notes outstanding as -- as of the petition date
14 being assets on the estate.  I mean, we put
15 together -- you know, they're in the books and
16 records of the financial statements.  I don't
17 recall having a specific conversation.
18    Q.   Did you ever prepare any documents
19 that were delivered to Mr. Seery that concerned
20 the promissory notes issued by any of the
21 affiliates or Mr. Dondero?
22        MS. DANDENEAU:  Objection to form.
23    A.   Did I produce any that concerned --
24 you mean did I just -- did I give Mr. Seery

Page 236

WATERHOUSE - 10-19-21

1 anything that -- that said I have concerns over
2 these notes?
3    Q.   No.  Let me try again.  Maybe it was
4 my question.
5        Did you ever give Mr. Seery any
6 information concerning any of the notes that
7 were issued by any of the affiliates or
8 Mr. Dondero?
9        MS. DANDENEAU:  Objection to form.
10    A.   I don't recall if I did or not.  I
11 don't -- I don't remember.  I mean, you have my
12 emails.  You may have asked.  Again, I don't --
13 I don't know.
14        MR. MORRIS:  Can we put up the
15        document that has been premarked as Exhibit
16        39?
17        MS. DANDENEAU:  John, that is this
18        document, isn't it?
19        MR. MORRIS:  Oh, yeah, it might be,
20        as a matter of fact.  Let's go to Number
21        40.
22        (Exhibit 40 marked.)
23    Q.   During the bankruptcy,
24 Mr. Waterhouse, did you prepare documents that

Page 237

WATERHOUSE - 10-19-21

1 were filed with the bankruptcy court?
2    A.   I didn't -- I didn't prepare them
3 personally.
4    Q.   Did people prepare them under your
5 direction?
6    A.   Yes.  There were members of the team
7 that prepared them, and they worked in -- you
8 know, there were members of DSI that were
9 involved in the process as well.
10    Q.   To the best of your knowledge, did
11 DSI rely on the employees of Highland for the
12 information that they used to prepare the
13 bankruptcy filings?
14    A.   Yes.  The books and records were
15 with the Highland personnel.
16    Q.   Okay.  And do you see on the screen
17 here, there is a document that we have marked
18 as Exhibit 40 that is -- that is titled Summary
19 of Assets and Liabilities?
20    A.   Uh-huh.
21    Q.   Okay.  And do you recall reviewing
22 any summary of assets and liabilities before it
23 was filed with the bankruptcy court?
24    A.   Yes, I recall reviewing this at a

Page 238

WATERHOUSE - 10-19-21

1
2 high level.
3     Q.   And did you believe that it was
4 accurate at the time it was filed?
5     A.   I didn't have any other reason to
6 believe otherwise.
7     Q.   Okay.  Do you see that the total
8 value of all properties listed in Part 1 is
9 approximately $410 million?
10        MS. DEITSCH-PEREZ:  Objection to
11    form.
12    A.  Yes, it is in 1c.
13    Q.   Yes.
14    A.   Yes, I see that.
15    Q.   Okay.  If we go to the second page,
16 now I think I may just have excerpts here, just
17 so everybody is clear, but if we scroll down to
18 the second page, you will see that there is
19 a -- a little further.  There you go.  You will
20 see there is a reference to Item 71, notes
21 receivable.
22        Do you see that?
23    A.   I do.
24    Q.   And that was a reference to the
25 notes receivable from the affiliates and

Page 239

WATERHOUSE - 10-19-21

1
2 Mr. Dondero, among others; is that right?
3        MS. DANDENEAU:  Objection to form.
4     A.   Yes.  The affiliate notes and the
5 Dondero notes were in this amount, but they
6 weren't -- again, like you said, and among
7 others.
8     Q.   Okay.  We will look at the
9 specificity because I'm not playing gaming
10 here, but do you know if the $150 million of
11 notes receivable was included within the
12 $410 million of total value of the debtor's
13 assets?
14        MS. DANDENEAU:  Objection to form.
15    A.   I -- I believe so.
16    Q.   Right.  And so is it fair to say
17 that as of the date this document was prepared,
18 the notes receivable were more than one-third
19 of the value of the debtor's assets?
20        MS. DEITSCH-PEREZ:  Object to the
21    form.
22        MS. DANDENEAU:  Object to the form.
23    A.   Again, if you are just taking the
24 math, 150 divided by whatever the $400 million
25 number is above, then yes, you get there.

Page 240

WATERHOUSE - 10-19-21

1
2     Q.   Okay.
3     A.   You know, but as of the time of this
4 filing, that is what was put in this filing,
5 right, but, you know, I mean, numbers --
6 numbers change, facts and circumstances change.
7     Q.   But as the CFO of Highland, the
8 debtor in bankruptcy, did you believe that this
9 number accurately reflected the total amount
10 due under the notes receivable?
11    A.   That is what we had in our books and
12 records.
13    Q.   Okay.  And did you believe as the
14 CFO that the books and records accurately
15 reported the then value of the debtor's assets?
16        MS. DANDENEAU:  Objection to form.
17    A.   We didn't -- as part of this filing,
18 there was no fair value measurement or
19 anything.  These were just accounting entries
20 for the promissory notes.  There is no analysis
21 for impairment or fair market value adjustments
22 or anything of that nature.  This is purely
23 taking numbers and putting them in our form.
24    Q.   Did you do any impairment analysis
25 at any time while you were employed by

Page 241

WATERHOUSE - 10-19-21

1
2 Highland?
3     A.   Yes, we did do impairment analysis
4 on -- on assets.
5     Q.   Okay.  Did you ever do an impairment
6 analysis on any of the promissory notes that
7 were given to Highland by any of the affiliates
8 or Mr. Dondero?
9     A.   Not that I recall.
10    Q.   Under what circumstances do you
11 prepare impairment analyses?
12    A.   As -- as -- if you're preparing
13 financials in accordance with GAAP, generally
14 accepted accounting principles, if you're
15 preparing full GAAP financials, you should be
16 preparing -- you should be undergoing on a
17 periodic basis any fair market value
18 adjustments to assets.
19        As I was instructed at the time of
20 the petition date, we weren't producing GAAP
21 financials.  So this wasn't something I was
22 worried about nor concerned about.
23    Q.   Okay.  Were NexPoint and HCMFA and
24 Highland's audited financial statements
25 prepared in accordance with GAAP?

Page 242

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2       A.   The audited financials -- yes,
3    audited financial statements are prepared in
4    accordance with GAAP.
5       Q.   Do you recall whether any of
6    Highland or HCMFA or NexPoint ever made a fair
7    market value adjustment to any of the notes
8    issued by any of the affiliates or Mr. Dondero
9    to Highland?
10      A.   I do not recall that happening, but
11   the -- it is because under -- under GAAP,
12   the -- the treatment of liabilities is
13   different than assets.
14      Q.   Okay.  So then let's just focus on
15   Highland's audited financial statements.
16           The last audited financial
17   statements were for the period ending December
18   31st, 2018; correct?
19      A.   That is my understanding.
20      Q.   And you had -- you had an obligation
21   to disclose anything to PricewaterhouseCoopers
22   concerning any subsequent events between the
23   end of 2018 and June 3rd, 2019; correct?
24           MS. DANDENEAU:  Objection to form.
25           MS. DEITSCH-PEREZ:  Form.

Page 243

1    WATERHOUSE - 10-19-21
2       A.   Correct.
3       Q.   Okay.  To the best of your
4    knowledge, as Highland's CFO, did Highland ever
5    make any fair market value adjustments to any
6    of the promissory notes that were carried on
7    its balance sheet and that were issued by any
8    of the affiliates or Mr. Dondero?
9       A.   I think I answered that question
10   earlier.  I don't recall doing that for any of
11   the -- those -- those notes.  So it would have
12   included the audit for the -- for the 2018
13   period.
14      Q.   Okay.
15           MR. MORRIS:  Can we go to the next
16   page.
17      Q.   Do you see this is a note a list of
18   notes receivable?  Do you see that?
19      A.   Yes, I do.
20      Q.   And do you see that this ties into
21   the page that we were just looking?
22      A.   I'm sorry, can we go back to the
23   prior page?  I mean, it was at 150,331,222.  It
24   was on the prior page.  Next page.  Yes, it
25   agrees.

Page 244

1    WATERHOUSE - 10-19-21
2       Q.   Okay.  So now let's look at that
3    schedule.  So this was the face amount of all
4    of the promissory notes that Highland held at
5    the time this document was filed with the
6    bankruptcy court; right?
7       A.   Yes.
8       Q.   There is a footnote there that says,
9    doubtful or uncollectible accounts are
10   evaluated at year-end.
11           Do you see that?
12      A.   I do.
13      Q.   Okay.  And is it fair to say that as
14   of the year-end 2018, the year before this,
15   that to the extent any of these notes were
16   outstanding at that time, they weren't deemed
17   to be doubtful or uncollectible?
18      A.   Yeah.  For the 2018 audit, there
19   weren't any -- there weren't any adjustments to
20   fair value.
21      Q.   Okay.  And during the bankruptcy, do
22   you recall that Highland subsequently reserved
23   for the Hunter Mountain Investment Trust note?
24      A.   Yes.
25      Q.   Why did Highland -- were you

Page 245

1    WATERHOUSE - 10-19-21
2    involved in the decision to reserve the Hunter
3    Mountain Investment Trust note?
4       A.   I was not.
5       Q.   Do you know why Highland decided to
6    reserve for the Hunter Mountain Investment
7    Trust note?
8       A.   I don't know yet decision was made.
9    I believe it was made by someone at DSI.
10      Q.   Okay.  I'm just asking if you know
11   why.
12           Did you ever ask anyone why they
13   reserved for that particular note?
14      A.   I don't recall.
15      Q.   Do you know whether the debtor
16   reserved for any other note on this list during
17   the bankruptcy?
18      A.   Again, I don't recall.  I wasn't
19   part of any process of -- again, like any fair
20   value adjustments or anything to that degree.
21   Like I said, a lot of that was done by DSI and
22   it was kind of out of our court.
23      Q.   Okay.  Do you know if any note
24   receivable on this list was ever deemed by the
25   debtor to be doubtful or uncollectible?

Page 246

WATERHOUSE - 10-19-21

1
2    A.   I don't -- I don't have a
3    recollection of every filing, so I don't know.
4    Q.   Did you ever have a discussion with
5    anybody at any time about whether any of the
6    notes receivable on this list should be deemed
7    to be doubtful or uncollectible?
8    A.   No.  As I previously stated, we were
9    told we didn't have to keep GAAP financials.
10   We weren't having -- you know, there is no
11   underlying audits being performed, so I mean,
12   it wasn't something I worried about.
13   MR. MORRIS:  I move to strike.
14   Q.   Did you ever have a conversation
15   with anybody about any of the notes receivable
16   and whether they should be deemed to be
17   doubtful or uncollectible?  Did you have the
18   conversation, yes or no?
19   MS. DANDENEAU:  Objection to form.
20   A.   I don't recall.
21   Q.   Do you recall ever telling anybody
22   that you believed any of the notes receivable
23   on this list should be doubtful -- should be
24   deemed to be doubtful or uncollectible?
25   MS. DANDENEAU:  Objection to form.

Page 247

WATERHOUSE - 10-19-21

1
2    A.   I don't recall.  I mean, it may have
3    happened, you know, again, when we initially
4    getting DSI up to speed and going through
5    financials, it may have happened, but I don't
6    recall specifically.
7    Q.   While you were the CFO of Highland
8    during the time that the company was in
9    bankruptcy, did you have any reason to believe
10   that any of the notes receivable on this list
11   other than Hunter Mountain Investment Trust
12   should have been characterized as doubtful or
13   uncollectible?
14   MS. DANDENEAU:  Objection to form.
15   MS. DEITSCH-PEREZ:  Form.
16   A.   I didn't know.  I didn't form an
17   opinion.  Bankruptcy was new to me.  It still
18   is new to me, even after going through this.
19   So I really didn't know what to expect nor
20   really -- you know, I didn't know.
21   MR. MORRIS:  I move to strike.
22   Q.   During the period of Highland's
23   bankruptcy when you were serving as CFO, did
24   you have any reason to believe any of the notes
25   on this list were doubtful or uncollectible?

Page 248

WATERHOUSE - 10-19-21

1
2    MS. DEITSCH-PEREZ:  This is like the
3    fifth time you've asked it.  Object to the
4    form.
5    MR. MORRIS:  I'm moving to strike,
6    if you haven't noticed, because he's not
7    answering the question.
8    MS. DEITSCH-PEREZ:  He was answering
9    the question, you just didn't like it, like
10   the answer.
11   MR. MORRIS:  Good Lord.
12   Q.   Go ahead, Mr. Waterhouse.
13   A.   Again, I don't -- we brought up a
14   myriad of issues at the start of the bankruptcy
15   case.  I don't recall if this was one of them,
16   but, again, there are a lot of things we
17   couldn't change.  Even, you know, I was told
18   status quo, blah, blah, blah, right, there is a
19   stay, you can't -- you know, I don't recall
20   specifically, but that doesn't mean it didn't
21   happen.
22   MR. MORRIS:  I move to strike.
23   Q.   During the time that Highland was in
24   bankruptcy and you served as CFO, did you have
25   any reason to believe that any of the notes

Page 249

WATERHOUSE - 10-19-21

1
2    receivable on this list were doubtful or
3    uncollectible?
4    MS. DEITSCH-PEREZ:  Object to the
5    form.
6    A.   Potentially.
7    Q.   Did you ever tell anybody that?
8    A.   As I just stated like five times,
9    yes, we -- at the beginning after filing and we
10   were getting DSI and others up to speed, you
11   know, we had a myriad of discussions of a lot
12   of things and this was likely one of them.  I
13   don't -- but I don't recall specifically we
14   talked --
15   Q.   I don't want to know -- I don't want
16   to know what was --
17   MS. DEITSCH-PEREZ:  Wait, wait.
18   Excuse me.  Mr. Morris, you did not let him
19   finish his answer.
20   A.   I spoke -- we had -- we were
21   bringing Fred Karesa and Brad Sharp (phonetic)
22   up to speed on all of these items, contracts,
23   and investments and going through -- we had
24   hours and hours and hours of discussion.  And
25   then not only do I have to repeat this not

Page 250

```
1          WATERHOUSE - 10-19-21
2   once, twice, three, four times with -- you
3   know, I mean, we -- I don't -- I don't remember
4   the sum culmination of all these discussions.
5   They all kind of blend together.
6          MR. MORRIS:  Okay.  I move to strike
7     and I will try one more time.
8     Q.   Did you ever tell anybody at DSI
9   that you believed any of the notes receivable
10  on this list were doubtful or uncollectible?
11         MS. DANDENEAU:  Object to form.
12    A.   Potentially.
13    Q.   Potentially you told them or
14  potentially they were doubtful or
15  uncollectible?
16    A.   Potentially I told them that we
17  needed to look at the value of these -- of
18  these assets.
19    Q.   Okay.  Did you -- okay.  It is
20  potential that you told them and it is
21  potentially that you didn't; right?
22         MS. DANDENEAU:  Objection to form.
23    A.   I've gone through that.  I don't
24  recall specifically.
25    Q.   So you should just -- I don't want
```

Page 251

```
1          WATERHOUSE - 10-19-21
2   to tell what you to do.  Do you have --
3         MS. DANDENEAU:  Good.
4     Q.   Other than -- other than telling
5   them that they should look at the values, do
6   you have any recollection whatsoever of ever
7   having told anybody at DSI that any of the
8   notes receivable on this page were doubtful or
9   uncollectible?
10        MS. DEITSCH-PEREZ:  Object to the
11    form.
12        MS. DANDENEAU:  Objection.
13    A.   I recall having general discussions
14  about everything on our balance sheet which
15  would have included these -- these notes
16  receivable.
17    Q.   Okay.
18    A.   I don't recall specifically where
19  those discussions delved into.
20    Q.   Do you recall any discussion at all
21  on the topic of whether any of these notes on
22  this list were doubtful or uncollectible?
23        MR. AIGEN:  Mr. Morris, how on earth
24    is that question different from the
25    question that you just asked for the last
```

Page 252

```
1          WATERHOUSE - 10-19-21
2   five times?  I mean, really I thought you
3   were -- (overspeak.)
4         MR. MORRIS:  Because he never
5     answered it.
6         MS. DEITSCH-PEREZ:  Are you
7     listening to him?
8         MR. MORRIS:  You know --
9         MS. DEITSCH-PEREZ:  He basically
10    said that he had a conversation with DSI
11    that went over all of this stuff and that
12    conversation could have included the notes
13    but he doesn't recall specifically.
14        What more do you want him -- to ask
15    of him?
16        MR. MORRIS:  I want him -- I would
17    love him to say -- I would like him to
18    testify to the truth, and that is he has no
19    recollection.
20        MS. DEITSCH-PEREZ:  Well, the truth
21    as you would like to see it, but -- but he
22    is testifying truthfully.  And I -- and, by
23    the way, I move to strike that comment --
24        MR. MORRIS:  Okay.
25        MS. DEITSCH-PEREZ:  -- because it
```

Page 253

```
1          WATERHOUSE - 10-19-21
2   suggests that he has not testified
3   truthfully.
4         MR. MORRIS:  I will ask my question
5     again.  And if at any time you want to
6     direct him not to answer, that is your
7     prerogative.
8     Q.   Mr. Waterhouse, do you have any
9   recollection at all of ever telling anybody
10  from DSI that any of these notes were doubtful
11  or uncollectible?
12        MS. DANDENEAU:  Object to form.
13    A.   I don't remember specifically.
14    Q.   Do you remember generally that
15  specific topic?
16    A.   We generally talked about assets,
17  values.  If -- we had discussions of that and
18  collectability in nature.  I mean, of Highland,
19  the funds, the CLOs, the entire complex.  We
20  had discussions like that, which is, you know,
21  as you look at a billion dollar consolidated
22  balance sheet.
23        So I generally remember -- this is
24  billions of dollars, including these assets --
25  having discussions of this -- of this type.
```

**Appx. 00250**

Page 254

WATERHOUSE - 10-19-21

1
2    Q.   Do you believe that an affiliate
3    loan on this list was doubtful or
4    uncollectible?  Would you have told that to
5    DSI?
6        MS. DANDENEAU:  Objection to form.
7        MS. DEITSCH-PEREZ:  Object to form.
8    A.   If we had, like -- again, if we --
9    if -- if we weren't preparing financial
10   statements in accordance with GAAP, and -- you
11   know, if DSI at that point -- they were --
12   again, I was new to bankruptcy.
13       The CRO is -- we are delegating
14   everything to the CRO.  All the decisionmaking.
15   Remember -- remember when you and I went into
16   Delaware Court and we were saying DSI basically
17   does everything, remember this, Mr. Morris?
18       You were my counsel at the time, and
19   basically we're running everything through DSI.
20   That was what this was like in the early part.
21       Everything was communicated through
22   DSI.  So DSI says this.  DSI says that.  That
23   is what we're doing, and we're pointing out
24   things to them.
25       Now, they decide what direction this

Page 255

WATERHOUSE - 10-19-21

1    goes.
2    Q.   Did you point out that any of
3    these --
4    A.   I don't recall specifically.
5    Q.   Okay.  At any time that you served
6    as Highland's CFO, did you ever point out to
7    DSI that any of these loans were doubtful or
8    uncollectible?
9        MS. DEITSCH-PEREZ:  Object to the
10   form.
11       MS. DANDENEAU:  Objection.
12   A.   If you're asking me if I had a
13   conversation with DSI, if any of these loans
14   were doubtful or uncollectible, I don't recall
15   specifically.
16   Q.   Do you recall that the debtor filed
17   on the docket monthly operating reports?
18   A.   Yes.
19   Q.   You prepared those personally,
20   didn't you?
21       MS. DEITSCH-PEREZ:  Objection to
22   form.
23   A.   I didn't personally prepare them,
24   the team did with DSI.
25

Page 256

WATERHOUSE - 10-19-21

1
2    Q.   But you signed them; correct?
3    A.   My signature is on the MORs.
4    Q.   And you signed them as the preparer
5    of the document; correct?
6    A.   Yes, I did this pursuant to DSI's
7    instructions.
8    Q.   Okay.  You wouldn't have signed the
9    document if you didn't believe it to be
10   accurate; correct?
11   A.   If I had reason to believe it
12   wasn't, presumably I wouldn't have signed it.
13   Q.   Okay.  And do you have any reason to
14   believe right now that any monthly operating
15   report that has your signature on it was
16   inaccurate in any way?
17       MS. DEITSCH-PEREZ:  Object to the
18   form.
19   A.   My understanding of the monthly
20   operating reports is we were filing them in
21   accordance with the standards set by the Court.
22   It wasn't -- you know, again, I don't -- you
23   know, it wasn't GAAP.  It wasn't these other
24   standards, so I testified I didn't have
25   experience in this.  The CRO was running the

Page 257

WATERHOUSE - 10-19-21

1
2    show.  I followed their advice.
3    Q.   But you assured yourself that
4    everything in the report was accurate before
5    you signed them; correct?
6        MS. DANDENEAU:  Objection to form.
7    A.   I trusted the guidance from the CRO
8    and their team and their experience and their
9    guidance for doing this for many, many, many
10   years to -- to -- to categorize and put things
11   in ways on the form.
12       You know, my team had -- had not
13   filled out these forms before and needed all of
14   this guidance.  I'm not an expert in this.  I
15   have oversight of it.  I signed the form.  DSI
16   told me to.
17   Q.   And you and your team are the source
18   of the information that DSI used to create the
19   reports; correct?
20       MS. DANDENEAU:  Objection to form.
21   A.   The books and records reside with
22   the -- with -- with the corporate accounting
23   team.
24   Q.   Okay.  And the corporate accounting
25   team was the corporate accounting team that was

Page 258

WATERHOUSE - 10-19-21

2 under your direction; correct?
3    A.  Yes.
4    Q.  So -- so your team was responsible
5 for maintaining Highland's books and records;
6 correct?
7    A.  I'm sorry, my team was responsible?
8    Q.  Correct.
9    A.  Yes.  They -- they -- they were
10 the -- the -- the general ledger of Highland,
11 that responsibility was with the corporate
12 accounting team.
13    Q.  The corporate accounting group
14 reported to you; correct?
15    A.  Yes.
16        MR. MORRIS:  Can we put up 41,
17    please.
18        (Exhibit 41 marked.)
19    Q.  All right.  You will see that this
20 is a report that is dated January 31st, 2020,
21 but it is for the month ending December 2019.
22        Do you see that?
23    A.  I do.
24    Q.  And you signed this report in your
25 capacity as the chief financial officer of

Page 259

WATERHOUSE - 10-19-21

2 Highland; correct?
3    A.  Yes.
4    Q.  And you're the preparer -- you're
5 identified as the preparer of the report;
6 correct?
7    A.  That is correct.
8    Q.  Do you recall participating in the
9 preparation of monthly operating reports?
10    A.  As I testified earlier, it was put
11 together, you know, with the team.  The team
12 worked with DSI to put these monthly operating
13 reports together.  We had no experience at this
14 time of the monthly operating reports or things
15 of this nature.
16        MR. MORRIS:  Can you turn to the
17    next page, please.
18    Q.  Do you see a line item under assets
19 due from affiliates?
20    A.  Yes, I do.
21    Q.  Okay.  And to the best of your
22 knowledge and understanding, as the person who
23 is identified as the preparer of this report,
24 does that line item include the affiliate loans
25 that we've been talking about?

Page 260

WATERHOUSE - 10-19-21

2    A.  Again, I would have to see, just
3 like we did with the financial statements of
4 Highland and NexPoint, I would have to see a
5 detailed build, but, you know, if you look at
6 the other line items, you know, the only other
7 place it could be would be in -- in other
8 assets.
9    Q.  Okay.  And as a matter of
10 arithmetic, is it fair to say that is the value
11 of the assets due from affiliates was more than
12 25 percent of the value of Highland's total
13 assets as of 12/31/2019?
14        MS. DANDENEAU:  Objection to form.
15    I'm really not doing the mental math
16 right now, so I've been going at this depo for
17 hours, so I'm really not -- you know --
18    Q.  All right.  No problem.
19    A.  -- these are millions of dollars.
20    Q.  Let's look at the Footnote 1,
21 please.  Do you see there is a reference to the
22 Hunter Mountain note?
23    A.  Yes, I see that in Footnote 1.
24    Q.  Okay.  And that's the reserve that
25 was taken against that note?

Page 261

WATERHOUSE - 10-19-21

2    A.  Yes, that is what this indicates.
3    Q.  Okay.  And were you aware that the
4 reserve was being taken on that it was?
5    A.  I was -- I was aware, yeah, at some
6 point, yes.
7    Q.  Okay.  And are you aware of any
8 reserve being taken with respect to any other
9 note that was issued in favor of Highland?
10    A.  Again, as I testified, we didn't go
11 through an analysis on -- on -- on the other
12 notes.
13    Q.  Can we turn --
14    A.  I believe -- I believe it says that
15 in Footnote 1, fair value has not been
16 determined with respect to any of the notes.
17        So this footnote -- footnotes, look,
18 there has been no determination.
19    Q.  Okay.  The determination was made in
20 the audited financial statements just six
21 months earlier; right?  We saw that earlier?
22    A.  That was as of 12/31/18.  I mean,
23 things -- circumstances -- there's a bank --
24 circumstances change, things change -- things
25 change over time, you know, facts and

WATERHOUSE - 10-19-21

1   circumstances change.  Again, you have to do an
2   analysis.
3
4      Q.   Okay.  And you do recall that in
5   Highland's 2018 financial statement, all of the
6   notes issued by affiliates and Mr. Dondero that
7   were due at year-end had a fair value equal to
8   the carrying value; correct?  We looked at
9   that?
10     A.   Yes.  That was in the -- in the
11  disclosure for the -- for the affiliate notes,
12  yes.
13     Q.   And -- and you were obligated to
14  share with PwC any subsequent events between
15  the end of 2018 and the date that you signed
16  your management representation letter on June
17  3rd, 2019; correct?
18         MS. DEITSCH-PEREZ:  Object to the
19  form.
20     A.   Yes.  I -- I -- I signed the
21  management, you know, my signature is in the
22  management representation letter -- I hope I'm
23  answering your question -- that is dated in
24  June with the representations made in that
25  management representation letter.

WATERHOUSE - 10-19-21

1
2      Q.   Okay.  And there was nothing that
3   caused PricewaterhouseCoopers to include in
4   subsequent events any adjustment to the
5   conclusion that the fair value of the affiliate
6   notes and the notes issued by Mr. Dondero
7   equaled the carrying value; correct?
8          MS. DANDENEAU:  Objection to the
9   form.
10     A.   That is correct.  That is what was
11  in the -- in the -- in the footnotes.
12     Q.   Okay.  So are you aware of anything
13  that occurred between June 3rd, 2019 and
14  December 31st, 2019 that would have caused the
15  fair value of the notes to differ from the
16  carrying value?
17     A.   Yeah.  Highland filed for
18  bankruptcy, things changed -- I mean, there was
19  a bankruptcy filed in October of -- of -- of
20  2019, right, the petition date that we've
21  described earlier.
22         I mean, I had a -- I guess looking
23  back naively, I thought we were going to get an
24  audit from PwC for year-ended 2019, and when we
25  had discussions with PwC, they were like, are

WATERHOUSE - 10-19-21

1   you crazy, we're not auditing this.  Values
2   change, all these things change, bankruptcy
3   changes the entire scenario.  I mean -- and
4   they're like, we're not -- we're not touching
5   this.
6          And so, you know, I was like, okay,
7   sorry, I get it, okay, no an audit.
8          I mean, it is -- you know, and --
9   you know, and we weren't preparing GAAP
10  financial statements.
11         Again, I didn't know what we were
12  doing in relation to our financial statements,
13  but these were the discussions I was having at
14  the time.  And yeah, I mean, filing bankruptcy
15  from what I got from outside auditors and
16  others involved changed things dramatically.
17     Q.   Okay.  Highland wasn't the obligor
18  under any of the notes that we're talking
19  about; correct?
20     A.   No.
21     Q.   So --
22     A.   That's right.
23     Q.   So can you identify any fact that
24  would cause the fair value to deviate from the

WATERHOUSE - 10-19-21

1   carrying value during the seven-month period
2   between June 3rd and the end of the year, 2019?
3          MS. DANDENEAU:  Objection to form.
4      A.   No.  I mean, I'm putting myself back
5   at that time, right.  Hindsight is 2020, but we
6   didn't do an analysis, but we would have done a
7   fulsome analysis and looked at all of the facts
8   and circumstances at the time, but asset values
9   change.  You know, there could have been a
10  market crash in hindsight in 2020, which --
11  which affected entities' abilities.
12         There could have been all of these
13  things, right, that -- that happen.  It is --
14  it is easy to look back in hindsight, but when
15  you are looking at this in -- in realtime, the
16  analysis is different, and again, we didn't do
17  an analysis.
18     Q.   Okay.  You didn't do an analysis.
19         Do I have that right?
20     A.   I don't -- I don't recall doing one
21  or maybe -- you know, I don't recall doing one.
22         MR. MORRIS:  Okay.  I'm going to
23  take a break.  I may be done, so the time
24  now is -- is 4:30 your time.  Let's just

take a short break until 4:40 your time.

MS. DANDENEAU: Okay.

VIDEOGRAPHER: We're going off the record, 4:31 p.m.

(Recess taken 4:31 p.m. to 4:43 p.m.)

VIDEOGRAPHER: We are back on the record at 4:43 p.m.

MR. MORRIS: I have no further questions.

MR. RUKAVINA: Okay.

Mr. Waterhouse, I will go next.

EXAMINATION

BY MR. RUKAVINA:

Q. Sir, my name is Davor Rukavina. I'm the lawyer for --

MR. MORRIS: Hey, Davor, just before you begin, I just want to put on the record Highland's objection to documents that were produced to me 10 minutes before the deposition began.

MR. RUKAVINA: What the basis of your objection?

MR. MORRIS: That they were due quite some time ago, and the fact that you





had -- I just think it's appropriate to -- to dump documents on somebody 10 minutes before the deposition. I just think that's --

MR. RUKAVINA: Well, these are documents Highland produced. I'm not aware of any rule I have to give you advance documents when I know for the record that other than the exhibits that you sent to us last week, most of the exhibits you used today you did not provide to me prior to this deposition.

MR. MORRIS: No, but the documents were produced by me in -- in litigation, right?

MR. RUKAVINA: I'm going to use primarily, John, the documents that you produced to me today, but you may.

MR. MORRIS: Primarily. I've got -- I've got my objection. You have got your response. Proceed.

Q. Mr. Waterhouse, again, I represent the advisors, HCMFA and NexPoint Advisors.

Do you understand that?





A. Yes.

Q. You and I have never met or talked before today, have we?

A. No, I have -- I have heard your voice on calls before.

Q. Okay.

MR. RUKAVINA: Madam Court Reporter, I will use a few exhibits today. My associate, Mr. Nguyen, will find some way to get them to you. I don't know how to do that, but it looks like you guys do.

I am going to use numbers as well. But to differentiate them from Mr. Morris we're going to mark mine with the prefix A for advisors.

Do you understand?

COURT REPORTER: Yes.

MR. RUKAVINA: Okay. Perfect.

Q. Okay. So, Mr. Waterhouse, let's start with those two HCMFA notes that you were asked about, one for 5 million and one for 2.4 million.

Do you recall those notes?

A. Yes.





Q. Were you ever the CFO of HCMFA?

A. I don't recall.

Q. So to the best of your recollection, you were still an officer of HCMFA in 2019, just that your title was treasurer?

MR. MORRIS: Object to the form of the question. There is no leading here. He works for your client.

MS. DANDENEAU: That is not -- that is not true.

MR. MORRIS: He's the treasurer -- he is the treasurer of your client. I don't -- I'm going to object every time you try to lead, so...

MR. RUKAVINA: Totally fine to object.

MR. MORRIS: Okay.

Q. Please answer my question, Mr. Waterhouse.

A. I'm sorry, could you repeat? There was...

Q. Yes. You were -- you testified earlier that in 2019 you were an officer of HCMFA; correct?

Page 270

WATERHOUSE - 10-19-21

1
2    A.   Yes, I testified that I was the
3  treasurer and I didn't know if that incumbency
4  certificate, you know, was one that appointed
5  me as a treasurer, but yes.
6    Q.   I'm just trying to confirm that
7  sitting here today, to the best of your
8  recollection, at that time your were -- your
9  title was treasurer.  It was not chief
10 financial officer.
11   A.   I don't recall that being my title.
12   Q.   Okay.  And in May of 2019, however,
13 I think you testified you were the chief
14 financial officer of the debtor; correct?
15       MR. MORRIS:  Objection to the form
16   of the question.
17   A.   Yes, I was -- yes.
18   Q.   Okay.  As such, in May of 2019, did
19 you have the authority, to your understanding,
20 to unilaterally loan $5 million or $2.4 million
21 to anyone on behalf of the debtor?
22       MR. MORRIS:  Objection to the form
23   of the question.
24   A.   Sorry, can you repeat that?
25   Q.   Yes.  So in your capacity as the

Page 271

WATERHOUSE - 10-19-21

1
2  chief financial officer of the debtor, Highland
3  Capital Management, L.P., in May of 2019, did
4  you believe that you unilaterally, just Frank
5  Waterhouse, had the authority to loan on behalf
6  of the debtor to anyone $5 million and
7  $2.4 million?
8        MR. MORRIS:  Objection to the form
9    of the question.
10   A.   No.
11   Q.   Is it because loans of that amount
12 would have had to be approved by someone else?
13   A.   Yes.
14   Q.   Who in '20 -- in May of 2019, if
15 Highland wanted to loan 5 million or
16 $2.4 million to someone, what would have been
17 the internal approval procedure?
18       MR. MORRIS:  Objection to the form
19   of the question.
20   A.   If -- if we had loans of that nature
21 that needed to be made due to their size, we
22 would have gotten approval from the -- the
23 president of Highland.
24   Q.   And who that was individual?
25   A.   It was James Dondero.

Page 272

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Now, I'm going to ask you a
3  similar question but for a different entity.
4        In May of 2019, as the treasurer of
5  HCMFA, did you believe that you unilaterally
6  had the ability to cause HCMFA to become the
7  borrower of a $5 million loan and a
8  $2.4 million loan?
9        MR. MORRIS:  Objection to the form
10   of the question.
11   A.   No.
12   Q.   What would -- what would the
13 approval have taken place -- strike that.
14       What would the approval process have
15 been like in May of 2019 at HCMFA for HCMFA to
16 take out a $7.4 million loan?
17       MR. MORRIS:  Objection to the form
18   of the question.
19   A.   The process would have been similar
20 to what we just discussed on -- for Highland to
21 make a loan to others.  So, again, you know,
22 we -- we would have -- either myself or someone
23 on the team would have discussed this with
24 the -- the president and owner of -- of HCMFA.
25   Q.   And who was that individual?

Page 273

WATERHOUSE - 10-19-21

1
2    A.   That was James -- Jim Dondero.
3    Q.   So do I understand that in May of
4  2019, on behalf of both the lender, Highland,
5  and the borrower, HCMFA, Mr. Dondero would have
6  had to approve $7.4 million in loans?
7        MR. MORRIS:  Objection to the form
8    of the question.
9    A.   Yes.
10   Q.   You mentioned when Mr. Morris was
11 asking you the NAV error, N-A-V error, with
12 respect to TerreStar, without writing us a
13 novel, unless you feel like you have to, can
14 you summarize what that NAV error was?  What
15 happened?
16   A.   There was a -- in the Highland
17 Global Allocation Fund, it owned at the time an
18 equity interest in a company called TerreStar.
19 And TerreStar is -- at the time was a private
20 company, and it may still be today.  Again, I'm
21 putting myself back then as a private company.
22       We had -- sorry, I don't mean we --
23 the fund and the advisor Houlihan Lokey
24 to -- to value that investment.  And during
25 that time there was some trades that were

**Appx. 00255**

Page 274

WATERHOUSE - 10-19-21

1   executed at market levels that were much lower
2   than the Houlihan Lokey model.
3         And based on information and
4   discussions with the portfolio managers and,
5   you know, principals that were very familiar
6   with TerreStar, it was determined that those
7   trades were non-orderly and they were not
8   considered in the valuation as consulted with
9   Houlihan Lokey and PricewaterhouseCoopers at
10  the time.
11        Subsequent to a -- I can't remember
12  the exact circumstances of why the SEC got
13  involved.  I think it was due to this -- this
14  investment became a material position in the
15  fund.  It triggered an SEC, kind of, inquiry.
16  And as part of that inquiry, they questioned
17  the valuation methodology.  "They" meaning the
18  SEC.
19        And at the culmination of that
20  process -- this is all summarized -- the value
21  that was -- that ultimately had to be used in
22  the fund's NAV was different than -- materially
23  different than what the original valuation at
24  Houlihan Lokey provided.

Page 275

WATERHOUSE - 10-19-21

1         And given that there was this fund
2   was, as we discussed -- I don't know if we
3   discussed it, but it was an open-ended fund
4   that was going -- that was converting to a
5   close-end fund.
6         Due to the fact that it was an
7   open-ended fund, you had to recalculate NAV and
8   see what the impact was on people -- on
9   investors coming in and out of the fund and if
10  there is a detrimental impact and to calculate
11  what that -- what that impact was and if there
12  was any amounts owed to the fund pursuant to
13  the error.
14        Q.   Were you personally involved
15  internally at either Highland or HCMFA with
16  these investigations and discussions with the
17  SEC?
18        A.   I was.
19        Q.   Which other key people or senior
20  people at Highland were involved, to your
21  recollection?
22        A.   Myself, Thomas Surgent, David Klos,
23  Lauren Thedford, Jason Post.
24        Q.   Mr. Dondero, was he --

Page 276

WATERHOUSE - 10-19-21

1         A.   I believe Cliff Stoops.  I'm trying
2   to think.  And maybe that is -- that is -- that
3   is -- that is all kind I can recall at the
4   moment.
5         Q.   Do you recall whether it was
6   determined that the fund suffered losses as a
7   result of this error?
8         A.   The -- the fund -- the -- the --
9   because the open-ended nature of the fund,
10  there were losses that were attributable to
11  investors.  Meaning they -- they would have
12  redeemed and got a less money or -- or they
13  subscribed in and maybe because they didn't get
14  enough shares and then they later sold and then
15  they were harmed in that fashion.
16        And there is -- there is -- there
17  were very -- there were very detailed
18  calculations and, you know, all these different
19  scenarios that we had to -- I'm sorry, I keep
20  saying "we" -- that the individuals involved
21  had to calculate and quantify.
22        Q.   Well, do you recall whether HCMFA
23  admitted certain fault and liability for this
24  error?

Page 277

WATERHOUSE - 10-19-21

1         A.   I don't recall specifically.
2         Q.   Do you recall whether HCMFA caused
3   any funds to be paid to the investors and the
4   fund the subject of the NAV error?
5         A.   Yes.
6         Q.   Do you recall the approximate amount
7   of funds, moneys paid to the investors and the
8   fund?
9         A.   It was -- it was approximately
10  $7 million.
11        Q.   If I was to suggest 7.8 million,
12  would that ring more true or are you sticking
13  with your original answer?
14        A.   It was -- it was approximately 7 --
15  7 to $8 million.  Again, I don't remember the
16  exact number, but it was in that ballpark.
17        Q.   So regardless of whether HCMFA
18  accepted fault or liability, it caused some
19  $7 million or more to be paid out to affected
20  investors in the fund?
21        MR. MORRIS:  Objection to the form
22  of the question.
23        A.   And I want to make sure I'm
24  understanding your question because there is a

Page 278

WATERHOUSE - 10-19-21

1  lot of different entities that are going on to
2  my head.
3      I think what you are saying is based
4  on this error, shareholders were harmed by this
5  approximately $7.8 million -- by approximately
6  $7.8 million.  Is that what you are asking?
7      Q.   Yes, sir.
8      A.   Yes, that was -- again, I don't have
9  the exact numbers.  If I take -- it was -- it
10  was in that ballpark, and there is a detail
11  calculation and write-up that could, that --
12  that exists someplace.
13      Q.   Now, at that time, at the time that
14  the NAV error occurred, was there a contract in
15  place between HCMFA and the debtor pursuant to
16  which the debtor was providing services to
17  HCMFA?
18      MR. MORRIS:  Objection to the form
19  of the question.
20      A.   Yes.
21      Q.   Was that contract generally called a
22  shared services agreement?
23      A.   It was generally called that, but
24  there were -- there were -- I mean, it -- it --

Page 279

WATERHOUSE - 10-19-21

1  it depends on who you talk to, but yes,
2  generally, there were -- there are multiple
3  agreements.
4      Q.   Pursuant to one or more of those
5  agreements, was the debtor providing certain
6  services to HCMFA?
7      MR. MORRIS:  Objection to the form
8  of the question.
9      A.   Yes.
10      Q.   And can you at a very high level
11  summarize in 2018 and 2019 what those services
12  were?
13      A.   Yes, there was a -- yes.
14      Q.   Okay.  Please -- please go -- go
15  through a short summary.
16      A.   There was a -- a cost reimbursement
17  agreement between Highland Capital Management
18  Fund Advisors and Highland Capital Management,
19  L.P.  That agreement was for what we referred
20  to as front office services, so investment
21  management, things of that nature.
22      There was I think what most people
23  refer to as the shared services agreement that
24  was -- that agreement was between Highland

Page 280

WATERHOUSE - 10-19-21

1  Capital Management Fund Advisors and Highland
2  Capital Management for back office services.
3      Q.   And can you summarize what you mean
4  by back office services?
5      A.   Those services were for accounting,
6  finance, tax, valuation, HR, IT, you know,
7  legal compliance, things of -- things of those
8  nature -- or things of that nature, excuse me.
9      Q.   So in the spring of 2019, do you
10  recall whether HCMFA took the position that it
11  was actually Highland that caused the NAV error
12  to occur pursuant to the valuation services
13  that Highland was providing?
14      MR. MORRIS:  Objection to the form
15  of the question.
16      A.   I do not recall.
17      Q.   Did you ever have any discussions
18  with anyone, Jim Dondero or anyone in the first
19  half of 2019 as to whether Highland, the
20  debtor, that is, had any liability to HCMFA
21  related to the NAV error?
22      MR. MORRIS:  Objection to the form
23  of the question.
24      A.   I do not recall.

Page 281

WATERHOUSE - 10-19-21

1      Q.   And then you mentioned that the fund
2  was being closed and some compensation related
3  to that.  Can you -- can you elaborate?  What
4  were you referring to?
5      A.   Right.  So the advisor, pursuant to
6  board approval, put a proposal in front of the
7  shareholders of the Highland Global Allocation
8  Fund to convert it from an open-ended fund to a
9  closed-end fund.
10      So an open-ended fund, when
11  shareholders subscribe to the fund or redeem
12  into the fund, they do it at NAV.
13      When it is -- when you have a
14  closed-end fund, closed-end funds are -- are
15  publicly-traded, like on the New York Stock
16  Exchange, exchanges like that, and -- and
17  shareholders or investors, they're not --
18  they're -- they're not subscribing and
19  redeeming with the fund.  They are like shares
20  of Apple.
21      Those shares of the Highland Global
22  Allocation Fund trade on an exchange, and that
23  is how you, you know, that is how, you know,
24  you become an equity owner in the fund or you

Page 282

WATERHOUSE - 10-19-21

1   sell your shares and you are no longer an
2   equity owner.
3         As part of that proposal, the
4   advisor told shareholders if you -- if you vote
5   for this proposal to -- to convert it from an
6   open-ended fund to a closed-end fund, we will
7   pay you some amounts of money. I forgot -- a
8   certain number of points. I think it was
9   like -- it was like two to three points or
10  something -- something like that.
11     Q.   Okay. You mentioned when Mr. Morris
12  was asking you, going back to those two
13  promissory notes, you will recall the 5 million
14  and 2.4 million, you mentioned something to the
15  effect that Mr. Dondero told -- told you to pay
16  some moneys out of Highland. Do you remember
17  that discussion with Mr. Morris?
18     A.   I do.
19     Q.   So, to the best of your
20  recollection, did you have a discussion with
21  Mr. Dondero about making some payments in May
22  of 2019 out of Highland?
23     A.   I recall, as I testified earlier,
24  that I had a conversation with Mr. Dondero

Page 283

WATERHOUSE - 10-19-21

1   for -- for these amounts attributable to -- it
2   was either the error -- you know, the error,
3   and in that conversation he said, go get the
4   money from Highland. I believe that is what I
5   testified earlier, and that -- that is my
6   recollection.
7      Q.   Do you recall if that was an
8   in-person meeting or some other mode for the
9   meeting?
10     A.   I -- I -- I recall that being
11  in-person.
12     Q.   Do you recall if anyone else was
13  present, or was it just you and Mr. Dondero?
14     A.   I recall just he and I.
15     Q.   And the moneys that he told you to
16  find from -- or get from Highland, was that in
17  the amount of $5 million and $2.4 million?
18         MR. MORRIS: Objection to the form
19     of the question.
20     A.   I believe so, but I would have to go
21  back and look and see when those moneys were
22  actually paid into the -- into the fund and,
23  you know, when those transfers were done. If
24  they were all done around that same time, then

Page 284

WATERHOUSE - 10-19-21

1   yes, I would say it was -- it was all related
2   to that.
3      Q.   Did Mr. Dondero tell you that those
4   funds would be a loan from Highland to HCMFA?
5      A.   I don't recall.
6         MR. MORRIS: Objection to the form
7      of the question.
8      Q.   Now, and forgive me, I'm probably
9   the only non-American born here, but I speak
10  reasonably well in English. I don't recall,
11  does that mean you don't remember or does that
12  mean it didn't happen?
13        MR. MORRIS: Objection to the form
14     of the question.
15     A.   It -- it means I don't -- I don't
16  remember.
17     Q.   Did Mr. Dondero tell you to have
18  those two promissory notes prepared?
19     A.   I don't recall.
20     Q.   When you -- again, when you say, I
21  don't recall today, that means that sitting
22  here today, you just don't remember one way or
23  the other. Is that accurate?
24     A.   Yes.

Page 285

WATERHOUSE - 10-19-21

1      Q.   Is it possible that you, having
2   heard what Mr. Dondero said and seeing funds
3   being transferred, assumed that that would be a
4   loan without him actually telling you that
5   would be a loan?
6         MR. MORRIS: Objection to the form
7      of the question.
8      A.   Sorry, I want to make sure -- did I
9   ask the amounts that were transferred that I --
10  that -- that I assumed that that was a loan?
11     Q.   Well, let me -- let me take -- let
12  me try again.
13        So you have established already that
14  there were quite a number of promissory notes
15  back and forth -- I'm sorry, quite a number of
16  promissory notes with affiliated companies and
17  individuals owing Highland money; right?
18     A.   Yes.
19     Q.   And you have established that there
20  were many transactions and transfers going back
21  and forth over the years; right?
22        MS. DANDENEAU: Objection to form.
23     A.   In -- yes, in my capacity as CFO and
24  my employment, yes, that is -- yes.

Page 286

WATERHOUSE - 10-19-21

1
2    Q.   And that's part of the reason why
3  you just can't remember some of the details
4  today because this -- this happened years ago,
5  and there were a number of transactions.  Is
6  that accurate?
7        MS. DANDENEAU:  Objection to the
8    form.
9        MR. MORRIS:  Objection to the form
10    of the question.
11    A.   I mean, I deal with thousands of --
12  of -- of -- of transactions, you know, whether
13  it has -- the processing of transactions, you
14  know, if it has got, you know, more -- more
15  zeros, you know, behind it than others.
16        When you look at thousands of
17  transactions over the years for funds and
18  advisors and -- and, you know, financial
19  statements, I mean, it is -- it is very hard
20  going back in -- in -- in my -- you know,
21  14-ish year career at -- at Highland to
22  remember a lot of those details, especially
23  when I don't have any records or books or
24  anything like that, and -- and going back many
25  years.

Page 287

WATERHOUSE - 10-19-21

1
2    Q.   And that is fine.  That -- that --
3  that is why I asked the question.
4        Is it possible in May of 2019 when
5  Mr. Dondero told you to transfer the funds from
6  Highland, you just assumed on your own that
7  those would be loans without him actually
8  telling you that those would be loans?
9        MR. MORRIS:  Objection to the form
10    of the question.
11    A.   I don't know.
12    Q.   I'm sorry, you --
13    A.   I said I don't know.
14    Q.   Okay.  Well, as the -- as the CFO
15  for Highland, if you saw $7.4 million going
16  out, you would feel some responsibility to
17  account for that, wouldn't you?
18        MR. MORRIS:  Objection to the form
19    of the question.
20    A.   Yes.
21    Q.   Is it fair to say that those would
22  be in the range large enough to rise up to your
23  level?
24        MR. MORRIS:  Objection to the form
25    of the question.

Page 288

WATERHOUSE - 10-19-21

1
2    A.   If -- I don't know if I understand
3  your question.  Those amounts would arise to my
4  level where I would be involved or...
5    Q.   You would want to know what a
6  transfer for that amount, $7.4 million, was all
7  about, as the CFO of Highland, wouldn't you?
8        MR. MORRIS:  Objection to the form
9    of the question.
10    A.   Yes, I make it -- I mean, I -- I
11  review all sorts of payments, I mean, even
12  smaller dollar payments on a periodic basis,
13  you know, to -- to -- to understand and to make
14  sure that we are paying things in a -- you
15  know, in -- in -- in an informed way.  And, you
16  know -- and we're -- and we're paying things
17  pursuant to vendor contracts and things like
18  that.
19    Q.   So as part of that, is it possible
20  that seeing $7.4 million go out you would have
21  promissory notes made in order to keep a paper
22  trail, assuming that those were loans, when
23  perhaps they were never intended to be loans by
24  Mr. Dondero?
25        MR. MORRIS:  Objection to the form

Page 289

WATERHOUSE - 10-19-21

1
2    of the question.
3    A.   I don't know.  As I testified
4  earlier, I had conversations with Mr. Dondero
5  about -- about the -- the -- the moneys that
6  were needed for the NAV error.  And I recall
7  him saying go get it from Highland -- or get it
8  from Highland.
9    Q.   Well, why did you sign those
10  promissory notes and why didn't you have him
11  sign them?
12        MR. MORRIS:  Objection to the form
13    of the question.
14    A.   I don't know.  I don't know.
15    Q.   You mentioned earlier that you
16  typically don't sign promissory notes.  Am I
17  remembering your testimony correctly?
18        I mean, promissory notes on behalf
19  of the entities.  Not yourself, obviously.
20    A.   Yes, that is what I said earlier.
21    Q.   Do you recall any other promissory
22  notes in the million-plus range that you had
23  ever signed before on behalf of any entity?
24    A.   There is -- there has been a lot of
25  transactions over the years.  I don't -- I

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    don't -- I don't recall generally.  I don't --
3    I don't recall.
4        Q.    So -- but to the best of your
5    recollection, it was on your initiative,
6    following your discussion with Mr. Dondero,
7    that you had someone draft those two promissory
8    notes; is that correct?
9            MR. MORRIS:  Objection to the form
10        of the question.
11       A.    Yes, we would have -- the team, as I
12   stated earlier, we don't draft promissory
13   notes.  "The team" meaning the accounting and
14   finance team.
15           So the team would have worked with
16   the legal group at Highland to draft any notes.
17       Q.    Do you believe or do you have any
18   recollection as to whether you would have done
19   that pursuant to an email or telephone call or
20   in-person meeting?
21           MR. MORRIS:  Objection to the form
22        of the question.
23       A.    Are you asking if I would have -- if
24   those notes would have been drafted pursuant to
25   an email or phone call?

1    WATERHOUSE - 10-19-21
2        Q.    Strike that.
3            Do you recall whether you sent an
4    email to anyone asking them to draft those two
5    promissory notes?
6        A.    I don't recall because, again,
7    once -- I would have instructed -- likely
8    instructed the team to -- to work with the
9    legal group to draft these documents.
10           I -- I -- I -- yeah, I didn't -- I
11   mean, that is more an operational-type
12   procedure.  So, you know, a manager or a
13   controller or working with legal.  You know,
14   they -- they can certainly handle that task to
15   get that -- you know, to request that from
16   legal.
17       Q.    And who on your team do you think
18   you would have asked to do that?
19           MR. MORRIS:  Objection --
20           Who would have been the logical
21   person or people, if you don't remember their
22   name today?
23           MR. MORRIS:  Objection to the form
24        of the question.
25       A.    It -- it -- there is only two

1    WATERHOUSE - 10-19-21
2    managers of the group.  That would have been
3    Dave Klos or Kristin Hendrix.
4            Dave was the -- one of his duties
5    was managing the valuation team, and so he was
6    intimately involved with this process.  So, you
7    know...
8        Q.    Okay.
9        A.    I don't recall specifically but, I
10   mean, my general -- you know, I -- I -- I
11   likely would have talked to Dave first about it
12   versus someone like Kristin who hadn't been
13   intimately involved.
14       Q.    And -- and do you have a view as to
15   whether it is most likely that you would have
16   done that by email or in-person or how would
17   you believe you would have communicated that to
18   Mr. Klos?
19           MR. MORRIS:  Objection to the form
20        of the question.
21       A.    I likely would have done that in
22   person.  Again, if things of this nature
23   that -- again, you have to put ourselves back
24   to, we have been working on this very stressful
25   project for many, many months.  And once the

1    WATERHOUSE - 10-19-21
2    go-ahead was to -- you know, we see the light
3    at the end of the tunnel with wrapping this up
4    and making shareholders whole -- sorry to say
5    "we" -- you know, the -- so the folks that are
6    involved in it.
7            I like to talk to people
8    face-to-face and -- and -- and go to -- and go
9    to their desk, because that shows if I'm going
10   to their desk that -- that is something that I
11   want done, you know.
12       Q.    And do you remember, Mr. Waterhouse,
13   getting those two promissory notes in paper
14   format or by email before they were executed?
15           MR. MORRIS:  Objection to the form
16        of the question.
17       A.    I don't recall.
18       Q.    For whatever was the ordinary course
19   back then in May 2019, would you expect to have
20   received them only on paper or would you have
21   expected to have received them in Word document
22   or PDF document by email?
23           MR. MORRIS:  Objection to the form
24        of the question.
25       A.    I -- I didn't sign -- I signed very

Page 294

WATERHOUSE - 10-19-21

1 few documents via email. I can't say that it
2 never happened, but people either stopped by my
3 office and physically walked in documents for
4 signature that we discussed face-to-face.
5          Or documents were -- if -- if --
6 if -- if -- let's say I wasn't there or I
7 wasn't available, documents were dropped off.
8 I had -- I had some in- and outboxes in front
9 of my -- my office there at the Crescent.
10          Documents would be dropped off for
11 signature. There would be a cover sheet that
12 would be -- have been applied to those
13 documents detailing, you know, who dropped it
14 off, the purpose, why, what time.
15          And then, you know, as I stated, I
16 don't draft documents and I always go to the
17 legal group and the compliance group to make
18 sure that they're in the loop. And there is
19 a -- a box or section that says, Has legal
20 reviewed or approved, or something to that
21 nature.
22          Again, I don't -- I don't have
23 access to that cover sheet anymore, but it
24 was -- it was something to that effect.

Page 295

WATERHOUSE - 10-19-21

1          And my assistant, you know, if she
2 was there, she would review that -- you know,
3 whatever was being dropped off. And if that
4 has legal, you know, reviewed or -- reviewed or
5 approved it, if that wasn't -- if that stuff
6 hadn't been done, it was like she would just
7 tell them like, go -- go -- go to the legal
8 group, because --
9     Q.   Let me -- let me pause --
10          MS. DANDENEAU: Let him finish.
11          MR. MORRIS: Thank you. Go ahead.
12     A.   I take -- go to the legal group
13 because that -- that was my -- you know, I
14 didn't -- I didn't review anything that -- that
15 they weren't -- you know, or there wasn't some
16 representation made to me that they had
17 reviewed, approved in some capacity.
18          Again, my -- my -- my goal, as CFO,
19 is to provide transparency and make sure that
20 groups like compliance and other things -- and
21 the other group in legal are -- are in -- you
22 know, their -- they're made aware of
23 transactions of -- you know, that are crossing
24 my desk.

Page 296

WATERHOUSE - 10-19-21

1          Because I'm not in every
2 conversation. They're not in every
3 conversation -- meaning legal compliance -- and
4 I just want to make sure that -- that everyone
5 is in sync to, you know, to -- to the extent
6 possible.
7     Q.   So if we summarize, you don't
8 specifically remember signing these two notes,
9 but most likely it would have been that they
10 would have presented -- been presented to you
11 physically on paper?
12          MR. MORRIS: Objection to the form
13 of the question.
14     A.   They would -- they would have been
15 presented physically on paper most likely or
16 someone would have left it. But, I mean,
17 again, I don't -- I don't recall.
18     Q.   I understand. Understand.
19          When you signed -- when you signed
20 documents, when you personally signed
21 documents, did you typically use a ink pen or
22 did you use a stamp?
23     A.   No, I -- I -- I use a -- an -- an
24 ink pen.

Page 297

WATERHOUSE - 10-19-21

1     Q.   Do you know -- was there a file at
2 Highland kept anywhere with ink-signed
3 originals of a promissory notes in general or
4 these two promissory notes specifically?
5          MR. MORRIS: Objection to the form
6 of the question.
7     A.   Sorry, I just want to make sure I
8 understand your question. Are you saying is
9 there a file somewhere that has ink-signed
10 originals of these two promissory notes?
11     Q.   Yes.
12     A.   I would -- I would assume they're
13 some place. I mean --
14     Q.   Well, was there a -- was there a
15 place where Highland generally kept originals
16 of promissory notes owed to it?
17     A.   I wouldn't -- no.
18          MR. RUKAVINA: Mr. Nguyen, would you
19 please pull up my A7, alpha 7.
20     Q.   These are the two promissory notes,
21 Mr. Waterhouse.
22          (Exhibit A7 marked.)
23     Q.   And please -- Mr. Waterhouse, please
24 command my associate to scroll down as you need

Page 298

WATERHOUSE - 10-19-21

1     WATERHOUSE - 10-19-21
2  to, but I want you to take a very close look at
3  your two signatures here and tell me whether
4  you believe, in fact, that you ink signed them
5  or whether you --
6        MS. DANDENEAU:  Mr. Rukavina,
7     Mr. Waterhouse has the copies.
8        MR. RUKAVINA:  Perfect.  Then you
9     can take this down, Mr. Nguyen.
10       A.  These -- these -- these signatures
11  are identical, now that I stare at them, and I
12  mean, they are so close -- I mean, they're
13  identical that, I mean, even with my chicken
14  scratch signature, I don't know if I can -- you
15  know, I do this 100 times, could I do that
16  as -- as precisely as I see between the two
17  notes.
18       Q.  Well, that is why I ask.
19  Mr. Waterhouse, now that you have examined
20  them, does it seem like it is more likely that
21  you actually electronically signed these?
22       MR. MORRIS:  Objection to the form
23    of the question.
24       A.  Is -- I don't -- I don't recall
25  specifically.  As I said before, my assistant

Page 299

WATERHOUSE - 10-19-21

1     WATERHOUSE - 10-19-21
2  did have a -- an electronic signature, and that
3  was used from time to time.  It wasn't as
4  common practice back in 2019.  It definitely
5  was more common practice when we had to work
6  from home and remotely for COVID because it
7  that made it almost impossible to, right,
8  provide wet signatures since we're all working
9  from home remotely.
10       Q.  Well, going just for these two
11  promissory notes, Mr. Waterhouse, in light of
12  your inability to remember any details, are you
13  sure you actually signed either or both of
14  those notes?
15       MS. DANDENEAU:  Objection to form.
16       A.  I don't recall specifically
17  signing -- actually physically signing these
18  notes.  As I said before, I don't recall doing
19  that.  This -- this looks like my signature,
20  but yet these two signatures are identical.
21       Q.  So you don't recall physically
22  signing them, and I take it you don't recall
23  electronically signing them either?
24       A.  I don't recall.  You know, Highland
25  has all my emails.  If that occurred, you know,

Page 300

WATERHOUSE - 10-19-21

1     WATERHOUSE - 10-19-21
2  you know, I don't have any of these records is
3  what I'm saying.  I don't have any of those
4  records.
5        Q.  That is why I'm asking you these
6  questions in great detail because I don't have
7  those emails.  I'm trying to -- I'm hoping that
8  you will give me some names or some details so
9  I can go look for more emails, but again, you
10  don't remember any -- any individual, other
11  than Mr. Dondero that we've discussed, you
12  don't remember any individual with whom you
13  discussed these promissory notes prior to their
14  execution?
15       MR. MORRIS:  Objection to the form
16    of the question.
17       A.  I don't recall discussing it with
18  anybody else.
19       Q.  Okay.
20       A.  I mean, prior --
21       Q.  I understand.
22       A.  You know, there was no one else --
23  there was no one else in that meeting that I
24  recall with Mr. Dondero.
25       Q.  Now, when you established that by

Page 301

WATERHOUSE - 10-19-21

1     WATERHOUSE - 10-19-21
2  May of 2019 --
3        A.  And -- and from what I recall, and
4  the reason why I was by myself is -- is, you
5  know, I don't -- I don't want to speculate, I'm
6  sorry.
7        Q.  Okay.  We have established that by
8  May of 2019, in your view, the liabilities of
9  HCMFA exceeded its assets; correct?
10       A.  Yeah.  I mean, again, I don't have
11  financial statements in front of me, but I
12  think, if I recall, we'd have to go through the
13  testimony with Mr. Morris, I believe that was
14  the case.
15       Q.  In fact, you will recall that in
16  April of 2019, Mr. Dondero signed a document
17  that extended the demand feature of two prior
18  notes to May 31, 2019.  Do you recall that?
19       MS. DEITSCH-PEREZ:  I think you
20    might -- maybe have the court reporter read
21    that back.  You might have misspoke.
22       (Record read.)
23       MR. RUKAVINA:  And I did misspeak.
24       Q.  I meant to say to May 31, 2021.  Do
25  you recall that, sir?

Page 302

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | MR. MORRIS: Objection to the form |
| 3 | of the question. |
| 4 | A. Yes. |
| 5 | MR. RUKAVINA: And, Mr. Nguyen, just |
| 6 | so that the record is clear, will you please |
| 7 | pull up my Exhibit Alpha 10, A10. |
| 8 | (Exhibit A10 marked.) |
| 9 | Q. You don't have this one in front of |
| 10 | you, Mr. Waterhouse? This is the one that |
| 11 | Mr. Morris used earlier. Do you see that |
| 12 | document, sir? |
| 13 | A. Yes, I do. |
| 14 | Q. And this is what you were testifying |
| 15 | about before when Mr. Morris was asking you. |
| 16 | Do you remember that? |
| 17 | A. Yes. |
| 18 | Q. So here is my question for you, |
| 19 | Mr. Waterhouse: As the chief financial officer |
| 20 | of Highland, was it prudent for Highland less |
| 21 | than three weeks later to be lending |
| 22 | $7.2 million to an insolvent entity that |
| 23 | couldn't even then pay its debts back to |
| 24 | Highland? |
| 25 | MS. DANDENEAU: Objection to form. |

Page 303

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | MR. MORRIS: Objection to the form |
| 3 | of the question. |
| 4 | A. Sorry, I just want to make sure -- |
| 5 | are you asking me, did you say, was it prudent |
| 6 | for Highland to loan $7.4 million to HCMFA a |
| 7 | few weeks after this document was executed? |
| 8 | Q. Yes, and at a time when HCMFA's |
| 9 | liabilities exceeded its assets. |
| 10 | MR. MORRIS: Objection to the form |
| 11 | of the question. |
| 12 | A. I don't -- it is odd. I don't know. |
| 13 | MR. RUKAVINA: You can take this |
| 14 | exhibit down, Mr. Nguyen. |
| 15 | Q. Do you recall asking anyone, |
| 16 | Mr. Dondero or -- or anyone outside as to |
| 17 | whether Highland ought to be lending |
| 18 | $7.4 million to HCMF regarding HCMF's |
| 19 | creditworthiness? |
| 20 | MR. MORRIS: Objection to the form |
| 21 | of the question. |
| 22 | A. I don't recall. |
| 23 | Q. Did you receive personally any of |
| 24 | that $7.4 million? |
| 25 | A. No. |

Page 304

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | Q. Did you even -- |
| 3 | MR. MORRIS: I didn't hear that |
| 4 | question, sir. |
| 5 | MR. RUKAVINA: The one that he |
| 6 | answered, John, or my new one? |
| 7 | MR. MORRIS: No, no, your question, |
| 8 | Davor. |
| 9 | MR. RUKAVINA: I had asked him |
| 10 | whether he received any of the |
| 11 | $7.4 million. He said no. |
| 12 | MR. MORRIS: Yeah. I thought there |
| 13 | was a question after that. Maybe I was |
| 14 | mistaken. I apologize. |
| 15 | MR. RUKAVINA: I had started a new |
| 16 | question, so here, let me start the new |
| 17 | question again. |
| 18 | Q. Did you personally receive any |
| 19 | direct benefit from those two notes for |
| 20 | $7.4 million? |
| 21 | A. No. |
| 22 | Q. Did you ever personally consider |
| 23 | yourself obligated to repay either or both of |
| 24 | those notes? |
| 25 | A. No. |

Page 305

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | MR. RUKAVINA: Pull up those notes |
| 3 | again, Mr. Nguyen. |
| 4 | Q. You can have them in front of you, |
| 5 | Exhibit 7, Mr. Waterhouse, whatever is easier |
| 6 | for you. If you go to your signature page, my |
| 7 | question to you is, why did you not include |
| 8 | your title as treasurer by your name, Frank |
| 9 | Waterhouse? |
| 10 | MS. DANDENEAU: Objection to form. |
| 11 | A. I didn't -- I didn't draft this |
| 12 | document. |
| 13 | Q. So you relied on whoever drafted it |
| 14 | to draft it correctly? |
| 15 | A. Yes. |
| 16 | Q. Okay. But back then when you signed |
| 17 | this, did it ever cross your mind that you were |
| 18 | the maker on these notes? |
| 19 | A. No. |
| 20 | Q. Back then when you signed this |
| 21 | document, did it ever cross your mind that you |
| 22 | could be a co-obligor on these notes? |
| 23 | A. No. I didn't receive $7.4 million, |
| 24 | I mean... |
| 25 | Q. But can you say that HCMFA received |

Page 306

1    WATERHOUSE - 10-19-21
2  $7.4 million?
3    A.   I would have to go back and look and
4  check in, you know, the -- the financial
5  records and the bank statements.
6    MR. RUKAVINA:  You can take this
7  exhibit down, Mr. Nguyen.
8    Q.   Mr. Waterhouse, I'm not trying to be
9  a smart-ass, but if the law says that because
10  of the way that you signed this promissory
11  note, if that is what the law says, that that
12  made you personally -- personally liable, then
13  you would agree with me that that was never
14  your intent?
15    MR. MORRIS:  Objection to the form
16  of the question.
17    A.   That was never -- I wouldn't sign a
18  note and not get consideration in return.
19    Q.   So putting all other issues aside,
20  if the law -- if the law says that you were
21  liable for those notes because of how you
22  signed them, then would you agree with me that
23  these notes are a mistake?
24    MR. MORRIS:  Objection to the form
25  of the question.

Page 307

1    WATERHOUSE - 10-19-21
2    MS. DANDENEAU:  Objection to the
3  form.
4    A.   Yes.
5    Q.   So do you agree with me that it's
6  odd -- I think that is the word you used --
7  that Highland would be loaning $7.4 million a
8  few weeks after that extension to an entity
9  whose liabilities exceeded its assets, and you
10  would agree with me that it was never your
11  intention to be in any way liable for these two
12  promissory notes; correct?
13    MR. MORRIS:  Objection to the form
14  of the question.
15    A.   Sorry, you -- you asked a lot there.
16    MR. RUKAVINA:  I will strike it and
17  I will move on.
18    Let's go to -- pull up Exhibit 9,
19  please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha
20  9, A9.
21    (Exhibit A9 marked.)
22    Q.   Sir, take a moment to look at this,
23  but this is an email, and you will see attached
24  July 31, 2020 affiliate notes.
25    Do you see that attachment?

Page 308

1    WATERHOUSE - 10-19-21
2    A.   Yes.
3    Q.   Okay.  And do you see an entry for
4  Highland Capital Management Fund Advisors?
5    MR. MORRIS:  I'm sorry, hold on.
6  Where are you looking?
7    MR. RUKAVINA:  Last page, John.
8    MR. MORRIS:  Is it the page on the
9  screen?
10    MR. RUKAVINA:  Oh, I'm sorry.
11  Mr. Nguyen just did it.  Yes, the last page
12  there.
13    MR. MORRIS:  Thank you.
14    Q.   Do you see an entry there for HCMFA?
15    A.   Yes.
16    Q.   About $10.5 million.
17    Do you see that?
18    A.   I do.
19    Q.   And, now, do you have any
20  explanation for why if HCMFA owed $7.4 million,
21  plus the 5.3 million that had been extended,
22  why that amount was only 10.5 million?
23    A.   I don't know.  Okay.
24    MR. RUKAVINA:  Close this one and
25  pull up, Mr. Nguyen, the schedules,

Page 309

1    WATERHOUSE - 10-19-21
2  schedule of assets.  What exhibit is this
3  of ours, Mr. Nguyen?
4    MR. NGUYEN:  This is A11.
5    MR. RUKAVINA:  Oh, this will be A11.
6    (Exhibit A11 marked.)
7    Q.   You don't have this in front of you,
8  Mr. Waterhouse?
9    A.   Okay.
10    Q.   This is what Mr. Morris used
11  earlier.  Do you remember looking at this with
12  Mr. Morris?
13    A.   Yes.
14    MR. RUKAVINA:  You might have to
15  zoom in a little.  Okay.
16    Q.   Now, I see Affiliate Note A, B, and
17  C.
18    Do you have any recollection as to
19  why the names of the affiliates are omitted?
20    A.   I don't.  I testified earlier that,
21  you know, the team worked with DSI in providing
22  these.  I -- I don't -- I don't know.
23    Q.   Can we deduce -- is it logical to
24  deduce that Affiliate Note A would be NexPoint
25  given its size of $24.5 million?

WATERHOUSE - 10-19-21

1
2      MR. MORRIS:  Objection to the form
3   of the question.
4      A.   I mean, it -- it is a -- it is -- it
5   is approximate.
6      Q.   Well, can we -- can we deduce -- or,
7   I'm sorry, strike that.
8           Can you, sitting here today,
9   logically conclude that Affiliate Note B or C
10  represents HCMFA?
11      MR. MORRIS:  Objection to the form
12   of the question.
13      A.   I don't know.  I don't know.  I
14  can't.
15      Q.   Okay.  As of the petition date, we
16  have established that HCMFA, under promissory
17  notes, owed $7.4 million and $5.3 million to
18  the debtor; correct?
19      MR. MORRIS:  Objection to the form
20   of the question.
21      A.   Yes.
22      Q.   Okay.  And by my reckoning, that
23  would be somewhere approaching $13 million.
24      MR. MORRIS:  Objection to the form
25   of the question.

WATERHOUSE - 10-19-21

1
2      Q.   It would be $12.7 million.  Is that
3   generally correct?
4      A.   Sorry, the amounts were 7.4, 5.3.
5      Q.   Yes.
6      A.   Okay.  Yeah, that -- that -- I can
7   do that math, yes.
8      Q.   Do you have any explanation or any
9   understanding of why there is no similar entry
10  listed here on the schedule of assets filed
11  with the bankruptcy court?
12      MR. MORRIS:  Objection to the form
13   of the question.
14      A.   I don't know.  We have to look at
15  the supporting schedules, like I talked about
16  other -- presumably there is -- there is a
17  build to the schedule that would provide the
18  detail.
19      Q.   Well, that was going to be my next
20  question.  You anticipated it.
21      MR. RUKAVINA:  You can -- you can
22   take this down, Mr. Nguyen.
23      Q.   Do you believe that whenever you and
24  your team provided the underlying data to the
25  financial advisor that the actual names of the

WATERHOUSE - 10-19-21

1
2   affiliates for Affiliate Note A, B, and C would
3   have been listed there?
4      A.   Are you asking we provided the names
5   to the financial advisor?  I don't -- I don't
6   understand who the financial advisor is.
7      Q.   I'm sorry, DSI.
8           Let me ask the question this way,
9   Mr. Waterhouse.
10          Whenever you provided information
11  about the affiliate notes to DSI, do you
12  believe that you would have included the actual
13  names of the affiliates, you or your team, or
14  that you would have done the Affiliate Note A,
15  Note B, Note C?
16      MR. MORRIS:  Objection to the form
17   of the question.
18      MS. DANDENEAU:  Objection to the
19   form.
20      A.   We -- like I testified earlier, when
21  we were -- we gave everything to -- to DSI.  We
22  were giving all of our records, all of our
23  files, everything to DSI.  We weren't redacting
24  information or saying, hey, here is a note,
25  here is Affiliate Note A or B.

WATERHOUSE - 10-19-21

1
2           I mean, it was -- our job and our
3   focus -- and I testified in court back in 2019;
4   right -- was -- was to be transparent and, you
5   know, get DSI up to speed on -- on the matters
6   at Highland.  So I can't see us redacting for
7   that point.
8      MR. RUKAVINA:  Mr. Nguyen, will you
9   please pull up Mr. Morris' Exhibit 36.
10   Just the very first page, the very top
11   email.  You might zoom in a little bit.
12      Q.   Now, you recall being asked about
13  this by Mr. Morris?
14      A.   Yes, I do.
15      Q.   And you wrote:  The HCMFA note is a
16  demand note.
17          You wrote that; right?
18      A.   Yes.
19      Q.   And, in fact, weren't there by that
20  point in time several notes?
21      A.   Yes, there were.  Again, I don't --
22  I don't remember everything specifically.  I
23  mean --
24      Q.   I understand.  I understand.
25          So this is an example where -- where

Page 314

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2  you might have made a mistake by referring to a
3  singular instead of a plural; right?
4        A.   Yes.
5        Q.   Okay.  And you -- you wrote -- a
6  couple of sentences later, you wrote:  There
7  was an agreement between HCMLP and HCMFA the
8  earliest they could demand is May 2021.
9             You wrote that; right?
10       A.   Yes.
11       Q.   But I think you -- you agreed with
12  Mr. Morris that that can't possibly apply to
13  the May 2019 notes, can it?
14            MR. MORRIS:  Objection to the form
15       of the question.  That is not what he
16       testified to.
17       Q.   Let me ask -- let me ask a different
18  question.
19            Sitting here today -- or if you can
20  answer me from your memory on October 6,
21  2020 -- did the April acknowledgment that
22  extended the maturity date apply to the
23  May 2019 notes also?
24       A.   I don't recall specifically.
25       Q.   Well, you recall that the notes that

Page 315

1        WATERHOUSE - 10-19-21
2  you signed were demand notes; right?
3        A.   Yes.
4        Q.   Do you find it logical, based on
5  your experience, that had they intended to have
6  a different or a set maturity date, you would
7  have instructed that that set maturity date be
8  included instead of a demand feature?
9            MR. MORRIS:  Objection to the form
10       of the question.
11       A.   Sorry, just want to make sure I
12  understand.  You are saying that -- that the
13  $5 million note, the $2.4 million note, if
14  those were supposed to be a term note, that I
15  would have made sure that those were a term
16  note?
17       Q.   I'm saying -- I'm saying,
18  Mr. Waterhouse, that on May the 2nd and May the
19  3rd, 2019, if you intended that those two
20  promissory notes could not be called until May
21  2021, would you have included such language in
22  those two promissory notes?
23            MR. MORRIS:  Objection to the form
24       of the question.
25       A.   I guess -- I'm sorry, I don't recall

Page 316

1        WATERHOUSE - 10-19-21
2  putting language in those May notes.  I don't
3  remember what language you are referring to.
4        Q.   Well, let's read this again.
5             There was an agreement between HCMLP
6  and HCMFA the earliest they could demand is May
7  2021.
8             Do you recall that agreement?
9        A.   Yes, that was the agreement we
10  looked at earlier; correct?
11       Q.   Okay.  Yes.
12            Do you -- do you understand now that
13  that agreement that we looked at earlier also
14  applied to the May 2019 notes that you signed?
15       A.   I don't -- I don't know.
16       Q.   But as of October 6, 2020, you're
17  writing that there is one demand note and
18  you're categorizing that demand note as not
19  being demandable on May 2021; correct?
20       A.   Yes.
21       Q.   And you know now that you made at
22  least one mistake in this email; correct?
23            MR. MORRIS:  Objection to the form
24       of the question.
25       A.   Yes.

Page 317

1        WATERHOUSE - 10-19-21
2            MR. RUKAVINA:  You can pull this
3       down, Mr. Nguyen.
4        Q.   So, Mr. Waterhouse, you don't
5  remember Mr. Dondero telling you to make these
6  loans or not.  HCMLP was loaning $7.4 million
7  to someone that their assets were less than
8  their liabilities.
9             We don't see on the July list of
10  notes, where there is $12.7 million of notes,
11  we don't see that on the bankruptcy schedules,
12  and we have this Exhibit 36 where you are
13  confused.
14            Are you prepared to tell me, sir,
15  today that you might have made a mistake in
16  executing those two promissory notes?
17            MR. MORRIS:  Objection to the form
18       of the question.
19       A.   I -- I don't know.
20       Q.   And if it turns out that you're
21  personally liable for those promissory notes,
22  it would certainly be a mistake, wouldn't it?
23            MS. DANDENEAU:  Objection to the
24       form.
25            MR. MORRIS:  Join.

Page 318

WATERHOUSE - 10-19-21

1
2    A.   Yes.
3    Q.   If Mr. Dondero testifies that he
4    never told you to make these loans, would you
5    disagree with his testimony?
6         MR. MORRIS:  Objection to the form
7    of the question.
8    A.   Like I testified earlier with my
9    conversation with Mr. Dondero, all I recall is
10   he said, get the money from Highland.
11   Q.   And if Mr. Dondero testifies that
12   he, in consultation with other senior personnel
13   at Highland, decided that Highland needed to
14   pay HCMFA $7.4 million as compensation for the
15   NAV error and not a loan, would you have any
16   reason to disagree with Mr. Dondero?
17        MR. MORRIS:  Objection to the form
18   of the question.
19   A.   If that was -- if that was his
20   intent, yes, it would -- I would --
21   Q.   Do you have any reason to disagree
22   with him?
23        MR. MORRIS:  Objection to the form
24   of the question.
25   A.   If that was his intent, I don't

Page 319

WATERHOUSE - 10-19-21

1
2    know.  I don't know how I disagree with that.
3    Q.   And just to confirm, you don't
4    remember ever asking Mr. Dondero whether you
5    should have two promissory notes prepared?
6    A.   No.
7    Q.   And you don't remember discussing
8    with Mr. Dondero what the terms of those two
9    promissory notes should be?
10   A.   I don't recall -- I testified all I
11   recall is he said, get the money from Highland.
12   I don't -- the -- the terms of the note, I
13   don't recall ever having a discussion around
14   the terms of the note, but since I don't draft
15   the notes, that -- there could have been a
16   conversation with other people later.
17   Q.   Do you have any memory of whether
18   after the notes were drafted, but before you
19   signed them, that you communicated with
20   Mr. Dondero in any way to just confirm or -- or
21   get his blessing or ratification to signing
22   those notes?
23        MR. MORRIS:  Objection to the form
24   of the question.
25   A.   I don't recall.

Page 320

WATERHOUSE - 10-19-21

1
2    Q.   Again, the only thing you remember,
3    sitting here today, was Mr. Dondero said, get
4    the money from Highland, and that is it, that
5    is all you remember?
6         MR. MORRIS:  Objection to the form
7    of the question.
8    A.   I testified to that several times.
9    This was over two years ago.  A lot has
10   happened.  That is all I recall.
11   Q.   And help me here.  I'm not very
12   technologically astute.  When you -- and I -- I
13   recognize that you do it rarely, but when you
14   sign a document electronically, do you believe
15   that there is an electronic record of you
16   having authorized or signed a document
17   electronically?
18        MR. MORRIS:  Objection to the form
19   of the question.
20   A.   I -- I don't know the tech answer to
21   that, but, you know, since I don't have -- I
22   don't ever attach my signature block
23   electronically, my assistant would have done
24   that, and if it is done over email like we
25   did several times -- you know, multiple,

Page 321

WATERHOUSE - 10-19-21

1
2    multiple times over COVID, she would attach my
3    signature block and then email it out to
4    whatever party.
5    Q.   What was your assistant's name in
6    May 2019?
7    A.   It was Naomi Chisum.
8    Q.   Is she the only one?  I'm sorry, was
9    she your only assistant that would have maybe
10   facilitated logistically something like you
11   just described?
12   A.   You know, she was out on maternity
13   leave at some point.  I don't -- I don't recall
14   those dates where she was out for maternity
15   leave.  There was -- there were folks backing
16   her up.  I don't recall specifically who
17   those -- who those, you know, administrative
18   assistants were, and I don't recall
19   specifically if she was out during this time on
20   maternity leave.
21        I do know that that she was out for
22   a period of time, or who knows, or she could
23   have been on vacation that day or, you know, I
24   don't know.
25   Q.   Switching gears now, the two

Page 322

WATERHOUSE - 10-19-21

2  complaints that have been filed that is against
3  HCMFA and NexPoint, did you see any drafts of
4  those complaints before they were filed?
5       MR. MORRIS:  Objection to the form
6    of the question, and to the extent that you
7    had any communications with counsel or you
8    were shown drafts of the complaints by
9    counsel while you were employed by
10   Highland, I direct you not to answer.
11      A.   I -- I reviewed documents yesterday
12  with counsel here.  I believe that is the first
13  time I have ever seen those.
14      Q.   Okay.  Did you ever discuss with
15  Mr. Seery these two lawsuits before or after
16  they were filed?
17      A.   I don't recall.
18      Q.   Were you ever interviewed by legal
19  counsel, to your knowledge, about these
20  promissory notes before the complaints were
21  filed?  Without going into what was said, were
22  you ever interviewed by legal counsel?
23      MR. MORRIS:  Objection to the form
24    of the question.
25      A.   I don't recall.

Page 323

WATERHOUSE - 10-19-21

2      Q.   Obviously with COVID, it changed,
3  but -- but before COVID, did you used to meet
4  with Mr. Seery from time to time in-person?
5      A.   Yeah, I mean, so before COVID -- so
6  we're talking kind of late March, early April,
7  right, there was about -- I don't remember the
8  specific date when the board for Highland was
9  appointed.  I believe it was around February of
10  2020, so maybe there was a month-and-a-half,
11  two-month window where we were meeting
12  in-person or, you know, like we were actually
13  in the office, excuse me, we were in the
14  office.
15       And, you know, when they were first
16  appointed, the board members and Mr. Seery
17  were -- were definitely down here more
18  in-person.
19      Q.   Did you ever see Mr. Seery taking
20  written notes of -- of his meetings with you or
21  others?
22      A.   I don't recall.
23      Q.   Do you recall on any Zoom or video
24  conference with Mr. Seery, seeing him take
25  notes, written notes?

Page 324

WATERHOUSE - 10-19-21

2      A.   The Zoom calls we had, I don't
3  recall having seen video or you, you know, or if it
4  was on Zoom, I just remember it being -- well,
5  no, you know what, there were some -- you know,
6  I take that back.
7       So there were -- there were some
8  times that I did remember seeing Mr. Seery
9  on -- on some of the Zoom calls.
10      Q.   Well, let me --
11      A.   I don't -- sorry, I'm thinking.  I'm
12  thinking -- I'm going back.  I'm trying to
13  process this.
14      Q.   I can make it much quicker,
15  Mr. Waterhouse.  I have heard -- I have heard
16  that Mr. Seery is a copious note taker.
17       Do you have any knowledge about
18  that?
19      A.   No.
20      Q.   Okay.  Switching gears yet again,
21  and this will be last theme.  Do you need a
22  restroom break, or are you good to go for
23  another half an hour?
24      MS. DEITSCH-PEREZ:  I need a
25    restroom break.

Page 325

WATERHOUSE - 10-19-21

2      MR. RUKAVINA:  Can we make it five
3  minutes?
4      THE WITNESS:  Five minutes would be
5  great.
6      VIDEOGRAPHER:  We're going off the
7  record at 5:53 p.m.
8  (Recess taken 5:53 p.m. to 5:59 p.m.)
9      VIDEOGRAPHER:  We are back on the
10  record at 5:59 p.m.
11      Q.   Mr. Waterhouse, I had asked you
12  earlier about contracts between HCMFA and the
13  debtor, and now I'm going to talk about
14  contracts between the debtor and NexPoint
15  Advisors.  Okay?
16      A.   Okay.
17      Q.   Now, were there contracts similar to
18  the ones with HCMFA that NexPoint had in the
19  nature of employee reimbursement and shared
20  services?
21      A.   Yes, they -- NexPoint Advisors and
22  Highland Capital Management Fund Advisors had
23  cost reimbursement and shared services
24  agreements with Highland Capital Management,
25  L.P.

Page 326

WATERHOUSE - 10-19-21

1
2    Q.    And was that shared services
3    agreement, to the best of your understanding,
4    in place as of December 31, 2020?
5        A.    It was -- it was terminated at some
6    point, and I remember the contracts had
7    different termination dates, but I think the --
8    the date of termination was January 31st of
9    2021, after the termination was put in.
10        So yeah, it would be in place at the
11    end of the year of December -- it would be in
12    place at December 31st, 2020.
13    Q.    And pursuant to that agreement as of
14    December 31st, 2020, was the debtor providing
15    what you would describe as back office services
16    to NexPoint?
17    A.    Yes.
18    Q.    Would those have included accounting
19    services?
20    A.    Yes.
21    Q.    And as part of those accounting
22    services, would the debtor have assisted
23    NexPoint with paying its bills?
24        MR. MORRIS:  Objection to the form
25    of the question.

Page 327

WATERHOUSE - 10-19-21

1
2    A.    Yes.
3    Q.    So let's break that up.  You were a
4    treasurer of NexPoint as well in December of
5    2020?
6        MR. MORRIS:  Objection to the form
7    of the question.
8    A.    Yes.
9    Q.    Okay.  And in December of 2020, did
10    NexPoint have its own bank accounts?
11    A.    Yes.
12    Q.    And did it use those bank accounts
13    to pay various of its obligations?
14    A.    Yes.
15    Q.    Did employees of the debtor have the
16    ability to cause transfers to be made from
17    those bank accounts on behalf of NexPoint?
18    A.    Yes.
19    Q.    And is that one of services that the
20    debtor provided NexPoint, basically ensuring
21    that accounts payable and other obligations
22    would be paid?
23    A.    Yes.
24        MR. MORRIS:  Objection to the form
25    of the question.

Page 328

WATERHOUSE - 10-19-21

1
2    Q.    You answered yes?
3    A.    Yes.
4    Q.    And the payments, though, whose
5    funds would they be made from?
6    A.    From the bank account of NexPoint
7    Advisors.  If they were NexPoint advisor
8    obligations, it would be made from NexPoint
9    Advisors' bank account.
10    Q.    So let's pull up Exhibit Alpha 1.
11    You should have that -- it is my Tab 1 or my
12    Exhibit 1.
13        (Exhibit A1 marked.)
14    Q.    So this is a -- this is a series of
15    emails, Mr. Waterhouse.  Let's look at the
16    first page here, November 25, 2020, between
17    Kristin Hendrix and yourself.
18        Do you see that, sir?
19    A.    I do.
20    Q.    And do you see where Ms. Hendrix
21    writes:  NPA.
22        Do you know what NPA stood for?
23    A.    Yes.
24    Q.    And what does it stand for?
25    A.    NexPoint Advisors.

Page 329

WATERHOUSE - 10-19-21

1
2    Q.    And was that how you-all internally
3    at Highland refer to NexPoint Advisors, L.P.?
4    A.    I mean, yes, amongst other things.
5    Q.    And she writes at the bottom of her
6    email:  Okay to release?
7        Do you see that?
8    A.    Yes, I do.
9    Q.    So what --
10        MR. MORRIS:  Hold on one second.
11        Okay.  Go ahead.
12        MR. RUKAVINA:  Yeah.
13    Q.    So what is -- what is Ms. Hendrix
14    here on November 25 asking of you?
15    A.    She is asking me -- so she -- these
16    are -- these are payments -- typically we would
17    do an accounts payable run every week at the
18    end of every Friday.  But looking at this date,
19    it is Wednesday, November 25th, which means, to
20    me, it is likely Thanksgiving weekend.
21        So this is the day before
22    Thanksgiving, so this is the last kind of --
23    kind of day before the holidays and vacation
24    and things of that nature.  So it is
25    effectively the Friday of that week.

Page 330

WATERHOUSE - 10-19-21

1    So she is -- she is putting in all
2    the payments for the week because we batch
3    payments weekly. And these are the payments
4    that go out that week, and she is informing me
5    of the payments and -- you know, again, at the
6    bottom of the email, she is asking for my okay
7    to -- to release these payments in the wire
8    system.
9    Q. So these would be accounts payable
10   of NexPoint?
11   A. I mean, it would be accounts payable
12   for all of these entities listed on this email.
13   Q. And who was Ms. Hendrix employed by
14   in November and December of 2020?
15   A. Highland Capital Management.
16   Q. Okay. So -- part of the services
17   that NexPoint had contracted with was for
18   Highland to ensure that NexPoint timely paid
19   its accounts payable; is that accurate?
20   MR. MORRIS: Objection to the form
21   of the question. You have got to be
22   kidding me.
23   Q. Is that accurate?
24   A. Yes.

Page 331

WATERHOUSE - 10-19-21

1    Q. And did NexPoint rely on employees
2    of the debtor to ensure that NexPoint's
3    accounts payable were timely paid?
4    MR. MORRIS: Objection to the form
5    of the question.
6    A. Yes.
7    MR. RUKAVINA: Let's flip to the
8    next page, Mr. Nguyen, if you will please
9    scroll to the next page.
10   Q. So this is an email similar to the
11   prior one, November 30th.
12   Do you see where it says, NPA HCMFA,
13   USD $325,000 one-day loan?
14   Do you see that, sir?
15   A. I do.
16   Q. Do you have any memory of what that
17   was?
18   A. I don't recall what that -- what
19   that payment was for.
20   Q. Did it sometimes occur that one
21   advisor would, on very short-terms, make loans
22   to another advisor?
23   A. Yes. This -- this -- this occurred
24   from -- from -- from time to time. It actually

Page 332

WATERHOUSE - 10-19-21

1    looking at -- I'm -- I'm looking at the date of
2    this email. It is November 30th. It is the
3    last day of the prior.
4    HCMFA has obligations it needs to
5    pay to its broker-dealer, which is HCFD. And
6    it likely was short funds to make those
7    obligations under that -- under its agreement,
8    and so it provided a one-day loan because on
9    the next business day on 12/1 -- or the next
10   business day in December, it would receive
11   management fees from the underlying funds that
12   it managed and it would be able to pay back
13   that loan to NexPoint Advisors.
14   Q. So -- so here Ms. Hendrix was
15   seeking your approval to transfer $325,000 from
16   NexPoint to HCMFA for a one-day loan; is that
17   correct?
18   A. That is correct.
19   Q. Let's flip to the next page, sir.
20   MR. RUKAVINA: And, Mr. Nguyen, if
21   you will please scroll down.
22   Q. Now we have an entry for
23   $325,000, 11/30 loan payment.
24   Do you see that, sir?

Page 333

WATERHOUSE - 10-19-21

1    A. Yes.
2    Q. And that is probably the loan that
3    was approved on the prior page?
4    A. Yes, most likely.
5    Q. So is it also true, sir, that in
6    addition to accounts payable debtor employees
7    would be assisting NexPoint with respect to
8    paying back its debt?
9    MR. MORRIS: Objection to the form
10   of the question.
11   A. I mean, yes, for loans of this
12   nature, yes.
13   Q. Well, what about long term loans?
14   Was it reasonable for NexPoint to expect debtor
15   employees to ensure that NexPoint timely paid
16   its obligations under long-term notes?
17   MR. MORRIS: Objection to the form
18   of the question.
19   MS. DANDENEAU: Objection to form.
20   A. I mean, that is one of the things
21   that the Highland personnel did provide to the
22   advisors. Yes, we would -- we would -- over
23   the years, yes, we -- we -- we -- we did do
24   that generally. Again, I don't remember

Page 334

WATERHOUSE - 10-19-21

1 specifically but, yes, generally we -- you
2 know, we did do that.
3     Q.   So do you recall -- and we can pull
4 it up, if need be -- that under the NexPoint
5 note that Mr. Morris asked you about earlier,
6 the one for more than $30 million, that
7 NexPoint was obligated to make an annual
8 payment of principal and interest?
9     MR. MORRIS:  Objection to the form
10 of the question.
11     A.   Yes, it was -- yes, it -- it was an
12 amortizing note.  It was -- you know, from what
13 we reviewed earlier, it was payable by
14 December 31st of each year.  So -- but are --
15 are you asking me --
16     Q.   I'm just asking you, sir, if you
17 recall the note.
18     A.   Yes, the $30 million note, yes, we
19 reviewed it earlier, yes.
20     Q.   And do you recall Mr. Morris had you
21 go through the fact that NexPoint had made
22 payments in years prior to 2020 on that note?
23     A.   I do.
24     Q.   And do you believe that employees of
25

Page 335

WATERHOUSE - 10-19-21

1 the debtor would have played any role in
2 NexPoint having made those prior payments?
3     MR. MORRIS:  Objection to the form
4 of the question.
5     A.   Yes.
6     Q.   And what role in years prior to 2020
7 would employees of the debtor have had with
8 respect to NexPoint making that annual payment?
9     A.   We -- we -- we would have -- I keep
10 saying "we."  The team would have calculated
11 any amounts due under that loan and other
12 loans, as -- as standard course.
13     We would -- since we provided
14 treasury services to the advisors, we would
15 inform the -- the -- we informed
16 Mr. Dondero of any cash obligations that are
17 forthcoming, whether we do cash projections.
18     If, you know, any of these payments
19 would have -- or, you know, the sum total of
20 all of these payments, including any note
21 payments, if there were any cash shortfalls, we
22 would have informed Mr. Dondero of any cash
23 shortfalls.  We could adequately plan, you
24 know, in instances like that.
25

Page 336

WATERHOUSE - 10-19-21

1     Or, sorry, we -- I say "we" -- I
2 keep saying "we" -- I keep wearing my -- again,
3 my -- my treasurer hat.
4     But, yes, it is to -- it is to
5 inform Mr. Dondero of the obligations of the
6 advisors in terms of cash and obligations that
7 are -- are upcoming and that -- and that are --
8 are scheduled to be paid.
9     Q.   And would those obligations that are
10 upcoming and scheduled to be paid prior to 2020
11 have incurred the annual payment on that
12 NexPoint $30 million note?
13     MS. DANDENEAU:  Objection to form.
14     MS. DEITSCH-PEREZ:  Davor, I think
15 you misspoke.  You might want to just
16 repeat the question.
17     Q.   Okay.  Let me repeat the question,
18 sir.
19     Prior to 2020, those services that
20 you just described, would that -- on behalf of
21 the debtor, would that have included NexPoint's
22 payments on the $30 million note?
23     A.   Yes.
24     Q.   So someone at the debtor in treasury
25

Page 337

WATERHOUSE - 10-19-21

1 or accounting would have sent some schedule or
2 a reminder that a payment would be coming due
3 in the future.  Is that generally the practice?
4     A.   Yes, we would -- you know, again, I
5 didn't -- I didn't micromanage the teams, but
6 we had a -- a corporate accounting calendar
7 that we use as kind of a tickler file to keep
8 track of payments.
9     I actually, you know, don't know how
10 actively they're using that in -- in prior to
11 2020, but it was actively used at some point.
12     We did look at NexPoint cash
13 periodically and cash for the other advisors as
14 well and payments.  You know, we -- payments
15 like this would have appeared in our cash
16 projections, in the advisor's cash projections.
17     And, again, as like I said earlier,
18 they would have appeared there, so there would
19 be time to plan for making any of these
20 payments.
21     Q.   And based on your experience, would
22 it have been reasonable for NexPoint to rely on
23 the debtors' employees to inform NexPoint of an
24 upcoming payment due on the $30 million

WATERHOUSE - 10-19-21

1
2 promissory note?
3     MR. MORRIS:  Objection to form of
4 the question.
5     MS. DANDENEAU:  Objection to form.
6   A.   Yes.  Yes, they did.  I mean, but I
7 mean, but I don't think these -- these notes
8 were any secret to anybody.
9   Q.   I understand, and I'm not suggesting
10 otherwise.
11     MR. RUKAVINA:  Please pull up Alpha
12 2, Mr. Nguyen.
13     (Exhibit A2 marked.)
14   Q.   Now, this document is similar to the
15 ones we've seen before as of December 31, 2020,
16 and I don't see under NTA anything there for
17 paying the promissory note to Highland.
18     Do you see anything like that?
19   A.   I do not.
20     MR. RUKAVINA:  You can pull that --
21 that exhibit down, Mr. Nguyen.
22   Q.   You are aware, of course, by now
23 that, in fact, NexPoint failed to make the
24 payment due December 31, 2020, are you not?
25   A.   I am aware, and yes, I do understand

WATERHOUSE - 10-19-21

1
2 it.
3   Q.   Were you aware that Highland
4 accelerated that $30 million promissory note?
5   A.   I am aware.
6   Q.   Were you aware of that acceleration
7 at the time that it occurred?
8   A.   I don't remember specifically.
9   Q.   Do you recall whether anyone asked
10 you -- prior to the acceleration, anyone asked
11 you at Highland, what Highland should do with
12 respect to the missed payment?
13   A.   Did anyone ask me what Highland
14 should do about the missed payment?
15   Q.   Yes, before acceleration.
16     MR. MORRIS:  Objection to the form
17 of the question.
18   A.   I mean, what -- what I recall is
19 there was the -- sorry, are you asking me --
20     MS. DANDENEAU:  Why don't you just
21 repeat the question, Mr. Rukavina.
22   Q.   Let me try again, Mr. Waterhouse,
23 let me try again.
24     I am saying you're the CFO of
25 someone, in this case, Highland, and the

WATERHOUSE - 10-19-21

1
2 borrower failed to make the required payment.
3 Are you with me so far?
4   A.   I am.
5   Q.   Did anyone then ask you, what should
6 we do with respect to our rights against the
7 borrower that missed the payment?
8   A.   Not that I recall.
9   Q.   Did you play a role in the decision
10 to accelerate that $30 million promissory note?
11   A.   I did not.
12   Q.   Do you recall whether Mr. Seery ever
13 asked you before the acceleration as to whether
14 he should accelerate the note?
15   A.   I don't recall.
16   Q.   And you don't recall when you
17 learned of the acceleration itself?
18     MR. MORRIS:  Objection to the form
19 of that question.
20   A.   It was -- it was sometime in
21 early -- in early 2021.  I don't remember
22 specifically.
23   Q.   But do you recall whether it was
24 after the acceleration had already been
25 transmitted?

WATERHOUSE - 10-19-21

1
2     MS. DANDENEAU:  Objection to the
3 form of the question.
4   A.   I don't recall.
5   Q.   Do you recall in early to mid
6 January of 2021, after the default, discussing
7 the default with Mr. Dondero?
8   A.   I do recall discussing with
9 Mr. Dondero after December 31, 2020?
10   Q.   Yes, the fact of the default.
11   A.   I don't recall.
12     MR. RUKAVINA:  Let's pull up my
13 Exhibit 6, Alpha 6.
14     (Exhibit A6 marked.)
15     MR. RUKAVINA:  And, Mr. Nguyen, if
16 you will please scroll down.
17   Q.   This email chain begins with you
18 writing to Ms. Hendrix on January the 12th:
19 NexPoint note to HCMLP.
20     Do you see that, sir?
21   A.   I do.
22   Q.   Were you discussing this same
23 $30 million note we're talking about right now
24 with Ms. Hendrix?
25   A.   Yes.

Page 342

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Do you recall what prompted
3  you to send that email to her?
4    A.   Yes, I had -- I had a conversation
5  with Jim.
6    Q.   Okay.  And what -- what did you
7  discuss with Jim that led to this email chain?
8    A.   He -- he called me and he said he
9  wanted to make payment on the NexPoint note,
10  and I didn't -- I didn't know the -- the amount
11  offhand, so I reached out to Kristin and got
12  the details and relayed that to him.
13    Q.   And you see you sent that email to
14  her at 11:15 a.m.  Does that help you remember
15  when you had this discussion with Mr. Dondero?
16  In other words, was it that morning or the day
17  before, or can you -- can you --
18    A.   No, it was -- it was that morning.
19    Q.   And do you recall how you had that
20  conversation with him?
21        MR. MORRIS:  Objection to the form
22  of the question.
23    Q.   By telephone, by email, in-person?
24    A.   Yeah, he -- he called me.  I was at
25  home.  We were working from home here in

Page 343

WATERHOUSE - 10-19-21

1
2  December of 2020.  He called me from home.  He
3  said he was in court.  He wanted to -- he asked
4  about, you know, making payment on the note and
5  the amount, and so I didn't have those numbers
6  in front of me, so I said I would get back to
7  him.  I wanted all the details, so here is
8  this -- so I reached out to Kristin.
9    Q.   And then she gave you that
10  $1,406,000 figure?
11        MR. RUKAVINA:  Mr. Nguyen, if you
12  will scroll up, please.
13    A.   Yes.  Yeah, she -- the $1,406,112.
14    Q.   And do you recall whether you
15  conveyed that amount to Mr. Dondero?
16    A.   Yes.  I -- I called him back and
17  gave him -- gave him this amount.
18    Q.   Are you aware of whether NexPoint,
19  in fact, then made that 1 million 406 and
20  change payment?
21    A.   Yes, they did.
22    Q.   Did you discuss with Mr. Dondero at
23  that time, either the first conference or the
24  second conference that day -- strike that.
25        When you conveyed the number to

Page 344

WATERHOUSE - 10-19-21

1
2  Mr. Dondero, was -- was it also on January
3  12th?
4    A.   Sorry, when I conveyed the
5  $1.4 million number?
6    Q.   Yes.
7    A.   Yes, yes, it was that -- it was --
8    Q.   So you had --
9    A.   It was that point.
10    Q.   Well, to the best of your
11  recollection, you had a conference with
12  Mr. Dondero by the telephone in the morning,
13  and then another conference with him by
14  telephone after 11:40 a.m. that morning?
15    A.   Yeah, I can't remember -- yeah, it
16  was either that morning or it could have been,
17  you know, early afternoon, but again, I
18  remember calling him back, relaying this
19  information to him, and he said, okay, pay --
20  you know, make -- make this payment.
21    Q.   And during either of those two
22  calls, did you tell Mr. Dondero anything to the
23  effect that making those -- I'm sorry, making
24  that payment would not de-accelerate the
25  promissory note?

Page 345

WATERHOUSE - 10-19-21

1
2    A.   No.
3    Q.   Did you tell him anything to the
4  effect that making that payment would not cure
5  the default?
6    A.   No.
7    Q.   Did you discuss that in any way with
8  him?
9    A.   No, I did not.
10    Q.   Did he say why he wanted to have
11  that $1.4 million payment made?
12        MR. MORRIS:  Objection to the form
13  of the question.
14    A.   He -- he -- he didn't go into
15  specifics.
16    Q.   Did he say anything to you to the
17  effect that if NexPoint makes that payment,
18  then the note will be de-accelerated?
19        MR. MORRIS:  Objection to the form
20  of the question.
21    A.   I don't recall.
22        MR. RUKAVINA:  You can put this one
23  down, Mr. Nguyen.
24    Q.   And, again, when you say you don't
25  recall, you mean you don't remember right now

WATERHOUSE - 10-19-21

1 either way; correct?

2     A.  Yeah, I don't remember. I don't

3 remember us discussing that.

4     Q.  Now -- and we're almost done, I

5 promise. I'm just going to -- I don't know how

6 to ask this question, so I'm just going to try

7 to do my best.

8     Prior to the default on December 31,

9 2020, did Mr. Seery ever tell you any words to

10 the effect that you or someone at Highland

11 should ensure that NexPoint doesn't make its

12 payment?

13     A.  No.

14     Q.  Did you have any hint or any belief

15 that anyone at NexPoint -- I'm sorry, strike

16 that.

17     Did you have any reason to believe

18 that anyone with Highland was actively trying

19 to get NexPoint to make that default by not

20 paying on December 31?

21     MR. MORRIS:  Objection to the form

22 of the question.

23     A.  Are you asking, did any Highland

24 employees actively work to make -- to

WATERHOUSE - 10-19-21

1 somehow --

2     Q.  Yes. Let me take a step back. Let

3 me take a step back.

4     So you are aware now that as a

5 result of that default, what was still some

6 25-year note was accelerated and became

7 immediately due. You are aware of that now;

8 right?

9     A.  Yes.

10     Q.  And can you see how someone at

11 Highland might actually have been pleased with

12 that development?

13     MR. MORRIS:  Objection to the form.

14     Q.  Not that they were --- not that they

15 were pleased, but you can see how someone at

16 Highland might have been pleased with that

17 development?

18     MR. MORRIS:  Objection to the form

19 of the question.

20     MS. DANDENEAU:  Object to form.

21     A.  I don't know how they would have

22 reacted to that.

23     Q.  Okay. But you're not -- you're not

24 aware of any instructions or any actions being

25  

WATERHOUSE - 10-19-21

1 given or taken at Highland by Mr. Seery, the

2 independent board, DSI, that -- that would have

3 basically led Highland to ensure that NexPoint

4 would fail to make that payment?

5     A.  I'm not aware.

6     Q.  In other words, there wasn't a trick

7 or a settlement; right?

8     MS. DEITSCH-PEREZ:  Objection to

9 form.

10     MS. DANDENEAU:  Object to form.

11     MR. MORRIS:  Object to form.

12     A.  I'm not aware.

13     Look, I'm not aware. I'm not in

14 every conversation. I mean, and I'm just --

15 again, I'm sitting at home. It is the end of

16 the year. Again, I'm not aware.

17     Q.  That is a perfectly legitimate

18 answer. I don't know why -- why you think

19 otherwise.

20     Okay. Just give me one second to

21 compose my thoughts.

22     MS. DEITSCH-PEREZ:  While you're

23 taking your one second, why don't we take

24 three minutes. I will be right back.

WATERHOUSE - 10-19-21

1     VIDEOGRAPHER:  Do we want to go off

2 the record?

3     MR. RUKAVINA:  Yes.

4     VIDEOGRAPHER:  All right. We're

5 going off the record at 6:27 p.m.

6 (Recess taken 6:27 p.m. to 6:30 p.m.)

7     VIDEOGRAPHER:  We are back on the

8 record at 6:30 p.m.

9     MR. HORN:  Is Deb back?

10     MS. DANDENEAU:  Are you asking about

11 me? I'm here.

12     MR. HORN:  Oh, okay. I don't see

13 you, sorry.

14     Q.  Actually, yeah, Mr. Waterhouse, so

15 when you had --

16     MS. DANDENEAU:  Are you asking about

17 Deb Dandeneau or Deborah? I mean, there

18 are a lot -- as we talked about, a lot of

19 Debs. I'm here.

20     MS. DEITSCH-PEREZ:  I'm here.

21     MR. HORN:  Yes, I was asking about

22 DDP.

23     MS. DEITSCH-PEREZ:  Oh, DDP is here.

24     MR. HORN:  Okay. Here we go. I'm

Page 350

1  WATERHOUSE - 10-19-21
2  going back on mute.
3  MS. DANDENEAU: Get the right
4  nomenclature.
5  Q.  Mr. Waterhouse, on January 12th,
6  2021, when you had those talks with Mr. Dondero
7  about the $1.4 million payment, did you have a
8  communication or a conversation with Mr. Seery
9  about that payment after January 12th, 2021?
10  A.  I don't recall.
11  Q.  Well, in response to Mr. Dondero
12  reaching out to you, do you recall on that day,
13  January 12th, talking to Mr. Seery or anyone at
14  Highland other than the email chain we just saw
15  about Mr. Dondero's call with you?
16  A.  Did I talk to -- I spoke with
17  Kristin -- I don't know if I spoke to her. I
18  likely spoke to Kristin Hendrix because we had
19  to get the wire on NexPoint's behalf to make
20  the payment to Highland.
21  Q.  So it is true, then, that -- that
22  employees of the debtor did actually cause that
23  payment to be made when it was made after
24  January 12th?
25  A.  Yes, I mean, we -- we -- as I

Page 351

1  WATERHOUSE - 10-19-21
2  testified earlier, we provided that accounting
3  finance treasury function as -- under the
4  shared services agreement. And so once I
5  got the -- I talked to Jim, got the approval to
6  make this payment, we have to then make the
7  payment, or the team does, and so the payment
8  was made.
9  Q.  Okay. But -- okay. And -- and
10  sitting here right now, after Jim called you,
11  you don't remember talking to anyone other than
12  the -- the couple of people you mentioned,
13  talking to anyone about something to the effect
14  that, hey, Jim wants to make this payment now?
15  MR. MORRIS: Objection to the form
16  of the question.
17  A.  I don't -- I don't recall.
18  Q.  And does that include legal counsel?
19  Without going into any detail, on
20  January 12th or before that payment was made,
21  did you consult with legal counsel about
22  anything having to do with the $1.4 million
23  payment?
24  A.  I don't recall.
25  Q.  Okay. Thank you, sir, for your

Page 352

1  WATERHOUSE - 10-19-21
2  time.
3  MR. RUKAVINA: Pass the witness.
4  MR. MORRIS: I just have a few
5  questions, if I may.
6  MS. DEITSCH-PEREZ: Don't you go at
7  the end?
8  MR. MORRIS: Oh, I apologize. He is
9  your witness. I'm surprised you want to
10  ask him questions, but go right ahead.
11  MS. DEITSCH-PEREZ: Just have a
12  couple of things.
13  MR. RUKAVINA: And I will just
14  object to that, that he's our witness.
15  That's not --
16  MR. MORRIS: I'm not talking to you.
17  I'm not talking to you.
18  MS. DANDENEAU: Also, Mr. Morris, it
19  is -- it is --
20  MS. DEITSCH-PEREZ: He is not my
21  witness. He's been subpoenaed by you.
22  Okay?
23  That is no offense, Mr. Waterhouse,
24  I'm -- I'm not -- okay. Anyway.
25  EXAMINATION

Page 353

1  WATERHOUSE - 10-19-21
2  BY MS. DEITSCH-PEREZ:
3  Q.  Good evening. I'm very sorry to be
4  going last and I know you have had a long and
5  taxing day, so I thank you for indulging me.
6  The kinds of services that you
7  describe that the -- that Highland provided for
8  NexPoint, did Highland also provide similar
9  services to that to HCRE and HCMS?
10  A.  Yes.
11  MR. MORRIS: Objection to the form
12  of the question.
13  Q.  What kind of services did Highland
14  provide to HCRE and HCMS?
15  MR. MORRIS: Objection to the form
16  of the question.
17  MS. DEITSCH-PEREZ: What is your
18  objection, John?
19  MR. MORRIS: It is vague and
20  ambiguous. Unlike the advisors and
21  NexPoint, they actually had shared services
22  agreements.
23  MS. DEITSCH-PEREZ: I got -- I
24  understand your objection. That is fine.
25  Q.  Let's take them one at a time.

Page 354

WATERHOUSE - 10-19-21

1
2     What kinds of services did Highland
3  provide to HCRE?
4        MR. MORRIS:  Objection to the form
5  of the question.
6     A.   HCMS, Highland employees provided
7  accounting services, treasury management
8  services, potentially legal services.  I
9  don't -- but I wouldn't have been directly
10  involved in that.  But as far as the teams that
11  I manage, it was accounting, treasury, things
12  of that nature.
13     Q.   Okay.  And that was for HCM, LLP --
14     A.   And -- and, sorry, it would also be
15  any asset valuation if needed as well.
16     Q.   Okay.  We went back and forth on
17  each other and I apologize, so just to clarify.
18        You were talking about the services
19  that Highland Capital Management provided to
20  HCMS; is that right?
21     A.   HCMS.  So, again, yes.  And
22  accounting, treasury, valuation, and also tax
23  services too.
24     Q.   Okay.
25     A.   Tax services.  Look, I'm expanding

Page 355

WATERHOUSE - 10-19-21

1
2  this, their HR services as well.
3     Q.   Okay.  And did that include bill
4  paying?
5        MR. MORRIS:  Objection to the form
6  of the question.
7     Q.   Did the services that HCM provided
8  to HCMS include bill paying?
9        MR. MORRIS:  Objection to the form
10  of the question.
11     A.   Yes.
12     Q.   And did the services that HCMLP
13  provided to HCMS include scheduling upcoming
14  bills?
15        MR. MORRIS:  Objection to the form
16  of the question.
17     A.   Yes.
18     Q.   And did HCMLP regularly pay -- cause
19  to be paid the payments on loans HCMS had from
20  HCMLP?
21        MR. MORRIS:  Objection to the form
22  of the question.
23     A.   Yes.
24     Q.   Typically -- if there is a
25  typically, how far in advance of due dates did

Page 356

WATERHOUSE - 10-19-21

1
2  HCMLP cause HCMS to pay its bills?
3        MR. MORRIS:  Objection to the form
4  of the question.
5     A.   I mean, it -- it -- it depend -- it
6  depended on the nature of the payment and the
7  vendor, but, you know, if there were -- if
8  there were larger scheduled payments, you know,
9  I would like to give at least 30 days notice.
10        And that is -- that is kind of my
11  rule of thumb so no one is surprised.
12     Q.   Okay.  And was it generally HCMLP's
13  practice to timely pay HCMS' bills?
14        MR. MORRIS:  Objection to the form
15  of the question.
16     A.   It -- it -- it -- that depended on
17  the nature of the payment.
18     Q.   Okay.  And can you explain what you
19  mean by that?
20     A.   Yeah, I mean if -- if it was -- I
21  mean -- if there was some professional fees
22  that weren't -- you know, they were due but
23  they weren't urgent, those fees may not be paid
24  as timely as others that have a due date or --
25  or things like that.

Page 357

WATERHOUSE - 10-19-21

1
2     Q.   Okay.  Are loan payments the kinds
3  of thing that HCMLP would pay on time because
4  of potential consequences of not paying on
5  time?
6        MR. MORRIS:  Objection to the form
7  of the question.
8     A.   Yes.  As I testified earlier, we
9  would want to give, you know, notice on -- on
10  -- on larger payments and -- and things of that
11  nature so we didn't miss due dates.
12     Q.   Okay.  And over the course of time,
13  did HCMLP generally pay HCMS' loan payments in
14  a timely fashion?
15        MR. MORRIS:  Objection to the form
16  of the question.
17     A.   I can't remember specifically, but
18  generally, yes.
19     Q.   Okay.  Now, did HCMLP provide
20  similar services to HCRE that you have
21  described it provided to HCMS?
22        MR. MORRIS:  Objection to the form
23  of the question.
24     A.   Yes, but I don't think it -- it
25  provided -- I don't think it provided HR

Page 358

```
 1        WATERHOUSE - 10-19-21
 2   services.
 3        Q.   Can you describe the accounting and
 4   treasury services that HCMLP provided for HCRE?
 5        A.   Yeah, it -- it would provide
 6   bookkeeping services on a -- on a periodic
 7   basis.  It would make payments, you know, as
 8   needed.
 9        Q.   Okay.  So did it provide --
10        A.   And -- and I believe it -- it -- it
11   provided tax services as well.
12        Q.   Okay.  And so did it provide the
13   same kind of bill -- did HCMLP provide the same
14   kind of bill-paying services for HCRE that it
15   provided for HCMS and NexPoint?
16        MR. MORRIS:  Objection to the form
17   of the question.
18        A.   Yes.
19        Q.   And over the course of time, did
20   HCMLP generally cause to be made the loan
21   payments that HCRE owed to HCMLP?
22        MR. MORRIS:  Objection to the form
23   of the question.
24        A.   Yes.
25        Q.   Did HCMLP make loan payment -- the
```

Page 359

```
 1        WATERHOUSE - 10-19-21
 2   loan payment that was due from HCMS to HCMLP in
 3   December of 2020?
 4        MR. MORRIS:  Objection to the form
 5   of the question.
 6        A.   I don't believe that payment --
 7   payment was made.
 8        Q.   Okay.  And when HCMLP caused HCMS in
 9   the past to make loan payments, whose money did
10   it use to make those payments?
11        MR. MORRIS:  Objection to the form
12   of the question.
13        A.   It was the -- the money in HCMS's
14   operating account would be made to that --
15   those moneys would be used to make payment to
16   Highland Capital Management.
17        Q.   Okay.  And Highland -- is it correct
18   that Highland Capital Management personnel had
19   the access to HCMS's accounts to be able to
20   cause such payments to be made?
21        A.   Yes, Highland personnel had access
22   to those accounts.
23        Q.   Okay.  And so now for HCRE, whose
24   money was used when HCMLP caused HCRE
25   payments -- loan payments to Highland to be
```

Page 360

```
 1        WATERHOUSE - 10-19-21
 2   made?
 3        MR. MORRIS:  Objection to the form
 4   of the question.
 5        A.   It was -- it was cash in HCRE's bank
 6   account that would be used to make payments to
 7   Highland Capital Management.
 8        Q.   Okay.  And so did Highland Capital
 9   Management have access to HCRE's funds in order
10   to be able to make such payments?
11        MR. MORRIS:  Objection to the form
12   of the question.
13        A.   Personnel at Highland Capital
14   Management had access to HCRE's bank account to
15   effectuate the payments.
16        Q.   Okay.  And was the payment due from
17   HCRE to HCMLP due in December of 2020 made?
18        A.   It --
19        Q.   In December of 2020.
20        A.   It was not.
21        Q.   Okay.  And was there money in HCRE's
22   account that would have enabled the payment to
23   be made had HCM personnel attempted to make the
24   payment?
25        MR. MORRIS:  Objection to the form
```

Page 361

```
 1        WATERHOUSE - 10-19-21
 2   of the question.
 3        A.   I -- I don't recall.
 4        Q.   Do you have any reason to believe
 5   that either HCRE or HCMS simply didn't have the
 6   funds on hand to make the December 2020
 7   payments?
 8        A.   I don't know.
 9        Q.   I guess I'm asking, do you have any
10   reason to believe that they didn't have the
11   funds?
12        A.   We managed cash for so many
13   different entities and funds, and I don't
14   recall, you know, where the cash position was
15   for HCRE and HCMS at 12/31/2020.
16        Q.   Okay.
17        A.   I just don't recall, and I don't --
18   and I don't remember what the loan payment
19   obligations were from HCRE to Highland, and
20   from HCMS to Highland.  I don't recall.  I
21   don't recall, I mean...
22        Q.   Let me come at it a different way.
23   Were the -- were the payments that would
24   otherwise have been due in December of 2020
25   made in January of 2021 for HCMS and HCRE?
```

Page 362

WATERHOUSE - 10-19-21

1
2      A.   I believe the HCRE payment was made
3   in January of 2021. I don't recall any
4   payments being made from HCMS to Highland.
5      Q.   If it -- how is it the HCRE payment
6   came to be made? Why did you make it -- why
7   did HCM make the payment in January of 2021?
8      A.   Jim -- Jim called me and instructed
9   me to -- to make the payment on behalf of HCRE,
10   Jim Dondero -- Jim Dondero.
11      Q.   Did he seem upset that -- that the
12   payment had not been made?
13      A.   Yeah. On the note that was, you
14   know, that was the term note, yes, he -- he was
15   displeased that the -- that the payment had not
16   been made by year-end.
17      Q.   Okay. And did you make the -- cause
18   the payment to be made as -- as requested?
19      A.   Yes.
20      Q.   And did anyone else from HCM
21   participate with you in causing the payment to
22   be made to -- on the HCRE loan?
23      A.   Yes. It would have been Kristin
24   Hendrix. I -- again, I don't -- as I testified
25   earlier, I'm not an officer of HCRE. I don't

Page 363

WATERHOUSE - 10-19-21

1
2   believe I'm an authorized signer. So I
3   can't -- other personnel have to make payment
4   from HCRE to -- to -- to Highland.
5      Q.   Okay. And in the conversation
6   that -- that you had with Mr. Dondero when he
7   requested the payment to be made, did you say
8   to him words to the effect, Jim, this loan is
9   going to stay in default, what are you making
10   the payment for, anything like that?
11      A.   No.
12      Q.   In fact, did you have the impression
13   from him that he thought that the loan would
14   be -- the default would be cured by making the
15   payment?
16      MR. MORRIS: Objection to the form
17   of the question.
18      A.   Did I get the impression from Jim
19   Dondero that the loan would be cured if the
20   payment from HCRE --
21      Q.   Yeah, if that is what he thought.
22      MR. MORRIS: Objection to the form
23   of the question.
24      A.   I didn't get any impression from him
25   on that at the time.

Page 364

WATERHOUSE - 10-19-21

1
2      Q.   Do you know whether there was an
3   HCMS term loan that had a payment due in
4   December of 2020?
5      A.   I don't recall.
6      Q.   Okay. And so the reason you don't
7   recall whether or not there was a payment in
8   January of 2021 is because you just don't
9   remember whether there was such a loan at all?
10      MR. MORRIS: Objection to the form
11   of the question.
12      A.   I don't remember. There is -- there
13   is so many notes, and I mean, demands, and I
14   don't -- I don't remember. It's a lot to keep
15   track in your head.
16      Q.   I understand, and -- and I hear your
17   frustration when you have explained that the
18   debtor has your documents and you don't, and so
19   I fully appreciate it, and this is no knock on
20   you. It's a knock on somebody else on this
21   call.
22      MR. MORRIS: I move to strike. That
23   was pretty obnoxious, but go ahead.
24      Q.   Okay. But so, Mr. Waterhouse, if --
25   if a payment on the HCMS loan was made in

Page 365

WATERHOUSE - 10-19-21

1
2   January of 2021, do you think it was part of
3   the same conversation where Jim Dondero said,
4   hey, why didn't that get paid, please make
5   that -- get that payment done?
6      MR. MORRIS: I object to the form of
7   the question.
8      A.   Yes. Likely it would have been -- I
9   mean, again, I don't recall a payment being
10   made, but, you know, again, I don't remember
11   everything.
12      Q.   Okay. Did -- at the time you were
13   communicating with Kristin Hendrix about the
14   payment being made, whichever payments were
15   made in January, did she say anything to you
16   about the payments not curing the loan
17   defaults?
18      A.   No.
19      Q.   Okay. All right. So I'm going to
20   take you back to very early in the deposition
21   when Mr. Morris was asking you about the --
22   the -- the -- the agreement with respect to
23   the -- the forgiveness element of the loans, so
24   that is just to orient you.
25      Do you remember that there was a

Page 366

WATERHOUSE - 10-19-21

1
2  time that you and Mr. Dondero were
3  communicating about potential means of
4  resolving the Highland bankruptcy by what was
5  colloquially referred to as a pot plan?
6      A.   Yes.
7      Q.   Okay.  And can you tell me generally
8  when that was?
9      A.   Like mid -- mid 2020, sometime in
10 2020, mid 2020.
11     Q.   Okay.  And did the process of trying
12 to figure out what the numbers should be
13 involve looking at what one should pay for the
14 Highland assets?
15         MR. MORRIS:  Objection to the form
16 of the question.
17     A.   Yes.
18     Q.   Okay.  And did there come a time
19 when you were proposing some potential numbers
20 and Mr. Dondero said something to you like,
21 well, why are you including payment for the
22 related party notes, those, you know, were
23 likely to be forgiven as part of my deferred
24 executive compensation?
25         MR. MORRIS:  Objection to the form

Page 367

WATERHOUSE - 10-19-21

1
2  of the question.
3      A.   Yes, we did have that conversation.
4      Q.   Okay.  Was that conversation in
5  connection with trying to figure out the right
6  numbers for a pot plan?
7      A.   Yeah.  I mean, it was -- it was -- I
8  mean, Jim -- Jim would ask for you, know,
9  most -- most recent asset values, you know, for
10 Highland, and -- and myself and the team
11 provided those to him, so it was in that
12 context.
13     Q.   Okay.  And does that refresh your
14 recollection that these communications were in
15 2020 rather than 2021?
16         MR. MORRIS:  Objection to the form
17 of the question.
18     A.   The -- the -- the executive
19 compensation discussions were definitely in
20 2020.
21     Q.   Okay.  Now, did you ever make
22 proposals that took into account Jim's comment
23 that the notes were likely to end up forgiven
24 as part of his compensation?
25         MR. MORRIS:  Objection to the form

Page 368

WATERHOUSE - 10-19-21

1
2  of the question.
3      A.   Yes, we -- the team and myself put
4  together, you know, asset summaries of Highland
5  at various times for all the assets of
6  Highland, and not including the notes.
7      Q.   Okay.  And were those presentations
8  communicated to -- to Mr. Seery?
9      A.   No.  Well, look, I didn't tell -- I
10 didn't tell Mr. Seery.  I don't know what
11 Mr. Dondero did with the information.
12     Q.   Okay.
13     A.   I did not have conversations with
14 Mr. Seery.
15     Q.   Okay.  Do you know who saw the
16 presentations that you put together that didn't
17 include the value of the related party notes?
18     A.   We're talking presentations -- these
19 are -- these are Excel spreadsheets?
20     Q.   Uh-huh.
21     A.   I don't know who -- these were given
22 to -- to Jim Dondero.  I don't know what was
23 done with them after that.
24     Q.   Okay.  You also mentioned earlier
25 that sometime during your tenure at Highland

Page 369

WATERHOUSE - 10-19-21

1
2  you knew of the practice of giving forgivable
3  loans to executives.
4          MR. MORRIS:  Objection to the form
5  of the question.
6      Q.   Can you -- can you tell me what you
7  recall about that practice?
8          MR. MORRIS:  Objection to the form
9  of the question.
10     A.   Yes, so there were -- there were --
11 during my tenure at Highland, there were loans
12 or -- given to employees that were later
13 forgiven at a future date and time.
14     Q.   Okay.  And when the loans were
15 given, did the notes, to your recollection, say
16 anything about the potential forgiveness term?
17         MR. MORRIS:  Objection to the form
18 of the question.
19     A.   When you say "did the notes," did
20 the promissory notes detail the forgiveness?
21     Q.   Yes.
22     A.   Not that I recall.
23     Q.   And until such time as whatever was
24 to trigger the forgiveness occurred, were the
25 notes bona fide notes as far as you were

Page 370

WATERHOUSE - 10-19-21

1
2  concerned?
3      MR. MORRIS:  Objection to the form
4   of the question.
5      A.   Yes, similar to -- yes.
6      Q.   Okay.  You were going to say similar
7  to what?
8      A.   Mr. Morris earlier today showed
9  notes of the financial statements about various
10  affiliate loans.  I -- I -- I do recall these
11  notes because I -- at that time personally
12  worked on the -- the financial statements of
13  Highland.  That was, you know, in my role as a
14  corporate accountant.
15          And there were -- those loans
16  were -- to the partners were detailed in the
17  notes to the financial statements, similar to
18  what we went through earlier today in the prior
19  testimony about what we saw with Highland
20  and -- and -- and the -- and HCMFA.
21      Q.   Is it fair to say that on Highland's
22  balance sheet there were any number of assets
23  that the value of which could be affected by
24  subsequent events?
25      MR. MORRIS:  Objection to the form

Page 371

WATERHOUSE - 10-19-21

1
2   of the question.
3      A.   Yes.  I mean, yes, that -- there
4   are.  And that is -- yes.
5      Q.   Okay.  And is it typical accounting
6  practice that until there is some certainty
7  about those potential future events, that asset
8  value listed on -- on the books doesn't take
9  into account those potential future events?
10      MR. MORRIS:  Objection to the form
11   of the question.
12      A.   Yeah, if those -- yes.  If -- if
13  those future events, you know, at the time of
14  issuance are not known or knowable, like I
15  discussed earlier with, like, market practice,
16  asset dislocation, or, you know, I mean, things
17  like that, you -- I mean, it -- it could affect
18  its fair value --
19      Q.   Okay.
20      A.   -- in the future.
21      Q.   And am I correct you wouldn't feel
22  compelled to footnote in every possible change
23  in -- in an asset when those possibilities are
24  still remote?
25      MR. MORRIS:  Objection to the form

Page 372

WATERHOUSE - 10-19-21

1
2   of the question.
3      A.   The accounting standard is you have
4  to estimate to the best -- you know, to -- to
5  the best of your ability, the fair value of an
6  asset as of the balance sheet date under --
7  under GAAP.
8      Q.   Did -- strike that.
9          Okay.  Give me a minute.  I'm
10  close -- I'm close to done.  Let me just go off
11  and look at my notes for a second.  So take two
12  minutes.
13      VIDEOGRAPHER:  We're going off the
14   record at 7:02 p.m.
15   (Recess taken 7:02 p.m. to 7:03 p.m.)
16      VIDEOGRAPHER:  We are back on the
17   record at 7:03 p.m.
18      Q.   Mr. Waterhouse, is it generally your
19  understanding that people you work with now
20  have been asking the debtor for full and
21  unfettered access to their own former files?
22      MR. MORRIS:  Objection to the form
23   of the question.
24      A.   Yes, I am -- I am generally aware.
25      Q.   Okay.  And do you think you could

Page 373

WATERHOUSE - 10-19-21

1
2  have been better prepared for this deposition
3  if the debtor had complied with those requests?
4      MR. MORRIS:  Objection to the form
5   of the question.
6      A.   I -- I -- I most certainly -- yes.
7  I mean, again, these are multiple years,
8  multiple years ago, lots and lots of
9  transactions.
10          You know, we asked about NAV errors
11  and, you know, things like that and these
12  are -- it would make this process a lot more --
13  a lot easier and if we had -- if we had access
14  to that.
15      Q.   Okay.  And has the debtor -- is the
16  debtor suing you right now?
17      A.   Yes.
18      Q.   And is the debtor trying to renege
19  on deals that it had previously made with you?
20      MR. MORRIS:  Objection to the form
21   of the question.
22      A.   Sorry, I need to -- it is my
23  understanding that the litigation trust is
24  suing me.  And not being a lawyer, I don't
25  know -- is that the debtor?

Page 374

WATERHOUSE - 10-19-21

1        Is that -- I don't know the
2  relationship.  So, again, I'm not the lawyers.
3  I've said many times.  But my understanding is
4  the litigation trust is suing me.  I could be
5  wrong there.  I don't know.
6      Q.   Okay.  I understand.
7           Someone with some connection to the
8  Highland debtor has brought a claim against
9  you; is that fair?
10         MR. MORRIS:  Objection to the form
11     of the question.
12     A.   Yes.
13     Q.   Okay.  And is there also some motion
14 practice in the bankruptcy where the debtor or
15 someone associated with the debtor is
16 attempting to undo something that was
17 previously resolved with you?
18     A.   Yes.
19     Q.   And so in one action somebody is
20 associated with the debtors trying to --
21 threatening you with trying to take money from
22 you, and then in the other -- and trying to --
23 and in the other they are threatening not to
24 pay you things that had previously been agreed;

Page 375

WATERHOUSE - 10-19-21

1  is that correct?
2          MR. MORRIS:  Objection to the form
3      of the question.
4      A.   I want to be -- yes, I -- there
5  is -- I'm being sued, again, on -- on something
6  that was agreed to with Mr. Seery and myself.
7  I don't -- I don't -- I don't own that claim.
8      Q.   Okay.
9      A.   To be transparent, I don't own that
10 claim.  So it is not my personal property.
11     Q.   Okay.
12     A.   And -- and being the nonlawyer, I
13 don't know how I can get sued for something
14 that I don't owe or, like, I don't own
15 anything.  I'm not the lawyer.  But, I mean, if
16 that is -- if I'm understanding the facts
17 correctly.
18     Q.   Okay.  And the lawsuit that was
19 filed that names you, that was just filed
20 this -- this past week; is that right?
21         MS. DANDENEAU:  Ms. Deitsch-Perez, I
22     do want to interrupt at this point because
23     just as I told Mr. Morris, that this is a
24     deposition about the noticed litigation.

Page 376

WATERHOUSE - 10-19-21

1         I really don't want to go -- go
2  afield --
3         MS. DEITSCH-PEREZ:  Yeah.
4         MS. DANDENEAU:  -- and open up a
5  whole new line of inquiry about the lawsuit
6  or the -- the motion and the bankruptcy
7  court.  We will be here all night.
8         MS. DEITSCH-PEREZ:  And I
9  understand.
10     Q.   My -- my point is:  Do you feel
11 like -- like there is some effort by these
12 parties related to the debtor to intimidate
13 you -- not that you -- I'm not saying you are
14 or you aren't.
15         But do you feel like there is some
16 effort to intimidate you and maybe an effort to
17 deter you from being as prepared as you might
18 be in this deposition?
19         MR. MORRIS:  Objection to the form
20     of the question.
21     A.   I was -- I was surprised by the
22 lawsuit, by me being named, because, again, I
23 don't own the asset and things like that.
24 Yeah, I just -- I want to move forward with my

Page 377

WATERHOUSE - 10-19-21

1  life at Skyview.
2      Q.   MS. DEITSCH-PEREZ:  Thank you.
3         THE WITNESS:  Thank you.
4         FURTHER EXAMINATION
5  BY MR. MORRIS:
6      Q.   If I may, I just have a few
7  questions.
8          Mr. Waterhouse, we saw a number of
9  documents that Mr. Rukavina put up on the
10 screen where Ms. Hendrix would send you a
11 schedule of payments that were due on behalf of
12 certain Highland affiliates.
13         Do you remember that?
14     A.   Yes.
15     Q.   And in each instance she asked for
16 your approval to make the payments; is that
17 right?
18     A.   Yes, she did.
19     Q.   And was that the -- was that the
20 practice in the second half of 2020 whereby
21 Ms. Hendrix would prepare a list of payments
22 that were due on behalf of Highland associates
23 and ask for approval?
24     A.   Yes.

Page 378

WATERHOUSE - 10-19-21

1
2    Q.   And I think you said that there was
3    a -- a --
4    A.   It was -- I think I testified to
5    this earlier when we talked about procedures
6    and policy, you know, again, I want to be
7    informed of -- of -- of -- of -- of any
8    payments that are going out.  I want to be made
9    aware of these payments, and that was just a
10   general policy, not just for 2020.
11   Q.   Okay.  So it went beyond 2020?
12   A.   Yes.
13   Q.   Is that right?
14   A.   Yes.
15   Q.   Okay.  And the corporate accounting
16   group would prepare a calendar that would set
17   forth all of the payments that were anticipated
18   in the -- in the three weeks ahead; is that
19   right?
20   A.   I -- like I testified earlier, we
21   had a corporate calendar that was set up, you
22   know, to -- to provide reminders or, you know,
23   of anything of any nature, whether it is
24   payments or -- or financial statements or, you
25   know, whatever it is, you know, to meet

Page 379

WATERHOUSE - 10-19-21

1
2    deadlines.
3        I don't know how, as I testified
4    earlier, how much they were using that
5    calendar.
6    Q.   Okay.  But -- but you did get notice
7    and a request to approve the payments that were
8    coming due on behalf of Highland's affiliates.
9    Do I have that right?
10       MS. DANDENEAU:  Objection to form.
11   A.   I mean, generally, yes.  I mean, you
12   know, as we saw with these emails, generally, I
13   mean, did that encompass everything, no.
14   Q.   Okay.  Do you know why the
15   payment -- do you know why there was no payment
16   made by NexPoint at the end of 2020?
17   A.   Yes.  There was -- there was -- we
18   talked about these agreements between the
19   advisors and Highland, the shared services and
20   the cost reimbursement agreement.
21       And in late 2020, there were
22   overpayments, large overpayments that had been
23   made over the years on these agreements, and it
24   was my understanding that the advisors were --
25   were talking with -- like Jim Seery and others

Page 380

WATERHOUSE - 10-19-21

1
2    to offset any obligations that the advisors
3    owed to Highland as offset to the overpayments
4    on these agreements.
5    Q.   Okay.  Did you participate in any of
6    those conversations?
7    A.   I did not.
8    Q.   Okay.  Do you know -- do you recall
9    that the -- at the end of November, the debtor
10   did notice to the advisors of their intent to
11   terminate the shared services agreements?
12   A.   Like I testified earlier, there
13   was -- the agreements weren't identical, from
14   what I recall, and there is one that had a
15   longer notice period, which I think had a
16   60-day notice period.  I don't recall which one
17   that was, so not all of them were -- notice
18   hadn't been given as of November 30th, for all
19   of the agreements.
20   Q.   Upon the receipt of the -- the
21   termination notices that you recall, do you
22   know if the advisors decided at that point not
23   to make any further payments of any kind to
24   Highland?
25       MR. RUKAVINA:  Objection, form.

Page 381

WATERHOUSE - 10-19-21

1
2    A.   No.  The advisors -- the advisors
3    had stopped making payments prior to that
4    notice.
5    Q.   Okay.  And how do you know that the
6    advisors stopped making -- making payments
7    prior to the notice?
8    A.   I had -- I had a conversation
9    with -- with Jim Dondero.
10   Q.   And did Mr. Dondero tell you that
11   the advisors would no longer make payments to
12   Highland?
13       MS. DEITSCH-PEREZ:  Object to the
14   form.
15   A.   Yes, he -- he -- again, he said
16   they -- they -- the advisors have overpaid on
17   these agreements, to not make any future
18   payments, and that there needs to be offsets,
19   and they're working on getting offsets to these
20   overpayment.
21   Q.   Do you know if anybody ever
22   instructed Highland's employees to make the
23   payment that was due by NexPoint at the end of
24   the year?
25   A.   Did anyone instruct Highland's

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  employees to make that payment?
3      Q.   Correct.
4      A.   Anyone -- not that I'm aware.
5      Q.   Were any of Highland's employees
6  authorized to make the payments on behalf of
7  its affiliates -- withdrawn.
8           Was any of Highland's employees
9  authorized to effectuate the payment on behalf
10 of NexPoint that was due at the end of the year
11 without getting approval from either you or
12 Mr. Dondero?
13     A.   They had the -- they had the ability
14 to make the payment, but they didn't -- you
15 know, that -- that payment needed to be
16 approved.
17     Q.   Okay.  And it needed to be approved
18 by you or Mr. Dondero; is that right?
19     A.   I mean, I'm not going to make the
20 unilateral decision.
21     Q.   Is that a decision that you
22 understood had to be made by Mr. Dondero?
23     A.   Yes.  Sitting back in December of
24 2020, the -- that -- there was this off --
25 offset negotiation that -- that was happening,

1  WATERHOUSE - 10-19-21
2  so I mean, until those negotiations were
3  resolved, you know, there wasn't any
4  payments -- there weren't any payments.
5      Q.   And -- and there were no payments
6  until the negotiations were resolved because
7  that was the directive that you received from
8  Mr. Dondero; correct?
9      A.   I don't think he said -- I mean, I
10 think -- yeah, I mean -- I'm trying to recall
11 the conversation.  It was -- you know, there
12 is -- there is these negotiations.  There's --
13 there needs to be these offsets.  They're
14 talking with the debtor.  So, you know, until
15 this is resolved, right, I mean, depending on
16 how, whatever that resolution was, were we to
17 take any action.
18     Q.   Okay.  How about with respect to
19 HCMS, did HCMS have a term payment due at the
20 end of the year?
21     A.   Again, I don't -- I don't recall.
22     Q.   Okay.  You discussed briefly two
23 payments that were made in January of 2021, one
24 on behalf of NexPoint, and one on behalf of
25 HCMS.  Do I have that right?

1  WATERHOUSE - 10-19-21
2      A.   No.  The two payments I recall were
3  NexPoint and HCRE.
4      Q.   Okay.  And those two payments --
5  thank you for the correction.  And those two
6  payments were made because Mr. Dondero
7  authorized those payments to be made; correct?
8      A.   Yes.
9      Q.   And they hadn't been made before
10 that because Mr. Dondero had not authorized
11 them to be made?
12          MS. DEITSCH-PEREZ:  Object to the
13 form.
14     A.   Yes, because of these negotiations.
15     Q.   Okay.  Just a couple of more
16 questions.
17          Did anybody, to the best of your
18 knowledge, on behalf of HCMFA, ever tell the
19 SEC that HCMLP was responsible for the mistakes
20 that were made on the TerreStar valuation?
21     A.   Did anyone from Highland on HCMFA's
22 behalf tell the SEC that Highland -- that
23 Highland was responsible for there -- I just
24 want to make sure --
25     Q.   It was a little bit different, so

1  WATERHOUSE - 10-19-21
2  let me try again.
3      A.   These are very long questions, John.
4  I'm not trying to be --
5      Q.   That is good.  Do you know whether
6  anybody -- do you know whether anybody on
7  behalf of HCMS -- HCMFA ever told the SEC that
8  Highland was the responsible party for the
9  TerreStar valuation error?
10     A.   Not that I'm aware.
11     Q.   Okay.  Did anybody on behalf of
12 the -- on behalf of HCMFA ever tell the retail
13 board that Highland was responsible for the
14 TerreStar valuation error?
15     A.   Not that I'm aware.
16     Q.   Do you know if HCMFA made an
17 insurance claim with respect to the damages
18 that were incurred in relation to the TerreStar
19 valuation error?
20     A.   Yes.
21     Q.   And do you know why they made that
22 insurance claim?
23     A.   Because there was an error.  I
24 mean --
25     Q.   Was the insured's claim made -- was

Page 386

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2   the insurance claim made under HCMFA's policy?
3       A.   Yes.
4       Q.   Did HCMFA at any time prior to the
5   petition date -- withdrawn.
6           You were asked a couple of questions
7   where -- where you said that Mr. Dondero told
8   you that he was ascribing zero value to the
9   notes as part of a pot plan because he believed
10  that the notes were part of executive
11  compensation.
12          Do I have that right?
13          MS. DEITSCH-PEREZ:   Object to the
14      form.
15      A.   Okay.  Have you ever heard that
16      Q.   Okay.  Have you ever heard that
17  before the time that Mr. Dondero told you that
18  in the conversation about the pot plan?
19      A.   Had I heard that prior to my
20  conversation with Mr. Dondero?
21      Q.   Yes.
22      A.   No, I had not heard that prior.
23      Q.   Okay.  And that was in the context
24  of his formulation of the settlement proposal;
25  is that right?

Page 387

1   WATERHOUSE - 10-19-21
2       A.   I mean, generally, yes.  You know,
3   we were asked to provide asset values, right,
4   and he was having settlement discussions.
5   Again, I don't know who those went to
6   ultimately.  I don't recall.
7           MR. MORRIS:  I have no further
8       questions.  Thank you very much for your
9       patience.  I apologize for the late hour.
10          MS. DEITSCH-PEREZ:  John, you stay
11      on about your email when --
12          MR. RUKAVINA:  Hold on, I'm not
13      done.
14          MS. DEITSCH-PEREZ:  Oh, okay.  Davor
15      still has questions.  Sorry.  I was going
16      to say both John and Davor, could you stay
17      on afterwards just to talk about the
18      requests.
19          FURTHER EXAMINATION
20  BY MR. RUKAVINA:
21      Q.   Mr. Waterhouse, you were just now
22  testifying about a discussion you had with
23  Mr. Dondero where he said something like no
24  more payments.
25          Do you remember that testimony?

Page 388

1   WATERHOUSE - 10-19-21
2       A.   Yes.
3       Q.   Okay.  And was that late November or
4   early December of 2020?
5       A.   It was, I would say, first or second
6   week of November.
7       Q.   Okay.  Do you recall whether --
8   whenever you had that discussion, whether
9   Mr. Dondero had already been fired by the
10  debtor?
11      A.   Yes, I -- I believe he was not an
12  employee of the debtor anymore at that time.
13      Q.   And when you were discussing this
14  with Mr. Dondero and he said no more payments,
15  you were discussing the two shared services
16  agreements and employee reimbursement
17  agreements we testified -- you testified about
18  before; is that correct?
19          MR. MORRIS:  Objection to the form
20      of the question.
21      A.   That is correct.
22      Q.   And had your office or you -- and we
23  will talk at a future deposition about the
24  administrative claim.
25          But had -- by that time that you

Page 389

1   WATERHOUSE - 10-19-21
2   talked to Mr. Dondero, had your office or you
3   done any estimate of what the alleged
4   overpayments were?
5           MR. MORRIS:  Objection to the form
6       of the question.
7       A.   Yes, we had -- there was a -- there
8   was a detailed analysis that was put together
9   by David Klos at the time.
10      Q.   And do you recall just generally
11  what the total amount for both advisors of the
12  overpayments was?
13      A.   It was in excess of $10 million.
14      Q.   Was it in excess of $14 million?
15          MR. MORRIS:  Objection to the form
16      of the question.
17      A.   I -- I remember it was an
18  eight-figure number.  I don't remember
19  specifically.
20      Q.   Okay.  And did you convey that
21  number to Mr. Dondero when you had that
22  conversation?
23      A.   Yes.
24      Q.   What was his reaction?
25      A.   I mean, he wasn't happy.

Page 390

1          WATERHOUSE - 10-19-21
2      Q.   Is it fair to say he was upset?
3      A.   Yes.
4      Q.   Did Mr. Dondero ever expressly tell
5  you to not have NexPoint make the required
6  December 31, 2020, payment?
7      A.   Yes, I recall him saying don't make
8  the payment because it was being negotiated, as
9  I discussed with Mr. Morris, this offset
10 concept.  So there were obligations due by the
11 advisors to Highland, they should be offset
12 that -- you know, those obligations should be
13 offset by this -- by this overpayment.
14     Q.   And when did he tell you that?
15     A.   I would say -- I would say around --
16 probably December -- December-ish.
17     Q.   Early December, late December?
18     A.   I don't recall with as much
19 specificity as -- as -- as stopping the
20 shared services payments, because we had
21 actually made one shared services payment in
22 November.  So that is why I need to remember
23 that one more clearly.  I don't remember where
24 exactly in December that conversation occurred.
25     Q.   Did Mr. Dondero expressly use the

Page 391

1          WATERHOUSE - 10-19-21
2  word "NexPoint" when he was saying don't make
3  these payments?
4          MR. MORRIS:  Objection to the form
5      of the question, asked and answered.
6      A.   Yeah, we were -- we were discussing
7  advisor obligations.  So it was -- you know, it
8  was just obligations from the advisors.
9          And -- and he specifically talked
10 about the NexPoint payment as well.
11     Q.   Okay.  And it is your testimony that
12 he expressly told you not to make that NexPoint
13 December 31 payment?
14         MR. MORRIS:  Objection, asked and
15     answered twice.
16     A.   Yes, he -- he did, during that
17 conversation.
18     Q.   And did you ever follow up with him
19 after that about whether NexPoint should or
20 shouldn't make that payment?
21     A.   I did not.
22     Q.   Did you ever, on or about
23 December 31, 2020, remind him and say, hey,
24 this payment is due, what shall I -- what
25 should I do?

Page 392

1          WATERHOUSE - 10-19-21
2      A.   I did not.
3      Q.   So sitting here today, you -- you
4  remember distinctly that Dondero in December of
5  2020 expressly told you not to have NexPoint
6  make that payment?
7          MR. MORRIS:  Objection, asked and
8      answered three times.
9      A.   Yes.
10     Q.   Can you say categorically it wasn't
11 just some general discussion where he told you
12 not to make payments?
13         MR. MORRIS:  Objection, asked and
14     answer four times.
15         MR. HORN:  Four times now.  Go for
16     five.
17     A.   Yes.
18     Q.   Did you tell Mr. Seery that?
19     A.   I don't believe I did.  I don't
20 recall.
21     Q.   And was this an in-person discussion
22 or telephone or email?  Do you remember?
23     A.   This was a phone -- a phone
24 conversation.
25     Q.   Okay.  Would you have a record of --

Page 393

1          WATERHOUSE - 10-19-21
2  on your cell phone of when that conversation
3  might have taken place?
4          I'm sorry, strike that.
5          Was that by cell phone?
6      A.   I believe -- yes, because we -- I
7  was at home.  I mean, I don't have a landline.
8  All I have is my cell phone.
9      Q.   Do you know whether your cell phone
10 still has records of conversations from
11 December 2020 on it?
12     A.   My call log doesn't go back that
13 far.
14     Q.   Okay.  Thank you.
15         MR. RUKAVINA:  I will pass the
16     witness.
17         MS. DEITSCH-PEREZ:  Just a couple
18     quick questions.
19         FURTHER EXAMINATION
20 BY MS. DEITSCH-PEREZ:
21     Q.   With respect to HCRE and HCMS, am I
22 correct there was -- there was no direction not
23 to pay those loan payments?
24         MR. MORRIS:  Objection to the form
25     of the question.

Page 394

```
 1          WATERHOUSE - 10-19-21
 2     A.   Yes, I don't recall having
 3   conversations about, you know, those -- those
 4   entities.
 5     Q.   And, in fact, what was the tone that
 6   Mr. Dondero had when he talked to you about the
 7   fact that HCRE and HCMS payments hadn't been
 8   made when he found out that they hadn't been
 9   paid?
10          MS. DANDENEAU:  Objection to form.
11          MR. MORRIS:  Objection to form.
12     Q.   What was the tone he took with you?
13     A.   Oh, it was -- it was -- it was -- it
14   was very negative.  I mean, I think he cursed
15   at me and he doesn't usually curse.
16     Q.   Okay.  And in your mind, is that
17   consistent with the fact that he was surprised
18   that those payments hadn't been made?
19          MR. MORRIS:  Objection to the form
20   of the question.
21     A.   Yes.
22     Q.   Okay.  Thank you.
23          MR. MORRIS:  I have nothing further.
24   Thank you so much, Mr. Waterhouse.
25          MR. HORN:  I have no questions.
```

Page 395

```
 1          WATERHOUSE - 10-19-21
 2   Thank you, Mr. Waterhouse.  We appreciate
 3   your time.  I am logging off the discussion
 4   and I will talk to y'all tomorrow.
 5          MR. MORRIS:  Super.
 6          VIDEOGRAPHER:  If there are no
 7   further questions, this ends the
 8   deposition -- excuse me.  This ends the
 9   deposition, and we are going off the record
10   at 7:30 p.m.
11     (Deposition concluded at 7:30 p.m.)
12
13          _____
14          FRANK WATERHOUSE
15
16   Subscribed and sworn to before me
17   this     day of        2021.
18
19   -----------------------------
20
21
22
23
24
25
```

Page 396

```
 1          WATERHOUSE - 10-19-21
 2          C E R T I F I C A T E
 3
 4       I, SUSAN S. KLINGER, a certified shorthand
 5   reporter within and for the State of Texas, do
 6   hereby certify:
 7       That FRANK WATERHOUSE, the witness whose
 8   deposition is hereinbefore set forth, was duly
 9   sworn by me and that such deposition is a true
10   record of the testimony given by such witness.
11       I further certify that I am not related to
12   any of the parties to this action by blood or
13   marriage; and that I am in no way interested in
14   the outcome of this matter.
15       IN WITNESS WHEREOF, I have hereunto set my
16   hand this 19th of October, 2021.
17
18          _____
19          Susan S. Klinger, RMR-CRR, CSR
20          Texas CSR# 6531
21
22
23
24
25
```

Page 397

```
 1          WATERHOUSE - 10-19-21
 2   NAME OF CASE:  In re:  Highland Capital
 3   DATE OF DEPOSITION:  October 19, 2021
 4   NAME OF WITNESS:  Frank Waterhouse
 5   Reason Codes:
 6     1.  To clarify the record.
 7     2.  To conform to the facts.
 8     3.  To correct transcription errors.
 9   Page____Line_____Reason_____
10   From_____to_____
11   Page____Line_____Reason_____
12   From_____to_____
13   Page____Line_____Reason_____
14   From_____to_____
15   Page____Line_____Reason_____
16   From_____to_____
17   Page____Line_____Reason_____
18   From_____to_____
19   Page____Line_____Reason_____
20   From_____to_____
21   Page____Line_____Reason_____
22   From_____to_____
23   Page____Line_____Reason_____
24   From_____to_____
25
```

Index: $1,406,000..2

**$**

**$1,406,000** 343:10

**$1,406,112** 343:13

**$1.04** 109:15

**$1.4** 344:5 345:11
350:7 351:22

**$1.5** 223:17

**$1.7** 92:22

**$10** 389:13

**$10.5** 308:16

**$12.7** 311:2 317:10

**$13** 310:23

**$14** 389:14

**$150** 239:10

**$173,398,000** 107:7

**$2.4** 140:14 141:9,18
270:20 271:7,16
272:8 283:18 315:13

**$23** 220:24

**$24** 178:19

**$24.5** 309:25

**$30** 161:25 220:13,20
223:7 224:2 334:7,19
336:13,23 337:25
339:4 340:10 341:23

**$30.7** 216:17

**$325,000** 331:14
332:16,24

**$400** 239:24

**$410** 238:9 239:12

**$5** 142:19 270:20
271:6 272:7 283:18
315:13

**$5.3** 119:23 310:17

**$7** 217:16,19 221:7
277:11,20

**$7.2** 302:22

**$7.4** 131:13 132:8
138:12 143:12 144:6,
17,23 272:16 273:6

287:15 288:6,20
303:6,18,24 304:11,
20 305:23 306:2
307:7 308:20 310:17
317:6 318:14

**$7.8** 278:6,7

**$8** 277:16

**1**

**1** 8:9 35:17 139:22
140:12,13 215:25
216:3,7,12 238:8
260:20,23 261:15
328:10,11,12 343:19

**1/12** 6:9

**10** 5:6 197:4,7,9,15
198:2 266:20 267:3
302:7

**10-19-21** 3:1 4:1 5:1
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1

129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1

297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:1
336:1 337:1 338:1
339:1 340:1 341:1
342:1 343:1 344:1
345:1 346:1 347:1
348:1 349:1 350:1
351:1 352:1 353:1
354:1 355:1 356:1
357:1 358:1 359:1
360:1 361:1 362:1
363:1 364:1 365:1
366:1 367:1 368:1
369:1 370:1 371:1
372:1 373:1 374:1
375:1 376:1 377:1
378:1 379:1 380:1
381:1 382:1 383:1
384:1 385:1 386:1
387:1 388:1 389:1
390:1 391:1 392:1
393:1 394:1 395:1

**10.5** 308:22

**100** 108:23 298:15

**10010** 4:21

**10017** 3:10

**10:08** 36:15,16

**10:11** 36:16,18

**11/25** 6:7

**11/30** 332:24

**11:02** 72:25 73:2,5,6

**11:15** 73:3 342:14

**11:20** 73:6,8

**11:40** 344:14

**11th** 152:18,25

**12/1** 332:10

**12/19** 5:25

**12/31** 6:8

**12/31/18** 117:12
122:12 135:21
261:22

**12/31/19** 219:16

**12/31/2018** 93:15

**12/31/2019** 260:13

**12/31/2020** 361:15

**12th** 341:18 344:3
350:5,9,13,24 351:20

**135** 6:2

**14-ish** 286:21

**142** 5:15

**15** 73:3 200:4 202:13,
23 203:3 210:6
213:18 221:23

**15(c)** 5:21 160:11
169:21,23 170:4,8,10
171:6 175:3,9 176:23
179:20 184:5 195:9
210:12,21

**150** 239:24

**150,331,222** 243:23

**151** 5:20

**15th** 203:15

**16** 224:5

**17** 89:16 109:19
110:8 137:24

**170** 5:21

**173** 110:14

**18** 89:16

**1900** 3:15

**19th** 8:19 21:7

**1:04** 150:24,25

**1:49** 150:25 151:3

**1c** 238:12

**1st** 14:8

**2**

**2** 5:15 35:18 140:18
142:15,16,22 171:10

172:8 174:13 179:4
195:11,14 215:22,23
216:3,4,5,8,25
338:12

**2.4** 268:23 282:15

**2/18** 5:22

**20** 15:25 271:14

**2006** 18:15

**2011** 19:2,4,22

**2012** 19:2,4 95:25

**2013** 52:7

**2014** 20:2

**2016** 23:19 25:13
87:8,20,24 89:15,16

**2017** 126:12 161:23
165:22 216:16
220:14 222:10 223:7
224:2,12

**2018** 105:19 109:14,
20 119:21 165:18
186:25 202:19 203:9
228:3,23 242:18,23
243:12 244:14,18
262:5,15 279:12

**2019** 6:4 21:7 98:17
99:25 103:2 125:18
126:2 131:10 132:6,
21 133:12 134:5,17,
23 137:6 138:12,20
139:18 140:14 141:5
142:18 152:18,25
165:15 180:24 181:4,
9,16,23 182:8,16
200:4,7 201:22
202:13,23 203:3,15
204:10 210:7 213:9,
19 218:21 219:7,12,
24 220:19,22 221:6
222:4,12 223:4,14
242:23 258:21
262:17 263:13,14,20,
24 265:3 269:5,24
270:12,18 271:3,14
272:4,15 273:4
279:12 280:10,20
282:23 287:4 293:19
299:4 301:2,8,16,18
313:3 314:13,23
315:19 316:14 321:6

**2020** 59:7,9 68:15
70:17 160:7,14,22
165:14 169:17,20
171:19 173:24 175:8
176:10 179:24 183:7,
14 186:12,14 189:13
195:20 196:3,17
200:24 204:20
207:16 221:11,16,21
258:20 265:6,11
307:24 314:21
316:16 323:10 326:4,
12,14 327:5,9 328:16
330:15 334:23 335:7
336:11,20 337:12
338:15,24 341:9
343:2 346:10 359:3
360:17,19 361:6,24
364:4 366:9,10
367:15,20 377:21
378:10,11 379:16,21
382:24 388:4 390:6
391:23 392:5 393:11

**2021** 8:19 14:8 19:5
37:2,10,19 38:2
70:21 71:3,5,12
121:13,22 122:19,24
163:2,7,8 165:5,9
166:2 173:18 176:24
187:3 198:21 199:7,
12,20 200:14 201:2
203:4,21 210:2,23
212:19 219:11,13,17
226:4 301:24 314:8
315:21 316:7,19
326:9 340:21 341:6
350:6,9 361:25
362:3,7 364:8 365:2
367:15 383:23
395:17

**20th** 160:5

**21** 78:3

**21-03000-SGI** 8:15

**21-3004** 197:18
215:4

**215** 106:2

**218** 6:4

**226** 5:22

**228** 8:22

**23** 178:19

**236** 5:23

**241** 110:23

**25** 260:12 328:16
329:14

**25-year** 347:7

**251** 129:16,22

**256** 5:7

**258** 5:25

**25th** 329:19

**297** 6:10

**2nd** 132:20 141:5
213:9 315:18

———————

**3**

**3** 220:2

**30** 7:19 16:3 186:16
356:9

**302** 6:12

**307** 6:11

**309** 6:13

**30th** 176:10,24
331:12 332:3 380:18

**31** 122:19 197:20,24
198:7,9 199:7,12
200:24 201:2 203:4
301:18,24 307:24
326:4 338:15,24
341:9 346:9,21 390:6
391:13,23

**3102** 4:7

**31st** 105:18 109:14
119:21 121:13
122:23 199:20
200:14 202:19 203:9,
21 212:19 216:16
218:21 219:7 221:15,
21 242:18 258:20
263:14 326:8,12,14
334:15

**328** 6:7

**33** 5:16 91:20,21

**33416** 100:10

**338** 6:8

**34** 5:18 104:23,24

**341** 6:9

**35** 5:20 15:20,22
100:10 151:20,21

**352** 5:8

**35D** 101:10,19

**36** 5:21 102:18
170:18,19 177:18
313:9 317:12

**377** 5:9

**387** 5:10

**39** 5:22 226:23,24
236:17

**393** 5:11

**3:26** 224:20,23,24

**3:39** 224:24 225:2

**3:40** 224:21

**3rd** 92:2 98:17 99:25
103:2 132:20,25
135:2 137:6 142:18
200:7 213:9 242:23
262:17 263:13 265:3
315:19

———————

**4**

**40** 5:23 236:22,23
237:19

**406** 343:19

**41** 5:25 258:16,18

**419** 103:11

**45** 6:2 135:12,14,15

**45th** 8:23

**46** 6:4 218:16,17

**4:30** 265:25

**4:31** 266:5,6

**4:40** 266:2

**4:43** 266:6,8

**4th** 135:2

———————

**5**

**5** 268:22 271:15
282:14

**5.3** 121:3,6 124:17
308:21 311:4

**500** 3:23

**51** 4:20

**5:52** 172:4 174:6

**5:53** 325:7,8

**5:59** 325:8,10

———————

**6**

**6** 183:7 186:14
217:16,19 314:20
316:16 341:13

**6/3/19** 5:16

**6/30** 176:8,16

**60-day** 380:16

**650** 4:13

**6:27** 349:6,7

**6:30** 349:7,9

**6th** 172:4 174:6
186:11 189:13

———————

**7**

**7** 277:15,16 297:20
305:5

**7.4** 132:2 311:4

**7.8** 277:12

**70130** 4:14

**71** 238:20

**71A** 6:13

**75** 18:2

**75201** 3:16

**75201-6659** 3:24

**75219** 4:8

**780** 3:9

**7:02** 372:14,15

**7:03** 372:15,17

**7:30** 395:10,11

---

**8**

**8/31** 6:11

**850** 100:25 101:2,4,9

---

**9**

**9** 307:18,19,20

**90** 18:4

**91** 5:16

**94** 5:18

**99** 86:14

**9:32** 8:20

**9th** 70:16

---

**A**

**a.m.** 8:20 36:15,16,18 73:5,6,8 342:14 344:14

**A1** 6:7 328:13

**A10** 6:12 302:7,8

**A11** 6:13 309:4,5,6

**A2** 6:8 338:13

**A6** 6:9 341:14

**A7** 6:10 297:20,23

**A9** 6:11 307:20,21

**abilities** 265:12

**ability** 20:17 42:6 124:3 204:15 272:6 327:16 372:5 382:13

**absolute** 109:2

**accelerate** 340:10, 14

**accelerated** 339:4 347:7

**acceleration** 339:6, 10,15 340:13,17,24

**accept** 16:17 152:23 188:19

**accepted** 241:14 277:19

**accepting** 153:16

**accepts** 8:6

**access** 294:24 359:19,21 360:9,14 372:21 373:13

**accordance** 241:13, 25 242:4 254:10 256:21

**account** 287:17 328:6,9 359:14 360:6,14,22 367:22 371:9

**accountant** 21:17 25:20 116:12 370:14

**accountants** 147:22

**accounting** 26:2,4, 7,17 28:16 38:24 87:12,14,17 112:10, 11 148:23 149:2,14 150:14,19 188:11 200:17 230:16,18,21 240:19 241:14 257:22,24,25 258:12, 13 280:6 290:13 326:18,21 337:2,7 351:2 354:7,11,22 358:3 371:5 372:3 378:15

**accounts** 244:9 327:10,12,17,21 329:17 330:10,12,20 331:4 333:7 359:19, 22

**accuracy** 113:17 114:17 115:2

**accurate** 88:7,11,17 89:13,23 90:2,6 110:16 112:19 133:5 176:17 204:4 238:4 256:10 257:4 284:24 286:6 330:20,24

**accurately** 240:9,14

**accusations** 157:18

**acknowledgment**

6:12 201:13,25 213:6,17 314:21

**acting** 23:23 24:2,3,8 28:5,8,12,18,20 29:5, 9,11 30:14,16,24 31:2,3,5 155:6,9,14 156:4,12 158:3,9,11

**action** 374:20 383:17

**actions** 9:7 347:25

**actively** 337:11,12 346:19,25

**actual** 115:21 311:25 312:12

**add** 183:23

**added** 183:24

**addition** 333:7

**additional** 171:6

**adequately** 335:24

**adjustment** 242:7 263:4

**adjustments** 36:4 240:21 241:18 243:5 244:19 245:20

**administrative** 321:17 388:24

**admissible** 7:17

**admitted** 276:24

**advance** 57:21 60:21 61:5,10 62:21 63:5 267:8 355:25

**adversary** 197:18

**advice** 172:7 205:7 257:2

**advisor** 125:8,15 192:25 193:15 205:10 273:23 281:6 282:5 311:25 312:5,6 328:7 331:22,23 391:7

**advisor's** 337:17

**advisors** 3:17,18 9:21,22 22:22 27:10 29:10,12 32:18,20,25 33:24 39:2 42:21,22 44:6,7 58:8,14,15,18

125:3 126:10,13,16 127:10 152:14 160:10 167:13 168:19 171:14 172:18 175:7,13 178:11 179:18,21 183:7,18 184:15,19, 22 189:23 190:9,12, 19 191:2 192:25 193:8,19 194:3,21 195:10 196:8,22 205:7,12,23 206:14 208:4,7 210:5 213:22 215:14 235:9 267:24 268:16 279:19 280:2 286:18 308:4 325:15, 21,22 328:7,25 329:3 332:14 333:23 335:15 336:7 337:14 353:20 379:19,24 380:2,10,22 381:2,6, 11,16 389:11 390:11 391:8

**advisors'** 168:9 179:8,25 180:9 184:3 194:17 218:19 328:9

**advisory** 32:21 33:24

**affect** 371:17

**affected** 265:12 277:20 370:23

**affidavit** 164:10

**affiliate** 41:18 42:2,4 44:12,16 47:25 48:9, 22 49:5,6,10 51:17 54:17 57:19 58:3 60:14,21 61:4 62:9, 20 63:3,15,22 64:6, 10,16,24 65:18 78:18 93:21 94:6 100:25 105:8 107:2,13,21 108:3,7 109:10 131:2 171:14 220:6 225:6, 14,21 239:4 254:2 259:24 262:11 263:5 307:24 309:16,24 310:9 312:2,11,14,25 370:10

**affiliated** 134:6 285:17

**affiliates** 41:2,5,8,10, 13,14 44:4,11,15,25

125:3 126:10,13,16

45:13 46:3,9 47:18 48:7,13 54:2,11,13, 20,21,25 55:6,11,18 56:2,16,23 61:20 62:2 63:11 65:4 66:8 82:16,20 91:3 100:22 101:16 106:22 107:3 108:14,18 109:8,18 110:7 111:2,6,9,13, 23 112:18,24 113:19 115:4 117:24 118:7 119:4 120:20 121:4 176:9 233:9,23 234:10,16,21 235:4, 22 236:8 238:25 241:7 242:8 243:8 259:19 260:11 262:6 309:19 312:2,13 377:13 379:8 382:7

**affirmative** 96:15

**afield** 16:22 376:3

**afternoon** 344:17

**aggregate** 131:13 132:7 138:11 217:15, 19

**agree** 77:5 306:13,22 307:5,10

**agreed** 16:17 75:20 121:16,20 198:20 199:5,11,19 200:13 209:25 210:6 314:11 374:25 375:7

**agreement** 17:9 59:24 65:9,16,23 66:2,6 67:3,7,8,12, 16,22 68:4,9,12,17, 24 69:15,19,22 70:2, 7,11,16,20 71:18,24 72:4,7,10,13 75:4,5, 9,14,16,23,24 76:3,6, 7,10,14 77:6 78:15, 21,25 79:8,10,17,18, 24 80:5,6,11,16,20 81:6 82:9,17,22 83:7, 10,14,17,20,23 99:15,24 100:2,6 102:3,6 104:13,17,19 122:5 123:22 124:4 134:12 186:24 187:2, 16 189:2 200:13 210:22 212:17 278:23 279:18,20,24,

25 314:7 316:5,8,9, 13 326:3,13 332:8 351:4 365:22 379:20

**agreements** 58:16 77:24 83:4 168:9 186:10 279:4,6 325:24 353:22 379:18,23 380:4,11, 13,19 381:17 388:16, 17

**agrees** 243:25

**ahead** 68:22 82:6 156:20 164:10 212:25 248:12 295:12 329:11 352:10 364:23 378:18

**Aigen** 4:5 9:24 214:4 251:23

**Akard** 3:23

**allegations** 208:17

**alleged** 389:3

**Allocation** 35:19,21 125:2 273:17 281:8, 23

**allowed** 62:8 81:23, 25

**alpha** 297:20 302:7 307:19 328:10 338:11 341:13

**alter** 187:16

**ambiguous** 353:20

**amended** 5:15 214:18

**amortizing** 334:13

**amount** 49:10,11 50:23,24 57:6 119:7 131:13 132:8 138:11 142:18 144:5,16 161:19,25 195:16 196:16 216:17 217:15 220:23 222:11 239:5 240:9 244:3 271:11 277:7 283:18 288:6 308:22 342:10 343:5,15,17 389:11

**amounts** 106:21,25 108:14 109:7,18 110:6 111:2,5,8,12, 23 112:18,24 113:18 114:19 115:3 119:3 120:20 121:4,11 125:8 126:6 161:8 168:3 171:12 174:15, 22 175:11 176:9 181:15 199:12 202:7, 22 203:7,13,19 204:11,16,25 205:12 211:11 212:10,18 217:19,21 222:3,11 234:23 235:3 275:13 282:8 283:2 285:10 288:3 311:4 335:12

**analyses** 241:11

**analysis** 240:20,24 241:3,6 261:11 262:3 265:7,8,17,18,19 389:8

**and/or** 42:8,16 43:3, 14 59:14

**annual** 26:10 84:17, 23 85:2,24 96:7 168:10 170:5,9 184:5 217:2 228:16 334:8 335:9 336:12

**answering** 248:7,8 262:23

**answers** 12:2 16:25 26:15

**anticipated** 311:20 378:17

**anymore** 294:24 388:12

**apologize** 30:10 40:22 78:14 99:22 104:12 125:21,24 139:2 170:2 192:14 197:19 226:17 227:17 304:14 352:8 354:17 387:9

**appearances** 3:3

**appeared** 337:16,19

**appearing** 8:18

**appears** 224:8

**Apple** 281:21

**application** 165:10

**applied** 55:16,24 56:6 59:17 60:12 162:5 168:4 294:13 316:14

**apply** 213:7 314:12, 22

**appointed** 18:21,24 24:14,19,25 25:8 29:11,15 270:4 323:9,16

**appointment** 152:24 153:4,16

**appointments** 227:14

**appoints** 183:9

**appreciated** 74:16

**approaching** 310:23

**approval** 57:13 62:5, 10 63:12,17,23 144:24 170:14 206:5, 16 271:17,22 272:13, 14 281:7 332:16 351:5 377:17,24 382:11

**approve** 56:21 57:2, 3,20 61:5,9 231:21 273:6 379:7

**approved** 57:5 60:20 231:14 271:12 294:21 295:6,18 333:4 382:16,17

**approximate** 17:22 23:15 27:24 30:19 36:23 38:15 120:15 161:24 216:17 277:7 310:5

**approximately** 8:20 15:13,20 19:23 109:15,19 110:7 119:23 126:12 169:7 173:14,15 178:19 220:12,24 221:3,7 238:9 277:10,15 278:6

**approximates** 118:13 121:6

**April** 152:18,25 200:4 202:13,23 203:3,15 204:10 210:6 213:18 301:16 314:21 323:6

**areas** 26:5

**Argumentative** 156:10

**arise** 288:3

**arithmetic** 260:10

**armchair** 153:11

**ASC** 100:25 101:2,4, 9

**ascribing** 386:8

**Asia** 4:24 92:14 118:3 129:16 135:10 177:14 218:14

**asks** 97:12 171:10 172:6 174:21

**aspect** 26:18 116:20

**asset** 107:25 108:6, 24 109:14 118:23 225:16,23 265:9 354:15 367:9 368:4 371:7,16,23 372:6 376:24 387:3

**assets** 5:23 107:14 108:10,13 109:20 110:8 122:3,8 137:14 190:3 194:2 195:17, 20 196:3,9,17 204:19 211:3 225:8 235:11, 15 237:20,23 239:13, 19 240:15 241:4,18 242:13 250:18 253:16,24 259:18 260:8,11,13 301:9 303:9 307:9 309:2 311:10 317:7 366:14 368:5 370:22

**assistant** 295:2 298:25 320:23 321:9

**assistant's** 321:5

**assistants** 321:18

**assisted** 326:22

**assisting** 333:8

**associate** 268:10 297:25

**associates** 377:23

**association** 7:5 8:25

**assume** 22:15 133:24 297:13

**assumed** 285:4,11 287:6

**assuming** 288:22

**assure** 105:4

**assured** 257:3

**astute** 320:12

**attach** 320:22 321:2

**attached** 307:23

**attaching** 171:5

**attachment** 307:25

**attempted** 360:23

**attempting** 374:17

**attorney** 153:11 172:12

**attorneys** 3:4,11,17 4:2,10,16 147:21 187:6,11,15 188:3,7, 24,25

**attributable** 132:3 276:11 283:2

**audit** 26:11 48:5 52:23 85:24,25 86:9, 23 88:2,6,13,14,16 89:10,11,22 91:11,14 93:4,14 95:6 96:7,10 97:22 98:19 103:25 104:4 106:7,16,17 109:24 110:25 111:20 112:7,24 113:17 114:2,7 115:2,20 116:5 117:2,20 119:19 131:5 132:9,24 135:6 137:5,7,10,12,21 138:18 142:9,11 148:25 149:4 199:23, 25 200:6 218:7 219:4,5,12,15 221:11,14,20 243:12 244:18 263:24 264:8

**audited** 6:4 41:7 47:25 84:16,23 85:3, 19 90:2 93:24 95:14

98:6 102:7,10 104:21 107:22 113:7 114:18 133:22 138:3,4,9 143:8 186:25 196:21 200:9,12 201:7 211:6 217:24 218:4,12,24 241:24 242:2,3,15,16 261:20

**auditing** 264:2

**auditor** 84:21 97:12 113:11 136:6

**auditors** 46:8 47:17 48:7,10 52:11,20 53:4,11,13 84:10 86:10 88:9 91:12 113:8 136:16 137:3 149:13 211:16 212:15 264:16

**audits** 149:12 246:11

**authority** 63:9,21 270:19 271:5

**authorized** 57:8 139:4 143:13,22 144:7,18 150:4 152:11 158:4,13,18 159:4,15,23 160:15,24 181:3 320:16 363:2 382:6,9 384:7,10

**availability** 121:12

**Avenue** 3:9 4:7,20

**aware** 12:14 21:6 32:7 43:22 45:12 48:8,11 49:4,8 50:20,25 51:5,8,13,18 53:24 57:6 61:7,19,23 65:3,5 66:21 78:5,15,22 83:15 85:10 93:8 102:5,14,16,22 103:5,16 107:20,23,24 108:6 133:15,19 148:5 161:2,6,22,23 162:2,3,8 167:18,19,24,25 168:7 181:6,7,12,13,17,24,25 182:4,9,10,13,14,18 198:16 199:9,13,17 202:11,17,21 213:5,13,15 220:17 223:3 226:3,6,7 261:3,5,7 263:12 267:7 295:23

338:22,25 339:3,5,6 343:18 347:5,8,25 348:6,13,14,17 372:24 378:9 382:4 385:10,15

---

**B**

**back** 20:14 36:17 40:22 50:2 61:24 71:11 73:2,7 75:17 89:17 91:10 92:9 93:11 95:18,20 125:19 140:14 141:12 151:2 160:6 174:20 183:8 185:19 192:23 202:3 205:19 207:2,5 209:6,13 215:20 224:20,25 226:18 243:22 263:23 265:5,15 266:7 273:21 280:3,5 282:13 283:22 285:16,21 286:20,24 292:23 293:19 299:4 301:21 302:23 305:16,20 306:3 313:3 324:6,12 325:9 326:15 332:13 333:9 343:6,16 344:18 347:3,4 348:25 349:8,10 350:2 354:16 365:20 372:16 382:23 393:12

**backed** 50:22 123:5

**background** 13:22 16:13

**backing** 189:9,15 190:10,12,19 191:3 193:20 194:20 205:8,14,24 206:14,23 208:5 321:15

**bad** 134:9

**badly** 81:18

**Baker** 3:14 9:9

**balance** 106:19 107:14,22,25 108:11 109:6 110:4,5 111:11 112:4 120:23 175:2,8,14 179:17 196:25 220:2 222:21 228:22

229:3,8,16 230:5 243:7 251:14 253:22 370:22 372:6

**ballpark** 196:15 277:17 278:11

**bank** 142:12 261:23 306:5 327:10,12,17 328:6,9 360:5,14

**bankruptcy** 8:13 21:7 45:24 187:15 188:25 219:23 236:24 237:2,14,24 240:8 244:6,21 245:17 247:9,17,23 248:14,24 254:12 263:18,19 264:3,15 311:11 317:11 366:4 374:15 376:7

**base** 109:14

**based** 71:16 78:25 101:13 108:21,23 111:15 146:8,23 204:22 274:4 278:4 315:4 337:22

**bases** 228:13

**basically** 122:19 145:15 152:10 199:14,23 200:23 252:9 254:16,19 327:20 348:4

**basis** 16:18 19:4 47:10 84:18 110:3,10,17,18 137:16 151:14 154:6 170:15 190:13 226:11 227:5,20,25 228:13,16 241:17 266:22 288:12 358:7

**batch** 330:3

**Bates** 129:16,21 137:25 177:16

**bear** 17:5

**began** 20:8,13,17,23 266:21

**begin** 11:22 12:2 266:18

**beginning** 202:5 249:9

**begins** 12:15 170:23 197:25 341:17

**behalf** 58:11 122:22 139:18 180:22 181:2, 7,13 182:17 201:13, 15 210:5 211:9 212:8 213:8 270:21 271:5 273:4 289:18,23 327:17 336:21 350:19 362:9 377:12, 23 379:8 382:6,9 383:24 384:18,22 385:7,11,12

**belief** 98:17 346:15

**believed** 143:22 161:7,17 175:22 246:22 250:9 386:9

**believing** 144:17

**benefit** 17:19 304:19

**bigger** 89:5

**bill** 117:9 355:3,8 358:13

**bill-paying** 358:14

**billion** 109:15 110:14 253:21

**billions** 253:24

**bills** 326:23 355:14 356:2,13

**binder** 91:23 216:10

**binders** 216:5

**bit** 16:22 96:4 117:22 152:17 171:2,25 201:12 222:25 313:11 384:25

**BK** 187:6

**blah** 248:18

**Blank** 170:24

**blend** 250:5

**blessing** 319:21

**block** 152:21 320:22 321:3

**board** 33:5,12 34:4 166:23 168:18,21,23 169:10,12,14,20 170:12,13 171:7

175:3,8,15 176:22 178:7,13,17,23 179:8,12,15,19,25 180:8,23 182:6,15 184:4,8 185:14 189:7,14,19 190:4, 14,18,21 191:2,8,13, 16,20 192:3,8 193:3, 18 194:12 204:18,23 205:6,22 206:12,13 209:16,19,21,24 210:6,20,22 233:7, 13,16 281:7 323:8,16 348:3 385:13

**board's** 174:13 175:23 176:18 179:3 194:17 195:10 210:11

**boards** 33:8 160:8 171:19 181:2,8,14, 19,21 182:2,11

**bona** 369:25

**book** 140:15

**bookkeeping** 358:6

**books** 225:8,15,23 235:16 237:15 240:11,14 257:21 258:5 286:23 371:8

**born** 284:10

**borrowed** 127:15,24 128:5,23 129:2,5

**borrower** 272:7 273:5 340:2,7

**borrowers** 44:15,19

**bottom** 92:16 106:5 129:25 143:3 170:21 221:24 224:4 329:5 330:7

**box** 294:20

**Boyce** 21:5

**Brad** 249:21

**break** 36:6 72:17,20 73:10 74:4,14 139:25 150:22 151:5 224:19 265:24 266:2 324:22, 25 327:3

**briefly** 383:22

Index: bring..company

**bring** 73:16 154:20

**bringing** 249:21

**broke** 221:12

**broker-dealer** 332:6

**brought** 73:17
248:13 374:9

**build** 107:7 108:22
260:5 311:17

**bulk** 89:9

**burdening** 81:12

**business** 226:10
229:22 332:10,11

---

**C**

**calculate** 275:11
276:22

**calculated** 335:11

**calculation** 278:12

**calculations** 276:19

**calculator** 110:12

**calendar** 337:7
378:16,21 379:5

**call** 46:14 55:2 68:6
70:3 154:8 167:4
191:14,15,24 192:2
290:19,25 350:15
364:21 393:12

**called** 16:10 22:21
27:10 29:25 31:8
32:4 81:9 115:3
130:3 227:2,19
228:21 273:18
278:22,24 315:20
342:8,24 343:2,16
351:10 362:8

**calling** 344:18

**calls** 45:17 46:10
55:21 107:5 126:4
268:6 324:2,9 344:22

**camera** 36:2

**Canty** 4:24 105:2,23
129:18,23 135:12,16
177:10,21,25 218:15

**capable** 86:12 88:20

**capacity** 11:3 19:25
21:3 24:17 26:22
65:10 97:15 143:25
174:3 232:4 258:25
270:25 285:24
295:18

**Capital** 3:4,18 8:11
9:6,22 10:22 11:7
15:16,23 18:7 22:21
30:2 41:18 42:10,18,
21 43:11,16 44:6
58:15,17,20 70:21
109:23 110:9 125:3
127:12 133:10
152:13 172:14
215:14,17 271:3
279:18,19 280:2,3
308:4 325:22,24
330:16 354:19
359:16,18 360:7,8,13

**capture** 107:10
130:15 203:11

**captured** 131:3

**career** 286:21

**careers** 89:6

**carefully** 40:14,18
47:9 114:14 144:14
223:12

**carried** 107:14,18,21
109:6,11 233:5 243:6

**carrying** 118:13,25
120:2,4,12,14 262:8
263:7,16 265:2

**case** 7:21 8:14
208:15 248:15
301:14 339:25

**cash** 57:3,4 121:12
335:17,18,22,23
336:7 337:13,14,16,
17 360:5 361:12,14

**categorically**
392:10

**categorize** 257:10

**categorizing** 316:18

**category** 107:24
109:6

**caused** 263:3,14
277:3,19 280:12
359:8,24

**causing** 362:21

**CCO** 192:25 193:8,14

**cease** 173:15

**ceased** 71:6 173:12

**cell** 393:2,5,8,9

**CEO** 14:16

**certainty** 371:6

**certificate** 5:20 22:3
152:2,5,10,13 159:19
183:11 270:4

**certificates** 21:21
154:20

**certification** 22:3

**certifications** 22:13

**certified** 7:5 21:17

**cetera** 164:10

**CF-** 25:2

**CFO** 14:14 18:10,17,
21,24 19:3,14,25
21:3 39:10,15,19,21,
23 40:3,4,9,12,25
42:5 43:10,23 44:25
46:7 47:16,24 49:17
50:10 51:10,15,20,25
53:9 55:16 60:23
61:21 62:4,8 84:20
85:12 86:3,19,24
88:10,15 90:15 94:4,
23 95:7,15 100:17
107:11 111:16 114:5
133:7,10,16 176:14
202:11 203:25
225:17,20 226:8
227:6 229:23 230:14,
18 240:7,14 243:4
247:7,23 248:24
255:7 269:2 285:24
287:14 288:7 295:19
339:24

**chain** 341:17 342:7
350:14

**challenges** 12:21

**change** 28:7,11,17
93:7 187:7,16 189:2

229:11 240:6 248:17
261:24,25 262:2
264:3 265:10 343:20
371:22

**changed** 20:6 28:11
189:10 194:13
206:24 207:6,7,9
208:2,3 263:18
264:17 323:2

**characterized**
247:12

**chat** 81:25 92:12
105:2,5 135:17
177:7,18

**check** 86:8 306:4

**chicken** 298:13

**chief** 14:12 26:24
27:5 120:8 184:22,24
258:25 270:9,13
271:2 302:19

**Chisum** 321:7

**chose** 113:25

**circumstances**
71:15 231:6 240:6
241:10 261:23,24
262:2 265:9 274:13

**Civil** 7:20

**claim** 167:9,13,25
374:9 375:8,11
385:17,22,25 386:2
388:24

**claims** 208:23

**clarify** 354:17

**clear** 40:15,16 54:22
55:5 75:16 81:2
156:2 188:21 214:17
238:17 302:6

**client** 74:5,10 75:19
269:9,13

**clients** 195:8 209:2

**Cliff** 276:2

**clock** 46:25

**CLOS** 253:19

**close** 229:10,19,21
230:2,23 232:8,20
233:3 298:2,12

308:24 372:10

**close-end** 275:6

**closed** 281:3

**closed-end** 281:10,
15 282:7

**co-invest** 127:13,16

**co-obligor** 305:22

**code** 101:21

**collect** 54:3

**collectability** 253:18

**collectively** 33:2
54:12

**colloquially** 366:5

**combined** 233:18

**comfort** 159:22
193:25

**comfortable** 90:9

**command** 297:25

**commenced** 53:25
54:11 181:22

**commencing**
203:20

**comment** 252:23
367:22

**common** 299:4,5

**communicate** 64:3

**communicated**
114:9 211:15,20
254:21 292:17
319:19 368:8

**communicating**
365:13 366:3

**communication**
87:6 207:23 350:8

**communications**
66:19 71:13,14
116:16 322:7 367:14

**comp** 78:10

**companies** 42:7
285:17

**company** 27:9 29:25
31:7 247:8 273:18,

20,21

**compared** 12:21

**comparing** 118:24

**compelled** 81:8
371:22

**compensation**
125:14 281:3 318:14
366:24 367:19,24
386:11

**competent** 88:20

**complaint** 5:15
140:4 208:17,22

**complaints** 322:2,4,
8,20

**complete** 112:19
208:16 221:10,13,18,
19,20

**completed** 132:24
178:8 200:7 219:7,
10,13,16

**completely** 13:4,7
205:5

**completeness**
97:22 98:5

**complex** 253:19

**compliance** 148:3,4
184:22,24 193:17
280:8 294:18 295:21
296:4

**complied** 373:3

**component** 119:17
120:22

**compose** 348:22

**conceived** 232:17

**concept** 52:24
201:20 390:10

**concern** 105:8
122:13

**concerned** 35:25
112:23 235:20,24
241:22 370:2

**concerns** 112:15
113:3 114:6,25
117:23 236:2

**conclude** 108:17
310:9

**concluded** 395:11

**conclusion** 42:20
43:9 44:18 45:5,9,17
46:11 47:21 48:4,17
49:2,14 55:21 107:5
126:4 142:7 143:16
153:13 154:9 157:8
212:25 263:5

**conduct** 85:24
169:10

**conducted** 86:14

**conference** 8:17
323:24 343:23,24
344:11,13

**conferred** 98:8

**confers** 143:20

**confirm** 96:14 98:16
108:23 141:13 143:4
214:3 270:6 319:3,20

**confirmation** 103:21

**confirming** 98:23

**confused** 78:11
317:13

**connection** 16:11,
16,19 48:15,23 50:15
93:13,14 95:5 96:9
125:25 149:3 160:11
175:9 179:19 184:5
199:22 367:5 374:8

**consequences**
357:4

**consideration**
306:18

**considered** 274:9

**consisted** 59:21

**consistent** 394:17

**consolidated** 5:18
6:2 105:17 110:2,5,9,
17 113:13 135:20
137:16 218:19
253:21

**constitute** 110:7

**constituted** 109:19

**consult** 94:12,17
351:21

**consultation** 318:12

**consulted** 274:9

**contend** 65:6 168:4

**contends** 168:3

**context** 41:21,22
58:13 124:18 136:21
168:20 170:4,9
189:18 367:12
386:23

**contexts** 41:15

**continue** 209:4

**continuing** 203:20

**continuous** 19:4

**contract** 278:15,22

**contracted** 330:18

**contracts** 15:9,11
249:22 288:17
325:12,14,17 326:6

**control** 90:3,5,9,14,
20,25 101:4,9,24
113:6 137:17,20
207:21

**controlled** 15:6 16:8
17:24 42:8,16,25
43:3,14 101:16

**controller** 291:13

**controls** 43:5,6
112:16

**conversation** 58:23
59:5 73:18 74:2 78:9
113:16 114:16 124:8
145:7,14,21 148:17,
20 164:23 166:2,9,
11,19,23 187:14
190:23 194:8 207:13
233:21 234:25
235:13,18 246:14,18
252:10,12 255:14
282:25 283:4 296:3,4
318:9 319:16 342:4,
20 348:15 350:8
363:5 365:3 367:3,4
381:8 383:11 386:18,
20 389:22 390:24
391:17 392:24 393:2

**conversations**
66:16 74:21 113:22
115:9 124:11 206:11
233:25 289:4 368:13
380:6 393:10 394:3

**conversion** 125:12,
14 131:23

**convert** 281:9 282:6

**converting** 275:5

**convey** 208:6 389:20

**conveyed** 343:15,25
344:4

**conveys** 193:15

**copied** 183:3

**copies** 13:11,16
142:12 149:8 298:7

**copious** 324:16

**copy** 92:13 148:24
197:23 200:18

**corner** 198:6

**corporate** 41:2,5
54:25 87:11,14,16
112:10,11 116:12
148:23 149:2,14
150:14,19 172:20
188:11 200:17
230:16,17,21 257:22,
24,25 258:11,13
337:7 370:14 378:15,
21

**correct** 11:16 18:10
19:8 22:16 24:7 29:3,
8 32:4,22 33:5 39:4,
12 41:3 43:24 45:2
50:24 55:19 59:18
69:24 74:12 79:24
84:11,18 91:23,24
93:15 95:7 100:4
109:17 110:19 112:8
115:4 117:17 120:21
132:8,24 133:7,11
137:3,8,22 142:5
143:9,14 149:4
150:9,16 155:7
156:13 160:17 161:9,
20,25 165:16,19,23
166:15 167:16
168:11 175:24 179:9
185:23 186:5,6

187:3,4 201:4,9
204:20 205:24 206:6
211:25 214:21,24
218:4 223:7 242:18,
23 243:2 256:2,5,10
257:5,19 258:2,6,8,
14 259:2,6,7 262:8,
17 263:7,10 264:20
269:25 270:14 290:8
301:9 307:12 310:18
311:3 316:10,19,22
332:18,19 346:2
359:17 371:21 375:2
382:3 383:8 384:7
388:18,21 393:22

**correction** 384:5

**correctly** 138:7
175:20 289:17
305:14 375:18

**cost** 279:17 325:23
379:20

**counsel** 9:2 66:17
73:13,14 74:15,21
140:10 150:2 164:7,
16,20 187:22,23
254:18 322:7,9,12,
19,22 351:18,21

**counsel's** 151:16

**Counselors** 7:4

**couple** 17:5 100:9
314:6 351:12 352:12
384:15 386:6 393:17

**court** 8:13,24 10:10
12:10 209:5 213:23
215:13 226:16 237:2,
24 244:6 245:22
254:16 256:21 268:8,
18 301:20 311:11
313:3 343:3 376:8

**courtroom** 7:18
156:19 157:23

**cover** 105:16 294:12,
24

**cover-to-cover**
208:22

**covered** 67:4 189:7
191:13

**COVID** 207:16,17
219:19 299:6 321:2

Index: COVID-19..Deitsch-perez

323:2,3,5

**COVID-19** 7:7 8:18

**CPA** 22:13

**crafted** 178:6

**crash** 265:11

**craziest** 157:5

**crazy** 264:2

**create** 257:18

**created** 199:10

**creditworthiness** 303:19

**Crescent** 294:10

**CRO** 254:13,14 256:25 257:7

**cross** 305:17,21

**crossing** 295:24

**culmination** 145:8 250:4 274:20

**cure** 345:4

**cured** 363:14,19

**curing** 365:16

**current** 86:13 158:9

**curse** 394:15

**cursed** 394:14

**D**

**D.C.** 162:20 164:6

**daily** 219:20

**Dallas** 3:16,24 4:8 8:14 9:20

**damages** 385:17

**Dandeneau** 3:12 7:23 9:8 13:10 14:25 16:9 17:7,18 20:4,20 22:14 25:15 31:16, 20,24 33:9 34:20 36:8,12 40:10 41:4, 12,24 42:11 43:17 46:18 47:3,7,12 50:7 52:8 53:18 54:8 55:10 56:11,25 58:25 59:19,25 60:7,15

61:12 62:11 63:13,24 64:19 65:12 66:14,24 67:17 69:5 72:15 73:12,21,24 74:8,12, 17 75:6,10,13 77:9, 14,21 79:4,14,20 80:12 82:5,11,24 83:25 85:15 86:2 91:4,8,22 92:11 94:3 96:11,20 99:17 104:25 107:15 108:5 110:11 111:24 112:20 113:20 114:20 115:5 117:6, 18 119:12 120:16 122:10,16 124:6,23 127:19 132:16 134:8 135:8,18 143:10 144:8 146:20 149:5 150:10,17 151:13 153:18 154:14 155:11,18,20,23 156:10,16 157:2,6, 11,15,24 158:15 159:17 160:3,12,18 163:24 167:5 168:8 177:15,20 178:20 180:3,11 181:5,11 183:15 184:6,20 185:2,18,24 193:21 194:5 195:21 196:13, 18 200:20 203:23 205:3,15,25 206:21 208:10 210:24 211:4, 13 212:22 213:11 216:2,9 220:10,15 222:13 225:10,24 228:9 229:24 231:18 234:6 235:23 236:10, 18 239:3,14,22 240:16 242:24 246:19,25 247:14 250:11,22 251:3,12 253:12 254:6 255:12 257:6,20 260:14 263:8 265:4 266:3 269:10 285:23 286:7 295:11 298:6 299:15 302:25 305:10 307:2 312:18 317:23 333:20 336:14 338:5 339:20 341:2 347:21 348:11 349:11,17,18 350:3 352:18 375:22 376:5 379:10 394:10

**data** 311:24

**date** 18:13,18,20 21:10 56:18 70:12 84:11 98:18 103:14 104:4 106:4 131:11 133:2,12 136:10 186:15 226:7 235:10, 14 239:17 241:20 262:15 263:20 310:15 314:22 315:6, 7 323:8 326:8 329:18 332:2 356:24 369:13 372:6 386:5

**dated** 92:2 106:10 132:20 142:18 152:17 200:3 203:2 213:18 216:16 220:14 228:3,23 258:20 262:23

**dates** 30:17 178:8 321:14 326:7 355:25 357:11

**Dave** 87:20 172:6 230:19 292:3,4,11

**David** 124:9 275:23 389:9

**Davor** 3:20 9:19 178:10 266:15,17 304:8 336:15 387:14, 16

**day** 106:10,13,16 134:20 187:8 226:4 321:23 329:21,23 332:4,10,11 342:16 343:24 350:12 353:5 395:17

**days** 71:12 356:9

**DDP** 349:23,24

**de-accelerate** 344:24

**de-accelerated** 345:18

**deadlines** 86:9 379:2

**deal** 74:25 219:18 224:14 286:11

**deals** 373:19

**Deb** 151:7 349:10,18

**Deborah** 4:4,18 9:8, 12 10:2,3 349:18

**Debra** 3:12

**Debs** 349:20

**debt** 333:9

**debtor** 240:8 245:15, 25 255:17 270:14,21 271:2,6 278:16,17 279:6 280:21 310:18 325:13,14 326:14,22 327:15,20 331:3 333:7,15 335:2,8 336:22,25 350:22 364:18 372:20 373:3, 15,16,18,25 374:9, 15,16 376:13 380:9 383:14 388:10,12

**debtor's** 233:7 239:12,19 240:15

**debtors** 374:21

**debtors'** 337:24

**debts** 302:23

**decade** 95:19 231:22

**decades** 95:21

**December** 59:9,12 105:18 109:14 119:21 202:19 203:8 218:21 219:7 221:15, 21 242:17 258:21 263:14 326:4,11,12, 14 327:4,9 330:15 332:11 334:15 338:15,24 341:9 343:2 346:9,21 359:3 360:17,19 361:6,24 364:4 382:23 388:4 390:6,16,17,24 391:13,23 392:4 393:11

**December-ish** 390:16

**decide** 254:25

**decided** 245:5 318:13 380:22

**deciding** 56:13,17

**decision** 121:24 122:2,21,22 245:2,8 340:9 382:20,21

**decisionmaking** 254:14

**declared** 182:7,12

**deduce** 309:23,24 310:6

**deemed** 53:2 94:19 109:9,10 113:11 131:6 244:16 245:24 246:6,16,24

**default** 182:7,12 341:6,7,10 345:5 346:9,20 347:6 363:9,14

**defaults** 365:17

**defendant's** 214:18

**defendants** 81:14

**defended** 11:14

**deferral** 200:23 201:4,7,21

**deferred** 203:3 366:23

**define** 32:9 33:21 101:6

**defined** 33:13 45:13 51:17 53:13 54:2 99:15 173:2

**defining** 44:16 69:8 109:21

**definition** 42:24 43:2 53:16 54:18 69:15 75:20 77:6 100:25 101:9,13 104:6

**degree** 245:20

**degrees** 22:7

**Deitsch-perez** 4:4 5:8,11 9:12,13 10:2 17:8,13 29:20 42:12 46:12 50:5 60:16,24 64:17 65:19 66:10 67:9,24 69:6,10,13 76:15,17,21,24 78:19 79:25 81:16,20,22,24 97:4 107:16 115:6 117:7 119:13 120:17 144:25 146:12 147:4, 11 148:12 149:21 153:19,25 154:7

159:25 160:19 177:6, 17 178:3 180:4,12 191:4,22 194:6,22 195:22 196:4,11 202:24 205:16 206:7 208:11 209:8 212:12, 20 214:9,13,16,22 215:5,11 216:11 220:25 227:21 231:8 232:9 238:10 239:20 242:25 247:15 248:2, 8 249:4,17 251:10 252:6,9,20,25 254:7 255:10,22 256:17 262:18 301:19 324:24 336:15 348:9, 23 349:21,24 352:6, 11,20 353:2,17,23 375:22 376:4,9 377:3 381:13 384:12 386:13 387:10,14 393:17,20

**Delaware** 254:16

**delegating** 254:13

**deliver** 50:14 230:22

**delivered** 178:7 235:20

**delved** 251:19

**demand** 121:11,17, 21 122:4,7,9,15,19, 23 123:23 124:4 134:13 140:17 142:21 182:15 186:18 187:3,17 198:21 199:6,11,19 200:14 202:18,22 205:19 209:25 210:7, 23 212:18 301:17 313:16 314:8 315:2,8 316:6,17,18

**demandable** 316:19

**demands** 122:14 364:13

**department** 146:10 147:3,10

**depend** 356:5

**depended** 356:6,16

**depending** 87:4 164:4 383:15

**depends** 41:20 57:15 279:2

**depo** 260:16

**deposed** 11:9,12

**deposition** 7:11 8:10,16 11:2,15,18 12:7,15,22 16:15,23 33:23 72:21,23 73:10,15,20 74:6 76:8 77:12 81:3 123:17 151:6,9 215:6 227:15 266:21 267:4, 13 365:20 373:2 375:25 376:19 388:23 395:8,9,11

**depositions** 11:19 12:19

**derived** 16:6 17:23

**describe** 56:4 84:3 111:21 326:15 353:7 358:3

**describing** 125:17 126:2

**description** 108:21, 24

**desk** 293:9,10 295:25

**detail** 107:7 120:25 153:8 159:20 222:22 229:14 278:11 300:6 311:18 351:19 369:20

**detailed** 122:20 132:12 179:23 224:9 230:7 260:5 276:18 370:16 389:8

**detailing** 294:14

**details** 77:24 78:7,12 80:8 84:7 104:16 131:25 286:3,22 299:12 300:8 342:12 343:7

**deter** 376:18

**determination** 41:25 42:4 261:18,19

**determine** 53:19 82:19 83:6

**determined** 261:16

274:7 276:7

**detrimental** 275:11

**development** 347:13,18

**deviate** 264:25

**dictate** 90:10

**differ** 263:15

**differentiate** 268:14

**differently** 96:5

**difficult** 145:12 205:19 207:18 222:25

**diligence** 85:5,8,13 169:11

**direct** 113:22 253:6 304:19 322:10

**directed** 57:17

**direction** 237:6 254:25 258:2 393:22

**directive** 383:7

**directly** 15:5 16:7 17:23 19:8 42:7,15 43:14 88:2 177:11 219:2 354:9

**director** 23:6 32:15 39:25

**directors** 15:22 72:7

**disagree** 318:5,16, 21 319:2

**disclosable** 131:7

**disclose** 46:7 47:17 52:11 53:10 88:13 91:12 94:6 99:14,20, 23 103:2 111:21 112:3 113:8 179:12 210:12,15 242:21

**disclosed** 48:7,9 52:19 53:4 93:24 94:18 102:3,7,13,18 103:8,10 113:12 117:13 130:10 133:21 134:3 138:8 190:25 212:4

**disclosure** 100:12 134:12,16 185:15

191:20 211:21,23 262:11

**disclosures** 91:2 94:16

**discovery** 81:4 196:21

**discuss** 99:3 124:2 148:18 201:18,20 322:14 342:7 343:22 345:7

**discussed** 26:18 73:23 74:11 80:14 107:9 114:25 192:12 193:23 227:12 234:4 272:20,23 275:3,4 294:5 300:11,13 371:15 383:22 390:9

**discussing** 117:25 148:22 180:8 191:6 217:18 234:9,15 300:17 319:7 341:6, 8,22 346:4 388:13,15 391:6

**discussion** 164:4,9, 12,17 180:19 191:9 217:21 246:4 249:24 251:20 282:18,21 290:6 319:13 342:15 387:22 388:8 392:11, 21 395:3

**discussions** 58:20 233:6,15 249:11 250:4 251:13,19 253:17,20,25 263:25 264:14 274:5 275:17 280:18 367:19 387:4

**dislocation** 371:16

**displeased** 362:15

**dispute** 61:7,10,13, 16

**disputes** 16:16

**distancing** 7:9

**distinction** 23:25 52:3 164:19

**distinctions** 33:17

**distinctly** 392:4

**District** 8:13

**diversion** 208:16

**divided** 110:14 239:24

**Division** 8:14

**docket** 215:4 255:18

**document** 13:3,6 91:19 92:5 96:3 103:18 104:23 105:5, 10,16 136:11 139:22 140:8,12 141:4,10,16 144:3 147:16 151:22 153:6,15,22,23,24 154:5,11,18,24 155:3 156:24 159:21 197:13,14,16,17,25 198:12,15,17,23 199:3,4,10,14,17,25 200:3,18,22 201:3,6, 15,18 202:4 203:2 209:14,16,22 210:12, 15 211:24 212:4 213:21 214:3,6,12, 15,17,20,24 215:7,13 216:7 226:10,25 227:8,19 228:6 236:16,19 237:18 239:17 244:5 256:5,9 293:21,22 301:16 302:12 303:7 305:12, 21 320:14,16 338:14

**documents** 12:24 13:12,14,16,19 25:5 123:15,17 126:19 140:10 143:24 147:20,25 149:12 153:8 159:15 197:2 227:13 235:19 236:25 266:19 267:3, 7,9,14,18 291:9 294:2,4,6,8,11,14,17 296:21,22 322:11 364:18 377:10

**dollar** 253:21 288:12

**dollars** 253:24 260:19

**Don-** 68:19

**Dondero** 4:2 9:14 15:6 16:8 17:24 19:8, 12,25 20:9,13,18,24 21:4 42:9,17 43:15, 24 44:3,5 50:11,14,

21,25 51:6,12 54:15,
17 55:2,7,11,19 56:2,
16,24 57:20,24 58:9
59:6 60:11,14,20
61:4,5,8,21 62:3,9,20
63:4,7,11 64:4,7,9,
10,13,16,21 65:3,5,9,
10,17,18 66:6,7,8
67:7,23 68:19,25
71:13 75:25 78:16,18
80:15 82:16,21,23
91:3 92:5 94:20 98:8
99:4,6,10,13,20,23
101:17 107:3,13,21
108:3,19 117:25
118:7 123:3 124:2
145:5,7,14 148:9,14
189:9,16 190:10,13,
17,25 191:3,9 193:20
194:19 201:14,21
205:9,14,24 206:6,
11,15,24 208:5,8
225:7,14,21 232:18
233:9,24 234:11,16,
22 235:5,7,9,22
236:9 239:2,5 241:8
242:8 243:8 262:6
263:6 271:25 273:2,5
275:25 280:19
282:16,22,25 283:14
284:4,18 285:3 287:5
288:24 289:4 290:6
300:11,24 301:16
303:16 317:5 318:3,
9,11,16 319:4,8,20
320:3 335:17,23
336:6 341:7,9 342:15
343:15,22 344:2,12,
22 350:6,11 362:10
363:6,19 365:3
366:2,20 368:11,22
381:9,10 382:12,18,
22 383:8 384:6,10
386:7,17,20 387:23
388:9,14 389:2,21
390:4,25 392:4 394:6

**Dondero's** 57:13
62:4,10 63:23 144:23
206:15 217:11
350:15

**doubtful** 244:9,17
245:25 246:7,17,23,
24 247:12,25 249:2
250:10,14 251:8,22
253:10 254:3 255:8,

15

**draft** 145:25 146:4
147:10,20 149:17
176:4 182:24 213:17
290:7,12,16 291:4,9
294:17 305:11,14
319:14

**drafted** 145:23
146:10 147:2,25
290:24 305:13
319:18

**drafting** 115:20
116:5 146:7 213:12,
13

**drafts** 230:22 322:3,8

**dramatically** 264:17

**Draper** 4:12 9:17

**driver's** 21:25

**dropped** 294:8,11,14
295:4

**DSI** 72:3 166:12
237:9,12 245:9,21
247:4 249:10 250:8
251:7 252:10 253:10
254:5,11,16,19,22
255:8,14,25 257:15,
18 259:12 309:21
312:7,11,21,23 313:5
348:3

**DSI's** 256:6

**Dubel** 233:21

**due** 7:7 8:18 50:3
55:17 56:18 58:2
59:15 63:10 106:21,
25 108:14 109:7,18
110:6 111:2,5,9,12,
23 112:18,24 113:19
114:19 115:3 119:3,
10,22 120:20 121:4
161:9 162:6 163:22
165:11 167:11 168:5
171:12 174:15
175:12 176:9 190:6
194:4 203:19 204:12,
16 205:2,13 208:8
211:12 212:10,11
220:23 223:6 234:23
240:10 259:19
260:11 262:7 266:24
271:21 274:14 275:7

335:12 337:3,25
338:24 347:8 355:25
356:22,24 357:11
359:2 360:16,17
361:24 364:3 377:12,
23 379:8 381:23
382:10 383:19
390:10 391:24

**Dugaboy** 4:10 9:18
42:23 43:6 65:11
100:18

**duly** 10:12

**dump** 267:3

**Dustin** 183:2,23
184:7

**Dustin's** 183:10

**duties** 25:17,19,22,
25 28:10 30:25 31:4
38:20 219:20 292:4

---

**E**

**e.g** 171:13

**earlier** 84:5 86:18
93:12 100:3,5 119:3
130:9 131:18 134:11
136:2 148:21 155:5
162:14 179:7,16
183:12 195:24
206:18 211:15
217:14 218:8 222:19
243:10 259:10
261:21 263:21
269:24 282:24 283:6
289:4,15,20 290:12
302:11 309:11,20
312:20 316:10,13
318:8 325:12 334:6,
14,20 337:18 351:2
357:8 362:25 368:24
370:8,18 371:15
378:5,20 379:4
380:12

**earliest** 314:8 316:6

**early** 19:5 173:17
231:22 254:20 323:6
340:21 341:5 344:17
365:20 388:4 390:17

**earth** 251:23

**easier** 305:5 373:13

**East** 8:23

**easy** 265:15

**educate** 204:9

**educated** 120:10

**education** 21:23
22:7

**effect** 282:16 294:25
344:23 345:4,17
346:11 351:13 363:8

**effective** 152:18,24

**effectively** 329:25

**effectuate** 57:8,12
63:22 360:15 382:9

**effort** 83:5 376:12,17

**efforts** 188:16

**eight-figure** 389:18

**elaborate** 26:12
281:4

**electronic** 299:2
320:15

**electronically**
298:21 299:2
320:14,17,23

**element** 365:23

**Ellington** 14:20,22

**email** 5:21 6:11 68:6
70:3 170:23 171:3,22
172:3 174:5 182:20
183:3,22 185:25
187:20 194:10
198:18 206:9,23
207:2,4,5,25 290:19,
25 291:4 292:16
293:14,22 294:2
307:23 313:11
316:22 320:24 321:3
329:6 330:7,13
331:11 332:3 341:17
342:3,7,13,23 350:14
387:11 392:22

**emails** 6:7,8,9
227:13 236:13
299:25 300:7,9
328:15 379:12

**Emanuel** 4:19 10:4

**employed** 14:2,6
23:3 27:15 30:7
32:10 34:7 89:21
240:25 322:9 330:14

**employee** 24:4
28:20,22 51:22 52:6,
17 70:24 71:7 72:12
115:22 172:17
184:21 325:19
388:12,16

**employees** 15:15,
19,23 39:12,19 40:6,
8,12 51:24 52:14,25
57:8,17 86:13 93:22
167:2 237:12 327:15
331:2 333:7,16
334:25 335:8 337:24
346:25 350:22 354:6
369:12 381:22 382:2,
5,8

**employment** 71:19
165:2,3 166:4 167:3
285:25

**enabled** 360:22

**encompass** 379:13

**encourage** 13:18
17:12

**end** 46:19,20 86:17
103:12,13 104:5
109:20 118:10 131:4
145:13 148:13 187:8
203:7 214:12 220:19,
22 221:6 222:12
223:4,14,17 224:13
242:23 262:15 265:3
293:3 326:11 329:18
348:16 352:7 367:23
379:16 380:9 381:23
382:10 383:20

**ending** 93:14 105:18
135:21 218:21 219:7,
16 221:15,21 242:17
258:21

**ends** 395:7,8

**enforced** 231:12

**English** 284:11

**ensure** 98:4 330:19
331:3 333:16 346:12

348:4

**ensuring** 327:20

**enter** 122:21

**entered** 67:7 68:25 104:14,19 122:6 124:5

**entire** 19:7 192:13 253:19 264:4

**entirety** 130:12,15

**entities** 16:7 17:23 43:13 44:3 54:21,25 55:4 101:8,15 189:8 278:2 289:19 330:13 361:13 394:4

**entities'** 265:12

**entitled** 41:8 82:7 110:25 157:16

**entity** 15:5 22:20,25 27:18 31:11,23 32:3, 6,11 42:14 109:24 137:13 272:3 289:23 302:22 307:8

**entries** 240:19

**entry** 131:10 308:3, 14 311:9 332:23

**environment** 90:3,5, 9,14,20 113:6 137:18,20

**environments** 207:21

**equal** 49:11 50:23 262:7

**equaled** 263:7

**equals** 119:6,9

**equity** 273:18 281:25 282:3

**erroneously** 197:22

**error** 125:6,9 131:17, 24 132:3 145:8 165:9 213:12,14 214:5 273:11,14 275:14 276:8,25 277:5 278:5,15 280:12,22 283:3 289:6 318:15 385:9,14,19,23

**errors** 163:21 167:14 373:10

**Esq** 3:6,7,12,13,20, 21 4:4,5,11,18

**established** 94:2 285:14,20 300:25 301:7 310:16

**estate** 31:12,17 235:11,15

**estimate** 20:12 372:4 389:3

**et al** 5:15

**evaluate** 170:12,14

**evaluated** 244:10

**evening** 353:3

**event** 131:2 134:22 138:9 143:9

**events** 103:13 125:16,25 130:4,10, 21 133:8 138:5 242:22 262:14 263:4 370:24 371:7,9,13

**exact** 15:24 17:25 18:13,18,19,22 20:5 30:17 131:20 156:21 274:13 277:17 278:10

**EXAMINATION** 5:6, 7,8,9,10,11 10:14 266:13 352:25 377:5 387:19 393:19

**examined** 298:19

**exceed** 121:12 190:2 195:19 196:3

**exceeded** 93:25 194:2 196:9,17 204:19 211:3 301:9 303:9 307:9

**Excel** 368:19

**exceptions** 231:2

**excerpts** 238:16

**excess** 94:6 121:12 389:13,14

**exchange** 45:15 212:17 281:17,23

**exchanged** 45:21

**exchanges** 281:17

**excuse** 14:25 35:23 201:2 249:18 280:9 323:13 395:8

**execute** 48:14,22

**executed** 49:21 142:10 161:12 221:6 274:2 293:14 303:7

**executing** 317:16

**execution** 181:9 300:14

**executive** 35:10,11, 16 36:20,24 37:5,18 38:3,4,9,14,16,21 39:3 78:10 366:24 367:18 386:10

**executives** 369:3

**exhibit** 5:15,16,18, 20,21,22,23,25 6:2,4, 7,8,9,10,11,12,13 13:13 91:20,21 104:23,24 135:8,14, 15 140:12,13 142:15, 16 151:20,21 170:18, 19 197:3,9,15 198:2 214:7 215:22,23,25 216:3,4,5,7,8,12 218:13,16,17 226:23, 24 236:16,23 237:19 258:18 297:23 302:7, 8 303:14 305:5 306:7 307:18,21 309:2,6 313:9 317:12 328:10, 12,13 338:13,21 341:13,14

**exhibits** 267:10,11 268:9

**exist** 15:12 16:17 114:22

**existence** 67:15 69:18 80:16 81:6 99:14,20,24 102:3

**exists** 278:13

**expanding** 354:25

**expect** 247:19 293:19 333:15

**exchanged** 45:21

**exchanges** 281:17

**expectation** 231:5

**expected** 200:17,21 293:21

**expects** 203:18 212:9

**experience** 101:14 111:16 116:14 169:10 256:25 257:8 259:13 315:5 337:22

**experienced** 47:13

**expert** 43:5 143:19 153:7 183:9 257:14

**explain** 356:18

**explained** 364:17

**explaining** 163:15

**explanation** 308:20 311:8

**expressly** 390:4,25 391:12 392:5

**extended** 301:17 308:21 314:22

**extension** 307:8

**extent** 45:17 55:21 66:15 107:5 126:4 208:6 244:15 296:6 322:6

**extra** 219:23

**F**

**face** 50:23 120:11 144:16 244:3

**face-to-face** 293:8 294:5

**facilitated** 321:10

**fact** 62:7 192:20 236:21 264:24 266:25 275:7 298:4 301:15 313:19 334:22 338:23 341:10 343:19 363:12 394:5,7,17

**facts** 111:22 240:6 261:25 265:8 375:17

**factual** 164:9

**fail** 12:3 348:5

**failed** 338:23 340:2

**fair** 11:23 19:24 44:14 49:7 52:4 93:17 99:13 110:21 118:11, 21,24 119:6,8,9 120:3,15 121:5 126:8,21 141:18 143:23 149:20 224:6 239:16 240:18,21 241:17 242:6 243:5 244:13,20 245:19 260:10 261:15 262:7 263:5,15 264:25 287:21 370:21 371:18 372:5 374:10 390:2

**faith** 189:8,15 190:9, 12,19 191:3 193:19 194:20 205:8,14,23 206:14,23 208:5

**familiar** 22:20 31:22 32:3 54:6,9 226:13 227:8,18 274:6

**fashion** 86:11 276:16 357:14

**fault** 229:17 276:24 277:19

**favor** 60:6 62:19 139:17 161:24 261:9

**feature** 301:17 315:8

**February** 70:21 226:3,4 228:3,23 323:9

**Federal** 7:19

**feel** 81:8,18 176:25 273:13 287:16 371:21 376:11,16

**fees** 332:12 356:21, 23

**fide** 369:25

**figure** 343:10 366:12 367:5

**file** 167:8,13 297:2,10 337:8

**filed** 21:6 197:17 208:18 213:23 215:13 219:23

226:16 237:2,24 238:4 244:5 255:17 263:17,19 311:10 322:2,4,16,21 375:20

**files** 312:23 372:21

**filing** 45:25 240:4,17 246:3 249:9 256:20 264:15

**filings** 237:14

**filled** 257:13

**finalized** 88:7 89:12 230:23

**finance** 25:21 26:2,4, 8,17 28:15 38:23 127:25 128:16 129:6 280:7 290:14 351:3

**financial** 5:18 6:2 14:12 26:24 27:5 41:7 48:2 84:17,23 85:3,13,19 88:11 90:2,7 93:24 95:14 96:7 100:12 102:7, 10,12 104:21 105:17 107:22 112:2 113:7, 14 114:18 120:8,18 122:11 130:23 133:22,25 135:20 138:3,4,9 143:8 176:21,24 179:16,23 180:15 196:22 201:8 211:7,21 217:24 218:3,19,24 219:6 221:14 222:24 224:10 235:17 241:24 242:3,15,16 254:9 258:25 260:3 261:20 262:5 264:11, 13 270:10,14 271:2 286:18 301:11 302:19 306:4 311:25 312:5,6 370:9,12,17 378:24

**financials** 6:5 137:16 168:19 176:8, 16 179:8 186:15,16 187:2 189:23,25 200:10,12 218:12 241:13,15,21 242:2 246:9 247:5

**find** 53:23 268:10 283:17 315:4

**fine** 36:8,9 45:10 84:8 154:12 269:16 287:2 353:24

**finish** 11:21 12:2 76:18,24 249:19 295:11

**fired** 388:9

**firm** 10:21

**fiscal** 103:14 104:6 131:4

**fit** 42:24

**flip** 331:8 332:20

**fluctuate** 93:10

**fluctuates** 94:10

**focus** 242:14 313:3

**folks** 46:15,24 87:25 152:10 197:23 293:5 321:15

**follow** 61:17 151:15 391:18

**follow-up** 171:7

**footnote** 244:8 260:20,23 261:15,17 371:22

**footnotes** 261:17 263:11

**forbearance** 134:5, 16

**forgave** 49:23 51:23 52:12 93:20

**forgivable** 369:2

**forgive** 51:10,15,20 52:5 284:9

**forgiven** 52:18 53:11 94:11 366:23 367:23 369:13

**forgiveness** 52:22 93:23 94:8 365:23 369:16,20,24

**forgot** 282:8

**form** 20:4,20 22:14 25:15 29:21 31:16 33:9 34:20 40:10 41:4,12,24 42:11,12

43:17 50:6,7 52:8 53:18 54:8 55:10 56:11,25 58:25 59:19,25 60:7,15,17, 25 61:12 62:11 63:13,24 64:18,19 65:12,20 66:11,24 67:10,17,25 69:7 75:6,10 78:20 79:4, 14,20 80:2,12 82:24 83:25 85:15 86:2 91:4 94:3 96:11,20 97:5 99:17 107:15,16 108:5 110:11 111:24 112:20 113:20 114:20 115:5,7 117:6,18 119:12,13 120:16,17 122:10,16 124:6,23 127:19 132:16 133:23 134:8 142:5,7 143:10 144:8 145:2 146:13 147:5, 12 149:5,22 150:10, 17 153:18,19 154:2,4 155:11 156:17 158:15 159:17 160:2, 3,12,18,20 167:5 168:8 178:21 180:3, 5,11,13 181:5,11 183:15 184:6,20 185:2,18,24 191:5,23 193:21 194:5,6,23 195:21,22 196:5,12, 13,18 200:20 201:25 202:25 203:23 204:14,23 205:3,9, 11,15,16,25 206:8,21 208:10,12 209:9 210:24 211:4,13 212:13,21,22 213:11, 25 220:10,15 221:2 222:13 225:10,24 227:22 228:9 229:24 231:9,18 232:10 234:6 235:23 236:10 238:11 239:3,14,21, 22 240:16,23 242:24, 25 246:19,25 247:14, 15,16 248:4 249:5 250:11,22 251:11 253:12 254:6,7 255:11,23 256:18 257:6,11,15,20 260:14 262:19 263:9 265:4 269:7 270:15, 22 271:8,18 272:9,17

273:7 277:22 278:19 279:8 280:15,23 283:19 284:7,14 285:7,23 286:8,9 287:9,18,24 288:8,25 289:12 290:9,21 291:23 292:19 293:15,23 296:13 297:6 298:22 299:15 300:15 302:2,25 303:2,10,20 305:10 306:15,24 307:3,13 310:2,11,19,24 311:12 312:16,19 314:14 315:9,23 316:23 317:17,24 318:6,17,23 319:23 320:6,18 322:5,23 326:24 327:6,24 330:21 331:5 333:10, 18,20 334:10 335:4 336:14 338:3,5 339:16 340:18 341:3 342:21 345:12,19 346:22 347:14,19,21 348:10,11,12 351:15 353:11,15 354:4 355:5,9,15,21 356:3, 14 357:6,15,22 358:16,22 359:4,11 360:3,11,25 363:16, 22 364:10 365:6 366:15,25 367:16,25 369:4,8,17 370:3,25 371:10,25 372:22 373:4,20 374:11 375:3 376:20 379:10 380:25 381:14 384:13 386:14 388:19 389:5,15 391:4 393:24 394:10, 11,19

**formal** 231:20

**format** 293:14

**forms** 257:13

**formulating** 184:3

**formulation** 386:24

**forthcoming** 335:18

**forward** 79:17 376:25

**found** 53:17 66:12 125:6 140:15 394:8

**Frank** 5:5 8:10 9:11 10:11,18 271:4 305:8 395:14

**frankly** 232:2

**Fred** 249:21

**Friday** 208:18 329:18,25

**front** 110:12 122:12 140:16 279:21 281:7 294:9 301:11 302:9 305:4 309:7 343:6

**frozen** 144:9

**frustration** 364:17

**full** 189:8,15 190:9, 12,19 191:2 193:19 194:19 205:8,14,23 206:14,23 208:5 241:15 372:20

**fully** 13:4,7 17:4 364:19

**fulsome** 265:8

**function** 26:8,20 28:16 87:3 89:4 351:3

**fund** 3:18 9:22 22:21 33:23 35:2,6,18,19, 21 39:7 42:22 44:7 58:15 125:2,3,6,7,10, 11 127:10,13 145:16 152:14 176:18 202:14 203:14 215:14 273:17,23 274:16 275:2,4,6,8, 10,13 276:7,9,10 277:5,9,21 279:19 280:2 281:2,9,10,11, 12,13,15,20,23,25 282:7 283:23 308:4 325:22

**fund's** 274:23

**funding** 202:8

**funds** 32:22,25 33:2, 4,8,12,15,16,18,22 34:5,8,13,18,23 35:12,15,17,18 36:21,25 37:4,9,17 38:2,5,10,17,22 39:4 145:15 160:8 168:10 171:15 173:2,6,10,

13,16,20,23 184:11
192:16,24 193:4,6,
11,16 253:19 277:4,8
281:15 284:5 285:3
286:17 287:5 328:5
332:7,12 360:9
361:6,11,13

**future** 171:12 174:16
175:13 185:17 337:4
369:13 371:7,9,13,20
381:17 388:23

---

### G

**GAAP** 94:15 101:5,
16 109:10 130:21
131:23 241:13,15,20,
25 242:4,11 246:9
254:10 256:23
264:10 372:7

**gaming** 239:9

**garbling** 46:14

**gave** 45:14 57:11
149:2 197:23 205:6
215:10 312:21 343:9,
17

**gears** 321:25 324:20

**gen** 85:16

**general** 11:17 32:20
57:5 84:25 88:18
97:15,17 128:9,25
152:4,6,7,8 170:7
180:7 195:15 251:13
258:10 292:10 297:4
378:10 392:11

**generally** 54:9 61:2
62:14 64:2 80:23
84:24 87:6 89:7 95:8,
10,25 97:7 128:7,8,
19,24 129:8,13
162:2,3,8 170:6
180:14 187:19
189:20 192:11 194:8,
9,14 195:4 226:13
234:14 241:13
253:14,16,23 278:22,
24 279:3 290:2
297:16 311:3 333:25
334:2 337:4 356:12
357:13,18 358:20
366:7 372:18,24

379:11,12 387:2
389:10

**give** 12:25 20:11
35:5,9 38:15 45:4
49:6 51:7 86:15
96:15 97:17 116:14
117:4 123:12,13
150:8 159:22 163:17
193:25 235:25 236:6
267:8 300:8 348:21
356:9 357:9 372:9

**giving** 16:19 26:14
51:3 150:11 194:20
312:22 369:2

**Global** 35:18,20
124:25 273:17 281:8,
22

**go-ahead** 293:2

**goal** 295:19

**God** 156:19

**good** 7:3 10:19 72:16
118:5 156:19 248:11
251:3 324:22 353:3
385:5

**governed** 33:4

**great** 32:8 105:3
183:5 300:6 325:5

**ground** 11:17

**group** 14:5,7,24
15:4,14 16:14 29:23
146:5 148:24 149:2
150:15 154:19
172:13 258:13
290:16 291:9 292:2
294:18 295:9,13,22
378:16

**groups** 295:21

**grow** 88:23 89:4,9

**guess** 73:3 169:22
170:20 204:17
225:25 263:22
315:25 361:9

**guidance** 94:12,17
257:7,9,14

**guy** 25:21 81:19
88:25

**guys** 77:3 157:3

268:12

---

### H

**half** 72:16 145:10
280:20 324:23
377:21

**halfway** 48:18

**hand** 361:6

**handle** 291:14

**handled** 147:18

**happen** 141:14
156:15 165:2,15,18,
22 168:25 248:21
265:14 284:13

**happened** 87:23
156:22 165:17
174:19 247:3,5
273:15 286:4 294:3
320:10

**happening** 165:21
231:6 242:10 382:25

**happy** 117:4 188:19
200:10 215:7 389:25

**hard** 13:11,16 104:11
123:16 197:23
286:19

**HARDD** 3:22

**Hardt** 3:22 9:20

**harmed** 276:16
278:5

**Harr** 9:20

**Hartmann** 3:13 9:10

**hat** 336:4

**Hatch** 7:4 8:21

**Hayley** 3:7

**HCFD** 332:6

**HCM** 42:22 45:5
156:12 354:13 355:7
360:23 362:7,20

**HCMA** 186:18

**HCMF** 30:10 43:12
180:22 303:18

**HCMF's** 303:18

**HCMFA** 5:20 6:2
22:25 23:3,6,11,16,
22,24 24:6,9,11,13,
15,21 25:2,8,14,18,
24 26:3,5,8,22,24
27:4,5 29:3,6 31:5
32:18 43:12 54:14
100:23 122:2,7,13
124:14,21 131:11
132:6 133:12,21
134:11,14 135:6,21,
23 137:22 138:8,14
139:18 140:4,21
141:9,16 142:2,24
143:18 144:22
152:24 153:17 155:7,
10 156:4,13 158:4,12
161:7,17 171:13
172:20 176:14
178:12 179:13
180:22,23 181:2,8,
14,15 182:8,17
184:25 186:9,18
187:3,17 189:14,24
195:19 198:21 199:6,
12,14,19 201:15
202:7,12,14 203:14,
18 204:2,11,24
205:7,19 210:2,7
211:10 212:9,18
213:8 218:8 221:20
241:23 242:6 267:24
268:21 269:2,5,25
272:5,6,15,24 273:5
275:16 276:23 277:3,
18 278:16,18 279:7
280:11,21 284:5
301:9 303:6 305:25
308:14,20 310:10,16
313:15 314:7 316:6
318:14 322:3 325:12,
18 331:13 332:5,17
370:20 384:18 385:7,
12,16 386:4

**HCMFA's** 26:10
121:12,21 122:11
124:3 137:3,10
138:3,19 143:8
196:16 202:14
204:15,19 211:2
303:8 384:21 386:2

**HCMLP** 5:18,22 6:12,
13 171:13 176:9

185:16 314:7 316:5
317:6 341:19 355:12,
18,20 356:2 357:3,
13,19 358:4,13,20,
21,25 359:2,8,24
360:17 384:19

**HCMLP's** 228:22
356:12

**HCMS** 4:3 9:15 30:4,
6,7,10,13,16,20,22,
24 31:3 43:12 44:8,9
54:14 65:6 100:24
128:23 129:2,4
353:9,14 354:6,20,21
355:8,13,19 356:2
357:21 358:15 359:2,
8 361:5,15,20,25
362:4 364:3,25
383:19,25 385:7
393:21 394:7

**HCMS'** 356:13
357:13

**HCMS's** 359:13,19

**HCRA** 4:2 9:15

**HCRE** 31:8,14,15
32:4,7,10,12,15
43:18 44:7 54:14
65:6 100:24 128:4,5,
11,14 353:9,14 354:3
357:20 358:4,14,21
359:23,24 360:17
361:5,15,19,25
362:2,5,9,22,25
363:4,20 384:3
393:21 394:7

**HCRE's** 360:5,9,14,
21

**head** 87:13,16 278:3
364:15

**headquartered** 8:22

**hear** 46:13,20 148:12
304:3 364:16

**heard** 27:9 29:25
31:7 74:22 77:25
78:21,23 79:6,7 80:4,
5,7,22 100:6 268:5
285:3 324:15 386:16,
19,22

**held** 8:16 27:20 30:9,
12 37:8 107:12

172:25 173:5 174:3
183:6 244:4

**Heller** 4:12 9:16

**Hendrix** 172:7
186:21 230:20 292:3
328:17,20 329:13
330:14 332:15
341:18,24 350:18
362:24 365:13
377:11,22

**hey** 45:3 188:6
266:17 312:24
351:14 365:4 391:23

**high** 126:25 238:2
279:11

**higher** 110:19

**Highland** 3:4,18 8:11
9:6,22 10:22 11:6
15:16,23 18:6,7,12,
25 20:3 21:6 22:21
30:2 35:17,18 39:10,
15,19,23,24,25 40:3,
4,7,25 41:18 42:6,10,
18,21 43:11,16,23
44:6 45:2,14,25 46:7
47:16 48:6,14,24
49:5,10,17,23 50:4,
10,14,16,21 51:6,10,
15,20,23 52:5,11,18
53:9,10,24 54:11
55:23 58:15,16,20
60:6 61:20 62:8,19
63:8,20 64:7 70:20,
24 71:7,10,18 72:13
78:18 84:22 85:2
86:13,22 87:8,18
93:20 94:5 95:13
96:7 103:2 105:17
107:12 109:22,23
110:8 112:8 115:21
116:4 118:23 120:8
121:16,20 122:23
123:21 124:13,20,25
125:3 126:11,23
127:2,16,25 128:5,
10,15,20,23 129:2,6
132:5 133:10,16,20
134:13 136:2 137:7,
11,21 138:8,11
140:21 141:9,18,23
142:25 143:7 144:23
145:17,19 146:5
149:19 152:13

160:10 161:8,24
165:7 167:3,9,14,15
172:14,17 175:13
176:15 178:19,23
179:13,22 180:2,9
181:21 182:2,6,11,15
186:9,11 198:20
199:5,11,18 200:13
201:15 202:7,12,13
203:13 204:12,16,25
205:13 209:25 210:6
211:9,11 212:8,11,16
215:14,17 216:22
218:8 219:21 220:19
222:2,17 223:5,24
225:9,21 226:2,3,9
227:5,20 228:8
229:2,6,9,21 230:3,
10 232:22 233:24
234:17 237:12,16
240:7 241:2,7 242:6,
9 243:4 244:4,22,25
245:5 247:7 248:23
253:18 258:10 259:2
260:4 261:9 263:17
264:18 267:7 271:2,
15,23 272:20 273:4,
16 275:16,21 279:18,
19,25 280:2,12,14,20
281:8,22 282:17,23
283:5,17 284:5
285:18 286:21 287:6,
15 288:7 289:7,8
290:16 297:3,16
299:24 302:20,24
303:6,17 307:7 308:4
313:6 318:10,13
319:11 320:4 322:10
323:8 325:22,24
329:3 330:16,19
333:22 338:17 339:3,
11,13,25 346:11,19,
24 347:12,17 348:2,4
350:14,20 353:7,8,13
354:2,6,19 359:16,
17,18,21,25 360:7,8,
13 361:19,20 362:4
363:4 366:4,14
367:10 368:4,6,25
369:11 370:13,19
374:9 377:13,23
379:19 380:3,24
381:12 384:21,22,23
385:8,13 390:11

**Highland's** 18:10,17
19:3 39:10,15 40:25

41:7 44:24 46:6
47:16,24,25 50:19
51:10,15,20 52:19
55:16 57:8,17 72:6
84:10,17 86:23 89:22
94:22 95:6 102:7,10
107:14,22,25 109:20
113:9 115:23 116:2,3
137:15 138:3 139:17
146:10 165:2,3 166:4
167:3 187:2 210:22
222:24 225:8,15,23
230:5 241:24 242:15
243:4 247:22 255:7
258:5 260:12 262:5
266:19 370:21 379:8
381:22,25 382:5,8

**hindsight** 265:6,11,
15

**hint** 346:15

**hit** 86:9

**hold** 21:12,16 23:5,8
25:13 27:17 34:15
37:3,15,16,21 39:6
163:12,25 167:12
184:9 192:15 193:9
199:13 212:24 308:5
329:10 387:12

**holding** 37:25

**holds** 184:14,18

**holidays** 329:23

**home** 191:17 207:15,
19 219:19 299:6,9
342:25 343:2 348:16
393:7

**honest** 144:3

**honestly** 78:4
198:22

**hope** 82:2 262:22

**hoping** 300:17

**Horn** 4:11,12 7:22
9:16,17 349:10,13,
22,25 392:15 394:25

**Houlihan** 273:23
274:3,10,25

**hour** 46:24 72:16
324:23 387:9

**hours** 249:24 260:17

**HR** 280:7 355:2
357:25

**Hunter** 244:23 245:2,
6 247:11 260:22

**I**

**idea** 150:2 154:21
156:23 201:24
232:14

**Ideally** 211:17

**identical** 298:11,13
299:20 380:13

**identified** 36:21
37:5,10 38:6,11,18
45:2 47:19 81:14
229:2,7 259:5,23

**identify** 35:14 42:14
52:17 57:23 58:6
60:10 61:3 62:25
188:24 191:18,25
264:24

**identity** 102:19 103:3

**imagine** 136:3

**immaterial** 53:3
94:19

**immediately** 347:8

**impact** 275:9,11,12

**impacted** 229:8
230:4

**impacting** 228:21
229:3

**impairment** 240:21,
24 241:3,5,11

**important** 11:21,25
12:25

**impossible** 299:7

**impression** 363:12,
18,24

**in-** 294:9

**in-house** 164:7

**in-person** 12:22
191:15 283:9,12
290:20 292:16 323:4,

12,18 342:23 392:21

**inability** 299:12

**inaccurate** 112:25
116:21 117:2,17
136:18 138:20,24
256:16

**inaudible** 48:14
148:10

**include** 26:9 106:25
189:7 230:3 259:24
263:3 305:7 351:18
355:3,8,13 368:17

**included** 54:17 81:4
108:4,7,19 175:13
176:23 183:21
194:18 200:12
213:22 217:23 222:2
232:14 239:11
243:12 251:15
252:12 312:12 315:8,
21 326:18 336:22

**includes** 172:3

**including** 132:11
178:15 210:4
335:21 366:21 368:6

**income** 35:18 179:17

**incomplete** 112:25
116:22 117:2

**incorporated** 153:9

**incumbency** 5:20
151:25 152:5,9,13
154:20 159:19
183:11 270:3

**incurred** 336:12
385:18

**independent** 72:7
166:22 233:7,12,15
348:3

**indirectly** 15:6 16:7
17:24 42:8,16 43:14
88:3

**individual** 11:3
271:24 272:25
300:10,12

**individually** 9:11
16:10

**individuals** 15:15

276:21 285:18

**indulging** 353:5

**inform** 190:18
210:19 211:2 335:16
336:6 337:24

**information** 16:14
80:19 86:10 88:13
91:12 112:5,17
117:14,15 169:11,13
171:20 176:8,15,22
179:16,17,18 188:8
206:3,5 218:20 230:3
236:7 237:13 257:18
274:4 312:10,24
344:19 368:11

**informed** 69:18
178:17 190:24 210:5
211:9 212:8 288:15
335:16,23 378:7

**informing** 64:13
181:25 182:11 330:5

**initially** 132:17 185:5
247:3

**initiated** 58:10

**initiating** 58:12

**initiative** 290:5

**ink** 296:22,25 298:4

**ink-signed** 297:3,10

**inquiries** 160:9

**inquiry** 210:12
274:16,17 376:6

**inside** 187:22

**insolvent** 302:22

**installment** 217:2

**instance** 52:12 57:16
60:10 377:16

**instances** 335:25

**instruct** 133:6 164:3
210:10,13,19 381:25

**instructed** 77:15
147:8,9,23 241:19
291:7,8 315:7 362:8
381:22

**instruction** 8:6
57:11 74:14,23

**instructions** 256:7
347:25

**insufficient** 122:8

**insurance** 385:17,22
386:2

**insured's** 385:25

**intend** 208:6

**intended** 111:21
214:19 288:23 315:5,
19

**intending** 16:25
146:16

**intent** 306:14 318:20,
25 380:10

**intention** 81:11
307:11

**interest** 50:3 55:25
56:22 57:18 58:2
59:14,17 60:13 62:18
63:2,10 64:5,15,22
119:10,16,21 120:22
162:6 163:22 164:25
165:11 167:11 168:5
217:17 223:18
273:18 334:9

**interests** 55:17

**internal** 271:17

**internally** 275:17
329:2

**interpret** 119:8

**interpreted** 74:20

**interrupt** 375:23

**interrupted** 76:25

**interrupting** 77:16,
18

**interviewed** 322:18,
22

**intimately** 292:6,13

**intimidate** 376:13,17

**introduce** 9:2

**invalid** 136:24 235:5

**investigations**
275:17

**investment** 4:10
9:18 32:21 65:11
127:17,24,25 128:12,
14,16 129:3 244:23
245:3,6 247:11
273:24 274:15
279:21

**investments** 128:17
129:5,6 249:23

**investors** 275:10
276:12 277:4,8,21
281:18

**invoices** 185:10

**involve** 366:13

**involved** 237:10
245:2 264:17 274:14
275:15,21 276:21
288:4 292:6,13 293:6
354:10

**issuance** 131:5
138:10,18 371:14

**issue** 54:7 178:14
191:13 201:25
204:10 208:24

**issued** 56:16 60:5
62:19 65:8,18 66:8
81:13 82:15,20 93:13
107:13,20 108:2
131:11 132:6 133:12
161:23 162:5 180:10
218:25 223:7,17
233:8 234:10,15
235:4,9,21 236:8
242:8 243:7 261:9
262:6 263:6

**issues** 113:5 248:14
306:19

**item** 108:19 111:11,
18 112:4 119:2,16
123:6 185:21 220:5
238:20 259:18,24

**items** 53:3 97:21
100:9 112:3 131:21
149:8 228:21 229:3,7
230:4,7 249:22 260:6

---

**J**

**James** 234:11
271:25 273:2

**investment** 4:10
9:18 32:21 65:11

**January** 70:16
163:7,8 219:11,13,17
258:20 326:8 341:6,
18 344:2 350:5,9,13,
24 351:20 361:25
362:3,7 364:8 365:2,
15 383:23

**Jason** 185:3 275:24

**Jim** 4:2 9:14 15:6
16:8 19:8 43:15,24
44:5 50:11,25 65:16
67:6,22 68:18 71:23
72:7 75:24 78:9,16
82:22 123:3,20
189:9,16 190:10,13,
15 205:9 206:23
232:18 273:2 280:19
342:5,7 351:5,10,14
362:8,10 363:8,18
365:3 367:8 368:22
379:25 381:9

**Jim's** 367:22

**job** 25:19,25 42:3
219:20 313:2

**John** 3:6 7:24 9:4
10:20 45:3 46:13,18
69:13 74:8 76:15,17
77:10 95:17 105:23
129:18 146:13 154:7
155:18 157:6 177:6
192:18 208:13 216:2
222:14 236:18
267:18 304:6 308:7
353:18 385:3 387:10,
16

**join** 18:12 317:25

**Jones** 3:8 9:5 10:21
72:10

**July** 307:24 317:9

**jumping** 234:18

**June** 92:2 98:17
99:25 103:2 132:25
135:2 137:6 176:10,
24 186:16 200:7
242:23 262:16,24
263:13 265:3

---

**K**

**Karesa** 249:21

**key** 275:20

**kidding** 330:23

**kind** 168:2 188:12
221:12 222:23
245:22 250:5 274:16
276:4 323:6 329:22,
23 337:8 353:13
356:10 358:13,14
380:23

**kinds** 353:6 354:2
357:2

**Kirschner** 4:16 10:5

**Klinger** 7:12 8:24

**Klos** 87:20 124:9
172:6 230:19 275:23
292:3,18 389:9

**knew** 68:18 103:9,10
369:2

**knock** 364:19,20

**knowable** 371:14

**knowledge** 43:10
46:5 47:23 48:12,21
49:9 50:13 52:5,10
53:10 62:5 63:12,16,
21,23 79:23 80:10
81:5 82:7,8 89:23
93:23 95:3 98:17
101:13,19 102:2,25
106:25 111:16 112:6
138:16 144:24 147:8
153:13 167:8,22
184:10 188:15 189:9
194:13 206:5 207:8
208:2 225:5,12
226:21 232:21,23,24
237:11 243:4 259:22
322:19 324:17
384:18

**Kopf** 3:22 9:20

**Kristin** 172:7 186:21
230:20 292:3,12
328:17 342:11 343:8
350:17,18 362:23
365:13

---

**L**

**L.P.** 3:19 8:12 9:6,23
10:22 11:7 15:16,23

18:7 41:19 42:10,18 43:16 58:17,21 109:23 110:9 152:14 172:15 271:3 279:20 325:25 329:3

**La** 4:24 104:25 118:3 129:16 135:10 177:14 218:14

**labeled** 8:9

**laborious** 145:12

**laid** 56:6

**landline** 393:7

**language** 101:4 315:21 316:2,3

**large** 287:22 379:22

**largely** 11:18

**larger** 356:8 357:10

**late** 323:6 379:21 387:9 388:3 390:17

**launching** 127:10

**Lauren** 171:4 183:24 192:5,12 275:24

**Lauren's** 185:9

**law** 12:11 306:9,11, 20

**Lawn** 4:7

**lawsuit** 55:8 164:13 181:22 375:19 376:6, 23

**lawsuits** 53:25 54:7, 10,12 322:15

**lawyer** 73:19 154:15 157:7 164:5 266:16 373:24 375:16

**lawyers** 147:20 374:3

**lead** 269:15

**leading** 269:8

**learn** 65:15 67:15 89:4,9 104:13

**learned** 66:16 68:3,8, 11 69:25 70:6,10,15, 19,23 71:17 76:2 80:19 90:19 340:17

**learning** 75:3 83:23

**leave** 157:23 321:13, 15,20

**led** 342:7 348:4

**ledger** 258:10

**leeway** 16:13 208:14

**left** 20:2 70:20 71:10, 18 87:8,18 164:25 165:3 166:4 167:3 226:2,3 232:22 296:17

**legal** 7:5 8:21 25:5 29:23 42:19 43:5,7,8 44:17,21 45:4,9,17 46:11 47:20 48:3,16, 25 49:13 55:21 107:5 126:4 127:11 142:6 143:15,19 146:5,10 147:3,9,24 148:2,4,5 149:7,11,15,24,25 150:20 153:2,7,8,12 154:8,19 155:12,13, 15,23 156:2,6 157:8 164:12 167:20 172:13 183:9 193:16 212:25 280:8 290:16 291:9,13,16 294:18, 20 295:5,8,13,22 296:4 322:18,22 351:18,21 354:8

**legitimate** 348:18

**lender** 273:4

**lending** 127:2 302:21 303:17

**lengthy** 105:15

**letter** 91:16 92:2 93:13 95:5,16 96:9 98:23 99:2,3,7,11,16, 21,25 103:7,14,18,23 104:8 106:11,15 130:8 135:25 136:7, 17 262:16,22,25

**letters** 94:21 95:11 96:19,22 97:3,8,13, 19,25 98:9 136:14

**level** 22:11 53:7 92:25 93:5,25 238:2 279:11 287:23 288:4

**levels** 274:2

**liabilities** 5:24 175:17,22 190:2,6 194:2 195:19 196:2, 8,17 204:19 211:3 220:4 237:20,23 242:12 301:8 303:9 307:9 317:8

**liability** 175:14 217:24 276:24 277:19 280:21

**liable** 306:12,21 307:11 317:21

**license** 21:22,25 22:2,8,9

**licenses** 21:13,16,21 22:12,16

**life** 377:2

**light** 293:2 299:11

**lighting** 35:25

**list** 83:12 100:9 243:17 245:16,24 246:6,23 247:10,25 249:2 250:10 251:22 254:3 317:9 377:22

**listed** 214:6 238:8 311:10 312:3 330:13 371:8

**listen** 40:14 47:8 114:13 144:14 223:12

**listening** 40:18 252:7

**lists** 152:10

**litigation** 4:17 10:5,6 16:12,20 17:3 267:15 373:23 374:5 375:25

**LLC** 31:8 32:4

**LLP** 9:13 354:13

**loan** 40:7 42:18 43:16 45:21 48:8,15,23 49:4,10,17,24 50:4, 15,20,24 51:2,5,16, 21 52:6,13,17,22 53:11 60:21 61:3,10, 19,22,23 62:9 63:10, 15,22 64:10 93:20

94:10 126:16,17 128:15 142:5 145:6 203:13 225:13,20 254:3 270:20 271:5, 15 272:7,8,16,21 284:5 285:5,6,11 303:6 318:15 331:14 332:9,14,17,24 333:3 335:12 357:2,13 358:20,25 359:2,9,25 361:18 362:22 363:8, 13,19 364:3,9,25 365:16 393:23

**loaned** 39:11,16,19 41:2 43:23 48:14 50:10 124:14,17,20 126:23 128:10 202:7

**loaning** 39:24 307:7 317:6

**loans** 40:4 41:8,23 42:9 44:10,12,16 45:15 46:8 47:18,25 48:6 51:11,23 52:22, 25 61:9,25 91:2 94:6, 8 105:8 125:24 126:10,11 128:15 129:10 131:2 202:14, 17 225:6,7 255:8,14 259:24 271:11,20 273:6 287:7,8 288:22,23 317:6 318:4 331:22 333:12, 14 335:13 355:19 365:23 369:3,11,14 370:10,15

**log** 393:12

**logging** 395:3

**logical** 291:20 309:23 315:4

**logically** 310:9

**logistically** 331:10

**Lokey** 273:23 274:3, 10,25

**long** 192:8 233:4 333:14 353:4 385:3

**long-term** 333:17

**longer** 282:2 380:15 381:11

**looked** 101:2 111:12,

18 134:6 136:2 158:5,14,19,24 159:5,10,16,24 160:17,25 198:19 201:8 220:9,13 222:5 224:2 262:8 265:8 316:10,13

**loop** 148:3 294:19

**Lord** 248:11

**losses** 276:7,11

**lot** 55:4 143:24 147:16 162:15 188:3 208:13 225:4 245:21 248:16 249:11 278:2 286:22 289:24 307:15 320:9 349:19 364:14 373:12,13

**lots** 169:12,13 373:8

**Louisiana** 4:14

**love** 252:17

**lower** 274:2

**LP** 3:17 9:21

**lunch** 139:25 150:22 158:6,14,20,25 159:6,11,16,24

**lured** 231:4

**M**

**Madam** 268:8

**made** 15:14 46:8 47:18 48:6,9 49:24 51:11,16,21 52:6,13 56:8,14,22 57:6,25 58:4,11 60:21 61:4, 11,19,22 62:2,4,18 63:2 64:5,9,14,22 78:5 98:19 121:24 122:2,9,15,21,22 124:4 125:25 127:21, 24 128:14 129:12 130:9 131:4 134:17 139:9,13,16 148:5 159:9 161:4 162:10, 11,18 163:6,10,21 165:10 168:2 182:15 190:14 195:10 202:6, 13 203:14 217:14 225:7 242:6 245:8,9

261:19 262:24 271:21 288:21 295:17,23 299:7 306:12 314:2 315:15 316:21 317:15 327:16 328:5,8 334:22 335:3 343:19 345:11 350:23 351:8,20 358:20 359:7,14,20 360:2,17,23 361:25 362:2,4,6,12,16,18,22 363:7 364:25 365:10,14,15 373:19 378:8 379:16,23 382:22 383:23 384:6,7,9,11,20 385:16,21,25 386:2 390:21 394:8,18

**Madison** 4:20

**maintain** 90:5

**maintaining** 258:5

**make** 36:4 41:25 42:3 57:17 63:9,14 74:3 83:2,5 86:8 88:16 89:21 96:14 112:16 117:10 123:23 127:16,18,21 129:5 136:16,23 145:6 157:17 164:19 176:19 177:7,12 187:3,17 198:20 199:19 200:14 209:25 210:7,16,23 243:5 272:21 277:24 285:9 288:10,13 294:18 295:20 296:5 297:8 303:4 315:11 317:5 318:4 324:14 325:2 331:22 332:7 334:8 338:23 340:2 342:9 344:20 346:12,20,25 348:5 350:19 351:6,14 358:7,25 359:9,10,15 360:6,10,23 361:6 362:6,7,9,17 363:3 365:4 367:21 373:12 377:17 380:23 381:11,17,22 382:2,6,14,19 384:24 390:5,7 391:2,12,20 392:6,12

**maker** 140:20 142:25

216:19 305:18

**makes** 123:16 153:3,22 345:17

**making** 40:7 41:22 88:6 160:9 282:22 293:4 335:9 337:20 343:4 344:23 345:4 363:9,14 381:3,6

**manage** 26:7,17 28:15 38:23 116:11 354:11

**managed** 113:24 125:2 332:13 361:12

**management** 3:5,18 5:16 8:12 9:6,22 10:22 11:7 15:16,23 18:7 22:21 26:20 30:2 41:19 42:10,18,22 43:11,16 44:6 58:15,17,20 70:21 90:21 91:16 94:21 95:4,16 96:8,18,21,23 97:2,8,12,19,24 98:9,25 103:17,22 104:8 106:11,15 109:23 110:9 125:3 128:20 130:8 135:24 136:6,13 152:14 172:14 215:14,17 232:13,15 262:16,21,22,25 271:3 279:18,19,22 280:2,3 308:4 325:22,24 330:16 332:12 354:7,19 359:16,18 360:7,9,14

**manager** 116:9 230:16,22 291:12

**managers** 88:23,24 230:18 274:5 292:2

**managing** 88:21 292:5

**Marc** 4:16 10:5

**March** 14:8 323:6

**mark** 49:18,21 232:18 268:15

**marked** 91:21 104:24 135:13,15 142:16 151:21 170:19 197:9 215:23 216:7 218:17 226:24 236:23

237:18 258:18 297:23 302:8 307:21 309:6 328:13 338:13 341:14

**market** 119:6,9 120:15 240:21 241:17 242:7 243:5 265:11 274:2 371:15

**matching** 222:22

**material** 53:12 104:5 111:22 112:3 113:11 131:6 133:25 171:11 174:14 185:15,21 274:15

**materiality** 52:24 53:7,16,20 92:18,20 93:2,5,8 94:2,7,9 98:15 104:7 117:11,13

**materially** 274:23

**materials** 175:4

**maternity** 321:12,14,20

**math** 109:17 110:13 221:8 239:24 260:15 311:7

**matter** 236:21 260:9

**matters** 313:5

**maturity** 314:22 315:6,7

**Mckenzie** 3:14 9:9

**meaning** 231:3 274:18 276:12 290:13 296:4

**meanings** 41:14

**means** 33:23 41:11 118:17 284:16,22 329:19 366:3

**meant** 186:8 301:24

**measurement** 240:18

**mechanic** 155:13,16

**media** 8:9

**meet** 194:3 323:3 378:25

**meeting** 68:5 70:2 168:21,23 169:15 189:7 192:9 206:12 231:20 283:9,10 290:20 300:23 323:11

**meetings** 184:8 323:20

**members** 89:2 166:23 191:21 192:3 233:16 237:7,9 323:16

**memorialized** 75:9

**memory** 95:23 133:2,5 224:11,16 314:20 319:17 331:17

**mental** 260:15

**mentioned** 131:17,20 273:10 281:2 282:12,15 289:15 351:12 368:24

**met** 268:3

**methodology** 274:18

**Michael** 4:5 9:24

**Michelle** 3:13 9:9 151:7

**micromanage** 337:6

**micromanaging** 89:3

**mid** 341:5 366:9,10

**middle** 119:19 121:8,9 152:21

**milestones** 66:3,9,12,22 69:2 76:3 79:2,9 84:4

**million** 92:22 119:23 121:3,6 124:17 131:13 132:2,8 138:12 140:14 141:9,18 142:19 143:12 144:6,17,23 161:25 178:19 216:17 217:16,19 220:13,20,24 221:7 223:7,17 224:2 238:9 239:10,12,24 268:22,23

270:20 271:6,7,15,16 272:7,8,16 273:6 277:11,12,16,20 278:6,7 282:14,15 283:18 287:15 288:6,20 302:22 303:6,18,24 304:11,20 305:23 306:2 307:7 308:16,20,21,22 309:25 310:17,23 311:2 315:13 317:6,10 318:14 334:7,19 336:13,23 337:25 339:4 340:10 341:23 343:19 344:5 345:11 350:7 351:22 389:13,14

**million-plus** 289:22

**millions** 260:19

**mind** 19:20 59:23 60:4 160:6 161:17 198:18 305:17,21 394:16

**mine** 268:15

**minimal** 86:4,5,17

**minute** 129:19 174:8 372:9

**minutes** 53:23 139:24 174:21 176:4 182:23 266:20 267:3 325:3,4 348:25 372:12

**misapplication** 163:15

**misremembering** 229:13

**missed** 339:12,14 340:7

**misspeak** 301:23

**misspoke** 301:21 336:16

**mistake** 61:17 139:9,13,16 159:9 161:4 162:11,19 165:9 181:10 306:23 314:2 316:22 317:15,22

**mistaken** 304:14

**mistakenly** 167:10

168:4 214:11

**mistakes** 384:19

**mode** 283:9

**model** 274:3

**moment** 117:4 198:10 222:5 224:3 276:5 307:22

**money** 39:11,16,24 41:2 43:24 49:11,17 50:10 62:9 124:14,20 126:6,23 127:3,15,25 128:5,10,23 129:2,5 145:16,18 186:10 276:13 282:8 283:5 285:18 318:10 319:11 320:4 359:9, 13,24 360:21 374:22

**moneys** 39:19 162:5 167:9 277:8 282:17 283:16,22 289:5 359:15

**month** 59:11 132:23 226:16 229:15 258:21 332:4

**month-and-a-half** 323:10

**monthly** 5:25 226:11,14 227:5,20, 25 228:12 229:10,19, 21 230:2,11,22 231:14 232:6,8,13, 19,20 255:18 256:14, 19 259:9,12,14

**months** 261:21 292:25

**morning** 7:3 10:19 342:16,18 344:12,14, 16

**Morris** 3:6 5:6,9 7:24 9:4 10:7,15,20 13:10, 17 16:9,24 17:11,14, 19,20 22:16,18 31:18,19,21,25 35:24 36:5,11 45:6,10 46:15,23 47:4,6,11 55:4 69:8,11 72:15, 18,25 74:3,9,13,18, 24 75:11,15,19 76:19,23 77:2,11,19, 22 81:16,18,21,23

82:10,13 91:8,18,22, 24 92:9,11,14 95:9 105:4,25 110:22 114:11 118:2 129:15, 21,24 130:14,18 135:5,10,13 136:9 137:24 139:20 140:11,23 142:14 146:17 150:21 151:19 154:3,13,16 155:19,22,25 156:18, 25 157:3,10,13,21 170:17,20,25 171:24 174:18 177:9,14,16, 19,23 178:10 195:6 196:20 197:6,21 201:11 202:3 207:15 208:20 209:13 214:4, 8,10,14,21 215:3,10, 21,24 216:4,13 217:5,8 218:11 219:25 221:23 222:16 224:18 226:22 228:18 236:15,20 243:15 246:13 247:21 248:5, 11,22 249:18 250:6 251:23 252:4,8,16,24 253:4 254:17 258:16 259:16 265:23 266:9, 17,24 267:14,20 268:14 269:7,12,18 270:15,22 271:8,18 272:9,17 273:7,10 277:22 278:19 279:8 280:15,23 282:12,18 283:19 284:7,14 285:7 286:9 287:9, 18,24 288:8,25 289:12 290:9,21 291:19,23 292:19 293:15,23 295:12 296:13 297:6 298:22 300:15 301:13 302:2, 11,15 303:2,10,20 304:3,7,12 306:15,24 307:13 308:5,8,13 309:10,12 310:2,11, 19,24 311:12 312:16 313:13 314:12,14 315:9,23 316:23 317:17,25 318:6,17, 23 319:23 320:6,18 322:5,23 326:24 327:6,24 329:10 330:21 331:5 333:10,

18 334:6,10,21 335:4 338:3 339:16 340:18 342:21 345:12,19 346:22 347:14,19 348:12 351:15 352:4, 8,16,18 353:11,15,19 354:4 355:5,9,15,21 356:3,14 357:6,15,22 358:16,22 359:4,11 360:3,11,25 363:16, 22 364:10,22 365:6, 21 366:15,25 367:16, 25 369:4,8,17 370:3, 8,25 371:10,25 372:22 373:4,20 374:11 375:3,24 376:20 377:6 387:7 388:19 389:5,15 390:9 391:4,14 392:7,13 393:24 394:11,19,23 395:5

**Morris'** 313:9

**MORS** 256:3

**motion** 374:14 376:7

**Mountain** 244:23 245:3,6 247:11 260:22

**mouthpiece** 206:2

**move** 69:11,12 114:11 208:19 246:13 247:21 248:22 250:6 252:23 307:17 364:22 376:25

**moved** 126:6

**moving** 248:5

**muffled** 48:19

**multi-month** 145:11

**multiple** 279:3 320:25 321:2 373:7,8

**Munsch** 3:22 9:20

**mute** 36:10 350:2

**myriad** 248:14 249:11

---

**N**
---

**N-A-V** 273:11

**naively** 263:23

**named** 44:3 376:23

**names** 229:11 300:8 309:19 311:25 312:4, 13 375:20

**Nancy** 4:2 9:14 65:9, 17 66:7 67:6,22 68:19,25 75:25 78:16 82:22

**Naomi** 321:7

**narrative** 111:17

**nature** 84:4 85:6 144:2 147:17,18 180:20 230:8 240:22 253:18 259:15 271:20 276:10 279:22 280:9 292:22 294:22 325:19 329:24 333:13 354:12 356:6,17 357:11 378:23

**NAV** 125:6,9 131:17, 24 132:3 145:8 273:11,14 274:23 275:8 277:5 278:15 280:12,22 281:13 289:6 318:15 373:10

**needed** 155:2 250:17 257:13 271:21 289:6 318:13 354:15 358:8 382:15,17

**needle** 118:4

**negative** 7:25 394:14

**negotiated** 390:8

**negotiation** 382:25

**negotiations** 58:19 383:2,6,12 384:14

**Nelms** 233:21

**Newman** 4:18 10:3

**Nexpoint** 3:17 6:4 9:21 27:10,12,15,18, 21,25 28:4,6,16 29:7, 10,12,16,24 31:3,11, 17 32:17 42:21 43:12 44:6 54:14 58:7,11, 14 60:5 65:6 100:23 126:9,13,16,23 127:3,10,11,15,18,24

161:23 162:5,7,11,18 163:23 164:6 165:11 167:7,8,13,15 168:2, 6 171:13 172:21 176:14 178:12,17,18, 22 179:13 182:3,12 184:21,23 186:9,21 189:15 196:3,23,24 216:20 217:14,23 218:3,19 219:15,22 220:18 221:6,10,13, 25 223:5,24 241:23 242:6 260:4 267:24 309:24 322:3 325:14, 18,21 326:16,23 327:4,10,17,20 328:6,7,8,25 329:3 330:11,18,19 331:2 332:14,17 333:8,15, 16 334:5,8,22 335:3, 9 336:13 337:13,23, 24 338:23 341:19 342:9 343:18 345:17 346:12,16,20 348:4 353:8,21 358:15 379:16 381:23 382:10 383:24 384:3 390:5 391:2,10,12,19 392:5

**Nexpoint's** 59:18 218:6,12 219:6 331:3 336:22 350:19

**Nguyen** 3:21 268:10 297:19 298:9 302:5 303:14 305:3 306:7 307:19 308:11,25 309:3,4 311:22 313:8 317:3 331:9 332:21 338:12,21 341:15 343:11 345:23

**night** 376:8

**nomenclature** 350:4

**non-american** 284:10

**non-orderly** 274:8

**nonlawyer** 375:13

**nonsense** 156:6

**Norris** 183:3,6 184:2, 7,9 192:15,23 193:5

**North** 3:15,23

**Northern** 8:13

**note** 13:11 45:14,21 48:15,22 49:6,12 50:15,22 51:7 56:7 57:4,19 59:18 60:5, 13 62:19 63:3 64:6, 15,23 78:17 107:20 117:9,12 120:18 122:4 126:12 134:6 140:14,17,20 141:22, 24 142:2,4,18,22 147:15 149:17 150:4 161:24 162:4,7,18 163:23 165:12 167:11,15 168:6 182:3,12 186:18,22 187:17 213:16 214:4 216:16,20 217:2,13, 23 220:5,8,13,18,20, 23 221:5 222:4,10 223:4,7 224:2,9,12 233:22 234:10 243:17 244:23 245:3, 7,13,16,23 260:22,25 261:9 306:11,18 309:16,24 310:9 312:2,14,15,24,25 313:15,16 315:13,14, 16 316:17,18 319:12, 14 324:16 334:6,13, 18,19,23 335:21 336:13,23 338:2,17 339:4 340:10,14 341:19,23 342:9 343:4 344:25 345:18 347:7 362:13,14

**noted** 185:5 186:17

**notes** 6:10 44:20 45:2 46:2 49:21 50:18 54:3,6 55:7,18, 25 56:10,15,23 58:2 65:7,14,18 66:7 67:3 68:14,17 76:2 82:15, 20 83:6,10,13 106:21 107:2,12 108:2,14,18 109:5,7,17 110:6,25 111:5,8,12,22,25 112:18,23 113:9,10, 13,18 114:19 115:3 118:12,13,25 119:3, 6,9,11,22 120:19 121:3,21 122:8,15 123:6 124:3,15 130:23 131:12,16

132:7,10,14,20 133:13,21 134:5,14, 17,23 138:11,20 139:5,10,17,21 142:10 143:6,7,14, 21,23 144:5,12,16,22 145:4,23 146:2,4,7, 11,14,25 147:10 148:15,18,24 149:2 150:5,8,15 158:5,13, 19,24 159:5,10,23 160:16,25 161:5,9, 10,19 162:11 171:13 175:16 178:14,15 179:14,21 180:2,10, 24 181:4,9,16,22 182:8,16 205:19 209:2 210:8 213:7,8 222:2,17 223:13,16, 19,23 224:9 233:8 234:15,23 235:4,9, 14,21 236:3,7 238:20,25 239:4,5, 11,18 240:10,20 241:6 242:7 243:6, 11,18 244:4,15 246:6,15,22 247:10, 24 248:25 250:9 251:8,15,21 252:12 253:10 261:12,16 262:6,11 263:6,15 264:19 268:21,24 282:14 284:19 285:15,17 288:21 289:10,16,18,22 290:8,13,16,24 291:5 293:13 296:9 297:4, 5,11,17,21 298:17 299:11,14,18 300:13 301:18 304:19,24 305:2,18,22 306:21, 23 307:12,24 310:17 312:11 313:20 314:13,23,25 315:2, 20,22 316:2,14 317:10,16,21 319:5, 9,15,18,22 322:20 323:20,25 333:17 338:7 364:13 366:22 367:23 368:6,17 369:15,19,20,25 370:9,11,17 372:11 386:9,10

**notice** 7:25 356:9 357:9 379:6 380:10, 15,16,17 381:4,7

**noticed** 16:12,20 248:6 375:25

**notices** 380:21

**November** 59:12 328:16 329:14,19 330:15 331:12 332:3 380:9,18 388:3,6 390:22

**NPA** 5:15 189:24 328:21,22 331:13

**NTA** 338:16

**number** 8:9,14 13:13 15:24 17:25 93:7,10 100:10 108:9 111:7 126:10 135:10 137:25 139:22 170:24 177:15,16 179:4 197:4,7 218:13 222:21 236:21 239:25 240:9 277:17 282:9 285:15,16 286:5 343:25 344:5 370:22 377:9 389:18, 21

**numbers** 240:5,6,23 268:13 278:10 343:5 366:12,19 367:6

---

**O**

**Oak** 4:7

**object** 29:20 45:7,8,9 47:4 60:24 65:19 66:10,15 67:9,24 69:6 73:24 77:13 78:19 79:20,25 97:4 107:16 115:5 119:12 144:25 146:12 147:4, 11 149:21 151:13 156:7,16 159:25 164:2 180:4,11,12 191:4,22 194:6,22 202:24 206:7 208:10, 11 211:4 212:12,20, 22,24 213:25 220:25 225:10 227:21 231:8 232:9 239:20,22 248:3 249:4 250:11 251:10 253:12 254:7 255:10 256:17 262:18 269:7,14,17 347:21 348:11,12

352:14 365:6 381:13 384:12 386:13

**objecting** 154:3

**objection** 8:4 17:9, 10 20:4,20 22:14 25:15 31:16 33:9 34:20 40:10 41:4,12, 24 42:11,12,19 43:17 44:17 45:4,16 46:10 47:20 48:3,16,25 49:13 50:5,7 52:8 53:18 54:8 55:10,20 56:11,25 58:25 59:19,25 60:7,15,16 61:12 62:11 63:13,24 64:17,19 65:12 66:24 67:17 69:5,9,10 75:6, 10 79:4,14 80:12 82:24 83:25 85:15 86:2 91:4 94:3 96:11, 20 99:17 107:4,15 108:5 110:11 111:24 112:20 113:20 114:20 115:6 117:6, 18 119:13 120:16,17 122:10,16 124:6,23 126:3 127:19 132:16 133:23 134:8 142:6 143:10,15 144:8 149:5 150:10,17 151:16 153:18,19,25 154:6 155:11 157:2 158:15 159:17 160:3, 12,18,19 167:5 168:8 178:20 180:3 181:5, 11 183:15 184:6,20 185:2,18,24 193:21 194:5 195:21,22 196:4,11,18 200:20 203:23 205:3,15,25 206:21 210:24 211:13 213:11 220:10,15 222:13 225:24 228:9 229:24 231:18 234:6 235:23 236:10 238:10 239:3, 14 240:16 242:24 246:19,25 247:14 250:22 251:12 254:6 255:12,22 257:6,20 260:14 263:8 265:4 266:19,23 267:21 270:15,22 271:8,18 272:9,17 273:7 277:22 278:19 279:8

280:15,23 283:19 284:7,14 285:7,23 286:7,9 287:9,18,24 288:8,25 289:12 290:9,21 291:19,23 292:19 293:15,23 296:13 297:6 298:22 299:15 300:15 302:2, 25 303:2,10,20 305:10 306:15,24 307:2,13 310:2,11, 19,24 311:12 312:16, 18 314:14 315:9,23 316:23 317:17,23 318:6,17,23 319:23 320:6,18 322:5,23 326:24 327:6,24 330:21 331:5 333:10, 18,20 334:10 335:4 336:14 338:3,5 339:16 340:18 341:2 342:21 345:12,19 346:22 347:14,19 348:9 351:15 353:11, 15,18,24 354:4 355:5,9,15,21 356:3, 14 357:6,15,22 358:16,22 359:4,11 360:3,11,25 363:16, 22 364:10 366:15,25 367:16,25 369:4,8,17 370:3,25 371:10,25 372:22 373:4,20 374:11 375:3 376:20 379:10 380:25 388:19 389:5,15 391:4,14 392:7,13 393:24 394:10,11,19

**objections** 209:9

**obligated** 161:18 262:13 304:23 334:8

**obligating** 144:22

**obligation** 234:22 242:20

**obligations** 160:9 178:15 179:12 180:2, 9,23 185:15 194:4 208:8 327:13,21 328:8 332:5,8 333:17 335:17 336:6,7,10 361:19 380:2 390:10, 12 391:7,8

**obligor** 264:18

**obnoxious** 364:23

**obstacles** 90:23

**obtain** 57:12

**obtained** 48:23 49:5 50:4,16 51:6 126:10 128:15 176:16

**obtaining** 62:10

**occur** 169:6 280:13 331:21

**occurred** 103:13 104:5 125:17 126:2 263:13 278:15 299:25 331:24 339:7 369:24 390:24

**October** 8:19 21:7 160:5,7,14,21 169:17,24 171:19 172:4 173:24 174:6 183:7,14 186:11,13 189:13 207:16 219:24 263:19 314:20 316:16

**odd** 303:12 307:6

**offense** 352:23

**offhand** 342:11

**office** 279:21 280:3,5 294:4,10 323:13,14 326:15 388:22 389:2

**officer** 14:12 23:6 26:25 27:6 28:24 29:2,7 32:14 35:10, 12,16 36:20,24 37:6, 18 38:3,5,10,16,22 39:3,24 51:22 52:6, 17 120:8 143:18 173:7,9,13,16,20,23 174:3 184:23,24 258:25 269:5,24 270:10,14 271:2 302:19 362:25

**officers** 15:22 29:24 39:11 40:5,8,12 51:23 52:13 93:21 153:9

**offset** 380:2,3 382:25 390:9,11,13

**offsets** 58:21 381:18, 19 383:13

**Okada** 49:18,21,24 50:2 118:3 232:18

**omitted** 309:19

**one-day** 331:14 332:9,17

**one-third** 239:18

**one-word** 174:9

**ongoing** 125:11 202:8,14 203:14

**open** 36:13 376:5

**open-end-to-close-end** 125:12

**open-ended** 125:7 275:4,8 276:10 281:9,11 282:7

**operating** 5:22,25 90:10 226:11,14 227:2,4,19 228:7 255:18 256:14,20 259:9,12,14 359:14

**operational** 143:25 147:17

**operational-type** 291:11

**operations** 202:8,15 203:14

**opinion** 120:6,7,10 204:8 205:9 247:17

**opinions** 204:15

**opportunity** 13:2

**oral** 65:8,16

**order** 13:3,7 105:11 128:16 129:6 288:21 360:9

**ordinary** 226:9 229:22 293:18

**organizational** 112:13

**orient** 365:24

**original** 223:25 232:11 274:24 277:14

**originally** 177:21 232:16

**originals** 297:4,11, 16

**Orleans** 4:14 9:17

**outboxes** 294:9

**output** 90:6

**outstanding** 118:12 119:22 142:10 171:11 174:15 175:12 185:10,23 186:8 202:6,18,23 203:7,8,13 220:18 222:3,12 223:4,14, 19,24 224:13,17 235:10,14 244:16

**overpaid** 58:16 381:16

**overpayment** 381:20 390:13

**overpayments** 58:22 379:22 380:3 389:4,12

**overruled** 17:15

**overseeing** 26:10 86:22 230:11

**oversight** 257:15

**overspeak** 115:16 252:3

**owe** 375:15

**owed** 125:8 160:10 161:8 178:18,23 185:6,16 186:9 199:12 204:12,25 205:13 212:18 275:13 297:17 308:20 310:17 358:21 380:3

**owing** 50:3 211:11 212:10 223:6 234:23 285:18

**owned** 15:6 16:7 17:24 42:8,16,24 43:3,13 273:17

**owner** 272:24 281:25 282:3

---

**P**

**p.m.** 150:24,25 151:3 174:6 224:23,24 225:2 266:5,6,8 325:7,8,10 349:6,7,9 372:14,15,17 395:10, 11

**Pachulski** 3:8 9:4 10:20 72:9 166:19

**package** 229:10,20, 22 230:2,12,23 232:6,8 233:3

**packages** 231:15 232:20

**pages** 214:11,17

**paid** 50:2 56:18 167:10 221:7 277:4, 8,20 283:23 327:22 330:19 331:4 333:16 336:9,11 355:19 356:23 365:4 394:9

**paper** 288:21 293:13, 20 296:12,16

**paragraph** 92:17 118:11 119:20 121:9 124:15 126:9 134:11 140:18 142:22 203:6 216:25 221:24 222:7, 9,10,14,16,18 223:9, 15

**paragraphs** 117:23 118:6

**part** 42:9,17 43:15 50:18 51:11,16,21 52:12,19,23 53:12 58:17 85:5 88:12,14, 22 90:21 91:14 93:22 103:22 105:9 116:13 117:20 125:12 142:9, 11 148:4 149:12 156:24 169:14,19 175:3 176:23 179:11 193:17 200:16 210:21 213:16 214:19 238:8 240:17 245:19 254:20 274:17 282:4 286:2 288:19 326:21 330:17 365:2 366:23

**367:24 386:9,10**

**participants** 8:17

**participate** 168:13 218:23 219:2 362:21 380:5

**participated** 87:25 137:20

**participating** 191:9 259:8

**participation** 86:23

**parties** 7:15 9:25 85:7,12 100:14,22 101:6,23 103:4 376:13

**partner** 9:9

**partners** 31:8,12,15, 18 32:4 370:16

**partnership** 121:11 122:6 131:12 132:7

**partnership's** 102:19 103:3 118:12

**party** 17:10 100:19 101:18 102:20 103:4 321:4 366:22 368:17 385:8

**pass** 352:3 393:15

**passing** 78:8

**past** 190:16 226:7 359:9 375:21

**patience** 387:9

**Patrick** 21:5

**pause** 295:10

**pay** 65:7 122:4 144:22 161:18 181:15 205:10,19 209:3 234:22 282:8, 16 302:23 318:14 327:13 332:6,13 344:19 355:18 356:2, 13 357:3,13 366:13 374:25 393:23

**payable** 171:12 174:15 190:6 202:18, 22 220:5 222:2,17 327:21 329:17 330:10,12,20 331:4

333:7 334:14

**payee** 140:21 142:25 216:22

**paying** 288:14,16 326:23 333:9 338:17 346:21 355:4,8 357:4

**payment** 56:5,21 57:4,6,12,18,25 58:6, 10,12 59:14,16,20,22 60:3,4,9,11 62:17,25 63:9,15 64:4,9,22 121:11,17,21 122:7, 19,23 162:13,16,17 163:4,6,10,14 164:24 182:16 199:6,11 212:18 331:20 332:24 334:9 335:9 336:12 337:3,25 338:24 339:12,14 340:2,7 342:9 343:4, 20 344:20,24 345:4, 11,17 346:13 348:5 350:7,9,20,23 351:6, 7,14,20,23 356:6,17 358:25 359:2,6,7,15 360:16,22,24 361:18 362:2,5,7,9,12,15,18, 21 363:3,7,10,15,20 364:3,7,25 365:5,9, 14 366:21 379:15 381:23 382:2,9,14,15 383:19 390:6,8,21 391:10,13,20,24 392:6

**payments** 55:16,24 56:8,14 57:2,9 64:14 162:10,24 163:16,21 165:10 167:14 217:15 282:22 288:11,12 328:4 329:16 330:3,4,6,8 334:23 335:3,19,21, 22 336:23 337:9,15, 21 355:19 356:8 357:2,10,13 358:7,21 359:9,10,20,25 360:6,10,15 361:7,23 362:4 365:14,16 377:12,17,22 378:8, 9,17,24 379:7 380:23 381:3,6,11,18 382:6 383:4,5,23 384:2,4,6, 7 387:24 388:14 390:20 391:3 392:12

393:23 394:7,18

**PDF** 293:22

**Pearl** 3:15

**pen** 296:22,25

**pending** 7:21 16:16

**people** 33:7,11 34:4 89:3 146:4 170:24 237:5 275:9,20,21 279:23 291:21 293:7 294:3 319:16 351:12 372:19

**percent** 18:2,4 86:15 108:23 109:19 110:8 260:12

**percentage** 110:19

**percentages** 86:16

**perfect** 90:17 118:5 130:19 189:4 197:19 268:19 298:8

**perfectly** 144:3 223:2 348:18

**performed** 48:5 246:11

**performing** 114:7 219:4

**period** 25:12 39:9,14 40:24 90:15 93:14 95:15 105:18 120:9 135:21 169:5 203:20 218:21 219:6,16 221:15 226:18 231:15 242:17 243:13 247:22 265:2 321:22 380:15,16

**periodic** 228:13 241:17 288:12 358:6

**periodically** 337:14

**persist** 157:9

**person** 26:2,4 43:7 44:21 57:7 79:9 86:21 87:6,7 114:2,4 116:14 155:16 167:20 191:18 259:22 291:21 292:22

**personal** 79:22 80:10 97:15 375:11

**personally** 62:20 64:3 85:23 89:11 95:4 97:9 101:22 237:4 255:20,24 275:15 296:21 303:23 304:18,22 306:12 317:21 370:11

**personnel** 237:16 318:12 333:22 359:18,21 360:13,23 363:3

**pertaining** 65:17

**petition** 21:9 70:11 84:11 235:10,14 241:20 263:20 310:15 386:5

**phone** 68:6 70:3 290:25 392:23 393:2, 5,8,9

**phonetic** 249:21

**phrase** 41:10 229:19

**physically** 191:16 294:4 296:12,16 299:17,21

**pick** 101:6

**picked** 101:10,12

**piece** 203:11

**pile** 139:23

**place** 58:24 59:6 112:16 122:18 166:2 260:7 272:13 278:16 297:14,16 326:4,10, 12 393:3

**plaintiff** 9:7

**plan** 335:24 337:20 366:5 367:6 386:9,18

**play** 85:23 153:11 168:16 184:2 340:9

**played** 86:3,6,17 335:2

**playing** 239:9

**pleading** 213:22

**pleased** 347:12,16, 17

**plural** 314:3

**point** 78:9 87:2,6,7 114:2,4 157:16 166:9 190:16 254:11 255:3, 7 261:6 313:7,20 321:13 326:6 337:12 344:9 375:23 376:11 380:22

**pointing** 254:23

**points** 282:9,10

**policy** 378:6,10 386:2

**poor** 207:22

**poorly** 104:10

**portfolio** 274:5

**portion** 13:2,6 16:5 17:22 19:13,16,19 112:23

**portions** 12:10

**position** 37:9 122:3 184:14 193:3,6,9 274:15 280:11 361:14

**positions** 38:24 172:25 173:5 183:6 184:10,18 192:16

**possession** 45:25 113:9 132:11

**possibilities** 29:19 371:23

**possibly** 213:7 314:12

**post** 92:12 184:13, 14,18 192:15,24 193:7,8 275:24

**pot** 366:5 367:6 386:9,18

**potential** 250:20 357:4 366:3,19 369:16 371:7,9

**potentially** 113:5 249:6 250:12,13,14, 16,21 354:8

**Poydras** 4:13

**practice** 7:8 64:13 89:20,24,25 90:4

91:11 97:7 98:7,12 106:14 146:9,24 150:13 230:25 231:2, 3,22,24 233:5 299:4, 5 337:4 356:13 369:2,7 371:6,15 374:15 377:21

**pre-petition** 226:18

**precisely** 205:21 298:16

**prefix** 268:15

**premarked** 91:19 104:23 197:15 216:5 236:16

**preparation** 137:21 230:11 259:9

**prepare** 123:17 204:23 226:9 229:6, 21 235:19 236:25 237:3,5,13 241:11 255:24 377:22 378:16

**prepared** 227:5,20, 24 228:15 229:2,4,9 230:3 232:20 237:8 239:17 241:25 242:3 255:20 284:19 317:14 319:5 373:2 376:18

**preparer** 256:4 259:4,5,23

**preparing** 137:10 164:9 232:5,7 241:12,15,16 254:9 264:10

**prerogative** 253:7

**present** 4:23 90:23 180:15 191:19 283:14

**presentations** 368:7,16,18

**presented** 86:10 113:14 117:10 161:11 296:11,16

**presents** 12:20

**president** 14:16 271:23 272:24

**presume** 207:13

**pretty** 105:15 364:23

**prevented** 231:6

**previously** 18:9 24:4 80:13 225:22 246:8 373:19 374:18,25

**Pricewaterhouseco opers** 84:9,13,16,20 106:7 113:23 132:5 137:2 141:24 142:3 149:3 150:9,12,16 211:10 212:9 242:21 263:3 274:10

**primarily** 267:18,20

**principal** 35:10,11, 15 36:20,24 37:5,18 38:3,4,9,13,16,21 39:3 49:11 50:3,23 55:17,25 56:22 57:18,25 59:14,17 60:12 62:18 63:2,9 64:5,14,22 119:7,10, 22 142:4 144:5 161:8,19 162:6 163:11,22 164:24 165:11 167:10 168:5 217:16,19 220:23 222:11 223:6,18,25 334:9

**principals** 274:6

**principles** 241:14

**prior** 20:14 26:12 37:10,18 54:21 56:18 57:13 62:4,10 63:23 74:14 84:10 87:17 99:16,24 121:13 131:5 138:17 144:24 163:15 164:25 165:9 189:13 193:23 199:6 206:15 212:19 217:20 227:15 243:23,24 267:12 300:13,20 301:17 331:12 333:4 334:23 335:3,7 336:11,20 337:11 339:10 346:9 370:18 381:3,7 386:4,19,22

**private** 273:19,21

**privilege** 151:14

**privileged** 66:18 74:2

**probe** 82:7

**problem** 8:3 214:14 260:18

**procedure** 271:17 291:12

**procedures** 7:20 114:8 207:21 378:5

**Proceed** 267:22

**proceeding** 197:18

**process** 52:23 55:23 56:4,5 58:18 90:21, 25 91:14 116:13 131:24 137:9,11 145:10,11 148:25 156:21,24 168:14,17, 25 169:6,9,15,17,19 170:5,9,14 176:23 179:11,20 189:2 200:16 210:21 218:6, 7,23 237:10 245:19 272:14,19 274:21 292:6 324:13 366:11 373:12

**processes** 207:21

**processing** 286:13

**produce** 178:12 195:8 210:14 235:24

**produced** 132:10 183:11 228:12,13 266:20 267:7,15,19

**producing** 241:20

**professional** 21:12, 15,20,22 22:15 356:21

**proficiency** 22:11

**project** 292:25

**projections** 335:18 337:17

**promise** 346:6

**promissory** 6:10 45:14,21 46:2 48:15, 22 49:6,12,20 50:15, 18,22 51:7 54:3 55:7 56:6,9 60:5,13 67:3 75:25 78:17 82:15,20

83:6,10,13 107:20 108:2 109:5 119:22 131:12 132:6,10,14 133:13 138:10 139:5, 10,17,21 140:14 142:9,17 144:5,12, 16,22 146:7 158:5, 13,19,24 159:5,10,23 160:16 161:10 178:14 179:14 209:2 210:8 216:16 217:13, 23 233:8,22 234:10, 15 235:8,21 240:20 241:6 243:6 244:4 282:14 284:19 285:15,17 288:21 289:10,16,18,21 290:7,12 291:5 293:13 297:4,5,11, 17,21 299:11 300:13 306:10 307:12 310:16 315:20,22 317:16,21 319:5,9 322:20 338:2,17 339:4 340:10 344:25 369:20

**prompted** 81:7 342:2

**proof** 167:8,13

**proper** 100:11 229:18

**properties** 146:15 238:8

**property** 375:11

**proposal** 125:13 281:7 282:4,6 386:24

**proposals** 367:22

**proposed** 136:18 178:5

**proposing** 366:19

**prosecution** 208:23

**provide** 15:4 28:24 174:22 175:7 267:12 295:20 299:8 311:17 333:22 353:8,14 354:3 357:19 358:5, 9,12,13 378:22 387:3

**provided** 32:20 112:8,9,17 114:18 127:12 142:8 146:15

175:3 176:22 179:19 182:23 194:25 200:18 274:25 311:24 312:4,10 327:20 332:9 335:14 351:2 353:7 354:6,19 355:7,13 357:21,25 358:4,11,15 367:11

**providing** 88:11 219:21 278:17 279:6 280:14 309:21 326:14

**provision** 103:17 132:15

**provisions** 105:7

**prudent** 302:20 303:5

**public** 21:17

**publicly-traded** 281:16

**pull** 200:10 215:6 297:20 302:7 305:2 307:18 308:25 313:9 317:2 328:10 334:4 338:11,20 341:12

**purely** 240:22

**purporting** 228:7

**purpose** 16:23 17:2 36:6 53:17 112:2 126:7 232:5,7,11 294:15

**purposes** 16:11 33:22 85:8 92:21 93:4 101:18 128:13 129:3 197:12

**pursuant** 15:8 122:6 148:25 199:10,18 200:13 256:6 275:13 278:16 279:5 280:13 281:6 288:17 290:19, 24 326:13

**put** 12:23 36:9 61:24 71:11 81:10 89:25 91:18 104:22 105:2,5 122:2 124:18 135:5, 16 139:22 151:19 170:17 177:8,10,13 197:7 207:2,5,14 215:21 218:11,18

226:22 235:15 236:15 240:4 257:10 258:16 259:10,12 266:18 281:7 292:23 326:9 345:22 368:3, 16 377:10 389:8

**putting** 144:19 197:11 240:23 265:5 273:21 306:19 316:2 330:2

**Pwc** 84:14 92:25 93:5 94:2 96:17,25 97:10 102:4 103:2,21 104:3 114:6 142:8 200:19 211:2 262:14 263:24, 25

**Pwc's** 85:24 86:23 97:6 105:22

---

**Q**

**qualified** 194:11 206:19

**qualify** 101:18 136:14

**quantify** 276:22

**question** 11:22 12:3 13:4,8 17:17 22:17 26:13 35:4 38:8 40:15 45:11,22 46:19,20 48:19 51:4 68:20,21 93:12 96:4 99:19 104:11 114:14 132:4 139:14 144:15 146:18 148:13 150:7 154:4,17 155:24 156:9 157:20 158:8 164:22 171:10 174:13 175:19,23 176:18,20 178:18,24 179:3 185:9 188:18 192:21 194:18 195:11,14,24 209:6, 10 210:20 212:23 213:2 223:13 224:6 226:2 229:5 236:5 243:9 248:7,9 251:24,25 253:4 262:23 269:8,19 270:16,23 271:9,19 272:3,10,18 273:8 277:23,25 278:20

279:9 280:16,24
283:20 284:8,15
285:8 286:10 287:3,
10,19,25 288:3,9
289:2,13 290:10,22
291:24 292:20
293:16,24 296:14
297:7,9 298:23
300:16 302:3,18
303:3,11,21 304:4,7,
13,16,17 305:7
306:16,25 307:14
310:3,12,20,25
311:13,20 312:8,17
314:15,18 315:10,24
316:24 317:18 318:7,
18,24 319:24 320:7,
19 322:6,24 326:25
327:7,25 330:22
331:6 333:11,19
334:11 335:5 336:17,
18 338:4 339:17,21
340:19 341:3 342:22
345:13,20 346:7,23
347:20 351:16
353:12,16 354:5
355:6,10,16,22
356:4,15 357:7,16,23
358:17,23 359:5,12
360:4,12 361:2
363:17,23 364:11
365:7 366:16 367:2,
17 368:2 369:5,9,18
370:4 371:2,11
372:2,23 373:5,21
374:12 375:4 376:21
388:20 389:6,16
391:5 393:25 394:20

**questioned** 274:17

**questions** 11:20
17:2,4 26:15 40:19,
21,23 47:9 77:13
79:13 81:17 82:6,12
99:7,10 105:7,13
156:2 157:12 169:21,
24 171:7 177:2
180:16,17 184:4
209:5 266:10 300:6
352:5,10 377:8
384:16 385:3 386:6
387:8,15 393:18
394:25 395:7

**quick** 393:18

**quicker** 324:14

**quickly** 139:21

**Quinn** 4:19 10:4

**quo** 248:18

**quote** 118:11 189:6

---

**R**

**ran** 88:2

**range** 287:22 289:22

**rarely** 320:13

**ratification** 319:21

**reached** 66:4,9 69:3
76:3 79:2,9 342:11
343:8

**reaching** 350:12

**reacted** 347:23

**reaction** 389:24

**read** 101:21,25
102:12 172:8 198:10
208:21 209:6,7
301:20,22 316:4

**reading** 120:11
138:7

**Real** 31:11,17

**realtime** 265:16

**reason** 81:13 85:2
96:6 101:11 109:4
114:23 116:25
117:16 127:2 141:21
150:3 159:14 160:15,
23 161:3 205:21
235:3,5 238:5 247:9,
24 248:25 256:11,13
286:2 301:4 318:16,
21 346:18 361:4,10
364:6

**reasonable** 108:17
333:15 337:23

**reasons** 161:13

**recalculate** 275:8

**recall** 15:3 18:13,18,
20,22 19:17,20 20:8,
10,21,22 23:4,12,20
24:23 25:16 27:16

29:13,17 30:17,18
32:16 36:22,23 37:7,
12,22,23,25 38:19
39:8,20 40:2 49:19,
22,25 50:2,8,9 52:9,
21 53:8,15,16 57:22
59:2,3,11,20 60:18
61:25 62:6,17,23
63:6 65:2 67:19 68:2,
3,7,8,11 69:17,20,21,
25 70:5 71:6,21,22,
23 78:5 79:15 80:17,
18,21 89:14,19 90:13
91:5,6,9,13 95:2,9,
13,17,21 96:13 99:5,
6,8,9,12 100:20
102:6 112:21,22
113:15 114:3,15,21
115:8,14,17,18
116:15,18,19,23
119:15 122:17 123:5
124:7,10,12 126:5,9,
16,20,25 127:2,5,8,
21 131:25 132:13,17,
19 134:10,18 135:3
136:4,5 138:21,25
139:7,19 141:6,8,11
144:12 145:3,4,16,
20,22 148:16,17,20,
22 150:11 155:4
158:16,21 159:2,7,12
160:7,13 165:4,5,13,
17,20,24 166:13,16,
18,20,21,25 167:6
168:24 169:16
171:18,21 173:7,8,21
178:5 179:6,24
180:6,14,18,19,20
183:16,20 188:19
189:3,21 190:22,24
191:6,10,12,19,24
192:10,19 194:16
196:19 200:9,11
201:23 202:2 209:17,
20,23 210:3,9,18,25
211:19 212:3,14
217:18,20 219:5,9
220:21 223:10
225:13,18,20 228:25
233:10,20,25 234:8,
9,12,14,20,24 235:6,
12,18 236:11 237:22,
25 241:9 242:5,10
243:10 244:22
245:14,18 246:20,21
247:2,6 248:15,19

249:13 250:24
251:13,18,20 252:13
255:5,15,17 259:8
262:4 265:21,22
268:24 269:3 270:11
276:4,6,23 277:2,3,7
280:11,17,25 282:14,
24 283:8,11,13,15
284:6,11,20,22
289:6,21 290:2,3
291:3,6 292:9 293:17
296:18 298:24
299:16,18,21,22,24
300:17,24 301:3,12,
15,18,25 303:15,22
313:12 314:24,25
315:25 316:8 318:9
319:10,11,13,25
320:10 321:13,16,18
322:17,25 323:22,23
324:3 331:19 334:4,
18,21 339:9,18
340:8,12,15,16,23
341:4,5,8,11 342:2,
19 343:14 345:21,25
350:10,12 351:17,24
361:3,14,17,20,21
362:3 364:5,7 365:9
369:7,22 370:10
380:8,14,16,21
383:10,21 384:2
387:6 388:7 389:10
390:7,18 392:20
394:2

**receipt** 380:20

**receivable** 118:12,
14 238:21,25 239:11,
18 240:10 243:18
245:24 246:6,15,22
247:10 249:2 250:9
251:8,16

**receive** 11:6 22:10
141:17 303:23
304:18 305:23
332:11

**received** 42:9,17
43:15 85:12 123:21
125:14 141:17 142:3
212:16 293:20,21
304:10 305:25 383:7

**receives** 179:16

**recent** 367:9

**recess** 36:16 73:6
150:25 224:24 266:6
325:8 349:7 372:15

**reckoning** 310:22

**recognize** 217:10
320:13

**recollection** 24:25
29:14 39:22 40:6
67:21 71:5 105:12
115:12 124:19
126:22 127:23
128:10,22,25 131:16
166:15 173:22 180:7
183:19 187:24
192:20 221:5 223:23
225:6 227:10 228:14
229:7 246:3 251:6
252:19 253:9 269:4
270:8 275:22 282:21
283:7 290:5,18
309:18 344:11
367:14 369:15

**record** 7:10 10:17
36:3,15,18 73:5,8
150:24 151:3 209:7
224:23 225:2 266:5,
8,18 267:9 301:22
302:6 320:15 325:7,
10 349:3,6,9 372:14,
17 392:25 395:9

**recorded** 8:10 225:7,
15,22

**recording** 7:16
100:11

**records** 50:19 225:8,
15 227:13 235:17
237:15 240:12,14
257:21 258:5 286:23
300:2,4 306:5 312:22
393:10

**recover** 167:9 168:3
181:22 182:3

**redacting** 312:23
313:6

**redeem** 281:12

**redeemed** 276:13

**redeeming** 281:20

**refer** 13:13 18:6 21:9
22:24 27:12 30:4

31:14 32:7,17,24
33:19 44:2,10 54:10,
24 68:24 79:17 84:13
95:11 175:2 186:24
203:6 279:24 329:3

**reference** 92:17
103:12 200:12 202:6
222:3,10 223:9
238:20,24 260:21

**referenced** 132:14
186:25

**referred** 84:4 91:15
123:24 143:7 169:21
186:7,20 223:15
279:20 366:5

**referring** 33:16
50:17 75:24 76:6
118:8 163:5 187:11
199:25 223:11
226:15 281:5 314:2
316:3

**refers** 170:4

**reflected** 13:14 75:5
175:16 181:15 235:4
240:9

**refresh** 24:24 105:12
131:15 192:20 221:4
223:22 227:10
367:13

**refuse** 74:9,10 209:2

**regard** 133:5

**regret** 81:10

**regularly** 355:18

**reimburse** 145:15

**reimbursement**
279:17 325:19,23
379:20 388:16

**relate** 130:6

**related** 59:23 60:4
90:25 100:13,19,22
101:6,18,23 102:19,
20 103:3,4 105:7
131:17 138:5,10
145:9 167:14 208:25
280:22 281:3 284:2
366:22 368:17
376:13

**relates** 76:14 113:6,
18 130:11 211:24

**relating** 131:2
138:19

**relation** 27:21 30:10,
13 35:6 41:18 58:21
112:3 125:9 163:21
172:25 176:17
184:11,18 191:16
264:13 385:18

**relationship** 374:3

**relationships**
100:13 102:20,21
103:4

**relative** 192:16

**relayed** 188:8 206:4
342:12

**relaying** 206:3
207:24 344:18

**release** 329:6 330:8

**relevant** 88:13
208:15

**reliable** 113:2

**relied** 305:13

**rely** 85:14,18 96:3
237:12 331:2 337:23

**relying** 85:20

**remained** 202:18,23
203:8

**remaining** 119:10
223:25

**remember** 59:8 70:9
71:2,3 80:22,23,24
87:23 95:19 102:9
122:25 123:2,19
124:16,24 127:6,14
128:6,7 129:11
131:19 147:15
162:22,24 163:4
165:6 166:3,7 172:17
174:4 187:13,19,21
188:15 189:18 194:7,
15,24 195:4 200:6,15
234:4 236:12 250:3
253:13,14,23 254:15,
17 274:12 277:16
282:17 284:12,17,23
286:3,22 291:21

293:12 296:9 299:12
300:10,12 302:16
309:11 313:22 316:3
317:5 319:4,7 320:2,
5 323:7 324:4,8
326:6 333:25 339:8
340:21 342:14
344:15,18 345:25
346:3,4 351:11
357:17 361:18 364:9,
12,14 365:10,25
377:14 387:25
389:17,18 390:22,23
392:4,22

**remembering**
289:17

**remind** 72:19 77:17
391:23

**reminded** 132:18

**reminder** 337:3

**reminders** 378:22

**remote** 7:16 371:24

**remotely** 7:11,14
8:18 12:20 299:6,9

**rendered** 204:5
233:23

**renege** 373:18

**renew** 196:25

**renewal** 168:10,14,
16,25 169:6 170:5,9

**reorganized** 3:4 9:5

**rep** 95:11 136:17

**repaid** 57:4

**repay** 203:19 204:11,
15,25 205:12 211:11
212:10 304:23

**repeat** 17:19 38:7
45:11 46:21 48:20
146:21,22 249:25
269:21 270:24
336:17,18 339:21

**report** 5:25 14:13,21
19:12 26:21 88:2,6,
16 89:12 98:18 105:8
106:4,8,16 110:25
111:21 112:7,12,25
115:20 116:5,17,21

117:2 119:19 131:5,
11 133:12 134:7
135:6 137:5,7,10,12,
25 138:3,4,9,13,19
166:8,11 178:13
219:13,15 226:19
227:4 228:7 229:2,4
232:12 256:15 257:4
258:20,24 259:5,23

**reported** 19:7,10,17,
21,25 20:23 21:2
119:17 120:23
226:10 240:15
258:14

**reporter** 7:12 8:24
10:10 209:6 268:8,18
301:20

**reporting** 7:6 8:22,
25 20:9,13,17,23
21:4 87:22 91:2
114:17 230:12
231:14 232:6,19

**reports** 89:22 113:18
115:2 143:8 171:5
196:22 226:14,16
229:6 255:18 256:20
257:19 259:9,13,14

**represent** 9:25 10:4,
22 133:4 267:23

**representation** 5:17
91:16 94:21 95:5,16
96:9,18,22 97:2,8,13,
19,25 98:9 99:2
103:7,17,23 104:8
106:11,15 130:8,9
135:25 136:6,14
214:23 215:9 262:16,
22,25 295:17

**representations**
92:21 98:19,24
136:16,23,24 262:24

**representing** 9:11,
14,17,21

**represents** 310:10

**reproducing** 171:6

**request** 87:4 103:25
172:8 196:25 291:15
379:7

**requested** 196:21
362:18 363:7

**requests** 85:18
373:3 387:18

**require** 63:16

**required** 56:9 94:5
96:17 97:19,20,21,25
98:3 127:18,20 340:2
390:5

**requires** 96:25

**reserve** 245:2,6
260:24 261:4,8

**reserved** 244:22
245:13,16

**reserving** 46:17

**reside** 257:21

**resolution** 383:16

**resolved** 374:18
383:3,6,15

**resolving** 366:4

**respect** 27:18 34:13,
18,23 35:2 37:4 39:7
56:15 112:17 134:17
182:7 212:5 261:8,16
273:12 333:8 335:9
339:12 340:6 365:22
383:18 385:17
393:21

**respond** 174:25

**responded** 174:8
182:22

**responding** 210:11

**responds** 176:3

**response** 8:5 83:24
174:8,13 176:4
178:6,18 182:20,24
185:5 189:6 190:8
194:17,18 195:9,13
205:6 210:20 267:22
350:11

**responses** 81:4
184:3

**responsibilities**
25:18,23 28:10 31:2,
4 38:21 219:20

**responsibility** 26:6,
10 88:5,9 115:23
116:2,3 258:11

287:16

**responsible** 56:13, 17 86:22 89:8,9 115:19,22 116:4 146:6 230:10 258:4,7 384:19,23 385:8,13

**responsive** 175:23 176:17,25 185:8

**rest** 214:23

**restate** 75:17

**restrictions** 8:19

**restroom** 324:22,25

**result** 276:8 347:6

**results** 5:22 226:11 227:2,5,19 228:7

**retail** 32:21,24 33:2, 4,8,12,14,15,18,22, 23 34:5,8,13,18,23 35:2,6,12,14 36:21 37:17 38:2,5,10,17, 22 39:4,7 160:8 168:10,18 169:20 170:12 171:19 172:25 173:5,10,13, 16,20,23 174:13 175:15,23 176:18,22 178:7,13,17,23 179:3,8,12,15,19,25 180:8,22 181:2,8,14, 19,21 182:2,6,11,15 184:4,11 185:14 189:14,19 190:4,14, 18,20 191:2 192:16, 24 193:3,4,6,11,15, 18 194:11,17 204:18, 23 205:6,22,23 206:13 209:16,19,21, 24 210:5,11,20,22 385:12

**retain** 149:8,9

**retract** 39:17

**return** 49:7 51:7 123:22 306:18

**reveal** 66:17,18

**revenue** 16:6 17:22

**review** 11:5,6 13:2 89:11 160:11 175:9 184:5 288:11 295:3,

15

**reviewed** 231:13 232:13 233:3 294:21 295:5,18 322:11 334:14,20

**reviewing** 198:12 233:2 237:22,25

**right-hand** 198:6

**rights** 340:6

**ring** 277:13

**rise** 287:22

**role** 14:14 31:5 85:23 86:4,5,17 168:16 184:2,8 335:2,7 340:9 370:13

**roll-up** 126:17

**rolled** 126:11

**Rome** 170:24

**room** 7:9,13 9:10 105:3,5

**rope** 88:24

**roughly** 120:14

**Rukavina** 3:20 5:7, 10 9:19 42:19 44:17 45:3,8,16 46:10 47:20 48:3,16,25 49:13 55:20 107:4 126:3 133:23 142:6 143:15 163:25 195:7 212:24 213:24 266:11,14,15,22 267:6,17 268:8,19 269:16 297:19 298:6, 8 301:23 302:5 303:13 304:5,9,15 305:2 306:6 307:16 308:7,10,24 309:5,14 311:21 313:8 317:2 325:2 329:12 331:8 332:21 338:11,20 339:21 341:12,15 343:11 345:22 349:4 352:3,13 377:10 380:25 387:12,20 393:15

**rule** 7:19 267:8 356:11

**rules** 7:19,20 11:17

**run** 46:24 188:6 329:17

**running** 45:4 254:19 256:25

─────

**S**

**satisfied** 89:21

**satisfy** 89:12 122:8, 14 124:3 208:7

**Sauter** 162:20,21 163:20 164:7,8,24 166:20,24 167:4 168:4

**scenario** 264:4

**scenarios** 276:20

**schedule** 6:13 117:10 222:23 244:3 309:2 311:10,17 337:2 377:12

**scheduled** 336:9,11 356:8

**schedules** 129:10 308:25 311:15 317:11

**scheduling** 355:13

**school** 22:5

**scope** 136:18

**Scott** 7:4 8:21 14:20

**scratch** 298:14

**screen** 12:24 91:19 104:22 135:6 140:6 151:20 170:18 197:7, 12 215:22 216:14 226:23 230:7 237:17 308:9 377:11

**scroll** 106:18 117:22 130:14 136:9 140:23 152:16 170:25 171:24 174:7,18 176:2 182:21 201:11 202:3 217:3,5,8 238:17 297:25 331:10 332:22 341:16 343:12

**SEC** 274:13,16,19 275:18 384:19,22 385:7

**secret** 338:8

**secretary** 172:20

**section** 41:8 101:5, 19,22,25 110:24 111:17,20 112:7 113:12,17 115:2 116:5,17,21,25 117:17 130:3,15 131:3 134:7,22 138:4 170:10 175:14 192:6 215:16 220:5 294:20

**sections** 143:9 192:7

**seek** 12:9 199:6

**seeking** 332:16

**Seery** 71:23 72:2 166:9 233:20 234:11, 17,21 235:2,8,20,25 236:6 322:15 323:4, 16,19,24 324:8,16 340:12 346:10 348:2 350:8,13 368:8,10,14 375:7 379:25 392:18

**sell** 118:23 282:2

**send** 13:20 342:3 377:11

**sends** 174:5

**senior** 232:13,15 275:20 318:12

**sense** 57:5 88:19

**sentence** 98:14,15, 20 118:20 120:13 121:7,10,18 130:7 133:17 138:19,23 139:6,11 187:9 189:6 199:5 203:18 211:24 212:5

**sentences** 314:6

**separate** 54:24

**September** 169:7

**series** 11:20 328:14

**serve** 19:3 24:15,21 29:2 32:14 33:7,12 34:4 35:11,15 37:17 38:25 39:2

**served** 11:7 18:10 19:13 32:25 39:9,14 40:9,24 46:6 47:16 49:16 51:9,14,19 84:9 90:15 94:22 95:6 137:2 155:6 172:19 227:6 229:23 248:24 255:6

**serves** 133:2

**service** 185:10

**services** 15:5 28:25 30:2 32:21 33:25 42:22 59:23 128:21 129:9 171:15 185:6, 23 186:8,10 219:22 278:17,23 279:7,12, 21,24 280:3,5,6,13 325:20,23 326:2,15, 19,22 327:19 330:17 335:15 336:20 351:4 353:6,9,13,21 354:2, 7,8,18,23,25 355:2,7, 12 357:20 358:2,4,6, 11,14 379:19 380:11 388:15 390:20,21

**serving** 247:23

**set** 89:24 92:25 93:5 112:6 256:21 315:6,7 378:16,21

**settlement** 348:8 386:24 387:4

**seven-month** 265:2

**severity** 7:7

**shades** 36:13

**share** 209:18 262:14

**shared** 59:23 185:6, 10,22 186:7,10 209:16 278:23 279:24 325:19,23 326:2 351:4 353:21 379:19 380:11 388:15 390:20,21

**shareholders** 125:13 278:5 281:8, 12,18 282:5 293:4

**shares** 276:15 281:20,22 282:2

**Sharp** 249:21

**sheet** 106:19 107:25 108:11 109:6 110:4,5 111:11 112:4 120:23 175:2,14 179:17 220:2 222:21 228:22 229:3,8,16 230:5 243:7 251:14 253:22 294:12,24 370:22 372:6

**sheets** 107:14,22 175:8

**short** 266:2 279:16 332:7

**short-terms** 331:22

**shortfalls** 335:22,24

**show** 126:20 189:25 226:20 257:2

**showed** 119:2 370:8

**shown** 322:8

**shows** 293:9

**sign** 50:14 91:15 94:20 95:16,22 96:8, 18 97:2 106:14 135:24 136:6,22,25 139:4 141:4,21 143:14,23 144:11 150:4 153:24 154:5, 10,18,22 155:3 158:4,13,18 159:4, 15,23 160:16,25 181:3 213:16 289:9, 11,16 293:25 306:17 320:14

**signature** 92:3,7 105:22 106:9 130:7 136:20 140:25 141:2, 7 143:4,21 144:20 152:20,21 217:9,11 256:3,15 262:21 294:5,12 298:14 299:2,19 305:6 320:22 321:3

**signatures** 298:3,10 299:8,20

**signed** 46:2 55:7,12 92:5 94:25 95:2,4,11 96:22 98:10,23,25 99:4,7,10,16,25 103:18 106:7,16 107:2 123:4 132:13

137:6 139:10,16 141:10,15 143:24 144:4,13,15,21 148:15 153:14 158:23 159:9 161:5, 20 180:24 181:16,23 182:8,16 201:12,14 213:7,9 256:2,4,8,12 257:5,15 258:24 262:15,20 289:23 293:25 296:20,21 298:4,21 299:13 301:16 305:16,20 306:10,22 315:2 316:14 319:19 320:16

**signer** 103:7 363:2

**signers** 152:11 159:20

**significant** 228:21 229:3,7 230:4

**signing** 141:6 152:23 156:23 296:9 299:17, 22,23 319:21

**similar** 135:25 218:7, 9 272:3,19 311:9 325:17 331:11 338:14 353:8 357:20 370:5,6,17

**simple** 156:8

**simply** 188:23 361:5

**single** 62:13,24 89:15 93:9 95:9 129:11

**singular** 314:3

**sir** 13:23 21:13 22:17 43:9 68:17 69:14 80:11 115:12 130:17 140:3 141:2 144:4 146:18 151:23 154:18 156:8,20 158:2 167:23 209:12 218:18 266:15 278:8 301:25 302:12 304:4 307:22 317:14 328:18 331:15 332:20,25 333:6 334:17 336:19 341:20 351:25

**sit** 102:13 114:24

116:24 138:22 141:12 159:13 231:20

**sitting** 149:24 270:7 284:22 310:8 314:19 320:3 348:16 351:10 382:23 392:3

**size** 271:21 309:25

**skip** 55:13

**Skyview** 14:5,7,9,17, 24 15:4,14,19 16:6, 14 24:4 28:20,22 377:2

**Skyview's** 16:6 17:22

**smaller** 288:12

**smart-ass** 306:9

**social** 7:8

**sold** 276:15

**solely** 132:3 208:25

**someplace** 278:13

**sort** 142:13 208:15, 16

**sorts** 288:11

**source** 80:18 257:17

**speak** 62:13 63:25 72:20 73:9,14 74:15, 19 94:24 103:6 151:4 233:12 284:10

**speaking** 95:8 179:24

**specialist** 8:21

**specialized** 94:16

**specific** 25:22 40:19, 23 97:7 120:19 124:8 198:15 199:3 224:16 235:12,18 253:15 323:8

**specifically** 29:13 40:21 57:22 59:2,11 68:10 70:9 71:21 85:17 87:10 117:24 121:19 124:16 126:5 128:6 131:25 141:6, 11 145:5 146:3 162:23 180:6 187:19

192:10 194:8,25 196:20 233:11 234:2, 5,13 247:6 248:20 249:13 250:24 251:18 252:13 253:13 255:5,16 277:2 292:9 296:9 297:5 298:25 299:16 313:22 314:24 321:16,19 334:2 339:8 340:22 357:17 389:19 391:9

**specificity** 163:18 239:9 390:19

**specifics** 345:15

**speculate** 20:5 188:21 301:5

**speculation** 142:7

**speed** 247:4 249:10, 22 313:5

**spilled** 169:17

**spoke** 62:14 74:5 151:7 188:9 249:20 350:16,17,18

**spreadsheets** 368:19

**spring** 125:17 201:21 280:10

**stable** 90:5

**stack** 197:4

**staff** 116:9

**stamp** 296:23

**stand** 328:24

**stand-behind-you** 88:25

**standard** 231:22 233:4 335:13 372:3

**standards** 256:21,24

**Stang** 3:8 9:5 10:20 72:10 166:19

**stapled** 197:22 214:12

**stare** 298:11

**start** 8:9 41:9 170:21 214:18 248:14

268:21 304:16

**started** 21:3 36:7 125:19 207:15 231:10 304:15

**state** 8:4 10:16 47:2 161:16

**state's** 7:20

**stated** 8:3 24:5 179:15 206:9 246:8 249:8 290:12 294:16

**statement** 114:18 118:24 120:19 121:5, 10 133:7,13 134:4 179:17 190:14 194:18 204:3 205:18 224:10 228:20 262:5

**statements** 5:19 6:3 41:7 48:2 84:17,23 85:3,13,19 88:11 90:3,7 93:25 95:14 100:12 102:8,11,12 104:22 105:18 112:2 113:7,14 122:12 130:23 133:22 134:2 135:20 142:12 176:24 179:23 180:15 201:8 211:7, 22 217:25 218:4,20, 24 219:6 221:15 222:24 235:17 241:24 242:3,15,17 254:10 260:3 261:20 264:11,13 286:19 301:11 306:5 370:9, 12,17 378:24

**states** 8:12 98:16 118:11 119:20 200:23 201:3,6

**status** 248:18

**stay** 248:19 363:9 387:10,16

**step** 347:3,4

**steps** 88:16

**stick** 20:7

**sticking** 203:5 277:13

**Stinson** 4:6 9:13,25

**stipulate** 7:15

**stipulation** 8:6

**Stock** 281:16

**stonewall** 157:18

**stood** 328:22

**Stoops** 276:2

**stop** 76:19,20,21,23 77:11,22 81:21,22 106:2 155:19,22 157:14 215:6 220:2

**stopped** 231:16 294:3 381:3,6

**stopping** 390:19

**strategy** 164:12

**Street** 3:15,23 4:13 8:23

**stressful** 292:24

**strike** 114:12 246:13 247:21 248:5,22 250:6 252:23 272:13 291:2 307:16 310:7 343:24 346:16 364:22 372:8 393:4

**string** 5:21 172:3 183:22

**structure** 87:22 112:13

**stuff** 156:6 157:5 252:11 295:6

**subevent** 130:24

**subject** 55:8 65:8 82:16,21 83:6,10,14 109:24,25 124:14 139:5,11 168:10 277:5

**subpoena** 11:6 16:18 81:13

**subpoenaed** 352:21

**subscribe** 281:12

**subscribed** 276:14 395:16

**subscribing** 281:19

**subsequent** 130:3, 10,21 131:2 133:8 134:19,22 138:5,9

143:9 242:22 262:14 263:4 274:12 370:24

**subsequently** 244:22

**substance** 72:22 73:15,19 74:6 151:5, 8 185:7 209:22

**substantively** 12:15

**substitute** 16:15

**succeeded** 31:22 32:11

**successor** 32:8,15

**sued** 182:2 375:6,14

**suffered** 276:7

**sufficient** 122:3

**suggest** 277:12

**suggesting** 338:9

**suggests** 253:2

**suing** 373:16,24 374:5

**SULLIVAN** 4:19

**sum** 250:4 335:20

**summaries** 368:4

**summarize** 273:14 279:12 280:4 296:8

**summarized** 274:21

**summarizing** 188:13

**summary** 5:23 237:19,23 279:16

**Suntrust** 4:17 10:6

**Super** 395:5

**supplemental** 218:20

**supporting** 311:15

**supposed** 315:14

**Surgent** 171:4 275:23

**surprised** 352:9 356:11 376:22 394:17

**Susan** 7:12 8:24

**sustained** 17:14

**swear** 7:13 10:10

**swearing** 7:17

**Switching** 321:25 324:20

**sworn** 10:12 395:16

**sync** 296:6

**system** 330:9

---

**T**

**Tab** 328:11

**taker** 324:16

**taking** 81:12 110:14 120:12 176:7 208:16 226:17 239:23 240:23 323:19 348:24

**talk** 89:2 157:16 164:15,20 233:19 279:2 293:7 325:13 350:16 387:17 388:23 395:4

**talked** 100:3 113:4 130:8 151:11 162:14, 15 187:21,23 188:4,7 190:15 217:14 222:23 249:14 253:16 268:3 292:11 311:15 349:19 351:5 378:5 379:18 389:2 391:9 394:6

**talking** 40:5 59:13,16 75:14 76:20,23 77:12,22 89:15 101:23 157:14 162:16 208:24 222:6, 8 231:19 259:25 264:19 323:6 341:23 350:13 351:11,13 352:16,17 354:18 368:18 379:25 383:14

**talks** 58:19 100:11 350:6

**task** 291:14

**tax** 280:7 354:22,25 358:11

**taxing** 353:5

**team** 53:4 86:8,12 87:12,14,22 88:21,23 89:2,8 112:10,12 113:8,24 116:7 137:18,20 147:14,18, 19,24 148:2,4,5 149:7,11,14,15,24 150:19,20 188:4,6 200:17 219:3 237:7 255:25 257:8,12,17, 23,25 258:4,7,12 259:11 272:23 290:11,13,14,15 291:8,17 292:5 309:21 311:24 312:13 335:11 351:7 367:10 368:3

**teams** 116:10 337:6 354:10

**tech** 320:20

**technologically** 320:12

**telephone** 191:15 290:19 342:23 344:12,14 392:22

**telling** 71:23 79:10 125:4 166:18 181:8, 14 182:14 207:24 246:21 251:4 253:9 285:5 287:8 317:5

**tendered** 45:2 55:18 57:19 58:3 60:13 63:3 64:6,15,23

**tenure** 39:20 40:2 86:3 94:4 102:11 114:5 230:14,18 368:25 369:11

**term** 28:19 33:13 41:17 44:16 45:14 51:17 53:13 54:2 58:14 69:8 71:20 75:23 79:8 99:16 170:8 173:2 186:21 315:14,15 333:14 362:14 364:3 369:16 383:19

**terminate** 380:11

**terminated** 326:5

**termination** 326:7,8, 9 380:21

**terms** 33:21 65:23 66:2,6 69:22 75:8 76:2 78:25 79:23 80:11 83:16,20 319:8,12,14 336:7

**Terrestar** 145:9 273:12,18,19 274:7 384:20 385:9,14,18

**testified** 12:60 68:18 80:7 155:5 156:11 179:7 201:23 206:10, 18 211:14 253:2 256:24 259:10 261:10 269:23 270:2, 13 282:24 283:6 289:3 309:20 312:20 313:3 314:16 318:8 319:10 320:8 351:2 357:8 362:24 378:4, 20 379:3 380:12 388:17

**testifies** 318:3,11

**testify** 252:18

**testifying** 252:22 302:14 387:22

**testimony** 16:11,19 20:7,15 29:5 72:22 289:17 301:13 318:5 370:19 387:25 391:11

**Texas** 3:16,24 4:8 8:14

**Thanksgiving** 329:20,22

**Thedford** 171:4 172:3,11,24 173:5 174:20 176:3,16 178:6 182:23 186:20 192:5 198:19 210:10, 13 275:24

**Thedford's** 182:20

**theme** 324:21

**thing** 129:4 187:5 199:23 215:17 320:2 357:3

**things** 61:14 85:6
89:5 136:19 142:13
147:17 153:10
162:15 248:16
249:12 254:24
257:10 259:14
261:23,24 263:18
264:3,17 265:14
279:22 280:8,9
288:14,16,17 292:22
295:21 329:4,24
333:21 352:12
354:11 356:25
357:10 371:16
373:11 374:25
376:24

**thinking** 22:18
324:11,12

**Thomas** 171:4
275:23

**thought** 37:14 40:11
54:20 127:9 188:25
235:8 252:2 263:23
304:12 363:13,21

**thoughts** 348:22

**thousands** 224:14
286:11,16

**thread** 118:4

**threatening** 374:22,
24

**thumb** 356:11

**tickler** 337:8

**tie** 222:25

**ties** 111:18 243:20

**till** 200:24

**time** 12:23 17:15
19:7,13,16,19 20:2
24:16,18,20,21 25:3,
12 37:18 38:25
39:10,15,18,23 40:8,
25 42:2 43:22,23
45:9,24 46:6 47:15
49:16 50:10 51:9,14,
19,25 55:15 56:8
58:19 60:22 61:10,
21,25 62:3 64:4
72:17 73:2,3 75:21
76:7 77:8 81:12
84:19 85:4,9 86:19,

24 87:3,8,17 93:7
99:16,24 100:6 101:3
113:16 114:16
116:16,20 120:9
122:5 124:4 127:16
135:24 136:15,16
137:12,22 138:15,18
139:4,9,16 141:10
148:19,21 154:21
158:11,18,23 159:4,9
160:8,24 162:4
163:10 164:25
166:12 168:24 169:2,
4,5 186:4 191:7
192:13 204:4,14
205:20 206:12
207:20 212:13,21
221:5 225:17,19
227:6 229:12,23
230:14,15 231:7,15,
16,23 232:21 233:4,
13,14,15 238:4
240:3,25 241:19
244:5,16 246:5 247:8
248:3,23 250:7 253:5
254:18 255:6 259:14
261:25 264:15 265:6,
9,24,25 266:2,25
269:14 270:8 273:17,
19,25 274:11 278:14
283:25 294:15 299:3
303:8 313:20 321:19,
22 322:13 323:4
331:25 337:20 339:7
343:23 352:2 353:25
357:3,5,12 358:19
363:25 365:12 366:2,
18 369:13,23 370:11
371:13 386:4,17
388:12,25 389:9
395:3

**timeframe** 169:8

**timeline** 40:20

**timely** 86:11 330:19
331:4 333:16 356:13,
24 357:14

**times** 11:11,13 25:7
62:12 90:17,18,19
207:17 249:8 250:2
252:2 298:15 320:8,
25 321:2 324:8 368:5
374:4 392:8,14,15

**title** 14:9,11,12 23:6,8

25:13 27:17 28:7,11,
17 34:12,22,25 35:5,
8 37:3,9,16 39:6
51:25 111:10 173:8
174:2 183:13,17
192:23 227:3,11
269:6 270:9,11 305:8

**titled** 237:19

**titles** 27:20 30:9,12
34:15,17 37:15,21,
22,23,25

**today** 11:2 13:20
23:22,23 24:7,13
28:4 30:23 31:11
51:17 73:15 81:11
93:12 102:14 116:24
118:8 141:12 162:14,
16 173:10 203:20
267:12,19 268:4,9
270:7 273:20 284:22,
23 286:4 291:22
310:8 314:19 317:15
320:3 370:8,18 392:3

**told** 47:8 58:18 60:11
67:19,21 69:21 78:3
81:6 116:19 132:5
138:23 139:3 145:18
154:10 162:17
163:20 165:8 174:4
180:22 181:2,19,21
182:6 189:14,19
190:20,25 191:8
203:9 204:18 205:22
211:5 234:20 246:9
248:17 250:13,16,20
251:7 254:4 257:16
282:5,16 283:16
287:5 318:4 375:24
385:7 386:7,17
391:12 392:5,11

**tomorrow** 395:4

**tone** 394:5,12

**top** 92:10 111:4,8
198:5 219:19 313:10

**topic** 114:19 234:3,
15 251:21 253:15

**total** 109:13 110:8
119:21 238:7 239:12
240:9 260:12 335:20
389:11

**totaled** 143:11

**totaling** 223:17

**Totally** 269:16

**touching** 264:5

**track** 337:9 364:15

**trade** 281:23

**trades** 273:25 274:8

**trail** 288:22

**transactions** 85:6,8,
14 100:13 102:21
103:5 148:6 224:15
285:21 286:5,12,13,
17 289:25 295:24
373:9

**transfer** 141:20
287:5 288:6 332:16

**transferred** 141:9
285:4,10

**transfers** 283:24
285:21 327:16

**transmitted** 340:25

**transparency**
295:20

**transparent** 313:4
375:10

**treasurer** 23:9,10,
16,22,23 24:2,3,6,8,
10,13,15,21 25:2,8,
14,18,23 26:19,22
27:4,22,23,25 28:3,5,
8,12,18,20 29:5,9,12,
15 30:14,15,16,20,
22,24 31:2,3,5 39:2
135:23 138:14
152:24 153:3,16,22
155:7,10,14,21
156:4,12 158:3,9,12
176:14 202:12 204:2
269:6,12,13 270:3,5,
9 272:4 305:8 327:4
336:4

**treasury** 335:15
336:25 351:3 354:7,
11,22 358:4

**treatment** 242:12

**trick** 348:7

**trigger** 369:24

**triggered** 274:16

**true** 74:18 89:22
186:4 204:4 269:11
277:13 333:6 350:21

**trust** 4:10 9:18 65:11
244:23 245:3,7
247:11 373:23 374:5

**trusted** 257:7

**trustee** 4:16 10:5
65:10

**truth** 252:18,20

**truthfully** 252:22
253:3

**TSG** 7:6 8:22,25

**Tuesday** 8:19 172:4

**tunnel** 293:3

**turn** 100:8 105:25
110:22 149:12
259:16 261:13

**turning** 197:12,16

**turns** 317:20

**two-month** 323:11

**type** 88:25 94:21
130:23,25 227:9
253:25

**types** 148:6

**typical** 103:25
106:17 371:5

**typically** 144:11
168:22 169:10
192:12 230:16
289:16 296:22
329:16 355:24,25

**U**

**Uh-huh** 69:4 210:17
237:21 368:20

**ultimately** 125:6
178:17 274:22 387:6

**unable** 122:14
203:18 204:24 208:7
211:10 212:10

**unaware** 64:24

**uncollectible** 244:9, 17 245:25 246:7,17, 24 247:13,25 249:3 250:10,15 251:9,22 253:11 254:4 255:9, 15

**uncomfortable** 90:14,20,24 91:9

**unconsolidated** 110:2,18

**undergoing** 207:20 241:16

**underlying** 246:11 311:24 332:12

**understand** 10:21, 25 12:6,9 13:24 17:3 31:10 41:13 45:22 53:22 55:9 68:20 74:4 75:22 76:5 78:24 79:16 98:22 99:18 104:2 127:7 133:9 153:15 158:7 176:20 203:12 222:9 225:25 267:25 268:17 273:3 288:2, 13 296:19 297:9 300:21 312:6 313:24 315:12 316:12 338:9, 25 353:24 364:16 374:7 376:10

**understanding** 41:10,17 53:6 65:22, 25 66:5 84:25 85:11 96:25 97:11,16,18,24 100:18 103:20 104:3 111:15 118:16,19 146:25 152:4,6,7,9 153:14,21 156:3 170:3,8 173:4 175:19 184:17 195:15 242:19 256:19 259:22 270:19 277:25 311:9 326:3 372:19 373:23 374:4 375:17 379:24

**understood** 69:2 155:6 203:10 382:22

**undo** 374:17

**unfettered** 372:21

**unilateral** 382:20

**unilaterally** 270:20 271:4 272:5

**unique** 12:21

**United** 8:12

**unlike** 12:18 353:20

**unpaid** 119:10 161:8, 18

**untested** 207:22

**upcoming** 336:8,11 337:25 355:13

**updated** 154:22

**upset** 362:11 390:2

**urgent** 356:23

**URQUHART** 4:19

**USD** 331:14

**V**

**vacation** 321:23 329:23

**vague** 353:19

**valid** 159:18 161:12, 16

**validity** 7:16

**valuation** 274:9,18, 24 280:7,13 292:5 354:15,22 384:20 385:9,14,19

**values** 251:5 253:17 264:2 265:9 367:9 387:3

**varied** 230:15

**varies** 87:2,3 230:14

**vendor** 288:17 356:7

**verify** 97:22

**verifying** 215:2

**versions** 136:13 146:14

**versus** 292:12

**video** 7:16 8:10,17, 21 323:23 324:3

**videotape** 12:10

**view** 204:24 205:11 292:14 301:8

**voice** 268:6

**vote** 282:5

**voted** 125:13

**W**

**wait** 156:18 157:4,5, 22 249:17

**waiting** 196:24

**walk** 180:17

**walk-through** 168:19

**walked** 179:7 294:4

**walking** 189:22

**wanted** 89:8 104:3 129:4 271:15 342:9 343:3,7 345:10

**Warren** 4:11 9:16

**Waterhouse** 3:1 4:1 5:1,5 6:1 7:1 8:1,11 9:1,11 10:1,11,18,19 11:1 12:1,24 13:1,15 14:1 15:1 16:1,10 17:1,16 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1,19 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1,7,15 48:1 49:1 50:1 51:1,4 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,19 73:1,9 74:1 75:1,3,22 76:1 77:1 78:1,14 79:1 80:1,25 81:1 82:1,4,14 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1,25 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1

100:1 101:1 102:1 103:1 104:1 105:1,9 106:1,6 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1,2 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1,23 147:1 148:1 149:1 150:1 151:1,4 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1,5 165:1 166:1 167:1 168:1 169:1 170:1,21 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1,25 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1,17 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1,5 198:1, 3 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1,15 210:1 211:1 212:1 213:1 214:1 215:1 216:1,15 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1,3 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1,25 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1,12 249:1 250:1 251:1 252:1 253:1,8 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1,12

267:1,23 268:1,20 269:1,20 270:1 271:1,5 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1,12 294:1 295:1 296:1 297:1, 22,24 298:1,7,19 299:1,11 300:1 301:1 302:1,10,19 303:1 304:1 305:1,5,9 306:1,8 307:1 308:1 309:1,8 310:1 311:1 312:1,9 313:1 314:1 315:1,18 316:1 317:1,4 318:1 319:1 320:1 321:1 322:1 323:1 324:1,15 325:1,11 326:1 327:1 328:1,15 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1,22 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1,15 350:1,5 351:1 352:1,23 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1,24 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,18 373:1 374:1 375:1 376:1 377:1,9 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1,21 388:1 389:1 390:1 391:1 392:1 393:1 394:1,24 395:1,2,14

**Waterhouse's** 140:24

**ways** 257:11

**wearing** 336:3

**Webex** 191:14

**Wednesday** 329:19

**week** 267:11 329:17, 25 330:3,5 375:21 388:6

**weekend** 329:20

**weekly** 330:4

**weeks** 302:21 303:7 307:8 378:18

**wet** 299:8

**whatsoever** 251:6

**whichever** 365:14

**wholly** 233:17

**window** 323:11

**Winograd** 3:7

**wire** 330:8 350:19

**withdraw** 35:4 134:9

**withdrawn** 19:11 34:16,21 38:14 57:23 59:15 62:16 63:7 65:4 93:18 98:13 119:7 133:20 141:25 148:8 157:3 160:5 163:18,19 180:24 181:19 191:11 195:16,18 201:19 203:25 220:11 232:6, 19 382:7 386:5

**witness'** 36:2 156:3

**word** 68:23 76:7 146:13 293:21 307:6 391:2

**worded** 104:10

**words** 79:5 342:16 346:10 348:7 363:8

**work** 113:8 204:22 219:23 233:18 291:8 299:5 346:25 372:19

**worked** 116:7,12 237:8 259:12 290:15 309:21 370:12

**working** 90:22 147:13 207:19 219:18 291:13 292:24 299:8 342:25 381:19

**works** 269:9

**worried** 241:22 246:12

**worry** 215:18

**wrapping** 293:3

**write** 187:6

**write-up** 278:12

**writes** 174:20 328:21 329:5

**writing** 67:13 75:5 79:11 273:12 316:17 341:18

**written** 15:9 83:17,20 186:3 195:9 323:20, 25

**wrong** 77:3,4 133:18 138:20,24 215:16 374:6

**wrote** 313:15,17 314:5,6,9

**Y**

**y'all** 139:23 395:4

**year** 18:14,16,20,22 19:23 20:6,12 23:13, 14,15 27:24 30:19 36:23 38:15 59:3,5 68:11 80:9 84:23 85:3 87:3 90:12 93:5, 9 94:10,22 95:6,10, 14 100:7 103:14 104:6 131:4 145:10 160:7 161:4,7,17 162:25 166:6 168:14 169:2,4,6 170:12 220:19 221:21 223:16,18 224:13,15 244:14 265:3 286:21 326:11 334:15 348:17 381:24 382:10 383:20

**year-end** 222:4 244:10,14 262:7 362:16

**year-ended** 263:24

**yearly** 170:15

**years** 18:23 62:13,22 86:18 87:17 89:16

91:10 115:10 123:23 231:11 257:10 285:22 286:4,17,25 289:25 320:9 333:24 334:23 335:7 373:7,8 379:23

**years-plus** 89:18

**yellow** 178:8

**yesterday** 8:2 66:13 140:10 322:11

**York** 3:10 4:21 8:23 281:16

**you-all** 329:2

**Z**

**zeros** 286:15

**Ziehl** 3:8 9:5 10:21 72:10

**zoom** 3:3 191:14 309:15 313:11 323:23 324:2,4,9

# EXHIBIT 12

Appx. 00317

Case 3:21-cv-00881-X   Document 39   Filed 01/31/22   Page 322 of 1780   PageID 4652
Case 21-03006-sgj Doc 91 Filed 10/29/21   Entered 10/29/21 21:54:01   Page 1 of 4
Docket #0091 Date Filed: 10/29/2021

Deborah Deitsch-Perez
Michael P. Aigen
**STINSON LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for Defendant Highland Capital
Management Services, Inc.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| SERVICES, INC., JAMES DONDERO, NANCY | § | |
| DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S MOTION
TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW, Highland Capital Management Services, Inc. ("HCMS"), one of the

Defendants in the above styled and numbered Adversary Proceeding initiated by Highland Capital

Management, L.P. as Plaintiff (the "Debtor"), and files this, its *Motion to Extend Expert Disclosure*

*and Discovery Deadlines* (the "Motion"). HCMS respectfully shows as follows:



## I.      RELIEF REQUESTED

1.      On October 29, 2021, NexPoint Advisors, L.P. ("NexPoint") filed its *Motion to Extend Expert Disclosure and Discovery Deadlines* with several exhibits attached (the "NexPoint Motion") in Case No. 19-34054-sgj11, Adversary Proceeding No. 21-03005-sgj, collectively attached hereto as "Exhibit A."[1]   HCRE and HCMS incorporate the context of the NexPoint Motion as if fully set forth herein.

2.      As described in the NexPoint Motion, in the NexPoint, HCMS and HCRE Notes cases there is a similar issue regarding whether the Debtor, Highland Capital Management, as the servicer for NexPoint, HCMS and HCRE, failed to make term loan payments at the end of 2020, enabling the Debtor to contend that the term loans were accelerated. As described in the Rukavina Declaration annexed to the NexPoint Motion, unexpected testimony just last week gave rise to the need to investigate whether expert testimony on the duties of a servicer like Highland Capital Management would be useful.

3.      As a result of the timing, it was not possible to retain an expert who could provide a report by the existing deadline, today.  HCRE and HCMS therefore seek an extension of time to potentially obtain an expert report from Mr. Steven Pully.   HCRE and HCMS would act expeditiously to minimize any impact on the schedule.

4.      For generally the same reasons set forth in the NexPoint Motion, HCMS requests this Court grant it the same relief requested by NexPoint.

---

[1] *Motion to Extend Expert Disclosure and Discovery Deadlines,* Case 21-03005-sgj [Doc 86]; *Declaration of Davor Rukavina*, Case 21-03005-sgj [Doc 86-1]; *Exhibit A*, Case 21-03005-sgj [Doc 86-2]; *Exhibit B*, Case 21-03005-sgj [Doc 86-3]; *Exhibit C*, Case 21-03005-sgj [Doc 86-4].

CORE/3522697.0002/170630628.2

**Appx. 00319**

## II.     PRAYER

WHEREFORE, PREMISES CONSIDERED, HCMS respectfully requests this Court enter an order (i) granting this Motion; (ii) modifying the Scheduling Order to extend the deadline to designate experts and serve expert reports through December 13, 2021; (iii) modifying the Scheduling Order accordingly for the potential designation of rebuttal experts and service of rebuttal expert reports, and extending expert discovery; and (iv) granting HCMS such other and further relief as may be proper.

RESPECTUFLLY SUBMITTED this 29th day of October, 2021.

**STINSON LLP**

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANT
HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.**

## CERTIFICATE OF CONFERENCE

Counsel for NexPoint requested counsel for the Debtor to agree to the extension and within minutes, the Debtor declined.  For that reason, counsel for HCRE and HCMS concluded further conferencing would be futile.

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3522697.0002/170630628.2

**Appx. 00320**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on October 29, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

/s/ *Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3522697.0002/170630628.2

**Appx. 00321**

# Exhibit A

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND
EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as the plaintiff (the "Debtor"), and files this its *Motion to Extend Expert Disclosure and Discovery Deadlines* (the "Motion"), respectfully stating as follows:

## I.   RELIEF REQUESTED

1.     By this Motion, NexPoint requests that the Court extend the deadline, in its *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* [docket no. 70] (the "Scheduling Order"), for the designation of experts and service of expert reports, through December 13, 2021, with a corresponding extension of expert discovery.  Specifically, NexPoint finds it appropriate and advisable to designate a testifying expert on the standards and duties of care under the parties' Shared Services Agreement (defined below) with respect to Highland's role in NexPoint's alleged failure to make a December 21, 2020 payment on the Note (defined below); specifically, that Highland was responsible for ensuring that NexPoint made this payment.  This request is necessitated by recent deposition testimony of key individuals on October 19 and 21, 2021, prior to which NexPoint did not know or reasonably believe that expert testimony on the duties of care would be advisable.

## II.   PROCEDURAL BACKGROUND

2.     The Debtor initiated this Adversary Proceeding with the filing of its original complaint against NexPoint on January 22, 2021.

3.     By this Adversary Proceeding, the Debtor seeks to collect on a promissory note issued by NexPoint to the Debtor on May 31, 2017 in the original principal amount of $30,746,812.33 (the "Note").  The Note is a 30-year note and provides for an annual payment of principal and interest.  After prior payments, the Debtor asserts that $23,071,195.03 remains due and owing on the Note.

4.     NexPoint has asserted various defenses and affirmative defenses to the Debtor's allegations and causes of action.  This Motion concerns one such affirmative defense only, to the effect that the Debtor, through its employees, caused the alleged underlying default.

5.      On July 28, 2021, the District Court entered an order adopting this Court's report and recommendation and ordering that the reference for this Adversary Proceeding will be withdrawn once this Court certifies this Adversary Proceeding as being trial ready.  As part of the same, the District Court necessarily agreed and ordered that NexPoint has a right to a trial by jury of this Adversary Proceeding.

### III.     FACTS

6.      This Motion is supported by the Declaration of Davor Rukavina, attached hereto as incorporated herein (the "Declaration").

7.      The Debtor alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment.  Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated, and the Debtor demanded full and immediate payment.

8.      One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "Shared Services Agreement") between the Debtor and NexPoint dated January 1, 2018.  The Agreement was in place as of December 31, 2020, although the Debtor terminated it later, in 2021.  Under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services.  NexPoint has alleged that, pursuant to the Shared Services Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds.  Indeed, Waterhouse (defined below) testified that it was "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note."  *See* Declaration at Exhibit C, 337:22-338:8.

9.     NexPoint asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place.  NexPoint has always asserted this as an affirmative defense.  *See* Docket No. 6. NexPoint's defense, however, was based on its belief that the Debtor and its employees, including Waterhouse, did nothing to facilitate or ensure the payment, as opposed to a conscious decision not to make the payment.

10.     On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as did NexPoint, in connection with this Adversary Proceeding.  Waterhouse was the Debtor's chief financial officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.  To be clear, Waterhouse was the Debtor's employee, although he provided services to NexPoint as well pursuant to the Shared Services Agreement. Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note.

11.     This changed the potential facts as NexPoint understood them to be from ones where the Debtor simply failed utterly to facilitate the payment, as it has always done, to one where the Debtor intentionally, allegedly upon the instructions of Dondero, decided not to facilitate the payment.  Assuming the Dondero instruction to be true, this raises the question of whether the Debtor thereafter had any affirmative duty with respect to the alleged instruction.

12.     NexPoint did not know that Waterhouse would provide this testimony.  NexPoint understood that Dondero instructed Waterhouse to make no further payments on the Shared Services Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars

on the Shared Services Agreement.  But NexPoint did not understand that Waterhouse would testify that Dondero instructed him also not to pay the Note.

13.     If Dondero told Waterhouse in early December, 2020 not to pay on the Note, then the question becomes whether Waterhouse or the Debtor thereafter "put their heads in the sand" in violation of any affirmative duty or obligation they may have had regarding the matter, such as: to ask Dondero whether they correctly understood him; to ask Dondero whether he meant NexPoint and the Note; to inform Dondero of the potential consequences of a default by potentially accelerating a 30-year promissory note; or to try to dissuade him from his decision.  After all, the Debtor was responsible to facilitate the payment, the Debtor had various duties under the Shared Services Agreement, and it was in the Debtor's interest that NexPoint would default, thus creating a conflict of interest.

14.     Accordingly, on October 19, 2021, when NexPoint deposed James Seery, NexPoint asked Mr. Seery about section 6.01 of the Shared Services Agreement, labeled "standard of care," which provides that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims."  Mr. Seery testified that he did not believe that this provision of the Shared Services Agreement obligated the Debtor or Waterhouse to do anything further after Dondero allegedly instructed Waterhouse not to pay on the Note.

15.     At that time, NexPoint determined that it was appropriate, and would assist the finder of fact, to retain an expert on the "standard of care" provided for in the Shared Services Agreement.  This is especially important because this will be a jury trial in the District Court. NexPoint did not believe that it would need to retain such an expert, and it had no reasonable grounds to suspect that it would need such an expert, prior to these depositions.

16.     NexPoint moved as promptly as it could thereafter.  NexPoint decided to retain an expert on October 22, 2021 and began searching for one on that day.  NexPoint located a potential expert, Steven J. Pully, on October 26, 2021, and after conflicts were cleared and terms agreed to, Mr. Pully agreed to serve as NexPoint's expert on October 28, 2021.  NexPoint files this motion just one day later, and less than two weeks after Waterhouse's deposition triggered the issue.

17.     It goes without saying that neither Pully nor any reasonable expert can possibly review the issues, formulate an opinion, and prepare a report one day after they are retained. Among other things, Pully needs to review all underlying documents and deposition transcripts, some of which have yet to be returned by the court reporters.  Accordingly, NexPoint believes that approximately six (6) weeks will be sufficient for Pully to prepare a report.  NexPoint submits that the Debtor should have a period of time to then designate a potential rebuttal expert, and a period of time for expert discovery.  Such a procedure would be fair for all involved and would constitute a minimal delay to what has already been a rapidly advanced case.

## IV.     ARGUMENT AND AUTHORITIES

18.     It is appropriate for an expert to consider the issue of Waterhouse's and the Debtor's duties under the Shared Services Agreement—*i.e.*, "duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims,"—as issues such as "prudent person" and "like capacity and familiar with like aims" are appropriate for expert analysis and will assist the finder of fact, especially a jury.

19.     Rule 16(b) provides that a deadline in a scheduling order may be modified "for good cause," although there is some uncertainty as to whether this standard applies only after a deadline has passed (which is not the case here).  *See* Fed. R. Civ. P. 16(b)(4); *Marathon Fin. Ins.*

*Inc. RRG v. Ford Motor Co.*, 591 F.3d 458, 470 (5th Cir. 2009) ("Federal Rule of Civil Procedure 16(b) governs amendment of pleadings after a scheduling order's deadline to amend has expired").

20.     When the issue concerns an "untimely submission of expert reports," the Fifth Circuit has specified the following for factors as guiding the decision: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S&W Enters. v. Southtrust Bank of Ala.*, 315 F.3d 533, 536 (5th Cir. 2003).  Again, this test applies to a deadline which has already expired.  Logically, therefore, a lesser standard should apply when a party seeks relief prior to the expiration of a deadline, as NexPoint does here.

21.     Applying these or any factors:

(i)     this Adversary Proceeding is only some nine (9) months old and the parties have moved very quickly, with all discovery almost over;

(ii)     if this Motion is granted, all discovery in this Adversary Proceeding will have been completed by the end of 2021, still less than one (1) year after filing;

(iii)     the reason for the need to extend the deadline is the most logical reason that most frequently appears—that discovery has necessitated some previously unexpected action—which is one of the purposes of discovery;

(iv)     NexPoint's failure to previously designate an expert was due solely to not having the benefit of Waterhouse's and Seery's recent deposition testimony, and is not the result of any delay or lack of diligence, as evidenced by the fact that NexPoint did already and timely designate two other experts on other issues (*i.e.* NexPoint did not sit on its responsibility to consider retaining experts);

(v)     the matter is important because the duties of care as specified in the Shared Services Agreement are terms of art necessitating an expert analysis, especially before a jury, and the matter goes to the heart of NexPoint's affirmative defense, and is necessitated by Waterhouse's testimony and not any prior action or inaction of NexPoint;

(vi)     there is no prejudice to the Debtor, which will have sufficient time to retain a rebuttal expert and take expert discovery (*i.e.* no witnesses or documents have been lost); and

(vii)   a continuance is easily available to avoid any prejudice to the Debtor—indeed, there is no need for a continuance even as the Adversary Proceeding has yet to be certified as trial ready and it is likely that the District Court will not schedule the Adversary Proceeding for trial for some time.

22.     NexPoint submits that this Motion cannot come as a surprise to the Debtor. NexPoint has asserted its affirmative defense since the beginning. The only difference now is that, instead of a wholesale disregard of any duty to facilitate the Note payment, the issue has evolved to whether the Debtor or Waterhouse had any affirmative duty to act after the alleged instruction from Dondero. As it can be presumed that Waterhouse previously informed the Debtor or its counsel of this alleged instruction (as he apparently informed other employees at the Debtor), the Debtor likely knew what Waterhouse's testimony would be well before NexPoint learned of that testimony. It is reasonable to conclude that the Debtor knew or should have known that the "standard of care" under the Shared Services Agreement would then become a material issue.

23.     Accordingly, "good cause" to amend the Scheduling Order exists, if that higher standard even applies, and approving such amendment will not prejudice the Debtor and will instead serve the interests of justice.

## V.   <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, NexPoint respectfully requests that the Court enter an order: (i) granting this Motion; (ii) modifying the Scheduling Order to extend the deadline to designate experts and serve expert reports through December 13, 2021; (iii) modifying the Scheduling Order accordingly for the potential designation of rebuttal experts and service of rebuttal expert reports, and extending expert discovery; and (iv) granting NexPoint such other and further relief as may be proper.

RESPECTFULLY SUBMITTED this 29th day of October, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email: drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that, on October 28, 2021, he conferred with counsel for the Debtor, John Morris, and the Debtor opposes the relief requested herein.

/s/ Davor Rukavina
Davor Rukavina

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on October 29, 2021, a true and correct copy of the foregoing document, including the exhibit thereto, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Bryan C. Assink on behalf of Defendant James Dondero
bryan.assink@bondsellis.com

Greta M. Brouphy on behalf of Defendant The Dugaboy Investment Trust
gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com

Leslie A. Collins on behalf of Defendant The Dugaboy Investment Trust
lcollins@hellerdraper.com

Deborah Rose Deitsch-Perez on behalf of Defendant James Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez on behalf of Defendant Nancy Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Douglas S. Draper on behalf of Defendant The Dugaboy Investment Trust
ddraper@hellerdraper.com,
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

/s/ Davor Rukavina
Davor Rukavina

MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 10
4871-8469-1713v.2 019717.00004

Appx. 00332

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF DAVOR RUKAVINA

STATE OF TEXAS

COUNTY OF DALLAS

    I, Davor Rukavina, hereby state and testify to the following as being true and correct and under penalty of perjury pursuant to the laws of the United States of America:

    1.    My name is Davor Rukavina. I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise competent to execute this Declaration.

    2.    I am an attorney duly licensed to practice law in the State of Texas. I am a shareholder at Munsch Hardt Kopf & Harr, P.C. I am the lead attorney for NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in this Adversary Proceeding.

    3.    At issue in this Adversary Proceeding is a 30-year promissory note executed by NexPoint in the original principal amount of $30,746,812.33 (the "Note"), although the Note had been paid down significantly by the time of the filing of this Adversary Proceeding.

4.      Highland Capital Management, L.P. (the "Debtor") alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment.  Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated and the Debtor demanded full and immediate payment.

5.      The parties agreed by written stipulation that they would disclose experts and produce expert reports on or before October 29, 2021, and the Court's scheduling order so requires. NexPoint requests an extension of this deadline.  The following is the reason why.

6.      One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "Agreement") between the Debtor and NexPoint dated January 1, 2018, a copy of which is attached hereto as Exhibit "A."  The Agreement was in place as of December 31, 2020, although the Debtor terminated it later in 2021. NexPoint alleges that, under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services. NexPoint has alleged that, pursuant to the Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds.  NexPoint therefore asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place.

7.      The foregoing has always been an affirmative defense of NexPoint in this Adversary Proceeding, including in its amended answer filed on September 1, 2021, a copy of which is attached hereto as Exhibit "B."

8.      On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as did I, in connection with this Adversary Proceeding.  Waterhouse was the Debtor's chief financial

---

DECLARATION OF DAVOR RUKAVINA—Page 2

officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.

9.      Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note. A copy of this deposition transcript is attached as Exhibit "C."

10.      This testimony was not expected by me or by NexPoint. I had understood that Dondero instructed Waterhouse to make no further payments on the Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars on the Agreement and because that was what Dondero and Waterhouse had been discussing. I had not understood that Waterhouse would testify that Dondero instructed him to also not pay the Note specifically.

11.      Prior to that deposition, I had never spoken to Waterhouse. Waterhouse presently serves as an officer of NexPoint; however, and unlike every other case I have been involved with, I have not been permitted to discuss with Waterhouse litigation matters. This is because Waterhouse is in litigation with the Debtor on other matters and has separate and independent counsel, Debra Dandeneau and Frances Smith, who would not permit me to speak directly to Waterhouse, which I understood to be a logical and appropriate instruction to protect their client. I did discuss with Ms. Dandeneau what Waterhouse may know about the litigation between the Debtor and my clients, but that primarily focused on defenses that another client of mine, Highland Capital Management Fund Advisors, L.P., has. And I did discuss with Ms. Dandeneau that Dondero told Waterhouse to not make payments, but I understood that to be limited to the Agreement and to not include the Note, since the topic under discussion (as it was told to me)

DECLARATION OF DAVOR RUKAVINA—Page 3

between Dondero and Waterhouse was the Agreement and overpayments on the Agreement, and not the Note.

12.     In sum, prior to October 19, 2021, I did not know that Waterhouse would testify that Dondero told him to not pay on the Note, and I had no reasonable reason to suspect the same. My surprise is evident from the transcript of that deposition, where I asked Waterhouse multiple times whether he was sure that Dondero told him this—so much so that opposing counsel objected multiple times as "asked and answered," and even objected as having been asked and answered "four time." Exhibit "C" at 390-392.

13.     Assuming that Waterhouse's testimony on this issue will be accepted by a trier of fact, the question is whether, from NexPoint's perspective, Waterhouse had no further duties to review, confirm, investigate, or to discuss the issue with Dondero.  In that respect, section 6.01 of the Agreement, labeled "standard of care," states that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

14.     I deposed Jim Seery on October 21, 2021, and asked him various questions about this provision of the Agreement.  Mr. Seery testified to the effect that he did not believe that the Agreement obligated the Debtor or Waterhouse to do anything further after Dondero told Waterhouse to not pay the Note (again, assuming that this was true).  I do not have a copy of Mr. Seer's deposition yet.

15.     With Mr. Seery testifying that he did not believe that the Agreement required the Debtor or Waterhouse to do anything further if Dondero in fact gave the instruction Waterhouse testified that he did, NexPoint concluded that it needed to retain an expert to review whether the "standard of care" specified in the Agreement compelled the Debtor or Waterhouse to do anything

DECLARATION OF DAVOR RUKAVINA—Page 4

further after Dondero gave the alleged instruction, such as checking with him to see if they understood him correctly, advising him of the potential serious consequences of a default, trying to dissuade him, or at least asking him once again prior to December 31, 2020 whether the payment should be made.

16.    On October 22, 2021, I began searching for a potential expert.  On October 26, 2021, I contacted Steven J. Pully about the potential engagement.  After clearing conflicts and coming to an agreement, Mr. Pully agreed to the engagement on October 28, 2021.  The engagement letter has yet to be finalized and executed, but I have every confidence that it will and the urgency of the matter necessitates this Declaration at this time.  I have been extremely diligent in searching for an finding an expert once NexPoint determined that the retention of an expert was appropriate, which did not occur until the Seery deposition on October 21, 2021.

17.    Even though NexPoint has retained Mr. Pully as of October 28, 2021, it is not possible for Mr. Pully to formulate an opinion and prepare a report by October 29, 2021.  Among other things, various deposition transcripts of important witnesses have yet to be received and reviewed by Mr. Pully, and Mr. Pully has yet to review the underlying documents.  Assuming no undue delays with respect to deposition transcripts, Mr. Pully should be able to prepare a report by December 13, 2021.

18.    NexPoint therefore seeks an extension of the expert designation and report deadline through December 13, 2021, in order that justice may be done and not for delay or any improper purpose, NexPoint not having designated an expert before due solely to the lack of knowledge that Waterhouse would testify as he did on October 19, 2021 and that Mr. Seery would testify as to his view that the Agreement did not require Waterhouse to do anything thereafter.

I hereby swear under oath and penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DECLARATION OF DAVOR RUKAVINA—Page 5

DAVOR RUKAVINA

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows.

## ARTICLE I

## DEFINITIONS

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:



**Exhibit A**

**Appx. 00339**

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

2

Appx. 00340

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02   Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01   General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)   *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

3

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

(b)      *Legal/Compliance/Risk Analysis*.  Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

(c)      *Tax*.  Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

(d)      *Management of Clients and Accounts*.  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

(e)      *Valuation*.  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(f)      *Execution and Documentation*.  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

(g)      *Marketing*.  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(h)      *Reporting*.  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

4

       (i)     *Administrative Services.*  The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

       (j)     *Shared Employees.*  To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

       (k)     *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing; and

       (l)     *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

     Section 2.03   Shared Employees.

       (a)     The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider. Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company. To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder. The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

<center>5</center>

Case 2:21-cv-00880-gjp Doc 39-12 Filed 01/31/22 Entered 01/31/22 13:50:43 Page 27 of 296

(b)     Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)     The Staff and Services Provider shall require that each Shared Employee:

(i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)     to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)     Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf of or in the name of the Management Company, acting as principal.

Section 2.04     Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05     Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the

7

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    Authority. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07    Third Parties.

(a)      The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)      In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

8

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).   Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01   Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02   Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03   Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01   Representations. Each of the Parties hereto represents and warrants that:

(a)      It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)      this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)      no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)      neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

9

Case 21-03003-sgj Doc 913-2 Filed 09/29/21   Entered 09/29/21 03:49:53   Page 20 of 296

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01   Compliance: Advisory Restrictions.

(a)      The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)      This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02   Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

10

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01   Standard of Care.   Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder. No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account. Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Appx. 00349

Section 6.02   Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03   Indemnification by the Management Company.   The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

12

Appx. 00350

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Appx. 00351

Case 3:21-cv-00881-X   Doc 39-32   Filed 01/29/21   Entered 01/29/21 03:49:03   Page 356 of 426

Section 6.05   <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 6.03</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   <u>Reliance</u>. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01   <u>Termination</u>. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01   <u>Amendments</u>. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   <u>Assignment and Delegation</u>.

(a)   Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)   Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)   The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

14

Appx. 00352

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03   Non-Recourse; Non-Petition.

(a)     The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)     Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)     Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)     The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)     The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Appx. 00353

Section 8.04   Governing Law.

(a)       This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)       The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05   WAIVER OF JURY TRIAL.   EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06   Severability.   The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07   No Waiver.   The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08   Counterparts.   This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Case 21-03003-sgj Doc 183-32 Filed 09/29/21   Entered 09/29/21 16:42:48   Page 359 of 406

Section 8.09   <u>Third Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   <u>Independent Contractor</u>.  Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12   <u>Written Disclosure Statement</u>.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13   <u>Headings</u>.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15   <u>Notices</u>.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

        (a)    If to the Management Company:

            NexPoint Advisors, L.P.
            200 Crescent Court
            Suite 700
            Dallas, TX 75201

Case 21-04008-mdg   Doc 184-32   Filed 09/29/21   Entered 09/29/21 02:59:03   Page 359 of 406

(b)     If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

18

Appx. 00356

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

**NEXPOINT ADVISORS, L.P.**

By:  NexPoint Advisors GP, LLC, its General Partner

By: _____

Name: Frank Waterhouse

Title: Treasurer

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:  Strand Advisors, Inc., its General Partner

By: _____

Name: Frank Waterhouse

Title: Treasurer

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Defendant NexPoint Advisors, L.P.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT NEXPOINT ADVISORS, L.P.'S
ANSWER TO AMENDED COMPLAINT**

Defendant NexPoint Advisors, L.P. ("NexPoint"), a defendant in the above-styled and

numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital

Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the

*Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent*

*Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "Amended Complaint"). Where

an allegation in the Amended Complaint is not expressly admitted in this Answer, it is denied.

Exhibit B

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Defendant NexPoint admits that NPA's First Amended Answer speaks for itself. To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.      Defendant NexPoint denies the allegations in paragraph 3 of the Amended Complaint.

4.      Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6.      Defendant NexPoint admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.      Defendant NexPoint admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

**Appx. 00359**

8.      Defendant NexPoint denies the allegations contained in paragraph 8 of the Amended Complaint.  Defendant NexPoint does not consent to any trial before, or final order entered by, the Bankruptcy Court.  Defendant NexPoint demands a trial by jury of all issues so triable.

9.      Defendant NexPoint admits the allegations in paragraph 9 of the Amended Complaint.

## THE PARTIES

10.      Defendant NexPoint admits the allegations in paragraph 10 of the Amended Complaint.

11.      Defendant NexPoint admits the allegations in paragraph 11 of the Amended Complaint.

12.      Defendant NexPoint admits the allegations in paragraph 12 of the Amended Complaint.

13.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15.      Defendant NexPoint admits the allegations in paragraph 15 of the Amended Complaint.

16.      Defendant NexPoint admits the allegations in paragraph 16 of the Amended Complaint.

17.     Defendant NexPoint admits the allegations in paragraph 17 of the Amended Complaint.

18.     Defendant NexPoint admits the allegations in paragraph 18 of the Amended Complaint.

19.     Defendant NexPoint admits the allegations in paragraph 19 of the Amended Complaint.

## STATEMENT OF FACTS

20.     Defendant NexPoint admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.     Defendant NexPoint admits the allegations in paragraph 21 of the Amended Complaint.

22.     Defendant NexPoint denies paragraph 22 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 22 is not verbatim.

23.     Defendant NexPoint admits the allegations in paragraph 23 of the Amended Complaint.

24.     Defendant NexPoint denies paragraph 24 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 24 is not verbatim.

25.     Defendant NexPoint admits the allegations in paragraph 25 of the Amended Complaint.

26.     Defendant NexPoint admits that it did not make a payment under the Note on December 31, 2020. Defendant NexPoint denies that any payment was due under the Note on December 31, 2020.  To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.     Defendant NexPoint admits that Exhibit 2 to the Amended Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 27 of the Amended Complaint is denied.

28.     Defendant NexPoint admits that it paid the Debtor $1,406,111.92 on January 14, 2021, but denies that any payment was due on December 31, 2020 or that this was an attempt to cure a default.  To the extent not expressly admitted, paragraph 28 of the Amended Complaint is denied.

29.     Defendant NexPoint admits that Exhibit 3 to the Amended Complaint (the "Second Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 29 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 29 of the Amended Complaint is denied.

30.     To the extent paragraph 30 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits paragraph 30 of the Amended Complaint.

31.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.     Defendant NexPoint denies the allegations in paragraph 32 of the Amended Complaint.

33.     Defendant NexPoint admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 33 of the Amended

Complaint. Defendant NexPoint denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34.     Defendant NexPoint admits the allegations in paragraph 34 of the Amended Complaint.

35.     Defendant NexPoint admits the allegations in paragraph 35 of the Amended Complaint.

36.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 36 contradicts the First Amended Answer, it is denied.

37.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 37 contradicts the First Amended Answer, it is denied.

38.     Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no answer is required.  To the extent of any factual allegation, Defendant NexPoint admits that Mr. Dondero controlled NPA and denies that he controlled the Debtor at the time of the Alleged Agreement.

39.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Amended Complaint and therefore denies the same.

40.     Defendant NexPoint denies the allegations in paragraph 40 of the Amended Complaint.

41.     Defendant NexPoint admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and

**Appx. 00363**

it is denied.  To the extent not expressly admitted, paragraph 41 of the Amended Complaint is denied.

42.     Paragraph 42 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

43.     Paragraph 43 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### FIRST CLAIM FOR RELIEF
### (against NexPoint)
### (for Breach of Contract)

44.     Paragraph 44 of the Amended Complaint is a sentence of incorporation that does not require a response.  All prior responses are incorporated herein by reference.

45.     Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

46.     Paragraph 46 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

47.     Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

48.     Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### <u>SECOND CLAIM FOR RELIEF</u>
### (against NexPoint)
### (Turnover by NexPoint Pursuant to 11 U.S.C. § 542(b))

49.     Paragraph 49 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

---

50.     Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

51.     Paragraph 51 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

52.     Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

53.     Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  Defendant NexPoint admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.

54.     Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

55.     Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### THIRD CLAIM FOR RELIEF
**(Against NexPoint)**
**(Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58.     Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

59.      Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

60.      Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

61.      Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

<u>**FOURTH CLAIM FOR RELIEF**</u>
**(Against NexPoint)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

62.      Paragraph 62 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

63.      Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

64.      Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

65.      Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

66.      Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

<u>**FIFTH CLAIM FOR RELIEF**</u>
**(Against Dugaboy Investment Trust and Nancy Dondero)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

67.      Paragraph 67 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

68.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

69.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

70.     Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

## SIXTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (Breach of Fiduciary Duty)

71.     Paragraph 71 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

72.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

73.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

74.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

## SEVENTH CLAIM FOR RELIEF
### (Against James Dondero and Nancy Dondero)
### (Aiding and Abetting a Breach of Fiduciary Duty)

75.     Paragraph 75 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

76.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

77.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

78.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

79.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

Defendant NexPoint denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## AFFIRMATIVE DEFENSES

80.     Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

81.     Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

82.     Furthermore, the Plaintiff has waived the right to accelerate the note and /or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

83.     Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant NexPoint believes there may be testimony or email correspondence that discusses the

existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

84.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because NexPoint acted in good faith, without knowledge of any alleged avoidability, and because reasonably equivalent value was provided for any alleged transfer or obligation.

85.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because no transferor or transferee, or obligor or obligee, was insolvent.

86.     To the extent of any avoidance, NexPoint asserts a lien under 11 U.S.C. § 548(c) to the extent that NexPoint gave value, and a similar preference lien under any applicable provision of the Texas Uniform Fraudulent Transfer Act.

## JURY DEMAND

87.     Defendant NexPoint demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

88.     Defendant NexPoint does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant NexPoint respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant NexPoint such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of September, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
      Davor Rukavina, Esq.
      Texas Bar No. 24030781
      Julian P. Vasek, Esq.
      Texas Bar No. 24070790
      3800 Ross Tower
      500 N. Akard Street
      Dallas, Texas  75201-6659
      Telephone: (214) 855-7500
      Facsimile: (214) 855-7584
      Email: drukavina@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

        /s/ Davor Rukavina
        Davor Rukavina

Page 1

```
 1              WATERHOUSE - 10-19-21

 2        IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
 3                 DALLAS DIVISION
      -----------------------------
 4    IN RE:

 5                                Chapter 11
      HIGHLAND CAPITAL
 6    MANAGEMENT, L.P.,          CASE NO.
                                 19-34054-SGI11
 7
              Debtor.
 8    -----------------------------
      HIGHLAND CAPITAL MANAGEMENT, L.P.,
 9
              Plaintiff,
10    vs.                          Adversary
                                   Proceeding No.
11    HIGHLAND CAPITAL MANAGEMENT    21-03000-SGI
      FUND ADVISORS, L.P.; NEXPOINT
12    ADVISORS, L.P.; HIGHLAND
      INCOME FUND; NEXPOINT
13    STRATEGIC OPPORTUNITIES FUND;
      NEXPOINT CAPITAL, INC.; and
14    CLO HOLDCO, LTD.,

15            Defendants.
      -----------------------------
16

17        REMOTE VIDEOTAPED DEPOSITION OF

18              FRANK WATERHOUSE

19             October 19, 2021

20

21

22

23

24    Reported by:  Susan S. Klinger, RMR-CRR, CSR

25    Job No: 201195
```

Exhibit C

Appx. 00371

```
 1                 WATERHOUSE - 10-19-21

 2

 3

 4                         October 19, 2021

 5                         9:30 a.m.

 6

 7

 8

 9        Remote Deposition of FRANK WATERHOUSE,

10   held before Susan S. Klinger, a Registered

11   Merit Reporter and Certified Realtime Reporter

12   of the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              WATERHOUSE - 10-19-21

 2  A P P E A R A N C E S:

 3  (All appearances via Zoom.)

 4  Attorneys for the Reorganized Highland Capital

 5  Management:

 6       John Morris, Esq.

 7       Hayley Winograd, Esq.

 8       PACHULSKI STANG ZIEHL & JONES

 9       780 Third Avenue

10       New York, New York  10017

11  Attorneys for the Witness:

12       Debra Dandeneau, Esq.

13       Michelle Hartmann, Esq.

14       BAKER McKENZIE

15       1900 North Pearl Street

16       Dallas, Texas  75201

17  Attorneys for NexPoint Advisors, LP and

18  Highland Capital Management Fund Advisors,

19  L.P.:

20       Davor Rukavina, Esq.

21       An Nguyen, Esq.

22       MUNSCH HARDT KOPF & HARDD

23       500 North Akard Street

24       Dallas, Texas  75201-6659

25
```

```
 1              WATERHOUSE - 10-19-21

 2   Attorneys for Jim Dondero, Nancy Dondero, HCRA,

 3   and HCMS:

 4        Deborah Deitsch-Perez, Esq.

 5        Michael Aigen, Esq.

 6        STINSON

 7        3102 Oak Lawn Avenue

 8        Dallas, Texas   75219

 9

10   Attorneys for Dugaboy Investment Trust:

11        Warren Horn, Esq.

12        HELLER, DRAPER & HORN

13        650 Poydras Street

14        New Orleans, Louisiana 70130

15

16   Attorneys for Marc Kirschner as the trustee for

17   the litigation SunTrust:

18        Deborah Newman, Esq.

19        QUINN EMANUEL URQUHART & SULLIVAN

20        51 Madison Avenue

21        New York, New York   10010

22

23   Also Present:

24        Ms. La Asia Canty

25
```

```
 1              WATERHOUSE - 10-19-21

 2                    I N D E X

 3

 4   WITNESS                           PAGE

 5   FRANK WATERHOUSE

 6   EXAMINATION BY MR. MORRIS              10

 7   EXAMINATION BY MR. RUKAVINA            256

 8   EXAMINATION BY MS. DEITSCH-PEREZ       352

 9   EXAMINATION BY MR. MORRIS              377

10   EXAMINATION BY MR. RUKAVINA            387

11   EXAMINATION BY MS. DEITSCH-PEREZ       393

12

13                E X H I B I T S

14   No.                              Page

15   Exhibit 2  NPA et al Amended Complaint    142

16   Exhibit 33 6/3/19 Management              91

17           Representation

18   Exhibit 34 HCMLP Consolidated Financial   94

19           Statements

20   Exhibit 35 HCMFA Incumbency Certificate   151

21   Exhibit 36 Email string re 15(c)          170

22   Exhibit 39 HCMLP Operating Results 2/18   226

23   Exhibit 40 Summary of Assets and          236

24           Liabilities

25   Exhibit 41 12/19 Monthly Operating Report 258
```

```
 1              WATERHOUSE - 10-19-21

 2   Exhibit 45 HCMFA Consolidated Financial    135

 3              Statements

 4   Exhibit 46 NexPoint 2019 Audited           218

 5              Financials

 6

 7   Exhibit A1 Emails 11/25                     328

 8   Exhibit A2 Emails 12/31                     338

 9   Exhibit A6 Emails 1/12                      341

10   Exhibit A7 Promissory Notes                 297

11   Exhibit A9 Email, 8/31                      307

12   Exhibit A10 Acknowledgment from HCMLP       302

13   Exhibit A11 HCMLP Schedule 71A              309

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                          Page 7
 1            WATERHOUSE - 10-19-21

 2          P R O C E E D I N G S

 3          VIDEOGRAPHER:  Good morning,

 4   Counselors.  My name is Scott Hatch.  I'm a

 5   certified legal videographer in association

 6   with TSG Reporting, Inc.

 7          Due to the severity of COVID-19 and

 8   following the practice of social

 9   distancing, I will not be in the same room

10   with the witness.  Instead, I will record

11   this videotaped deposition remotely.  The

12   reporter, Susan Klinger, also will not be

13   in the same room and will swear the witness

14   remotely.

15          Do all parties stipulate to the

16   validity of this video recording and remote

17   swearing, and that it will be admissible in

18   the courtroom as if it had been taken

19   following Rule 30 of the Federal Rules of

20   Civil Procedures and the state's rules

21   where this case is pending?

22          MR. HORN:  Yes.

23          MS. DANDENEAU:  Yes.

24          MR. MORRIS:  Yes.  John Morris.  I

25   would just try to do a negative notice
```

Page 8

```
 1            WATERHOUSE - 10-19-21
 2    here, as we did yesterday.  If anybody has
 3    a problem with what was just stated, can
 4    you state your objection now?
 5         Okay.  No response, so everybody
 6    accepts the stipulation and the instruction
 7    that was just given.
 8         VIDEOGRAPHER:  Thank you.  This is
 9    the start of media labeled Number 1 of the
10    video recorded deposition of Frank
11    Waterhouse In Re: Highland Capital
12    Management, L.P., in the United States
13    Bankruptcy Court for the Northern District
14    of Texas, Dallas Division, Case Number
15    21-03000-SGI.
16         This deposition is being held via
17    video conference with participants
18    appearing remotely due to COVID-19
19    restrictions on Tuesday, October 19th, 2021
20    at approximately 9:32 a.m.  My name is
21    Scott Hatch, legal video specialist with
22    TSG Reporting, Inc. headquartered at 228
23    East 45th Street, New York, New York.  The
24    court reporter is Susan Klinger in
25    association with TSG Reporting.
```

```
 1            WATERHOUSE - 10-19-21

 2        Counsel, please introduce

 3    yourselves.

 4        MR. MORRIS:  John Morris, Pachulski

 5    Stang Ziehl & Jones for the reorganized

 6    Highland Capital Management, L.P., the

 7    plaintiff in these actions.

 8        MS. DANDENEAU:  Deborah Dandeneau

 9    from Baker McKenzie.  My partner, Michelle

10    Hartmann, is also in the room with me,

11    representing Frank Waterhouse individually.

12        MS. DEITSCH-PEREZ:  Deborah

13    Deitsch-Perez from Stinson, LLP,

14    representing Jim Dondero, Nancy Dondero,

15    HCRA, and HCMS.

16        MR. HORN:  Warren Horn with Heller,

17    Draper & Horn in New Orleans representing

18    Dugaboy Investment Trust.

19        MR. RUKAVINA:  Davor Rukavina with

20    Munsch Hardt Kopf & Harr in Dallas

21    representing NexPoint Advisors, LP and

22    Highland Capital Management Fund Advisors,

23    L.P.

24        MR. AIGEN:  Michael Aigen from

25    Stinson, and I represent the same parties
```

```
 1                WATERHOUSE - 10-19-21

 2         as Deborah Deitsch-Perez.

 3              MS. NEWMAN:  This is Deborah Newman

 4         from Quinn Emanuel.  We represent the

 5         litigation -- Marc Kirschner as the trustee

 6         for the litigation SunTrust.

 7              MR. MORRIS:  I think that is

 8         everybody.

 9              VIDEOGRAPHER:  Thank you.  Will the

10         court reporter please swear in the witness.

11                  FRANK WATERHOUSE,

12    having been first duly sworn, testified as

13    follows:

14                   EXAMINATION

15    BY MR. MORRIS:

16         Q.   Please state your name for the

17    record.

18         A.   My name is Frank Waterhouse.

19         Q.   Good morning, Mr. Waterhouse.  I'm

20    John Morris, as you know, from Pachulski Stang

21    Ziehl & Jones.  You understand that my firm and

22    I represent Highland Capital Management, L.P.;

23    is that right?

24         A.   Yes.

25         Q.   Okay.  And do you understand that
```

 1              WATERHOUSE - 10-19-21
 2    we're here today for your deposition in your
 3    individual capacity?
 4         A.    Yes.
 5         Q.    Did you review and -- did you
 6    receive and review a subpoena that Highland
 7    Capital Management, L.P., served upon you?
 8         A.    Yes.
 9         Q.    You have been deposed before; right?
10         A.    Yes.
11         Q.    How many times have you been
12    deposed?
13         A.    About three or four times.
14         Q.    Okay.  And I defended you in one
15    deposition; isn't that right?
16         A.    That is correct.
17         Q.    So the general ground rules for this
18    deposition are largely the same as the
19    depositions you have given before.  And that is
20    I will ask you a series of questions, and it is
21    important that you allow me to finish my
22    question before you begin your answer; is that
23    fair?
24         A.    Yes.
25         Q.    And it is important that I allow you

Page 12

1                    WATERHOUSE - 10-19-21

2    to finish your answers before I begin a

3    question, but if I fail to do that, will you

4    let me know?

5          A.    I can certainly do that.

6          Q.    Okay.  Do you understand that this

7    deposition is being videotaped?

8          A.    Yes.

9          Q.    You understand that I may seek to

10   use portions of the videotape in a court of

11   law?

12         A.    I did not know that, until you just

13   said that.

14         Q.    Okay.  And you are aware of that now

15   before the deposition begins substantively; is

16   that right?

17         A.    Yes.

18         Q.    So unlike I think the other

19   depositions that you have given, this one is

20   being given remotely.  So that presents some

21   unique challenges, at least as compared to a

22   deposition that is taken in-person.

23              From time to time we're going to put

24   documents up on the screen, Mr. Waterhouse.

25   And it is important that I give you the

```
 1              WATERHOUSE - 10-19-21
 2   opportunity to review any portion of the
 3   document that you think you need in order to
 4   fully and completely answer the question.
 5              So I would ask you to let me know if
 6   there is a portion of a document that you need
 7   to see in order to fully and completely answer
 8   the question.  Can you do that for me?
 9   A.    Yes.
10              MS. DANDENEAU:  Mr. Morris, I would
11         just note that we do have hard copies of
12         the documents that you sent, so if you can
13         just refer to the exhibit number as
14         reflected in the documents that you sent,
15         Mr. Waterhouse will be able to look at the
16         hard copies of those documents.
17              MR. MORRIS:  I appreciate that,
18         and -- and I will encourage him to do so.
19         There will be other documents that we did
20         not send to you that we'll be using today
21         though.
22   Q.    Okay.  With that as background, if
23   there is anything that I ask you, sir, that you
24   don't understand, will you let me know?
25   A.    Yes.
```

```
                                                    Page 14
 1                 WATERHOUSE - 10-19-21

 2        Q.    Okay.  Are you currently employed?

 3        A.    Yes.

 4        Q.    By whom?

 5        A.    The Skyview Group.

 6        Q.    When did you become employed by the

 7   Skyview Group?

 8        A.    I believe March 1st of 2021.

 9        Q.    Do you have a title at Skyview?

10        A.    Yes.

11        Q.    What is your title?

12        A.    My title is chief financial officer.

13        Q.    Do you report to anybody in your

14   role as CFO?

15        A.    I don't, no.

16        Q.    No.  Is there a president or a CEO

17   of Skyview?

18        A.    Yes.

19        Q.    Who is that?

20        A.    That is Scott Ellington.

21        Q.    But you don't report to

22   Mr. Ellington; is that right?

23        A.    I don't think so.

24        Q.    Does Skyview Group --

25              MS. DANDENEAU:  Excuse me, we --
```

Page 15

```
 1                  WATERHOUSE - 10-19-21

 2         A.    I -- I -- I might.  I just -- I

 3    don't recall.

 4         Q.    Okay.  Does Skyview Group provide

 5    any services to any entity directly or

 6    indirectly owned or controlled by Jim Dondero?

 7         A.    Yes.

 8         Q.    Can you name -- is that pursuant to

 9    written contracts?

10         A.    Yes.

11         Q.    And do you know how many contracts

12    exist?

13         A.    Approximately six or so.

14         Q.    And is the Skyview Group made up of

15    individuals who were formerly employees of

16    Highland Capital Management, L.P.?

17         A.    No.

18         Q.    Do you know how many -- how many --

19    how many employees does Skyview have?

20         A.    Approximately 35.

21         Q.    And can you tell me how many of

22    those 35 are former officers, directors, or

23    employees of Highland Capital Management, L.P.?

24         A.    I don't know the exact number.

25         Q.    Is it more than 20?
```

Appx. 00385

```
 1                  WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    Is it more than 30?

 4        A.    I don't know.

 5        Q.    Can you tell me what portion of

 6   Skyview -- Skyview's revenue is derived from

 7   entities that are directly or indirectly owned

 8   or controlled by Jim Dondero?

 9              MS. DANDENEAU:  Mr. Morris, I mean,

10        you called Mr. Waterhouse here individually

11        for purposes of his testimony in connection

12        with the noticed litigation.  I have given

13        you some leeway to ask him some background

14        information about Skyview Group, but this

15        is not a substitute for a deposition in

16        connection with any other pending disputes

17        that exist.  And -- and we agreed to accept

18        the subpoena on the basis of he -- this is

19        testimony that he is giving in connection

20        with the noticed litigation.

21              I really think that you are now

22        going a little bit far afield from the

23        purpose of this deposition.

24              MR. MORRIS:  Okay.  It is -- I'm not

25        intending to use these -- the answers to
```

```
 1              WATERHOUSE - 10-19-21
 2       these questions for any purpose other than
 3       this litigation.  I think you understand
 4       fully why I'm asking the questions, and I
 5       just have a couple more, if you will bear
 6       with me.
 7              MS. DANDENEAU:  Okay.
 8              MS. DEITSCH-PEREZ:  Can we have an
 9       agreement that an objection by one is an
10       objection for any other party here?
11              MR. MORRIS:  Sure.  I would -- I
12       would encourage that, sure.
13              MS. DEITSCH-PEREZ:  Thank you.
14              MR. MORRIS:  It can't be sustained
15       or overruled more than one time, so...
16       Q.   Mr. Waterhouse, can you answer my
17   question, please.
18              MS. DANDENEAU:  Do you want to
19       repeat it, Mr. Morris, for his benefit?
20              MR. MORRIS:  Sure.
21       Q.   Can you -- can you tell me the
22   approximate portion of Skyview's revenue that
23   is derived from entities that are directly or
24   indirectly owned or controlled by Mr. Dondero?
25       A.   I don't know the exact number.
```

Page 18

```
 1                WATERHOUSE - 10-19-21

 2       Q.    Is it more than 75 percent?

 3       A.    Yes.

 4       Q.    Is it more than 90 percent?

 5       A.    I don't know.

 6       Q.    Okay.  Can I refer to Highland

 7  Capital Management, L.P., as Highland?

 8       A.    Yes.

 9       Q.    All right.  And you previously

10  served as Highland's CFO; correct?

11       A.    Yes.

12       Q.    When did you join Highland?

13       A.    I don't recall the exact date.

14       Q.    Can you tell me what year?

15       A.    2006.

16       Q.    When did you -- in what year did you

17  become Highland's CFO?

18       A.    I don't recall the exact date.

19       Q.    I'm not asking you for the exact

20  date.  I'm asking you if you recall the year in

21  which you were appointed CFO.

22       A.    I don't recall the exact year.

23       Q.    Can you tell me which years it is

24  possible that you were appointed to CFO of

25  Highland?
```

```
 1                 WATERHOUSE - 10-19-21

 2        A.    2011 or 2012.

 3        Q.    Did you serve as Highland's CFO on a

 4   continuous basis from in or around 2011 or 2012

 5   until early 2021?

 6        A.    Yes.

 7        Q.    During that entire time you reported

 8   directly to Jim Dondero; correct?

 9        A.    I -- I don't know.

10        Q.    Is there anybody else you reported

11   to -- withdrawn.

12              Did you report to Mr. Dondero for

13   some portion of the time that you served as

14   CFO?

15        A.    Yes.

16        Q.    Is there a portion of time that you

17   don't recall who you reported to?

18        A.    Yes.

19        Q.    What portion of time do you have in

20   your mind when you can't recall who you

21   reported to?

22        A.    From the 2011 to -- for

23   approximately a year or two.

24        Q.    Okay.  So is it fair to say that you

25   reported to Mr. Dondero in your capacity as CFO
```

Page 20

```
 1              WATERHOUSE - 10-19-21

 2    from at least 2014 until the time you left

 3    Highland?

 4              MS. DANDENEAU:  Objection to form.

 5        A.    I don't want to speculate the exact

 6    or what year that changed or -- so I would like

 7    to stick with my testimony.

 8        Q.    Can you recall when you began

 9    reporting to Mr. Dondero?

10        A.    I don't recall.

11        Q.    Can you -- can you give me an

12    estimate of what year you think you might have

13    began reporting to Mr. Dondero?

14        A.    I will go back to my prior

15    testimony.

16        Q.    Okay.  There is no -- you have no

17    ability to tell me when you began reporting to

18    Mr. Dondero.

19              Do I have that right?

20              MS. DANDENEAU:  Objection to form.

21        A.    I don't recall.

22        Q.    Okay.  Do you recall who you might

23    have reported to before you began reporting to

24    Mr. Dondero?

25        A.    Yes.
```

Page 21

1                    WATERHOUSE - 10-19-21

2          Q.    Who might you have reported to in

3     your capacity as CFO before you started

4     reporting to Mr. Dondero?

5          A.    That would have been Patrick Boyce.

6          Q.    Are you aware that Highland filed

7     for bankruptcy on October 19th, 2019?

8          A.    Yes.

9          Q.    And we refer to that as the petition

10    date?

11         A.    Yes.

12         Q.    Okay.  Do you hold any professional

13    licenses, sir?

14         A.    Yes.

15         Q.    Can you tell me what professional

16    licenses you hold?

17         A.    I'm a certified public accountant.

18         Q.    Okay.  Anything else?

19         A.    No.

20         Q.    Do you have any other professional

21    licenses or certificates?

22         A.    When you say "professional license,"

23    that is not education?

24         Q.    Tell me -- sure.  Anything other

25    than a driver's license.

```
 1                WATERHOUSE - 10-19-21
 2           Do you have any other license or
 3   certificate or certification?
 4       A.   Are you asking, like, where I went
 5   to school and the --
 6       Q.   I am not.  I am not.  I didn't say
 7   education.  I didn't ask about degrees.
 8           Do you know what a license is?
 9       A.   Well, yeah, I mean, a license is
10   something you get after you receive a certain
11   level of proficiency.
12       Q.   Do you have any licenses or
13   certifications other than your CPA?
14           MS. DANDENEAU:  Objection, form.
15           I assume you mean professional
16       licenses, Mr. Morris; correct?
17       Q.   Can you answer my question, sir?
18       A.   Mr. Morris, I'm thinking.  I
19   don't -- I don't think I have any others.
20       Q.   Are you familiar with an entity
21   called Highland Capital Management Fund
22   Advisors?
23       A.   Yes.
24       Q.   Were you ever -- can we refer to
25   that entity as HCMFA?
```

Page 23

```
 1              WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    Were you ever employed by HCMFA?

 4        A.    Not that I recall.

 5        Q.    Were you ever -- did you ever hold

 6   the title of an officer or director of HCMFA?

 7        A.    Yes.

 8        Q.    What title did you hold?

 9        A.    Treasurer.

10        Q.    When did you become the treasurer of

11   HCMFA?

12        A.    I don't recall.

13        Q.    Can you tell me the year?

14        A.    I don't -- I don't know the year.

15        Q.    Can you approximate the year in

16   which you became the treasurer of HCMFA?

17        A.    I don't know.

18        Q.    Can you tell me if it was before or

19   after 2016?

20        A.    I don't recall.

21        Q.    Are you still the -- do you know if

22   you're still the treasurer of HCMFA today?

23        A.    Today, I am the acting treasurer for

24   HCMFA.

25        Q.    Is there a distinction between
```

```
 1                WATERHOUSE - 10-19-21
 2    treasurer and acting treasurer?
 3         A.    I said "acting treasurer" as I am an
 4    employee of Skyview, as you previously
 5    stated -- or asked.
 6         Q.    But you are the treasurer of HCMFA
 7    today; correct?
 8         A.    I am -- I am the acting treasurer
 9    for HCMFA.
10         Q.    How did you become the treasurer of
11    HCMFA?
12         A.    Are you asking how I became the
13    treasurer of HCMFA today?
14         Q.    How did you become appointed to
15    serve as the treasurer of HCMFA?
16         A.    Well, in -- in -- in what time
17    capacity?
18         Q.    The first time that you were
19    appointed.
20         A.    First time.  I believe I was asked
21    to serve as treasurer for HCMFA the first time.
22         Q.    By who?  Who asked you to do that?
23         A.    I don't recall.
24         Q.    Is there anything that would refresh
25    your recollection as to who appointed you as
```

```
 1              WATERHOUSE - 10-19-21
 2    the treasurer of CF- -- HCMFA for the first
 3    time?
 4          A.    I don't -- I mean, there would be
 5    some documents, some legal documents.  I don't
 6    know where those are.
 7          Q.    How many times have you been
 8    appointed the treasurer of HCMFA?
 9          A.    I don't know.
10          Q.    Was it more than once?
11          A.    I don't know.
12          Q.    Can you tell me any period of time
13    since 2016 that you did not hold the title of
14    treasurer of HCMFA?
15               MS. DANDENEAU:  Objection to form.
16          A.    I don't recall.
17          Q.    What are your duties and
18    responsibilities as the treasurer of HCMFA?
19          A.    My duties are to do the best job
20    that I can as the -- as an accountant and
21    finance guy.
22          Q.    What specific duties and
23    responsibilities do you have as the treasurer
24    of HCMFA?
25          A.    My duties are to do the best job
```

 1                 WATERHOUSE - 10-19-21

 2    that I can as the accounting and finance person

 3    for HCMFA.

 4         Q.    As the accounting and finance person

 5    for HCMFA, do you have any particular areas of

 6    responsibility?

 7         A.    Yeah, it is to manage the accounting

 8    and finance function for HCMFA.

 9         Q.    Would that include -- do you have

10    responsibility for overseeing HCMFA's annual

11    audit?

12         A.    Can I please elaborate on my prior

13    question?

14         Q.    Of course.  You -- you are giving

15    answers.  I'm asking questions.

16         A.    Okay.  Yes, so the -- it -- like I

17    said, it is to manage the accounting finance

18    aspect, but I am, as we discussed, the

19    treasurer.  That is -- being treasurer is what

20    gives me that -- that management function.

21         Q.    Does anybody report to you in your

22    capacity as treasurer of HCMFA?

23         A.    I don't believe so.

24         Q.    Does HCMFA have a chief financial

25    officer?

```
 1              WATERHOUSE - 10-19-21

 2       A.    I don't -- I don't know.

 3       Q.    You don't know?

 4             You're the treasurer of HCMFA but

 5   you don't know if HCMFA has a chief financial

 6   officer.

 7             Do I have that right?

 8       A.    That's right.

 9       Q.    Okay.  Have you heard of a company

10   called NexPoint Advisors?

11       A.    Yes.

12       Q.    We will refer to that as NexPoint.

13   Okay?

14       A.    Okay.

15       Q.    Were you ever employed by NexPoint?

16       A.    I don't recall.

17       Q.    Did you ever hold any title with

18   respect to the entity known as NexPoint?

19       A.    Yes.

20       Q.    What titles have you held in

21   relation to NexPoint?

22       A.    Treasurer.  I think it was only

23   treasurer.

24       Q.    Can you tell me the approximate year

25   you became the treasurer of NexPoint?
```

Page 28

```
 1                WATERHOUSE - 10-19-21

 2        A.    I don't know.

 3        Q.    Are you still the treasurer of

 4   NexPoint today?

 5        A.    I am the acting treasurer for

 6   NexPoint.

 7        Q.    When did your title change from

 8   treasurer to acting treasurer?

 9        A.    I don't know.

10        Q.    Did your duties and responsibilities

11   change at all when your title was changed from

12   treasurer to acting treasurer?

13        A.    I don't -- I don't believe so.

14        Q.    Why did --

15        A.    I still manage the finance and

16   accounting function for NexPoint.

17        Q.    Why did your title change from

18   treasurer to acting treasurer?

19        A.    I don't -- I'm using the term

20   "acting treasurer" as I'm a Skyview employee.

21   I don't -- I don't know -- again, I am a -- as

22   I am the Skyview employee.

23        Q.    Okay.

24        A.    And we -- we provide officer

25   services.
```

Appx. 00398

Page 29

```
 1                WATERHOUSE - 10-19-21
 2        Q.    And you serve as an officer of
 3   HCMFA; correct?
 4        A.    I think we went over that with my
 5   testimony.  Yes, I'm the acting treasurer for
 6   HCMFA.
 7        Q.    And you are an officer of NexPoint;
 8   correct?
 9        A.    I think -- I am the acting treasurer
10   for NexPoint Advisors.
11        Q.    And -- and who appointed you acting
12   treasurer of NexPoint Advisors?
13        A.    I don't recall specifically.
14        Q.    Do you have any recollection of who
15   might have appointed you the treasurer of
16   NexPoint?
17        A.    I mean, it -- it -- I don't recall
18   exactly who it was.
19        Q.    Who were the possibilities?
20              MS. DEITSCH-PEREZ:  Object to the
21        form.
22        Q.    You can answer.
23        A.    Someone in the legal group for
24   NexPoint.  The other officers as well.
25        Q.    Have you heard of a company called
```

```
 1              WATERHOUSE - 10-19-21

 2   Highland Capital Management Services, Inc.?

 3       A.    Yes.

 4       Q.    We will refer to that as HCMS.

 5   Okay?

 6       A.    HCMS.  Okay.

 7       Q.    Were you ever employed by HCMS?

 8       A.    No.

 9       Q.    Have you ever held any titles in

10   relation to HCMF -- I apologize -- HCMS?

11       A.    Yes.

12       Q.    What titles have you held in

13   relation to HCMS?

14       A.    Treasurer and acting treasurer.

15       Q.    When did you first become treasurer

16   or acting treasurer of HCMS?

17       A.    I don't recall the exact dates.

18       Q.    Can you recall -- can you

19   approximate the year that you became the

20   treasurer of HCMS?

21       A.    I don't -- I don't know.

22       Q.    Are you still the treasurer of HCMS

23   today?

24       A.    I am the acting treasurer for HCMS.

25       Q.    And are your duties and
```

```
 1                 WATERHOUSE - 10-19-21

 2      responsibilities as the acting treasurer for

 3      HCMS and the acting treasurer for NexPoint the

 4      same as your duties and responsibilities in

 5      your role as the acting treasurer of HCMFA?

 6           A.    More or less.

 7           Q.    Have you ever heard of a company

 8      called HCRE Partners, LLC?

 9           A.    Yes.

10           Q.    And do you understand that that

11      entity is now known today as NexPoint Real

12      Estate Partners?

13           A.    I did not know that.

14           Q.    All right.  Can we refer to HCRE

15      Partners as HCRE?

16                 MS. DANDENEAU:  Objection to form.

17                 Did you mean NexPoint Real Estate

18           Partners, Mr. Morris?

19                 MR. MORRIS:  No.

20                 MS. DANDENEAU:  Oh.

21                 MR. MORRIS:  He said he wasn't

22           familiar that it was succeeded by that

23           entity.  So --

24                 MS. DANDENEAU:  Okay.

25                 MR. MORRIS:  -- let's go with what
```

Page 32

1           WATERHOUSE - 10-19-21

2         the witness knows.

3         Q.    You're familiar with an entity

4    called HCRE Partners, LLC; correct?

5         A.    Yes.

6         Q.    Okay.  So that is the entity that we

7    will refer to as HCRE.  If you're aware of any

8    successor, that is great.  If not, let's just

9    define it as such.

10              Have you ever been employed by HCRE

11   or any entity that you know to have succeeded

12   HCRE?

13        A.    No.

14        Q.    Did you ever serve as an officer or

15   director of HCRE or any successor?

16        A.    Not that I recall.

17        Q.    Okay.  Can we refer to NexPoint and

18   HCMFA as the advisors?

19        A.    Yes.

20        Q.    In general, the advisors provided

21   investment advisory services to certain retail

22   funds; correct?

23        A.    Yes.

24        Q.    And we will refer to the retail

25   funds that are served by the advisors

Page 33

```
 1                 WATERHOUSE - 10-19-21
 2   collectively as the retail funds; is that okay?
 3        A.    Okay.
 4        Q.    Each of the retail funds is governed
 5   by a board; correct?
 6        A.    Yes.
 7        Q.    And do you know the people who serve
 8   on the boards of the retail funds?
 9              MS. DANDENEAU:  Objection to form.
10        A.    I don't know all of them.
11        Q.    Do you know whether the same people
12   serve on the board of each of the retail funds
13   as we've defined that term?
14        A.    Which -- so when you say "retail
15   funds" -- again, I want to be -- what retail
16   funds are you referring to, because there are
17   -- there are several distinctions?
18              What retail funds are you using when
19   you refer to them?
20        Q.    That is why -- that is why I tried
21   to define the terms.  So let me do it again.
22              Retail funds for the purposes of
23   this deposition means any retail fund to which
24   either of the advisors provides advisory
25   services.  Okay?
```

```
 1                WATERHOUSE - 10-19-21

 2        A.     Okay.

 3        Q.     Okay.  So do you know whether the

 4   same people serve on the board of each of the

 5   retail funds?

 6        A.     I don't know.

 7        Q.     Were you ever employed by any of the

 8   retail funds?

 9        A.     No.

10        Q.     No?

11        A.     No.

12        Q.     Okay.  Do you have any title with

13   respect to any of the retail funds?

14        A.     Yes.

15        Q.     What titles do you hold --

16   withdrawn.

17               Do you have the same titles with

18   respect to all of the retail funds or do

19   they -- or just something else?

20               MS. DANDENEAU:  Objection to form.

21        Q.     Withdrawn.

22               Do you have the same title with

23   respect to each of the retail funds?

24        A.     No.

25        Q.     Tell me which title you have with
```

Page 35

```
 1                  WATERHOUSE - 10-19-21

 2    respect to each retail fund.

 3              Actually, let's do it a different

 4    way.  I withdraw the question.

 5              Can you give me one title you have

 6    in relation to any retail fund?

 7        A.    Yes.

 8        Q.    What title -- what title can you

 9    give me?

10        A.    Principal executive officer.

11        Q.    Do you serve as principal executive

12    officer for each of the retail funds?

13        A.    No.

14        Q.    Can you identify for me the retail

15    funds in which you serve as the principal

16    executive officer?

17        A.    Yes.  Highland Funds 1, Highland

18    Funds 2, Highland Income Fund, Highland Global

19    Allocation Fund.

20        Q.    I'm sorry, you said "Global

21    Allocation Fund"?

22        A.    Yes.

23              VIDEOGRAPHER:  Excuse me,

24        Mr. Morris.  This is the videographer.  I'm

25        concerned about the lighting in the
```

Page 36

```
 1                  WATERHOUSE - 10-19-21

 2          witness' camera.

 3                  Do you want to go off the record and

 4          make some adjustments?

 5                  MR. MORRIS:  Sure, but just for this

 6          purpose.  I don't want to take a break.  We

 7          just started.

 8                  MS. DANDENEAU:  Yeah, that is fine.

 9          That is fine.  We're going to put you on

10          mute.

11                  MR. MORRIS:  All right.

12                  MS. DANDENEAU:  I'm going to try to

13          open up some of the shades.

14                  VIDEOGRAPHER:  We're going off the

15          record at 10:08 a.m.

16          (Recess taken 10:08 a.m. to 10:11 a.m.)

17                  VIDEOGRAPHER:  We are back on the

18          record at 10:11 a.m.

19          Q.    Mr. Waterhouse, when did you become

20      the principal executive officer of the four

21      retail funds that you just identified?

22          A.    I don't recall.

23          Q.    Do you recall the approximate year

24      that you became the principal executive officer

25      of the four funds?
```

Appx. 00406

Page 37

```
 1                  WATERHOUSE - 10-19-21

 2          A.    2021.

 3          Q.    Did you ever hold any title with

 4    respect to any of the four funds you have just

 5    identified other than principal executive

 6    officer?

 7          A.    I don't recall.

 8          Q.    Is it possible that you held a

 9    position or a title with the four funds you

10    just identified prior to 2021?

11          A.    Yes.

12          Q.    But you don't recall if you did or

13    not; do I have that right?

14          A.    No.  You -- I thought you asked, did

15    I hold other titles.

16          Q.    Did you hold any title at the four

17    retail funds for which you now serve as

18    principal executive officer at any time prior

19    to 2021?

20          A.    Yes.

21          Q.    What titles did you hold?

22          A.    I don't recall all the titles.

23          Q.    Do you recall any of the titles?

24          A.    Yes.

25          Q.    What titles do you recall holding at
```

```
 1                 WATERHOUSE - 10-19-21
 2   those four retail funds before 2021?
 3        A.    Principal executive officer.
 4        Q.    Were you the principal executive
 5   officer of the four retail funds that you have
 6   identified?
 7        A.    Sorry, could you repeat the
 8   question?
 9        Q.    Were you the principal executive
10   officer for each of the four retail funds that
11   you have identified?
12        A.    Yes.
13        Q.    When did you become the principal
14   executive -- withdrawn.
15              Can you give me the approximate year
16   that you became the principal executive officer
17   for each of the four retail funds you've
18   identified?
19        A.    I don't recall.
20        Q.    What are your duties and
21   responsibilities as the principal executive
22   officer of these four retail funds?
23        A.    It is to manage the finance and
24   accounting positions.
25        Q.    So at the same time you serve as the
```

Page 39

1          WATERHOUSE - 10-19-21
2     treasurer of the advisors, you also serve as
3     the principal executive officer of these four
4     retail funds; correct?
5          A.    Yes.
6          Q.    Did you ever hold any title with
7     respect to any other retail fund?
8          A.    Not that I recall.
9          Q.    During the period that you served as
10    Highland's CFO, from time to time Highland
11    loaned money to certain of its officers and
12    employees; correct?
13         A.    Yes.
14         Q.    During the period that you served as
15    Highland's CFO, from time to time Highland
16    loaned money to certain --
17         A.    Let me -- let me retract that,
18    sorry, that -- you asked during the time I was
19    CFO, Highland loaned moneys to employees.  I
20    don't -- I don't recall that during my tenure
21    of CFO.
22         Q.    You have no recollection during the
23    time that you were the CFO of Highland of
24    Highland ever loaning any money to any officer
25    or director of Highland?

Appx. 00409

Page 40

```
 1                    WATERHOUSE - 10-19-21

 2        A.    I don't recall during my tenure of

 3   Highland or my -- as CFO of Highland -- yeah,

 4   if there are any loans as CFO of Highland.

 5        Q.    I'm just talking about officers and

 6   employees right now.  You have no recollection

 7   of Highland ever making a loan to any of its

 8   officers or employees during the time that you

 9   served as CFO.  Do I have that right?

10             MS. DANDENEAU:  Objection to form.

11        A.    So I thought you were saying

12   officers and employees as CFO, right, so there

13   were -- I mean, okay, yes.

14        Q.    I would ask you to listen carefully

15   to my question.  If I -- if I'm not clear, let

16   me know, but I'm really trying to be as clear

17   as I can.

18        A.    I'm listening as carefully as I can,

19   and you are asking very specific questions in a

20   timeline.  And I'm trying to answer your

21   questions as specifically as I can, and I

22   apologize if -- if I'm going back.  I am -- you

23   are asking very specific questions.  Thank you.

24        Q.    During the period that you served as

25   Highland's CFO, from time to time Highland
```

```
 1                WATERHOUSE - 10-19-21
 2   loaned money to certain corporate affiliates;
 3   correct?
 4             MS. DANDENEAU:  Objection to form.
 5        A.   What are corporate affiliates?
 6        Q.   How about the ones that are in
 7   Highland's audited financial statements under
 8   the section entitled Loans to Affiliates.  Why
 9   don't we start with those.  Do you have any
10   understanding of what the phrase "affiliates"
11   means?
12             MS. DANDENEAU:  Objection to form.
13        A.   I understand what affiliates are,
14   yet affiliates can have different meanings in
15   different contexts, so...
16        Q.   Why don't you -- why don't you tell
17   me what your understanding of the term
18   "affiliate" is in relation to Highland Capital
19   Management, L.P.
20        A.   Is that a -- it depends on the
21   context.
22        Q.   How about the context of making
23   loans?
24             MS. DANDENEAU:  Objection to form.
25        A.   I didn't make the determination of
```

Page 42

```
 1                    WATERHOUSE - 10-19-21
 2    who an affiliate was or is at the time those --
 3    I didn't -- that wasn't my job to make a
 4    determination of who an affiliate is.
 5         Q.    All right.  So as the CFO of
 6    Highland, do you have any ability right now to
 7    tell me which companies that were directly or
 8    indirectly owned and/or controlled by
 9    Mr. Dondero in whole or in part received loans
10    from Highland Capital Management, L.P.?
11              MS. DANDENEAU:  Objection to form.
12              MS. DEITSCH-PEREZ:  Objection, form.
13         A.    Yes.
14         Q.    Okay.  Identify every entity that
15    you can think of that was directly or
16    indirectly owned and/or controlled by
17    Mr. Dondero in whole or in part that received a
18    loan from Highland Capital Management, L.P.
19              MR. RUKAVINA:  Objection, legal
20         conclusion.
21         A.    NexPoint Advisors, Highland Capital
22    Management Fund Advisors, HCM Services,
23    Dugaboy.  Sorry, I don't think -- Dugaboy
24    doesn't fit that definition.  You said owned
25    and controlled.  I don't think that that
```

Appx. 00412

Page 43

1          WATERHOUSE - 10-19-21

2    definition --

3          Q.    I said owned and/or controlled.

4          A.    I don't -- again, I'm not -- I'm not

5    the legal expert.  I don't think it controls --

6    he controls Dugaboy, so again, I'm not the

7    legal person.

8          Q.    I'm not asking you for a legal

9    conclusion, sir.  I'm asking you for your

10   knowledge, okay, as the CFO -- the former CFO

11   of Highland Capital Management, other than

12   NexPoint, HCMFA, and HCMF -- HCMS, can you

13   think of any other entities that were owned

14   and/or controlled directly or indirectly in

15   whole or in part by Jim Dondero who received a

16   loan from Highland Capital Management, L.P.?

17              MS. DANDENEAU:  Objection to form.

18         A.    HCRE.

19         Q.    Any others?

20         A.    That is -- that is all I can think

21   of.

22         Q.    And you're aware that from time to

23   time while you were the CFO, Highland loaned

24   money to Jim Dondero; correct?

25         A.    Yes.

Appx. 00413

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.  Can we refer to the four

 3   entities that you just named and Mr. Dondero as

 4   the affiliates?

 5        A.    So that would be Jim Dondero,

 6   NexPoint Advisors, Highland Capital Management

 7   Fund Advisors, and HCRE.

 8        Q.    And HCMS?

 9        A.    And HCMS, okay.

10        Q.    And can we refer to the loans that

11   were given to each of those affiliates as the

12   affiliate loans?

13        A.    Yes.

14        Q.    And is it fair to say that each of

15   the affiliates were the borrowers under the

16   affiliate loans as we're defining the term?

17             MR. RUKAVINA:  Objection, legal

18        conclusion.

19        A.    The borrowers are whoever were on

20   the notes.  I don't -- I don't know.  I'm not

21   the legal person.

22        Q.    But you --

23        A.    I don't know.

24        Q.    You do know, as Highland's former

25   CFO, that each of the affiliates that you have
```

```
 1                    WATERHOUSE - 10-19-21
 2    identified tendered notes to Highland; correct?
 3                    MR. RUKAVINA:  Hey, John, will you
 4          just give me a running objection to legal
 5          conclusion to HCM --
 6                    MR. MORRIS:  No.  No, if you want to
 7          object --
 8                    MR. RUKAVINA:  I will object every
 9          time.  Object to legal conclusion.
10                    MR. MORRIS:  That is fine.
11    A.    Sorry, can you repeat the question?
12    Q.    Are you aware that each of the --
13    that each of the affiliates, as we have defined
14    the term, gave to Highland a promissory note in
15    exchange for the loans?
16                    MR. RUKAVINA:  Objection to the
17          extent that calls for a legal conclusion.
18    A.    I don't.
19    Q.    No, you don't know that?
20    A.    No, they didn't -- you said they
21    exchanged a promissory note for a loan.  I
22    don't -- I don't understand that question, so I
23    said no.
24    Q.    At the time of the bankruptcy
25    filing, did Highland have in its possession
```

```
 1                WATERHOUSE - 10-19-21
 2    promissory notes that were signed by each of
 3    the affiliates?
 4         A.    Yes.
 5         Q.    To the best of your knowledge,
 6    during the time that you served as Highland's
 7    CFO, did Highland disclose to its outside
 8    auditors all of the loans that were made to
 9    affiliates?
10              MR. RUKAVINA:  Objection, that calls
11         for a legal conclusion.
12              MS. DEITSCH-PEREZ:  I also couldn't
13         hear you, John, because there was some
14         garbling on -- on the -- on the call.
15              MR. MORRIS:  Folks, I've got to tell
16         you this is not going well, and I'm
17         reserving my right --
18              MS. DANDENEAU:  John, it was just
19         the end of that question.  It was just the
20         end of that question.  I couldn't hear it
21         either.  Sorry, if you could repeat it,
22         please.
23              MR. MORRIS:  That is less than an
24         hour into this, but folks are trying to run
25         out the clock, and so I'm just going to
```

```
 1                  WATERHOUSE - 10-19-21

 2       state that now.

 3             MS. DANDENEAU:  You know, and,

 4       Mr. Morris, I really object to that.  I

 5       mean --

 6             MR. MORRIS:  Okay.

 7             MS. DANDENEAU:  -- Mr. Waterhouse

 8       just told you he's trying to listen to your

 9       questions and answer them carefully, and

10       you have no basis for saying that.

11             MR. MORRIS:  Okay.

12             MS. DANDENEAU:  This does not --

13       this is not an experienced witness, so he's

14       trying to do the best he can.

15       Q.    Mr. Waterhouse, during the time that

16   you served as Highland's CFO, did Highland

17   disclose to its outside auditors all of the

18   loans that it made to each of the affiliates

19   that you have identified?

20             MR. RUKAVINA:  Objection, legal

21       conclusion.

22       A.    Yes.

23       Q.    To the best of your knowledge, while

24   you were Highland's CFO, were all of the

25   affiliate loans described in Highland's audited
```

```
                                                     Page 48
 1                WATERHOUSE - 10-19-21

 2   financial statements?

 3              MR. RUKAVINA:  Objection, legal

 4        conclusion.

 5        A.    When an audit was performed, any

 6   loans that were made by Highland to the

 7   affiliates were disclosed to auditors.

 8        Q.    Are you aware of any loan that was

 9   made to any affiliate that was not disclosed to

10   the auditors?

11        A.    I'm not aware.

12        Q.    To the best of your knowledge, did

13   each of the affiliates who were --

14   (inaudible) -- loaned from Highland execute a

15   promissory note in connection with that loan?

16              MR. RUKAVINA:  Objection, legal

17        conclusion.

18        A.    Sorry, you -- halfway through the

19   question it got muffled.

20              Can you repeat that again?

21        Q.    To the best of your knowledge, did

22   every affiliate execute a promissory note in

23   connection with each loan that it obtained from

24   Highland?

25              MR. RUKAVINA:  Objection, legal
```

Appx. 00418

```
 1              WATERHOUSE - 10-19-21

 2         conclusion.

 3         A.    Yes.

 4         Q.    You are not aware of any loan that

 5    any affiliate ever obtained from Highland where

 6    the affiliate did not give a promissory note in

 7    return; is that fair?

 8         A.    Yes, I'm not aware.

 9         Q.    And to the best of your knowledge,

10    did Highland loan to each affiliate an amount

11    of money equal to the principal amount of each

12    promissory note?

13              MR. RUKAVINA:  Objection, legal

14         conclusion.

15         A.    Yes.

16         Q.    During the time that you served as

17    CFO, did Highland ever loan money to

18    Mark Okada?

19         A.    I -- I don't recall.

20         Q.    Did you ever see any promissory

21    notes executed by Mark Okada?

22         A.    I don't recall.

23         Q.    Do you know if Highland ever forgave

24    any loan that it ever made to Mr. Okada?

25         A.    I don't recall.
```

```
 1                 WATERHOUSE - 10-19-21
 2        Q.    Do you recall if Mr. Okada paid back
 3    all principal and interest due and owing under
 4    any loan he obtained from Highland?
 5              MS. DEITSCH-PEREZ:  Objection to
 6         form.
 7              MS. DANDENEAU:  Objection to form.
 8        A.    I don't recall.
 9        Q.    Do you recall whether -- during your
10    time as CFO, whether Highland ever loaned money
11    to Jim Dondero?
12        A.    Yes.
13        Q.    To the best of your knowledge, did
14    Mr. Dondero sign and deliver to Highland a
15    promissory note in connection with each loan
16    that he obtained from Highland?
17        A.    If you are referring to the
18    promissory notes that, you know, part of
19    Highland's records, yes.
20        Q.    Okay.  You're not aware of any loan
21    that Mr. Dondero took from Highland that wasn't
22    backed up by -- by a promissory note with a
23    face -- with a principal amount equal to the
24    amount of the loan; correct?
25        A.    Am I aware that Jim Dondero took a
```

Case 21-03005-sgj   Doc 96-14 Filed 10/29/21   Entered 10/29/21 17:52:03   Page 50 of 346

Page 51

```
 1              WATERHOUSE - 10-19-21
 2   loan?
 3        Q.    Without giving a -- let me ask a
 4   better question.  I'm sorry, Mr. Waterhouse.
 5              Are you aware of any loan that
 6   Mr. Dondero obtained from Highland where he
 7   didn't give a promissory note in return?
 8        A.    I'm not aware.
 9        Q.    During the time that you served as
10   Highland's CFO, did Highland ever forgive any
11   loans, in whole or in part, that it made to
12   Mr. Dondero?
13        A.    Not that I'm aware.
14        Q.    At the time that you served as
15   Highland's CFO, did Highland ever forgive any
16   loan, in whole or in part, that it made to any
17   affiliate as we've defined the term today?
18        A.    Not that I'm aware.
19        Q.    During the time that you served as
20   Highland's CFO, did Highland ever forgive, in
21   whole or in part, any loan that it ever made to
22   any officer or employee?
23        A.    Highland forgave loans to officers
24   and employees.  It may not have been at the
25   time when my title was CFO.
```

Case 21-00300-sgj Doc 936-14 Filed 10/29/21   Entered 10/29/21 21:52:08   Page 152 of 396

```
 1                WATERHOUSE - 10-19-21

 2       Q.    Okay.  And so I appreciate the

 3   distinction.

 4             Is it fair to say that, to the best

 5   of your knowledge, Highland did not forgive a

 6   loan that it made to an officer or employee

 7   after 2013?

 8             MS. DANDENEAU:  Objection to form.

 9       A.    I don't recall.

10       Q.    To the best of your knowledge, did

11   Highland disclose to its auditors every

12   instance where it forgave, in whole or in part,

13   a loan that it had made to one of its officers

14   or employees?

15       A.    No.

16       Q.    Can you think of -- can you -- can

17   you identify any loan to an officer or employee

18   that was forgiven by Highland, in whole or in

19   part, that was not disclosed to Highland's

20   outside auditors?

21       A.    Look, I don't recall all of the

22   loans and the loan forgiveness.  I just know as

23   part of the audit process there is a

24   materiality concept.

25             So if there were loans to employees
```

1              WATERHOUSE - 10-19-21

2    that were of -- you know, that were deemed

3    immaterial, those items may not have been

4    disclosed by the team to the auditors.

5         Q.    I appreciate that.

6              Do you have an understanding as to

7    what the level of materiality was?

8         A.    I don't recall.

9         Q.    As the CFO of Highland, to the best

10   of your knowledge, did Highland disclose to its

11   outside auditors every loan that was forgiven,

12   in whole or in part, that was material as that

13   term was defined by the outside auditors?

14        A.    Yes.

15        Q.    And do you recall where -- do you

16   recall where the definition of materiality can

17   be found for -- for this particular purpose?

18              MS. DANDENEAU:  Objection to form.

19        A.    No.  You -- I don't determine

20   materiality.

21        Q.    Okay.  I'm just asking you if you

22   can help me understand where it is, but I think

23   we will find it in a few minutes.

24              You are aware that Highland has

25   commenced lawsuits against each of the

```
 1                    WATERHOUSE - 10-19-21
 2    affiliates, as we've defined the term, to
 3    collect under certain promissory notes; is that
 4    right?
 5         A.    Yes.
 6         Q.    And are you familiar with the notes
 7    that are issue -- at issue in the lawsuits?
 8               MS. DANDENEAU:  Objection to form.
 9         A.    Generally familiar.
10         Q.    Can we refer to the lawsuits that
11    Highland has commenced against the affiliates
12    collectively as the lawsuits?
13         A.    Yes.  And, again, the affiliates are
14    NexPoint, HCMFA, HCMS, and HCRE.
15         Q.    And Mr. Dondero?
16         A.    Okay.  See, that is a new -- and now
17    Mr. Dondero is included in your affiliate
18    definition.
19         Q.    I just --
20         A.    I thought affiliates -- I thought
21    affiliates were just the four prior entities,
22    so I just want to be clear.
23         Q.    I appreciate that.  So let's --
24    let's keep them separate and let's refer to the
25    four corporate entities as the affiliates, and
```

Case 21-03005-sgj Doc 36-14 Filed 10/29/21   Entered 10/29/21 21:52:03   Page 554 of 946

```
                                               Page 55
 1                  WATERHOUSE - 10-19-21

 2  Mr. Dondero we will call Mr. Dondero.  Okay?

 3       A.    Okay.  Thank you.  As you can see,

 4  Mr. Morris, there is a lot of entities -- a lot

 5  here.  I just want to be clear.

 6       Q.    Okay.  Now, the affiliates of

 7  Mr. Dondero signed promissory notes that are

 8  not subject to the lawsuit.

 9            Do you understand that?

10            MS. DANDENEAU:  Objection to form.

11       A.    The affiliates and Mr. Dondero

12  signed --

13       Q.    You know what?  I will skip it.

14  That is okay.  Okay.

15            From time to time while you were

16  Highland's CFO, payments were applied against

17  principal and interests that were due under the

18  notes that were tendered by the affiliates and

19  Mr. Dondero; correct?

20            MR. RUKAVINA:  Objection to the

21       extent that calls for a legal conclusion.

22       A.    Yes.

23       Q.    Did Highland have a process where --

24  whereby payments would be applied against

25  principal and interest against the notes that
```

Page 56

1                    WATERHOUSE - 10-19-21

2    were given by the affiliates and Mr. Dondero?

3         A.    Yes.

4         Q.    Can you describe the process for me?

5         A.    The process, payment should be

6    applied as laid out in the -- in the promissory

7    note.

8         Q.    From time to time were payments made

9    that were not required under the promissory

10   notes?

11              MS. DANDENEAU:  Objection to form.

12        A.    Yes.

13        Q.    Who was responsible for deciding

14   when and how much the payments would be made

15   with respect to each of the notes that were

16   issued by the affiliates and Mr. Dondero?

17        A.    Who was responsible for deciding how

18   much was paid prior to the due date?

19        Q.    Yes.

20        A.    I don't know.

21        Q.    Did you approve of each payment that

22   was made against principal and interest on the

23   notes that were given by the affiliates and

24   Mr. Dondero?

25              MS. DANDENEAU:  Objection to form.

Appx. 00426

Case 21-03005-sgj   Doc 96-14   Filed 10/29/21   Entered 10/29/21 21:52:08   Page 16 of 46

```
 1                WATERHOUSE - 10-19-21

 2        A.    Did I approve the payments?  I

 3   approve -- I approve -- if there was cash -- if

 4   there was cash being repaid on a note payment,

 5   yes, I approved in the general sense of being

 6   made aware of the payment and the amount.

 7        Q.    And are you the person who

 8   authorized Highland's employees to effectuate

 9   those payments?

10        A.    Yes.

11        Q.    When you gave the instruction to

12   effectuate the payment, did you obtain

13   Mr. Dondero's prior approval?

14        A.    I mean, it -- I mean, it -- it

15   depends.

16        Q.    Can you think of any instance where

17   you directed Highland's employees to make a

18   payment of principal or interest against any

19   note that was tendered by an affiliate or

20   Mr. Dondero that Mr. Dondero did not approve of

21   in advance?

22        A.    I can't recall specifically.

23        Q.    Can you identify -- withdrawn.

24              Did Mr. Dondero ever tell you that a

25   payment that was made against principal and
```

```
 1              WATERHOUSE - 10-19-21
 2    interest due under one of the notes that was
 3    tendered by an affiliate or himself should not
 4    have been made?
 5         A.    Yes.
 6         Q.    Can you identify the payment for me?
 7         A.    It would be for -- for NexPoint
 8    Advisors.
 9         Q.    Okay.  And when did Mr. Dondero tell
10    you that a payment that you had initiated on
11    behalf of NexPoint should not have been made?
12         A.    I wasn't initiating payment.  It was
13    in the context of the -- I think you used this
14    term, "the advisors," so NexPoint Advisors and
15    Highland Capital Management Fund Advisors had
16    overpaid on certain agreements with Highland
17    Capital Management, L.P.  And as a part of that
18    process, the advisors -- what I was told at the
19    time were in talks and negotiations and
20    discussions with Highland Capital Management,
21    L.P., on offsets in relation to those
22    overpayments.
23         Q.    When did this conversation take
24    place?
25              MS. DANDENEAU:  Objection to form.
```

Page 59

```
 1                 WATERHOUSE - 10-19-21

 2        A.    I don't recall specifically.

 3        Q.    Do you recall what year it was?

 4        A.    Yes.

 5        Q.    What year did the conversation with

 6   Mr. Dondero take place that you just described?

 7        A.    2020.

 8        Q.    Okay.  Do you remember if it was

 9   December 2020?

10        A.    It -- it -- I don't -- I don't

11   recall what month specifically, but it would

12   have been November or December.

13        Q.    And we're talking here about a

14   payment of principal and/or interest that was

15   due -- withdrawn.

16              We're talking here about a payment

17   of principal and interest that was applied

18   against NexPoint's note; correct?

19              MS. DANDENEAU:  Objection to form.

20        A.    I don't recall what that payment

21   consisted of.

22        Q.    Is it possible that the payment you

23   have in mind related to the shared services

24   agreement?

25              MS. DANDENEAU:  Objection to form.
```

Page 60

1                    WATERHOUSE - 10-19-21

2        A.    No.

3        Q.    Are you certain that the payment --

4   that the payment that you have in mind related

5   to the promissory note that NexPoint issued in

6   favor of Highland?

7              MS. DANDENEAU:  Objection to form.

8        A.    Yes.

9        Q.    Okay.  Other than that one payment,

10  can you identify any other instance where

11  Mr. Dondero told you that a payment should not

12  have been applied against principal and

13  interest under any promissory note tendered by

14  any affiliate or Mr. Dondero?

15             MS. DANDENEAU:  Objection to form.

16             MS. DEITSCH-PEREZ:  Objection to

17       form.

18       A.    Not that I recall.

19       Q.    Thank you very much.

20             Do you know if Mr. Dondero approved

21  in advance of each loan made to each affiliate

22  and himself during the time that you were the

23  CFO?

24             MS. DEITSCH-PEREZ:  Object to the

25       form.

Appx. 00430

```
                                                        Page 61
 1                  WATERHOUSE - 10-19-21

 2        A.    Yes, generally.

 3        Q.    Can you identify any loan that was

 4   ever made to an affiliate or to Mr. Dondero

 5   that Mr. Dondero did not approve of in advance?

 6        A.    Other than the ones that are in

 7   dispute, I'm not aware.

 8        Q.    Do you believe that Mr. Dondero did

 9   not approve of each of the loans that are in

10   dispute in advance of the time that the loan

11   was made?

12              MS. DANDENEAU:  Objection to form.

13        A.    Given what is in the dispute, you

14   know, and -- and -- and the way things might --

15   yeah, I mean...

16        Q.    I am not asking about the dispute,

17   and it was probably my mistake to follow you

18   there.

19              Were you aware of every loan made by

20   Highland to each of its affiliates and

21   Mr. Dondero while you were the CFO at the time

22   each loan was made?

23        A.    Was I aware of every loan, yes.

24        Q.    Okay.  And if you put yourself back

25   in time, do you recall that any of the loans
```

```
                                                    Page 62
 1              WATERHOUSE - 10-19-21

 2    that were made to one of the affiliates or

 3    Mr. Dondero during the time that you were the

 4    CFO was made without Mr. Dondero's prior

 5    knowledge and approval?

 6         A.    Not that I recall.

 7         Q.    Thank you.  In fact, do you -- as

 8    the CFO, would you have allowed Highland to

 9    loan money to an affiliate or to Mr. Dondero

10    without obtaining Mr. Dondero's prior approval?

11              MS. DANDENEAU:  Objection to form.

12         A.    I can't -- there was so many times

13    over the years, I can't speak for every single

14    one, but generally, yes, I -- I spoke to him.

15         Q.    You -- you never -- you never --

16    withdrawn.  I will just take that.

17              Can you recall any payment that was

18    ever made against principal and interest on a

19    note that was issued in favor of Highland by an

20    affiliate or Mr. Dondero that you personally

21    did not know about in advance?

22         A.    There are so many through the years,

23    I don't -- I don't -- I don't recall every

24    single one.

25         Q.    Okay.  Can you identify any payment
```

```
 1                   WATERHOUSE - 10-19-21
 2     that was made against principal and interest on
 3     any note tendered by any affiliate or
 4     Mr. Dondero that you didn't know about in
 5     advance?
 6          A.    I don't recall.
 7          Q.    Other than Mr. Dondero -- withdrawn.
 8                Did anybody at Highland have the
 9     authority to make a payment against principal
10     and interest due under a loan given to the
11     affiliates and Mr. Dondero without your
12     knowledge and approval?
13                MS. DANDENEAU:  Objection to form.
14          A.    Sorry, there was -- to make a
15     payment on an affiliate loan, what you are
16     saying would it require my knowledge and
17     approval, yes.
18          Q.    Okay.  I appreciate that.  Thank
19     you.
20                Did anybody at Highland have the
21     authority, to the best of your knowledge, to
22     effectuate a loan to an affiliate without
23     Mr. Dondero's prior knowledge and approval?
24                MS. DANDENEAU:  Objection to form.
25          A.    I can't speak for all, but
```

Page 64

1          WATERHOUSE - 10-19-21

2    generally, yes.

3          Q.    Did you personally communicate with

4    Mr. Dondero to let him know each time a payment

5    of principal or interest was being made against

6    any note that was tendered by an affiliate or

7    Mr. Dondero to Highland?

8          A.    I don't -- are you saying, did I let

9    Mr. Dondero know if a payment was made on any

10   affiliate or loan to Mr. Dondero?  I mean,

11   not -- not every -- no.

12         Q.    Let me ask it this way:  Did you

13   have a practice of informing Mr. Dondero when

14   payments were made against principal and

15   interest on any note that was tendered by an

16   affiliate or Mr. Dondero?

17              MS. DEITSCH-PEREZ:  Objection to

18        form.

19              MS. DANDENEAU:  Objection to form.

20         A.    No, I did not.

21         Q.    Did Mr. Dondero ever tell you that a

22   payment of principal or interest had been made

23   against a note that was tendered by an

24   affiliate or himself that he had been unaware

25   of?

Page 65

```
 1                   WATERHOUSE - 10-19-21

 2        A.    Not that I recall.

 3        Q.    Are you aware that Mr. Dondero and

 4    the affiliates -- withdrawn.

 5              Are you aware that Mr. Dondero

 6    NexPoint, HCRE, and HCMS all contend that they

 7    do not have to pay on any of the notes they

 8    issued because they are subject to an oral

 9    agreement between Mr. Dondero and Nancy

10    Dondero, in her capacity as the trustee of the

11    Dugaboy Investment Trust?

12              MS. DANDENEAU:  Objection to form.

13        A.    I didn't -- I didn't -- I didn't

14    know that it was all notes.

15        Q.    Okay.  Are you -- did you ever learn

16    that there was an oral agreement between Jim

17    Dondero and Nancy Dondero pertaining to any

18    notes issued by any affiliate or Mr. Dondero?

19              MS. DEITSCH-PEREZ:  Object to the

20        form.

21        A.    Yes.

22        Q.    Do you have any understanding as to

23    the terms of that agreement?

24        A.    Yes.

25        Q.    What is your understanding of the
```

Appx. 00435

```
 1                 WATERHOUSE - 10-19-21
 2    terms of the agreement?
 3         A.    That there were certain milestones
 4    that had to be reached.
 5         Q.    Do you have any understanding of the
 6    terms of the agreement between Mr. Dondero and
 7    Nancy Dondero concerning any of the notes
 8    issued by the affiliates or Mr. Dondero other
 9    than that there have to be milestones reached?
10              MS. DEITSCH-PEREZ:  Object to the
11         form.
12         A.    There are milestones, I found out
13    yesterday, or there was some --
14              MS. DANDENEAU:  Okay.  I'm just
15         going to object to the extent that you
16         learned anything in conversations with
17         counsel, please don't reveal -- that is
18         privileged, and don't reveal any privileged
19         communications.
20              THE WITNESS:  Okay.
21         A.    So I'm not aware of anything else.
22         Q.    Do you know what the milestones
23    were?
24              MS. DANDENEAU:  Objection to form.
25         A.    I don't.
```

Page 67

```
 1                 WATERHOUSE - 10-19-21
 2        Q.    Do you know anything about -- do you
 3    know what promissory notes the agreement
 4    covered?
 5        A.    I don't.
 6        Q.    Do you know if -- if Jim and Nancy
 7    Dondero entered into one agreement or more than
 8    one agreement?
 9             MS. DEITSCH-PEREZ:  Object to the
10        form.
11        A.    I don't know.
12        Q.    Do you know if the agreement is in
13    writing?
14        A.    I don't know.
15        Q.    How did you learn of the existence
16    of the agreement?
17             MS. DANDENEAU:  Objection to form.
18        Again --
19        A.    I don't -- I don't recall who told
20    me.
21        Q.    You have no recollection of who told
22    you about this agreement between Jim and Nancy
23    Dondero?
24             MS. DEITSCH-PEREZ:  Object to the
25        form.
```

```
 1                WATERHOUSE - 10-19-21

 2        A.    I don't recall.

 3        Q.    Do you recall how you learned of the

 4   agreement?

 5              Was it in a meeting?  Was it in a

 6   phone call?  Was it in an email?

 7        A.    I don't recall.

 8        Q.    Do you recall when you learned of

 9   the agreement?

10        A.    Not specifically.

11        Q.    Do you recall what year you learned

12   of the agreement?

13        A.    In -- look, I mean, there are so

14   many notes.  I may be getting -- I believe it

15   was 2020.

16        Q.    All right.  I'm not asking about

17   notes, sir.  I'm asking about the agreement

18   that you testified you knew about between Jim

19   and Don- -- Nancy Dondero.  Okay.

20              Do you understand my question now?

21   Should I ask my question again?

22        A.    Yeah, sure.  Go ahead.

23        Q.    I'm going to use the word

24   "agreement" to refer to the agreement that

25   Mr. Dondero and Nancy Dondero entered into
```

```
1                    WATERHOUSE - 10-19-21
2      where you understood that certain milestones
3      had to be reached.  Okay?
4          A.    Uh-huh.
5                MS. DANDENEAU:  Objection.
6                MS. DEITSCH-PEREZ:  Object to the
7          form.
8                MR. MORRIS:  Just defining a term,
9          what is the objection.
10               MS. DEITSCH-PEREZ:  The objection --
11               MR. MORRIS:  I will move on.  I will
12         move on.
13               MS. DEITSCH-PEREZ:  John --
14         Q.    Sir, are you okay with that
15     definition of agreement?
16         A.    Okay.
17         Q.    Okay.  So you don't recall who --
18     who informed you of the existence of the
19     agreement; is that right?
20         A.    I don't recall.
21         Q.    You don't recall who told you the
22     terms of the agreement.
23               Do I have that right?
24         A.    Correct.
25         Q.    And you don't recall if you learned
```

```
 1                  WATERHOUSE - 10-19-21
 2    about the agreement in a meeting, through an
 3    email, or through a phone call.
 4                  Do I have that right?
 5         A.    I don't recall.
 6         Q.    Can you tell me when you learned of
 7    the agreement?
 8         A.    I don't -- I don't -- I don't
 9    remember specifically.
10         Q.    Can you tell me if you learned of
11    the agreement before or after the petition
12    date?
13         A.    It would have been -- it would have
14    been after.
15         Q.    Can you tell me if you learned of
16    the agreement before or after January 9th,
17    2020?
18         A.    It would have been after.
19         Q.    Can you tell me if you learned of
20    the agreement before or after you left Highland
21    Capital Management in February of 2021?
22         A.    I don't -- I don't -- I don't know.
23         Q.    It is possible that you learned of
24    it while you were a Highland employee.
25                  Do I have that right?
```

Case 3:21-00300105-sgj jDoc 936-14 Filed 110/229/221   Entered 110/229/221 217:522:038   Page 720 of 3946

```
 1              WATERHOUSE - 10-19-21

 2       A.    I don't remember the -- I mean, it

 3  was sometime in 2021.  I don't remember when.

 4       Q.    All right.  So to the best of your

 5  recollection, it was in 2021 but you don't

 6  recall if it was before or after you ceased to

 7  be a Highland employee.

 8              Do I have that right?

 9       A.    Yeah, I mean, it was -- it was

10  likely after I was -- after I left Highland

11  because, if I put myself back into the last

12  days of -- of 2021, it was -- you know, the

13  communications with Mr. Dondero were -- were --

14  were -- there weren't as many communications

15  because of the circumstances.

16       Q.    And so based on that you believe

17  that it is most likely that you learned of this

18  agreement sometime after you left Highland

19  employment?

20       A.    I wouldn't use the term "most

21  likely."  I don't recall specifically.  I don't

22  recall.

23       Q.    Do you recall ever telling Jim Seery

24  about this agreement?

25       A.    No, I don't -- I didn't tell
```

1              WATERHOUSE - 10-19-21

2    Jim Seery.

3         Q.    Did you tell anybody at DSI about

4    this agreement?

5         A.    No.

6         Q.    Did you tell any of Highland's

7    independent directors about this agreement?

8         A.    No.

9         Q.    Did you tell anybody at Pachulski

10   Stang Ziehl & Jones about this agreement?

11        A.    No.

12        Q.    Did you tell any employee of

13   Highland about this agreement?

14        A.    No.

15             MS. DANDENEAU:  Mr. Morris, it has

16        been an hour and a half.  Is this a good

17        time for a break?

18             MR. MORRIS:  Sure.

19        Q.    Mr. Waterhouse, I will just remind

20   you that during the break please don't speak

21   with anybody about the deposition, the

22   substance of your testimony or anything else

23   concerning the deposition.  Okay?

24        A.    Yes.

25             MR. MORRIS:  So it is 11:02.  We're

```
                                                         Page 73
 1                  WATERHOUSE - 10-19-21

 2        at 11:02 your time.  Let's come back, I

 3        guess, at 15 -- at 11:15 your time.

 4               VIDEOGRAPHER:  We're going off the

 5        record at 11:02 a.m.

 6        (Recess taken 11:02 a.m. to 11:20 a.m.)

 7               VIDEOGRAPHER:  We are back on the

 8        record at 11:20 a.m.

 9        Q.    Mr. Waterhouse, did you speak with

10    anybody during the break about this deposition?

11        A.    No.

12               MS. DANDENEAU:  Other than -- other

13        than his counsel.

14        Q.    Did you speak to your counsel about

15    the substance of your deposition today?

16        A.    No, I didn't bring it up.

17        Q.    I didn't ask you if you brought it

18    up.  I asked you if you had any conversation

19    with your lawyer about the substance of your

20    deposition.

21               MS. DANDENEAU:  Yes, he did.

22        Q.    Can you tell me what the -- you

23    discussed?

24               MS. DANDENEAU:  No, I object to

25        that.  He's not going to answer.  That is a
```

```
 1              WATERHOUSE - 10-19-21
 2    privileged conversation.
 3         MR. MORRIS:  So I just want to make
 4    sure that I understand.  During the break
 5    you spoke with your client about the
 6    substance of this deposition; is that
 7    right?
 8         MS. DANDENEAU:  Yes, John.
 9         MR. MORRIS:  And you refuse -- you
10    refuse to let your client tell me what was
11    discussed; is that right?
12         MS. DANDENEAU:  That's correct.
13         MR. MORRIS:  You know, I had given
14    the instruction prior to the break not to
15    speak with counsel.  I would have
16    appreciated --
17         MS. DANDENEAU:  No, you didn't --
18    actually, that is not true, Mr. Morris.
19    You said not to speak with anyone.  We
20    never have interpreted that to mean
21    conversations with counsel.  That's never
22    been -- I have never, ever heard that
23    instruction.
24         MR. MORRIS:  Okay.  We will -- we
25    will -- we will deal with it when and if we
```

```
                                                        Page 75
 1             WATERHOUSE - 10-19-21
 2        have to.
 3        Q.    Mr. Waterhouse, after learning about
 4   the agreement, did you ask anybody if the
 5   agreement was reflected in a writing?
 6             MS. DANDENEAU:  Objection to form.
 7        A.    No.
 8        Q.    Did you ask anybody if the terms of
 9   the agreement were memorialized anywhere?
10             MS. DANDENEAU:  Objection to form.
11             MR. MORRIS:  What is the --
12        A.    No.
13             MS. DANDENEAU:  Well, because you
14        keep talking about this agreement and I --
15        I -- I think, Mr. Morris, that is really
16        not clear what you mean by "the agreement."
17        And maybe you can just go back and restate
18        what that is.
19             MR. MORRIS:  Okay.  Your client has
20        agreed with me twice on the definition, but
21        I will try one more time.
22        Q.    Mr. Waterhouse, do you understand
23   that when I use the term "agreement," I'm
24   referring to the agreement between Jim and
25   Nancy Dondero concerning certain promissory
```

Page 76

 1                    WATERHOUSE - 10-19-21

 2    notes where you learned that one of the terms

 3    of the agreement was milestones reached?

 4         A.    Okay.

 5         Q.    And did you understand that that was

 6    the -- the agreement that we were referring to

 7    every time we used the word "agreement" in this

 8    deposition?

 9         A.    I don't know anything about this

10    agreement.  So, look, I do -- it -- I don't

11    know whether --

12         Q.    Let's -- let's try this again.

13         A.    Yeah.  Look, I don't know what this

14    agreement relates.

15              MS. DEITSCH-PEREZ:  John, John --

16         Q.    Let me try --

17              MS. DEITSCH-PEREZ:  John, please let

18         the witness finish.

19              MR. MORRIS:  Please stop.  Please

20         stop.  Please stop talking.

21              MS. DEITSCH-PEREZ:  No, you stop.

22         Let the witness --

23              MR. MORRIS:  Stop talking.

24              MS. DEITSCH-PEREZ:  -- finish -- you

25         interrupted him.

Page 77

```
 1              WATERHOUSE - 10-19-21

 2              MR. MORRIS:  You know what, you

 3        guys, this is really wrong.  It is really,

 4        really wrong.  Okay?

 5              I had the witness agree not once,

 6        but twice to the definition of agreement.

 7        Okay?  I'm going to try and do it a third

 8        time.

 9              MS. DANDENEAU:  No, but, please,

10        John, really --

11              MR. MORRIS:  No, please stop

12        talking.  Please.  It is my deposition.

13        Object to questions.

14              MS. DANDENEAU:  No, but also you

15        instructed him that -- that if you were

16        going -- if you were interrupting him, that

17        he should remind you that you're

18        interrupting him and -- and --

19              MR. MORRIS:  Let him do that.  Let

20        him do that.

21              MS. DANDENEAU:  Okay.  Well, you --

22              MR. MORRIS:  Please stop talking.

23        A.    Okay.  I don't know any of the

24    details of these agreements.  I don't know

25    anything about them.  I heard -- someone -- I
```

Appx. 00447

Page 78

1            WATERHOUSE - 10-19-21

2    don't know who, I don't know when, as you

3    asked, sometime in '21, someone told me about

4    this -- or I don't honestly know -- I don't

5    even recall exactly how I was made aware of

6    this, but I was.  I don't know -- I don't know

7    any of these details, and I'm getting -- again,

8    there is, you know, I -- I -- I had a passing

9    conversation with -- with Jim at some point

10   on -- on some -- on the executive comp, and I'm

11   getting confused of what is what, because

12   again, I don't know any of these details.

13        Q.    Okay.  Let me try again,

14   Mr. Waterhouse, and I apologize.

15             Are you aware of any agreement

16   between Jim Dondero and Nancy Dondero

17   concerning any promissory note that was given

18   to Highland by any affiliate or Mr. Dondero?

19             MS. DEITSCH-PEREZ:  Object to the

20        form.

21        A.    I've heard of an agreement.  That

22   is -- that is -- I mean, if you are using aware

23   as heard, sure.

24        Q.    And you understand that one of the

25   terms of the agreement is that it was based on

Page 79

1                    WATERHOUSE - 10-19-21

2   milestones that had to be reached; is that

3   right?

4                    MS. DANDENEAU:  Objection to form.

5        A.    That was one of the words that was

6   used when I heard about it, yes.

7        Q.    And when you heard about this

8   agreement that had a term in it concerning

9   milestones reached, did you ask the person who

10  was telling you about the agreement whether or

11  not it was in writing?

12       A.    I did not.

13       Q.    Did you ask any questions at all?

14                   MS. DANDENEAU:  Objection to form.

15       A.    Not that I recall.

16       Q.    But do you understand that going

17  forward, we're going to refer to the agreement

18  as the agreement that you just described that

19  you were --

20                   MS. DANDENEAU:  Object to the form.

21       A.    Yes.

22       Q.    Okay.  You don't have any personal

23  knowledge concerning the terms of the

24  agreement; correct?

25                   MS. DEITSCH-PEREZ:  Object to the

Appx. 00449

Case 21-03005-sgj Doc 936-14 Filed 10/29/21   Entered 10/29/21 21:52:03   Page 129 of 346

```
 1            WATERHOUSE - 10-19-21

 2       form.

 3       Q.    You can answer.

 4       A.    I don't -- I heard about the

 5  agreement.  I don't know anything -- I heard

 6  there was an agreement.  That is -- again, as I

 7  testified before -- I said before, heard about

 8  it, don't know the details.  I believe it was

 9  sometime this year.

10       Q.    Do you have any personal knowledge

11  about the terms of the agreement, sir?

12            MS. DANDENEAU:  Objection to form.

13       A.    Other than what I have previously

14  discussed, I don't -- I don't know.

15       Q.    Did -- did Mr. Dondero tell you

16  about the existence of the agreement?

17       A.    I don't recall.

18       Q.    Do you recall the source of your

19  information when you learned about the

20  agreement?

21       A.    No, I don't -- I don't recall.  I

22  don't remember.  I just -- I heard about it

23  generally.  I don't remember -- I don't

24  remember who, how, if, how.  I don't remember.

25       Q.    You know, Mr. Waterhouse, I just
```

Page 81
```
 1              WATERHOUSE - 10-19-21
 2   want to be clear that I never would have asked
 3   you to appear at this deposition if your name
 4   hadn't been included in responses to discovery
 5   as to somebody with knowledge about the -- who
 6   was told about the existence of the agreement.
 7              That is what prompted me do this,
 8   and I really do feel compelled to tell you that
 9   I otherwise would never have called you as a
10   witness.  So I regret that you're being put
11   through this today.  I had no intention of
12   burdening you or taking your time, but that is
13   the reason that we issued the subpoena is
14   because certain of the defendants identified
15   you as somebody --
16              MS. DEITSCH-PEREZ:  Mr. Morris, you
17       are here to ask questions, not to have --
18              MR. MORRIS:  I feel badly for the
19       guy.  I really do.
20              MS. DEITSCH-PEREZ:  I'm sure you do.
21              MR. MORRIS:  I do.  Stop.
22              MS. DEITSCH-PEREZ:  You stop.
23              MR. MORRIS:  I'm allowed.
24              MS. DEITSCH-PEREZ:  No, you're not
25       allowed to have a chat with the witness.
```

Appx. 00451

```
 1                WATERHOUSE - 10-19-21
 2        Q.    Okay.  Well, I hope that you
 3   appreciate what I'm saying here,
 4   Mr. Waterhouse.
 5             MS. DANDENEAU:  All right.  Let's go
 6        ahead and ask questions, and again, you're
 7        entitled to probe his -- his knowledge
 8        of -- whatever knowledge he has about
 9        this -- this agreement and --
10             MR. MORRIS:  That is what I'm doing.
11             MS. DANDENEAU:  -- he will answer
12        the questions to the best that he can.
13             MR. MORRIS:  That is what I'm doing.
14        Q.    Mr. Waterhouse, I take it you do not
15   know which promissory notes issued by which
16   affiliates or Mr. Dondero are the subject of
17   this agreement; do I have that right?
18        A.    Yes, I don't -- I don't know.
19        Q.    Do you know of any way to determine
20   which promissory notes issued by the affiliates
21   and Mr. Dondero are the subject of this
22   agreement other than asking Jim or Nancy
23   Dondero?
24             MS. DANDENEAU:  Objection to form.
25        A.    I don't know.
```

```
                                                          Page 83
 1                    WATERHOUSE - 10-19-21

 2          Q.    Did you ever make --

 3          A.    I don't know anything about these

 4   agreements.

 5          Q.    Did you ever make any effort to

 6   determine which promissory notes are subject to

 7   this agreement?

 8          A.    No.

 9          Q.    Did you ever ask anybody which

10   promissory notes are subject to this agreement?

11          A.    No.

12          Q.    Do you know if there is a list

13   anywhere of the promissory notes that are

14   subject to this agreement?

15          A.    I'm not aware.

16          Q.    Have you ever seen the terms of the

17   agreement written down anywhere?

18          A.    No.

19          Q.    Have you ever asked anybody whether

20   the terms of the agreement were written down

21   anywhere?

22          A.    I have not.

23          Q.    Did learning about the agreement

24   cause you to do anything in response?

25                MS. DANDENEAU:  Objection to form.
```

```
 1                WATERHOUSE - 10-19-21

 2        A.    No.

 3        Q.    Did anybody ever describe to you the

 4   nature of the milestones that you referred to

 5   earlier?

 6        A.    No, I don't -- I don't have any

 7   details of this.

 8        Q.    That is fine.

 9              PricewaterhouseCoopers served as

10   Highland's outside auditors prior to the

11   petition date; correct?

12        A.    Yes.

13        Q.    You refer to PricewaterhouseCoopers

14   as PwC?

15        A.    Yes.

16        Q.    PricewaterhouseCoopers audited

17   Highland's financial statements on an annual

18   basis; correct?

19        A.    During my -- during my time as -- as

20   CFO, yes, PricewaterhouseCoopers was the

21   auditor.

22        Q.    Do you know why Highland had its

23   annual financial statements audited each year?

24        A.    Generally.

25        Q.    Tell me your general understanding
```

Page 85

```
 1              WATERHOUSE - 10-19-21
 2    as to the reason why Highland had its annual
 3    financial statements audited each year.
 4         A.    From -- from time to time, they were
 5    used -- or asked for, as part of diligence or
 6    transactions or -- or things of that nature.
 7         Q.    And were they given to third parties
 8    for purposes of diligence or transactions from
 9    time to time?
10         A.    As far as I'm aware, yes.
11         Q.    And was it your understanding as the
12    CFO that the third parties who received the
13    financial statements in diligence or
14    transactions was going to rely on those?
15              MS. DANDENEAU:  Objection to form.
16         A.    I don't know -- I don't know gen --
17    I don't know specifically what they were going
18    to rely on.  You know, we would get requests
19    for audited financial statements.  I don't know
20    what they were relying on.
21         Q.    And --
22         A.    You would have to ask them.
23         Q.    Did you personally play a role in
24    PwC's annual audit and the conduct of the
25    audit?
```

 1              WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  Objection to form.

 3      A.    During my tenure as CFO, I played a

 4   very minimal role.

 5      Q.    What was the minimal role that you

 6   played?

 7      A.    You know, again, it was -- it was to

 8   check in with the team, to make sure that, you

 9   know, audit -- the deadlines were being hit,

10   information was being presented to the auditors

11   in a -- in a timely fashion, but, you know,

12   other than that, it was a very capable team

13   that are still current employees of Highland

14   and, you know, they -- they conducted 99

15   percent of -- look, I don't want to give

16   percentages.  I mean, this is -- but I -- I --

17   I played a minimal role towards the end.

18              Before during my earlier years as

19   CFO, I did more, and then as time went on, I

20   did less in it.

21      Q.    Okay.  Was there a person at

22   Highland who was responsible for overseeing

23   Highland's participation in PwC's audit during

24   the time that you were the CFO?

25      A.    Yeah.  I mean, there was -- there

Case 21-03006-sgj Doc 96-14 Filed 10/29/21   Entered 10/29/21 21:52:08   Page 136 of 346

```
                                                      Page 87
 1              WATERHOUSE - 10-19-21

 2    was a -- there was a point -- it varies.  It

 3    varies by year, in function, in time and, you

 4    know, depending on the request, but yes, I

 5    mean, there is -- there is -- there is

 6    generally a point person of communication.

 7         Q.    And who was the point person from

 8    2016 until the time you left Highland?

 9         A.    I don't -- I don't know

10    specifically, but it would have been, you

11    know -- you know, someone on the corporate

12    accounting team.

13         Q.    And was there a head of the

14    corporate accounting team?

15         A.    Yes, so -- yes.

16         Q.    Who was the head of corporate

17    accounting for the five years prior to the time

18    you left Highland?

19         A.    I don't -- if you're asking from

20    2016 on, I don't -- it was Dave Klos, but,

21    again, there was -- there was changes to the

22    team and the reporting structure.  I don't

23    remember exactly when that happened during --

24    you know, over the last -- since 2016.

25         Q.    Did the folks who participated and
```

Appx. 00457

Page 88

```
 1              WATERHOUSE - 10-19-21
 2   ran the audit all report to you, directly or
 3   indirectly?
 4        A.    Yes.
 5        Q.    And did you have any responsibility
 6   for making sure that the audit report was
 7   accurate before it was finalized?
 8        A.    Yeah.  I mean, you know, that --
 9   that is -- my responsibility to the auditors
10   was -- again, is -- and the CFO is to -- we are
11   providing accurate financial statements; right?
12              And -- and -- and as part of any
13   audit, we disclose all relevant information as
14   part of any audit.
15        Q.    Okay.  And as the CFO, did you take
16   steps to make sure that the audit report was
17   accurate?
18        A.    I mean, I would say in a general
19   sense, yes.  But, again, I mean, I had a
20   very -- I had a very capable and competent
21   team.  I wasn't managing them.
22              You know, part of what I do is I let
23   the team -- I want managers to grow.  I want
24   managers to have rope.  And that is -- you
25   know, I'm not a stand-behind-you type of guy.
```

Appx. 00458

```
 1                  WATERHOUSE - 10-19-21
 2    If you -- if you talk to my team members, I'm
 3    not micromanaging people.  I want people to
 4    learn and grow in their function so they can go
 5    on and do bigger and better things with their
 6    careers.
 7                And so, yes, generally I was
 8    responsible for it, but I wanted the team to
 9    learn and grow and be responsible for the bulk
10    of the audit.
11        Q.    Did you personally review each audit
12    report before it was finalized to satisfy
13    yourself that it was accurate?
14        A.    I don't -- I don't recall, you know,
15    for every single -- we're talking 2016, there
16    would have been three years, 2016 to '17, '18.
17    I don't -- we're -- we're going back
18    five years-plus.  I don't -- you know, I don't
19    recall.
20        Q.    Did you have a practice that you
21    employed to make sure that you were satisfied
22    that Highland's audit reports were true and
23    accurate to the best of your knowledge?
24        A.    I mean, our -- the practice was set
25    up with our -- the -- the practice to put
```

```
 1                    WATERHOUSE - 10-19-21
 2    together accurate audited or accurate financial
 3    statements is to your control environment.
 4             So, you know, the -- so the practice
 5    was to maintain a stable control environment
 6    which then the output is -- is accurate
 7    financial statements.
 8             So -- so, you know, if I was
 9    comfortable that the control environment was
10    operating, then, you know, that would dictate
11    how I would -- you know, what I might or might
12    not do in a given year.
13        Q.   Okay.  Do you recall ever being
14    uncomfortable with the control environment
15    during the period that you served as CFO?
16        A.   Yeah.  I mean, look, yes, there are
17    times -- you know, nothing is perfect.  So
18    there were -- there were times when, yes, you
19    know -- there are times I learned I was
20    uncomfortable with the control environment, and
21    that is part of the management of the process
22    and having, you know -- and -- and working
23    through whatever obstacles present themselves.
24        Q.   Okay.  Were you ever uncomfortable
25    with the control process as it related to
```

```
                                                        Page 91
 1                 WATERHOUSE - 10-19-21

 2    reporting and disclosures of loans to

 3    affiliates and Mr. Dondero?

 4              MS. DANDENEAU:  Objection to form.

 5        A.    I don't -- I don't recall --

 6        Q.    So you don't recall --

 7        A.    -- the --

 8              MS. DANDENEAU:  Mr. Morris --

 9        A.    I don't recall being uncomfortable.

10    But, again, we're going back several years.  I

11    don't -- you know, the practice in an audit is

12    to disclose all information to the auditors.

13    And I don't -- I don't recall.

14        Q.    As part of the process of the audit,

15    did you sign what is sometimes referred to as a

16    management representation letter?

17        A.    Yes.

18              MR. MORRIS:  Can we put up on the

19         screen a document that we have premarked as

20         Exhibit 33.

21              (Exhibit 33 marked.)

22              MS. DANDENEAU:  Mr. Morris, that is

23         not in the binder; correct?

24              MR. MORRIS:  Correct.

25        Q.    So you will see, Mr. Waterhouse,
```

Page 92

```
 1                 WATERHOUSE - 10-19-21
 2    this is a letter dated June 3rd.  And if we
 3    could go to the signature page.
 4                 And do you see that you and
 5    Mr. Dondero signed this document?
 6        A.    Yes.
 7        Q.    That is your signature; right?
 8        A.    Yes.
 9             MR. MORRIS:  Okay.  Can you go back
10        to the top.
11             MS. DANDENEAU:  Mr. Morris, can you
12        have somebody post this in the chat so that
13        we have can have a copy of this, please.
14             MR. MORRIS:  Yeah, sure.  Asia, can
15        you do that, please.
16        Q.    Okay.  Do you see at the bottom of
17    the second paragraph there is a reference to
18    materiality?
19        A.    Yes.
20        Q.    Okay.  It says, Materiality used for
21    purposes of these representations is
22    $1.7 million.
23                 Do you see that?
24        A.    I do.
25        Q.    And did PwC set that level of
```

```
 1              WATERHOUSE - 10-19-21
 2  materiality?
 3       A.    Yes.
 4       Q.    And for purposes of the audit, did
 5  PwC set the level of materiality each year?
 6       A.    Yes.
 7       Q.    Did that number change over time?
 8       A.    I'm not aware of what materiality is
 9  every single year, so -- but, you know, this
10  number would likely fluctuate.
11       Q.    Okay.  I'm going to go back to a
12  question I asked you earlier today.  And that
13  is in connection -- this letter is issued in
14  connection with the audit for the period ending
15  12/31/2018; correct?
16       A.    Yes.
17       Q.    Okay.  And is it fair to say that if
18  any -- actually, withdrawn.  I'm going to take
19  it outside of this.
20            If Highland ever forgave the loan to
21  any affiliate or any of its officers or
22  employees, in whole or in part, to the best of
23  your knowledge, would that forgiveness have
24  been disclosed in the audited financial
25  statements if it exceeded the level of
```

```
 1                 WATERHOUSE - 10-19-21
 2   materiality that PwC established?
 3                 MS. DANDENEAU:  Objection to form.
 4       A.    So, again, during my tenure as CFO,
 5   and -- Highland -- it was -- it is required to
 6   disclose any affiliate loans that are in excess
 7   of materiality.
 8                 Now, the forgiveness of those loans
 9   may or may not -- I mean, since materiality
10   fluctuates every year, a -- you know, if a loan
11   was forgiven, it may or may not, you know --
12   and, look, I would want to consult the guidance
13   around this.
14                 It is not something we do -- you
15   know, it is not -- you know, GAAP can be and
16   disclosures can be very specialized so, again,
17   we want to consult the guidance.  But we would
18   see if and what would need to be disclosed if
19   it were deemed immaterial.
20       Q.    Did you and Mr. Dondero sign
21   management representation letters of this type
22   in each year in which you served as Highland's
23   CFO?
24       A.    I -- I -- I will speak for myself.
25   I signed them.  There may have been others that
```

```
 1              WATERHOUSE - 10-19-21
 2  signed as well.  I don't -- I don't recall.
 3       Q.    But to the best of your knowledge,
 4  you, personally, signed a management
 5  representation letter in connection with
 6  Highland's audit each year that you served as
 7  the CFO; correct?
 8       A.    I would say generally speaking,
 9  Mr. Morris.  I don't recall for every single
10  year, you know, generally, but I would want to
11  refer to all the rep letters and see who signed
12  them.
13       Q.    Do you recall Highland having its
14  financial statements audited in any year during
15  the period that you were a CFO where you didn't
16  sign the management representation letter?
17       A.    I don't recall.  But, John, we're
18  going back five, six, seven, eight, nine,
19  decade.  I don't -- I don't remember.
20       Q.    I don't want to go back that many
21  decades, but I'm just asking you if you recall
22  that there was you didn't sign it?
23       A.    I -- I -- I don't, but my memory
24  is -- again, I -- I -- I can't tell you what I
25  did in 2012.  I mean, I think generally, yes,
```

```
 1                WATERHOUSE - 10-19-21
 2   but I don't -- I don't know for sure, and I
 3   would want to rely on the document.
 4        Q.    Let me ask the question a little bit
 5   differently then.
 6             Do you have any reason to believe
 7   that Highland had its annual financial audit
 8   and you did not sign a management
 9   representation letter in connection with that
10   audit?
11             MS. DANDENEAU:  Objection to form.
12        A.    I don't believe it would, but,
13   again, I would want to -- I don't recall and I
14   would want to confirm it to -- to make, you
15   know, an affirmative -- to give an affirmative
16   answer.
17        Q.    Do you know whether PwC required
18   management to sign management representation
19   letters?
20             MS. DANDENEAU:  Objection to form.
21        A.    Yes.  I mean, it -- management
22   representation letters are signed by
23   management.
24        Q.    Okay.  And do you know -- do you
25   have any understanding as to why PwC requires
```

```
 1                   WATERHOUSE - 10-19-21
 2    management to sign management representation
 3    letters?
 4               MS. DEITSCH-PEREZ:  Object to the
 5         form.
 6         A.    I don't know why PwC's -- what PwC's
 7    specific practice is.  I know generally what
 8    management representation letters are.
 9         Q.    Okay.  Do you personally -- I'm not
10    asking about PwC.  I'm asking for you -- I'm
11    asking about you, do you have an understanding
12    as to why the auditor asks for management
13    representation letters?
14         A.    Okay.  So you're asking me in my
15    personal capacity, yes, I have a general
16    understanding of why.
17         Q.    Can you give me the general
18    understanding that you have as to why
19    management representation letters are required?
20         A.    They are -- they are required to --
21    they are -- they are one of the items required
22    in an audit to help verify completeness.
23         Q.    Do you have any -- any other
24    understanding as to why management
25    representation letters are required?
```

Page 98

```
 1                 WATERHOUSE - 10-19-21
 2          A.    That is -- that is -- other than
 3    what I said, it is -- it is -- it is required
 4    so -- to ensure that the -- you know, there
 5    is -- there is completeness in what is being
 6    audited.
 7          Q.    Did you -- did you have a practice
 8    whereby you and Mr. Dondero conferred about the
 9    management representation letters before you
10    signed them?
11          A.    No.
12          Q.    Did you have a practice --
13    withdrawn.
14                Do you see just the next sentence
15    after the materiality, there is a sentence that
16    states:  We confirm, to the best of our
17    knowledge and belief, as of June 3rd, 2019, the
18    date of your report, the following
19    representations made to you during your audit.
20                Do you see that sentence?
21          A.    Yes.
22          Q.    Okay.  Did you understand when you
23    signed this letter that you were confirming the
24    representations that followed?
25          A.    When I signed this management
```

```
 1                   WATERHOUSE - 10-19-21
 2   letter -- representation letter, yes.
 3        Q.    Okay.  Did you discuss this letter
 4   with Mr. Dondero before you signed it?
 5        A.    I don't recall.
 6        Q.    Do you recall if Mr. Dondero asked
 7   you any questions before he signed the letter?
 8        A.    I don't recall.
 9        Q.    Do you recall if you asked
10   Mr. Dondero any questions before you signed
11   this letter?
12        A.    I don't recall.
13        Q.    Is it fair to say that Mr. Dondero
14   did not disclose to you the existence of the
15   agreement that we have -- as we've defined that
16   term prior to the time you signed this letter?
17             MS. DANDENEAU:  Objection to form.
18        A.    I don't think I understand the
19   question.  So, again, you are saying, did
20   Mr. Dondero not disclose to me the existence of
21   this letter?
22        Q.    No, I apologize.
23             Did Mr. Dondero disclose to you the
24   existence of the agreement prior to the time
25   you signed this letter on June 3rd, 2019?
```

Page 100

```
 1                  WATERHOUSE - 10-19-21

 2        A.    The agreement -- the agreement that

 3   we talked about earlier?

 4        Q.    Correct.

 5        A.    Look, as I said earlier, the first

 6   time I heard of this agreement was sometime

 7   this year.

 8        Q.    Okay.  Can we turn -- let's just

 9   look at a couple of items on the list.  If we

10   can go to page 33416.  Do you see in Number 35

11   it talks about the proper recording or

12   disclosure in the financial statements of ND

13   relationships and transactions with related

14   parties.

15             Do you see that?

16        A.    I do.

17        Q.    As the CFO, do you have any

18   understanding as to whether Dugaboy is a

19   related party?

20        A.    I don't recall.

21        Q.    Do you know whether any of the

22   affiliates are related parties?

23        A.    If -- if it was NexPoint, HCMFA,

24   HCMS, HCRE, yeah, if -- if that is the

25   affiliate definition, and there.  In ASC 850 --
```

Page 101

```
 1                WATERHOUSE - 10-19-21

 2    again, I mean, I haven't looked at ASC 850 in

 3    quite some time, but, you know, if -- if there

 4    is a control language, you know, ASC 850, would

 5    that -- that section in GAAP would -- would

 6    pick up and define what are related parties.

 7                So, you know, like I said, if -- one

 8    of the four entities I just described, if -- if

 9    they are in that control definition of ASC 850,

10    they would be picked up in 35D.

11         Q.    Do you -- do you have any reason to

12    believe that they would be picked up in that

13    definition, based on your knowledge and

14    experience?

15         A.    I -- I believe that entities

16    controlled under GAAP are -- are affiliates.

17         Q.    Okay.  Would Mr. Dondero also

18    qualify as a related party for purposes of

19    Section 35D, to the best of your knowledge?

20         A.    Yeah, I don't -- I don't know.  I

21    would think -- I would have to read the code

22    section to see if someone personally -- is it

23    talking about related parties.  So, look, if

24    your own in control, yeah, I mean, I would have

25    to read the section.
```

Appx. 00471

Page 102

```
 1               WATERHOUSE - 10-19-21

 2        Q.    To the best of your knowledge, was

 3   the existence of the agreement ever disclosed

 4   to PwC?

 5        A.    I'm not -- I'm not aware.

 6        Q.    Do you recall if the agreement was

 7   ever disclosed in Highland's audited financial

 8   statements?

 9        A.    I don't -- I don't remember if it

10   was in every Highland's audited financial

11   statements during my tenure.  We would have to

12   read the financial statements to see what was

13   disclosed, but I'm not -- I mean, as I sit here

14   today, I'm not aware.

15        Q.    That is all I'm asking for.

16        A.    I'm not aware.

17        Q.    Can we go to the next page, please,

18   and look at 36.  36 says, we have disclosed to

19   you the identity of the partnership's related

20   party relationships and all the related party

21   relationships and transactions of which we are

22   aware.

23               Do you see that?

24        A.    Yes.

25        Q.    To the best of your knowledge, as of
```

Appx. 00472

Page 103

1                    WATERHOUSE - 10-19-21

2    June 3rd, 2019, did Highland disclose to PwC

3    the identity of the partnership's related

4    parties and all the related party relationships

5    and transactions of which it was aware?

6         A.    I mean, I can speak for myself as

7    signer of this representation letter.  I

8    disclosed what -- what, you know, what --

9    what -- what I knew.  Sorry, look, yes, so I --

10   I disclosed what I knew.

11        Q.    Okay.  Can we go to page 419.  Do

12   you see at the end there is a reference to

13   events that occurred since the end of the

14   fiscal year and the date of the letter?

15        A.    Yes.

16        Q.    And were you aware of that -- of

17   that provision of the management representation

18   letter before you signed the document?

19        A.    Yes.

20        Q.    Do you have an understanding as to

21   why PwC asked for that confirmation of that

22   particular part of the management

23   representation letter?

24        A.    It is -- it is -- it is just -- it

25   is a typical audit request.

Appx. 00473

Page 104

1           WATERHOUSE - 10-19-21

2        Q.    And do you understand -- do you have

3    an understanding that PwC wanted to know that

4    as of the date of the audit whether any

5    material changes had occurred since the end of

6    the fiscal year, using the definition of

7    materiality that is in this particular

8    management representation letter?

9        A.    It -- it is -- it is -- it is a --

10   it is as described.  It is just a poorly worded

11   question, so it is hard for me to say yes.

12       Q.    If I asked you this, I apologize,

13   but did you ever learn when the agreement was

14   entered into?

15       A.    I don't -- I don't -- like I said

16   before, I don't know or have any details of the

17   agreement.

18       Q.    Okay.  Did you ever ask anybody when

19   the agreement was entered into?

20       A.    I did not.

21       Q.    Let's look at the audited financial

22   statements.  We will put up on the screen a

23   document that has been premarked as Exhibit 34.

24           (Exhibit 34 marked.)

25           MS. DANDENEAU:  And again, if Ms. La

Page 105

```
 1                WATERHOUSE - 10-19-21

 2           Canty could please put that in the chat

 3           room, that would be great.

 4                MR. MORRIS:  I will assure you we

 5           will put every document in the chat room.

 6           Q.    Now, I'm just going to ask you

 7      questions that are related to the provisions of

 8      this report that concern the affiliate loans,

 9      but again, Mr. Waterhouse, if there is any part

10      of the document that you need to see or that

11      you think you might need to see in order to

12      refresh your recollection to answer any of my

13      questions, will you let me know that?

14           A.    Yes.

15           Q.    Because this is a pretty lengthy

16      document, but do you see that the cover page

17      here is the Highland consolidated financial

18      statements for the period ending December 31st,

19      2018?

20           A.    Yes.

21           Q.    If we can go to -- I think it is the

22      next one, looking for PwC's signature line.

23                MS. CANTY:  I'm sorry, John, did you

24      say something?

25                MR. MORRIS:  Yes, can we turn the
```

```
 1              WATERHOUSE - 10-19-21

 2         page.  I think it is 215.  Yes, stop right

 3         there, just above -- I'm sorry, I want to

 4         see just the date of the report.

 5         Q.    Okay.  Do you see at the bottom of

 6    that page there, Mr. Waterhouse,

 7    PricewaterhouseCoopers has signed this audit

 8    report?

 9         A.    Yes, I see their signature.

10         Q.    Okay.  And it is the dated same day

11    as your management representation letter; is

12    that right?

13         A.    It is -- yes, it is the same day.

14         Q.    Was that the practice to sign the

15    management representation letter on the same

16    day that the audit report was signed?

17         A.    Yes, that is typical in every audit.

18         Q.    Can we just scroll down to the

19    balance sheet on the next page.

20              Do you see that there is a line

21    there that says, Notes and Other Amounts Due

22    from Affiliates?

23         A.    Yes.

24         Q.    Does that line, to the best of your

25    knowledge, include the amounts that were due
```

Page 107

1          WATERHOUSE - 10-19-21

2     under the affiliate under the notes signed by

3     the affiliates and Mr. Dondero?

4          MR. RUKAVINA:  Objection to the

5          extent that calls for a legal conclusion.

6          A.    I mean, I would want to see the

7     detail and the build to this $173,398,000, but,

8     yes, I mean, if -- if -- given what we

9     discussed before, you know, it -- it should

10    capture that.

11         Q.    And -- and while you were the CFO of

12    Highland, were all notes held by Highland that

13    were issued by an affiliate or Mr. Dondero

14    carried as assets on Highland's balance sheets?

15         MS. DANDENEAU:  Objection to form.

16         MS. DEITSCH-PEREZ:  Object to form.

17         A.    I don't -- I don't know how else

18    they would be carried.

19         Q.    Okay.  Can you think of any -- are

20    you aware of any promissory note issued by an

21    affiliate or Mr. Dondero that was not carried

22    on Highland's audited financial balance sheets?

23         A.    I'm -- I'm -- I'm not aware.

24         Q.    Okay.  Are you aware of any category

25    of asset on Highland's balance sheet in which

Appx. 00477

1              WATERHOUSE - 10-19-21

2      any of the promissory notes issued by an

3      affiliate or Mr. Dondero would have been

4      included?

5              MS. DANDENEAU:  Objection to form.

6      A.    Sorry, am I aware of any asset of an

7      affiliate being included --

8      Q.    That -- let me -- let me try again.

9              Do you see there is a number of

10     different assets that are described on this

11     balance sheet?

12     A.    Yes.

13     Q.    One of the assets that is described

14     is Notes and Other Amounts Due from Affiliates;

15     right?

16     A.    Yes.

17     Q.    And it is reasonable to conclude

18     that the notes from the affiliates and

19     Mr. Dondero are included in that line item;

20     right?

21     A.    Yes, based on this description.

22     Again, I would want to see a build of this to

23     100 percent confirm, but based on the

24     description, the asset description, it is -- it

25     is likely.

Page 109

```
 1              WATERHOUSE - 10-19-21
 2              Now, does that mean absolute?  I
 3   don't know.
 4        Q.    Do you have any reason to believe
 5   that the promissory notes would have been
 6   carried on the balance sheet in a category
 7   other than Notes and Other Amounts Due from
 8   Affiliates?
 9        A.    If they were deemed -- no.  If they
10   were deemed an affiliate, you know, under GAAP,
11   they should be carried in that line.
12   Otherwise, it would go into another line.
13        Q.    Okay.  And do you see the total
14   asset base as of December 31st, 2018, was
15   approximately $1.04 billion?
16        A.    Yes.
17        Q.    Is my math correct that the Notes
18   and Other Amounts Due from Affiliates
19   constituted approximately 17 percent of
20   Highland's assets as of the end of 2018?
21        A.    Well, so how are you defining
22   Highland?
23        Q.    Highland Capital Management, L.P.,
24   the entity that this audit is subject to -- or
25   the subject of.
```

Page 110

1                    WATERHOUSE - 10-19-21

2          A.    On a consolidated or unconsolidated

3    basis?

4          Q.    I'm looking at the balance sheet.

5    It is a consolidated balance sheet.  Okay?

6                Does the Notes and Other Amounts Due

7    from Affiliates constitute approximately

8    17 percent of the total assets of Highland

9    Capital Management, L.P., on a consolidated

10   basis?

11               MS. DANDENEAU:  Objection to form.

12         A.    I don't have a calculator in front

13   of me but I will take your math, if you are

14   taking the 173 divided by the billion.

15         Q.    Okay.

16         A.    If that is accurate, yes.  But,

17   again, on a consolidated basis.

18         Q.    And on an unconsolidated basis the

19   percentage would be higher; correct?

20         A.    I -- no.  I don't know.

21         Q.    Well, okay.  That is fair.

22               MR. MORRIS:  Can we turn to

23         page 241, please.

24         Q.    Do you see that this is a section of

25   the audit report that is entitled Notes and

```
 1                    WATERHOUSE - 10-19-21

 2    Other Amounts Due from Affiliates?

 3         A.    Sorry, I can't see the -- the --

 4         Q.    It is at the top.

 5         A.    Notes and Other Amounts Due from

 6    Affiliates, yes, I see that.  I don't -- I

 7    don't have a page number, but I'm on a page

 8    that says at the top:  Notes and Other Amounts

 9    Due from Affiliates.

10         Q.    Okay.  And that is the same title of

11    the line item on the balance sheet that we just

12    looked at; right?  Notes and Other Amounts Due

13    from Affiliates?

14         A.    Yes.

15         Q.    And is it your understanding, based

16    on your experience and knowledge as the CFO,

17    that this is the section of the narrative that

18    ties into the line item that we just looked at?

19         A.    Yes.

20         Q.    And is this section of the audit

21    report intended to describe and disclose all of

22    the material facts concerning the Notes and

23    Other Amounts Due from Affiliates?

24               MS. DANDENEAU:  Objection, form.

25         A.    This -- these notes -- these notes
```

Page 112

                    WATERHOUSE - 10-19-21

1

2    of the financial statements are -- the purpose

3    is to disclose any material items in relation

4    to that balance sheet line item.

5         Q.    Okay.  And all of the information,

6    to the best of your knowledge, that is set

7    forth in this section of the audit report was

8    provided by Highland; correct?

9         A.    Yes, it would have been provided by

10   the corporate accounting team.

11        Q.    Okay.  And the corporate accounting

12   team, did that team report to you in the

13   organizational structure?

14        A.    Yes.

15        Q.    And did you have any concerns about

16   the controls that were in place to make sure

17   that the information provided with respect to

18   Notes and Other Amounts Due from Affiliates was

19   accurate and complete?

20             MS. DANDENEAU:  Objection to form.

21        A.    Not that I recall.

22        Q.    Okay.  Do you recall ever being

23   concerned that any portion of the Notes and

24   Other Amounts Due from Affiliates in any audit

25   report was inaccurate, incomplete, or not

Appx. 00482

Page 113

1           WATERHOUSE - 10-19-21

2    reliable?

3           A.    I didn't -- I had concerns about,

4    you know, like I talked about before, of there

5    were -- there were potentially issues in the

6    control environment.  But as far as it relates

7    to the audited financial statements, any -- the

8    team would work with the auditors to disclose

9    all -- all notes in Highland's possession.

10               And any -- any notes that were

11   deemed material by the auditor, right, these

12   were disclosed in these -- in this section, you

13   know, in -- in the notes to the consolidated

14   financial statements as you presented.

15          Q.    Do you recall ever having a

16   conversation with anybody at any time

17   concerning the accuracy of the section of audit

18   reports that relates to Notes and Other Amounts

19   Due from Affiliates?

20               MS. DANDENEAU:  Objection to form.

21          A.    You know, as -- as -- I didn't have

22   direct conversations with

23   PricewaterhouseCoopers as I had, you know --

24   I -- I had the team that managed this.

25               Again, I wasn't anywhere chose to

```
 1                  WATERHOUSE - 10-19-21
 2   being the point person of this audit.  And I
 3   can't recall, you know, when -- you know, I
 4   don't even know if I was ever the point person
 5   during my tenure as CFO.
 6              I don't know if PwC had any concerns
 7   when they were performing those audit
 8   procedures.  They may have and they may have --
 9   and it may not have been communicated to me.  I
10   don't know.
11              MR. MORRIS:  All right.  I move to
12        strike.
13        Q.    And I'm going to ask you to listen
14   carefully to my question.
15              Did you -- do you recall ever having
16   a conversation with anybody at any time
17   concerning the accuracy of the reporting
18   provided in the audited financial statement on
19   the topic of Notes and Other Amounts Due?
20              MS. DANDENEAU:  Objection to form.
21        A.    I don't recall for this, but that
22   doesn't mean that it didn't exist.
23        Q.    Okay.  But you have no reason to
24   believe, as you sit here right now, that you
25   ever discussed with anybody concerns over the
```

Page 115

```
 1              WATERHOUSE - 10-19-21

 2   accuracy of the section of the audit reports

 3   called Notes and Other Amounts Due from

 4   Affiliates; correct?

 5              MS. DANDENEAU:  Object to the form.

 6              MS. DEITSCH-PEREZ:  Objection to

 7        form.

 8        A.    I don't recall having any

 9   conversations.  But, again, I mean, this is --

10   this is two years ago.

11        Q.    I'm just asking for your

12   recollection, sir.

13        A.    Yes.

14        Q.    If you don't recall, this will --

15        A.    Yeah.

16        Q.    (Overspeak) -- if you don't

17   recall --

18        A.    Yeah, I don't -- I don't recall.

19        Q.    Do you know who was responsible for

20   drafting the audit report?

21        A.    Are you asking the actual Highland

22   employee responsible?  I mean, it was

23   Highland's responsibility, so, I mean, that

24   is --

25        Q.    Right.
```

Appx. 00485

```
 1                    WATERHOUSE - 10-19-21

 2         A.    -- Highland's responsibility.

 3    Highland's responsibility.

 4         Q.    Who, at Highland, was responsible

 5    for drafting this section of the audit report?

 6         A.    I -- I don't know the answer to

 7    that.  Again, there was a team who worked on

 8    this.  And I don't know, you know, whether it

 9    was the staff or the manager.

10              Again, this is where I let the teams

11    manage.  And, you know, there may be a

12    corporate accountant who worked on this.  I

13    just -- you know, I wasn't part of that process

14    to give that person experience.  I don't know.

15         Q.    Do you recall having any

16    communications with anybody at any time

17    concerning this section of the report?

18         A.    Yeah, I don't recall.

19         Q.    Do you recall whether you ever told

20    anybody at any time that any aspect of this

21    section of the report was inaccurate or

22    incomplete?

23         A.    I don't recall.

24         Q.    As you sit here today, do you have

25    any reason to believe that this section of the
```

```
 1                WATERHOUSE - 10-19-21
 2   audit report is incomplete or inaccurate in any
 3   way?
 4                And I'm happy to give you a moment
 5   to -- to look at it, if you would like.
 6                MS. DANDENEAU:  Objection to form.
 7                MS. DEITSCH-PEREZ:  Same.
 8        A.    I mean, I would have to look at -- I
 9   would have to look at the bill to the note
10   schedule to make sure I know you presented me
11   with materiality, but again, there might be a
12   note as of 12/31/18 that somehow was -- was
13   under materiality not disclosed.  I don't -- I
14   don't know.  I would need more information.
15        Q.    Okay.  But without more information,
16   you have no reason to believe anything this
17   section is inaccurate; correct?
18                MS. DANDENEAU:  Objection to form.
19        A.    I don't.  I mean, you know, this was
20   part of the audit.
21        Q.    Thank you.  Now, you will see if we
22   could scroll just a little bit more that each
23   of the first five paragraphs concerns
24   specifically the four affiliates that we've
25   been discussing and Mr. Dondero.
```

```
 1              WATERHOUSE - 10-19-21

 2              MR. MORRIS:  If we could go the

 3         other way, La Asia.  We don't need Okada.

 4         We're going to have to thread the needle.

 5         Okay.  Good, perfect.

 6         Q.   Do you see those five paragraphs

 7    certain the four affiliates and Mr. Dondero as

 8    we've been referring to today?

 9         A.   Yes.

10         Q.   Okay.  And do you see at the end of

11    every paragraph it states, quote:  A fair value

12    of a partnership's outstanding notes receivable

13    approximates the carrying value of the notes

14    receivable?

15         A.   Yes, I see that.

16         Q.   Do you have an understanding of what

17    that means?

18         A.   Yes.

19         Q.   What is your understanding of that

20    sentence?

21         A.   It is the -- again, the -- the fair

22    value, right, which is -- which is what the --

23    what Highland could sell that asset for.  This

24    statement is comparing the fair value of the

25    notes to the carrying value, so the carrying
```

Page 119

```
 1              WATERHOUSE - 10-19-21

 2   value is the line item that you showed me

 3   earlier that is in Notes and Other Amounts Due

 4   from Affiliates.

 5        Q.    Okay.  Is another way to say this is

 6   that the fair market value of the notes equals

 7   the principal amount and -- withdrawn.

 8              Is the fair way to interpret this

 9   that the fair market value of the notes equals

10   all remaining unpaid principal and interest due

11   under the notes?

12              MS. DANDENEAU:  Object to the form.

13              MS. DEITSCH-PEREZ:  Objection, form.

14        A.    I don't know the answer to that,

15   because I don't recall where -- where any --

16   where -- in what line item was the interest

17   component reported.

18        Q.    All right.  Well, if we look in this

19   audit report, you will see in the middle of the

20   first paragraph, for example, it states that as

21   of December 31st, 2018, total interest and

22   principal due on outstanding promissory notes

23   was approximately $5.3 million.

24              Do you see that?

25        A.    I do.
```

Appx. 00489

Page 120

1            WATERHOUSE - 10-19-21

2        Q.    Is that the carrying value or the

3    fair value?

4        A.    That would be the carrying value --

5        Q.    And is the last --

6        A.    -- in my opinion.

7        Q.    Okay.  And it is in your opinion as

8    the chief financial officer of Highland during

9    the period of time that you described; right?

10   It is an educated opinion?

11       A.    I'm reading this at face value.  I'm

12   taking that as that is carrying value.

13       Q.    Okay.  And does the last sentence

14   say that the carrying value is roughly

15   approximate to the fair market value?

16            MS. DANDENEAU:  Objection to form.

17            MS. DEITSCH-PEREZ:  Objection, form.

18       A.    Again, this note to the financial

19   statement is specific to notes and other

20   amounts due from affiliates.

21       Q.    Correct.

22       A.    If the interest component is

23   reported elsewhere on the balance sheet, you

24   know, it -- it -- it could be off.  Again, I

25   don't have the detail.  I don't know, but yes,

```
 1              WATERHOUSE - 10-19-21

 2    look, I mean, if you -- I mean, if you are

 3    saying the 5.3 million is in the notes and

 4    other amounts due from affiliates, then the

 5    last statement is saying the fair value

 6    approximates 5.3 million.  That is what that

 7    last sentence is saying.

 8         Q.    Do you see in the middle of the

 9    first paragraph -- not in the middle, the next

10    to last sentence there is a statement that the

11    partnership will not demand payment on amounts

12    that exceed HCMFA's excess cash availability

13    prior to May 31st, 2021.

14              Do you see that?

15         A.    I do.

16         Q.    Do you know when Highland agreed not

17    to demand payment as described in that

18    sentence?

19         A.    I don't know specifically.

20         Q.    Do you know why Highland agreed not

21    to demand payment on HCMFA's notes until May

22    2021?

23         A.    Yes.

24         Q.    Why was that decision made?

25         A.    You know, well, it -- it -- that
```

Page 122

1          WATERHOUSE - 10-19-21

2    decision was made as to not put HCMFA into a

3    position where it didn't have sufficient assets

4    to pay for the demand note.

5          Q.    And at the time the agreement was

6    entered into, pursuant to which the partnership

7    wouldn't demand payment, did HCMFA have

8    insufficient assets to satisfy the notes if a

9    demand had been made?

10              MS. DANDENEAU:  Objection to form.

11         A.    I don't have HCMFA's financial

12   statements in front of me as of 12/31/18.

13         Q.    Was there a concern that HCMFA would

14   be unable to satisfy its demands under the

15   notes if demand was made?

16              MS. DANDENEAU:  Objection to form.

17         A.    Well, there is -- I don't recall --

18   I mean, there is something, right, in place to

19   basically not demand payment until May 31, 2021

20   as detailed here.

21         Q.    And who made the decision to enter

22   into -- who made the decision on behalf of

23   Highland not to demand payment until May 31st,

24   2021?

25         A.    I'm trying to remember.  I don't

Appx. 00492

Page 123

1          WATERHOUSE - 10-19-21

2     remember exactly -- I don't remember if it was

3     myself or -- or Jim Dondero who -- who -- there

4     was -- there was something signed, from what I

5     recall, that -- that -- that backed up this

6     line item in the -- in the notes I'm -- look,

7     I'm, I'm --

8          Q.    We will get to that.

9          A.    You --

10         Q.    I'm just --

11         A.    You have -- I mean --

12         Q.    We're going to give that to you.

13    I'm going to give that to you.

14         A.    You -- you -- you have all the

15    documents.  I don't have the documents, and

16    that is what makes it so hard.  I don't have

17    any documents to prepare for this deposition;

18    right?  You have all -- I don't -- I don't -- I

19    don't remember, but, you know, again, it would

20    probably be myself or Jim.

21         Q.    Do you know if Highland received

22    anything in return for its agreement not to

23    make a demand for two years?

24         A.    I don't -- I don't think it referred

25    anything.

Page 124

```
 1              WATERHOUSE - 10-19-21

 2        Q.    And did you and Mr. Dondero discuss

 3   HCMFA's ability to satisfy the notes if a

 4   demand was made at the time this agreement was

 5   entered into?

 6              MS. DANDENEAU:  Objection to form.

 7        A.    I don't -- I don't -- I don't recall

 8   having a specific conversation, if I did, or --

 9   or David Klos.

10        Q.    Okay.  I'm just asking if you recall

11   any conversations that you had.

12        A.    I don't recall.

13        Q.    Okay.  Do you know why Highland

14   loaned the money to HCMFA that is the subject

15   of the notes described in this paragraph?

16        A.    I don't remember specifically why

17   5.3 million was loaned.  I mean, I -- it would

18   have to be put in the context.

19        Q.    Do you have any recollection at all

20   as to why Highland ever loaned any money to

21   HCMFA?

22        A.    Yes.

23              MS. DANDENEAU:  Objection to form.

24        Q.    What do you remember about that?

25        A.    There was a Highland Global
```

Appx. 00494

Page 125

1            WATERHOUSE - 10-19-21

2    Allocation Fund, which was a -- a fund managed

3    by Highland Capital Management Fund Advisors.

4    There was a -- we -- I'm just telling you,

5    there was -- there was -- there was a -- a

6    ultimately a NAV error found in this fund while

7    it was an open-ended fund and, you know, there

8    were amounts owed by the advisor in -- in

9    relation to that NAV error.

10           There were also, for the same fund,

11   that same fund was ongoing an

12   open-end-to-close-end conversion, and as part

13   of that proposal, shareholders who voted for

14   the conversion received compensation from the

15   advisor.

16      Q.   All right.  Now, the events that

17   you're describing occurred in the spring of

18   2019; right?

19      A.   These started back -- I think, I

20   mean --

21      Q.   I apologize.

22      A.   -- that -- I mean, the answer to

23   that is no.

24      Q.   I apologize, the loans that were

25   made in connection with the events that you're

Appx. 00495

```
 1              WATERHOUSE - 10-19-21
 2   describing occurred in May 2019; right?
 3              MR. RUKAVINA:  Objection to the
 4         extent that calls for a legal conclusion.
 5         A.   I don't recall specifically what
 6   amounts of money were moved when, for what
 7   purpose.
 8         Q.   Okay.  Fair enough.  Going to the
 9   next paragraph, do you recall that NexPoint
10   Advisors had obtained a number of loans from
11   Highland, and they rolled up those loans into
12   one note in approximately 2017?
13         A.   This is for NexPoint Advisors?
14         Q.   Yes.
15         A.   I -- I mean, I don't -- I don't
16   recall the NexPoint Advisors loan being a
17   roll-up loan, but --
18         Q.   Do you know why?
19         A.   But, look, if you have documents
20   that show -- I mean, look, I just don't recall.
21         Q.   Okay.  That is fair.  Do you know
22   why -- do you have any recollection as to why
23   Highland loaned money to NexPoint?
24         A.   Yes.
25         Q.   Why did High -- why do you recall --
```

```
 1                  WATERHOUSE - 10-19-21
 2    what is the reason you recall Highland lending
 3    money to NexPoint?
 4         A.    I mean, I was just -- I just -- I
 5    just recall.  I mean, I just -- I don't
 6    remember why.
 7         Q.    I understand.  And I'm asking you if
 8    you recall --
 9         A.    Oh, why -- I thought you say --
10    NexPoint Advisors was launching a fund which
11    is -- I believe that the legal name is NexPoint
12    Capital, Inc.  And it -- it provided a
13    co-invest into that fund.
14               And, from what I remember, the --
15    the -- that NexPoint borrowed money from
16    Highland at the time to make that co-invest.
17         Q.    So this was an investment that
18    NexPoint was required to make; is that right?
19               MS. DANDENEAU:  Objection to form.
20         A.    I don't know if it was required to
21    make, I don't recall that, or if it just made
22    it.
23         Q.    Okay.  But your recollection is that
24    NexPoint made an investment and they borrowed
25    money from Highland to finance the investment.
```

Page 128

```
 1              WATERHOUSE - 10-19-21

 2              Do I have that right?

 3         A.   Yes.

 4         Q.   How about HCRE?  Do you know why

 5    HCRE borrowed money from Highland?

 6         A.   I don't remember specifically.

 7         Q.   Do you remember generally?

 8         A.   Generally, yeah -- I mean, yes.

 9         Q.   Can you tell me your general

10    recollection as to why Highland loaned money to

11    HCRE?

12         A.   For -- for -- for investment

13    purposes.

14         Q.   So HCRE made the investment and it

15    obtained a loan, or loans, from Highland in

16    order to finance that investment or those

17    investments.

18              Do I have that right?

19         A.   I mean, I -- you know, generally.

20         Q.   Okay.  How about Highland Management

21    Services, Inc.?

22              Do you have any recollection as to

23    why HCMS borrowed money from Highland?

24         A.   Generally.

25         Q.   What is your general recollection as
```

Appx. 00498

Page 129

```
 1              WATERHOUSE - 10-19-21

 2    to why HCMS borrowed money from Highland?

 3         A.    For -- for investment purposes.

 4         Q.    So it is the same thing, HCMS wanted

 5    to make investments and it borrowed money from

 6    Highland in order to finance those investments;

 7    is that right?

 8         A.    I mean, yes, generally.  I mean, I

 9    can't -- I don't -- on the services, there --

10    there are several loans in these schedules.

11    You know, I can't remember why every single one

12    of these were made, but I would say, yeah, I

13    mean, generally.

14         Q.    Okay.  I appreciate that.

15              MR. MORRIS:  Let's go to the page

16         with Bates No. 251.  La Asia, are you

17         there?

18              MS. CANTY:  Sorry, John.  It went

19         out for a minute.  Can you say that again.

20         I don't know what is going on.

21              MR. MORRIS:  The page with Bates

22         No. 251, can we go to that.

23              MS. CANTY:  Yes, sorry.

24              MR. MORRIS:  Keep going to the

25         bottom.  Yeah, there you go.
```

Page 130

```
 1              WATERHOUSE - 10-19-21
 2      Q.    Do you see, Mr. Waterhouse, that
 3   there is a section there called Subsequent
 4   Events?
 5      A.    I do.
 6      Q.    And does this relate to the last
 7   sentence above the signature line on the
 8   management representation letter that we talked
 9   about earlier where you made the representation
10   that you disclosed subsequent events?
11      A.    I mean, it relates to it, but not in
12   its entirety.
13      Q.    Okay.
14            MR. MORRIS:  If we can scroll up to
15        capture the entirety of this section right
16        here.
17      Q.    And what do you mean by that, sir?
18            MR. MORRIS:  Yeah, right there.
19        Perfect.
20      A.    There are -- there are different
21   subsequent events in -- under GAAP.  So there
22   are -- and -- and -- so what we see in the
23   notes to the financial statements are one type
24   of subevent.
25      Q.    Okay.  And -- and would the type of
```

1                WATERHOUSE - 10-19-21

2    subsequent event relating to affiliate loans be

3    captured in this section if they were -- if

4    they were made after the end of the fiscal year

5    and prior to the issuance of the audit report?

6         A.    Yes, if they were deemed material or

7    disclosable.

8         Q.    Okay.  I appreciate that.

9               Do you see the next to the last

10   entry there?  It says, Over the course of 2019

11   through the report date, HCMFA issued

12   promissory notes to the partnership in the

13   aggregate amount of $7.4 million?

14        A.    Yes.

15        Q.    And does that refresh your

16   recollection that those are the notes that

17   related to the NAV error that you mentioned

18   earlier?

19        A.    I don't -- I don't remember the

20   exact.  Again, there are -- I mentioned two

21   line items; right?

22        Q.    Yes.

23        A.    I mean, it was the GAAP conversion

24   process plus the -- the NAV error.  I don't

25   have the details.  I don't recall specifically

Page 132

```
 1              WATERHOUSE - 10-19-21
 2   if -- you know, what -- if that 7.4 million was
 3   solely attributable to the NAV error.
 4        Q.    Okay.  But there is no question that
 5   Highland told PricewaterhouseCoopers that over
 6   the course of 2019 HCMFA issued promissory
 7   notes to the partnership in the aggregate
 8   amount of $7.4 million; correct?
 9        A.    In the course of the audit, we would
10   have produced all promissory notes in our
11   possession, including the ones that are
12   detailed here.
13        Q.    Do you recall that you signed the
14   two promissory notes that are referenced in
15   that provision?
16              MS. DANDENEAU:  Objection to form.
17        A.    I didn't recall initially but I've
18   been reminded.
19        Q.    Okay.  And -- and do you recall that
20   those notes are dated May 2nd and May 3rd,
21   2019?
22        A.    Yes.
23        Q.    So that was just a month before the
24   audit was completed; correct?
25        A.    Yes.  I think we had a June 3rd
```

```
 1                WATERHOUSE - 10-19-21

 2   date, right, if -- if my memory serves me

 3   right.

 4        Q.    Yes, I will represent to you that

 5   your memory is accurate in that regard.

 6              Did anybody ever instruct you as the

 7   CFO to correct this statement that we're

 8   looking at in subsequent events?

 9        A.    So let me understand.  You're saying

10   when I was CFO at Highland Capital did anyone

11   ever ask me to correct the -- over the course

12   of 2019 through the report date HCMFA issued

13   promissory notes, this statement?

14        Q.    Right.

15        A.    Not that I'm aware.

16        Q.    While you were the CFO of Highland,

17   did anybody ever tell you that that sentence

18   was wrong?

19        A.    Not that I'm aware.

20        Q.    Highland -- withdrawn.

21              HCMFA disclosed these notes in its

22   own audited financial statements; right?

23              MR. RUKAVINA:  Objection, form.

24        A.    I assume that these would be

25   material -- if these are material financial
```

```
 1                WATERHOUSE - 10-19-21

 2    statements, yes, they -- they -- they should be

 3    and they were likely disclosed.

 4         Q.    Now, there is no statement

 5    concerning the 2019 notes about the forbearance

 6    that we looked at in the affiliated note

 7    section of the report; right?

 8                MS. DANDENEAU:   Objection to form.

 9         Q.    I'll withdraw.  That was bad.

10                Do you recall when we were looking

11    at the paragraph concerning HCMFA earlier it

12    had that disclosure about the agreement whereby

13    Highland wouldn't ask for demand on the -- on

14    the HCMFA notes?

15         A.    Yes.

16         Q.    That forbearance disclosure is not

17    made with respect to the 2019 notes; right?

18         A.    Not -- look, not that I can recall,

19    unless -- unless it was done at a subsequent

20    day.

21         Q.    Right.  And it is not in the

22    subsequent event section that we're looking at

23    right now where the 2019 notes are described;

24    right?

25         A.    Right.  But this is through
```

1              WATERHOUSE - 10-19-21

2     June 3rd.  It could have been done on June 4th.

3     I don't -- I don't -- I don't recall.

4          Q.   Okay.

5               MR. MORRIS:  Can we put up on the

6          screen the HCMFA audit report.  And while

7          we're --

8               MS. DANDENEAU:  What exhibit is

9          this?

10              MR. MORRIS:  La Asia, what number is

11         that?

12              MS. CANTY:  45.

13              MR. MORRIS:  So this will be marked

14         as Exhibit 45.

15              (Exhibit 45 marked.)

16              MS. CANTY:  Yeah, and I will put it

17         in the chat.

18              MS. DANDENEAU:  Thank you.

19         Q.   Okay.  All right.  Do you see that

20    this is the consolidated financial statements

21    for HCMFA for the period ending 12/31/18?

22         A.   Yes.

23         Q.   As the treasurer of HCMFA at the

24    time, did you have to sign a management

25    representation letter similar to the one that

Page 136

```
 1                 WATERHOUSE - 10-19-21
 2    we looked at earlier for Highland?
 3         A.    I would imagine I would have been
 4    asked to.  I don't recall if I did.
 5         Q.    Do you recall ever being asked by an
 6    auditor to sign a management representation
 7    letter and then not doing it?
 8         A.    No.
 9               MR. MORRIS:  Can we just scroll down
10         again.  I just want to see the date of the
11         document.
12         A.    I mean, let me -- you know, there
13    are different versions to management
14    representation letters I will qualify.
15               Yes, there are certain -- from time
16    to time auditors can make representations
17    that -- in the rep letter that is being
18    proposed that are inaccurate or out of scope or
19    things like that and they've asked for
20    signature.
21               In that context, yes.  I mean, you
22    know -- I mean, if I have been asked to sign
23    and make those representations and those
24    representations are invalid, yes, I would not,
25    I mean, I -- I wouldn't sign that.
```

Appx. 00506

Page 137

```
 1              WATERHOUSE - 10-19-21

 2        Q.    Okay.  PricewaterhouseCoopers served

 3    as HCMFA's outside auditors as well; correct?

 4        A.    Yes.

 5        Q.    Do you see that this audit report is

 6    signed on June 3rd, 2019, just like the

 7    Highland audit report?

 8        A.    That is correct.

 9        Q.    And did the process of -- of

10    preparing HCMFA's audit report, was that the

11    same process that Highland followed when it did

12    its audit report at this time?

13        A.    I mean, it is a different entity.

14    There are different assets.  You know, it --

15    it -- it is -- as you saw, Highland's

16    financials are on a consolidated basis.  This

17    is different, so it is under the same control

18    environment and team.

19        Q.    Okay.  I appreciate that.  So the

20    same control environment and team participated

21    in the preparation of the audit for Highland

22    and for HCMFA at around the same time; correct?

23        A.    Yes.

24              MR. MORRIS:  Can we go to page 17 of

25        the report.  I don't have the Bates number.
```

```
 1              WATERHOUSE - 10-19-21

 2        Q.    Okay.  Do you see that just like

 3   Highland's audited financial report, HCMFA's

 4   audited financial report also has a section

 5   related to subsequent events?

 6        A.    Yes.

 7        Q.    And am I reading this correctly that

 8   just as Highland had done, HCMFA disclosed in

 9   its audited financial report a subsequent event

10   that related to the issuance of promissory

11   notes to Highland in the aggregate amount of

12   $7.4 million in 2019?

13        A.    That is what I see in the report.

14        Q.    And you were the treasurer of HCMFA

15   at the time; right?

16        A.    Yes, to the best of my knowledge.

17        Q.    And did anybody ever tell you prior

18   to the time of the issuance of this audit

19   report that that sentence relating to HCMFA's

20   2019 notes was inaccurate or wrong in any way?

21        A.    Not that I recall.

22        Q.    As you sit here right now, has

23   anybody ever told you that that sentence is

24   inaccurate or wrong in any way?

25        A.    Not that I recall.
```

Page 139

```
 1              WATERHOUSE - 10-19-21

 2        Q.    I apologize if I asked you this

 3    already, but has anybody ever told you at any

 4    time that you are not authorized to sign the

 5    promissory notes that are the subject of the

 6    sentence we're looking at?

 7        A.    Not that I recall.

 8        Q.    Did anybody ever tell you at any

 9    time that you had made a mistake when you

10    signed the promissory notes that are the

11    subject of this sentence?

12        A.    Say that again.  Did anyone ever say

13    that I made a mistake?

14        Q.    Let me ask the question again.

15              Did anybody ever tell you at any

16    time that you made a mistake when you signed

17    the two promissory notes in Highland's favor on

18    behalf of HCMFA in 2019?

19        A.    Not that I recall.

20              MR. MORRIS:  Let's just look at the

21        promissory notes quickly.  Can we please

22        put up Document Number 1, and so this is in

23        the pile that y'all have.  We'll just go

24        for a few more minutes and we can take our

25        lunch break.
```

Appx. 00509

Page 140

1              WATERHOUSE - 10-19-21

2       Q.   All right.  So I don't know if you

3   have seen this before, sir.  Do you see that

4   this is a complaint against HCMFA?

5       A.   Yes, I am looking at it on the

6   screen.

7       Q.   Okay.  And have you ever seen this

8   document before?

9       A.   I went through some of these

10  documents with my counsel here yesterday.

11           MR. MORRIS:  All right.  Can we go

12       to Exhibit 1 of this document.

13       Q.   Do you see Exhibit 1 is a

14  $2.4 million promissory note back in 2019?

15       A.   Yeah, I found it in the book.  Yes,

16  I have it here in front of me.

17       Q.   And this is a demand note, right, if

18  you look at Paragraph 2?

19       A.   Yes.

20       Q.   And this is a note where the maker

21  is HCMFA, and Highland is the payee; right?

22       A.   Yes.

23           MR. MORRIS:  And if we can scroll

24       down, can we just see Mr. Waterhouse's

25       signature.

Appx. 00510

```
 1                  WATERHOUSE - 10-19-21

 2           Q.    Is that your signature, sir?

 3           A.    Yes, it is.

 4           Q.    And did you sign this document on or

 5    around May 2nd, 2019?

 6           A.    I don't recall specifically signing

 7    this, but this is my signature.

 8           Q.    Okay.  And do you recall that

 9    Highland transferred $2.4 million to HCMFA at

10    or around the time you signed this document?

11           A.    I don't recall specifically.  I

12    would want to, as I sit here today, go back and

13    confirm that, but again, presumably that --

14    that -- that did happen.

15           Q.    You wouldn't have signed this

16    document if you didn't believe that HCMFA

17    either received or was going to receive

18    $2.4 million from Highland; is that fair?

19           A.    I mean, it -- if -- if -- if there

20    wasn't a transfer of value, yeah, I mean, you

21    know, I would have no reason to -- to sign a

22    note.

23           Q.    And -- and Highland wouldn't have

24    given this note to PricewaterhouseCoopers if --

25    withdrawn.
```

Page 142

1          WATERHOUSE - 10-19-21

2              HCMFA wouldn't have given this note

3     to PricewaterhouseCoopers if it hadn't received

4     the principal value of -- of the note in the

5     form of a loan; correct?

6              MR. RUKAVINA:  Objection, legal

7          conclusion, speculation and form.

8      A.    Again, we -- what we provided to PwC

9     were, as part of the audit, any promissory

10    notes executed and outstanding.  You know, as a

11    part of the audit, they, you know, they -- they

12    have copies of all the bank statements,

13    things -- things of that sort.

14              MR. MORRIS:  Okay.  Can we go to

15          Exhibit 2.

16              (Exhibit 2 marked.)

17      Q.    Do you see that this is a promissory

18    note dated May 3rd, 2019 in the amount of

19    $5 million?

20      A.    Yes.

21      Q.    Do you believe this is also a demand

22    note if you look at Paragraph 2?

23      A.    Yes.

24      Q.    And do you see that HCMFA is the

25    maker, and Highland is the payee?

```
 1                  WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    And if we go to the bottom, can we

 4   just confirm that that is your signature?

 5        A.    Yes.

 6        Q.    And together these notes are the

 7   notes that are referred to both in Highland and

 8   HCMFA's audited financial reports in the

 9   subsequent event sections; correct?

10              MS. DANDENEAU:  Objection to form.

11        A.    They -- they -- they totaled

12   $7.4 million, so presumably, yes.

13        Q.    Okay.  And you were authorized to

14   sign these two notes; correct?

15              MR. RUKAVINA:  Objection, legal

16        conclusion.

17        A.    Yeah.  I mean, I'm -- I was the

18   officer of -- of HCMFA.  You know, I -- I'm not

19   the legal expert on -- on what that -- what

20   that confers to me or what it doesn't.  I mean,

21   that is my signature on the notes.

22        Q.    And you believed you were authorized

23   to sign the notes; is that fair?

24        A.    I signed a lot of documents in my

25   capacity, just because it is operational in
```

Page 144

```
 1              WATERHOUSE - 10-19-21

 2    nature.  So, you know, to me this was just

 3    another document, to be perfectly honest.

 4         Q.    Sir, would you have signed

 5    promissory notes with the principal amount of

 6    $7.4 million if you didn't believe you were

 7    authorized to do so?

 8              MS. DANDENEAU:  Objection to form.

 9         Q.    Are you frozen?

10         A.    No.  I'm just -- you know, it is --

11    you know, again, I typically don't sign

12    promissory notes, and I don't recall why I

13    signed these, but -- you know, but I did.

14         Q.    All right.  So listen carefully to

15    my question.  Would you have ever signed

16    promissory notes with a face amount of

17    $7.4 million without believing that you were

18    authorized to do so?

19         A.    No.  I mean, I'm -- I'm putting my

20    signature on there, so no.

21         Q.    Okay.  And would you have signed two

22    promissory notes obligating HCMFA to pay

23    Highland $7.4 million without Mr. Dondero's

24    prior knowledge and approval?

25              MS. DEITSCH-PEREZ:  Object to the
```

Page 145

```
 1              WATERHOUSE - 10-19-21

 2       form.

 3       A.    You know, from -- from what I recall

 4  around these notes, you know, I don't recall

 5  specifically Mr. -- Mr. Dondero saying to -- to

 6  make this a loan.

 7              So my conversation with Mr. Dondero

 8  around the culmination of the NAV error as

 9  related to TerreStar which was a -- a -- I

10  think it was a year and a half process.  I

11  don't know, it was a multi-month process, very

12  laborious, very difficult.

13              When we got to the end, I had a

14  conversation with Mr. Dondero on where to, you

15  know, basically get the funds to reimburse the

16  fund, and I recall him saying, get the money

17  from Highland.

18       Q.    And so he told you to get the money

19  from Highland; is that right?

20       A.    That is what I recall -- in my

21  conversation with him, that is -- that is what

22  I can recall.

23       Q.    Do you know who drafted these notes?

24       A.    I don't.

25       Q.    Did you ask somebody to draft the
```

Appx. 00515

Page 146

```
 1              WATERHOUSE - 10-19-21
 2   notes?
 3       A.   I didn't ask -- I don't specifically
 4   ask people to draft notes really.  I mean,
 5   again, you know, the legal group at Highland is
 6   responsible and has always been responsible for
 7   drafting promissory notes.
 8       Q.   So based on your -- based on the
 9   practice, you believe that somebody from the
10   Highland's legal department would have drafted
11   these notes.  Do I have that right?
12            MS. DEITSCH-PEREZ:  Object to the
13       form.  John, I also asked you for the Word
14       versions of these notes so we could look at
15       the properties, and you have not provided
16       them.  Are you intending to?
17            MR. MORRIS:  No.
18       Q.   Can you answer my question, sir?
19       A.   Again, I --
20            MS. DANDENEAU:  Do you want him to
21       repeat it?
22       A.   Yeah, why don't you repeat it?
23       Q.   Sure.  Mr. Waterhouse, based on the
24   practice that you have described in your
25   understanding, do you believe that these notes
```

Appx. 00516

Page 147

```
 1               WATERHOUSE - 10-19-21
 2   would have been drafted by somebody in the
 3   legal department?
 4               MS. DEITSCH-PEREZ:  Object to the
 5      form.
 6      A.   Yes.
 7      Q.   Okay.  And do you know who would
 8   have instructed -- do you have any knowledge as
 9   to who would have instructed the legal
10   department to draft these notes?
11               MS. DEITSCH-PEREZ:  Object to the
12      form.
13      A.   It was whoever was working -- I
14   mean, it was likely someone on the team.  I
15   mean, I don't remember exactly on every note or
16   every document, but, again, a lot of these
17   things of this nature -- they're operational in
18   nature -- were handled by the team.
19               The team knows to -- I mean, we
20   don't draft documents.  We're not lawyers.
21   We're not attorneys.  It is not what I do or
22   accountants do.
23               So they are always instructed to go
24   and -- and go to the legal team to get
25   documents like this drafted.  Also, when you go
```

1           WATERHOUSE - 10-19-21

2    to the legal team, the -- you know, we always

3    loop in compliance.  And compliance -- when you

4    go to the legal team, compliance is part of

5    legal team.  They're made aware of -- of -- of

6    these types of transactions.

7         Q.    And do you believe that you had

8    the -- withdrawn.

9               Did you ever tell Mr. Dondero --

10   (inaudible) -- did you see those?

11        A.    Sorry.

12              MS. DEITSCH-PEREZ:  I did not hear

13         the end of that question.

14        Q.    Did you ever tell Mr. Dondero that

15   you signed these two notes?

16        A.    I don't recall ever -- no, I don't

17   recall having a conversation with him.

18        Q.    Did you ever discuss these two notes

19   with him at any time?

20        A.    The conversation, I recall, was what

21   I described earlier.  And that is the only time

22   I recall ever discussing this.

23        Q.    Okay.  But the corporate accounting

24   group had a copy of this -- of these two notes.

25   And pursuant to the audit process, the

```
 1                  WATERHOUSE - 10-19-21

 2   corporate accounting group gave the two notes

 3   to PricewaterhouseCoopers in connection with

 4   the audit; correct?

 5             MS. DANDENEAU:  Objection to form.

 6        A.    Yes.  I mean, that is -- yeah, I

 7   mean, they -- unless the legal team can also

 8   retain copies of items like this.  I mean, I

 9   don't know everything that they would retain as

10   well.

11             The legal team would also, if they

12   had documents as part of audits, turn that over

13   to the auditors as well.  So it could have been

14   the corporate accounting team.  It could be

15   someone on the legal team.

16        Q.    All right.  So you didn't -- you

17   didn't draft this note; right?

18        A.    I -- I -- I did not.

19        Q.    But somebody at Highland did; is

20   that fair?

21             MS. DEITSCH-PEREZ:  Object to the

22        form.

23        A.    I don't know.  I mean, we can go to

24   the legal team.  I don't -- I'm not sitting

25   behind someone in legal.  Maybe they went to
```

Page 150

```
 1                WATERHOUSE - 10-19-21

 2   outside counsel.  I have no idea.

 3        Q.    Did you have any reason to believe

 4   you weren't authorized to sign this note,

 5   either of these two notes?

 6        A.    I think I have already answered that

 7   question.

 8        Q.    Okay.  You didn't give these notes

 9   to PricewaterhouseCoopers; correct?

10             MS. DANDENEAU:  Objection to form.

11        A.    I don't recall giving these to

12   PricewaterhouseCoopers.

13        Q.    And in the practice that you have

14   described, somebody in the corporate accounting

15   group would have given these two notes to

16   PricewaterhouseCoopers; correct?

17             MS. DANDENEAU:  Objection to form.

18        A.    I think I've answered that.  I said

19   either the corporate accounting team or maybe

20   the legal team.

21             MR. MORRIS:  Okay.  Why don't we

22        take our lunch break here.

23             VIDEOGRAPHER:  We're going off the

24        record at 1:04 p.m.

25        (Recess taken 1:04 p.m. to 1:49 p.m.)
```

Appx. 00520

Page 151

```
 1              WATERHOUSE - 10-19-21

 2              VIDEOGRAPHER:  We are back on the

 3         record at 1:49 p.m.

 4         Q.   Mr. Waterhouse, did you speak with

 5   anybody during the break about the substance of

 6   this deposition?

 7         A.   I spoke to -- to Deb and Michelle.

 8         Q.   About the substance of the

 9   deposition?

10         A.   Yes.

11         Q.   Can you tell me what you talked

12   about?

13              MS. DANDENEAU:  No.  We object on

14         the basis of privilege.

15         Q.   Okay.  You are going to follow your

16   counsel's objection here?

17         A.   Yes.

18         Q.   Okay.

19              MR. MORRIS:  Can we put up on the

20         screen Exhibit 35.

21              (Exhibit 35 marked.)

22         Q.   Are you able to see that document,

23   sir?

24         A.   Yes.

25         Q.   Have you ever seen an incumbency
```

Appx. 00521

Page 152

```
 1              WATERHOUSE - 10-19-21

 2    certificate before?

 3         A.    I have.

 4         Q.    Do you have a general understanding

 5    of what an incumbency certificate is?

 6         A.    I have a general understanding.

 7         Q.    What is your general understanding?

 8         A.    You know, those -- my general

 9    understanding is that the incumbency

10    certificate basically lists folks that can --

11    are like authorized signers.

12         Q.    Okay.  And do you see that this is

13    an incumbency certificate for Highland Capital

14    Management Fund Advisors, L.P.?

15         A.    Yes.

16         Q.    Okay.  And if we could scroll down

17    just a little bit, do you see that it's dated

18    effective as of April 11th, 2019?

19         A.    Yes, I see that.

20         Q.    Okay.  And is that your signature in

21    the middle of the signature block?

22         A.    Yes, it is.

23         Q.    And by signing it, did you accept

24    appointment as the treasurer of HCMFA effective

25    as of April 11th, 2019?
```

Page 153

1            WATERHOUSE - 10-19-21

2        A.    Again, I'm not the legal -- I don't

3   know if this makes me the treasurer or the

4   appointment.  I don't know -- I don't know

5   that, so I don't -- I don't know if that

6   document -- again, I think -- again, I'm not

7   the legal expert.  I think isn't there --

8   aren't there other legal documents that detail

9   who the officers are that could be incorporated

10  or things like that?  Again, I don't want to

11  play armchair attorney here.

12        Q.    I'm not asking you for a legal

13  conclusion.  I'm asking you for your knowledge

14  and understanding.  When you signed this

15  document, did you understand that you were

16  accepting an appointment as the treasurer of

17  HCMFA?

18            MS. DANDENEAU:  Objection to form.

19            MS. DEITSCH-PEREZ:  Objection, form.

20        A.    Again, I don't think this -- that

21  wasn't my understanding.  I don't think this

22  makes -- this document makes me the treasurer.

23        Q.    What do you think this document --

24  why did you sign this document?

25            MS. DEITSCH-PEREZ:  Objection to

Page 154

```
 1                  WATERHOUSE - 10-19-21

 2        form.

 3                  MR. MORRIS:  You're objecting to the

 4        form of the question when I asked him why

 5        did you sign the document?  What is the

 6        basis for the objection?

 7                  MS. DEITSCH-PEREZ:  Because, John, I

 8        think that it does call for a legal

 9        conclusion other than -- with him saying

10        because somebody told me to sign this

11        document.  But if you want to go there,

12        that is fine.

13                  MR. MORRIS:  Okay.

14                  MS. DANDENEAU:  I don't think --

15        he's already said he's not a lawyer.

16                  MR. MORRIS:  I'll allow the witness

17        to answer this question.

18        Q.    Why did you sign this document, sir?

19        A.    I mean, our -- our legal group would

20   bring by these incumbency certificates from

21   time to time.  I have no idea why they're being

22   updated, and I was asked to sign.

23        Q.    Did you ask anybody, what is this

24   document?

25        A.    No.
```

Page 155

1          WATERHOUSE - 10-19-21

2      Q.    Did anybody tell you why they needed

3   you to sign the document?

4      A.    Not that I can recall.

5      Q.    You testified earlier that you

6   understood that you served as the acting

7   treasurer for HCMFA; correct?

8      A.    Yes.

9      Q.    How did you become the acting

10   treasurer of HCMFA?

11          MS. DANDENEAU:  Objection to form.

12      A.    I don't -- I don't know the legal --

13   I don't know the legal mechanic of how I became

14   the acting treasurer.

15      Q.    I'm not asking for the legal

16   mechanic.  I'm asking you as the person who

17   is --

18          MS. DANDENEAU:  John, you said --

19          MR. MORRIS:  Stop.

20          MS. DANDENEAU:  -- how did you

21      become the treasurer.  That is --

22          MR. MORRIS:  Please stop.

23          MS. DANDENEAU:  That is a legal

24      question.

25          MR. MORRIS:  I am not asking any

Page 156

```
 1              WATERHOUSE - 10-19-21
 2         legal questions, to be clear.  I'm asking
 3         for this witness' understanding as to how
 4         he became the acting treasurer of HCMFA.
 5         If he doesn't know, he can say he doesn't
 6         know, but this legal stuff is nonsense, and
 7         I really object to it.
 8         Q.    Sir, I'm asking you a very simple
 9    question.
10              MS. DANDENEAU:  Argumentative.
11         Q.    You testified -- you testified that
12    you became the acting treasurer of HCM --
13    HCMFA; correct?
14         A.    Yes.
15         Q.    How did that happen?
16              MS. DANDENEAU:  Again, object to
17         form.
18              MR. MORRIS:  I can't wait to do this
19         in a courtroom.  Good God.
20         Q.    Go ahead, sir.
21         A.    I don't know the exact process of
22    how that happened.
23         Q.    Do you have any idea whether signing
24    this document was part of the process?
25              MR. MORRIS:  You know what --
```

Page 157

```
 1          WATERHOUSE - 10-19-21

 2          MS. DANDENEAU:  Objection.

 3          MR. MORRIS:  -- withdrawn.  You guys

 4   want to do this, I can't wait.  I can't

 5   wait.  This is the craziest stuff ever.

 6          MS. DANDENEAU:  John, he said he's

 7   not a lawyer, and you are asking him for a

 8   legal conclusion, and he says he doesn't

 9   know, and you persist.

10          MR. MORRIS:  Okay.

11          MS. DANDENEAU:  So you can ask these

12   questions --

13          MR. MORRIS:  Did anyone -- please

14   stop talking.

15          MS. DANDENEAU:  -- at another

16   point -- no, no, no, I'm entitled to talk,

17   too; right?  If you're going to make these

18   accusations as if we're trying to stonewall

19   you, this is not the witness to ask that

20   question.

21          MR. MORRIS:  I can't -- I can't

22   wait -- I can't wait to do this in a

23   courtroom.  I will just leave it at that.

24          MS. DANDENEAU:  That's right, I'm

25   sure you can't.
```

Page 158

```
 1                WATERHOUSE - 10-19-21

 2         Q.    Did anyone ever tell you, sir, that

 3    even though you were the acting treasurer of

 4    HCMFA, that you were not authorized to sign the

 5    two promissory notes that we looked at before

 6    lunch?

 7         A.    I'm not sure I understand the

 8    question.  I wasn't -- I mean, I'm -- I'm the

 9    current acting treasurer.

10         Q.    Did anybody ever tell you at any

11    time that even though you were the acting

12    treasurer of HCMFA, that you were not

13    authorized to sign the two promissory notes

14    that we looked at before lunch?

15              MS. DANDENEAU:  Objection to form.

16         A.    Not that I recall.

17         Q.    Did anybody ever tell you at any

18    time that you were not authorized to sign the

19    two promissory notes that we looked at before

20    lunch?

21         A.    Not that I recall.

22         Q.    Did anybody ever tell you at any

23    time that you should not have signed the two

24    promissory notes that we looked at before

25    lunch?
```

Appx. 00528

Page 159

```
 1                  WATERHOUSE - 10-19-21

 2          A.    Not that I recall.

 3          Q.    Did you ever tell anybody at any

 4    time that you weren't authorized to sign the

 5    two promissory notes that we looked at before

 6    lunch?

 7          A.    Not that I recall.

 8          Q.    Did you ever tell anybody at any

 9    time that you made a mistake when you signed

10    the two promissory notes that we looked at

11    before lunch?

12          A.    Not that I recall.

13          Q.    As you sit here right now, do you

14    have any reason to believe that you were not

15    authorized to sign the two documents that we

16    looked at before lunch?

17                MS. DANDENEAU:  Objection to form.

18          A.    If -- if this is the -- the valid

19    incumbency certificate, I mean, this does --

20    this does detail who the signers are.

21          Q.    Okay.  And looking at that document,

22    does that give you comfort that you were

23    authorized to sign the two promissory notes

24    that we looked at before lunch?

25                MS. DEITSCH-PEREZ:  Object to the
```

Appx. 00529

```
 1                WATERHOUSE - 10-19-21

 2        form.

 3                MS. DANDENEAU:  Objection, form.

 4        A.    Yes.

 5        Q.    As of October 20th -- withdrawn.

 6                I'm trying to take your mind back to

 7    a year ago, October 2020.  Do you recall at

 8    that time that the boards of the retail funds

 9    were making inquiries about obligations that

10    were owed by the advisors to Highland in

11    connection with their 15(c) review?

12                MS. DANDENEAU:  Objection to form.

13        A.    I don't -- I don't recall.

14        Q.    As of October 2020, you had no

15    reason to believe you weren't authorized to

16    sign the two promissory notes that we just

17    looked at; correct?

18                MS. DANDENEAU:  Objection, form.

19                MS. DEITSCH-PEREZ:  Objection to

20        form.

21        A.    I didn't think about it in October

22    of 2020, but I mean --

23        Q.    Did you have any reason to believe

24    at that time that you weren't authorized to

25    sign the two notes that we just looked at?
```

Page 161

```
 1              WATERHOUSE - 10-19-21
 2        A.    Not that I'm aware, no.
 3        Q.    Did you have any reason to believe a
 4   year ago that you made a mistake when you
 5   signed those two notes?
 6        A.    Not that I'm aware.
 7        Q.    A year ago you believed that HCMFA
 8   owed Highland the unpaid principal amounts that
 9   were due under those two notes; correct?
10        A.    They're -- they're promissory notes
11   that were -- as you presented, that were --
12   that were executed.  Whether they're valid or
13   if there's other reasons, I didn't -- I don't
14   know.
15        Q.    I'm not asking you whether they're
16   valid or not.  I'm asking you for your state of
17   mind.  A year ago you believed that HCMFA
18   was -- was obligated to pay the unpaid
19   principal amount under the two notes that you
20   signed; correct?
21        A.    Yeah, I'm -- I'm -- yes.
22        Q.    Thank you.  Are you aware -- you're
23   aware that -- that in 2017, NexPoint issued a
24   note in favor of Highland in the approximate
25   amount of $30 million; correct?
```

Appx. 00531

1                    WATERHOUSE - 10-19-21

2          A.    I'm -- I'm -- I'm generally aware.

3          Q.    Okay.  And are you generally aware

4    that from time to time, after the note was

5    issued by NexPoint, that moneys were applied to

6    principal and interest that were due under the

7    NexPoint note?

8          A.    Yes, I'm generally aware.

9          Q.    Okay.  And did anybody ever tell you

10   that the payments that were made against the

11   NexPoint notes were made by mistake?

12         A.    Yes.

13         Q.    And is it the one payment that we

14   talked about earlier today?

15         A.    We talked about a lot of things

16   today.  What payment are we talking about?

17         Q.    Okay.  Who told you that any payment

18   made against the NexPoint note was made by

19   mistake?

20         A.    D.C. Sauter.

21         Q.    When did Mr. Sauter tell you that?

22         A.    I don't -- I don't remember

23   specifically.

24         Q.    Do you remember what payments --

25         A.    Sometime -- sometime this year.

Page 163

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Sometime in 2021?

 3      A.    Yes.

 4      Q.    Do you remember what payment he was

 5  referring to?

 6      A.    It was the -- the payment made in

 7  January of 2021 or -- yeah, January of -- of

 8  this -- January of 2021.

 9      Q.    Okay.  So did anybody ever tell you

10  at any time that any payment that was made

11  against principal --

12      A.    And -- and -- and -- hold on, and it

13  may have been other -- again, it may have been

14  that payment or -- or there may have been what

15  he was explaining, a misapplication of prior

16  payments as well.

17      Q.    Can you -- can you give me any

18  specificity -- withdrawn.

19            Withdrawn.  Can you tell me

20  everything that Mr. Sauter told you about --

21  about errors in relation to payments made

22  against principal and interest due under the

23  NexPoint note?

24            MS. DANDENEAU:  Can I just --

25            MR. RUKAVINA:  Hold on.  Hold on.
```

Appx. 00533

1           WATERHOUSE - 10-19-21

2           I'm going to object here, and I'm going to

3           instruct the witness not to answer

4           depending on the discussion that you had --

5           Mr. Waterhouse, I'm the lawyer for

6           NexPoint, and as everyone here knows, D.C.

7           Sauter is in-house counsel.

8                So if you and Mr. Sauter were having

9           a factual discussion and him preparing his

10          affidavit, et cetera, then go ahead and

11          answer that.  But if you were having a

12          discussion as to our legal strategy in this

13          lawsuit, or anything having to do with

14          that, then do not answer that.

15               And if you need to talk to either

16          your counsel or me about that, then we need

17          to have that discussion now.

18          A.   Okay.  Yeah, I don't -- I don't

19     really know how to make that distinction, so

20     maybe I need to talk to counsel before I

21     answer, or if I can answer.

22          Q.   Let me just ask you this question:

23     Did -- did you have any conversation with

24     Mr. Sauter about any payment of principal and

25     interest prior to the time that you left

```
 1                  WATERHOUSE - 10-19-21

 2    Highland's employment, or did it happen after

 3    you left Highland's employment?

 4         A.    I don't -- I don't recall if -- I

 5    don't recall.  I mean, it was sometime in 2021.

 6    I don't remember if it was before or after I

 7    was let go from Highland.

 8         Q.    Okay.  So -- so nobody told you

 9    prior to 2021 that any error or mistake was

10    made in the application of payments against

11    principal and interest due on the NexPoint

12    note.  Do I have that right?

13         A.    Yeah, I don't -- I don't recall this

14    being in 2020.

15         Q.    Okay.  And it didn't happen in 2019;

16    correct?

17         A.    I don't recall that happened.

18         Q.    And it didn't happen in 2018;

19    correct?

20         A.    I don't -- I don't recall that

21    happening.

22         Q.    And it didn't happen in 2017;

23    correct?

24         A.    I don't recall.

25         Q.    But -- but you believe the
```

Page 166

```
 1              WATERHOUSE - 10-19-21

 2    conversation took place in 2021.  You just

 3    don't remember if it was before or after you

 4    left Highland's employment.  Do I have that

 5    right?

 6         A.   It was sometime this year.  I

 7    don't -- I don't remember.

 8         Q.   Okay.  Did you report this

 9    conversation to Mr. Seery at any point?

10         A.   I don't believe so.

11         Q.   Did you report this conversation to

12    anybody at DSI at any time?

13         A.   I don't recall.

14         Q.   Do you have -- you don't have a

15    recollection of ever doing that; correct?

16         A.   Yeah, that's right.  I don't recall

17    doing that.

18         Q.   Do you recall telling anybody at

19    Pachulski Stang about the conversation you

20    recall with Mr. Sauter?

21         A.   No, I don't -- I don't recall.

22         Q.   Did you tell any of the independent

23    board members about your conversation with

24    Mr. Sauter?

25         A.   I don't recall.
```

Appx. 00536

Page 167

```
 1              WATERHOUSE - 10-19-21

 2        Q.    Did you tell any of the employees at

 3   Highland before you left Highland's employment

 4   about this call that you had with Mr. Sauter?

 5              MS. DANDENEAU:  Objection to form.

 6        A.    No, I don't -- no, I don't recall.

 7        Q.    NexPoint -- to the best of your

 8   knowledge, did NexPoint ever file a proof of

 9   claim against Highland to try to recover moneys

10   that were mistakenly paid against the principal

11   and interest due under the note?

12        A.    Okay.  Hold on.  You are saying did

13   NexPoint Advisors file a proof of claim to

14   Highland for errors related to payments under

15   the NexPoint note to Highland?

16        Q.    Correct.

17        A.    I'm -- I'm -- I'm not -- I'm not

18   aware.

19        Q.    Are you aware --

20        A.    I'm not the legal person here, I

21   don't know.

22        Q.    I'm just asking for your knowledge,

23   sir.

24        A.    Yeah, I don't know.  I'm not aware.

25        Q.    Are you aware of any claim of any
```

Page 168

```
 1                  WATERHOUSE - 10-19-21

 2     kind that NexPoint has ever made to try to

 3     recover the amounts that it contends were -- or

 4     that Mr. Sauter contend were mistakenly applied

 5     against principal and interest due under the

 6     NexPoint note?

 7          A.    I'm not aware.

 8                MS. DANDENEAU:  Objection to form.

 9          Q.    Okay.  The advisors' agreements with

10     the retail funds are subject to annual renewal;

11     correct?

12          A.    Yes.

13          Q.    And do you participate in the

14     renewal process each year?

15          A.    Yes.

16          Q.    What role do you play in the renewal

17     process?

18          A.    I'm -- I'm asked by the retail board

19     to walk-through the advisors financials.

20          Q.    And do you do that in the context of

21     a board meeting?

22          A.    Yes, it is -- yes, it is typically

23     done in a board meeting.

24          Q.    And do you recall the time --

25     does -- does the renewal process happen around
```

Appx. 00538

1              WATERHOUSE - 10-19-21

2    the same time each year?

3         A.    Yes, it is -- it is around the same

4    time every year.

5         Q.    And what -- what time period of the

6    year does the renewal process occur?

7         A.    Approximately the September

8    timeframe.

9         Q.    During that process, in your

10   experience, does the board typically conduct

11   its own diligence and ask for information?

12        A.    Does the board ask for lots of -- I

13   mean, just -- I mean, lots of information as a

14   part of that -- that -- as part of that board

15   meeting and that process.

16        Q.    Okay.  And do you recall that the

17   process in 2020 spilled into October?

18        A.    Yes.  Yes.

19        Q.    Okay.  And as part of the process in

20   2020, the retail board asked -- asked what are

21   referred to as 15(c) questions; right?

22        A.    I guess I don't want to be -- they

23   asked 15(c) -- are you saying they asked 15(c)

24   questions and this is why it went into October

25   or --

```
                                                    Page 170
 1               WATERHOUSE - 10-19-21

 2        Q.    No, I apologize.

 3               Do you have an understanding of

 4   what -- of what 15(c) refers to in the context

 5   of the annual renewal process?

 6        A.    Yes, generally.

 7        Q.    All right.  What is your general

 8   understanding of the term "15(c)" in the

 9   context of the annual renewal process?

10        A.    I -- I think 15(c) is the section

11   that -- that -- you know, that -- that the

12   board has to evaluate every year, the retail

13   board.  They have to, you know, go through,

14   evaluate, and go through that approval process

15   on a yearly basis.

16        Q.    Okay.

17               MR. MORRIS:  Can we put up on the

18        screen Exhibit 36, please.

19               (Exhibit 36 marked.)

20               MR. MORRIS:  I guess let's just

21        start at the bottom so Mr. Waterhouse can

22        see what is here.

23        Q.    You see this begins with an email

24   from Blank Rome to a number of people.

25               MR. MORRIS:  And if we can scroll
```

Page 171

1                    WATERHOUSE - 10-19-21

2          up -- keep going just a little bit.

3          Q.    You will see that there is an email

4     from Lauren Thedford to Thomas Surgent and

5     others where she reports that she was attaching

6     and reproducing below additional 15(c)

7     follow-up questions from the board.

8               Do you see that?

9          A.    Yes.

10         Q.    And do you see Question No. 2 asks

11    whether there are any material outstanding

12    amounts currently payable or due in the future

13    (e.g., notes) to HCMLP by HCMFA or NexPoint

14    Advisors or any other affiliate that provides

15    services to the funds?

16              Do you see that?

17         A.    Yes.

18         Q.    And -- and did you -- do you recall

19    that in -- in October of 2020 the retail boards

20    were asking for that information?

21         A.    I don't recall it, but there --

22    they're obviously asking in this email.

23         Q.    Okay.

24              MR. MORRIS:  Can we scroll up a

25         little bit, please.

Appx. 00541

Page 172

```
 1              WATERHOUSE - 10-19-21

 2         Q.    And then do you see that

 3    Ms. Thedford includes you on the email string

 4    on Tuesday, October 6th, at 5:52?

 5         A.    Yes.

 6         Q.    And she asks you and Dave Klos and

 7    Kristin Hendrix for advice on that particular

 8    Request No. 2 that I have just read; right?

 9         A.    Yes.

10         Q.    Okay.  Can you tell me who

11    Ms. Thedford is?

12         A.    She was an attorney that was in the

13    legal group.

14         Q.    At Highland Capital Management,

15    L.P.?

16         A.    I'm -- I'm -- I'm -- I don't

17    remember if she was an employee of Highland or

18    any of the advisors.

19         Q.    Okay.  Do you know if she served as

20    the corporate secretary for both HCMFA and

21    NexPoint?

22         A.    Yes.

23         Q.    And -- okay.

24              Do you know whether Ms. Thedford

25    held any positions in relation to the retail
```

Appx. 00542

Page 173

```
 1                WATERHOUSE - 10-19-21

 2    funds as we defined that term?

 3         A.    Yes.

 4         Q.    What is your understanding of the

 5    positions that Ms. Thedford held at the retail

 6    funds?

 7         A.    I -- I recall her being an officer.

 8    I don't recall her title.

 9         Q.    Okay.  Is she still an officer at

10    any of the retail funds today?

11         A.    No.

12         Q.    Do you know when she ceased to be an

13    officer of the retail funds?

14         A.    Approximately.

15         Q.    And when did she approximately cease

16    to be an officer of the retail funds?

17         A.    It was in -- it was in early of

18    2021.

19         Q.    Okay.  Do you know when she became

20    an officer of the retail funds?

21         A.    I don't recall.

22         Q.    To the best of your recollection,

23    was she an officer of the retail funds in

24    October of 2020?

25         A.    I believe so.
```

Appx. 00543

Page 174

1        WATERHOUSE - 10-19-21

2        Q.    Okay.  Do you know what title she

3    held in her capacity as an officer, if any?

4        A.    I told you I don't remember.

5        Q.    Okay.  So she sends this email to

6    you at 5:52 p.m. on October 6th.

7              And if we can scroll up to the

8    response, you responded a minute later with a

9    one-word answer:  Yes.

10             Do you see that?

11       A.    Yes.

12       Q.    And -- and yes is -- yes was in

13   response to the retail board's Question No. 2,

14   right, whether there are any material

15   outstanding amounts currently payable or due in

16   the future?

17       A.    Yes.

18             MR. MORRIS:  And can we scroll up to

19       see what happened next.

20       Q.    So Ms. Thedford writes back to you a

21   few minutes later and she asks whether you

22   could provide the amounts.

23             Do you see that?

24       A.    Yes.

25       Q.    And then you respond further and you

Page 175

```
 1              WATERHOUSE - 10-19-21

 2    refer her to the balance sheet that was

 3    provided to the board as part of the 15(c)

 4    materials.

 5              Do you see that?

 6        A.    Yes.

 7        Q.    And -- and did the advisors provide

 8    to the board certain balance sheets in 2020 in

 9    connection with the 15(c) review?

10        A.    Yes, they did.

11        Q.    Okay.  And were the amounts that

12    were outstanding or that were to be due in the

13    future by the advisors to Highland included in

14    the liability section of the balance sheet that

15    was given to the retail board?

16        A.    Yes.  Notes would be reflected as

17    liabilities.

18        Q.    Okay.  And --

19        A.    If I'm understanding your question

20    correctly.

21        Q.    You are.  And -- and -- and those

22    liabilities you -- you were -- you believed

23    were responsive to the retail board's question;

24    correct?

25        A.    Yes.
```

Appx. 00545

Page 176

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Okay.  And then if we can scroll up,

 3   you see Ms. Thedford responds to you

 4   nine minutes later with a draft response.

 5              Do you see that?

 6       A.    Yes.

 7       Q.    And she says that she is taking from

 8   the 6/30 financials certain information about

 9   amounts that were due to HCMLP and affiliates

10   as of June 30th, 2020.

11              Do you see that?

12       A.    I do.

13       Q.    Okay.  And did you believe, as the

14   treasurer of NexPoint and HCMFA and as the CFO

15   of Highland, that the information that

16   Ms. Thedford obtained from the 6/30 financials

17   was accurate and responsive in relation to the

18   retail fund board's question?

19       A.    I just want to make sure I

20   understand the question.

21              Are you saying that the financial

22   information provided to the retail board as

23   part of the 15(c) process, which included

24   financial statements as of June 30th of 2021,

25   did I feel like those were responsive to their
```

Page 177

```
 1            WATERHOUSE - 10-19-21

 2   questions?

 3        Q.    Yes.

 4        A.    Yes.

 5        Q.    Thank you.

 6            MS. DEITSCH-PEREZ:  John, it is not

 7        in the chat yet.  Can you just make sure it

 8        gets put in there.

 9            MR. MORRIS:  Sure.

10            MS. CANTY:  I put it in there.  I

11        think maybe I just sent it directly, so let

12        me make sure it says to everyone.  But I

13        did put it in there.  I will try again.

14            MR. MORRIS:  Thank you, La Asia.

15            MS. DANDENEAU:  What number is it.

16            MR. MORRIS:  What, the Bates number?

17            MS. DEITSCH-PEREZ:  No, the --

18        this -- yeah, 36 is not in the chat.

19            MR. MORRIS:  Okay.  We'll get it.

20            MS. DANDENEAU:  I think that

21        Ms. Canty just sent it to me originally.

22        Sorry.

23            MR. MORRIS:  Okay.  We will get it

24        there.

25            MS. CANTY:  Okay.  It is there now
```

```
 1              WATERHOUSE - 10-19-21

 2       for everyone.

 3              MS. DEITSCH-PEREZ:  Got it.  Thank

 4       you.

 5       Q.    Do you recall if the proposed

 6    response that Ms. Thedford crafted was

 7    delivered to the retail board with the -- with

 8    the yellow dates having been completed?

 9       A.    I don't know.

10              MR. MORRIS:  Davor, I'm going to ask

11       that the advisors and -- the advisors of

12       both HCMFA and NexPoint produce to me any

13       report that was given to the retail board

14       concerning the promissory notes at issue,

15       including the obligations under the notes.

16       Q.    Do you know -- do you know if

17    ultimately NexPoint informed the retail board

18    in response to its question that NexPoint owed

19    Highland approximately 23 or $24 million?

20              MS. DANDENEAU:  Objection to the

21       form.

22       A.    Sorry, are you asking, did NexPoint

23    tell the retail board that it owed Highland?

24       Q.    Let me ask a better question,

25    Mr. Waterhouse.
```

```
 1                  WATERHOUSE - 10-19-21

 2                  Did -- do you know if anybody ever

 3      answered the retail board's question that was

 4      Number 2?

 5           A.    I don't -- I can't say for sure.

 6           Q.    Okay.  Do you recall -- I think you

 7      testified earlier that you walked through the

 8      advisors' financials with the retail board;

 9      correct?

10           A.    Yes.

11           Q.    And as part of that process, did you

12      disclose to the retail board the obligations

13      that NexPoint and HCMFA had to Highland under

14      promissory notes?

15           A.    The retail board, as I stated

16      earlier, receives financial information,

17      balance sheet, income statement information

18      from the advisors.  That information is

19      provided to the retail board in connection with

20      the 15(c) process.

21                  So any notes between the advisors

22      and the Highland would be -- anything would be

23      detailed in those financial statements.

24           Q.    Do you recall in 2020 ever speaking

25      with the retail board about the advisors'
```

1                    WATERHOUSE - 10-19-21

2     obligations under the notes to Highland?

3                    MS. DANDENEAU:  Objection to form.

4                    MS. DEITSCH-PEREZ:  Object to the

5          form.

6          A.    I don't recall specifically.

7          Q.    Do you have any general recollection

8     of discussing with the retail board the

9     advisors' obligations to Highland under the

10    notes that they issued?

11                   MS. DANDENEAU:  Object to the form.

12                   MS. DEITSCH-PEREZ:  Object to the

13         form.

14         A.    I just recall generally just -- it

15    is just -- I present the financial statements,

16    and if they have questions, I answer their

17    questions and walk them through.

18                   I don't recall what they asked.  I

19    don't recall where the discussion went.  I

20    don't recall anything of that nature.

21         Q.    Okay.  Do you know if anybody on

22    behalf of HCMF -- HCMFA ever told the retail

23    board that HCMFA had no obligations under the

24    two 2019 notes that you signed?  Withdrawn.

25                   Do you know whether anybody on

Page 181

```
 1                 WATERHOUSE - 10-19-21

 2    behalf of HCMFA ever told the retail boards

 3    that you weren't authorized to sign either of

 4    the two 2019 notes?

 5                 MS. DANDENEAU:  Objection to form.

 6         A.    I'm not aware.

 7         Q.    Are you aware of anybody on behalf

 8    of HCMFA ever telling the retail boards that

 9    your execution of the two 2019 notes was a

10    mistake?

11                 MS. DANDENEAU:  Objection to form.

12         A.    I'm not aware.

13         Q.    Are you aware of anybody on behalf

14    of HCMFA ever telling the retail boards that

15    HCMFA did not have to pay the amounts reflected

16    in the two notes that you signed in 2019?

17         A.    I'm not aware.

18         Q.    Do you know whether anybody ever

19    told the retail boards -- withdrawn.

20                 Do you know whether anybody ever

21    told the retail boards that Highland has

22    commenced a lawsuit to recover on the two notes

23    that you signed in 2019?

24         A.    I'm not aware.

25         Q.    Are you aware of anybody informing
```

Appx. 00551

Page 182

```
1              WATERHOUSE - 10-19-21

2    the retail boards that Highland has sued to

3    recover on the NexPoint note?

4         A.    I'm not aware.

5         Q.    Do you know whether anybody ever

6    told the retail board that Highland had

7    declared a default with respect to the two

8    HCMFA notes that you signed in 2019?

9         A.    I'm not aware.

10        Q.    Are you aware of anybody ever

11   informing the retail boards that Highland had

12   declared a default under the NexPoint note?

13        A.    I'm not aware.

14        Q.    Are you aware of anybody telling the

15   retail board that Highland made a demand for

16   payment under the 2019 notes that you signed on

17   behalf of HCMFA?

18        A.    I'm not aware.

19        Q.    Let's -- let's see if there is a

20   response to Ms. Thedford's email, if we can

21   scroll up.

22              Do you see you responded to

23   Ms. Thedford five minutes after she provided

24   the draft response to you?

25        A.    Yes.
```

```
 1              WATERHOUSE - 10-19-21

 2        Q.    Okay.  And do you see that Dustin

 3   Norris is copied on this email?

 4        A.    Yes, he is.

 5        Q.    Great.  Do you know whether

 6   Mr. Norris held any positions at either of the

 7   advisors as of October 6, 2020?

 8        A.    I will go back to -- I'm not the

 9   legal expert of what appoints you or how or

10   why, but you did see Dustin's name on the

11   incumbency certificate that you produced

12   earlier.

13        Q.    Do you know what his title was in

14   October of 2020?

15              MS. DANDENEAU:  Objection to form.

16        A.    I don't -- I don't recall.

17        Q.    Was he -- did he have a title with

18   each of the advisors, to the best of your

19   recollection?

20        A.    I don't recall.

21        Q.    Do you know why he is included on

22   this email string?

23        A.    I didn't add Dustin.  It looks like

24   Lauren did.  I don't know why she added him or

25   not.  You would have to ask her.
```

Page 184

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Does Mr. Norris play a role in

 3  formulating the advisors' responses to the

 4  questions asked by the retail board in

 5  connection with the 15(c) annual review?

 6              MS. DANDENEAU:  Objection to form.

 7       A.    He -- Dustin Norris is there in the

 8  board meetings.  But -- so he has a role, yes.

 9       Q.    Okay.  And does Mr. Norris hold any

10  positions, to the best of your knowledge, in

11  relation to any of the retail funds?

12       A.    I don't -- I don't believe he does.

13       Q.    How about Mr. Post, do you know

14  whether Mr. Post holds any position in either

15  of the advisors?

16       A.    I mean, he -- he -- yes.

17       Q.    What is your understanding of the

18  positions that Mr. Post holds in relation to

19  the advisors?

20              MS. DANDENEAU:  Objection to form.

21       A.    He is an employee of NexPoint

22  Advisors.  He is also the chief compliance

23  officer for -- for NexPoint.

24       Q.    Who is the chief compliance officer

25  for HCMFA, if you know?
```

Page 185

```
 1              WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  Objection to form.

 3       A.    That would be Jason as well.

 4       Q.    Okay.  Now, looking at your

 5  response, you noted initially that nothing was

 6  owed under shared services.  Do I have that

 7  right in substance?

 8       A.    Yeah.  I think I'm being responsive

 9  to Lauren's question here, whether any of the

10  shared service invoices are outstanding.

11       Q.    Right.

12       A.    Yes.

13       Q.    And that is because -- and that is

14  because the retail the retail board has asked

15  for the disclosure of all material obligations

16  that were owed to HCMLP either then or in the

17  future; isn't that right?

18              MS. DANDENEAU:  Objection to form.

19       Q.    We can go back down and look.

20       A.    Look, I don't know if that's a

21  material item, I mean, again, but sure.

22       Q.    Okay.  But there were no shared

23  services outstanding; correct?

24              MS. DANDENEAU:  Objection to form.

25       A.    That is what this email seems to
```

Page 186

```
 1              WATERHOUSE - 10-19-21

 2     indicate.

 3          Q.    And you wouldn't have written it if

 4     you didn't believe it to be true at the time;

 5     correct?

 6          A.    Correct.

 7          Q.    And when you referred to shared

 8     services outstanding, what you meant there was

 9     that neither NexPoint nor HCMFA owed Highland

10     any money under the shared services agreements

11     that they had with Highland as of October 6th,

12     2020; right?

13          A.    I don't know if it is as of October

14     6, 2020 or if it was from -- like through the

15     financials -- through the date of the

16     financials as of June 30.

17          Q.    Okay.  And then you noted that

18     HCMA -- the HCMFA note is a demand note; right?

19          A.    Yes.

20          Q.    And then you referred Ms. Thedford

21     to Kristin Hendrix for the term of the NexPoint

22     note.  Do I have that right?

23          A.    Yes.

24          Q.    And then you refer to that agreement

25     that is referenced in the 2018 audited
```

Appx. 00556

Page 187

```
 1              WATERHOUSE - 10-19-21

 2   financials about Highland's agreement not to

 3   make demand upon HCMFA until May 2021; correct?

 4        A.    Correct.

 5        Q.    And then -- and then the next thing

 6   you write is that the attorneys think that BK

 7   doesn't change that, but don't know for sure at

 8   the end of the day.

 9              Do you see that sentence?

10        A.    Yes.

11        Q.    Which attorneys were you referring

12   to?

13        A.    I don't remember.

14        Q.    Did you have a conversation with

15   attorneys concerning whether the bankruptcy

16   would change or alter in any way the agreement

17   not to make a demand under the HCMFA note?

18        A.    Look, yeah, I mean, I don't

19   specifically remember, but generally, I mean,

20   it is in this email.  I don't -- I don't -- I

21   don't -- I don't remember who I talked to or,

22   you know, was it inside counsel, outside

23   counsel, but obviously I talked to somebody.

24        Q.    Do you have any recollection --

25        A.    Well, I don't even know if it's --
```

Appx. 00557

Page 188

```
 1              WATERHOUSE - 10-19-21
 2    actually, it may not even have been me.  I say
 3    the attorneys in, you know, a lot of -- like I
 4    talked about the team.
 5              It could have been someone on the
 6    team, like, hey, we need to run this down, and
 7    maybe they talked to attorneys again and
 8    relayed that information to me.
 9              So I really don't know if I spoke or
10    someone else did or -- or, I mean, and maybe it
11    wasn't even from corporate accounting.  Maybe
12    it was, you know, other -- I'm kind of
13    summarizing, you know, again, so I don't really
14    know -- I can't really say for sure.  I don't
15    remember how I came about of this knowledge.
16      Q.    I appreciate your efforts,
17    Mr. Waterhouse, but I will just tell you that
18    if I ask a question and you don't know the
19    answer or you don't recall, I'm happy to accept
20    that.  I don't -- I don't want you to
21    speculate, so I want to be clear about that.
22    So I appreciate it.
23              Let me just ask you simply:  Do you
24    know what attorneys -- can you identify any of
25    the attorneys who thought that the bankruptcy
```

Appx. 00558

```
 1              WATERHOUSE - 10-19-21

 2   process didn't change the agreement?

 3        A.    I don't recall.

 4        Q.    Okay.  Perfect.

 5              And then let's look at the last

 6   sentence.  It says, quote:  The response should

 7   include, as I covered in the board meeting,

 8   that both entities have the full faith and

 9   backing from Jim Dondero, and to my knowledge

10   that hasn't changed.

11              Do you see that?

12        A.    Yes.

13        Q.    Okay.  Prior to October 6th, 2020,

14   had you told the retail board that HCMFA and

15   NexPoint have the full faith and backing from

16   Jim Dondero?

17        A.    Yes.

18        Q.    Do you remember in the context in

19   which you told the retail board that?

20        A.    I mean, generally, yes.

21        Q.    Tell me what you recall.

22        A.    So we were walking through the

23   financials from the advisors; right?  So as I

24   described to you, you have got HCMFA and NPA.

25   And these -- the financials, you know, show
```

Page 190

1              WATERHOUSE - 10-19-21

2    they have liabilities on them that exceed

3    assets.

4              So the retail board has asked, okay,

5    you know, how -- you know, if -- if these

6    liabilities come due or they're payable, you

7    know, how does that come about?

8              And, you know, the response is,

9    well, the advisors have the -- the full faith

10   and backing from -- from Jim Dondero.

11       Q.   And how did you know that the

12   advisors had the full faith and backing from

13   Jim Dondero?  What was the basis for that

14   statement that you made to the retail board?

15       A.   I talked to Jim about it at some

16   point in the past.

17       Q.   And did you tell Mr. Dondero that

18   you were going to inform the retail board that

19   the advisors had his full faith and backing

20   before you actually told that to the retail

21   board?

22       A.   I don't recall having that

23   conversation.

24       Q.   Do you recall if you ever informed

25   Mr. Dondero that you had disclosed or told the

Appx. 00560

```
 1              WATERHOUSE - 10-19-21

 2   retail board that the advisors had the full

 3   faith and backing of Mr. -- Mr. Dondero?

 4              MS. DEITSCH-PEREZ:  Object to the

 5         form.

 6         A.    I don't recall discussing that with

 7   him at the time.

 8         Q.    When you told this to the board, was

 9   Mr. Dondero participating in the discussion?

10         A.    Not that I recall.

11         Q.    Withdrawn.  Was it not -- withdrawn.

12              Do you recall whether -- when you

13   covered this issue with the board, was that in

14   a -- a Zoom call or a Webex call?  Was it a

15   telephone call?  Was it in-person?  Like where

16   were you physically in relation to the board?

17         A.    I believe I was at home.

18         Q.    Okay.  Can you identify every person

19   that you recall who was present for this

20   disclosure other than -- other than the board

21   members themselves?

22              MS. DEITSCH-PEREZ:  Object to the

23         form.

24         A.    I don't recall everyone on the call.

25         Q.    Can you identify anybody who was on
```

Page 192

```
 1            WATERHOUSE - 10-19-21

 2   the call?

 3        A.   Other than the board members?

 4        Q.   Yes.

 5        A.   Lauren Thedford.  I mean, there

 6   are -- there are many -- my section is just one

 7   of many sections that are just -- you know, as

 8   you can appreciate, this is a long board

 9   meeting.

10            I can't recall specifically, really

11   even generally, or who was on when this was

12   discussed.  But Lauren was typically on for the

13   entire time.

14        Q.   I apologize if I asked you this, but

15   do either of Mr. Norris or Mr. Post hold any

16   positions relative to the retail funds?

17        A.   I think you asked me this already,

18   John.

19        Q.   Okay.  I just don't recall.  Can you

20   just refresh my recollection if I did, in fact,

21   ask you the question?

22        A.   I don't believe -- if we can go

23   back.  I don't believe Mr. Norris has a title

24   at the retail funds.  Mr. -- and Mr. Post is

25   the CCO of the advisor, the advisors.
```

Appx. 00562

Page 193

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Okay.  Do you know if either of them

 3   have a position with the retail board -- with

 4   the retail funds?

 5      A.    I don't believe Mr. Norris has a

 6   position with the retail funds.

 7      Q.    All right.  What about Mr. Post?

 8      A.    Mr. Post is the CCO of the advisors.

 9      Q.    Okay.  Does he hold any position --

10      A.    I don't believe so.

11      Q.    -- with the retail funds?

12      A.    I don't believe so.

13      Q.    Okay.

14      A.    I don't know if being the CCO for

15   the advisor conveys something for the retail

16   funds.  Again, I am not -- that is the legal

17   compliance part of it.  I don't know.

18      Q.    Why did you tell the retail board

19   that the advisors have the full faith and

20   backing from Mr. Dondero?

21            MS. DANDENEAU:  Objection to form.

22      A.    It is -- it is -- it is what has

23   been discussed with them prior.

24      Q.    And were you -- were you trying to

25   give them comfort that even though the
```

Appx. 00563

Page 194

```
 1                  WATERHOUSE - 10-19-21
 2    liabilities exceeded the assets that the
 3    advisors would still be able to meet their
 4    obligations as they become due?
 5                  MS. DANDENEAU:  Objection to form.
 6                  MS. DEITSCH-PEREZ:  Object form.
 7         A.    I -- I can't -- I don't remember
 8    specifically the conversation, but generally --
 9    you know, generally, yes.  And that is why --
10    but, you know, again, in this email saying, you
11    know, I am sure I qualified it with the retail
12    board, you know, as I said I like -- you know,
13    to my knowledge, that hasn't changed.  But,
14    again, generally -- generally that is what I
15    remember.
16         Q.    Okay.  Do you recall if in the
17    advisors' response to the retail board's
18    question if the response included any statement
19    concerning Mr. Dondero and -- and the full
20    faith and backing that he was giving to the
21    advisors?
22                  MS. DEITSCH-PEREZ:  Object to the
23         form.
24         A.    I don't -- I don't remember
25    specifically what was provided.
```

Appx. 00564

Page 195

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Okay.

 3      A.    And I don't really -- I don't really

 4   remember generally either.

 5      Q.    Okay.

 6            MR. MORRIS:  So -- so, again, I'm

 7            just going to ask Mr. Rukavina if your

 8            clients can produce as soon as possible the

 9            15(c) response, the written response that

10            the advisors made, if any, to the board's

11            Question No. 2.

12            I'm not looking for the whole

13            response, but I certainly want the response

14            to Question No. 2.

15      Q.    Do you have a general understanding

16   as to the amount by which -- withdrawn.

17            Did -- did the assets of --

18   withdrawn.

19            Did the liabilities of HCMFA exceed

20   its assets in 2020?

21            MS. DANDENEAU:  Objection to form.

22            MS. DEITSCH-PEREZ:  Objection, form.

23      A.    I believe I have already answered

24   that question earlier, I think.  I believe I

25   said yes.
```

Page 196

1              WATERHOUSE - 10-19-21

2        Q.    Okay.  And did the liabilities of

3   NexPoint exceed its assets in 2020?

4              MS. DEITSCH-PEREZ:  Objection to

5        form.

6        A.    I don't believe so.

7        Q.    Okay.  So -- so it was only one of

8   the two advisors who had liabilities that

9   exceeded the value of the assets.

10             Do I have that right?

11             MS. DEITSCH-PEREZ:  Objection to

12        form.

13             MS. DANDENEAU:  Form.

14        A.    Yes.

15        Q.    And do you know, ballpark, the

16   amount by which the value of HCMFA's

17   liabilities exceeded their assets in 2020?

18             MS. DANDENEAU:  Objection to form.

19        A.    I don't -- I don't recall.

20             MR. MORRIS:  I had specifically

21        requested in discovery the audited

22        financial reports for both advisors and

23        NexPoint.  I think I may have gotten one

24        for NexPoint but I'm still waiting for the

25        balance.  And I'm going to renew my request

Page 197

```
 1                  WATERHOUSE - 10-19-21

 2           for those documents too.

 3           Q.    Let's go to the next exhibit, which

 4      is Number 10.  So I think it is in your stack,

 5      Mr. Waterhouse.

 6                  MR. MORRIS:  And we can take the one

 7           down from the screen and put up Number 10

 8           for everybody.

 9                  (Exhibit 10 marked.)

10           Q.    And I don't know if you have ever

11      seen this before, but I'm really putting it up

12      on the screen for purposes of turning to the

13      very last page of the document.

14                  So this is a document that we have

15      been -- that we premarked as Exhibit 10.  And

16      we're turning to the last page of the document,

17      which is a document that was filed in the

18      adversary proceeding 21-3004.  And -- no, I

19      apologize, I think we -- right there.  Perfect.

20                  And it is page 31 of 31.

21                  MR. MORRIS:  I think there may have

22           been some something erroneously stapled to

23           the hard copy that I gave you folks, but

24           I'm looking for page 31 of 31 in the

25           document that begins with the first page of
```

Page 198

1              WATERHOUSE - 10-19-21

2          Exhibit 10.

3          Q.    Do you have that, Mr. Waterhouse?

4          A.    I don't have it yet.  I'm looking.

5          Q.    All right.  If you look at the top

6    right-hand corner, you will see it says page

7    hopefully something of 31?

8          A.    Yes, I've got it now.

9          Q.    Okay.  You have got 31 of 31.  You

10   can take a moment to read that, if you would

11   like.

12         A.    (Reviewing document.)  Okay.

13         Q.    Have you ever seen this before?

14         A.    I don't know if I have seen this

15   specific document, but, you know, I've --

16   I'm -- I'm aware of it.

17         Q.    And is this the document that you

18   had in mind when you sent that email to

19   Ms. Thedford that we just looked at where you

20   said that Highland had agreed not to make a

21   demand upon HCMFA until May 2021?

22         A.    Honestly, I don't -- it wasn't this

23   document.  I mean, it's something like this,

24   yes.  I mean, yes.

25         Q.    Well --

Page 199

```
 1              WATERHOUSE - 10-19-21

 2        A.    It is something like this, but I

 3   don't think it was this specific document.

 4        Q.    Well, but this document does say in

 5   the last sentence that Highland agreed not to

 6   seek -- not to demand payment from HCMFA prior

 7   to May 31, 2021; right?

 8        A.    Yes.

 9        Q.    And are you aware of any other

10   document that was ever created pursuant to

11   which Highland agreed not to demand payment on

12   amounts owed by HCMFA before May 31, 2021?

13        A.    Hold on.  Are you asking, am I aware

14   of a document that by HCMFA that basically says

15   otherwise?

16        Q.    No.  Let me try again.

17              Are you aware of any other document

18   pursuant to which -- pursuant to which Highland

19   agreed not to make a demand on HCMFA until May

20   31st, 2021?

21        A.    I'm -- I think there was something

22   in connection with -- with the -- with the

23   audit that basically says the same thing.

24        Q.    Okay.  And do you think that the

25   audit is referring to this particular document?
```

Appx. 00569

Page 200

```
 1              WATERHOUSE - 10-19-21

 2        A.    I don't know.

 3        Q.    All right.  This document is dated

 4   April 15, 2019.  Do you see that?

 5        A.    I do.

 6        Q.    And do you remember that the audit

 7   was completed on June 3rd, 2019?

 8        A.    Yes.

 9        Q.    And do you recall that the audited

10   financials -- and I'm happy to pull them up if

11   you would like, but do you recall that the

12   audited financials included a reference to the

13   agreement pursuant to which Highland agreed not

14   to make a demand until May 31st, 2021?

15        A.    Yes, I remember.

16        Q.    And as part of the process, would

17   you have expected the corporate accounting team

18   to have provided a copy of this document to

19   PwC?

20              MS. DANDENEAU:  Objection to form.

21        A.    Yes, I would have expected something

22   like this, or again, you know, some document

23   that basically states -- states the deferral

24   till May 31 of 2020.

25        Q.    Okay.
```

Page 201

```
 1              WATERHOUSE - 10-19-21

 2        A.    May 31 of 2021, excuse me.

 3        Q.    And this document states the

 4   deferral that you just described; correct?

 5        A.    It does.

 6        Q.    And this document states the

 7   deferral that was described in the audited

 8   financial statements that we looked at before;

 9   correct?

10        A.    It does.

11              MR. MORRIS:   Okay.  Can we scroll

12        down just a little bit to see who signed on

13        behalf of the acknowledgment there.

14        Q.    Okay.  So Mr. Dondero signed this

15   document on behalf of both HCMFA and Highland;

16   do you see that?

17        A.    I do.

18        Q.    Okay.  Did you discuss this document

19   or the -- withdrawn.

20              Did you discuss the concept of the

21   deferral with Mr. Dondero in the spring of

22   2019?

23        A.    I think I testified I don't recall.

24        Q.    Okay.  Do you know whose idea it was

25   to issue the acknowledgment in this form?
```

Appx. 00571

```
 1                    WATERHOUSE - 10-19-21

 2        A.    I don't recall.

 3              MR. MORRIS:  Can we scroll back up

 4        to the document, please.

 5        Q.    Do you see in the beginning it says,

 6   reference is made to certain outstanding

 7   amounts loaned from Highland to HCMFA for

 8   funding ongoing operations.

 9              Do you see that?

10        A.    Yes.

11        Q.    And were you aware as the CFO of

12   Highland and as the treasurer of HCMFA that as

13   of April 15, 2019, Highland had made certain

14   loans to HCMFA to fund HCMFA's ongoing

15   operations?

16        A.    Yes.

17        Q.    And were you aware that those loans

18   were payable on demand and remained outstanding

19   as of December 31st, 2018?

20        A.    Yes.

21        Q.    And were you aware that those

22   amounts were payable on demand, and they

23   remained outstanding as of April 15, 2019?

24              MS. DEITSCH-PEREZ:  Object to the

25        form.
```

Page 203

1          WATERHOUSE - 10-19-21

2      A.    Well, this -- this document dated

3   April 15, 2019 says they have been deferred to

4   May 31, 2021.

5      Q.    Right.  But I'm just sticking to the

6   first paragraph where they refer to the

7   outstanding amounts.  And in the end it says

8   the -- it remained outstanding on December

9   31st, 2018, and I think you told me that you

10  understood that, and then I'm just trying to

11  capture the last piece of it.

12          Did you understand that there were

13  amounts outstanding from the loan that Highland

14  made to HCMFA to fund ongoing operations as of

15  April 15th, 2019?

16     A.    Yes.

17     Q.    Thank you.  Let's look at the next

18  sentence.  HCMFA expects that it may be unable

19  to repay such amounts should they become due

20  for the period commencing today and continuing

21  through May 31st, 2021.

22          Do you see that?

23          MS. DANDENEAU:  Objection to form.

24     A.    I do.

25     Q.    As the CFO -- withdrawn.

```
 1                  WATERHOUSE - 10-19-21

 2                  As the treasurer of HCMFA, did you

 3      believe that -- do you believe that statement

 4      was true and accurate at the time it was

 5      rendered?

 6           A.    I mean, it -- it -- the answer to

 7      that is I really didn't have any -- I didn't

 8      have an opinion really.

 9           Q.    Did you do anything to educate

10      yourself in April of 2019 on the issue of

11      whether HCMFA could repay the amounts that it

12      owed to Highland should they become due?

13           A.    I don't believe so.

14           Q.    Did you at any time form any

15      opinions as to HCMFA's ability to repay all

16      amounts due to Highland should they become due?

17           A.    Not really.  I guess I don't...

18           Q.    Well, you told the retail board that

19      HCMFA's liabilities exceeded their assets in

20      2020; correct?

21           A.    Yes.

22           Q.    Based on the work that you did to

23      prepare for the retail board, did you form any

24      view as to whether HCMFA would be unable to

25      repay the amounts that it owed to Highland
```

```
 1                  WATERHOUSE - 10-19-21
 2    should they become due?
 3              MS. DANDENEAU:  Objection to form.
 4         A.    I mean, I -- when you look at that,
 5    to answer you, completely, you know, again,
 6    if -- the response I gave the retail board was,
 7    you know, the -- the advice -- HCMFA advisors
 8    have the -- have the full faith and backing of
 9    Jim Dondero.  So I didn't form an opinion of
10    whether the advisor could pay it or not.
11         Q.    Did you form any view as to whether
12    the advisors could repay the amounts that it
13    owed to Highland should they become due without
14    the full faith and backing of Mr. Dondero?
15              MS. DANDENEAU:  Objection to form.
16              MS. DEITSCH-PEREZ:  Form.
17         A.    I mean, if you -- if you -- if you
18    take that last statement out, I mean, it would
19    be difficult for HCMFA to pay back demand notes
20    at that time.
21         Q.    And it was precisely for that reason
22    that you told the retail board that -- that the
23    retail -- that the advisors had the full faith
24    and backing of Mr. Dondero; correct?
25              MS. DANDENEAU:  Objection to form.
```

Appx. 00575

 1              WATERHOUSE - 10-19-21

 2         A.    I mean, yes, as the mouthpiece, I

 3    was relaying information.

 4         Q.    Okay.  And you relayed that

 5    information with the knowledge and approval of

 6    Mr. Dondero; correct?

 7              MS. DEITSCH-PEREZ:  Object to the

 8         form.

 9         A.    As I stated in the email, I don't

10    believe, and I think I testified I don't

11    believe I had conversations with Mr. Dondero at

12    the time of that board meeting.

13         Q.    Did you tell the retail board that

14    the advisors had the full faith and backing of

15    Mr. Dondero without Mr. Dondero's prior

16    approval?

17         A.    Yeah, I -- I -- yes, I'm -- like I

18    said, I think I testified earlier, I'm sure I

19    qualified it as well.

20         Q.    What do you mean by that?

21              MS. DANDENEAU:  Objection to form.

22         A.    Again -- again, like I said in the

23    email, it has the full faith and backing of Jim

24    Dondero unless that has changed.

25         Q.    Actually that is not what you said,

Page 207

```
 1              WATERHOUSE - 10-19-21

 2    so let's put the email back up.

 3         A.    It is -- it is -- it is in the

 4    email.

 5         Q.    Let's put the email back up.  You

 6    didn't say unless it has changed.  You said you

 7    believe it hasn't changed; right?

 8         A.    Okay.  And to my knowledge that

 9    hasn't changed, that is what it says.

10         Q.    That's right.

11         A.    But, again, I mean, that is -- I

12    don't know everything.  And I'm not in every

13    conversation.  I'm not -- to presume that I am,

14    is -- and you have to put myself -- as you

15    started this out, Mr. Morris, I was at home in

16    October of 2020 with COVID -- or, you know,

17    under these COVID times that we described is

18    very difficult.

19              We have all been working at home for

20    really the first time ever, undergoing

21    processes, procedures, control environments

22    that have been untested, and there is poor

23    communication.

24              So I am relaying, as I'm telling you

25    now, what is in the email.  And unless
```

```
 1              WATERHOUSE - 10-19-21

 2    something has changed -- to my knowledge, it

 3    hasn't changed, but it could have changed.

 4         Q.    When you say that the advisors have

 5    the full faith and backing from Mr. Dondero,

 6    did you intend to convey that, to the extent

 7    the advisors were unable to satisfy their

 8    obligations as they become due, Mr. Dondero

 9    would do it for them?

10              MS. DANDENEAU:  Object to the form.

11              MS. DEITSCH-PEREZ:  Object to the

12         form.

13              And, John, we have given you a lot

14         of leeway here but this does not seem

15         relevant to this case.  You seem sort of

16         taking a complete sort of diversion into

17         the allegations and the complaint just

18         filed on Friday, and so I would ask you to

19         move on because --

20              MR. MORRIS:  And I will tell you --

21         I will tell you that I have never read that

22         complaint cover-to-cover.  I have nothing

23         to do with the prosecution of those claims.

24         And this issue that we're talking about

25         right now is related solely to the
```

 1                  WATERHOUSE - 10-19-21

 2         promissory notes that your clients refuse

 3         to pay.

 4              So I'm going to continue to ask my

 5         questions, and I would ask the court

 6         reporter to read back my last question.

 7                       (Record read.)

 8              MS. DEITSCH-PEREZ:  And then I

 9         believe there were objections to form.

10         Q.    You can answer the question.

11         A.    Yes.

12         Q.    Thank you very much, sir.

13              MR. MORRIS:  Can we go back to the

14         other document, please?

15         Q.    Mr. Waterhouse, do you know if this

16    document was ever shared with the retail board?

17         A.    I don't recall.

18         Q.    Did you ever share it with the

19    retail board?

20         A.    I don't recall.

21         Q.    Did you ever tell the retail board

22    about the substance of this document?

23         A.    I don't recall.

24         Q.    Did you ever tell the retail board

25    that Highland had agreed not to make a demand

1              WATERHOUSE - 10-19-21

2    against HCMFA until May 2021?

3         A.    I don't recall.

4         Q.    Do you know whether anybody on

5    behalf of the advisors ever informed the retail

6    board that Highland had agreed on April 15,

7    2019, not to make a demand against HCMFA under

8    the promissory notes?

9         A.    I don't recall.

10        Q.    Did you instruct Ms. Thedford or

11   anybody else responding to the retail board's

12   15(c) inquiry to disclose this document?

13        A.    Did I instruct Ms. Thedford or

14   anyone else to -- to -- to produce this, to

15   disclose this document?  Is that what you -- I

16   just want to make sure.

17        Q.    Uh-huh.

18        A.    Yeah, I don't -- I don't recall.

19        Q.    Did you instruct anybody to inform

20   the retail board, in response to their question

21   as part of the 15(c) process, to -- to tell the

22   retail board about Highland's agreement not to

23   make a demand until 2021?

24            MS. DANDENEAU:  Objection to form.

25        A.    I don't recall.

Page 211

1          WATERHOUSE - 10-19-21

2     Q.    Did you ever inform PwC that HCMFA's

3  liabilities exceeded its assets?

4          MS. DANDENEAU:  Object to the form.

5     A.    I don't -- I don't think I told

6  them.  I mean, they -- they audited the

7  financial statements.

8     Q.    Did -- do you know if anybody on

9  behalf of Highland ever informed

10 PricewaterhouseCoopers that HCMFA may be unable

11 to repay amounts owing to Highland, should they

12 become due?

13         MS. DANDENEAU:  Objection to form.

14    A.    Yes.  Again, I think I testified

15 earlier that -- that this was communicated to

16 the auditors.

17    Q.    Ideally --

18    A.    I don't know who exactly did that.

19 I don't recall doing it, but, yeah, it was --

20 it was communicated.  And that is why -- I

21 mean, there is a disclosure in the financial

22 statements; right?

23    Q.    There is, and that disclosure

24 relates to the last sentence of this document;

25 correct?

Page 212

```
 1              WATERHOUSE - 10-19-21
 2       A.    Yes.
 3       Q.    Do you recall looking in the
 4  document and seeing anything that was disclosed
 5  with respect to the sentence above that?
 6       A.    No.
 7       Q.    Do you know whether anybody on
 8  behalf of Highland ever informed
 9  PricewaterhouseCoopers that HCMFA expects that
10  it may be unable to repay amounts due and owing
11  to Highland should they become due?
12            MS. DEITSCH-PEREZ:  Object to the
13       form.  I think that is the third time.
14       A.    I don't recall.  Again, as I said,
15  we -- all of this was given to the auditors.
16       Q.    Do you know if Highland received
17  anything of value in exchange for its agreement
18  not to demand payment on amounts owed by HCMFA
19  prior to May 31st, 2021?
20            MS. DEITSCH-PEREZ:  Object to the
21       form.  That is the second time.
22            MS. DANDENEAU:  Object to the form.
23       A.    I have answered this question.
24            MR. RUKAVINA:  Hold on.  Object to
25       legal conclusion.  Go ahead.
```

Page 213

```
 1              WATERHOUSE - 10-19-21

 2       A.    I have answered this question

 3  before.

 4       Q.    And the answer was no?

 5       A.    I'm not aware.

 6       Q.    Now, this acknowledgment can't

 7  possibly apply to the two notes that you signed

 8  on behalf of HCMFA because those notes were

 9  signed on May 2nd and May 3rd, 2019; is that

10  right?

11              MS. DANDENEAU:  Objection to form.

12       A.    Unless there is a drafting error.

13       Q.    Okay.  Are you aware of a drafting

14  error?

15       A.    I'm not aware.  I didn't -- I wasn't

16  part of -- I didn't sign this note or this

17  acknowledgment.  I didn't draft it.

18       Q.    But you do see it is dated April 15,

19  2019; right?

20       A.    Yes.

21       Q.    And this was a document that was

22  actually included by the advisors in a pleading

23  they filed with the Court; right?

24              MR. RUKAVINA:  Well, I don't know

25         that so I object to form.
```

Appx. 00583

```
 1                WATERHOUSE - 10-19-21

 2        Q.   Okay.  Let's go to the first page of

 3   the document and just confirm that.

 4              MR. AIGEN:  Mr. Morris, I just note

 5        that you already said there was some error

 6        with the document that is listed as

 7        exhibit --

 8              MR. MORRIS:  No.  No, no, no.

 9              MS. DEITSCH-PEREZ:  Oh, okay.

10              MR. MORRIS:  What I said is that

11        there is a few pages that were mistakenly

12        stapled to the end of the document.

13              MS. DEITSCH-PEREZ:  Okay.

14              MR. MORRIS:  There is no problem

15        with this document.

16              MS. DEITSCH-PEREZ:  And just so

17        we're clear that the document -- the pages

18        that start with defendant's amended answer

19        are not intended to be part of this

20        document?

21              MR. MORRIS:  That's correct.

22              MS. DEITSCH-PEREZ:  And that the --

23        but it is your representation that the rest

24        of the document is -- is -- is correct

25        because we don't -- we don't have any way
```

```
 1                WATERHOUSE - 10-19-21

 2         of verifying that, we're just --

 3              MR. MORRIS:  You do, actually.  You

 4         could just go to Docket No. 21-3004.

 5              MS. DEITSCH-PEREZ:  If you want to

 6         stop this deposition so we can go and pull

 7         that document up, we're happy to do it.  So

 8         I am just asking you for your

 9         representation.

10              MR. MORRIS:  Sure.  I gave that.

11              MS. DEITSCH-PEREZ:  Okay.

12         Q.   So do you see that this is a

13    document that was actually filed with the Court

14    by Highland Capital Management Fund Advisors?

15         A.   No.  I get with the first page in

16    the section.  Maybe I'm looking at the wrong

17    thing.  It says, Highland Capital Management.

18         Q.   Don't worry about it.  Don't worry

19    about it.

20         A.   Maybe I went back -- okay.

21              MR. MORRIS:  All right.  Can we put

22         up on the screen Exhibit 2.

23              (Exhibit 2 marked.)

24              MR. MORRIS:  I think it is

25         Exhibit 1.
```

Page 216

1           WATERHOUSE - 10-19-21

2           MS. DANDENEAU:  I'm sorry, John, did

3      you say Exhibit 2 or Exhibit 1?

4           MR. MORRIS:  It is Exhibit 2 in the

5      binders so it is premarked Exhibit 2.  And

6      now I'm asking -- right there -- going to

7      Exhibit 1 to the document that was marked

8      as Exhibit 2.

9           MS. DANDENEAU:  Got it.  In the

10     binder there is no --

11          MS. DEITSCH-PEREZ:  There is no

12     Exhibit 1.

13          MR. MORRIS:  All right.  So look at

14     the one on the screen.

15     Q.   Do you see, Mr. Waterhouse, that

16  this is a promissory note dated May 31st, 2017,

17  in the approximate amount of $30.7 million?

18     A.   Yes.

19     Q.   And do you see that the maker of the

20  note is NexPoint?

21     A.   Yes.

22     Q.   And that Highland is the payee; is

23  that right?

24     A.   Yes.

25     Q.   Okay.  And do you see in Paragraph 2

Page 217

1              WATERHOUSE - 10-19-21

2    this is an annual installment note?

3         A.    Can you scroll down.

4         Q.    Sure.

5              MR. MORRIS:  Can we scroll down --

6         yeah, there you go.

7         A.    Right there, yeah.  Yes.

8              MR. MORRIS:  And can we scroll down

9         to the signature line.

10        Q.    And do you recognize that as

11   Mr. Dondero's signature?

12        A.    Yes.

13        Q.    And is this the promissory note that

14   we talked about earlier where NexPoint had made

15   certain payments in the aggregate amount of

16   about 6 to $7 million against principal and

17   interest?

18        A.    I don't recall discussing the

19   aggregate principal amounts of 6 to $7 million,

20   but -- so I don't -- I don't recall that prior

21   discussion with those amounts.

22        Q.    All right.  Let's take a look.

23   NexPoint always included this promissory note

24   as a liability on its audited financial

25   statements; right?

Page 218

```
 1              WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    And NexPoint had its financial

 4    statements audited; isn't that correct?

 5        A.    Yes.

 6        Q.    And was the process of NexPoint's

 7    audit similar to the process you described

 8    earlier for Highland and HCMFA?

 9        A.    Yes, it is similar.

10        Q.    Okay.

11              MR. MORRIS:  Can we put up

12        NexPoint's audited financials and let

13        everybody know what exhibit number it is,

14        La Asia?

15              MS. CANTY:  It is going to be

16        Exhibit 46.

17              (Exhibit 46 marked.)

18        Q.    And do you see, sir, that we've put

19    up NexPoint Advisors' consolidated financial

20    statements and supplemental information for the

21    period ending December 31st, 2019?

22        A.    Yes.

23        Q.    Did you participate in the process

24    whereby these audited financial statements were

25    issued?
```

Appx. 00588

Page 219

```
 1              WATERHOUSE - 10-19-21

 2        A.    I didn't participate directly, as

 3   I've described before, about the -- the team

 4   performing the audit.

 5        Q.    Do you recall when the audit of

 6   NexPoint's financial statements for the period

 7   ending December 31st, 2019 was completed?

 8        A.    Yes.

 9        Q.    And when do you recall it being

10   completed?

11        A.    In January of 2021.

12        Q.    Do you know why the 2019 audit

13   report wasn't completed until January of 2021?

14        A.    Yes.

15        Q.    Why was the NexPoint audit report

16   for the period ending 12/31/19 not completed

17   until January 2021?

18        A.    Because we had to deal with working

19   from home from -- with COVID, and on top of all

20   of our daily responsibilities and job duties

21   at -- at providing -- at Highland providing

22   services to NexPoint, we had to do all of this

23   extra work for a bankruptcy that was filed in

24   October of 2019.

25              MR. MORRIS:  Can we go to the
```

```
 1                 WATERHOUSE - 10-19-21

 2          balance sheet on page 3?  Okay.  Stop right

 3          there.

 4          Q.    Do you see under the liabilities

 5     section, the last item is note payable to

 6     affiliate?

 7          A.    Yes.

 8          Q.    And is that the note that we just

 9     looked at?

10                MS. DANDENEAU:  Objection to form.

11          Q.    Withdrawn.

12                Is that the approximately

13     $30 million note that we just looked at that

14     was dated from 2017?

15                MS. DANDENEAU:  Objection to form.

16          A.    I believe no.

17          Q.    Okay.  You're not aware of any other

18     note that was outstanding from NexPoint to

19     Highland as of the end of the year 2019, other

20     than that one $30 million note; right?

21          A.    I don't recall.

22          Q.    And as of the end of 2019, the

23     principal amount that was due on the note was

24     approximately $23 million; right?

25                MS. DEITSCH-PEREZ:  Object to the
```

Page 221

```
 1              WATERHOUSE - 10-19-21

 2        form.

 3        A.    Approximately.

 4        Q.    And does that refresh your

 5   recollection that between the time the note was

 6   executed and the end of 2019, that NexPoint had

 7   paid down approximately $7 million?

 8        A.    Yes.  If we are just doing the math,

 9   yes.

10        Q.    Okay.  Did NexPoint complete its

11   audit from 2020?

12        A.    Sorry, you kind of broke up.  Do

13   NexPoint complete?

14        Q.    The audit of its financial

15   statements for the period ending December 31st,

16   2020?

17        A.    No.

18        Q.    No, it's not complete?

19        A.    No, it is not complete.

20        Q.    Did HCMFA complete its audit for the

21   year ending December 31st, 2020?

22        A.    No.

23              MR. MORRIS:  Can we go to page 15,

24        please, the paragraph at the bottom.

25        Q.    Do you see that NexPoint has
```

```
 1                 WATERHOUSE - 10-19-21

 2   included under notes payable to Highland a

 3   reference to the amounts that were outstanding

 4   as of the year-end 2019 under the note that we

 5   looked at just a moment ago?

 6        A.    Yes.  Are you talking about the

 7   second paragraph?

 8        Q.    I'm actually talking about first

 9   paragraph.  Do you understand that the first

10   paragraph is a reference to the 2017 note, and

11   the amounts that were -- the principal amount

12   that was outstanding as of the end of 2019?

13             MS. DANDENEAU:  Objection to form.

14        John, do you mean the first paragraph of

15        that page?

16             MR. MORRIS:  No, the first paragraph

17        under notes payable to Highland.

18        A.    Yeah, I see the paragraph, and

19   again, this is what I answered earlier.  I

20   believe so, just because I don't -- again, this

21   is a number in a balance sheet, and without

22   matching it up and seeing the detail with the

23   schedule like I kind of talked about for

24   Highland's financial statements, it is a little

25   bit more difficult to tie everything in
```

```
 1                    WATERHOUSE - 10-19-21

 2   perfectly together.

 3        Q.    Okay.  But you're not aware of any

 4   note that was outstanding at the end of 2019

 5   from NexPoint to Highland other than whatever

 6   principal was still due and owing under the

 7   $30 million note issued in 2017; correct?

 8        A.    Well, it -- I don't -- there is

 9   reference in the second paragraph.  I don't --

10   I don't -- I don't recall what that is

11   referring to, so I don't -- I don't know.

12        Q.    Well, if you listen carefully to my

13   question, right, I'm asking about notes that

14   were outstanding at the end of 2019, and if we

15   look at the paragraph you just referred to, it

16   says that during the year there were new notes

17   issued totaling $1.5 million, but by the end of

18   the year, no principal or interest was

19   outstanding on the notes.

20             Do you see that?

21        A.    Oh, I do, yes.

22        Q.    So does that refresh your

23   recollection that there were no notes

24   outstanding from NexPoint to Highland other

25   than the principal remaining under the original
```

Page 224

1          WATERHOUSE - 10-19-21

2    $30 million 2017 note that we looked at a

3    moment ago?

4          A.    Well, we're at the bottom of the

5    page.  Is there anything on page 16?

6          Q.    That is a fair question, sure.  That

7    is it.

8          A.    Okay.  So it appears that that is

9    the only note that is detailed in the notes in

10   the financial statement.

11         Q.    And you don't have any memory of any

12   other note other than the 2017 note, right,

13   being outstanding as of the end of the year?

14         A.    I deal with thousands of

15   transactions every year.  I don't really have a

16   very specific memory for what exactly was

17   outstanding.

18             MR. MORRIS:  Why don't we take a

19         break now.  We've been going for a little

20         while.  It's 3:26.  Let's come back at

21         3:40.

22             VIDEOGRAPHER:  We're going off the

23         record at 3:26 p.m.

24         (Recess taken 3:26 p.m. to 3:39 p.m.)

25             VIDEOGRAPHER:  We are going back on

Page 225

```
 1                  WATERHOUSE - 10-19-21

 2          the record at 3:39 p.m.

 3          Q.    All right.  Mr. Waterhouse, we -- I

 4    don't think we have a lot more here.

 5                To the best of your knowledge and

 6    recollection, were all affiliate loans and all

 7    loans made to Mr. Dondero recorded on

 8    Highland's books and records as assets of

 9    Highland?

10                MS. DANDENEAU:  Object to the form,

11          asked and answered.

12          A.    To my knowledge, yes.

13          Q.    Okay.  Can you recall any loan to

14    any affiliate or Mr. Dondero that was not

15    recorded on Highland's books and records as an

16    asset?

17          A.    Like during my time as CFO?  I don't

18    recall.

19          Q.    How about after the time that you

20    were CFO?  Did you recall that there was a loan

21    by Highland to an affiliate or to Mr. Dondero

22    that hadn't been previously recorded on

23    Highland's books as an asset?

24                MS. DANDENEAU:  Objection to form.

25          A.    I guess I don't understand the
```

Appx. 00595

1              WATERHOUSE - 10-19-21

2    question.  I left Highland as of -- I'm not

3    aware of -- I left Highland in February --

4    probably the last day of February of 2021.

5         Q.    Okay.

6         A.    I'm not -- I'm not aware of any --

7    I'm not aware of anything past that date.

8         Q.    Okay.  While you were the CFO at

9    Highland, did Highland prepare in the ordinary

10   course of business a document that reported

11   operating results on a monthly basis?

12        A.    Yes.

13        Q.    And are you generally familiar with

14   the monthly operating reports?

15        A.    Yeah.  You are referring to the

16   reports that we filed to the Court every month?

17        Q.    I apologize, I'm not.  I'm taking

18   you back to the pre-petition period.  There was

19   a report that I have seen that I'm going to

20   show you, but I'm just asking for your

21   knowledge.

22             MR. MORRIS:  Let's put it up on the

23        screen, Exhibit 39.

24             (Exhibit 39 marked.)

25        Q.    Do you see this is a document that

```
 1                  WATERHOUSE - 10-19-21
 2    is called operating results?
 3         A.    Yeah, that's the title of it.
 4         Q.    Okay.  And was a report of operating
 5    results prepared by Highland on a monthly basis
 6    during the time that you served as CFO?
 7         A.    No.
 8         Q.    Are you familiar with a document of
 9    this type?  And we can certainly look at the
10    next page or two to refresh your recollection.
11         A.    I'm just looking at the title.  I
12    don't really -- again, as I discussed before, I
13    don't have any records or documents or emails
14    or appointments or anything that I was able to
15    use prior to -- prior to this deposition, so
16    I'm doing the best I can.
17         Q.    Okay.  You don't need to apologize.
18    I'm just asking you if you are familiar with
19    the document called Operating Results that was
20    prepared on a monthly basis at Highland?
21              MS. DEITSCH-PEREZ:  Object to the
22         form.
23         Q.    If you're not, you're not.
24         A.    I don't believe this was prepared on
25    a monthly basis.
```

Page 228

```
 1                WATERHOUSE - 10-19-21
 2        Q.    Okay.  Do you see that this one
 3   is -- is dated February 2018?
 4        A.    Yes.
 5        Q.    Do you have -- do you believe --
 6   have you ever seen a document that was
 7   purporting to report operating results for
 8   Highland?
 9              MS. DANDENEAU:  Objection to form.
10        A.    Yes.
11        Q.    Okay.  And when you say that you
12   don't believe it was produced on a monthly
13   basis, was it produced on any periodic bases to
14   the best of your recollection?
15        A.    I believe it was -- it was prepared
16   on an annual basis.
17        Q.    Okay.
18              MR. MORRIS:  Can we look at the next
19        page.
20        Q.    Do you see that there is a statement
21   here called:  Significant items impacting
22   HCMLP's balance sheet?
23              And it is dated February 2018.
24        A.    Yes.
25        Q.    Do you recall that there was a
```

Appx. 00598

```
 1              WATERHOUSE - 10-19-21
 2    report that Highland prepared that identified
 3    significant items impacting the balance sheet?
 4         A.    A report that was prepared.
 5         Q.    Let me ask a better question:  Did
 6    Highland prepare reports to the best of your
 7    recollection that identified significant items
 8    that impacted its balance sheet?
 9         A.    Well, so Highland prepared a -- a
10    monthly close package.  And maybe I'm
11    getting -- and -- and maybe change names at one
12    time or maybe I'm just -- again, just
13    misremembering -- but in that, yes, there is a
14    page that would detail just changes in -- you
15    know, just changes month over month on the
16    balance sheet.
17         Q.    Okay.  And maybe it is my fault.
18    Maybe I didn't know the proper name for it.
19    But let's use the phrase "monthly close
20    package."
21              Did Highland prepare a monthly close
22    package in the ordinary course of business
23    during the time that you served as CFO?
24              MS. DANDENEAU:  Objection to form.
25         A.    Yes.
```

```
 1              WATERHOUSE - 10-19-21

 2         Q.    And did the monthly close package

 3    that Highland prepared include information

 4    concerning significant items that impacted

 5    Highland's balance sheet?

 6         A.    Yes, it had a page like that is --

 7    that is on the screen that detailed items

 8    like -- of that nature.

 9         Q.    And do you know who -- was there

10    anybody at Highland who was responsible for

11    overseeing the preparation of the monthly

12    reporting package?

13         A.    That would have been -- again, it

14    varies over time during my tenure as CFO.

15    It -- it varied over -- over time, but -- but

16    typically a -- a corporate accounting manager.

17         Q.    And who were the corporate

18    accounting managers during your tenure as CFO?

19         A.    It would have been Dave Klos and

20    Kristin Hendrix.

21         Q.    And did the corporate accounting

22    manager deliver to you drafts of the monthly

23    close package before it was finalized?

24         A.    Sometimes.

25         Q.    Was that the practice even if there
```

```
 1                  WATERHOUSE - 10-19-21

 2   were exceptions to the practice?

 3        A.    The practice meaning that they

 4   sometimes lured them to me?

 5        Q.    That that was the expectation even

 6   if circumstances prevented that from happening

 7   from time to time.

 8              MS. DEITSCH-PEREZ:  Object to the

 9        form.

10        A.    I -- I would say it started out that

11   way but over the years it -- it was not

12   enforced.

13        Q.    Okay.  So you were -- you reviewed

14   and approved monthly -- monthly reporting

15   packages for a certain period of time and then

16   over time you stopped doing that.

17              Do I have that right?

18              MS. DANDENEAU:  Objection to form.

19        A.    Yes, I mean, if you're talking about

20   a formal meeting where we sit down and go

21   through and approve it.  I would say that was

22   standard practice a decade -- you know, early

23   on.  And as time went on that -- that -- that

24   practice wasn't followed.

25        Q.    Okay.
```

Page 232

```
1              WATERHOUSE - 10-19-21

2        A.    And, quite frankly, I don't even

3   know if these were -- these were sent to me

4   even in any capacity.

5        Q.    What was the purpose of preparing

6   the monthly reporting package -- withdrawn.

7              What was the purpose of preparing

8   the monthly close package?

9              MS. DEITSCH-PEREZ:  Object to the

10        form.

11        A.    The -- the original purpose was so

12   that it would just -- it would be a report that

13   was reviewed monthly with senior management.

14        Q.    Who was included in the idea of

15   senior management?

16        A.    You know, I think originally when

17   this was conceived that would have been like

18   Jim Dondero and Mark Okada.

19        Q.    Were monthly reporting -- withdrawn.

20              Were monthly close packages prepared

21   to the best of your knowledge until the time

22   you left Highland?

23        A.    To my knowledge -- I don't know,

24   actually.  I mean, to my knowledge, I believe

25   it was being -- that was still being done.  I
```

Page 233

```
 1              WATERHOUSE - 10-19-21
 2   don't know because, again, I wasn't reviewing
 3   them.  I hadn't reviewed a close package for --
 4   for a long time.  But I believe the standard
 5   practice that was still being carried out.
 6        Q.    Did you ever have any discussions
 7   with the debtor's independent board concerning
 8   any promissory notes that were issued by any of
 9   the affiliates or Mr. Dondero?
10        A.    I can't -- I can't -- I can't recall
11   specifically.
12        Q.    Did you speak with the independent
13   board from time to time?
14        A.    Yes, from -- from -- from time to
15   time I had discussions with the independent
16   board members, you know, either -- either, you
17   know, by themselves or wholly, you know, as --
18   as a -- as a combined work.
19        Q.    Okay.  Before we talk about
20   Mr. Seery, do you recall ever having a
21   conversation with Mr. Nelms or Mr. Dubel
22   concerning any promissory note that was
23   rendered by one of the affiliates or
24   Mr. Dondero to Highland?
25        A.    I don't recall any conversations
```

Appx. 00603

Page 234

```
 1              WATERHOUSE - 10-19-21
 2   specifically.
 3        Q.   Do you know if the topic was ever
 4   discussed, even if you don't remember it
 5   specifically?
 6              MS. DANDENEAU:  Objection to form.
 7        A.   It -- it -- it may have.  I don't
 8   know.  I don't recall.
 9        Q.   Do you recall ever discussing any
10   promissory note issued by any of the affiliates
11   or Mr. Dondero with James Seery?
12        A.   I don't -- I don't recall
13   specifically.
14        Q.   Do you recall generally ever
15   discussing the topic of promissory notes issued
16   by any of the affiliates or Mr. Dondero to
17   Highland with Mr. Seery?
18        A.   Nothing -- nothing is really jumping
19   out at me.
20        Q.   Do you recall if you ever told
21   Mr. Seery that any of the affiliates or
22   Mr. Dondero didn't have an obligation to pay
23   all amounts due and owing under their notes?
24        A.   I don't recall having that
25   conversation.
```

Appx. 00604

Page 235

```
 1                WATERHOUSE - 10-19-21

 2        Q.    Did you ever tell Mr. Seery that you

 3   had any reason to believe that the amounts

 4   reflected in the notes issued by the affiliates

 5   and Mr. Dondero were invalid for any reason?

 6        A.    I don't -- I don't recall.

 7        Q.    Did you tell Mr. Dondero -- did you

 8   tell Mr. Seery that you thought the promissory

 9   notes issued by the advisors and Mr. Dondero

10   that were outstanding as of the petition date

11   were assets of the estate?

12        A.    I don't recall having a specific

13   conversation about those -- you know, those

14   notes outstanding as -- as of the petition date

15   being assets on the estate.  I mean, we put

16   together -- you know, they're in the books and

17   records of the financial statements.  I don't

18   recall having a specific conversation.

19        Q.    Did you ever prepare any documents

20   that were delivered to Mr. Seery that concerned

21   the promissory notes issued by any of the

22   affiliates or Mr. Dondero?

23             MS. DANDENEAU:  Objection to form.

24        A.    Did I produce any that concerned --

25   you mean did I just -- did I give Mr. Seery
```

1              WATERHOUSE - 10-19-21

2    anything that -- that said I have concerns over

3    these notes?

4        Q.   No.  Let me try again.  Maybe it was

5    my question.

6              Did you ever give Mr. Seery any

7    information concerning any of the notes that

8    were issued by any of the affiliates or

9    Mr. Dondero?

10             MS. DANDENEAU:  Objection to form.

11       A.   I don't recall if I did or not.  I

12   don't -- I don't remember.  I mean, you have my

13   emails.  You may have asked.  Again, I don't --

14   I don't know.

15             MR. MORRIS:  Can we put up the

16        document that has been premarked as Exhibit

17        39?

18             MS. DANDENEAU:  John, that is this

19        document, isn't it?

20             MR. MORRIS:  Oh, yeah, it might be,

21        as a matter of fact.  Let's go to Number

22        40.

23             (Exhibit 40 marked.)

24       Q.   During the bankruptcy,

25   Mr. Waterhouse, did you prepare documents that

```
 1                  WATERHOUSE - 10-19-21
 2    were filed with the bankruptcy court?
 3         A.    I didn't -- I didn't prepare them
 4    personally.
 5         Q.    Did people prepare them under your
 6    direction?
 7         A.    Yes.  There were members of the team
 8    that prepared them, and they worked in -- you
 9    know, there were members of DSI that were
10    involved in the process as well.
11         Q.    To the best of your knowledge, did
12    DSI rely on the employees of Highland for the
13    information that they used to prepare the
14    bankruptcy filings?
15         A.    Yes.  The books and records were
16    with the Highland personnel.
17         Q.    Okay.  And do you see on the screen
18    here, there is a document that we have marked
19    as Exhibit 40 that is -- that is titled Summary
20    of Assets and Liabilities?
21         A.    Uh-huh.
22         Q.    Okay.  And do you recall reviewing
23    any summary of assets and liabilities before it
24    was filed with the bankruptcy court?
25         A.    Yes, I recall reviewing this at a
```

```
 1                  WATERHOUSE - 10-19-21

 2    high level.

 3         Q.    And did you believe that it was

 4    accurate at the time it was filed?

 5         A.    I didn't have any other reason to

 6    believe otherwise.

 7         Q.    Okay.  Do you see that the total

 8    value of all properties listed in Part 1 is

 9    approximately $410 million?

10              MS. DEITSCH-PEREZ:  Objection to

11         form.

12         A.    Yes, it is in 1c.

13         Q.    Yes.

14         A.    Yes, I see that.

15         Q.    Okay.  If we go to the second page,

16    now I think I may just have excerpts here, just

17    so everybody is clear, but if we scroll down to

18    the second page, you will see that there is

19    a -- a little further.  There you go.  You will

20    see there is a reference to Item 71, notes

21    receivable.

22              Do you see that?

23         A.    I do.

24         Q.    And that was a reference to the

25    notes receivable from the affiliates and
```

Page 239

```
 1                  WATERHOUSE - 10-19-21
 2   Mr. Dondero, among others; is that right?
 3              MS. DANDENEAU:  Objection to form.
 4       A.   Yes.  The affiliate notes and the
 5   Dondero notes were in this amount, but they
 6   weren't -- again, like you said, and among
 7   others.
 8       Q.   Okay.  We will look at the
 9   specificity because I'm not playing gaming
10   here, but do you know if the $150 million of
11   notes receivable was included within the
12   $410 million of total value of the debtor's
13   assets?
14              MS. DANDENEAU:  Objection to form.
15       A.   I -- I -- I believe so.
16       Q.   Right.  And so is it fair to say
17   that as of the date this document was prepared,
18   the notes receivable were more than one-third
19   of the value of the debtor's assets?
20              MS. DEITSCH-PEREZ:  Object to the
21         form.
22              MS. DANDENEAU:  Object to the form.
23       A.   Again, if you are just taking the
24   math, 150 divided by whatever the $400 million
25   number is above, then yes, you get there.
```

Appx. 00609

Page 240

```
 1                WATERHOUSE - 10-19-21

 2        Q.    Okay.

 3        A.    You know, but as of the time of this

 4   filing, that is what was put in this filing,

 5   right, but, you know, I mean, numbers --

 6   numbers change, facts and circumstances change.

 7        Q.    But as the CFO of Highland, the

 8   debtor in bankruptcy, did you believe that this

 9   number accurately reflected the total amount

10   due under the notes receivable?

11        A.    That is what we had in our books and

12   records.

13        Q.    Okay.  And did you believe as the

14   CFO that the books and records accurately

15   reported the then value of the debtor's assets?

16              MS. DANDENEAU:  Objection to form.

17        A.    We didn't -- as part of this filing,

18   there was no fair value measurement or

19   anything.  These were just accounting entries

20   for the promissory notes.  There is no analysis

21   for impairment or fair market value adjustments

22   or anything of that nature.  This is purely

23   taking numbers and putting them in our form.

24        Q.    Did you do any impairment analysis

25   at any time while you were employed by
```

Page 241

```
 1                WATERHOUSE - 10-19-21

 2    Highland?

 3         A.    Yes, we did do impairment analysis

 4    on -- on assets.

 5         Q.    Okay.  Did you ever do an impairment

 6    analysis on any of the promissory notes that

 7    were given to Highland by any of the affiliates

 8    or Mr. Dondero?

 9         A.    Not that I recall.

10         Q.    Under what circumstances do you

11    prepare impairment analyses?

12         A.    As -- as -- if you're preparing

13    financials in accordance with GAAP, generally

14    accepted accounting principles, if you're

15    preparing full GAAP financials, you should be

16    preparing -- you should be undergoing on a

17    periodic basis any fair market value

18    adjustments to assets.

19              As I was instructed at the time of

20    the petition date, we weren't producing GAAP

21    financials.  So this wasn't something I was

22    worried about nor concerned about.

23         Q.    Okay.  Were NexPoint and HCMFA and

24    Highland's audited financial statements

25    prepared in accordance with GAAP?
```

Appx. 00611

```
 1                WATERHOUSE - 10-19-21

 2        A.    The audited financials -- yes,

 3   audited financial statements are prepared in

 4   accordance with GAAP.

 5        Q.    Do you recall whether any of

 6   Highland or HCMFA or NexPoint ever made a fair

 7   market value adjustment to any of the notes

 8   issued by any of the affiliates or Mr. Dondero

 9   to Highland?

10        A.    I do not recall that happening, but

11   the -- it is because under -- under GAAP,

12   the -- the treatment of liabilities is

13   different than assets.

14        Q.    Okay.  So then let's just focus on

15   Highland's audited financial statements.

16              The last audited financial

17   statements were for the period ending December

18   31st, 2018; correct?

19        A.    That is my understanding.

20        Q.    And you had -- you had an obligation

21   to disclose anything to PricewaterhouseCoopers

22   concerning any subsequent events between the

23   end of 2018 and June 3rd, 2019; correct?

24              MS. DANDENEAU:  Objection to form.

25              MS. DEITSCH-PEREZ:  Form.
```

```
 1              WATERHOUSE - 10-19-21

 2      A.    Correct.

 3      Q.    Okay.  To the best of your

 4   knowledge, as Highland's CFO, did Highland ever

 5   make any fair market value adjustments to any

 6   of the promissory notes that were carried on

 7   its balance sheet and that were issued by any

 8   of the affiliates or Mr. Dondero?

 9      A.    I think I answered that question

10   earlier.  I don't recall doing that for any of

11   the -- those -- those notes.  So it would have

12   included the audit for the -- for the 2018

13   period.

14      Q.    Okay.

15            MR. MORRIS:  Can we go to the next

16       page.

17      Q.    Do you see this is a note a list of

18   notes receivable?  Do you see that?

19      A.    Yes, I do.

20      Q.    And do you see that this ties into

21   the page that we were just looking?

22      A.    I'm sorry, can we go back to the

23   prior page?  I mean, it was at 150,331,222.  It

24   was on the prior page.  Next page.  Yes, it

25   agrees.
```

Page 244

```
 1              WATERHOUSE - 10-19-21

 2        Q.    Okay.  So now let's look at that

 3   schedule.  So this was the face amount of all

 4   of the promissory notes that Highland held at

 5   the time this document was filed with the

 6   bankruptcy court; right?

 7        A.    Yes.

 8        Q.    There is a footnote there that says,

 9   doubtful or uncollectible accounts are

10   evaluated at year-end.

11              Do you see that?

12        A.    I do.

13        Q.    Okay.  And is it fair to say that as

14   of the year-end 2018, the year before this,

15   that to the extent any of these notes were

16   outstanding at that time, they weren't deemed

17   to be doubtful or uncollectible?

18        A.    Yeah.  For the 2018 audit, there

19   weren't any -- there weren't any adjustments to

20   fair value.

21        Q.    Okay.  And during the bankruptcy, do

22   you recall that Highland subsequently reserved

23   for the Hunter Mountain Investment Trust note?

24        A.    Yes.

25        Q.    Why did Highland -- were you
```

Page 245

WATERHOUSE - 10-19-21

1

2    involved in the decision to reserve the Hunter

3    Mountain Investment Trust note?

4         A.    I was not.

5         Q.    Do you know why Highland decided to

6    reserve for the Hunter Mountain Investment

7    Trust note?

8         A.    I don't know yet decision was made.

9    I believe it was made by someone at DSI.

10        Q.    Okay.  I'm just asking if you know

11   why.

12              Did you ever ask anyone why they

13   reserved for that particular note?

14        A.    I don't recall.

15        Q.    Do you know whether the debtor

16   reserved for any other note on this list during

17   the bankruptcy?

18        A.    Again, I don't recall.  I wasn't

19   part of any process of -- again, like any fair

20   value adjustments or anything to that degree.

21   Like I said, a lot of that was done by DSI and

22   it was kind of out of our court.

23        Q.    Okay.  Do you know if any note

24   receivable on this list was ever deemed by the

25   debtor to be doubtful or uncollectible?

Appx. 00615

1          WATERHOUSE - 10-19-21

2          A.    I don't -- I don't have a

3    recollection of every filing, so I don't know.

4          Q.    Did you ever have a discussion with

5    anybody at any time about whether any of the

6    notes receivable on this list should be deemed

7    to be doubtful or uncollectible?

8          A.    No.  As I previously stated, we were

9    told we didn't have to keep GAAP financials.

10   We weren't having -- you know, there is no

11   underlying audits being performed, so I mean,

12   it wasn't something I worried about.

13              MR. MORRIS:  I move to strike.

14         Q.    Did you ever have a conversation

15   with anybody about any of the notes receivable

16   and whether they should be deemed to be

17   doubtful or uncollectible?  Did you have the

18   conversation, yes or no?

19              MS. DANDENEAU:  Objection to form.

20         A.    I don't recall.

21         Q.    Do you recall ever telling anybody

22   that you believed any of the notes receivable

23   on this list should be doubtful -- should be

24   deemed to be doubtful or uncollectible?

25              MS. DANDENEAU:  Objection to form.

Page 247

1          WATERHOUSE - 10-19-21

2       A.    I don't recall.  I mean, it may have

3   happened, you know, again, when we initially

4   getting DSI up to speed and going through

5   financials, it may have happened, but I don't

6   recall specifically.

7       Q.    While you were the CFO of Highland

8   during the time that the company was in

9   bankruptcy, did you have any reason to believe

10  that any of the notes receivable on this list

11  other than Hunter Mountain Investment Trust

12  should have been characterized as doubtful or

13  uncollectible?

14          MS. DANDENEAU:  Objection to form.

15          MS. DEITSCH-PEREZ:  Form.

16      A.    I didn't know.  I didn't form an

17  opinion.  Bankruptcy was new to me.  It still

18  is new to me, even after going through this.

19  So I really didn't know what to expect nor

20  really -- you know, I didn't know.

21          MR. MORRIS:  I move to strike.

22      Q.    During the period of Highland's

23  bankruptcy when you were serving as CFO, did

24  you have any reason to believe any of the notes

25  on this list were doubtful or uncollectible?

```
 1              WATERHOUSE - 10-19-21

 2              MS. DEITSCH-PEREZ:  This is like the

 3         fifth time you've asked it.  Object to the

 4         form.

 5              MR. MORRIS:  I'm moving to strike,

 6         if you haven't noticed, because he's not

 7         answering the question.

 8              MS. DEITSCH-PEREZ:  He was answering

 9         the question, you just didn't like it, like

10         the answer.

11              MR. MORRIS:  Good Lord.

12         Q.   Go ahead, Mr. Waterhouse.

13         A.   Again, I don't -- we brought up a

14    myriad of issues at the start of the bankruptcy

15    case.  I don't recall if this was one of them,

16    but, again, there are a lot of things we

17    couldn't change.  Even, you know, I was told

18    status quo, blah, blah, blah, right, there is a

19    stay, you can't -- you know, I don't recall

20    specifically, but that doesn't mean it didn't

21    happen.

22              MR. MORRIS:  I move to strike.

23         Q.   During the time that Highland was in

24    bankruptcy and you served as CFO, did you have

25    any reason to believe that any of the notes
```

```
 1              WATERHOUSE - 10-19-21

 2    receivable on this list were doubtful or

 3    uncollectible?

 4              MS. DEITSCH-PEREZ:  Object to the

 5         form.

 6         A.    Potentially.

 7         Q.    Did you ever tell anybody that?

 8         A.    As I just stated like five times,

 9    yes, we -- at the beginning after filing and we

10    were getting DSI and others up to speed, you

11    know, we had a myriad of discussions of a lot

12    of things and this was likely one of them.  I

13    don't -- but I don't recall specifically we

14    talked --

15         Q.    I don't want to know -- I don't want

16    to know what was --

17              MS. DEITSCH-PEREZ:  Wait, wait.

18         Excuse me.  Mr. Morris, you did not let him

19         finish his answer.

20         A.    I spoke -- we had -- we were

21    bringing Fred Karesa and Brad Sharp (phonetic)

22    up to speed on all of these items, contracts,

23    and investments and going through -- we had

24    hours and hours and hours of discussion.  And

25    then not only do I have to repeat this not
```

Page 250

```
1                 WATERHOUSE - 10-19-21

2   once, twice, three, four times with -- you

3   know, I mean, we -- I don't -- I don't remember

4   the sum culmination of all these discussions.

5   They all kind of blend together.

6                 MR. MORRIS:  Okay.  I move to strike

7        and I will try one more time.

8        Q.   Did you ever tell anybody at DSI

9   that you believed any of the notes receivable

10  on this list were doubtful or uncollectible?

11                MS. DANDENEAU:  Object to form.

12       A.   Potentially.

13       Q.   Potentially you told them or

14  potentially they were doubtful or

15  uncollectible?

16       A.   Potentially I told them that we

17  needed to look at the value of these -- of

18  these assets.

19       Q.   Okay.  Did you -- okay.  It is

20  potential that you told them and it is

21  potentially that you didn't; right?

22                MS. DANDENEAU:  Objection to form.

23       A.   I've gone through that.  I don't

24  recall specifically.

25       Q.   So you should just -- I don't want
```

```
 1                 WATERHOUSE - 10-19-21
 2    to tell what you to do.  Do you have --
 3              MS. DANDENEAU:  Good.
 4         Q.    Other than -- other than telling
 5    them that they should look at the values, do
 6    you have any recollection whatsoever of ever
 7    having told anybody at DSI that any of the
 8    notes receivable on this page were doubtful or
 9    uncollectible?
10              MS. DEITSCH-PEREZ:  Object to the
11         form.
12              MS. DANDENEAU:  Objection.
13         A.    I recall having general discussions
14    about everything on our balance sheet which
15    would have included these -- these notes
16    receivable.
17         Q.    Okay.
18         A.    I don't recall specifically where
19    those discussions delved into.
20         Q.    Do you recall any discussion at all
21    on the topic of whether any of these notes on
22    this list were doubtful or uncollectible?
23              MR. AIGEN:  Mr. Morris, how on earth
24         is that question different from the
25         question that you just asked for the last
```

Page 252

```
 1            WATERHOUSE - 10-19-21
 2   five times?  I mean, really I thought you
 3   were -- (overspeak.)
 4         MR. MORRIS:  Because he never
 5   answered it.
 6         MS. DEITSCH-PEREZ:  Are you
 7   listening to him?
 8         MR. MORRIS:  You know --
 9         MS. DEITSCH-PEREZ:  He basically
10   said that he had a conversation with DSI
11   that went over all of this stuff and that
12   conversation could have included the notes
13   but he doesn't recall specifically.
14         What more do you want him -- to ask
15   of him?
16         MR. MORRIS:  I want him -- I would
17   love him to say -- I would like him to
18   testify to the truth, and that is he has no
19   recollection.
20         MS. DEITSCH-PEREZ:  Well, the truth
21   as you would like to see it, but -- but he
22   is testifying truthfully.  And I -- and, by
23   the way, I move to strike that comment --
24         MR. MORRIS:  Okay.
25         MS. DEITSCH-PEREZ:  -- because it
```

Appx. 00622

```
 1                  WATERHOUSE - 10-19-21

 2         suggests that he has not testified

 3         truthfully.

 4              MR. MORRIS:  I will ask my question

 5         again.  And if at any time you want to

 6         direct him not to answer, that is your

 7         prerogative.

 8         Q.   Mr. Waterhouse, do you have any

 9  recollection at all of ever telling anybody

10  from DSI that any of these notes were doubtful

11  or uncollectible?

12              MS. DANDENEAU:  Object to form.

13         A.   I don't remember specifically.

14         Q.   Do you remember generally that

15  specific topic?

16         A.   We generally talked about assets,

17  values.  If -- we had discussions of that and

18  collectability in nature.  I mean, of Highland,

19  the funds, the CLOs, the entire complex.  We

20  had discussions like that, which is, you know,

21  as you look at a billion dollar consolidated

22  balance sheet.

23              So I generally remember -- this is

24  billions of dollars, including these assets --

25  having discussions of this -- of this type.
```

1              WATERHOUSE - 10-19-21

2         Q.    Do you believe that an affiliate

3    loan on this list was doubtful or

4    uncollectible?  Would you have told that to

5    DSI?

6              MS. DANDENEAU:  Objection to form.

7              MS. DEITSCH-PEREZ:  Object to form.

8         A.    If we had, like -- again, if we --

9    if -- if we weren't preparing financial

10   statements in accordance with GAAP, and -- you

11   know, if DSI at that point -- they were --

12   again, I was new to bankruptcy.

13             The CRO is -- we are delegating

14   everything to the CRO.  All the decisionmaking.

15   Remember -- remember when you and I went into

16   Delaware Court and we were saying DSI basically

17   does everything, remember this, Mr. Morris?

18             You were my counsel at the time, and

19   basically we're running everything through DSI.

20   That was what this was like in the early part.

21             Everything was communicated through

22   DSI.  So DSI says this.  DSI says that.  That

23   is what we're doing, and we're pointing out

24   things to them.

25             Now, they decide what direction this

```
 1              WATERHOUSE - 10-19-21

 2    goes.

 3         Q.    Did you point out that any of

 4    these --

 5         A.    I don't recall specifically.

 6         Q.    Okay.  At any time that you served

 7    as Highland's CFO, did you ever point out to

 8    DSI that any of these loans were doubtful or

 9    uncollectible?

10              MS. DEITSCH-PEREZ:  Object to the

11         form.

12              MS. DANDENEAU:  Objection.

13         A.    If you're asking me if I had a

14    conversation with DSI, if any of these loans

15    were doubtful or uncollectible, I don't recall

16    specifically.

17         Q.    Do you recall that the debtor filed

18    on the docket monthly operating reports?

19         A.    Yes.

20         Q.    You prepared those personally,

21    didn't you?

22              MS. DEITSCH-PEREZ:  Objection to

23         form.

24         A.    I didn't personally prepare them,

25    the team did with DSI.
```

Page 256

```
 1              WATERHOUSE - 10-19-21
 2       Q.    But you signed them; correct?
 3       A.    My signature is on the MORs.
 4       Q.    And you signed them as the preparer
 5  of the document; correct?
 6       A.    Yes, I did this pursuant to DSI's
 7  instructions.
 8       Q.    Okay.  You wouldn't have signed the
 9  document if you didn't believe it to be
10  accurate; correct?
11       A.    If I had reason to believe it
12  wasn't, presumably I wouldn't have signed it.
13       Q.    Okay.  And do you have any reason to
14  believe right now that any monthly operating
15  report that has your signature on it was
16  inaccurate in any way?
17              MS. DEITSCH-PEREZ:  Object to the
18        form.
19       A.    My understanding of the monthly
20  operating reports is we were filing them in
21  accordance with the standards set by the Court.
22  It wasn't -- you know, again, I don't -- you
23  know, it wasn't GAAP.  It wasn't these other
24  standards, so I testified I didn't have
25  experience in this.  The CRO was running the
```

Page 257

```
 1                WATERHOUSE - 10-19-21

 2    show.  I followed their advice.

 3        Q.    But you assured yourself that

 4    everything in the report was accurate before

 5    you signed them; correct?

 6              MS. DANDENEAU:  Objection to form.

 7        A.    I trusted the guidance from the CRO

 8    and their team and their experience and their

 9    guidance for doing this for many, many, many

10    years to -- to -- to categorize and put things

11    in ways on the form.

12              You know, my team had -- had not

13    filled out these forms before and needed all of

14    this guidance.  I'm not an expert in this.  I

15    have oversight of it.  I signed the form.  DSI

16    told me to.

17        Q.    And you and your team are the source

18    of the information that DSI used to create the

19    reports; correct?

20              MS. DANDENEAU:  Objection to form.

21        A.    The books and records reside with

22    the -- with -- with the corporate accounting

23    team.

24        Q.    Okay.  And the corporate accounting

25    team was the corporate accounting team that was
```

Page 258

```
1                    WATERHOUSE - 10-19-21

2    under your direction; correct?

3         A.    Yes.

4         Q.    So -- so your team was responsible

5    for maintaining Highland's books and records;

6    correct?

7         A.    I'm sorry, my team was responsible?

8         Q.    Correct.

9         A.    Yes.  They -- they -- they were

10   the -- the -- the general ledger of Highland,

11   that responsibility was with the corporate

12   accounting team.

13        Q.    The corporate accounting group

14   reported to you; correct?

15        A.    Yes.

16              MR. MORRIS:  Can we put up 41,

17        please.

18              (Exhibit 41 marked.)

19        Q.    All right.  You will see that this

20   is a report that is dated January 31st, 2020,

21   but it is for the month ending December 2019.

22              Do you see that?

23        A.    I do.

24        Q.    And you signed this report in your

25   capacity as the chief financial officer of
```

Appx. 00628

Page 259

```
 1                WATERHOUSE - 10-19-21
 2   Highland; correct?
 3        A.    Yes.
 4        Q.    And you're the preparer -- you're
 5   identified as the preparer of the report;
 6   correct?
 7        A.    That is correct.
 8        Q.    Do you recall participating in the
 9   preparation of monthly operating reports?
10        A.    As I testified earlier, it was put
11   together, you know, with the team.  The team
12   worked with DSI to put these monthly operating
13   reports together.  We had no experience at this
14   time of the monthly operating reports or things
15   of this nature.
16             MR. MORRIS:  Can you turn to the
17        next page, please.
18        Q.    Do you see a line item under assets
19   due from affiliates?
20        A.    Yes, I do.
21        Q.    Okay.  And to the best of your
22   knowledge and understanding, as the person who
23   is identified as the preparer of this report,
24   does that line item include the affiliate loans
25   that we've been talking about?
```

Page 260

```
 1                WATERHOUSE - 10-19-21

 2        A.     Again, I would have to see, just

 3   like we did with the financial statements of

 4   Highland and NexPoint, I would have to see a

 5   detailed build, but, you know, if you look at

 6   the other line items, you know, the only other

 7   place it could be would be in -- in other

 8   assets.

 9        Q.     Okay.  And as a matter of

10   arithmetic, is it fair to say that is the value

11   of the assets due from affiliates was more than

12   25 percent of the value of Highland's total

13   assets as of 12/31/2019?

14               MS. DANDENEAU:  Objection to form.

15        A.     I'm really not doing the mental math

16   right now, so I've been going at this depo for

17   hours, so I'm really not -- you know --

18        Q.     All right.  No problem.

19        A.     -- these are millions of dollars.

20        Q.     Let's look at the Footnote 1,

21   please.  Do you see there is a reference to the

22   Hunter Mountain note?

23        A.     Yes, I see that in Footnote 1.

24        Q.     Okay.  And that's the reserve that

25   was taken against that note?
```

Page 261

```
 1                WATERHOUSE - 10-19-21
 2        A.    Yes, that is what this indicates.
 3        Q.    Okay.  And were you aware that the
 4   reserve was being taken on that it was?
 5        A.    I was -- I was aware, yeah, at some
 6   point, yes.
 7        Q.    Okay.  And are you aware of any
 8   reserve being taken with respect to any other
 9   note that was issued in favor of Highland?
10        A.    Again, as I testified, we didn't go
11   through an analysis on -- on -- on the other
12   notes.
13        Q.    Can we turn --
14        A.    I believe -- I believe it says that
15   in Footnote 1, fair value has not been
16   determined with respect to any of the notes.
17              So this footnote -- footnotes, look,
18   there has been no determination.
19        Q.    Okay.  The determination was made in
20   the audited financial statements just six
21   months earlier; right?  We saw that earlier?
22        A.    That was as of 12/31/18.  I mean,
23   things -- circumstances -- there's a bank --
24   circumstances change, things change -- things
25   change over time, you know, facts and
```

Appx. 00631

```
 1                 WATERHOUSE - 10-19-21

 2     circumstances change.  Again, you have to do an

 3     analysis.

 4          Q.    Okay.  And you do recall that in

 5     Highland's 2018 financial statement, all of the

 6     notes issued by affiliates and Mr. Dondero that

 7     were due at year-end had a fair value equal to

 8     the carrying value; correct?  We looked at

 9     that?

10          A.    Yes.  That was in the -- in the

11     disclosure for the -- for the affiliate notes,

12     yes.

13          Q.    And -- and you were obligated to

14     share with PwC any subsequent events between

15     the end of 2018 and the date that you signed

16     your management representation letter on June

17     3rd, 2019; correct?

18               MS. DEITSCH-PEREZ:  Object to the

19          form.

20          A.    Yes.  I -- I -- I signed the

21     management, you know, my signature is in the

22     management representation letter -- I hope I'm

23     answering your question -- that is dated in

24     June with the representations made in that

25     management representation letter.
```

Page 263

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Okay.  And there was nothing that

 3   caused PricewaterhouseCoopers to include in

 4   subsequent events any adjustment to the

 5   conclusion that the fair value of the affiliate

 6   notes and the notes issued by Mr. Dondero

 7   equaled the carrying value; correct?

 8              MS. DANDENEAU:  Objection to the

 9        form.

10        A.    That is correct.  That is what was

11   in the -- in the -- in the footnotes.

12        Q.    Okay.  So are you aware of anything

13   that occurred between June 3rd, 2019 and

14   December 31st, 2019 that would have caused the

15   fair value of the notes to differ from the

16   carrying value?

17        A.    Yeah.  Highland filed for

18   bankruptcy, things changed -- I mean, there was

19   a bankruptcy filed in October of -- of -- of

20   2019, right, the petition date that we've

21   described earlier.

22              I mean, I had a -- I guess looking

23   back naively, I thought we were going to get an

24   audit from PwC for year-ended 2019, and when we

25   had discussions with PwC, they were like, are
```

```
 1              WATERHOUSE - 10-19-21

 2   you crazy, we're not auditing this.  Values

 3   change, all these things change, bankruptcy

 4   changes the entire scenario.  I mean -- and

 5   they're like, we're not -- we're not touching

 6   this.

 7              And so, you know, I was like, okay,

 8   sorry, I get it, okay, no an audit.

 9              I mean, it is -- you know, and --

10   you know, and we weren't preparing GAAP

11   financial statements.

12              Again, I didn't know what we were

13   doing in relation to our financial statements,

14   but these were the discussions I was having at

15   the time.  And yeah, I mean, filing bankruptcy

16   from what I got from outside auditors and

17   others involved changed things dramatically.

18       Q.    Okay.  Highland wasn't the obligor

19   under any of the notes that we're talking

20   about; correct?

21       A.    No.

22       Q.    So --

23       A.    That's right.

24       Q.    So can you identify any fact that

25   would cause the fair value to deviate from the
```

Page 265

```
1                WATERHOUSE - 10-19-21

2    carrying value during the seven-month period

3    between June 3rd and the end of the year, 2019?

4              MS. DANDENEAU:  Objection to form.

5         A.    No.  I mean, I'm putting myself back

6    at that time, right.  Hindsight is 2020, but we

7    didn't do an analysis, but we would have done a

8    fulsome analysis and looked at all of the facts

9    and circumstances at the time, but asset values

10   change.  You know, there could have been a

11   market crash in hindsight in 2020, which --

12   which affected entities' abilities.

13             There could have been all of these

14   things, right, that -- that happen.  It is --

15   it is easy to look back in hindsight, but when

16   you are looking at this in -- in realtime, the

17   analysis is different, and again, we didn't do

18   an analysis.

19        Q.    Okay.  You didn't do an analysis.

20             Do I have that right?

21        A.    I don't -- I don't recall doing one

22   or maybe -- you know, I don't recall doing one.

23             MR. MORRIS:  Okay.  I'm going to

24        take a break.  I may be done, so the time

25        now is -- is 4:30 your time.  Let's just
```

```
 1                   WATERHOUSE - 10-19-21

 2        take a short break until 4:40 your time.

 3              MS. DANDENEAU:  Okay.

 4              VIDEOGRAPHER:  We're going off the

 5        record, 4:31 p.m.

 6        (Recess taken 4:31 p.m. to 4:43 p.m.)

 7              VIDEOGRAPHER:  We are back on the

 8        record at 4:43 p.m.

 9              MR. MORRIS:  I have no further

10        questions.

11              MR. RUKAVINA:  Okay.

12        Mr. Waterhouse, I will go next.

13                   EXAMINATION

14   BY MR. RUKAVINA:

15        Q.   Sir, my name is Davor Rukavina.  I'm

16   the lawyer for --

17              MR. MORRIS:  Hey, Davor, just before

18        you begin, I just want to put on the record

19        Highland's objection to documents that were

20        produced to me 10 minutes before the

21        deposition began.

22              MR. RUKAVINA:  What the basis of

23        your objection?

24              MR. MORRIS:  That they were due

25        quite some time ago, and the fact that you
```

 1                    WATERHOUSE - 10-19-21

 2          had -- I just think it's appropriate to --

 3          to dump documents on somebody 10 minutes

 4          before the deposition.  I just think

 5          that's --

 6                    MR. RUKAVINA:  Well, these are

 7          documents Highland produced.  I'm not aware

 8          of any rule I have to give you advance

 9          documents when I know for the record that

10          other than the exhibits that you sent to us

11          last week, most of the exhibits you used

12          today you did not provide to me prior to

13          this deposition.

14                    MR. MORRIS:  No, but the documents

15          were produced by me in -- in litigation,

16          right?

17                    MR. RUKAVINA:  I'm going to use

18          primarily, John, the documents that you

19          produced to me today, but you may.

20                    MR. MORRIS:  Primarily.  I've got --

21          I've got my objection.  You have got your

22          response.  Proceed.

23          Q.   Mr. Waterhouse, again, I represent

24      the advisors, HCMFA and NexPoint Advisors.

25                    Do you understand that?

1             WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    You and I have never met or talked

4    before today, have we?

5        A.    No, I have -- I have heard your

6    voice on calls before.

7        Q.    Okay.

8             MR. RUKAVINA:  Madam Court Reporter,

9        I will use a few exhibits today.  My

10       associate, Mr. Nguyen, will find some way

11       to get them to you.  I don't know how to do

12       that, but it looks like you guys do.

13            I am going to use numbers as well.

14       But to differentiate them from Mr. Morris

15       we're going to mark mine with the prefix A

16       for advisors.

17            Do you understand?

18            COURT REPORTER:  Yes.

19            MR. RUKAVINA:  Okay.  Perfect.

20       Q.    Okay.  So, Mr. Waterhouse, let's

21   start with those two HCMFA notes that you were

22   asked about, one for 5 million and one for

23   2.4 million.

24            Do you recall those notes?

25       A.    Yes.

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Were you ever the CFO of HCMFA?

 3      A.    I don't recall.

 4      Q.    So to the best of your recollection,

 5  you were still an officer of HCMFA in 2019,

 6  just that your title was treasurer?

 7            MR. MORRIS:  Object to the form of

 8      the question.  There is no leading here.

 9      He works for your client.

10            MS. DANDENEAU:  That is not -- that

11      is not true.

12            MR. MORRIS:  He's the treasurer --

13      he is the treasurer of your client.  I

14      don't -- I'm going to object every time you

15      try to lead, so...

16            MR. RUKAVINA:  Totally fine to

17      object.

18            MR. MORRIS:  Okay.

19      Q.    Please answer my question,

20  Mr. Waterhouse.

21      A.    I'm sorry, could you repeat?  There

22  was...

23      Q.    Yes.  You were -- you testified

24  earlier that in 2019 you were an officer of

25  HCMFA; correct?
```

```
 1              WATERHOUSE - 10-19-21
 2       A.    Yes, I testified that I was the
 3  treasurer and I didn't know if that incumbency
 4  certificate, you know, was one that appointed
 5  me as a treasurer, but yes.
 6       Q.    I'm just trying to confirm that
 7  sitting here today, to the best of your
 8  recollection, at that time you were -- your
 9  title was treasurer.  It was not chief
10  financial officer.
11       A.    I don't recall that being my title.
12       Q.    Okay.  And in May of 2019, however,
13  I think you testified you were the chief
14  financial officer of the debtor; correct?
15              MR. MORRIS:  Objection to the form
16       of the question.
17       A.    Yes, I was -- yes.
18       Q.    Okay.  As such, in May of 2019, did
19  you have the authority, to your understanding,
20  to unilaterally loan $5 million or $2.4 million
21  to anyone on behalf of the debtor?
22              MR. MORRIS:  Objection to the form
23       of the question.
24       A.    Sorry, can you repeat that?
25       Q.    Yes.  So in your capacity as the
```

Page 271

```
 1              WATERHOUSE - 10-19-21
 2   chief financial officer of the debtor, Highland
 3   Capital Management, L.P., in May of 2019, did
 4   you believe that you unilaterally, just Frank
 5   Waterhouse, had the authority to loan on behalf
 6   of the debtor to anyone $5 million and
 7   $2.4 million?
 8              MR. MORRIS:  Objection to the form
 9        of the question.
10        A.    No.
11        Q.    Is it because loans of that amount
12   would have had to be approved by someone else?
13        A.    Yes.
14        Q.    Who in '20 -- in May of 2019, if
15   Highland wanted to loan 5 million or
16   $2.4 million to someone, what would have been
17   the internal approval procedure?
18              MR. MORRIS:  Objection to the form
19        of the question.
20        A.    If -- if we had loans of that nature
21   that needed to be made due to their size, we
22   would have gotten approval from the -- the
23   president of Highland.
24        Q.    And who that was individual?
25        A.    It was James Dondero.
```

Appx. 00641

Page 272

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Okay.  Now, I'm going to ask you a

 3   similar question but for a different entity.

 4              In May of 2019, as the treasurer of

 5   HCMFA, did you believe that you unilaterally

 6   had the ability to cause HCMFA to become the

 7   borrower of a $5 million loan and a

 8   $2.4 million loan?

 9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    No.

12        Q.    What would -- what would the

13   approval have taken place -- strike that.

14              What would the approval process have

15   been like in May of 2019 at HCMFA for HCMFA to

16   take out a $7.4 million loan?

17              MR. MORRIS:  Objection to the form

18        of the question.

19        A.    The process would have been similar

20   to what we just discussed on -- for Highland to

21   make a loan to others.  So, again, you know,

22   we -- we would have -- either myself or someone

23   on the team would have discussed this with

24   the -- the president and owner of -- of HCMFA.

25        Q.    And who was that individual?
```

Appx. 00642

1          WATERHOUSE - 10-19-21

2     A.    That was James -- Jim Dondero.

3     Q.    So do I understand that in May of

4  2019, on behalf of both the lender, Highland,

5  and the borrower, HCMFA, Mr. Dondero would have

6  had to approve $7.4 million in loans?

7          MR. MORRIS:  Objection to the form

8     of the question.

9     A.    Yes.

10     Q.    You mentioned when Mr. Morris was

11  asking you the NAV error, N-A-V error, with

12  respect to TerreStar, without writing us a

13  novel, unless you feel like you have to, can

14  you summarize what that NAV error was?  What

15  happened?

16     A.    There was a -- in the Highland

17  Global Allocation Fund, it owned at the time an

18  equity interest in a company called TerreStar.

19  And TerreStar is -- at the time was a private

20  company, and it may still be today.  Again, I'm

21  putting myself back then as a private company.

22          We had -- sorry, I don't mean we --

23  the fund and the advisor used Houlihan Lokey

24  to -- to value that investment.  And during

25  that time there was some trades that were

Page 274

```
 1                 WATERHOUSE - 10-19-21

 2    executed at market levels that were much lower

 3    than the Houlihan Lokey model.

 4                 And based on information and

 5    discussions with the portfolio managers and,

 6    you know, principals that were very familiar

 7    with TerreStar, it was determined that those

 8    trades were non-orderly and they were not

 9    considered in the valuation as consulted with

10    Houlihan Lokey and PricewaterhouseCoopers at

11    the time.

12                 Subsequent to a -- I can't remember

13    the exact circumstances of why the SEC got

14    involved.  I think it was due to this -- this

15    investment became a material position in the

16    fund.  It triggered an SEC, kind of, inquiry.

17    And as part of that inquiry, they questioned

18    the valuation methodology.  "They" meaning the

19    SEC.

20                 And at the culmination of that

21    process -- this is all summarized -- the value

22    that was -- that ultimately had to be used in

23    the fund's NAV was different than -- materially

24    different than what the original valuation at

25    Houlihan Lokey provided.
```

Appx. 00644

```
 1              WATERHOUSE - 10-19-21

 2              And given that there was this fund

 3    was, as we discussed -- I don't know if we

 4    discussed it, but it was an open-ended fund

 5    that was going -- that was converting to a

 6    close-end fund.

 7              Due to the fact that it was an

 8    open-ended fund, you had to recalculate NAV and

 9    see what the impact was on people -- on

10    investors coming in and out of the fund and if

11    there is a detrimental impact and to calculate

12    what that -- what that impact was and if there

13    was any amounts owed to the fund pursuant to

14    the error.

15         Q.    Were you personally involved

16    internally at either Highland or HCMFA with

17    these investigations and discussions with the

18    SEC?

19         A.    I was.

20         Q.    Which other key people or senior

21    people at Highland were involved, to your

22    recollection?

23         A.    Myself, Thomas Surgent, David Klos,

24    Lauren Thedford, Jason Post.

25         Q.    Mr. Dondero, was he --
```

Page 276

```
 1                  WATERHOUSE - 10-19-21

 2        A.    I believe Cliff Stoops.  I'm trying

 3   to think.  And maybe that is -- that is -- that

 4   is -- that is all kind I can recall at the

 5   moment.

 6        Q.    Do you recall whether it was

 7   determined that the fund suffered losses as a

 8   result of this error?

 9        A.    The -- the fund -- the -- the --

10   because the open-ended nature of the fund,

11   there were losses that were attributable to

12   investors.  Meaning they -- they would have

13   redeemed and got a less money or -- or they

14   subscribed in and maybe because they didn't get

15   enough shares and then they later sold and then

16   they were harmed in that fashion.

17                And there is -- there is -- there

18   were very -- there were very detailed

19   calculations and, you know, all these different

20   scenarios that we had to -- I'm sorry, I keep

21   saying "we" -- that the individuals involved

22   had to calculate and quantify.

23        Q.    Well, do you recall whether HCMFA

24   admitted certain fault and liability for this

25   error?
```

Page 277

```
 1              WATERHOUSE - 10-19-21

 2       A.    I don't recall specifically.

 3       Q.    Do you recall whether HCMFA caused

 4  any funds to be paid to the investors and the

 5  fund the subject of the NAV error?

 6       A.    Yes.

 7       Q.    Do you recall the approximate amount

 8  of funds, moneys paid to the investors and the

 9  fund?

10       A.    It was -- it was approximately

11  $7 million.

12       Q.    If I was to suggest 7.8 million,

13  would that ring more true or are you sticking

14  with your original answer?

15       A.    It was -- it was approximately 7 --

16  7 to $8 million.  Again, I don't remember the

17  exact number, but it was in that ballpark.

18       Q.    So regardless of whether HCMFA

19  accepted fault or liability, it caused some

20  $7 million or more to be paid out to affected

21  investors in the fund?

22            MR. MORRIS:  Objection to the form

23       of the question.

24       A.    And I want to make sure I'm

25  understanding your question because there is a
```

Appx. 00647

```
 1                  WATERHOUSE - 10-19-21

 2      lot of different entities that are going on to

 3      my head.

 4                  I think what you are saying is based

 5      on this error, shareholders were harmed by this

 6      approximately $7.8 million -- by approximately

 7      $7.8 million.  Is that what you are asking?

 8           Q.    Yes, sir.

 9           A.    Yes, that was -- again, I don't have

10      the exact numbers.  If I take -- it was -- it

11      was in that ballpark, and there is a detail

12      calculation and write-up that could, that --

13      that exists someplace.

14           Q.    Now, at that time, at the time that

15      the NAV error occurred, was there a contract in

16      place between HCMFA and the debtor pursuant to

17      which the debtor was providing services to

18      HCMFA?

19                  MR. MORRIS:  Objection to the form

20           of the question.

21           A.    Yes.

22           Q.    Was that contract generally called a

23      shared services agreement?

24           A.    It was generally called that, but

25      there were -- there were -- I mean, it -- it --
```

Page 279

```
 1                  WATERHOUSE - 10-19-21

 2     it depends on who you talk to, but yes,

 3     generally, there were -- there are multiple

 4     agreements.

 5          Q.    Pursuant to one or more of those

 6     agreements, was the debtor providing certain

 7     services to HCMFA?

 8                MR. MORRIS:  Objection to the form

 9          of the question.

10          A.    Yes.

11          Q.    And can you at a very high level

12     summarize in 2018 and 2019 what those services

13     were?

14          A.    Yes, there was a -- yes.

15          Q.    Okay.  Please -- please go -- go

16     through a short summary.

17          A.    There was a -- a cost reimbursement

18     agreement between Highland Capital Management

19     Fund Advisors and Highland Capital Management,

20     L.P.  That agreement was for what we referred

21     to as front office services, so investment

22     management, things of that nature.

23                There was I think what most people

24     refer to as the shared services agreement that

25     was -- that agreement was between Highland
```

Page 280

```
1                   WATERHOUSE - 10-19-21

2      Capital Management Fund Advisors and Highland

3      Capital Management for back office services.

4           Q.    And can you summarize what you mean

5      by back office services?

6           A.    Those services were for accounting,

7      finance, tax, valuation, HR, IT, you know,

8      legal compliance, things of -- things of those

9      nature -- or things of that nature, excuse me.

10          Q.    So in the spring of 2019, do you

11     recall whether HCMFA took the position that it

12     was actually Highland that caused the NAV error

13     to occur pursuant to the valuation services

14     that Highland was providing?

15               MR. MORRIS:  Objection to the form

16          of the question.

17          A.    I do not recall.

18          Q.    Did you ever have any discussions

19     with anyone, Jim Dondero or anyone in the first

20     half of 2019 as to whether Highland, the

21     debtor, that is, had any liability to HCMFA

22     related to the NAV error?

23               MR. MORRIS:  Objection to the form

24          of the question.

25          A.    I do not recall.
```

Page 281

```
 1              WATERHOUSE - 10-19-21
 2       Q.    And then you mentioned that the fund
 3  was being closed and some compensation related
 4  to that.  Can you -- can you elaborate?  What
 5  were you referring to?
 6       A.    Right.  So the advisor, pursuant to
 7  board approval, put a proposal in front of the
 8  shareholders of the Highland Global Allocation
 9  Fund to convert it from an open-ended fund to a
10  closed-end fund.
11            So an open-ended fund, when
12  shareholders subscribe to the fund or redeem
13  into the fund, they do it at NAV.
14            When it is -- when you have a
15  closed-end fund, closed-end funds are -- are
16  publicly-traded, like on the New York Stock
17  Exchange, exchanges like that, and -- and
18  shareholders or investors, they're not --
19  they're -- they're not subscribing and
20  redeeming with the fund.  They are like shares
21  of Apple.
22            Those shares of the Highland Global
23  Allocation Fund trade on an exchange, and that
24  is how you, you know, that is how, you know,
25  you become an equity owner in the fund or you
```

Appx. 00651

1            WATERHOUSE - 10-19-21

2    sell your shares and you are no longer an

3    equity owner.

4            As part of that proposal, the

5    advisor told shareholders if you -- if you vote

6    for this proposal to -- to convert it from an

7    open-ended fund to a closed-end fund, we will

8    pay you some amounts of money.  I forgot -- a

9    certain number of points.  I think it was

10   like -- it was like two to three points or

11   something -- something like that.

12       Q.    Okay.  You mentioned when Mr. Morris

13   was asking you, going back to those two

14   promissory notes, you will recall the 5 million

15   and 2.4 million, you mentioned something to the

16   effect that Mr. Dondero told -- told you to pay

17   some moneys out of Highland.  Do you remember

18   that discussion with Mr. Morris?

19       A.    I do.

20       Q.    So, to the best of your

21   recollection, did you have a discussion with

22   Mr. Dondero about making some payments in May

23   of 2019 out of Highland?

24       A.    I recall, as I testified earlier,

25   that I had a conversation with Mr. Dondero

Page 283

1                    WATERHOUSE - 10-19-21

2      for -- for these amounts attributable to -- it

3      was either the error -- you know, the error,

4      and in that conversation he said, go get the

5      money from Highland.  I believe that is what I

6      testified earlier, and that -- that is my

7      recollection.

8           Q.    Do you recall if that was an

9      in-person meeting or some other mode for the

10     meeting?

11          A.    I -- I -- I recall that being

12     in-person.

13          Q.    Do you recall if anyone else was

14     present, or was it just you and Mr. Dondero?

15          A.    I recall just he and I.

16          Q.    And the moneys that he told you to

17     find from -- or get from Highland, was that in

18     the amount of $5 million and $2.4 million?

19               MR. MORRIS:  Objection to the form

20          of the question.

21          A.    I believe so, but I would have to go

22     back and look and see when those moneys were

23     actually paid into the -- into the fund and,

24     you know, when those transfers were done.  If

25     they were all done around that same time, then

Page 284

1            WATERHOUSE - 10-19-21

2    yes, I would say it was -- it was all related

3    to that.

4         Q.    Did Mr. Dondero tell you that those

5    funds would be a loan from Highland to HCMFA?

6         A.    I don't recall.

7              MR. MORRIS:  Objection to the form

8         of the question.

9         Q.    Now, and forgive me, I'm probably

10   the only non-American born here, but I speak

11   reasonably well in English.  I don't recall,

12   does that mean you don't remember or does that

13   mean it didn't happen?

14             MR. MORRIS:  Objection to the form

15        of the question.

16        A.    It -- it means I don't -- I don't

17   remember.

18        Q.    Did Mr. Dondero tell you to have

19   those two promissory notes prepared?

20        A.    I don't recall.

21        Q.    When you -- again, when you say, I

22   don't recall today, that means that sitting

23   here today, you just don't remember one way or

24   the other.  Is that accurate?

25        A.    Yes.

Page 285

```
 1                WATERHOUSE - 10-19-21
 2        Q.    Is it possible that you, having
 3   heard what Mr. Dondero said and seeing funds
 4   being transferred, assumed that that would be a
 5   loan without him actually telling you that
 6   would be a loan?
 7              MR. MORRIS:  Objection to the form
 8        of the question.
 9        A.    Sorry, I want to make sure -- did I
10   ask the amounts that were transferred that I --
11   that -- that I assumed that that was a loan?
12        Q.    Well, let me -- let me take -- let
13   me try again.
14              So you have established already that
15   there were quite a number of promissory notes
16   back and forth -- I'm sorry, quite a number of
17   promissory notes with affiliated companies and
18   individuals owing Highland money; right?
19        A.    Yes.
20        Q.    And you have established that there
21   were many transactions and transfers going back
22   and forth over the years; right?
23              MS. DANDENEAU:  Objection to form.
24        A.    In -- yes, in my capacity as CFO and
25   my employment, yes, that is -- yes.
```

1            WATERHOUSE - 10-19-21

2        Q.    And that's part of the reason why

3    you just can't remember some of the details

4    today because this -- this happened years ago,

5    and there were a number of transactions.  Is

6    that accurate?

7             MS. DANDENEAU:  Objection to the

8        form.

9             MR. MORRIS:  Objection to the form

10       of the question.

11       A.    I mean, I deal with thousands of --

12   of -- of -- of transactions, you know, whether

13   it has -- the processing of transactions, you

14   know, if it has got, you know, more -- more

15   zeros, you know, behind it than others.

16            When you look at thousands of

17   transactions over the years for funds and

18   advisors and -- and, you know, financial

19   statements, I mean, it is -- it is very hard

20   going back in -- in -- in my -- you know,

21   14-ish year career at -- at Highland to

22   remember a lot of those details, especially

23   when I don't have any records or books or

24   anything like that, and -- and going back many

25   years.

Page 287

1           WATERHOUSE - 10-19-21

2      Q.    And that is fine.  That -- that --

3  that is why I asked the question.

4           Is it possible in May of 2019 when

5  Mr. Dondero told you to transfer the funds from

6  Highland, you just assumed on your own that

7  those would be loans without him actually

8  telling you that those would be loans?

9           MR. MORRIS:  Objection to the form

10      of the question.

11      A.    I don't know.

12      Q.    I'm sorry, you --

13      A.    I said I don't know.

14      Q.    Okay.  Well, as the -- as the CFO

15  for Highland, if you saw $7.4 million going

16  out, you would feel some responsibility to

17  account for that, wouldn't you?

18           MR. MORRIS:  Objection to the form

19      of the question.

20      A.    Yes.

21      Q.    Is it fair to say that those would

22  be in the range large enough to rise up to your

23  level?

24           MR. MORRIS:  Objection to the form

25      of the question.

Page 288

1          WATERHOUSE - 10-19-21

2          A.    If -- I don't know if I understand

3    your question.  Those amounts would arise to my

4    level where I would be involved or...

5          Q.    You would want to know what a

6    transfer for that amount, $7.4 million, was all

7    about, as the CFO of Highland, wouldn't you?

8                MR. MORRIS:  Objection to the form

9          of the question.

10         A.    Yes, I make it -- I mean, I -- I

11   review all sorts of payments, I mean, even

12   smaller dollar payments on a periodic basis,

13   you know, to -- to -- to understand and to make

14   sure that we are paying things in a -- you

15   know, in -- in -- in an informed way.  And, you

16   know -- and we're -- and we're paying things

17   pursuant to vendor contracts and things like

18   that.

19         Q.    So as part of that, is it possible

20   that seeing $7.4 million go out you would have

21   promissory notes made in order to keep a paper

22   trail, assuming that those were loans, when

23   perhaps they were never intended to be loans by

24   Mr. Dondero?

25               MR. MORRIS:  Objection to the form

```
 1                  WATERHOUSE - 10-19-21
 2          of the question.
 3          A.    I don't know.  As I testified
 4     earlier, I had conversations with Mr. Dondero
 5     about -- about the -- the -- the moneys that
 6     were needed for the NAV error.  And I recall
 7     him saying go get it from Highland -- or get it
 8     from Highland.
 9          Q.    Well, why did you sign those
10     promissory notes and why didn't you have him
11     sign them?
12                  MR. MORRIS:  Objection to the form
13          of the question.
14          A.    I don't know.  I don't know.
15          Q.    You mentioned earlier that you
16     typically don't sign promissory notes.  Am I
17     remembering your testimony correctly?
18                  I mean, promissory notes on behalf
19     of the entities.  Not yourself, obviously.
20          A.    Yes, that is what I said earlier.
21          Q.    Do you recall any other promissory
22     notes in the million-plus range that you had
23     ever signed before on behalf of any entity?
24          A.    There is -- there has been a lot of
25     transactions over the years.  I don't -- I
```

Page 290

```
 1                WATERHOUSE - 10-19-21
 2    don't -- I don't recall generally.  I don't --
 3    I don't recall.
 4        Q.    So -- but to the best of your
 5    recollection, it was on your initiative,
 6    following your discussion with Mr. Dondero,
 7    that you had someone draft those two promissory
 8    notes; is that correct?
 9            MR. MORRIS:  Objection to the form
10        of the question.
11        A.    Yes, we would have -- the team, as I
12    stated earlier, we don't draft promissory
13    notes.  "The team" meaning the accounting and
14    finance team.
15            So the team would have worked with
16    the legal group at Highland to draft any notes.
17        Q.    Do you believe or do you have any
18    recollection as to whether you would have done
19    that pursuant to an email or telephone call or
20    in-person meeting?
21            MR. MORRIS:  Objection to the form
22        of the question.
23        A.    Are you asking if I would have -- if
24    those notes would have been drafted pursuant to
25    an email or phone call?
```

Appx. 00660

```
 1                 WATERHOUSE - 10-19-21
 2        Q.    Strike that.
 3              Do you recall whether you sent an
 4    email to anyone asking them to draft those two
 5    promissory notes?
 6        A.    I don't recall because, again,
 7    once -- I would have instructed -- likely
 8    instructed the team to -- to work with the
 9    legal group to draft these documents.
10              I -- I -- I -- yeah, I didn't -- I
11    mean, that is more an operational-type
12    procedure.  So, you know, a manager or a
13    controller or working with legal.  You know,
14    they -- they can certainly handle that task to
15    get that -- you know, to request that from
16    legal.
17        Q.    And who on your team do you think
18    you would have asked to do that?
19              MR. MORRIS:  Objection --
20        Q.    Who would have been the logical
21    person or people, if you don't remember their
22    name today?
23              MR. MORRIS:  Objection to the form
24        of the question.
25        A.    It -- it -- there is only two
```

Page 292

```
 1                  WATERHOUSE - 10-19-21

 2     managers of the group.  That would have been

 3     Dave Klos or Kristin Hendrix.

 4                  Dave was the -- one of his duties

 5     was managing the valuation team, and so he was

 6     intimately involved with this process.  So, you

 7     know...

 8          Q.    Okay.

 9          A.    I don't recall specifically but, I

10     mean, my general -- you know, I -- I -- I

11     likely would have talked to Dave first about it

12     versus someone like Kristin who hadn't been

13     intimately involved.

14          Q.    And -- and do you have a view as to

15     whether it is most likely that you would have

16     done that by email or in-person or how would

17     you believe you would have communicated that to

18     Mr. Klos?

19                  MR. MORRIS:  Objection to the form

20         of the question.

21          A.    I likely would have done that in

22     person.  Again, if things of this nature

23     that -- again, you have to put ourselves back

24     to, we have been working on this very stressful

25     project for many, many months.  And once the
```

Page 293

1              WATERHOUSE - 10-19-21

2     go-ahead was to -- you know, we see the light

3     at the end of the tunnel with wrapping this up

4     and making shareholders whole -- sorry to say

5     "we" -- you know, the -- so the folks that are

6     involved in it.

7              I like to talk to people

8     face-to-face and -- and -- and go to -- and go

9     to their desk, because that shows if I'm going

10    to their desk that -- that is something that I

11    want done, you know.

12        Q.    And do you remember, Mr. Waterhouse,

13    getting those two promissory notes in paper

14    format or by email before they were executed?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't recall.

18        Q.    For whatever was the ordinary course

19    back then in May 2019, would you expect to have

20    received them only on paper or would you have

21    expected to have received them in Word document

22    or PDF document by email?

23             MR. MORRIS:  Objection to the form

24        of the question.

25        A.    I -- I didn't sign -- I signed very

Page 294

1          WATERHOUSE - 10-19-21

2   few documents via email.  I can't say that it

3   never happened, but people either stopped by my

4   office and physically walked in documents for

5   signature that we discussed face-to-face.

6          Or documents were -- if -- if --

7   if -- if -- let's say I wasn't there or I

8   wasn't available, documents were dropped off.

9   I had -- I had some in- and outboxes in front

10  of my -- my office there at the Crescent.

11          Documents would be dropped off for

12  signature.  There would be a cover sheet that

13  would be -- have been applied to those

14  documents detailing, you know, who dropped it

15  off, the purpose, why, what time.

16          And then, you know, as I stated, I

17  don't draft documents and I always go to the

18  legal group and the compliance group to make

19  sure that they're in the loop.  And there is

20  a -- a box or section that says, Has legal

21  reviewed or approved, or something to that

22  nature.

23          Again, I don't -- I don't have

24  access to that cover sheet anymore, but it

25  was -- it was something to that effect.

Appx. 00664

Page 295

```
 1              WATERHOUSE - 10-19-21
 2              And my assistant, you know, if she
 3    was there, she would review that -- you know,
 4    whatever was being dropped off.  And if that
 5    has legal, you know, reviewed or -- reviewed or
 6    approved it, if that wasn't -- if that stuff
 7    hadn't been done, it was like she would just
 8    tell them like, go -- go -- go to the legal
 9    group, because --
10        Q.    Let me -- let me pause --
11              MS. DANDENEAU:  Let him finish.
12              MR. MORRIS:  Thank you.  Go ahead.
13        A.    I take -- go to the legal group
14    because that -- that was my -- you know, I
15    didn't -- I didn't review anything that -- that
16    they weren't -- you know, or there wasn't some
17    representation made to me that they had
18    reviewed, approved in some capacity.
19              Again, my -- my -- my goal, as CFO,
20    is to provide transparency and make sure that
21    groups like compliance and other things -- and
22    the other group in legal are -- are in -- you
23    know, their -- they're made aware of
24    transactions of -- you know, that are crossing
25    my desk.
```

```
 1              WATERHOUSE - 10-19-21

 2              Because I'm not in every

 3    conversation.  They're not in every

 4    conversation -- meaning legal compliance -- and

 5    I just want to make sure that -- that everyone

 6    is in sync to, you know, to -- to the extent

 7    possible.

 8        Q.    So if we summarize, you don't

 9    specifically remember signing these two notes,

10    but most likely it would have been that they

11    would have presented -- been presented to you

12    physically on paper?

13              MR. MORRIS:  Objection to the form

14        of the question.

15        A.    They would -- they would have been

16    presented physically on paper most likely or

17    someone would have left it.  But, I mean,

18    again, I don't -- I don't recall.

19        Q.    I understand.  Understand.

20              When you signed -- when you signed

21    documents, when you personally signed

22    documents, did you typically use a ink pen or

23    did you use a stamp?

24        A.    No, I -- I -- I use a -- an -- an

25    ink pen.
```

1          WATERHOUSE - 10-19-21

2      Q.    Do you know -- was there a file at

3   Highland kept anywhere with ink-signed

4   originals of a promissory notes in general or

5   these two promissory notes specifically?

6            MR. MORRIS:  Objection to the form

7       of the question.

8      A.    Sorry, I just want to make sure I

9   understand your question.  Are you saying is

10  there a file somewhere that has ink-signed

11  originals of these two promissory notes?

12     Q.    Yes.

13     A.    I would -- I would assume they're

14  some place.  I mean --

15     Q.    Well, was there a -- was there a

16  place where Highland generally kept originals

17  of promissory notes owed to it?

18     A.    I wouldn't -- no.

19            MR. RUKAVINA:  Mr. Nguyen, would you

20  please pull up my A7, alpha 7.

21     Q.    These are the two promissory notes,

22  Mr. Waterhouse.

23            (Exhibit A7 marked.)

24     Q.    And please -- Mr. Waterhouse, please

25  command my associate to scroll down as you need

```
 1                  WATERHOUSE - 10-19-21

 2    to, but I want you to take a very close look at

 3    your two signatures here and tell me whether

 4    you believe, in fact, that you ink signed them

 5    or whether you --

 6                  MS. DANDENEAU:  Mr. Rukavina,

 7          Mr. Waterhouse has the copies.

 8                  MR. RUKAVINA:  Perfect.  Then you

 9          can take this down, Mr. Nguyen.

10          A.    These -- these -- these signatures

11    are identical, now that I stare at them, and I

12    mean, they are so close -- I mean, they're

13    identical that, I mean, even with my chicken

14    scratch signature, I don't know if I can -- you

15    know, I do this 100 times, could I do that

16    as -- as precisely as I see between the two

17    notes.

18          Q.    Well, that is why I ask.

19    Mr. Waterhouse, now that you have examined

20    them, does it seem like it is more likely that

21    you actually electronically signed these?

22                  MR. MORRIS:  Objection to the form

23          of the question.

24          A.    Is -- I don't -- I don't recall

25    specifically.  As I said before, my assistant
```

Page 299

```
 1                 WATERHOUSE - 10-19-21
 2   did have a -- an electronic signature, and that
 3   was used from time to time.  It wasn't as
 4   common practice back in 2019.  It definitely
 5   was more common practice when we had to work
 6   from home and remotely for COVID because it
 7   that made it almost impossible to, right,
 8   provide wet signatures since we're all working
 9   from home remotely.
10        Q.    Well, going just for these two
11   promissory notes, Mr. Waterhouse, in light of
12   your inability to remember any details, are you
13   sure you actually signed either or both of
14   those notes?
15              MS. DANDENEAU:  Objection to form.
16        A.    I don't recall specifically
17   signing -- actually physically signing these
18   notes.  As I said before, I don't recall doing
19   that.  This -- this looks like my signature,
20   but yet these two signatures are identical.
21        Q.    So you don't recall physically
22   signing them, and I take it you don't recall
23   electronically signing them either?
24        A.    I don't recall.  You know, Highland
25   has all my emails.  If that occurred, you know,
```

Appx. 00669

```
 1                 WATERHOUSE - 10-19-21

 2   you know, I don't have any of these records is

 3   what I'm saying.  I don't have any of those

 4   records.

 5        Q.    That is why I'm asking you these

 6   questions in great detail because I don't have

 7   those emails.  I'm trying to -- I'm hoping that

 8   you will give me some names or some details so

 9   I can go look for more emails, but again, you

10   don't remember any -- any individual, other

11   than Mr. Dondero that we've discussed, you

12   don't remember any individual with whom you

13   discussed these promissory notes prior to their

14   execution?

15                 MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't recall discussing it with

18   anybody else.

19        Q.    Okay.

20        A.    I mean, prior --

21        Q.    I understand.

22        A.    You know, there was no one else --

23   there was no one else in that meeting that I

24   recall with Mr. Dondero.

25        Q.    Now, when you established that by
```

Page 301

1           WATERHOUSE - 10-19-21

2    May of 2019 --

3        A.    And -- and from what I recall, and

4    the reason why I was by myself is -- is, you

5    know, I don't -- I don't want to speculate, I'm

6    sorry.

7        Q.    Okay.  We have established that by

8    May of 2019, in your view, the liabilities of

9    HCMFA exceeded its assets; correct?

10       A.    Yeah.  I mean, again, I don't have

11   financial statements in front of me, but I

12   think, if I recall, we'd have to go through the

13   testimony with Mr. Morris, I believe that was

14   the case.

15       Q.    In fact, you will recall that in

16   April of 2019, Mr. Dondero signed a document

17   that extended the demand feature of two prior

18   notes to May 31, 2019.  Do you recall that?

19            MS. DEITSCH-PEREZ:  I think you

20       might -- maybe have the court reporter read

21       that back.  You might have misspoke.

22            (Record read.)

23            MR. RUKAVINA:  And I did misspeak.

24       Q.    I meant to say to May 31, 2021.  Do

25   you recall that, sir?

Appx. 00671

Page 302

```
 1              WATERHOUSE - 10-19-21
 2              MR. MORRIS:  Objection to the form
 3      of the question.
 4      A.   Yes.
 5              MR. RUKAVINA:  And, Mr. Nguyen, just
 6      so that the record is clear, will you please
 7      pull up my Exhibit Alpha 10, A10.
 8              (Exhibit A10 marked.)
 9      Q.   You don't have this one in front of
10      you, Mr. Waterhouse?  This is the one that
11      Mr. Morris used earlier.  Do you see that
12      document, sir?
13      A.   Yes, I do.
14      Q.   And this is what you were testifying
15      about before when Mr. Morris was asking you.
16      Do you remember that?
17      A.   Yes.
18      Q.   So here is my question for you,
19      Mr. Waterhouse:  As the chief financial officer
20      of Highland, was it prudent for Highland less
21      than three weeks later to be lending
22      $7.2 million to an insolvent entity that
23      couldn't even then pay its debts back to
24      Highland?
25              MS. DANDENEAU:  Objection to form.
```

Page 303

```
 1                  WATERHOUSE - 10-19-21

 2                  MR. MORRIS:  Objection to the form

 3        of the question.

 4        A.    Sorry, I just want to make sure --

 5   are you asking me, did you say, was it prudent

 6   for Highland to loan $7.4 million to HCMFA a

 7   few weeks after this document was executed?

 8        Q.    Yes, and at a time when HCMFA's

 9   liabilities exceeded its assets.

10                  MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I don't -- it is odd.  I don't know.

13                  MR. RUKAVINA:  You can take this

14   exhibit down, Mr. Nguyen.

15        Q.    Do you recall asking anyone,

16   Mr. Dondero or -- or anyone outside as to

17   whether Highland ought to be lending

18   $7.4 million to HCMF regarding HCMF's

19   creditworthiness?

20                  MR. MORRIS:  Objection to the form

21        of the question.

22        A.    I don't recall.

23        Q.    Did you receive personally any of

24   that $7.4 million?

25        A.    No.
```

Appx. 00673

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Did you even --

 3            MR. MORRIS:  I didn't hear that

 4      question, sir.

 5            MR. RUKAVINA:  The one that he

 6      answered, John, or my new one?

 7            MR. MORRIS:  No, no, your question,

 8      Davor.

 9            MR. RUKAVINA:  I had asked him

10      whether he received any of the

11      $7.4 million.  He said no.

12            MR. MORRIS:  Yeah.  I thought there

13      was a question after that.  Maybe I was

14      mistaken.  I apologize.

15            MR. RUKAVINA:  I had started a new

16      question, so here, let me start the new

17      question again.

18      Q.    Did you personally receive any

19  direct benefit from those two notes for

20  $7.4 million?

21      A.    No.

22      Q.    Did you ever personally consider

23  yourself obligated to repay either or both of

24  those notes?

25      A.    No.
```

```
 1               WATERHOUSE - 10-19-21

 2               MR. RUKAVINA:  Pull up those notes

 3  again, Mr. Nguyen.

 4       Q.    You can have them in front of you,

 5  Exhibit 7, Mr. Waterhouse, whatever is easier

 6  for you.  If you go to your signature page, my

 7  question to you is, why did you not include

 8  your title as treasurer by your name, Frank

 9  Waterhouse?

10               MS. DANDENEAU:  Objection to form.

11       A.    I didn't -- I didn't draft this

12  document.

13       Q.    So you relied on whoever drafted it

14  to draft it correctly?

15       A.    Yes.

16       Q.    Okay.  But back then when you signed

17  this, did it ever cross your mind that you were

18  the maker on these notes?

19       A.    No.

20       Q.    Back then when you signed this

21  document, did it ever cross your mind that you

22  could be a co-obligor on these notes?

23       A.    No.  I didn't receive $7.4 million,

24  I mean...

25       Q.    But can you say that HCMFA received
```

Page 306

1                    WATERHOUSE - 10-19-21

2     $7.4 million?

3          A.    I would have to go back and look and

4     check in, you know, the -- the financial

5     records and the bank statements.

6                MR. RUKAVINA:  You can take this

7     exhibit down, Mr. Nguyen.

8          Q.    Mr. Waterhouse, I'm not trying to be

9     a smart-ass, but if the law says that because

10    of the way that you signed this promissory

11    note, if that is what the law says, that that

12    made you personally -- personally liable, then

13    you would agree with me that that was never

14    your intent?

15               MR. MORRIS:  Objection to the form

16         of the question.

17         A.    That was never -- I wouldn't sign a

18    note and not get consideration in return.

19         Q.    So putting all other issues aside,

20    if the law -- if the law says that you were

21    liable for those notes because of how you

22    signed them, then would you agree with me that

23    these notes are a mistake?

24               MR. MORRIS:  Objection to the form

25         of the question.

Appx. 00676

Page 307

```
 1              WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  Objection to the

 3      form.

 4      A.    Yes.

 5      Q.    So do you agree with me that it's

 6  odd -- I think that is the word you used --

 7  that Highland would be loaning $7.4 million a

 8  few weeks after that extension to an entity

 9  whose liabilities exceeded its assets, and you

10  would agree with me that it was never your

11  intention to be in any way liable for these two

12  promissory notes; correct?

13              MR. MORRIS:  Objection to the form

14      of the question.

15      A.    Sorry, you -- you asked a lot there.

16              MR. RUKAVINA:  I will strike it and

17      I will move on.

18              Let's go to -- pull up Exhibit 9,

19  please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha

20  9, A9.

21              (Exhibit A9 marked.)

22      Q.    Sir, take a moment to look at this,

23  but this is an email, and you will see attached

24  July 31, 2020 affiliate notes.

25              Do you see that attachment?
```

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    Okay.  And do you see an entry for

 4   Highland Capital Management Fund Advisors?

 5              MR. MORRIS:  I'm sorry, hold on.

 6        Where are you looking?

 7              MR. RUKAVINA:  Last page, John.

 8              MR. MORRIS:  Is it the page on the

 9        screen?

10              MR. RUKAVINA:  Oh, I'm sorry.

11        Mr. Nguyen just did it.  Yes, the last page

12        there.

13              MR. MORRIS:  Thank you.

14        Q.    Do you see an entry there for HCMFA?

15        A.    Yes.

16        Q.    About $10.5 million.

17              Do you see that?

18        A.    I do.

19        Q.    And, now, do you have any

20   explanation for why if HCMFA owed $7.4 million,

21   plus the 5.3 million that had been extended,

22   why that amount was only 10.5 million?

23        A.    I don't know.  Okay.

24              MR. RUKAVINA:  Close this one and

25        pull up, Mr. Nguyen, the schedules,
```

1            WATERHOUSE - 10-19-21

2        schedule of assets.  What exhibit is this

3        of ours, Mr. Nguyen?

4              MR. NGUYEN:  This is A11.

5              MR. RUKAVINA:  Oh, this will be A11.

6              (Exhibit A11 marked.)

7        Q.    You don't have this in front of you,

8    Mr. Waterhouse?

9        A.    Okay.

10        Q.    This is what Mr. Morris used

11    earlier.  Do you remember looking at this with

12    Mr. Morris?

13        A.    Yes.

14              MR. RUKAVINA:  You might have to

15        zoom in a little.  Okay.

16        Q.    Now, I see Affiliate Note A, B, and

17    C.

18              Do you have any recollection as to

19    why the names of the affiliates are omitted?

20        A.    I don't.  I testified earlier that,

21    you know, the team worked with DSI in providing

22    these.  I -- I don't -- I don't know.

23        Q.    Can we deduce -- is it logical to

24    deduce that Affiliate Note A would be NexPoint

25    given its size of $24.5 million?

Page 310

```
 1              WATERHOUSE - 10-19-21

 2              MR. MORRIS:  Objection to the form

 3         of the question.

 4         A.   I mean, it -- it is a -- it is -- it

 5    is approximate.

 6         Q.   Well, can we -- can we deduce -- or,

 7    I'm sorry, strike that.

 8              Can you, sitting here today,

 9    logically conclude that Affiliate Note B or C

10    represents HCMFA?

11              MR. MORRIS:  Objection to the form

12         of the question.

13         A.   I don't know.  I don't know.  I

14    can't.

15         Q.   Okay.  As of the petition date, we

16    have established that HCMFA, under promissory

17    notes, owed $7.4 million and $5.3 million to

18    the debtor; correct?

19              MR. MORRIS:  Objection to the form

20         of the question.

21         A.   Yes.

22         Q.   Okay.  And by my reckoning, that

23    would be somewhere approaching $13 million.

24              MR. MORRIS:  Objection to the form

25         of the question.
```

Appx. 00680

Page 311

```
 1              WATERHOUSE - 10-19-21

 2      Q.    It would be $12.7 million.  Is that

 3   generally correct?

 4      A.    Sorry, the amounts were 7.4, 5.3.

 5      Q.    Yes.

 6      A.    Okay.  Yeah, that -- that -- I can

 7   do that math, yes.

 8      Q.    Do you have any explanation or any

 9   understanding of why there is no similar entry

10   listed here on the schedule of assets filed

11   with the bankruptcy court?

12            MR. MORRIS:  Objection to the form

13      of the question.

14      A.    I don't know.  We have to look at

15   the supporting schedules, like I talked about

16   other -- presumably there is -- there is a

17   build to the schedule that would provide the

18   detail.

19      Q.    Well, that was going to be my next

20   question.  You anticipated it.

21            MR. RUKAVINA:  You can -- you can

22      take this down, Mr. Nguyen.

23      Q.    Do you believe that whenever you and

24   your team provided the underlying data to the

25   financial advisor that the actual names of the
```

Appx. 00681

Page 312

```
 1                WATERHOUSE - 10-19-21

 2   affiliates for Affiliate Note A, B, and C would

 3   have been listed there?

 4        A.    Are you asking we provided the names

 5   to the financial advisor?  I don't -- I don't

 6   understand who the financial advisor is.

 7        Q.    I'm sorry, DSI.

 8              Let me ask the question this way,

 9   Mr. Waterhouse.

10              Whenever you provided information

11   about the affiliate notes to DSI, do you

12   believe that you would have included the actual

13   names of the affiliates, you or your team, or

14   that you would have done the Affiliate Note A,

15   Note B, Note C?

16              MR. MORRIS:  Objection to the form

17         of the question.

18              MS. DANDENEAU:  Objection to the

19         form.

20        A.    We -- like I testified earlier, when

21   we were -- we gave everything to -- to DSI.  We

22   were giving all of our records, all of our

23   files, everything to DSI.  We weren't redacting

24   information or saying, hey, here is a note,

25   here is Affiliate Note A or B.
```

Appx. 00682

Page 313

```
 1                  WATERHOUSE - 10-19-21

 2               I mean, it was -- our job and our

 3    focus -- and I testified in court back in 2019;

 4    right -- was -- was to be transparent and, you

 5    know, get DSI up to speed on -- on the matters

 6    at Highland.  So I can't see us redacting at

 7    that point.

 8               MR. RUKAVINA:  Mr. Nguyen, will you

 9          please pull up Mr. Morris' Exhibit 36.

10          Just the very first page, the very top

11          email.  You might zoom in a little bit.

12          Q.   Now, you recall being asked about

13    this by Mr. Morris?

14          A.   Yes, I do.

15          Q.   And you wrote:  The HCMFA note is a

16    demand note.

17               You wrote that; right?

18          A.   Yes.

19          Q.   And, in fact, weren't there by that

20    point in time several notes?

21          A.   Yes, there were.  Again, I don't --

22    I don't remember everything specifically.  I

23    mean --

24          Q.   I understand.  I understand.

25               So this is an example where -- where
```

```
 1                WATERHOUSE - 10-19-21

 2    you might have made a mistake by referring to a

 3    singular instead of a plural; right?

 4         A.    Yes.

 5         Q.    Okay.  And you -- you wrote -- a

 6    couple of sentences later, you wrote:  There

 7    was an agreement between HCMLP and HCMFA the

 8    earliest they could demand is May 2021.

 9              You wrote that; right?

10         A.    Yes.

11         Q.    But I think you -- you agreed with

12    Mr. Morris that that can't possibly apply to

13    the May 2019 notes, can it?

14              MR. MORRIS:  Objection to the form

15         of the question.  That is not what he

16         testified to.

17         Q.    Let me ask -- let me ask a different

18    question.

19              Sitting here today -- or if you can

20    answer me from your memory on October 6,

21    2020 -- did the April acknowledgment that

22    extended the maturity date apply to the

23    May 2019 notes also?

24         A.    I don't recall specifically.

25         Q.    Well, you recall that the notes that
```

```
 1                  WATERHOUSE - 10-19-21

 2      you signed were demand notes; right?

 3           A.    Yes.

 4           Q.    Do you find it logical, based on

 5      your experience, that had they intended to have

 6      a different or a set maturity date, you would

 7      have instructed that that set maturity date be

 8      included instead of a demand feature?

 9                 MR. MORRIS:  Objection to the form

10           of the question.

11           A.    Sorry, just want to make sure I

12      understand.  You are saying that -- that the

13      $5 million note, the $2.4 million note, if

14      those were supposed to be a term note, that I

15      would have made sure that those were a term

16      note?

17           Q.    I'm saying -- I'm saying,

18      Mr. Waterhouse, that on May the 2nd and May the

19      3rd, 2019, if you intended that those two

20      promissory notes could not be called until May

21      2021, would you have included such language in

22      those two promissory notes?

23                 MR. MORRIS:  Objection to the form

24           of the question.

25           A.    I guess -- I'm sorry, I don't recall
```

```
 1                  WATERHOUSE - 10-19-21

 2   putting language in those May notes.  I don't

 3   remember what language you are referring to.

 4        Q.    Well, let's read this again.

 5              There was an agreement between HCMLP

 6   and HCMFA the earliest they could demand is May

 7   2021.

 8              Do you recall that agreement?

 9        A.    Yes, that was the agreement we

10   looked at earlier; correct?

11        Q.    Okay.  Yes.

12              Do you -- do you understand now that

13   that agreement that we looked at earlier also

14   applied to the May 2019 notes that you signed?

15        A.    I don't -- I don't know.

16        Q.    But as of October 6, 2020, you're

17   writing that there is one demand note and

18   you're categorizing that demand note as not

19   being demandable on May 2021; correct?

20        A.    Yes.

21        Q.    And you know now that you made at

22   least one mistake in this email; correct?

23              MR. MORRIS:  Objection to the form

24        of the question.

25        A.    Yes.
```

1          WATERHOUSE - 10-19-21

2          MR. RUKAVINA:  You can pull this

3     down, Mr. Nguyen.

4     Q.    So, Mr. Waterhouse, you don't

5  remember Mr. Dondero telling you to make these

6  loans or not.  HCMLP was loaning $7.4 million

7  to someone that their assets were less than

8  their liabilities.

9          We don't see on the July list of

10  notes, where there is $12.7 million of notes,

11  we don't see that on the bankruptcy schedules,

12  and we have this Exhibit 36 where you are

13  confused.

14          Are you prepared to tell me, sir,

15  today that you might have made a mistake in

16  executing those two promissory notes?

17          MR. MORRIS:  Objection to the form

18     of the question.

19     A.    I -- I don't know.

20     Q.    And if it turns out that you're

21  personally liable for those promissory notes,

22  it would certainly be a mistake, wouldn't it?

23          MS. DANDENEAU:  Objection to the

24     form.

25          MR. MORRIS:  Join.

Page 318

```
 1                    WATERHOUSE - 10-19-21

 2          A.    Yes.

 3          Q.    If Mr. Dondero testifies that he

 4    never told you to make these loans, would you

 5    disagree with his testimony?

 6                MR. MORRIS:  Objection to the form

 7          of the question.

 8          A.    Like I testified earlier with my

 9    conversation with Mr. Dondero, all I recall is

10    he said, get the money from Highland.

11          Q.    And if Mr. Dondero testifies that

12    he, in consultation with other senior personnel

13    at Highland, decided that Highland needed to

14    pay HCMFA $7.4 million as compensation for the

15    NAV error and not a loan, would you have any

16    reason to disagree with Mr. Dondero?

17                MR. MORRIS:  Objection to the form

18          of the question.

19          A.    If that was -- if that was his

20    intent, yes, it would -- I would --

21          Q.    Do you have any reason to disagree

22    with him?

23                MR. MORRIS:  Objection to the form

24          of the question.

25          A.    If that was his intent, I don't
```

Appx. 00688

Page 319

```
 1              WATERHOUSE - 10-19-21
 2   know.  I don't know how I disagree with that.
 3        Q.    And just to confirm, you don't
 4   remember ever asking Mr. Dondero whether you
 5   should have two promissory notes prepared?
 6        A.    No.
 7        Q.    And you don't remember discussing
 8   with Mr. Dondero what the terms of those two
 9   promissory notes should be?
10        A.    I don't recall -- I testified all I
11   recall is he said, get the money from Highland.
12   I don't -- the -- the terms of the note, I
13   don't recall ever having a discussion around
14   the terms of the note, but since I don't draft
15   the notes, that -- there could have been a
16   conversation with other people later.
17        Q.    Do you have any memory of whether
18   after the notes were drafted, but before you
19   signed them, that you communicated with
20   Mr. Dondero in any way to just confirm or -- or
21   get his blessing or ratification to signing
22   those notes?
23              MR. MORRIS:  Objection to the form
24         of the question.
25        A.    I don't recall.
```

Appx. 00689

Page 320

1              WATERHOUSE - 10-19-21

2        Q.    Again, the only thing you remember,

3   sitting here today, was Mr. Dondero said, get

4   the money from Highland, and that is it, that

5   is all you remember?

6              MR. MORRIS:  Objection to the form

7        of the question.

8        A.    I testified to that several times.

9   This was over two years ago.  A lot has

10  happened.  That is all I recall.

11       Q.    And help me here.  I'm not very

12  technologically astute.  When you -- and I -- I

13  recognize that you do it rarely, but when you

14  sign a document electronically, do you believe

15  that there is an electronic record of you

16  having authorized or signed a document

17  electronically?

18             MR. MORRIS:  Objection to the form

19       of the question.

20       A.    I -- I don't know the tech answer to

21  that, but, you know, since I don't have -- I

22  don't ever attach my signature block

23  electronically, my assistant would have done

24  that, and if that is done over email like we

25  did several times -- you know, multiple,

```
 1               WATERHOUSE - 10-19-21
 2    multiple times over COVID, she would attach my
 3    signature block and then email it out to
 4    whatever party.
 5         Q.    What was your assistant's name in
 6    May 2019?
 7         A.    It was Naomi Chisum.
 8         Q.    Is she the only one?  I'm sorry, was
 9    she your only assistant that would have maybe
10    facilitated logistically something like you
11    just described?
12         A.    You know, she was out on maternity
13    leave at some point.  I don't -- I don't recall
14    those dates where she was out for maternity
15    leave.  There was -- there were folks backing
16    her up.  I don't recall specifically who
17    those -- who those, you know, administrative
18    assistants were, and I don't recall
19    specifically if she was out during this time on
20    maternity leave.
21              I do know that that she was out for
22    a period of time, or who knows, or she could
23    have been on vacation that day or, you know, I
24    don't know.
25         Q.    Switching gears now, the two
```

Page 322

```
 1                WATERHOUSE - 10-19-21
 2   complaints that have been filed that is against
 3   HCMFA and NexPoint, did you see any drafts of
 4   those complaints before they were filed?
 5            MR. MORRIS:  Objection to the form
 6        of the question, and to the extent that you
 7        had any communications with counsel or you
 8        were shown drafts of the complaints by
 9        counsel while you were employed by
10        Highland, I direct you not to answer.
11        A.    I -- I reviewed documents yesterday
12   with counsel here.  I believe that is the first
13   time I have ever seen those.
14        Q.    Okay.  Did you ever discuss with
15   Mr. Seery these two lawsuits before or after
16   they were filed?
17        A.    I don't recall.
18        Q.    Were you ever interviewed by legal
19   counsel, to your knowledge, about these
20   promissory notes before the complaints were
21   filed?  Without going into what was said, were
22   you ever interviewed by legal counsel?
23            MR. MORRIS:  Objection to the form
24        of the question.
25        A.    I don't recall.
```

Appx. 00692

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Obviously with COVID, it changed,

 3   but -- but before COVID, did you used to meet

 4   with Mr. Seery from time to time in-person?

 5        A.    Yeah, I mean, so before COVID -- so

 6   we're talking kind of late March, early April,

 7   right, there was about -- I don't remember the

 8   specific date when the board for Highland was

 9   appointed.  I believe it was around February of

10   2020, so maybe there was a month-and-a-half,

11   two-month window where we were meeting

12   in-person or, you know, like we were actually

13   in the office, excuse me, we were in the

14   office.

15             And, you know, when they were first

16   appointed, the board members and Mr. Seery

17   were -- were definitely down here more

18   in-person.

19        Q.    Did you ever see Mr. Seery taking

20   written notes of -- of his meetings with you or

21   others?

22        A.    I don't recall.

23        Q.    Do you recall on any Zoom or video

24   conference with Mr. Seery, seeing him take

25   notes, written notes?
```

 1                  WATERHOUSE - 10-19-21

 2          A.    The Zoom calls we had, I don't

 3    recall having seen video or, you know, or if it

 4    was on Zoom, I just remember it being -- well,

 5    no, you know what, there were some -- you know,

 6    I take that back.

 7                So there were -- there were some

 8    times that I did remember seeing Mr. Seery

 9    on -- on some of the Zoom calls.

10          Q.    Well, let me --

11          A.    I don't -- sorry, I'm thinking.  I'm

12    thinking -- I'm going back.  I'm trying to

13    process this.

14          Q.    I can make it much quicker,

15    Mr. Waterhouse.  I have heard -- I have heard

16    that Mr. Seery is a copious note taker.

17                Do you have any knowledge about

18    that?

19          A.    No.

20          Q.    Okay.  Switching gears yet again,

21    and this will be last theme.  Do you need a

22    restroom break, or are you good to go for

23    another half an hour?

24                MS. DEITSCH-PEREZ:  I need a

25          restroom break.

```
 1              WATERHOUSE - 10-19-21

 2              MR. RUKAVINA:  Can we make it five

 3       minutes?

 4              THE WITNESS:  Five minutes would be

 5       great.

 6              VIDEOGRAPHER:  We're going off the

 7       record at 5:53 p.m.

 8       (Recess taken 5:53 p.m. to 5:59 p.m.)

 9              VIDEOGRAPHER:  We are back on the

10       record at 5:59 p.m.

11       Q.    Mr. Waterhouse, I had asked you

12   earlier about contracts between HCMFA and the

13   debtor, and now I'm going to talk about

14   contracts between the debtor and NexPoint

15   Advisors.  Okay?

16       A.    Okay.

17       Q.    Now, were there contracts similar to

18   the ones with HCMFA that NexPoint had in the

19   nature of employee reimbursement and shared

20   services?

21       A.    Yes, they -- NexPoint Advisors and

22   Highland Capital Management Fund Advisors had

23   cost reimbursement and shared services

24   agreements with Highland Capital Management,

25   L.P.
```

Page 326

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    And was that shared services

 3   agreement, to the best of your understanding,

 4   in place as of December 31, 2020?

 5        A.    It was -- it was terminated at some

 6   point, and I remember the contracts had

 7   different termination dates, but I think the --

 8   the date of termination was January 31st of

 9   2021, after the termination was put in.

10             So yeah, it would be in place at the

11   end of the year of December -- it would be in

12   place at December 31st, 2020.

13        Q.    And pursuant to that agreement as of

14   December 31st, 2020, was the debtor providing

15   what you would describe as back office services

16   to NexPoint?

17        A.    Yes.

18        Q.    Would those have included accounting

19   services?

20        A.    Yes.

21        Q.    And as part of those accounting

22   services, would the debtor have assisted

23   NexPoint with paying its bills?

24             MR. MORRIS:  Objection to the form

25        of the question.
```

Appx. 00696

Page 327

```
 1                   WATERHOUSE - 10-19-21

 2         A.    Yes.

 3         Q.    So let's break that up.  You were a

 4    treasurer of NexPoint as well in December of

 5    2020?

 6               MR. MORRIS:  Objection to the form

 7         of the question.

 8         A.    Yes.

 9         Q.    Okay.  And in December of 2020, did

10    NexPoint have its own bank accounts?

11         A.    Yes.

12         Q.    And did it use those bank accounts

13    to pay various of its obligations?

14         A.    Yes.

15         Q.    Did employees of the debtor have the

16    ability to cause transfers to be made from

17    those bank accounts on behalf of NexPoint?

18         A.    Yes.

19         Q.    And is that one of services that the

20    debtor provided NexPoint, basically ensuring

21    that accounts payable and other obligations

22    would be paid?

23         A.    Yes.

24               MR. MORRIS:  Objection to the form

25         of the question.
```

Appx. 00697

Page 328

```
 1              WATERHOUSE - 10-19-21

 2       Q.    You answered yes?

 3       A.    Yes.

 4       Q.    And the payments, though, whose

 5  funds would they be made from?

 6       A.    From the bank account of NexPoint

 7  Advisors.  If they were NexPoint advisor

 8  obligations, it would be made from NexPoint

 9  Advisors' bank account.

10       Q.    So let's pull up Exhibit Alpha 1.

11  You should have that -- it is my Tab 1 or my

12  Exhibit 1.

13             (Exhibit A1 marked.)

14       Q.    So this is a -- this is a series of

15  emails, Mr. Waterhouse.  Let's look at the

16  first page here, November 25, 2020, between

17  Kristin Hendrix and yourself.

18             Do you see that, sir?

19       A.    I do.

20       Q.    And do you see where Ms. Hendrix

21  writes:  NPA.

22             Do you know what NPA stood for?

23       A.    Yes.

24       Q.    And what does it stand for?

25       A.    NexPoint Advisors.
```

Appx. 00698

```
 1               WATERHOUSE - 10-19-21

 2       Q.    And was that how you-all internally

 3    at Highland refer to NexPoint Advisors, L.P.?

 4       A.    I mean, yes, amongst other things.

 5       Q.    And she writes at the bottom of her

 6    email:  Okay to release?

 7             Do you see that?

 8       A.    Yes, I do.

 9       Q.    So what --

10             MR. MORRIS:  Hold on one second.

11             Okay.  Go ahead.

12             MR. RUKAVINA:  Yeah.

13       Q.    So what is -- what is Ms. Hendrix

14    here on November 25 asking of you?

15       A.    She is asking me -- so she -- these

16    are -- these are payments -- typically we would

17    do an accounts payable run every week at the

18    end of every Friday.  But looking at this date,

19    it is Wednesday, November 25th, which means, to

20    me, it is likely Thanksgiving weekend.

21             So this is the day before

22    Thanksgiving, so this is the last kind of --

23    kind of day before the holidays and vacation

24    and things of that nature.  So it is

25    effectively the Friday of that week.
```

Page 330

```
 1                WATERHOUSE - 10-19-21

 2               So she is -- she is putting in all

 3      the payments for the week because we batch

 4      payments weekly.  And these are the payments

 5      that go out that week, and she is informing me

 6      of the payments and -- you know, again, at the

 7      bottom of the email, she is asking for my okay

 8      to -- to release these payments in the wire

 9      system.

10          Q.   So these would be accounts payable

11      of NexPoint?

12          A.   I mean, it would be accounts payable

13      for all of these entities listed on this email.

14          Q.   And who was Ms. Hendrix employed by

15      in November and December of 2020?

16          A.   Highland Capital Management.

17          Q.   Okay.  So -- so part of the services

18      that NexPoint had contracted with was for

19      Highland to ensure that NexPoint timely paid

20      its accounts payable; is that accurate?

21               MR. MORRIS:  Objection to the form

22          of the question.  You have got to be

23          kidding me.

24          Q.   Is that accurate?

25          A.   Yes.
```

```
 1                WATERHOUSE - 10-19-21

 2        Q.    And did NexPoint rely on employees

 3   of the debtor to ensure that NexPoint's

 4   accounts payable were timely paid?

 5            MR. MORRIS:  Objection to the form

 6        of the question.

 7   A.    Yes.

 8            MR. RUKAVINA:  Let's flip to the

 9        next page, Mr. Nguyen, if you will please

10        scroll to the next page.

11        Q.    So this is an email similar to the

12   prior one, November 30th.

13            Do you see where it says, NPA HCMFA,

14   USD $325,000 one-day loan?

15            Do you see that, sir?

16   A.    I do.

17        Q.    Do you have any memory of what that

18   was?

19   A.    I don't recall what that -- what

20   that payment was for.

21        Q.    Did it sometimes occur that one

22   advisor would, on very short-terms, make loans

23   to another advisor?

24   A.    Yes.  This -- this -- this occurred

25   from -- from -- from time to time.  It actually
```

Page 332

```
 1                   WATERHOUSE - 10-19-21
 2     looking at -- I'm -- I'm looking at the date of
 3     this email.  It is November 30th.  It is the
 4     last day of the month.
 5                   HCMFA has obligations it needs to
 6     pay to its broker-dealer, which is HCFD.  And
 7     it likely was short funds to make those
 8     obligations under that -- under its agreement,
 9     and so it provided a one-day loan because on
10     the next business day on 12/1 -- or the next
11     business day in December, it would receive
12     management fees from the underlying funds that
13     it managed and it would be able to pay back
14     that loan to NexPoint Advisors.
15          Q.   So -- so here Ms. Hendrix was
16     seeking your approval to transfer $325,000 from
17     NexPoint to HCMFA for a one-day loan; is that
18     correct?
19          A.   That is correct.
20          Q.   Let's flip to the next page, sir.
21                   MR. RUKAVINA:  And, Mr. Nguyen, if
22          you will please scroll down.
23          Q.   Now we have as an entry for
24     $325,000, 11/30 loan payment.
25                   Do you see that, sir?
```

Page 333

1           WATERHOUSE - 10-19-21

2        A.     Yes.

3        Q.     And that is probably the loan that

4     was approved on the prior page?

5        A.     Yes, most likely.

6        Q.     So is it also true, sir, that in

7     addition to accounts payable debtor employees

8     would be assisting NexPoint with respect to

9     paying back its debt?

10           MR. MORRIS:  Objection to the form

11       of the question.

12       A.     I mean, yes, for loans of this

13    nature, yes.

14       Q.     Well, what about long term loans?

15    Was it reasonable for NexPoint to expect debtor

16    employees to ensure that NexPoint timely paid

17    its obligations under long-term notes?

18           MR. MORRIS:  Objection to the form

19       of the question.

20           MS. DANDENEAU:  Objection to form.

21       A.     I mean, that is one of the things

22    that the Highland personnel did provide to the

23    advisors.  Yes, we would -- we would -- over

24    the years, yes, we -- we -- we -- we did do

25    that generally.  Again, I don't remember

```
 1                  WATERHOUSE - 10-19-21

 2   specifically but, yes, generally we -- you

 3   know, we did do that.

 4        Q.   So do you recall -- and we can pull

 5   it up, if need be -- that under the NexPoint

 6   note that Mr. Morris asked you about earlier,

 7   the one for more than $30 million, that

 8   NexPoint was obligated to make an annual

 9   payment of principal and interest?

10             MR. MORRIS:  Objection to the form

11        of the question.

12        A.   Yes, it was -- yes, it -- it was an

13   amortizing note.  It was -- you know, from what

14   we reviewed earlier, it was payable by

15   December 31st of each year.  So -- but are --

16   are you asking me --

17        Q.   I'm just asking you, sir, if you

18   recall the note.

19        A.   Yes, the $30 million note, yes, we

20   reviewed it earlier, yes.

21        Q.   And do you recall Mr. Morris had you

22   go through the fact that NexPoint had made

23   payments in years prior to 2020 on that note?

24        A.   I do.

25        Q.   And do you believe that employees of
```

Page 335

```
 1                WATERHOUSE - 10-19-21

 2    the debtor would have played any role in

 3    NexPoint having made those prior payments?

 4                MR. MORRIS:  Objection to the form

 5         of the question.

 6         A.    Yes.

 7         Q.    And what role in years prior to 2020

 8    would employees of the debtor have had with

 9    respect to NexPoint making that annual payment?

10         A.    We -- we -- we would have -- I keep

11    saying "we."  The team would have calculated

12    any amounts due under that loan and other

13    loans, as -- as standard course.

14                We would -- since we provided

15    treasury services to the advisors, we would

16    inform the -- the -- the -- we informed

17    Mr. Dondero of any cash obligations that are

18    forthcoming, whether we do cash projections.

19                If, you know, any of these payments

20    would have -- or, you know, the sum total of

21    all of these payments, including any note

22    payments, if there were any cash shortfalls, we

23    would have informed Mr. Dondero of any cash

24    shortfalls.  We could adequately plan, you

25    know, in instances like that.
```

Page 336

```
 1              WATERHOUSE - 10-19-21

 2              Or, sorry, we -- I say "we" -- I

 3    keep saying "we" -- I keep wearing my -- again,

 4    my -- my treasurer hat.

 5              But, yes, it is to -- it is to

 6    inform Mr. Dondero of the obligations of the

 7    advisors in terms of cash and obligations that

 8    are -- are upcoming and that -- and that are --

 9    are scheduled to be paid.

10        Q.    And would those obligations that are

11    upcoming and scheduled to be paid prior to 2020

12    have incurred the annual payment on that

13    NexPoint $30 million note?

14              MS. DANDENEAU:  Objection to form.

15              MS. DEITSCH-PEREZ:  Davor, I think

16         you misspoke.  You might want to just

17         repeat the question.

18        Q.    Okay.  Let me repeat the question,

19    sir.

20              Prior to 2020, those services that

21    you just described, would that -- on behalf of

22    the debtor, would that have included NexPoint's

23    payments on the $30 million note?

24        A.    Yes.

25        Q.    So someone at the debtor in treasury
```

1          WATERHOUSE - 10-19-21

2    or accounting would have sent some schedule or

3    a reminder that a payment would be coming due

4    in the future.  Is that generally the practice?

5         A.    Yes, we would -- you know, again, I

6    didn't -- I didn't micromanage the teams, but

7    we had a -- a corporate accounting calendar

8    that we use as kind of a tickler file to keep

9    track of payments.

10              I actually, you know, don't know how

11   actively they're using that in -- in prior to

12   2020, but it was actively used at some point.

13              We did look at NexPoint cash

14   periodically and cash for the other advisors as

15   well and payments.  You know, we -- payments

16   like this would have appeared in our cash

17   projections, in the advisor's cash projections.

18              And, again, as like I said earlier,

19   they would have appeared there, so there would

20   be time to plan for making any of these

21   payments.

22        Q.    And based on your experience, would

23   it have been reasonable for NexPoint to rely on

24   the debtors' employees to inform NexPoint of an

25   upcoming payment due on the $30 million

```
 1                 WATERHOUSE - 10-19-21

 2    promissory note?

 3                 MR. MORRIS:  Objection to form of

 4        the question.

 5                 MS. DANDENEAU:  Objection to form.

 6        A.    Yes.  Yes, they did.  I mean, but I

 7    mean, but I don't think these -- these notes

 8    were any secret to anybody.

 9        Q.    I understand, and I'm not suggesting

10    otherwise.

11                 MR. RUKAVINA:  Please pull up Alpha

12    2, Mr. Nguyen.

13                 (Exhibit A2 marked.)

14        Q.    Now, this document is similar to the

15    ones we've seen before as of December 31, 2020,

16    and I don't see under NTA anything there for

17    paying the promissory note to Highland.

18                 Do you see anything like that?

19        A.    I do not.

20                 MR. RUKAVINA:  You can pull that --

21    that exhibit down, Mr. Nguyen.

22        Q.    You are aware, of course, by now

23    that, in fact, NexPoint failed to make the

24    payment due December 31, 2020, are you not?

25        A.    I am aware, and yes, I do understand
```

```
 1              WATERHOUSE - 10-19-21

 2   it.

 3        Q.    Were you aware that Highland

 4   accelerated that $30 million promissory note?

 5        A.    I am aware.

 6        Q.    Were you aware of that acceleration

 7   at the time that it occurred?

 8        A.    I don't remember specifically.

 9        Q.    Do you recall whether anyone asked

10   you -- prior to the acceleration, anyone asked

11   you at Highland, what Highland should do with

12   respect to the missed payment?

13        A.    Did anyone ask me what Highland

14   should do about the missed payment?

15        Q.    Yes, before acceleration.

16              MR. MORRIS:  Objection to the form

17        of the question.

18        A.    I mean, what -- what I recall is

19   there was the -- sorry, are you asking me --

20              MS. DANDENEAU:  Why don't you just

21        repeat the question, Mr. Rukavina.

22        Q.    Let me try again, Mr. Waterhouse,

23   let me try again.

24              I am saying you're the CFO of

25   someone, in this case, Highland, and the
```

Page 340

```
1              WATERHOUSE - 10-19-21
2    borrower failed to make the required payment.
3    Are you with me so far?
4         A.    I am.
5         Q.    Did anyone then ask you, what should
6    we do with respect to our rights against the
7    borrower that missed the payment?
8         A.    Not that I recall.
9         Q.    Did you play a role in the decision
10   to accelerate that $30 million promissory note?
11        A.    I did not.
12        Q.    Do you recall whether Mr. Seery ever
13   asked you before the acceleration as to whether
14   he should accelerate the note?
15        A.    I don't recall.
16        Q.    And you don't recall when you
17   learned of the acceleration itself?
18             MR. MORRIS:  Objection to the form
19        of that question.
20        A.    It was -- it was sometime in
21   early -- in early 2021.  I don't remember
22   specifically.
23        Q.    But do you recall whether it was
24   after the acceleration had already been
25   transmitted?
```

Appx. 00710

```
 1              WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  Objection to the

 3         form of the question.

 4         A.    I don't recall.

 5         Q.    Do you recall in early to mid

 6    January of 2021, after the default, discussing

 7    the default with Mr. Dondero?

 8         A.    I do recall discussing with

 9    Mr. Dondero after December 31, 2020?

10         Q.    Yes, the fact of the default.

11         A.    I don't recall.

12              MR. RUKAVINA:  Let's pull up my

13    Exhibit 6, Alpha 6.

14              (Exhibit A6 marked.)

15              MR. RUKAVINA:  And, Mr. Nguyen, if

16         you will please scroll down.

17         Q.    This email chain begins with you

18    writing to Ms. Hendrix on January the 12th:

19    NexPoint note to HCMLP.

20              Do you see that, sir?

21         A.    I do.

22         Q.    Were you discussing this same

23    $30 million note we're talking about right now

24    with Ms. Hendrix?

25         A.    Yes.
```

Page 342

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Okay.  Do you recall what prompted

 3   you to send that email to her?

 4      A.    Yes, I had -- I had a conversation

 5   with Jim.

 6      Q.    Okay.  And what -- what did you

 7   discuss with Jim that led to this email chain?

 8      A.    He -- he called me and he said he

 9   wanted to make payment on the NexPoint note,

10   and I didn't -- I didn't know the -- the amount

11   offhand, so I reached out to Kristin and got

12   the details and relayed that to him.

13      Q.    And you see you sent that email to

14   her at 11:15 a.m.  Does that help you remember

15   when you had this discussion with Mr. Dondero?

16   In other words, was it that morning or the day

17   before, or can you -- can you --

18      A.    No, it was -- it was that morning.

19      Q.    And do you recall how you had that

20   conversation with him?

21            MR. MORRIS:  Objection to the form

22      of the question.

23      Q.    By telephone, by email, in-person?

24      A.    Yeah, he -- he called me.  I was at

25   home.  We were working from home here in
```

Page 343

```
 1                WATERHOUSE - 10-19-21

 2   December of 2020.  He called me from home.  He

 3   said he was in court.  He wanted to -- he asked

 4   about, you know, making payment on the note and

 5   the amount, and so I didn't have those numbers

 6   in front of me, so I said I would get back to

 7   him.  I wanted all the details, so here is

 8   this -- so I reached out to Kristin.

 9        Q.    And then she gave you that

10   $1,406,000 figure?

11              MR. RUKAVINA:  Mr. Nguyen, if you

12   will scroll up, please.

13        A.    Yes.  Yeah, she -- the $1,406,112.

14        Q.    And do you recall whether you

15   conveyed that amount to Mr. Dondero?

16        A.    Yes.  I -- I called him back and

17   gave him -- gave him this amount.

18        Q.    Are you aware of whether NexPoint,

19   in fact, then made that 1 million 406 and

20   change payment?

21        A.    Yes, they did.

22        Q.    Did you discuss with Mr. Dondero at

23   that time, either the first conference or the

24   second conference that day -- strike that.

25              When you conveyed the number to
```

```
 1                WATERHOUSE - 10-19-21
 2   Mr. Dondero, was -- was it also on January
 3   12th?
 4        A.    Sorry, when I conveyed the
 5   $1.4 million number?
 6        Q.    Yes.
 7        A.    Yes, yes, it was that -- it was --
 8        Q.    So you had --
 9        A.    It was that point.
10        Q.    Well, to the best of your
11   recollection, you had a conference with
12   Mr. Dondero by the telephone in the morning,
13   and then another conference with him by
14   telephone after 11:40 a.m. that morning?
15        A.    Yeah, I can't remember -- yeah, it
16   was either that morning or it could have been,
17   you know, early afternoon, but again, I
18   remember calling him back, relaying this
19   information to him, and he said, okay, pay --
20   you know, make -- make this payment.
21        Q.    And during either of those two
22   calls, did you tell Mr. Dondero anything to the
23   effect that making those -- I'm sorry, making
24   that payment would not de-accelerate the
25   promissory note?
```

 1                    WATERHOUSE - 10-19-21

 2         A.    No.

 3         Q.    Did you tell him anything to the

 4    effect that making that payment would not cure

 5    the default?

 6         A.    No.

 7         Q.    Did you discuss that in any way with

 8    him?

 9         A.    No, I did not.

10         Q.    Did he say why he wanted to have

11    that $1.4 million payment made?

12              MR. MORRIS:  Objection to the form

13         of the question.

14         A.    He -- he -- he didn't go into

15    specifics.

16         Q.    Did he say anything to you to the

17    effect that if NexPoint makes that payment,

18    then the note will be de-accelerated?

19              MR. MORRIS:  Objection to the form

20         of the question.

21         A.    I don't recall.

22              MR. RUKAVINA:  You can put this one

23         down, Mr. Nguyen.

24         Q.    And, again, when you say you don't

25    recall, you mean you don't remember right now

1                   WATERHOUSE - 10-19-21

2    either way; correct?

3         A.    Yeah, I don't remember.  I don't

4    remember us discussing that.

5         Q.    Now -- and we're almost done, I

6    promise.  I'm just going to -- I don't know how

7    to ask this question, so I'm just going to try

8    to do my best.

9              Prior to the default on December 31,

10   2020, did Mr. Seery ever tell you any words to

11   the effect that you or someone at Highland

12   should ensure that NexPoint doesn't make its

13   payment?

14        A.    No.

15        Q.    Did you have any hint or any belief

16   that anyone at NexPoint -- I'm sorry, strike

17   that.

18             Did you have any reason to believe

19   that anyone with Highland was actively trying

20   to get NexPoint to make that default by not

21   paying on December 31?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Are you asking, did any Highland

25   employees actively work to make -- to

Page 347

```
 1              WATERHOUSE - 10-19-21

 2    somehow --

 3         Q.    Yes.  Let me take a step back.  Let

 4    me take a step back.

 5              So you are aware now that as a

 6    result of that default, what was still some

 7    25-year note was accelerated and became

 8    immediately due.  You are aware of that now;

 9    right?

10         A.    Yes.

11         Q.    And can you see how someone at

12    Highland might actually have been pleased with

13    that development?

14              MR. MORRIS:  Objection to the form.

15         Q.    Not that they were --- not that they

16    were pleased, but you can see how someone at

17    Highland might have been pleased with that

18    development?

19              MR. MORRIS:  Objection to the form

20         of the question.

21              MS. DANDENEAU:  Object to form.

22         A.    I don't know how they would have

23    reacted to that.

24         Q.    Okay.  But you're not -- you're not

25    aware of any instructions or any actions being
```

1          WATERHOUSE - 10-19-21

2    given or taken at Highland by Mr. Seery, the

3    independent board, DSI, that -- that would have

4    basically led Highland to ensure that NexPoint

5    would fail to make that payment?

6         A.    I'm not aware.

7         Q.    In other words, there wasn't a trick

8    or a settlement; right?

9               MS. DEITSCH-PEREZ:  Objection to

10         form.

11              MS. DANDENEAU:  Object to form.

12              MR. MORRIS:  Object to form.

13        A.    I'm not aware.

14              Look, I'm not aware.  I'm not in

15   every conversation.  I mean, and I'm just --

16   again, I'm sitting at home.  It is the end of

17   the year.  Again, I'm not aware.

18        Q.    That is a perfectly legitimate

19   answer.  I don't know why -- why you think

20   otherwise.

21              Okay.  Just give me one second to

22   compose my thoughts.

23              MS. DEITSCH-PEREZ:  While you're

24         taking your one second, why don't we take

25         three minutes.  I will be right back.

```
 1              WATERHOUSE - 10-19-21

 2              VIDEOGRAPHER:  Do we want to go off

 3      the record?

 4              MR. RUKAVINA:  Yes.

 5              VIDEOGRAPHER:  All right.  We're

 6      going off the record at 6:27 p.m.

 7      (Recess taken 6:27 p.m. to 6:30 p.m.)

 8              VIDEOGRAPHER:  We are back on the

 9      record at 6:30 p.m.

10              MR. HORN:  Is Deb back?

11              MS. DANDENEAU:  Are you asking about

12      me?  I'm here.

13              MR. HORN:  Oh, okay.  I don't see

14      you, sorry.

15      Q.   Actually, yeah, Mr. Waterhouse, so

16   when you had --

17              MS. DANDENEAU:  Are you asking about

18      Deb Dandeneau or Deborah?  I mean, there

19      are a lot -- as we talked about, a lot of

20      Debs.  I'm here.

21              MS. DEITSCH-PEREZ:  I'm here.

22              MR. HORN:  Yes, I was asking about

23      DDP.

24              MS. DEITSCH-PEREZ:  Oh, DDP is here.

25              MR. HORN:  Okay.  Here we go.  I'm
```

```
 1                  WATERHOUSE - 10-19-21

 2          going back on mute.

 3                  MS. DANDENEAU:  Get the right

 4          nomenclature.

 5          Q.    Mr. Waterhouse, on January 12th,

 6   2021, when you had those talks with Mr. Dondero

 7   about the $1.4 million payment, did you have a

 8   communication or a conversation with Mr. Seery

 9   about that payment after January 12th, 2021?

10          A.    I don't recall.

11          Q.    Well, in response to Mr. Dondero

12   reaching out to you, do you recall on that day,

13   January 12th, talking to Mr. Seery or anyone at

14   Highland other than the email chain we just saw

15   about Mr. Dondero's call with you?

16          A.    Did I talk to -- I spoke with

17   Kristin -- I don't know if I spoke to her.  I

18   likely spoke to Kristin Hendrix because we had

19   to get the wire on NexPoint's behalf to make

20   the payment to Highland.

21          Q.    So it is true, then, that -- that

22   employees of the debtor did actually cause that

23   payment to be made when it was made after

24   January 12th?

25          A.    Yes, I mean, we -- we -- as I
```

```
 1                WATERHOUSE - 10-19-21

 2    testified earlier, we provided that accounting

 3    finance treasury function as -- under the

 4    shared services agreement.  And so once I

 5    got the -- I talked to Jim, got the approval to

 6    make this payment, we have to then make the

 7    payment, or the team does, and so the payment

 8    was made.

 9        Q.    Okay.  But -- okay.  And -- and

10    sitting here right now, after Jim called you,

11    you don't remember talking to anyone other than

12    the -- the couple of people you mentioned,

13    talking to anyone about something to the effect

14    that, hey, Jim wants to make this payment now?

15              MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't -- I don't recall.

18        Q.    And does that include legal counsel?

19              Without going into any detail, on

20    January 12th or before that payment was made,

21    did you consult with legal counsel about

22    anything having to do with the $1.4 million

23    payment?

24        A.    I don't recall.

25        Q.    Okay.  Thank you, sir, for your
```

 1                    WATERHOUSE - 10-19-21

 2       time.

 3                    MR. RUKAVINA:  Pass the witness.

 4                    MR. MORRIS:  I just have a few

 5            questions, if I may.

 6                    MS. DEITSCH-PEREZ:  Don't you go at

 7            the end?

 8                    MR. MORRIS:  Oh, I apologize.  He is

 9            your witness.  I'm surprised you want to

10            ask him questions, but go right ahead.

11                    MS. DEITSCH-PEREZ:  Just have a

12            couple of things.

13                    MR. RUKAVINA:  And I will just

14            object to that, that he's our witness.

15            That's not --

16                    MR. MORRIS:  I'm not talking to you.

17            I'm not talking to you.

18                    MS. DANDENEAU:  Also, Mr. Morris, it

19            is -- it is --

20                    MS. DEITSCH-PEREZ:  He is not my

21            witness.  He's been subpoenaed by you.

22            Okay?

23                    That is no offense, Mr. Waterhouse,

24            I'm -- I'm not -- okay.  Anyway.

25                            EXAMINATION

1              WATERHOUSE - 10-19-21

2    BY MS. DEITSCH-PEREZ:

3        Q.    Good evening.  I'm very sorry to be

4    going last and I know you have had a long and

5    taxing day, so I thank you for indulging me.

6              The kinds of services that you

7    describe that the -- that Highland provided for

8    NexPoint, did Highland also provide similar

9    services to that to HCRE and HCMS?

10       A.    Yes.

11             MR. MORRIS:  Objection to the form

12       of the question.

13       Q.    What kind of services did Highland

14   provide to HCRE and HCMS?

15             MR. MORRIS:  Objection to the form

16       of the question.

17             MS. DEITSCH-PEREZ:  What is your

18       objection, John?

19             MR. MORRIS:  It is vague and

20       ambiguous.  Unlike the advisors and

21       NexPoint, they actually had shared services

22       agreements.

23             MS. DEITSCH-PEREZ:  I got -- I

24       understand your objection.  That is fine.

25       Q.    Let's take them one at a time.

Page 354

```
 1               WATERHOUSE - 10-19-21
 2               What kinds of services did Highland
 3    provide to HCRE?
 4               MR. MORRIS:  Objection to the form
 5        of the question.
 6        A.     HCMS, Highland employees provided
 7    accounting services, treasury management
 8    services, potentially legal services.  I
 9    don't -- but I wouldn't have been directly
10    involved in that.  But as far as the teams that
11    I manage, it was accounting, treasury, things
12    of that nature.
13        Q.     Okay.  And that was for HCM, LLP --
14        A.     And -- and, sorry, it would also be
15    any asset valuation if needed as well.
16        Q.     Okay.  We went back and forth on
17    each other and I apologize, so just to clarify.
18               You were talking about the services
19    that Highland Capital Management provided to
20    HCMS; is that right?
21        A.     HCMS.  So, again, yes.  And
22    accounting, treasury, valuation, and also tax
23    services too.
24        Q.     Okay.
25        A.     Tax services.  Look, I'm expanding
```

Appx. 00724

1                    WATERHOUSE - 10-19-21

2    this, their HR services as well.

3         Q.    Okay.  And did that include bill

4    paying?

5              MR. MORRIS:  Objection to the form

6         of the question.

7         Q.    Did the services that HCM provided

8    to HCMS include bill paying?

9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    Yes.

12        Q.    And did the services that HCMLP

13   provided to HCMS include scheduling upcoming

14   bills?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    Yes.

18        Q.    And did HCMLP regularly pay -- cause

19   to be paid the payments on loans HCMS had from

20   HCMLP?

21             MR. MORRIS:  Objection to the form

22        of the question.

23        A.    Yes.

24        Q.    Typically -- if there is a

25   typically, how far in advance of due dates did

1                    WATERHOUSE - 10-19-21

2    HCMLP cause HCMS to pay its bills?

3                    MR. MORRIS:  Objection to the form

4         of the question.

5         A.    I mean, it -- it -- it depend -- it

6    depended on the nature of the payment and the

7    vendor, but, you know, if there were -- if

8    there were larger scheduled payments, you know,

9    I would like to give at least 30 days notice.

10                   And that is -- that is kind of my

11   rule of thumb so no one is surprised.

12        Q.    Okay.  And was it generally HCMLP's

13   practice to timely pay HCMS' bills?

14                   MR. MORRIS:  Objection to the form

15        of the question.

16        A.    It -- it -- it -- that depended on

17   the nature of the payment.

18        Q.    Okay.  And can you explain what you

19   mean by that?

20        A.    Yeah, I mean if -- if it was -- I

21   mean -- if there was some professional fees

22   that weren't -- you know, they were due but

23   they weren't urgent, those fees may not be paid

24   as timely as others that have a due date or --

25   or things like that.

1              WATERHOUSE - 10-19-21

2        Q.    Okay.  Are loan payments the kinds

3    of thing that HCMLP would pay on time because

4    of potential consequences of not paying on

5    time?

6              MR. MORRIS:  Objection to the form

7         of the question.

8        A.    Yes.  As I testified earlier, we

9    would want to give, you know, notice on -- on

10   -- on larger payments and -- and things of that

11   nature so we didn't miss due dates.

12       Q.    Okay.  And over the course of time,

13   did HCMLP generally pay HCMS' loan payments in

14   a timely fashion?

15             MR. MORRIS:  Objection to the form

16        of the question.

17       A.    I can't remember specifically, but

18   generally, yes.

19       Q.    Okay.  Now, did HCMLP provide

20   similar services to HCRE that you have

21   described it provided to HCMS?

22             MR. MORRIS:  Objection to the form

23        of the question.

24       A.    Yes, but I don't think it -- it

25   provided -- I don't think it provided HR

```
 1                   WATERHOUSE - 10-19-21
```

2    services.

3         Q.    Can you describe the accounting and

4    treasury services that HCMLP provided for HCRE?

5         A.    Yeah, it -- it would provide

6    bookkeeping services on a -- on a periodic

7    basis.  It would make payments, you know, as

8    needed.

9         Q.    Okay.  So did it provide --

10        A.    And -- and I believe it -- it -- it

11   provided tax services as well.

12        Q.    Okay.  And so did it provide the

13   same kind of bill -- did HCMLP provide the same

14   kind of bill-paying services for HCRE that it

15   provided for HCMS and NexPoint?

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    Yes.

19        Q.    And over the course of time, did

20   HCMLP generally cause to be made the loan

21   payments that HCRE owed to HCMLP?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes.

25        Q.    Did HCMLP make loan payment -- the

Page 359

```
 1                 WATERHOUSE - 10-19-21
 2    loan payment that was due from HCMS to HCMLP in
 3    December of 2020?
 4                 MR. MORRIS:  Objection to the form
 5         of the question.
 6         A.    I don't believe that payment --
 7    payment was made.
 8         Q.    Okay.  And when HCMLP caused HCMS in
 9    the past to make loan payments, whose money did
10    it use to make those payments?
11                 MR. MORRIS:  Objection to the form
12         of the question.
13         A.    It was the -- the money in HCMS's
14    operating account would be made to that --
15    those moneys would be used to make payment to
16    Highland Capital Management.
17         Q.    Okay.  And Highland -- is it correct
18    that Highland Capital Management personnel had
19    the access to HCMS's accounts to be able to
20    cause such payments to be made?
21         A.    Yes, Highland personnel had access
22    to those accounts.
23         Q.    Okay.  And so now for HCRE, whose
24    money was used when HCMLP caused HCRE
25    payments -- loan payments to Highland to be
```

Appx. 00729

Page 360

```
 1              WATERHOUSE - 10-19-21

 2   made?

 3              MR. MORRIS:  Objection to the form

 4        of the question.

 5        A.    It was -- it was cash in HCRE's bank

 6   account that would be used to make payments to

 7   Highland Capital Management.

 8        Q.    Okay.  And so did Highland Capital

 9   Management have access to HCRE's funds in order

10   to be able to make such payments?

11              MR. MORRIS:  Objection to the form

12        of the question.

13        A.    Personnel at Highland Capital

14   Management had access to HCRE's bank account to

15   effectuate the payments.

16        Q.    Okay.  And was the payment due from

17   HCRE to HCMLP due in December of 2020 made?

18        A.    It --

19        Q.    In December of 2020.

20        A.    It was not.

21        Q.    Okay.  And was there money in HCRE's

22   account that would have enabled the payment to

23   be made had HCM personnel attempted to make the

24   payment?

25              MR. MORRIS:  Objection to the form
```

Appx. 00730

Page 361

```
 1              WATERHOUSE - 10-19-21

 2         of the question.

 3         A.    I -- I don't recall.

 4         Q.    Do you have any reason to believe

 5    that either HCRE or HCMS simply didn't have the

 6    funds on hand to make the December 2020

 7    payments?

 8         A.    I don't know.

 9         Q.    I guess I'm asking, do you have any

10    reason to believe that they didn't have the

11    funds?

12         A.    We managed cash for so many

13    different entities and funds, and I don't

14    recall, you know, where the cash position was

15    for HCRE and HCMS at 12/31/2020.

16         Q.    Okay.

17         A.    I just don't recall, and I don't --

18    and I don't remember what the loan payment

19    obligations were from HCRE to Highland, and

20    from HCMS to Highland.  I don't recall.  I

21    don't recall, I mean...

22         Q.    Let me come at it a different way.

23    Were the -- were the payments that would

24    otherwise have been due in December of 2020

25    made in January of 2021 for HCMS and HCRE?
```

Page 362

```
 1              WATERHOUSE - 10-19-21

 2        A.    I believe the HCRE payment was made

 3   in January of 2021.  I don't recall any

 4   payments being made from HCMS to Highland.

 5        Q.    If it -- how is it the HCRE payment

 6   came to be made?  Why did you make it -- why

 7   did HCM make the payment in January of 2021?

 8        A.    Jim -- Jim called me and instructed

 9   me to -- to make the payment on behalf of HCRE,

10   Jim Dondero -- Jim Dondero.

11        Q.    Did he seem upset that -- that the

12   payment had not been made?

13        A.    Yeah.  On the note that was, you

14   know, that was the term note, yes, he -- he was

15   displeased that the -- that the payment had not

16   been made by year-end.

17        Q.    Okay.  And did you make the -- cause

18   the payment to be made as -- as requested?

19        A.    Yes.

20        Q.    And did anyone else from HCM

21   participate with you in causing the payment to

22   be made to -- on the HCRE loan?

23        A.    Yes.  It would have been Kristin

24   Hendrix.  I -- again, I don't -- as I testified

25   earlier, I'm not an officer of HCRE.  I don't
```

Appx. 00732

```
                                                    Page 363
 1              WATERHOUSE - 10-19-21

 2    believe I'm an authorized signer.  So I

 3    can't -- other personnel have to make payment

 4    from HCRE to -- to -- to -- to Highland.

 5         Q.    Okay.  And in the conversation

 6    that -- that you had with Mr. Dondero when he

 7    requested the payment to be made, did you say

 8    to him words to the effect, Jim, this loan is

 9    going to stay in default, what are you making

10    the payment for, anything like that?

11         A.    No.

12         Q.    In fact, did you have the impression

13    from him that he thought that the loan would

14    be -- the default would be cured by making the

15    payment?

16              MR. MORRIS:  Objection to the form

17         of the question.

18         A.    Did I get the impression from Jim

19    Dondero that the loan would be cured if the

20    payment from HCRE --

21         Q.    Yeah, if that is what he thought.

22              MR. MORRIS:  Objection to the form

23         of the question.

24         A.    I didn't get any impression from him

25    on that at the time.
```

Appx. 00733

```
 1              WATERHOUSE - 10-19-21

 2        Q.    Do you know whether there was an

 3   HCMS term loan that had a payment due in

 4   December of 2020?

 5        A.    I don't recall.

 6        Q.    Okay.  And so the reason you don't

 7   recall whether or not there was a payment in

 8   January of 2021 is because you just don't

 9   remember whether there was such a loan at all?

10             MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I don't remember.  There is -- there

13   is so many notes, and I mean, demands, and I

14   don't -- I don't remember.  It's a lot to keep

15   track in your head.

16        Q.    I understand, and -- and I hear your

17   frustration when you have explained that the

18   debtor has your documents and you don't, and so

19   I fully appreciate it, and this is no knock on

20   you.  It's a knock on somebody else on this

21   call.

22             MR. MORRIS:  I move to strike.  That

23        was pretty obnoxious, but go ahead.

24        Q.    Okay.  But so, Mr. Waterhouse, if --

25   if a payment on the HCMS loan was made in
```

```
 1              WATERHOUSE - 10-19-21
 2   January of 2021, do you think it was part of
 3   the same conversation where Jim Dondero said,
 4   hey, why didn't that get paid, please make
 5   that -- get that payment done?
 6              MR. MORRIS:  I object to the form of
 7        the question.
 8        A.    Yes.  Likely it would have been -- I
 9   mean, again, I don't recall a payment being
10   made, but, you know, again, I don't remember
11   everything.
12        Q.    Okay.  Did -- at the time you were
13   communicating with Kristin Hendrix about the
14   payment being made, whichever payments were
15   made in January, did she say anything to you
16   about the payments not curing the loan
17   defaults?
18        A.    No.
19        Q.    Okay.  All right.  So I'm going to
20   take you back to very early in the deposition
21   when Mr. Morris was asking you about the --
22   the -- the -- the agreement with respect to
23   the -- the forgiveness element of the loans, so
24   that is just to orient you.
25              Do you remember that there was a
```

Page 366

```
 1                WATERHOUSE - 10-19-21

 2     time that you and Mr. Dondero were

 3     communicating about potential means of

 4     resolving the Highland bankruptcy by what was

 5     colloquially referred to as a pot plan?

 6         A.    Yes.

 7         Q.    Okay.  And can you tell me generally

 8     when that was?

 9         A.    Like mid -- mid 2020, sometime in

10     2020, mid 2020.

11         Q.    Okay.  And did the process of trying

12     to figure out what the numbers should be

13     involve looking at what one should pay for the

14     Highland assets?

15                MR. MORRIS:  Objection to the form

16         of the question.

17         A.    Yes.

18         Q.    Okay.  And did there come a time

19     when you were proposing some potential numbers

20     and Mr. Dondero said something to you like,

21     well, why are you including payment for the

22     related party notes, those, you know, were

23     likely to be forgiven as part of my deferred

24     executive compensation?

25                MR. MORRIS:  Objection to the form
```

```
 1                 WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    Yes, we did have that conversation.

 4        Q.    Okay.  Was that conversation in

 5   connection with trying to figure out the right

 6   numbers for a pot plan?

 7        A.    Yeah.  I mean, it was -- it was -- I

 8   mean, Jim -- Jim would ask for, you know,

 9   most -- most recent asset values, you know, for

10   Highland, and -- and myself and the team

11   provided those to him, so it was in that

12   context.

13        Q.    Okay.  And does that refresh your

14   recollection that these communications were in

15   2020 rather than 2021?

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    The -- the -- the executive

19   compensation discussions were definitely in

20   2020.

21        Q.    Okay.  Now, did you ever make

22   proposals that took into account Jim's comment

23   that the notes were likely to end up forgiven

24   as part of his compensation?

25             MR. MORRIS:  Objection to the form
```

```
 1                 WATERHOUSE - 10-19-21

 2          of the question.

 3          A.    Yes, we -- the team and myself put

 4     together, you know, asset summaries of Highland

 5     at various times for all the assets of

 6     Highland, and not including the notes.

 7          Q.    Okay.  And were those presentations

 8     communicated to -- to Mr. Seery?

 9          A.    No.  Well, look, I didn't tell -- I

10     didn't tell Mr. Seery.  I don't know what

11     Mr. Dondero did with the information.

12          Q.    Okay.

13          A.    I did not have conversations with

14     Mr. Seery.

15          Q.    Okay.  Do you know who saw the

16     presentations that you put together that didn't

17     include the value of the related party notes?

18          A.    We're talking presentations -- these

19     are -- these are Excel spreadsheets?

20          Q.    Uh-huh.

21          A.    I don't know who -- these were given

22     to -- to Jim Dondero.  I don't know what was

23     done with them after that.

24          Q.    Okay.  You also mentioned earlier

25     that sometime during your tenure at Highland
```

```
 1                 WATERHOUSE - 10-19-21
 2   you knew of the practice of giving forgivable
 3   loans to executives.
 4               MR. MORRIS:  Objection to the form
 5        of the question.
 6        Q.    Can you -- can you tell me what you
 7   recall about that practice?
 8               MR. MORRIS:  Objection to the form
 9        of the question.
10        A.    Yes, so there were -- there were --
11   during my tenure at Highland, there were loans
12   or -- given to employees that were later
13   forgiven at a future date and time.
14        Q.    Okay.  And when the loans were
15   given, did the notes, to your recollection, say
16   anything about the potential forgiveness term?
17               MR. MORRIS:  Objection to the form
18        of the question.
19        A.    When you say "did the notes," did
20   the promissory notes detail the forgiveness?
21        Q.    Yes.
22        A.    Not that I recall.
23        Q.    And until such time as whatever was
24   to trigger the forgiveness occurred, were the
25   notes bona fide notes as far as you were
```

```
 1                WATERHOUSE - 10-19-21

 2   concerned?

 3              MR. MORRIS:  Objection to the form

 4      of the question.

 5      A.    Yes, similar to -- yes.

 6      Q.    Okay.  You were going to say similar

 7   to what?

 8      A.    Mr. Morris earlier today showed

 9   notes of the financial statements about various

10   affiliate loans.  I -- I -- I do recall these

11   notes because I -- at that time personally

12   worked on the -- the financial statements of

13   Highland.  That was, you know, in my role as a

14   corporate accountant.

15              And there were -- those loans

16   were -- to the partners were detailed in the

17   notes to the financial statements, similar to

18   what we went through earlier today in the prior

19   testimony about what we saw with Highland

20   and -- and -- and the -- and HCMFA.

21      Q.    Is it fair to say that on Highland's

22   balance sheet there were any number of assets

23   that the value of which could be affected by

24   subsequent events?

25              MR. MORRIS:  Objection to the form
```

 1                    WATERHOUSE - 10-19-21

 2          of the question.

 3          A.    Yes.  I mean, yes, that -- there

 4     are.  And that is -- yes.

 5          Q.    Okay.  And is it typical accounting

 6     practice that until there is some certainty

 7     about those potential future events, that asset

 8     value listed on -- on the books doesn't take

 9     into account those potential future events?

10               MR. MORRIS:  Objection to the form

11          of the question.

12          A.    Yeah, if those -- yes.  If -- if

13     those future events, you know, at the time of

14     issuance are not known or knowable, like I

15     discussed earlier with, like, market practice,

16     asset dislocation, or, you know, I mean, things

17     like that, you -- I mean, it -- it could affect

18     its fair value --

19          Q.    Okay.

20          A.    -- in the future.

21          Q.    And am I correct you wouldn't feel

22     compelled to footnote in every possible change

23     in -- in an asset when those possibilities are

24     still remote?

25               MR. MORRIS:  Objection to the form

 1            WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    The accounting standard is you have

 4    to estimate to the best -- you know, to -- to

 5    the best of your ability, the fair value of an

 6    asset as of the balance sheet date under --

 7    under GAAP.

 8        Q.    Did -- strike that.

 9              Okay.  Give me a minute.  I'm

10    close -- I'm close to done.  Let me just go off

11    and look at my notes for a second.  So take two

12    minutes.

13              VIDEOGRAPHER:  We're going off the

14        record at 7:02 p.m.

15        (Recess taken 7:02 p.m. to 7:03 p.m.)

16              VIDEOGRAPHER:  We are back on the

17        record at 7:03 p.m.

18        Q.    Mr. Waterhouse, is it generally your

19    understanding that people you work with now

20    have been asking the debtor for full and

21    unfettered access to their own former files?

22              MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes, I am -- I am generally aware.

25        Q.    Okay.  And do you think you could

Page 373

1          WATERHOUSE - 10-19-21

2    have been better prepared for this deposition

3    if the debtor had complied with those requests?

4              MR. MORRIS:  Objection to the form

5         of the question.

6         A.    I -- I -- I most certainly -- yes.

7    I mean, again, these are multiple years,

8    multiple years ago, lots and lots of

9    transactions.

10             You know, we asked about NAV errors

11   and, you know, things like that and these

12   are -- it would make this process a lot more --

13   a lot easier and if we had -- if we had access

14   to that.

15        Q.    Okay.  And has the debtor -- is the

16   debtor suing you right now?

17        A.    Yes.

18        Q.    And is the debtor trying to renege

19   on deals that it had previously made with you?

20             MR. MORRIS:  Objection to the form

21        of the question.

22        A.    Sorry, I need to -- it is my

23   understanding that the litigation trust is

24   suing me.  And not being a lawyer, I don't

25   know -- is that the debtor?

```
 1              WATERHOUSE - 10-19-21

 2              Is that -- I don't know the

 3    relationship.  So, again, I'm not the lawyers.

 4    I've said many times.  But my understanding is

 5    the litigation trust is suing me.  I could be

 6    wrong there.  I don't know.

 7         Q.   Okay.  I understand.

 8              Someone with some connection to the

 9    Highland debtor has brought a claim against

10    you; is that fair?

11              MR. MORRIS:  Objection to the form

12         of the question.

13         A.   Yes.

14         Q.   Okay.  And is there also some motion

15    practice in the bankruptcy where the debtor or

16    someone associated with the debtor is

17    attempting to undo something that was

18    previously resolved with you?

19         A.   Yes.

20         Q.   And so in one action somebody is

21    associated with the debtors trying to --

22    threatening you with trying to take money from

23    you, and then in the other -- and trying to --

24    and in the other they are threatening not to

25    pay you things that had previously been agreed;
```

```
 1                WATERHOUSE - 10-19-21
 2   is that correct?
 3                MR. MORRIS:  Objection to the form
 4        of the question.
 5        A.    I want to be -- yes, I -- there
 6   is -- I'm being sued, again, on -- on something
 7   that was agreed to with Mr. Seery and myself.
 8   I don't -- I don't -- I don't own that claim.
 9        Q.    Okay.
10        A.    To be transparent, I don't own that
11   claim.  So it is not my personal property.
12        Q.    Okay.
13        A.    And -- and being the nonlawyer, I
14   don't know how I can get sued for something
15   that I don't owe or, like, I don't own
16   anything.  I'm not the lawyer.  But, I mean, if
17   that is -- if I'm understanding the facts
18   correctly.
19        Q.    Okay.  And the lawsuit that was
20   filed that names you, that was just filed
21   this -- this past week; is that right?
22                MS. DANDENEAU:  Ms. Deitsch-Perez, I
23        do want to interrupt at this point because
24        just as I told Mr. Morris, that this is a
25        deposition about the noticed litigation.
```

Page 376

```
 1                 WATERHOUSE - 10-19-21

 2                 I really don't want to go -- go

 3          afield --

 4                 MS. DEITSCH-PEREZ:  Yeah.

 5                 MS. DANDENEAU:  -- and open up a

 6          whole new line of inquiry about the lawsuit

 7          or the -- the motion and the bankruptcy

 8          court.  We will be here all night.

 9                 MS. DEITSCH-PEREZ:  And I

10          understand.

11          Q.    My -- my point is:  Do you feel

12   like -- like there is some effort by these

13   parties related to the debtor to intimidate

14   you -- not that you -- I'm not saying you are

15   or you aren't.

16                 But do you feel like there is some

17   effort to intimidate you and maybe an effort to

18   deter you from being as prepared as you might

19   be in this deposition?

20                 MR. MORRIS:  Objection to the form

21          of the question.

22          A.    I was -- I was surprised by the

23   lawsuit, by me being named, because, again, I

24   don't own the asset and things like that.

25   Yeah, I just -- I want to move forward with my
```

Page 377

```
 1                  WATERHOUSE - 10-19-21

 2     life at Skyview.

 3                  MS. DEITSCH-PEREZ:  Thank you.

 4                  THE WITNESS:  Thank you.

 5                       FURTHER EXAMINATION

 6     BY MR. MORRIS:

 7          Q.   If I may, I just have a few

 8     questions.

 9                  Mr. Waterhouse, we saw a number of

10     documents that Mr. Rukavina put up on the

11     screen where Ms. Hendrix would send you a

12     schedule of payments that were due on behalf of

13     certain Highland affiliates.

14                  Do you remember that?

15          A.   Yes.

16          Q.   And in each instance she asked for

17     your approval to make the payments; is that

18     right?

19          A.   Yes, she did.

20          Q.   And was that the -- was that the

21     practice in the second half of 2020 whereby

22     Ms. Hendrix would prepare a list of payments

23     that were due on behalf of Highland associates

24     and ask for approval?

25          A.   Yes.
```

Appx. 00747

Page 378

```
 1            WATERHOUSE - 10-19-21

 2       Q.    And I think you said that there was

 3   a -- a --

 4       A.    It was -- I think I testified to

 5   this earlier when we talked about procedures

 6   and policy, you know, again, I want to be

 7   informed of -- of -- of -- of -- of any

 8   payments that are going out.  I want to be made

 9   aware of these payments, and that was just a

10   general policy, not just for 2020.

11       Q.    Okay.  So it went beyond 2020?

12       A.    Yes.

13       Q.    Is that right?

14       A.    Yes.

15       Q.    Okay.  And the corporate accounting

16   group would prepare a calendar that would set

17   forth all of the payments that were anticipated

18   in the -- in the three weeks ahead; is that

19   right?

20       A.    I -- like I testified earlier, we

21   had a corporate calendar that was set up, you

22   know, to -- to provide reminders or, you know,

23   of anything of any nature, whether it is

24   payments or -- or financial statements or, you

25   know, whatever it is, you know, to meet
```

Page 379

```
 1              WATERHOUSE - 10-19-21

 2    deadlines.

 3              I don't know how, as I testified

 4    earlier, how much they were using that

 5    calendar.

 6       Q.   Okay.  But -- but you did get notice

 7    and a request to approve the payments that were

 8    coming due on behalf of Highland's affiliates.

 9    Do I have that right?

10              MS. DANDENEAU:  Objection to form.

11       A.   I mean, generally, yes.  I mean, you

12    know, as we saw with these emails, generally, I

13    mean, did that encompass everything, no.

14       Q.   Okay.  Do you know why the

15    payment -- do you know why there was no payment

16    made by NexPoint at the end of 2020?

17       A.   Yes.  There was -- there was -- we

18    talked about these agreements between the

19    advisors and Highland, the shared services and

20    the cost reimbursement agreement.

21              And in late 2020, there were

22    overpayments, large overpayments that had been

23    made over the years on these agreements, and it

24    was my understanding that the advisors were --

25    were talking with -- like Jim Seery and others
```

Appx. 00749

Page 380

```
 1              WATERHOUSE - 10-19-21

 2    to offset any obligations that the advisors

 3    owed to Highland as offset to the overpayments

 4    on these agreements.

 5         Q.    Okay.  Did you participate in any of

 6    those conversations?

 7         A.    I did not.

 8         Q.    Okay.  Do you know -- do you recall

 9    that the -- at the end of November, the debtor

10    did notice to the advisors of their intent to

11    terminate the shared services agreements?

12         A.    Like I testified earlier, there

13    was -- the agreements weren't identical, from

14    what I recall, and there is one that had a

15    longer notice period, which I think had a

16    60-day notice period.  I don't recall which one

17    that was, so not all of them were -- notice

18    hadn't been given as of November 30th, for all

19    of the agreements.

20         Q.    Upon the receipt of the -- the

21    termination notices that you recall, do you

22    know if the advisors decided at that point not

23    to make any further payments of any kind to

24    Highland?

25              MR. RUKAVINA:  Objection, form.
```

Appx. 00750

Page 381

1          WATERHOUSE - 10-19-21

2          A.    No.   The advisors -- the advisors

3     had stopped making payments prior to that

4     notice.

5          Q.    Okay.   And how do you know that the

6     advisors stopped making -- making payments

7     prior to the notice?

8          A.    I had -- I had a conversation

9     with -- with Jim Dondero.

10          Q.    And did Mr. Dondero tell you that

11     the advisors would no longer make payments to

12     Highland?

13               MS. DEITSCH-PEREZ:   Object to the

14          form.

15          A.    Yes, he -- he -- again, he said

16     they -- they -- the advisors have overpaid on

17     these agreements, to not make any future

18     payments, and that there needs to be offsets,

19     and they're working on getting offsets to these

20     overpayment.

21          Q.    Do you know if anybody ever

22     instructed Highland's employees to make the

23     payment that was due by NexPoint at the end of

24     the year?

25          A.    Did anyone instruct Highland's

Page 382

```
 1                  WATERHOUSE - 10-19-21

 2    employees to make that payment?

 3         Q.    Correct.

 4         A.    Anyone -- not that I'm aware.

 5         Q.    Were any of Highland's employees

 6    authorized to make the payments on behalf of

 7    its affiliates -- withdrawn.

 8                Was any of Highland's employees

 9    authorized to effectuate the payment on behalf

10    of NexPoint that was due at the end of the year

11    without getting approval from either you or

12    Mr. Dondero?

13         A.    They had the -- they had the ability

14    to make the payment, but they didn't -- you

15    know, that -- that payment needed to be

16    approved.

17         Q.    Okay.  And it needed to be approved

18    by you or Mr. Dondero; is that right?

19         A.    I mean, I'm not going to make the

20    unilateral decision.

21         Q.    Is that a decision that you

22    understood had to be made by Mr. Dondero?

23         A.    Yes.  Sitting back in December of

24    2020, the -- that -- there was this off --

25    offset negotiation that -- that was happening,
```

Page 383

1                WATERHOUSE - 10-19-21

2    so I mean, until those negotiations were

3    resolved, you know, there wasn't any

4    payments -- there weren't any payments.

5         Q.    And -- and there were no payments

6    until the negotiations were resolved because

7    that was the directive that you received from

8    Mr. Dondero; correct?

9         A.    I don't think he said -- I mean, I

10   think -- yeah, I mean -- I'm trying to recall

11   the conversation.  It was -- you know, there

12   is -- there is these negotiations.  There's --

13   there needs to be these offsets.  They're

14   talking with the debtor.  So, you know, until

15   this is resolved, right, I mean, depending on

16   how, whatever that resolution was, were we to

17   take any action.

18        Q.    Okay.  How about with respect to

19   HCMS, did HCMS have a term payment due at the

20   end of the year?

21        A.    Again, I don't -- I don't recall.

22        Q.    Okay.  You discussed briefly two

23   payments that were made in January of 2021, one

24   on behalf of NexPoint, and one on behalf of

25   HCMS.  Do I have that right?

Page 384

```
 1              WATERHOUSE - 10-19-21

 2       A.    No.  The two payments I recall were

 3   NexPoint and HCRE.

 4       Q.    Okay.  And those two payments --

 5   thank you for the correction.  And those two

 6   payments were made because Mr. Dondero

 7   authorized those payments to be made; correct?

 8       A.    Yes.

 9       Q.    And they hadn't been made before

10   that because Mr. Dondero had not authorized

11   them to be made?

12              MS. DEITSCH-PEREZ:  Object to the

13       form.

14       A.    Yes, because of these negotiations.

15       Q.    Okay.  Just a couple of more

16   questions.

17              Did anybody, to the best of your

18   knowledge, on behalf of HCMFA, ever tell the

19   SEC that HCMLP was responsible for the mistakes

20   that were made on the TerreStar valuation?

21       A.    Did anyone from Highland on HCMFA's

22   behalf tell the SEC that Highland -- that

23   Highland was responsible for there -- I just

24   want to make sure --

25       Q.    It was a little bit different, so
```

```
 1                  WATERHOUSE - 10-19-21

 2     let me try again.

 3          A.    These are very long questions, John.

 4     I'm not trying to be --

 5          Q.    That is good.  Do you know whether

 6     anybody -- do you know whether anybody on

 7     behalf of HCMS -- HCMFA ever told the SEC that

 8     Highland was the responsible party for the

 9     TerreStar valuation error?

10          A.    Not that I'm aware.

11          Q.    Okay.  Did anybody on behalf of

12     the -- on behalf of HCMFA ever tell the retail

13     board that Highland was responsible for the

14     TerreStar valuation error?

15          A.    Not that I'm aware.

16          Q.    Do you know if HCMFA made an

17     insurance claim with respect to the damages

18     that were incurred in relation to the TerreStar

19     valuation error?

20          A.    Yes.

21          Q.    And do you know why they made that

22     insurance claim?

23          A.    Because there was an error.  I

24     mean --

25          Q.    Was the insured's claim made -- was
```

```
 1                WATERHOUSE - 10-19-21
 2    the insurance claim made under HCMFA's policy?
 3         A.    Yes.
 4         Q.    Did HCMFA at any time prior to the
 5    petition date -- withdrawn.
 6                You were asked a couple of questions
 7    where -- where you said that Mr. Dondero told
 8    you that he was ascribing zero value to the
 9    notes as part of a pot plan because he believed
10    that the notes were part of executive
11    compensation.
12                Do I have that right?
13                MS. DEITSCH-PEREZ:  Object to the
14         form.
15         A.    Yes.
16         Q.    Okay.  Have you ever heard that
17    before the time that Mr. Dondero told you that
18    in the conversation about the pot plan?
19         A.    Had I heard that prior to my
20    conversation with Mr. Dondero?
21         Q.    Yes.
22         A.    No, I had not heard that prior.
23         Q.    Okay.  And that was in the context
24    of his formulation of the settlement proposal;
25    is that right?
```

```
 1                WATERHOUSE - 10-19-21

 2        A.    I mean, generally, yes.  You know,

 3    we were asked to provide asset values, right,

 4    and he was having settlement discussions.

 5    Again, I don't know who those went to

 6    ultimately.  I don't recall.

 7              MR. MORRIS:  I have no further

 8        questions.  Thank you very much for your

 9        patience.  I apologize for the late hour.

10              MS. DEITSCH-PEREZ:  John, you stay

11        on about your email when --

12              MR. RUKAVINA:  Hold on, I'm not

13        done.

14              MS. DEITSCH-PEREZ:  Oh, okay.  Davor

15        still has questions.  Sorry.  I was going

16        to say both John and Davor, could you stay

17        on afterwards just to talk about the

18        requests.

19              FURTHER EXAMINATION

20    BY MR. RUKAVINA:

21        Q.    Mr. Waterhouse, you were just now

22    testifying about a discussion you had with

23    Mr. Dondero where he said something like no

24    more payments.

25              Do you remember that testimony?
```

Page 388

```
 1              WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    Okay.  And was that late November or

 4   early December of 2020?

 5        A.    It was, I would say, first or second

 6   week of November.

 7        Q.    Okay.  Do you recall whether --

 8   whenever you had that discussion, whether

 9   Mr. Dondero had already been fired by the

10   debtor?

11        A.    Yes, I -- I believe he was not an

12   employee of the debtor anymore at that time.

13        Q.    And when you were discussing this

14   with Mr. Dondero and he said no more payments,

15   you were discussing the two shared services

16   agreements and employee reimbursement

17   agreements we testified -- you testified about

18   before; is that correct?

19              MR. MORRIS:  Objection to the form

20        of the question.

21        A.    That is correct.

22        Q.    And had your office or you -- and we

23   will talk at a future deposition about the

24   administrative claim.

25              But had -- by that time that you
```

Page 389

```
 1                WATERHOUSE - 10-19-21
 2   talked to Mr. Dondero, had your office or you
 3   done any estimate of what the alleged
 4   overpayments were?
 5                MR. MORRIS:  Objection to the form
 6        of the question.
 7        A.   Yes, we had -- there was a -- there
 8   was a detailed analysis that was put together
 9   by David Klos at the time.
10        Q.   And do you recall just generally
11   what the total amount for both advisors of the
12   overpayments was?
13        A.   It was in excess of $10 million.
14        Q.   Was it in excess of $14 million?
15                MR. MORRIS:  Objection to the form
16        of the question.
17        A.   I -- I remember it was an
18   eight-figure number.  I don't remember
19   specifically.
20        Q.   Okay.  And did you convey that
21   number to Mr. Dondero when you had that
22   conversation?
23        A.   Yes.
24        Q.   What was his reaction?
25        A.   I mean, he wasn't happy.
```

Appx. 00759

Page 390

```
 1              WATERHOUSE - 10-19-21

 2        Q.    Is it fair to say he was upset?

 3        A.    Yes.

 4        Q.    Did Mr. Dondero ever expressly tell

 5   you to not have NexPoint make the required

 6   December 31, 2020, payment?

 7        A.    Yes, I recall him saying don't make

 8   the payment because it was being negotiated, as

 9   I discussed with Mr. Morris, this offset

10   concept.  So there were obligations due by the

11   advisors to Highland, they should be offset

12   that -- you know, those obligations should be

13   offset by this -- by this overpayment.

14        Q.    And when did he tell you that?

15        A.    I would say -- I would say around --

16   probably December -- December-ish.

17        Q.    Early December, late December?

18        A.    I don't recall with as much

19   specificity as -- as -- as -- as stopping the

20   shared services payments, because we had

21   actually made one shared services payment in

22   November.  So that is why I need to remember

23   that one more clearly.  I don't remember where

24   exactly in December that conversation occurred.

25        Q.    Did Mr. Dondero expressly use the
```

Appx. 00760

Page 391

```
 1                 WATERHOUSE - 10-19-21

 2    word "NexPoint" when he was saying don't make

 3    these payments?

 4                 MR. MORRIS:  Objection to the form

 5         of the question, asked and answered.

 6         A.    Yeah, we were -- we were discussing

 7    advisor obligations.  So it was -- you know, it

 8    was just obligations from the advisors.

 9                 And -- and he specifically talked

10    about the NexPoint payment as well.

11         Q.    Okay.  And it is your testimony that

12    he expressly told you not to make that NexPoint

13    December 31 payment?

14                 MR. MORRIS:  Objection, asked and

15         answered twice.

16         A.    Yes, he -- he did, during that

17    conversation.

18         Q.    And did you ever follow up with him

19    after that about whether NexPoint should or

20    shouldn't make that payment?

21         A.    I did not.

22         Q.    Did you ever, on or about

23    December 31, 2020, remind him and say, hey,

24    this payment is due, what shall I -- what

25    should I do?
```

Page 392

1        WATERHOUSE - 10-19-21

2        A.    I did not.

3        Q.    So sitting here today, you -- you

4   remember distinctly that Dondero in December of

5   2020 expressly told you not to have NexPoint

6   make that payment?

7              MR. MORRIS:  Objection, asked and

8         answered three times.

9        A.    Yes.

10       Q.    Can you say categorically it wasn't

11  just some general discussion where he told you

12  not to make payments?

13             MR. MORRIS:  Objection, asked and

14        answer four times.

15             MR. HORN:  Four times now.  Go for

16        five.

17       A.    Yes.

18       Q.    Did you tell Mr. Seery that?

19       A.    I don't believe I did.  I don't

20  recall.

21       Q.    And was this an in-person discussion

22  or telephone or email?  Do you remember?

23       A.    This was a phone -- a phone

24  conversation.

25       Q.    Okay.  Would you have a record of --

Page 393

1                    WATERHOUSE - 10-19-21

2     on your cell phone of when that conversation

3     might have taken place?

4                    I'm sorry, strike that.

5                    Was that by cell phone?

6          A.    I believe -- yes, because we -- I

7     was at home.  I mean, I don't have a landline.

8     All I have is my cell phone.

9          Q.    Do you know whether your cell phone

10    still has records of conversations from

11    December 2020 on it?

12         A.    My call log doesn't go back that

13    far.

14         Q.    Okay.  Thank you.

15              MR. RUKAVINA:  I will pass the

16    witness.

17              MS. DEITSCH-PEREZ:  Just a couple

18         quick questions.

19                 FURTHER EXAMINATION

20    BY MS. DEITSCH-PEREZ:

21         Q.    With respect to HCRE and HCMS, am I

22    correct there was -- there was no direction not

23    to pay those loan payments?

24              MR. MORRIS:  Objection to the form

25         of the question.

Page 394

```
 1              WATERHOUSE - 10-19-21

 2      A.    Yes, I don't recall having

 3  conversations about, you know, those -- those

 4  entities.

 5      Q.    And, in fact, what was the tone that

 6  Mr. Dondero had when he talked to you about the

 7  fact that HCRE and HCMS payments hadn't been

 8  made when he found out that they hadn't been

 9  paid?

10              MS. DANDENEAU:  Objection to form.

11              MR. MORRIS:  Objection to form.

12      Q.    What was the tone he took with you?

13      A.    Oh, it was -- it was -- it was -- it

14  was very negative.  I mean, I think he cursed

15  at me and he doesn't usually curse.

16      Q.    Okay.  And in your mind, is that

17  consistent with the fact that he was surprised

18  that those payments hadn't been made?

19              MR. MORRIS:  Objection to the form

20      of the question.

21      A.    Yes.

22      Q.    Okay.  Thank you.

23              MR. MORRIS:  I have nothing further.

24      Thank you so much, Mr. Waterhouse.

25              MR. HORN:  I have no questions.
```

```
                                                    Page 395
 1              WATERHOUSE - 10-19-21

 2         Thank you, Mr. Waterhouse.  We appreciate

 3         your time.  I am logging off the discussion

 4         and I will talk to y'all tomorrow.

 5              MR. MORRIS:  Super.

 6              VIDEOGRAPHER:  If there are no

 7         further questions, this ends the

 8         deposition -- excuse me.  This ends the

 9         deposition, and we are going off the record

10         at 7:30 p.m.

11         (Deposition concluded at 7:30 p.m.)

12

13                    _____

14                    FRANK WATERHOUSE

15

16    Subscribed and sworn to before me

17    this     day of            2021.

18

19    --------------------------------

20

21

22

23

24

25
```

Page 396

1                    WATERHOUSE - 10-19-21

2                    C E R T I F I C A T E

3

4          I, SUSAN S. KLINGER, a certified shorthand

5     reporter within and for the State of Texas, do

6     hereby certify:

7          That FRANK WATERHOUSE, the witness whose

8     deposition is hereinbefore set forth, was duly

9     sworn by me and that such deposition is a true

10    record of the testimony given by such witness.

11         I further certify that I am not related to

12    any of the parties to this action by blood or

13    marriage; and that I am in no way interested in

14    the outcome of this matter.

15         IN WITNESS WHEREOF, I have hereunto set my

16    hand this 19th of October, 2021.

17

18    _____

19         Susan S. Klinger, RMR-CRR, CSR

20         Texas CSR# 6531

21

22

23

24

25

Appx. 00766

```
                                                      Page 397
 1              WATERHOUSE - 10-19-21

 2   NAME OF CASE:  In re:  Highland Capital

 3   DATE OF DEPOSITION:  October 19, 2021

 4   NAME OF WITNESS:  Frank Waterhouse

 5   Reason Codes:

 6         1.  To clarify the record.

 7         2.  To conform to the facts.

 8         3.  To correct transcription errors.

 9   Page____Line_____Reason_____

10   From_____to_____

11   Page____Line_____Reason_____

12   From_____to_____

13   Page____Line_____Reason_____

14   From_____to_____

15   Page____Line_____Reason_____

16   From_____to_____

17   Page____Line_____Reason_____

18   From_____to_____

19   Page____Line_____Reason_____

20   From_____to_____

21   Page____Line_____Reason_____

22   From_____to_____

23   Page____Line_____Reason_____

24   From_____to_____

25
```

# EXHIBIT 13

Docket #0086  Date Filed: 10/29/2021

Deborah Deitsch-Perez
Michael P. Aigen
**STINSON LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for Defendant HCRE Partners, LLC*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03007-sgj |
| | § | |
| HCRE PARTNERS, LLC (n/k/a NEXPOINT | § | |
| REAL ESTATE PARTNERS, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT HCRE PARTNERS, LLC'S MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES**

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW, HCRE Partners, LLC ("HCRE"), one of the Defendants in the above styled

and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as Plaintiff

(the "Debtor"), and files this, its *Motion to Extend Expert Disclosure and Discovery Deadlines*

(the "Motion"). HCRE respectfully shows as follows:



Appx. 00769

## I.     RELIEF REQUESTED

1.      On October 29, 2021, NexPoint Advisors, L.P. ("NexPoint") filed its *Motion to Extend Expert Disclosure and Discovery Deadlines* with several exhibits attached (the "NexPoint Motion") in Case No. 19-34054-sgj11, Adversary Proceeding No. 21-03005-sgj, collectively attached hereto as "Exhibit A."[1]   HCRE and HCMS incorporate the context of the NexPoint Motion as if fully set forth herein.

2.      As described in the NexPoint Motion, in the NexPoint, HCMS and HCRE Notes cases there is a similar issue regarding whether the Debtor, Highland Capital Management, as the servicer for NexPoint, HCMS and HCRE, failed to make term loan payments at the end of 2020, enabling the Debtor to contend that the term loans were accelerated. As described in the Rukavina Declaration annexed to the NexPoint Motion, unexpected testimony just last week gave rise to the need to investigate whether expert testimony on the duties of a servicer like Highland Capital Management would be useful.

3.      As a result of the timing, it was not possible to retain an expert who could provide a report by the existing deadline, today.  HCRE and HCMS therefore seek an extension of time to potentially obtain an expert report from Mr. Steven Pully.   HCRE and HCMS would act expeditiously to minimize any impact on the schedule.

4.      For generally the same reasons set forth in the NexPoint Motion, HCRE requests this Court grant it the same relief requested by NexPoint.

---

[1] *Motion to Extend Expert Disclosure and Discovery Deadlines,* Case 21-03005-sgj [Doc 86]; *Declaration of Davor Rukavina*, Case 21-03005-sgj [Doc 86-1]; *Exhibit A*, Case 21-03005-sgj [Doc 86-2]; *Exhibit B*, Case 21-03005-sgj [Doc 86-3]; *Exhibit C*, Case 21-03005-sgj [Doc 86-4].

CORE/3522697.0002/170630746.1

**Appx. 00770**

## II.     PRAYER

WHEREFORE, PREMISES CONSIDERED, HCRE respectfully requests this Court enter an order (i) granting this Motion; (ii) modifying the Scheduling Order to extend the deadline to designate experts and serve expert reports through December 13, 2021; (iii) modifying the Scheduling Order accordingly for the potential designation of rebuttal experts and service of rebuttal expert reports, and extending expert discovery; and (iv) granting HCRE such other and further relief as may be proper.

RESPECTUFLLY SUBMITTED this 29th day of October, 2021.

STINSON LLP

/s/ *Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

ATTORNEYS FOR DEFENDANT
HCRE PARTNERS, LLC

## CERTIFICATE OF CONFERENCE

Counsel for NexPoint requested counsel for the Debtor to agree to the extension and within minutes, the Debtor declined.  For that reason, counsel for HCRE and HCMS concluded further conferencing would be futile.

/s/ *Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3522697.0002/170630746.1

Appx. 00771

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on October 29, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

/s/ *Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3522697.0002/170630746.1

Appx. 00772

# Exhibit A

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: § | |
| § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., § | |
| § | Case No. 19-34054-sgj11 |
| Debtor. § | |
| § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., § | |
| § | |
| Plaintiff, § | Adversary Proceeding No. |
| § | |
| vs. § | 21-03005-sgj |
| § | |
| NEXPOINT ADVISORS, L.P., JAMES § | |
| DONDERO, NANCY DONDERO, AND THE § | |
| DUGABOY INVESTMENT TRUST, § | |
| § | |
| Defendants. § | |

### MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as the plaintiff (the "Debtor"), and files this its *Motion to Extend Expert Disclosure and Discovery Deadlines* (the "Motion"), respectfully stating as follows:

## I.     RELIEF REQUESTED

1.      By this Motion, NexPoint requests that the Court extend the deadline, in its *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* [docket no. 70] (the "Scheduling Order"), for the designation of experts and service of expert reports, through December 13, 2021, with a corresponding extension of expert discovery.  Specifically, NexPoint finds it appropriate and advisable to designate a testifying expert on the standards and duties of care under the parties' Shared Services Agreement (defined below) with respect to Highland's role in NexPoint's alleged failure to make a December 21, 2020 payment on the Note (defined below); specifically, that Highland was responsible for ensuring that NexPoint made this payment.  This request is necessitated by recent deposition testimony of key individuals on October 19 and 21, 2021, prior to which NexPoint did not know or reasonably believe that expert testimony on the duties of care would be advisable.

## II.     PROCEDURAL BACKGROUND

2.      The Debtor initiated this Adversary Proceeding with the filing of its original complaint against NexPoint on January 22, 2021.

3.      By this Adversary Proceeding, the Debtor seeks to collect on a promissory note issued by NexPoint to the Debtor on May 31, 2017 in the original principal amount of $30,746,812.33 (the "Note").  The Note is a 30-year note and provides for an annual payment of principal and interest.  After prior payments, the Debtor asserts that $23,071,195.03 remains due and owing on the Note.

4.      NexPoint has asserted various defenses and affirmative defenses to the Debtor's allegations and causes of action.  This Motion concerns one such affirmative defense only, to the effect that the Debtor, through its employees, caused the alleged underlying default.

---

5.      On July 28, 2021, the District Court entered an order adopting this Court's report and recommendation and ordering that the reference for this Adversary Proceeding will be withdrawn once this Court certifies this Adversary Proceeding as being trial ready.  As part of the same, the District Court necessarily agreed and ordered that NexPoint has a right to a trial by jury of this Adversary Proceeding.

### III.     FACTS

6.      This Motion is supported by the Declaration of Davor Rukavina, attached hereto as incorporated herein (the "Declaration").

7.      The Debtor alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment.  Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated, and the Debtor demanded full and immediate payment.

8.      One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "Shared Services Agreement") between the Debtor and NexPoint dated January 1, 2018.  The Agreement was in place as of December 31, 2020, although the Debtor terminated it later, in 2021.  Under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services.  NexPoint has alleged that, pursuant to the Shared Services Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds.  Indeed, Waterhouse (defined below) testified that it was "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note."  *See* Declaration at Exhibit C, 337:22-338:8.

9.      NexPoint asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place.  NexPoint has always asserted this as an affirmative defense.  *See* Docket No. 6. NexPoint's defense, however, was based on its belief that the Debtor and its employees, including Waterhouse, did nothing to facilitate or ensure the payment, as opposed to a conscious decision not to make the payment.

10.     On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as did NexPoint, in connection with this Adversary Proceeding.  Waterhouse was the Debtor's chief financial officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.  To be clear, Waterhouse was the Debtor's employee, although he provided services to NexPoint as well pursuant to the Shared Services Agreement. Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note.

11.     This changed the potential facts as NexPoint understood them to be from ones where the Debtor simply failed utterly to facilitate the payment, as it has always done, to one where the Debtor intentionally, allegedly upon the instructions of Dondero, decided not to facilitate the payment.  Assuming the Dondero instruction to be true, this raises the question of whether the Debtor thereafter had any affirmative duty with respect to the alleged instruction.

12.     NexPoint did not know that Waterhouse would provide this testimony.  NexPoint understood that Dondero instructed Waterhouse to make no further payments on the Shared Services Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars

on the Shared Services Agreement.  But NexPoint did not understand that Waterhouse would testify that Dondero instructed him also not to pay the Note.

13.     If Dondero told Waterhouse in early December, 2020 not to pay on the Note, then the question becomes whether Waterhouse or the Debtor thereafter "put their heads in the sand" in violation of any affirmative duty or obligation they may have had regarding the matter, such as: to ask Dondero whether they correctly understood him; to ask Dondero whether he meant NexPoint and the Note; to inform Dondero of the potential consequences of a default by potentially accelerating a 30-year promissory note; or to try to dissuade him from his decision.  After all, the Debtor was responsible to facilitate the payment, the Debtor had various duties under the Shared Services Agreement, and it was in the Debtor's interest that NexPoint would default, thus creating a conflict of interest.

14.     Accordingly, on October 19, 2021, when NexPoint deposed James Seery, NexPoint asked Mr. Seery about section 6.01 of the Shared Services Agreement, labeled "standard of care," which provides that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims."  Mr. Seery testified that he did not believe that this provision of the Shared Services Agreement obligated the Debtor or Waterhouse to do anything further after Dondero allegedly instructed Waterhouse not to pay on the Note.

15.     At that time, NexPoint determined that it was appropriate, and would assist the finder of fact, to retain an expert on the "standard of care" provided for in the Shared Services Agreement.  This is especially important because this will be a jury trial in the District Court. NexPoint did not believe that it would need to retain such an expert, and it had no reasonable grounds to suspect that it would need such an expert, prior to these depositions.

16.     NexPoint moved as promptly as it could thereafter.  NexPoint decided to retain an expert on October 22, 2021 and began searching for one on that day.  NexPoint located a potential expert, Steven J. Pully, on October 26, 2021, and after conflicts were cleared and terms agreed to, Mr. Pully agreed to serve as NexPoint's expert on October 28, 2021.  NexPoint files this motion just one day later, and less than two weeks after Waterhouse's deposition triggered the issue.

17.     It goes without saying that neither Pully nor any reasonable expert can possibly review the issues, formulate an opinion, and prepare a report one day after they are retained. Among other things, Pully needs to review all underlying documents and deposition transcripts, some of which have yet to be returned by the court reporters.  Accordingly, NexPoint believes that approximately six (6) weeks will be sufficient for Pully to prepare a report.  NexPoint submits that the Debtor should have a period of time to then designate a potential rebuttal expert, and a period of time for expert discovery.  Such a procedure would be fair for all involved and would constitute a minimal delay to what has already been a rapidly advanced case.

## IV.     ARGUMENT AND AUTHORITIES

18.     It is appropriate for an expert to consider the issue of Waterhouse's and the Debtor's duties under the Shared Services Agreement—*i.e.*, "duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims,"—as issues such as "prudent person" and "like capacity and familiar with like aims" are appropriate for expert analysis and will assist the finder of fact, especially a jury.

19.     Rule 16(b) provides that a deadline in a scheduling order may be modified "for good cause," although there is some uncertainty as to whether this standard applies only after a deadline has passed (which is not the case here).  *See* Fed. R. Civ. P. 16(b)(4); *Marathon Fin. Ins.*

*Inc. RRG v. Ford Motor Co.*, 591 F.3d 458, 470 (5th Cir. 2009) ("Federal Rule of Civil Procedure 16(b) governs amendment of pleadings after a scheduling order's deadline to amend has expired").

20.     When the issue concerns an "untimely submission of expert reports," the Fifth Circuit has specified the following for factors as guiding the decision: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S&W Enters. v. Southtrust Bank of Ala.*, 315 F.3d 533, 536 (5th Cir. 2003). Again, this test applies to a deadline which has already expired. Logically, therefore, a lesser standard should apply when a party seeks relief prior to the expiration of a deadline, as NexPoint does here.

21.     Applying these or any factors:

(i)      this Adversary Proceeding is only some nine (9) months old and the parties have moved very quickly, with all discovery almost over;

(ii)     if this Motion is granted, all discovery in this Adversary Proceeding will have been completed by the end of 2021, still less than one (1) year after filing;

(iii)    the reason for the need to extend the deadline is the most logical reason that most frequently appears—that discovery has necessitated some previously unexpected action—which is one of the purposes of discovery;

(iv)    NexPoint's failure to previously designate an expert was due solely to not having the benefit of Waterhouse's and Seery's recent deposition testimony, and is not the result of any delay or lack of diligence, as evidenced by the fact that NexPoint did already and timely designate two other experts on other issues (*i.e.* NexPoint did not sit on its responsibility to consider retaining experts);

(v)     the matter is important because the duties of care as specified in the Shared Services Agreement are terms of art necessitating an expert analysis, especially before a jury, and the matter goes to the heart of NexPoint's affirmative defense, and is necessitated by Waterhouse's testimony and not any prior action or inaction of NexPoint;

(vi)    there is no prejudice to the Debtor, which will have sufficient time to retain a rebuttal expert and take expert discovery (*i.e.* no witnesses or documents have been lost); and

(vii)    a continuance is easily available to avoid any prejudice to the Debtor—indeed, there is no need for a continuance even as the Adversary Proceeding has yet to be certified as trial ready and it is likely that the District Court will not schedule the Adversary Proceeding for trial for some time.

22.    NexPoint submits that this Motion cannot come as a surprise to the Debtor. NexPoint has asserted its affirmative defense since the beginning.  The only difference now is that, instead of a wholesale disregard of any duty to facilitate the Note payment, the issue has evolved to whether the Debtor or Waterhouse had any affirmative duty to act after the alleged instruction from Dondero.  As it can be presumed that Waterhouse previously informed the Debtor or its counsel of this alleged instruction (as he apparently informed other employees at the Debtor), the Debtor likely knew what Waterhouse's testimony would be well before NexPoint learned of that testimony.  It is reasonable to conclude that the Debtor knew or should have known that the "standard of care" under the Shared Services Agreement would then become a material issue.

23.    Accordingly, "good cause" to amend the Scheduling Order exists, if that higher standard even applies, and approving such amendment will not prejudice the Debtor and will instead serve the interests of justice.

## V.    **PRAYER**

WHEREFORE, PREMISES CONSIDERED, NexPoint respectfully requests that the Court enter an order: (i) granting this Motion; (ii) modifying the Scheduling Order to extend the deadline to designate experts and serve expert reports through December 13, 2021; (iii) modifying the Scheduling Order accordingly for the potential designation of rebuttal experts and service of rebuttal expert reports, and extending expert discovery; and (iv) granting NexPoint such other and further relief as may be proper.

RESPECTFULLY SUBMITTED this 29th day of October, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email:  drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that, on October 28, 2021, he conferred with counsel for the Debtor, John Morris, and the Debtor opposes the relief requested herein.

/s/ Davor Rukavina
Davor Rukavina

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on October 29, 2021, a true and correct copy of the foregoing document, including the exhibit thereto, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Bryan C. Assink on behalf of Defendant James Dondero
bryan.assink@bondsellis.com

Greta M. Brouphy on behalf of Defendant The Dugaboy Investment Trust
gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com

Leslie A. Collins on behalf of Defendant The Dugaboy Investment Trust
lcollins@hellerdraper.com

Deborah Rose Deitsch-Perez on behalf of Defendant James Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez on behalf of Defendant Nancy Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Douglas S. Draper on behalf of Defendant The Dugaboy Investment Trust
ddraper@hellerdraper.com,
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

/s/ Davor Rukavina
Davor Rukavina

---

MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 10
4871-8469-1713v.2 019717.00004

**Appx. 00783**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF DAVOR RUKAVINA

STATE OF TEXAS

COUNTY OF DALLAS

I, Davor Rukavina, hereby state and testify to the following as being true and correct and under penalty of perjury pursuant to the laws of the United States of America:

1.      My name is Davor Rukavina. I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise competent to execute this Declaration.

2.      I am an attorney duly licensed to practice law in the State of Texas. I am a shareholder at Munsch Hardt Kopf & Harr, P.C. I am the lead attorney for NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in this Adversary Proceeding.

3.      At issue in this Adversary Proceeding is a 30-year promissory note executed by NexPoint in the original principal amount of $30,746,812.33 (the "Note"), although the Note had been paid down significantly by the time of the filing of this Adversary Proceeding.

DECLARATION OF DAVOR RUKAVINA—Page 1

4.     Highland Capital Management, L.P. (the "Debtor") alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment. Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated and the Debtor demanded full and immediate payment.

5.     The parties agreed by written stipulation that they would disclose experts and produce expert reports on or before October 29, 2021, and the Court's scheduling order so requires. NexPoint requests an extension of this deadline. The following is the reason why.

6.     One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "Agreement") between the Debtor and NexPoint dated January 1, 2018, a copy of which is attached hereto as Exhibit "A." The Agreement was in place as of December 31, 2020, although the Debtor terminated it later in 2021. NexPoint alleges that, under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services. NexPoint has alleged that, pursuant to the Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds. NexPoint therefore asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place.

7.     The foregoing has always been an affirmative defense of NexPoint in this Adversary Proceeding, including in its amended answer filed on September 1, 2021, a copy of which is attached hereto as Exhibit "B."

8.     On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as did I, in connection with this Adversary Proceeding. Waterhouse was the Debtor's chief financial

DECLARATION OF DAVOR RUKAVINA—Page 2

officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.

9.      Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note. A copy of this deposition transcript is attached as Exhibit "C."

10.     This testimony was not expected by me or by NexPoint. I had understood that Dondero instructed Waterhouse to make no further payments on the Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars on the Agreement and because that was what Dondero and Waterhouse had been discussing. I had not understood that Waterhouse would testify that Dondero instructed him to also not pay the Note specifically.

11.     Prior to that deposition, I had never spoken to Waterhouse. Waterhouse presently serves as an officer of NexPoint; however, and unlike every other case I have been involved with, I have not been permitted to discuss with Waterhouse litigation matters. This is because Waterhouse is in litigation with the Debtor on other matters and has separate and independent counsel, Debra Dandeneau and Frances Smith, who would not permit me to speak directly to Waterhouse, which I understood to be a logical and appropriate instruction to protect their client. I did discuss with Ms. Dandeneau what Waterhouse may know about the litigation between the Debtor and my clients, but that primarily focused on defenses that another client of mine, Highland Capital Management Fund Advisors, L.P., has. And I did discuss with Ms. Dandeneau that Dondero told Waterhouse to not make payments, but I understood that to be limited to the Agreement and to not include the Note, since the topic under discussion (as it was told to me)

between Dondero and Waterhouse was the Agreement and overpayments on the Agreement, and not the Note.

12.     In sum, prior to October 19, 2021, I did not know that Waterhouse would testify that Dondero told him to not pay on the Note, and I had no reasonable reason to suspect the same. My surprise is evident from the transcript of that deposition, where I asked Waterhouse multiple times whether he was sure that Dondero told him this—so much so that opposing counsel objected multiple times as "asked and answered," and even objected as having been asked and answered "four time." Exhibit "C" at 390-392.

13.     Assuming that Waterhouse's testimony on this issue will be accepted by a trier of fact, the question is whether, from NexPoint's perspective, Waterhouse had no further duties to review, confirm, investigate, or to discuss the issue with Dondero. In that respect, section 6.01 of the Agreement, labeled "standard of care," states that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

14.     I deposed Jim Seery on October 21, 2021, and asked him various questions about this provision of the Agreement. Mr. Seery testified to the effect that he did not believe that the Agreement obligated the Debtor or Waterhouse to do anything further after Dondero told Waterhouse to not pay the Note (again, assuming that this was true). I do not have a copy of Mr. Seer's deposition yet.

15.     With Mr. Seery testifying that he did not believe that the Agreement required the Debtor or Waterhouse to do anything further if Dondero in fact gave the instruction Waterhouse testified that he did, NexPoint concluded that it needed to retain an expert to review whether the "standard of care" specified in the Agreement compelled the Debtor or Waterhouse to do anything

DECLARATION OF DAVOR RUKAVINA—Page 4

further after Dondero gave the alleged instruction, such as checking with him to see if they understood him correctly, advising him of the potential serious consequences of a default, trying to dissuade him, or at least asking him once again prior to December 31, 2020 whether the payment should be made.

16.      On October 22, 2021, I began searching for a potential expert.  On October 26, 2021, I contacted Steven J. Pully about the potential engagement.  After clearing conflicts and coming to an agreement, Mr. Pully agreed to the engagement on October 28, 2021.   The engagement letter has yet to be finalized and executed, but I have every confidence that it will and the urgency of the matter necessitates this Declaration at this time.  I have been extremely diligent in searching for an finding an expert once NexPoint determined that the retention of an expert was appropriate, which did not occur until the Seery deposition on October 21, 2021.

17.      Even though NexPoint has retained Mr. Pully as of October 28, 2021, it is not possible for Mr. Pully to formulate an opinion and prepare a report by October 29, 2021.  Among other things, various deposition transcripts of important witnesses have yet to be received and reviewed by Mr. Pully, and Mr. Pully has yet to review the underlying documents.  Assuming no undue delays with respect to deposition transcripts, Mr. Pully should be able to prepare a report by December 13, 2021.

18.      NexPoint therefore seeks an extension of the expert designation and report deadline through December 13, 2021, in order that justice may be done and not for delay or any improper purpose, NexPoint not having designated an expert before due solely to the lack of knowledge that Waterhouse would testify as he did on October 19, 2021 and that Mr. Seery would testify as to his view that the Agreement did not require Waterhouse to do anything thereafter.

I hereby swear under oath and penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DAVOR RUKAVINA

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows.

## ARTICLE I

## DEFINITIONS

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:



**Appx. 00790**

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

Appx. 00791

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02   Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01   General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)     *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

3

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

(b)   *Legal/Compliance/Risk Analysis.*  Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

(c)   *Tax.*  Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

(d)   *Management of Clients and Accounts.*  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

(e)   *Valuation.*  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(f)   *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

(g)   *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(h)   *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

     (i)    *Administrative Services.*  The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

     (j)    *Shared Employees.*  To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

     (k)    *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing; and

     (l)    *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

    Section 2.03   Shared Employees.

     (a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

Appx. 00794

(b)     Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable. To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

       (i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

       (j)     The Staff and Services Provider shall require that each Shared Employee:

          (i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

          (ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

          (iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

          (iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

          (v)     to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

          (vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

       (k)     Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf of or in the name of the Management Company, acting as principal.

     Section 2.04    <u>Applicable Asset Criteria and Concentrations</u>. The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with <u>Section 2.02</u> above and any other assistance or advice provided in accordance with this Agreement.

     Section 2.05    <u>Compliance with Management Company Policies and Procedures</u>. The Management Company will from time to time provide the Staff and Services Provider and the

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06   Authority. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07   Third Parties.

(a)      The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)      In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08   Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09   Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

8

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).   Any such power shall be revocable in the sole discretion of the Management Company.

<div align="center">ARTICLE III</div>

<div align="center">CONSIDERATION AND EXPENSES</div>

Section 3.01   <u>Consideration</u>. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "<u>Staff and Services Fee</u>"), payable monthly in advance on the first business day of each month.

Section 3.02   <u>Costs and Expenses</u>. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03   <u>Deferral</u>. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

<div align="center">ARTICLE IV</div>

<div align="center">REPRESENTATIONS AND COVENANTS</div>

Section 4.01   <u>Representations</u>. Each of the Parties hereto represents and warrants that:

(a)   It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)   this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)   no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)   neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

<div align="center">9</div>

Case 3:21-cv-00881-X   Document 39-32   Filed 01/29/21   Entered 01/29/21 02:52:58   Page 201 of 296

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

<div align="center">

**ARTICLE V**

**COVENANTS**

</div>

Section 5.01   <u>Compliance; Advisory Restrictions</u>.

(a)   The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)   This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "<u>Advisory Restrictions</u>"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02   <u>Records; Confidentiality</u>.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

<div align="center">10</div>

Case 2:14-01800-rdd Doc 39-3 Filed 09/29/21   Entered 09/29/21 03:59:53   Page 22 of 46

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01   Standard of Care.   Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder. No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account. Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

11

Section 6.02    Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03    Indemnification by the Management Company.    The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

12

Appx. 00801

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04   Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; provided that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

13

Section 6.05   <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 6.03</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   <u>Reliance</u>. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01   <u>Termination</u>. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01   <u>Amendments</u>. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   <u>Assignment and Delegation</u>.

(a)   Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)   Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)   The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

14

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    Non-Recourse; Non-Petition.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)    The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Appx. 00804

Section 8.04    Governing Law.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    Severability.    The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    No Waiver.    The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    Counterparts.    This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09   Third Party Beneficiaries.   This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   No Partnership or Joint Venture.   Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.   Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   Independent Contractor.   Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12   Written Disclosure Statement.   The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13   Headings.   The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14   Entire Agreement.   This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15   Notices.   Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)   If to the Management Company:

NexPoint Advisors, L.P.
200 Crescent Court
Suite 700
Dallas, TX 75201

17

Appx. 00806

(b)     If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.


*[The remainder of this page intentionally left blank.]*

Appx. 00807

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

**NEXPOINT ADVISORS, L.P.**

By:  NexPoint Advisors GP, LLC, its General Partner

By: _____

Name: Frank Waterhouse

Title: Treasurer

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:  Strand Advisors, Inc., its General Partner

By: _____

Name: Frank Waterhouse

Title: Treasurer

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Defendant NexPoint Advisors, L.P.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT NEXPOINT ADVISORS, L.P.'S**
**ANSWER TO AMENDED COMPLAINT**

Defendant NexPoint Advisors, L.P. ("NexPoint"), a defendant in the above-styled and

numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital

Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the

*Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent*

*Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "Amended Complaint"). Where

an allegation in the Amended Complaint is not expressly admitted in this Answer, it is denied.

Exhibit B

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Defendant NexPoint admits that NPA's First Amended Answer speaks for itself. To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.      Defendant NexPoint denies the allegations in paragraph 3 of the Amended Complaint.

4.      Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6.      Defendant NexPoint admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.      Defendant NexPoint admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.      Defendant NexPoint denies the allegations contained in paragraph 8 of the Amended Complaint.  Defendant NexPoint does not consent to any trial before, or final order entered by, the Bankruptcy Court.  Defendant NexPoint demands a trial by jury of all issues so triable.

9.      Defendant NexPoint admits the allegations in paragraph 9 of the Amended Complaint.

## THE PARTIES

10.     Defendant NexPoint admits the allegations in paragraph 10 of the Amended Complaint.

11.     Defendant NexPoint admits the allegations in paragraph 11 of the Amended Complaint.

12.     Defendant NexPoint admits the allegations in paragraph 12 of the Amended Complaint.

13.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15.     Defendant NexPoint admits the allegations in paragraph 15 of the Amended Complaint.

16.     Defendant NexPoint admits the allegations in paragraph 16 of the Amended Complaint.

17.     Defendant NexPoint admits the allegations in paragraph 17 of the Amended Complaint.

18.     Defendant NexPoint admits the allegations in paragraph 18 of the Amended Complaint.

19.     Defendant NexPoint admits the allegations in paragraph 19 of the Amended Complaint.

## STATEMENT OF FACTS

20.     Defendant NexPoint admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.     Defendant NexPoint admits the allegations in paragraph 21 of the Amended Complaint.

22.     Defendant NexPoint denies paragraph 22 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 22 is not verbatim.

23.     Defendant NexPoint admits the allegations in paragraph 23 of the Amended Complaint.

24.     Defendant NexPoint denies paragraph 24 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 24 is not verbatim.

25.     Defendant NexPoint admits the allegations in paragraph 25 of the Amended Complaint.

26.     Defendant NexPoint admits that it did not make a payment under the Note on December 31, 2020. Defendant NexPoint denies that any payment was due under the Note on December 31, 2020.  To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.     Defendant NexPoint admits that Exhibit 2 to the Amended Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 27 of the Amended Complaint is denied.

28.     Defendant NexPoint admits that it paid the Debtor $1,406,111.92 on January 14, 2021, but denies that any payment was due on December 31, 2020 or that this was an attempt to cure a default.  To the extent not expressly admitted, paragraph 28 of the Amended Complaint is denied.

29.     Defendant NexPoint admits that Exhibit 3 to the Amended Complaint (the "Second Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 29 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 29 of the Amended Complaint is denied.

30.     To the extent paragraph 30 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits paragraph 30 of the Amended Complaint.

31.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.     Defendant NexPoint denies the allegations in paragraph 32 of the Amended Complaint.

33.     Defendant NexPoint admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 33 of the Amended

Complaint. Defendant NexPoint denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34.     Defendant NexPoint admits the allegations in paragraph 34 of the Amended Complaint.

35.     Defendant NexPoint admits the allegations in paragraph 35 of the Amended Complaint.

36.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 36 contradicts the First Amended Answer, it is denied.

37.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 37 contradicts the First Amended Answer, it is denied.

38.     Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no answer is required.  To the extent of any factual allegation, Defendant NexPoint admits that Mr. Dondero controlled NPA and denies that he controlled the Debtor at the time of the Alleged Agreement.

39.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Amended Complaint and therefore denies the same.

40.     Defendant NexPoint denies the allegations in paragraph 40 of the Amended Complaint.

41.     Defendant NexPoint admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and

it is denied.  To the extent not expressly admitted, paragraph 41 of the Amended Complaint is denied.

42.     Paragraph 42 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

43.     Paragraph 43 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**(against NexPoint)**
**(for Breach of Contract)**

</div>

44.     Paragraph 44 of the Amended Complaint is a sentence of incorporation that does not require a response.  All prior responses are incorporated herein by reference.

45.     Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

46.     Paragraph 46 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

47.     Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

48.     Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

<div align="center">

**<u>SECOND CLAIM FOR RELIEF</u>**
**(against NexPoint)**
**(Turnover by NexPoint Pursuant to 11 U.S.C. § 542(b))**

</div>

49.     Paragraph 49 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

50.     Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

51.     Paragraph 51 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

52.     Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

53.     Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  Defendant NexPoint admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.

54.     Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

55.     Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### THIRD CLAIM FOR RELIEF
#### (Against NexPoint)
**(Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58.     Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

59.     Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

60.     Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

61.     Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FOURTH CLAIM FOR RELIEF
### (Against NexPoint)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))

62.     Paragraph 62 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

63.     Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

64.     Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

65.     Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

66.     Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

67.     Paragraph 67 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

68.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

69.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

70.     Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

## SIXTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (Breach of Fiduciary Duty)

71.     Paragraph 71 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

72.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

73.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

74.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

## SEVENTH CLAIM FOR RELIEF
### (Against James Dondero and Nancy Dondero)
### (Aiding and Abetting a Breach of Fiduciary Duty)

75.     Paragraph 75 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

76.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

77.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

78.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

79.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

Defendant NexPoint denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## AFFIRMATIVE DEFENSES

80.     Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

81.     Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

82.     Furthermore, the Plaintiff has waived the right to accelerate the note and /or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

83.     Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant NexPoint believes there may be testimony or email correspondence that discusses the

existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

84.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because NexPoint acted in good faith, without knowledge of any alleged avoidability, and because reasonably equivalent value was provided for any alleged transfer or obligation.

85.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because no transferor or transferee, or obligor or obligee, was insolvent.

86.     To the extent of any avoidance, NexPoint asserts a lien under 11 U.S.C. § 548(c) to the extent that NexPoint gave value, and a similar preference lien under any applicable provision of the Texas Uniform Fraudulent Transfer Act.

## JURY DEMAND

87.     Defendant NexPoint demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

88.     Defendant NexPoint does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant NexPoint respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant NexPoint such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of September, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina

    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

        /s/ Davor Rukavina
        Davor Rukavina

Page 1

```
 1                WATERHOUSE - 10-19-21

 2         IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
 3                  DALLAS DIVISION
      ------------------------------
 4    IN RE:

 5                              Chapter 11
      HIGHLAND CAPITAL
 6    MANAGEMENT, L.P.,          CASE NO.
                                 19-34054-SGI11
 7
              Debtor.
 8    ------------------------------
      HIGHLAND CAPITAL MANAGEMENT, L.P.,
 9
              Plaintiff,
10    vs.                        Adversary
                                 Proceeding No.
11    HIGHLAND CAPITAL MANAGEMENT    21-03000-SGI
      FUND ADVISORS, L.P.; NEXPOINT
12    ADVISORS, L.P.; HIGHLAND
      INCOME FUND; NEXPOINT
13    STRATEGIC OPPORTUNITIES FUND;
      NEXPOINT CAPITAL, INC.; and
14    CLO HOLDCO, LTD.,

15            Defendants.
      ------------------------------
16

17        REMOTE VIDEOTAPED DEPOSITION OF

18               FRANK WATERHOUSE

19             October 19, 2021

20

21

22

23

24    Reported by:  Susan S. Klinger, RMR-CRR, CSR

25    Job No: 201195
```

Exhibit C

Appx. 00822

Page 2

```
 1                  WATERHOUSE - 10-19-21

 2

 3

 4                      October 19, 2021

 5                      9:30 a.m.

 6

 7

 8

 9        Remote Deposition of FRANK WATERHOUSE,

10   held before Susan S. Klinger, a Registered

11   Merit Reporter and Certified Realtime Reporter

12   of the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Appx. 00823

```
 1                  WATERHOUSE - 10-19-21

 2    A P P E A R A N C E S:

 3    (All appearances via Zoom.)

 4    Attorneys for the Reorganized Highland Capital

 5    Management:

 6          John Morris, Esq.

 7          Hayley Winograd, Esq.

 8          PACHULSKI STANG ZIEHL & JONES

 9          780 Third Avenue

10          New York, New York  10017

11    Attorneys for the Witness:

12          Debra Dandeneau, Esq.

13          Michelle Hartmann, Esq.

14          BAKER McKENZIE

15          1900 North Pearl Street

16          Dallas, Texas  75201

17    Attorneys for NexPoint Advisors, LP and

18    Highland Capital Management Fund Advisors,

19    L.P.:

20          Davor Rukavina, Esq.

21          An Nguyen, Esq.

22          MUNSCH HARDT KOPF & HARDD

23          500 North Akard Street

24          Dallas, Texas  75201-6659

25
```

Page 4

```
 1              WATERHOUSE - 10-19-21

 2    Attorneys for Jim Dondero, Nancy Dondero, HCRA,

 3    and HCMS:

 4         Deborah Deitsch-Perez, Esq.

 5         Michael Aigen, Esq.

 6         STINSON

 7         3102 Oak Lawn Avenue

 8         Dallas, Texas   75219

 9

10    Attorneys for Dugaboy Investment Trust:

11         Warren Horn, Esq.

12         HELLER, DRAPER & HORN

13         650 Poydras Street

14         New Orleans, Louisiana 70130

15

16    Attorneys for Marc Kirschner as the trustee for

17    the litigation SunTrust:

18         Deborah Newman, Esq.

19         QUINN EMANUEL URQUHART & SULLIVAN

20         51 Madison Avenue

21         New York, New York  10010

22

23    Also Present:

24         Ms. La Asia Canty

25
```

Appx. 00825

```
 1              WATERHOUSE - 10-19-21
```

```
 2                  I N D E X

 3

 4   WITNESS                              PAGE

 5   FRANK WATERHOUSE

 6   EXAMINATION BY MR. MORRIS             10

 7   EXAMINATION BY MR. RUKAVINA          256

 8   EXAMINATION BY MS. DEITSCH-PEREZ     352

 9   EXAMINATION BY MR. MORRIS           377

10   EXAMINATION BY MR. RUKAVINA         387

11   EXAMINATION BY MS. DEITSCH-PEREZ     393

12

13                E X H I B I T S

14   No.                                  Page

15   Exhibit 2  NPA et al Amended Complaint   142

16   Exhibit 33 6/3/19 Management            91

17              Representation

18   Exhibit 34 HCMLP Consolidated Financial   94

19              Statements

20   Exhibit 35 HCMFA Incumbency Certificate  151

21   Exhibit 36 Email string re 15(c)        170

22   Exhibit 39 HCMLP Operating Results 2/18  226

23   Exhibit 40 Summary of Assets and        236

24              Liabilities

25   Exhibit 41 12/19 Monthly Operating Report  258
```

```
                                                          Page 6
 1                    WATERHOUSE - 10-19-21

 2    Exhibit 45 HCMFA Consolidated Financial      135

 3               Statements

 4    Exhibit 46 NexPoint 2019 Audited             218

 5               Financials

 6

 7    Exhibit A1 Emails 11/25                       328

 8    Exhibit A2 Emails 12/31                       338

 9    Exhibit A6 Emails 1/12                        341

10    Exhibit A7 Promissory Notes                   297

11    Exhibit A9 Email, 8/31                        307

12    Exhibit A10 Acknowledgment from HCMLP         302

13    Exhibit A11 HCMLP Schedule 71A                309

14

15

16

17

18

19

20

21

22

23

24

25
```

Appx. 00827

```
 1            WATERHOUSE - 10-19-21

 2            P R O C E E D I N G S

 3            VIDEOGRAPHER:  Good morning,

 4    Counselors.  My name is Scott Hatch.  I'm a

 5    certified legal videographer in association

 6    with TSG Reporting, Inc.

 7            Due to the severity of COVID-19 and

 8    following the practice of social

 9    distancing, I will not be in the same room

10    with the witness.  Instead, I will record

11    this videotaped deposition remotely.  The

12    reporter, Susan Klinger, also will not be

13    in the same room and will swear the witness

14    remotely.

15            Do all parties stipulate to the

16    validity of this video recording and remote

17    swearing, and that it will be admissible in

18    the courtroom as if it had been taken

19    following Rule 30 of the Federal Rules of

20    Civil Procedures and the state's rules

21    where this case is pending?

22            MR. HORN:  Yes.

23            MS. DANDENEAU:  Yes.

24            MR. MORRIS:  Yes.  John Morris.  I

25    would just try to do a negative notice
```

Page 8

```
 1              WATERHOUSE - 10-19-21
 2   here, as we did yesterday.  If anybody has
 3   a problem with what was just stated, can
 4   you state your objection now?
 5         Okay.  No response, so everybody
 6   accepts the stipulation and the instruction
 7   that was just given.
 8         VIDEOGRAPHER:  Thank you.  This is
 9   the start of media labeled Number 1 of the
10   video recorded deposition of Frank
11   Waterhouse In Re: Highland Capital
12   Management, L.P., in the United States
13   Bankruptcy Court for the Northern District
14   of Texas, Dallas Division, Case Number
15   21-03000-SGI.
16         This deposition is being held via
17   video conference with participants
18   appearing remotely due to COVID-19
19   restrictions on Tuesday, October 19th, 2021
20   at approximately 9:32 a.m.  My name is
21   Scott Hatch, legal video specialist with
22   TSG Reporting, Inc. headquartered at 228
23   East 45th Street, New York, New York.  The
24   court reporter is Susan Klinger in
25   association with TSG Reporting.
```

```
1          WATERHOUSE - 10-19-21
2          Counsel, please introduce
3     yourselves.
4          MR. MORRIS:  John Morris, Pachulski
5     Stang Ziehl & Jones for the reorganized
6     Highland Capital Management, L.P., the
7     plaintiff in these actions.
8          MS. DANDENEAU:  Deborah Dandeneau
9     from Baker McKenzie.  My partner, Michelle
10    Hartmann, is also in the room with me,
11    representing Frank Waterhouse individually.
12         MS. DEITSCH-PEREZ:  Deborah
13    Deitsch-Perez from Stinson, LLP,
14    representing Jim Dondero, Nancy Dondero,
15    HCRA, and HCMS.
16         MR. HORN:  Warren Horn with Heller,
17    Draper & Horn in New Orleans representing
18    Dugaboy Investment Trust.
19         MR. RUKAVINA:  Davor Rukavina with
20    Munsch Hardt Kopf & Harr in Dallas
21    representing NexPoint Advisors, LP and
22    Highland Capital Management Fund Advisors,
23    L.P.
24         MR. AIGEN:  Michael Aigen from
25    Stinson, and I represent the same parties
```

Page 10

```
 1                 WATERHOUSE - 10-19-21

 2         as Deborah Deitsch-Perez.

 3                 MS. NEWMAN:  This is Deborah Newman

 4         from Quinn Emanuel.  We represent the

 5         litigation -- Marc Kirschner as the trustee

 6         for the litigation SunTrust.

 7                 MR. MORRIS:  I think that is

 8         everybody.

 9                 VIDEOGRAPHER:  Thank you.  Will the

10         court reporter please swear in the witness.

11                     FRANK WATERHOUSE,

12     having been first duly sworn, testified as

13     follows:

14                         EXAMINATION

15     BY MR. MORRIS:

16         Q.    Please state your name for the

17     record.

18         A.    My name is Frank Waterhouse.

19         Q.    Good morning, Mr. Waterhouse.  I'm

20     John Morris, as you know, from Pachulski Stang

21     Ziehl & Jones.  You understand that my firm and

22     I represent Highland Capital Management, L.P.;

23     is that right?

24         A.    Yes.

25         Q.    Okay.  And do you understand that
```

Appx. 00831

Page 11

                    WATERHOUSE - 10-19-21

1

2     we're here today for your deposition in your

3     individual capacity?

4          A.    Yes.

5          Q.    Did you review and -- did you

6     receive and review a subpoena that Highland

7     Capital Management, L.P., served upon you?

8          A.    Yes.

9          Q.    You have been deposed before; right?

10         A.    Yes.

11         Q.    How many times have you been

12    deposed?

13         A.    About three or four times.

14         Q.    Okay.  And I defended you in one

15    deposition; isn't that right?

16         A.    That is correct.

17         Q.    So the general ground rules for this

18    deposition are largely the same as the

19    depositions you have given before.  And that is

20    I will ask you a series of questions, and it is

21    important that you allow me to finish my

22    question before you begin your answer; is that

23    fair?

24         A.    Yes.

25         Q.    And it is important that I allow you

Page 12

```
 1              WATERHOUSE - 10-19-21

 2    to finish your answers before I begin a

 3    question, but if I fail to do that, will you

 4    let me know?

 5         A.    I can certainly do that.

 6         Q.    Okay.  Do you understand that this

 7    deposition is being videotaped?

 8         A.    Yes.

 9         Q.    You understand that I may seek to

10    use portions of the videotape in a court of

11    law?

12         A.    I did not know that, until you just

13    said that.

14         Q.    Okay.  And you are aware of that now

15    before the deposition begins substantively; is

16    that right?

17         A.    Yes.

18         Q.    So unlike I think the other

19    depositions that you have given, this one is

20    being given remotely.  So that presents some

21    unique challenges, at least as compared to a

22    deposition that is taken in-person.

23              From time to time we're going to put

24    documents up on the screen, Mr. Waterhouse.

25    And it is important that I give you the
```

Page 13

```
 1                 WATERHOUSE - 10-19-21
 2    opportunity to review any portion of the
 3    document that you think you need in order to
 4    fully and completely answer the question.
 5                 So I would ask you to let me know if
 6    there is a portion of a document that you need
 7    to see in order to fully and completely answer
 8    the question.  Can you do that for me?
 9        A.    Yes.
10              MS. DANDENEAU:  Mr. Morris, I would
11              just note that we do have hard copies of
12              the documents that you sent, so if you can
13              just refer to the exhibit number as
14              reflected in the documents that you sent,
15              Mr. Waterhouse will be able to look at the
16              hard copies of those documents.
17              MR. MORRIS:  I appreciate that,
18              and -- and I will encourage him to do so.
19              There will be other documents that we did
20              not send to you that we'll be using today
21              though.
22        Q.    Okay.  With that as background, if
23    there is anything that I ask you, sir, that you
24    don't understand, will you let me know?
25        A.    Yes.
```

```
 1                 WATERHOUSE - 10-19-21

 2         Q.    Okay.  Are you currently employed?

 3         A.    Yes.

 4         Q.    By whom?

 5         A.    The Skyview Group.

 6         Q.    When did you become employed by the

 7   Skyview Group?

 8         A.    I believe March 1st of 2021.

 9         Q.    Do you have a title at Skyview?

10         A.    Yes.

11         Q.    What is your title?

12         A.    My title is chief financial officer.

13         Q.    Do you report to anybody in your

14   role as CFO?

15         A.    I don't, no.

16         Q.    No.  Is there a president or a CEO

17   of Skyview?

18         A.    Yes.

19         Q.    Who is that?

20         A.    That is Scott Ellington.

21         Q.    But you don't report to

22   Mr. Ellington; is that right?

23         A.    I don't think so.

24         Q.    Does Skyview Group --

25               MS. DANDENEAU:  Excuse me, we --
```

Page 15

```
 1                 WATERHOUSE - 10-19-21

 2           A.    I -- I -- I might.  I just -- I

 3      don't recall.

 4           Q.    Okay.  Does Skyview Group provide

 5      any services to any entity directly or

 6      indirectly owned or controlled by Jim Dondero?

 7           A.    Yes.

 8           Q.    Can you name -- is that pursuant to

 9      written contracts?

10           A.    Yes.

11           Q.    And do you know how many contracts

12      exist?

13           A.    Approximately six or so.

14           Q.    And is the Skyview Group made up of

15      individuals who were formerly employees of

16      Highland Capital Management, L.P.?

17           A.    No.

18           Q.    Do you know how many -- how many --

19      how many employees does Skyview have?

20           A.    Approximately 35.

21           Q.    And can you tell me how many of

22      those 35 are former officers, directors, or

23      employees of Highland Capital Management, L.P.?

24           A.    I don't know the exact number.

25           Q.    Is it more than 20?
```

Appx. 00836

```
                                                            Page 16
 1                  WATERHOUSE - 10-19-21

 2       A.    Yes.

 3       Q.    Is it more than 30?

 4       A.    I don't know.

 5       Q.    Can you tell me what portion of

 6   Skyview -- Skyview's revenue is derived from

 7   entities that are directly or indirectly owned

 8   or controlled by Jim Dondero?

 9              MS. DANDENEAU:  Mr. Morris, I mean,

10         you called Mr. Waterhouse here individually

11         for purposes of his testimony in connection

12         with the noticed litigation.  I have given

13         you some leeway to ask him some background

14         information about Skyview Group, but this

15         is not a substitute for a deposition in

16         connection with any other pending disputes

17         that exist.  And -- and we agreed to accept

18         the subpoena on the basis of he -- this is

19         testimony that he is giving in connection

20         with the noticed litigation.

21              I really think that you are now

22         going a little bit far afield from the

23         purpose of this deposition.

24              MR. MORRIS:  Okay.  It is -- I'm not

25         intending to use these -- the answers to
```

```
 1                  WATERHOUSE - 10-19-21
 2           these questions for any purpose other than
 3           this litigation.  I think you understand
 4           fully why I'm asking the questions, and I
 5           just have a couple more, if you will bear
 6           with me.
 7                  MS. DANDENEAU:  Okay.
 8                  MS. DEITSCH-PEREZ:  Can we have an
 9           agreement that an objection by one is an
10           objection for any other party here?
11                  MR. MORRIS:  Sure.  I would -- I
12           would encourage that, sure.
13                  MS. DEITSCH-PEREZ:  Thank you.
14                  MR. MORRIS:  It can't be sustained
15           or overruled more than one time, so...
16           Q.   Mr. Waterhouse, can you answer my
17      question, please.
18                  MS. DANDENEAU:  Do you want to
19           repeat it, Mr. Morris, for his benefit?
20                  MR. MORRIS:  Sure.
21           Q.   Can you -- can you tell me the
22      approximate portion of Skyview's revenue that
23      is derived from entities that are directly or
24      indirectly owned or controlled by Mr. Dondero?
25           A.   I don't know the exact number.
```

Page 18
```
 1                 WATERHOUSE - 10-19-21

 2        Q.    Is it more than 75 percent?

 3        A.    Yes.

 4        Q.    Is it more than 90 percent?

 5        A.    I don't know.

 6        Q.    Okay.  Can I refer to Highland

 7   Capital Management, L.P., as Highland?

 8        A.    Yes.

 9        Q.    All right.  And you previously

10   served as Highland's CFO; correct?

11        A.    Yes.

12        Q.    When did you join Highland?

13        A.    I don't recall the exact date.

14        Q.    Can you tell me what year?

15        A.    2006.

16        Q.    When did you -- in what year did you

17   become Highland's CFO?

18        A.    I don't recall the exact date.

19        Q.    I'm not asking you for the exact

20   date.  I'm asking you if you recall the year in

21   which you were appointed CFO.

22        A.    I don't recall the exact year.

23        Q.    Can you tell me which years it is

24   possible that you were appointed to CFO of

25   Highland?
```

```
 1                    WATERHOUSE - 10-19-21
 2          A.     2011 or 2012.
 3          Q.     Did you serve as Highland's CFO on a
 4   continuous basis from in or around 2011 or 2012
 5   until early 2021?
 6          A.     Yes.
 7          Q.     During that entire time you reported
 8   directly to Jim Dondero; correct?
 9          A.     I -- I don't know.
10          Q.     Is there anybody else you reported
11   to -- withdrawn.
12                 Did you report to Mr. Dondero for
13   some portion of the time that you served as
14   CFO?
15          A.     Yes.
16          Q.     Is there a portion of time that you
17   don't recall who you reported to?
18          A.     Yes.
19          Q.     What portion of time do you have in
20   your mind when you can't recall who you
21   reported to?
22          A.     From the 2011 to -- for
23   approximately a year or two.
24          Q.     Okay.  So is it fair to say that you
25   reported to Mr. Dondero in your capacity as CFO
```

Page 20

```
 1                  WATERHOUSE - 10-19-21

 2    from at least 2014 until the time you left

 3    Highland?

 4              MS. DANDENEAU:  Objection to form.

 5         A.   I don't want to speculate the exact

 6    or what year that changed or -- so I would like

 7    to stick with my testimony.

 8         Q.   Can you recall when you began

 9    reporting to Mr. Dondero?

10         A.   I don't recall.

11         Q.   Can you -- can you give me an

12    estimate of what year you think you might have

13    began reporting to Mr. Dondero?

14         A.   I will go back to my prior

15    testimony.

16         Q.   Okay.  There is no -- you have no

17    ability to tell me when you began reporting to

18    Mr. Dondero.

19              Do I have that right?

20              MS. DANDENEAU:  Objection to form.

21         A.   I don't recall.

22         Q.   Okay.  Do you recall who you might

23    have reported to before you began reporting to

24    Mr. Dondero?

25         A.   Yes.
```

Appx. 00841

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Who might you have reported to in

 3    your capacity as CFO before you started

 4    reporting to Mr. Dondero?

 5       A.    That would have been Patrick Boyce.

 6       Q.    Are you aware that Highland filed

 7    for bankruptcy on October 19th, 2019?

 8       A.    Yes.

 9       Q.    And we refer to that as the petition

10    date?

11       A.    Yes.

12       Q.    Okay.  Do you hold any professional

13    licenses, sir?

14       A.    Yes.

15       Q.    Can you tell me what professional

16    licenses you hold?

17       A.    I'm a certified public accountant.

18       Q.    Okay.  Anything else?

19       A.    No.

20       Q.    Do you have any other professional

21    licenses or certificates?

22       A.    When you say "professional license,"

23    that is not education?

24       Q.    Tell me -- sure.  Anything other

25    than a driver's license.
```

```
 1              WATERHOUSE - 10-19-21
 2         Do you have any other license or
 3    certificate or certification?
 4         A.   Are you asking, like, where I went
 5    to school and the --
 6         Q.   I am not.  I am not.  I didn't say
 7    education.  I didn't ask about degrees.
 8         Do you know what a license is?
 9         A.   Well, yeah, I mean, a license is
10    something you get after you receive a certain
11    level of proficiency.
12         Q.   Do you have any licenses or
13    certifications other than your CPA?
14              MS. DANDENEAU:  Objection, form.
15         I assume you mean professional
16         licenses, Mr. Morris; correct?
17         Q.   Can you answer my question, sir?
18         A.   Mr. Morris, I'm thinking.  I
19    don't -- I don't think I have any others.
20         Q.   Are you familiar with an entity
21    called Highland Capital Management Fund
22    Advisors?
23         A.   Yes.
24         Q.   Were you ever -- can we refer to
25    that entity as HCMFA?
```

```
 1                WATERHOUSE - 10-19-21

 2          A.    Yes.

 3          Q.    Were you ever employed by HCMFA?

 4          A.    Not that I recall.

 5          Q.    Were you ever -- did you ever hold

 6     the title of an officer or director of HCMFA?

 7          A.    Yes.

 8          Q.    What title did you hold?

 9          A.    Treasurer.

10          Q.    When did you become the treasurer of

11     HCMFA?

12          A.    I don't recall.

13          Q.    Can you tell me the year?

14          A.    I don't -- I don't know the year.

15          Q.    Can you approximate the year in

16     which you became the treasurer of HCMFA?

17          A.    I don't know.

18          Q.    Can you tell me if it was before or

19     after 2016?

20          A.    I don't recall.

21          Q.    Are you still the -- do you know if

22     you're still the treasurer of HCMFA today?

23          A.    Today, I am the acting treasurer for

24     HCMFA.

25          Q.    Is there a distinction between
```

Page 24

1              WATERHOUSE - 10-19-21

2    treasurer and acting treasurer?

3        A.    I said "acting treasurer" as I am an

4    employee of Skyview, as you previously

5    stated -- or asked.

6        Q.    But you are the treasurer of HCMFA

7    today; correct?

8        A.    I am -- I am the acting treasurer

9    for HCMFA.

10       Q.    How did you become the treasurer of

11   HCMFA?

12       A.    Are you asking how I became the

13   treasurer of HCMFA today?

14       Q.    How did you become appointed to

15   serve as the treasurer of HCMFA?

16       A.    Well, in -- in -- in what time

17   capacity?

18       Q.    The first time that you were

19   appointed.

20       A.    First time.  I believe I was asked

21   to serve as treasurer for HCMFA the first time.

22       Q.    By who?  Who asked you to do that?

23       A.    I don't recall.

24       Q.    Is there anything that would refresh

25   your recollection as to who appointed you as

```
 1                    WATERHOUSE - 10-19-21

 2       the treasurer of CF- -- HCMFA for the first

 3       time?

 4            A.    I don't -- I mean, there would be

 5       some documents, some legal documents.  I don't

 6       know where those are.

 7            Q.    How many times have you been

 8       appointed the treasurer of HCMFA?

 9            A.    I don't know.

10            Q.    Was it more than once?

11            A.    I don't know.

12            Q.    Can you tell me any period of time

13       since 2016 that you did not hold the title of

14       treasurer of HCMFA?

15                  MS. DANDENEAU:  Objection to form.

16            A.    I don't recall.

17            Q.    What are your duties and

18       responsibilities as the treasurer of HCMFA?

19            A.    My duties are to do the best job

20       that I can as the -- as an accountant and

21       finance guy.

22            Q.    What specific duties and

23       responsibilities do you have as the treasurer

24       of HCMFA?

25            A.    My duties are to do the best job
```

```
 1              WATERHOUSE - 10-19-21

 2   that I can as the accounting and finance person

 3   for HCMFA.

 4        Q.    As the accounting and finance person

 5   for HCMFA, do you have any particular areas of

 6   responsibility?

 7        A.    Yeah, it is to manage the accounting

 8   and finance function for HCMFA.

 9        Q.    Would that include -- do you have

10   responsibility for overseeing HCMFA's annual

11   audit?

12        A.    Can I please elaborate on my prior

13   question?

14        Q.    Of course.  You -- you are giving

15   answers.  I'm asking questions.

16        A.    Okay.  Yes, so the -- it -- like I

17   said, it is to manage the accounting finance

18   aspect, but I am, as we discussed, the

19   treasurer.  That is -- being treasurer is what

20   gives me that -- that management function.

21        Q.    Does anybody report to you in your

22   capacity as treasurer of HCMFA?

23        A.    I don't believe so.

24        Q.    Does HCMFA have a chief financial

25   officer?
```

```
 1              WATERHOUSE - 10-19-21

 2      A.    I don't -- I don't know.

 3      Q.    You don't know?

 4            You're the treasurer of HCMFA but

 5   you don't know if HCMFA has a chief financial

 6   officer.

 7            Do I have that right?

 8      A.    That's right.

 9      Q.    Okay.  Have you heard of a company

10   called NexPoint Advisors?

11      A.    Yes.

12      Q.    We will refer to that as NexPoint.

13   Okay?

14      A.    Okay.

15      Q.    Were you ever employed by NexPoint?

16      A.    I don't recall.

17      Q.    Did you ever hold any title with

18   respect to the entity known as NexPoint?

19      A.    Yes.

20      Q.    What titles have you held in

21   relation to NexPoint?

22      A.    Treasurer.  I think it was only

23   treasurer.

24      Q.    Can you tell me the approximate year

25   you became the treasurer of NexPoint?
```

```
 1              WATERHOUSE - 10-19-21
 2        A.    I don't know.
 3        Q.    Are you still the treasurer of
 4   NexPoint today?
 5        A.    I am the acting treasurer for
 6   NexPoint.
 7        Q.    When did your title change from
 8   treasurer to acting treasurer?
 9        A.    I don't know.
10        Q.    Did your duties and responsibilities
11   change at all when your title was changed from
12   treasurer to acting treasurer?
13        A.    I don't -- I don't believe so.
14        Q.    Why did --
15        A.    I still manage the finance and
16   accounting function for NexPoint.
17        Q.    Why did your title change from
18   treasurer to acting treasurer?
19        A.    I don't -- I'm using the term
20   "acting treasurer" as I'm a Skyview employee.
21   I don't -- I don't know -- again, I am a -- as
22   I am the Skyview employee.
23        Q.    Okay.
24        A.    And we -- we provide officer
25   services.
```

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    And you serve as an officer of

 3   HCMFA; correct?

 4        A.    I think we went over that with my

 5   testimony.  Yes, I'm the acting treasurer for

 6   HCMFA.

 7        Q.    And you are an officer of NexPoint;

 8   correct?

 9        A.    I think -- I am the acting treasurer

10   for NexPoint Advisors.

11        Q.    And -- and who appointed you acting

12   treasurer of NexPoint Advisors?

13        A.    I don't recall specifically.

14        Q.    Do you have any recollection of who

15   might have appointed you the treasurer of

16   NexPoint?

17        A.    I mean, it -- it -- I don't recall

18   exactly who it was.

19        Q.    Who were the possibilities?

20              MS. DEITSCH-PEREZ:  Object to the

21        form.

22        Q.    You can answer.

23        A.    Someone in the legal group for

24   NexPoint.  The other officers as well.

25        Q.    Have you heard of a company called
```

```
 1              WATERHOUSE - 10-19-21

 2    Highland Capital Management Services, Inc.?

 3         A.    Yes.

 4         Q.    We will refer to that as HCMS.

 5    Okay?

 6         A.    HCMS.  Okay.

 7         Q.    Were you ever employed by HCMS?

 8         A.    No.

 9         Q.    Have you ever held any titles in

10    relation to HCMF -- I apologize -- HCMS?

11         A.    Yes.

12         Q.    What titles have you held in

13    relation to HCMS?

14         A.    Treasurer and acting treasurer.

15         Q.    When did you first become treasurer

16    or acting treasurer of HCMS?

17         A.    I don't recall the exact dates.

18         Q.    Can you recall -- can you

19    approximate the year that you became the

20    treasurer of HCMS?

21         A.    I don't -- I don't know.

22         Q.    Are you still the treasurer of HCMS

23    today?

24         A.    I am the acting treasurer for HCMS.

25         Q.    And are your duties and
```

```
 1                WATERHOUSE - 10-19-21
 2   responsibilities as the acting treasurer for
 3   HCMS and the acting treasurer for NexPoint the
 4   same as your duties and responsibilities in
 5   your role as the acting treasurer of HCMFA?
 6        A.    More or less.
 7        Q.    Have you ever heard of a company
 8   called HCRE Partners, LLC?
 9        A.    Yes.
10        Q.    And do you understand that that
11   entity is now known today as NexPoint Real
12   Estate Partners?
13        A.    I did not know that.
14        Q.    All right.  Can we refer to HCRE
15   Partners as HCRE?
16             MS. DANDENEAU:  Objection to form.
17             Did you mean NexPoint Real Estate
18        Partners, Mr. Morris?
19             MR. MORRIS:  No.
20             MS. DANDENEAU:  Oh.
21             MR. MORRIS:  He said he wasn't
22        familiar that it was succeeded by that
23        entity.  So --
24             MS. DANDENEAU:  Okay.
25             MR. MORRIS:  -- let's go with what
```

Page 32

1                   WATERHOUSE - 10-19-21

2          the witness knows.

3          Q.    You're familiar with an entity

4     called HCRE Partners, LLC; correct?

5          A.    Yes.

6          Q.    Okay.  So that is the entity that we

7     will refer to as HCRE.  If you're aware of any

8     successor, that is great.  If not, let's just

9     define it as such.

10               Have you ever been employed by HCRE

11    or any entity that you know to have succeeded

12    HCRE?

13         A.    No.

14         Q.    Did you ever serve as an officer or

15    director of HCRE or any successor?

16         A.    Not that I recall.

17         Q.    Okay.  Can we refer to NexPoint and

18    HCMFA as the advisors?

19         A.    Yes.

20         Q.    In general, the advisors provided

21    investment advisory services to certain retail

22    funds; correct?

23         A.    Yes.

24         Q.    And we will refer to the retail

25    funds that are served by the advisors

Page 33

```
 1                 WATERHOUSE - 10-19-21

 2    collectively as the retail funds; is that okay?

 3          A.    Okay.

 4          Q.    Each of the retail funds is governed

 5    by a board; correct?

 6          A.    Yes.

 7          Q.    And do you know the people who serve

 8    on the boards of the retail funds?

 9                MS. DANDENEAU:   Objection to form.

10          A.    I don't know all of them.

11          Q.    Do you know whether the same people

12    serve on the board of each of the retail funds

13    as we've defined that term?

14          A.    Which -- so when you say "retail

15    funds" -- again, I want to be -- what retail

16    funds are you referring to, because there are

17    -- there are several distinctions?

18                What retail funds are you using when

19    you refer to them?

20          Q.    That is why -- that is why I tried

21    to define the terms.  So let me do it again.

22                Retail funds for the purposes of

23    this deposition means any retail fund to which

24    either of the advisors provides advisory

25    services.  Okay?
```

Appx. 00854

```
 1                   WATERHOUSE - 10-19-21
 2         A.     Okay.
 3         Q.     Okay.  So do you know whether the
 4    same people serve on the board of each of the
 5    retail funds?
 6         A.     I don't know.
 7         Q.     Were you ever employed by any of the
 8    retail funds?
 9         A.     No.
10         Q.     No?
11         A.     No.
12         Q.     Okay.  Do you have any title with
13    respect to any of the retail funds?
14         A.     Yes.
15         Q.     What titles do you hold --
16    withdrawn.
17                Do you have the same titles with
18    respect to all of the retail funds or do
19    they -- or just something else?
20                MS. DANDENEAU:  Objection to form.
21         Q.     Withdrawn.
22                Do you have the same title with
23    respect to each of the retail funds?
24         A.     No.
25         Q.     Tell me which title you have with
```

Page 35

1              WATERHOUSE - 10-19-21

2    respect to each retail fund.

3              Actually, let's do it a different

4    way.  I withdraw the question.

5              Can you give me one title you have

6    in relation to any retail fund?

7         A.    Yes.

8         Q.    What title -- what title can you

9    give me?

10        A.    Principal executive officer.

11        Q.    Do you serve as principal executive

12   officer for each of the retail funds?

13        A.    No.

14        Q.    Can you identify for me the retail

15   funds in which you serve as the principal

16   executive officer?

17        A.    Yes.  Highland Funds 1, Highland

18   Funds 2, Highland Income Fund, Highland Global

19   Allocation Fund.

20        Q.    I'm sorry, you said "Global

21   Allocation Fund"?

22        A.    Yes.

23             VIDEOGRAPHER:  Excuse me,

24        Mr. Morris.  This is the videographer.  I'm

25        concerned about the lighting in the

Page 36

```
 1              WATERHOUSE - 10-19-21

 2       witness' camera.

 3            Do you want to go off the record and

 4       make some adjustments?

 5            MR. MORRIS:  Sure, but just for this

 6       purpose.  I don't want to take a break.  We

 7       just started.

 8            MS. DANDENEAU:  Yeah, that is fine.

 9       That is fine.  We're going to put you on

10       mute.

11            MR. MORRIS:  All right.

12            MS. DANDENEAU:  I'm going to try to

13       open up some of the shades.

14            VIDEOGRAPHER:  We're going off the

15       record at 10:08 a.m.

16       (Recess taken 10:08 a.m. to 10:11 a.m.)

17            VIDEOGRAPHER:  We are back on the

18       record at 10:11 a.m.

19       Q.    Mr. Waterhouse, when did you become

20    the principal executive officer of the four

21    retail funds that you just identified?

22       A.    I don't recall.

23       Q.    Do you recall the approximate year

24    that you became the principal executive officer

25    of the four funds?
```

Page 37

```
 1            WATERHOUSE - 10-19-21

 2       A.    2021.

 3       Q.    Did you ever hold any title with

 4  respect to any of the four funds you have just

 5  identified other than principal executive

 6  officer?

 7       A.    I don't recall.

 8       Q.    Is it possible that you held a

 9  position or a title with the four funds you

10  just identified prior to 2021?

11       A.    Yes.

12       Q.    But you don't recall if you did or

13  not; do I have that right?

14       A.    No.  You -- I thought you asked, did

15  I hold other titles.

16       Q.    Did you hold any title at the four

17  retail funds for which you now serve as

18  principal executive officer at any time prior

19  to 2021?

20       A.    Yes.

21       Q.    What titles did you hold?

22       A.    I don't recall all the titles.

23       Q.    Do you recall any of the titles?

24       A.    Yes.

25       Q.    What titles do you recall holding at
```

Appx. 00858

Page 38

1                    WATERHOUSE - 10-19-21

2     those four retail funds before 2021?

3          A.     Principal executive officer.

4          Q.     Were you the principal executive

5     officer of the four retail funds that you have

6     identified?

7          A.     Sorry, could you repeat the

8     question?

9          Q.     Were you the principal executive

10    officer for each of the four retail funds that

11    you have identified?

12         A.     Yes.

13         Q.     When did you become the principal

14    executive -- withdrawn.

15              Can you give me the approximate year

16    that you became the principal executive officer

17    for each of the four retail funds you've

18    identified?

19         A.     I don't recall.

20         Q.     What are your duties and

21    responsibilities as the principal executive

22    officer of these four retail funds?

23         A.     It is to manage the finance and

24    accounting positions.

25         Q.     So at the same time you serve as the

Page 39

```
 1              WATERHOUSE - 10-19-21

 2    treasurer of the advisors, you also serve as

 3    the principal executive officer of these four

 4    retail funds; correct?

 5         A.    Yes.

 6         Q.    Did you ever hold any title with

 7    respect to any other retail fund?

 8         A.    Not that I recall.

 9         Q.    During the period that you served as

10    Highland's CFO, from time to time Highland

11    loaned money to certain of its officers and

12    employees; correct?

13         A.    Yes.

14         Q.    During the period that you served as

15    Highland's CFO, from time to time Highland

16    loaned money to certain --

17         A.    Let me -- let me retract that,

18    sorry, that -- you asked during the time I was

19    CFO, Highland loaned moneys to employees.  I

20    don't -- I don't recall that during my tenure

21    of CFO.

22         Q.    You have no recollection during the

23    time that you were the CFO of Highland of

24    Highland ever loaning any money to any officer

25    or director of Highland?
```

Appx. 00860

Page 40

```
 1                WATERHOUSE - 10-19-21
 2        A.    I don't recall during my tenure of
 3   Highland or my -- as CFO of Highland -- yeah,
 4   if there are any loans as CFO of Highland.
 5        Q.    I'm just talking about officers and
 6   employees right now.  You have no recollection
 7   of Highland ever making a loan to any of its
 8   officers or employees during the time that you
 9   served as CFO.  Do I have that right?
10             MS. DANDENEAU:  Objection to form.
11        A.    So I thought you were saying
12   officers and employees as CFO, right, so there
13   were -- I mean, okay, yes.
14        Q.    I would ask you to listen carefully
15   to my question.  If I -- if I'm not clear, let
16   me know, but I'm really trying to be as clear
17   as I can.
18        A.    I'm listening as carefully as I can,
19   and you are asking very specific questions in a
20   timeline.  And I'm trying to answer your
21   questions as specifically as I can, and I
22   apologize if -- if I'm going back.  I am -- you
23   are asking very specific questions.  Thank you.
24        Q.    During the period that you served as
25   Highland's CFO, from time to time Highland
```

Appx. 00861

Page 41

```
 1                 WATERHOUSE - 10-19-21
 2    loaned money to certain corporate affiliates;
 3    correct?
 4              MS. DANDENEAU:  Objection to form.
 5       A.    What are corporate affiliates?
 6       Q.    How about the ones that are in
 7    Highland's audited financial statements under
 8    the section entitled Loans to Affiliates.  Why
 9    don't we start with those.  Do you have any
10    understanding of what the phrase "affiliates"
11    means?
12              MS. DANDENEAU:  Objection to form.
13       A.    I understand what affiliates are,
14    yet affiliates can have different meanings in
15    different contexts, so...
16       Q.    Why don't you -- why don't you tell
17    me what your understanding of the term
18    "affiliate" is in relation to Highland Capital
19    Management, L.P.
20       A.    Is that a -- it depends on the
21    context.
22       Q.    How about the context of making
23    loans?
24              MS. DANDENEAU:  Objection to form.
25       A.    I didn't make the determination of
```

Appx. 00862

```
 1              WATERHOUSE - 10-19-21
 2   who an affiliate was or is at the time those --
 3   I didn't -- that wasn't my job to make a
 4   determination of who an affiliate is.
 5        Q.    All right.  So as the CFO of
 6   Highland, do you have any ability right now to
 7   tell me which companies that were directly or
 8   indirectly owned and/or controlled by
 9   Mr. Dondero in whole or in part received loans
10   from Highland Capital Management, L.P.?
11              MS. DANDENEAU:  Objection to form.
12              MS. DEITSCH-PEREZ:  Objection, form.
13        A.    Yes.
14        Q.    Okay.  Identify every entity that
15   you can think of that was directly or
16   indirectly owned and/or controlled by
17   Mr. Dondero in whole or in part that received a
18   loan from Highland Capital Management, L.P.
19              MR. RUKAVINA:  Objection, legal
20        conclusion.
21        A.    NexPoint Advisors, Highland Capital
22   Management Fund Advisors, HCM Services,
23   Dugaboy.  Sorry, I don't think -- Dugaboy
24   doesn't fit that definition.  You said owned
25   and controlled.  I don't think that that
```

```
 1              WATERHOUSE - 10-19-21
 2    definition --
 3         Q.    I said owned and/or controlled.
 4         A.    I don't -- again, I'm not -- I'm not
 5    the legal expert.  I don't think it controls --
 6    he controls Dugaboy, so again, I'm not the
 7    legal person.
 8         Q.    I'm not asking you for a legal
 9    conclusion, sir.  I'm asking you for your
10    knowledge, okay, as the CFO -- the former CFO
11    of Highland Capital Management, other than
12    NexPoint, HCMFA, and HCMF -- HCMS, can you
13    think of any other entities that were owned
14    and/or controlled directly or indirectly in
15    whole or in part by Jim Dondero who received a
16    loan from Highland Capital Management, L.P.?
17              MS. DANDENEAU:  Objection to form.
18         A.    HCRE.
19         Q.    Any others?
20         A.    That is -- that is all I can think
21    of.
22         Q.    And you're aware that from time to
23    time while you were the CFO, Highland loaned
24    money to Jim Dondero; correct?
25         A.    Yes.
```

1          WATERHOUSE - 10-19-21

2          Q.    Okay.  Can we refer to the four

3     entities that you just named and Mr. Dondero as

4     the affiliates?

5          A.    So that would be Jim Dondero,

6     NexPoint Advisors, Highland Capital Management

7     Fund Advisors, and HCRE.

8          Q.    And HCMS?

9          A.    And HCMS, okay.

10         Q.    And can we refer to the loans that

11    were given to each of those affiliates as the

12    affiliate loans?

13         A.    Yes.

14         Q.    And is it fair to say that each of

15    the affiliates were the borrowers under the

16    affiliate loans as we're defining the term?

17              MR. RUKAVINA:  Objection, legal

18         conclusion.

19         A.    The borrowers are whoever were on

20    the notes.  I don't -- I don't know.  I'm not

21    the legal person.

22         Q.    But you --

23         A.    I don't know.

24         Q.    You do know, as Highland's former

25    CFO, that each of the affiliates that you have

Page 45

```
 1                    WATERHOUSE - 10-19-21
 2    identified tendered notes to Highland; correct?
 3              MR. RUKAVINA:  Hey, John, will you
 4         just give me a running objection to legal
 5         conclusion to HCM --
 6              MR. MORRIS:  No.  No, if you want to
 7         object --
 8              MR. RUKAVINA:  I will object every
 9         time.  Object to legal conclusion.
10              MR. MORRIS:  That is fine.
11    A.    Sorry, can you repeat the question?
12    Q.    Are you aware that each of the --
13    that each of the affiliates, as we have defined
14    the term, gave to Highland a promissory note in
15    exchange for the loans?
16              MR. RUKAVINA:  Objection to the
17         extent that calls for a legal conclusion.
18    A.    I don't.
19    Q.    No, you don't know that?
20    A.    No, they didn't -- you said they
21    exchanged a promissory note for a loan.  I
22    don't -- I don't understand that question, so I
23    said no.
24    Q.    At the time of the bankruptcy
25    filing, did Highland have in its possession
```

Appx. 00866

1              WATERHOUSE - 10-19-21

2    promissory notes that were signed by each of

3    the affiliates?

4         A.    Yes.

5         Q.    To the best of your knowledge,

6    during the time that you served as Highland's

7    CFO, did Highland disclose to its outside

8    auditors all of the loans that were made to

9    affiliates?

10             MR. RUKAVINA:  Objection, that calls

11        for a legal conclusion.

12             MS. DEITSCH-PEREZ:  I also couldn't

13        hear you, John, because there was some

14        garbling on -- on the -- on the call.

15             MR. MORRIS:  Folks, I've got to tell

16        you this is not going well, and I'm

17        reserving my right --

18             MS. DANDENEAU:  John, it was just

19        the end of that question.  It was just the

20        end of that question.  I couldn't hear it

21        either.  Sorry, if you could repeat it,

22        please.

23             MR. MORRIS:  That is less than an

24        hour into this, but folks are trying to run

25        out the clock, and so I'm just going to

Page 47

```
 1                  WATERHOUSE - 10-19-21
 2        state that now.
 3             MS. DANDENEAU:  You know, and,
 4        Mr. Morris, I really object to that.  I
 5        mean --
 6             MR. MORRIS:  Okay.
 7             MS. DANDENEAU:  -- Mr. Waterhouse
 8        just told you he's trying to listen to your
 9        questions and answer them carefully, and
10        you have no basis for saying that.
11             MR. MORRIS:  Okay.
12             MS. DANDENEAU:  This does not --
13        this is not an experienced witness, so he's
14        trying to do the best he can.
15        Q.   Mr. Waterhouse, during the time that
16   you served as Highland's CFO, did Highland
17   disclose to its outside auditors all of the
18   loans that it made to each of the affiliates
19   that you have identified?
20             MR. RUKAVINA:  Objection, legal
21        conclusion.
22        A.   Yes.
23        Q.   To the best of your knowledge, while
24   you were Highland's CFO, were all of the
25   affiliate loans described in Highland's audited
```

Page 48

1                   WATERHOUSE - 10-19-21

2      financial statements?

3                   MR. RUKAVINA:  Objection, legal

4          conclusion.

5          A.    When an audit was performed, any

6      loans that were made by Highland to the

7      affiliates were disclosed to auditors.

8          Q.    Are you aware of any loan that was

9      made to any affiliate that was not disclosed to

10     the auditors?

11         A.    I'm not aware.

12         Q.    To the best of your knowledge, did

13     each of the affiliates who were --

14     (inaudible) -- loaned from Highland execute a

15     promissory note in connection with that loan?

16                  MR. RUKAVINA:  Objection, legal

17         conclusion.

18         A.    Sorry, you -- halfway through the

19     question it got muffled.

20                  Can you repeat that again?

21         Q.    To the best of your knowledge, did

22     every affiliate execute a promissory note in

23     connection with each loan that it obtained from

24     Highland?

25                  MR. RUKAVINA:  Objection, legal

Appx. 00869

1              WATERHOUSE - 10-19-21

2         conclusion.

3         A.    Yes.

4         Q.    You are not aware of any loan that

5    any affiliate ever obtained from Highland where

6    the affiliate did not give a promissory note in

7    return; is that fair?

8         A.    Yes, I'm not aware.

9         Q.    And to the best of your knowledge,

10   did Highland loan to each affiliate an amount

11   of money equal to the principal amount of each

12   promissory note?

13             MR. RUKAVINA:  Objection, legal

14        conclusion.

15        A.    Yes.

16        Q.    During the time that you served as

17   CFO, did Highland ever loan money to

18   Mark Okada?

19        A.    I -- I don't recall.

20        Q.    Did you ever see any promissory

21   notes executed by Mark Okada?

22        A.    I don't recall.

23        Q.    Do you know if Highland ever forgave

24   any loan that it ever made to Mr. Okada?

25        A.    I don't recall.

 1            WATERHOUSE - 10-19-21

 2       Q.    Do you recall if Mr. Okada paid back

 3   all principal and interest due and owing under

 4   any loan he obtained from Highland?

 5            MS. DEITSCH-PEREZ:  Objection to

 6       form.

 7            MS. DANDENEAU:  Objection to form.

 8       A.    I don't recall.

 9       Q.    Do you recall whether -- during your

10   time as CFO, whether Highland ever loaned money

11   to Jim Dondero?

12       A.    Yes.

13       Q.    To the best of your knowledge, did

14   Mr. Dondero sign and deliver to Highland a

15   promissory note in connection with each loan

16   that he obtained from Highland?

17       A.    If you are referring to the

18   promissory notes that, you know, part of

19   Highland's records, yes.

20       Q.    Okay.  You're not aware of any loan

21   that Mr. Dondero took from Highland that wasn't

22   backed up by -- by a promissory note with a

23   face -- with a principal amount equal to the

24   amount of the loan; correct?

25       A.    Am I aware that Jim Dondero took a

1              WATERHOUSE - 10-19-21

2     loan?

3         Q.    Without giving a -- let me ask a

4     better question.  I'm sorry, Mr. Waterhouse.

5              Are you aware of any loan that

6     Mr. Dondero obtained from Highland where he

7     didn't give a promissory note in return?

8         A.    I'm not aware.

9         Q.    During the time that you served as

10    Highland's CFO, did Highland ever forgive any

11    loans, in whole or in part, that it made to

12    Mr. Dondero?

13        A.    Not that I'm aware.

14        Q.    At the time that you served as

15    Highland's CFO, did Highland ever forgive any

16    loan, in whole or in part, that it made to any

17    affiliate as we've defined the term today?

18        A.    Not that I'm aware.

19        Q.    During the time that you served as

20    Highland's CFO, did Highland ever forgive, in

21    whole or in part, any loan that it ever made to

22    any officer or employee?

23        A.    Highland forgave loans to officers

24    and employees.  It may not have been at the

25    time when my title was CFO.

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Okay.  And so I appreciate the

 3  distinction.

 4              Is it fair to say that, to the best

 5  of your knowledge, Highland did not forgive a

 6  loan that it made to an officer or employee

 7  after 2013?

 8              MS. DANDENEAU:  Objection to form.

 9      A.    I don't recall.

10      Q.    To the best of your knowledge, did

11  Highland disclose to its auditors every

12  instance where it forgave, in whole or in part,

13  a loan that it had made to one of its officers

14  or employees?

15      A.    No.

16      Q.    Can you think of -- can you -- can

17  you identify any loan to an officer or employee

18  that was forgiven by Highland, in whole or in

19  part, that was not disclosed to Highland's

20  outside auditors?

21      A.    Look, I don't recall all of the

22  loans and the loan forgiveness.  I just know as

23  part of the audit process there is a

24  materiality concept.

25              So if there were loans to employees
```

```
 1                   WATERHOUSE - 10-19-21
 2     that were of -- you know, that were deemed
 3     immaterial, those items may not have been
 4     disclosed by the team to the auditors.
 5          Q.    I appreciate that.
 6                Do you have an understanding as to
 7     what the level of materiality was?
 8          A.    I don't recall.
 9          Q.    As the CFO of Highland, to the best
10     of your knowledge, did Highland disclose to its
11     outside auditors every loan that was forgiven,
12     in whole or in part, that was material as that
13     term was defined by the outside auditors?
14          A.    Yes.
15          Q.    And do you recall where -- do you
16     recall where the definition of materiality can
17     be found for -- for this particular purpose?
18                MS. DANDENEAU:  Objection to form.
19          A.    No.  You -- I don't determine
20     materiality.
21          Q.    Okay.  I'm just asking you if you
22     can help me understand where it is, but I think
23     we will find it in a few minutes.
24                You are aware that Highland has
25     commenced lawsuits against each of the
```

Case 21-03005-sgj Doc 86-14 Filed 10/29/21   Entered 10/29/21 21:52:53   Page 593 of 946

```
 1              WATERHOUSE - 10-19-21

 2   affiliates, as we've defined the term, to

 3   collect under certain promissory notes; is that

 4   right?

 5        A.    Yes.

 6        Q.    And are you familiar with the notes

 7   that are issue -- at issue in the lawsuits?

 8              MS. DANDENEAU:  Objection to form.

 9        A.    Generally familiar.

10        Q.    Can we refer to the lawsuits that

11   Highland has commenced against the affiliates

12   collectively as the lawsuits?

13        A.    Yes.  And, again, the affiliates are

14   NexPoint, HCMFA, HCMS, and HCRE.

15        Q.    And Mr. Dondero?

16        A.    Okay.  See, that is a new -- and now

17   Mr. Dondero is included in your affiliate

18   definition.

19        Q.    I just --

20        A.    I thought affiliates -- I thought

21   affiliates were just the four prior entities,

22   so I just want to be clear.

23        Q.    I appreciate that.  So let's --

24   let's keep them separate and let's refer to the

25   four corporate entities as the affiliates, and
```

```
 1                 WATERHOUSE - 10-19-21

 2   Mr. Dondero we will call Mr. Dondero.  Okay?

 3        A.    Okay.  Thank you.  As you can see,

 4   Mr. Morris, there is a lot of entities -- a lot

 5   here.  I just want to be clear.

 6        Q.    Okay.  Now, the affiliates of

 7   Mr. Dondero signed promissory notes that are

 8   not subject to the lawsuit.

 9              Do you understand that?

10              MS. DANDENEAU:  Objection to form.

11        A.    The affiliates and Mr. Dondero

12   signed --

13        Q.    You know what?  I will skip it.

14   That is okay.  Okay.

15              From time to time while you were

16   Highland's CFO, payments were applied against

17   principal and interests that were due under the

18   notes that were tendered by the affiliates and

19   Mr. Dondero; correct?

20              MR. RUKAVINA:  Objection to the

21         extent that calls for a legal conclusion.

22        A.    Yes.

23        Q.    Did Highland have a process where --

24   whereby payments would be applied against

25   principal and interest against the notes that
```

Page 56

```
 1                WATERHOUSE - 10-19-21
 2    were given by the affiliates and Mr. Dondero?
 3         A.    Yes.
 4         Q.    Can you describe the process for me?
 5         A.    The process, payment should be
 6    applied as laid out in the -- in the promissory
 7    note.
 8         Q.    From time to time were payments made
 9    that were not required under the promissory
10    notes?
11               MS. DANDENEAU:  Objection to form.
12         A.    Yes.
13         Q.    Who was responsible for deciding
14    when and how much the payments would be made
15    with respect to each of the notes that were
16    issued by the affiliates and Mr. Dondero?
17         A.    Who was responsible for deciding how
18    much was paid prior to the due date?
19         Q.    Yes.
20         A.    I don't know.
21         Q.    Did you approve of each payment that
22    was made against principal and interest on the
23    notes that were given by the affiliates and
24    Mr. Dondero?
25               MS. DANDENEAU:  Objection to form.
```

Appx. 00877

Page 57

```
 1              WATERHOUSE - 10-19-21
 2      A.    Did I approve the payments?  I
 3  approve -- I approve -- if there was cash -- if
 4  there was cash being repaid on a note payment,
 5  yes, I approved in the general sense of being
 6  made aware of the payment and the amount.
 7      Q.    And are you the person who
 8  authorized Highland's employees to effectuate
 9  those payments?
10      A.    Yes.
11      Q.    When you gave the instruction to
12  effectuate the payment, did you obtain
13  Mr. Dondero's prior approval?
14      A.    I mean, it -- I mean, it -- it
15  depends.
16      Q.    Can you think of any instance where
17  you directed Highland's employees to make a
18  payment of principal or interest against any
19  note that was tendered by an affiliate or
20  Mr. Dondero that Mr. Dondero did not approve of
21  in advance?
22      A.    I can't recall specifically.
23      Q.    Can you identify -- withdrawn.
24            Did Mr. Dondero ever tell you that a
25  payment that was made against principal and
```

Appx. 00878

Page 58

```
 1              WATERHOUSE - 10-19-21
 2   interest due under one of the notes that was
 3   tendered by an affiliate or himself should not
 4   have been made?
 5        A.    Yes.
 6        Q.    Can you identify the payment for me?
 7        A.    It would be for -- for NexPoint
 8   Advisors.
 9        Q.    Okay.  And when did Mr. Dondero tell
10   you that a payment that you had initiated on
11   behalf of NexPoint should not have been made?
12        A.    I wasn't initiating payment.  It was
13   in the context of the -- I think you used this
14   term, "the advisors," so NexPoint Advisors and
15   Highland Capital Management Fund Advisors had
16   overpaid on certain agreements with Highland
17   Capital Management, L.P.  And as a part of that
18   process, the advisors -- what I was told at the
19   time were in talks and negotiations and
20   discussions with Highland Capital Management,
21   L.P., on offsets in relation to those
22   overpayments.
23        Q.    When did this conversation take
24   place?
25              MS. DANDENEAU:  Objection to form.
```

Appx. 00879

```
 1                    WATERHOUSE - 10-19-21
 2          A.    I don't recall specifically.
 3          Q.    Do you recall what year it was?
 4          A.    Yes.
 5          Q.    What year did the conversation with
 6   Mr. Dondero take place that you just described?
 7          A.    2020.
 8          Q.    Okay.  Do you remember if it was
 9   December 2020?
10          A.    It -- it -- I don't -- I don't
11   recall what month specifically, but it would
12   have been November or December.
13          Q.    And we're talking here about a
14   payment of principal and/or interest that was
15   due -- withdrawn.
16                We're talking here about a payment
17   of principal and interest that was applied
18   against NexPoint's note; correct?
19                MS. DANDENEAU:  Objection to form.
20          A.    I don't recall what that payment
21   consisted of.
22          Q.    Is it possible that the payment you
23   have in mind related to the shared services
24   agreement?
25                MS. DANDENEAU:  Objection to form.
```

Page 60

```
 1                 WATERHOUSE - 10-19-21

 2       A.    No.

 3       Q.    Are you certain that the payment --

 4  that the payment that you have in mind related

 5  to the promissory note that NexPoint issued in

 6  favor of Highland?

 7             MS. DANDENEAU:  Objection to form.

 8       A.    Yes.

 9       Q.    Okay.  Other than that one payment,

10  can you identify any other instance where

11  Mr. Dondero told you that a payment should not

12  have been applied against principal and

13  interest under any promissory note tendered by

14  any affiliate or Mr. Dondero?

15             MS. DANDENEAU:  Objection to form.

16             MS. DEITSCH-PEREZ:  Objection to

17       form.

18       A.    Not that I recall.

19       Q.    Thank you very much.

20             Do you know if Mr. Dondero approved

21  in advance of each loan made to each affiliate

22  and himself during the time that you were the

23  CFO?

24             MS. DEITSCH-PEREZ:  Object to the

25       form.
```

Appx. 00881

```
 1                  WATERHOUSE - 10-19-21

 2        A.    Yes, generally.

 3        Q.    Can you identify any loan that was

 4   ever made to an affiliate or to Mr. Dondero

 5   that Mr. Dondero did not approve of in advance?

 6        A.    Other than the ones that are in

 7   dispute, I'm not aware.

 8        Q.    Do you believe that Mr. Dondero did

 9   not approve of each of the loans that are in

10   dispute in advance of the time that the loan

11   was made?

12             MS. DANDENEAU:  Objection to form.

13        A.    Given what is in the dispute, you

14   know, and -- and -- and the way things might --

15   yeah, I mean...

16        Q.    I am not asking about the dispute,

17   and it was probably my mistake to follow you

18   there.

19             Were you aware of every loan made by

20   Highland to each of its affiliates and

21   Mr. Dondero while you were the CFO at the time

22   each loan was made?

23        A.    Was I aware of every loan, yes.

24        Q.    Okay.  And if you put yourself back

25   in time, do you recall that any of the loans
```

Page 62

```
 1                WATERHOUSE - 10-19-21
 2    that were made to one of the affiliates or
 3    Mr. Dondero during the time that you were the
 4    CFO was made without Mr. Dondero's prior
 5    knowledge and approval?
 6         A.    Not that I recall.
 7         Q.    Thank you.  In fact, do you -- as
 8    the CFO, would you have allowed Highland to
 9    loan money to an affiliate or to Mr. Dondero
10    without obtaining Mr. Dondero's prior approval?
11              MS. DANDENEAU:  Objection to form.
12         A.    I can't -- there was so many times
13    over the years, I can't speak for every single
14    one, but generally, yes, I -- I spoke to him.
15         Q.    You -- you never -- you never --
16    withdrawn.  I will just take that.
17              Can you recall any payment that was
18    ever made against principal and interest on a
19    note that was issued in favor of Highland by an
20    affiliate or Mr. Dondero that you personally
21    did not know about in advance?
22         A.    There are so many through the years,
23    I don't -- I don't -- I don't recall every
24    single one.
25         Q.    Okay.  Can you identify any payment
```

Appx. 00883

Page 63

```
 1                    WATERHOUSE - 10-19-21
 2    that was made against principal and interest on
 3    any note tendered by any affiliate or
 4    Mr. Dondero that you didn't know about in
 5    advance?
 6         A.    I don't recall.
 7         Q.    Other than Mr. Dondero -- withdrawn.
 8              Did anybody at Highland have the
 9    authority to make a payment against principal
10    and interest due under a loan given to the
11    affiliates and Mr. Dondero without your
12    knowledge and approval?
13              MS. DANDENEAU:  Objection to form.
14         A.    Sorry, there was -- to make a
15    payment on an affiliate loan, what you are
16    saying would it require my knowledge and
17    approval, yes.
18         Q.    Okay.  I appreciate that.  Thank
19    you.
20              Did anybody at Highland have the
21    authority, to the best of your knowledge, to
22    effectuate a loan to an affiliate without
23    Mr. Dondero's prior knowledge and approval?
24              MS. DANDENEAU:  Objection to form.
25         A.    I can't speak for all, but
```

Appx. 00884

 1                 WATERHOUSE - 10-19-21

 2   generally, yes.

 3       Q.    Did you personally communicate with

 4   Mr. Dondero to let him know each time a payment

 5   of principal or interest was being made against

 6   any note that was tendered by an affiliate or

 7   Mr. Dondero to Highland?

 8       A.    I don't -- are you saying, did I let

 9   Mr. Dondero know if a payment was made on any

10   affiliate or loan to Mr. Dondero?  I mean,

11   not -- not every -- no.

12       Q.    Let me ask it this way:  Did you

13   have a practice of informing Mr. Dondero when

14   payments were made against principal and

15   interest on any note that was tendered by an

16   affiliate or Mr. Dondero?

17              MS. DEITSCH-PEREZ:  Objection to

18       form.

19              MS. DANDENEAU:  Objection to form.

20       A.    No, I did not.

21       Q.    Did Mr. Dondero ever tell you that a

22   payment of principal or interest had been made

23   against a note that was tendered by an

24   affiliate or himself that he had been unaware

25   of?

Page 65

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Not that I recall.

 3        Q.    Are you aware that Mr. Dondero and

 4   the affiliates -- withdrawn.

 5              Are you aware that Mr. Dondero

 6   NexPoint, HCRE, and HCMS all contend that they

 7   do not have to pay on any of the notes they

 8   issued because they are subject to an oral

 9   agreement between Mr. Dondero and Nancy

10   Dondero, in her capacity as the trustee of the

11   Dugaboy Investment Trust?

12              MS. DANDENEAU:  Objection to form.

13        A.    I didn't -- I didn't -- I didn't

14   know that it was all notes.

15        Q.    Okay.  Are you -- did you ever learn

16   that there was an oral agreement between Jim

17   Dondero and Nancy Dondero pertaining to any

18   notes issued by any affiliate or Mr. Dondero?

19              MS. DEITSCH-PEREZ:  Object to the

20        form.

21        A.    Yes.

22        Q.    Do you have any understanding as to

23   the terms of that agreement?

24        A.    Yes.

25        Q.    What is your understanding of the
```

Page 66

```
 1               WATERHOUSE - 10-19-21
 2    terms of the agreement?
 3        A.    That there were certain milestones
 4    that had to be reached.
 5        Q.    Do you have any understanding of the
 6    terms of the agreement between Mr. Dondero and
 7    Nancy Dondero concerning any of the notes
 8    issued by the affiliates or Mr. Dondero other
 9    than that there have to be milestones reached?
10              MS. DEITSCH-PEREZ:  Object to the
11         form.
12        A.    There are milestones, I found out
13    yesterday, or there was some --
14              MS. DANDENEAU:  Okay.  I'm just
15         going to object to the extent that you
16         learned anything in conversations with
17         counsel, please don't reveal -- that is
18         privileged, and don't reveal any privileged
19         communications.
20              THE WITNESS:  Okay.
21        A.    So I'm not aware of anything else.
22        Q.    Do you know what the milestones
23    were?
24              MS. DANDENEAU:  Objection to form.
25        A.    I don't.
```

Page 67

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Do you know anything about -- do you

 3   know what promissory notes the agreement

 4   covered?

 5        A.    I don't.

 6        Q.    Do you know if -- if Jim and Nancy

 7   Dondero entered into one agreement or more than

 8   one agreement?

 9              MS. DEITSCH-PEREZ:  Object to the

10        form.

11        A.    I don't know.

12        Q.    Do you know if the agreement is in

13   writing?

14        A.    I don't know.

15        Q.    How did you learn of the existence

16   of the agreement?

17              MS. DANDENEAU:  Objection to form.

18        Again --

19        A.    I don't -- I don't recall who told

20   me.

21        Q.    You have no recollection of who told

22   you about this agreement between Jim and Nancy

23   Dondero?

24              MS. DEITSCH-PEREZ:  Object to the

25        form.
```

Page 68

```
 1                    WATERHOUSE - 10-19-21
 2        A.    I don't recall.
 3        Q.    Do you recall how you learned of the
 4   agreement?
 5              Was it in a meeting?  Was it in a
 6   phone call?  Was it in an email?
 7        A.    I don't recall.
 8        Q.    Do you recall when you learned of
 9   the agreement?
10        A.    Not specifically.
11        Q.    Do you recall what year you learned
12   of the agreement?
13        A.    In -- look, I mean, there are so
14   many notes.  I may be getting -- I believe it
15   was 2020.
16        Q.    All right.  I'm not asking about
17   notes, sir.  I'm asking about the agreement
18   that you testified you knew about between Jim
19   and Don- -- Nancy Dondero.  Okay.
20              Do you understand my question now?
21   Should I ask my question again?
22        A.    Yeah, sure.  Go ahead.
23        Q.    I'm going to use the word
24   "agreement" to refer to the agreement that
25   Mr. Dondero and Nancy Dondero entered into
```

Appx. 00889

```
 1                  WATERHOUSE - 10-19-21
 2   where you understood that certain milestones
 3   had to be reached.  Okay?
 4        A.    Uh-huh.
 5              MS. DANDENEAU:  Objection.
 6              MS. DEITSCH-PEREZ:  Object to the
 7        form.
 8              MR. MORRIS:  Just defining a term,
 9        what is the objection.
10              MS. DEITSCH-PEREZ:  The objection --
11              MR. MORRIS:  I will move on.  I will
12        move on.
13              MS. DEITSCH-PEREZ:  John --
14        Q.    Sir, are you okay with that
15   definition of agreement?
16        A.    Okay.
17        Q.    Okay.  So you don't recall who --
18   who informed you of the existence of the
19   agreement; is that right?
20        A.    I don't recall.
21        Q.    You don't recall who told you the
22   terms of the agreement.
23              Do I have that right?
24        A.    Correct.
25        Q.    And you don't recall if you learned
```

 1                WATERHOUSE - 10-19-21

 2    about the agreement in a meeting, through an

 3    email, or through a phone call.

 4                Do I have that right?

 5        A.    I don't recall.

 6        Q.    Can you tell me when you learned of

 7    the agreement?

 8        A.    I don't -- I don't -- I don't

 9    remember specifically.

10        Q.    Can you tell me if you learned of

11    the agreement before or after the petition

12    date?

13        A.    It would have been -- it would have

14    been after.

15        Q.    Can you tell me if you learned of

16    the agreement before or after January 9th,

17    2020?

18        A.    It would have been after.

19        Q.    Can you tell me if you learned of

20    the agreement before or after you left Highland

21    Capital Management in February of 2021?

22        A.    I don't -- I don't -- I don't know.

23        Q.    It is possible that you learned of

24    it while you were a Highland employee.

25                Do I have that right?

```
                                                      Page 71
 1                  WATERHOUSE - 10-19-21

 2        A.    I don't remember the -- I mean, it

 3   was sometime in 2021.  I don't remember when.

 4        Q.    All right.  So to the best of your

 5   recollection, it was in 2021 but you don't

 6   recall if it was before or after you ceased to

 7   be a Highland employee.

 8              Do I have that right?

 9        A.    Yeah, I mean, it was -- it was

10   likely after I was -- after I left Highland

11   because, if I put myself back into the last

12   days of -- of 2021, it was -- you know, the

13   communications with Mr. Dondero were -- were --

14   were -- there weren't as many communications

15   because of the circumstances.

16        Q.    And so based on that you believe

17   that it is most likely that you learned of this

18   agreement sometime after you left Highland

19   employment?

20        A.    I wouldn't use the term "most

21   likely."  I don't recall specifically.  I don't

22   recall.

23        Q.    Do you recall ever telling Jim Seery

24   about this agreement?

25        A.    No, I don't -- I didn't tell
```

Page 72

```
 1              WATERHOUSE - 10-19-21

 2    Jim Seery.

 3         Q.    Did you tell anybody at DSI about

 4    this agreement?

 5         A.    No.

 6         Q.    Did you tell any of Highland's

 7    independent directors about this agreement?

 8         A.    No.

 9         Q.    Did you tell anybody at Pachulski

10    Stang Ziehl & Jones about this agreement?

11         A.    No.

12         Q.    Did you tell any employee of

13    Highland about this agreement?

14         A.    No.

15              MS. DANDENEAU:  Mr. Morris, it has

16         been an hour and a half.  Is this a good

17         time for a break?

18              MR. MORRIS:  Sure.

19         Q.    Mr. Waterhouse, I will just remind

20    you that during the break please don't speak

21    with anybody about the deposition, the

22    substance of your testimony or anything else

23    concerning the deposition.  Okay?

24         A.    Yes.

25              MR. MORRIS:  So it is 11:02.  We're
```

```
                                                        Page 73
 1              WATERHOUSE - 10-19-21

 2         at 11:02 your time.  Let's come back, I

 3         guess, at 15 -- at 11:15 your time.

 4              VIDEOGRAPHER:  We're going off the

 5         record at 11:02 a.m.

 6         (Recess taken 11:02 a.m. to 11:20 a.m.)

 7              VIDEOGRAPHER:  We are back on the

 8         record at 11:20 a.m.

 9         Q.    Mr. Waterhouse, did you speak with

10    anybody during the break about this deposition?

11         A.    No.

12              MS. DANDENEAU:  Other than -- other

13         than his counsel.

14         Q.    Did you speak to your counsel about

15    the substance of your deposition today?

16         A.    No, I didn't bring it up.

17         Q.    I didn't ask you if you brought it

18    up.  I asked you if you had any conversation

19    with your lawyer about the substance of your

20    deposition.

21              MS. DANDENEAU:  Yes, he did.

22         Q.    Can you tell me what the -- you

23    discussed?

24              MS. DANDENEAU:  No, I object to

25         that.  He's not going to answer.  That is a
```

```
 1            WATERHOUSE - 10-19-21
 2   privileged conversation.
 3            MR. MORRIS:  So I just want to make
 4   sure that I understand.  During the break
 5   you spoke with your client about the
 6   substance of this deposition; is that
 7   right?
 8            MS. DANDENEAU:  Yes, John.
 9            MR. MORRIS:  And you refuse -- you
10   refuse to let your client tell me what was
11   discussed; is that right?
12            MS. DANDENEAU:  That's correct.
13            MR. MORRIS:  You know, I had given
14   the instruction prior to the break not to
15   speak with counsel.  I would have
16   appreciated --
17            MS. DANDENEAU:  No, you didn't --
18   actually, that is not true, Mr. Morris.
19   You said not to speak with anyone.  We
20   never have interpreted that to mean
21   conversations with counsel.  That's never
22   been -- I have never, ever heard that
23   instruction.
24            MR. MORRIS:  Okay.  We will -- we
25   will -- we will deal with it when and if we
```

```
 1              WATERHOUSE - 10-19-21

 2        have to.

 3        Q.    Mr. Waterhouse, after learning about

 4   the agreement, did you ask anybody if the

 5   agreement was reflected in a writing?

 6              MS. DANDENEAU:  Objection to form.

 7   A.    No.

 8        Q.    Did you ask anybody if the terms of

 9   the agreement were memorialized anywhere?

10              MS. DANDENEAU:  Objection to form.

11              MR. MORRIS:  What is the --

12   A.    No.

13              MS. DANDENEAU:  Well, because you

14         keep talking about this agreement and I --

15         I -- I think, Mr. Morris, that is really

16         not clear what you mean by "the agreement."

17         And maybe you can just go back and restate

18         what that is.

19              MR. MORRIS:  Okay.  Your client has

20         agreed with me twice on the definition, but

21         I will try one more time.

22        Q.    Mr. Waterhouse, do you understand

23   that when I use the term "agreement," I'm

24   referring to the agreement between Jim and

25   Nancy Dondero concerning certain promissory
```

```
 1                    WATERHOUSE - 10-19-21
 2    notes where you learned that one of the terms
 3    of the agreement was milestones reached?
 4         A.    Okay.
 5         Q.    And did you understand that that was
 6    the -- the agreement that we were referring to
 7    every time we used the word "agreement" in this
 8    deposition?
 9         A.    I don't know anything about this
10    agreement.  So, look, I do -- it -- I don't
11    know whether --
12         Q.    Let's -- let's try this again.
13         A.    Yeah.  Look, I don't know what this
14    agreement relates.
15              MS. DEITSCH-PEREZ:  John, John --
16         Q.    Let me try --
17              MS. DEITSCH-PEREZ:  John, please let
18         the witness finish.
19              MR. MORRIS:  Please stop.  Please
20         stop.  Please stop talking.
21              MS. DEITSCH-PEREZ:  No, you stop.
22         Let the witness --
23              MR. MORRIS:  Stop talking.
24              MS. DEITSCH-PEREZ:  -- finish -- you
25         interrupted him.
```

Page 77

```
 1            WATERHOUSE - 10-19-21
 2            MR. MORRIS:  You know what, you
 3       guys, this is really wrong.  It is really,
 4       really wrong.  Okay?
 5            I had the witness agree not once,
 6       but twice to the definition of agreement.
 7       Okay?  I'm going to try and do it a third
 8       time.
 9            MS. DANDENEAU:  No, but, please,
10       John, really --
11            MR. MORRIS:  No, please stop
12       talking.  Please.  It is my deposition.
13       Object to questions.
14            MS. DANDENEAU:  No, but also you
15       instructed him that -- that if you were
16       going -- if you were interrupting him, that
17       he should remind you that you're
18       interrupting him and -- and --
19            MR. MORRIS:  Let him do that.  Let
20       him do that.
21            MS. DANDENEAU:  Okay.  Well, you --
22            MR. MORRIS:  Please stop talking.
23       A.   Okay.  I don't know any of the
24  details of these agreements.  I don't know
25  anything about them.  I heard -- someone -- I
```

Appx. 00898

```
                                                              Page 78
 1                    WATERHOUSE - 10-19-21

 2    don't know who, I don't know when, as you

 3    asked, sometime in '21, someone told me about

 4    this -- or I don't honestly know -- I don't

 5    even recall exactly how I was made aware of

 6    this, but I was.  I don't know -- I don't know

 7    any of these details, and I'm getting -- again,

 8    there is, you know, I -- I -- I had a passing

 9    conversation with -- with Jim at some point

10    on -- on some -- on the executive comp, and I'm

11    getting confused of what is what, because

12    again, I don't know any of these details.

13         Q.    Okay.  Let me try again,

14    Mr. Waterhouse, and I apologize.

15              Are you aware of any agreement

16    between Jim Dondero and Nancy Dondero

17    concerning any promissory note that was given

18    to Highland by any affiliate or Mr. Dondero?

19              MS. DEITSCH-PEREZ:  Object to the

20         form.

21         A.    I've heard of an agreement.  That

22    is -- that is -- I mean, if you are using aware

23    as heard, sure.

24         Q.    And you understand that one of the

25    terms of the agreement is that it was based on
```

 1                WATERHOUSE - 10-19-21

 2   milestones that had to be reached; is that

 3   right?

 4                MS. DANDENEAU:  Objection to form.

 5        A.    That was one of the words that was

 6   used when I heard about it, yes.

 7        Q.    And when you heard about this

 8   agreement that had a term in it concerning

 9   milestones reached, did you ask the person who

10   was telling you about the agreement whether or

11   not it was in writing?

12        A.    I did not.

13        Q.    Did you ask any questions at all?

14                MS. DANDENEAU:  Objection to form.

15        A.    Not that I recall.

16        Q.    But do you understand that going

17   forward, we're going to refer to the agreement

18   as the agreement that you just described that

19   you were --

20                MS. DANDENEAU:  Object to the form.

21        A.    Yes.

22        Q.    Okay.  You don't have any personal

23   knowledge concerning the terms of the

24   agreement; correct?

25                MS. DEITSCH-PEREZ:  Object to the

```
                                                        Page 80
 1                    WATERHOUSE - 10-19-21

 2        form.

 3        Q.    You can answer.

 4        A.    I don't -- I heard about the

 5   agreement.  I don't know anything -- I heard

 6   there was an agreement.  That is -- again, as I

 7   testified before -- I said before, heard about

 8   it, don't know the details.  I believe it was

 9   sometime this year.

10        Q.    Do you have any personal knowledge

11   about the terms of the agreement, sir?

12              MS. DANDENEAU:  Objection to form.

13        A.    Other than what I have previously

14   discussed, I don't -- I don't know.

15        Q.    Did -- did Mr. Dondero tell you

16   about the existence of the agreement?

17        A.    I don't recall.

18        Q.    Do you recall the source of your

19   information when you learned about the

20   agreement?

21        A.    No, I don't -- I don't recall.  I

22   don't remember.  I just -- I heard about it

23   generally.  I don't remember -- I don't

24   remember who, how, if, how.  I don't remember.

25        Q.    You know, Mr. Waterhouse, I just
```

Page 81

```
 1              WATERHOUSE - 10-19-21

 2   want to be clear that I never would have asked

 3   you to appear at this deposition if your name

 4   hadn't been included in responses to discovery

 5   as to somebody with knowledge about the -- who

 6   was told about the existence of the agreement.

 7              That is what prompted me do this,

 8   and I really do feel compelled to tell you that

 9   I otherwise would never have called you as a

10   witness.  So I regret that you're being put

11   through this today.  I had no intention of

12   burdening you or taking your time, but that is

13   the reason that we issued the subpoena is

14   because certain of the defendants identified

15   you as somebody --

16              MS. DEITSCH-PEREZ:  Mr. Morris, you

17       are here to ask questions, not to have --

18              MR. MORRIS:  I feel badly for the

19       guy.  I really do.

20              MS. DEITSCH-PEREZ:  I'm sure you do.

21              MR. MORRIS:  I do.  Stop.

22              MS. DEITSCH-PEREZ:  You stop.

23              MR. MORRIS:  I'm allowed.

24              MS. DEITSCH-PEREZ:  No, you're not

25       allowed to have a chat with the witness.
```

Page 82

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Okay.  Well, I hope that you

 3   appreciate what I'm saying here,

 4   Mr. Waterhouse.

 5              MS. DANDENEAU:  All right.  Let's go

 6         ahead and ask questions, and again, you're

 7         entitled to probe his -- his knowledge

 8         of -- whatever knowledge he has about

 9         this -- this agreement and --

10              MR. MORRIS:  That is what I'm doing.

11              MS. DANDENEAU:  -- he will answer

12         the questions to the best that he can.

13              MR. MORRIS:  That is what I'm doing.

14      Q.    Mr. Waterhouse, I take it you do not

15   know which promissory notes issued by which

16   affiliates or Mr. Dondero are the subject of

17   this agreement; do I have that right?

18      A.    Yes, I don't -- I don't know.

19      Q.    Do you know of any way to determine

20   which promissory notes issued by the affiliates

21   and Mr. Dondero are the subject of this

22   agreement other than asking Jim or Nancy

23   Dondero?

24              MS. DANDENEAU:  Objection to form.

25      A.    I don't know.
```

Appx. 00903

Page 83

```
 1                 WATERHOUSE - 10-19-21

 2          Q.    Did you ever make --

 3          A.    I don't know anything about these

 4    agreements.

 5          Q.    Did you ever make any effort to

 6    determine which promissory notes are subject to

 7    this agreement?

 8          A.    No.

 9          Q.    Did you ever ask anybody which

10    promissory notes are subject to this agreement?

11          A.    No.

12          Q.    Do you know if there is a list

13    anywhere of the promissory notes that are

14    subject to this agreement?

15          A.    I'm not aware.

16          Q.    Have you ever seen the terms of the

17    agreement written down anywhere?

18          A.    No.

19          Q.    Have you ever asked anybody whether

20    the terms of the agreement were written down

21    anywhere?

22          A.    I have not.

23          Q.    Did learning about the agreement

24    cause you to do anything in response?

25                MS. DANDENEAU:  Objection to form.
```

Appx. 00904

```
 1                 WATERHOUSE - 10-19-21

 2        A.    No.

 3        Q.    Did anybody ever describe to you the

 4   nature of the milestones that you referred to

 5   earlier?

 6        A.    No, I don't -- I don't have any

 7   details of this.

 8        Q.    That is fine.

 9              PricewaterhouseCoopers served as

10   Highland's outside auditors prior to the

11   petition date; correct?

12        A.    Yes.

13        Q.    You refer to PricewaterhouseCoopers

14   as PwC?

15        A.    Yes.

16        Q.    PricewaterhouseCoopers audited

17   Highland's financial statements on an annual

18   basis; correct?

19        A.    During my -- during my time as -- as

20   CFO, yes, PricewaterhouseCoopers was the

21   auditor.

22        Q.    Do you know why Highland had its

23   annual financial statements audited each year?

24        A.    Generally.

25        Q.    Tell me your general understanding
```

Page 85

```
 1                    WATERHOUSE - 10-19-21

 2    as to the reason why Highland had its annual

 3    financial statements audited each year.

 4         A.    From -- from time to time, they were

 5    used -- or asked for, as part of diligence or

 6    transactions or -- or things of that nature.

 7         Q.    And were they given to third parties

 8    for purposes of diligence or transactions from

 9    time to time?

10         A.    As far as I'm aware, yes.

11         Q.    And was it your understanding as the

12    CFO that the third parties who received the

13    financial statements in diligence or

14    transactions was going to rely on those?

15              MS. DANDENEAU:  Objection to form.

16         A.    I don't know -- I don't know gen --

17    I don't know specifically what they were going

18    to rely on.  You know, we would get requests

19    for audited financial statements.  I don't know

20    what they were relying on.

21         Q.    And --

22         A.    You would have to ask them.

23         Q.    Did you personally play a role in

24    PwC's annual audit and the conduct of the

25    audit?
```

Appx. 00906

Page 86

```
 1              WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  Objection to form.

 3      A.    During my tenure as CFO, I played a

 4   very minimal role.

 5      Q.    What was the minimal role that you

 6   played?

 7      A.    You know, again, it was -- it was to

 8   check in with the team, to make sure that, you

 9   know, audit -- the deadlines were being hit,

10   information was being presented to the auditors

11   in a -- in a timely fashion, but, you know,

12   other than that, it was a very capable team

13   that are still current employees of Highland

14   and, you know, they -- they conducted 99

15   percent of -- look, I don't want to give

16   percentages.  I mean, this is -- but I -- I --

17   I played a minimal role towards the end.

18              Before during my earlier years as

19   CFO, I did more, and then as time went on, I

20   did less in it.

21      Q.    Okay.  Was there a person at

22   Highland who was responsible for overseeing

23   Highland's participation in PwC's audit during

24   the time that you were the CFO?

25      A.    Yeah.  I mean, there was -- there
```

Appx. 00907

```
 1              WATERHOUSE - 10-19-21

 2   was a -- there was a point -- it varies.  It

 3   varies by year, in function, in time and, you

 4   know, depending on the request, but yes, I

 5   mean, there is -- there is -- there is

 6   generally a point person of communication.

 7        Q.    And who was the point person from

 8   2016 until the time you left Highland?

 9        A.    I don't -- I don't know

10   specifically, but it would have been, you

11   know -- you know, someone on the corporate

12   accounting team.

13        Q.    And was there a head of the

14   corporate accounting team?

15        A.    Yes, so -- yes.

16        Q.    Who was the head of corporate

17   accounting for the five years prior to the time

18   you left Highland?

19        A.    I don't -- if you're asking from

20   2016 on, I don't -- it was Dave Klos, but,

21   again, there was -- there was changes to the

22   team and the reporting structure.  I don't

23   remember exactly when that happened during --

24   you know, over the last -- since 2016.

25        Q.    Did the folks who participated and
```

```
 1                WATERHOUSE - 10-19-21
 2   ran the audit all report to you, directly or
 3   indirectly?
 4        A.    Yes.
 5        Q.    And did you have any responsibility
 6   for making sure that the audit report was
 7   accurate before it was finalized?
 8        A.    Yeah.  I mean, you know, that --
 9   that is -- my responsibility to the auditors
10   was -- again, is -- and the CFO is to -- we are
11   providing accurate financial statements; right?
12             And -- and -- and as part of any
13   audit, we disclose all relevant information as
14   part of any audit.
15        Q.    Okay.  And as the CFO, did you take
16   steps to make sure that the audit report was
17   accurate?
18        A.    I mean, I would say in a general
19   sense, yes.  But, again, I mean, I had a
20   very -- I had a very capable and competent
21   team.  I wasn't managing them.
22             You know, part of what I do is I let
23   the team -- I want managers to grow.  I want
24   managers to have rope.  And that is -- you
25   know, I'm not a stand-behind-you type of guy.
```

Page 89

```
 1                 WATERHOUSE - 10-19-21

 2     If you -- if you talk to my team members, I'm

 3     not micromanaging people.  I want people to

 4     learn and grow in their function so they can go

 5     on and do bigger and better things with their

 6     careers.

 7                 And so, yes, generally I was

 8     responsible for it, but I wanted the team to

 9     learn and grow and be responsible for the bulk

10     of the audit.

11         Q.    Did you personally review each audit

12     report before it was finalized to satisfy

13     yourself that it was accurate?

14         A.    I don't -- I don't recall, you know,

15     for every single -- we're talking 2016, there

16     would have been three years, 2016 to '17, '18.

17     I don't -- we're -- we're going back

18     five years-plus.  I don't -- you know, I don't

19     recall.

20         Q.    Did you have a practice that you

21     employed to make sure that you were satisfied

22     that Highland's audit reports were true and

23     accurate to the best of your knowledge?

24         A.    I mean, our -- the practice was set

25     up with our -- the -- the practice to put
```

 1                    WATERHOUSE - 10-19-21

 2    together accurate audited or accurate financial

 3    statements is to your control environment.

 4             So, you know, the -- so the practice

 5    was to maintain a stable control environment

 6    which then the output is -- is accurate

 7    financial statements.

 8             So -- so, you know, if I was

 9    comfortable that the control environment was

10    operating, then, you know, that would dictate

11    how I would -- you know, what I might or might

12    not do in a given year.

13        Q.    Okay.  Do you recall ever being

14    uncomfortable with the control environment

15    during the period that you served as CFO?

16        A.    Yeah.  I mean, look, yes, there are

17    times -- you know, nothing is perfect.  So

18    there were -- there were times when, yes, you

19    know -- there are times I learned I was

20    uncomfortable with the control environment, and

21    that is part of the management of the process

22    and having, you know -- and -- and working

23    through whatever obstacles present themselves.

24        Q.    Okay.  Were you ever uncomfortable

25    with the control process as it related to

 1                    WATERHOUSE - 10-19-21

 2    reporting and disclosures of loans to

 3    affiliates and Mr. Dondero?

 4             MS. DANDENEAU:  Objection to form.

 5        A.    I don't -- I don't recall --

 6        Q.    So you don't recall --

 7        A.    -- the --

 8             MS. DANDENEAU:  Mr. Morris --

 9        A.    I don't recall being uncomfortable.

10    But, again, we're going back several years.  I

11    don't -- you know, the practice in an audit is

12    to disclose all information to the auditors.

13    And I don't -- I don't recall.

14        Q.    As part of the process of the audit,

15    did you sign what is sometimes referred to as a

16    management representation letter?

17        A.    Yes.

18             MR. MORRIS:  Can we put up on the

19        screen a document that we have premarked as

20        Exhibit 33.

21             (Exhibit 33 marked.)

22             MS. DANDENEAU:  Mr. Morris, that is

23        not in the binder; correct?

24             MR. MORRIS:  Correct.

25        Q.    So you will see, Mr. Waterhouse,

```
 1                WATERHOUSE - 10-19-21
 2   this is a letter dated June 3rd.  And if we
 3   could go to the signature page.
 4                And do you see that you and
 5   Mr. Dondero signed this document?
 6       A.    Yes.
 7       Q.    That is your signature; right?
 8       A.    Yes.
 9             MR. MORRIS:  Okay.  Can you go back
10       to the top.
11             MS. DANDENEAU:  Mr. Morris, can you
12       have somebody post this in the chat so that
13       we have can have a copy of this, please.
14             MR. MORRIS:  Yeah, sure.  Asia, can
15       you do that, please.
16       Q.    Okay.  Do you see at the bottom of
17   the second paragraph there is a reference to
18   materiality?
19       A.    Yes.
20       Q.    Okay.  It says, Materiality used for
21   purposes of these representations is
22   $1.7 million.
23             Do you see that?
24       A.    I do.
25       Q.    And did PwC set that level of
```

Case 21-03005-sgj Doc 366-14 Filed 10/29/21   Entered 10/29/21 21:52:58   Page 142 of 346

```
                                                          Page 93
 1               WATERHOUSE - 10-19-21

 2  materiality?

 3       A.    Yes.

 4       Q.    And for purposes of the audit, did

 5  PwC set the level of materiality each year?

 6       A.    Yes.

 7       Q.    Did that number change over time?

 8       A.    I'm not aware of what materiality is

 9  every single year, so -- but, you know, this

10  number would likely fluctuate.

11       Q.    Okay.  I'm going to go back to a

12  question I asked you earlier today.  And that

13  is in connection -- this letter is issued in

14  connection with the audit for the period ending

15  12/31/2018; correct?

16       A.    Yes.

17       Q.    Okay.  And is it fair to say that if

18  any -- actually, withdrawn.  I'm going to take

19  it outside of this.

20            If Highland ever forgave the loan to

21  any affiliate or any of its officers or

22  employees, in whole or in part, to the best of

23  your knowledge, would that forgiveness have

24  been disclosed in the audited financial

25  statements if it exceeded the level of
```

Case 3:21-03000-5-sgj jDoc 386-14 Filed 10/29/21   Entered 10/29/21 21:52:53   Page 943 of 946

```
 1              WATERHOUSE - 10-19-21
 2   materiality that PwC established?
 3              MS. DANDENEAU:  Objection to form.
 4        A.    So, again, during my tenure as CFO,
 5   and -- Highland -- it was -- it is required to
 6   disclose any affiliate loans that are in excess
 7   of materiality.
 8              Now, the forgiveness of those loans
 9   may or may not -- I mean, since materiality
10   fluctuates every year, a -- you know, if a loan
11   was forgiven, it may or may not, you know --
12   and, look, I would want to consult the guidance
13   around this.
14              It is not something we do -- you
15   know, it is not -- you know, GAAP can be and
16   disclosures can be very specialized so, again,
17   we want to consult the guidance.  But we would
18   see if and what would need to be disclosed if
19   it were deemed immaterial.
20        Q.    Did you and Mr. Dondero sign
21   management representation letters of this type
22   in each year in which you served as Highland's
23   CFO?
24        A.    I -- I -- I will speak for myself.
25   I signed them.  There may have been others that
```

Page 95
```
 1              WATERHOUSE - 10-19-21
 2   signed as well.  I don't -- I don't recall.
 3       Q.    But to the best of your knowledge,
 4   you, personally, signed a management
 5   representation letter in connection with
 6   Highland's audit each year that you served as
 7   the CFO; correct?
 8       A.    I would say generally speaking,
 9   Mr. Morris.  I don't recall for every single
10   year, you know, generally, but I would want to
11   refer to all the rep letters and see who signed
12   them.
13       Q.    Do you recall Highland having its
14   financial statements audited in any year during
15   the period that you were a CFO where you didn't
16   sign the management representation letter?
17       A.    I don't recall.  But, John, we're
18   going back five, six, seven, eight, nine,
19   decade.  I don't -- I don't remember.
20       Q.    I don't want to go back that many
21   decades, but I'm just asking you if you recall
22   that there was you didn't sign it?
23       A.    I -- I -- I don't, but my memory
24   is -- again, I -- I -- I can't tell you what I
25   did in 2012.  I mean, I think generally, yes,
```

```
 1                  WATERHOUSE - 10-19-21
 2    but I don't -- I don't know for sure, and I
 3    would want to rely on the document.
 4         Q.    Let me ask the question a little bit
 5    differently then.
 6               Do you have any reason to believe
 7    that Highland had its annual financial audit
 8    and you did not sign a management
 9    representation letter in connection with that
10    audit?
11               MS. DANDENEAU:  Objection to form.
12         A.    I don't believe it would, but,
13    again, I would want to -- I don't recall and I
14    would want to confirm it to -- to make, you
15    know, an affirmative -- to give an affirmative
16    answer.
17         Q.    Do you know whether PwC required
18    management to sign management representation
19    letters?
20               MS. DANDENEAU:  Objection to form.
21         A.    Yes.  I mean, it -- management
22    representation letters are signed by
23    management.
24         Q.    Okay.  And do you know -- do you
25    have any understanding as to why PwC requires
```

```
 1                 WATERHOUSE - 10-19-21
 2     management to sign management representation
 3     letters?
 4                 MS. DEITSCH-PEREZ:  Object to the
 5          form.
 6          A.   I don't know why PwC's -- what PwC's
 7     specific practice is.  I know generally what
 8     management representation letters are.
 9          Q.   Okay.  Do you personally -- I'm not
10     asking about PwC.  I'm asking for you -- I'm
11     asking about you, do you have an understanding
12     as to why the auditor asks for management
13     representation letters?
14          A.   Okay.  So you're asking me in my
15     personal capacity, yes, I have a general
16     understanding of why.
17          Q.   Can you give me the general
18     understanding that you have as to why
19     management representation letters are required?
20          A.   They are -- they are required to --
21     they are -- they are one of the items required
22     in an audit to help verify completeness.
23          Q.   Do you have any -- any other
24     understanding as to why management
25     representation letters are required?
```

Page 98

 1              WATERHOUSE - 10-19-21

 2         A.    That is -- that is -- other than

 3   what I said, it is -- it is -- it is required

 4   so -- to ensure that the -- you know, there

 5   is -- there is completeness in what is being

 6   audited.

 7         Q.    Did you -- did you have a practice

 8   whereby you and Mr. Dondero conferred about the

 9   management representation letters before you

10   signed them?

11         A.    No.

12         Q.    Did you have a practice --

13   withdrawn.

14              Do you see just the next sentence

15   after the materiality, there is a sentence that

16   states:  We confirm, to the best of our

17   knowledge and belief, as of June 3rd, 2019, the

18   date of your report, the following

19   representations made to you during your audit.

20              Do you see that sentence?

21         A.    Yes.

22         Q.    Okay.  Did you understand when you

23   signed this letter that you were confirming the

24   representations that followed?

25         A.    When I signed this management

```
 1                  WATERHOUSE - 10-19-21
 2    letter -- representation letter, yes.
 3         Q.    Okay.  Did you discuss this letter
 4    with Mr. Dondero before you signed it?
 5         A.    I don't recall.
 6         Q.    Do you recall if Mr. Dondero asked
 7    you any questions before he signed the letter?
 8         A.    I don't recall.
 9         Q.    Do you recall if you asked
10    Mr. Dondero any questions before you signed
11    this letter?
12         A.    I don't recall.
13         Q.    Is it fair to say that Mr. Dondero
14    did not disclose to you the existence of the
15    agreement that we have -- as we've defined that
16    term prior to the time you signed this letter?
17              MS. DANDENEAU:  Objection to form.
18         A.    I don't think I understand the
19    question.  So, again, you are saying, did
20    Mr. Dondero not disclose to me the existence of
21    this letter?
22         Q.    No, I apologize.
23              Did Mr. Dondero disclose to you the
24    existence of the agreement prior to the time
25    you signed this letter on June 3rd, 2019?
```

```
 1                    WATERHOUSE - 10-19-21

 2         A.    The agreement -- the agreement that

 3    we talked about earlier?

 4         Q.    Correct.

 5         A.    Look, as I said earlier, the first

 6    time I heard of this agreement was sometime

 7    this year.

 8         Q.    Okay.  Can we turn -- let's just

 9    look at a couple of items on the list.  If we

10    can go to page 33416.  Do you see in Number 35

11    it talks about the proper recording or

12    disclosure in the financial statements of ND

13    relationships and transactions with related

14    parties.

15              Do you see that?

16         A.    I do.

17         Q.    As the CFO, do you have any

18    understanding as to whether Dugaboy is a

19    related party?

20         A.    I don't recall.

21         Q.    Do you know whether any of the

22    affiliates are related parties?

23         A.    If -- if it was NexPoint, HCMFA,

24    HCMS, HCRE, yeah, if -- if that is the

25    affiliate definition, and there.  In ASC 850 --
```

```
 1               WATERHOUSE - 10-19-21

 2   again, I mean, I haven't looked at ASC 850 in

 3   quite some time, but, you know, if -- if there

 4   is a control language, you know, ASC 850, would

 5   that -- that section in GAAP would -- would

 6   pick up and define what are related parties.

 7               So, you know, like I said, if -- one

 8   of the four entities I just described, if -- if

 9   they are in that control definition of ASC 850,

10   they would be picked up in 35D.

11       Q.   Do you -- do you have any reason to

12   believe that they would be picked up in that

13   definition, based on your knowledge and

14   experience?

15       A.   I -- I believe that entities

16   controlled under GAAP are -- are affiliates.

17       Q.   Okay.  Would Mr. Dondero also

18   qualify as a related party for purposes of

19   Section 35D, to the best of your knowledge?

20       A.   Yeah, I don't -- I don't know.  I

21   would think -- I would have to read the code

22   section to see if someone personally -- is it

23   talking about related parties.  So, look, if

24   your own in control, yeah, I mean, I would have

25   to read the section.
```

Page 102

```
 1              WATERHOUSE - 10-19-21

 2        Q.    To the best of your knowledge, was

 3   the existence of the agreement ever disclosed

 4   to PwC?

 5        A.    I'm not -- I'm not aware.

 6        Q.    Do you recall if the agreement was

 7   ever disclosed in Highland's audited financial

 8   statements?

 9        A.    I don't -- I don't remember if it

10   was in every Highland's audited financial

11   statements during my tenure.  We would have to

12   read the financial statements to see what was

13   disclosed, but I'm not -- I mean, as I sit here

14   today, I'm not aware.

15        Q.    That is all I'm asking for.

16        A.    I'm not aware.

17        Q.    Can we go to the next page, please,

18   and look at 36.  36 says, we have disclosed to

19   you the identity of the partnership's related

20   party relationships and all the related party

21   relationships and transactions of which we are

22   aware.

23              Do you see that?

24        A.    Yes.

25        Q.    To the best of your knowledge, as of
```

Appx. 00923

Page 103

```
1                   WATERHOUSE - 10-19-21

2    June 3rd, 2019, did Highland disclose to PwC

3    the identity of the partnership's related

4    parties and all the related party relationships

5    and transactions of which it was aware?

6         A.    I mean, I can speak for myself as

7    signer of this representation letter.  I

8    disclosed what -- what, you know, what --

9    what -- what I knew.  Sorry, look, yes, so I --

10   I disclosed what I knew.

11        Q.    Okay.  Can we go to page 419.  Do

12   you see at the end there is a reference to

13   events that occurred since the end of the

14   fiscal year and the date of the letter?

15        A.    Yes.

16        Q.    And were you aware of that -- of

17   that provision of the management representation

18   letter before you signed the document?

19        A.    Yes.

20        Q.    Do you have an understanding as to

21   why PwC asked for that confirmation of that

22   particular part of the management

23   representation letter?

24        A.    It is -- it is -- it is just -- it

25   is a typical audit request.
```

Appx. 00924

 1                  WATERHOUSE - 10-19-21

 2        Q.    And do you understand -- do you have

 3    an understanding that PwC wanted to know that

 4    as of the date of the audit whether any

 5    material changes had occurred since the end of

 6    the fiscal year, using the definition of

 7    materiality that is in this particular

 8    management representation letter?

 9        A.    It -- it is -- it is -- it is a --

10    it is as described.  It is just a poorly worded

11    question, so it is hard for me to say yes.

12        Q.    If I asked you this, I apologize,

13    but did you ever learn when the agreement was

14    entered into?

15        A.    I don't -- I don't -- like I said

16    before, I don't know or have any details of the

17    agreement.

18        Q.    Okay.  Did you ever ask anybody when

19    the agreement was entered into?

20        A.    I did not.

21        Q.    Let's look at the audited financial

22    statements.  We will put up on the screen a

23    document that has been premarked as Exhibit 34.

24              (Exhibit 34 marked.)

25              MS. DANDENEAU:  And again, if Ms. La

Page 105

```
 1              WATERHOUSE - 10-19-21
 2       Canty could please put that in the chat
 3       room, that would be great.
 4              MR. MORRIS:  I will assure you we
 5       will put every document in the chat room.
 6       Q.    Now, I'm just going to ask you
 7  questions that are related to the provisions of
 8  this report that concern the affiliate loans,
 9  but again, Mr. Waterhouse, if there is any part
10  of the document that you need to see or that
11  you think you might need to see in order to
12  refresh your recollection to answer any of my
13  questions, will you let me know that?
14       A.    Yes.
15       Q.    Because this is a pretty lengthy
16  document, but do you see that the cover page
17  here is the Highland consolidated financial
18  statements for the period ending December 31st,
19  2018?
20       A.    Yes.
21       Q.    If we can go to -- I think it is the
22  next one, looking for PwC's signature line.
23              MS. CANTY:  I'm sorry, John, did you
24  say something?
25              MR. MORRIS:  Yes, can we turn the
```

```
 1              WATERHOUSE - 10-19-21

 2        page.  I think it is 215.  Yes, stop right

 3        there, just above -- I'm sorry, I want to

 4        see just the date of the report.

 5        Q.    Okay.  Do you see at the bottom of

 6   that page there, Mr. Waterhouse,

 7   PricewaterhouseCoopers has signed this audit

 8   report?

 9        A.    Yes, I see their signature.

10        Q.    Okay.  And it is the dated same day

11   as your management representation letter; is

12   that right?

13        A.    It is -- yes, it is the same day.

14        Q.    Was that the practice to sign the

15   management representation letter on the same

16   day that the audit report was signed?

17        A.    Yes, that is typical in every audit.

18        Q.    Can we just scroll down to the

19   balance sheet on the next page.

20              Do you see that there is a line

21   there that says, Notes and Other Amounts Due

22   from Affiliates?

23        A.    Yes.

24        Q.    Does that line, to the best of your

25   knowledge, include the amounts that were due
```

Page 107

```
 1                  WATERHOUSE - 10-19-21
 2   under the affiliate under the notes signed by
 3   the affiliates and Mr. Dondero?
 4               MR. RUKAVINA:  Objection to the
 5           extent that calls for a legal conclusion.
 6           A.    I mean, I would want to see the
 7   detail and the build to this $173,398,000, but,
 8   yes, I mean, if -- if -- given what we
 9   discussed before, you know, it -- it should
10   capture that.
11           Q.    And -- and while you were the CFO of
12   Highland, were all notes held by Highland that
13   were issued by an affiliate or Mr. Dondero
14   carried as assets on Highland's balance sheets?
15               MS. DANDENEAU:  Objection to form.
16               MS. DEITSCH-PEREZ:  Object to form.
17           A.    I don't -- I don't know how else
18   they would be carried.
19           Q.    Okay.  Can you think of any -- are
20   you aware of any promissory note issued by an
21   affiliate or Mr. Dondero that was not carried
22   on Highland's audited financial balance sheets?
23           A.    I'm -- I'm -- I'm not aware.
24           Q.    Okay.  Are you aware of any category
25   of asset on Highland's balance sheet in which
```

Page 108

```
 1              WATERHOUSE - 10-19-21

 2    any of the promissory notes issued by an

 3    affiliate or Mr. Dondero would have been

 4    included?

 5              MS. DANDENEAU:  Objection to form.

 6         A.    Sorry, am I aware of any asset of an

 7    affiliate being included --

 8         Q.    That -- let me -- let me try again.

 9              Do you see there is a number of

10    different assets that are described on this

11    balance sheet?

12         A.    Yes.

13         Q.    One of the assets that is described

14    is Notes and Other Amounts Due from Affiliates;

15    right?

16         A.    Yes.

17         Q.    And it is reasonable to conclude

18    that the notes from the affiliates and

19    Mr. Dondero are included in that line item;

20    right?

21         A.    Yes, based on this description.

22    Again, I would want to see a build of this to

23    100 percent confirm, but based on the

24    description, the asset description, it is -- it

25    is likely.
```

Appx. 00929

Page 109

1          WATERHOUSE - 10-19-21

2               Now, does that mean absolute?  I

3     don't know.

4          Q.    Do you have any reason to believe

5     that the promissory notes would have been

6     carried on the balance sheet in a category

7     other than Notes and Other Amounts Due from

8     Affiliates?

9          A.    If they were deemed -- no.  If they

10    were deemed an affiliate, you know, under GAAP,

11    they should be carried in that line.

12    Otherwise, it would go into another line.

13         Q.    Okay.  And do you see the total

14    asset base as of December 31st, 2018, was

15    approximately $1.04 billion?

16         A.    Yes.

17         Q.    Is my math correct that the Notes

18    and Other Amounts Due from Affiliates

19    constituted approximately 17 percent of

20    Highland's assets as of the end of 2018?

21         A.    Well, so how are you defining

22    Highland?

23         Q.    Highland Capital Management, L.P.,

24    the entity that this audit is subject to -- or

25    the subject of.

Page 110

1              WATERHOUSE - 10-19-21

2        A.    On a consolidated or unconsolidated

3   basis?

4        Q.    I'm looking at the balance sheet.

5   It is a consolidated balance sheet.  Okay?

6              Does the Notes and Other Amounts Due

7   from Affiliates constitute approximately

8   17 percent of the total assets of Highland

9   Capital Management, L.P., on a consolidated

10  basis?

11             MS. DANDENEAU:  Objection to form.

12       A.    I don't have a calculator in front

13  of me but I will take your math, if you are

14  taking the 173 divided by the billion.

15       Q.    Okay.

16       A.    If that is accurate, yes.  But,

17  again, on a consolidated basis.

18       Q.    And on an unconsolidated basis the

19  percentage would be higher; correct?

20       A.    I -- no.  I don't know.

21       Q.    Well, okay.  That is fair.

22             MR. MORRIS:  Can we turn to

23        page 241, please.

24       Q.    Do you see that this is a section of

25  the audit report that is entitled Notes and

Page 111

1                    WATERHOUSE - 10-19-21

2   Other Amounts Due from Affiliates?

3        A.    Sorry, I can't see the -- the --

4        Q.    It is at the top.

5        A.    Notes and Other Amounts Due from

6   Affiliates, yes, I see that.  I don't -- I

7   don't have a page number, but I'm on a page

8   that says at the top:  Notes and Other Amounts

9   Due from Affiliates.

10       Q.    Okay.  And that is the same title of

11  the line item on the balance sheet that we just

12  looked at; right?  Notes and Other Amounts Due

13  from Affiliates?

14       A.    Yes.

15       Q.    And is it your understanding, based

16  on your experience and knowledge as the CFO,

17  that this is the section of the narrative that

18  ties into the line item that we just looked at?

19       A.    Yes.

20       Q.    And is this section of the audit

21  report intended to describe and disclose all of

22  the material facts concerning the Notes and

23  Other Amounts Due from Affiliates?

24            MS. DANDENEAU:  Objection, form.

25       A.    This -- these notes -- these notes

Page 112

1          WATERHOUSE - 10-19-21

2    of the financial statements are -- the purpose

3    is to disclose any material items in relation

4    to that balance sheet line item.

5          Q.    Okay.  And all of the information,

6    to the best of your knowledge, that is set

7    forth in this section of the audit report was

8    provided by Highland; correct?

9          A.    Yes, it would have been provided by

10   the corporate accounting team.

11         Q.    Okay.  And the corporate accounting

12   team, did that team report to you in the

13   organizational structure?

14         A.    Yes.

15         Q.    And did you have any concerns about

16   the controls that were in place to make sure

17   that the information provided with respect to

18   Notes and Other Amounts Due from Affiliates was

19   accurate and complete?

20              MS. DANDENEAU:  Objection to form.

21         A.    Not that I recall.

22         Q.    Okay.  Do you recall ever being

23   concerned that any portion of the Notes and

24   Other Amounts Due from Affiliates in any audit

25   report was inaccurate, incomplete, or not

Page 113

1             WATERHOUSE - 10-19-21

2    reliable?

3        A.    I didn't -- I had concerns about,

4    you know, like I talked about before, of there

5    were -- there were potentially issues in the

6    control environment.  But as far as it relates

7    to the audited financial statements, any -- the

8    team would work with the auditors to disclose

9    all -- all notes in Highland's possession.

10            And any -- any notes that were

11   deemed material by the auditor, right, these

12   were disclosed in these -- in this section, you

13   know, in -- in the notes to the consolidated

14   financial statements as you presented.

15       Q.    Do you recall ever having a

16   conversation with anybody at any time

17   concerning the accuracy of the section of audit

18   reports that relates to Notes and Other Amounts

19   Due from Affiliates?

20            MS. DANDENEAU:  Objection to form.

21       A.    You know, as -- as -- I didn't have

22   direct conversations with

23   PricewaterhouseCoopers as I had, you know --

24   I -- I had the team that managed this.

25            Again, I wasn't anywhere chose to

Appx. 00934

```
 1              WATERHOUSE - 10-19-21
 2   being the point person of this audit.  And I
 3   can't recall, you know, when -- you know, I
 4   don't even know if I was ever the point person
 5   during my tenure as CFO.
 6              I don't know if PwC had any concerns
 7   when they were performing those audit
 8   procedures.  They may have and they may have --
 9   and it may not have been communicated to me.  I
10   don't know.
11              MR. MORRIS:  All right.  I move to
12      strike.
13      Q.   And I'm going to ask you to listen
14   carefully to my question.
15              Did you -- do you recall ever having
16   a conversation with anybody at any time
17   concerning the accuracy of the reporting
18   provided in the audited financial statement on
19   the topic of Notes and Other Amounts Due?
20              MS. DANDENEAU:  Objection to form.
21      A.   I don't recall for this, but that
22   doesn't mean that it didn't exist.
23      Q.   Okay.  But you have no reason to
24   believe, as you sit here right now, that you
25   ever discussed with anybody concerns over the
```

```
 1                WATERHOUSE - 10-19-21

 2   accuracy of the section of the audit reports

 3   called Notes and Other Amounts Due from

 4   Affiliates; correct?

 5                MS. DANDENEAU:  Object to the form.

 6                MS. DEITSCH-PEREZ:  Objection to

 7        form.

 8        A.    I don't recall having any

 9   conversations.  But, again, I mean, this is --

10   this is two years ago.

11        Q.    I'm just asking for your

12   recollection, sir.

13        A.    Yes.

14        Q.    If you don't recall, this will --

15        A.    Yeah.

16        Q.    (Overspeak) -- if you don't

17   recall --

18        A.    Yeah, I don't -- I don't recall.

19        Q.    Do you know who was responsible for

20   drafting the audit report?

21        A.    Are you asking the actual Highland

22   employee responsible?  I mean, it was

23   Highland's responsibility, so, I mean, that

24   is --

25        Q.    Right.
```

Page 116

1              WATERHOUSE - 10-19-21

2        A.    -- Highland's responsibility.

3    Highland's responsibility.

4        Q.    Who, at Highland, was responsible

5    for drafting this section of the audit report?

6        A.    I -- I don't know the answer to

7    that.  Again, there was a team who worked on

8    this.  And I don't know, you know, whether it

9    was the staff or the manager.

10            Again, this is where I let the teams

11   manage.  And, you know, there may be a

12   corporate accountant who worked on this.  I

13   just -- you know, I wasn't part of that process

14   to give that person experience.  I don't know.

15       Q.    Do you recall having any

16   communications with anybody at any time

17   concerning this section of the report?

18       A.    Yeah, I don't recall.

19       Q.    Do you recall whether you ever told

20   anybody at any time that any aspect of this

21   section of the report was inaccurate or

22   incomplete?

23       A.    I don't recall.

24       Q.    As you sit here today, do you have

25   any reason to believe that this section of the

Page 117

```
 1                  WATERHOUSE - 10-19-21
 2   audit report is incomplete or inaccurate in any
 3   way?
 4              And I'm happy to give you a moment
 5   to -- to look at it, if you would like.
 6              MS. DANDENEAU:  Objection to form.
 7              MS. DEITSCH-PEREZ:  Same.
 8      A.    I mean, I would have to look at -- I
 9   would have to look at the bill to the note
10   schedule to make sure I know you presented me
11   with materiality, but again, there might be a
12   note as of 12/31/18 that somehow was -- was
13   under materiality not disclosed.  I don't -- I
14   don't know.  I would need more information.
15      Q.    Okay.  But without more information,
16   you have no reason to believe anything this
17   section is inaccurate; correct?
18              MS. DANDENEAU:  Objection to form.
19      A.    I don't.  I mean, you know, this was
20   part of the audit.
21      Q.    Thank you.  Now, you will see if we
22   could scroll just a little bit more that each
23   of the first five paragraphs concerns
24   specifically the four affiliates that we've
25   been discussing and Mr. Dondero.
```

Page 118

```
 1              WATERHOUSE - 10-19-21

 2              MR. MORRIS:  If we could go the

 3       other way, La Asia.  We don't need Okada.

 4       We're going to have to thread the needle.

 5       Okay.  Good, perfect.

 6       Q.    Do you see those five paragraphs

 7   certain the four affiliates and Mr. Dondero as

 8   we've been referring to today?

 9       A.    Yes.

10       Q.    Okay.  And do you see at the end of

11   every paragraph it states, quote:  A fair value

12   of a partnership's outstanding notes receivable

13   approximates the carrying value of the notes

14   receivable?

15       A.    Yes, I see that.

16       Q.    Do you have an understanding of what

17   that means?

18       A.    Yes.

19       Q.    What is your understanding of that

20   sentence?

21       A.    It is the -- again, the -- the fair

22   value, right, which is -- which is what the --

23   what Highland could sell that asset for.  This

24   statement is comparing the fair value of the

25   notes to the carrying value, so the carrying
```

Appx. 00939

Page 119

```
 1                    WATERHOUSE - 10-19-21

 2      value is the line item that you showed me

 3      earlier that is in Notes and Other Amounts Due

 4      from Affiliates.

 5           Q.    Okay.  Is another way to say this is

 6      that the fair market value of the notes equals

 7      the principal amount and -- withdrawn.

 8                  Is the fair way to interpret this

 9      that the fair market value of the notes equals

10      all remaining unpaid principal and interest due

11      under the notes?

12                  MS. DANDENEAU:  Object to the form.

13                  MS. DEITSCH-PEREZ:  Objection, form.

14           A.    I don't know the answer to that,

15      because I don't recall where -- where any --

16      where -- in what line item was the interest

17      component reported.

18           Q.    All right.  Well, if we look in this

19      audit report, you will see in the middle of the

20      first paragraph, for example, it states that as

21      of December 31st, 2018, total interest and

22      principal due on outstanding promissory notes

23      was approximately $5.3 million.

24                  Do you see that?

25           A.    I do.
```

Page 120

```
 1            WATERHOUSE - 10-19-21

 2        Q.    Is that the carrying value or the

 3   fair value?

 4        A.    That would be the carrying value --

 5        Q.    And is the last --

 6        A.    -- in my opinion.

 7        Q.    Okay.  And it is in your opinion as

 8   the chief financial officer of Highland during

 9   the period of time that you described; right?

10   It is an educated opinion?

11        A.    I'm reading this at face value.  I'm

12   taking that as that is carrying value.

13        Q.    Okay.  And does the last sentence

14   say that the carrying value is roughly

15   approximate to the fair market value?

16            MS. DANDENEAU:  Objection to form.

17            MS. DEITSCH-PEREZ:  Objection, form.

18        A.    Again, this note to the financial

19   statement is specific to notes and other

20   amounts due from affiliates.

21        Q.    Correct.

22        A.    If the interest component is

23   reported elsewhere on the balance sheet, you

24   know, it -- it -- it could be off.  Again, I

25   don't have the detail.  I don't know, but yes,
```

Page 121

```
 1              WATERHOUSE - 10-19-21

 2   look, I mean, if you -- I mean, if you are

 3   saying the 5.3 million is in the notes and

 4   other amounts due from affiliates, then the

 5   last statement is saying the fair value

 6   approximates 5.3 million.  That is what that

 7   last sentence is saying.

 8        Q.    Do you see in the middle of the

 9   first paragraph -- not in the middle, the next

10   to last sentence there is a statement that the

11   partnership will not demand payment on amounts

12   that exceed HCMFA's excess cash availability

13   prior to May 31st, 2021.

14              Do you see that?

15        A.    I do.

16        Q.    Do you know when Highland agreed not

17   to demand payment as described in that

18   sentence?

19        A.    I don't know specifically.

20        Q.    Do you know why Highland agreed not

21   to demand payment on HCMFA's notes until May

22   2021?

23        A.    Yes.

24        Q.    Why was that decision made?

25        A.    You know, well, it -- it -- that
```

Page 122

```
 1              WATERHOUSE - 10-19-21
 2   decision was made as to not put HCMFA into a
 3   position where it didn't have sufficient assets
 4   to pay for the demand note.
 5        Q.    And at the time the agreement was
 6   entered into, pursuant to which the partnership
 7   wouldn't demand payment, did HCMFA have
 8   insufficient assets to satisfy the notes if a
 9   demand had been made?
10              MS. DANDENEAU:  Objection to form.
11        A.    I don't have HCMFA's financial
12   statements in front of me as of 12/31/18.
13        Q.    Was there a concern that HCMFA would
14   be unable to satisfy its demands under the
15   notes if demand was made?
16              MS. DANDENEAU:  Objection to form.
17        A.    Well, there is -- I don't recall --
18   I mean, there is something, right, in place to
19   basically not demand payment until May 31, 2021
20   as detailed here.
21        Q.    And who made the decision to enter
22   into -- who made the decision on behalf of
23   Highland not to demand payment until May 31st,
24   2021?
25        A.    I'm trying to remember.  I don't
```

Appx. 00943

```
1              WATERHOUSE - 10-19-21

2    remember exactly -- I don't remember if it was

3    myself or -- or Jim Dondero who -- who -- there

4    was -- there was something signed, from what I

5    recall, that -- that -- that backed up this

6    line item in the -- in the notes I'm -- look,

7    I'm, I'm --

8         Q.    We will get to that.

9         A.    You --

10        Q.    I'm just --

11        A.    You have -- I mean --

12        Q.    We're going to give that to you.

13   I'm going to give that to you.

14        A.    You -- you -- you have all the

15   documents.  I don't have the documents, and

16   that is what makes it so hard.  I don't have

17   any documents to prepare for this deposition;

18   right?  You have all -- I don't -- I don't -- I

19   don't remember, but, you know, again, it would

20   probably be myself or Jim.

21        Q.    Do you know if Highland received

22   anything in return for its agreement not to

23   make a demand for two years?

24        A.    I don't -- I don't think it referred

25   anything.
```

Page 124

```
 1              WATERHOUSE - 10-19-21

 2       Q.    And did you and Mr. Dondero discuss

 3   HCMFA's ability to satisfy the notes if a

 4   demand was made at the time this agreement was

 5   entered into?

 6             MS. DANDENEAU:  Objection to form.

 7       A.    I don't -- I don't -- I don't recall

 8   having a specific conversation, if I did, or --

 9   or David Klos.

10       Q.    Okay.  I'm just asking if you recall

11   any conversations that you had.

12       A.    I don't recall.

13       Q.    Okay.  Do you know why Highland

14   loaned the money to HCMFA that is the subject

15   of the notes described in this paragraph?

16       A.    I don't remember specifically why

17   5.3 million was loaned.  I mean, I -- it would

18   have to be put in the context.

19       Q.    Do you have any recollection at all

20   as to why Highland ever loaned any money to

21   HCMFA?

22       A.    Yes.

23             MS. DANDENEAU:  Objection to form.

24       Q.    What do you remember about that?

25       A.    There was a Highland Global
```

Appx. 00945

Page 125

```
 1              WATERHOUSE - 10-19-21

 2   Allocation Fund, which was a -- a fund managed

 3   by Highland Capital Management Fund Advisors.

 4   There was a -- we -- I'm just telling you,

 5   there was -- there was -- there was a -- a

 6   ultimately a NAV error found in this fund while

 7   it was an open-ended fund and, you know, there

 8   were amounts owed by the advisor in -- in

 9   relation to that NAV error.

10              There were also, for the same fund,

11   that same fund was ongoing an

12   open-end-to-close-end conversion, and as part

13   of that proposal, shareholders who voted for

14   the conversion received compensation from the

15   advisor.

16        Q.    All right.  Now, the events that

17   you're describing occurred in the spring of

18   2019; right?

19        A.    These started back -- I think, I

20   mean --

21        Q.    I apologize.

22        A.    -- that -- I mean, the answer to

23   that is no.

24        Q.    I apologize, the loans that were

25   made in connection with the events that you're
```

Page 126

```
 1              WATERHOUSE - 10-19-21
 2   describing occurred in May 2019; right?
 3              MR. RUKAVINA:  Objection to the
 4        extent that calls for a legal conclusion.
 5        A.    I don't recall specifically what
 6   amounts of money were moved when, for what
 7   purpose.
 8        Q.    Okay.  Fair enough.  Going to the
 9   next paragraph, do you recall that NexPoint
10   Advisors had obtained a number of loans from
11   Highland, and they rolled up those loans into
12   one note in approximately 2017?
13        A.    This is for NexPoint Advisors?
14        Q.    Yes.
15        A.    I -- I mean, I don't -- I don't
16   recall the NexPoint Advisors loan being a
17   roll-up loan, but --
18        Q.    Do you know why?
19        A.    But, look, if you have documents
20   that show -- I mean, look, I just don't recall.
21        Q.    Okay.  That is fair.  Do you know
22   why -- do you have any recollection as to why
23   Highland loaned money to NexPoint?
24        A.    Yes.
25        Q.    Why did High -- why do you recall --
```

Page 127

```
 1              WATERHOUSE - 10-19-21

 2    what is the reason you recall Highland lending

 3    money to NexPoint?

 4         A.    I mean, I was just -- I just -- I

 5    just recall.  I mean, I just -- I don't

 6    remember why.

 7         Q.    I understand.  And I'm asking you if

 8    you recall --

 9         A.    Oh, why -- I thought you say --

10    NexPoint Advisors was launching a fund which

11    is -- I believe that the legal name is NexPoint

12    Capital, Inc.  And it -- it provided a

13    co-invest into that fund.

14              And, from what I remember, the --

15    the -- that NexPoint borrowed money from

16    Highland at the time to make that co-invest.

17         Q.    So this was an investment that

18    NexPoint was required to make; is that right?

19              MS. DANDENEAU:  Objection to form.

20         A.    I don't know if it was required to

21    make, I don't recall that, or if it just made

22    it.

23         Q.    Okay.  But your recollection is that

24    NexPoint made an investment and they borrowed

25    money from Highland to finance the investment.
```

Page 128

```
 1              WATERHOUSE - 10-19-21

 2              Do I have that right?

 3        A.    Yes.

 4        Q.    How about HCRE?  Do you know why

 5   HCRE borrowed money from Highland?

 6        A.    I don't remember specifically.

 7        Q.    Do you remember generally?

 8        A.    Generally, yeah -- I mean, yes.

 9        Q.    Can you tell me your general

10   recollection as to why Highland loaned money to

11   HCRE?

12        A.    For -- for -- for investment

13   purposes.

14        Q.    So HCRE made the investment and it

15   obtained a loan, or loans, from Highland in

16   order to finance that investment or those

17   investments.

18              Do I have that right?

19        A.    I mean, I -- you know, generally.

20        Q.    Okay.  How about Highland Management

21   Services, Inc.?

22              Do you have any recollection as to

23   why HCMS borrowed money from Highland?

24        A.    Generally.

25        Q.    What is your general recollection as
```

Appx. 00949

```
 1               WATERHOUSE - 10-19-21
 2    to why HCMS borrowed money from Highland?
 3         A.    For -- for investment purposes.
 4         Q.    So it is the same thing, HCMS wanted
 5    to make investments and it borrowed money from
 6    Highland in order to finance those investments;
 7    is that right?
 8         A.    I mean, yes, generally.  I mean, I
 9    can't -- I don't -- on the services, there --
10    there are several loans in these schedules.
11    You know, I can't remember why every single one
12    of these were made, but I would say, yeah, I
13    mean, generally.
14         Q.    Okay.  I appreciate that.
15               MR. MORRIS:  Let's go to the page
16          with Bates No. 251.  La Asia, are you
17          there?
18               MS. CANTY:  Sorry, John.  It went
19          out for a minute.  Can you say that again.
20          I don't know what is going on.
21               MR. MORRIS:  The page with Bates
22          No. 251, can we go to that.
23               MS. CANTY:  Yes, sorry.
24               MR. MORRIS:  Keep going to the
25          bottom.  Yeah, there you go.
```

Page 130

1                 WATERHOUSE - 10-19-21

2         Q.    Do you see, Mr. Waterhouse, that

3    there is a section there called Subsequent

4    Events?

5         A.    I do.

6         Q.    And does this relate to the last

7    sentence above the signature line on the

8    management representation letter that we talked

9    about earlier where you made the representation

10   that you disclosed subsequent events?

11        A.    I mean, it relates to it, but not in

12   its entirety.

13        Q.    Okay.

14             MR. MORRIS:  If we can scroll up to

15        capture the entirety of this section right

16        here.

17        Q.    And what do you mean by that, sir?

18             MR. MORRIS:  Yeah, right there.

19        Perfect.

20        A.    There are -- there are different

21   subsequent events in -- under GAAP.  So there

22   are -- and -- and -- so what we see in the

23   notes to the financial statements are one type

24   of subevent.

25        Q.    Okay.  And -- and would the type of

```
 1              WATERHOUSE - 10-19-21

 2   subsequent event relating to affiliate loans be

 3   captured in this section if they were -- if

 4   they were made after the end of the fiscal year

 5   and prior to the issuance of the audit report?

 6       A.   Yes, if they were deemed material or

 7   disclosable.

 8       Q.   Okay.  I appreciate that.

 9            Do you see the next to the last

10   entry there?  It says, Over the course of 2019

11   through the report date, HCMFA issued

12   promissory notes to the partnership in the

13   aggregate amount of $7.4 million?

14       A.   Yes.

15       Q.   And does that refresh your

16   recollection that those are the notes that

17   related to the NAV error that you mentioned

18   earlier?

19       A.   I don't -- I don't remember the

20   exact.  Again, there are -- I mentioned two

21   line items; right?

22       Q.   Yes.

23       A.   I mean, it was the GAAP conversion

24   process plus the -- the NAV error.  I don't

25   have the details.  I don't recall specifically
```

Page 132

1          WATERHOUSE - 10-19-21

2     if -- you know, what -- if that 7.4 million was

3     solely attributable to the NAV error.

4          Q.    Okay.  But there is no question that

5     Highland told PricewaterhouseCoopers that over

6     the course of 2019 HCMFA issued promissory

7     notes to the partnership in the aggregate

8     amount of $7.4 million; correct?

9          A.    In the course of the audit, we would

10    have produced all promissory notes in our

11    possession, including the ones that are

12    detailed here.

13         Q.    Do you recall that you signed the

14    two promissory notes that are referenced in

15    that provision?

16              MS. DANDENEAU:  Objection to form.

17         A.    I didn't recall initially but I've

18    been reminded.

19         Q.    Okay.  And -- and do you recall that

20    those notes are dated May 2nd and May 3rd,

21    2019?

22         A.    Yes.

23         Q.    So that was just a month before the

24    audit was completed; correct?

25         A.    Yes.  I think we had a June 3rd

Page 133

1          WATERHOUSE - 10-19-21

2    date, right, if -- if my memory serves me

3    right.

4          Q.    Yes, I will represent to you that

5    your memory is accurate in that regard.

6                Did anybody ever instruct you as the

7    CFO to correct this statement that we're

8    looking at in subsequent events?

9          A.    So let me understand.  You're saying

10   when I was CFO at Highland Capital did anyone

11   ever ask me to correct the -- over the course

12   of 2019 through the report date HCMFA issued

13   promissory notes, this statement?

14         Q.    Right.

15         A.    Not that I'm aware.

16         Q.    While you were the CFO of Highland,

17   did anybody ever tell you that that sentence

18   was wrong?

19         A.    Not that I'm aware.

20         Q.    Highland -- withdrawn.

21               HCMFA disclosed these notes in its

22   own audited financial statements; right?

23               MR. RUKAVINA:  Objection, form.

24         A.    I assume that these would be

25   material -- if these are material financial

```
 1                WATERHOUSE - 10-19-21

 2   statements, yes, they -- they -- they should be

 3   and they were likely disclosed.

 4        Q.    Now, there is no statement

 5   concerning the 2019 notes about the forbearance

 6   that we looked at in the affiliated note

 7   section of the report; right?

 8             MS. DANDENEAU:  Objection to form.

 9        Q.    I'll withdraw.  That was bad.

10             Do you recall when we were looking

11   at the paragraph concerning HCMFA earlier it

12   had that disclosure about the agreement whereby

13   Highland wouldn't ask for demand on the -- on

14   the HCMFA notes?

15        A.    Yes.

16        Q.    That forbearance disclosure is not

17   made with respect to the 2019 notes; right?

18        A.    Not -- look, not that I can recall,

19   unless -- unless it was done at a subsequent

20   day.

21        Q.    Right.  And it is not in the

22   subsequent event section that we're looking at

23   right now where the 2019 notes are described;

24   right?

25        A.    Right.  But this is through
```

1                   WATERHOUSE - 10-19-21

2    June 3rd.  It could have been done on June 4th.

3    I don't -- I don't -- I don't recall.

4         Q.   Okay.

5              MR. MORRIS:  Can we put up on the

6         screen the HCMFA audit report.  And while

7         we're --

8              MS. DANDENEAU:  What exhibit is

9         this?

10             MR. MORRIS:  La Asia, what number is

11        that?

12             MS. CANTY:  45.

13             MR. MORRIS:  So this will be marked

14        as Exhibit 45.

15             (Exhibit 45 marked.)

16             MS. CANTY:  Yeah, and I will put it

17        in the chat.

18             MS. DANDENEAU:  Thank you.

19        Q.   Okay.  All right.  Do you see that

20   this is the consolidated financial statements

21   for HCMFA for the period ending 12/31/18?

22        A.   Yes.

23        Q.   As the treasurer of HCMFA at the

24   time, did you have to sign a management

25   representation letter similar to the one that

Page 136

                    WATERHOUSE - 10-19-21

1

2    we looked at earlier for Highland?

3         A.    I would imagine I would have been

4    asked to.  I don't recall if I did.

5         Q.    Do you recall ever being asked by an

6    auditor to sign a management representation

7    letter and then not doing it?

8         A.    No.

9              MR. MORRIS:  Can we just scroll down

10        again.  I just want to see the date of the

11        document.

12        A.    I mean, let me -- you know, there

13   are different versions to management

14   representation letters I will qualify.

15             Yes, there are certain -- from time

16   to time auditors can make representations

17   that -- in the rep letter that is being

18   proposed that are inaccurate or out of scope or

19   things like that and they've asked for

20   signature.

21             In that context, yes.  I mean, you

22   know -- I mean, if I have been asked to sign

23   and make those representations and those

24   representations are invalid, yes, I would not,

25   I mean, I -- I wouldn't sign that.

Appx. 00957

Page 137

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Okay.  PricewaterhouseCoopers served

 3   as HCMFA's outside auditors as well; correct?

 4        A.    Yes.

 5        Q.    Do you see that this audit report is

 6   signed on June 3rd, 2019, just like the

 7   Highland audit report?

 8        A.    That is correct.

 9        Q.    And did the process of -- of

10   preparing HCMFA's audit report, was that the

11   same process that Highland followed when it did

12   its audit report at this time?

13        A.    I mean, it is a different entity.

14   There are different assets.  You know, it --

15   it -- it is -- as you saw, Highland's

16   financials are on a consolidated basis.  This

17   is different, so it is under the same control

18   environment and team.

19        Q.    Okay.  I appreciate that.  So the

20   same control environment and team participated

21   in the preparation of the audit for Highland

22   and for HCMFA at around the same time; correct?

23        A.    Yes.

24             MR. MORRIS:  Can we go to page 17 of

25        the report.  I don't have the Bates number.
```

Appx. 00958

```
 1                WATERHOUSE - 10-19-21

 2        Q.    Okay.  Do you see that just like

 3   Highland's audited financial report, HCMFA's

 4   audited financial report also has a section

 5   related to subsequent events?

 6        A.    Yes.

 7        Q.    And am I reading this correctly that

 8   just as Highland had done, HCMFA disclosed in

 9   its audited financial report a subsequent event

10   that related to the issuance of promissory

11   notes to Highland in the aggregate amount of

12   $7.4 million in 2019?

13        A.    That is what I see in the report.

14        Q.    And you were the treasurer of HCMFA

15   at the time; right?

16        A.    Yes, to the best of my knowledge.

17        Q.    And did anybody ever tell you prior

18   to the time of the issuance of this audit

19   report that that sentence relating to HCMFA's

20   2019 notes was inaccurate or wrong in any way?

21        A.    Not that I recall.

22        Q.    As you sit here right now, has

23   anybody ever told you that that sentence is

24   inaccurate or wrong in any way?

25        A.    Not that I recall.
```

Page 139

1          WATERHOUSE - 10-19-21

2          Q.    I apologize if I asked you this

3    already, but has anybody ever told you at any

4    time that you are not authorized to sign the

5    promissory notes that are the subject of the

6    sentence we're looking at?

7          A.    Not that I recall.

8          Q.    Did anybody ever tell you at any

9    time that you had made a mistake when you

10   signed the promissory notes that are the

11   subject of this sentence?

12         A.    Say that again.  Did anyone ever say

13   that I made a mistake?

14         Q.    Let me ask the question again.

15               Did anybody ever tell you at any

16   time that you made a mistake when you signed

17   the two promissory notes in Highland's favor on

18   behalf of HCMFA in 2019?

19         A.    Not that I recall.

20               MR. MORRIS:  Let's just look at the

21         promissory notes quickly.  Can we please

22         put up Document Number 1, and so this is in

23         the pile that y'all have.  We'll just go

24         for a few more minutes and we can take our

25         lunch break.

Appx. 00960

Page 140

```
 1              WATERHOUSE - 10-19-21

 2       Q.    All right.  So I don't know if you

 3   have seen this before, sir.  Do you see that

 4   this is a complaint against HCMFA?

 5       A.    Yes, I am looking at it on the

 6   screen.

 7       Q.    Okay.  And have you ever seen this

 8   document before?

 9       A.    I went through some of these

10   documents with my counsel here yesterday.

11             MR. MORRIS:  All right.  Can we go

12       to Exhibit 1 of this document.

13       Q.    Do you see Exhibit 1 is a

14   $2.4 million promissory note back in 2019?

15       A.    Yeah, I found it in the book.  Yes,

16   I have it here in front of me.

17       Q.    And this is a demand note, right, if

18   you look at Paragraph 2?

19       A.    Yes.

20       Q.    And this is a note where the maker

21   is HCMFA, and Highland is the payee; right?

22       A.    Yes.

23             MR. MORRIS:  And if we can scroll

24       down, can we just see Mr. Waterhouse's

25       signature.
```

Page 141

1                    WATERHOUSE - 10-19-21

2          Q.    Is that your signature, sir?

3          A.    Yes, it is.

4          Q.    And did you sign this document on or

5    around May 2nd, 2019?

6          A.    I don't recall specifically signing

7    this, but this is my signature.

8          Q.    Okay.  And do you recall that

9    Highland transferred $2.4 million to HCMFA at

10   or around the time you signed this document?

11         A.    I don't recall specifically.  I

12   would want to, as I sit here today, go back and

13   confirm that, but again, presumably that --

14   that -- that did happen.

15         Q.    You wouldn't have signed this

16   document if you didn't believe that HCMFA

17   either received or was going to receive

18   $2.4 million from Highland; is that fair?

19         A.    I mean, it -- if -- if -- if there

20   wasn't a transfer of value, yeah, I mean, you

21   know, I would have no reason to -- to sign a

22   note.

23         Q.    And -- and Highland wouldn't have

24   given this note to PricewaterhouseCoopers if --

25   withdrawn.

Page 142

1                  WATERHOUSE - 10-19-21

2              HCMFA wouldn't have given this note

3    to PricewaterhouseCoopers if it hadn't received

4    the principal value of -- of the note in the

5    form of a loan; correct?

6              MR. RUKAVINA:  Objection, legal

7         conclusion, speculation and form.

8         A.    Again, we -- what we provided to PwC

9    were, as part of the audit, any promissory

10   notes executed and outstanding.  You know, as a

11   part of the audit, they, you know, they -- they

12   have copies of all the bank statements,

13   things -- things of that sort.

14             MR. MORRIS:  Okay.  Can we go to

15        Exhibit 2.

16             (Exhibit 2 marked.)

17        Q.    Do you see that this is a promissory

18   note dated May 3rd, 2019 in the amount of

19   $5 million?

20        A.    Yes.

21        Q.    Do you believe this is also a demand

22   note if you look at Paragraph 2?

23        A.    Yes.

24        Q.    And do you see that HCMFA is the

25   maker, and Highland is the payee?

Page 143

```
 1              WATERHOUSE - 10-19-21

 2       A.    Yes.

 3       Q.    And if we go to the bottom, can we

 4  just confirm that that is your signature?

 5       A.    Yes.

 6       Q.    And together these notes are the

 7  notes that are referred to both in Highland and

 8  HCMFA's audited financial reports in the

 9  subsequent event sections; correct?

10             MS. DANDENEAU:  Objection to form.

11       A.    They -- they -- they totaled

12  $7.4 million, so presumably, yes.

13       Q.    Okay.  And you were authorized to

14  sign these two notes; correct?

15             MR. RUKAVINA:  Objection, legal

16       conclusion.

17       A.    Yeah.  I mean, I'm -- I was the

18  officer of -- of HCMFA.  You know, I -- I'm not

19  the legal expert on -- on what that -- what

20  that confers to me or what it doesn't.  I mean,

21  that is my signature on the notes.

22       Q.    And you believed you were authorized

23  to sign the notes; is that fair?

24       A.    I signed a lot of documents in my

25  capacity, just because it is operational in
```

Appx. 00964

Page 144

```
 1               WATERHOUSE - 10-19-21
 2    nature.  So, you know, to me this was just
 3    another document, to be perfectly honest.
 4         Q.   Sir, would you have signed
 5    promissory notes with the principal amount of
 6    $7.4 million if you didn't believe you were
 7    authorized to do so?
 8               MS. DANDENEAU:  Objection to form.
 9         Q.   Are you frozen?
10         A.   No.  I'm just -- you know, it is --
11    you know, again, I typically don't sign
12    promissory notes, and I don't recall why I
13    signed these, but -- you know, but I did.
14         Q.   All right.  So listen carefully to
15    my question.  Would you have ever signed
16    promissory notes with a face amount of
17    $7.4 million without believing that you were
18    authorized to do so?
19         A.   No.  I mean, I'm -- I'm putting my
20    signature on there, so no.
21         Q.   Okay.  And would you have signed two
22    promissory notes obligating HCMFA to pay
23    Highland $7.4 million without Mr. Dondero's
24    prior knowledge and approval?
25               MS. DEITSCH-PEREZ:  Object to the
```

Appx. 00965

Page 145

1        WATERHOUSE - 10-19-21

2        form.

3        A.    You know, from -- from what I recall

4    around these notes, you know, I don't recall

5    specifically Mr. -- Mr. Dondero saying to -- to

6    make this a loan.

7             So my conversation with Mr. Dondero

8    around the culmination of the NAV error as

9    related to TerreStar which was a -- a -- I

10   think it was a year and a half process.  I

11   don't know, it was a multi-month process, very

12   laborious, very difficult.

13            When we got to the end, I had a

14   conversation with Mr. Dondero on where to, you

15   know, basically get the funds to reimburse the

16   fund, and I recall him saying, get the money

17   from Highland.

18        Q.    And so he told you to get the money

19   from Highland; is that right?

20        A.    That is what I recall -- in my

21   conversation with him, that is -- that is what

22   I can recall.

23        Q.    Do you know who drafted these notes?

24        A.    I don't.

25        Q.    Did you ask somebody to draft the

```
 1              WATERHOUSE - 10-19-21
 2   notes?
 3        A.    I didn't ask -- I don't specifically
 4   ask people to draft notes really.  I mean,
 5   again, you know, the legal group at Highland is
 6   responsible and has always been responsible for
 7   drafting promissory notes.
 8        Q.    So based on your -- based on the
 9   practice, you believe that somebody from the
10   Highland's legal department would have drafted
11   these notes.  Do I have that right?
12              MS. DEITSCH-PEREZ:  Object to the
13        form.  John, I also asked you for the Word
14        versions of these notes so we could look at
15        the properties, and you have not provided
16        them.  Are you intending to?
17              MR. MORRIS:  No.
18        Q.    Can you answer my question, sir?
19        A.    Again, I --
20              MS. DANDENEAU:  Do you want him to
21        repeat it?
22        A.    Yeah, why don't you repeat it?
23        Q.    Sure.  Mr. Waterhouse, based on the
24   practice that you have described in your
25   understanding, do you believe that these notes
```

Page 147

```
 1                    WATERHOUSE - 10-19-21

 2      would have been drafted by somebody in the

 3      legal department?

 4                    MS. DEITSCH-PEREZ:  Object to the

 5           form.

 6      A.    Yes.

 7      Q.    Okay.  And do you know who would

 8      have instructed -- do you have any knowledge as

 9      to who would have instructed the legal

10      department to draft these notes?

11                    MS. DEITSCH-PEREZ:  Object to the

12           form.

13      A.    It was whoever was working -- I

14      mean, it was likely someone on the team.  I

15      mean, I don't remember exactly on every note or

16      every document, but, again, a lot of these

17      things of this nature -- they're operational in

18      nature -- were handled by the team.

19                    The team knows to -- I mean, we

20      don't draft documents.  We're not lawyers.

21      We're not attorneys.  It is not what I do or

22      accountants do.

23                    So they are always instructed to go

24      and -- and go to the legal team to get

25      documents like this drafted.  Also, when you go
```

```
                                                Page 148
 1                WATERHOUSE - 10-19-21

 2    to the legal team, the -- you know, we always

 3    loop in compliance.  And compliance -- when you

 4    go to the legal team, compliance is part of

 5    legal team.  They're made aware of -- of -- of

 6    these types of transactions.

 7         Q.    And do you believe that you had

 8    the -- withdrawn.

 9              Did you ever tell Mr. Dondero --

10    (inaudible) -- did you see those?

11         A.    Sorry.

12              MS. DEITSCH-PEREZ:  I did not hear

13         the end of that question.

14         Q.    Did you ever tell Mr. Dondero that

15    you signed these two notes?

16         A.    I don't recall ever -- no, I don't

17    recall having a conversation with him.

18         Q.    Did you ever discuss these two notes

19    with him at any time?

20         A.    The conversation, I recall, was what

21    I described earlier.  And that is the only time

22    I recall ever discussing this.

23         Q.    Okay.  But the corporate accounting

24    group had a copy of this -- of these two notes.

25    And pursuant to the audit process, the
```

Page 149

```
 1              WATERHOUSE - 10-19-21

 2   corporate accounting group gave the two notes

 3   to PricewaterhouseCoopers in connection with

 4   the audit; correct?

 5              MS. DANDENEAU:  Objection to form.

 6       A.   Yes.  I mean, that is -- yeah, I

 7   mean, they -- unless the legal team can also

 8   retain copies of items like this.  I mean, I

 9   don't know everything that they would retain as

10   well.

11              The legal team would also, if they

12   had documents as part of audits, turn that over

13   to the auditors as well.  So it could have been

14   the corporate accounting team.  It could be

15   someone on the legal team.

16       Q.   All right.  So you didn't -- you

17   didn't draft this note; right?

18       A.   I -- I -- I did not.

19       Q.   But somebody at Highland did; is

20   that fair?

21              MS. DEITSCH-PEREZ:  Object to the

22       form.

23       A.   I don't know.  I mean, we can go to

24   the legal team.  I don't -- I'm not sitting

25   behind someone in legal.  Maybe they went to
```

Appx. 00970

Page 150

```
 1                 WATERHOUSE - 10-19-21
 2    outside counsel.  I have no idea.
 3         Q.    Did you have any reason to believe
 4    you weren't authorized to sign this note,
 5    either of these two notes?
 6         A.    I think I have already answered that
 7    question.
 8         Q.    Okay.  You didn't give these notes
 9    to PricewaterhouseCoopers; correct?
10              MS. DANDENEAU:  Objection to form.
11         A.    I don't recall giving these to
12    PricewaterhouseCoopers.
13         Q.    And in the practice that you have
14    described, somebody in the corporate accounting
15    group would have given these two notes to
16    PricewaterhouseCoopers; correct?
17              MS. DANDENEAU:  Objection to form.
18         A.    I think I've answered that.  I said
19    either the corporate accounting team or maybe
20    the legal team.
21              MR. MORRIS:  Okay.  Why don't we
22         take our lunch break here.
23              VIDEOGRAPHER:  We're going off the
24         record at 1:04 p.m.
25         (Recess taken 1:04 p.m. to 1:49 p.m.)
```

Appx. 00971

Page 151

```
 1              WATERHOUSE - 10-19-21

 2              VIDEOGRAPHER:  We are back on the

 3       record at 1:49 p.m.

 4       Q.    Mr. Waterhouse, did you speak with

 5  anybody during the break about the substance of

 6  this deposition?

 7       A.    I spoke to -- to Deb and Michelle.

 8       Q.    About the substance of the

 9  deposition?

10       A.    Yes.

11       Q.    Can you tell me what you talked

12  about?

13              MS. DANDENEAU:  No.  We object on

14       the basis of privilege.

15       Q.    Okay.  You are going to follow your

16  counsel's objection here?

17       A.    Yes.

18       Q.    Okay.

19              MR. MORRIS:  Can we put up on the

20       screen Exhibit 35.

21              (Exhibit 35 marked.)

22       Q.    Are you able to see that document,

23  sir?

24       A.    Yes.

25       Q.    Have you ever seen an incumbency
```

Appx. 00972

```
                                                        Page 152
 1              WATERHOUSE - 10-19-21

 2   certificate before?

 3        A.    I have.

 4        Q.    Do you have a general understanding

 5   of what an incumbency certificate is?

 6        A.    I have a general understanding.

 7        Q.    What is your general understanding?

 8        A.    You know, those -- my general

 9   understanding is that the incumbency

10   certificate basically lists folks that can --

11   are like authorized signers.

12        Q.    Okay.  And do you see that this is

13   an incumbency certificate for Highland Capital

14   Management Fund Advisors, L.P.?

15        A.    Yes.

16        Q.    Okay.  And if we could scroll down

17   just a little bit, do you see that it's dated

18   effective as of April 11th, 2019?

19        A.    Yes, I see that.

20        Q.    Okay.  And is that your signature in

21   the middle of the signature block?

22        A.    Yes, it is.

23        Q.    And by signing it, did you accept

24   appointment as the treasurer of HCMFA effective

25   as of April 11th, 2019?
```

Page 153

```
 1              WATERHOUSE - 10-19-21

 2       A.    Again, I'm not the legal -- I don't

 3   know if this makes me the treasurer or the

 4   appointment.  I don't know -- I don't know

 5   that, so I don't -- I don't know if that

 6   document -- again, I think -- again, I'm not

 7   the legal expert.  I think isn't there --

 8   aren't there other legal documents that detail

 9   who the officers are that could be incorporated

10   or things like that?  Again, I don't want to

11   play armchair attorney here.

12       Q.    I'm not asking you for a legal

13   conclusion.  I'm asking you for your knowledge

14   and understanding.  When you signed this

15   document, did you understand that you were

16   accepting an appointment as the treasurer of

17   HCMFA?

18              MS. DANDENEAU:  Objection to form.

19              MS. DEITSCH-PEREZ:  Objection, form.

20       A.    Again, I don't think this -- that

21   wasn't my understanding.  I don't think this

22   makes -- this document makes me the treasurer.

23       Q.    What do you think this document --

24   why did you sign this document?

25              MS. DEITSCH-PEREZ:  Objection to
```

Appx. 00974

Page 154

```
 1                  WATERHOUSE - 10-19-21
 2      form.
 3              MR. MORRIS:  You're objecting to the
 4      form of the question when I asked him why
 5      did you sign the document?  What is the
 6      basis for the objection?
 7              MS. DEITSCH-PEREZ:  Because, John, I
 8      think that it does call for a legal
 9      conclusion other than -- with him saying
10      because somebody told me to sign this
11      document.  But if you want to go there,
12      that is fine.
13              MR. MORRIS:  Okay.
14              MS. DANDENEAU:  I don't think --
15      he's already said he's not a lawyer.
16              MR. MORRIS:  I'll allow the witness
17      to answer this question.
18      Q.   Why did you sign this document, sir?
19      A.   I mean, our -- our legal group would
20   bring by these incumbency certificates from
21   time to time.  I have no idea why they're being
22   updated, and I was asked to sign.
23      Q.   Did you ask anybody, what is this
24   document?
25      A.   No.
```

Page 155

```
 1              WATERHOUSE - 10-19-21
 2       Q.    Did anybody tell you why they needed
 3  you to sign the document?
 4       A.    Not that I can recall.
 5       Q.    You testified earlier that you
 6  understood that you served as the acting
 7  treasurer for HCMFA; correct?
 8       A.    Yes.
 9       Q.    How did you become the acting
10  treasurer of HCMFA?
11            MS. DANDENEAU:  Objection to form.
12       A.    I don't -- I don't know the legal --
13  I don't know the legal mechanic of how I became
14  the acting treasurer.
15       Q.    I'm not asking for the legal
16  mechanic.  I'm asking you as the person who
17  is --
18            MS. DANDENEAU:  John, you said --
19            MR. MORRIS:  Stop.
20            MS. DANDENEAU:  -- how did you
21       become the treasurer.  That is --
22            MR. MORRIS:  Please stop.
23            MS. DANDENEAU:  That is a legal
24       question.
25            MR. MORRIS:  I am not asking any
```

Appx. 00976

```
 1                WATERHOUSE - 10-19-21

 2          legal questions, to be clear.  I'm asking

 3          for this witness' understanding as to how

 4          he became the acting treasurer of HCMFA.

 5          If he doesn't know, he can say he doesn't

 6          know, but this legal stuff is nonsense, and

 7          I really object to it.

 8          Q.   Sir, I'm asking you a very simple

 9    question.

10               MS. DANDENEAU:  Argumentative.

11          Q.   You testified -- you testified that

12    you became the acting treasurer of HCM --

13    HCMFA; correct?

14          A.   Yes.

15          Q.   How did that happen?

16               MS. DANDENEAU:  Again, object to

17          form.

18               MR. MORRIS:  I can't wait to do this

19          in a courtroom.  Good God.

20          Q.   Go ahead, sir.

21          A.   I don't know the exact process of

22    how that happened.

23          Q.   Do you have any idea whether signing

24    this document was part of the process?

25               MR. MORRIS:  You know what --
```

1          WATERHOUSE - 10-19-21

2          MS. DANDENEAU:  Objection.

3          MR. MORRIS:  -- withdrawn.  You guys

4    want to do this, I can't wait.  I can't

5    wait.  This is the craziest stuff ever.

6          MS. DANDENEAU:  John, he said he's

7    not a lawyer, and you are asking him for a

8    legal conclusion, and he says he doesn't

9    know, and you persist.

10         MR. MORRIS:  Okay.

11         MS. DANDENEAU:  So you can ask these

12   questions --

13         MR. MORRIS:  Did anyone -- please

14   stop talking.

15         MS. DANDENEAU:  -- at another

16   point -- no, no, no, I'm entitled to talk,

17   too; right?  If you're going to make these

18   accusations as if we're trying to stonewall

19   you, this is not the witness to ask that

20   question.

21         MR. MORRIS:  I can't -- I can't

22   wait -- I can't wait to do this in a

23   courtroom.  I will just leave it at that.

24         MS. DANDENEAU:  That's right, I'm

25   sure you can't.

Page 158

```
 1              WATERHOUSE - 10-19-21

 2         Q.    Did anyone ever tell you, sir, that

 3    even though you were the acting treasurer of

 4    HCMFA, that you were not authorized to sign the

 5    two promissory notes that we looked at before

 6    lunch?

 7         A.    I'm not sure I understand the

 8    question.  I wasn't -- I mean, I'm -- I'm the

 9    current acting treasurer.

10         Q.    Did anybody ever tell you at any

11    time that even though you were the acting

12    treasurer of HCMFA, that you were not

13    authorized to sign the two promissory notes

14    that we looked at before lunch?

15              MS. DANDENEAU:  Objection to form.

16         A.    Not that I recall.

17         Q.    Did anybody ever tell you at any

18    time that you were not authorized to sign the

19    two promissory notes that we looked at before

20    lunch?

21         A.    Not that I recall.

22         Q.    Did anybody ever tell you at any

23    time that you should not have signed the two

24    promissory notes that we looked at before

25    lunch?
```

Appx. 00979

Page 159

```
 1                  WATERHOUSE - 10-19-21

 2         A.    Not that I recall.

 3         Q.    Did you ever tell anybody at any

 4   time that you weren't authorized to sign the

 5   two promissory notes that we looked at before

 6   lunch?

 7         A.    Not that I recall.

 8         Q.    Did you ever tell anybody at any

 9   time that you made a mistake when you signed

10   the two promissory notes that we looked at

11   before lunch?

12         A.    Not that I recall.

13         Q.    As you sit here right now, do you

14   have any reason to believe that you were not

15   authorized to sign the two documents that we

16   looked at before lunch?

17              MS. DANDENEAU:  Objection to form.

18         A.    If -- if this is the -- the valid

19   incumbency certificate, I mean, this does --

20   this does detail who the signers are.

21         Q.    Okay.  And looking at that document,

22   does that give you comfort that you were

23   authorized to sign the two promissory notes

24   that we looked at before lunch?

25              MS. DEITSCH-PEREZ:  Object to the
```

Appx. 00980

Page 160

1          WATERHOUSE - 10-19-21

2      form.

3              MS. DANDENEAU:  Objection, form.

4      A.    Yes.

5      Q.    As of October 20th -- withdrawn.

6              I'm trying to take your mind back to

7    a year ago, October 2020.  Do you recall at

8    that time that the boards of the retail funds

9    were making inquiries about obligations that

10   were owed by the advisors to Highland in

11   connection with their 15(c) review?

12             MS. DANDENEAU:  Objection to form.

13   A.    I don't -- I don't recall.

14   Q.    As of October 2020, you had no

15   reason to believe you weren't authorized to

16   sign the two promissory notes that we just

17   looked at; correct?

18             MS. DANDENEAU:  Objection, form.

19             MS. DEITSCH-PEREZ:  Objection to

20     form.

21   A.    I didn't think about it in October

22   of 2020, but I mean --

23   Q.    Did you have any reason to believe

24   at that time that you weren't authorized to

25   sign the two notes that we just looked at?

Page 161

```
 1              WATERHOUSE - 10-19-21

 2         A.    Not that I'm aware, no.

 3         Q.    Did you have any reason to believe a

 4    year ago that you made a mistake when you

 5    signed those two notes?

 6         A.    Not that I'm aware.

 7         Q.    A year ago you believed that HCMFA

 8    owed Highland the unpaid principal amounts that

 9    were due under those two notes; correct?

10         A.    They're -- they're promissory notes

11    that were -- as you presented, that were --

12    that were executed.  Whether they're valid or

13    if there's other reasons, I didn't -- I don't

14    know.

15         Q.    I'm not asking you whether they're

16    valid or not.  I'm asking you for your state of

17    mind.  A year ago you believed that HCMFA

18    was -- was obligated to pay the unpaid

19    principal amount under the two notes that you

20    signed; correct?

21         A.    Yeah, I'm -- I'm -- yes.

22         Q.    Thank you.  Are you aware -- you're

23    aware that -- that in 2017, NexPoint issued a

24    note in favor of Highland in the approximate

25    amount of $30 million; correct?
```

Page 162

```
 1                  WATERHOUSE - 10-19-21

 2          A.    I'm -- I'm -- I'm generally aware.

 3          Q.    Okay.  And are you generally aware

 4   that from time to time, after the note was

 5   issued by NexPoint, that moneys were applied to

 6   principal and interest that were due under the

 7   NexPoint note?

 8          A.    Yes, I'm generally aware.

 9          Q.    Okay.  And did anybody ever tell you

10   that the payments that were made against the

11   NexPoint notes were made by mistake?

12          A.    Yes.

13          Q.    And is it the one payment that we

14   talked about earlier today?

15          A.    We talked about a lot of things

16   today.  What payment are we talking about?

17          Q.    Okay.  Who told you that any payment

18   made against the NexPoint note was made by

19   mistake?

20          A.    D.C. Sauter.

21          Q.    When did Mr. Sauter tell you that?

22          A.    I don't -- I don't remember

23   specifically.

24          Q.    Do you remember what payments --

25          A.    Sometime -- sometime this year.
```

Appx. 00983

Page 163

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Sometime in 2021?

 3       A.    Yes.

 4       Q.    Do you remember what payment he was

 5  referring to?

 6       A.    It was the -- the payment made in

 7  January of 2021 or -- yeah, January of -- of

 8  this -- January of 2021.

 9       Q.    Okay.  So did anybody ever tell you

10  at any time that any payment that was made

11  against principal --

12       A.    And -- and -- and -- hold on, and it

13  may have been other -- again, it may have been

14  that payment or -- or there may have been what

15  he was explaining, a misapplication of prior

16  payments as well.

17       Q.    Can you -- can you give me any

18  specificity -- withdrawn.

19              Withdrawn.  Can you tell me

20  everything that Mr. Sauter told you about --

21  about errors in relation to payments made

22  against principal and interest due under the

23  NexPoint note?

24              MS. DANDENEAU:  Can I just --

25              MR. RUKAVINA:  Hold on.  Hold on.
```

Appx. 00984

Page 164

```
1              WATERHOUSE - 10-19-21
2         I'm going to object here, and I'm going to
3         instruct the witness not to answer
4         depending on the discussion that you had --
5         Mr. Waterhouse, I'm the lawyer for
6         NexPoint, and as everyone here knows, D.C.
7         Sauter is in-house counsel.
8              So if you and Mr. Sauter were having
9         a factual discussion and him preparing his
10        affidavit, et cetera, then go ahead and
11        answer that.  But if you were having a
12        discussion as to our legal strategy in this
13        lawsuit, or anything having to do with
14        that, then do not answer that.
15             And if you need to talk to either
16        your counsel or me about that, then we need
17        to have that discussion now.
18        A.   Okay.  Yeah, I don't -- I don't
19   really know how to make that distinction, so
20   maybe I need to talk to counsel before I
21   answer, or if I can answer.
22        Q.   Let me just ask you this question:
23   Did -- did you have any conversation with
24   Mr. Sauter about any payment of principal and
25   interest prior to the time that you left
```

Page 165

```
 1              WATERHOUSE - 10-19-21
 2   Highland's employment, or did it happen after
 3   you left Highland's employment?
 4        A.   I don't -- I don't recall if -- I
 5   don't recall.  I mean, it was sometime in 2021.
 6   I don't remember if it was before or after I
 7   was let go from Highland.
 8        Q.   Okay.  So -- so nobody told you
 9   prior to 2021 that any error or mistake was
10   made in the application of payments against
11   principal and interest due on the NexPoint
12   note.  Do I have that right?
13        A.   Yeah, I don't -- I don't recall this
14   being in 2020.
15        Q.   Okay.  And it didn't happen in 2019;
16   correct?
17        A.   I don't recall that happened.
18        Q.   And it didn't happen in 2018;
19   correct?
20        A.   I don't -- I don't recall that
21   happening.
22        Q.   And it didn't happen in 2017;
23   correct?
24        A.   I don't recall.
25        Q.   But -- but you believe the
```

Appx. 00986

Page 166

```
 1              WATERHOUSE - 10-19-21
 2    conversation took place in 2021.  You just
 3    don't remember if it was before or after you
 4    left Highland's employment.  Do I have that
 5    right?
 6         A.    It was sometime this year.  I
 7    don't -- I don't remember.
 8         Q.    Okay.  Did you report this
 9    conversation to Mr. Seery at any point?
10         A.    I don't believe so.
11         Q.    Did you report this conversation to
12    anybody at DSI at any time?
13         A.    I don't recall.
14         Q.    Do you have -- you don't have a
15    recollection of ever doing that; correct?
16         A.    Yeah, that's right.  I don't recall
17    doing that.
18         Q.    Do you recall telling anybody at
19    Pachulski Stang about the conversation you
20    recall with Mr. Sauter?
21         A.    No, I don't -- I don't recall.
22         Q.    Did you tell any of the independent
23    board members about your conversation with
24    Mr. Sauter?
25         A.    I don't recall.
```

Page 167

```
 1              WATERHOUSE - 10-19-21

 2         Q.   Did you tell any of the employees at

 3    Highland before you left Highland's employment

 4    about this call that you had with Mr. Sauter?

 5              MS. DANDENEAU:  Objection to form.

 6         A.   No, I don't -- no, I don't recall.

 7         Q.   NexPoint -- to the best of your

 8    knowledge, did NexPoint ever file a proof of

 9    claim against Highland to try to recover moneys

10    that were mistakenly paid against the principal

11    and interest due under the note?

12         A.   Okay.  Hold on.  You are saying did

13    NexPoint Advisors file a proof of claim to

14    Highland for errors related to payments under

15    the NexPoint note to Highland?

16         Q.   Correct.

17         A.   I'm -- I'm -- I'm not -- I'm not

18    aware.

19         Q.   Are you aware --

20         A.   I'm not the legal person here, I

21    don't know.

22         Q.   I'm just asking for your knowledge,

23    sir.

24         A.   Yeah, I don't know.  I'm not aware.

25         Q.   Are you aware of any claim of any
```

Appx. 00988

Page 168

```
 1                WATERHOUSE - 10-19-21
 2    kind that NexPoint has ever made to try to
 3    recover the amounts that it contends were -- or
 4    that Mr. Sauter contend were mistakenly applied
 5    against principal and interest due under the
 6    NexPoint note?
 7         A.   I'm not aware.
 8              MS. DANDENEAU:  Objection to form.
 9         Q.   Okay.  The advisors' agreements with
10    the retail funds are subject to annual renewal;
11    correct?
12         A.   Yes.
13         Q.   And do you participate in the
14    renewal process each year?
15         A.   Yes.
16         Q.   What role do you play in the renewal
17    process?
18         A.   I'm -- I'm asked by the retail board
19    to walk-through the advisors financials.
20         Q.   And do you do that in the context of
21    a board meeting?
22         A.   Yes, it is -- yes, it is typically
23    done in a board meeting.
24         Q.   And do you recall the time --
25    does -- does the renewal process happen around
```

```
 1                  WATERHOUSE - 10-19-21

 2    the same time each year?

 3         A.    Yes, it is -- it is around the same

 4    time every year.

 5         Q.    And what -- what time period of the

 6    year does the renewal process occur?

 7         A.    Approximately the September

 8    timeframe.

 9         Q.    During that process, in your

10    experience, does the board typically conduct

11    its own diligence and ask for information?

12         A.    Does the board ask for lots of -- I

13    mean, just -- I mean, lots of information as a

14    part of that -- that -- as part of that board

15    meeting and that process.

16         Q.    Okay.  And do you recall that the

17    process in 2020 spilled into October?

18         A.    Yes.  Yes.

19         Q.    Okay.  And as part of the process in

20    2020, the retail board asked -- asked what are

21    referred to as 15(c) questions; right?

22         A.    I guess I don't want to be -- they

23    asked 15(c) -- are you saying they asked 15(c)

24    questions and this is why it went into October

25    or --
```

Page 170

```
 1                 WATERHOUSE - 10-19-21

 2        Q.    No, I apologize.

 3              Do you have an understanding of

 4   what -- of what 15(c) refers to in the context

 5   of the annual renewal process?

 6        A.    Yes, generally.

 7        Q.    All right.  What is your general

 8   understanding of the term "15(c)" in the

 9   context of the annual renewal process?

10        A.    I -- I think 15(c) is the section

11   that -- that -- you know, that -- that the

12   board has to evaluate every year, the retail

13   board.  They have to, you know, go through,

14   evaluate, and go through that approval process

15   on a yearly basis.

16        Q.    Okay.

17              MR. MORRIS:  Can we put up on the

18        screen Exhibit 36, please.

19              (Exhibit 36 marked.)

20              MR. MORRIS:  I guess let's just

21        start at the bottom so Mr. Waterhouse can

22        see what is here.

23        Q.    You see this begins with an email

24   from Blank Rome to a number of people.

25              MR. MORRIS:  And if we can scroll
```

Appx. 00991

Page 171

```
 1                   WATERHOUSE - 10-19-21

 2          up -- keep going just a little bit.

 3          Q.    You will see that there is an email

 4    from Lauren Thedford to Thomas Surgent and

 5    others where she reports that she was attaching

 6    and reproducing below additional 15(c)

 7    follow-up questions from the board.

 8                 Do you see that?

 9          A.    Yes.

10          Q.    And do you see Question No. 2 asks

11    whether there are any material outstanding

12    amounts currently payable or due in the future

13    (e.g., notes) to HCMLP by HCMFA or NexPoint

14    Advisors or any other affiliate that provides

15    services to the funds?

16                 Do you see that?

17          A.    Yes.

18          Q.    And -- and did you -- do you recall

19    that in -- in October of 2020 the retail boards

20    were asking for that information?

21          A.    I don't recall it, but there --

22    they're obviously asking in this email.

23          Q.    Okay.

24                 MR. MORRIS:  Can we scroll up a

25          little bit, please.
```

Appx. 00992

Page 172

1           WATERHOUSE - 10-19-21

2           Q.    And then do you see that

3    Ms. Thedford includes you on the email string

4    on Tuesday, October 6th, at 5:52?

5           A.    Yes.

6           Q.    And she asks you and Dave Klos and

7    Kristin Hendrix for advice on that particular

8    Request No. 2 that I have just read; right?

9           A.    Yes.

10          Q.    Okay.  Can you tell me who

11   Ms. Thedford is?

12          A.    She was an attorney that was in the

13   legal group.

14          Q.    At Highland Capital Management,

15   L.P.?

16          A.    I'm -- I'm -- I'm -- I don't

17   remember if she was an employee of Highland or

18   any of the advisors.

19          Q.    Okay.  Do you know if she served as

20   the corporate secretary for both HCMFA and

21   NexPoint?

22          A.    Yes.

23          Q.    And -- okay.

24                Do you know whether Ms. Thedford

25   held any positions in relation to the retail

Page 173

```
 1                  WATERHOUSE - 10-19-21

 2     funds as we defined that term?

 3          A.    Yes.

 4          Q.    What is your understanding of the

 5     positions that Ms. Thedford held at the retail

 6     funds?

 7          A.    I -- I recall her being an officer.

 8     I don't recall her title.

 9          Q.    Okay.  Is she still an officer at

10     any of the retail funds today?

11          A.    No.

12          Q.    Do you know when she ceased to be an

13     officer of the retail funds?

14          A.    Approximately.

15          Q.    And when did she approximately cease

16     to be an officer of the retail funds?

17          A.    It was in -- it was in early of

18     2021.

19          Q.    Okay.  Do you know when she became

20     an officer of the retail funds?

21          A.    I don't recall.

22          Q.    To the best of your recollection,

23     was she an officer of the retail funds in

24     October of 2020?

25          A.    I believe so.
```

Page 174

```
 1                WATERHOUSE - 10-19-21

 2        Q.    Okay.  Do you know what title she

 3    held in her capacity as an officer, if any?

 4        A.    I told you I don't remember.

 5        Q.    Okay.  So she sends this email to

 6    you at 5:52 p.m. on October 6th.

 7              And if we can scroll up to the

 8    response, you responded a minute later with a

 9    one-word answer:  Yes.

10              Do you see that?

11        A.    Yes.

12        Q.    And -- and yes is -- yes was in

13    response to the retail board's Question No. 2,

14    right, whether there are any material

15    outstanding amounts currently payable or due in

16    the future?

17        A.    Yes.

18              MR. MORRIS:  And can we scroll up to

19        see what happened next.

20        Q.    So Ms. Thedford writes back to you a

21    few minutes later and she asks whether you

22    could provide the amounts.

23              Do you see that?

24        A.    Yes.

25        Q.    And then you respond further and you
```

Page 175

```
 1                   WATERHOUSE - 10-19-21

 2     refer her to the balance sheet that was

 3     provided to the board as part of the 15(c)

 4     materials.

 5             Do you see that?

 6        A.   Yes.

 7        Q.   And -- and did the advisors provide

 8     to the board certain balance sheets in 2020 in

 9     connection with the 15(c) review?

10        A.   Yes, they did.

11        Q.   Okay.  And were the amounts that

12     were outstanding or that were to be due in the

13     future by the advisors to Highland included in

14     the liability section of the balance sheet that

15     was given to the retail board?

16        A.   Yes.  Notes would be reflected as

17     liabilities.

18        Q.   Okay.  And --

19        A.   If I'm understanding your question

20     correctly.

21        Q.   You are.  And -- and -- and those

22     liabilities you -- you were -- you believed

23     were responsive to the retail board's question;

24     correct?

25        A.   Yes.
```

Appx. 00996

Page 176

```
 1            WATERHOUSE - 10-19-21

 2       Q.    Okay.  And then if we can scroll up,

 3   you see Ms. Thedford responds to you

 4   nine minutes later with a draft response.

 5            Do you see that?

 6       A.    Yes.

 7       Q.    And she says that she is taking from

 8   the 6/30 financials certain information about

 9   amounts that were due to HCMLP and affiliates

10   as of June 30th, 2020.

11            Do you see that?

12       A.    I do.

13       Q.    Okay.  And did you believe, as the

14   treasurer of NexPoint and HCMFA and as the CFO

15   of Highland, that the information that

16   Ms. Thedford obtained from the 6/30 financials

17   was accurate and responsive in relation to the

18   retail fund board's question?

19       A.    I just want to make sure I

20   understand the question.

21            Are you saying that the financial

22   information provided to the retail board as

23   part of the 15(c) process, which included

24   financial statements as of June 30th of 2021,

25   did I feel like those were responsive to their
```

Page 177

1          WATERHOUSE - 10-19-21

2     questions?

3          Q.    Yes.

4          A.    Yes.

5          Q.    Thank you.

6               MS. DEITSCH-PEREZ:  John, it is not

7          in the chat yet.  Can you just make sure it

8          gets put in there.

9               MR. MORRIS:  Sure.

10              MS. CANTY:  I put it in there.  I

11         think maybe I just sent it directly, so let

12         me make sure it says to everyone.  But I

13         did put it in there.  I will try again.

14              MR. MORRIS:  Thank you, La Asia.

15              MS. DANDENEAU:  What number is it.

16              MR. MORRIS:  What, the Bates number?

17              MS. DEITSCH-PEREZ:  No, the --

18         this -- yeah, 36 is not in the chat.

19              MR. MORRIS:  Okay.  We'll get it.

20              MS. DANDENEAU:  I think that

21         Ms. Canty just sent it to me originally.

22         Sorry.

23              MR. MORRIS:  Okay.  We will get it

24         there.

25              MS. CANTY:  Okay.  It is there now

Page 178

```
 1                    WATERHOUSE - 10-19-21

 2        for everyone.

 3              MS. DEITSCH-PEREZ:  Got it.  Thank

 4        you.

 5        Q.    Do you recall if the proposed

 6   response that Ms. Thedford crafted was

 7   delivered to the retail board with the -- with

 8   the yellow dates having been completed?

 9        A.    I don't know.

10              MR. MORRIS:  Davor, I'm going to ask

11        that the advisors and -- the advisors of

12        both HCMFA and NexPoint produce to me any

13        report that was given to the retail board

14        concerning the promissory notes at issue,

15        including the obligations under the notes.

16        Q.    Do you know -- do you know if

17   ultimately NexPoint informed the retail board

18   in response to its question that NexPoint owed

19   Highland approximately 23 or $24 million?

20              MS. DANDENEAU:  Objection to the

21        form.

22        A.    Sorry, are you asking, did NexPoint

23   tell the retail board that it owed Highland?

24        Q.    Let me ask a better question,

25   Mr. Waterhouse.
```

```
 1                 WATERHOUSE - 10-19-21

 2               Did -- do you know if anybody ever

 3      answered the retail board's question that was

 4      Number 2?

 5          A.    I don't -- I can't say for sure.

 6          Q.    Okay.  Do you recall -- I think you

 7      testified earlier that you walked through the

 8      advisors' financials with the retail board;

 9      correct?

10          A.    Yes.

11          Q.    And as part of that process, did you

12      disclose to the retail board the obligations

13      that NexPoint and HCMFA had to Highland under

14      promissory notes?

15          A.    The retail board, as I stated

16      earlier, receives financial information,

17      balance sheet, income statement information

18      from the advisors.  That information is

19      provided to the retail board in connection with

20      the 15(c) process.

21               So any notes between the advisors

22      and the Highland would be -- anything would be

23      detailed in those financial statements.

24          Q.    Do you recall in 2020 ever speaking

25      with the retail board about the advisors'
```

Page 180

```
 1                    WATERHOUSE - 10-19-21

 2    obligations under the notes to Highland?

 3               MS. DANDENEAU:  Objection to form.

 4               MS. DEITSCH-PEREZ:  Object to the

 5         form.

 6         A.    I don't recall specifically.

 7         Q.    Do you have any general recollection

 8    of discussing with the retail board the

 9    advisors' obligations to Highland under the

10    notes that they issued?

11               MS. DANDENEAU:  Object to the form.

12               MS. DEITSCH-PEREZ:  Object to the

13         form.

14         A.    I just recall generally just -- it

15    is just -- I present the financial statements,

16    and if they have questions, I answer their

17    questions and walk them through.

18               I don't recall what they asked.  I

19    don't recall where the discussion went.  I

20    don't recall anything of that nature.

21         Q.    Okay.  Do you know if anybody on

22    behalf of HCMF -- HCMFA ever told the retail

23    board that HCMFA had no obligations under the

24    two 2019 notes that you signed?  Withdrawn.

25               Do you know whether anybody on
```

Page 181

```
 1              WATERHOUSE - 10-19-21

 2    behalf of HCMFA ever told the retail boards

 3    that you weren't authorized to sign either of

 4    the two 2019 notes?

 5              MS. DANDENEAU:  Objection to form.

 6         A.   I'm not aware.

 7         Q.   Are you aware of anybody on behalf

 8    of HCMFA ever telling the retail boards that

 9    your execution of the two 2019 notes was a

10    mistake?

11              MS. DANDENEAU:  Objection to form.

12         A.   I'm not aware.

13         Q.   Are you aware of anybody on behalf

14    of HCMFA ever telling the retail boards that

15    HCMFA did not have to pay the amounts reflected

16    in the two notes that you signed in 2019?

17         A.   I'm not aware.

18         Q.   Do you know whether anybody ever

19    told the retail boards -- withdrawn.

20              Do you know whether anybody ever

21    told the retail boards that Highland has

22    commenced a lawsuit to recover on the two notes

23    that you signed in 2019?

24         A.   I'm not aware.

25         Q.   Are you aware of anybody informing
```

Appx. 01002

Page 182

```
 1                   WATERHOUSE - 10-19-21

 2      the retail boards that Highland has sued to

 3      recover on the NexPoint note?

 4            A.    I'm not aware.

 5            Q.    Do you know whether anybody ever

 6      told the retail board that Highland had

 7      declared a default with respect to the two

 8      HCMFA notes that you signed in 2019?

 9            A.    I'm not aware.

10            Q.    Are you aware of anybody ever

11      informing the retail boards that Highland had

12      declared a default under the NexPoint note?

13            A.    I'm not aware.

14            Q.    Are you aware of anybody telling the

15      retail board that Highland made a demand for

16      payment under the 2019 notes that you signed on

17      behalf of HCMFA?

18            A.    I'm not aware.

19            Q.    Let's -- let's see if there is a

20      response to Ms. Thedford's email, if we can

21      scroll up.

22                   Do you see you responded to

23      Ms. Thedford five minutes after she provided

24      the draft response to you?

25            A.    Yes.
```

Appx. 01003

```
                                                    Page 183
 1              WATERHOUSE - 10-19-21

 2       Q.    Okay.  And do you see that Dustin

 3   Norris is copied on this email?

 4       A.    Yes, he is.

 5       Q.    Great.  Do you know whether

 6   Mr. Norris held any positions at either of the

 7   advisors as of October 6, 2020?

 8       A.    I will go back to -- I'm not the

 9   legal expert of what appoints you or how or

10   why, but you did see Dustin's name on the

11   incumbency certificate that you produced

12   earlier.

13       Q.    Do you know what his title was in

14   October of 2020?

15             MS. DANDENEAU:  Objection to form.

16       A.    I don't -- I don't recall.

17       Q.    Was he -- did he have a title with

18   each of the advisors, to the best of your

19   recollection?

20       A.    I don't recall.

21       Q.    Do you know why he is included on

22   this email string?

23       A.    I didn't add Dustin.  It looks like

24   Lauren did.  I don't know why she added him or

25   not.  You would have to ask her.
```

Appx. 01004

```
 1              WATERHOUSE - 10-19-21

 2        Q.    Does Mr. Norris play a role in

 3   formulating the advisors' responses to the

 4   questions asked by the retail board in

 5   connection with the 15(c) annual review?

 6              MS. DANDENEAU:  Objection to form.

 7        A.    He -- Dustin Norris is there in the

 8   board meetings.  But -- so he has a role, yes.

 9        Q.    Okay.  And does Mr. Norris hold any

10   positions, to the best of your knowledge, in

11   relation to any of the retail funds?

12        A.    I don't -- I don't believe he does.

13        Q.    How about Mr. Post, do you know

14   whether Mr. Post holds any position in either

15   of the advisors?

16        A.    I mean, he -- he -- yes.

17        Q.    What is your understanding of the

18   positions that Mr. Post holds in relation to

19   the advisors?

20              MS. DANDENEAU:  Objection to form.

21        A.    He is an employee of NexPoint

22   Advisors.  He is also the chief compliance

23   officer for -- for NexPoint.

24        Q.    Who is the chief compliance officer

25   for HCMFA, if you know?
```

```
 1              WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  Objection to form.

 3         A.   That would be Jason as well.

 4         Q.   Okay.  Now, looking at your

 5    response, you noted initially that nothing was

 6    owed under shared services.  Do I have that

 7    right in substance?

 8         A.   Yeah.  I think I'm being responsive

 9    to Lauren's question here, whether any of the

10    shared service invoices are outstanding.

11         Q.   Right.

12         A.   Yes.

13         Q.   And that is because -- and that is

14    because the retail the retail board has asked

15    for the disclosure of all material obligations

16    that were owed to HCMLP either then or in the

17    future; isn't that right?

18              MS. DANDENEAU:  Objection to form.

19         Q.   We can go back down and look.

20         A.   Look, I don't know if that's a

21    material item, I mean, again, but sure.

22         Q.   Okay.  But there were no shared

23    services outstanding; correct?

24              MS. DANDENEAU:  Objection to form.

25         A.   That is what this email seems to
```

Page 186

```
 1                WATERHOUSE - 10-19-21

 2    indicate.

 3         Q.    And you wouldn't have written it if

 4    you didn't believe it to be true at the time;

 5    correct?

 6         A.    Correct.

 7         Q.    And when you referred to shared

 8    services outstanding, what you meant there was

 9    that neither NexPoint nor HCMFA owed Highland

10    any money under the shared services agreements

11    that they had with Highland as of October 6th,

12    2020; right?

13         A.    I don't know if it is as of October

14    6, 2020 or if it was from -- like through the

15    financials -- through the date of the

16    financials as of June 30.

17         Q.    Okay.  And then you noted that

18    HCMA -- the HCMFA note is a demand note; right?

19         A.    Yes.

20         Q.    And then you referred Ms. Thedford

21    to Kristin Hendrix for the term of the NexPoint

22    note.  Do I have that right?

23         A.    Yes.

24         Q.    And then you refer to that agreement

25    that is referenced in the 2018 audited
```

Appx. 01007

```
 1                 WATERHOUSE - 10-19-21

 2     financials about Highland's agreement not to

 3     make demand upon HCMFA until May 2021; correct?

 4          A.    Correct.

 5          Q.    And then -- and then the next thing

 6     you write is that the attorneys think that BK

 7     doesn't change that, but don't know for sure at

 8     the end of the day.

 9                Do you see that sentence?

10          A.    Yes.

11          Q.    Which attorneys were you referring

12     to?

13          A.    I don't remember.

14          Q.    Did you have a conversation with

15     attorneys concerning whether the bankruptcy

16     would change or alter in any way the agreement

17     not to make a demand under the HCMFA note?

18          A.    Look, yeah, I mean, I don't

19     specifically remember, but generally, I mean,

20     it is in this email.  I don't -- I don't -- I

21     don't -- I don't remember who I talked to or,

22     you know, was it inside counsel, outside

23     counsel, but obviously I talked to somebody.

24          Q.    Do you have any recollection --

25          A.    Well, I don't even know if it's --
```

Page 188

```
 1                WATERHOUSE - 10-19-21

 2    actually, it may not even have been me.  I say

 3    the attorneys in, you know, a lot of -- like I

 4    talked about the team.

 5              It could have been someone on the

 6    team, like, hey, we need to run this down, and

 7    maybe they talked to attorneys again and

 8    relayed that information to me.

 9              So I really don't know if I spoke or

10    someone else did or -- or, I mean, and maybe it

11    wasn't even from corporate accounting.  Maybe

12    it was, you know, other -- I'm kind of

13    summarizing, you know, again, so I don't really

14    know -- I can't really say for sure.  I don't

15    remember how I came about of this knowledge.

16        Q.    I appreciate your efforts,

17    Mr. Waterhouse, but I will just tell you that

18    if I ask a question and you don't know the

19    answer or you don't recall, I'm happy to accept

20    that.  I don't -- I don't want you to

21    speculate, so I want to be clear about that.

22    So I appreciate it.

23              Let me just ask you simply:  Do you

24    know what attorneys -- can you identify any of

25    the attorneys who thought that the bankruptcy
```

Appx. 01009

```
 1                    WATERHOUSE - 10-19-21
 2      process didn't change the agreement?
 3           A.    I don't recall.
 4           Q.    Okay.  Perfect.
 5                 And then let's look at the last
 6      sentence.  It says, quote:  The response should
 7      include, as I covered in the board meeting,
 8      that both entities have the full faith and
 9      backing from Jim Dondero, and to my knowledge
10      that hasn't changed.
11                 Do you see that?
12           A.    Yes.
13           Q.    Okay.  Prior to October 6th, 2020,
14      had you told the retail board that HCMFA and
15      NexPoint have the full faith and backing from
16      Jim Dondero?
17           A.    Yes.
18           Q.    Do you remember in the context in
19      which you told the retail board that?
20           A.    I mean, generally, yes.
21           Q.    Tell me what you recall.
22           A.    So we were walking through the
23      financials from the advisors; right?  So as I
24      described to you, you have got HCMFA and NPA.
25      And these -- the financials, you know, show
```

Page 190

```
 1                  WATERHOUSE - 10-19-21
 2    they have liabilities on them that exceed
 3    assets.
 4                 So the retail board has asked, okay,
 5    you know, how -- you know, if -- if these
 6    liabilities come due or they're payable, you
 7    know, how does that come about?
 8                 And, you know, the response is,
 9    well, the advisors have the -- the full faith
10    and backing from -- from Jim Dondero.
11         Q.   And how did you know that the
12    advisors had the full faith and backing from
13    Jim Dondero?  What was the basis for that
14    statement that you made to the retail board?
15         A.   I talked to Jim about it at some
16    point in the past.
17         Q.   And did you tell Mr. Dondero that
18    you were going to inform the retail board that
19    the advisors had his full faith and backing
20    before you actually told that to the retail
21    board?
22         A.   I don't recall having that
23    conversation.
24         Q.   Do you recall if you ever informed
25    Mr. Dondero that you had disclosed or told the
```

Page 191

```
 1              WATERHOUSE - 10-19-21

 2   retail board that the advisors had the full

 3   faith and backing of Mr. -- Mr. Dondero?

 4              MS. DEITSCH-PEREZ:  Object to the

 5         form.

 6         A.    I don't recall discussing that with

 7   him at the time.

 8         Q.    When you told this to the board, was

 9   Mr. Dondero participating in the discussion?

10         A.    Not that I recall.

11         Q.    Withdrawn.  Was it not -- withdrawn.

12              Do you recall whether -- when you

13   covered this issue with the board, was that in

14   a -- a Zoom call or a Webex call?  Was it a

15   telephone call?  Was it in-person?  Like where

16   were you physically in relation to the board?

17         A.    I believe I was at home.

18         Q.    Okay.  Can you identify every person

19   that you recall who was present for this

20   disclosure other than -- other than the board

21   members themselves?

22              MS. DEITSCH-PEREZ:  Object to the

23         form.

24         A.    I don't recall everyone on the call.

25         Q.    Can you identify anybody who was on
```

Page 192

1          WATERHOUSE - 10-19-21

2     the call?

3          A.    Other than the board members?

4          Q.    Yes.

5          A.    Lauren Thedford.  I mean, there

6     are -- there are many -- my section is just one

7     of many sections that are just -- you know, as

8     you can appreciate, this is a long board

9     meeting.

10              I can't recall specifically, really

11    even generally, or who was on when this was

12    discussed.  But Lauren was typically on for the

13    entire time.

14         Q.    I apologize if I asked you this, but

15    do either of Mr. Norris or Mr. Post hold any

16    positions relative to the retail funds?

17         A.    I think you asked me this already,

18    John.

19         Q.    Okay.  I just don't recall.  Can you

20    just refresh my recollection if I did, in fact,

21    ask you the question?

22         A.    I don't believe -- if we can go

23    back.  I don't believe Mr. Norris has a title

24    at the retail funds.  Mr. -- and Mr. Post is

25    the CCO of the advisor, the advisors.

Page 193

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Okay.  Do you know if either of them

 3   have a position with the retail board -- with

 4   the retail funds?

 5      A.    I don't believe Mr. Norris has a

 6   position with the retail funds.

 7      Q.    All right.  What about Mr. Post?

 8      A.    Mr. Post is the CCO of the advisors.

 9      Q.    Okay.  Does he hold any position --

10      A.    I don't believe so.

11      Q.    -- with the retail funds?

12      A.    I don't believe so.

13      Q.    Okay.

14      A.    I don't know if being the CCO for

15   the advisor conveys something for the retail

16   funds.  Again, I am not -- that is the legal

17   compliance part of it.  I don't know.

18      Q.    Why did you tell the retail board

19   that the advisors have the full faith and

20   backing from Mr. Dondero?

21              MS. DANDENEAU:  Objection to form.

22      A.    It is -- it is -- it is what has

23   been discussed with them prior.

24      Q.    And were you -- were you trying to

25   give them comfort that even though the
```

Page 194

```
 1              WATERHOUSE - 10-19-21

 2   liabilities exceeded the assets that the

 3   advisors would still be able to meet their

 4   obligations as they become due?

 5              MS. DANDENEAU:  Objection to form.

 6              MS. DEITSCH-PEREZ:  Object form.

 7       A.    I -- I can't -- I don't remember

 8   specifically the conversation, but generally --

 9   you know, generally, yes.  And that is why --

10   but, you know, again, in this email saying, you

11   know, I am sure I qualified it with the retail

12   board, you know, as I said I like -- you know,

13   to my knowledge, that hasn't changed.  But,

14   again, generally -- generally that is what I

15   remember.

16       Q.    Okay.  Do you recall if in the

17   advisors' response to the retail board's

18   question if the response included any statement

19   concerning Mr. Dondero and -- and the full

20   faith and backing that he was giving to the

21   advisors?

22              MS. DEITSCH-PEREZ:  Object to the

23       form.

24       A.    I don't -- I don't remember

25   specifically what was provided.
```

Appx. 01015

Page 195

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Okay.

 3       A.    And I don't really -- I don't really

 4   remember generally either.

 5       Q.    Okay.

 6             MR. MORRIS:  So -- so, again, I'm

 7       just going to ask Mr. Rukavina if your

 8       clients can produce as soon as possible the

 9       15(c) response, the written response that

10       the advisors made, if any, to the board's

11       Question No. 2.

12             I'm not looking for the whole

13       response, but I certainly want the response

14       to Question No. 2.

15       Q.    Do you have a general understanding

16   as to the amount by which -- withdrawn.

17             Did -- did the assets of --

18   withdrawn.

19             Did the liabilities of HCMFA exceed

20   its assets in 2020?

21             MS. DANDENEAU:  Objection to form.

22             MS. DEITSCH-PEREZ:  Objection, form.

23       A.    I believe I have already answered

24   that question earlier, I think.  I believe I

25   said yes.
```

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Okay.  And did the liabilities of

 3    NexPoint exceed its assets in 2020?

 4              MS. DEITSCH-PEREZ:  Objection to

 5        form.

 6        A.    I don't believe so.

 7        Q.    Okay.  So -- so it was only one of

 8    the two advisors who had liabilities that

 9    exceeded the value of the assets.

10              Do I have that right?

11              MS. DEITSCH-PEREZ:  Objection to

12        form.

13              MS. DANDENEAU:  Form.

14        A.    Yes.

15        Q.    And do you know, ballpark, the

16    amount by which the value of HCMFA's

17    liabilities exceeded their assets in 2020?

18              MS. DANDENEAU:  Objection to form.

19        A.    I don't -- I don't recall.

20              MR. MORRIS:  I had specifically

21        requested in discovery the audited

22        financial reports for both advisors and

23        NexPoint.  I think I may have gotten one

24        for NexPoint but I'm still waiting for the

25        balance.  And I'm going to renew my request
```

Page 197

```
 1                WATERHOUSE - 10-19-21

 2          for those documents too.

 3          Q.    Let's go to the next exhibit, which

 4     is Number 10.  So I think it is in your stack,

 5     Mr. Waterhouse.

 6                MR. MORRIS:  And we can take the one

 7          down from the screen and put up Number 10

 8          for everybody.

 9                (Exhibit 10 marked.)

10          Q.    And I don't know if you have ever

11     seen this before, but I'm really putting it up

12     on the screen for purposes of turning to the

13     very last page of the document.

14                So this is a document that we have

15     been -- that we premarked as Exhibit 10.  And

16     we're turning to the last page of the document,

17     which is a document that was filed in the

18     adversary proceeding 21-3004.  And -- no, I

19     apologize, I think we -- right there.  Perfect.

20                And it is page 31 of 31.

21                MR. MORRIS:  I think there may have

22          been some something erroneously stapled to

23          the hard copy that I gave you folks, but

24          I'm looking for page 31 of 31 in the

25          document that begins with the first page of
```

Appx. 01018

```
                                                     Page 198
 1                WATERHOUSE - 10-19-21

 2          Exhibit 10.

 3          Q.    Do you have that, Mr. Waterhouse?

 4          A.    I don't have it yet.  I'm looking.

 5          Q.    All right.  If you look at the top

 6    right-hand corner, you will see it says page

 7    hopefully something of 31?

 8          A.    Yes, I've got it now.

 9          Q.    Okay.  You have got 31 of 31.  You

10    can take a moment to read that, if you would

11    like.

12          A.    (Reviewing document.)  Okay.

13          Q.    Have you ever seen this before?

14          A.    I don't know if I have seen this

15    specific document, but, you know, I've --

16    I'm -- I'm aware of it.

17          Q.    And is this the document that you

18    had in mind when you sent that email to

19    Ms. Thedford that we just looked at where you

20    said that Highland had agreed not to make a

21    demand upon HCMFA until May 2021?

22          A.    Honestly, I don't -- it wasn't this

23    document.  I mean, it's something like this,

24    yes.  I mean, yes.

25          Q.    Well --
```

Page 199

```
 1              WATERHOUSE - 10-19-21

 2        A.    It is something like this, but I

 3   don't think it was this specific document.

 4        Q.    Well, but this document does say in

 5   the last sentence that Highland agreed not to

 6   seek -- not to demand payment from HCMFA prior

 7   to May 31, 2021; right?

 8        A.    Yes.

 9        Q.    And are you aware of any other

10   document that was ever created pursuant to

11   which Highland agreed not to demand payment on

12   amounts owed by HCMFA before May 31, 2021?

13        A.    Hold on.  Are you asking, am I aware

14   of a document that by HCMFA that basically says

15   otherwise?

16        Q.    No.  Let me try again.

17              Are you aware of any other document

18   pursuant to which -- pursuant to which Highland

19   agreed not to make a demand on HCMFA until May

20   31st, 2021?

21        A.    I'm -- I think there was something

22   in connection with -- with the -- with the

23   audit that basically says the same thing.

24        Q.    Okay.  And do you think that the

25   audit is referring to this particular document?
```

Page 200

```
 1                WATERHOUSE - 10-19-21

 2        A.    I don't know.

 3        Q.    All right.  This document is dated

 4   April 15, 2019.  Do you see that?

 5        A.    I do.

 6        Q.    And do you remember that the audit

 7   was completed on June 3rd, 2019?

 8        A.    Yes.

 9        Q.    And do you recall that the audited

10   financials -- and I'm happy to pull them up if

11   you would like, but do you recall that the

12   audited financials included a reference to the

13   agreement pursuant to which Highland agreed not

14   to make a demand until May 31st, 2021?

15        A.    Yes, I remember.

16        Q.    And as part of the process, would

17   you have expected the corporate accounting team

18   to have provided a copy of this document to

19   PwC?

20              MS. DANDENEAU:  Objection to form.

21        A.    Yes, I would have expected something

22   like this, or again, you know, some document

23   that basically states -- states the deferral

24   till May 31 of 2020.

25        Q.    Okay.
```

Page 201

```
 1              WATERHOUSE - 10-19-21

 2        A.    May 31 of 2021, excuse me.

 3        Q.    And this document states the

 4   deferral that you just described; correct?

 5        A.    It does.

 6        Q.    And this document states the

 7   deferral that was described in the audited

 8   financial statements that we looked at before;

 9   correct?

10        A.    It does.

11              MR. MORRIS:  Okay.  Can we scroll

12        down just a little bit to see who signed on

13        behalf of the acknowledgment there.

14        Q.    Okay.  So Mr. Dondero signed this

15   document on behalf of both HCMFA and Highland;

16   do you see that?

17        A.    I do.

18        Q.    Okay.  Did you discuss this document

19   or the -- withdrawn.

20              Did you discuss the concept of the

21   deferral with Mr. Dondero in the spring of

22   2019?

23        A.    I think I testified I don't recall.

24        Q.    Okay.  Do you know whose idea it was

25   to issue the acknowledgment in this form?
```

```
 1                  WATERHOUSE - 10-19-21

 2        A.    I don't recall.

 3              MR. MORRIS:  Can we scroll back up

 4        to the document, please.

 5        Q.    Do you see in the beginning it says,

 6   reference is made to certain outstanding

 7   amounts loaned from Highland to HCMFA for

 8   funding ongoing operations.

 9              Do you see that?

10        A.    Yes.

11        Q.    And were you aware as the CFO of

12   Highland and as the treasurer of HCMFA that as

13   of April 15, 2019, Highland had made certain

14   loans to HCMFA to fund HCMFA's ongoing

15   operations?

16        A.    Yes.

17        Q.    And were you aware that those loans

18   were payable on demand and remained outstanding

19   as of December 31st, 2018?

20        A.    Yes.

21        Q.    And were you aware that those

22   amounts were payable on demand, and they

23   remained outstanding as of April 15, 2019?

24              MS. DEITSCH-PEREZ:  Object to the

25        form.
```

Page 203

WATERHOUSE - 10-19-21

1

2      A.    Well, this -- this document dated

3   April 15, 2019 says they have been deferred to

4   May 31, 2021.

5      Q.    Right.  But I'm just sticking to the

6   first paragraph where they refer to the

7   outstanding amounts.  And in the end it says

8   the -- it remained outstanding on December

9   31st, 2018, and I think you told me that you

10  understood that, and then I'm just trying to

11  capture the last piece of it.

12         Did you understand that there were

13  amounts outstanding from the loan that Highland

14  made to HCMFA to fund ongoing operations as of

15  April 15th, 2019?

16     A.    Yes.

17     Q.    Thank you.  Let's look at the next

18  sentence.  HCMFA expects that it may be unable

19  to repay such amounts should they become due

20  for the period commencing today and continuing

21  through May 31st, 2021.

22         Do you see that?

23         MS. DANDENEAU:  Objection to form.

24     A.    I do.

25     Q.    As the CFO -- withdrawn.

Page 204

1              WATERHOUSE - 10-19-21

2                   As the treasurer of HCMFA, did you

3    believe that -- do you believe that statement

4    was true and accurate at the time it was

5    rendered?

6         A.    I mean, it -- it -- the answer to

7    that is I really didn't have any -- I didn't

8    have an opinion really.

9         Q.    Did you do anything to educate

10   yourself in April of 2019 on the issue of

11   whether HCMFA could repay the amounts that it

12   owed to Highland should they become due?

13        A.    I don't believe so.

14        Q.    Did you at any time form any

15   opinions as to HCMFA's ability to repay all

16   amounts due to Highland should they become due?

17        A.    Not really.  I guess I don't...

18        Q.    Well, you told the retail board that

19   HCMFA's liabilities exceeded their assets in

20   2020; correct?

21        A.    Yes.

22        Q.    Based on the work that you did to

23   prepare for the retail board, did you form any

24   view as to whether HCMFA would be unable to

25   repay the amounts that it owed to Highland

Page 205

1                    WATERHOUSE - 10-19-21

2     should they become due?

3                    MS. DANDENEAU:  Objection to form.

4          A.    I mean, I -- when you look at that,

5     to answer you, completely, you know, again,

6     if -- the response I gave the retail board was,

7     you know, the -- the advice -- HCMFA advisors

8     have the -- have the full faith and backing of

9     Jim Dondero.  So I didn't form an opinion of

10    whether the advisor could pay it or not.

11         Q.    Did you form any view as to whether

12    the advisors could repay the amounts that it

13    owed to Highland should they become due without

14    the full faith and backing of Mr. Dondero?

15                   MS. DANDENEAU:  Objection to form.

16                   MS. DEITSCH-PEREZ:  Form.

17         A.    I mean, if you -- if you -- if you

18    take that last statement out, I mean, it would

19    be difficult for HCMFA to pay back demand notes

20    at that time.

21         Q.    And it was precisely for that reason

22    that you told the retail board that -- that the

23    retail -- that the advisors had the full faith

24    and backing of Mr. Dondero; correct?

25                   MS. DANDENEAU:  Objection to form.

```
 1              WATERHOUSE - 10-19-21

 2        A.    I mean, yes, as the mouthpiece, I

 3    was relaying information.

 4        Q.    Okay.  And you relayed that

 5    information with the knowledge and approval of

 6    Mr. Dondero; correct?

 7              MS. DEITSCH-PEREZ:  Object to the

 8        form.

 9        A.    As I stated in the email, I don't

10    believe, and I think I testified I don't

11    believe I had conversations with Mr. Dondero at

12    the time of that board meeting.

13        Q.    Did you tell the retail board that

14    the advisors had the full faith and backing of

15    Mr. Dondero without Mr. Dondero's prior

16    approval?

17        A.    Yeah, I -- I -- yes, I'm -- like I

18    said, I think I testified earlier, I'm sure I

19    qualified it as well.

20        Q.    What do you mean by that?

21              MS. DANDENEAU:  Objection to form.

22        A.    Again -- again, like I said in the

23    email, it has the full faith and backing of Jim

24    Dondero unless that has changed.

25        Q.    Actually that is not what you said,
```

```
 1                    WATERHOUSE - 10-19-21

 2   so let's put the email back up.

 3        A.    It is -- it is -- it is in the

 4   email.

 5        Q.    Let's put the email back up.  You

 6   didn't say unless it has changed.  You said you

 7   believe it hasn't changed; right?

 8        A.    Okay.  And to my knowledge that

 9   hasn't changed, that is what it says.

10        Q.    That's right.

11        A.    But, again, I mean, that is -- I

12   don't know everything.  And I'm not in every

13   conversation.  I'm not -- to presume that I am,

14   is -- and you have to put myself -- as you

15   started this out, Mr. Morris, I was at home in

16   October of 2020 with COVID -- or, you know,

17   under these COVID times that we described is

18   very difficult.

19              We have all been working at home for

20   really the first time ever, undergoing

21   processes, procedures, control environments

22   that have been untested, and there is poor

23   communication.

24              So I am relaying, as I'm telling you

25   now, what is in the email.  And unless
```

Page 208

```
 1                  WATERHOUSE - 10-19-21

 2   something has changed -- to my knowledge, it

 3   hasn't changed, but it could have changed.

 4        Q.    When you say that the advisors have

 5   the full faith and backing from Mr. Dondero,

 6   did you intend to convey that, to the extent

 7   the advisors were unable to satisfy their

 8   obligations as they become due, Mr. Dondero

 9   would do it for them?

10             MS. DANDENEAU:  Object to the form.

11             MS. DEITSCH-PEREZ:  Object to the

12        form.

13             And, John, we have given you a lot

14        of leeway here but this does not seem

15        relevant to this case.  You seem sort of

16        taking a complete sort of diversion into

17        the allegations and the complaint just

18        filed on Friday, and so I would ask you to

19        move on because --

20             MR. MORRIS:  And I will tell you --

21        I will tell you that I have never read that

22        complaint cover-to-cover.  I have nothing

23        to do with the prosecution of those claims.

24        And this issue that we're talking about

25        right now is related solely to the
```

Appx. 01029

Page 209

```
 1                WATERHOUSE - 10-19-21

 2         promissory notes that your clients refuse

 3         to pay.

 4              So I'm going to continue to ask my

 5         questions, and I would ask the court

 6         reporter to read back my last question.

 7                    (Record read.)

 8              MS. DEITSCH-PEREZ:  And then I

 9         believe there were objections to form.

10         Q.    You can answer the question.

11         A.    Yes.

12         Q.    Thank you very much, sir.

13              MR. MORRIS:  Can we go back to the

14         other document, please?

15         Q.    Mr. Waterhouse, do you know if this

16    document was ever shared with the retail board?

17         A.    I don't recall.

18         Q.    Did you ever share it with the

19    retail board?

20         A.    I don't recall.

21         Q.    Did you ever tell the retail board

22    about the substance of this document?

23         A.    I don't recall.

24         Q.    Did you ever tell the retail board

25    that Highland had agreed not to make a demand
```

Appx. 01030

Page 210

```
 1              WATERHOUSE - 10-19-21

 2   against HCMFA until May 2021?

 3         A.    I don't recall.

 4         Q.    Do you know whether anybody on

 5   behalf of the advisors ever informed the retail

 6   board that Highland had agreed on April 15,

 7   2019, not to make a demand against HCMFA under

 8   the promissory notes?

 9         A.    I don't recall.

10         Q.    Did you instruct Ms. Thedford or

11   anybody else responding to the retail board's

12   15(c) inquiry to disclose this document?

13         A.    Did I instruct Ms. Thedford or

14   anyone else to -- to -- to produce this, to

15   disclose this document?  Is that what you -- I

16   just want to make sure.

17         Q.    Uh-huh.

18         A.    Yeah, I don't -- I don't recall.

19         Q.    Did you instruct anybody to inform

20   the retail board, in response to their question

21   as part of the 15(c) process, to -- to tell the

22   retail board about Highland's agreement not to

23   make a demand until 2021?

24              MS. DANDENEAU:  Objection to form.

25         A.    I don't recall.
```

Page 211

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Did you ever inform PwC that HCMFA's

 3  liabilities exceeded its assets?

 4              MS. DANDENEAU:  Object to the form.

 5      A.    I don't -- I don't think I told

 6  them.  I mean, they -- they audited the

 7  financial statements.

 8      Q.    Did -- do you know if anybody on

 9  behalf of Highland ever informed

10  PricewaterhouseCoopers that HCMFA may be unable

11  to repay amounts owing to Highland, should they

12  become due?

13              MS. DANDENEAU:  Objection to form.

14      A.    Yes.  Again, I think I testified

15  earlier that -- that this was communicated to

16  the auditors.

17      Q.    Ideally --

18      A.    I don't know who exactly did that.

19  I don't recall doing it, but, yeah, it was --

20  it was communicated.  And that is why -- I

21  mean, there is a disclosure in the financial

22  statements; right?

23      Q.    There is, and that disclosure

24  relates to the last sentence of this document;

25  correct?
```

Appx. 01032

Page 212

```
 1              WATERHOUSE - 10-19-21

 2      A.    Yes.

 3      Q.    Do you recall looking in the

 4  document and seeing anything that was disclosed

 5  with respect to the sentence above that?

 6      A.    No.

 7      Q.    Do you know whether anybody on

 8  behalf of Highland ever informed

 9  PricewaterhouseCoopers that HCMFA expects that

10  it may be unable to repay amounts due and owing

11  to Highland should they become due?

12            MS. DEITSCH-PEREZ:  Object to the

13       form.  I think that is the third time.

14      A.    I don't recall.  Again, as I said,

15  we -- all of this was given to the auditors.

16      Q.    Do you know if Highland received

17  anything of value in exchange for its agreement

18  not to demand payment on amounts owed by HCMFA

19  prior to May 31st, 2021?

20            MS. DEITSCH-PEREZ:  Object to the

21       form.  That is the second time.

22            MS. DANDENEAU:  Object to the form.

23      A.    I have answered this question.

24            MR. RUKAVINA:  Hold on.  Object to

25       legal conclusion.  Go ahead.
```

Appx. 01033

```
 1                    WATERHOUSE - 10-19-21

 2        A.    I have answered this question

 3   before.

 4        Q.    And the answer was no?

 5        A.    I'm not aware.

 6        Q.    Now, this acknowledgment can't

 7   possibly apply to the two notes that you signed

 8   on behalf of HCMFA because those notes were

 9   signed on May 2nd and May 3rd, 2019; is that

10   right?

11             MS. DANDENEAU:  Objection to form.

12        A.    Unless there is a drafting error.

13        Q.    Okay.  Are you aware of a drafting

14   error?

15        A.    I'm not aware.  I didn't -- I wasn't

16   part of -- I didn't sign this note or this

17   acknowledgment.  I didn't draft it.

18        Q.    But you do see it is dated April 15,

19   2019; right?

20        A.    Yes.

21        Q.    And this was a document that was

22   actually included by the advisors in a pleading

23   they filed with the Court; right?

24             MR. RUKAVINA:  Well, I don't know

25        that so I object to form.
```

Page 214

1          WATERHOUSE - 10-19-21

2          Q.    Okay.  Let's go to the first page of

3     the document and just confirm that.

4               MR. AIGEN:  Mr. Morris, I just note

5          that you already said there was some error

6          with the document that is listed as

7          exhibit --

8               MR. MORRIS:  No.  No, no, no.

9               MS. DEITSCH-PEREZ:  Oh, okay.

10              MR. MORRIS:  What I said is that

11         there is a few pages that were mistakenly

12         stapled to the end of the document.

13              MS. DEITSCH-PEREZ:  Okay.

14              MR. MORRIS:  There is no problem

15         with this document.

16              MS. DEITSCH-PEREZ:  And just so

17         we're clear that the document -- the pages

18         that start with defendant's amended answer

19         are not intended to be part of this

20         document?

21              MR. MORRIS:  That's correct.

22              MS. DEITSCH-PEREZ:  And that the --

23         but it is your representation that the rest

24         of the document is -- is -- is correct

25         because we don't -- we don't have any way

Page 215

```
 1              WATERHOUSE - 10-19-21

 2        of verifying that, we're just --

 3              MR. MORRIS:  You do, actually.  You

 4        could just go to Docket No. 21-3004.

 5              MS. DEITSCH-PEREZ:  If you want to

 6        stop this deposition so we can go and pull

 7        that document up, we're happy to do it.  So

 8        I am just asking you for your

 9        representation.

10              MR. MORRIS:  Sure.  I gave that.

11              MS. DEITSCH-PEREZ:  Okay.

12        Q.    So do you see that this is a

13   document that was actually filed with the Court

14   by Highland Capital Management Fund Advisors?

15        A.    No.  I get with the first page in

16   the section.  Maybe I'm looking at the wrong

17   thing.  It says, Highland Capital Management.

18        Q.    Don't worry about it.  Don't worry

19   about it.

20        A.    Maybe I went back -- okay.

21              MR. MORRIS:  All right.  Can we put

22        up on the screen Exhibit 2.

23              (Exhibit 2 marked.)

24              MR. MORRIS:  I think it is

25        Exhibit 1.
```

Page 216

1          WATERHOUSE - 10-19-21

2               MS. DANDENEAU:  I'm sorry, John, did

3          you say Exhibit 2 or Exhibit 1?

4               MR. MORRIS:  It is Exhibit 2 in the

5          binders so it is premarked Exhibit 2.  And

6          now I'm asking -- right there -- going to

7          Exhibit 1 to the document that was marked

8          as Exhibit 2.

9               MS. DANDENEAU:  Got it.  In the

10         binder there is no --

11              MS. DEITSCH-PEREZ:  There is no

12         Exhibit 1.

13              MR. MORRIS:  All right.  So look at

14         the one on the screen.

15         Q.    Do you see, Mr. Waterhouse, that

16    this is a promissory note dated May 31st, 2017,

17    in the approximate amount of $30.7 million?

18         A.    Yes.

19         Q.    And do you see that the maker of the

20    note is NexPoint?

21         A.    Yes.

22         Q.    And that Highland is the payee; is

23    that right?

24         A.    Yes.

25         Q.    Okay.  And do you see in Paragraph 2

Page 217

```
 1              WATERHOUSE - 10-19-21
 2   this is an annual installment note?
 3        A.    Can you scroll down.
 4        Q.    Sure.
 5              MR. MORRIS:  Can we scroll down --
 6        yeah, there you go.
 7        A.    Right there, yeah.  Yes.
 8              MR. MORRIS:  And can we scroll down
 9        to the signature line.
10        Q.    And do you recognize that as
11   Mr. Dondero's signature?
12        A.    Yes.
13        Q.    And is this the promissory note that
14   we talked about earlier where NexPoint had made
15   certain payments in the aggregate amount of
16   about 6 to $7 million against principal and
17   interest?
18        A.    I don't recall discussing the
19   aggregate principal amounts of 6 to $7 million,
20   but -- so I don't -- I don't recall that prior
21   discussion with those amounts.
22        Q.    All right.  Let's take a look.
23   NexPoint always included this promissory note
24   as a liability on its audited financial
25   statements; right?
```

Appx. 01038

Page 218

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    And NexPoint had its financial

 4   statements audited; isn't that correct?

 5        A.    Yes.

 6        Q.    And was the process of NexPoint's

 7   audit similar to the process you described

 8   earlier for Highland and HCMFA?

 9        A.    Yes, it is similar.

10        Q.    Okay.

11              MR. MORRIS:  Can we put up

12        NexPoint's audited financials and let

13        everybody know what exhibit number it is,

14        La Asia?

15              MS. CANTY:  It is going to be

16        Exhibit 46.

17              (Exhibit 46 marked.)

18        Q.    And do you see, sir, that we've put

19   up NexPoint Advisors' consolidated financial

20   statements and supplemental information for the

21   period ending December 31st, 2019?

22        A.    Yes.

23        Q.    Did you participate in the process

24   whereby these audited financial statements were

25   issued?
```

Appx. 01039

Page 219

```
 1                WATERHOUSE - 10-19-21

 2        A.    I didn't participate directly, as

 3   I've described before, about the -- the team

 4   performing the audit.

 5        Q.    Do you recall when the audit of

 6   NexPoint's financial statements for the period

 7   ending December 31st, 2019 was completed?

 8        A.    Yes.

 9        Q.    And when do you recall it being

10   completed?

11        A.    In January of 2021.

12        Q.    Do you know why the 2019 audit

13   report wasn't completed until January of 2021?

14        A.    Yes.

15        Q.    Why was the NexPoint audit report

16   for the period ending 12/31/19 not completed

17   until January 2021?

18        A.    Because we had to deal with working

19   from home from -- with COVID, and on top of all

20   of our daily responsibilities and job duties

21   at -- at providing -- at Highland providing

22   services to NexPoint, we had to do all of this

23   extra work for a bankruptcy that was filed in

24   October of 2019.

25              MR. MORRIS:  Can we go to the
```

```
 1              WATERHOUSE - 10-19-21

 2         balance sheet on page 3?  Okay.  Stop right

 3         there.

 4         Q.    Do you see under the liabilities

 5    section, the last item is note payable to

 6    affiliate?

 7         A.    Yes.

 8         Q.    And is that the note that we just

 9    looked at?

10              MS. DANDENEAU:  Objection to form.

11         Q.    Withdrawn.

12              Is that the approximately

13    $30 million note that we just looked at that

14    was dated from 2017?

15              MS. DANDENEAU:  Objection to form.

16         A.    I believe no.

17         Q.    Okay.  You're not aware of any other

18    note that was outstanding from NexPoint to

19    Highland as of the end of the year 2019, other

20    than that one $30 million note; right?

21         A.    I don't recall.

22         Q.    And as of the end of 2019, the

23    principal amount that was due on the note was

24    approximately $23 million; right?

25              MS. DEITSCH-PEREZ:  Object to the
```

Page 221

```
 1                  WATERHOUSE - 10-19-21

 2        form.

 3        A.    Approximately.

 4        Q.    And does that refresh your

 5   recollection that between the time the note was

 6   executed and the end of 2019, that NexPoint had

 7   paid down approximately $7 million?

 8        A.    Yes.  If we are just doing the math,

 9   yes.

10        Q.    Okay.  Did NexPoint complete its

11   audit from 2020?

12        A.    Sorry, you kind of broke up.  Do

13   NexPoint complete?

14        Q.    The audit of its financial

15   statements for the period ending December 31st,

16   2020?

17        A.    No.

18        Q.    No, it's not complete?

19        A.    No, it is not complete.

20        Q.    Did HCMFA complete its audit for the

21   year ending December 31st, 2020?

22        A.    No.

23              MR. MORRIS:  Can we go to page 15,

24        please, the paragraph at the bottom.

25        Q.    Do you see that NexPoint has
```

Appx. 01042

```
1                    WATERHOUSE - 10-19-21
2     included under notes payable to Highland a
3     reference to the amounts that were outstanding
4     as of the year-end 2019 under the note that we
5     looked at just a moment ago?
6          A.    Yes.  Are you talking about the
7     second paragraph?
8          Q.    I'm actually talking about first
9     paragraph.  Do you understand that the first
10    paragraph is a reference to the 2017 note, and
11    the amounts that were -- the principal amount
12    that was outstanding as of the end of 2019?
13              MS. DANDENEAU:  Objection to form.
14         John, do you mean the first paragraph of
15         that page?
16              MR. MORRIS:  No, the first paragraph
17         under notes payable to Highland.
18         A.    Yeah, I see the paragraph, and
19    again, this is what I answered earlier.  I
20    believe so, just because I don't -- again, this
21    is a number in a balance sheet, and without
22    matching it up and seeing the detail with the
23    schedule like I kind of talked about for
24    Highland's financial statements, it is a little
25    bit more difficult to tie everything in
```

```
                                           Page 223
 1              WATERHOUSE - 10-19-21
 2  perfectly together.
 3      Q.   Okay.  But you're not aware of any
 4  note that was outstanding at the end of 2019
 5  from NexPoint to Highland other than whatever
 6  principal was still due and owing under the
 7  $30 million note issued in 2017; correct?
 8      A.   Well, it -- I don't -- there is
 9  reference in the second paragraph.  I don't --
10  I don't -- I don't recall what that is
11  referring to, so I don't -- I don't know.
12      Q.   Well, if you listen carefully to my
13  question, right, I'm asking about notes that
14  were outstanding at the end of 2019, and if we
15  look at the paragraph you just referred to, it
16  says that during the year there were new notes
17  issued totaling $1.5 million, but by the end of
18  the year, no principal or interest was
19  outstanding on the notes.
20          Do you see that?
21      A.   Oh, I do, yes.
22      Q.   So does that refresh your
23  recollection that there were no notes
24  outstanding from NexPoint to Highland other
25  than the principal remaining under the original
```

 1                WATERHOUSE - 10-19-21

 2    $30 million 2017 note that we looked at a

 3    moment ago?

 4         A.    Well, we're at the bottom of the

 5    page.  Is there anything on page 16?

 6         Q.    That is a fair question, sure.  That

 7    is it.

 8         A.    Okay.  So it appears that that is

 9    the only note that is detailed in the notes in

10    the financial statement.

11         Q.    And you don't have any memory of any

12    other note other than the 2017 note, right,

13    being outstanding as of the end of the year?

14         A.    I deal with thousands of

15    transactions every year.  I don't really have a

16    very specific memory for what exactly was

17    outstanding.

18              MR. MORRIS:  Why don't we take a

19         break now.  We've been going for a little

20         while.  It's 3:26.  Let's come back at

21         3:40.

22              VIDEOGRAPHER:  We're going off the

23         record at 3:26 p.m.

24         (Recess taken 3:26 p.m. to 3:39 p.m.)

25              VIDEOGRAPHER:  We are going back on

Page 225

```
 1                  WATERHOUSE - 10-19-21

 2           the record at 3:39 p.m.

 3           Q.    All right.  Mr. Waterhouse, we -- I

 4      don't think we have a lot more here.

 5                  To the best of your knowledge and

 6      recollection, were all affiliate loans and all

 7      loans made to Mr. Dondero recorded on

 8      Highland's books and records as assets of

 9      Highland?

10                  MS. DANDENEAU:  Object to the form,

11           asked and answered.

12           A.    To my knowledge, yes.

13           Q.    Okay.  Can you recall any loan to

14      any affiliate or Mr. Dondero that was not

15      recorded on Highland's books and records as an

16      asset?

17           A.    Like during my time as CFO?  I don't

18      recall.

19           Q.    How about after the time that you

20      were CFO?  Did you recall that there was a loan

21      by Highland to an affiliate or to Mr. Dondero

22      that hadn't been previously recorded on

23      Highland's books as an asset?

24                  MS. DANDENEAU:  Objection to form.

25           A.    I guess I don't understand the
```

Appx. 01046

Page 226

```
 1              WATERHOUSE - 10-19-21

 2    question.  I left Highland as of -- I'm not

 3    aware of -- I left Highland in February --

 4    probably the last day of February of 2021.

 5          Q.    Okay.

 6          A.    I'm not -- I'm not aware of any --

 7    I'm not aware of anything past that date.

 8          Q.    Okay.  While you were the CFO at

 9    Highland, did Highland prepare in the ordinary

10    course of business a document that reported

11    operating results on a monthly basis?

12          A.    Yes.

13          Q.    And are you generally familiar with

14    the monthly operating reports?

15          A.    Yeah.  You are referring to the

16    reports that we filed to the Court every month?

17          Q.    I apologize, I'm not.  I'm taking

18    you back to the pre-petition period.  There was

19    a report that I have seen that I'm going to

20    show you, but I'm just asking for your

21    knowledge.

22              MR. MORRIS:  Let's put it up on the

23          screen, Exhibit 39.

24              (Exhibit 39 marked.)

25          Q.    Do you see this is a document that
```

Page 227

```
 1                WATERHOUSE - 10-19-21
 2    is called operating results?
 3         A.    Yeah, that's the title of it.
 4         Q.    Okay.  And was a report of operating
 5    results prepared by Highland on a monthly basis
 6    during the time that you served as CFO?
 7         A.    No.
 8         Q.    Are you familiar with a document of
 9    this type?  And we can certainly look at the
10    next page or two to refresh your recollection.
11         A.    I'm just looking at the title.  I
12    don't really -- again, as I discussed before, I
13    don't have any records or documents or emails
14    or appointments or anything that I was able to
15    use prior to -- prior to this deposition, so
16    I'm doing the best I can.
17         Q.    Okay.  You don't need to apologize.
18    I'm just asking you if you are familiar with
19    the document called Operating Results that was
20    prepared on a monthly basis at Highland?
21              MS. DEITSCH-PEREZ:  Object to the
22         form.
23         Q.    If you're not, you're not.
24         A.    I don't believe this was prepared on
25    a monthly basis.
```

Page 228

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Okay.  Do you see that this one

 3   is -- is dated February 2018?

 4       A.    Yes.

 5       Q.    Do you have -- do you believe --

 6   have you ever seen a document that was

 7   purporting to report operating results for

 8   Highland?

 9              MS. DANDENEAU:  Objection to form.

10       A.    Yes.

11       Q.    Okay.  And when you say that you

12   don't believe it was produced on a monthly

13   basis, was it produced on any periodic bases to

14   the best of your recollection?

15       A.    I believe it was -- it was prepared

16   on an annual basis.

17       Q.    Okay.

18              MR. MORRIS:  Can we look at the next

19       page.

20       Q.    Do you see that there is a statement

21   here called:  Significant items impacting

22   HCMLP's balance sheet?

23              And it is dated February 2018.

24       A.    Yes.

25       Q.    Do you recall that there was a
```

Appx. 01049

Page 229

1                    WATERHOUSE - 10-19-21

2     report that Highland prepared that identified

3     significant items impacting the balance sheet?

4          A.    A report that was prepared.

5          Q.    Let me ask a better question:  Did

6     Highland prepare reports to the best of your

7     recollection that identified significant items

8     that impacted its balance sheet?

9          A.    Well, so Highland prepared a -- a

10    monthly close package.  And maybe I'm

11    getting -- and -- and maybe change names at one

12    time or maybe I'm just -- again, just

13    misremembering -- but in that, yes, there is a

14    page that would detail just changes in -- you

15    know, just changes month over month on the

16    balance sheet.

17         Q.    Okay.  And maybe it is my fault.

18    Maybe I didn't know the proper name for it.

19    But let's use the phrase "monthly close

20    package."

21              Did Highland prepare a monthly close

22    package in the ordinary course of business

23    during the time that you served as CFO?

24              MS. DANDENEAU:  Objection to form.

25         A.    Yes.

Page 230

```
 1              WATERHOUSE - 10-19-21

 2         Q.    And did the monthly close package

 3    that Highland prepared include information

 4    concerning significant items that impacted

 5    Highland's balance sheet?

 6         A.    Yes, it had a page like that is --

 7    that is on the screen that detailed items

 8    like -- of that nature.

 9         Q.    And do you know who -- was there

10    anybody at Highland who was responsible for

11    overseeing the preparation of the monthly

12    reporting package?

13         A.    That would have been -- again, it

14    varies over time during my tenure as CFO.

15    It -- it varied over -- over time, but -- but

16    typically a -- a corporate accounting manager.

17         Q.    And who were the corporate

18    accounting managers during your tenure as CFO?

19         A.    It would have been Dave Klos and

20    Kristin Hendrix.

21         Q.    And did the corporate accounting

22    manager deliver to you drafts of the monthly

23    close package before it was finalized?

24         A.    Sometimes.

25         Q.    Was that the practice even if there
```

```
 1                 WATERHOUSE - 10-19-21

 2    were exceptions to the practice?

 3         A.    The practice meaning that they

 4    sometimes lured them to me?

 5         Q.    That that was the expectation even

 6    if circumstances prevented that from happening

 7    from time to time.

 8                MS. DEITSCH-PEREZ:  Object to the

 9         form.

10         A.    I -- I would say it started out that

11    way but over the years it -- it was not

12    enforced.

13         Q.    Okay.  So you were -- you reviewed

14    and approved monthly -- monthly reporting

15    packages for a certain period of time and then

16    over time you stopped doing that.

17                Do I have that right?

18                MS. DANDENEAU:  Objection to form.

19         A.    Yes, I mean, if you're talking about

20    a formal meeting where we sit down and go

21    through and approve it.  I would say that was

22    standard practice a decade -- you know, early

23    on.  And as time went on that -- that -- that

24    practice wasn't followed.

25         Q.    Okay.
```

```
 1              WATERHOUSE - 10-19-21

 2        A.    And, quite frankly, I don't even

 3   know if these were -- these were sent to me

 4   even in any capacity.

 5        Q.    What was the purpose of preparing

 6   the monthly reporting package -- withdrawn.

 7              What was the purpose of preparing

 8   the monthly close package?

 9              MS. DEITSCH-PEREZ:  Object to the

10        form.

11        A.    The -- the original purpose was so

12   that it would just -- it would be a report that

13   was reviewed monthly with senior management.

14        Q.    Who was included in the idea of

15   senior management?

16        A.    You know, I think originally when

17   this was conceived that would have been like

18   Jim Dondero and Mark Okada.

19        Q.    Were monthly reporting -- withdrawn.

20              Were monthly close packages prepared

21   to the best of your knowledge until the time

22   you left Highland?

23        A.    To my knowledge -- I don't know,

24   actually.  I mean, to my knowledge, I believe

25   it was being -- that was still being done.  I
```

Page 233

1            WATERHOUSE - 10-19-21

2    don't know because, again, I wasn't reviewing

3    them.  I hadn't reviewed a close package for --

4    for a long time.  But I believe the standard

5    practice that was still being carried out.

6         Q.    Did you ever have any discussions

7    with the debtor's independent board concerning

8    any promissory notes that were issued by any of

9    the affiliates or Mr. Dondero?

10        A.    I can't -- I can't -- I can't recall

11   specifically.

12        Q.    Did you speak with the independent

13   board from time to time?

14        A.    Yes, from -- from -- from time to

15   time I had discussions with the independent

16   board members, you know, either -- either, you

17   know, by themselves or wholly, you know, as --

18   as a -- as a combined work.

19        Q.    Okay.  Before we talk about

20   Mr. Seery, do you recall ever having a

21   conversation with Mr. Nelms or Mr. Dubel

22   concerning any promissory note that was

23   rendered by one of the affiliates or

24   Mr. Dondero to Highland?

25        A.    I don't recall any conversations

Page 234

```
 1                 WATERHOUSE - 10-19-21

 2    specifically.

 3         Q.    Do you know if the topic was ever

 4    discussed, even if you don't remember it

 5    specifically?

 6                MS. DANDENEAU:  Objection to form.

 7         A.    It -- it -- it may have.  I don't

 8    know.  I don't recall.

 9         Q.    Do you recall ever discussing any

10    promissory note issued by any of the affiliates

11    or Mr. Dondero with James Seery?

12         A.    I don't -- I don't recall

13    specifically.

14         Q.    Do you recall generally ever

15    discussing the topic of promissory notes issued

16    by any of the affiliates or Mr. Dondero to

17    Highland with Mr. Seery?

18         A.    Nothing -- nothing is really jumping

19    out at me.

20         Q.    Do you recall if you ever told

21    Mr. Seery that any of the affiliates or

22    Mr. Dondero didn't have an obligation to pay

23    all amounts due and owing under their notes?

24         A.    I don't recall having that

25    conversation.
```

Page 235

1              WATERHOUSE - 10-19-21

2         Q.    Did you ever tell Mr. Seery that you

3    had any reason to believe that the amounts

4    reflected in the notes issued by the affiliates

5    and Mr. Dondero were invalid for any reason?

6         A.    I don't -- I don't recall.

7         Q.    Did you tell Mr. Dondero -- did you

8    tell Mr. Seery that you thought the promissory

9    notes issued by the advisors and Mr. Dondero

10   that were outstanding as of the petition date

11   were assets of the estate?

12        A.    I don't recall having a specific

13   conversation about those -- you know, those

14   notes outstanding as -- as of the petition date

15   being assets on the estate.  I mean, we put

16   together -- you know, they're in the books and

17   records of the financial statements.  I don't

18   recall having a specific conversation.

19        Q.    Did you ever prepare any documents

20   that were delivered to Mr. Seery that concerned

21   the promissory notes issued by any of the

22   affiliates or Mr. Dondero?

23              MS. DANDENEAU:  Objection to form.

24        A.    Did I produce any that concerned --

25   you mean did I just -- did I give Mr. Seery

Appx. 01056

Page 236

```
 1              WATERHOUSE - 10-19-21
 2    anything that -- that said I have concerns over
 3    these notes?
 4         Q.   No.  Let me try again.  Maybe it was
 5    my question.
 6              Did you ever give Mr. Seery any
 7    information concerning any of the notes that
 8    were issued by any of the affiliates or
 9    Mr. Dondero?
10              MS. DANDENEAU:  Objection to form.
11         A.   I don't recall if I did or not.  I
12    don't -- I don't remember.  I mean, you have my
13    emails.  You may have asked.  Again, I don't --
14    I don't know.
15              MR. MORRIS:  Can we put up the
16         document that has been premarked as Exhibit
17         39?
18              MS. DANDENEAU:  John, that is this
19         document, isn't it?
20              MR. MORRIS:  Oh, yeah, it might be,
21         as a matter of fact.  Let's go to Number
22         40.
23              (Exhibit 40 marked.)
24         Q.   During the bankruptcy,
25    Mr. Waterhouse, did you prepare documents that
```

Appx. 01057

Page 237

```
 1                   WATERHOUSE - 10-19-21

 2    were filed with the bankruptcy court?

 3         A.    I didn't -- I didn't prepare them

 4    personally.

 5         Q.    Did people prepare them under your

 6    direction?

 7         A.    Yes.  There were members of the team

 8    that prepared them, and they worked in -- you

 9    know, there were members of DSI that were

10    involved in the process as well.

11         Q.    To the best of your knowledge, did

12    DSI rely on the employees of Highland for the

13    information that they used to prepare the

14    bankruptcy filings?

15         A.    Yes.  The books and records were

16    with the Highland personnel.

17         Q.    Okay.  And do you see on the screen

18    here, there is a document that we have marked

19    as Exhibit 40 that is -- that is titled Summary

20    of Assets and Liabilities?

21         A.    Uh-huh.

22         Q.    Okay.  And do you recall reviewing

23    any summary of assets and liabilities before it

24    was filed with the bankruptcy court?

25         A.    Yes, I recall reviewing this at a
```

Appx. 01058

Page 238

```
 1                  WATERHOUSE - 10-19-21

 2     high level.

 3          Q.    And did you believe that it was

 4     accurate at the time it was filed?

 5          A.    I didn't have any other reason to

 6     believe otherwise.

 7          Q.    Okay.  Do you see that the total

 8     value of all properties listed in Part 1 is

 9     approximately $410 million?

10               MS. DEITSCH-PEREZ:  Objection to

11          form.

12          A.    Yes, it is in 1c.

13          Q.    Yes.

14          A.    Yes, I see that.

15          Q.    Okay.  If we go to the second page,

16     now I think I may just have excerpts here, just

17     so everybody is clear, but if we scroll down to

18     the second page, you will see that there is

19     a -- a little further.  There you go.  You will

20     see there is a reference to Item 71, notes

21     receivable.

22               Do you see that?

23          A.    I do.

24          Q.    And that was a reference to the

25     notes receivable from the affiliates and
```

Appx. 01059

Page 239

```
 1                WATERHOUSE - 10-19-21

 2   Mr. Dondero, among others; is that right?

 3            MS. DANDENEAU:  Objection to form.

 4       A.   Yes.  The affiliate notes and the

 5   Dondero notes were in this amount, but they

 6   weren't -- again, like you said, and among

 7   others.

 8       Q.   Okay.  We will look at the

 9   specificity because I'm not playing gaming

10   here, but do you know if the $150 million of

11   notes receivable was included within the

12   $410 million of total value of the debtor's

13   assets?

14            MS. DANDENEAU:  Objection to form.

15       A.   I -- I -- I believe so.

16       Q.   Right.  And so is it fair to say

17   that as of the date this document was prepared,

18   the notes receivable were more than one-third

19   of the value of the debtor's assets?

20            MS. DEITSCH-PEREZ:  Object to the

21       form.

22            MS. DANDENEAU:  Object to the form.

23       A.   Again, if you are just taking the

24   math, 150 divided by whatever the $400 million

25   number is above, then yes, you get there.
```

Page 240

1          WATERHOUSE - 10-19-21

2          Q.     Okay.

3          A.     You know, but as of the time of this

4    filing, that is what was put in this filing,

5    right, but, you know, I mean, numbers --

6    numbers change, facts and circumstances change.

7          Q.     But as the CFO of Highland, the

8    debtor in bankruptcy, did you believe that this

9    number accurately reflected the total amount

10   due under the notes receivable?

11         A.     That is what we had in our books and

12   records.

13         Q.     Okay.  And did you believe as the

14   CFO that the books and records accurately

15   reported the then value of the debtor's assets?

16              MS. DANDENEAU:  Objection to form.

17         A.     We didn't -- as part of this filing,

18   there was no fair value measurement or

19   anything.  These were just accounting entries

20   for the promissory notes.  There is no analysis

21   for impairment or fair market value adjustments

22   or anything of that nature.  This is purely

23   taking numbers and putting them in our form.

24         Q.     Did you do any impairment analysis

25   at any time while you were employed by

Page 241

1                  WATERHOUSE - 10-19-21

2     Highland?

3          A.    Yes, we did do impairment analysis

4     on -- on assets.

5          Q.    Okay.  Did you ever do an impairment

6     analysis on any of the promissory notes that

7     were given to Highland by any of the affiliates

8     or Mr. Dondero?

9          A.    Not that I recall.

10         Q.    Under what circumstances do you

11    prepare impairment analyses?

12         A.    As -- as -- if you're preparing

13    financials in accordance with GAAP, generally

14    accepted accounting principles, if you're

15    preparing full GAAP financials, you should be

16    preparing -- you should be undergoing on a

17    periodic basis any fair market value

18    adjustments to assets.

19              As I was instructed at the time of

20    the petition date, we weren't producing GAAP

21    financials.  So this wasn't something I was

22    worried about nor concerned about.

23         Q.    Okay.  Were NexPoint and HCMFA and

24    Highland's audited financial statements

25    prepared in accordance with GAAP?

Page 242

```
 1                   WATERHOUSE - 10-19-21

 2        A.    The audited financials -- yes,

 3   audited financial statements are prepared in

 4   accordance with GAAP.

 5        Q.    Do you recall whether any of

 6   Highland or HCMFA or NexPoint ever made a fair

 7   market value adjustment to any of the notes

 8   issued by any of the affiliates or Mr. Dondero

 9   to Highland?

10        A.    I do not recall that happening, but

11   the -- it is because under -- under GAAP,

12   the -- the treatment of liabilities is

13   different than assets.

14        Q.    Okay.  So then let's just focus on

15   Highland's audited financial statements.

16              The last audited financial

17   statements were for the period ending December

18   31st, 2018; correct?

19        A.    That is my understanding.

20        Q.    And you had -- you had an obligation

21   to disclose anything to PricewaterhouseCoopers

22   concerning any subsequent events between the

23   end of 2018 and June 3rd, 2019; correct?

24              MS. DANDENEAU:  Objection to form.

25              MS. DEITSCH-PEREZ:  Form.
```

Appx. 01063

Page 243

```
 1                    WATERHOUSE - 10-19-21

 2         A.    Correct.

 3         Q.    Okay.  To the best of your

 4    knowledge, as Highland's CFO, did Highland ever

 5    make any fair market value adjustments to any

 6    of the promissory notes that were carried on

 7    its balance sheet and that were issued by any

 8    of the affiliates or Mr. Dondero?

 9         A.    I think I answered that question

10    earlier.  I don't recall doing that for any of

11    the -- those -- those notes.  So it would have

12    included the audit for the -- for the 2018

13    period.

14         Q.    Okay.

15              MR. MORRIS:  Can we go to the next

16         page.

17         Q.    Do you see this is a note a list of

18    notes receivable?  Do you see that?

19         A.    Yes, I do.

20         Q.    And do you see that this ties into

21    the page that we were just looking?

22         A.    I'm sorry, can we go back to the

23    prior page?  I mean, it was at 150,331,222.  It

24    was on the prior page.  Next page.  Yes, it

25    agrees.
```

Appx. 01064

Page 244

```
 1                WATERHOUSE - 10-19-21

 2        Q.    Okay.  So now let's look at that

 3   schedule.  So this was the face amount of all

 4   of the promissory notes that Highland held at

 5   the time this document was filed with the

 6   bankruptcy court; right?

 7        A.    Yes.

 8        Q.    There is a footnote there that says,

 9   doubtful or uncollectible accounts are

10   evaluated at year-end.

11             Do you see that?

12        A.    I do.

13        Q.    Okay.  And is it fair to say that as

14   of the year-end 2018, the year before this,

15   that to the extent any of these notes were

16   outstanding at that time, they weren't deemed

17   to be doubtful or uncollectible?

18        A.    Yeah.  For the 2018 audit, there

19   weren't any -- there weren't any adjustments to

20   fair value.

21        Q.    Okay.  And during the bankruptcy, do

22   you recall that Highland subsequently reserved

23   for the Hunter Mountain Investment Trust note?

24        A.    Yes.

25        Q.    Why did Highland -- were you
```

Page 245

```
 1              WATERHOUSE - 10-19-21

 2   involved in the decision to reserve the Hunter

 3   Mountain Investment Trust note?

 4        A.    I was not.

 5        Q.    Do you know why Highland decided to

 6   reserve for the Hunter Mountain Investment

 7   Trust note?

 8        A.    I don't know yet decision was made.

 9   I believe it was made by someone at DSI.

10        Q.    Okay.  I'm just asking if you know

11   why.

12              Did you ever ask anyone why they

13   reserved for that particular note?

14        A.    I don't recall.

15        Q.    Do you know whether the debtor

16   reserved for any other note on this list during

17   the bankruptcy?

18        A.    Again, I don't recall.  I wasn't

19   part of any process of -- again, like any fair

20   value adjustments or anything to that degree.

21   Like I said, a lot of that was done by DSI and

22   it was kind of out of our court.

23        Q.    Okay.  Do you know if any note

24   receivable on this list was ever deemed by the

25   debtor to be doubtful or uncollectible?
```

Appx. 01066

```
 1                  WATERHOUSE - 10-19-21

 2          A.    I don't -- I don't have a

 3     recollection of every filing, so I don't know.

 4          Q.    Did you ever have a discussion with

 5     anybody at any time about whether any of the

 6     notes receivable on this list should be deemed

 7     to be doubtful or uncollectible?

 8          A.    No.  As I previously stated, we were

 9     told we didn't have to keep GAAP financials.

10     We weren't having -- you know, there is no

11     underlying audits being performed, so I mean,

12     it wasn't something I worried about.

13               MR. MORRIS:  I move to strike.

14          Q.    Did you ever have a conversation

15     with anybody about any of the notes receivable

16     and whether they should be deemed to be

17     doubtful or uncollectible?  Did you have the

18     conversation, yes or no?

19               MS. DANDENEAU:  Objection to form.

20          A.    I don't recall.

21          Q.    Do you recall ever telling anybody

22     that you believed any of the notes receivable

23     on this list should be doubtful -- should be

24     deemed to be doubtful or uncollectible?

25               MS. DANDENEAU:  Objection to form.
```

1              WATERHOUSE - 10-19-21

2       A.    I don't recall.  I mean, it may have

3  happened, you know, again, when we initially

4  getting DSI up to speed and going through

5  financials, it may have happened, but I don't

6  recall specifically.

7       Q.    While you were the CFO of Highland

8  during the time that the company was in

9  bankruptcy, did you have any reason to believe

10  that any of the notes receivable on this list

11  other than Hunter Mountain Investment Trust

12  should have been characterized as doubtful or

13  uncollectible?

14              MS. DANDENEAU:  Objection to form.

15              MS. DEITSCH-PEREZ:  Form.

16       A.    I didn't know.  I didn't form an

17  opinion.  Bankruptcy was new to me.  It still

18  is new to me, even after going through this.

19  So I really didn't know what to expect nor

20  really -- you know, I didn't know.

21              MR. MORRIS:  I move to strike.

22       Q.    During the period of Highland's

23  bankruptcy when you were serving as CFO, did

24  you have any reason to believe any of the notes

25  on this list were doubtful or uncollectible?

```
 1              WATERHOUSE - 10-19-21
 2              MS. DEITSCH-PEREZ:  This is like the
 3         fifth time you've asked it.  Object to the
 4         form.
 5              MR. MORRIS:  I'm moving to strike,
 6         if you haven't noticed, because he's not
 7         answering the question.
 8              MS. DEITSCH-PEREZ:  He was answering
 9         the question, you just didn't like it, like
10         the answer.
11              MR. MORRIS:  Good Lord.
12         Q.   Go ahead, Mr. Waterhouse.
13         A.   Again, I don't -- we brought up a
14    myriad of issues at the start of the bankruptcy
15    case.  I don't recall if this was one of them,
16    but, again, there are a lot of things we
17    couldn't change.  Even, you know, I was told
18    status quo, blah, blah, blah, right, there is a
19    stay, you can't -- you know, I don't recall
20    specifically, but that doesn't mean it didn't
21    happen.
22              MR. MORRIS:  I move to strike.
23         Q.   During the time that Highland was in
24    bankruptcy and you served as CFO, did you have
25    any reason to believe that any of the notes
```

Page 249

1            WATERHOUSE - 10-19-21

2    receivable on this list were doubtful or

3    uncollectible?

4            MS. DEITSCH-PEREZ:   Object to the

5        form.

6        A.    Potentially.

7        Q.    Did you ever tell anybody that?

8        A.    As I just stated like five times,

9    yes, we -- at the beginning after filing and we

10   were getting DSI and others up to speed, you

11   know, we had a myriad of discussions of a lot

12   of things and this was likely one of them.  I

13   don't -- but I don't recall specifically we

14   talked --

15       Q.    I don't want to know -- I don't want

16   to know what was --

17            MS. DEITSCH-PEREZ:   Wait, wait.

18       Excuse me.  Mr. Morris, you did not let him

19       finish his answer.

20       A.    I spoke -- we had -- we were

21   bringing Fred Karesa and Brad Sharp (phonetic)

22   up to speed on all of these items, contracts,

23   and investments and going through -- we had

24   hours and hours and hours of discussion.  And

25   then not only do I have to repeat this not

Page 250

```
 1               WATERHOUSE - 10-19-21

 2   once, twice, three, four times with -- you

 3   know, I mean, we -- I don't -- I don't remember

 4   the sum culmination of all these discussions.

 5   They all kind of blend together.

 6               MR. MORRIS:  Okay.  I move to strike

 7        and I will try one more time.

 8        Q.    Did you ever tell anybody at DSI

 9   that you believed any of the notes receivable

10   on this list were doubtful or uncollectible?

11               MS. DANDENEAU:  Object to form.

12        A.    Potentially.

13        Q.    Potentially you told them or

14   potentially they were doubtful or

15   uncollectible?

16        A.    Potentially I told them that we

17   needed to look at the value of these -- of

18   these assets.

19        Q.    Okay.  Did you -- okay.  It is

20   potential that you told them and it is

21   potentially that you didn't; right?

22               MS. DANDENEAU:  Objection to form.

23        A.    I've gone through that.  I don't

24   recall specifically.

25        Q.    So you should just -- I don't want
```

Page 251

```
 1                  WATERHOUSE - 10-19-21

 2    to tell what you to do.  Do you have --

 3                  MS. DANDENEAU:  Good.

 4        Q.    Other than -- other than telling

 5    them that they should look at the values, do

 6    you have any recollection whatsoever of ever

 7    having told anybody at DSI that any of the

 8    notes receivable on this page were doubtful or

 9    uncollectible?

10                  MS. DEITSCH-PEREZ:  Object to the

11         form.

12                  MS. DANDENEAU:  Objection.

13        A.    I recall having general discussions

14    about everything on our balance sheet which

15    would have included these -- these notes

16    receivable.

17        Q.    Okay.

18        A.    I don't recall specifically where

19    those discussions delved into.

20        Q.    Do you recall any discussion at all

21    on the topic of whether any of these notes on

22    this list were doubtful or uncollectible?

23                  MR. AIGEN:  Mr. Morris, how on earth

24         is that question different from the

25         question that you just asked for the last
```

Page 252

```
 1          WATERHOUSE - 10-19-21

 2   five times?  I mean, really I thought you

 3   were -- (overspeak.)

 4          MR. MORRIS:  Because he never

 5   answered it.

 6          MS. DEITSCH-PEREZ:  Are you

 7   listening to him?

 8          MR. MORRIS:  You know --

 9          MS. DEITSCH-PEREZ:  He basically

10   said that he had a conversation with DSI

11   that went over all of this stuff and that

12   conversation could have included the notes

13   but he doesn't recall specifically.

14          What more do you want him -- to ask

15   of him?

16          MR. MORRIS:  I want him -- I would

17   love him to say -- I would like him to

18   testify to the truth, and that is he has no

19   recollection.

20          MS. DEITSCH-PEREZ:  Well, the truth

21   as you would like to see it, but -- but he

22   is testifying truthfully.  And I -- and, by

23   the way, I move to strike that comment --

24          MR. MORRIS:  Okay.

25          MS. DEITSCH-PEREZ:  -- because it
```

1              WATERHOUSE - 10-19-21

2        suggests that he has not testified

3        truthfully.

4              MR. MORRIS:  I will ask my question

5        again.  And if at any time you want to

6        direct him not to answer, that is your

7        prerogative.

8        Q.   Mr. Waterhouse, do you have any

9   recollection at all of ever telling anybody

10  from DSI that any of these notes were doubtful

11  or uncollectible?

12             MS. DANDENEAU:  Object to form.

13       A.   I don't remember specifically.

14       Q.   Do you remember generally that

15  specific topic?

16       A.   We generally talked about assets,

17  values.  If -- we had discussions of that and

18  collectability in nature.  I mean, of Highland,

19  the funds, the CLOs, the entire complex.  We

20  had discussions like that, which is, you know,

21  as you look at a billion dollar consolidated

22  balance sheet.

23             So I generally remember -- this is

24  billions of dollars, including these assets --

25  having discussions of this -- of this type.

Page 254

```
 1              WATERHOUSE - 10-19-21

 2       Q.   Do you believe that an affiliate

 3  loan on this list was doubtful or

 4  uncollectible?  Would you have told that to

 5  DSI?

 6            MS. DANDENEAU:  Objection to form.

 7            MS. DEITSCH-PEREZ:  Object to form.

 8       A.   If we had, like -- again, if we --

 9  if -- if we weren't preparing financial

10  statements in accordance with GAAP, and -- you

11  know, if DSI at that point -- they were --

12  again, I was new to bankruptcy.

13            The CRO is -- we are delegating

14  everything to the CRO.  All the decisionmaking.

15  Remember -- remember when you and I went into

16  Delaware Court and we were saying DSI basically

17  does everything, remember this, Mr. Morris?

18            You were my counsel at the time, and

19  basically we're running everything through DSI.

20  That was what this was like in the early part.

21            Everything was communicated through

22  DSI.  So DSI says this.  DSI says that.  That

23  is what we're doing, and we're pointing out

24  things to them.

25            Now, they decide what direction this
```

```
 1                WATERHOUSE - 10-19-21

 2    goes.

 3        Q.    Did you point out that any of

 4    these --

 5        A.    I don't recall specifically.

 6        Q.    Okay.  At any time that you served

 7    as Highland's CFO, did you ever point out to

 8    DSI that any of these loans were doubtful or

 9    uncollectible?

10              MS. DEITSCH-PEREZ:  Object to the

11        form.

12              MS. DANDENEAU:  Objection.

13        A.    If you're asking me if I had a

14    conversation with DSI, if any of these loans

15    were doubtful or uncollectible, I don't recall

16    specifically.

17        Q.    Do you recall that the debtor filed

18    on the docket monthly operating reports?

19        A.    Yes.

20        Q.    You prepared those personally,

21    didn't you?

22              MS. DEITSCH-PEREZ:  Objection to

23        form.

24        A.    I didn't personally prepare them,

25    the team did with DSI.
```

Page 256

1          WATERHOUSE - 10-19-21

2          Q.    But you signed them; correct?

3          A.    My signature is on the MORs.

4          Q.    And you signed them as the preparer

5     of the document; correct?

6          A.    Yes, I did this pursuant to DSI's

7     instructions.

8          Q.    Okay.  You wouldn't have signed the

9     document if you didn't believe it to be

10    accurate; correct?

11         A.    If I had reason to believe it

12    wasn't, presumably I wouldn't have signed it.

13         Q.    Okay.  And do you have any reason to

14    believe right now that any monthly operating

15    report that has your signature on it was

16    inaccurate in any way?

17              MS. DEITSCH-PEREZ:  Object to the

18         form.

19         A.    My understanding of the monthly

20    operating reports is we were filing them in

21    accordance with the standards set by the Court.

22    It wasn't -- you know, again, I don't -- you

23    know, it wasn't GAAP.  It wasn't these other

24    standards, so I testified I didn't have

25    experience in this.  The CRO was running the

Page 257

```
 1              WATERHOUSE - 10-19-21
 2    show.  I followed their advice.
 3         Q.    But you assured yourself that
 4    everything in the report was accurate before
 5    you signed them; correct?
 6              MS. DANDENEAU:  Objection to form.
 7         A.    I trusted the guidance from the CRO
 8    and their team and their experience and their
 9    guidance for doing this for many, many, many
10    years to -- to -- to categorize and put things
11    in ways on the form.
12              You know, my team had -- had not
13    filled out these forms before and needed all of
14    this guidance.  I'm not an expert in this.  I
15    have oversight of it.  I signed the form.  DSI
16    told me to.
17         Q.    And you and your team are the source
18    of the information that DSI used to create the
19    reports; correct?
20              MS. DANDENEAU:  Objection to form.
21         A.    The books and records reside with
22    the -- with -- with the corporate accounting
23    team.
24         Q.    Okay.  And the corporate accounting
25    team was the corporate accounting team that was
```

Appx. 01078

Page 258

```
 1                WATERHOUSE - 10-19-21

 2   under your direction; correct?

 3        A.    Yes.

 4        Q.    So -- so your team was responsible

 5   for maintaining Highland's books and records;

 6   correct?

 7        A.    I'm sorry, my team was responsible?

 8        Q.    Correct.

 9        A.    Yes.  They -- they -- they were

10   the -- the -- the general ledger of Highland,

11   that responsibility was with the corporate

12   accounting team.

13        Q.    The corporate accounting group

14   reported to you; correct?

15        A.    Yes.

16              MR. MORRIS:  Can we put up 41,

17        please.

18              (Exhibit 41 marked.)

19        Q.    All right.  You will see that this

20   is a report that is dated January 31st, 2020,

21   but it is for the month ending December 2019.

22              Do you see that?

23        A.    I do.

24        Q.    And you signed this report in your

25   capacity as the chief financial officer of
```

Page 259

```
 1                    WATERHOUSE - 10-19-21
 2    Highland; correct?
 3          A.    Yes.
 4          Q.    And you're the preparer -- you're
 5    identified as the preparer of the report;
 6    correct?
 7          A.    That is correct.
 8          Q.    Do you recall participating in the
 9    preparation of monthly operating reports?
10          A.    As I testified earlier, it was put
11    together, you know, with the team.  The team
12    worked with DSI to put these monthly operating
13    reports together.  We had no experience at this
14    time of the monthly operating reports or things
15    of this nature.
16                MR. MORRIS:  Can you turn to the
17          next page, please.
18          Q.    Do you see a line item under assets
19    due from affiliates?
20          A.    Yes, I do.
21          Q.    Okay.  And to the best of your
22    knowledge and understanding, as the person who
23    is identified as the preparer of this report,
24    does that line item include the affiliate loans
25    that we've been talking about?
```

Page 260

1                    WATERHOUSE - 10-19-21

2         A.    Again, I would have to see, just

3    like we did with the financial statements of

4    Highland and NexPoint, I would have to see a

5    detailed build, but, you know, if you look at

6    the other line items, you know, the only other

7    place it could be would be in -- in other

8    assets.

9         Q.    Okay.  And as a matter of

10   arithmetic, is it fair to say that is the value

11   of the assets due from affiliates was more than

12   25 percent of the value of Highland's total

13   assets as of 12/31/2019?

14              MS. DANDENEAU:  Objection to form.

15        A.    I'm really not doing the mental math

16   right now, so I've been going at this depo for

17   hours, so I'm really not -- you know --

18        Q.    All right.  No problem.

19        A.    -- these are millions of dollars.

20        Q.    Let's look at the Footnote 1,

21   please.  Do you see there is a reference to the

22   Hunter Mountain note?

23        A.    Yes, I see that in Footnote 1.

24        Q.    Okay.  And that's the reserve that

25   was taken against that note?

Page 261

```
 1              WATERHOUSE - 10-19-21

 2        A.    Yes, that is what this indicates.

 3        Q.    Okay.  And were you aware that the

 4   reserve was being taken on that it was?

 5        A.    I was -- I was aware, yeah, at some

 6   point, yes.

 7        Q.    Okay.  And are you aware of any

 8   reserve being taken with respect to any other

 9   note that was issued in favor of Highland?

10        A.    Again, as I testified, we didn't go

11   through an analysis on -- on -- on the other

12   notes.

13        Q.    Can we turn --

14        A.    I believe -- I believe it says that

15   in Footnote 1, fair value has not been

16   determined with respect to any of the notes.

17              So this footnote -- footnotes, look,

18   there has been no determination.

19        Q.    Okay.  The determination was made in

20   the audited financial statements just six

21   months earlier; right?  We saw that earlier?

22        A.    That was as of 12/31/18.  I mean,

23   things -- circumstances -- there's a bank --

24   circumstances change, things change -- things

25   change over time, you know, facts and
```

Page 262

```
 1              WATERHOUSE - 10-19-21

 2   circumstances change.  Again, you have to do an

 3   analysis.

 4        Q.    Okay.  And you do recall that in

 5   Highland's 2018 financial statement, all of the

 6   notes issued by affiliates and Mr. Dondero that

 7   were due at year-end had a fair value equal to

 8   the carrying value; correct?  We looked at

 9   that?

10        A.    Yes.  That was in the -- in the

11   disclosure for the -- for the affiliate notes,

12   yes.

13        Q.    And -- and you were obligated to

14   share with PwC any subsequent events between

15   the end of 2018 and the date that you signed

16   your management representation letter on June

17   3rd, 2019; correct?

18              MS. DEITSCH-PEREZ:  Object to the

19        form.

20        A.    Yes.  I -- I -- I signed the

21   management, you know, my signature is in the

22   management representation letter -- I hope I'm

23   answering your question -- that is dated in

24   June with the representations made in that

25   management representation letter.
```

Page 263

1          WATERHOUSE - 10-19-21

2          Q.    Okay.  And there was nothing that

3    caused PricewaterhouseCoopers to include in

4    subsequent events any adjustment to the

5    conclusion that the fair value of the affiliate

6    notes and the notes issued by Mr. Dondero

7    equaled the carrying value; correct?

8                MS. DANDENEAU:  Objection to the

9          form.

10         A.    That is correct.  That is what was

11   in the -- in the -- in the footnotes.

12         Q.    Okay.  So are you aware of anything

13   that occurred between June 3rd, 2019 and

14   December 31st, 2019 that would have caused the

15   fair value of the notes to differ from the

16   carrying value?

17         A.    Yeah.  Highland filed for

18   bankruptcy, things changed -- I mean, there was

19   a bankruptcy filed in October of -- of -- of

20   2019, right, the petition date that we've

21   described earlier.

22               I mean, I had a -- I guess looking

23   back naively, I thought we were going to get an

24   audit from PwC for year-ended 2019, and when we

25   had discussions with PwC, they were like, are

Page 264

```
 1                    WATERHOUSE - 10-19-21

 2    you crazy, we're not auditing this.  Values

 3    change, all these things change, bankruptcy

 4    changes the entire scenario.  I mean -- and

 5    they're like, we're not -- we're not touching

 6    this.

 7                    And so, you know, I was like, okay,

 8    sorry, I get it, okay, no an audit.

 9                    I mean, it is -- you know, and --

10    you know, and we weren't preparing GAAP

11    financial statements.

12                    Again, I didn't know what we were

13    doing in relation to our financial statements,

14    but these were the discussions I was having at

15    the time.  And yeah, I mean, filing bankruptcy

16    from what I got from outside auditors and

17    others involved changed things dramatically.

18        Q.    Okay.  Highland wasn't the obligor

19    under any of the notes that we're talking

20    about; correct?

21        A.    No.

22        Q.    So --

23        A.    That's right.

24        Q.    So can you identify any fact that

25    would cause the fair value to deviate from the
```

1              WATERHOUSE - 10-19-21

2    carrying value during the seven-month period

3    between June 3rd and the end of the year, 2019?

4              MS. DANDENEAU:  Objection to form.

5         A.    No.  I mean, I'm putting myself back

6    at that time, right.  Hindsight is 2020, but we

7    didn't do an analysis, but we would have done a

8    fulsome analysis and looked at all of the facts

9    and circumstances at the time, but asset values

10   change.  You know, there could have been a

11   market crash in hindsight in 2020, which --

12   which affected entities' abilities.

13             There could have been all of these

14   things, right, that -- that happen.  It is --

15   it is easy to look back in hindsight, but when

16   you are looking at this in -- in realtime, the

17   analysis is different, and again, we didn't do

18   an analysis.

19        Q.    Okay.  You didn't do an analysis.

20             Do I have that right?

21        A.    I don't -- I don't recall doing one

22   or maybe -- you know, I don't recall doing one.

23             MR. MORRIS:  Okay.  I'm going to

24        take a break.  I may be done, so the time

25        now is -- is 4:30 your time.  Let's just

Page 266

```
 1                  WATERHOUSE - 10-19-21
 2         take a short break until 4:40 your time.
 3                 MS. DANDENEAU:  Okay.
 4                 VIDEOGRAPHER:  We're going off the
 5         record, 4:31 p.m.
 6         (Recess taken 4:31 p.m. to 4:43 p.m.)
 7                 VIDEOGRAPHER:  We are back on the
 8         record at 4:43 p.m.
 9                 MR. MORRIS:  I have no further
10         questions.
11                 MR. RUKAVINA:  Okay.
12         Mr. Waterhouse, I will go next.
13                        EXAMINATION
14    BY MR. RUKAVINA:
15         Q.    Sir, my name is Davor Rukavina.  I'm
16    the lawyer for --
17                 MR. MORRIS:  Hey, Davor, just before
18         you begin, I just want to put on the record
19         Highland's objection to documents that were
20         produced to me 10 minutes before the
21         deposition began.
22                 MR. RUKAVINA:  What the basis of
23         your objection?
24                 MR. MORRIS:  That they were due
25         quite some time ago, and the fact that you
```

```
 1                WATERHOUSE - 10-19-21

 2       had -- I just think it's appropriate to --

 3       to dump documents on somebody 10 minutes

 4       before the deposition.  I just think

 5       that's --

 6            MR. RUKAVINA:  Well, these are

 7       documents Highland produced.  I'm not aware

 8       of any rule I have to give you advance

 9       documents when I know for the record that

10       other than the exhibits that you sent to us

11       last week, most of the exhibits you used

12       today you did not provide to me prior to

13       this deposition.

14            MR. MORRIS:  No, but the documents

15       were produced by me in -- in litigation,

16       right?

17            MR. RUKAVINA:  I'm going to use

18       primarily, John, the documents that you

19       produced to me today, but you may.

20            MR. MORRIS:  Primarily.  I've got --

21       I've got my objection.  You have got your

22       response.  Proceed.

23       Q.   Mr. Waterhouse, again, I represent

24    the advisors, HCMFA and NexPoint Advisors.

25            Do you understand that?
```

```
 1                WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    You and I have never met or talked

 4   before today, have we?

 5        A.    No, I have -- I have heard your

 6   voice on calls before.

 7        Q.    Okay.

 8              MR. RUKAVINA:  Madam Court Reporter,

 9        I will use a few exhibits today.  My

10        associate, Mr. Nguyen, will find some way

11        to get them to you.  I don't know how to do

12        that, but it looks like you guys do.

13              I am going to use numbers as well.

14        But to differentiate them from Mr. Morris

15        we're going to mark mine with the prefix A

16        for advisors.

17              Do you understand?

18              COURT REPORTER:  Yes.

19              MR. RUKAVINA:  Okay.  Perfect.

20        Q.    Okay.  So, Mr. Waterhouse, let's

21   start with those two HCMFA notes that you were

22   asked about, one for 5 million and one for

23   2.4 million.

24              Do you recall those notes?

25        A.    Yes.
```

Page 269

```
 1                  WATERHOUSE - 10-19-21
 2        Q.    Were you ever the CFO of HCMFA?
 3        A.    I don't recall.
 4        Q.    So to the best of your recollection,
 5   you were still an officer of HCMFA in 2019,
 6   just that your title was treasurer?
 7             MR. MORRIS:  Object to the form of
 8        the question.  There is no leading here.
 9        He works for your client.
10             MS. DANDENEAU:  That is not -- that
11        is not true.
12             MR. MORRIS:  He's the treasurer --
13        he is the treasurer of your client.  I
14        don't -- I'm going to object every time you
15        try to lead, so...
16             MR. RUKAVINA:  Totally fine to
17        object.
18             MR. MORRIS:  Okay.
19        Q.    Please answer my question,
20   Mr. Waterhouse.
21        A.    I'm sorry, could you repeat?  There
22   was...
23        Q.    Yes.  You were -- you testified
24   earlier that in 2019 you were an officer of
25   HCMFA; correct?
```

Appx. 01090

Page 270

```
 1              WATERHOUSE - 10-19-21

 2        A.    Yes, I testified that I was the

 3   treasurer and I didn't know if that incumbency

 4   certificate, you know, was one that appointed

 5   me as a treasurer, but yes.

 6        Q.    I'm just trying to confirm that

 7   sitting here today, to the best of your

 8   recollection, at that time you were -- your

 9   title was treasurer.  It was not chief

10   financial officer.

11        A.    I don't recall that being my title.

12        Q.    Okay.  And in May of 2019, however,

13   I think you testified you were the chief

14   financial officer of the debtor; correct?

15              MR. MORRIS:  Objection to the form

16        of the question.

17        A.    Yes, I was -- yes.

18        Q.    Okay.  As such, in May of 2019, did

19   you have the authority, to your understanding,

20   to unilaterally loan $5 million or $2.4 million

21   to anyone on behalf of the debtor?

22              MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Sorry, can you repeat that?

25        Q.    Yes.  So in your capacity as the
```

Page 271

```
 1              WATERHOUSE - 10-19-21

 2    chief financial officer of the debtor, Highland

 3    Capital Management, L.P., in May of 2019, did

 4    you believe that you unilaterally, just Frank

 5    Waterhouse, had the authority to loan on behalf

 6    of the debtor to anyone $5 million and

 7    $2.4 million?

 8              MR. MORRIS:  Objection to the form

 9         of the question.

10         A.    No.

11         Q.    Is it because loans of that amount

12    would have had to be approved by someone else?

13         A.    Yes.

14         Q.    Who in '20 -- in May of 2019, if

15    Highland wanted to loan 5 million or

16    $2.4 million to someone, what would have been

17    the internal approval procedure?

18              MR. MORRIS:  Objection to the form

19         of the question.

20         A.    If -- if we had loans of that nature

21    that needed to be made due to their size, we

22    would have gotten approval from the -- the

23    president of Highland.

24         Q.    And who that was individual?

25         A.    It was James Dondero.
```

Appx. 01092

Page 272

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Okay.  Now, I'm going to ask you a

 3   similar question but for a different entity.

 4              In May of 2019, as the treasurer of

 5   HCMFA, did you believe that you unilaterally

 6   had the ability to cause HCMFA to become the

 7   borrower of a $5 million loan and a

 8   $2.4 million loan?

 9              MR. MORRIS:  Objection to the form

10       of the question.

11       A.    No.

12       Q.    What would -- what would the

13   approval have taken place -- strike that.

14              What would the approval process have

15   been like in May of 2019 at HCMFA for HCMFA to

16   take out a $7.4 million loan?

17              MR. MORRIS:  Objection to the form

18       of the question.

19       A.    The process would have been similar

20   to what we just discussed on -- for Highland to

21   make a loan to others.  So, again, you know,

22   we -- we would have -- either myself or someone

23   on the team would have discussed this with

24   the -- the president and owner of -- of HCMFA.

25       Q.    And who was that individual?
```

Appx. 01093

Page 273

```
 1                  WATERHOUSE - 10-19-21

 2        A.    That was James -- Jim Dondero.

 3        Q.    So do I understand that in May of

 4   2019, on behalf of both the lender, Highland,

 5   and the borrower, HCMFA, Mr. Dondero would have

 6   had to approve $7.4 million in loans?

 7              MR. MORRIS:  Objection to the form

 8        of the question.

 9        A.    Yes.

10        Q.    You mentioned when Mr. Morris was

11   asking you the NAV error, N-A-V error, with

12   respect to TerreStar, without writing us a

13   novel, unless you feel like you have to, can

14   you summarize what that NAV error was?  What

15   happened?

16        A.    There was a -- in the Highland

17   Global Allocation Fund, it owned at the time an

18   equity interest in a company called TerreStar.

19   And TerreStar is -- at the time was a private

20   company, and it may still be today.  Again, I'm

21   putting myself back then as a private company.

22              We had -- sorry, I don't mean we --

23   the fund and the advisor used Houlihan Lokey

24   to -- to value that investment.  And during

25   that time there was some trades that were
```

Page 274

```
 1                  WATERHOUSE - 10-19-21

 2    executed at market levels that were much lower

 3    than the Houlihan Lokey model.

 4                And based on information and

 5    discussions with the portfolio managers and,

 6    you know, principals that were very familiar

 7    with TerreStar, it was determined that those

 8    trades were non-orderly and they were not

 9    considered in the valuation as consulted with

10    Houlihan Lokey and PricewaterhouseCoopers at

11    the time.

12                Subsequent to a -- I can't remember

13    the exact circumstances of why the SEC got

14    involved.  I think it was due to this -- this

15    investment became a material position in the

16    fund.  It triggered an SEC, kind of, inquiry.

17    And as part of that inquiry, they questioned

18    the valuation methodology.  "They" meaning the

19    SEC.

20                And at the culmination of that

21    process -- this is all summarized -- the value

22    that was -- that ultimately had to be used in

23    the fund's NAV was different than -- materially

24    different than what the original valuation at

25    Houlihan Lokey provided.
```

Appx. 01095

Page 275

```
 1                WATERHOUSE - 10-19-21

 2                And given that there was this fund

 3     was, as we discussed -- I don't know if we

 4     discussed it, but it was an open-ended fund

 5     that was going -- that was converting to a

 6     close-end fund.

 7                Due to the fact that it was an

 8     open-ended fund, you had to recalculate NAV and

 9     see what the impact was on people -- on

10     investors coming in and out of the fund and if

11     there is a detrimental impact and to calculate

12     what that -- what that impact was and if there

13     was any amounts owed to the fund pursuant to

14     the error.

15        Q.    Were you personally involved

16     internally at either Highland or HCMFA with

17     these investigations and discussions with the

18     SEC?

19        A.    I was.

20        Q.    Which other key people or senior

21     people at Highland were involved, to your

22     recollection?

23        A.    Myself, Thomas Surgent, David Klos,

24     Lauren Thedford, Jason Post.

25        Q.    Mr. Dondero, was he --
```

Page 276

```
 1                WATERHOUSE - 10-19-21

 2         A.    I believe Cliff Stoops.  I'm trying

 3    to think.  And maybe that is -- that is -- that

 4    is -- that is all kind I can recall at the

 5    moment.

 6         Q.    Do you recall whether it was

 7    determined that the fund suffered losses as a

 8    result of this error?

 9         A.    The -- the fund -- the -- the --

10    because the open-ended nature of the fund,

11    there were losses that were attributable to

12    investors.  Meaning they -- they would have

13    redeemed and got a less money or -- or they

14    subscribed in and maybe because they didn't get

15    enough shares and then they later sold and then

16    they were harmed in that fashion.

17                And there is -- there is -- there

18    were very -- there were very detailed

19    calculations and, you know, all these different

20    scenarios that we had to -- I'm sorry, I keep

21    saying "we" -- that the individuals involved

22    had to calculate and quantify.

23         Q.    Well, do you recall whether HCMFA

24    admitted certain fault and liability for this

25    error?
```

Appx. 01097

Page 277

```
 1              WATERHOUSE - 10-19-21

 2        A.    I don't recall specifically.

 3        Q.    Do you recall whether HCMFA caused

 4   any funds to be paid to the investors and the

 5   fund the subject of the NAV error?

 6        A.    Yes.

 7        Q.    Do you recall the approximate amount

 8   of funds, moneys paid to the investors and the

 9   fund?

10        A.    It was -- it was approximately

11   $7 million.

12        Q.    If I was to suggest 7.8 million,

13   would that ring more true or are you sticking

14   with your original answer?

15        A.    It was -- it was approximately 7 --

16   7 to $8 million.  Again, I don't remember the

17   exact number, but it was in that ballpark.

18        Q.    So regardless of whether HCMFA

19   accepted fault or liability, it caused some

20   $7 million or more to be paid out to affected

21   investors in the fund?

22              MR. MORRIS:  Objection to the form

23        of the question.

24        A.    And I want to make sure I'm

25   understanding your question because there is a
```

Page 278

```
 1                  WATERHOUSE - 10-19-21

 2    lot of different entities that are going on to

 3    my head.

 4                  I think what you are saying is based

 5    on this error, shareholders were harmed by this

 6    approximately $7.8 million -- by approximately

 7    $7.8 million.  Is that what you are asking?

 8         Q.    Yes, sir.

 9         A.    Yes, that was -- again, I don't have

10    the exact numbers.  If I take -- it was -- it

11    was in that ballpark, and there is a detail

12    calculation and write-up that could, that --

13    that exists someplace.

14         Q.    Now, at that time, at the time that

15    the NAV error occurred, was there a contract in

16    place between HCMFA and the debtor pursuant to

17    which the debtor was providing services to

18    HCMFA?

19                  MR. MORRIS:  Objection to the form

20         of the question.

21         A.    Yes.

22         Q.    Was that contract generally called a

23    shared services agreement?

24         A.    It was generally called that, but

25    there were -- there were -- I mean, it -- it --
```

```
 1                WATERHOUSE - 10-19-21
 2    it depends on who you talk to, but yes,
 3    generally, there were -- there are multiple
 4    agreements.
 5         Q.    Pursuant to one or more of those
 6    agreements, was the debtor providing certain
 7    services to HCMFA?
 8              MR. MORRIS:  Objection to the form
 9         of the question.
10         A.    Yes.
11         Q.    And can you at a very high level
12    summarize in 2018 and 2019 what those services
13    were?
14         A.    Yes, there was a -- yes.
15         Q.    Okay.  Please -- please go -- go
16    through a short summary.
17         A.    There was a -- a cost reimbursement
18    agreement between Highland Capital Management
19    Fund Advisors and Highland Capital Management,
20    L.P.  That agreement was for what we referred
21    to as front office services, so investment
22    management, things of that nature.
23              There was I think what most people
24    refer to as the shared services agreement that
25    was -- that agreement was between Highland
```

```
 1                  WATERHOUSE - 10-19-21

 2     Capital Management Fund Advisors and Highland

 3     Capital Management for back office services.

 4          Q.    And can you summarize what you mean

 5     by back office services?

 6          A.    Those services were for accounting,

 7     finance, tax, valuation, HR, IT, you know,

 8     legal compliance, things of -- things of those

 9     nature -- or things of that nature, excuse me.

10          Q.    So in the spring of 2019, do you

11     recall whether HCMFA took the position that it

12     was actually Highland that caused the NAV error

13     to occur pursuant to the valuation services

14     that Highland was providing?

15               MR. MORRIS:  Objection to the form

16          of the question.

17          A.    I do not recall.

18          Q.    Did you ever have any discussions

19     with anyone, Jim Dondero or anyone in the first

20     half of 2019 as to whether Highland, the

21     debtor, that is, had any liability to HCMFA

22     related to the NAV error?

23               MR. MORRIS:  Objection to the form

24          of the question.

25          A.    I do not recall.
```

```
 1              WATERHOUSE - 10-19-21

 2        Q.    And then you mentioned that the fund

 3   was being closed and some compensation related

 4   to that.  Can you -- can you elaborate?  What

 5   were you referring to?

 6        A.    Right.  So the advisor, pursuant to

 7   board approval, put a proposal in front of the

 8   shareholders of the Highland Global Allocation

 9   Fund to convert it from an open-ended fund to a

10   closed-end fund.

11              So an open-ended fund, when

12   shareholders subscribe to the fund or redeem

13   into the fund, they do it at NAV.

14              When it is -- when you have a

15   closed-end fund, closed-end funds are -- are

16   publicly-traded, like on the New York Stock

17   Exchange, exchanges like that, and -- and

18   shareholders or investors, they're not --

19   they're -- they're not subscribing and

20   redeeming with the fund.  They are like shares

21   of Apple.

22              Those shares of the Highland Global

23   Allocation Fund trade on an exchange, and that

24   is how you, you know, that is how, you know,

25   you become an equity owner in the fund or you
```

Page 282

```
 1                WATERHOUSE - 10-19-21

 2   sell your shares and you are no longer an

 3   equity owner.

 4             As part of that proposal, the

 5   advisor told shareholders if you -- if you vote

 6   for this proposal to -- to convert it from an

 7   open-ended fund to a closed-end fund, we will

 8   pay you some amounts of money.  I forgot -- a

 9   certain number of points.  I think it was

10   like -- it was like two to three points or

11   something -- something like that.

12        Q.   Okay.  You mentioned when Mr. Morris

13   was asking you, going back to those two

14   promissory notes, you will recall the 5 million

15   and 2.4 million, you mentioned something to the

16   effect that Mr. Dondero told -- told you to pay

17   some moneys out of Highland.  Do you remember

18   that discussion with Mr. Morris?

19        A.   I do.

20        Q.   So, to the best of your

21   recollection, did you have a discussion with

22   Mr. Dondero about making some payments in May

23   of 2019 out of Highland?

24        A.   I recall, as I testified earlier,

25   that I had a conversation with Mr. Dondero
```

     1                WATERHOUSE - 10-19-21

     2    for -- for these amounts attributable to -- it

     3    was either the error -- you know, the error,

     4    and in that conversation he said, go get the

     5    money from Highland.  I believe that is what I

     6    testified earlier, and that -- that is my

     7    recollection.

     8         Q.    Do you recall if that was an

     9    in-person meeting or some other mode for the

    10    meeting?

    11         A.    I -- I -- I recall that being

    12    in-person.

    13         Q.    Do you recall if anyone else was

    14    present, or was it just you and Mr. Dondero?

    15         A.    I recall just he and I.

    16         Q.    And the moneys that he told you to

    17    find from -- or get from Highland, was that in

    18    the amount of $5 million and $2.4 million?

    19              MR. MORRIS:  Objection to the form

    20         of the question.

    21         A.    I believe so, but I would have to go

    22    back and look and see when those moneys were

    23    actually paid into the -- into the fund and,

    24    you know, when those transfers were done.  If

    25    they were all done around that same time, then

Page 284

```
 1                  WATERHOUSE - 10-19-21

 2    yes, I would say it was -- it was all related

 3    to that.

 4         Q.    Did Mr. Dondero tell you that those

 5    funds would be a loan from Highland to HCMFA?

 6         A.    I don't recall.

 7              MR. MORRIS:  Objection to the form

 8         of the question.

 9         Q.    Now, and forgive me, I'm probably

10    the only non-American born here, but I speak

11    reasonably well in English.  I don't recall,

12    does that mean you don't remember or does that

13    mean it didn't happen?

14              MR. MORRIS:  Objection to the form

15         of the question.

16         A.    It -- it means I don't -- I don't

17    remember.

18         Q.    Did Mr. Dondero tell you to have

19    those two promissory notes prepared?

20         A.    I don't recall.

21         Q.    When you -- again, when you say, I

22    don't recall today, that means that sitting

23    here today, you just don't remember one way or

24    the other.  Is that accurate?

25         A.    Yes.
```

Appx. 01105

Page 285

```
 1                WATERHOUSE - 10-19-21

 2       Q.    Is it possible that you, having

 3  heard what Mr. Dondero said and seeing funds

 4  being transferred, assumed that that would be a

 5  loan without him actually telling you that

 6  would be a loan?

 7             MR. MORRIS:  Objection to the form

 8       of the question.

 9       A.    Sorry, I want to make sure -- did I

10  ask the amounts that were transferred that I --

11  that -- that I assumed that that was a loan?

12       Q.    Well, let me -- let me take -- let

13  me try again.

14             So you have established already that

15  there were quite a number of promissory notes

16  back and forth -- I'm sorry, quite a number of

17  promissory notes with affiliated companies and

18  individuals owing Highland money; right?

19       A.    Yes.

20       Q.    And you have established that there

21  were many transactions and transfers going back

22  and forth over the years; right?

23             MS. DANDENEAU:  Objection to form.

24       A.    In -- yes, in my capacity as CFO and

25  my employment, yes, that is -- yes.
```

Appx. 01106

Page 286

```
 1              WATERHOUSE - 10-19-21

 2        Q.    And that's part of the reason why

 3   you just can't remember some of the details

 4   today because this -- this happened years ago,

 5   and there were a number of transactions.  Is

 6   that accurate?

 7              MS. DANDENEAU:  Objection to the

 8        form.

 9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    I mean, I deal with thousands of --

12   of -- of -- of transactions, you know, whether

13   it has -- the processing of transactions, you

14   know, if it has got, you know, more -- more

15   zeros, you know, behind it than others.

16              When you look at thousands of

17   transactions over the years for funds and

18   advisors and -- and, you know, financial

19   statements, I mean, it is -- it is very hard

20   going back in -- in -- in my -- you know,

21   14-ish year career at -- at Highland to

22   remember a lot of those details, especially

23   when I don't have any records or books or

24   anything like that, and -- and going back many

25   years.
```

Appx. 01107

Page 287

```
 1              WATERHOUSE - 10-19-21

 2        Q.    And that is fine.  That -- that --

 3   that is why I asked the question.

 4              Is it possible in May of 2019 when

 5   Mr. Dondero told you to transfer the funds from

 6   Highland, you just assumed on your own that

 7   those would be loans without him actually

 8   telling you that those would be loans?

 9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    I don't know.

12        Q.    I'm sorry, you --

13        A.    I said I don't know.

14        Q.    Okay.  Well, as the -- as the CFO

15   for Highland, if you saw $7.4 million going

16   out, you would feel some responsibility to

17   account for that, wouldn't you?

18              MR. MORRIS:  Objection to the form

19        of the question.

20        A.    Yes.

21        Q.    Is it fair to say that those would

22   be in the range large enough to rise up to your

23   level?

24              MR. MORRIS:  Objection to the form

25        of the question.
```

Page 288

```
 1              WATERHOUSE - 10-19-21

 2       A.    If -- I don't know if I understand

 3   your question.  Those amounts would arise to my

 4   level where I would be involved or...

 5       Q.    You would want to know what a

 6   transfer for that amount, $7.4 million, was all

 7   about, as the CFO of Highland, wouldn't you?

 8              MR. MORRIS:  Objection to the form

 9       of the question.

10       A.    Yes, I make it -- I mean, I -- I

11   review all sorts of payments, I mean, even

12   smaller dollar payments on a periodic basis,

13   you know, to -- to -- to understand and to make

14   sure that we are paying things in a -- you

15   know, in -- in -- in an informed way.  And, you

16   know -- and we're -- and we're paying things

17   pursuant to vendor contracts and things like

18   that.

19       Q.    So as part of that, is it possible

20   that seeing $7.4 million go out you would have

21   promissory notes made in order to keep a paper

22   trail, assuming that those were loans, when

23   perhaps they were never intended to be loans by

24   Mr. Dondero?

25              MR. MORRIS:  Objection to the form
```

Page 289

```
 1                    WATERHOUSE - 10-19-21

 2          of the question.

 3          A.    I don't know.  As I testified

 4     earlier, I had conversations with Mr. Dondero

 5     about -- about the -- the -- the moneys that

 6     were needed for the NAV error.  And I recall

 7     him saying go get it from Highland -- or get it

 8     from Highland.

 9          Q.    Well, why did you sign those

10     promissory notes and why didn't you have him

11     sign them?

12                    MR. MORRIS:  Objection to the form

13          of the question.

14          A.    I don't know.  I don't know.

15          Q.    You mentioned earlier that you

16     typically don't sign promissory notes.  Am I

17     remembering your testimony correctly?

18                    I mean, promissory notes on behalf

19     of the entities.  Not yourself, obviously.

20          A.    Yes, that is what I said earlier.

21          Q.    Do you recall any other promissory

22     notes in the million-plus range that you had

23     ever signed before on behalf of any entity?

24          A.    There is -- there has been a lot of

25     transactions over the years.  I don't -- I
```

Appx. 01110

Page 290

```
 1              WATERHOUSE - 10-19-21

 2    don't -- I don't recall generally.  I don't --

 3    I don't recall.

 4        Q.    So -- but to the best of your

 5    recollection, it was on your initiative,

 6    following your discussion with Mr. Dondero,

 7    that you had someone draft those two promissory

 8    notes; is that correct?

 9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    Yes, we would have -- the team, as I

12    stated earlier, we don't draft promissory

13    notes.  "The team" meaning the accounting and

14    finance team.

15              So the team would have worked with

16    the legal group at Highland to draft any notes.

17        Q.    Do you believe or do you have any

18    recollection as to whether you would have done

19    that pursuant to an email or telephone call or

20    in-person meeting?

21              MR. MORRIS:  Objection to the form

22        of the question.

23        A.    Are you asking if I would have -- if

24    those notes would have been drafted pursuant to

25    an email or phone call?
```

Page 291

```
 1                WATERHOUSE - 10-19-21

 2        Q.    Strike that.

 3              Do you recall whether you sent an

 4   email to anyone asking them to draft those two

 5   promissory notes?

 6        A.    I don't recall because, again,

 7   once -- I would have instructed -- likely

 8   instructed the team to -- to work with the

 9   legal group to draft these documents.

10              I -- I -- I -- yeah, I didn't -- I

11   mean, that is more an operational-type

12   procedure.  So, you know, a manager or a

13   controller or working with legal.  You know,

14   they -- they can certainly handle that task to

15   get that -- you know, to request that from

16   legal.

17        Q.    And who on your team do you think

18   you would have asked to do that?

19              MR. MORRIS:  Objection --

20        Q.    Who would have been the logical

21   person or people, if you don't remember their

22   name today?

23              MR. MORRIS:  Objection to the form

24        of the question.

25        A.    It -- it -- there is only two
```

```
 1                  WATERHOUSE - 10-19-21

 2    managers of the group.  That would have been

 3    Dave Klos or Kristin Hendrix.

 4              Dave was the -- one of his duties

 5    was managing the valuation team, and so he was

 6    intimately involved with this process.  So, you

 7    know...

 8         Q.    Okay.

 9         A.    I don't recall specifically but, I

10    mean, my general -- you know, I -- I -- I

11    likely would have talked to Dave first about it

12    versus someone like Kristin who hadn't been

13    intimately involved.

14         Q.    And -- and do you have a view as to

15    whether it is most likely that you would have

16    done that by email or in-person or how would

17    you believe you would have communicated that to

18    Mr. Klos?

19              MR. MORRIS:  Objection to the form

20         of the question.

21         A.    I likely would have done that in

22    person.  Again, if things of this nature

23    that -- again, you have to put ourselves back

24    to, we have been working on this very stressful

25    project for many, many months.  And once the
```

Page 293

```
 1              WATERHOUSE - 10-19-21

 2    go-ahead was to -- you know, we see the light

 3    at the end of the tunnel with wrapping this up

 4    and making shareholders whole -- sorry to say

 5    "we" -- you know, the -- so the folks that are

 6    involved in it.

 7              I like to talk to people

 8    face-to-face and -- and -- and go to -- and go

 9    to their desk, because that shows if I'm going

10    to their desk that -- that is something that I

11    want done, you know.

12        Q.   And do you remember, Mr. Waterhouse,

13    getting those two promissory notes in paper

14    format or by email before they were executed?

15              MR. MORRIS:  Objection to the form

16        of the question.

17        A.   I don't recall.

18        Q.   For whatever was the ordinary course

19    back then in May 2019, would you expect to have

20    received them only on paper or would you have

21    expected to have received them in Word document

22    or PDF document by email?

23              MR. MORRIS:  Objection to the form

24        of the question.

25        A.   I -- I didn't sign -- I signed very
```

Appx. 01114

Page 294

```
 1                   WATERHOUSE - 10-19-21

 2   few documents via email.  I can't say that it

 3   never happened, but people either stopped by my

 4   office and physically walked in documents for

 5   signature that we discussed face-to-face.

 6              Or documents were -- if -- if --

 7   if -- if -- let's say I wasn't there or I

 8   wasn't available, documents were dropped off.

 9   I had -- I had some in- and outboxes in front

10   of my -- my office there at the Crescent.

11              Documents would be dropped off for

12   signature.  There would be a cover sheet that

13   would be -- have been applied to those

14   documents detailing, you know, who dropped it

15   off, the purpose, why, what time.

16              And then, you know, as I stated, I

17   don't draft documents and I always go to the

18   legal group and the compliance group to make

19   sure that they're in the loop.  And there is

20   a -- a box or section that says, Has legal

21   reviewed or approved, or something to that

22   nature.

23              Again, I don't -- I don't have

24   access to that cover sheet anymore, but it

25   was -- it was something to that effect.
```

Appx. 01115

```
 1              WATERHOUSE - 10-19-21

 2              And my assistant, you know, if she

 3    was there, she would review that -- you know,

 4    whatever was being dropped off.  And if that

 5    has legal, you know, reviewed or -- reviewed or

 6    approved it, if that wasn't -- if that stuff

 7    hadn't been done, it was like she would just

 8    tell them like, go -- go -- go to the legal

 9    group, because --

10         Q.    Let me -- let me pause --

11              MS. DANDENEAU:  Let him finish.

12              MR. MORRIS:  Thank you.  Go ahead.

13         A.    I take -- go to the legal group

14    because that -- that was my -- you know, I

15    didn't -- I didn't review anything that -- that

16    they weren't -- you know, or there wasn't some

17    representation made to me that they had

18    reviewed, approved in some capacity.

19              Again, my -- my -- my goal, as CFO,

20    is to provide transparency and make sure that

21    groups like compliance and other things -- and

22    the other group in legal are -- are in -- you

23    know, their -- they're made aware of

24    transactions of -- you know, that are crossing

25    my desk.
```

Page 296

1          WATERHOUSE - 10-19-21

2               Because I'm not in every

3     conversation.  They're not in every

4     conversation -- meaning legal compliance -- and

5     I just want to make sure that -- that everyone

6     is in sync to, you know, to -- to the extent

7     possible.

8          Q.   So if we summarize, you don't

9     specifically remember signing these two notes,

10    but most likely it would have been that they

11    would have presented -- been presented to you

12    physically on paper?

13               MR. MORRIS:  Objection to the form

14         of the question.

15         A.   They would -- they would have been

16    presented physically on paper most likely or

17    someone would have left it.  But, I mean,

18    again, I don't -- I don't recall.

19         Q.   I understand.  Understand.

20               When you signed -- when you signed

21    documents, when you personally signed

22    documents, did you typically use a ink pen or

23    did you use a stamp?

24         A.   No, I -- I -- I use a -- an -- an

25    ink pen.

Page 297

1              WATERHOUSE - 10-19-21

2        Q.    Do you know -- was there a file at

3    Highland kept anywhere with ink-signed

4    originals of a promissory notes in general or

5    these two promissory notes specifically?

6              MR. MORRIS:   Objection to the form

7        of the question.

8        A.    Sorry, I just want to make sure I

9    understand your question.   Are you saying is

10   there a file somewhere that has ink-signed

11   originals of these two promissory notes?

12       Q.    Yes.

13       A.    I would -- I would assume they're

14   some place.   I mean --

15       Q.    Well, was there a -- was there a

16   place where Highland generally kept originals

17   of promissory notes owed to it?

18       A.    I wouldn't -- no.

19             MR. RUKAVINA:   Mr. Nguyen, would you

20   please pull up my A7, alpha 7.

21       Q.    These are the two promissory notes,

22   Mr. Waterhouse.

23             (Exhibit A7 marked.)

24       Q.    And please -- Mr. Waterhouse, please

25   command my associate to scroll down as you need

```
 1                 WATERHOUSE - 10-19-21

 2   to, but I want you to take a very close look at

 3   your two signatures here and tell me whether

 4   you believe, in fact, that you ink signed them

 5   or whether you --

 6              MS. DANDENEAU:  Mr. Rukavina,

 7        Mr. Waterhouse has the copies.

 8              MR. RUKAVINA:  Perfect.  Then you

 9        can take this down, Mr. Nguyen.

10        A.   These -- these -- these signatures

11   are identical, now that I stare at them, and I

12   mean, they are so close -- I mean, they're

13   identical that, I mean, even with my chicken

14   scratch signature, I don't know if I can -- you

15   know, I do this 100 times, could I do that

16   as -- as precisely as I see between the two

17   notes.

18        Q.   Well, that is why I ask.

19   Mr. Waterhouse, now that you have examined

20   them, does it seem like it is more likely that

21   you actually electronically signed these?

22              MR. MORRIS:  Objection to the form

23        of the question.

24        A.   Is -- I don't -- I don't recall

25   specifically.  As I said before, my assistant
```

```
 1              WATERHOUSE - 10-19-21
 2   did have a -- an electronic signature, and that
 3   was used from time to time.  It wasn't as
 4   common practice back in 2019.  It definitely
 5   was more common practice when we had to work
 6   from home and remotely for COVID because it
 7   that made it almost impossible to, right,
 8   provide wet signatures since we're all working
 9   from home remotely.
10        Q.    Well, going just for these two
11   promissory notes, Mr. Waterhouse, in light of
12   your inability to remember any details, are you
13   sure you actually signed either or both of
14   those notes?
15              MS. DANDENEAU:  Objection to form.
16        A.    I don't recall specifically
17   signing -- actually physically signing these
18   notes.  As I said before, I don't recall doing
19   that.  This -- this looks like my signature,
20   but yet these two signatures are identical.
21        Q.    So you don't recall physically
22   signing them, and I take it you don't recall
23   electronically signing them either?
24        A.    I don't recall.  You know, Highland
25   has all my emails.  If that occurred, you know,
```

Page 300

```
 1                WATERHOUSE - 10-19-21

 2   you know, I don't have any of these records is

 3   what I'm saying.  I don't have any of those

 4   records.

 5        Q.    That is why I'm asking you these

 6   questions in great detail because I don't have

 7   those emails.  I'm trying to -- I'm hoping that

 8   you will give me some names or some details so

 9   I can go look for more emails, but again, you

10   don't remember any -- any individual, other

11   than Mr. Dondero that we've discussed, you

12   don't remember any individual with whom you

13   discussed these promissory notes prior to their

14   execution?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't recall discussing it with

18   anybody else.

19        Q.    Okay.

20        A.    I mean, prior --

21        Q.    I understand.

22        A.    You know, there was no one else --

23   there was no one else in that meeting that I

24   recall with Mr. Dondero.

25        Q.    Now, when you established that by
```

Appx. 01121

1           WATERHOUSE - 10-19-21

2   May of 2019 --

3        A.    And -- and from what I recall, and

4   the reason why I was by myself is -- is, you

5   know, I don't -- I don't want to speculate, I'm

6   sorry.

7        Q.    Okay.  We have established that by

8   May of 2019, in your view, the liabilities of

9   HCMFA exceeded its assets; correct?

10       A.    Yeah.  I mean, again, I don't have

11  financial statements in front of me, but I

12  think, if I recall, we'd have to go through the

13  testimony with Mr. Morris, I believe that was

14  the case.

15       Q.    In fact, you will recall that in

16  April of 2019, Mr. Dondero signed a document

17  that extended the demand feature of two prior

18  notes to May 31, 2019.  Do you recall that?

19            MS. DEITSCH-PEREZ:  I think you

20       might -- maybe have the court reporter read

21       that back.  You might have misspoke.

22            (Record read.)

23            MR. RUKAVINA:  And I did misspeak.

24       Q.    I meant to say to May 31, 2021.  Do

25  you recall that, sir?

```
 1                  WATERHOUSE - 10-19-21

 2                  MR. MORRIS:  Objection to the form

 3        of the question.

 4        A.    Yes.

 5                  MR. RUKAVINA:  And, Mr. Nguyen, just

 6        so that the record is clear, will you please

 7        pull up my Exhibit Alpha 10, A10.

 8                  (Exhibit A10 marked.)

 9        Q.    You don't have this one in front of

10        you, Mr. Waterhouse?  This is the one that

11        Mr. Morris used earlier.  Do you see that

12        document, sir?

13        A.    Yes, I do.

14        Q.    And this is what you were testifying

15        about before when Mr. Morris was asking you.

16        Do you remember that?

17        A.    Yes.

18        Q.    So here is my question for you,

19        Mr. Waterhouse:  As the chief financial officer

20        of Highland, was it prudent for Highland less

21        than three weeks later to be lending

22        $7.2 million to an insolvent entity that

23        couldn't even then pay its debts back to

24        Highland?

25                  MS. DANDENEAU:  Objection to form.
```

Page 303

```
 1                   WATERHOUSE - 10-19-21

 2                   MR. MORRIS:  Objection to the form

 3        of the question.

 4        A.    Sorry, I just want to make sure --

 5   are you asking me, did you say, was it prudent

 6   for Highland to loan $7.4 million to HCMFA a

 7   few weeks after this document was executed?

 8        Q.    Yes, and at a time when HCMFA's

 9   liabilities exceeded its assets.

10                   MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I don't -- it is odd.  I don't know.

13                   MR. RUKAVINA:  You can take this

14   exhibit down, Mr. Nguyen.

15        Q.    Do you recall asking anyone,

16   Mr. Dondero or -- or anyone outside as to

17   whether Highland ought to be lending

18   $7.4 million to HCMF regarding HCMF's

19   creditworthiness?

20                   MR. MORRIS:  Objection to the form

21        of the question.

22        A.    I don't recall.

23        Q.    Did you receive personally any of

24   that $7.4 million?

25        A.    No.
```

Appx. 01124

Page 304

```
 1              WATERHOUSE - 10-19-21

 2       Q.   Did you even --

 3            MR. MORRIS:  I didn't hear that

 4       question, sir.

 5            MR. RUKAVINA:  The one that he

 6       answered, John, or my new one?

 7            MR. MORRIS:  No, no, your question,

 8       Davor.

 9            MR. RUKAVINA:  I had asked him

10       whether he received any of the

11       $7.4 million.  He said no.

12            MR. MORRIS:  Yeah.  I thought there

13       was a question after that.  Maybe I was

14       mistaken.  I apologize.

15            MR. RUKAVINA:  I had started a new

16       question, so here, let me start the new

17       question again.

18       Q.   Did you personally receive any

19  direct benefit from those two notes for

20  $7.4 million?

21       A.   No.

22       Q.   Did you ever personally consider

23  yourself obligated to repay either or both of

24  those notes?

25       A.   No.
```

```
 1                WATERHOUSE - 10-19-21
 2                MR. RUKAVINA:  Pull up those notes
 3     again, Mr. Nguyen.
 4          Q.   You can have them in front of you,
 5     Exhibit 7, Mr. Waterhouse, whatever is easier
 6     for you.  If you go to your signature page, my
 7     question to you is, why did you not include
 8     your title as treasurer by your name, Frank
 9     Waterhouse?
10                MS. DANDENEAU:  Objection to form.
11          A.   I didn't -- I didn't draft this
12     document.
13          Q.   So you relied on whoever drafted it
14     to draft it correctly?
15          A.   Yes.
16          Q.   Okay.  But back then when you signed
17     this, did it ever cross your mind that you were
18     the maker on these notes?
19          A.   No.
20          Q.   Back then when you signed this
21     document, did it ever cross your mind that you
22     could be a co-obligor on these notes?
23          A.   No.  I didn't receive $7.4 million,
24     I mean...
25          Q.   But can you say that HCMFA received
```

```
 1                WATERHOUSE - 10-19-21

 2   $7.4 million?

 3        A.    I would have to go back and look and

 4   check in, you know, the -- the financial

 5   records and the bank statements.

 6              MR. RUKAVINA:  You can take this

 7   exhibit down, Mr. Nguyen.

 8        Q.    Mr. Waterhouse, I'm not trying to be

 9   a smart-ass, but if the law says that because

10   of the way that you signed this promissory

11   note, if that is what the law says, that that

12   made you personally -- personally liable, then

13   you would agree with me that that was never

14   your intent?

15              MR. MORRIS:  Objection to the form

16        of the question.

17        A.    That was never -- I wouldn't sign a

18   note and not get consideration in return.

19        Q.    So putting all other issues aside,

20   if the law -- if the law says that you were

21   liable for those notes because of how you

22   signed them, then would you agree with me that

23   these notes are a mistake?

24              MR. MORRIS:  Objection to the form

25        of the question.
```

1              WATERHOUSE - 10-19-21

2              MS. DANDENEAU:  Objection to the

3      form.

4      A.    Yes.

5      Q.    So do you agree with me that it's

6  odd -- I think that is the word you used --

7  that Highland would be loaning $7.4 million a

8  few weeks after that extension to an entity

9  whose liabilities exceeded its assets, and you

10  would agree with me that it was never your

11  intention to be in any way liable for these two

12  promissory notes; correct?

13              MR. MORRIS:  Objection to the form

14      of the question.

15      A.    Sorry, you -- you asked a lot there.

16              MR. RUKAVINA:  I will strike it and

17  I will move on.

18              Let's go to -- pull up Exhibit 9,

19  please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha

20  9, A9.

21              (Exhibit A9 marked.)

22      Q.    Sir, take a moment to look at this,

23  but this is an email, and you will see attached

24  July 31, 2020 affiliate notes.

25              Do you see that attachment?

Page 308

```
 1              WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    Okay.  And do you see an entry for

 4   Highland Capital Management Fund Advisors?

 5              MR. MORRIS:  I'm sorry, hold on.

 6        Where are you looking?

 7              MR. RUKAVINA:  Last page, John.

 8              MR. MORRIS:  Is it the page on the

 9        screen?

10              MR. RUKAVINA:  Oh, I'm sorry.

11        Mr. Nguyen just did it.  Yes, the last page

12        there.

13              MR. MORRIS:  Thank you.

14        Q.    Do you see an entry there for HCMFA?

15        A.    Yes.

16        Q.    About $10.5 million.

17              Do you see that?

18        A.    I do.

19        Q.    And, now, do you have any

20   explanation for why if HCMFA owed $7.4 million,

21   plus the 5.3 million that had been extended,

22   why that amount was only 10.5 million?

23        A.    I don't know.  Okay.

24              MR. RUKAVINA:  Close this one and

25        pull up, Mr. Nguyen, the schedules,
```

Appx. 01129

```
 1                  WATERHOUSE - 10-19-21
 2           schedule of assets.  What exhibit is this
 3           of ours, Mr. Nguyen?
 4                  MR. NGUYEN:  This is A11.
 5                  MR. RUKAVINA:  Oh, this will be A11.
 6                  (Exhibit A11 marked.)
 7           Q.   You don't have this in front of you,
 8      Mr. Waterhouse?
 9           A.   Okay.
10           Q.   This is what Mr. Morris used
11      earlier.  Do you remember looking at this with
12      Mr. Morris?
13           A.   Yes.
14                  MR. RUKAVINA:  You might have to
15           zoom in a little.  Okay.
16           Q.   Now, I see Affiliate Note A, B, and
17      C.
18                  Do you have any recollection as to
19      why the names of the affiliates are omitted?
20           A.   I don't.  I testified earlier that,
21      you know, the team worked with DSI in providing
22      these.  I -- I don't -- I don't know.
23           Q.   Can we deduce -- is it logical to
24      deduce that Affiliate Note A would be NexPoint
25      given its size of $24.5 million?
```

Page 310

```
 1              WATERHOUSE - 10-19-21

 2              MR. MORRIS:  Objection to the form

 3         of the question.

 4         A.    I mean, it -- it is a -- it is -- it

 5    is approximate.

 6         Q.    Well, can we -- can we deduce -- or,

 7    I'm sorry, strike that.

 8              Can you, sitting here today,

 9    logically conclude that Affiliate Note B or C

10    represents HCMFA?

11              MR. MORRIS:  Objection to the form

12         of the question.

13         A.    I don't know.  I don't know.  I

14    can't.

15         Q.    Okay.  As of the petition date, we

16    have established that HCMFA, under promissory

17    notes, owed $7.4 million and $5.3 million to

18    the debtor; correct?

19              MR. MORRIS:  Objection to the form

20         of the question.

21         A.    Yes.

22         Q.    Okay.  And by my reckoning, that

23    would be somewhere approaching $13 million.

24              MR. MORRIS:  Objection to the form

25         of the question.
```

Page 311

1          WATERHOUSE - 10-19-21

2          Q.    It would be $12.7 million.  Is that

3     generally correct?

4          A.    Sorry, the amounts were 7.4, 5.3.

5          Q.    Yes.

6          A.    Okay.  Yeah, that -- that -- I can

7     do that math, yes.

8          Q.    Do you have any explanation or any

9     understanding of why there is no similar entry

10    listed here on the schedule of assets filed

11    with the bankruptcy court?

12              MR. MORRIS:  Objection to the form

13         of the question.

14         A.    I don't know.  We have to look at

15    the supporting schedules, like I talked about

16    other -- presumably there is -- there is a

17    build to the schedule that would provide the

18    detail.

19         Q.    Well, that was going to be my next

20    question.  You anticipated it.

21              MR. RUKAVINA:  You can -- you can

22         take this down, Mr. Nguyen.

23         Q.    Do you believe that whenever you and

24    your team provided the underlying data to the

25    financial advisor that the actual names of the

1          WATERHOUSE - 10-19-21

2    affiliates for Affiliate Note A, B, and C would

3    have been listed there?

4          A.    Are you asking we provided the names

5    to the financial advisor?  I don't -- I don't

6    understand who the financial advisor is.

7          Q.    I'm sorry, DSI.

8                Let me ask the question this way,

9    Mr. Waterhouse.

10                Whenever you provided information

11    about the affiliate notes to DSI, do you

12    believe that you would have included the actual

13    names of the affiliates, you or your team, or

14    that you would have done the Affiliate Note A,

15    Note B, Note C?

16                MR. MORRIS:  Objection to the form

17          of the question.

18                MS. DANDENEAU:  Objection to the

19          form.

20          A.    We -- like I testified earlier, when

21    we were -- we gave everything to -- to DSI.  We

22    were giving all of our records, all of our

23    files, everything to DSI.  We weren't redacting

24    information or saying, hey, here is a note,

25    here is Affiliate Note A or B.

Page 313

```
 1                  WATERHOUSE - 10-19-21

 2                  I mean, it was -- our job and our

 3      focus -- and I testified in court back in 2019;

 4      right -- was -- was to be transparent and, you

 5      know, get DSI up to speed on -- on the matters

 6      at Highland.  So I can't see us redacting at

 7      that point.

 8                  MR. RUKAVINA:  Mr. Nguyen, will you

 9           please pull up Mr. Morris' Exhibit 36.

10           Just the very first page, the very top

11           email.  You might zoom in a little bit.

12           Q.   Now, you recall being asked about

13      this by Mr. Morris?

14           A.   Yes, I do.

15           Q.   And you wrote:  The HCMFA note is a

16      demand note.

17                  You wrote that; right?

18           A.   Yes.

19           Q.   And, in fact, weren't there by that

20      point in time several notes?

21           A.   Yes, there were.  Again, I don't --

22      I don't remember everything specifically.  I

23      mean --

24           Q.   I understand.  I understand.

25                  So this is an example where -- where
```

```
 1                    WATERHOUSE - 10-19-21

 2      you might have made a mistake by referring to a

 3      singular instead of a plural; right?

 4           A.    Yes.

 5           Q.    Okay.  And you -- you wrote -- a

 6      couple of sentences later, you wrote:  There

 7      was an agreement between HCMLP and HCMFA the

 8      earliest they could demand is May 2021.

 9                 You wrote that; right?

10           A.    Yes.

11           Q.    But I think you -- you agreed with

12      Mr. Morris that that can't possibly apply to

13      the May 2019 notes, can it?

14                 MR. MORRIS:  Objection to the form

15            of the question.  That is not what he

16            testified to.

17           Q.    Let me ask -- let me ask a different

18      question.

19                 Sitting here today -- or if you can

20      answer me from your memory on October 6,

21      2020 -- did the April acknowledgment that

22      extended the maturity date apply to the

23      May 2019 notes also?

24           A.    I don't recall specifically.

25           Q.    Well, you recall that the notes that
```

1                    WATERHOUSE - 10-19-21

2      you signed were demand notes; right?

3          A.    Yes.

4          Q.    Do you find it logical, based on

5      your experience, that had they intended to have

6      a different or a set maturity date, you would

7      have instructed that that set maturity date be

8      included instead of a demand feature?

9                MR. MORRIS:  Objection to the form

10         of the question.

11         A.    Sorry, just want to make sure I

12     understand.  You are saying that -- that the

13     $5 million note, the $2.4 million note, if

14     those were supposed to be a term note, that I

15     would have made sure that those were a term

16     note?

17         Q.    I'm saying -- I'm saying,

18     Mr. Waterhouse, that on May the 2nd and May the

19     3rd, 2019, if you intended that those two

20     promissory notes could not be called until May

21     2021, would you have included such language in

22     those two promissory notes?

23               MR. MORRIS:  Objection to the form

24         of the question.

25         A.    I guess -- I'm sorry, I don't recall

Page 316

```
 1                  WATERHOUSE - 10-19-21

 2    putting language in those May notes.  I don't

 3    remember what language you are referring to.

 4         Q.    Well, let's read this again.

 5               There was an agreement between HCMLP

 6    and HCMFA the earliest they could demand is May

 7    2021.

 8               Do you recall that agreement?

 9         A.    Yes, that was the agreement we

10    looked at earlier; correct?

11         Q.    Okay.  Yes.

12               Do you -- do you understand now that

13    that agreement that we looked at earlier also

14    applied to the May 2019 notes that you signed?

15         A.    I don't -- I don't know.

16         Q.    But as of October 6, 2020, you're

17    writing that there is one demand note and

18    you're categorizing that demand note as not

19    being demandable on May 2021; correct?

20         A.    Yes.

21         Q.    And you know now that you made at

22    least one mistake in this email; correct?

23               MR. MORRIS:  Objection to the form

24         of the question.

25         A.    Yes.
```

Appx. 01137

Page 317

```
 1                   WATERHOUSE - 10-19-21

 2              MR. RUKAVINA:  You can pull this

 3       down, Mr. Nguyen.

 4       Q.    So, Mr. Waterhouse, you don't

 5   remember Mr. Dondero telling you to make these

 6   loans or not.  HCMLP was loaning $7.4 million

 7   to someone that their assets were less than

 8   their liabilities.

 9              We don't see on the July list of

10   notes, where there is $12.7 million of notes,

11   we don't see that on the bankruptcy schedules,

12   and we have this Exhibit 36 where you are

13   confused.

14              Are you prepared to tell me, sir,

15   today that you might have made a mistake in

16   executing those two promissory notes?

17              MR. MORRIS:  Objection to the form

18       of the question.

19       A.    I -- I don't know.

20       Q.    And if it turns out that you're

21   personally liable for those promissory notes,

22   it would certainly be a mistake, wouldn't it?

23              MS. DANDENEAU:  Objection to the

24       form.

25              MR. MORRIS:  Join.
```

Page 318

```
 1                    WATERHOUSE - 10-19-21

 2         A.    Yes.

 3         Q.    If Mr. Dondero testifies that he

 4   never told you to make these loans, would you

 5   disagree with his testimony?

 6               MR. MORRIS:  Objection to the form

 7         of the question.

 8         A.    Like I testified earlier with my

 9   conversation with Mr. Dondero, all I recall is

10   he said, get the money from Highland.

11         Q.    And if Mr. Dondero testifies that

12   he, in consultation with other senior personnel

13   at Highland, decided that Highland needed to

14   pay HCMFA $7.4 million as compensation for the

15   NAV error and not a loan, would you have any

16   reason to disagree with Mr. Dondero?

17               MR. MORRIS:  Objection to the form

18         of the question.

19         A.    If that was -- if that was his

20   intent, yes, it would -- I would --

21         Q.    Do you have any reason to disagree

22   with him?

23               MR. MORRIS:  Objection to the form

24         of the question.

25         A.    If that was his intent, I don't
```

Page 319

1          WATERHOUSE - 10-19-21

2    know.  I don't know how I disagree with that.

3          Q.    And just to confirm, you don't

4    remember ever asking Mr. Dondero whether you

5    should have two promissory notes prepared?

6          A.    No.

7          Q.    And you don't remember discussing

8    with Mr. Dondero what the terms of those two

9    promissory notes should be?

10         A.    I don't recall -- I testified all I

11   recall is he said, get the money from Highland.

12   I don't -- the -- the terms of the note, I

13   don't recall ever having a discussion around

14   the terms of the note, but since I don't draft

15   the notes, that -- there could have been a

16   conversation with other people later.

17         Q.    Do you have any memory of whether

18   after the notes were drafted, but before you

19   signed them, that you communicated with

20   Mr. Dondero in any way to just confirm or -- or

21   get his blessing or ratification to signing

22   those notes?

23              MR. MORRIS:  Objection to the form

24         of the question.

25         A.    I don't recall.

Page 320

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Again, the only thing you remember,

 3  sitting here today, was Mr. Dondero said, get

 4  the money from Highland, and that is it, that

 5  is all you remember?

 6            MR. MORRIS:  Objection to the form

 7       of the question.

 8       A.    I testified to that several times.

 9  This was over two years ago.  A lot has

10  happened.  That is all I recall.

11       Q.    And help me here.  I'm not very

12  technologically astute.  When you -- and I -- I

13  recognize that you do it rarely, but when you

14  sign a document electronically, do you believe

15  that there is an electronic record of you

16  having authorized or signed a document

17  electronically?

18            MR. MORRIS:  Objection to the form

19       of the question.

20       A.    I -- I don't know the tech answer to

21  that, but, you know, since I don't have -- I

22  don't ever attach my signature block

23  electronically, my assistant would have done

24  that, and if that is done over email like we

25  did several times -- you know, multiple,
```

Page 321

```
1              WATERHOUSE - 10-19-21
2     multiple times over COVID, she would attach my
3     signature block and then email it out to
4     whatever party.
5          Q.    What was your assistant's name in
6     May 2019?
7          A.    It was Naomi Chisum.
8          Q.    Is she the only one?  I'm sorry, was
9     she your only assistant that would have maybe
10    facilitated logistically something like you
11    just described?
12         A.    You know, she was out on maternity
13    leave at some point.  I don't -- I don't recall
14    those dates where she was out for maternity
15    leave.  There was -- there were folks backing
16    her up.  I don't recall specifically who
17    those -- who those, you know, administrative
18    assistants were, and I don't recall
19    specifically if she was out during this time on
20    maternity leave.
21              I do know that that she was out for
22    a period of time, or who knows, or she could
23    have been on vacation that day or, you know, I
24    don't know.
25         Q.    Switching gears now, the two
```

```
 1                 WATERHOUSE - 10-19-21

 2    complaints that have been filed that is against

 3    HCMFA and NexPoint, did you see any drafts of

 4    those complaints before they were filed?

 5                 MR. MORRIS:  Objection to the form

 6          of the question, and to the extent that you

 7          had any communications with counsel or you

 8          were shown drafts of the complaints by

 9          counsel while you were employed by

10          Highland, I direct you not to answer.

11          A.    I -- I reviewed documents yesterday

12    with counsel here.  I believe that is the first

13    time I have ever seen those.

14          Q.    Okay.  Did you ever discuss with

15    Mr. Seery these two lawsuits before or after

16    they were filed?

17          A.    I don't recall.

18          Q.    Were you ever interviewed by legal

19    counsel, to your knowledge, about these

20    promissory notes before the complaints were

21    filed?  Without going into what was said, were

22    you ever interviewed by legal counsel?

23                 MR. MORRIS:  Objection to the form

24          of the question.

25          A.    I don't recall.
```

Page 323

```
 1                    WATERHOUSE - 10-19-21
 2          Q.    Obviously with COVID, it changed,
 3     but -- but before COVID, did you used to meet
 4     with Mr. Seery from time to time in-person?
 5          A.    Yeah, I mean, so before COVID -- so
 6     we're talking kind of late March, early April,
 7     right, there was about -- I don't remember the
 8     specific date when the board for Highland was
 9     appointed.  I believe it was around February of
10     2020, so maybe there was a month-and-a-half,
11     two-month window where we were meeting
12     in-person or, you know, like we were actually
13     in the office, excuse me, we were in the
14     office.
15                And, you know, when they were first
16     appointed, the board members and Mr. Seery
17     were -- were definitely down here more
18     in-person.
19          Q.    Did you ever see Mr. Seery taking
20     written notes of -- of his meetings with you or
21     others?
22          A.    I don't recall.
23          Q.    Do you recall on any Zoom or video
24     conference with Mr. Seery, seeing him take
25     notes, written notes?
```

Appx. 01144

Page 324

```
 1              WATERHOUSE - 10-19-21

 2        A.    The Zoom calls we had, I don't

 3   recall having seen video or, you know, or if it

 4   was on Zoom, I just remember it being -- well,

 5   no, you know what, there were some -- you know,

 6   I take that back.

 7              So there were -- there were some

 8   times that I did remember seeing Mr. Seery

 9   on -- on some of the Zoom calls.

10        Q.    Well, let me --

11        A.    I don't -- sorry, I'm thinking.  I'm

12   thinking -- I'm going back.  I'm trying to

13   process this.

14        Q.    I can make it much quicker,

15   Mr. Waterhouse.  I have heard -- I have heard

16   that Mr. Seery is a copious note taker.

17              Do you have any knowledge about

18   that?

19        A.    No.

20        Q.    Okay.  Switching gears yet again,

21   and this will be last theme.  Do you need a

22   restroom break, or are you good to go for

23   another half an hour?

24              MS. DEITSCH-PEREZ:  I need a

25        restroom break.
```

Page 325

```
 1              WATERHOUSE - 10-19-21

 2              MR. RUKAVINA:  Can we make it five

 3      minutes?

 4              THE WITNESS:  Five minutes would be

 5      great.

 6              VIDEOGRAPHER:  We're going off the

 7      record at 5:53 p.m.

 8      (Recess taken 5:53 p.m. to 5:59 p.m.)

 9              VIDEOGRAPHER:  We are back on the

10      record at 5:59 p.m.

11      Q.    Mr. Waterhouse, I had asked you

12  earlier about contracts between HCMFA and the

13  debtor, and now I'm going to talk about

14  contracts between the debtor and NexPoint

15  Advisors.  Okay?

16      A.    Okay.

17      Q.    Now, were there contracts similar to

18  the ones with HCMFA that NexPoint had in the

19  nature of employee reimbursement and shared

20  services?

21      A.    Yes, they -- NexPoint Advisors and

22  Highland Capital Management Fund Advisors had

23  cost reimbursement and shared services

24  agreements with Highland Capital Management,

25  L.P.
```

```
 1              WATERHOUSE - 10-19-21

 2       Q.    And was that shared services

 3   agreement, to the best of your understanding,

 4   in place as of December 31, 2020?

 5       A.    It was -- it was terminated at some

 6   point, and I remember the contracts had

 7   different termination dates, but I think the --

 8   the date of termination was January 31st of

 9   2021, after the termination was put in.

10             So yeah, it would be in place at the

11   end of the year of December -- it would be in

12   place at December 31st, 2020.

13       Q.    And pursuant to that agreement as of

14   December 31st, 2020, was the debtor providing

15   what you would describe as back office services

16   to NexPoint?

17       A.    Yes.

18       Q.    Would those have included accounting

19   services?

20       A.    Yes.

21       Q.    And as part of those accounting

22   services, would the debtor have assisted

23   NexPoint with paying its bills?

24             MR. MORRIS:  Objection to the form

25        of the question.
```

Page 327

```
 1                  WATERHOUSE - 10-19-21

 2         A.    Yes.

 3         Q.    So let's break that up.  You were a

 4   treasurer of NexPoint as well in December of

 5   2020?

 6               MR. MORRIS:  Objection to the form

 7         of the question.

 8         A.    Yes.

 9         Q.    Okay.  And in December of 2020, did

10   NexPoint have its own bank accounts?

11         A.    Yes.

12         Q.    And did it use those bank accounts

13   to pay various of its obligations?

14         A.    Yes.

15         Q.    Did employees of the debtor have the

16   ability to cause transfers to be made from

17   those bank accounts on behalf of NexPoint?

18         A.    Yes.

19         Q.    And is that one of services that the

20   debtor provided NexPoint, basically ensuring

21   that accounts payable and other obligations

22   would be paid?

23         A.    Yes.

24               MR. MORRIS:  Objection to the form

25         of the question.
```

Appx. 01148

```
 1                WATERHOUSE - 10-19-21

 2        Q.    You answered yes?

 3        A.    Yes.

 4        Q.    And the payments, though, whose

 5   funds would they be made from?

 6        A.    From the bank account of NexPoint

 7   Advisors.  If they were NexPoint advisor

 8   obligations, it would be made from NexPoint

 9   Advisors' bank account.

10        Q.    So let's pull up Exhibit Alpha 1.

11   You should have that -- it is my Tab 1 or my

12   Exhibit 1.

13             (Exhibit A1 marked.)

14        Q.    So this is a -- this is a series of

15   emails, Mr. Waterhouse.  Let's look at the

16   first page here, November 25, 2020, between

17   Kristin Hendrix and yourself.

18             Do you see that, sir?

19        A.    I do.

20        Q.    And do you see where Ms. Hendrix

21   writes:  NPA.

22             Do you know what NPA stood for?

23        A.    Yes.

24        Q.    And what does it stand for?

25        A.    NexPoint Advisors.
```

```
1                WATERHOUSE - 10-19-21
2         Q.    And was that how you-all internally
3    at Highland refer to NexPoint Advisors, L.P.?
4         A.    I mean, yes, amongst other things.
5         Q.    And she writes at the bottom of her
6    email:  Okay to release?
7                Do you see that?
8         A.    Yes, I do.
9         Q.    So what --
10               MR. MORRIS:  Hold on one second.
11               Okay.  Go ahead.
12               MR. RUKAVINA:  Yeah.
13        Q.    So what is -- what is Ms. Hendrix
14   here on November 25 asking of you?
15        A.    She is asking me -- so she -- these
16   are -- these are payments -- typically we would
17   do an accounts payable run every week at the
18   end of every Friday.  But looking at this date,
19   it is Wednesday, November 25th, which means, to
20   me, it is likely Thanksgiving weekend.
21               So this is the day before
22   Thanksgiving, so this is the last kind of --
23   kind of day before the holidays and vacation
24   and things of that nature.  So it is
25   effectively the Friday of that week.
```

Page 330

1          WATERHOUSE - 10-19-21

2              So she is -- she is putting in all

3     the payments for the week because we batch

4     payments weekly.  And these are the payments

5     that go out that week, and she is informing me

6     of the payments and -- you know, again, at the

7     bottom of the email, she is asking for my okay

8     to -- to release these payments in the wire

9     system.

10         Q.    So these would be accounts payable

11    of NexPoint?

12         A.    I mean, it would be accounts payable

13    for all of these entities listed on this email.

14         Q.    And who was Ms. Hendrix employed by

15    in November and December of 2020?

16         A.    Highland Capital Management.

17         Q.    Okay.  So -- so part of the services

18    that NexPoint had contracted with was for

19    Highland to ensure that NexPoint timely paid

20    its accounts payable; is that accurate?

21              MR. MORRIS:  Objection to the form

22         of the question.  You have got to be

23         kidding me.

24         Q.    Is that accurate?

25         A.    Yes.

```
 1              WATERHOUSE - 10-19-21

 2        Q.    And did NexPoint rely on employees

 3   of the debtor to ensure that NexPoint's

 4   accounts payable were timely paid?

 5              MR. MORRIS:  Objection to the form

 6        of the question.

 7        A.    Yes.

 8              MR. RUKAVINA:  Let's flip to the

 9        next page, Mr. Nguyen, if you will please

10        scroll to the next page.

11        Q.    So this is an email similar to the

12   prior one, November 30th.

13              Do you see where it says, NPA HCMFA,

14   USD $325,000 one-day loan?

15              Do you see that, sir?

16        A.    I do.

17        Q.    Do you have any memory of what that

18   was?

19        A.    I don't recall what that -- what

20   that payment was for.

21        Q.    Did it sometimes occur that one

22   advisor would, on very short-terms, make loans

23   to another advisor?

24        A.    Yes.  This -- this -- this occurred

25   from -- from -- from time to time.  It actually
```

Page 332

```
 1              WATERHOUSE - 10-19-21

 2    looking at -- I'm -- I'm looking at the date of

 3    this email.  It is November 30th.  It is the

 4    last day of the month.

 5              HCMFA has obligations it needs to

 6    pay to its broker-dealer, which is HCFD.  And

 7    it likely was short funds to make those

 8    obligations under that -- under its agreement,

 9    and so it provided a one-day loan because on

10    the next business day on 12/1 -- or the next

11    business day in December, it would receive

12    management fees from the underlying funds that

13    it managed and it would be able to pay back

14    that loan to NexPoint Advisors.

15         Q.   So -- so here Ms. Hendrix was

16    seeking your approval to transfer $325,000 from

17    NexPoint to HCMFA for a one-day loan; is that

18    correct?

19         A.   That is correct.

20         Q.   Let's flip to the next page, sir.

21              MR. RUKAVINA:  And, Mr. Nguyen, if

22         you will please scroll down.

23         Q.   Now we have as an entry for

24    $325,000, 11/30 loan payment.

25              Do you see that, sir?
```

Appx. 01153

Page 333

```
 1              WATERHOUSE - 10-19-21

 2       A.    Yes.

 3       Q.    And that is probably the loan that

 4  was approved on the prior page?

 5       A.    Yes, most likely.

 6       Q.    So is it also true, sir, that in

 7  addition to accounts payable debtor employees

 8  would be assisting NexPoint with respect to

 9  paying back its debt?

10             MR. MORRIS:  Objection to the form

11       of the question.

12       A.    I mean, yes, for loans of this

13  nature, yes.

14       Q.    Well, what about long term loans?

15  Was it reasonable for NexPoint to expect debtor

16  employees to ensure that NexPoint timely paid

17  its obligations under long-term notes?

18             MR. MORRIS:  Objection to the form

19       of the question.

20             MS. DANDENEAU:  Objection to form.

21       A.    I mean, that is one of the things

22  that the Highland personnel did provide to the

23  advisors.  Yes, we would -- we would -- over

24  the years, yes, we -- we -- we -- we did do

25  that generally.  Again, I don't remember
```

```
 1              WATERHOUSE - 10-19-21
 2   specifically but, yes, generally we -- you
 3   know, we did do that.
 4        Q.   So do you recall -- and we can pull
 5   it up, if need be -- that under the NexPoint
 6   note that Mr. Morris asked you about earlier,
 7   the one for more than $30 million, that
 8   NexPoint was obligated to make an annual
 9   payment of principal and interest?
10             MR. MORRIS:  Objection to the form
11        of the question.
12        A.   Yes, it was -- yes, it -- it was an
13   amortizing note.  It was -- you know, from what
14   we reviewed earlier, it was payable by
15   December 31st of each year.  So -- but are --
16   are you asking me --
17        Q.   I'm just asking you, sir, if you
18   recall the note.
19        A.   Yes, the $30 million note, yes, we
20   reviewed it earlier, yes.
21        Q.   And do you recall Mr. Morris had you
22   go through the fact that NexPoint had made
23   payments in years prior to 2020 on that note?
24        A.   I do.
25        Q.   And do you believe that employees of
```

```
 1              WATERHOUSE - 10-19-21

 2   the debtor would have played any role in

 3   NexPoint having made those prior payments?

 4              MR. MORRIS:  Objection to the form

 5        of the question.

 6        A.    Yes.

 7        Q.    And what role in years prior to 2020

 8   would employees of the debtor have had with

 9   respect to NexPoint making that annual payment?

10        A.    We -- we -- we would have -- I keep

11   saying "we."  The team would have calculated

12   any amounts due under that loan and other

13   loans, as -- as standard course.

14              We would -- since we provided

15   treasury services to the advisors, we would

16   inform the -- the -- the -- we informed

17   Mr. Dondero of any cash obligations that are

18   forthcoming, whether we do cash projections.

19              If, you know, any of these payments

20   would have -- or, you know, the sum total of

21   all of these payments, including any note

22   payments, if there were any cash shortfalls, we

23   would have informed Mr. Dondero of any cash

24   shortfalls.  We could adequately plan, you

25   know, in instances like that.
```

Page 336

```
 1              WATERHOUSE - 10-19-21

 2              Or, sorry, we -- I say "we" -- I

 3    keep saying "we" -- I keep wearing my -- again,

 4    my -- my treasurer hat.

 5              But, yes, it is to -- it is to

 6    inform Mr. Dondero of the obligations of the

 7    advisors in terms of cash and obligations that

 8    are -- are upcoming and that -- and that are --

 9    are scheduled to be paid.

10       Q.    And would those obligations that are

11    upcoming and scheduled to be paid prior to 2020

12    have incurred the annual payment on that

13    NexPoint $30 million note?

14              MS. DANDENEAU:  Objection to form.

15              MS. DEITSCH-PEREZ:  Davor, I think

16         you misspoke.  You might want to just

17         repeat the question.

18       Q.    Okay.  Let me repeat the question,

19    sir.

20              Prior to 2020, those services that

21    you just described, would that -- on behalf of

22    the debtor, would that have included NexPoint's

23    payments on the $30 million note?

24       A.    Yes.

25       Q.    So someone at the debtor in treasury
```

Page 337

1          WATERHOUSE - 10-19-21

2     or accounting would have sent some schedule or

3     a reminder that a payment would be coming due

4     in the future.  Is that generally the practice?

5          A.    Yes, we would -- you know, again, I

6     didn't -- I didn't micromanage the teams, but

7     we had a -- a corporate accounting calendar

8     that we use as kind of a tickler file to keep

9     track of payments.

10              I actually, you know, don't know how

11    actively they're using that in -- in prior to

12    2020, but it was actively used at some point.

13              We did look at NexPoint cash

14    periodically and cash for the other advisors as

15    well and payments.  You know, we -- payments

16    like this would have appeared in our cash

17    projections, in the advisor's cash projections.

18              And, again, as like I said earlier,

19    they would have appeared there, so there would

20    be time to plan for making any of these

21    payments.

22          Q.    And based on your experience, would

23    it have been reasonable for NexPoint to rely on

24    the debtors' employees to inform NexPoint of an

25    upcoming payment due on the $30 million

Page 338

1              WATERHOUSE - 10-19-21

2     promissory note?

3              MR. MORRIS:  Objection to form of

4        the question.

5              MS. DANDENEAU:  Objection to form.

6        A.    Yes.  Yes, they did.  I mean, but I

7     mean, but I don't think these -- these notes

8     were any secret to anybody.

9        Q.    I understand, and I'm not suggesting

10    otherwise.

11             MR. RUKAVINA:  Please pull up Alpha

12    2, Mr. Nguyen.

13             (Exhibit A2 marked.)

14       Q.    Now, this document is similar to the

15    ones we've seen before as of December 31, 2020,

16    and I don't see under NTA anything there for

17    paying the promissory note to Highland.

18             Do you see anything like that?

19       A.    I do not.

20             MR. RUKAVINA:  You can pull that --

21    that exhibit down, Mr. Nguyen.

22       Q.    You are aware, of course, by now

23    that, in fact, NexPoint failed to make the

24    payment due December 31, 2020, are you not?

25       A.    I am aware, and yes, I do understand

```
 1              WATERHOUSE - 10-19-21
 2   it.
 3        Q.    Were you aware that Highland
 4   accelerated that $30 million promissory note?
 5        A.    I am aware.
 6        Q.    Were you aware of that acceleration
 7   at the time that it occurred?
 8        A.    I don't remember specifically.
 9        Q.    Do you recall whether anyone asked
10   you -- prior to the acceleration, anyone asked
11   you at Highland, what Highland should do with
12   respect to the missed payment?
13        A.    Did anyone ask me what Highland
14   should do about the missed payment?
15        Q.    Yes, before acceleration.
16              MR. MORRIS:  Objection to the form
17        of the question.
18        A.    I mean, what -- what I recall is
19   there was the -- sorry, are you asking me --
20              MS. DANDENEAU:  Why don't you just
21        repeat the question, Mr. Rukavina.
22        Q.    Let me try again, Mr. Waterhouse,
23   let me try again.
24              I am saying you're the CFO of
25   someone, in this case, Highland, and the
```

1                  WATERHOUSE - 10-19-21

2      borrower failed to make the required payment.

3      Are you with me so far?

4           A.    I am.

5           Q.    Did anyone then ask you, what should

6      we do with respect to our rights against the

7      borrower that missed the payment?

8           A.    Not that I recall.

9           Q.    Did you play a role in the decision

10     to accelerate that $30 million promissory note?

11          A.    I did not.

12          Q.    Do you recall whether Mr. Seery ever

13     asked you before the acceleration as to whether

14     he should accelerate the note?

15          A.    I don't recall.

16          Q.    And you don't recall when you

17     learned of the acceleration itself?

18               MR. MORRIS:  Objection to the form

19          of that question.

20          A.    It was -- it was sometime in

21     early -- in early 2021.  I don't remember

22     specifically.

23          Q.    But do you recall whether it was

24     after the acceleration had already been

25     transmitted?

Page 341

```
 1               WATERHOUSE - 10-19-21

 2               MS. DANDENEAU:  Objection to the

 3          form of the question.

 4     A.    I don't recall.

 5     Q.    Do you recall in early to mid

 6  January of 2021, after the default, discussing

 7  the default with Mr. Dondero?

 8     A.    I do recall discussing with

 9  Mr. Dondero after December 31, 2020?

10     Q.    Yes, the fact of the default.

11     A.    I don't recall.

12               MR. RUKAVINA:  Let's pull up my

13  Exhibit 6, Alpha 6.

14               (Exhibit A6 marked.)

15               MR. RUKAVINA:  And, Mr. Nguyen, if

16          you will please scroll down.

17     Q.    This email chain begins with you

18  writing to Ms. Hendrix on January the 12th:

19  NexPoint note to HCMLP.

20               Do you see that, sir?

21     A.    I do.

22     Q.    Were you discussing this same

23  $30 million note we're talking about right now

24  with Ms. Hendrix?

25     A.    Yes.
```

Page 342

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Okay.  Do you recall what prompted

 3   you to send that email to her?

 4       A.    Yes, I had -- I had a conversation

 5   with Jim.

 6       Q.    Okay.  And what -- what did you

 7   discuss with Jim that led to this email chain?

 8       A.    He -- he called me and he said he

 9   wanted to make payment on the NexPoint note,

10   and I didn't -- I didn't know the -- the amount

11   offhand, so I reached out to Kristin and got

12   the details and relayed that to him.

13       Q.    And you see you sent that email to

14   her at 11:15 a.m.  Does that help you remember

15   when you had this discussion with Mr. Dondero?

16   In other words, was it that morning or the day

17   before, or can you -- can you --

18       A.    No, it was -- it was that morning.

19       Q.    And do you recall how you had that

20   conversation with him?

21             MR. MORRIS:  Objection to the form

22       of the question.

23       Q.    By telephone, by email, in-person?

24       A.    Yeah, he -- he called me.  I was at

25   home.  We were working from home here in
```

Page 343

```
 1                WATERHOUSE - 10-19-21

 2    December of 2020.  He called me from home.  He

 3    said he was in court.  He wanted to -- he asked

 4    about, you know, making payment on the note and

 5    the amount, and so I didn't have those numbers

 6    in front of me, so I said I would get back to

 7    him.  I wanted all the details, so here is

 8    this -- so I reached out to Kristin.

 9         Q.    And then she gave you that

10    $1,406,000 figure?

11               MR. RUKAVINA:  Mr. Nguyen, if you

12    will scroll up, please.

13         A.    Yes.  Yeah, she -- the $1,406,112.

14         Q.    And do you recall whether you

15    conveyed that amount to Mr. Dondero?

16         A.    Yes.  I -- I called him back and

17    gave him -- gave him this amount.

18         Q.    Are you aware of whether NexPoint,

19    in fact, then made that 1 million 406 and

20    change payment?

21         A.    Yes, they did.

22         Q.    Did you discuss with Mr. Dondero at

23    that time, either the first conference or the

24    second conference that day -- strike that.

25               When you conveyed the number to
```

Page 344

```
 1              WATERHOUSE - 10-19-21
 2   Mr. Dondero, was -- was it also on January
 3   12th?
 4       A.   Sorry, when I conveyed the
 5   $1.4 million number?
 6       Q.   Yes.
 7       A.   Yes, yes, it was that -- it was --
 8       Q.   So you had --
 9       A.   It was that point.
10       Q.   Well, to the best of your
11   recollection, you had a conference with
12   Mr. Dondero by the telephone in the morning,
13   and then another conference with him by
14   telephone after 11:40 a.m. that morning?
15       A.   Yeah, I can't remember -- yeah, it
16   was either that morning or it could have been,
17   you know, early afternoon, but again, I
18   remember calling him back, relaying this
19   information to him, and he said, okay, pay --
20   you know, make -- make this payment.
21       Q.   And during either of those two
22   calls, did you tell Mr. Dondero anything to the
23   effect that making those -- I'm sorry, making
24   that payment would not de-accelerate the
25   promissory note?
```

Appx. 01165

```
 1                 WATERHOUSE - 10-19-21

 2        A.    No.

 3        Q.    Did you tell him anything to the

 4   effect that making that payment would not cure

 5   the default?

 6        A.    No.

 7        Q.    Did you discuss that in any way with

 8   him?

 9        A.    No, I did not.

10        Q.    Did he say why he wanted to have

11   that $1.4 million payment made?

12             MR. MORRIS:  Objection to the form

13        of the question.

14        A.    He -- he -- he didn't go into

15   specifics.

16        Q.    Did he say anything to you to the

17   effect that if NexPoint makes that payment,

18   then the note will be de-accelerated?

19             MR. MORRIS:  Objection to the form

20        of the question.

21        A.    I don't recall.

22             MR. RUKAVINA:  You can put this one

23        down, Mr. Nguyen.

24        Q.    And, again, when you say you don't

25   recall, you mean you don't remember right now
```

Page 346

                    WATERHOUSE - 10-19-21

1          either way; correct?

2          A.    Yeah, I don't remember.  I don't

3     remember us discussing that.

4          Q.    Now -- and we're almost done, I

5     promise.  I'm just going to -- I don't know how

6     to ask this question, so I'm just going to try

7     to do my best.

8                Prior to the default on December 31,

9     2020, did Mr. Seery ever tell you any words to

10    the effect that you or someone at Highland

11    should ensure that NexPoint doesn't make its

12    payment?

13         A.    No.

14         Q.    Did you have any hint or any belief

15    that anyone at NexPoint -- I'm sorry, strike

16    that.

17               Did you have any reason to believe

18    that anyone with Highland was actively trying

19    to get NexPoint to make that default by not

20    paying on December 31?

21               MR. MORRIS:  Objection to the form

22         of the question.

23         A.    Are you asking, did any Highland

24    employees actively work to make -- to

```
 1              WATERHOUSE - 10-19-21
 2   somehow --
 3        Q.    Yes.  Let me take a step back.  Let
 4   me take a step back.
 5              So you are aware now that as a
 6   result of that default, what was still some
 7   25-year note was accelerated and became
 8   immediately due.  You are aware of that now;
 9   right?
10        A.    Yes.
11        Q.    And can you see how someone at
12   Highland might actually have been pleased with
13   that development?
14              MR. MORRIS:  Objection to the form.
15        Q.    Not that they were --- not that they
16   were pleased, but you can see how someone at
17   Highland might have been pleased with that
18   development?
19              MR. MORRIS:  Objection to the form
20        of the question.
21              MS. DANDENEAU:  Object to form.
22        A.    I don't know how they would have
23   reacted to that.
24        Q.    Okay.  But you're not -- you're not
25   aware of any instructions or any actions being
```

```
 1                  WATERHOUSE - 10-19-21

 2    given or taken at Highland by Mr. Seery, the

 3    independent board, DSI, that -- that would have

 4    basically led Highland to ensure that NexPoint

 5    would fail to make that payment?

 6         A.    I'm not aware.

 7         Q.    In other words, there wasn't a trick

 8    or a settlement; right?

 9              MS. DEITSCH-PEREZ:  Objection to

10         form.

11              MS. DANDENEAU:  Object to form.

12              MR. MORRIS:  Object to form.

13         A.    I'm not aware.

14              Look, I'm not aware.  I'm not in

15    every conversation.  I mean, and I'm just --

16    again, I'm sitting at home.  It is the end of

17    the year.  Again, I'm not aware.

18         Q.    That is a perfectly legitimate

19    answer.  I don't know why -- why you think

20    otherwise.

21              Okay.  Just give me one second to

22    compose my thoughts.

23              MS. DEITSCH-PEREZ:  While you're

24         taking your one second, why don't we take

25         three minutes.  I will be right back.
```

```
 1              WATERHOUSE - 10-19-21

 2              VIDEOGRAPHER:  Do we want to go off

 3       the record?

 4              MR. RUKAVINA:  Yes.

 5              VIDEOGRAPHER:  All right.  We're

 6       going off the record at 6:27 p.m.

 7       (Recess taken 6:27 p.m. to 6:30 p.m.)

 8              VIDEOGRAPHER:  We are back on the

 9       record at 6:30 p.m.

10              MR. HORN:  Is Deb back?

11              MS. DANDENEAU:  Are you asking about

12       me?  I'm here.

13              MR. HORN:  Oh, okay.  I don't see

14       you, sorry.

15       Q.   Actually, yeah, Mr. Waterhouse, so

16    when you had --

17              MS. DANDENEAU:  Are you asking about

18       Deb Dandeneau or Deborah?  I mean, there

19       are a lot -- as we talked about, a lot of

20       Debs.  I'm here.

21              MS. DEITSCH-PEREZ:  I'm here.

22              MR. HORN:  Yes, I was asking about

23       DDP.

24              MS. DEITSCH-PEREZ:  Oh, DDP is here.

25              MR. HORN:  Okay.  Here we go.  I'm
```

Page 350

```
 1              WATERHOUSE - 10-19-21

 2         going back on mute.

 3              MS. DANDENEAU:  Get the right

 4         nomenclature.

 5         Q.    Mr. Waterhouse, on January 12th,

 6    2021, when you had those talks with Mr. Dondero

 7    about the $1.4 million payment, did you have a

 8    communication or a conversation with Mr. Seery

 9    about that payment after January 12th, 2021?

10         A.    I don't recall.

11         Q.    Well, in response to Mr. Dondero

12    reaching out to you, do you recall on that day,

13    January 12th, talking to Mr. Seery or anyone at

14    Highland other than the email chain we just saw

15    about Mr. Dondero's call with you?

16         A.    Did I talk to -- I spoke with

17    Kristin -- I don't know if I spoke to her.  I

18    likely spoke to Kristin Hendrix because we had

19    to get the wire on NexPoint's behalf to make

20    the payment to Highland.

21         Q.    So it is true, then, that -- that

22    employees of the debtor did actually cause that

23    payment to be made when it was made after

24    January 12th?

25         A.    Yes, I mean, we -- we -- as I
```

Page 351

```
1              WATERHOUSE - 10-19-21

2   testified earlier, we provided that accounting

3   finance treasury function as -- under the

4   shared services agreement.  And so once I

5   got the -- I talked to Jim, got the approval to

6   make this payment, we have to then make the

7   payment, or the team does, and so the payment

8   was made.

9        Q.    Okay.  But -- okay.  And -- and

10  sitting here right now, after Jim called you,

11  you don't remember talking to anyone other than

12  the -- the couple of people you mentioned,

13  talking to anyone about something to the effect

14  that, hey, Jim wants to make this payment now?

15            MR. MORRIS:  Objection to the form

16       of the question.

17       A.    I don't -- I don't recall.

18       Q.    And does that include legal counsel?

19            Without going into any detail, on

20  January 12th or before that payment was made,

21  did you consult with legal counsel about

22  anything having to do with the $1.4 million

23  payment?

24       A.    I don't recall.

25       Q.    Okay.  Thank you, sir, for your
```

Page 352

```
 1                WATERHOUSE - 10-19-21
 2    time.
 3              MR. RUKAVINA:  Pass the witness.
 4              MR. MORRIS:  I just have a few
 5        questions, if I may.
 6              MS. DEITSCH-PEREZ:  Don't you go at
 7        the end?
 8              MR. MORRIS:  Oh, I apologize.  He is
 9        your witness.  I'm surprised you want to
10        ask him questions, but go right ahead.
11              MS. DEITSCH-PEREZ:  Just have a
12        couple of things.
13              MR. RUKAVINA:  And I will just
14        object to that, that he's our witness.
15        That's not --
16              MR. MORRIS:  I'm not talking to you.
17        I'm not talking to you.
18              MS. DANDENEAU:  Also, Mr. Morris, it
19        is -- it is --
20              MS. DEITSCH-PEREZ:  He is not my
21        witness.  He's been subpoenaed by you.
22        Okay?
23              That is no offense, Mr. Waterhouse,
24        I'm -- I'm not -- okay.  Anyway.
25                        EXAMINATION
```

Appx. 01173

Page 353

1         WATERHOUSE - 10-19-21

2   BY MS. DEITSCH-PEREZ:

3        Q.    Good evening.  I'm very sorry to be

4   going last and I know you have had a long and

5   taxing day, so I thank you for indulging me.

6              The kinds of services that you

7   describe that the -- that Highland provided for

8   NexPoint, did Highland also provide similar

9   services to that to HCRE and HCMS?

10       A.    Yes.

11             MR. MORRIS:  Objection to the form

12        of the question.

13       Q.    What kind of services did Highland

14   provide to HCRE and HCMS?

15             MR. MORRIS:  Objection to the form

16        of the question.

17             MS. DEITSCH-PEREZ:  What is your

18        objection, John?

19             MR. MORRIS:  It is vague and

20        ambiguous.  Unlike the advisors and

21        NexPoint, they actually had shared services

22        agreements.

23             MS. DEITSCH-PEREZ:  I got -- I

24        understand your objection.  That is fine.

25       Q.    Let's take them one at a time.

Appx. 01174

```
 1                WATERHOUSE - 10-19-21

 2                What kinds of services did Highland

 3     provide to HCRE?

 4                MR. MORRIS:  Objection to the form

 5          of the question.

 6          A.    HCMS, Highland employees provided

 7     accounting services, treasury management

 8     services, potentially legal services.  I

 9     don't -- but I wouldn't have been directly

10     involved in that.  But as far as the teams that

11     I manage, it was accounting, treasury, things

12     of that nature.

13          Q.    Okay.  And that was for HCM, LLP --

14          A.    And -- and, sorry, it would also be

15     any asset valuation if needed as well.

16          Q.    Okay.  We went back and forth on

17     each other and I apologize, so just to clarify.

18                You were talking about the services

19     that Highland Capital Management provided to

20     HCMS; is that right?

21          A.    HCMS.  So, again, yes.  And

22     accounting, treasury, valuation, and also tax

23     services too.

24          Q.    Okay.

25          A.    Tax services.  Look, I'm expanding
```

Page 355

```
 1              WATERHOUSE - 10-19-21
 2   this, their HR services as well.
 3        Q.   Okay.  And did that include bill
 4   paying?
 5              MR. MORRIS:  Objection to the form
 6        of the question.
 7        Q.   Did the services that HCM provided
 8   to HCMS include bill paying?
 9              MR. MORRIS:  Objection to the form
10        of the question.
11        A.   Yes.
12        Q.   And did the services that HCMLP
13   provided to HCMS include scheduling upcoming
14   bills?
15              MR. MORRIS:  Objection to the form
16        of the question.
17        A.   Yes.
18        Q.   And did HCMLP regularly pay -- cause
19   to be paid the payments on loans HCMS had from
20   HCMLP?
21              MR. MORRIS:  Objection to the form
22        of the question.
23        A.   Yes.
24        Q.   Typically -- if there is a
25   typically, how far in advance of due dates did
```

```
 1                   WATERHOUSE - 10-19-21

 2   HCMLP cause HCMS to pay its bills?

 3              MR. MORRIS:  Objection to the form

 4      of the question.

 5      A.    I mean, it -- it -- it depend -- it

 6   depended on the nature of the payment and the

 7   vendor, but, you know, if there were -- if

 8   there were larger scheduled payments, you know,

 9   I would like to give at least 30 days notice.

10              And that is -- that is kind of my

11   rule of thumb so no one is surprised.

12      Q.    Okay.  And was it generally HCMLP's

13   practice to timely pay HCMS' bills?

14              MR. MORRIS:  Objection to the form

15      of the question.

16      A.    It -- it -- it -- that depended on

17   the nature of the payment.

18      Q.    Okay.  And can you explain what you

19   mean by that?

20      A.    Yeah, I mean if -- if it was -- I

21   mean -- if there was some professional fees

22   that weren't -- you know, they were due but

23   they weren't urgent, those fees may not be paid

24   as timely as others that have a due date or --

25   or things like that.
```

Page 357

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Okay.  Are loan payments the kinds

 3   of thing that HCMLP would pay on time because

 4   of potential consequences of not paying on

 5   time?

 6            MR. MORRIS:  Objection to the form

 7       of the question.

 8       A.    Yes.  As I testified earlier, we

 9   would want to give, you know, notice on -- on

10   -- on larger payments and -- and things of that

11   nature so we didn't miss due dates.

12       Q.    Okay.  And over the course of time,

13   did HCMLP generally pay HCMS' loan payments in

14   a timely fashion?

15            MR. MORRIS:  Objection to the form

16       of the question.

17       A.    I can't remember specifically, but

18   generally, yes.

19       Q.    Okay.  Now, did HCMLP provide

20   similar services to HCRE that you have

21   described it provided to HCMS?

22            MR. MORRIS:  Objection to the form

23       of the question.

24       A.    Yes, but I don't think it -- it

25   provided -- I don't think it provided HR
```

```
                                                     Page 358
 1              WATERHOUSE - 10-19-21

 2    services.

 3         Q.    Can you describe the accounting and

 4    treasury services that HCMLP provided for HCRE?

 5         A.    Yeah, it -- it would provide

 6    bookkeeping services on a -- on a periodic

 7    basis.  It would make payments, you know, as

 8    needed.

 9         Q.    Okay.  So did it provide --

10         A.    And -- and I believe it -- it -- it

11    provided tax services as well.

12         Q.    Okay.  And so did it provide the

13    same kind of bill -- did HCMLP provide the same

14    kind of bill-paying services for HCRE that it

15    provided for HCMS and NexPoint?

16              MR. MORRIS:  Objection to the form

17         of the question.

18         A.    Yes.

19         Q.    And over the course of time, did

20    HCMLP generally cause to be made the loan

21    payments that HCRE owed to HCMLP?

22              MR. MORRIS:  Objection to the form

23         of the question.

24         A.    Yes.

25         Q.    Did HCMLP make loan payment -- the
```

Page 359

```
 1               WATERHOUSE - 10-19-21

 2    loan payment that was due from HCMS to HCMLP in

 3    December of 2020?

 4               MR. MORRIS:  Objection to the form

 5         of the question.

 6         A.    I don't believe that payment --

 7    payment was made.

 8         Q.    Okay.  And when HCMLP caused HCMS in

 9    the past to make loan payments, whose money did

10    it use to make those payments?

11               MR. MORRIS:  Objection to the form

12         of the question.

13         A.    It was the -- the money in HCMS's

14    operating account would be made to that --

15    those moneys would be used to make payment to

16    Highland Capital Management.

17         Q.    Okay.  And Highland -- is it correct

18    that Highland Capital Management personnel had

19    the access to HCMS's accounts to be able to

20    cause such payments to be made?

21         A.    Yes, Highland personnel had access

22    to those accounts.

23         Q.    Okay.  And so now for HCRE, whose

24    money was used when HCMLP caused HCRE

25    payments -- loan payments to Highland to be
```

```
 1                WATERHOUSE - 10-19-21

 2   made?

 3            MR. MORRIS:  Objection to the form

 4        of the question.

 5        A.    It was -- it was cash in HCRE's bank

 6   account that would be used to make payments to

 7   Highland Capital Management.

 8        Q.    Okay.  And so did Highland Capital

 9   Management have access to HCRE's funds in order

10   to be able to make such payments?

11            MR. MORRIS:  Objection to the form

12        of the question.

13        A.    Personnel at Highland Capital

14   Management had access to HCRE's bank account to

15   effectuate the payments.

16        Q.    Okay.  And was the payment due from

17   HCRE to HCMLP due in December of 2020 made?

18        A.    It --

19        Q.    In December of 2020.

20        A.    It was not.

21        Q.    Okay.  And was there money in HCRE's

22   account that would have enabled the payment to

23   be made had HCM personnel attempted to make the

24   payment?

25            MR. MORRIS:  Objection to the form
```

Page 361

```
 1              WATERHOUSE - 10-19-21

 2         of the question.

 3         A.    I -- I don't recall.

 4         Q.    Do you have any reason to believe

 5    that either HCRE or HCMS simply didn't have the

 6    funds on hand to make the December 2020

 7    payments?

 8         A.    I don't know.

 9         Q.    I guess I'm asking, do you have any

10    reason to believe that they didn't have the

11    funds?

12         A.    We managed cash for so many

13    different entities and funds, and I don't

14    recall, you know, where the cash position was

15    for HCRE and HCMS at 12/31/2020.

16         Q.    Okay.

17         A.    I just don't recall, and I don't --

18    and I don't remember what the loan payment

19    obligations were from HCRE to Highland, and

20    from HCMS to Highland.  I don't recall.  I

21    don't recall, I mean...

22         Q.    Let me come at it a different way.

23    Were the -- were the payments that would

24    otherwise have been due in December of 2020

25    made in January of 2021 for HCMS and HCRE?
```

```
 1              WATERHOUSE - 10-19-21

 2        A.    I believe the HCRE payment was made

 3   in January of 2021.  I don't recall any

 4   payments being made from HCMS to Highland.

 5        Q.    If it -- how is it the HCRE payment

 6   came to be made?  Why did you make it -- why

 7   did HCM make the payment in January of 2021?

 8        A.    Jim -- Jim called me and instructed

 9   me to -- to make the payment on behalf of HCRE,

10   Jim Dondero -- Jim Dondero.

11        Q.    Did he seem upset that -- that the

12   payment had not been made?

13        A.    Yeah.  On the note that was, you

14   know, that was the term note, yes, he -- he was

15   displeased that the -- that the payment had not

16   been made by year-end.

17        Q.    Okay.  And did you make the -- cause

18   the payment to be made as -- as requested?

19        A.    Yes.

20        Q.    And did anyone else from HCM

21   participate with you in causing the payment to

22   be made to -- on the HCRE loan?

23        A.    Yes.  It would have been Kristin

24   Hendrix.  I -- again, I don't -- as I testified

25   earlier, I'm not an officer of HCRE.  I don't
```

```
 1                    WATERHOUSE - 10-19-21

 2    believe I'm an authorized signer.  So I

 3    can't -- other personnel have to make payment

 4    from HCRE to -- to -- to -- to Highland.

 5         Q.    Okay.  And in the conversation

 6    that -- that you had with Mr. Dondero when he

 7    requested the payment to be made, did you say

 8    to him words to the effect, Jim, this loan is

 9    going to stay in default, what are you making

10    the payment for, anything like that?

11         A.    No.

12         Q.    In fact, did you have the impression

13    from him that he thought that the loan would

14    be -- the default would be cured by making the

15    payment?

16              MR. MORRIS:  Objection to the form

17         of the question.

18         A.    Did I get the impression from Jim

19    Dondero that the loan would be cured if the

20    payment from HCRE --

21         Q.    Yeah, if that is what he thought.

22              MR. MORRIS:  Objection to the form

23         of the question.

24         A.    I didn't get any impression from him

25    on that at the time.
```

```
 1                 WATERHOUSE - 10-19-21

 2        Q.    Do you know whether there was an

 3   HCMS term loan that had a payment due in

 4   December of 2020?

 5        A.    I don't recall.

 6        Q.    Okay.  And so the reason you don't

 7   recall whether or not there was a payment in

 8   January of 2021 is because you just don't

 9   remember whether there was such a loan at all?

10             MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I don't remember.  There is -- there

13   is so many notes, and I mean, demands, and I

14   don't -- I don't remember.  It's a lot to keep

15   track in your head.

16        Q.    I understand, and -- and I hear your

17   frustration when you have explained that the

18   debtor has your documents and you don't, and so

19   I fully appreciate it, and this is no knock on

20   you.  It's a knock on somebody else on this

21   call.

22             MR. MORRIS:  I move to strike.  That

23        was pretty obnoxious, but go ahead.

24        Q.    Okay.  But so, Mr. Waterhouse, if --

25   if a payment on the HCMS loan was made in
```

Page 365

```
 1              WATERHOUSE - 10-19-21

 2   January of 2021, do you think it was part of

 3   the same conversation where Jim Dondero said,

 4   hey, why didn't that get paid, please make

 5   that -- get that payment done?

 6              MR. MORRIS:  I object to the form of

 7         the question.

 8         A.    Yes.  Likely it would have been -- I

 9   mean, again, I don't recall a payment being

10   made, but, you know, again, I don't remember

11   everything.

12         Q.    Okay.  Did -- at the time you were

13   communicating with Kristin Hendrix about the

14   payment being made, whichever payments were

15   made in January, did she say anything to you

16   about the payments not curing the loan

17   defaults?

18         A.    No.

19         Q.    Okay.  All right.  So I'm going to

20   take you back to very early in the deposition

21   when Mr. Morris was asking you about the --

22   the -- the -- the agreement with respect to

23   the -- the forgiveness element of the loans, so

24   that is just to orient you.

25              Do you remember that there was a
```

Page 366

```
 1                 WATERHOUSE - 10-19-21
 2     time that you and Mr. Dondero were
 3     communicating about potential means of
 4     resolving the Highland bankruptcy by what was
 5     colloquially referred to as a pot plan?
 6          A.    Yes.
 7          Q.    Okay.  And can you tell me generally
 8     when that was?
 9          A.    Like mid -- mid 2020, sometime in
10     2020, mid 2020.
11          Q.    Okay.  And did the process of trying
12     to figure out what the numbers should be
13     involve looking at what one should pay for the
14     Highland assets?
15               MR. MORRIS:  Objection to the form
16          of the question.
17          A.    Yes.
18          Q.    Okay.  And did there come a time
19     when you were proposing some potential numbers
20     and Mr. Dondero said something to you like,
21     well, why are you including payment for the
22     related party notes, those, you know, were
23     likely to be forgiven as part of my deferred
24     executive compensation?
25               MR. MORRIS:  Objection to the form
```

```
 1              WATERHOUSE - 10-19-21

 2       of the question.

 3       A.    Yes, we did have that conversation.

 4       Q.    Okay.  Was that conversation in

 5  connection with trying to figure out the right

 6  numbers for a pot plan?

 7       A.    Yeah.  I mean, it was -- it was -- I

 8  mean, Jim -- Jim would ask for, you know,

 9  most -- most recent asset values, you know, for

10  Highland, and -- and myself and the team

11  provided those to him, so it was in that

12  context.

13       Q.    Okay.  And does that refresh your

14  recollection that these communications were in

15  2020 rather than 2021?

16              MR. MORRIS:  Objection to the form

17       of the question.

18       A.    The -- the -- the executive

19  compensation discussions were definitely in

20  2020.

21       Q.    Okay.  Now, did you ever make

22  proposals that took into account Jim's comment

23  that the notes were likely to end up forgiven

24  as part of his compensation?

25              MR. MORRIS:  Objection to the form
```

```
 1              WATERHOUSE - 10-19-21

 2         of the question.

 3         A.    Yes, we -- the team and myself put

 4    together, you know, asset summaries of Highland

 5    at various times for all the assets of

 6    Highland, and not including the notes.

 7         Q.    Okay.  And were those presentations

 8    communicated to -- to Mr. Seery?

 9         A.    No.  Well, look, I didn't tell -- I

10    didn't tell Mr. Seery.  I don't know what

11    Mr. Dondero did with the information.

12         Q.    Okay.

13         A.    I did not have conversations with

14    Mr. Seery.

15         Q.    Okay.  Do you know who saw the

16    presentations that you put together that didn't

17    include the value of the related party notes?

18         A.    We're talking presentations -- these

19    are -- these are Excel spreadsheets?

20         Q.    Uh-huh.

21         A.    I don't know who -- these were given

22    to -- to Jim Dondero.  I don't know what was

23    done with them after that.

24         Q.    Okay.  You also mentioned earlier

25    that sometime during your tenure at Highland
```

Page 369

 1                  WATERHOUSE - 10-19-21

 2   you knew of the practice of giving forgivable

 3   loans to executives.

 4              MR. MORRIS:  Objection to the form

 5        of the question.

 6        Q.   Can you -- can you tell me what you

 7   recall about that practice?

 8              MR. MORRIS:  Objection to the form

 9        of the question.

10        A.   Yes, so there were -- there were --

11   during my tenure at Highland, there were loans

12   or -- given to employees that were later

13   forgiven at a future date and time.

14        Q.   Okay.  And when the loans were

15   given, did the notes, to your recollection, say

16   anything about the potential forgiveness term?

17              MR. MORRIS:  Objection to the form

18        of the question.

19        A.   When you say "did the notes," did

20   the promissory notes detail the forgiveness?

21        Q.   Yes.

22        A.   Not that I recall.

23        Q.   And until such time as whatever was

24   to trigger the forgiveness occurred, were the

25   notes bona fide notes as far as you were

```
 1                WATERHOUSE - 10-19-21

 2    concerned?

 3                MR. MORRIS:  Objection to the form

 4        of the question.

 5        A.    Yes, similar to -- yes.

 6        Q.    Okay.  You were going to say similar

 7    to what?

 8        A.    Mr. Morris earlier today showed

 9    notes of the financial statements about various

10    affiliate loans.  I -- I -- I do recall these

11    notes because I -- at that time personally

12    worked on the -- the financial statements of

13    Highland.  That was, you know, in my role as a

14    corporate accountant.

15                And there were -- those loans

16    were -- to the partners were detailed in the

17    notes to the financial statements, similar to

18    what we went through earlier today in the prior

19    testimony about what we saw with Highland

20    and -- and -- and the -- and HCMFA.

21        Q.    Is it fair to say that on Highland's

22    balance sheet there were any number of assets

23    that the value of which could be affected by

24    subsequent events?

25                MR. MORRIS:  Objection to the form
```

```
 1              WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    Yes.  I mean, yes, that -- there

 4   are.  And that is -- yes.

 5        Q.    Okay.  And is it typical accounting

 6   practice that until there is some certainty

 7   about those potential future events, that asset

 8   value listed on -- on the books doesn't take

 9   into account those potential future events?

10              MR. MORRIS:  Objection to the form

11        of the question.

12        A.    Yeah, if those -- yes.  If -- if

13   those future events, you know, at the time of

14   issuance are not known or knowable, like I

15   discussed earlier with, like, market practice,

16   asset dislocation, or, you know, I mean, things

17   like that, you -- I mean, it -- it could affect

18   its fair value --

19        Q.    Okay.

20        A.    -- in the future.

21        Q.    And am I correct you wouldn't feel

22   compelled to footnote in every possible change

23   in -- in an asset when those possibilities are

24   still remote?

25              MR. MORRIS:  Objection to the form
```

Page 372

```
 1              WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    The accounting standard is you have

 4   to estimate to the best -- you know, to -- to

 5   the best of your ability, the fair value of an

 6   asset as of the balance sheet date under --

 7   under GAAP.

 8        Q.    Did -- strike that.

 9              Okay.  Give me a minute.  I'm

10   close -- I'm close to done.  Let me just go off

11   and look at my notes for a second.  So take two

12   minutes.

13              VIDEOGRAPHER:  We're going off the

14        record at 7:02 p.m.

15        (Recess taken 7:02 p.m. to 7:03 p.m.)

16              VIDEOGRAPHER:  We are back on the

17        record at 7:03 p.m.

18        Q.    Mr. Waterhouse, is it generally your

19   understanding that people you work with now

20   have been asking the debtor for full and

21   unfetterred access to their own former files?

22              MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes, I am -- I am generally aware.

25        Q.    Okay.  And do you think you could
```

Page 373

```
 1              WATERHOUSE - 10-19-21
 2   have been better prepared for this deposition
 3   if the debtor had complied with those requests?
 4              MR. MORRIS:  Objection to the form
 5        of the question.
 6        A.    I -- I -- I most certainly -- yes.
 7   I mean, again, these are multiple years,
 8   multiple years ago, lots and lots of
 9   transactions.
10              You know, we asked about NAV errors
11   and, you know, things like that and these
12   are -- it would make this process a lot more --
13   a lot easier and if we had -- if we had access
14   to that.
15        Q.    Okay.  And has the debtor -- is the
16   debtor suing you right now?
17        A.    Yes.
18        Q.    And is the debtor trying to renege
19   on deals that it had previously made with you?
20              MR. MORRIS:  Objection to the form
21        of the question.
22        A.    Sorry, I need to -- it is my
23   understanding that the litigation trust is
24   suing me.  And not being a lawyer, I don't
25   know -- is that the debtor?
```

Appx. 01194

Page 374

```
 1              WATERHOUSE - 10-19-21

 2              Is that -- I don't know the

 3   relationship.  So, again, I'm not the lawyers.

 4   I've said many times.  But my understanding is

 5   the litigation trust is suing me.  I could be

 6   wrong there.  I don't know.

 7       Q.   Okay.  I understand.

 8              Someone with some connection to the

 9   Highland debtor has brought a claim against

10   you; is that fair?

11              MR. MORRIS:  Objection to the form

12       of the question.

13       A.   Yes.

14       Q.   Okay.  And is there also some motion

15   practice in the bankruptcy where the debtor or

16   someone associated with the debtor is

17   attempting to undo something that was

18   previously resolved with you?

19       A.   Yes.

20       Q.   And so in one action somebody is

21   associated with the debtors trying to --

22   threatening you with trying to take money from

23   you, and then in the other -- and trying to --

24   and in the other they are threatening not to

25   pay you things that had previously been agreed;
```

Appx. 01195

Page 375

```
 1                 WATERHOUSE - 10-19-21

 2    is that correct?

 3                 MR. MORRIS:  Objection to the form

 4          of the question.

 5          A.    I want to be -- yes, I -- there

 6    is -- I'm being sued, again, on -- on something

 7    that was agreed to with Mr. Seery and myself.

 8    I don't -- I don't -- I don't own that claim.

 9          Q.    Okay.

10          A.    To be transparent, I don't own that

11    claim.  So it is not my personal property.

12          Q.    Okay.

13          A.    And -- and being the nonlawyer, I

14    don't know how I can get sued for something

15    that I don't owe or, like, I don't own

16    anything.  I'm not the lawyer.  But, I mean, if

17    that is -- if I'm understanding the facts

18    correctly.

19          Q.    Okay.  And the lawsuit that was

20    filed that names you, that was just filed

21    this -- this past week; is that right?

22                 MS. DANDENEAU:  Ms. Deitsch-Perez, I

23          do want to interrupt at this point because

24          just as I told Mr. Morris, that this is a

25          deposition about the noticed litigation.
```

Page 376

1          WATERHOUSE - 10-19-21

2              I really don't want to go -- go

3       afield --

4              MS. DEITSCH-PEREZ:  Yeah.

5              MS. DANDENEAU:  -- and open up a

6       whole new line of inquiry about the lawsuit

7       or the -- the motion and the bankruptcy

8       court.  We will be here all night.

9              MS. DEITSCH-PEREZ:  And I

10      understand.

11      Q.   My -- my point is:  Do you feel

12  like -- like there is some effort by these

13  parties related to the debtor to intimidate

14  you -- not that you -- I'm not saying you are

15  or you aren't.

16             But do you feel like there is some

17  effort to intimidate you and maybe an effort to

18  deter you from being as prepared as you might

19  be in this deposition?

20             MR. MORRIS:  Objection to the form

21      of the question.

22      A.   I was -- I was surprised by the

23  lawsuit, by me being named, because, again, I

24  don't own the asset and things like that.

25  Yeah, I just -- I want to move forward with my

```
 1                  WATERHOUSE - 10-19-21

 2    life at Skyview.

 3                  MS. DEITSCH-PEREZ:  Thank you.

 4                  THE WITNESS:  Thank you.

 5                  FURTHER EXAMINATION

 6    BY MR. MORRIS:

 7        Q.   If I may, I just have a few

 8    questions.

 9                  Mr. Waterhouse, we saw a number of

10    documents that Mr. Rukavina put up on the

11    screen where Ms. Hendrix would send you a

12    schedule of payments that were due on behalf of

13    certain Highland affiliates.

14                  Do you remember that?

15        A.   Yes.

16        Q.   And in each instance she asked for

17    your approval to make the payments; is that

18    right?

19        A.   Yes, she did.

20        Q.   And was that the -- was that the

21    practice in the second half of 2020 whereby

22    Ms. Hendrix would prepare a list of payments

23    that were due on behalf of Highland associates

24    and ask for approval?

25        A.   Yes.
```

1              WATERHOUSE - 10-19-21

2        Q.    And I think you said that there was

3   a -- a --

4        A.    It was -- I think I testified to

5   this earlier when we talked about procedures

6   and policy, you know, again, I want to be

7   informed of -- of -- of -- of -- of any

8   payments that are going out.  I want to be made

9   aware of these payments, and that was just a

10  general policy, not just for 2020.

11       Q.    Okay.  So it went beyond 2020?

12       A.    Yes.

13       Q.    Is that right?

14       A.    Yes.

15       Q.    Okay.  And the corporate accounting

16  group would prepare a calendar that would set

17  forth all of the payments that were anticipated

18  in the -- in the three weeks ahead; is that

19  right?

20       A.    I -- like I testified earlier, we

21  had a corporate calendar that was set up, you

22  know, to -- to provide reminders or, you know,

23  of anything of any nature, whether it is

24  payments or -- or financial statements or, you

25  know, whatever it is, you know, to meet

Page 379

```
 1              WATERHOUSE - 10-19-21

 2   deadlines.

 3              I don't know how, as I testified

 4   earlier, how much they were using that

 5   calendar.

 6        Q.   Okay.  But -- but you did get notice

 7   and a request to approve the payments that were

 8   coming due on behalf of Highland's affiliates.

 9   Do I have that right?

10              MS. DANDENEAU:  Objection to form.

11        A.   I mean, generally, yes.  I mean, you

12   know, as we saw with these emails, generally, I

13   mean, did that encompass everything, no.

14        Q.   Okay.  Do you know why the

15   payment -- do you know why there was no payment

16   made by NexPoint at the end of 2020?

17        A.   Yes.  There was -- there was -- we

18   talked about these agreements between the

19   advisors and Highland, the shared services and

20   the cost reimbursement agreement.

21              And in late 2020, there were

22   overpayments, large overpayments that had been

23   made over the years on these agreements, and it

24   was my understanding that the advisors were --

25   were talking with -- like Jim Seery and others
```

Page 380

```
 1              WATERHOUSE - 10-19-21

 2   to offset any obligations that the advisors

 3   owed to Highland as offset to the overpayments

 4   on these agreements.

 5        Q.   Okay.  Did you participate in any of

 6   those conversations?

 7        A.   I did not.

 8        Q.   Okay.  Do you know -- do you recall

 9   that the -- at the end of November, the debtor

10   did notice to the advisors of their intent to

11   terminate the shared services agreements?

12        A.    Like I testified earlier, there

13   was -- the agreements weren't identical, from

14   what I recall, and there is one that had a

15   longer notice period, which I think had a

16   60-day notice period.  I don't recall which one

17   that was, so not all of them were -- notice

18   hadn't been given as of November 30th, for all

19   of the agreements.

20        Q.   Upon the receipt of the -- the

21   termination notices that you recall, do you

22   know if the advisors decided at that point not

23   to make any further payments of any kind to

24   Highland?

25              MR. RUKAVINA:  Objection, form.
```

Appx. 01201

```
 1                 WATERHOUSE - 10-19-21
 2       A.    No.  The advisors -- the advisors
 3   had stopped making payments prior to that
 4   notice.
 5       Q.    Okay.  And how do you know that the
 6   advisors stopped making -- making payments
 7   prior to the notice?
 8       A.    I had -- I had a conversation
 9   with -- with Jim Dondero.
10       Q.    And did Mr. Dondero tell you that
11   the advisors would no longer make payments to
12   Highland?
13             MS. DEITSCH-PEREZ:  Object to the
14       form.
15       A.    Yes, he -- he -- again, he said
16   they -- they -- the advisors have overpaid on
17   these agreements, to not make any future
18   payments, and that there needs to be offsets,
19   and they're working on getting offsets to these
20   overpayment.
21       Q.    Do you know if anybody ever
22   instructed Highland's employees to make the
23   payment that was due by NexPoint at the end of
24   the year?
25       A.    Did anyone instruct Highland's
```

Page 382

```
 1                    WATERHOUSE - 10-19-21

 2      employees to make that payment?

 3           Q.     Correct.

 4           A.     Anyone -- not that I'm aware.

 5           Q.     Were any of Highland's employees

 6      authorized to make the payments on behalf of

 7      its affiliates -- withdrawn.

 8                  Was any of Highland's employees

 9      authorized to effectuate the payment on behalf

10      of NexPoint that was due at the end of the year

11      without getting approval from either you or

12      Mr. Dondero?

13           A.     They had the -- they had the ability

14      to make the payment, but they didn't -- you

15      know, that -- that payment needed to be

16      approved.

17           Q.     Okay.  And it needed to be approved

18      by you or Mr. Dondero; is that right?

19           A.     I mean, I'm not going to make the

20      unilateral decision.

21           Q.     Is that a decision that you

22      understood had to be made by Mr. Dondero?

23           A.     Yes.  Sitting back in December of

24      2020, the -- that -- there was this off --

25      offset negotiation that -- that was happening,
```

Page 383

```
 1              WATERHOUSE - 10-19-21

 2   so I mean, until those negotiations were

 3   resolved, you know, there wasn't any

 4   payments -- there weren't any payments.

 5        Q.    And -- and there were no payments

 6   until the negotiations were resolved because

 7   that was the directive that you received from

 8   Mr. Dondero; correct?

 9        A.    I don't think he said -- I mean, I

10   think -- yeah, I mean -- I'm trying to recall

11   the conversation.  It was -- you know, there

12   is -- there is these negotiations.  There's --

13   there needs to be these offsets.  They're

14   talking with the debtor.  So, you know, until

15   this is resolved, right, I mean, depending on

16   how, whatever that resolution was, were we to

17   take any action.

18        Q.    Okay.  How about with respect to

19   HCMS, did HCMS have a term payment due at the

20   end of the year?

21        A.    Again, I don't -- I don't recall.

22        Q.    Okay.  You discussed briefly two

23   payments that were made in January of 2021, one

24   on behalf of NexPoint, and one on behalf of

25   HCMS.  Do I have that right?
```

Appx. 01204

```
 1                    WATERHOUSE - 10-19-21

 2        A.    No.  The two payments I recall were

 3    NexPoint and HCRE.

 4        Q.    Okay.  And those two payments --

 5    thank you for the correction.  And those two

 6    payments were made because Mr. Dondero

 7    authorized those payments to be made; correct?

 8        A.    Yes.

 9        Q.    And they hadn't been made before

10    that because Mr. Dondero had not authorized

11    them to be made?

12              MS. DEITSCH-PEREZ:  Object to the

13        form.

14        A.    Yes, because of these negotiations.

15        Q.    Okay.  Just a couple of more

16    questions.

17              Did anybody, to the best of your

18    knowledge, on behalf of HCMFA, ever tell the

19    SEC that HCMLP was responsible for the mistakes

20    that were made on the TerreStar valuation?

21        A.    Did anyone from Highland on HCMFA's

22    behalf tell the SEC that Highland -- that

23    Highland was responsible for there -- I just

24    want to make sure --

25        Q.    It was a little bit different, so
```

```
 1                WATERHOUSE - 10-19-21
 2    let me try again.
 3         A.    These are very long questions, John.
 4    I'm not trying to be --
 5         Q.    That is good.  Do you know whether
 6    anybody -- do you know whether anybody on
 7    behalf of HCMS -- HCMFA ever told the SEC that
 8    Highland was the responsible party for the
 9    TerreStar valuation error?
10         A.    Not that I'm aware.
11         Q.    Okay.  Did anybody on behalf of
12    the -- on behalf of HCMFA ever tell the retail
13    board that Highland was responsible for the
14    TerreStar valuation error?
15         A.    Not that I'm aware.
16         Q.    Do you know if HCMFA made an
17    insurance claim with respect to the damages
18    that were incurred in relation to the TerreStar
19    valuation error?
20         A.    Yes.
21         Q.    And do you know why they made that
22    insurance claim?
23         A.    Because there was an error.  I
24    mean --
25         Q.    Was the insured's claim made -- was
```

Page 386

```
 1                WATERHOUSE - 10-19-21

 2    the insurance claim made under HCMFA's policy?

 3         A.    Yes.

 4         Q.    Did HCMFA at any time prior to the

 5    petition date -- withdrawn.

 6               You were asked a couple of questions

 7    where -- where you said that Mr. Dondero told

 8    you that he was ascribing zero value to the

 9    notes as part of a pot plan because he believed

10    that the notes were part of executive

11    compensation.

12               Do I have that right?

13               MS. DEITSCH-PEREZ:  Object to the

14         form.

15         A.    Yes.

16         Q.    Okay.  Have you ever heard that

17    before the time that Mr. Dondero told you that

18    in the conversation about the pot plan?

19         A.    Had I heard that prior to my

20    conversation with Mr. Dondero?

21         Q.    Yes.

22         A.    No, I had not heard that prior.

23         Q.    Okay.  And that was in the context

24    of his formulation of the settlement proposal;

25    is that right?
```

Appx. 01207

```
 1                WATERHOUSE - 10-19-21
 2       A.    I mean, generally, yes.  You know,
 3   we were asked to provide asset values, right,
 4   and he was having settlement discussions.
 5   Again, I don't know who those went to
 6   ultimately.  I don't recall.
 7              MR. MORRIS:  I have no further
 8        questions.  Thank you very much for your
 9        patience.  I apologize for the late hour.
10              MS. DEITSCH-PEREZ:  John, you stay
11        on about your email when --
12              MR. RUKAVINA:  Hold on, I'm not
13        done.
14              MS. DEITSCH-PEREZ:  Oh, okay.  Davor
15        still has questions.  Sorry.  I was going
16        to say both John and Davor, could you stay
17        on afterwards just to talk about the
18        requests.
19                   FURTHER EXAMINATION
20   BY MR. RUKAVINA:
21       Q.    Mr. Waterhouse, you were just now
22   testifying about a discussion you had with
23   Mr. Dondero where he said something like no
24   more payments.
25              Do you remember that testimony?
```

```
 1              WATERHOUSE - 10-19-21

 2       A.    Yes.

 3       Q.    Okay.  And was that late November or

 4  early December of 2020?

 5       A.    It was, I would say, first or second

 6  week of November.

 7       Q.    Okay.  Do you recall whether --

 8  whenever you had that discussion, whether

 9  Mr. Dondero had already been fired by the

10  debtor?

11       A.    Yes, I -- I believe he was not an

12  employee of the debtor anymore at that time.

13       Q.    And when you were discussing this

14  with Mr. Dondero and he said no more payments,

15  you were discussing the two shared services

16  agreements and employee reimbursement

17  agreements we testified -- you testified about

18  before; is that correct?

19            MR. MORRIS:  Objection to the form

20       of the question.

21       A.    That is correct.

22       Q.    And had your office or you -- and we

23  will talk at a future deposition about the

24  administrative claim.

25            But had -- by that time that you
```

```
 1                WATERHOUSE - 10-19-21
 2     talked to Mr. Dondero, had your office or you
 3     done any estimate of what the alleged
 4     overpayments were?
 5                MR. MORRIS:  Objection to the form
 6          of the question.
 7          A.   Yes, we had -- there was a -- there
 8     was a detailed analysis that was put together
 9     by David Klos at the time.
10          Q.   And do you recall just generally
11     what the total amount for both advisors of the
12     overpayments was?
13          A.   It was in excess of $10 million.
14          Q.   Was it in excess of $14 million?
15                MR. MORRIS:  Objection to the form
16          of the question.
17          A.   I -- I remember it was an
18     eight-figure number.  I don't remember
19     specifically.
20          Q.   Okay.  And did you convey that
21     number to Mr. Dondero when you had that
22     conversation?
23          A.   Yes.
24          Q.   What was his reaction?
25          A.   I mean, he wasn't happy.
```

Page 390

```
 1                 WATERHOUSE - 10-19-21

 2        Q.    Is it fair to say he was upset?

 3        A.    Yes.

 4        Q.    Did Mr. Dondero ever expressly tell

 5   you to not have NexPoint make the required

 6   December 31, 2020, payment?

 7        A.    Yes, I recall him saying don't make

 8   the payment because it was being negotiated, as

 9   I discussed with Mr. Morris, this offset

10   concept.  So there were obligations due by the

11   advisors to Highland, they should be offset

12   that -- you know, those obligations should be

13   offset by this -- by this overpayment.

14        Q.    And when did he tell you that?

15        A.    I would say -- I would say around --

16   probably December -- December-ish.

17        Q.    Early December, late December?

18        A.    I don't recall with as much

19   specificity as -- as -- as -- as stopping the

20   shared services payments, because we had

21   actually made one shared services payment in

22   November.  So that is why I need to remember

23   that one more clearly.  I don't remember where

24   exactly in December that conversation occurred.

25        Q.    Did Mr. Dondero expressly use the
```

Page 391

```
 1              WATERHOUSE - 10-19-21

 2   word "NexPoint" when he was saying don't make

 3   these payments?

 4              MR. MORRIS:  Objection to the form

 5         of the question, asked and answered.

 6         A.    Yeah, we were -- we were discussing

 7   advisor obligations.  So it was -- you know, it

 8   was just obligations from the advisors.

 9              And -- and he specifically talked

10   about the NexPoint payment as well.

11         Q.    Okay.  And it is your testimony that

12   he expressly told you not to make that NexPoint

13   December 31 payment?

14              MR. MORRIS:  Objection, asked and

15         answered twice.

16         A.    Yes, he -- he did, during that

17   conversation.

18         Q.    And did you ever follow up with him

19   after that about whether NexPoint should or

20   shouldn't make that payment?

21         A.    I did not.

22         Q.    Did you ever, on or about

23   December 31, 2020, remind him and say, hey,

24   this payment is due, what shall I -- what

25   should I do?
```

```
 1              WATERHOUSE - 10-19-21

 2        A.    I did not.

 3        Q.    So sitting here today, you -- you

 4   remember distinctly that Dondero in December of

 5   2020 expressly told you not to have NexPoint

 6   make that payment?

 7              MR. MORRIS:  Objection, asked and

 8        answered three times.

 9        A.    Yes.

10        Q.    Can you say categorically it wasn't

11   just some general discussion where he told you

12   not to make payments?

13              MR. MORRIS:  Objection, asked and

14        answer four times.

15              MR. HORN:  Four times now.  Go for

16        five.

17        A.    Yes.

18        Q.    Did you tell Mr. Seery that?

19        A.    I don't believe I did.  I don't

20   recall.

21        Q.    And was this an in-person discussion

22   or telephone or email?  Do you remember?

23        A.    This was a phone -- a phone

24   conversation.

25        Q.    Okay.  Would you have a record of --
```

Page 393

```
 1              WATERHOUSE - 10-19-21
 2   on your cell phone of when that conversation
 3   might have taken place?
 4              I'm sorry, strike that.
 5              Was that by cell phone?
 6        A.    I believe -- yes, because we -- I
 7   was at home.  I mean, I don't have a landline.
 8   All I have is my cell phone.
 9        Q.    Do you know whether your cell phone
10   still has records of conversations from
11   December 2020 on it?
12        A.    My call log doesn't go back that
13   far.
14        Q.    Okay.  Thank you.
15              MR. RUKAVINA:  I will pass the
16   witness.
17              MS. DEITSCH-PEREZ:  Just a couple
18        quick questions.
19                  FURTHER EXAMINATION
20   BY MS. DEITSCH-PEREZ:
21        Q.    With respect to HCRE and HCMS, am I
22   correct there was -- there was no direction not
23   to pay those loan payments?
24              MR. MORRIS:  Objection to the form
25        of the question.
```

Page 394

```
  1                WATERHOUSE - 10-19-21

  2        A.    Yes, I don't recall having

  3   conversations about, you know, those -- those

  4   entities.

  5        Q.    And, in fact, what was the tone that

  6   Mr. Dondero had when he talked to you about the

  7   fact that HCRE and HCMS payments hadn't been

  8   made when he found out that they hadn't been

  9   paid?

 10             MS. DANDENEAU:  Objection to form.

 11             MR. MORRIS:  Objection to form.

 12        Q.    What was the tone he took with you?

 13        A.    Oh, it was -- it was -- it was -- it

 14   was very negative.  I mean, I think he cursed

 15   at me and he doesn't usually curse.

 16        Q.    Okay.  And in your mind, is that

 17   consistent with the fact that he was surprised

 18   that those payments hadn't been made?

 19             MR. MORRIS:  Objection to the form

 20        of the question.

 21        A.    Yes.

 22        Q.    Okay.  Thank you.

 23             MR. MORRIS:  I have nothing further.

 24        Thank you so much, Mr. Waterhouse.

 25             MR. HORN:  I have no questions.
```

Appx. 01215

Page 395

```
 1              WATERHOUSE - 10-19-21

 2        Thank you, Mr. Waterhouse.  We appreciate

 3        your time.  I am logging off the discussion

 4        and I will talk to y'all tomorrow.

 5             MR. MORRIS:  Super.

 6             VIDEOGRAPHER:  If there are no

 7        further questions, this ends the

 8        deposition -- excuse me.  This ends the

 9        deposition, and we are going off the record

10        at 7:30 p.m.

11        (Deposition concluded at 7:30 p.m.)

12

13             _____

14                  FRANK WATERHOUSE

15

16   Subscribed and sworn to before me

17   this     day of           2021.

18

19   --------------------------------

20

21

22

23

24

25
```

Appx. 01216

Page 396

```
 1              WATERHOUSE - 10-19-21

 2              C E R T I F I C A T E

 3

 4        I, SUSAN S. KLINGER, a certified shorthand

 5   reporter within and for the State of Texas, do

 6   hereby certify:

 7        That FRANK WATERHOUSE, the witness whose

 8   deposition is hereinbefore set forth, was duly

 9   sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11        I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage; and that I am in no way interested in

14   the outcome of this matter.

15        IN WITNESS WHEREOF, I have hereunto set my

16   hand this 19th of October, 2021.

17

18   _____

19        Susan S. Klinger, RMR-CRR, CSR

20        Texas CSR# 6531

21

22

23

24

25
```

Appx. 01217

```
                                                       Page 397
 1              WATERHOUSE - 10-19-21

 2  NAME OF CASE:  In re:  Highland Capital

 3  DATE OF DEPOSITION:  October 19, 2021

 4  NAME OF WITNESS:  Frank Waterhouse

 5  Reason Codes:

 6        1.  To clarify the record.

 7        2.  To conform to the facts.

 8        3.  To correct transcription errors.

 9  Page____Line_____Reason_____

10  From_____to_____

11  Page____Line_____Reason_____

12  From_____to_____

13  Page____Line_____Reason_____

14  From_____to_____

15  Page____Line_____Reason_____

16  From_____to_____

17  Page____Line_____Reason_____

18  From_____to_____

19  Page____Line_____Reason_____

20  From_____to_____

21  Page____Line_____Reason_____

22  From_____to_____

23  Page____Line_____Reason_____

24  From_____to_____

25
```

# EXHIBIT 14

Case 3:21-cv-00881-X   Document 39   Filed 01/31/22   Page 1224 of 1780   PageID 5554
Case 21-03005-sgj Doc 86 Filed 10/29/21   Entered 10/29/21 17:22:38   Page 1 of 10
Docket #0086 Date Filed: 10/29/2021

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND
EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above

styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as

the plaintiff (the "Debtor"), and files this its *Motion to Extend Expert Disclosure and Discovery*

*Deadlines* (the "Motion"), respectfully stating as follows:

Appx. 01220

## I.   RELIEF REQUESTED

1.     By this Motion, NexPoint requests that the Court extend the deadline, in its *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* [docket no. 70] (the "Scheduling Order"), for the designation of experts and service of expert reports, through December 13, 2021, with a corresponding extension of expert discovery.  Specifically, NexPoint finds it appropriate and advisable to designate a testifying expert on the standards and duties of care under the parties' Shared Services Agreement (defined below) with respect to Highland's role in NexPoint's alleged failure to make a December 21, 2020 payment on the Note (defined below); specifically, that Highland was responsible for ensuring that NexPoint made this payment.  This request is necessitated by recent deposition testimony of key individuals on October 19 and 21, 2021, prior to which NexPoint did not know or reasonably believe that expert testimony on the duties of care would be advisable.

## II.   PROCEDURAL BACKGROUND

2.     The Debtor initiated this Adversary Proceeding with the filing of its original complaint against NexPoint on January 22, 2021.

3.     By this Adversary Proceeding, the Debtor seeks to collect on a promissory note issued by NexPoint to the Debtor on May 31, 2017 in the original principal amount of $30,746,812.33 (the "Note").  The Note is a 30-year note and provides for an annual payment of principal and interest.  After prior payments, the Debtor asserts that $23,071,195.03 remains due and owing on the Note.

4.     NexPoint has asserted various defenses and affirmative defenses to the Debtor's allegations and causes of action.  This Motion concerns one such affirmative defense only, to the effect that the Debtor, through its employees, caused the alleged underlying default.

5.      On July 28, 2021, the District Court entered an order adopting this Court's report and recommendation and ordering that the reference for this Adversary Proceeding will be withdrawn once this Court certifies this Adversary Proceeding as being trial ready.  As part of the same, the District Court necessarily agreed and ordered that NexPoint has a right to a trial by jury of this Adversary Proceeding.

### III.    FACTS

6.      This Motion is supported by the Declaration of Davor Rukavina, attached hereto as incorporated herein (the "Declaration").

7.      The Debtor alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment.  Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated, and the Debtor demanded full and immediate payment.

8.      One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "Shared Services Agreement") between the Debtor and NexPoint dated January 1, 2018.  The Agreement was in place as of December 31, 2020, although the Debtor terminated it later, in 2021.  Under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services.  NexPoint has alleged that, pursuant to the Shared Services Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds.  Indeed, Waterhouse (defined below) testified that it was "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note."  *See* Declaration at Exhibit C, 337:22-338:8.

9.      NexPoint asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place.  NexPoint has always asserted this as an affirmative defense.  *See* Docket No. 6.  NexPoint's defense, however, was based on its belief that the Debtor and its employees, including Waterhouse, did nothing to facilitate or ensure the payment, as opposed to a conscious decision not to make the payment.

10.     On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as did NexPoint, in connection with this Adversary Proceeding.  Waterhouse was the Debtor's chief financial officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.  To be clear, Waterhouse was the Debtor's employee, although he provided services to NexPoint as well pursuant to the Shared Services Agreement.  Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note.

11.     This changed the potential facts as NexPoint understood them to be from ones where the Debtor simply failed utterly to facilitate the payment, as it has always done, to one where the Debtor intentionally, allegedly upon the instructions of Dondero, decided not to facilitate the payment.  Assuming the Dondero instruction to be true, this raises the question of whether the Debtor thereafter had any affirmative duty with respect to the alleged instruction.

12.     NexPoint did not know that Waterhouse would provide this testimony.  NexPoint understood that Dondero instructed Waterhouse to make no further payments on the Shared Services Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars

on the Shared Services Agreement.  But NexPoint did not understand that Waterhouse would testify that Dondero instructed him also not to pay the Note.

13.     If Dondero told Waterhouse in early December, 2020 not to pay on the Note, then the question becomes whether Waterhouse or the Debtor thereafter "put their heads in the sand" in violation of any affirmative duty or obligation they may have had regarding the matter, such as: to ask Dondero whether they correctly understood him; to ask Dondero whether he meant NexPoint and the Note; to inform Dondero of the potential consequences of a default by potentially accelerating a 30-year promissory note; or to try to dissuade him from his decision.  After all, the Debtor was responsible to facilitate the payment, the Debtor had various duties under the Shared Services Agreement, and it was in the Debtor's interest that NexPoint would default, thus creating a conflict of interest.

14.     Accordingly, on October 19, 2021, when NexPoint deposed James Seery, NexPoint asked Mr. Seery about section 6.01 of the Shared Services Agreement, labeled "standard of care," which provides that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims."  Mr. Seery testified that he did not believe that this provision of the Shared Services Agreement obligated the Debtor or Waterhouse to do anything further after Dondero allegedly instructed Waterhouse not to pay on the Note.

15.     At that time, NexPoint determined that it was appropriate, and would assist the finder of fact, to retain an expert on the "standard of care" provided for in the Shared Services Agreement.  This is especially important because this will be a jury trial in the District Court. NexPoint did not believe that it would need to retain such an expert, and it had no reasonable grounds to suspect that it would need such an expert, prior to these depositions.

16.     NexPoint moved as promptly as it could thereafter.  NexPoint decided to retain an expert on October 22, 2021 and began searching for one on that day.  NexPoint located a potential expert, Steven J. Pully, on October 26, 2021, and after conflicts were cleared and terms agreed to, Mr. Pully agreed to serve as NexPoint's expert on October 28, 2021.  NexPoint files this motion just one day later, and less than two weeks after Waterhouse's deposition triggered the issue.

17.     It goes without saying that neither Pully nor any reasonable expert can possibly review the issues, formulate an opinion, and prepare a report one day after they are retained. Among other things, Pully needs to review all underlying documents and deposition transcripts, some of which have yet to be returned by the court reporters.  Accordingly, NexPoint believes that approximately six (6) weeks will be sufficient for Pully to prepare a report.  NexPoint submits that the Debtor should have a period of time to then designate a potential rebuttal expert, and a period of time for expert discovery.  Such a procedure would be fair for all involved and would constitute a minimal delay to what has already been a rapidly advanced case.

## IV.     ARGUMENT AND AUTHORITIES

18.     It is appropriate for an expert to consider the issue of Waterhouse's and the Debtor's duties under the Shared Services Agreement—*i.e.*, "duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims,"—as issues such as "prudent person" and "like capacity and familiar with like aims" are appropriate for expert analysis and will assist the finder of fact, especially a jury.

19.     Rule 16(b) provides that a deadline in a scheduling order may be modified "for good cause," although there is some uncertainty as to whether this standard applies only after a deadline has passed (which is not the case here).  *See* Fed. R. Civ. P. 16(b)(4); *Marathon Fin. Ins.*

*Inc. RRG v. Ford Motor Co.*, 591 F.3d 458, 470 (5th Cir. 2009) ("Federal Rule of Civil Procedure 16(b) governs amendment of pleadings after a scheduling order's deadline to amend has expired").

20.     When the issue concerns an "untimely submission of expert reports," the Fifth Circuit has specified the following for factors as guiding the decision: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S&W Enters. v. Southtrust Bank of Ala.*, 315 F.3d 533, 536 (5th Cir. 2003).  Again, this test applies to a deadline which has already expired.  Logically, therefore, a lesser standard should apply when a party seeks relief prior to the expiration of a deadline, as NexPoint does here.

21.     Applying these or any factors:

(i)     this Adversary Proceeding is only some nine (9) months old and the parties have moved very quickly, with all discovery almost over;

(ii)    if this Motion is granted, all discovery in this Adversary Proceeding will have been completed by the end of 2021, still less than one (1) year after filing;

(iii)   the reason for the need to extend the deadline is the most logical reason that most frequently appears—that discovery has necessitated some previously unexpected action—which is one of the purposes of discovery;

(iv)    NexPoint's failure to previously designate an expert was due solely to not having the benefit of Waterhouse's and Seery's recent deposition testimony, and is not the result of any delay or lack of diligence, as evidenced by the fact that NexPoint did already and timely designate two other experts on other issues (*i.e.* NexPoint did not sit on its responsibility to consider retaining experts);

(v)     the matter is important because the duties of care as specified in the Shared Services Agreement are terms of art necessitating an expert analysis, especially before a jury, and the matter goes to the heart of NexPoint's affirmative defense, and is necessitated by Waterhouse's testimony and not any prior action or inaction of NexPoint;

(vi)    there is no prejudice to the Debtor, which will have sufficient time to retain a rebuttal expert and take expert discovery (*i.e.* no witnesses or documents have been lost); and

(vii)    a continuance is easily available to avoid any prejudice to the Debtor—indeed, there is no need for a continuance even as the Adversary Proceeding has yet to be certified as trial ready and it is likely that the District Court will not schedule the Adversary Proceeding for trial for some time.

22.    NexPoint submits that this Motion cannot come as a surprise to the Debtor. NexPoint has asserted its affirmative defense since the beginning.  The only difference now is that, instead of a wholesale disregard of any duty to facilitate the Note payment, the issue has evolved to whether the Debtor or Waterhouse had any affirmative duty to act after the alleged instruction from Dondero.  As it can be presumed that Waterhouse previously informed the Debtor or its counsel of this alleged instruction (as he apparently informed other employees at the Debtor), the Debtor likely knew what Waterhouse's testimony would be well before NexPoint learned of that testimony.  It is reasonable to conclude that the Debtor knew or should have known that the "standard of care" under the Shared Services Agreement would then become a material issue.

23.    Accordingly, "good cause" to amend the Scheduling Order exists, if that higher standard even applies, and approving such amendment will not prejudice the Debtor and will instead serve the interests of justice.

## V.    <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, NexPoint respectfully requests that the Court enter an order: (i) granting this Motion; (ii) modifying the Scheduling Order to extend the deadline to designate experts and serve expert reports through December 13, 2021; (iii) modifying the Scheduling Order accordingly for the potential designation of rebuttal experts and service of rebuttal expert reports, and extending expert discovery; and (iv) granting NexPoint such other and further relief as may be proper.

RESPECTFULLY SUBMITTED this 29th day of October, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email:  drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that, on October 28, 2021, he conferred with counsel for the Debtor, John Morris, and the Debtor opposes the relief requested herein.

/s/ Davor Rukavina
Davor Rukavina

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on October 29, 2021, a true and correct copy of the foregoing document, including the exhibit thereto, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Bryan C. Assink on behalf of Defendant James Dondero
bryan.assink@bondsellis.com

Greta M. Brouphy on behalf of Defendant The Dugaboy Investment Trust
gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com

Leslie A. Collins on behalf of Defendant The Dugaboy Investment Trust
lcollins@hellerdraper.com

Deborah Rose Deitsch-Perez on behalf of Defendant James Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez on behalf of Defendant Nancy Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Douglas S. Draper on behalf of Defendant The Dugaboy Investment Trust
ddraper@hellerdraper.com,
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

/s/ Davor Rukavina
Davor Rukavina

MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND EXPERT DISCLOSURE AND
DISCOVERY DEADLINES—Page 10
4871-8469-1713v.2 019717.00004

Appx. 01229

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF DAVOR RUKAVINA

STATE OF TEXAS

COUNTY OF DALLAS

I, Davor Rukavina, hereby state and testify to the following as being true and correct and under penalty of perjury pursuant to the laws of the United States of America:

1.    My name is Davor Rukavina.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise competent to execute this Declaration.

2.    I am an attorney duly licensed to practice law in the State of Texas.  I am a shareholder at Munsch Hardt Kopf & Harr, P.C.  I am the lead attorney for NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in this Adversary Proceeding.

3.    At issue in this Adversary Proceeding is a 30-year promissory note executed by NexPoint in the original principal amount of $30,746,812.33 (the "Note"), although the Note had been paid down significantly by the time of the filing of this Adversary Proceeding.

DECLARATION OF DAVOR RUKAVINA—Page 1

4. Highland Capital Management, L.P. (the "Debtor") alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment. Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated and the Debtor demanded full and immediate payment.

5. The parties agreed by written stipulation that they would disclose experts and produce expert reports on or before October 29, 2021, and the Court's scheduling order so requires. NexPoint requests an extension of this deadline. The following is the reason why.

6. One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "Agreement") between the Debtor and NexPoint dated January 1, 2018, a copy of which is attached hereto as Exhibit "A." The Agreement was in place as of December 31, 2020, although the Debtor terminated it later in 2021. NexPoint alleges that, under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services. NexPoint has alleged that, pursuant to the Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds. NexPoint therefore asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place.

7. The foregoing has always been an affirmative defense of NexPoint in this Adversary Proceeding, including in its amended answer filed on September 1, 2021, a copy of which is attached hereto as Exhibit "B."

8. On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as did I, in connection with this Adversary Proceeding. Waterhouse was the Debtor's chief financial

officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.

9.      Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note. A copy of this deposition transcript is attached as Exhibit "C."

10.      This testimony was not expected by me or by NexPoint. I had understood that Dondero instructed Waterhouse to make no further payments on the Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars on the Agreement and because that was what Dondero and Waterhouse had been discussing. I had not understood that Waterhouse would testify that Dondero instructed him to also not pay the Note specifically.

11.      Prior to that deposition, I had never spoken to Waterhouse. Waterhouse presently serves as an officer of NexPoint; however, and unlike every other case I have been involved with, I have not been permitted to discuss with Waterhouse litigation matters. This is because Waterhouse is in litigation with the Debtor on other matters and has separate and independent counsel, Debra Dandeneau and Frances Smith, who would not permit me to speak directly to Waterhouse, which I understood to be a logical and appropriate instruction to protect their client. I did discuss with Ms. Dandeneau what Waterhouse may know about the litigation between the Debtor and my clients, but that primarily focused on defenses that another client of mine, Highland Capital Management Fund Advisors, L.P., has. And I did discuss with Ms. Dandeneau that Dondero told Waterhouse to not make payments, but I understood that to be limited to the Agreement and to not include the Note, since the topic under discussion (as it was told to me)

between Dondero and Waterhouse was the Agreement and overpayments on the Agreement, and not the Note.

12.     In sum, prior to October 19, 2021, I did not know that Waterhouse would testify that Dondero told him to not pay on the Note, and I had no reasonable reason to suspect the same. My surprise is evident from the transcript of that deposition, where I asked Waterhouse multiple times whether he was sure that Dondero told him this—so much so that opposing counsel objected multiple times as "asked and answered," and even objected as having been asked and answered "four time." Exhibit "C" at 390-392.

13.     Assuming that Waterhouse's testimony on this issue will be accepted by a trier of fact, the question is whether, from NexPoint's perspective, Waterhouse had no further duties to review, confirm, investigate, or to discuss the issue with Dondero.  In that respect, section 6.01 of the Agreement, labeled "standard of care," states that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

14.     I deposed Jim Seery on October 21, 2021, and asked him various questions about this provision of the Agreement.  Mr. Seery testified to the effect that he did not believe that the Agreement obligated the Debtor or Waterhouse to do anything further after Dondero told Waterhouse to not pay the Note (again, assuming that this was true).  I do not have a copy of Mr. Seer's deposition yet.

15.     With Mr. Seery testifying that he did not believe that the Agreement required the Debtor or Waterhouse to do anything further if Dondero in fact gave the instruction Waterhouse testified that he did, NexPoint concluded that it needed to retain an expert to review whether the "standard of care" specified in the Agreement compelled the Debtor or Waterhouse to do anything

DECLARATION OF DAVOR RUKAVINA—Page 4

further after Dondero gave the alleged instruction, such as checking with him to see if they understood him correctly, advising him of the potential serious consequences of a default, trying to dissuade him, or at least asking him once again prior to December 31, 2020 whether the payment should be made.

16.    On October 22, 2021, I began searching for a potential expert.  On October 26, 2021, I contacted Steven J. Pully about the potential engagement.  After clearing conflicts and coming to an agreement, Mr. Pully agreed to the engagement on October 28, 2021.   The engagement letter has yet to be finalized and executed, but I have every confidence that it will and the urgency of the matter necessitates this Declaration at this time.  I have been extremely diligent in searching for an finding an expert once NexPoint determined that the retention of an expert was appropriate, which did not occur until the Seery deposition on October 21, 2021.

17.    Even though NexPoint has retained Mr. Pully as of October 28, 2021, it is not possible for Mr. Pully to formulate an opinion and prepare a report by October 29, 2021.  Among other things, various deposition transcripts of important witnesses have yet to be received and reviewed by Mr. Pully, and Mr. Pully has yet to review the underlying documents.  Assuming no undue delays with respect to deposition transcripts, Mr. Pully should be able to prepare a report by December 13, 2021.

18.    NexPoint therefore seeks an extension of the expert designation and report deadline through December 13, 2021, in order that justice may be done and not for delay or any improper purpose, NexPoint not having designated an expert before due solely to the lack of knowledge that Waterhouse would testify as he did on October 19, 2021 and that Mr. Seery would testify as to his view that the Agreement did not require Waterhouse to do anything thereafter.

I hereby swear under oath and penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DAVOR RUKAVINA

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

### R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows.

### ARTICLE I

### DEFINITIONS

Section 1.01    Certain Defined Terms.    As used in this Agreement, the following terms shall have the following meanings:



Exhibit A

Appx. 01236

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.   The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

Appx. 01237

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02   Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01   General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment. The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)   *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

3

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

      (b)   *Legal/Compliance/Risk Analysis*. Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

      (c)   *Tax*. Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

      (d)   *Management of Clients and Accounts*. Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

      (e)   *Valuation*. Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

      (f)   *Execution and Documentation*. Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

      (g)   *Marketing*. Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

      (h)   *Reporting*. Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(i)      *Administrative Services.*  The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

(j)      *Shared Employees.*  To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

(k)      *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing; and

(l)      *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Section 2.03   Shared Employees.

(a)      The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)    Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)    Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)    The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)    The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)    The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)    The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)    The Staff and Services Provider shall require that each Shared Employee:

(i)    certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)    be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)    provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)    to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf of or in the name of the Management Company, acting as principal.

Section 2.04    Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the

7

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    Authority. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.   The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07    Third Parties.

(a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).   Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    Consideration.  As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02    Costs and Expenses.  Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03    Deferral.  Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    Representations.  Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

9

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01   <u>Compliance; Advisory Restrictions</u>.

    (a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

    (b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "<u>Advisory Restrictions</u>"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02   <u>Records; Confidentiality</u>.

    The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

    The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

10

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01   Standard of Care.   Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder. No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account. Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Appx. 01246

Section 6.02    Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03    Indemnification by the Management Company.    The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

12

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04   Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Appx. 01248

Section 6.05   <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 6.03</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   <u>Reliance</u>. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

<div align="center">

## ARTICLE VII

## TERMINATION

</div>

Section 7.01   <u>Termination</u>. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

<div align="center">

## ARTICLE VIII

## MISCELLANEOUS

</div>

Section 8.01   <u>Amendments</u>. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   <u>Assignment and Delegation</u>.

(a)   Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)   Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)   The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

<div align="center">14</div>

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03   Non-Recourse; Non-Petition.

(a)   The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)   Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive.  The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)   Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)   The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)   The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Appx. 01250

Section 8.04    Governing Law.

(a)      This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)      The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    Severability.    The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    No Waiver.    The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    Counterparts.    This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Appx. 01251

Section 8.09    Third Party Beneficiaries.  This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10    No Partnership or Joint Venture.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11    Independent Contractor.  Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    Written Disclosure Statement.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    Headings.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    Notices.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)    If to the Management Company:

NexPoint Advisors, L.P.
200 Crescent Court
Suite 700
Dallas, TX 75201

Appx. 01252

    (b)    If to the Staff and Services Provider:

             Highland Capital Management, L.P.
             300 Crescent Court
             Suite 700
             Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.


*[The remainder of this page intentionally left blank.]*

Appx. 01253

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

**NEXPOINT ADVISORS, L.P.**

By: NexPoint Advisors GP, LLC, its General Partner

By: _____

Name: Frank Waterhouse
Title: Treasurer

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: Strand Advisors, Inc., its General Partner

By: _____

Name: Frank Waterhouse
Title: Treasurer

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Defendant NexPoint Advisors, L.P.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT NEXPOINT ADVISORS, L.P.'S
ANSWER TO AMENDED COMPLAINT**

Defendant NexPoint Advisors, L.P. ("NexPoint"), a defendant in the above-styled and

numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital

Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the

*Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent*

*Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "Amended Complaint"). Where

an allegation in the Amended Complaint is not expressly admitted in this Answer, it is denied.

Exhibit B

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Defendant NexPoint admits that NPA's First Amended Answer speaks for itself. To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.      Defendant NexPoint denies the allegations in paragraph 3 of the Amended Complaint.

4.      Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6.      Defendant NexPoint admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.      Defendant NexPoint admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.      Defendant NexPoint denies the allegations contained in paragraph 8 of the Amended Complaint.  Defendant NexPoint does not consent to any trial before, or final order entered by, the Bankruptcy Court.  Defendant NexPoint demands a trial by jury of all issues so triable.

9.      Defendant NexPoint admits the allegations in paragraph 9 of the Amended Complaint.

<div align="center">**THE PARTIES**</div>

10.      Defendant NexPoint admits the allegations in paragraph 10 of the Amended Complaint.

11.      Defendant NexPoint admits the allegations in paragraph 11 of the Amended Complaint.

12.      Defendant NexPoint admits the allegations in paragraph 12 of the Amended Complaint.

13.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

<div align="center">**CASE BACKGROUND**</div>

15.      Defendant NexPoint admits the allegations in paragraph 15 of the Amended Complaint.

16.      Defendant NexPoint admits the allegations in paragraph 16 of the Amended Complaint.

17.     Defendant NexPoint admits the allegations in paragraph 17 of the Amended Complaint.

18.     Defendant NexPoint admits the allegations in paragraph 18 of the Amended Complaint.

19.     Defendant NexPoint admits the allegations in paragraph 19 of the Amended Complaint.

## STATEMENT OF FACTS

20.     Defendant NexPoint admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.     Defendant NexPoint admits the allegations in paragraph 21 of the Amended Complaint.

22.     Defendant NexPoint denies paragraph 22 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 22 is not verbatim.

23.     Defendant NexPoint admits the allegations in paragraph 23 of the Amended Complaint.

24.     Defendant NexPoint denies paragraph 24 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 24 is not verbatim.

25.     Defendant NexPoint admits the allegations in paragraph 25 of the Amended Complaint.

26.     Defendant NexPoint admits that it did not make a payment under the Note on December 31, 2020. Defendant NexPoint denies that any payment was due under the Note on December 31, 2020.  To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.     Defendant NexPoint admits that Exhibit 2 to the Amended Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 27 of the Amended Complaint is denied.

28.     Defendant NexPoint admits that it paid the Debtor $1,406,111.92 on January 14, 2021, but denies that any payment was due on December 31, 2020 or that this was an attempt to cure a default.  To the extent not expressly admitted, paragraph 28 of the Amended Complaint is denied.

29.     Defendant NexPoint admits that Exhibit 3 to the Amended Complaint (the "Second Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 29 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 29 of the Amended Complaint is denied.

30.     To the extent paragraph 30 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits paragraph 30 of the Amended Complaint.

31.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.     Defendant NexPoint denies the allegations in paragraph 32 of the Amended Complaint.

33.     Defendant NexPoint admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 33 of the Amended

Complaint. Defendant NexPoint denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34.     Defendant NexPoint admits the allegations in paragraph 34 of the Amended Complaint.

35.     Defendant NexPoint admits the allegations in paragraph 35 of the Amended Complaint.

36.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 36 contradicts the First Amended Answer, it is denied.

37.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 37 contradicts the First Amended Answer, it is denied.

38.     Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no answer is required.  To the extent of any factual allegation, Defendant NexPoint admits that Mr. Dondero controlled NPA and denies that he controlled the Debtor at the time of the Alleged Agreement.

39.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Amended Complaint and therefore denies the same.

40.     Defendant NexPoint denies the allegations in paragraph 40 of the Amended Complaint.

41.     Defendant NexPoint admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and

it is denied.  To the extent not expressly admitted, paragraph 41 of the Amended Complaint is denied.

42.      Paragraph 42 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

43.      Paragraph 43 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

## FIRST CLAIM FOR RELIEF
### (against NexPoint)
### (for Breach of Contract)

44.      Paragraph 44 of the Amended Complaint is a sentence of incorporation that does not require a response.  All prior responses are incorporated herein by reference.

45.      Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

46.      Paragraph 46 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

47.      Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

48.      Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## SECOND CLAIM FOR RELIEF
### (against NexPoint)
### (Turnover by NexPoint Pursuant to 11 U.S.C. § 542(b))

49.      Paragraph 49 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

---

50.     Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

51.     Paragraph 51 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

52.     Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

53.     Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  Defendant NexPoint admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.

54.     Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

55.     Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### **THIRD CLAIM FOR RELIEF**
**(Against NexPoint)**
**(Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58.     Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

59.     Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

60.     Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

61.     Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### FOURTH CLAIM FOR RELIEF
**(Against NexPoint)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

62.     Paragraph 62 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

63.     Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

64.     Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

65.     Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

66.     Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### FIFTH CLAIM FOR RELIEF
**(Against Dugaboy Investment Trust and Nancy Dondero)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

67.     Paragraph 67 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

68.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

69.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

70.     Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### SIXTH CLAIM FOR RELIEF
**(Against Dugaboy Investment Trust and Nancy Dondero)**
**(Breach of Fiduciary Duty)**

71.     Paragraph 71 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

72.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

73.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

74.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

### SEVENTH CLAIM FOR RELIEF
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

75.     Paragraph 75 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

76.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

77.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

78.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

79.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

Defendant NexPoint denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## AFFIRMATIVE DEFENSES

80.     Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

81.     Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

82.     Furthermore, the Plaintiff has waived the right to accelerate the note and /or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

83.     Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant NexPoint believes there may be testimony or email correspondence that discusses the

existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

84.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because NexPoint acted in good faith, without knowledge of any alleged avoidability, and because reasonably equivalent value was provided for any alleged transfer or obligation.

85.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because no transferor or transferee, or obligor or obligee, was insolvent.

86.     To the extent of any avoidance, NexPoint asserts a lien under 11 U.S.C. § 548(c) to the extent that NexPoint gave value, and a similar preference lien under any applicable provision of the Texas Uniform Fraudulent Transfer Act.

## JURY DEMAND

87.     Defendant NexPoint demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

88.     Defendant NexPoint does <u>not</u> consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant NexPoint respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant NexPoint such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of September, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
      Davor Rukavina, Esq.
      Texas Bar No. 24030781
      Julian P. Vasek, Esq.
      Texas Bar No. 24070790
      3800 Ross Tower
      500 N. Akard Street
      Dallas, Texas  75201-6659
      Telephone: (214) 855-7500
      Facsimile: (214) 855-7584
      Email: drukavina@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

      /s/ Davor Rukavina
      Davor Rukavina

Appx. 01267

```
                                                          Page 1
 1              WATERHOUSE - 10-19-21

 2        IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
 3                  DALLAS DIVISION
       ------------------------------
 4     IN RE:

 5                               Chapter 11
       HIGHLAND CAPITAL
 6     MANAGEMENT, L.P.,          CASE NO.
                                  19-34054-SGI11
 7
                Debtor.
 8     ------------------------------
       HIGHLAND CAPITAL MANAGEMENT, L.P.,
 9
                Plaintiff,
10     vs.                          Adversary
                                   Proceeding No.
11     HIGHLAND CAPITAL MANAGEMENT    21-03000-SGI
       FUND ADVISORS, L.P.; NEXPOINT
12     ADVISORS, L.P.; HIGHLAND
       INCOME FUND; NEXPOINT
13     STRATEGIC OPPORTUNITIES FUND;
       NEXPOINT CAPITAL, INC.; and
14     CLO HOLDCO, LTD.,

15                Defendants.
       ------------------------------
16

17         REMOTE VIDEOTAPED DEPOSITION OF

18                FRANK WATERHOUSE

19              October 19, 2021

20

21

22

23

24     Reported by:  Susan S. Klinger, RMR-CRR, CSR

25     Job No: 201195
```

Exhibit C

Appx. 01268

Page 2

```
 1                    WATERHOUSE - 10-19-21

 2

 3

 4                    October 19, 2021

 5                    9:30 a.m.

 6

 7

 8

 9        Remote Deposition of FRANK WATERHOUSE,

10   held before Susan S. Klinger, a Registered

11   Merit Reporter and Certified Realtime Reporter

12   of the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Appx. 01269

Page 3

```
 1                  WATERHOUSE - 10-19-21

 2    A P P E A R A N C E S:

 3    (All appearances via Zoom.)

 4    Attorneys for the Reorganized Highland Capital

 5    Management:

 6         John Morris, Esq.

 7         Hayley Winograd, Esq.

 8         PACHULSKI STANG ZIEHL & JONES

 9         780 Third Avenue

10         New York, New York  10017

11    Attorneys for the Witness:

12         Debra Dandeneau, Esq.

13         Michelle Hartmann, Esq.

14         BAKER McKENZIE

15         1900 North Pearl Street

16         Dallas, Texas  75201

17    Attorneys for NexPoint Advisors, LP and

18    Highland Capital Management Fund Advisors,

19    L.P.:

20         Davor Rukavina, Esq.

21         An Nguyen, Esq.

22         MUNSCH HARDT KOPF & HARDD

23         500 North Akard Street

24         Dallas, Texas  75201-6659

25
```

Appx. 01270

```
                                                        Page 4
 1              WATERHOUSE - 10-19-21

 2   Attorneys for Jim Dondero, Nancy Dondero, HCRA,

 3   and HCMS:

 4        Deborah Deitsch-Perez, Esq.

 5        Michael Aigen, Esq.

 6        STINSON

 7        3102 Oak Lawn Avenue

 8        Dallas, Texas  75219

 9

10   Attorneys for Dugaboy Investment Trust:

11        Warren Horn, Esq.

12        HELLER, DRAPER & HORN

13        650 Poydras Street

14        New Orleans, Louisiana 70130

15

16   Attorneys for Marc Kirschner as the trustee for

17   the litigation SunTrust:

18        Deborah Newman, Esq.

19        QUINN EMANUEL URQUHART & SULLIVAN

20        51 Madison Avenue

21        New York, New York  10010

22

23   Also Present:

24        Ms. La Asia Canty

25
```

Page 5

```
 1              WATERHOUSE - 10-19-21

 2                    I N D E X

 3

 4   WITNESS                              PAGE

 5   FRANK WATERHOUSE

 6   EXAMINATION BY MR. MORRIS              10

 7   EXAMINATION BY MR. RUKAVINA           256

 8   EXAMINATION BY MS. DEITSCH-PEREZ      352

 9   EXAMINATION BY MR. MORRIS            377

10   EXAMINATION BY MR. RUKAVINA          387

11   EXAMINATION BY MS. DEITSCH-PEREZ     393

12

13                E X H I B I T S

14   No.                                  Page

15   Exhibit 2  NPA et al Amended Complaint   142

16   Exhibit 33 6/3/19 Management            91

17            Representation

18   Exhibit 34 HCMLP Consolidated Financial  94

19            Statements

20   Exhibit 35 HCMFA Incumbency Certificate  151

21   Exhibit 36 Email string re 15(c)        170

22   Exhibit 39 HCMLP Operating Results 2/18  226

23   Exhibit 40 Summary of Assets and        236

24            Liabilities

25   Exhibit 41 12/19 Monthly Operating Report  258
```

Appx. 01272

Page 6

```
 1                  WATERHOUSE - 10-19-21

 2   Exhibit 45 HCMFA Consolidated Financial     135

 3              Statements

 4   Exhibit 46 NexPoint 2019 Audited            218

 5              Financials

 6

 7   Exhibit A1 Emails 11/25                      328

 8   Exhibit A2 Emails 12/31                      338

 9   Exhibit A6 Emails 1/12                       341

10   Exhibit A7 Promissory Notes                  297

11   Exhibit A9 Email, 8/31                       307

12   Exhibit A10 Acknowledgment from HCMLP        302

13   Exhibit A11 HCMLP Schedule 71A               309

14

15

16

17

18

19

20

21

22

23

24

25
```

Appx. 01273

```
 1            WATERHOUSE - 10-19-21

 2            P R O C E E D I N G S

 3            VIDEOGRAPHER:  Good morning,

 4   Counselors.  My name is Scott Hatch.  I'm a

 5   certified legal videographer in association

 6   with TSG Reporting, Inc.

 7            Due to the severity of COVID-19 and

 8   following the practice of social

 9   distancing, I will not be in the same room

10   with the witness.  Instead, I will record

11   this videotaped deposition remotely.  The

12   reporter, Susan Klinger, also will not be

13   in the same room and will swear the witness

14   remotely.

15            Do all parties stipulate to the

16   validity of this video recording and remote

17   swearing, and that it will be admissible in

18   the courtroom as if it had been taken

19   following Rule 30 of the Federal Rules of

20   Civil Procedures and the state's rules

21   where this case is pending?

22            MR. HORN:  Yes.

23            MS. DANDENEAU:  Yes.

24            MR. MORRIS:  Yes.  John Morris.  I

25   would just try to do a negative notice
```

Page 8

```
 1            WATERHOUSE - 10-19-21
 2   here, as we did yesterday.  If anybody has
 3   a problem with what was just stated, can
 4   you state your objection now?
 5        Okay.  No response, so everybody
 6   accepts the stipulation and the instruction
 7   that was just given.
 8        VIDEOGRAPHER:  Thank you.  This is
 9   the start of media labeled Number 1 of the
10   video recorded deposition of Frank
11   Waterhouse In Re: Highland Capital
12   Management, L.P., in the United States
13   Bankruptcy Court for the Northern District
14   of Texas, Dallas Division, Case Number
15   21-03000-SGI.
16        This deposition is being held via
17   video conference with participants
18   appearing remotely due to COVID-19
19   restrictions on Tuesday, October 19th, 2021
20   at approximately 9:32 a.m.  My name is
21   Scott Hatch, legal video specialist with
22   TSG Reporting, Inc. headquartered at 228
23   East 45th Street, New York, New York.  The
24   court reporter is Susan Klinger in
25   association with TSG Reporting.
```

Page 9

```
 1            WATERHOUSE - 10-19-21
 2         Counsel, please introduce
 3    yourselves.
 4         MR. MORRIS:  John Morris, Pachulski
 5    Stang Ziehl & Jones for the reorganized
 6    Highland Capital Management, L.P., the
 7    plaintiff in these actions.
 8         MS. DANDENEAU:  Deborah Dandeneau
 9    from Baker McKenzie.  My partner, Michelle
10    Hartmann, is also in the room with me,
11    representing Frank Waterhouse individually.
12         MS. DEITSCH-PEREZ:  Deborah
13    Deitsch-Perez from Stinson, LLP,
14    representing Jim Dondero, Nancy Dondero,
15    HCRA, and HCMS.
16         MR. HORN:  Warren Horn with Heller,
17    Draper & Horn in New Orleans representing
18    Dugaboy Investment Trust.
19         MR. RUKAVINA:  Davor Rukavina with
20    Munsch Hardt Kopf & Harr in Dallas
21    representing NexPoint Advisors, LP and
22    Highland Capital Management Fund Advisors,
23    L.P.
24         MR. AIGEN:  Michael Aigen from
25    Stinson, and I represent the same parties
```

Appx. 01276

Page 10

```
 1                 WATERHOUSE - 10-19-21
 2         as Deborah Deitsch-Perez.
 3             MS. NEWMAN:  This is Deborah Newman
 4         from Quinn Emanuel.  We represent the
 5         litigation -- Marc Kirschner as the trustee
 6         for the litigation SunTrust.
 7             MR. MORRIS:  I think that is
 8         everybody.
 9             VIDEOGRAPHER:  Thank you.  Will the
10         court reporter please swear in the witness.
11                 FRANK WATERHOUSE,
12     having been first duly sworn, testified as
13     follows:
14                     EXAMINATION
15     BY MR. MORRIS:
16         Q.    Please state your name for the
17     record.
18         A.    My name is Frank Waterhouse.
19         Q.    Good morning, Mr. Waterhouse.  I'm
20     John Morris, as you know, from Pachulski Stang
21     Ziehl & Jones.  You understand that my firm and
22     I represent Highland Capital Management, L.P.;
23     is that right?
24         A.    Yes.
25         Q.    Okay.  And do you understand that
```

Appx. 01277

Page 11

```
 1              WATERHOUSE - 10-19-21
 2    we're here today for your deposition in your
 3    individual capacity?
 4         A.    Yes.
 5         Q.    Did you review and -- did you
 6    receive and review a subpoena that Highland
 7    Capital Management, L.P., served upon you?
 8         A.    Yes.
 9         Q.    You have been deposed before; right?
10         A.    Yes.
11         Q.    How many times have you been
12    deposed?
13         A.    About three or four times.
14         Q.    Okay.  And I defended you in one
15    deposition; isn't that right?
16         A.    That is correct.
17         Q.    So the general ground rules for this
18    deposition are largely the same as the
19    depositions you have given before.  And that is
20    I will ask you a series of questions, and it is
21    important that you allow me to finish my
22    question before you begin your answer; is that
23    fair?
24         A.    Yes.
25         Q.    And it is important that I allow you
```

Page 12

```
 1                   WATERHOUSE - 10-19-21
 2     to finish your answers before I begin a
 3     question, but if I fail to do that, will you
 4     let me know?
 5          A.    I can certainly do that.
 6          Q.    Okay.  Do you understand that this
 7     deposition is being videotaped?
 8          A.    Yes.
 9          Q.    You understand that I may seek to
10     use portions of the videotape in a court of
11     law?
12          A.    I did not know that, until you just
13     said that.
14          Q.    Okay.  And you are aware of that now
15     before the deposition begins substantively; is
16     that right?
17          A.    Yes.
18          Q.    So unlike I think the other
19     depositions that you have given, this one is
20     being given remotely.  So that presents some
21     unique challenges, at least as compared to a
22     deposition that is taken in-person.
23              From time to time we're going to put
24     documents up on the screen, Mr. Waterhouse.
25     And it is important that I give you the
```

Appx. 01279

Page 13

```
1              WATERHOUSE - 10-19-21
2    opportunity to review any portion of the
3    document that you think you need in order to
4    fully and completely answer the question.
5              So I would ask you to let me know if
6    there is a portion of a document that you need
7    to see in order to fully and completely answer
8    the question.  Can you do that for me?
9         A.   Yes.
10             MS. DANDENEAU:  Mr. Morris, I would
11             just note that we do have hard copies of
12             the documents that you sent, so if you can
13             just refer to the exhibit number as
14             reflected in the documents that you sent,
15             Mr. Waterhouse will be able to look at the
16             hard copies of those documents.
17             MR. MORRIS:  I appreciate that,
18             and -- and I will encourage him to do so.
19             There will be other documents that we did
20             not send to you that we'll be using today
21             though.
22        Q.   Okay.  With that as background, if
23    there is anything that I ask you, sir, that you
24    don't understand, will you let me know?
25        A.   Yes.
```

```
                                                      Page 14
 1              WATERHOUSE - 10-19-21

 2        Q.    Okay.  Are you currently employed?

 3        A.    Yes.

 4        Q.    By whom?

 5        A.    The Skyview Group.

 6        Q.    When did you become employed by the

 7   Skyview Group?

 8        A.    I believe March 1st of 2021.

 9        Q.    Do you have a title at Skyview?

10        A.    Yes.

11        Q.    What is your title?

12        A.    My title is chief financial officer.

13        Q.    Do you report to anybody in your

14   role as CFO?

15        A.    I don't, no.

16        Q.    No.  Is there a president or a CEO

17   of Skyview?

18        A.    Yes.

19        Q.    Who is that?

20        A.    That is Scott Ellington.

21        Q.    But you don't report to

22   Mr. Ellington; is that right?

23        A.    I don't think so.

24        Q.    Does Skyview Group --

25              MS. DANDENEAU:  Excuse me, we --
```

Appx. 01281

Page 15

```
 1                WATERHOUSE - 10-19-21

 2         A.    I -- I -- I might.  I just -- I

 3    don't recall.

 4         Q.    Okay.  Does Skyview Group provide

 5    any services to any entity directly or

 6    indirectly owned or controlled by Jim Dondero?

 7         A.    Yes.

 8         Q.    Can you name -- is that pursuant to

 9    written contracts?

10         A.    Yes.

11         Q.    And do you know how many contracts

12    exist?

13         A.    Approximately six or so.

14         Q.    And is the Skyview Group made up of

15    individuals who were formerly employees of

16    Highland Capital Management, L.P.?

17         A.    No.

18         Q.    Do you know how many -- how many --

19    how many employees does Skyview have?

20         A.    Approximately 35.

21         Q.    And can you tell me how many of

22    those 35 are former officers, directors, or

23    employees of Highland Capital Management, L.P.?

24         A.    I don't know the exact number.

25         Q.    Is it more than 20?
```

Page 16

 1                    WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    Is it more than 30?

 4        A.    I don't know.

 5        Q.    Can you tell me what portion of

 6    Skyview -- Skyview's revenue is derived from

 7    entities that are directly or indirectly owned

 8    or controlled by Jim Dondero?

 9              MS. DANDENEAU:  Mr. Morris, I mean,

10         you called Mr. Waterhouse here individually

11         for purposes of his testimony in connection

12         with the noticed litigation.  I have given

13         you some leeway to ask him some background

14         information about Skyview Group, but this

15         is not a substitute for a deposition in

16         connection with any other pending disputes

17         that exist.  And -- and we agreed to accept

18         the subpoena on the basis of he -- this is

19         testimony that he is giving in connection

20         with the noticed litigation.

21              I really think that you are now

22         going a little bit far afield from the

23         purpose of this deposition.

24              MR. MORRIS:  Okay.  It is -- I'm not

25         intending to use these -- the answers to

Page 17

```
 1                    WATERHOUSE - 10-19-21

 2           these questions for any purpose other than

 3           this litigation.  I think you understand

 4           fully why I'm asking the questions, and I

 5           just have a couple more, if you will bear

 6           with me.

 7                    MS. DANDENEAU:  Okay.

 8                    MS. DEITSCH-PEREZ:  Can we have an

 9           agreement that an objection by one is an

10           objection for any other party here?

11                    MR. MORRIS:  Sure.  I would -- I

12           would encourage that, sure.

13                    MS. DEITSCH-PEREZ:  Thank you.

14                    MR. MORRIS:  It can't be sustained

15           or overruled more than one time, so...

16           Q.    Mr. Waterhouse, can you answer my

17    question, please.

18                    MS. DANDENEAU:  Do you want to

19           repeat it, Mr. Morris, for his benefit?

20                    MR. MORRIS:  Sure.

21           Q.    Can you -- can you tell me the

22    approximate portion of Skyview's revenue that

23    is derived from entities that are directly or

24    indirectly owned or controlled by Mr. Dondero?

25           A.    I don't know the exact number.
```

Page 18

```
 1              WATERHOUSE - 10-19-21
 2      Q.    Is it more than 75 percent?
 3      A.    Yes.
 4      Q.    Is it more than 90 percent?
 5      A.    I don't know.
 6      Q.    Okay.  Can I refer to Highland
 7  Capital Management, L.P., as Highland?
 8      A.    Yes.
 9      Q.    All right.  And you previously
10  served as Highland's CFO; correct?
11      A.    Yes.
12      Q.    When did you join Highland?
13      A.    I don't recall the exact date.
14      Q.    Can you tell me what year?
15      A.    2006.
16      Q.    When did you -- in what year did you
17  become Highland's CFO?
18      A.    I don't recall the exact date.
19      Q.    I'm not asking you for the exact
20  date.  I'm asking you if you recall the year in
21  which you were appointed CFO.
22      A.    I don't recall the exact year.
23      Q.    Can you tell me which years it is
24  possible that you were appointed to CFO of
25  Highland?
```

Appx. 01285

Page 19

```
 1                 WATERHOUSE - 10-19-21
 2        A.    2011 or 2012.
 3        Q.    Did you serve as Highland's CFO on a
 4   continuous basis from in or around 2011 or 2012
 5   until early 2021?
 6        A.    Yes.
 7        Q.    During that entire time you reported
 8   directly to Jim Dondero; correct?
 9        A.    I -- I don't know.
10        Q.    Is there anybody else you reported
11   to -- withdrawn.
12              Did you report to Mr. Dondero for
13   some portion of the time that you served as
14   CFO?
15        A.    Yes.
16        Q.    Is there a portion of time that you
17   don't recall who you reported to?
18        A.    Yes.
19        Q.    What portion of time do you have in
20   your mind when you can't recall who you
21   reported to?
22        A.    From the 2011 to -- for
23   approximately a year or two.
24        Q.    Okay.  So is it fair to say that you
25   reported to Mr. Dondero in your capacity as CFO
```

Appx. 01286

Page 20

```
 1                 WATERHOUSE - 10-19-21
 2   from at least 2014 until the time you left
 3   Highland?
 4             MS. DANDENEAU:  Objection to form.
 5        A.    I don't want to speculate the exact
 6   or what year that changed or -- so I would like
 7   to stick with my testimony.
 8        Q.    Can you recall when you began
 9   reporting to Mr. Dondero?
10        A.    I don't recall.
11        Q.    Can you -- can you give me an
12   estimate of what year you think you might have
13   began reporting to Mr. Dondero?
14        A.    I will go back to my prior
15   testimony.
16        Q.    Okay.  There is no -- you have no
17   ability to tell me when you began reporting to
18   Mr. Dondero.
19             Do I have that right?
20             MS. DANDENEAU:  Objection to form.
21        A.    I don't recall.
22        Q.    Okay.  Do you recall who you might
23   have reported to before you began reporting to
24   Mr. Dondero?
25        A.    Yes.
```

Appx. 01287

Page 21

```
 1                    WATERHOUSE - 10-19-21
 2          Q.    Who might you have reported to in
 3    your capacity as CFO before you started
 4    reporting to Mr. Dondero?
 5          A.    That would have been Patrick Boyce.
 6          Q.    Are you aware that Highland filed
 7    for bankruptcy on October 19th, 2019?
 8          A.    Yes.
 9          Q.    And we refer to that as the petition
10    date?
11          A.    Yes.
12          Q.    Okay.  Do you hold any professional
13    licenses, sir?
14          A.    Yes.
15          Q.    Can you tell me what professional
16    licenses you hold?
17          A.    I'm a certified public accountant.
18          Q.    Okay.  Anything else?
19          A.    No.
20          Q.    Do you have any other professional
21    licenses or certificates?
22          A.    When you say "professional license,"
23    that is not education?
24          Q.    Tell me -- sure.  Anything other
25    than a driver's license.
```

Page 22

```
 1              WATERHOUSE - 10-19-21
 2              Do you have any other license or
 3    certificate or certification?
 4        A.   Are you asking, like, where I went
 5    to school and the --
 6        Q.   I am not.  I am not.  I didn't say
 7    education.  I didn't ask about degrees.
 8              Do you know what a license is?
 9        A.   Well, yeah, I mean, a license is
10    something you get after you receive a certain
11    level of proficiency.
12        Q.   Do you have any licenses or
13    certifications other than your CPA?
14              MS. DANDENEAU:  Objection, form.
15              I assume you mean professional
16         licenses, Mr. Morris; correct?
17        Q.   Can you answer my question, sir?
18        A.   Mr. Morris, I'm thinking.  I
19    don't -- I don't think I have any others.
20        Q.   Are you familiar with an entity
21    called Highland Capital Management Fund
22    Advisors?
23        A.   Yes.
24        Q.   Were you ever -- can we refer to
25    that entity as HCMFA?
```

Appx. 01289

```
                                                          Page 23
 1                 WATERHOUSE - 10-19-21

 2         A.    Yes.

 3         Q.    Were you ever employed by HCMFA?

 4         A.    Not that I recall.

 5         Q.    Were you ever -- did you ever hold

 6    the title of an officer or director of HCMFA?

 7         A.    Yes.

 8         Q.    What title did you hold?

 9         A.    Treasurer.

10         Q.    When did you become the treasurer of

11    HCMFA?

12         A.    I don't recall.

13         Q.    Can you tell me the year?

14         A.    I don't -- I don't know the year.

15         Q.    Can you approximate the year in

16    which you became the treasurer of HCMFA?

17         A.    I don't know.

18         Q.    Can you tell me if it was before or

19    after 2016?

20         A.    I don't recall.

21         Q.    Are you still the -- do you know if

22    you're still the treasurer of HCMFA today?

23         A.    Today, I am the acting treasurer for

24    HCMFA.

25         Q.    Is there a distinction between
```

Page 24

```
 1                WATERHOUSE - 10-19-21

 2    treasurer and acting treasurer?

 3        A.    I said "acting treasurer" as I am an

 4    employee of Skyview, as you previously

 5    stated -- or asked.

 6        Q.    But you are the treasurer of HCMFA

 7    today; correct?

 8        A.    I am -- I am the acting treasurer

 9    for HCMFA.

10        Q.    How did you become the treasurer of

11    HCMFA?

12        A.    Are you asking how I became the

13    treasurer of HCMFA today?

14        Q.    How did you become appointed to

15    serve as the treasurer of HCMFA?

16        A.    Well, in -- in -- in what time

17    capacity?

18        Q.    The first time that you were

19    appointed.

20        A.    First time.  I believe I was asked

21    to serve as treasurer for HCMFA the first time.

22        Q.    By who?  Who asked you to do that?

23        A.    I don't recall.

24        Q.    Is there anything that would refresh

25    your recollection as to who appointed you as
```

Appx. 01291

Page 25

```
 1                  WATERHOUSE - 10-19-21
 2    the treasurer of CF- -- HCMFA for the first
 3    time?
 4         A.   I don't -- I mean, there would be
 5    some documents, some legal documents.  I don't
 6    know where those are.
 7         Q.   How many times have you been
 8    appointed the treasurer of HCMFA?
 9         A.   I don't know.
10         Q.   Was it more than once?
11         A.   I don't know.
12         Q.   Can you tell me any period of time
13    since 2016 that you did not hold the title of
14    treasurer of HCMFA?
15              MS. DANDENEAU:  Objection to form.
16         A.   I don't recall.
17         Q.   What are your duties and
18    responsibilities as the treasurer of HCMFA?
19         A.   My duties are to do the best job
20    that I can as the -- as an accountant and
21    finance guy.
22         Q.   What specific duties and
23    responsibilities do you have as the treasurer
24    of HCMFA?
25         A.   My duties are to do the best job
```

Appx. 01292

Page 26

```
 1                   WATERHOUSE - 10-19-21
 2   that I can as the accounting and finance person
 3   for HCMFA.
 4        Q.    As the accounting and finance person
 5   for HCMFA, do you have any particular areas of
 6   responsibility?
 7        A.    Yeah, it is to manage the accounting
 8   and finance function for HCMFA.
 9        Q.    Would that include -- do you have
10   responsibility for overseeing HCMFA's annual
11   audit?
12        A.    Can I please elaborate on my prior
13   question?
14        Q.    Of course.  You -- you are giving
15   answers.  I'm asking questions.
16        A.    Okay.  Yes, so the -- it -- like I
17   said, it is to manage the accounting finance
18   aspect, but I am, as we discussed, the
19   treasurer.  That is -- being treasurer is what
20   gives me that -- that management function.
21        Q.    Does anybody report to you in your
22   capacity as treasurer of HCMFA?
23        A.    I don't believe so.
24        Q.    Does HCMFA have a chief financial
25   officer?
```

Page 27

```
 1                 WATERHOUSE - 10-19-21

 2        A.    I don't -- I don't know.

 3        Q.    You don't know?

 4              You're the treasurer of HCMFA but

 5   you don't know if HCMFA has a chief financial

 6   officer.

 7              Do I have that right?

 8        A.    That's right.

 9        Q.    Okay.  Have you heard of a company

10   called NexPoint Advisors?

11        A.    Yes.

12        Q.    We will refer to that as NexPoint.

13   Okay?

14        A.    Okay.

15        Q.    Were you ever employed by NexPoint?

16        A.    I don't recall.

17        Q.    Did you ever hold any title with

18   respect to the entity known as NexPoint?

19        A.    Yes.

20        Q.    What titles have you held in

21   relation to NexPoint?

22        A.    Treasurer.  I think it was only

23   treasurer.

24        Q.    Can you tell me the approximate year

25   you became the treasurer of NexPoint?
```

Page 28

```
 1                 WATERHOUSE - 10-19-21
 2         A.    I don't know.
 3         Q.    Are you still the treasurer of
 4    NexPoint today?
 5         A.    I am the acting treasurer for
 6    NexPoint.
 7         Q.    When did your title change from
 8    treasurer to acting treasurer?
 9         A.    I don't know.
10         Q.    Did your duties and responsibilities
11    change at all when your title was changed from
12    treasurer to acting treasurer?
13         A.    I don't -- I don't believe so.
14         Q.    Why did --
15         A.    I still manage the finance and
16    accounting function for NexPoint.
17         Q.    Why did your title change from
18    treasurer to acting treasurer?
19         A.    I don't -- I'm using the term
20    "acting treasurer" as I'm a Skyview employee.
21    I don't -- I don't know -- again, I am a -- as
22    I am the Skyview employee.
23         Q.    Okay.
24         A.    And we -- we provide officer
25    services.
```

Appx. 01295

Page 29

```
 1                    WATERHOUSE - 10-19-21

 2          Q.    And you serve as an officer of

 3    HCMFA; correct?

 4          A.    I think we went over that with my

 5    testimony.  Yes, I'm the acting treasurer for

 6    HCMFA.

 7          Q.    And you are an officer of NexPoint;

 8    correct?

 9          A.    I think -- I am the acting treasurer

10    for NexPoint Advisors.

11          Q.    And -- and who appointed you acting

12    treasurer of NexPoint Advisors?

13          A.    I don't recall specifically.

14          Q.    Do you have any recollection of who

15    might have appointed you the treasurer of

16    NexPoint?

17          A.    I mean, it -- it -- I don't recall

18    exactly who it was.

19          Q.    Who were the possibilities?

20                MS. DEITSCH-PEREZ:  Object to the

21          form.

22          Q.    You can answer.

23          A.    Someone in the legal group for

24    NexPoint.  The other officers as well.

25          Q.    Have you heard of a company called
```

Page 30

```
 1                    WATERHOUSE - 10-19-21

 2   Highland Capital Management Services, Inc.?

 3         A.    Yes.

 4         Q.    We will refer to that as HCMS.

 5   Okay?

 6         A.    HCMS.  Okay.

 7         Q.    Were you ever employed by HCMS?

 8         A.    No.

 9         Q.    Have you ever held any titles in

10   relation to HCMF -- I apologize -- HCMS?

11         A.    Yes.

12         Q.    What titles have you held in

13   relation to HCMS?

14         A.    Treasurer and acting treasurer.

15         Q.    When did you first become treasurer

16   or acting treasurer of HCMS?

17         A.    I don't recall the exact dates.

18         Q.    Can you recall -- can you

19   approximate the year that you became the

20   treasurer of HCMS?

21         A.    I don't -- I don't know.

22         Q.    Are you still the treasurer of HCMS

23   today?

24         A.    I am the acting treasurer for HCMS.

25         Q.    And are your duties and
```

Appx. 01297

Page 31

```
 1                    WATERHOUSE - 10-19-21
 2     responsibilities as the acting treasurer for
 3     HCMS and the acting treasurer for NexPoint the
 4     same as your duties and responsibilities in
 5     your role as the acting treasurer of HCMFA?
 6          A.    More or less.
 7          Q.    Have you ever heard of a company
 8     called HCRE Partners, LLC?
 9          A.    Yes.
10          Q.    And do you understand that that
11     entity is now known today as NexPoint Real
12     Estate Partners?
13          A.    I did not know that.
14          Q.    All right.  Can we refer to HCRE
15     Partners as HCRE?
16               MS. DANDENEAU:  Objection to form.
17               Did you mean NexPoint Real Estate
18          Partners, Mr. Morris?
19               MR. MORRIS:  No.
20               MS. DANDENEAU:  Oh.
21               MR. MORRIS:  He said he wasn't
22          familiar that it was succeeded by that
23          entity.  So --
24               MS. DANDENEAU:  Okay.
25               MR. MORRIS:  -- let's go with what
```

Page 32

1              WATERHOUSE - 10-19-21

2         the witness knows.

3         Q.    You're familiar with an entity

4    called HCRE Partners, LLC; correct?

5         A.    Yes.

6         Q.    Okay.  So that is the entity that we

7    will refer to as HCRE.  If you're aware of any

8    successor, that is great.  If not, let's just

9    define it as such.

10             Have you ever been employed by HCRE

11   or any entity that you know to have succeeded

12   HCRE?

13        A.    No.

14        Q.    Did you ever serve as an officer or

15   director of HCRE or any successor?

16        A.    Not that I recall.

17        Q.    Okay.  Can we refer to NexPoint and

18   HCMFA as the advisors?

19        A.    Yes.

20        Q.    In general, the advisors provided

21   investment advisory services to certain retail

22   funds; correct?

23        A.    Yes.

24        Q.    And we will refer to the retail

25   funds that are served by the advisors

Page 33

```
 1              WATERHOUSE - 10-19-21
 2    collectively as the retail funds; is that okay?
 3         A.    Okay.
 4         Q.    Each of the retail funds is governed
 5    by a board; correct?
 6         A.    Yes.
 7         Q.    And do you know the people who serve
 8    on the boards of the retail funds?
 9              MS. DANDENEAU:  Objection to form.
10         A.    I don't know all of them.
11         Q.    Do you know whether the same people
12    serve on the board of each of the retail funds
13    as we've defined that term?
14         A.    Which -- so when you say "retail
15    funds" -- again, I want to be -- what retail
16    funds are you referring to, because there are
17    -- there are several distinctions?
18              What retail funds are you using when
19    you refer to them?
20         Q.    That is why -- that is why I tried
21    to define the terms.  So let me do it again.
22              Retail funds for the purposes of
23    this deposition means any retail fund to which
24    either of the advisors provides advisory
25    services.  Okay?
```

Appx. 01300

Page 34

```
 1                 WATERHOUSE - 10-19-21

 2        A.     Okay.

 3        Q.     Okay.  So do you know whether the

 4   same people serve on the board of each of the

 5   retail funds?

 6        A.     I don't know.

 7        Q.     Were you ever employed by any of the

 8   retail funds?

 9        A.     No.

10        Q.     No?

11        A.     No.

12        Q.     Okay.  Do you have any title with

13   respect to any of the retail funds?

14        A.     Yes.

15        Q.     What titles do you hold --

16   withdrawn.

17               Do you have the same titles with

18   respect to all of the retail funds or do

19   they -- or just something else?

20               MS. DANDENEAU:  Objection to form.

21        Q.     Withdrawn.

22               Do you have the same title with

23   respect to each of the retail funds?

24        A.     No.

25        Q.     Tell me which title you have with
```

Appx. 01301

Page 35

```
 1                    WATERHOUSE - 10-19-21
 2    respect to each retail fund.
 3                    Actually, let's do it a different
 4    way.  I withdraw the question.
 5                    Can you give me one title you have
 6    in relation to any retail fund?
 7         A.    Yes.
 8         Q.    What title -- what title can you
 9    give me?
10         A.    Principal executive officer.
11         Q.    Do you serve as principal executive
12    officer for each of the retail funds?
13         A.    No.
14         Q.    Can you identify for me the retail
15    funds in which you serve as the principal
16    executive officer?
17         A.    Yes.  Highland Funds 1, Highland
18    Funds 2, Highland Income Fund, Highland Global
19    Allocation Fund.
20         Q.    I'm sorry, you said "Global
21    Allocation Fund"?
22         A.    Yes.
23                    VIDEOGRAPHER:  Excuse me,
24         Mr. Morris.  This is the videographer.  I'm
25         concerned about the lighting in the
```

Appx. 01302

Page 36

```
 1              WATERHOUSE - 10-19-21

 2       witness' camera.

 3            Do you want to go off the record and

 4       make some adjustments?

 5            MR. MORRIS:  Sure, but just for this

 6       purpose.  I don't want to take a break.  We

 7       just started.

 8            MS. DANDENEAU:  Yeah, that is fine.

 9       That is fine.  We're going to put you on

10       mute.

11            MR. MORRIS:  All right.

12            MS. DANDENEAU:  I'm going to try to

13       open up some of the shades.

14            VIDEOGRAPHER:  We're going off the

15       record at 10:08 a.m.

16       (Recess taken 10:08 a.m. to 10:11 a.m.)

17            VIDEOGRAPHER:  We are back on the

18       record at 10:11 a.m.

19       Q.    Mr. Waterhouse, when did you become

20    the principal executive officer of the four

21    retail funds that you just identified?

22       A.    I don't recall.

23       Q.    Do you recall the approximate year

24    that you became the principal executive officer

25    of the four funds?
```

Page 37

```
 1              WATERHOUSE - 10-19-21
 2        A.    2021.
 3        Q.    Did you ever hold any title with
 4   respect to any of the four funds you have just
 5   identified other than principal executive
 6   officer?
 7        A.    I don't recall.
 8        Q.    Is it possible that you held a
 9   position or a title with the four funds you
10   just identified prior to 2021?
11        A.    Yes.
12        Q.    But you don't recall if you did or
13   not; do I have that right?
14        A.    No.  You -- I thought you asked, did
15   I hold other titles.
16        Q.    Did you hold any title at the four
17   retail funds for which you now serve as
18   principal executive officer at any time prior
19   to 2021?
20        A.    Yes.
21        Q.    What titles did you hold?
22        A.    I don't recall all the titles.
23        Q.    Do you recall any of the titles?
24        A.    Yes.
25        Q.    What titles do you recall holding at
```

Page 38

1                    WATERHOUSE - 10-19-21

2    those four retail funds before 2021?

3         A.    Principal executive officer.

4         Q.    Were you the principal executive

5    officer of the four retail funds that you have

6    identified?

7         A.    Sorry, could you repeat the

8    question?

9         Q.    Were you the principal executive

10   officer for each of the four retail funds that

11   you have identified?

12        A.    Yes.

13        Q.    When did you become the principal

14   executive -- withdrawn.

15             Can you give me the approximate year

16   that you became the principal executive officer

17   for each of the four retail funds you've

18   identified?

19        A.    I don't recall.

20        Q.    What are your duties and

21   responsibilities as the principal executive

22   officer of these four retail funds?

23        A.    It is to manage the finance and

24   accounting positions.

25        Q.    So at the same time you serve as the

Page 39

```
 1                    WATERHOUSE - 10-19-21
 2    treasurer of the advisors, you also serve as
 3    the principal executive officer of these four
 4    retail funds; correct?
 5         A.    Yes.
 6         Q.    Did you ever hold any title with
 7    respect to any other retail fund?
 8         A.    Not that I recall.
 9         Q.    During the period that you served as
10    Highland's CFO, from time to time Highland
11    loaned money to certain of its officers and
12    employees; correct?
13         A.    Yes.
14         Q.    During the period that you served as
15    Highland's CFO, from time to time Highland
16    loaned money to certain --
17         A.    Let me -- let me retract that,
18    sorry, that -- you asked during the time I was
19    CFO, Highland loaned moneys to employees.  I
20    don't -- I don't recall that during my tenure
21    of CFO.
22         Q.    You have no recollection during the
23    time that you were the CFO of Highland of
24    Highland ever loaning any money to any officer
25    or director of Highland?
```

Page 40

```
1              WATERHOUSE - 10-19-21

2        A.    I don't recall during my tenure of

3   Highland or my -- as CFO of Highland -- yeah,

4   if there are any loans as CFO of Highland.

5        Q.    I'm just talking about officers and

6   employees right now.  You have no recollection

7   of Highland ever making a loan to any of its

8   officers or employees during the time that you

9   served as CFO.  Do I have that right?

10            MS. DANDENEAU:  Objection to form.

11       A.    So I thought you were saying

12  officers and employees as CFO, right, so there

13  were -- I mean, okay, yes.

14       Q.    I would ask you to listen carefully

15  to my question.  If I -- if I'm not clear, let

16  me know, but I'm really trying to be as clear

17  as I can.

18       A.    I'm listening as carefully as I can,

19  and you are asking very specific questions in a

20  timeline.  And I'm trying to answer your

21  questions as specifically as I can, and I

22  apologize if -- if I'm going back.  I am -- you

23  are asking very specific questions.  Thank you.

24       Q.    During the period that you served as

25  Highland's CFO, from time to time Highland
```

Page 41
```
 1                WATERHOUSE - 10-19-21
 2   loaned money to certain corporate affiliates;
 3   correct?
 4          MS. DANDENEAU:  Objection to form.
 5      A.    What are corporate affiliates?
 6      Q.    How about the ones that are in
 7   Highland's audited financial statements under
 8   the section entitled Loans to Affiliates.  Why
 9   don't we start with those.  Do you have any
10   understanding of what the phrase "affiliates"
11   means?
12          MS. DANDENEAU:  Objection to form.
13      A.    I understand what affiliates are,
14   yet affiliates can have different meanings in
15   different contexts, so...
16      Q.    Why don't you -- why don't you tell
17   me what your understanding of the term
18   "affiliate" is in relation to Highland Capital
19   Management, L.P.
20      A.    Is that a -- it depends on the
21   context.
22      Q.    How about the context of making
23   loans?
24          MS. DANDENEAU:  Objection to form.
25      A.    I didn't make the determination of
```

Page 42

```
 1              WATERHOUSE - 10-19-21
 2   who an affiliate was or is at the time those --
 3   I didn't -- that wasn't my job to make a
 4   determination of who an affiliate is.
 5        Q.   All right.  So as the CFO of
 6   Highland, do you have any ability right now to
 7   tell me which companies that were directly or
 8   indirectly owned and/or controlled by
 9   Mr. Dondero in whole or in part received loans
10   from Highland Capital Management, L.P.?
11              MS. DANDENEAU:  Objection to form.
12              MS. DEITSCH-PEREZ:  Objection, form.
13        A.   Yes.
14        Q.   Okay.  Identify every entity that
15   you can think of that was directly or
16   indirectly owned and/or controlled by
17   Mr. Dondero in whole or in part that received a
18   loan from Highland Capital Management, L.P.
19              MR. RUKAVINA:  Objection, legal
20         conclusion.
21        A.   NexPoint Advisors, Highland Capital
22   Management Fund Advisors, HCM Services,
23   Dugaboy.  Sorry, I don't think -- Dugaboy
24   doesn't fit that definition.  You said owned
25   and controlled.  I don't think that that
```

Page 43

```
 1                WATERHOUSE - 10-19-21
 2  definition --
 3       Q.    I said owned and/or controlled.
 4       A.    I don't -- again, I'm not -- I'm not
 5  the legal expert.  I don't think it controls --
 6  he controls Dugaboy, so again, I'm not the
 7  legal person.
 8       Q.    I'm not asking you for a legal
 9  conclusion, sir.  I'm asking you for your
10  knowledge, okay, as the CFO -- the former CFO
11  of Highland Capital Management, other than
12  NexPoint, HCMFA, and HCMF -- HCMS, can you
13  think of any other entities that were owned
14  and/or controlled directly or indirectly in
15  whole or in part by Jim Dondero who received a
16  loan from Highland Capital Management, L.P.?
17            MS. DANDENEAU:  Objection to form.
18       A.    HCRE.
19       Q.    Any others?
20       A.    That is -- that is all I can think
21  of.
22       Q.    And you're aware that from time to
23  time while you were the CFO, Highland loaned
24  money to Jim Dondero; correct?
25       A.    Yes.
```

Page 44

```
 1              WATERHOUSE - 10-19-21
 2        Q.    Okay.  Can we refer to the four
 3   entities that you just named and Mr. Dondero as
 4   the affiliates?
 5        A.    So that would be Jim Dondero,
 6   NexPoint Advisors, Highland Capital Management
 7   Fund Advisors, and HCRE.
 8        Q.    And HCMS?
 9        A.    And HCMS, okay.
10        Q.    And can we refer to the loans that
11   were given to each of those affiliates as the
12   affiliate loans?
13        A.    Yes.
14        Q.    And is it fair to say that each of
15   the affiliates were the borrowers under the
16   affiliate loans as we're defining the term?
17              MR. RUKAVINA:  Objection, legal
18        conclusion.
19        A.    The borrowers are whoever were on
20   the notes.  I don't -- I don't know.  I'm not
21   the legal person.
22        Q.    But you --
23        A.    I don't know.
24        Q.    You do know, as Highland's former
25   CFO, that each of the affiliates that you have
```

Page 45

```
 1                    WATERHOUSE - 10-19-21
 2    identified tendered notes to Highland; correct?
 3                    MR. RUKAVINA:  Hey, John, will you
 4          just give me a running objection to legal
 5          conclusion to HCM --
 6                    MR. MORRIS:  No.  No, if you want to
 7          object --
 8                    MR. RUKAVINA:  I will object every
 9          time.  Object to legal conclusion.
10                    MR. MORRIS:  That is fine.
11    A.    Sorry, can you repeat the question?
12    Q.    Are you aware that each of the --
13    that each of the affiliates, as we have defined
14    the term, gave to Highland a promissory note in
15    exchange for the loans?
16                    MR. RUKAVINA:  Objection to the
17          extent that calls for a legal conclusion.
18    A.    I don't.
19    Q.    No, you don't know that?
20    A.    No, they didn't -- you said they
21    exchanged a promissory note for a loan.  I
22    don't -- I don't understand that question, so I
23    said no.
24    Q.    At the time of the bankruptcy
25    filing, did Highland have in its possession
```

Appx. 01312

Page 46

```
 1              WATERHOUSE - 10-19-21

 2  promissory notes that were signed by each of

 3  the affiliates?

 4       A.    Yes.

 5       Q.    To the best of your knowledge,

 6  during the time that you served as Highland's

 7  CFO, did Highland disclose to its outside

 8  auditors all of the loans that were made to

 9  affiliates?

10            MR. RUKAVINA:  Objection, that calls

11       for a legal conclusion.

12            MS. DEITSCH-PEREZ:  I also couldn't

13       hear you, John, because there was some

14       garbling on -- on the -- on the call.

15            MR. MORRIS:  Folks, I've got to tell

16       you this is not going well, and I'm

17       reserving my right --

18            MS. DANDENEAU:  John, it was just

19       the end of that question.  It was just the

20       end of that question.  I couldn't hear it

21       either.  Sorry, if you could repeat it,

22       please.

23            MR. MORRIS:  That is less than an

24       hour into this, but folks are trying to run

25       out the clock, and so I'm just going to
```

```
                                              Page 47
 1                WATERHOUSE - 10-19-21

 2        state that now.

 3               MS. DANDENEAU:  You know, and,

 4        Mr. Morris, I really object to that.  I

 5        mean --

 6               MR. MORRIS:  Okay.

 7               MS. DANDENEAU:  -- Mr. Waterhouse

 8        just told you he's trying to listen to your

 9        questions and answer them carefully, and

10        you have no basis for saying that.

11               MR. MORRIS:  Okay.

12               MS. DANDENEAU:  This does not --

13        this is not an experienced witness, so he's

14        trying to do the best he can.

15        Q.    Mr. Waterhouse, during the time that

16   you served as Highland's CFO, did Highland

17   disclose to its outside auditors all of the

18   loans that it made to each of the affiliates

19   that you have identified?

20               MR. RUKAVINA:  Objection, legal

21        conclusion.

22        A.    Yes.

23        Q.    To the best of your knowledge, while

24   you were Highland's CFO, were all of the

25   affiliate loans described in Highland's audited
```

Page 48

```
 1                    WATERHOUSE - 10-19-21
 2      financial statements?
 3                    MR. RUKAVINA:  Objection, legal
 4           conclusion.
 5           A.    When an audit was performed, any
 6      loans that were made by Highland to the
 7      affiliates were disclosed to auditors.
 8           Q.    Are you aware of any loan that was
 9      made to any affiliate that was not disclosed to
10      the auditors?
11           A.    I'm not aware.
12           Q.    To the best of your knowledge, did
13      each of the affiliates who were --
14      (inaudible) -- loaned from Highland execute a
15      promissory note in connection with that loan?
16                    MR. RUKAVINA:  Objection, legal
17           conclusion.
18           A.    Sorry, you -- halfway through the
19      question it got muffled.
20                    Can you repeat that again?
21           Q.    To the best of your knowledge, did
22      every affiliate execute a promissory note in
23      connection with each loan that it obtained from
24      Highland?
25                    MR. RUKAVINA:  Objection, legal
```

Page 49

```
 1                 WATERHOUSE - 10-19-21

 2        conclusion.

 3        A.    Yes.

 4        Q.    You are not aware of any loan that

 5   any affiliate ever obtained from Highland where

 6   the affiliate did not give a promissory note in

 7   return; is that fair?

 8        A.    Yes, I'm not aware.

 9        Q.    And to the best of your knowledge,

10   did Highland loan to each affiliate an amount

11   of money equal to the principal amount of each

12   promissory note?

13             MR. RUKAVINA:  Objection, legal

14        conclusion.

15        A.    Yes.

16        Q.    During the time that you served as

17   CFO, did Highland ever loan money to

18   Mark Okada?

19        A.    I -- I don't recall.

20        Q.    Did you ever see any promissory

21   notes executed by Mark Okada?

22        A.    I don't recall.

23        Q.    Do you know if Highland ever forgave

24   any loan that it ever made to Mr. Okada?

25        A.    I don't recall.
```

Page 50

```
 1                   WATERHOUSE - 10-19-21
 2        Q.    Do you recall if Mr. Okada paid back
 3   all principal and interest due and owing under
 4   any loan he obtained from Highland?
 5             MS. DEITSCH-PEREZ:  Objection to
 6        form.
 7             MS. DANDENEAU:  Objection to form.
 8        A.    I don't recall.
 9        Q.    Do you recall whether -- during your
10   time as CFO, whether Highland ever loaned money
11   to Jim Dondero?
12        A.    Yes.
13        Q.    To the best of your knowledge, did
14   Mr. Dondero sign and deliver to Highland a
15   promissory note in connection with each loan
16   that he obtained from Highland?
17        A.    If you are referring to the
18   promissory notes that, you know, part of
19   Highland's records, yes.
20        Q.    Okay.  You're not aware of any loan
21   that Mr. Dondero took from Highland that wasn't
22   backed up by -- by a promissory note with a
23   face -- with a principal amount equal to the
24   amount of the loan; correct?
25        A.    Am I aware that Jim Dondero took a
```

Page 51

```
 1              WATERHOUSE - 10-19-21

 2   loan?

 3        Q.    Without giving a -- let me ask a

 4   better question.  I'm sorry, Mr. Waterhouse.

 5              Are you aware of any loan that

 6   Mr. Dondero obtained from Highland where he

 7   didn't give a promissory note in return?

 8        A.    I'm not aware.

 9        Q.    During the time that you served as

10   Highland's CFO, did Highland ever forgive any

11   loans, in whole or in part, that it made to

12   Mr. Dondero?

13        A.    Not that I'm aware.

14        Q.    At the time that you served as

15   Highland's CFO, did Highland ever forgive any

16   loan, in whole or in part, that it made to any

17   affiliate as we've defined the term today?

18        A.    Not that I'm aware.

19        Q.    During the time that you served as

20   Highland's CFO, did Highland ever forgive, in

21   whole or in part, any loan that it ever made to

22   any officer or employee?

23        A.    Highland forgave loans to officers

24   and employees.  It may not have been at the

25   time when my title was CFO.
```

```
                                                    Page 52
 1                WATERHOUSE - 10-19-21

 2        Q.    Okay.  And so I appreciate the

 3   distinction.

 4               Is it fair to say that, to the best

 5   of your knowledge, Highland did not forgive a

 6   loan that it made to an officer or employee

 7   after 2013?

 8               MS. DANDENEAU:  Objection to form.

 9        A.    I don't recall.

10        Q.    To the best of your knowledge, did

11   Highland disclose to its auditors every

12   instance where it forgave, in whole or in part,

13   a loan that it had made to one of its officers

14   or employees?

15        A.    No.

16        Q.    Can you think of -- can you -- can

17   you identify any loan to an officer or employee

18   that was forgiven by Highland, in whole or in

19   part, that was not disclosed to Highland's

20   outside auditors?

21        A.    Look, I don't recall all of the

22   loans and the loan forgiveness.  I just know as

23   part of the audit process there is a

24   materiality concept.

25               So if there were loans to employees
```

Page 53

```
 1                   WATERHOUSE - 10-19-21
 2    that were of -- you know, that were deemed
 3    immaterial, those items may not have been
 4    disclosed by the team to the auditors.
 5         Q.    I appreciate that.
 6               Do you have an understanding as to
 7    what the level of materiality was?
 8         A.    I don't recall.
 9         Q.    As the CFO of Highland, to the best
10    of your knowledge, did Highland disclose to its
11    outside auditors every loan that was forgiven,
12    in whole or in part, that was material as that
13    term was defined by the outside auditors?
14         A.    Yes.
15         Q.    And do you recall where -- do you
16    recall where the definition of materiality can
17    be found for -- for this particular purpose?
18               MS. DANDENEAU:  Objection to form.
19         A.    No.  You -- I don't determine
20    materiality.
21         Q.    Okay.  I'm just asking you if you
22    can help me understand where it is, but I think
23    we will find it in a few minutes.
24               You are aware that Highland has
25    commenced lawsuits against each of the
```

Page 54

```
 1                    WATERHOUSE - 10-19-21
 2     affiliates, as we've defined the term, to
 3     collect under certain promissory notes; is that
 4     right?
 5          A.    Yes.
 6          Q.    And are you familiar with the notes
 7     that are issue -- at issue in the lawsuits?
 8                MS. DANDENEAU:  Objection to form.
 9          A.    Generally familiar.
10          Q.    Can we refer to the lawsuits that
11     Highland has commenced against the affiliates
12     collectively as the lawsuits?
13          A.    Yes.  And, again, the affiliates are
14     NexPoint, HCMFA, HCMS, and HCRE.
15          Q.    And Mr. Dondero?
16          A.    Okay.  See, that is a new -- and now
17     Mr. Dondero is included in your affiliate
18     definition.
19          Q.    I just --
20          A.    I thought affiliates -- I thought
21     affiliates were just the four prior entities,
22     so I just want to be clear.
23          Q.    I appreciate that.  So let's --
24     let's keep them separate and let's refer to the
25     four corporate entities as the affiliates, and
```

Appx. 01321

Page 55

```
 1                    WATERHOUSE - 10-19-21
 2   Mr. Dondero we will call Mr. Dondero.  Okay?
 3        A.    Okay.  Thank you.  As you can see,
 4   Mr. Morris, there is a lot of entities -- a lot
 5   here.  I just want to be clear.
 6        Q.    Okay.  Now, the affiliates of
 7   Mr. Dondero signed promissory notes that are
 8   not subject to the lawsuit.
 9              Do you understand that?
10              MS. DANDENEAU:  Objection to form.
11        A.    The affiliates and Mr. Dondero
12   signed --
13        Q.    You know what?  I will skip it.
14   That is okay.  Okay.
15              From time to time while you were
16   Highland's CFO, payments were applied against
17   principal and interests that were due under the
18   notes that were tendered by the affiliates and
19   Mr. Dondero; correct?
20              MR. RUKAVINA:  Objection to the
21        extent that calls for a legal conclusion.
22        A.    Yes.
23        Q.    Did Highland have a process where --
24   whereby payments would be applied against
25   principal and interest against the notes that
```

Page 56

```
 1                WATERHOUSE - 10-19-21
 2    were given by the affiliates and Mr. Dondero?
 3         A.    Yes.
 4         Q.    Can you describe the process for me?
 5         A.    The process, payment should be
 6    applied as laid out in the -- in the promissory
 7    note.
 8         Q.    From time to time were payments made
 9    that were not required under the promissory
10    notes?
11                MS. DANDENEAU:  Objection to form.
12         A.    Yes.
13         Q.    Who was responsible for deciding
14    when and how much the payments would be made
15    with respect to each of the notes that were
16    issued by the affiliates and Mr. Dondero?
17         A.    Who was responsible for deciding how
18    much was paid prior to the due date?
19         Q.    Yes.
20         A.    I don't know.
21         Q.    Did you approve of each payment that
22    was made against principal and interest on the
23    notes that were given by the affiliates and
24    Mr. Dondero?
25                MS. DANDENEAU:  Objection to form.
```

Page 57

```
 1              WATERHOUSE - 10-19-21
 2       A.    Did I approve the payments?  I
 3  approve -- I approve -- if there was cash -- if
 4  there was cash being repaid on a note payment,
 5  yes, I approved in the general sense of being
 6  made aware of the payment and the amount.
 7       Q.    And are you the person who
 8  authorized Highland's employees to effectuate
 9  those payments?
10       A.    Yes.
11       Q.    When you gave the instruction to
12  effectuate the payment, did you obtain
13  Mr. Dondero's prior approval?
14       A.    I mean, it -- I mean, it -- it
15  depends.
16       Q.    Can you think of any instance where
17  you directed Highland's employees to make a
18  payment of principal or interest against any
19  note that was tendered by an affiliate or
20  Mr. Dondero that Mr. Dondero did not approve of
21  in advance?
22       A.    I can't recall specifically.
23       Q.    Can you identify -- withdrawn.
24             Did Mr. Dondero ever tell you that a
25  payment that was made against principal and
```

Page 58

```
 1                WATERHOUSE - 10-19-21
 2    interest due under one of the notes that was
 3    tendered by an affiliate or himself should not
 4    have been made?
 5         A.    Yes.
 6         Q.    Can you identify the payment for me?
 7         A.    It would be for -- for NexPoint
 8    Advisors.
 9         Q.    Okay.  And when did Mr. Dondero tell
10    you that a payment that you had initiated on
11    behalf of NexPoint should not have been made?
12         A.    I wasn't initiating payment.  It was
13    in the context of the -- I think you used this
14    term, "the advisors," so NexPoint Advisors and
15    Highland Capital Management Fund Advisors had
16    overpaid on certain agreements with Highland
17    Capital Management, L.P.  And as a part of that
18    process, the advisors -- what I was told at the
19    time were in talks and negotiations and
20    discussions with Highland Capital Management,
21    L.P., on offsets in relation to those
22    overpayments.
23         Q.    When did this conversation take
24    place?
25                MS. DANDENEAU:  Objection to form.
```

Appx. 01325

```
                                                      Page 59
 1              WATERHOUSE - 10-19-21
 2      A.    I don't recall specifically.
 3      Q.    Do you recall what year it was?
 4      A.    Yes.
 5      Q.    What year did the conversation with
 6  Mr. Dondero take place that you just described?
 7      A.    2020.
 8      Q.    Okay.  Do you remember if it was
 9  December 2020?
10      A.    It -- it -- I don't -- I don't
11  recall what month specifically, but it would
12  have been November or December.
13      Q.    And we're talking here about a
14  payment of principal and/or interest that was
15  due -- withdrawn.
16            We're talking here about a payment
17  of principal and interest that was applied
18  against NexPoint's note; correct?
19            MS. DANDENEAU:  Objection to form.
20      A.    I don't recall what that payment
21  consisted of.
22      Q.    Is it possible that the payment you
23  have in mind related to the shared services
24  agreement?
25            MS. DANDENEAU:  Objection to form.
```

Page 60

```
 1                WATERHOUSE - 10-19-21
 2        A.    No.
 3        Q.    Are you certain that the payment --
 4   that the payment that you have in mind related
 5   to the promissory note that NexPoint issued in
 6   favor of Highland?
 7              MS. DANDENEAU:  Objection to form.
 8        A.    Yes.
 9        Q.    Okay.  Other than that one payment,
10   can you identify any other instance where
11   Mr. Dondero told you that a payment should not
12   have been applied against principal and
13   interest under any promissory note tendered by
14   any affiliate or Mr. Dondero?
15              MS. DANDENEAU:  Objection to form.
16              MS. DEITSCH-PEREZ:  Objection to
17        form.
18        A.    Not that I recall.
19        Q.    Thank you very much.
20              Do you know if Mr. Dondero approved
21   in advance of each loan made to each affiliate
22   and himself during the time that you were the
23   CFO?
24              MS. DEITSCH-PEREZ:  Object to the
25        form.
```

Page 61

```
 1                    WATERHOUSE - 10-19-21
 2          A.    Yes, generally.
 3          Q.    Can you identify any loan that was
 4    ever made to an affiliate or to Mr. Dondero
 5    that Mr. Dondero did not approve of in advance?
 6          A.    Other than the ones that are in
 7    dispute, I'm not aware.
 8          Q.    Do you believe that Mr. Dondero did
 9    not approve of each of the loans that are in
10    dispute in advance of the time that the loan
11    was made?
12                MS. DANDENEAU:  Objection to form.
13          A.    Given what is in the dispute, you
14    know, and -- and -- and the way things might --
15    yeah, I mean...
16          Q.    I am not asking about the dispute,
17    and it was probably my mistake to follow you
18    there.
19                Were you aware of every loan made by
20    Highland to each of its affiliates and
21    Mr. Dondero while you were the CFO at the time
22    each loan was made?
23          A.    Was I aware of every loan, yes.
24          Q.    Okay.  And if you put yourself back
25    in time, do you recall that any of the loans
```

Appx. 01328

```
                                                    Page 62
 1                WATERHOUSE - 10-19-21
 2    that were made to one of the affiliates or
 3    Mr. Dondero during the time that you were the
 4    CFO was made without Mr. Dondero's prior
 5    knowledge and approval?
 6         A.    Not that I recall.
 7         Q.    Thank you.  In fact, do you -- as
 8    the CFO, would you have allowed Highland to
 9    loan money to an affiliate or to Mr. Dondero
10    without obtaining Mr. Dondero's prior approval?
11              MS. DANDENEAU:  Objection to form.
12         A.    I can't -- there was so many times
13    over the years, I can't speak for every single
14    one, but generally, yes, I -- I spoke to him.
15         Q.    You -- you never -- you never --
16    withdrawn.  I will just take that.
17              Can you recall any payment that was
18    ever made against principal and interest on a
19    note that was issued in favor of Highland by an
20    affiliate or Mr. Dondero that you personally
21    did not know about in advance?
22         A.    There are so many through the years,
23    I don't -- I don't -- I don't recall every
24    single one.
25         Q.    Okay.  Can you identify any payment
```

Appx. 01329

Page 63

```
 1              WATERHOUSE - 10-19-21
 2   that was made against principal and interest on
 3   any note tendered by any affiliate or
 4   Mr. Dondero that you didn't know about in
 5   advance?
 6        A.    I don't recall.
 7        Q.    Other than Mr. Dondero -- withdrawn.
 8              Did anybody at Highland have the
 9   authority to make a payment against principal
10   and interest due under a loan given to the
11   affiliates and Mr. Dondero without your
12   knowledge and approval?
13              MS. DANDENEAU:  Objection to form.
14        A.    Sorry, there was -- to make a
15   payment on an affiliate loan, what you are
16   saying would it require my knowledge and
17   approval, yes.
18        Q.    Okay.  I appreciate that.  Thank
19   you.
20              Did anybody at Highland have the
21   authority, to the best of your knowledge, to
22   effectuate a loan to an affiliate without
23   Mr. Dondero's prior knowledge and approval?
24              MS. DANDENEAU:  Objection to form.
25        A.    I can't speak for all, but
```

Page 64

```
 1              WATERHOUSE - 10-19-21
 2   generally, yes.
 3        Q.    Did you personally communicate with
 4   Mr. Dondero to let him know each time a payment
 5   of principal or interest was being made against
 6   any note that was tendered by an affiliate or
 7   Mr. Dondero to Highland?
 8        A.    I don't -- are you saying, did I let
 9   Mr. Dondero know if a payment was made on any
10   affiliate or loan to Mr. Dondero?  I mean,
11   not -- not every -- no.
12        Q.    Let me ask it this way:  Did you
13   have a practice of informing Mr. Dondero when
14   payments were made against principal and
15   interest on any note that was tendered by an
16   affiliate or Mr. Dondero?
17              MS. DEITSCH-PEREZ:  Objection to
18        form.
19              MS. DANDENEAU:  Objection to form.
20        A.    No, I did not.
21        Q.    Did Mr. Dondero ever tell you that a
22   payment of principal or interest had been made
23   against a note that was tendered by an
24   affiliate or himself that he had been unaware
25   of?
```

Appx. 01331

Page 65

```
 1              WATERHOUSE - 10-19-21

 2       A.    Not that I recall.

 3       Q.    Are you aware that Mr. Dondero and

 4   the affiliates -- withdrawn.

 5             Are you aware that Mr. Dondero

 6   NexPoint, HCRE, and HCMS all contend that they

 7   do not have to pay on any of the notes they

 8   issued because they are subject to an oral

 9   agreement between Mr. Dondero and Nancy

10   Dondero, in her capacity as the trustee of the

11   Dugaboy Investment Trust?

12             MS. DANDENEAU:  Objection to form.

13       A.    I didn't -- I didn't -- I didn't

14   know that it was all notes.

15       Q.    Okay.  Are you -- did you ever learn

16   that there was an oral agreement between Jim

17   Dondero and Nancy Dondero pertaining to any

18   notes issued by any affiliate or Mr. Dondero?

19             MS. DEITSCH-PEREZ:  Object to the

20       form.

21       A.    Yes.

22       Q.    Do you have any understanding as to

23   the terms of that agreement?

24       A.    Yes.

25       Q.    What is your understanding of the
```

Appx. 01332

Page 66

```
 1                    WATERHOUSE - 10-19-21
 2    terms of the agreement?
 3        A.    That there were certain milestones
 4    that had to be reached.
 5        Q.    Do you have any understanding of the
 6    terms of the agreement between Mr. Dondero and
 7    Nancy Dondero concerning any of the notes
 8    issued by the affiliates or Mr. Dondero other
 9    than that there have to be milestones reached?
10            MS. DEITSCH-PEREZ:   Object to the
11        form.
12        A.    There are milestones, I found out
13    yesterday, or there was some --
14            MS. DANDENEAU:   Okay.  I'm just
15        going to object to the extent that you
16        learned anything in conversations with
17        counsel, please don't reveal -- that is
18        privileged, and don't reveal any privileged
19        communications.
20            THE WITNESS:   Okay.
21        A.    So I'm not aware of anything else.
22        Q.    Do you know what the milestones
23    were?
24            MS. DANDENEAU:   Objection to form.
25        A.    I don't.
```

Appx. 01333

Page 67

```
 1                WATERHOUSE - 10-19-21
 2        Q.    Do you know anything about -- do you
 3    know what promissory notes the agreement
 4    covered?
 5        A.    I don't.
 6        Q.    Do you know if -- if Jim and Nancy
 7    Dondero entered into one agreement or more than
 8    one agreement?
 9              MS. DEITSCH-PEREZ:  Object to the
10        form.
11        A.    I don't know.
12        Q.    Do you know if the agreement is in
13    writing?
14        A.    I don't know.
15        Q.    How did you learn of the existence
16    of the agreement?
17              MS. DANDENEAU:  Objection to form.
18        Again --
19        A.    I don't -- I don't recall who told
20    me.
21        Q.    You have no recollection of who told
22    you about this agreement between Jim and Nancy
23    Dondero?
24              MS. DEITSCH-PEREZ:  Object to the
25        form.
```

Appx. 01334

Page 68

```
 1              WATERHOUSE - 10-19-21
 2       A.    I don't recall.
 3       Q.    Do you recall how you learned of the
 4  agreement?
 5              Was it in a meeting?  Was it in a
 6  phone call?  Was it in an email?
 7       A.    I don't recall.
 8       Q.    Do you recall when you learned of
 9  the agreement?
10       A.    Not specifically.
11       Q.    Do you recall what year you learned
12  of the agreement?
13       A.    In -- look, I mean, there are so
14  many notes.  I may be getting -- I believe it
15  was 2020.
16       Q.    All right.  I'm not asking about
17  notes, sir.  I'm asking about the agreement
18  that you testified you knew about between Jim
19  and Don- -- Nancy Dondero.  Okay.
20              Do you understand my question now?
21  Should I ask my question again?
22       A.    Yeah, sure.  Go ahead.
23       Q.    I'm going to use the word
24  "agreement" to refer to the agreement that
25  Mr. Dondero and Nancy Dondero entered into
```

```
 1                    WATERHOUSE - 10-19-21
 2    where you understood that certain milestones
 3    had to be reached.  Okay?
 4         A.    Uh-huh.
 5               MS. DANDENEAU:  Objection.
 6               MS. DEITSCH-PEREZ:  Object to the
 7         form.
 8               MR. MORRIS:  Just defining a term,
 9         what is the objection.
10               MS. DEITSCH-PEREZ:  The objection --
11               MR. MORRIS:  I will move on.  I will
12         move on.
13               MS. DEITSCH-PEREZ:  John --
14         Q.    Sir, are you okay with that
15    definition of agreement?
16         A.    Okay.
17         Q.    Okay.  So you don't recall who --
18    who informed you of the existence of the
19    agreement; is that right?
20         A.    I don't recall.
21         Q.    You don't recall who told you the
22    terms of the agreement.
23               Do I have that right?
24         A.    Correct.
25         Q.    And you don't recall if you learned
```

Page 70

```
 1                  WATERHOUSE - 10-19-21
 2    about the agreement in a meeting, through an
 3    email, or through a phone call.
 4              Do I have that right?
 5         A.   I don't recall.
 6         Q.   Can you tell me when you learned of
 7    the agreement?
 8         A.   I don't -- I don't -- I don't
 9    remember specifically.
10         Q.   Can you tell me if you learned of
11    the agreement before or after the petition
12    date?
13         A.   It would have been -- it would have
14    been after.
15         Q.   Can you tell me if you learned of
16    the agreement before or after January 9th,
17    2020?
18         A.   It would have been after.
19         Q.   Can you tell me if you learned of
20    the agreement before or after you left Highland
21    Capital Management in February of 2021?
22         A.   I don't -- I don't -- I don't know.
23         Q.   It is possible that you learned of
24    it while you were a Highland employee.
25              Do I have that right?
```

Appx. 01337

Page 71

```
 1                   WATERHOUSE - 10-19-21
 2        A.    I don't remember the -- I mean, it
 3   was sometime in 2021.  I don't remember when.
 4        Q.    All right.  So to the best of your
 5   recollection, it was in 2021 but you don't
 6   recall if it was before or after you ceased to
 7   be a Highland employee.
 8               Do I have that right?
 9        A.    Yeah, I mean, it was -- it was
10   likely after I was -- after I left Highland
11   because, if I put myself back into the last
12   days of -- of 2021, it was -- you know, the
13   communications with Mr. Dondero were -- were --
14   were -- there weren't as many communications
15   because of the circumstances.
16        Q.    And so based on that you believe
17   that it is most likely that you learned of this
18   agreement sometime after you left Highland
19   employment?
20        A.    I wouldn't use the term "most
21   likely."  I don't recall specifically.  I don't
22   recall.
23        Q.    Do you recall ever telling Jim Seery
24   about this agreement?
25        A.    No, I don't -- I didn't tell
```

Appx. 01338

Page 72

```
 1                WATERHOUSE - 10-19-21
 2     Jim Seery.
 3         Q.    Did you tell anybody at DSI about
 4     this agreement?
 5         A.    No.
 6         Q.    Did you tell any of Highland's
 7     independent directors about this agreement?
 8         A.    No.
 9         Q.    Did you tell anybody at Pachulski
10     Stang Ziehl & Jones about this agreement?
11         A.    No.
12         Q.    Did you tell any employee of
13     Highland about this agreement?
14         A.    No.
15              MS. DANDENEAU:  Mr. Morris, it has
16         been an hour and a half.  Is this a good
17         time for a break?
18              MR. MORRIS:  Sure.
19         Q.    Mr. Waterhouse, I will just remind
20     you that during the break please don't speak
21     with anybody about the deposition, the
22     substance of your testimony or anything else
23     concerning the deposition.  Okay?
24         A.    Yes.
25              MR. MORRIS:  So it is 11:02.  We're
```

Page 73

```
 1              WATERHOUSE - 10-19-21
 2        at 11:02 your time.  Let's come back, I
 3        guess, at 15 -- at 11:15 your time.
 4              VIDEOGRAPHER:  We're going off the
 5        record at 11:02 a.m.
 6        (Recess taken 11:02 a.m. to 11:20 a.m.)
 7              VIDEOGRAPHER:  We are back on the
 8        record at 11:20 a.m.
 9        Q.    Mr. Waterhouse, did you speak with
10    anybody during the break about this deposition?
11        A.    No.
12              MS. DANDENEAU:  Other than -- other
13        than his counsel.
14        Q.    Did you speak to your counsel about
15    the substance of your deposition today?
16        A.    No, I didn't bring it up.
17        Q.    I didn't ask you if you brought it
18    up.  I asked you if you had any conversation
19    with your lawyer about the substance of your
20    deposition.
21              MS. DANDENEAU:  Yes, he did.
22        Q.    Can you tell me what the -- you
23    discussed?
24              MS. DANDENEAU:  No, I object to
25        that.  He's not going to answer.  That is a
```

Appx. 01340

Page 74

```
 1              WATERHOUSE - 10-19-21
 2   privileged conversation.
 3         MR. MORRIS:  So I just want to make
 4   sure that I understand.  During the break
 5   you spoke with your client about the
 6   substance of this deposition; is that
 7   right?
 8         MS. DANDENEAU:  Yes, John.
 9         MR. MORRIS:  And you refuse -- you
10   refuse to let your client tell me what was
11   discussed; is that right?
12         MS. DANDENEAU:  That's correct.
13         MR. MORRIS:  You know, I had given
14   the instruction prior to the break not to
15   speak with counsel.  I would have
16   appreciated --
17         MS. DANDENEAU:  No, you didn't --
18   actually, that is not true, Mr. Morris.
19   You said not to speak with anyone.  We
20   never have interpreted that to mean
21   conversations with counsel.  That's never
22   been -- I have never, ever heard that
23   instruction.
24         MR. MORRIS:  Okay.  We will -- we
25   will -- we will deal with it when and if we
```

Page 75

```
 1                  WATERHOUSE - 10-19-21
 2         have to.
 3         Q.    Mr. Waterhouse, after learning about
 4    the agreement, did you ask anybody if the
 5    agreement was reflected in a writing?
 6              MS. DANDENEAU:  Objection to form.
 7         A.    No.
 8         Q.    Did you ask anybody if the terms of
 9    the agreement were memorialized anywhere?
10              MS. DANDENEAU:  Objection to form.
11              MR. MORRIS:  What is the --
12         A.    No.
13              MS. DANDENEAU:  Well, because you
14         keep talking about this agreement and I --
15         I -- I think, Mr. Morris, that is really
16         not clear what you mean by "the agreement."
17         And maybe you can just go back and restate
18         what that is.
19              MR. MORRIS:  Okay.  Your client has
20         agreed with me twice on the definition, but
21         I will try one more time.
22         Q.    Mr. Waterhouse, do you understand
23    that when I use the term "agreement," I'm
24    referring to the agreement between Jim and
25    Nancy Dondero concerning certain promissory
```

Appx. 01342

Page 76

1                    WATERHOUSE - 10-19-21

2     notes where you learned that one of the terms

3     of the agreement was milestones reached?

4          A.    Okay.

5          Q.    And did you understand that that was

6     the -- the agreement that we were referring to

7     every time we used the word "agreement" in this

8     deposition?

9          A.    I don't know anything about this

10    agreement.  So, look, I do -- it -- I don't

11    know whether --

12         Q.    Let's -- let's try this again.

13         A.    Yeah.  Look, I don't know what this

14    agreement relates.

15              MS. DEITSCH-PEREZ:  John, John --

16         Q.    Let me try --

17              MS. DEITSCH-PEREZ:  John, please let

18         the witness finish.

19              MR. MORRIS:  Please stop.  Please

20         stop.  Please stop talking.

21              MS. DEITSCH-PEREZ:  No, you stop.

22         Let the witness --

23              MR. MORRIS:  Stop talking.

24              MS. DEITSCH-PEREZ:  -- finish -- you

25         interrupted him.

Page 77

```
 1            WATERHOUSE - 10-19-21

 2            MR. MORRIS:  You know what, you

 3       guys, this is really wrong.  It is really,

 4       really wrong.  Okay?

 5            I had the witness agree not once,

 6       but twice to the definition of agreement.

 7       Okay?  I'm going to try and do it a third

 8       time.

 9            MS. DANDENEAU:  No, but, please,

10       John, really --

11            MR. MORRIS:  No, please stop

12       talking.  Please.  It is my deposition.

13       Object to questions.

14            MS. DANDENEAU:  No, but also you

15       instructed him that -- that if you were

16       going -- if you were interrupting him, that

17       he should remind you that you're

18       interrupting him and -- and --

19            MR. MORRIS:  Let him do that.  Let

20       him do that.

21            MS. DANDENEAU:  Okay.  Well, you --

22            MR. MORRIS:  Please stop talking.

23       A.   Okay.  I don't know any of the

24   details of these agreements.  I don't know

25   anything about them.  I heard -- someone -- I
```

Appx. 01344

Page 78

```
 1              WATERHOUSE - 10-19-21

 2   don't know who, I don't know when, as you

 3   asked, sometime in '21, someone told me about

 4   this -- or I don't honestly know -- I don't

 5   even recall exactly how I was made aware of

 6   this, but I was.  I don't know -- I don't know

 7   any of these details, and I'm getting -- again,

 8   there is, you know, I -- I -- I had a passing

 9   conversation with -- with Jim at some point

10   on -- on some -- on the executive comp, and I'm

11   getting confused of what is what, because

12   again, I don't know any of these details.

13        Q.   Okay.  Let me try again,

14   Mr. Waterhouse, and I apologize.

15             Are you aware of any agreement

16   between Jim Dondero and Nancy Dondero

17   concerning any promissory note that was given

18   to Highland by any affiliate or Mr. Dondero?

19             MS. DEITSCH-PEREZ:  Object to the

20        form.

21        A.   I've heard of an agreement.  That

22   is -- that is -- I mean, if you are using aware

23   as heard, sure.

24        Q.   And you understand that one of the

25   terms of the agreement is that it was based on
```

Page 79

```
 1                  WATERHOUSE - 10-19-21
 2    milestones that had to be reached; is that
 3    right?
 4              MS. DANDENEAU:  Objection to form.
 5         A.    That was one of the words that was
 6    used when I heard about it, yes.
 7         Q.    And when you heard about this
 8    agreement that had a term in it concerning
 9    milestones reached, did you ask the person who
10    was telling you about the agreement whether or
11    not it was in writing?
12         A.    I did not.
13         Q.    Did you ask any questions at all?
14              MS. DANDENEAU:  Objection to form.
15         A.    Not that I recall.
16         Q.    But do you understand that going
17    forward, we're going to refer to the agreement
18    as the agreement that you just described that
19    you were --
20              MS. DANDENEAU:  Object to the form.
21         A.    Yes.
22         Q.    Okay.  You don't have any personal
23    knowledge concerning the terms of the
24    agreement; correct?
25              MS. DEITSCH-PEREZ:  Object to the
```

Page 80

```
 1                   WATERHOUSE - 10-19-21
 2        form.
 3        Q.    You can answer.
 4        A.    I don't -- I heard about the
 5   agreement.  I don't know anything -- I heard
 6   there was an agreement.  That is -- again, as I
 7   testified before -- I said before, heard about
 8   it, don't know the details.  I believe it was
 9   sometime this year.
10        Q.    Do you have any personal knowledge
11   about the terms of the agreement, sir?
12             MS. DANDENEAU:  Objection to form.
13        A.    Other than what I have previously
14   discussed, I don't -- I don't know.
15        Q.    Did -- did Mr. Dondero tell you
16   about the existence of the agreement?
17        A.    I don't recall.
18        Q.    Do you recall the source of your
19   information when you learned about the
20   agreement?
21        A.    No, I don't -- I don't recall.  I
22   don't remember.  I just -- I heard about it
23   generally.  I don't remember -- I don't
24   remember who, how, if, how.  I don't remember.
25        Q.    You know, Mr. Waterhouse, I just
```

Appx. 01347

```
 1              WATERHOUSE - 10-19-21
 2  want to be clear that I never would have asked
 3  you to appear at this deposition if your name
 4  hadn't been included in responses to discovery
 5  as to somebody with knowledge about the -- who
 6  was told about the existence of the agreement.
 7              That is what prompted me do this,
 8  and I really do feel compelled to tell you that
 9  I otherwise would never have called you as a
10  witness.  So I regret that you're being put
11  through this today.  I had no intention of
12  burdening you or taking your time, but that is
13  the reason that we issued the subpoena is
14  because certain of the defendants identified
15  you as somebody --
16              MS. DEITSCH-PEREZ:  Mr. Morris, you
17        are here to ask questions, not to have --
18              MR. MORRIS:  I feel badly for the
19        guy.  I really do.
20              MS. DEITSCH-PEREZ:  I'm sure you do.
21              MR. MORRIS:  I do.  Stop.
22              MS. DEITSCH-PEREZ:  You stop.
23              MR. MORRIS:  I'm allowed.
24              MS. DEITSCH-PEREZ:  No, you're not
25        allowed to have a chat with the witness.
```

```
                                                    Page 82
 1                WATERHOUSE - 10-19-21

 2        Q.    Okay.  Well, I hope that you

 3   appreciate what I'm saying here,

 4   Mr. Waterhouse.

 5             MS. DANDENEAU:  All right.  Let's go

 6        ahead and ask questions, and again, you're

 7        entitled to probe his -- his knowledge

 8        of -- whatever knowledge he has about

 9        this -- this agreement and --

10             MR. MORRIS:  That is what I'm doing.

11             MS. DANDENEAU:  -- he will answer

12        the questions to the best that he can.

13             MR. MORRIS:  That is what I'm doing.

14        Q.    Mr. Waterhouse, I take it you do not

15   know which promissory notes issued by which

16   affiliates or Mr. Dondero are the subject of

17   this agreement; do I have that right?

18        A.    Yes, I don't -- I don't know.

19        Q.    Do you know of any way to determine

20   which promissory notes issued by the affiliates

21   and Mr. Dondero are the subject of this

22   agreement other than asking Jim or Nancy

23   Dondero?

24             MS. DANDENEAU:  Objection to form.

25        A.    I don't know.
```

Page 83

```
 1                  WATERHOUSE - 10-19-21
 2          Q.    Did you ever make --
 3          A.    I don't know anything about these
 4    agreements.
 5          Q.    Did you ever make any effort to
 6    determine which promissory notes are subject to
 7    this agreement?
 8          A.    No.
 9          Q.    Did you ever ask anybody which
10    promissory notes are subject to this agreement?
11          A.    No.
12          Q.    Do you know if there is a list
13    anywhere of the promissory notes that are
14    subject to this agreement?
15          A.    I'm not aware.
16          Q.    Have you ever seen the terms of the
17    agreement written down anywhere?
18          A.    No.
19          Q.    Have you ever asked anybody whether
20    the terms of the agreement were written down
21    anywhere?
22          A.    I have not.
23          Q.    Did learning about the agreement
24    cause you to do anything in response?
25                MS. DANDENEAU:  Objection to form.
```

Page 84

```
 1              WATERHOUSE - 10-19-21
 2       A.    No.
 3       Q.    Did anybody ever describe to you the
 4  nature of the milestones that you referred to
 5  earlier?
 6       A.    No, I don't -- I don't have any
 7  details of this.
 8       Q.    That is fine.
 9             PricewaterhouseCoopers served as
10  Highland's outside auditors prior to the
11  petition date; correct?
12       A.    Yes.
13       Q.    You refer to PricewaterhouseCoopers
14  as PwC?
15       A.    Yes.
16       Q.    PricewaterhouseCoopers audited
17  Highland's financial statements on an annual
18  basis; correct?
19       A.    During my -- during my time as -- as
20  CFO, yes, PricewaterhouseCoopers was the
21  auditor.
22       Q.    Do you know why Highland had its
23  annual financial statements audited each year?
24       A.    Generally.
25       Q.    Tell me your general understanding
```

Page 85

1          WATERHOUSE - 10-19-21

2    as to the reason why Highland had its annual

3    financial statements audited each year.

4          A.    From -- from time to time, they were

5    used -- or asked for, as part of diligence or

6    transactions or -- or things of that nature.

7          Q.    And were they given to third parties

8    for purposes of diligence or transactions from

9    time to time?

10         A.    As far as I'm aware, yes.

11         Q.    And was it your understanding as the

12   CFO that the third parties who received the

13   financial statements in diligence or

14   transactions was going to rely on those?

15              MS. DANDENEAU:  Objection to form.

16         A.    I don't know -- I don't know gen --

17   I don't know specifically what they were going

18   to rely on.  You know, we would get requests

19   for audited financial statements.  I don't know

20   what they were relying on.

21         Q.    And --

22         A.    You would have to ask them.

23         Q.    Did you personally play a role in

24   PwC's annual audit and the conduct of the

25   audit?

```
                                                     Page 86
 1              WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  Objection to form.

 3      A.    During my tenure as CFO, I played a

 4   very minimal role.

 5      Q.    What was the minimal role that you

 6   played?

 7      A.    You know, again, it was -- it was to

 8   check in with the team, to make sure that, you

 9   know, audit -- the deadlines were being hit,

10   information was being presented to the auditors

11   in a -- in a timely fashion, but, you know,

12   other than that, it was a very capable team

13   that are still current employees of Highland

14   and, you know, they -- they conducted 99

15   percent of -- look, I don't want to give

16   percentages.  I mean, this is -- but I -- I --

17   I played a minimal role towards the end.

18              Before during my earlier years as

19   CFO, I did more, and then as time went on, I

20   did less in it.

21      Q.    Okay.  Was there a person at

22   Highland who was responsible for overseeing

23   Highland's participation in PwC's audit during

24   the time that you were the CFO?

25      A.    Yeah.  I mean, there was -- there
```

Page 87

```
 1              WATERHOUSE - 10-19-21
 2   was a -- there was a point -- it varies.  It
 3   varies by year, in function, in time and, you
 4   know, depending on the request, but yes, I
 5   mean, there is -- there is -- there is
 6   generally a point person of communication.
 7        Q.    And who was the point person from
 8   2016 until the time you left Highland?
 9        A.    I don't -- I don't know
10   specifically, but it would have been, you
11   know -- you know, someone on the corporate
12   accounting team.
13        Q.    And was there a head of the
14   corporate accounting team?
15        A.    Yes, so -- yes.
16        Q.    Who was the head of corporate
17   accounting for the five years prior to the time
18   you left Highland?
19        A.    I don't -- if you're asking from
20   2016 on, I don't -- it was Dave Klos, but,
21   again, there was -- there was changes to the
22   team and the reporting structure.  I don't
23   remember exactly when that happened during --
24   you know, over the last -- since 2016.
25        Q.    Did the folks who participated and
```

Page 88

```
 1                WATERHOUSE - 10-19-21
 2    ran the audit all report to you, directly or
 3    indirectly?
 4         A.    Yes.
 5         Q.    And did you have any responsibility
 6    for making sure that the audit report was
 7    accurate before it was finalized?
 8         A.    Yeah.  I mean, you know, that --
 9    that is -- my responsibility to the auditors
10    was -- again, is -- and the CFO is to -- we are
11    providing accurate financial statements; right?
12              And -- and -- and as part of any
13    audit, we disclose all relevant information as
14    part of any audit.
15         Q.    Okay.  And as the CFO, did you take
16    steps to make sure that the audit report was
17    accurate?
18         A.    I mean, I would say in a general
19    sense, yes.  But, again, I mean, I had a
20    very -- I had a very capable and competent
21    team.  I wasn't managing them.
22              You know, part of what I do is I let
23    the team -- I want managers to grow.  I want
24    managers to have rope.  And that is -- you
25    know, I'm not a stand-behind-you type of guy.
```

Page 89

1          WATERHOUSE - 10-19-21

2    If you -- if you talk to my team members, I'm

3    not micromanaging people.  I want people to

4    learn and grow in their function so they can go

5    on and do bigger and better things with their

6    careers.

7               And so, yes, generally I was

8    responsible for it, but I wanted the team to

9    learn and grow and be responsible for the bulk

10   of the audit.

11       Q.    Did you personally review each audit

12   report before it was finalized to satisfy

13   yourself that it was accurate?

14       A.    I don't -- I don't recall, you know,

15   for every single -- we're talking 2016, there

16   would have been three years, 2016 to '17, '18.

17   I don't -- we're -- we're going back

18   five years-plus.  I don't -- you know, I don't

19   recall.

20       Q.    Did you have a practice that you

21   employed to make sure that you were satisfied

22   that Highland's audit reports were true and

23   accurate to the best of your knowledge?

24       A.    I mean, our -- the practice was set

25   up with our -- the -- the practice to put

Page 90

```
 1                    WATERHOUSE - 10-19-21
 2    together accurate audited or accurate financial
 3    statements is to your control environment.
 4               So, you know, the -- so the practice
 5    was to maintain a stable control environment
 6    which then the output is -- is accurate
 7    financial statements.
 8               So -- so, you know, if I was
 9    comfortable that the control environment was
10    operating, then, you know, that would dictate
11    how I would -- you know, what I might or might
12    not do in a given year.
13        Q.    Okay.  Do you recall ever being
14    uncomfortable with the control environment
15    during the period that you served as CFO?
16        A.    Yeah.  I mean, look, yes, there are
17    times -- you know, nothing is perfect.  So
18    there were -- there were times when, yes, you
19    know -- there are times I learned I was
20    uncomfortable with the control environment, and
21    that is part of the management of the process
22    and having, you know -- and -- and working
23    through whatever obstacles present themselves.
24        Q.    Okay.  Were you ever uncomfortable
25    with the control process as it related to
```

Appx. 01357

Page 91

```
 1                WATERHOUSE - 10-19-21
 2   reporting and disclosures of loans to
 3   affiliates and Mr. Dondero?
 4             MS. DANDENEAU:  Objection to form.
 5       A.    I don't -- I don't recall --
 6       Q.    So you don't recall --
 7       A.    -- the --
 8             MS. DANDENEAU:  Mr. Morris --
 9       A.    I don't recall being uncomfortable.
10   But, again, we're going back several years.  I
11   don't -- you know, the practice in an audit is
12   to disclose all information to the auditors.
13   And I don't -- I don't recall.
14       Q.    As part of the process of the audit,
15   did you sign what is sometimes referred to as a
16   management representation letter?
17       A.    Yes.
18             MR. MORRIS:  Can we put up on the
19         screen a document that we have premarked as
20         Exhibit 33.
21             (Exhibit 33 marked.)
22             MS. DANDENEAU:  Mr. Morris, that is
23         not in the binder; correct?
24             MR. MORRIS:  Correct.
25       Q.    So you will see, Mr. Waterhouse,
```

```
                                                       Page 92
 1                   WATERHOUSE - 10-19-21

 2    this is a letter dated June 3rd.  And if we

 3    could go to the signature page.

 4                   And do you see that you and

 5    Mr. Dondero signed this document?

 6        A.    Yes.

 7        Q.    That is your signature; right?

 8        A.    Yes.

 9             MR. MORRIS:  Okay.  Can you go back

10        to the top.

11             MS. DANDENEAU:  Mr. Morris, can you

12        have somebody post this in the chat so that

13        we have can have a copy of this, please.

14             MR. MORRIS:  Yeah, sure.  Asia, can

15        you do that, please.

16        Q.    Okay.  Do you see at the bottom of

17    the second paragraph there is a reference to

18    materiality?

19        A.    Yes.

20        Q.    Okay.  It says, Materiality used for

21    purposes of these representations is

22    $1.7 million.

23                   Do you see that?

24        A.    I do.

25        Q.    And did PwC set that level of
```

Appx. 01359

Page 93

```
1              WATERHOUSE - 10-19-21
2    materiality?
3         A.    Yes.
4         Q.    And for purposes of the audit, did
5    PwC set the level of materiality each year?
6         A.    Yes.
7         Q.    Did that number change over time?
8         A.    I'm not aware of what materiality is
9    every single year, so -- but, you know, this
10   number would likely fluctuate.
11        Q.    Okay.  I'm going to go back to a
12   question I asked you earlier today.  And that
13   is in connection -- this letter is issued in
14   connection with the audit for the period ending
15   12/31/2018; correct?
16        A.    Yes.
17        Q.    Okay.  And is it fair to say that if
18   any -- actually, withdrawn.  I'm going to take
19   it outside of this.
20              If Highland ever forgave the loan to
21   any affiliate or any of its officers or
22   employees, in whole or in part, to the best of
23   your knowledge, would that forgiveness have
24   been disclosed in the audited financial
25   statements if it exceeded the level of
```

Page 94

```
 1              WATERHOUSE - 10-19-21
 2   materiality that PwC established?
 3              MS. DANDENEAU:  Objection to form.
 4       A.    So, again, during my tenure as CFO,
 5   and -- Highland -- it was -- it is required to
 6   disclose any affiliate loans that are in excess
 7   of materiality.
 8              Now, the forgiveness of those loans
 9   may or may not -- I mean, since materiality
10   fluctuates every year, a -- you know, if a loan
11   was forgiven, it may or may not, you know --
12   and, look, I would want to consult the guidance
13   around this.
14              It is not something we do -- you
15   know, it is not -- you know, GAAP can be and
16   disclosures can be very specialized so, again,
17   we want to consult the guidance.  But we would
18   see if and what would need to be disclosed if
19   it were deemed immaterial.
20       Q.    Did you and Mr. Dondero sign
21   management representation letters of this type
22   in each year in which you served as Highland's
23   CFO?
24       A.    I -- I -- I will speak for myself.
25   I signed them.  There may have been others that
```

Page 95

```
 1              WATERHOUSE - 10-19-21

 2   signed as well.  I don't -- I don't recall.

 3        Q.    But to the best of your knowledge,

 4   you, personally, signed a management

 5   representation letter in connection with

 6   Highland's audit each year that you served as

 7   the CFO; correct?

 8        A.    I would say generally speaking,

 9   Mr. Morris.  I don't recall for every single

10   year, you know, generally, but I would want to

11   refer to all the rep letters and see who signed

12   them.

13        Q.    Do you recall Highland having its

14   financial statements audited in any year during

15   the period that you were a CFO where you didn't

16   sign the management representation letter?

17        A.    I don't recall.  But, John, we're

18   going back five, six, seven, eight, nine,

19   decade.  I don't -- I don't remember.

20        Q.    I don't want to go back that many

21   decades, but I'm just asking you if you recall

22   that there was you didn't sign it?

23        A.    I -- I -- I don't, but my memory

24   is -- again, I -- I -- I can't tell you what I

25   did in 2012.  I mean, I think generally, yes,
```

Appx. 01362

Page 96

```
 1               WATERHOUSE - 10-19-21
 2    but I don't -- I don't know for sure, and I
 3    would want to rely on the document.
 4         Q.    Let me ask the question a little bit
 5    differently then.
 6               Do you have any reason to believe
 7    that Highland had its annual financial audit
 8    and you did not sign a management
 9    representation letter in connection with that
10    audit?
11               MS. DANDENEAU:  Objection to form.
12         A.    I don't believe it would, but,
13    again, I would want to -- I don't recall and I
14    would want to confirm it to -- to make, you
15    know, an affirmative -- to give an affirmative
16    answer.
17         Q.    Do you know whether PwC required
18    management to sign management representation
19    letters?
20               MS. DANDENEAU:  Objection to form.
21         A.    Yes.  I mean, it -- management
22    representation letters are signed by
23    management.
24         Q.    Okay.  And do you know -- do you
25    have any understanding as to why PwC requires
```

Appx. 01363

Page 97

```
 1                  WATERHOUSE - 10-19-21
 2     management to sign management representation
 3     letters?
 4                  MS. DEITSCH-PEREZ:  Object to the
 5          form.
 6          A.    I don't know why PwC's -- what PwC's
 7     specific practice is.  I know generally what
 8     management representation letters are.
 9          Q.    Okay.  Do you personally -- I'm not
10     asking about PwC.  I'm asking for you -- I'm
11     asking about you, do you have an understanding
12     as to why the auditor asks for management
13     representation letters?
14          A.    Okay.  So you're asking me in my
15     personal capacity, yes, I have a general
16     understanding of why.
17          Q.    Can you give me the general
18     understanding that you have as to why
19     management representation letters are required?
20          A.    They are -- they are required to --
21     they are -- they are one of the items required
22     in an audit to help verify completeness.
23          Q.    Do you have any -- any other
24     understanding as to why management
25     representation letters are required?
```

Appx. 01364

Page 98

```
 1              WATERHOUSE - 10-19-21
 2        A.    That is -- that is -- other than
 3   what I said, it is -- it is -- it is required
 4   so -- to ensure that the -- you know, there
 5   is -- there is completeness in what is being
 6   audited.
 7        Q.    Did you -- did you have a practice
 8   whereby you and Mr. Dondero conferred about the
 9   management representation letters before you
10   signed them?
11        A.    No.
12        Q.    Did you have a practice --
13   withdrawn.
14              Do you see just the next sentence
15   after the materiality, there is a sentence that
16   states:  We confirm, to the best of our
17   knowledge and belief, as of June 3rd, 2019, the
18   date of your report, the following
19   representations made to you during your audit.
20              Do you see that sentence?
21        A.    Yes.
22        Q.    Okay.  Did you understand when you
23   signed this letter that you were confirming the
24   representations that followed?
25        A.    When I signed this management
```

Page 99

```
 1              WATERHOUSE - 10-19-21
 2    letter -- representation letter, yes.
 3         Q.    Okay.  Did you discuss this letter
 4    with Mr. Dondero before you signed it?
 5         A.    I don't recall.
 6         Q.    Do you recall if Mr. Dondero asked
 7    you any questions before he signed the letter?
 8         A.    I don't recall.
 9         Q.    Do you recall if you asked
10    Mr. Dondero any questions before you signed
11    this letter?
12         A.    I don't recall.
13         Q.    Is it fair to say that Mr. Dondero
14    did not disclose to you the existence of the
15    agreement that we have -- as we've defined that
16    term prior to the time you signed this letter?
17              MS. DANDENEAU:  Objection to form.
18         A.    I don't think I understand the
19    question.  So, again, you are saying, did
20    Mr. Dondero not disclose to me the existence of
21    this letter?
22         Q.    No, I apologize.
23              Did Mr. Dondero disclose to you the
24    existence of the agreement prior to the time
25    you signed this letter on June 3rd, 2019?
```

Page 100

```
 1                  WATERHOUSE - 10-19-21

 2        A.    The agreement -- the agreement that

 3   we talked about earlier?

 4        Q.    Correct.

 5        A.    Look, as I said earlier, the first

 6   time I heard of this agreement was sometime

 7   this year.

 8        Q.    Okay.  Can we turn -- let's just

 9   look at a couple of items on the list.  If we

10   can go to page 33416.  Do you see in Number 35

11   it talks about the proper recording or

12   disclosure in the financial statements of ND

13   relationships and transactions with related

14   parties.

15              Do you see that?

16        A.    I do.

17        Q.    As the CFO, do you have any

18   understanding as to whether Dugaboy is a

19   related party?

20        A.    I don't recall.

21        Q.    Do you know whether any of the

22   affiliates are related parties?

23        A.    If -- if it was NexPoint, HCMFA,

24   HCMS, HCRE, yeah, if -- if that is the

25   affiliate definition, and there.  In ASC 850 --
```

Page 101

```
 1                WATERHOUSE - 10-19-21
 2    again, I mean, I haven't looked at ASC 850 in
 3    quite some time, but, you know, if -- if there
 4    is a control language, you know, ASC 850, would
 5    that -- that section in GAAP would -- would
 6    pick up and define what are related parties.
 7                So, you know, like I said, if -- one
 8    of the four entities I just described, if -- if
 9    they are in that control definition of ASC 850,
10    they would be picked up in 35D.
11        Q.   Do you -- do you have any reason to
12    believe that they would be picked up in that
13    definition, based on your knowledge and
14    experience?
15        A.   I -- I believe that entities
16    controlled under GAAP are -- are affiliates.
17        Q.   Okay.  Would Mr. Dondero also
18    qualify as a related party for purposes of
19    Section 35D, to the best of your knowledge?
20        A.   Yeah, I don't -- I don't know.  I
21    would think -- I would have to read the code
22    section to see if someone personally -- is it
23    talking about related parties.  So, look, if
24    your own in control, yeah, I mean, I would have
25    to read the section.
```

Page 102

```
 1                  WATERHOUSE - 10-19-21

 2         Q.    To the best of your knowledge, was

 3    the existence of the agreement ever disclosed

 4    to PwC?

 5         A.    I'm not -- I'm not aware.

 6         Q.    Do you recall if the agreement was

 7    ever disclosed in Highland's audited financial

 8    statements?

 9         A.    I don't -- I don't remember if it

10    was in every Highland's audited financial

11    statements during my tenure.  We would have to

12    read the financial statements to see what was

13    disclosed, but I'm not -- I mean, as I sit here

14    today, I'm not aware.

15         Q.    That is all I'm asking for.

16         A.    I'm not aware.

17         Q.    Can we go to the next page, please,

18    and look at 36.  36 says, we have disclosed to

19    you the identity of the partnership's related

20    party relationships and all the related party

21    relationships and transactions of which we are

22    aware.

23               Do you see that?

24         A.    Yes.

25         Q.    To the best of your knowledge, as of
```

Page 103

```
 1                 WATERHOUSE - 10-19-21
 2   June 3rd, 2019, did Highland disclose to PwC
 3   the identity of the partnership's related
 4   parties and all the related party relationships
 5   and transactions of which it was aware?
 6        A.    I mean, I can speak for myself as
 7   signer of this representation letter.  I
 8   disclosed what -- what, you know, what --
 9   what -- what I knew.  Sorry, look, yes, so I --
10   I disclosed what I knew.
11        Q.    Okay.  Can we go to page 419.  Do
12   you see at the end there is a reference to
13   events that occurred since the end of the
14   fiscal year and the date of the letter?
15        A.    Yes.
16        Q.    And were you aware of that -- of
17   that provision of the management representation
18   letter before you signed the document?
19        A.    Yes.
20        Q.    Do you have an understanding as to
21   why PwC asked for that confirmation of that
22   particular part of the management
23   representation letter?
24        A.    It is -- it is -- it is just -- it
25   is a typical audit request.
```

Page 104

```
 1                WATERHOUSE - 10-19-21

 2        Q.    And do you understand -- do you have

 3   an understanding that PwC wanted to know that

 4   as of the date of the audit whether any

 5   material changes had occurred since the end of

 6   the fiscal year, using the definition of

 7   materiality that is in this particular

 8   management representation letter?

 9        A.    It -- it is -- it is -- it is a --

10   it is as described.  It is just a poorly worded

11   question, so it is hard for me to say yes.

12        Q.    If I asked you this, I apologize,

13   but did you ever learn when the agreement was

14   entered into?

15        A.    I don't -- I don't -- like I said

16   before, I don't know or have any details of the

17   agreement.

18        Q.    Okay.  Did you ever ask anybody when

19   the agreement was entered into?

20        A.    I did not.

21        Q.    Let's look at the audited financial

22   statements.  We will put up on the screen a

23   document that has been premarked as Exhibit 34.

24               (Exhibit 34 marked.)

25               MS. DANDENEAU:  And again, if Ms. La
```

Page 105

```
 1                  WATERHOUSE - 10-19-21
 2        Canty could please put that in the chat
 3        room, that would be great.
 4              MR. MORRIS:  I will assure you we
 5        will put every document in the chat room.
 6        Q.    Now, I'm just going to ask you
 7   questions that are related to the provisions of
 8   this report that concern the affiliate loans,
 9   but again, Mr. Waterhouse, if there is any part
10   of the document that you need to see or that
11   you think you might need to see in order to
12   refresh your recollection to answer any of my
13   questions, will you let me know that?
14        A.    Yes.
15        Q.    Because this is a pretty lengthy
16   document, but do you see that the cover page
17   here is the Highland consolidated financial
18   statements for the period ending December 31st,
19   2018?
20        A.    Yes.
21        Q.    If we can go to -- I think it is the
22   next one, looking for PwC's signature line.
23              MS. CANTY:  I'm sorry, John, did you
24   say something?
25              MR. MORRIS:  Yes, can we turn the
```

Appx. 01372

Page 106

1          WATERHOUSE - 10-19-21

2          page.  I think it is 215.  Yes, stop right

3          there, just above -- I'm sorry, I want to

4          see just the date of the report.

5          Q.    Okay.  Do you see at the bottom of

6    that page there, Mr. Waterhouse,

7    PricewaterhouseCoopers has signed this audit

8    report?

9          A.    Yes, I see their signature.

10         Q.    Okay.  And it is the dated same day

11   as your management representation letter; is

12   that right?

13         A.    It is -- yes, it is the same day.

14         Q.    Was that the practice to sign the

15   management representation letter on the same

16   day that the audit report was signed?

17         A.    Yes, that is typical in every audit.

18         Q.    Can we just scroll down to the

19   balance sheet on the next page.

20              Do you see that there is a line

21   there that says, Notes and Other Amounts Due

22   from Affiliates?

23         A.    Yes.

24         Q.    Does that line, to the best of your

25   knowledge, include the amounts that were due

```
 1              WATERHOUSE - 10-19-21
 2    under the affiliate under the notes signed by
 3    the affiliates and Mr. Dondero?
 4              MR. RUKAVINA:  Objection to the
 5         extent that calls for a legal conclusion.
 6         A.    I mean, I would want to see the
 7    detail and the build to this $173,398,000, but,
 8    yes, I mean, if -- if -- given what we
 9    discussed before, you know, it -- it should
10    capture that.
11         Q.    And -- and while you were the CFO of
12    Highland, were all notes held by Highland that
13    were issued by an affiliate or Mr. Dondero
14    carried as assets on Highland's balance sheets?
15              MS. DANDENEAU:  Objection to form.
16              MS. DEITSCH-PEREZ:  Object to form.
17         A.    I don't -- I don't know how else
18    they would be carried.
19         Q.    Okay.  Can you think of any -- are
20    you aware of any promissory note issued by an
21    affiliate or Mr. Dondero that was not carried
22    on Highland's audited financial balance sheets?
23         A.    I'm -- I'm -- I'm not aware.
24         Q.    Okay.  Are you aware of any category
25    of asset on Highland's balance sheet in which
```

Page 108

```
 1              WATERHOUSE - 10-19-21

 2   any of the promissory notes issued by an

 3   affiliate or Mr. Dondero would have been

 4   included?

 5              MS. DANDENEAU:  Objection to form.

 6        A.    Sorry, am I aware of any asset of an

 7   affiliate being included --

 8        Q.    That -- let me -- let me try again.

 9              Do you see there is a number of

10   different assets that are described on this

11   balance sheet?

12        A.    Yes.

13        Q.    One of the assets that is described

14   is Notes and Other Amounts Due from Affiliates;

15   right?

16        A.    Yes.

17        Q.    And it is reasonable to conclude

18   that the notes from the affiliates and

19   Mr. Dondero are included in that line item;

20   right?

21        A.    Yes, based on this description.

22   Again, I would want to see a build of this to

23   100 percent confirm, but based on the

24   description, the asset description, it is -- it

25   is likely.
```

Page 109

```
 1                   WATERHOUSE - 10-19-21
 2                Now, does that mean absolute?  I
 3     don't know.
 4          Q.    Do you have any reason to believe
 5     that the promissory notes would have been
 6     carried on the balance sheet in a category
 7     other than Notes and Other Amounts Due from
 8     Affiliates?
 9          A.    If they were deemed -- no.  If they
10     were deemed an affiliate, you know, under GAAP,
11     they should be carried in that line.
12     Otherwise, it would go into another line.
13          Q.    Okay.  And do you see the total
14     asset base as of December 31st, 2018, was
15     approximately $1.04 billion?
16          A.    Yes.
17          Q.    Is my math correct that the Notes
18     and Other Amounts Due from Affiliates
19     constituted approximately 17 percent of
20     Highland's assets as of the end of 2018?
21          A.    Well, so how are you defining
22     Highland?
23          Q.    Highland Capital Management, L.P.,
24     the entity that this audit is subject to -- or
25     the subject of.
```

Page 110

```
 1              WATERHOUSE - 10-19-21

 2       A.    On a consolidated or unconsolidated

 3  basis?

 4       Q.    I'm looking at the balance sheet.

 5  It is a consolidated balance sheet.  Okay?

 6             Does the Notes and Other Amounts Due

 7  from Affiliates constitute approximately

 8  17 percent of the total assets of Highland

 9  Capital Management, L.P., on a consolidated

10  basis?

11             MS. DANDENEAU:  Objection to form.

12       A.    I don't have a calculator in front

13  of me but I will take your math, if you are

14  taking the 173 divided by the billion.

15       Q.    Okay.

16       A.    If that is accurate, yes.  But,

17  again, on a consolidated basis.

18       Q.    And on an unconsolidated basis the

19  percentage would be higher; correct?

20       A.    I -- no.  I don't know.

21       Q.    Well, okay.  That is fair.

22             MR. MORRIS:  Can we turn to

23         page 241, please.

24       Q.    Do you see that this is a section of

25  the audit report that is entitled Notes and
```

Page 111

```
 1                WATERHOUSE - 10-19-21
 2   Other Amounts Due from Affiliates?
 3        A.    Sorry, I can't see the -- the --
 4        Q.    It is at the top.
 5        A.    Notes and Other Amounts Due from
 6   Affiliates, yes, I see that.  I don't -- I
 7   don't have a page number, but I'm on a page
 8   that says at the top:  Notes and Other Amounts
 9   Due from Affiliates.
10        Q.    Okay.  And that is the same title of
11   the line item on the balance sheet that we just
12   looked at; right?  Notes and Other Amounts Due
13   from Affiliates?
14        A.    Yes.
15        Q.    And is it your understanding, based
16   on your experience and knowledge as the CFO,
17   that this is the section of the narrative that
18   ties into the line item that we just looked at?
19        A.    Yes.
20        Q.    And is this section of the audit
21   report intended to describe and disclose all of
22   the material facts concerning the Notes and
23   Other Amounts Due from Affiliates?
24              MS. DANDENEAU:  Objection, form.
25        A.    This -- these notes -- these notes
```

Appx. 01378

Page 112

```
 1              WATERHOUSE - 10-19-21

 2  of the financial statements are -- the purpose

 3  is to disclose any material items in relation

 4  to that balance sheet line item.

 5       Q.   Okay.  And all of the information,

 6  to the best of your knowledge, that is set

 7  forth in this section of the audit report was

 8  provided by Highland; correct?

 9       A.   Yes, it would have been provided by

10  the corporate accounting team.

11       Q.   Okay.  And the corporate accounting

12  team, did that team report to you in the

13  organizational structure?

14       A.   Yes.

15       Q.   And did you have any concerns about

16  the controls that were in place to make sure

17  that the information provided with respect to

18  Notes and Other Amounts Due from Affiliates was

19  accurate and complete?

20            MS. DANDENEAU:  Objection to form.

21       A.   Not that I recall.

22       Q.   Okay.  Do you recall ever being

23  concerned that any portion of the Notes and

24  Other Amounts Due from Affiliates in any audit

25  report was inaccurate, incomplete, or not
```

Appx. 01379

Page 113

```
 1                WATERHOUSE - 10-19-21

 2   reliable?

 3        A.    I didn't -- I had concerns about,

 4   you know, like I talked about before, of there

 5   were -- there were potentially issues in the

 6   control environment.  But as far as it relates

 7   to the audited financial statements, any -- the

 8   team would work with the auditors to disclose

 9   all -- all notes in Highland's possession.

10             And any -- any notes that were

11   deemed material by the auditor, right, these

12   were disclosed in these -- in this section, you

13   know, in -- in the notes to the consolidated

14   financial statements as you presented.

15        Q.    Do you recall ever having a

16   conversation with anybody at any time

17   concerning the accuracy of the section of audit

18   reports that relates to Notes and Other Amounts

19   Due from Affiliates?

20             MS. DANDENEAU:  Objection to form.

21        A.    You know, as -- as -- I didn't have

22   direct conversations with

23   PricewaterhouseCoopers as I had, you know --

24   I -- I had the team that managed this.

25             Again, I wasn't anywhere chose to
```

Page 114

```
 1               WATERHOUSE - 10-19-21
 2   being the point person of this audit.  And I
 3   can't recall, you know, when -- you know, I
 4   don't even know if I was ever the point person
 5   during my tenure as CFO.
 6               I don't know if PwC had any concerns
 7   when they were performing those audit
 8   procedures.  They may have and they may have --
 9   and it may not have been communicated to me.  I
10   don't know.
11               MR. MORRIS:  All right.  I move to
12        strike.
13        Q.    And I'm going to ask you to listen
14   carefully to my question.
15               Did you -- do you recall ever having
16   a conversation with anybody at any time
17   concerning the accuracy of the reporting
18   provided in the audited financial statement on
19   the topic of Notes and Other Amounts Due?
20               MS. DANDENEAU:  Objection to form.
21        A.    I don't recall for this, but that
22   doesn't mean that it didn't exist.
23        Q.    Okay.  But you have no reason to
24   believe, as you sit here right now, that you
25   ever discussed with anybody concerns over the
```

Page 115

```
 1                   WATERHOUSE - 10-19-21
 2    accuracy of the section of the audit reports
 3    called Notes and Other Amounts Due from
 4    Affiliates; correct?
 5              MS. DANDENEAU:  Object to the form.
 6              MS. DEITSCH-PEREZ:  Objection to
 7         form.
 8         A.    I don't recall having any
 9    conversations.  But, again, I mean, this is --
10    this is two years ago.
11         Q.    I'm just asking for your
12    recollection, sir.
13         A.    Yes.
14         Q.    If you don't recall, this will --
15         A.    Yeah.
16         Q.    (Overspeak) -- if you don't
17    recall --
18         A.    Yeah, I don't -- I don't recall.
19         Q.    Do you know who was responsible for
20    drafting the audit report?
21         A.    Are you asking the actual Highland
22    employee responsible?  I mean, it was
23    Highland's responsibility, so, I mean, that
24    is --
25         Q.    Right.
```

Page 116

```
 1                WATERHOUSE - 10-19-21

 2        A.    -- Highland's responsibility.

 3   Highland's responsibility.

 4        Q.    Who, at Highland, was responsible

 5   for drafting this section of the audit report?

 6        A.    I -- I don't know the answer to

 7   that.  Again, there was a team who worked on

 8   this.  And I don't know, you know, whether it

 9   was the staff or the manager.

10             Again, this is where I let the teams

11   manage.  And, you know, there may be a

12   corporate accountant who worked on this.  I

13   just -- you know, I wasn't part of that process

14   to give that person experience.  I don't know.

15        Q.    Do you recall having any

16   communications with anybody at any time

17   concerning this section of the report?

18        A.    Yeah, I don't recall.

19        Q.    Do you recall whether you ever told

20   anybody at any time that any aspect of this

21   section of the report was inaccurate or

22   incomplete?

23        A.    I don't recall.

24        Q.    As you sit here today, do you have

25   any reason to believe that this section of the
```

Page 117

```
 1                 WATERHOUSE - 10-19-21
 2    audit report is incomplete or inaccurate in any
 3    way?
 4                 And I'm happy to give you a moment
 5    to -- to look at it, if you would like.
 6                 MS. DANDENEAU:  Objection to form.
 7                 MS. DEITSCH-PEREZ:  Same.
 8         A.    I mean, I would have to look at -- I
 9    would have to look at the bill to the note
10    schedule to make sure I know you presented me
11    with materiality, but again, there might be a
12    note as of 12/31/18 that somehow was -- was
13    under materiality not disclosed.  I don't -- I
14    don't know.  I would need more information.
15         Q.    Okay.  But without more information,
16    you have no reason to believe anything this
17    section is inaccurate; correct?
18                 MS. DANDENEAU:  Objection to form.
19         A.    I don't.  I mean, you know, this was
20    part of the audit.
21         Q.    Thank you.  Now, you will see if we
22    could scroll just a little bit more that each
23    of the first five paragraphs concerns
24    specifically the four affiliates that we've
25    been discussing and Mr. Dondero.
```

Page 118

```
 1                  WATERHOUSE - 10-19-21

 2                  MR. MORRIS:  If we could go the

 3        other way, La Asia.  We don't need Okada.

 4        We're going to have to thread the needle.

 5        Okay.  Good, perfect.

 6        Q.    Do you see those five paragraphs

 7   certain the four affiliates and Mr. Dondero as

 8   we've been referring to today?

 9        A.    Yes.

10        Q.    Okay.  And do you see at the end of

11   every paragraph it states, quote:  A fair value

12   of a partnership's outstanding notes receivable

13   approximates the carrying value of the notes

14   receivable?

15        A.    Yes, I see that.

16        Q.    Do you have an understanding of what

17   that means?

18        A.    Yes.

19        Q.    What is your understanding of that

20   sentence?

21        A.    It is the -- again, the -- the fair

22   value, right, which is -- which is what the --

23   what Highland could sell that asset for.  This

24   statement is comparing the fair value of the

25   notes to the carrying value, so the carrying
```

Page 119

```
 1              WATERHOUSE - 10-19-21

 2   value is the line item that you showed me

 3   earlier that is in Notes and Other Amounts Due

 4   from Affiliates.

 5        Q.    Okay.  Is another way to say this is

 6   that the fair market value of the notes equals

 7   the principal amount and -- withdrawn.

 8             Is the fair way to interpret this

 9   that the fair market value of the notes equals

10   all remaining unpaid principal and interest due

11   under the notes?

12             MS. DANDENEAU:  Object to the form.

13             MS. DEITSCH-PEREZ:  Objection, form.

14        A.    I don't know the answer to that,

15   because I don't recall where -- where any --

16   where -- in what line item was the interest

17   component reported.

18        Q.    All right.  Well, if we look in this

19   audit report, you will see in the middle of the

20   first paragraph, for example, it states that as

21   of December 31st, 2018, total interest and

22   principal due on outstanding promissory notes

23   was approximately $5.3 million.

24             Do you see that?

25        A.    I do.
```

Page 120

```
 1              WATERHOUSE - 10-19-21

 2        Q.    Is that the carrying value or the

 3   fair value?

 4        A.    That would be the carrying value --

 5        Q.    And is the last --

 6        A.    -- in my opinion.

 7        Q.    Okay.  And it is in your opinion as

 8   the chief financial officer of Highland during

 9   the period of time that you described; right?

10   It is an educated opinion?

11        A.    I'm reading this at face value.  I'm

12   taking that as that is carrying value.

13        Q.    Okay.  And does the last sentence

14   say that the carrying value is roughly

15   approximate to the fair market value?

16              MS. DANDENEAU:  Objection to form.

17              MS. DEITSCH-PEREZ:  Objection, form.

18        A.    Again, this note to the financial

19   statement is specific to notes and other

20   amounts due from affiliates.

21        Q.    Correct.

22        A.    If the interest component is

23   reported elsewhere on the balance sheet, you

24   know, it -- it -- it could be off.  Again, I

25   don't have the detail.  I don't know, but yes,
```

```
                                                Page 121
 1             WATERHOUSE - 10-19-21

 2   look, I mean, if you -- I mean, if you are

 3   saying the 5.3 million is in the notes and

 4   other amounts due from affiliates, then the

 5   last statement is saying the fair value

 6   approximates 5.3 million.  That is what that

 7   last sentence is saying.

 8        Q.   Do you see in the middle of the

 9   first paragraph -- not in the middle, the next

10   to last sentence there is a statement that the

11   partnership will not demand payment on amounts

12   that exceed HCMFA's excess cash availability

13   prior to May 31st, 2021.

14             Do you see that?

15        A.   I do.

16        Q.   Do you know when Highland agreed not

17   to demand payment as described in that

18   sentence?

19        A.   I don't know specifically.

20        Q.   Do you know why Highland agreed not

21   to demand payment on HCMFA's notes until May

22   2021?

23        A.   Yes.

24        Q.   Why was that decision made?

25        A.   You know, well, it -- it -- that
```

Page 122

```
 1                WATERHOUSE - 10-19-21

 2     decision was made as to not put HCMFA into a

 3     position where it didn't have sufficient assets

 4     to pay for the demand note.

 5          Q.    And at the time the agreement was

 6     entered into, pursuant to which the partnership

 7     wouldn't demand payment, did HCMFA have

 8     insufficient assets to satisfy the notes if a

 9     demand had been made?

10                MS. DANDENEAU:  Objection to form.

11          A.    I don't have HCMFA's financial

12     statements in front of me as of 12/31/18.

13          Q.    Was there a concern that HCMFA would

14     be unable to satisfy its demands under the

15     notes if demand was made?

16                MS. DANDENEAU:  Objection to form.

17          A.    Well, there is -- I don't recall --

18     I mean, there is something, right, in place to

19     basically not demand payment until May 31, 2021

20     as detailed here.

21          Q.    And who made the decision to enter

22     into -- who made the decision on behalf of

23     Highland not to demand payment until May 31st,

24     2021?

25          A.    I'm trying to remember.  I don't
```

Page 123

```
 1              WATERHOUSE - 10-19-21
 2   remember exactly -- I don't remember if it was
 3   myself or -- or Jim Dondero who -- who -- there
 4   was -- there was something signed, from what I
 5   recall, that -- that -- that backed up this
 6   line item in the -- in the notes I'm -- look,
 7   I'm, I'm --
 8        Q.    We will get to that.
 9        A.    You --
10        Q.    I'm just --
11        A.    You have -- I mean --
12        Q.    We're going to give that to you.
13   I'm going to give that to you.
14        A.    You -- you -- you have all the
15   documents.  I don't have the documents, and
16   that is what makes it so hard.  I don't have
17   any documents to prepare for this deposition;
18   right?  You have all -- I don't -- I don't -- I
19   don't remember, but, you know, again, it would
20   probably be myself or Jim.
21        Q.    Do you know if Highland received
22   anything in return for its agreement not to
23   make a demand for two years?
24        A.    I don't -- I don't think it referred
25   anything.
```

Page 124

```
 1              WATERHOUSE - 10-19-21
 2      Q.    And did you and Mr. Dondero discuss
 3   HCMFA's ability to satisfy the notes if a
 4   demand was made at the time this agreement was
 5   entered into?
 6            MS. DANDENEAU:  Objection to form.
 7      A.    I don't -- I don't -- I don't recall
 8   having a specific conversation, if I did, or --
 9   or David Klos.
10      Q.    Okay.  I'm just asking if you recall
11   any conversations that you had.
12      A.    I don't recall.
13      Q.    Okay.  Do you know why Highland
14   loaned the money to HCMFA that is the subject
15   of the notes described in this paragraph?
16      A.    I don't remember specifically why
17   5.3 million was loaned.  I mean, I -- it would
18   have to be put in the context.
19      Q.    Do you have any recollection at all
20   as to why Highland ever loaned any money to
21   HCMFA?
22      A.    Yes.
23            MS. DANDENEAU:  Objection to form.
24      Q.    What do you remember about that?
25      A.    There was a Highland Global
```

Appx. 01391

Page 125

```
 1                WATERHOUSE - 10-19-21

 2    Allocation Fund, which was a -- a fund managed

 3    by Highland Capital Management Fund Advisors.

 4    There was a -- we -- I'm just telling you,

 5    there was -- there was -- there was a -- a

 6    ultimately a NAV error found in this fund while

 7    it was an open-ended fund and, you know, there

 8    were amounts owed by the advisor in -- in

 9    relation to that NAV error.

10               There were also, for the same fund,

11    that same fund was ongoing an

12    open-end-to-close-end conversion, and as part

13    of that proposal, shareholders who voted for

14    the conversion received compensation from the

15    advisor.

16          Q.    All right.  Now, the events that

17    you're describing occurred in the spring of

18    2019; right?

19          A.    These started back -- I think, I

20    mean --

21          Q.    I apologize.

22          A.    -- that -- I mean, the answer to

23    that is no.

24          Q.    I apologize, the loans that were

25    made in connection with the events that you're
```

```
 1              WATERHOUSE - 10-19-21

 2   describing occurred in May 2019; right?

 3              MR. RUKAVINA:  Objection to the

 4         extent that calls for a legal conclusion.

 5         A.   I don't recall specifically what

 6   amounts of money were moved when, for what

 7   purpose.

 8         Q.   Okay.  Fair enough.  Going to the

 9   next paragraph, do you recall that NexPoint

10   Advisors had obtained a number of loans from

11   Highland, and they rolled up those loans into

12   one note in approximately 2017?

13         A.   This is for NexPoint Advisors?

14         Q.   Yes.

15         A.   I -- I mean, I don't -- I don't

16   recall the NexPoint Advisors loan being a

17   roll-up loan, but --

18         Q.   Do you know why?

19         A.   But, look, if you have documents

20   that show -- I mean, look, I just don't recall.

21         Q.   Okay.  That is fair.  Do you know

22   why -- do you have any recollection as to why

23   Highland loaned money to NexPoint?

24         A.   Yes.

25         Q.   Why did High -- why do you recall --
```

Page 127

```
 1                 WATERHOUSE - 10-19-21
 2   what is the reason you recall Highland lending
 3   money to NexPoint?
 4        A.   I mean, I was just -- I just -- I
 5   just recall.  I mean, I just -- I don't
 6   remember why.
 7        Q.   I understand.  And I'm asking you if
 8   you recall --
 9        A.   Oh, why -- I thought you say --
10   NexPoint Advisors was launching a fund which
11   is -- I believe that the legal name is NexPoint
12   Capital, Inc.  And it -- it provided a
13   co-invest into that fund.
14             And, from what I remember, the --
15   the -- that NexPoint borrowed money from
16   Highland at the time to make that co-invest.
17        Q.   So this was an investment that
18   NexPoint was required to make; is that right?
19             MS. DANDENEAU:  Objection to form.
20        A.   I don't know if it was required to
21   make, I don't recall that, or if it just made
22   it.
23        Q.   Okay.  But your recollection is that
24   NexPoint made an investment and they borrowed
25   money from Highland to finance the investment.
```

Appx. 01394

Page 128

```
 1                WATERHOUSE - 10-19-21

 2              Do I have that right?

 3       A.    Yes.

 4       Q.    How about HCRE?  Do you know why

 5  HCRE borrowed money from Highland?

 6       A.    I don't remember specifically.

 7       Q.    Do you remember generally?

 8       A.    Generally, yeah -- I mean, yes.

 9       Q.    Can you tell me your general

10  recollection as to why Highland loaned money to

11  HCRE?

12       A.    For -- for -- for investment

13  purposes.

14       Q.    So HCRE made the investment and it

15  obtained a loan, or loans, from Highland in

16  order to finance that investment or those

17  investments.

18              Do I have that right?

19       A.    I mean, I -- you know, generally.

20       Q.    Okay.  How about Highland Management

21  Services, Inc.?

22              Do you have any recollection as to

23  why HCMS borrowed money from Highland?

24       A.    Generally.

25       Q.    What is your general recollection as
```

Page 129

```
 1                    WATERHOUSE - 10-19-21

 2    to why HCMS borrowed money from Highland?

 3         A.    For -- for investment purposes.

 4         Q.    So it is the same thing, HCMS wanted

 5    to make investments and it borrowed money from

 6    Highland in order to finance those investments;

 7    is that right?

 8         A.    I mean, yes, generally.  I mean, I

 9    can't -- I don't -- on the services, there --

10    there are several loans in these schedules.

11    You know, I can't remember why every single one

12    of these were made, but I would say, yeah, I

13    mean, generally.

14         Q.    Okay.  I appreciate that.

15              MR. MORRIS:  Let's go to the page

16         with Bates No. 251.  La Asia, are you

17         there?

18              MS. CANTY:  Sorry, John.  It went

19         out for a minute.  Can you say that again.

20         I don't know what is going on.

21              MR. MORRIS:  The page with Bates

22         No. 251, can we go to that.

23              MS. CANTY:  Yes, sorry.

24              MR. MORRIS:  Keep going to the

25         bottom.  Yeah, there you go.
```

Page 130

```
 1              WATERHOUSE - 10-19-21
 2       Q.    Do you see, Mr. Waterhouse, that
 3   there is a section there called Subsequent
 4   Events?
 5       A.    I do.
 6       Q.    And does this relate to the last
 7   sentence above the signature line on the
 8   management representation letter that we talked
 9   about earlier where you made the representation
10   that you disclosed subsequent events?
11       A.    I mean, it relates to it, but not in
12   its entirety.
13       Q.    Okay.
14            MR. MORRIS:  If we can scroll up to
15       capture the entirety of this section right
16       here.
17       Q.    And what do you mean by that, sir?
18            MR. MORRIS:  Yeah, right there.
19       Perfect.
20       A.    There are -- there are different
21   subsequent events in -- under GAAP.  So there
22   are -- and -- and -- so what we see in the
23   notes to the financial statements are one type
24   of subevent.
25       Q.    Okay.  And -- and would the type of
```

Page 131

```
 1                 WATERHOUSE - 10-19-21
 2    subsequent event relating to affiliate loans be
 3    captured in this section if they were -- if
 4    they were made after the end of the fiscal year
 5    and prior to the issuance of the audit report?
 6        A.    Yes, if they were deemed material or
 7    disclosable.
 8        Q.    Okay.  I appreciate that.
 9              Do you see the next to the last
10    entry there?  It says, Over the course of 2019
11    through the report date, HCMFA issued
12    promissory notes to the partnership in the
13    aggregate amount of $7.4 million?
14        A.    Yes.
15        Q.    And does that refresh your
16    recollection that those are the notes that
17    related to the NAV error that you mentioned
18    earlier?
19        A.    I don't -- I don't remember the
20    exact.  Again, there are -- I mentioned two
21    line items; right?
22        Q.    Yes.
23        A.    I mean, it was the GAAP conversion
24    process plus the -- the NAV error.  I don't
25    have the details.  I don't recall specifically
```

Page 132

```
 1                    WATERHOUSE - 10-19-21

 2    if -- you know, what -- if that 7.4 million was

 3    solely attributable to the NAV error.

 4        Q.    Okay.  But there is no question that

 5    Highland told PricewaterhouseCoopers that over

 6    the course of 2019 HCMFA issued promissory

 7    notes to the partnership in the aggregate

 8    amount of $7.4 million; correct?

 9        A.    In the course of the audit, we would

10    have produced all promissory notes in our

11    possession, including the ones that are

12    detailed here.

13        Q.    Do you recall that you signed the

14    two promissory notes that are referenced in

15    that provision?

16            MS. DANDENEAU:  Objection to form.

17        A.    I didn't recall initially but I've

18    been reminded.

19        Q.    Okay.  And -- and do you recall that

20    those notes are dated May 2nd and May 3rd,

21    2019?

22        A.    Yes.

23        Q.    So that was just a month before the

24    audit was completed; correct?

25        A.    Yes.  I think we had a June 3rd
```

Page 133

```
 1                  WATERHOUSE - 10-19-21
 2   date, right, if -- if my memory serves me
 3   right.
 4        Q.    Yes, I will represent to you that
 5   your memory is accurate in that regard.
 6              Did anybody ever instruct you as the
 7   CFO to correct this statement that we're
 8   looking at in subsequent events?
 9        A.    So let me understand.  You're saying
10   when I was CFO at Highland Capital did anyone
11   ever ask me to correct the -- over the course
12   of 2019 through the report date HCMFA issued
13   promissory notes, this statement?
14        Q.    Right.
15        A.    Not that I'm aware.
16        Q.    While you were the CFO of Highland,
17   did anybody ever tell you that that sentence
18   was wrong?
19        A.    Not that I'm aware.
20        Q.    Highland -- withdrawn.
21              HCMFA disclosed these notes in its
22   own audited financial statements; right?
23              MR. RUKAVINA:  Objection, form.
24        A.    I assume that these would be
25   material -- if these are material financial
```

Page 134

```
 1              WATERHOUSE - 10-19-21

 2    statements, yes, they -- they -- they should be

 3    and they were likely disclosed.

 4         Q.    Now, there is no statement

 5    concerning the 2019 notes about the forbearance

 6    that we looked at in the affiliated note

 7    section of the report; right?

 8              MS. DANDENEAU:   Objection to form.

 9         Q.    I'll withdraw.   That was bad.

10              Do you recall when we were looking

11    at the paragraph concerning HCMFA earlier it

12    had that disclosure about the agreement whereby

13    Highland wouldn't ask for demand on the -- on

14    the HCMFA notes?

15         A.    Yes.

16         Q.    That forbearance disclosure is not

17    made with respect to the 2019 notes; right?

18         A.    Not -- look, not that I can recall,

19    unless -- unless it was done at a subsequent

20    day.

21         Q.    Right.  And it is not in the

22    subsequent event section that we're looking at

23    right now where the 2019 notes are described;

24    right?

25         A.    Right.  But this is through
```

Appx. 01401

Page 135

```
 1              WATERHOUSE - 10-19-21

 2   June 3rd.  It could have been done on June 4th.

 3   I don't -- I don't -- I don't recall.

 4        Q.   Okay.

 5             MR. MORRIS:  Can we put up on the

 6        screen the HCMFA audit report.  And while

 7        we're --

 8             MS. DANDENEAU:  What exhibit is

 9        this?

10             MR. MORRIS:  La Asia, what number is

11        that?

12             MS. CANTY:  45.

13             MR. MORRIS:  So this will be marked

14        as Exhibit 45.

15             (Exhibit 45 marked.)

16             MS. CANTY:  Yeah, and I will put it

17        in the chat.

18             MS. DANDENEAU:  Thank you.

19        Q.   Okay.  All right.  Do you see that

20   this is the consolidated financial statements

21   for HCMFA for the period ending 12/31/18?

22        A.   Yes.

23        Q.   As the treasurer of HCMFA at the

24   time, did you have to sign a management

25   representation letter similar to the one that
```

Appx. 01402

Page 136

```
 1              WATERHOUSE - 10-19-21
 2    we looked at earlier for Highland?
 3        A.    I would imagine I would have been
 4    asked to.  I don't recall if I did.
 5        Q.    Do you recall ever being asked by an
 6    auditor to sign a management representation
 7    letter and then not doing it?
 8        A.    No.
 9              MR. MORRIS:  Can we just scroll down
10        again.  I just want to see the date of the
11        document.
12        A.    I mean, let me -- you know, there
13    are different versions to management
14    representation letters I will qualify.
15              Yes, there are certain -- from time
16    to time auditors can make representations
17    that -- in the rep letter that is being
18    proposed that are inaccurate or out of scope or
19    things like that and they've asked for
20    signature.
21              In that context, yes.  I mean, you
22    know -- I mean, if I have been asked to sign
23    and make those representations and those
24    representations are invalid, yes, I would not,
25    I mean, I -- I wouldn't sign that.
```

Appx. 01403

Page 137

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Okay.  PricewaterhouseCoopers served

 3   as HCMFA's outside auditors as well; correct?

 4       A.    Yes.

 5       Q.    Do you see that this audit report is

 6   signed on June 3rd, 2019, just like the

 7   Highland audit report?

 8       A.    That is correct.

 9       Q.    And did the process of -- of

10   preparing HCMFA's audit report, was that the

11   same process that Highland followed when it did

12   its audit report at this time?

13       A.    I mean, it is a different entity.

14   There are different assets.  You know, it --

15   it -- it is -- as you saw, Highland's

16   financials are on a consolidated basis.  This

17   is different, so it is under the same control

18   environment and team.

19       Q.    Okay.  I appreciate that.  So the

20   same control environment and team participated

21   in the preparation of the audit for Highland

22   and for HCMFA at around the same time; correct?

23       A.    Yes.

24             MR. MORRIS:  Can we go to page 17 of

25       the report.  I don't have the Bates number.
```

Page 138

```
 1                 WATERHOUSE - 10-19-21

 2        Q.     Okay.  Do you see that just like

 3    Highland's audited financial report, HCMFA's

 4    audited financial report also has a section

 5    related to subsequent events?

 6        A.     Yes.

 7        Q.     And am I reading this correctly that

 8    just as Highland had done, HCMFA disclosed in

 9    its audited financial report a subsequent event

10    that related to the issuance of promissory

11    notes to Highland in the aggregate amount of

12    $7.4 million in 2019?

13        A.     That is what I see in the report.

14        Q.     And you were the treasurer of HCMFA

15    at the time; right?

16        A.     Yes, to the best of my knowledge.

17        Q.     And did anybody ever tell you prior

18    to the time of the issuance of this audit

19    report that that sentence relating to HCMFA's

20    2019 notes was inaccurate or wrong in any way?

21        A.     Not that I recall.

22        Q.     As you sit here right now, has

23    anybody ever told you that that sentence is

24    inaccurate or wrong in any way?

25        A.     Not that I recall.
```

Page 139

```
 1                 WATERHOUSE - 10-19-21
 2        Q.    I apologize if I asked you this
 3    already, but has anybody ever told you at any
 4    time that you are not authorized to sign the
 5    promissory notes that are the subject of the
 6    sentence we're looking at?
 7        A.    Not that I recall.
 8        Q.    Did anybody ever tell you at any
 9    time that you had made a mistake when you
10    signed the promissory notes that are the
11    subject of this sentence?
12        A.    Say that again.  Did anyone ever say
13    that I made a mistake?
14        Q.    Let me ask the question again.
15              Did anybody ever tell you at any
16    time that you made a mistake when you signed
17    the two promissory notes in Highland's favor on
18    behalf of HCMFA in 2019?
19        A.    Not that I recall.
20              MR. MORRIS:  Let's just look at the
21        promissory notes quickly.  Can we please
22        put up Document Number 1, and so this is in
23        the pile that y'all have.  We'll just go
24        for a few more minutes and we can take our
25        lunch break.
```

Page 140

```
 1              WATERHOUSE - 10-19-21
 2      Q.    All right.  So I don't know if you
 3   have seen this before, sir.  Do you see that
 4   this is a complaint against HCMFA?
 5      A.    Yes, I am looking at it on the
 6   screen.
 7      Q.    Okay.  And have you ever seen this
 8   document before?
 9      A.    I went through some of these
10   documents with my counsel here yesterday.
11              MR. MORRIS:  All right.  Can we go
12         to Exhibit 1 of this document.
13      Q.    Do you see Exhibit 1 is a
14   $2.4 million promissory note back in 2019?
15      A.    Yeah, I found it in the book.  Yes,
16   I have it here in front of me.
17      Q.    And this is a demand note, right, if
18   you look at Paragraph 2?
19      A.    Yes.
20      Q.    And this is a note where the maker
21   is HCMFA, and Highland is the payee; right?
22      A.    Yes.
23              MR. MORRIS:  And if we can scroll
24         down, can we just see Mr. Waterhouse's
25         signature.
```

Appx. 01407

Page 141

```
 1                  WATERHOUSE - 10-19-21
 2        Q.    Is that your signature, sir?
 3        A.    Yes, it is.
 4        Q.    And did you sign this document on or
 5   around May 2nd, 2019?
 6        A.    I don't recall specifically signing
 7   this, but this is my signature.
 8        Q.    Okay.  And do you recall that
 9   Highland transferred $2.4 million to HCMFA at
10   or around the time you signed this document?
11        A.    I don't recall specifically.  I
12   would want to, as I sit here today, go back and
13   confirm that, but again, presumably that --
14   that -- that did happen.
15        Q.    You wouldn't have signed this
16   document if you didn't believe that HCMFA
17   either received or was going to receive
18   $2.4 million from Highland; is that fair?
19        A.    I mean, it -- if -- if -- if there
20   wasn't a transfer of value, yeah, I mean, you
21   know, I would have no reason to -- to sign a
22   note.
23        Q.    And -- and Highland wouldn't have
24   given this note to PricewaterhouseCoopers if --
25   withdrawn.
```

Page 142

```
 1                  WATERHOUSE - 10-19-21

 2                  HCMFA wouldn't have given this note

 3       to PricewaterhouseCoopers if it hadn't received

 4       the principal value of -- of the note in the

 5       form of a loan; correct?

 6                  MR. RUKAVINA:  Objection, legal

 7            conclusion, speculation and form.

 8       A.     Again, we -- what we provided to PwC

 9       were, as part of the audit, any promissory

10       notes executed and outstanding.  You know, as a

11       part of the audit, they, you know, they -- they

12       have copies of all the bank statements,

13       things -- things of that sort.

14                  MR. MORRIS:  Okay.  Can we go to

15            Exhibit 2.

16            (Exhibit 2 marked.)

17       Q.     Do you see that this is a promissory

18       note dated May 3rd, 2019 in the amount of

19       $5 million?

20       A.     Yes.

21       Q.     Do you believe this is also a demand

22       note if you look at Paragraph 2?

23       A.     Yes.

24       Q.     And do you see that HCMFA is the

25       maker, and Highland is the payee?
```

Page 143

```
 1              WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    And if we go to the bottom, can we

 4   just confirm that that is your signature?

 5        A.    Yes.

 6        Q.    And together these notes are the

 7   notes that are referred to both in Highland and

 8   HCMFA's audited financial reports in the

 9   subsequent event sections; correct?

10              MS. DANDENEAU:  Objection to form.

11        A.    They -- they -- they totaled

12   $7.4 million, so presumably, yes.

13        Q.    Okay.  And you were authorized to

14   sign these two notes; correct?

15              MR. RUKAVINA:  Objection, legal

16        conclusion.

17        A.    Yeah.  I mean, I'm -- I was the

18   officer of -- of HCMFA.  You know, I -- I'm not

19   the legal expert on -- on what that -- what

20   that confers to me or what it doesn't.  I mean,

21   that is my signature on the notes.

22        Q.    And you believed you were authorized

23   to sign the notes; is that fair?

24        A.    I signed a lot of documents in my

25   capacity, just because it is operational in
```

Page 144

```
 1                   WATERHOUSE - 10-19-21

 2     nature.  So, you know, to me this was just

 3     another document, to be perfectly honest.

 4          Q.    Sir, would you have signed

 5     promissory notes with the principal amount of

 6     $7.4 million if you didn't believe you were

 7     authorized to do so?

 8                   MS. DANDENEAU:  Objection to form.

 9          Q.    Are you frozen?

10          A.    No.  I'm just -- you know, it is --

11     you know, again, I typically don't sign

12     promissory notes, and I don't recall why I

13     signed these, but -- you know, but I did.

14          Q.    All right.  So listen carefully to

15     my question.  Would you have ever signed

16     promissory notes with a face amount of

17     $7.4 million without believing that you were

18     authorized to do so?

19          A.    No.  I mean, I'm -- I'm putting my

20     signature on there, so no.

21          Q.    Okay.  And would you have signed two

22     promissory notes obligating HCMFA to pay

23     Highland $7.4 million without Mr. Dondero's

24     prior knowledge and approval?

25                   MS. DEITSCH-PEREZ:  Object to the
```

Appx. 01411

Page 145

```
 1                 WATERHOUSE - 10-19-21

 2         form.

 3         A.    You know, from -- from what I recall

 4    around these notes, you know, I don't recall

 5    specifically Mr. -- Mr. Dondero saying to -- to

 6    make this a loan.

 7                 So my conversation with Mr. Dondero

 8    around the culmination of the NAV error as

 9    related to TerreStar which was a -- a -- I

10    think it was a year and a half process.  I

11    don't know, it was a multi-month process, very

12    laborious, very difficult.

13                 When we got to the end, I had a

14    conversation with Mr. Dondero on where to, you

15    know, basically get the funds to reimburse the

16    fund, and I recall him saying, get the money

17    from Highland.

18         Q.    And so he told you to get the money

19    from Highland; is that right?

20         A.    That is what I recall -- in my

21    conversation with him, that is -- that is what

22    I can recall.

23         Q.    Do you know who drafted these notes?

24         A.    I don't.

25         Q.    Did you ask somebody to draft the
```

Appx. 01412

Page 146

```
 1              WATERHOUSE - 10-19-21
 2   notes?
 3        A.    I didn't ask -- I don't specifically
 4   ask people to draft notes really.  I mean,
 5   again, you know, the legal group at Highland is
 6   responsible and has always been responsible for
 7   drafting promissory notes.
 8        Q.    So based on your -- based on the
 9   practice, you believe that somebody from the
10   Highland's legal department would have drafted
11   these notes.  Do I have that right?
12              MS. DEITSCH-PEREZ:  Object to the
13         form.  John, I also asked you for the Word
14         versions of these notes so we could look at
15         the properties, and you have not provided
16         them.  Are you intending to?
17              MR. MORRIS:  No.
18        Q.    Can you answer my question, sir?
19        A.    Again, I --
20              MS. DANDENEAU:  Do you want him to
21         repeat it?
22        A.    Yeah, why don't you repeat it?
23        Q.    Sure.  Mr. Waterhouse, based on the
24   practice that you have described in your
25   understanding, do you believe that these notes
```

Appx. 01413

Page 147

```
 1                 WATERHOUSE - 10-19-21
 2    would have been drafted by somebody in the
 3    legal department?
 4                 MS. DEITSCH-PEREZ:  Object to the
 5         form.
 6         A.    Yes.
 7         Q.    Okay.  And do you know who would
 8    have instructed -- do you have any knowledge as
 9    to who would have instructed the legal
10    department to draft these notes?
11                 MS. DEITSCH-PEREZ:  Object to the
12         form.
13         A.    It was whoever was working -- I
14    mean, it was likely someone on the team.  I
15    mean, I don't remember exactly on every note or
16    every document, but, again, a lot of these
17    things of this nature -- they're operational in
18    nature -- were handled by the team.
19                 The team knows to -- I mean, we
20    don't draft documents.  We're not lawyers.
21    We're not attorneys.  It is not what I do or
22    accountants do.
23                 So they are always instructed to go
24    and -- and go to the legal team to get
25    documents like this drafted.  Also, when you go
```

Page 148

```
 1                WATERHOUSE - 10-19-21
 2  to the legal team, the -- you know, we always
 3  loop in compliance.  And compliance -- when you
 4  go to the legal team, compliance is part of
 5  legal team.  They're made aware of -- of -- of
 6  these types of transactions.
 7        Q.    And do you believe that you had
 8  the -- withdrawn.
 9              Did you ever tell Mr. Dondero --
10  (inaudible) -- did you see those?
11        A.    Sorry.
12              MS. DEITSCH-PEREZ:  I did not hear
13        the end of that question.
14        Q.    Did you ever tell Mr. Dondero that
15  you signed these two notes?
16        A.    I don't recall ever -- no, I don't
17  recall having a conversation with him.
18        Q.    Did you ever discuss these two notes
19  with him at any time?
20        A.    The conversation, I recall, was what
21  I described earlier.  And that is the only time
22  I recall ever discussing this.
23        Q.    Okay.  But the corporate accounting
24  group had a copy of this -- of these two notes.
25  And pursuant to the audit process, the
```

Page 149

```
 1                    WATERHOUSE - 10-19-21

 2   corporate accounting group gave the two notes

 3   to PricewaterhouseCoopers in connection with

 4   the audit; correct?

 5             MS. DANDENEAU:  Objection to form.

 6        A.    Yes.  I mean, that is -- yeah, I

 7   mean, they -- unless the legal team can also

 8   retain copies of items like this.  I mean, I

 9   don't know everything that they would retain as

10   well.

11             The legal team would also, if they

12   had documents as part of audits, turn that over

13   to the auditors as well.  So it could have been

14   the corporate accounting team.  It could be

15   someone on the legal team.

16        Q.    All right.  So you didn't -- you

17   didn't draft this note; right?

18        A.    I -- I -- I did not.

19        Q.    But somebody at Highland did; is

20   that fair?

21             MS. DEITSCH-PEREZ:  Object to the

22        form.

23        A.    I don't know.  I mean, we can go to

24   the legal team.  I don't -- I'm not sitting

25   behind someone in legal.  Maybe they went to
```

Page 150

```
 1                  WATERHOUSE - 10-19-21
 2    outside counsel.  I have no idea.
 3         Q.    Did you have any reason to believe
 4    you weren't authorized to sign this note,
 5    either of these two notes?
 6         A.    I think I have already answered that
 7    question.
 8         Q.    Okay.  You didn't give these notes
 9    to PricewaterhouseCoopers; correct?
10              MS. DANDENEAU:  Objection to form.
11         A.    I don't recall giving these to
12    PricewaterhouseCoopers.
13         Q.    And in the practice that you have
14    described, somebody in the corporate accounting
15    group would have given these two notes to
16    PricewaterhouseCoopers; correct?
17              MS. DANDENEAU:  Objection to form.
18         A.    I think I've answered that.  I said
19    either the corporate accounting team or maybe
20    the legal team.
21              MR. MORRIS:  Okay.  Why don't we
22         take our lunch break here.
23              VIDEOGRAPHER:  We're going off the
24         record at 1:04 p.m.
25         (Recess taken 1:04 p.m. to 1:49 p.m.)
```

Appx. 01417

Page 151

```
 1                    WATERHOUSE - 10-19-21

 2                    VIDEOGRAPHER:  We are back on the

 3         record at 1:49 p.m.

 4         Q.    Mr. Waterhouse, did you speak with

 5    anybody during the break about the substance of

 6    this deposition?

 7         A.    I spoke to -- to Deb and Michelle.

 8         Q.    About the substance of the

 9    deposition?

10         A.    Yes.

11         Q.    Can you tell me what you talked

12    about?

13                    MS. DANDENEAU:  No.  We object on

14         the basis of privilege.

15         Q.    Okay.  You are going to follow your

16    counsel's objection here?

17         A.    Yes.

18         Q.    Okay.

19                    MR. MORRIS:  Can we put up on the

20         screen Exhibit 35.

21              (Exhibit 35 marked.)

22         Q.    Are you able to see that document,

23    sir?

24         A.    Yes.

25         Q.    Have you ever seen an incumbency
```

Appx. 01418

Page 152

```
 1              WATERHOUSE - 10-19-21
 2   certificate before?
 3        A.    I have.
 4        Q.    Do you have a general understanding
 5   of what an incumbency certificate is?
 6        A.    I have a general understanding.
 7        Q.    What is your general understanding?
 8        A.    You know, those -- my general
 9   understanding is that the incumbency
10   certificate basically lists folks that can --
11   are like authorized signers.
12        Q.    Okay.  And do you see that this is
13   an incumbency certificate for Highland Capital
14   Management Fund Advisors, L.P.?
15        A.    Yes.
16        Q.    Okay.  And if we could scroll down
17   just a little bit, do you see that it's dated
18   effective as of April 11th, 2019?
19        A.    Yes, I see that.
20        Q.    Okay.  And is that your signature in
21   the middle of the signature block?
22        A.    Yes, it is.
23        Q.    And by signing it, did you accept
24   appointment as the treasurer of HCMFA effective
25   as of April 11th, 2019?
```

Page 153

```
 1              WATERHOUSE - 10-19-21

 2       A.    Again, I'm not the legal -- I don't

 3  know if this makes me the treasurer or the

 4  appointment.  I don't know -- I don't know

 5  that, so I don't -- I don't know if that

 6  document -- again, I think -- again, I'm not

 7  the legal expert.  I think isn't there --

 8  aren't there other legal documents that detail

 9  who the officers are that could be incorporated

10  or things like that?  Again, I don't want to

11  play armchair attorney here.

12       Q.    I'm not asking you for a legal

13  conclusion.  I'm asking you for your knowledge

14  and understanding.  When you signed this

15  document, did you understand that you were

16  accepting an appointment as the treasurer of

17  HCMFA?

18              MS. DANDENEAU:  Objection to form.

19              MS. DEITSCH-PEREZ:  Objection, form.

20       A.    Again, I don't think this -- that

21  wasn't my understanding.  I don't think this

22  makes -- this document makes me the treasurer.

23       Q.    What do you think this document --

24  why did you sign this document?

25              MS. DEITSCH-PEREZ:  Objection to
```

Page 154

```
 1                 WATERHOUSE - 10-19-21
 2         form.
 3                 MR. MORRIS:  You're objecting to the
 4         form of the question when I asked him why
 5         did you sign the document?  What is the
 6         basis for the objection?
 7                 MS. DEITSCH-PEREZ:  Because, John, I
 8         think that it does call for a legal
 9         conclusion other than -- with him saying
10         because somebody told me to sign this
11         document.  But if you want to go there,
12         that is fine.
13                 MR. MORRIS:  Okay.
14                 MS. DANDENEAU:  I don't think --
15         he's already said he's not a lawyer.
16                 MR. MORRIS:  I'll allow the witness
17         to answer this question.
18         Q.   Why did you sign this document, sir?
19         A.    I mean, our -- our legal group would
20    bring by these incumbency certificates from
21    time to time.  I have no idea why they're being
22    updated, and I was asked to sign.
23         Q.   Did you ask anybody, what is this
24    document?
25         A.    No.
```

Appx. 01421

Page 155

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    Did anybody tell you why they needed

 3   you to sign the document?

 4        A.    Not that I can recall.

 5        Q.    You testified earlier that you

 6   understood that you served as the acting

 7   treasurer for HCMFA; correct?

 8        A.    Yes.

 9        Q.    How did you become the acting

10   treasurer of HCMFA?

11              MS. DANDENEAU:  Objection to form.

12        A.    I don't -- I don't know the legal --

13   I don't know the legal mechanic of how I became

14   the acting treasurer.

15        Q.    I'm not asking for the legal

16   mechanic.  I'm asking you as the person who

17   is --

18              MS. DANDENEAU:  John, you said --

19              MR. MORRIS:  Stop.

20              MS. DANDENEAU:  -- how did you

21        become the treasurer.  That is --

22              MR. MORRIS:  Please stop.

23              MS. DANDENEAU:  That is a legal

24        question.

25              MR. MORRIS:  I am not asking any
```

Page 156

```
 1                  WATERHOUSE - 10-19-21

 2          legal questions, to be clear.  I'm asking

 3          for this witness' understanding as to how

 4          he became the acting treasurer of HCMFA.

 5          If he doesn't know, he can say he doesn't

 6          know, but this legal stuff is nonsense, and

 7          I really object to it.

 8      Q.   Sir, I'm asking you a very simple

 9  question.

10              MS. DANDENEAU:  Argumentative.

11      Q.   You testified -- you testified that

12  you became the acting treasurer of HCM --

13  HCMFA; correct?

14      A.   Yes.

15      Q.   How did that happen?

16              MS. DANDENEAU:  Again, object to

17          form.

18              MR. MORRIS:  I can't wait to do this

19          in a courtroom.  Good God.

20      Q.   Go ahead, sir.

21      A.    I don't know the exact process of

22  how that happened.

23      Q.   Do you have any idea whether signing

24  this document was part of the process?

25              MR. MORRIS:  You know what --
```

Page 157

```
 1          WATERHOUSE - 10-19-21

 2          MS. DANDENEAU:  Objection.

 3          MR. MORRIS:  -- withdrawn.  You guys

 4   want to do this, I can't wait.  I can't

 5   wait.  This is the craziest stuff ever.

 6          MS. DANDENEAU:  John, he said he's

 7   not a lawyer, and you are asking him for a

 8   legal conclusion, and he says he doesn't

 9   know, and you persist.

10          MR. MORRIS:  Okay.

11          MS. DANDENEAU:  So you can ask these

12   questions --

13          MR. MORRIS:  Did anyone -- please

14   stop talking.

15          MS. DANDENEAU:  -- at another

16   point -- no, no, no, I'm entitled to talk,

17   too; right?  If you're going to make these

18   accusations as if we're trying to stonewall

19   you, this is not the witness to ask that

20   question.

21          MR. MORRIS:  I can't -- I can't

22   wait -- I can't wait to do this in a

23   courtroom.  I will just leave it at that.

24          MS. DANDENEAU:  That's right, I'm

25   sure you can't.
```

Page 158

```
1              WATERHOUSE - 10-19-21

2       Q.    Did anyone ever tell you, sir, that

3   even though you were the acting treasurer of

4   HCMFA, that you were not authorized to sign the

5   two promissory notes that we looked at before

6   lunch?

7       A.    I'm not sure I understand the

8   question.  I wasn't -- I mean, I'm -- I'm the

9   current acting treasurer.

10      Q.    Did anybody ever tell you at any

11  time that even though you were the acting

12  treasurer of HCMFA, that you were not

13  authorized to sign the two promissory notes

14  that we looked at before lunch?

15            MS. DANDENEAU:  Objection to form.

16      A.    Not that I recall.

17      Q.    Did anybody ever tell you at any

18  time that you were not authorized to sign the

19  two promissory notes that we looked at before

20  lunch?

21      A.    Not that I recall.

22      Q.    Did anybody ever tell you at any

23  time that you should not have signed the two

24  promissory notes that we looked at before

25  lunch?
```

Page 159

```
 1                 WATERHOUSE - 10-19-21
 2         A.    Not that I recall.
 3         Q.    Did you ever tell anybody at any
 4   time that you weren't authorized to sign the
 5   two promissory notes that we looked at before
 6   lunch?
 7         A.    Not that I recall.
 8         Q.    Did you ever tell anybody at any
 9   time that you made a mistake when you signed
10   the two promissory notes that we looked at
11   before lunch?
12         A.    Not that I recall.
13         Q.    As you sit here right now, do you
14   have any reason to believe that you were not
15   authorized to sign the two documents that we
16   looked at before lunch?
17               MS. DANDENEAU:  Objection to form.
18         A.    If -- if this is the -- the valid
19   incumbency certificate, I mean, this does --
20   this does detail who the signers are.
21         Q.    Okay.  And looking at that document,
22   does that give you comfort that you were
23   authorized to sign the two promissory notes
24   that we looked at before lunch?
25               MS. DEITSCH-PEREZ:  Object to the
```

Page 160

1                    WATERHOUSE - 10-19-21

2           form.

3                    MS. DANDENEAU:  Objection, form.

4      A.    Yes.

5      Q.    As of October 20th -- withdrawn.

6                    I'm trying to take your mind back to

7      a year ago, October 2020.  Do you recall at

8      that time that the boards of the retail funds

9      were making inquiries about obligations that

10     were owed by the advisors to Highland in

11     connection with their 15(c) review?

12                   MS. DANDENEAU:  Objection to form.

13     A.    I don't -- I don't recall.

14     Q.    As of October 2020, you had no

15     reason to believe you weren't authorized to

16     sign the two promissory notes that we just

17     looked at; correct?

18                   MS. DANDENEAU:  Objection, form.

19                   MS. DEITSCH-PEREZ:  Objection to

20          form.

21     A.    I didn't think about it in October

22     of 2020, but I mean --

23     Q.    Did you have any reason to believe

24     at that time that you weren't authorized to

25     sign the two notes that we just looked at?

Page 161

```
 1                 WATERHOUSE - 10-19-21

 2         A.    Not that I'm aware, no.

 3         Q.    Did you have any reason to believe a

 4    year ago that you made a mistake when you

 5    signed those two notes?

 6         A.    Not that I'm aware.

 7         Q.    A year ago you believed that HCMFA

 8    owed Highland the unpaid principal amounts that

 9    were due under those two notes; correct?

10         A.    They're -- they're promissory notes

11    that were -- as you presented, that were --

12    that were executed.  Whether they're valid or

13    if there's other reasons, I didn't -- I don't

14    know.

15         Q.    I'm not asking you whether they're

16    valid or not.  I'm asking you for your state of

17    mind.  A year ago you believed that HCMFA

18    was -- was obligated to pay the unpaid

19    principal amount under the two notes that you

20    signed; correct?

21         A.    Yeah, I'm -- I'm -- yes.

22         Q.    Thank you.  Are you aware -- you're

23    aware that -- that in 2017, NexPoint issued a

24    note in favor of Highland in the approximate

25    amount of $30 million; correct?
```

Page 162

```
 1                    WATERHOUSE - 10-19-21

 2          A.    I'm -- I'm -- I'm generally aware.

 3          Q.    Okay.  And are you generally aware

 4    that from time to time, after the note was

 5    issued by NexPoint, that moneys were applied to

 6    principal and interest that were due under the

 7    NexPoint note?

 8          A.    Yes, I'm generally aware.

 9          Q.    Okay.  And did anybody ever tell you

10    that the payments that were made against the

11    NexPoint notes were made by mistake?

12          A.    Yes.

13          Q.    And is it the one payment that we

14    talked about earlier today?

15          A.    We talked about a lot of things

16    today.  What payment are we talking about?

17          Q.    Okay.  Who told you that any payment

18    made against the NexPoint note was made by

19    mistake?

20          A.    D.C. Sauter.

21          Q.    When did Mr. Sauter tell you that?

22          A.    I don't -- I don't remember

23    specifically.

24          Q.    Do you remember what payments --

25          A.    Sometime -- sometime this year.
```

Appx. 01429

Page 163

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Sometime in 2021?

 3       A.    Yes.

 4       Q.    Do you remember what payment he was

 5   referring to?

 6       A.    It was the -- the payment made in

 7   January of 2021 or -- yeah, January of -- of

 8   this -- January of 2021.

 9       Q.    Okay.  So did anybody ever tell you

10   at any time that any payment that was made

11   against principal --

12       A.    And -- and -- and -- hold on, and it

13   may have been other -- again, it may have been

14   that payment or -- or there may have been what

15   he was explaining, a misapplication of prior

16   payments as well.

17       Q.    Can you -- can you give me any

18   specificity -- withdrawn.

19              Withdrawn.  Can you tell me

20   everything that Mr. Sauter told you about --

21   about errors in relation to payments made

22   against principal and interest due under the

23   NexPoint note?

24              MS. DANDENEAU:  Can I just --

25              MR. RUKAVINA:  Hold on.  Hold on.
```

Page 164

```
 1               WATERHOUSE - 10-19-21
 2       I'm going to object here, and I'm going to
 3       instruct the witness not to answer
 4       depending on the discussion that you had --
 5       Mr. Waterhouse, I'm the lawyer for
 6       NexPoint, and as everyone here knows, D.C.
 7       Sauter is in-house counsel.
 8            So if you and Mr. Sauter were having
 9       a factual discussion and him preparing his
10       affidavit, et cetera, then go ahead and
11       answer that.  But if you were having a
12       discussion as to our legal strategy in this
13       lawsuit, or anything having to do with
14       that, then do not answer that.
15            And if you need to talk to either
16       your counsel or me about that, then we need
17       to have that discussion now.
18       A.    Okay.  Yeah, I don't -- I don't
19  really know how to make that distinction, so
20  maybe I need to talk to counsel before I
21  answer, or if I can answer.
22       Q.    Let me just ask you this question:
23  Did -- did you have any conversation with
24  Mr. Sauter about any payment of principal and
25  interest prior to the time that you left
```

Page 165

```
 1                WATERHOUSE - 10-19-21
 2   Highland's employment, or did it happen after
 3   you left Highland's employment?
 4        A.    I don't -- I don't recall if -- I
 5   don't recall.  I mean, it was sometime in 2021.
 6   I don't remember if it was before or after I
 7   was let go from Highland.
 8        Q.    Okay.  So -- so nobody told you
 9   prior to 2021 that any error or mistake was
10   made in the application of payments against
11   principal and interest due on the NexPoint
12   note.  Do I have that right?
13        A.    Yeah, I don't -- I don't recall this
14   being in 2020.
15        Q.    Okay.  And it didn't happen in 2019;
16   correct?
17        A.    I don't recall that happened.
18        Q.    And it didn't happen in 2018;
19   correct?
20        A.    I don't -- I don't recall that
21   happening.
22        Q.    And it didn't happen in 2017;
23   correct?
24        A.    I don't recall.
25        Q.    But -- but you believe the
```

Appx. 01432

Page 166

```
 1              WATERHOUSE - 10-19-21
 2   conversation took place in 2021.  You just
 3   don't remember if it was before or after you
 4   left Highland's employment.  Do I have that
 5   right?
 6        A.    It was sometime this year.  I
 7   don't -- I don't remember.
 8        Q.    Okay.  Did you report this
 9   conversation to Mr. Seery at any point?
10        A.    I don't believe so.
11        Q.    Did you report this conversation to
12   anybody at DSI at any time?
13        A.    I don't recall.
14        Q.    Do you have -- you don't have a
15   recollection of ever doing that; correct?
16        A.    Yeah, that's right.  I don't recall
17   doing that.
18        Q.    Do you recall telling anybody at
19   Pachulski Stang about the conversation you
20   recall with Mr. Sauter?
21        A.    No, I don't -- I don't recall.
22        Q.    Did you tell any of the independent
23   board members about your conversation with
24   Mr. Sauter?
25        A.    I don't recall.
```

Page 167

```
 1              WATERHOUSE - 10-19-21

 2        Q.    Did you tell any of the employees at

 3   Highland before you left Highland's employment

 4   about this call that you had with Mr. Sauter?

 5              MS. DANDENEAU:  Objection to form.

 6        A.    No, I don't -- no, I don't recall.

 7        Q.    NexPoint -- to the best of your

 8   knowledge, did NexPoint ever file a proof of

 9   claim against Highland to try to recover moneys

10   that were mistakenly paid against the principal

11   and interest due under the note?

12        A.    Okay.  Hold on.  You are saying did

13   NexPoint Advisors file a proof of claim to

14   Highland for errors related to payments under

15   the NexPoint note to Highland?

16        Q.    Correct.

17        A.    I'm -- I'm -- I'm not -- I'm not

18   aware.

19        Q.    Are you aware --

20        A.    I'm not the legal person here, I

21   don't know.

22        Q.    I'm just asking for your knowledge,

23   sir.

24        A.    Yeah, I don't know.  I'm not aware.

25        Q.    Are you aware of any claim of any
```

Appx. 01434

Page 168

```
 1                 WATERHOUSE - 10-19-21
 2      kind that NexPoint has ever made to try to
 3      recover the amounts that it contends were -- or
 4      that Mr. Sauter contend were mistakenly applied
 5      against principal and interest due under the
 6      NexPoint note?
 7           A.    I'm not aware.
 8                 MS. DANDENEAU:  Objection to form.
 9           Q.    Okay.  The advisors' agreements with
10      the retail funds are subject to annual renewal;
11      correct?
12           A.    Yes.
13           Q.    And do you participate in the
14      renewal process each year?
15           A.    Yes.
16           Q.    What role do you play in the renewal
17      process?
18           A.    I'm -- I'm asked by the retail board
19      to walk-through the advisors financials.
20           Q.    And do you do that in the context of
21      a board meeting?
22           A.    Yes, it is -- yes, it is typically
23      done in a board meeting.
24           Q.    And do you recall the time --
25      does -- does the renewal process happen around
```

Appx. 01435

Page 169

```
 1                    WATERHOUSE - 10-19-21
 2     the same time each year?
 3          A.    Yes, it is -- it is around the same
 4     time every year.
 5          Q.    And what -- what time period of the
 6     year does the renewal process occur?
 7          A.    Approximately the September
 8     timeframe.
 9          Q.    During that process, in your
10     experience, does the board typically conduct
11     its own diligence and ask for information?
12          A.    Does the board ask for lots of -- I
13     mean, just -- I mean, lots of information as a
14     part of that -- that -- as part of that board
15     meeting and that process.
16          Q.    Okay.  And do you recall that the
17     process in 2020 spilled into October?
18          A.    Yes.  Yes.
19          Q.    Okay.  And as part of the process in
20     2020, the retail board asked -- asked what are
21     referred to as 15(c) questions; right?
22          A.    I guess I don't want to be -- they
23     asked 15(c) -- are you saying they asked 15(c)
24     questions and this is why it went into October
25     or --
```

Appx. 01436

Page 170

```
 1                    WATERHOUSE - 10-19-21

 2          Q.    No, I apologize.

 3                Do you have an understanding of

 4     what -- of what 15(c) refers to in the context

 5     of the annual renewal process?

 6          A.    Yes, generally.

 7          Q.    All right.  What is your general

 8     understanding of the term "15(c)" in the

 9     context of the annual renewal process?

10          A.    I -- I think 15(c) is the section

11     that -- that -- you know, that -- that the

12     board has to evaluate every year, the retail

13     board.  They have to, you know, go through,

14     evaluate, and go through that approval process

15     on a yearly basis.

16          Q.    Okay.

17                MR. MORRIS:  Can we put up on the

18          screen Exhibit 36, please.

19                (Exhibit 36 marked.)

20                MR. MORRIS:  I guess let's just

21          start at the bottom so Mr. Waterhouse can

22          see what is here.

23          Q.    You see this begins with an email

24     from Blank Rome to a number of people.

25                MR. MORRIS:  And if we can scroll
```

Page 171

```
 1                  WATERHOUSE - 10-19-21

 2          up -- keep going just a little bit.

 3          Q.    You will see that there is an email

 4     from Lauren Thedford to Thomas Surgent and

 5     others where she reports that she was attaching

 6     and reproducing below additional 15(c)

 7     follow-up questions from the board.

 8                Do you see that?

 9          A.    Yes.

10          Q.    And do you see Question No. 2 asks

11     whether there are any material outstanding

12     amounts currently payable or due in the future

13     (e.g., notes) to HCMLP by HCMFA or NexPoint

14     Advisors or any other affiliate that provides

15     services to the funds?

16                Do you see that?

17          A.    Yes.

18          Q.    And -- and did you -- do you recall

19     that in -- in October of 2020 the retail boards

20     were asking for that information?

21          A.    I don't recall it, but there --

22     they're obviously asking in this email.

23          Q.    Okay.

24                MR. MORRIS:  Can we scroll up a

25          little bit, please.
```

Appx. 01438

Page 172

```
 1              WATERHOUSE - 10-19-21

 2         Q.    And then do you see that

 3    Ms. Thedford includes you on the email string

 4    on Tuesday, October 6th, at 5:52?

 5         A.    Yes.

 6         Q.    And she asks you and Dave Klos and

 7    Kristin Hendrix for advice on that particular

 8    Request No. 2 that I have just read; right?

 9         A.    Yes.

10         Q.    Okay.  Can you tell me who

11    Ms. Thedford is?

12         A.    She was an attorney that was in the

13    legal group.

14         Q.    At Highland Capital Management,

15    L.P.?

16         A.    I'm -- I'm -- I'm -- I don't

17    remember if she was an employee of Highland or

18    any of the advisors.

19         Q.    Okay.  Do you know if she served as

20    the corporate secretary for both HCMFA and

21    NexPoint?

22         A.    Yes.

23         Q.    And -- okay.

24               Do you know whether Ms. Thedford

25    held any positions in relation to the retail
```

Page 173

```
 1              WATERHOUSE - 10-19-21
 2   funds as we defined that term?
 3        A.   Yes.
 4        Q.   What is your understanding of the
 5   positions that Ms. Thedford held at the retail
 6   funds?
 7        A.   I -- I recall her being an officer.
 8   I don't recall her title.
 9        Q.   Okay.  Is she still an officer at
10   any of the retail funds today?
11        A.   No.
12        Q.   Do you know when she ceased to be an
13   officer of the retail funds?
14        A.   Approximately.
15        Q.   And when did she approximately cease
16   to be an officer of the retail funds?
17        A.   It was in -- it was in early of
18   2021.
19        Q.   Okay.  Do you know when she became
20   an officer of the retail funds?
21        A.   I don't recall.
22        Q.   To the best of your recollection,
23   was she an officer of the retail funds in
24   October of 2020?
25        A.   I believe so.
```

Page 174

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    Okay.  Do you know what title she

 3   held in her capacity as an officer, if any?

 4        A.    I told you I don't remember.

 5        Q.    Okay.  So she sends this email to

 6   you at 5:52 p.m. on October 6th.

 7              And if we can scroll up to the

 8   response, you responded a minute later with a

 9   one-word answer:  Yes.

10              Do you see that?

11        A.    Yes.

12        Q.    And -- and yes is -- yes was in

13   response to the retail board's Question No. 2,

14   right, whether there are any material

15   outstanding amounts currently payable or due in

16   the future?

17        A.    Yes.

18              MR. MORRIS:  And can we scroll up to

19        see what happened next.

20        Q.    So Ms. Thedford writes back to you a

21   few minutes later and she asks whether you

22   could provide the amounts.

23              Do you see that?

24        A.    Yes.

25        Q.    And then you respond further and you
```

Appx. 01441

Page 175

```
 1              WATERHOUSE - 10-19-21

 2   refer her to the balance sheet that was

 3   provided to the board as part of the 15(c)

 4   materials.

 5              Do you see that?

 6        A.    Yes.

 7        Q.    And -- and did the advisors provide

 8   to the board certain balance sheets in 2020 in

 9   connection with the 15(c) review?

10        A.    Yes, they did.

11        Q.    Okay.  And were the amounts that

12   were outstanding or that were to be due in the

13   future by the advisors to Highland included in

14   the liability section of the balance sheet that

15   was given to the retail board?

16        A.    Yes.  Notes would be reflected as

17   liabilities.

18        Q.    Okay.  And --

19        A.    If I'm understanding your question

20   correctly.

21        Q.    You are.  And -- and -- and those

22   liabilities you -- you were -- you believed

23   were responsive to the retail board's question;

24   correct?

25        A.    Yes.
```

Page 176

 1              WATERHOUSE - 10-19-21

 2        Q.    Okay.  And then if we can scroll up,

 3   you see Ms. Thedford responds to you

 4   nine minutes later with a draft response.

 5              Do you see that?

 6        A.    Yes.

 7        Q.    And she says that she is taking from

 8   the 6/30 financials certain information about

 9   amounts that were due to HCMLP and affiliates

10   as of June 30th, 2020.

11              Do you see that?

12        A.    I do.

13        Q.    Okay.  And did you believe, as the

14   treasurer of NexPoint and HCMFA and as the CFO

15   of Highland, that the information that

16   Ms. Thedford obtained from the 6/30 financials

17   was accurate and responsive in relation to the

18   retail fund board's question?

19        A.    I just want to make sure I

20   understand the question.

21              Are you saying that the financial

22   information provided to the retail board as

23   part of the 15(c) process, which included

24   financial statements as of June 30th of 2021,

25   did I feel like those were responsive to their

Appx. 01443

```
                                                      Page 177
 1              WATERHOUSE - 10-19-21

 2    questions?

 3         Q.    Yes.

 4         A.    Yes.

 5         Q.    Thank you.

 6              MS. DEITSCH-PEREZ:  John, it is not

 7         in the chat yet.  Can you just make sure it

 8         gets put in there.

 9              MR. MORRIS:  Sure.

10              MS. CANTY:  I put it in there.  I

11         think maybe I just sent it directly, so let

12         me make sure it says to everyone.  But I

13         did put it in there.  I will try again.

14              MR. MORRIS:  Thank you, La Asia.

15              MS. DANDENEAU:  What number is it.

16              MR. MORRIS:  What, the Bates number?

17              MS. DEITSCH-PEREZ:  No, the --

18         this -- yeah, 36 is not in the chat.

19              MR. MORRIS:  Okay.  We'll get it.

20              MS. DANDENEAU:  I think that

21         Ms. Canty just sent it to me originally.

22         Sorry.

23              MR. MORRIS:  Okay.  We will get it

24         there.

25              MS. CANTY:  Okay.  It is there now
```

Appx. 01444

Page 178

```
 1              WATERHOUSE - 10-19-21

 2      for everyone.

 3              MS. DEITSCH-PEREZ:  Got it.  Thank

 4      you.

 5      Q.    Do you recall if the proposed

 6  response that Ms. Thedford crafted was

 7  delivered to the retail board with the -- with

 8  the yellow dates having been completed?

 9      A.    I don't know.

10              MR. MORRIS:  Davor, I'm going to ask

11      that the advisors and -- the advisors of

12      both HCMFA and NexPoint produce to me any

13      report that was given to the retail board

14      concerning the promissory notes at issue,

15      including the obligations under the notes.

16      Q.    Do you know -- do you know if

17  ultimately NexPoint informed the retail board

18  in response to its question that NexPoint owed

19  Highland approximately 23 or $24 million?

20              MS. DANDENEAU:  Objection to the

21      form.

22      A.    Sorry, are you asking, did NexPoint

23  tell the retail board that it owed Highland?

24      Q.    Let me ask a better question,

25  Mr. Waterhouse.
```

Page 179

```
 1                  WATERHOUSE - 10-19-21

 2               Did -- do you know if anybody ever

 3      answered the retail board's question that was

 4      Number 2?

 5          A.    I don't -- I can't say for sure.

 6          Q.    Okay.  Do you recall -- I think you

 7      testified earlier that you walked through the

 8      advisors' financials with the retail board;

 9      correct?

10          A.    Yes.

11          Q.    And as part of that process, did you

12      disclose to the retail board the obligations

13      that NexPoint and HCMFA had to Highland under

14      promissory notes?

15          A.    The retail board, as I stated

16      earlier, receives financial information,

17      balance sheet, income statement information

18      from the advisors.  That information is

19      provided to the retail board in connection with

20      the 15(c) process.

21               So any notes between the advisors

22      and the Highland would be -- anything would be

23      detailed in those financial statements.

24          Q.    Do you recall in 2020 ever speaking

25      with the retail board about the advisors'
```

Appx. 01446

Page 180

```
 1                   WATERHOUSE - 10-19-21
 2   obligations under the notes to Highland?
 3                MS. DANDENEAU:  Objection to form.
 4                MS. DEITSCH-PEREZ:  Object to the
 5         form.
 6         A.   I don't recall specifically.
 7         Q.   Do you have any general recollection
 8   of discussing with the retail board the
 9   advisors' obligations to Highland under the
10   notes that they issued?
11                MS. DANDENEAU:  Object to the form.
12                MS. DEITSCH-PEREZ:  Object to the
13         form.
14         A.   I just recall generally just -- it
15   is just -- I present the financial statements,
16   and if they have questions, I answer their
17   questions and walk them through.
18                I don't recall what they asked.  I
19   don't recall where the discussion went.  I
20   don't recall anything of that nature.
21         Q.   Okay.  Do you know if anybody on
22   behalf of HCMF -- HCMFA ever told the retail
23   board that HCMFA had no obligations under the
24   two 2019 notes that you signed?  Withdrawn.
25                Do you know whether anybody on
```

Appx. 01447

Page 181

```
 1              WATERHOUSE - 10-19-21

 2    behalf of HCMFA ever told the retail boards

 3    that you weren't authorized to sign either of

 4    the two 2019 notes?

 5              MS. DANDENEAU:  Objection to form.

 6         A.   I'm not aware.

 7         Q.   Are you aware of anybody on behalf

 8    of HCMFA ever telling the retail boards that

 9    your execution of the two 2019 notes was a

10    mistake?

11              MS. DANDENEAU:  Objection to form.

12         A.   I'm not aware.

13         Q.   Are you aware of anybody on behalf

14    of HCMFA ever telling the retail boards that

15    HCMFA did not have to pay the amounts reflected

16    in the two notes that you signed in 2019?

17         A.   I'm not aware.

18         Q.   Do you know whether anybody ever

19    told the retail boards -- withdrawn.

20              Do you know whether anybody ever

21    told the retail boards that Highland has

22    commenced a lawsuit to recover on the two notes

23    that you signed in 2019?

24         A.   I'm not aware.

25         Q.   Are you aware of anybody informing
```

Page 182

```
 1                WATERHOUSE - 10-19-21

 2   the retail boards that Highland has sued to

 3   recover on the NexPoint note?

 4        A.    I'm not aware.

 5        Q.    Do you know whether anybody ever

 6   told the retail board that Highland had

 7   declared a default with respect to the two

 8   HCMFA notes that you signed in 2019?

 9        A.    I'm not aware.

10        Q.    Are you aware of anybody ever

11   informing the retail boards that Highland had

12   declared a default under the NexPoint note?

13        A.    I'm not aware.

14        Q.    Are you aware of anybody telling the

15   retail board that Highland made a demand for

16   payment under the 2019 notes that you signed on

17   behalf of HCMFA?

18        A.    I'm not aware.

19        Q.    Let's -- let's see if there is a

20   response to Ms. Thedford's email, if we can

21   scroll up.

22              Do you see you responded to

23   Ms. Thedford five minutes after she provided

24   the draft response to you?

25        A.    Yes.
```

Page 183

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  And do you see that Dustin

3    Norris is copied on this email?

4        A.    Yes, he is.

5        Q.    Great.  Do you know whether

6    Mr. Norris held any positions at either of the

7    advisors as of October 6, 2020?

8        A.    I will go back to -- I'm not the

9    legal expert of what appoints you or how or

10   why, but you did see Dustin's name on the

11   incumbency certificate that you produced

12   earlier.

13       Q.    Do you know what his title was in

14   October of 2020?

15             MS. DANDENEAU:  Objection to form.

16       A.    I don't -- I don't recall.

17       Q.    Was he -- did he have a title with

18   each of the advisors, to the best of your

19   recollection?

20       A.    I don't recall.

21       Q.    Do you know why he is included on

22   this email string?

23       A.    I didn't add Dustin.  It looks like

24   Lauren did.  I don't know why she added him or

25   not.  You would have to ask her.

Page 184

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Does Mr. Norris play a role in

 3   formulating the advisors' responses to the

 4   questions asked by the retail board in

 5   connection with the 15(c) annual review?

 6             MS. DANDENEAU:  Objection to form.

 7       A.    He -- Dustin Norris is there in the

 8   board meetings.  But -- so he has a role, yes.

 9       Q.    Okay.  And does Mr. Norris hold any

10   positions, to the best of your knowledge, in

11   relation to any of the retail funds?

12       A.    I don't -- I don't believe he does.

13       Q.    How about Mr. Post, do you know

14   whether Mr. Post holds any position in either

15   of the advisors?

16       A.    I mean, he -- he -- yes.

17       Q.    What is your understanding of the

18   positions that Mr. Post holds in relation to

19   the advisors?

20             MS. DANDENEAU:  Objection to form.

21       A.    He is an employee of NexPoint

22   Advisors.  He is also the chief compliance

23   officer for -- for NexPoint.

24       Q.    Who is the chief compliance officer

25   for HCMFA, if you know?
```

Page 185

```
 1                WATERHOUSE - 10-19-21

 2                MS. DANDENEAU:  Objection to form.

 3       A.    That would be Jason as well.

 4       Q.    Okay.  Now, looking at your

 5  response, you noted initially that nothing was

 6  owed under shared services.  Do I have that

 7  right in substance?

 8       A.    Yeah.  I think I'm being responsive

 9  to Lauren's question here, whether any of the

10  shared service invoices are outstanding.

11       Q.    Right.

12       A.    Yes.

13       Q.    And that is because -- and that is

14  because the retail the retail board has asked

15  for the disclosure of all material obligations

16  that were owed to HCMLP either then or in the

17  future; isn't that right?

18                MS. DANDENEAU:  Objection to form.

19       Q.    We can go back down and look.

20       A.    Look, I don't know if that's a

21  material item, I mean, again, but sure.

22       Q.    Okay.  But there were no shared

23  services outstanding; correct?

24                MS. DANDENEAU:  Objection to form.

25       A.    That is what this email seems to
```

Appx. 01452

Page 186

```
 1                  WATERHOUSE - 10-19-21
 2    indicate.
 3         Q.    And you wouldn't have written it if
 4    you didn't believe it to be true at the time;
 5    correct?
 6         A.    Correct.
 7         Q.    And when you referred to shared
 8    services outstanding, what you meant there was
 9    that neither NexPoint nor HCMFA owed Highland
10    any money under the shared services agreements
11    that they had with Highland as of October 6th,
12    2020; right?
13         A.    I don't know if it is as of October
14    6, 2020 or if it was from -- like through the
15    financials -- through the date of the
16    financials as of June 30.
17         Q.    Okay.  And then you noted that
18    HCMA -- the HCMFA note is a demand note; right?
19         A.    Yes.
20         Q.    And then you referred Ms. Thedford
21    to Kristin Hendrix for the term of the NexPoint
22    note.  Do I have that right?
23         A.    Yes.
24         Q.    And then you refer to that agreement
25    that is referenced in the 2018 audited
```

Appx. 01453

Page 187

```
 1                    WATERHOUSE - 10-19-21
 2      financials about Highland's agreement not to
 3      make demand upon HCMFA until May 2021; correct?
 4          A.    Correct.
 5          Q.    And then -- and then the next thing
 6      you write is that the attorneys think that BK
 7      doesn't change that, but don't know for sure at
 8      the end of the day.
 9                Do you see that sentence?
10          A.    Yes.
11          Q.    Which attorneys were you referring
12      to?
13          A.    I don't remember.
14          Q.    Did you have a conversation with
15      attorneys concerning whether the bankruptcy
16      would change or alter in any way the agreement
17      not to make a demand under the HCMFA note?
18          A.    Look, yeah, I mean, I don't
19      specifically remember, but generally, I mean,
20      it is in this email.  I don't -- I don't -- I
21      don't -- I don't remember who I talked to or,
22      you know, was it inside counsel, outside
23      counsel, but obviously I talked to somebody.
24          Q.    Do you have any recollection --
25          A.    Well, I don't even know if it's --
```

Page 188

1          WATERHOUSE - 10-19-21

2   actually, it may not even have been me.  I say

3   the attorneys in, you know, a lot of -- like I

4   talked about the team.

5          It could have been someone on the

6   team, like, hey, we need to run this down, and

7   maybe they talked to attorneys again and

8   relayed that information to me.

9          So I really don't know if I spoke or

10  someone else did or -- or, I mean, and maybe it

11  wasn't even from corporate accounting.  Maybe

12  it was, you know, other -- I'm kind of

13  summarizing, you know, again, so I don't really

14  know -- I can't really say for sure.  I don't

15  remember how I came about of this knowledge.

16     Q.    I appreciate your efforts,

17  Mr. Waterhouse, but I will just tell you that

18  if I ask a question and you don't know the

19  answer or you don't recall, I'm happy to accept

20  that.  I don't -- I don't want you to

21  speculate, so I want to be clear about that.

22  So I appreciate it.

23          Let me just ask you simply:  Do you

24  know what attorneys -- can you identify any of

25  the attorneys who thought that the bankruptcy

Page 189

```
 1                WATERHOUSE - 10-19-21
 2   process didn't change the agreement?
 3        A.    I don't recall.
 4        Q.    Okay.  Perfect.
 5              And then let's look at the last
 6   sentence.  It says, quote:  The response should
 7   include, as I covered in the board meeting,
 8   that both entities have the full faith and
 9   backing from Jim Dondero, and to my knowledge
10   that hasn't changed.
11              Do you see that?
12        A.    Yes.
13        Q.    Okay.  Prior to October 6th, 2020,
14   had you told the retail board that HCMFA and
15   NexPoint have the full faith and backing from
16   Jim Dondero?
17        A.    Yes.
18        Q.    Do you remember in the context in
19   which you told the retail board that?
20        A.    I mean, generally, yes.
21        Q.    Tell me what you recall.
22        A.    So we were walking through the
23   financials from the advisors; right?  So as I
24   described to you, you have got HCMFA and NPA.
25   And these -- the financials, you know, show
```

Page 190

```
 1                    WATERHOUSE - 10-19-21

 2     they have liabilities on them that exceed

 3     assets.

 4              So the retail board has asked, okay,

 5     you know, how -- you know, if -- if these

 6     liabilities come due or they're payable, you

 7     know, how does that come about?

 8              And, you know, the response is,

 9     well, the advisors have the -- the full faith

10     and backing from -- from Jim Dondero.

11     Q.   And how did you know that the

12     advisors had the full faith and backing from

13     Jim Dondero?  What was the basis for that

14     statement that you made to the retail board?

15     A.   I talked to Jim about it at some

16     point in the past.

17     Q.   And did you tell Mr. Dondero that

18     you were going to inform the retail board that

19     the advisors had his full faith and backing

20     before you actually told that to the retail

21     board?

22     A.   I don't recall having that

23     conversation.

24     Q.   Do you recall if you ever informed

25     Mr. Dondero that you had disclosed or told the
```

```
                                                        Page 191
 1               WATERHOUSE - 10-19-21

 2   retail board that the advisors had the full

 3   faith and backing of Mr. -- Mr. Dondero?

 4               MS. DEITSCH-PEREZ:  Object to the

 5        form.

 6        A.    I don't recall discussing that with

 7   him at the time.

 8        Q.    When you told this to the board, was

 9   Mr. Dondero participating in the discussion?

10        A.    Not that I recall.

11        Q.    Withdrawn.  Was it not -- withdrawn.

12               Do you recall whether -- when you

13   covered this issue with the board, was that in

14   a -- a Zoom call or a Webex call?  Was it a

15   telephone call?  Was it in-person?  Like where

16   were you physically in relation to the board?

17        A.    I believe I was at home.

18        Q.    Okay.  Can you identify every person

19   that you recall who was present for this

20   disclosure other than -- other than the board

21   members themselves?

22               MS. DEITSCH-PEREZ:  Object to the

23        form.

24        A.    I don't recall everyone on the call.

25        Q.    Can you identify anybody who was on
```

Page 192

```
 1              WATERHOUSE - 10-19-21

 2   the call?

 3        A.   Other than the board members?

 4        Q.   Yes.

 5        A.   Lauren Thedford.  I mean, there

 6   are -- there are many -- my section is just one

 7   of many sections that are just -- you know, as

 8   you can appreciate, this is a long board

 9   meeting.

10              I can't recall specifically, really

11   even generally, or who was on when this was

12   discussed.  But Lauren was typically on for the

13   entire time.

14        Q.   I apologize if I asked you this, but

15   do either of Mr. Norris or Mr. Post hold any

16   positions relative to the retail funds?

17        A.   I think you asked me this already,

18   John.

19        Q.   Okay.  I just don't recall.  Can you

20   just refresh my recollection if I did, in fact,

21   ask you the question?

22        A.   I don't believe -- if we can go

23   back.  I don't believe Mr. Norris has a title

24   at the retail funds.  Mr. -- and Mr. Post is

25   the CCO of the advisor, the advisors.
```

Appx. 01459

Page 193

1          WATERHOUSE - 10-19-21

2     Q.    Okay.  Do you know if either of them

3  have a position with the retail board -- with

4  the retail funds?

5     A.    I don't believe Mr. Norris has a

6  position with the retail funds.

7     Q.    All right.  What about Mr. Post?

8     A.    Mr. Post is the CCO of the advisors.

9     Q.    Okay.  Does he hold any position --

10    A.    I don't believe so.

11    Q.    -- with the retail funds?

12    A.    I don't believe so.

13    Q.    Okay.

14    A.    I don't know if being the CCO for

15  the advisor conveys something for the retail

16  funds.  Again, I am not -- that is the legal

17  compliance part of it.  I don't know.

18    Q.    Why did you tell the retail board

19  that the advisors have the full faith and

20  backing from Mr. Dondero?

21          MS. DANDENEAU:  Objection to form.

22    A.    It is -- it is -- it is what has

23  been discussed with them prior.

24    Q.    And were you -- were you trying to

25  give them comfort that even though the

Page 194

```
 1              WATERHOUSE - 10-19-21

 2   liabilities exceeded the assets that the

 3   advisors would still be able to meet their

 4   obligations as they become due?

 5              MS. DANDENEAU:  Objection to form.

 6              MS. DEITSCH-PEREZ:  Object form.

 7        A.    I -- I can't -- I don't remember

 8   specifically the conversation, but generally --

 9   you know, generally, yes.  And that is why --

10   but, you know, again, in this email saying, you

11   know, I am sure I qualified it with the retail

12   board, you know, as I said I like -- you know,

13   to my knowledge, that hasn't changed.  But,

14   again, generally -- generally that is what I

15   remember.

16        Q.    Okay.  Do you recall if in the

17   advisors' response to the retail board's

18   question if the response included any statement

19   concerning Mr. Dondero and -- and the full

20   faith and backing that he was giving to the

21   advisors?

22              MS. DEITSCH-PEREZ:  Object to the

23         form.

24        A.    I don't -- I don't remember

25   specifically what was provided.
```

Case 3:21-cv-00881-X   Document 39   Filed 01/31/22   Page 1466 of 1780   PageID 5796

Case 21-03005-sgj Doc 86-4 Filed 10/29/21   Entered 10/29/21 17:22:38   Page 195 of 397

Page 195

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.

 3        A.    And I don't really -- I don't really

 4   remember generally either.

 5        Q.    Okay.

 6              MR. MORRIS:  So -- so, again, I'm

 7        just going to ask Mr. Rukavina if your

 8        clients can produce as soon as possible the

 9        15(c) response, the written response that

10        the advisors made, if any, to the board's

11        Question No. 2.

12              I'm not looking for the whole

13        response, but I certainly want the response

14        to Question No. 2.

15        Q.    Do you have a general understanding

16   as to the amount by which -- withdrawn.

17              Did -- did the assets of --

18   withdrawn.

19              Did the liabilities of HCMFA exceed

20   its assets in 2020?

21              MS. DANDENEAU:  Objection to form.

22              MS. DEITSCH-PEREZ:  Objection, form.

23        A.    I believe I have already answered

24   that question earlier, I think.  I believe I

25   said yes.
```

TSG Reporting - Worldwide    877-702-9580

Appx. 01462

Page 196

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Okay.  And did the liabilities of

 3   NexPoint exceed its assets in 2020?

 4              MS. DEITSCH-PEREZ:  Objection to

 5         form.

 6      A.    I don't believe so.

 7      Q.    Okay.  So -- so it was only one of

 8   the two advisors who had liabilities that

 9   exceeded the value of the assets.

10              Do I have that right?

11              MS. DEITSCH-PEREZ:  Objection to

12         form.

13              MS. DANDENEAU:  Form.

14      A.    Yes.

15      Q.    And do you know, ballpark, the

16   amount by which the value of HCMFA's

17   liabilities exceeded their assets in 2020?

18              MS. DANDENEAU:  Objection to form.

19      A.    I don't -- I don't recall.

20              MR. MORRIS:  I had specifically

21         requested in discovery the audited

22         financial reports for both advisors and

23         NexPoint.  I think I may have gotten one

24         for NexPoint but I'm still waiting for the

25         balance.  And I'm going to renew my request
```

Page 197

```
1                    WATERHOUSE - 10-19-21

2          for those documents too.

3          Q.    Let's go to the next exhibit, which

4    is Number 10.  So I think it is in your stack,

5    Mr. Waterhouse.

6               MR. MORRIS:  And we can take the one

7          down from the screen and put up Number 10

8          for everybody.

9               (Exhibit 10 marked.)

10         Q.    And I don't know if you have ever

11   seen this before, but I'm really putting it up

12   on the screen for purposes of turning to the

13   very last page of the document.

14              So this is a document that we have

15   been -- that we premarked as Exhibit 10.  And

16   we're turning to the last page of the document,

17   which is a document that was filed in the

18   adversary proceeding 21-3004.  And -- no, I

19   apologize, I think we -- right there.  Perfect.

20              And it is page 31 of 31.

21              MR. MORRIS:  I think there may have

22         been some something erroneously stapled to

23         the hard copy that I gave you folks, but

24         I'm looking for page 31 of 31 in the

25         document that begins with the first page of
```

Page 198

 1              WATERHOUSE - 10-19-21

 2        Exhibit 10.

 3        Q.    Do you have that, Mr. Waterhouse?

 4        A.    I don't have it yet.  I'm looking.

 5        Q.    All right.  If you look at the top

 6   right-hand corner, you will see it says page

 7   hopefully something of 31?

 8        A.    Yes, I've got it now.

 9        Q.    Okay.  You have got 31 of 31.  You

10   can take a moment to read that, if you would

11   like.

12        A.    (Reviewing document.)  Okay.

13        Q.    Have you ever seen this before?

14        A.    I don't know if I have seen this

15   specific document, but, you know, I've --

16   I'm -- I'm aware of it.

17        Q.    And is this the document that you

18   had in mind when you sent that email to

19   Ms. Thedford that we just looked at where you

20   said that Highland had agreed not to make a

21   demand upon HCMFA until May 2021?

22        A.    Honestly, I don't -- it wasn't this

23   document.  I mean, it's something like this,

24   yes.  I mean, yes.

25        Q.    Well --

Page 199

```
 1              WATERHOUSE - 10-19-21

 2        A.    It is something like this, but I

 3   don't think it was this specific document.

 4        Q.    Well, but this document does say in

 5   the last sentence that Highland agreed not to

 6   seek -- not to demand payment from HCMFA prior

 7   to May 31, 2021; right?

 8        A.    Yes.

 9        Q.    And are you aware of any other

10   document that was ever created pursuant to

11   which Highland agreed not to demand payment on

12   amounts owed by HCMFA before May 31, 2021?

13        A.    Hold on.  Are you asking, am I aware

14   of a document that by HCMFA that basically says

15   otherwise?

16        Q.    No.  Let me try again.

17              Are you aware of any other document

18   pursuant to which -- pursuant to which Highland

19   agreed not to make a demand on HCMFA until May

20   31st, 2021?

21        A.    I'm -- I think there was something

22   in connection with -- with the -- with the

23   audit that basically says the same thing.

24        Q.    Okay.  And do you think that the

25   audit is referring to this particular document?
```

Page 200

```
 1                  WATERHOUSE - 10-19-21

 2        A.    I don't know.

 3        Q.    All right.  This document is dated

 4   April 15, 2019.  Do you see that?

 5        A.    I do.

 6        Q.    And do you remember that the audit

 7   was completed on June 3rd, 2019?

 8        A.    Yes.

 9        Q.    And do you recall that the audited

10   financials -- and I'm happy to pull them up if

11   you would like, but do you recall that the

12   audited financials included a reference to the

13   agreement pursuant to which Highland agreed not

14   to make a demand until May 31st, 2021?

15        A.    Yes, I remember.

16        Q.    And as part of the process, would

17   you have expected the corporate accounting team

18   to have provided a copy of this document to

19   PwC?

20              MS. DANDENEAU:  Objection to form.

21        A.    Yes, I would have expected something

22   like this, or again, you know, some document

23   that basically states -- states the deferral

24   till May 31 of 2020.

25        Q.    Okay.
```

Page 201

```
 1                   WATERHOUSE - 10-19-21
 2        A.    May 31 of 2021, excuse me.
 3        Q.    And this document states the
 4   deferral that you just described; correct?
 5        A.    It does.
 6        Q.    And this document states the
 7   deferral that was described in the audited
 8   financial statements that we looked at before;
 9   correct?
10        A.    It does.
11              MR. MORRIS:   Okay.  Can we scroll
12        down just a little bit to see who signed on
13        behalf of the acknowledgment there.
14        Q.    Okay.  So Mr. Dondero signed this
15   document on behalf of both HCMFA and Highland;
16   do you see that?
17        A.    I do.
18        Q.    Okay.  Did you discuss this document
19   or the -- withdrawn.
20              Did you discuss the concept of the
21   deferral with Mr. Dondero in the spring of
22   2019?
23        A.    I think I testified I don't recall.
24        Q.    Okay.  Do you know whose idea it was
25   to issue the acknowledgment in this form?
```

Appx. 01468

Page 202

```
 1                 WATERHOUSE - 10-19-21

 2        A.    I don't recall.

 3              MR. MORRIS:  Can we scroll back up

 4        to the document, please.

 5        Q.    Do you see in the beginning it says,

 6   reference is made to certain outstanding

 7   amounts loaned from Highland to HCMFA for

 8   funding ongoing operations.

 9              Do you see that?

10        A.    Yes.

11        Q.    And were you aware as the CFO of

12   Highland and as the treasurer of HCMFA that as

13   of April 15, 2019, Highland had made certain

14   loans to HCMFA to fund HCMFA's ongoing

15   operations?

16        A.    Yes.

17        Q.    And were you aware that those loans

18   were payable on demand and remained outstanding

19   as of December 31st, 2018?

20        A.    Yes.

21        Q.    And were you aware that those

22   amounts were payable on demand, and they

23   remained outstanding as of April 15, 2019?

24              MS. DEITSCH-PEREZ:  Object to the

25        form.
```

Appx. 01469

Page 203

```
 1                  WATERHOUSE - 10-19-21

 2        A.    Well, this -- this document dated

 3   April 15, 2019 says they have been deferred to

 4   May 31, 2021.

 5        Q.    Right.  But I'm just sticking to the

 6   first paragraph where they refer to the

 7   outstanding amounts.  And in the end it says

 8   the -- it remained outstanding on December

 9   31st, 2018, and I think you told me that you

10   understood that, and then I'm just trying to

11   capture the last piece of it.

12             Did you understand that there were

13   amounts outstanding from the loan that Highland

14   made to HCMFA to fund ongoing operations as of

15   April 15th, 2019?

16        A.    Yes.

17        Q.    Thank you.  Let's look at the next

18   sentence.  HCMFA expects that it may be unable

19   to repay such amounts should they become due

20   for the period commencing today and continuing

21   through May 31st, 2021.

22             Do you see that?

23             MS. DANDENEAU:  Objection to form.

24        A.    I do.

25        Q.    As the CFO -- withdrawn.
```

Page 204

```
 1                  WATERHOUSE - 10-19-21

 2                  As the treasurer of HCMFA, did you

 3    believe that -- do you believe that statement

 4    was true and accurate at the time it was

 5    rendered?

 6        A.    I mean, it -- it -- the answer to

 7    that is I really didn't have any -- I didn't

 8    have an opinion really.

 9        Q.    Did you do anything to educate

10    yourself in April of 2019 on the issue of

11    whether HCMFA could repay the amounts that it

12    owed to Highland should they become due?

13        A.    I don't believe so.

14        Q.    Did you at any time form any

15    opinions as to HCMFA's ability to repay all

16    amounts due to Highland should they become due?

17        A.    Not really.  I guess I don't...

18        Q.    Well, you told the retail board that

19    HCMFA's liabilities exceeded their assets in

20    2020; correct?

21        A.    Yes.

22        Q.    Based on the work that you did to

23    prepare for the retail board, did you form any

24    view as to whether HCMFA would be unable to

25    repay the amounts that it owed to Highland
```

Appx. 01471

Page 205

```
 1              WATERHOUSE - 10-19-21

 2   should they become due?

 3              MS. DANDENEAU:  Objection to form.

 4      A.    I mean, I -- when you look at that,

 5   to answer you, completely, you know, again,

 6   if -- the response I gave the retail board was,

 7   you know, the -- the advice -- HCMFA advisors

 8   have the -- have the full faith and backing of

 9   Jim Dondero.  So I didn't form an opinion of

10   whether the advisor could pay it or not.

11      Q.    Did you form any view as to whether

12   the advisors could repay the amounts that it

13   owed to Highland should they become due without

14   the full faith and backing of Mr. Dondero?

15              MS. DANDENEAU:  Objection to form.

16              MS. DEITSCH-PEREZ:  Form.

17      A.    I mean, if you -- if you -- if you

18   take that last statement out, I mean, it would

19   be difficult for HCMFA to pay back demand notes

20   at that time.

21      Q.    And it was precisely for that reason

22   that you told the retail board that -- that the

23   retail -- that the advisors had the full faith

24   and backing of Mr. Dondero; correct?

25              MS. DANDENEAU:  Objection to form.
```

Appx. 01472

Page 206

```
 1              WATERHOUSE - 10-19-21

 2       A.    I mean, yes, as the mouthpiece, I

 3  was relaying information.

 4       Q.    Okay.  And you relayed that

 5  information with the knowledge and approval of

 6  Mr. Dondero; correct?

 7              MS. DEITSCH-PEREZ:  Object to the

 8       form.

 9       A.    As I stated in the email, I don't

10  believe, and I think I testified I don't

11  believe I had conversations with Mr. Dondero at

12  the time of that board meeting.

13       Q.    Did you tell the retail board that

14  the advisors had the full faith and backing of

15  Mr. Dondero without Mr. Dondero's prior

16  approval?

17       A.    Yeah, I -- I -- yes, I'm -- like I

18  said, I think I testified earlier, I'm sure I

19  qualified it as well.

20       Q.    What do you mean by that?

21              MS. DANDENEAU:  Objection to form.

22       A.    Again -- again, like I said in the

23  email, it has the full faith and backing of Jim

24  Dondero unless that has changed.

25       Q.    Actually that is not what you said,
```

Appx. 01473

Page 207

```
 1                   WATERHOUSE - 10-19-21
 2    so let's put the email back up.
 3         A.    It is -- it is -- it is in the
 4    email.
 5         Q.    Let's put the email back up.  You
 6    didn't say unless it has changed.  You said you
 7    believe it hasn't changed; right?
 8         A.    Okay.  And to my knowledge that
 9    hasn't changed, that is what it says.
10         Q.    That's right.
11         A.    But, again, I mean, that is -- I
12    don't know everything.  And I'm not in every
13    conversation.  I'm not -- to presume that I am,
14    is -- and you have to put myself -- as you
15    started this out, Mr. Morris, I was at home in
16    October of 2020 with COVID -- or, you know,
17    under these COVID times that we described is
18    very difficult.
19              We have all been working at home for
20    really the first time ever, undergoing
21    processes, procedures, control environments
22    that have been untested, and there is poor
23    communication.
24              So I am relaying, as I'm telling you
25    now, what is in the email.  And unless
```

Page 208

```
 1                    WATERHOUSE - 10-19-21
 2    something has changed -- to my knowledge, it
 3    hasn't changed, but it could have changed.
 4         Q.    When you say that the advisors have
 5    the full faith and backing from Mr. Dondero,
 6    did you intend to convey that, to the extent
 7    the advisors were unable to satisfy their
 8    obligations as they become due, Mr. Dondero
 9    would do it for them?
10              MS. DANDENEAU:  Object to the form.
11              MS. DEITSCH-PEREZ:  Object to the
12         form.
13              And, John, we have given you a lot
14         of leeway here but this does not seem
15         relevant to this case.  You seem sort of
16         taking a complete sort of diversion into
17         the allegations and the complaint just
18         filed on Friday, and so I would ask you to
19         move on because --
20              MR. MORRIS:  And I will tell you --
21         I will tell you that I have never read that
22         complaint cover-to-cover.  I have nothing
23         to do with the prosecution of those claims.
24         And this issue that we're talking about
25         right now is related solely to the
```

Appx. 01475

Page 209

```
 1              WATERHOUSE - 10-19-21
 2      promissory notes that your clients refuse
 3      to pay.
 4              So I'm going to continue to ask my
 5      questions, and I would ask the court
 6      reporter to read back my last question.
 7                      (Record read.)
 8              MS. DEITSCH-PEREZ:  And then I
 9      believe there were objections to form.
10      Q.    You can answer the question.
11      A.    Yes.
12      Q.    Thank you very much, sir.
13              MR. MORRIS:  Can we go back to the
14      other document, please?
15      Q.    Mr. Waterhouse, do you know if this
16   document was ever shared with the retail board?
17      A.    I don't recall.
18      Q.    Did you ever share it with the
19   retail board?
20      A.    I don't recall.
21      Q.    Did you ever tell the retail board
22   about the substance of this document?
23      A.    I don't recall.
24      Q.    Did you ever tell the retail board
25   that Highland had agreed not to make a demand
```

Page 210

1          WATERHOUSE - 10-19-21

2    against HCMFA until May 2021?

3          A.    I don't recall.

4          Q.    Do you know whether anybody on

5    behalf of the advisors ever informed the retail

6    board that Highland had agreed on April 15,

7    2019, not to make a demand against HCMFA under

8    the promissory notes?

9          A.    I don't recall.

10         Q.    Did you instruct Ms. Thedford or

11   anybody else responding to the retail board's

12   15(c) inquiry to disclose this document?

13         A.    Did I instruct Ms. Thedford or

14   anyone else to -- to -- to produce this, to

15   disclose this document?  Is that what you -- I

16   just want to make sure.

17         Q.    Uh-huh.

18         A.    Yeah, I don't -- I don't recall.

19         Q.    Did you instruct anybody to inform

20   the retail board, in response to their question

21   as part of the 15(c) process, to -- to tell the

22   retail board about Highland's agreement not to

23   make a demand until 2021?

24              MS. DANDENEAU:  Objection to form.

25         A.    I don't recall.

Page 211

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Did you ever inform PwC that HCMFA's

 3  liabilities exceeded its assets?

 4              MS. DANDENEAU:  Object to the form.

 5       A.    I don't -- I don't think I told

 6  them.  I mean, they -- they audited the

 7  financial statements.

 8       Q.    Did -- do you know if anybody on

 9  behalf of Highland ever informed

10  PricewaterhouseCoopers that HCMFA may be unable

11  to repay amounts owing to Highland, should they

12  become due?

13              MS. DANDENEAU:  Objection to form.

14       A.    Yes.  Again, I think I testified

15  earlier that -- that this was communicated to

16  the auditors.

17       Q.    Ideally --

18       A.    I don't know who exactly did that.

19  I don't recall doing it, but, yeah, it was --

20  it was communicated.  And that is why -- I

21  mean, there is a disclosure in the financial

22  statements; right?

23       Q.    There is, and that disclosure

24  relates to the last sentence of this document;

25  correct?
```

Page 212

```
 1                   WATERHOUSE - 10-19-21

 2         A.    Yes.

 3         Q.    Do you recall looking in the

 4    document and seeing anything that was disclosed

 5    with respect to the sentence above that?

 6         A.    No.

 7         Q.    Do you know whether anybody on

 8    behalf of Highland ever informed

 9    PricewaterhouseCoopers that HCMFA expects that

10    it may be unable to repay amounts due and owing

11    to Highland should they become due?

12              MS. DEITSCH-PEREZ:  Object to the

13         form.  I think that is the third time.

14         A.    I don't recall.  Again, as I said,

15    we -- all of this was given to the auditors.

16         Q.    Do you know if Highland received

17    anything of value in exchange for its agreement

18    not to demand payment on amounts owed by HCMFA

19    prior to May 31st, 2021?

20              MS. DEITSCH-PEREZ:  Object to the

21         form.  That is the second time.

22              MS. DANDENEAU:  Object to the form.

23         A.    I have answered this question.

24              MR. RUKAVINA:  Hold on.  Object to

25         legal conclusion.  Go ahead.
```

Appx. 01479

Page 213

```
 1                    WATERHOUSE - 10-19-21

 2          A.    I have answered this question

 3     before.

 4          Q.    And the answer was no?

 5          A.    I'm not aware.

 6          Q.    Now, this acknowledgment can't

 7     possibly apply to the two notes that you signed

 8     on behalf of HCMFA because those notes were

 9     signed on May 2nd and May 3rd, 2019; is that

10     right?

11                MS. DANDENEAU:  Objection to form.

12          A.    Unless there is a drafting error.

13          Q.    Okay.  Are you aware of a drafting

14     error?

15          A.    I'm not aware.  I didn't -- I wasn't

16     part of -- I didn't sign this note or this

17     acknowledgment.  I didn't draft it.

18          Q.    But you do see it is dated April 15,

19     2019; right?

20          A.    Yes.

21          Q.    And this was a document that was

22     actually included by the advisors in a pleading

23     they filed with the Court; right?

24                MR. RUKAVINA:  Well, I don't know

25          that so I object to form.
```

Page 214

 1                    WATERHOUSE - 10-19-21

 2          Q.    Okay.  Let's go to the first page of

 3      the document and just confirm that.

 4                MR. AIGEN:  Mr. Morris, I just note

 5          that you already said there was some error

 6          with the document that is listed as

 7          exhibit --

 8                MR. MORRIS:  No.  No, no, no.

 9                MS. DEITSCH-PEREZ:  Oh, okay.

10                MR. MORRIS:  What I said is that

11          there is a few pages that were mistakenly

12          stapled to the end of the document.

13                MS. DEITSCH-PEREZ:  Okay.

14                MR. MORRIS:  There is no problem

15          with this document.

16                MS. DEITSCH-PEREZ:  And just so

17          we're clear that the document -- the pages

18          that start with defendant's amended answer

19          are not intended to be part of this

20          document?

21                MR. MORRIS:  That's correct.

22                MS. DEITSCH-PEREZ:  And that the --

23          but it is your representation that the rest

24          of the document is -- is -- is correct

25          because we don't -- we don't have any way

Page 215

```
 1                    WATERHOUSE - 10-19-21

 2           of verifying that, we're just --

 3                  MR. MORRIS:  You do, actually.  You

 4           could just go to Docket No. 21-3004.

 5                  MS. DEITSCH-PEREZ:  If you want to

 6           stop this deposition so we can go and pull

 7           that document up, we're happy to do it.  So

 8           I am just asking you for your

 9           representation.

10                  MR. MORRIS:  Sure.  I gave that.

11                  MS. DEITSCH-PEREZ:  Okay.

12           Q.    So do you see that this is a

13    document that was actually filed with the Court

14    by Highland Capital Management Fund Advisors?

15           A.    No.  I get with the first page in

16    the section.  Maybe I'm looking at the wrong

17    thing.  It says, Highland Capital Management.

18           Q.    Don't worry about it.  Don't worry

19    about it.

20           A.    Maybe I went back -- okay.

21                  MR. MORRIS:  All right.  Can we put

22           up on the screen Exhibit 2.

23                  (Exhibit 2 marked.)

24                  MR. MORRIS:  I think it is

25           Exhibit 1.
```

Appx. 01482

```
1                WATERHOUSE - 10-19-21

2              MS. DANDENEAU:  I'm sorry, John, did

3        you say Exhibit 2 or Exhibit 1?

4              MR. MORRIS:  It is Exhibit 2 in the

5        binders so it is premarked Exhibit 2.  And

6        now I'm asking -- right there -- going to

7        Exhibit 1 to the document that was marked

8        as Exhibit 2.

9              MS. DANDENEAU:  Got it.  In the

10       binder there is no --

11             MS. DEITSCH-PEREZ:  There is no

12       Exhibit 1.

13             MR. MORRIS:  All right.  So look at

14       the one on the screen.

15       Q.   Do you see, Mr. Waterhouse, that

16   this is a promissory note dated May 31st, 2017,

17   in the approximate amount of $30.7 million?

18       A.   Yes.

19       Q.   And do you see that the maker of the

20   note is NexPoint?

21       A.   Yes.

22       Q.   And that Highland is the payee; is

23   that right?

24       A.   Yes.

25       Q.   Okay.  And do you see in Paragraph 2
```

Page 217

```
 1              WATERHOUSE - 10-19-21
 2   this is an annual installment note?
 3        A.   Can you scroll down.
 4        Q.   Sure.
 5             MR. MORRIS:  Can we scroll down --
 6        yeah, there you go.
 7        A.   Right there, yeah.  Yes.
 8             MR. MORRIS:  And can we scroll down
 9        to the signature line.
10        Q.   And do you recognize that as
11   Mr. Dondero's signature?
12        A.   Yes.
13        Q.   And is this the promissory note that
14   we talked about earlier where NexPoint had made
15   certain payments in the aggregate amount of
16   about 6 to $7 million against principal and
17   interest?
18        A.   I don't recall discussing the
19   aggregate principal amounts of 6 to $7 million,
20   but -- so I don't -- I don't recall that prior
21   discussion with those amounts.
22        Q.   All right.  Let's take a look.
23   NexPoint always included this promissory note
24   as a liability on its audited financial
25   statements; right?
```

Page 218

```
 1                  WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    And NexPoint had its financial

 4    statements audited; isn't that correct?

 5        A.    Yes.

 6        Q.    And was the process of NexPoint's

 7    audit similar to the process you described

 8    earlier for Highland and HCMFA?

 9        A.    Yes, it is similar.

10        Q.    Okay.

11              MR. MORRIS:  Can we put up

12        NexPoint's audited financials and let

13        everybody know what exhibit number it is,

14        La Asia?

15              MS. CANTY:  It is going to be

16        Exhibit 46.

17              (Exhibit 46 marked.)

18        Q.    And do you see, sir, that we've put

19    up NexPoint Advisors' consolidated financial

20    statements and supplemental information for the

21    period ending December 31st, 2019?

22        A.    Yes.

23        Q.    Did you participate in the process

24    whereby these audited financial statements were

25    issued?
```

Page 219

```
 1                WATERHOUSE - 10-19-21

 2        A.    I didn't participate directly, as

 3   I've described before, about the -- the team

 4   performing the audit.

 5        Q.    Do you recall when the audit of

 6   NexPoint's financial statements for the period

 7   ending December 31st, 2019 was completed?

 8        A.    Yes.

 9        Q.    And when do you recall it being

10   completed?

11        A.    In January of 2021.

12        Q.    Do you know why the 2019 audit

13   report wasn't completed until January of 2021?

14        A.    Yes.

15        Q.    Why was the NexPoint audit report

16   for the period ending 12/31/19 not completed

17   until January 2021?

18        A.    Because we had to deal with working

19   from home from -- with COVID, and on top of all

20   of our daily responsibilities and job duties

21   at -- at providing -- at Highland providing

22   services to NexPoint, we had to do all of this

23   extra work for a bankruptcy that was filed in

24   October of 2019.

25               MR. MORRIS:  Can we go to the
```

Appx. 01486

Page 220

```
 1              WATERHOUSE - 10-19-21

 2        balance sheet on page 3?  Okay.  Stop right

 3        there.

 4        Q.    Do you see under the liabilities

 5   section, the last item is note payable to

 6   affiliate?

 7        A.    Yes.

 8        Q.    And is that the note that we just

 9   looked at?

10              MS. DANDENEAU:  Objection to form.

11        Q.    Withdrawn.

12              Is that the approximately

13   $30 million note that we just looked at that

14   was dated from 2017?

15              MS. DANDENEAU:  Objection to form.

16        A.    I believe no.

17        Q.    Okay.  You're not aware of any other

18   note that was outstanding from NexPoint to

19   Highland as of the end of the year 2019, other

20   than that one $30 million note; right?

21        A.    I don't recall.

22        Q.    And as of the end of 2019, the

23   principal amount that was due on the note was

24   approximately $23 million; right?

25              MS. DEITSCH-PEREZ:  Object to the
```

Page 221

```
 1                  WATERHOUSE - 10-19-21
 2        form.
 3        A.    Approximately.
 4        Q.    And does that refresh your
 5   recollection that between the time the note was
 6   executed and the end of 2019, that NexPoint had
 7   paid down approximately $7 million?
 8        A.    Yes.  If we are just doing the math,
 9   yes.
10        Q.    Okay.  Did NexPoint complete its
11   audit from 2020?
12        A.    Sorry, you kind of broke up.  Do
13   NexPoint complete?
14        Q.    The audit of its financial
15   statements for the period ending December 31st,
16   2020?
17        A.    No.
18        Q.    No, it's not complete?
19        A.    No, it is not complete.
20        Q.    Did HCMFA complete its audit for the
21   year ending December 31st, 2020?
22        A.    No.
23              MR. MORRIS:  Can we go to page 15,
24        please, the paragraph at the bottom.
25        Q.    Do you see that NexPoint has
```

Page 222

```
 1                  WATERHOUSE - 10-19-21

 2    included under notes payable to Highland a

 3    reference to the amounts that were outstanding

 4    as of the year-end 2019 under the note that we

 5    looked at just a moment ago?

 6         A.    Yes.  Are you talking about the

 7    second paragraph?

 8         Q.    I'm actually talking about first

 9    paragraph.  Do you understand that the first

10    paragraph is a reference to the 2017 note, and

11    the amounts that were -- the principal amount

12    that was outstanding as of the end of 2019?

13              MS. DANDENEAU:  Objection to form.

14         John, do you mean the first paragraph of

15         that page?

16              MR. MORRIS:  No, the first paragraph

17         under notes payable to Highland.

18         A.    Yeah, I see the paragraph, and

19    again, this is what I answered earlier.  I

20    believe so, just because I don't -- again, this

21    is a number in a balance sheet, and without

22    matching it up and seeing the detail with the

23    schedule like I kind of talked about for

24    Highland's financial statements, it is a little

25    bit more difficult to tie everything in
```

Appx. 01489

```
                                                    Page 223
 1              WATERHOUSE - 10-19-21

 2   perfectly together.

 3        Q.    Okay.  But you're not aware of any

 4   note that was outstanding at the end of 2019

 5   from NexPoint to Highland other than whatever

 6   principal was still due and owing under the

 7   $30 million note issued in 2017; correct?

 8        A.    Well, it -- I don't -- there is

 9   reference in the second paragraph.  I don't --

10   I don't -- I don't recall what that is

11   referring to, so I don't -- I don't know.

12        Q.    Well, if you listen carefully to my

13   question, right, I'm asking about notes that

14   were outstanding at the end of 2019, and if we

15   look at the paragraph you just referred to, it

16   says that during the year there were new notes

17   issued totaling $1.5 million, but by the end of

18   the year, no principal or interest was

19   outstanding on the notes.

20              Do you see that?

21        A.    Oh, I do, yes.

22        Q.    So does that refresh your

23   recollection that there were no notes

24   outstanding from NexPoint to Highland other

25   than the principal remaining under the original
```

Page 224

```
 1              WATERHOUSE - 10-19-21
 2    $30 million 2017 note that we looked at a
 3    moment ago?
 4        A.    Well, we're at the bottom of the
 5    page.  Is there anything on page 16?
 6        Q.    That is a fair question, sure.  That
 7    is it.
 8        A.    Okay.  So it appears that that is
 9    the only note that is detailed in the notes in
10    the financial statement.
11        Q.    And you don't have any memory of any
12    other note other than the 2017 note, right,
13    being outstanding as of the end of the year?
14        A.    I deal with thousands of
15    transactions every year.  I don't really have a
16    very specific memory for what exactly was
17    outstanding.
18            MR. MORRIS:  Why don't we take a
19        break now.  We've been going for a little
20        while.  It's 3:26.  Let's come back at
21        3:40.
22            VIDEOGRAPHER:  We're going off the
23        record at 3:26 p.m.
24    (Recess taken 3:26 p.m. to 3:39 p.m.)
25            VIDEOGRAPHER:  We are going back on
```

```
 1              WATERHOUSE - 10-19-21

 2       the record at 3:39 p.m.

 3       Q.    All right.  Mr. Waterhouse, we -- I

 4    don't think we have a lot more here.

 5              To the best of your knowledge and

 6    recollection, were all affiliate loans and all

 7    loans made to Mr. Dondero recorded on

 8    Highland's books and records as assets of

 9    Highland?

10              MS. DANDENEAU:  Object to the form,

11         asked and answered.

12       A.    To my knowledge, yes.

13       Q.    Okay.  Can you recall any loan to

14    any affiliate or Mr. Dondero that was not

15    recorded on Highland's books and records as an

16    asset?

17       A.    Like during my time as CFO?  I don't

18    recall.

19       Q.    How about after the time that you

20    were CFO?  Did you recall that there was a loan

21    by Highland to an affiliate or to Mr. Dondero

22    that hadn't been previously recorded on

23    Highland's books as an asset?

24              MS. DANDENEAU:  Objection to form.

25       A.    I guess I don't understand the
```

Page 226

```
 1              WATERHOUSE - 10-19-21
 2    question.  I left Highland as of -- I'm not
 3    aware of -- I left Highland in February --
 4    probably the last day of February of 2021.
 5         Q.    Okay.
 6         A.    I'm not -- I'm not aware of any --
 7    I'm not aware of anything past that date.
 8         Q.    Okay.  While you were the CFO at
 9    Highland, did Highland prepare in the ordinary
10    course of business a document that reported
11    operating results on a monthly basis?
12         A.    Yes.
13         Q.    And are you generally familiar with
14    the monthly operating reports?
15         A.    Yeah.  You are referring to the
16    reports that we filed to the Court every month?
17         Q.    I apologize, I'm not.  I'm taking
18    you back to the pre-petition period.  There was
19    a report that I have seen that I'm going to
20    show you, but I'm just asking for your
21    knowledge.
22              MR. MORRIS:  Let's put it up on the
23         screen, Exhibit 39.
24              (Exhibit 39 marked.)
25         Q.    Do you see this is a document that
```

Page 227

```
 1                 WATERHOUSE - 10-19-21
 2    is called operating results?
 3         A.    Yeah, that's the title of it.
 4         Q.    Okay.  And was a report of operating
 5    results prepared by Highland on a monthly basis
 6    during the time that you served as CFO?
 7         A.    No.
 8         Q.    Are you familiar with a document of
 9    this type?  And we can certainly look at the
10    next page or two to refresh your recollection.
11         A.    I'm just looking at the title.  I
12    don't really -- again, as I discussed before, I
13    don't have any records or documents or emails
14    or appointments or anything that I was able to
15    use prior to -- prior to this deposition, so
16    I'm doing the best I can.
17         Q.    Okay.  You don't need to apologize.
18    I'm just asking you if you are familiar with
19    the document called Operating Results that was
20    prepared on a monthly basis at Highland?
21                MS. DEITSCH-PEREZ:  Object to the
22         form.
23         Q.    If you're not, you're not.
24         A.    I don't believe this was prepared on
25    a monthly basis.
```

Page 228

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Okay.  Do you see that this one

 3   is -- is dated February 2018?

 4        A.    Yes.

 5        Q.    Do you have -- do you believe --

 6   have you ever seen a document that was

 7   purporting to report operating results for

 8   Highland?

 9              MS. DANDENEAU:  Objection to form.

10        A.    Yes.

11        Q.    Okay.  And when you say that you

12   don't believe it was produced on a monthly

13   basis, was it produced on any periodic bases to

14   the best of your recollection?

15        A.    I believe it was -- it was prepared

16   on an annual basis.

17        Q.    Okay.

18              MR. MORRIS:  Can we look at the next

19        page.

20        Q.    Do you see that there is a statement

21   here called:  Significant items impacting

22   HCMLP's balance sheet?

23              And it is dated February 2018.

24        A.    Yes.

25        Q.    Do you recall that there was a
```

Appx. 01495

Page 229

```
 1              WATERHOUSE - 10-19-21

 2   report that Highland prepared that identified

 3   significant items impacting the balance sheet?

 4        A.    A report that was prepared.

 5        Q.    Let me ask a better question:  Did

 6   Highland prepare reports to the best of your

 7   recollection that identified significant items

 8   that impacted its balance sheet?

 9        A.    Well, so Highland prepared a -- a

10   monthly close package.  And maybe I'm

11   getting -- and -- and maybe change names at one

12   time or maybe I'm just -- again, just

13   misremembering -- but in that, yes, there is a

14   page that would detail just changes in -- you

15   know, just changes month over month on the

16   balance sheet.

17        Q.    Okay.  And maybe it is my fault.

18   Maybe I didn't know the proper name for it.

19   But let's use the phrase "monthly close

20   package."

21              Did Highland prepare a monthly close

22   package in the ordinary course of business

23   during the time that you served as CFO?

24              MS. DANDENEAU:  Objection to form.

25        A.    Yes.
```

Page 230

```
 1                WATERHOUSE - 10-19-21

 2        Q.     And did the monthly close package

 3   that Highland prepared include information

 4   concerning significant items that impacted

 5   Highland's balance sheet?

 6        A.     Yes, it had a page like that is --

 7   that is on the screen that detailed items

 8   like -- of that nature.

 9        Q.     And do you know who -- was there

10   anybody at Highland who was responsible for

11   overseeing the preparation of the monthly

12   reporting package?

13        A.     That would have been -- again, it

14   varies over time during my tenure as CFO.

15   It -- it varied over -- over time, but -- but

16   typically a -- a corporate accounting manager.

17        Q.     And who were the corporate

18   accounting managers during your tenure as CFO?

19        A.     It would have been Dave Klos and

20   Kristin Hendrix.

21        Q.     And did the corporate accounting

22   manager deliver to you drafts of the monthly

23   close package before it was finalized?

24        A.     Sometimes.

25        Q.     Was that the practice even if there
```

Page 231

```
 1                  WATERHOUSE - 10-19-21

 2    were exceptions to the practice?

 3         A.    The practice meaning that they

 4    sometimes lured them to me?

 5         Q.    That that was the expectation even

 6    if circumstances prevented that from happening

 7    from time to time.

 8              MS. DEITSCH-PEREZ:  Object to the

 9         form.

10         A.    I -- I would say it started out that

11    way but over the years it -- it was not

12    enforced.

13         Q.    Okay.  So you were -- you reviewed

14    and approved monthly -- monthly reporting

15    packages for a certain period of time and then

16    over time you stopped doing that.

17              Do I have that right?

18              MS. DANDENEAU:  Objection to form.

19         A.    Yes, I mean, if you're talking about

20    a formal meeting where we sit down and go

21    through and approve it.  I would say that was

22    standard practice a decade -- you know, early

23    on.  And as time went on that -- that -- that

24    practice wasn't followed.

25         Q.    Okay.
```

Appx. 01498

Page 232

```
 1            WATERHOUSE - 10-19-21

 2       A.    And, quite frankly, I don't even

 3  know if these were -- these were sent to me

 4  even in any capacity.

 5       Q.    What was the purpose of preparing

 6  the monthly reporting package -- withdrawn.

 7             What was the purpose of preparing

 8  the monthly close package?

 9             MS. DEITSCH-PEREZ:  Object to the

10       form.

11       A.    The -- the original purpose was so

12  that it would just -- it would be a report that

13  was reviewed monthly with senior management.

14       Q.    Who was included in the idea of

15  senior management?

16       A.    You know, I think originally when

17  this was conceived that would have been like

18  Jim Dondero and Mark Okada.

19       Q.    Were monthly reporting -- withdrawn.

20             Were monthly close packages prepared

21  to the best of your knowledge until the time

22  you left Highland?

23       A.    To my knowledge -- I don't know,

24  actually.  I mean, to my knowledge, I believe

25  it was being -- that was still being done.  I
```

Page 233

```
 1              WATERHOUSE - 10-19-21
 2    don't know because, again, I wasn't reviewing
 3    them.  I hadn't reviewed a close package for --
 4    for a long time.  But I believe the standard
 5    practice that was still being carried out.
 6         Q.    Did you ever have any discussions
 7    with the debtor's independent board concerning
 8    any promissory notes that were issued by any of
 9    the affiliates or Mr. Dondero?
10         A.    I can't -- I can't -- I can't recall
11    specifically.
12         Q.    Did you speak with the independent
13    board from time to time?
14         A.    Yes, from -- from -- from time to
15    time I had discussions with the independent
16    board members, you know, either -- either, you
17    know, by themselves or wholly, you know, as --
18    as a -- as a combined work.
19         Q.    Okay.  Before we talk about
20    Mr. Seery, do you recall ever having a
21    conversation with Mr. Nelms or Mr. Dubel
22    concerning any promissory note that was
23    rendered by one of the affiliates or
24    Mr. Dondero to Highland?
25         A.    I don't recall any conversations
```

Page 234

1              WATERHOUSE - 10-19-21

2    specifically.

3         Q.    Do you know if the topic was ever

4    discussed, even if you don't remember it

5    specifically?

6              MS. DANDENEAU:  Objection to form.

7         A.    It -- it -- it may have.  I don't

8    know.  I don't recall.

9         Q.    Do you recall ever discussing any

10   promissory note issued by any of the affiliates

11   or Mr. Dondero with James Seery?

12        A.    I don't -- I don't recall

13   specifically.

14        Q.    Do you recall generally ever

15   discussing the topic of promissory notes issued

16   by any of the affiliates or Mr. Dondero to

17   Highland with Mr. Seery?

18        A.    Nothing -- nothing is really jumping

19   out at me.

20        Q.    Do you recall if you ever told

21   Mr. Seery that any of the affiliates or

22   Mr. Dondero didn't have an obligation to pay

23   all amounts due and owing under their notes?

24        A.    I don't recall having that

25   conversation.

Page 235

```
 1              WATERHOUSE - 10-19-21

 2       Q.     Did you ever tell Mr. Seery that you

 3    had any reason to believe that the amounts

 4    reflected in the notes issued by the affiliates

 5    and Mr. Dondero were invalid for any reason?

 6       A.     I don't -- I don't recall.

 7       Q.     Did you tell Mr. Dondero -- did you

 8    tell Mr. Seery that you thought the promissory

 9    notes issued by the advisors and Mr. Dondero

10    that were outstanding as of the petition date

11    were assets of the estate?

12       A.     I don't recall having a specific

13    conversation about those -- you know, those

14    notes outstanding as -- as of the petition date

15    being assets on the estate.  I mean, we put

16    together -- you know, they're in the books and

17    records of the financial statements.  I don't

18    recall having a specific conversation.

19       Q.     Did you ever prepare any documents

20    that were delivered to Mr. Seery that concerned

21    the promissory notes issued by any of the

22    affiliates or Mr. Dondero?

23              MS. DANDENEAU:  Objection to form.

24       A.     Did I produce any that concerned --

25    you mean did I just -- did I give Mr. Seery
```

Appx. 01502

Page 236

```
 1              WATERHOUSE - 10-19-21

 2   anything that -- that said I have concerns over

 3   these notes?

 4       Q.    No.  Let me try again.  Maybe it was

 5   my question.

 6              Did you ever give Mr. Seery any

 7   information concerning any of the notes that

 8   were issued by any of the affiliates or

 9   Mr. Dondero?

10              MS. DANDENEAU:  Objection to form.

11       A.    I don't recall if I did or not.  I

12   don't -- I don't remember.  I mean, you have my

13   emails.  You may have asked.  Again, I don't --

14   I don't know.

15              MR. MORRIS:  Can we put up the

16         document that has been premarked as Exhibit

17         39?

18              MS. DANDENEAU:  John, that is this

19         document, isn't it?

20              MR. MORRIS:  Oh, yeah, it might be,

21         as a matter of fact.  Let's go to Number

22         40.

23              (Exhibit 40 marked.)

24       Q.    During the bankruptcy,

25   Mr. Waterhouse, did you prepare documents that
```

Page 237

```
 1                  WATERHOUSE - 10-19-21
 2    were filed with the bankruptcy court?
 3         A.    I didn't -- I didn't prepare them
 4    personally.
 5         Q.    Did people prepare them under your
 6    direction?
 7         A.    Yes.  There were members of the team
 8    that prepared them, and they worked in -- you
 9    know, there were members of DSI that were
10    involved in the process as well.
11         Q.    To the best of your knowledge, did
12    DSI rely on the employees of Highland for the
13    information that they used to prepare the
14    bankruptcy filings?
15         A.    Yes.  The books and records were
16    with the Highland personnel.
17         Q.    Okay.  And do you see on the screen
18    here, there is a document that we have marked
19    as Exhibit 40 that is -- that is titled Summary
20    of Assets and Liabilities?
21         A.    Uh-huh.
22         Q.    Okay.  And do you recall reviewing
23    any summary of assets and liabilities before it
24    was filed with the bankruptcy court?
25         A.    Yes, I recall reviewing this at a
```

Appx. 01504

Page 238

```
 1                WATERHOUSE - 10-19-21

 2  high level.

 3       Q.    And did you believe that it was

 4  accurate at the time it was filed?

 5       A.    I didn't have any other reason to

 6  believe otherwise.

 7       Q.    Okay.  Do you see that the total

 8  value of all properties listed in Part 1 is

 9  approximately $410 million?

10            MS. DEITSCH-PEREZ:  Objection to

11       form.

12       A.    Yes, it is in 1c.

13       Q.    Yes.

14       A.    Yes, I see that.

15       Q.    Okay.  If we go to the second page,

16  now I think I may just have excerpts here, just

17  so everybody is clear, but if we scroll down to

18  the second page, you will see that there is

19  a -- a little further.  There you go.  You will

20  see there is a reference to Item 71, notes

21  receivable.

22            Do you see that?

23       A.    I do.

24       Q.    And that was a reference to the

25  notes receivable from the affiliates and
```

Appx. 01505

Page 239

```
 1                 WATERHOUSE - 10-19-21
 2   Mr. Dondero, among others; is that right?
 3                 MS. DANDENEAU:  Objection to form.
 4       A.    Yes.  The affiliate notes and the
 5   Dondero notes were in this amount, but they
 6   weren't -- again, like you said, and among
 7   others.
 8       Q.    Okay.  We will look at the
 9   specificity because I'm not playing gaming
10   here, but do you know if the $150 million of
11   notes receivable was included within the
12   $410 million of total value of the debtor's
13   assets?
14                 MS. DANDENEAU:  Objection to form.
15       A.    I -- I -- I believe so.
16       Q.    Right.  And so is it fair to say
17   that as of the date this document was prepared,
18   the notes receivable were more than one-third
19   of the value of the debtor's assets?
20                 MS. DEITSCH-PEREZ:  Object to the
21       form.
22                 MS. DANDENEAU:  Object to the form.
23       A.    Again, if you are just taking the
24   math, 150 divided by whatever the $400 million
25   number is above, then yes, you get there.
```

Appx. 01506

Page 240

```
 1                    WATERHOUSE - 10-19-21

 2         Q.    Okay.

 3         A.    You know, but as of the time of this

 4    filing, that is what was put in this filing,

 5    right, but, you know, I mean, numbers --

 6    numbers change, facts and circumstances change.

 7         Q.    But as the CFO of Highland, the

 8    debtor in bankruptcy, did you believe that this

 9    number accurately reflected the total amount

10    due under the notes receivable?

11         A.    That is what we had in our books and

12    records.

13         Q.    Okay.  And did you believe as the

14    CFO that the books and records accurately

15    reported the then value of the debtor's assets?

16              MS. DANDENEAU:  Objection to form.

17         A.    We didn't -- as part of this filing,

18    there was no fair value measurement or

19    anything.  These were just accounting entries

20    for the promissory notes.  There is no analysis

21    for impairment or fair market value adjustments

22    or anything of that nature.  This is purely

23    taking numbers and putting them in our form.

24         Q.    Did you do any impairment analysis

25    at any time while you were employed by
```

Page 241

```
 1                 WATERHOUSE - 10-19-21

 2   Highland?

 3        A.   Yes, we did do impairment analysis

 4   on -- on assets.

 5        Q.   Okay.  Did you ever do an impairment

 6   analysis on any of the promissory notes that

 7   were given to Highland by any of the affiliates

 8   or Mr. Dondero?

 9        A.   Not that I recall.

10        Q.   Under what circumstances do you

11   prepare impairment analyses?

12        A.   As -- as -- if you're preparing

13   financials in accordance with GAAP, generally

14   accepted accounting principles, if you're

15   preparing full GAAP financials, you should be

16   preparing -- you should be undergoing on a

17   periodic basis any fair market value

18   adjustments to assets.

19             As I was instructed at the time of

20   the petition date, we weren't producing GAAP

21   financials.  So this wasn't something I was

22   worried about nor concerned about.

23        Q.   Okay.  Were NexPoint and HCMFA and

24   Highland's audited financial statements

25   prepared in accordance with GAAP?
```

Page 242

```
 1                  WATERHOUSE - 10-19-21

 2        A.    The audited financials -- yes,

 3   audited financial statements are prepared in

 4   accordance with GAAP.

 5        Q.    Do you recall whether any of

 6   Highland or HCMFA or NexPoint ever made a fair

 7   market value adjustment to any of the notes

 8   issued by any of the affiliates or Mr. Dondero

 9   to Highland?

10        A.    I do not recall that happening, but

11   the -- it is because under -- under GAAP,

12   the -- the treatment of liabilities is

13   different than assets.

14        Q.    Okay.  So then let's just focus on

15   Highland's audited financial statements.

16              The last audited financial

17   statements were for the period ending December

18   31st, 2018; correct?

19        A.    That is my understanding.

20        Q.    And you had -- you had an obligation

21   to disclose anything to PricewaterhouseCoopers

22   concerning any subsequent events between the

23   end of 2018 and June 3rd, 2019; correct?

24              MS. DANDENEAU:  Objection to form.

25              MS. DEITSCH-PEREZ:  Form.
```

Page 243

```
 1                  WATERHOUSE - 10-19-21

 2        A.    Correct.

 3        Q.    Okay.  To the best of your

 4   knowledge, as Highland's CFO, did Highland ever

 5   make any fair market value adjustments to any

 6   of the promissory notes that were carried on

 7   its balance sheet and that were issued by any

 8   of the affiliates or Mr. Dondero?

 9        A.    I think I answered that question

10   earlier.  I don't recall doing that for any of

11   the -- those -- those notes.  So it would have

12   included the audit for the -- for the 2018

13   period.

14        Q.    Okay.

15              MR. MORRIS:  Can we go to the next

16        page.

17        Q.    Do you see this is a note a list of

18   notes receivable?  Do you see that?

19        A.    Yes, I do.

20        Q.    And do you see that this ties into

21   the page that we were just looking?

22        A.    I'm sorry, can we go back to the

23   prior page?  I mean, it was at 150,331,222.  It

24   was on the prior page.  Next page.  Yes, it

25   agrees.
```

Page 244

```
1              WATERHOUSE - 10-19-21
2         Q.    Okay.  So now let's look at that
3    schedule.  So this was the face amount of all
4    of the promissory notes that Highland held at
5    the time this document was filed with the
6    bankruptcy court; right?
7         A.    Yes.
8         Q.    There is a footnote there that says,
9    doubtful or uncollectible accounts are
10   evaluated at year-end.
11             Do you see that?
12        A.    I do.
13        Q.    Okay.  And is it fair to say that as
14   of the year-end 2018, the year before this,
15   that to the extent any of these notes were
16   outstanding at that time, they weren't deemed
17   to be doubtful or uncollectible?
18        A.    Yeah.  For the 2018 audit, there
19   weren't any -- there weren't any adjustments to
20   fair value.
21        Q.    Okay.  And during the bankruptcy, do
22   you recall that Highland subsequently reserved
23   for the Hunter Mountain Investment Trust note?
24        A.    Yes.
25        Q.    Why did Highland -- were you
```

Page 245

```
 1              WATERHOUSE - 10-19-21
 2   involved in the decision to reserve the Hunter
 3   Mountain Investment Trust note?
 4        A.    I was not.
 5        Q.    Do you know why Highland decided to
 6   reserve for the Hunter Mountain Investment
 7   Trust note?
 8        A.    I don't know yet decision was made.
 9   I believe it was made by someone at DSI.
10        Q.    Okay.  I'm just asking if you know
11   why.
12              Did you ever ask anyone why they
13   reserved for that particular note?
14        A.    I don't recall.
15        Q.    Do you know whether the debtor
16   reserved for any other note on this list during
17   the bankruptcy?
18        A.    Again, I don't recall.  I wasn't
19   part of any process of -- again, like any fair
20   value adjustments or anything to that degree.
21   Like I said, a lot of that was done by DSI and
22   it was kind of out of our court.
23        Q.    Okay.  Do you know if any note
24   receivable on this list was ever deemed by the
25   debtor to be doubtful or uncollectible?
```

Page 246

1          WATERHOUSE - 10-19-21

2          A.    I don't -- I don't have a

3     recollection of every filing, so I don't know.

4          Q.    Did you ever have a discussion with

5     anybody at any time about whether any of the

6     notes receivable on this list should be deemed

7     to be doubtful or uncollectible?

8          A.    No.  As I previously stated, we were

9     told we didn't have to keep GAAP financials.

10    We weren't having -- you know, there is no

11    underlying audits being performed, so I mean,

12    it wasn't something I worried about.

13          MR. MORRIS:  I move to strike.

14          Q.    Did you ever have a conversation

15    with anybody about any of the notes receivable

16    and whether they should be deemed to be

17    doubtful or uncollectible?  Did you have the

18    conversation, yes or no?

19          MS. DANDENEAU:  Objection to form.

20          A.    I don't recall.

21          Q.    Do you recall ever telling anybody

22    that you believed any of the notes receivable

23    on this list should be doubtful -- should be

24    deemed to be doubtful or uncollectible?

25          MS. DANDENEAU:  Objection to form.

Page 247

```
1              WATERHOUSE - 10-19-21
2      A.     I don't recall.  I mean, it may have
3   happened, you know, again, when we initially
4   getting DSI up to speed and going through
5   financials, it may have happened, but I don't
6   recall specifically.
7      Q.     While you were the CFO of Highland
8   during the time that the company was in
9   bankruptcy, did you have any reason to believe
10  that any of the notes receivable on this list
11  other than Hunter Mountain Investment Trust
12  should have been characterized as doubtful or
13  uncollectible?
14            MS. DANDENEAU:  Objection to form.
15            MS. DEITSCH-PEREZ:  Form.
16     A.     I didn't know.  I didn't form an
17  opinion.  Bankruptcy was new to me.  It still
18  is new to me, even after going through this.
19  So I really didn't know what to expect nor
20  really -- you know, I didn't know.
21            MR. MORRIS:  I move to strike.
22     Q.     During the period of Highland's
23  bankruptcy when you were serving as CFO, did
24  you have any reason to believe any of the notes
25  on this list were doubtful or uncollectible?
```

Page 248

```
 1              WATERHOUSE - 10-19-21
 2              MS. DEITSCH-PEREZ:  This is like the
 3         fifth time you've asked it.  Object to the
 4         form.
 5              MR. MORRIS:  I'm moving to strike,
 6         if you haven't noticed, because he's not
 7         answering the question.
 8              MS. DEITSCH-PEREZ:  He was answering
 9         the question, you just didn't like it, like
10         the answer.
11              MR. MORRIS:  Good Lord.
12         Q.   Go ahead, Mr. Waterhouse.
13         A.   Again, I don't -- we brought up a
14    myriad of issues at the start of the bankruptcy
15    case.  I don't recall if this was one of them,
16    but, again, there are a lot of things we
17    couldn't change.  Even, you know, I was told
18    status quo, blah, blah, blah, right, there is a
19    stay, you can't -- you know, I don't recall
20    specifically, but that doesn't mean it didn't
21    happen.
22              MR. MORRIS:  I move to strike.
23         Q.   During the time that Highland was in
24    bankruptcy and you served as CFO, did you have
25    any reason to believe that any of the notes
```

Appx. 01515

Page 249

```
 1              WATERHOUSE - 10-19-21

 2   receivable on this list were doubtful or

 3   uncollectible?

 4              MS. DEITSCH-PEREZ:  Object to the

 5         form.

 6         A.    Potentially.

 7         Q.    Did you ever tell anybody that?

 8         A.    As I just stated like five times,

 9   yes, we -- at the beginning after filing and we

10   were getting DSI and others up to speed, you

11   know, we had a myriad of discussions of a lot

12   of things and this was likely one of them.  I

13   don't -- but I don't recall specifically we

14   talked --

15         Q.    I don't want to know -- I don't want

16   to know what was --

17              MS. DEITSCH-PEREZ:  Wait, wait.

18         Excuse me.  Mr. Morris, you did not let him

19         finish his answer.

20         A.    I spoke -- we had -- we were

21   bringing Fred Karesa and Brad Sharp (phonetic)

22   up to speed on all of these items, contracts,

23   and investments and going through -- we had

24   hours and hours and hours of discussion.  And

25   then not only do I have to repeat this not
```

Appx. 01516

Page 250

```
 1              WATERHOUSE - 10-19-21
 2   once, twice, three, four times with -- you
 3   know, I mean, we -- I don't -- I don't remember
 4   the sum culmination of all these discussions.
 5   They all kind of blend together.
 6              MR. MORRIS:  Okay.  I move to strike
 7        and I will try one more time.
 8        Q.   Did you ever tell anybody at DSI
 9   that you believed any of the notes receivable
10   on this list were doubtful or uncollectible?
11              MS. DANDENEAU:  Object to form.
12        A.   Potentially.
13        Q.   Potentially you told them or
14   potentially they were doubtful or
15   uncollectible?
16        A.   Potentially I told them that we
17   needed to look at the value of these -- of
18   these assets.
19        Q.   Okay.  Did you -- okay.  It is
20   potential that you told them and it is
21   potentially that you didn't; right?
22              MS. DANDENEAU:  Objection to form.
23        A.   I've gone through that.  I don't
24   recall specifically.
25        Q.   So you should just -- I don't want
```

Page 251

```
 1                 WATERHOUSE - 10-19-21

 2    to tell what you to do.  Do you have --

 3                 MS. DANDENEAU:  Good.

 4         Q.    Other than -- other than telling

 5    them that they should look at the values, do

 6    you have any recollection whatsoever of ever

 7    having told anybody at DSI that any of the

 8    notes receivable on this page were doubtful or

 9    uncollectible?

10                 MS. DEITSCH-PEREZ:  Object to the

11         form.

12                 MS. DANDENEAU:  Objection.

13         A.    I recall having general discussions

14    about everything on our balance sheet which

15    would have included these -- these notes

16    receivable.

17         Q.    Okay.

18         A.    I don't recall specifically where

19    those discussions delved into.

20         Q.    Do you recall any discussion at all

21    on the topic of whether any of these notes on

22    this list were doubtful or uncollectible?

23                 MR. AIGEN:  Mr. Morris, how on earth

24         is that question different from the

25         question that you just asked for the last
```

Page 252

```
 1              WATERHOUSE - 10-19-21
 2    five times?  I mean, really I thought you
 3    were -- (overspeak.)
 4         MR. MORRIS:  Because he never
 5    answered it.
 6         MS. DEITSCH-PEREZ:  Are you
 7    listening to him?
 8         MR. MORRIS:  You know --
 9         MS. DEITSCH-PEREZ:  He basically
10    said that he had a conversation with DSI
11    that went over all of this stuff and that
12    conversation could have included the notes
13    but he doesn't recall specifically.
14         What more do you want him -- to ask
15    of him?
16         MR. MORRIS:  I want him -- I would
17    love him to say -- I would like him to
18    testify to the truth, and that is he has no
19    recollection.
20         MS. DEITSCH-PEREZ:  Well, the truth
21    as you would like to see it, but -- but he
22    is testifying truthfully.  And I -- and, by
23    the way, I move to strike that comment --
24         MR. MORRIS:  Okay.
25         MS. DEITSCH-PEREZ:  -- because it
```

Appx. 01519

Page 253

1          WATERHOUSE - 10-19-21

2          suggests that he has not testified

3          truthfully.

4               MR. MORRIS:  I will ask my question

5          again.  And if at any time you want to

6          direct him not to answer, that is your

7          prerogative.

8          Q.   Mr. Waterhouse, do you have any

9    recollection at all of ever telling anybody

10   from DSI that any of these notes were doubtful

11   or uncollectible?

12               MS. DANDENEAU:  Object to form.

13        A.   I don't remember specifically.

14        Q.   Do you remember generally that

15   specific topic?

16        A.   We generally talked about assets,

17   values.  If -- we had discussions of that and

18   collectability in nature.  I mean, of Highland,

19   the funds, the CLOs, the entire complex.  We

20   had discussions like that, which is, you know,

21   as you look at a billion dollar consolidated

22   balance sheet.

23               So I generally remember -- this is

24   billions of dollars, including these assets --

25   having discussions of this -- of this type.

Page 254

```
1              WATERHOUSE - 10-19-21

2       Q.   Do you believe that an affiliate

3  loan on this list was doubtful or

4  uncollectible?  Would you have told that to

5  DSI?

6            MS. DANDENEAU:  Objection to form.

7            MS. DEITSCH-PEREZ:  Object to form.

8       A.   If we had, like -- again, if we --

9  if -- if we weren't preparing financial

10 statements in accordance with GAAP, and -- you

11 know, if DSI at that point -- they were --

12 again, I was new to bankruptcy.

13           The CRO is -- we are delegating

14 everything to the CRO.  All the decisionmaking.

15 Remember -- remember when you and I went into

16 Delaware Court and we were saying DSI basically

17 does everything, remember this, Mr. Morris?

18           You were my counsel at the time, and

19 basically we're running everything through DSI.

20 That was what this was like in the early part.

21           Everything was communicated through

22 DSI.  So DSI says this.  DSI says that.  That

23 is what we're doing, and we're pointing out

24 things to them.

25           Now, they decide what direction this
```

Page 255

```
 1              WATERHOUSE - 10-19-21

 2    goes.

 3         Q.    Did you point out that any of

 4    these --

 5         A.    I don't recall specifically.

 6         Q.    Okay.  At any time that you served

 7    as Highland's CFO, did you ever point out to

 8    DSI that any of these loans were doubtful or

 9    uncollectible?

10              MS. DEITSCH-PEREZ:  Object to the

11         form.

12              MS. DANDENEAU:  Objection.

13         A.    If you're asking me if I had a

14    conversation with DSI, if any of these loans

15    were doubtful or uncollectible, I don't recall

16    specifically.

17         Q.    Do you recall that the debtor filed

18    on the docket monthly operating reports?

19         A.    Yes.

20         Q.    You prepared those personally,

21    didn't you?

22              MS. DEITSCH-PEREZ:  Objection to

23         form.

24         A.    I didn't personally prepare them,

25    the team did with DSI.
```

Page 256

```
 1                  WATERHOUSE - 10-19-21

 2       Q.    But you signed them; correct?

 3       A.    My signature is on the MORs.

 4       Q.    And you signed them as the preparer

 5  of the document; correct?

 6       A.    Yes, I did this pursuant to DSI's

 7  instructions.

 8       Q.    Okay.  You wouldn't have signed the

 9  document if you didn't believe it to be

10  accurate; correct?

11       A.    If I had reason to believe it

12  wasn't, presumably I wouldn't have signed it.

13       Q.    Okay.  And do you have any reason to

14  believe right now that any monthly operating

15  report that has your signature on it was

16  inaccurate in any way?

17             MS. DEITSCH-PEREZ:  Object to the

18       form.

19       A.    My understanding of the monthly

20  operating reports is we were filing them in

21  accordance with the standards set by the Court.

22  It wasn't -- you know, again, I don't -- you

23  know, it wasn't GAAP.  It wasn't these other

24  standards, so I testified I didn't have

25  experience in this.  The CRO was running the
```

Page 257

```
 1                WATERHOUSE - 10-19-21

 2   show.  I followed their advice.

 3       Q.    But you assured yourself that

 4   everything in the report was accurate before

 5   you signed them; correct?

 6            MS. DANDENEAU:  Objection to form.

 7       A.    I trusted the guidance from the CRO

 8   and their team and their experience and their

 9   guidance for doing this for many, many, many

10   years to -- to -- to categorize and put things

11   in ways on the form.

12            You know, my team had -- had not

13   filled out these forms before and needed all of

14   this guidance.  I'm not an expert in this.  I

15   have oversight of it.  I signed the form.  DSI

16   told me to.

17       Q.    And you and your team are the source

18   of the information that DSI used to create the

19   reports; correct?

20            MS. DANDENEAU:  Objection to form.

21       A.    The books and records reside with

22   the -- with -- with the corporate accounting

23   team.

24       Q.    Okay.  And the corporate accounting

25   team was the corporate accounting team that was
```

Page 258

```
 1                WATERHOUSE - 10-19-21
 2   under your direction; correct?
 3        A.    Yes.
 4        Q.    So -- so your team was responsible
 5   for maintaining Highland's books and records;
 6   correct?
 7        A.    I'm sorry, my team was responsible?
 8        Q.    Correct.
 9        A.    Yes.  They -- they -- they were
10   the -- the -- the general ledger of Highland,
11   that responsibility was with the corporate
12   accounting team.
13        Q.    The corporate accounting group
14   reported to you; correct?
15        A.    Yes.
16              MR. MORRIS:  Can we put up 41,
17        please.
18              (Exhibit 41 marked.)
19        Q.    All right.  You will see that this
20   is a report that is dated January 31st, 2020,
21   but it is for the month ending December 2019.
22              Do you see that?
23        A.    I do.
24        Q.    And you signed this report in your
25   capacity as the chief financial officer of
```

Appx. 01525

Page 259

```
 1              WATERHOUSE - 10-19-21
 2    Highland; correct?
 3         A.    Yes.
 4         Q.    And you're the preparer -- you're
 5    identified as the preparer of the report;
 6    correct?
 7         A.    That is correct.
 8         Q.    Do you recall participating in the
 9    preparation of monthly operating reports?
10         A.    As I testified earlier, it was put
11    together, you know, with the team.  The team
12    worked with DSI to put these monthly operating
13    reports together.  We had no experience at this
14    time of the monthly operating reports or things
15    of this nature.
16              MR. MORRIS:  Can you turn to the
17         next page, please.
18         Q.    Do you see a line item under assets
19    due from affiliates?
20         A.    Yes, I do.
21         Q.    Okay.  And to the best of your
22    knowledge and understanding, as the person who
23    is identified as the preparer of this report,
24    does that line item include the affiliate loans
25    that we've been talking about?
```

Page 260

```
 1               WATERHOUSE - 10-19-21

 2        A.    Again, I would have to see, just

 3   like we did with the financial statements of

 4   Highland and NexPoint, I would have to see a

 5   detailed build, but, you know, if you look at

 6   the other line items, you know, the only other

 7   place it could be would be in -- in other

 8   assets.

 9        Q.    Okay.  And as a matter of

10   arithmetic, is it fair to say that is the value

11   of the assets due from affiliates was more than

12   25 percent of the value of Highland's total

13   assets as of 12/31/2019?

14             MS. DANDENEAU:  Objection to form.

15        A.    I'm really not doing the mental math

16   right now, so I've been going at this depo for

17   hours, so I'm really not -- you know --

18        Q.    All right.  No problem.

19        A.    -- these are millions of dollars.

20        Q.    Let's look at the Footnote 1,

21   please.  Do you see there is a reference to the

22   Hunter Mountain note?

23        A.    Yes, I see that in Footnote 1.

24        Q.    Okay.  And that's the reserve that

25   was taken against that note?
```

Page 261

1                    WATERHOUSE - 10-19-21

2          A.    Yes, that is what this indicates.

3          Q.    Okay.  And were you aware that the

4     reserve was being taken on that it was?

5          A.    I was -- I was aware, yeah, at some

6     point, yes.

7          Q.    Okay.  And are you aware of any

8     reserve being taken with respect to any other

9     note that was issued in favor of Highland?

10         A.    Again, as I testified, we didn't go

11    through an analysis on -- on -- on the other

12    notes.

13         Q.    Can we turn --

14         A.    I believe -- I believe it says that

15    in Footnote 1, fair value has not been

16    determined with respect to any of the notes.

17              So this footnote -- footnotes, look,

18    there has been no determination.

19         Q.    Okay.  The determination was made in

20    the audited financial statements just six

21    months earlier; right?  We saw that earlier?

22         A.    That was as of 12/31/18.  I mean,

23    things -- circumstances -- there's a bank --

24    circumstances change, things change -- things

25    change over time, you know, facts and

Appx. 01528

Page 262

```
 1              WATERHOUSE - 10-19-21
 2   circumstances change.  Again, you have to do an
 3   analysis.
 4        Q.    Okay.  And you do recall that in
 5   Highland's 2018 financial statement, all of the
 6   notes issued by affiliates and Mr. Dondero that
 7   were due at year-end had a fair value equal to
 8   the carrying value; correct?  We looked at
 9   that?
10        A.    Yes.  That was in the -- in the
11   disclosure for the -- for the affiliate notes,
12   yes.
13        Q.    And -- and you were obligated to
14   share with PwC any subsequent events between
15   the end of 2018 and the date that you signed
16   your management representation letter on June
17   3rd, 2019; correct?
18              MS. DEITSCH-PEREZ:  Object to the
19        form.
20        A.    Yes.  I -- I -- I signed the
21   management, you know, my signature is in the
22   management representation letter -- I hope I'm
23   answering your question -- that is dated in
24   June with the representations made in that
25   management representation letter.
```

Appx. 01529

Page 263

```
 1                  WATERHOUSE - 10-19-21

 2       Q.    Okay.  And there was nothing that

 3  caused PricewaterhouseCoopers to include in

 4  subsequent events any adjustment to the

 5  conclusion that the fair value of the affiliate

 6  notes and the notes issued by Mr. Dondero

 7  equaled the carrying value; correct?

 8             MS. DANDENEAU:  Objection to the

 9       form.

10       A.    That is correct.  That is what was

11  in the -- in the -- in the footnotes.

12       Q.    Okay.  So are you aware of anything

13  that occurred between June 3rd, 2019 and

14  December 31st, 2019 that would have caused the

15  fair value of the notes to differ from the

16  carrying value?

17       A.    Yeah.  Highland filed for

18  bankruptcy, things changed -- I mean, there was

19  a bankruptcy filed in October of -- of -- of

20  2019, right, the petition date that we've

21  described earlier.

22             I mean, I had a -- I guess looking

23  back naively, I thought we were going to get an

24  audit from PwC for year-ended 2019, and when we

25  had discussions with PwC, they were like, are
```

Page 264

```
 1                   WATERHOUSE - 10-19-21
 2    you crazy, we're not auditing this.  Values
 3    change, all these things change, bankruptcy
 4    changes the entire scenario.  I mean -- and
 5    they're like, we're not -- we're not touching
 6    this.
 7                   And so, you know, I was like, okay,
 8    sorry, I get it, okay, no an audit.
 9                   I mean, it is -- you know, and --
10    you know, and we weren't preparing GAAP
11    financial statements.
12                   Again, I didn't know what we were
13    doing in relation to our financial statements,
14    but these were the discussions I was having at
15    the time.  And yeah, I mean, filing bankruptcy
16    from what I got from outside auditors and
17    others involved changed things dramatically.
18         Q.    Okay.  Highland wasn't the obligor
19    under any of the notes that we're talking
20    about; correct?
21         A.    No.
22         Q.    So --
23         A.    That's right.
24         Q.    So can you identify any fact that
25    would cause the fair value to deviate from the
```

Appx. 01531

Page 265

```
 1                 WATERHOUSE - 10-19-21

 2   carrying value during the seven-month period

 3   between June 3rd and the end of the year, 2019?

 4            MS. DANDENEAU:  Objection to form.

 5       A.    No.  I mean, I'm putting myself back

 6   at that time, right.  Hindsight is 2020, but we

 7   didn't do an analysis, but we would have done a

 8   fulsome analysis and looked at all of the facts

 9   and circumstances at the time, but asset values

10   change.  You know, there could have been a

11   market crash in hindsight in 2020, which --

12   which affected entities' abilities.

13            There could have been all of these

14   things, right, that -- that happen.  It is --

15   it is easy to look back in hindsight, but when

16   you are looking at this in -- in realtime, the

17   analysis is different, and again, we didn't do

18   an analysis.

19       Q.    Okay.  You didn't do an analysis.

20            Do I have that right?

21       A.    I don't -- I don't recall doing one

22   or maybe -- you know, I don't recall doing one.

23            MR. MORRIS:  Okay.  I'm going to

24       take a break.  I may be done, so the time

25       now is -- is 4:30 your time.  Let's just
```

Page 266

```
 1                WATERHOUSE - 10-19-21

 2        take a short break until 4:40 your time.

 3               MS. DANDENEAU:  Okay.

 4               VIDEOGRAPHER:  We're going off the

 5        record, 4:31 p.m.

 6        (Recess taken 4:31 p.m. to 4:43 p.m.)

 7               VIDEOGRAPHER:  We are back on the

 8        record at 4:43 p.m.

 9               MR. MORRIS:  I have no further

10        questions.

11               MR. RUKAVINA:  Okay.

12        Mr. Waterhouse, I will go next.

13                      EXAMINATION

14   BY MR. RUKAVINA:

15        Q.   Sir, my name is Davor Rukavina.  I'm

16   the lawyer for --

17               MR. MORRIS:  Hey, Davor, just before

18        you begin, I just want to put on the record

19        Highland's objection to documents that were

20        produced to me 10 minutes before the

21        deposition began.

22               MR. RUKAVINA:  What the basis of

23        your objection?

24               MR. MORRIS:  That they were due

25        quite some time ago, and the fact that you
```

Page 267

```
1              WATERHOUSE - 10-19-21
2        had -- I just think it's appropriate to --
3        to dump documents on somebody 10 minutes
4        before the deposition.  I just think
5        that's --
6              MR. RUKAVINA:  Well, these are
7        documents Highland produced.  I'm not aware
8        of any rule I have to give you advance
9        documents when I know for the record that
10       other than the exhibits that you sent to us
11       last week, most of the exhibits you used
12       today you did not provide to me prior to
13       this deposition.
14             MR. MORRIS:  No, but the documents
15       were produced by me in -- in litigation,
16       right?
17             MR. RUKAVINA:  I'm going to use
18       primarily, John, the documents that you
19       produced to me today, but you may.
20             MR. MORRIS:  Primarily.  I've got --
21       I've got my objection.  You have got your
22       response.  Proceed.
23       Q.   Mr. Waterhouse, again, I represent
24    the advisors, HCMFA and NexPoint Advisors.
25             Do you understand that?
```

Page 268

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    You and I have never met or talked

 4   before today, have we?

 5        A.    No, I have -- I have heard your

 6   voice on calls before.

 7        Q.    Okay.

 8              MR. RUKAVINA:  Madam Court Reporter,

 9        I will use a few exhibits today.  My

10        associate, Mr. Nguyen, will find some way

11        to get them to you.  I don't know how to do

12        that, but it looks like you guys do.

13              I am going to use numbers as well.

14        But to differentiate them from Mr. Morris

15        we're going to mark mine with the prefix A

16        for advisors.

17              Do you understand?

18              COURT REPORTER:  Yes.

19              MR. RUKAVINA:  Okay.  Perfect.

20        Q.    Okay.  So, Mr. Waterhouse, let's

21   start with those two HCMFA notes that you were

22   asked about, one for 5 million and one for

23   2.4 million.

24              Do you recall those notes?

25        A.    Yes.
```

Appx. 01535

Page 269

```
 1                    WATERHOUSE - 10-19-21

 2          Q.    Were you ever the CFO of HCMFA?

 3          A.    I don't recall.

 4          Q.    So to the best of your recollection,

 5     you were still an officer of HCMFA in 2019,

 6     just that your title was treasurer?

 7                 MR. MORRIS:  Object to the form of

 8          the question.  There is no leading here.

 9          He works for your client.

10                 MS. DANDENEAU:  That is not -- that

11          is not true.

12                 MR. MORRIS:  He's the treasurer --

13          he is the treasurer of your client.  I

14          don't -- I'm going to object every time you

15          try to lead, so...

16                 MR. RUKAVINA:  Totally fine to

17          object.

18                 MR. MORRIS:  Okay.

19          Q.    Please answer my question,

20     Mr. Waterhouse.

21          A.    I'm sorry, could you repeat?  There

22     was...

23          Q.    Yes.  You were -- you testified

24     earlier that in 2019 you were an officer of

25     HCMFA; correct?
```

Appx. 01536

Page 270

```
 1              WATERHOUSE - 10-19-21

 2      A.    Yes, I testified that I was the

 3   treasurer and I didn't know if that incumbency

 4   certificate, you know, was one that appointed

 5   me as a treasurer, but yes.

 6      Q.    I'm just trying to confirm that

 7   sitting here today, to the best of your

 8   recollection, at that time you were -- your

 9   title was treasurer.  It was not chief

10   financial officer.

11      A.    I don't recall that being my title.

12      Q.    Okay.  And in May of 2019, however,

13   I think you testified you were the chief

14   financial officer of the debtor; correct?

15              MR. MORRIS:  Objection to the form

16        of the question.

17      A.    Yes, I was -- yes.

18      Q.    Okay.  As such, in May of 2019, did

19   you have the authority, to your understanding,

20   to unilaterally loan $5 million or $2.4 million

21   to anyone on behalf of the debtor?

22              MR. MORRIS:  Objection to the form

23        of the question.

24      A.    Sorry, can you repeat that?

25      Q.    Yes.  So in your capacity as the
```

Page 271

```
 1                 WATERHOUSE - 10-19-21
 2    chief financial officer of the debtor, Highland
 3    Capital Management, L.P., in May of 2019, did
 4    you believe that you unilaterally, just Frank
 5    Waterhouse, had the authority to loan on behalf
 6    of the debtor to anyone $5 million and
 7    $2.4 million?
 8                 MR. MORRIS:  Objection to the form
 9         of the question.
10         A.    No.
11         Q.    Is it because loans of that amount
12    would have had to be approved by someone else?
13         A.    Yes.
14         Q.    Who in '20 -- in May of 2019, if
15    Highland wanted to loan 5 million or
16    $2.4 million to someone, what would have been
17    the internal approval procedure?
18                 MR. MORRIS:  Objection to the form
19         of the question.
20         A.    If -- if we had loans of that nature
21    that needed to be made due to their size, we
22    would have gotten approval from the -- the
23    president of Highland.
24         Q.    And who that was individual?
25         A.    It was James Dondero.
```

Appx. 01538

Page 272

```
1              WATERHOUSE - 10-19-21

2      Q.    Okay.  Now, I'm going to ask you a

3  similar question but for a different entity.

4            In May of 2019, as the treasurer of

5  HCMFA, did you believe that you unilaterally

6  had the ability to cause HCMFA to become the

7  borrower of a $5 million loan and a

8  $2.4 million loan?

9            MR. MORRIS:  Objection to the form

10      of the question.

11      A.    No.

12      Q.    What would -- what would the

13  approval have taken place -- strike that.

14            What would the approval process have

15  been like in May of 2019 at HCMFA for HCMFA to

16  take out a $7.4 million loan?

17            MR. MORRIS:  Objection to the form

18      of the question.

19      A.    The process would have been similar

20  to what we just discussed on -- for Highland to

21  make a loan to others.  So, again, you know,

22  we -- we would have -- either myself or someone

23  on the team would have discussed this with

24  the -- the president and owner of -- of HCMFA.

25      Q.    And who was that individual?
```

Appx. 01539

Page 273

```
 1                  WATERHOUSE - 10-19-21

 2        A.    That was James -- Jim Dondero.

 3        Q.    So do I understand that in May of

 4   2019, on behalf of both the lender, Highland,

 5   and the borrower, HCMFA, Mr. Dondero would have

 6   had to approve $7.4 million in loans?

 7              MR. MORRIS:  Objection to the form

 8        of the question.

 9        A.    Yes.

10        Q.    You mentioned when Mr. Morris was

11   asking you the NAV error, N-A-V error, with

12   respect to TerreStar, without writing us a

13   novel, unless you feel like you have to, can

14   you summarize what that NAV error was?  What

15   happened?

16        A.    There was a -- in the Highland

17   Global Allocation Fund, it owned at the time an

18   equity interest in a company called TerreStar.

19   And TerreStar is -- at the time was a private

20   company, and it may still be today.  Again, I'm

21   putting myself back then as a private company.

22              We had -- sorry, I don't mean we --

23   the fund and the advisor used Houlihan Lokey

24   to -- to value that investment.  And during

25   that time there was some trades that were
```

Appx. 01540

Page 274

```
 1                  WATERHOUSE - 10-19-21
 2    executed at market levels that were much lower
 3    than the Houlihan Lokey model.
 4                  And based on information and
 5    discussions with the portfolio managers and,
 6    you know, principals that were very familiar
 7    with TerreStar, it was determined that those
 8    trades were non-orderly and they were not
 9    considered in the valuation as consulted with
10    Houlihan Lokey and PricewaterhouseCoopers at
11    the time.
12                  Subsequent to a -- I can't remember
13    the exact circumstances of why the SEC got
14    involved.  I think it was due to this -- this
15    investment became a material position in the
16    fund.  It triggered an SEC, kind of, inquiry.
17    And as part of that inquiry, they questioned
18    the valuation methodology.  "They" meaning the
19    SEC.
20                  And at the culmination of that
21    process -- this is all summarized -- the value
22    that was -- that ultimately had to be used in
23    the fund's NAV was different than -- materially
24    different than what the original valuation at
25    Houlihan Lokey provided.
```

Page 275

```
 1              WATERHOUSE - 10-19-21

 2              And given that there was this fund

 3    was, as we discussed -- I don't know if we

 4    discussed it, but it was an open-ended fund

 5    that was going -- that was converting to a

 6    close-end fund.

 7              Due to the fact that it was an

 8    open-ended fund, you had to recalculate NAV and

 9    see what the impact was on people -- on

10    investors coming in and out of the fund and if

11    there is a detrimental impact and to calculate

12    what that -- what that impact was and if there

13    was any amounts owed to the fund pursuant to

14    the error.

15        Q.    Were you personally involved

16    internally at either Highland or HCMFA with

17    these investigations and discussions with the

18    SEC?

19        A.    I was.

20        Q.    Which other key people or senior

21    people at Highland were involved, to your

22    recollection?

23        A.    Myself, Thomas Surgent, David Klos,

24    Lauren Thedford, Jason Post.

25        Q.    Mr. Dondero, was he --
```

Page 276

```
 1              WATERHOUSE - 10-19-21
 2      A.    I believe Cliff Stoops.  I'm trying
 3  to think.  And maybe that is -- that is -- that
 4  is -- that is all kind I can recall at the
 5  moment.
 6      Q.    Do you recall whether it was
 7  determined that the fund suffered losses as a
 8  result of this error?
 9      A.    The -- the fund -- the -- the --
10  because the open-ended nature of the fund,
11  there were losses that were attributable to
12  investors.  Meaning they -- they would have
13  redeemed and got a less money or -- or they
14  subscribed in and maybe because they didn't get
15  enough shares and then they later sold and then
16  they were harmed in that fashion.
17              And there is -- there is -- there
18  were very -- there were very detailed
19  calculations and, you know, all these different
20  scenarios that we had to -- I'm sorry, I keep
21  saying "we" -- that the individuals involved
22  had to calculate and quantify.
23      Q.    Well, do you recall whether HCMFA
24  admitted certain fault and liability for this
25  error?
```

Page 277

```
 1                  WATERHOUSE - 10-19-21
 2        A.    I don't recall specifically.
 3        Q.    Do you recall whether HCMFA caused
 4   any funds to be paid to the investors and the
 5   fund the subject of the NAV error?
 6        A.    Yes.
 7        Q.    Do you recall the approximate amount
 8   of funds, moneys paid to the investors and the
 9   fund?
10        A.    It was -- it was approximately
11   $7 million.
12        Q.    If I was to suggest 7.8 million,
13   would that ring more true or are you sticking
14   with your original answer?
15        A.    It was -- it was approximately 7 --
16   7 to $8 million.  Again, I don't remember the
17   exact number, but it was in that ballpark.
18        Q.    So regardless of whether HCMFA
19   accepted fault or liability, it caused some
20   $7 million or more to be paid out to affected
21   investors in the fund?
22              MR. MORRIS:  Objection to the form
23        of the question.
24        A.    And I want to make sure I'm
25   understanding your question because there is a
```

Appx. 01544

Page 278

```
 1                WATERHOUSE - 10-19-21

 2   lot of different entities that are going on to

 3   my head.

 4                I think what you are saying is based

 5   on this error, shareholders were harmed by this

 6   approximately $7.8 million -- by approximately

 7   $7.8 million.  Is that what you are asking?

 8        Q.    Yes, sir.

 9        A.    Yes, that was -- again, I don't have

10   the exact numbers.  If I take -- it was -- it

11   was in that ballpark, and there is a detail

12   calculation and write-up that could, that --

13   that exists someplace.

14        Q.    Now, at that time, at the time that

15   the NAV error occurred, was there a contract in

16   place between HCMFA and the debtor pursuant to

17   which the debtor was providing services to

18   HCMFA?

19                MR. MORRIS:  Objection to the form

20        of the question.

21        A.    Yes.

22        Q.    Was that contract generally called a

23   shared services agreement?

24        A.    It was generally called that, but

25   there were -- there were -- I mean, it -- it --
```

Page 279

```
 1              WATERHOUSE - 10-19-21
 2   it depends on who you talk to, but yes,
 3   generally, there were -- there are multiple
 4   agreements.
 5        Q.    Pursuant to one or more of those
 6   agreements, was the debtor providing certain
 7   services to HCMFA?
 8              MR. MORRIS:  Objection to the form
 9        of the question.
10        A.    Yes.
11        Q.    And can you at a very high level
12   summarize in 2018 and 2019 what those services
13   were?
14        A.    Yes, there was a -- yes.
15        Q.    Okay.  Please -- please go -- go
16   through a short summary.
17        A.    There was a -- a cost reimbursement
18   agreement between Highland Capital Management
19   Fund Advisors and Highland Capital Management,
20   L.P.  That agreement was for what we referred
21   to as front office services, so investment
22   management, things of that nature.
23              There was I think what most people
24   refer to as the shared services agreement that
25   was -- that agreement was between Highland
```

Page 280

```
1              WATERHOUSE - 10-19-21

2   Capital Management Fund Advisors and Highland

3   Capital Management for back office services.

4        Q.    And can you summarize what you mean

5   by back office services?

6        A.    Those services were for accounting,

7   finance, tax, valuation, HR, IT, you know,

8   legal compliance, things of -- things of those

9   nature -- or things of that nature, excuse me.

10        Q.    So in the spring of 2019, do you

11   recall whether HCMFA took the position that it

12   was actually Highland that caused the NAV error

13   to occur pursuant to the valuation services

14   that Highland was providing?

15              MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I do not recall.

18        Q.    Did you ever have any discussions

19   with anyone, Jim Dondero or anyone in the first

20   half of 2019 as to whether Highland, the

21   debtor, that is, had any liability to HCMFA

22   related to the NAV error?

23              MR. MORRIS:  Objection to the form

24        of the question.

25        A.    I do not recall.
```

Appx. 01547

Page 281

```
 1              WATERHOUSE - 10-19-21

 2      Q.    And then you mentioned that the fund

 3  was being closed and some compensation related

 4  to that.  Can you -- can you elaborate?  What

 5  were you referring to?

 6      A.    Right.  So the advisor, pursuant to

 7  board approval, put a proposal in front of the

 8  shareholders of the Highland Global Allocation

 9  Fund to convert it from an open-ended fund to a

10  closed-end fund.

11            So an open-ended fund, when

12  shareholders subscribe to the fund or redeem

13  into the fund, they do it at NAV.

14            When it is -- when you have a

15  closed-end fund, closed-end funds are -- are

16  publicly-traded, like on the New York Stock

17  Exchange, exchanges like that, and -- and

18  shareholders or investors, they're not --

19  they're -- they're not subscribing and

20  redeeming with the fund.  They are like shares

21  of Apple.

22            Those shares of the Highland Global

23  Allocation Fund trade on an exchange, and that

24  is how you, you know, that is how, you know,

25  you become an equity owner in the fund or you
```

Page 282

1                    WATERHOUSE - 10-19-21

2    sell your shares and you are no longer an

3    equity owner.

4              As part of that proposal, the

5    advisor told shareholders if you -- if you vote

6    for this proposal to -- to convert it from an

7    open-ended fund to a closed-end fund, we will

8    pay you some amounts of money.  I forgot -- a

9    certain number of points.  I think it was

10   like -- it was like two to three points or

11   something -- something like that.

12        Q.    Okay.  You mentioned when Mr. Morris

13   was asking you, going back to those two

14   promissory notes, you will recall the 5 million

15   and 2.4 million, you mentioned something to the

16   effect that Mr. Dondero told -- told you to pay

17   some moneys out of Highland.  Do you remember

18   that discussion with Mr. Morris?

19        A.    I do.

20        Q.    So, to the best of your

21   recollection, did you have a discussion with

22   Mr. Dondero about making some payments in May

23   of 2019 out of Highland?

24        A.    I recall, as I testified earlier,

25   that I had a conversation with Mr. Dondero

Appx. 01549

Page 283

1           WATERHOUSE - 10-19-21

2    for -- for these amounts attributable to -- it

3    was either the error -- you know, the error,

4    and in that conversation he said, go get the

5    money from Highland.  I believe that is what I

6    testified earlier, and that -- that is my

7    recollection.

8        Q.   Do you recall if that was an

9    in-person meeting or some other mode for the

10   meeting?

11       A.   I -- I -- I recall that being

12   in-person.

13       Q.   Do you recall if anyone else was

14   present, or was it just you and Mr. Dondero?

15       A.   I recall just he and I.

16       Q.   And the moneys that he told you to

17   find from -- or get from Highland, was that in

18   the amount of $5 million and $2.4 million?

19            MR. MORRIS:  Objection to the form

20       of the question.

21       A.   I believe so, but I would have to go

22   back and look and see when those moneys were

23   actually paid into the -- into the fund and,

24   you know, when those transfers were done.  If

25   they were all done around that same time, then

Appx. 01550

Page 284

```
 1              WATERHOUSE - 10-19-21
 2   yes, I would say it was -- it was all related
 3   to that.
 4       Q.    Did Mr. Dondero tell you that those
 5   funds would be a loan from Highland to HCMFA?
 6       A.    I don't recall.
 7             MR. MORRIS:  Objection to the form
 8       of the question.
 9       Q.    Now, and forgive me, I'm probably
10   the only non-American born here, but I speak
11   reasonably well in English.  I don't recall,
12   does that mean you don't remember or does that
13   mean it didn't happen?
14             MR. MORRIS:  Objection to the form
15       of the question.
16       A.    It -- it means I don't -- I don't
17   remember.
18       Q.    Did Mr. Dondero tell you to have
19   those two promissory notes prepared?
20       A.    I don't recall.
21       Q.    When you -- again, when you say, I
22   don't recall today, that means that sitting
23   here today, you just don't remember one way or
24   the other.  Is that accurate?
25       A.    Yes.
```

Page 285

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Is it possible that you, having

 3   heard what Mr. Dondero said and seeing funds

 4   being transferred, assumed that that would be a

 5   loan without him actually telling you that

 6   would be a loan?

 7             MR. MORRIS:  Objection to the form

 8        of the question.

 9        A.    Sorry, I want to make sure -- did I

10   ask the amounts that were transferred that I --

11   that -- that I assumed that that was a loan?

12        Q.    Well, let me -- let me take -- let

13   me try again.

14             So you have established already that

15   there were quite a number of promissory notes

16   back and forth -- I'm sorry, quite a number of

17   promissory notes with affiliated companies and

18   individuals owing Highland money; right?

19        A.    Yes.

20        Q.    And you have established that there

21   were many transactions and transfers going back

22   and forth over the years; right?

23             MS. DANDENEAU:  Objection to form.

24        A.    In -- yes, in my capacity as CFO and

25   my employment, yes, that is -- yes.
```

Page 286

```
 1              WATERHOUSE - 10-19-21

 2      Q.    And that's part of the reason why

 3  you just can't remember some of the details

 4  today because this -- this happened years ago,

 5  and there were a number of transactions.  Is

 6  that accurate?

 7              MS. DANDENEAU:  Objection to the

 8      form.

 9              MR. MORRIS:  Objection to the form

10      of the question.

11      A.    I mean, I deal with thousands of --

12  of -- of -- of transactions, you know, whether

13  it has -- the processing of transactions, you

14  know, if it has got, you know, more -- more

15  zeros, you know, behind it than others.

16              When you look at thousands of

17  transactions over the years for funds and

18  advisors and -- and, you know, financial

19  statements, I mean, it is -- it is very hard

20  going back in -- in -- in my -- you know,

21  14-ish year career at -- at Highland to

22  remember a lot of those details, especially

23  when I don't have any records or books or

24  anything like that, and -- and going back many

25  years.
```

Appx. 01553

Page 287

1            WATERHOUSE - 10-19-21

2        Q.    And that is fine.  That -- that --

3    that is why I asked the question.

4              Is it possible in May of 2019 when

5    Mr. Dondero told you to transfer the funds from

6    Highland, you just assumed on your own that

7    those would be loans without him actually

8    telling you that those would be loans?

9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    I don't know.

12        Q.    I'm sorry, you --

13        A.    I said I don't know.

14        Q.    Okay.  Well, as the -- as the CFO

15    for Highland, if you saw $7.4 million going

16    out, you would feel some responsibility to

17    account for that, wouldn't you?

18              MR. MORRIS:  Objection to the form

19        of the question.

20        A.    Yes.

21        Q.    Is it fair to say that those would

22    be in the range large enough to rise up to your

23    level?

24              MR. MORRIS:  Objection to the form

25        of the question.

Page 288

```
 1                WATERHOUSE - 10-19-21

 2       A.    If -- I don't know if I understand

 3  your question.  Those amounts would arise to my

 4  level where I would be involved or...

 5       Q.    You would want to know what a

 6  transfer for that amount, $7.4 million, was all

 7  about, as the CFO of Highland, wouldn't you?

 8            MR. MORRIS:  Objection to the form

 9       of the question.

10       A.    Yes, I make it -- I mean, I -- I

11  review all sorts of payments, I mean, even

12  smaller dollar payments on a periodic basis,

13  you know, to -- to -- to understand and to make

14  sure that we are paying things in a -- you

15  know, in -- in -- in an informed way.  And, you

16  know -- and we're -- and we're paying things

17  pursuant to vendor contracts and things like

18  that.

19       Q.    So as part of that, is it possible

20  that seeing $7.4 million go out you would have

21  promissory notes made in order to keep a paper

22  trail, assuming that those were loans, when

23  perhaps they were never intended to be loans by

24  Mr. Dondero?

25            MR. MORRIS:  Objection to the form
```

```
                                                    Page 289
 1                    WATERHOUSE - 10-19-21

 2           of the question.

 3           A.    I don't know.  As I testified

 4      earlier, I had conversations with Mr. Dondero

 5      about -- about the -- the -- the moneys that

 6      were needed for the NAV error.  And I recall

 7      him saying go get it from Highland -- or get it

 8      from Highland.

 9           Q.    Well, why did you sign those

10      promissory notes and why didn't you have him

11      sign them?

12                 MR. MORRIS:  Objection to the form

13           of the question.

14           A.    I don't know.  I don't know.

15           Q.    You mentioned earlier that you

16      typically don't sign promissory notes.  Am I

17      remembering your testimony correctly?

18                 I mean, promissory notes on behalf

19      of the entities.  Not yourself, obviously.

20           A.    Yes, that is what I said earlier.

21           Q.    Do you recall any other promissory

22      notes in the million-plus range that you had

23      ever signed before on behalf of any entity?

24           A.    There is -- there has been a lot of

25      transactions over the years.  I don't -- I
```

Page 290

```
 1                 WATERHOUSE - 10-19-21
 2   don't -- I don't recall generally.  I don't --
 3   I don't recall.
 4       Q.    So -- but to the best of your
 5   recollection, it was on your initiative,
 6   following your discussion with Mr. Dondero,
 7   that you had someone draft those two promissory
 8   notes; is that correct?
 9             MR. MORRIS:  Objection to the form
10       of the question.
11       A.    Yes, we would have -- the team, as I
12   stated earlier, we don't draft promissory
13   notes.  "The team" meaning the accounting and
14   finance team.
15             So the team would have worked with
16   the legal group at Highland to draft any notes.
17       Q.    Do you believe or do you have any
18   recollection as to whether you would have done
19   that pursuant to an email or telephone call or
20   in-person meeting?
21             MR. MORRIS:  Objection to the form
22       of the question.
23       A.    Are you asking if I would have -- if
24   those notes would have been drafted pursuant to
25   an email or phone call?
```

Page 291

```
 1                  WATERHOUSE - 10-19-21

 2         Q.    Strike that.

 3               Do you recall whether you sent an

 4    email to anyone asking them to draft those two

 5    promissory notes?

 6         A.    I don't recall because, again,

 7    once -- I would have instructed -- likely

 8    instructed the team to -- to work with the

 9    legal group to draft these documents.

10               I -- I -- I -- yeah, I didn't -- I

11    mean, that is more an operational-type

12    procedure.  So, you know, a manager or a

13    controller or working with legal.  You know,

14    they -- they can certainly handle that task to

15    get that -- you know, to request that from

16    legal.

17         Q.    And who on your team do you think

18    you would have asked to do that?

19               MR. MORRIS:  Objection --

20         Q.    Who would have been the logical

21    person or people, if you don't remember their

22    name today?

23               MR. MORRIS:  Objection to the form

24         of the question.

25         A.    It -- it -- there is only two
```

Appx. 01558

Page 292

```
 1              WATERHOUSE - 10-19-21
 2    managers of the group.  That would have been
 3    Dave Klos or Kristin Hendrix.
 4              Dave was the -- one of his duties
 5    was managing the valuation team, and so he was
 6    intimately involved with this process.  So, you
 7    know...
 8         Q.    Okay.
 9         A.    I don't recall specifically but, I
10    mean, my general -- you know, I -- I -- I
11    likely would have talked to Dave first about it
12    versus someone like Kristin who hadn't been
13    intimately involved.
14         Q.    And -- and do you have a view as to
15    whether it is most likely that you would have
16    done that by email or in-person or how would
17    you believe you would have communicated that to
18    Mr. Klos?
19              MR. MORRIS:  Objection to the form
20         of the question.
21         A.    I likely would have done that in
22    person.  Again, if things of this nature
23    that -- again, you have to put ourselves back
24    to, we have been working on this very stressful
25    project for many, many months.  And once the
```

Page 293

1          WATERHOUSE - 10-19-21

2   go-ahead was to -- you know, we see the light

3   at the end of the tunnel with wrapping this up

4   and making shareholders whole -- sorry to say

5   "we" -- you know, the -- so the folks that are

6   involved in it.

7              I like to talk to people

8   face-to-face and -- and -- and go to -- and go

9   to their desk, because that shows if I'm going

10  to their desk that -- that is something that I

11  want done, you know.

12       Q.    And do you remember, Mr. Waterhouse,

13  getting those two promissory notes in paper

14  format or by email before they were executed?

15              MR. MORRIS:  Objection to the form

16       of the question.

17       A.    I don't recall.

18       Q.    For whatever was the ordinary course

19  back then in May 2019, would you expect to have

20  received them only on paper or would you have

21  expected to have received them in Word document

22  or PDF document by email?

23              MR. MORRIS:  Objection to the form

24       of the question.

25       A.    I -- I didn't sign -- I signed very

Page 294

```
 1                  WATERHOUSE - 10-19-21

 2    few documents via email.  I can't say that it

 3    never happened, but people either stopped by my

 4    office and physically walked in documents for

 5    signature that we discussed face-to-face.

 6                  Or documents were -- if -- if --

 7    if -- if -- let's say I wasn't there or I

 8    wasn't available, documents were dropped off.

 9    I had -- I had some in- and outboxes in front

10    of my -- my office there at the Crescent.

11                  Documents would be dropped off for

12    signature.  There would be a cover sheet that

13    would be -- have been applied to those

14    documents detailing, you know, who dropped it

15    off, the purpose, why, what time.

16                  And then, you know, as I stated, I

17    don't draft documents and I always go to the

18    legal group and the compliance group to make

19    sure that they're in the loop.  And there is

20    a -- a box or section that says, Has legal

21    reviewed or approved, or something to that

22    nature.

23                  Again, I don't -- I don't have

24    access to that cover sheet anymore, but it

25    was -- it was something to that effect.
```

Appx. 01561

```
1                 WATERHOUSE - 10-19-21

2                 And my assistant, you know, if she

3      was there, she would review that -- you know,

4      whatever was being dropped off.  And if that

5      has legal, you know, reviewed or -- reviewed or

6      approved it, if that wasn't -- if that stuff

7      hadn't been done, it was like she would just

8      tell them like, go -- go -- go to the legal

9      group, because --

10         Q.    Let me -- let me pause --

11               MS. DANDENEAU:  Let him finish.

12               MR. MORRIS:  Thank you.  Go ahead.

13         A.    I take -- go to the legal group

14      because that -- that was my -- you know, I

15      didn't -- I didn't review anything that -- that

16      they weren't -- you know, or there wasn't some

17      representation made to me that they had

18      reviewed, approved in some capacity.

19               Again, my -- my -- my goal, as CFO,

20      is to provide transparency and make sure that

21      groups like compliance and other things -- and

22      the other group in legal are -- are in -- you

23      know, their -- they're made aware of

24      transactions of -- you know, that are crossing

25      my desk.
```

Page 296

```
 1                WATERHOUSE - 10-19-21

 2            Because I'm not in every

 3   conversation.  They're not in every

 4   conversation -- meaning legal compliance -- and

 5   I just want to make sure that -- that everyone

 6   is in sync to, you know, to -- to the extent

 7   possible.

 8       Q.    So if we summarize, you don't

 9   specifically remember signing these two notes,

10   but most likely it would have been that they

11   would have presented -- been presented to you

12   physically on paper?

13            MR. MORRIS:  Objection to the form

14       of the question.

15       A.    They would -- they would have been

16   presented physically on paper most likely or

17   someone would have left it.  But, I mean,

18   again, I don't -- I don't recall.

19       Q.    I understand.  Understand.

20            When you signed -- when you signed

21   documents, when you personally signed

22   documents, did you typically use a ink pen or

23   did you use a stamp?

24       A.    No, I -- I -- I use a -- an -- an

25   ink pen.
```

Page 297

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Do you know -- was there a file at

 3  Highland kept anywhere with ink-signed

 4  originals of a promissory notes in general or

 5  these two promissory notes specifically?

 6              MR. MORRIS:  Objection to the form

 7       of the question.

 8       A.    Sorry, I just want to make sure I

 9  understand your question.  Are you saying is

10  there a file somewhere that has ink-signed

11  originals of these two promissory notes?

12       Q.    Yes.

13       A.    I would -- I would assume they're

14  some place.  I mean --

15       Q.    Well, was there a -- was there a

16  place where Highland generally kept originals

17  of promissory notes owed to it?

18       A.    I wouldn't -- no.

19              MR. RUKAVINA:  Mr. Nguyen, would you

20  please pull up my A7, alpha 7.

21       Q.    These are the two promissory notes,

22  Mr. Waterhouse.

23              (Exhibit A7 marked.)

24       Q.    And please -- Mr. Waterhouse, please

25  command my associate to scroll down as you need
```

Appx. 01564

Page 298

```
 1              WATERHOUSE - 10-19-21
 2   to, but I want you to take a very close look at
 3   your two signatures here and tell me whether
 4   you believe, in fact, that you ink signed them
 5   or whether you --
 6              MS. DANDENEAU:  Mr. Rukavina,
 7         Mr. Waterhouse has the copies.
 8              MR. RUKAVINA:  Perfect.  Then you
 9         can take this down, Mr. Nguyen.
10         A.    These -- these -- these signatures
11   are identical, now that I stare at them, and I
12   mean, they are so close -- I mean, they're
13   identical that, I mean, even with my chicken
14   scratch signature, I don't know if I can -- you
15   know, I do this 100 times, could I do that
16   as -- as precisely as I see between the two
17   notes.
18         Q.    Well, that is why I ask.
19   Mr. Waterhouse, now that you have examined
20   them, does it seem like it is more likely that
21   you actually electronically signed these?
22              MR. MORRIS:  Objection to the form
23         of the question.
24         A.    Is -- I don't -- I don't recall
25   specifically.  As I said before, my assistant
```

Page 299

```
1              WATERHOUSE - 10-19-21
2   did have a -- an electronic signature, and that
3   was used from time to time.  It wasn't as
4   common practice back in 2019.  It definitely
5   was more common practice when we had to work
6   from home and remotely for COVID because it
7   that made it almost impossible to, right,
8   provide wet signatures since we're all working
9   from home remotely.
10      Q.   Well, going just for these two
11  promissory notes, Mr. Waterhouse, in light of
12  your inability to remember any details, are you
13  sure you actually signed either or both of
14  those notes?
15           MS. DANDENEAU:  Objection to form.
16      A.   I don't recall specifically
17  signing -- actually physically signing these
18  notes.  As I said before, I don't recall doing
19  that.  This -- this looks like my signature,
20  but yet these two signatures are identical.
21      Q.   So you don't recall physically
22  signing them, and I take it you don't recall
23  electronically signing them either?
24      A.   I don't recall.  You know, Highland
25  has all my emails.  If that occurred, you know,
```

Page 300

```
 1                  WATERHOUSE - 10-19-21
 2     you know, I don't have any of these records is
 3     what I'm saying.  I don't have any of those
 4     records.
 5          Q.    That is why I'm asking you these
 6     questions in great detail because I don't have
 7     those emails.  I'm trying to -- I'm hoping that
 8     you will give me some names or some details so
 9     I can go look for more emails, but again, you
10     don't remember any -- any individual, other
11     than Mr. Dondero that we've discussed, you
12     don't remember any individual with whom you
13     discussed these promissory notes prior to their
14     execution?
15                  MR. MORRIS:  Objection to the form
16          of the question.
17          A.    I don't recall discussing it with
18     anybody else.
19          Q.    Okay.
20          A.    I mean, prior --
21          Q.    I understand.
22          A.    You know, there was no one else --
23     there was no one else in that meeting that I
24     recall with Mr. Dondero.
25          Q.    Now, when you established that by
```

Appx. 01567

```
 1              WATERHOUSE - 10-19-21

 2   May of 2019 --

 3        A.    And -- and from what I recall, and

 4   the reason why I was by myself is -- is, you

 5   know, I don't -- I don't want to speculate, I'm

 6   sorry.

 7        Q.    Okay.  We have established that by

 8   May of 2019, in your view, the liabilities of

 9   HCMFA exceeded its assets; correct?

10        A.    Yeah.  I mean, again, I don't have

11   financial statements in front of me, but I

12   think, if I recall, we'd have to go through the

13   testimony with Mr. Morris, I believe that was

14   the case.

15        Q.    In fact, you will recall that in

16   April of 2019, Mr. Dondero signed a document

17   that extended the demand feature of two prior

18   notes to May 31, 2019.  Do you recall that?

19             MS. DEITSCH-PEREZ:  I think you

20        might -- maybe have the court reporter read

21        that back.  You might have misspoke.

22             (Record read.)

23             MR. RUKAVINA:  And I did misspeak.

24        Q.    I meant to say to May 31, 2021.  Do

25   you recall that, sir?
```

Page 302

```
 1              WATERHOUSE - 10-19-21

 2              MR. MORRIS:  Objection to the form

 3         of the question.

 4    A.    Yes.

 5              MR. RUKAVINA:  And, Mr. Nguyen, just

 6    so that the record is clear, will you please

 7    pull up my Exhibit Alpha 10, A10.

 8              (Exhibit A10 marked.)

 9    Q.    You don't have this one in front of

10    you, Mr. Waterhouse?  This is the one that

11    Mr. Morris used earlier.  Do you see that

12    document, sir?

13    A.    Yes, I do.

14    Q.    And this is what you were testifying

15    about before when Mr. Morris was asking you.

16    Do you remember that?

17    A.    Yes.

18    Q.    So here is my question for you,

19    Mr. Waterhouse:  As the chief financial officer

20    of Highland, was it prudent for Highland less

21    than three weeks later to be lending

22    $7.2 million to an insolvent entity that

23    couldn't even then pay its debts back to

24    Highland?

25              MS. DANDENEAU:  Objection to form.
```

Page 303

```
 1                WATERHOUSE - 10-19-21

 2                MR. MORRIS:  Objection to the form

 3        of the question.

 4        A.    Sorry, I just want to make sure --

 5   are you asking me, did you say, was it prudent

 6   for Highland to loan $7.4 million to HCMFA a

 7   few weeks after this document was executed?

 8        Q.    Yes, and at a time when HCMFA's

 9   liabilities exceeded its assets.

10                MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I don't -- it is odd.  I don't know.

13                MR. RUKAVINA:  You can take this

14   exhibit down, Mr. Nguyen.

15        Q.    Do you recall asking anyone,

16   Mr. Dondero or -- or anyone outside as to

17   whether Highland ought to be lending

18   $7.4 million to HCMF regarding HCMF's

19   creditworthiness?

20                MR. MORRIS:  Objection to the form

21        of the question.

22        A.    I don't recall.

23        Q.    Did you receive personally any of

24   that $7.4 million?

25        A.    No.
```

Page 304

```
 1              WATERHOUSE - 10-19-21
 2      Q.    Did you even --
 3            MR. MORRIS:  I didn't hear that
 4      question, sir.
 5            MR. RUKAVINA:  The one that he
 6      answered, John, or my new one?
 7            MR. MORRIS:  No, no, your question,
 8      Davor.
 9            MR. RUKAVINA:  I had asked him
10      whether he received any of the
11      $7.4 million.  He said no.
12            MR. MORRIS:  Yeah.  I thought there
13      was a question after that.  Maybe I was
14      mistaken.  I apologize.
15            MR. RUKAVINA:  I had started a new
16      question, so here, let me start the new
17      question again.
18      Q.    Did you personally receive any
19   direct benefit from those two notes for
20   $7.4 million?
21      A.    No.
22      Q.    Did you ever personally consider
23   yourself obligated to repay either or both of
24   those notes?
25      A.    No.
```

Page 305

```
 1              WATERHOUSE - 10-19-21

 2              MR. RUKAVINA:  Pull up those notes

 3    again, Mr. Nguyen.

 4        Q.    You can have them in front of you,

 5    Exhibit 7, Mr. Waterhouse, whatever is easier

 6    for you.  If you go to your signature page, my

 7    question to you is, why did you not include

 8    your title as treasurer by your name, Frank

 9    Waterhouse?

10              MS. DANDENEAU:  Objection to form.

11        A.    I didn't -- I didn't draft this

12    document.

13        Q.    So you relied on whoever drafted it

14    to draft it correctly?

15        A.    Yes.

16        Q.    Okay.  But back then when you signed

17    this, did it ever cross your mind that you were

18    the maker on these notes?

19        A.    No.

20        Q.    Back then when you signed this

21    document, did it ever cross your mind that you

22    could be a co-obligor on these notes?

23        A.    No.  I didn't receive $7.4 million,

24    I mean...

25        Q.    But can you say that HCMFA received
```

Page 306

```
 1              WATERHOUSE - 10-19-21

 2    $7.4 million?

 3        A.    I would have to go back and look and

 4    check in, you know, the -- the financial

 5    records and the bank statements.

 6              MR. RUKAVINA:  You can take this

 7    exhibit down, Mr. Nguyen.

 8        Q.    Mr. Waterhouse, I'm not trying to be

 9    a smart-ass, but if the law says that because

10    of the way that you signed this promissory

11    note, if that is what the law says, that that

12    made you personally -- personally liable, then

13    you would agree with me that that was never

14    your intent?

15              MR. MORRIS:  Objection to the form

16        of the question.

17        A.    That was never -- I wouldn't sign a

18    note and not get consideration in return.

19        Q.    So putting all other issues aside,

20    if the law -- if the law says that you were

21    liable for those notes because of how you

22    signed them, then would you agree with me that

23    these notes are a mistake?

24              MR. MORRIS:  Objection to the form

25        of the question.
```

Page 307

```
 1                  WATERHOUSE - 10-19-21

 2                  MS. DANDENEAU:  Objection to the

 3        form.

 4        A.    Yes.

 5        Q.    So do you agree with me that it's

 6   odd -- I think that is the word you used --

 7   that Highland would be loaning $7.4 million a

 8   few weeks after that extension to an entity

 9   whose liabilities exceeded its assets, and you

10   would agree with me that it was never your

11   intention to be in any way liable for these two

12   promissory notes; correct?

13                  MR. MORRIS:  Objection to the form

14        of the question.

15        A.    Sorry, you -- you asked a lot there.

16                  MR. RUKAVINA:  I will strike it and

17   I will move on.

18                  Let's go to -- pull up Exhibit 9,

19   please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha

20   9, A9.

21                  (Exhibit A9 marked.)

22        Q.    Sir, take a moment to look at this,

23   but this is an email, and you will see attached

24   July 31, 2020 affiliate notes.

25                  Do you see that attachment?
```

Page 308

```
 1            WATERHOUSE - 10-19-21
 2      A.    Yes.
 3      Q.    Okay.  And do you see an entry for
 4  Highland Capital Management Fund Advisors?
 5            MR. MORRIS:  I'm sorry, hold on.
 6      Where are you looking?
 7            MR. RUKAVINA:  Last page, John.
 8            MR. MORRIS:  Is it the page on the
 9      screen?
10            MR. RUKAVINA:  Oh, I'm sorry.
11      Mr. Nguyen just did it.  Yes, the last page
12      there.
13            MR. MORRIS:  Thank you.
14      Q.    Do you see an entry there for HCMFA?
15      A.    Yes.
16      Q.    About $10.5 million.
17            Do you see that?
18      A.    I do.
19      Q.    And, now, do you have any
20  explanation for why if HCMFA owed $7.4 million,
21  plus the 5.3 million that had been extended,
22  why that amount was only 10.5 million?
23      A.    I don't know.  Okay.
24            MR. RUKAVINA:  Close this one and
25      pull up, Mr. Nguyen, the schedules,
```

Page 309

```
 1              WATERHOUSE - 10-19-21

 2        schedule of assets.  What exhibit is this

 3        of ours, Mr. Nguyen?

 4              MR. NGUYEN:  This is A11.

 5              MR. RUKAVINA:  Oh, this will be A11.

 6              (Exhibit A11 marked.)

 7        Q.    You don't have this in front of you,

 8   Mr. Waterhouse?

 9        A.    Okay.

10        Q.    This is what Mr. Morris used

11   earlier.  Do you remember looking at this with

12   Mr. Morris?

13        A.    Yes.

14              MR. RUKAVINA:  You might have to

15        zoom in a little.  Okay.

16        Q.    Now, I see Affiliate Note A, B, and

17   C.

18              Do you have any recollection as to

19   why the names of the affiliates are omitted?

20        A.    I don't.  I testified earlier that,

21   you know, the team worked with DSI in providing

22   these.  I -- I don't -- I don't know.

23        Q.    Can we deduce -- is it logical to

24   deduce that Affiliate Note A would be NexPoint

25   given its size of $24.5 million?
```

Page 310

```
 1              WATERHOUSE - 10-19-21

 2              MR. MORRIS:  Objection to the form

 3     of the question.

 4       A.   I mean, it -- it is a -- it is -- it

 5     is approximate.

 6       Q.   Well, can we -- can we deduce -- or,

 7     I'm sorry, strike that.

 8              Can you, sitting here today,

 9     logically conclude that Affiliate Note B or C

10     represents HCMFA?

11              MR. MORRIS:  Objection to the form

12     of the question.

13       A.   I don't know.  I don't know.  I

14     can't.

15       Q.   Okay.  As of the petition date, we

16     have established that HCMFA, under promissory

17     notes, owed $7.4 million and $5.3 million to

18     the debtor; correct?

19              MR. MORRIS:  Objection to the form

20     of the question.

21       A.   Yes.

22       Q.   Okay.  And by my reckoning, that

23     would be somewhere approaching $13 million.

24              MR. MORRIS:  Objection to the form

25     of the question.
```

Appx. 01577

Page 311

```
 1                    WATERHOUSE - 10-19-21
 2        Q.    It would be $12.7 million.  Is that
 3   generally correct?
 4        A.    Sorry, the amounts were 7.4, 5.3.
 5        Q.    Yes.
 6        A.    Okay.  Yeah, that -- that -- I can
 7   do that math, yes.
 8        Q.    Do you have any explanation or any
 9   understanding of why there is no similar entry
10   listed here on the schedule of assets filed
11   with the bankruptcy court?
12             MR. MORRIS:  Objection to the form
13        of the question.
14        A.    I don't know.  We have to look at
15   the supporting schedules, like I talked about
16   other -- presumably there is -- there is a
17   build to the schedule that would provide the
18   detail.
19        Q.    Well, that was going to be my next
20   question.  You anticipated it.
21             MR. RUKAVINA:  You can -- you can
22        take this down, Mr. Nguyen.
23        Q.    Do you believe that whenever you and
24   your team provided the underlying data to the
25   financial advisor that the actual names of the
```

Appx. 01578

Page 312

```
 1              WATERHOUSE - 10-19-21
 2   affiliates for Affiliate Note A, B, and C would
 3   have been listed there?
 4        A.    Are you asking we provided the names
 5   to the financial advisor?  I don't -- I don't
 6   understand who the financial advisor is.
 7        Q.    I'm sorry, DSI.
 8              Let me ask the question this way,
 9   Mr. Waterhouse.
10              Whenever you provided information
11   about the affiliate notes to DSI, do you
12   believe that you would have included the actual
13   names of the affiliates, you or your team, or
14   that you would have done the Affiliate Note A,
15   Note B, Note C?
16              MR. MORRIS:  Objection to the form
17        of the question.
18              MS. DANDENEAU:  Objection to the
19        form.
20        A.    We -- like I testified earlier, when
21   we were -- we gave everything to -- to DSI.  We
22   were giving all of our records, all of our
23   files, everything to DSI.  We weren't redacting
24   information or saying, hey, here is a note,
25   here is Affiliate Note A or B.
```

Appx. 01579

Page 313

1                    WATERHOUSE - 10-19-21

2                I mean, it was -- our job and our

3    focus -- and I testified in court back in 2019;

4    right -- was -- was to be transparent and, you

5    know, get DSI up to speed on -- on the matters

6    at Highland.  So I can't see us redacting at

7    that point.

8                MR. RUKAVINA:  Mr. Nguyen, will you

9         please pull up Mr. Morris' Exhibit 36.

10         Just the very first page, the very top

11         email.  You might zoom in a little bit.

12         Q.   Now, you recall being asked about

13    this by Mr. Morris?

14         A.   Yes, I do.

15         Q.   And you wrote:  The HCMFA note is a

16    demand note.

17              You wrote that; right?

18         A.   Yes.

19         Q.   And, in fact, weren't there by that

20    point in time several notes?

21         A.   Yes, there were.  Again, I don't --

22    I don't remember everything specifically.  I

23    mean --

24         Q.   I understand.  I understand.

25              So this is an example where -- where

Appx. 01580

Page 314

```
 1                   WATERHOUSE - 10-19-21
 2    you might have made a mistake by referring to a
 3    singular instead of a plural; right?
 4         A.    Yes.
 5         Q.    Okay.  And you -- you wrote -- a
 6    couple of sentences later, you wrote:  There
 7    was an agreement between HCMLP and HCMFA the
 8    earliest they could demand is May 2021.
 9               You wrote that; right?
10         A.    Yes.
11         Q.    But I think you -- you agreed with
12    Mr. Morris that that can't possibly apply to
13    the May 2019 notes, can it?
14               MR. MORRIS:  Objection to the form
15          of the question.  That is not what he
16          testified to.
17         Q.    Let me ask -- let me ask a different
18    question.
19               Sitting here today -- or if you can
20    answer me from your memory on October 6,
21    2020 -- did the April acknowledgment that
22    extended the maturity date apply to the
23    May 2019 notes also?
24         A.    I don't recall specifically.
25         Q.    Well, you recall that the notes that
```

Page 315

```
 1                WATERHOUSE - 10-19-21

 2   you signed were demand notes; right?

 3        A.    Yes.

 4        Q.    Do you find it logical, based on

 5   your experience, that had they intended to have

 6   a different or a set maturity date, you would

 7   have instructed that that set maturity date be

 8   included instead of a demand feature?

 9             MR. MORRIS:  Objection to the form

10        of the question.

11        A.    Sorry, just want to make sure I

12   understand.  You are saying that -- that the

13   $5 million note, the $2.4 million note, if

14   those were supposed to be a term note, that I

15   would have made sure that those were a term

16   note?

17        Q.    I'm saying -- I'm saying,

18   Mr. Waterhouse, that on May the 2nd and May the

19   3rd, 2019, if you intended that those two

20   promissory notes could not be called until May

21   2021, would you have included such language in

22   those two promissory notes?

23             MR. MORRIS:  Objection to the form

24        of the question.

25        A.    I guess -- I'm sorry, I don't recall
```

Page 316

```
 1               WATERHOUSE - 10-19-21

 2    putting language in those May notes.  I don't

 3    remember what language you are referring to.

 4         Q.    Well, let's read this again.

 5               There was an agreement between HCMLP

 6    and HCMFA the earliest they could demand is May

 7    2021.

 8               Do you recall that agreement?

 9         A.    Yes, that was the agreement we

10    looked at earlier; correct?

11         Q.    Okay.  Yes.

12               Do you -- do you understand now that

13    that agreement that we looked at earlier also

14    applied to the May 2019 notes that you signed?

15         A.    I don't -- I don't know.

16         Q.    But as of October 6, 2020, you're

17    writing that there is one demand note and

18    you're categorizing that demand note as not

19    being demandable on May 2021; correct?

20         A.    Yes.

21         Q.    And you know now that you made at

22    least one mistake in this email; correct?

23               MR. MORRIS:  Objection to the form

24         of the question.

25         A.    Yes.
```

Page 317

```
 1                WATERHOUSE - 10-19-21

 2              MR. RUKAVINA:  You can pull this

 3      down, Mr. Nguyen.

 4      Q.    So, Mr. Waterhouse, you don't

 5  remember Mr. Dondero telling you to make these

 6  loans or not.  HCMLP was loaning $7.4 million

 7  to someone that their assets were less than

 8  their liabilities.

 9              We don't see on the July list of

10  notes, where there is $12.7 million of notes,

11  we don't see that on the bankruptcy schedules,

12  and we have this Exhibit 36 where you are

13  confused.

14              Are you prepared to tell me, sir,

15  today that you might have made a mistake in

16  executing those two promissory notes?

17              MR. MORRIS:  Objection to the form

18      of the question.

19      A.    I -- I don't know.

20      Q.    And if it turns out that you're

21  personally liable for those promissory notes,

22  it would certainly be a mistake, wouldn't it?

23              MS. DANDENEAU:  Objection to the

24      form.

25              MR. MORRIS:  Join.
```

Page 318

```
 1                  WATERHOUSE - 10-19-21
 2       A.    Yes.
 3       Q.    If Mr. Dondero testifies that he
 4   never told you to make these loans, would you
 5   disagree with his testimony?
 6             MR. MORRIS:  Objection to the form
 7        of the question.
 8       A.    Like I testified earlier with my
 9   conversation with Mr. Dondero, all I recall is
10   he said, get the money from Highland.
11       Q.    And if Mr. Dondero testifies that
12   he, in consultation with other senior personnel
13   at Highland, decided that Highland needed to
14   pay HCMFA $7.4 million as compensation for the
15   NAV error and not a loan, would you have any
16   reason to disagree with Mr. Dondero?
17             MR. MORRIS:  Objection to the form
18        of the question.
19       A.    If that was -- if that was his
20   intent, yes, it would -- I would --
21       Q.    Do you have any reason to disagree
22   with him?
23             MR. MORRIS:  Objection to the form
24        of the question.
25       A.    If that was his intent, I don't
```

Page 319

```
 1              WATERHOUSE - 10-19-21
 2   know.  I don't know how I disagree with that.
 3        Q.    And just to confirm, you don't
 4   remember ever asking Mr. Dondero whether you
 5   should have two promissory notes prepared?
 6        A.    No.
 7        Q.    And you don't remember discussing
 8   with Mr. Dondero what the terms of those two
 9   promissory notes should be?
10        A.    I don't recall -- I testified all I
11   recall is he said, get the money from Highland.
12   I don't -- the -- the terms of the note, I
13   don't recall ever having a discussion around
14   the terms of the note, but since I don't draft
15   the notes, that -- there could have been a
16   conversation with other people later.
17        Q.    Do you have any memory of whether
18   after the notes were drafted, but before you
19   signed them, that you communicated with
20   Mr. Dondero in any way to just confirm or -- or
21   get his blessing or ratification to signing
22   those notes?
23              MR. MORRIS:  Objection to the form
24        of the question.
25        A.    I don't recall.
```

Appx. 01586

Page 320

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Again, the only thing you remember,

 3  sitting here today, was Mr. Dondero said, get

 4  the money from Highland, and that is it, that

 5  is all you remember?

 6              MR. MORRIS:  Objection to the form

 7      of the question.

 8      A.    I testified to that several times.

 9  This was over two years ago.  A lot has

10  happened.  That is all I recall.

11      Q.    And help me here.  I'm not very

12  technologically astute.  When you -- and I -- I

13  recognize that you do it rarely, but when you

14  sign a document electronically, do you believe

15  that there is an electronic record of you

16  having authorized or signed a document

17  electronically?

18              MR. MORRIS:  Objection to the form

19      of the question.

20      A.    I -- I don't know the tech answer to

21  that, but, you know, since I don't have -- I

22  don't ever attach my signature block

23  electronically, my assistant would have done

24  that, and if that is done over email like we

25  did several times -- you know, multiple,
```

Appx. 01587

Page 321

```
 1              WATERHOUSE - 10-19-21
 2   multiple times over COVID, she would attach my
 3   signature block and then email it out to
 4   whatever party.
 5        Q.   What was your assistant's name in
 6   May 2019?
 7        A.   It was Naomi Chisum.
 8        Q.   Is she the only one?  I'm sorry, was
 9   she your only assistant that would have maybe
10   facilitated logistically something like you
11   just described?
12        A.   You know, she was out on maternity
13   leave at some point.  I don't -- I don't recall
14   those dates where she was out for maternity
15   leave.  There was -- there were folks backing
16   her up.  I don't recall specifically who
17   those -- who those, you know, administrative
18   assistants were, and I don't recall
19   specifically if she was out during this time on
20   maternity leave.
21             I do know that that she was out for
22   a period of time, or who knows, or she could
23   have been on vacation that day or, you know, I
24   don't know.
25        Q.   Switching gears now, the two
```

Appx. 01588

Page 322

```
 1                  WATERHOUSE - 10-19-21
 2   complaints that have been filed that is against
 3   HCMFA and NexPoint, did you see any drafts of
 4   those complaints before they were filed?
 5                  MR. MORRIS:  Objection to the form
 6           of the question, and to the extent that you
 7           had any communications with counsel or you
 8           were shown drafts of the complaints by
 9           counsel while you were employed by
10           Highland, I direct you not to answer.
11           A.    I -- I reviewed documents yesterday
12   with counsel here.  I believe that is the first
13   time I have ever seen those.
14           Q.    Okay.  Did you ever discuss with
15   Mr. Seery these two lawsuits before or after
16   they were filed?
17           A.    I don't recall.
18           Q.    Were you ever interviewed by legal
19   counsel, to your knowledge, about these
20   promissory notes before the complaints were
21   filed?  Without going into what was said, were
22   you ever interviewed by legal counsel?
23                  MR. MORRIS:  Objection to the form
24           of the question.
25           A.    I don't recall.
```

Appx. 01589

Page 323

```
 1                WATERHOUSE - 10-19-21

 2        Q.    Obviously with COVID, it changed,

 3   but -- but before COVID, did you used to meet

 4   with Mr. Seery from time to time in-person?

 5        A.    Yeah, I mean, so before COVID -- so

 6   we're talking kind of late March, early April,

 7   right, there was about -- I don't remember the

 8   specific date when the board for Highland was

 9   appointed.  I believe it was around February of

10   2020, so maybe there was a month-and-a-half,

11   two-month window where we were meeting

12   in-person or, you know, like we were actually

13   in the office, excuse me, we were in the

14   office.

15                And, you know, when they were first

16   appointed, the board members and Mr. Seery

17   were -- were definitely down here more

18   in-person.

19        Q.    Did you ever see Mr. Seery taking

20   written notes of -- of his meetings with you or

21   others?

22        A.    I don't recall.

23        Q.    Do you recall on any Zoom or video

24   conference with Mr. Seery, seeing him take

25   notes, written notes?
```

Page 324

```
 1              WATERHOUSE - 10-19-21

 2       A.    The Zoom calls we had, I don't

 3  recall having seen video or, you know, or if it

 4  was on Zoom, I just remember it being -- well,

 5  no, you know what, there were some -- you know,

 6  I take that back.

 7             So there were -- there were some

 8  times that I did remember seeing Mr. Seery

 9  on -- on some of the Zoom calls.

10       Q.    Well, let me --

11       A.    I don't -- sorry, I'm thinking.  I'm

12  thinking -- I'm going back.  I'm trying to

13  process this.

14       Q.    I can make it much quicker,

15  Mr. Waterhouse.  I have heard -- I have heard

16  that Mr. Seery is a copious note taker.

17             Do you have any knowledge about

18  that?

19       A.    No.

20       Q.    Okay.  Switching gears yet again,

21  and this will be last theme.  Do you need a

22  restroom break, or are you good to go for

23  another half an hour?

24             MS. DEITSCH-PEREZ:  I need a

25        restroom break.
```

Appx. 01591

Page 325

```
 1                    WATERHOUSE - 10-19-21

 2                    MR. RUKAVINA:  Can we make it five

 3        minutes?

 4                    THE WITNESS:  Five minutes would be

 5        great.

 6                    VIDEOGRAPHER:  We're going off the

 7        record at 5:53 p.m.

 8        (Recess taken 5:53 p.m. to 5:59 p.m.)

 9                    VIDEOGRAPHER:  We are back on the

10        record at 5:59 p.m.

11        Q.    Mr. Waterhouse, I had asked you

12   earlier about contracts between HCMFA and the

13   debtor, and now I'm going to talk about

14   contracts between the debtor and NexPoint

15   Advisors.  Okay?

16        A.    Okay.

17        Q.    Now, were there contracts similar to

18   the ones with HCMFA that NexPoint had in the

19   nature of employee reimbursement and shared

20   services?

21        A.    Yes, they -- NexPoint Advisors and

22   Highland Capital Management Fund Advisors had

23   cost reimbursement and shared services

24   agreements with Highland Capital Management,

25   L.P.
```

Page 326

```
 1              WATERHOUSE - 10-19-21

 2       Q.    And was that shared services

 3   agreement, to the best of your understanding,

 4   in place as of December 31, 2020?

 5       A.    It was -- it was terminated at some

 6   point, and I remember the contracts had

 7   different termination dates, but I think the --

 8   the date of termination was January 31st of

 9   2021, after the termination was put in.

10              So yeah, it would be in place at the

11   end of the year of December -- it would be in

12   place at December 31st, 2020.

13       Q.    And pursuant to that agreement as of

14   December 31st, 2020, was the debtor providing

15   what you would describe as back office services

16   to NexPoint?

17       A.    Yes.

18       Q.    Would those have included accounting

19   services?

20       A.    Yes.

21       Q.    And as part of those accounting

22   services, would the debtor have assisted

23   NexPoint with paying its bills?

24              MR. MORRIS:  Objection to the form

25       of the question.
```

Appx. 01593

```
 1                    WATERHOUSE - 10-19-21

 2         A.    Yes.

 3         Q.    So let's break that up.  You were a

 4    treasurer of NexPoint as well in December of

 5    2020?

 6               MR. MORRIS:  Objection to the form

 7         of the question.

 8         A.    Yes.

 9         Q.    Okay.  And in December of 2020, did

10    NexPoint have its own bank accounts?

11         A.    Yes.

12         Q.    And did it use those bank accounts

13    to pay various of its obligations?

14         A.    Yes.

15         Q.    Did employees of the debtor have the

16    ability to cause transfers to be made from

17    those bank accounts on behalf of NexPoint?

18         A.    Yes.

19         Q.    And is that one of services that the

20    debtor provided NexPoint, basically ensuring

21    that accounts payable and other obligations

22    would be paid?

23         A.    Yes.

24               MR. MORRIS:  Objection to the form

25         of the question.
```

Page 328

```
 1              WATERHOUSE - 10-19-21

 2       Q.    You answered yes?

 3       A.    Yes.

 4       Q.    And the payments, though, whose

 5  funds would they be made from?

 6       A.    From the bank account of NexPoint

 7  Advisors.  If they were NexPoint advisor

 8  obligations, it would be made from NexPoint

 9  Advisors' bank account.

10       Q.    So let's pull up Exhibit Alpha 1.

11  You should have that -- it is my Tab 1 or my

12  Exhibit 1.

13            (Exhibit A1 marked.)

14       Q.    So this is a -- this is a series of

15  emails, Mr. Waterhouse.  Let's look at the

16  first page here, November 25, 2020, between

17  Kristin Hendrix and yourself.

18            Do you see that, sir?

19       A.    I do.

20       Q.    And do you see where Ms. Hendrix

21  writes:  NPA.

22            Do you know what NPA stood for?

23       A.    Yes.

24       Q.    And what does it stand for?

25       A.    NexPoint Advisors.
```

Appx. 01595

Page 329

```
 1              WATERHOUSE - 10-19-21

 2       Q.    And was that how you-all internally

 3   at Highland refer to NexPoint Advisors, L.P.?

 4       A.    I mean, yes, amongst other things.

 5       Q.    And she writes at the bottom of her

 6   email:  Okay to release?

 7             Do you see that?

 8       A.    Yes, I do.

 9       Q.    So what --

10             MR. MORRIS:  Hold on one second.

11             Okay.  Go ahead.

12             MR. RUKAVINA:  Yeah.

13       Q.    So what is -- what is Ms. Hendrix

14   here on November 25 asking of you?

15       A.    She is asking me -- so she -- these

16   are -- these are payments -- typically we would

17   do an accounts payable run every week at the

18   end of every Friday.  But looking at this date,

19   it is Wednesday, November 25th, which means, to

20   me, it is likely Thanksgiving weekend.

21             So this is the day before

22   Thanksgiving, so this is the last kind of --

23   kind of day before the holidays and vacation

24   and things of that nature.  So it is

25   effectively the Friday of that week.
```

Appx. 01596

Page 330

```
 1              WATERHOUSE - 10-19-21

 2              So she is -- she is putting in all

 3    the payments for the week because we batch

 4    payments weekly.  And these are the payments

 5    that go out that week, and she is informing me

 6    of the payments and -- you know, again, at the

 7    bottom of the email, she is asking for my okay

 8    to -- to release these payments in the wire

 9    system.

10         Q.    So these would be accounts payable

11    of NexPoint?

12         A.    I mean, it would be accounts payable

13    for all of these entities listed on this email.

14         Q.    And who was Ms. Hendrix employed by

15    in November and December of 2020?

16         A.    Highland Capital Management.

17         Q.    Okay.  So -- so part of the services

18    that NexPoint had contracted with was for

19    Highland to ensure that NexPoint timely paid

20    its accounts payable; is that accurate?

21              MR. MORRIS:  Objection to the form

22         of the question.  You have got to be

23         kidding me.

24         Q.    Is that accurate?

25         A.    Yes.
```

Page 331

1              WATERHOUSE - 10-19-21

2      Q.    And did NexPoint rely on employees

3  of the debtor to ensure that NexPoint's

4  accounts payable were timely paid?

5              MR. MORRIS:  Objection to the form

6         of the question.

7      A.    Yes.

8              MR. RUKAVINA:  Let's flip to the

9         next page, Mr. Nguyen, if you will please

10        scroll to the next page.

11     Q.    So this is an email similar to the

12  prior one, November 30th.

13             Do you see where it says, NPA HCMFA,

14  USD $325,000 one-day loan?

15             Do you see that, sir?

16     A.    I do.

17     Q.    Do you have any memory of what that

18  was?

19     A.    I don't recall what that -- what

20  that payment was for.

21     Q.    Did it sometimes occur that one

22  advisor would, on very short-terms, make loans

23  to another advisor?

24     A.    Yes.  This -- this -- this occurred

25  from -- from -- from time to time.  It actually

Appx. 01598

Page 332

```
 1                   WATERHOUSE - 10-19-21
 2    looking at -- I'm -- I'm looking at the date of
 3    this email.  It is November 30th.  It is the
 4    last day of the month.
 5              HCMFA has obligations it needs to
 6    pay to its broker-dealer, which is HCFD.  And
 7    it likely was short funds to make those
 8    obligations under that -- under its agreement,
 9    and so it provided a one-day loan because on
10    the next business day on 12/1 -- or the next
11    business day in December, it would receive
12    management fees from the underlying funds that
13    it managed and it would be able to pay back
14    that loan to NexPoint Advisors.
15         Q.   So -- so here Ms. Hendrix was
16    seeking your approval to transfer $325,000 from
17    NexPoint to HCMFA for a one-day loan; is that
18    correct?
19         A.   That is correct.
20         Q.   Let's flip to the next page, sir.
21              MR. RUKAVINA:  And, Mr. Nguyen, if
22         you will please scroll down.
23         Q.   Now we have as an entry for
24    $325,000, 11/30 loan payment.
25              Do you see that, sir?
```

Page 333

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    And that is probably the loan that

 4   was approved on the prior page?

 5        A.    Yes, most likely.

 6        Q.    So is it also true, sir, that in

 7   addition to accounts payable debtor employees

 8   would be assisting NexPoint with respect to

 9   paying back its debt?

10             MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I mean, yes, for loans of this

13   nature, yes.

14        Q.    Well, what about long term loans?

15   Was it reasonable for NexPoint to expect debtor

16   employees to ensure that NexPoint timely paid

17   its obligations under long-term notes?

18             MR. MORRIS:  Objection to the form

19        of the question.

20             MS. DANDENEAU:  Objection to form.

21        A.    I mean, that is one of the things

22   that the Highland personnel did provide to the

23   advisors.  Yes, we would -- we would -- over

24   the years, yes, we -- we -- we -- we did do

25   that generally.  Again, I don't remember
```

Appx. 01600

Page 334

```
 1              WATERHOUSE - 10-19-21
 2   specifically but, yes, generally we -- you
 3   know, we did do that.
 4        Q.   So do you recall -- and we can pull
 5   it up, if need be -- that under the NexPoint
 6   note that Mr. Morris asked you about earlier,
 7   the one for more than $30 million, that
 8   NexPoint was obligated to make an annual
 9   payment of principal and interest?
10              MR. MORRIS:  Objection to the form
11        of the question.
12        A.   Yes, it was -- yes, it -- it was an
13   amortizing note.  It was -- you know, from what
14   we reviewed earlier, it was payable by
15   December 31st of each year.  So -- but are --
16   are you asking me --
17        Q.   I'm just asking you, sir, if you
18   recall the note.
19        A.   Yes, the $30 million note, yes, we
20   reviewed it earlier, yes.
21        Q.   And do you recall Mr. Morris had you
22   go through the fact that NexPoint had made
23   payments in years prior to 2020 on that note?
24        A.   I do.
25        Q.   And do you believe that employees of
```

Page 335

```
 1                 WATERHOUSE - 10-19-21
 2    the debtor would have played any role in
 3    NexPoint having made those prior payments?
 4                 MR. MORRIS:  Objection to the form
 5         of the question.
 6         A.    Yes.
 7         Q.    And what role in years prior to 2020
 8    would employees of the debtor have had with
 9    respect to NexPoint making that annual payment?
10         A.    We -- we -- we would have -- I keep
11    saying "we."  The team would have calculated
12    any amounts due under that loan and other
13    loans, as -- as standard course.
14                 We would -- since we provided
15    treasury services to the advisors, we would
16    inform the -- the -- the -- we informed
17    Mr. Dondero of any cash obligations that are
18    forthcoming, whether we do cash projections.
19                 If, you know, any of these payments
20    would have -- or, you know, the sum total of
21    all of these payments, including any note
22    payments, if there were any cash shortfalls, we
23    would have informed Mr. Dondero of any cash
24    shortfalls.  We could adequately plan, you
25    know, in instances like that.
```

Page 336

```
 1                   WATERHOUSE - 10-19-21

 2                   Or, sorry, we -- I say "we" -- I

 3   keep saying "we" -- I keep wearing my -- again,

 4   my -- my treasurer hat.

 5                   But, yes, it is to -- it is to

 6   inform Mr. Dondero of the obligations of the

 7   advisors in terms of cash and obligations that

 8   are -- are upcoming and that -- and that are --

 9   are scheduled to be paid.

10       Q.    And would those obligations that are

11   upcoming and scheduled to be paid prior to 2020

12   have incurred the annual payment on that

13   NexPoint $30 million note?

14                   MS. DANDENEAU:  Objection to form.

15                   MS. DEITSCH-PEREZ:  Davor, I think

16           you misspoke.  You might want to just

17           repeat the question.

18       Q.    Okay.  Let me repeat the question,

19   sir.

20                   Prior to 2020, those services that

21   you just described, would that -- on behalf of

22   the debtor, would that have included NexPoint's

23   payments on the $30 million note?

24       A.    Yes.

25       Q.    So someone at the debtor in treasury
```

Page 337

```
 1              WATERHOUSE - 10-19-21
 2   or accounting would have sent some schedule or
 3   a reminder that a payment would be coming due
 4   in the future.  Is that generally the practice?
 5        A.    Yes, we would -- you know, again, I
 6   didn't -- I didn't micromanage the teams, but
 7   we had a -- a corporate accounting calendar
 8   that we use as kind of a tickler file to keep
 9   track of payments.
10              I actually, you know, don't know how
11   actively they're using that in -- in prior to
12   2020, but it was actively used at some point.
13              We did look at NexPoint cash
14   periodically and cash for the other advisors as
15   well and payments.  You know, we -- payments
16   like this would have appeared in our cash
17   projections, in the advisor's cash projections.
18              And, again, as like I said earlier,
19   they would have appeared there, so there would
20   be time to plan for making any of these
21   payments.
22        Q.    And based on your experience, would
23   it have been reasonable for NexPoint to rely on
24   the debtors' employees to inform NexPoint of an
25   upcoming payment due on the $30 million
```

Page 338

```
 1                 WATERHOUSE - 10-19-21
 2    promissory note?
 3                 MR. MORRIS:  Objection to form of
 4        the question.
 5                 MS. DANDENEAU:  Objection to form.
 6        A.    Yes.  Yes, they did.  I mean, but I
 7    mean, but I don't think these -- these notes
 8    were any secret to anybody.
 9        Q.    I understand, and I'm not suggesting
10    otherwise.
11                 MR. RUKAVINA:  Please pull up Alpha
12    2, Mr. Nguyen.
13                 (Exhibit A2 marked.)
14        Q.    Now, this document is similar to the
15    ones we've seen before as of December 31, 2020,
16    and I don't see under NTA anything there for
17    paying the promissory note to Highland.
18                 Do you see anything like that?
19        A.    I do not.
20                 MR. RUKAVINA:  You can pull that --
21    that exhibit down, Mr. Nguyen.
22        Q.    You are aware, of course, by now
23    that, in fact, NexPoint failed to make the
24    payment due December 31, 2020, are you not?
25        A.    I am aware, and yes, I do understand
```

Appx. 01605

Page 339

1            WATERHOUSE - 10-19-21

2      it.

3           Q.    Were you aware that Highland

4      accelerated that $30 million promissory note?

5           A.    I am aware.

6           Q.    Were you aware of that acceleration

7      at the time that it occurred?

8           A.    I don't remember specifically.

9           Q.    Do you recall whether anyone asked

10     you -- prior to the acceleration, anyone asked

11     you at Highland, what Highland should do with

12     respect to the missed payment?

13          A.    Did anyone ask me what Highland

14     should do about the missed payment?

15          Q.    Yes, before acceleration.

16                MR. MORRIS:  Objection to the form

17          of the question.

18          A.    I mean, what -- what I recall is

19     there was the -- sorry, are you asking me --

20                MS. DANDENEAU:  Why don't you just

21          repeat the question, Mr. Rukavina.

22          Q.    Let me try again, Mr. Waterhouse,

23     let me try again.

24                I am saying you're the CFO of

25     someone, in this case, Highland, and the

Page 340

```
 1                  WATERHOUSE - 10-19-21
 2    borrower failed to make the required payment.
 3    Are you with me so far?
 4          A.    I am.
 5          Q.    Did anyone then ask you, what should
 6    we do with respect to our rights against the
 7    borrower that missed the payment?
 8          A.    Not that I recall.
 9          Q.    Did you play a role in the decision
10    to accelerate that $30 million promissory note?
11          A.    I did not.
12          Q.    Do you recall whether Mr. Seery ever
13    asked you before the acceleration as to whether
14    he should accelerate the note?
15          A.    I don't recall.
16          Q.    And you don't recall when you
17    learned of the acceleration itself?
18                MR. MORRIS:  Objection to the form
19          of that question.
20          A.    It was -- it was sometime in
21    early -- in early 2021.  I don't remember
22    specifically.
23          Q.    But do you recall whether it was
24    after the acceleration had already been
25    transmitted?
```

```
 1              WATERHOUSE - 10-19-21
 2              MS. DANDENEAU:  Objection to the
 3        form of the question.
 4        A.    I don't recall.
 5        Q.    Do you recall in early to mid
 6   January of 2021, after the default, discussing
 7   the default with Mr. Dondero?
 8        A.    I do recall discussing with
 9   Mr. Dondero after December 31, 2020?
10        Q.    Yes, the fact of the default.
11        A.    I don't recall.
12              MR. RUKAVINA:  Let's pull up my
13   Exhibit 6, Alpha 6.
14              (Exhibit A6 marked.)
15              MR. RUKAVINA:  And, Mr. Nguyen, if
16        you will please scroll down.
17        Q.    This email chain begins with you
18   writing to Ms. Hendrix on January the 12th:
19   NexPoint note to HCMLP.
20              Do you see that, sir?
21        A.    I do.
22        Q.    Were you discussing this same
23   $30 million note we're talking about right now
24   with Ms. Hendrix?
25        A.    Yes.
```

Page 342

```
 1              WATERHOUSE - 10-19-21
 2        Q.    Okay.  Do you recall what prompted
 3   you to send that email to her?
 4        A.    Yes, I had -- I had a conversation
 5   with Jim.
 6        Q.    Okay.  And what -- what did you
 7   discuss with Jim that led to this email chain?
 8        A.     He -- he called me and he said he
 9   wanted to make payment on the NexPoint note,
10   and I didn't -- I didn't know the -- the amount
11   offhand, so I reached out to Kristin and got
12   the details and relayed that to him.
13        Q.    And you see you sent that email to
14   her at 11:15 a.m.  Does that help you remember
15   when you had this discussion with Mr. Dondero?
16   In other words, was it that morning or the day
17   before, or can you -- can you --
18        A.    No, it was -- it was that morning.
19        Q.    And do you recall how you had that
20   conversation with him?
21              MR. MORRIS:  Objection to the form
22        of the question.
23        Q.    By telephone, by email, in-person?
24        A.    Yeah, he -- he called me.  I was at
25   home.  We were working from home here in
```

Page 343

```
 1              WATERHOUSE - 10-19-21

 2   December of 2020.  He called me from home.  He

 3   said he was in court.  He wanted to -- he asked

 4   about, you know, making payment on the note and

 5   the amount, and so I didn't have those numbers

 6   in front of me, so I said I would get back to

 7   him.  I wanted all the details, so here is

 8   this -- so I reached out to Kristin.

 9        Q.   And then she gave you that

10   $1,406,000 figure?

11             MR. RUKAVINA:  Mr. Nguyen, if you

12   will scroll up, please.

13        A.   Yes.  Yeah, she -- the $1,406,112.

14        Q.   And do you recall whether you

15   conveyed that amount to Mr. Dondero?

16        A.   Yes.  I -- I called him back and

17   gave him -- gave him this amount.

18        Q.   Are you aware of whether NexPoint,

19   in fact, then made that 1 million 406 and

20   change payment?

21        A.   Yes, they did.

22        Q.   Did you discuss with Mr. Dondero at

23   that time, either the first conference or the

24   second conference that day -- strike that.

25             When you conveyed the number to
```

Page 344

```
 1              WATERHOUSE - 10-19-21
 2   Mr. Dondero, was -- was it also on January
 3   12th?
 4        A.    Sorry, when I conveyed the
 5   $1.4 million number?
 6        Q.    Yes.
 7        A.    Yes, yes, it was that -- it was --
 8        Q.    So you had --
 9        A.    It was that point.
10        Q.    Well, to the best of your
11   recollection, you had a conference with
12   Mr. Dondero by the telephone in the morning,
13   and then another conference with him by
14   telephone after 11:40 a.m. that morning?
15        A.    Yeah, I can't remember -- yeah, it
16   was either that morning or it could have been,
17   you know, early afternoon, but again, I
18   remember calling him back, relaying this
19   information to him, and he said, okay, pay --
20   you know, make -- make this payment.
21        Q.    And during either of those two
22   calls, did you tell Mr. Dondero anything to the
23   effect that making those -- I'm sorry, making
24   that payment would not de-accelerate the
25   promissory note?
```

Page 345

```
 1                 WATERHOUSE - 10-19-21

 2        A.    No.

 3        Q.    Did you tell him anything to the

 4   effect that making that payment would not cure

 5   the default?

 6        A.    No.

 7        Q.    Did you discuss that in any way with

 8   him?

 9        A.    No, I did not.

10        Q.    Did he say why he wanted to have

11   that $1.4 million payment made?

12             MR. MORRIS:  Objection to the form

13        of the question.

14        A.    He -- he -- he didn't go into

15   specifics.

16        Q.    Did he say anything to you to the

17   effect that if NexPoint makes that payment,

18   then the note will be de-accelerated?

19             MR. MORRIS:  Objection to the form

20        of the question.

21        A.    I don't recall.

22             MR. RUKAVINA:  You can put this one

23        down, Mr. Nguyen.

24        Q.    And, again, when you say you don't

25   recall, you mean you don't remember right now
```

Appx. 01612

Page 346

```
1              WATERHOUSE - 10-19-21
2   either way; correct?
3        A.    Yeah, I don't remember.  I don't
4   remember us discussing that.
5        Q.    Now -- and we're almost done, I
6   promise.  I'm just going to -- I don't know how
7   to ask this question, so I'm just going to try
8   to do my best.
9              Prior to the default on December 31,
10  2020, did Mr. Seery ever tell you any words to
11  the effect that you or someone at Highland
12  should ensure that NexPoint doesn't make its
13  payment?
14       A.    No.
15       Q.    Did you have any hint or any belief
16  that anyone at NexPoint -- I'm sorry, strike
17  that.
18             Did you have any reason to believe
19  that anyone with Highland was actively trying
20  to get NexPoint to make that default by not
21  paying on December 31?
22             MR. MORRIS:  Objection to the form
23       of the question.
24       A.    Are you asking, did any Highland
25  employees actively work to make -- to
```

Appx. 01613

Page 347

```
 1              WATERHOUSE - 10-19-21

 2    somehow --

 3        Q.   Yes.  Let me take a step back.  Let

 4    me take a step back.

 5             So you are aware now that as a

 6    result of that default, what was still some

 7    25-year note was accelerated and became

 8    immediately due.  You are aware of that now;

 9    right?

10        A.   Yes.

11        Q.   And can you see how someone at

12    Highland might actually have been pleased with

13    that development?

14             MR. MORRIS:  Objection to the form.

15        Q.   Not that they were --- not that they

16    were pleased, but you can see how someone at

17    Highland might have been pleased with that

18    development?

19             MR. MORRIS:  Objection to the form

20        of the question.

21             MS. DANDENEAU:  Object to form.

22        A.   I don't know how they would have

23    reacted to that.

24        Q.   Okay.  But you're not -- you're not

25    aware of any instructions or any actions being
```

Appx. 01614

Page 348

```
1              WATERHOUSE - 10-19-21
2    given or taken at Highland by Mr. Seery, the
3    independent board, DSI, that -- that would have
4    basically led Highland to ensure that NexPoint
5    would fail to make that payment?
6         A.    I'm not aware.
7         Q.    In other words, there wasn't a trick
8    or a settlement; right?
9              MS. DEITSCH-PEREZ:  Objection to
10        form.
11             MS. DANDENEAU:  Object to form.
12             MR. MORRIS:  Object to form.
13        A.    I'm not aware.
14             Look, I'm not aware.  I'm not in
15   every conversation.  I mean, and I'm just --
16   again, I'm sitting at home.  It is the end of
17   the year.  Again, I'm not aware.
18        Q.    That is a perfectly legitimate
19   answer.  I don't know why -- why you think
20   otherwise.
21             Okay.  Just give me one second to
22   compose my thoughts.
23             MS. DEITSCH-PEREZ:  While you're
24        taking your one second, why don't we take
25        three minutes.  I will be right back.
```

Appx. 01615

Page 349

```
 1              WATERHOUSE - 10-19-21

 2              VIDEOGRAPHER:  Do we want to go off

 3      the record?

 4              MR. RUKAVINA:  Yes.

 5              VIDEOGRAPHER:  All right.  We're

 6      going off the record at 6:27 p.m.

 7      (Recess taken 6:27 p.m. to 6:30 p.m.)

 8              VIDEOGRAPHER:  We are back on the

 9      record at 6:30 p.m.

10              MR. HORN:  Is Deb back?

11              MS. DANDENEAU:  Are you asking about

12      me?  I'm here.

13              MR. HORN:  Oh, okay.  I don't see

14      you, sorry.

15      Q.   Actually, yeah, Mr. Waterhouse, so

16   when you had --

17              MS. DANDENEAU:  Are you asking about

18      Deb Dandeneau or Deborah?  I mean, there

19      are a lot -- as we talked about, a lot of

20      Debs.  I'm here.

21              MS. DEITSCH-PEREZ:  I'm here.

22              MR. HORN:  Yes, I was asking about

23      DDP.

24              MS. DEITSCH-PEREZ:  Oh, DDP is here.

25              MR. HORN:  Okay.  Here we go.  I'm
```

Page 350

```
 1                WATERHOUSE - 10-19-21
 2        going back on mute.
 3             MS. DANDENEAU:  Get the right
 4        nomenclature.
 5        Q.    Mr. Waterhouse, on January 12th,
 6   2021, when you had those talks with Mr. Dondero
 7   about the $1.4 million payment, did you have a
 8   communication or a conversation with Mr. Seery
 9   about that payment after January 12th, 2021?
10        A.    I don't recall.
11        Q.    Well, in response to Mr. Dondero
12   reaching out to you, do you recall on that day,
13   January 12th, talking to Mr. Seery or anyone at
14   Highland other than the email chain we just saw
15   about Mr. Dondero's call with you?
16        A.    Did I talk to -- I spoke with
17   Kristin -- I don't know if I spoke to her.  I
18   likely spoke to Kristin Hendrix because we had
19   to get the wire on NexPoint's behalf to make
20   the payment to Highland.
21        Q.    So it is true, then, that -- that
22   employees of the debtor did actually cause that
23   payment to be made when it was made after
24   January 12th?
25        A.    Yes, I mean, we -- we -- as I
```

Page 351

```
 1                  WATERHOUSE - 10-19-21

 2   testified earlier, we provided that accounting

 3   finance treasury function as -- under the

 4   shared services agreement.  And so once I

 5   got the -- I talked to Jim, got the approval to

 6   make this payment, we have to then make the

 7   payment, or the team does, and so the payment

 8   was made.

 9        Q.    Okay.  But -- okay.  And -- and

10   sitting here right now, after Jim called you,

11   you don't remember talking to anyone other than

12   the -- the couple of people you mentioned,

13   talking to anyone about something to the effect

14   that, hey, Jim wants to make this payment now?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't -- I don't recall.

18        Q.    And does that include legal counsel?

19             Without going into any detail, on

20   January 12th or before that payment was made,

21   did you consult with legal counsel about

22   anything having to do with the $1.4 million

23   payment?

24        A.    I don't recall.

25        Q.    Okay.  Thank you, sir, for your
```

Page 352

```
 1                  WATERHOUSE - 10-19-21
 2    time.
 3              MR. RUKAVINA:  Pass the witness.
 4              MR. MORRIS:  I just have a few
 5        questions, if I may.
 6              MS. DEITSCH-PEREZ:  Don't you go at
 7        the end?
 8              MR. MORRIS:  Oh, I apologize.  He is
 9        your witness.  I'm surprised you want to
10        ask him questions, but go right ahead.
11              MS. DEITSCH-PEREZ:  Just have a
12        couple of things.
13              MR. RUKAVINA:  And I will just
14        object to that, that he's our witness.
15        That's not --
16              MR. MORRIS:  I'm not talking to you.
17        I'm not talking to you.
18              MS. DANDENEAU:  Also, Mr. Morris, it
19        is -- it is --
20              MS. DEITSCH-PEREZ:  He is not my
21        witness.  He's been subpoenaed by you.
22        Okay?
23              That is no offense, Mr. Waterhouse,
24        I'm -- I'm not -- okay.  Anyway.
25                       EXAMINATION
```

Appx. 01619

Page 353

```
 1                  WATERHOUSE - 10-19-21

 2    BY MS. DEITSCH-PEREZ:

 3         Q.    Good evening.  I'm very sorry to be

 4    going last and I know you have had a long and

 5    taxing day, so I thank you for indulging me.

 6               The kinds of services that you

 7    describe that the -- that Highland provided for

 8    NexPoint, did Highland also provide similar

 9    services to that to HCRE and HCMS?

10         A.    Yes.

11               MR. MORRIS:  Objection to the form

12         of the question.

13         Q.    What kind of services did Highland

14    provide to HCRE and HCMS?

15               MR. MORRIS:  Objection to the form

16         of the question.

17               MS. DEITSCH-PEREZ:  What is your

18         objection, John?

19               MR. MORRIS:  It is vague and

20         ambiguous.  Unlike the advisors and

21         NexPoint, they actually had shared services

22         agreements.

23               MS. DEITSCH-PEREZ:  I got -- I

24         understand your objection.  That is fine.

25         Q.    Let's take them one at a time.
```

Page 354

```
 1              WATERHOUSE - 10-19-21
 2              What kinds of services did Highland
 3    provide to HCRE?
 4              MR. MORRIS:  Objection to the form
 5         of the question.
 6         A.    HCMS, Highland employees provided
 7    accounting services, treasury management
 8    services, potentially legal services.  I
 9    don't -- but I wouldn't have been directly
10    involved in that.  But as far as the teams that
11    I manage, it was accounting, treasury, things
12    of that nature.
13         Q.    Okay.  And that was for HCM, LLP --
14         A.    And -- and, sorry, it would also be
15    any asset valuation if needed as well.
16         Q.    Okay.  We went back and forth on
17    each other and I apologize, so just to clarify.
18              You were talking about the services
19    that Highland Capital Management provided to
20    HCMS; is that right?
21         A.    HCMS.  So, again, yes.  And
22    accounting, treasury, valuation, and also tax
23    services too.
24         Q.    Okay.
25         A.    Tax services.  Look, I'm expanding
```

```
 1                    WATERHOUSE - 10-19-21
 2    this, their HR services as well.
 3         Q.    Okay.  And did that include bill
 4    paying?
 5              MR. MORRIS:  Objection to the form
 6         of the question.
 7         Q.    Did the services that HCM provided
 8    to HCMS include bill paying?
 9              MR. MORRIS:  Objection to the form
10         of the question.
11         A.    Yes.
12         Q.    And did the services that HCMLP
13    provided to HCMS include scheduling upcoming
14    bills?
15              MR. MORRIS:  Objection to the form
16         of the question.
17         A.    Yes.
18         Q.    And did HCMLP regularly pay -- cause
19    to be paid the payments on loans HCMS had from
20    HCMLP?
21              MR. MORRIS:  Objection to the form
22         of the question.
23         A.    Yes.
24         Q.    Typically -- if there is a
25    typically, how far in advance of due dates did
```

Page 356

```
 1                   WATERHOUSE - 10-19-21

 2    HCMLP cause HCMS to pay its bills?

 3                   MR. MORRIS:  Objection to the form

 4        of the question.

 5        A.    I mean, it -- it -- it depend -- it

 6    depended on the nature of the payment and the

 7    vendor, but, you know, if there were -- if

 8    there were larger scheduled payments, you know,

 9    I would like to give at least 30 days notice.

10               And that is -- that is kind of my

11    rule of thumb so no one is surprised.

12        Q.    Okay.  And was it generally HCMLP's

13    practice to timely pay HCMS' bills?

14                   MR. MORRIS:  Objection to the form

15        of the question.

16        A.    It -- it -- it -- that depended on

17    the nature of the payment.

18        Q.    Okay.  And can you explain what you

19    mean by that?

20        A.    Yeah, I mean if -- if it was -- I

21    mean -- if there was some professional fees

22    that weren't -- you know, they were due but

23    they weren't urgent, those fees may not be paid

24    as timely as others that have a due date or --

25    or things like that.
```

Page 357

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Okay.  Are loan payments the kinds

 3   of thing that HCMLP would pay on time because

 4   of potential consequences of not paying on

 5   time?

 6            MR. MORRIS:  Objection to the form

 7       of the question.

 8       A.    Yes.  As I testified earlier, we

 9   would want to give, you know, notice on -- on

10   -- on larger payments and -- and things of that

11   nature so we didn't miss due dates.

12       Q.    Okay.  And over the course of time,

13   did HCMLP generally pay HCMS' loan payments in

14   a timely fashion?

15            MR. MORRIS:  Objection to the form

16       of the question.

17       A.    I can't remember specifically, but

18   generally, yes.

19       Q.    Okay.  Now, did HCMLP provide

20   similar services to HCRE that you have

21   described it provided to HCMS?

22            MR. MORRIS:  Objection to the form

23       of the question.

24       A.    Yes, but I don't think it -- it

25   provided -- I don't think it provided HR
```

Appx. 01624

Page 358

```
 1                  WATERHOUSE - 10-19-21

 2   services.

 3        Q.    Can you describe the accounting and

 4   treasury services that HCMLP provided for HCRE?

 5        A.    Yeah, it -- it would provide

 6   bookkeeping services on a -- on a periodic

 7   basis.  It would make payments, you know, as

 8   needed.

 9        Q.    Okay.  So did it provide --

10        A.    And -- and I believe it -- it -- it

11   provided tax services as well.

12        Q.    Okay.  And so did it provide the

13   same kind of bill -- did HCMLP provide the same

14   kind of bill-paying services for HCRE that it

15   provided for HCMS and NexPoint?

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    Yes.

19        Q.    And over the course of time, did

20   HCMLP generally cause to be made the loan

21   payments that HCRE owed to HCMLP?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes.

25        Q.    Did HCMLP make loan payment -- the
```

Page 359

```
 1                WATERHOUSE - 10-19-21
 2   loan payment that was due from HCMS to HCMLP in
 3   December of 2020?
 4                MR. MORRIS:  Objection to the form
 5        of the question.
 6        A.    I don't believe that payment --
 7   payment was made.
 8        Q.    Okay.  And when HCMLP caused HCMS in
 9   the past to make loan payments, whose money did
10   it use to make those payments?
11                MR. MORRIS:  Objection to the form
12        of the question.
13        A.    It was the -- the money in HCMS's
14   operating account would be made to that --
15   those moneys would be used to make payment to
16   Highland Capital Management.
17        Q.    Okay.  And Highland -- is it correct
18   that Highland Capital Management personnel had
19   the access to HCMS's accounts to be able to
20   cause such payments to be made?
21        A.    Yes, Highland personnel had access
22   to those accounts.
23        Q.    Okay.  And so now for HCRE, whose
24   money was used when HCMLP caused HCRE
25   payments -- loan payments to Highland to be
```

Appx. 01626

Page 360

```
 1              WATERHOUSE - 10-19-21

 2   made?

 3              MR. MORRIS:  Objection to the form

 4       of the question.

 5       A.    It was -- it was cash in HCRE's bank

 6   account that would be used to make payments to

 7   Highland Capital Management.

 8       Q.    Okay.  And so did Highland Capital

 9   Management have access to HCRE's funds in order

10   to be able to make such payments?

11              MR. MORRIS:  Objection to the form

12       of the question.

13       A.    Personnel at Highland Capital

14   Management had access to HCRE's bank account to

15   effectuate the payments.

16       Q.    Okay.  And was the payment due from

17   HCRE to HCMLP due in December of 2020 made?

18       A.    It --

19       Q.    In December of 2020.

20       A.    It was not.

21       Q.    Okay.  And was there money in HCRE's

22   account that would have enabled the payment to

23   be made had HCM personnel attempted to make the

24   payment?

25              MR. MORRIS:  Objection to the form
```

Appx. 01627

Page 361

```
 1                    WATERHOUSE - 10-19-21

 2         of the question.

 3         A.    I -- I don't recall.

 4         Q.    Do you have any reason to believe

 5   that either HCRE or HCMS simply didn't have the

 6   funds on hand to make the December 2020

 7   payments?

 8         A.    I don't know.

 9         Q.    I guess I'm asking, do you have any

10   reason to believe that they didn't have the

11   funds?

12         A.    We managed cash for so many

13   different entities and funds, and I don't

14   recall, you know, where the cash position was

15   for HCRE and HCMS at 12/31/2020.

16         Q.    Okay.

17         A.    I just don't recall, and I don't --

18   and I don't remember what the loan payment

19   obligations were from HCRE to Highland, and

20   from HCMS to Highland.  I don't recall.  I

21   don't recall, I mean...

22         Q.    Let me come at it a different way.

23   Were the -- were the payments that would

24   otherwise have been due in December of 2020

25   made in January of 2021 for HCMS and HCRE?
```

Appx. 01628

Page 362

```
 1                  WATERHOUSE - 10-19-21

 2        A.    I believe the HCRE payment was made

 3   in January of 2021.  I don't recall any

 4   payments being made from HCMS to Highland.

 5        Q.    If it -- how is it the HCRE payment

 6   came to be made?  Why did you make it -- why

 7   did HCM make the payment in January of 2021?

 8        A.    Jim -- Jim called me and instructed

 9   me to -- to make the payment on behalf of HCRE,

10   Jim Dondero -- Jim Dondero.

11        Q.    Did he seem upset that -- that the

12   payment had not been made?

13        A.    Yeah.  On the note that was, you

14   know, that was the term note, yes, he -- he was

15   displeased that the -- that the payment had not

16   been made by year-end.

17        Q.    Okay.  And did you make the -- cause

18   the payment to be made as -- as requested?

19        A.    Yes.

20        Q.    And did anyone else from HCM

21   participate with you in causing the payment to

22   be made to -- on the HCRE loan?

23        A.    Yes.  It would have been Kristin

24   Hendrix.  I -- again, I don't -- as I testified

25   earlier, I'm not an officer of HCRE.  I don't
```

```
                                                        Page 363
 1                WATERHOUSE - 10-19-21
 2    believe I'm an authorized signer.  So I
 3    can't -- other personnel have to make payment
 4    from HCRE to -- to -- to -- to Highland.
 5         Q.    Okay.  And in the conversation
 6    that -- that you had with Mr. Dondero when he
 7    requested the payment to be made, did you say
 8    to him words to the effect, Jim, this loan is
 9    going to stay in default, what are you making
10    the payment for, anything like that?
11         A.    No.
12         Q.    In fact, did you have the impression
13    from him that he thought that the loan would
14    be -- the default would be cured by making the
15    payment?
16              MR. MORRIS:  Objection to the form
17         of the question.
18         A.    Did I get the impression from Jim
19    Dondero that the loan would be cured if the
20    payment from HCRE --
21         Q.    Yeah, if that is what he thought.
22              MR. MORRIS:  Objection to the form
23         of the question.
24         A.    I didn't get any impression from him
25    on that at the time.
```

```
                                              Page 364
1                 WATERHOUSE - 10-19-21

2        Q.    Do you know whether there was an

3   HCMS term loan that had a payment due in

4   December of 2020?

5        A.    I don't recall.

6        Q.    Okay.  And so the reason you don't

7   recall whether or not there was a payment in

8   January of 2021 is because you just don't

9   remember whether there was such a loan at all?

10             MR. MORRIS:  Objection to the form

11       of the question.

12       A.    I don't remember.  There is -- there

13  is so many notes, and I mean, demands, and I

14  don't -- I don't remember.  It's a lot to keep

15  track in your head.

16       Q.    I understand, and -- and I hear your

17  frustration when you have explained that the

18  debtor has your documents and you don't, and so

19  I fully appreciate it, and this is no knock on

20  you.  It's a knock on somebody else on this

21  call.

22             MR. MORRIS:  I move to strike.  That

23       was pretty obnoxious, but go ahead.

24       Q.    Okay.  But so, Mr. Waterhouse, if --

25  if a payment on the HCMS loan was made in
```

Page 365

```
 1                WATERHOUSE - 10-19-21
 2    January of 2021, do you think it was part of
 3    the same conversation where Jim Dondero said,
 4    hey, why didn't that get paid, please make
 5    that -- get that payment done?
 6              MR. MORRIS:  I object to the form of
 7         the question.
 8         A.   Yes.  Likely it would have been -- I
 9    mean, again, I don't recall a payment being
10    made, but, you know, again, I don't remember
11    everything.
12         Q.   Okay.  Did -- at the time you were
13    communicating with Kristin Hendrix about the
14    payment being made, whichever payments were
15    made in January, did she say anything to you
16    about the payments not curing the loan
17    defaults?
18         A.   No.
19         Q.   Okay.  All right.  So I'm going to
20    take you back to very early in the deposition
21    when Mr. Morris was asking you about the --
22    the -- the -- the agreement with respect to
23    the -- the forgiveness element of the loans, so
24    that is just to orient you.
25              Do you remember that there was a
```

Page 366

```
 1              WATERHOUSE - 10-19-21

 2    time that you and Mr. Dondero were

 3    communicating about potential means of

 4    resolving the Highland bankruptcy by what was

 5    colloquially referred to as a pot plan?

 6         A.   Yes.

 7         Q.   Okay.  And can you tell me generally

 8    when that was?

 9         A.   Like mid -- mid 2020, sometime in

10    2020, mid 2020.

11         Q.   Okay.  And did the process of trying

12    to figure out what the numbers should be

13    involve looking at what one should pay for the

14    Highland assets?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.   Yes.

18         Q.   Okay.  And did there come a time

19    when you were proposing some potential numbers

20    and Mr. Dondero said something to you like,

21    well, why are you including payment for the

22    related party notes, those, you know, were

23    likely to be forgiven as part of my deferred

24    executive compensation?

25              MR. MORRIS:  Objection to the form
```

Page 367

```
 1              WATERHOUSE - 10-19-21

 2       of the question.

 3       A.    Yes, we did have that conversation.

 4       Q.    Okay.  Was that conversation in

 5  connection with trying to figure out the right

 6  numbers for a pot plan?

 7       A.    Yeah.  I mean, it was -- it was -- I

 8  mean, Jim -- Jim would ask for, you know,

 9  most -- most recent asset values, you know, for

10  Highland, and -- and myself and the team

11  provided those to him, so it was in that

12  context.

13       Q.    Okay.  And does that refresh your

14  recollection that these communications were in

15  2020 rather than 2021?

16            MR. MORRIS:  Objection to the form

17       of the question.

18       A.    The -- the -- the executive

19  compensation discussions were definitely in

20  2020.

21       Q.    Okay.  Now, did you ever make

22  proposals that took into account Jim's comment

23  that the notes were likely to end up forgiven

24  as part of his compensation?

25            MR. MORRIS:  Objection to the form
```

Page 368

```
 1              WATERHOUSE - 10-19-21
 2         of the question.
 3         A.    Yes, we -- the team and myself put
 4    together, you know, asset summaries of Highland
 5    at various times for all the assets of
 6    Highland, and not including the notes.
 7         Q.    Okay.  And were those presentations
 8    communicated to -- to Mr. Seery?
 9         A.    No.  Well, look, I didn't tell -- I
10    didn't tell Mr. Seery.  I don't know what
11    Mr. Dondero did with the information.
12         Q.    Okay.
13         A.    I did not have conversations with
14    Mr. Seery.
15         Q.    Okay.  Do you know who saw the
16    presentations that you put together that didn't
17    include the value of the related party notes?
18         A.    We're talking presentations -- these
19    are -- these are Excel spreadsheets?
20         Q.    Uh-huh.
21         A.    I don't know who -- these were given
22    to -- to Jim Dondero.  I don't know what was
23    done with them after that.
24         Q.    Okay.  You also mentioned earlier
25    that sometime during your tenure at Highland
```

Page 369

```
 1                   WATERHOUSE - 10-19-21
 2   you knew of the practice of giving forgivable
 3   loans to executives.
 4              MR. MORRIS:  Objection to the form
 5         of the question.
 6         Q.   Can you -- can you tell me what you
 7   recall about that practice?
 8              MR. MORRIS:  Objection to the form
 9         of the question.
10         A.   Yes, so there were -- there were --
11   during my tenure at Highland, there were loans
12   or -- given to employees that were later
13   forgiven at a future date and time.
14         Q.   Okay.  And when the loans were
15   given, did the notes, to your recollection, say
16   anything about the potential forgiveness term?
17              MR. MORRIS:  Objection to the form
18         of the question.
19         A.   When you say "did the notes," did
20   the promissory notes detail the forgiveness?
21         Q.   Yes.
22         A.   Not that I recall.
23         Q.   And until such time as whatever was
24   to trigger the forgiveness occurred, were the
25   notes bona fide notes as far as you were
```

Page 370

1                    WATERHOUSE - 10-19-21

2      concerned?

3                    MR. MORRIS:  Objection to the form

4          of the question.

5          A.    Yes, similar to -- yes.

6          Q.    Okay.  You were going to say similar

7      to what?

8          A.    Mr. Morris earlier today showed

9      notes of the financial statements about various

10     affiliate loans.  I -- I -- I do recall these

11     notes because I -- at that time personally

12     worked on the -- the financial statements of

13     Highland.  That was, you know, in my role as a

14     corporate accountant.

15                   And there were -- those loans

16     were -- to the partners were detailed in the

17     notes to the financial statements, similar to

18     what we went through earlier today in the prior

19     testimony about what we saw with Highland

20     and -- and -- and the -- and HCMFA.

21         Q.    Is it fair to say that on Highland's

22     balance sheet there were any number of assets

23     that the value of which could be affected by

24     subsequent events?

25                   MR. MORRIS:  Objection to the form

Page 371

```
 1               WATERHOUSE - 10-19-21
 2        of the question.
 3        A.    Yes.  I mean, yes, that -- there
 4   are.  And that is -- yes.
 5        Q.    Okay.  And is it typical accounting
 6   practice that until there is some certainty
 7   about those potential future events, that asset
 8   value listed on -- on the books doesn't take
 9   into account those potential future events?
10               MR. MORRIS:  Objection to the form
11        of the question.
12        A.    Yeah, if those -- yes.  If -- if
13   those future events, you know, at the time of
14   issuance are not known or knowable, like I
15   discussed earlier with, like, market practice,
16   asset dislocation, or, you know, I mean, things
17   like that, you -- I mean, it -- it could affect
18   its fair value --
19        Q.    Okay.
20        A.    -- in the future.
21        Q.    And am I correct you wouldn't feel
22   compelled to footnote in every possible change
23   in -- in an asset when those possibilities are
24   still remote?
25               MR. MORRIS:  Objection to the form
```

Page 372

```
 1                 WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    The accounting standard is you have

 4   to estimate to the best -- you know, to -- to

 5   the best of your ability, the fair value of an

 6   asset as of the balance sheet date under --

 7   under GAAP.

 8        Q.    Did -- strike that.

 9              Okay.  Give me a minute.  I'm

10   close -- I'm close to done.  Let me just go off

11   and look at my notes for a second.  So take two

12   minutes.

13              VIDEOGRAPHER:  We're going off the

14        record at 7:02 p.m.

15        (Recess taken 7:02 p.m. to 7:03 p.m.)

16              VIDEOGRAPHER:  We are back on the

17        record at 7:03 p.m.

18        Q.    Mr. Waterhouse, is it generally your

19   understanding that people you work with now

20   have been asking the debtor for full and

21   unfetterred access to their own former files?

22              MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes, I am -- I am generally aware.

25        Q.    Okay.  And do you think you could
```

Page 373

```
 1                  WATERHOUSE - 10-19-21
 2    have been better prepared for this deposition
 3    if the debtor had complied with those requests?
 4              MR. MORRIS:  Objection to the form
 5         of the question.
 6         A.    I -- I -- I most certainly -- yes.
 7    I mean, again, these are multiple years,
 8    multiple years ago, lots and lots of
 9    transactions.
10              You know, we asked about NAV errors
11    and, you know, things like that and these
12    are -- it would make this process a lot more --
13    a lot easier and if we had -- if we had access
14    to that.
15         Q.    Okay.  And has the debtor -- is the
16    debtor suing you right now?
17         A.    Yes.
18         Q.    And is the debtor trying to renege
19    on deals that it had previously made with you?
20              MR. MORRIS:  Objection to the form
21         of the question.
22         A.    Sorry, I need to -- it is my
23    understanding that the litigation trust is
24    suing me.  And not being a lawyer, I don't
25    know -- is that the debtor?
```

Page 374

1            WATERHOUSE - 10-19-21

2            Is that -- I don't know the

3      relationship.  So, again, I'm not the lawyers.

4      I've said many times.  But my understanding is

5      the litigation trust is suing me.  I could be

6      wrong there.  I don't know.

7            Q.    Okay.  I understand.

8            Someone with some connection to the

9      Highland debtor has brought a claim against

10     you; is that fair?

11           MR. MORRIS:  Objection to the form

12        of the question.

13           A.    Yes.

14           Q.    Okay.  And is there also some motion

15     practice in the bankruptcy where the debtor or

16     someone associated with the debtor is

17     attempting to undo something that was

18     previously resolved with you?

19           A.    Yes.

20           Q.    And so in one action somebody is

21     associated with the debtors trying to --

22     threatening you with trying to take money from

23     you, and then in the other -- and trying to --

24     and in the other they are threatening not to

25     pay you things that had previously been agreed;

Page 375

```
 1                    WATERHOUSE - 10-19-21
 2    is that correct?
 3               MR. MORRIS:  Objection to the form
 4          of the question.
 5          A.    I want to be -- yes, I -- there
 6    is -- I'm being sued, again, on -- on something
 7    that was agreed to with Mr. Seery and myself.
 8    I don't -- I don't -- I don't own that claim.
 9          Q.    Okay.
10          A.    To be transparent, I don't own that
11    claim.  So it is not my personal property.
12          Q.    Okay.
13          A.    And -- and being the nonlawyer, I
14    don't know how I can get sued for something
15    that I don't owe or, like, I don't own
16    anything.  I'm not the lawyer.  But, I mean, if
17    that is -- if I'm understanding the facts
18    correctly.
19          Q.    Okay.  And the lawsuit that was
20    filed that names you, that was just filed
21    this -- this past week; is that right?
22               MS. DANDENEAU:  Ms. Deitsch-Perez, I
23          do want to interrupt at this point because
24          just as I told Mr. Morris, that this is a
25          deposition about the noticed litigation.
```

Page 376

1          WATERHOUSE - 10-19-21

2               I really don't want to go -- go

3      afield --

4               MS. DEITSCH-PEREZ:  Yeah.

5               MS. DANDENEAU:  -- and open up a

6      whole new line of inquiry about the lawsuit

7      or the -- the motion and the bankruptcy

8      court.  We will be here all night.

9               MS. DEITSCH-PEREZ:  And I

10     understand.

11     Q.    My -- my point is:  Do you feel

12     like -- like there is some effort by these

13     parties related to the debtor to intimidate

14     you -- not that you -- I'm not saying you are

15     or you aren't.

16               But do you feel like there is some

17     effort to intimidate you and maybe an effort to

18     deter you from being as prepared as you might

19     be in this deposition?

20               MR. MORRIS:  Objection to the form

21      of the question.

22     A.    I was -- I was surprised by the

23     lawsuit, by me being named, because, again, I

24     don't own the asset and things like that.

25     Yeah, I just -- I want to move forward with my

Page 377

```
 1                  WATERHOUSE - 10-19-21

 2    life at Skyview.

 3                  MS. DEITSCH-PEREZ:  Thank you.

 4                  THE WITNESS:  Thank you.

 5                  FURTHER EXAMINATION

 6    BY MR. MORRIS:

 7        Q.    If I may, I just have a few

 8    questions.

 9                  Mr. Waterhouse, we saw a number of

10    documents that Mr. Rukavina put up on the

11    screen where Ms. Hendrix would send you a

12    schedule of payments that were due on behalf of

13    certain Highland affiliates.

14                  Do you remember that?

15        A.    Yes.

16        Q.    And in each instance she asked for

17    your approval to make the payments; is that

18    right?

19        A.    Yes, she did.

20        Q.    And was that the -- was that the

21    practice in the second half of 2020 whereby

22    Ms. Hendrix would prepare a list of payments

23    that were due on behalf of Highland associates

24    and ask for approval?

25        A.    Yes.
```

Appx. 01644

Page 378

```
 1                  WATERHOUSE - 10-19-21
 2        Q.    And I think you said that there was
 3   a -- a --
 4        A.    It was -- I think I testified to
 5   this earlier when we talked about procedures
 6   and policy, you know, again, I want to be
 7   informed of -- of -- of -- of -- of any
 8   payments that are going out.  I want to be made
 9   aware of these payments, and that was just a
10   general policy, not just for 2020.
11        Q.    Okay.  So it went beyond 2020?
12        A.    Yes.
13        Q.    Is that right?
14        A.    Yes.
15        Q.    Okay.  And the corporate accounting
16   group would prepare a calendar that would set
17   forth all of the payments that were anticipated
18   in the -- in the three weeks ahead; is that
19   right?
20        A.    I -- like I testified earlier, we
21   had a corporate calendar that was set up, you
22   know, to -- to provide reminders or, you know,
23   of anything of any nature, whether it is
24   payments or -- or financial statements or, you
25   know, whatever it is, you know, to meet
```

Page 379

```
 1                WATERHOUSE - 10-19-21

 2   deadlines.

 3            I don't know how, as I testified

 4   earlier, how much they were using that

 5   calendar.

 6       Q.   Okay.  But -- but you did get notice

 7   and a request to approve the payments that were

 8   coming due on behalf of Highland's affiliates.

 9   Do I have that right?

10            MS. DANDENEAU:  Objection to form.

11       A.   I mean, generally, yes.  I mean, you

12   know, as we saw with these emails, generally, I

13   mean, did that encompass everything, no.

14       Q.   Okay.  Do you know why the

15   payment -- do you know why there was no payment

16   made by NexPoint at the end of 2020?

17       A.   Yes.  There was -- there was -- we

18   talked about these agreements between the

19   advisors and Highland, the shared services and

20   the cost reimbursement agreement.

21            And in late 2020, there were

22   overpayments, large overpayments that had been

23   made over the years on these agreements, and it

24   was my understanding that the advisors were --

25   were talking with -- like Jim Seery and others
```

Page 380

```
 1              WATERHOUSE - 10-19-21
 2   to offset any obligations that the advisors
 3   owed to Highland as offset to the overpayments
 4   on these agreements.
 5        Q.    Okay.  Did you participate in any of
 6   those conversations?
 7        A.    I did not.
 8        Q.    Okay.  Do you know -- do you recall
 9   that the -- at the end of November, the debtor
10   did notice to the advisors of their intent to
11   terminate the shared services agreements?
12        A.    Like I testified earlier, there
13   was -- the agreements weren't identical, from
14   what I recall, and there is one that had a
15   longer notice period, which I think had a
16   60-day notice period.  I don't recall which one
17   that was, so not all of them were -- notice
18   hadn't been given as of November 30th, for all
19   of the agreements.
20        Q.    Upon the receipt of the -- the
21   termination notices that you recall, do you
22   know if the advisors decided at that point not
23   to make any further payments of any kind to
24   Highland?
25              MR. RUKAVINA:  Objection, form.
```

Appx. 01647

Page 381

```
 1                  WATERHOUSE - 10-19-21

 2          A.    No.   The advisors -- the advisors

 3     had stopped making payments prior to that

 4     notice.

 5          Q.    Okay.  And how do you know that the

 6     advisors stopped making -- making payments

 7     prior to the notice?

 8          A.    I had -- I had a conversation

 9     with -- with Jim Dondero.

10          Q.    And did Mr. Dondero tell you that

11     the advisors would no longer make payments to

12     Highland?

13                MS. DEITSCH-PEREZ:   Object to the

14          form.

15          A.    Yes, he -- he -- again, he said

16     they -- they -- the advisors have overpaid on

17     these agreements, to not make any future

18     payments, and that there needs to be offsets,

19     and they're working on getting offsets to these

20     overpayment.

21          Q.    Do you know if anybody ever

22     instructed Highland's employees to make the

23     payment that was due by NexPoint at the end of

24     the year?

25          A.    Did anyone instruct Highland's
```

Page 382

```
 1                  WATERHOUSE - 10-19-21
 2    employees to make that payment?
 3         Q.    Correct.
 4         A.    Anyone -- not that I'm aware.
 5         Q.    Were any of Highland's employees
 6    authorized to make the payments on behalf of
 7    its affiliates -- withdrawn.
 8               Was any of Highland's employees
 9    authorized to effectuate the payment on behalf
10    of NexPoint that was due at the end of the year
11    without getting approval from either you or
12    Mr. Dondero?
13         A.    They had the -- they had the ability
14    to make the payment, but they didn't -- you
15    know, that -- that payment needed to be
16    approved.
17         Q.    Okay.  And it needed to be approved
18    by you or Mr. Dondero; is that right?
19         A.    I mean, I'm not going to make the
20    unilateral decision.
21         Q.    Is that a decision that you
22    understood had to be made by Mr. Dondero?
23         A.    Yes.  Sitting back in December of
24    2020, the -- that -- there was this off --
25    offset negotiation that -- that was happening,
```

Page 383

```
 1              WATERHOUSE - 10-19-21
 2   so I mean, until those negotiations were
 3   resolved, you know, there wasn't any
 4   payments -- there weren't any payments.
 5        Q.    And -- and there were no payments
 6   until the negotiations were resolved because
 7   that was the directive that you received from
 8   Mr. Dondero; correct?
 9        A.    I don't think he said -- I mean, I
10   think -- yeah, I mean -- I'm trying to recall
11   the conversation.  It was -- you know, there
12   is -- there is these negotiations.  There's --
13   there needs to be these offsets.  They're
14   talking with the debtor.  So, you know, until
15   this is resolved, right, I mean, depending on
16   how, whatever that resolution was, were we to
17   take any action.
18        Q.    Okay.  How about with respect to
19   HCMS, did HCMS have a term payment due at the
20   end of the year?
21        A.    Again, I don't -- I don't recall.
22        Q.    Okay.  You discussed briefly two
23   payments that were made in January of 2021, one
24   on behalf of NexPoint, and one on behalf of
25   HCMS.  Do I have that right?
```

Page 384

```
 1                  WATERHOUSE - 10-19-21
 2        A.    No.  The two payments I recall were
 3   NexPoint and HCRE.
 4        Q.    Okay.  And those two payments --
 5   thank you for the correction.  And those two
 6   payments were made because Mr. Dondero
 7   authorized those payments to be made; correct?
 8        A.    Yes.
 9        Q.    And they hadn't been made before
10   that because Mr. Dondero had not authorized
11   them to be made?
12             MS. DEITSCH-PEREZ:  Object to the
13        form.
14        A.    Yes, because of these negotiations.
15        Q.    Okay.  Just a couple of more
16   questions.
17             Did anybody, to the best of your
18   knowledge, on behalf of HCMFA, ever tell the
19   SEC that HCMLP was responsible for the mistakes
20   that were made on the TerreStar valuation?
21        A.    Did anyone from Highland on HCMFA's
22   behalf tell the SEC that Highland -- that
23   Highland was responsible for there -- I just
24   want to make sure --
25        Q.    It was a little bit different, so
```

Appx. 01651

Page 385

```
 1                   WATERHOUSE - 10-19-21
 2    let me try again.
 3         A.    These are very long questions, John.
 4    I'm not trying to be --
 5         Q.    That is good.  Do you know whether
 6    anybody -- do you know whether anybody on
 7    behalf of HCMS -- HCMFA ever told the SEC that
 8    Highland was the responsible party for the
 9    TerreStar valuation error?
10         A.    Not that I'm aware.
11         Q.    Okay.  Did anybody on behalf of
12    the -- on behalf of HCMFA ever tell the retail
13    board that Highland was responsible for the
14    TerreStar valuation error?
15         A.    Not that I'm aware.
16         Q.    Do you know if HCMFA made an
17    insurance claim with respect to the damages
18    that were incurred in relation to the TerreStar
19    valuation error?
20         A.    Yes.
21         Q.    And do you know why they made that
22    insurance claim?
23         A.    Because there was an error.  I
24    mean --
25         Q.    Was the insured's claim made -- was
```

Page 386

```
 1                    WATERHOUSE - 10-19-21
 2      the insurance claim made under HCMFA's policy?
 3           A.    Yes.
 4           Q.    Did HCMFA at any time prior to the
 5      petition date -- withdrawn.
 6                 You were asked a couple of questions
 7      where -- where you said that Mr. Dondero told
 8      you that he was ascribing zero value to the
 9      notes as part of a pot plan because he believed
10      that the notes were part of executive
11      compensation.
12                 Do I have that right?
13                 MS. DEITSCH-PEREZ:  Object to the
14           form.
15           A.    Yes.
16           Q.    Okay.  Have you ever heard that
17      before the time that Mr. Dondero told you that
18      in the conversation about the pot plan?
19           A.    Had I heard that prior to my
20      conversation with Mr. Dondero?
21           Q.    Yes.
22           A.    No, I had not heard that prior.
23           Q.    Okay.  And that was in the context
24      of his formulation of the settlement proposal;
25      is that right?
```

Page 387

```
 1                  WATERHOUSE - 10-19-21

 2       A.    I mean, generally, yes.  You know,

 3   we were asked to provide asset values, right,

 4   and he was having settlement discussions.

 5   Again, I don't know who those went to

 6   ultimately.  I don't recall.

 7              MR. MORRIS:  I have no further

 8         questions.  Thank you very much for your

 9         patience.  I apologize for the late hour.

10              MS. DEITSCH-PEREZ:  John, you stay

11         on about your email when --

12              MR. RUKAVINA:  Hold on, I'm not

13         done.

14              MS. DEITSCH-PEREZ:  Oh, okay.  Davor

15         still has questions.  Sorry.  I was going

16         to say both John and Davor, could you stay

17         on afterwards just to talk about the

18         requests.

19                  FURTHER EXAMINATION

20   BY MR. RUKAVINA:

21       Q.    Mr. Waterhouse, you were just now

22   testifying about a discussion you had with

23   Mr. Dondero where he said something like no

24   more payments.

25              Do you remember that testimony?
```

Appx. 01654

Page 388

```
 1              WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    Okay.  And was that late November or

 4   early December of 2020?

 5        A.    It was, I would say, first or second

 6   week of November.

 7        Q.    Okay.  Do you recall whether --

 8   whenever you had that discussion, whether

 9   Mr. Dondero had already been fired by the

10   debtor?

11        A.    Yes, I -- I believe he was not an

12   employee of the debtor anymore at that time.

13        Q.    And when you were discussing this

14   with Mr. Dondero and he said no more payments,

15   you were discussing the two shared services

16   agreements and employee reimbursement

17   agreements we testified -- you testified about

18   before; is that correct?

19              MR. MORRIS:  Objection to the form

20        of the question.

21        A.    That is correct.

22        Q.    And had your office or you -- and we

23   will talk at a future deposition about the

24   administrative claim.

25              But had -- by that time that you
```

Appx. 01655

Page 389

```
 1              WATERHOUSE - 10-19-21
 2   talked to Mr. Dondero, had your office or you
 3   done any estimate of what the alleged
 4   overpayments were?
 5              MR. MORRIS:  Objection to the form
 6        of the question.
 7        A.   Yes, we had -- there was a -- there
 8   was a detailed analysis that was put together
 9   by David Klos at the time.
10        Q.   And do you recall just generally
11   what the total amount for both advisors of the
12   overpayments was?
13        A.   It was in excess of $10 million.
14        Q.   Was it in excess of $14 million?
15              MR. MORRIS:  Objection to the form
16        of the question.
17        A.   I -- I remember it was an
18   eight-figure number.  I don't remember
19   specifically.
20        Q.   Okay.  And did you convey that
21   number to Mr. Dondero when you had that
22   conversation?
23        A.   Yes.
24        Q.   What was his reaction?
25        A.   I mean, he wasn't happy.
```

Page 390

1              WATERHOUSE - 10-19-21

2          Q.    Is it fair to say he was upset?

3          A.    Yes.

4          Q.    Did Mr. Dondero ever expressly tell

5    you to not have NexPoint make the required

6    December 31, 2020, payment?

7          A.    Yes, I recall him saying don't make

8    the payment because it was being negotiated, as

9    I discussed with Mr. Morris, this offset

10   concept.  So there were obligations due by the

11   advisors to Highland, they should be offset

12   that -- you know, those obligations should be

13   offset by this -- by this overpayment.

14         Q.    And when did he tell you that?

15         A.    I would say -- I would say around --

16   probably December -- December-ish.

17         Q.    Early December, late December?

18         A.    I don't recall with as much

19   specificity as -- as -- as -- as stopping the

20   shared services payments, because we had

21   actually made one shared services payment in

22   November.  So that is why I need to remember

23   that one more clearly.  I don't remember where

24   exactly in December that conversation occurred.

25         Q.    Did Mr. Dondero expressly use the

Page 391

```
 1                    WATERHOUSE - 10-19-21
 2    word "NexPoint" when he was saying don't make
 3    these payments?
 4             MR. MORRIS:  Objection to the form
 5        of the question, asked and answered.
 6        A.   Yeah, we were -- we were discussing
 7    advisor obligations.  So it was -- you know, it
 8    was just obligations from the advisors.
 9             And -- and he specifically talked
10    about the NexPoint payment as well.
11        Q.   Okay.  And it is your testimony that
12    he expressly told you not to make that NexPoint
13    December 31 payment?
14             MR. MORRIS:  Objection, asked and
15        answered twice.
16        A.   Yes, he -- he did, during that
17    conversation.
18        Q.   And did you ever follow up with him
19    after that about whether NexPoint should or
20    shouldn't make that payment?
21        A.   I did not.
22        Q.   Did you ever, on or about
23    December 31, 2020, remind him and say, hey,
24    this payment is due, what shall I -- what
25    should I do?
```

Page 392

```
 1              WATERHOUSE - 10-19-21

 2      A.    I did not.

 3      Q.    So sitting here today, you -- you

 4  remember distinctly that Dondero in December of

 5  2020 expressly told you not to have NexPoint

 6  make that payment?

 7            MR. MORRIS:  Objection, asked and

 8       answered three times.

 9      A.    Yes.

10      Q.    Can you say categorically it wasn't

11  just some general discussion where he told you

12  not to make payments?

13            MR. MORRIS:  Objection, asked and

14       answer four times.

15            MR. HORN:  Four times now.  Go for

16       five.

17      A.    Yes.

18      Q.    Did you tell Mr. Seery that?

19      A.    I don't believe I did.  I don't

20  recall.

21      Q.    And was this an in-person discussion

22  or telephone or email?  Do you remember?

23      A.    This was a phone -- a phone

24  conversation.

25      Q.    Okay.  Would you have a record of --
```

Page 393

```
 1                  WATERHOUSE - 10-19-21
 2   on your cell phone of when that conversation
 3   might have taken place?
 4                  I'm sorry, strike that.
 5                  Was that by cell phone?
 6        A.    I believe -- yes, because we -- I
 7   was at home.  I mean, I don't have a landline.
 8   All I have is my cell phone.
 9        Q.    Do you know whether your cell phone
10   still has records of conversations from
11   December 2020 on it?
12        A.    My call log doesn't go back that
13   far.
14        Q.    Okay.  Thank you.
15                  MR. RUKAVINA:  I will pass the
16   witness.
17                  MS. DEITSCH-PEREZ:  Just a couple
18        quick questions.
19                    FURTHER EXAMINATION
20   BY MS. DEITSCH-PEREZ:
21        Q.    With respect to HCRE and HCMS, am I
22   correct there was -- there was no direction not
23   to pay those loan payments?
24                  MR. MORRIS:  Objection to the form
25        of the question.
```

Page 394

```
 1              WATERHOUSE - 10-19-21
 2       A.    Yes, I don't recall having
 3  conversations about, you know, those -- those
 4  entities.
 5       Q.    And, in fact, what was the tone that
 6  Mr. Dondero had when he talked to you about the
 7  fact that HCRE and HCMS payments hadn't been
 8  made when he found out that they hadn't been
 9  paid?
10              MS. DANDENEAU:  Objection to form.
11              MR. MORRIS:  Objection to form.
12       Q.    What was the tone he took with you?
13       A.    Oh, it was -- it was -- it was -- it
14  was very negative.  I mean, I think he cursed
15  at me and he doesn't usually curse.
16       Q.    Okay.  And in your mind, is that
17  consistent with the fact that he was surprised
18  that those payments hadn't been made?
19              MR. MORRIS:  Objection to the form
20       of the question.
21       A.    Yes.
22       Q.    Okay.  Thank you.
23              MR. MORRIS:  I have nothing further.
24       Thank you so much, Mr. Waterhouse.
25              MR. HORN:  I have no questions.
```

Appx. 01661

Page 395

```
 1              WATERHOUSE - 10-19-21

 2         Thank you, Mr. Waterhouse.  We appreciate

 3         your time.  I am logging off the discussion

 4         and I will talk to y'all tomorrow.

 5              MR. MORRIS:  Super.

 6              VIDEOGRAPHER:  If there are no

 7         further questions, this ends the

 8         deposition -- excuse me.  This ends the

 9         deposition, and we are going off the record

10         at 7:30 p.m.

11         (Deposition concluded at 7:30 p.m.)

12

13                   _____

14                   FRANK WATERHOUSE

15

16  Subscribed and sworn to before me

17  this    day of         2021.

18

19  --------------------------------

20

21

22

23

24

25
```

Appx. 01662

```
                                                      Page 396
 1              WATERHOUSE - 10-19-21

 2              C E R T I F I C A T E

 3

 4      I, SUSAN S. KLINGER, a certified shorthand

 5   reporter within and for the State of Texas, do

 6   hereby certify:

 7      That FRANK WATERHOUSE, the witness whose

 8   deposition is hereinbefore set forth, was duly

 9   sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11      I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage; and that I am in no way interested in

14   the outcome of this matter.

15      IN WITNESS WHEREOF, I have hereunto set my

16   hand this 19th of October, 2021.

17

18   _____

19      Susan S. Klinger, RMR-CRR, CSR

20      Texas CSR# 6531

21

22

23

24

25
```

Appx. 01663

Page 397

1        WATERHOUSE - 10-19-21

2   NAME OF CASE:  In re:  Highland Capital

3   DATE OF DEPOSITION:  October 19, 2021

4   NAME OF WITNESS:  Frank Waterhouse

5   Reason Codes:

6        1.  To clarify the record.

7        2.  To conform to the facts.

8        3.  To correct transcription errors.

9   Page____Line_____Reason_____

10  From_____to_____

11  Page____Line_____Reason_____

12  From_____to_____

13  Page____Line_____Reason_____

14  From_____to_____

15  Page____Line_____Reason_____

16  From_____to_____

17  Page____Line_____Reason_____

18  From_____to_____

19  Page____Line_____Reason_____

20  From_____to_____

21  Page____Line_____Reason_____

22  From_____to_____

23  Page____Line_____Reason_____

24  From_____to_____

25

Appx. 01664

# EXHIBIT 15

Docket #0115  Date Filed: 12/8/2021

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION
TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above

styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as

the plaintiff (the "Debtor"), and files this its *Reply* (the "Reply") in support of its *Motion to Extend

Expert Disclosure and Discovery Deadlines* (the "Motion"), and replying to the *Objection to

Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery

Deadlines* (the "Objection"), filed by the Debtor, respectfully stating as follows:

¹⁹³⁴⁰⁵⁴²¹¹²⁰⁸⁰⁰⁰⁰⁰⁰⁰⁰⁰⁰⁰⁰³
Appx. 01666

## I.      **SUMMARY**

1.      The Shared Services Agreement required the Debtor to assist and *advise* with payments, including on notes.  That is in the contract.  The Debtor's former CFO confirmed it. The Shared Services Agreement contains a standard of care that the Debtor had to follow.  That is also in the contract.  And the Fifth Circuit confirms that expert testimony is appropriate, and potentially *required*, when the standard of care is not obvious.  Here, it was obvious until it wasn't. Before Mr. Waterhouse's deposition, the standard of care was not at issue *per se*.  The Defendant simply alleged the Debtor was obligated to facilitate the December payment but did not.  That came down to simple contract interpretation.  No expert was needed because any lay juror could understand that the Debtor breached its duties by doing nothing to facilitate the payment.  But things changed after Mr. Waterhouse's testimony in late October, when he testified that Mr. Dondero allegedly *told* him not to pay this note.  The question then became what the Debtor was obligated to do next under the contractual standard of care.  The answer is not obvious.  And it is the type of issue on which a jury could only benefit from expert opinion testimony.  This is precisely the type of case where the Fifth Circuit finds expert testimony appropriate, if not required.  Nor is there prejudice to the Debtor: there is no trial setting, the Debtor can contest the admission of the expert's testimony and present its own rebuttal, and, if the Debtor prevails, it also can also seek to recover all collection costs.

## II.      **THE EXPERT TESTIMONY IS APPROPRIATE**

2.      The Shared Services Agreement, in place during November and December, 2020, provides as follows:

> Section 6.01.  Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 2

**Appx. 01667**

inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies, and procedures in performing its duties hereunder.

*See* Rukavina Declaration, Exh. A at § 6.01.

3.      "Covered Person" includes the "Staff and Services Provider," *i.e.* the Debtor, and its managers, directors, officers, and shareholders.  *See id*. at p 2.  There can be no dispute that section 6.01 applied to the Debtor itself, to Mr. Waterhouse, and to the other employees involved (David Kloss, the controller, and Kristin Hendrix, the senior accountant).

4.      The Debtor argues that section 6.01 applies only to duties specifically set forth in the Shared Services Agreement, and that the duty to facilitate payments on NexPoint's behalf is not among those duties.  This argument is wrong.  The Shared Services Agreement identifies at least three services that the Debtor was required to provide that are directly on point:

> (a)      *Back- and Middle Office*.  Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, <u>payments</u>, operation, book keeping, cash management . . . accounts payable . . .
>
> (k)      *Ancillary Services*.  Assistance and advice on all things ancillary or incidental to the foregoing.
>
> (l)      *Other*.  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of [NexPoint] as [NexPoint] and [the Debtor] may from time to time agree.

*See id*. at § 2.02 (emphasis added).

5.      Assistance and advice—again, *advice*—with respect to "payments" is expressly included.  And, should there be any doubt, the Debtor's own Chief Financial Officer at the time confirmed that it was "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note."  *See* Rukavina Declaration at Exh. C, 337:22-338:8.  That is why NexPoint was paying millions of dollars to the Debtor, to assist and *advise* NexPoint with respect to NexPoint's payment obligations.  Advice would include advising NexPoint of the consequences of a potential default, especially given the

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 3

Appx. 01668

Debtor's conflict-of-interest at the time between being NexPoint's creditor as well as its accounting, payment, and legal professional.  This is especially the case if Mr. Dondero in fact instructed Mr. Waterhouse not to make the payment on the belief that the payment was not due, or would be netted against NexPoint's overpayments to the Debtor.

6.      Next, the Debtor argues that expert testimony is not proper on the scope of a party's legal duty, because that is a legal conclusion for the Court.  NexPoint agrees.  The Debtor also argues that whether the Debtor owed or breached a legal duty is for the jury to decide.  NexPoint agrees in part: whether duties are *breached* is an issue for the jury; not whether duties were owed.  *See Askanese v. Fajto*, 130 F.3d 657, 673 (5th Cir. 1997).  None of these issues are present here: the Court will construe the Shared Services Agreement as a matter of law; that agreement contains section 6.01, and the Court will construe that section.  But, the standard of care in that section is:

> the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

*See* Rukavina Declaration, Exh. A at § 6.01.

7.      The issue is simple: if the jury finds that Mr. Dondero did in fact instruct Mr. Waterhouse not to make the payment, then did the Debtor fail to act with "the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" by failing to do anything to advise NexPoint as to the consequences of a default, failing to confirm that Mr. Waterhouse correctly understood the instruction, or not even trying to dissuade Mr. Dondero from his alleged instruction?  As simple as this issue appears to sophisticated bankruptcy professionals, it is not one a lay juror could resolve from personal experience or common sense.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 4

Appx. 01669

8.      "Expert testimony is generally <u>required</u> to prove the applicable standard of care." *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003) (emphasis added); *Streber v. Hunter*, 221 F.3d 701, 724 (5th Cir. 2000) ("Breach of the standard of care must generally be proven by expert testimony"). [E]xpert testimony is <u>necessary</u> to establish the standard of care . . . Similarly, breach of a fiduciary duty or a conflict of interest <u>requires</u> proof of expert testimony." *Geiserman v. MacDonald*, 893 F.2d 787, 793-94 (5th Cir. 1990) (internal quotations removed) (emphasis added).  An expert is appropriate, and potentially needed, for the jury to understand whether the Debtor employed "the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  That should not be a controversial proposition.

9.      The Debtor cites the Fifth Circuit's opinion in *Askanese v. Fajto* as support for its argument.  130 F.3d 657 (5th Cir. 1997).  In that opinion, the Fifth Circuit affirmed the exclusion of an expert because "[i]t is not for [the expert] to tell the trier of fact what to decide."  *Id*. at 1997.  Here, NexPoint's expert would not be telling the jury what to decide; only whether, in his opinion, the Debtor's actions and inactions breached the duties as otherwise specified in the Shared Services Agreement and construed by the Court.  The Debtor would have the ability to have a rebuttal expert, and the jury would be free to disregard the expert's testimony.  NexPoint's expert would not be telling the jury how to decide, only his opinion as to whether the standard of care as specified in the agreement and construed by the Court was met.  Conversely, if NexPoint's lay witnesses purported to present evidence on these duties at trial, the Debtor would certainly object to any such evidence because it would *not* be expert testimony.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 5

Appx. 01670

### III.   REPLY REGARDING "GOOD CAUSE"

**A.   NEXPOINT'S NEED AND GOOD CAUSE FOR LEAVE**

10.     The Debtor argues that NexPoint seeks leave because the testimony of its witness, Mr. Waterhouse, allegedly did not go well.  But the Debtor takes some liberties in its argument.  For one thing, Mr. Waterhouse is not one of NexPoint's witnesses.  In fact, the Debtor took his deposition and he is not NexPoint's witness.  Also, his deposition did not go badly for NexPoint.  On the contrary, other than his unexpected testimony regarding Mr. Dondero's alleged instruction not to pay the note, his testimony was not harmful to NexPoint and was, objectively, neither helpful nor harmful to either side.  The Debtor makes these wrong allegations solely to shoehorn its argument into a case that it cites.  *See* Objection at ¶ 43.

11.     But the more pertinent objection is that, as NexPoint has always argued that the Debtor caused the alleged default, NexPoint should have retained an expert months ago: "[i]If NexPoint wanted to offer 'expert testimony' concerning Highland's duties under the SSA, it had nine months to do so, and Mr. Waterhouse's testimony, expected or not, does nothing to change that." Objection at ¶ 44.  This argument is wrong as a matter of Fifth Circuit law.

12.     Prior to Mr. Waterhouse's deposition, NexPoint did not know that Mr. Dondero allegedly instructed Mr. Waterhouse not to make the payment.  NexPoint understood that the Debtor's employees simply dropped the ball on ensuring that the payment was made.  Under those facts, expert testimony would not have been needed because anyone, using common sense, can determine whether the Debtor in that case breached it duties.  But the situation changed when Mr. Waterhouse gave his deposition testimony because, if the jury believes that Mr. Dondero gave the instruction, now the situation is much more complicated; *i.e.* whether, in light of such an alleged instruction, the Debtor nevertheless breached its duties.  This important distinction has been aptly explained by the Fifth Circuit in a case where the issue was whether a trustee breached his duties:

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 6

Appx. 01671

Finders of fact are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn.  Accordingly, we have explained that, as a general rule, expert testimony is not needed in many if not most cases. Moreover, although expert testimony may be necessary in a professional negligence case to establish the standard of care for the industry, an exception applies in instances of negligence that are a matter of common knowledge comprehensible to laymen.

Although Liberty Mutual contends that expert testimony was required in this case, Lamesa suggests that inasmuch as the Trustee failed to act in the face of obvious danger posed by Mrs. Schooler's ready access to the bankruptcy estate's assets, and in the face of repeated warnings and inquiries by a concerned creditor, a layperson could discern that the standard of care was not met in this case.

We agree with Lamesa that, under the facts of this case, expert testimony was not required to establish that the Trustee breached her duties. While the precise course of action the Trustee should have taken may be subject to reasonable debate, it requires no technical or expert knowledge to recognize that she affirmatively should have undertaken *some* form of action to acquire for the bankruptcy estate the assets to which it was entitled. As the bankruptcy court explained, by doing nothing, the Trustee ignored basic human nature.

*In re Schooler*, 725 F.3d 498, 514-15 (5th Cir. 2013) (internal citations and quotations omitted).

13.      So too, here, NexPoint did not need an expert for the jury to conclude that the

Debtor breached its duties by doing *nothing* in light of the upcoming payment, without Mr.

Dondero's alleged instruction.  But if the jury finds that that instruction occurred, the situation is

more complicated: did the Debtor have an affirmative duty after receiving such instruction to seek

confirmation, advise as to the potential consequences of a default, or try to dissuade Mr. Dondero?

These issues are not within a lay person's common knowledge or common sense.  And this is all

the more important because, at the same time, the Debtor was providing legal services to NexPoint;

*i.e.* the Debtor was NexPoint's law firm.

14.      By analogy, it is one thing for a lawyer to fail to inform his client of an upcoming

deposition, which leads to a "death penalty" order.  Anyone can know, using common sense, that

the lawyer committed professional negligence.  But what if the lawyer advises the client of the

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 7

Appx. 01672

deadline, but the client tells the lawyer he does not feel like attending the deposition?  Can the lawyer sit on his hands and do nothing, or must the lawyer take affirmative steps, for example, to inform the client of the potential consequences, try to reschedule the deposition, or try to dissuade the client from his decision?  That is a much more difficult question.  Here again:

> the general rule is that expert testimony is required to establish the standard of care in a legal malpractice action; an exception to the general rule is recognized where the attorney's lack of care and skill is so evident that the jury can find negligence as a matter of common knowledge, e.g., when an attorney allows the statute of limitations to run on a client's claim.

*Floyd v. Hefner*, 556 F. Supp. 2d 617, 643 (S.D. Tex. 2008).

15.     The Debtor's objection that the expert testimony is irrelevant is likewise wrong. NexPoint has explained above why expert testimony is appropriate, and arguably required, to address the standard of care in the Shared Services Agreement.  NexPoint has likewise demonstrated that the Shared Services Agreement expressly provides for assistance and advice with respect to "payments."  Here, the Debtor attempts misdirection:

> NexPoint does not and cannot identify any provision in the SSA that imposes a duty on Highland to make Annual Installment payments on NexPoint's behalf without direction from an authorized NexPoint representative.

Objection at ¶ 49.

16.     NexPoint has never argued that the Debtor should have made the payment "on NexPoint's behalf," in the sense that the Debtor would do so from its funds.  And, the issue is not whether the payment should have been made without direction from an authorized NexPoint representative—itself a disputed question of fact made much more complicated by the fact that it was the same individual responsible for the payment on both sides, who was also an officer of both parties.  Even if the Debtor is correct, though, the point is that the Debtor failed in its duties to *seek* such authorization.

---

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 8

**Appx. 01673**

17.     The Debtor also argues that, as NexPoint should always have known that Mr. Dondero did not authorize the payment, Mr. Waterhouse's testimony that Mr. Dondero instructed him not to make the payment does not change the situation such that NexPoint's delay is unreasonable.  First, the issue is not whether NexPoint instructed the Debtor to make the payment; that is merely the Debtor's interpretation of its duties under the Shared Services Agreement and the Court or the jury will have to decide whether that is correct.  NexPoint does not agree that is the correct standard (and its expert has not been asked to opine on that issue).  Second, the issue is the Debtor's failure to *advise* NexPoint on the issue—and *advice* is an express duty under the contract.  Third, the Debtor fails to recount the whole of Mr. Dondero's testimony on the "authorization" issue:

> Q. Okay. And do you know whether anybody acting on behalf of any of the three corporate obligors under the term notes ever took any steps in December 2020 to make sure that Highland would, in fact, make the payments that were due at year-end?
>
> MS. DEITSCH-PEREZ:  Object to the form.
>
> A.   No, there was a reliance on Highland.
>
> Q.     Okay.  Is it your testimony that Highland was authorized to make the payments under the notes at year-end without being directed by a representative of the three corporate obligors?
>
> A.  Yes.  It is my contention that that is how it worked in prior years also.
>
> Q.  And so you believe that nobody on behalf of any of the corporate obligors ever authorized or directed Highland to make the payments but that Highland did it without -- without direction?
>
> MS. DEITSCH-PEREZ:  Object to the form.
>
> A.   Yes, typically.  And in 2017 or 2018, 2019, for sure.

Morris Declaration Exh. 4 at: 462:24-463:25.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 9

Appx. 01674

18.     And contrary to the Debtor's characterization of Mr. Waterhouse's testimony, Mr.

Waterhouse testified as follows:

Q.    Well, what about long term loans?  Was it reasonable for NexPoint to expect debtor employees to ensure that NexPoint timely paid its obligations under long-term notes?

MR. MORRIS:  Objection to the form of the question.

MS. DANDENEAU:  Objection to form.

A.    I mean, that is one of the things that the Highland personnel did provide to the advisors.  Yes, we would -- we would – over the years, yes, we -- we -- we -- we did do that generally.  Again, I don't remember specifically but, yes, generally we – you know, we did do that.

*        *        *

Q. And what role in years prior to 2020 would employees of the debtor have had with respect to NexPoint making that annual payment?

A. We -- we -- we would have -- I keep saying "we." The team would have calculated any amounts due under that loan and other loans, as -- as standard course. We would -- since we provided treasury services to the advisors, we would inform the -- the -- the -- we informed Mr. Dondero of any cash obligations that are forthcoming, whether we do cash projections. If, you know, any of these payments would have -- or, you know, the sum total of all of these payments, including any note payments, if there were any cash shortfalls, we would have informed Mr. Dondero of any cash shortfalls. We could adequately plan, you know, in instances like that.

Or, sorry, we -- I say "we" – I keep saying "we" -- I keep wearing my -- again, my -- my treasurer hat. But, yes, it is to -- it is to inform Mr. Dondero of the obligations of the advisors in terms of cash and obligations that are -- are upcoming and that -- and that are -- are scheduled to be paid.

*        *        *

Q.  And based on your experience, would it have been reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note?

MR. MORRIS: Objection to form of the question.

MS. DANDENEAU: Objection to form.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 10

Appx. 01675

A.  Yes. Yes, they did. I mean, but I mean, but I don't think these -- these notes
were any secret to anybody

Rukavina Declaration at Exh. C: 333:14-338:8.

19.     The situation was not, therefore, as the Debtor construes it; that the Debtor could

sit around and do nothing until an instruction to pay was issued.  On the contrary, as the Shared

Services Agreement requires, it was to *advise* NexPoint: "to inform Mr. Dondero of the obligations

of the advisors in terms of cash and obligations that are [] upcoming . . . [and] scheduled to be

paid."  Whatever else can be said about what happened, and whether the jury will believe Mr.

Dondero or Mr. Waterhouse, one thing is clear: the course that had been followed for years was

not followed here, because the Debtor failed to inform Mr. Dondero of the upcoming alleged

obligation, whether outright or because of Mr. Dondero's alleged instruction not to pay.

20.     On the issue of timing, NexPoint has already explained that, while it understood

that Mr. Dondero instructed Mr. Waterhouse to make no further payments on the Shared Services

Agreement, Mr. Dondero never made a similar instruction regarding the Note.  *See* Rukavina

Declaration at ¶ 10.  Mr. Waterhouse's counsel prevented NexPoint's counsel from discussing the

matter with Mr. Waterhouse, due to ongoing litigation between the Debtor and Mr. Waterhouse.

*See id*. at ¶ 11.  If the Court questions the truthfulness of this, the Court need only review the

transcript of Mr. Waterhouse' deposition, where NexPoint's attorney asked four (4) times whether

Mr. Waterhouse was sure of the instruction, as evidence of counsel's surprise at the answer.  *See*

Rukavina Declaration a Exh. C: 390:4-392:17.

21.     At the same time, it appears that the Debtor knew what Mr. Waterhouse's answer

would be well ahead of time—an issue also relevant below to prejudice.  On May 11, 2021, the

Debtor served its amended responses to NexPoint's discovery.  *See* Supplemental Rukavina

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 11

Appx. 01676

Declaration [filed concurrently herewith] at Exh. "A."  In those, the Debtor answered the following interrogatory:

**INTERROGATORY NO. 2:**

If the Debtor contends that it was not responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

**RESPONSE TO INTERROGATORY NO. 2:**

The Debtor objects to Interrogatory No. 2 on the ground that it seeks a legal conclusion or legal analysis. Subject to its objection, the Shared Services Agreement did not provide that the Debtor was responsible for causing payments to be made under the Note. The Debtor further states that after the Debtor sent NexPoint the Default Letters, NexPoint did not contend that the Debtor was required to make payments under the Note on NexPoint's behalf. The Debtor's personnel caused the January Payment to be processed upon instruction from NexPoint.

*See* Supplemental Rukavina Declaration at Exh. "B" at p. 7.

22.     Even though NexPoint asked the Debtor to explain, factually, why the Debtor was not responsible for causing payments to be made, rather than including in its answer that Mr. Dondero gave Mr. Waterhouse the alleged instruction, the Debtor merely answered (as it does now, despite the clear language of the Shard Services Agreement) that the contract did not impose this responsibility on the Debtor.  Yet, the Debtor's answer to the following request for production strongly suggests that the Debtor knew of the alleged instruction, yet did not include it in the interrogatory answer:

**REQUEST FOR PRODUCTION NO. 1**:

All Communications pursuant to which any director, officer, or employee of the Debtor was advised or instructed not to make the December Payment or to cause the December Payment to be made.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 12

Appx. 01677

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Subject to the General Objections, the Debtor is unaware of any documents responsive to Request for Production No. 1. <u>Any Communications responsive to Request for Production No. 1 were verbal.</u>

*See id*. at p. 10 (emphasis added).

23.    The Debtor could and should have stated what these verbal communications were in May, 2021.  Instead, NexPoint was forced to wait until Mr. Waterhouse's deposition to learn of the alleged verbal communication.  Alternatively, the Debtor too did not know ahead of time how Mr. Waterhouse would answer, but then it can hardly accuse NexPoint of any delay.

**B.    EXPERT TESTIMONY IS RELEVANT**

24.    NexPoint has already addressed above why expert testimony is appropriate, why it may even be required, and why, both pursuant to the language of the contract and the Debtor's CFO's testimony, the Debtor had *some* level of duties with respect to the payment.

25.    The Debtor argues that the agreement exculpates the Debtor for "any acts or omissions unless it is determined by a court of competent jurisdiction to 'be the result of gross negligence or to constitute fraud or willful misconduct.'"  Objection at p. 13, n. 8.  That is not true.  That exculpation provision applies only to the "conduct of the business of [NexPoint]."  Rukavina Declaration Exh. A at § 6.02.  The payment of a note is not the "business" of NexPoint; its business is managing and advising funds and investments.  Even so, if the Debtor argues otherwise, then that is a matter for the jury, and the issue is not one appropriate to the present Motion.

26.    The Debtor's reliance on the Shared Service Agreement's indemnification provision is likewise unavailing: "an indemnity provision does not apply to claims between the parties to the agreement."  *Derr Constr. Co. v. Houston*, 846 S.W.2d 854, 858 (Tex. App. – Houston [14th Dist.] 1992).  *Accord In re 1701 Commerce LLC*, 2014 Bankr. LEXIS 3962 at *40 (Bankr. N.D. Tex. 2014) ("[u]nder Texas law, indemnity agreements do not generally apply to

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 13

Appx. 01678

claims between the parties to an agreement"). There is an exception if the agreement expressly provides that the indemnification applies to a claim brought by one party against the other, *see In re 1701 Commerce LLC*, 2014 Bankr. LEXIS at *40, but the language in the Shared Services Agreement does not so provide.

## C. THE DEBTOR WILL NOT BE PREJUDICED

27.    The Debtor will not suffer prejudice if the Motion is granted. If the Debtor hires a rebuttal expert and prevails at trial, then it will be entitled to the costs of that expert. The scheduling order provided for expert designations by October 29, 2021. NexPoint filed its motion on that day. The Debtor cannot credibly argue prejudice with respect to added costs when the Debtor would have incurred those costs anyway had NexPoint provided an expert report on that day. In this respect:

> any additional costs incurred from an extension would not be unreasonable. Here, Plaintiffs seek an extension so they can offer an expert witness for their products liability claims. Defendants have been aware of these claims since this case's inception. Because expert witnesses are crucial for Plaintiffs' prima facie case, Defendants have known they would need to prepare rebuttal evidence since this case began on October 14, 2019. These facts do not present an instance in which a party adds an additional claim, or introduces an eleventh-hour witness, to foist additional litigation costs without warning.

*Adams v. Medtronics Inc.*, 2021 U.S. Dist. LEXIS 47246 at *12 (E.D. Tex. 2021).

28.    Likewise here, the Debtor always knew of NexPoint's defense. And, as discussed above, it appears that the Debtor (but not NexPoint) knew what Mr. Waterhouse's testimony would be in May, 2021. Again, had NexPoint provided an expert report on October 29, the Debtor would have incurred whatever costs it would have incurred anyway, except that, in that instance, the Debtor would likely be moving to extend the expert deadline, since the scheduling order does not provide for a separate rebuttal expert deadline. Moreover, the Debtor will have every opportunity

---

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 14

Appx. 01679

to contest the expert's admission at trial; the Court's approval of the Motion does not mean that the expert's testimony is admissible.

29.     The Debtor's discussion of a "continuance" is irrelevant, as trial has not been set and likely will not be set for a long time given the Debtor's own desire to pursue summary judgment practice.  In that respect, assuming the Court grants the Motion on December 13, 2021, and the Debtor needs one month for a rebuttal expert, and the parties need two weeks for expert depositions, that would still mean that this case would be trial ready by the end of February, 2022—thirteen (13) months after being filed.  This is not unreasonable and is faster than many cases are declared trial ready.  In fact, the Debtor has indicated that it will move for summary judgment by December 17, 2021, with responses due on January 17, 2022, with the Debtor's reply on January 31, 2022—a schedule the Court accepted.  And, on December 7, 2021, the Debtor apparently filed motions seeking to consolidate for trial various note cases, including this one, which motion alone will likely take significant time to decide as several District Court judges are involved.  In other words, this Adversary Proceeding is not going to be certified as trial ready for a few months at least.  Nor would granting this Motion affect the timing of the summary judgment proceedings; whether the Debtor breached the standard of care is a question of fact outside the scope of summary judgment.

## IV.     **PRAYER**

WHEREFORE, PREMISES CONSIDERED, NexPoint respectfully requests that the Court overrule the Debtor's objection and grant the Motion.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 15

Appx. 01680

RESPECTFULLY SUBMITTED this 8th day of December, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
 Davor Rukavina
 State Bar No. 24030781
 Julian P. Vasek.
 State Bar No. 24070790
 500 N. Akard Street, Suite 3800
 Dallas, Texas 75202-2790
 Telephone: (214) 855-7500
 Facsimile: (214) 978-4375
 Email:  drukavina@munsch.com
 Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that, on December 8th, 2021, a true and correct copy of the foregoing document, including the exhibit thereto, was served via the Court's CM/ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

/s/ Davor Rukavina
Davor Rukavina

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 16
4862-9489-0502v.1 019717.00004

Appx. 01681

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## SUPPLEMENTAL DECLARATION OF DAVOR RUKAVINA

The undersigned, Davor Rukavina, hereby declares under penalty of perjury pursuant to the laws of the United States of America the following:

1.      My name is Davor Rukavina. I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.

2.      I am an attorney duly licensed to practice law in the State of Texas. I am lead counsel for NexPoint Advisors, L.P. ("NexPoint"), in the above styled and numbered Adversary Proceeding. As such, I directly supervised discovery served by NexPoint in this Adversary Proceeding and the receipt of responses to the same from Highland Capital Management, LP (the "Debtor"), and I have personal knowledge of the same (although not the underlying facts).

3.      Attached to this Declaration as Exhibit "A" is a true and correct copy of discovery served by NexPoint on the Debtor on or about March 31, 2021.

SUPPLEMENTAL DECLARATION OF DAVOR RUKAVINA—Page 1

4.      Attached to this Declaration as Exhibit "B" is a true and correct copy of the Debtor's amended responses to said discovery.

5.      I hereby swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and ability.

Executed: December 8, 2021.

/s/ Davor Rukavina
DAVOR RUKAVINA

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

*Counsel for NexPoint Advisors, L.P*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03005 |
| v. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S REQUESTS FOR ADMISSIONS, INTERROGATORIES,
## AND REQUESTS FOR PRODUCTION TO PLAINTIFF

TO:   Highland Capital Management, L.P. through its counsel of record, Jeffrey Pomerantz and
John Morris, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor,
Los Angeles, CA 90067, jpomerantz@pszjlaw.com; jmorris@pszjlaw.com; Zachery
Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, TX 75231,
zannable@haywardfirm.com

NexPoint Advisors, L.P., the defendant in the above-styled and numbered adversary

proceeding, hereby serves these *Requests for Admissions, Interrogatories, and Requests for*

---


EXHIBIT "A"
**Appx. 01684**

*Production* pursuant to Rules 33, 34, and 36 of the Federal Rules of Civil Procedure and Rules 7033, 7034, and 7036 of the Federal Rules of Bankruptcy Procedure.

Highland Capital Management, L.P. is instructed to serve its responses to these requests and interrogatories, along with all documents responsive to these requests, no later than **April 30, 2021**, by delivering them to Julian Vasek, Munsch Hardt Kopf & Harr P.C., 500 N. Akard St., Ste. 3800, Dallas, Texas 75201, jvasek@munsch.com.

Pursuant to Federal Rule of Civil Procedure 34(b)(1)(C), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7034, electronically stored information should be produced in native format.

## I.   **DEFINITIONS**

1. "Adversary Proceeding" means the above-captioned adversary proceeding.

2. "Committee" means the Official Committee of Unsecured Creditors appointed in the Debtor's bankruptcy case, including its officers, directors, employees, agents, and representatives.

3. "Communication" or "Communications" means every kind of written, recorded, or oral transmission of information.

4. "Complaint" means the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* filed at Dkt. No. 1 in the Adversary Proceeding.

5. "Debtor" means Highland Capital Management, L.P., including its officers, directors, employees, agents, and representatives.

6. "December Payment" means the payment that was allegedly due on December 31, 2020 under the Note.

---

DEFENDANT'S REQUESTS FOR ADMISSIONS, INTERROGATORIES,
AND REQUESTS FOR PRODUCTION TO DEFENDANT

7.    "Default Letters" means the letters sent from the Debtor to NexPoint dated January 7, 2021 and January 15, 2021 that are attached as exhibits to the Complaint.

8.    "Document" or "Documents" means writings of every type and from any source, including e-mail and electronic documents and including originals and nonidentical copies thereof that are in your possession, custody, or control or known by you to exist.

The term also includes communications not only in words, but in symbols, pictures, sound recordings, film, tapes, and information stored in, or accessible through, computer or other information storage or retrieval systems.  If the information is kept in a computer or informational storage or retrieval system, the term also includes codes and programming instructions and other materials necessary to understand such systems.

The term includes, but is not limited to:  the original and all copies (regardless of origin and whether or not including additional writing thereon or attached thereto) of pictures, loan agreements, memoranda, reports, books, manuals, instructions, financial reports, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, inter-office and intra-office communications, contracts, cables, electronic mails, deleted electronic mails, text messages, notations or memoranda of any sort of any conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes and amendments of any of the foregoing), graphic or oral records or representations of any kind, (including, without limitation, tapes, cassettes, discs and records)

and other written, printed, typed, photographed, or other graphic recorded matter of any kind or nature, however reproduced and whether preserved in writing, phono record, film, photograph, type or video tape.

9.      "January Payment" means the payment made by NexPoint under the Note on January 14, 2021 in the amount of $1,406,111.92.

10.     "NexPoint" means NexPoint Advisors, L.P., including its officers, directors, employees, agents, and representatives.

11.     "Note" means that certain *Promissory Note* attached to the Complaint as Exhibit 1.

12.     "Shared Services Agreement" means that certain *Amended and Restated Shared Services Agreement* between NexPoint and the Debtor, dated effective as of January 1, 2018.

## II.      REQUESTS FOR ADMISSIONS

1.      Admit that the Debtor was responsible for making payments under the Note on NexPoint's behalf pursuant to the Shard Services Agreement.

2.      Admit that the Debtor was responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shard Services Agreement.

3.      Admit that the Debtor did not make the December Payment on NexPoint's behalf.

4.      Admit that the Debtor did not cause the December Payment to be made on NexPoint's behalf.

5.      Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2018.

6.      Admit that, pursuant to the Shared Services Agreement, the Debtor caused a payment to be made on the Debtor's behalf under the Note on or about December 31, 2018.

7.      Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2019.

8.      Admit that, pursuant to the Shared Services Agreement, the Debtor caused a payment to be made on the Debtor's behalf under the Note on or about December 31, 2019.

9.      Admit that, prior to the alleged default on December 31, 2020, NexPoint never defaulted under the Note.

### III.   <u>INTERROGATORIES</u>

1.      If the Debtor contends that it was not responsible for making payments under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

2.      If the Debtor contends that it was not responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

3.      Provide the following information with respect to each payment made under the Note since its inception: (a) the date such payment was made; (b) the amount of such payment; (c) the individuals involved in making such payment or causing such payment to be made; (d) the account from which such payment was made; and (e) the method by which such payment was made.

4.      Describe in detail all steps the Debtor took, including by identifying every individual involved, to evaluate the Note, the December Payment, the January Payment, and/or the alleged default.

5.     Describe in detail all steps the Debtor took, including by identifying every individual involved, to evaluate the Debtor's obligations to make a payment or cause a payment to be made under the Note on NexPoint's behalf.

6.     Identify all records the Debtor kept regarding services the Debtor provided to NexPoint under the Shared Services Agreement with respect to the Note, and indicate whether such records identify what employee(s) provided services, when such services were provided, and how much time was spent providing such services.

7.     For each request for admission above that the Debtor did not unequivocally admit, explain the factual and legal basis for not doing so.

## IV.     REQUESTS FOR PRODUCTION

1.     All Communications pursuant to which any director, officer, or employee of the Debtor was advised or instructed not to make the December Payment or to cause the December Payment to be made.

2.     All Communications between directors, officers, and/or employees of the Debtor related to the Note.

3.     All Communications between directors, officers, and/or employees of the Debtor related to any and all defaults under the Note.

4.     All Communications between directors, officers, and/or employees of the Debtor related to the December Payment.

5.     All Communications between directors, officers, and/or employees of the Debtor related to prior payments the Debtor made or caused to be made on NexPoint's behalf under the Note.

6.      All Communications between directors, officers, and/or employees of the Debtor related to the January Payment.

7.      All Communications with third parties related to the Note.

8.      All Communications with third parties related to the December Payment.

9.      All Communications with third parties related to the January Payment.

10.     All Communications with third parties related to prior payments the Debtor made or caused to be made on NexPoint's behalf under the Note.

11.     All Communications with third parties related to any and all defaults under the Note.

12.     All Communications with the Committee (including, but not limited to, Communications solely between counsel for the Debtor and the Committee) related to the Note, any and all defaults under the Note, the December Payment, the January Payment, and/or the Default Letters.

13.     All ledgers, statements, and accounting records related to payments made under the Note to date.

14.     All Documents pursuant to which the Debtor was authorized and/or required to make payments or cause payments to be made on NexPoint's behalf under the Note.

15.     All Documents and Communications pursuant to which the Debtor contends it was relieved of its obligation to make payments or cause payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement.

16.     All Communications related to potentially marketing and/or selling the Note.

17.     The Shared Services Agreement, including all amendments and supplements thereto, whether informal or formal, regardless of how documented.

18.     All Documents and Communications construing the Debtor's obligations to NexPoint under the Shared Services Agreement.

19.     All Documents and Communications related to the scope of the Debtor's obligations to NexPoint under the Shared Services Agreement.

20.     All Documents and Communications identified in connection with Interrogatory 6 above.

21.     All billing statements from Pachulski Stang Ziehl & Jones LLP and Hayward PLLC related to fees the Debtor seeks to collect in the Adversary Proceeding.

RESPECTFULLY SUBMITTED this 31st day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/  *Julian P. Vasek*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 31st day of March, 2021, a true and correct copy of this document was electronically served via email on counsel for the Debtor (jpomerantz@pszjlaw.com; jmorriss@pszjlaw.com; zannable@haywardfirm.com), as well as by first class U.S. mail, postage prepaid to the following recipients:

Zachery Z. Annable
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231

Jeffrey N. Pomerantz
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

/s/ *Julian P. Vasek*
Julian P. Vasek, Esq.

DEFENDANT'S REQUESTS FOR ADMISSIONS, INTERROGATORIES,
AND REQUESTS FOR PRODUCTION TO DEFENDANT                    Page **9** of 9
4848-7374-7683v.2 .

**Appx. 01692**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-03005 |
| v. | § § | |
| NEXPOINT ADVISORS, L.P., | § § | |
| Defendant. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



EXHIBIT "B"
Appx. 01693

**DEBTOR'S AMENDED RESPONSES AND OBJECTIONS TO NEXPOINT ADVISORS,
L.P.'S REQUESTS FOR ADMISSIONS, INTERROGATORIES,
<u>AND REQUESTS FOR PRODUCTION</u>**

Highland Capital Management, L.P., ("<u>Plaintiff</u>" or the "<u>Debtor</u>") hereby responds to
*Defendant's Requests for Admissions, Interrogatories, and Requests for Production to Plaintiff*
(the "<u>Requests</u>")[2] served by NexPoint Advisors, L.P. ("<u>NexPoint</u>" or "<u>Defendant</u>") in the above-
captioned adversary proceeding (the "<u>Adversary Proceeding</u>").  The Debtor's amended responses
and objections to the Requests (the "<u>Amended Responses</u>") are made pursuant to Federal Rules of
Civil Procedure ("<u>FRCP</u>") 26, 33, and 34 as made applicable in bankruptcy cases pursuant to
Federal Rules of Bankruptcy Procedure 7026, 7033, and 7034.

## <u>GENERAL OBJECTIONS</u>

Unless otherwise specified, the following general objections and caveats are applicable to
each and every Response and are incorporated into each Response as though set forth in full:

1.      The Responses contained herein are based upon information presently
known and ascertained by the Debtor.

2.      The Debtor objects to the Requests to the extent they seek information or
documents that are protected from discovery by the attorney-client privilege, the attorney work
product doctrine or any other privilege or immunity.  The inadvertent disclosure or production of
any document that is protected from discovery by any privilege or immunity shall not constitute a
waiver of any such privilege or immunity.  All references in these objections and responses to the
Debtor's agreement to produce documents shall be construed to mean non-privileged documents.

3.      The Debtor objects to the Requests to the extent they request information
that is not reasonably or readily available to it, in its possession, custody or control, or is more

---

[2]  Capitalized terms not defined herein shall have the meanings set forth in the Requests.

2

**Appx. 01694**

readily available to NexPoint from another source or for which the burden of obtaining such information is not substantially greater for NexPoint than it is for the Debtor.

4.     The Debtor objects to the Requests to the extent they call for legal conclusions and/or legal analyses.

5.     All specific responses to the Requests are provided without waiver of, and with express reservation of (a) all objections as to competency, relevancy, materiality, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceedings in this matter; (b) all privileges, including the attorney-client privilege and work product doctrine; (c) the right to object to the use of such responses, or the subject matter thereof, on any ground in any further proceeding in this action; and (d) the right to object on any ground at any time to a demand or request for further responses to these or any other discovery requests or other discovery proceedings.

6.     The Debtor objects to the Requests to the extent they seek to expand on or conflict with Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of the Bankruptcy Court for the Northern District of Texas.

7.     The Debtor's agreement to produce documents with respect to a specific Request shall not be construed as a representation that such documents actually exist or are within Plaintiff's possession, custody or control.

8.     These General Objections and Responses shall be deemed to be incorporated by reference into the Specific Responses and Objections set forth below.

Appx. 01695

## RESPONSES TO REQUESTS FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 1**:

Admit that the Debtor was responsible for making payments under the Note on NexPoint's behalf pursuant to the Shared Services Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

The Debtor denies Request for Admission No. 1 on the ground that the Shared Services

Agreement does not provide that the Debtor was responsible for making payments under the Note.

**REQUEST FOR ADMISSION NO. 2**:

Admit that the Debtor was responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shard Services Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

The Debtor denies Request for Admission No. 2 on the ground that the Shared Services

Agreement does not provide that Debtor was responsible for causing payments to be made under

the Note.

**REQUEST FOR ADMISSION NO. 3**:

Admit that the Debtor did not make the December Payment on NexPoint's behalf.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Admit, providing that NexPoint did not request that any such payment be made, and

providing also that when the Debtor received instruction from NexPoint to make a payment during

January 2021, it did make the payment.

**REQUEST FOR ADMISSION NO. 4**:

Admit that the Debtor did not cause the December Payment to be made on NexPoint's behalf.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Admit, providing also that when the Debtor received instruction from NexPoint to cause a

payment to be made during January 2021, it did so.

DOCS_NY:43039.4 36027/002

4

Appx. 01696

**REQUEST FOR ADMISSION NO. 5**:

Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2018.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5**:

The Debtor admits that it made a payment on NexPoint's behalf, and at NexPoint's request and instruction, under the Note on or about December 31, 2018.  The Debtor otherwise denies Request for Admission No. 5 on the grounds that the Shared Services Agreement speaks for itself and the Debtor did not make any payment on its own behalf.

**REQUEST FOR ADMISSION NO. 6**:

Admit that, pursuant to the Shared Services Agreement, the Debtor caused a payment to be made on the Debtor's behalf under the Note on or about December 31, 2018.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6**:

The Debtor admits that it caused a payment to be made on NexPoint's behalf, and at NexPoint's request and instruction, under the Note on or about December 31, 2018.  The Debtor otherwise denies Request for Admission No. 6 on the grounds that the Shared Services Agreement speaks for itself and the Debtor did not make any payment on its own behalf.

**REQUEST FOR ADMISSION NO. 7**:

Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2019.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7**:

The Debtor admits that it made a payment on NexPoint's behalf, and at NexPoint's request and instruction, under the Note on or about December 31, 2019.  The Debtor otherwise denies Request for Admission No. 7 on the grounds that the Shared Services Agreement speaks for itself and the Debtor did not make any payment on its own behalf.

**Appx. 01697**

**REQUEST FOR ADMISSION NO. 8**:

Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2019.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

The Debtor admits that it caused a payment to be made on NexPoint's behalf, and at NexPoint's request and instruction, under the Note on or about December 31, 2019.  The Debtor otherwise denies Request for Admission No. 8 on the grounds that the Shared Services Agreement speaks for itself and the Debtor did not make any payment on its own behalf.

**REQUEST FOR ADMISSION NO. 9**:

Admit that, prior to the alleged default on December 31, 2020, NexPoint never defaulted under the Note.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Admit.

Appx. 01698

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

If the Debtor contends that it was not responsible for making payments under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

**RESPONSE TO INTERROGATORY NO. 1:**

The Debtor objects to Interrogatory No. 1 on the ground that it seeks a legal conclusion or legal analysis.  Subject to its objection, the Shared Services Agreement did not require that the Debtor to make payments under the Note on NexPoint's behalf.  The Debtor further states that after the Debtor sent NexPoint the Default Letters, NexPoint did not contend that the Debtor was required to make payments under the Note on NexPoint's behalf.  The Debtor's personnel processed the January Payment upon instruction from NexPoint.

**INTERROGATORY NO. 2:**

If the Debtor contends that it was not responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

**RESPONSE TO INTERROGATORY NO. 2:**

The Debtor objects to Interrogatory No. 2 on the ground that it seeks a legal conclusion or legal analysis.  Subject to its objection, the Shared Services Agreement did not provide that the Debtor was responsible for causing payments to be made under the Note.  The Debtor further states that after the Debtor sent NexPoint the Default Letters, NexPoint did not contend that the Debtor was required to make payments under the Note on NexPoint's behalf.  The Debtor's personnel caused the January Payment to be processed upon instruction from NexPoint.

**INTERROGATORY NO. 3:**

Provide the following information with respect to each payment made under the Note since its inception: (a) the date such payment was made; (b) the amount of such payment; (c) the individuals involved in making such payment or causing such payment to be made; (d) the account from which such payment was made; and (e) the method by which such payment was made.

Appx. 01699

**RESPONSE TO INTERROGATORY NO. 3:**

See **Exhibit A**.

**INTERROGATORY NO. 4:**

Describe in detail all steps the Debtor took, including by identifying every individual involved, to evaluate the Note, the December Payment, the January Payment, and/or the alleged default.

**RESPONSE TO INTERROGATORY NO. 4:**

The Debtor objects to Interrogatory No. 4 on the grounds that it calls for a legal conclusion or legal analysis, is vague and ambiguous, and is overly broad and unduly burdensome. *See* Fed. R. Civ. P. 26(b)(1).  Subject to its objection, the Debtor identifies the following individuals and entity in response to Interrogatory No. 4:

Jim Seery

Greg Demo

John Morris

Frank Waterhouse

Kristin Hendrix

DSI Consulting

**INTERROGATORY NO. 5:**

Describe in detail all steps the Debtor took, including by identifying every individual involved, to evaluate the Debtor's obligations to make a payment or cause a payment to be made under the Note on NexPoint's behalf.

**RESPONSE TO INTERROGATORY NO. 5:**

The Debtor objects to Interrogatory No. 5 on the grounds that it assumes the Debtor was obligated to make payments or cause a payment to be made under the Note on NexPoint's behalf. The Debtor further objects on the grounds that it calls for a legal conclusion or analysis, and is

Appx. 01700

overly broad and unduly burdensome. *See* Fed. R. Civ. P. 26(b)(1).  Subject to its objection, the

Debtor identifies the following individuals and entity in response to Interrogatory No. 5:

> Jim Seery
>
> Greg Demo
>
> John Morris
>
> Frank Waterhouse
>
> Kristin Hendrix
>
> Blair Hillis
>
> DSI Consulting

**INTERROGATORY NO. 6:**

Identify all records the Debtor kept regarding services the Debtor provided to NexPoint under the Shared Services Agreement with respect to the Note, and indicate whether such records identify what employee(s) provided services, when such services were provided, and how much time was spent providing such services.

**RESPONSE TO INTERROGATORY NO. 6:**

The Debtor does not possess information responsive to Interrogatory No. 6.

**INTERROGATORY NO. 7:**

For each request for admission above that the Debtor did not unequivocally admit, explain the factual and legal basis for not doing so.

**RESPONSE TO INTERROGATORY NO. 7:**

The Debtor objects to Interrogatory No. 7 on the grounds that it calls for a legal analysis

or legal conclusion, and is overly broad and unduly burdensome. *See* Fed. R. Civ. P. 26(b)(1).

Appx. 01701

## SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 1:**

All Communications pursuant to which any director, officer, or employee of the Debtor was advised or instructed not to make the December Payment or to cause the December Payment to be made.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Subject to the General Objections, the Debtor is unaware of any documents responsive to Request for Production No. 1.  Any Communications responsive to Request for Production No. 1 were verbal.

**REQUEST FOR PRODUCTION NO. 2:**

All Communications between directors, officers, and/or employees of the Debtor related to the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 2.

**REQUEST FOR PRODUCTION NO. 3:**

All Communications between directors, officers, and/or employees of the Debtor related to any and all defaults under the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 3.

**REQUEST FOR PRODUCTION NO. 4:**

All Communications between directors, officers, and/or employees of the Debtor related to the December Payment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 4.

Appx. 01702

**REQUEST FOR PRODUCTION NO. 5:**

All Communications between directors, officers, and/or employees of the Debtor related to prior payments the Debtor made or caused to be made on NexPoint's behalf under the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 5.

**REQUEST FOR PRODUCTION NO. 6:**

All Communications between directors, officers, and/or employees of the Debtor related to the January Payment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 6.

**REQUEST FOR PRODUCTION NO. 7:**

All Communications with third parties related to the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 7.

**REQUEST FOR PRODUCTION NO. 8:**

All Communications with third parties related to the December Payment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 8.

**REQUEST FOR PRODUCTION NO. 9:**

All Communications with third parties related to the January Payment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Appx. 01703

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 9.

**REQUEST FOR PRODUCTION NO. 10:**

All Communications with third parties related to prior payments the Debtor made or caused to be made on NexPoint's behalf under the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 10.

**REQUEST FOR PRODUCTION NO. 11:**

All Communications with third parties related to any and all defaults under the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 11.

**REQUEST FOR PRODUCTION NO. 12:**

All Communications with the Committee (including, but not limited to, Communications solely between counsel for the Debtor and the Committee) related to the Note, any and all defaults under the Note, the December Payment, the January Payment, and/or the Default Letters.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 12.

**REQUEST FOR PRODUCTION NO. 13:**

All ledgers, statements, and accounting records related to payments made under the Note to date.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 13.

Appx. 01704

**REQUEST FOR PRODUCTION NO. 14:**

All Documents pursuant to which the Debtor was authorized and/or required to make payments or cause payments to be made on NexPoint's behalf under the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

The Debtor objects to Request for Production No. 14 to the extent that it assumes that the Debtor was required to make payments or cause payments to be made on NexPoint's behalf under the Note.  Subject to its General and Specific Objections, the Debtor is not aware of documents otherwise responsive to Request for Production No. 14.

**REQUEST FOR PRODUCTION NO. 15:**

All Documents and Communications pursuant to which the Debtor contends it was relieved of its obligation to make payments or cause payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

The Debtor objects to Request for Production No. 15 to the extent that it assumes that the Debtor was obligated to make payments or cause payments to be made on NexPoint's behalf under the Note.  Subject to its General and Specific Objections, the Debtor is not aware of documents otherwise responsive to Request for Production No. 15.

**REQUEST FOR PRODUCTION NO. 16:**

All Communications related to potentially marketing and/or selling the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

The Debtor objects to Request for Production No. 16 on the ground that it is not "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 17:**

The Shared Services Agreement, including all amendments and supplements thereto, whether informal or formal, regardless of how documented.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 17.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents and Communications construing the Debtor's obligations to NexPoint under the Shared Services Agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

The Debtor objects to Request for Production No. 18 on the ground that it is vague and ambiguous, overly broad, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 19:**

All Documents and Communications related to the scope of the Debtor's obligations to NexPoint under the Shared Services Agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

The Debtor objects to Request for Production No. 19 on the ground that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 20:**

All Documents and Communications identified in connection with Interrogatory 6 above.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

The Debtor objects to Request for Production No. 20 on the ground that it is not aware of any such documents.  Subject to the General and Specific Objections, the Debtor will search for and produce documents responsive to Request for Production No. 20.

**REQUEST FOR PRODUCTION NO. 21:**

All billing statements from Pachulski Stang Ziehl & Jones LLP and Hayward PLLC related to fees the Debtor seeks to collect in the Adversary Proceeding.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

Appx. 01706

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 21.

Dated:  May 11, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
              ikharasch@pcszjlaw.com
              jmorris@pszjlaw.com
              gdemo@pszjlaw.com
              hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## EXHIBIT A

**Response to Interrogatory No. 3**

**NexPoint Advisors**
**Note Receivable Payment Summary**

| Payment Date | Total Paid | Pmt Account | Pmt Method | Individuals Involved in Making Pmt |
|---|---|---|---|---|
| 10/20/2017 | 800,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 12/5/2017 | 1,301,504.99 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 4/10/2018 | 439,721.54 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 5/1/2018 | 146,573.85 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 5/9/2018 | 879,927.65 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 9/5/2018 | 280,765.40 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 9/21/2018 | 1,023,750.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 12/18/2018 | 294,695.10 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 3/29/2019 | 750,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 4/16/2019 | 1,300,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 6/4/2019 | 300,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 6/19/2019 | 2,100,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 7/9/2019 | 630,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 8/13/2019 | 1,300,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 12/30/2019 | 530,112.36 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 1/14/2021 | 1,406,111.92 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |

EXHIBIT "A"

# EXHIBIT 16

Docket #0105  Date Filed: 12/1/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612568) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006-sgj |
| | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

¨1¤}HV5.!    *N«

1934054211201000000000010

Appx. 01711

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § |
| Defendants. | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § |
| Plaintiff, | § § | Adversary Proceeding No. |
| vs. | § § | 21-03007-sgj |
| HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § |
| Defendants. | § |

Appx. 01712

# **TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ........................................................................... 1

II.   STATEMENT OF FACTS ................................................................................. 4

    A.   The Note .................................................................................................. 4

    B.   NexPoint Defaults under the Note and Highland Sues to Collect ...................... 5

    C.   NexPoint Blames Highland for Its Default .......................................................... 6

    D.   The Court Enters the Scheduling Order .............................................................. 6

    E.   Mr. Waterhouse Testifies that Mr. Dondero Instructed Him Not to Make Any
        Payments to Highland ........................................................................................ 7

    F.   Highland's Obligations under the Shared Services Agreement Were Limited to
        Those "Specifically" Identified Therein .............................................................. 8

    G.   The Instant Motion ............................................................................................ 9

III.  ARGUMENT ................................................................................................... 9

    A.   NexPoint's Suggested "Expert Testimony" Is Improper as a Matter of Law .................... 9

    B.   NexPoint Fails to Establish that Good Cause Exists to Modify the Scheduling
        Order ................................................................................................................ 10

        1.   NexPoint's Explanation for Failing to Timely Designate an Expert Is
              Deficient ............................................................................................... 12

        2.   NexPoint's Suggested "Expert" Testimony Is Irrelevant ......................................... 13

        3.   Allowing the Testimony Would Prejudice Highland ................................................. 15

    C.   HCRE's and HCMS's Joinders Have Even Less Merit than the Motion and Should
        Be Denied ........................................................................................................ 17

    CONCLUSION ..................................................................................................... 17

DOCS_NY:44447.9 36027/003

## TABLE OF AUTHORITIES

### Cases

*Askanase v. Fatjo*,
    130 F.3d 657 (5th Cir. 1997) ................................................................................ 10

*Binh Hoa Le v. Exeter Fin. Corp.*,
    3:15-CV-3839-L, 2019 WL 1436375 (N.D. Tex. Mar. 31, 2019) ........................ 12, 13, 17, 18

*Charalambopoulos v. Grammer*,
    3:14-CV-2424-D, 2017 WL 930819 (N.D. Tex. Mar. 8, 2017) .............................. 14

*Flax v. Quitman County Hosp.,
    LLC*, 2:09-CV-101-M-D, 2011 WL 3585870 (N.D. Miss. Aug. 16, 2011) ............................ 10

*Geiserman v. MacDonald*,
    893 F.2d 787 (5th Cir.1990) ............................................................................ passim

*Grand Time Corp. v. Watch Factory, Inc.*,
    3:08-CV-1770-K, 2009 WL 10678210 (N.D. Tex. Nov. 18, 2009) .................................. 11, 12

*Hanspard v. Otis Elevator Co.*,
    CIV.A. 05-1292, 2007 WL 839994 (W.D. La. Jan. 12, 2007) ................................. 10

*Henderson v. Atmos Energy*,
    496 F. Supp. 3d 1011 (E.D. La. 2020) ................................................................ 16

*Nola Ventures, LLC v. Upshaw Ins. Agency, Inc.*,
    CV 12-1026, 2014 WL 12721924 (E.D. La. Nov. 7, 2014) .................................... 15

*Panhandle Advert., LLC v. United Rentals Realty,
    LLC*, 2:19-CV-189-Z-BR, 2021 WL 1112901 (N.D. Tex. Feb. 12, 2021) .......................... 9, 10

*Pipitone v. Biomatrix, Inc.*,
    288 F.3d 239 (5th Cir. 2002) ............................................................................ 14

*Reliance Ins. Co. v. Louisiana Land & Expl. Co.*,
    110 F.3d 253 (5th Cir. 1997) ..................................................................... 12, 13, 17

*Rolls-Royce Corp. v. Heros, Inc.*,
    CIV.A. 307-CV-0739-D, 2010 WL 184313 (N.D. Tex. Jan. 14, 2010) ................................. 15

*S&W Enters., L.L.C. v. SouthTrust Bank of Alabama, NA*,
    315 F.3d 533 (5th Cir. 2003) ....................................................................... 12, 17

*Taylor Pipeline Const., Inc. v. Directional Rd. Boring, Inc.*,
    438 F. Supp. 2d 696 (E.D. Tex. 2006) ................................................................. 10

ii

**<u>Rules</u>**

Fed. R. Civ. P. 16(b)(4)................................................................................................................ 11

**Appx. 01715**

**HIGHLAND'S MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO
MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES**

Highland Capital Management, L.P., the reorganized debtor ("Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case") and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), hereby objects (the "Objection") to the *Motion of NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* [AP Docket No. 86][2] (the "Motion") filed by defendant NexPoint Advisors, L.P. ("NexPoint") and joined by certain defendants in other related adversary proceedings.[3]  In support of its Objection, Highland respectfully states as follows:

## I.       PRELIMINARY STATEMENT[4]

1.       NexPoint's Motion to modify the Scheduling Order is without merit and should be denied.

2.       This Adversary Proceeding arises from NexPoint's default under its Note in the original principal amount of $30.7 million.  The Note required NexPoint to make Annual Installment payments to Highland on December 31 of each year.

3.       NexPoint blames Highland for its failure to timely make the Annual Installment payment.  Initially, NexPoint contended that Highland breached its obligations by negligently failing to make the payment on NexPoint's behalf.  Then, Frank Waterhouse, an officer of NexPoint, a current employee of Skyview (the entity that services numerous of Mr. Dondero's

---

[2] Unless specified otherwise, references to "AP Docket No. __" are to the docket entries in NexPoint's Adversary Proceeding, 21-03005.

[3] *See Motion of Highland Capital Management Services, Inc. to Extend Expert Disclosure and Discovery Deadlines*, filed at Docket No. 91 in Adversary Proceeding 21-03006 ("HCMS's Joinder") (incorporating NexPoint's Motion), and *Motion of HCRE Partners, LLC to Extend Expert Disclosure and Discovery Deadlines*, filed at Docket No. 86 in Adversary Proceeding 21-03007 ("HCRE's Joinder", and together with HCMS's Joinder, the "Joinders," and collectively with the Motion, the "Motions") (incorporating NexPoint's Motion).

[4] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed thereto below.

1

businesses), and Highland's former Chief Financial Officer, testified in his deposition that NexPoint failed to make the Annual Installment payment because Mr. Dondero instructed him in December 2020 not to make *any* payments to Highland from *any* of the entities that Mr. Dondero controlled.

4.      NexPoint contends that, in light of this testimony, an expert is necessary to testify regarding whether Highland violated an "affirmative duty or obligation" it owed to NexPoint under Section 6.01 of the Shared Services Agreement to effectuate the payment on behalf of NexPoint, despite Mr. Dondero's instructions to the contrary.   According to NexPoint:

> [T]he question becomes whether Waterhouse or the Debtor 'put their head in the sand' in violation of any affirmative duty or obligation they may have had regarding the matter, such as; to ask Dondero whether they correctly understood him; to ask Dondero whether he meant NexPoint or the Note; to inform Dondero of the potential consequences of a default by potentially accelerating a 30-year promissory note; or to try to dissuade him from his decision.

Motion ¶ 13.

5.      NexPoint's Motion to extend the expert disclosure and discovery deadlines in order to retain a testifying expert on Highland's duties of care under the Shared Services Agreement is without merit.

6.      NexPoint's suggested expert testimony is improper because it concerns "the standards and duties of care under the parties' Shared Services Agreement" and otherwise seeks to interpret that Agreement for the Court.  It is black-letter law that the determination of the existence and scope of contractual and other legal duties are improper subjects of expert opinion because they constitute legal conclusions that fall within the exclusive province of the Court.

7.      Even if that were not the case (and it is), NexPoint fails to satisfy its burden of demonstrating "good cause" to modify the Scheduling Order under Rule 16(b) for three independent reasons.  ***First***, as set forth below, the Motion is untimely.  ***Second***, the suggested expert testimony is irrelevant because it would not assist a factfinder in determining any technical

2

or complex issues in this case.  By its plain terms, the Shared Services Agreement does not impose an affirmative duty on—or even authorize—Highland to effectuate payments on behalf of NexPoint without authorization from a NexPoint Representative.  NexPoint's reliance on Section 6.01 as the source of Highland's alleged duties is thus misguided, as that provision applies only to duties specifically set forth under the Agreement.[5]  **Finally**, allowance of the expert testimony at this late juncture would substantially prejudice Highland, with such prejudice being exacerbated (and not cured) by a continuance.  If the Motion is granted, Highland will be forced to expend significant resources addressing NexPoint's latest theories of its defense, including through additional discovery and motion practice.  It will also cause a further delay of the trial on the merits, thereby impeding Highland's ultimate recovery under the Note, all at the expense of Highland's creditors.

8.      Separately, as ill-conceived as the Motion is, the Joinders raise considerable questions of good faith, because neither Highland Management Services, Inc. ("HCMS") nor HCRE Partners, LLC ("HCRE") even alleges that it is a party to a shared services agreement (let alone the Shared Services Agreement submitted with the Motion), nor can it.  The Motion seeks to "designate a testifying expert on the standards and duties of care under the parties' Shared Services Agreement," but the Joinders offer no explanation for why such expert testimony would have any relevance to them since they are not parties to **any** shared services agreement.

9.      For the reasons set forth herein, Highland respectfully requests that the Court deny the Motion in all respects.

---

[5] NexPoint offers no explanation for why Highland's alleged obligations under the Shared Services Agreement supersede Mr. Waterhouse's fiduciary duties to NexPoint.  If anyone had a duty to ask Mr. Dondero "Are you sure?" or "Do you know what you're doing" (an absurd concept on its own), it was surely Mr. Waterhouse—not in his capacity as a Highland employee—but in his capacity as an officer of, and a fiduciary to, NexPoint.

Appx. 01718

## II.      STATEMENT OF FACTS

**A.      The Note**

10.      On May 31, 2017, James Dondero ("Mr. Dondero") signed a 30-year term note on behalf of NexPoint and in favor of Highland (the "Note").  Morris Dec.[6] Exhibit 1.

11.      The Note consolidated NexPoint's obligations under five Prior Notes (as that term is defined in the Note) and was for an original principal amount of $30,746,812.33.  *See* Morris Dec. Exhibit 1, Ex. A.  Highland received no consideration for consolidating the five demand notes into a single 30-year term note.

12.      NexPoint and Mr. Dondero knew that NexPoint was required to pay Highland in Annual Installments, because it was spelled out plainly in the Note:

> 2.1      Annual Payment Dates.  During the term of this Note, [NexPoint] shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each payment) in thirty (30) equal annual payments (the "Annual Installments") until the Note is paid in full.  ***[NexPoint] shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note***, commencing on the first such date to occur after the date of execution of this Note.

Morris Dec. Exhibit 1 § 2.1 (emphasis added).

13.      NexPoint and Mr. Dondero also knew the consequences of failing to timely make the required Annual Installment payments, because they were also spelled out plainly in the Note:

> 4.      Acceleration Upon Default.  ***Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof [i.e., Highland]***, without notice, demand presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, ***mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable*** and subject to those remedies of the holder hereof [i.e., Highland].

*Id*. § 4 (emphases added).

---

[6] References to "Morris Dec. __" are to the *Declaration of John Morris in Support of Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosures and Discovery Deadlines* being filed concurrently herewith.

14.    Finally, Mr. Dondero expressly agreed on behalf of NexPoint to waive any notice of default or acceleration:

> 5.    <u>Waiver</u>.  [NexPoint] hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration, and all other notices of any kind hereunder.

*Id*. § 5.

15.    Thus, based on the plain terms of the Note executed by Mr. Dondero on NexPoint's behalf at a time when Mr. Dondero indisputably controlled both entities, NexPoint agreed (a) to make Annual Installment payments to Highland on December 31 of each year; (b) that Highland would have the unilateral right upon a default to accelerate all unpaid principal and interest due under the Note without notice or demand; and (c) to waive, among other things, a grace period, notice of nonpayment, notice of intent to accelerate, and "all other notices of any kind hereunder."

**B.    <u>NexPoint Defaults under the Note and Highland Sues to Collect</u>**

16.    NexPoint does not dispute that it failed to make the Annual Installment payment due under the Note on December 31, 2020 in the amount of $1,406,111.92.

17.    By letter dated January 7, 2021, in an exercise of its unambiguous and unconditional rights under the Note, Highland demanded that NexPoint immediately pay all unpaid principal and interest then due under the Note (the "<u>Demand Letter</u>").  Morris Dec. Exhibit 2.  The Demand Letter stated:

> Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.
>
> The Note is in default, and payment is due immediately.

*Id*.

18.    On January 22, 2021, after NexPoint failed to meet its obligations under the Note, Highland commenced this Adversary Proceeding.  [AP Docket No. 1].

**C.    NexPoint Blames Highland for Its Default**

19.    On March 1, 2021, NexPoint filed its *Original Answer* asserting, among other things, that "[p]ursuant to that certain Shared Services Agreement, [Highland] was responsible for making payments on behalf of [NexPoint] under the note" such that any "alleged default" was caused by Highland's own negligence and breach of contract (the "Original Defense"). *Defendant's Original Answer* [AP Docket No. 6] (the "Original Answer") ¶¶ 39-41.

20.    On August 9, 2021, NexPoint filed its *First Amended Answer*, which did not substantively alter its Original Defense.  [AP Docket No. 50] (the "Amended Answer") ¶¶ 39-41.

21.    On September 1, 2021, after Highland amended its Complaint, NexPoint filed its *Answer to Amended Complaint* [AP Docket No. 64] (the "Final Answer").  The Final Answer did not substantively alter NexPoint's Original Defense.  *See id.* ¶¶ 80-82.

22.    Thus, at all times prior to filing the Motion, NexPoint contended that its failure to timely make the Annual Installment due on December 31, 2020 was caused by Highland's own alleged negligence and breach of the Shared Services Agreement.

**D.    The Court Enters the Scheduling Order**

23.    On September 6, 2021, the Court entered the *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* [AP Docket No. 70] (the "Scheduling Order").

24.    The Scheduling Order provides, in pertinent part, that "expert designations and disclosures of all opinions, and the bases therefor, will be made by October 29, 2021, and experts will be deposed between October 29, 2021 and November 8, 2021."  Scheduling Order ¶ 3.

6

E.   **Mr. Waterhouse Testifies that Mr. Dondero Instructed Him Not to Make Any Payments to Highland**

25.     In December 2020, Frank Waterhouse ("Mr. Waterhouse") wore multiple hats that Mr. Dondero gave to him, including: (a) Chief Financial Officer of Highland; (b) Treasurer of NexPoint; (c) Treasurer of HCMS; (d) Treasurer of Highland Capital Management Fund Advisors, L.P. ("HCMFA", and together with NexPoint, the "Advisors"); and (e) Principal Executive Officer of certain funds managed by the Advisors.  *See* Morris Dec. Exhibit 3 at 24:2-25; 35:8-22; 120:7-12; 327:3-8.

26.     At a recent deposition, Mr. Waterhouse testified that NexPoint did not make the Annual Installment payment due on December 31, 2020 because Mr. Dondero had instructed him in December 2020 not to cause any payments to be made to Highland.  Mr. Waterhouse also testified that he never followed up with Mr. Dondero or reminded him that the payment was coming due at the end of the month.  *See* Morris Dec. Exhibit 3 at 390:4-392:17.

27.     Mr. Dondero testified that he was unaware of anyone ever instructing or authorizing Highland to make the Annual Installment payment due under the Note on NexPoint's behalf. Morris Dec. Exhibit 4 at 462:16-463:9.  Mr. Waterhouse concurred and confirmed that Highland's employees were not authorized to make the Annual Installment payment due at the end of the year without prior approval:

> Q:  Do you know if anybody ever instructed Highland's employees to make the payment that was due by NexPoint at the end of the year?
>
> A:  Did anyone instruct Highland's employees to make that payment?
>
> Q:  Correct.
>
> A:  Anyone – not that I'm aware.
>
> Q:  . . . [Were] any of Highland's employees authorized to effectuate the payment on behalf of NexPoint that was due at the end of the year without getting approval from either you or Mr. Dondero?

7

A:  They had the – they had the ability to make the payment, but they didn't – you
know, that – that payment needed to be approved.

Morris Dec. Exhibit 3 at 381:21-382:16.

**F.   Highland's Obligations under the Shared Services Agreement Were
Limited to Those "Specifically" Identified Therein**

28.   NexPoint and Highland entered into that certain *Amended and Restated Shared Services Agreement* effective as of January 1, 2018 (the "SSA").  Rukavina Dec., Exhibit A.[7]

29.   Article II of the SSA required Highland to provide "assistance and advice" with respect to certain specified services.  Highland is unaware of any provision in the SSA—and NexPoint cites to none—that authorized Highland to control NexPoint's bank accounts or required Highland to effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint.

30.   In fact, Article II of the SSA expressly provided that "for the avoidance of doubt . . . [Highland] shall ***not*** provide any advice to [NexPoint] or perform any duties on behalf of [NexPoint], other than the back- and middle office services contemplated herein, with respect to (a) the general management of [NexPoint], its business or activities . . . ."  SSA at § 2.02 (emphasis added).

31.   To emphasize the point further, the SSA expressly curtailed Highland's authority to act on NexPoint's behalf:

Section 2.06  Authority.  [Highland's] scope of assistance and advice hereunder is
***limited to the services specifically provided for in this Agreement.  [Highland]
shall not assume or be deemed to assume any rights or obligations of [NexPoint]
under any other document or agreement to which NexPoint is a party***. . . .
[Highland] shall not have any duties or obligations to [NexPoint] unless those
duties and obligations are specifically provided for in this Agreement (or in any
amendment, modification or novation hereto or hereof to which [NexPoint] is a
party.

---

[7] References to "Rukavina Dec. __" are to the *Declaration of Davor Rukavina* [AP Docket No. 86-1] attached to the Motion.

8

**Appx. 01723**

*Id*. § 2.06 (emphasis added).

32.     There can be no credible dispute that (a) the Note is a "document or agreement to which NexPoint is a party," and that (b) the making of the Annual Installment payments were "obligations of" NexPoint under the Note.

### G.     The Instant Motion

33.     Apparently stunned by Mr. Waterhouse's testimony, NexPoint now seeks to extend the expert disclosure and discovery deadlines set forth in the Scheduling Order so it can obtain expert testimony regarding Highland's legal duties under Section 6.01 of the Shared Services Agreement.   Specifically, NexPoint proposes to retain an expert to testify "on the standards and duties of care under the parties' Shared Services Agreement . . . with respect to Highland's role in NexPoint's alleged failure to make a December 21, 2020 payment on the Note (defined below); specifically, that Highland was responsible for ensuring that NexPoint made this payment." Motion ¶ 1.

### III.     ARGUMENT

### A.     NexPoint's Suggested "Expert Testimony" Is Improper as a Matter of Law

34.     NexPoint's suggested expert testimony is improper as a matter of law because it amounts to a legal conclusion.

35.     A party may not offer an expert opinion on the scope of a party's "legal duty" because such testimony amounts to a legal conclusion.   *See Panhandle Adver., LLC v. United Rentals Realty, LLC*, 2:19-CV-189-Z-BR, 2021 WL 1112901, at *5 (N.D. Tex. Feb. 12, 2021); *Flax v. Quitman County Hosp., LLC*, 2:09-CV-101-M-D, 2011 WL 3585870, at *5 (N.D. Miss. Aug. 16, 2011).

36.     NexPoint's suggested expert testimony relates to Highland's "duties of care under the parties' [SSA]" and, specifically, whether "Highland was responsible" under the SSA for

Appx. 01724

"ensuring that NexPoint made" its Annual Installment payment under its Note.  Motion ¶¶ 1, 18. This is precisely the type of expert testimony that courts preclude because it constitutes a legal conclusion.  *See Panhandle*, 2021 WL 1112901 at *5 (granting plaintiff's motion to exclude expert testimony "as to his opinions regarding the legal duties Defendant owed Plaintiff under the lease at issue" because "opinions on the duties owed by the defendants and whether they fulfilled those duties were legal conclusions and not the proper subject for expert testimony"); *Flax*, 2011 WL 3585870 at *5 (prohibiting expert testimony "on the issue of *law* of whether a duty of care was owed") (emphasis in original); *Hanspard v. Otis Elevator Co.*, CIV.A. 05-1292, 2007 WL 839994, at *2 (W.D. La. Jan. 12, 2007) (granting plaintiff's motion *in limine* to exclude expert testimony where "an opinion as to the scope of [party's] contractual duties" constitutes a legal conclusion); *Taylor Pipeline Const., Inc. v. Directional Rd. Boring, Inc.*, 438 F. Supp. 2d 696, 706 (E.D. Tex. 2006) (finding expert testimony improper where it "opines as to the duties" owed by parties because "they amount to conclusions of law").

37.     The question of whether Highland owed or breached any legal duties is an issue for the trier of fact to decide. *See Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) (affirming lower court's preclusion of expert testimony regarding whether officers and directors "fulfilled their fiduciary duties to the Company … is a legal opinion and inadmissible.  Whether the officers and directors breached their fiduciary duties is an issue for the trier of fact to decide. It is not for [the expert] to tell the trier of fact what to decide").

38.     Accordingly, NexPoint's suggested expert testimony on Highland's duties under the SSA is improper as a matter of law, and the Motion should be denied on this basis alone.

**B.**   **NexPoint Fails to Establish that Good Cause Exists to Modify the Scheduling Order**

39.     NexPoint fails to satisfy its burden of demonstrating good cause to modify the Scheduling Order.

10

40.     Under Rule 16(b) of the Federal Rules of Civil Procedure, a scheduling order may be modified only for "good cause." FED. R. CIV. P. 16(b)(4).   Courts consider four factors in determining whether "good cause" is shown: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir.1990).   These are the same four factors used to determine whether to exclude expert testimony under Rule 37(c)(1) of the Federal Rules of Civil Procedure.   *See Grand Time Corp. v. Watch Factory, Inc.*, 3:08-CV-1770-K, 2009 WL 10678210, at *2 (N.D. Tex. Nov. 18, 2009).   Ultimately, "the good cause standard requires the 'party seeking relief to show that the deadlines [could not] reasonably [have been] met despite the diligence of the party needing the extension.'" *Binh Hoa Le v. Exeter Fin. Corp.*, 3:15-CV-3839-L, 2019 WL 1436375, at *14 (N.D. Tex. Mar. 31, 2019) (quoting *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir. 2003)).

41.     "Under Rule 16(b), the movant has the burden of showing good cause to modify a scheduling order." *Grand Time*, 2009 WL 10678210 at *3.   Whether to modify a scheduling order is within the court's broad discretion.   *See Geiserman*, 893 F.2d at 790 ("[O]ur court gives the trial court broad discretion to preserve the integrity and purpose of the pretrial order") (internal quotations omitted); *Reliance Ins. Co. v. La. Land & Expl. Co.*, 110 F.3d 253, 257 (5th Cir. 1997).   Moreover, "a trial court's decision to exclude evidence as a means of enforcing a pretrial order must not be disturbed absent a clear abuse of discretion." *Geiserman*, 893 F.2d at 790.

42.     Each of the four factors weighs in favor of denying modification of the Scheduling Order.

1.    **NexPoint's Explanation for Failing to Timely Designate an Expert Is Deficient**

43.    NexPoint's explanation for its failure to timely designate an expert is disingenuous. NexPoint contends that, *inter alia*, its failure to previously designate an expert was "due solely to not having the benefit of Waterhouse's and Seery's recent deposition testimony," and that expert testimony is now "necessitated by Waterhouse's testimony and not any prior action or inaction of NexPoint Motion." Motion ¶ 21.   NexPoint seeks to modify the Scheduling Order simply because the deposition of one of its witnesses did not go well.   This is plainly improper under Rule 16(b). *See Reliance*, 110 F.3d at 257 (affirming lower court's denial of party's request to supplement expert report where "[movant] asked for an opportunity to avoid the deadline for its expert report merely because the deposition of its expert witness did not go well," noting that "[d]istrict judges have the power to control their dockets by refusing to give ineffective litigants a second chance to develop their case").

44.    Moreover, NexPoint filed its Original Answer nine (9) months ago and its Original Defense was expressly based on the SSA.   [AP Docket No. 6 ¶¶ 39-41].   Given the testimony of Mr. Dondero (which could not have been unexpected) and Mr. Waterhouse that NexPoint never authorized or instructed Highland to make the Annual Installment payment due on December 31, 2020, *see* Section II.E, *supra*, NexPoint has always had the burden of proving that Highland owed a duty under the SSA, yet it never offered expert opinions on the topic.   If NexPoint wanted to offer "expert testimony" concerning Highland's duties under the SSA, it had nine months to do so, and Mr. Waterhouse's testimony, expected or not, does nothing to change that.   *See Geiserman*, 893 F.2d at 792 (finding party failed to provide a "valid reason that would justify excusing him from the deadlines imposed by the lower court," noting "[t]he claimed importance of expert testimony underscores the need for [party] to have timely designated his expert witness," and "[t]he importance of such proposed testimony cannot singularly override the enforcement of local rules

12

and scheduling orders"). NexPoint's conclusory statements regarding the need for expert testimony are insufficient under Rule 16(b). *See Binh Hoa*, 2019 WL 1436375 at *20 (finding "vague and conclusory statements regarding the need for additional information or facts do not adequately explain [party's] failure to meet the expert deadline in the Scheduling Order").

45.     Accordingly, the first factor strongly favors denial of the Motion.

## 2.     **NexPoint's Suggested "Expert" Testimony Is Irrelevant**

46.     The second factor—the importance of the suggested expert testimony— weighs heavily in favor of denying modification of the Scheduling Order.

47.     In addition to being improper, the suggested expert testimony is also irrelevant. To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Charalambopoulos v. Grammer*, 3:14-CV-2424-D, 2017 WL 930819, at *9 (N.D. Tex. Mar. 8, 2017) (quoting *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002)).

48.     NexPoint contends that its suggested expert testimony is "important because the duties of care as specified in the [SSA] are terms of art necessitating an expert analysis." Motion ¶ 21. NexPoint's reliance on Section 6.01 in support of its Motion is misplaced.

49.     By its express terms, Section 6.01 does not impose a duty on Highland to make or effectuate Annual Installment payments on NexPoint's behalf without authorization from a representative of NexPoint. Rather, Section 6.01 sets forth a "standard of care" that applies ***only*** with respect to the discharge of "duties under this Agreement."[8] In fact, to remove all doubt, the

---

[8] Notably, and notwithstanding the "standard of care" set forth in Section 6.01, the SSA provides Highland with considerable exculpation and indemnification protections that alone defeat NexPoint's Original Defense. For example, NexPoint agreed not to hold Highland liable for any acts or omissions unless it is determined by a court of competent jurisdiction to "be the result of gross negligence or to constitute fraud or willful misconduct." Rukavina Dec., Exhibit A § 6.02. NexPoint also agreed to indemnify Highland "from and against any and all claims and causes of action" for, among other things, "negligence." *Id.* § 6.03.

SSA emphasizes multiple times that Highland had ***no*** duties or obligations except with respect to those "specifically" identified therein.  *See* Rukavina Dec., Exhibit A §§ 2.02, 2.06.  NexPoint does not and cannot identify any provision in the SSA that imposes a duty on Highland to make Annual Installment payments on NexPoint's behalf without direction from an authorized NexPoint representative.  *See* Original Answer ¶¶ 39-41 (no SSA provision cited); Amended Answer ¶¶ 39-41 (no SSA provision cited); Final Answer ¶¶ 80-82 (no SSA provision cited); Motion, generally (citing only to Section 6.01).

50.     Thus, based on the plain terms of the SSA and NexPoint's own pleadings, expert testimony regarding Highland's alleged "duties" is irrelevant.  *See Geiserman*, 893 F.2d at 791 (affirming lower court's refusal to modify scheduling order, noting that expert testimony "is not critical" if the issue at hand is "obvious to a layperson or established as a matter of law"); *Rolls-Royce Corp. v. Heros, Inc.*, CIV.A. 307-CV-0739-D, 2010 WL 184313, at *6 (N.D. Tex. Jan. 14, 2010) ("Testimony is irrelevant [] when an expert offers a conclusion based on assumptions unsupported by the facts of the case").

51.     Moreover, the suggested expert testimony will not help the factfinder understand a complex fact in issue.  Contrary to NexPoint's representations, this Adversary Proceeding does not involve complicated or technical issues.  The issues in this Adversary proceeding are whether NexPoint defaulted on its Note and whether NexPoint can prove that Highland's alleged "negligence" or "breach of contract" caused such default.  Final Answer ¶¶ 80-82.  These issues are well within a fact-finder's understanding and are not the type which would necessitate an expert.  *See Nola Ventures, LLC v. Upshaw Ins. Agency, Inc.*, CV 12-1026, 2014 WL 12721924, at *10 (E.D. La. Nov. 7, 2014), *on reconsideration,* CIV.A. 12-1026, 2014 WL 6090584 (E.D. La. Nov. 13, 2014) (excluding expert testimony where, "[d]espite Plaintiffs' arguments to the contrary, this case is not about the complicated inner workings of the insurance industry.  It is about whether

an insurance agent misrepresented the type of coverage that Plaintiffs believed they were purchasing, and whether Defendants owed a heightened duty of care to Plaintiffs. Nothing in [expert's] report or proposed testimony will help the jury to understand a fact in issue that is not within the common understanding of a lay juror"); *Henderson v. Atmos Energy*, 496 F. Supp. 3d 1011, 1017 (E.D. La. 2020) (excluding expert testimony as irrelevant and unnecessary where "it is one based in common sense").

52.     At all relevant times, Mr. Waterhouse was an officer and a fiduciary of NexPoint, serving as its Treasurer.  If anyone had an obligation to ask Mr. Dondero if he wanted to reconsider his instructions, it was Mr. Waterhouse in the first instance—not in his capacity as an employee of Highland, but as an officer and fiduciary of the obligor, NexPoint.  Whether Mr. Dondero or Mr. Waterhouse is telling the truth is an interesting issue, but the Court need not resolve their dispute because it would only be relevant if the SSA imposed a duty on Highland to effectuate the Annual Installment payment without ever receiving any direction or instruction from a duly authorized representative of NexPoint.  And, as Mr. Waterhouse testified, the SSA imposes no such duty.

53.     Accordingly, the suggested expert testimony is irrelevant, and the Motion should be denied on this basis.

**3.     Allowing the Testimony Would Prejudice Highland**

54.     The third and fourth factors also weigh in favor of denying the Motion.

55.     Allowing the suggested expert testimony would prejudice Highland because Highland would need to expend additional resources responding to NexPoint's latest theory of its defense by way of: (i) retaining a rebuttal expert; (ii) deposing NexPoint's expert; or (iii) moving to strike the expert testimony.  *See Geiserman*, 893 F.2d at 791 (affirming lower court's striking of untimely witness designation and preclusion of expert testimony where delay of "a couple

15

weeks in designating the expert witness" would have "disrupted the court's discovery scheduling and the opponent's preparation," and resulted in "expense that would result from an extended discovery schedule for [movant's] failure to adhere to deadlines," noting that "the trial court has latitude to control discovery abuses and cure prejudice by excluding improperly designated evidence"); *Binh Hoa*, 2019 WL 1436375 at *20 ("It would [] be patently unfair to allow Plaintiff to supplement and amend his expert report this late in the case without: (1) allowing Defendants to amend their expert designations and provide an expert report to address the matters in Plaintiff's amended and supplemental expert reports, (2) giving Defendants an opportunity to depose Plaintiff's expert regarding his most recent opinion . . .").

56.     A continuance would not cure this prejudice because the trial on the merits of the underlying action would be unnecessarily delayed.  This would ultimately delay Highland's potential recovery under the Note and distributions to creditors under Highland's Plan.  *See S&W Enters.*, 315 F.3d at 537 (affirming lower court's denial of untimely submission of expert report where defendant would be forced to conduct additional discovery in response to movant's new materials, noting that "while a continuance could be granted for additional discovery . . . a continuance would unnecessarily delay the trial"); *Reliance*, 110 F.3d at 257-58 (affirming lower court's denial to modify scheduling order to add expert testimony where court found "[t]o allow plaintiff to add more material now and create essentially a new report would prejudice the defendants, who would then have to get an expert to address these last-minute conclusions, and thus disrupt the trial date in this case") (internal quotations omitted); *Geiserman*, 893 F.2d at 791 (finding that while attorney "could have conducted new discovery and redeposed witnesses under a continuance in response to the untimely designation, this would have resulted in additional delay and increased the expense of defending the lawsuit"); *Binh Hoa*, 2019 WL 1436375 at *20 ("Ordering another continuance would only serve to reward Plaintiff for his dilatory conduct and

failure to comply with court-ordered deadlines and this district's Local Civil Rules and result in additional delay and expense. Regardless, it is not incumbent on the court to award litigants for failing to develop their cases"). A simple collection action like the Adversary Proceeding should not be continually extended simply because the defendant is unsatisfied with its defenses and the evidence adduced in discovery.

57.    For these additional reasons, NexPoint fails to demonstrate good cause to excuse it from the deadlines set forth in the Scheduling Order. Accordingly, the Motion should be denied.

**C.    <u>HCRE's and HCMS's Joinders Have Even Less Merit than the<br>Motion and Should Be Denied</u>**

58.    The Joinders are even more frivolous than the Motion. In addition to the reasons set forth above, neither HCMS nor HCRE was ever a party to any shared services agreement with Highland, let alone the SSA that is the foundation of the Motion. Accordingly, the Joinders are without merit and should be summarily denied by the Court.

<div align="center"><u>CONCLUSION</u></div>

For the foregoing reasons, Highland respectfully requests that the Court (i) deny the Motions and (ii) grant such other and further relief as the Court deems just and proper.

<div align="center">17</div>

Dated:  December 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
              jmorris@pszjlaw.com
              gdemo@pszjlaw.com
              hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
E-mail:    MHayward@HaywardFirm.com
              ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

18

# EXHIBIT 17

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                    )    Case No. 19-34054-sgj-11
In Re:                              )    Chapter 11
                                    )
HIGHLAND CAPITAL                    )    Dallas, Texas
MANAGEMENT, L.P.,                   )    Monday, December 13, 2021
                                    )    10:30 a.m. Docket
          Debtor.                   )
_____    )
                                    )
HIGHLAND CAPITAL                    )    Adversary Proceeding 21-3005-sgj
MANAGEMENT, L.P.,                   )
                                    )    MOTION TO EXTEND EXPERT
          Plaintiff,                )    DISCLOSURE AND DISCOVERY
                                    )    DEADLINES
v.                                  )
                                    )
NEXPOINT ADVISORS, L.P.,            )
et al.,                             )
                                    )
          Defendants.               )
_____    )
                                    )
HIGHLAND CAPITAL                    )    Adversary Proceeding 21-3006-sgj
MANAGEMENT, L.P.,                   )
                                    )    MOTION TO EXTEND EXPERT
          Plaintiff,                )    DISCLOSURE AND DISCOVERY
                                    )    DEADLINES
v.                                  )
                                    )
HIGHLAND CAPITAL                    )
MANAGEMENT SERVICES, INC.,          )
et al.,                             )
                                    )
          Defendants.               )
_____    )
```

2

1 )
HIGHLAND CAPITAL           )        **Adversary Proceeding 21-3007-sgj**
2 MANAGEMENT, L.P.,         )
                           )        MOTION TO EXTEND EXPERT
3         Plaintiff,        )        DISCLOSURE AND DISCOVERY
                           )        DEADLINES
4 v.                        )
                           )
5 HCRE PARTNERS, LLC        )
  (n/k/a NEXPOINT REAL      )
6 ESTATE PARTNERS, LLC),    )
                           )
7         Defendant.        )
  _____  )
8
                    TRANSCRIPT OF PROCEEDINGS
9          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                UNITED STATES BANKRUPTCY JUDGE.
10
11 WEBEX APPEARANCES:

12 For the Debtor-Plaintiffs:  Hayley Winograd
                               PACHULSKI STANG ZIEHL & JONES, LLP
13                             780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
14                             (212) 561-7700

15 For NexPoint Advisors,      Davor Rukavina
   LP:                         Julian Preston Vasek
16                             MUNSCH HARDT KOPF & HARR, P.C
                               500 N. Akard Street, Suite 3800
17                             Dallas, TX  75201-6659
                               (214) 855-7587

18 For HCMS and HCRE:          Michael P. Aigen
                               Deborah Rose Deitsch-Perez
19                             STINSON LEONARD STREET
                               3102 Oak Lawn Avenue, Suite 777
20                             Dallas, TX  75219
                               (214) 560-2201
21
22 Recorded by:                Michael F. Edmond, Sr.
                               UNITED STATES BANKRUPTCY COURT
23                             1100 Commerce Street, 12th Floor
                               Dallas, TX  75242
24                             (214) 753-2062

25

3

Transcribed by:            Kathy Rehling
                           311 Paradise Cove
                           Shady Shores, TX  76208
                           (972) 786-3063

            Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.

Appx. 01737

4

1          DALLAS, TEXAS - DECEMBER 13, 2021 - 10:55 A.M.

2          THE COURT:  I will now take up the Highland three

3   motions to extend expert deadlines.  So let me get appearances

4   from lawyers.  First, who do we have appearing for the Debtor

5   this morning?

6          MS. WINOGRAD:  Good morning, Your Honor.  My name is

7   Hayley Winograd of Pachulski Stang Ziehl & Jones appearing on

8   behalf of Highland.

9          THE COURT:  Okay.  Good morning.  For NexPoint

10  Advisors, who do we have appearing?

11         MR. RUKAVINA:  Your Honor, good morning.  Davor

12  Rukavina and Julian Vasek.

13         THE COURT:  Good morning.  All right.  For HCMS and

14  NPRE, who do we have appearing?

15     (No response.)

16         THE COURT:  Okay.  Maybe I should say these names in

17  full.

18         MS. DEITSCH-PEREZ:  I apologize, Your Honor.  This is

19  Deborah Deitsch-Perez.  I believe Michael Aigen will be

20  appearing for HCRE and HCMS.  And I wonder if he's having

21  technical difficulties.  I saw him on the line a few minutes

22  ago.  I'm going to go off and call to make sure that there

23  isn't a problem.

24         THE COURT:  Okay.

25         MR. RUKAVINA:  But Your Honor, I'll be handling the

<div align="right">5</div>

1   bulk of the arguments, and Mr. Aigen will cover a much smaller

2   amount.

3            THE COURT:  Okay.  Well, we'll --

4            MR. AIGEN:  Your Honor, this is Michael Aigen.  Are

5   you able to hear me now?

6            THE COURT:  I can hear you now.

7            MR. AIGEN:  I apologize.  Michael Aigen for HCMS and

8   HCRE.

9            THE COURT:  All right.  I presume those are our only

10  formal appearances, but is there anyone else who wished to

11  appear?

12       (No response.)

13           THE COURT:  All right.  Well, Mr. Rukavina, I'll hear

14  your argument.

15           MR. RUKAVINA:  Thank you, Your Honor.

16      I'm sure that the Court has read our papers, and by this

17  motion we seek to extend the expert deadline so that we can

18  retain Steven Pully as our expert on the standard of care.

19  Mr. Pully is on the video.  I can see him right now.  So, good

20  morning, Mr. Pully.

21      And Your Honor, I'd like for you to be aware that Friday

22  evening I did file on the docket Mr. Pully's report.

23  Obviously, the Court hasn't granted this motion, but I wanted

24  the Court to know that we moved as rapidly as possible, and

25  Mr. Pully has now finalized his report.  So there's no future

6

 1   need for additional time on my end if the Court grants this

 2   motion.

 3        Your Honor, before I get to the actual merits of this

 4   motion, I feel it important to address a hearing that occurred

 5   a few weeks ago that I was not present at because this motion

 6   was discussed briefly at the end.  This was a hearing held on

 7   Ms. Deitsch-Perez's motion to dismiss and compel arbitration.

 8        And Mr. Vasek, if you could please pull up the transcript

 9   of that and scroll down to near the end where this motion is

10   discussed.

11        Your Honor will maybe recall that we have the transcript

12   where Ms. Deitsch-Perez mentioned as a scheduling matter that

13   this motion had been filed.  And the Court says, What on earth

14   does that have to do with this litigation?  I don't mean to be

15   flippant and laugh, but what on earth does that have to do

16   with notes?

17        And if we scroll down some more, Your Honor, Ms. Deitsch-

18   Perez was attempting to explain to the Court the purpose of

19   this motion, and the Court notes that, It sounds like you're

20   talking about an affirmative defense that hasn't been

21   articulated yet.

22        And if we scroll down some more, Ms. Deitsch-Perez

23   attempts to tell the Court that, in fact, this is an

24   affirmative defense that has always been asserted.

25        And the Court notes there in her dialogue with Ms.

7

1   Deitsch-Perez that, I'm just letting you know you have a very

2   uphill battle convincing me that experts regarding shared

3   services agreements would be germane.

4        And the Court goes on to say that it has heard a lot about

5   shared services agreements during the past few years,

6   including experts on the witness stand in the *Acis* case.  And

7   the Court notes that, Under the pleadings as now in the

8   record, I just can't imagine why experts on shared services

9   agreements are going to be relevant evidence.

10        I think, Mr. Vasek, you can pull that down.

11        And I point this out only because, again, I know that the

12   Court has prepared for this hearing, but this is an

13   affirmative defense that has always been pled from the

14   beginning.  It does not involve the interpretation of the

15   contract.  We're not talking about the shared services

16   agreement.  We're not talking about the contract.  And recall,

17   Your Honor, that both Your Honor and the District Courts have

18   agreed that jury rights do attach here.  So the question

19   really is not the Court's familiarity with shared services

20   agreements but whether expert testimony will be relevant to

21   help the jury.

22        So, what is that expert evidence, Your Honor, and how did

23   this arise?  NexPoint is the obligor, the maker on a $30

24   million note -- I'm using round numbers -- and that note had

25   been paid down to some $24 million.

8

1      The note purports to require a payment every year on

2  December the 31st.  And in the year 2020, although we argued

3  that the payment was prepaid, that payment was not made

4  timely.  It was made a couple weeks later, when Mr. Dondero

5  realized what had happened.

6      Our version, NexPoint's version of why this payment did

7  not happen has until recently been that the Debtor dropped the

8  ball.  Under the shared services agreement, and as Mr. Dondero

9  and Mr. Frank Waterhouse, the Debtor's former CFO, confirmed,

10  the Debtor was for years responsible to facilitate the annual

11  payment.  The Debtor didn't pay from its own funds.  It would

12  pay it from our funds.  But that was both in the contract and

13  that was the practice.  Again, Mr. Waterhouse -- and Your

14  Honor has seen in my papers and in his transcript -- confirmed

15  that it was reasonable for NexPoint to rely on the Debtor to

16  ensure that this payment would be made.

17      So Mr. Vasek, if we can pull up the shared services

18  agreement here.

19      I know that the Court likes to look at contracts, so I

20  will briefly take Your Honor through some of the pertinent

21  provisions, because this relates to directly to Mr. Pully.

22      And Mr. Vasek, if you'll please scroll down to the

23  definitions of Covered Person.

24      And Your Honor can read it for herself.  This is just a

25  definitional that we need as we go forward.   But Covered

9

1    Person means the staff and services provider.  That is
2    Highland.  That is the Debtor.  And it includes managers,
3    members, employees, et cetera.  Well, that would be Mr. Frank
4    Waterhouse.  Mr. Waterhouse at that time was the Debtor' chief
5    financial officer, and he was also an officer of NexPoint.  So
6    he, like many people here, wore two hats.
7        Mr. David Klos at that time was the controller for
8    Highland, and Ms. Kristin Hendrix was a senior accountant at
9    Highland.  Both Mr. Klos and Ms. Hendrix were providing the
10   services we're going to discuss.
11       If you'll scroll down, Mr. Vasek.
12       The next provision, Your Honor, relates to what services
13   were being provided.
14       Scroll up just a -- just a tad.
15       So you'll see under Section 2.02 the parties are now
16   agreeing here's the services that Highland will be provided.
17   And it's important to note, Your Honor, that at this time this
18   agreement was in place.  This agreement was terminated I want
19   to say at the end of February this year.  But in December and
20   November of 2020, this agreement was in place.
21       And if the Court looks at the services being provided, the
22   first one there is assistance and advice.  That word "advice"
23   is important.  Assistance and advice with respect to various
24   things.  And you see down there those things include finance
25   and accounting, payments, bookkeeping, cash management, cash

10

1    forecasting, accounts payable, et cetera.

2        Keep scrolling down, Mr. Vasek.  Obviously, as the Court

3    very well knows, the Debtor was also providing legal services.

4        And if you keep scrolling down, Mr. Vasek, to the next

5    page, there you go, to K and L.

6        These are more catch-all.  So if the language of what I

7    just showed you is not express or specific enough, here you

8    have these catch-alls, such as advice on all things ancillary

9    or incidental to the foregoing and advice relating to other

10   back- and middle-office services in connection with the day-

11   to-day business.

12       So, again, we're not here today, we're not asking the

13   Court to decide, nor do I think that it would be this Court to

14   decide, whether the Debtor had a duty to facilitate the

15   December payment.  I'm just pointing out that we have, I think

16   anyone would agree, at least a *prima facie* colorable argument

17   that the Debtor would have such duty.

18       And just to address an issue that the Debtor raised, Mr.

19   Vasek, if you'll scroll down to 6.01, and then if you'll zoom

20   in.

21       Here, now, Your Honor, is the language that is of

22   relevance, the direct relevance.  So we've seen that Covered

23   Person is defined, and we have seen that -- and we can now see

24   that this agreement requires Covered Person -- that includes

25   the Debtor; that includes Mr. Waterhouse; that includes Mr.

11

1   Klos -- to discharge its duties under this agreement.  We've

2   seen that there's certainly a colorable argument that the

3   duties under this agreement include facilitating payments and

4   advice with payments and accounts payable and the like, and

5   that the Debtor has to discharge its duties with the care,

6   skill, prudence, and diligence under the circumstances then

7   prevailing that a prudent person acting in a like capacity and

8   familiar with such matters would use in the conduct of an

9   enterprise of a like character and with like aims.

10      That, Your Honor, is what we need the expert on.  Not to

11   tell the jury what this contract says, not to tell the jury

12   that the Debtor had a duty, but to look at, under the facts,

13   did the Debtor's performance or lack thereof -- and I'll tell

14   you why that's important in a moment -- did that performance

15   or lack thereof comport with this standard of care?

16      This is a matter for an expert.  The average juror, the

17   average layperson, myself, I would not know what the care,

18   skill, prudence, and diligence of a reasonable prudent person

19   in this situation would be.  I can theorize on that.  I can

20   opine on that.  I'm not an expert on that.  This is a matter

21   for an expert, the same as with medical malpractice, legal

22   malpractice, breach of fiduciary duty.

23      While we're on this agreement, just to address another

24   argument that the Debtor makes, the Debtor says that this

25   agreement exculpates negligence.

12

1      Mr. Vasek, if you'll please scroll down to the
2  exculpation.
3      And there is an exculpation provision.  But if Your Honor
4  -- and it does exculpate negligence.  It doesn't exculpate
5  gross negligence, et cetera.  But it talks about that only
6  acts or omissions -- it's Romanette (i) -- acts or omissions
7  arising out of or in connection with the conduct of the
8  business of the management company that is exculpated.  Again,
9  we're not here today to decide what this means, but the
10  business of NexPoint is not note-making; the business of
11  NexPoint is advising thousands of investors and funds with
12  respect to a billion dollars of investments.
13      It is -- the Debtor does have an argument, and either the
14  Court or the jury will have to decide whether this exculpation
15  provision applies.  And then if -- and you can remove this,
16  Mr. Vasek -- the Debtor likewise says that the agreement's
17  indemnification provision prohibits this argument.  We pointed
18  out in our briefing, Your Honor, that, in fact,
19  indemnification under Texas law does not apply to the parties
20  to the contract.  It applies to claims made by third parties.
21  But, again, that's an argument that the Debtor has.
22      So we have this contract in place.  Late November/early
23  December rolls around, and both Mr. Dondero and Mr. Waterhouse
24  testify that they had a meeting.  What was said at that
25  meeting is in dispute.

13

1      Mr. Dondero believes that he told Mr. Waterhouse, stop

2  paying on the shared services agreement.  It's NexPoint's

3  position -- Your Honor knows we filed an administrative claim

4  -- it's NexPoint's position that it had overpaid millions of

5  dollars under the shared services agreement, in part because

6  many of the employees of the Debtor that we were supposed to

7  be paying our respective share of weren't there anymore.  So

8  Mr. Dondero says to Mr. Waterhouse, stop paying on this shared

9  services agreement.

10      Those are the facts as we knew them going into late

11  October.  Based on that fact, and based on the fact that the

12  Debtor did not facilitate the payment, we've always asserted

13  as an affirmative defense that our lender, who is also our

14  lawyer, who's also our accountant, who's also our treasury

15  management people, and who have always facilitated these

16  payments in the past, dropped the ball.  They committed simple

17  negligence, they dropped the ball, thereby causing the alleged

18  default.

19      We did not need an expert opinion on that at that time.

20  You've seen in my reply briefing, Your Honor, that, in fact,

21  the Fifth Circuit holds in multiple instances that when it's

22  simply a matter of missing a deadline -- a lawyer missing

23  limitations, if you will -- expert testimony is not required,

24  and in fact may be inappropriate because a lay person can

25  figure out that, a lay juror can figure out that, well, if you

14

1   just simply didn't do something, whether that's -- whether
2   that comports with the standard of care or not.
3       On October the 19th of this year, the Debtor and we
4   deposed Mr. Waterhouse.  And Mr. Waterhouse had a different
5   testimony.  He had a different recollection of that meeting.
6   Mr. Waterhouse said that Mr. Dondero told him in late November
7   or early December, don't make this NexPoint payment.  In other
8   words, that Mr. Dondero expressly said the payment that's
9   coming up for NexPoint, do not make this payment.
10      That was news to us.  I was so surprised by that testimony
11  that I actually asked Mr. Waterhouse that question four times.
12  And opposing counsel actually got angry at me, kept saying,
13  how many times are you going to keep asking this question?  I
14  was surprised.
15      I was not able to talk to Mr. Waterhouse meaningfully
16  before that.  Mr. Waterhouse has attorneys, Mr. Waterhouse is
17  in litigation with the Debtor, and those attorneys require
18  that I not communicate with him directly, I communicate only
19  through them.  I never took up the chance to ask them about
20  this meeting because the only information that I had and that
21  my client had was that there was no such instruction.  The
22  Debtor may or may not have been surprised as well.
23      Mr. Vasek, if you'll please pull up discovery.
24      Your Honor, we're sharing with you now certain of the
25  discovery in this case -- in particular, the Debtor's

15

1  responses.

2      And if you'll go to Interrogatory No. 1, Mr. Vasek.

3      So, Your Honor obviously can read this.  But I ask the

4  Debtor, if it contends that it was not responsible for making

5  payments under the note on NexPoint's behalf, please explain

6  the legal and factual basis for such contention.  I asked for

7  a factual basis as well.  And Your Honor can see in the

8  response that the Debtor objects, the Debtor says that it was

9  not required to make the payment, but nowhere here does the

10 Debtor say that it had received an instruction not to make the

11 payment.

12     Pardon me, Your Honor.

13     This was, I believe, from May or June.  In any event, it

14 was early in this litigation.  Nowhere here am I put on any

15 kind of notice that it's the Debtor's position that it

16 received an instruction not to make the payment.

17     If we scroll down to Request for Production, I believe

18 it's No. 1, Mr. Vasek.

19     Here, we -- I ask for all communications pursuant to which

20 the Debtor was advised or instructed not to make the payment

21 or to cause the payment to be made.  And the Debtor's answer

22 includes the following:  Any communications responsive to

23 Request for Production No. 1 were verbal.

24     Okay.  I had to await depositions.  That's fine.  I had

25 asked in an interrogatory, I didn't get a factual response,

16

1   and then I'm now being told that any communications were
2   verbal.
3        Now, the Debtor may not have known about Mr. Waterhouse's
4   instruction, it may not have, in which case I don't think it's
5   fair to accuse NexPoint or its counsel of dropping the ball.
6   Or the Debtor may have known of the instruction, in which case
7   the Debtor should have answered Interrogatory No. 1 factually
8   by saying, oh, wait, not only were we not required to make the
9   payment, et cetera, et cetera, but we received an instruction
10  from your boss, NexPoint, not to make the payment.
11       You can remove that.
12       So, here we go into October 19th.  We depose Mr.
13  Waterhouse.  We now see that, in fact, I guess it's -- I
14  forget who -- who the author is, but the plot has thickened.
15  The situation is now much more complicated.  Whereas
16  previously we argued that the Debtor had dropped the ball, the
17  question now is, okay, if in fact the jury believes that Mr.
18  Dondero went to Mr. Waterhouse and said, don't make this
19  payment, did that discharge the Debtor's duties as specified
20  by the contract or not?
21       It's our belief that it did not.  It's our belief that Mr.
22  Waterhouse should have, at a minimum, asked Mr. Dondero after
23  that, did I get you right, Jim?  Did I understand correctly?
24  Did you mean not to make this payment?  It's our belief that
25  the Debtor -- our legal advisers, our accountants, people that

1    are supposed to advise us -- should have called back and said,

2    Jim, you know that if you don't make this payment you're going

3    to have a note accelerated and it's going to be $24 million.

4    They should have advised Mr. Dondero of the potential

5    consequences, especially given their clear conflict of

6    interest.

7        At the same time, they're our lender to the tune of $24

8    million, and they're providing us all this assistance and

9    advice that we're paying millions and millions of dollars for.

10       And then also, if Mr. Dondero gave such an instruction,

11   did the Debtor have some duty to try to dissuade him by

12   saying, Jim, you're being a hothead, this is a very serious

13   matter, it's only $1.4 million, make the payment?  In fact, we

14   did make the payment in January, after this issue was learned

15   about.  But the Debtor didn't do any of those things.

16       So, again, the question now is, did the Debtor's lack of

17   any subsequent follow-up -- putting its head in the sand, so

18   to speak -- did that comport with the duties as specified,

19   what would a reasonable person discharging his or her duties

20   under the facts and circumstances in that industry then in

21   place, what should or would have such a reasonable person

22   done?  That's where Mr. Pully comes in.

23       I deposed Mr. Seery a few days after this deposition and I

24   asked him about this, and Mr. Seery said that no, in his view,

25   Mr. Waterhouse acted perfectly appropriately, that Mr.

1   Waterhouse had no duty to seek clarification or explain the

2   ramifications or anything else.  And it was clear to me that

3   Mr. Seery is going to testify to that effect.

4        So at that point in time, now that we knew Mr.

5   Waterhouse's testimony, we decided that it is not only

6   advisable but perhaps necessary to retain an expert.  And we

7   moved very quickly.  I have had the fortune of working with

8   Mr. Pully before, so I knew him.  I was able to rapidly retain

9   him because of our prior familiarity with each other.  Mr.

10  Pully reviewed all the transcripts.  He reviewed the

11  discovery.  He prepared a full and final report.  So, from

12  beginning to end, we were done in maybe five weeks, maybe six

13  weeks.

14       And we're not proposing, Your Honor, that the Debtor

15  doesn't have whatever time it needs to prepare a rebuttal.

16  We're not proposing that the Debtor can't depose Mr. Seery

17  [sic].  Of course it can.

18       So where this adversary proceeding now is is that

19  discovery is over.  The Debtor will be filing by December the

20  17th a motion for summary judgment.  Your Honor will recall

21  that Your Honor approved a scheduling order on that.  And

22  there will be hearings before this Court on summary judgment,

23  and perhaps opposing counsel can remind me, but it's going to

24  be in late January, or I'm going by memory here, maybe early

25  February.

1      So that is, Your Honor, what happened.  That is how it

2  happened.  It's the truth.  It's -- there's no laying behind

3  the log here.  There's no litigation decisions that are now

4  backfiring and we're trying to get out of them.  What happened

5  here is exactly what should happen in a lawsuit like this,

6  where discovery has illuminated various issues and now we have

7  to deal with the consequences of that discovery as we prepare

8  for trial.

9      October the 29th was the date in the scheduling order to

10 disclose experts and provide their reports.  Mr. Pully

11 couldn't even hypothetically do that in time since I had

12 retained him a few days before that.  But we moved very

13 quickly to file this motion, to file it before the deadline

14 actually expired, in hopes, again, of not -- not only of

15 showing Your Honor that we moved diligently and rapidly when

16 this issue unfolded, but also that we didn't need *nunc pro*

17 *tunc* relief.

18     So, Rule 16 does apply.  The good cause requirement does

19 apply.  But this is not some talismanic super-high burden to

20 meet.  Yes, there's a burden.  Yes, I must demonstrate to Your

21 Honor why leave based on good cause is required.  But we're

22 not trying to unscramble the eggs, and we're not seeking

23 something extraordinary or exotic here.

24     The Fifth Circuit has specified the four factors that the

25 Court should look at.  In the Fifth Circuit cases that we've

1   seen and that we've briefed, the deadline had already expired

2   and the people were seeking *nunc pro tunc* relief.  I don't

3   think we have that high of a burden here, but even if we do,

4   we've analyzed those four factors.

5       And the first factor is the explanation for the lateness.

6   Again, did NexPoint act diligently?  Did NexPoint hide behind

7   the log?  Is there some litigation strategy here that has

8   backfired?  None of that, Your Honor, is present.  There's

9   been no delay.  We deposed, pursuant to agreed deposition

10  schedules, we deposed all of the main witnesses in October.

11  When we deposed Mr. Waterhouse, this issue arose.  We moved as

12  rapidly as we could thereafter.  And you've seen, Your Honor,

13  in the interrogatory answer, that if the Debtor knew about

14  this instruction, then, really, the Debtor should have

15  answered its interrogatory to say, we got an instruction not

16  to pay and that's why we didn't pay.

17      Maybe the Debtor -- maybe the Debtor didn't know that.

18  But when we deposed Mr. Klos and Ms. Hendrix, who are still

19  employees of the Debtor, they testified that they heard Mr.

20  Waterhouse tell them that in late November last year.  So they

21  -- they testified that in late November last year Frank

22  Waterhouse told them, Jim Dondero told me, don't make this

23  payment.

24      So, even if the Debtor didn't know what Mr. Waterhouse

25  would testify to, Mr. Klos and Ms. Henderson [sic] did.

21

1          Again, I am not pointing the fingers here at the Debtor.

2     I'm not saying that their answer to Interrogatory No. 1 was

3     manipulative, that it was calculated to deceive.  I'm not

4     suggesting that.  I'm just suggesting that, had the Debtor

5     given a more fulsome answer, we would have immediately

6     investigated and immediately retained an expert back in May or

7     June of this year.

8          The next element, or the next factor, rather, is the

9     importance of this extension.  And Your Honor, we have quoted

10    at length Fifth Circuit opinions that say that when the

11    standard of care is involved, expert opinion is appropriate

12    and may be required.

13         It goes back to, again, if the Debtor just dropped the

14    ball and didn't facilitate the payment, that's easy.  That

15    doesn't need an expert.  But if the Debtor was instructed by

16    Mr. Dondero not to make the payment and there was a month left

17    before the payment was to be made, did the standard of care as

18    specified in the contract require the Debtor to do something

19    that it failed to do?

20         So we are talking about the standard of care.  That is

21    appropriate expert testimony.  It may be required.  And it is

22    not something that I can argue to a lay juror just based on a

23    deadline being missed.

24         So, yes, this -- the relief we're seeking is important,

25    especially given the jury nature of this trial.

22

1      The third factor is the potential prejudice.  So, the
2  Debtor says, well, this will increase costs.  Yes, it will.
3  But costs alone is not the legally -- the legal standard here.
4  Every litigation has costs.  Every litigation has burdens.
5  And if the Debtor prevails in this lawsuit, they will claim
6  attorneys' fees and costs.  They're entitled to that under the
7  note and under Texas law.

8      So there will be an incremental cost for the Debtor to
9  retain an expert, but that would have been present as of
10 October the 29th anyway.

11     Remember, I filed this motion on the deadline.  We're
12 seeking six weeks of delay here.  This is not late-stage
13 litigation where all the facts are known, all the witnesses
14 have been deposed, everyone's ready for trial, and suddenly a
15 party seeks to increase its opponent's litigation costs here
16 with a last-second expert.  This is not that case.

17     So, there is no prejudice, at least not in the legally
18 relevant way by way of costs, nor is there any prejudice by
19 delay.  And this also ties into the fourth factor, which
20 discusses a continuance.  There is no prejudice here because
21 we're not trial-set.  We don't know when we're going to be
22 trial-set.

23     Even if the Court denies summary judgment in whole or in
24 part at the end of January or early February -- which I don't
25 think that's very realistic because I think the Court is going

23

1   to want to think about it some, the Court is going to want to

2   prepare a report and recommendation -- this is not going to be

3   a straightforward summary judgment proceeding.

4       What is also out there is that the Debtor has filed a

5   motion to consolidate all these note cases in front of one

6   District Court judge.  That's going to have to be reviewed by

7   the District Court judges and ruled on.

8       So we are months, months away from being trial-ready, and

9   then we don't know how long it's going to be before we're up

10  for a week or two long jury trial.  No one knows that.  That

11  is plenty of time for the Debtor to get a rebuttal expert.

12  It's plenty of time for the Debtor to depose Mr. Pully.  It's

13  plenty of time for everything to come to play so that this

14  case will be certified trial-ready, irrespective of whether

15  there's an expert or not.  This is not going to delay the

16  process.  We're not seeking to delay the process.

17      Nor are we seeking to derail the summary judgment

18  proceedings.  If the Debtor wants to retain an expert for

19  summary judgment proceedings, that just proves that there is a

20  question of fact here that precludes summary judgment.

21      But as far as continuance or trial-setting, that's just

22  not present here.

23      And I've quoted Your Honor at length a District Court's

24  opinion from the Eastern District of Texas that talks about

25  prejudice, that talks about costs.  And that judge basically

1    said, look, when it's -- when it's an affirmative defense that

2    you've known that since the beginning, which the Debtor has

3    known here since the beginning, then, really, it's not a last-

4    second tactic.  It's not real prejudice.  Yeah.  Yeah, there's

5    a delay.  Yeah, there's an increased cost.  But the plaintiff

6    is now trying to fundamentally change this lawsuit, to

7    fundamentally interject something new here.  The plaintiff

8    just needs some more time.  And the question is, should the

9    plaintiff have more time?

10        Your Honor, those are the factors.  We have -- we have the

11   exhibits.  We have the record prepared.  It's a part of the

12   motion and the Debtor's response.  And Your Honor, we ask that

13   the Court grant this motion -- again, reminding the Court that

14   this does relate to an affirmative defense that's been around

15   since the beginning.  It does relate to one that was -- only

16   -- only really became the subject of expert testimony in late

17   October.  And it's only because discovery in this case worked

18   as it should.  No one laid behind the log.  No one made a

19   calculated decision that has backfired.  No one delayed

20   anything or was less than diligent.

21        Under these circumstances, Your Honor, because the point

22   of a trial in front of a jury is to get to the truth and it's

23   to enable the jury to have what it needs to make a true, full,

24   and informed decision, we believe that good cause exists, and

25   we'd ask -- NexPoint would ask that the Court grant this

25

 1 | motion.

 2 |         THE COURT:  All right.  Thank you.

 3 |     I'll ask Mr. Aigen, does he have anything he wants to

 4 | supplement with?

 5 |         MR. AIGEN:  Yes, Your Honor.  I can make a very quick

 6 | argument here.

 7 |     As you know, HCMS and HCRE have filed a joinder, asking

 8 | for the same relief.  The only thing I want to quickly point

 9 | out is that the only difference between our clients and Mr.

10 | Rukavina's client is the lack of a written services agreement.

11 | But I would point out, as the evidence we submitted in our

12 | briefing shows, the undisputed testimony is that there was an

13 | oral agreement to provide these services, that the Debtor did

14 | provide these same exact services that they provided from --

15 | for NexPoint to HCMS and HCRE, that they had done this for

16 | years, and this included making loan payments.

17 |     So I just wanted to point that out, and I think what this

18 | means is that, for the same reasons that Mr. Rukavina asked

19 | for this relief, we believe we are entitled to the same

20 | relief.  And I won't bother to go through all the same

21 | arguments that Mr. Rukavina just made to the Court.  So that's

22 | all I have, Your Honor.

23 |         THE COURT:  All right.  Thank you.  Ms. Winograd?

24 |         MS. WINOGRAD:  May it please the Court?

25 |         THE COURT:  You may proceed.

1          MS. WINOGRAD:  Your Honor, the motion should be

2     denied because there is no good cause for modifying the

3     scheduling order.  The motion is untimely.  The expert

4     testimony Defendants seek to gather is both improper and

5     irrelevant.  And if the motion is granted, Highland will be

6     prejudiced.

7          This is -- this adversary -- adversary proceeding is a

8     garden-variety collection action on a simple note, it has been

9     going on for roughly a year, and it continues to get delayed

10    due to unnecessary and costly motion practice.  Defendants'

11    latest motion is not only another delay tactic, but it is also

12    completely unsupported.

13         And before I tell you why it is unsupported, I want to

14    take a step back and just summarize the context of Defendants'

15    motion.  Defendants have always and continue to assert the

16    same affirmative defense, which is that their default under

17    the note was the result of Highland's negligence under the

18    shared services agreement.  It is Defendants' position that

19    before Mr. Waterhouse's deposition an expert was not needed to

20    testify regarding Highland's duties under the shared services

21    agreement.

22         Mr. Waterhouse then testified that Mr. Dondero gave him

23    instruction not to make a payment under the note.  It is now

24    Defendants' contention that, solely in light of this

25    testimony, all of a sudden an expert is needed to testify

1   regarding whether Highland owed an affirmative duty under that

2   same shared services agreement to ask Mr. Dondero if he

3   understood the implications of his instruction, and if so, if

4   Highland breached such a purported duty.

5        First of all, Your Honor, based on the clear terms of the

6   shared services agreement, there is no affirmative duty for

7   Highland to ask Mr. Dondero if he understood the implications

8   of his own instruction.

9        Moreover, Your Honor, the question of what Highland's

10  duties are is a legal issue reserved for the Court, and the

11  issue of whether Highland breached -- and Highland submits

12  there was no such breach -- but that issue is reserved for the

13  jury.

14       Your Honor, if expert testimony wasn't needed before, it

15  is not needed now.

16       This Court entered a scheduling order in September of

17  2021.  Under Rule 16(b) of the Federal Rules of Civil

18  Procedure, an existing scheduling order can only be modified

19  upon a showing of good cause.  The purpose of Rule 16 is for

20  the Court to prevent unforeseeable and never-ending litigation

21  expenditures.

22       So the critical question before Your Honor today is

23  whether there is good cause to modify the scheduling order.

24  And Highland submits there is not.

25       Courts consider four general factors to determine whether

1   there's good cause.  It's the party's explanation for failing

2   to previously identify the witness.  It's the importance of

3   the witness's testimony.  And it's the prejudice to the other

4   side in allowing the testimony.  All of these factors weigh in

5   favor of denying the motion.

6       Regarding the first factor, Defendants' explanation for

7   failing to previously identify the witness is entirely without

8   merit.  Again, NexPoint first raised its affirmative defense

9   that its default under the note was the result of Highland's

10  own negligence back in March of 2021.  In other words,

11  NexPoint had nine months to retain an expert to testify

12  regarding Highland's duties for nine months.

13      NexPoint seeks to create -- to distinguish between these

14  notions of Highland somehow, quote, dropping the ball versus

15  Highland not asking Mr. Dondero if he understood the

16  implications of his own instruction.  Defendants cite no

17  authority in support of the notion that one of these factual

18  circumstances would somehow require an expert but that the

19  other would not.

20      What this comes down to, Your Honor, is that Defendants

21  are using this testimony as an excuse to muddy the water, to

22  muddy the waters as to the critical issues in this case and as

23  a latch-ditch attempt to bolster their defense.

24      I don't want to bog you down with case law that's already

25  cited in our brief, but I want to flag a particularly on-point

1   case, and that is *Reliance*, 110 F.3d at 257.  The Fifth

2   Circuit affirmed the lower court's denial of a party's motion

3   to modify the scheduling order when that -- when a deposition

4   didn't go well, specifically holding District Courts have the

5   power to control their dockets by refusing to give ineffective

6   litigants a second chance to develop their case.

7        The suggested expert testimony also is improper as a

8   matter of law.  It is well-settled law in the Fifth Circuit

9   that an expert cannot testify regarding the scope of a party's

10  contractual duties under an agreement and whether that party

11  fulfilled such duties.  And that is exactly what NexPoint and

12  Defendants are trying to do here.  It is trying to have its

13  expert interpret the terms of a shared services agreement and

14  testify regarding Highland's duties thereunder and ultimately

15  whether it thinks Highland breached those duties.

16       This is an improper subject for expert testimony and

17  precisely the type of expert testimony that the Northern

18  District of Texas rejected in *Panhandle* and which the Fifth

19  Circuit affirmed the rejection of in *Askanase*, two cases cited

20  in our papers.

21       Even if the suggested expert testimony were proper, which

22  it is not, it is also irrelevant.  In order to be relevant,

23  expert testimony must assist the trier of fact understand a

24  complex or distinct issue in a case.  Here, the critical issue

25  for Defendants is whether they can prove that their default

1   under the note was the result of Highland's negligence.  This

2   issue is well within the common understanding of a lay person.

3       Again, this is a garden-variety collection action.  All of

4   the cases NexPoint cites in its papers in support of the

5   notion that expert testimony is required, all of those cases

6   involve professional malpractice cases, whether legal or

7   medical.  And in those cases, an expert was required to

8   testify regarding the general standard of care in a particular

9   industry.

10      Here, NexPoint doesn't seek to have an expert testify

11  regarding the general standard of care in a particular

12  industry.  That is not an issue in this case.  And this

13  certainly is not a professional malpractice case.

14      NexPoint seeks to have its expert opine as to the scope of

15  Highland's legal duties in a shared services agreement and

16  ultimately whether Highland breached the purported duties,

17  which, again, we submit it did not.

18      The other case NexPoint cites to, *In re Schooler,* that

19  case also doesn't support Defendants' position, and in fact

20  supports Highland's position.  In that case, the Fifth Circuit

21  noted, and I quote, Expert testimony is not needed in many, if

22  not most, cases.

23      I also want to briefly address NexPoint's argument raised

24  for the first time in its reply that Highland was also acting

25  as an attorney to Defendants during this time.  As a

1    procedural matter, this argument is entirely improper because

2    it is not proper to raise an argument for the first time in a

3    reply.

4        And on the merits, again, this is not a professional

5    malpractice case.  So for these reasons alone, such a

6    contention should be summarily disregarded by the Court.

7        Finally, Your Honor, Highland would suffer prejudice if

8    the motion is granted because it would be forced to expend

9    significant and costly resources responding to the testimony

10   in the form of retaining a rebuttal expert, taking and

11   defending additional depositions, and engaging in more motion

12   practice.  This would be a waste of resources for both parties

13   and for the Court because this testimony isn't ultimately

14   going to be needed at trial.

15       It is improper because it opines as to the ultimate legal

16   issues in this case that are reserved for the Court and then

17   for the jury.  And it is also irrelevant because all of the

18   issues in this case are well within the common understanding

19   of a lay person.

20       I also want to note that HCRE and HCMS's motions asking

21   for the same relief are equally if not more frivolous than

22   NexPoint's because HCMS and HCRE aren't even parties to the

23   shared services agreement.  To the extent HCMS and HCRE are

24   asking an expert to testify regarding Highland's alleged

25   duties under an oral agreement, the terms of which are

 1   unknown, such a contention is frivolous on its face.

 2       But even if such an alleged oral agreement exists, which

 3   it does not, this does not change the Rule 16(b) analysis.

 4   The Defendants fail to show good cause for modifying the

 5   scheduling order.

 6       In brief, Your Honor, this motion is simply a delay

 7   tactic, the expert testimony is improper, and the motion

 8   should be denied.  Thank you.

 9           THE COURT:  Thank you.

10       All right.  Movants get the last word.  Mr. Rukavina,

11   anything further?

12           MR. RUKAVINA:  Yes, Your Honor.  Most of what

13   opposing counsel says is the topic of a *Daubert* issue.  We're

14   not seeking to prejudice *Daubert* today, and they have every

15   ability in the future to argue that Mr. Pully's testimony

16   should not be admissible.

17       Second, this is not a garden-variety case.  It is not.  It

18   is a case where, again, our lender was also our officer, was

19   providing all kinds of payment services, accounting services,

20   and legal services.  It may not be unique, it may not have

21   never happened before, but it is not a garden-variety.

22       I do take issue with the notion that there has been any

23   delay in this case.  That is not correct.  I just looked at

24   the docket again to refresh my memory.  We had a contested

25   hearing on my motion to withdraw the reference that the Debtor

33

1    objected to, arguing that 542 was a core matter.  Your Honor

2    rejected that argument, and Your Honor agreed with me, as did

3    the District Court, that the reference will be withdrawn when

4    this trial -- when this case is certified trial-ready.

5        So the notion that there has been delay, intentional delay

6    by us, that this is a matter of delay, is absolutely wrong.

7    In fact, this lawsuit has gone on quickly.  It's been handled

8    professionally.  Both sides have been cooperative, giving each

9    other various accommodations.  And I am proud, I think, of how

10   every lawyer has handled themselves in this lawsuit.  To

11   suggest delay or intentional delay is wrong.

12       On the law, Your Honor, *In re Schooler*, I heard counsel

13   argue that it's just illogical and wrong to argue that an

14   expert wasn't required in one situation but now is.  But

15   that's *In re Schooler*, the Fifth Circuit, Your Honor, 725 F.3d

16   498, that I quote at length from.  That's one where the

17   trustee dropped the ball, a Chapter 7 trustee failed to give

18   property of the estate.  And that's the one where the Fifth

19   Circuit does say, Accordingly, we have explained that, as a

20   general rule, expert testimony is not needed in many, if not

21   most, cases.  And then the Fifth Circuit says that, It

22   requires no technical or expert knowledge to recognize that

23   she -- the trustee -- affirmatively should have undertaken

24   some form of action to acquire for the bankruptcy estate the

25   assets to which it was entitled.

34

1      But, again, this is not that case.  This was that case

2  before Mr. Waterhouse testified, and now it's not.  This is

3  not a case anymore where the debtor simply dropped the ball,

4  as did that trustee, or as does the doctor who amputates the

5  wrong leg, or as does the lawyer who misses a limitations

6  deadline.  This is now a case where, if the jury believes Mr.

7  Waterhouse, the plot has thickened.

8      And finally, Your Honor, again, I'm not here to point

9  fingers, but look at the Debtor's response to Interrogatory

10  No. 1.  All that the Debtor needed to say six or seven months

11  ago to avoid this delay is that, oh, wait, we received an

12  instruction not to pay.  It would have taken ten words, one

13  sentence, by the Debtor to fully answer an interrogatory and

14  this motion would not have been necessary.

15      Thank you.

16          THE COURT:  All right.  Mr. Aigen, anything further

17  from you?

18          MR. AIGEN:  No, nothing further, Your Honor.  We just

19  join in Mr. Rukavina's reply points.

20          THE COURT:  All right.  As I understand it, the

21  deadline was October 29th for disclosure of experts, and the

22  record shows that at 5:22 p.m. on October 29th the Defendants

23  -- let me double-check that.  That was actually the

24  declaration of Mr. Rukavina.  No, 5:22 p.m. on the deadline,

25  the motion of the Defendant to extend the expert disclosure

1    and discovery deadlines was filed.

2        The legal authority that governs here is Rule 16(b).  As

3    everyone has acknowledged, it provides that deadlines in

4    scheduling orders may be modified for good cause.  I think the

5    standard does apply here.  While I guess a lot of the cases

6    analyze it in terms of a request after a deadline has expired,

7    I think a motion on the day of the deadline at 5:22 p.m. is

8    going to be governed by Rule 16(b).

9        So, as the parties have argued to the Court, the Fifth

10   Circuit has specified four factors in guiding a decision in

11   this situation:  the explanation for failure to timely move

12   for leave to amend; the importance of the amendment; potential

13   prejudice in allowing the amendment; and availability of a

14   continuance to cure such prejudice.

15       Here, as I think everyone readily acknowledges, these

16   Defendants have always asserted as a defense that the Debtor

17   dropped the ball, I think was one phrase used.  That, in any

18   event, it was the fault of the Debtor that the Defendants did

19   default on the payment of these notes.  I do not think the

20   sudden statement of Frank Waterhouse suddenly is a game-

21   changer that creates some new need for an expert.  So,

22   therefore, looking at the factors, I don't think the

23   explanation here to extend the deadlines has merit.

24       Moreover, as far as the importance of the amendment,

25   Factor No. 2, I think it is appropriate to look at the big

1    picture here a little bit, even though we're not in a *Daubert*

2    situation, and look at what the expert is argued to be needed

3    for.  And I do not think an expert can testify about

4    contractual duties and attempt to interpret its provisions.

5    That is the job of the Court, and I think it is improper

6    subject matter for an expert.

7        I don't buy into any notion that this is terribly unique

8    territory or exotic.  I mean, it was a contract.  Shared

9    services agreements are not all that unique, shall we say?

10   It's not a device that is used solely in the investment

11   advisor fund world.  It's in the corporate world generally.

12   Courts see these in all kinds of cases.  So, again, I don't

13   think contract interpretation needs an expert here or should

14   have an expert here.

15       And just because experts are sometimes -- often, I should

16   say -- appropriate in legal malpractice or medical malpractice

17   or other kinds of tort cases where duties might be needing of

18   elaboration, here, the contract spells out the duties, and I

19   just don't think any of those cases argued are applicable.

20       Prejudice, I do think there is potential prejudice in

21   allowing an extension of this deadline.  It will be costly,

22   add a layer of expense and delay to this litigation, when I

23   don't think it would be admissible at trial ultimately.

24       So the motions are denied.

25       Ms. Winograd, could you please prepare a form of order?

37

1    It can be a simple form of order.  Run it by opposing counsel

2    before you upload it, please.  All right?

3              MS. WINOGRAD:  Yes, Your Honor.

4              THE COURT:  Thank you.  We're adjourned.

5              MS. WINOGRAD:  Thank you.

6              THE CLERK:  All rise.

7         (Proceedings concluded at 11:47 a.m.)

8                                --oOo--

9

10

11

12

13

14

15

16

17

18

19

20                            CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                        **12/13/2021**

24   _____          _____
     Kathy Rehling, CETD-444                        Date
25   Certified Electronic Court Transcriber

38

INDEX

PROCEEDINGS                                                    4

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                      34

END OF PROCEEDINGS                                           37

INDEX                                                        38

# EXHIBIT 18

Case 3:21-cv-00881-X   Document 39   Filed 01/31/22   Page 1778 of 1780   PageID 6108
Case 21-03005-sgj Doc 138 Filed 12/22/21   Entered 12/22/21 12:04:16   Page 1 of 3
Docket #0138 Date Filed: 12/22/2021



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 21, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006-sgj |
| | § | |

_____

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

DOCS_NY:44447.8 36027/003

1

HIGHLAND CAPITAL MANAGEMENT §
SERVICES, INC., JAMES DONDERO, NANCY §
DONDERO, AND THE DUGABOY §
INVESTMENT TRUST, §
                                    §
                                    §
                    Defendants.     §
HIGHLAND CAPITAL MANAGEMENT, L.P., §
                                    §
                                    §
            Plaintiff,              §     Adversary Proceeding No.
                                    §
vs.                                 §     21-03007-sgj
                                    §
HCRE PARTNERS, LLC (N/K/A NEXPOINT §
REAL ESTATE PARTNERS, LLC), JAMES  §
DONDERO, NANCY DONDERO, AND THE    §
DUGABOY INVESTMENT TRUST,          §
                                    §
                                    §
                    Defendants.     §

## ORDER DENYING MOTIONS TO EXTEND EXPERT DISCLOSURE
## AND DISCOVERY DEADLINES

This matter having come before the Court on the (a) *Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosures and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 86] (the "NexPoint Motion") filed by NexPoint Advisors, L.P. ("NexPoint"); (b) *Defendant Highland Capital Management Services, Inc.'s Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3006, Docket No. 91] (the "HCMS Motion") filed by Highland Capital Management Services, Inc. ("HCMS"); and (c) *Defendant HCRE Partners, LLC's Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3007, Docket No. 86] (the "HCRE Motion," and collectively with the NexPoint Motion and the HCMS Motion, the "Motions") filed by HCRE Partners, LLC ("HCRE," and collectively with NexPoint and HCMS, "Defendants"); and this Court having considered (i) the Motions; (ii) *Highland's Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 104; Adv. Proc. 21-3006, Docket No. 109; Adv. Proc. 21-3007, Docket No. 104] (the "Objection") filed by Highland Capital Management, L.P. ("Highland"); (iii) the (a) *Reply of*

*Defendant NexPoint Advisors, L.P. in Support of Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 115] (the "NexPoint Reply") filed by NexPoint; and (b) *Highland Capital Management Services, Inc. and HCRE partners, LLC's Reply in Support of Defendants' Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3006, Docket No. 120, and Adv. Proc. 21-3007, Docket No. 115] (the "HCRE and HCMS Replies," and together with the NexPoint Reply, the "Replies") filed by HCRE and HCMS; and (iv) the arguments made during the hearing held on December 13, 2021 (the "Hearing"); and this Court having found that Defendants have not established "good cause" under Rule 16(b) of the Federal Rules of Civil Procedure for the relief requested in the Motions; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that venue of this proceeding and the Motions in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and upon all of the proceedings had before this Court, and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth during the Hearing on these Motions, **IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motions are **DENIED**.

2.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

### ### END OF ORDER ###

DOCS_NY:44447.8 36027/003

**Appx. 01776**