Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email:  drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Civ. Act. No. 3:21-cv-00881-X |
| | § | |
| v. | § | (Consolidated with 3:21-cv-00880-X, 3:21-cv-01010-X, 3:21-cv-01378-X, 3:21-cv-01379-X) |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

## SUPPLEMENTAL APPENDIX IN SUPPORT OF OBJECTION OF NEXPOINT ADVISORS, L.P. TO ORDER DENYING MOTIONS TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above styled and numbered Adversary Proceedings initiated by Highland Capital Management, L.P. as the plaintiff (the "Debtor"), and files this its *Supplemental Appendix* in support of its *Objection to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*.

## SUPPLEMENTAL APPENDIX

| BK Dkt. | Description | APP # |
|---|---|---|
| 156 | Defendants' Memorandum of Law in Response to Plaintiff's Motion for Partial Summary Judgment | 897 |
| N/A | January 25, 2022 Email Correspondence Transmitting Proposed Stipulation to Resolve Plaintiff's Contempt Threat | 962 |
| N/A | Proposed Stipulation[1] | 968 |
| 162 | Brief in Support of Plaintiff's Omnibus Motion (A) to Strike Certain Documents and Arguments from the Record, (B) for Sanctions, and (C) for an Order of Contempt | 973 |

RESPECTFULLY SUBMITTED this the 14th day of February, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email: drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

---

[1]     Though this document appears bear the parties' signatures, those signatures were included in the draft. For the avoidance of doubt, the Debtor refused to enter into this stipulation.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on February 14, 2022, a true and correct copy of the foregoing document, including any exhibit(s) thereto, was served on the following recipients via the Court's CM/ECF system:

Daniel P Elms    elmsd@gtlaw.com, guerrak@gtlaw.com

Deborah Rose Deitsch-Perez    deborah.deitsch-perez@stinson.com, kinga.mccoy@stinson.com, patricia.tomasky@stinson.com

Michael P Aigen    michael.aigen@stinson.com, stephanie.gratt@stinson.com

Clay M Taylor    clay.taylor@bondsellis.com

Davor Rukavina    drukavina@munsch.com

Melissa S Hayward    mhayward@haywardfirm.com, mholmes@haywardfirm.com

Douglas Draper    ddraper@hellerdraper.com, dhepting@hellerdraper.com, gbrouphy@hellerdraper.com, vgamble@hellerdraper.com

Leslie A Collins    lcollins@hellerdraper.com, dhepting@hellerdraper.com

Zachery Z. Annable    zannable@haywardfirm.com, zannable@franklinhayward.com

Julian Preston Vasek    jvasek@munsch.com

Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com, samantha.tandy@wickphillips.com

Bryan Christopher Assink    bryan.assink@bondsellis.com

John A Morris    jmorris@pszjlaw.com, hwinograd@pszjlaw.com, lsc@pszjlaw.com

Jeffrey N Pomerantz    jpomerantz@pszjlaw.com

Gregory V Demo    gdemo@pszjlaw.com, hwinograd@pszjlaw.com, jfried@pszjlaw.com, lsc@pszjlaw.com

Case Admin Sup    txnb_appeals@txnb.uscourts.gov

Stacey G Jernigan    sgj_settings@txnb.uscourts.gov, anna_saucier@txnb.uscourts.gov

/s/ Davor Rukavina
Davor Rukavina

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc. and
NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND** | § | |
| **THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

1934054220121000000000005
APP 897

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff,<br><br>vs.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | § § § § § § § § § § § § | Adv. Proc. No. 21-03005-sgj |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff,<br><br>vs.<br><br>HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | § § § § § § § § § § § § | Adv. Proc. No. 21-03006-sgj |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff,<br><br>vs.<br><br>HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | § § § § § § § § § § § | Adv. Proc. No. 21-03007-sgj |

## DEFENDANTS'[1] MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

[1] Defendants Jim Dondero, HCMS, HCRE, and NexPoint, are collectively referred to as the "Defendants" throughout this Memorandum of Law unless otherwise expressly named.

## TABLE OF CONTENTS

<div align="right">**Page**</div>

I. Preliminary Statement ........................................................................................................ 1

II. Statement of Facts ............................................................................................................. 1

  A. Procedural Background ................................................................................................ 1

  B. The Promissory Notes ................................................................................................. 2

  C. Plaintiff Agreed to Forgive the Notes Upon Fulfilment of Conditions Subsequent ........... 2

    1. Forgivable Loans as Compensation Are Not Uncommon. ......................................... 2

    2. The Agreements to Forgive the Notes ................................................................... 3

    3. The Agreements Were Never Kept "Secret" from Anyone ....................................... 5

    4. Jim and Nancy Dondero Do Not Disagree About Whether the Notes Were Specifically Identified. ......................................................................................... 7

    5. Jim and Nancy Dondero Provide Sworn Deposition Testimony and Declarations Evidencing the Agreements ................................................................................. 9

  D. Plaintiff was Responsible for Making Term Note Payments under a Shared Services Agreement with NexPoint, HCMS, and HCRE ................................................................ 11

    1. The NexPoint Shared Services Agreement ............................................................. 11

    2. The HCMS and HCRE Shared Services Agreements ................................................ 13

  E. Prepayment on the Term Notes .................................................................................... 15

    1. NexPoint's Prepayments ..................................................................................... 15

    2. HCMS' Prepayments .......................................................................................... 16

III. Argument and Authorities ................................................................................................ 17

  A. Legal Standard .......................................................................................................... 17

  B. Plaintiff is Not Entitled to Summary Judgment because Defendants Raise Genuine Issues of Material Fact with their Defenses ................................................................... 18

    1. The Agreements to Forgive the Notes ................................................................... 18

      a. The Evidence Shows that the Agreements Exist .................................................. 18

        (i) The Evidence Shows That Jim Dondero Identifies Material Terms of the Agreements ................................................................................................. 19

        (ii) The Evidence Shows that Jim and Nancy Dondero Do Not Disagree About Whether Jim Dondero Identified the Notes Subject to the Agreements ................. 20

        (iii) Jim Dondero Not "Declaring the Notes Forgiven" upon the Sale of the MGM Asset Has No Bearing on Whether the Agreements Exist .......................................... 20

        (iv) Whether Nancy Dondero Ever Saw a Note is Irrelevant to the Agreements' Existence. ..................................................................................................... 21

(v) Whether the Agreements Were Disclosed is Irrelevant to the Agreements' Existence. ................................................................................................... 21

(vi)The Lack of Written Documentation of the Oral Agreements is Irrelevant to the Agreements' Existence. ............................................................... 22

(vii) Defendant's Summary Judgment Evidence Shows that Plaintiff Does Have a History of Forgiving Loans as Compensation. ................................... 22

b. Both Sides to the Agreements Provide Summary Judgment Evidence Attesting to the Agreements' Existence. ......................................................................... 22

c. The Evidence Shows the Agreements Were Supported by Consideration ................ 25

d. The Evidence Shows the Agreements Were Definite ................................................ 28

e. The Evidence Shows the Agreements Were Supported by a Meeting of the Minds ....................................................................................................................... 29

f. Nancy Dondero Was Competent to Cause Plaintiff to Enter into the Agreements. .............................................................................................................. 31

(i) Nancy Dondero Lacking Certain Information Has No Bearing on her Competency to Enter into the Agreements. ...................................................... 32

(ii) Nancy Dondero Had the Information She Needed to Cause Highland Capital to Enter into the Agreements. ............................................................... 32

(iii)Nancy Dondero's Personal Lack of Financial Details Has No Bearing on the Validity or Enforceability of the Agreements. ................................................. 34

(iv)Nancy Dondero Was Personally "Competent" to Cause Plaintiff to Enter into the Agreements. ......................................................................................... 35

2. The Evidence Shows that Debtor was Responsible for Making Payments on the NexPoint, HCRE, and HCMS Notes under Shared Services Agreements ...................... 36

a. The Affirmative Defense ......................................................................................... 36

b. The Law ................................................................................................................... 36

c. The NexPoint SSA and the Debtor's Duties Thereunder ......................................... 37

3. The Debtor Failed to Assist, Advise, or Facilitate Any Payment Obligation ................ 42

4. Debtor's Negligence and Fault In Creating Alleged Default ......................................... 44

(i) If Dondero Did Not Issue the Non-Payment Instruction ....................................... 44

(ii) If Dondero Issued the Non-Payment Instruction: Offer of Proof .......................... 45

5. The HCMS and HCRE SSAs. ....................................................................................... 47

6. Prepayments by NexPoint and HCMS .......................................................................... 47

a. NexPoint Prepayments ............................................................................................ 47

b. HCMS Prepayments ................................................................................................ 52

IV. Conclusion ........................................................................................................................ 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1320/1390 Don Haskins, Ltd. v. Xerox Com. Sols., LLC*,
584 S.W.3d 53 (Tex. App. 2018) ............................................................................26

*271 Truck Repair & Parts, Inc. v. First Air Express, Inc.*,
03-07-00498-CV, 2008 WL 2387630 (Tex. App.—Austin
June 11, 2008, no pet.) ...........................................................................................24

*Al-Saud v. Youtoo Media, L.P.*,
3:15-CV-3074-C, 2017 WL 3841197 (N.D. Tex. Mar. 15, 2017).....................18, 20

*Alexander v. Good Marble & Tile Co.*,
4 S.W.2d 636 (Tex. Civ. App. 1928) ...............................................................37, 38

*Anderson Bros. Corp. v. O'Meara*,
306 F.3d 672 (5th Cir. 1962) ..................................................................................35

*Anderson v. Liberty Lobby Inc.*,
477 U.S. 242 (1986)................................................................................................44

*Armstrong v. Assocs. Int'l Holding Corp.*,
No. 3:05-CV-02006-K, 2006 U.S. Dist. LEXIS 70043
(N.D. Tex. Sept. 20, 2006) ......................................................................................34

*Bacher v. Maddux*,
550 S.W.2d 405 (Tex. Civ. App. 1977) ..................................................................48

*Brown v. Jackson*,
40 S.W. 162 (Tex. Civ. App. 1897) .........................................................................26

*Buxani v. Nussbaum*,
940 S.W.2d 350 (Tex. App.—San Antonio 1997, no writ) .....................................23

*In re Capco Energy, Inc.*,
669 F.3d 274 (5th Cir. 2012) ..................................................................................30

*Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*,
297 S.W.3d 248 (Tex. 2009).....................................................................................47

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005)....................................................................................18

*Collier v. Robinson*,
129 S.W. 389, 61 Tex. Civ. App. 164 (Tex. Civ. App. 1910) .................................36

CORE/3522697.0002/171927721.9

*Corsaro v. Columbia Hosp. at Med. City Dallas Subsidiary, LP*,
  No. 3:21-CV-01748-N, 2021 LEXIS 247218 (N.D. Tex., Dec. 29, 2021)............................35

*Craig Sessions M.D., P.A. v. TH Healthcare Ltd.*
  412 S.W.3d 738 (Tex. App. – Texarkana 2013)................................................................38, 48

*Critchfield v. Smith*,
  151 S.W.3d 225 (Tex. App.—Tyler 2004, pet. denied)..........................................................22

*Curry v. O'Daniel*,
  102 S.W.2d 481 (Tex. Civ. App. 1937) ..................................................................................48

*Del Bosque v. AT&T Adver., L.P.*,
  441 Fed. Appx. 258 (5th Cir. Sept. 16, 2011)........................................................................36

*DeWitt County Elec. Coop. Inc. v. Parks*,
  1 S.W.3d 96 (Tex. 1999)..........................................................................................................48

*Diamond v. Hodges*,
  58 S.W.2d 187 (Tex. Civ. App. 1933) ....................................................................................54

*Dorsett v. Hispanic Hous. & Educ. Corp.*,
  389 S.W.3d 609 (Tex. App.—Houston [14th Dist.] 2012, no pet.)........................................18

*Envtl. Conservation Org. v. City of Dallas, Tex.*,
  529 F.3d 519 (5th Cir. 2008) ..................................................................................................18

*First Com. Bank v. Palmer*,
  226 S.W.3d 396 (Tex. 2007)....................................................................................................26

*First Nat'l Bank v. Whirlpool Corp.*,
  517 S.W.2d 262 (Tex. 1974)....................................................................................................51

*Fischer v. CTMI, LLC*,
  479 S.W.3d 231 (Tex. 2016)....................................................................................................29

*Fisher v. Blue Cross and Blue Shield of Tex., Inc.*,
  3:10-CV-2652-L, 2015 WL 5603711 (N.D. Tex. Sept. 23, 2015) ....................................23, 24

*Floyd v. Hefner*,
  556 F. Supp. 2d 617 (S.D. Tex. 2008) ....................................................................................45

*Franklin v. Regions Bank*,
  CV 5:16-1152, 2021 WL 867261 (W.D. La. Mar. 8, 2021) ...................................................24

*Garcia v. Lumacorp, Inc.*,
  No. CIV.A. 3:02-CV-2426-, 2004 WL 1686635 (N.D. Tex. July 27, 2004),
  aff'd, 429 F.3d 549 (5th Cir. 2005) ........................................................................................28

iv

*Getto v. Gray*,
    627 S.W.2d 437 (Tex. App. 1981).........................................................................................48

*Ginther-Davis Ctr., Ltd. v. Houston Nat. Bank*,
    600 S.W.2d 856 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e) ....................34

*Hallmark v. Hand*,
    885 S.W.2d 471 (Tex. App.—El Paso 1994, writ denied)....................................................30

*Haverda v. Hays County*,
    723 F.3d 586 (5th Cir. 2013) ...............................................................................................18

*Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding*,
    480 S.W.2d 607 (Tex. 1972).................................................................................................23

*Hoard v. McFarland*,
    229 S.W. 687 (Tex. Civ. App. 1921) ....................................................................................26

*Honore v. Douglas*,
    833 F.2d 565 (5th Cir.1987) .................................................................................................25

*Ibarra v. Texas Employment Commission*,
    823 F.2d 873 (5th Cir. 1987) ................................................................................................34

*Katy Int'l, Inc. v. Jinchun Jiang*,
    451 S.W.3d 74 (Tex. App. 2014)..........................................................................................26

*Katz v. Intel Pharma*,
    CV H-18-1347, 2019 WL 13037048 (S.D. Tex. Apr. 19, 2019) ..........................................29

*Looney v. Irvine Sensors Corp*,
    CIV.A.309-CV-0840-G, 2010 WL 532431 (N.D. Tex. Feb. 15, 2010) ................................17

*Mack v. John L. Wortham & Son, L.P.*,
    541 Fed. Appx. 348 (5th Cir. 2013)......................................................................................30

*Mandell & Wright v. Thomas*,
    441 S.W.2d 841 (Tex. 1969).................................................................................................35

*Martinez v. Pilgrim's Pride Corp.*,
    3:16-CV-3043-D, 2017 WL 6372385 (N.D. Tex Dec. 13, 2017)..........................................30

*Marx v. FDP, LP*,
    474 S.W.3d 368 (Tex. App. 2015)........................................................................................26

*Nat'l Union Fire Ins. Co. v. CBI Indus.*,
    907 S.W.2d 517 (Tex. 1995).................................................................................................48

CORE/3522697.0002/171927721.9

*O'Connor v. United States,*
  479 U.S. 27 (1986)......................................................................48

*In re Palms at Water's Edge, L.P.,*
  334 B.R. 853 (Bankr. W.D. Tex. 2005)......................................23

*Parrish v. Haynes,*
  62 F.2d 105 (5th Cir. 1932) .......................................................51

*PGP Gas Products, Inc. v. Reserve Equip., Inc.,*
  667 S.W.2d 604 (Tex. App.—Austin 1984, writ ref'd n.r.e.).....24

*Phillips v. Herdon,*
  78 Tex. 378 (Tex. 1890) ............................................................52

*Roark v. Stallworth Oil and Gas, Inc.,*
  813 S.W.2d 492 (Tex. 1991).......................................................28

*Runnells v. Firestone,*
  746 S.W.2d 845 (Tex. App.—Houston [14th Dist.] 1988, writ denied)................23

*Samuel v. Holmes,*
  138 F.3d 173 (5th Cir.1998) ......................................................18

*In re Schooler,*
  725 F.3d 498 (5th Cir. 2013) .....................................................45

*Sinclair Oil Corp. v. Heights Energy Corp.,*
  4:05-CV-825-Y, 2007 WL 9718223 (N.D. Tex. Nov. 13, 2007) ...........30

*Southern Equip. Sales, Inc. v. Ready Mix Sols., LLC,*
  No. 05-17-01176-CV, 2018 WL 3454801 (Tex. App. July 18, 2018) .....26

*Szanto v. Pagel,*
  47 S.W.2d 632 (Tex. Civ. App. – Austin 1932) ........................37

*T.O. Stanley Boot Co., Inc. v. Bank of El Paso,*
  847 S.W.2d 218 (Tex. 1992).......................................................29

*Texas Co. v. Schram,*
  93 S.W.2d 544 (Tex. Civ. App. – Austin 1936) ........................52

*Vaughan v. Crown Plumbing & Sewer Serv., Inc.,*
  523 S.W.2d 72 (Tex. Civ. App. 1975) .......................................54

*W.E. Grace Mfg. Co. v. Levin,*
  506 S.W.2d 580 (Tex. 1974).......................................................51

CORE/3522697.0002/171927721.9

*WCW Int'l, Inc. v. Broussard*,
No. 14–12–00940–CV, 2014 WL 2700892 (Tex.App.-Houston [14th Dist.]
Mar. 4, 2014, pet. filed) ...................................................................................26

*Williams v. Cambridge Cos.*,
615 S.W.2d 172 (Tex. 1981)...........................................................................48

*Yaquinto v. Segerstrom (In re Segerstrom)*,
247 F.3d 218 (5th Cir.2001) ...........................................................................18

**Other Authorities**

Restatement (Second) of Contracts § 12(2) (1981) ...............................................36

Restatement (Second) of Contracts § 33 comment A ...........................................29

14 Tex. Jur. 3d Contracts § 157 ...........................................................................26

3 Williston on Contracts § 7:44 (4th ed.)...............................................................26

Defendants file this Memorandum of Law in Response to Highland Capital Management, L.P.'s ("Highland Capital" or "Plaintiff") *Motion for Partial Summary Judgment* (the "Motion").

## I. Preliminary Statement

1.      Plaintiff's central argument is that it does not believe – and therefore, this Court should not believe – Defendants' "story," a set of facts that is supported by sworn declarations and uncontroverted deposition testimony. Plaintiff's assertion that "there is a complete absence of evidence to support each of Defendants' affirmative defenses" is demonstrably false and misleading. Indeed, the very fact that Plaintiff's principal argument is that the "Defendants' stories are so weak that the Court must grant [Plaintiff's] Motion" is a concession that the case turns on disputed genuine issues of material fact, regardless of how loudly or snidely Plaintiff avows disbelief. Plaintiff's disdain for Defendants' defenses does not equate to an absence of evidence. Defendants' affirmative defenses are supported by facts and evidence in their Appendix, and the Court – when viewing the evidence in the light most favorable to the Defendants – must deny Plaintiff's Motion. Plaintiff's Motion is essentially a closing argument at trial – arguing that Plaintiff's version of the facts should be accepted over Defendants' version – rather than a motion for summary judgment, as it is based almost entirely on the credibility of disputed facts and lacks authorities addressing the legal sufficiency of Defendants' evidence. In this Response, Defendants direct the Court to summary judgment evidence supporting their defenses that create genuine issues of material fact requiring the Court to deny Plaintiff's Motion.

## II. Statement of Facts

### A. Procedural Background

2.      Defendants generally agree with Plaintiff's recitation of procedural background recited in ¶¶ 6-18 of its Motion; however, the procedural history and the description of claims on which Plaintiff is not moving are not relevant to this Motion.

**B.    The Promissory Notes**

3.      Plaintiff issued three demand promissory notes (collectively, the "<u>Dondero Demand Notes</u>") to Jim Dondero in 2018.[2]  Defendant Jim Dondero does not dispute the amounts or the existence of the Dondero Demand Notes as Plaintiff has recited and referenced them.[3]

4.      Plaintiff issued four demand promissory notes to Highland Capital Management Services, Inc. ("<u>HCMS</u>") in 2019 (collectively, the "<u>HCMS Demand Notes</u>").[4]  Defendant HCMS does not dispute the initial amount loaned or the existence of the HCMS Demand Notes.[5]

5.      Plaintiff issued one promissory term note payable on a term schedule with NexPoint Advisors, L.P. ("<u>NexPoint</u>"), on May 31, 2017 (the "<u>NexPoint Term Note</u>").[6]  Defendant NexPoint does not dispute the initial amount loaned or the existence of the NexPoint Term Note.[7]

6.      Plaintiff issued five promissory notes payable on demand and one promissory note payable on a term schedule with HCRE Partners, LLC ("<u>HCRE</u>"),  between November of 2013 and October of 2018 (the "<u>HCRE Demand Notes</u>" and the "<u>HCRE Term Note</u>").[8]  Defendant HCRE does not dispute the initial amounts loaned or the existence of either the HCRE Demand Notes or the HCRE Term Note.[9]

**C.    Plaintiff Agreed to Forgive the Notes Upon Fulfilment of Conditions Subsequent**

        **1.      Forgivable Loans as Compensation Are Not Uncommon.**

7.      Contrary to Plaintiff's assertion that "There is No History of Loans Being Forgiven [by Plaintiff]," it was not an uncommon practice for Plaintiff to provide executives with forgivable

---

[2] Def. Ex. 1, Declaration of James Dondero ("J Dondero Dec."), ¶¶ 5-7, Def. Appx. 5.
[3] Motion, ¶ 20(i).
[4] Def. Ex. 1, J Dondero Dec., ¶¶ 14-18, Def. Appx. 9-11.
[5] Motion, ¶ 20(iii).
[6] Def. Ex. 1, J Dondero Dec., ¶ 8, Def. Appx. 6-7.
[7] Motion, ¶ 20(iii).
[8] Def. Ex. 1, J Dondero Dec., ¶¶ 9-13, Def. Appx. 7-9.
[9] Motion, ¶¶ 29-31.

loans as compensation.[10] Along with Jim Dondero, several of Plaintiff's executives received loans that were forgiven, including Mike Hurley, Tim Lawler, Pat Daugherty, Jack Yang, Paul Adkins, Gibran Mahmud, Jean-Luc Eberlin, and Appu Mundassery.[11] Plaintiff's corporate representative, James Seery, confirmed that several of the above-named individuals received loans that were forgiven in the past.[12] Further, Plaintiff's own Motion contradicts itself by claiming there is no history of loans being forgiven, but in the very next paragraph concedes that "[Plaintiff] has not forgiven any loan to Mr. Dondero since at least 2008," recognizing that, in fact, Plaintiff has forgiven loans to Jim Dondero in the past.[13] Using forgivable loans to compensate Jim Dondero made sense for Plaintiff, as Jim Dondero was undercompensated in his position compared to other similarly-situated contemporaries at comparable investment firms.[14]

## 2. The Agreements to Forgive the Notes

8. The Highland Capital Limited Partnership Agreement (the "LPA") authorized the Dugaboy Family Trust ("Dugaboy") to approve compensation for the General Partner and Affiliates of the General Partner. Specifically, the LPA provides, in pertinent part:

> (a) <u>Compensation</u>. The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements *unless approved by a Majority Interest.*"[15]

The LPA defines the relevant actors in the Compensation provision as follows:

---

[10] Motion, ¶ 103; Def. Ex. 1, J Dondero Dec., ¶ 23, Def. Appx. 13; Pl. Ex. 98, Jim Dondero 10/29/21 Tr. 424:4-8, Pl. Appx. 01777.

[11] Def. Ex. 1, J Dondero Dec., ¶ 23, Def. Appx. 13; Pl. Ex. 24, Jim Dondero's Objections and Responses to Plaintiff's Requests for Admission, Interrogatories, and Requests for Production, Pl. Appx. 00526; Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 109:7-22, Pl. Appx. 03154; Pl. Ex. 195, David Klos 10/27/21 Tr. 106:6-22, Pl. Appx. 03208; Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 212:4-25, Pl. Appx. 02011.

[12] Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 94:21-96:22, Pl. Appx. 01982; Def. Ex. 3-A, Deposition of James P. Seery, Jr. (177:19-178:5), Def. Appx. 141-142.

[13] Motion, ¶ 104.

[14] Def. Ex. 1, J Dondero Dec., ¶ 23, Def. Appx. 13; Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 160:10-161:3; 218:12-222:14, Pl. Appx. 02013-02014; Def. Ex. 3-B, Deposition of Bruce McGovern Tr. 24:7-25:4, Def. Appx. 193 (providing expert testimony that the Agreements did not create taxable income for Jim Dondero).

[15] Pl. Ex. 30, 4th LPA, § 3.10(a) (emphasis added), Pl. Appx. 00622.

3

> "*'Majority Interest'* means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners."[16]

> "*'Class A Limited Partners'* means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A."[17]

> **Exhibit A** reflects "The Dugaboy Investment Trust" as a Class A Limited Partner owning 74.4426% of the Class A Limited Partnership Interests.[18]

Nancy Dondero is the Dugaboy Trustee and was therefore the individual entitled to approve compensation under the pertinent LPA provisions above.[19]

9.    In December of 2017 or January of 2018, Nancy Dondero – on behalf of Plaintiff and as representative for a majority of Class A shareholders – entered into an oral agreement with Jim Dondero that Plaintiff would forgive the Notes issued in 2017 upon the fulfilment of certain conditions subsequent.[20]  Specifically, if certain portfolio companies were sold at or above cost – Trussway, Cornerstone, or MGM – the Notes would be forgiven.[21]  Jim and Nancy Dondero entered into identical Agreements subsequent to each Note at issue in this litigation in 2018, 2019, and 2020, respectively (referred to collectively as the "Agreements").[22]  Notably, nowhere in Plaintiff's Motion does it dispute that Jim Dondero and Nancy Dondero had the authority to enter into these Agreements or that the Agreements would be legally binding on Plaintiff.

10.    The Agreements themselves served as an incentive for Jim Dondero to work particularly diligently on the sale of the portfolio companies and to make sure they were

---

[16] *Id.*, § 2.1, Pl. Appx. 00612.

[17] *Id.*, § 2.1, Pl. Appx. 00610.

[18] *Id.*, Exhibit A, line 5, Pl. Appx. 00639.

[19] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 22:13-15, Pl. Appx. 01880; Pl. Ex. 98, James Dondero 10/29/21 Tr. 400:8-19, Pl. Appx. 01771; Def. Ex. 1, J Dondero Dec., ¶ 21, Def. Appx. 13; Def. Ex. 2, N Dondero Dec., ¶ 3, Def. Appx. 80; Def. Ex. 2-A, Nancy Dondero Acceptance of Appointment of [Dugaboy] Family Trustee, Def. Appx. 89.

[20] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 162:22-163:8, Pl. Appx. 01915; Pl. Ex. 96, James Dondero 5/28/21 Tr. 176:20-177:5, Pl. Appx. 01659; Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 6, Def. Appx. 81.

[21] *Id.*

[22] Def. Ex. 1, J Dondero Dec., ¶¶ 25-26, Def. Appx. 14-15; Def. Ex. 2, N Dondero Dec., ¶¶ 7-8, Def. Appx. 81-83

successful.[23]  This incentive benefitted Plaintiff by maintaining its profitability and reputation across the industry for successful performance as a private equity firm.[24]  The Agreements acted to motivate and retain Jim Dondero as Plaintiff's employee.[25]  Further, Jim Dondero forwent opting to increase his own salary with cash compensation in accordance with § 3.10 of the LPA, as he would have been allowed to do.  Instead, Jim Dondero elected to make his potential compensation conditional upon his own successful performance, and Plaintiff benefitted from the Agreements by not paying Jim Dondero higher base compensation, something Jim Dondero thought was "great for the [Plaintiff] at the time," and "reduces other compensation [that he would have otherwise taken].[26]  Therefore, Plaintiff benefited from the Agreements on two fronts: (i) receiving more focused and dedicated work from Jim Dondero in his efforts to make the portfolio companies more profitable, and (ii) not paying Jim Dondero a higher base compensation.

### 3.    The Agreements Were Never Kept "Secret" from Anyone

11.    Plaintiff's assertion that the Agreements were "kept secret" and "never disclosed by Mr. Dondero" is not only irrelevant to the Motion, but also inaccurate.[27]  Jim Dondero indicated to both Frank Waterhouse and Plaintiff's counsel that the Notes were forgivable.  Well before these proceedings, Jim Dondero told Frank Waterhouse, the Debtor's Chief Financial Officer, that there were "mechanisms in place for forgiving the Notes, or for having them considered as compensation and not being an asset to the Debtor's estate."[28]  Further, on February 1, 2021, counsel for Jim Dondero – the late Judge Michael Lynn – informed opposing counsel that "[a]s you are aware, in addition to other defenses, Mr. Dondero views the notes in question as *having*

---

[23] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 10, Def. Appx. 83-84.
[24] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 10, Def. Appx. 83-84.
[25] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 10, Def. Appx. 83-84.
[26] Pl. Ex. 96, James Dondero 5/28/21 Tr. 182:2-18, Pl. Appx. 01660; Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14.
[27] Motion ¶ 98.
[28] Pl. Ex. 99, James Dondero 11/4/21 Tr. 167:10-16, Pl. Appx. 01854; Def. Ex. 1, J Dondero Dec., ¶ 28, Def. Appx. 15.

been given in exchange for loans by Highland made in lieu of compensation to Mr. Dondero."[29] Although that correspondence did not detail every facet of the Agreements, it alerted Debtor to Defendants' position that the Notes were potentially forgivable, which Debtor did not question.

12.    Jim Dondero did not disclose the Agreements to the financial auditors at Highland Capital because such disclosure was unnecessary.[30]  In light of Highland Capital's sizable financial assets, potential Note forgiveness under the Agreements was *de minimis.*[31]  Thus, such a disclosure was not considered material, and would have been unwarranted.[32]  And, of course, whether the Agreements were disclosed to the financial auditors – or anyone else for that matter – has no bearing on whether the Agreements are legally enforceable.

13.    Plaintiff's claim in ¶ 47 of its Motion that: "[i]f PwC had learned before June 3, 2019, at any of the Notes (a) might not be collectible, or (b) might be forgiven, or (c) was amended, or (d) would be extinguished based on the fulfillment of certain conditions subsequent, it would have required that fact to be disclosed," is demonstrably untrue, as cross-examination testimony from Peet Burger of PwC – the testimonial basis for Plaintiff's position – concedes.[33]  On cross examination, Burger confirmed that disclosure of the Agreements would only have been required when the Notes were *actually forgiven*, not that they *might* be forgivable.[34]  Thus, Peet Burger

---

[29] Def. Ex. 1-D, Letter to Pachulski Stang Ziehl & Jones, LLP, Def. Appx. 74 (emphasis added).
[30] Def. Ex. 1, J Dondero Dec., ¶ 27, Def. Appx. 15.
[31] *Id.*
[32] *Id.*
[33] Motion, ¶ 47, citing the Deposition of Peet Burger (74:19-76:12), Pl. Appx. 1571.
[34] Pl. Ex. 94 Peet Burger 7/30/21 Tr. 78:11-79:13, Pl. Appx. 01572:

Q:    And I want to focus on this.  I know these are [Plaintiff's counsel's] questions, so it may not have been your language, but you were asked if it [the loans] might be forgiven.  What does that mean to you?  Are we talking about is there a difference for you if there was a 1 percent chance that something would be forgiven or a 90 percent chance of it being forgiven?

A:    If we learned about something, let's say, we learned [it] might be forgiven, that would have resulted in additional audit work.  *The question I understood to be and the answer I gave was if something happened where there was an event that actually occurred before or on June 3rd, we would have required disclosure.*

Q:    Got it.  So is it fair to say that in response to all of [Plaintiff's counsel's] questions about what would have been required to be disclosed, in your mind he was referring those events or items have *actually occurred* and the notes being *actually forgiven* at that point in time; is that correct?

CORE/3522697.0002/171927721.9

very quickly changed his position and conceded that he misunderstood Plaintiff's counsel's question when he gave the quote that forms the basis of Plaintiff's Motion, ¶ 47. Plaintiff is fully aware of the recantation, making its use of a demonstrably false statement in its Motion a concession of the Motion's lack of merit.

### 4. Jim and Nancy Dondero Do Not Disagree About Whether the Notes Were Specifically Identified.

14. Plaintiff's assertion that Jim and Nancy Dondero disagree as to whether or not Jim Dondero identified which notes were subject to the Agreements is a mischaracterization of the deposition testimony.[35] Nancy Dondero testified that she understood which Notes were subject to the Agreements:

"Q: At the time that you entered into the agreements, did you have any understanding that the agreements would cover all notes executed by your brother, NexPoint, HCRE and HCMS?

A: Yes."[36]
. . . .

"Q: Was it your understanding that when you entered into each of these agreements, that the agreements would cover every promissory note that was executed by your brother, by NexPoint, by HCMS, and by HCRE, irrespective of whether it wound up being part of the lawsuit?

A: My understanding for the agreement I had with Jim is just for these 13 notes."[37]
. . . .

"Q: Why don't you tell me what the conversations were that led to each of the agreements to best that you can recall.

A: The conversations with my brother that took place towards the end of each of the years that we're discussing, they started as general conversations about business, about work. And Jim would bring up the loans that were done earlier in the year. He had stated in the conversation that he thought he was undercompensated for the work that he does and the time that he

---

Q: I didn't hear your answer.
A: Correct.
[35] Motion, ¶ 93 ("Mr. and Ms. Dondero disagree on perhaps the most important aspect of the Alleged Agreements; namely, its scope. Ms. Dondero insists that Mr. Dondero identified the notes that are the subject of each Alleged Agreement. Mr. Dondero, on the other hand, disagrees.").
[36] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 186:7-12, Pl. Appx. 01921.
[37] *Id.* at (186:25-187-10), Pl. Appx. 01921.

puts in. And he wanted those loans to be forgiven if any of the three portfolio companies that we talked about monetized at a higher value.

Q: And you agreed with that?

A: Well, it was – yes, I did agree with that proposal. I thought it was a win-win for everybody. [38]

Nancy Dondero reaffirms in her declaration: "During our conversations in which we made the Agreements, I understood which Notes were subject to the Agreements."[39]

15. Jim Dondero did not "disagree" with Nancy Dondero that he identified the Notes subject to the Agreements. Rather, Plaintiff cites a portion of Jim Dondero's deposition in which, in response to unclear questioning,[40] Jim Dondero indicated that he communicated to Nancy Dondero that the Notes were made by different entities:

"Q: No. I'm just asking if during your discussions with the Dugaboy trustee, you ever disclosed the name of the maker of any of the Notes that were subject to the agreements?

A: She – she knew they were Notes due to Highland from various entities. So I don't know what your question is. Did I identify specifically that they were Notes due to Highland? I guess the answer to that is yes, *but I don't know what you're asking me*."[41]
. . . .

"A: She was aware that they were notes due to Highland from a variety of entities."[42]

Jim Dondero reiterates in his declaration: "when entering into the Agreements . . . I specifically remember discussing and identifying the Notes to Nancy Dondero."[43] Thus, Plaintiff's argument

---

[38] *Id.* at (193:19-194:15), Pl. Appx. 01923.
[39] Def. Ex. 2, N Dondero Dec., ¶ 8, Def. Appx. 81-83.
[40] Motion, ¶ 93, citing Ex. 99 at 79:6-81:23, Appx. 1832.
[41] Pl. Ex. 99, James Dondero 11/4/21 Tr. 79:20-80:5, Pl. Appx. 01832 (emphasis added).
[42] *Id.* at (80:16-17), Pl. Appx. 01832. Moreover, Mr. Dondero's additional testimony is even clearer. Pl. Ex. 99, James Dondero 11/4/21 Tr. 28:6-21, Pl. Appx. 01819; Declaration of Jim Dondero, ¶ 24-26; James Dondero 10/29/21 Tr. 403:10-404:12, Pl. Appx. 01771-01771; Pl. Ex. 96, James Dondero 5/28/21 Tr. 153:5-154:6, 180:5-9, 214:16-24, Pl. Appx. 01653, 01660, 01668.
[43] Def. Ex. 1, J Dondero Dec., ¶¶ 25-26, Def. Appx. 14-15.

8

that there is some discrepancy between Jim Dondero and Nancy Dondero's testimony that supports its summary judgment motion is without foundation.

### 5. Jim and Nancy Dondero Provide Sworn Deposition Testimony and Declarations Evidencing the Agreements

16.     Throughout this litigation, Plaintiff has taken the position that the Agreements are fabricated and lack any evidence of their existence.[44]  However, Jim and Nancy Dondero have consistently testified under oath that the Agreements took place, exist, and are valid.[45]  Further, both Jim and Nancy Dondero have provided this Court with declarations swearing to the Agreements' factual existence:

> 24.  At either the end of 2017 or the beginning of 2018, Dugaboy – through Nancy Dondero – entered into a verbal agreement (the "2017 Agreement") with myself that HCM would not collect on any of the aforementioned Notes issued in 2017 if certain events occurred.  [The Declaration of James Dondero goes on to also describe the Agreements for the Notes issued in years 2018 and 2019].[46]

> 6.  In either December of 2017 or January of 2018, I caused Dugaboy (solely in my capacity as Dugaboy's Family Trustee) to cause Highland Capital to enter into the first of a series of verbal agreements with Jim Dondero that provided that the repayment obligation on the notes made in 2017 involved in this litigation would be forgiven if Highland Capital sold any of Trussway, Cornerstone, or MGM for a price greater than its cost, or if any of those portfolio companies were sold in a circumstance that was outside of Jim Dondero's control. [The Declaration of Nancy Dondero goes on to also describe the Agreements for the Notes issued in years 2018 and 2019].[47]

17.     Plaintiff also suggests that because Jim Dondero would have preferred to use a list of the Notes to refresh his recollection regarding the Agreements during his deposition, no reasonable trier of fact could find the Agreements existed.[48]  While whether an agreement was

---

[44] Motion, ¶ 90.
[45] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 162:22-163:8, Pl. Appx. 01915; Pl. Ex. 96, James Dondero 5/28/21 Tr. 176:20-177:5, Pl. Appx. 01659; Def. Ex. 1, J Dondero Dec., ¶ 24-26, Def. Appx. 14-15; Def. Ex. 2, N Dondero Dec., ¶¶ 6-8, Def. Appx. 81-83.
[46] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14.
[47] Def. Ex. 2, N Dondero Dec., ¶ 6, Def. Appx. 81.
[48] Motion, ¶ 91.

CORE/3522697.0002/171927721.9

actually made is potentially a proper issue for summary judgment in a he said she said situation

(which does not exist here), whether or not a witness uses notes to refresh his recollection is not a

basis for granting a summary judgment. It would be a factor for a fact-finder to take into account

in determining the credibility of a witness. Here, the fuss Debtor makes about Jim Dondero's list

of the Notes is much ado about nothing, as shown by the following:

> Q: Thank you very much. The agreements covered each of the notes that are the subject of the lawsuits that Highland commenced against you, HCRE Services, and NexPoint, is that right?
>
> A: The – yes.[49]
>     . . . .
>
> Q: Can you identify any Promissory Note that is the subject of any specific agreement that you ever entered into with the Dugaboy trustee without looking at the list?
>
> A: I believe it covered virtually all of them. So I don't remember [now] which ones specifically in each year. Generally, it was, I believe, the ones incurred in that year, but I don't remember which entities. But again, the ultimate result being that the term loans, the demand notes, the things incurred, the things outstanding were part of the agreement.[50]

A deposition, much less a 30(b)6(6) deposition, where witnesses frequently bring notebooks full

of data to be able to testify to specific details is not a game of gotcha, entitling one party to force

the other to testify about dozens of details without the aids a business person would typically use

to keep track of such information.

      18.    Defendants refer the Court to the declarations and deposition testimony of Jim

Dondero and Nancy Dondero to demonstrate that the Agreements exist, and Plaintiff's assertion

that "no reasonable trier of fact can find that the [] Agreement[] existed" is simply inconsistent

with the summary judgment evidence.

---

[49] Pl. Ex. 99, James Dondero 11/4/21 Tr. 14:7-12, Pl. Appx. 01816.
[50] *Id.* at (28:6-21), Pl. Appx. 01819.

**D.** **Plaintiff was Responsible for Making Term Note Payments under a Shared Services Agreement with NexPoint, HCMS, and HCRE**

19. The Shared Services Agreements ("SSAs") between Highland Capital and NexPoint, HCMS, and HCRE provided that Highland Capital would manage "back and middle office" tasks, which included making debt payments for NexPoint, HCMS, and HCRE.[51] SSAs are common in the private equity industry, and exist to consolidate function and manpower between large and small entities that share overlapping ownership structure.[52]

## 1. The NexPoint Shared Services Agreement

20. NexPoint and Plaintiff entered into a written Shared Services Agreement (the "NexPoint SSA") on January 1, 2018, which resulted in Plaintiff providing almost the entire workforce for NexPoint's business.[53] Specifically, Plaintiff was to provide back- and middle-office, legal compliance, administrative services, management of clients and accounts, and other services to NexPoint.[54] These services included making debt payments on behalf of NexPoint. The NexPoint SSA outlined these responsibilities in Section 2.02:

> Section 2.02 <u>Provision of Services</u>. . . .[T]he Staff and Services Provider [Plaintiff] hereby agrees, from the date hereof, to provide the following back- and middle-offices services and administrative, infrastructure and other services to the Management Company [NexPoint].
>
> > (a) *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, ***payments***, operations, book keeping, cash management . . . ***accounts payable*** . . .[55]

Further, the NexPoint SSA provided the standard of care that Plaintiff was required to adhere to when it provided such services for NexPoint:

---

[51] *Id.* at ¶ 36.
[52] *Id.*
[53] Def. Ex. 1, J Dondero Dec., ¶ 32, Def. Appx. 16-17; Pl. Ex. 205, NexPoint's Amended and Restated Shared Services Agreement as of January 1, 2018, Pl. Appx. 04162.
[54] *Id.*
[55] *Id.* at 04165-04166 (emphasis added).

> Section 6.01 <u>Standard of Care</u>. Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . .[56]

Thus, the NexPoint SSA itself clearly provided both the specific services that Plaintiff was to provide NexPoint – namely the back- and middle-office tasks of handling payments and accounts payable – and the standard of care under which Plaintiff was to provide those services.

21.     Further, Kristin Hendrix – who served as Plaintiff's assistant controller in 2020 and is currently employed by Plaintiff – stated that she knew about the upcoming NexPoint Annual Installment in 2020, but received a phone call from Frank Waterhouse instructing her not to make any payments from the Advisors (which includes NexPoint) to Plaintiff.[57]

22.     Therefore, Plaintiff decided on either November 30, 2020 or December 1, 2020 that it was not going to make the annual term payment on the NexPoint Note. However, Plaintiff never reached out in writing to confirm this with Jim Dondero or anyone else at NexPoint, or to inquire about clarification or whether Frank Waterhouse's instruction was a mistake, given the significant consequences of nonpayment. Plaintiff's inaction certainly ran afoul of the NexPoint SSA Section 6.01 "Standard of Care" provision.

23.     Plaintiff's characterization of the relationship between Highland and NexPoint under the NexPoint SSA is disputed and inaccurate.[58] Plaintiff claims that "[n]one of the services [provided for under the NexPoint SSA] authorized Highland to…effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint."[59] However, Highland Capital made payments for NexPoint in December of 2017,

---

[56] *Id.* at 04173.
[57] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 71:3-20, Pl. Appx. 03144.
[58] Motion, ¶ 123-126.
[59] Motion, ¶ 125.

2018, and 2019 **without any specific authorization, direction, or permission** from either Jim Dondero or any other NexPoint executive.[60]

24.     This course of conduct would lead any reasonable person to believe that Plaintiff would continue to make the annual payments without explicit direction, **as they had done for three years prior.** Defendant believed that Plaintiff would continue to make the NexPoint Term Note payments, and was surprised to learn that Plaintiff decided not to make the December 31, 2020 annual payment.[61] Whether or not Plaintiff should have continued to make payments on the NexPoint Note is a genuine issue of material fact. Moreover, Plaintiff failed to bring certain prepayments to NexPoint's attention, resulting in NexPoint believing that payment was due, when it was not, although Plaintiff now claims it was due, even though it failed to make that payment.

## 2.     The HCMS and HCRE Shared Services Agreements

25.     Similar to the NexPoint SSA, Plaintiff had similar SSAs with both HCMS (the "HCMS SSA") and HCRE (the "HCRE SSA"), which were both established by oral agreement and course of conduct.[62] Plaintiff provided identical services to both HCMS and HCRE as it did to NexPoint, and made sure all their financial obligations were promptly paid on time.[63] There was a lengthy history of Plaintiff providing such services to HCMS and HCRE.[64] The need for these SSAs with HCMS and HCRE were predicated on the fact that both entities – like NexPoint – lacked the internal infrastructure to operate entirely independently.[65] Both HCMS and HCRE heavily relied on Plaintiff to provide these services, as Plaintiff had for years prior.[66] Plaintiff was

---

[60] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03248-03249; Def. Ex. 1, J Dondero Dec., ¶ 34, Def. Appx. 17.
[61] J Dondero Dec. at ¶ 35, Def. Appx. 17-18.
[62] *Id.* at ¶¶ 36-39, Def. Appx. 18-19.
[63] *Id.*
[64] *Id.* at ¶¶ 36, 38, Def. Appx. 18-19.
[65] Pl. Ex. 98, James Dondero 10/29/21 Tr. 335:14-337:3, Pl. Appx. 01754-01755; Def. Ex. 1, J Dondero Dec., ¶¶ 36, 38, Def. Appx. 18-19.
[66] *Id.*

required to act reasonably in the performance of its obligations to HCMS and HCRE, given the record of past practices and the precedent created by similar work done by Plaintiff for NexPoint.[67]

26.     Frank Waterhouse confirmed in his deposition that Plaintiff provided the same services to HCRE and HCMS as it did to NexPoint, including ". . . accounting services, treasury management services, [and] potentially legal services."[68] He also specifically confirmed that loan payments were the "kinds of things that [Plaintiff] would pay on time because of potential consequences of not paying on time" for HCMS and HCRE.[69]

27.     Further, Kristin Hendrix testified that it was "fair to say that [she] [did not] remember any instructions telling [her] not to make any payments from HCMS or HCRE,"[70] and that the reason she never made the December 31, 2020 payments on the HCMS or HCRE Term Notes was because she "never got an affirmative instruction to actually make the payment."[71] However, Hendrix later confirmed that Plaintiff "make[s] payments all the time" without the specific instruction of Frank Waterhouse or Jim Dondero.[72] Hendrix made no attempts to determine if Jim Dondero wanted the HCMS or HCRE annual installment payments to be made.[73]

28.     Plaintiff ultimately knew about but failed to make the December 31, 2020 payments on both the HCMS Term Note and the HCRE Term Note.[74] No one at HCMS or HCRE – including Jim Dondero – directed any person to miss or skip the payments on these Notes.[75] Whether or not Plaintiff should have continued to make payments on the HCMS Term Note and

---

[67] Def. Ex. 3-F, Expert Report of Steven J. Pully ¶ 57, Def. Appx. 231.
[68] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 353:3-354:12, Pl. Appx. 02137-02138.
[69] *Id.* at (357:2-11), Pl. Appx. 02138.
[70] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 100:20-23, Pl. Appx. 03151.
[71] *Id.* at (101:13-16), Pl. Appx. 03152.
[72] *Id.* at (103:10-16), Pl. Appx. 03152.
[73] *Id.* at (102:10-13), Pl. Appx. 03152.
[74] Def. Ex. 1, J Dondero Dec., ¶¶ 37, 39, Def. Appx. 18-19.
[75] *Id.*

14

the HCRE Term Note pursuant to the respective oral SSAs are genuine issues of material fact.[76] Moreover, as discussed in greater detail below, Plaintiff failed to remind HCMS of prepayments that had been made that relieved it of the obligation to make any additional payment in 2020.

### E. Prepayment on the Term Notes

#### 1. NexPoint's Prepayments

29.     NexPoint asserts the affirmative defense of prepayment on the NexPoint Note, which relieved NexPoint of any obligation to make any additional payment in 2020. Thus, the NexPoint Note was not in default when no payment was made on December 31, 2020. NexPoint demonstrates *infra* that there is evidence supporting this affirmative defense and summary judgment denying this affirmative defense is inappropriate as a matter of law.

30.     There is no dispute of fact that, between March and August of 2019, the following payments were made on the NexPoint Note (collectively, the "NexPoint Prepayments"): (i) $750,000.00 on March 29, 2019; (ii) $1,300,000.00 on April 16, 2019; (iii) $300,000.00 on June 4, 2019; (iv) $2,100,000.00 on June 19, 2019; (v) $630,000.00 on July 9, 2019; and (vi) $1,300,000.00 on August 13, 2019.[77] These payments totaled $6,380,000.00 in 2019.[78] The normal December, 2019 payment of principal and interest on the Note would have been $2,273,970.54, leaving $4,106,029.46 remaining to apply as prepayments on the Note.

31.     None of the aforementioned payments were scheduled payments or payments on arrears.[79] Rather, they were prepayments since the Plaintiff needed money and asked NexPoint to transfer it funds for liquidity purposes, which NexPoint did.[80] These transfers were intended by

---

[76] Defendants' position is bolstered by the Expert Report of Steven J. Pully, ¶ 59 (Def. Ex. 3-F, Def. Appx. 232), which was incorrectly not permitted to be included in the record by the Court. Defendants submit this proffer to preserve their objection.
[77] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03249.
[78] Id.
[79] Id.
[80] Def. Ex. 1, J Dondero Dec., ¶ 42, Def. Appx. 21.

both NexPoint and Plaintiff to be prepayments on the Note.[81]  This fact is confirmed by testimony from Plaintiff's personnel and its amortization schedule for the NexPoint Note.[82]  The only dispute here is how these NexPoint Prepayments should have been applied; more specifically, whether they should have been applied to the December 31, 2020 scheduled payment, rendering further payment at that time unnecessary.

### 2.    HCMS' Prepayments

32.    Plaintiff's Motion never directly addresses HCMS's prepayment defense.  Rather, in its 50-page Motion, Plaintiff lists HCMS in several headings, but then never actually makes any arguments or raises any facts specific to HCMS.  Moreover, not once in paragraphs 3-14 Mr. Klos's Declaration addressing the NexPoint prepayment defense (or anywhere else), does Klos mention the HCMS Term Note.[83]  Therefore, it does not appear that Plaintiff actually is moving for summary judgment on HCMS' prepayment defense.  However, as with NexPoint, any such motion would have no merit.

33.    There is no factual dispute that between May of 2017 and December of 2020, the HCMS Term Note's principal amount was paid down by almost $14,000,000.00.[84]  Between May of 2017 and December of 2020, the following prepayments were made on the HCMS Note (collectively, the "HCMS Prepayments"): (i) $985,216.44 on June 23, 2017; (ii) $907,296.25 on July 6, 2017; (iii) $1,031,463.70 on July 18, 2017; (iv) $1,971,260.13 on August 25, 2017; (v) $1,500,000.00 on December 21, 2017; (vi) $160,665.94 on May 31, 2018; (vii) $1,000,000.00 on

---

[81] *Id.*
[82] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03249; Pl. Ex. 194, Kristen Hendrix 10/27/21 Tr. 81:13-82:3, Pl. Appx. 03147 (objections omitted).
[83] Declaration of David Klos in Support of [Plaintiff's] Motion for Partial Summary Judgment in Note Actions, ¶¶ 3-14, Case 21-03003-sgj [Doc. 133].
[84] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.

October 8, 2018; (viii) $1,015,000.00 on May 5, 2019; (ix) $550,000.00 on August 9, 2019; (x) $5,600,000.00 on August 21, 2019; and (xi) $65,360.49 on December 30, 2019.[85]

34.     Again, none of the above payments were scheduled, nor were they ever made on December 31 of any given year.[86] Further, none of these payments were made on arrears.[87] Rather, these prepayments were intended by HCMS to be applied to the scheduled Annual Installment payments, and were obviously accepted as such, since Plaintiff never declared the note to be in default in 2017, 2018, or 2019.[88] Plaintiff presents no legal or factual argument to the contrary, so summary judgment for this defense must be denied.

### III.     Argument and Authorities

#### A.     Legal Standard

35.     Plaintiff suggests that there is a separate or independent summary judgment standard for promissory notes.[89] The fact that the elements of breach of promissory note differ from breach of contract in no way lessens Plaintiff's burden of proving there are no genuine issues of material fact.[90] *Looney v. Irvine Sensors Corp*, CIV.A.309-CV-0840-G, 2010 WL 532431 at 2 (N.D. Tex. Feb. 15, 2010) (noting that, although the elements for breach of a promissory note differs from traditional breach of contract, "[s]ummary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, what that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law").

---

[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] Def. Ex. 1, J Dondero Dec., ¶ 46, Def. Appx. 22.
[89] Compare, Motion, III. A. 1: "Summary Judgment Standard" with III. A. 2: "Summary Judgment Standard for Promissory Notes."
[90] Motion, ¶ 132 (under the heading: "Summary Judgment Standard for Promissory Notes").

36.     Plaintiff's Motion is a "no-evidence" motion, arguing that "[t]here is a complete absence of evidence to support each of Defendants' affirmative defenses." Motion, ¶ 2. Therefore, the Court may only grant Plaintiff's Motion if: ". . . (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact."[91]

37.     When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant.[92] To determine whether a genuine dispute exists such that the case must be submitted to a jury, courts must consider all of the evidence in the light most favorable to the non-moving party, draw all reasonable inferences in favor of the non-moving party, refuse to make credibility determinations or weigh the relative strength of the evidence, and disregard all evidence favorable to the movant that the jury would not be required to believe.[93]

**B.     Plaintiff is Not Entitled to Summary Judgment because Defendants Raise Genuine Issues of Material Fact with their Defenses**

**1.     The Agreements to Forgive the Notes**

**a.     The Evidence Shows that the Agreements Exist**

38.     Plaintiff argues that "[t]here is a complete absence of evidence in support of this defense [the Agreements]," claiming that: (i) Jim Dondero could not "identify material terms" of the Agreements, (ii) "Mr. and Ms. Dondero cannot even agree whether Mr. Dondero identified the Notes subject to each. . .Agreement," (iii) Jim Dondero "failed to declare the Notes forgiven" when

---

[91] *Dorsett v. Hispanic Hous. & Educ. Corp.*, 389 S.W.3d 609, 613 (Tex. App.—Houston [14ᵗʰ Dist.] 2012, no pet.) (citing *City of Keller v. Wilson,* 168 S.W.3d 802, 816 (Tex. 2005)).
[92] *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5ᵗʰ Cir. 2008); *Yaquinto v. Segerstrom (In re Segerstrom),* 247 F.3d 218, 223 (5th Cir.2001); *Samuel v. Holmes,* 138 F.3d 173, 176 (5th Cir.1998).
[93] *Al-Saud v. Youtoo Media, L.P.*, 3:15-CV-3074-C, 2017 WL 3841197, at 2 (N.D. Tex. Mar. 15, 2017) (citing *Haverda v. Hays County,* 723 F.3d 586, 591 (5th Cir. 2013)).

CORE/3522697.0002/171927721.9

MGM stock was sold in November 2019, (iv) "Ms. Dondero. . .never saw a Note signed by Mr. Dondero. . .and was not competent to enter into the [] Agreements," (v) the Agreements were "never disclosed to anyone," (vi) there is no written evidence of the Agreements, (vii) and "there is no history of loans being forgiven [by Plaintiff]."[94] These are simply closing arguments that address credibility of evidence and are properly made at trial, not at summary judgment.

### (i) The Evidence Shows That Jim Dondero Identified Material Terms of the Agreements

39. Plaintiff argues that Jim Dondero was not able to identify the material terms of the Agreements.[95] However – as addressed in section C.4, *supra* – Jim Dondero identified that the Notes that were subject to the Agreements and provided general details,[96] but was prevented by the examiner from referencing his list of the Notes to give the specific details of each.[97] Mr. Dondero was noticed for deposition in both his personal and 30(b)(6) capacities and therefore it was appropriate for him to have a list to be able to give precise details for questions that might be asked about the exact amounts, dates and terms of the Notes. There is no surprise about which loans the Agreements applied to since Jim Dondero has consistently stated that all the loans at issue in this litigation were subject to the Agreements.[98] Regardless, Jim Dondero provides the Court with a sworn declaration evidencing his knowledge of the details of the Notes.[99]

40. Plaintiff provides no legal authority supporting its claim that no jury could believe the Agreements exist because Jim Dondero could not reference the specific terms without his

---

[94] Motion, ¶ 147.
[95] *Id.*
[96] Response, ¶ 15.
[97] *Id.*
[98] See note 42 *supra*.
[99] J Dondero Dec., ¶¶ 5-18 (itemizing the Notes subject to the Agreements, including their amounts and dates of each Note).

CORE/3522697.0002/171927721.9

notes. Plaintiff's argument is simply an attack on Mr. Dondero's credibility, which is improper at the summary judgment stage. *See, Al-Saud* at 2.

>   **(ii)** **The Evidence Shows that Jim and Nancy Dondero Do Not Disagree About Whether Jim Dondero Identified the Notes Subject to the Agreements**

41.     As demonstrated in section C.4, *supra*, Jim and Nancy Dondero do not disagree about whether Jim Dondero identified the Notes subject to the Agreements. Defendants have pointed this court to specific summary judgment evidence that there is no disagreement about which Notes Jim Dondero identified.[100] Further, Plaintiff has no authority supporting its claim that no reasonable trier of fact could find that the Agreements exist in these circumstances.

>   **(iii)** **Jim Dondero Not "Declaring the Notes Forgiven" upon the Sale of the MGM Asset Has No Bearing on Whether the Agreements Exist**

42.     Regarding whether Jim Dondero failed to declare the Notes forgiven upon the alleged sale of some unspecified amount of HCM's interest in MGM, Plaintiff provides no legal authority (nor have Defendants located any) addressing the relevance of this point. Even if all of Plaintiff's interest in MGM had been sold for more than it had cost (in which case Mr. Dondero would have raised the forgiveness of the Notes), there is no legal proposition in Texas requiring a party to a contract to declare that a contractual term has been completed in an effort to prove that contract's existence. But, in fact, Plaintiff does not assert that HCM's interest in MGM was sufficiently liquidated to trigger forgiveness, and indeed only a tiny amount was sold.[101]

43.     More importantly, Plaintiff is estopped from making this argument because it is contradicted by its sworn interrogatory answers. When Defendants requested Plaintiff "[i]dentify any sale or potential sale of any portfolio companies (or a portion of such portfolio companies)

---

[100] Response, ¶¶ 14-17.
[101] Def. Ex. 1, J Dondero Dec., ¶ 47, Def. Appx. 22.

owned (wholly or partially) by the [Plaintiff], including, but not limited to, Trussway, MGM and

Cornerstone…," Plaintiff responded that it "ha[d] not sold Trussway, MGM or Cornerstone…."[102]

### (iv) Whether Nancy Dondero Ever Saw a Note is Irrelevant to the Agreements' Existence.

44. Whether Nancy Dondero ever saw the Notes is completely irrelevant to whether a

reasonable trier of fact could conclude the Agreements existed. Again, Plaintiff cites no legal

authority to support its position that this fact has any bearing on the existence of the Agreements.

Similar to the MGM issue above, Plaintiff's point is irrelevant and must be disregarded.

### (v) Whether the Agreements Were Disclosed is Irrelevant to the Agreements' Existence.

45. Plaintiff argues – without any supporting legal authority – that since the

Agreements were "never disclosed . . . to anyone," there is no evidence supporting their

existence.[103] However, Plaintiff overlooks the fact that Jim Dondero alerted Frank Waterhouse

that there were mechanisms in place for forgiving the Notes,[104] and that Jim Dondero's counsel

sent a letter to Plaintiff's counsel indicating that Jim Dondero planned on citing the Agreements

as an affirmative defense.[105] Moreover, Plaintiff cites no authority for its proposition that a failure

to broadly disclose an agreement has any bearing on whether the agreement does or does not exist.

Plaintiff's lack of authority is especially telling in a case that is not a "he said, she said" debate on

whether an agreement was made: rather both side to the Agreements (Dugaboy for HCM and Jim

Dondero) agree *that the Agreements were made*. Therefore, again, Plaintiff's argument does not

support its motion for summary judgment.

---

[102] Def. Ex. 3-H, Highland Capital Management, L.P.'s Responses and Objections to Defendants' Joint Discovery Requests, Interrogatory 14, Def. Appx. 299.
[103] Motion, ¶¶ 145-147.
[104] Response, ¶ 11.
[105] *Id.*

(vi)    **The Lack of Written Documentation of the Oral Agreements is Irrelevant to the Agreements' Existence.**

46.    Plaintiff argues that, because there is no written documentation evidencing the oral Agreements, the existence of the oral Agreements cannot be believed.[106]  The fact that the oral Agreements between Jim and Nancy Dondero lack written documentation should not be surprising, as they were reached through verbal communication.  In Texas, oral contracts have the same validity and enforceability as written contracts.  "The elements of written and oral contracts are the same and must be present for a contract to be binding." *Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App.—Tyler 2004, pet. denied).   Plaintiff cites no authority to the contrary.

(vii)   **Defendant's Summary Judgment Evidence Shows that Plaintiff Does Have a History of Forgiving Loans as Compensation.**

47.    Plaintiff's argument that "there is no history of loans being forgiven" by Plaintiff is rebutted by the record.  As demonstrated *supra*, Defendants present evidence that Plaintiff has forgiven loans to several executives in the past.[107]  Further, Plaintiff has forgiven loans to Jim Dondero in the past, a fact conceded in its Motion and confirmed by its own witness.[108]

b.    **Both Sides to the Agreements Provide Summary Judgment Evidence Attesting to the Agreements' Existence.**

48.    Jim and Nancy Dondero's testimony alone is sufficient under Texas law to show that the Agreements exist.  Plaintiff's lack of legal authority supporting the proposition that when *both sides* to an agreement testify to that same agreement's existence, there is somehow still a material issue of fact regarding that agreement's existence, should not come as a surprise.  Only one side to an oral agreement is required to testify as to its existence to survive a motion for

---

[106] Motion, ¶ 147.
[107] Response, ¶ 7.
[108] *Id.*

summary judgment.  "Where there is no written contract in evidence, and *one party* attests to a contractual agreement while the other vigorously denies any meeting of the minds, determining the existence of a contract is a question of fact under Texas law."[109]  In other words, Defendants' summary judgment evidence is more than sufficient to provide proof that the Agreements exist and create a genuine issue of material fact, since they present testimony from *both* sides to the Agreements while Texas law only requires testimony from *one*.

49.     Further, "whether the parties had a meeting of the minds or common understanding is better suited for the trier of fact and cannot be determined by the court at this [summary judgment] juncture."[110]  In *Fisher*, the movant argued on summary judgment that no implied contract with the non-movant existed.  However, the court denied summary judgment on the existence of an implied contract where the non-movant produced evidence of a course of conduct that "raised a genuine dispute of material fact as to whether the parties had an implied contract…"[111]

50.     Of course, unlike the case cites above, here, *both sides* that made the Agreements attest the Agreements exist.   Jim and Nancy Dondero – the only two individuals who have firsthand knowledge of the Agreements – have testified numerous times that the Agreements occurred and do exist.  Nancy Dondero testified to the Agreements' existence at her deposition:

> Q:     Is it your testimony that you, as the trustee of The Dugaboy Investment Trust, entered into oral agreements with your brother between December and the year each note was made and February of the following year,

---

[109] *In re Palms at Water's Edge, L.P.*, 334 B.R. 853, 857 (Bankr. W.D. Tex. 2005) (citing *Runnells v. Firestone*, 746 S.W.2d 845, 849 (Tex. App.—Houston [14th Dist.] 1988, writ denied) (emphasis added); *Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding*, 480 S.W.2d 607, 610 (Tex. 1972); *Buxani v. Nussbaum*, 940 S.W.2d 350, 352 (Tex. App.—San Antonio 1997, no writ)).

[110] *Fisher v. Blue Cross and Blue Shield of Tex., Inc.*, 3:10-CV-2652-L, 2015 WL 5603711 at 10 (N.D. Tex. Sept. 23, 2015) (analoguing the *In re Palms* in a summary judgment context: "[s]imply alleging there was no meeting of the minds is not a legitimate basis for summary judgment because "[w]here there is no written contract in evidence, and *one party* attests to a contractual agreement while the other vigorously denies any meeting of the minds, determining the existence of a contract is a question of fact.").

[111] *Id*. at 10.

23

> pursuant to which plaintiff agreed that plaintiff would forgive the notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control?

> A:     That is correct.[112]

Jim Dondero also testified to the Agreements' existence at his deposition:

> Q:     Okay.  And in the first sentence to your answer in Interrogatory 1, you wrote, or somebody wrote on your behalf, quote: "The agreements were entered into on behalf of the debtor by James Dondero, subsequent to the time each note was executed."  Is that an accurate statement, or is it an inaccurate statement?"

> A:     Again, it was between me and the Class A, the majority of the Class A members.  It was a Class A – the Class A members were representing Highland, never the debtor, because the debtor didn't exist yet.[113]

51.     Plaintiff ignores this testimony in its Motion.  Both Jim and Nancy Dondero also provide this Court with sworn Declarations explicitly asserting that the Agreements exist.  Based on the evidence above, Defendant Jim Dondero provides evidence that the Agreements exist, and creates a genuine issue of material fact.  *See, Fisher* at 10.

52.     Plaintiff seems to suggest that testimony from Jim and Nancy Dondero attesting to the Agreements' existence is insufficient to create an issue of material fact that the Agreements exist.  While this may be the case in one state with markedly different law than other states (*see Franklin v. Regions Bank*, CV 5:16-1152, 2021 WL 867261 (W.D. La. Mar. 8, 2021) (statutorily requiring corroborating evidence in addition to testimony from one party to prove an oral contract in excess of $500.00 in Louisiana)), this is not the case in Texas.  In Texas, "[t]he existence of an oral contract may be proved by circumstantial evidence as well as by direct evidence."[114]  The circumstantial evidence supports the existence of the Agreements.  Plaintiff never demanded any

---

[112] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 164:13-23, Pl. Appx. 1915.
[113] Pl. Ex. 96, James Dondero 5/28/21 Tr. 165:8-20, Pl. Appx. 01656.
[114] *271 Truck Repair & Parts, Inc. v. First Air Express, Inc*., 03-07-00498-CV, 2008 WL 2387630 at 4 (Tex. App.—Austin June 11, 2008, no pet.) (citing *PGP Gas Products, Inc. v. Reserve Equip., Inc.*, 667 S.W.2d 604, 607 (Tex. App.—Austin 1984, writ ref'd n.r.e.)).

of demand notes at issue in this case (nor did it declare any Term Notes to be in default) until James Seery assumed control of Plaintiff. Actually, it was not until Plaintiff was in bankruptcy that Plaintiff decided to conspicuously call all the demand notes for payment.[115] Prior to the bankruptcy, Plaintiff made no attempt to demand the Notes. Circumstantially, it appears that Plaintiff was operating from 2017 to 2020 as if the Agreements were valid and in effect.

53.    Plaintiff's argument that the evidence of the Agreements' existence is factually insufficient flies in the face of black letter law that the court cannot "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence."[116] Because Jim and Nancy Dondero have sworn to the existence and validity of the Agreements, Plaintiff's arguments amount to nothing more than factual attacks that impermissibly require this Court to opine on the credibility of Defendants' evidence. Thus, summary judgement must be denied.

c.    **The Evidence Shows the Agreements Were Supported by Consideration**

54.    Plaintiff also argues that the Agreements are unenforceable due to a lack of consideration.[117]  Specifically, Plaintiff simply broadly asserts – without reference to any supporting facts – that ". . . no reasonable trier of fact could find that . . . such oral agreement was exchanged for consideration."[118]  Despite Plaintiff's lack of any relevant supporting facts besides a "laundry list" of grievances against the Donderos that have no applicability to Plaintiff's arguments – discussed in more detail *infra* – the Agreements were supported by adequate consideration independent from any pre-existing consideration supporting the Notes.

---

[115] Motion, ¶ 22 (referencing Plaintiff's demand on the Demand Notes); Pl. Ex. 2, Amended Complaint against NPA et al., ¶ 27, Pl. Appx. 00029; Pl. Ex. 3, Amended Complaint against HCMS, ¶ 43, Pl. Appx. 00189; Pl. Ex. 4, Amended Complaint against HCRE et al., ¶ 43, Pl. Appx. 00189.
[116] *Honore v. Douglas,* 833 F.2d 565, 567 (5th Cir.1987).
[117] Motion, ¶ 148.
[118] Motion, ¶ 149.

55.     Consideration is a present exchange bargained for in return for a promise that may

consist of *some* right, interest, or profit, or benefit that accrues to one party or of *some* forbearance,

loss, or responsibility that is undertaken or incurred by the other party.[119]  Consideration consists

of *either* a benefit to the promisor *or* a detriment to the promisee and thus, there is valid

consideration when "when a party gives up a pre-existing legal right."[120]

56.     Here, Jim Dondero's forbearance from increasing his own compensation—a legal

right he possessed prior to entering into the Agreements—as well as his contribution to increasing

the value of all of the portfolio companies in efforts to sell the companies above cost, is adequate

consideration for the Agreements.  At the time the Agreements were formed, Jim Dondero was

authorized as General Partner of the Plaintiff to set his own compensation subject to approval by

the Majority Interest.[121] Therefore, Jim Dondero had a legal right to increase his own salary that

existed before the Agreement was formed.[122]  Accordingly, his decision to set his compensation

conditional upon his own performance instead of exercising his right under the LPA to increase

the immediate cash component of his compensation provided adequate consideration in exchange

---

[119] *Katy Int'l, Inc. v. Jinchun Jiang*, 451 S.W.3d 74, 85 (Tex. App. 2014) (emphasis added) (citing *WCW Int'l, Inc. v. Broussard*, No. 14–12–00940–CV, 2014 WL 2700892, at *9 (Tex.App.-Houston [14th Dist.] Mar. 4, 2014, pet. filed) (sub. mem. op.).

[120] *See, e.g., 1320/1390 Don Haskins, Ltd. v. Xerox Com. Sols., LLC*, 584 S.W.3d 53, 65–66 (Tex. App. 2018); *Marx v. FDP, LP*, 474 S.W.3d 368, 378–79 (Tex. App. 2015) (cleaned up) (relinquishment of disputed claims against each other adequate consideration agreement granting purchaser option to purchase vendors' homestead); *First Com. Bank v. Palmer*, 226 S.W.3d 396, 398–99 (Tex. 2007) (guaranties executed in connection with renewal of promissory note to prevent payee from accelerating debt supported by consideration consisting of the payee's forbearance on prior guaranties and agreement to renew and extend the original debt); *Southern Equip. Sales, Inc. v. Ready Mix Sols., LLC*, No. 05-17-01176-CV, 2018 WL 3454801, at *5 (Tex. App. July 18, 2018) (extending time for payment of note or debt suffices as consideration); *Hoard v. McFarland*, 229 S.W. 687 (Tex. Civ. App. 1921) (cancellation of vendor's lien note before expiration of limitations period was sufficient consideration for reconveyance), writ refused (June 7, 1922); *Brown v. Jackson*, 40 S.W. 162 (Tex. Civ. App. 1897) (agreement by execution debtor with agent of execution creditor not to bid at execution sale was sufficient consideration for agent's promise to allow the debtor to redeem). *See also* 3 Williston on Contracts § 7:44 (4th ed.) ("Just as a promisor may make an agreement for acts or promises to act, so too may it bargain for forbearances or promises to forbear."); 14 Tex. Jur. 3d Contracts § 157 ("Generally, forbearance from exercising a legal right, or the outright surrender of a legal right that one is not bound to surrender, is sufficient consideration for a contract or promise.").

[121] Pl. Ex. 30, 4th LPA, § 3.10(a), Pl. Appx. 00622.

[122] *Id.*

CORE/3522697.0002/171927721.9

for the Agreements.  Jim Dondero's testimony was clear that the Agreements served to motivate his performance with heightened focus and reduce other compensation Plaintiff would have otherwise had to pay him through an increased salary.[123]

57.     Here, Jim Dondero was incentivized to work particularly hard on the profitability and sale of the three portfolio companies – MGM, Trussway, and Cornerstone – to ensure that Plaintiff maintained its profitability and reputation.[124]    Jim Dondero's increased efforts and workload to maximize these assets was also a right he gave up – and a benefit obtained by Plaintiff – in exchange for the potential for increased deferred compensation.

58.     At the time of the Agreements, Nancy Dondero believed that Jim Dondero was undercompensated for the work that he did for the Debtor and that he was also undercompensated in comparison to other asset managers in similar industry roles.[125]    Therefore, Nancy Dondero understood Jim Dondero's forbearance of pay increase as a fair exchange for the Agreements.

59.     In addition, Nancy Dondero agreed that Jim Dondero's efforts to increase the value of any of the portfolio companies would cause them to be sold for the highest value possible; if she did not believe that to be true, the Agreements would not have been made.[126] Plaintiff's Motion not only fails to cite to any authority to support failed or inadequate consideration, but also misconstrues Nancy Dondero's testimony. The Motion inaccurately states that Nancy Dondero "admitted that she did not know, and had no reason to expect, that Highland would benefit from the sale of the portfolio companies by a third party."[127] What she actually stated, however, was

---

[123] Pl. Ex. 96, James Dondero 5/28/21 Tr. 182:2-19, Pl. Appx. 01660.
[124] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14.
[125] Pl. Ex. 100,  Nancy Dondero 10/18/21 Tr. 193:19-25-194:1-19, 206:17-25-207:1-17, 211:12-23, Pl. Appx. 01922-01923, 01926-01927;  Pl. Ex. 99, James Dondero 11/4/21 Tr. 51:8-13, 52:19-25-53:1-4, Pl. Appx. 01825-01826; Pl. Ex. 98, James Dondero 10/29/21 Tr. 421:4-17, Pl. Appx. 01776; Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 94:21-96:22, Pl. Appx. 01982.
[126] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 194:20-25-195:1-10, 206:17-25-207:1-17, Pl. Appx. 01926.
[127] Motion, ¶¶ 98, 101.

27

that she entered into the Agreements and understood that if "any of the portfolio companies monetized higher [] the notes would be forgiven."[128]  Only when Plaintiff's counsel asked if she expected the Plaintiff to benefit if the portfolio companies were "sold on a basis outside of Mr. Dondero's control" did she answer that she did not know what to expect.[129] Nancy Dondero acknowledged that if the portfolio companies were sold for less than their value by a third party, then that would not be in Jim Dondero's control.[130]

60.     Furthermore, "[i]n order for the consideration to be deemed inadequate, it must be *so grossly inadequate as to shock the conscience*, being tantamount to fraud."[131] Even if this Court finds that the exchange was not made for equal value, Jim Dondero's conditional forbearance to increase his own pay and his specific dedication to increase his focus on the profitable sale of the portfolio companies is ***not so inadequate as to shock the conscience***, particularly given that it is common practice in private companies to forgive bona fide debt in order to manage compensation and provide incentives to managers.[132]  Simply because Plaintiff disagrees with Mr. Dondero's assessment does not make the consideration "grossly inadequate;" it is an issue of fact for a jury.[133]

### d.     The Evidence Shows the Agreements Were Definite

61.     Plaintiff argues, with very limited supportive facts and no legal authority, that the Agreements are not enforceable as a matter of law "for lack of. . .(b) definitiveness."[134]  However, Plaintiff never specifically articulates how the Agreements fail for lack of definitiveness.[135]

---

[128] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 205:14-21, Pl. Appx. 01925.

[129] *Id.* at (202:23-25-203:1-11), Pl. Appx. 01925.

[130] *Id.*

[131] *Garcia v. Lumacorp, Inc.*, No. CIV.A. 3:02-CV-2426-, 2004 WL 1686635, at *11 (N.D. Tex. July 2004), aff'd, 429 F.3d 549 (5th Cir. 2005) (emphasis added, citations omitted).

[132] It was common practice in private companies to loan money that is bona fide debt and then forgive it over time to manage compensation and as incentives to managers of private companies. Pl. Ex. 98, James Dondero 10/29/21 Tr. 421:18-25, Pl. Appx. 1776; Alan Johnson Expert Report p. 14-15.

[133] *Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) (determining that adequacy of consideration is a question of fact for the jury).

[134] Motion, ¶ 148.

[135] *Id.*

CORE/3522697.0002/171927721.9

62.     In Texas, "[i]n order to be legally binding, a [verbal] contract must be sufficiently definite in its terms so that a court can understand what a promisor understood."[136] Further, "[t]he material terms of a contract are determined on a case-by-case basis."[137] "[A] term that 'appears to be indefinite may be given precision by usage of trade or by course of dealing between the parties," and "[t]erms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of an agreement to the contrary."[138]

63.     Here, there is certainly enough evidence for the Court to understand what the promisor (Nancy Dondero) understood. Nancy Dondero understood that Jim Dondero was undercompensated, and that the Agreements created an "everybody wins" situation for both the Plaintiff and Jim Dondero.[139] Further, Nancy Dondero and Jim Dondero articulated the terms of the Agreements in their depositions: that if any of the three portfolio companies were sold for above cost, the Notes would be forgiven.[140] The Agreements were simple, and both the promisor and promisee understood their terms.[141] The only individuals that entered into the Agreements were Nancy and Jim Dondero, and both have provided this Court with sworn declarations providing evidence of the Agreements' definitiveness.

### e.     The Evidence Shows the Agreements Were Supported by a Meeting of the Minds

64.     Plaintiff's argument that the Agreements were not supported by a meeting of the minds fails because the summary judgment evidence shows that Jim Dondero and Nancy Dondero, on behalf of Plaintiff, objectively assented to the terms of the Agreement.[142] Plaintiff does not

---

[136] *Katz v. Intel Pharma*, CV H-18-1347, 2019 WL 13037048 at 6 (S.D. Tex. Apr. 19, 2019) (quoting *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992)).
[137] *Intel Pharma* at 6 (quoting *Fischer v. CTMI, LLC*, 479 S.W.3d 231, 237 (Tex. 2016)).
[138] *CTMI, LLC* at 239-240 (quoting the Restatement (Second) of Contracts § 33 comment A).
[139] Response, ¶ 14.
[140] Response, throughout.
[141] Response, ¶ 16.
[142] Response, ¶ throughout.

articulate how the evidence does not support a meeting of the minds.  Nor does Plaintiff articulate

specific facts that show there was no meeting of the minds between Jim Dondero and Nancy

Dondero, other than the "scope" issue, which Defendants have addressed in section C.4, *supra*.

Regardless, the contested issue of whether or not Jim Dondero and Nancy Dondero had a meeting

of the minds is an issue of fact that precludes summary judgment.

65.    In Texas, "[t]he determination of a meeting of the minds, and thus offer and

acceptance, is based on the objective standard of what the parties said and did and not their

subjective state of mind."[143]  "[A] meeting of the minds refers to a mutual understanding and assent

to the agreement regarding the subject matter and the essential terms of the contract."[144]  Further,

". . .the determination of whether the parties reached an agreement – whether there was a meeting

of the minds – is a question of fact, which precludes summary judgment."[145]

66.    Plaintiff does not identify what facts lend themselves to the argument that there was

no meeting of the minds other than its very brief "scope" argument: "Ms. Dondero insists that Mr.

Dondero identified the notes that are the subject of each Alleged Agreement.  Mr. Dondero, on the

other hand disagrees."  Motion, ¶ 93.  Nevertheless, Jim and Nancy Dondero provide evidence that

they objectively understood and agreed to the essential terms and scope of the Agreements.  Nancy

Dondero testified that she understood which Notes were subject to the Agreements, as well as the

Agreements' terms.[146]  These facts are also asserted in Nancy Dondero's declaration.[147]

---

[143] *Martinez v. Pilgrim's Pride Corp.*, 3:16-CV-3043-D, 2017 WL 6372385 at 4 (N.D. Tex Dec. 13, 2017) (quoting *In re Capco Energy, Inc.*, 669 F.3d 274, 280 (5th Cir. 2012)).

[144] *Pilgrim's Pride* at 4 (quoting *Mack v. John L. Wortham & Son, L.P.*, 541 Fed. Appx. 348, 362 (5th Cir. 2013)).

[145] *Sinclair Oil Corp. v. Heights Energy Corp.*, 4:05-CV-825-Y, 2007 WL 9718223 at 3 (N.D. Tex. Nov. 13, 2007) (Court agreeing with respondent that meeting of the minds is an issue of fact precluding summary judgment); *See also: Hallmark v. Hand,* 885 S.W.2d 471, 476 (Tex. App.—El Paso 1994, writ denied) ("Where the element pertaining as to whether or not there was a meeting of the minds is contested, determination of the existence of a contract is a question of fact").

[146] Response, ¶ 14, quoting Nancy Dondero's deposition testimony.

[147] Def. Ex. 2, N Dondero Dec., ¶¶ 6-8, Def. Appx. 81.

67.     Plaintiff's assertion that Jim Dondero "disagrees" with Nancy Dondero that he identified the Notes subject to the Agreements misstates Jim Dondero's testimony.  Jim Dondero clarified that Nancy Dondero did know that the Notes were made by different entities.[148] These facts are also set forth in Jim Dondero's Declaration.[149]

68.     Ignoring Plaintiff's attempt to paraphrase Jim Dondero's testimony out of context – and in light of Nancy Dondero's testimony that Jim Dondero did identify the Notes – it is clear that Jim Dondero communicated to Nancy Dondero that the Notes were made on behalf of the various entities on behalf of which they were made, and Nancy Dondero understood this. Therefore, not only is the issue of whether there is a meeting of the minds a fact issue not susceptible of summary judgment, the evidence also shows the Donderos objectively understood the terms of the Agreements.  If anything, the evidence would support summary judgment *that there was a meeting of the minds*.

### f.     Nancy Dondero Was Competent to Cause Plaintiff to Enter into the Agreements.

69.     Plaintiff argues that Nancy Dondero was not "competent" to enter into the Agreements.[150]  The cited evidence has nothing to do with Nancy Dondero's competency to contract (as "competency" is normally understood under Texas law), but instead references various bits of information that Nancy Dondero allegedly lacked when she caused Plaintiff to enter into the Agreements.  Although mislabeled, the Debtor's argument appears to be that the Agreements are unenforceable because they were the product of a unilateral mistake by Nancy Dondero.

70.     This argument fails for several reasons.  First, Texas law provides that Nancy Dondero gets to determine the information she needed to decide whether to cause Plaintiff to enter

---

[148] Response, ¶ 15, quoting Jim Dondero's deposition testimony.
[149] *Id.*
[150] Motion ¶ 96.

into the Agreements, and the evidence confirms that she had what she needed. Second, Plaintiff does not argue or submit any evidence suggesting that Plaintiff – the actual party to the Agreements – lacked any relevant information. Third, a unilateral mistake can invalidate a contract only when it goes to a material term, when enforcement of the contract would be unreasonable, and when the mistake is made despite the exercise of due care. Plaintiff does not even allege any of these elements, much less submit any evidence to support them.

<div align="center">

**(i)     Nancy Dondero Lacking Certain Information Has No Bearing on her Competency to Enter into the Agreements.**

</div>

71.     The evidence shows that Nancy Dondero had the information she considered necessary and appropriate to cause Plaintiff to enter into the Agreements, and Texas law requires nothing more. Plaintiff's assertion that Nancy Dondero should have had more and different information before entering into those Agreements has no legal effect on their validity or enforceability.

<div align="center">

**(ii)     Nancy Dondero Had the Information She Needed to Cause Highland Capital to Enter into the Agreements.**

</div>

72.     Plaintiff's allegation that Nancy Dondero was ignorant of the facts and circumstances giving rise to the Agreements is not accurate.[151] Specifically, at the time Nancy Dondero caused Plaintiff to enter into the Agreements, she knew Plaintiff was in the hedge fund business which included buying and selling portfolio companies, and she knew that it owned an interest in each of Cornerstone, MGM and Trussway, the portfolio companies involved in the Agreements.[152] She knew that Jim Dondero's annual salary had historically been around $500,000 to $700,000 in the years preceding the Agreements, and she understood that Jim Dondero was

---

[151] Motion, ¶ 96; Plaintiff also ignores Nancy Dondero's business experience outlined in Def. Ex. 2, N Dondero Dec., ¶ 2, Def. Appx. 80.
[152] *Id.* at ¶ 9, Def. Appx. 83.

<div align="center">32</div>

undercompensated as compared to other senior executives in the financial services industry.[153] She also knew that executives in the financial services industry tend to be paid on a bonus or incentive basis.[154] Nancy Dondero knew that potentially increasing Jim Dondero's compensation through contingent loan forgiveness would have less of an impact on Plaintiff's financial condition than requiring it to pay him additional cash in salary or bonus.[155]

73. Nancy Dondero was aware that Plaintiff owned an interest in Cornerstone, MGM, and Trussway, the portfolio companies that were involved in the Agreements.[156] Nancy Dondero knew that Plaintiff's business included, among other things, buying and selling portfolio companies or interests in them for a profit.[157] Nancy Dondero also knew that Jim Dondero would the person most involved in, and responsible for, Plaintiff's marketing and eventual sale of Cornerstone, MGM, and Trussway.[158] And Nancy Dondero knew and believed that the Agreements would operate to further motivate and incentivize Jim Dondero to maximize Plaintiff's return on its investments in Cornerstone, MGM, and Trussway.[159] That Nancy Dondero may not have known every detail identified by the Plaintiff has no bearing on whether she had sufficient information to cause Plaintiff to enter into valid and binding Agreements.[160]

---

[153] *Id.* at ¶ 4, Def. Appx. 80-81.
[154] *Id.* at ¶ 9, Def. Appx. 83.
[155] *Id.* at ¶ 10, Def. Appx. 83-84.
[156] *Id.* at ¶ 9, Def. Appx. 83.
[157] *Id.*
[158] *Id.*
[159] *Id.* at ¶ 10, Def. Appx. 83-84.
[160] Plaintiff ignores the fact that Plaintiff was the actual party to the Agreements, and, even if Nancy Dondero lacked specific information, Plaintiff cannot credibly claim that it too lacked that information.

CORE/3522697.0002/171927721.9

(iii)   **Nancy Dondero's Personal Lack of Financial Details Has No Bearing on the Validity or Enforceability of the Agreements.**

74.     Under Texas law, the parties to a contract determine what they need to know before entering into the agreement.[161] The summary judgment evidence confirms that Nancy Dondero knew and understood the nature of the Agreements, and had all of the information she believed she needed to cause Plaintiff to enter into them.[162] Nancy Dondero did not investigate the additional specifics identified by the Plaintiff because she did not believe she needed that information in order to make an informed and reasonable decision regarding the Agreements.[163]

75.     Nevertheless, Plaintiff seems to argue that the Agreements should be invalidated under the doctrine of unilateral mistake, arguing that Nancy Dondero was mistaken about, or unaware of, certain facts. Under Texas law, a unilateral mistake is generally not grounds for voiding a contract, and can do so only when (i) the mistake relates to a material term, (ii) the mistake makes enforcement of the contract unreasonable, and (iii) the mistake is made despite the exercise of due care.[164] Plaintiff does not allege the existence of any (much less all) of these conditions, or offer any supporting evidence.

76.     Unsurprisingly, Texas law does not permit a party to avoid a contractual obligation when it could have conducted further investigation into the facts and circumstances underlying the contract, but chose not to do so.

---

[161] *Ginther-Davis Ctr., Ltd. v. Houston Nat. Bank,* 600 S.W.2d 856, 861 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e) (recognizing that it is presumed that a contracting party has sufficient information to enter into an agreement in Texas).

[162] *Id.* at ¶¶ 11, 12, Def. Appx. 84.

[163] *Id.* The Debtor's claim that Alan Johnson, Jim Dondero's executive compensation expert, would deem Nancy Dondero incompetent to enter into the Agreements is absurd. Mr. Johnson never said this or anything like it. Rather, he testified that he had no awareness of the Agreements and had never ever heard Nancy Dondero's name, other than that she was represented by legal counsel. Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 99:5-100:5, Pl. Appx. 01983.

[164] *Armstrong v. Assocs. Int'l Holding Corp.*, No. 3:05-CV-02006-K, 2006 U.S. Dist. LEXIS 70043, **9-10 (N.D. Tex. Sept. 20, 2006) (*citing Ibarra v. Texas Employment Commission*, 823 F.2d 873, 879 (5th Cir. 1987)).

34

> It has been stated that 'though a court of equity will relieve against mistake, it will not assist a man whose condition is attributable to the want of due diligence which may be fairly expected from a reasonable person.' This is consistent with the general rule of equity that when a person does not avail himself of an opportunity to gain knowledge of the facts, he will not be relieved of the consequences of acting on supposition.

*Anderson Bros. Corp. v. O'Meara*, 306 F.3d 672, 677 (5th Cir. 1962) (internal citation omitted).

77.    Nancy Dondero had all of the information she considered necessary to decide whether to cause Plaintiff to enter into the Agreements.[165]  Plaintiff apparently disagrees, listing numerous details and specifics that it believes she should have investigated further.[166]  But Texas law does not permit a party to avoid a contract by claiming unilateral mistake when that party has conducted the due diligence it considered appropriate and necessary prior to entering into that contract. *Id.* This is exactly what happened here, and these facts cannot support a finding that the Agreements were – as a matter of law – the result of any "mistake" by Nancy Dondero.

### (iv)    Nancy Dondero Was Personally "Competent" to Cause Plaintiff to Enter into the Agreements.

78.    The only other possible construction of Plaintiff's "competency" argument is that Nancy Dondero lacked the personal capacity to cause Plaintiff to contract.  Texas law presumes that every party to a legal contract has sufficient capacity to understand the transaction involved, and the burden of proof to overcome this presumption is on the party challenging it.[167]  "A person has the mental capacity to contract under Texas law 'if she appreciated the effect of what she was doing and understood the nature and consequences of her acts.'"[168]

---

[165] Def. Ex. 2, N Dondero Dec., ¶ 11, Def. Appx. 84.
[166] Motion, ¶ 96.
[167] *Corsaro v. Columbia Hosp. at Med. City Dallas Subsidiary, LP*, No. 3:21-CV-01748-N, 2021 LEXIS 247218, 9 (N.D. Tex., Dec. 29, 2021).
[168] *Id.* (*quoting Mandell & Wright v. Thomas*, 441 S.W.2d 841, 845 (Tex. 1969)).

79.     A party lacks capacity to contract only when he or she is a minor, under a guardianship, mentally ill, or intoxicated.[169] The summary judgment evidence reflects that at the time she caused Highland Capital to enter into the Agreements, Nancy Dondero appreciated the effect of what she was doing and understood the nature and consequences of those acts.[170] Ms. Dondero was not mentally incompetent, under a legal guardianship, intoxicated, or under any other mental impairment at the time she caused Highland Capital to enter into the Agreements.[171]

### 2.     The Evidence Shows that Debtor was Responsible for Making Payments on the NexPoint, HCRE, and HCMS Notes under Shared Services Agreements

#### a.     The Affirmative Defense

80.     The Debtor declared a default under the NexPoint Note based on its allegation that NexPoint failed to make the December 2020 annual payment allegedly due under that note. Among other defenses, NexPoint pleads that Plaintiff caused the alleged default through its own negligence and fault.   Specifically, NexPoint had outsourced to Plaintiff the responsibility to ensure that NexPoint timely paid its payables, including under the NexPoint Note.  Plaintiff failed to properly discharge its responsibilities, causing the alleged default.   Accordingly, because Plaintiff caused the alleged default, plaintiff is estopped from seeking to capitalize on it.

#### b.     The Law

81.     Texas law recognizes that, when the plaintiff, through its negligence, has caused a delay in the defendant's performance of a contractual obligation, that delay is excused.[172]     As stated by one Texas appellate court:

---

[169] *Del Bosque v. AT&T Adver., L.P.*, 441 Fed. Appx. 258, 262 (5th Cir. Sept. 16, 2011) (*citing* RESTATEMENT (SECOND) OF THE LAW OF CONTRACTS § 12(2) (1981)).
[170] Def. Ex. 2, N Dondero Dec. at ¶ 12, Def. Appx. 84.
[171] *Id.*
[172] *Collier v. Robinson*, 129 S.W. 389, 61 Tex. Civ. App. 164, 166-67 (Tex. Civ. App. 1910) ("plaintiffs were excused from payment of the purchase price of the property within sixty days from the date of the contract, in the event only of a finding by the jury that they were prevented from so doing by the negligence of the defendants").

> It is settled law that one may not take advantage of, nor recover damages for, delays
> for which he is himself responsible, and that the time for performance is excused
> and a corresponding extension of time given where the delay is occasioned by the
> act or default of the party claiming the damages.

*Szanto v. Pagel*, 47 S.W.2d 632, 635 (Tex. Civ. App. – Austin 1932).[173]

### c.    The NexPoint SSA and the Debtor's Duties Thereunder

82.    There is no question of fact that, at all times material to the Debtor's claims of

default, NexPoint and the Debtor were parties to the SSA.[174]   Under the SSA, NexPoint outsourced

various functions to the Debtor and the Debtor was obligated to provide various services to

NexPoint.  The Shared Services Agreement identifies at least three services that the Debtor was

required to provide that are directly on point:

> (a) Back- and Middle Office. Assistance and advice with respect to back- and
> middle-office functions including, but not limited to . . . finance and accounting,
> payments, operation, book keeping, cash management . . . accounts payable . . .
>
> (k) Ancillary Services. Assistance and advice on all things ancillary or incidental
> to the foregoing.
>
> (l) Other. Assistance and advice relating to such other back- and middle-office
> services in connection with the day-to-day business of [NexPoint] as [NexPoint]
> and [the Debtor] may from time to time agree.[175]

83.    The SSA itself expressly required the Debtor to provide "assistance" and "advice"

with respect to, among other things, "payments" and "account payable," including" all things

"ancillary" or "incidental" to the same.

84.    There should be no question of fact that the foregoing included providing NexPoint

with assistance and advice in making payments allegedly required under the NexPoint Note.  At a

---

[173] *Accord Alexander v. Good Marble & Tile Co.*, 4 S.W.2d   636, 639 (Tex. Civ. App. 1928), *writ ref'd* ("it is elementary that the owner is not entitled to recover damages brought about by his own wrong, regardless of whether the contract expressly so provided").

[174] Pl. Ex. 205, NexPoint's Amended and Restated Shared Services Agreement as of January 1, 2018, Pl. Appx. 04163 ("This Amended and Restated Shared Services Agreement. . .is entered into by and between NexPoint Advisors, L.P. . . .and Highland Capital Management, L.P. . . .").

[175] *Id.* at § 2.02, Pl. Appx. 04165-04166 ("Provision of Services") (emphasis added).

minimum, there is a genuine issue of material fact regarding this question. In this respect, it is not parole evidence to consider the parties' past performance under a contract to determine their intention with respect to the same, so long as this is not offered to vary the express terms of a contract.[176] Here, the question is whether assistance and advice with respect to "payments" and "accounts payable," and all things "ancillary" or "incidental" to the same, included the Debtor assisting and advising NexPoint with respect to the alleged December 2020 annual payment. These phrases are not expressly defined in the SSA, so it is appropriate to consider the parties' prior course of dealing to understand the meanings of these terms.

85.    In this respect, Waterhouse, the CFO of the Debtor and an officer of NexPoint at the time, confirmed that the Debtor was responsible under the SSA to advise and assist NexPoint with respect to the alleged payment:

> Q.    <u>Well, what about long term loans? Was it reasonable for NexPoint to expect debtor employees to ensure that NexPoint timely paid its obligations under longterm notes</u>?
>
> A.    <u>I mean, that is one of the things that the Highland personnel did provide to the advisors. Yes, we would -- we would – over the years, yes, we -- we -- we – we did do that generally. Again, I don't remember specifically but, yes, generally we – you know, we did do that</u>.
>
>     . . . .
>
> Q.    And do you recall Mr. Morris had you go through the fact that NexPoint had made payments in years prior to 2020 on that note?
>
> A.    I do.
>
>     . . . .
>
> Q.    And what role in years prior to 2020 would employees of the debtor have had with respect to NexPoint making that annual payment?
>
> A.    We -- we -- we would have -- I keep saying "we." The team would have calculated any amounts due under that loan and other loans, as -- as standard course. We would -- since we provided treasury services to the

---

[176] *See Craig Sessions M.D., P.A. v. TH Healthcare Ltd.* 412 S.W.3d 738, 745-46 (Tex. App. – Texarkana 2013). *Accord O'Connor v. United States*, 479 U.S. 27, 33 (1986) ("the course of conduct of parties to any contract, is evidence of its meaning").

CORE/3522697.0002/171927721.9

advisors,[177] we would inform the -- the -- the -- we informed Mr. Dondero of any cash obligations that are forthcoming, whether we do cash projections. If, you know, any of these payments would have -- or, you know, the sum total of all of these payments, including any note payments, if there were any cash shortfalls, we would have informed Mr. Dondero of any cash shortfalls. We could adequately plan, you know, in instances like that. Or, sorry, we -- I say "we" – I keep saying "we" -- I keep wearing my -- again, my -- my treasurer hat. But, yes, it is to -- it is to inform Mr. Dondero of the obligations of the advisors in terms of cash and obligations that are -- are upcoming and that -- and that are -- are scheduled to be paid.

. . . .

Q.  Prior to 2020, those services that you just described, would that -- on behalf of the debtor, would that have included NexPoint's payments on the $30 million note?

A.  Yes.

Q.  So someone at the debtor in treasury or accounting would have sent some schedule or a reminder that a payment would be coming due in the future. Is that generally the practice?

A.  Yes, we would -- you know, again, I didn't -- I didn't micromanage the teams, but we had a -- a corporate accounting calendar that we use as kind of a tickler file to keep track of payments.

I actually, you know, don't know how actively they're using that in -- in prior to 2020, but it was actively used at some point.

We did look at NexPoint cash periodically and cash for the other advisors as well and payments. You know, we – payments like this would have appeared in our cash projections, in the advisor's cash projections.

And, again, as like I said earlier, they would have appeared there, so there would be time to plan for making any of these payments.

Q.  And based on your experience, would it have been reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note?

A.  Yes. Yes, they did. I mean, but I mean, but I don't think these -- these notes were any secret to anybody.[178]

---

[177] The "advisors" include NexPoint.

[178] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 333:14-338:8, Pl. Appx. 02132-02134 (objections omitted) (emphasis added).

CORE/3522697.0002/171927721.9

86.     Debtor was able to perform these services because it had access to and control over the bank accounts of the corporate Defendants, including NexPoint, HCMS and HCRE.[179]  In addition to the testimony of Waterhouse—who testified about the issues, roles, and duties of the parties under the SSA—Hendrix, a senior accountant for the Debtor at that time and still the Debtor's controller, confirmed the Debtor's "treasury" duties under the SSA to advise NexPoint of the alleged December, 2020 payment:

> Q.     You mentioned treasury management as of 2019, May. What do you mean by treasury management? What is that?
>
> A.     Generally speaking, we – it's not just me as one person. We have checks and balances.
> My team would be in charge of sending out payments, reconciling bank statements, making sure money is in the right accounts, creating cash forecasts and reporting on those every week with the CFO and oftentimes the CEO.
> Generally that's everything that fell under the umbrella.
>
> Q.     And would your description of treasury management be the same for the December 2020 period?
>
> A.     Yes.
>
>        . . . .
>
> Q.     We'll cut to the chase. In December of 2020, the debtor was providing services to various other entities affiliated with Mr. Dondero; correct?
>
> A.     Correct.
>
> Q.     That would have included NexPoint Advisors, LP?
>
> A.     Correct.
>
> Q.     And you're aware that NexPoint Advisors was the obligor on at least one promissory note to the debtor; correct?
>
> A.     Correct.
>
> Q.     And did the debtor in December 2020 provide so-called treasury management services to NexPoint Advisors?
>
> Q.     (BY MR. RUKAVINA) <u>As part of that, in December 2020, would it have been employees of the debtor that would have scheduled for potential payment, subject to approval by NexPoint, NexPoint's future obligations as they were coming due</u>?

---

[179] Frank Waterhouse 10/19/21 Tr. 327:9-328:9, 359:17-22, 360:8-15, Pl. Appx. 02131, 02139.

CORE/3522697.0002/171927721.9

> A.      Yes, we would have scheduled, only with approval.
>
> Q.      And would that have included NexPoint's obligations on the promissory note to Highland?
>
> A.      Yes.[180]

87.      Finally, Jim Dondero, in charge of NexPoint in December, 2020, and in charge of the Debtor in 2019 and prior years of the NexPoint Note, both the past practice and his understanding that the Debtor would advise him of any payments due under the NexPoint Note and his reliance on that advice, and that it did not occur in 2020:

> Q.      Okay. And I just want to make sure that I have this right. Is it -- is it the corporate obligors' -- those three corporate obligors' contention that one of the reasons they didn't make the payments at the end of the year is that they were relying on Highland to make the payment for them?
>
> A.      Absolutely.
>
> Q.      Okay.
>
> A.      It was due course de minimis, and those entities didn't have a single employee or capable financial person other than the people at Highland that were doing the shared services for them.
>
> Q.      NexPoint didn't have any employees in December 2020. Is that your testimony?
>
> A.      I was thinking about HCRE and Services had zero employees. NexPoint had employees but none that were involved in basic accounting functions.
>
>          . . . .
>
> Q.      I'm just – I'm just asking a pretty simple question, sir. I don't mean to be contentious with you. We have identified one defense that these corporate obligors contends exists; and that is, Highland was supposed to make the payment. Fair?
>
> A.      Yes.
>
>          . . . .
>
> Q.      Okay. And do you know whether anybody acting on behalf of any of the three corporate obligors under the term notes ever took any steps in December 2020 to make sure that Highland would, in fact, make the payments that were due at year-end?
>
> A.      No, there was a reliance on Highland.

---

[180] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 13:14-16:11, Pl. Appx. 03130 (objections omitted) (emphasis added).

CORE/3522697.0002/171927721.9

Q.     Okay.  Is it your testimony that Highland was authorized to make the payments under the notes at year-end without being directed by a representative of the three corporate obligors?

A.     Yes.  It is my contention that that is how it worked in prior years also.

Q      And so you believe that nobody on behalf of any of the corporate obligors ever authorized or directed Highland to make the payments but that Highland did it without -- without direction?

A.     Yes, typically. And in 2017 or 2018, 2019, for sure.[181]

88.     Accordingly, based on the plain language of the SSA and the above testimony, there is ample evidence—if not overwhelming and conclusive evidence—that the Debtor had duties under the SSA to at least remind NexPoint of any upcoming payment on the NexPoint Note and to advise NexPoint regarding the same, if not outright facilitating and making the payment: certainly to advise NexPoint of the upcoming payment and warn of the consequences of not making the payments.

### 3.     The Debtor Failed to Assist, Advise, or Facilitate Any Payment Obligation

89.     Notwithstanding its duties under the SSA and the parties' prior understanding of, and practice, under the SSA and those duties, the evidence demonstrates that the Debtor did nothing to assist NexPoint with, or advise NexPoint regarding, much less to facilitate, NexPoint's alleged payment in December, 2020 on the NexPoint Note.

90.     First, and despite the testimony of both Waterhouse and Hendrix that the Debtor would have, pursuant to the SSA and prior practice, identified and flagged any upcoming payment obligations on the Note and sought approval from NexPoint to make the same, the evidence is that the Debtor failed to do so.  In the record are several weekly runs of upcoming payment obligations of NexPoint, from late November and December, 2020, which fail to include any payment

---

[181] Pl. Ex. 98, James Dondero 10/29/21 Tr. 458:11-463:25, Pl. Appx. 01785-01786 (objections omitted) (emphasis added).

CORE/3522697.0002/171927721.9

obligation on the Note, even though various other payment obligations—including upcoming loan payments—are listed and scheduled.[182] Most relevant is the payment run from December 31, 2020 itself, which fails to list or schedule any payment on the NexPoint Note.[183]

91. Second, Dondero's testimony confirms that the Debtor failed to advise or assist him and NexPoint with respect to the alleged payment, or to facilitate the same, cause the same to be made, or to seek his approval to make the same.

92. Third, Waterhouse and his team at the Debtor failed to facilitate or to make the payment, despite Dondero's testimony that he relied on them to do so and that this is how the payments had been handed in 2017, 2019, and 2019.[184] Here, there is a disagreement between Dondero and Waterhouse on the facts. Namely, Waterhouse testified that, in late November or early December, 2020, he advised Dondero of the upcoming payment on the NexPoint Note and that Dondero expressly instructed him to not make the payment, as NexPoint had overpaid the Debtor millions of dollars on the SSA.[185] Dondero testified that he only instructed Waterhouse to forbear from making any additional payments for shared services fees because they had been overpaid.[186] Obviously, the Court cannot determine whose version of the events is correct and whose testimony the jury believe, but either way, Waterhouse's testimony confirms that the Debtor failed to assist with, advice, or facilitate the alleged payment, albeit due to an alleged instruction from Dondero. Either way, the Debtor was negligent and at fault for the alleged default, as explained below.

---

[182] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 6:7-8 (referencing Exhibits A1 and A2, which were not included in Plaintiff's Appx), Pl. Appx. 02051; Def. Ex. 3-D, Email from F. Waterhouse to K. Hendrix, dated November 25, 2020, Def. Appx. 204-208; Def. Ex. 3-E, Email from F. Waterhouse to K. Hendrix, dated December 31, 2020, Def. Appx. 210.
[183] Id.
[184] Pl. Ex. 98, James Dondero 10/29/21 Tr. 458:11-463:25, Pl. Appx. 01785-01786.
[185] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 390:4-392:17, Pl. Appx. 02147.
[186] Pl. Ex. 99, James Dondero 11/4/21 Tr. 151:8-152:23, Pl. Appx. 01850.

CORE/3522697.0002/171927721.9

### 4.      Debtor's Negligence and Fault In Creating an Alleged Default

93.      As demonstrated above, the Debtor failed to advise NexPoint of any upcoming payment on the NexPoint Note, much less to facilitate the same.  As such, there is ample evidence, at least to demonstrate a genuine issue of material fact, that it was the Debtor's own negligence and fault that caused the alleged default—all the more so since, on summary judgment, NexPoint's evidence is to be believed and reasonable inferences must be drawn in favor of NexPoint.  *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

94.      In this respect, the SSA sets forth the applicable standard of care by which the Debtor must discharge its duties under the SSA:

> "[T]he care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."[187]

95.      Here, the analysis diverges depending on whether the jury will believe Waterhouse that he did in fact consult with Dondero regarding whether NexPoint should make the December, 2020 alleged payment and that Dondero instructed him not to make the payment, or whether the jury will believe Dondero that he gave no such instruction and was instead not consulted about the payment.  As noted throughout, the Court cannot make this determination on summary judgment. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

### (i)      If Dondero Did Not Issue the Non-Payment Instruction

96.      If a jury found that Dondero did not instruct Waterhouse to not cause the December, 2020 payment to be made, then the Debtor clearly breached the standard of care under the SSA by doing *nothing* to assist and advise with respect to the payment, and no expert testimony is required

---

[187] Pl. Ex. 205, NexPoint's Amended and Restated Shared Services Agreement as of January 1, 2018, § 6.01, Pl. Appx. 04173.

CORE/3522697.0002/171927721.9

on this issue because a layperson juror can reach this conclusion based on his or her own experience:

> under the facts of this case, expert testimony was not required to establish that the Trustee breached her duties. While the precise course of action the Trustee should have taken may be subject to reasonable debate, it requires no technical or expert knowledge to recognize that she affirmatively should have undertaken some form of action to acquire for the bankruptcy estate the assets to which it was entitled. As the bankruptcy court explained, by doing nothing, the Trustee ignored basic human nature.

*In re Schooler*, 725 F.3d 498, 514-15 (5th Cir. 2013). *Accord Floyd v. Hefner*, 556 F. Supp. 2d 617, 643 (S.D. Tex. 2008) ("an exception to the general rule is recognized where the [ ] lack of care and skill is so evident that the jury can find negligence as a matter of common knowledge").

97.     Because the jury could well accept Dondero's testimony, and because the SSA sets forth a standard of care that would therefore have been breached by the Debtor by doing nothing to assist or advise NexPoint on the December 2020 payment, which conclusion the jury may reach without resort to expert testimony, and drawing all reasonable inferences in favor of NexPoint, the Court should deny summary judgment based on NexPoint's affirmative defense of the Debtor's own negligence and fault without any need to consider the alternative if the jury were to accept Waterhouse's testimony on Dondero's alleged instruction.

### (ii) If Dondero Issued the Non-Payment Instruction: Offer of Proof

98.     Conversely, if a jury accepted Waterhouse's testimony that Dondero instructed him to not make the December 2020 alleged payment, expert testimony would be helpful to appreciate the consequences. In such an event, the Debtor would still be at fault and would have committed negligence in failing to take any additional steps after receiving the alleged instruction, including to: (i) double check, at a minimum, that Waterhouse correctly understood Dondero; (ii) advise

Dondero of the potential consequences of a missed payment; and (iii) try to dissuade Dondero from his alleged instruction.

99. In this respect, NexPoint offers the expert opinion of its expert on this issue, Steven J. Pully.[188] The Bankruptcy Court denied NexPoint's motion for leave to extend the expert witness designation, report, and discovery deadlines, even though NexPoint filed its motion seeking such leave only ten (10) days after Waterhouse's deposition, when NexPoint first learned of Waterhouse's testimony regarding the alleged instruction, which first triggered the potential need for expert testimony regarding whether the Debtor properly discharged its duties under the SSA *if* Dondero gave the alleged instruction. NexPoint has timely filed a motion with the District Court seeking its review of the Bankruptcy Court's denial of its motion for leave, and hereby incorporates, to the extent necessary, said motion.[189]

100. Accordingly, under this offer of proof, there is a genuine issue of material fact regarding the Debtor's own negligence and fault in creating the alleged default, even if a jury could accept Waterhouse's testimony regarding Dondero's alleged instruction.

101. At a minimum, there is admissible evidence to create a genuine issue of material fact that the Debtor was negligent and at fault for creating the alleged default, and the law confirms that, in such an event, timely performance under the NexPoint Note was excused as a result of such negligence and fault: (i) the SSA was in place at the time and, under the SSA, NexPoint outsourced payment, accounts payable, and treasury service functions to the Debtor; (ii) these included assisting and advising NexPoint with regard to payment obligations due under the Note, and to facilitate NexPoint's timey payment of such obligations; (iii) the Debtor utterly failed to

---

[188] Def. Ex. 3-F, Expert Report of Steven J. Pully, Def. Appx. 212-235.
[189] *Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines,* Case 21-03005-sgj [Doc. 86]; *Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines,* Case 21-03005-sgj [Doc. 138].

CORE/3522697.0002/171927721.9

take any steps to assist, advise, or facilitate the same or, if Dondero in fact instructed that the payment not be made, the Debtor utterly failed to take any steps thereafter consistent with its duties; and (iv) any resulting default in not making a timely payment under the NexPoint note is excused due to the Debtor's own negligence and fault.

### 5. The HCMS and HCRE SSAs.

102. For the reasons discussed in section D.2, *supra,* Plaintiff also owed the same services to HCMS and HCRE as it did NexPoint pursuant to its verbal SSAs with HCMS and HCRE. Because the HCMS and HCRE SSAs carried with them the same obligations, rights, and duties as the NexPoint SSA, Plaintiff is also responsible for the skipped December 2020 annual payments for the same reasons outlined *supra*. Therefore, there is sufficient summary judgment evidence creating a genuine issue of material fact that Plaintiff is responsible for these missed payments, and the Court must deny summary judgment.

### 6. Prepayments by NexPoint and HCMS

#### a. NexPoint Prepayments

103. NexPoint presents evidence showing a course of conduct wherein prepayments on the NexPoint Term Note were accepted by the Plaintiff without default in prior years in contradiction to Plaintiff's claim that the term Notes required payment precisely on December 31 of each year. This Court cannot resolve this issue at the summary judgment stage, as it raises a genuine issue of material fact regarding NexPoint's defense of prepayment. Since the NexPoint Term Note is a contract, Texas law on contract interpretation and ambiguity must be applied.

104. In Texas, it is clear that this Court's primary goal when interpreting the NexPoint Note is to "determine the parties' intent as reflected in the [Note's] terms." *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009). As further summarized:

CORE/3522697.0002/171927721.9

> When a court concludes that contract language can be given a certain or definite meaning, then the language is not ambiguous, and the court is obligated to interpret the contract as a matter of law.  A term is not ambiguous because of a simple lack of clarity.  Nor does an ambiguity arise merely because parties to an agreement proffer different interpretations of a term.  An ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning.  Further, for an ambiguity to exist, both potential meanings must be reasonable.

*DeWitt County Elec. Coop. Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999).  However, when a contract contains an ambiguity, ". . . the courts [may] consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument."[190] Additionally, "[e]vidence of trade usage and ***course of conduct*** is admissible to explain, supplement, or qualify a term or an agreement, but it may not be used to contradict an express term."[191]   And more importantly, Texas law requires a lender to apply prepayments to upcoming installments absent express, contrary instructions.[192]

105.    Here, the NexPoint Term Note itself is ambiguous with respect to the prepayment of future interest and the application of any prepayment between accrued interest, future interest, and principal.  Section 2.1 of the Note provides:

> 2.1  Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the **"Annual Installment"**) until the Note is paid in full.  Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of

---

[190] *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995).

[191] *Craig Sessions M.D., P.A. v. TH Healthcare Ltd.* 412 S.W.3d 738, 745-46 (Tex. App. – Texarkana 2013) (emphasis added); s*ee also O'Connor v. United States*, 479 U.S. 27, 33 (1986) ("the course of conduct of parties to any contract, is evidence of its meaning").

[192] *See Williams v. Cambridge Cos.*, 615 S.W.2d 172, 175 (Tex. 1981) ("Even in the absence of [instructions to apply a prepayment to the next installment], the prepayment was correctly applied to the installment first maturing."); *Getto v. Gray*, 627 S.W.2d 437, 440 (Tex. App. 1981) ("In the absence of an express stipulation to the contrary, prepayments on an indebtedness are to be applied to the installments first maturing."); *Bacher v. Maddux*, 550 S.W.2d 405, 405 (Tex. Civ. App. 1977) ("Where a party prepays note payments, these prepayments are applied to the installments first maturing."); *Curry v. O'Daniel*, 102 S.W.2d 481, 482 (Tex. Civ. App. 1937) ("Under these circumstances, the law will make the application according to the justice and equity of the case and this usually requires that such payment be applied according to priority of time—that is to the installments first maturing . . . .").

48

this Note, commencing on the first such date to occur after the date of execution of this Note.[193]

Section 3 of the Note further provides:

> 3. <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.[194]

106. Clearly, the NexPoint Note does not require the annual payment on December 31 despite any prepayments. In fact, the NexPoint Note contains *no* provision to the effect that a prepayment will not relieve the maker of any regularly scheduled payment. James Seery – testifying for the Debtor – confirmed this at his deposition.[195] Most importantly, NexPoint *never made the full annual payment* on December 31 in 2017, 2018, or 2019.[196] For example, NexPoint paid $294,695.10 on December 18, 2018.[197] NexPoint paid $530,112.36 on December 30, 2019.[198] Yet there were *no defaults* because, as explained below, NexPoint had prepaid the annual payment. Therefore, it is clear from the language of the Note, the parties' understanding of the NexPoint Note, and the parties' course of conduct that the annual installment payment can be prepaid, and was prepaid in the past.

107. The ambiguity in the NexPoint Note is fairly straightforward: can NexPoint prepay future interest? The Note itself says that it can "prepay . . . accrued interest."[199] Accrued interest is of course interest that has already accrued, but the Note expressly permits NexPoint to prepay this interest, in effect prepaying future interest. Yet the Note also provides that "payments on this

---

[193] Pl. Ex. 2, Amended Complaint against NPA et al., Exhibit 1, Pl. Appx. 00042.
[194] *Id.*
[195] Def. Ex. 3-A, Deposition of James P. Seery (65:20-66:2), Def. Appx. 113-114 ("It's -- it says on, but typically there's no issue about prepayment and that paragraph 3 says you can prepay").
[196] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 3247-3258.
[197] *Id.*
[198] *Id.*
[199] Pl. Ex. 2, Amended Complaint against NPA et al., Exhibit 1, Pl. Appx. 00042.

CORE/3522697.0002/171927721.9

Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof."[200] This provision forecloses the ability to prepay future interest, since any prepayment can only be applied to accrued interest and then to principal. This is the ambiguity in the Note itself: on the one hand, the Note permits NexPoint to prepay future interest, while on the other hand, such prepayment is impossible.

108.     There is no question that the parties – well before this litigation – understood that NexPoint was permitted to prepay future interest. On May 9, 2018, NexPoint paid $879,927.65 on the Note.[201] The *entirety* of this payment was applied as a prepayment towards future interest for the months of May through October, 2018, and *none* of it was applied to principal.[202] Likewise, on December 5, 2017, NexPoint made a payment of which $127,030.67 was applied to future interest on the NexPoint Note, such that no payment was due – and no payment was made – on December 31, 2017.[203] Similarly, on December 18, 2018, $60,727.60 of NexPoint's payment was applied to future interest.[204]   In addition to the parties' actual practice and conduct, Mr. Seery confirmed at his deposition that future interest can be prepaid under the NexPoint Note: "Interest accrues on this note. How you prepay it is you send the money before the accrual date."[205] Thus, NexPoint can prepay and has prepaid future interest under the Note, as evidenced by the parties' actual practice and Mr. Seery's testimony, regardless of Section 3's implication that prepaying future interest is impossible (since that provision provides that any prepayment is first applied to accrued interest and then to principal, leaving no room for any prepayment of future interest).

---

[200] *Id.*
[201] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 3247-3258.
[202] *Id.*
[203] *Id.*
[204] *Id.*
[205] Def. Ex. 3-A, Deposition of James P. Seery (67:15-22), Def. Appx. 114.

109.     As noted, NexPoint prepaid the Note by $6,380,000.00 in 2019.  Plaintiff clearly

concluded that the 2019 annual principal payment on the Note had been prepaid because there was

no such payment made on December 31, 2019.[206]  But, the Debtor billed NexPoint for $530,112.36

for accrued interest on December 30, 2019, which NexPoint paid.[207]  This was the Plaintiff's error.

In fact – as consistent with prior payments – the large prepayments in 2019 should have prepaid

*future* annual instalments as there is no provision in the Note that links any prepayment to simply

the annual payment for the year in which the prepayment is made; *i.e.* nothing in the Note prevents

a prepayment of annual instalments due in future years.   In sum, when NexPoint made

$6,380,000.00 in 2019, those payments should have been applied to future annual installments in

accordance with the parties' course of conduct and prior dealings.

110.     Fortunately, Texas law addresses the situation where a debt instrument fails to

specify how a payment should be applied against the underlying obligation.  Generally, the debtor

may direct the application of a payment in the absence of a written agreement providing otherwise.

*See Parrish v. Haynes*, 62 F.2d 105, 107 (5th Cir. 1932).  "When a debtor fails to properly exercise

his power to direct the application of the payment, the creditor ordinarily may apply the payment

to any valid and subsisting claim he has against the debtor."  *W.E. Grace Mfg. Co. v. Levin*, 506

S.W.2d 580, 585 (Tex. 1974).   However, the creditor may "not make an application that is

inequitable and unjust to the debtor."  *First Nat'l Bank v. Whirlpool Corp.*, 517 S.W.2d 262, 269

(Tex. 1974) (emphasis added).  This is a "limitation on the general rule that in the absence of

application of payments by the parties themselves the law applies them to the oldest items then

due."  *Id.*

---

[206] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 3247-3258.
[207] *Id.*

CORE/3522697.0002/171927721.9

111.    However, if neither the debtor not creditor make a proper application of a payment,

then "the law will make the application according to the justice of the case." *Phillips v. Herdon*,

78 Tex. 378, 384 (Tex. 1890). *Accord Texas Co. v. Schram*, 93 S.W.2d 544, 548 (Tex. Civ. App.

– Austin 1936) ("the law makes the application which is in accord with the justice and equity of

the particular case"). And, importantly:

> that the debtor has the absolute right to make the application if he sees proper to
> exercise it. If he omits to do so, and it is left to the law to make it for him, it ought,
> it would seem, to be made in accordance with the presumed intention of the debtor.
> And we think it must be presumed that the debtor intended to apply it to the debt
> that would be most beneficial to him.

*Phillips*, 78 Tex. at 385.

112.    The Court cannot resolve these ambiguities and course of conduct issues on

summary judgment. NexPoint intended that the payments in 2019 be applied as prepayments on

the Note in 2019. Plaintiff agreed and understood this to be the case as well.[208] The only question

is what the prepayments should be applied to and, in particular, whether they should have been

applied to the 2020 annual installment. NexPoint did not expressly direct such prepayment. And,

the Plaintiff did not apply the prepayments to the 2020 annual installment. Although the Plaintiff's

application is to be given weight, it should not result in a manner that is "inequitable and unjust"

to NexPoint. And, the ultimate application of the payments must be made in equity and under the

facts and equities of the case, with the presumption that NexPoint "intended to apply [the

prepayments] to the debt that would be most beneficial to [it]." *Phillips*, 78 Tex. At 385.

**b.    HCMS Prepayments**

113.    Similarly-situated to NexPoint, HCMS also presents evidence showing a course of

conduct wherein Plaintiff consistently accepted prepayments prior to December 31 of a given

---

[208] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 81:13-82:3, Pl. Appx. 03147.

CORE/3522697.0002/171927721.9

calendar year for the HCMS Term Note, but never considered the Note to be in default when a payment was not made precisely on December 31.[209]  Further, the allocation of HCMS' prepayments on the Note between principal and interest raise the same defensive issue of ambiguity as the NexPoint Note discussed *supra*.

114.    The terms of the HCMS Term Note and the NexPoint Term Note are nearly identical, with both presenting the same ambiguity issues.  Section 2.1 of the HCMS Term Note provides:

> 2.1 <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the **"Annual Installment"**) until the Note is paid in full.  Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.[210]

Further, Section 3 of the HCMS Term Note provides:

> 3.  Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.[211]

115.    HCMS never made a single payment on December 31 of 2017, 2018, or 2019.[212] And, yet again, Plaintiff never called for payment or declared the HCMS Term Note to be in default in January – or any other month – of 2017, 2018, or 2019.[213]  However – like NexPoint – HCMS made large payments on the Note in 2017, 2018, and 2019 that it believed applied towards future scheduled payments on the HCMS Term Note.[214]  Specifically, HCMS paid $6,395,236.52 on the Note in 2017 ($5,395,319.15 more than the annual installment), $1,160,665.94 on the Note in 2018

---

[209] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.
[210] Pl. Ex. 3, Amended Complaint against HCMS, Exhibit 6, Pl. Appx. 00134.
[211] *Id.*
[212] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.
[213] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25; Def. Ex. 1, J Dondero Dec., ¶ 46, Def. Appx. 22.
[214] *Id.*

($160,748.57 more than the annual installment), and $7,230,360.49 on the Note in 2019 ($6,230,443.12 more than the annual installment).[215] Again, none of these payments were made on December 31, and at no time did Plaintiff declare the Note in default.[216]

116. Applying the same Texas precedent raised *supra*, the Court should look to the pattern of conduct between the parties to the instrument to determine how a contractual ambiguity should be resolved. Here – similarly to the NexPoint prepayments – the Plaintiff accepted enormous prepayments by HCMS in the past, and never once raised the issue of default when it did not receive the annual installment payment on December 31.[217] Working off of this pattern of conduct, Plaintiff was not entitled to declare the Note in default. Again, however, the Court cannot resolve these ambiguities and course of conduct issues on summary judgment.

117. Additionally, even if there were any missed payments, payments were made on the NexPoint, HCRE, and HCMS Term Notes to cure any defaults. "'An optional acceleration of maturity of a note can be waived by the acts and words of one who holds right of election.'" *Vaughan v. Crown Plumbing & Sewer Serv., Inc.*, 523 S.W.2d 72, 75 (Tex. Civ. App. 1975) (quoting *Diamond v. Hodges*, 58 S.W.2d 187, 188 (Tex. Civ. App. 1933)). As Defendants' evidence demonstrates, after learning about the alleged missed payments and talking with Frank Waterhouse, Plaintiff's CFO, Jim Dondero instructed him to make the payments and cure any default, and subsequently caused the payments to be made in January of 2021, payments that would not have been made if Mr. Waterhouse disagreed and told Jim Dondero that the payments would not cure and reinstate the loans.[218] Therefore, to the extent there was a default, it was cured.

---

[215] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.
[216] Def. Ex. 1, J Dondero Dec., ¶ 46, Def. Appx. 22.
[217] *Id.*
[218] *Id.* at ¶ 40, Def. Appx. 19-20.

CORE/3522697.0002/171927721.9

## IV.    Conclusion

118.    WHEREFORE, Defendants respectfully request this Court Deny Plaintiff's Motion

for Partial Summary Judgment and grant such other and further relief as the Court deems just and

proper.

Dated: January 20, 2022                    Respectfully submitted,

                                           /s/Deborah Deitsch-Perez
                                           Deborah Deitsch-Perez
                                           State Bar No. 24036072
                                           Michael P. Aigen
                                           State Bar No. 24012196
                                           STINSON LLP
                                           3102 Oak Lawn Avenue, Suite 777
                                           Dallas, Texas 75219
                                           (214) 560-2201 telephone
                                           (214) 560-2203 facsimile
                                           Email: deborah.deitschperez@stinson.com
                                           Email: michael.aigen@stinson.com
                                           **ATTORNEYS FOR JAMES DONDERO,
                                           NANCY DONDERO, HIGHLAND CAPITAL
                                           MANAGEMENT SERVICES, INC. AND
                                           NEXPOINT REAL ESTATE PARTNERS, LLC**


                                           /s/Clay M. Taylor
                                           Clay M. Taylor
                                           State Bar No. 24033261
                                           Bryan C. Assink
                                           State Bar No. 24089009
                                           BONDS ELLIS EPPICH SCHAFER JONES LLP
                                           420 Throckmorton Street, Suite 1000
                                           Fort Worth, Texas 76102
                                           (817) 405-6900 telephone
                                           (817) 405-6902 facsimile
                                           Email: clay.taylor@bondsellis.com
                                           Email: bryan.assink@bondsellis.com
                                           **ATTORNEYS FOR JAMES DONDERO**

CORE/3522697.0002/171927721.9

*/s/Davor Rukavina*
Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P. AND
HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on January 20, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for Plaintiff Highland Capital Management, L.P. and on all other parties requesting or consenting to such service in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3522697.0002/171927721.9

APP 961

| From: | Aigen, Michael P. |
|---|---|
| To: | John A. Morris; Rukavina, Davor; Vasek, Julian; Deitsch-Perez, Deborah R. |
| Cc: | Jeff Pomerantz; Gregory V. Demo; Hayley R. Winograd |
| Subject: | RE: Highland: NOTICE OF INTENT TO FILE A MOTION FOR CONTEMPT |
| Date: | Tuesday, January 25, 2022 4:30:18 PM |
| Attachments: | Stipulation.DOCX |

John,

As we indicated yesterday and as we indicated in our summary judgment response, our inclusion of the Pully Report in our response was an offer of proof intended to preserve our ability to object to and appeal the Bankruptcy Court's consideration of Plaintiff's Summary Judgement Motion without consideration of the Pully Material (as defined in the Stipulation), as well as to preserve our ability to appeal the denial of the Expert Deadline Motion (lest Debtor argue it is moot or otherwise infirm because of a grant of a motion for summary judgment).

As you know, offers of proof are typically used (i) to permit the trial judge "to reevaluate his decision in light of the actual evidence to be offered" and (ii) "to permit the reviewing court to determine if the exclusion affected the substantial rights of the party offering it." Fortunato v. Ford Motor Co., 464 F.2d 962, 967 (2d Cir. 1972).  A proffer of evidence may be required if the trial judge is not "well aware of the content and purpose of the evidence." Frederick v. Swift Transp. Co., 616 F.3d 1074, 1083 (10th Cir. 2010).  The court must be "well aware of the substance of the evidence," and the record must "reflect[] the substance of the evidence." United States v. Sheffield, 992 F.2d 1164, 1169–70 (11th Cir. 1993).  The proponent of excluded evidence must show "the substance of the proposed evidence" and "make known to the court for what reasons the evidence is offered." McQuaig v. McCoy, 806 F.2d 1298, 1301–02 (5th Cir. 1987).  Where the "pretrial proffer is adequate and evidence is excluded unconditionally by a pretrial order," then "the proponent has preserved the issue for appeal and (other circumstances being unchanged) need not bring the witness to court and proffer the evidence again at trial." Fusco v. Gen. Motors Corp., 11 F.3d 259, 262–63 (1st Cir. 1993); see also Walden v. Georgia-Pac. Corp., 126 F.3d 506, 517, 519 (3d Cir. 1997).  Offers of proof are also used at summary judgment. Utica Mutual Insurance Company v. Munich Reinsurance America, Inc., 7 F.4th 50, 64 (2d. Cir. 2021); Germano v. International Profit Ass'n, Inc., 544 F.3d 798, 801 (7th Cir. 2008); York v. Toone, 2018 WL 8619800, at *1 (W.D. Tex. Dec. 10, 2018).

Based on this, we don't understand how making an offer of proof (not in front of a jury, where harm occurs because of the inability of jurors to unhear something they should not have heard) can violate an order excluding evidence (even assuming the Court's order could be so construed, which it cannot be) because that is the exact reason that offers of proof are allowed, and indeed, often required.   In an effort to resolve this without court intervention, however, we have drafted the attached stipulation, which should alleviate your expressed concerns about the Pully Report being used at summary judgment but still allows us to properly preserve our appellate rights. Please let me know if it is acceptable.  If you are willing to do so, my understanding is that Davor will contact you about negotiating a similar stipulation or resolution with respect to the HCMFA Motion to Amend.

Additionally, we once again request that you provide us with any case law or authority that would support your position that making an offer of proof with respect to evidence not yet admitted but

likely to be excluded because of a prior procedural motion is improper and would subject us to sanctions or contempt. Without making a proffer in connection with a summary judgment motion or trial, as the case may be, a court has not been given the context in which to evaluate proposed evidence. Absent some authority for your position, any motion that you file would be improper and frivolous. We have found no such authority and you have provided none. The Court's prior contempt orders were issued in entirely different circumstances. There is no definitive order that making a proffer violates. If you proceed to file your motion, we intend to file a Rule 11 motion.

Thank you,
Michael

**Michael P. Aigen**
Partner

STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219
Direct: 214.560.2201 \ Bio

**STINSON.COM**

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Monday, January 24, 2022 5:01 PM
**To:** Aigen, Michael P. <michael.aigen@stinson.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: Highland: NOTICE OF INTENT TO FILE A MOTION FOR CONTEMPT

Michael:

The legal standard for civil contempt can be found in two other contempt orders issued by the bankruptcy court in the Highland case, Docket No. 2660 at 22-23 and Adv. Pro. 20-03190, Docket No. 191 at 39-41.

Here, the Court entered Orders prohibiting Defendants from (a) pursuing expert testimony concerning the shared services agreement and (b) arguing the Barred Defense. Nevertheless, with full knowledge of the Orders, the Defendants did the very things the Court said they could not. I'm not sure I can think of a better definition of contempt.

To be clear, we do not need any further response. Defendants will either comply with Plaintiff's demands or they won't.

Regards,

John

**John A. Morris**

Pachulski Stang Ziehl & Jones LLP

Direct Dial: 212.561.7760

Tel: 212.561.7700 | Fax: 212.561.7777

jmorris@pszjlaw.com

vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

---

**From:** Aigen, Michael P. [mailto:michael.aigen@stinson.com]

**Sent:** Monday, January 24, 2022 5:21 PM

**To:** John A. Morris <jmorris@pszjlaw.com>; Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>

**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>

**Subject:** RE: Highland: NOTICE OF INTENT TO FILE A MOTION FOR CONTEMPT

John:

Thank you for your email. We will get back to you by tomorrow, as requested, with our response. As you know, we explicitly stated in our Response that the Expert Order was denied and that the evidence was being offered as part of an offer of proof. Do you have any authority stating that providing such an offer of proof is improper, let alone something that could be subject to a contempt finding? If so, please provide us with such authority so we can adequately respond to your email.

Thanks,

Michael

**Michael P. Aigen**

Partner

STINSON LLP

3102 Oak Lawn Avenue, Suite 777

Dallas, TX 75219

Direct: 214.560.2201 \ Bio

**STINSON.COM**

This communication (including any attachments) is from a law firm and may contain confidential and/or privileged information. If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Saturday, January 22, 2022 7:17 AM
**To:** Rukavina, Davor (drukavina@munsch.com) <drukavina@munsch.com>; Vasek, Julian (jvasek@munsch.com) <jvasek@munsch.com>; Aigen, Michael P. <michael.aigen@stinson.com>; Deitsch-Perez, Deborah R. <deborah.deitschperez@stinson.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** Highland: NOTICE OF INTENT TO FILE A MOTION FOR CONTEMPT

**External Email – Use Caution**

Counsel:

We are reviewing the Defendants' opposition papers to Plaintiff's motion for partial summary judgment and write to address two issues that, if not promptly addressed, will result in Plaintiff filing a motion to hold you, your firms, and your clients in contempt of Court for violating multiple Court orders.

First, Defendants have included in their appendix the expert report of Mr. Tully, dated December 10, 2021 and filed as Appendix Exhibit F (the "Tully Report"). The inclusion of the Tully Report violates the Bankruptcy Court's *Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*, entered on December 22, 2021, in Adv. Pro. 21-03005 at Docket No. 138 (the "Expert Order"), in response to motions filed by NexPoint, HCMS, and HCRE. The inclusion of the Tully Report in Defendants' appendix also violates the *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* (*see, e.g.*, Adv. Pro. 21-03004 at Docket No. 67) which required, among other things, that expert disclosures be completed by October 29, 2021 (the "Discovery Order").

Second, in its brief, HCMFA contends, among other things, that "HCMFA never actually signed the notes." HCMFA moved for leave to amend its answer to assert this exact defense (the "Barred Defense"), but the motion was denied in the Court's *Order Denying Defendant's Second Motion for Leave to Amend Answer*, entered on January 14, 2022, in Adv. Pro. 21-03004, at Docket No. 123 (the "Answer Order" and together with the Expert Order and the Discovery Order, the "Orders"). We believe HCMFA's assertion of the defense plainly violates the Answer Order.

Plaintiff demands that Defendants take all steps to (a) withdraw the Tully Report from its Appendix, and (b) remove all references to, and all arguments derived from, the Tully Report and the Barred Defense by 5:00 p.m. on Tuesday, January 25, 2022.

Defendants' failure to timely comply with these demands will result in a motion to hold you, your firms, and your clients in contempt of Court for knowing and intentional violations of the Orders.

Plaintiff reserves, and does not waive, all of its rights at law and in equity with respect to these matters.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

*Attorneys for James Dondero*

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Attorneys for James Dondero, Nancy Dondero, Highland
Capital Management Services, Inc. and NexPoint Real
Estate Partners, LLC*

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

*Attorneys for NexPoint Advisors, L.P.*

John A. Morris *(pro hac vice)*
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Email:    jmorris@pszjlaw.com

*Attorneys for Debtor Highland Capital
Management, LP*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| **vs.** | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO,** | § | |
| **AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| **Defendants.** | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03005-sgj** |
| **vs.** | § § | |
| **NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03006-sgj** |
| **vs.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03007-sgj** |
| **vs.** | § § | |
| **HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |

## <u>STIPULATION</u>

This Stipulation is entered into between and among Highland Capital Management, L.P., the plaintiff (the "Plaintiff" or "HCMLP") in the above-referenced adversary proceedings (the "Adversary Proceedings"), on the one hand, and James Dondero ("Dondero"), L.P., NexPoint Advisors, L.P. ("NexPoint"), Highland Capital Management Services, Inc. ("HCMS"), and HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE" and together with Dondero,

NexPoint, and HCMS, the "Defendants," and Plaintiff and Defendants together, the "Parties") on the other hand.

## **RECITALS**

WHEREAS, on January 22, 2021, Plaintiff commenced the Adversary Proceedings;

WHEREAS, Plaintiff subsequently amended its pleading to add additional claims and parties (collectively, the "Amended Complaints");

WHEREAS, October 29, 2021, Defendants NexPoint, HCMS and HCRE filed Motions to Extend Expert Disclosure and Discovery Deadlines (the "Expert Deadline Motion");

WHEERAS, on December 22, 2021, the Bankruptcy Court entered an Order denying the Expert Deadline Motion (the "Expert Deadline Order");

WHEREAS, on December 17 and 18, 2021, Plaintiff filed its Motion for Partial Summary Judgment (as amended on December 20, 2021) (the "Summary Judgment Motion");

WHEREAS, on January 20, 2022, Defendants filed their Opposition to Highland Capital Management, L.P.'s Motion for Partial Summary Judgment (the "Opposition");

WHEREAS, in their Opposition, Defendants specifically stated that the Expert Report of Steven J. Pully ("Pully Report") "was incorrectly not permitted to be in included in the record by the Court" and that "Defendants submit this proffer to preserve their objection." (Opposition at fn. 76);

WHEREAS, on January 22, 2022, Plaintiff send a Notice of Intent to File a Motion for Contempt, asserting that the inclusion of the Pully Report into their appendix and referencing the Pully Report in Defendants' Opposition violated the Expert Deadline Order; and

WHEREAS, Plaintiff demanded that Defendants withdraw the Pully Report from their appendix and remove all references to the Pully Report (the "Pully Material") from the Opposition.

## **STIPULATION**

NOW, THEREFORE, in consideration of the foregoing, the Parties agree and stipulate as follows:

1.      The Bankruptcy Court may disregard the Pully Material in the Opposition and consider the Opposition as if it did not contain any references to the Pully Material (until and unless the Expert Deadline Order is modified to allow the Pully Report to be used by Defendants);

2.      Defendants properly preserved any objections that they may have to the Expert Deadline Order for purposes of any appeals, objections, or otherwise;

3.       Defendants properly preserved any objection to the exclusion from consideration of the Pully Report and the issue of whether the Pully Report should have been considered in connection with Plaintiff's Partial Motion for Summary Judgment is preserved for any challenge to the Court's report and recommendation on the motion for summary judgment and/or any appeal, just as if the proffer of such evidence fully remained before the Bankruptcy Court unaffected by this stipulation; and

4.      Plaintiff expressly agrees that it will not argue in any court or in any proceeding that Defendants waived any objections to the Expert Deadline Order or to the Bankruptcy Court not considering the Pully Material in connection with Plaintiff's Motion for Partial Summary Judgment.

Dated: January 25, 2022

CONSENTED AND AGREED TO BY:

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Attorneys for James Dondero, Nancy Dondero, Highland Capital Management Services, Inc. and NexPoint Real Estate Partners, LLC*

*/s/Clay M. Taylor*
Clay M. Taylor
State Bar No. 24033261
Bryan C. Assink
State Bar No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

*Attorneys for James Dondero*

*/s/ John A. Morris*
John A. Morris *(pro hac vice)*
NY Bar No. 266326
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Email: jmorris@pszjlaw.com

*Attorneys for Debtor Highland Capital Management, LP*

*/s/Davor Rukavina*
Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

*Attorneys for NexPoint Advisors, L.P.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 25, 2022, a true and correct copy of the foregoing document was served via the Court's Electronic Case Filing system to the parties that are registered or otherwise entitled to receive electronic notices in this adversary proceeding.

<div align="right">

*/s/ Michael P. Aigen*
Michael P. Aigen

</div>

Case 21-03005-sgj Doc 162 Filed 02/07/22    Entered 02/07/22 20:24:10    Page 1 of 19
Docket #0162  Date Filed: 2/7/2022
Case 3:21-cv-00881-X   Document 42   Filed 02/14/22   Page 80 of 98   PageID 6209

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:    jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com


-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:    Mhayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-3004 |
| vs. | § § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § § § | Case No. 3:21-cv-00881-X |
| Defendant. | § § § | |

1934054220207000000000006
APP 973

HIGHLAND CAPITAL MANAGEMENT, L.P.,    §
          §
          §
       Plaintiff,    §  Adv. Proc. No. 21-3005
          §
vs.            §
          §
NEXPOINT ADVISORS, L.P., JAMES   §  Case No. 3:21-cv-00880-C
DONDERO, NANCY DONDERO, AND   §
THE DUGABOY INVESTMENT TRUST,   §
          §
       Defendants.   §

HIGHLAND CAPITAL MANAGEMENT, L.P.,    §
          §
       Plaintiff,    §  Adv. Proc. No. 21-3006
          §
vs.            §
          §
HIGHLAND CAPITAL MANAGEMENT   §  Case No. 3:21-cv-01378-N
SERVICES, INC., JAMES DONDERO,   §
NANCY DONDERO, AND THE DUGABOY   §
INVESTMENT TRUST,      §
          §
       Defendants.   §

HIGHLAND CAPITAL MANAGEMENT, L.P.,    §
          §
          §
       Plaintiff,    §  Adv. Proc. No. 21-3007
          §
vs.            §
          §  Case No. 3:21-cv-01379-X
HCRE PARTNERS, LLC (n/k/a NexPoint   §
Real Estate Partners, LLC), JAMES   §
DONDERO, NANCY DONDERO, AND   §
THE DUGABOY INVESTMENT TRUST,   §
          §
          §
       Defendants.   §

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 3

   A.   The Court Denied the Term Note Defendants' Motion to Extend the Expert
Disclosure and Discovery Deadlines .......................................................................... 3

   B.   The Court Denied HCMFA's Second Motion for Leave to Amend Its Answer ................ 5

   C.   The Alleged Violators Ignore the Orders, Include the Pully Report in the Record,
and Press the Barred Defense ..................................................................................... 7

   D.   Plaintiff Has Been and Will Be Prejudiced by the Wrongful Conduct ............................ 8

ARGUMENT .......................................................................................................................... 10

   A.   HCMFA's Barred Defense Should Be Stricken from the Summary Record
Pursuant to Rule 12 ................................................................................................... 10

   B.   HCMFA Is in Contempt of the Second Motion for Leave Order ...................................... 10

   C.   The Term Note Defendants Should Be Sanctioned under Rule 37 .................................. 12

   D.   The Pully Report Should Be Stricken from the Record .................................................. 13

   E.   The Term Note Defendants Are in Contempt of the Expert Order .................................. 13

   F.   The Term Note Defendants Should Reimburse Plaintiff for Reasonable Costs
Incurred for Their Violation of the Discovery Orders ................................................... 14

CONCLUSION ........................................................................................................................ 14

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Batson v. Neal Spelce Associates, Inc.*,
 765 F.2d 51 (5th Cir. 1985) ............................................................................................ 14

*Chilcutt v. United States*,
 4 F.3d 1313 (5th Cir.1993) ............................................................................................ 14

*F.D.I.C. v. LeGrand*,
 43 F.3d 163 (5th Cir. 1995) ...................................................................................... 11, 12

*Geiserman v. MacDonald*,
 893 F.2d 787 (5th Cir. 1990) .................................................................................... 13, 14

*In re Terrebonne Fuel & Lube, Inc.*,
 108 F.3d 609 (5th Cir. 1997) ........................................................................................ 12

*Jacobs v. Tapscott*,
 Civ. Act. 304CV1968D, 2004 WL 2921806 (N.D. Tex. Dec. 16, 2004) ................. 10

*Martin v. Trinity Indus., Inc.*,
 959 F.2d 45 (5th Cir.1992) ........................................................................................... 11

*Matter of Ridgeway*,
 973 F.3d 421, 428 (5th Cir. 2020) ............................................................................... 13

*N.L.R.B. v. Trailways, Inc.*,
 729 F.2d 1013 (5th Cir.1984) ...................................................................................... 11

*Norman Bridge Drug Co. v. Banner*,
 529 F.2d 822 (5th Cir.1976) ........................................................................................ 12

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*,
 685 F.3d 486 (5th Cir. 2012) .................................................................................. 13, 14

*Travelhost, Inc. v. Blandford*,
 68 F.3d 958 (5th Cir. 1995) ...................................................................................... 11, 12

*Whitcraft v. Brown*,
 570 F.3d 268 (5th Cir. 2009) .................................................................................. 11, 12

**STATUTES**

11 U.S.C. § 105 ................................................................................................................ 10

**RULES**

Fed. R. Civ. P. 12(f) ........................................................................................................ 10

Fed. R. Civ. P. 37(b)(2) .................................................................................................. 13

Fed. R. Civ. P. 37(b)(2)(A) ............................................................................................ 13

Fed. R. Civ. P. Rule 37(b)(2)(C) .................................................................................... 13

## BRIEF IN SUPPORT OF
## PLAINTIFF'S OMNIBUS MOTION (A) TO STRIKE CERTAIN
## DOCUMENTS AND ARGUMENTS FROM THE RECORD, (B) FOR
## <u>SANCTIONS, AND (C) FOR AN ORDER OF CONTEMPT</u>

Highland Capital Management, L.P. ("<u>Highland</u>" or "<u>Plaintiff</u>"), the reorganized debtor in the above-captioned chapter 11 case (the "<u>Bankruptcy Case</u>") and plaintiff in the above-referenced adversary proceedings (collectively, the "<u>Notes Actions</u>"), hereby files this brief in support of its motion (the "<u>Motion</u>") for the entry of an order substantially in the form annexed as **Exhibit A** to the Motion (a) striking (i) the Pully Report and (ii) all references to, and all arguments derived from, the Pully Report and the Barred Defense, as highlighted on **Morris Exhibits 1 and 2**,[1] respectively, (b) imposing sanctions on the Alleged Violators[2] for violating multiple rules, and (c) holding the Alleged Violators in civil contempt for their willful and knowing violation of three court Orders.

The Motion is made pursuant to Rules 12 and 37 of the Federal Rules of Civil Procedure, Rules 7012 and 7037 of the Federal Rules of Bankruptcy Procedure, and section 105 of the United States Bankruptcy Code.  In support of the Motion, Plaintiff respectfully represents as follows:

## <u>PRELIMINARY STATEMENT</u>[3]

1.     Plaintiff brings the Motion due to the Alleged Violators' complete disregard of multiple court Orders and other straight-forward and applicable rules.

---

[1] References to "<u>Morris Exhibit ___</u>" are to the exhibits attached to the *Declaration of John A. Morris Submitted in Support of Plaintiff's Motion (A) to Strike Certain Documents and Arguments from the Record, (B) for Sanctions, and (C) for an Order of Contempt* being filed simultaneously with the Motion.

[2] The "Alleged Violators" include each of the corporate entities that are defendants in the Notes Actions and their counsel.

[3] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

2.      Last fall, (a) the Term Note Defendants asked this Court for permission to extend the expert disclosure and discovery deadlines so that they could offer the expert opinions of Mr. Pully and engage in further expert discovery (*i.e.*, the Expert Motion), and (b) HCMFA asked this Court for permission to amend its Answer to assert the affirmative defense that HCMFA never signed the HCMFA Notes (*i.e.*, the Second Motion for Leave).  Following extended hearings, this Court entered Orders denying both requests.  Nevertheless, the Alleged Violators have proceeded as if the Orders do not exist.

3.      Ignoring basic rules of appellate practice, the Alleged Violators have improperly sought reconsideration of the interlocutory Orders from the District Court.  Not satisfied with the disruption those improper pleadings have caused, the Alleged Violators created further chaos by (a) ignoring the Orders, (b) including the Pully Report in their Appendix, and (c) pressing the Barred Defense, all in opposition to Plaintiff's Summary Judgment Motion (the "<u>Wrongful Conduct</u>").

4.      The Wrongful Conduct violates Rule 12 and Rule 37 and constitutes civil contempt on the ground that the Alleged Violators did ***exactly*** what the Orders prohibited.

5.      Before filing the Motion, Plaintiff gave the Alleged Violators an opportunity to correct their errors and avoid the Motion.  Specifically, Plaintiff demanded in writing that the Alleged Violators withdraw the Pully Report and all references to, and argument based on, the Pully Report and the Barred Defense.  In response, the Alleged Violators doubled down, contending that they could proceed under the guise of "offers of proof" or "proffers."  Nonsense. The Orders and applicable rules govern and, unless overturned by the District Court, prohibited the Alleged Violators from engaging in the Wrongful Conduct.

DOCS_NY:45107.6 36027/003

6.      If the Wrongful Conduct is not remedied and the Alleged Violators are not held accountable, Plaintiff will be severely prejudiced because (a) Plaintiff relied on the Orders and did not seek discovery in connection with the Pully Report or the Barred Defense; (b) consequently, Plaintiff cannot adequately respond to the Pully Report and the Barred Defense; (c) the appellate record will improperly include evidence and arguments concerning an affirmative defense that have already been excluded; and (d) Plaintiff will have effectively expended substantial time, money, and effort opposing the Expert Motion and the Second Motion for Leave for no purpose.

7.      There is no credible justification for any of this Wrongful Conduct. The appellate rights of the Term Note Defendants and HCMFA were preserved when their Motions were denied – and, in any event, they have (albeit improperly) already sought reconsideration of the Orders from District Court. Under the circumstances, there is no good faith basis for the Alleged Violators to have engaged in the Wrongful Conduct, and they must be held accountable for the havoc they intentionally created.

8.      For the reasons set forth below, the Motion should be granted in all respects.

## STATEMENT OF FACTS

**A.      The Court Denied the Term Note Defendants' Motion to Extend
the Expert Disclosure and Discovery Deadlines**

9.      In January 2021, Plaintiff commenced five different actions seeking to recover on promissory notes executed by James Dondero and entities he controls.

10.      On September 6, 2021, after a series of maneuvers by the defendants that necessitated the amendment of Plaintiff's original complaints, the Court entered an *Order*

3

*Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* [*see*, *e.g.*, Adv. Pro. No. 21-03005, Docket No. 70][4] (the "Scheduling Order"). **Morris Exhibit 3**.

11.     The Scheduling Order provided that, among other things, "expert designations and disclosures of all opinions, and the bases therefor, will be made by October 29, 2021, and experts will be deposed between October 29, 2021 and November 8, 2021." *Id.* ¶ 3.

12.     On October 29, 2021, NexPoint Advisors, L.P. ("NexPoint") filed its *Motion to Extend Expert Disclosure and Discovery Deadlines* [Docket No. 86] (the "Expert Motion").[5] In the Expert Motion, the Term Note Defendants sought this Court's permission to extend the deadlines to designate experts, serve expert reports, and take expert discovery. Specifically, NexPoint sought permission to commission an expert report by Steven J. Pully (the "Pully Report") concerning the "Debtor's duties [of care] under the Shared Services Agreement" and to otherwise extend the expert discovery deadlines. Expert Motion ¶¶ 1, 13, 17.

13.     Pursuant to the Court's *Order Approving Amended Stipulation Regarding Briefing and Hearing Schedule* [Docket No. 102], Plaintiff filed its objection to the Expert Motion on December 1, 2021 [Docket No. 104], and NexPoint filed its reply on December 8, 2021 [Docket No. 115].

---

[4] Unless noted otherwise, all docket references are to those maintained in the adversary proceeding captioned *Highland Capital Management, L.P. v. NexPoint Advisors, L.P.*, Adv. Pro. No. 21-03005.

[5] Even though Mr. Pully's opinions concern the interpretation of HCMFA's Shared Services Agreement with Plaintiff, Highland Capital Management Services, Inc. ("HCMS") and HCRE Partners, LLC ("HCRE" and together with NexPoint and HCMS, the "Term Note Defendants") effectively joined the Expert Motion despite the fact that they were never parties to that Agreement and have no written shared services agreement of their own. *See* Adv. Pro. No. 21-03006 [Docket No. 91] (HCMS's motion to extend expert disclosure and discovery deadlines) and Adv. Pro. No. 21-03007 [Docket No. 86] (HCRE's motion to extend expert disclosure and discovery deadlines). Notably, NexPoint has been pursuing the issue of Plaintiff's alleged obligations under the Shared Services Agreement since March 1, 2021, but never sought to offer expert discovery concerning Plaintiff's alleged obligations under the Agreement before filing the Expert Motion on October 29, 2021, the last day for the designation of experts under the Scheduling Order. *See Defendant's Original Answer*, Adv. Pro. No. 21-03005, Docket No. 6 ¶ 39 (asserting as an affirmative defense Plaintiff's alleged negligence and breach of its duty of care under the Shared Services Agreement).

14.     On December 13, 2021, at the conclusion of a hearing on the Expert Motion and the presentation of extensive argument, the Court stated that it would deny the Expert Motion. [*See* Docket No. 122].

15.     On December 22, 2021, the Court entered its Order denying the Expert Motion in all respects (the "Expert Order").  [Docket No. 138].  **Morris Ex. 4**.

16.     On January 5, 2022, the Term Note Defendants filed objections in the United States District Court for the Northern District of Texas (the "District Court") seeking "reconsideration" and other forms of review of the Expert Order (the "Expert Reconsideration Motion").[6]

17.     On January 31, 2022, Plaintiff objected to the Term Note Defendants' Expert Reconsideration Motion, arguing that it was both procedurally and substantively improper.  *See* Civ. Act. No. 3:21-cv-00881-X, Docket Nos. 37-39.  **Morris Exhibit 6**.

**B.      The Court Denied HCMFA's Second Motion for Leave to Amend Its Answer**

18.     On March 1, 2021, Highland Capital Management Fund Advisors, L.P. ("HCMFA" and together with the Term Note Defendants and their counsel, the "Alleged Violators") filed its *Original Answer* to Plaintiff's Complaint in which it failed to assert any affirmative defenses to Plaintiff's claims for recovery on two promissory notes issued by HCMFA (the "HCMFA Notes"). *See* Adv. Pro. No. 21-03004, Docket No. 6.

19.     On May 22, 2021, HCMFA moved for leave to amend its *Original Answer* to assert as an affirmative defense that Frank Waterhouse, HCMFA's Treasurer and the person whose signature appears on the HCMFA Notes, signed the HCMFA notes by mistake and without

---

[6] *See* Civ. Act. No. 3:21-cv-00880-X, Docket Nos. 21-23 (*Objection of NexPoint Advisors, L.P. to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*) (**Morris Exhibit 5**); Civ. Act. No. 3:21-cv-01378, Docket No. 26 (*Defendants Highland Capital Management Services, Inc. and HCRE Partners, LLC's Objection to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*) (together, the "Expert Reconsideration Motion").

authority.  *See generally Defendants' Motion for Leave to Amend Answer* (the "<u>First Motion for Leave</u>"), Adv. Pro. No. 21-03004, Docket No. 32.  HCMFA's First Motion for Leave was based on a purported internal investigation conducted by Dennis C. Sauter, Jr. that included multiple interviews with Mr. Waterhouse.

20.     The Court granted HCMFA's First Motion for Leave and on July 6, 2021, HCMFA filed its *Amended Answer*.  Adv. Pro. No. 21-03004, Docket No. 48 (the "<u>Amended Answer</u>").  In its *Amended Answer*, HCMFA alleged, among other things, that "Waterhouse ***signed*** the two promissory notes," and that "Waterhouse made a mistake in preparing and ***signing*** the Notes for defendant," and that "Waterhouse prepared and ***signed*** the Notes on his own, without proper knowledge of the underlying facts and without actual authority."  *See* Amended Answer ¶¶ 43-44 (emphases added).

21.     On November 30, 2021, about a month after the close of discovery, HCMFA filed its *Second Motion for Leave to Amend Answer* [Adv. Pro. No. 21-03004, Docket No. 82] (the "<u>Second Motion for Leave</u>" and together with the Expert Motion, the "<u>Motions</u>").  In its Second Motion for Leave, HCMFA requested permission "to amend its answer to expressly deny that the notes were signed" by Mr. Waterhouse or HCMFA (the "<u>Barred Defense</u>").  Second Motion for Leave ¶ 1.[7]

---

[7] HCMFA filed its Second Motion for Leave while also contending that it "does not concede that [the relief requested] is required."  Second Motion for Leave ¶ 1.  This contention was (and remains) disingenuous because (i) after conducting an internal investigation that included multiple interviews with the HCMFA officer whose name appears on the HCMFA Notes (*i.e.*, Mr. Waterhouse), HCFMA asserted multiple times in its Amended Answer that ***Mr. Waterhouse signed the Notes***, albeit allegedly by mistake and without authority (Mr. Waterhouse has rejected the claim of mistake and never admitted lack of authority), such that HCMFA's Second Motion for Leave was unquestionably required, but (ii) even if it were not, HCMFA voluntarily filed its Second Motion for Leave and must live with the consequences of its decision.  HCMFA cannot have it both ways: the Court's order denying the Second Motion for Leave was not transformed into an advisory opinion merely because HCMFA did not like the result.

DOCS_NY:45107.6 36027/003

APP 982

22.     On December 30, 2021, Plaintiff filed its opposition to HCMFA's Second Motion for Leave [Adv. Pro. No. 21-03004, Docket No. 107] and on January 10, 2022, the Court held an evidentiary hearing on HCMFA's Second Motion for Leave during which the Court heard extensive testimony from Mr. Sauter, the person who claims to have conducted HCMFA's internal investigation (including the interviews of Mr. Waterhouse) which formed the foundation for HCMFA's First Motion for Leave.  During cross examination, Mr. Sauter was forced to admit that (a) Mr. Waterhouse specifically told him that the HCFMA Notes were prepared for HCMFA's auditors because the transfer of $7.4 million from Highland to HCMFA in May 2019 had to be documented, and (b) Mr. Sauter failed to disclose Mr. Waterhouse's statements supporting the Notes in Mr. Sauter's Declarations submitted in support of either the First Motion for Leave or the Second Motion for Leave.  **Morris Exhibit 7** at 61:1-62:1; 64:7-20; 67:1-21.

23.     On January 14, 2022, the Court entered an order denying HCMFA's Second Motion for Leave (the "Second Motion for Leave Order" and together with the Scheduling Order and the Expert Order, the "Orders").  Adv. Pro. No. 21-03004, Docket No. 123.  **Morris Exhibit 8**.

24.     On January 27, 2022, HCMFA filed its objection to the *Order Denying Motion to Amend Answer* in the District Court seeking "reconsideration" and other forms of review of the Second Motion for Leave Order.  *See* Civ. Act. No. 3:21-cv-00881-X, Docket Nos. 34-36.[8]

## C.     The Alleged Violators Ignore the Orders, Include the Pully Report in the Record, and Press the Barred Defense

25.     In flagrant disregard of the Orders, the Alleged Violators did exactly what the Court told them they could not: they included the Pully Report in the evidentiary record, and fully pressed the Barred Defense, in their opposition to Plaintiff's Summary Judgment Motion.

---

[8] Plaintiff's time for responding to this latest baseless filing has not yet expired.

26.     First, despite the passage of all applicable deadlines in the Scheduling Order and the entry of Expert Order denying the Expert Motion, the Term Note Defendants and their counsel willfully and defiantly (i) included the Pully Report in their appendix (*see, e.g.*, Adv. Pro. No. 21-03005, Docket No. 157 (Def. Ex. 3-F, Def. Appx. 211-235), and (ii) advanced arguments based on the Pully Report in opposition to Plaintiff's Summary Judgment Motion.[9]

27.     Second, despite the entry of the Second Motion for Leave Order denying HCMFA's Second Motion for Leave, HCMFA and its counsel willfully and defiantly made extensive arguments based on the Barred Defense in its opposition to Plaintiff's Summary Judgment Motion. *See* **Morris Exhibit 2** (highlighted portions).

28.     Plaintiff promptly demanded that the Alleged Violators immediately correct their Wrongful Conduct.  They steadfastly refused, claiming that they were merely "preserv[ing] their appellate rights by making a proffer."  **Morris Exhibit 9**.

## D.     Plaintiff Has Been and Will Be Prejudiced by the Wrongful Conduct

29.     If not rectified, Plaintiff will be severely and irreparably prejudiced by the Alleged Violators' Wrongful Conduct.

30.     Among other things, Plaintiff will be prejudiced because (a) it justifiably relied on the Orders and never sought discovery in connection with the Pully Report or the Barred Defense, (b) consequently, Plaintiff cannot fully respond to the Pully Report or the Barred Defense and the arguments "proffered" in connection therewith, nor should it have been baited into doing so, (c) the appellate record will improperly include evidence (*i.e.*, the Pully Report) and arguments

---

[9] According to the Term Note Defendants, their defense under the Shared Services Agreements (the written agreement between Plaintiff and HCMFA and the allegedly unwritten agreements between Plaintiff and HCMS and HCRE) is "bolstered by the Expert Report of Steven J. Pully . . . which was incorrectly not permitted to be included in the record by the Court.  Defendants submit this proffer to preserve their objection."  *See Defendants' Memorandum of Law in Response to Plaintiff's Motion for Partial Summary Judgment*, Adv. Pro. No. 21-03003 [Docket No. 154] ¶28, n. 76.

DOCS_NY:45107.6 36027/003

concerning an affirmative defense) (*i.e.*, the Barred Defense) that the Court has already excluded, and (d) Plaintiff will have effectively expended substantial time, money, and effort negotiating the Scheduling Order and opposing the Expert Motion and the Second Motion for Leave for no apparent purpose.

31.     All of this (and more) was explained to defense counsel.[10]  Indeed, Plaintiff was willing to address the entire purported premise for the Wrongful Conduct – preserving the record for appeal – stating:

> If your issue is preserving the issue for appeal, I would consider a stipulation – although, given that the evidence and arguments subject to the proffer were already the subject of motions and orders, one of which has already been presented to the District Court for review, I don't understand the concern or the necessity.  Indeed, as you note, "[w]here the "pretrial proffer is adequate and ***evidence is excluded unconditionally by a pretrial order,***" then "the proponent ***has preserved the issue for appeal*** and (other circumstances being unchanged) need not bring the witness to court and proffer the evidence again at trial."  Fusco v. Gen. Motors Corp., 11 F.3d 259, 262–63 (1st Cir. 1993) (emphasis added).

**Morris Exhibit 9**.

32.     *One of the very cases cited by defense counsel gave them all the comfort they needed that their issues were already preserved for appeal.*  Nevertheless, the Alleged Violators

---

[10] Prior to filing the Motion, Plaintiff put the Alleged Violators on notice of the myriad problems caused by their recalcitrant insistence on pursuing the Wrongful Conduct, including raising the following questions:

"1.  Why should any court – whether the bankruptcy court or an appellate court -- consider evidence that has been excluded by court order?

2.  And if you don't intend the Court to consider the evidence and defense, why proffer it?

3.  Why should the record include evidence that has been excluded?  I have never seen that before.  Judge Jernigan has excluded numerous exhibits throughout this bankruptcy and then files a statement showing the evidence that was admitted.  Only admitted evidence is part of the record.

4.  I don't have my own expert to counter yours.  How do I address that?  How can a court consider your expert report when I did not have a chance to obtain my own?

5.  I haven't taken discovery on the Barred Defense.  How do I fairly address the defense?  I just argue in a vaacum [*sic*]?

6.  Am I supposed to address evidence and a defense that have been barred?

7.  You've "incorporated by reference" a 21page [*sic*] brief filed in the District Court (violating the page limits).  Am I supposed to respond to that brief, too?"

Morris Exhibit 9.

contemptuously refused to comply with Plaintiff's demands or the Orders precisely because they wanted the Pully Report and the Barred Defense "in the record as part of an offer of proof." *Id.*

## ARGUMENT

### A. HCMFA's Barred Defense Should Be Stricken from the Summary Record Pursuant to Rule 12

33. Rule 12 of the Federal Rules of Civil Procedure provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The decision to grant a motion to strike is within the court's discretion. *Jacobs v. Tapscott*, Civ. Act. 304CV1968D, 2004 WL 2921806, at *2 (N.D. Tex. Dec. 16, 2004).

34. The Barred Defense should be stricken from HCMFA's response to summary judgment under Rule 12(f) because HCMFA failed to plead the Barred Defense in its Amended Answer, and the Court prohibited HCMFA from belatedly asserting such defense in its Second Motion for Leave Order. As HCMFA and its counsel knew, Plaintiff will be severely prejudiced by the inclusion of the Barred Defense in the summary judgment record because Plaintiff reasonably relied on the entry of the applicable Order and took no discovery related to the Barred Defense. Consequently, Plaintiff cannot now adequately respond to the Barred Defense. And, most fundamentally, there is no good faith basis to permit the Alleged Violators to argue an affirmative defense that has been prohibited.

### B. HCMFA Is in Contempt of the Second Motion for Leave Order

35. HCMFA is in civil contempt for violating the Second Motion for Leave Order.

36. "A party commits contempt when [they] violate[] a definite and specific order of the court requiring [them] to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995);

*Whitcraft v. Brown*, 570 F.3d 268, 271 (5th Cir. 2009) (same). The party seeking an order of contempt in a civil contempt proceeding need only establish, by clear and convincing evidence: "(1) that a court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order." *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995); *see also Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992) (same); *Travelhost*, 68 F.3d at 961 (same). "The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Circ. 2000) (citing *N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013 1017 (5th Cir.1984)).

37.     Judicial sanctions in civil contempt proceedings may be employed for either or both of two purposes: "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Am. Airlines*, 228 F.3d at 586 (internal quotations omitted). "Compensatory civil contempt reimburses the injured party for the losses and expenses incurred because of [their] adversary's noncompliance." *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir.1976); *see also Travelhost*, 68 F.3d at 961 (noting that "[b]ecause the contempt order in the present case is intended to compensate [plaintiff] for lost profits and attorneys' fees resulting from the contemptuous conduct, it is clearly compensatory in nature"); *In re Terrebonne Fuel & Lube, Inc.*, 108 F.3d 609, 612 (5th Cir. 1997) (affirming court's decision to impose sanctions for violating injunction and awarding plaintiff costs and fees incurred in connection with prosecuting defendant's conduct); *F.D.I.C.*, 43 F.3d at 168 (affirming court's imposition of sanctions requiring defendant to pay movant attorneys' fees). Ultimately, courts have "broad discretion in the assessment of damages in a civil contempt proceeding." *Am. Airlines*, 228 F.3d at 585; *see also F.D.I.C.*, 43 F.3d 168 (reviewing lower court's contempt order for "abuse

11

of discretion" under the "clearly erroneous standard."); *In re Terrebonne Fuel & Lube, Inc.*, 108

F.3d at 613 ("The [] court's decision to impose sanctions is discretionary[]").

38.     Plaintiff easily meets the foregoing standards: (a) the Second Motion for Leave

Order was entered in response to HCMFA's own motion and was effective when HCMFA

defiantly included the Barred Defense in its summary judgment response; (b) the Second Motion

for Leave Order expressly prohibited HCMFA from asserting the Barred Defense; and (c) HCMFA

failed to comply with the clear requirements of the Second Motion for Leave Order by including

the Barred Defense in its summary judgment pleading.  Accordingly, Plaintiff has demonstrated

by clear and undisputed evidence that HCMFA is in civil contempt.  *See Whitcraft*, 570 F.3d at

272 (affirming finding of civil contempt where a court order was in effect, party was on notice of

such order, and party failed to abide by it).  HCMFA's flouting of the Second Motion for Leave

Order cannot be justified or explained away, and there is no basis to oppose this relief requested

herein.

**C.     The Term Note Defendants Should Be Sanctioned under Rule 37**

39.     Under Rule 37(b), courts may "strik[e] pleadings in whole or in part" and find a

party in "contempt" for violation of a discovery order.  FED. R. CIV. P. 37(b)(2)(A); *see also Matter

of Ridgeway*, 973 F.3d 421, 428 (5th Cir. 2020).[11]  "This sort of sanction is justifiable when there

is willful misconduct and when lesser sanctions will not achieve the desired deterrent effect." *Id.*;

*see also Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490 (5th Cir. 2012);

("In addition to a broad range of sanctions, including contempt, FED. R. CIV. P. 37(b)(2)

authorizes the court to impose a concurrent sanction of reasonable expenses, including attorneys'

---

[11] For the avoidance of doubt, Rule 37 is incorporated into Federal Rule of Bankruptcy Procedure 7037 and applies in adversary proceedings such as these.  FED. R. BANK. P. 7037.

fees, caused by the failure to obey a discovery order"); *Geiserman v. MacDonald*, 893 F.2d 787, 792 (5th Cir. 1990) (same). Under Rule 37, a party, their attorney, or both, may be personally liable for reasonable expenses including attorney's fees caused by the failure to comply with a discovery order. *See* FED. R. CIV. P. 37(b)(2)(C); *Smith*, 685 F.3d at 490; *Batson v. Neal Spelce Assocs., Inc.*, 765 F.2d 511, 516 (5th Cir. 1985).

40. It is "well within the court's discretion to use sanctions as a tool to deter future abuse of discovery" under Rule 37. *Smith*, 685 F.3d at 490; *see also Chilcutt v. United States*, 4 F.3d 1313, 1323 n. 23 (5th Cir.1993) (stating that district courts "have authority to grant a broad spectrum of sanctions" under Rule 37(b), and "neither this Court nor the Supreme Court has ever determined that the lack of willful, contumacious, or prolonged misconduct prohibits all sanctions").

**D.    The Pully Report Should Be Stricken from the Record**

41. The Pully Report should be stricken from the Term Note Defendants' Appendix under Rule 37(b)(2)(A)(iii). By including the Pully Report in the record, the Term Note Defendants violated two discovery orders, the Scheduling Order and the Expert Order. Moreover, the Term Note Defendants cannot be permitted to create factual issues in the summary judgment record with evidence that is inadmissible at trial. *See Geiserman*, 893 F.2d at 792 ("We uphold the court's exclusion of the affidavit of the proposed expert witness [in summary judgment pleading], in order to enforce its discovery order and local rule. [Party] cannot attempt to create a fact issue with evidence of facts that cannot be proven at trial").

**E.    The Term Note Defendants Are in Contempt of the Expert Order**

42. The Term Note Defendants should be held in contempt under Rule 37(b)(2)(A)(vii) for violating the two discovery orders; namely, the Scheduling Order and the Expert Order.

13

**F.**  **The Term Note Defendants Should Reimburse Plaintiff for Reasonable Costs Incurred for Their Violation of the Discovery Orders**

43.    The Term Note Defendants should be held liable to Plaintiff for the reasonable costs and attorney fees and expenses incurred by Plaintiff as a result of Defendants' violation of the discovery orders under Rule 37(b)(2)(C).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order: (i) striking the Barred Defense (and all arguments in support of that defense) from the summary judgment record; (ii) striking the Pully Report from the summary judgment record; (iii) finding HCMFA, the Term Note Defendants, and their counsel in civil contempt of a court order; (iv) finding HCMFA, the Term Note Defendants, and their counsel in contempt of discovery orders and (v) granting Plaintiff such other and further relief that the Court deems just and proper.

DOCS_NY:45107.6 36027/003

APP 990

Dated:  February 7, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

15

APP 991