PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-3004-sgj |
| vs. | § § | Case No. 3:21-cv-00881-X |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § § | |
| Defendant. | § § § | |

## APPENDIX IN SUPPORT OF HIGHLAND CAPITAL MANAGEMENT, L.P.'S OBJECTION AND RESPONSE TO OBJECTION TO ORDER DENYING MOTION TO AMEND ANSWER

| Ex. | Description | Appx. # |
|---|---|---|
| 1 | Original Complaint against HCMFA, Adv. Pro. No. 21-3004, D.I. 1, (Bankr. N.D. Tex. January 22, 2021) | 1-21 |
| 5 | Defendant's Original Answer, Adv. Pro. No. 21-3004, D.I. 6, (Bankr. N.D. Tex. March 1, 2021) | 22-29 |
| 34 | Highland's Consolidated Financial Statements, dated December 31, 2018 | 30-76 |
| 35 | HCMFA's Incumbency Certificate, April 2019 | 77-78 |
| 36 | Email string re 15(c) Follow up (10/2/21 – 10/6/21) | 79-83 |
| 45 | HCMFA's Consolidated Financial Statements and Supplemental Information (December 31, 2018) **(FILED UNDER SEAL)** | 84 |
| 54 | 5/2/19 e-mail and attachment (Promissory Note) | 85-88 |
| 56 | 5/3/19 e-mail | 89-90 |
| 57 | 5/3/19 Promissory Note | 91-93 |
| 59 | Supplemental 15(c) Information Request 10.23.20 | 94-101 |
| 94 | Peet Burger 7/30/21 Deposition Transcript | 102-136 |
| 99 | James Dondero 11/4/21 Deposition Transcript | 137-198 |
| 105 | Frank Waterhouse 10/19/21 Deposition Transcript | 199-329 |
| 192 | Dustin Norris 12/1/21 Deposition Transcript | 330-399 |
| 194 | Kristin Hendrix 10/27/21 Deposition Transcript | 400-454 |
| 195 | David Klos 10/27/21 Deposition Transcript | 455-512 |
| 199 | Debtor's January 2021 Affiliates Loan Receivables Summary **(Adv. Pro. No. 21-3003)** | 513-514 |
| 210 | Declaration of David Klos in Support of HCMLP's Motion for Partial Summary Judgment, Adv. Pro. No. 21-3004, D.I. 92, (Bankr. N.D. Tex. December 17, 2021) | 515-594 |
| 213 | Defendant's Motion to Withdraw the Reference, Adv. Pro. No. 21-3004, D.I. 20, (Bankr. N.D. Tex. April 13, 2021) | 595-598 |
| 214 | Report and Recommendation to District Court Proposing that it: (A) Grant Defendant's Motion to Withdraw the Reference at Such Time as Bankruptcy Court Certifies that Action is Trial Ready; and (B) Defer | 599-611 |

| Ex. | Description | Appx. # |
|---|---|---|
| | Pretrial Matters to Bankruptcy Court, Adv. Pro. No. 21-3004, D.I. 50, (Bankr. N.D. Tex. July 8, 2021) | |
| 215 | Motion for Leave to Amend Answer, Adv. Pro. No. 21-3004, D.I. 32, (Bankr. N.D. Tex. May 22, 2021) | 612-661 |
| 216 | Defendant's Amended Answer, Adv. Pro. No. 21-3004, D.I. 48, (Bankr. N.D. Tex. July 6, 2021) | 662-671 |
| 217 | Defendant's Second Motion for Leave to Amend Answer and Brief in Support Thereof, Adv. Pro. No. 21-3004, D.I. 82, (Bankr. N.D. Tex. November 30, 2021) | 672-699 |
| 218 | Second Declaration of Dennis C. Sauter, Adv. Pro. No. 21-3004, D.I. 83, (Bankr. N.D. Tex. November 30, 2021) | 700-752 |
| 219 | January 10, 2022 Hearing Transcript | 753-897 |
| 220 | Order Denying Defendant's Second Motion for Leave to Amend Answer, Adv. Pro. No. 21-3004, D.I. 123, (Bankr. N.D. Tex. January 13, 2022) | 898-901 |

Dated:  February 17, 2022.    **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 1

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | _____ |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_NY:41996.4 36027/002

1934054210127000000000010

## COMPLAINT FOR (I) BREACH OF CONTRACT
## AND (II) TURNOVER OF PROPERTY OF THE DEBTOR'S ESTATE

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its complaint (the "Complaint") against defendant, Highland Capital Management Fund Advisors, L.P. ("HCMFA" or "Defendant"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

### PRELIMINARY STATEMENT

1.      The Debtor brings this action against HCMFA as a result of HCMFA's defaults under two promissory notes executed by HCMFA in favor of the Debtor in the aggregate original principal amount of $7,400,000 and payable upon the Debtor's demand.  Despite due demand, HCMFA has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      Through this Complaint, the Debtor seeks (a) damages from HCMFA in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the Notes), and (b) turnover by HCMFA to the Debtor of the foregoing amounts.

### JURISDICTION AND VENUE

3.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

DOCS_NY:41996.4 36027/002

D-CNL002796

**Appx. 00003**

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

5.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

### THE PARTIES

7.      The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

8.      Upon information and belief, HCMFA is a limited partnership with offices located in Dallas, Texas and is organized under the laws of the state of Delaware.

### CASE BACKGROUND

9.      On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

10.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis LP and Acis GP.

DOCS_NY:41996.4 36027/002

D-CNL002797

**Appx. 00004**

11.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

12.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

### STATEMENT OF FACTS

**A.**     **The HCMFA Notes**

13.     HCMFA is the maker under a series of promissory notes in favor of the Debtor.

14.     Specifically, on May 2, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,400,000 ("HCMFA's First Note").  A true and correct copy of HCMFA's First Note is attached hereto as **Exhibit 1**.

15.     On May 3, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "Notes").  A true and correct copy of HCMFA's Second Note is attached hereto as **Exhibit 2**.

16.     Section 2 of each Note provides: "**Payment of Principal and Interest**.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

17.     Section 4 of each Note provides:

**Acceleration Upon Default**.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:41996.4 36027/002

D-CNL002798

**Appx. 00005**

18.    Section 6 of each Note provides:

> **Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.    HCMFA's Default under Each Note**

19.    By letter dated December 3, 2020, the Debtor made demand on HCMFA for payment under the Notes by December 11, 2020 (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 3**.  The Demand Letter provided:

> By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued interest and principal through and including December 11, 2020.
>
> **Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

20.    Despite the Debtor's demand, HCMFA did not pay all or any portion of the amounts demanded by the Debtor on December 11, 2020 or at any time thereafter.

21.    As of December 11, 2020, there was an outstanding principal amount of $2,457,517.15 on HCMFA's First Note and accrued but unpaid interest in the amount of $35,884.46, resulting in a total outstanding amount as of that date of $2,493,401.61.

22.    As of December 11, 2020, there was an outstanding principal balance of $5,119,827.40 on HCMFA's Second Note and accrued but unpaid interest in the amount of $74,424.05, resulting in a total outstanding amount as of that date of $5,194,251.45.

23.    Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Notes was $7,687,653.07

5

D-CNL002799

**Appx. 00006**

24.     Pursuant to Section 4 of each Note, each Note is in default and is currently due and payable.

### FIRST CLAIM FOR RELIEF
**(For Breach of Contract)**

25.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

26.     Each Note is a binding and enforceable contract.

27.     HCMFA breached each Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

28.     Pursuant to each Note, the Debtor is entitled to damages from HCMFA in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for HCMFA's breach of its obligations under each of the Notes.

29.     As a direct and proximate cause of HCMFA's breach of each Note, the Debtor has suffered damages in the total amount of at least $7,687,653.07 as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

### SECOND CLAIM FOR RELIEF
**(Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))**

30.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

31.     HCMFA owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs

6

D-CNL002800

Appx. 00007

and reasonable attorneys' fees and expenses) for HCMFA's breach of its obligations under each of the Notes.

32.     Each Note is property of the Debtor's estate, and the amounts due under each Note are matured and payable upon demand.

33.     HCMFA has not paid the amounts due under each Note to the Debtor.

34.     The Debtor has made demand for the turnover of the amounts due under each Note.

35.     As of the date of filing of this Complaint, HCMFA has not turned over to the Debtor all or any of the amounts due under each of the Notes.

36.     The Debtor is entitled to the turnover of all amounts due under each of the Notes.

WHEREFORE, the Debtor prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial, including, among other things, (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)    On its Second Claim for Relief, ordering turnover by HCMFA to the Debtor of an amount equal to (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses); and

(iii)   Such other and further relief as this Court deems just and proper.

DOCS_NY:41996.4 36027/002

D-CNL002801

Appx. 00008

Dated:  January 22, 2021.                    **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com
             hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:41996.4 36027/002

D-CNL002802

**Appx. 00009**

# EXHIBIT 1

**EXHIBIT 1**

D-CNL002803

**Appx. 00010**

# PROMISSORY NOTE

$2,400,000.00                                                                                May 2, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.  <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.  <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

3.  <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.  <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.  <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.  <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**


_____

FRANK WATERHOUSE

2

D-CNL002805

**Appx. 00012**

# EXHIBIT 2

**EXHIBIT 2**

**PROMISSORY NOTE**

$5,000,000.00                                                                                        May 3, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand.

3.      <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

2

D-CNL002808

**Appx. 00015**

# EXHIBIT 3

**EXHIBIT 3**

D-CNL002809

**Appx. 00016**

## HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Fund Advisors, LP
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  Frank Waterhouse, CFO

      Re:  Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("Maker") entered into the following promissory notes (collectively, the "Notes"), among others,[1] in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 5/2/2019 | $2,400,000 | $2,457,517.15 | $35,884.46 | $2,493,401.61 |
| 5/3/2019 | $5,000,000 | $5,119,827.40 | $74,424.05 | $5,194,251.45 |
| **TOTALS** | **$7,400,000** | **$7,577,344.55** | **$110,308.52** | **$7,687,653.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee prior to April 15, 2019.  Pursuant to that certain *Acknowledgment from HCMLP*, dated as of April 15, 2019, Payee agreed not to demand payment on such amounts until May 31, 2021.  Payee reserves all rights with respect to such amounts.

expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:     Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        DC Sauter

D-CNL002811

Appx. 00018

**Appendix A**

ABA #:            322070381
Bank Name:        East West Bank
Account Name:     Highland Capital Management, LP
Account #:        5500014686

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Highland Capital Management, L.P. | **DEFENDANTS**<br>Highland Capital Management Fund Advisors, L.P. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Hayward LLP<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | **ATTORNEYS** (If Known)<br>Munsch Hardt Kopf & Harr, P.C.<br>500 N. Akard Street, Suite 3800<br>Dallas, Texas 75201  Tel.: (214) 855-7500 |
| **PARTY** (Check One Box Only)<br>☑ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor     ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor     ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Count 1:  Breach of contract; Count 2:  Turnover pursuant to 11 U.S.C. 542

---

### NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☑ 2 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
- ☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $7,687,653.07 plus interest, fees, and expenses |
| Other Relief Sought | |

D-CNL002813

**Appx. 00020**

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | | |
|---|---|---|---|
| NAME OF DEBTOR<br> Highland Capital Management, L.P. | | BANKRUPTCY CASE NO.<br> 19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br> Northern District of Texas | | DIVISION OFFICE<br> Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | | |
| PLAINTIFF | DEFENDANT | | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | | |
| DATE<br><br> January 22, 2021 | | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br> Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 1040 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# EXHIBIT 5

Docket #0006  Date Filed: 3/1/2021

K&L GATES LLP
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management Fund
Advisors, L.P.*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

*Counsel for Highland Capital Management Fund
Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S ORIGINAL ANSWER

COMES NOW Highland Capital Management Fund Advisors, L.P. (the "Defendant"), the

defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding")

filed by Highland Capital Management, L.P. (the "Plaintiff"), and files this its *Defendant's

Original Answer* (the "Answer"), responding to the *Complaint for (I) Breach of Contract and (II)*

DEFENDANT'S ORIGINAL ANSWER

1934054210302000000000006

D-CNL002868
Appx. 00023

*Turnover of Property of the Debtor's Estate* (the "Complaint").  Where an allegation in the Complaint is not expressly admitted in this Answer, it is denied.

### PRELIMINARY STATEMENT

1.      The first sentence of ¶ 1 sets forth the Plaintiff's objective in bringing the Complaint and does not require a response.  To the extent it contains factual allegations, they are denied.  The second sentence contains a legal conclusion that does not require a response.  To the extent it contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

### JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Case to adjudicate this dispute.  Any allegations in ¶ 3 not expressly admitted are denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding.  Any allegations in ¶ 4 not expressly admitted are denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt.  The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does not consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding.  Any allegations in ¶ 5 not expressly admitted are denied.

6.      The Defendant admits ¶ 6 of the Complaint.

D-CNL002869

**Appx. 00024**

**THE PARTIES**

7.      The Defendant admits ¶ 7 of the Complaint.

8.      The Defendant admits ¶ 8 of the Complaint.

**CASE BACKGROUND**

9.      The Defendant admits ¶ 9 of the Complaint.

10.     The Defendant admits ¶ 10 of the Complaint.

11.     The Defendant admits ¶ 11 of the Complaint.

12.     The Defendant admits ¶ 12 of the Complaint.

**STATEMENT OF FACTS**

A.      **The HCMFA Notes**

13.     The Defendant admits that it has executed at least one promissory note under which the Debtor is the payee.  Any allegations in ¶ 13 not expressly admitted are denied.

14.     The Defendant admits ¶ 14 of the Complaint.

15.     The Defendant admits ¶ 15 of the Complaint.

16.     The Defendant denies ¶ 16 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 16 is not verbatim.

17.     The Defendant denies ¶ 17 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 17 is not verbatim.

18.     The Defendant admits ¶ 18 of the Complaint.

B.      **HCMFA's Default under Each Note**

19.     The Defendant admits that Exhibit 3 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent ¶ 19 of the Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, ¶ 19 of the Complaint is denied.

D-CNL002870

20.     To the extent ¶ 20 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits ¶ 20 of the Complaint.

21.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 21 of the Complaint and therefore denies the same.

22.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 22 of the Complaint and therefore denies the same.

23.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 23 of the Complaint and therefore denies the same.

24.     The Defendant denies ¶ 24 of the Complaint.

### FIRST CLAIM FOR RELIEF
**(For Breach of Contract)**

25.     Paragraph 25 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

26.     Paragraph 26 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 26 of the Complaint and therefore denies the same.

27.     Paragraph 27 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 27 of the Complaint and therefore denies the same.

28.     Paragraph 28 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient

D-CNL002871

**Appx. 00026**

to form a belief about the truth of the allegations in ¶ 28 of the Complaint and therefore denies the same.

29.     The Defendant denies ¶ 29 of the Complaint.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**(Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))**

</div>

30.     Paragraph 30 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

31.     Paragraph 31 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 31 of the Complaint and therefore denies the same.

32.     Paragraph 32 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 32 of the Complaint and therefore denies the same.

33.     The Defendant denies ¶ 33 of the Complaint.

34.     Paragraph 34 of the Complaint states a legal conclusion that does not require a response.  The Defendant admits that the Plaintiff transmitted the Demand Letter.  To the extent ¶ 34 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 34 of the Complaint and therefore denies the same.

35.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 35 of the Complaint and therefore denies the same.

36.     Paragraph 36 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient

D-CNL002872

**Appx. 00027**

to form a belief about the truth of the allegations in ¶ 36 of the Complaint and therefore denies the same.

37.    The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including parts (i), (ii), and (iii).

## JURY DEMAND

38.    The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

39.    The Defendant does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that, following a trial on the merits, the Court enter a judgment that the Plaintiff take noting on the Complaint and provide the Defendant such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of March, 2021.

D-CNL002873

**Appx. 00028**

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/  Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas  75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    drukavina@munsch.com
    jvasek@munsch.com

**K&L GATES LLP**

    Artoush Varshosaz (TX Bar No. 24066234)
    1717 Main Street, Suite 2800
    Dallas, TX 75201
    Tel: (214) 939-5659
    artoush.varshosaz@klgates.com

    A. Lee Hogewood, III (*pro hac vice*)
    4350 Lassiter at North Hills Ave., Suite 300
    Raleigh, NC 27609
    Tel: (919) 743-7306
    Lee.hogewood@klgates.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS,
L.P.**

### CERTIFICATE OF SERVICE

    The undersigned hereby certifies that, on the 1st day of March, 2021, a true and correct copy of this document was electronically served by the Court's ECF system on parties entitled to notice thereof, including counsel for the Plaintiff.

                /s/  Davor Rukavina
                   Davor Rukavina, Esq.

D-CNL002874

# EXHIBIT 34

# Highland Capital Management, L.P.

**(A Delaware Limited Partnership)**
**Consolidated Financial Statements and**
**Supplemental Information**
**December 31, 2018**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Index**
**December 31, 2018**

Page

**Report of Independent Auditors** ...........................................................................................................1

**Consolidated Financial Statements**

Consolidated Balance Sheet...................................................................................................................2

Consolidated Statement of Income .......................................................................................................3

Consolidated Statement of Changes in Partners' Capital......................................................................4

Consolidated Statement of Cash Flows .................................................................................................5

Notes to Consolidated Financial Statements ....................................................................................6-39

Supplemental Information…………………………………………………………………………..40-44



### Report of Independent Auditors

To the General Partner of Highland Capital Management, L.P.

We have audited the accompanying consolidated financial statements of Highland Capital Management, L.P. and its subsidiaries (collectively, the "Partnership"), which comprise the consolidated balance sheet as of December 31, 2018, and the related consolidated statements of income, of changes in partners' capital and of cash flows for the year then ended.

#### *Management's Responsibility for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

#### *Auditors' Responsibility*

Our responsibility is to express an opinion on the consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Partnership's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

#### *Opinion*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Highland Capital Management, L.P. and its subsidiaries as of December 31. 2018, and the results of their operations, changes in their partners' capital and their cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

#### *Other Matter*

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The Supplemental Consolidating Balance Sheet, the Supplemental Consolidating Statement of Income, the Supplemental Unconsolidated Balance Sheet and the Supplemental Unconsolidated Statement of Income are presented for purposes of additional analysis and are not a required part of the consolidated financial statements. The information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the consolidated financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the consolidated financial statements or to the consolidated financial statements themselves and other additional procedures, in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole.

*PricewaterhouseCoopers LLP*

June 3, 2019

---

*PricewaterhouseCoopers LLP, 2121 N Pearl Street, Suite 2000, Dallas, Texas 75201*
*T: (214) 999 1400, F: (214) 754 7991, www.pwc.com/us*

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Balance Sheet**
**December 31, 2018**

*(in thousands)*

### Assets

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 5,034 |
| Investments at fair value (cost $922,027) | | 845,186 |
| Management and incentive fees receivable | | 2,393 |
| Due from broker for securities sold, not yet settled | | 598 |
| Other assets | | 9,255 |
| Notes and other amounts due from affiliates | | 173,398 |
| Intangible assets | | 3,022 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,197 | | 4,581 |
| **Total assets** | $ | 1,043,467 |

### Liabilities and partners' capital

### Liabilities

| | | |
|---|---|---:|
| Accounts payable | $ | 4,983 |
| Securities sold, not yet purchased (proceeds $26,135) | | 32,357 |
| Withdrawals payable | | 57,009 |
| Due to brokers | | 116,560 |
| Due to brokers for securities purchased, not yet settled | | 1,640 |
| Accrued and other liabilities | | 40,246 |
| Notes payable | | 55,752 |
| Investment liabilities | | 46,092 |
| **Total liabilities** | | 354,639 |
| Non-controlling interest | | 316,867 |
| **Partners' capital** | | 371,961 |
| **Total liabilities and partners' capital** | $ | 1,043,467 |

The accompanying notes are an integral part of these consolidated financial statements.

2

HIGHLY CONFIDENTIAL

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Income**
**Year Ended December 31, 2018**

*(in thousands)*

| | | |
|---|---:|---:|
| **Revenue:** | | |
| Management fees | $ | 36,600 |
| Interest and investment income | | 15,831 |
| Incentive fees | | 70 |
| Shared services fees | | 9,187 |
| Other income | | 2,622 |
| Total revenue | | 64,310 |
| | | |
| **Expenses:** | | |
| Compensation and benefits | | 34,475 |
| Professional fees | | 17,679 |
| Interest expense | | 5,670 |
| Marketing and advertising expense | | 2,413 |
| Depreciation and amortization | | 1,317 |
| Investment and research consulting | | 1,082 |
| Bad debt expense | | 7,862 |
| Other operating expenses | | 10,027 |
| Total expenses | | 80,525 |
| | | |
| **Other Income/(Expense):** | | |
| Other income | | 9,826 |
| Impairment on intangible assets | | (2,830) |
| Total other income | | 6,996 |
| | | |
| Loss before investment and derivative activities | | (9,219) |
| | | |
| **Realized and unrealized loss on investments and derivatives:** | | |
| Net realized loss on investments and derivatives | | (31,517) |
| Net change in unrealized loss on investments and derivatives | | (93,755) |
| Net realized and unrealized loss on investments and derivatives | | (125,272) |
| | | |
| Net loss | | (134,491) |
| | | |
| Net loss attributable to non-controlling interest | | (61,313) |
| | | |
| Net loss attributable to Highland Capital Management, L.P. | $ | (73,178) |

The accompanying notes are an integral part of these consolidated financial statements.

3

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Consolidated Statement of Changes in Partners' Capital**
**Year Ended December 31, 2018**

*(in thousands)*

|  | General Partner | | Limited Partners | | Total | |
|---|---|---|---|---|---|---|
| Partners' capital, December 31, 2017 | $ | 163 | $ | 450,014 | $ | 450,177 |
| Net loss attributable to Highland Capital Management, L.P. | $ | (183) | $ | (72,995) | $ | (73,178) |
| Partner distributions | $ | (13) | $ | (5,025) | $ | (5,038) |
| Partners' capital, December 31, 2018 | $ | (33) | $ | 371,994 | $ | 371,961 |

The accompanying notes are an integral part of these consolidated financial statements.

4

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2018**

*(in thousands)*

| | | |
|---|---|---:|
| **Cash flows from operating activities:** | | |
| Net loss | $ | (134,491) |
| Adjustment to reconcile net loss to net cash | | |
| provided from operating activities: | | |
| Net realized loss on investments and derivative transactions | | 31,517 |
| Net change in unrealized loss on investments and derivative transactions | | 93,755 |
| Amortization and depreciation | | 1,317 |
| Changes in assets and liabilities: | | |
| Management and incentive fee receivable | | 9,468 |
| Due from brokers | | 1,689 |
| Due from affiliate | | (10,989) |
| Other assets | | 4,272 |
| Intangible assets | | 3,308 |
| Accounts payable | | 546 |
| Accrued and other liabilities | | 1,214 |
| Due to brokers for securities purchased, not yet settled | | 1,886 |
| Due to brokers | | 11,665 |
| Net cash provided from operating activities | | 15,157 |
| **Cash flows from investing activities:** | | |
| Purchases of fixed assets and leasehold improvements, net | | (67) |
| Purchases of investments | | (195,263) |
| Proceeds from dispositions of investments | | 258,858 |
| Proceeds from securities sold, not yet purchased | | 46,550 |
| Issuance of notes receivable to affiliates | | (2,400) |
| Proceeds from repayments of notes receivable from affiliates | | 3,395 |
| Purchases of investments to cover securities sold, not yet purchased | | (127,954) |
| Net cash used in investing activities | | (16,881) |
| **Cash flows from financing activities:** | | |
| Payments on notes payable & investment liabilities | | (2,743) |
| Proceeds from long-term debt | | 38,501 |
| Capital contributions from minority interest investors of consolidated entities | | 14,615 |
| Capital withdrawals by minority interest investors of consolidated entities | | (141,986) |
| Partner distributions | | (5,060) |
| Net cash used in financing activities | | (96,673) |
| Net decrease in cash and cash equivalents | | (98,397) |
| **Cash and cash equivalents** | | |
| Beginning of year | | 103,479 |
| De-consolidating funds adjustment | | (48) |
| End of year | $ | 5,034 |
| **Supplemental disclosure of cash flow information:** | | |
| Interest paid during the year | $ | (5,629) |
| Taxes paid during the year | | (510,961) |
| Investments acquired for non-cash consideration | | 26,018 |
| Investments disposed for non-cash consideration | | 116 |

The accompanying notes are an integral part of these consolidated financial statements.

5

## Highland Capital Management, L.P.
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**1.    Description of Business**

Highland Capital Management, L.P. (the "Partnership") was formed on July 7, 1997 as a limited partnership in the state of Delaware.  The Partnership is a registered investment adviser under the Investment Advisers Act of 1940 that manages collateralized loan obligations ("CLOs"), hedge funds, private equity funds, and other leveraged loan transactions that are collateralized predominately by senior secured bank debt and high-yield bonds.  The Partnership and its subsidiaries make direct investments in debt, equity, and other securities in the normal course of business.  The Partnership's general partner is Strand Advisors, Inc. (the "General Partner").  The Partnership is owned by an unaffiliated (other than through its direct ownership) trust as well as affiliated trusts and personal holdings of the senior management of the Partnership.

As of December 31, 2018, the Partnership provided investment advisory services for eighteen CLOs, five separate accounts, one master limited partnership, and nine hedge funds or private equity structures, with total fee-earning assets under management of approximately $3.1 billion.  The Partnership also provides investment services on behalf of affiliate advisors.

**2.    Summary of Significant Accounting Policies**

The following is a summary of the significant accounting policies followed by the Partnership in preparation of its consolidated financial statements.

**Basis of Accounting**
The Partnership's consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles in the United States of America ("U.S. GAAP") as set forth in the Financial Accounting Standards Board's Accounting Standards Codification and are stated in the United States Dollar.

**Use of Estimates**
The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts and disclosures in the consolidated financial statements.  Actual results could differ from those estimates and those differences could be material.

**Principles of Consolidation**
The consolidated financial statements include the accounts of the Partnership and the Partnership's consolidated subsidiaries ("Consolidated Entities"), which are comprised of (i) those entities in which it has controlling investment and has control over significant operating, financial and investing decisions, (ii) those entities in which it, as the general partner, has control over significant operating, financial and investing decisions, and (iii) variable interest entities ("VIEs") in which it is the primary beneficiary as described below.

The Partnership determines whether an entity has equity investors who lack the characteristics of a controlling financial interest or does not have sufficient equity at risk to finance its expected activities without additional subordinated financial support from other parties.  If an entity has either of these characteristics, it is considered a VIE and must be consolidated by its primary beneficiary, which is the party that, along with its affiliates and de facto agents, absorbs a majority of the VIEs' expected losses or receives a majority of the expected residual returns as a result of holding variable interests.

6

D-CNL000219
**Appx. 00038**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership assesses consolidation requirements pursuant to ASU 2015-02: Consolidation, which was adopted using the modified retrospective method and resulted in an effective date of adoption of January 1, 2016.

The Partnership and its affiliate's involvement with unconsolidated VIEs is generally limited to that of an advisory services provider, and their investment, if any, represents an insignificant interest in the relevant investment entities' assets under management. The Partnership's affiliate's exposure to risk in these entities is generally limited to any capital contribution it has made or is required to make and any earned but uncollected asset based and performance fees. The Partnership has not issued any investment performance guarantees to these VIEs or their investors, except that the Partnership has agreed to subject the full value of its equity interest in Highland Prometheus Fund to dollar-for-dollar reduction to the extent the third party investor in such fund does not achieve an annual target return.

As of December 31, 2018, the net assets of the unconsolidated VIEs and the Partnership's maximum risk of loss were as follows:

*(in thousands)*

|  | Unconsolidated VIE Net Assets | Carrying Value and Maximum Risk of Loss |
|---|---|---|
| Sponsored investment funds | $ 206,329 | $ 12,178 |

**Consolidation of Variable Interest Entities**
The Partnership consolidates the following VIEs (along with majority owned funds: Highland Diversified Credit Fund, L.P., and Highland Select Equity Fund, L.P., collectively the "Consolidated Investment Funds"), as the Partnership (or its wholly owned subsidiaries) controls the general partner of the respective entities and is responsible for the daily operations of the following entities:

- Highland Multi Strategy Credit Fund, L.P. ("Multi Strategy Master"), formerly Highland Credit Opportunities CDO, L.P., a Delaware limited partnership that commenced operations on December 15, 2005 and changed its name on August 26, 2014;

- Highland Multi-Strategy Master Fund, L.P. ("Multi-Strategy Master"), a Bermuda limited partnership that commenced operations on July 18, 2006;

- Highland Multi-Strategy Fund, L.P. ("Multi-Strat Domestic Feeder"), a Delaware limited partnership that commenced operations on July 6, 2006;

- Highland Restoration Capital Partners Offshore, L.P. ("Restoration Offshore"), a Cayman limited partnership that commenced operations on September 2, 2008;

- Highland Restoration Capital Partners, L.P. ("Restoration Onshore"), a Delaware limited partnership that commenced operations on September 2, 2008; and

7

D-CNL000220
**Appx. 00039**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Consolidation of Majority Owned Entities**
The Partnership consolidates the following entities as it has a controlling majority interest:

- 100% interest in Highland Capital Special Allocation, LLC ("HCSA"), a Delaware limited liability company that commenced operations on December 21, 2006;

- 100% interest in Highland Receivables Finance 1, LLC, a Delaware limited liability company that commenced operations on December 29, 2006;

- 100% interest in Highland Multi-Strategy Onshore Master SubFund, LLC, a Delaware limited liability company that commenced operations on July 19, 2006;

- 100% interest in Highland Multi-Strategy Onshore Master Subfund II, LLC, LLC, a Delaware limited liability company that commenced operations on February 22, 2007;

- 100% interest in Highland Brasil, LLC, a Delaware limited liability company that commenced operations on January 28, 2014;

- 100% interest in Highland Capital Management (Singapore) Pte, Ltd. ("HCM Singapore"), a company organized in the Republic of Singapore that commenced operations on April 2, 2008;

- 100% interest in Highland Capital Management Korea, Ltd. ("HCM Korea"), a company organized in the Republic of Korea that commenced operations on August 2, 2012;

- 100% interest in Highland Capital Management Latin America, L.P., ("HCM Latin America"), a Cayman company that was formed on April 13, 2017;

- 100% interest in HE Capital, LLC, a Delaware limited liability company that was formed on March 22, 2007;

- 100% interest in De Kooning, Ltd, a Cayman company that was formed on December 1, 2012;

- 100% interest in Hirst, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Hockney, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Oldenburg, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Eames, Ltd, a Cayman company that was formed on December 12, 2012;

- 99.9% interest in Penant Management, L.P., a Delaware limited partnership that was formed on December 12, 2012;

- 100% interest in Pollack, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Warhol, Ltd., a Cayman company that was formed on December 1, 2012;

8

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

- 100% interest in HCREF-I Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XI Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XII Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in Highland ERA Management, LLC, a Delaware limited liability company that was formed on February 1, 2013;

- 100% interest in The Dondero Insurance Rabbi Trust., a trust that was formed on May 27, 2004;

- 100% interest in The Okada Insurance Rabbi Trust, a trust that was formed on May 27, 2004;

- 100% interest in Highland Employee Retention Assets ("HERA"), LLC, a Delaware limited liability company that was formed on October 26, 2009;

- 100% interest in Highland Diversified Credit Fund, L.P. ("Highland Offshore Partners"), a Delaware limited partnership which began operations on February 29, 2000 and was organized for the sole purpose of investing substantially all of its assets in Highland Offshore Partners, L.P.;

- 99.6% interest in Highland Select Equity Master Fund, LP, and Highland Select Equity Fund, LP Delaware limited partnerships which began operations on January 1, 2002 and was organized for the purpose of investing and trading in large and small cap stocks that trade for less than intrinsic value;

- 100% interest in Highland Fund Holdings, LLC, a Delaware limited liability company that was formed on May 24, 2016;

- 100% interest in Maple Avenue Holdings, LLC, a Texas limited liability company formed on August 17, 2016;

- 100% interest in Highland HCF Advisor, Ltd., a Cayman company that was formed on October 27, 2017;

- 100% interest in Asury Holdings, LLC, a Delaware limited liability company formed on February 14, 2017 and;

- 100% interest in Highland CLO Management, Ltd., a Cayman company that was formed on October 27, 2017.

All inter-partnership and intercompany accounts and transactions involving the above listed Consolidated Entities have been eliminated in all of the aforementioned consolidating schedules. All the Consolidated Investment Funds are, for U.S. GAAP purposes, investment companies under the American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide - Investment Companies. The Partnership has retained the specialized accounting of these funds required under U.S. GAAP.

9

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The following table includes a rollforward of non-controlling interests from December 31, 2017, to December 31, 2018.

*(in thousands)*

| | |
|---|---:|
| Noncontrolling interest, December 31, 2017 | $ 424,844 |
| Net loss attributable to noncontrolling interest | (61,313) |
| Noncontrolling partner contributions | 14,615 |
| Noncontrolling partner distributions | (58,061) |
| Noncontrolling interest of deconsolidated entities | (3,218) |
| Noncontrolling interest, December 31, 2018 | $ 316,867 |

**Investment Transactions**
Investment transactions are recorded on a trade date basis.  Investments in securities are valued at market or fair value at the date of the consolidated financial statements with the resulting net unrealized appreciation or depreciation reflected in the Consolidated Statement of Income. Realized gains and losses on the transactions are determined based on either the first-in, first-out or specific identification method.

See Note 5 for the Partnership's fair value process and hierarchy disclosures.

**Management and Incentive Fee Revenue**
The Partnership recognizes revenue as earned in connection with services provided under collateral and investment management agreements.   Under these agreements, the Partnership earns management fees calculated as a percentage of assets under management or net asset value.  The Partnership also has an opportunity to earn additional incentive fees and incentive allocations related to certain management agreements depending ultimately on the financial performance of the underlying assets the Partnership manages.   During the year ended December 31, 2018, the Partnership and its Consolidated Entities recognized management fees and incentive fees of approximately $36.6 million and $0.1 million, respectively.

**Shared Services Revenue**
The Partnership recognizes revenue as earned in connection with services provided to related parties under various shared services agreements. Under these agreements, the Partnership earns fees for services including, but not limited to, back office support functions, marketing, and investment advisory services. During the year ended December 31, 2018, the Partnership and its Consolidated Entities recognized shared services revenue of approximately $9.2 million, which has been presented in *Shared services fees* in the Consolidated Statement of Income. See further discussion in Note 8.

HIGHLY CONFIDENTIAL

D-CNL000223

**Appx. 00042**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Income and Expense Recognition**
Interest on currently paying debt instruments is accrued as earned and dividend income and dividends on securities sold, not yet purchased are recorded on the ex-dividend date, net of withholding taxes.  In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognized when received. Discounts and premiums associated with purchases of investments are accreted and amortized to interest income, except for deep-discounted debt where ultimate collection of interest and principal may be in doubt. Such accretion/amortization is calculated on an effective-yield basis over the life of the investment. Amendment fees are recognized when agreed to by the underlying company and all settlement contingencies are met. Operating expenses, including interest on securities sold short, not yet purchased, are recorded on the accrual basis as incurred.

**Income Taxes**
The Partnership is not subject to federal income taxes, and therefore, no provision has been made for such taxes in the accompanying consolidated financial statements.  Income taxes are the responsibility of the partners.  Certain consolidated subsidiaries are subject to federal income taxes.

Certain entities that are included in these consolidated financial statements are subject to federal and/or state income taxes.  Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases.  Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled.  The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. See further discussion in Note 13.

**Cash and Cash Equivalents**
Cash and cash equivalents consist of cash held at U.S. and foreign banks, deposits with original maturities of less than 90 days, and money market funds.  Cash equivalents are carried at cost, which approximates market value. At December 31, 2018, the Partnership and Consolidated Entities held cash balances at certain financial institutions in excess of the federally insured limit of $0.3 million. The Partnership and Consolidated Entities regularly monitor the credit quality of these institutions.

**Notes Receivable**
Notes receivable consists of secured promissory notes with maturities greater than one year.  When available, the Partnership uses observable market data, including pricing on recent closed transactions to value notes.  When appropriate, these notes may be valued using collateral values.  Adjustments to the value may be performed in circumstances where attributes specific to the collateral exist suggesting impairment.

**Other Intangible Assets**
Goodwill and other intangible assets are recorded on the Consolidated Balance Sheet at current carrying values. The Partnership and its Consolidated Entities perform an impairment test on an annual basis.  Any impairment in the value of other intangible assets is accounted for in the year when it occurs.

**Fixed Assets and Leasehold Improvements**
Fixed assets and leasehold improvements are carried at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the shorter of the estimated useful life of the assets or the lease term.

11

D-CNL000224
Appx. 00043

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership and its Consolidated Entities are depreciating fixed assets as follows:

|  | Period |
|---|---|
| Leasehold improvements | Lease term |
| Buildings | 29 - 40 years |
| Furniture and fixtures | 7 years |
| Computer and equipment | 3 - 5 years |
| Computer software | 3 years |

**Securities Sold, Not Yet Purchased**
Certain of the Partnership's Consolidated Investment Funds engage in "short sales" as part of their investment strategies. Short selling is the practice of selling securities that are borrowed from a third party. The Consolidated Investment Funds are required to return securities equivalent to those borrowed for the short sale at the lender's demand.

Pending the return of such securities, the Consolidated Investment Funds deposit with the lender as collateral the proceeds of the short sale plus additional cash. The amount of the required deposit, which earns interest, is adjusted periodically to reflect any change in the market price of the securities that the Consolidated Investment Funds are required to return to the lender. A gain (which cannot exceed the price at which the Consolidated Investment Funds sold the security short) or a loss (which theoretically could be unlimited in size) will be settled upon termination of a short sale.

**Due to/from Brokers**
Due to and from broker balances recorded on the Consolidated Balance Sheet include liquid assets maintained with brokers and counterparties for margin account balances and the amounts due for or due from the settlement of purchase and sales transactions. Certain due to and from broker balances have been reported on a net-by-counterparty basis where, in accordance with contractual rights and the Partnership's opinion, there is a right of offset in the event of bankruptcy or default by a counterparty.

**Options Contracts**
The Partnership and the Consolidated Entities may purchase and write call and put options to gain market exposure or to hedge investments. A call option gives the purchaser of the option the right (but not the obligation) to buy, and obligates the seller to sell (when the option is exercised), the underlying position at the exercise price at any time or at a specified time during the option period. A put option gives the holder the right to sell and obligates the writer to buy the underlying position at the exercise price at any time or at a specified time during the option period. When the Partnership or the Consolidated Entities purchase (write) an option, an amount equal to the premium paid (received) by the entity is reflected as an asset (liability). The amount of the asset (liability) is subsequently marked-to-market to reflect the current market value of the option purchased (written). When a security is purchased (or sold) through an exercise of an option, the related premium paid (or received) is added to (or deducted from) the basis of the security acquired or deducted from (or added to) the proceeds of the security sold. When an option expires (or the Partnership or the Consolidated Entities enter into a closing transaction), the entity realizes a gain or loss on the option to the extent of the premiums received or paid (or gain or loss to the extent the cost of the closing transaction exceeds the premium received or paid). Exercise of a written option could result in the Partnership or the Consolidated Entities purchasing a security at a price different from the current market value.

12

D-CNL000225
**Appx. 00044**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership and the Consolidated Entities are exposed to counterparty risk from the potential that a seller of an option contract does not sell or purchase the underlying asset as agreed under the terms of the option contract. The maximum risk of loss from counterparty risk to the Partnership and the Consolidated Entities is the greater of the fair value of its open option contracts or the premiums paid to purchase the open option contracts. The Partnership and the Consolidated Entities consider the credit risk of the intermediary counterparties to its option transactions in evaluating potential credit risk.

**Margin Transactions**
To obtain more investable cash, certain of the Consolidated Entities may use various forms of leverage including purchasing securities on margin.  A margin transaction consists of purchasing an investment with money loaned by a broker and agreeing to repay the broker at a later date. Interest expense on the outstanding margin balance is based on market rates at the time of the borrowing.

**Withdrawals Payable**
Withdrawals are recognized as liabilities, net of incentive allocations, when the amount requested in the withdrawal notice becomes fixed and determinable.  This generally may occur either at the time of receipt of the notice, or on the last day of a fiscal period, depending on the nature of the request. As a result, withdrawals paid after the end of the year, but based upon year-end capital balances are reflected as withdrawals payable at December 31, 2018.  Withdrawal notices received for which the dollar amount is not fixed remains in capital until the amount is determined. At December 31, 2018, the Consolidated Investment Funds had withdrawals payable of $57.0 million.

**Foreign Currency Transactions**
The Partnership's subsidiaries HCM Singapore and HCM Korea use Singapore dollars and Korean won, respectively, as their functional currency.  All foreign currency asset and liability balances are presented in U.S. dollars in the consolidated financial statements, translated using the exchange rate as of December 31, 2018.  Revenues and expenses are recorded in U.S. dollars using an average exchange rate for the relative period.  Foreign currency transaction gains and losses resulting from transactions outside of the functional currency of an entity are included in *Other income* on the Consolidated Statement of Income.

The Consolidated Entities do not isolate that portion of the results of operations resulting from changes in foreign exchange rates or investment or fluctuations from changes in market prices of securities held.  Such fluctuations are included within the *Net realized and unrealized gains or loss from investments* on the Consolidated Statement of Income.

**Life Settlement Contracts**
One of the Consolidated Investment Funds, through a subsidiary, holds life settlement contracts and accounts for them using the fair value method. These contracts are recorded as a component of "Investments at fair value" on the Consolidated Balance Sheet. Realized and unrealized gains (losses) on the contracts are recorded in the Consolidated Income Statement. Cash flows relating to the purchase and sale of the contracts are recorded as a component of *Purchase of investments* and *Proceeds from dispositions of investments* on the Consolidated Statement of Cash Flows. At December 31, 2018, the Consolidated Investment Fund was invested in 13 policies, which had a total face value of approximately $145.3 million and a fair value of $35.7 million.

HIGHLY CONFIDENTIAL

D-CNL000226

**Appx. 00045**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Financing**
The Partnership and its Consolidated Entities may finance the acquisition of its investments in securities and loans through financing arrangements which are classified in Notes payable and Investment liabilities on the Consolidated Balance Sheet.  The Partnership and its Consolidated Entities recognize interest expense on all borrowings on the accrual basis in the Consolidated Statement of Income.

**Financial Instruments**
The Partnership and its Consolidated Entities determine fair value of financial instruments as required by U.S. GAAP.  The carrying amounts for cash and cash equivalents, receivables, accounts payable, withdrawals payable, debt and notes payable, due to brokers, investment liabilities and accrued liabilities approximate their fair values. For fair value of investment, see Note 5.

**Accounts Payable, Accrued and Other Liabilities**
Expenses are recorded on an accrual basis, as incurred. Current liabilities are included in Accounts payable. Long-term liabilities are included in Accrued and other liabilities.

**Partners' Capital**
The Partnership agreement requires that income or loss of the Partnership be allocated to the partners in accordance with their respective partnership interests.

HIGHLY CONFIDENTIAL

D-CNL000227

**Appx. 00046**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

3.    **Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are comprised of the following as of December 31, 2018:

*(in thousands)*

| | | |
|---|---|---:|
| Leasehold improvements | $ | 7,193 |
| Buildings | | 2,595 |
| Furniture and fixtures | | 2,796 |
| Computer and equipment | | 2,863 |
| Computer software | | 331 |
| Accumulated depreciation | | (11,197) |
| | $ | 4,581 |

Depreciation expense in 2018 totaled approximately $1.3 million for the Partnership and its subsidiaries.

4.    **Investments**

Detailed below is a summary of the Partnership and its Consolidated Entities' investments at December 31, 2018:

| *(in thousands)* | | Amortized Cost/Cost | | Fair Value |
|---|---|---:|---|---:|
| Common equity securities | $ | 423,306 | $ | 535,374 |
| Closed-end mutual funds | | 100,788 | | 94,845 |
| Floating rate syndicated bank loans | | 142,586 | | 72,622 |
| Real Estate Investment Trusts | | 28,271 | | 57,475 |
| Life settlement contracts | | 65,276 | | 35,744 |
| Limited partnership interests | | 24,892 | | 30,521 |
| Rights & warrants | | 26,661 | | 7,446 |
| LLC interests | | 10,629 | | 2,775 |
| Preferred equity | | 258 | | 8,282 |
| Asset-backed securities | | 7,350 | | 102 |
| Participation interests | | 6,590 | | - |
| Corporate bonds | | 85,421 | | - |
| Total investments | $ | 922,027 | $ | 845,186 |
| | | **Proceeds** | | **Fair Value** |
| Securities sold, not yet purchased | $ | (26,135) | $ | (32,357) |

15

D-CNL000228
Appx. 00047

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

---

5.   **Fair Value of Financial Instruments**

**Fair Value Measurement**

U.S. GAAP defines fair value as the price an entity would receive to sell an asset or pay to transfer a liability in an orderly transaction between market participants as of the measurement date. The standard requires fair value measurement techniques to reflect the assumptions market participants would use in pricing an asset or liability and, where possible, to maximize the use of observable inputs and minimize the use of unobservable inputs. It also establishes the following hierarchy that prioritizes the valuation inputs into three broad levels:

- Level 1 – Valuation based on unadjusted quoted prices in active markets for identical assets and liabilities that the Partnership and the Consolidated Entities have the ability to access as of the measurement date.  Valuations utilizing Level 1 inputs do not require any degree of judgment.

- Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

- Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction.  When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs.  For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above.  In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership and Consolidated Entities use prices and inputs that are current as of the measurement dates.  The Partnership also considers the counterparty's non-performance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Partnership and its Consolidated Entities use actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities.  In cases where observable inputs are not available, the Partnership and Consolidated Entities  develop methodologies that provide appropriate fair value estimates.  These methodologies are reviewed on a continuous basis to account for changing market conditions.

HIGHLY CONFIDENTIAL

D-CNL000229

**Appx. 00048**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership has established policies, as described above, processes and procedures to ensure that valuation methodologies for investments and financial instruments that are categorized within all levels of the fair value hierarchy are fair and consistent. A Pricing Committee has been established to provide oversight of the valuation policies, processes and procedures, and is comprised of various personnel from the Partnership. The Pricing Committee meets monthly to review the proposed valuations for investments and financial instruments. The Pricing Committee is responsible for establishing the valuation policies and evaluating the overall fairness and consistent application of those policies.

As of December 31, 2018, the Partnership and its Consolidated Entities' investments consisted primarily of common equity securities, closed-end mutual funds, floating rate syndicated bank loans, real estate investment trusts, life settlement contracts, limited partnership interests, rights and warrants, LLC interests, asset-backed securities, and preferred equity. In addition, certain of the Consolidated Entities engage in short sale transactions. The majority of these financial instruments are not listed on national securities exchanges and management is required to use significant judgment to estimate their values.

**Public Equity Investments**
Publicly traded equities, including closed-end mutual funds and publicly traded REITs are valued at the closing price at the date of the financial statements. The fair value of equity investments that are not traded on national exchanges or through real-time quotation services are derived from methodologies that provide appropriate fair value estimates. Equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets.

**Private Equity Investments**
The Partnership and Consolidated Entities hold private equity investments which often resulted from the restructuring of other instruments which are classified as common equity securities.  These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets when available.  In the event both a reliable market quote and third-party pricing service data are not available for such assets, the Partnership and Consolidated Entities  will fair value the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis.  When utilizing comparable trading multiples, the Investment Manager determines comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publically available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortization (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Investment Manager to be within a reasonable range as calculated amongst its peers is then applied to the underlying company's price to book ratio or EBITDA (which may be normalized to adjust for certain nonrecurring events), to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances. Private equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Private equity investments that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

17

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Consolidated Entities also invest in warrant securities of publicly–traded companies. The fair value of these investments is based on an option pricing model. The option model bases warrant value on a number of factors including underlying equity price as of the valuation date, strike price, exercise date, time to expiration and volatility. Warrant investments that have observable volatility are classified as Level 2 assets. Warrant investments where volatility inputs are not observable are valued using an estimated volatility input, and are classified as Level 3 assets.

**Debt Securities**
The Partnership and Consolidated Entities invest in various types of debt, including floating rate syndicated bank loans, which are almost exclusively valued using market data obtained from one or more third-party pricing services or brokers. In instances where a third-party pricing service does not provide pricing for a specific asset, the Partnership and Consolidated Entities first seek to obtain reliable market quotes from other parties dealing in the specific asset. Loans and bonds with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Loans and bonds that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

Absent both a reliable market quote and third-party pricing service date, the Partnership and Consolidated Entities may use various models to establish an estimated exit price. These investments are classified as Level 3 assets. Models used for debt securities are primarily based on identifying comparable assets for which market data is available and pricing the target asset consistent with the yields of the comparable assets. As circumstances require, other industry accepted techniques may be used in modeling debt assets.

**Life Settlement Contracts**
Life Settlement contracts are valued using mortality tables and interest rate assumptions that are deemed by management to be appropriate for the demographic characteristics of the parties insured under the policies. Management generally utilizes an independent third party firm to perform these calculations and provide the relevant inputs. Management evaluates the results based on visible market activity and market research. Since these inputs are not readily observable, these contracts are classified as Level 3 assets.

At December 31, 2018, the Consolidated Entities' investments in life settlement contracts consisted of the following:

(U.S. dollars in thousands, except number of policies)

| Remaining Life Expectancy (in years) | Number of Policies | Face Value | Fair Value |
|---|---|---|---|
| 1-2 | - | $ - | $ - |
| 2-3 | 3 | 33,785 | 16,940 |
| 3-4 | - | - | - |
| 4-5 | - | - | - |
| Thereafter | 10 | 111,500 | 18,804 |
| Total | 13 | $ 145,285 | $ 35,744 |

HIGHLY CONFIDENTIAL

D-CNL000231

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Asset-Backed Securities**
The Consolidated Entities invest in a variety of asset-backed securities. Asset-backed securities are generally valued based on complex cash flow models that analyze the cash flows generated by the investment's underlying assets after adjusting for expected default rates, prepayment rates, collateral quality, market liquidity among other factors. These models are then adjusted based on spreads available in the market place from various research firms, dealers, and trading activity.  The Consolidated Entities generally utilize an independent third parties to provide the relevant inputs. The Consolidated Entities evaluate the results based on visible market activity and market research. When appropriate, the Consolidated Entities may apply other techniques based on a specific asset's characteristics. Asset-backed securities with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Asset-backed securities that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

**Limited Partnership and LLC Interests**
The Partnership and its Consolidated Entities hold limited partnership and LLC interests in various entities. These assets are valued as the net asset value of the limited partnership interests because the entities utilize fair value accounting for their own financial statements. These interests are classified as Level 3 assets.

The Partnership categorizes investments recorded at fair value in accordance with the hierarchy established under U.S. GAAP. The following table provides a summary of the financial instruments recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2018:

*(in thousands)*

| Assets | Level 1 | Level 2 | Level 3 | Total Fair Value at 12/31/18 |
|---|---|---|---|---|
| Common equity securities | $ 139,236 | $ 296,695 | $ 99,443 | $ 535,374 |
| Closed-end mutual funds | 94,845 | - | - | 94,845 |
| Floating rate syndicated bank loans | - | 21 | 72,601 | 72,622 |
| Real Estate Investment Trusts | 46,594 | 10,881 | - | 57,475 |
| Life settlement contracts | - | - | 35,744 | 35,744 |
| Limited partnership interests | - | - | 30,521 | 30,521 |
| Rights & warrants | 20 | 123 | 7,303 | 7,446 |
| LLC interests | - | - | 2,775 | 2,775 |
| Preferred equity | 8,282 | - | - | 8,282 |
| Asset-backed securities | - | - | 102 | 102 |
| **Total** | $ 288,977 | $ 307,720 | $ 248,489 | $ 845,186 |

| Liabilities | | | | |
|---|---|---|---|---|
| Common stock & Options sold short | $ 32,357 | $ - | - | $ 32,357 |

19

D-CNL000232

**Appx. 00051**

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement. The following table provides a roll forward of the investments classified within Level 3 for the year ended December 31, 2018:

(in thousands)

| | Fair Value at December 31, 2017 | Purchases | Sales and Maturities | Restructures | Transfers Into Level 3 | Net Realized Gains / (Losses) | Net Unrealized Gains / (Losses) | Fair Value at December 31, 2018 |
|---|---|---|---|---|---|---|---|---|
| Common equity securities | $ 141,201 | $ 1,058 | $ (116) | $ - | $ - | $ - | $ (42,700) | $ 99,443 |
| Floating rate syndicated bank loans | 64,307 | 12,146 | (1,952) | - | - | (2,799) | 899 | 72,601 |
| Life settlement contracts | 28,959 | 7,353 | - | - | - | - | (568) | 35,744 |
| Limited partnership interests | 27,863 | 4,600 | (4,766) | - | 928 | 351 | 1,545 | 30,521 |
| Rights & warrants | 8,013 | - | - | - | - | - | (710) | 7,303 |
| LLC interests | 3,352 | 165 | (1,312) | - | - | 985 | (415) | 2,775 |
| Asset-backed securities | 6,477 | 1 | (3,051) | (2,171) | (928) | (39,580) | 39,354 | 102 |
| | $ 280,172 | $ 25,323 | $ (11,197) | $ (2,171) | $ - | $ (41,043) | $ (2,595) | $ 248,489 |

All net realized and unrealized gains and losses in the tables above are reflected in the accompanying Consolidated Income Statement. Approximately $41.8 million of the net unrealized losses presented in the table above relate to investments held as of December 31, 2018.

The following page includes a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy.

20

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

| Category | Ending Balance at 12/31/2018 | Valuation Technique | Unobservable Inputs | Input Value(s) |
|---|---|---|---|---|
| Common equity securities | $ 99,443 | Multiples Analysis | Multiple of EBITDA | 2.5x - 7.0x |
| | | | Cap Rate | 8.0 - 10.0% |
| | | | Multiple of Revenue | 0.20x - 0.30x |
| | | | Liquidity Discount | 25% |
| | | Discounted Cash Flow | Discount Rate | 10.5 - 40.0% |
| | | | Terminal Multiple | 1.25x - 6.50x |
| | | | Long-Term Growth Rate | 2% |
| | | Transaction Analysis | Multiple of EBITDA | 4.0x - 7.75x |
| | | | Cap Rate | 8 - 10% |
| | | Bid Indications | Enterprise Value ($mm) | $720.0 - $765.0 |
| | | Impairment Analysis | Recoverable Value | 0% |
| | | Appraisal | N/A | N/A |
| Floating rate syndicated bank loans | 72,601 | Multiples Analysis | Multiple of EBITDA | 2.0x - 5.0x |
| | | | Multiple of Revenue | 0.35x - 0.50x |
| | | Escrow Recovery Analysis | Risk Discount | 40% |
| | | Appraisal | NA | NA |
| | | Bid Indications | Transaction Price | 10% |
| | | Sales Proceeds Analysis | Discount Rate | 6.0% |
| | | Discounted Cash Flow | Discount Rate | 12.3% - 40.0% |
| | | | Terminal Multiple | 1.25x |
| | | | Spread Adjustment | 0.0% - 6.3% |
| Life settlement contracts | 35,744 | Discounted Cash Flow | Discount Rate | 15.0 - 16.0% |
| Limited partnership interests | 30,521 | Net Asset Value | Various models including liquidation analysis, and third-party pricing vendor | N/A |
| Rights & warrants | 7,303 | Discounted Cash Flow | Discount Rate | 11.0% - 17.0% |
| | | | Terminal Multiple | 6.5 |
| | | Multiples Analysis | Multiple of EBITDA | 6.0x - 7.0x |
| | | Transaction Analysis | Multiple of EBITDA | 7.25x - 7.75x |
| | | Bid Indication of Value | Enterprise Value (in millions) | $720.0 - $765.0 |
| LLC interests | 2,775 | Discounted Cash Flow | Discount Rate | 6% |
| | | Adjusted Appraisal | Minority Discount | 25% |
| | | Bid Indication | Total Purchase Price (in millions) | $130.00 |
| Asset-backed securities | 102 | Adjusted NAV | N/A | N/A |
| **Total** | **$ 248,489** | | | |

In addition to the unobservable inputs utilized for various valuation methodologies, the Partnership often uses a combination of two or more valuation methodologies to determine fair value for a single holding. In such instances, the Partnership assesses the methodologies and ascribes weightings to each methodology. The selection of weightings is an inherently subjective process, dependent on professional judgement. These selections may have a material impact to the concluded fair value for such holdings.

The significant unobservable inputs used in the fair value measurement of the Partnership's assets could fluctuate significantly, resulting in a significantly higher or lower fair value measurement.

HIGHLY CONFIDENTIAL

D-CNL000234

Appx. 00053

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

6.    **Financial Instruments with Concentration of Credit and Other Risks**

**Financial Instruments**
The Partnership and its Consolidated Entities' investments include, among other things, equity securities, debt securities (both investment and non-investment grade) and bank loans. The Consolidated Entities may also invest in derivative instruments, including total return and credit default swaps. Investments in these derivative instruments throughout the year subject the Consolidated Entities to off-balance sheet market risk, where changes in the market or fair value of the financial instruments underlying the derivative instruments may be in excess of the amounts recognized in the Consolidated Balance Sheet.

**Market Risk**
Market risk represents the potential loss that may be incurred by the Partnership and its Consolidated Entities due to a change in the market value of its investments or the value of the investments underlying swap agreements. The Partnership and its Consolidated Entities' exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations. These factors may affect the level and volatility of securities prices and the liquidity of the Partnership and its Consolidated Entities investments. Volatility or illiquidity could impair the Partnership and its Consolidated Entities performance or result in losses. The Partnership and its Consolidated Entities may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets. The performance of life settlement contracts may be adversely impacted by the under estimation of mortality and other rates.

**Credit Risk**
Credit risk is the potential loss the Partnership and its Consolidated Entities may incur as a result of the failure of a counterparty or an issuer to make payments according to the terms of a contract. Because the Consolidated Entities enter into over-the-counter derivatives such as swaps, it is exposed to the credit risk of their counterparties. To limit the credit risk associated with such transactions, the Consolidated Entities execute transactions with financial institutions that the Investment Manager believes to be financially viable.

**Liquidity Risk**
The Consolidated Entities' limited partner interests have not been registered under the Securities Act of 1933 or any other applicable securities law. There is no public market for the interests, and neither the Consolidated Entities nor their manager expects such a market to develop.

**Business Risk**
The Partnership provides advisory services to the Consolidated Entities. Consolidated Entities could be materially affected by the liquidity, credit and other events of the Partnership.

HIGHLY CONFIDENTIAL

D-CNL000235

**Appx. 00054**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**High Yield Bonds and Loans**
The Partnership and its Consolidated Entities' investment portfolios consist of floating rate syndicated bank loans and fixed income securities that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. In addition, certain of the Partnership and its Consolidated Entities' investments have resale or transfer restrictions that further reduce their liquidity. Because of the inherent uncertainty of these investments, the Investment Manager's best estimates may differ significantly from values that would have been used had a broader market for the investments existed.

When the Partnership and its Consolidated Entities purchase a senior secured syndicated bank loan, it enters into a contractual relationship directly with the corporate borrower, and as such, is exposed to certain degrees of risk, including interest rate risk, market risk and the potential non-payment of principal and interest, including default or bankruptcy of the corporate borrower or early payment by the corporate borrower. Typically, senior secured syndicated bank loans are secured by the assets of the corporate borrower and the Partnership and its Consolidated Entities have a policy of regularly reviewing the adequacy of each corporate borrower's collateral.

The Partnership and its Consolidated Entities may invest in high-yield bonds that have been assigned lower rating categories or are not rated by the various credit rating agencies. Bonds in the lower rating categories are generally considered to be speculative with respect to the issuer's ability to repay principal and pay interest. They are also subject to greater risks than bonds with higher ratings in the case of deterioration of general economic conditions. Due to these risks, the yields and prices of lower-rated bonds are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed.

**Debt Obligations**
The Partnership and its Consolidated Entities' investment portfolio consists of collateralized loan obligations that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. Because of the inherent uncertainty of these investments, the Partnership's best estimates may differ significantly from values that would have been used had broader market for the investments existed.

**Distressed Investments**
A portion of the high yield corporate bonds and senior secured syndicated bank loans in which the Partnership and its Consolidated Entities invest have been issued by distressed companies in an unstable financial condition that have experienced poor operating performance and may be involved in bankruptcy or other reorganization and liquidation proceedings. These investments have substantial inherent risks. Many of these distressed companies are likely to have significantly leveraged capital structures, which make them highly sensitive to declines in revenue and to increases in expenses and interest rates. The leveraged capital structure also exposes the companies to adverse economic factors, including macroeconomic conditions, which may affect their ability to repay borrowed amounts on schedule.

HIGHLY CONFIDENTIAL

D-CNL000236

**Appx. 00055**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Corporate Bonds, Preferred Securities, and Loans**

The Consolidated Entities may invest in corporate bonds, floating rate syndicated bank loans, and preferred securities which are rated in the lower rating categories by the various credit rating agencies (or in comparable non-rated securities).  Securities in the lower rating categories are subject to greater risk of loss of principal and interest than higher-rated securities and are generally considered to be predominantly speculative with respect to the issuer's capacity to pay interest and repay principal.  They are also subject to greater risks than securities with higher ratings in the case of deterioration of general economic conditions.  Because of these greater risks associated with the lower-rated securities, the yields and prices of such securities may be more volatile than those for higher-rated securities.  The market for lower-rated securities is thinner and less active than that for higher-rated securities, which could adversely affect the prices at which these securities may be sold by the Consolidated Entities.

**Limited Diversification**

The Investment Manager attempts to diversify the Consolidated Entities' investments.  However, the Consolidated Entities' portfolios could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of credit risk may increase the losses suffered by the Consolidated Entities.  In addition, it is possible that the Investment Manager may select investments that are concentrated in certain classes of financial instruments.  This limited diversity could expose the Consolidated Entities to losses that are disproportionate to market movements as a whole.

At December 31, 2018, the Consolidated Entities' investments were predominantly concentrated in the United States and Cayman Islands.

**Exit Difficulties**

The Partnership and its Consolidated Entities cannot assure investors that it will be able to exit its investments by sale or other disposition at attractive prices, if at all.  The mergers and acquisitions and public securities markets are highly cyclical, which means that the Consolidated Entities' investments, even its best performing investments, may be illiquid for extended periods of time despite the Consolidated Entities' efforts to identify attractive exit opportunities.  Additionally, a significant portion of the Consolidated Entities' assets at any time will likely consist of debt obligations and other securities that are thinly-traded, for which no market exists and/or are restricted as to their transferability under applicable law and/or documents governing particular transactions of the Consolidated Entities.  In some cases, the Consolidated Entities may be unable to realize an investment prior to the date on which the Consolidated Entities are scheduled to terminate and/or have to sell or otherwise dispose of one or more investments on disadvantageous terms as a result of the Consolidated Entities' termination, or distribute such investments in kind.

**Custody Risk**

The clearing operations for the Partnership and its Consolidated Entities are provided by major financial institutions.  In addition, all of the Partnership and its Consolidated Entities' cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of all major securities exchanges.  The Partnership or its Consolidated Entities may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations.  While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership and its Consolidated Entities might be unable to recover the full value of their assets or incur losses due to their assets being unavailable for a period of time.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Leverage Risk**
The Consolidated Entities may borrow funds from brokers, banks and other lenders to finance its trading operations. The use of leverage can, in certain circumstances, magnify the losses to which the Consolidated Entities' investment portfolio may be subject. The use of margin and short-term borrowings creates several risks for the Consolidated Entities. If the value of the Consolidated Entities' securities fall below the margin level required by a counterparty, additional margin deposits would be required. If the Consolidated Entities are unable to satisfy a margin call, the counterparty could liquidate the Consolidated Entities' positions in some or all of the financial instruments that are in the account at the prime broker and cause the Consolidated Entities to incur significant losses. In addition, to the extent the Consolidated Entities have posted excess collateral for margin transactions, there is a risk that the counterparty will fail to fulfill its obligation to return the full value of that collateral.

The failure to satisfy a margin call, or the occurrence of other material defaults under margin or other financing agreements, may trigger cross-defaults under the Consolidated Entities' agreements with other brokers, lenders, clearing firms or other counterparties, multiplying the adverse impact to the Consolidated Entities. In addition, because the use of leverage allows the Consolidated Entities to control positions worth significantly more than its investment in those positions, the amount that the Consolidated Entities may lose in the event of adverse price movements is high in relation to the amount of their investment.

In the event of a sudden drop in the value of the Consolidated Entities' assets, the Consolidated Entities may not be able to liquidate assets quickly enough to satisfy their margin or collateral requirements. As a result, the Consolidated Entities may become subject to claims of financial intermediaries, and such claims could exceed the value of its assets. The banks and dealers that provide financing to the Consolidated Entities have the ability to apply discretionary margin, haircut, and financing and collateral valuation policies. Changes by banks and dealers in any of the foregoing may result in large margin calls, loss of financing and forced liquidations of positions and disadvantageous prices.

**Foreign Currency Risk**
The Partnership and its Consolidated Entities may invest in securities or maintain cash denominated in currencies other than the U.S. dollar. The Partnership and its Consolidated Entities are exposed to risk that the exchange rate of the U.S. dollar relative to other currencies may change in a manner that has an adverse effect on the reported value of the Partnership and its Consolidated Entities' assets and liabilities denominated in currencies other than the U.S. dollar.

**Concentration of Investments**
At December 31, 2018, the Consolidated Entities' investments and derivative contracts were predominantly concentrated in the United States and Cayman Islands and across several industries.

**Litigation Risk**
The Partnership and its Consolidated Entities are periodically subject to legal actions arising from the ordinary course of business. The ultimate outcome of these cases is inherently uncertain and could result in additional losses to the Partnership and/or its Consolidated Entities. Refer to Note 14 for a discussion of open litigation.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

7.    **Intangible Assets**

On May 12, 2017, HCM Latin America, as manager, purchased all rights and obligations for management of a certain hedge fund. As of December 31, 2018, the current carrying value of these rights and obligations is $3.0 million, which consists of the original purchase price of $2.0 million and a deferred purchase price of $1.0 million and is reflected in the Consolidated Balance Sheet.

The Partnership and its Consolidated Entities perform an impairment test as required by U.S. GAAP on a yearly basis.  The Partnership has determined that an impairment charge was necessary for the value obtained on December 19, 2017, for subadvisory and shared servicing rights from an affiliate. As of December 31, 2018, the asset was determined to be fully impaired and an impairment expense of $2.8 million is reflected in the Consolidated Statement of Income.

8.    **Related Party Transactions**

**Investments Under Common Control**
Certain members of the Partnership's management serve as members on the Boards of Directors for some of the companies with which it invests.  Because these individuals participate in the management of these companies, investments held by the Partnership and its subsidiaries in these companies may, from time to time, not be freely tradable.  As of December 31, 2018, the Partnership and its Consolidated Entities held the following investments in these companies:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---|
| Metro-Goldwyn-Mayer, Inc. | Common Stock | 296,695 |
| Cornerstone Healthcare Group Holding, Inc. | Common Equity | 59,539 |
| OmniMax International, Inc. | Term Loan | 52,464 |
| JHT Holdings Inc. | Common Stock | 25,099 |
| OmniMax International, Inc. | Common Equity | 7,804 |
| Carey International, Inc. | Term Loan | 5,401 |
| CCS Medical, Inc. | Loan | 5,960 |
| Trussway Holdings, LLC | Common Equity | 4,582 |
| JHT Holdings Inc. | Term Loan | 4,160 |
| OmniMax International, Inc. | Warrants | 551 |

26

D-CNL000239

**Appx. 00058**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Certain investments are issued and managed by affiliates of the Partnership. These investments are subject to the same valuation policies and procedures as similar investments within the same level of the fair value hierarchy. As of December 31, 2018, the Partnership and the Consolidated Entities held the following investments that were issued and managed by affiliates of the Partnership:

*(in thousands)*

| Issuer | Type of Investment | | Fair Value |
|---|---|---|---|
| Harko, LLC | LLC Units | $ | 2,721 |
| Highland CLO Funding | Partnership Interest | | 610 |
| Highland Energy MLP Fund | Mutual Fund Shares | | 1,363 |
| Highland Floating Rate Opportunities Fund | Closed-end mutual fund shares | | 832 |
| Highland Global Allocation Fund | Mutual Fund Shares | | 2,173 |
| Highland Long/Short Equity Fund | Mutual Fund Shares | | 267 |
| Highland Long/Short Healthcare Fund | Mutual Fund Shares | | 2,963 |
| Highland Master Loan Fund | Limited Partnership interest | | 106 |
| Highland Merger Arbitrage Fund | Mutual Fund Shares | | 1,321 |
| Highland Opportunistic Credit Fund | Mutual Fund Shares | | 5,477 |
| Highland Premier Growth Equity Fund | Mutual Fund Shares | | 64 |
| Highland Small Cap Equity Fund | Mutual Fund Shares | | 465 |
| NexPoint Strategic Opportunities Fund | Mutual Fund Shares | | 36,563 |
| NexPoint Multi Family Capital Trust | REIT | | 10,881 |
| NexPoint Real Estate Strategies Fund | Closed-end mutual fund shares | | 1,454 |
| NexPoint Residential Trust | REIT | | 85,223 |

**Expenses Reimbursable by Funds Managed**
In the normal course of business, the Partnership typically pays invoices it receives from vendors for various services provided to the investment funds the Partnership manages.  A summary of these eligible reimbursable expenses are then submitted to the trustee/administrator for each respective fund, typically on a quarterly basis, and the Partnership receives payment as reimbursement for paying the invoices on behalf of the respective funds.  As of December 31, 2018, approximately $6.4 million in reimbursable expenses were due from various affiliated funds and entities for these eligible expenses, and is included in *Other Assets* in the accompanying Consolidated Balance Sheet.

**Accounts Held with Related Party**
During the year the Partnership and its Consolidated Entities maintained bank accounts at NexBank, SSB ("NexBank"), a related party by way of common control.  As of December 31, 2018, balances in these accounts were approximately $0.5 million, a portion of which exceeds Federal deposit insurance limits.

**Investment in Affiliated Loans**
During the year, certain subsidiaries of the Partnership were invested in several bank loans in which NexBank was the agent bank.  Interest earned on the loans during the year was approximately $10.4 million and is included in interest and investment income in the Consolidated Statement of Income. At December 31, 2018, these subsidiaries were invested in NexBank agented loans with commitments and market values totaling approximately $83.3 million and $56.5 million, respectively.

27

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Notes and Other Amounts Due from Affiliates**

During the year ended December 31, 2018, Highland Capital Management Fund Advisors, L.P. ("HCMFA") did not issue any new promissory notes to the Partnership. The outstanding promissory notes accrue interest at a rate ranging from of 1.97 - 2.62%, the mid-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $5.3 million and is payable on demand. The Partnership will not demand payment on amounts owed that exceed HCMFA's excess cash availability prior to May 31, 2021. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, NexPoint Advisors, L.P. ("NPA") did not issue any new promissory notes to the Partnership. The outstanding promissory note accrues interest at a rate of 6.0%. As of December 31, 2018 total interest and principal due on the outstanding promissory note was approximately $28.6 million and is payable in annual installments throughout the term of the loan. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, HCRE Partners, LLC ("HCRE") issued a promissory note to the Partnership in the amount of $0.8 million. The note accrues interest at a rate of 8.0%. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $9.4 million and is generally payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, Highland Capital Management Services, Inc. ("HCMSI") issued promissory notes to the Partnership in the aggregate amount of $0.4 million. All outstanding promissory notes accrue interest at a rate ranging from 2.75% – 3.05%, the long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $14.0 million and is generally payable in annual installments throughout the term of the notes. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, James Dondero ("Dondero") issued promissory notes to the Partnership in the aggregate amount of $14.9 million. The outstanding promissory notes accrue interest at a rate ranging from 2.03% – 2.95%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $29.2 million and is generally payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, Mark Okada ("Okada") did not issue any new promissory notes to the Partnership. All outstanding promissory notes accrue interest at a rate of 2.25%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $1.3 million and is payable on demand. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

During the year ended December 31, 2018, The Dugaboy Investment Trust ("Dugaboy") did not issue any new promissory notes to the Partnership. All outstanding promissory notes accrue interest at a rate of 3.26%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $20.1 million and is payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

On December 21, 2015, the Partnership entered into a contribution agreement (the "Contribution Agreement") with an affiliated trust. Pursuant to the Contribution Agreement, a note (the "Note Receivable") in the amount of $63.0 million was due to the Partnership. The Note Receivable will mature on December 21, 2030. The Note Receivable accrues interest at a rate of 2.61% per annum. Accrued interest is paid-in-kind, with principal receipts occurring pursuant to a note amortization schedule, with such annual receipts commencing December 21, 2019. During the year, the trust pre-paid $2.1 million. As of December 31, 2018 total interest and principal due on the Note Receivable was approximately $60.2 million.

**Services Performed by or on Behalf of an Affiliate**
In March 2007, Highland Capital of New York, Inc. a New York corporation ("Highland New York"), was formed and has performed marketing services for the Partnership and its affiliates in connection with the Partnership's investment management and advising business, including, but not limited to, assisting Highland Capital in the marketing and sales of interests in investment pools for which Highland Capital serves as the investment manager. The Partnership is charged a marketing services fee for the services that Highland New York performs on the Partnership's behalf. Separately, the Partnership pays for, and seeks reimbursement for, various operating expenses on behalf of Highland New York. For the year ended December 31, 2018, total marketing fee expense charged to the Partnership by Highland New York was approximately $0.9 million. Because the Partnership funded Highland New York's operations, including amounts above the marketing fee, as of December 31, 2018, net amounts owed to the Partnership by Highland New York was approximately $4.9 million.

Effective December 15, 2011, the Partnership commenced performing services on behalf of HCMFA, a Delaware limited partnership and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to HCMFA was approximately $2.7 million and as of December 31, 2018, amount owed to the Partnership by HCMFA was approximately $0.2 million.

Effective July 29, 2010, the Partnership commenced performing services on behalf of Falcon E&P Opportunities GP, LLC. ("Falcon"), a Delaware limited liability company and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to Falcon was approximately $0.2 million and as of December 31, 2018, no amounts were owed to the Partnership by Falcon for services rendered.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Effective March 17, 2017, pursuant to the Third Amended and Restated Sub-Advisory Agreement and the Fourth Amended and Restated Shared Services Agreement, the Partnership continued performing services on behalf of Acis Capital Management, L.P. ("Acis"), a Delaware limited partnership and registered investment advisor. Subadvisory services include investment advisory services and shared services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fees charged by the Partnership to Acis for shared services and subadvisory fees were approximately $2.6 million and $3.4 million, respectively. As of December 31, 2018, amount owed to the Partnership by Acis was approximately $6.0 million. Although such fees were earned in 2018, all related revenues and receivables recorded by the Partnership have been fully reserved against based on estimated collectability.

Effective January 1, 2018, pursuant to the Third Amended and Restated Shared Services Agreement, the Partnership commenced performing services on behalf of NPA. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexPoint was approximately $2.0 million and as of December 31, 2018, no amounts were owed to the Partnership by NexPoint for services rendered.

Effective September 1, 2017, pursuant to the Third Amended and Restated Shared Services Agreement dated September 26, 2017, the Partnership commenced performing services on behalf of NexBank Capital, Inc. ("NexBank Capital"), financial services company. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexBank Capital was approximately $0.2 million and as of December 31, 2018, $0.1 million was owed to the Partnership by NexBank Capital for services rendered.

Effective September 1, 2017, pursuant to the Third Amended and Restated Investment Advisory Agreement dated September 26, 2017, the Partnership commenced performing services on behalf of NexBank SSB, ("NexBank"), a Texas savings bank. Services include investment advisory services. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexBank was approximately $3.6 million and as of December 31, 2018, amounts owed by NexBank to the Partnership for services rendered were approximately $0.9 million.

Effective April 1, 2015, the Partnership commenced performing services on behalf of NexPoint Real Estate Advisors, L.P. ("NREA"). Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. NREA is charged a fee for the services provided. For the year ended December 31, 2018, the total fee charged to NREA by the Partnership was approximately $1.0 million and as of December 31, 2018, no amounts were owed by NREA to the Partnership for services rendered.

Effective January 1, 2018, the Partnership entered in to a Payroll Reimbursement Agreement (the "Agreement") with HCMFA. Under the Agreement, HCMFA reimburses the Partnership for the cost of any dual employees of the Partnership and HCMFA and who provide advice to registered investment companies advised by HCMFA. For the year ended December 31, 2018, the total fees charged by the Partnership to HCMFA was approximately $6.2 million and as of December 31, 2018, no amounts were owed by HCMFA to the Partnership for services rendered.

30

D-CNL000243

Appx. 00062

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Effective January 1, 2018, the Partnership entered in to a Payroll Reimbursement Agreement (the "Agreement") with NPA. Under the Agreement, NPA reimburses the Partnership for the cost of any dual employees of the Partnership and NPA and who provide advice to registered investment companies advised by NPA. For the year ended December 31, 2018, the total fees charged by the Partnership to NPA was approximately $4.3 million and as of December 31, 2018, no amounts were owed by NPA to the Partnership for services rendered.

**Investment liability**
On December 28, 2016, the Partnership entered into a purchase and sale agreement with The Get Good Nonexempt Trust ("Get Good"). In consideration for a note receivable from an affiliate, the Partnership sold or participated certain investments that it already held, with the participated investments carrying an aggregate market value of $21.3 million as of the date of the transaction. The fair value of the Agreement will fluctuate with the fair value of the securities, throughout the term of the Agreement. As of December 31, 2018, the fair value of the participated investments was $12.1 million.

On December 5, 2016, Select entered in to Stock Purchase Agreements with two counterparties for shares of Trussway Industries ("Trussway"), in exchange for promissory notes in the aggregate amount of $15.4 million. The promissory notes accrue interest at a rate of 2.07%, the long-term Applicable Federal Rate, compounded annually. Select must pay one-twenty-fifth of the initial note amounts, plus any additional principal attributable to the sale of Trussway, along with accumulated interest on an annual basis. The promissory notes will mature on December 5, 2041. As of December 31, 2018 the remaining principal payable on the promissory notes was $14.8 million. The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

During 2014 and 2015, Select received multiple master securities loan agreements (the "Securities Agreements") for securities borrowed from an affiliate. The Securities Agreements accrue interest at a rate ranging from 0.38 - 0.48%, the short term Applicable Federal Rate. The fair value of the securities loans will fluctuate with the fair value of the borrowed securities, throughout the term of the Securities Agreements. As of December 31, 2018, the fair value of the loans was $19.2 million. The fair value of Select's securities loans approximates the carrying value of the securities loans.

9. **Notes Payable**

**Promissory Notes and Loan Agreements**
On August 17, 2015, the Partnership entered in to a promissory note with Frontier State Bank ("Frontier") in the amount of $9.5 million. Pursuant to the First Amended and Restated Loan Agreement, dated March 29, 2018, Frontier made an additional loan to the Partnership in the amount of $1.0 million. The promissory note accrues interest at the 3 month LIBOR rate plus 4.75%, adjusted each date of change, per annum. Accrued interest shall be paid quarterly. The promissory note is collateralized by shares of voting common stock of MGM Holdings, Inc and will mature on August 17, 2021. As of December 31, 2018 the remaining principal payable on the promissory note was $7.2 million. The fair value of the Partnership's outstanding notes payable approximates the carrying value of the notes payable.

On August 25, 2015, Highland Select Equity Fund, L.P. ("Select") entered in to a promissory note with Dugaboy in the amount of $1.0 million. The promissory note accrues interest at a rate of 2.82%, the long-term Applicable Federal Rate, compounded annually. The accrued interest and principal of the promissory note is due and payable on demand. As of December 31, 2018 the remaining principal payable on the promissory note was $1.0 million.  The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

31

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

On October 7, 2016, the Partnership entered in to a promissory note with Acis in the amount of $12.7 million. The Partnership is required to make certain payments of the initial note amount, plus accumulated interest on May 31 of each year, until maturity. The promissory note is set to mature on May 31, 2020.  The promissory note accrues interest at a rate of 3.00% per annum. Pursuant to an Assignment and Transfer Agreement dated November 3, 2017, between Acis and an affiliate of the Partnership, Acis transferred the promissory note to the affiliate. As of December 31, 2018 the remaining principal payable on the promissory note was $9.5 million.

On August 29, 2016, Maple Avenue Holdings, LLC ("Maple") entered in to a promissory note with Great Southern Bank in the amount of $3.9 million. Maple must pay principal and accrued interest installments on a monthly basis until maturity. The promissory note will mature on August 29, 2019. The promissory note accrues interest at a rate of 3.26% per annum. As of December 31, 2018 the remaining principal payable on the promissory note was $3.4 million. The fair value of Maple's outstanding notes payable approximates the carrying value of the notes payable.

On May 1, 2018, Multi Strategy Master executed a loan agreement (the "Loan Agreement") with NexBank SSB, an affiliate of the Partnership.  The original principal borrowed under the Loan Agreement was $36.5 million.  The loan bears interest at the 1-month LIBOR rate plus 3.25%.  The maturity date is May 1, 2021.  For the year ended December 31, 2018, the Multi Strategy Master incurred and paid approximately $1.3 million of interest expense, and made aggregate principal payments of approximately $1.9 million. Shares of Metro-Goldwyn Mayer, Inc. are pledged as collateral on the loan.  The loan was used to purchase an outstanding redemption of $38.7 million at a discount resulting in a reallocation of partners' capital on the Statement of Changes in Partners' Capital. As of December 31, 2018 the remaining principal payable on the loan was $34.6 million. The fair value of Multi Strategy Master's outstanding loan approximates the carrying value of the loan.

10.    **Due to Broker**

As of December 31, 2018 the due to broker balance of approximately $116.6 million is payable to financing counterparties for margin transactions.

11.    **Commitments and Contingencies**

**Contracts in the Normal Course of Business**
In the normal course of business the Partnership and its subsidiaries may enter into contracts which provide general indemnifications and contain a variety of presentations and warranties that may expose the Partnership and its subsidiaries to some risk of loss.   The Partnership regularly co-invests in vehicles it advises. The amounts committed are within the Partnerships capacity to fund when capital is called. In addition to the other financial commitments discussed in the consolidated financial statements, the amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant. Also refer to Note 8 for commitments of certain subsidiaries in affiliated loans.

**Loans as Co-Borrower**
The Partnership is a named co-borrower in a Bridge Loan Agreement ("Loan") dated September 26, 2018 with Key Bank for $556.3 million. The Loan accrues interest at the 3 month LIBOR rate plus 3.75%, per annum. Accrued interest shall be paid monthly by a borrower other than the Partnership ("Lead Borrower"). The Loan will mature on September 26, 2019. The carrying value of the Loan is reflected on the financial statements of the Lead Borrower.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Legal Proceedings**
The Partnership is a party to various legal proceedings arising in the ordinary course of business. While any proceeding or litigation has an element of uncertainty, management believes that the final outcome will not have a materially adverse effect on the Partnership's Consolidated Balance Sheet, Consolidated statement of Income, or its liquidity.  See Note 14.

**Operating Leases**
The Partnership has an operating lease and associated commitments related to its main office space. Future minimum lease payments under operating lease commitments with initial or non-cancelable terms in excess of one year, at inception, are as follows:

*(in thousands)*

| Years Ending December 31, | |
| --- | --- |
| 2019 | 1,550 |
| 2020 | 1,566 |
| 2021 | 1,567 |
| 2022 | 522 |
| Total | $    5,205 |

Total rental expense of the Partnership and its Consolidated Entities for operating leases was approximately $1.5 million for the year ended December 31, 2018.

**12.    Post Retirement Benefits**

In December 2006, the Partnership created a defined benefit plan to which all employees and certain affiliated persons could participate if they met the eligibility requirements.  The Partnership uses a December 31 measurement date for its defined benefit plan.

Effective December 31, 2008, the Partnership amended the plan by freezing it to new participants and additional benefit accruals.  A new amendment became effective on January 1, 2011 in which a named participant was admitted to the plan and is eligible to earn benefit accrual. 2018 expense reflects a service cost charge for the value of the new participant's benefit earned during 2018.

The Partnership's benefit plan obligation and plan assets for the year ended December 31, 2018 are reconciled in the tables below.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

*(in thousands)*

| **Change in projected benefit obligation** | | **2018** |
|---|---|---|
| Benefit obligation at beginning of year | $ | 2,578 |
| Service cost | | 6 |
| Interest cost | | 80 |
| Plan participants' contributions | | - |
| Amendments | | - |
| Actuarial loss/(gain) | | 386 |
| Acquisition/(divestiture) | | - |
| Benefits paid | | (121) |
| Benefit obligation at end of year | $ | 2,929 |

| **Change in plan assets** | | **2018** |
|---|---|---|
| Fair value of plan assets at beginning of year | $ | 2,924 |
| Actual return on plan assets | | 449 |
| Acquisition/(divestiture) | | - |
| Employer contribution | | - |
| Plan participants' contributions | | - |
| Benefits paid | | (121) |
| Other increase/(decrease) | | - |
| Fair value of plan assets at year end | $ | 3,252 |

| **Reconciliation of Funded Status** | | **2018** |
|---|---|---|
| Accumulated benefit obligation at end of year | $ | 2,929 |
| Projected benefit obligation at end of year | | 2,929 |
| Fair value of assets at end of year | | 3,252 |
| Funded status at end of year | $ | 323 |

The Partnership did not contribute to the plan during 2018.

**Assumptions**

Weighted-average assumptions used to determine benefit obligations at December 31, 2018:

| | |
|---|---|
| Discount rate | 3.19% |
| Rate of compensation increase | N/A |

34

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Weighted-average assumptions used to determine net periodic benefit cost at December 31, 2018:

| | |
|---|---|
| Discount rate | 3.19% |
| Expected long-term return on plan assets | 3.19% |
| Rate of compensation increase | N/A |

As of December 31, 2018, there were no plan assets categorized as Level 3.

13. **Income Taxes**

**The Partnership**
For U.S. income tax purposes, the Partnership is treated as a pass-through-entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on their share of the Partnership's net taxable income.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal and foreign jurisdictions, where applicable.  As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

Authoritative guidance on accounting for and disclosure of uncertainty in tax positions requires the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position.  For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that as a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority.  The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018.

**Multi Strategy Master**
For U.S. income tax purposes, Multi Strategy Master is treated as a pass-through entity, which means it is not subject to federal income taxes under current Internal Revenue Service guidelines. However, each investor may be individually liable for income taxes, if any, on its share of the partnership's net taxable income.

Multi Strategy Master trades in senior secured syndicated bank loans for its own account and, as such, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The Partnership intends to conduct Multi Strategy Master business in such a manner that it does not constitute a U.S. trade or business, nor does it create a taxable presence in any of the jurisdictions in which the Partnership has offices.

Dividends as well as certain interest and other income received by Multi Strategy Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Multi Strategy Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. As of December 31, 2018, a minimal withholding tax liability of $0.9 million is classified within accrued and other liabilities on the Consolidated Balance Sheet.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Multi Strategy Master applies authoritative guidance which requires management to determine whether a tax position Multi Strategy Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018.

Multi Strategy Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Multi Strategy Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

**Restoration Onshore**
Restoration Onshore is treated as a pass-through entity for tax purposes, which means it is not subject to U.S. income taxes under current Internal Revenue Service or state and local guidelines. Each Partner is individually liable for income taxes, if any, on its share of the Restoration Onshore's net taxable income. Interest, dividends and other income realized by Restoration Onshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Onshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Onshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority.

The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018. Restoration Onshore files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal, state, local and foreign jurisdictions, where applicable. As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

**Restoration Offshore**
Restoration Offshore is a Cayman Islands exempted company. Under the current laws of the Cayman Islands, there is no income, estate, transfer, sales or other tax payable by Restoration Offshore. Restoration Offshore has elected to be treated as a corporation for U.S. tax purposes and files a protective 1120-F.

The General Partner intends to conduct the business of Restoration Offshore in such a way that Restoration Offshore's activities do not constitute a U.S. trade or business and any income or realized gains earned by Restoration Offshore do not become "effectively connected" with a trade or business carried on in the United States for U.S. federal income tax purposes.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Dividends as well as certain interest and other income received by the master partnership of Restoration Offshore from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by the master partnership of Restoration Offshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Offshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Offshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority. The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018. As of December 31, 2018, the tax years that remain subject to examination by major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

The remaining entities consolidated by the Partnership had no uncertain tax positions which required accrual under U.S. GAAP.

HIGHLY CONFIDENTIAL

D-CNL000250

**Appx. 00069**

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**14.   Legal Proceedings**

The Partnership and certain affiliated investment vehicles are defendants in a complaint filed on February 24, 2009 New York state court by UBS Securities LLC and UBS AG, London Branch relating to a CLO warehouse facility with respect to which UBS is attempting to extend liability beyond the two entities that bore sole risk of loss under the governing documents.  On February 19, 2010, the court dismissed all claims against the Partnership.  UBS since has filed additional claims against the Partnership and certain additional investment vehicles.  On July 21, 2011, the First Appellate Division again dismissed two of UBS's four claims against the Partnership, severely limiting the remaining two claims.  Additional claims were dismissed in a further appellate ruling issued on October 31, 2017.  Certain claims were tried in July 2018 against two Highland-affiliated defendants, but the trial court has neither ruled on those claims nor indicated when it will set UBS's remaining claims for trial.  The second trial, if it occurs, will try all claims against the Partnership and certain affiliated investment vehicles.

From time to time the Partnership is party to disputes with disgruntled former employees.  One such matter involves a former employee that improperly recorded internal conversations in violation of the Partnership's internal policies and procedures and potentially certain criminal and regulatory provisions.  The former employee obtained a $7.9 million judgment against Highland affiliate Acis Capital Management, L.P. ("Acis").  The employee currently is attempting to collect this judgment through various proceedings in Texas state and federal court, including claims against Highland for receipt of assets from Acis.

In another matter, a Court ruled that a former employee breached his fiduciary duty to the Partnership, owed damages to the Partnership, and ordered the former employee to cease using or disclosing the Partnership's confidential information.  Additionally, an award was entered in favor of the employee against a separate incentive compensation entity for an interest that was already escrowed in his name prior to trial and in which he was already vested.  The dispute over the amount of his vested interest is on-going.  Additionally, the Partnership from time to time must take action to enforce the permanent injunction against the former employee's continuing improper disclosures of the Partnership's confidential information.

The Partnership is engaged in litigation and arbitration with a group of investors relating to the post-financial crisis wind down and distribution of the remaining assets in the Crusader hedge fund vehicle.

The Partnership currently is and has been previously subject to various legal proceedings, many of which have been due to the nature of operating in the distressed loan business in the U.S. The legal process is often the route of last resort to recover amounts due from delinquent borrowers. We currently do not anticipate these proceedings will have a material negative impact to the Partnership.

**15.   Subsequent Events**

On March 18, 2019, SSP Holdings, LLC issued a promissory note to the Partnership in the amount of $2.0 million. The note accrues interest at a rate of 18%.

On March 26, 2019, Trussway Holdings, LLC issued a promissory note to the Partnership in the amount of $1.0 million. The note accrues interest at a rate of 10%.

38

D-CNL000251

**Appx. 00070**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

On March 28, 2019, the Partnership distributed equity to its partners in the aggregate amount of $3.7 million.

On March 28, 2019, the Partnership received a $3.7 million pay down on the outstanding Contribution Agreement.

Over the course of 2019, through the report date, HCMFA issued promissory notes to the Partnership in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%.

The Partnership has performed an evaluation of subsequent events through June 3, 2019, which is the date the consolidated financial statements were available to be issued, and has determined that there are no other material subsequent events that would require disclosure in the Partnership's consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000252
**Appx. 00071**

**Highland Capital Management, L.P.**

**(A Delaware Limited Partnership)**

**As of And Year Ended December 31, 2018**

**Supplemental Information**

HIGHLY CONFIDENTIAL

D-CNL000253

**Appx. 00072**

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Consolidating Balance Sheet**
**December 31, 2018**

| *(in thousands)* | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ 2,567 | $ 2,467 | $ - | $ 5,034 |
| Investments at fair value (cost $922,027) | 161,939 | 683,247 | - | 845,186 |
| Equity method investees | 121,936 | - | (121,936) | - |
| Management and incentive fees receivable | 2,242 | 158 | (7) | 2,393 |
| Due from brokers | - | 598 | - | 598 |
| Other assets | 8,421 | 5,660 | (4,826) | 9,255 |
| Notes and other amounts due from affiliates | 176,963 | - | (3,565) | 173,398 |
| Intangible assets | - | 3,022 | - | 3,022 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,197 | 4,538 | 43 | - | 4,581 |
| **Total assets** | $ 478,606 | $ 695,195 | $ (130,334) | $ 1,043,467 |
| | | | | |
| **Liabilities and partners' capital** | | | | |
| | | | | |
| **Liabilities** | | | | |
| Accounts payable | $ 4,838 | $ 145 | $ - | $ 4,983 |
| Securities sold, not yet purchased (proceeds $26,135) | - | 32,357 | - | 32,357 |
| Withdrawals payable | - | 57,009 | - | 57,009 |
| Due to affiliates | 4,542 | - | (4,542) | - |
| Due to brokers | 31,194 | 86,108 | (742) | 116,560 |
| Due to brokers for securities purchased, not yet settled | 1,640 | - | - | 1,640 |
| Accrued and other liabilities | 35,574 | 4,276 | 396 | 40,246 |
| Notes payable | 16,722 | 42,540 | (3,510) | 55,752 |
| Investment liabilities | 12,135 | 33,957 | - | 46,092 |
| **Total liabilities** | 106,645 | 256,392 | (8,398) | 354,639 |
| | | | | |
| Non-controlling interest | - | 316,867 | - | 316,867 |
| | | | | |
| Commitments and contingencies | | | | |
| | | | | |
| **Partners' capital** | 371,961 | 121,936 | (121,936) | 371,961 |
| | | | | |
| **Total liabilities and partners' capital** | $ 478,606 | $ 695,195 | $ (130,334) | $ 1,043,467 |

HIGHLY CONFIDENTIAL

D-CNL000254

**Appx. 00073**

# Highland Capital Management, L.P.
(A Delaware Limited Partnership)
## Supplemental Consolidating Statement of Income
## Year Ended December 31, 2018

| (in thousands) | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---|---|---|---|
| **Revenue:** | | | | |
| Management fees | $ 35,264 | $ 1,336 | $ - | $ 36,600 |
| Interest and investment income | 4,857 | 10,974 | - | 15,831 |
| Incentive fees | 17 | 53 | - | 70 |
| Shared services fees | 9,187 | - | - | 9,187 |
| Other income | 1,038 | 1,584 | - | 2,622 |
| Total revenue | 50,363 | 13,947 | - | 64,310 |
| **Expenses:** | | | | |
| Compensation and benefits | 33,670 | 805 | - | 34,475 |
| Professional fees | 14,624 | 3,055 | - | 17,679 |
| Interest expense | 1,695 | 3,975 | - | 5,670 |
| Marketing and advertising expense | 2,413 | - | - | 2,413 |
| Depreciation and amortization | 1,304 | 13 | - | 1,317 |
| Investment and research consulting | 1,082 | - | - | 1,082 |
| Bad debt expense | 7,862 | - | - | 7,862 |
| Other operating expenses | 6,786 | 3,241 | - | 10,027 |
| Total expenses | 69,436 | 11,089 | - | 80,525 |
| **Other Income/(Expense):** | | | | |
| Other income | 9,816 | 10 | - | 9,826 |
| Impairment on intangible assets | (2,830) | - | - | (2,830) |
| Total other income | 6,986 | 10 | - | 6,996 |
| Income/(loss) before investment and derivative activities | (12,087) | 2,868 | - | (9,219) |
| **Realized and unrealized gain/(loss) on investments and derivatives:** | | | | |
| Net realized gain/(loss) on investments and derivatives | 13,397 | (44,914) | - | (31,517) |
| Net change in unrealized loss on investments and derivatives | (406) | (93,349) | - | (93,755) |
| Net realized and unrealized loss on investments and derivatives | 12,991 | (138,263) | - | (125,272) |
| Net unrealized losses from equity method investees | (74,082) | - | 74,082 | - |
| Net loss | (73,178) | (135,395) | 74,082 | (134,491) |
| Net loss attributable to non-controlling interest | - | (61,313) | - | (61,313) |
| Net loss attributable to Highland Capital Management, L.P. | $ (73,178) | $ (74,082) | $ 74,082 | $ (73,178) |

42

D-CNL000255

**Appx. 00074**

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Balance Sheet**
**December 31, 2018**

*(in thousands)*

**Assets**

Current assets:

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 2,567 |
| Investments at fair value (cost $263,008*) | | 259,460 |
| Equity method investees | | 24,415 |
| Management and incentive fees receivable | | 2,242 |
| Intangible assets | | 8,421 |
| Notes and other amounts due from affiliates | | 176,963 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,177 | | 4,538 |
| **Total assets** | $ | 478,606 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 4,838 |
| Due to affiliate | | 4,542 |
| Due to brokers | | 31,194 |
| Due to brokers for securities purchased not yet settled | | 1,640 |
| Accrued and other liabilities | | 35,574 |
| Notes payable | | 16,722 |
| Investment liabilities | | 12,135 |
| Total liabilities | | 106,645 |
| Partners' capital | | 371,961 |
| **Total liabilities and partners' capital** | $ | 478,606 |

*Investments, at fair value includes $97.5 million of limited partnership interest ownership of Consolidated Investment Funds, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2018 consolidated financial statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited financial statements.

HIGHLY CONFIDENTIAL

D-CNL000256
Appx. 00075

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Statement of Income**
**Year Ended December 31, 2018**

*(in thousands)*

| | | |
|---|---:|---:|
| **Revenue:** | | |
| Management fees | $ | 35,264 |
| Incentive fees | | 17 |
| Shared services fees | | 9,187 |
| Interest and investment income | | 4,857 |
| Miscellaneous income | | 1,038 |
| Total revenue | | 50,363 |
| **Expenses:** | | |
| Compensation and benefits | | 33,670 |
| Professional fees | | 14,624 |
| Marketing and advertising expense | | 2,413 |
| Interest expense | | 1,695 |
| Depreciation and amortization | | 1,304 |
| Investment and research consulting | | 1,082 |
| Bad debt expense | | 7,862 |
| Other operating expenses | | 6,786 |
| Total expenses | | 69,436 |
| **Other Income/(Expense):** | | |
| Other income | | 9,816 |
| Impairment on intangible assets | | (2,830) |
| Total other income | | 6,986 |
| Loss before investment activities | | (12,087) |
| **Realized and unrealized gains/losses on investments:** | | |
| Net realized gain on sale of investments | | 13,397 |
| Net change in unrealized loss on investments* | | (56,529) |
| Total realized and unrealized loss on investments | | (43,132) |
| Loss from equity method investees: | | (17,959) |
| **Net loss** | $ | (73,178) |

*Net change in unrealized gain on investments includes $56.1 million of unrealized loss from holdings of limited partnership interests of Consolidated Investment Funds, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2018 consolidated financial statements of Highland Capital Management, L.P.  This information should be read in conjunction with such audited consolidated financial statements.

HIGHLY CONFIDENTIAL

D-CNL000257

**Appx. 00076**

# EXHIBIT 35

**HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

**INCUMBENCY CERTIFICATE**

I am the sole Director of STRAND ADVISORS XVI, INC., a Delaware corporation (the "*General Partner*"), the general partner of **HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**, a Delaware limited partnership (the "*Partnership*").  In that capacity, I certify that the persons listed below have been duly appointed and qualified as, and currently are, officers of the General Partner of the Partnership.  I also certify that each person listed below holds the position that is listed opposite his or her name in the General Partner, and that the signatures attached are the genuine signatures of the persons indicated.  I also certify that in their capacity as officers of the General Partner, the persons listed below are authorized to execute any and all agreements on behalf of the General Partner in its capacity as the general partner of the Partnership.  I further certify that in their capacity as officers of the General Partner, the persons listed below are authorized to give any party on behalf of the Partnership all notices, orders, directions, or instructions (including but not limited to written, facsimile, or oral funds transfer instructions) in connection with any transaction to which the Partnership is or in the future may be a party to in any capacity.

| Name of Officer | Title | Signature |
|---|---|---|
| Dustin Norris | Executive Vice President | |
| Frank Waterhouse | Treasurer | |
| Lauren Thedford | Secretary | |

WITNESS my hand to be effective as of the 11th day of April, 2019.

HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

By:  Strand Advisors XVI, Inc., its general partner

By: _____
    James D. Dondero, Sole Director

# EXHIBIT 36

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 6:19 PM
**To:** Lauren Thedford <LThedford@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

No shared services outstanding.  The HCMFA note is a demand note.  The NexPoint note Kristin can give the end term.  There was an agreement between HCMLP and HCMFA the earliest they could demand is May 2021.  The attorneys think that BK doesn't change that but don't know for sure at the end of the day.  The response should include as I covered in the Board meeting that both entities have the full faith and backing from Jim Dondero and to my knowledge that hasn't changed.

**From:** Lauren Thedford <LThedford@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 6:14 PM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

I see the below from the 6/30 financials –

NPA: Due to HCMLP and affiliates as of June 30, 2020 - 23,683,000
HCMFA: Due to HCMLP as of June 30, 2020 - 12,286

I expect the follow-up question will be regarding terms and structure of the notes and whether any of the shared services invoices are outstanding.

Draft answer below.

> Are there any material outstanding amounts currently payable or due in the future (*e.g.*, notes) to HCMLP by HCMFA or NexPoint Advisors or any other affiliate that provide services to the Funds?
>
> **Response**: As of June 30, 2020, $23,683,000 remains outstanding to HCMLP and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP from HCMFA. The Notes between HCMLP and NexPoint come due on [DATE]. The Notes between HCMLP and HCMFA come due on [DATE]. All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of [DATE].

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 6:05 PM
**To:** Lauren Thedford <LThedford@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris

1

D-HCMFA290880

**Appx. 00080**

<DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

It's on the balance sheet that was provided to the board as part of the 15c materials.

**From:** Lauren Thedford <LThedford@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 6:04 PM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix
<KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris
<DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

Could you provide the amounts?

Thanks

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 5:53 PM
**To:** Lauren Thedford <LThedford@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix
<KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris
<DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

Yes

**From:** Lauren Thedford <LThedford@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 5:52 PM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix
<KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris
<DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

Good evening Frank, Klos, Kristin – please advise on the below in connection with the Board's follow-up request. Thanks!

> Are there any material outstanding amounts currently payable or due in the future (*e.g.*, notes) to HLCMLP by
> HCMFA or NexPoint Advisors or any other affiliate that provide services to the Funds?

**From:** Lauren Thedford
**Sent:** Friday, October 2, 2020 2:50 PM
**To:** Thomas Surgent <TSurgent@HighlandCapital.com>
**Cc:** Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@Nexpointsecurities.com>; Will Mabry
<WMabry@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>
**Subject:** FW: 15(c) Follow up (10_2_20).DOCX

Thomas – please see attached (and reproduced below) additional 15c follow-up questions from the Board.

2

1.  Please provide, to the extent practicable, the contingency plans with respect to the services provided under the Shared Services Agreements in the event that the outcome of the HCMLP bankruptcy proceedings were to impact the current servicing structure. For example, has the Advisers considered any outside service providers if necessary?

    Note prior question and response on related topic:

    With respect to the Estimated Adviser Profitability chart (Item A.2.a in the Board book), is the "Shared Services" line the only expenses attributable to HCMLP?  Has any work been done or consideration been given to the solicitation of a third party bid on performing these services or bringing them in house to HCMFA?

    **Response**: Shared services, along with a portion of the investment professional compensation & benefits lines, are the only allocations attributable to HCMLP employees' support of the Advisers. HCMFA does not have the resources to bring these services in-house at this time, but given that HCMLP staffing levels for the provision of the shared services have remained fairly consistent and HCMLP remains capable of providing such shared services on economically reasonable terms, outsourced third-party bids have not been solicited at this time.

2.  Are there any material outstanding amounts currently payable or due in the future (*e.g.*, notes) to HLCMLP by HCMFA or NexPoint Advisors or any other affiliate that provide services to the Funds?

3.  The Board notes the provision of the updated list of current co-investments provided by HCMFA/NexPoint Advisors and the Advisers' discussion, including the senior-level team in place, to address any potential conflicts of interest matters.  With respect to the compliance function, please confirm that the Funds' Chief Compliance Officer overall will continue in his usual role with respect to the Funds.  Are there any other potential conflicts outside of the specific co-investment matters identified?

Please let me know if you would like me to set up a call on Monday to discuss.

---

**From:** Louizos, Stacy <SLouizos@BlankRome.com>
**Sent:** Friday, October 2, 2020 1:54 PM
**To:** Dustin Norris <DNorris@NexPointSecurities.com>; Lauren Thedford <LThedford@HighlandCapital.com>
**Cc:** Jason Post <JPost@HighlandCapital.com>; Zornada, George <George.Zornada@klgates.com>; Charles.Miller@klgates.com; Jon-Luc.Dupuy@klgates.com
**Subject:** 15(c) Follow up (10_2_20).DOCX

Hi Dustin and Lauren—Please see attached follow up questions from the Trustees after the latest Board call. Happy to have a call to discuss if helpful.

Best,
Stacy

**Stacy H. Louizos** | BLANKROME
1271 Avenue of the Americas | New York, NY 10020
O: 212.885.5147 | F: 917.332.3028 | slouizos@blankrome.com
M: 203.918.3666

CONFIDENTIAL

D-HCMFA290882

**Appx. 00082**

*************************************************************************************************************
*

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the Blank Rome LLP or Blank Rome Government Relations LLC sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

*************************************************************************************************************
*

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

CONFIDENTIAL

D-HCMFA290883

**Appx. 00083**

**EXHIBIT 45**

# TO BE FILED

# UNDER SEAL

Appx. 00084

# EXHIBIT 54

Appx. 00085

**From:** Kristin Hendrix
**Sent:** Thursday, May 02, 2019 12:33 PM
**To:** Hayley Eliason <HEliason@HighlandCapital.com>; Blair Roeber <BRoeber@HighlandCapital.com>
**Subject:** FW: HCMLP to HCMFA loan

Blair,

Here is a copy of the note for support.

Hayley – FYI for your loan tracker.

**From:** David Klos
**Sent:** Thursday, May 02, 2019 11:24 AM
**To:** Corporate Accounting
**Subject:** HCMLP to HCMFA loan

Blair,
Please send $2,400,000 from HCMLP to HCMFA. This is a new interco loan. Kristin, can you or Hayley please prep a note for execution. I'll have further instructions later today, but please process this payment as soon as possible.

**DAVID KLOS** | CONTROLLER



300 Crescent Court | Suite 700 | Dallas, Texas 75201
C: 214.674.2926 | O: 972.419.4478 | F: 972 628.4147
dklos@highlandcapital.com | www.highlandcapital.com

1

**Appx. 00086**

# PROMISSORY NOTE

$2,400,000.00                                                                    May 2, 2019

     FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "***Note***").   All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.   Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    <u>Payment of Principal and Interest</u>.   The accrued interest and principal of this Note shall be due and payable on demand.

     3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.   Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Acceleration Upon Default</u>.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.   No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    <u>Waiver</u>.   Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    <u>Attorneys' Fees</u>.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

2

# EXHIBIT 56

**From:** Kristin Hendrix
**Sent:** Friday, May 03, 2019 3:06 PM
**To:** Corporate Accounting <CorporateAccounting@hcmlp.com>
**Subject:** HCMLP Loan to HCMFA

Blair,

Please set up a wire from HCMLP to HCMFA for $5M as a new loan ($4.4M should be coming in from Jim soon).

Hayley, please add this to your loan tracker. I will paper the loan.

Thanks,

**Kristin Hendrix, CPA** | Manager, Corporate Accounting



300 Crescent Court | Suite 700 | Dallas, Texas 75201
O: 972.628.4127 | F: 972.628.4147
khendrix@highlandcapital.com | www.highlandcapital.com



1

# EXHIBIT 57

**PROMISSORY NOTE**

$5,000,000.00                                                                May 3, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "*Note*").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.   Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand.

3.      Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

2

# EXHIBIT 59

 

| | |
|---|---|
| **TO:** | Board of Trustees or Board of Directors (as the case may be) (collectively, the "Board") of Highland Funds I, Highland Funds II, Highland Income Fund, Highland Global Allocation Fund, NexPoint Strategic Opportunities Fund, NexPoint Real Estate Strategies Fund and NexPoint Capital, Inc. |
| **FROM:** | Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. and NexPoint Securities, Inc. |
| **RE:** | Supplemental 15(c) Information Request |
| **DATE:** | October 23, 2020 |

Pursuant to your supplemental request dated October 2, 2020, Highland Capital Management Fund Advisors, L.P. ("HCMFA"), NexPoint Advisors, L.P. ("NexPoint", and with HCMFA, each, an "Adviser", and together, the "Advisers") and NexPoint Securities, Inc. ("NSI" the "Distributor") submit the following supplemental information to the Board in order to assist the Board in fulfilling its obligations under Section 15(c) of the Investment Company Act of 1940, as amended (the "1940 Act"), and to assist in the Board's consideration of the investment advisory, and other contractual arrangements, for the funds listed on Appendix A (each, a "Fund" and, collectively, the "Funds"). References to the 2020 15(c) Response dated August 13, 2020 and the supplemental response dated September 17-18, 2020 are referred to as the "2020 15(c) Response" and "2020 Supplemental 15(c) Response", respectively.

Your requests have been noted below, each of which is followed by our response. Unless otherwise specified, reference documents are located on Director's Desk at the following location: Home > Documents > Corporate Documents > 15c Reference Documents.

**A.**   _**Nature, Extent and Quality of Services**_

    1.    Please provide, to the extent practicable, the contingency plans with respect to the services provided under the Shared Services Agreements in the event that the outcome of the HCMLP bankruptcy proceedings were to impact the current servicing structure. For example, has the Advisers considered any outside service providers if necessary?

        **Response**: As a result of the Highland Capital Management, L.P. ("HCMLP") bankruptcy, NexPoint's senior management's plan as a backup/contingency plan is to extend employment offers to the vast majority of HCMLP's employees by December 31, 2020.  This will help ensure that there is no disruption in services to the Funds.  Once we have further details of this we will advise.  In the interim, the plan is to continue with existing shared services.

        Representatives of HCMLP and NexPoint will be available to discuss the structure of these contingency plans, relevant employees, and communications

to current employees regarding these matters. Representatives of HCMLP and NexPoint are working to facilitate the shared use of and/or transfer of services such as the intranet, shared computer drives, and third-party contracts.

2.   Are there any material outstanding amounts currently payable or due in the future (*e.g.*, notes) to HLCMLP by HCMFA or NexPoint Advisors or any other affiliate that provide services to the Funds?

   **Response**: As of June 30, 2020, $23,683,000 remains outstanding to HCMLP and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP from HCMFA. The Note between HCMLP and NexPoint comes due on December 31, 2047. The earliest the Note between HCMLP and HCMFA could come due is in May 2021. All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of the date of this letter. The Adviser notes that both entities have the full faith and support of James Dondero.

3.   The Board notes the provision of the updated list of current co-investments provided by HCMFA/NexPoint Advisors and the Advisers' discussion, including the senior-level team in place, to address any potential conflicts of interest matters.  With respect to the compliance function, please confirm that the Funds' Chief Compliance Officer overall will continue in his usual role with respect to the Funds.  Are there any other potential conflicts outside of the specific co-investment matters identified?

   **Response**: The Advisers confirm that the Funds' Chief Compliance Officer overall will continue in his usual role with respect to the Funds. As of October 14, 2020, the Funds' Chief Compliance Officer is an employee of NexPoint. Please see <u>Exhibit A</u> for a list of current co-investments and cross-held positions where a future conflict may arise together with <u>Exhibit B</u> for the list of non-HCMLP employees available to assist the Board in any future conflicts.

## Exhibit A

**Co-Investment Analysis**

CONFIDENTIAL

Highland Capital Management, LP ("HCMLP")
Condensed Co-Investment Analysis
As of 9/30/20

**Condensed Co-Investments [1]**

| | Investment | HCMLP MV | Funds Managed by HCMLP MV | Retail Funds | Non-HCMLP Investment Coverage |
|---|---|---|---|---|---|
| 1 | Metro-Goldwyn-Mayer Inc. Class A Common Stock | $13,085,369 | $418,019,027 | $61,820,908 | Dondero |
| 2 | CCS Medical, Inc. (Chronic Care) Loan 1st Lien @ PRIME 7%  7/31/2021 | - | 121,166,994 | 47,510,599 | Dondero |
| 3 | TerreStar Corporation Term Loan A @ LIBOR 11%  2/28/2022 | - | 49,742,043 | 40,159,485 | Dondero |
| 4 | VST US Equity | - | 41,904,280 | 24,381,982 | Sowin |
| 5 | NXRT | 10,799,003 | 2,228,410 | 21,256,955 | McGraner |
| 6 | Grayson CLO, Ltd. Class II Preference Shares | - | 2,201,500 | 18,861,500 | Sowin |
| 7 | NHT/U CN | 2,028,793 | - | 18,524,594 | McGraner |
| 8 | NHF | 2,208,872 | 2,954,619 | 15,808,648 | Dondero |
| 9 | Advantage Sales & Marketing Inc. Term Loan (Second Lien) @ LIBOR 6.5%  7/25/2022 | - | 1,940,140 | 13,784,695 | Sowin |
| 10 | Procera Networks, Inc.  (aka Sandvine Corp) Initial Term Loan (First Lien) @ LIBOR 4.5%  10/3 | - | 1,367,373 | 13,681,487 | Sowin |
| 11 | Gruden Acquisition, Inc. (aka Quality Distribution) ITL (First Lien) @ LIBOR 5.5%  8/18/2022 | - | 2,568,463 | 11,124,738 | Sowin |
| 12 | Westchester CLO, Ltd Class I Preference Shares 144A | - | 3,373,333 | 10,888,813 | Sowin |
| 13 | HRTX | - | 81,510 | 10,686,168 | Dondero |
| 14 | Vistra Energy Corp. (fka TCEH Corp.) TXU TRA rights | - | 3,494,825 | 10,476,054 | Sowin |
| 15 | American Banknote Common | 693,467 | - | 1,843,371 | Dondero |
| 16 | American Airlines Escrow | 154,650 | 630,365 | 1,444,839 | Dondero |
| 17 | Ginn LA Conduit Lender, Inc. 1st Lien A CL Deposit @ PRIME 4.5%  6/8/2011 | 68,860 | 812,716 | 846,955 | Sowin |
| 18 | TerreStar Corporation TL C @ LIBOR 11%  2/28/2022 | - | 25,418 | 553,282 | Dondero |
| 19 | CCS Medical, Inc. (Chronic Care) Common | - | 6,008 | 5,797 | Dondero |
| | **Sub-Total** | **$29,039,013** | **$652,517,024** | **$323,660,869** | |

**Additional HCMLP Ownership of Retail Funds (non-co-investments) [2]**

| Investment | HCMLP MV | Retail Fund MV | Funds Managed by HCMLP MV |
|---|---|---|---|
| Highland Opportunistic Credit Fund (HNRZX) | $2,911,923 | - | - |
| NexPoint Real Estate Strategies Fund (NRSZX) | 663,982 | - | - |
| **Sub-Total** | **$3,575,905** | **$0** | **$0** |

Footnote:
1 - Listing includes the following: 1) all investments held by both HCMLP and retail funds, regardless of materiality 2) investments for which retail funds hold $10 million or greater in the aggregate and are also held by funds advised by HCMLP 3) investments for which retail funds hold ownership less than $10 million in the aggregate, the position is private and fair valued, and are also held by funds advised by HCMLP.
2 - 'Additional HCMLP Ownership of Retail Funds' does not reflect other immaterial holdings of investments below $5,000.

Highland Capital Management, LP ("HCMLP")
Co-Investment Analysis
As of 9/30/20

**Co-Investments, excluding holdings with zero market value**

| | Investment | HCMLP MV | Funds Managed by HCMLP MV | Retail Funds |
|---|---|---|---|---|
| 1 | Metro-Goldwyn-Mayer Inc. Class A Common Stock | $13,085,369 | $418,019,027 | $61,820,908 |
| 2 | CCS Medical, Inc. (Chronic Care) Loan 1st Lien @ PRIME 7% 7/31/2021 | - | 121,166,994 | 47,510,599 |
| 3 | TerreStar Corporation Term Loan A @ LIBOR 11% 2/28/2022 | - | 49,742,043 | 40,159,485 |
| 4 | VST US Equity | - | 41,904,280 | 24,381,982 |
| 5 | NXRT | 10,799,003 | 2,238,410 | 21,256,955 |
| 6 | Grayson CLO, Ltd. Class II Preference Shares | - | 2,201,500 | 18,861,500 |
| 7 | NHT/U CN | 2,028,793 | - | 18,524,594 |
| 8 | NHF | 2,208,872 | 2,954,619 | 15,808,648 |
| 9 | Advantage Sales & Marketing Inc. Term Loan (Second Lien) @ LIBOR 6.5% 7/25/2022 | - | 1,940,140 | 13,784,695 |
| 10 | Procera Networks, Inc. (aka Sandvine Corp) Initial Term Loan (First Lien) @ LIBOR 4.5% 10/31/2025 | - | 1,367,373 | 13,681,487 |
| 11 | Gruden Acquisition, Inc. (aka Quality Distribution) ITL (First Lien) @ LIBOR 5.5% 8/18/2022 | - | 2,568,463 | 11,124,738 |
| 12 | Westchester CLO, Ltd Class I Preference Shares 144A | - | 3,373,333 | 10,888,813 |
| 13 | HRTX | - | 81,510 | 10,686,168 |
| 14 | Vistra Energy Corp. (fka TCEH Corp.) TXU TRA rights | - | 3,494,825 | 10,476,054 |
| 15 | Traverse Midstream Partners LLC Advance @ LIBOR 5.5% 9/27/2024 | - | 25,916,705 | 9,945,051 |
| 16 | VM Consolidated, Inc. (aka American Traffic Solutions) B-1 1st Lien Non-ext @ LIBOR 3.25% 2/28/2025 | - | 2,719,702 | 9,594,505 |
| 17 | Edelman Financial Center, LLC, The (fka Flight Debt Merger Sub Inc.) Initial Term Loan (Second Lien) @ LIBOR 6.75% 7/20/2026 | - | 125,340 | 9,078,334 |
| 18 | Forest City Enterprises, L.P. Replacement TL @ LIBOR 3.5% 12/8/2025 | - | 2,222,324 | 8,889,297 |
| 19 | Avaya Inc. B TL @ LIBOR 4.25% 12/15/2024 | - | 1,357,685 | 8,802,760 |
| 20 | MPMQ Appraisal Rights Claims | - | 527,460 | 8,224,455 |
| 21 | USS Ultimate Holdings, Inc. (aka United Site Services, Inc.) Initial Term Loan (First Lien) @ LIBOR 3.75% 8/25/2024 | - | 2,877,263 | 6,691,414 |
| 22 | PSC Industrial Holdings Corp. Term Loan (First Lien) @ LIBOR 3.75% 10/11/2024 | - | 3,685,775 | 6,511,970 |
| 23 | EnergySolutions, LLC (aka Envirocare of Utah, LLC) Initial Term Loan @ LIBOR 3.75% 5/9/2025 | - | 7,194,271 | 5,678,112 |
| 24 | Truck Hero, Inc. Initial TL 2nd Lien @ LIBOR 8.25% 4/21/2025 | - | 645,557 | 5,561,471 |
| 25 | Envision Healthcare Corporation Initial Term Loan @ LIBOR 3.75% 10/10/2025 | - | 2,854,870 | 5,502,657 |
| 26 | AERI | - | 35,310 | 5,211,756 |
| 27 | MDPK 2014-15A Float - 01/2026 - DR - 55818WAG0 @ LIBOR 5.4400 1/27/2026 | - | 1,249,500 | 4,774,875 |
| 28 | Brentwood CLO Ltd Class II Preference Shares | - | 7,424,000 | 4,416,000 |
| 29 | Jo-Ann Stores, LLC Initial Loan @ LIBOR 5% 10/20/2023 | - | 2,354,854 | 4,384,100 |
| 30 | Advantage Sales & Marketing Inc. Initial Term Loan (First Lien) @ LIBOR 3.25% 7/23/2021 | - | 1,896,829 | 3,571,805 |
| 31 | Radnet Management, Inc. T B-1 L @ LIBOR 3.75% 6/30/2023 | - | 1,601,339 | 3,479,728 |
| 32 | Fort Dearborn Holding Company, Inc. Initial Term Loan (First Lien) @ LIBOR 4% 10/19/2023 | - | 1,394,305 | 3,406,180 |
| 33 | Sound Inpatient Physicians, Inc. Initial Term Loan (First Lien) @ LIBOR 6.75% 6/26/2026 | - | 326,460 | 3,264,600 |
| 34 | Liberty CLO, Ltd. Preferred | - | 8,339,310 | 2,989,000 |
| 35 | UDFI | - | 1,291,306 | 2,801,645 |
| 36 | Auris Luxembourg III S.a r.l. Facility B2 @ LIBOR 3.75% 2/27/2026 | - | 1,891,886 | 2,364,858 |
| 37 | BIO | - | 2,131,490 | 2,319,570 |
| 38 | Dayco Products LLC - (Mark IV Industries, Inc.) Term Loan @ LIBOR 4.25% 5/19/2023 | - | 1,587,518 | 2,121,554 |
| 39 | Rockwall CLO, Ltd. Preferred Shares | - | 5,211,000 | 2,026,500 |
| 40 | AVYA | - | 30,877,250 | 1,911,598 |
| 41 | RWIC NOT LISTED | - | 579,000 | 1,852,800 |
| 42 | American Banknote Common | 693,467 | - | 1,843,371 |
| 43 | TCW 2019-2A D2A Float - 10/2030 - 87242BAS9 @ 4.89 10/20/2032 | - | 1,250,000 | 1,750,000 |
| 44 | Red River CLO, Ltd. Red River CLO | - | 3,797,722 | 1,744,900 |
| 45 | American Airlines Escrow | 154,650 | 630,365 | 1,444,839 |
| 46 | Refinitiv US Holdings Inc. (fka Financial & Risk US Holdings, Inc.) Initial Dollar Term Loan @ LIBOR 3.25% 10/1/2025 | - | 1,950,070 | 1,231,425 |
| 47 | Scientific Games International, Inc. Initial Term B-5 Loan @ LIBOR 2.75% 8/14/2024 | - | 3,715,025 | 1,213,050 |
| 48 | ACIS 2015-6A Zero Coupon - 05/2027 - SUB - 004524AD6 @ Zero Coupon 0.0000 5/1/2027 | - | 8,296,000 | 1,200,000 |
| 49 | CIFC 2015-5A DR Float - 10/02027 - 12550NAU7 @ 5.55 10/25/2027 | - | 1,109,375 | 1,198,125 |
| 50 | General Nutrition Centers, Inc. FILO Term Loan @ PRIME 8% 12/31/2022 | - | 487,190 | 1,148,178 |
| 51 | Change Healthcare Holdings, LLC closing date TL @ LIBOR 2.5% 3/1/2024 | - | 2,709,671 | 991,845 |
| 52 | CIFC 2016-1A D2R Float - 10/02031 - 17180TAW2 @ 4.43 10/21/2031 | - | 980,000 | 980,000 |
| 53 | TMO | - | 201,775 | 927,192 |
| 54 | ACIS 2016-6A Float - 05/2027 - D - 00452PAR8 @ LIBOR 3.7700 5/1/2027 | - | 1,810,000 | 905,000 |
| 55 | Edelman Financial Center, LLC, The (fka Flight Debt Merger Sub Inc.) Initial Term Loan (First Lien) @ LIBOR 3% 7/21/2025 | - | 3,329,415 | 903,218 |
| 56 | AHT1 2018-KEYS E Float - 05/02035 - 04410CAN9 @ 4.15 05/15/2035 | - | 645,850 | 850,255 |
| 57 | Ginn LA Conduit Lender, Inc. 1st Lien A CL Deposit @ PRIME 4.5% 6/8/2011 | 68,860 | 812,716 | 846,955 |
| 58 | Bausch Health Companies Inc. (fka Valeant Pharmaceuticals International, Inc.) Initial Term Loan @ LIBOR 3% 6/2/2025 | - | 3,010,042 | 825,922 |
| 59 | CSC Holdings, LLC (fka CSC Holdings Inc. (Cablevision)) March 2017 Refinancing Term Loan @ LIBOR 2.25% 7/17/2025 | - | 1,142,030 | 824,572 |
| 60 | Hub International Limited Initial Term Loan @ LIBOR 3% 4/25/2025 | - | 1,270,064 | 819,121 |
| 61 | Nielsen Finance LLC (VNU, Inc.) Class B-4 Term Loan @ LIBOR 2% 10/4/2023 | - | 480,085 | 813,503 |
| 62 | PRTK | - | 100,626 | 757,508 |
| 63 | MPH Acquisition Holdings LLC Initial Term Loan @ LIBOR 2.75% 6/7/2023 | - | 3,767,027 | 739,421 |
| 64 | VICI Properties 1 LLC Term B Loan @ LIBOR 1.75% 12/20/2024 | - | 969,035 | 726,776 |
| 65 | McAfee, LLC Term B USD Loan @ LIBOR 3.75% 9/30/2024 | - | 1,469,387 | 722,848 |
| 66 | IRB Holding Corp. (aka Arby's / Buffalo Wild Wings) 2020 Replacement Term B Loan @ Libor 2.75% 2/5/2025 | - | 531,087 | 716,184 |
| 67 | Global Medical Response, Inc. (aka Air Medical) 2018 Term Loan @ LIBOR 3.25% 4/28/2022 | - | 969,179 | 699,346 |
| 68 | CityCenter Holdings, LLC Term B Loan @ LIBOR 2.25% 4/18/2024 | - | 344,250 | 694,346 |
| 69 | Misys Limited (aka Almonde/Tahoe, Finastra USA) Dollar Term Loan (First Lien) @ LIBOR 3.5% 6/13/2024 | - | 920,265 | 693,208 |
| 70 | Golden Nugget, Inc. (aka Landry's Inc.) TL @ LIBOR 2.5% 10/4/2023 | - | 383,374 | 671,846 |
| 71 | H.B. Fuller Company Commitment @ LIBOR 2% 10/20/2024 | - | 250,488 | 638,664 |
| 72 | Lightstone Holdco LLC Refinancing Term B Loan @ LIBOR 3.75% 1/30/2024 | - | 4,262,832 | 616,367 |
| 73 | ACHC | - | 73,700 | 589,600 |
| 74 | Crown Finance US, Inc. (aka Cineworld Group plc) Initial Dollar Tranche Term Loan @ LIBOR 2.5% 2/28/2025 | - | 11,999,814 | 572,658 |
| 75 | Calpine Corporation Term Loan (2015) @ LIBOR 2.25% 1/15/2024 | - | 375,085 | 567,158 |
| 76 | TerreStar Corporation TL C @ LIBOR 11% 2/28/2022 | - | 25,418 | 553,282 |
| 77 | TransDigm Inc. Tranche E Refinancing Term Loan @ LIBOR 2.5% 5/30/2025 | - | 6,149,465 | 542,437 |
| 78 | Tronox Finance LLC Initial Dollar Term Loan (First Lien) @ LIBOR 3% 9/23/2024 | - | 3,327,701 | 493,305 |
| 79 | Solera, LLC (Solera Finance, Inc.) Dollar TL @ LIBOR 2.75% 3/3/2023 | - | 446,555 | 490,314 |
| 80 | AlixPartners, LLP 2017 Refinancing Term Loan @ LIBOR 2.5% 4/4/2024 | - | 3,254,084 | 483,887 |
| 81 | iHeartCommunications, Inc. (fka Clear Channel Communications, Inc.)6.375% - 05/2026 - 45174HBC0 FIX 6.375% 5/1/2026 | - | 1,446 | 482,002 |
| 82 | Fieldwood Energy LLC Closing Date Loan (First Lien) @ LIBOR 5.25% 4/11/2022 | - | 10,941,771 | 479,396 |
| 83 | HLF 1X Floating - 08/2014 - C1 - 43037QAE9 @ LIBOR 0.0000 8/2/2018 | - | 318,583 | 477,874 |
| 84 | Ineos US Finance LLC New 2024 Dollar Term Loan @ LIBOR 2% 4/1/2024 | - | 2,131,748 | 474,805 |
| 85 | CGMS 2019-4A D Float - 01/02033 - 14317WAA6 @ 7.65 01/15/2033 | - | 930,500 | 465,250 |
| 86 | BJ's Wholesale Club, Inc. Tranche B Term Loan (First Lien) @ LIBOR 2% 2/3/2024 | - | 515,535 | 460,180 |
| 87 | Titan Acquisition Limited (aka Husky IMS International Ltd.) Initial Term Loan @ LIBOR 3% 3/28/2025 | - | 923,108 | 459,071 |
| 88 | Plantronics, Inc. Initial Term B Loan @ LIBOR 2.5% 7/2/2025 | - | 12,145,824 | 376,874 |
| 89 | SS&C Technologies Holdings, Inc. Term B-5 Loan @ LIBOR 2.25% 4/16/2025 | - | 952,120 | 264,538 |
| 90 | Berry Global, Inc. (fka Berry Plastics Corporation) Term W Loan @ LIBOR 2% 10/1/2022 | - | 339,055 | 248,184 |
| 91 | Applied Systems, Inc. Closing Date Term Loan (First Lien) @ LIBOR 3.25% 9/19/2024 | - | 1,693,433 | 245,795 |
| 92 | SolarWinds Holdings, Inc. 2018 Refinancing Term Loan (First Lien) @ LIBOR 2.75% 2/5/2024 | - | 956,532 | 243,383 |
| 93 | VAHA 2004-1A Variable - 08/2012 - 91914QAA4 @ Variable 0.0000 8/1/2012 | - | 375,000 | 225,000 |
| 94 | SRC | - | 1,212 | 220,219 |
| 95 | COLL | - | 62,398 | 166,456 |
| 96 | Texas Competitive Electric Holdings Company LLC (TXU) Escrow Loan Extended @ LIBOR 0% | - | 2,079 | 151,087 |
| 97 | AAMRQ escrow Common Stock | - | 57,400 | 123,000 |
| 98 | Tecton 9 PERP | - | 467,201 | 114,573 |
| 99 | ACRG/A/U CN | - | 41,887 | 111,422 |
| 100 | NRG | - | 26,498 | 83,767 |
| 101 | FGI Operating Company, LLC Common | - | 51,252 | 68,922 |
| 102 | Fieldwood Energy LLC Common1 | - | 15,420 | 56,288 |
| 103 | ACRG/B/U CN | - | 15,420 | 33,960 |
| 104 | Lightstone Holdco LLC Refinancing Term C Loan @ LIBOR 3.75% 1/30/2024 | - | 240,430 | 34,764 |
| 105 | SMTA (Delisted 01/02/2020) | - | 93,852 | 7,880 |
| 106 | CCS Medical, Inc. (Chronic Care) Common | - | 6,008 | 5,797 |
| | **Total** | **$29,039,013** | **$878,908,335** | **$495,707,848** |

**Additional HCMLP Ownership of Retail Funds (non-co-investments)[1]**

| | Investment | HCMLP MV | Retail Fund MV | Funds Managed by HCMLP MV |
|---|---|---|---|---|
| | Highland Opportunistic Credit Fund (HNRZX) | $2,911,923 | - | - |
| | NexPoint Real Estate Strategies Fund (NRSZX) | 663,982 | - | - |
| | **Total** | **$3,575,905** | **0.00** | **$0** |

**Footnote:**
1 - 'Additional HCMLP Ownership of Retail Funds' does not reflect other immaterial holdings of investments below $5,000.

CONFIDENTIAL

**Exhibit B**

**Non-HCMLP Employees**

| Name | Role | Current Title | Employed By |
|------|------|---------------|-------------|
| Jim Dondero | Senior Investment Team Member | Partner | NPA |
| Jason Post | Chief Compliance Officer | Chief Compliance Officer | NPA |
| Joe Sowin | Senior Investment Team Member | Co-CIO and Head of Global Equity Trading | HCMFA |
| Brad Heiss | Senior Investment Team Member | Managing Director | HCMFA |
| Matt McGraner | Senior Investment Team Member | Managing Director | NPA |
| Dustin Norris | Fund Officer/Liaison | Head of Distribution and Chief Product Strategist | NPA |
| DC Sauter | Legal | General Counsel | NPA |
| Eric Holt | Compliance | Chief Compliance Officer, Affiliated Broker Dealers | NSI |
| David Willmore | Accounting/Operations | Senior Manager, Real Estate Accounting | NXRT |
| Paul Richards | Valuation | Director, Real Estate | NPA |
| Jackie Graham | PR/Marketing | Investor Relations Manager | NPA |

| | |
|---|---|
| HCMFA | Highland Capital Management Fund Advisors, L.P. |
| NPA | NexPoint Advisors, L.P. |
| NSI | NexPoint Securities, Inc. |
| NXRT | NexPoint Residential Trust, Inc. |

.

CONFIDENTIAL

4

Appx. 00100

## Appendix A

**Open-End Funds**

Highland Funds I:

1. Highland Healthcare Opportunities Fund
2. Highland/iBoxx Senior Loan ETF
3. Highland Opportunistic Credit Fund (*in liquidation*)
4. Highland Merger Arbitrage Fund

Highland Funds II:

5. Highland Small-Cap Equity Fund
6. Highland Socially Responsible Equity Fund
7. Highland Fixed Income Fund *(sub-advised)*
8. Highland Total Return Fund *(sub-advised)*

**Closed-End Funds**

9. NexPoint Capital, Inc.
   a. BDC REIT Sub, LLC                                  (*REIT Subsidiary*)
10. NexPoint Strategic Opportunities Fund
    a. NexPoint Real Estate Opportunities, LLC            (*REIT Subsidiary*)
    b. NexPoint Real Estate Capital, LLC                  (*REIT Subsidiary*)
11. Highland Income Fund
    a. HFRO Sub, LLC                                      (*Credit Subsidiary*)
    b. NFRO REIT Sub, LLC                                 (*REIT Subsidiary*)
12. Highland Global Allocation Fund
    a. GAF REIT, LLC                                      (*REIT Subsidiary*)

**Interval Funds:**

13. NexPoint Real Estate Strategies Fund
    a. NRESF REIT Sub, LLC                                (*REIT Subsidiary*)

CONFIDENTIAL

# EXHIBIT 94

Page 1

1                    BURGER

2      IN THE UNITED STATES BANKRUPTCY COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
3              DALLAS DIVISION
   ------------------------------
4   IN RE:

5                    Chapter 11
    HIGHLAND CAPITAL
6    MANAGEMENT, L.P.,        CASE NO.
                     19-34054-SGI11
7
          Debtor.
8    ------------------------------
    HIGHLAND CAPITAL MANAGEMENT, L.P.,
9
          Plaintiff,
10   vs.                    Adversary
                        Proceeding No.
11   HIGHLAND CAPITAL MANAGEMENT      21-03000-sgj
    FUND ADVISORS, L.P.; NEXPOINT
12   ADVISORS, L.P.; HIGHLAND
    INCOME FUND; NEXPOINT
13   STRATEGIC OPPORTUNITIES FUND;
    NEXPOINT CAPITAL, INC.; and
14   CLO HOLDCO, LTD.,

15          Defendants.
   ------------------------------
16

17          REMOTE DEPOSITION OF

18            PEET BURGER

19          July 30, 2021

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No. 197393

Page 2

```
 1              BURGER
 2
 3
 4         July 30, 2021
 5         10:01 a.m.
 6
 7
 8
 9      Remote Deposition of PEET BURGER, held
10   before Susan S. Klinger, a Registered Merit
11   Reporter and Certified Realtime Reporter of the
12   State of Texas.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              BURGER
 2   A P P E A R A N C E S :
 3   (All appearances via Zoom.)
 4   Attorneys for Debtor:
         BY: John Morris, Esq.
 5      PACHULSKI STANG ZIEHL & JONES
        780 Third Avenue
 6      New York, New York  10017
 7   Attorneys for the PwC and the Witness:
         BY: John Wander, Esq.
 8      VINSON & ELKINS
        2001 Ross Avenue
 9      Dallas, Texas  75201
10   Attorneys for John Dondero, Highland Capital
     Management Services, NexPoint:
11      BY: Michael Aigen, Esq.
        STINSON
12      3102 Oak Lawn Avenue
        Dallas, Texas 75219
13
     Attorneys for NexPoint Advisors, LP, Highland
14   Capital Fund Advisors:
         BY: Thomas Berghman, Esq.
15      MUNSCH HARDT KOPF & HARR
        500 North Akard Street
16      Dallas, Texas  75201
17   Also Present:
        Ms. La Asia Canty
18
19
20
21
22
23
24
25
```

Page 4

```
 1              BURGER
 2            I N D E X
 3
 4   WITNESS                    PAGE
 5   PEET BURGER
```

```
 6   EXAMINATION BY MR. MORRIS        5
 7   EXAMINATION BY MR. AIGEN        76
 8   EXAMINATION BY MR. MORRIS       92
```

```
 9
10          E X H I B I T S
11   No.                      Page
```

```
12   Exhibit 1  Management representation    18
13          Letter, 6/3/19
14   Exhibit 2  2017 Financial Statements    30
15   Exhibit 3  2017 Workpapers              41
16   Exhibit 4  2018 Financial Statements    47
17   Exhibit 5  2018 Workpapers              55
```

```
18
19
20
21
22
23
24
25
```

Page 5

```
 1              BURGER
 2         P R O C E E D I N G S
 3         PEET BURGER,
 4   having been first duly sworn testified as
 5   follows:
 6         EXAMINATION
 7   BY MR. MORRIS:
 8      Q.   Good morning.  Can you state your
 9   name for the record, please?
10      A.   I can.  Peet Burger.
11      Q.   Are you currently employed,
12   Mr. Burger?
13      A.   Yes.
14      Q.   By whom?
15      A.   PricewaterhouseCoopers.
16      Q.   And what is your title at
17   PricewaterhouseCoopers?
18      A.   I'm an audit partner.
19      Q.   When did you become an audit partner
20   at PricewaterhouseCoopers?
21      A.   January 1st of 2014.
22      Q.   Have you been an audit partner at
23   PricewaterhouseCoopers on a consistent basis
24   since January 1st, 2014?
25      A.   Yes, I have.
```

Appx. 00104

Page 6

```
 1              BURGER
 2     Q.   In that capacity, have you overseen
 3  the audits for Highland Capital Management,
 4  L.P.?
 5     A.   Yes, I did.
 6     Q.   Just briefly, were you employed by
 7  PricewaterhouseCoopers prior to the time you
 8  became an audit partner at the beginning of
 9  2014?
10     A.   Yes, I have.  Do I need to give the
11  dates?
12     Q.   Can you just tell me when you first
13  joined PwC?
14     A.   I joined in January of 1997 in our
15  South African firm.  Yes, that's correct.
16     Q.   When did you join the audit group?
17     A.   In January of 1997.
18     Q.   So you have been with
19  PricewaterhouseCoopers' audit unit on a
20  consistent basis for more than 20 years; is
21  that fair?
22     A.   Correct.
23     Q.   Okay.  When did you personally begin
24  working on the Highland Capital Management,
25  L.P. audits, do you recall?
```

Page 7

```
 1              BURGER
 2     A.   Somewhere in 2013.  I would say
 3  April, 2013.
 4     Q.   And were you the audit partner in
 5  charge of the Highland engagement from 2013
 6  until the time the 2018 financial statements
 7  were completed?
 8     A.   This is specific to Highland Capital
 9  Management, L.P., yes.
10     Q.   I'm just going to refer to Highland
11  Capital Management, L.P. as Highland going
12  forward; is that okay?
13     A.   Yes.
14     Q.   Have you ever been deposed before?
15     A.   No.
16     Q.   Okay.
17     A.   No.
18     Q.   I apologize, I should have started
19  with some ground rules, but I'm trying to be
20  mindful of the time.  It is important that you
21  allow me to finish my questions before you
22  begin your answers; is that okay?
23     A.   Sure.
24     Q.   And if I begin my next question
25  before you begin – before you finish your
```

Page 8

```
 1              BURGER
 2  answer, will you let me know that?
 3     A.   Sure.
 4     Q.   Do you understand that the court
 5  reporter is taking down every word that we say?
 6     A.   Yes.
 7     Q.   If you want to break at any time,
 8  will you let me know?
 9     A.   Sure.
10     Q.   If there is anything that you don't
11  understand, if there is a question that I ask
12  that you either don't understand or you think
13  is ambiguous in some way, will you let me know
14  that?
15     A.   Yes.
16     Q.   Okay.  From PricewaterhouseCoopers'
17  perspective, what is the purpose of an audit?
18     A.   To provide reasonable assurance in
19  in terms of the auditing and accounting
20  standards.
21     Q.   What standards are you referring to?
22     A.   In this case Generally Accepted
23  Auditing Standards.
24     Q.   What are Generally Accepted Auditing
25  Standards, if you know?
```

Page 9

```
 1              BURGER
 2     A.   It is a set of rules basically
 3  governed by the AICPA of what – considered
 4  what is the sort of conglomerate of rules on
 5  your professional standards of engagement to
 6  sign an audit opinion.
 7     Q.   And do I have this correctly, that
 8  the purpose of the audit is to provide
 9  reasonable assurance that the financial
10  statements are in compliance with Generally
11  Accepted Auditing Standards?
12          MR. WANDER:  Did you say assurance
13     or insurance?
14     Q.   Assurance?
15     A.   Yes, assurance, yes.  The procedures
16  performed by us in terms of Generally Accepted
17  Auditing Standards and the financials itself is
18  presented in terms of Generally Accepted
19  Accounting Practice.
20     Q.   Okay.  And are those standards or
21  practices familiar to you in the course of your
22  duties?
23     A.   Yes, it is.
24     Q.   Okay.  Can you describe for me
25  generally the process that PwC undertook in
```

**Appx. 00105**

Page 10

BURGER

1
2  connection with its auditing of the Highland
3  financial statements?  Is there, you know, a
4  process that you follow?
5      A.   Yes, there is.  I mean, it is a
6  pretty long process which starts all the way
7  from the planning to completion and you know,
8  through the execution which audit approach
9  outlines all the relevant standards of the
10  procedures that we're supposed perform from the
11  planning, execution and completion stage.
12      Q.   And is that something that you share
13  with Highland so that they understand the
14  process?
15      A.   We don't share our workpapers and
16  absolutely every single part of that, but they
17  -- I mean, they know what we are looking for in
18  the sense of obviously for -- we make requests
19  for information.  And if the information is not
20  clear, we need to explain to them why we are
21  asking them for it.
22      Q.   And how soon after the completion of
23  the fiscal year does PwC begin the process that
24  leads to the final audit?
25      A.   We start this engagement in its

Page 11

BURGER

1
2  fieldwork stage in around about April after --
3  April after the unit.
4      Q.   And what do you mean when you use
5  the phrase fieldwork?
6      A.   Our execution phase.
7      Q.   Is that the time when you begin to
8  send informational requests to Highland?
9      A.   No, we send it through the planning
10  phase as well, which the planning phase is the
11  phase where you get engaged to go through all
12  the planning and setting up the procedures that
13  you are supposed to perform for the -- for the
14  execution phase.  And you can also do some of
15  the execution transaction work during that
16  period to save yourself from having to spend
17  that time in April and May.
18      Q.   And when does the planning stage
19  begin?
20      A.   Each year can be slightly different,
21  but in this case, this was around about the
22  October -- September, October.
23      Q.   So the planning would begin in the
24  fall of each fiscal year and --
25      A.   Correct.

Page 12

BURGER

1
2      Q.   Is that fair?
3      A.   That's fair.
4      Q.   And then during the planning stage,
5  PwC would make information requests to
6  Highland.  Do I have that right?
7      A.   You have got that correct.
8      Q.   And then in response to that,
9  Highland would feed information to PwC for
10  PwC's review.  Do I have that right?
11      A.   Correct.
12      Q.   And then the fieldwork is -- is the
13  next step the fieldwork?
14      A.   Yes.
15      Q.   Okay.  Do you recall during the time
16  that you were the audit partner did you have a
17  primary contact at Highland for purposes of the
18  planning and the execution phases of the audit?
19      A.   There were more than one individual
20  we dealt with, but I recall there was a primary
21  contact which facilitated sort of -- you know,
22  the -- which facilitated all of our
23  communication.
24      Q.   And who was that?
25      A.   That was David Klos.

Page 13

BURGER

1
2      Q.   And who besides Mr. Klos were the
3  primary points of contact?
4      A.   Frank Waterhouse is the CFO and
5  Kristin Hendrix who, for the lack of a better
6  word was the -- the sort of chief -- the
7  accountant.
8      Q.   The accountant?
9      A.   Yes.
10      Q.   Yes.  And how many people typically
11  were on the Price Waterhouse team for purposes
12  of the Highland audits?
13      A.   It depends on the phase of the
14  audit, but at the biggest part of the audit the
15  execution phase we were, including me I would
16  say six or seven people.
17      Q.   Okay.  And how would
18  PricewaterhouseCoopers obtain the information
19  that it needed to prepare the audited financial
20  statements?
21      A.   Sorry.  Just to make sure, say
22  obtain the information.  We -- we have a -- I
23  mean, I did this over seven years.  It morphed
24  over time, but we have a -- a site, a secure
25  site called Connect.  And I think towards the

Page 14

BURGER

1   end we used that for them to upload
2   information.
3          Previously Highland had its own
4   secure site where we would raise a request and
5   they would upload the information on the secure
6   site.
7      Q.   Okay.  Did PricewaterhouseCoopers
8   rely on management to provide the information
9   that would enable PwC to prepare the audited
10  financial statements?
11     A.   We did.
12     Q.   Did PwC ever make any site visits to
13  Highland in connection with the audits?
14     A.   We did.
15     Q.   And during those visits, was it
16  typical that PricewaterhouseCoopers might have
17  follow-up requests for information?
18         MR. AIGEN:  Objection, form.
19     A.   Yes.
20     Q.   Did PwC ever provide drafts of the
21  audit reports to Highland for their review
22  prior to the time they were finalized?
23     A.   If you mean audit reports, do you
24  mean the one- or two-page opinion that I signed
25

Page 15

BURGER

1   or do you mean the financial statements?
2      Q.   I apologize, thank you for the
3   clarification.
4          I mean, the financial statements and
5   the notes accompanying the financial
6   statements?
7      A.   They compile that and that is their
8   responsibility, so they provide us with that
9   document.
10     Q.   Okay.  So the five or six pages of
11  financial statements and all of the notes are
12  compiled by Highland, not by PwC?
13     A.   Correct, yeah, correct.
14     Q.   And did PwC have an opportunity to
15  review and comment on the drafts of the
16  financial statements on the accompanying notes?
17     A.   Yes, we do.
18     Q.   And did PwC in the course of its
19  engagement ask the questions that PwC thought
20  was relevant in order to give reasonable
21  assurance that the financial statements were in
22  accordance with Generally Accepted Auditing
23  Standards?
24         MR. AIGEN:  Objection, form.
25

Page 16

BURGER

1          MR. WANDER:  You mean, GAAP, not
2   GAAS?
3      Q.   I mean, it is auditing not
4   accounting; right?  So it is Generally Accepted
5   Accounting Standards, do I have that right?
6          MR. WANDER:  The audited – the
7   financials are in accordance with GAAP.
8          The audit is done in accordance with GAAS.
9      Q.   Thank you for the clarification, so
10  let me rephrase the question.
11         Did PwC ask the questions that it
12  believed were necessary in order to provide
13  reasonable assurance that the financial
14  statements were in conformance with GAAP?
15         MR. AIGEN:  Objection, form.
16     A.   We did.
17     Q.   Did PwC receive representation
18  letters from Highland in connection with each
19  audit?
20     A.   Yeah, we did.
21     Q.   And are you personally familiar with
22  the form of management representation letter
23  that Highland provided to PwC each year?
24     A.   Yes, I am.
25

Page 17

BURGER

1      Q.   Was it part of your personal
2   responsibilities to review the management
3   representation letters?
4      A.   It was.
5      Q.   From PwC's perspective, what was the
6   purpose of the management representation
7   letters?
8      A.   It is an opportunity for us to get
9   management to make certain representations of
10  us – in terms of scope of what is expected of
11  us in an audit.
12     Q.   And was that representation letter
13  required by PwC in order for PwC to sign-off on
14  the audit?
15     A.   It is, it was.
16     Q.   And is it fair to say that PwC
17  relied on the management representation letters
18  when it decided to sign-off on the audit?
19     A.   We did.
20     Q.   I would like to put up on the screen
21  a document that I have marked as Exhibit 1,
22  which is the June 3rd, 2019 management
23  representation letter.
24         (Exhibit 1 marked.)
25

Page 18

```
1              BURGER
2   Q.   Mr. Burger, so --
3        MR. AIGEN:  Sorry was this produced?
4   I just want to make sure, is there a Bates
5   label on this for the record?
6        MR. MORRIS:  I don't know but it was
7   used in Mr. Dondero's deposition.
8        MR. AIGEN:  There is a Bates label.
9   Q.   So Mr. Burger, this is a little
10  awkward.  Usually in a deposition I would be in
11  the room with you and you would have the
12  document in front of you and it would be easy
13  for you to review the document.  Since we can't
14  do that, and I don't know that you have this
15  particular document in front of you, we've put
16  it up on the screen.
17        I'm going to ask you a few questions
18  about it, but I strongly encourage you, I
19  really request that you let me know if you
20  believe that there are other portions of the
21  document that you need to review in order to
22  either refresh your recollection or to put my
23  question into context, okay?
24        We're just going to have to make due
25  with the technology, but with that background,
```

Page 19

```
1              BURGER
2   you know, let's -- let's go to the -- to the
3   page ending in 419?
4        Do you see there that there are two
5   signatures?
6   A.   Correct.
7   Q.   And do you understand that those are
8   the signatures of James Dondero and Frank
9   Waterhouse?
10  A.   Yes, correct.
11  Q.   Okay.  If we could go back to the
12  top of the document, do you understand that
13  this is the management representation letter
14  that was provided to PwC by Mr. Dondero and
15  Mr. Waterhouse on June 3rd, 2019?
16  A.   Yes.
17  Q.   Do you know why Mr. Waterhouse and
18  Mr. Dondero were the people who signed this
19  letter?
20  A.   Starting with Mr. Waterhouse, he is
21  the responsible party from management in the
22  sense of being the CFO and Mr. Dondero as the
23  general partner because the entity is a limited
24  partner and we expect the general partner to
25  sign the rep letter.
```

Page 20

```
1              BURGER
2   Q.   Do you know who drafted this letter?
3   A.   We did.
4   Q.   Is this a form of management
5   representation that PwC typically prepares in
6   the ordinary course of its audits?
7   A.   Yes, it is derived from a standard
8   template.
9   Q.   And you see in the first paragraph
10  there is a reference to the balance sheet date.
11  Do I have that right?
12  A.   Correct.
13  Q.   And for this particular management
14  representation letter, the balance sheet is for
15  the fiscal year ending December 31st, 2018;
16  correct?
17  A.   Correct.
18  Q.   We can scroll down to the bottom,
19  but there is -- stop right there.
20        There is a series of representations
21  that are made in this letter.  Do you
22  understand that?
23  A.   I do.
24  Q.   And if we scroll down to, I guess,
25  the page ending in 18, you will see that there
```

Page 21

```
1              BURGER
2   is 50 separate representations that are made by
3   Mr. Waterhouse and Mr. Dondero, not including
4   the subparts.  Do you see that?
5   A.   I do.
6        MR. MORRIS:  And thank you, La Asia,
7   if we can go back to the top.
8   Q.   So even though the audit letter was
9   for the fiscal year ending December 31st, 2018,
10  do you see in the sentence just before general
11  that Mr. Dondero and Mr. Waterhouse confirmed
12  based on their then current knowledge that each
13  of the 50 representations were still correct as
14  of June 3rd, 2019?
15  A.   I do.
16  Q.   Okay.  And is that a standard
17  practice of PwC to require management to
18  confirm the accuracy of the representations not
19  just as of the end of the fiscal year, but
20  carrying through to the date of the completion
21  of the audit?
22  A.   It is.
23  Q.   And why does PwC require that the
24  representations be carried forward to the date
25  of the completion of the audit?
```

Page 22

```
1              BURGER
2     A.   Because per Generally Accepted
3  Auditing Standards we have to consider material
4  events occurring after year-end but prior to
5  our opinion date or prior to on our opinion
6  date.
7     Q.   Okay.  And do you see in the middle
8  of the first page there is a paragraph
9  that begins "certain representations"?
10    A.   Yes.
11    Q.   And you see that there is a
12 definition of items that are considered
13 material?
14    A.   Yes.
15    Q.   Do you know why the management
16 representation letter included a definition for
17 items considered material?
18    A.   Because we cannot reasonably -- we,
19 the basis of an audit is our reasonable
20 assurance with deals with our definition --
21 which deals with materiality.  So if we expect
22 management to represent to us, we give them a
23 sense of what we consider to be material.
24    Q.   Okay.  And did Highland ever express
25 any concerns about PwC's definition of
```

Page 23

```
1              BURGER
2  materiality?
3     A.   Not that I can recall.
4     Q.   Did PwC rely on Mr. Dondero and
5  Mr. Waterhouse to provide all information
6  concerning items considered material as defined
7  in this letter?
8         MR. AIGEN:  Objection, form.
9     A.   We did.
10    Q.   Are you generally aware that from
11 time-to-time Highland loaned money to
12 Mr. Dondero and certain affiliated entities in
13 exchange for promissory notes?
14    A.   I am.
15    Q.   Can we call those promissory notes
16 the affiliated party notes?
17    A.   That is fine.
18    Q.   For purposes of the audits, were the
19 makers obligations under the affiliated party
20 notes considered receivables of Highland?
21    A.   Yes, receivables of Highland Capital
22 Management, L.P.
23    Q.   Okay.  Can we go to the page that is
24 ending in 413?
25        I'm just going to ask you a few
```

Page 24

```
1              BURGER
2  questions about some of the representations
3  here.  Do you see, Mr. Burger, representation
4  number 11?
5     A.   I do.
6     Q.   Does representation number 11 apply
7  to the affiliated party notes?
8     A.   It does.
9     Q.   Was it PwC's understanding that
10 Mr. Dondero and Mr. Waterhouse represented that
11 the affiliate party notes represented bona fide
12 claims against the makers for transactions
13 arising on or before the balance sheet date?
14        MR. WANDER:  Objection, form.
15    A.   Correct.
16    Q.   This is one of the 50
17 representations that Mr. Dondero and
18 Mr. Waterhouse confirmed as of June 30th, 2019;
19 correct?
20    A.   June 3rd, yes, correct.
21    Q.   Thank you for the clarification.
22 Does the last sentence of representation number
23 11 mean that all affiliated party notes were
24 current as of June 3rd, 2019?
25    A.   It does.
```

Page 25

```
1              BURGER
2     Q.   Stated another way, none of the
3  affiliated notes were in default as of June
4  30th, 2019; correct?
5     A.   That's correct.
6     Q.   All right.  If we can go to page
7  416, please.
8         Take a look at representation number
9  32 at the top of the page.  Do you have an
10 understanding of what representation number 32
11 means?
12    A.   Yeah, that is a representation where
13 if we were to find any misstatements which does
14 not meet the level of materiality, we would put
15 that on what we call a summary of uncorrected
16 misstatements.  And management would --
17 management would defer to the fact that they do
18 not consider those adjustments necessary in
19 terms of neutrality.
20    Q.   Did PwC understand that in
21 representation number 32 Mr. Dondero and
22 Mr. Waterhouse represented that basically if
23 they got anything wrong it was not material?
24        MR. AIGEN:  Objection, form.
25    A.   That is correct.
```

**Appx. 00109**

Page 26

BURGER

2    Q.    And why did PwC request this
3    particular representation?
4    A.    Because if anything gets sort of
5    found out to be a potential let's call it error
6    to the financial statements, part of the
7    standards require us to assert from management
8    their view that it is not material.
9    Q.    Okay.  Did PwC rely on
10   representation number 32 when signing off on
11   the audit?
12         MR. AIGEN:  Objection, form.
13   A.    We did.
14   Q.    Let's look at representation number
15   34.  Can you tell me what that means from PwC's
16   perspective?
17   A.    It is a assessment of completeness.
18   So in other words, management asserting or,
19   sorry, representing to us that they are not
20   aware of any material transactions or
21   agreements or – agreements being out there
22   that wasn't recorded in the financial
23   statements.
24   Q.    And why did PwC want this material
25   representation?

Page 27

BURGER

2    A.    Under as – under standards it is
3    not our duty to go out and look for necessarily
4    fraud.  And you know, it is on the completeness
5    of transactions we do rely on management to let
6    us know if they were material transactions.
7    Q.    Did PwC rely on representing –
8    withdrawn.
9         Did PwC rely on representation
10   number 34 when signing off on the audit?
11   A.    We did.
12   Q.    Let's take a look at representation
13   35D.  If you can just read that to yourself for
14   a moment?
15   A.    Excuse me, did you say B or D?
16   Q.    D as in dog?
17   A.    D, okay, okay.
18   Q.    Is it fair to say that in
19   representation number 35D, as in dog,
20   Mr. Dondero and Mr. Waterhouse represented that
21   all material transactions with related parties
22   have been properly reported and disclosed in
23   the consolidated financial statements?
24   A.    That's correct.
25   Q.    Did PwC request this particular

Page 28

BURGER

2    representation?
3    A.    We did.
4    Q.    Why?
5    A.    Again, because it is important under
6    alleged party disclosures specifically all
7    disclosures but related party specific that if
8    you have material transactions or events that
9    those be disclosed.  And again, we – we do
10   rely on management to also take ownership for
11   that.
12   Q.    Okay.  Can we go to the next page,
13   please, page ending in 417?  Okay, right there.
14   And take a look at representation number 36,
15   please.
16   A.    Okay, okay.
17   Q.    Can you tell me from PwC's
18   perspective what representation 36 means?
19   A.    Again, for management to let us know
20   or assert to us who the related parties are.
21   Q.    Is it fair to say that in management
22   representation number 36 Mr. Dondero and
23   Mr. Waterhouse represented that they had
24   disclosed, among other things, all related
25   party transactions of which they were aware?

Page 29

BURGER

2    A.    Correct.
3    Q.    And did PwC rely on that
4    representation when it signed off on the audit?
5    A.    We did.
6    Q.    Go to page 419, please.  Okay.  Just
7    before the signature line there is a sentence
8    that begins, "to the best of our knowledge."
9    Do you see that?
10   A.    Correct.
11   Q.    Can you just read that to yourself?
12   A.    Okay.
13   Q.    Can you tell me from PWC's
14   perspective what that sentence means?
15   A.    It means if there were events that
16   occurred after the balance sheet date, before
17   the opinion date that required disclosure, that
18   such disclosures had been made.
19   Q.    And why did – is that
20   representation one that is required by GAAP?
21   A.    It is – it is a GAAS principle, not
22   a GAAP.
23   Q.    And did PwC rely on that
24   representation in the last sentence when it
25   signed off on the audits?

Appx. 00110

Page 30

BURGER

1
2    A.   We did.
3    Q.   Let's move to the 2017 financial
4    statements.  Can we please put up the next
5    exhibit.
6          (Exhibit 2 marked.)
7    Q.   Again, Mr. Burger, I will just
8    remind you that if at any time you believe you
9    need to see any other portion of the document
10   in order to capably and fully answer the
11   question that I ask, just let me know, okay?
12         MR. WANDER:  John, he has a hard
13   copy of this one in front of him.
14   Q.   Beautiful.  Maybe it would be easier
15   for you to just take it out and the rest of us
16   will just look on the screen.
17         MR. MORRIS:  Thank you, John.
18   Q.   Do you have the 2017 audited
19   financial statements in front of you, sir?
20   A.   I do.
21   Q.   And did you personally lead PwC's
22   efforts in completing the audit for the debtors
23   for Highland's 2017 financial statements?
24   A.   Would you mind repeating the
25   question?

Page 31

BURGER

1
2    Q.   Did you personally lead PwC's
3    efforts in auditing Highland's 2017 financial
4    statements?
5    A.   I did.
6    Q.   Do you recall any deviations from
7    the process that you described earlier in
8    connection with the preparation of Highland's
9    2017 financial statements?
10   A.   I do not.
11   Q.   Can we go to page 2, please, right
12   there.  Do you see in the top half of the
13   screen there is a list of assets?
14   A.   I do.
15   Q.   And one of those – one of those
16   assets is identified as notes and other amounts
17   due from affiliates.  Do you see that?
18   A.   I do.
19   Q.   And do you know what that relates
20   to?
21   A.   So that is the consolidated amount
22   of Highland Capital Management, L.P. with all
23   its affiliates of notes and other amounts that
24   are due from affiliates as defined.
25   Q.   Do you know why the notes and other

Page 32

BURGER

1
2    amounts due from affiliates are carried as
3    assets on Highland's balance sheets?
4    A.   Because it meets the definition of
5    an asset.
6    Q.   And what is the definition of the
7    asset – withdrawn.
8          What is the definition of an asset
9    that causes the notes and other amounts due
10   from affiliates to appear on the asset portion
11   of the balance sheet?
12   A.   This is amounts in the forms of
13   notes or receivables that the entity has title
14   to in the form of an asset, or the classic
15   definition of an asset is you are entitled to
16   the asset and there is reasonable assurance of
17   the recoverability of the asset.
18   Q.   Did anybody from Highland ever
19   dispute that the notes and other amounts due
20   from affiliates should be carried on Highland's
21   balance sheet as assets?
22         MR. AIGEN:  Objection, form.
23   A.   Sorry?
24         MR. WANDER:  If you understand, you
25   can answer.

Page 33

BURGER

1
2    A.   No, no, they did not.
3    Q.   And that is because these are
4    Highland's balance sheets; correct?
5    A.   Correct.
6    Q.   Highland, in fact, prepared the
7    document that we're looking at right now;
8    correct?
9    A.   Correct, we did not.
10   Q.   And Highland made the decision to
11   record the notes and other amounts due from
12   other affiliates as assets on its own balance
13   sheet; right?
14         MR. AIGEN:  Objection, form.
15   A.   Right.
16   Q.   Did PwC ever have any reason to
17   question the carrying of the notes and other
18   amounts due from affiliates as assets on
19   Highland's balance sheets?
20   A.   We did not.
21   Q.   Is my math right here that the
22   balance sheet shows that as of the end of 2017
23   notes and other amounts due from affiliates
24   constituted more than 10 percent of Highland's
25   assets?

**Appx. 00111**

BURGER

1
2    A.   That's correct.
3    Q.   Okay.  If we could just scroll down
4    to the bottom of the page.  Little further,
5    yeah, right there.
6         Do you see there is a reference that
7    says, quote, the accompanying notes are an
8    integral part of these consolidated financial
9    statements, closed quote?
10   A.   I do.
11   Q.   What does that mean?
12   A.   That is to draw the attention for
13   the reader of not reading this page in a
14   stand-alone basis, because there are further
15   explanations required to the amounts in the
16   footnotes.
17   Q.   Okay.  Let's go to page 28 of the
18   document.  Okay.  Do you see that there is a
19   Section 9 entitled related party transactions?
20   A.   I do.
21   Q.   And can you describe for me your
22   understanding of why there is a note dedicated
23   to related party transactions?
24   A.   It is a GAAP requirement for
25   financial statements to disclose material

BURGER

1
2    related-party relationships and transactions.
3    Q.   If we can go to page 30, please, and
4    just scroll straight down so Mr. Burger can see
5    what he's got front of him, if we can go to
6    page 30.
7         Page 30 has a subheading to note 9
8    called notes and other amounts due from
9    affiliates.  Do you see that?
10   A.   Correct.
11   Q.   Okay.  And do I have it --
12   withdrawn.
13        Highland prepared all of the
14   information that is set forth in this section
15   of note 9; is that correct?
16   MR. AIGEN:  Objection, form.
17   A.   I did.
18   Q.   Is it fair to say that this portion
19   of note 9 is intended to describe obligations
20   due to the debtor by affiliates?
21   MR. AIGEN:  Objection, form.
22   A.   That's correct.
23   Q.   Let me ask a different question to
24   deal with Michael's objection.
25        Can you tell me, Mr. Burger, what

BURGER

1
2    information is conveyed in the section called
3    notes and other amounts due from affiliates?
4    MR. AIGEN:  Objection, form.
5    MR. WANDER:  You can answer.
6    A.   I can answer, sorry.
7         The purpose of this footnote is to
8    strike out out -- because if you look at the
9    balance sheet you just see notes and you have
10   no idea who that is from, which amounts and
11   what the basic terms are.
12   Q.   Is it your understanding that this
13   section of note 9 sets forth the amounts due
14   and owing by each affiliate as of December
15   31st, 2017?
16   A.   That's correct.
17   Q.   And are the amounts included -- are
18   those amounts included in the line item that we
19   just looked at in the balance sheet called
20   notes and other amounts due from affiliates?
21   A.   Correct.
22   Q.   Do you know who calculated the
23   amounts due and owing by each affiliate as of
24   December 31st, 2017?
25   A.   It was management.

BURGER

1
2    Q.   Okay.  Did management ever tell PwC
3    at any time prior to June -- withdrawn.
4         Did management ever tell PwC at any
5    time prior to PwC's signing off on the audited
6    financial statements for 2017 that there was
7    anything inaccurate about this section of the
8    notes?
9    MR. AIGEN:  Objection, form.
10   A.   They did not.
11   Q.   Each of the paragraph ends with a
12   sentence that may differ only in as to whether
13   it is singular or plural, but it says quote,
14   the fair value of the partnership's outstanding
15   notes receivable approximates the carrying
16   value of the notes receivable.  Do you see
17   that?
18   A.   Correct.
19   Q.   And we can scroll down a little bit
20   just so you can -- you have got the document in
21   front of you.  I would just ask you to confirm
22   that each paragraph ends with the same sentence
23   except for the last paragraph.  And does it,
24   sir?
25   A.   Yes, it is on each paragraph for

BURGER

1
2 that section of the notes except the paragraph
3 starting on December 21st, 2015.
4     Q.   Do you have an understanding of what
5 that sentence means?
6     A.   That sentence means that these notes
7 are per GAAP, the notes are supposed to be
8 recorded at fair value and the assertion is
9 that the carrying value is considered a
10 reasonable proxy for fair value.
11     Q.   I'm sorry, what is fair value in
12 this context?
13     A.   Fair value of all assets would be
14 what you consider to be the reasonable value
15 for exchange of the asset.
16     Q.   And then what is the carrying value?
17 How does that differ from the carrying value?
18     A.   Carrying value is the -- is a
19 contractual, is the term of the contractual
20 amount.  In other words, whatever their loan
21 plus accrued interest minus payments.  And fair
22 value is -- is basically the concept of this
23 sentence is stating that the fair value of the
24 approximate or reasonable proxy for carrying
25 value in its (inaudible).

1            BURGER
2     Q.   So is it fair to say that based on
3 this portion of note 9, the debtors' financial
4 statements -- withdrawn.
5         Is it fair to say that based on this
6 portion of note 9, Highland is saying that the
7 fair value of the promissory notes from the
8 affiliates was approximately equal to the
9 principal and interest then due under the
10 notes?
11         MR. AIGEN:  Objection, form.
12     A.   That's correct.
13     Q.   Is it fair to say that when the
14 audit -- withdrawn.
15         Is it fair to say that -- no,
16 withdrawn.
17         At the time the audit was completed
18 for 2017, did PwC have any reason to discount
19 the value of any of the notes described on page
20 30 or 31?
21     A.   We did not.
22     Q.   Okay.  Can we go to page 41, please.
23 If you scroll down a little bit you will see
24 there is a section entitled subsequent events
25 which is note 16.  Do you see that?

1            BURGER
2     A.   Correct.
3     Q.   Okay.  What is this section intended
4 to capture?
5     A.   This is supposed to capture any
6 significant material events that occurred after
7 the balance sheet that requires disclosure.
8     Q.   And is the information described
9 here information that was provided by Highland
10 Capital?
11     A.   Yeah, correct, by management.
12     Q.   This section notes that Mr. Dondero
13 issued promissory notes to the partnership in
14 the amount of $11.7 million in 2018.  Do you
15 see that?
16     A.   I do.
17     Q.   Those obligations are not included
18 in the balance sheet that we looked at earlier
19 for the period ending December 31st, 2017;
20 correct?
21     A.   That's correct.
22     Q.   The notes issued by Mr. Dondero are
23 the only material subsequent event that PwC was
24 informed about; is that correct?
25     A.   Correct.

1            BURGER
2     Q.   Let's go to the 2017 workpapers, if
3 we can call it the next exhibit, please.
4         (Exhibit 3 marked.)
5     Q.   All right.  I've put up on the
6 screen what I believe are PwC's workpapers in
7 connection with the 2017 audit as it pertains
8 to notes and other amounts due from affiliates.
9 Is that an accurate way to describe this
10 particular document?
11     A.   Yes, it would be a workpaper that we
12 retain in our file.
13     Q.   Was it prepared in connection with
14 the 2017 audit?
15     A.   Yes, this one was.
16     Q.   And when I use the phrase "2017
17 audit," I'm specifically talking about the
18 audit that was prepared for the financial
19 statements for the fiscal year ending December
20 31st, 2017.  Do you understand that?
21     A.   Correct.
22     Q.   Okay.  Who prepared this particular
23 document?
24     A.   Who prepared it?
25     Q.   I apologize, who prepared it?

Page 42

BURGER

2     A.   Sorry, Hilda Garcia.

3     Q.   Hilda Garcia, is she employed by

4  PwC?

5     A.   She is.

6     Q.   And what is her title?

7     A.   She is a senior associate now.  She

8  would have been a senior associate back then as

9  well.

10    Q.   Does she report to you or to

11 somebody else?

12    A.   She reports to me.

13    Q.   And are you responsible for

14 overseeing Ms. Garcia's work?

15    A.   I am.

16    Q.   And what is the purpose of this

17 document?

18    A.   The purpose of this document is to

19 layout what are the amounts that makes up the

20 line item that is on the balance sheet of

21 HCMLP.  And then the audit procedure is

22 performed to gain comfort over those -- the

23 existence of those amounts based on

24 materiality.

25    Q.   And did PwC prepare workpapers of

Page 43

BURGER

2  this type in the ordinary course of its

3  business?

4     A.   We do.

5     Q.   And did PwC prepare this particular

6  workpaper in the ordinary course of its

7  preparation of Highland's 2017 audit?

8     A.   We did.

9     Q.   Okay.  Can we go to the tab that is

10 marked as detailed, if you look at the bottom?

11 Do you have that, sir?

12    A.   Yes, I have.

13    Q.   Is that tab intended to list all of

14 the -- of the notes and other amounts due from

15 affiliates that were outstanding at the end of

16 the fiscal year?

17    A.   Correct.

18    Q.   And is this information -- where did

19 PwC get the information that is set forth on

20 the detail tab?

21    A.   It is from management from the trial

22 balance.

23    Q.   For the record, can you just tell me

24 what a trial balance is?

25    A.   So that is a summary document

Page 44

BURGER

2  listing out the balances of all accounts from

3  the general ledger that is used to produce the

4  set of financial statements.

5     Q.   And was the trial balance made

6  available to PwC by Highland in connection with

7  its audit work?

8     A.   It was.

9     Q.   The next tab is marked credit risk

10 analysis.  Do you see that?

11    A.   Yes.

12    Q.   What is the purpose of the credit

13 risk analysis?

14    A.   The purpose of this is that if you

15 think about a receivable or any amount due it

16 is about intent and ability.  And this is where

17 we deal with ability to ask ourself the

18 question is the counterparty reasonably able to

19 repay the amounts.

20    Q.   And did PwC conclude in 2000 -- in

21 connection with the 2017 audit that the makers

22 of the notes set forth on this particular slide

23 had the ability to pay?

24    A.   In our opinion, yes.

25    Q.   Okay.  And did PwC base that opinion

Page 45

BURGER

2  on the information that was provided by

3  management?

4         MR. AIGEN:  Objection, form.

5     A.   Partly management and partly our own

6  due diligence.

7     Q.   Okay.  The next tab is results

8  template.  Do you see that?

9     A.   Yes.

10    Q.   Can you just explain to me what that

11 page is, if we could scroll to the top, please?

12    A.   This -- there are a number of notes

13 that are being dealt with.  This -- so if you

14 go back to the detail tab, those are the

15 individual notes that makes up the amount that

16 ties to the back of the financial statement.

17 And there are relevant tabs here that deal with

18 a number of these loans.  In preparation for

19 this, we focused on due from HCMSI as that is

20 under question.

21    Q.   Why is due from HCMSI under

22 question?

23    A.   That is my understanding of what the

24 deposition relates to.

25         MR. WANDER:  When he says in

Page 46

BURGER

1
2      preparation for this, he means in
3      preparation for the deposition he reviewed
4      this piece of it, the HCMSI.  Not the rest
5      of the notes, just HCMSI.
6          Q.   Okay.  So, so but with respect to
7      this particular page, is there an analysis that
8      PwC is undertaking?  Does this reflect an –
9      withdrawn.
10         Does this page reflect an analysis
11     that PwC did?
12         MR. AIGEN:  Objection, form.
13     A.   If you add the other relevant tabs
14     to it, yes.  So in other words, some of them
15     link to other tabs.  Some of them have
16     individual documentation as referenced in the
17     marked legends.
18         Q.   And then there are tabs for the
19     individual maker of each set of notes.  Do I
20     have that right?
21     A.   Correct.
22         Q.   All right.  Let's go to the 2018
23     financial statements, please.  Are you familiar
24     with Highland's audited financial statements
25     for the period ending December 31st, 2018?

Page 47

BURGER

1
2      A.   I am.
3          MR. AIGEN:  Sorry to interrupt.  Are
4      you marking this?  I'm trying to keep
5      track, is this –
6          MR. MORRIS:  Yes, I apologize, this
7      will be Exhibit 4.
8          (Exhibit 4 marked.)
9          MR. AIGEN:  4, okay.
10         Q.   And did you oversee the preparation
11     of the audited financial statements on behalf
12     of PwC for the period ending December 31st,
13     2018?
14     A.   Correction, not preparation, we
15     don't prepare any of these documents.
16         Q.   Let – I apologize, let me restate
17     the question.
18         Did you oversee PwC's audit of
19     Highland's financial statements for the period
20     ending December 31st, 2018?
21     A.   Yeah, I did.
22         Q.   Okay.  Do you recall any deviations
23     from the process you described earlier in
24     connection with the preparation of the 2018
25     audited financials?

Page 48

BURGER

1
2      A.   No, I do not.
3          Q.   Can we go to the third page of the
4      document right there.  This document is dated,
5      if you look at the bottom, June 3rd, 2019.  Do
6      you see that?
7      A.   I do.
8          Q.   And that was the same date as the
9      management representation letter that we looked
10     at earlier, do you recall that?  We can pull it
11     up.
12     A.   No, I do.
13         Q.   Is it a coincidence that they both
14     have the same date?
15     A.   No, it is not.  We require that to
16     be the same.
17         Q.   And why do you require that the
18     management representation letter and the report
19     of independent auditors be issued on the same
20     day?
21     A.   This is – this is the date that we
22     effectively consider these financials available
23     to be issued.  And under standards, we are
24     required to consider all subsequent events and
25     representations up to this date.  So therefore,

Page 49

BURGER

1
2      we cannot accept a date of, let's call it June
3      2nd or 1st or earlier from management's
4      representation.
5          Q.   Is – is the report that is set out
6      here required by either GAAS or GAAP?
7      A.   This is – GAAS requires the audit
8      opinion to be – to be the document whereby we
9      report to the general partner on our – on our
10     audit.
11         Q.   And does PwC have an internal
12     process by which it determines whether or not
13     to sign-off on – on any particular client's
14     audit?
15     A.   We do.
16         Q.   Can you describe that process for me
17     generally?
18     A.   From an acceptance phase of the
19     client or do you mean the content of their
20     opinion?
21         Q.   The content of the opinion, thank
22     you.
23     A.   Yes.  So there is a framework that
24     we follow on going back to whether there –
25     whether we consider two things.  Whether there

**Appx. 00115**

BURGER

1
2  are material uncorrected misstatements to the
3  financials or material deviations from required
4  disclosures.  So in other words, are the
5  financials reasonable and accurate in terms of
6  GAAP, and were we able to perform all the
7  procedures.  So in other words there weren't
8  any undue scope limitations which -- which got
9  us to a point we weren't able to perform the
10  audit and fulfill our professional duty.
11         If the answer to those are that we
12  fulfill both then we would give what we call an
13  unqualified or a clean opinion.
14     Q.   And is there an opinion committee
15  that is -- that is dedicated to this process?
16     A.   No, it is -- if it is a clean
17  opinion then it is the partner and if
18  applicable the second partner on the engagement
19  is called.  If there is anything which goes
20  away from an unqualified opinion, in any
21  deviation, then there is a whole consultation
22  process with our national office.
23     Q.   And did you personally approve this
24  opinion letter?
25     A.   I did, that is my signature.

BURGER

1
2     Q.   Okay.  Let's go to page 2, please,
3  consolidated balance sheet.
4         Do you see, again, there is the
5  notes and other amounts due from affiliates?
6     A.   I do.
7     Q.   And does this just carry over from
8  the prior years subject to any payments or
9  additional notes subject to any changes since
10  the end of the prior fiscal year?
11     A.   It does.
12     Q.   As of the end of 2018, is it fair to
13  say that the notes and other amounts due from
14  affiliates now exceeded more than 15 percent of
15  Highland's assets?
16     A.   That is correct.
17     Q.   Now, let's go to page 26, please.
18  And you will see number -- note number 8
19  relates to related-party transactions.  Do you
20  see that?
21     A.   I do.
22     Q.   So again, do I have this right that
23  this section of the notes is intended to
24  provide the detail about transactions between
25  Highland and related parties?

BURGER

1
2     A.   It is.
3     Q.   And that is required by GAAP, do I
4  have that right?
5     A.   You have got it correct.
6     Q.   Okay.  Let's go to page 28, please.
7         Do you see on page 28 and continuing
8  on page 29 there is again a section of note 9
9  entitled notes and other amounts due from
10  affiliates?
11     A.   I do.
12     Q.   And this information was provided by
13  management; correct?
14     A.   Correct.
15     Q.   And this portion of note 8 is
16  intended to describe the obligations that were
17  owed to the debtor by affiliates; correct?
18     A.   Correct.
19     Q.   Does this section of note 8 set
20  forth the amounts that were due and owing by
21  each affiliate as of the end of fiscal year
22  2018?
23     A.   It does.
24     Q.   And are those amounts included in
25  the line item that we just looked at on the

BURGER

1
2  balance sheet called notes and other amounts
3  due from affiliates?
4     A.   It is.
5     Q.   And can you confirm for me that
6  management is the one who decided -- withdrawn.
7         Can you confirm for me that
8  management is the one who calculated the
9  amounts due and owing by each affiliate as of
10  December 31st, 2018?
11         MR. AIGEN:  Objection, form.
12     A.   That is correct.
13     Q.   To the best of your knowledge, did
14  anybody from Highland ever tell anybody from
15  PwC that any of the amounts due and owing as
16  set forth in the notes and other amounts due
17  from affiliates was wrong or incorrect?
18     A.   Not to my knowledge.
19     Q.   And can you confirm for me that in
20  connection with the 2018 financial statements
21  Highland again stated in general that the fair
22  value of the notes and other amounts due from
23  affiliates approximates the carrying value of
24  the notes receivable?
25     A.   That's correct.

BURGER

1
2      Q.   Is it fair to say that when PwC
3   issued its audit opinion on June 3rd, 2019 that
4   they had no reason to discount the fair value
5   of any of the notes described in this portion
6   of note 8?
7          MR. AIGEN:  Objection, form.
8      A.   Yeah, that is correct.
9      Q.   Let's go to page 38, please, note
10   15.  Do you see note 15 beginning on page 38?
11     A.   I do.
12     Q.   And is this the section of the notes
13   that are intended to describe material
14   subsequent events that would require
15   disclosure?
16     A.   It is.
17     Q.   And is the information set forth in
18   section 15 or note 15 information that was
19   provided by Highland?
20     A.   Correct.
21     Q.   To the best of PwC's knowledge, as
22   of June 3rd, 2019, did note 15 in fact include
23   a description of all material subsequent events
24   that required disclosure?
25     A.   That's correct.

BURGER

1
2      Q.   Did anyone -- withdrawn.
3          Do you know whether anyone from
4   Highland ever informed anyone at PwC that there
5   were material subsequent events that were
6   omitted from note 15?
7      A.   I'm not.
8      Q.   Let's go to the 2018 workpapers.
9          (Exhibit 5 marked.)
10     Q.   We will mark this as Exhibit 5.
11         MR. MORRIS:  I am trying to go as
12   quickly as I can, Michael, to leave you a
13   little time.
14         MR. AIGEN:  Thanks.
15     Q.   Do you have that, Mr. Burger?
16     A.   Yeah, I do.
17         MR. AIGEN:  This is Exhibit 5, John?
18         MR. MORRIS:  Yes.
19     Q.   Is there anything that you need to
20   look at, Mr. Burger, to confirm that these are
21   PwC's workpapers for the 2018 audit as it
22   relates to notes and other amounts due from
23   affiliates?
24     A.   I can confirm.
25     Q.   Okay.  And was this also prepared in

BURGER

1
2   the first instance by Ms. Garcia?
3      A.   No, this was prepared by Madeline
4   Pacocha.
5      Q.   How do you spell her last name?
6      A.   P-a-c-o-c-h-a.
7      Q.   And did she report directly to you?
8      A.   She did.  She was part of the team.
9      Q.   Okay.  And do you know whether the
10   same process that was followed in 2018 was
11   followed in 2000 -- withdrawn.
12         Did PwC follow the same process in
13   creating this document that it did when it
14   created the workpapers in 2017?
15     A.   We did.
16     Q.   Can you confirm that this document
17   was prepared in the ordinary course of PwC's
18   business?
19     A.   It was.
20     Q.   Can you confirm that this document
21   was prepared in the ordinary course of PwC's
22   audit of Highland's 2018 financial statements?
23     A.   That's correct.
24     Q.   Okay.  I'm going to ask a few more
25   detailed questions than we did last time.  Can

BURGER

1
2   we go to the section called credit risk
3   analysis, the tab.
4          I think earlier you testified that
5   there was kind of two aspects that PwC looked
6   at when analyzing the notes and they were the
7   intent and the ability to pay.  Do I have that
8   right?
9          MR. AIGEN:  Objection, form.
10     A.   That's correct.
11     Q.   Okay.  And this particular tab,
12   credit risk analysis, related to the ability to
13   pay part of that analysis; correct?
14     A.   That's correct.
15     Q.   Do you see there is a column called
16   recoverability?
17     A.   I do.
18     Q.   What is that?
19     A.   That is a qualitative assessment to
20   give us reasonable assurance that these notes
21   are, A, not in default or -- and B, that the --
22   at least materially the maker has enough assets
23   that we are aware of to -- to be able to repay.
24     Q.   And did Highland provide the data
25   and information related to each maker's ability

Page 58

BURGER

1          BURGER
2   to pay?
3       A.   This is a combination but most of
4   this is our own due diligence.
5       Q.   And – and can you describe for me
6   what steps in the due diligence process PwC
7   undertook to ascertain whether the makers have
8   the ability to pay?
9       A.   Mostly – mostly relates to evidence
10  that there are payments on notes and that none
11  of the notes are contractually in default.  And
12  then also very much specifically to
13  Mr. Dondero's ability from known assets that
14  can be found on public filings.
15      Q.   And did PwC analyze public filings
16  and conclude that Mr. Dondero had the ability
17  to repay the notes that had – that he had
18  issued to the debtor?
19      A.   Through public filings which we
20  could obtain, we could at least assess that
21  there are assets in those, sort of let's call
22  it public filings that would be adequate to
23  repay the amounts.
24      Q.   Is it fair to say that this section
25  of the workpapers is an assessment of each

Page 59

BURGER

1          BURGER
2   affiliate's creditworthiness?
3       A.   Not each individual, but on a more
4   look-through basis to specifically Mr. Dondero.
5   The purpose of this is not to sign-off on an
6   absolute creditworthiness of each party, but to
7   provide enough evidence to give us reasonable
8   assurance that these notes are recoverable.
9       Q.   And based on the due diligence that
10  PwC did and the information provided by
11  Highland, did PwC conclude that the makers of
12  the notes had the ability to repay the
13  obligations set forth therein?
14      A.   We did.
15      Q.   Did PwC rely on the analysis set
16  forth on this document in deciding to issue the
17  opinion in connection – the clean opinion in
18  connection with the 2018 audit?
19      A.   Yeah, this is part of our workpapers
20  which forms the collective base of our opinion,
21  yes.
22      Q.   If PwC had any concerns that any
23  maker was unable to repay the obligations under
24  any of the notes made to Highland, is there a
25  process or what would happen under that

Page 60

BURGER

1          BURGER
2   circumstance?
3          MR. AIGEN:  Objection, form.
4   A.   Do I answer that?
5          MR. WANDER:  Yes.
6       A.   If we become aware of any data or
7   anything which shows us that a counterparty
8   cannot repay the note, the question stems to
9   management as to why they consider the note
10  fully recoverable.  Because the fact that there
11  is a note with a legal agreement to it doesn't
12  mean – there may be adverse data that show
13  that the counterparty is not able to pay and
14  that then results in additional work to assess
15  whether that loan can be recorded at its full
16  value.
17      Q.   But in connection with the 2018
18  audit, management represented that each of the
19  notes was fully recoverable.  Do I have that
20  right?
21          MR. AIGEN:  Objection, form.
22  A.   They did.
23      Q.   Let's go to the results template,
24  please.
25          Now, do you see that there is

Page 61

BURGER

1          BURGER
2   approximately 116 or 117 – withdrawn.
3          Do you see that there is
4   approximately $116 difference between the
5   amount per client and the balance per testing?
6   A.   Yes, I do.
7       Q.   Okay.  What – what does –
8   withdrawn.
9          Is the amount per client the total
10  principal and interest due as of the balance
11  sheet date for each of the makers listed under
12  the account description column?
13      A.   That is the amount that is obtained
14  from the trial balance that is used for the
15  financial statements –
16  Q.   Okay.
17  A.   – in Column D.
18      Q.   And did PwC then test those amounts
19  for accuracy or reasonableness?
20      A.   For reasonableness we went back if
21  material to the appropriate legal agreements.
22          MR. AIGEN:  I didn't want to
23  interrupt, but I was objecting to form with
24  that one.
25      Q.   And based on the testing that PwC

BURGER

1    did, did it reach any conclusions as to the
2    reliability of the debtors' of Highland's
3    assessment as to the amount owed by each
4    client?
5        A.   Do you mind repeating that question?
6        Q.   Yeah, that wasn't very good.
7            What is the purpose of the testing
8    that -- that was undertaken that is reflected
9    on this page?
10       A.   So the purpose is, again, the 173 is
11   the amount that goes to the line item in
12   question that we are or that part feeds into
13   another tab called detail, which goes back into
14   the detail.
15           So from there if we have a balance
16   as recorded in the financial statements we need
17   to obtain the detail behind that, what makes up
18   those amounts.  And for each one individually
19   or collective material, we need to test the, A,
20   the existence of the amount and, B, the
21   evaluation of the amount.
22       Q.   Let's go to the next tab, due from
23   HCMSI.  Do you see that?
24       A.   I do.

BURGER

1        Q.   So does this show that an entity
2    known as HCMSI had principal and interest due
3    on one or more promissory notes totaling
4    approximately 13 and a half million dollars?
5        A.   It is three promissory notes, which
6    adds up to approximately 13.9 million dollars.
7        Q.   Okay.  So promissory note one is on
8    the left where it says closing date May 31,
9    2017.  Do I have that right?
10       A.   Correct.
11       Q.   And if we scroll down promissory --
12   where is the second promissory note?
13       A.   Just go over to column R and then
14   AB, I can read.
15       Q.   Okay.  So then -- so that is the
16   second promissory note is the one that was
17   issued on June 25th, 2018 in the amount of
18   $200,000, and then the third one is issued on
19   March 26th, 2018 in the amount of $150,000.  Do
20   I have that right?
21       A.   That's correct.
22       Q.   And this shows that under the first
23   note, if we could go to the left a bit, that
24   HCMSI paid Highland exactly $1 million on

BURGER

1    October 8th, 2018 that was allocated -- a
2    portion of which was allocated to principal and
3    a portion of which was allocated to interest?
4        A.   That's correct.
5        Q.   Okay.  Let's go to the next tab,
6    Dondero tax loans.  Do you know why the loans
7    to Mr. Dondero are described as tax loans?
8        A.   It is -- it is described as tax loan
9    to facilitate tax payments based on earnings is
10   my understanding.
11       Q.   Did PwC ever make any inquiry as to
12   whether the amounts loaned to Mr. Dondero
13   approximated the amount of tax liability that
14   he faced?
15           MR. AIGEN:  Objection, form.
16       A.   We did not.
17       Q.   Does PwC have any information as to
18   whether or not the loans made to Mr. Dondero
19   were related in any way to his actual tax
20   obligations?
21           MR. AIGEN:  Objection, form.
22       A.   We did not.  We didn't consider it
23   necessary.
24       Q.   Did PwC make any inquiry as to the

BURGER

1    purpose of the loans to Mr. Dondero?
2            MR. AIGEN:  Objection, form.
3        A.   In general.
4        Q.   In general you made an inquiry?
5        A.   Yeah, as to the -- the -- as to
6    whether these loans are considered reasonable
7    and arm's length.
8        Q.   What information do you recall that
9    you have whether the loans were reasonable and
10   arm's length?
11       A.   Related to the notes being at an
12   interest rate which is considered a reasonable
13   interest rate considering all the parties
14   involved.  And then more on, you know, again,
15   the testing that were done and the existence of
16   the notes.
17       Q.   Did PwC make any inquiry as to the
18   purpose of any of the loans to any of the
19   affiliates including Mr. Dondero?
20       A.   We did.
21       Q.   Okay.  With respect to Mr. Dondero,
22   do you have any information that you haven't
23   already provided as to PwC's understanding of
24   the purpose of the loans?

Page 66

```
BURGER
 1               BURGER
 2      MR. AIGEN:  Objection.
 3      A.   No.
 4      Q.   No.  And who -- who told PwC, if you
 5  know, that the loans were being made to
 6  Mr. Dondero to pay tax payments based on
 7  earnings?
 8      A.   Management.  I cannot recall a
 9  specific name.
10      Q.   Okay.  But it is your understanding
11  that the loans were made to Mr. Dondero in
12  order to enable him to pay the taxes due on his
13  earnings.  Do I have that right?
14      A.   That's correct.
15      Q.   And who decided the amount of the
16  loans, to the best of your knowledge?
17      MR. AIGEN:  Objection, form.
18      A.   It is an agreement between
19  management and Mr. -- management.
20      Q.   Do you have anybody -- do you have
21  any knowledge as to who on behalf of Highland
22  made the agreement with Mr. Dondero about the
23  amount of the loans?
24      A.   I cannot recall the specific name.
25      Q.   If you look at loan number 1 there,
```

Page 67

```
BURGER
 1               BURGER
 2  the $14 million loan that was first made in
 3  December 2017, do I have this right that
 4  Mr. Dondero made a payment of over $750,000
 5  that was applied to principal and interest on
 6  December 19th, 2018?
 7      A.   That's correct.
 8      Q.   Okay.  And if we scroll down a
 9  little bit more, keep going, note number 4.
10  Did Mr. Dondero make a $2 million payment to
11  Highland on December 18th, 2018, a portion
12  of which was used to pay principal and a portion
13  of which was used to pay interest on note
14  number 4?
15      A.   That's correct.
16      Q.   Did anybody ever tell you that in
17  January or February 2019 that Mr. Dondero had
18  entered into an oral agreement with his sister
19  acting on behalf of Highland whereby
20  Mr. Dondero and certain of his affiliates would
21  be relieved of the obligation to pay amounts
22  due under the promissory notes if certain
23  conditions subsequent were met?
24      MR. AIGEN:  Objection, form.
25      A.   No, they did not.
```

Page 68

```
BURGER
 1               BURGER
 2      Q.   Do you know whether anybody at PwC
 3  was ever informed by Mr. Dondero -- withdrawn.
 4      Do you know if anybody at PwC was
 5  ever informed by anybody at Highland that in
 6  January or February 2019 Mr. Dondero entered
 7  into an oral agreement with his sister acting
 8  on behalf of Highland whereby Mr. Dondero and
 9  certain of his affiliates would be relieved of
10  all obligations to pay all amounts otherwise
11  due and owing under the promissory notes if
12  certain conditions subsequent were met?
13      MR. AIGEN:  Objection, form.
14      A.   I do not.
15      Q.   Okay.  Can we go -- I apologize, but
16  can we go back to tab number -- the detail tab
17  in the -- in the workpapers?
18      MR. WANDER:  In Exhibit 5 or Exhibit
19  3?
20      Q.   Exhibit 5, thank you for the
21  clarification.  Okay, so the detail tab and the
22  workpapers for 2018 lists all of the notes
23  receivable that were made by affiliates of
24  Highland; correct?
25      A.   Correct.
```

Page 69

```
BURGER
 1               BURGER
 2      Q.   Are you aware of any oral or written
 3  amendment to any of the promissory notes that
 4  are described on the detail page of Exhibit 5?
 5      MR. AIGEN:  Objection, form.
 6      MR. MORRIS:  What -- what is the
 7  objection?  Hold on before you answer, what
 8  is the objection?
 9      MR. AIGEN:  I think it is vague.  I
10  don't know which stuff you are talking
11  about here.  Are you asking for a legal
12  conclusion, and there is no foundation.
13      Q.   Yeah, okay.  Certainly not asking
14  for a legal conclusion and I will -- let me ask
15  the question again, sir.
16      This page lists the amounts that
17  each of the affiliates owes to Highland under
18  various promissory notes; correct?
19      A.   Correct.
20      Q.   Are you aware of any oral or written
21  amendment to any of those promissory notes?
22      A.   No, up to June 3rd, 2019.
23      Q.   And do you know whether anyone at
24  PwC was aware of any oral or written amendment
25  to any of the promissory notes as of June 3rd,
```

Appx. 00120

Page 70

```
1              BURGER
2  2019?
3        MR. AIGEN:  Objection, form.
4     A.  No, I'm not.
5     Q.  Were you ever informed of any
6  amendment, written or oral, to any promissory
7  note at any time?
8     A.  I was not.
9     Q.  Did anyone ever tell you that any of
10 the notes in -- referred to in the detail tab
11 of Exhibit 5 might be forgiven under certain
12 circumstances?
13    A.  No.
14    Q.  Do you know whether anybody at PwC
15 was ever informed by anybody at Highland that
16 any of the notes in the detail tab in Exhibit 5
17 might be forgiven?
18       MR. AIGEN:  Objection, form.
19    A.  I do not.
20    Q.  Under your understanding of the GAAP
21 rules, did Mr. Dondero and Mr. Waterhouse have
22 a continuing obligation to inform PwC of any
23 circumstances that would call into question the
24 collectability of any of the notes due from
25 affiliates?
```

Page 71

```
1              BURGER
2        MR. AIGEN:  Objection, form.
3     A.  Yes, they had the responsibility.
4     Q.  To the best of your knowledge, did
5  Mr. Dondero ever inform anybody at PwC prior to
6  June 3rd, 2019 that any of the notes might not
7  be collectable?
8        MR. AIGEN:  Objection, form.
9     A.  He did not.
10    Q.  To the best of your knowledge, did
11 Mr. Dondero ever inform anybody at PwC prior to
12 June 3rd, 2019 that any of the notes might be
13 forgiven under certain circumstances?
14       MR. AIGEN:  Objection, form.
15    A.  He did not.
16    Q.  To the best of your knowledge, did
17 Mr. Dondero ever inform anyone at PwC prior to
18 June 3rd, 2019 that any of the notes were
19 amended?
20       MR. AIGEN:  Objection, form.
21    A.  He did not.
22    Q.  To the best of your knowledge, did
23 Mr. Dondero ever inform anyone at PwC prior to
24 June 3rd, 2019 that the obligations under any
25 of the notes would be extinguished based on the
```

Page 72

```
1              BURGER
2  fulfillment of certain conditions subsequent?
3        MR. AIGEN:  Objection, form.
4     A.  Again, he did not.
5     Q.  I'm going to ask the same questions
6  now with respect to Mr. Waterhouse.
7        To the best of your knowledge, did
8  Mr. Waterhouse ever inform anyone at PwC prior
9  to June 3rd, 2019 that any of the notes might
10 not be collectable?
11       MR. AIGEN:  Objection, form.
12    A.  He did not.
13    Q.  To the best of your knowledge, did
14 Mr. Waterhouse ever inform anyone at PwC prior
15 to June 3rd, 2019 that any of the notes might
16 be forgiven under certain circumstances?
17    A.  No, he did not.
18    Q.  To the best of your knowledge, did
19 Mr. Waterhouse ever inform anyone at PwC prior
20 to June 3rd, 2019 that any of the notes were
21 amended?
22    A.  He did not.
23    Q.  To the best of your knowledge, did
24 Mr. Waterhouse ever inform anybody at PwC prior
25 to June 3rd, 2019 that the obligations under
```

Page 73

```
1              BURGER
2  any of the notes would be extinguished upon the
3  fulfillment of certain conditions subsequent?
4        MR. AIGEN:  Objection, form.
5     A.  He did not.
6     Q.  Now, just going to finish up the
7  last set of questions to make it broader for
8  anybody at Highland.
9        To the best of your knowledge, did
10 anyone from Highland ever inform anyone at PwC
11 prior to June 3rd, 2019 that any of the notes
12 might not be collectable?
13       MR. AIGEN:  Objection, form.
14    A.  Not to my knowledge.
15    Q.  To the best of your knowledge, did
16 anyone from Highland ever inform anyone at PwC
17 prior to June 3rd, 2019 that any of the notes
18 might be forgiven under certain circumstances?
19    A.  Not to my knowledge.
20    Q.  To the best of your knowledge, did
21 anyone from Highland ever inform anyone at PwC
22 prior to June 3rd, 2019 that any of the notes
23 were amended?
24       MR. AIGEN:  Objection, form.
25    A.  Not to my knowledge.
```

Appx. 00121

Page 74

BURGER

1
2     Q.   To the best of your knowledge, did
3  anyone from Highland ever inform anyone at PwC
4  prior to June 3rd, 2019 that the obligations
5  under any of the notes would be extinguished
6  upon the fulfillment of certain conditions
7  subsequent?
8     A.   Not to my knowledge.
9     Q.   If PwC had learned before June 3rd,
10  2019 that any of the notes might not be
11  collectable, would PwC have required that
12  information to be disclosed?
13        MR. AIGEN:  Objection, form.
14     A.   Disclosed or potentially based on
15  materiality financials adjusted.
16     Q.   I'm going to ask that question
17  again.
18     A.   Okay.
19     Q.   If PwC had learned before June 3rd,
20  2019 that any of the notes that had an
21  outstanding principal amount of at least $1.7
22  million might not be collectable, would PwC
23  have required that to be disclosed?
24     A.   Correct.
25        MR. AIGEN:  Objection, form.

Page 75

BURGER

1
2     Q.   And why is that?
3     A.   If you have a material – if you
4  have material adverse effects of the balance
5  sheet which gives a material adjustment to the
6  financial statements, depending on the type of
7  event you require either disclosure or actual
8  adjustment to the balance sheet.
9     Q.   If PwC had learned before June 3rd,
10  2019 that any of the notes that had a
11  outstanding principal amount due of at least
12  $1.7 million might be forgiven, would PwC have
13  required that to be disclosed?
14     A.   Yes.
15        MR. AIGEN:  Objection, form.
16     Q.   Is that for the same reasons that
17  you just articulated with respect to the lack
18  of collectability?
19     A.   Correct.
20     Q.   Just two more questions.  If PwC
21  learned before June 3rd, 2019 that any of the
22  notes that had an outstanding principal amount
23  of $1.7 million or more, if those notes had
24  been amended, would PwC have required that to
25  be disclosed?

Page 76

BURGER

1
2        MR. AIGEN:  Objection, form.
3     A.   We would have.
4     Q.   And finally, if PwC learned before
5  June 3rd, 2019 that any of the notes that had a
6  then outstanding principal amount due of at
7  least $1.7 million would be extinguished based
8  on the fulfillment of certain conditions
9  subsequent, would PwC have required that to be
10  disclosed?
11        MR. AIGEN:  Objection, form.
12     A.   We would have.
13     Q.   Okay.
14        MR. MORRIS:  I have no further
15  questions.  Thank you very much, sir.
16        EXAMINATION
17  BY MR. AIGEN:
18     Q.   All right.  I guess my first
19  question is, how much of a hard stop time is
20  11:45?  I don't mean that for you that can be
21  for counsel.
22     A.   I can go to noon.
23     Q.   I will try – I do not think I'm
24  going to be able to be done by then.  I guess
25  at that point we can stop and it is possible

Page 77

BURGER

1
2  John and I can work out stuff on the side.  But
3  just for the record, I understand this isn't
4  your problem I just want to note that we were
5  never told there would be this sort of time
6  limit today.  Again, not your problem and I
7  just want to reserve all rights if we can't
8  finish today we may have to come back another
9  time.  Hopefully not, I will do my best to ask
10  questions.
11        Let's start with some of the
12  questions you were asked at the end about –
13  Mr. Morris asked you if you had learned certain
14  things.  And he asked you several questions
15  about it, that PwC would have required that
16  information to be disclosed.  Do you remember
17  that?
18     A.   Okay.
19     Q.   Yes, you remember that?
20     A.   Yes, I do.
21     Q.   When you say or he said required to
22  be disclosed, what are you talking about,
23  disclosed where and to whom?
24     A.   Typically that would be disclosed in
25  your subsequent events footnotes, but you can

Page 78

BURGER

1          BURGER
2    also disclose it in note 9 or 8 in this
3    instance, the relevant note.
4        Q.    And those questions were, for
5    instance, one of the questions were do you
6    remember being asked if PwC had learned that
7    the notes might be forgiven PwC would have
8    required that to have been disclosed.  Do you
9    remember answering that question?
10       A.    Yeah, I do.
11       Q.    And I want to focus on this.  I know
12   these are Mr. Morris' questions, so it may not
13   have been your language, but you were asked if
14   it might be forgiven.
15            What does that mean to you?  Are we
16   talking about is there a difference for you if
17   there was a 1 percent chance that something
18   would be forgiven or a 90 percent change of it
19   being forgiven?
20       A.    If we learned about something, let's
21   say, we learned might be forgiven, that would
22   have resulted in additional audit work.  The
23   question I understood to be and the answer I
24   gave was if something happened where there was
25   an event that actually occurred before or on

Page 79

1          BURGER
2    June 3rd, we would have required disclosure.
3        Q.    Got it.  So is it fair to say that
4    in response to all of Mr. Morris' questions
5    about what would have been required to be
6    disclosed, in your mind he was referring to
7    those events or items having actually occurred
8    and the notes being actually forgiven at that
9    point in time; is that correct?
10            MR. MORRIS:  Objection to the form
11   of the question.
12       Q.    I didn't hear your answer.
13       A.    Correct.
14       Q.    So you haven't provided any
15   testimony today about what PwC might have
16   required to be disclosed or disclosed if
17   certain events took place in the future; is
18   that fair to say?
19            MR. MORRIS:  Objection to the form
20   of the question.
21       A.    That is fair to say, but any events
22   that we learn of may have -- will be assessed
23   for what the impact on the valuation of the
24   loan is.
25       Q.    And is it fair to say, then, that

Page 80

1          BURGER
2    PwC would have to analyze and assess a
3    condition to determine whether it is something
4    this needs to be disclosed?
5        A.    Yeah, we will have to analyze it.
6        Q.    And how would PwC go about analyzing
7    a potential event that might forgive or
8    discharge the notes?
9        A.    It depends on what the event is.  It
10   comes down to a function of materiality and
11   probability and understanding the potential
12   event through discussions with management.
13   Again, it depends on the event.
14       Q.    Okay.  And without knowing the
15   specific event, would you agree that you can't
16   testify today on whether that would need to be
17   disclosed in the financials?
18            MR. MORRIS:  Objection to the form
19   of the question.
20       A.    Again, the purpose of subsequent
21   event disclosure is to disclose to the reader
22   of the financial statements any events that
23   actually occurred.  And if we are aware of
24   something that -- that did not occur but that
25   may have a material adverse effect on the

Page 81

1          BURGER
2    financial statements, that is something that we
3    would consider for disclosure.
4        Q.    And when you say you'd consider it,
5    is it fair that you would analyze the
6    probability that the event would occur?
7            MR. MORRIS:  Objection to the form
8    of the question.
9        A.    Correct.
10       Q.    And would you also --
11       A.    Correct.
12       Q.    Would you also look at the potential
13   materiality of that event?
14       A.    Yes.
15       Q.    And with respect to the promissory
16   notes at issue in this litigation, is it fair
17   to say that no one at PwC made any sort of
18   analysis about whether those notes would be
19   potentially discharged due to events that might
20   occur in the future?
21            MR. MORRIS:  Objection to the form
22   of the question.
23       A.    That is not part of our professional
24   work responsibility to consider potential
25   events that might occur.

Page 82

BURGER

2   Q.   And the audits that we were talking
3   about were in 2017 and 2018; is that correct?
4   A.   Yeah, conducted in '18 for '17 and
5   conducted in '19 for '18.
6   Q.   Okay.  And I just want to ask some
7   general questions about the audits that were
8   done.  And to speed things up, I'm going to ask
9   you the questions combining those two years.
10  If you need to break it down per year we can do
11  that, too, but these are pretty general
12  questions.
13         Can you tell me approximately how
14  many people worked on the audits of Highland at
15  PwC in 2017 and 2018?
16  A.   Again, earlier I said six or seven.
17  Q.   And out of those six or seven, how
18  many people had communications with anyone at
19  Highland?
20  A.   I would argue all of them, all of
21  us.
22  Q.   Okay.  And who at Highland did these
23  six or seven people have communications with
24  with respect to the work on the audits?
25  A.   It depends.  It depends on the

Page 83

BURGER

2   nature of the question.  So again, Kristin
3   Hendrix, and actually earlier there is another
4   name Drew Wilson would have been a person that
5   we dealt with on a day-to-day basis.  Above
6   them would be Dave Klos and above them would be
7   Frank Waterhouse, the CFO.
8         So again, if it is a routine matter,
9   our more junior people probably dealt with
10  Kristin and Drew.  And if it is not a routine
11  matter and on periodic status meetings, my
12  communication would have probably been more
13  with Dave Klos and my managers.
14  Q.   I apologize.  Other than those four,
15  Ms. Hendrix, Mr. Wilson, Mr. Klos and
16  Mr. Waterhouse, is there anyone else at
17  Highland that PwC communicated with as part of
18  the audit that you are aware of?
19  A.   Not that I'm aware of.  I mean,
20  there is a chance that they might have had
21  somebody else involved, but not that I can
22  recall.
23  Q.   Have you ever had any conversations
24  with Mr. Dondero?
25  A.   Not specifically relating to any --

Page 84

BURGER

2   related to the audit directly.
3   Q.   Do you know whether any of the other
4   people at PwC that worked on the audit had any
5   conversations with Mr. Dondero?
6   A.   Not that I'm aware of.
7   Q.   At the end of Mr. Morris' questions
8   if you remember you were asked several
9   questions about whether you or anyone at PwC
10  had different conversations with anyone at
11  Highland about the notes and them being
12  potentially forgivable or discharged or
13  amended.  Do you remember testifying to that?
14  A.   Yeah, I do.
15  Q.   You were asked about conversations
16  you had and you said you had no such
17  conversations; is that correct?
18  A.   Correct.
19  Q.   You also testified that you are not
20  aware of any conversations of anyone else that
21  PwC had with anyone at Highland about this
22  subject; is that correct?
23  A.   That's correct.
24  Q.   Did you -- I know you said you're
25  not aware and I guess my question is how do you

Page 85

BURGER

2   know that?  Did you have any conversations with
3   anyone else at PwC about whether they had any
4   such conversations with anyone at Highland
5   about potential dischargeability of the notes?
6   A.   I would have had discussions with my
7   manager directly through a review of the
8   engagement as we go through all of this.  And
9   in this instance depending on the person
10  involved whether it was Hilda or Madeline, we
11  analyze, review as we try to get towards
12  sign-off.
13         And on this line item, we would have
14  gone through the work done on this note, you
15  know, and the discussion of whether there is
16  any adverse event that anybody is aware of.
17  Q.   These are all the conversations you
18  are aware of during the audit not in the last
19  couple of years; is that correct?
20  A.   Yeah, during the audit.
21  MR. MORRIS:  Objection to the form
22  of the question.
23  Q.   Are you aware of any specific
24  discussions that you had with anyone else at
25  PwC about whether they had any communications

Page 86

BURGER

1        BURGER
2   with anyone at Highland about whether the notes
3   were potentially dischargeable or amended?
4        MR. MORRIS:  Objection.
5        A.   No, I'm not aware.
6        Q.   As part of the audit process, is one
7   of the things that PwC looks at who would be
8   reviewing or relying on the financial
9   statements that you are auditing?
10       A.   Yes, we consider that.
11       Q.   And why is that considered?
12       A.   It is important -- well, A, the --
13   the format of our report and obviously just
14   governed by who relies on it.  So in other
15   words, if you have a public client with the
16   PCAOB standards where everybody in the public
17   relied on there are additional procedures and
18   additional scope than we have to perform.  In a
19   certain sense you can deal with two sets of
20   rules.  And the other part of that is
21   considered in who we address our opinion to.
22       Q.   And in the case of the Highland
23   audits, did PwC make an effort to determine who
24   would be reviewing and relying on the audits,
25   audited financial statements?

Page 87

BURGER

1        BURGER
2        A.   Yes.  As this is a partnership, it
3   is generally available to the general partner
4   and the partners.  And there wasn't any
5   specific need that we were aware of with
6   third-party lenders or banks or anything that
7   we are relying on financials.
8        Q.   Is who is going to end up reviewing
9   and relying on a financial statement relevant
10   to what PwC considers to be material and thus
11   need to be disclosed?
12       MR. MORRIS:  Objection to the form
13   of the question, asked and answered.
14   A.   No, sorry.
15       Q.   Then what is the relevance -- sorry.
16       If it is -- if who is going to
17   review a financial statement is not relevant to
18   what is going to be disclosed, why is it
19   relevant to the work that PwC is doing?
20       A.   We perform audits either in terms of
21   GAAS as promulgated by AICPA or PCAOB, and
22   there are differences in those standards.
23       And a correction to your previous
24   question, on materiality the basis for forming
25   a point of view on what is material is not

Page 88

BURGER

1        BURGER
2   different, but there are certain nuances in our
3   obligation of neutrality as to whether I'm in a
4   PCAOB engagement or a AICPA engagement.
5        Q.   What do you mean by that?
6        A.   So when we decide -- you get to an
7   overall materiality.  So if you for example,
8   are in a fund engagement you can use different
9   metrics as to whether you are in, let's say, a
10   hedge fund or a mutual fund, which is driven by
11   the users of the financials.
12       MR. WANDER:  It is a difference
13   between public and private, Michael.
14       Q.   And this would be a private
15   transaction we're calling it; is that correct?
16       A.   Yes, governed -- sorry, not
17   governed, performed.  Performed under the
18   standards of the AICPA and not the PCAOB.
19       Q.   And would those standards make a
20   difference on what is considered material as
21   part of PwC's work?
22       A.   Depending on the industry, it may.
23       Q.   And would those differences
24   potentially make a difference on what needed to
25   be disclosed in the financial statements?

Page 89

BURGER

1        BURGER
2        A.   Yeah.  The standards from a PCAOB
3   the asset and disclosure requirements under the
4   PCAOB rules, which would not be there under
5   AICPA.
6        Q.   Changing topics a little bit here.
7   We talked about related-party transactions a
8   little earlier.  Do you remember?
9        A.   Sure, I do.
10       Q.   Not we, you and Mr. Morris.  Can you
11   just generally at a high level explain what a
12   related-party transaction is?
13       A.   So related-party I cannot -- I
14   cannot quote the verbatim GAAP or GAAS
15   definition right now, but in effect the
16   related-party is any party that up or down the
17   stream can have material influence or control
18   of the entity.  So it would be key management,
19   anybody in an ownership structure upstream
20   which has significant interest or control as
21   well as even -- it can be in certain
22   circumstances, certain service providers.
23       Q.   Let's concentrate on notes for a
24   second.  There can be --
25       A.   Okay.

BURGER

1
2    Q.   – related-party notes and then what
3    would you call them non-related-party notes if
4    they're not related-party notes?  Is there a
5    term for that?
6         MR. MORRIS:  Objection to form of
7    the question.
8    A.   Third party, unaffiliated.
9    Q.   When analyzing the collectability of
10   notes, is there any differences in what PwC was
11   doing looking at affiliated – non-affiliated
12   transaction notes versus related-party notes?
13        MR. MORRIS:  Objection to the form
14   of the question.
15   A.   Not really.
16   Q.   You say "not really," that can –
17   A.   Yeah, not – no, there isn't,
18   because at the end of the day whether a note is
19   collectable or not is something that you have
20   to get evidence of, and the existence of the
21   note is something you have to get evidence of.
22   Q.   I think I can finish up with a
23   couple more questions here.  I just want to
24   sort of go back to what we talked about in the
25   beginning.  PwC did not do any sort of analysis

BURGER

1
2    as to whether the notes in question would be
3    potentially forgiven or discharged; is that
4    correct?
5         MR. MORRIS:  Objection to the form
6    of the question.
7         MR. AIGEN:  What is your basis for
8    the objection?
9         MR. MORRIS:  It is not their
10   responsibility to do that.  There is no
11   foundation.
12   Q.   That is fine, you can answer the
13   question.
14   A.   No, we did not as we did not have
15   to.
16   Q.   If PwC had learned that there was
17   some condition down the road that could
18   potentially discharge or forgive the notes,
19   would PwC have had to do some sort of analysis
20   to determine if that condition would need to be
21   disclosed?
22   A.   Yes, if you become aware of any
23   adverse event which may impact the valuation of
24   any asset you have to consider that.
25   Q.   And in order to consider that, you

BURGER

1
2    would look at the probability that that event
3    would occur; is that correct?
4    A.   Correct, probability and potential
5    impact.
6    Q.   And materiality?
7    A.   Materiality.
8    Q.   And that is nothing that you or
9    anyone at PwC did with respect to any potential
10   conditions that might forgive these notes; is
11   that correct?
12   A.   Yeah, we did not.  Yeah, we did not.
13        MR. AIGEN:  That is all the
14   questions I have.
15        FURTHER EXAMINATION.
16   BY MR. MORRIS:
17   Q.   I just have a few more, sir, few
18   follow-ups.
19        PwC made no assessment as to whether
20   or not any of the notes might not be forgiven
21   because they were never given any information
22   that indicated that that was even possible;
23   correct?
24        MR. AIGEN:  Objection, form.
25   A.   That's correct.

BURGER

1
2    Q.   PwC was never given any information
3    about the possibility that any of the
4    affiliated promissory notes might be forgiven;
5    correct?
6    A.   Correct.
7    Q.   PwC was never informed that
8    Mr. Dondero had entered into an agreement that
9    could impact the collectability of any of the
10   promissory notes; correct?
11        MR. AIGEN:  Objection, form.
12   A.   Correct.
13        MR. MORRIS:  I have no further
14   questions.
15        MR. AIGEN:  I don't have anything.
16        MR. MORRIS:  Mr. Burger, I greatly
17   appreciate your time and your patience.
18        Thank you very much, John, same to
19   you.  Thank you for the accommodations and
20   I hope –
21        MR. WANDER:  Certainly, thank you.
22        (Deposition adjourned at 11:41 a.m.)
23
24
25

Page 94

```
1        BURGER
2        _____
3        PEET BURGER
4
5   Subscribed and sworn to before me
6   this      day of          2021.
7
8   --------------------------------
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 95

```
1            BURGER
2        C E R T I F I C A T E
3
4       I, SUSAN S. KLINGER, a certified
5   shorthand reporter within and for the State
6   of Texas, do hereby certify:
7       That PEET BURGER, the witness whose
8   deposition is hereinbefore set forth, was
9   duly sworn by me and that such deposition
10  is a true record of the testimony given by
11  such witness.
12      I further certify that I am not
13  related to any of the parties to this
14  action by blood or marriage; and that I am
15  in no way interested in the outcome of this
16  matter.
17      IN WITNESS WHEREOF, I have hereunto
18  set my hand this 30th of July, 2021.
19
20      _____
21      Susan S. Klinger, RMR-CRR, CSR
22      Texas CSR# 6531
23
24
25
```

Page 96

```
1        ERRATA SHEET
2   Case Name:
3   Deposition Date:
4   Deponent:
5   Pg.  No. Now Reads   Should Read  Reason
6   ___  ___ _____   _____   _____
7   ___  ___ _____   _____   _____
8   ___  ___ _____   _____   _____
9   ___  ___ _____   _____   _____
10  ___  ___ _____   _____   _____
11  ___  ___ _____   _____   _____
12  ___  ___ _____   _____   _____
13  ___  ___ _____   _____   _____
14  ___  ___ _____   _____   _____
15  ___  ___ _____   _____   _____
16  ___  ___ _____   _____   _____
17  ___  ___ _____   _____   _____
18  ___  ___ _____   _____   _____
19  ___  ___ _____   _____   _____
20
21      _____
            Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2021.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____
```

Appx. 00127

Index: $1..amount

**$**

**$1** 63:25

**$1.7** 74:21 75:12,23
76:7

**$11.7** 40:14

**$116** 61:4

**$14** 67:2

**$150,000** 63:20

**$2** 67:10

**$200,000** 63:19

**$750,000** 67:4

**1**

**1** 17:22,25 66:25
78:17

**10** 33:24

**11** 24:4,6,23

**116** 61:2

**117** 61:2

**11:41** 93:22

**11:45** 76:20

**13** 63:5

**13.9** 63:7

**15** 51:14 54:10,18,22
55:6

**16** 39:25

**17** 82:4

**173** 62:11

**18** 20:25 82:4,5

**18th** 67:11

**19** 82:5

**1997** 6:14,17

**19th** 67:6

**1st** 5:21,24 49:3

**2**

**2** 30:6 31:11 51:2

**20** 6:20

**2000** 44:20 56:11

**2013** 7:2,3,5

**2014** 5:21,24 6:9

**2015** 38:3

**2017** 30:3,18,23 31:3,
9 33:22 36:15,24
37:6 39:18 40:19
41:2,7,14,16,20 43:7
44:21 56:14 63:10
67:3 82:3,15

**2018** 7:6 20:15 21:9
40:14 46:22,25
47:13,20,24 51:12
52:22 53:10,20 55:8,
21 56:10,22 59:18
60:17 63:18,20 64:2
67:6,11 68:22 82:3,
15

**2019** 17:23 19:15
21:14 24:18,24 25:4
48:5 54:3,22 67:17
68:6 69:22 70:2 71:6,
12,18,24 72:9,15,20,
25 73:11,17,22 74:4,
10,20 75:10,21 76:5

**21st** 38:3

**25th** 63:18

**26** 51:17

**26th** 63:20

**28** 34:17 52:6,7

**29** 52:8

**2nd** 49:3

**3**

**3** 41:4 68:19

**30** 35:3,6,7 39:20

**30th** 24:18 25:4

**31** 39:20 63:9

**31st** 20:15 21:9
36:15,24 40:19 41:20
46:25 47:12,20 53:10
67:3 82:3,15

**32** 25:9,10,21 26:10

**34** 26:15 27:10

**35D** 27:13,19

**36** 28:14,18,22

**38** 54:9,10

**3rd** 17:23 19:15 21:14
24:20,24 48:5 54:3,
22 69:22,25 71:6,12,
18,24 72:9,15,20,25
73:11,17,22 74:4,9,
19 75:9,21 76:5 79:2

**4**

**4** 47:7,8,9 67:9,14

**41** 39:22

**413** 23:24

**416** 25:7

**417** 28:13

**419** 19:3 29:6

**5**

**5** 55:9,10,17 68:18,20
69:4 70:11,16

**50** 21:2,13 24:16

**8**

**8** 51:18 52:15,19 54:6
78:2

**8th** 64:2

**9**

**9** 34:19 35:7,15,19
36:13 39:3,6 52:8
78:2

**90** 78:18

**A**

**a.m.** 93:22

**AB** 63:15

**ability** 44:16,17,23
57:7,12,25 58:8,13,

16 59:12

**absolute** 59:6

**absolutely** 10:16

**accept** 49:2

**acceptance** 49:18

**Accepted** 8:22,24
9:11,16,18 15:23
16:5 22:2

**accommodations**
93:19

**accompanying**
15:6,17 34:7

**accordance** 15:23
16:8,9

**account** 61:12

**accountant** 13:7,8

**accounting** 8:19
9:19 16:5,6

**accounts** 44:2

**accrued** 38:21

**accuracy** 21:18
61:19

**accurate** 41:9 50:5

**acting** 67:19 68:7

**actual** 64:20 75:7

**add** 46:13

**additional** 51:9
60:14 78:22 86:17,18

**address** 86:21

**adds** 63:7

**adequate** 58:22

**adjourned** 93:22

**adjusted** 74:15

**adjustment** 75:5,8

**adjustments** 25:18

**adverse** 60:12 75:4
80:25 85:16 91:23

**affiliate** 24:11 36:14,
23 52:21 53:9

**affiliate's** 59:2

**affiliated** 23:12,16,
19 24:7,23 25:3
90:11 93:4

**affiliates** 31:17,23,24
32:2,10,20 33:12,18,
23 35:9,20 36:3,20
39:8 41:8 43:15 51:5,
14 52:10,17 53:3,17,
23 55:23 65:20 67:20
68:9,23 69:17 70:25

**African** 6:15

**agree** 80:15

**agreement** 60:11
66:18,22 67:18 68:7
93:8

**agreements** 26:21
61:21

**AICPA** 9:3 87:21
88:4,18 89:5

**AIGEN** 14:19 15:25
16:16 18:3,8 23:8
25:24 26:12 32:22
33:14 35:16,21 36:4
37:9 39:11 45:4
46:12 47:3,9 53:11
54:7 55:14,17 57:9
60:3,21 61:22 64:16,
22 65:3 66:2,17
67:24 68:13 69:5,9
70:3,18 71:2,8,14,20
72:3,11 73:4,13,24
74:13,25 75:15 76:2,
11,17 91:7 92:13,24
93:11,15

**alleged** 28:6

**allocated** 64:2,3,4

**ambiguous** 8:13

**amended** 71:19
72:21 73:23 75:24
84:13 86:3

**amendment** 69:3,
21,24 70:6

**amount** 31:21 38:20
40:14 44:15 45:15
61:5,9,13 62:4,12,21,
22 63:18,20 64:14
66:15,23 74:21
75:11,22 76:6

**amounts** 31:16,23 32:2,9,12,19 33:11, 18,23 34:15 35:8 36:3,10,13,17,18,20, 23 41:8 42:19,23 43:14 44:19 51:5,13 52:9,20,24 53:2,9,15, 16,22 55:22 58:23 61:18 62:19 64:13 67:21 68:10 69:16

**analysis** 44:10,13 46:7,10 57:3,12,13 59:15 81:18 90:25 91:19

**analyze** 58:15 80:2,5 81:5 85:11

**analyzing** 57:6 80:6 90:9

**answering** 78:9

**answers** 7:22

**apologize** 7:18 15:3 41:25 47:6,16 68:15 83:14

**applicable** 50:18

**applied** 67:5

**apply** 24:6

**approach** 10:8

**approve** 50:23

**approximate** 38:24

**approximated** 64:14

**approximately** 39:8 61:2,4 63:5,7 82:13

**approximates** 37:15 53:23

**April** 7:3 11:2,3,17

**argue** 82:20

**arising** 24:13

**arm's** 65:8,11

**articulated** 75:17

**ascertain** 58:7

**Asia** 21:6

**aspects** 57:5

**assert** 26:7 28:20

**asserting** 26:18

**assertion** 38:8

**assess** 58:20 60:14 80:2

**assessed** 79:22

**assessment** 26:17 57:19 58:25 62:4 92:19

**asset** 32:5,7,8,10,14, 15,16,17 38:15 89:3 91:24

**assets** 31:13,16 32:3,21 33:12,18,25 38:13 51:15 57:22 58:13,21

**associate** 42:7,8

**assurance** 8:18 9:9, 12,14,15 15:22 16:14 22:20 32:16 57:20 59:8

**attention** 34:12

**audit** 5:18,19,22 6:8, 16,19 7:4 8:17 9:6,8 10:8,24 12:16,18 13:14 14:22,24 16:9, 20 17:12,15,19 21:8, 21,25 22:19 26:11 27:10 29:4 30:22 39:14,17 41:7,14,17, 18 42:21 43:7 44:7, 21 47:18 49:7,10,14 50:10 54:3 55:21 56:22 59:18 60:18 78:22 83:18 84:2,4 85:18,20 86:6

**audited** 13:19 14:10 16:7 30:18 37:5 46:24 47:11,25 86:25

**auditing** 8:19,23,24 9:11,17 10:2 15:23 16:4 22:3 31:3 86:9

**auditors** 48:19

**audits** 6:3,25 13:12 14:14 20:6 23:18 29:25 82:2,7,14,24 86:23,24 87:20

**aware** 23:10 26:20 28:25 57:23 60:6

69:2,20,24 80:23 83:18,19 84:6,20,25 85:16,18,23 86:5 87:5 91:22

**awkward** 18:10

---

**B**

**back** 19:11 21:7 42:8 45:14,16 49:24 61:20 62:14 68:16 77:8 90:24

**background** 18:25

**balance** 20:10,14 24:13 29:16 32:3,11, 21 33:4,12,19,22 36:9,19 40:7,18 42:20 43:22,24 44:5 51:3 53:2 61:5,10,14 62:16 75:4,8

**balances** 44:2

**banks** 87:6

**base** 44:25 59:20

**based** 21:12 39:2,5 42:23 59:9 61:25 64:10 66:6 71:25 74:14 76:7

**basic** 36:11

**basically** 9:2 25:22 38:22

**basis** 5:23 6:20 22:19 34:14 59:4 83:5 87:24 91:7

**Bates** 18:4,8

**Beautiful** 30:14

**begin** 6:23 7:22,24, 25 10:23 11:7,19,23

**beginning** 6:8 54:10 90:25

**begins** 22:9 29:8

**behalf** 47:11 66:21 67:19 68:8

**believed** 16:13

**biggest** 13:14

**bit** 37:19 39:23 63:24

67:9 89:6

**bona** 24:11

**bottom** 20:18 34:4 43:10 48:5

**break** 8:7 82:10

**briefly** 6:6

**broader** 73:7

**Burger** 5:1,3,10,12 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1, 2,9 19:1 20:1 21:1 22:1 23:1 24:1,3 25:1 26:1 27:1 28:1 29:1 30:1,7 31:1 32:1 33:1 34:1 35:1,4,25 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1,15,20 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1,16

**business** 43:3 56:18

---

**C**

**calculated** 36:22 53:8

**call** 23:15 25:15 26:5 41:3 49:2 50:12 58:21 70:23 90:3

**called** 13:25 35:8 36:2,19 50:19 53:2 57:2,15 62:14

**calling** 88:15

**capably** 30:10

**capacity** 6:2

**Capital** 6:3,24 7:8,11 23:21 31:22 40:10

**capture** 40:4,5

**carried** 21:24 32:2, 20

**carry** 51:7

**carrying** 21:20 33:17 37:15 38:9,16,17,18, 24 53:23

**case** 8:22 11:21 86:22

**CFO** 13:4 19:22 83:7

**chance** 78:17 83:20

**change** 78:18

**Changing** 89:6

**charge** 7:5

**chief** 13:6

**circumstance** 60:2

**circumstances** 70:12,23 71:13 72:16 73:18 89:22

**claims** 24:12

**clarification** 15:4 16:10 24:21 68:21

**classic** 32:14

**clean** 50:13,16 59:17

**clear** 10:20

**client** 49:19 61:5,9 62:5 86:15

**client's** 49:13

**closed** 34:9

**closing** 63:9

**coincidence** 48:13

**collectability** 70:24 75:18 90:9 93:9

**collectable** 71:7 72:10 73:12 74:11,22 90:19

**collective** 59:20 62:20

**column** 57:15 61:12, 17 63:14

**combination** 58:3

**combining** 82:9

**comfort** 42:22

**comment** 15:16

**committee** 50:14

**communicated** 83:17

**communication** 12:23 83:12

**communications** 82:18,23 85:25

**compile** 15:8

**compiled** 15:13

**completed** 7:7 39:17

**completeness** 26:17 27:4

**completing** 30:22

**completion** 10:7,11, 22 21:20,25

**compliance** 9:10

**concentrate** 89:23

**concept** 38:22

**concerns** 22:25 59:22

**conclude** 44:20 58:16 59:11

**conclusion** 69:12,14

**conclusions** 62:2

**condition** 80:3 91:17,20

**conditions** 67:23 68:12 72:2 73:3 74:6 76:8 92:10

**conducted** 82:4,5

**confirm** 21:18 37:21 53:5,7,19 55:20,24 56:16,20

**confirmed** 21:11 24:18

**conformance** 16:15

**conglomerate** 9:4

**Connect** 13:25

**connection** 10:2 14:14 16:19 31:8 41:7,13 44:6,21 47:24 53:20 59:17,18 60:17

**considered** 9:3 22:12,17 23:6,20 38:9 65:7,13 86:11, 21 88:20

**considers** 87:10

**consistent** 5:23 6:20

**consolidated** 27:23 31:21 34:8 51:3

**constituted** 33:24

**consultation** 50:21

**contact** 12:17,21 13:3

**content** 49:19,21

**context** 18:23 38:12

**continuing** 52:7 70:22

**contractual** 38:19

**contractually** 58:11

**control** 89:17,20

**conversations** 83:23 84:5,10,15,17, 20 85:2,4,17

**conveyed** 36:2

**copy** 30:13

**correct** 6:15,22 11:25 12:7,11 15:14 19:6,10 20:12,16,17 21:13 24:15,19,20 25:4,5,25 27:24 29:2, 10 33:4,5,8,9 34:2 35:10,15,22 36:16,21 37:18 39:12 40:2,11, 20,21,24,25 41:21 43:17 46:21 51:16 52:5,13,14,17,18 53:12,25 54:8,20,25 56:23 57:10,13,14 63:11,22 64:5 66:14 67:7,15 68:24,25 69:18,19 74:24 75:19 79:9,13 81:9,11 82:3 84:17,18,22,23 85:19

88:15 91:4 92:3,4,11, 23,25 93:5,6,10,12

**correction** 47:14 87:23

**correctly** 9:7

**counsel** 76:21

**counterparty** 44:18 60:7,13

**couple** 85:19 90:23

**court** 8:4

**created** 56:14

**creating** 56:13

**credit** 44:9,12 57:2, 12

**creditworthiness** 59:2,6

**current** 21:12 24:24

### D

**data** 57:24 60:6,12

**date** 20:10 21:20,24 22:5,6 24:13 29:16, 17 48:8,14,21,25 49:2 61:11 63:9

**dated** 48:4

**dates** 6:11

**Dave** 83:6,13

**David** 12:25

**day** 48:20 90:18

**day-to-day** 83:5

**deal** 35:24 44:17 45:17 86:19

**deals** 22:20,21

**dealt** 12:20 45:13 83:5,9

**debtor** 35:20 52:17 58:18

**debtors** 30:22

**debtors'** 39:3 62:3

**December** 20:15 21:9 36:14,24 38:3

40:19 41:19 46:25 47:12,20 53:10 67:3, 6,11

**decide** 88:6

**decided** 17:19 53:6 66:15

**deciding** 59:16

**decision** 33:10

**dedicated** 34:22 50:15

**default** 25:3 57:21 58:11

**defer** 25:17

**defined** 23:6 31:24

**definition** 22:12,16, 20,25 32:4,6,8,15 89:15

**depending** 75:6 85:9 88:22

**depends** 13:13 80:9, 13 82:25

**deposed** 7:14

**deposition** 18:7,10 45:24 46:3 93:22

**derived** 20:7

**describe** 9:24 34:21 35:19 41:9 49:16 52:16 54:13 58:5

**description** 54:23 61:12

**detail** 43:20 45:14 51:24 62:14,15,18 68:16,21 69:4 70:10, 16

**detailed** 43:10 56:25

**determine** 80:3 86:23 91:20

**determines** 49:12

**deviation** 50:21

**deviations** 31:6 47:22 50:3

**differ** 37:12 38:17

**difference** 61:4

78:16 88:12,20,24

**differences** 87:22 88:23 90:10

**diligence** 45:6 58:4, 6 59:9

**directly** 56:7 84:2 85:7

**discharge** 80:8 91:18

**dischargeability** 85:5

**dischargeable** 86:3

**discharged** 81:19 84:12 91:3

**disclose** 34:25 78:2 80:21

**disclosed** 27:22 28:9,24 74:12,14,23 75:13,25 76:10 77:16,22,23,24 78:8 79:6,16 80:4,17 87:11,18 88:25 91:21

**disclosure** 29:17 40:7 54:15,24 75:7 79:2 80:21 81:3 89:3

**disclosures** 28:6,7 29:18 50:4

**discount** 39:18 54:4

**discussion** 85:15

**discussions** 80:12 85:6,24

**dispute** 32:19

**document** 15:10 17:22 18:12,13,15,21 19:12 30:9 33:7 34:18 37:20 41:10,23 42:17,18 43:25 48:4 49:8 56:13,16,20 59:16

**documentation** 46:16

**documents** 47:15

**dog** 27:16,19

**dollars** 63:5,7

**Dondero** 19:8,14,18,

22 21:3,11 23:4,12
24:10,17 25:21 27:20
28:22 40:12,22 58:16
59:4 64:7,8,13,19
65:2,20,22 66:6,11,
22 67:4,10,17,20
68:3,6,8 70:21 71:5,
11,17,23 83:24 84:5
93:8

**Dondero's** 18:7
58:13

**drafted** 20:2

**drafts** 14:21 15:16

**draw** 34:12

**Drew** 83:4,10

**driven** 88:10

**due** 18:24 31:17,24
32:2,9,19 33:11,18,
23 35:8,20 36:3,13,
20,23 39:9 41:8
43:14 44:15 45:6,19,
21 51:5,13 52:9,20
53:3,9,15,16,22
55:22 58:4,6 59:9
61:10 62:23 63:3
66:12 67:22 68:11
70:24 75:11 76:6
81:19

**duly** 5:4

**duties** 9:22

**duty** 27:3 50:10

**E**

**earlier** 31:7 40:18
47:23 48:10 49:3
57:4 82:16 83:3 89:8

**earnings** 64:10 66:7,
13

**easier** 30:14

**easy** 18:12

**effect** 80:25 89:15

**effectively** 48:22

**effects** 75:4

**effort** 86:23

**efforts** 30:22 31:3

**employed** 5:11 6:6
42:3

**enable** 14:10 66:12

**encourage** 18:18

**end** 14:2 21:19 33:22
43:15 51:10,12 52:21
77:12 84:7 87:8
90:18

**ending** 19:3 20:15,25
21:9 23:24 28:13
40:19 41:19 46:25
47:12,20

**ends** 37:11,22

**engaged** 11:11

**engagement** 7:5 9:5
10:25 15:20 50:18
85:8 88:4,8

**entered** 67:18 68:6
93:8

**entities** 23:12

**entitled** 32:15 34:19
39:24 52:9

**entity** 19:23 32:13
63:2 89:18

**equal** 39:8

**error** 26:5

**evaluation** 62:22

**event** 40:23 75:7
78:25 80:7,9,12,13,
15,21 81:6,13 85:16
91:23 92:2

**events** 22:4 28:8
29:15 39:24 40:6
48:24 54:14,23 55:5
77:25 79:7,17,21
80:22 81:19,25

**evidence** 58:9 59:7
90:20,21

**EXAMINATION** 5:6
76:16 92:15

**exceeded** 51:14

**exchange** 23:13
38:15

**Excuse** 27:15

**execution** 10:8,11
11:6,14,15 12:18
13:15

**exhibit** 17:22,25
30:5,6 41:3,4 47:7,8
55:9,10,17 68:18,20
69:4 70:11,16

**existence** 42:23
62:21 65:16 90:20

**expect** 19:24 22:21

**expected** 17:11

**explain** 10:20 45:10
89:11

**explanations** 34:15

**express** 22:24

**extinguished** 71:25
73:2 74:5 76:7

**F**

**faced** 64:15

**facilitate** 64:10

**facilitated** 12:21,22

**fact** 25:17 33:6 54:22
60:10

**fair** 6:21 12:2,3 17:17
27:18 28:21 35:18
37:14 38:8,10,11,13,
21,23 39:2,5,7,13,15
51:12 53:21 54:2,4
58:24 79:3,18,21,25
81:5,16

**fall** 11:24

**familiar** 9:21 16:22
46:23

**February** 67:17 68:6

**feed** 12:9

**feeds** 62:13

**fide** 24:11

**fieldwork** 11:2,5
12:12,13

**file** 41:12

**filings** 58:14,15,19,
22

**final** 10:24

**finalized** 14:23

**finally** 76:4

**financial** 7:6 9:9 10:3
13:19 14:11 15:2,5,6,
12,17,22 16:14 26:6,
22 27:23 30:3,19,23
31:3,9 34:8,25 37:6
39:3 41:18 44:4
45:16 46:23,24
47:11,19 53:20 56:22
61:15 62:17 75:6
80:22 81:2 86:8,25
87:9,17 88:25

**financials** 9:17 16:8
47:25 48:22 50:3,5
74:15 80:17 87:7
88:11

**find** 25:13

**fine** 23:17 91:12

**finish** 7:21,25 73:6
77:8 90:22

**firm** 6:15

**fiscal** 10:23 11:24
20:15 21:9,19 41:19
43:16 51:10 52:21

**focus** 78:11

**focused** 45:19

**follow** 10:4 49:24
56:12

**follow-up** 14:18

**follow-ups** 92:18

**footnote** 36:7

**footnotes** 34:16
77:25

**forgivable** 84:12

**forgive** 80:7 91:18
92:10

**forgiven** 70:11,17
71:13 72:16 73:18
75:12 78:7,14,18,19,
21 79:8 91:3 92:20
93:4

**form** 14:19 15:25
16:16,23 20:4 23:8
24:14 25:24 26:12
32:14,22 33:14
35:16,21 36:4 37:9
39:11 45:4 46:12
53:11 54:7 57:9 60:3,
21 61:23 64:16,22
65:3 66:17 67:24
68:13 69:5 70:3,18
71:2,8,14,20 72:3,11
73:4,13,24 74:13,25
75:15 76:2,11 79:10,
19 80:18 81:7,21
85:21 87:12 90:6,13
91:5 92:24 93:11

**format** 86:13

**forming** 87:24

**forms** 32:12 59:20

**forward** 7:12 21:24

**found** 26:5 58:14

**foundation** 69:12
91:11

**framework** 49:23

**Frank** 13:4 19:8 83:7

**fraud** 27:4

**front** 18:12,15 30:13,
19 35:5 37:21

**fulfill** 50:10,12

**fulfillment** 72:2 73:3
74:6 76:8

**full** 60:15

**fully** 30:10 60:10,19

**function** 80:10

**fund** 88:8,10

**future** 79:17 81:20

**G**

**GAAP** 16:2,8,15
29:20,22 34:24 38:7
49:6 50:6 52:3 70:20
89:14

**GAAS** 16:3,9 29:21
49:6,7 87:21 89:14

**gain** 42:22

**Garcia** 42:2,3 56:2

**Garcia's** 42:14

**gave** 78:24

**general** 19:23,24 21:10 44:3 49:9 53:21 65:4,5 82:7,11 87:3

**generally** 8:22,24 9:10,16,18,25 15:23 16:5 22:2 23:10 49:17 87:3 89:11

**give** 6:10 15:21 22:22 50:12 57:20 59:7

**good** 5:8 62:7

**governed** 9:3 86:14 88:16,17

**greatly** 93:16

**ground** 7:19

**group** 6:16

**guess** 20:24 76:18, 24 84:25

**H**

**half** 31:12 63:5

**happen** 59:25

**happened** 78:24

**hard** 30:12 76:19

**HCMLP** 42:21

**HCMSI** 45:19,21 46:4,5 62:24 63:3,25

**hear** 79:12

**hedge** 88:10

**Hendrix** 13:5 83:3,15

**high** 89:11

**Highland** 6:3,24 7:5, 8,10,11 10:2,13 11:8 12:6,9,17 13:12 14:4, 14,22 15:13 16:19,24 22:24 23:11,20,21 31:22 32:18 33:6,10 35:13 39:6 40:9 44:6 51:25 53:14,21 54:19

55:4 57:24 59:11,24 63:25 66:21 67:11,19 68:5,8,24 69:17 70:15 73:8,10,16,21 74:3 82:14,19,22 83:17 84:11,21 85:4 86:2,22

**Highland's** 30:23 31:3,8 32:3,20 33:4, 19,24 43:7 46:24 47:19 51:15 56:22 62:3

**Hilda** 42:2,3 85:10

**Hold** 69:7

**hope** 93:20

**I**

**idea** 36:10

**identified** 31:16

**impact** 79:23 91:23 92:5 93:9

**important** 7:20 28:5 86:12

**inaccurate** 37:7

**inaudible** 38:25

**include** 54:22

**included** 22:16 36:17,18 40:17 52:24

**including** 13:15 21:3 65:20

**incorrect** 53:17

**independent** 48:19

**individual** 12:19 45:15 46:16,19 59:3

**individually** 62:19

**industry** 88:22

**influence** 89:17

**inform** 70:22 71:5, 11,17,23 72:8,14,19, 24 73:10,16,21 74:3

**information** 10:19 12:5,9 13:18,22 14:3, 6,9,18 23:5 35:14 36:2 40:8,9 43:18,19

45:2 52:12 54:17,18 57:25 59:10 64:18 65:9,23 74:12 77:16 92:21 93:2

**informational** 11:8

**informed** 40:24 55:4 68:3,5 70:5,15 93:7

**inquiry** 64:12,25 65:5,18

**instance** 56:2 78:3,5 85:9

**insurance** 9:13

**integral** 34:8

**intended** 35:19 40:3 43:13 51:23 52:16 54:13

**intent** 44:16 57:7

**interest** 38:21 39:9 61:10 63:3 64:4 65:13,14 67:5,13 89:20

**internal** 49:11

**interrupt** 47:3 61:23

**involved** 65:15 83:21 85:10

**issue** 59:16 81:16

**issued** 40:13,22 48:19,23 54:3 58:18 63:18,19

**item** 36:18 42:20 52:25 62:12 85:13

**items** 22:12,17 23:6 79:7

**J**

**James** 19:8

**January** 5:21,24 6:14,17 67:17 68:6

**John** 30:12,17 55:17 77:2 93:18

**join** 6:16

**joined** 6:13,14

**June** 17:23 19:15

21:14 24:18,20,24 25:3 37:3 48:5 49:2 54:3,22 63:18 69:22, 25 71:6,12,18,24 72:9,15,20,25 73:11, 17,22 74:4,9,19 75:9, 21 76:5 79:2

**junior** 83:9

**K**

**key** 89:18

**kind** 57:5

**Klos** 12:25 13:2 83:6, 13,15

**knowing** 80:14

**knowledge** 21:12 29:8 53:13,18 54:21 66:16,21 71:4,10,16, 22 72:7,13,18,23 73:9,14,15,19,20,25 74:2,8

**Kristin** 13:5 83:2,10

**L**

**L.P.** 6:4,25 7:9,11 23:22 31:22

**La** 21:6

**label** 18:5,8

**lack** 13:5 75:17

**language** 78:13

**layout** 42:19

**lead** 30:21 31:2

**leads** 10:24

**learn** 79:22

**learned** 74:9,19 75:9, 21 76:4 77:13 78:6, 20,21 91:16

**leave** 55:12

**ledger** 44:3

**left** 63:9,24

**legal** 60:11 61:21 69:11,14

**legends** 46:17

**lenders** 87:6

**length** 65:8,11

**letter** 16:23 17:13,24 19:13,19,25 20:2,14, 21 21:8 22:16 23:7 48:9,18 50:24

**letters** 16:19 17:4,8, 18

**level** 25:14 89:11

**liability** 64:14

**limit** 77:6

**limitations** 50:8

**limited** 19:23

**link** 46:15

**list** 31:13 43:13

**listed** 61:11

**listing** 44:2

**lists** 68:22 69:16

**litigation** 81:16

**loan** 38:20 60:15 64:9 66:25 67:2 79:24

**loaned** 23:11 64:13

**loans** 45:18 64:7,8, 19 65:2,7,10,19,25 66:5,11,16,23

**long** 10:6

**look-through** 59:4

**looked** 36:19 40:18 48:9 52:25 57:5

**M**

**made** 20:21 21:2 29:18 33:10 44:5 59:24 64:19 65:5 66:5,11,22 67:2,4 68:23 81:17 92:19

**Madeline** 56:3 85:10

**make** 10:18 12:5 13:21 14:13 17:10 18:4,24 64:12,25 65:18 67:10 73:7

86:23 88:19,24

**maker** 46:19 57:22 59:23

**maker's** 57:25

**makers** 23:19 24:12 44:21 58:7 59:11 61:11

**makes** 42:19 45:15 62:18

**management** 6:3,24 7:9,11 14:9 16:23 17:3,7,10,18,23 19:13,21 20:4,13 21:17 22:15,22 23:22 25:16,17 26:7,18 27:5 28:10,19,21 31:22 36:25 37:2,4 40:11 43:21 45:3,5 48:9,18 52:13 53:6,8 60:9,18 66:8,19 80:12 89:18

**management's** 49:3

**manager** 85:7

**managers** 83:13

**March** 63:20

**mark** 55:10

**marked** 17:22,25 30:6 41:4 43:10 44:9 46:17 47:8 55:9

**marking** 47:4

**material** 22:3,13,17, 23 23:6 25:23 26:8, 20,24 27:6,21 28:8 34:25 40:6,23 50:2,3 54:13,23 55:5 61:21 62:20 75:3,4,5 80:25 87:10,25 88:20 89:17

**materiality** 22:21 23:2 25:14 42:24 74:15 80:10 81:13 87:24 88:7 92:6,7

**materially** 57:22

**math** 33:21

**matter** 83:8,11

**means** 25:11 26:15 28:18 29:14,15 38:5, 6 46:2

**meet** 25:14

**meetings** 83:11

**meets** 32:4

**met** 67:23 68:12

**metrics** 88:9

**Michael** 55:12 88:13

**Michael's** 35:24

**middle** 22:7

**million** 40:14 63:5,7, 25 67:2,10 74:22 75:12,23 76:7

**mind** 30:24 62:6 79:6

**mindful** 7:20

**minus** 38:21

**misstatements** 25:13,16 50:2

**moment** 27:14

**money** 23:11

**morning** 5:8

**morphed** 13:23

**Morris** 5:7 18:6 21:6 30:17 47:6 55:11,18 69:6 76:14 77:13 79:10,19 80:18 81:7, 21 85:21 86:4 87:12 89:10 90:6,13 91:5,9 92:16 93:13,16

**Morris'** 78:12 79:4 84:7

**move** 30:3

**mutual** 88:10

**N**

**national** 50:22

**nature** 83:2

**necessarily** 27:3

**needed** 13:19 88:24

**neutrality** 25:19 88:3

**non-affiliated** 90:11

**non-related-party** 90:3

**noon** 76:22

**note** 34:22 35:7,15, 19 36:13 39:3,6,25 51:18 52:8,15,19 54:6,9,10,18,22 55:6 60:8,9,11 63:8,13,17, 24 67:9,13 70:7 77:4 78:2,3 85:14 90:18, 21

**notes** 15:6,12,17 23:13,15,16,20 24:7, 11,23 25:3 31:16,23, 25 32:9,13,19 33:11, 17,23 34:7 35:8 36:3, 9,20 37:8,15,16 38:2, 6,7 39:7,10,19 40:12, 13,22 41:8 43:14 44:22 45:12,15 46:5, 19 51:5,9,13,23 52:9 53:2,16,22,24 54:5, 12 55:22 57:6,20 58:10,11,17 59:8,12, 24 60:19 63:4,6 65:12,17 67:22 68:11,22 69:3,18,21, 25 70:10,16,24 71:6, 12,18,25 72:9,15,20 73:2,11,17,22 74:5, 10,20 75:10,22,23 76:5 78:7 79:8 80:8 81:16,18 84:11 85:5 86:2 89:23 90:2,3,4, 10,12 91:2,18 92:10, 20 93:4,10

**nuances** 88:2

**number** 24:4,6,22 25:8,10,21 26:10,14 27:10,19 28:14,22 45:12,18 51:18 66:25 67:9,14 68:16

**O**

**objecting** 61:23

**objection** 14:19 15:25 16:16 23:8 24:14 25:24 26:12 32:22 33:14 35:16, 21,24 36:4 37:9 39:11 45:4 46:12 53:11 54:7 57:9 60:3, 21 64:16,22 65:3 66:2,17 67:24 68:13

69:5,7,8 70:3,18 71:2,8,14,20 72:3,11 73:4,13,24 74:13,25 75:15 76:2,11 79:10, 19 80:18 81:7,21 85:21 86:4 87:12 90:6,13 91:5,8 92:24 93:11

**obligation** 67:21 70:22 88:3

**obligations** 23:19 35:19 40:17 52:16 59:13,23 64:21 68:10 71:24 72:25 74:4

**obtain** 13:18,22 58:20 62:18

**obtained** 61:13

**occur** 80:24 81:6,20, 25 92:3

**occurred** 29:16 40:6 78:25 79:7 80:23

**occurring** 22:4

**October** 11:22 64:2

**office** 50:22

**omitted** 55:6

**one-** 14:25

**opinion** 9:6 14:25 22:5 29:17 44:24,25 49:8,20,21 50:13,14, 17,20,24 54:3 59:17, 20 86:21

**opportunity** 15:15 17:9

**oral** 67:18 68:7 69:2, 20,24 70:6

**order** 15:21 16:13 17:14 18:21 30:10 66:12 91:25

**ordinary** 20:6 43:2,6 56:17,21

**ourself** 44:17

**outlines** 10:9

**outstanding** 37:14 43:15 74:21 75:11,22 76:6

**oversee** 47:10,18

**overseeing** 42:14

**overseen** 6:2

**owed** 52:17 62:4

**owes** 69:17

**owing** 36:14,23 52:20 53:9,15 68:11

**ownership** 28:10 89:19

**P**

**P-A-C-O-C-H-A** 56:6

**Pacocha** 56:4

**pages** 15:11

**paid** 63:25

**paragraph** 20:9 22:8 37:11,22,23,25 38:2

**part** 10:16 13:14 17:2 26:6 34:8 56:8 57:13 59:19 62:13 81:23 83:17 86:6,20 88:21

**parties** 27:21 28:20 51:25 65:14

**partly** 45:5

**partner** 5:18,19,22 6:8 7:4 12:16 19:23, 24 49:9 50:17,18 87:3

**partners** 87:4

**partnership** 40:13 87:2

**partnership's** 37:14

**party** 19:21 23:16,19 24:7,11,23 28:6,7,25 34:19,23 59:6 89:16 90:8

**patience** 93:17

**pay** 44:23 57:7,13 58:2,8 60:13 66:6,12 67:12,13,21 68:10

**payment** 67:4,10

**payments** 38:21 51:8 58:10 64:10

66:6

**PCAOB** 86:16 87:21 88:4,18 89:2,4

**Peet** 5:3,10

**people** 13:10,16 19:18 82:14,18,23 83:9 84:4

**percent** 33:24 51:14 78:17,18

**perform** 10:10 11:13 50:6,9 86:18 87:20

**performed** 9:16 42:22 88:17

**period** 11:16 40:19 46:25 47:12,19

**periodic** 83:11

**person** 83:4 85:9

**personal** 17:2

**personally** 6:23 16:22 30:21 31:2 50:23

**perspective** 8:17 17:6 26:16 28:18 29:14

**pertains** 41:7

**phase** 11:6,10,11,14 13:13,15 49:18

**phases** 12:18

**phrase** 11:5 41:16

**piece** 46:4

**place** 79:17

**planning** 10:7,11 11:9,10,12,18,23 12:4,18

**plural** 37:13

**point** 50:9 76:25 79:9 87:25

**points** 13:3

**portion** 30:9 32:10 35:18 39:3,6 52:15 54:5 64:3,4 67:11,12

**portions** 18:20

**possibility** 93:3

**potential** 26:5 80:7, 11 81:12,24 85:5 92:4,9

**potentially** 74:14 81:19 84:12 86:3 88:24 91:3,18

**practice** 9:19 21:17

**practices** 9:21

**preparation** 31:8 43:7 45:18 46:2,3 47:10,14,24

**prepare** 13:19 14:10 42:25 43:5 47:15

**prepared** 33:6 35:13 41:13,18,22,24,25 55:25 56:3,17,21

**prepares** 20:5

**presented** 9:18

**pretty** 10:6 82:11

**previous** 87:23

**Previously** 14:4

**Price** 13:11

**Pricewaterhouse opers** 5:15,17,20,23 6:7 13:18 14:8,17

**Pricewaterhouse opers'** 6:19 8:16

**primary** 12:17,20 13:3

**principal** 39:9 61:10 63:3 64:3 67:5,12 74:21 75:11,22 76:6

**principle** 29:21

**prior** 6:7 14:23 22:4,5 37:3,5 51:8,10 71:5, 11,17,23 72:8,14,19, 24 73:11,17,22 74:4

**private** 88:13,14

**probability** 80:11 81:6 92:2,4

**problem** 77:4,6

**procedure** 42:21

**procedures** 9:15 10:10 11:12 50:7 86:17

**process** 9:25 10:4,6, 14,23 31:7 47:23 49:12,16 50:15,22 56:10,12 58:6 59:25 86:6

**produce** 44:3

**produced** 18:3

**professional** 9:5 50:10 81:23

**promissory** 23:13, 15 39:7 40:13 63:4,6, 8,12,13,17 67:22 68:11 69:3,18,21,25 70:6 81:15 93:4,10

**promulgated** 87:21

**properly** 27:22

**provide** 8:18 9:8 14:9,21 15:9 16:13 23:5 51:24 57:24 59:7

**provided** 16:24 19:14 40:9 45:2 52:12 54:19 59:10 65:24 79:14

**providers** 89:22

**proxy** 38:10,24

**public** 58:14,15,19, 22 86:15,16 88:13

**pull** 48:10

**purpose** 8:17 9:8 17:7 36:7 42:16,18 44:12,14 59:5 62:8, 11 65:2,19,25 80:20

**purposes** 12:17 13:11 23:18

**put** 17:21 18:15,22 25:14 30:4 41:5

**Pwc** 6:13 9:25 10:23 12:5,9 14:10,13,21 15:13,15,19,20 16:12,18,24 17:14,17 19:14 20:5 21:17,23 23:4 25:20 26:2,9,24 27:7,9,25 29:3,23

33:16 37:2,4 39:18 40:23 42:4,25 43:5, 19 44:6,20,25 46:8, 11 47:12 49:11 53:15 54:2 55:4 56:12 57:5 58:6,15 59:10,11,15, 22 61:18,25 64:12, 18,25 65:18 66:4 68:2,4 69:24 70:14, 22 71:5,11,17,23 72:8,14,19,24 73:10, 16,21 74:3,9,11,19, 22 75:9,12,20,24 76:4,9 77:15 78:6,7 79:15 80:2,6 81:17 82:15 83:17 84:4,9, 21 85:3,25 86:7,23 87:10,19 90:10,25 91:16,19 92:9,19 93:2,7

**PWC's** 12:10 17:6 22:25 24:9 26:15 28:17 29:13 30:21 31:2 37:5 41:6 47:18 54:21 55:21 56:17,21 65:24 88:21

**Q**

**qualitative** 57:19

**question** 7:24 8:11 16:11 18:23 30:11,25 33:17 35:23 44:18 45:20,22 47:17 60:8 62:6,13 69:15 70:23 74:16 76:19 78:9,23 79:11,20 80:19 81:8, 22 83:2 84:25 85:22 87:13,24 90:7,14 91:2,6,13

**questions** 7:21 15:20 16:12 18:17 24:2 56:25 72:5 73:7 75:20 76:15 77:10, 12,14 78:4,5,12 79:4 82:7,9,12 84:7,9 90:23 92:14 93:14

**quickly** 55:12

**quote** 34:7,9 37:13 89:14

**R**

**raise** 14:5

**rate** 65:13,14

**reach** 62:2

**read** 27:13 29:11 63:15

**reader** 34:13 80:21

**reading** 34:13

**reason** 33:16 39:18 54:4

**reasonable** 8:18 9:9 15:21 16:14 22:19 32:16 38:10,14,24 50:5 57:20 59:7 65:7, 10,13

**reasonableness** 61:19,20

**reasons** 75:16

**recall** 6:25 12:15,20 23:3 31:6 47:22 48:10 65:9 66:8,24 83:22

**receivable** 37:15,16 44:15 53:24 68:23

**receivables** 23:20, 21 32:13

**receive** 16:18

**recollection** 18:22

**record** 5:9 18:5 33:11 43:23 77:3

**recorded** 26:22 38:8 60:15 62:17

**recoverability** 32:17 57:16

**recoverable** 59:8 60:10,19

**refer** 7:10

**reference** 20:10 34:6

**referenced** 46:16

**referred** 70:10

**referring** 8:21 79:6

**reflect** 46:8,10

**reflected** 62:9

**refresh** 18:22

**related** 27:21 28:7, 20,24 34:19,23 51:25 57:12,25 64:20 65:12 84:2

**related-party** 35:2 51:19 89:7,12,13,16 90:2,4,12

**relates** 31:19 45:24 51:19 55:22 58:9

**relating** 83:25

**relationships** 35:2

**relevance** 87:15

**relevant** 10:9 15:21 45:17 46:13 78:3 87:9,17,19

**reliability** 62:3

**relied** 17:18 86:17

**relies** 86:14

**relieved** 67:21 68:9

**rely** 14:9 23:4 26:9 27:5,7,9 28:10 29:3, 23 59:15

**relying** 86:8,24 87:7, 9

**remember** 77:16,19 78:6,9 84:8,13 89:8

**remind** 30:8

**rep** 19:25

**repay** 44:19 57:23 58:17,23 59:12,23 60:8

**repeating** 30:24 62:6

**rephrase** 16:11

**report** 42:10 48:18 49:5,9 56:7 86:13

**reported** 27:22

**reporter** 8:5

**reports** 14:22,24 42:12

**represent** 22:22

**representation** 16:18,23 17:4,7,13, 18,24 19:13 20:5,14 22:16 24:3,6,22 25:8, 10,12,21 26:3,10,14, 25 27:9,12,19 28:2, 14,18,22 29:4,20,24 48:9,18 49:4

**representations** 17:10 20:20 21:2,13, 18,24 22:9 24:2,17 48:25

**represented** 24:10, 11 25:22 27:20 28:23 60:18

**representing** 26:19 27:7

**request** 14:5 18:19 26:2 27:25

**requests** 10:18 11:8 12:5 14:18

**require** 21:17,23 26:7 48:15,17 54:14 75:7

**required** 17:14 29:17,20 34:15 48:24 49:6 50:3 52:3 54:24 74:11,23 75:13,24 76:9 77:15,21 78:8 79:2,5,16

**requirement** 34:24

**requirements** 89:3

**requires** 40:7 49:7

**reserve** 77:7

**respect** 46:6 65:22 72:6 75:17 81:15 82:24 92:9

**response** 12:8 79:4

**responsibilities** 17:3

**responsibility** 15:9 71:3 81:24 91:10

**responsible** 19:21 42:13

**rest** 30:15 46:4

**restate** 47:16

**resulted** 78:22

**results** 45:7 60:14,23

**retain** 41:12

**review** 12:10 14:22 15:16 17:3 18:13,21 85:7,11 87:17

**reviewed** 46:3

**reviewing** 86:8,11 87:8

**rights** 77:7

**risk** 44:9,13 57:2,12

**road** 91:17

**room** 18:11

**routine** 83:8,10

**rules** 7:19 9:2,4 70:21 86:20 89:4

---

**S**

**save** 11:16

**scope** 17:11 50:8 86:18

**screen** 17:21 18:16 30:16 31:13 41:6

**scroll** 20:18,24 34:3 35:4 37:19 39:23 45:11 63:12 67:8

**section** 34:19 35:14 36:2,13 37:7 38:2 39:24 40:3,12 51:23 52:8,19 54:12,18 57:2 58:24

**secure** 13:24 14:5,6

**send** 11:8,9

**senior** 42:7,8

**sense** 10:18 19:22 22:23 86:19

**sentence** 21:10 24:22 29:7,14,24 37:12,22 38:5,6,23

**separate** 21:2

**September** 11:22

**series** 20:20

**service** 89:22

**set** 9:2 35:14 43:19 44:4,22 46:19 49:5 52:19 53:16 54:17 59:13,15 73:7

**sets** 36:13 86:19

**setting** 11:12

**share** 10:12,15

**sheet** 20:10,14 24:13 29:16 32:11,21 33:13,22 36:9,19 40:7,18 42:20 51:3 53:2 61:11 75:5,8

**sheets** 32:3 33:4,19

**show** 60:12 63:2

**shows** 33:22 60:7 63:23

**side** 77:2

**sign** 9:6 19:25

**sign-off** 17:14,19 49:13 59:5 85:12

**signature** 29:7 50:25

**signatures** 19:5,8

**signed** 14:25 19:18 29:4,25

**significant** 40:6 89:20

**signing** 26:10 27:10 37:5

**single** 10:16

**singular** 37:13

**sir** 30:19 37:24 43:11 69:15 76:15 92:17

**sister** 67:18 68:7

**site** 13:24,25 14:5,7, 13

**slide** 44:22

**slightly** 11:20

**sort** 9:4 12:21 13:6 26:4 58:21 77:5 81:17 90:24,25 91:19

**South** 6:15

**specific** 7:8 28:7 66:9,24 80:15 85:23 87:5

**specifically** 28:6 41:17 58:12 59:4 83:25

**speed** 82:8

**spell** 56:5

**spend** 11:16

**stage** 10:11 11:2,18 12:4

**stand-alone** 34:14

**standard** 20:7 21:16

**standards** 8:20,21, 23,25 9:5,11,17,20 10:9 15:24 16:6 22:3 26:7 27:2 48:23 86:16 87:22 88:18,19 89:2

**start** 10:25 77:11

**started** 7:18

**starting** 19:20 38:3

**starts** 10:6

**state** 5:8

**stated** 25:2 53:21

**statement** 45:16 87:9,17

**statements** 7:6 9:10 10:3 13:20 14:11 15:2,5,7,12,17,22 16:15 26:6,23 27:23 30:4,19,23 31:4,9 34:9,25 37:6 39:4 41:19 44:4 46:23,24 47:11,19 53:20 56:22 61:15 62:17 75:6 80:22 81:2 86:9,25 88:25

**stating** 38:23

**status** 83:11

**stems** 60:8

**step** 12:13

**steps** 58:6

**stop** 20:19 76:19,25

**straight** 35:4

**stream** 89:17

**strike** 36:8

**strongly** 18:18

**structure** 89:19

**stuff** 69:10 77:2

**subheading** 35:7

**subject** 51:8,9 84:22

**subparts** 21:4

**subsequent** 39:24 40:23 48:24 54:14,23 55:5 67:23 68:12 72:2 73:3 74:7 76:9 77:25 80:20

**summary** 25:15 43:25

**supposed** 10:10 11:13 38:7 40:5

**sworn** 5:4

**T**

**tab** 43:9,13,20 44:9 45:7,14 57:3,11 62:14,23 64:6 68:16, 21 70:10,16

**tabs** 45:17 46:13,15, 18

**taking** 8:5

**talked** 89:7 90:24

**talking** 41:17 69:10 77:22 78:16 82:2

**tax** 64:7,8,9,10,14,20 66:6

**taxes** 66:12

**team** 13:11 56:8

**technology** 18:25

**template** 20:8 45:8 60:23

**term** 38:19 90:5

**terms** 8:19 9:16,18 17:11 25:19 36:11

50:5 87:20

**test** 61:18 62:20

**testified** 5:4 57:4 84:19

**testify** 80:16

**testifying** 84:13

**testimony** 79:15

**testing** 61:5,25 62:8 65:16

**things** 28:24 49:25 77:14 82:8 86:7

**third-party** 87:6

**thought** 15:20

**ties** 45:16

**time** 6:7 7:6,20 8:7 11:7,17 12:15 13:24 14:23 30:8 37:3,5 39:17 55:13 56:25 70:7 76:19 77:5,9 79:9 93:17

**time-to-time** 23:11

**title** 5:16 32:13 42:6

**today** 77:6,8 79:15 80:16

**told** 66:4 77:5

**top** 19:12 21:7 25:9 31:12 45:11

**topics** 89:6

**total** 61:9

**totaling** 63:4

**track** 47:5

**transaction** 11:15 88:15 89:12 90:12

**transactions** 24:12 26:20 27:5,6,21 28:8, 25 34:19,23 35:2 51:19,24 89:7

**trial** 43:21,24 44:5 61:14

**two-page** 14:25

**type** 43:2 75:6

**typical** 14:17

**typically** 13:10 20:5 77:24

**U**

**unable** 59:23

**unaffiliated** 90:8

**uncorrected** 25:15 50:2

**understand** 8:4,11, 12 10:13 19:7,12 20:22 25:20 32:24 41:20 77:3

**understanding** 24:9 25:10 34:22 36:12 38:4 45:23 64:11 65:24 66:10 70:20 80:11

**understood** 78:23

**undertaken** 62:9

**undertaking** 46:8

**undertook** 9:25 58:7

**undue** 50:8

**unit** 6:19 11:3

**unqualified** 50:13, 20

**upload** 14:2,6

**upstream** 89:19

**users** 88:11

**V**

**vague** 69:9

**valuation** 79:23 91:23

**verbatim** 89:14

**versus** 90:12

**view** 26:8 87:25

**visits** 14:13,16

**W**

**WANDER** 9:12 16:2, 7 24:14 30:12 32:24

36:5 45:25 60:5 68:18 88:12 93:21

**Waterhouse** 13:4,11 19:9,15,17,20 21:3, 11 23:5 24:10,18 25:22 27:20 28:23 70:21 72:6,8,14,19, 24 83:7,16

**Wilson** 83:4,15

**withdrawn** 27:8 32:7 35:12 37:3 39:4,14, 16 46:9 53:6 55:2 56:11 61:2,8 68:3

**word** 8:5 13:6

**words** 26:18 38:20 46:14 50:4,7 86:15

**work** 11:15 42:14 44:7 60:14 77:2 78:22 81:24 82:24 85:14 87:19 88:21

**worked** 82:14 84:4

**working** 6:24

**workpaper** 41:11 43:6

**workpapers** 10:15 41:2,6 42:25 55:8,21 56:14 58:25 59:19 68:17,22

**written** 69:2,20,24 70:6

**wrong** 25:23 53:17

**Y**

**year** 10:23 11:20,24 16:24 20:15 21:9,19 41:19 43:16 51:10 52:21 82:10

**year-end** 22:4

**years** 6:20 13:23 51:8 82:9 85:19

# EXHIBIT 99

Page 1

1        IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION

3
     In re:                    :
4                              : Chapter 11
                               : Case No.
5    HIGHLAND CAPITAL MANAGEMENT, : 19-34054-sgj11
     L.P.                      :
6              Debtor.      :
     ----------------------------
7                              :
     HIGHLAND CAPITAL MANAGEMENT, :
8     L.P.                      :
                               :
9              Plaintiff,   :
                               :
10        vs.            : Adversary
                           : Proceeding No.
11   NEXPOINT ADVISORS, L.P.,    : 21-03005-sgj
     JAMES DONDERO, NANCY DONDERO,:
12    AND THE DUGABOY INVESTMENT   :
     TRUST,                    :
13                             :
               Defendants.   :
14   ----------------------------

15

16

17

18      REMOTE VIDEO DEPOSITION OF JAMES DONDERO

19                 VOLUME III

20          Thursday, November 4, 2021

21

22

23

24

25   JOB NO. 202288

Page 2

1
2
3
4          November 4, 2021
5          1:17 p.m. CDT
6
7
8          Remote video deposition of JAMES
9    DONDERO taken in the above-entitled matter
10   before Suzanne J. Stotz, a Certified Shorthand
11   Reporter, Certified Realtime Reporter,
12   Registered Professional Reporter, and Notary
13   Public of the State of Texas, on Thursday,
14   November 4, 2021, commencing at 1:17 p.m. CDT.
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    A P P E A R A N C E S:
2
3    Attorneys for Highland Capital Management L.P.:
4       (Via videoconference)
        PACHULSKI STANG ZIEHL & JONES
5          780 Third Avenue
6          New York, New York 10017
7    BY:  JOHN MORRIS, ESQ.
8          HAYLEY WINOGRAD, ESQ.
9
10   Attorneys for NexPoint Advisors, L.P.:
11      (Via videoconference)
        MUNSCH HARDT KOPF & HARR
12         500 North Akard Street
           Dallas, Texas 75201
13
14   BY:  THOMAS BERGHMAN, ESQ.
15
16   Attorneys for James Dondero, Nancy Dondero,
     HCRE HCMS:
17
        (Via videoconference)
18      STINSON
           3102 Oak Lawn Avenue
19         Dallas, Texas 75219
20   BY:  DEBORAH DEITSCH-PEREZ, ESQ
21   BY:  MICHAEL AIGEN, ESQ.
22
23
24
25

Page 4

1    A P P E A R A N C E S (Continued):
2
3    Attorneys for Nancy Dondero:
4       (Via videoconference)
        GREENBERG TRAURIG
5          220 Ross Avenue
           Dallas, Texas 75201
6
7    BY:  DANIEL ELMS, ESQ.
8
9    Attorneys for The Dugaboy Investment Trust:
10      (Via videoconference)
        HELLER, DRAPER, HAYDEN, PATRICK & HORN
11         650 Poydras Street
           New Orleans, Louisiana 70130
12
13
        BY:  DOUGLAS DRAPER, ESQ.
14         MICHAEL LANDIS, ESQ.
15
16   Attorneys for The Litigation Trust:
17      (Via videoconference)
        QUINN EMANUEL URQUHART & SULLIVAN
18         51 Madison Avenue
           New York, New York 10010
19
20
        BY:  ROBERT LOIGMAN, ESQ.
21         DEBORAH NEWMAN, ESQ.
22
23
24
25

Page 5

1    A P P E A R A N C E S (Continued):
2
3    ALSO PRESENT:
4       (Via Videoconference)
        JACOB ARVOLD, Videographer
5
        (Via Videoconference)
6       LA ASIA CANTY, Legal Assistant
        c/o Pachulski Stang Ziehl & Jones
7
        (Via Videoconference)
8       AARON LAWRENCE, Law Clerk
        c/o Quinn Emanuel Urquhart & Sullivan
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1        I N D E X
2
3   EXAMINATION              Page No.
4   JAMES DONDERO
5     BY MR. MORRIS              10
6
7
8        E X H I B I T S
9
10  Exhibit
    Name      Description      Page No.
11
    Exhibit   James Dondero Compensation   56
12  68        and Benefits Statement,
              Bates stamped D-CNL003585
13
    Exhibit   James Dondero Compensation   59
14  50        and Benefits Statement,
              Bates stamped D-CNL003587
15
    Exhibit   E-mail correspondence, Bates   95
16  53        stamped D-CNL003768 through
              D-CNL003770
17
    Exhibit   E-mail correspondence, Bates   107
18  54        stamped D-CNL003777 through
              D-CNL003779
19
    Exhibit   E-mail correspondence, Bates   116
20  56        stamped D-CNL003763
21  Exhibit   Promissory Note, Bates   119
    57        stamped D-CNL003764 through
22            D-CNL003765
23
24
25

Page 7

1        I N D E X (Continued)
2
3      E X H I B I T S (Continued)
4
5   Exhibit
    Name      Description      Page No.
6
    Exhibit   Highland Capital Management,   123
7   34        L.P., Consolidated Financial
              Statements and Supplemental
8             Information, dated December
              31, 2018, Bates stamped
9             D-CNL000212 through
              D-CNL000257
10
    Exhibit   Memorandum, dated      130
11  59        October 23, 2020, Bates
              stamped HCMFAS 000025
12            through HCMFAS 000031
13  Exhibit   Defendant James Dondero's   163
    24        Objections and Responses to
14            Plaintiff's Requests for
              Admission, Interrogatories,
15            and Requests for Production
16  Exhibit   Defendant NexPoint Advisors,   173
    27        L.P.'s Objections and
17            Responses to Plaintiff's
              Requests for Admission,
18            Interrogatories, and
              Requests for Production
19
20
21
22  (Exhibits attached to transcript.)
23
24
25

Page 8

1        JAMES DONDERO
2        THE VIDEOGRAPHER:  Good afternoon.
3   My name is Jacob Arvold.  I'm a certified
4   legal videographer in association with
5   TSG Reporting, Inc.
6        Due to the severity of COVID-19 and
7   following the practice of social
8   distancing, I will not be in the same room
9   with the witness; instead, I will record
10  this video deposition remotely.
11       The reporter, Suzanne Stotz, also
12  will not be in the same room and will swear
13  the witness remotely.
14       Do all parties stipulate to the
15  validity of video recording and remote
16  swearing and that it will be admissible in
17  the courtroom as if it had been taken
18  following Rule 30 of the Federal Rules of
19  Civil Procedures and the state's rules
20  where this case is pending?
21       MR. MORRIS:  Yes.
22       If anybody objects to that, please
23  speak up.
24       Nobody has spoken up.  So everybody
25  is deemed to have accepted that.

Page 9

1        JAMES DONDERO
2        THE VIDEOGRAPHER:  Thank you.
3        This is the start of Media Number 1,
4   Volume II [sic] of the video-recorded
5   deposition of James Dondero in the matter
6   of In Re:  Highland Capital Management,
7   L.P., in the United States Bankruptcy Court
8   for the Northern District of Texas.
9        This deposition is being held
10  remotely on November 4, 2021, at
11  approximately 1:17 p.m.
12       Counsel, please introduce
13  yourselves.
14       MR. MORRIS:  Everybody is – is on
15  here.  I don't – we can't take the time to
16  do that.  I'm familiar with everybody on
17  here.  Everybody's appeared in this action
18  before, and I'd like to proceed.
19       THE VIDEOGRAPHER:  All right.  The
20  appearances will be on the stenographic
21  record.
22       Will the court reporter please
23  reswear the witness.
24       THE COURT REPORTER:  Could you raise
25  your hand.

Page 10

```
1           JAMES DONDERO
2           THE WITNESS:  (Complies with
3    request.)
4        J A M E S   D O N D E R O,
5    having first been duly sworn, was examined and
6    testified as follows:
7           MS. DEITSCH-PEREZ:  I only have one
8    questions.  Who's Robert Loigman?
9           MR. LOIGMAN:  I already stated for
10   the record.  I'm with Quinn Emanuel.  I'm
11   Debbie Newman's partner.
12          MS. DEITSCH-PEREZ:  Okay.  Thank
13   you.
14          MR. MORRIS:  Can we please put up on
15   the screen the document that's been marked
16   Exhibit 31.
17          MS. CANTY:  (Complies with request.)
18              EXAMINATION
19   BY MR. MORRIS:
20       Q.   Mr. Dondero, do you understand that
21   this is a continuation of your deposition from
22   Friday?
23       A.   Yes.
24       Q.   Have you spoken with anybody about
25   your testimony since we concluded the
```

Page 11

```
1           JAMES DONDERO
2    deposition on Friday?
3        A.   No.
4        Q.   Nobody in the world?
5        A.   Just my attorney.
6        Q.   And did you speak with your attorney
7    about the substance of the deposition on
8    Friday?  Just --
9           MS. DEITSCH-PEREZ:  I'm going to
10   direct – I'm going to direct him not to
11   answer.
12   BY MR. MORRIS:
13       Q.   Okay.  I'm just asking you a
14   yes-or-no question.  I'm not asking for the
15   substance of any communications.
16          MS. DEITSCH-PEREZ:  Well, you're --
17   one, I'd have to talk to him to see what he
18   thinks "substance" means.
19          And to the extent that's
20   substantive, you're actually getting at the
21   content potentially of a discussion.  So
22   I'm going to direct him not to answer.
23   BY MR. MORRIS:
24       Q.   Are you going to follow your
25   counsel's advice?
```

Page 12

```
1           JAMES DONDERO
2        A.   Yes.
3        Q.   How much time did you spend speaking
4    with your attorney since the conclusion of the
5    last deposition?
6        A.   30 minutes, 40 minutes.
7        Q.   Are you aware that Alan Johnson
8    testified in this case the other day?
9        A.   I don't know who Alan Johnson is.
10   Uh, no.
11       Q.   Okay.  Is it fair to say that you
12   have no knowledge of Mr. Johnson's testimony?
13       A.   I have no knowledge of Mr. Johnson's
14   testimony.
15       Q.   Are you aware that an expert was
16   examined by me earlier in the week in
17   connection with this case?
18       A.   I'm aware there's an expert.  I'm
19   not – I'm not aware that you've examined,
20   deposed, or whatever you did with him.
21       Q.   Okay.  When did you speak with your
22   counsel for 30 minutes about – following last
23   Friday's examination?
24       A.   About 40 minutes ago.
25       Q.   Okay.
```

Page 13

```
1           JAMES DONDERO
2           MR. MORRIS:  Can we go to
3    paragraph 82 of this document –
4        Q.   – Mr. Dondero, do you see that this
5    is your answer to the Plaintiff's Amended
6    Complaint.
7        A.   Yes.
8        Q.   And we looked at this the other day;
9    do you remember that?
10       A.   Yes.
11          MR. MORRIS:  Can we can go to page--
12   paragraph 82, please.
13          MS. CANTY:  (Complies with request.)
14   BY MR. MORRIS:
15       Q.   And I just want to table set to make
16   sure we're on the same page.
17          Paragraph 82 describes the
18   agreements that you entered into with Dugaboy
19   consuming the forgiveness of certain Promissory
20   Notes subject to conditions subsequent.
21          Is that a fair overarching overview
22   of the nature of the agreements?
23       A.   Yes.
24       Q.   Okay.  And for the rest of the
25   deposition today, when I use the phrase
```

**Appx. 00141**

Page 14

JAMES DONDERO

1  "agreements," I'm going to mean the agreements
2  that are referred to in paragraph 82; is that
3  fair?
4      A.   Yes, generally.  If I have any
5  questions, I'll -- I'll ask.
6      Q.   Thank you very much.
7          The agreements covered each of the
8  notes that are the subject of the lawsuits that
9  Highland commenced against you, HCRE Services,
10 and NexPoint; is that right?
11     A.   The -- yes.
12     Q.   What are you looking at?
13     A.   Just this note sheet that covers all
14 the notes.
15     Q.   Oh.
16         MR. MORRIS:  Deborah, I would demand
17 that that sheet be produced immediately.
18         MS. DEITSCH-PEREZ:  Okay.
19         MR. MORRIS:  Okay.  And I would ask
20 him to put it away.
21         MS. DEITSCH-PEREZ:  No.  He's a
22 30(b)(6) witness.  He's entitled to have a
23 list of the notes.  He sure he is.
24         MR. MORRIS:  I'm telling you now --

Page 15

JAMES DONDERO

1          MS. DEITSCH-PEREZ:  I'm sorry to say
2  to you.
3          MR. MORRIS:  I object.  That is -- I
4  have never in my life seen a witness --
5          MS. DEITSCH-PEREZ:  I have had
6  30(b)(6) witnesses with whole notebooks of
7  information.
8          MR. MORRIS:  Okay.  So let's just
9  make sure the record is clear.
10 BY MR. MORRIS:
11     Q.   Please describe for me what's on
12 that page.
13     A.   It's a listing of the Notes payable
14 to Highland, what their original term and
15 amount was, what the term is, and what the loan
16 date was.
17     Q.   Okay.  I'm going to ask the --
18         MS. DEITSCH-PEREZ:  No.  I'm going
19 to take a picture, and I'm going to send it
20 to you, okay?
21         MR. MORRIS:  Okay.  And what we're
22 going to do right now is ask him to put it
23 away, and I'm going to ask him questions
24 solely in his capacity as an individual,

Page 16

JAMES DONDERO

1  okay?
2      Please put it away.
3          THE WITNESS:  Isn't that what this
4  deposition is, right?  This deposition --
5          MS. DEITSCH-PEREZ:  Well, this
6  deposition is both.
7          We're going to take a break for a
8  second.  Let me think about that, but
9  I'll --
10         MR. MORRIS:  I object.  I really
11 object.  I really object.  I'm glad that
12 this is all on the record.  I object.
13         My request is that he put it away
14 and answer questions in his capacity as an
15 individual.
16         I don't know why we need to take a
17 break.
18         MS. DEITSCH-PEREZ:  Well, because
19 I'm going to go take a picture of it and
20 send it to you.
21         MR. MORRIS:  I don't want you to do
22 that, though.
23         MS. DEITSCH-PEREZ:  Why don't you
24 want -- okay.

Page 17

JAMES DONDERO

1          MR. MORRIS:  We can do that -- we
2  can do that when I ask him questions as a
3  30(b)(6) witness.
4          By the way, it's still
5  inappropriate, but --
6          MS. DEITSCH-PEREZ:  No, it's not
7  John.
8          MR. MORRIS:  Okay.
9          MS. DEITSCH-PEREZ:  It's just not.
10 You can say it as much as you want.  It
11 doesn't make it inappropriate.
12         And I am going to -- I want to think
13 for a minute about whether or not your
14 request to have him not have it in front of
15 him in his individual capacity is
16 appropriate.  And I'm not going to make a
17 snap decision.  I'm going to talk to my
18 colleagues, and we'll be back on the record
19 in a couple of minutes.
20         MR. MORRIS:  I object, but I can't
21 stop you.
22         MS. DEITSCH-PEREZ:  Okay.
23         THE VIDEOGRAPHER:  Would you like to
24 go off the video record, Counsel?

Page 18

1       JAMES DONDERO
2     MR. MORRIS: No, no, not at all.
3     THE VIDEOGRAPHER: Okay.
4     MR. MORRIS: And just keep the --
5 keep the record going.
6     THE VIDEOGRAPHER: Yep, will do.
7     MR. MORRIS: And we're not off the
8 record?
9     THE VIDEOGRAPHER: Correct.
10     THE COURT REPORTER: Correct.
11     MS. DEITSCH-PEREZ: Okay. We're
12 back on the record.
13     THE VIDEOGRAPHER: We remained on
14 the record.
15     MS. DEITSCH-PEREZ: Okay. And this
16 part -- this -- at this point Mr. Morris
17 only taking Mr. Dondero's deposition in his
18 personal capacity, not as a 30(b)(6)
19 witness.
20     If you want to resume taking his
21 deposition as a 30(b)(6) witness, let me
22 know; and I will tell him to get his list
23 of notes.
24     MR. MORRIS: So he doesn't have it
25 in front of him right now?

Page 19

1       JAMES DONDERO
2     THE WITNESS: Correct.
3     MS. DEITSCH-PEREZ: Correct, he does
4 not.
5     MR. MORRIS: Okay. I'm going to
6 proceed; and I would ask, Deborah, that
7 somebody from your office send that to me
8 as soon as possible. I'm sure it's on an
9 e-mail somewhere and all they have to do is
10 hit send.
11 BY MR. MORRIS:
12    Q. Mr. Dondero, let's continue.
13     So you don't have that document in
14 front of you right now?
15    A. Correct.
16    Q. Okay. How many agreements did you
17 enter into with Dugaboy?
18     MS. DEITSCH-PEREZ: You mean with
19 the Dugaboy trustee?
20     We had an agreement that you were
21 going to refer to these as the agreements
22 with the Dugaboy trustee. So let's stay
23 consistent.
24 BY MR. MORRIS:
25    Q. Mr. Dondero, how many agreements did

Page 20

1       JAMES DONDERO
2 you enter into with Dugaboy trustee concerning
3 Promissory Notes?
4    A. Is your question -- is your
5 questions how many Notes were entered into?
6    Q. No. How many separate agreements
7 did you enter into?
8    A. The 2017, '18, and '19 agreements.
9    Q. Okay. I didn't ask you what
10 agreements. I asked how many agreements you
11 entered into with the Dugaboy trustee.
12     MS. DEITSCH-PEREZ: Asked and
13 answered.
14     THE WITNESS: Three major ones.
15 BY MR. MORRIS:
16    Q. Are there any minor ones?
17    A. Not that I can recall right now.
18    Q. Okay. When did you enter into your
19 first major agreement with the Dugaboy trustee?
20    A. At the end of '17.
21    Q. Meaning December 2017 or early 2018?
22    A. Yes.
23    Q. What Promissory Notes are the
24 subject of the first major agreement that you
25 entered into with the Dugaboy trust-- with

Page 21

1       JAMES DONDERO
2 the Dugaboy trustee?
3    A. I don't remember which ones
4 specifically. I remember the amount was more
5 substantial than subsequent years.
6    Q. Do you know how many Promissory
7 Notes were the subject of your first major
8 agreement with the Dugaboy trustee?
9    A. No.
10    Q. Can you identify the maker of any
11 Note that's subject to the first major
12 agreement with the Dugaboy trustee?
13    A. Not without my list or details.
14    Q. Can you identify the principal
15 amount of any Promissory Note that was subject
16 to the first agreement that you entered into
17 with the Dugaboy trustee?
18    A. I know they were -- I know the gross
19 amount. I know they were some of the term
20 loans, but I don't know the specifics.
21    Q. Can you tell me the aggregate
22 amount -- withdrawn.
23     Can you tell me the aggregate
24 principal amount of the Notes that are the
25 subject of your first agreement with the

Page 22

JAMES DONDERO

1          JAMES DONDERO
2  Dugaboy trustee?
3      A.   I – I believe it was 30 – 30 some
4  odd million, 30 – I can't remember the
5  principal and interest, but it's only 30 – 34,
6  35, 36.  It was in that range.
7      Q.   Did your first agreement with the –
8  withdrawn.
9          Can you identify the date of any of
10  the Promissory Notes that are the subject of
11  your first agreement with the Dugaboy trustee?
12      A.   No.
13      Q.   Can you tell me the year that any of
14  the Promissory Notes that are the subject of
15  the – withdrawn.
16          Can you tell me the year that any of
17  the Promissory Notes were entered into that are
18  the subject of your first agreement with the
19  Dugaboy trustee?
20          MS. DEITSCH-PEREZ:  Asked and
21      answered.
22          THE WITNESS:  No, not off the top of
23      my head.
24  BY MR. MORRIS:
25      Q.   When did you – did – when did you

Page 23

JAMES DONDERO

1  enter into the second agreement with the
2  Dugaboy trustee?
3      A.   I – I believe it was 30 – 30 some
4          Was that in December of 2018 or
5  early 2019?
6      A.   Yes.
7      Q.   How many Notes are subject to your
8  second agreement with the Dugaboy trustee?
9      A.   Less than the first, but I don't
10  know how many.
11      Q.   You don't know the number of Notes
12  that are the subject of your second agreement
13  with the Dugaboy trustee; is that right?
14      A.   Correct.
15      Q.   Can you identify the maker of any
16  Notes that are the subject of your second
17  agreement with the Dugaboy trustee?
18      A.   No, I – I – no, I don't remember.
19      Q.   Okay.  So as you sit here right now,
20  you can't identify the maker of any of the
21  Notes that are the subject of the second
22  agreement with the Dugaboy trustee; is that
23  right?
24      A.   Well, it would be one of the three
25  parties or four parties here, me or NexPoint or

Page 24

JAMES DONDERO

1  whatever; but I don't remember –
2      Q.   Okay.
3      A.   – off the top of my head.
4      Q.   Off the top of your head, can you
5  tell me the original principal amount of any
6  Note that's subject to your second agreement
7  with the Dugaboy trustee?
8      A.   No.  I just – no.
9      Q.   Can you identify the date on which
10  any of the Promissory Notes were executed that
11  were the subject of your second agreement with
12  the Dugaboy trustee?
13      A.   No.
14      Q.   Can you tell me the aggregate
15  principal amount of the Notes that are the
16  subject of your second agreement with the
17  Dugaboy trustee?
18      A.   Yes.  A fraction of the prior year.
19  Less than ten million.
20      Q.   Can you be anymore precise than
21  that?
22      A.   Approximately ten million, I think.
23  Just under.
24      Q.   Okay.  Did you enter into your third

Page 25

JAMES DONDERO

1  agreement with the Dugaboy trustee in December
2  2019 or early 2020?
3      A.   Yes.
4      Q.   That's after the petition date; do I
5  have that right?
6      A.   I – yes.
7      Q.   Did you do it before or after
8  January 9, 2020?
9      A.   Before, I believe.
10      Q.   So while you were still in control
11  of Highland but after the petition date, you
12  entered into your third agreement with the
13  Dugaboy trustee concerning Promissory Notes.
14          Do I have that right?
15      A.   Yes.
16      Q.   Did you ever inform the bankruptcy
17  court of this agreement?
18      A.   No.
19      Q.   Did you ever inform the independent
20  directors of this agreement that you entered
21  into after the petition date?
22      A.   No.
23      Q.   Can you tell me which notes are the
24  subject of your third agreement with the

**Appx. 00144**

Page 26

```
1           JAMES DONDERO
2  Dugaboy trustee?
3      A.  No.
4      Q.  Can you identify the maker on any
5  Note that's the subject of your agreement that
6  you entered into after the petition date with
7  the Dugaboy trustee?
8      A.  Not off the top of my head.
9          MS. DEITSCH-PEREZ:  I mean, John, if
10  you would let him look at his list, he
11  could tell you.
12         But if you insist on making this a
13  memory test of 18 or so different things or
14  however many there are, 13, 14, then this
15  is – it's your deposition.  But if you
16  want more specific details, he could look
17  at the list.
18         MR. MORRIS:  Okay.  That's not even
19  an objection let alone a speaking
20  objection.
21         It is my deposition –
22         MS. DEITSCH-PEREZ:  No.
23         MR. MORRIS:  It is my deposition,
24  and I would appreciate your not making
25  gratuitous comments.
```

Page 27

```
1           JAMES DONDERO
2  BY MR. MORRIS:
3      Q.  Mr. Dondero, can you tell me the
4  aggregate value of the Notes that are the
5  subject of the third agreement that you entered
6  into with the Dugaboy trustee after the
7  petition date?
8      A.  I believe it was about a million
9  bucks.
10     Q.  And who were the makers of the Notes
11  that are the subject of the agreement with the
12  Dugaboy trustee that you entered into after the
13  petition date?
14     A.  I don't know.
15     Q.  Without the sheet that you looked at
16  earlier, you have no ability to tell me which
17  notes were the subject of which agreement that
18  you entered into with the Dugaboy trustee,
19  correct?
20         MS. DEITSCH-PEREZ:  Object to the
21  form.
22         THE WITNESS:  If I'm not certain off
23  the top of my head I can remember
24  accurately, I don't want to speculate.
25
```

Page 28

```
1           JAMES DONDERO
2  BY MR. MORRIS:
3      Q.  All right.  I don't want you to
4  speculate either.  So I'm going to ask you just
5  broad follow-up questions.
6         Can you identify any Promissory Note
7  that is the subject of any specific agreement
8  that you ever entered into with the Dugaboy
9  trustee without looking at the list?
10         MS. DEITSCH-PEREZ:  Object to the
11  form.  He's already done that to some
12  degree.
13         THE WITNESS:  I believe it covered
14  virtually all of them.  So I don't remember
15  which ones specifically in each year.
16         Generally, it was, I believe, the
17  ones incurred in that year; but I don't
18  remember which entities.  But again, the
19  ultimate result being that the term loans,
20  the demand notes, the things incurred, the
21  things outstanding were part of the
22  agreement.
23  BY MR. MORRIS:
24     Q.  Sir, you never wrote down a list of
25  the notes that are the subject of the
```

Page 29

```
1           JAMES DONDERO
2  agreements, correct?
3      A.  Correct.
4      Q.  You never asked anybody to make a
5  list of the notes that were the subject of each
6  of the agreements, correct?
7      A.  Correct.
8      Q.  You're not aware of any document
9  that was created prior to the commencement of
10  these lawsuits that identifies the Notes that
11  are the subject of the agreements, correct?
12     A.  Correct.
13     Q.  Other than the Promissory Notes that
14  are the subject of this lawsuit – withdrawn.
15         Other than the Promissory Notes that
16  are the subject of these lawsuits, are you
17  aware of any other doc- -- Promissory Notes
18  that are the subject of an agreement with the
19  Dugaboy trustee?
20     A.  I believe there are from time to
21  time, yes.  But I -- I don't know off the top
22  of my head.
23     Q.  Can you identify the maker of any
24  Promissory Note that is the subject of any
25  agreement with the Dugaboy trustee other than
```

Page 30

JAMES DONDERO

1
2  the Promissory Notes that are the subject of
3  the pending lawsuits?
4      A.   Not specifically, but I believe
5  there are.
6      Q.   Okay.  Can you identify the
7  principal amount of any Promissory Note that is
8  the subject of an agreement with the Dugaboy
9  trustee that is not part of the pending
10  lawsuits?
11      A.   Not specifically.
12      Q.   Can you tell me the year in which
13  any Promissory Note was ever executed that is
14  the subject of any agreement with the Dugaboy
15  trustee other than the Promissory Notes that
16  are the subject of the pending lawsuits?
17      A.   I believe there were several, and I
18  believe there were numerous ones over the
19  years.
20      Q.   Okay.  And – and are those
21  Promissory Notes subject to one of the three
22  agreements that we've identified or subject to
23  some other agreement with the Dugaboy trustee?
24      A.   Well, they weren't to these related
25  entities.  I – I don't know what the

Page 31

JAMES DONDERO

1
2  agreements were specifically subject to.
3      Q.   Are you the person who entered into
4  the agreement with the Dugaboy trustee
5  concerning the notes that you are describing
6  right now?
7      A.   Yes, I guess.
8      Q.   As the person who entered into the
9  agreement with the Dugaboy trustee concerning
10  Notes that are not the subject of the pending
11  litigation, can you identify anything about
12  those Notes, whether it's the maker, the date,
13  the principal amount, anything at all?
14      A.   Not off the top of my head.
15      Q.   Okay.  What would – what would you
16  have to look at to know?  The chart or
17  something else?
18      A.   No, not this – not this chart.
19  This only has to do with what we thought this
20  deposition was going to be about.
21          It would be the financials of
22  Dugaboy; and then from there, the detail
23  regarding any Notes that it has.
24      Q.   Did you enter into an agreement with
25  the Dugaboy trustee to forgive a Promissory

Page 32

JAMES DONDERO

1
2  Note where Dugaboy is the maker and Highland is
3  the payee?
4      A.   Dugaboy – can you repeat that
5  question one more time?
6      Q.   Sure.  Did you enter into an
7  agreement with the Dugaboy trustee relating to
8  any Promissory Note where Dugaboy is the maker?
9      A.   No, I don't believe so.
10      Q.   Okay.  So you don't have any
11  recollection of ever entering into an agreement
12  with the Dugaboy trustee concerning the
13  potential forgiveness of any Note that was made
14  by Dugaboy, correct?
15      A.   I – I do not believe so.
16      Q.   Okay.  And is there a – is there a
17  document that we could look at that would
18  refresh your recollection?
19      A.   Not beyond the financials of Dugaboy
20  and any relevant Note detail.
21      Q.   And would – is it – is it your
22  testimony that an agreement with Dugaboy would
23  be reflected in the Dugaboy financial
24  statements?
25      A.   No, but the Notes would be.

Page 33

JAMES DONDERO

1
2      Q.   Well, the Dugaboy Notes are
3  reflected in Highland's financial statements.
4  Do you want me to get that?
5      A.   No.  I didn't think that was – I
6  didn't think that was the question you were
7  asking me.
8      Q.   I apologize.  Maybe it was my fault.
9          What would we have to look at in
10  order to refresh your recollection as to
11  whether or not you entered into an agreement
12  with the Dugaboy trustee concerning the
13  potential forgiveness of any Note made by
14  Dugaboy?
15      A.   Other than the ones we're talking
16  about today, right?
17      Q.   We're not talking about – there's
18  no Promissory Note where Dugaboy is the maker
19  that is the subject of any of the pending
20  lawsuits, correct?
21      A.   Correct.
22      Q.   So I'm asking you to identify if you
23  can any Promissory Note that is the subject of
24  any agreement you have ever entered into with
25  the Dugaboy trustee that is not the subject of

**Appx. 00146**

Page 34

JAMES DONDERO

1    one of the pending lawsuits.
2        Do you understand that that's what
4    I'm trying to get at?
5        MS. DEITSCH-PEREZ:  Asked and
6    answered.
7        THE WITNESS:  Yes.
8    BY MR. MORRIS:
9    Q.   Okay.  Can you identify any such
10   Promissory Note?
11   A.   No, not specifically as I sit here
12   today.
13   Q.   Okay.  Other than the promissory --
14   withdrawn.
15       Are you familiar with the term
16   "majority interest" as used in the Highland
17   Limited Partnership Agreement?
18   A.   Yes.
19   Q.   Okay.  Other than the Promissory
20   Notes that are the subject of the pending
21   lawsuits, are you aware of any other Promissory
22   Notes that are the subject of any agreement
23   with the majority interest?
24       MS. DEITSCH-PEREZ:  Object to the
25       form.  Asked and answered.

Page 35

JAMES DONDERO

1    THE WITNESS:  The majority interest
2    is controlled by the 75 percent.  It's
4    controlled by Dugaboy.  But the majority
5    interest isn't an entity in and of itself,
6    right?
7    BY MR. MORRIS:
8    Q.   Okay.  Has Dugaboy held the majority
9    interest since the time that Highland was
10   created?
11   A.   No.
12   Q.   Okay.  So -- so then I'm going to
13   ask my question again.
14       Are you aware of any agreement
15   concerning any Promissory Note that is the
16   subject – withdrawn.
17       Are you aware of any agreement with
18   the majority interest that concerns any
19   Promissory Note where Highland is the payee
20   other than the Notes that are the subject of
21   the pending lawsuit?
22       MS. DEITSCH-PEREZ:  Asked and
23   answered.
24       THE WITNESS:  Not specifically as I
25       sit here today, but I do believe there have

Page 36

JAMES DONDERO

1        been numerous notes other than to these
2        entities today where Dugaboy was the maker
3        or recipient or whatever.
4    BY MR. MORRIS:
5    Q.   So you do believe that Dugaboy was
6    the maker of a Promissory Note that's subject
7    to an agreement with the majority interest?
8        MS. DEITSCH-PEREZ:  Object to the
9        form.
10       THE WITNESS:  What I'm saying is I
11       believe Dugaboy had other – made other
12       Notes and received other Notes from other
13       entities other than Highland.
14   BY MR. MORRIS:
15   Q.   Does that have anything to do with
16   Highland?
17       Maybe I wasn't clear.  I'm using the
18   phrase "majority interest" as that phrase -- I
19   thought we had -- I thought we had an
20   understanding -- as that phrase is used in the
21   Highland Limited Partnership Agreement, right?
22   A.   I thought it was a definition term
23   in the Highland, L.P.
24   Q.   It is, and I just -- I'd like to

Page 37

JAMES DONDERO

1    move on if I can, but I just want some clarity
2    here.
3        Is there any agreement between
4    Dugaboy and the majority interest concerning
5    any Promissory Note where Dugaboy is the maker?
6        MS. DEITSCH-PEREZ:  Object to the
7        form.
8        THE WITNESS:  I -- I don't know what
9        you're getting at.  I have a tried to
10       answer it the best I can several different
11       ways.
12       But try it one more time, and I'll
13       try and answer it just specifically yes or
14       no.
15   BY MR. MORRIS:
16   Q.   Okay.  Is Dugaboy the maker on any
17   Promissory Note where Highland is the payee?
18   A.   I don't believe so at this point.
19   Q.   Was Dugaboy ever the maker on a Note
20   where Highland was the payee to the best of
21   your knowledge?
22   A.   I don't -- I just don't know what
23   the actual accounting was or could have or
24   should have been.  But if it prepays a Note,

Appx. 00147

Page 38

JAMES DONDERO

1          JAMES DONDERO
2  instead of prepaying a Note, it could have left
3  it in an existing Note outstanding and then
4  issued a separate Note, right, instead of
5  prepaying, right?
6      So I don't know in the – in the pas
7  past or how exactly they handled prepays
8  consistently over time.  But at the moment, I
9  don't believe there's a loan going from Dugaboy
10  to Highland.
11      But I do believe over the years,
12  there were numerous loans from Dugaboy to other
13  entities other than the ones we're talking
14  about today.
15      MS. DEITSCH-PEREZ:  Okay.  John,
16  we've gone way far afield of the topics for
17  this deposition or anything that you ought
18  to be even asking this individual witness
19  about given what these litigations are.
20  Could we move on, please?
21      MR. MORRIS:  No.  Other than –
22      MS. DEITSCH-PEREZ:  You're spending
23  time on things other than the –
24      MR. MORRIS:  Please stop talking.
25      MS. DEITSCH-PEREZ:  -- action.

Page 39

JAMES DONDERO

1          JAMES DONDERO
2      MR. MORRIS:  Please stop talking.
3  BY MR. MORRIS:
4    Q.  Other than the Promissory Notes that
5  are the subject of the lawsuits, are you aware
6  of any other Promissory Notes that are the
7  subject of any agreement that the Dugaboy
8  trustee ever entered into as a representative
9  of the majority of Class A shareholders?
10      MS. DEITSCH-PEREZ:  Asked and
11  answered.  I think we've answered after the
12  sixth time.
13      THE WITNESS:  Not as I sit here
14  today.
15  BY MR. MORRIS:
16    Q.  In paragraph 82 in about the fifth
17  line down, there's a statement that, quote,
18  "Nancy Dondero is representative for a majority
19  of the Class A holders of plaintiff, agree that
20  plaintiff would forgive the Notes."
21      Do you see that?
22    A.  Yes.
23    Q.  The word "plaintiff" as used in your
24  answer refers to Highland Capital Management,
25  L.P., correct?

Page 40

JAMES DONDERO

1          JAMES DONDERO
2    A.  I – no – or wait.  Hold on a
3  second.
4      Yes.  I guess, yes.
5    Q.  Okay.  At the time you entered into
6  the agreements, did you understand that
7  Dugaboy, as a majority – as a representative
8  of a majority of the Class A shareholders of
9  the plaintiff was the entity that entered into
10  the agreement on behalf of Highland?
11    A.  Yes.
12    Q.  And your sister Nancy is the trustee
13  of Dugaboy today, correct?
14    A.  Yes.
15    Q.  And Nancy was the trustee of Dugaboy
16  at the time you entered into each of the
17  agreements, correct?
18    A.  Yes.
19    Q.  And you knew that at the time you
20  entered each of the agreements, correct?
21    A.  Yes.
22    Q.  You knew she was acting on behalf of
23  Dugaboy, correct?
24    A.  Yes.
25    Q.  Your understanding at that time that

Page 41

JAMES DONDERO

1          JAMES DONDERO
2  you entered into each of the agreements with
3  the Dugaboy trustee was that Dugaboy held the
4  majority of Highland's Class A interest,
5  correct?
6    A.  Yes.
7    Q.  And that's exactly why you contacted
8  Nancy to discuss the topics that ultimately led
9  to the agreements, correct?
10    A.  Yes.
11    Q.  You specifically called Nancy
12  because you wanted her to cause Dugaboy to
13  enter into the agreements with you on behalf of
14  Highland, correct?
15    A.  Yes.
16    Q.  And just as you wanted, Nancy, in
17  fact, caused Dugaboy, as a representative of a
18  majority of the Class A shareholders of
19  plaintiff, to enter into each of the
20  agreements, correct?
21    A.  Yes.
22    Q.  Would you agree with me that the
23  Promissory Notes that are the subject of the
24  agreements were the debtor's property?
25    A.  I think I've stated numerous times

Page 42

JAMES DONDERO

1   due to them as that they would ultimately be
2   compensation; but to be a bona fide Note and to
3   have bona fide deferral at the time that they
4   were issued, they were the debtor's property.
5   And I guess they remained such until satisfied
6   or until the condition as present -- the
7   condition subsequent is either triggered or
8   impossible to be triggered.
9       Q.   Okay.  Is it fair to say that the
10  Promissory Notes that are the subject of the
11  agreements were assets of the debtor at the
12  time you entered into the agreements?
13      A.   Yes.
14      Q.   At the time you entered into the
15  agreements, you understood that Dugaboy was
16  exercising control over the debtor's property,
17  correct?
18          MS. DEITSCH-PEREZ:  Object to the
19      form.
20          MR. MORRIS:  Withdrawn.
21  BY MR. MORRIS:
22      Q.   At the time you entered into the
23  agreements, you understood that the Dugaboy
24  trustee was going to exercise control over the

Page 43

JAMES DONDERO

1   debtor's property, correct?
2          MS. DEITSCH-PEREZ:  Object.  Object
3      to the form.
4          THE WITNESS:  Exercise control?  I
5      understood the trustee had the ability to
6      grant the, whatever you want to call them,
7      conditions subsequent.
8   BY MR. MORRIS:
9       Q.   On that --
10      A.   Yes.
11      Q.   And that was -- by entering into the
12  agreement, would you agree with me, that the
13  Dugaboy trustee exercised control over the
14  Promissory Notes?
15          MS. DEITSCH-PEREZ:  Object to the
16      form.
17          THE WITNESS:  They -- The trustee
18      exercised the rights given to it as a
19      majority of Class A holders.
20  BY MR. MORRIS:
21      Q.   Okay.  And is it your understanding
22  that as part of the right, it altered the
23  characteristics of the Promissory Notes?
24          MS. DEITSCH-PEREZ:  Object to the

Page 44

JAMES DONDERO

1          form.
2          THE WITNESS:  I just want to -- I
3      believe my testimony, I granted the
4      conditions subsequent is my interpretation.
5   BY MR. MORRIS:
6       Q.   Right.  And so that's fine.  But
7   that's -- that's the thing that happened, but
8   I'm just asking you what the impact of that
9   was.
10          When the Dugaboy trustee entered
11  into the agreement, the result was that the
12  terms and conditions of the Promissory Note
13  were altered, correct?
14          MS. DEITSCH-PEREZ:  Object to the
15      form.
16          THE WITNESS:  I don't want to -- I
17      want to say I don't know to that next week.
18  BY MR. MORRIS:
19      Q.   You can't -- okay.  You can't tell
20  me if your agreement with the Dugaboy trustee
21  altered the terms and conditions of the
22  Promissory Notes that were subject to the
23  agreement; you can't tell me that?
24          MS. DEITSCH-PEREZ:  Object to the

Page 45

JAMES DONDERO

1          form.
2          THE WITNESS:  Yeah.  I -- again, it
3      sounds like you're trying to take me
4      towards legal terms of changing terms or
5      modification in a Note or whatever; and
6      I -- I'm not -- I don't have an opinion or
7      the expert to comment on that.
8          I can just say I knew she had the
9      ability to create conditions subsequent.
10  BY MR. MORRIS:
11      Q.   Okay.  So let's take, for example,
12  the Notes that you signed.
13          Those were demand notes, right?
14      A.   Yes.
15      Q.   Okay.  And after you entered into
16  the agreement with the Dugaboy trustee, instead
17  of it being a demand note, it was now a demand
18  note subject to conditions subsequent, correct?
19          MS. DEITSCH-PEREZ:  Object to the
20      form.
21          THE WITNESS:  Yeah, that ultimately
22      they couldn't be demanded until conditions
23      subsequent were met or unable to be met.

Appx. 00149

JAMES DONDERO

1        JAMES DONDERO
2   BY MR. MORRIS:
3        Q.   Okay.  So can you agree with me that
4   that -- that that was a change in the term of
5   the Note?
6        MS. DEITSCH-PEREZ:  Object to the
7   form.
8        THE WITNESS:  Yeah.  See, that's the
9   part I don't want to comment on.  I just
10  want to say I don't know.
11  BY MR. MORRIS:
12       Q.   Okay.  Wasn't that the purpose of
13  entering into the agreements was to change the
14  terms of the each of the Promissory Notes?
15  Wasn't that your intent?
16       MS. DEITSCH-PEREZ:  Object to the
17  form.
18       THE WITNESS:  I'd say the intent was
19  to find and make compensation appropriate
20  for industry standards and Highland in
21  particular.
22  BY MR. MORRIS:
23       Q.   And did you believe that the Notes
24  as originally drafted and signed by you or the
25  representatives of the makers didn't take that

1        JAMES DONDERO
2   into account?
3        A.   I went through this already last
4   time, but the Notes were intentionally loose
5   and, I think, anticipated the ability to adjust
6   the subsequent conditions or other things.
7        Q.   Now, you told me that each of the
8   agreements was entered into between December of
9   one year or -- actually, withdrawn.
10       If we look at paragraph 82, it says
11  that each of the agreements was made, quote,
12  "sometime between the December of the year in
13  which each note was made and February of the
14  following year."
15       Do I have that right?
16       A.   Yes.
17       Q.   Can you identify with any greater
18  specificity when you entered into the first
19  agreement with the Dugaboy trustee referenced
20  in paragraph 82?
21       A.   No.
22       Q.   It's sometime within that 90-day
23  period; does that sound right to you?
24       A.   I believe it was closer to the
25  holidays around the turn of the year, but I

1        JAMES DONDERO
2   don't have specific recollection.
3        Q.   Is that answer the same for all
4   three agreements or only for the first
5   agreement?
6        A.   That would be the same for all
7   three.
8        Q.   So then why -- why does paragraph 82
9   refer to sometime between December of the year
10  in which each note was made and February of the
11  following year if your best recollection is
12  that it happened around the holidays?
13       A.   I don't know.
14       Q.   All right.  But as you sit here
15  right now, is it your testimony that you
16  believe each of the agreements was signed --
17  was more likely signed in December rather than
18  January or February?
19       MS. DEITSCH-PEREZ:  Object to the
20  form.
21       THE WITNESS:  I think signed is a --
22  I'm not -- I'm not testifying that signed,
23  I guess.
24  BY MR. MORRIS:
25       Q.   I apologize.  Maybe that was my

1        JAMES DONDERO
2   mistake.
3        Is it your testimony that each --
4   that you entered each of the agreements with
5   the Dugaboy trustee in December rather than
6   January or February of the years indicated?
7        A.   That's the best of my recollection,
8   but there may have been one year that was
9   towards the wider end of the interval.  I can't
10  remember with more specificity.
11       Q.   Okay.  Do you know of anything that
12  memorialized the date on which you entered into
13  any of the agreements?
14       A.   No, other than -- no, other than --
15  no, other than, you know, other than travel
16  schedule or phone logs or whatever.
17       Q.   All right.  During the discussion
18  that led to the agreements, did you ever
19  provide any information to Nancy or to Dugaboy
20  concerning your compensation?
21       A.   Just -- just verbal.  I mean, she
22  knew it was low, and she knew we had reinvested
23  most everything we made back in the company
24  over the years.  And that was the -- that was,
25  I think, understanding by all involved; and it

Page 50

JAMES DONDERO

1
2  should be obvious to anybody who's looked at
3  the numbers even in hindsight.
4      MR. MORRIS:  Okay.  I move to
5  strike.
6  BY MR. MORRIS:
7      Q.   And please listen carefully to my
8  question.
9      During the discussions that led to
10  each of the agreements, did you ever provide
11  any information to your sister or Dugaboy
12  concerning your compensation?
13      MS. DEITSCH-PEREZ:  Asked and
14  answered.
15      THE WITNESS:  Not specifically.
16  BY MR. MORRIS:
17      Q.   Did you provide any general
18  information to your sister or to Dugaboy prior
19  to the entry of any of the three agreements
20  that you entered into with the Dugaboy trustee?
21      A.   I would repeat the answer that was
22  struck two questions ago.
23      Q.   That's the information that you gave
24  to her?
25      A.   Yeah.  It was – again, it was

Page 51

JAMES DONDERO

1
2  verbal, and it was – but an understanding but
3  a clear and obvious understanding.
4      Q.   I want to know exactly what
5  information you gave to your sister and to
6  Dugaboy before entering into any of the three
7  agreements with the Dugaboy trustee?
8      A.   Most of what I had made over the
9  years was rolled back into the business to
10  propel growth and initiatives.  And that my
11  actual compensation was very modest based on
12  industry standards and relevant
13  responsibilities at Highland.
14      Q.   Did you tell her anything else?
15  Withdrawn.
16      Did you tell your – Nancy or
17  Dugaboy anything else beyond what you've now
18  testified to?
19      A.   You know, I think some of what I
20  testified to earlier, that forgiveness of the
21  Notes would be a modest increase in that
22  compensation but still not be in the ZIP code
23  of fair and appropriate compensation and that
24  the value of the Notes in aggregate were de
25  minimus relative to Highland and de minimis

Page 52

JAMES DONDERO

1
2  relative to Dugaboy.
3      Q.   Did you tell her anything else?
4      A.   Anything else would have fallen into
5  the buckets I just described, but I can't
6  remember specifically as I sit here today.
7      Q.   Did you ever tell your sister or
8  Dugaboy that your salary was less than a
9  million dollars?
10      A.   I –
11      MS. DEITSCH-PEREZ:  I mean, just
12  from Highland?
13      THE WITNESS:  Repeat the question
14  again for me, please.
15  BY MR. MORRIS:
16      Q.   Did you ever tell your sister that
17  your salary was less than a million dollars a
18  year?
19      A.   I know my sister was aware that it
20  was very low, and it kind of decreased over
21  time, and I think it was paid by different
22  entities.
23      Whether it was a million or
24  2 million, I can't remember exactly what I
25  would have told her; but it would have been in

Page 53

JAMES DONDERO

1
2  that ZIP code to paint the proper picture that
3  the cash compensation for somebody in my role
4  was well below industry standards.
5      Q.   Do you recall anything else that you
6  shared with your sister concerning your
7  compensation that you haven't testified to?
8      A.   Like I said, it would generally fall
9  into those buckets as I sit here today.
10      Q.   Did your sister or Dugaboy ask you
11  any questions about your compensation before
12  entering into the three agreements that you
13  entered into with the Dugaboy trustee?
14      A.   And, again, it would fall into the
15  buckets I just described.
16      Q.   Can you – can you recall any
17  question that your sister or Dugaboy asked of
18  you concerning your compensation before
19  entering into the agreements?
20      MS. DEITSCH-PEREZ:  Asked answered.
21      THE WITNESS:  Again, I – it would
22  fall into the buckets I just described.
23  BY MR. MORRIS:
24      Q.   Did you provide any documents to
25  your sister or to Dugaboy concerning your

**Appx. 00151**

Page 54

JAMES DONDERO

1 compensation before entering into the
2 compensation before entering into the
3 agreements?
4     A.   No, not that I can recall.
5     Q.   Did your sister or Dugaboy ask you
6 for any documents before entering into -- into
7 any of the agreements?
8     A.   I do not -- I do not believe so.
9     Q.   Do you recall that in the ordinary
10 course of business, Highland prepared a
11 document called a Compensation and Benefits
12 Statement for each of its employees?
13     A.   Yes.
14     Q.   And was that prepared by the Human
15 Resources Group?
16     A.   Yes.
17     Q.   And was Mark Collins the head of the
18 Human Resources Group?
19     A.   No.
20     Q.   Who was the head of the Human
21 Resources Group?
22     A.   Brian Collins.
23     Q.   I apologize to Mr. Collins.  Thank
24 you for the correction.
25          And Mr. Collins and his team were

Page 55

JAMES DONDERO

1 responsible for preparing the annual
2 responsible for preparing the annual
3 Compensation and Benefits Statements for
4 Highland's employees, correct?
5     A.   Yes.
6     Q.   And did you instruct them to do
7 that?
8     A.   Not specifically.
9     Q.   Okay.
10     A.   They do it every year.  They do it
11 every year as a matter of course, so I guess no
12 is the answer.
13     Q.   Okay.  So in the ordinary course of
14 business, Mr. Collins and his team would
15 prepare Compensation and Benefits Statements
16 for each of Highland's employees on an annual
17 basis, right?
18     A.   Yes.
19     Q.   Okay.
20          MR. MORRIS:  Can we please put up
21 Exhibit 68.
22          MS. CANTY:  (Complies with request.)
23
24
25

Page 56

JAMES DONDERO

1 (Whereupon, Exhibit 68, James
2          (Whereupon, Exhibit 68, James
3          Dondero Compensation and Benefits
4          Statement, Bates stamped D-CNL003585,
5          marked for identification, as of this
6          date.)
7 BY MR. MORRIS:
8     Q.   Do you see the document that's been
9 premarked as Exhibit 68 that's up on the
10 screen, sir?
11     A.   Yup.
12     Q.   And does this appear to be the form
13 of annual Compensation and Benefits Statement
14 that Mr. Collins and his team prepared on an
15 annual basis for Highland's employees?
16     A.   This looks like the format, yes.
17     Q.   Okay.  And the Compensation and
18 Benefits Statement was intended to set forth
19 the types and the amounts of compensation each
20 employee received each year, correct?
21     A.   Yes, generally.
22     Q.   Okay.  Did you ever disclose any
23 information on this page to Nancy or to
24 Dugaboy?
25     A.   Honestly, I don't think I've ever

Page 57

JAMES DONDERO

1 seen my award letters before.
2 seen my award letters before.
3     Q.   Okay.  So you never -- so then it's
4 a fair to say you never showed this letter to
5 your sister or Dugaboy, correct?
6     A.   Correct.
7     Q.   Okay.  Did you ever disclose to
8 Nancy or to Dugaboy the salary that's reflected
9 on this document?
10     A.   I can't remember specifically beyond
11 what I've already testified.
12     Q.   Did you ever describe for Nancy or
13 for Dugaboy the 2016 deferred compensation
14 award that's reflected on this document?
15     A.   No.  I -- by the way, I think that's
16 only 20 percent vested a year.  I think that's
17 a gross amount.  But no, I never -- I never
18 discussed that with her.
19     Q.   Okay.  Do you see in the
20 compensation award refers to 50,000 restricted
21 stock units of NXRT relating to your 2016
22 performance?
23     A.   Yes.
24     Q.   What is NXRT?
25     A.   That's the REIT that Highland used

**Appx. 00152**

JAMES DONDERO

1        JAMES DONDERO
2    to own million shares of that series hold at 20
3    that now trade at 70.
4        Q.    And is NexPoint REIT affiliated with
5    NexPoint Advisors, L.P.?
6        A.    Yes.
7        Q.    And do you have an understanding of
8    the nature of the relationship?
9        A.    Yes.
10       Q.    And what's -- what's your
11   understanding of the nature of the relationship
12   between NexPoint REIT and NexPoint Advisors,
13   L.P.?
14       A.    It's the external manager of the
15   REIT.
16       Q.    Okay.  Did you ever tell Nancy or
17   Dugaboy that you had received these restricted
18   stock units in 2016?
19       A.    No.  But the vested amount
20   would have probably been about $250,000 worth
21   at that moment.
22       Q.    And did it vest over a couple of
23   years?
24       A.    The first couple of years is vested
25   over five years.  I think now it vests over six

JAMES DONDERO

1        JAMES DONDERO
2    or seven years.  I don't remember whether the
3    2016 award was five years, six years, or seven
4    years.
5        Q.    Okay.  We talked earlier about an
6    expert that's been retained on your behalf.
7              Do you remember that?
8        A.    Yes.
9        Q.    Do you recall if you or anybody
10   acting on your behalf ever disclosed to that
11   expert the restricted stock units reflected on
12   this document?
13       MS. DEITSCH-PEREZ:  Object to the
14   form.
15       THE WITNESS:  I don't know.
16       MR. MORRIS:  Let's put up
17   Exhibit 50, please.
18       MS. CANTY:  (Complies with request.)
19       (Whereupon, Exhibit 50, James
20   Dondero Compensation and Benefits
21   Statement, Bates stamped D-CNL003587,
22   marked for identification, as of this
23   date.)
24   BY MR. MORRIS:
25       Q.    Do you see this is your benefits

JAMES DONDERO

1        JAMES DONDERO
2    statement for 2017?
3        A.    Yes.
4        Q.    Did you ever disclose any of the
5    information on this page to Nancy or to
6    Dugaboy?
7        A.    No.
8        Q.    Did you ever disclose to Nancy or to
9    Dugaboy that your base salary in 2017 was.
10   2,500,024?
11       MS. DEITSCH-PEREZ:  Object to the
12   form.
13       THE WITNESS:  Not specifically, no,
14   other than the buckets we talked about
15   earlier.
16       Like I said earlier, I'm not sure if
17   I have ever seen these before.  But I also
18   -- until it's verified, I don't want to --
19   everybody to assume that the base salary
20   came a hundred percent from Highland or if
21   it was also from some other entity.
22   Because for the purposes of this letter,
23   Brian Collins wouldn't have -- we have
24   numerous or several employees that are dual
25   employees.  And whether their base salary

JAMES DONDERO

1        JAMES DONDERO
2    came from one or multiple entities, he
3    wouldn't have differentiated in that line.
4        So I don't know whether that amount,
5    that 2.5 million came from Highland or a
6    combination of Highland/NexPoint or some
7    other entities.  I don't know.
8    BY MR. MORRIS:
9        Q.    And who made the decision as to how
10   to allocate the base salary?
11       A.    I don't know.  I -- I mean, I don't
12   know how it was split.  But my recollection of
13   my Highland base salary is that it was
14   diminishing over time.
15       Q.    And -- and as the president of
16   Highland and as the president of NexPoint, did
17   you have any say as to how your salary was
18   allocated between those two entities?
19       A.    Not that I recall.
20       Q.    Do you have any idea the basis on
21   which your salary was allocated between those
22   two entities?
23       A.    No.
24       Q.    Do you think -- do -- do you have
25   any understanding that it was allocated based

Page 62

JAMES DONDERO

1        JAMES DONDERO
2  on the amount of time you spent working for
3  each of those entities?
4     A.   I have no idea.
5     Q.   If your salary was $500,000 from
6  Highland in 2017 and $2 million to NexPoint,
7  can you -- can you think of any reason why it
8  would be allocated in that way?
9       MS. DEITSCH-PEREZ:  Object to the
10   form.
11      THE WITNESS:  Cash, cash
12   availability.  I -- I don't know.
13  BY MR. MORRIS:
14     Q.   Okay.  Did you devote your full time
15  and attention to Highland Capital Management,
16  L.P.?
17     A.   I spread my time as appropriate
18  across a variety of entities.
19     Q.   Can you identify for me the entities
20  that you spread your time across?
21     A.   Highland, NexPoint, HCMFA, HCRE.
22     Q.   How about Highland Management
23  Services, Inc.?
24     A.   Yes.
25     Q.   Are there any others?

Page 63

1        JAMES DONDERO
2     A.   Yes.
3     Q.   Can you identify any other companies
4  to which you devoted your time and attention?
5     A.   Not off the top of my head.  I'm
6  willing to be refreshed.  But over the years
7  there's been multiple initiatives at Highland
8  that have come and gone and private equity
9  companies that have come and gone and other
10  initiatives that have come and gone.
11     Q.   Do you see the reference to the
12  65,772 restricted stock units of the NexPoint
13  REIT there on this document?
14     A.   Yes.
15     Q.   And was that, to the best of your
16  recollection, the award that you were granted
17  in connection with your 2017 performance?
18     A.   It would have been for -- it would
19  have been the prior awards at -- it would have
20  been for the prior years' awards at NFLP.  And
21  it would have been -- it would have been the
22  same five- or seven-year vesting schedule.
23      MR. MORRIS:  Now I'm looking at my
24   phone, and I don't see, Deborah, any e-mail
25   from your firm.

Page 64

1        JAMES DONDERO
2      MS. DEITSCH-PEREZ:  Yeah.  On a
3   break, I'll take a picture of it and send
4   it to you.
5      Do you want a break now?
6      MR. MORRIS:  I really -- I really
7   don't.  And I don't know why I can't get an
8   e-mail copy rather than a photograph.  It's
9   not going to be -- it's not going to be
10   easy to read, and you know that?
11      MS. DEITSCH-PEREZ:  It'll be
12   perfectly fine.  If you can't, let me know;
13   and then I'll take the time to try and find
14   it.  But the fastest way to get it to you
15   is to take a picture of it.
16  BY MR. MORRIS:
17     Q.   Mr. Dondero, did you ever tell Nancy
18  or Dugaboy that you had received the restricted
19  stock units from the NexPoint REIT as reflected
20  on this page?
21     A.   You're -- you're saying the
22  $1.55-million number that was really 200,000
23  vested or 300,000 vested?
24     Q.   No.  I'm not talking about the
25  value.  I'm just talking about the restricted

Page 65

1        JAMES DONDERO
2  units.
3      Did you ever tell them -- let's keep
4   it -- let's keep it simple, and let's make it
5   really broad.
6      Did you ever tell Nancy or Dugaboy
7   that you received restricted stock units as
8   part of your compensation?
9     A.   I -- I don't remember.
10     Q.   Okay.  Did you ever -- because this
11  will speed it up.
12      Did you ever tell your expert that
13  you received restricted stock units as part of
14  your compensation?
15      MS. DEITSCH-PEREZ:  Object to the
16   form.
17      THE WITNESS:  I don't -- I don't
18   remember.
19  BY MR. MORRIS:
20     Q.   Did you ever direct anyone acting on
21  your behalf to share with your expert that you
22  had received restricted stock units as a form
23  of compensation?
24      MS. DEITSCH-PEREZ:  Object to the
25   form.

Page 66

JAMES DONDERO

1   THE WITNESS:  I not – I wasn't
2   involved.
3
4   MR. MORRIS:  All right.  You know,
5   what, Deborah, let's take a break; and why
6   don't you send me that document.
7   It is now 3:28.  Let's come back at
8   3:40 Eastern, and let's please be on time
9   because I'd like to try to finish this
10  today.  Thank you.
11  THE VIDEOGRAPHER:  Off the record at
12  2:28.
13  (Whereupon, a break was taken.)
14  THE VIDEOGRAPHER:  We are back on
15  the record.  The time is 2:43.
16  MR. MORRIS:  I received from counsel
17  a photograph in text message form of the
18  document that Mr. Dondero was referring to
19  at the beginning of the deposition.
20  I'm going to ask for that production
21  – for the production of that document with
22  a Bates number by the end of the day, and I
23  hope that could be accommodated.
24  MS. DEITSCH-PEREZ:  I'm not sure –
25  John, I'm not sure it will be by the end of

Page 67

JAMES DONDERO

1   the day because I don't know when the
2   people who do the Bates stamping leave.
3   But if it's not today, it will be tomorrow.
4
5   MR. MORRIS:  All right.  It's 2:44
6   in the afternoon your time.  I hope that
7   your firm has the capability of Bates
8   stamping and producing one page before the
9   close of business.
10  MS. DEITSCH-PEREZ:  Okay.  But I'm
11  not going to get – John, what difference
12  does it make whether it's tonight or
13  tomorrow?
14  MR. MORRIS:  You know what, I really
15  want to use it in the deposition now, but I
16  can't do that because – because you're not
17  able – because you – because apparently,
18  you can't even promise to do it by the end
19  of the day.
20  BY MR. MORRIS:
21  Q.  Mr. Dondero –
22  MS. DEITSCH-PEREZ:  Could you –
23  could you use it –
24  MR. MORRIS:  I'd like to –
25  MS. DEITSCH-PEREZ:  – if I sent it

Page 68

JAMES DONDERO

1
2   to you by e-mail instead.
3   MR. MORRIS:  I'd like to proceed.
4   You can e-mail it to me.  I mean, I
5   asked you to do that an hour ago.
6   MS. DEITSCH-PEREZ:  Well, the
7   easiest way to do it is to send a picture
8   is to text it; but if you give me a minute,
9   I'll figure out how to send it by e-mail.
10  Give me a second.  Let's see.
11  It just takes a second because it
12  goes into my personal e-mail first if it's
13  from my iPhone.  Okay.
14  MR. MORRIS:  Can we proceed?
15  MS. DEITSCH-PEREZ:  Yeah.  Give me a
16  minute and you'll have it.
17  Okay.  You should have it in your
18  e-mail now, John.
19  MR. MORRIS:  Thank you.  All right.
20  I'll let you know when it arrives.
21  BY MR. MORRIS:
22  Q.  Mr. Dondero, the questions now are
23  going to be both in your individual capacity
24  and in your capacity as the 30(b)(6) witness.
25  Do you understand that?

Page 69

JAMES DONDERO

1
2   A.  Okay.
3   Q.  Okay.
4   A.  It's either – it's either/or; it's
5   not one?
6   Q.  No.
7   A.  Okay.
8   Q.  You contend that the Notes are
9   subject to the – withdrawn.
10  You contend that the Notes that are
11  the subject of the agreements would be forgiven
12  upon the fulfillment of certain conditions
13  present, right?
14  A.  Right.
15  MS. DEITSCH-PEREZ:  Object to the
16  form.  He said "subsequent."
17  MR. MORRIS:  I apologize.  Let me
18  restate the question.
19  BY MR. MORRIS:
20  Q.  You contend that the Notes subject
21  to the agreement should be forgiven or would be
22  forgiven upon the fulfillment of certain
23  conditions subsequent, correct?
24  A.  Yes.
25  Q.  And to the best of your knowledge,

Page 70

JAMES DONDERO

1
2  none of those conditions have occurred as of
3  today, correct?
4      A.   To the best of my knowledge, yes.
5      Q.   Okay.  You're not aware of any facts
6  showing that any of the conditions subsequent
7  have been satisfied, fair?
8      A.   I -- yeah.  I wouldn't know.  You
9  would probably know.  I don't know.
10     Q.   I'm only asking for your knowledge.
11         One of the conditions subsequent was
12 that the Notes would be forgiven if you caused
13 Highland to sell its interest in one of three
14 portfolio companies above cost, right?
15         MS. DEITSCH-PEREZ:  Object to the
16     form.
17         THE WITNESS:  I -- yeah.  I don't
18     know if the noun is me or Highland, but
19     yeah.
20 BY MR. MORRIS:
21     Q.   Okay.  The portfolio companies at
22 issue were MGM, Cornerstone, and Trustway,
23 correct?
24     A.   Yes.
25     Q.   And prior to the petition date, you

Page 71

JAMES DONDERO

1
2  had the authority to sell any of those
3  portfolio companies at any time without having
4  to obtain approval from anyone, correct?
5          MS. DEITSCH-PEREZ:  Object to the
6      form.
7          THE WITNESS:  Yeah.  No, I can't
8      agree with that statement.
9  BY MR. MORRIS:
10     Q.   Why not?
11         Who's approval did you have to get
12 before you could sell any of those portfolio
13 companies?
14     A.   MGM, I was one board member and I
15 think an aggregate.  When I was running
16 Highland, we spoke for 18 percent of the
17 equity.  So I couldn't force the overall sale
18 of the company unilaterally.
19         There was also a shareholder's
20 agreement in place that restricted myself and
21 Anchorage and a couple of the large holders
22 from selling their shares without a disclosure
23 and approval process.  That is one example.
24         With regard to Trustway, I believe I
25 was largely unfettered.

Page 72

JAMES DONDERO

1
2          With regard to Cornerstone, a
3  majority of it -- or not a majority, but a
4  significant minority, I think, was owned by
5  both Restoration and the Old Redeemer Fund.
6      Q.   All right.  Well, let me ask you
7  this:  The conditions subsequent that are
8  embedded in the agreements, did that relate to
9  just Highland's interests in the portfolio
10 companies, or did it relate to interests held
11 by anybody else?
12     A.   It referred to a monetization in
13 creating liquidity around Highland's interests
14 that were large and illiquid portions of
15 Highland's balance sheet.
16     Q.   Okay.  So let me ask the question
17 again.
18         Prior to the petition date, did you
19 have the authority to sell Highland's interests
20 in any of the portfolio companies without
21 having to obtain the authority of anybody else?
22         MS. DEITSCH-PEREZ:  Object to the
23     form.  Asked and answered.
24         THE WITNESS:  Sub- -- subject to my
25     prior answer, I could speak for Highland

Page 73

JAMES DONDERO

1
2  prior to the bankruptcy.
3  BY MR. MORRIS:
4      Q.   Okay.  Before entering into the
5  agreements, did you or anybody acting on your
6  behalf analyze the likelihood that any of the
7  conditions subsequent would occur?
8      A.   Likelihood?  Analyze?  My
9  description of them, which was my understanding
10 of them, but my description of the assets to my
11 sister was -- to the trustee of Dugaboy was
12 that we held them for a long time.  We were
13 working towards monetization, but there wasn't
14 anything imminent regarding any of them in 2017
15 or '18.
16     Q.   Well, but the actual sale is just
17 one part of the condition subsequent, correct?
18         The other part is that it's got to
19 be sold above cost; is that correct?
20     A.   That is right.
21     Q.   Okay.  So at the time you entered
22 into each of your -- each of the three
23 agreements, had you done any analysis to
24 determine whether or not any -- whether
25 Highland's interests in any of the portfolio

Appx. 00156

Page 74

JAMES DONDERO

1    companies exceeded its cost?

2    A.   No, but I -- yes.  No, I did not.

3    Q.   Did you have any understanding at

4    all as to how the value of Highland's interests

5    in MGM compared to its costs at the time you

6    entered into each of these three agreements?

7    A.   No.  I mean, my understanding was I

8    knew they were substantially higher, but I

9    didn't know how much higher.

10   Q.   Okay.  So is it fair to say that the

11   time -- at the time you entered into each of

12   these agreements, you knew and understood that

13   the value of Highland's interests in MGM was

14   substantially higher than its costs?

15   A.   For MGM, yes.

16   Q.   Okay.  Did you have an understanding

17   of the relationship between value and costs

18   concerning Cornerstone at the time you entered

19   into these agreements?

20   A.   My understanding it was moderately

21   higher, and as Trustway was between substantially

22   and moderately and higher, I believe.

23   Q.   Okay.  So is it fair to say that at

24   the time you entered into each of these

Page 75

JAMES DONDERO

1    agreements, you believed that the value of

2    Highland's interests in each of the portfolio

3    companies exceeded its costs in varying

4    degrees?

5    A.   Varying degrees.  As a matter of

6    fact, I would adjust.  Cornerstone and

7    Trustway, I believe, were moderately higher

8    than their embedded costs or implied costs.

9    That was my understanding.

10        MGM was somewhat substantially.  But

11   all of them with a fair amount of volatility

12   and a fair amount of illiquidity.

13   Q.   Did you ever give your sister or

14   Dugaboy any information concerning how the

15   value of Highland's interests in any of the

16   portfolio companies compared to Highland's

17   costs before entering into the agreements?

18   A.   Not that I recall.

19   Q.   Do you have any reason to believe

20   that your sister or Dugaboy had any

21   understanding as to the likelihood that the

22   conditions subsequent would be satisfied at the

23   time the Dugaboy trustee entered into the three

24   agreements with you?

Page 76

JAMES DONDERO

1         MS. DEITSCH-PEREZ:  Object to the

2    form.

3         THE WITNESS:  I -- I remember saying

4    it would take a few years at minimum; but

5    other than expressing time, I don't believe

6    I expressed value versus cost or the

7    questions you were asking me previously.

8    BY MR. MORRIS:

9    Q.   Okay.  You never showed Nancy or

10   Dugaboy any of the Promissory Notes prior to

11   entering into any of the agreements, correct?

12   A.   Not that I recall.

13   Q.   And you never sent copies of the

14   Promissory Notes to Nancy or Dugaboy before

15   entering into any of these agreements, correct?

16   A.   Not that I recall.

17        MS. DEITSCH-PEREZ:  Object to the

18   form.

19        John, you've asked these at the last

20   deposition and actually also at the first

21   day of the deposition.

22        MR. MORRIS:  Thank you.  He's here

23   now in his 30(b)(6) capacity.  So please

24   just stop.

Page 77

JAMES DONDERO

1         You can object to the form of the

2    question.  I really don't appreciate it.

3    You should follow the very professional job

4    that your colleague, Michael Aigen, did the

5    other day.

6    BY MR. MORRIS:

7    Q.   Neither Nancy or Dugaboy has ever

8    asked to see copies of any of the Promissory

9    Notes before entering into any of the

10   agreements, correct?

11        MS. DEITSCH-PEREZ:  Object to the

12   form.

13        THE WITNESS:  I don't know.

14   BY MR. MORRIS:

15   Q.   Do you have any reason to believe

16   that Nancy or Dugaboy ever saw a copy of any of

17   the Promissory Notes at issue before entering

18   into the agreements?

19   A.   I don't know.

20   Q.   During your discussions with Nancy

21   and Dugaboy, did you identify the Promissory

22   Notes that were going to be the subject of each

23   agreement?

24        MS. DEITSCH-PEREZ:  Object to the

**Appx. 00157**

Page 78

```
1        JAMES DONDERO
2  form.
3      You know, we made an agreement that
4  you were going to refer to Nancy as the
5  Dugaboy trustee.  Please stick to it.
6  Otherwise, I'm going to have to object each
7  time, and I'd rather not.
8      MR. MORRIS:  I have no problem with
9  your objecting to the form of the question.
10  It's the speaking that I really do object
11  to.  And I don't know why you can't control
12  yourself.
13      MS. DEITSCH-PEREZ:  Because I
14  hope that --
15      MR. MORRIS:  Please stop.  Please
16  stop.
17      MS. DEITSCH-PEREZ:  -- by telling
18  you this, you will listen.
19      MR. MORRIS:  Okay.  Your discussion
20  and your inability to control yourself is
21  going to cause this deposition to go longer
22  than it needs to, okay?
23      MS. DEITSCH-PEREZ:  No.  It's your
24  repeating questions that's going to do
25  that.
```

Page 79

```
1        JAMES DONDERO
2      MR. MORRIS:  You let me know when
3  you're done.
4      MS. DEITSCH-PEREZ:  I'm done.
5  BY MR. MORRIS:
6      Q.   Mr. Dondero, during your discussions
7  with the Dugaboy trustee, did you identify the
8  Promissory Notes that were going to be the
9  subject of each agreement?
10      MS. DEITSCH-PEREZ:  Object to the
11  form.
12      THE WITNESS:  No, not that I recall.
13  BY MR. MORRIS:
14      Q.   Do you recall -- during your
15  discussions with the Dugaboy trustee, did you
16  identify the maker of any of the Notes that
17  were the subject of any of the agreements?
18      A.   You mean Highland as the maker; is
19  that what you're saying?
20      Q.   No.  I'm just asking if during your
21  discussions with the Dugaboy trustee, you ever
22  disclosed the name of the maker of any of the
23  Notes that were subject to the agreements?
24      A.   She -- she knew they were Notes due
25  to Highland from various entities.  So I don't
```

Page 80

```
1        JAMES DONDERO
2  know what your question is.  Did I identify
3  specifically that they were Notes due to
4  Highland?  I guess the answer to that is yes,
5  but I don't know what you're asking me.
6      Q.   I'm sorry, sir.  I'll take the
7  responsibility for that.
8          I'm asking you if you identified who
9  the maker of the Notes were, not who the payee
10  was.
11      MS. DEITSCH-PEREZ:  You mean the
12  borrowers, John?
13      THE WITNESS:  See, I don't want to
14  get stuck in my underwear on maker/borrower
15  nomenclature.
16          She was aware that they were notes
17  due to Highland from a variety of entities.
18  BY MR. MORRIS:
19      Q.   Okay.  Did you identify any of those
20  entities?
21      A.   I -- yeah.  She knew that some were
22  Dugaboy, some were NexPoint for sure, and some
23  were other entities.
24      Q.   So -- so there were notes where
25  Dugaboy owed the money or was the obligor or
```

Page 81

```
1        JAMES DONDERO
2  was the borrower or was the maker that are
3  subject to agreements that you entered into
4  with the Dugaboy trustee?
5      A.   No.  Wait.  The Dugaboy -- the
6  Dugaboy Notes weren't subject to the
7  forgiveness.  It was the other notes that were
8  subject to forgiveness.
9      Q.   So it's really kind of a simple
10  question, and I'm not trying to trick you.
11          If you think back to the
12  conversations that you had with the Dugaboy
13  trustee, did you identify the entity of -- did
14  you identify who the borrowers were under the
15  Notes that were going to be subject to the
16  agreements?
17      A.   She knew they were entities -- she
18  knew there were other related entities.  She
19  knew NexPoint for sure.  She knew Services.
20          I can't sit here as I remember -- as
21  I sit here today and remember whether or not I
22  specifically identified HCRE or not, you know;
23  but she knew they were related entities.
24      Q.   All of the revisions of the
25  agreement are set forth in paragraph 82; is
```

**Appx. 00158**

Page 82

JAMES DONDERO

1      that right?
2          We could put it back up on the
3      screen if you'd like.
4          MR. MORRIS:  In fact, why don't we
5      do that.
6          MS. CANTY:  I'm sorry, John.  51 --
7      I mean, 50?
8          MR. MORRIS:  I think it's
9      Exhibit 31, paragraph 82.
10         MS. CANTY:  Oh, okay, 82.  I've got
11     you.
12         MR. MORRIS:  Thank you.
13 BY MR. MORRIS:
14     Q.   Does -- Mr. Dondero, other than
15 specifying who the portfolio companies were,
16 does paragraph 82 set forth all of the material
17 terms of each of the agreements?
18     A.   I think it sets forth the conditions
19 subsequent.
20     Q.   Is there any aspect of your
21 agreement -- withdrawn.
22         Is there any aspect of your
23 agreements with the Dugaboy trustees that's not
24 described in this paragraph?

Page 83

JAMES DONDERO

1      A.   I don't know if it's captured in
2  there, but there was definitely a conversation,
3  discussion that if something like MGM was
4  sold -- Anchorage is the largest holder almost
5  a majority in and of themselves.  And if it was
6  bought or taken out at a price that we couldn't
7  control or couldn't agree with and it was lower
8  than cost or -- you know, Cornerstone, again,
9  had multiple funds between our ownership and
10 control that if -- if things were sold
11 beyond -- without my support but sold below
12 cost -- and I'm not sure that's captured in
13 that paragraph, but I think that was part of
14 the understanding, also.
15     Q.   Is there any other part of the
16 understanding that's not set forth in
17 paragraph 82, Mr. Dondero?
18     A.   Not that I can think of at this --
19 let me read it one more time, please.
20     Q.   Take your time.
21     A.   I believe that generally covers it.
22     Q.   Was any provision of the agreements
23 the subject of negotiation?
24         MS. DEITSCH-PEREZ:  Object to the

Page 84

JAMES DONDERO

1      form.
2          THE WITNESS:  I don't believe it was
3  materially adjusted by any negotiation.  It
4  was just clarified based on discussion is
5  how I would describe it.
6  BY MR. MORRIS:
7      Q.   Is there any provision in the
8  agreements that was included at your sis- -- at
9  the Dugaboy trustee's request?
10     A.   Like I said, there was discussion
11 and clarification.  Not specifically that I
12 recall.
13     Q.   Okay.  Did the Dugaboy trustee
14 refuse to include any provision in the
15 agreement that you had proposed?
16     A.   Not that I recall.
17     Q.   Can you identify any provision of
18 the agreements that were the subject of a
19 counterproposal that the Dugaboy trustee made?
20     A.   I remember clarification discussion
21 around, you know, three companies versus two or
22 one.  I remember clarification of monetization
23 being turned to cash versus illiquid.
24         Yeah.  I mean, I remember

Page 85

JAMES DONDERO

1      discussion -- I remember clarification
2  discussions like that, but I don't remember --
3  it was a long time ago.  I don't remember the
4  details of anything specific like that.
5          It wasn't -- it wasn't a
6  contentious, nor should it have been a
7  contentious negotiation.
8      Q.   How long did -- do you recall how
9  long each of the conversations lasted that led
10 to the entry of each of the three agreements?
11     A.   I remember the first one being
12 longer than the second two, and then I remember
13 it being spread out periods of time.  So I
14 can't -- I can't -- I can't put an exact
15 estimate on it.
16     Q.   Okay.  I'm going to shift gears.
17         MR. MORRIS:  We can take that down
18 now, please.
19         MS. CANTY:  (Complies with request.)
20 BY MR. MORRIS:
21     Q.   Do you know of any written agreement
22 pursuant to which HCRE provided services to
23 Highland at any time?
24         MS. DEITSCH-PEREZ:  Object to the

Appx. 00159

JAMES DONDERO

1  form.  Asked and answered.
2  THE WITNESS:  HCRE provided
3  preferred services to.  Well, the
4  participants there in HCRE are, my –
5  myself and McGraner.  And, you know, we
6  both provided significant other services to
7  Highland.
8  BY MR. MORRIS:
9  Q.  Okay.  Is that in writing?  Is there
10  a written agreement?
11  That was my question.
12  Is there a written agreement
13  pursuant to which HCRE ever provided services
14  to Highland?
15  A.  I don't believe so.
16  Q.  Did HCRE ever provide services to
17  Highland?
18  A.  I would incorporate my last two
19  answers.  Not under a written agreement, but I
20  believe myself and McGraner provided a lot of
21  services.
22  Q.  And what services did you and Mr.
23  McGraner provide to Highland?
24  A.  I'd say anything real estate related


1  JAMES DONDERO
2  form.  Asked and answered.
3  THE WITNESS:  HCRE provided
4  preferred services to.  Well, the
5  participants there in HCRE are, my –
6  myself and McGraner.  And, you know, we
7  both provided significant other services to
8  Highland.
9  BY MR. MORRIS:
10  Q.  Okay.  Is that in writing?  Is there
11  a written agreement?
12  That was my question.
13  Is there a written agreement
14  pursuant to which HCRE ever provided services
15  to Highland?
16  A.  I don't believe so.
17  Q.  Did HCRE ever provide services to
18  Highland?
19  A.  I would incorporate my last two
20  answers.  Not under a written agreement, but I
21  believe myself and McGraner provided a lot of
22  services.
23  Q.  And what services did you and Mr.
24  McGraner provide to Highland?
25  A.  I'd say anything real estate related

JAMES DONDERO

1  JAMES DONDERO
2  on the Highland platform McGraner would have
3  input into.
4  And then I think my – my portfolio
5  management, leadership role in Highland over
6  time is well documented.
7  Q.  And how did you know if you were
8  providing services in your capacity as the
9  president of Highland or in your capacity as an
10  officer or owner of the HCRE at the time you
11  provided the services?
12  A.  Never – never really thought about
13  parsing it that way.
14  Q.  I appreciate that.
15  Do you know whether Highland Capital
16  Management Services ever provided services to
17  Highland?
18  A.  Yeah.
19  MS. DEITSCH-PEREZ:  Object to the
20  form.  Asked and answered.
21  THE WITNESS:  Yeah.  I would – not
22  in writing.  I believe the services owners
23  isn't myself and McGraner.  I think it was
24  myself and Okada.
25  And I would say our portfolio and

JAMES DONDERO

1  JAMES DONDERO
2  leadership contributions to Highland are
3  well documented.
4  BY MR. MORRIS:
5  Q.  And my question didn't have anything
6  to do with any particular person.  It's just
7  simply whether Highland Capital Management
8  Services ever provided any services to Highland
9  Capital Management, L.P.
10  MS. DEITSCH-PEREZ:  Object to the
11  form.
12  THE WITNESS:  The entities that
13  you're describing or you're asking
14  questions about don't have employees'
15  services in HCRE.  They have ownership
16  individuals that I've described.
17  So I've tried the best I can to
18  answer your question and what the ownership
19  may have done for Highland.
20  But since there's no employee base
21  at either of those two companies, those
22  companies could not have directly provided
23  service to Highland other than, the last
24  thing I would bring up is the track-record
25  concept, you know, in terms of the

JAMES DONDERO

1  JAMES DONDERO
2  performance of whatever assets are in some
3  of those start-up entities ends up being a
4  useful track record that then Highland can
5  market.
6  BY MR. MORRIS:
7  Q.  Okay.  How about NexPoint, did
8  NexPoint ever provide services to Highland
9  Capital Management, L.P.?
10  A.  Yes.  The real estate – yes.  I
11  mean, can I just say yes or –
12  Q.  You could.  That would be really
13  helpful.
14  A.  Okay.  There we go.
15  Q.  Can you describe the circumstances
16  for me?
17  MS. DEITSCH-PEREZ:  Finally, some
18  accord between the witness and the
19  questioner.
20  BY MR. MORRIS:
21  Q.  Can you describe the services for
22  me?
23  A.  NexPoint has a couple of attorneys
24  that are real estate experts.  We have a lot of
25  different attorneys, or we did at Highland.

Page 90

JAMES DONDERO

1
2  But prior to the bankruptcy, none of the
3  Highland attorneys were experienced in real
4  estate.
5        So anything that required
6  transaction help on the Highland platform
7  regarding real estate, the NexPoint real estate
8  attorneys would help with.
9      Q.  Okay.  Anything else?
10     A.  I'm sure there are others.  That's
11 all I can think of off the top of my head.  I
12 just wanted to give you an example.
13     Q.  I appreciate that.
14         You're aware that Highland has sued
15 HCMFA to collect on two notes that were signed
16 by Frank Waterhouse in 2019 in the aggregate
17 amount of $7.4 million; is that right?
18     A.  Yes.
19     Q.  Okay.  And we actually went through
20 this the other day, so I don't want to belabor
21 it if I don't have.
22         But do you recall that we saw the
23 incumbency certificate which identified
24 Mr. Waterhouse as the treasurer of HCMFA as of
25 April 2019?

Page 91

JAMES DONDERO

1
2      A.  Yes.
3      Q.  Okay.  And do you recall that you
4  signed that incumbency certify in your capacity
5  as president of HCMFA?
6          MS. DEITSCH-PEREZ:  Object to the
7  form.
8          THE WITNESS:  Yes.
9  BY MR. MORRIS:
10     Q.  I want to talk about the first of
11 the two Notes, the $2.4 million Note.
12         Do you recall that in early May
13 2019, Highland transferred $2.4 million to
14 HCMFA?
15     A.  I don't remember a lot of specifics,
16 but I know there were two Notes as you're
17 describing.
18     Q.  Okay.  And there was -- and one of
19 them -- did you authorize the $2.4-million
20 payment?
21     A.  Yes.
22     Q.  And why did you authorize Highland
23 to transfer $2.4 million to HCMFA in early May
24 2019?
25     A.  My answer's the same for both --

Page 92

JAMES DONDERO

1
2  both Notes.  Essentially, it's regarding the
3  terrace start issue that we had with the
4  Fort Worth SEC.
5      Q.  Did you give anyone instructions
6  concerning the transfer of the $2.4 million?
7      A.  I instructed them to make the
8  transfer, or I was involved in the -- involved
9  in approving the transfer.
10     Q.  And who did you instruct to make the
11 transfer of $2.4 million?
12     A.  Yeah.  It would have been Frank.
13     Q.  Do you have a recollection of
14 instructing Frank to transfer $2.4 million?
15     A.  Yeah.  Generally, yes.
16     Q.  Do you have a recollection of what
17 instructions you gave him?
18     A.  It was well-known.  It was a very
19 disruptive -- the whole thing was very
20 disruptive at Highland and HCMFA.  Everybody
21 was aware of it.  The settlement, the
22 negotiations around the settlement, the
23 give-and-take, the amounts changed over time.
24         Everybody was aware of it in senior
25 management, including myself.  And putting the

Page 93

JAMES DONDERO

1
2  money into HCMFA to settle it was something I
3  was aware of and authorized and a critical
4  piece of putting that issue to bed.
5      Q.  Okay.  I'm just asking you if you
6  recall what instructions you gave to
7  Mr. Waterhouse concerning the transfer if you
8  recall?
9      A.  No.  I mean, like I said, I
10 authorized the movement of the money.
11     Q.  Okay.  Were you aware at that time
12 that the transfer of the $2.4 million from
13 Highland to HCMFA was booked as a loan on both
14 Highland and HCMFA's books and records?
15     A.  I was not aware at the time.
16     Q.  Okay.
17         MR. MORRIS:  Can we put up
18 Exhibit 53 please.
19         THE VIDEOGRAPHER:  Counsel, I will
20 need a media break in about five minutes.
21         MR. MORRIS:  Thank you very much.
22 Why don't we take that right now before I
23 begin my examination on this document.  How
24 long do you need?
25         THE VIDEOGRAPHER:  It will just be a

Page 94

JAMES DONDERO

1          JAMES DONDERO
2    minute, but this is the end of Media Number
3    1.
4          MR. MORRIS:  Okay.
5          THE VIDEOGRAPHER:  We are off the
6    record at 3:21.
7          MR. MORRIS:  We are off the record,
8    but don't go anywhere.
9          MS. DEITSCH-PEREZ:  What?
10         MR. MORRIS:  We're not taking a
11   break.
12         THE VIDEOGRAPHER:  Yep.  This will
13   just take a minute.  Please stand by.
14         MR. MORRIS:  Thank you.
15         THE VIDEOGRAPHER:  All right.
16   Suzanne, are you good to go?
17         THE COURT REPORTER:  I'm good.
18         THE VIDEOGRAPHER:  This is the
19   beginning of Media Number 2, Volume II
20   [sic] in the deposition of James Dondero.
21   We are back on the record at 3:22.
22         MR. MORRIS:  All right.  Can we
23   please put up Exhibit 53.
24         MS. CANTY:  Yeah.  Just one second.
25   My computer went haywire.  Give me one

Page 95

1          JAMES DONDERO
2    minute.
3          (Whereupon, Exhibit 53, E-mail
4    correspondence, Bates stamped D-CNL003768
5    through D-CNL003770, marked for
6    identification, as of this date.)
7    BY MR. MORRIS:
8    Q.    Okay.  So Mr. Dondero, do you see
9    what's on the screen here?
10         Mr. Dondero?
11         MR. MORRIS:  Deborah?
12         Apparently Mr. Dondero has left the
13   seat.
14         THE VIDEOGRAPHER:  Would you like to
15   go off record?
16         MR. MORRIS:  No.
17         THE VIDEOGRAPHER:  Okay.  We'll stay
18   on the record.
19         MR. MORRIS:  The video is still
20   rolling, right, sir?
21         THE VIDEOGRAPHER:  Yes, it is.
22         MR. MORRIS:  Thank you.
23         Hi, Michael.  If you're – if you're
24   able, can you reach out to your partner?
25         MR. AIGEN:  I had texted her.  I

Page 96

1          JAMES DONDERO
2    will try to call her, too; but I did text
3    her a couple of minutes ago.  I will try to
4    reach out again.  Hold on.
5          MS. DEITSCH-PEREZ:  I'm back.  I'm
6    lucky in that the ladies room is directly
7    across from the conference room.
8          Mr. Dondero's down at the other end
9    of the floor, so he will be back shortly.
10         And I just saw your note, John.  The
11   – the videographer said he needed a break;
12   and you said, okay, then let's take our
13   break now.  So we took a restroom break.
14         MR. MORRIS:  I think everybody on
15   the phone – and there's a transcript of it
16   – knows that I specifically said, how long
17   do you need.  He said one minute, and I
18   said don't go anywhere.
19         This is your time, not mine.
20         MS. DEITSCH-PEREZ:  Prior to that,
21   you said, let's take the break now.
22         MR. MORRIS:  Yeah, to allow him to
23   change the tape.  I'm not going to question
24   anybody on the call, but I'm 100 percent
25   certain that they would all tell you – and

Page 97

1          JAMES DONDERO
2    the record will reflect, I specifically
3    said do not leave.
4          MS. DEITSCH-PEREZ:  Okay.
5    Mr. Dondero is back.
6          You have to turn – turn the video
7    on.
8          THE WITNESS:  I'm back.
9    BY MR. MORRIS:
10   Q.    All right.  Do you see on the screen
11   there's a document that's been marked as
12   Exhibit 53?
13   A.    Yup.
14   Q.    Do you see there's an e-mail string
15   dated May 2, 2019?
16   A.    Yes.
17   Q.    And do you see that Mr. Waterhouse
18   has – if you look at the second to the top,
19   Mr. Waterhouse's e-mail is forwarding a
20   spreadsheet to David Klos and Kristin Hendrix
21   that he described as, quote, "The support for
22   the payment to GAF by HCMFA?
23   A.    Yes.
24   Q.    What's GAF?
25   A.    That's the fund itself that owned

JAMES DONDERO

1          JAMES DONDERO
2    the TerreStar investment. The SEC wanted, I
3    believe, some payment to go to them; but they
4    all, meaning the SEC, and the SEC wanted some
5    payment to go to the fund itself for the
6    benefit of the investors.
7        Q.  Okay.
8          MR. MORRIS:  Can we can to the chart
9    that's attached.
10         MS. CANTY:  (Complies with request.)
11   BY MR. MORRIS:
12       Q.  Have you ever seen this chart
13   before, sir?
14       A.  I don't believe so specifically, but
15   I understand what it is.
16       Q.  And is it your understanding, based
17   on this chart, that the loss to the fund was
18   $6,068,851?
19         MS. DEITSCH-PEREZ:  Object to the
20   form.
21         THE WITNESS:  Yes.
22   BY MR. MORRIS:
23       Q.  And there's -- there's a column
24   there that's lost to fund.
25         Do you see that?

JAMES DONDERO

1          JAMES DONDERO
2        A.  Yes.
3        Q.  And is it -- is it consistent with
4    your recollection that the estimated loss of
5    the fund or to the fund was approximately
6    $6 million?
7        A.  Yes.  There is approximately --
8    there's some other small numbers moving around,
9    but yes.
10       Q.  Okay.  And do you recall that HCMFA
11   informed the SEC that HCMFA would make the fund
12   whole by paying it an amount of money equal to
13   the loss?
14       A.  Yes.
15       Q.  And, in fact, HCMFA paid the fund
16   approximately $6 million in connection with the
17   losses sustained as a result of the NAV error,
18   correct?
19       A.  I don't know details like that.
20       Q.  So you're not -- you're not aware of
21   the fact that HCMFA paid to the fund
22   approximately $6 million in May of 2019?
23       A.  Approximately six or approximately
24   seven.  I -- I don't know.  Whatever the
25   agreement was with the SEC to be paid to them

JAMES DONDERO

1          JAMES DONDERO
2    or to the fund or whatever, I -- I have all
3    faith and confidence we complied with; but I
4    don't -- I don't know exact numbers.  I'm
5    not aware of the exact numbers.
6        Q.  Do you understand that this analysis
7    shows how HCMFA was going to finance the
8    payment to the fund as a result of the NAV
9    error?
10         MS. DEITSCH-PEREZ:  Object to the
11   form.
12         THE WITNESS:  I'm sorry.  Could you
13   repeat that question again?
14   BY MR. MORRIS:
15       Q.  Sure.  Do you understand that
16   this -- that this chart here sets forth the
17   manner in which HCMFA is going to fund the
18   payment that it was making to GAF on account of
19   the NAV error?
20       A.  I would call it more of a
21   calculation on where the amounts are coming
22   from.  It doesn't appear to me that this is a
23   funding statement.
24       Q.  Okay.  I appreciate that.
25         So -- so your interpretation of this

JAMES DONDERO

1          JAMES DONDERO
2    is that this shows the sources of money that
3    were going to be used to make the payment; is
4    that fair?
5          MS. DEITSCH-PEREZ:  Objection to the
6    form.
7          THE WITNESS:  Yeah.  I think it's a
8    reconciliation between the insurance, some
9    forgiveness of fees, and then additional
10   monies that are necessary.
11   BY MR. MORRIS:
12       Q.  Okay.  And --
13       A.  Yeah.  Go ahead.
14       Q.  Did HCMFA file an insurance claim in
15   connection with the NAV error?
16       A.  I believe they did get -- I believe
17   they did, and I believe they did get paid some
18   insurance.
19       Q.  And -- and if we look at the totals
20   column in the right, did HCMFA receive, to the
21   best of your recollection, approximately
22   $5 million from insurance?
23       A.  Yes.  I think we should work -- I
24   think we should work from that column --
25       Q.  Okay.  So let's --

Page 102

JAMES DONDERO

2  A.  -- versus the other column, yeah.
3  Q.  I apologize, Mr. Dondero.
4     So if we look at the last column,
5  the total, does that comport with your
6  recollection that HCMFA paid GAF approximately
7  $7.44 million in May of 2019 on account of the
8  NAV error?
9  A.  I think it's more than that, and I
10 think it's also the 375 below that.
11 Q.  Okay.
12 A.  And then I -- yeah, definitely those
13 two numbers in aggregate.  I don't know if it's
14 any others.
15 Q.  Okay.  And did, to the best of your
16 recollection, HCMFA make an insurance claim on
17 which it received almost $5 million as a source
18 of funding for the payment that was due to GAF?
19 A.  Yes.
20 Q.  Are you familiar with that insurance
21 claim?
22 A.  No.
23 Q.  Do you know if the insurance claim
24 made any mention of Highland?
25 A.  I have no idea.  I have no idea.

Page 103

JAMES DONDERO

2  Q.  Okay.  So as a -- as a matter of
3  rough math, would you agree with me that the
4  insurance procedures funded approximately
5  5 million of the $7.8 million that was the
6  total loss?
7     MS. DEITSCH-PEREZ:  Object to the
8     form.
9     THE WITNESS:  This was the amount
10    due to the investors.  I -- I -- my rough
11    recollection is there was another amount
12    that was due the SEC, but I don't remember
13    specifically.
14 BY MR. MORRIS:
15 Q.  Okay.  And do you see in the middle
16 of the page, there's a total additional payment
17 from advisor of approximately $2.4 million?
18 A.  Yes.
19 Q.  And is it your understanding that
20 that is the amount that HCMFA had to come out
21 of pocket in order to fully fund the GAF
22 payment?
23 A.  Yes, but it's clear to me also that
24 there's a forgiveness of management fees, also.
25 Q.  Okay.  But is two point -- but is

Page 104

JAMES DONDERO

2  $2.4 million the amount of money that HCMFA
3  needed in order to fully fund the payment to
4  GAF?
5  A.  And I don't want to mince small
6  numbers; but to the extent that they gave up
7  their management fees also, like that 1939 or
8  the 39 above that -- and I don't know what that
9  47 is above that -- those are management fees
10 that would have paid salaries and expenses at
11 HCMFA also.
12    So to the extent they gave up those
13 items as part of the settlement, then HCMFA
14 would have needed more money than even the 2.4
15 that came from Highland.
16 Q.  Do you know if HCMFA ever informed
17 the SEC that Highland was responsible for the
18 NAV error?
19 A.  I -- I don't know.  We wouldn't have
20 hidden it if they would have asked.  My
21 experience with the SEC is they identify the
22 advisor; and who the advisor picks for vendors
23 the advisor's responsible for.
24    MR. MORRIS:  I move to strike
25    everything after "I don't know."

Page 105

JAMES DONDERO

2  BY MR. MORRIS:
3  Q.  Did you ever direct anyone to inform
4  the SEC that Highland was responsible for the
5  NAV error?
6  A.  No, not that I recall.
7  Q.  Do you know if anybody acting on
8  behalf of HCMFA ever informed the SEC that
9  Highland was responsible for the NAV error?
10 A.  I don't know.
11 Q.  Do you know if HCMFA ever informed
12 GAF that Highland was responsible for the NAV
13 error?
14 A.  Yes.
15 Q.  And is that reflected in writing
16 anywhere?
17 A.  Yes.  Numerous places.
18 Q.  And what writing would that be
19 reflected in?
20 A.  The board minutes.  There were
21 conversations every board meeting for over a
22 year.  The retail board represents GAF.  They
23 were well aware of the subadvisory agreements,
24 and they were well aware that all the staff
25 regarding valuation were housed at Highland;

**Appx. 00164**

Page 106

JAMES DONDERO

1
2 all the valuation activities were performed by
3 Highland. And GAF and HCMFA relied on
4 Highland, and it was a material part of board
5 conversations for over a year.
6     MR. MORRIS: Okay. I move to
7     strike.
8 BY MR. MORRIS:
9    Q. I'm asking you just about writings,
10 sir.
11     Can you identify --
12    A. No, no, no. I'm not -- I'm not
13 going to -- I'm not going to allow that strike,
14 or I'm not answering anymore questions.
15    Q. Well, the judge will be the
16 determiner of that. So I'd like you to answer
17 my question.
18     Is there any -- I don't want to know
19 about board meetings.
20     Is there anything in writing that
21 HCMFA provided to GAF that specifically stated
22 that Highland and not HCMFA was responsible for
23 the NAV error?
24     MS. DEITSCH-PEREZ: Asked and
25     answered.

Page 107

JAMES DONDERO

1
2     THE WITNESS: Yes. Numerous board
3     minutes.
4 BY MR. MORRIS:
5    Q. Okay. And have those board minutes
6 been produced in this litigation?
7    A. I don't know.
8    Q. Okay.
9     MR. MORRIS: Let's go to the next
10     exhibit, 54.
11     MS. CANTY: (Complies with request.)
12     (Whereupon, Exhibit 54, E-mail
13     correspondence, Bates stamped D-CNL003777
14     through D-CNL003779, marked for
15     identification, as of this date.)
16 BY MR. MORRIS:
17    Q. Do you see that on the same day, at
18 the bottom, Mr. Klos sent an e-mail to the
19 Corporate Accounting Group?
20    A. Yes.
21    Q. And do you see that he instructed
22 the Corporate Accounting Group to transfer
23 $2.4 million from HCMLT to HCMFA?
24    A. Yes.
25    Q. And do you see that he specifically

Page 108

JAMES DONDERO

1
2 informed the Corporate Accounting Group that
3 this transaction was a, quote, "New inter
4 co-loan?
5    A. Yes.
6    Q. Do you see that he asked
7 Christian -- Kristin or Hayley to prepare a
8 Promissory Note for discussion?
9    A. Yes.
10    Q. Okay. Are you aware in May 2019,
11 Frank Waterhouse was included in the e-mail
12 string identified as Corporate Accounting?
13    A. I do not have that awareness.
14    Q. Okay. Do you see at the top
15 Ms. Hendrix -- Ms. Hendrix's response to
16 Mr. Klos's e-mail and attaches a copy of a
17 Promissory Note?
18    A. Yes.
19    Q. Okay.
20     MR. MORRIS: Can we just go to the
21     attachment, please.
22     MS. CANTY: (Complies with request.)
23 BY MR. MORRIS:
24    Q. Do you see that that is a Promissory
25 Note dated May 2, 2019, in the amount of

Page 109

JAMES DONDERO

1
2 $2.4 million that where the maker is Highland
3 Capital Management Fund Advisors, L.P.?
4    A. Yeah.
5    Q. Have you ever seen this before?
6    A. I think in our last deposition.
7    Q. Okay. Do you recall when you saw it
8 for the first time?
9    A. Our last deposition.
10    Q. Do you recall when you learned about
11 the existence of this document for the first
12 time?
13    A. I believe somehow regarding the
14 litigation.
15    Q. Okay. So you have no knowledge of
16 this Promissory Note until after the litigation
17 was commenced; do I have that right?
18    A. Correct.
19    Q. So you're not aware of Highland
20 having made a demand for payment on this
21 Promissory Note in December of 2020?
22    A. Not that I recall.
23    Q. Okay. Putting aside the question of
24 the Promissory Note, do you recall when you
25 first learned that the $2.4 million that you

Page 110

JAMES DONDERO

1         JAMES DONDERO
2  instructed to be paid to HCMFA by Highland in
3  May of 2019, do you recall when you first
4  learned that that was booked as a loan?
5      A.   I believe just generally as part of
6  this litigation, not before then.
7      Q.   Are you aware that the Corporate
8  Accounting Group created a daily list of wire
9  transfers that were being made on behalf of
10  Highland and its affiliates?
11     A.   Not -- no, not specifically.
12     Q.   Okay.  So since you did not know
13  that the $2.4 million transfer had been booked
14  as a loan, is it fair to say that you never
15  told anybody prior to the commencement of this
16  litigation that the transaction should not have
17  been booked as a loan?
18     A.   I had no conversations either way
19  prior to this litigation regarding the booking
20  of the 2.4 million.
21     Q.   Did you ever take any steps to try
22  to determine how Highland and HCMFA accounted
23  for the $2.4 million that you instructed to be
24  transferred from Highland to HCMFA in early
25  May 2019?

Page 111

1         JAMES DONDERO
2      A.   No.
3      Q.   Did you rely on Mr. Waterhouse to
4  oversee that?
5      A.   Yes.
6      Q.   Okay.  And you did so because he
7  held not only the CFO title at Highland, but he
8  also held the treasurer title at HCMFA,
9  correct?
10         MS. DEITSCH-PEREZ:  Object to the
11     form.
12         THE WITNESS:  I relied on him
13     because generally the accounting function
14     across the organization reported up through
15     him.
16  BY MR. MORRIS:
17     Q.   Let's talk about the $5 million
18  Note.
19         Do you recall that in early
20  May 2019, in fact, the next day, May 3rd,
21  Highland transferred $5 million to HCMFA?
22     A.   I -- I don't recall specifically.
23     Q.   Do you recall authorizing the
24  transfer of $5 million from Highland to HCMFA
25  in early May 2019?

Page 112

1         JAMES DONDERO
2      A.   Yes, generally.
3      Q.   Okay.  Why did you authorize
4  Highland to transfer $5 million to HCMFA in
5  early 2019?
6      A.   It was part of the overall
7  resolution of the TerreStar situation.
8      Q.   Do you recall that HCMFA paid
9  something called a consent fee equal to
10  $5 million in early May 2019?
11     A.   Well, like I said, I don't recall
12  the exact amounts or the exact amounts net of
13  insurance; but my recollection it was to
14  resolve that.
15     Q.   Do you know -- do you know -- did --
16  let's real simple.
17         Did -- did HCMFA pay a consent fee
18  in May of 2019?
19     A.   I -- I don't recall.
20     Q.   Do you know what a consent fee is?
21     A.   Yes.
22     Q.   What's a consent fee?
23     A.   It's a -- a fee to encourage
24  shareholder vote on something or shareholder
25  restitution on something, typically.

Page 113

1         JAMES DONDERO
2      Q.   And did -- do you recall if HCMFA
3  ever paid a consent fee in the year 2019?
4      A.   I don't recall.
5      Q.   Would Highland be responsible at all
6  if HCMFA paid a consent fee?
7         MS. DEITSCH-PEREZ:  Object to the
8     form.
9         THE WITNESS:  It could be.  I
10     don't -- I don't know or remember the
11     circumstances.
12  BY MR. MORRIS:
13     Q.   Is the payment of a consent fee a
14  voluntary decision by -- by HCMFA?  Is that
15  something that --
16         MS. DEITSCH-PEREZ:  Object to the
17     form.
18         MR. MORRIS:  Is that -- withdrawn.
19     That's fair.
20  BY MR. MORRIS:
21     Q.   Is the payment of a consent fee
22  required, or is that something that one can
23  exercise discretion in whether or not to make?
24         MS. DEITSCH-PEREZ:  Object to the
25     form.

Appx. 00166

Page 114

1          JAMES DONDERO
2          THE WITNESS:  My answer would be it
3      depends.
4  BY MR. MORRIS:
5      Q.   Do you recall whether Highland --
6  withdrawn.
7          Do you recall whether HCMFA was
8  required to make -- to make a -- to pay a
9  consent fee at any time in 2019?
10     A.   I don't recall.
11     Q.   Do you recall ever believing that
12 HCMFA paid a consent fee because of something
13 that -- because of a mistake that Highland
14 made?
15     A.   It could be.  I don't know.
16     Q.   I'm just asking if you had a
17 recollection?
18     A.   I don't have a recollection.
19     Q.   Okay.
20         MR. MORRIS:  To the videographer, I
21 think Mr. Dondero's screen has frozen.
22         MS. DEITSCH-PEREZ:  John, your
23 screen is frozen, too.
24         MR. MORRIS:  I'm --
25         MS. DEITSCH-PEREZ:  I'm also -- hang

Page 115

1          JAMES DONDERO
2  on.  I've lost contact.  Give me a minute.
3          THE VIDEOGRAPHER:  Okay.  I'd like
4  us to go off record.  Do you agree?
5          MR. MORRIS:  Yeah, but please don't
6  leave.
7          MS. DEITSCH-PEREZ:  Yes, we agree.
8          THE VIDEOGRAPHER:  All right.  Off
9  the record at 3:53.
10         (Discussion held off the record.)
11         THE VIDEOGRAPHER:  We are back on
12 the record at 3:54.
13 BY MR. MORRIS:
14     Q.   Okay.  Can we put up -- no.  Before
15 we do that, Mr. Dondero, can you hear me?
16         We can't hear you.  Are you on mute?
17         Are you on mute?  Can you speak?
18         You're yelling at me now.  Stop
19 yelling at me.
20         THE VIDEOGRAPHER:  I'm seeing is
21 that Mr. Dondero is on mute.
22         (Interruption.)
23         THE VIDEOGRAPHER:  We've got -- do
24 you want to go off video record?
25         MR. MORRIS:  No.

Page 116

1          JAMES DONDERO
2          Can somebody help Mr. Dondero and
3  get his audio feed fixed?
4          Thank you, sir.
5          MS. DEITSCH-PEREZ:  Does this make a
6  difference?
7          MR. MORRIS:  It sure does.
8          THE WITNESS:  Hello, hello.
9          THE WITNESS:  Thank you.  All right.
10 Let's try and -- let's try and finish this
11 up.
12 BY MR. MORRIS:
13     Q.   Are you ready, sir?
14     A.   Yes.
15     Q.   Were you aware in May 2019 that the
16 $5-million transfer from Highland to HCMFA was
17 booked as a loan?
18     A.   No.
19         MR. MORRIS:  Can we put up
20 Exhibit 56, please.
21         MS. CANTY:  (Complies with request.)
22         (Whereupon, Exhibit 56, E-mail
23 correspondence, Bates stamped D-CNL003763,
24 marked for identification, as of this
25 date.)

Page 117

1          JAMES DONDERO
2  BY MR. MORRIS:
3      Q.   All right.  Do you see that this is
4  an e-mail from Ms. Hendrix to the Corporate
5  Accounting Group on May 3, 2019?
6          Do you see that, sir?
7      A.   Yes.
8      Q.   And do you see that Ms. Hendrix told
9  corporate accounting to transfer $5 million as
10 a, quote, "new loan," close quote?
11     A.   Yes.
12     Q.   And did you see Ms. Hendrix also
13 said that she would, quote, "paper the loan,"
14 close quote?
15     A.   Yes.
16     Q.   Okay.  You're aware that from time
17 to time, members of the Corporate Accounting
18 Group used a template for a Promissory Note
19 that had been previously prepared by counsel,
20 correct?
21         MS. DEITSCH-PEREZ:  Object to the
22 form.
23         THE WITNESS:  I -- yeah.  I'm aware
24 they have a loan template, yes.
25

**Appx. 00167**

Page 118

1          JAMES DONDERO
2  BY MR. MORRIS:
3      Q.   Okay.  Do you see there's a
4  parenthetical in the first sentence that says,
5  "(4.4M should be coming in from Jim soon)"?
6      A.   Yes.
7      Q.   Do you know what that refers to?
8      A.   My -- my educated -- boy.  My
9  educted speculation is that Highland didn't
10  have enough cash, so I probably put four into
11  Highland for Highland to send to HCMFA.  That's
12  my educated guess; but otherwise, I don't know
13  specifically.
14      Q.   And do you recall that you had taken
15  out a loan from Highland in the year,
16  and this payment was credited against the
17  principal and interest then due on that Note?
18      A.   I don't have specific awareness.
19  That would make sense.
20      Q.   Okay.
21      A.   Versus -- versus creating a new loan
22  or something.
23      Q.   Okay.
24          MR. MORRIS:  Let's go to Exhibit 57,
25      please.

Page 119

1          JAMES DONDERO
2          MS. CANTY:  (Complies with request.)
3          (Whereupon, Exhibit 57, Promissory
4      Note, Bates stamped D-CNL003764 through
5      D-CNL003765, marked for identification, as
6      of this date.)
7  BY MR. MORRIS:
8      Q.   In fact, were you aware, sir, that
9  in May 2019, you paid Highland exactly
10  $7.5 million?
11      A.   Not specifically, but it makes sense
12  given the context we're discussing.
13      Q.   Okay.  So the context that we're
14  discussing was HCMFA needed $7.5 million.
15  Highland didn't have it.  So that seven -- you
16  paid $7.5 million to Highland, which was
17  applied against your outstanding note.  And
18  then Highland transferred that money to HCMFA.
19          Does that sound right to you?
20      A.   Generally, yes.
21      Q.   Okay.  So now if we look at this
22  that's on the screen, do you see this is a
23  Promissory Note for $5 million dated May 3,
24  2019?
25      A.   Yes.

Page 120

1          JAMES DONDERO
2      Q.   And did you see this for the first
3  time when I showed it to you late last week?
4      A.   Yes.
5      Q.   And did you learn about the loan
6  from Highland to HCMFA for the first time after
7  the litigation was commenced?
8      A.   That's the first time I remember.
9      Q.   And did you learn that Highland and
10  HCMFA had booked the $5-million transfer in May
11  of 2019 as a loan for the first time after the
12  litigation was commenced?
13      A.   That is my recollection.
14      Q.   Okay.  We talked at your first
15  deposition in May about Highland's audited
16  financial statements.
17          I don't know if you have a
18  recollection of that.  Do you?
19      A.   Just generally, yes.
20      Q.   Okay.  I just want to focus on these
21  two notes.
22          For this portion of the deposition,
23  we are questioning you in your individual
24  capacity, and you're only focused on these two
25  notes from HCMFA to Highland, okay?

Page 121

1          JAMES DONDERO
2      A.   Okay.
3      Q.   Okay.  When did you first learn that
4  these notes were carried as assets on
5  Highland's balance sheet?
6      A.   Like I said, I -- my recollection is
7  that as part of the bankruptcy and part of the
8  litigation.
9      Q.   And so did you learn of it as part
10  of the bankruptcy before the litigation was
11  commenced, or did you learn that these notes
12  were carried as assets after -- only after the
13  litigation was commenced?
14      A.   I believe only after.  Especially,
15  the specificity with regard to the notes, only
16  after the litigation was commenced.
17      Q.   Okay.  When did you learn for the
18  first time that these notes were carried as
19  liabilities on HCMFA's balance sheet?
20  Withdrawn.  No foundation.
21          Are you aware that these notes have
22  been carried as liabilities on HCMFA's balance
23  sheet?
24      A.   I wasn't -- I wasn't -- I wasn't
25  aware prior to the litigation.

Page 122

JAMES DONDERO

1
2    Q.   Okay.  Did you learn after the
3    litigation that these notes had been carried as
4    liabilities on HCMFA's balance sheets?
5    A.   Yes.
6    Q.   Okay.  Did you ever review
7    Highland's audited financial statements?
8    A.   Not with any specificity.
9    Q.   Are you aware that Highland gave
10   these Promissory Notes to PWC as part of the
11   audit process?
12   A.   I would assume they did, but I don't
13   have specific awareness.
14   Q.   Okay.  And why do you assume that
15   they did?
16   A.   As part of complete financials to
17   the extent that they were made by Kristin or
18   whoever, properly or improperly.  Once they
19   existed, they would have been part of a
20   complete audit.
21   Q.   Are you aware that these two
22   Promissory Notes were disclosed in Highland's
23   audited financial statements for the period
24   ending December 31, 2018, as subsequent events?
25   A.   No.

Page 123

JAMES DONDERO

1
2    Q.   Okay.
3       MR. MORRIS:  Can we put up
4    Exhibit 34, please.
5       MS. CANTY:  (Complies with request.)
6       (Whereupon, Exhibit 34, Highland
7    Capital Management, L.P., Consolidated
8    Financial Statements and Supplemental
9    Information, dated December 31, 2018, Bates
10   stamped D-CNL000212 through D-CNL000257,
11   marked for identification, as of this
12   date.)
13   BY MR. MORRIS:
14   Q.   And turn to -- just if you can see,
15   sir, the first page of this is the December 31,
16   2018, financials.
17      MR. MORRIS:  And if we could go to
18   the second or third page to see
19   PricewaterhouseCoopers' signature.
20      MS. CANTY:  (Complies with request.)
21   BY MR. MORRIS:
22   Q.   And do you see that
23   PricewaterhouseCoopers signed off on the audit
24   on June 3, 2019?
25   A.   Yes.

Page 124

JAMES DONDERO

1
2    Q.   Okay.
3       MR. MORRIS:  Can we go to page 252
4    of the document?  It's got to be -- let's
5    see the Bates.
6       MS. CANTY:  (Complies with request.)
7       MR. MORRIS:  Yeah.  Right there.
8    Okay.  Scroll just to the page before so we
9    can see the heading.
10      MS. CANTY:  (Complies with request.)
11   BY MR. MORRIS:
12   Q.   Okay.  Do you see that this is the
13   section of the audited financials entitled
14   "Subsequent Events"?
15   A.   Yes.
16   Q.   And is it your understanding that
17   the auditors include in subsequent events
18   material transactions THAT occur between the
19   end of the fiscal period in which had audit has
20   been conducted and the date that the auditors
21   sign off?
22   A.   Yes.
23   Q.   Okay.  So if you look at page 39,
24   the next to the last paragraph, do you see, it
25   says, quote, "Over the course of 2019 through

Page 125

JAMES DONDERO

1
2    the report date, HCMFA issued Promissory Notes
3    to the partnership in the aggregate amount of
4    $7.4 million?
5    A.   Yes.
6    Q.   Okay.  And are you surprised to see
7    that in the audit report?
8       MS. DEITSCH-PEREZ:  Object to the
9    form.
10      MR. MORRIS:  Withdrawn.
11   BY MR. MORRIS:
12   Q.   Have you seen -- have you seen this
13   entry in the audit report before this moment?
14   A.   No.
15   Q.   Okay.  Are you aware that Highland
16   employees were responsible for drafting the
17   audit report?
18   A.   Responsible for drafting the audit
19   report?  I don't know if that's a fair
20   statement.
21      I think they provide the detail; but
22   my understanding, the audit report is a work
23   product of the accounting firm.  That's my
24   understanding.
25   Q.   Was there a group within Highland

**Appx. 00169**

Page 126

JAMES DONDERO

1        JAMES DONDERO
2   that was responsible for working with the
3   auditors in the preparation of the audit
4   reports?
5        A.   Yeah, yes.
6        Q.   Do you know what group that was?
7        A.   I believe there's a financial
8   reporting group that reports to Frank that
9   handles this interaction.
10       Q.   Are you familiar -- are you aware of
11  what role Mr. Waterhouse plays, if any, in
12  connection with Highland's annual audit, at
13  least during the time that you were serving as
14  president?
15       A.   I think he -- he coordinates -- I
16  think he has to sign off on many aspects of it,
17  you know, as a C suite executive.  So he's
18  responsible for, you know, completeness,
19  integrity, et cetera.
20            And there's a certain amount of
21  reliance that PWC puts on it; but my
22  understanding is audits for the last bunch of
23  years has been pretty much a hundred percent
24  sampling and verification.
25       Q.   High- --

Page 127

JAMES DONDERO

1        JAMES DONDERO
2        A.   -- PWC.
3        Q.   I apologize, sir.
4            Highland was the sole source of
5   information that's contained in its audit
6   reports, right, to the best of your knowledge?
7        A.   No.  No.  When I -- the last thing I
8   said a minute ago about I believe it was a
9   hundred percent sampling and verification, I
10  think the audit firm ties back to vendors,
11  credit agreements, source documents, et cetera.
12           Highland is not the only source of
13  this information.
14       Q.   You were also responsible for the
15  audit report; is that fair?
16       A.   Yes.
17       Q.   And that's because you signed a
18  management representation letter, correct?
19       A.   Yes.
20       Q.   And do you have an understanding of
21  what management a representation letter is?
22           MS. DEITSCH-PEREZ:  Object to the
23           form.  I think you've asked this in each
24           day of the deposition.
25           MR. MORRIS:  Okay.  Just trying to

Page 128

JAMES DONDERO

1        JAMES DONDERO
2   get some background here.
3            THE WITNESS:  Yes, I have a general
4            understanding.  They very from accounting
5            firm to accounting firm, and they very
6            depending upon the type of audit.  But I
7            have a general understanding of them, yes.
8   BY MR. MORRIS:
9        Q.   Okay.  And you're -- are you aware
10  that HCMFA had its financial statements audited
11  by PWC as well?
12       A.   Yes.
13       Q.   Are you aware that HCMFA disclosed
14  the May 2019 Notes in its own audited financial
15  statements?
16       A.   I assume so.
17       Q.   Have you ever --
18       A.   I don't have specific -- I don't
19  have specific awareness, but it's not reported
20  here but not on HCMFA; so I assume they are,
21  yes.
22       Q.   Okay.  And do you sign Management
23  Representation Letters for HCMFA's audit as you
24  do for Highland?
25       A.   I believe so.

Page 129

JAMES DONDERO

1        JAMES DONDERO
2        Q.   Have you ever told anyone that
3   HCMFA's audited financial statements for the
4   period ending December 31, 2018, inaccurately
5   described the $7.4 million transferred from
6   Highland to HCMFA as loans?
7            MS. DEITSCH-PEREZ:  Object to the
8            form.
9            THE WITNESS:  No, I have not; but I
10           haven't been involved in any of the audit
11           functions for quite some time.
12           I don't think I was involved or
13           signed Management Representation Letters
14           for any period covered by this.
15  BY MR. MORRIS:
16       Q.   Okay.  Let's switch gears.
17           The advisors have annual contracts
18  to manage certain retail funds, correct?
19       A.   Yes.
20       Q.   And the retail funds have a board
21  that decides whether to renew the contracts
22  with the advisors, correct?
23       A.   Yes.
24       Q.   And in connection with the annual
25  renewal, the advisors provide information to

Page 130

1        JAMES DONDERO
2  the retail board, correct?
3      A.  Yes.
4      Q.  And you've participated in meetings
5  with the retail board concerning the renewal
6  process, correct?
7      A.  Sometimes.
8      Q.  Okay.  Do you recall that in late
9  2020, the advisors provided a written memo to
10  the retail board in connection with the annual
11  15-C review process?
12      A.  No.
13      Q.  Okay.
14        MR. MORRIS:  Can we put up
15  Exhibit 59, please.
16        MS. CANTY:  (Complies with request.)
17        (Whereupon, Exhibit 59, Memorandum,
18        dated October 23, 2020, Bates stamped
19        HCMFAS 000025 through HCMFAS 000031, marked
20        for identification, as of this date.)
21  BY MR. MORRIS:
22      Q.  Do you see that this is a memo dated
23  October 23, 2020?
24      A.  Yes.
25      Q.  Is it fair to describe this memo as

Page 131

1        JAMES DONDERO
2  a memo from the advisors to the retail boards
3  concerning a supplemental 15-C information
4  request?
5      A.  Yes.
6      Q.  Okay.  As always, Mr. Dondero, you
7  can view any portion of this document.  But if
8  we could just scroll down a little bit, I just
9  want to know --
10        MS. DEITSCH-PEREZ:  Do we have a
11  copy of this document?  Is it in your book?
12        MR. MORRIS:  No.
13        MS. DEITSCH-PEREZ:  Okay.  Well,
14  then he can't actually look at it.  He's
15  looking at what's on the screen.
16        MR. MORRIS:  Please.
17  BY MR. MORRIS:
18      Q.  Mr. Dondero, do you understand what
19  I meant?
20        Will you let me know if there's any
21  portion of the document you want to see?
22      A.  Sure.  Can you -- can you just keep
23  scrolling and let me see the next page?
24      Q.  Thank you, sir.
25        MS. CANTY:  (Complies with request.)

Page 132

1        JAMES DONDERO
2        THE WITNESS:  Just stop there for a
3  second.
4        MS. CANTY:  (Complies with request.)
5        THE WITNESS:  Okay.  Keep going.
6        MS. CANTY:  (Complies with request.)
7  BY MR. MORRIS:
8      Q.  Just -- I'm going to ask you
9  questions about Section 2 just so you know, but
10  you're welcome to view any portion of this
11  document as you believe necessary.
12        MS. CANTY:  I also put it in the
13  chat, John.
14        MR. MORRIS:  Thank you.
15        THE WITNESS:  I see it.
16  BY MR. MORRIS:
17      Q.  Okay.  So --
18      A.  Can you go -- let's keep going.
19  Just I'll quickly read the whole thing.
20      Q.  No problem.
21      A.  That's it.  Okay.  Got it.  All
22  right.
23      Q.  Okay.  So now that you've seen the
24  substance of the memo, do you recall if you saw
25  it before today?

Page 133

1        JAMES DONDERO
2      A.  I've never seen it before today.
3      Q.  Okay.  So do you know who's
4  responsible for preparing a memo of this type
5  on behalf of the advisors?
6      A.  Let's go back to the front and see
7  who it's from.
8      Q.  Sure.
9        MS. CANTY:  (Complies with request.)
10  BY MR. MORRIS:
11      Q.  Is that --
12      A.  Yeah.  Now, I -- given what it is,
13  it's something that, I'm sure, comes out of
14  legal and compliance.
15      Q.  And does -- do the advisors have --
16  withdrawn.
17        Did the advisors have their own
18  legal and compliance officers as of October 23,
19  2020?
20      A.  No.
21      Q.  Did they have any -- did anybody
22  serve as the advisors' general counsel as of
23  October 23, 2020?
24      A.  My belief and recollection is the
25  Shared Services Agreements provided the legal

Appx. 00171

Page 134

JAMES DONDERO

2  and accounting support for all the funds listed
3  in the "to" section here.
4        As I said earlier, NexPoint has a
5  couple accountants -- I mean -- I'm sorry -- a
6  couple lawyers who do real estate transactions
7  stuff.  Their -- their title -- their title
8  meaning DC's counsel, DC Sauter, who's the most
9  senior attorney there, it might be general
10  counsel; but he only does real estate
11  transactions.
12        The legal dependents of NexPoint and
13  HCMFA was on the Shared Services Agreement and
14  the Highland attorneys that performed those
15  Shared Services Agreements.
16    Q.  Okay.  Did anybody acting on behalf
17  of the advisors review and approve this memo
18  before it was sent to the retail funds?
19    A.  I don't know.
20    Q.  Is it your practice as the president
21  of the advisors to have memos sent to the
22  retail board without anybody reviewing and
23  approving the memos on behalf of the advisors?
24        MS. DEITSCH-PEREZ:  Object to the
25    form.

Page 135

JAMES DONDERO

2        THE WITNESS:  I'm not aware of what
3  standard practice was or wasn't; but again,
4  the infrastructure for something like this
5  would have been only at Highland.
6        HCMFA only had portfolio managers
7  and analysts as employees, and NexPoint
8  pretty much only had portfolio managers and
9  analysts as employees.
10        The staff functions were at
11  Highland, and Highland serviced the funds
12  via a Shared Services Agreement that was
13  still in place as of the date of this memo.
14    MR. MORRIS:  Okay.  Can we go down
15  to Section 2, please.
16    MS. CANTY:  (Complies with request.)
17  BY MR. MORRIS:
18    Q.  Looking at Section 2, do you see
19  that there's a question as to whether there are
20  any material amounts currently payable or due
21  in the future EG notes to --
22    A.  Yes.
23    Q.  -- the Highland by HCMFA or
24  NexPoint?
25    A.  Yes.

Page 136

JAMES DONDERO

2    Q.  Okay.  In the 53 or 54 weeks since
3  this memo as was sent, do you know if it has
4  been amended or modified in any way?
5    A.  I believe there was similar memos
6  like this for this year's annual -- for the
7  2021 renewal, but I do not have -- I've not
8  seen those either; and I don't know how this
9  answer would have changed.
10    Q.  Okay.  But at least as of
11  October 23, 2020, this is the response that the
12  advisors gave to the retail board in response
13  to Question Number 2, right?
14        MS. DEITSCH-PEREZ:  Object to the
15    form.
16        THE WITNESS:  As far -- as far as I
17    know, having seen it here for the first
18    time and not knowing whether this was the
19    final or if there were subsequent letters
20    and not knowing what the 2021 letter looks
21    like, on its surface that appears so; but I
22    have no awareness.
23  BY MR. MORRIS:
24    Q.  Okay.  And just I'll represent to
25  you, Mr. Dondero, that I obtained this letter

Page 137

JAMES DONDERO

2  from counsel to the advisors in response to my
3  specific request for the October 2020, 15-C
4  response.  So that's how -- that's how I got it
5  just so you know.
6    A.  Okay.
7    Q.  So -- so were you aware in October
8  of 2020 that NexPoint informed the retail board
9  that as of June 30, 2020, it owed Highland and
10  its affiliates approximately $23.7 million?
11        MS. DEITSCH-PEREZ:  Object to the
12    form.
13        THE WITNESS:  I was not aware.
14  BY MR. MORRIS:
15    Q.  Does that amount comport with your
16  recollection as to what was outstanding on the
17  May 31, 2017, note that NexPoint gave to
18  Highland?
19    A.  I don't have awareness.
20    Q.  Okay.  Did NexPoint -- do you know
21  if NexPoint ever informed the retail board that
22  any -- any portion of that $23.7 million was
23  subject to any of the agreements that you
24  entered into with the Dugaboy trustee?
25    A.  I -- I don't know.

Page 138

JAMES DONDERO

2    Q.   Did you ever instruct anybody on
3  behalf of NexPoint to advise the retail board
4  of the existence of the agreements?
5    A.   No, I do not believe so.
6    Q.   Do you know if anybody acting on
7  behalf of NexPoint has ever informed the retail
8  board that NexPoint's outstanding obligation
9  was subject to the agreements that you entered
10  into with the Dugaboy trustee?
11    A.   No.
12    Q.   Did you ever inform the retail
13  boards that any portion of this $23 million was
14  subject to offset?
15    A.   You know what, I -- let me answer
16  that and let me also adjust the last five no
17  answers I just rattled off.
18        I'm thinking in the context of the
19  time period of this letter, which
20  is October of 2020.
21        Again, there would have been similar
22  letters and disclosures like this and
23  additional questions, initial requests for
24  renewal, and then subsequent questions,
25  probably multiple subsequent questions, given

Page 139

JAMES DONDERO

2  everything that's going on with the Highland
3  bankruptcy in 2021.
4        And I'm not aware of what those
5  letters contain.  I haven't seen those letters
6  either, but those letters may include quite a
7  bit of disclosure regarding the questions that
8  you're asking me; but I don't know.  But I
9  didn't specifically instruct anybody to tell
10  the board.  I also didn't instruct anybody
11  specifically to not tell the board.
12        So I don't know what was told to the
13  board for the period after October 2020.
14    Q.   Okay.  I appreciate that, and I can
15  only ask you what you know, right?
16        And so what may or may not be in any
17  other report is kind of irrelevant here because
18  you haven't seen those reports, right?
19    A.   Correct.
20    Q.   Okay.  And so you have no basis of
21  knowing one way or the other whether any report
22  delivered to the retail board after October
23  2020 -- 2020 contains anything about the
24  agreements that you entered into with the
25  Dugaboy trustee, correct?

Page 140

JAMES DONDERO

2    A.   Right.  I just want to be clear that
3  my answer's saying I did not specifically
4  instruct somebody to tell them.  It doesn't
5  mean they don't know or someone else didn't
6  tell them.
7    Q.   Okay.
8    A.   So that's -- that's a clarification
9  I want to make.
10    Q.   Okay.  No problem.
11        And then -- and then do you see that
12  there's a report to the retail board that HCMFA
13  had approximately $12.3 million outstanding to
14  Highland as of June 30, 2020?
15    A.   Yes.
16    Q.   Okay.  So just the same type of
17  questions.
18        Do you have any knowledge as to how
19  that number was calculated?
20    A.   No.
21    Q.   Do you know if it includes the
22  $7.4 million, which is the aggregate principal
23  amount of the two notes that HCMFA issued to
24  Highland in May of 2019?
25    A.   I don't specifically, but given

Page 141

JAMES DONDERO

2  everything we have gone over in the last -- I
3  don't know.  Probably.
4    Q.   Okay.  Do you know whether anybody
5  has informed the retail board on behalf of
6  HCMFA that that $12.3 million was overstated by
7  $7.4 million?
8    A.   I -- I don't know.
9    Q.   Okay.  Do you know whether -- do you
10  know whether anybody acting behalf of HCMFA
11  ever told the retail boards that the
12  $12.3 million was subject to offset of any
13  kind?
14    A.   I don't know, but I can't imagine
15  the October 21 letter didn't address some of
16  those issues because those issues I'm not sure
17  were known at this point in time.
18    Q.   Okay.  If -- and we can look at
19  paragraph 1 if it helps.
20        But my question is whether you're
21  aware of anybody on behalf of HCMFA ever
22  informing the retail board in 2020 that HCMFA
23  had claims against Highland?
24        MS. DEITSCH-PEREZ:  Object to the
25  form.

Page 142

JAMES DONDERO

1       JAMES DONDERO
2       THE WITNESS: I don't know.
3   BY MR. MORRIS:
4       Q.   Do you know whether anybody acting
5   on behalf of either the advisors informed the
6   retail board at any time in the year 2020 that
7   either advisor had claims against Highland?
8       MS. DEITSCH-PEREZ: Object to the
9   form.
10       THE WITNESS: I don't know.
11       MR. MORRIS: Okay. We can take that
12   down, please.
13       MS. CANTY: (Complies with request.)
14   BY MR. MORRIS:
15       Q.   Are you aware that the Court
16   confirmed the Debtor's Fifth Amended Complaint
17   of Reorganization in February of 2021?
18       A.   Generally.
19       Q.   And do you recall that objections to
20   the confirmation of the plan were filed by you
21   and each of the advisors, among others?
22       A.   Yes.
23       Q.   And do you recall that these
24   actions, these lawsuits to collect on the
25   notes, they were commenced before the

Page 143

1   confirmation hearing, right?
2       A.   I – I don't – I don't know.
3       Q.   All right. I'll represent to you
4   that the lawsuits were commenced on or about
5   January 22, and the confirmation hearing took
6   place, I think, on February 2 and February 3,
7   2021.
8       Does that refresh your recollection
9   at all that the lawsuits were known to you at
10   the time of confirmation?
11       MS. DEITSCH-PEREZ: Object to the
12   form.
13       THE WITNESS: Not specifically. I
14   mean, given the details you just explained,
15   I guess generally.
16   BY MR. MORRIS:
17       Q.   Okay. I'd like to refer to you
18   NexPoint and HCMFA and HCRE and Services
19   collectively as the defendants for the next set
20   of questions, okay?
21       A.   Okay.
22       Q.   And these questions are in your
23   capacity as an individual and in your 30(b)(6)
24   capacity, okay?
25

Page 144

1       JAMES DONDERO
2       Is that okay, sir?
3       A.   I'll do the best I can. If I – if
4   I need clarity or caveats, I'll throw them out
5   there.
6       Q.   Okay. Now, I do understand you're
7   not a 30(b)(6) witness for HCMFA today. So
8   let's make that clear.
9       MS. DEITSCH-PEREZ: Thank you.
10   BY MR. MORRIS:
11       Q.   As to HCMFA, you're just here in
12   your individual capacity as the control person,
13   okay?
14       Prior to confirmation, do you know
15   whether anyone acting on behalf of any of the
16   defendants ever disclosed to the bankruptcy
17   court the terms or the existence of your
18   agreement – agreements with the Dugaboy
19   trustee?
20       A.   I guess generally, I've testified to
21   this already. There were numerous
22   conversations with Seery, and I know Lynn had
23   conversations.
24       Q.   Sir, I apologize, but I'm going to
25   interrupt because I know you're tired; and I

Page 145

1       JAMES DONDERO
2   want to get this done. But my question had to
3   do with the disclosure to the bankruptcy court,
4   okay? Let me just try again.
5       Are you aware, sir, whether any of
6   the defendants disclosed to the bankruptcy
7   court prior to confirmation the existence of
8   the agreements that you entered into with the
9   Dugaboy trustee?
10       MS. DEITSCH-PEREZ: Object to the
11   form and to interrupting the witness.
12       THE WITNESS: I'll say yes.
13   BY MR. MORRIS:
14       Q.   Okay. Did you do that?
15       A.   Yes.
16       Q.   And did you do that as part of your
17   testimony in the hearing, or did you do it
18   through the filing of a pleading?
19       MS. DEITSCH-PEREZ: Object to the
20   form.
21       THE WITNESS: I don't – I don't
22   know about pleadings or filings. I – I
23   don't know.
24   BY MR. MORRIS:
25       Q.   Do you recall what you told the

**Appx. 00174**

Page 146

JAMES DONDERO

1    JAMES DONDERO
2    bankruptcy court about the agreements that you
3    entered into with the Dugaboy trustee?
4        A.    No.  I'm not -- yes.  No.  I'm
5    not -- no, I don't.  I don't want to -- I don't
6    want to start talking and have you strike it or
7    object.  So I'll just answer specifically until
8    you get to the question.
9        Q.    Yeah.  So -- so again, I'm not
10   trying to trick you.
11           Can you recall when you told the
12   bankruptcy court that you had entered into will
13   the agreements with the Dugaboy trustee?
14       A.    No.
15       Q.    Can you remember the subject matter
16   of any hearing at which you informed the
17   bankruptcy court about the existence of the
18   agreements that you entered into with the
19   Dugaboy trustee?
20       A.    I don't know where or how this works
21   legally.  But every written proposal we put
22   forward as a solution and as a plot plan,
23   always had a zero on all the affiliated notes
24   as being a zero in something that was
25   ultimately likely to be compensation.

Page 147

1    JAMES DONDERO
2        All of those settlement proposals,
3    some were done formally through Seery; some
4    were done indirectly; some of it were -- some
5    of them were done to the independent board;
6    some of them were done directly to Clemente.
7    But all of those documented the expectation
8    that the notes were compensation.
9        Q.    Do you believe that any of the
10   documents that you just described were ever
11   presented to the bankruptcy court?
12       A.    Yes.
13       Q.    Okay.  When and in what context were
14   those documents delivered to the bankruptcy
15   court?
16       A.    I believed that the independent
17   board and Seery were representatives of the
18   bankruptcy court in that regard.
19       So I think within a month, two
20   months of the filing, there were proposals made
21   to creditors directly and the independent
22   board; and then subsequently, once Seery became
23   president, to him.
24       And then when Seery proved
25   ineffective regarding settlements, there were

Page 148

1    JAMES DONDERO
2    reach outs -- reaches out to creditors directly
3    again and -- to Clemente and the committee; but
4    I think the committee already sold all their
5    stuff by that point.
6        I mean, I -- listen, I -- but I
7    consider those reach-outs and characterizations
8    of the notes as not part of settlement under
9    the estate and that is likely to be
10   compensation notifying the Court generally.
11       Q.    Okay.  Are you aware of any notice
12   that was ever given to Judge Jernigan about the
13   existence of any of the agreements that you
14   entered into with the Dugaboy trustee?
15       A.    I -- I don't know.
16       Q.    Okay.  You're not aware of any as
17   you sit here right now; is that fair?
18       A.    Yes.  I'm not aware if any of my
19   reach-outs to the people that I described ever
20   made it to Jernigan.  I don't know.
21       Q.    Okay.
22       A.    I know she asked for updates on the
23   plot plan.  I know she asked for whatever, but
24   I don't know what specificity any of the people
25   I described presented them to her.  So I don't

Page 149

1    JAMES DONDERO
2    know.
3        Q.    And I appreciate what you've said
4    about the proposals that you've made.  But my
5    next question's very specific.
6        Prior to the commencement of
7    litigation, did you or anybody acting on your
8    behalf ever tell Jim Seery or Matt Clemente of
9    your agreements with the Dugaboy trustee?
10       A.    I -- I don't know specifically.
11       Q.    Thank you very much.
12       THE COURT REPORTER:  I'm sorry.
13   When you get to a good point, could we just
14   take a quick break?
15       MR. MORRIS:  Yeah.  Why don't we do
16   that, and I hope to try to wrap up.  So
17   it's 5:37.  I mean, I'm going to need
18   probably, you know, another half hour or an
19   hour; but I want to try to finish.  It's
20   5:38.
21       I'm fine with if we just come back
22   at 4:45 Central Time, seven minutes.
23       THE VIDEOGRAPHER:  All right.  We're
24   off record at 4:38.
25       (Whereupon, a break was taken.)

Page 150

JAMES DONDERO

1
2      THE VIDEOGRAPHER:  This is the
3   beginning of Media Number 3 in the
4   deposition of James Dondero.  We are back
5   on the record.  The time is 4:45.
6   BY MR. MORRIS:
7      Q.    Just to finish up on the topic we
8   were on when we took the break, Mr. Dondero.
9         Prior to confirmation, do you know
10  which of the defendants ever informed the
11  bankruptcy court that any of the Promissory
12  Notes that are the subject of the lawsuits were
13  unenforceable for any reason?
14         And when I use the phrase
15  "bankruptcy court" here -- you know what, let
16  me ask a different question.
17         Prior to confirmation, do you know
18  if anybody acting on behalf of the defendants
19  ever disclosed to Judge Jernigan that any of
20  the Promissory Notes subject to the lawsuits
21  were unenforceable for any reason?
22      MS. DEITSCH-PEREZ:  Object to the
23  form.
24      THE WITNESS:  I don't know.
25

Page 151

JAMES DONDERO

1
2   BY MR. MORRIS:
3      Q.    Prior to confirmation, did you
4   direct anybody to inform Judge Jernigan that
5   any of the Promissory Notes were unenforceable
6   for any reason?
7      A.    I don't know.
8      Q.    Okay.  I want to direct your
9   attention to December 2020.
10         Do you recall if you had a
11  conversation with Frank Waterhouse concerning
12  payments that were due to Highland by any of
13  the companies that you directly or indirectly
14  own or control?
15      A.    I'm trying to think.  Generally, we
16  overpaid on shared services, so -- by a
17  significant amount, I believe 14, 15 million
18  bucks.  And then there was a supposed to be an
19  overall transition settlement true-up regarding
20  the employees, the office space, you know,
21  whatever.
22         So the -- yeah, that's -- that's the
23  -- that's my general recollection.
24      Q.    But did you give Mr. Waterhouse any
25  instructions as to whether to pay or not pay

Page 152

JAMES DONDERO

1
2   any amounts that were due and owing to Highland
3   under any agreement between Highland and any
4   affiliate?
5      MS. DEITSCH-PEREZ:  Object to the
6   form.
7         Are you asking about the Notes or
8   the Shared Services Agreements?
9      MR. MORRIS:  I'm asking about -- I'm
10  asking very broadly any payments.
11         THE WITNESS:  I do remember having
12  conversations not to pay any more shared
13  services.
14         And I hope there weren't anymore
15  payments on shared services.  There --
16  There was never a specific to not pay the
17  notes.
18  BY MR. MORRIS:
19      Q.    So your recollection is that you
20  instructed Mr. Waterhouse not to make any
21  further payments under the shared services, and
22  that's the instruction you gave?
23      A.    Yes.
24      Q.    Did you ever tell anybody in
25  December of 2020 about your conversation with

Page 153

JAMES DONDERO

1
2   Mr. Waterhouse?
3      A.    Not that I recall.
4      Q.    Do you recall telling anybody other
5   than Mr. Waterhouse in December 2020 that no
6   payment should be made to Highland under the
7   Shared Services Agreement?
8      A.    I do believe there was a team -- I
9   can't remember -- I know Dustin Norris is on
10  that team.  He was aware.  He was aware.  And
11  as a matter of fact, I think -- yeah.  He -- I
12  know he was aware for sure.
13      Q.    Anybody else?
14      A.    There were other people on that
15  team, but I can't remember who was on that team
16  or who was in the room at any time.
17      Q.    Is there anything in writing that
18  you recall that reflects the instruction that
19  you gave to Mr. Waterhouse in December 2020
20  that we're talking about?
21      A.    I believe the back-and-forth and the
22  true-up with Seery on the multiple of things
23  that I was just discussing, you know, right to
24  transition of people, it included no more
25  shared services being paid and a credit for

Page 154

JAMES DONDERO

1     JAMES DONDERO
2  overpayment on shared services. And those --
3  those spreadsheets went back and forth, and
4  Seery has copies of them also.
5     Q.  Are you aware of any payments being
6  made by the advisors to Highland after
7  November 30, 2020?
8     A.  Hopefully not on shared services. I
9  believe there were payments on principal and
10 interest on notes.
11    Q.  Were any of those payments that you
12 have in mind made before the end of calendar
13 year 2020 -- withdrawn.
14       Were any of those payments that you
15 have in mind made in December 2020?
16    A.  I don't know. I don't know which
17 ones were paid and kept current. I don't know
18 which ones were cured. I don't -- I don't
19 remember which ones were cured.
20    Q.  Are you aware of any note that was
21 tendered by one of Highland's affiliates on
22 which payment was made in December 2020?
23    A.  I don't know. I don't know when --
24 I don't know which ones were kept current. I
25 don't know which ones were cured in December.

Page 155

JAMES DONDERO

1  I don't know which ones were cured in January
2  or February. I don't know.
3     Q.  Is it your testimony that you
4  believe that one or more of Highland affiliates
5  made a payment in December 2020 to cure -- as a
6  cure payment?
7     MS. DEITSCH-PEREZ:  Object to the
8  form.
9  BY MR. MORRIS:
10    Q.  I just -- I'm sorry. I --
11    A.  I -- I -- okay.
12    Q.  Yeah. I just want to try to get
13 this as cleanly as I can. Did you --
14    A.  I believe --
15    Q.  Go ahead, sir.
16    A.  No. I'll let you go. It's better
17 if you ask me.
18    Q.  Okay. Did you direct anybody to
19 make any payment in December 2020 to Highland
20 on behalf of any affiliate that you owned or
21 controlled?
22    A.  I believe all notes are outstanding
23 and current and in good standing. I don't know
24 when they were cured.
25

Page 156

JAMES DONDERO

1     JAMES DONDERO
2     Q.  Are you just talking about the term
3  notes here or the demand notes as well?
4     A.  All of the above. All of the notes
5  as far as I know.
6     Q.  Are you aware that in December 2020,
7  Highland made a demand for payment under all of
8  the demand notes?
9     A.  And I believe they're all current as
10 far as interest and principal amortization. I
11 believe they've all been cured.
12    Q.  Okay. Can you identify any payment
13 that was made in December 2020 to Highland on
14 behalf of yourself or any entity that you
15 directly or indirectly own or control?
16    A.  I wouldn't have been involved in --
17 I wouldn't have been involved in normal course
18 payments. I know there were -- I know for sure
19 there were cure payments in January. I don't
20 know if there were in December.
21    Q.  Okay. And that's -- we'll get to
22 January. I'm just trying to finish up
23 December.
24       Are you aware of any payments made
25 in December 2020 --

Page 157

JAMES DONDERO

1     JAMES DONDERO
2     MS. DEITSCH-PEREZ:  Object to the
3  form.
4  BY MR. MORRIS:
5     Q.  -- by you -- by you or any entity
6  directly or indirectly owned or control by you
7  to Highland?
8     A.  I don't have awareness.
9     Q.  Do you recall that early in 2021,
10 Highland gave notice of default on the three
11 term notes?
12    A.  I'm aware in -- that January -- yes,
13 I guess I am aware that Highland declared them
14 in default in January, yes.
15    Q.  And you're aware that in addition to
16 declaring them in default, they gave notice of
17 acceleration?
18    A.  I'm not aware of acceleration. I'm
19 aware of, I guess, default I had heard.
20    Q.  Did you ever see the
21 notice-of-default letters that Highland sent to
22 NexPoint HCRE and services?
23    A.  I don't believe I've seen all of
24 them. I think I've seen one on demand notes.
25 I don't think I've -- I don't remember seeing

Page 158

JAMES DONDERO

1 any on term loans.

2    Q.   All right. So as you sit here right

3 now, you don't have a recollection of having

4 seen the default notices that were sent by

5 Highland in January 2021 with respect to the

6 term notes, right?

7      MS. DEITSCH-PEREZ: Why don't you

8 show him one.

9      THE WITNESS: I don't recall. Yeah.

10 I mean, I don't -- I don't recall seeing

11 any of them.

12 BY MR. MORRIS:

13    Q.   Okay. How did you learn that

14 Highland had sent the default notices?

15    A.   I believe it was at a hearing I

16 attended in person from which I called Frank,

17 and I was surprised and annoyed that the

18 relative de minimis amounts hadn't been paid;

19 and I asked him what does it take to cure them

20 or make them current.

21      And then he told me the numbers, and

22 they were small and de minimis; and I told him

23 make sure they get paid and make sure the notes

24 are cured.

Page 159

JAMES DONDERO

1    Q.   Did you do anything or say anything

2 else with respect to your -- your learning

3 about the declaration of default?

4    A.   No. It -- no. I don't remember

5 anything else.

6    Q.   Did you ask your -- do you know

7 whether anyone acting on behalf of ever reached

8 out to Highland with respect to the payments

9 that were made in January of 2021 as cure

10 payments as you described them?

11    A.   Frank was Highland.

12    Q.   I'm asking --

13    A.   Frank -- Frank -- Frank was the

14 person I reached out to at Highland. Who else

15 would I reach out to at Highland?

16    Q.   Did you -- did you reach out to

17 anybody else?

18    A.   No. Just Frank.

19    Q.   Okay. Did anybody acting on your

20 behalf reach out to anybody else?

21    A.   Not that I know of or not that I

22 thought was necessary.

23    Q.   In January of 2021, did it occur to

24 you to either communicate with or through your

Page 160

JAMES DONDERO

1 lawyer, with Mr. Seery, about this?

2      MS. DEITSCH-PEREZ: Object to the

3 form.

4      THE WITNESS: No. I thought Frank

5 was fully empowered.

6 BY MR. MORRIS:

7    Q.   Okay. Did you ever confirm your

8 understanding about the cure with

9 Mr. Waterhouse in writing?

10    A.   In writing? No. I believe it was

11 all in that phone conversation from the Court.

12 I don't -- I don't recall anything in writing,

13 but I'll check.

14    Q.   Do you recall sending him an e-mail

15 in which you confirmed with Mr. Waterhouse your

16 understanding that the debtor had agreed that

17 the payments that were being paid would

18 constitute a cure?

19    A.   No, I didn't -- no. At the time I

20 didn't think it was necessary. It was -- the

21 cure amount was calculated by Frank. It was

22 paid immediately. It was accepted. I never --

23 I never thought to memorialize it beyond that.

24    Q.   Okay. Did you -- did you ever ask

Page 161

JAMES DONDERO

1 your attorneys to confirm with Pachulski Stang

2 Ziehl & Jones or anybody acting on behalf of

3 the debtor that the payments that were made

4 would be deemed to be cure payments?

5      MS. DEITSCH-PEREZ: I'm going to not

6 to disclose communications with counsel.

7 BY MR. MORRIS:

8    Q.   Okay. Do you know whether your

9 lawyers or anybody acting on your behalf ever

10 sought to confirm your understanding that the

11 payments would be deemed to have cured the

12 default under the three term notes?

13    A.   Not that I'm aware of.

14    Q.   Okay. Is there any written record

15 of your call with Mr. Waterhouse?

16    A.   If it was from my cell phone, I'm

17 sure there's a written record taking place of

18 the call taking place.

19    Q.   Right. But did you take any notes,

20 or is there anything in writing that

21 memorialized or reflected your conversation

22 with Mr. Waterhouse in January of 2021 about

23 the cure?

24    A.   Not that I'm aware of and not that I

JAMES DONDERO

1            JAMES DONDERO
2  thought was necessary.
3      Q.   Okay.  Did – did you ever tell
4  Judge Jernigan that you had made cure payments?
5      A.   I didn't know I'm allowed to have
6  ex parte conversations with her, but there's a
7  lot of things I'd like to tell her about this
8  case; but no I did not.
9      Q.   All right.  I'm not talking about
10 ex parte conversations, sir.  Let's take
11 confirmation, for example.
12        Did you or anybody acting on any of
13 the defendants' behalf ever inform
14 Judge Jernigan that Frank Waterhouse had told
15 you that the payments in January 2021 would be
16 deemed to be cure payments?
17     A.   Not that I'm aware of.
18     Q.   Thank you.
19     MR. MORRIS:  Give me one more
20 moment.  In fact, I'm going to ask for just
21 three minutes.  I'm going to check and see
22 how much more I have here.  It won't be
23 long if I have anything.  So let's go off
24 the record.
25     THE VIDEOGRAPHER:  Would you like to

JAMES DONDERO

1            JAMES DONDERO
2  go off the record?
3      All right.  We're off record at
4  5:03.
5      (Whereupon, a break was taken.)
6      THE VIDEOGRAPHER:  We are back on
7  the record.  The time is 5:06.
8      MR. MORRIS:  Okay.  Asia, can you
9  please put on the screen Exhibit 24, which
10 are Mr. Dondero's written responses to
11 discovery?
12     MS. CANTY:  (Complies with request.)
13     (Whereupon, Exhibit 24, Defendant
14 James Dondero's Objections and Responses to
15 Plaintiff's Requests for Admission,
16 Interrogatories, and Requests for
17 Production, marked for identification, as
18 of this date.)
19 BY MR. MORRIS:
20     Q.   And Mr. Dondero, I don't know if you
21 have that binder in front of you, but this is
22 one of the documents that will be in there,
23 Number 24.
24     A.   Number 24?
25     Q.   Yes, sir.

JAMES DONDERO

1            JAMES DONDERO
2      MS. DEITSCH-PEREZ:  Do you got it?
3      THE WITNESS:  Yes.
4  BY MR. MORRIS:
5      Q.   Have you seen this document before,
6  sir?
7      A.   No.
8      Q.   Let's go to page 15 and see if that
9  refreshes your recollection.
10     Is that your signature?
11     A.   Yes.
12     MS. DEITSCH-PEREZ:  Yeah.  It's late
13 in the day, John.
14     THE WITNESS:  Yes.
15     MR. MORRIS:  That's why I showed him
16 the signature.
17 BY MR. MORRIS:
18     Q.   Does that refresh your recollection
19 that you've seen this before?
20     A.   No.  It refreshes my recollection
21 that I signed it.
22     Q.   Okay.  And –
23     A.   Not that I recall – not that I
24 looked at it in detail in any way.
25     Q.   Okay.  Did you review it before you

JAMES DONDERO

1            JAMES DONDERO
2  signed it?
3      A.   I – as I sit here today, I don't
4  remember.  So let's go through whatever
5  questions you have.
6      Q.   Okay.
7      MR. MORRIS:  Go to page 8, please.
8      MS. CANTY:  (Complies with request.)
9  BY MR. MORRIS:
10     Q.   You will see that Interrogatories 3
11 and 4 ask in substance for you to admit that
12 you never disclosed the terms or existence of
13 the agreement to Frank Waterhouse prior to the
14 commencement of the adversary proceeding.
15     Do you see that?
16     MS. DEITSCH-PEREZ:  Wait.  Object to
17 the form.  Those are two different
18 requests.
19     MR. MORRIS:  Okay.  Okay.  I was
20 trying to do this quickly.  We'll do it –
21 we'll do it – we'll do it your way?
22     MS. DEITSCH-PEREZ:  No.  I think you
23 – okay.
24 BY MR. MORRIS:
25     Q.   So let's look at Request for

Page 166

JAMES DONDERO

1 Admission Number 3.
2         Do you see that Highland asked you
3 to admit, quote, "that prior to the
4 commencement of the adversary proceeding, you
5 never disclosed the terms of the agreement to
6 Frank Waterhouse," close quote?
7     A.   That's on page 8, Number 3, right?
8     Q.   Correct.  And you denied that,
9 correct?
10    A.   Yes.
11    Q.   Okay.  Did you disclose the terms
12 of the agreement as we've defined that term to
13 Frank Waterhouse prior to the commencement of
14 the adversary proceeding?
15    A.   You know, what I've answered was a
16 long answer earlier that the notes were
17 compensation.  The notes were to be – would be
18 forgiven as part of compensation, shouldn't be
19 included in any settlement.
20         Frank and his group were deeply
21 involved in all the plot plan and settlement,
22 things that went back and forth.  He knew.
23         Now, whether he knew the specifics
24 of the agreement in terms of, whether I ever

Page 167

JAMES DONDERO

1 discussed the MGM Cornerstone, Trustway, and
2 the specifics of the agreement with him before,
3 I don't – I don't know.  So...
4     Q.   Do you –
5     A.   I think denying is appropriate, but
6 I'm at not saying Frank knew the specifics of
7 the agreement prior to the commencement of
8 litigation.
9     Q.   Did you tell him that you had an
10 agreement with the Dugaboy trustee?
11    A.   I told him there were mechanisms for
12 forgiving the – or there were – there were
13 mechanisms for the notes being compensation and
14 not being part of any kind of cement or asset
15 to the estate.
16    Q.   Okay.  Do you recall telling him
17 anything else during these conversations?
18    A.   No, I didn't – no.  I didn't feel
19 it necessary to talk to him about the
20 specifics.
21    Q.   Okay.  And do you recall having this
22 discussion in any context other than in
23 connection with the preparation of a settlement
24 proposal?

Page 168

JAMES DONDERO

1     A.   There wasn't another reason – there
2 – no, I don't remember any other context.
3     Q.   Okay.
4     A.   But the settlements were regular and
5 ongoing –
6     Q.   Okay.
7     A.   – in our mind, not in the
8 Stonehill's mind.
9     Q.   Okay.  Can you go – can we go to
10 page 9, Request for Admission Number 8?
11    A.   Yes.
12    Q.   Number 8 we asked you to "admit that
13 no document was created prior to the
14 commencement of the adversary proceeding
15 concerning the existence of the agreement."
16         Have I read that right –
17    A.   I'm just reading what's on page 9,
18 admit that prior to the agreement he never
19 disclosed any other creditor.
20    Q.   No, no, no.  I'm sorry.  We're on
21 Number 8.
22         Can you read Number 8 out loud?
23    A.   Number 8, I'm sorry.  Admit that no
24 document was created prior to the commencement

Page 169

JAMES DONDERO

1 of the adversary proceeding concerning the
2 existence of the agreement.
3     Q.   All right.  So you've read that.
4 And so my question to you is:  Did you deny
5 that because there are settlement proposals
6 that you created that show zero value for the
7 Promissory Notes at issue?
8     A.   Yes, partly.
9     Q.   Okay.  What other documents were
10 created prior to the commencement of the
11 adversary proceeding that you contend concerned
12 the existence of the agreement?
13    A.   I'm trying to think if the LPA does.
14    Q.   Okay.  Anything else?
15    A.   No.  That would be – that would be
16 it.
17    Q.   Okay.  Request for Admission
18 Number 9, can you identify the creditor that
19 caused you to deny the Request for Admission
20 Number 9?
21    A.   I believe all the creditors via the
22 settlement agreements; but, you know,
23 specifically Clubock, you know, and to the
24 extent Frank is a creditor, Frank.

Page 170

```
1            JAMES DONDERO
2      Q.   But you just testified a few minutes
3  ago, I thought, that you didn't specifically
4  tell Mr. Waterhouse of the terms of the
5  agreements to him, right?  Did I miss --
6      A.   That's right.  I mean, not the
7  specific terms, correct.
8      Q.   Okay.  So is there any creditor to
9  whom you -- is there any creditor of Highland's
10 to whom you disclosed the existence of the
11 agreements that you entered into with the
12 Dugaboy trustee prior to the commencement of
13 the adversary proceeding?
14         MS. DEITSCH-PEREZ:  Asked and
15 answered.
16         THE WITNESS:  Yeah.  I mean,
17      generally, all the creditors via the
18      settlement.  And then we have lots of
19      one-off conversations with Clubock
20      representing UBS where the notes were
21      described as going to be forgiven
22      compensation, never part of the estate.
23 BY MR. MORRIS:
24      Q.   All right.  I don't -- I don't want
25 to wrestle with you.
```

Page 171

```
1            JAMES DONDERO
2      A.   Sure.
3      Q.   I'm going to remind you that when I
4  use the word "agreements," I'm referring
5  specifically to the agreements that were set
6  forth in paragraph 82 of your answer.
7         Do you understand that?
8      A.   Yes.  And so I guess my answer is
9  generally but not specifically.
10     Q.   Okay.  And when you say "generally,"
11 you don't mean that you disclosed the existence
12 or terms of the agreement to any creditor.
13 What you mean is that you told all of the
14 creditors that you believed that the notes
15 should be forgiven as part of compensation.
16        Do I have that right?
17     A.   Well, that they would be forgiven as
18 part of compensation.
19     Q.   Okay.  Subject to that correction,
20 are we on the same page now?
21     A.   Yes.
22     Q.   Okay.  Can we go to page 12,
23 Interrogatory Number 2?
24     A.   This is still in Section 24?
25     Q.   Yes, sir.
```

Page 172

```
1            JAMES DONDERO
2         MS. DEITSCH-PEREZ:  Object to the
3      form.
4         THE WITNESS:  24, I'm sorry.
5      Page 2?
6  BY MR. MORRIS:
7      Q.   Page 12.
8      A.   Page 12.  Yes.  Which one?
9      Q.   Number 2.
10     A.   All right.
11     Q.   You didn't identify any email
12 correspondence in response to Interrogatory
13 Number 2; is that correct?
14     A.   I don't have my e-mails.  So we have
15 painfully little from the Highland estate.
16     Q.   Okay.
17     A.   I think at the time we responded, we
18 thought we might get access to things; but we
19 haven't been able to come up with anything.  We
20 have -- we have no access to anything.
21     Q.   Okay.  So as you sit here today, you
22 cannot identify any e-mail correspondence that
23 discusses the existence of the agreement,
24 correct?
25     A.   Not yet, no.
```

Page 173

```
1            JAMES DONDERO
2         (Whereupon, Exhibit 27, Defendant
3      NexPoint Advisors, L.P.'s Objections and
4      Responses to Plaintiff's Requests for
5      Admission, Interrogatories, and Requests
6      for Production, marked for identification,
7      as of this date.)
8  BY MR. MORRIS:
9      Q.   Let's go to Exhibit Number 27.
10     A.   Yes.
11     Q.   And if we can go to page 7.
12        MR. MORRIS:  I think -- I don't know
13     who's shuffling paper.
14 BY MR. MORRIS:
15     Q.   But if we're at page 7, we're
16 looking at Interrogatory Number 3.
17        Is the reason for the denial -- and
18 I apologize.  I may be going too quickly
19 because I know we're all anxious to finish, but
20 I do want to represent to you that we're
21 looking at the discovery responses of NexPoint
22 Advisors.
23     A.   Right.
24     Q.   And if we went to page 12, we'd find
25 your signature on that one, okay?  So looking
```

Page 174

```
1          JAMES DONDERO
2   at –
3     A.   Yes.
4     Q.   – Request for Admission Number 3,
5   is your answer the same on behalf of NexPoint
6   Advisors as it was for yourself as to why you
7   denied Request for Admission Number 3?
8     A.   Yes.
9     Q.   Okay.  If we can go to Request for
10  Admission Number 6, that is the same Request
11  for Admission that we talked about with respect
12  to yourself in your individual capacity a
13  moment ago.
14        Is your reason for denying Request
15  for Admission Number 6 the same reason that you
16  gave for yourself?
17     A.  Yes.
18     Q.  And looking at Request for
19  Admissions Number 7 and 8, is the reason that
20  you denied those Requests for Admissions
21  because you told Seery and the committee and
22  Clubock that you wouldn't pay anything for the
23  notes because they were supposed to be forgiven
24  as part of your compensation?
25     A.  And the independent board, yes.
```

Page 175

```
1          JAMES DONDERO
2     Q.   Okay.  Is there any other reason
3   that you denied Request for Admissions Number 7
4   and 8?
5     A.   Not that I can think of at this
6   point in time.
7        I don't think the LPA applies much
8   here, but I may be –
9        MR. MORRIS:  All right.  I have no
10  further questions.
11       THE WITNESS:  Wonderful.  Thank you.
12  Have a good evening.
13       MR. MORRIS:  Thank you.  Take care.
14       MS. DEITSCH-PEREZ:  Thank you.
15       MR. MORRIS:  Bye now.
16       THE VIDEOGRAPHER:  All right.  If
17  there are no further questions, this
18  concludes today's deposition.  Volume II
19  [sic] consists of three media.  We are off
20  the record at 5:21 p.m.
21       THE COURT REPORTER:  Everybody is
22  leaving, and I wanted to get everybody's
23  order on the record.
24       MS. DEITSCH-PEREZ:  I'd like the
25  rough.  And then the regular can be
```

Page 176

```
1          JAMES DONDERO
2   whenever you get the regular done.  No
3   special rush.
4        THE COURT REPORTER:  Okay.  Thank
5   you.
6        MS. DEITSCH-PEREZ:  You're welcome.
7        THE COURT REPORTER:  Ms. Canty, I
8   think there's a standing order for a daily
9   delivery -- or an immediate delivery for
10  your firm?
11       MS. CANTY:  Yes.
12       THE COURT REPORTER:  Okay.  I just
13  wanted to confirm that.  I'll get that out
14  tonight, then.
15       MS. CANTY:  Okay, thank you.
16       (The witness is excused.)
17       (Deposition of James Dondero
18  concluded at 5:21 p.m. CDT.)
19
20
21
22
23
24
25
```

Page 177

```
1         C E R T I F I C A T E
2
3
4         I, SUZANNE J. STOTZ, a Certified
5   Shorthand Reporter, Registered Professional
6   Reporter, Certified Realtime Reporter, and
7   Notary Public in and for the State of Texas, do
8   hereby certify that the foregoing is a true and
9   accurate transcript of the stenographic
10  above-captioned matter.
11
12
13        _____
14        SUZANNE J. STOTZ, CSR, RPR, CRR
15        Texas Certification No. 11942
16
17
18  DATED:  November 4, 2021
19
20
21  NOTE:  THE CERTIFICATE APPENDED TO THIS
22  TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
23  OF THE SAME BY ANY MEANS, UNLESS UNDER THE
24  DIRECT CONTROL AND/OR DIRECTION OF THE
25  CERTIFYING COURT REPORTER.
```

Page 178

```
 1        E R R A T A   S H E E T
 2      I have read my testimony in the foregoing
 3    transcript and believe it to be true and
 4    correct to the best of my knowledge and belief
 5    with the following changes:
 6    PAGE    LINE      CHANGE
 7    _____ _____ _____
 8    _____ _____ _____
 9    _____ _____ _____
10    _____ _____ _____
11    _____ _____ _____
12    _____ _____ _____
13    _____ _____ _____
14    _____ _____ _____
15    _____ _____ _____
16    _____ _____ _____
17
18    _____ _____
19    WITNESS SIGNATURE           DATE
20
21    Sworn and subscribed to before me this
22    _____ day of _____ , 2021.
23
24    Notary Public of the
25    State of _____.
```

Appx. 00183

**$**

**$1.55-million** 64:22

**$12.3** 140:13 141:6, 12

**$2** 62:6

**$2.4** 91:11,13,23 92:6,11,14 93:12 103:17 104:2 107:23 109:2,25 110:13,23

**$2.4-million** 91:19

**$23** 138:13

**$23.7** 137:10,22

**$250,000** 58:20

**$5** 101:22 102:17 111:17,21,24 112:4, 10 117:9 119:23

**$5-million** 116:16 120:10

**$500,000** 62:5

**$6** 99:6,16,22

**$6,068,851** 98:18

**$7.4** 90:17 125:4 129:5 140:22 141:7

**$7.44** 102:7

**$7.5** 119:10,14,16

**$7.8** 103:5

**0**

**000025** 130:19

**000031** 130:19

**1**

**1** 9:3 94:3 141:19

**100** 96:24

**12** 171:22 172:7,8 173:24

**13** 26:14

**14** 26:14 151:17

**15** 151:17 164:8

**15-C** 130:11 131:3 137:3

**17** 20:20

**18** 20:8 26:13 71:16 73:15

**19** 20:8

**1939** 104:7

**1:17** 9:11

**2**

**2** 52:24 94:19 97:15 108:25 132:9 135:15, 18 136:13 143:7 171:23 172:5,9,13

**2,500,024** 60:10

**2.4** 104:14 110:20

**2.5** 61:5

**20** 57:16 58:2

**200,000** 64:22

**2016** 57:13,21 58:18 59:3

**2017** 20:8,21 60:2,9 62:6 63:17 73:14 137:17

**2018** 20:21 23:4 122:24 123:9,16 129:4

**2019** 23:5 25:3 90:16, 25 91:13,24 97:15 99:22 102:7 108:10, 25 110:3,25 111:20, 25 112:5,10,18 113:3 114:9 116:15 117:5 119:9,24 120:11 123:24 124:25 128:14 140:24

**2020** 25:3,9 109:21 130:9,18,23 133:19, 23 136:11 137:3,8,9 138:20 139:13,23 140:14 141:22 142:6 151:9 152:25 153:5, 19 154:7,13,15,22 155:6,20 156:6,13,25

**2021** 9:10 136:7,20 139:3 142:17 143:8 157:9 158:6 159:10, 24 161:23 162:15

**21** 141:15

**22** 143:6

**23** 130:18,23 133:18, 23 136:11

**24** 163:9,13,23,24 171:24 172:4

**252** 124:3

**27** 173:2,9

**2:28** 66:12

**2:43** 66:15

**2:44** 67:5

**3**

**3** 117:5 119:23 123:24 143:7 150:3 165:10 166:2,8 173:16 174:4,7

**30** 8:18 12:6,22 22:3, 4,5 137:9 140:14 154:7

**30(b)(6)** 14:23 15:7 17:4 18:18,21 68:24 76:24 143:24 144:7

**300,000** 64:23

**31** 10:16 82:10 122:24 123:9,15 129:4 137:17

**34** 22:5 123:4,6

**35** 22:6

**36** 22:6

**375** 102:10

**39** 104:8 124:23

**3:21** 94:6

**3:22** 94:21

**3:28** 66:7

**3:40** 66:8

**3:53** 115:9

**3:54** 115:12

**3rd** 111:20

**4**

**4** 9:10 165:11

**4.4M** 118:5

**40** 12:6,24

**47** 104:9

**4:38** 149:24

**4:45** 149:22 150:5

**5**

**5** 103:5

**50** 59:17,19 82:8

**50,000** 57:20

**51** 82:7

**53** 93:18 94:23 95:3 97:12 136:2

**54** 107:10,12 136:2

**56** 116:20,22

**57** 118:24 119:3

**59** 130:15,17

**5:03** 163:4

**5:06** 163:7

**5:21** 175:20 176:18

**5:37** 149:17

**5:38** 149:20

**6**

**6** 174:10,15

**65,772** 63:12

**68** 55:21 56:2,9

**7**

**7** 173:11,15 174:19 175:3

**70** 58:3

**75** 35:3

**8**

**8** 165:7 166:8 168:11, 13,22,23,24 174:19 175:4

**82** 13:3,12,17 14:3 39:16 47:10,20 48:8 81:25 82:10,11,17 83:18 171:6

**9**

**9** 25:9 168:11,18 169:19,21

**90-day** 47:22

**A**

**ability** 27:16 43:6 45:10 47:5

**acceleration** 157:17,18

**accepted** 8:25 160:23

**access** 172:18,20

**accommodated** 66:23

**accord** 89:18

**account** 47:2 100:18 102:7

**accountants** 134:5

**accounted** 110:22

**accounting** 37:24 107:19,22 108:2,12 110:8 111:13 117:5, 9,17 125:23 128:4,5 134:2

**accurately** 27:24

**acting** 40:22 59:10 65:20 73:5 105:7 134:16 138:6 141:10 142:4 144:15 149:7 150:18 159:8,20 161:3,10 162:12

Index: action..back

**action** 9:17 38:25

**actions** 142:24

**activities** 106:2

**actual** 37:24 51:11 73:16

**addition** 157:15

**additional** 101:9 103:16 138:23

**address** 141:15

**adjust** 47:5 75:7 138:16

**adjusted** 84:4

**admissible** 8:16

**Admission** 163:15 166:2 168:11 169:18, 20 173:5 174:4,7,10, 11,15

**Admissions** 174:19, 20 175:3

**admit** 165:11 166:4 168:13,19,24

**adversary** 165:14 166:5,15 168:15 169:2,12 170:13

**advice** 11:25

**advise** 138:3

**advisor** 103:17 104:22 142:7

**advisor's** 104:23

**advisors** 58:5,12 109:3 129:17,22,25 130:9 131:2 133:5, 15,17 134:17,21,23 136:12 137:2 142:5, 21 154:6 173:3,22 174:6

**advisors'** 133:22

**affiliate** 152:4 155:21

**affiliated** 58:4 146:23

**affiliates** 110:10 137:10 154:21 155:5

**afield** 38:16

**afternoon** 8:2 67:6

**aggregate** 21:21,23 24:15 27:4 51:24 71:15 90:16 102:13 125:3 140:22

**agree** 39:19 41:22 43:13 46:3 71:8 83:8 103:3 115:4,7

**agreed** 160:17

**agreement** 19:20 20:19,24 21:8,12,16, 25 22:7,11,18 23:2,8, 12,17,22 24:7,12,17 25:2,13,18,21,25 26:5 27:5,11,17 28:7, 22 29:18,25 30:8,14, 23 31:4,9,24 32:7,11, 22 33:11,24 34:17,22 35:14,17 36:8,22 37:4 39:7 40:10 43:13 44:12,21,24 45:17 47:19 48:5 69:21 71:20 77:24 78:3 79:9 81:25 82:22 84:16 85:22 86:11,13,20 99:25 134:13 135:12 144:18 152:3 153:7 165:13 166:6,13,25 167:3,8,11 168:16,19 169:3,13 171:12 172:23

**agreements** 13:18, 22 14:2,8 19:16,21, 25 20:6,8,10 29:2,6, 11 30:22 31:2 40:6, 17,20 41:2,9,13,20, 24 42:12,13,16,24 46:13 47:8,11 48:4, 16 49:4,13,18 50:10, 19 51:7 53:12,19 54:3,7 69:11 72:8 73:5,23 74:7,13,20 75:2,18,25 76:12,16 77:11,19 79:17,23 81:3,16 82:18,24 83:23 84:9,19 85:11 105:23 127:11 133:25 134:15 137:23 138:4,9 139:24 144:18 145:8 146:2,13,18 148:13 149:9 152:8 169:23

**afternoon** — see left

**ahead** 101:13 155:16

**Aigen** 77:5 95:25

**Alan** 12:7,9

**allocate** 61:10

**allocated** 61:18,21, 25 62:8

**allowed** 162:5

**altered** 43:23 44:14, 22

**amended** 13:5 136:4 142:16

**amortization** 156:10

**amount** 15:16 21:4, 15,19,22,24 24:6,16 30:7 31:13 57:17 58:19 61:4 62:2 75:12,13 90:17 99:12 103:9,11,20 104:2 108:25 125:3 126:20 137:15 140:23 151:17 160:22

**amounts** 56:19 92:23 100:21 112:12 135:20 152:2 158:19

**analysis** 73:23 100:6

**analysts** 135:7,9

**analyze** 73:6,8

**Anchorage** 71:21 83:5

**annoyed** 158:18

**annual** 55:2,16 56:13,15 126:12 129:17,24 130:10 136:6

**answer's** 91:25 140:3

**answering** 106:14

**answers** 86:20 138:17

**anticipated** 47:5

**anxious** 173:19

**anymore** 24:21 106:14 152:14

**170:5,11 171:4,5**

**apologize** 33:8 48:25 54:23 69:17 102:3 127:3 144:24 173:18

**apparently** 67:17 95:12

**appearances** 9:20

**appeared** 9:17

**appears** 136:21

**applied** 119:17

**applies** 175:7

**approval** 71:4,11,23

**approve** 134:17

**approving** 92:9 134:23

**approximately** 9:11 24:23 99:5,7,16,22, 23 101:21 102:6 103:4,17 137:10 140:13

**April** 90:25

**arrives** 68:20

**Arvold** 8:3

**Asia** 163:8

**aspect** 82:21,23

**aspects** 126:16

**asset** 167:15

**assets** 42:12 73:10 89:2 121:4,12

**association** 8:4

**assume** 60:19 122:12,14 128:16,20

**attached** 98:9

**attaches** 108:16

**attachment** 108:21

**attended** 158:17

**attention** 62:15 63:4 151:9

**attorney** 11:5,6 12:4 134:9

**attorneys** 89:23,25 90:3,8 134:14 161:2

**audio** 116:3

**audit** 122:11,20 123:23 124:19 125:7, 13,17,18,22 126:3,12 127:5,10,15 128:6,23 129:10

**audited** 120:15 122:7,23 124:13 128:10,14 129:3

**auditors** 124:17,20 126:3

**audits** 126:22

**authority** 71:2 72:19, 21

**authorize** 91:19,22 112:3

**authorized** 93:3,10

**authorizing** 111:23

**availability** 62:12

**award** 57:2,14,20 59:3 63:16

**awards** 63:19,20

**aware** 12:7,15,18,19 29:8,17 34:21 35:14, 17 39:5 52:19 70:5 80:16 90:14 92:21,24 93:3,11,15 99:20 100:5 105:23,24 108:10 109:19 110:7 116:15 117:16,23 119:8 121:21,25 122:9,21 125:15 126:10 128:9,13 135:2 137:7,13 139:4 141:21 142:15 145:5 148:11,16,18 153:10, 12 154:5,20 156:6,24 157:12,13,15,18,19 161:14,25 162:17

**awareness** 108:13 118:18 122:13 128:19 136:22 137:19 157:8

---

**B**

**back** 17:19 18:12 49:23 51:9 66:7,14

81:11 82:3 94:21
96:5,9 97:5,8 115:11
127:10 133:6 149:21
150:4 154:3 163:6
166:23

**back-and-forth**
153:21

**background** 128:2

**balance** 72:15 121:5,
19,22 122:4

**bankruptcy** 9:7
25:17 73:2 90:2
121:7,10 139:3
144:16 145:3,6
146:2,12,17 147:11,
14,18 150:11,15

**base** 60:9,19,25
61:10,13 88:20

**based** 51:11 61:25
84:5 98:16

**basis** 55:17 56:15
61:20 139:20

**Bates** 56:4 59:21
66:22 67:3,7 95:4
107:13 116:23 119:4
123:9 124:5 130:18

**bed** 93:4

**begin** 93:23

**beginning** 66:19
94:19 150:3

**behalf** 40:10,22
41:13 59:6,10 65:21
73:6 105:8 110:9
133:5 134:16,23
138:3,7 141:5,10,21
142:5 144:15 149:8
150:18 155:21
156:14 159:8,21
161:3,10 162:13
174:5

**belabor** 90:20

**belief** 133:24

**believed** 75:2 147:16
171:14

**believing** 114:11

**benefit** 98:6

**benefits** 54:11 55:3,
15 56:3,13,18 59:20,
25

**binder** 163:21

**bit** 131:8 139:7

**board** 71:14 105:20,
21,22 106:4,19
107:2,5 129:20
130:2,5,10 134:22
136:12 137:8,21
138:3,8 139:10,11,
13,22 140:12 141:5,
22 142:6 147:5,17,22
174:25

**boards** 131:2 138:13
141:11

**bona** 42:3,4

**book** 131:11

**booked** 93:13 110:4,
13,17 116:17 120:10

**booking** 110:19

**books** 93:14

**borrower** 81:2

**borrowers** 80:12
81:14

**bottom** 107:18

**bought** 83:7

**boy** 118:8

**break** 16:8,18 64:3,5
66:5,13 93:20 94:11
96:11,13,21 149:14,
25 150:8 163:5

**Brian** 54:22 60:23

**bring** 88:24

**broad** 28:5 65:5

**broadly** 152:10

**buckets** 52:5 53:9,
15,22 60:14

**bucks** 27:9 151:18

**bunch** 126:22

**business** 51:9 54:10
55:14 67:9

**Bye** 175:15

**C**

**calculated** 140:19
160:22

**calculation** 100:21

**calendar** 154:12

**call** 43:7 96:2,24
100:20 161:16,19

**called** 41:11 54:11
112:9 158:17

**Canty** 10:17 13:13
55:22 59:18 82:7,11
85:20 94:24 98:10
107:11 108:22
116:21 119:2 123:5,
20 124:6,10 130:16
131:25 132:4,6,12
133:9 135:16 142:13
163:12 165:8 176:7,
11,15

**capability** 67:7

**capacity** 15:25 16:15
17:16 18:18 68:23,24
76:24 87:8,9 91:4
120:24 143:24,25
144:12 174:12

**Capital** 9:6 39:24
62:15 87:15 88:7,9
89:9 109:3 123:7

**captured** 83:2,13

**care** 175:13

**carefully** 50:7

**carried** 121:4,12,18,
22 122:3

**case** 8:20 12:8,17
162:8

**cash** 53:3 62:11
84:24 118:10

**caused** 41:17 70:12
169:20

**caveats** 144:4

**CDT** 176:18

**cell** 161:17

**cement** 167:15

**Central** 149:22

**certificate** 90:23

**certified** 8:3

**certify** 91:4

**cetera** 126:19 127:11

**CFO** 111:7

**change** 46:4,13
96:23

**changed** 92:23
136:9

**changing** 45:5

**characteristics**
43:24

**characterizations**
148:7

**chart** 31:16,18 98:8,
12,17 100:16

**chat** 132:13

**check** 160:14 162:21

**Christian** 108:7

**circumstances**
89:15 113:11

**Civil** 8:19

**claim** 101:14 102:16,
21,23

**claims** 141:23 142:7

**clarification** 84:12,
21,23 85:2 140:8

**clarified** 84:5

**clarity** 37:2 144:4

**Class** 39:9,19 40:8
41:4,18 43:20

**cleanly** 155:14

**clear** 15:10 36:18
51:3 103:23 140:2
144:8

**Clemente** 147:6
148:3 149:8

**close** 67:9 117:10,14
166:7

**closer** 47:24

**Clubock** 169:24
170:19 174:22

**co-loan** 108:4

**code** 51:22 53:2

**colleague** 77:5

**colleagues** 17:19

**collect** 90:15 142:24

**collectively** 143:20

**Collins** 54:17,22,23,
25 55:14 56:14 60:23

**column** 98:23
101:20,24 102:2,4

**combination** 61:6

**commenced** 14:10
109:17 120:7,12
121:11,13,16 142:25
143:5

**commencement**
29:9 110:15 149:6
165:14 166:5,14
167:8 168:15,25
169:11 170:12

**comment** 45:8 46:9

**comments** 26:25

**committee** 148:3,4
174:21

**communicate**
159:25

**communications**
11:15 161:7

**companies** 63:3,9
70:14,21 71:3,13
72:10,20 74:2 75:4,
17 82:16 84:22
88:21,22 151:13

**company** 49:23
71:18

**compared** 74:6
75:17

**compensation** 42:3
46:19 49:20 50:12
51:11,22,23 53:3,7,
11,18 54:2,11 55:3,
15 56:3,13,17,19
57:13,20 59:20 65:8,
14,23 146:25 147:8

148:10 166:18,19
167:14 170:22
171:15,18 174:24

**Complaint** 13:6
142:16

**complete** 122:16,20

**completeness**
126:18

**compliance** 133:14,
18

**complied** 100:3

**complies** 10:2,17
13:13 55:22 59:18
85:20 98:10 107:11
108:22 116:21 119:2
123:5,20 124:6,10
130:16 131:25 132:4,
6 133:9 135:16
142:13 163:12 165:8

**comport** 102:5
137:15

**computer** 94:25

**concept** 88:25

**concerned** 169:12

**concerns** 35:18

**concluded** 10:25
176:18

**concludes** 175:18

**conclusion** 12:4

**condition** 42:7,8
73:17

**conditions** 13:20
43:8 44:5,13,22
45:10,19,23 47:6
69:12,23 70:2,6,11
72:7 73:7 75:23
82:19

**conducted** 124:20

**conference** 96:7

**confidence** 100:3

**confirm** 160:8 161:2,
11 176:13

**confirmation** 142:20
143:2,6,11 144:14
145:7 150:9,17 151:3

162:11

**confirmed** 142:16
160:16

**connection** 12:17
63:17 99:16 101:15
126:12 129:24
130:10 167:24

**consent** 112:9,17,
20,22 113:3,6,13,21
114:9,12

**consistent** 19:23
99:3

**consistently** 38:8

**consists** 175:19

**Consolidated** 123:7

**constitute** 160:19

**consuming** 13:19

**contact** 115:2

**contacted** 41:7

**contained** 127:5

**contend** 69:8,10,20
169:12

**content** 11:21

**contentious** 85:7,8

**context** 119:12,13
138:18 147:13
167:23 168:3

**continuation** 10:21

**continue** 19:12

**contracts** 129:17,21

**contributions** 88:2

**control** 25:11 42:17,
25 43:5,14 78:11,20
83:8,11 144:12
151:14 156:15 157:6

**controlled** 35:3,4
155:22

**conversation** 83:3
151:11 152:25
160:12 161:22

**conversations**
81:12 85:10 105:21
106:5 110:18 144:22,

23 152:12 162:6,10
167:18 170:19

**coordinates** 126:15

**copies** 76:14 77:9
154:4

**copy** 64:8 77:17
108:16 131:11

**Cornerstone** 70:22
72:2 74:19 75:7 83:9
167:2

**corporate** 107:19,22
108:2,12 110:7
117:4,9,17

**correct** 18:9,10 19:2,
3,15 23:14 27:19
29:2,3,6,7,11,12
32:14 33:20,21 39:25
40:13,17,20,23 41:5,
9,14,20 42:18 43:2
44:14 45:19 55:4
56:20 57:5,6 69:23
70:3,23 71:4 73:17,
19 76:12,16 77:11
99:18 109:18 111:9
117:20 127:18
129:18,22 130:2,6
139:19,25 166:9,10
170:7 172:13,24

**correction** 54:24
171:19

**correspondence**
95:4 107:13 116:23
172:12,22

**cost** 70:14 73:19 74:2
76:7 83:9,13

**costs** 74:6,15,18
75:4,9,18

**counsel** 9:12 12:22
17:25 66:16 93:19
117:19 133:22 134:8,
10 137:2 161:7

**counsel's** 11:25

**counterproposal**
84:20

**couple** 17:20 58:22,
24 71:21 89:23 96:3
134:5,6

**court** 9:7,22,24 18:10

25:18 94:17 142:15
144:17 145:3,7
146:2,12,17 147:11,
15,18 148:10 149:12
150:11,15 160:12
175:21 176:4,7,12

**courtroom** 8:17

**covered** 14:8 28:13
129:14

**covers** 14:14 83:22

**COVID-19** 8:6

**create** 45:10

**created** 29:9 35:10
110:8 168:14,25
169:7,11

**creating** 72:13
118:21

**credit** 127:11 153:25

**credited** 118:16

**creditor** 168:20
169:19,25 170:8,9
171:12

**creditors** 147:21
148:2 169:22 170:17
171:14

**critical** 93:3

**cure** 155:6,7 156:19
158:20 159:10 160:9,
19,22 161:5,24
162:4,16

**cured** 154:18,25
155:2,25 156:11
158:25 161:12

**current** 154:17,24
155:24 156:9 158:21

———————————

**D**

**D-CNL000212**
123:10

**D-CNL000257**
123:10

**D-CNL003585** 56:4

**D-CNL003587** 59:21

**D-CNL003763**

116:23

**D-CNL003764** 119:4

**D-CNL003765** 119:5

**D-CNL003768** 95:4

**D-CNL003770** 95:5

**D-CNL003777**
107:13

**D-CNL003779**
107:14

**daily** 110:8 176:8

**date** 15:17 22:9 24:10
25:5,12,22 26:6 27:7,
13 31:12 49:12 56:6
59:23 70:25 72:18
95:6 107:15 116:25
119:6 123:12 124:20
125:2 130:20 135:13
138:19 163:18 173:7

**dated** 97:15 108:25
119:23 123:9 130:18,
22

**David** 97:20

**day** 12:8 13:8 66:22
67:2,19 76:22 77:6
90:20 107:17 111:20
127:24 164:13

**DC** 134:8

**DC's** 134:8

**de** 51:24,25 158:19,
23

**Debbie** 10:11

**Deborah** 14:17 19:6
63:24 66:5 95:11

**debtor** 42:12 160:17
161:4

**debtor's** 41:24 42:5,
17 43:2 142:16

**December** 20:21
23:4 25:2 47:8,12
48:9,17 49:5 109:21
122:24 123:9,15
129:4 151:9 152:25
153:5,19 154:15,22,
25 155:6,20 156:6,
13,20,23,25

**decides** 129:21

**decision** 17:18 61:9 113:14

**declaration** 159:4

**declared** 157:13

**declaring** 157:16

**decreased** 52:20

**deemed** 8:25 161:5, 12 162:16

**deeply** 166:21

**default** 157:10,14,16, 19 158:5,15 159:4 161:13

**Defendant** 163:13 173:2

**defendants** 143:20 144:16 145:6 150:10, 18

**defendants'** 162:13

**deferral** 42:4

**deferred** 57:13

**defined** 166:13

**definition** 36:23

**degree** 28:12

**degrees** 75:5,6

**DEITSCH-PEREZ** 10:7,12 11:9,16 14:19,22 15:2,6,19 16:6,19,24 17:7,10, 23 18:11,15 19:3,18 20:12 22:20 26:9,22 27:20 28:10 34:5,24 35:22 36:9 37:7 38:15,22,25 39:10 42:19 43:3,16,25 44:15,25 45:20 46:6, 16 48:19 50:13 52:11 53:20 59:13 60:11 62:9 64:2,11 65:15, 24 66:24 67:10,22,25 68:6,15 69:15 70:15 71:5 72:22 76:2,18 77:12,25 78:13,17,23 79:4,10 80:11 83:25 85:25 87:19 88:10 89:17 91:6 94:9 96:5, 20 97:4 98:19 100:10

**delivered** 139:22 147:14

**delivery** 176:9

**demand** 14:17 28:20 45:14,18 109:20 156:3,7,8 157:24

**demanded** 45:23

**denial** 173:17

**denied** 166:9 174:7, 20 175:3

**deny** 169:5,20

**denying** 167:6 174:14

**dependents** 134:12

**depending** 128:6

**depends** 114:3

**deposed** 12:20

**deposition** 8:10 9:5, 9 10:21 11:2,7 12:5 13:25 16:5,7 18:17, 21 26:15,21,23 31:20 38:17 66:19 67:15 76:21,22 78:21 94:20 109:6,9 120:15,22 127:24 150:4 175:18 176:17

**describe** 15:12 57:12 84:6 89:15,21 130:25

**describes** 13:17

**describing** 31:5 88:13 91:17

**description** 73:9,10

101:5 103:7 106:24 111:10 113:7,16,24 114:22,25 115:7 116:5 117:21 125:8 127:22 129:7 131:10, 13 134:24 136:14 137:11 141:24 142:8 143:12 144:9 145:10, 19 150:22 152:5 155:8 157:2 158:8 160:3 161:6 164:2,12 165:16,22 170:14 172:2 175:14,24 176:6

**detail** 31:22 32:20 125:21 164:24

**details** 21:13 26:16 85:5 99:19 143:15

**determine** 73:24 110:22

**determiner** 106:16

**devote** 62:14

**devoted** 63:4

**difference** 67:11 116:6

**differentiated** 61:3

**diminishing** 61:14

**direct** 11:10,22 65:20 105:3 151:4,8 155:19

**directly** 88:22 96:6 147:6,21 148:2 151:13 156:15 157:6

**directors** 25:21

**disclose** 56:22 57:7 60:4,8 161:7 166:12

**disclosed** 59:10 79:22 122:22 128:13 144:16 145:6 150:19 165:12 166:6 168:20 170:10 171:11

**disclosure** 71:22 139:7 145:3

**disclosures** 138:22

**discovery** 163:11 173:21

**discretion** 113:23

**discuss** 41:8

**discussed** 57:18 167:2

**discusses** 172:23

**discussing** 119:12, 14 153:23

**discussion** 11:21 49:17 78:19 83:4 84:5,11,21 85:2 108:8 115:10 167:23

**discussions** 50:9 77:21 79:6,15,21

85:3

**disruptive** 92:19,20

**distancing** 8:8

**District** 9:8

**doc-** 29:17

**document** 10:15 13:3 19:13 29:8 32:17 54:11 56:8 57:9,14 59:12 63:13 66:6,18,21 93:23 97:11 109:11 124:4 131:7,11,21 132:11 164:5 168:14,25

**documented** 87:6 88:3 147:7

**documents** 53:24 54:6 127:11 147:10, 14 163:22 169:10

**dollars** 52:9,17

**Dondero** 8:1 9:1,5 10:1,20 11:1 12:1 13:1,4 14:1 15:1 16:1 17:1 18:1 19:1,12,25 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1,3 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1, 18 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1,3 57:1 58:1 59:1,20 60:1 61:1 62:1 63:1 64:1,17 65:1 66:1,18 67:1,21 68:1,22 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,6 80:1 81:1 82:1,15 83:1,18 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1,20 95:1,8, 10,12 96:1 97:1,5 98:1 99:1 100:1 101:1 102:1,3 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1,

15,21 116:1,2 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1,6,18 132:1 133:1 134:1 135:1 136:1,25 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1,4,8 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1,20 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1,17

**Dondero's** 18:17 96:8 114:21 163:10, 14

**drafted** 46:24

**drafting** 125:16,18

**dual** 60:24

**due** 8:6 42:2 79:24 80:3,17 102:18 103:10,12 118:17 135:20 151:12 152:2

**Dugaboy** 13:18 19:17,19,22 20:2,11, 19,25 21:2,8,12,17 22:2,11,19 23:3,8,13, 17,22 24:8,13,18 25:2,14 26:2,7 27:6, 12,18 28:8 29:19,25 30:8,14,23 31:4,9,22, 25 32:2,4,7,8,12,14, 19,22,23 33:2,12,14, 18,25 35:4,8 36:3,6, 12 37:5,6,17,20 38:9, 12 39:7 40:7,13,15, 23 41:3,12,17 42:16, 24 43:14 44:11,21 45:17 47:19 49:5,19 50:11,18,20 51:6,7, 17 52:2,8 53:10,13, 17,25 54:5 56:24 57:5,8,13 58:17 60:6, 9 64:18 65:6 73:11

75:15,21,24 76:11,15
77:8,17,22 78:5 79:7,
15,21 80:22,25 81:4,
5,6,12 82:24 84:10,
14,20 137:24 138:10
139:25 144:18 145:9
146:3,13,19 148:14
149:9 167:11 170:12

**duly** 10:5

**Dustin** 153:9

---

**E**

**e-mail** 19:9 63:24
64:8 68:2,4,9,12,18
95:3 97:14,19
107:12,18 108:11,16
116:22 117:4 160:15
172:22

**e-mails** 172:14

**earlier** 12:16 27:16
51:20 59:5 60:15,16
118:15 134:4 166:17

**early** 20:21 23:5 25:3
91:12,23 110:24
111:19,25 112:5,10
157:9

**easiest** 68:7

**Eastern** 66:8

**easy** 64:10

**educated** 118:8,12

**educted** 118:9

**either/or** 69:4

**email** 172:11

**Emanuel** 10:10

**embedded** 72:8 75:9

**employee** 56:20
88:20

**employees** 54:12
55:4,16 56:15 60:24,
25 125:16 135:7,9
151:20

**employees'** 88:14

**empowered** 160:6

**encourage** 112:23

**end** 20:20 49:9 66:22,
25 67:18 94:2 96:8
124:19 154:12

**ending** 122:24 129:4

**ends** 89:3

**enter** 19:17 20:2,7,18
23:2 24:25 31:24
32:6 41:13,19

**entered** 13:18 20:5,
11,25 21:16 22:17
25:13,21 26:6 27:5,
12,18 28:8 31:3,8
33:11,24 39:8 40:5,9,
16,20 41:2 42:13,15,
23 44:11 45:16 47:8,
18 49:4,12 50:20
53:13 73:21 74:7,12,
19,25 75:24 81:3
137:24 138:9 139:24
145:8 146:3,12,18
148:14 170:11

**entering** 32:11 43:12
46:13 51:6 53:12,19
54:2,6 73:4 75:18
76:12,16 77:10,18

**entities** 28:18 30:25
36:3,14 38:13 52:22
61:2,7,18,22 62:3,18,
19 79:25 80:17,20,23
81:17,18,23 88:12
89:3

**entitled** 14:23 124:13

**entity** 35:5 40:9
60:21 81:13 156:14
157:5

**entry** 50:19 85:11
125:13

**equal** 99:12 112:9

**equity** 63:8 71:17

**error** 99:17 100:9,19
101:15 102:8 104:18
105:5,9,13 106:23

**Essentially** 92:2

**estate** 86:25 89:10,
24 90:4,7 134:6,10
148:9 167:16 170:22
172:15

**estimate** 85:16

**estimated** 99:4

**evening** 175:12

**events** 122:24
124:14,17

**everybody's** 9:17
175:22

**exact** 85:15 100:4,5
112:12

**examination** 10:18
12:23 93:23

**examined** 10:5
12:16,19

**exceeded** 74:2 75:4

**excused** 176:16

**executed** 24:11
30:13

**executive** 126:17

**exercise** 42:25 43:5
113:23

**exercised** 43:14,19

**exercising** 42:17

**exhibit** 10:16 55:21
56:2,9 59:17,19
82:10 93:18 94:23
95:3 97:12 107:10,12
116:20,22 118:24
119:3 123:4,6
130:15,17 163:9,13
173:2,9

**existed** 122:19

**existence** 109:11
138:4 144:17 145:7
146:17 148:13
165:12 168:16 169:3,
13 170:10 171:11
172:23

**existing** 38:3

**expectation** 147:7

**expenses** 104:10

**experience** 104:21

**experienced** 90:3

**expert** 12:15,18 45:8
59:6,11 65:12,21

**experts** 89:24

**explained** 143:15

**expressed** 76:7

**expressing** 76:6

**extent** 11:19 104:6,
12 122:17 169:25

**external** 58:14

---

**F**

**fact** 41:17 75:7 82:5
99:15,21 111:20
119:8 153:11 162:20

**facts** 70:5

**fair** 12:11 13:21 14:4
42:10 51:23 57:4
70:7 74:11,24 75:12,
13 101:4 110:14
113:19 125:19
127:15 130:25
148:17

**faith** 100:3

**fall** 53:8,14,22

**fallen** 52:4

**familiar** 9:16 34:15
102:20 126:10

**fastest** 64:14

**fault** 33:8

**February** 47:13
48:10,18 49:6 142:17
143:7 155:3

**Federal** 8:18

**fee** 112:9,17,20,22,23
113:3,6,13,21 114:9,
12

**feed** 116:3

**feel** 167:19

**fees** 101:9 103:24
104:7,9

**fide** 42:3,4

**figure** 68:9

**file** 101:14

**filed** 142:20

**filing** 145:18 147:20

**filings** 145:22

**final** 136:19

**Finally** 89:17

**finance** 100:7

**financial** 32:23 33:3
120:16 122:7,23
123:8 126:7 128:10,
14 129:3

**financials** 31:21
32:19 122:16 123:16
124:13

**find** 46:19 64:13
173:24

**fine** 44:7 64:12
149:21

**finish** 66:9 116:10
149:19 150:7 156:22
173:19

**firm** 63:25 67:7
125:23 127:10 128:5
176:10

**fiscal** 124:19

**five-** 63:22

**fixed** 116:3

**floor** 96:9

**focus** 120:20

**focused** 120:24

**follow** 11:24 77:4

**follow-up** 28:5

**force** 71:17

**forgive** 31:25 39:20

**forgiven** 69:11,21,22
70:12 166:19 170:21
171:15,17 174:23

**forgiveness** 13:19
32:13 33:13 51:20
81:7,8 101:9 103:24

**forgiving** 167:13

**form** 27:21 28:11
34:25 36:10 37:8
42:20 43:4,17 44:2,
16 45:2,21 46:7,17

48:20 56:12 59:14
60:12 62:10 65:16,
22,25 66:17 69:16
70:16 71:6 72:23
76:3,19 77:2,13 78:2,
9 79:11 84:2 86:2
87:20 88:11 91:7
98:20 100:11 101:6
103:8 111:11 113:8,
17,25 117:22 125:9
127:23 129:8 134:25
136:15 137:12
141:25 142:9 143:13
145:11,20 150:23
152:6 155:9 157:3
160:4 165:17 172:3

**formally** 147:3

**format** 56:16

**Fort** 92:4

**forward** 146:22

**forwarding** 97:19

**foundation** 121:20

**fraction** 24:19

**Frank** 90:16 92:12,14
108:11 126:8 151:11
158:17 159:12,14,19
160:5,22 162:14
165:13 166:7,14,21
167:7 169:25

**Friday** 10:22 11:2,8

**Friday's** 12:23

**front** 17:15 18:25
19:14 133:6 163:21

**frozen** 114:21,23

**fulfillment** 69:12,22

**full** 62:14

**fully** 103:21 104:3
160:6

**function** 111:13

**functions** 129:11
135:10

**fund** 72:5 97:25 98:5,
17,24 99:5,11,15,21
100:2,8,17 103:21
104:3 109:3

**funded** 103:4

**funding** 100:23
102:18

**funds** 83:10 129:18,
20 134:2,18 135:11

**future** 135:21

**G**

**GAF** 97:22,24 100:18
102:6,18 103:21
104:4 105:12,22
106:3,21

**gave** 50:23 51:5
92:17 93:6 104:6,12
122:9 136:12 137:17
152:22 153:19
157:10,16 174:16

**gears** 85:17 129:16

**general** 50:17 128:3,
7 133:22 134:9
151:23

**generally** 14:5 28:16
53:8 56:21 83:22
92:15 110:5 111:13
112:2 119:20 120:19
142:18 143:16
144:20 148:10
151:15 170:17 171:9,
10

**give** 68:8,10,15 75:14
90:12 92:5 94:25
115:2 151:24 162:19

**give-and-take** 92:23

**glad** 16:12

**good** 8:2 94:16,17
149:13 155:24
175:12

**grant** 43:7

**granted** 44:4 63:16

**gratuitous** 26:25

**greater** 47:17

**gross** 21:18 57:17

**group** 54:15,18,21
107:19,22 108:2
110:8 117:5,18
125:25 126:6,8
166:21

**growth** 51:10

**guess** 31:7 40:4 42:6
48:23 55:11 80:4
118:12 143:16
144:20 157:13,19
171:8

**H**

**half** 149:18

**hand** 9:25

**handled** 38:7

**handles** 126:9

**hang** 114:25

**happened** 44:8
48:12

**Hayley** 108:7

**haywire** 94:25

**HCMFA** 62:21 90:15,
24 91:5,14,23 92:20
93:2,13 97:22 99:10,
11,15,21 100:7,17
101:14,20 102:6,16
103:20 104:2,11,13,
16 105:8,11 106:3,
21,22 107:23 110:2,
22,24 111:8,21,24
112:4,8,17 113:2,6,
14 114:7,12 116:16
118:11 119:14,18
120:6,10,25 125:2
128:10,13,20 129:6
134:13 135:6,23
140:12,23 141:6,10,
21,22 143:19 144:7,
11

**HCMFA's** 93:14
121:19,22 122:4
128:23 129:3

**HCMFAS** 130:19

**HCMLT** 107:23

**HCRE** 14:10 62:21
81:22 85:23 86:3,5,
14,17 87:10 88:15
143:19 157:22

**head** 22:23 24:4,5
26:8 27:23 29:22
31:14 54:17,20 63:5

90:11

**heading** 124:9

**hear** 115:15,16

**heard** 157:19

**hearing** 143:2,6
145:17 146:16
158:16

**held** 9:9 35:8 41:3
72:10 73:12 111:7,8
115:10

**helpful** 89:13

**helps** 141:19

**Hendrix** 97:20
108:15 117:4,8,12

**Hendrix's** 108:15

**hidden** 104:20

**High-** 126:25

**higher** 74:9,10,15,22,
23 75:8

**Highland** 9:6 14:10
15:15 25:12 32:2
34:16 35:9,19 36:14,
17,22,24 37:18,21
38:10 39:24 40:10
41:14 46:20 51:13,25
52:12 54:10 57:25
60:20 61:5,13,16
62:6,15,21,22 63:7
70:13,18 71:6 72:25
79:18,25 80:4,17
85:24 86:8,15,18,24
87:2,5,9,15,17 88:2,
7,8,19,23 89:4,8,25
90:3,6,14 91:13,22
92:20 93:13,14
102:24 104:15,17
105:4,9,12,25 106:3,
4,22 109:2,19 110:2,
10,22,24 111:7,21,24
112:4 113:5 114:5,13
116:16 118:9,11,15
119:9,15,16,18
120:6,9,25 122:9
123:6 125:15,25
127:4,12 128:24
129:6 134:14 135:5,
11,23 137:9,18 139:2
140:14,24 141:23
142:7 151:12 152:2,3

153:6 154:6 155:5,20
156:7,13 157:7,10,
13,21 158:6,15
159:9,12,15,16 166:3
172:15

**Highland's** 33:3
41:4 55:4,16 56:15
72:9,13,15,19 73:25
74:5,14 75:3,16,17
120:15 121:5 122:7,
22 126:12 154:21
170:9

**Highland/nexpoint**
61:6

**hindsight** 50:3

**hit** 19:10

**hold** 40:2 58:2 96:4

**holder** 83:5

**holders** 39:19 43:20
71:21

**holidays** 47:25 48:12

**Honestly** 56:25

**hope** 66:23 67:6
78:14 149:16 152:14

**hour** 68:5 149:18,19

**housed** 105:25

**Human** 54:14,18,20

**hundred** 60:20
126:23 127:9

**I**

**idea** 61:20 62:4
102:25

**identification** 56:5
59:22 95:6 107:15
116:24 119:5 123:11
130:20 163:17 173:6

**identified** 30:22 80:8
81:22 90:23 108:12

**identifies** 29:10

**identify** 21:10,14
22:9 23:15,20 24:10
26:4 28:6 29:23 30:6
31:11 33:22 34:9
47:17 62:19 63:3

77:22 79:7,16 80:2, 19 81:13,14 84:18 104:21 106:11 156:12 169:19 172:11,22

**II** 9:4 94:19 175:18

**illiquid** 72:14 84:24

**illiquidity** 75:13

**imagine** 141:14

**immediately** 14:18 160:23

**imminent** 73:14

**impact** 44:9

**implied** 75:9

**impossible** 42:9

**improperly** 122:18

**inability** 78:20

**inaccurately** 129:4

**inappropriate** 17:6, 12

**include** 84:15 124:17 139:6

**included** 84:9 108:11 153:24 166:20

**includes** 140:21

**including** 92:25

**incorporate** 86:19

**increase** 51:21

**incumbency** 90:23 91:4

**incurred** 28:17,20

**independent** 25:20 147:5,16,21 174:25

**indirectly** 147:4 151:13 156:15 157:6

**individual** 15:25 16:16 17:16 38:18 68:23 120:23 143:24 144:12 174:12

**individuals** 88:16

**industry** 46:20 51:12

53:4

**ineffective** 147:25

**inform** 25:17,20 105:3 138:12 151:4 162:13

**information** 15:8 49:19 50:11,18,23 51:5 56:23 60:5 75:15 123:9 127:5,13 129:25 131:3

**informed** 99:11 104:16 105:8,11 108:2 137:8,21 138:7 141:5 142:5 146:16 150:10

**informing** 141:22

**infrastructure** 135:4

**initial** 138:23

**initiatives** 51:10 63:7,10

**input** 87:3

**insist** 26:12

**instruct** 55:6 92:10 138:2 139:9,10 140:4

**instructed** 92:7 107:21 110:2,23 152:20

**instructing** 92:14

**instruction** 152:22 153:18

**instructions** 92:5,17 93:6 151:25

**insurance** 101:8,14, 18,22 102:16,20,23 103:4 112:13

**integrity** 126:19

**intended** 56:18

**intent** 46:15,18

**intentionally** 47:4

**inter** 108:3

**interaction** 126:9

**interest** 22:5 34:16, 23 35:2,5,9,18 36:8, 19 37:5 41:4 70:13

118:17 154:10 156:10

**interests** 72:9,10,13, 19 73:25 74:5,14 75:3,16

**interpretation** 44:5 100:25

**Interrogatories** 163:16 165:10 173:5

**Interrogatory** 171:23 172:12 173:16

**interrupt** 144:25

**interrupting** 145:11

**Interruption** 115:22

**interval** 49:9

**introduce** 9:12

**investment** 98:2

**investors** 98:6 103:10

**involved** 49:25 66:3 92:8 129:10,12 156:16,17 166:22

**iphone** 68:13

**irrelevant** 139:17

**issue** 70:22 77:18 92:3 93:4 169:8

**issued** 38:4 42:5 125:2 140:23

**issues** 141:16

**items** 104:13

**J**

**Jacob** 8:3

**James** 8:1 9:1,5 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1

47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1,2 57:1 58:1 59:1,19 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1,20 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1,4 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1,14 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1,17

**January** 25:9 48:18 49:6 143:6 155:2 156:19,22 157:12,14 158:6 159:10,24 161:23 162:15

**Jernigan** 148:12,20 150:19 151:4 162:4, 14

**Jim** 118:5 149:8

**job** 77:4

**John** 17:8 26:9 38:15 66:25 67:11 68:18 76:20 80:12 82:7

96:10 114:22 132:13 164:13

**Johnson** 12:7,9

**Johnson's** 12:12,13

**Jones** 161:3

**judge** 106:15 148:12 150:19 151:4 162:4, 14

**June** 123:24 137:9 140:14

**K**

**kind** 52:20 81:9 139:17 141:13 167:15

**Klos** 97:20 107:18

**Klos's** 108:16

**knew** 40:19,22 45:9 49:22 74:9,13 79:24 80:21 81:17,18,19,23 166:23,24 167:7

**knowing** 136:18,20 139:21

**knowledge** 12:12,13 37:22 69:25 70:4,10 109:15 127:6 140:18

**Kristin** 97:20 108:7 122:17

**L**

**L.P.** 9:7 36:24 39:25 58:5,13 62:16 88:9 89:9 109:3 123:7

**L.p.'s** 173:3

**ladies** 96:6

**large** 71:21 72:14

**largely** 71:25

**largest** 83:5

**lasted** 85:10

**late** 120:3 130:8 164:12

**lawsuit** 29:14 35:21

**lawsuits** 14:9 29:10, 16 30:3,10,16 33:20 34:2,21 39:5 142:24 143:5,10 150:12,20

**lawyer** 160:2

**lawyers** 134:6 161:10

**leadership** 87:5 88:2

**learn** 120:5,9 121:3, 9,11,17 122:2 158:14

**learned** 109:10,25 110:4

**learning** 159:3

**leave** 67:3 97:3 115:6

**leaving** 175:22

**led** 41:8 49:18 50:9 85:10

**left** 38:2 95:12

**legal** 8:4 45:5 133:14, 18,25 134:12

**legally** 146:21

**let alone** 26:19

**letter** 57:4 60:22 127:18,21 136:20,25 138:19 141:15

**letters** 57:2 128:23 129:13 136:19 138:22 139:5,6 157:21

**liabilities** 121:19,22 122:4

**life** 15:5

**likelihood** 73:6,8 75:22

**Limited** 34:17 36:22

**liquidity** 72:13

**list** 14:24 18:22 21:13 26:10,17 28:9,24 29:5 110:8

**listed** 134:2

**listen** 50:7 78:18 148:6

**listing** 15:14

**litigation** 31:11 107:6 109:14,16 110:6,16,19 120:7,12 121:8,10,13,16,25 122:3 149:7 167:9

**litigations** 38:19

**loan** 15:16 38:9 93:13 110:4,14,17 116:17 117:10,13,24 118:15, 21 120:5,11

**loans** 21:20 28:19 38:12 129:6 158:2

**logs** 49:16

**Loigman** 10:8,9

**long** 73:12 85:4,9,10 93:24 96:16 162:23 166:17

**longer** 78:21 85:13

**looked** 13:8 27:15 50:2 164:24

**loose** 47:4

**loss** 98:17 99:4,13 103:6

**losses** 99:17

**lost** 98:24 115:2

**lot** 86:21 89:24 91:15 162:7

**lots** 170:18

**loud** 168:23

**low** 49:22 52:20

**lower** 83:8

**LPA** 169:14 175:7

**lucky** 96:6

**Lynn** 144:22

---

**M**

**made** 32:13 33:13 36:12 47:11,13 48:10 49:23 51:8 61:9 78:3 84:20 102:24 109:20 110:9 114:14 122:17 147:20 148:20 149:4 153:6 154:6,12,15,22 155:6 156:7,13,24

159:10 161:4 162:4

**major** 20:14,19,24 21:7,11

**majority** 34:16,23 35:2,4,8,18 36:8,19 37:5 39:9,18 40:7,8 41:4,18 43:20 72:3 83:6

**make** 13:15 15:10 17:12,17 29:4 46:19 65:4 67:12 92:7,10 99:11 101:3 102:16 113:23 114:8 116:5 118:19 140:9 144:8 152:20 155:20 158:21,24

**maker** 21:10 23:15, 20 26:4 29:23 31:12 32:2,8 33:18 36:3,7 37:6,17,20 79:16,18, 22 80:9 81:2 109:2

**maker/borrower** 80:14

**makers** 27:10 46:25

**makes** 119:11

**making** 26:12,24 100:18

**manage** 129:18

**management** 9:6 39:24 62:15,22 87:5, 16 88:7,9 89:9 92:25 103:24 104:7,9 109:3 123:7 127:18,21 128:22 129:13

**manager** 58:14

**managers** 135:6,8

**manner** 100:17

**Mark** 54:17

**marked** 10:15 56:5 59:22 95:5 97:11 107:14 116:24 119:5 123:11 130:19 163:17 173:6

**market** 89:5

**material** 82:17 106:4 124:18 135:20

**materially** 84:4

**math** 103:3

**Matt** 149:8

**matter** 9:5 55:11 75:6 103:2 146:15 153:11

**Mcgraner** 86:6,21,24 87:2,23

**meaning** 20:21 98:4 134:8

**means** 11:18

**meant** 131:19

**mechanisms** 167:12,14

**media** 9:3 93:20 94:2,19 150:3 175:19

**meeting** 105:21

**meetings** 106:19 130:4

**member** 71:14

**members** 117:17

**memo** 130:9,22,25 131:2 132:24 133:4 134:17 135:13 136:3

**Memorandum** 130:17

**memorialize** 160:24

**memorialized** 49:12 161:22

**memory** 26:13

**memos** 134:21,23 136:5

**mention** 102:24

**message** 66:17

**met** 45:24

**MGM** 70:22 71:14 74:6,14,16 75:11 83:4 167:2

**Michael** 77:5 95:23

**middle** 103:15

**million** 22:4 24:20,23 27:8 52:9,17,23,24 58:2 61:5 62:6 90:17

91:11,13,23 92:6,11, 14 93:12 99:6,16,22 101:22 102:7,17 103:5,17 104:2 107:23 109:2,25 110:13,20,23 111:17, 21,24 112:4,10 117:9 119:10,14,16,23 125:4 129:5 137:10, 22 138:13 140:13,22 141:6,7,12 151:17

**mince** 104:5

**mind** 154:12,15 168:8,9

**mine** 96:19

**minimis** 51:25 158:19,23

**minimum** 76:5

**minimus** 51:25

**minor** 20:16

**minority** 72:4

**minute** 17:14 68:8,16 94:2,13 95:2 96:17 115:2 127:8

**minutes** 12:6,22,24 17:20 93:20 96:3 105:20 107:3,5 149:22 162:21 170:2

**mistake** 49:2 114:13

**moderately** 74:21, 23 75:8

**modest** 51:11,21

**modification** 45:6

**modified** 136:4

**moment** 38:8 58:21 125:13 162:20 174:13

**monetization** 72:12 73:13 84:23

**money** 80:25 93:2,10 99:12 101:2 104:2,14 119:18

**monies** 101:10

**month** 147:19

**months** 147:20

**Morris** 8:21 9:14
10:14,19 11:12,23
13:2,11,14 14:17,20,
25 15:4,9,11,22
16:11,22 17:2,9,21
18:2,4,7,16,24 19:5,
11,24 20:15 22:24
26:18,23 27:2 28:2,
23 34:8 35:7 36:5,15
37:16 38:21,24 39:2,
3,15 42:21,22 43:9,
21 44:6,19 45:11
46:2,11,22 48:24
50:4,6,16 52:15
53:23 55:20 56:7
59:16,24 61:8 62:13
63:23 64:6,16 65:19
66:4,16 67:5,14,20,
24 68:3,14,19,21
69:17,19 70:20 71:9
73:3 76:9,23 77:7,15
78:8,15,19 79:2,5,13
80:18 82:5,9,13,14
84:7 85:18,21 86:9
88:4 89:6,20 91:9
93:17,21 94:4,7,10,
14,22 95:7,11,16,19,
22 96:14,22 97:9
98:8,11,22 100:14
101:11 103:14
104:24 105:2 106:6,8
107:4,9,16 108:20,23
111:16 113:12,18,20
114:4,20,24 115:5,
13,25 116:7,9,12,19
117:2 118:2,24 119:7
123:3,13,17,21
124:3,7,11 125:10,11
127:25 128:8 129:15
130:14,21 131:12,16,
17 132:7,14,16
133:10 135:14,17
136:23 137:14 142:3,
11,14 143:17 144:10
145:13,24 149:15
150:6 151:2 152:9,18
155:10 157:4 158:13
160:7 161:8 162:19
163:8,19 164:4,15,17
165:7,9,19,24 170:23
172:6 173:8,12,14
175:9,13,15

**move** 37:2 38:20
50:4 104:24 106:6

**movement** 93:10

**moving** 99:8

**multiple** 61:2 63:7
83:10 138:25 153:22

**mute** 115:16,17,21

---

**N**

**Nancy** 39:18 40:12,
15 41:8,11,16 49:19
51:16 56:23 57:8,12
58:16 60:5,8 64:17
65:6 76:10,15 77:8,
17,21 78:4

**nature** 13:22 58:8,11

**NAV** 99:17 100:8,19
101:15 102:8 104:18
105:5,9,12 106:23

**needed** 96:11 104:3,
14 119:14

**negotiation** 83:24
84:4 85:8

**negotiations** 92:22

**net** 112:12

**Newman's** 10:11

**Nexpoint** 14:11
23:25 58:4,5,12
61:16 62:6,21 63:12
64:19 80:22 81:19
89:7,8,23 90:7 134:4,
12 135:7,24 137:8,
17,20,21 138:3,7
143:19 157:22 173:3,
21 174:5

**Nexpoint's** 138:8

**NFLP** 63:20

**nomenclature** 80:15

**normal** 156:17

**Norris** 153:9

**Northern** 9:8

**note** 14:14 21:11,15
24:7 26:5 28:6 29:24
30:7,13 32:2,8,13,20
33:13,18,23 34:10
35:15,19 36:7 37:6,
18,20,25 38:2,3,4

42:3 44:13 45:6,18,
19 46:5 47:13 48:10
91:11 96:10 108:8,
17,25 109:16,21,24
111:18 117:18
118:17 119:4,17,22,
23 137:17 154:20

**notebooks** 15:7

**notes** 13:20 14:9,15,
24 15:14 18:23 20:3,
5,23 21:7,24 22:10,
14,17 23:7,11,16,21
24:11,16 25:14,24
27:4,10,17 28:20,25
29:5,10,13,15,17
30:2,15,21 31:5,10,
12,23 32:25 33:2
34:20,22 35:20 36:2,
13 39:4,6,20 41:23
42:11 43:15,24 44:23
45:13,14 46:14,23
47:4 51:21,24 69:8,
10,20 70:12 76:11,15
77:10,18,23 79:8,16,
23,24 80:3,9,16,24
81:6,7,15 90:15
91:11,16 92:2
120:21,25 121:4,11,
15,18,21 122:3,10,22
125:2 128:14 135:21
140:23 142:25
146:23 147:8 148:8
150:12,20 151:5
152:7,17 154:10
155:23 156:3,4,8
157:11,24 158:7,24
161:13,20 166:17,18
167:14 169:8 170:20
171:14 174:23

**notice** 148:11
157:10,16

**notice-of-default**
157:21

**notices** 158:5,15

**notifying** 148:10

**noun** 70:18

**November** 9:10
154:7

**number** 9:3 23:11
64:22 66:22 94:2,19
136:13 140:19 150:3

163:23,24 166:2,8
168:11,13,22,23,24
169:19,21 171:23
172:9,13 173:9,16
174:4,7,10,15,19
175:3

**numbers** 50:3 99:8
100:4,5 102:13 104:6
158:22

**numerous** 30:18
36:2 38:12 41:25
60:24 105:17 107:2
144:21

**NXRT** 57:21,24

---

**O**

**object** 15:4 16:11,12,
13 17:21 27:20 28:10
34:24 36:9 37:7
42:19 43:3,16,25
44:15,25 45:20 46:6,
16 48:19 59:13 60:11
62:9 65:15,24 69:15
70:15 71:5 72:22
76:2,18 77:2,12,25
78:6,10 79:10 83:25
85:25 87:19 88:10
91:6 98:19 100:10
103:7 111:10 113:7,
16,24 117:21 125:8
127:22 129:7 134:24
136:14 137:11
141:24 142:8 143:12
145:10,19 146:7
150:22 152:5 155:8
157:2 160:3 165:16
172:2

**objecting** 78:9

**objection** 26:19,20
101:5

**objections** 142:19
163:14 173:3

**objects** 8:22

**obligation** 138:8

**obligor** 80:25

**obtain** 71:4 72:21

**obtained** 136:25

**obvious** 50:2 51:3

**occur** 73:7 124:18
159:24

**occurred** 70:2

**October** 130:18,23
133:18,23 136:11
137:3,7 138:20
139:13,22 141:15

**odd** 22:4

**office** 19:7 151:20

**officer** 87:10

**officers** 133:18

**offset** 138:14 141:12

**Okada** 87:24

**one-off** 170:19

**ongoing** 168:6

**opinion** 45:7

**order** 33:10 103:21
104:3 175:23 176:8

**ordinary** 54:9 55:13

**organization** 111:14

**original** 15:15 24:6

**originally** 46:24

**outs** 148:2

**outstanding** 28:21
38:3 119:17 137:16
138:8 140:13 155:23

**overarching** 13:21

**overpaid** 151:16

**overpayment** 154:2

**oversee** 111:4

**overstated** 141:6

**overview** 13:21

**owed** 80:25 137:9

**owing** 152:2

**owned** 72:4 97:25
155:21 157:6

**owner** 87:10

**owners** 87:22

**ownership** 83:10
88:15,18

**P**

**p.m.** 9:11 175:20
176:18

**Pachulski** 161:2

**page--** 13:11

**paid** 52:21 99:15,21,
25 101:17 102:6
104:10 110:2 112:8
113:3,6 114:12
119:9,16 153:25
154:17 158:19,24
160:18,23

**painfully** 172:15

**paint** 53:2

**paper** 117:13 173:13

**paragraph** 13:3,12,
17 14:3 39:16 47:10,
20 48:8 81:25 82:10,
17,25 83:14,18
124:24 141:19 171:6

**parenthetical** 118:4

**parsing** 87:13

**part** 18:16 28:21 30:9
43:23 46:9 65:8,13
73:17,18 83:14,16
104:13 106:4 110:5
112:6 121:7,9
122:10,16,19 145:16
148:8 166:19 167:15
170:22 171:15,18
174:24

**parte** 162:6,10

**participants** 86:5

**participated** 130:4

**parties** 8:14 23:25

**partly** 169:9

**partner** 10:11 95:24

**partnership** 34:17
36:22 125:3

**pas** 38:6

**past** 38:7

**pay** 112:17 114:8
151:25 152:12,16
174:22

**payable** 15:14
135:20

**payee** 32:3 35:19
37:18,21 80:9

**paying** 99:12

**payment** 91:20
97:22 98:3,5 100:8,
18 101:3 102:18
103:16,22 104:3
109:20 113:13,21
118:16 153:6 154:22
155:6,7,20 156:7,12

**payments** 151:12
152:10,15,21 154:5,
9,11,14 156:18,19,24
159:9,11 160:18
161:4,5,12 162:4,15,
16

**pending** 8:20 30:3,9,
16 31:10 33:19 34:2,
20 35:21

**people** 67:3 148:19,
24 153:14,24

**percent** 35:3 57:16
60:20 71:16 96:24
126:23 127:9

**perfectly** 64:12

**performance** 57:22
63:17 89:2

**performed** 106:2
134:14

**period** 47:23 122:23
124:19 129:4,14
138:19 139:13

**periods** 85:14

**person** 31:3,8 88:6
144:12 158:17
159:15

**personal** 18:18
68:12

**petition** 25:5,12,22
26:6 27:7,13 70:25
72:18

**phone** 49:16 63:24

**photograph** 64:8
66:17

**phrase** 13:25 36:19,
21 150:14

**picks** 104:22

**picture** 15:20 16:20
53:2 64:3,15 68:7

**piece** 93:4

**place** 71:20 135:13
143:7 161:18,19

**places** 105:17

**plaintiff** 39:19,20,23
40:9 41:19

**Plaintiff's** 13:5
163:15 173:4

**plan** 142:20 146:22
148:23 166:22

**platform** 87:2 90:6

**plays** 126:11

**pleading** 145:18

**pleadings** 145:22

**plot** 146:22 148:23
166:22

**pocket** 103:21

**point** 18:16 37:19
103:25 141:17 148:5
149:13 175:6

**portfolio** 70:14,21
71:3,12 72:9,20
73:25 75:3,17 82:16
87:4,25 135:6,8

**portion** 120:22
131:7,21 132:10
137:22 138:13

**portions** 72:14

**potential** 32:13
33:13

**potentially** 11:21

**practice** 8:7 134:20
135:3

**precise** 24:21

**preferred** 86:4

**premarked** 56:9

**preparation** 126:3
167:24

**prepare** 55:15 108:7

**prepared** 54:10,14
56:14 117:19

**preparing** 55:2
133:4

**prepaying** 38:2,5

**prepays** 37:25 38:7

**present** 42:7 69:13

**presented** 147:11
148:25

**president** 61:15,16
87:9 91:5 126:14
134:20 147:23

**pretty** 126:23 135:8

**previously** 76:8
117:19

**price** 83:7

**Pricewaterhouseco
opers** 123:23

**Pricewaterhouseco
opers'** 123:19

**principal** 21:14,24
22:5 24:6,16 30:7
31:13 118:17 140:22
154:9 156:10

**prior** 24:19 29:9
50:18 63:19,20 70:25
72:18,25 73:2 76:11
90:2 96:20 110:15,19
121:25 144:14 145:7
149:6 150:9,17 151:3
165:13 166:4,14
167:8 168:14,19,25
169:11 170:12

**private** 63:8

**problem** 78:8 132:20
140:10

**procedures** 8:19
103:4

**proceed** 9:18 19:6
68:3,14

**proceeding** 165:14
166:5,15 168:15
169:2,12 170:13

**process** 71:23
122:11 130:6,11

**produced** 14:18
107:6

**producing** 67:8

**product** 125:23

**production** 66:20,21
163:17 173:6

**professional** 77:4

**promise** 67:18

**promissory** 13:19
20:3,23 21:6,15
22:10,14,17 24:11
25:14 28:6 29:13,15,
17,24 30:2,7,13,15,
21 31:25 32:8 33:18,
23 34:10,13,19,21
35:15,19 36:7 37:6,
18 39:4,6 41:23
42:11 43:15,24
44:13,23 46:14
76:11,15 77:9,18,22
79:8 108:8,17,24
109:16,21,24 117:18
119:3,23 122:10,22
125:2 150:11,20
151:5 169:8

**propel** 51:10

**proper** 53:2

**properly** 122:18

**property** 41:24 42:5,
17 43:2

**proposal** 146:21
167:25

**proposals** 147:2,20
149:4 169:6

**proposed** 84:16

**proved** 147:24

**provide** 49:19 50:10,
17 53:24 86:17,24
89:8 125:21 129:25

**provided** 85:23 86:3,
7,14,21 87:11,16
88:8,22 106:21 130:9

133:25

**providing** 87:8

**provision** 83:23 84:8,15,18

**purpose** 46:12

**purposes** 60:22

**pursuant** 85:23 86:14

**put** 10:14 14:21 15:23 16:3,14 55:20 59:16 82:3 85:15 93:17 94:23 115:14 116:19 118:10 123:3 130:14 132:12 146:21 163:9

**puts** 126:21

**putting** 92:25 93:4 109:23

**PWC** 122:10 126:21 127:2 128:11

**Q**

**question** 11:14 20:4 32:5 33:6 35:13 50:8 52:13 53:17 69:18 72:16 77:3 78:9 80:2 81:10 86:12 88:5,18 96:23 100:13 106:17 109:23 135:19 136:13 141:20 145:2 146:8 150:16 169:5

**question's** 149:5

**questioner** 89:19

**questioning** 120:23

**questions** 10:8 14:6 15:24 16:15 17:3 20:5 28:5 50:22 53:11 68:22 76:8 78:24 88:14 106:14 132:9 138:23,24,25 139:7 140:17 143:21, 23 165:5 175:10,17

**quick** 149:14

**quickly** 132:19 165:20 173:18

**Quinn** 10:10

**quote** 39:17 47:11 97:21 108:3 117:10, 13,14 124:25 166:4,7

**R**

**raise** 9:24

**range** 22:6

**rattled** 138:17

**reach** 95:24 96:4 148:12 159:16,17,21

**reach-outs** 148:7,19

**reached** 159:8,15

**reaches** 148:2

**read** 64:10 83:20 132:19 168:17,23 169:4

**reading** 168:18

**ready** 116:13

**real** 86:25 89:10,24 90:3,7 112:16 134:6, 10

**reason** 62:7 75:20 77:16 150:13,21 151:6 168:2 173:17 174:14,15,19 175:2

**recall** 20:17 53:5,16 54:4,9 59:9 61:19 75:19 76:13,17 79:12,14 84:13,17 85:9 90:22 91:3,12 93:6,8 99:10 105:6 109:7,10,22,24 110:3 111:19,22,23 112:8, 11,19 113:2,4 114:5, 7,10,11 118:14 130:8 132:24 142:19,23 145:25 146:11 151:10 153:3,4,18 157:9 158:10,11 160:13,15 164:23 167:17,22

**receive** 101:20

**received** 36:13 56:20 58:17 64:18 65:7,13, 22 66:16 102:17

**recipient** 36:4

**recollection** 32:11, 18 33:10 48:2,11 49:7 61:12 63:16 92:13,16 99:4 101:21 102:6,16 103:11 112:13 114:17,18 120:13,18 121:6 133:24 137:16 143:9 151:23 152:19 158:4 164:9,18,20

**reconciliation** 101:8

**record** 8:9 9:21 10:10 15:10 16:13 17:19,25 18:5,8,12, 14 66:11,15 89:4 94:6,7,21 95:15,18 97:2 115:4,9,10,12, 24 149:24 150:5 161:15,18 162:24 163:2,3,7 175:20,23

**recording** 8:15

**records** 93:14

**Redeemer** 72:5

**refer** 19:21 48:9 78:4 143:18

**reference** 63:11

**referenced** 47:19

**referred** 14:3 72:12

**referring** 66:18 171:4

**refers** 39:24 57:20 118:7

**reflect** 97:2

**reflected** 32:23 33:3 57:8,14 59:11 64:19 105:15,19 161:22

**reflects** 153:18

**refresh** 32:18 33:10 143:9 164:18

**refreshed** 63:6

**refreshes** 164:9,20

**refuse** 84:15

**regard** 71:24 72:2 121:15 147:18

**regular** 168:5 175:25 176:2

**reinvested** 49:22

**REIT** 57:25 58:4,12, 15 63:13 64:19

**relate** 72:8,10

**related** 30:24 81:18, 23 86:25

**relating** 32:7 57:21

**relationship** 58:8,11 74:18

**relative** 51:25 52:2 158:19

**relevant** 32:20 51:12

**reliance** 126:21

**relied** 106:3 111:12

**rely** 111:3

**remained** 18:13 42:6

**remember** 13:9 21:3,4 22:4 23:18 24:2 27:23 28:14,18 49:10 52:6,24 57:10 59:2,7 65:9,18 76:4 81:20,21 84:21,23,25 85:2,3,4,12,13 91:15 103:12 113:10 120:8 146:15 152:11 153:9, 15 154:19 157:25 159:5 165:4 168:3

**remind** 171:3

**remote** 8:15

**remotely** 8:10,13 9:10

**renew** 129:21

**renewal** 129:25 130:5 136:7 138:24

**Reorganization** 142:17

**repeat** 32:4 50:21 52:13 100:13

**repeating** 78:24

**report** 125:2,7,13,17, 19,22 127:15 139:17, 21 140:12

**reported** 111:14 128:19

**reporter** 8:11 9:22, 24 18:10 94:17 149:12 175:21 176:4, 7,12

**reporting** 8:5 126:8

**reports** 126:4,8 127:6 139:18

**represent** 136:24 143:4 173:20

**representation** 127:18,21 128:23 129:13

**representative** 39:8,18 40:7 41:17

**representatives** 46:25 147:17

**representing** 170:20

**represents** 105:22

**request** 10:3,17 13:13 16:14 17:15 55:22 59:18 84:10 85:20 98:10 107:11 108:22 116:21 119:2 123:5,20 124:6,10 130:16 131:4,25 132:4,6 133:9 135:16 137:3 142:13 163:12 165:8,25 168:11 169:18,20 174:4,7,9, 10,14,18 175:3

**requests** 138:23 163:15,16 165:18 173:4,5 174:20

**required** 90:5 113:22 114:8

**resolution** 112:7

**resolve** 112:14

**Resources** 54:15, 18,21

**respect** 158:6 159:3, 9 174:11

**responded** 172:17

**response** 108:15 136:11,12 137:2,4 172:12

**responses** 163:10, 14 173:4,21

**responsibilities**
51:13

**responsibility** 80:7

**responsible** 55:2
104:17,23 105:4,9,12
106:22 113:5 125:16,
18 126:2,18 127:14
133:4

**rest** 13:24

**restate** 69:18

**restitution** 112:25

**Restoration** 72:5

**restricted** 57:20
58:17 59:11 63:12
64:18,25 65:7,13,22
71:20

**restroom** 96:13

**result** 28:19 44:12
99:17 100:8

**resume** 18:20

**reswear** 9:23

**retail** 105:22 129:18,
20 130:2,5,10 131:2
134:18,22 136:12
137:8,21 138:3,7,12
139:22 140:12 141:5,
11,22 142:6

**retained** 59:6

**review** 122:6 130:11
134:17 164:25

**reviewing** 134:22

**revisions** 81:24

**rights** 43:19

**Robert** 10:8

**role** 53:3 87:5 126:11

**rolled** 51:9

**rolling** 95:20

**room** 8:8,12 96:6,7
153:16

**rough** 103:3,10
175:25

**Rule** 8:18

**rules** 8:18,19

**running** 71:15

**rush** 176:3

---

**S**

**salaries** 104:10

**salary** 52:8,17 57:8
60:9,19,25 61:10,13,
17,21 62:5

**sale** 71:17 73:16

**sampling** 126:24
127:9

**satisfied** 42:6 70:7
75:23

**Sauter** 134:8

**schedule** 49:16
63:22

**screen** 10:15 56:10
82:4 95:9 97:10
114:21,23 119:22
131:15 163:9

**scroll** 124:8 131:8

**scrolling** 131:23

**seat** 95:13

**SEC** 92:4 98:2,4
99:11,25 103:12
104:17,21 105:4,8

**section** 124:13 132:9
134:3 135:15,18
171:24

**Seery** 144:22 147:3,
17,22,24 149:8
153:22 154:4 160:2
174:21

**sell** 70:13 71:2,12
72:19

**selling** 71:22

**send** 15:20 16:21
19:7,10 64:3 66:6
68:7,9 118:11

**sending** 160:15

**senior** 92:24 134:9

**sense** 118:19 119:11

**sentence** 118:4

**separate** 20:6 38:4

**series** 58:2

**serve** 133:22

**service** 88:23

**serviced** 135:11

**services** 14:10 62:23
81:19 85:23 86:4,7,
14,17,22,23 87:8,11,
16,22 88:8,15 89:8,
21 133:25 134:13,15
135:12 143:19
151:16 152:8,13,15,
21 153:7,25 154:2,8
157:22

**serving** 126:13

**set** 13:15 56:18 81:25
82:17 83:17 143:20
171:5

**sets** 82:19 100:16

**settle** 93:2

**settlement** 92:21,22
104:13 147:2 148:8
151:19 166:20,22
167:24 169:6,23
170:18

**settlements** 147:25
168:5

**seven-year** 63:22

**severity** 8:6

**share** 65:21

**shared** 53:6 133:25
134:13,15 135:12
151:16 152:8,12,15,
21 153:7,25 154:2,8

**shareholder** 112:24

**shareholder's** 71:19

**shareholders** 39:9
40:8 41:18

**shares** 58:2 71:22

**sheet** 14:14,18 27:15
72:15 121:5,19,23

**sheets** 122:4

**shift** 85:17

**shortly** 96:9

**show** 158:9 169:7

**showed** 57:4 76:10
120:3 164:15

**showing** 70:6

**shows** 100:7 101:2

**shuffling** 173:13

**sic** 9:4 94:20 175:19

**sign** 124:21 126:16
128:22

**signature** 123:19
164:10,16 173:25

**signed** 45:13 46:24
48:16,17,21,22 90:15
91:4 123:23 127:17
129:13 164:21 165:2

**significant** 72:4 86:7
151:17

**similar** 136:5 138:21

**simple** 65:4 81:9
112:16

**simply** 88:7

**sir** 28:24 56:10 80:6
95:20 98:13 106:10
116:4,13 117:6 119:8
123:15 127:3 131:24
144:2,24 145:5
155:16 162:10
163:25 164:6 171:25

**sis-** 84:9

**sister** 40:12 50:11,18
51:5 52:7,16,19 53:6,
10,17,25 54:5 57:5
73:11 75:14,21

**sit** 23:19 34:11 35:25
39:13 48:14 52:6
53:9 81:20,21 148:17
158:3 165:3 172:21

**situation** 112:7

**sixth** 39:12

**small** 99:8 104:5
158:23

**snap** 17:18

**social** 8:7

**sold** 73:19 83:5,11,12
148:4

**sole** 127:4

**solely** 15:25

**solution** 146:22

**sought** 161:11

**sound** 47:23 119:19

**sounds** 45:4

**source** 102:17 127:4,
11,12

**sources** 101:2

**space** 151:20

**speak** 8:23 11:6
12:21 72:25 115:17

**speaking** 12:3 26:19
78:10

**special** 176:3

**specific** 26:16 28:7
48:2 85:5 118:18
122:13 128:18,19
137:3 149:5 152:16
170:7

**specifically** 21:4
28:15 30:4,11 31:2
34:11 35:24 37:14
41:11 50:15 52:6
55:8 57:10 60:13
80:3 81:22 84:12
96:16 97:2 98:14
103:13 106:21
107:25 110:11
111:22 118:13
119:11 139:9,11
140:3,25 143:14
146:7 149:10 169:24
170:3 171:5,9

**specificity** 47:18
49:10 121:15 122:8
148:24

**specifics** 21:20
91:15 166:24 167:3,
7,21

**speculate** 27:24
28:4

**speculation** 118:9

**speed** 65:11

**spend** 12:3

**spending** 38:22

**spent** 62:2

**split** 61:12

**spoke** 71:16

**spoken** 8:24 10:24

**spread** 62:17,20 85:14

**spreadsheet** 97:20

**spreadsheets** 154:3

**staff** 105:24 135:10

**stamped** 56:4 59:21 95:4 107:13 116:23 119:4 123:10 130:18

**stamping** 67:3,8

**stand** 94:13

**standard** 135:3

**standards** 46:20 51:12 53:4

**standing** 155:24 176:8

**Stang** 161:2

**start** 9:3 92:3 146:6

**start-up** 89:3

**state's** 8:19

**stated** 10:9 41:25 106:21

**statement** 39:17 54:12 56:4,13,18 59:21 60:2 71:8 100:23 125:20

**statements** 32:24 33:3 55:3,15 120:16 122:7,23 123:8 128:10,15 129:3

**States** 9:7

**stay** 19:22 95:17

**stenographic** 9:20

**steps** 110:21

**stick** 78:5

**stipulate** 8:14

**stock** 57:21 58:18 59:11 63:12 64:19 65:7,13,22

**Stonehill's** 168:9

**stop** 17:22 38:24 39:2 76:25 78:15,16 115:18 132:2

**Stotz** 8:11

**strike** 50:5 104:24 106:7,13 146:6

**string** 97:14 108:12

**struck** 50:22

**stuck** 80:14

**stuff** 134:7 148:5

**Sub-** 72:24

**subadvisory** 105:23

**subject** 13:20 14:9 20:24 21:7,11,15,25 22:10,14,18 23:7,12, 16,21 24:7,12,17 25:25 26:5 27:5,11, 17 28:7,25 29:5,11, 14,16,18,24 30:2,8, 14,16,21,22 31:2,10 33:19,23,25 34:20,22 35:16,20 36:7 39:5,7 41:23 42:11 44:23 45:19 69:9,11,20 72:24 77:23 79:9,17, 23 81:3,6,8,15 83:24 84:19 137:23 138:9, 14 141:12 146:15 150:12,20 171:19

**subsequent** 13:20 21:5 42:8 43:8 44:5 45:10,19,24 47:6 69:16,23 70:6,11 72:7 73:7,17 75:23 82:20 122:24 124:14, 17 136:19 138:24,25

**subsequently** 147:22

**substance** 11:7,15, 18 132:24 165:11

**substantial** 21:5

**substantially** 74:9,

15,22 75:11

**substantive** 11:20

**sued** 90:14

**suite** 126:17

**supplemental** 123:8 131:3

**support** 83:12 97:21 134:2

**supposed** 151:18 174:23

**surface** 136:21

**surprised** 125:6 158:18

**sustained** 99:17

**Suzanne** 8:11 94:16

**swear** 8:12

**swearing** 8:16

**switch** 129:16

**sworn** 10:5

---

**T**

**table** 13:15

**takes** 68:11

**taking** 18:17,20 94:10 161:18,19

**talk** 11:17 17:18 91:10 111:17 167:20

**talked** 59:5 60:14 120:14 174:11

**talking** 33:15,17 38:13,24 39:2 64:24, 25 146:6 153:20 156:2 162:9

**tape** 96:23

**team** 54:25 55:14 56:14 153:8,10,15

**telling** 14:25 78:17 153:4 167:17

**template** 117:18,24

**ten** 24:20,23

**tendered** 154:21

**term** 15:15,16 21:19 28:19 34:15 36:23 46:4 156:2 157:11 158:2,7 161:13 166:13

**terms** 44:13,22 45:5 46:14 82:18 88:25 144:17 165:12 166:6, 12,25 170:4,7 171:12

**terrace** 92:3

**Terrestar** 98:2 112:7

**test** 26:13

**testified** 10:6 12:8 51:18,20 53:7 57:11 144:20 170:2

**testifying** 48:22

**testimony** 10:25 12:12,14 32:22 44:4 48:15 49:3 145:17 155:4

**Texas** 9:8

**text** 66:17 68:8 96:2

**texted** 95:25

**thing** 44:8 88:24 92:19 127:7 132:19

**things** 26:13 28:20, 21 38:23 47:6 83:11 153:22 162:7 166:23 172:18

**thinking** 138:18

**thinks** 11:18

**thought** 31:19 36:20, 23 87:12 159:23 160:5,24 162:2 170:3 172:18

**throw** 144:4

**ties** 127:10

**time** 9:15 12:3 29:20, 21 32:5 35:9 37:13 38:8,23 39:12 40:5, 16,19,25 42:4,13,15, 23 47:4 52:21 61:14 62:2,14,17,20 63:4 64:13 66:8,15 67:6 71:3 73:12,21 74:6, 12,19,25 75:24 76:6 78:7 83:20,21 85:4,

14,24 87:6,10 92:23 93:11,15 96:19 109:8,12 114:9 117:16,17 120:3,6,8, 11 121:18 126:13 129:11 136:18 138:19 141:17 142:6 143:11 149:22 150:5 153:16 160:20 163:7 172:17 175:6

**times** 41:25

**tired** 144:25

**title** 111:7,8 134:7

**today** 13:25 33:16 34:12 35:25 36:3 38:14 39:14 40:13 52:6 53:9 66:10 67:4 70:3 81:21 132:25 133:2 144:7 165:3 172:21

**today's** 175:18

**told** 47:7 52:25 110:15 117:8 129:2 139:12 141:11 145:25 146:11 158:22,23 162:14 167:12 171:13 174:21

**tomorrow** 67:4,13

**tonight** 67:12 176:14

**top** 22:22 24:4,5 26:8 27:23 29:21 31:14 63:5 90:11 97:18 108:14

**topic** 150:7

**topics** 38:16 41:8

**total** 102:5 103:6,16

**totals** 101:19

**track** 89:4

**track-record** 88:24

**trade** 58:3

**transaction** 90:6 108:3 110:16

**transactions** 124:18 134:6,11

**transcript** 96:15

**transfer** 91:23 92:6, 8,9,11,14 93:7,12 107:22 110:13 111:24 112:4 116:16 117:9 120:10

**transferred** 91:13 110:24 111:21 119:18 129:5

**transfers** 110:9

**transition** 151:19 153:24

**travel** 49:15

**treasurer** 90:24 111:8

**trick** 81:10 146:10

**triggered** 42:8,9

**true-up** 151:19 153:22

**trust-** 20:25

**trustee** 19:19,22 20:2,11,19 21:2,8,12, 17 22:2,11,19 23:3,8, 13,17,22 24:8,13,18 25:2,14 26:2,7 27:6, 12,18 28:9 29:19,25 30:9,15,23 31:4,9,25 32:7,12 33:12,25 39:8 40:12,15 41:3 42:25 43:6,14,18 44:11,21 45:17 47:19 49:5 50:20 51:7 53:13 73:11 75:24 78:5 79:7,15,21 81:4, 13 84:14,20 137:24 138:10 139:25 144:19 145:9 146:3, 13,19 148:14 149:9 167:11 170:12

**trustee's** 84:10

**trustees** 82:24

**Trustway** 70:22 71:24 74:22 75:8 167:2

**TSG** 8:5

**turn** 47:25 97:6 123:14

**turned** 84:24

**type** 128:6 133:4 140:16

**types** 56:19

**typically** 112:25

---

**U**

**UBS** 170:20

**ultimate** 28:19

**ultimately** 41:8 42:2 45:22 146:25

**unable** 45:24

**understand** 10:20 34:3 40:6 68:25 98:15 100:6,15 131:18 144:6 171:7

**understanding** 36:21 40:25 43:22 49:25 51:2,3 58:7,11 61:25 73:9 74:4,8,17, 21 75:10,22 83:15,17 98:16 103:19 124:16 125:22,24 126:22 127:20 128:4,7 160:9,17 161:11

**understood** 42:16, 24 43:6 74:13

**underwear** 80:14

**unenforceable** 150:13,21 151:5

**unfettered** 71:25

**unilaterally** 71:18

**United** 9:7

**units** 57:21 58:18 59:11 63:12 64:19 65:2,7,13,22

**updates** 148:22

---

**V**

**validity** 8:15

**valuation** 105:25 106:2

**variety** 62:18 80:17

**varying** 75:4,6

**vendors** 104:22 127:10

**verbal** 49:21 51:2

**verification** 126:24 127:9

**verified** 60:18

**versus** 76:7 84:22,24 102:2 118:21

**vest** 58:22

**vested** 57:16 58:19, 24 64:23

**vesting** 63:22

**vests** 58:25

**video** 8:10,15 17:25 95:19 97:6 115:24

**video-recorded** 9:4

**view** 131:7 132:10

**virtually** 28:14

**volatility** 75:12

**Volume** 9:4 94:19 175:18

**voluntary** 113:14

**vote** 112:24

---

**W**

**wait** 40:2 81:5 165:16

**wanted** 41:12,16 90:12 98:2,4 175:22 176:13

**Waterhouse** 90:16, 24 93:7 97:17 108:11 111:3 126:11 151:11, 24 152:20 153:2,5,19 160:10,16 161:16,23 162:14 165:13 166:7, 14 170:4

**Waterhouse's** 97:19

**ways** 37:12

**week** 12:16 44:18 120:3

**weeks** 136:2

**well-known** 92:18

**wider** 49:9

**wire** 110:8

**withdrawn** 21:22 22:8,15 29:14 34:14 35:16 42:21 47:9 51:15 69:9 82:22 113:18 114:6 121:20 125:10 133:16 154:13

**witnesses** 15:7

**Wonderful** 175:11

**word** 39:23 171:4

**work** 101:23,24 125:22

**working** 62:2 73:13 126:2

**works** 146:20

**world** 11:4

**worth** 58:20 92:4

**wrap** 149:16

**wrestle** 170:25

**writing** 86:10 87:22 105:15,18 106:20 153:17 160:10,11,13 161:21

**writings** 106:9

**written** 85:22 86:11, 13,20 130:9 146:21 161:15,18 163:10

**wrote** 28:24

---

**Y**

**year** 22:13,16 24:19 28:15,17 30:12 47:9, 12,14,25 48:9,11 49:8 52:18 55:10,11 56:20 57:16 105:22 106:5 113:3 118:15 142:6 154:13

**year's** 136:6

**years** 21:5 30:19 38:11 49:6,24 51:9 58:23,24,25 59:2,3,4 63:6 76:5 126:23

**years'** 63:20

**yelling** 115:18,19

**yes-or-no** 11:14

**Yup** 56:11 97:13

---

**Z**

**Ziehl** 161:3

**ZIP** 51:22 53:2

# EXHIBIT 105

Page 1

1          WATERHOUSE - 10-19-21

2     IN THE UNITED STATES BANKRUPTCY COURT
      FOR THE NORTHERN DISTRICT OF TEXAS
3           DALLAS DIVISION
   -----------------------------
4   IN RE:

5                      Chapter 11
     HIGHLAND CAPITAL
6    MANAGEMENT, L.P.,        CASE NO.
                     19-34054-SGI11
7
           Debtor.
8    -----------------------------
     HIGHLAND CAPITAL MANAGEMENT, L.P.,
9
           Plaintiff,
10   vs.                      Adversary
                         Proceeding No.
11   HIGHLAND CAPITAL MANAGEMENT      21-03000-SGI
     FUND ADVISORS, L.P.; NEXPOINT
12   ADVISORS, L.P.; HIGHLAND
     INCOME FUND; NEXPOINT
13   STRATEGIC OPPORTUNITIES FUND;
     NEXPOINT CAPITAL, INC.; and
14   CLO HOLDCO, LTD.,

15          Defendants.
   -----------------------------
16

17        REMOTE VIDEOTAPED DEPOSITION OF

18          FRANK WATERHOUSE

19             October 19, 2021

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No: 201195

Page 2

```
1          WATERHOUSE - 10-19-21
2
3
4          October 19, 2021
5          9:30 a.m.
6
7
8
9     Remote Deposition of FRANK WATERHOUSE,
10  held before Susan S. Klinger, a Registered
11  Merit Reporter and Certified Realtime Reporter
12  of the State of Texas.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1          WATERHOUSE - 10-19-21
2   A P P E A R A N C E S :
3   (All appearances via Zoom.)
4   Attorneys for the Reorganized Highland Capital
5   Management:
6       John Morris, Esq.
7       Hayley Winograd, Esq.
8       PACHULSKI STANG ZIEHL & JONES
9       780 Third Avenue
10      New York, New York  10017
11  Attorneys for the Witness:
12      Debra Dandeneau, Esq.
13      Michelle Hartmann, Esq.
14      BAKER McKENZIE
15      1900 North Pearl Street
16      Dallas, Texas  75201
17  Attorneys for NexPoint Advisors, LP and
18  Highland Capital Management Fund Advisors,
19  L.P.:
20      Davor Rukavina, Esq.
21      An Nguyen, Esq.
22      MUNSCH HARDT KOPF & HARDD
23      500 North Akard Street
24      Dallas, Texas  75201-6659
25
```

Page 4

```
1          WATERHOUSE - 10-19-21
2   Attorneys for Jim Dondero, Nancy Dondero, HCRA,
3   and HCMS:
4       Deborah Deitsch-Perez, Esq.
5       Michael Aigen, Esq.
6       STINSON
7       3102 Oak Lawn Avenue
8       Dallas, Texas  75219
9
10  Attorneys for Dugaboy Investment Trust:
11      Warren Horn, Esq.
12      HELLER, DRAPER & HORN
13      650 Poydras Street
14      New Orleans, Louisiana 70130
15
16  Attorneys for Marc Kirschner as the trustee for
17  the litigation SunTrust:
18      Deborah Newman, Esq.
19      QUINN EMANUEL URQUHART & SULLIVAN
20      51 Madison Avenue
21      New York, New York  10010
22
23  Also Present:
24      Ms. La Asia Canty
25
```

Page 5

```
1          WATERHOUSE - 10-19-21
2              I N D E X
3
4   WITNESS                          PAGE
5   FRANK WATERHOUSE
6   EXAMINATION BY MR. MORRIS             10
7   EXAMINATION BY MR. RUKAVINA          256
8   EXAMINATION BY MS. DEITSCH-PEREZ     352
9   EXAMINATION BY MR. MORRIS            377
10  EXAMINATION BY MR. RUKAVINA          387
11  EXAMINATION BY MS. DEITSCH-PEREZ     393
12
13          E X H I B I T S
14  No.                    Page
15  Exhibit 2  NPA et al Amended Complaint    142
16  Exhibit 33 6/3/19 Management          91
17      Representation
18  Exhibit 34 HCMLP Consolidated Financial    94
19      Statements
20  Exhibit 35 HCMFA Incumbency Certificate    151
21  Exhibit 36 Email string re 15(c)      170
22  Exhibit 39 HCMLP Operating Results 2/18    226
23  Exhibit 40 Summary of Assets and      236
24      Liabilities
25  Exhibit 41 12/19 Monthly Operating Report  258
```

Page 6

1          WATERHOUSE - 10-19-21
2   Exhibit 45 HCMFA Consolidated Financial     135
3          Statements
4   Exhibit 46 NexPoint 2019 Audited          218
5          Financials
6
7   Exhibit A1 Emails 11/25              328
8   Exhibit A2 Emails 12/31              338
9   Exhibit A6 Emails 1/12               341
10  Exhibit A7 Promissory Notes          297
11  Exhibit A9 Email, 8/31               307
12  Exhibit A10 Acknowledgment from HCMLP       302
13  Exhibit A11 HCMLP Schedule 71A          309
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          WATERHOUSE - 10-19-21
2          P R O C E E D I N G S
3          VIDEOGRAPHER:  Good morning,
4   Counselors.  My name is Scott Hatch.  I'm a
5   certified legal videographer in association
6   with TSG Reporting, Inc.
7          Due to the severity of COVID-19 and
8   following the practice of social
9   distancing, I will not be in the same room
10  with the witness.  Instead, I will record
11  this videotaped deposition remotely.  The
12  reporter, Susan Klinger, also will not be
13  in the same room and will swear the witness
14  remotely.
15         Do all parties stipulate to the
16  validity of this video recording and remote
17  swearing, and that it will be admissible in
18  the courtroom as if it had been taken
19  following Rule 30 of the Federal Rules of
20  Civil Procedures and the state's rules
21  where this case is pending?
22         MR. HORN:  Yes.
23         MS. DANDENEAU:  Yes.
24         MR. MORRIS:  Yes.  John Morris.  I
25  would just try to do a negative notice

Page 8

1   here, as we did yesterday.  If anybody has
2   a problem with what was just stated, can
3   you state your objection now?
4          Okay.  No response, so everybody
5   accepts the stipulation and the instruction
6   that was just given.
7          VIDEOGRAPHER:  Thank you.  This is
8   the start of media labeled Number 1 of the
9   video recorded deposition of Frank
10  Waterhouse In Re: Highland Capital
11  Management, L.P., in the United States
12  Bankruptcy Court for the Northern District
13  of Texas, Dallas Division, Case Number
14  21-03000-SGI.
15         This deposition is being held via
16  video conference with participants
17  appearing remotely due to COVID-19
18  restrictions on Tuesday, October 19th, 2021
19  at approximately 9:32 a.m.  My name is
20  Scott Hatch, legal video specialist with
21  TSG Reporting, Inc. headquartered at 228
22  East 45th Street, New York, New York.  The
23  court reporter is Susan Klinger in
24  association with TSG Reporting.

Page 9

1          WATERHOUSE - 10-19-21
2   Counsel, please introduce
3   yourselves.
4          MR. MORRIS:  John Morris, Pachulski
5   Stang Ziehl & Jones for the reorganized
6   Highland Capital Management, L.P., the
7   plaintiff in these actions.
8          MS. DANDENEAU:  Deborah Dandeneau
9   from Baker McKenzie.  My partner, Michelle
10  Hartmann, is also in the room with me,
11  representing Frank Waterhouse individually.
12         MS. DEITSCH-PEREZ:  Deborah
13  Deitsch-Perez from Stinson, LLP,
14  representing Jim Dondero, Nancy Dondero,
15  HCRA, and HCMS.
16         MR. HORN:  Warren Horn with Heller,
17  Draper & Horn in New Orleans representing
18  Dugaboy Investment Trust.
19         MR. RUKAVINA:  Davor Rukavina with
20  Munsch Hardt Kopf & Harr in Dallas
21  representing NexPoint Advisors, LP and
22  Highland Capital Management Fund Advisors,
23  L.P.
24         MR. AIGEN:  Michael Aigen from
25  Stinson, and I represent the same parties

Appx. 00202

Page 10

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2    as Deborah Deitsch-Perez.
3        MS. NEWMAN:  This is Deborah Newman
4    from Quinn Emanuel.  We represent the
5    litigation – Marc Kirschner as the trustee
6    for the litigation SunTrust.
7        MR. MORRIS:  I think that is
8    everybody.
9        VIDEOGRAPHER:  Thank you.  Will the
10   court reporter please swear in the witness.
11       FRANK WATERHOUSE,
12   having been first duly sworn, testified as
13   follows:
14            EXAMINATION
15   BY MR. MORRIS:
16   Q.   Please state your name for the
17   record.
18   A.   My name is Frank Waterhouse.
19   Q.   Good morning, Mr. Waterhouse.  I'm
20   John Morris, as you know, from Pachulski Stang
21   Ziehl & Jones.  You understand that my firm and
22   I represent Highland Capital Management, L.P.;
23   is that right?
24   A.   Yes.
25   Q.   Okay.  And do you understand that

Page 11

1       WATERHOUSE - 10-19-21
2    we're here today for your deposition in your
3    individual capacity?
4    A.   Yes.
5    Q.   Did you review and – did you
6    receive and review a subpoena that Highland
7    Capital Management, L.P., served upon you?
8    A.   Yes.
9    Q.   You have been deposed before; right?
10   A.   Yes.
11   Q.   How many times have you been
12   deposed?
13   A.   About three or four times.
14   Q.   Okay.  And I defended you in one
15   deposition; isn't that correct?
16   A.   That is correct.
17   Q.    So the general ground rules for this
18   deposition are largely the same as the
19   depositions you have given before.  And that is
20   I will ask you a series of questions, and it is
21   important that you allow me to finish my
22   question before you begin your answer; is that
23   fair?
24   A.   Yes.
25   Q.   And it is important that I allow you

Page 12

1       WATERHOUSE - 10-19-21
2    to finish your answers before I begin a
3    question, but if I fail to do that, will you
4    let me know?
5    A.   I can certainly do that.
6    Q.   Okay.  Do you understand that this
7    deposition is being videotaped?
8    A.   Yes.
9    Q.   You understand that I may seek to
10   use portions of the videotape in a court of
11   law?
12   A.   I did not know that, until you just
13   said that.
14   Q.   Okay.  And you are aware of that now
15   before the deposition begins substantively; is
16   that right?
17   A.   Yes.
18   Q.   So unlike I think the other
19   depositions that you have given, this one is
20   being given remotely.  So that presents some
21   unique challenges, at least as compared to a
22   deposition that is taken in-person.
23       From time to time we're going to put
24   documents up on the screen, Mr. Waterhouse.
25   And it is important that I give you the

Page 13

1       WATERHOUSE - 10-19-21
2    opportunity to review any portion of the
3    document that you think you need in order to
4    fully and completely answer the question.
5        So I would ask you to let me know if
6    there is a portion of a document that you need
7    to see in order to fully and completely answer
8    the question.  Can you do that for me?
9    A.   Yes.
10       MS. DANDENEAU:  Mr. Morris, I would
11   just note that we do have hard copies of
12   the documents that you sent, so if you can
13   just refer to the exhibit number as
14   reflected in the documents that you sent,
15   Mr. Waterhouse will be able to look at the
16   hard copies of those documents.
17       MR. MORRIS:  I appreciate that,
18   and – and I will encourage him to do so.
19   There will be other documents that we did
20   not send to you that we'll be using today
21   though.
22   Q.   Okay.  With that as background, if
23   there is anything that I ask you, sir, that you
24   don't understand, will you let me know?
25   A.   Yes.

Appx. 00203

Page 14

WATERHOUSE - 10-19-21

1
2 Q. Okay. Are you currently employed?
3 A. Yes.
4 Q. By whom?
5 A. The Skyview Group.
6 Q. When did you become employed by the
7 Skyview Group?
8 A. I believe March 1st of 2021.
9 Q. Do you have a title at Skyview?
10 A. Yes.
11 Q. What is your title?
12 A. My title is chief financial officer.
13 Q. Do you report to anybody in your
14 role as CFO?
15 A. I don't, no.
16 Q. No. Is there a president or a CEO
17 of Skyview?
18 A. Yes.
19 Q. Who is that?
20 A. That is Scott Ellington.
21 Q. But you don't report to
22 Mr. Ellington; is that right?
23 A. I don't think so.
24 Q. Does Skyview Group --
25     MS. DANDENEAU: Excuse me, we --

Page 15

WATERHOUSE - 10-19-21

1
2 A. I -- I -- I might. I just -- I
3 don't recall.
4 Q. Okay. Does Skyview Group provide
5 any services to any entity directly or
6 indirectly owned or controlled by Jim Dondero?
7 A. Yes.
8 Q. Can you name -- is that pursuant to
9 written contracts?
10 A. Yes.
11 Q. And do you know how many contracts
12 exist?
13 A. Approximately six or so.
14 Q. And is the Skyview Group made up of
15 individuals who were formerly employees of
16 Highland Capital Management, L.P.?
17 A. No.
18 Q. Do you know how many -- how many --
19 how many employees does Skyview have?
20 A. Approximately 35.
21 Q. And can you tell me how many of
22 those 35 are former officers, directors, or
23 employees of Highland Capital Management, L.P.?
24 A. I don't know the exact number.
25 Q. Is it more than 20?

Page 16

WATERHOUSE - 10-19-21

1
2 A. Yes.
3 Q. Is it more than 30?
4 A. I don't know.
5 Q. Can you tell me what portion of
6 Skyview -- Skyview's revenue is derived from
7 entities that are directly or indirectly owned
8 or controlled by Jim Dondero?
9     MS. DANDENEAU: Mr. Morris, I mean,
10 you called Mr. Waterhouse here individually
11 for purposes of his testimony in connection
12 with the noticed litigation. I have given
13 you some leeway to ask him some background
14 information about Skyview Group, but this
15 is not a substitute for a deposition in
16 connection with any other pending disputes
17 that exist. And -- and we agreed to accept
18 the subpoena on the basis of he -- this is
19 testimony that he is giving in connection
20 with the noticed litigation.
21     I really think that you are now
22 going a little bit far afield from the
23 purpose of this deposition.
24     MR. MORRIS: Okay. It is -- I'm not
25 intending to use these -- the answers to

Page 17

WATERHOUSE - 10-19-21

1
2 these questions for any purpose other than
3 this litigation. I think you understand
4 fully why I'm asking the questions, and I
5 just have a couple more, if you will bear
6 with me.
7     MS. DANDENEAU: Okay.
8     MS. DEITSCH-PEREZ: Can we have an
9 agreement that an objection by one is an
10 objection for any other party here?
11     MR. MORRIS: Sure. I would -- I
12 would encourage that, sure.
13     MS. DEITSCH-PEREZ: Thank you.
14     MR. MORRIS: It can't be sustained
15 or overruled more than one time, so...
16 Q. Mr. Waterhouse, can you answer my
17 question, please.
18     MS. DANDENEAU: Do you want to
19 repeat it, Mr. Morris, for his benefit?
20     MR. MORRIS: Sure.
21 Q. Can you -- can you tell me the
22 approximate portion of Skyview's revenue that
23 is derived from entities that are directly or
24 indirectly owned or controlled by Mr. Dondero?
25 A. I don't know the exact number.

**Appx. 00204**

Page 18

```
1          WATERHOUSE - 10-19-21
2    Q.   Is it more than 75 percent?
3    A.   Yes.
4    Q.   Is it more than 90 percent?
5    A.   I don't know.
6    Q.   Okay.  Can I refer to Highland
7  Capital Management, L.P., as Highland?
8    A.   Yes.
9    Q.   All right.  And you previously
10  served as Highland's CFO; correct?
11   A.   Yes.
12   Q.   When did you join Highland?
13   A.   I don't recall the exact date.
14   Q.   Can you tell me what year?
15   A.   2006.
16   Q.   When did you -- in what year did you
17  become Highland's CFO?
18   A.   I don't recall the exact date.
19   Q.   I'm not asking you for the exact
20  date.  I'm asking you if you recall the year in
21  which you were appointed CFO.
22   A.   I don't recall the exact year.
23   Q.   Can you tell me which years it is
24  possible that you were appointed to CFO of
25  Highland?
```

Page 19

```
1          WATERHOUSE - 10-19-21
2    A.   2011 or 2012.
3    Q.   Did you serve as Highland's CFO on a
4  continuous basis from in or around 2011 or 2012
5  until early 2021?
6    A.   Yes.
7    Q.   During that entire time you reported
8  directly to Jim Dondero; correct?
9    A.   I -- I don't know.
10   Q.   Is there anybody else you reported
11  to -- withdrawn.
12        Did you report to Mr. Dondero for
13  some portion of the time that you served as
14  CFO?
15   A.   Yes.
16   Q.   Is there a portion of time that you
17  don't recall who you reported to?
18   A.   Yes.
19   Q.   What portion of time do you have in
20  your mind when you can't recall who you
21  reported to?
22   A.   From the 2011 to -- for
23  approximately a year or two.
24   Q.   Okay.  So is it fair to say that you
25  reported to Mr. Dondero in your capacity as CFO
```

Page 20

```
1  from at least 2014 until the time you left
2  Highland?
3        MS. DANDENEAU:  Objection to form.
4    A.   I don't want to speculate the exact
5  or what year that changed or -- so I would like
6  to stick with my testimony.
7    Q.   Can you recall when you began
8  reporting to Mr. Dondero?
9    A.   I don't recall.
10   Q.   Can you -- can you give me an
11  estimate of what year you think you might have
12  began reporting to Mr. Dondero?
13   A.   I will go back to my prior
14  testimony.
15   Q.   Okay.  There is no -- you have no
16  ability to tell me when you began reporting to
17  Mr. Dondero.
18        Do I have that right?
19        MS. DANDENEAU:  Objection to form.
20   A.   I don't recall.
21   Q.   Okay.  Do you recall who you might
22  have reported to before you began reporting to
23  Mr. Dondero?
24   A.   Yes.
```

Page 21

```
1          WATERHOUSE - 10-19-21
2    Q.   Who might you have reported to in
3  your capacity as CFO before you started
4  reporting to Mr. Dondero?
5    A.   That would have been Patrick Boyce.
6    Q.   Are you aware that Highland filed
7  for bankruptcy on October 19th, 2019?
8    A.   Yes.
9    Q.   And we refer to that as the petition
10  date?
11   A.   Yes.
12   Q.   Okay.  Do you hold any professional
13  licenses, sir?
14   A.   Yes.
15   Q.   Can you tell me what professional
16  licenses you hold?
17   A.   I'm a certified public accountant.
18   Q.   Okay.  Anything else?
19   A.   No.
20   Q.   Do you have any other professional
21  licenses or certificates?
22   A.   When you say "professional license,"
23  that is not education?
24   Q.   Tell me -- sure.  Anything other
25  than a driver's license.
```

Page 22

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2          Do you have any other license or
3    certificate or certification?
4          A.   Are you asking, like, where I went
5    to school and the --
6          Q.   I am not.  I am not.  I didn't say
7    education.  I didn't ask about degrees.
8          Do you know what a license is?
9          A.   Well, yeah, I mean, a license is
10   something you get after you receive a certain
11   level of proficiency.
12         Q.   Do you have any licenses or
13   certifications other than your CPA?
14         MS. DANDENEAU:  Objection, form.
15   I assume you mean professional
16   licenses, Mr. Morris; correct?
17         Q.   Can you answer my question, sir?
18         A.   Mr. Morris, I'm thinking.  I
19   don't -- I don't think I have any others.
20         Q.   Are you familiar with an entity
21   called Highland Capital Management Fund
22   Advisors?
23         A.   Yes.
24         Q.   Were you ever -- can we refer to
25   that entity as HCMFA?

Page 23

1          WATERHOUSE - 10-19-21
2          A.   Yes.
3          Q.   Were you ever employed by HCMFA?
4          A.   Not that I recall.
5          Q.   Were you ever -- did you ever hold
6    the title of an officer or director of HCMFA?
7          A.   Yes.
8          Q.   What title did you hold?
9          A.   Treasurer.
10         Q.   When did you become the treasurer of
11   HCMFA?
12         A.   I don't recall.
13         Q.   Can you tell me the year?
14         A.   I don't -- I don't know the year.
15         Q.   Can you approximate the year in
16   which you became the treasurer of HCMFA?
17         A.   I don't know.
18         Q.   Can you tell me if it was before or
19   after 2016?
20         A.   I don't recall.
21         Q.   Are you still the -- do you know if
22   you're still the treasurer of HCMFA today?
23         A.   Today, I am the acting treasurer for
24   HCMFA.
25         Q.   Is there a distinction between

Page 24

1          WATERHOUSE - 10-19-21
2    treasurer and acting treasurer?
3          A.   I said "acting treasurer" as I am an
4    employee of Skyview, as you previously
5    stated -- or asked.
6          Q.   But you are the treasurer of HCMFA
7    today; correct?
8          A.   I am -- I am the acting treasurer
9    for HCMFA.
10         Q.   How did you become the treasurer of
11   HCMFA?
12         A.   Are you asking how I became the
13   treasurer of HCMFA today?
14         Q.   How did you become appointed to
15   serve as the treasurer of HCMFA?
16         A.   Well, in -- in -- in what time
17   capacity?
18         Q.   The first time that you were
19   appointed.
20         A.   First time.  I believe I was asked
21   to serve as treasurer for HCMFA the first time.
22         Q.   By who?  Who asked you to do that?
23         A.   I don't recall.
24         Q.   Is there anything that would refresh
25   your recollection as to who appointed you as

Page 25

1          WATERHOUSE - 10-19-21
2    the treasurer of CF- -- HCMFA for the first
3    time?
4          A.   I don't -- I mean, there would be
5    some documents, some legal documents.  I don't
6    know where those are.
7          Q.   How many times have you been
8    appointed the treasurer of HCMFA?
9          A.   I don't know.
10         Q.   Was it more than once?
11         A.   I don't know.
12         Q.   Can you tell me any period of time
13   since 2016 that you did not hold the title of
14   treasurer of HCMFA?
15         MS. DANDENEAU:  Objection to form.
16         A.   I don't recall.
17         Q.   What are your duties and
18   responsibilities as the treasurer of HCMFA?
19         A.   My duties are to do the best job
20   that I can as the -- as an accountant and
21   finance guy.
22         Q.   What specific duties and
23   responsibilities do you have as the treasurer
24   of HCMFA?
25         A.   My duties are to do the best job

Page 26

WATERHOUSE - 10-19-21

1
2 that I can as the accounting and finance person
3 for HCMFA.
4     Q.   As the accounting and finance person
5 for HCMFA, do you have any particular areas of
6 responsibility?
7     A.   Yeah, it is to manage the accounting
8 and finance function for HCMFA.
9     Q.   Would that include -- do you have
10 responsibility for overseeing HCMFA's annual
11 audit?
12     A.   Can I please elaborate on my prior
13 question?
14     Q.   Of course.  You -- you are giving
15 answers.  I'm asking questions.
16     A.   Okay.  Yes, so the -- it -- like I
17 said, it is to manage the accounting finance
18 aspect, but I am, as we discussed, the
19 treasurer.  That is -- being treasurer is what
20 gives me that -- that management function.
21     Q.   Does anybody report to you in your
22 capacity as treasurer of HCMFA?
23     A.   I don't believe so.
24     Q.   Does HCMFA have a chief financial
25 officer?

Page 27

WATERHOUSE - 10-19-21

1
2     A.   I don't -- I don't know.
3     Q.   You don't know?
4         You're the treasurer of HCMFA but
5 you don't know if HCMFA has a chief financial
6 officer.
7         Do I have that right?
8     A.   That's right.
9     Q.   Okay.  Have you heard of a company
10 called NexPoint Advisors?
11     A.   Yes.
12     Q.   We will refer to that as NexPoint.
13 Okay?
14     A.   Okay.
15     Q.   Were you ever employed by NexPoint?
16     A.   I don't recall.
17     Q.   Did you ever hold any title with
18 respect to the entity known as NexPoint?
19     A.   Yes.
20     Q.   What titles have you held in
21 relation to NexPoint?
22     A.   Treasurer.  I think it was only
23 treasurer.
24     Q.   Can you tell me the approximate year
25 you became the treasurer of NexPoint?

Page 28

WATERHOUSE - 10-19-21

1
2     A.   I don't know.
3     Q.   Are you still the treasurer of
4 NexPoint today?
5     A.   I am the acting treasurer for
6 NexPoint.
7     Q.   When did your title change from
8 treasurer to acting treasurer?
9     A.   I don't know.
10     Q.   Did your duties and responsibilities
11 change at all when your title was changed from
12 treasurer to acting treasurer?
13     A.   I don't -- I don't believe so.
14     Q.   Why did --
15     A.   I still manage the finance and
16 accounting function for NexPoint.
17     Q.   Why did your title change from
18 treasurer to acting treasurer?
19     A.   I don't -- I'm using the term
20 "acting treasurer" as I'm a Skyview employee.
21 I don't -- I don't know -- again, I am a -- as
22 I am the Skyview employee.
23     Q.   Okay.
24     A.   And we -- we provide officer
25 services.

Page 29

WATERHOUSE - 10-19-21

1
2     Q.   And you serve as an officer of
3 HCMFA; correct?
4     A.   I think we went over that with my
5 testimony.  Yes, I'm the acting treasurer for
6 HCMFA.
7     Q.   And you are an officer of NexPoint;
8 correct?
9     A.   I think -- I am the acting treasurer
10 for NexPoint Advisors.
11     Q.   And -- and who appointed you acting
12 treasurer of NexPoint Advisors?
13     A.   I don't recall specifically.
14     Q.   Do you have any recollection of who
15 might have appointed you the treasurer of
16 NexPoint?
17     A.   I mean, it -- it -- I don't recall
18 exactly who it was.
19     Q.   Who were the possibilities?
20         MS. DEITSCH-PEREZ:  Object to the
21 form.
22     Q.   You can answer.
23     A.   Someone in the legal group for
24 NexPoint.  The other officers as well.
25     Q.   Have you heard of a company called

Page 30

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2  Highland Capital Management Services, Inc.?
3       A.   Yes.
4       Q.   We will refer to that as HCMS.
5  Okay?
6       A.   HCMS.  Okay.
7       Q.   Were you ever employed by HCMS?
8       A.   No.
9       Q.   Have you ever held any titles in
10  relation to HCMF -- I apologize -- HCMS?
11      A.   Yes.
12      Q.   What titles have you held in
13  relation to HCMS?
14      A.   Treasurer and acting treasurer.
15      Q.   When did you first become treasurer
16  or acting treasurer of HCMS?
17      A.   I don't recall the exact dates.
18      Q.   Can you recall -- can you
19  approximate the year that you became the
20  treasurer of HCMS?
21      A.   I don't -- I don't know.
22      Q.   Are you still the treasurer of HCMS
23  today?
24      A.   I am the acting treasurer for HCMS.
25      Q.   And are your duties and

Page 31

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2  responsibilities as the acting treasurer for
3  HCMS and the acting treasurer for NexPoint the
4  same as your duties and responsibilities in
5  your role as the acting treasurer of HCMFA?
6       A.   More or less.
7       Q.   Have you ever heard of a company
8  called HCRE Partners, LLC?
9       A.   Yes.
10      Q.   And do you understand that that
11  entity is now known today as NexPoint Real
12  Estate Partners?
13      A.   I did not know that.
14      Q.   All right.  Can we refer to HCRE
15  Partners as HCRE?
16      MS. DANDENEAU:  Objection to form.
17      Did you mean NexPoint Real Estate
18  Partners, Mr. Morris?
19      MR. MORRIS:  No.
20      MS. DANDENEAU:  Oh.
21      MR. MORRIS:  He said he wasn't
22  familiar that it was succeeded by that
23  entity.  So --
24      MS. DANDENEAU:  Okay.
25      MR. MORRIS:  -- let's go with what

Page 32

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2  the witness knows.
3       Q.   You're familiar with an entity
4  called HCRE Partners, LLC; correct?
5       A.   Yes.
6       Q.   Okay.  So that is the entity that we
7  will refer to as HCRE.  If you're aware of any
8  successor, that is great.  If not, let's just
9  define it as such.
10      Have you ever been employed by HCRE
11  or any entity that you know to have succeeded
12  HCRE?
13      A.   No.
14      Q.   Did you ever serve as an officer or
15  director of HCRE or any successor?
16      A.   Not that I recall.
17      Q.   Okay.  Can we refer to NexPoint and
18  HCMFA as the advisors?
19      A.   Yes.
20      Q.   In general, the advisors provided
21  investment advisory services to certain retail
22  funds; correct?
23      A.   Yes.
24      Q.   And we will refer to the retail
25  funds that are served by the advisors

Page 33

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2  collectively as the retail funds; is that okay?
3       A.   Okay.
4       Q.   Each of the retail funds is governed
5  by a board; correct?
6       A.   Yes.
7       Q.   And do you know the people who serve
8  on the boards of the retail funds?
9       MS. DANDENEAU:  Objection to form.
10      A.   I don't know all of them.
11      Q.   Do you know whether the same people
12  serve on the board of each of the retail funds
13  as we've defined that term?
14      A.   Which -- so when you say "retail
15  funds" -- again, I want to be -- what retail
16  funds are you referring to, because there are
17  -- there are several distinctions?
18      What retail funds are you using when
19  you refer to them?
20      Q.   That is why -- that is why I tried
21  to define the terms.  So let me do it again.
22      Retail funds for the purposes of
23  this deposition means any retail fund to which
24  either of the advisors provides advisory
25  services.  Okay?

Page 34

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     A.   Okay.
3     Q.   Okay.  So do you know whether the
4  same people serve on the board of each of the
5  retail funds?
6     A.   I don't know.
7     Q.   Were you ever employed by any of the
8  retail funds?
9     A.   No.
10    Q.   No?
11    A.   No.
12    Q.   Okay.  Do you have any title with
13  respect to any of the retail funds?
14    A.   Yes.
15    Q.   What titles do you hold --
16  withdrawn.
17         Do you have the same titles with
18  respect to all of the retail funds or do
19  they -- or just something else?
20         MS. DANDENEAU:  Objection to form.
21    Q.   Withdrawn.
22         Do you have the same title with
23  respect to each of the retail funds?
24    A.   No.
25    Q.   Tell me which title you have with

Page 35

1  respect to each retail fund.
2         Actually, let's do it a different
3  way.  I withdraw the question.
4         Can you give me one title you have
5  in relation to any retail fund?
6     A.   Yes.
7     Q.   What title -- what title can you
8  give me?
9     A.   Principal executive officer.
10    Q.   Do you serve as principal executive
11  officer for each of the retail funds?
12    A.   No.
13    Q.   Can you identify for me the retail
14  funds in which you serve as the principal
15  executive officer?
16    A.   Yes.  Highland Funds 1, Highland
17  Funds 2, Highland Income Fund, Highland Global
18  Allocation Fund.
19    Q.   I'm sorry, you said "Global
20  Allocation Fund"?
21    A.   Yes.
22         VIDEOGRAPHER:  Excuse me,
23  Mr. Morris.  This is the videographer.  I'm
24  concerned about the lighting in the

Page 36

1          WATERHOUSE - 10-19-21
2  witness' camera.
3         Do you want to go off the record and
4  make some adjustments?
5         MR. MORRIS:  Sure, but just for this
6  purpose.  I don't want to take a break.  We
7  just started.
8         MS. DANDENEAU:  Yeah, that is fine.
9  That is fine.  We're going to put you on
10  mute.
11         MR. MORRIS:  All right.
12         MS. DANDENEAU:  I'm going to try to
13  open up some of the shades.
14         VIDEOGRAPHER:  We're going off the
15  record at 10:08 a.m.
16         (Recess taken 10:08 a.m. to 10:11 a.m.)
17         VIDEOGRAPHER:  We are back on the
18  record at 10:11 a.m.
19    Q.   Mr. Waterhouse, when did you become
20  the principal executive officer of the four
21  retail funds that you just identified?
22    A.   I don't recall.
23    Q.   Do you recall the approximate year
24  that you became the principal executive officer
25  of the four funds?

Page 37

1          WATERHOUSE - 10-19-21
2     A.   2021.
3     Q.   Did you ever hold any title with
4  respect to any of the four funds you have just
5  identified other than principal executive
6  officer?
7     A.   I don't recall.
8     Q.   Is it possible that you held a
9  position or a title with the four funds you
10  just identified prior to 2021?
11    A.   Yes.
12    Q.   But you don't recall if you did or
13  not; do I have that right?
14    A.   No.  You -- I thought you asked, did
15  I hold other titles.
16    Q.   Did you hold any title at the four
17  retail funds for which you now serve as
18  principal executive officer at any time prior
19  to 2021?
20    A.   Yes.
21    Q.   What titles did you hold?
22    A.   I don't recall all the titles.
23    Q.   Do you recall any of the titles?
24    A.   Yes.
25    Q.   What titles do you recall holding at

**Appx. 00209**

Page 38

WATERHOUSE - 10-19-21

1     those four retail funds before 2021?
2         A.   Principal executive officer.
3         Q.   Were you the principal executive
4     officer of the four retail funds that you have
5     identified?
6         A.   Sorry, could you repeat the
7     question?
8         Q.   Were you the principal executive
9     officer for each of the four retail funds that
10    you have identified?
11        A.   Yes.
12        Q.   When did you become the principal
13    executive -- withdrawn.
14             Can you give me the approximate year
15    that you became the principal executive officer
16    for each of the four retail funds you've
17    identified?
18        A.   I don't recall.
19        Q.   What are your duties and
20    responsibilities as the principal executive
21    officer of these four retail funds?
22        A.   It is to manage the finance and
23    accounting positions.
24        Q.   So at the same time you serve as the
25

Page 39

WATERHOUSE - 10-19-21

1     treasurer of the advisors, you also serve as
2     the principal executive officer of these four
3     retail funds; correct?
4         A.   Yes.
5         Q.   Did you ever hold any title with
6     respect to any other retail fund?
7         A.   Not that I recall.
8         Q.   During the period that you served as
9     Highland's CFO, from time to time Highland
10    loaned money to certain of its officers and
11    employees; correct?
12        A.   Yes.
13        Q.   During the period that you served as
14    Highland's CFO, from time to time Highland
15    loaned money to certain --
16        A.   Let me -- let me retract that,
17    sorry, that -- you asked during the time I was
18    CFO, Highland loaned moneys to employees. I
19    don't -- I don't recall that during my tenure
20    of CFO.
21        Q.   You have no recollection during the
22    time that you were the CFO of Highland of
23    Highland ever loaning any money to any officer
24    or director of Highland?
25

Page 40

WATERHOUSE - 10-19-21

1         A.   I don't recall during my tenure of
2     Highland or my -- as CFO of Highland -- yeah,
3     if there are any loans as CFO of Highland.
4         Q.   I'm just talking about officers and
5     employees right now. You have no recollection
6     of Highland ever making a loan to any of its
7     officers or employees during the time that you
8     served as CFO. Do I have that right?
9              MS. DANDENEAU: Objection to form.
10        A.   So I thought you were saying
11    officers and employees as CFO, right, so there
12    were -- I mean, okay, yes.
13        Q.   I would ask you to listen carefully
14    to my question. If I -- if I'm not clear, let
15    me know, but I'm really trying to be as clear
16    as I can.
17        A.   I'm listening as carefully as I can,
18    and you are asking very specific questions in a
19    timeline. And I'm trying to answer your
20    questions as specifically as I can, and I
21    apologize if -- if I'm going back. I am -- you
22    are asking very specific questions. Thank you.
23        Q.   During the period that you served as
24    Highland's CFO, from time to time Highland
25

Page 41

WATERHOUSE - 10-19-21

1     loaned money to certain corporate affiliates;
2     correct?
3              MS. DANDENEAU: Objection to form.
4         A.   What are corporate affiliates?
5         Q.   How about the ones that are in
6     Highland's audited financial statements under
7     the section entitled Loans to Affiliates. Why
8     don't we start with those. Do you have any
9     understanding of what the phrase "affiliates"
10    means?
11             MS. DANDENEAU: Objection to form.
12        A.   I understand what affiliates are,
13    yet affiliates can have different meanings in
14    different contexts, so...
15        Q.   Why don't you -- why don't you tell
16    me what your understanding of the term
17    "affiliate" is in relation to Highland Capital
18    Management, L.P.
19        A.   Is that a -- it depends on the
20    context.
21        Q.   How about the context of making
22    loans?
23             MS. DANDENEAU: Objection to form.
24        A.   I didn't make the determination of

Page 42

WATERHOUSE - 10-19-21

1
2  who an affiliate was or is at the time those –
3  I didn't – that wasn't my job to make a
4  determination of who an affiliate is.
5      Q.   All right.  So as the CFO of
6  Highland, do you have any ability right now to
7  tell me which companies that were directly or
8  indirectly owned and/or controlled by
9  Mr. Dondero in whole or in part received loans
10  from Highland Capital Management, L.P.?
11          MS. DANDENEAU:  Objection to form.
12          MS. DEITSCH-PEREZ:  Objection, form.
13      A.   Yes.
14      Q.   Okay.  Identify every entity that
15  you can think of that was directly or
16  indirectly owned and/or controlled by
17  Mr. Dondero in whole or in part that received a
18  loan from Highland Capital Management, L.P.
19          MR. RUKAVINA:  Objection, legal
20  conclusion.
21      A.   NexPoint Advisors, Highland Capital
22  Management Fund Advisors, HCM Services,
23  Dugaboy.  Sorry, I don't think – Dugaboy
24  doesn't fit that definition.  You said owned
25  and controlled.  I don't think that that

Page 43

WATERHOUSE - 10-19-21

1
2  definition –
3      Q.   I said owned and/or controlled.
4      A.   I don't – again, I'm not – I'm not
5  the legal expert.  I don't think it controls –
6  he controls Dugaboy, so again, I'm not the
7  legal person.
8      Q.   I'm not asking you for a legal
9  conclusion, sir.  I'm asking you for your
10  knowledge, okay, as the CFO – the former CFO
11  of Highland Capital Management, other than
12  NexPoint, HCMFA, and HCMF – HCMS, can you
13  think of any other entities that were owned
14  and/or controlled directly or indirectly in
15  whole or in part by Jim Dondero who received a
16  loan from Highland Capital Management, L.P.?
17          MS. DANDENEAU:  Objection to form.
18      A.   HCRE.
19      Q.   Any others?
20      A.   That is – that is all I can think
21  of.
22      Q.   And you're aware that from time to
23  time while you were the CFO, Highland loaned
24  money to Jim Dondero; correct?
25      A.   Yes.

Page 44

WATERHOUSE - 10-19-21

1
2      Q.   Okay.  Can we refer to the four
3  entities that you just named and Mr. Dondero as
4  the affiliates?
5      A.   So that would be Jim Dondero,
6  NexPoint Advisors, Highland Capital Management
7  Fund Advisors, and HCRE.
8      Q.   And HCMS?
9      A.   And HCMS, okay.
10      Q.   And can we refer to the loans that
11  were given to each of those affiliates as the
12  affiliate loans?
13      A.   Yes.
14      Q.   And is it fair to say that each of
15  the affiliates were the borrowers under the
16  affiliate loans as we're defining the term?
17          MR. RUKAVINA:  Objection, legal
18  conclusion.
19      A.   The borrowers are whoever were on
20  the notes.  I don't – I don't know.  I'm not
21  the legal person.
22      Q.   But you –
23      A.   I don't know.
24      Q.   You do know, as Highland's former
25  CFO, that each of the affiliates that you have

Page 45

WATERHOUSE - 10-19-21

1
2  identified tendered notes to Highland; correct?
3          MR. RUKAVINA:  Hey, John, will you
4  just give me a running objection to legal
5  conclusion to HCM –
6          MR. MORRIS:  No.  No, if you want to
7  object –
8          MR. RUKAVINA:  I will object every
9  time.  Object to legal conclusion.
10          MR. MORRIS:  That is fine.
11      A.   Sorry, can you repeat the question?
12      Q.   Are you aware that each of the –
13  that each of the affiliates, as we have defined
14  the term, gave to Highland a promissory note in
15  exchange for the loans?
16          MR. RUKAVINA:  Objection to the
17  extent that calls for a legal conclusion.
18      A.   I don't.
19      Q.   No, you don't know that?
20      A.   No, they didn't – you said they
21  exchanged a promissory note for a loan.  I
22  don't – I don't understand that question, so I
23  said no.
24      Q.   At the time of the bankruptcy
25  filing, did Highland have in its possession

Page 46

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2  promissory notes that were signed by each of
3  the affiliates?
4     A.  Yes.
5     Q.  To the best of your knowledge,
6  during the time that you served as Highland's
7  CFO, did Highland disclose to its outside
8  auditors all of the loans that were made to
9  affiliates?
10     MR. RUKAVINA:  Objection, that calls
11  for a legal conclusion.
12     MS. DEITSCH-PEREZ:  I also couldn't
13  hear you, John, because there was some
14  garbling on -- on the -- on the call.
15     MR. MORRIS:  Folks, I've got to tell
16  you this is not going well, and I'm
17  reserving my right --
18     MS. DANDENEAU:  John, it was just
19  the end of that question.  It was just the
20  end of that question.  I couldn't hear it
21  either.  Sorry, if you could repeat it,
22  please.
23     MR. MORRIS:  That is less than an
24  hour into this, but folks are trying to run
25  out the clock, and so I'm just going to

Page 47

1        WATERHOUSE - 10-19-21
2  state that now.
3     MS. DANDENEAU:  You know, and,
4  Mr. Morris, I really object to that.  I
5  mean --
6     MR. MORRIS:  Okay.
7     MS. DANDENEAU:  -- Mr. Waterhouse
8  just told you he's trying to listen to your
9  questions and answer them carefully, and
10  you have no basis for saying that.
11     MR. MORRIS:  Okay.
12     MS. DANDENEAU:  This does not --
13  this is not an experienced witness, so he's
14  trying to do the best he can.
15     Q.  Mr. Waterhouse, during the time that
16  you served as Highland's CFO, did Highland
17  disclose to its outside auditors all of the
18  loans that it made to each of the affiliates
19  that you have identified?
20     MR. RUKAVINA:  Objection, legal
21  conclusion.
22     A.  Yes.
23     Q.  To the best of your knowledge, while
24  you were Highland's CFO, were all of the
25  affiliate loans described in Highland's audited

Page 48

1        WATERHOUSE - 10-19-21
2  financial statements?
3     MR. RUKAVINA:  Objection, legal
4  conclusion.
5     A.  When an audit was performed, any
6  loans that were made by Highland to the
7  affiliates were disclosed to auditors.
8     Q.  Are you aware of any loan that was
9  made to any affiliate that was not disclosed to
10  the auditors?
11     A.  I'm not aware.
12     Q.  To the best of your knowledge, did
13  each of the affiliates who were --
14  (inaudible) -- loaned from Highland execute a
15  promissory note in connection with that loan?
16     MR. RUKAVINA:  Objection, legal
17  conclusion.
18     A.  Sorry, you -- halfway through the
19  question it got muffled.
20     Can you repeat that again?
21     Q.  To the best of your knowledge, did
22  every affiliate execute a promissory note in
23  connection with each loan that it obtained from
24  Highland?
25     MR. RUKAVINA:  Objection, legal

Page 49

1        WATERHOUSE - 10-19-21
2  conclusion.
3     A.  Yes.
4     Q.  You are not aware of any loan that
5  any affiliate ever obtained from Highland where
6  the affiliate did not give a promissory note in
7  return; is that fair?
8     A.  Yes, I'm not aware.
9     Q.  And to the best of your knowledge,
10  did Highland loan to each affiliate an amount
11  of money equal to the principal amount of each
12  promissory note?
13     MR. RUKAVINA:  Objection, legal
14  conclusion.
15     A.  Yes.
16     Q.  During the time that you served as
17  CFO, did Highland ever loan money to
18  Mark Okada?
19     A.  I -- I don't recall.
20     Q.  Did you ever see any promissory
21  notes executed by Mark Okada?
22     A.  I don't recall.
23     Q.  Do you know if Highland ever forgave
24  any loan that it ever made to Mr. Okada?
25     A.  I don't recall.

Page 50

1        WATERHOUSE - 10-19-21
2    Q.   Do you recall if Mr. Okada paid back
3  all principal and interest due and owing under
4  any loan he obtained from Highland?
5        MS. DEITSCH-PEREZ:  Objection to
6  form.
7        MS. DANDENEAU:  Objection to form.
8    A.   I don't recall.
9    Q.   Do you recall whether -- during your
10  time as CFO, whether Highland ever loaned money
11  to Jim Dondero?
12    A.   Yes.
13    Q.   To the best of your knowledge, did
14  Mr. Dondero sign and deliver to Highland a
15  promissory note in connection with each loan
16  that he obtained from Highland?
17    A.   If you are referring to the
18  promissory notes that, you know, part of
19  Highland's records, yes.
20    Q.   Okay.  You're not aware of any loan
21  that Mr. Dondero took from Highland that wasn't
22  backed up by -- by a promissory note with a
23  face -- with a principal amount equal to the
24  amount of the loan; correct?
25    A.   Am I aware that Jim Dondero took a

Page 51

1        WATERHOUSE - 10-19-21
2  loan?
3    Q.   Without giving a -- let me ask a
4  better question.  I'm sorry, Mr. Waterhouse.
5        Are you aware of any loan that
6  Mr. Dondero obtained from Highland where he
7  didn't give a promissory note in return?
8    A.   I'm not aware.
9    Q.   During the time that you served as
10  Highland's CFO, did Highland ever forgive any
11  loans, in whole or in part, that it made to
12  Mr. Dondero?
13    A.   Not that I'm aware.
14    Q.   At the time that you served as
15  Highland's CFO, did Highland ever forgive any
16  loan, in whole or in part, that it made to any
17  affiliate as we've defined the term today?
18    A.   Not that I'm aware.
19    Q.   During the time that you served as
20  Highland's CFO, did Highland ever forgive, in
21  whole or in part, any loan that it ever made to
22  any officer or employee?
23    A.   Highland forgave loans to officers
24  and employees.  It may not have been at the
25  time when my title was CFO.

Page 52

1        WATERHOUSE - 10-19-21
2    Q.   Okay.  And so I appreciate the
3  distinction.
4        Is it fair to say that, to the best
5  of your knowledge, Highland did not forgive a
6  loan that it made to an officer or employee
7  after 2013?
8        MS. DANDENEAU:  Objection to form.
9    A.   I don't recall.
10    Q.   To the best of your knowledge, did
11  Highland disclose to its auditors every
12  instance where it forgave, in whole or in part,
13  a loan that it had made to one of its officers
14  or employees?
15    A.   No.
16    Q.   Can you think of -- can you -- can
17  you identify any loan to an officer or employee
18  that was forgiven by Highland, in whole or in
19  part, that was not disclosed to Highland's
20  outside auditors?
21    A.   Look, I don't recall all of the
22  loans and the loan forgiveness.  I just know as
23  part of the audit process there is a
24  materiality concept.
25        So if there were loans to employees

Page 53

1        WATERHOUSE - 10-19-21
2  that were of -- you know, that were deemed
3  immaterial, those items may not have been
4  disclosed by the team to the auditors.
5    Q.   I appreciate that.
6        Do you have an understanding as to
7  what the level of materiality was?
8    A.   I don't recall.
9    Q.   As the CFO of Highland, to the best
10  of your knowledge, did Highland disclose to its
11  outside auditors every loan that was forgiven,
12  in whole or in part, that was material as that
13  term was defined by the outside auditors?
14    A.   Yes.
15    Q.   And do you recall where -- do you
16  recall where the definition of materiality can
17  be found for -- for this particular purpose?
18        MS. DANDENEAU:  Objection to form.
19    A.   No.  You -- I don't determine
20  materiality.
21    Q.   Okay.  I'm just asking you if you
22  can help me understand where it is, but I think
23  we will find it in a few minutes.
24        You are aware that Highland has
25  commenced lawsuits against each of the

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  affiliates, as we've defined the term, to
3  collect under certain promissory notes; is that
4  right?
5      A.  Yes.
6      Q.  And are you familiar with the notes
7  that are issue -- at issue in the lawsuits?
8          MS. DANDENEAU:  Objection to form.
9      A.  Generally familiar.
10     Q.  Can we refer to the lawsuits that
11 Highland has commenced against the affiliates
12 collectively as the lawsuits?
13     A.  Yes.  And, again, the affiliates are
14 NexPoint, HCMFA, HCMS, and HCRE.
15     Q.  And Mr. Dondero?
16     A.  Okay.  See, that is a new -- and now
17 Mr. Dondero is included in your affiliate
18 definition.
19     Q.  I just --
20     A.  I thought affiliates -- I thought
21 affiliates were just the four prior entities,
22 so I just want to be clear.
23     Q.  I appreciate that.  So let's --
24 let's keep them separate and let's refer to the
25 four corporate entities as the affiliates, and

1  WATERHOUSE - 10-19-21
2  Mr. Dondero we will call Mr. Dondero.  Okay?
3      A.  Okay.  Thank you.  As you can see,
4  Mr. Morris, there is a lot of entities -- a lot
5  here.  I just want to be clear.
6      Q.  Okay.  Now, the affiliates of
7  Mr. Dondero signed promissory notes that are
8  not subject to the lawsuit.
9          Do you understand that?
10         MS. DANDENEAU:  Objection to form.
11     A.  The affiliates and Mr. Dondero
12 signed --
13     Q.  You know what?  I will skip it.
14 That is okay.  Okay.
15         From time to time while you were
16 Highland's CFO, payments were applied against
17 principal and interests that were due under the
18 notes that were tendered by the affiliates and
19 Mr. Dondero; correct?
20         MR. RUKAVINA:  Objection to the
21     extent that calls for a legal conclusion.
22     A.  Yes.
23     Q.  Did Highland have a process where --
24 whereby payments would be applied against
25 principal and interest against the notes that

1  WATERHOUSE - 10-19-21
2  were given by the affiliates and Mr. Dondero?
3      A.  Yes.
4      Q.  Can you describe the process for me?
5      A.  The process, payment should be
6  applied as laid out in the -- in the promissory
7  note.
8      Q.  From time to time were payments made
9  that were not required under the promissory
10 notes?
11         MS. DANDENEAU:  Objection to form.
12     A.  Yes.
13     Q.  Who was responsible for deciding
14 when and how much the payments would be made
15 with respect to each of the notes that were
16 issued by the affiliates and Mr. Dondero?
17     A.  Who was responsible for deciding how
18 much was paid prior to the due date?
19     Q.  Yes.
20     A.  I don't know.
21     Q.  Did you approve of each payment that
22 was made against principal and interest on the
23 notes that were given by the affiliates and
24 Mr. Dondero?
25         MS. DANDENEAU:  Objection to form.

1  WATERHOUSE - 10-19-21
2      A.  Did I approve the payments?  I
3  approve -- I approve -- if there was cash -- if
4  there was cash being repaid on a note payment,
5  yes, I approved in the general sense of being
6  made aware of the payment and the amount.
7      Q.  And are you the person who
8  authorized Highland's employees to effectuate
9  those payments?
10     A.  Yes.
11     Q.  When you gave the instruction to
12 effectuate the payment, did you obtain
13 Mr. Dondero's prior approval?
14     A.  I mean, it -- I mean, it -- it
15 depends.
16     Q.  Can you think of any instance where
17 you directed Highland's employees to make a
18 payment of principal or interest against any
19 note that was tendered by an affiliate or
20 Mr. Dondero that Mr. Dondero did not approve of
21 in advance?
22     A.  I can't recall specifically.
23     Q.  Can you identify -- withdrawn.
24         Did Mr. Dondero ever tell you that a
25 payment that was made against principal and

Page 58

WATERHOUSE - 10-19-21

1    interest due under one of the notes that was
2    tendered by an affiliate or himself should not
3    have been made?
4       A.   Yes.
5       Q.   Can you identify the payment for me?
6       A.   It would be for -- for NexPoint
7    Advisors.
8       Q.   Okay.  And when did Mr. Dondero tell
9    you that a payment that you had initiated on
10   behalf of NexPoint should not have been made?
11      A.   I wasn't initiating payment.  It was
12   in the context of the -- I think you used this
13   term, "the advisors," so NexPoint Advisors and
14   Highland Capital Management Fund Advisors had
15   overpaid on certain agreements with Highland
16   Capital Management, L.P.  And as a part of that
17   process, the advisors -- what I was told at the
18   time were in talks and negotiations and
19   discussions with Highland Capital Management,
20   L.P., on offsets in relation to those
21   overpayments.
22      Q.   When did this conversation take
23   place?
24           MS. DANDENEAU:  Objection to form.

Page 59

WATERHOUSE - 10-19-21

1       A.   I don't recall specifically.
2       Q.   Do you recall what year it was?
3       A.   Yes.
4       Q.   What year did the conversation with
5    Mr. Dondero take place that you just described?
6       A.   2020.
7       Q.   Okay.  Do you remember if it was
8    December 2020?
9       A.   It -- it -- I don't -- I don't
10   recall what month specifically, but it would
11   have been November or December.
12      Q.   And we're talking here about a
13   payment of principal and/or interest that was
14   due -- withdrawn.
15           We're talking here about a payment
16   of principal and interest that was applied
17   against NexPoint's note; correct?
18           MS. DANDENEAU:  Objection to form.
19      A.   I don't recall what that payment
20   consisted of.
21      Q.   Is it possible that the payment you
22   have in mind related to the shared services
23   agreement?
24           MS. DANDENEAU:  Objection to form.

Page 60

WATERHOUSE - 10-19-21

1       A.   No.
2       Q.   Are you certain that the payment --
3    that the payment that you have in mind related
4    to the promissory note that NexPoint issued in
5    favor of Highland?
6           MS. DANDENEAU:  Objection to form.
7       A.   Yes.
8       Q.   Okay.  Other than that one payment,
9    can you identify any other instance where
10   Mr. Dondero told you that a payment should not
11   have been applied against principal and
12   interest under any promissory note tendered by
13   any affiliate or Mr. Dondero?
14           MS. DANDENEAU:  Objection to form.
15           MS. DEITSCH-PEREZ:  Objection to
16   form.
17      A.   Not that I recall.
18      Q.   Thank you very much.
19           Do you know if Mr. Dondero approved
20   in advance of each loan made to each affiliate
21   and himself during the time that you were the
22   CFO?
23           MS. DEITSCH-PEREZ:  Object to the
24   form.

Page 61

WATERHOUSE - 10-19-21

1       A.   Yes, generally.
2       Q.   Can you identify any loan that was
3    ever made to an affiliate or to Mr. Dondero
4    that Mr. Dondero did not approve of in advance?
5       A.   Other than the ones that are in
6    dispute, I'm not aware.
7       Q.   Do you believe that Mr. Dondero did
8    not approve of each of the loans that are in
9    dispute in advance of the time that the loan
10   was made?
11           MS. DANDENEAU:  Objection to form.
12      A.   Given what is in the dispute, you
13   know, and -- and -- and the way things might --
14   yeah, I mean...
15      Q.   I am not asking about the dispute,
16   and it was probably my mistake to follow you
17   there.
18           Were you aware of every loan made by
19   Highland to each of its affiliates and
20   Mr. Dondero while you were the CFO at the time
21   each loan was made?
22      A.   Was I aware of every loan, yes.
23      Q.   Okay.  And if you put yourself back
24   in time, do you recall that any of the loans

Page 62

WATERHOUSE - 10-19-21

1    that were made to one of the affiliates or
2    Mr. Dondero during the time that you were the
3    CFO was made without Mr. Dondero's prior
4    knowledge and approval?
5    A.    Not that I recall.
6    Q.    Thank you.  In fact, do you -- as
7    the CFO, would you have allowed Highland to
8    loan money to an affiliate or to Mr. Dondero
9    without obtaining Mr. Dondero's prior approval?
10        MS. DANDENEAU:  Objection to form.
11    A.    I can't -- there was so many times
12    over the years, I can't speak for every single
13    one, but generally, yes, I -- I spoke to him.
14    Q.    You -- you never -- you never --
15    withdrawn.  I will just take that.
16        Can you recall any payment that was
17    ever made against principal and interest on a
18    note that was issued in favor of Highland by an
19    affiliate or Mr. Dondero that you personally
20    did not know about in advance?
21    A.    There are so many through the years,
22    I don't -- I don't -- I don't recall every
23    single one.
24    Q.    Okay.  Can you identify any payment
25    

Page 63

WATERHOUSE - 10-19-21

1    that was made against principal and interest on
2    any note tendered by any affiliate or
3    Mr. Dondero that you didn't know about in
4    advance?
5    A.    I don't recall.
6    Q.    Other than Mr. Dondero -- withdrawn.
7        Did anybody at Highland have the
8    authority to make a payment against principal
9    and interest due under a loan given to the
10    affiliates and Mr. Dondero without your
11    knowledge and approval?
12        MS. DANDENEAU:  Objection to form.
13    A.    Sorry, there was -- to make a
14    payment on an affiliate loan, what you are
15    saying would it require my knowledge and
16    approval, yes.
17    Q.    Okay.  I appreciate that.  Thank
18    you.
19        Did anybody at Highland have the
20    authority, to the best of your knowledge, to
21    effectuate a loan to an affiliate without
22    Mr. Dondero's prior knowledge and approval?
23        MS. DANDENEAU:  Objection to form.
24    A.    I can't speak for all, but
25    

Page 64

WATERHOUSE - 10-19-21

1    generally, yes.
2    Q.    Did you personally communicate with
3    Mr. Dondero to let him know each time a payment
4    of principal or interest was being made against
5    any note that was tendered by an affiliate or
6    Mr. Dondero to Highland?
7    A.    I don't -- are you saying, did I let
8    Mr. Dondero know if a payment was made on any
9    affiliate or loan to Mr. Dondero?  I mean,
10    not -- not every -- no.
11    Q.    Let me ask it this way:  Did you
12    have a practice of informing Mr. Dondero when
13    payments were made against principal and
14    interest on any note that was tendered by an
15    affiliate or Mr. Dondero?
16        MS. DEITSCH-PEREZ:  Objection to
17    form.
18        MS. DANDENEAU:  Objection to form.
19    A.    No, I did not.
20    Q.    Did Mr. Dondero ever tell you that a
21    payment of principal or interest had been made
22    against a note that was tendered by an
23    affiliate or himself that he had been unaware
24    of?
25    

Page 65

WATERHOUSE - 10-19-21

1    A.    Not that I recall.
2    Q.    Are you aware that Mr. Dondero and
3    the affiliates -- withdrawn.
4        Are you aware that Mr. Dondero
5    NexPoint, HCRE, and HCMS all contend that they
6    do not have to pay on any of the notes they
7    issued because they are subject to an oral
8    agreement between Mr. Dondero and Nancy
9    Dondero, in her capacity as the trustee of the
10    Dugaboy Investment Trust?
11        MS. DANDENEAU:  Objection to form.
12    A.    I didn't -- I didn't -- I didn't
13    know that it was all notes.
14    Q.    Okay.  Are you -- did you ever learn
15    that there was an oral agreement between Jim
16    Dondero and Nancy Dondero pertaining to any
17    notes issued by any affiliate or Mr. Dondero?
18        MS. DEITSCH-PEREZ:  Object to the
19    form.
20    A.    Yes.
21    Q.    Do you have any understanding as to
22    the terms of that agreement?
23    A.    Yes.
24    Q.    What is your understanding of the

Appx. 00216

Page 66

```
 1         WATERHOUSE - 10-19-21
 2  terms of the agreement?
 3     A.   That there were certain milestones
 4  that had to be reached.
 5     Q.   Do you have any understanding of the
 6  terms of the agreement between Mr. Dondero and
 7  Nancy Dondero concerning any of the notes
 8  issued by the affiliates or Mr. Dondero other
 9  than that there have to be milestones reached?
10         MS. DEITSCH-PEREZ:  Object to the
11     form.
12     A.   There are milestones, I found out
13  yesterday, or there was some --
14         MS. DANDENEAU:  Okay.  I'm just
15     going to object to the extent that you
16     learned anything in conversations with
17     counsel, please don't reveal -- that is
18     privileged, and don't reveal any privileged
19     communications.
20         THE WITNESS:  Okay.
21     A.   So I'm not aware of anything else.
22     Q.   Do you know what the milestones
23  were?
24         MS. DANDENEAU:  Objection to form.
25     A.   I don't.
```

Page 67

```
 1         WATERHOUSE - 10-19-21
 2     Q.   Do you know anything about -- do you
 3  know what promissory notes the agreement
 4  covered?
 5     A.   I don't.
 6     Q.   Do you know if -- if Jim and Nancy
 7  Dondero entered into one agreement or more than
 8  one agreement?
 9         MS. DEITSCH-PEREZ:  Object to the
10     form.
11     A.   I don't know.
12     Q.   Do you know if the agreement is in
13  writing?
14     A.   I don't know.
15     Q.   How did you learn of the existence
16  of the agreement?
17         MS. DANDENEAU:  Objection to form.
18     Again --
19     A.   I don't -- I don't recall who told
20  me.
21     Q.   You have no recollection of who told
22  you about this agreement between Jim and Nancy
23  Dondero?
24         MS. DEITSCH-PEREZ:  Object to the
25     form.
```

Page 68

```
 1         WATERHOUSE - 10-19-21
 2     A.   I don't recall.
 3     Q.   Do you recall how you learned of the
 4  agreement?
 5         Was it in a meeting?  Was it in a
 6  phone call?  Was it in an email?
 7     A.   I don't recall.
 8     Q.   Do you recall when you learned of
 9  the agreement?
10     A.   Not specifically.
11     Q.   Do you recall what year you learned
12  of the agreement?
13     A.   In -- look, I mean, there are so
14  many notes.  I may be getting -- I believe it
15  was 2020.
16     Q.   All right.  I'm not asking about
17  notes, sir.  I'm asking about the agreement
18  that you testified you knew about between Jim
19  and Don- -- Nancy Dondero.  Okay.
20         Do you understand my question now?
21  Should I ask my question again?
22     A.   Yeah, sure.  Go ahead.
23     Q.   I'm going to use the word
24  "agreement" to refer to the agreement that
25  Mr. Dondero and Nancy Dondero entered into
```

Page 69

```
 1         WATERHOUSE - 10-19-21
 2  where you understood that certain milestones
 3  had to be reached.  Okay?
 4     A.   Uh-huh.
 5         MS. DANDENEAU:  Objection.
 6         MS. DEITSCH-PEREZ:  Object to the
 7     form.
 8         MR. MORRIS:  Just defining a term,
 9     what is the objection.
10         MS. DEITSCH-PEREZ:  The objection --
11         MR. MORRIS:  I will move on.  I will
12     move on.
13         MS. DEITSCH-PEREZ:  John --
14     Q.   Sir, are you okay with that
15  definition of agreement?
16     A.   Okay.
17     Q.   Okay.  So you don't recall who --
18  who informed you of the existence of the
19  agreement; is that right?
20     A.   I don't recall.
21     Q.   You don't recall who told you the
22  terms of the agreement.
23         Do I have that right?
24     A.   Correct.
25     Q.   And you don't recall if you learned
```

Appx. 00217

Page 70

WATERHOUSE - 10-19-21

1
2 about the agreement in a meeting, through an
3 email, or through a phone call.
4      Do I have that right?
5    A.  I don't recall.
6    Q.  Can you tell me when you learned of
7 the agreement?
8    A.  I don't -- I don't -- I don't
9 remember specifically.
10   Q.  Can you tell me if you learned of
11 the agreement before or after the petition
12 date?
13   A.  It would have been -- it would have
14 been after.
15   Q.  Can you tell me if you learned of
16 the agreement before or after January 9th,
17 2020?
18   A.  It would have been after.
19   Q.  Can you tell me if you learned of
20 the agreement before or after you left Highland
21 Capital Management in February of 2021?
22   A.  I don't -- I don't -- I don't know.
23   Q.  It is possible that you learned of
24 it while you were a Highland employee.
25      Do I have that right?

Page 71

WATERHOUSE - 10-19-21

1
2    A.  I don't remember the -- I mean, it
3 was sometime in 2021.  I don't remember when.
4    Q.  All right.  So to the best of your
5 recollection, it was in 2021 but you don't
6 recall if it was before or after you ceased to
7 be a Highland employee.
8      Do I have that right?
9    A.  Yeah, I mean, it was -- it was
10 likely after I was -- after I left Highland
11 because, if I put myself back into the last
12 days of -- of 2021, it was -- you know, the
13 communications with Mr. Dondero were -- were --
14 were -- there weren't as many communications
15 because of the circumstances.
16   Q.  And so based on that you believe
17 that it is most likely that you learned of this
18 agreement sometime after you left Highland
19 employment?
20   A.  I wouldn't use the term "most
21 likely."  I don't recall specifically.  I don't
22 recall.
23   Q.  Do you recall ever telling Jim Seery
24 about this agreement?
25   A.  No, I don't -- I didn't tell

Page 72

WATERHOUSE - 10-19-21

1
2 Jim Seery.
3    Q.  Did you tell anybody at DSI about
4 this agreement?
5    A.  No.
6    Q.  Did you tell any of Highland's
7 independent directors about this agreement?
8    A.  No.
9    Q.  Did you tell anybody at Pachulski
10 Stang Ziehl & Jones about this agreement?
11   A.  No.
12   Q.  Did you tell any employee of
13 Highland about this agreement?
14   A.  No.
15      MS. DANDENEAU:  Mr. Morris, it has
16      been an hour and a half.  Is this a good
17      time for a break?
18      MR. MORRIS:  Sure.
19   Q.  Mr. Waterhouse, I will just remind
20 you that during the break please don't speak
21 with anybody about the deposition, the
22 substance of your testimony or anything else
23 concerning the deposition.  Okay?
24   A.  Yes.
25      MR. MORRIS:  So it is 11:02.  We're

Page 73

WATERHOUSE - 10-19-21

1
2 at 11:02 your time.  Let's come back, I
3 guess, at 15 -- at 11:15 your time.
4      VIDEOGRAPHER:  We're going off the
5 record at 11:02 a.m.
6 (Recess taken 11:02 a.m. to 11:20 a.m.)
7      VIDEOGRAPHER:  We are back on the
8 record at 11:20 a.m.
9    Q.  Mr. Waterhouse, did you speak with
10 anybody during the break about this deposition?
11   A.  No.
12      MS. DANDENEAU:  Other than -- other
13      than his counsel.
14   Q.  Did you speak to your counsel about
15 the substance of your deposition today?
16   A.  No, I didn't bring it up.
17   Q.  I didn't ask you if you brought it
18 up.  I asked you if you had any conversation
19 with your lawyer about the substance of your
20 deposition.
21      MS. DANDENEAU:  Yes, he did.
22   Q.  Can you tell me what the -- you
23 discussed?
24      MS. DANDENEAU:  No, I object to
25      that.  He's not going to answer.  That is a

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2   privileged conversation.
3      MR. MORRIS: So I just want to make
4   sure that I understand. During the break
5   you spoke with your client about the
6   substance of this deposition; is that
7   right?
8      MS. DANDENEAU: Yes, John.
9      MR. MORRIS: And you refuse – you
10  refuse to let your client tell me what was
11  discussed; is that right?
12     MS. DANDENEAU: That's correct.
13     MR. MORRIS: You know, I had given
14  the instruction prior to the break not to
15  speak with counsel. I would have
16  appreciated –
17     MS. DANDENEAU: No, you didn't –
18  actually, that is not true, Mr. Morris.
19  You said not to speak with anyone. We
20  never have interpreted that to mean
21  conversations with counsel. That's never
22  been – I have never, ever heard that
23  instruction.
24     MR. MORRIS: Okay. We will – we
25  will – we will deal with it when and if we

1   WATERHOUSE - 10-19-21
2   have to.
3      Q.   Mr. Waterhouse, after learning about
4   the agreement, did you ask anybody if the
5   agreement was reflected in a writing?
6      MS. DANDENEAU: Objection to form.
7      A.   No.
8      Q.   Did you ask anybody if the terms of
9   the agreement were memorialized anywhere?
10     MS. DANDENEAU: Objection to form.
11     MR. MORRIS: What is the –
12     A.   No.
13     MS. DANDENEAU: Well, because you
14  keep talking about this agreement and I –
15  I – I think, Mr. Morris, that is really
16  not clear what you mean by "the agreement."
17  And maybe you can just go back and restate
18  what that is.
19     MR. MORRIS: Okay. Your client has
20  agreed with me twice on the definition, but
21  I will try one more time.
22     Q.   Mr. Waterhouse, do you understand
23  that when I use the term "agreement," I'm
24  referring to the agreement between Jim and
25  Nancy Dondero concerning certain promissory

1   WATERHOUSE - 10-19-21
2   notes where you learned that one of the terms
3   of the agreement was milestones reached?
4      A.   Okay.
5      Q.   And did you understand that that was
6   the – the agreement that we were referring to
7   every time we used the word "agreement" in this
8   deposition?
9      A.   I don't know anything about this
10  agreement. So, look, I do – it – I don't
11  know whether –
12     Q.   Let's – let's try this again.
13     A.   Yeah. Look, I don't know what this
14  agreement relates.
15     MS. DEITSCH-PEREZ: John, John –
16     Q.   Let me try –
17     MS. DEITSCH-PEREZ: John, please let
18  the witness finish.
19     MR. MORRIS: Please stop. Please
20  stop. Please stop talking.
21     MS. DEITSCH-PEREZ: No, you stop.
22  Let the witness –
23     MR. MORRIS: Stop talking.
24     MS. DEITSCH-PEREZ: – finish – you
25  interrupted him.

1   WATERHOUSE - 10-19-21
2      MR. MORRIS: You know what, you
3   guys, this is really wrong. It is really,
4   really wrong. I had the witness agree not once,
5   but twice to the definition of agreement.
6      Okay? I'm going to try and do it a third
7   time.
8      MS. DANDENEAU: No, but, please,
9   John, really –
10     MR. MORRIS: No, please stop
11  talking. Please. It is my deposition.
12  Object to questions.
13     MS. DANDENEAU: No, but also you
14  instructed him that – that if you were
15  going – if you were interrupting him, that
16  he should remind you that you're
17  interrupting him and – and –
18     MR. MORRIS: Let him do that. Let
19  him do that.
20     MS. DANDENEAU: Okay. Well, you –
21     MR. MORRIS: Please stop talking.
22     A.   Okay. I don't know any of the
23  details of these agreements. I don't know
24  anything about them. I heard – someone – I

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    don't know who, I don't know when, as you
3    asked, sometime in '21, someone told me about
4    this -- or I don't honestly know -- I don't
5    even recall exactly how I was made aware of
6    this, but I was. I don't know -- I don't know
7    any of these details, and I'm getting -- again,
8    there is, you know, I -- I -- I had a passing
9    conversation with -- with Jim at some point
10   on -- on some -- on the executive comp, and I'm
11   getting confused of what is what, because
12   again, I don't know any of these details.
13       Q.   Okay. Let me try again,
14   Mr. Waterhouse, and I apologize.
15            Are you aware of any agreement
16   between Jim Dondero and Nancy Dondero
17   concerning any promissory note that was given
18   to Highland by any affiliate or Mr. Dondero?
19       MS. DEITSCH-PEREZ:   Object to the
20   form.
21       A.   I've heard of an agreement. That
22   is -- that is -- I mean, if you are using aware
23   as heard, sure.
24       Q.   And you understand that one of the
25   terms of the agreement is that it was based on

1    WATERHOUSE - 10-19-21
2    milestones that had to be reached; is that
3    right?
4        MS. DANDENEAU:   Objection to form.
5        A.   That was one of the words that was
6    used when I heard about it, yes.
7        Q.   And when you heard about this
8    agreement that had a term in it concerning
9    milestones reached, did you ask the person who
10   was telling you about the agreement whether or
11   not it was in writing?
12       A.   I did not.
13       Q.   Did you ask any questions at all?
14       MS. DANDENEAU:   Objection to form.
15       A.   Not that I recall.
16       Q.   But do you understand that going
17   forward, we're going to refer to the agreement
18   as the agreement that you just described that
19   you were --
20       MS. DANDENEAU:   Object to the form.
21       A.   Yes.
22       Q.   Okay. You don't have any personal
23   knowledge concerning the terms of the
24   agreement; correct?
25       MS. DEITSCH-PEREZ:   Object to the

1    WATERHOUSE - 10-19-21
2    form.
3        Q.   You can answer.
4        A.   I don't -- I heard about the
5    agreement. I don't know anything -- I heard
6    there was an agreement. That is -- again, as I
7    testified before -- I said before, heard about
8    it, don't know the details. I believe it was
9    sometime this year.
10       Q.   Do you have any personal knowledge
11   about the terms of the agreement, sir?
12       MS. DANDENEAU:   Objection to form.
13       A.   Other than what I have previously
14   discussed, I don't -- I don't know.
15       Q.   Did -- did Mr. Dondero tell you
16   about the existence of the agreement?
17       A.   I don't recall.
18       Q.   Do you recall the source of your
19   information when you learned about the
20   agreement?
21       A.   No, I don't -- I don't recall. I
22   don't remember. I just -- I heard about it
23   generally. I don't remember -- I don't
24   remember who, how, if, how. I don't remember.
25       Q.   You know, Mr. Waterhouse, I just

1    WATERHOUSE - 10-19-21
2    want to be clear that I never would have asked
3    you to appear at this deposition if your name
4    hadn't been included in responses to discovery
5    as somebody with knowledge about the -- who
6    was told about the existence of the agreement.
7            That is what prompted me do this,
8    and I really do feel compelled to tell you that
9    I otherwise would never have called you as a
10   witness. So I regret that you're being put
11   through this today. I had no intention of
12   burdening or taking your time, but that is
13   the reason that we issued the subpoena is
14   because certain of the defendants identified
15   you as somebody --
16       MS. DEITSCH-PEREZ:   Mr. Morris, you
17   are here to ask questions, not to have --
18       MR. MORRIS:   I feel badly for the
19   guy. I really do.
20       MS. DEITSCH-PEREZ:   I'm sure you do.
21       MR. MORRIS:   I do. Stop.
22       MS. DEITSCH-PEREZ:   You stop.
23       MR. MORRIS:   I'm allowed.
24       MS. DEITSCH-PEREZ:   No, you're not
25   allowed to have a chat with the witness.

Page 82

WATERHOUSE - 10-19-21

1
2    Q.    Okay.  Well, I hope that you
3    appreciate what I'm saying here,
4    Mr. Waterhouse.
5          MS. DANDENEAU:  All right.  Let's go
6    ahead and ask questions, and again, you're
7    entitled to probe his -- his knowledge
8    of -- whatever knowledge he has about
9    this -- this agreement and --
10         MR. MORRIS:  That is what I'm doing.
11         MS. DANDENEAU:  -- he will answer
12   the questions to the best that he can.
13         MR. MORRIS:  That is what I'm doing.
14   Q.    Mr. Waterhouse, I take it you do not
15   know which promissory notes issued by which
16   affiliates or Mr. Dondero are the subject of
17   this agreement; do I have that right?
18   A.    Yes, I don't -- I don't know.
19   Q.    Do you know of any way to determine
20   which promissory notes issued by the affiliates
21   and Mr. Dondero are the subject of this
22   agreement other than asking Jim or Nancy
23   Dondero?
24         MS. DANDENEAU:  Objection to form.
25   A.    I don't know.

Page 83

WATERHOUSE - 10-19-21

1
2    Q.    Did you ever make --
3    A.    I don't know anything about these
4    agreements.
5    Q.    Did you ever make any effort to
6    determine which promissory notes are subject to
7    this agreement?
8    A.    No.
9    Q.    Did you ever ask anybody which
10   promissory notes are subject to this agreement?
11   A.    No.
12   Q.    Do you know if there is a list
13   anywhere of the promissory notes that are
14   subject to this agreement?
15   A.    I'm not aware.
16   Q.    Have you ever seen the terms of the
17   agreement written down anywhere?
18   A.    No.
19   Q.    Have you ever asked anybody whether
20   the terms of the agreement were written down
21   anywhere?
22   A.    I have not.
23   Q.    Did learning about the agreement
24   cause you to do anything in response?
25         MS. DANDENEAU:  Objection to form.

Page 84

WATERHOUSE - 10-19-21

1
2    A.    No.
3    Q.    Did anybody ever describe to you the
4    nature of the milestones that you referred to
5    earlier?
6    A.    No, I don't -- I don't have any
7    details of this.
8    Q.    That is fine.
9          PricewaterhouseCoopers served as
10   Highland's outside auditors prior to the
11   petition date; correct?
12   A.    Yes.
13   Q.    You refer to PricewaterhouseCoopers
14   as PwC?
15   A.    Yes.
16   Q.    PricewaterhouseCoopers audited
17   Highland's financial statements on an annual
18   basis; correct?
19   A.    During my -- during my time as -- as
20   CFO, yes, PricewaterhouseCoopers was the
21   auditor.
22   Q.    Do you know why Highland had its
23   annual financial statements audited each year?
24   A.    Generally.
25   Q.    Tell me your general understanding

Page 85

WATERHOUSE - 10-19-21

1
2    as to the reason why Highland had its annual
3    financial statements audited each year.
4    A.    From -- from time to time, they were
5    used -- or asked for, as part of diligence or
6    transactions or -- or things of that nature.
7    Q.    And were they given to third parties
8    for purposes of diligence or transactions from
9    time to time?
10   A.    As far as I'm aware, yes.
11   Q.    And was it your understanding as the
12   CFO that the third parties who received the
13   financial statements in diligence or
14   transactions was going to rely on those?
15         MS. DANDENEAU:  Objection to form.
16   A.    I don't know -- I don't know gen --
17   I don't know specifically what they were going
18   to rely on.  You know, we would get requests
19   for audited financial statements.  I don't know
20   what they were relying on.
21   Q.    And --
22   A.    You would have to ask them.
23   Q.    Did you personally play a role in
24   PwC's annual audit and the conduct of the
25   audit?

Page 86

1      WATERHOUSE - 10-19-21
2      MS. DANDENEAU:  Objection to form.
3      A.   During my tenure as CFO, I played a
4  very minimal role.
5      Q.   What was the minimal role that you
6  played?
7      A.   You know, again, it was -- it was to
8  check in with the team, to make sure that, you
9  know, audit -- the deadlines were being hit,
10  information was being presented to the auditors
11  in a -- in a timely fashion, but, you know,
12  other than that, it was a very capable team
13  that are still current employees of Highland
14  and, you know, they -- they conducted 99
15  percent of -- look, I don't want to give
16  percentages.  I mean, this is -- but I -- I --
17  I played a minimal role towards the end.
18          Before during my earlier years as
19  CFO, I did more, and then as time went on, I
20  did less in it.
21      Q.   Okay.  Was there a person at
22  Highland who was responsible for overseeing
23  Highland's participation in PwC's audit during
24  the time that you were the CFO?
25      A.   Yeah.  I mean, there was -- there

Page 87

1      WATERHOUSE - 10-19-21
2  was a -- there was a point -- it varies.  It
3  varies by year, in function, in time and, you
4  know, depending on the request, but yes, I
5  mean, there is -- there is -- there is
6  generally a point person of communication.
7      Q.   And who was the point person from
8  2016 until the time you left Highland?
9      A.   I don't -- I don't know
10  specifically, but it would have been, you
11  know -- you know, someone on the corporate
12  accounting team.
13      Q.   And was there a head of the
14  corporate accounting team?
15      A.   Yes, so -- yes.
16      Q.   Who was the head of corporate
17  accounting for the five years prior to the time
18  you left Highland?
19      A.   I don't -- if you're asking from
20  2016 on, I don't -- it was Dave Klos, but,
21  again, there was -- there was changes to the
22  team and the reporting structure.  I don't
23  remember exactly when that happened during --
24  you know, over the last -- since 2016.
25      Q.   Did the folks who participated and

Page 88

1      WATERHOUSE - 10-19-21
2  ran the audit all report to you, directly or
3  indirectly?
4      A.   Yes.
5      Q.   And did you have any responsibility
6  for making sure that the audit report was
7  accurate before it was finalized?
8      A.   Yeah.  I mean, you know, that --
9  that is -- my responsibility to the auditors
10  was -- again, is -- and the CFO is to -- we are
11  providing accurate financial statements; right?
12          And -- and -- and as part of any
13  audit, we disclose all relevant information as
14  part of any audit.
15      Q.   Okay.  And as the CFO, did you take
16  steps to make sure that the audit report was
17  accurate?
18      A.   I mean, I would say in a general
19  sense, yes.  But, again, I mean, I had a
20  very -- I had a very capable and competent
21  team.  I wasn't managing them.
22          You know, part of what I do is I let
23  the team -- I want managers to grow.  I want
24  managers to have rope.  And that is -- you
25  know, I'm not a stand-behind-you type of guy.

Page 89

1      WATERHOUSE - 10-19-21
2  If you -- if you talk to my team members, I'm
3  not micromanaging people.  I want people to
4  learn and grow in their function so they can go
5  on and do bigger and better things with their
6  careers.
7          And so, yes, generally I was
8  responsible for it, but I wanted the team to
9  learn and grow and be responsible for the bulk
10  of the audit.
11      Q.   Did you personally review each audit
12  report before it was finalized to satisfy
13  yourself that it was accurate?
14      A.   I don't -- I don't recall, you know,
15  for every single -- we're talking 2016, there
16  would have been three years, 2016 to '17, '18.
17  I don't -- we're -- we're going back
18  five years-plus.  I don't -- you know, I don't
19  recall.
20      Q.   Did you have a practice that you
21  employed to make sure that you were satisfied
22  that Highland's audit reports were true and
23  accurate to the best of your knowledge?
24      A.   I mean, our -- the practice was set
25  up with our -- the -- the practice to put

Page 90

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2    together accurate audited or accurate financial
3    statements is to your control environment.
4        So, you know, the – so the practice
5    was to maintain a stable control environment
6    which then the output is – is accurate
7    financial statements.
8        So – so, you know, if I was
9    comfortable that the control environment was
10   operating, then, you know, that would dictate
11   how I would – you know, what I might or might
12   not do in a given year.
13       Q.   Okay.  Do you recall ever being
14   uncomfortable with the control environment
15   during the period that you served as CFO?
16       A.   Yeah.  I mean, look, yes, there are
17   times – you know, nothing is perfect.  So
18   there were – there were times when, yes, you
19   know – there are times I learned I was
20   uncomfortable with the control environment, and
21   that is part of the management of the process
22   and having, you know – and – and working
23   through whatever obstacles present themselves.
24       Q.   Okay.  Were you ever uncomfortable
25   with the control process as it related to

Page 91

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2    reporting and disclosures of loans to
3    affiliates and Mr. Dondero?
4        MS. DANDENEAU:  Objection to form.
5        A.   I don't – I don't recall.
6        Q.   So you don't recall –
7        A.   – the –
8        MS. DANDENEAU:  Mr. Morris –
9        A.   I don't recall being uncomfortable.
10   But, again, we're going back several years.  I
11   don't – you know, the practice in an audit is
12   to disclose all information to the auditors.
13   And I don't – I don't recall.
14       Q.   As part of the process of the audit,
15   did you sign what is sometimes referred to as a
16   management representation letter?
17       A.   Yes.
18       MR. MORRIS:  Can we put up on the
19   screen a document that we have premarked as
20   Exhibit 33.
21       (Exhibit 33 marked.)
22       MS. DANDENEAU:  Mr. Morris, that is
23   not in the binder; correct?
24       MR. MORRIS:  Correct.
25       Q.   So you will see, Mr. Waterhouse,

Page 92

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2    this is a letter dated June 3rd.  And if we
3    could go to the signature page.
4        And do you see that you and
5    Mr. Dondero signed this document?
6        A.   Yes.
7        Q.   That is your signature; right?
8        A.   Yes.
9        MR. MORRIS:  Okay.  Can you go back
10   to the top.
11       MS. DANDENEAU:  Mr. Morris, can you
12   have somebody post this in the chat so that
13   we have can have a copy of this, please.
14       MR. MORRIS:  Yeah, sure.  Asia, can
15   you do that, please.
16       Q.   Okay.  Do you see at the bottom of
17   the second paragraph there is a reference to
18   materiality?
19       A.   Yes.
20       Q.   Okay.  It says, Materiality used for
21   purposes of these representations is
22   $1.7 million.
23       Do you see that?
24       A.   I do.
25       Q.   And did PwC set that level of

Page 93

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2    materiality?
3        A.   Yes.
4        Q.   And for purposes of the audit, did
5    PwC set the level of materiality each year?
6        A.   Yes.
7        Q.   Did that number change over time?
8        A.   I'm not aware of what materiality is
9    every single year, so – but, you know, this
10   number would likely fluctuate.
11       Q.   Okay.  I'm going to go back to a
12   question I asked you earlier today.  And that
13   is in connection – this letter is issued in
14   connection with the audit for the period ending
15   12/31/2018; correct?
16       A.   Yes.
17       Q.   Okay.  And is it fair to say that if
18   any – actually, withdrawn.  I'm going to take
19   it outside of this.
20       If Highland ever forgave the loan to
21   any affiliate or any of its officers or
22   employees, in whole or in part, to the best of
23   your knowledge, would that forgiveness have
24   been disclosed in the audited financial
25   statements if it exceeded the level of

WATERHOUSE - 10-19-21

1    materiality that PwC established?
2        MS. DANDENEAU:  Objection to form.
3    A.   So, again, during my tenure as CFO,
4    and -- Highland -- it was -- it is required to
5    disclose any affiliate loans that are in excess
6    of materiality.
7        Now, the forgiveness of those loans
8    may or may not -- I mean, since materiality
9    fluctuates every year, a -- you know, if a loan
10   was forgiven, it may or may not, you know --
11   and, look, I would want to consult the guidance
12   around this.
13       It is not something we do -- you
14   know, it is not -- you know, GAAP can be and
15   disclosures can be very specialized so, again,
16   we want to consult the guidance.  But we would
17   see if and what would need to be disclosed if
18   it were deemed immaterial.
19   Q.   Did you and Mr. Dondero sign
20   management representation letters of this type
21   in each year in which you served as Highland's
22   CFO?
23   A.   I -- I -- I will speak for myself.
24   I signed them.  There may have been others that

WATERHOUSE - 10-19-21

1    signed as well.  I don't -- I don't recall.
2    Q.   But to the best of your knowledge,
3    you, personally, signed a management
4    representation letter in connection with
5    Highland's audit each year that you served as
6    the CFO; correct?
7    A.   I would say generally speaking,
8    Mr. Morris.  I don't recall for every single
9    year, you know, generally, but I would want to
10   refer to all the rep letters and see who signed
11   them.
12   Q.   Do you recall Highland having its
13   financial statements audited in any year during
14   the period that you were a CFO where you didn't
15   sign the management representation letter?
16   A.   I don't recall.  But, John, we're
17   going back five, six, seven, eight, nine,
18   decade.  I don't -- I don't remember.
19   Q.   I don't want to go back that many
20   decades, but I'm just asking you if you recall
21   that there was you didn't sign it?
22   A.   I -- I -- I don't, but my memory
23   is -- again, I -- I -- I can't tell you what I
24   did in 2012.  I mean, I think generally, yes,

WATERHOUSE - 10-19-21

1    but I don't -- I don't know for sure, and I
2    would want to rely on the document.
3    Q.   Let me ask the question a little bit
4    differently then.
5        Do you have any reason to believe
6    that Highland had its annual financial audit
7    and you did not sign a management
8    representation letter in connection with that
9    audit?
10       MS. DANDENEAU:  Objection to form.
11   A.   I don't believe it would, but,
12   again, I would want to -- I don't recall and I
13   would want to confirm it to -- to make, you
14   know, an affirmative -- to give an affirmative
15   answer.
16   Q.   Do you know whether PwC required
17   management to sign management representation
18   letters?
19       MS. DANDENEAU:  Objection to form.
20   A.   Yes.  I mean, it -- management
21   representation letters are signed by
22   management.
23   Q.   Okay.  And do you know -- do you
24   have any understanding as to why PwC requires

WATERHOUSE - 10-19-21

1    management to sign management representation
2    letters?
3        MS. DEITSCH-PEREZ:  Object to the
4    form.
5    A.   I don't know why PwC's -- what PwC's
6    specific practice is.  I know generally what
7    management representation letters are.
8    Q.   Okay.  Do you personally -- I'm not
9    asking about PwC.  I'm asking for you -- I'm
10   asking about you, do you have an understanding
11   as to why the auditor asks for management
12   representation letters?
13   A.   Okay.  So you're asking me in my
14   personal capacity, yes, I have a general
15   understanding of why.
16   Q.   Can you give me the general
17   understanding that you have as to why
18   management representation letters are required?
19   A.   They are -- they are required to --
20   they are -- they are one of the items required
21   in an audit to help verify completeness.
22   Q.   Do you have any -- any other
23   understanding as to why management
24   representation letters are required?

WATERHOUSE - 10-19-21

1
2   A.   That is – that is – other than
3   what I said, it is – it is – it is required
4   so – to ensure that the – you know, there
5   is – there is completeness in what is being
6   audited.
7   Q.   Did you – did you have a practice
8   whereby you and Mr. Dondero conferred about the
9   management representation letters before you
10  signed them?
11  A.   No.
12  Q.   Did you have a practice –
13  withdrawn.
14       Do you see just the next sentence
15  after the materiality, there is a sentence that
16  states:  We confirm, to the best of our
17  knowledge and belief, as of June 3rd, 2019, the
18  date of your report, the following
19  representations made to you during your audit.
20       Do you see that sentence?
21  A.   Yes.
22  Q.   Okay.  Did you understand when you
23  signed this letter that you were confirming the
24  representations that followed?
25  A.   When I signed this management

WATERHOUSE - 10-19-21

1
2   letter – representation letter, yes.
3   Q.   Okay.  Did you discuss this letter
4   with Mr. Dondero before you signed it?
5   A.   I don't recall.
6   Q.   Do you recall if Mr. Dondero asked
7   you any questions before he signed the letter?
8   A.   I don't recall.
9   Q.   Do you recall if you asked
10  Mr. Dondero any questions before you signed
11  this letter?
12  A.   I don't recall.
13  Q.   Is it fair to say that Mr. Dondero
14  did not disclose to you the existence of the
15  agreement that we have – as we've defined that
16  term prior to the time you signed this letter?
17       MS. DANDENEAU:  Objection to form.
18  A.   I don't think I understand the
19  question.  So, again, you are saying, did
20  Mr. Dondero not disclose to me the existence of
21  this letter?
22  Q.   No, I apologize.
23       Did Mr. Dondero disclose to you the
24  existence of the agreement prior to the time
25  you signed this letter on June 3rd, 2019?

WATERHOUSE - 10-19-21

1
2   A.   The agreement – the agreement that
3   we talked about earlier?
4   Q.   Correct.
5   A.   Look, as I said earlier, the first
6   time I heard of this agreement was sometime
7   this year.
8   Q.   Okay.  Can we turn – let's just
9   look at a couple of items on the list.  If we
10  can go to page 33416.  Do you see in Number 35
11  it talks about the proper recording or
12  disclosure in the financial statements of ND
13  relationships and transactions with related
14  parties.
15       Do you see that?
16  A.   I do.
17  Q.   As the CFO, do you have any
18  understanding as to whether Dugaboy is a
19  related party?
20  A.   I don't recall.
21  Q.   Do you know whether any of the
22  affiliates are related parties?
23  A.   If – if it was NexPoint, HCMFA,
24  HCMS, HCRE, yeah, if – if that is the
25  affiliate definition, and there.  In ASC 850 –

WATERHOUSE - 10-19-21

1
2   again, I mean, I haven't looked at ASC 850 in
3   quite some time, but, you know, if – if there
4   is a control language, you know, ASC 850, would
5   that – that section in GAAP would – would
6   pick up and define what are related parties.
7       So, you know, like I said, if – one
8   of the four entities I just described, if – if
9   they are in that control definition of ASC 850,
10  they would be picked up in 35D.
11  Q.   Do you – do you have any reason to
12  believe that they would be picked up in that
13  definition, based on your knowledge and
14  experience?
15  A.   I – I believe that entities
16  controlled under GAAP are – are affiliates.
17  Q.   Okay.  Would Mr. Dondero also
18  qualify as a related party for purposes of
19  Section 35D, to the best of your knowledge?
20  A.   Yeah, I don't – I don't know.  I
21  would think – I would have to read the code
22  section to see if someone personally – is it
23  talking about related parties.  So, look, if
24  your own in control, yeah, I mean, I would have
25  to read the section.

Page 102

WATERHOUSE - 10-19-21

2    Q.    To the best of your knowledge, was
3  the existence of the agreement ever disclosed
4  to PwC?
5    A.    I'm not – I'm not aware.
6    Q.    Do you recall if the agreement was
7  ever disclosed in Highland's audited financial
8  statements?
9    A.    I don't – I don't remember if it
10  was in every Highland's audited financial
11  statements during my tenure.  We would have to
12  read the financial statements to see what was
13  disclosed, but I'm not – I mean, as I sit here
14  today, I'm not aware.
15    Q.    That is all I'm asking for.
16    A.    I'm not aware.
17    Q.    Can we go to the next page, please,
18  and look at 36.  36 says, we have disclosed to
19  you the identity of the partnership's related
20  party relationships and all the related party
21  relationships and transactions of which we are
22  aware.
23        Do you see that?
24    A.    Yes.
25    Q.    To the best of your knowledge, as of

Page 103

WATERHOUSE - 10-19-21

2  June 3rd, 2019, did Highland disclose to PwC
3  the identity of the partnership's related
4  parties and all the related party relationships
5  and transactions of which it was aware?
6    A.    I mean, I can speak for myself as
7  signer of this representation letter.  I
8  disclosed what – what, you know, what –
9  what – what I knew.  Sorry, look, yes, so I –
10  I disclosed what I knew.
11    Q.    Okay.  Can we go to page 419.  Do
12  you see at the end there is a reference to
13  events that occurred since the end of the
14  fiscal year and the date of the letter?
15    A.    Yes.
16    Q.    And were you aware of that – of
17  that provision of the management representation
18  letter before you signed the document?
19    A.    Yes.
20    Q.    Do you have an understanding as to
21  why PwC asked for that confirmation of that
22  particular part of the management
23  representation letter?
24    A.    It is – it is – it is just – it
25  is a typical audit request.

Page 104

WATERHOUSE - 10-19-21

2    Q.    And do you understand – do you have
3  an understanding that PwC wanted to know that
4  as of the date of the audit whether any
5  material changes had occurred since the end of
6  the fiscal year, using the definition of
7  materiality that is in this particular
8  management representation letter?
9    A.    It – it is – it is – it is a –
10  it is as described.  It is just a poorly worded
11  question, so it is hard for me to say yes.
12    Q.    If I asked you this, I apologize,
13  but did you ever learn when the agreement was
14  entered into?
15    A.    I don't – I don't – like I said
16  before, I don't know or have any details of the
17  agreement.
18    Q.    Okay.  Did you ever ask anybody when
19  the agreement was entered into?
20    A.    I did not.
21    Q.    Let's look at the audited financial
22  statements.  We will put up on the screen a
23  document that has been premarked as Exhibit 34.
24        (Exhibit 34 marked.)
25        MS. DANDENEAU:  And again, if Ms. La

Page 105

WATERHOUSE - 10-19-21

2  Canty could please put that in the chat
3  room, that would be great.
4        MR. MORRIS:  I will assure you we
5  will put every document in the chat room.
6    Q.    Now, I'm just going to ask you
7  questions that are related to the provisions of
8  this report that concern the affiliate loans,
9  but again, Mr. Waterhouse, if there is any part
10  of the document that you need to see or that
11  you think you might need to see in order to
12  refresh your recollection to answer any of my
13  questions, will you let me know that?
14    A.    Yes.
15    Q.    Because this is a pretty lengthy
16  document, but do you see that the cover page
17  here is the Highland consolidated financial
18  statements for the period ending December 31st,
19  2018?
20    A.    Yes.
21    Q.    If we can go to – I think it is the
22  next one, looking for PwC's signature line.
23        MS. CANTY:  I'm sorry, John, did you
24  say something?
25        MR. MORRIS:  Yes, can we turn the

**Appx. 00226**

Page 106

```
1          WATERHOUSE - 10-19-21
2     page. I think it is 215. Yes, stop right
3     there, just above -- I'm sorry, I want to
4     see just the date of the report.
5        Q.   Okay. Do you see at the bottom of
6     that page there, Mr. Waterhouse,
7     PricewaterhouseCoopers has signed this audit
8     report?
9        A.   Yes, I see their signature.
10       Q.   Okay. And it is the dated same day
11    as your management representation letter; is
12    that right?
13       A.   It is -- yes, it is the same day.
14       Q.   Was that the practice to sign the
15    management representation letter on the same
16    day that the audit report was signed?
17       A.   Yes, that is typical in every audit.
18       Q.   Can we just scroll down to the
19    balance sheet on the next page.
20            Do you see that there is a line
21    there that says, Notes and Other Amounts Due
22    from Affiliates?
23       A.   Yes.
24       Q.   Does that line, to the best of your
25    knowledge, include the amounts that were due
```

Page 107

```
1          WATERHOUSE - 10-19-21
2     under the affiliate under the notes signed by
3     the affiliates and Mr. Dondero?
4        MR. RUKAVINA: Objection to the
5        extent that calls for a legal conclusion.
6        A.   I mean, I would want to see the
7     detail and the build to this $173,398,000, but,
8     yes, I mean, if -- if -- given what we
9     discussed before, you know, it -- it should
10    capture that.
11       Q.   And -- and while you were the CFO of
12    Highland, were all notes held by Highland that
13    were issued by an affiliate or Mr. Dondero
14    carried as assets on Highland's balance sheets?
15       MS. DANDENEAU: Objection to form.
16       MS. DEITSCH-PEREZ: Object to form.
17       A.   I don't -- I don't know how else
18    they would be carried.
19       Q.   Okay. Can you think of any -- are
20    you aware of any promissory note issued by an
21    affiliate or Mr. Dondero that was not carried
22    on Highland's audited financial balance sheets?
23       A.   I'm -- I'm -- I'm not aware.
24       Q.   Okay. Are you aware of any category
25    of asset on Highland's balance sheet in which
```

Page 108

```
1          WATERHOUSE - 10-19-21
2     any of the promissory notes issued by an
3     affiliate or Mr. Dondero would have been
4     included?
5        MS. DANDENEAU: Objection to form.
6        A.   Sorry, am I aware of any asset of an
7     affiliate being included --
8        Q.   That -- let me -- let me try again.
9            Do you see there is a number of
10    different assets that are described on this
11    balance sheet?
12       A.   Yes.
13       Q.   One of the assets that is described
14    is Notes and Other Amounts Due from Affiliates;
15    right?
16       A.   Yes.
17       Q.   And it is reasonable to conclude
18    that the notes from the affiliates and
19    Mr. Dondero are included in that line item;
20    right?
21       A.   Yes, based on this description.
22    Again, I would want to see a build of this to
23    100 percent confirm, but based on the
24    description, the asset description, it is -- it
25    is likely.
```

Page 109

```
1          WATERHOUSE - 10-19-21
2            Now, does that mean absolute? I
3     don't know.
4        Q.   Do you have any reason to believe
5     that the promissory notes would have been
6     carried on the balance sheet in a category
7     other than Notes and Other Amounts Due from
8     Affiliates?
9        A.   If they were deemed -- no. If they
10    were deemed an affiliate, you know, under GAAP,
11    they should be carried in that line.
12    Otherwise, it would go into another line.
13       Q.   Okay. And do you see the total
14    asset base as of December 31st, 2018, was
15    approximately $1.04 billion?
16       A.   Yes.
17       Q.   Is my math correct that the Notes
18    and Other Amounts Due from Affiliates
19    constituted approximately 17 percent of
20    Highland's assets as of the end of 2018?
21       A.   Well, so how are you defining
22    Highland?
23       Q.   Highland Capital Management, L.P.,
24    the entity that this audit is subject to -- or
25    the subject of.
```

Page 110

WATERHOUSE - 10-19-21

2   A.   On a consolidated or unconsolidated

3   basis?

4   Q.   I'm looking at the balance sheet.

5   It is a consolidated balance sheet.  Okay?

6         Does the Notes and Other Amounts Due

7   from Affiliates constitute approximately

8   17 percent of the total assets of Highland

9   Capital Management, L.P., on a consolidated

10  basis?

11       MS. DANDENEAU:  Objection to form.

12  A.   I don't have a calculator in front

13  of me but I will take your math, if you are

14  taking the 173 divided by the billion.

15  Q.   Okay.

16  A.   If that is accurate, yes.  But,

17  again, on a consolidated basis.

18  Q.   And on an unconsolidated basis the

19  percentage would be higher; correct?

20  A.   I – no.  I don't know.

21  Q.   Well, okay.  That is fair.

22       MR. MORRIS:  Can we turn to

23  page 241, please.

24  Q.   Do you see that this is a section of

25  the audit report that is entitled Notes and

Page 111

WATERHOUSE - 10-19-21

2   Other Amounts Due from Affiliates?

3   A.   Sorry, I can't see the – the –

4   Q.   It is at the top.

5   A.   Notes and Other Amounts Due from

6   Affiliates, yes, I see that.  I don't – I

7   don't have a page number, but I'm on a page

8   that says at the top:  Notes and Other Amounts

9   Due from Affiliates.

10  Q.   Okay.  And that is the same title of

11  the line item on the balance sheet that we just

12  looked at; right?  Notes and Other Amounts Due

13  from Affiliates?

14  A.   Yes.

15  Q.   And is it your understanding, based

16  on your experience and knowledge as the CFO,

17  that this is the section of the narrative that

18  ties into the line item that we just looked at?

19  A.   Yes.

20  Q.   And is this section of the audit

21  report intended to describe and disclose all of

22  the material facts concerning the Notes and

23  Other Amounts Due from Affiliates?

24       MS. DANDENEAU:  Objection, form.

25  A.   This – these notes – these notes

Page 112

WATERHOUSE - 10-19-21

2   of the financial statements are – the purpose

3   is to disclose any material items in relation

4   to that balance sheet line item.

5   Q.   Okay.  And all of the information,

6   to the best of your knowledge, that is set

7   forth in this section of the audit report was

8   provided by Highland; correct?

9   A.   Yes, it would have been provided by

10  the corporate accounting team.

11  Q.   Okay.  And the corporate accounting

12  team, did that team report to you in the

13  organizational structure?

14  A.   Yes.

15  Q.   And did you have any concerns about

16  the controls that were in place to make sure

17  that the information provided with respect to

18  Notes and Other Amounts Due from Affiliates was

19  accurate and complete?

20       MS. DANDENEAU:  Objection to form.

21  A.   Not that I recall.

22  Q.   Okay.  Do you recall ever being

23  concerned that any portion of the Notes and

24  Other Amounts Due from Affiliates in any audit

25  report was inaccurate, incomplete, or not

Page 113

WATERHOUSE - 10-19-21

2   reliable?

3   A.   I didn't – I had concerns about,

4   you know, like I talked about before, of there

5   were – there were potentially issues in the

6   control environment.  But as far as it relates

7   to the audited financial statements, any – the

8   team would work with the auditors to disclose

9   all – all notes in Highland's possession.

10       And any – any notes that were

11  deemed material by the auditor, right, these

12  were disclosed in these – in this section, you

13  know, in – in the notes to the consolidated

14  financial statements as you presented.

15  Q.   Do you recall ever having a

16  conversation with anybody at any time

17  concerning the accuracy of the section of audit

18  reports that relates to Notes and Other Amounts

19  Due from Affiliates?

20       MS. DANDENEAU:  Objection to form.

21  A.   You know, as – as – I didn't have

22  direct conversations with

23  PricewaterhouseCoopers as I had, you know –

24  I – I had the team that managed this.

25       Again, I wasn't anywhere chose to

Page 114

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2  being the point person of this audit.  And I
3  can't recall, you know, when -- you know, I
4  don't even know if I was ever the point person
5  during my tenure as CFO.
6         I don't know if PwC had any concerns
7  when they were performing those audit
8  procedures.  They may have and they may have --
9  and it may not have been communicated to me.  I
10  don't know.
11        MR. MORRIS:  All right.  I move to
12  strike.
13     Q.   And I'm going to ask you to listen
14  carefully to my question.
15        Did you -- do you recall ever having
16  a conversation with anybody at any time
17  concerning the accuracy of the reporting
18  provided in the audited financial statement on
19  the topic of Notes and Other Amounts Due?
20        MS. DANDENEAU:  Objection to form.
21     A.   I don't recall for this, but that
22  doesn't mean that it didn't exist.
23     Q.   Okay.  But you have no reason to
24  believe, as you sit here right now, that you
25  ever discussed with anybody concerns over the

Page 115

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2  accuracy of the section of the audit reports
3  called Notes and Other Amounts Due from
4  Affiliates; correct?
5         MS. DANDENEAU:  Object to the form.
6         MS. DEITSCH-PEREZ:  Objection to
7  form.
8      A.   I don't recall having any
9  conversations.  But, again, I mean, this is --
10  this is two years ago.
11     Q.   I'm just asking for your
12  recollection, sir.
13     A.   Yes.
14     Q.   If you don't recall, this will --
15     A.   Yeah.
16     Q.   (Overspeak) -- if you don't
17  recall --
18     A.   Yeah, I don't -- I don't recall.
19     Q.   Do you know who was responsible for
20  drafting the audit report?
21     A.   Are you asking the actual Highland
22  employee responsible?  I mean, it was
23  Highland's responsibility, so, I mean, that
24  is --
25     Q.   Right.

Page 116

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2      A.   -- Highland's responsibility.
3  Highland's responsibility.
4      Q.   Who, at Highland, was responsible
5  for drafting this section of the audit report?
6      A.   I -- I don't know the answer to
7  that.  Again, there was a team who worked on
8  this.  And I don't know, you know, whether it
9  was the staff or the manager.
10        Again, this is where I let the teams
11  manage.  And, you know, there may be a
12  corporate accountant who worked on this.  I
13  just -- you know, I wasn't part of that process
14  to give that person experience.  I don't know.
15     Q.   Do you recall having any
16  communications with anybody at any time
17  concerning this section of the report?
18     A.   Yeah, I don't recall.
19     Q.   Do you recall whether you ever told
20  anybody at any time that any aspect of this
21  section of the report was inaccurate or
22  incomplete?
23     A.   I don't recall.
24     Q.   As you sit here today, do you have
25  any reason to believe that this section of the

Page 117

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2  audit report is incomplete or inaccurate in any
3  way?
4         And I'm happy to give you a moment
5  to -- to look at it, if you would like.
6         MS. DANDENEAU:  Objection to form.
7         MS. DEITSCH-PEREZ:  Same.
8      A.   I mean, I would have to look at -- I
9  would have to look at the bill to the note
10  schedule to make sure I know you presented me
11  with materiality, but again, there might be a
12  note as of 12/31/18 that somehow was -- was
13  under materiality not disclosed.  I don't -- I
14  don't know.  I would need more information.
15     Q.   Okay.  But without more information,
16  you have no reason to believe anything this
17  section is inaccurate; correct?
18        MS. DANDENEAU:  Objection to form.
19     A.   I don't.  I mean, you know, this was
20  part of the audit.
21     Q.   Thank you.  Now, you will see if we
22  could scroll just a little bit more that each
23  of the first five paragraphs concerns
24  specifically the four affiliates that we've
25  been discussing and Mr. Dondero.

Page 118

```
1              WATERHOUSE - 10-19-21
2        MR. MORRIS:  If we could go the
3    other way, La Asia.  We don't need Okada.
4    We're going to have to thread the needle.
5    Okay.  Good, perfect.
6        Q.   Do you see those five paragraphs
7    certain the four affiliates and Mr. Dondero as
8    we've been referring to today?
9        A.   Yes.
10       Q.   Okay.  And do you see at the end of
11   every paragraph it states, quote:  A fair value
12   of a partnership's outstanding notes receivable
13   approximates the carrying value of the notes
14   receivable?
15       A.   Yes, I see that.
16       Q.   Do you have an understanding of what
17   that means?
18       A.   Yes.
19       Q.   What is your understanding of that
20   sentence?
21       A.   It is the -- again, the -- the fair
22   value, right, which is -- which is what the --
23   what Highland could sell that asset for.  This
24   statement is comparing the fair value of the
25   notes to the carrying value, so the carrying
```

Page 119

```
1              WATERHOUSE - 10-19-21
2    value is the line item that you showed me
3    earlier that is in Notes and Other Amounts Due
4    from Affiliates.
5        Q.   Okay.  Is another way to say this is
6    that the fair market value of the notes equals
7    the principal amount and -- withdrawn.
8             Is the fair way to interpret this
9    that the fair market value of the notes equals
10   all remaining unpaid principal and interest due
11   under the notes?
12            MS. DANDENEAU:  Object to the form.
13            MS. DEITSCH-PEREZ:  Objection, form.
14       A.   I don't know the answer to that,
15   because I don't recall where -- where any --
16   where -- in what line item was the interest
17   component reported.
18       Q.   All right.  Well, if we look in this
19   audit report, you will see in the middle of the
20   first paragraph, for example, it states that as
21   of December 31st, 2018, total interest and
22   principal due on outstanding promissory notes
23   was approximately $5.3 million.
24            Do you see that?
25       A.   I do.
```

Page 120

```
1              WATERHOUSE - 10-19-21
2        Q.   Is that the carrying value or the
3    fair value?
4        A.   That would be the carrying value --
5        Q.   And is the last --
6        A.   -- in my opinion.
7        Q.   Okay.  And it is in your opinion as
8    the chief financial officer of Highland during
9    the period of time that you described; right?
10   It is an educated opinion?
11       A.   I'm reading this at face value.  I'm
12   taking that as that is carrying value.
13       Q.   Okay.  And does the last sentence
14   say that the carrying value is roughly
15   approximate to the fair market value?
16            MS. DANDENEAU:  Objection to form.
17            MS. DEITSCH-PEREZ:  Objection, form.
18       A.   Again, this note to the financial
19   statement is specific to notes and other
20   amounts due from affiliates.
21       Q.   Correct.
22       A.   If the interest component is
23   reported elsewhere on the balance sheet, you
24   know, it -- it -- it could be off.  Again, I
25   don't have the detail.  I don't know, but yes,
```

Page 121

```
1              WATERHOUSE - 10-19-21
2    look, I mean, if you -- I mean, if you are
3    saying the 5.3 million is in the notes and
4    other amounts due from affiliates, then the
5    last statement is saying the fair value
6    approximates 5.3 million.  That is what that
7    last sentence is saying.
8        Q.   Do you see in the middle of the
9    first paragraph -- not in the middle, the next
10   to last sentence there is a statement that the
11   partnership will not demand payment on amounts
12   that exceed HCMFA's excess cash availability
13   prior to May 31st, 2021.
14            Do you see that?
15       A.   I do.
16       Q.   Do you know when Highland agreed not
17   to demand payment as described in that
18   sentence?
19       A.   I don't know specifically.
20       Q.   Do you know why Highland agreed not
21   to demand payment on HCMFA's notes until May
22   2021?
23       A.   Yes.
24       Q.   Why was that decision made?
25       A.   You know, well, it -- it -- that
```

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    decision was made as to not put HCMFA into a
3    position where it didn't have sufficient assets
4    to pay for the demand note.
5        Q.   And at the time the agreement was
6    entered into, pursuant to which the partnership
7    wouldn't demand payment, did HCMFA have
8    insufficient assets to satisfy the notes if a
9    demand had been made?
10       MS. DANDENEAU:  Objection to form.
11       A.   I don't have HCMFA's financial
12   statements in front of me as of 12/31/18.
13       Q.   Was there a concern that HCMFA would
14   be unable to satisfy its demands under the
15   notes if demand was made?
16       MS. DANDENEAU:  Objection to form.
17       A.   Well, there is – I don't recall –
18   I mean, there is something, right, in place to
19   basically not demand payment until May 31, 2021
20   as detailed here.
21       Q.   And who made the decision to enter
22   into – who made the decision on behalf of
23   Highland not to demand payment until May 31st,
24   2021?
25       A.   I'm trying to remember.  I don't

1    WATERHOUSE - 10-19-21
2    remember exactly – I don't remember if it was
3    myself or – or Jim Dondero who – who – there
4    was – there was something signed, from what I
5    recall, that – that – that backed up this
6    line item in the – in the notes I'm – look,
7    I'm, I'm –
8        Q.   We will get to that.
9        A.   You –
10       Q.   I'm just –
11       A.   You have – I mean –
12       Q.   We're going to give that to you.
13   I'm going to give that to you.
14       A.   You – you – you have all the
15   documents.  I don't have the documents, and
16   that is what makes it so hard.  I don't have
17   any documents to prepare for this deposition;
18   right?  You have all – I don't – I don't – I
19   don't remember, but, you know, again, it would
20   probably be myself or Jim.
21       Q.   Do you know if Highland received
22   anything in return for its agreement not to
23   make a demand for two years?
24       A.   I don't – I don't think it referred
25   anything.

1    WATERHOUSE - 10-19-21
2        Q.   And did you and Mr. Dondero discuss
3    HCMFA's ability to satisfy the notes if a
4    demand was made at the time this agreement was
5    entered into?
6        MS. DANDENEAU:  Objection to form.
7        A.   I don't – I don't – I don't recall
8    having a specific conversation, if I did, or –
9    or David Klos.
10       Q.   Okay.  I'm just asking if you recall
11   any conversations that you had.
12       A.   I don't recall.
13       Q.   Okay.  Do you know why Highland
14   loaned the money to HCMFA that is the subject
15   of the notes described in this paragraph?
16       A.   I don't remember specifically why
17   5.3 million was loaned.  I mean, I – it would
18   have to be put in the context.
19       Q.   Do you have any recollection at all
20   as to why Highland ever loaned any money to
21   HCMFA?
22       A.   Yes.
23       MS. DANDENEAU:  Objection to form.
24       Q.   What do you remember about that?
25       A.   There was a Highland Global

1    WATERHOUSE - 10-19-21
2    Allocation Fund, which was a – a fund managed
3    by Highland Capital Management Fund Advisors.
4    There was a we – I'm just telling you,
5    there was – there was – there was a – a
6    ultimately a NAV error found in this fund while
7    it was an open-ended fund and, you know, there
8    were amounts owed by the advisor in – in
9    relation to that NAV error.
10       There were also, for the same fund,
11   that same fund was ongoing an
12   open-end-to-close-end conversion, and as part
13   of that proposal, shareholders who voted for
14   the conversion received compensation from the
15   advisor.
16       Q.   All right.  Now, the events that
17   you're describing occurred in the spring of
18   2019; right?
19       A.   These started back – I think, I
20   mean –
21       Q.   I apologize.
22       A.   – that – I mean, the answer to
23   that is no.
24       Q.   I apologize, the loans that were
25   made in connection with the events that you're

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2   describing occurred in May 2019; right?
3          MR. RUKAVINA:  Objection to the
4     extent that calls for a legal conclusion.
5      A.   I don't recall specifically what
6   amounts of money were moved when, for what
7   purpose.
8      Q.   Okay.  Fair enough.  Going to the
9   next paragraph, do you recall that NexPoint
10  Advisors had obtained a number of loans from
11  Highland, and they rolled up those loans into
12  one note in approximately 2017?
13     A.   This is for NexPoint Advisors?
14     Q.   Yes.
15     A.   I -- I mean, I don't -- I don't
16  recall the NexPoint Advisors loan being a
17  roll-up loan, but --
18     Q.   Do you know why?
19     A.   But, look, if you have documents
20  that show -- I mean, look, I just don't recall.
21     Q.   Okay.  That is fair.  Do you know
22  why -- do you have any recollection as to why
23  Highland loaned money to NexPoint?
24     A.   Yes.
25     Q.   Why did High -- why do you recall --

1        WATERHOUSE - 10-19-21
2   what is the reason you recall Highland lending
3   money to NexPoint?
4      A.   I mean, I was just -- I just -- I
5   just recall.  I mean, I just -- I don't
6   remember why.
7      Q.   I understand.  And I'm asking you if
8   you recall --
9      A.   Oh, why -- I thought you say --
10  NexPoint Advisors was launching a fund which
11  is -- I believe the legal name is NexPoint
12  Capital, Inc.  And it -- it provided a
13  co-invest into that fund.
14          And, from what I remember, the --
15  the -- that NexPoint borrowed money from
16  Highland at the time to make that co-invest.
17     Q.   So this was an investment that
18  NexPoint was required to make; is that right?
19          MS. DANDENEAU:  Objection to form.
20     A.   I don't know if it was required to
21  make, I don't recall that, or if it just made
22  it.
23     Q.   Okay.  But your recollection is that
24  NexPoint made an investment and they borrowed
25  money from Highland to finance the investment.

1        WATERHOUSE - 10-19-21
2          Do I have that right?
3      A.   Yes.
4      Q.   How about HCRE?  Do you know why
5   HCRE borrowed money from Highland?
6      A.   I don't remember specifically.
7      Q.   Do you remember generally?
8      A.   Generally, yeah -- I mean, yes.
9      Q.   Can you tell me your general
10  recollection as to why Highland loaned money to
11  HCRE?
12     A.   For -- for -- for investment
13  purposes.
14     Q.   So HCRE made the investment and it
15  obtained a loan, or loans, from Highland in
16  order to finance that investment or those
17  investments.
18          Do I have that right?
19     A.   I mean, I -- you know, generally.
20     Q.   Okay.  How about Highland Management
21  Services, Inc.?
22          Do you have any recollection as to
23  why HCMS borrowed money from Highland?
24     A.   Generally.
25     Q.   What is your general recollection as

1        WATERHOUSE - 10-19-21
2   to why HCMS borrowed money from Highland?
3      A.   For -- for investment purposes.
4      Q.   So it is the same thing, HCMS wanted
5   to make investments and it borrowed money from
6   Highland in order to finance those investments;
7   is that right?
8      A.   I mean, yes, generally.  I mean, I
9   can't -- I don't -- on the services, there --
10  there are several loans in these schedules.
11  You know, I can't remember why every single one
12  of these were made, but I would say, yeah, I
13  mean, generally.
14     Q.   Okay.  I appreciate that.
15          MR. MORRIS:  Let's go to the page
16  with Bates No. 251.  La Asia, are you
17  there?
18          MS. CANTY:  Sorry, John.  It went
19  out for a minute.  Can you say that again.
20  I don't know what is going on.
21          MR. MORRIS:  The page with Bates
22  No. 251, can we go to that.
23          MS. CANTY:  Yes, sorry.
24          MR. MORRIS:  Keep going to the
25  bottom.  Yeah, there you go.

Page 130

WATERHOUSE - 10-19-21

1
2  Q.  Do you see, Mr. Waterhouse, that
3  there is a section there called Subsequent
4  Events?
5  A.  I do.
6  Q.  And does this relate to the last
7  sentence above the signature line on the
8  management representation letter that we talked
9  about earlier where you made the representation
10  that you disclosed subsequent events?
11  A.  I mean, it relates to it, but not in
12  its entirety.
13  Q.  Okay.
14  MR. MORRIS:  If we can scroll up to
15  capture the entirety of this section right
16  here.
17  Q.  And what do you mean by that, sir?
18  MR. MORRIS:  Yeah, right there.
19  Perfect.
20  A.  There are -- there are different
21  subsequent events in -- under GAAP.  So there
22  are -- and -- and -- so what we see in the
23  notes to the financial statements are one type
24  of subevent.
25  Q.  Okay.  And -- and would the type of

Page 131

WATERHOUSE - 10-19-21

1
2  subsequent event relating to affiliate loans be
3  captured in this section if they were -- if
4  they were made after the end of the fiscal year
5  and prior to the issuance of the audit report?
6  A.  Yes, if they were deemed material or
7  disclosable.
8  Q.  Okay.  I appreciate that.
9  Do you see the next to the last
10  entry there?  It says, Over the course of 2019
11  through the report date, HCMFA issued
12  promissory notes to the partnership in the
13  aggregate amount of $7.4 million?
14  A.  Yes.
15  Q.  And does that refresh your
16  recollection that those are the notes that
17  related to the NAV error that you mentioned
18  earlier?
19  A.  I don't -- I don't remember the
20  exact.  Again, there are -- I mentioned two
21  line items; right?
22  Q.  Yes.
23  A.  I mean, it was the GAAP conversion
24  process plus the -- the NAV error.  I don't
25  have the details.  I don't recall specifically

Page 132

WATERHOUSE - 10-19-21

1
2  if -- you know, what -- if that 7.4 million was
3  solely attributable to the NAV error.
4  Q.  Okay.  But there is no question that
5  Highland told PricewaterhouseCoopers that over
6  the course of 2019 HCMFA issued promissory
7  notes to the partnership in the aggregate
8  amount of $7.4 million; correct?
9  A.  In the course of the audit, we would
10  have produced all promissory notes in our
11  possession, including the ones that are
12  detailed here.
13  Q.  Do you recall that you signed the
14  two promissory notes that are referenced in
15  that provision?
16  MS. DANDENEAU:  Objection to form.
17  A.  I didn't recall initially but I've
18  been reminded.
19  Q.  Okay.  And -- and do you recall that
20  those notes are dated May 2nd and May 3rd,
21  2019?
22  A.  Yes.
23  Q.  So that was just a month before the
24  audit was completed; correct?
25  A.  Yes.  I think we had a June 3rd

Page 133

WATERHOUSE - 10-19-21

1
2  date, right, if -- if my memory serves me
3  right.
4  Q.  Yes, I will represent to you that
5  your memory is accurate in that regard.
6  Did anybody ever instruct you as the
7  CFO to correct this statement that we're
8  looking at in subsequent events?
9  A.  So let me understand.  You're saying
10  when I was CFO at Highland Capital did anyone
11  ever ask me to correct the -- over the course
12  of 2019 through the report date HCMFA issued
13  promissory notes, this statement?
14  Q.  Right.
15  A.  Not that I'm aware.
16  Q.  While you were the CFO of Highland,
17  did anybody ever tell you that that sentence
18  was wrong?
19  A.  Not that I'm aware.
20  Q.  Highland -- withdrawn.
21  HCMFA disclosed these notes in its
22  own audited financial statements; right?
23  MR. RUKAVINA:  Objection, form.
24  A.  I assume that these would be
25  material -- if these are material financial

Page 134

1         WATERHOUSE - 10-19-21
2   statements, yes, they -- they -- they should be
3   and they were likely disclosed.
4       Q.   Now, there is no statement
5   concerning the 2019 notes about the forbearance
6   that we looked at in the affiliated note
7   section of the report; right?
8         MS. DANDENEAU:  Objection to form.
9       Q.   I'll withdraw.  That was bad.
10        Do you recall when we were looking
11  at the paragraph concerning HCMFA earlier it
12  had that disclosure about the agreement whereby
13  Highland wouldn't ask for demand on the -- on
14  the HCMFA notes?
15      A.   Yes.
16      Q.   That forbearance disclosure is not
17  made with respect to the 2019 notes; right?
18      A.   Not -- look, not that I can recall,
19  unless -- unless it was done at a subsequent
20  day.
21      Q.   Right.  And it is not in the
22  subsequent event section that we're looking at
23  right now where the 2019 notes are described;
24  right?
25      A.   Right.  But this is through

Page 135

1         WATERHOUSE - 10-19-21
2   June 3rd.  It could have been done on June 4th.
3   I don't -- I don't -- I don't recall.
4       Q.   Okay.
5         MR. MORRIS:  Can we put up on the
6   screen the HCMFA audit report.  And while
7   we're --
8         MS. DANDENEAU:  What exhibit is
9   this?
10        MR. MORRIS:  La Asia, what number is
11  that?
12        MS. CANTY:  45.
13        MR. MORRIS:  So this will be marked
14  as Exhibit 45.
15        (Exhibit 45 marked.)
16        MS. CANTY:  Yeah, and I will put it
17  in the chat.
18        MS. DANDENEAU:  Thank you.
19      Q.   Okay.  All right.  Do you see that
20  this is the consolidated financial statements
21  for HCMFA for the period ending 12/31/18?
22      A.   Yes.
23      Q.   As the treasurer of HCMFA at the
24  time, did you have to sign a management
25  representation letter similar to the one that

Page 136

1         WATERHOUSE - 10-19-21
2   we looked at earlier for Highland?
3       A.   I would imagine I would have been
4   asked to.  I don't recall if I did.
5       Q.   Do you recall ever being asked by an
6   auditor to sign a management representation
7   letter and then not doing it?
8       A.   No.
9         MR. MORRIS:  Can we just scroll down
10        again.  I just want to see the date of the
11        document.
12      A.   I mean, let me -- you know, there
13  are different versions to management
14  representation letters I will qualify.
15        Yes, there are certain -- from time
16  to time auditors can make representations
17  that -- in the rep letter that is being
18  proposed that are inaccurate or out of scope or
19  things like that and they've asked for
20  signature.
21        In that context, yes.  I mean, you
22  know -- I mean, if I have been asked to sign
23  and make those representations and those
24  representations are invalid, yes, I would not,
25  I mean, I -- I wouldn't sign that.

Page 137

1         WATERHOUSE - 10-19-21
2       Q.   Okay.  PricewaterhouseCoopers served
3   as HCMFA's outside auditors as well; correct?
4       A.   Yes.
5       Q.   Do you see that this audit report is
6   signed on June 3rd, 2019, just like the
7   Highland audit report?
8       A.   That is correct.
9       Q.   And did the process of -- of
10  preparing HCMFA's audit report, was that the
11  same process that Highland followed when it did
12  its audit report at this time?
13      A.   I mean, it is a different entity.
14  There are different assets.  You know, it --
15  it -- it is -- as you saw, Highland's
16  financials are on a consolidated basis.  This
17  is different, so it is under the same control
18  environment and team.
19      Q.   Okay.  I appreciate that.  So the
20  same control environment and team participated
21  in the preparation of the audit for Highland
22  and for HCMFA at around the same time; correct?
23      A.   Yes.
24        MR. MORRIS:  Can we go to page 17 of
25        the report.  I don't have the Bates number.

Appx. 00234

Page 138

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Do you see that just like
3  Highland's audited financial report, HCMFA's
4  audited financial report also has a section
5  related to subsequent events?
6    A.   Yes.
7    Q.   And am I reading this correctly that
8  just as Highland had done, HCMFA disclosed in
9  its audited financial report a subsequent event
10  that related to the issuance of promissory
11  notes to Highland in the aggregate amount of
12  $7.4 million in 2019?
13    A.   That is what I see in the report.
14    Q.   And you were the treasurer of HCMFA
15  at the time; right?
16    A.   Yes, to the best of my knowledge.
17    Q.   And did anybody ever tell you prior
18  to the time of the issuance of this audit
19  report that that sentence relating to HCMFA's
20  2019 notes was inaccurate or wrong in any way?
21    A.   Not that I recall.
22    Q.   As you sit here right now, has
23  anybody ever told you that that sentence is
24  inaccurate or wrong in any way?
25    A.   Not that I recall.

Page 139

WATERHOUSE - 10-19-21

1
2    Q.   I apologize if I asked you this
3  already, but has anybody ever told you at any
4  time that you are not authorized to sign the
5  promissory notes that are the subject of the
6  sentence we're looking at?
7    A.   Not that I recall.
8    Q.   Did anybody ever tell you at any
9  time that you had made a mistake when you
10  signed the promissory notes that are the
11  subject of this sentence?
12    A.   Say that again.  Did anyone ever say
13  that I made a mistake?
14    Q.   Let me ask the question again.
15        Did anybody ever tell you at any
16  time that you made a mistake when you signed
17  the two promissory notes in Highland's favor on
18  behalf of HCMFA in 2019?
19    A.   Not that I recall.
20    MR. MORRIS:  Let's just look at the
21  promissory notes quickly.  Can we please
22  put up Document Number 1, and so this is in
23  the pile that y'all have.  We'll just go
24  for a few more minutes and we can take our
25  lunch break.

Page 140

WATERHOUSE - 10-19-21

1
2    Q.   All right.  So I don't know if you
3  have seen this before, sir.  Do you see that
4  this is a complaint against HCMFA?
5    A.   Yes, I am looking at it on the
6  screen.
7    Q.   Okay.  And have you ever seen this
8  document before?
9    A.   I went through some of these
10  documents with my counsel here yesterday.
11    MR. MORRIS:  All right.  Can we go
12  to Exhibit 1 of this document.
13    Q.   Do you see Exhibit 1 is a
14  $2.4 million promissory note back in 2019?
15    A.   Yeah, I found it in the book.  Yes,
16  I have it here in front of me.
17    Q.   And this is a demand note, right, if
18  you look at Paragraph 2?
19    A.   Yes.
20    Q.   And this is a note where the maker
21  is HCMFA, and Highland is the payee; right?
22    A.   Yes.
23    MR. MORRIS:  And if we can scroll
24  down, can we just see Mr. Waterhouse's
25  signature.

Page 141

WATERHOUSE - 10-19-21

1
2    Q.   Is that your signature, sir?
3    A.   Yes, it is.
4    Q.   And did you sign this document on or
5  around May 2nd, 2019?
6    A.   I don't recall specifically signing
7  this, but this is my signature.
8    Q.   Okay.  And do you recall that
9  Highland transferred $2.4 million to HCMFA at
10  or around the time you signed this document?
11    A.   I don't recall specifically.  I
12  would want to, as I sit here today, go back and
13  confirm that, but again, presumably that --
14  that -- that did happen.
15    Q.   You wouldn't have signed this
16  document if you didn't believe that HCMFA
17  either received or was going to receive
18  $2.4 million from Highland; is that fair?
19    A.   I mean, it -- if -- if -- if there
20  wasn't a transfer of value, yeah, I mean, you
21  know, I would have no reason to -- to sign a
22  note.
23    Q.   And -- and Highland wouldn't have
24  given this note to PricewaterhouseCoopers if --
25  withdrawn.

Page 142

```
1        WATERHOUSE - 10-19-21
2        HCMFA wouldn't have given this note
3  to PricewaterhouseCoopers if it hadn't received
4  the principal value of – of the note in the
5  form of a loan; correct?
6        MR. RUKAVINA:  Objection, legal
7     conclusion, speculation and form.
8     A.    Again, we – what we provided to PwC
9  were, as part of the audit, any promissory
10 notes executed and outstanding.  You know, as a
11 part of the audit, they, you know, they – they
12 have copies of all the bank statements,
13 things – things of that sort.
14       MR. MORRIS:  Okay.  Can we go to
15    Exhibit 2.
16       (Exhibit 2 marked.)
17    Q.    Do you see that this is a promissory
18 note dated May 3rd, 2019 in the amount of
19 $5 million?
20    A.    Yes.
21    Q.    Do you believe this is also a demand
22 note if you look at Paragraph 2?
23    A.    Yes.
24    Q.    And do you see that HCMFA is the
25 maker, and Highland is the payee?
```

Page 143

```
1        WATERHOUSE - 10-19-21
2     A.    Yes.
3     Q.    And if we go to the bottom, can we
4  just confirm that that is your signature?
5     A.    Yes.
6     Q.    And together these notes are the
7  notes that are referred to both in Highland and
8  HCMFA's audited financial reports in the
9  subsequent event sections; correct?
10       MS. DANDENEAU:  Objection to form.
11    A.    They – they – they totaled
12 $7.4 million, so presumably, yes.
13    Q.    Okay.  And you were authorized to
14 sign these two notes; correct?
15       MR. RUKAVINA:  Objection, legal
16    conclusion.
17    A.    Yeah.  I mean, I'm – I was the
18 officer of – of HCMFA.  You know, I – I'm not
19 the legal expert on – on what that – what
20 that confers to me or what it doesn't.  I mean,
21 that is my signature on the notes.
22    Q.    And you believed you were authorized
23 to sign the notes; is that fair?
24    A.    I signed a lot of documents in my
25 capacity, just because it is operational in
```

Page 144

```
1        WATERHOUSE - 10-19-21
2  nature.  So, you know, to me this was just
3  another document, to be perfectly honest.
4     Q.    Sir, would you have signed
5  promissory notes with the principal amount of
6  $7.4 million if you didn't believe you were
7  authorized to do so?
8        MS. DANDENEAU:  Objection to form.
9     Q.    Are you frozen?
10    A.    No.  I'm just – you know, it is –
11 you know, again, I typically don't sign
12 promissory notes, and I don't recall why I
13 signed these, but – you know, but I did.
14    Q.    All right.  So listen carefully to
15 my question.  Would you have ever signed
16 promissory notes with a face amount of
17 $7.4 million without believing that you were
18 authorized to do so?
19    A.    No.  I mean, I'm – I'm putting my
20 signature on there, so no.
21    Q.    Okay.  And would you have signed two
22 promissory notes obligating HCMFA to pay
23 Highland $7.4 million without Mr. Dondero's
24 prior knowledge and approval?
25       MS. DEITSCH-PEREZ:  Object to the
```

Page 145

```
1        WATERHOUSE - 10-19-21
2     form.
3     A.    You know, from – from what I recall
4  around these notes, you know, I don't recall
5  specifically Mr. – Mr. Dondero saying to – to
6  make this a loan.
7        So my conversation with Mr. Dondero
8  around the culmination of the NAV error as
9  related to TerreStar which was a – a – I
10 think it was a year and a half process.  I
11 don't know, it was a multi-month process, very
12 laborious, very difficult.
13       When we got to the end, I had a
14 conversation with Mr. Dondero on where to, you
15 know, basically get the funds to reimburse the
16 fund, and I recall him saying, get the money
17 from Highland.
18    Q.    And so he told you to get the money
19 from Highland; is that right?
20    A.    That is what I recall – in my
21 conversation with him, that is – that is what
22 I can recall.
23    Q.    Do you know who drafted these notes?
24    A.    I don't.
25    Q.    Did you ask somebody to draft the
```

**Appx. 00236**

Page 146

WATERHOUSE - 10-19-21

1 notes?
2 A.   I didn't ask -- I don't specifically
3 ask people to draft notes really.  I mean,
4 again, you know, the legal group at Highland is
5 responsible and has always been responsible for
6 drafting promissory notes.
7 Q.   So based on your -- based on the
8 practice, you believe that somebody from the
9 Highland's legal department would have drafted
10 these notes.  Do I have that right?
11       MS. DEITSCH-PEREZ:  Object to the
12       form.  John, I also asked you for the Word
13       versions of these notes so we could look at
14       the properties, and you have not provided
15       them.  Are you intending to?
16       MR. MORRIS:  No.
17       Q.   Can you answer my question, sir?
18 A.   Again, I --
19       MS. DANDENEAU:  Do you want him to
20       repeat it?
21 A.   Yeah, why don't you repeat it?
22       Q.   Sure.  Mr. Waterhouse, based on the
23 practice that you have described in your
24 understanding, do you believe that these notes

Page 147

WATERHOUSE - 10-19-21

1 would have been drafted by somebody in the
2 legal department?
3       MS. DEITSCH-PEREZ:  Object to the
4       form.
5       A.   Yes.
6       Q.   Okay.  And do you know who would
7 have instructed -- do you have any knowledge as
8 to who would have instructed the legal
9 department to draft these notes?
10       MS. DEITSCH-PEREZ:  Object to the
11       form.
12       A.   It was whoever was working --
13 mean, it was likely someone on the team.  I
14 mean, I don't remember exactly on every note or
15 every document, but, again, a lot of these
16 things of this nature -- they're operational in
17 nature -- were handled by the team.
18       The team knows to -- I mean, we
19 don't draft documents.  We're not lawyers.
20 We're not attorneys.  It is not what I do or
21 accountants do.
22       So they are always instructed to go
23 and -- and go to the legal team to get
24 documents like this drafted.  Also, when you go

Page 148

WATERHOUSE - 10-19-21

1 to the legal team, the -- you know, we always
2 loop in compliance.  And compliance -- when you
3 go to the legal team, compliance is part of
4 legal team.  They're made aware of -- of -- of
5 these types of transactions.
6       Q.   And do you believe that you had
7 the -- withdrawn.
8       Did you ever tell Mr. Dondero --
9 (inaudible) -- did you see those?
10       A.   Sorry.
11       MS. DEITSCH-PEREZ:  I did not hear
12       the end of that question.
13       Q.   Did you ever tell Mr. Dondero that
14 you signed these two notes?
15       A.   I don't recall ever -- no, I don't
16 recall having a conversation with him.
17       Q.   Did you ever discuss these two notes
18 with him at any time?
19       A.   The conversation, I recall, was what
20 I described earlier.  And that is the only time
21 I recall ever discussing this.
22       Q.   Okay.  But the corporate accounting
23 group had a copy of this -- of these two notes.
24 And pursuant to the audit process, the

Page 149

WATERHOUSE - 10-19-21

1 corporate accounting group gave the two notes
2 to PricewaterhouseCoopers in connection with
3 the audit; correct?
4       MS. DANDENEAU:  Objection to form.
5       A.   Yes.  I mean, that is -- yeah, I
6 mean, they -- unless the legal team can also
7 retain copies of items like this.  I mean, I
8 don't know everything that they would retain as
9 well.
10       The legal team would also, if they
11 had documents as part of audits, turn that over
12 to the auditors as well.  So it could have been
13 the corporate accounting team.  It could be
14 someone on the legal team.
15       Q.   All right.  So you didn't -- you
16 didn't draft this note; right?
17       A.   I -- I -- I did not.
18       Q.   But somebody at Highland did; is
19 that fair?
20       MS. DEITSCH-PEREZ:  Object to the
21       form.
22       A.   I don't know.  I mean, we can go to
23 the legal team.  I don't -- I'm not sitting
24 behind someone in legal.  Maybe they went to

Page 150

WATERHOUSE - 10-19-21

1    outside counsel. I have no idea.
2    Q.   Did you have any reason to believe
3    you weren't authorized to sign this note,
4    either of these two notes?
5    A.   I think I have already answered that
6    question.
7    Q.   Okay. You didn't give these notes
8    to PricewaterhouseCoopers; correct?
9         MS. DANDENEAU: Objection to form.
10   A.   I don't recall giving these to
11   PricewaterhouseCoopers.
12   Q.   And in the practice that you have
13   described, somebody in the corporate accounting
14   group would have given these two notes to
15   PricewaterhouseCoopers; correct?
16        MS. DANDENEAU: Objection to form.
17   A.   I think I've answered that. I said
18   either the corporate accounting team or maybe
19   the legal team.
20        MR. MORRIS: Okay. Why don't we
21   take our lunch break here.
22        VIDEOGRAPHER: We're going off the
23   record at 1:04 p.m.
24        (Recess taken 1:04 p.m. to 1:49 p.m.)
25

Page 151

WATERHOUSE - 10-19-21

1         VIDEOGRAPHER: We are back on the
2    record at 1:49 p.m.
3    Q.   Mr. Waterhouse, did you speak with
4    anybody during the break about the substance of
5    this deposition?
6    A.   I spoke to -- to Deb and Michelle.
7    Q.   About the substance of the
8    deposition?
9    A.   Yes.
10   Q.   Can you tell me what you talked
11   about?
12        MS. DANDENEAU: No. We object on
13   the basis of privilege.
14   Q.   Okay. You are going to follow your
15   counsel's objection here?
16   A.   Yes.
17   Q.   Okay.
18        MR. MORRIS: Can we put up on the
19   screen Exhibit 35.
20        (Exhibit 35 marked.)
21   Q.   Are you able to see that document,
22   sir?
23   A.   Yes.
24   Q.   Have you ever seen an incumbency
25

Page 152

WATERHOUSE - 10-19-21

1    certificate before?
2    A.   I have.
3    Q.   Do you have a general understanding
4    of what an incumbency certificate is?
5    A.   I have a general understanding.
6    Q.   What is your general understanding?
7    A.   You know, those -- my general
8    understanding is that the incumbency
9    certificate basically lists folks that can --
10   are like authorized signers.
11   Q.   Okay. And do you see that this is
12   an incumbency certificate for Highland Capital
13   Management Fund Advisors, L.P.?
14   A.   Yes.
15   Q.   Okay. And if we could scroll down
16   just a little bit, do you see that it's dated
17   effective as of April 11th, 2019?
18   A.   Yes, I see that.
19   Q.   Okay. And is that your signature in
20   the middle of the signature block?
21   A.   Yes, it is.
22   Q.   And by signing it, did you accept
23   appointment as the treasurer of HCMFA effective
24   as of April 11th, 2019?
25

Page 153

WATERHOUSE - 10-19-21

1    A.   Again, I'm not the legal -- I don't
2    know if this makes me the treasurer or the
3    appointment. I don't know -- I don't know
4    that, so I don't -- I don't know if that
5    document -- again, I think -- again, I'm not
6    the legal expert. I think isn't there --
7    aren't there other legal documents that detail
8    who the officers are that could be incorporated
9    or things like that? Again, I don't want to
10   play armchair attorney here.
11   Q.   I'm not asking you for a legal
12   conclusion. I'm asking you for your knowledge
13   and understanding. When you signed this
14   document, did you understand that you were
15   accepting an appointment as the treasurer of
16   HCMFA?
17        MS. DANDENEAU: Objection to form.
18        MS. DEITSCH-PEREZ: Objection, form.
19   A.   Again, I don't think this -- that
20   wasn't my understanding. I don't think this
21   makes -- this document makes me the treasurer.
22   Q.   What do you think this document --
23   why did you sign this document?
24        MS. DEITSCH-PEREZ: Objection to

Page 154

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    form.
3        MR. MORRIS:  You're objecting to the
4    form of the question when I asked him why
5    did you sign the document?  What is the
6    basis for the objection?
7        MS. DEITSCH-PEREZ:  Because, John, I
8    think that it does call for a legal
9    conclusion other than -- with him saying
10   because somebody told me to sign this
11   document.  But if you want to go there,
12   that is fine.
13       MR. MORRIS:  Okay.
14       MS. DANDENEAU:  I don't think --
15   he's already said he's not a lawyer.
16       MR. MORRIS:  I'll allow the witness
17   to answer this question.
18   Q.   Why did you sign this document, sir?
19   A.   I mean, our -- our legal group would
20   bring by these incumbency certificates from
21   time to time.  I have no idea why they're being
22   updated, and I was asked to sign.
23   Q.   Did you ask anybody, what is this
24   document?
25   A.   No.

Page 155

1    WATERHOUSE - 10-19-21
2    Q.   Did anybody tell you why they needed
3    you to sign the document?
4    A.   Not that I can recall.
5    Q.   You testified earlier that you
6    understood that you served as the acting
7    treasurer for HCMFA; correct?
8    A.   Yes.
9    Q.   How did you become the acting
10   treasurer of HCMFA?
11       MS. DANDENEAU:  Objection to form.
12   A.   I don't -- I don't know the legal --
13   I don't know the legal mechanic of how I became
14   the acting treasurer.
15   Q.   I'm not asking for the legal
16   mechanic.  I'm asking you as the person who
17   is --
18       MS. DANDENEAU:  John, you said --
19       MR. MORRIS:  Stop.
20       MS. DANDENEAU:  -- how did you
21   become the treasurer.  That is --
22       MR. MORRIS:  Please stop.
23       MS. DANDENEAU:  That is a legal
24   question.
25       MR. MORRIS:  I am not asking any

Page 156

1    WATERHOUSE - 10-19-21
2    legal questions, to be clear.  I'm asking
3    for this witness' understanding as to how
4    he became the acting treasurer of HCMFA.
5    If he doesn't know, he can say he doesn't
6    know, but this legal stuff is nonsense, and
7    I really object to it.
8    Q.   Sir, I'm asking you a very simple
9    question.
10       MS. DANDENEAU:  Argumentative.
11   Q.   You testified -- you testified that
12   you became the acting treasurer of HCM --
13   HCMFA; correct?
14   A.   Yes.
15   Q.   How did that happen?
16       MS. DANDENEAU:  Again, object to
17   form.
18       MR. MORRIS:  I can't wait to do this
19   in a courtroom.  Good God.
20   Q.   Go ahead, sir.
21   A.   I don't know the exact process of
22   how that happened.
23   Q.   Do you have any idea whether signing
24   this document was part of the process?
25       MR. MORRIS:  You know what --

Page 157

1    WATERHOUSE - 10-19-21
2        MS. DANDENEAU:  Objection.
3        MR. MORRIS:  -- withdrawn.  You guys
4    want to do this, I can't wait.  I can't
5    wait.  This is the craziest stuff ever.
6        MS. DANDENEAU:  John, he said he's
7    not a lawyer, and you are asking him for a
8    legal conclusion, and he says he doesn't
9    know, and you persist.
10       MR. MORRIS:  Okay.
11       MS. DANDENEAU:  So you can ask these
12   questions --
13       MR. MORRIS:  Did anyone -- please
14   stop talking.
15       MS. DANDENEAU:  -- at another
16   point -- no, no, no, I'm entitled to talk,
17   too; right?  If you're going to make these
18   accusations as if we're trying to stonewall
19   you, this is not the witness to ask that
20   question.
21       MR. MORRIS:  I can't -- I can't
22   wait -- I can't wait to do this in a
23   courtroom.  I will just leave it at that.
24       MS. DANDENEAU:  That's right, I'm
25   sure you can't.

Page 158

1    WATERHOUSE - 10-19-21
2    Q.  Did anyone ever tell you, sir, that
3    even though you were the acting treasurer of
4    HCMFA, that you were not authorized to sign the
5    two promissory notes that we looked at before
6    lunch?
7    A.  I'm not sure I understand the
8    question.  I wasn't -- I mean, I'm -- I'm the
9    current acting treasurer.
10   Q.  Did anybody ever tell you at any
11   time that even though you were the acting
12   treasurer of HCMFA, that you were not
13   authorized to sign the two promissory notes
14   that we looked at before lunch?
15       MS. DANDENEAU:  Objection to form.
16   A.  Not that I recall.
17   Q.  Did anybody ever tell you at any
18   time that you were not authorized to sign the
19   two promissory notes that we looked at before
20   lunch?
21   A.  Not that I recall.
22   Q.  Did anybody ever tell you at any
23   time that you should not have signed the two
24   promissory notes that we looked at before
25   lunch?

Page 159

1    WATERHOUSE - 10-19-21
2    A.  Not that I recall.
3    Q.  Did you ever tell anybody at any
4    time that you weren't authorized to sign the
5    two promissory notes that we looked at before
6    lunch?
7    A.  Not that I recall.
8    Q.  Did you ever tell anybody at any
9    time that you made a mistake when you signed
10   the two promissory notes that we looked at
11   before lunch?
12   A.  Not that I recall.
13   Q.  As you sit here right now, do you
14   have any reason to believe that you were not
15   authorized to sign the two documents that we
16   looked at before lunch?
17       MS. DANDENEAU:  Objection to form.
18   A.  If -- if this is the -- the valid
19   incumbency certificate, then this, does --
20   this does detail who the signers are.
21   Q.  Okay.  And looking at that document,
22   does that give you comfort that you were
23   authorized to sign the two promissory notes
24   that we looked at before lunch?
25       MS. DEITSCH-PEREZ:  Object to the

Page 160

1    WATERHOUSE - 10-19-21
2    form.
3        MS. DANDENEAU:  Objection, form.
4    A.  Yes.
5    Q.  As of October 20th -- withdrawn.
6        I'm trying to take your mind back to
7    a year ago, October 2020.  Do you recall at
8    that time that the boards of the retail funds
9    were making inquiries about obligations that
10   were owed by the advisors to Highland in
11   connection with their 15(c) review?
12       MS. DANDENEAU:  Objection to form.
13   A.  I don't -- I don't recall.
14   Q.  As of October 2020, you had no
15   reason to believe you weren't authorized to
16   sign the two promissory notes that we just
17   looked at; correct?
18       MS. DANDENEAU:  Objection, form.
19       MS. DEITSCH-PEREZ:  Objection to
20   form.
21   A.  I didn't think about it in October
22   of 2020, but I mean --
23   Q.  Did you have any reason to believe
24   at that time that you weren't authorized to
25   sign the two notes that we just looked at?

Page 161

1    WATERHOUSE - 10-19-21
2    A.  Not that I'm aware, no.
3    Q.  Did you have any reason to believe a
4    year ago that you made a mistake when you
5    signed those two notes?
6    A.  Not that I'm aware.
7    Q.  A year ago you believed that HCMFA
8    owed Highland the unpaid principal amounts that
9    were due under those two notes; correct?
10   A.  They're -- they're promissory notes
11   that were -- as you presented, that were --
12   that were executed.  Whether they're valid or
13   if there's other reasons, I didn't -- I don't
14   know.
15   Q.  I'm not asking you whether they're
16   valid or not.  I'm asking you for your state of
17   mind.  A year ago you believed that HCMFA
18   was -- was obligated to pay the unpaid
19   principal amount under the two notes that you
20   signed; correct?
21   A.  Yeah, I'm -- I'm -- yes.
22   Q.  Thank you.  Are you aware -- you're
23   aware that -- that in 2017, NexPoint issued a
24   note in favor of Highland in the approximate
25   amount of $30 million; correct?

Page 162

WATERHOUSE - 10-19-21

1     A.   I'm – I'm – I'm generally aware.
2     Q.   Okay.  And are you generally aware
3   that from time to time, after the note was
4   issued by NexPoint, that moneys were applied to
5   principal and interest that were due under the
6   NexPoint note?
7     A.   Yes, I'm generally aware.
8     Q.   Okay.  And did anybody ever tell you
9   that the payments that were made against the
10  NexPoint notes were made by mistake?
11    A.   Yes.
12    Q.   And is it the one payment that we
13  talked about earlier today?
14    A.   We talked about a lot of things
15  today.  What payment are we talking about?
16    Q.   Okay.  Who told you that any payment
17  made against the NexPoint note was made by
18  mistake?
19    A.   D.C. Sauter.
20    Q.   When did Mr. Sauter tell you that?
21    A.   I don't – I don't remember
22  specifically.
23    Q.   Do you remember what payments –
24    A.   Sometime – sometime this year.

Page 163

WATERHOUSE - 10-19-21

1     Q.   Sometime in 2021?
2     A.   Yes.
3     Q.   Do you remember what payment he was
4   referring to?
5     A.   It was the – the payment made in
6   January of 2021 or – yeah, January of – of
7   this – January of 2021.
8     Q.   Okay.  So did anybody ever tell you
9   at any time that any payment that was made
10  against principal –
11    A.   And – and – and – hold on, and it
12  may have been other – again, it may have been
13  that payment or – or there may have been what
14  he was explaining, a misapplication of prior
15  payments as well.
16    Q.   Can you – can you give me any
17  specificity – withdrawn.
18         Withdrawn.  Can you tell me
19  everything that Mr. Sauter told you about –
20  about errors in relation to payments made
21  against principal and interest due under the
22  NexPoint note?
23    MS. DANDENEAU:  Can I just –
24    MR. RUKAVINA:  Hold on.  Hold on.

Page 164

WATERHOUSE - 10-19-21

1   I'm going to object here, and I'm going to
2   instruct the witness not to answer
3   depending on the discussion that you had –
4   Mr. Waterhouse, I'm the lawyer for
5   NexPoint, and as everyone here knows, D.C.
6   Sauter is in-house counsel.
7        So if you and Mr. Sauter were having
8   a factual discussion and him preparing his
9   affidavit, et cetera, then go ahead and
10  answer that.  But if you were having a
11  discussion as to our legal strategy in this
12  lawsuit, or anything having to do with
13  that, then do not answer that.
14       And if you need to talk to either
15  your counsel or me about that, then we need
16  to have that discussion now.
17    A.   Okay.  Yeah, I don't – I don't
18  really know how to make that distinction, so
19  maybe I need to talk to counsel before I
20  answer, or if I can answer.
21    Q.   Let me just ask you this question:
22  Did – did you have any conversation with
23  Mr. Sauter about any payment of principal and
24  interest prior to the time that you left

Page 165

WATERHOUSE - 10-19-21

1   Highland's employment, or did it happen after
2   you left Highland's employment?
3     A.   I don't – I don't recall if – I
4   don't recall.  I mean, it was sometime in 2021.
5   I don't remember if it was before or after I
6   was let go from Highland.
7     Q.   Okay.  So – so nobody told you
8   prior to 2021 that any error or mistake was
9   made in the application of payments against
10  principal and interest due on the NexPoint
11  note.  Do I have that right?
12    A.   Yeah, I don't – I don't recall this
13  being in 2020.
14    Q.   Okay.  And it didn't happen in 2019;
15  correct?
16    A.   I don't recall that happened.
17    Q.   And it didn't happen in 2018;
18  correct?
19    A.   I don't – I don't recall that
20  happening.
21    Q.   And it didn't happen in 2017;
22  correct?
23    A.   I don't recall.
24    Q.   But – but you believe the

WATERHOUSE - 10-19-21

1    conversation took place in 2021.  You just
2    don't remember if it was before or after you
3    left Highland's employment.  Do I have that
4    right?
5        A.   It was sometime this year.  I
6    don't – I don't remember.
7        Q.   Okay.  Did you report this
8    conversation to Mr. Seery at any point?
9        A.   I don't believe so.
10       Q.   Did you report this conversation to
11   anybody at DSI at any time?
12       A.   I don't recall.
13       Q.   Do you have – you don't have a
14   recollection of ever doing that; correct?
15       A.   Yeah, that's right.  I don't recall
16   doing that.
17       Q.   Do you recall telling anybody at
18   Pachulski Stang about the conversation you
19   recall with Mr. Sauter?
20       A.   No, I don't – I don't recall.
21       Q.   Did you tell any of the independent
22   board members about your conversation with
23   Mr. Sauter?
24       A.   I don't recall.

WATERHOUSE - 10-19-21

1    Q.   Did you tell any of the employees at
2    Highland before you left Highland's employment
3    about this call that you had with Mr. Sauter?
4        MS. DANDENEAU:  Objection to form.
5        A.   No, I don't – no, I don't recall.
6        Q.   NexPoint – to the best of your
7    knowledge, did NexPoint ever file a proof of
8    claim against Highland to try to recover moneys
9    that were mistakenly paid against the principal
10   and interest due under the note?
11       A.   Okay.  Hold on.  You are saying did
12   NexPoint Advisors file a proof of claim to
13   Highland for errors related to payments under
14   the NexPoint note to Highland?
15       Q.   Correct.
16       A.   I'm – I'm – I'm not – I'm not
17   aware.
18       Q.   Are you aware –
19       A.   I'm not the legal person here, I
20   don't know.
21       Q.   I'm just asking for your knowledge,
22   sir.
23       A.   Yeah, I don't know.  I'm not aware.
24       Q.   Are you aware of any claim of any

WATERHOUSE - 10-19-21

1    kind that NexPoint has ever made to try to
2    recover the amounts that it contends were – or
3    that Mr. Sauter contend were mistakenly applied
4    against principal and interest due under the
5    NexPoint note?
6        A.   I'm not aware.
7        MS. DANDENEAU:  Objection to form.
8        Q.   Okay.  The advisors' agreements with
9    the retail funds are subject to annual renewal;
10   correct?
11       A.   Yes.
12       Q.   And do you participate in the
13   renewal process each year?
14       A.   Yes.
15       Q.   What role do you play in the renewal
16   process?
17       A.   I'm – I'm asked by the retail board
18   to walk-through the advisors financials.
19       Q.   And do you do that in the context of
20   a board meeting?
21       A.   Yes, it is – yes, it is typically
22   done in a board meeting.
23       Q.   And do you recall the time –
24   does – does the renewal process happen around

WATERHOUSE - 10-19-21

1    the same time each year?
2        A.   Yes, it is – it is around the same
3    time every year.
4        Q.   And what – what time period of the
5    year does the renewal process occur?
6        A.   Approximately the September
7    timeframe.
8        Q.   During that process, in your
9    experience, does the board typically conduct
10   its own diligence and ask for information?
11       A.   Does the board ask for lots of – I
12   mean, just – I mean, lots of information as a
13   part of that – that – as part of that board
14   meeting and that process.
15       Q.   Okay.  And do you recall that the
16   process in 2020 spilled into October?
17       A.   Yes.  Yes.
18       Q.   Okay.  And as part of the process in
19   2020, the retail board asked – asked what are
20   referred to as 15(c) questions; right?
21       A.   I guess I don't want to be – they
22   asked 15(c) – are you saying they asked 15(c)
23   questions and this is why it went into October
24   or –

Page 170

WATERHOUSE - 10-19-21

1
2    Q.   No, I apologize.
3         Do you have an understanding of
4    what – of what 15(c) refers to in the context
5    of the annual renewal process?
6    A.   Yes, generally.
7    Q.   All right.  What is your general
8    understanding of the term "15(c)" in the
9    context of the annual renewal process?
10   A.   I – I think 15(c) is the section
11   that – that – you know, that – that the
12   board has to evaluate every year, the retail
13   board.  They have to, you know, go through,
14   evaluate, and go through that approval process
15   on a yearly basis.
16   Q.   Okay.
17        MR. MORRIS:  Can we put up on the
18   screen Exhibit 36, please.
19        (Exhibit 36 marked.)
20        MR. MORRIS:  I guess let's just
21   start at the bottom so Mr. Waterhouse can
22   see what is here.
23   Q.   You see this begins with an email
24   from Blank Rome to a number of people.
25        MR. MORRIS:  And if we can scroll

Page 171

WATERHOUSE - 10-19-21

1
2    up – keep going just a little bit.
3    Q.   You will see that there is an email
4    from Lauren Thedford to Thomas Surgent and
5    others where she reports that she was attaching
6    and reproducing below additional 15(c)
7    follow-up questions from the board.
8         Do you see that?
9    A.   Yes.
10   Q.   And do you see Question No. 2 asks
11   whether there are any material outstanding
12   amounts currently payable or due in the future
13   (e.g., notes) to HCMLP by HCMFA or NexPoint
14   Advisors or any other affiliate that provides
15   services to the funds?
16        Do you see that?
17   A.   Yes.
18   Q.   And – and did you – do you recall
19   that in – in October of 2020 the retail boards
20   were asking for that information?
21   A.   I don't recall it, but there –
22   they're obviously asking in this email.
23   Q.   Okay.
24        MR. MORRIS:  Can we scroll up a
25   little bit, please.

Page 172

WATERHOUSE - 10-19-21

1
2    Q.   And then do you see that
3    Ms. Thedford includes you on the email string
4    on Tuesday, October 6th, at 5:52?
5    A.   Yes.
6    Q.   And she asks you and Dave Klos and
7    Kristin Hendrix for advice on that particular
8    Request No. 2 that I have just read; right?
9    A.   Yes.
10   Q.   Okay.  Can you tell me who
11   Ms. Thedford is?
12   A.   She was an attorney that was in the
13   legal group.
14   Q.   At Highland Capital Management,
15   L.P.?
16   A.   I'm – I'm – I'm – I don't
17   remember if she was an employee of Highland or
18   any of the advisors.
19   Q.   Okay.  Do you know if she served as
20   the corporate secretary for both HCMFA and
21   NexPoint?
22   A.   Yes.
23   Q.   And – okay.
24        Do you know whether Ms. Thedford
25   held any positions in relation to the retail

Page 173

WATERHOUSE - 10-19-21

1
2    funds as we defined that term?
3    A.   Yes.
4    Q.   What is your understanding of the
5    positions that Ms. Thedford held at the retail
6    funds?
7    A.   I – I recall her being an officer.
8    I don't recall her title.
9    Q.   Okay.  Is still an officer at
10   any of the retail funds today?
11   A.   No.
12   Q.   Do you know when she ceased to be an
13   officer of the retail funds?
14   A.   Approximately.
15   Q.   And when did she approximately cease
16   to be an officer of the retail funds?
17   A.   It was in – it was in early of
18   2021.
19   Q.   Okay.  Do you know when she became
20   an officer of the retail funds?
21   A.   I don't recall.
22   Q.   To the best of your recollection,
23   was she an officer of the retail funds in
24   October of 2020?
25   A.   I believe so.

**Appx. 00243**

WATERHOUSE - 10-19-21

1  
2    Q.   Okay.  Do you know what title she
3   held in her capacity as an officer, if any?
4    A.   I told you I don't remember.
5    Q.   Okay.  So she sends this email to
6   you at 5:52 p.m. on October 6th.
7        And if we can scroll up to the
8   response, you responded a minute later with a
9   one-word answer:  Yes.
10       Do you see that?
11   A.   Yes.
12   Q.   And – and yes is – yes was in
13  response to the retail board's Question No. 2,
14  right, whether there are any material
15  outstanding amounts currently payable or due in
16  the future?
17   A.   Yes.
18       MR. MORRIS:  And can we scroll up to
19  see what happened next.
20   Q.   So Ms. Thedford writes back to you a
21  few minutes later and she asks whether you
22  could provide the amounts.
23       Do you see that?
24   A.   Yes.
25   Q.   And then you respond further and you

WATERHOUSE - 10-19-21

1  
2   refer her to the balance sheet that was
3   provided to the board as part of the 15(c)
4   materials.
5        Do you see that?
6    A.   Yes.
7    Q.   And – and did the advisors provide
8   to the board certain balance sheets in 2020 in
9   connection with the 15(c) review?
10   A.   Yes, they did.
11   Q.   Okay.  And were the amounts that
12  were outstanding or that were to be due in the
13  future by the advisors to Highland included in
14  the liability section of the balance sheet that
15  was given to the retail board?
16   A.   Yes.  Notes would be reflected as
17  liabilities.
18   Q.   Okay.  And –
19   A.   If I'm understanding your question
20  correctly.
21   Q.   You are.  And – and – and those
22  liabilities you – you were – you believed
23  were responsive to the retail board's question;
24  correct?
25   A.   Yes.

WATERHOUSE - 10-19-21

1  
2    Q.   Okay.  And then if we can scroll up,
3   you see Ms. Thedford responds to you
4   nine minutes later with a draft response.
5        Do you see that?
6    A.   Yes.
7    Q.   And she says that she is taking from
8   the 6/30 financials certain information about
9   amounts that were due to HCMLP and affiliates
10  as of June 30th, 2020.
11       Do you see that?
12   A.   I do.
13   Q.   Okay.  And did you believe, as the
14  treasurer of NexPoint and HCMFA and as the CFO
15  of Highland, that the information that
16  Ms. Thedford obtained from the 6/30 financials
17  was accurate and responsive in relation to the
18  retail fund board's question?
19   A.   I just want to make sure I
20  understand the question.
21       Are you saying that the financial
22  information provided to the retail board as
23  part of the 15(c) process, which included
24  financial statements as of June 30th of 2021,
25  did I feel like those were responsive to their

WATERHOUSE - 10-19-21

1  
2   questions?
3    Q.   Yes.
4    A.   Yes.
5    Q.   Thank you.
6        MS. DEITSCH-PEREZ:  John, it is not
7   in the chat yet.  Can you just make sure it
8   gets put in there.
9        MR. MORRIS:  Sure.
10       MS. CANTY:  I put it in there.  I
11  think maybe I just sent it directly, so let
12  me make sure it says to everyone.  But I
13  did put it in there.  I will try again.
14       MR. MORRIS:  Thank you, La Asia.
15       MS. DANDENEAU:  What number is it.
16       MR. MORRIS:  What, the Bates number?
17       MS. DEITSCH-PEREZ:  No, the –
18  this – yeah, 36 is not in the chat.
19       MR. MORRIS:  Okay.  We'll get it.
20       MS. DANDENEAU:  I think that
21  Ms. Canty just sent it to me originally.
22  Sorry.
23       MR. MORRIS:  Okay.  We will get it
24  there.
25       MS. CANTY:  Okay.  It is there now

Page 178

WATERHOUSE - 10-19-21

1         WATERHOUSE - 10-19-21
2    for everyone.
3         MS. DEITSCH-PEREZ:  Got it.  Thank
4    you.
5    Q.   Do you recall if the proposed
6    response that Ms. Thedford crafted was
7    delivered to the retail board with the -- with
8    the yellow dates having been completed?
9    A.   I don't know.
10        MR. MORRIS:  Davor, I'm going to ask
11        that the advisors and -- the advisors of
12        both HCMFA and NexPoint produce to me any
13        report that was given to the retail board
14        concerning the promissory notes at issue,
15        including the obligations under the notes.
16   Q.   Do you know -- do you know if
17   ultimately NexPoint informed the retail board
18   in response to its question that NexPoint owed
19   Highland approximately 23 or $24 million?
20        MS. DANDENEAU:  Objection to the
21        form.
22   A.   Sorry, are you asking, did NexPoint
23   tell the retail board that it owed Highland?
24   Q.   Let me ask a better question,
25   Mr. Waterhouse.

Page 179

WATERHOUSE - 10-19-21

1         WATERHOUSE - 10-19-21
2         Did -- do you know if anybody ever
3    answered the retail board's question that was
4    Number 2?
5    A.   I don't -- I can't say for sure.
6    Q.   Okay.  Do you recall -- I think you
7    testified earlier that you walked through the
8    advisors' financials with the retail board;
9    correct?
10   A.   Yes.
11   Q.   And as part of that process, did you
12   disclose to the retail board the obligations
13   that NexPoint and HCMFA had to Highland under
14   promissory notes?
15   A.   The retail board, as I stated
16   earlier, receives financial information,
17   balance sheet, income statement information
18   from the advisors.  That information is
19   provided to the retail board in connection with
20   the 15(c) process.
21        So any notes between the advisors
22   and the Highland would be -- anything would be
23   detailed in those financial statements.
24   Q.   Do you recall in 2020 ever speaking
25   with the retail board about the advisors'

Page 180

WATERHOUSE - 10-19-21

1         WATERHOUSE - 10-19-21
2    obligations under the notes to Highland?
3         MS. DANDENEAU:  Objection to form.
4         MS. DEITSCH-PEREZ:  Object to the
5         form.
6    A.   I don't recall specifically.
7    Q.   Do you have any general recollection
8    of discussing with the retail board the
9    advisors' obligations to Highland under the
10   notes that they issued?
11        MS. DANDENEAU:  Object to the form.
12        MS. DEITSCH-PEREZ:  Object to the
13        form.
14   A.   I just recall generally just -- it
15   is just -- I present the financial statements,
16   and if they have questions, I answer their
17   questions and walk them through.
18        I don't recall what they asked.  I
19   don't recall where the discussion went.  I
20   don't recall anything of that nature.
21   Q.   Okay.  Do you know if anybody on
22   behalf of HCMF -- HCMFA ever told the retail
23   board that HCMFA had no obligations under the
24   two 2019 notes that you signed?  Withdrawn.
25        Do you know whether anybody on

Page 181

WATERHOUSE - 10-19-21

1         WATERHOUSE - 10-19-21
2    behalf of HCMFA ever told the retail boards
3    that you weren't authorized to sign either of
4    the two 2019 notes?
5         MS. DANDENEAU:  Objection to form.
6    A.   I'm not aware.
7    Q.   Are you aware of anybody on behalf
8    of HCMFA ever telling the retail boards that
9    your execution of the two 2019 notes was a
10   mistake?
11        MS. DANDENEAU:  Objection to form.
12   A.   I'm not aware.
13   Q.   Are you aware of anybody on behalf
14   of HCMFA ever telling the retail boards that
15   HCMFA did not have to pay the amounts reflected
16   in the two notes that you signed in 2019?
17   A.   I'm not aware.
18   Q.   Do you know whether anybody ever
19   told the retail boards -- withdrawn.
20        Do you know whether anybody ever
21   told the retail boards that Highland has
22   commenced a lawsuit to recover on the two notes
23   that you signed in 2019?
24   A.   I'm not aware.
25   Q.   Are you aware of anybody informing

**Appx. 00245**

Page 182

WATERHOUSE - 10-19-21

1    the retail boards that Highland has sued to
2    recover on the NexPoint note?
3    A.    I'm not aware.
4    Q.    Do you know whether anybody ever
5    told the retail board that Highland had
6    declared a default with respect to the two
7    HCMFA notes that you signed in 2019?
8    A.    I'm not aware.
9    Q.    Are you aware of anybody ever
10   informing the retail boards that Highland had
11   declared a default under the NexPoint note?
12   A.    I'm not aware.
13   Q.    Are you aware of anybody telling the
14   retail board that Highland made a demand for
15   payment under the 2019 notes that you signed on
16   behalf of HCMFA?
17   A.    I'm not aware.
18   Q.    Let's -- let's see if there is a
19   response to Ms. Thedford's email, if we can
20   scroll up.
21           Do you see you responded to
22   Ms. Thedford five minutes after she provided
23   the draft response to you?
24   A.    Yes.

Page 183

WATERHOUSE - 10-19-21

1    Q.    Okay.  And do you see that Dustin
2    Norris is copied on this email?
3    A.    Yes, he is.
4    Q.    Great.  Do you know whether
5    Mr. Norris held any positions at either of the
6    advisors as of October 6, 2020?
7    A.    I will go back to -- I'm not the
8    legal expert of what appoints you or how or
9    why, but you did see Dustin's name on the
10   incumbency certificate that you produced
11   earlier.
12   Q.    Do you know what his title was in
13   October of 2020?
14   MS. DANDENEAU:  Objection to form.
15   A.    I don't -- I don't recall.
16   Q.    Was he -- did he have a title with
17   each of the advisors, to the best of your
18   recollection?
19   A.    I don't recall.
20   Q.    Do you know why he is included on
21   this email string?
22   A.    I didn't add Dustin.  It looks like
23   Lauren did.  I don't know why she added him or
24   not.  You would have to ask her.

Page 184

WATERHOUSE - 10-19-21

1    Q.    Does Mr. Norris play a role in
2    formulating the advisors' responses to the
3    questions asked by the retail board in
4    connection with the 15(c) annual review?
5    MS. DANDENEAU:  Objection to form.
6    A.    He -- Dustin Norris is there in the
7    board meetings.  But -- so he has a role, yes.
8    Q.    Okay.  And does Mr. Norris hold any
9    positions, to the best of your knowledge, in
10   relation to any of the retail funds?
11   A.    I don't -- I don't believe he does.
12   Q.    How about Mr. Post, do you know
13   whether Mr. Post holds any position in either
14   of the advisors?
15   A.    I mean, he -- he -- yes.
16   Q.    What is your understanding of the
17   positions that Mr. Post holds in relation to
18   the advisors?
19   MS. DANDENEAU:  Objection to form.
20   A.    He is an employee of NexPoint
21   Advisors.  He is also the chief compliance
22   officer for -- for NexPoint.
23   Q.    Who is the chief compliance officer
24   for HCMFA, if you know?

Page 185

WATERHOUSE - 10-19-21

1    MS. DANDENEAU:  Objection to form.
2    A.    That would be Jason as well.
3    Q.    Okay.  Now, looking at your
4    response, you noted initially that nothing was
5    owed under shared services.  Do I have that
6    right in substance?
7    A.    Yeah.  I think I'm being responsive
8    to Lauren's question here, whether any of the
9    shared service invoices are outstanding.
10   Q.    Right.
11   A.    Yes.
12   Q.    And that is because -- and that is
13   because the retail the retail board has asked
14   for the disclosure of all material obligations
15   that were owed to HCMLP either then or in the
16   future; isn't that right?
17   MS. DANDENEAU:  Objection to form.
18   Q.    We can go back down and look.
19   A.    Look, I don't know if that's a
20   material item, I mean, again, but sure.
21   Q.    Okay.  But there were no shared
22   services outstanding; correct?
23   MS. DANDENEAU:  Objection to form.
24   A.    That is what this email seems to

WATERHOUSE - 10-19-21

1 WATERHOUSE - 10-19-21
2 indicate.
3     Q.    And you wouldn't have written it if
4 you didn't believe it to be true at the time;
5 correct?
6     A.    Correct.
7     Q.    And when you referred to shared
8 services outstanding, what you meant there was
9 that neither NexPoint nor HCMFA owed Highland
10 any money under the shared services agreements
11 that they had with Highland as of October 6th,
12 2020; right?
13     A.    I don't know if it is as of October
14 6, 2020 or if it was from -- like through the
15 financials -- through the date of the
16 financials as of June 30.
17     Q.    Okay. And then you noted that
18 HCMA -- the HCMFA note is a demand note; right?
19     A.    Yes.
20     Q.    And then you referred Ms. Thedford
21 to Kristin Hendrix for the term of the NexPoint
22 note. Do I have that right?
23     A.    Yes.
24     Q.    And then you refer to that agreement
25 that is referenced in the 2018 audited

1 WATERHOUSE - 10-19-21
2 financials about Highland's agreement not to
3 make demand upon HCMFA until May 2021; correct?
4     A.    Correct.
5     Q.    And then -- and then the next thing
6 you write is that the attorneys think that BK
7 doesn't change that, but don't know for sure at
8 the end of the day.
9         Do you see that sentence?
10     A.    Yes.
11     Q.    Which attorneys were you referring
12 to?
13     A.    I don't remember.
14     Q.    Did you have a conversation with
15 attorneys concerning whether the bankruptcy
16 would change or alter in any way the agreement
17 not to make a demand under the HCMFA note?
18     A.    Look, yeah, I mean, I don't
19 specifically remember, but generally, I mean,
20 it is in this email. I don't -- I don't -- I
21 don't -- I don't remember who I talked to or,
22 you know, was it inside counsel, outside
23 counsel, but obviously I talked to somebody.
24     Q.    Do you have any recollection --
25     A.    Well, I don't even know if it's --

1 WATERHOUSE - 10-19-21
2 actually, it may not even have been me. I say
3 the attorneys in, you know, a lot of -- like I
4 talked about the team.
5         It could have been someone on the
6 team, like, hey, we need to run this down, and
7 maybe they talked to attorneys again and
8 relayed that information to me.
9         So I really don't know if I spoke or
10 someone else did or -- or, I mean, and maybe it
11 wasn't even from corporate accounting. Maybe
12 it was, you know, other -- I'm kind of
13 summarizing, you know, again, so I don't really
14 know -- I can't really say for sure. I don't
15 remember how I came about of this knowledge.
16     Q.    I appreciate your efforts,
17 Mr. Waterhouse, but I will just tell you that
18 if I ask a question and you don't know the
19 answer or you don't recall, I'm happy to accept
20 that. I don't -- I don't want you to
21 speculate, so I want to be clear about that.
22 So I appreciate it.
23         Let me just ask you simply: Do you
24 know what attorneys -- can you identify any of
25 the attorneys who thought that the bankruptcy

1 WATERHOUSE - 10-19-21
2 process didn't change the agreement?
3     A.    I don't recall.
4     Q.    Okay. Perfect.
5         And then let's look at the last
6 sentence. It says, quote: The response should
7 include, as I covered in the board meeting,
8 that both entities have the full faith and
9 backing from Jim Dondero, and to my knowledge
10 that hasn't changed.
11         Do you see that?
12     A.    Yes.
13     Q.    Okay. Prior to October 6th, 2020,
14 had you told the retail board that HCMFA and
15 NexPoint have the full faith and backing from
16 Jim Dondero?
17     A.    Yes.
18     Q.    Do you remember in the context in
19 which you told the retail board that?
20     A.    I mean, generally, yes.
21     Q.    Tell me what you recall.
22     A.    So we were walking through the
23 financials from the advisors; right? So as I
24 described to you, you have got HCMFA and NPA.
25 And these -- the financials, you know, show

WATERHOUSE - 10-19-21

1   they have liabilities on them that exceed
2   assets.
3       So the retail board has asked, okay,
4   you know, how -- you know, if -- if these
5   liabilities come due or they're payable, you
6   know, how does that come about?
7       And, you know, the response is,
8   well, the advisors have the -- the full faith
9   and backing from -- from Jim Dondero.
10      Q.   And how did you know that the
11  advisors had the full faith and backing from
12  Jim Dondero?  What was the basis for that
13  statement that you made to the retail board?
14      A.   I talked to Jim about it at some
15  point in the past.
16      Q.   And did you tell Mr. Dondero that
17  you were going to inform the retail board that
18  the advisors had his full faith and backing
19  before you actually told that to the retail
20  board?
21      A.   I don't recall having that
22  conversation.
23      Q.   Do you recall if you ever informed
24  Mr. Dondero that you had disclosed or told the

WATERHOUSE - 10-19-21

1   retail board that the advisors had the full
2   faith and backing of Mr. -- Mr. Dondero?
3       MS. DEITSCH-PEREZ:  Object to the
4   form.
5       A.   I don't recall discussing that with
6   him at the time.
7       Q.   When you told this to the board, was
8   Mr. Dondero participating in the discussion?
9       A.   Not that I recall.
10      Q.   Withdrawn.  Was it not -- withdrawn.
11      Do you recall whether -- when you
12  covered this issue with the board, was that in
13  a -- a Zoom call or a Webex call?  Was it a
14  telephone call?  Was it in-person?  Like where
15  were you physically in relation to the board?
16      A.   I believe I was at home.
17      Q.   Okay.  Can you identify every person
18  that you recall who was present for this
19  disclosure other than -- other than the board
20  members themselves?
21      MS. DEITSCH-PEREZ:  Object to the
22  form.
23      A.   I don't recall everyone on the call.
24      Q.   Can you identify anybody who was on

WATERHOUSE - 10-19-21

1   the call?
2       A.   Other than the board members?
3       Q.   Yes.
4       A.   Lauren Thedford.  I mean, there
5   are -- there are many -- my section is just one
6   of many sections that are just -- you know, as
7   you can appreciate, this is a long board
8   meeting.
9       I can't recall specifically, really
10  even generally, or who was on when this was
11  discussed.  But Lauren was typically on for the
12  entire time.
13      Q.   I apologize if I asked you this, but
14  do either of Mr. Norris or Mr. Post hold any
15  positions relative to the retail funds?
16      A.   I think you asked me this already,
17  John.
18      Q.   Okay.  I just don't recall.  Can you
19  just refresh my recollection if I did, in fact,
20  ask you the question?
21      A.   I don't believe -- if we can go
22  back.  I don't believe Mr. Norris has a title
23  at the retail funds.  Mr. -- and Mr. Post is
24  the CCO of the advisor, the advisors.

WATERHOUSE - 10-19-21

1       Q.   Okay.  Do you know if either of them
2   have a position with the retail board -- with
3   the retail funds?
4       A.   I don't believe Mr. Norris has a
5   position with the retail funds.
6       Q.   All right.  What about Mr. Post?
7       A.   Mr. Post is the CCO of the advisors.
8       Q.   Okay.  Does he hold any position --
9       A.   I don't believe so.
10      Q.   -- with the retail funds?
11      A.   I don't believe so.
12      Q.   Okay.
13      A.   I don't know if being the CCO for
14  the advisor conveys something for the retail
15  funds.  Again, I am not -- that is the legal
16  compliance part of it.  I don't know.
17      Q.   Why did you tell the retail board
18  that the advisors have the full faith and
19  backing from Mr. Dondero?
20      MS. DANDENEAU:  Objection to form.
21      A.   It is -- it is -- it is what has
22  been discussed with them prior.
23      Q.   And were you -- were you trying to
24  give them comfort that even though the

1           WATERHOUSE - 10-19-21
2    liabilities exceeded the assets that the
3    advisors would still be able to meet their
4    obligations as they become due?
5           MS. DANDENEAU:  Objection to form.
6           MS. DEITSCH-PEREZ:  Object form.
7    A.   I – I can't – I don't remember
8    specifically the conversation, but generally –
9    you know, generally, yes.  And that is why –
10   but, you know, again, in this email saying, you
11   know, I am sure I qualified it with the retail
12   board, you know, as I said I like – you know,
13   to my knowledge, that hasn't changed.  But,
14   again, generally – generally that is what I
15   remember.
16   Q.   Okay.  Do you recall if in the
17   advisors' response to the retail board's
18   question if the response included any statement
19   concerning Mr. Dondero and – and the full
20   faith and backing that he was giving to the
21   advisors?
22          MS. DEITSCH-PEREZ:  Object to the
23   form.
24   A.   I don't – I don't remember
25   specifically what was provided.

1           WATERHOUSE - 10-19-21
2    Q.   Okay.
3    A.   And I don't really – I don't really
4    remember generally either.
5    Q.   Okay.
6           MR. MORRIS:  So – so, again, I'm
7    just going to ask Mr. Rukavina if your
8    clients can produce as soon as possible the
9    15(c) response, the written response that
10   the advisors made, if any, to the board's
11   Question No. 2.
12          I'm not looking for the whole
13   response, but I certainly want the response
14   to Question No. 2.
15   Q.   Do you have a general understanding
16   as to the amount by which – withdrawn.
17          Did – did the assets of –
18   withdrawn.
19          Did the liabilities of HCMFA exceed
20   its assets in 2020?
21          MS. DANDENEAU:  Objection to form.
22          MS. DEITSCH-PEREZ:  Objection, form.
23   A.   I believe I have already answered
24   that question earlier, I think.  I believe I
25   said yes.

1           WATERHOUSE - 10-19-21
2    Q.   Okay.  And did the liabilities of
3    NexPoint exceed its assets in 2020?
4           MS. DEITSCH-PEREZ:  Objection to
5    form.
6    A.   I don't believe so.
7    Q.   Okay.  So – so it was only one of
8    the two advisors who had liabilities that
9    exceeded the value of the assets.
10          Do I have that right?
11          MS. DEITSCH-PEREZ:  Objection to
12   form.
13          MS. DANDENEAU:  Form.
14   A.   Yes.
15   Q.   And do you know, ballpark, the
16   amount by which the value of HCMFA's
17   liabilities exceeded their assets in 2020?
18          MS. DANDENEAU:  Objection to form.
19   A.   I don't – I don't recall.
20          MR. MORRIS:  I had specifically
21   requested in discovery the audited
22   financial reports from both advisors and
23   NexPoint.  I think I may have gotten one
24   for NexPoint but I'm still waiting for the
25   balance.  And I'm going to renew my request

1           WATERHOUSE - 10-19-21
2    for those documents too.
3    Q.   Let's go to the next exhibit, which
4    is Number 10.  So I think it is in your stack,
5    Mr. Waterhouse.
6           MR. MORRIS:  And we can take the one
7    down from the screen and put up Number 10
8    for everybody.
9           (Exhibit 10 marked.)
10   Q.   And I don't know if you have ever
11   seen this before, but I'm really putting it up
12   on the screen for purposes of turning to the
13   very last page of the document.
14          So this is a document that we have
15   been – that we premarked as Exhibit 10.  And
16   we're turning to the last page of the document,
17   which is a document that was filed in the
18   adversary proceeding 21-3004.  And – no, I
19   apologize, I think we – right there.  Perfect.
20          And it is page 31 of 31.
21          MR. MORRIS:  I think there may have
22   been some something erroneously stapled to
23   the hard copy that I gave you folks, but
24   I'm looking for page 31 of 31 in the
25   document that begins with the first page of

1          WATERHOUSE - 10-19-21
2     Exhibit 10.
3     Q.   Do you have that, Mr. Waterhouse?
4     A.   I don't have it yet.  I'm looking.
5     Q.   All right.  If you look at the top
6  right-hand corner, you will see it says page
7  hopefully something of 31?
8     A.   Yes, I've got it now.
9     Q.   Okay.  You have got 31 of 31.  You
10 can take a moment to read that, if you would
11 like.
12    A.   (Reviewing document.)  Okay.
13    Q.   Have you ever seen this before?
14    A.   I don't know if I have seen this
15 specific document, but, you know, I've --
16 I'm -- I'm aware of it.
17    Q.   And is this the document that you
18 had in mind when you sent that email to
19 Ms. Thedford that we just looked at where you
20 said that Highland had agreed not to make a
21 demand upon HCMFA until May 2021?
22    A.   Honestly, I don't -- it wasn't this
23 document.  I mean, it's something like this,
24 yes.  I mean, yes.
25    Q.   Well --

1          WATERHOUSE - 10-19-21
2     A.   It is something like this, but I
3  don't think it was this specific document.
4     Q.   Well, but this document does say in
5  the last sentence that Highland agreed not to
6  seek -- not to demand payment from HCMFA prior
7  to May 31, 2021; right?
8     A.   Yes.
9     Q.   And are you aware of any other
10 document that was ever created pursuant to
11 which Highland agreed not to demand payment on
12 amounts owed by HCMFA before May 31, 2021?
13    A.   Hold on.  Are you asking, am I aware
14 of a document that by HCMFA that basically says
15 otherwise?
16    Q.   No.  Let me try again.
17         Are you aware of any other document
18 pursuant to which -- pursuant to which Highland
19 agreed not to make a demand on HCMFA until May
20 31st, 2021?
21    A.   I'm -- I think there was something
22 in connection with -- with the -- with the
23 audit that basically says the same thing.
24    Q.   Okay.  And do you think that the
25 audit is referring to this particular document?

1          WATERHOUSE - 10-19-21
2     A.   I don't know.
3     Q.   All right.  This document is dated
4  April 15, 2019.  Do you see that?
5     A.   I do.
6     Q.   And do you remember that the audit
7  was completed on June 3rd, 2019?
8     A.   Yes.
9     Q.   And do you recall that the audited
10 financials -- and I'm happy to pull them up if
11 you would like, but do you recall that the
12 audited financials included a reference to the
13 agreement pursuant to which Highland agreed not
14 to make a demand until May 31st, 2021?
15    A.   Yes, I remember.
16    Q.   And as part of the process, would
17 you have expected the corporate accounting team
18 to have provided a copy of this document to
19 PwC?
20         MS. DANDENEAU:  Objection to form.
21    A.   Yes, I would have expected something
22 like this, or again, you know, some document
23 that basically states -- states the deferral
24 till May 31 of 2020.
25    Q.   Okay.

1          WATERHOUSE - 10-19-21
2     A.   May 31 of 2021, excuse me.
3     Q.   And this document states the
4  deferral that you just described; correct?
5     A.   It does.
6     Q.   And this document states the
7  deferral that was described in the audited
8  financial statements that we looked at before;
9  correct?
10    A.   It does.
11         MR. MORRIS:  Okay.  Can we scroll
12         down just a little bit to see who signed on
13         behalf of the acknowledgment there.
14    Q.   Okay.  So Mr. Dondero signed this
15 document on behalf of both HCMFA and Highland;
16 do you see that?
17    A.   I do.
18    Q.   Okay.  Did you discuss this document
19 or the -- withdrawn.
20         Did you discuss the concept of the
21 deferral with Mr. Dondero in the spring of
22 2019?
23    A.   I think I testified I don't recall.
24    Q.   Okay.  Do you know whose idea it was
25 to issue the acknowledgment in this form?

Page 202

WATERHOUSE - 10-19-21

1           WATERHOUSE - 10-19-21
2     A.   I don't recall.
3          MR. MORRIS:  Can we scroll back up
4     to the document, please.
5     Q.   Do you see in the beginning it says,
6     reference is made to certain outstanding
7     amounts loaned from Highland to HCMFA for
8     funding ongoing operations.
9          Do you see that?
10    A.   Yes.
11    Q.   And were you aware as the CFO of
12    Highland and as the treasurer of HCMFA that as
13    of April 15, 2019, Highland had made certain
14    loans to HCMFA to fund HCMFA's ongoing
15    operations?
16    A.   Yes.
17    Q.   And were you aware that those loans
18    were payable on demand and remained outstanding
19    as of December 31st, 2018?
20    A.   Yes.
21    Q.   And were you aware that those
22    amounts were payable on demand, and they
23    remained outstanding as of April 15, 2019?
24         MS. DEITSCH-PEREZ:  Object to the
25    form.

Page 203

1           WATERHOUSE - 10-19-21
2     A.   Well, this -- this document dated
3     April 15, 2019 says they have been deferred to
4     May 31, 2021.
5     Q.   Right.  But I'm just sticking to the
6     first paragraph where they refer to the
7     outstanding amounts.  And in the end it says
8     the -- it remained outstanding on December
9     31st, 2018, and I think you told me that you
10    understood that, and then I'm just trying to
11    capture the last piece of it.
12         Did you understand that there were
13    amounts outstanding from the loan that Highland
14    made to HCMFA to fund ongoing operations as of
15    April 15th, 2019?
16    A.   Yes.
17    Q.   Thank you.  Let's look at the next
18    sentence.  HCMFA expects that it may be unable
19    to repay such amounts should they become due
20    for the period commencing today and continuing
21    through May 31st, 2021.
22         Do you see that?
23         MS. DANDENEAU:  Objection to form.
24    A.   I do.
25    Q.   As the CFO -- withdrawn.

Page 204

1           WATERHOUSE - 10-19-21
2          As the treasurer of HCMFA, did you
3     believe that -- do you believe that statement
4     was true and accurate at the time it was
5     rendered?
6     A.   I mean, it -- it -- the answer to
7     that is I really didn't have any -- I didn't
8     have an opinion really.
9     Q.   Did you do anything to educate
10    yourself in April of 2019 on the issue of
11    whether HCMFA could repay the amounts that it
12    owed to Highland should they become due?
13    A.   I don't believe so.
14    Q.   Did you at any time form any
15    opinions as to HCMFA's ability to repay all
16    amounts due to Highland should they become due?
17    A.   Not really.  I guess I don't...
18    Q.   Well, you told the retail board that
19    HCMFA's liabilities exceeded their assets in
20    2020; correct?
21    A.   Yes.
22    Q.   Based on the work that you did to
23    prepare for the retail board, did you form any
24    view as to whether HCMFA would be unable to
25    repay the amounts that it owed to Highland

Page 205

1           WATERHOUSE - 10-19-21
2     should they become due?
3          MS. DANDENEAU:  Objection to form.
4     A.   I mean, I -- when you look at that,
5     to answer you, completely, you know, again,
6     if -- the response I gave the retail board was,
7     you know, the -- the advice -- HCMFA advisors
8     have the -- have the full faith and backing of
9     Jim Dondero.  So I didn't form an opinion of
10    whether the advisor could pay it or not.
11    Q.   Did you form any view as to whether
12    the advisors could repay the amounts that it
13    owed to Highland should they become due without
14    the full faith and backing of Mr. Dondero?
15         MS. DANDENEAU:  Objection to form.
16         MS. DEITSCH-PEREZ:  Form.
17    A.   I mean, if you -- if you -- if you
18    take that last statement out, I mean, it would
19    be difficult for HCMFA to pay back demand notes
20    at that time.
21    Q.   And it was precisely for that reason
22    that you told the retail board that -- that the
23    retail -- that the advisors had the full faith
24    and backing of Mr. Dondero; correct?
25         MS. DANDENEAU:  Objection to form.

**Appx. 00251**

Page 206

WATERHOUSE - 10-19-21

1
2    A.   I mean, yes, as the mouthpiece, I
3  was relaying information.
4    Q.   Okay.  And you relayed that
5  information with the knowledge and approval of
6  Mr. Dondero; correct?
7         MS. DEITSCH-PEREZ:  Object to the
8  form.
9    A.   As I stated in the email, I don't
10  believe, and I think I testified I don't
11  believe I had conversations with Mr. Dondero at
12  the time of that board meeting.
13    Q.   Did you tell the retail board that
14  the advisors had the full faith and backing of
15  Mr. Dondero without Mr. Dondero's prior
16  approval?
17    A.   Yeah, I -- I -- yes, I'm -- like I
18  said, I think I testified earlier, I'm sure I
19  qualified it as well.
20    Q.   What do you mean by that?
21         MS. DANDENEAU:  Objection to form.
22    A.   Again -- again, like I said in the
23  email, it has the full faith and backing of Jim
24  Dondero unless that has changed.
25    Q.   Actually that is not what you said,

Page 207

WATERHOUSE - 10-19-21

1  so let's put the email back up.
2    A.   It is -- it is -- it is in the
3  email.
4    Q.   Let's put the email back up.  You
5  didn't say unless it has changed.  You said you
6  believe it hasn't changed; right?
7    A.   Okay.  And to my knowledge that
8  hasn't changed, that is what it says.
9    Q.   That's right.
10    A.   But, again, I mean, that is -- I
11  don't know everything.  And I'm not in every
12  conversation.  I'm not -- to presume that I am,
13  is -- and you have to put myself -- as you
14  started this out, Mr. Morris, I was at home in
15  October of 2020 with COVID -- or, you know,
16  under these COVID times that we described is
17  very difficult.
18         We have all been working at home for
19  really the first time ever, undergoing
20  processes, procedures, control environments
21  that have been untested, and there is poor
22  communication.
23         So I am relaying, as I'm telling you
24  now, what is in the email.  And unless

Page 208

WATERHOUSE - 10-19-21

1  something has changed -- to my knowledge, it
2  hasn't changed, but it could have changed.
3    Q.   When you say that the advisors have
4  the full faith and backing from Mr. Dondero,
5  did you intend to convey that, to the extent
6  the advisors were unable to satisfy their
7  obligations as they become due, Mr. Dondero
8  would do it for them?
9         MS. DANDENEAU:  Object to the form.
10         MS. DEITSCH-PEREZ:  Object to the
11  form.
12         And, John, we have given you a lot
13  of leeway here but this does not seem
14  relevant to this case.  You seem sort of
15  taking a complete sort of diversion into
16  the allegations and the complaint just
17  filed on Friday, and so I would ask you to
18  move on because --
19         MR. MORRIS:  And I will tell you --
20  I will tell you that I have never read that
21  complaint cover-to-cover.  I have nothing
22  to do with the prosecution of those claims.
23  And this issue that we're talking about
24  right now is related solely to the

Page 209

WATERHOUSE - 10-19-21

1  promissory notes that your clients refuse
2  to pay.
3         So I'm going to continue to ask my
4  questions, and I would ask the court
5  reporter to read back my last question.
6         (Record read.)
7         MS. DEITSCH-PEREZ:  And then I
8  believe there were objections to form.
9    Q.   You can answer the question.
10    A.   Yes.
11    Q.   Thank you very much, sir.
12         MR. MORRIS:  Can we go back to the
13  other document, please?
14    Q.   Mr. Waterhouse, do you know if this
15  document was ever shared with the retail board?
16    A.   I don't recall.
17    Q.   Did you ever share it with the
18  retail board?
19    A.   I don't recall.
20    Q.   Did you ever tell the retail board
21  about the substance of this document?
22    A.   I don't recall.
23    Q.   Did you ever tell the retail board
24  that Highland had agreed not to make a demand

Page 210

WATERHOUSE - 10-19-21

1           WATERHOUSE - 10-19-21
2  against HCMFA until May 2021?
3     A.  I don't recall.
4     Q.  Do you know whether anybody on
5  behalf of the advisors ever informed the retail
6  board that Highland had agreed on April 15,
7  2019, not to make a demand against HCMFA under
8  the promissory notes?
9     A.  I don't recall.
10    Q.  Did you instruct Ms. Thedford or
11  anybody else responding to the retail board's
12  15(c) inquiry to disclose this document?
13    A.  Did I instruct Ms. Thedford or
14  anyone else to -- to -- to produce this, to
15  disclose this document?  Is that what you -- I
16  just want to make sure.
17    Q.  Uh-huh.
18    A.  Yeah, I don't -- I don't recall.
19    Q.  Did you instruct anybody to inform
20  the retail board, in response to their question
21  as part of the 15(c) process, to -- to tell the
22  retail board about Highland's agreement not to
23  make a demand until 2021?
24       MS. DANDENEAU:  Objection to form.
25    A.  I don't recall.

Page 211

1           WATERHOUSE - 10-19-21
2    Q.  Did you ever inform PwC that HCMFA's
3  liabilities exceeded its assets?
4       MS. DANDENEAU:  Object to the form.
5    A.  I don't -- I don't think I told
6  them.  I mean, they -- they audited the
7  financial statements.
8    Q.  Did -- do you know if anybody on
9  behalf of Highland ever informed
10  PricewaterhouseCoopers that HCMFA may be unable
11  to repay amounts owing to Highland, should they
12  become due?
13       MS. DANDENEAU:  Objection to form.
14    A.  Yes.  Again, I think I testified
15  earlier that -- that this was communicated to
16  the auditors.
17    Q.  Ideally --
18    A.  I don't know who exactly did that.
19  I don't recall doing it, but, yeah, it was --
20  it was communicated.  And that is why -- I
21  mean, there is a disclosure in the financial
22  statements; right?
23    Q.  There is, and that disclosure
24  relates to the last sentence of this document;
25  correct?

Page 212

1           WATERHOUSE - 10-19-21
2    A.  Yes.
3    Q.  Do you recall looking in the
4  document and seeing anything that was disclosed
5  with respect to the sentence above that?
6    A.  No.
7    Q.  Do you know whether anybody on
8  behalf of Highland ever informed
9  PricewaterhouseCoopers that HCMFA expects that
10  it may be unable to repay amounts due and owing
11  to Highland should they become due?
12       MS. DEITSCH-PEREZ:  Object to the
13    form.  I think that is the third time.
14    A.  I don't recall.  Again, as I said,
15  we -- all of this was given to the auditors.
16    Q.  Do you know if Highland received
17  anything of value in exchange for its agreement
18  not to demand payment on amounts owed by HCMFA
19  prior to May 31st, 2021?
20       MS. DEITSCH-PEREZ:  Object to the
21    form.  That is the second time.
22       MS. DANDENEAU:  Object to the form.
23    A.  I have answered this question.
24       MR. RUKAVINA:  Hold on.  Object to
25    legal conclusion.  Go ahead.

Page 213

1           WATERHOUSE - 10-19-21
2    A.  I have answered this question
3  before.
4    Q.  And the answer was no?
5    A.  I'm not aware.
6    Q.  Now, this acknowledgment can't
7  possibly apply to the two notes that you signed
8  on behalf of HCMFA because those notes were
9  signed on May 2nd and May 3rd, 2019; is that
10  right?
11       MS. DANDENEAU:  Objection to form.
12    A.  Unless there is a drafting error.
13    Q.  Okay.  Are you aware of a drafting
14  error?
15    A.  I'm not aware.  I didn't -- I wasn't
16  part of -- I didn't sign this note or this
17  acknowledgment.  I didn't draft it.
18    Q.  But you do see it is dated April 15,
19  2019; right?
20    A.  Yes.
21    Q.  And this was a document that was
22  actually included by the advisors in a pleading
23  they filed with the Court; right?
24       MR. RUKAVINA:  Well, I don't know
25    that so I object to form.

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Let's go to the first page of
3    the document and just confirm that.
4         MR. AIGEN:  Mr. Morris, I just note
5    that you already said there was some error
6    with the document that is listed as
7    exhibit –
8         MR. MORRIS:  No.  No, no, no.
9         MS. DEITSCH-PEREZ:  Oh, okay.
10        MR. MORRIS:  What I said is that
11   there is a few pages that were mistakenly
12   stapled to the end of the document.
13        MS. DEITSCH-PEREZ:  Okay.
14        MR. MORRIS:  There is no problem
15   with this document.
16        MS. DEITSCH-PEREZ:  And just so
17   we're clear that the document – the pages
18   that start with defendant's amended answer
19   are not intended to be part of this
20   document?
21        MR. MORRIS:  That's correct.
22        MS. DEITSCH-PEREZ:  And that the –
23   but it is your representation that the rest
24   of the document is – is – is correct
25   because we don't – we don't have any way

WATERHOUSE - 10-19-21

1
2    of verifying that, we're just –
3         MR. MORRIS:  You do, actually.  You
4    could just go to Docket No. 21-3004.
5         MS. DEITSCH-PEREZ:  If you want to
6    stop this deposition so we can go and pull
7    that document up, we're happy to do it.  So
8    I am just asking you for your
9    representation.
10        MR. MORRIS:  Sure.  I gave that.
11        MS. DEITSCH-PEREZ:  Okay.
12   Q.   So do you see that this is a
13   document that was actually filed with the Court
14   by Highland Capital Management Fund Advisors?
15   A.   No.  I get with the first page in
16   the section.  Maybe I'm looking at the wrong
17   thing.  It says, Highland Capital Management.
18   Q.   Don't worry about it.  Don't worry
19   about it.
20   A.   Maybe I went back – okay.
21        MR. MORRIS:  All right.  Can we put
22   up on the screen Exhibit 2.
23        (Exhibit 2 marked.)
24        MR. MORRIS:  I think it is
25   Exhibit 1.

WATERHOUSE - 10-19-21

1
2         MS. DANDENEAU:  I'm sorry, John, did
3    you say Exhibit 2 or Exhibit 1?
4         MR. MORRIS:  It is Exhibit 2 in the
5    binders so it is premarked Exhibit 2.  And
6    now I'm asking – right there – going to
7    Exhibit 1 to the document that was marked
8    as Exhibit 2.
9         MS. DANDENEAU:  Got it.  In the
10   binder there is no –
11        MS. DEITSCH-PEREZ:  There is no
12   Exhibit 1.
13        MR. MORRIS:  All right.  So look at
14   the one on the screen.
15   Q.   Do you see, Mr. Waterhouse, that
16   this is a promissory note dated May 31st, 2017,
17   in the approximate amount of $30.7 million?
18   A.   Yes.
19   Q.   And do you see that the maker of the
20   note is NexPoint?
21   A.   Yes.
22   Q.   And that Highland is the payee; is
23   that right?
24   A.   Yes.
25   Q.   Okay.  And do you see in Paragraph 2

WATERHOUSE - 10-19-21

1
2    this is an annual installment note?
3    A.   Can you scroll down.
4    Q.   Sure.
5         MR. MORRIS:  Can we scroll down –
6    yeah, there you go.
7    A.   Right there, yeah.  Yes.
8         MR. MORRIS:  And can we scroll down
9    to the signature line.
10   Q.   And do you recognize that as
11   Mr. Dondero's signature?
12   A.   Yes.
13   Q.   And is this the promissory note that
14   we talked about earlier where NexPoint had made
15   certain payments in the aggregate amount of
16   about 6 to $7 million against principal and
17   interest?
18   A.   I don't recall discussing the
19   aggregate principal amounts of 6 to $7 million,
20   but – so I don't – I don't recall that prior
21   discussion with those amounts.
22   Q.   All right.  Let's take a look.
23   NexPoint always included this promissory note
24   as a liability on its audited financial
25   statements; right?

Page 218

1        WATERHOUSE - 10-19-21
2     A.   Yes.
3     Q.   And NexPoint had its financial
4  statements audited; isn't that correct?
5     A.   Yes.
6     Q.   And was the process of NexPoint's
7  audit similar to the process you described
8  earlier for Highland and HCMFA?
9     A.   Yes, it is similar.
10    Q.   Okay.
11        MR. MORRIS:  Can we put up
12    NexPoint's audited financials and let
13    everybody know what exhibit number it is,
14    La Asia?
15        MS. CANTY:  It is going to be
16    Exhibit 46.
17        (Exhibit 46 marked.)
18    Q.   And do you see, sir, that we've put
19  up NexPoint Advisors' consolidated financial
20  statements and supplemental information for the
21  period ending December 31st, 2019?
22    A.   Yes.
23    Q.   Did you participate in the process
24  whereby these audited financial statements were
25  issued?

Page 219

1        WATERHOUSE - 10-19-21
2     A.   I didn't participate directly, as
3  I've described before, about the – the team
4  performing the audit.
5     Q.   Do you recall when the audit of
6  NexPoint's financial statements for the period
7  ending December 31st, 2019 was completed?
8     A.   Yes.
9     Q.   And when do you recall it being
10  completed?
11    A.   In January of 2021.
12    Q.   Do you know why the 2019 audit
13  report wasn't completed until January of 2021?
14    A.   Yes.
15    Q.   Why was the NexPoint audit report
16  for the period ending 12/31/19 not completed
17  until January 2021?
18    A.   Because we had to deal with working
19  from home from – with COVID, and on top of all
20  of our daily responsibilities and job duties
21  at – at providing – at Highland providing
22  services to NexPoint, we had to do all of this
23  extra work for a bankruptcy that was filed in
24  October of 2019.
25        MR. MORRIS:  Can we go to the

Page 220

1        WATERHOUSE - 10-19-21
2     balance sheet on page 3?  Okay.  Stop right
3     there.
4     Q.   Do you see under the liabilities
5  section, the last item is note payable to
6  affiliate?
7     A.   Yes.
8     Q.   And is that the note that we just
9  looked at?
10        MS. DANDENEAU:  Objection to form.
11    Q.   Withdrawn.
12        Is that the approximately
13  $30 million note that we just looked at that
14  was dated from 2017?
15        MS. DANDENEAU:  Objection to form.
16    A.   I believe no.
17    Q.   Okay.  You're not aware of any other
18  note that was outstanding from NexPoint to
19  Highland as of the end of the year 2019, other
20  than that one $30 million note; right?
21    A.   I don't recall.
22    Q.   And as of the end of 2019, the
23  principal amount that was due on the note was
24  approximately $23 million; right?
25        MS. DEITSCH-PEREZ:  Object to the

Page 221

1        WATERHOUSE - 10-19-21
2     form.
3     A.   Approximately.
4     Q.   And does that refresh your
5  recollection that between the time the note was
6  executed and the end of 2019, that NexPoint had
7  paid down approximately $7 million?
8     A.   Yes.  If we are just doing the math,
9  yes.
10    Q.   Okay.  Did NexPoint complete its
11  audit from 2020?
12    A.   Sorry, you kind of broke up.  Do
13  NexPoint complete?
14    Q.   The audit of its financial
15  statements for the period ending December 31st,
16  2020?
17    A.   No.
18    Q.   No, it's not complete?
19    A.   No, it is not complete.
20    Q.   Did HCMFA complete its audit for the
21  year ending December 31st, 2020?
22    A.   No.
23        MR. MORRIS:  Can we go to page 15,
24    please, the paragraph at the bottom.
25    Q.   Do you see that NexPoint has

Page 222

WATERHOUSE - 10-19-21

1       included under notes payable to Highland a
2       reference to the amounts that were outstanding
3       as of the year-end 2019 under the note that we
4       looked at just a moment ago?
5           A.   Yes.  Are you talking about the
6       second paragraph?
7           Q.   I'm actually talking about first
8       paragraph.  Do you understand that the first
9       paragraph is a reference to the 2017 note, and
10      the amounts that were -- the principal amount
11      that was outstanding as of the end of 2019?
12          MS. DANDENEAU:  Objection to form.
13      John, do you mean the first paragraph of
14      that page?
15          MR. MORRIS:  No, the first paragraph
16      under notes payable to Highland.
17          A.   Yeah, I see the paragraph, and
18      again, this is what I answered earlier.  I
19      believe so, just because I don't -- again, this
20      is a number in a balance sheet, and without
21      matching it up and seeing the detail with the
22      schedule like I kind of talked about for
23      Highland's financial statements, it is a little
24      bit more difficult to tie everything in

Page 223

WATERHOUSE - 10-19-21

1       perfectly together.
2           Q.   Okay.  But you're not aware of any
3       note that was outstanding at the end of 2019
4       from NexPoint to Highland other than whatever
5       principal was still due and owing under the
6       $30 million note issued in 2017; correct?
7           A.   Well, it -- I don't -- there is
8       reference in the second paragraph.  I don't --
9       I don't -- I don't recall what that is
10      referring to, so I don't -- I don't know.
11          Q.   Well, if you listen carefully to my
12      question, right, I'm asking about notes that
13      were outstanding at the end of 2019, and if we
14      look at the paragraph you just referred to, it
15      says that during the year there were new notes
16      issued totaling $1.5 million, but by the end of
17      the year, no principal or interest was
18      outstanding on the notes.
19          Do you see that?
20          A.   Oh, I do, yes.
21          Q.   So does that refresh your
22      recollection that there were no notes
23      outstanding from NexPoint to Highland other
24      than the principal remaining under the original

Page 224

WATERHOUSE - 10-19-21

1       $30 million 2017 note that we looked at a
2       moment ago?
3           A.   Well, we're at the bottom of the
4       page.  Is there anything on page 16?
5           Q.   That is a fair question, sure.  That
6       is it.
7           A.   Okay.  So it appears that that is
8       the only note that is detailed in the notes in
9       the financial statement.
10          Q.   And you don't have any memory of any
11      other note other than the 2017 note, right,
12      being outstanding as of the end of the year?
13          A.   I deal with thousands of
14      transactions every year.  I don't really have a
15      very specific memory for what exactly was
16      outstanding.
17          MR. MORRIS:  Why don't we take a
18      break now.  We've been going for a little
19      while.  It's 3:26.  Let's come back at
20      3:40.
21          VIDEOGRAPHER:  We're going off the
22      record at 3:26 p.m.
23          (Recess taken 3:26 p.m. to 3:39 p.m.)
24          VIDEOGRAPHER:  We are going back on

Page 225

WATERHOUSE - 10-19-21

1       the record at 3:39 p.m.
2           Q.   All right.  Mr. Waterhouse, we -- I
3       don't think we have a lot more here.
4           To the best of your knowledge and
5       recollection, were all affiliate loans and all
6       loans made to Mr. Dondero recorded on
7       Highland's books and records as assets of
8       Highland?
9           MS. DANDENEAU:  Object to the form,
10      asked and answered.
11          A.   To my knowledge, yes.
12          Q.   Okay.  Can you recall any loan to
13      any affiliate or Mr. Dondero that was not
14      recorded on Highland's books and records as an
15      asset?
16          A.   Like during my time as CFO?  I don't
17      recall.
18          Q.   How about after the time that you
19      were CFO?  Did you recall that there was a loan
20      by Highland to an affiliate or to Mr. Dondero
21      that hadn't been previously recorded on
22      Highland's books as an asset?
23          MS. DANDENEAU:  Objection to form.
24          A.   I guess I don't understand the

Page 226

WATERHOUSE - 10-19-21

1    question.  I left Highland as of – I'm not
2
3    aware of – I left Highland in February –
4    probably the last day of February of 2021.
5        Q.   Okay.
6        A.   I'm not – I'm not aware of any –
7    I'm not aware of anything past that date.
8        Q.   Okay.  While you were the CFO at
9    Highland, did Highland prepare in the ordinary
10   course of business a document that reported
11   operating results on a monthly basis?
12       A.   Yes.
13       Q.   And are you generally familiar with
14   the monthly operating reports?
15       A.   Yeah.  You are referring to the
16   reports that we filed to the Court every month?
17       Q.   I apologize, I'm not.  I'm taking
18   you back to the pre-petition period.  There was
19   a report that I have seen that I'm going to
20   show you, but I'm just asking for your
21   knowledge.
22           MR. MORRIS:  Let's put it up on the
23   screen, Exhibit 39.
24           (Exhibit 39 marked.)
25       Q.   Do you see this is a document that

Page 227

WATERHOUSE - 10-19-21

1    is called operating results?
2
3        A.   Yeah, that's the title of it.
4        Q.   Okay.  And was a report of operating
5    results prepared by Highland on a monthly basis
6    during the time that you served as CFO?
7        A.   No.
8        Q.   Are you familiar with a document of
9    this type?  And we can certainly look at the
10   next page or two to refresh your recollection.
11       A.   I'm just looking at the title.  I
12   don't really – again, as I discussed before, I
13   don't have any records or documents or emails
14   or appointments or anything that I was able to
15   use prior to – prior to this deposition, so
16   I'm doing the best I can.
17       Q.   Okay.  You don't need to apologize.
18   I'm just asking you if you are familiar with
19   the document called Operating Results that was
20   prepared on a monthly basis at Highland?
21           MS. DEITSCH-PEREZ:  Object to the
22   form.
23       Q.   If you're not, you're not.
24       A.   I don't believe this was prepared on
25   a monthly basis.

Page 228

WATERHOUSE - 10-19-21

1        Q.   Okay.  Do you see that this one
2
3    is – is dated February 2018?
4        A.   Yes.
5        Q.   Do you have – do you believe –
6    have you ever seen a document that was
7    purporting to report operating results for
8    Highland?
9            MS. DANDENEAU:  Objection to form.
10       A.   Yes.
11       Q.   Okay.  And when you say that you
12   don't believe it was produced on a monthly
13   basis, was it produced on any periodic bases to
14   the best of your recollection?
15       A.   I believe it was – it was prepared
16   on an annual basis.
17       Q.   Okay.
18           MR. MORRIS:  Can we look at the next
19   page.
20       Q.   Do you see that there is a statement
21   here called:  Significant items impacting
22   HCMLP's balance sheet?
23           And it is dated February 2018.
24       A.   Yes.
25       Q.   Do you recall that there was a

Page 229

WATERHOUSE - 10-19-21

1    report that Highland prepared that identified
2
3    significant items impacting the balance sheet?
4        A.   A report that was prepared.
5        Q.   Let me ask a better question:  Did
6    Highland prepare reports to the best of your
7    recollection that identified significant items
8    that impacted its balance sheet?
9        A.   Well, so Highland prepared a – a
10   monthly close package.  And maybe I'm
11   getting – and – and maybe change names at one
12   time or maybe I'm just – again, just
13   misremembering – but in that, yes, there is a
14   page that would detail just changes in – you
15   know, just changes month over month on the
16   balance sheet.
17       Q.   Okay.  And maybe it is my fault.
18   Maybe I didn't know the proper name for it.
19   But let's use the phrase "monthly close
20   package."
21           Did Highland prepare a monthly close
22   package in the ordinary course of business
23   during the time that you served as CFO?
24           MS. DANDENEAU:  Objection to form.
25       A.   Yes.

Page 230

WATERHOUSE - 10-19-21

1
2    Q.   And did the monthly close package
3    that Highland prepared include information
4    concerning significant items that impacted
5    Highland's balance sheet?
6    A.   Yes, it had a page like that is –
7    that is on the screen that detailed items
8    like – of that nature.
9    Q.   And do you know who – was there
10   anybody at Highland who was responsible for
11   overseeing the preparation of the monthly
12   reporting package?
13   A.   That would have been – again, it
14   varies over time during my tenure as CFO.
15   It – it varied over – over time, but – but
16   typically a – a corporate accounting manager.
17   Q.   And who were the corporate
18   accounting managers during your tenure as CFO?
19   A.   It would have been Dave Klos and
20   Kristin Hendrix.
21   Q.   And did the corporate accounting
22   manager deliver to you drafts of the monthly
23   close package before it was finalized?
24   A.   Sometimes.
25   Q.   Was that the practice even if there

Page 231

WATERHOUSE - 10-19-21

1    were exceptions to the practice?
2    A.   The practice meaning that they
3    sometimes lured them to me?
4    Q.   That that was the expectation even
5    if circumstances prevented that from happening
6    from time to time.
7    MS. DEITSCH-PEREZ:  Object to the
8    form.
9    A.   I – I would say it started out that
10   way but over the years it – it was not
11   enforced.
12   Q.   Okay.  So you were – you reviewed
13   and approved monthly – monthly reporting
14   packages for a certain period of time and then
15   over time you stopped doing that.
16   Do I have that right?
17   MS. DANDENEAU:  Objection to form.
18   A.   Yes, I mean, if you're talking about
19   a formal meeting where we sit down and go
20   through and approve it.  I would say that was
21   standard practice a decade – you know, early
22   on.  And as time went on that – that – that
23   practice wasn't followed.
24   Q.   Okay.
25

Page 232

WATERHOUSE - 10-19-21

1
2    A.   And, quite frankly, I don't even
3    know if these were – these were sent to me
4    even in any capacity.
5    Q.   What was the purpose of preparing
6    the monthly reporting package – withdrawn.
7    What was the purpose of preparing
8    the monthly close package?
9    MS. DEITSCH-PEREZ:  Object to the
10   form.
11   A.   The – the original purpose was so
12   that it would just – it would be a report that
13   was reviewed monthly with senior management.
14   Q.   Who was included in the idea of
15   senior management?
16   A.   You know, I think originally when
17   this was conceived that would have been like
18   Jim Dondero and Mark Okada.
19   Q.   Were monthly reporting – withdrawn.
20   Were monthly close packages prepared
21   to the best of your knowledge until the time
22   you left Highland?
23   A.   To my knowledge – I don't know,
24   actually.  I mean, to my knowledge, I believe
25   it was being – that was still being done.  I

Page 233

WATERHOUSE - 10-19-21

1
2    don't know because, again, I wasn't reviewing
3    them.  I hadn't reviewed a close package for –
4    for a long time.  But I believe the standard
5    practice that was still being carried out.
6    Q.   Did you ever have any discussions
7    with the debtor's independent board concerning
8    any promissory notes that were issued by any of
9    the affiliates or Mr. Dondero?
10   A.   I can't – I can't – I can't recall
11   specifically.
12   Q.   Did you speak with the independent
13   board from time to time?
14   A.   Yes, from – from – from time to
15   time I had discussions with the independent
16   board members, you know, either – either, you
17   know, by themselves or wholly, you know, as –
18   as a – as a combined work.
19   Q.   Okay.  Before we talk about
20   Mr. Seery, do you recall ever having a
21   conversation with Mr. Nelms or Mr. Dubel
22   concerning any promissory note that was
23   rendered by one of the affiliates or
24   Mr. Dondero to Highland?
25   A.   I don't recall any conversations

**Appx. 00258**

Page 234

WATERHOUSE - 10-19-21

1    specifically.
2        Q.   Do you know if the topic was ever
3    discussed, even if you don't remember it
4    specifically?
5        MS. DANDENEAU:  Objection to form.
6        A.   It – it – it may have.  I don't
7    know.  I don't recall.
8        Q.   Do you recall ever discussing any
9    promissory note issued by any of the affiliates
10   or Mr. Dondero with James Seery?
11       A.   I don't – I don't recall
12   specifically.
13       Q.   Do you recall generally ever
14   discussing the topic of promissory notes issued
15   by any of the affiliates or Mr. Dondero to
16   Highland with Mr. Seery?
17       A.   Nothing – nothing is really jumping
18   out at me.
19       Q.   Do you recall if you ever told
20   Mr. Seery that any of the affiliates or
21   Mr. Dondero didn't have an obligation to pay
22   all amounts due and owing under their notes?
23       A.   I don't recall having that
24   conversation.

Page 235

WATERHOUSE - 10-19-21

1        Q.   Did you ever tell Mr. Seery that you
2    had any reason to believe that the amounts
3    reflected in the notes issued by the affiliates
4    and Mr. Dondero were invalid for any reason?
5        A.   I don't – I don't recall.
6        Q.   Did you tell Mr. Dondero – did you
7    tell Mr. Seery that you thought the promissory
8    notes issued by the advisors and Mr. Dondero
9    that were outstanding as of the petition date
10   were assets of the estate?
11       A.   I don't recall having a specific
12   conversation about those – you know, those
13   notes outstanding as -- as of the petition date
14   being assets on the estate.  I mean, we put
15   together – you know, they're in the books and
16   records of the financial statements.  I don't
17   recall having a specific conversation.
18       Q.   Did you ever prepare any documents
19   that were delivered to Mr. Seery that concerned
20   the promissory notes issued by any of the
21   affiliates or Mr. Dondero?
22       MS. DANDENEAU:  Objection to form.
23       A.   Did I produce any that concerned –
24   you mean did I just – did I give Mr. Seery

Page 236

WATERHOUSE - 10-19-21

1    anything that – that said I have concerns over
2    these notes?
3        Q.   No.  Let me try again.  Maybe it was
4    my question.
5        Did you ever give Mr. Seery any
6    information concerning any of the notes that
7    were issued by any of the affiliates or
8    Mr. Dondero?
9        MS. DANDENEAU:  Objection to form.
10       A.   I don't recall if I did or not.  I
11   don't – I don't remember.  I mean, you have my
12   emails.  You may have asked.  Again, I don't –
13   I don't know.
14       MR. MORRIS:  Can we put up the
15   document that has been premarked as Exhibit
16   39?
17       MS. DANDENEAU:  John, that is this
18   document, isn't it?
19       MR. MORRIS:  Oh, yeah, it might be,
20   as a matter of fact.  Let's go to Number
21   40.
22       (Exhibit 40 marked.)
23       Q.   During the bankruptcy,
24   Mr. Waterhouse, did you prepare documents that

Page 237

WATERHOUSE - 10-19-21

1    were filed with the bankruptcy court?
2        A.   I didn't – I didn't prepare them
3    personally.
4        Q.   Did people prepare them under your
5    direction?
6        A.   Yes.  There were members of the team
7    that prepared them, and they worked in – you
8    know, there were members of DSI that were
9    involved in the process as well.
10       Q.   To the best of your knowledge, did
11   DSI rely on the employees of Highland for the
12   information that they used to prepare the
13   bankruptcy filings?
14       A.   Yes.  The books and records were
15   with the Highland personnel.
16       Q.   Okay.  And do you see on the screen
17   here, there is a document that we have marked
18   as Exhibit 40 that is – that is titled Summary
19   of Assets and Liabilities?
20       A.   Uh-huh.
21       Q.   Okay.  And do you recall reviewing
22   any summary of assets and liabilities before it
23   was filed with the bankruptcy court?
24       A.   Yes, I recall reviewing this at a

Page 238

WATERHOUSE - 10-19-21

1 high level.

2 Q. And did you believe that it was

3 accurate at the time it was filed?

4 A. I didn't have any other reason to

5 believe otherwise.

6 Q. Okay. Do you see that the total

7 value of all properties listed in Part 1 is

8 approximately $410 million?

9 MS. DEITSCH-PEREZ: Objection to

10 form.

11 A. Yes, it is in 1c.

12 Q. Yes.

13 A. Yes, I see that.

14 Q. Okay. If we go to the second page,

15 now I think I may just have excerpts here, just

16 so everybody is clear, but if we scroll down to

17 the second page, you will see that there is

18 a – a little further. There you go. You will

19 see there is a reference to Item 71, notes

20 receivable.

21 Do you see that?

22 A. I do.

23 Q. And that was a reference to the

24 notes receivable from the affiliates and

---

Page 239

WATERHOUSE - 10-19-21

1 Mr. Dondero, among others; is that right?

2 MS. DANDENEAU: Objection to form.

3 A. Yes. The affiliate notes and the

4 Dondero notes were in this amount, but they

5 weren't – again, like you said, and among

6 others.

7 Q. Okay. We will look at the

8 specificity because I'm not playing gaming

9 here, but do you know if the $150 million of

10 notes receivable was included within the

11 $410 million of total value of the debtor's

12 assets?

13 MS. DANDENEAU: Objection to form.

14 A. I – I – I believe so.

15 Q. Right. And so is it fair to say

16 that as of the date this document was prepared,

17 the notes receivable were more than one-third

18 of the value of the debtor's assets?

19 MS. DEITSCH-PEREZ: Object to the

20 form.

21 MS. DANDENEAU: Object to the form.

22 A. Again, if you are just taking the

23 math, 150 divided by whatever the $400 million

24 number is above, then yes, you get there.

1 WATERHOUSE - 10-19-21

2 Mr. Dondero, among others; is that right?

3 MS. DANDENEAU: Objection to form.

4 A. Yes. The affiliate notes and the

5 Dondero notes were in this amount, but they

6 weren't – again, like you said, and among

7 others.

8 Q. Okay. We will look at the

9 specificity because I'm not playing gaming

10 here, but do you know if the $150 million of

11 notes receivable was included within the

12 $410 million of total value of the debtor's

13 assets?

14 MS. DANDENEAU: Objection to form.

15 A. I – I – I believe so.

16 Q. Right. And so is it fair to say

17 that as of the date this document was prepared,

18 the notes receivable were more than one-third

19 of the value of the debtor's assets?

20 MS. DEITSCH-PEREZ: Object to the

21 form.

22 MS. DANDENEAU: Object to the form.

23 A. Again, if you are just taking the

24 math, 150 divided by whatever the $400 million

25 number is above, then yes, you get there.

---

Page 240

WATERHOUSE - 10-19-21

1 Q. Okay.

2 A. You know, but as of the time of this

3 filing, that is what was put in this filing,

4 right, but, you know, I mean, numbers --

5 numbers change, facts and circumstances change.

6 Q. But as the CFO of Highland, the

7 debtor in bankruptcy, did you believe that this

8 number accurately reflected the total amount

9 due under the notes receivable?

10 A. That is what we had in our books and

11 records.

12 Q. Okay. And did you believe as the

13 CFO that the books and records accurately

14 reported the then value of the debtor's assets?

15 MS. DANDENEAU: Objection to form.

16 A. We didn't -- as part of this filing,

17 there was no fair value measurement or

18 anything. These were just accounting entries

19 for the promissory notes. There is no analysis

20 for impairment or fair market value adjustments

21 or anything of that nature. This is purely

22 taking numbers and putting them in our form.

23 Q. Did you do any impairment analysis

24 at any time while you were employed by

1 WATERHOUSE - 10-19-21

2 Q. Okay.

3 A. You know, but as of the time of this

4 filing, that is what was put in this filing,

5 right, but, you know, I mean, numbers --

6 numbers change, facts and circumstances change.

7 Q. But as the CFO of Highland, the

8 debtor in bankruptcy, did you believe that this

9 number accurately reflected the total amount

10 due under the notes receivable?

11 A. That is what we had in our books and

12 records.

13 Q. Okay. And did you believe as the

14 CFO that the books and records accurately

15 reported the then value of the debtor's assets?

16 MS. DANDENEAU: Objection to form.

17 A. We didn't -- as part of this filing,

18 there was no fair value measurement or

19 anything. These were just accounting entries

20 for the promissory notes. There is no analysis

21 for impairment or fair market value adjustments

22 or anything of that nature. This is purely

23 taking numbers and putting them in our form.

24 Q. Did you do any impairment analysis

25 at any time while you were employed by

---

Page 241

WATERHOUSE - 10-19-21

1 Highland?

2 A. Yes, we did do impairment analysis

3 on -- on assets.

4 Q. Okay. Did you ever do an impairment

5 analysis on any of the promissory notes that

6 were given to Highland by any of the affiliates

7 or Mr. Dondero?

8 A. Not that I recall.

9 Q. Under what circumstances do you

10 prepare impairment analyses?

11 A. As – as – if you're preparing

12 financials in accordance with GAAP, generally

13 accepted accounting principles, if you're

14 preparing full GAAP financials, you should be

15 preparing -- you should be undergoing on a

16 periodic basis any fair market value

17 adjustments to assets.

18 As I was instructed at the time of

19 the petition date, we weren't producing GAAP

20 financials. So this wasn't something I was

21 worried about nor concerned about.

22 Q. Okay. Were NexPoint and HCMFA and

23 Highland's audited financial statements

24 prepared in accordance with GAAP?

1 WATERHOUSE - 10-19-21

2 Highland?

3 A. Yes, we did do impairment analysis

4 on -- on assets.

5 Q. Okay. Did you ever do an impairment

6 analysis on any of the promissory notes that

7 were given to Highland by any of the affiliates

8 or Mr. Dondero?

9 A. Not that I recall.

10 Q. Under what circumstances do you

11 prepare impairment analyses?

12 A. As – as – if you're preparing

13 financials in accordance with GAAP, generally

14 accepted accounting principles, if you're

15 preparing full GAAP financials, you should be

16 preparing -- you should be undergoing on a

17 periodic basis any fair market value

18 adjustments to assets.

19 As I was instructed at the time of

20 the petition date, we weren't producing GAAP

21 financials. So this wasn't something I was

22 worried about nor concerned about.

23 Q. Okay. Were NexPoint and HCMFA and

24 Highland's audited financial statements

25 prepared in accordance with GAAP?

---

Page 242

WATERHOUSE - 10-19-21

1    A.    The audited financials -- yes,
2    audited financial statements are prepared in
3    accordance with GAAP.
4    Q.    Do you recall whether any of
5    Highland or HCMFA or NexPoint ever made a fair
6    market value adjustment to any of the notes
7    issued by any of the affiliates or Mr. Dondero
8    to Highland?
9    A.    I do not recall that happening, but
10   the -- it is because under -- under GAAP,
11   the -- the treatment of liabilities is
12   different than assets.
13   Q.    Okay.  So then let's just focus on
14   Highland's audited financial statements.
15        The last audited financial
16   statements were for the period ending December
17   31st, 2018; correct?
18   A.    That is my understanding.
19   Q.    And you had -- you had an obligation
20   to disclose anything to PricewaterhouseCoopers
21   concerning any subsequent events between the
22   end of 2018 and June 3rd, 2019; correct?
23        MS. DANDENEAU:  Objection to form.
24        MS. DEITSCH-PEREZ:  Form.
25

Page 243

WATERHOUSE - 10-19-21

1    A.    Correct.
2    Q.    Okay.  To the best of your
3    knowledge, as Highland's CFO, did Highland ever
4    make any fair market value adjustments to any
5    of the promissory notes that were carried on
6    its balance sheet and that were issued by any
7    of the affiliates or Mr. Dondero?
8    A.    I think I answered that question
9    earlier.  I don't recall doing that for any of
10   the -- those -- those notes.  So it would have
11   included the audit for the -- for the 2018
12   period.
13   Q.    Okay.
14        MR. MORRIS:  Can we go to the next
15   page.
16   Q.    Do you see this is a note a list of
17   notes receivable?  Do you see that?
18   A.    Yes, I do.
19   Q.    And do you see that this ties into
20   the page that we were just looking at?
21   A.    I'm sorry, can we go back to the
22   prior page?  I mean, it was at 150,331,222.  It
23   was on the prior page.  Next page.  Yes, it
24   agrees.
25

Page 244

WATERHOUSE - 10-19-21

1    Q.    Okay.  So now let's look at that
2    schedule.  So this was the face amount of all
3    of the promissory notes that Highland held at
4    the time this document was filed with the
5    bankruptcy court; right?
6    A.    Yes.
7    Q.    There is a footnote there that says,
8    doubtful or uncollectible accounts are
9    evaluated at year-end.
10        Do you see that?
11   A.    I do.
12   Q.    Okay.  And is it fair to say that as
13   of the year-end 2018, the year before this,
14   that to the extent any of these notes were
15   outstanding at that time, they weren't deemed
16   to be doubtful or uncollectible?
17   A.    Yeah.  For the 2018 audit, there
18   weren't any -- there weren't any adjustments to
19   fair value.
20   Q.    Okay.  And during the bankruptcy, do
21   you recall that Highland subsequently reserved
22   for the Hunter Mountain Investment Trust note?
23   A.    Yes.
24   Q.    Why did Highland -- were you

Page 245

WATERHOUSE - 10-19-21

1    involved in the decision to reserve the Hunter
2    Mountain Investment Trust note?
3    A.    I was not.
4    Q.    Do you know why Highland decided to
5    reserve for the Hunter Mountain Investment
6    Trust note?
7    A.    I don't know yet decision was made.
8    I believe it was made by someone at DSI.
9    Q.    Okay.  I'm just asking if you know
10   why.
11        Did you ever ask anyone why they
12   reserved for that particular note?
13   A.    I don't recall.
14   Q.    Do you know whether the debtor
15   reserved for any other note on this list during
16   the bankruptcy?
17   A.    Again, I don't recall.  I wasn't
18   part of any process of -- again, like any fair
19   value adjustments or anything to that degree.
20   Like I said, a lot of that was done by DSI and
21   it was kind of out of our court.
22   Q.    Okay.  Do you know if any note
23   receivable on this list was ever deemed by the
24   debtor to be doubtful or uncollectible?
25

Page 246

WATERHOUSE - 10-19-21

1
2    A.    I don't -- I don't have a
3    recollection of every filing, so I don't know.
4    Q.    Did you ever have a discussion with
5    anybody at any time about whether any of the
6    notes receivable on this list should be deemed
7    to be doubtful or uncollectible?
8    A.    No.  As I previously stated, we were
9    told we didn't have to keep GAAP financials.
10   We weren't having -- you know, there is no
11   underlying audits being performed, so I mean,
12   it wasn't something I worried about.
13   MR. MORRIS:  I move to strike.
14   Q.    Did you ever have a conversation
15   with anybody about any of the notes receivable
16   and whether they should be deemed to be
17   doubtful or uncollectible?  Did you have the
18   conversation, yes or no?
19   MS. DANDENEAU:  Objection to form.
20   A.    I don't recall.
21   Q.    Do you recall ever telling anybody
22   that you believed any of the notes receivable
23   on this list should be doubtful -- should be
24   deemed to be doubtful or uncollectible?
25   MS. DANDENEAU:  Objection to form.

Page 247

WATERHOUSE - 10-19-21

1
2    A.    I don't recall.  I mean, it may have
3    happened, you know, again, when we initially
4    getting DSI up to speed and going through
5    financials, it may have happened, but I don't
6    recall specifically.
7    Q.    While you were the CFO of Highland
8    during the time that the company was in
9    bankruptcy, did you have any reason to believe
10   that any of the notes receivable on this list
11   other than Hunter Mountain Investment Trust
12   should have been characterized as doubtful or
13   uncollectible?
14   MS. DANDENEAU:  Objection to form.
15   MS. DEITSCH-PEREZ:  Form.
16   A.    I didn't know.  I didn't form an
17   opinion.  Bankruptcy was new to me.  It still
18   is new to me, even after going through this.
19   So I really didn't know what to expect nor
20   really -- you know, I didn't know.
21   MR. MORRIS:  I move to strike.
22   Q.    During the period of Highland's
23   bankruptcy when you were serving as CFO, did
24   you have any reason to believe any of the notes
25   on this list were doubtful or uncollectible?

Page 248

WATERHOUSE - 10-19-21

1
2    MS. DEITSCH-PEREZ:  This is like the
3    fifth time you've asked it.  Object to the
4    form.
5    MR. MORRIS:  I'm moving to strike,
6    if you haven't noticed, because he's not
7    answering the question.
8    MS. DEITSCH-PEREZ:  He was answering
9    the question, you just didn't like it, like
10   the answer.
11   MR. MORRIS:  Good Lord.
12   Q.    Go ahead, Mr. Waterhouse.
13   A.    Again, I don't -- we brought up a
14   myriad of issues at the start of the bankruptcy
15   case.  I don't recall if this was one of them,
16   but, again, there are a lot of things we
17   couldn't change.  Even, you know, I was told
18   status quo, blah, blah, blah, right, there is a
19   stay, you can't -- you know, I don't recall
20   specifically, but that doesn't mean it didn't
21   happen.
22   MR. MORRIS:  I move to strike.
23   Q.    During the time that Highland was in
24   bankruptcy and you served as CFO, did you have
25   any reason to believe that any of the notes

Page 249

WATERHOUSE - 10-19-21

1
2    receivable on this list were doubtful or
3    uncollectible?
4    MS. DEITSCH-PEREZ:  Object to the
5    form.
6    A.    Potentially.
7    Q.    Did you ever tell anybody that?
8    A.    As I just stated like five times,
9    yes, we -- at the beginning after filing and we
10   were getting DSI and others up to speed, you
11   know, we had a myriad of discussions of a lot
12   of things and this was likely one of them.  I
13   don't -- but I don't recall specifically we
14   talked --
15   Q.    I don't want to know -- I don't want
16   to know what was --
17   MS. DEITSCH-PEREZ:  Wait, wait.
18   Excuse me.  Mr. Morris, you did not let him
19   finish his answer.
20   A.    I spoke -- we had -- we were
21   bringing Fred Karesa and Brad Sharp (phonetic)
22   up to speed on all of these items, contracts,
23   and investments and going through -- we had
24   hours and hours and hours of discussion.  And
25   then not only do I have to repeat this not

Page 250

WATERHOUSE - 10-19-21

1  once, twice, three, four times with – you
2  know, I mean, we – I don't – I don't remember
3  the sum culmination of all these discussions.
4  They all kind of blend together.
5      MR. MORRIS:  Okay.  I move to strike
6      and I will try one more time.
7      Q.   Did you ever tell anybody at DSI
8  that you believed any of the notes receivable
9  on this list were doubtful or uncollectible?
10     MS. DANDENEAU:  Object to form.
11     A.   Potentially.
12     Q.   Potentially you told them or
13 potentially they were doubtful or
14 uncollectible?
15     A.   Potentially I told them that we
16 needed to look at the value of these – of
17 these assets.
18     Q.   Okay.  Did you – okay.  It is
19 potential that you told them and it is
20 potentially that you didn't; right?
21     MS. DANDENEAU:  Objection to form.
22     A.   I've gone through that.  I don't
23 recall specifically.
24     Q.   So you should just – I don't want
25

Page 251

WATERHOUSE - 10-19-21

1  to tell what you to do.  Do you have –
2      MS. DANDENEAU:  Good.
3      Q.   Other than – other than telling
4  them that they should look at the values, do
5  you have any recollection whatsoever of ever
6  having told anybody at DSI that any of the
7  notes receivable on this page were doubtful or
8  uncollectible?
9      MS. DEITSCH-PEREZ:  Object to the
10     form.
11     MS. DANDENEAU:  Objection.
12     A.   I recall having general discussions
13 about everything on our balance sheet which
14 would have included these – these notes
15 receivable.
16     Q.   Okay.
17     A.   I don't recall specifically where
18 those discussions delved into.
19     Q.   Do you recall any discussion at all
20 on the topic of whether any of these notes on
21 this list were doubtful or uncollectible?
22     MR. AIGEN:  Mr. Morris, how on earth
23     is that question different from the
24     question that you just asked for the last
25

Page 252

WATERHOUSE - 10-19-21

1  five times?  I mean, really I thought you
2  were – (overspeak.)
3      MR. MORRIS:  Because he never
4  answered it.
5      MS. DEITSCH-PEREZ:  Are you
6  listening to him?
7      MR. MORRIS:  You know –
8      MS. DEITSCH-PEREZ:  He basically
9  said that he had a conversation with DSI
10 that went over all of this stuff and that
11 conversation could have included the notes
12 but he doesn't recall specifically.
13     What more do you want him – to ask
14 of him?
15     MR. MORRIS:  I want him – I would
16 love him to say – I would like him to
17 testify to the truth, and that is he has no
18 recollection.
19     MS. DEITSCH-PEREZ:  Well, the truth
20 as you would like to see it, but – but he
21 is testifying truthfully.  And I – and, by
22 the way, I move to strike that comment –
23     MR. MORRIS:  Okay.
24     MS. DEITSCH-PEREZ:  – because it
25

Page 253

WATERHOUSE - 10-19-21

1  suggests that he has not testified
2  truthfully.
3      MR. MORRIS:  I will ask my question
4  again.  And if at any time you want to
5  direct him not to answer, that is your
6  prerogative.
7      Q.   Mr. Waterhouse, do you have any
8  recollection at all of ever telling anybody
9  from DSI that any of these notes were doubtful
10 or uncollectible?
11     MS. DANDENEAU:  Object to form.
12     A.   I don't remember specifically.
13     Q.   Do you remember generally that
14 specific topic?
15     A.   We generally talked about assets,
16 values.  If – we had discussions of that and
17 collectability in nature.  I mean, of Highland,
18 the funds, the CLOs, the entire complex.  We
19 had discussions like that, which is, you know,
20 as you look at a billion dollar consolidated
21 balance sheet.
22     So I generally remember – this is
23 billions of dollars, including these assets –
24 having discussions of this – of this type.
25

Appx. 00263

Page 254

1          WATERHOUSE - 10-19-21
2     Q.   Do you believe that an affiliate
3   loan on this list was doubtful or
4   uncollectible?  Would you have told that to
5   DSI?
6          MS. DANDENEAU:  Objection to form.
7          MS. DEITSCH-PEREZ:  Object to form.
8     A.   If we had, like -- again, if we --
9   if -- if we weren't preparing financial
10  statements in accordance with GAAP, and -- you
11  know, if DSI at that point -- they were --
12  again, I was new to bankruptcy.
13         The CRO is -- we are delegating
14  everything to the CRO.  All the decisionmaking.
15  Remember -- remember when you and I went into
16  Delaware Court and we were saying DSI basically
17  does everything, remember this, Mr. Morris?
18         You were my counsel at the time, and
19  basically we're running everything through DSI.
20  That was what this was like in the early part.
21         Everything was communicated through
22  DSI.  So DSI says this.  DSI says that.  That
23  is what we're doing, and we're pointing out
24  things to them.
25         Now, they decide what direction this

Page 255

1          WATERHOUSE - 10-19-21
2   goes.
3     Q.   Did you point out that any of
4   these --
5     A.   I don't recall specifically.
6     Q.   Okay.  At any time that you served
7   as Highland's CFO, did you ever point out to
8   DSI that any of these loans were doubtful or
9   uncollectible?
10         MS. DEITSCH-PEREZ:  Object to the
11  form.
12         MS. DANDENEAU:  Objection.
13    A.   If you're asking me if I had a
14  conversation with DSI, if any of these loans
15  were doubtful or uncollectible, I don't recall
16  specifically.
17    Q.   Do you recall that the debtor filed
18  on the docket monthly operating reports?
19    A.   Yes.
20    Q.   You prepared those personally,
21  didn't you?
22         MS. DEITSCH-PEREZ:  Objection to
23  form.
24    A.   I didn't personally prepare them,
25  the team did with DSI.

Page 256

1          WATERHOUSE - 10-19-21
2     Q.   But you signed them; correct?
3     A.   My signature is on the MORs.
4     Q.   And you signed them as the preparer
5   of the document; correct?
6     A.   Yes, I did this pursuant to DSI's
7   instructions.
8     Q.   Okay.  You wouldn't have signed the
9   document if you didn't believe it to be
10  accurate; correct?
11    A.   If I had reason to believe it
12  wasn't, presumably I wouldn't have signed it.
13    Q.   Okay.  And do you have any reason to
14  believe right now that any monthly operating
15  report that has your signature on it was
16  inaccurate in any way?
17         MS. DEITSCH-PEREZ:  Object to the
18  form.
19    A.   My understanding of the monthly
20  operating reports is we were filing them in
21  accordance with the standards set by the Court.
22  It wasn't -- you know, again, I don't -- you
23  know, it wasn't GAAP.  It was these other
24  standards, so I testified I didn't have
25  experience in this.  The CRO was running the

Page 257

1          WATERHOUSE - 10-19-21
2   show.  I followed their advice.
3     Q.   But you assured yourself that
4   everything in the report was accurate before
5   you signed them; correct?
6          MS. DANDENEAU:  Objection to form.
7     A.   I trusted the guidance from the CRO
8   and their team and their experience and their
9   guidance for doing this for many, many, many
10  years to -- to -- to categorize and put things
11  in ways on the form.
12         You know, my team had -- had not
13  filled out these forms before and needed all of
14  this guidance.  I'm not an expert in this.  I
15  have oversight of it.  I signed the form.  DSI
16  told me to.
17    Q.   And you and your team are the source
18  of the information that DSI used to create the
19  reports; correct?
20         MS. DANDENEAU:  Objection to form.
21    A.   The books and records reside with
22  the -- with -- with the corporate accounting
23  team.
24    Q.   Okay.  And the corporate accounting
25  team was the corporate accounting team that was

Page 258

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2    under your direction; correct?
3      A.   Yes.
4      Q.   So -- so your team was responsible
5    for maintaining Highland's books and records;
6    correct?
7      A.   I'm sorry, my team was responsible?
8      Q.   Correct.
9      A.   Yes.  They -- they -- they were
10   the -- the -- the general ledger of Highland,
11   that responsibility was with the corporate
12   accounting team.
13     Q.   The corporate accounting group
14   reported to you; correct?
15     A.   Yes.
16         MR. MORRIS:  Can we put up 41,
17     please.
18         (Exhibit 41 marked.)
19     Q.   All right.  You will see that this
20   is a report that is dated January 31st, 2020,
21   but it is for the month ending December 2019.
22         Do you see that?
23     A.   I do.
24     Q.   And you signed this report in your
25   capacity as the chief financial officer of

Page 259

1      WATERHOUSE - 10-19-21
2    Highland; correct?
3      A.   Yes.
4      Q.   And you're the preparer -- you're
5    identified as the preparer of the report;
6    correct?
7      A.   That is correct.
8      Q.   Do you recall participating in the
9    preparation of monthly operating reports?
10     A.   As I testified earlier, it was put
11   together, you know, with the team.  The team
12   worked with DSI to put these monthly operating
13   reports together.  We had no experience at this
14   time of the monthly operating reports or things
15   of this nature.
16         MR. MORRIS:  Can you turn to the
17     next page, please.
18     Q.   Do you see a line item under assets
19   due from affiliates?
20     A.   Yes, I do.
21     Q.   Okay.  And to the best of your
22   knowledge and understanding, as the person who
23   is identified as the preparer of this report,
24   does that line item include the affiliate loans
25   that we've been talking about?

Page 260

1      WATERHOUSE - 10-19-21
2      A.   Again, I would have to see, just
3    like we did with the financial statements of
4    Highland and NexPoint, I would have to see a
5    detailed build, but, you know, if you look at
6    the other line items, you know, the only other
7    place it could be would be in -- in other
8    assets.
9      Q.   Okay.  And as a matter of
10   arithmetic, is it fair to say that is the value
11   of the assets due from affiliates was more than
12   25 percent of the value of Highland's total
13   assets as of 12/31/2019?
14         MS. DANDENEAU:  Objection to form.
15     I'm really not doing the mental math
16   right now, so I've been going at this depo for
17   hours, so I'm really not -- you know --
18     Q.   All right.  No problem.
19     A.   -- these are millions of dollars.
20     Q.   Let's look at the Footnote 1,
21   please.  Do you see there is a reference to the
22   Hunter Mountain note?
23     A.   Yes, I see that in Footnote 1.
24     Q.   Okay.  And that's the reserve that
25   was taken against that note?

Page 261

1      WATERHOUSE - 10-19-21
2      A.   Yes, that is what this indicates.
3      Q.   Okay.  And were you aware that the
4    reserve was being taken on that it was?
5      A.   I was -- I was aware, yeah, at some
6    point, yes.
7      Q.   Okay.  And are you aware of any
8    reserve being taken with respect to any other
9    note that was issued in favor of Highland?
10     A.   Again, as I testified, we didn't go
11   through an analysis on -- on -- on the other
12   notes.
13     Q.   Can we turn --
14     A.   I believe -- I believe it says that
15   in Footnote 1, fair value has not been
16   determined with respect to any of the notes.
17         So this footnote -- footnotes, look,
18   there has been no determination.
19     Q.   Okay.  The determination was made in
20   the audited financial statements just six
21   months earlier; right?  We saw that earlier?
22     A.   That was as of 12/31/18.  I mean,
23   things -- circumstances -- there's a bank --
24   circumstances change, things change -- things
25   change over time, you know, facts and

**Appx. 00265**

Page 262

1        WATERHOUSE - 10-19-21
2   circumstances change. Again, you have to do an
3   analysis.
4        Q.   Okay.  And you do recall that in
5   Highland's 2018 financial statement, all of the
6   notes issued by affiliates and Mr. Dondero that
7   were due at year-end had a fair value equal to
8   the carrying value; correct?  We looked at
9   that?
10       A.   Yes.  That was in the -- in the
11  disclosure for the -- for the affiliate notes,
12  yes.
13       Q.   And -- and you were obligated to
14  share with PwC any subsequent events between
15  the end of 2018 and the date that you signed
16  your management representation letter on June
17  3rd, 2019; correct?
18       MS. DEITSCH-PEREZ:  Object to the
19  form.
20       A.   Yes.  I -- I -- I signed the
21  management, you know, my signature is in the
22  management representation letter -- I hope I'm
23  answering your question -- that is dated in
24  June with the representations made in that
25  management representation letter.

Page 263

1        WATERHOUSE - 10-19-21
2        Q.   Okay.  And there was nothing that
3   caused PricewaterhouseCoopers to include in
4   subsequent events any adjustment to the
5   conclusion that the fair value of the affiliate
6   notes and the notes issued by Mr. Dondero
7   equaled the carrying value; correct?
8        MS. DANDENEAU:  Objection to the
9   form.
10       A.   That is correct.  That is what was
11  in the -- in the -- in the footnotes.
12       Q.   Okay.  So are you aware of anything
13  that occurred between June 3rd, 2019 and
14  December 31st, 2019 that would have caused the
15  fair value of the notes to differ from the
16  carrying value?
17       A.   Yeah.  Highland filed for
18  bankruptcy, things changed -- I mean, there was
19  a bankruptcy filed in October of -- of -- of
20  2019, right, the petition date that we've
21  described earlier.
22       I mean, I had a -- I guess looking
23  back naively, I thought we were going to get an
24  audit from PwC for year-ended 2019, and when we
25  had discussions with PwC, they were like, are

Page 264

1        WATERHOUSE - 10-19-21
2   you crazy, we're not auditing this.  Values
3   change, all these things change, bankruptcy
4   changes the entire scenario.  I mean -- and
5   they're like, we're not -- we're not touching
6   this.
7        And so, you know, I was like, okay,
8   sorry, I get it, okay, no an audit.
9        I mean, it is -- you know, and --
10  you know, and we weren't preparing GAAP
11  financial statements.
12       Again, I didn't know what we were
13  doing in relation to our financial statements,
14  but these were the discussions I was having at
15  the time.  And yeah, I mean, filing bankruptcy
16  from what I got from outside auditors and
17  others involved changed things dramatically.
18       Q.   Okay.  Highland wasn't the obligor
19  under any of the notes that we're talking
20  about; correct?
21       A.   No.
22       Q.   So --
23       A.   That's right.
24       Q.   So can you identify any fact that
25  would cause the fair value to deviate from the

Page 265

1        WATERHOUSE - 10-19-21
2   carrying value during the seven-month period
3   between June 3rd and the end of the year, 2019?
4        MS. DANDENEAU:  Objection to form.
5        A.   No.  I mean, I'm putting myself back
6   at that time, right.  Hindsight is 2020, but we
7   didn't do an analysis, but we would have done a
8   fulsome analysis and looked at all of the facts
9   and circumstances at the time, but asset values
10  change.  You know, there could have been a
11  market crash in hindsight in 2020, which --
12  which affected entities' abilities.
13       There could have been all of these
14  things, right, that -- that happen.  It is --
15  it is easy to look back in hindsight, but when
16  you are looking at this in -- in realtime, the
17  analysis is different, and again, we didn't do
18  an analysis.
19       Q.   Okay.  You didn't do an analysis.
20       Do I have that right?
21       A.   I don't -- I don't recall doing one
22  or maybe -- you know, I don't recall doing one.
23       MR. MORRIS:  Okay.  I'm going to
24  take a break.  I may be done, so the time
25  now is -- is 4:30 your time.  Let's just

Page 266

```
1              WATERHOUSE - 10-19-21
2    take a short break until 4:40 your time.
3         MS. DANDENEAU:  Okay.
4         VIDEOGRAPHER:  We're going off the
5    record, 4:31 p.m.
6    (Recess taken 4:31 p.m. to 4:43 p.m.)
7         VIDEOGRAPHER:  We are back on the
8    record at 4:43 p.m.
9         MR. MORRIS:  I have no further
10   questions.
11        MR. RUKAVINA:  Okay.
12   Mr. Waterhouse, I will go next.
13             EXAMINATION
14   BY MR. RUKAVINA:
15        Q.   Sir, my name is Davor Rukavina.  I'm
16   the lawyer for --
17        MR. MORRIS:  Hey, Davor, just before
18   you begin, I just want to put on the record
19   Highland's objection to documents that were
20   produced to me 10 minutes before the
21   deposition began.
22        MR. RUKAVINA:  What the basis of
23   your objection?
24        MR. MORRIS:  That they were due
25   quite some time ago, and the fact that you
```

Page 267

```
1              WATERHOUSE - 10-19-21
2    had -- I just think it's appropriate to --
3    to dump documents on somebody 10 minutes
4    before the deposition.  I just think
5    that's --
6         MR. RUKAVINA:  Well, these are
7    documents Highland produced.  I'm not aware
8    of any rule I have to give you advance
9    documents when I know for the record that
10   other than the exhibits that you sent to us
11   last week, most of the exhibits you used
12   today you did not provide to me prior to
13   this deposition.
14        MR. MORRIS:  No, but the documents
15   were produced by me in -- in litigation,
16   right?
17        MR. RUKAVINA:  I'm going to use
18   primarily, John, the documents that you
19   produced to me today, but you may.
20        MR. MORRIS:  Primarily.  I've got --
21   I've got my objection.  You have got your
22   response.  Proceed.
23        Q.   Mr. Waterhouse, again, I represent
24   the advisors, HCMFA and NexPoint Advisors.
25        Do you understand that?
```

Page 268

```
1              WATERHOUSE - 10-19-21
2         A.   Yes.
3         Q.   You and I have never met or talked
4    before today, have we?
5         A.   No, I have -- I have heard your
6    voice on calls before.
7         Q.   Okay.
8         MR. RUKAVINA:  Madam Court Reporter,
9    I will use a few exhibits today.  My
10   associate, Mr. Nguyen, will find some way
11   to get them to you.  I don't know how to do
12   that, but it looks like you guys do.
13        I am going to use numbers as well.
14   But to differentiate them from Mr. Morris
15   we're going to mark mine with the prefix A
16   for advisors.
17        Do you understand?
18        COURT REPORTER:  Yes.
19        MR. RUKAVINA:  Okay.  Perfect.
20        Q.   Okay.  So, Mr. Waterhouse, let's
21   start with those two HCMFA notes that you were
22   asked about, one for 5 million and one for
23   2.4 million.
24        Do you recall those notes?
25        A.   Yes.
```

Page 269

```
1              WATERHOUSE - 10-19-21
2         Q.   Were you ever the CFO of HCMFA?
3         A.   I don't recall.
4         Q.   So to the best of your recollection,
5    you were still an officer of HCMFA in 2019,
6    just that your title was treasurer?
7         MR. MORRIS:  Object to the form of
8    the question.  There is no leading here.
9    He works for your client.
10        MS. DANDENEAU:  That is not -- that
11   is not true.
12        MR. MORRIS:  He's the treasurer --
13   he is the treasurer of your client.  I
14   don't -- I'm going to object every time you
15   try to lead, so...
16        MR. RUKAVINA:  Totally fine to
17   object.
18        MR. MORRIS:  Okay.
19        Q.   Please answer my question,
20   Mr. Waterhouse.
21        A.   I'm sorry, could you repeat?  There
22   was...
23        Q.   Yes.  You were -- you testified
24   earlier that in 2019 you were an officer of
25   HCMFA; correct?
```

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2    A.   Yes, I testified that I was the
3 treasurer and I didn't know if that incumbency
4 certificate, you know, was one that appointed
5 me as a treasurer, but yes.
6    Q.   I'm just trying to confirm that
7 sitting here today, to the best of your
8 recollection, at that time you were – your
9 title was treasurer.  It was not chief
10 financial officer.
11    A.   I don't recall that being my title.
12    Q.   Okay.  And in May of 2019, however,
13 I think you testified you were the chief
14 financial officer of the debtor; correct?
15       MR. MORRIS:  Objection to the form
16    of the question.
17    A.   Yes, I was – yes.
18    Q.   Okay.  As such, in May of 2019, did
19 you have the authority, to your understanding,
20 to unilaterally loan $5 million or $2.4 million
21 to anyone on behalf of the debtor?
22       MR. MORRIS:  Objection to the form
23    of the question.
24    A.   Sorry, can you repeat that?
25    Q.   Yes.  So in your capacity as the

1          WATERHOUSE - 10-19-21
2 chief financial officer of the debtor, Highland
3 Capital Management, L.P., in May of 2019, did
4 you believe that you unilaterally, just Frank
5 Waterhouse, had the authority to loan on behalf
6 of the debtor to anyone $5 million and
7 $2.4 million?
8       MR. MORRIS:  Objection to the form
9    of the question.
10    A.   No.
11    Q.   Is it because loans of that amount
12 would have had to be approved by someone else?
13    A.   Yes.
14    Q.   Who in '20 – in May of 2019, if
15 Highland wanted to loan 5 million or
16 $2.4 million to someone, what would have been
17 the internal approval procedure?
18       MR. MORRIS:  Objection to the form
19    of the question.
20    A.   If – if we had loans of that nature
21 that needed to be made due to their size, we
22 would have gotten approval from the – the
23 president of Highland.
24    Q.   And who that was individual?
25    A.   It was James Dondero.

1          WATERHOUSE - 10-19-21
2    Q.   Okay.  Now, I'm going to ask you a
3 similar question but for a different entity.
4      In May of 2019, as the treasurer of
5 HCMFA, did you believe that you unilaterally
6 had the ability to cause HCMFA to become the
7 borrower of a $5 million loan and a
8 $2.4 million loan?
9       MR. MORRIS:  Objection to the form
10    of the question.
11    A.   No.
12    Q.   What would – what would the
13 approval have taken place – strike that.
14      What would the approval process have
15 been like in May of 2019 at HCMFA for HCMFA to
16 take out a $7.4 million loan?
17       MR. MORRIS:  Objection to the form
18    of the question.
19    A.   The process would have been similar
20 to what we just discussed on – for Highland to
21 make a loan to others.  So, again, you know,
22 we – we would have – either myself or someone
23 on the team would have discussed this with
24 the – the president and owner of – of HCMFA.
25    Q.   And who was that individual?

1          WATERHOUSE - 10-19-21
2    A.   That was James – Jim Dondero.
3    Q.   So do I understand that in May of
4 2019, on behalf of both the lender, Highland,
5 and the borrower, HCMFA, Mr. Dondero would have
6 had to approve $7.4 million in loans?
7       MR. MORRIS:  Objection to the form
8    of the question.
9    A.   Yes.
10    Q.   You mentioned when Mr. Morris was
11 asking you the NAV error, N-A-V error, with
12 respect to TerreStar, without writing us a
13 novel, unless you feel like you have to, can
14 you summarize what that NAV error was?  What
15 happened?
16    A.   There was a – in the Highland
17 Global Allocation Fund, it owned at the time an
18 equity interest in a company called TerreStar.
19 And TerreStar is – at the time was a private
20 company, and it may still be today.  Again, I'm
21 putting myself back then as a private company.
22      We had – sorry, I don't mean we –
23 the fund and the advisor Houlihan Lokey
24 to – value that investment.  And during
25 that time there was some trades that were

Page 274

1          WATERHOUSE - 10-19-21
2    executed at market levels that were much lower
3    than the Houlihan Lokey model.
4          And based on information and
5    discussions with the portfolio managers and,
6    you know, principals that were very familiar
7    with TerreStar, it was determined that those
8    trades were non-orderly and they were not
9    considered in the valuation as consulted with
10   Houlihan Lokey and PricewaterhouseCoopers at
11   the time.
12         Subsequent to a -- I can't remember
13   the exact circumstances of why the SEC got
14   involved.  I think it was due to this -- this
15   investment became a material position in the
16   fund.  It triggered an SEC, kind of, inquiry.
17   And as part of that inquiry, they questioned
18   the valuation methodology.  "They" meaning the
19   SEC.
20         And at the culmination of that
21   process -- this is all summarized -- the value
22   that was -- that ultimately had to be used in
23   the fund's NAV was different than -- materially
24   different than what the original valuation at
25   Houlihan Lokey provided.

Page 275

1          WATERHOUSE - 10-19-21
2          And given that there was this fund
3    was, as we discussed -- I don't know if we
4    discussed it, but it was an open-ended fund
5    that was going -- that was converting to a
6    close-end fund.
7          Due to the fact that it was an
8    open-ended fund, you had to recalculate NAV and
9    see what the impact was on people -- on
10   investors coming in and out of the fund and if
11   there is a detrimental impact and to calculate
12   what that -- what that impact was and if there
13   was any amounts owed to the fund pursuant to
14   the error.
15     Q.   Were you personally involved
16   internally at either Highland or HCMFA with
17   these investigations and discussions with the
18   SEC?
19     A.   I was.
20     Q.   Which other key people or senior
21   people at Highland were involved, to your
22   recollection?
23     A.   Myself, Thomas Surgent, David Klos,
24   Lauren Thedford, Jason Post.
25     Q.   Mr. Dondero, was he --

Page 276

1          WATERHOUSE - 10-19-21
2     A.   I believe Cliff Stoops.  I'm trying
3    to think.  And maybe that is -- that is -- that
4    is -- that is all kind I can recall at the
5    moment.
6     Q.   Do you recall whether it was
7    determined that the fund suffered losses as a
8    result of this error?
9     A.   The -- the fund -- the -- the --
10   because the open-ended nature of the fund,
11   there were losses that were attributable to
12   investors.  Meaning they -- they would have
13   redeemed and got a less money or -- or they
14   subscribed in and maybe because they didn't get
15   enough shares and then they later sold and then
16   they were harmed in that fashion.
17         And there is -- there is -- there
18   were very -- there were very detailed
19   calculations, and you know, all these different
20   scenarios that we had to -- I'm sorry, I keep
21   saying "we" -- that the individuals involved
22   had to calculate and quantify.
23     Q.   Well, do you recall whether HCMFA
24   admitted certain fault and liability for this
25   error?

Page 277

1          WATERHOUSE - 10-19-21
2     A.   I don't recall specifically.
3     Q.   Do you recall whether HCMFA caused
4    any funds to be paid to the investors and the
5    fund the subject of the NAV error?
6     A.   Yes.
7     Q.   Do you recall the approximate amount
8    of funds, moneys paid to the investors and the
9    fund?
10    A.   It was -- it was approximately
11   $7 million.
12    Q.   If I was to suggest 7.8 million,
13   would that ring more true or are you sticking
14   with your original answer?
15    A.   It was -- it was approximately 7 --
16   7 to $8 million.  Again, I don't remember the
17   exact number, but it was in that ballpark.
18    Q.   So regardless of whether HCMFA
19   accepted fault or liability, it caused some
20   $7 million or more to be paid out to affected
21   investors in the fund?
22         MR. MORRIS:  Objection to the form
23   of the question.
24    A.   And I want to make sure I'm
25   understanding your question because there is a

WATERHOUSE - 10-19-21

1   lot of different entities that are going on to
2   my head.
3       I think what you are saying is based
4   on this error, shareholders were harmed by this
5   approximately $7.8 million -- by approximately
6   $7.8 million.  Is that what you are asking?
7       Q.  Yes, sir.
8       A.  Yes, that was -- again, I don't have
9   the exact numbers.  If I take -- it was -- it
10  was in that ballpark, and there is a detail
11  calculation and write-up that could, that --
12  that exists someplace.
13      Q.  Now, at that time, at the time that
14  the NAV error occurred, was there a contract in
15  place between HCMFA and the debtor pursuant to
16  which the debtor was providing services to
17  HCMFA?
18      MR. MORRIS:  Objection to the form
19  of the question.
20      A.  Yes.
21      Q.  Was that contract generally called a
22  shared services agreement?
23      A.  It was generally called that, but
24  there were -- there were -- I mean, it -- it --

WATERHOUSE - 10-19-21

1   it depends on who you talk to, but yes,
2   generally, there were -- there are multiple
3   agreements.
4       Q.  Pursuant to one or more of those
5   agreements, was the debtor providing certain
6   services to HCMFA?
7       MR. MORRIS:  Objection to the form
8   of the question.
9       A.  Yes.
10      Q.  And can you at a very high level
11  summarize in 2018 and 2019 what those services
12  were?
13      A.  Yes, there was a -- yes.
14      Q.  Okay.  Please -- please go -- go
15  through a short summary.
16      A.  There was a -- a cost reimbursement
17  agreement between Highland Capital Management
18  Fund Advisors and Highland Capital Management,
19  L.P.  That agreement was for what we referred
20  to as front office services, so investment
21  management, things of that nature.
22      There was I think what most people
23  refer to as the shared services agreement that
24  was -- that agreement was between Highland

WATERHOUSE - 10-19-21

1   Capital Management Fund Advisors and Highland
2   Capital Management for back office services.
3       Q.  And can you summarize what you mean
4   by back office services?
5       A.  Those services were for accounting,
6   finance, tax, valuation, HR, IT, you know,
7   legal compliance, things of -- things of those
8   nature -- or things of that nature, excuse me.
9       Q.  So in the spring of 2019, do you
10  recall whether HCMFA took the position that it
11  was actually Highland that caused the NAV error
12  to occur pursuant to the valuation services
13  that Highland was providing?
14      MR. MORRIS:  Objection to the form
15  of the question.
16      A.  I do not recall.
17      Q.  Did you ever have any discussions
18  with anyone, Jim Dondero or anyone in the first
19  half of 2019 as to whether Highland, the
20  debtor, that is, had any liability to HCMFA
21  related to the NAV error?
22      MR. MORRIS:  Objection to the form
23  of the question.
24      A.  I do not recall.

WATERHOUSE - 10-19-21

1       Q.  And then you mentioned that the fund
2   was being closed and some compensation related
3   to that.  Can you -- can you elaborate?  What
4   were you referring to?
5       A.  Right.  So the advisor, pursuant to
6   board approval, put a proposal in front of the
7   shareholders of the Highland Global Allocation
8   Fund to convert it from an open-ended fund to a
9   closed-end fund.
10      So an open-ended fund, when
11  shareholders subscribe to the fund or redeem
12  into the fund, they do it at NAV.
13      When it is -- when you have a
14  closed-end fund, closed-end funds are -- are
15  publicly-traded, like on the New York Stock
16  Exchange, exchanges like that, and -- and
17  shareholders or investors, they're not --
18  they're -- they're not subscribing and
19  redeeming with the fund.  They are like shares
20  of Apple.
21      Those shares of the Highland Global
22  Allocation Fund trade on an exchange, and that
23  is how you, you know, that is how you, you know,
24  you become an equity owner in the fund or you

Page 282

WATERHOUSE - 10-19-21

1
2  sell your shares and you are no longer an
3  equity owner.
4         As part of that proposal, the
5  advisor told shareholders if you -- if you vote
6  for this proposal to -- to convert it from an
7  open-ended fund to a closed-end fund, we will
8  pay you some amounts of money.  I forgot -- a
9  certain number of points.  I think it was
10 like -- it was like two to three points or
11 something -- something like that.
12    Q.   Okay.  You mentioned when Mr. Morris
13 was asking you, going back to those two
14 promissory notes, you will recall the 5 million
15 and 2.4 million, you mentioned something to the
16 effect that Mr. Dondero told -- told you to pay
17 some moneys out of Highland.  Do you remember
18 that discussion with Mr. Morris?
19    A.   I do.
20    Q.   So, to the best of your
21 recollection, did you have a discussion with
22 Mr. Dondero about making some payments in May
23 of 2019 out of Highland?
24    A.   I recall, as I testified earlier,
25 that I had a conversation with Mr. Dondero

Page 283

WATERHOUSE - 10-19-21

1
2  for -- for these amounts attributable to -- it
3  was either the error -- you know, the error,
4  and in that conversation he said, go get the
5  money from Highland.  I believe that is what I
6  testified earlier, and that -- that is my
7  recollection.
8     Q.   Do you recall if that was an
9  in-person meeting or some other mode for the
10 meeting?
11    A.   I -- I -- I recall that being
12 in-person.
13    Q.   Do you recall if anyone else was
14 present, or was it just you and Mr. Dondero?
15    A.   I recall just he and I.
16    Q.   And the moneys that he told you to
17 find from -- or get from Highland, was that in
18 the amount of $5 million and $2.4 million?
19       MR. MORRIS:  Objection to the form
20 of the question.
21    A.   I believe so, but I would have to go
22 back and look and see when those moneys were
23 actually paid into the -- into the fund and,
24 you know, when those transfers were done.  If
25 they were all done around that same time, then

Page 284

WATERHOUSE - 10-19-21

1
2  yes, I would say it was -- it was all related
3  to that.
4     Q.   Did Mr. Dondero tell you that those
5  funds would be a loan from Highland to HCMFA?
6     A.   I don't recall.
7        MR. MORRIS:  Objection to the form
8  of the question.
9     Q.   Now, and forgive me, I'm probably
10 the only non-American born here, but I speak
11 reasonably well in English.  I don't recall,
12 does that mean you don't remember or does that
13 mean it didn't happen?
14       MR. MORRIS:  Objection to the form
15 of the question.
16    A.   It -- it means I don't -- I don't
17 remember.
18    Q.   Did Mr. Dondero tell you to have
19 those two promissory notes prepared?
20    A.   I don't recall.
21    Q.   When you -- again, when you say, I
22 don't recall today, that means that sitting
23 here today, you just don't remember one way or
24 the other.  Is that accurate?
25    A.   Yes.

Page 285

WATERHOUSE - 10-19-21

1
2     Q.   Is it possible that you, having
3  heard what Mr. Dondero said and seeing funds
4  being transferred, assumed that that would be a
5  loan without him actually telling you that
6  would be a loan?
7        MR. MORRIS:  Objection to the form
8  of the question.
9     A.   Sorry, I want to make sure -- did I
10 ask the amounts that were transferred that I --
11 that I assumed that that was a loan?
12    Q.   Well, let me -- let me take -- let
13 me try again.
14       So you have established already that
15 there were quite a number of promissory notes
16 back and forth -- I'm sorry, quite a number of
17 promissory notes with affiliated companies and
18 individuals owing Highland money; right?
19    A.   Yes.
20    Q.   And you have established that there
21 were many transactions and transfers going back
22 and forth over the years; right?
23       MS. DANDENEAU:  Objection to form.
24    A.   In -- yes, in my capacity as CFO and
25 my employment, yes, that is -- yes.

WATERHOUSE - 10-19-21

1
2    Q.   And that's part of the reason why
3    you just can't remember some of the details
4    today because this -- this happened years ago,
5    and there were a number of transactions.  Is
6    that accurate?
7         MS. DANDENEAU:  Objection to the
8     form.
9         MR. MORRIS:  Objection to the form
10     of the question.
11        A.   I mean, I deal with thousands of --
12    of -- of -- of transactions, you know, whether
13    it has -- the processing of transactions, you
14    know, if it has got, you know, more -- more
15    zeros, you know, behind it than others.
16         When you look at thousands of
17    transactions over the years for funds and
18    advisors and -- and, you know, financial
19    statements, I mean, it is -- it is very hard
20    going back in -- in -- in my -- you know,
21    14-ish year career at -- at Highland to
22    remember a lot of those details, especially
23    when I don't have any records or books or
24    anything like that, and -- and going back many
25    years.

WATERHOUSE - 10-19-21

1
2    Q.   And that is fine.  That -- that --
3    that is why I asked the question.
4         Is it possible in May of 2019 when
5    Mr. Dondero told you to transfer the funds from
6    Highland, you just assumed on your own that
7    those would be loans without him actually
8    telling you that those would be loans?
9         MR. MORRIS:  Objection to the form
10     of the question.
11        A.   I don't know.
12        Q.   I'm sorry, you --
13        A.   I said I don't know.
14        Q.   Okay.  Well, as the -- as the CFO
15    for Highland, if you saw $7.4 million going
16    out, you would feel some responsibility to
17    account for that, wouldn't you?
18         MR. MORRIS:  Objection to the form
19     of the question.
20        A.   Yes.
21        Q.   Is it fair to say that those would
22    be in the range large enough to rise up to your
23    level?
24         MR. MORRIS:  Objection to the form
25     of the question.

WATERHOUSE - 10-19-21

1
2    A.   If -- I don't know if I understand
3    your question.  Those amounts would arise to my
4    level where I would be involved or...
5    Q.   You would want to know what a
6    transfer for that amount, $7.4 million, was all
7    about, as the CFO of Highland, wouldn't you?
8         MR. MORRIS:  Objection to the form
9     of the question.
10        A.   Yes, I make it -- I mean, I -- I
11    review all sorts of payments, I mean, even
12    smaller dollar payments on a periodic basis,
13    you know, to -- to -- to understand and to make
14    sure that we are paying things in a -- you
15    know, in -- in -- in an informed way.  And, you
16    know -- and we're -- and we're paying things
17    pursuant to vendor contracts and things like
18    that.
19        Q.   So as part of that, is it possible
20    that seeing $7.4 million go out you would have
21    promissory notes made in order to keep a paper
22    trail, assuming that those were loans, when
23    perhaps they were never intended to be loans by
24    Mr. Dondero?
25         MR. MORRIS:  Objection to the form

WATERHOUSE - 10-19-21

1
2     of the question.
3    A.   I don't know.  As I testified
4    earlier, I had conversations with Mr. Dondero
5    about -- about the -- the -- the moneys that
6    were needed for the NAV error.  And I recall
7    him saying go get it from Highland -- or get it
8    from Highland.
9    Q.   Well, why did you sign those
10    promissory notes and why didn't you have him
11    sign them?
12         MR. MORRIS:  Objection to the form
13     of the question.
14        A.   I don't know.  I don't know.
15        Q.   You mentioned earlier that you
16    typically don't sign promissory notes.  Am I
17    remembering your testimony correctly?
18         I mean, promissory notes on behalf
19    of the entities.  Not yourself, obviously.
20        A.   Yes, that is what I said earlier.
21        Q.   Do you recall any other promissory
22    notes in the million-plus range that you had
23    ever signed before on behalf of any entity?
24        A.   There is -- there has been a lot of
25    transactions over the years.  I don't -- I

Page 290

```
1           WATERHOUSE - 10-19-21
2   don't -- I don't recall generally.  I don't --
3   I don't recall.
4       Q.   So -- but to the best of your
5   recollection, it was on your initiative,
6   following your discussion with Mr. Dondero,
7   that you had someone draft those two promissory
8   notes; is that correct?
9           MR. MORRIS:  Objection to the form
10      of the question.
11      A.   Yes, we would have -- the team, as I
12  stated earlier, we don't draft promissory
13  notes.  "The team" meaning the accounting and
14  finance team.
15          So the team would have worked with
16  the legal group at Highland to draft any notes.
17      Q.   Do you believe or do you have any
18  recollection as to whether you would have done
19  that pursuant to an email or telephone call or
20  in-person meeting?
21          MR. MORRIS:  Objection to the form
22      of the question.
23      A.   Are you asking if I would have -- if
24  those notes would have been drafted pursuant to
25  an email or phone call?
```

Page 291

```
1           WATERHOUSE - 10-19-21
2       Q.   Strike that.
3           Do you recall whether you sent an
4   email to anyone asking them to draft those two
5   promissory notes?
6       A.   I don't recall because, again,
7   once -- I would have instructed -- likely
8   instructed the team to -- to work with the
9   legal group to draft these documents.
10          I -- I -- I -- yeah, I didn't -- I
11  mean, that is more an operational-type
12  procedure.  So, you know, a manager or a
13  controller or working with legal.  You know,
14  they -- they can certainly handle that task to
15  get that -- you know, to request that from
16  legal.
17      Q.   And who on your team do you think
18  you would have asked to do that?
19          MR. MORRIS:  Objection --
20      Q.   Who would have been the logical
21  person or people, if you don't remember their
22  name today?
23          MR. MORRIS:  Objection to the form
24      of the question.
25      A.   It -- it -- there is only two
```

Page 292

```
1           WATERHOUSE - 10-19-21
2   managers of the group.  That would have been
3   Dave Klos or Kristin Hendrix.
4           Dave was the -- one of his duties
5   was managing the valuation team, and so he was
6   intimately involved with this process.  So, you
7   know...
8       Q.   Okay.
9       A.   I don't recall specifically but, I
10  mean, my general -- you know, I -- I -- I
11  likely would have talked to Dave first about it
12  versus someone like Kristin who hadn't been
13  intimately involved.
14      Q.   And -- and do you have a view as to
15  whether it is most likely that you would have
16  done that by email or in-person or how would
17  you believe you would have communicated that to
18  Mr. Klos?
19          MR. MORRIS:  Objection to the form
20      of the question.
21      A.   I likely would have done that in
22  person.  Again, if things of this nature
23  that -- again, you have to put ourselves back
24  to, we have been working on this very stressful
25  project for many, many months.  And once the
```

Page 293

```
1           WATERHOUSE - 10-19-21
2   go-ahead was to -- you know, we see the light
3   at the end of the tunnel with wrapping this up
4   and making shareholders whole -- sorry to say
5   "we" -- you know, the -- so the folks that are
6   involved in it.
7           I like to talk to people
8   face-to-face and -- and -- and go to -- and go
9   to their desk, because that shows if I'm going
10  to their desk that -- that is something that I
11  want done, you know.
12      Q.   And do you remember, Mr. Waterhouse,
13  getting those two promissory notes in paper
14  format or by email before they were executed?
15          MR. MORRIS:  Objection to the form
16      of the question.
17      A.   I don't recall.
18      Q.   For whatever was the ordinary course
19  back then in May 2019, would you expect to have
20  received them only on paper or would you have
21  expected to have received them in Word document
22  or PDF document by email?
23          MR. MORRIS:  Objection to the form
24      of the question.
25      A.   I -- I didn't sign -- I signed very
```

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2   few documents via email. I can't say that it
3   never happened, but people either stopped by my
4   office and physically walked in documents for
5   signature that we discussed face-to-face.
6           Or documents were -- if -- if --
7   if -- if -- let's say I wasn't there or I
8   wasn't available, documents were dropped off.
9   I had -- I had some in- and outboxes in front
10  of my -- my office there at the Crescent.
11          Documents would be dropped off for
12  signature. There would be a cover sheet that
13  would be -- have been applied to those
14  documents detailing, you know, who dropped it
15  off, the purpose, why, what time.
16          And then, you know, as I stated, I
17  don't draft documents and I always go to the
18  legal group and the compliance group to make
19  sure that they're in the loop. And there is
20  a -- a box or section that says, Has legal
21  reviewed or approved, or something to that
22  nature.
23          Again, I don't -- I don't have
24  access to that cover sheet anymore, but it
25  was -- it was something to that effect.

1   WATERHOUSE - 10-19-21
2           And my assistant, you know, if she
3   was there, she would review that -- you know,
4   whatever was being dropped off. And if that
5   has legal, you know, reviewed or -- reviewed or
6   approved it, if that wasn't -- if that stuff
7   hadn't been done, it was like she would just
8   tell them like, go -- go -- go to the legal
9   group, because --
10  Q.    Let me -- let me pause --
11          MS. DANDENEAU: Let him finish.
12          MR. MORRIS: Thank you. Go ahead.
13  A.    I take -- go to the legal group
14  because that -- that was my -- you know, I
15  didn't -- I didn't review anything that -- that
16  they weren't -- you know, or there wasn't some
17  representation made to me that they had
18  reviewed, approved in some capacity.
19          Again, my -- my -- my goal, as CFO,
20  is to provide transparency and make sure that
21  groups like compliance and other things -- and
22  the other group in legal are -- are in -- you
23  know, their -- they're made aware of
24  transactions of -- you know, that are crossing
25  my desk.

1   WATERHOUSE - 10-19-21
2           Because I'm not in every
3   conversation. They're not in every
4   conversation -- meaning legal compliance -- and
5   I just want to make sure that -- that everyone
6   is in sync to, you know, to -- to the extent
7   possible.
8   Q.    So if we summarize, you don't
9   specifically remember signing these two notes,
10  but most likely it would have been that they
11  would have presented -- been presented to you
12  physically on paper?
13          MR. MORRIS: Objection to the form
14  of the question.
15  A.    They would -- they would have been
16  presented physically on paper most likely or
17  someone would have left it. But, I mean,
18  again, I don't -- I don't recall.
19  Q.    I understand. Understand.
20          When you signed -- when you signed
21  documents, when you personally signed
22  documents, did you typically use a ink pen or
23  did you use a stamp?
24  A.    No, I -- I -- I use a -- an -- an
25  ink pen.

1   WATERHOUSE - 10-19-21
2   Q.    Do you know -- was there a file at
3   Highland kept anywhere with ink-signed
4   originals of a promissory notes in general or
5   these two promissory notes specifically?
6           MR. MORRIS: Objection to the form
7   of the question.
8   A.    Sorry, I just want to make sure I
9   understand your question. Are you saying is
10  there a file somewhere that has ink-signed
11  originals of these two promissory notes?
12  Q.    Yes.
13  A.    I would -- I would assume they're
14  some place. I mean --
15  Q.    Well, was there a -- was there a
16  place where Highland generally kept originals
17  of promissory notes owed to it?
18  A.    I wouldn't -- no.
19          MR. RUKAVINA: Mr. Nguyen, would you
20  please pull up my A7, alpha 7.
21  Q.    These are the two promissory notes,
22  Mr. Waterhouse.
23          (Exhibit A7 marked.)
24  Q.    And please -- Mr. Waterhouse, please
25  command my associate to scroll down as you need

WATERHOUSE - 10-19-21

1 WATERHOUSE - 10-19-21
2 to, but I want you to take a very close look at
3 your two signatures here and tell me whether
4 you believe, in fact, that you ink signed them
5 or whether you --
6   MS. DANDENEAU: Mr. Rukavina,
7 Mr. Waterhouse has the copies.
8   MR. RUKAVINA: Perfect. Then you
9 can take this down, Mr. Nguyen.
10  A. These -- these -- these signatures
11 are identical, now that I stare at them, and I
12 mean, they are so close -- I mean, they're
13 identical that, I mean, even with my chicken
14 scratch signature, I don't know if I can -- you
15 know, I do this 100 times, could I do that
16 as -- as precisely as I see between the two
17 notes.
18  Q. Well, that is why I ask.
19 Mr. Waterhouse, now that you have examined
20 them, does it seem like it is more likely that
21 you actually electronically signed these?
22   MR. MORRIS: Objection to the form
23 of the question.
24  A. Is -- I don't -- I don't recall
25 specifically. As I said before, my assistant

WATERHOUSE - 10-19-21

1 WATERHOUSE - 10-19-21
2 did have a -- an electronic signature, and that
3 was used from time to time. It wasn't as
4 common practice back in 2019. It definitely
5 was more common practice when we had to work
6 from home and remotely for COVID because it
7 that made it almost impossible to, right,
8 provide wet signatures since we're all working
9 from home remotely.
10  Q. Well, going just for these two
11 promissory notes, Mr. Waterhouse, in light of
12 your inability to remember any details, are you
13 sure you actually signed either or both of
14 those notes?
15   MS. DANDENEAU: Objection to form.
16  A. I don't recall specifically
17 signing -- actually physically signing these
18 notes. As I said before, I don't recall doing
19 that. This -- this looks like my signature,
20 but yet these two signatures are identical.
21  Q. So you don't recall physically
22 signing them, and I take it you don't recall
23 electronically signing them either?
24  A. I don't recall. You know, Highland
25 has all my emails. If that occurred, you know,

WATERHOUSE - 10-19-21

1 WATERHOUSE - 10-19-21
2 you know, I don't have any of these records is
3 what I'm saying. I don't have any of those
4 records.
5  Q. That is why I'm asking you these
6 questions in great detail because I don't have
7 those emails. I'm trying to -- I'm hoping that
8 you will give me some names or some details so
9 I can go look for more emails, but again, you
10 don't remember any -- any individual, other
11 than Mr. Dondero that we've discussed, you
12 don't remember any individual with whom you
13 discussed these promissory notes prior to their
14 execution?
15   MR. MORRIS: Objection to the form
16 of the question.
17  A. I don't recall discussing it with
18 anybody else.
19  Q. Okay.
20  A. I mean, prior --
21  Q. I understand.
22  A. You know, there was no one else --
23 there was no one else in that meeting that I
24 recall with Mr. Dondero.
25  Q. Now, when you established that by

WATERHOUSE - 10-19-21

1 WATERHOUSE - 10-19-21
2 May of 2019 --
3  A. And -- and from what I recall, and
4 the reason why I was by myself is -- is, you
5 know, I don't -- I don't want to speculate, I'm
6 sorry.
7  Q. Okay. We have established that by
8 May of 2019, in your view, the liabilities of
9 HCMFA exceeded its assets; correct?
10  A. Yeah. I mean, again, I don't have
11 financial statements in front of me, but I
12 think, if I recall, we'd have to go through the
13 testimony with Mr. Morris, I believe that was
14 the case.
15  Q. In fact, you will recall that in
16 April of 2019, Mr. Dondero signed a document
17 that extended the demand feature of two prior
18 notes to May 31, 2019. Do you recall that?
19   MS. DEITSCH-PEREZ: I think you
20 might -- maybe have the court reporter read
21 that back. You might have misspoke.
22   (Record read.)
23   MR. RUKAVINA: And I did misspeak.
24  Q. I meant to say to May 31, 2021. Do
25 you recall that, sir?

Page 302

```
1         WATERHOUSE - 10-19-21
2         MR. MORRIS:  Objection to the form
3   of the question.
4      A.  Yes.
5         MR. RUKAVINA:  And, Mr. Nguyen, just
6   so that the record is clear, will you please
7   pull up my Exhibit Alpha 10, A10.
8         (Exhibit A10 marked.)
9      Q.  You don't have this one in front of
10  you, Mr. Waterhouse?  This is the one that
11  Mr. Morris used earlier.  Do you see that
12  document, sir?
13     A.  Yes, I do.
14     Q.  And this is what you were testifying
15  about before when Mr. Morris was asking you.
16  Do you remember that?
17     A.  Yes.
18     Q.  So here is my question for you,
19  Mr. Waterhouse:  As the chief financial officer
20  of Highland, was it prudent for Highland less
21  than three weeks later to be lending
22  $7.2 million to an insolvent entity that
23  couldn't even then pay its debts back to
24  Highland?
25         MS. DANDENEAU:  Objection to form.
```

Page 303

```
1         WATERHOUSE - 10-19-21
2         MR. MORRIS:  Objection to the form
3   of the question.
4      A.  Sorry, I just want to make sure --
5   are you asking me, did you say, was it prudent
6   for Highland to loan $7.4 million to HCMFA a
7   few weeks after this document was executed?
8      Q.  Yes, and at a time when HCMFA's
9   liabilities exceeded its assets.
10         MR. MORRIS:  Objection to the form
11  of the question.
12     A.  I don't -- it is odd.  I don't know.
13         MR. RUKAVINA:  You can take this
14  exhibit down, Mr. Nguyen.
15     Q.  Do you recall asking anyone,
16  Mr. Dondero or -- or anyone outside as to
17  whether Highland ought to be lending
18  $7.4 million to HCMF regarding HCMF's
19  creditworthiness?
20         MR. MORRIS:  Objection to the form
21  of the question.
22     A.  I don't recall.
23     Q.  Did you receive personally any of
24  that $7.4 million?
25     A.  No.
```

Page 304

```
1         WATERHOUSE - 10-19-21
2      Q.  Did you even --
3         MR. MORRIS:  I didn't hear that
4   question, sir.
5         MR. RUKAVINA:  The one that he
6   answered, John, or my new one?
7         MR. MORRIS:  No, no, your question,
8   Davor.
9         MR. RUKAVINA:  I had asked him
10  whether he received any of the
11  $7.4 million.  He said no.
12         MR. MORRIS:  Yeah.  I thought there
13  was a question after that.  Maybe I was
14  mistaken.  I apologize.
15         MR. RUKAVINA:  I had started a new
16  question, so here, let me start the new
17  question again.
18     Q.  Did you personally receive any
19  direct benefit from those two notes for
20  $7.4 million?
21     A.  No.
22     Q.  Did you ever personally consider
23  yourself obligated to repay either or both of
24  those notes?
25     A.  No.
```

Page 305

```
1         WATERHOUSE - 10-19-21
2         MR. RUKAVINA:  Pull up those notes
3   again, Mr. Nguyen.
4      Q.  You can have them in front of you,
5   Exhibit 7, Mr. Waterhouse, whatever is easier
6   for you.  If you go to your signature page, my
7   question to you is, why did you not include
8   your title as treasurer by your name, Frank
9   Waterhouse?
10         MS. DANDENEAU:  Objection to form.
11     A.  I didn't -- I didn't draft this
12  document.
13     Q.  So you relied on whoever drafted it
14  to draft it correctly?
15     A.  Yes.
16     Q.  Okay.  But back then when you signed
17  this, did it ever cross your mind that you were
18  the maker on these notes?
19     A.  No.
20     Q.  Back then when you signed this
21  document, did it ever cross your mind that you
22  could be a co-obligor on these notes?
23     A.  No.  I didn't receive $7.4 million,
24  I mean...
25     Q.  But can you say that HCMFA received
```

Page 306

WATERHOUSE - 10-19-21

1  $7.4 million?
2     A.  I would have to go back and look and
3  check in, you know, the -- the financial
4  records and the bank statements.
5     MR. RUKAVINA:  You can take this
6  exhibit down, Mr. Nguyen.
7     Q.  Mr. Waterhouse, I'm not trying to be
8  a smart-ass, but if the law says that because
9  of the way that you signed this promissory
10  note, if that is what the law says, that that
11  made you personally -- personally liable, then
12  you would agree with me that that was never
13  your intent?
14     MR. MORRIS:  Objection to the form
15  of the question.
16     A.  That was never -- I wouldn't sign a
17  note and not get consideration in return.
18     Q.  So putting all other issues aside,
19  if the law -- if the law says that you were
20  liable for those notes because of how you
21  signed them, then would you agree with me that
22  these notes are a mistake?
23     MR. MORRIS:  Objection to the form
24  of the question.

Page 307

WATERHOUSE - 10-19-21

1     MS. DANDENEAU:  Objection to the
2  form.
3     A.  Yes.
4     Q.  So do you agree with me that it's
5  odd -- I think that is the word you used --
6  that Highland would be loaning $7.4 million a
7  few weeks after that extension to an entity
8  whose liabilities exceeded its assets, and you
9  would agree with me that it was never your
10  intention to be in any way liable for these two
11  promissory notes; correct?
12     MR. MORRIS:  Objection to the form
13  of the question.
14     A.  Sorry, you -- you asked a lot there.
15     MR. RUKAVINA:  I will strike it and
16  I will move on.
17     Let's go to -- pull up Exhibit 9,
18  please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha
19  9, A9.
20     (Exhibit A9 marked.)
21     Q.  Sir, take a moment to look at this,
22  but this is an email, and you will see attached
23  July 31, 2020 affiliate notes.
24     Do you see that attachment?

Page 308

WATERHOUSE - 10-19-21

1     A.  Yes.
2     Q.  Okay.  And do you see an entry for
3  Highland Capital Management Fund Advisors?
4     MR. MORRIS:  I'm sorry, hold on.
5  Where are you looking?
6     MR. RUKAVINA:  Last page, John.
7     MR. MORRIS:  Is it the page on the
8  screen?
9     MR. RUKAVINA:  Oh, I'm sorry.
10  Mr. Nguyen just did it.  Yes, the last page
11  there.
12     MR. MORRIS:  Thank you.
13     Q.  Do you see an entry there for HCMFA?
14     A.  Yes.
15     Q.  About $10.5 million.
16     Do you see that?
17     A.  I do.
18     Q.  And, now, do you have any
19  explanation for why if HCMFA owed $7.4 million,
20  plus the 5.3 million that had been extended,
21  why that amount was only 10.5 million?
22     A.  I don't know.  Okay.
23     MR. RUKAVINA:  Close this one and
24  pull up, Mr. Nguyen, the schedules,

Page 309

WATERHOUSE - 10-19-21

1  schedule of assets.  What exhibit is this
2  of ours, Mr. Nguyen?
3     MR. NGUYEN:  This is A11.
4     MR. RUKAVINA:  Oh, this will be A11.
5     (Exhibit A11 marked.)
6     Q.  You don't have this in front of you,
7  Mr. Waterhouse?
8     A.  Okay.
9     Q.  This is what Mr. Morris used
10  earlier.  Do you remember looking at this with
11  Mr. Morris?
12     A.  Yes.
13     MR. RUKAVINA:  You might have to
14  zoom in a little.  Okay.
15     Q.  Now, I see Affiliate Note A, B, and
16  C.
17     Do you have any recollection as to
18  why the names of the affiliates are omitted?
19     A.  I don't.  I testified earlier that,
20  you know, the team worked with DSI in providing
21  these.  I -- I don't -- I don't know.
22     Q.  Can we deduce -- is it logical to
23  deduce that Affiliate Note A would be NexPoint
24  given its size of $24.5 million?

Page 310

```
 1          WATERHOUSE - 10-19-21
 2      MR. MORRIS:  Objection to the form
 3  of the question.
 4      A.   I mean, it -- it is a -- it is -- it
 5  is approximate.
 6      Q.   Well, can we -- can we deduce -- or,
 7  I'm sorry, strike that.
 8          Can you, sitting here today,
 9  logically conclude that Affiliate Note B or C
10  represents HCMFA?
11      MR. MORRIS:  Objection to the form
12  of the question.
13      A.   I don't know.  I don't know.  I
14  can't.
15      Q.   Okay.  As of the petition date, we
16  have established that HCMFA, under promissory
17  notes, owed $7.4 million and $5.3 million to
18  the debtor; correct?
19      MR. MORRIS:  Objection to the form
20  of the question.
21      A.   Yes.
22      Q.   Okay.  And by my reckoning, that
23  would be somewhere approaching $13 million.
24      MR. MORRIS:  Objection to the form
25  of the question.
```

Page 311

```
 1          WATERHOUSE - 10-19-21
 2      Q.   It would be $12.7 million.  Is that
 3  generally correct?
 4      A.   Sorry, the amounts were 7.4, 5.3.
 5      Q.   Yes.
 6      A.   Okay.  Yeah, that -- that -- I can
 7  do that math, yes.
 8      Q.   Do you have any explanation or any
 9  understanding of why there is no similar entry
10  listed here on the schedule of assets filed
11  with the bankruptcy court?
12          MR. MORRIS:  Objection to the form
13  of the question.
14      A.   I don't know.  We have to look at
15  the supporting schedules, like I talked about
16  other -- presumably there is -- there is a
17  build to the schedule that would provide the
18  detail.
19      Q.   Well, that was going to be my next
20  question.  You anticipated it.
21          MR. RUKAVINA:  You can -- you can
22  take this down, Mr. Nguyen.
23      Q.   Do you believe that whenever you and
24  your team provided the underlying data to the
25  financial advisor that the actual names of the
```

Page 312

```
 1          WATERHOUSE - 10-19-21
 2  affiliates for Affiliate Note A, B, and C would
 3  have been listed there?
 4      A.   Are you asking we provided the names
 5  to the financial advisor?  I don't -- I don't
 6  understand who the financial advisor is.
 7      Q.   I'm sorry, DSI.
 8          Let me ask the question this way,
 9  Mr. Waterhouse.
10          Whenever you provided information
11  about the affiliate notes to DSI, do you
12  believe that you would have included the actual
13  names of the affiliates, you or your team, or
14  that you would have done the Affiliate Note A,
15  Note B, Note C?
16      MR. MORRIS:  Objection to the form
17  of the question.
18      MS. DANDENEAU:  Objection to the
19  form.
20      A.   We -- like I testified earlier, when
21  we were -- we gave everything to -- to DSI.  We
22  were giving all of our records, all of our
23  files, everything to DSI.  We weren't redacting
24  information or saying, hey, here is a note,
25  here is Affiliate Note A or B.
```

Page 313

```
 1          WATERHOUSE - 10-19-21
 2          I mean, it was -- our job and our
 3  focus -- and I testified in court back in 2019;
 4  right -- was -- was to be transparent and, you
 5  know, get DSI up to speed on -- on the matters
 6  at Highland.  So I can't see us redacting for
 7  that point.
 8      MR. RUKAVINA:  Mr. Nguyen, will you
 9  please pull up Mr. Morris' Exhibit 36.
10      Just the very first page, the very top
11  email.  You might zoom in a little bit.
12      Q.   Now, you recall being asked about
13  this by Mr. Morris?
14      A.   Yes, I do.
15      Q.   And you wrote:  The HCMFA note is a
16  demand note.
17          You wrote that; right?
18      A.   Yes.
19      Q.   And, in fact, weren't there by that
20  point in time several notes?
21      A.   Yes, there were.  Again, I don't --
22  I don't remember everything specifically.  I
23  mean --
24      Q.   I understand.  I understand.
25          So this is an example where -- where
```

Page 314

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    you might have made a mistake by referring to a
3    singular instead of a plural; right?
4         A.   Yes.
5         Q.   Okay.  And you -- you wrote -- a
6    couple of sentences later, you wrote:  There
7    was an agreement between HCMLP and HCMFA the
8    earliest they could demand is May 2021.
9              You wrote that; right?
10        A.   Yes.
11        Q.   But I think you -- you agreed with
12   Mr. Morris that that can't possibly apply to
13   the May 2019 notes, can it?
14             MR. MORRIS:  Objection to the form
15        of the question.  That is not what he
16        testified to.
17        Q.   Let me ask -- let me ask a different
18   question.
19             Sitting here today -- or if you can
20   answer me from your memory on October 6,
21   2020 -- did the April acknowledgment that
22   extended the maturity date apply to the
23   May 2019 notes also?
24        A.   I don't recall specifically.
25        Q.   Well, you recall that the notes that

Page 315

1    WATERHOUSE - 10-19-21
2    you signed were demand notes; right?
3         A.   Yes.
4         Q.   Do you find it logical, based on
5    your experience, that had they intended to have
6    a different or a set maturity date, you would
7    have instructed that that set maturity date be
8    included instead of a demand feature?
9              MR. MORRIS:  Objection to the form
10        of the question.
11        A.   Sorry, just want to make sure I
12   understand.  You are saying that -- that the
13   $5 million note, the $2.4 million note, if
14   those were supposed to be a term note, that I
15   would have made sure that those were a term
16   note?
17        Q.   I'm saying -- I'm saying,
18   Mr. Waterhouse, that on May the 2nd and May the
19   3rd, 2019, if you intended that those two
20   promissory notes could not be called until May
21   2021, would you have included such language in
22   those two promissory notes?
23             MR. MORRIS:  Objection to the form
24        of the question.
25        A.   I guess -- I'm sorry, I don't recall

Page 316

1    WATERHOUSE - 10-19-21
2    putting language in those May notes.  I don't
3    remember what language you are referring to.
4         Q.   Well, let's read this again.
5              There was an agreement between HCMLP
6    and HCMFA the earliest they could demand is May
7    2021.
8              Do you recall that agreement?
9         A.   Yes, that was the agreement we
10   looked at earlier; correct?
11        Q.   Okay.  Yes.
12             Do you -- do you understand now that
13   that agreement that we looked at earlier also
14   applied to the May 2019 notes that you signed?
15        A.   I don't -- I don't know.
16        Q.   But as of October 6, 2020, you're
17   writing that there is one demand note and
18   you're categorizing that demand note as not
19   being demandable on May 2021; correct?
20        A.   Yes.
21        Q.   And you know now that you made at
22   least one mistake in this email; correct?
23             MR. MORRIS:  Objection to the form
24        of the question.
25        A.   Yes.

Page 317

1    WATERHOUSE - 10-19-21
2             MR. RUKAVINA:  You can pull this
3        down, Mr. Nguyen.
4         Q.   So, Mr. Waterhouse, you don't
5    remember Mr. Dondero telling you to make these
6    loans or not.  HCMLP was loaning $7.4 million
7    to someone that their assets were less than
8    their liabilities.
9              We don't see on the July list of
10   notes, where there is $12.7 million of notes,
11   we don't see that on the bankruptcy schedules,
12   and we have this Exhibit 36 where you are
13   confused.
14             Are you prepared to tell me, sir,
15   today that you might have made a mistake in
16   executing those two promissory notes?
17             MR. MORRIS:  Objection to the form
18        of the question.
19        A.   I -- I don't know.
20        Q.   And if it turns out that you're
21   personally liable for those promissory notes,
22   it would certainly be a mistake, wouldn't it?
23             MS. DANDENEAU:  Objection to the
24        form.
25             MR. MORRIS:  Join.

**Appx. 00279**

Page 318

WATERHOUSE - 10-19-21

1 
2 A. Yes.
3 Q. If Mr. Dondero testifies that he
4 never told you to make these loans, would you
5 disagree with his testimony?
6 MR. MORRIS: Objection to the form
7 of the question.
8 A. Like I testified earlier with my
9 conversation with Mr. Dondero, all I recall is
10 he said, get the money from Highland.
11 Q. And if Mr. Dondero testifies that
12 he, in consultation with other senior personnel
13 at Highland, decided that Highland needed to
14 pay HCMFA $7.4 million as compensation for the
15 NAV error and not a loan, would you have any
16 reason to disagree with Mr. Dondero?
17 MR. MORRIS: Objection to the form
18 of the question.
19 A. If that was -- if that was his
20 intent, yes, it would -- I would --
21 Q. Do you have any reason to disagree
22 with him?
23 MR. MORRIS: Objection to the form
24 of the question.
25 A. If that was his intent, I don't

Page 319

WATERHOUSE - 10-19-21

1 know. I don't know how I disagree with that.
2 
3 Q. And just to confirm, you don't
4 remember ever asking Mr. Dondero whether you
5 should have two promissory notes prepared?
6 A. No.
7 Q. And you don't remember discussing
8 with Mr. Dondero what the terms of those two
9 promissory notes should be?
10 A. I don't recall -- I testified all I
11 recall is he said, get the money from Highland.
12 I don't -- the -- the terms of the note, I
13 don't recall ever having a discussion around
14 the terms of the note, but since I don't draft
15 the notes, that -- there could have been a
16 conversation with other people later.
17 Q. Do you have any memory of whether
18 after the notes were drafted, but before you
19 signed them, that you communicated with
20 Mr. Dondero in any way to just confirm or -- or
21 get his blessing or ratification to signing
22 those notes?
23 MR. MORRIS: Objection to the form
24 of the question.
25 A. I don't recall.

Page 320

WATERHOUSE - 10-19-21

1 
2 Q. Again, the only thing you remember,
3 sitting here today, was Mr. Dondero said, get
4 the money from Highland, and that is it, that
5 is all you remember?
6 MR. MORRIS: Objection to the form
7 of the question.
8 A. I testified to that several times.
9 This was over two years ago. A lot has
10 happened. That is all I recall.
11 Q. And help me here. I'm not very
12 technologically astute. When you -- and I -- I
13 recognize that you do it rarely, but when you
14 sign a document electronically, do you believe
15 that there is an electronic record of you
16 having authorized or signed a document
17 electronically?
18 MR. MORRIS: Objection to the form
19 of the question.
20 A. I -- I don't know the tech answer to
21 that, but, you know, since I don't have -- I
22 don't ever attach my signature block
23 electronically, my assistant would have done
24 that, and if that is done over email like we
25 did several times -- you know, multiple,

Page 321

WATERHOUSE - 10-19-21

1 multiple times over COVID, she would attach my
2 signature block and then email it out to
3 whatever party.
4 Q. What was your assistant's name in
5 May 2019?
6 A. It was Naomi Chisum.
7 Q. Is she the only one? I'm sorry, was
8 she your only assistant that would have maybe
9 facilitated logistically something like you
10 just described?
11 A. You know, she was out on maternity
12 leave at some point. I don't -- I don't recall
13 those dates where she was out for maternity
14 leave. There was -- there were folks backing
15 her up. I don't recall specifically who
16 those -- who those, you know, administrative
17 assistants were, and I don't recall
18 specifically if she was out during this time on
19 maternity leave.
20 I do know that that she was out for
21 a period of time, or who knows, or she could
22 have been on vacation that day or, you know, I
23 don't know.
24 Q. Switching gears now, the two

**Appx. 00280**

Page 322

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2  complaints that have been filed that is against
3  HCMFA and NexPoint, did you see any drafts of
4  those complaints before they were filed?
5      MR. MORRIS:  Objection to the form
6      of the question, and to the extent that you
7      had any communications with counsel or you
8      were shown drafts of the complaints by
9      counsel while you were employed by
10     Highland, I direct you not to answer.
11     A.   I -- I reviewed documents yesterday
12  with counsel here.  I believe that is the first
13  time I have ever seen those.
14     Q.   Okay.  Did you ever discuss with
15  Mr. Seery these two lawsuits before or after
16  they were filed?
17     A.   I don't recall.
18     Q.   Were you ever interviewed by legal
19  counsel, to your knowledge, about these
20  promissory notes before the complaints were
21  filed?  Without going into what was said, were
22  you ever interviewed by legal counsel?
23     MR. MORRIS:  Objection to the form
24     of the question.
25     A.   I don't recall.

Page 323

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2      Q.   Obviously with COVID, it changed,
3  but -- but before COVID, did you used to meet
4  with Mr. Seery from time to time in-person?
5      A.   Yeah, I mean, so before COVID -- so
6  we're talking kind of late March, early April,
7  right, there was about -- I don't remember the
8  specific date when the board for Highland was
9  appointed.  I believe it was around February of
10 2020, so maybe there was a month-and-a-half,
11 two-month window where we were meeting
12 in-person or, you know, like we were actually
13 in the office, excuse me, we were in the
14 office.
15     And, you know, when they were first
16 appointed, the board members and Mr. Seery
17 were -- were definitely down here more
18 in-person.
19     Q.   Did you ever see Mr. Seery taking
20 written notes of -- of his meetings with you or
21 others?
22     A.   I don't recall.
23     Q.   Do you recall on any Zoom or video
24 conference with Mr. Seery, seeing him take
25 notes, written notes?

Page 324

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2      A.   The Zoom calls we had, I don't
3  recall having seen video or, you know, or if it
4  was on Zoom, I just remember it being -- well,
5  no, you know what, there were some -- you know,
6  I take that back.
7      So there were -- there were some
8  times that I did remember seeing Mr. Seery
9  on -- on some of the Zoom calls.
10     Q.   Well, let me --
11     A.   I don't -- sorry, I'm thinking.  I'm
12  thinking -- I'm going back.  I'm trying to
13  process this.
14     Q.   I can make it much quicker,
15  Mr. Waterhouse.  I have heard -- I have heard
16  that Mr. Seery is a copious note taker.
17     Do you have any knowledge about
18  that?
19     A.   No.
20     Q.   Okay.  Switching gears yet again,
21  and this will be last theme.  Do you need a
22  restroom break, or are you good to go for
23  another half an hour?
24     MS. DEITSCH-PEREZ:  I need a
25     restroom break.

Page 325

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2      MR. RUKAVINA:  Can we make it five
3  minutes?
4      THE WITNESS:  Five minutes would be
5  great.
6      VIDEOGRAPHER:  We're going off the
7  record at 5:53 p.m.
8  (Recess taken 5:53 p.m. to 5:59 p.m.)
9      VIDEOGRAPHER:  We are back on the
10  record at 5:59 p.m.
11     Q.   Mr. Waterhouse, I had asked you
12  earlier about contracts between HCMFA and the
13  debtor, and now I'm going to talk about
14  contracts between the debtor and NexPoint
15  Advisors.  Okay?
16     A.   Okay.
17     Q.   Now, were there contracts similar to
18  the ones with HCMFA that NexPoint had in the
19  nature of employee reimbursement and shared
20  services?
21     A.   Yes, they -- NexPoint Advisors and
22  Highland Capital Management Fund Advisors had
23  cost reimbursement and shared services
24  agreements with Highland Capital Management,
25  L.P.

Appx. 00281

Page 326

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    Q.   And was that shared services
3    agreement, to the best of your understanding,
4    in place as of December 31, 2020?
5    A.   It was – it was terminated at some
6    point, and I remember the contracts had
7    different termination dates, but I think the –
8    the date of termination was January 31st of
9    2021, after the termination was put in.
10       So yeah, it would be in place at the
11   end of the year of December – it would be in
12   place at December 31st, 2020.
13   Q.   And pursuant to that agreement as of
14   December 31st, 2020, was the debtor providing
15   what you would describe as back office services
16   to NexPoint?
17   A.   Yes.
18   Q.   Would those have included accounting
19   services?
20   A.   Yes.
21   Q.   And as part of those accounting
22   services, would the debtor have assisted
23   NexPoint with paying its bills?
24       MR. MORRIS:  Objection to the form
25   of the question.

Page 327

1    WATERHOUSE - 10-19-21
2    A.   Yes.
3    Q.   So let's break that up.  You were a
4    treasurer of NexPoint as well in December of
5    2020?
6        MR. MORRIS:  Objection to the form
7    of the question.
8    A.   Yes.
9    Q.   Okay.  And in December of 2020, did
10   NexPoint have its own bank accounts?
11   A.   Yes.
12   Q.   And did it use those bank accounts
13   to pay various of its obligations?
14   A.   Yes.
15   Q.   Did employees of the debtor have the
16   ability to cause transfers to be made from
17   those bank accounts on behalf of NexPoint?
18   A.   Yes.
19   Q.   And is that one of services that the
20   debtor provided NexPoint, basically ensuring
21   that accounts payable and other obligations
22   would be paid?
23   A.   Yes.
24       MR. MORRIS:  Objection to the form
25   of the question.

Page 328

1    WATERHOUSE - 10-19-21
2    Q.   You answered yes?
3    A.   Yes.
4    Q.   And the payments, though, whose
5    funds would they be made from?
6    A.   From the bank account of NexPoint
7    Advisors.  If they were NexPoint advisor
8    obligations, it would be made from NexPoint
9    Advisors' bank account.
10   Q.   So let's pull up Exhibit Alpha 1.
11   You should have that – it is my Tab 1 or my
12   Exhibit 1.
13       (Exhibit A1 marked.)
14   Q.   So this is a – this is a series of
15   emails, Mr. Waterhouse.  Let's look at the
16   first page here, November 25, 2020, between
17   Kristin Hendrix and yourself.
18       Do you see that, sir?
19   A.   I do.
20   Q.   And do you see where Ms. Hendrix
21   writes:  NPA.
22       Do you know what NPA stood for?
23   A.   Yes.
24   Q.   And what does it stand for?
25   A.   NexPoint Advisors.

Page 329

1    WATERHOUSE - 10-19-21
2    Q.   And was that how you-all internally
3    at Highland refer to NexPoint Advisors, L.P.?
4    A.   I mean, yes, amongst other things.
5    Q.   And she writes at the bottom of her
6    email:  Okay to release?
7        Do you see that?
8    A.   Yes, I do.
9    Q.   So what –
10       MR. MORRIS:  Hold on one second.
11       Okay.  Go ahead.
12       MR. RUKAVINA:  Yeah.
13   Q.   So what is – what is Ms. Hendrix
14   here on November 25 asking of you?
15   A.   She is asking me – so she – these
16   are – these are payments – typically we would
17   do an accounts payable run every week at the
18   end of every Friday.  But looking at this date,
19   it is Wednesday, November 25th, which means, to
20   me, it is likely Thanksgiving weekend.
21       So this is the day before
22   Thanksgiving, so this is the last kind of –
23   kind of day before the holidays and vacation
24   and things of that nature.  So it is
25   effectively the Friday of that week.

Page 330

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2          So she is – she is putting in all
3 the payments for the week because we batch
4 payments weekly.  And these are the payments
5 that go out that week, and she is informing me
6 of the payments and – you know, again, at the
7 bottom of the email, she is asking for my okay
8 to – to release these payments in the wire
9 system.
10     Q.    So these would be accounts payable
11 of NexPoint?
12     A.    I mean, it would be accounts payable
13 for all of these entities listed on this email.
14     Q.    And who was Ms. Hendrix employed by
15 in November and December of 2020?
16     A.    Highland Capital Management.
17     Q.    Okay.  So – so part of the services
18 that NexPoint had contracted with was for
19 Highland to ensure that NexPoint timely paid
20 its accounts payable; is that accurate?
21          MR. MORRIS:  Objection to the form
22 of the question.  You have got to be
23 kidding me.
24     Q.    Is that accurate?
25     A.    Yes.

Page 331

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     Q.    And did NexPoint rely on employees
3 of the debtor to ensure that NexPoint's
4 accounts payable were timely paid?
5          MR. MORRIS:  Objection to the form
6 of the question.
7     A.    Yes.
8          MR. RUKAVINA:  Let's flip to the
9 next page, Mr. Nguyen, if you will please
10 scroll to the next page.
11     Q.    So this is an email similar to the
12 prior one, November 30th.
13          Do you see where it says, NPA HCMFA,
14 USD $325,000 one-day loan?
15          Do you see that, sir?
16     A.    I do.
17     Q.    Do you have any memory of what that
18 was?
19     A.    I don't recall what that – what
20 that payment was for.
21     Q.    Did it sometimes occur that one
22 advisor would, on very short-terms, make loans
23 to another advisor?
24     A.    Yes.  This – this – this occurred
25 from – from – from time to time.  It actually

Page 332

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2 looking at – I'm – I'm looking at the date of
3 this email.  It is November 30th.  It is the
4 last day of the month.
5          HCMFA has obligations it needs to
6 pay to its broker-dealer, which is HCFD.  And
7 it likely was short funds to make those
8 obligations under that – under its agreement,
9 and so it provided a one-day loan because on
10 the next business day on 12/1 – or the next
11 business day in December, it would receive
12 management fees from the underlying funds that
13 it managed and it would be able to pay back
14 that loan to NexPoint Advisors.
15     Q.    So – so here Ms. Hendrix was
16 seeking your approval to transfer $325,000 from
17 NexPoint to HCMFA for a one-day loan; is that
18 correct?
19     A.    That is correct.
20     Q.    Let's flip to the next page, sir.
21          MR. RUKAVINA:  And, Mr. Nguyen, if
22 you will please scroll down.
23     Q.    Now we have an entry for
24 $325,000, 11/30 loan payment.
25          Do you see that, sir?

Page 333

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     A.    Yes.
3     Q.    And that is probably the loan that
4 was approved on the prior page?
5     A.    Yes, most likely.
6     Q.    So is it also true, sir, that in
7 addition to accounts payable debtor employees
8 would be assisting NexPoint with respect to
9 paying back its debt?
10          MR. MORRIS:  Objection to the form
11 of the question.
12     A.    I mean, yes, for loans of this
13 nature, yes.
14     Q.    Well, what about long term loans?
15 Was it reasonable for NexPoint to expect debtor
16 employees to ensure that NexPoint timely paid
17 its obligations under long-term notes?
18          MR. MORRIS:  Objection to the form
19 of the question.
20          MS. DANDENEAU:  Objection to form.
21     A.    I mean, that is one of the things
22 that the Highland personnel did provide to the
23 advisors.  Yes, we would – we would – over
24 the years, yes, we – we – we – we did do
25 that generally.  Again, I don't remember

Page 334

1      WATERHOUSE - 10-19-21
2  specifically but, yes, generally we -- you
3  know, we did do that.
4      Q.   So do you recall -- and we can pull
5  it up, if need be -- that under the NexPoint
6  note that Mr. Morris asked you about earlier,
7  the one for more than $30 million, that
8  NexPoint was obligated to make an annual
9  payment of principal and interest?
10     MR. MORRIS:  Objection to the form
11  of the question.
12     A.   Yes, it was -- yes, it -- it was an
13  amortizing note.  It was -- you know, from what
14  we reviewed earlier, it was payable by
15  December 31st of each year.  So -- but are --
16  are you asking me --
17     Q.   I'm just asking you, sir, if you
18  recall the note.
19     A.   Yes, the $30 million note, yes, we
20  reviewed it earlier, yes.
21     Q.   And do you recall Mr. Morris had you
22  go through the fact that NexPoint had made
23  payments in years prior to 2020 on that note?
24     A.   I do.
25     Q.   And do you believe that employees of

Page 335

1      WATERHOUSE - 10-19-21
2  the debtor would have played any role in
3  NexPoint having made those prior payments?
4      MR. MORRIS:  Objection to the form
5  of the question.
6      A.   Yes.
7      Q.   And what role in years prior to 2020
8  would employees of the debtor have had with
9  respect to NexPoint making that annual payment?
10     A.   We -- we -- we would have -- I keep
11  saying "we."  The team would have calculated
12  any amounts due under that loan and other
13  loans, as -- as standard course.
14     We would -- since we provided
15  treasury services to the advisors, we would
16  inform the -- the -- the -- we informed
17  Mr. Dondero of any cash obligations that are
18  forthcoming, whether we do cash projections.
19     If, you know, any of these payments
20  would have -- or, you know, the sum total of
21  all of these payments, including any note
22  payments, if there were any cash shortfalls, we
23  would have informed Mr. Dondero of any cash
24  shortfalls.  We could adequately plan, you
25  know, in instances like that.

Page 336

1      WATERHOUSE - 10-19-21
2      Or, sorry, we -- I say "we" -- I
3  keep saying "we" -- I keep wearing my -- again,
4  my -- my treasurer hat.
5      But, yes, it is to -- it is to
6  inform Mr. Dondero of the obligations of the
7  advisors in terms of cash and obligations that
8  are -- are upcoming and that -- and that are --
9  are scheduled to be paid.
10     Q.   And would those obligations that are
11  upcoming and scheduled to be paid prior to 2020
12  have incurred the annual payment on that
13  NexPoint $30 million note?
14     MS. DANDENEAU:  Objection to form.
15     MS. DEITSCH-PEREZ:  Davor, I think
16  you misspoke.  You might want to just
17  repeat the question.
18     Q.   Okay.  Let me repeat the question,
19  sir.
20     Prior to 2020, those services that
21  you just described, would that -- on behalf of
22  the debtor, would that have included NexPoint's
23  payments on the $30 million note?
24     A.   Yes.
25     Q.   So someone at the debtor in treasury

Page 337

1      WATERHOUSE - 10-19-21
2  or accounting would have sent some schedule or
3  a reminder that a payment would be coming due
4  in the future.  Is that generally the practice?
5      A.   Yes, we would -- you know, again, I
6  didn't -- I didn't micromanage the teams, but
7  we had a -- a corporate accounting calendar
8  that we use as kind of a tickler file to keep
9  track of payments.
10     I actually, you know, don't know how
11  actively they're using that in -- in prior to
12  2020, but it was actively used at some point.
13     We did look at NexPoint cash
14  periodically and cash for the other advisors as
15  well and payments.  You know, we -- payments
16  like this would have appeared in our cash
17  projections, in the advisor's cash projections.
18     And, again, as like I said earlier,
19  they would have appeared there, so there would
20  be time to plan for making any of these
21  payments.
22     Q.   And based on your experience, would
23  it have been reasonable for NexPoint to rely on
24  the debtors' employees to inform NexPoint of an
25  upcoming payment due on the $30 million

Page 338

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    promissory note?
3        MR. MORRIS: Objection to form of
4    the question.
5        MS. DANDENEAU: Objection to form.
6    A.   Yes. Yes, they did. I mean, but I
7    mean, but I don't think these – these notes
8    were any secret to anybody.
9    Q.   I understand, and I'm not suggesting
10   otherwise.
11       MR. RUKAVINA: Please pull up Alpha
12   2, Mr. Nguyen.
13       (Exhibit A2 marked.)
14   Q.   Now, this document is similar to the
15   ones we've seen before as of December 31, 2020,
16   and I don't see under NTA anything there for
17   paying the promissory note to Highland.
18       Do you see anything like that?
19   A.   I do not.
20       MR. RUKAVINA: You can pull that –
21   that exhibit down, Mr. Nguyen.
22   Q.   You are aware, of course, by now
23   that, in fact, NexPoint failed to make the
24   payment due December 31, 2020, are you not?
25   A.   I am aware, and yes, I do understand

Page 339

WATERHOUSE - 10-19-21

1    it.
2    Q.   Were you aware that Highland
3    accelerated that $30 million promissory note?
4    A.   I am aware.
5    Q.   Were you aware of that acceleration
6    at the time that it occurred?
7    A.   I don't remember specifically.
8    Q.   Do you recall whether anyone asked
9    you – prior to the acceleration, anyone asked
10   you at Highland, what Highland should do with
11   respect to the missed payment?
12   A.   Did anyone ask me what Highland
13   should do about the missed payment?
14   Q.   Yes, before acceleration.
15       MR. MORRIS: Objection to the form
16   of the question.
17   A.   I mean, what – what I recall is
18   there was the – sorry, are you asking me –
19       MS. DANDENEAU: Why don't you just
20   repeat the question, Mr. Rukavina.
21   Q.   Let me try again, Mr. Waterhouse,
22   let me try again.
23       I am saying you're the CFO of
24   someone, in this case, Highland, and the

Page 340

WATERHOUSE - 10-19-21

1    borrower failed to make the required payment.
2    Are you with me so far?
3    A.   I am.
4    Q.   Did anyone then ask you, what should
5    we do with respect to our rights against the
6    borrower that missed the payment?
7    A.   Not that I recall.
8    Q.   Did you play a role in the decision
9    to accelerate that $30 million promissory note?
10   A.   I did not.
11   Q.   Do you recall whether Mr. Seery ever
12   asked you before the acceleration as to whether
13   he should accelerate the note?
14   A.   I don't recall.
15   Q.   And you don't recall when you
16   learned of the acceleration itself?
17       MR. MORRIS: Objection to the form
18   of that question.
19   A.   It was – it was sometime in
20   early – early 2021. I don't remember
21   specifically.
22   Q.   But do you recall whether it was
23   after the acceleration had already been
24   transmitted?

Page 341

WATERHOUSE - 10-19-21

1        MS. DANDENEAU: Objection to the
2    form of the question.
3    A.   I don't recall.
4    Q.   Do you recall in early to mid
5    January of 2021, after the default, discussing
6    the default with Mr. Dondero?
7    A.   I do recall discussing with
8    Mr. Dondero after December 31, 2020?
9    Q.   Yes, the fact of the default.
10   A.   I don't recall.
11       MR. RUKAVINA: Let's pull up my
12   Exhibit 6, Alpha 6.
13       (Exhibit A6 marked.)
14       MR. RUKAVINA: And, Mr. Nguyen, if
15   you will please scroll down.
16   Q.   This email chain begins with you
17   writing to Ms. Hendrix on January the 12th:
18   NexPoint note to HCMLP.
19       Do you see that, sir?
20   A.   I do.
21   Q.   Were you discussing this same
22   $30 million note we're talking about right now
23   with Ms. Hendrix?
24   A.   Yes.

Page 342

WATERHOUSE - 10-19-21

1
2   Q.   Okay.  Do you recall what prompted
3   you to send that email to her?
4   A.   Yes, I had -- I had a conversation
5   with Jim.
6   Q.   Okay.  And what -- what did you
7   discuss with Jim that led to this email chain?
8   A.   He -- he called me and he said he
9   wanted to make payment on the NexPoint note,
10  and I didn't -- I didn't know the -- the amount
11  offhand, so I reached out to Kristin and got
12  the details and relayed that to him.
13  Q.   And you see you sent that email to
14  her at 11:15 a.m.  Does that help you remember
15  when you had this discussion with Mr. Dondero?
16  In other words, was it that morning or the day
17  before, or can you -- can you --
18  A.   No, it was -- it was that morning.
19  Q.   And do you recall how you had that
20  conversation with him?
21      MR. MORRIS:  Objection to the form
22  of the question.
23  Q.   By telephone, by email, in-person?
24  A.   Yeah, he -- he called me.  I was at
25  home.  We were working from home here in

Page 343

WATERHOUSE - 10-19-21

1
2   December of 2020.  He called me from home.  He
3   said he was in court.  He wanted to -- he asked
4   about, you know, making payment on the note and
5   the amount, and so I didn't have those numbers
6   in front of me, so I said I would get back to
7   him.  I wanted all the details, so here is
8   this -- so I reached out to Kristin.
9   Q.   And then she gave you that
10  $1,406,000 figure?
11      MR. RUKAVINA:  Mr. Nguyen, if you
12  will scroll up, please.
13  A.   Yes.  Yeah, she -- the $1,406,112.
14  Q.   And do you recall whether you
15  conveyed that amount to Mr. Dondero?
16  A.   Yes.  I -- I called him back and
17  gave him -- gave him this amount.
18  Q.   Are you aware of whether NexPoint,
19  in fact, then made that 1 million 406 and
20  change payment?
21  A.   Yes, they did.
22  Q.   Did you discuss with Mr. Dondero at
23  that time, either the first conference or the
24  second conference that day -- strike that.
25      When you conveyed the number to

Page 344

WATERHOUSE - 10-19-21

1
2   Mr. Dondero, was -- was it also on January
3   12th?
4   A.   Sorry, when I conveyed the
5   $1.4 million number?
6   Q.   Yes.
7   A.   Yes, yes, it was that -- it was --
8   Q.   So you had --
9   A.   It was that point.
10  Q.   Well, to the best of your
11  recollection, you had a conference with
12  Mr. Dondero by the telephone in the morning,
13  and then another conference with him by
14  telephone after 11:40 a.m. that morning?
15  A.   Yeah, I can't remember -- yeah, it
16  was either that morning or it could have been,
17  you know, early afternoon, but again, I
18  remember calling him back, relaying this
19  information to him, and he said, okay, pay --
20  you know, make -- make this payment.
21  Q.   And during either of those two
22  calls, did you tell Mr. Dondero anything to the
23  effect that making those -- I'm sorry, making
24  that payment would not de-accelerate the
25  promissory note?

Page 345

WATERHOUSE - 10-19-21

1
2   A.   No.
3   Q.   Did you tell him anything to the
4   effect that making that payment would not cure
5   the default?
6   A.   No.
7   Q.   Did you discuss that in any way with
8   him?
9   A.   No, I did not.
10  Q.   Did he say why he wanted to have
11  that $1.4 million payment made?
12      MR. MORRIS:  Objection to the form
13  of the question.
14  A.   He -- he -- he didn't go into
15  specifics.
16  Q.   Did he say anything to you to the
17  effect that if NexPoint makes that payment,
18  then the note will be de-accelerated?
19      MR. MORRIS:  Objection to the form
20  of the question.
21  A.   I don't recall.
22      MR. RUKAVINA:  You can put this one
23  down, Mr. Nguyen.
24  Q.   And, again, when you say you don't
25  recall, you mean you don't remember right now

Page 346

WATERHOUSE - 10-19-21

1
2 either way; correct?
3     A.   Yeah, I don't remember.  I don't
4 remember us discussing that.
5     Q.   Now -- and we're almost done, I
6 promise.  I'm just going to -- I don't know how
7 to ask this question, so I'm just going to try
8 to do my best.
9         Prior to the default on December 31,
10 2020, did Mr. Seery ever tell you any words to
11 the effect that you or someone at Highland
12 should ensure that NexPoint doesn't make its
13 payment?
14     A.   No.
15     Q.   Did you have any hint or any belief
16 that anyone at NexPoint -- I'm sorry, strike
17 that.
18         Did you have any reason to believe
19 that anyone with Highland was actively trying
20 to get NexPoint to make that default by not
21 paying on December 31?
22     MR. MORRIS:  Objection to the form
23     of the question.
24     A.   Are you asking, did any Highland
25 employees actively work to make -- to

Page 347

WATERHOUSE - 10-19-21

1
2 somehow --
3     Q.   Yes.  Let me take a step back.  Let
4 me take a step back.
5         So you are aware now that as a
6 result of that default, what was still some
7 25-year note was accelerated and became
8 immediately due.  You are aware of that now;
9 right?
10     A.   Yes.
11     Q.   And can you see how someone at
12 Highland might actually have been pleased with
13 that development?
14     MR. MORRIS:  Objection to the form.
15     Q.   Not that they were -- not that they
16 were pleased, but you can see how someone at
17 Highland might have been pleased with that
18 development?
19     MR. MORRIS:  Objection to the form
20     of the question.
21     MS. DANDENEAU:  Object to form.
22     A.   I don't know how they would have
23 reacted to that.
24     Q.   Okay.  But you're not -- you're not
25 aware of any instructions or any actions being

Page 348

WATERHOUSE - 10-19-21

1
2 given or taken at Highland by Mr. Seery, the
3 independent board, DSI, that -- that would have
4 basically led Highland to ensure that NexPoint
5 would fail to make that payment?
6     A.   I'm not aware.
7     Q.   In other words, there wasn't a trick
8 or a settlement; right?
9     MS. DEITSCH-PEREZ:  Objection to
10     form.
11     MS. DANDENEAU:  Object to form.
12     MR. MORRIS:  Object to form.
13     A.   I'm not aware.
14         Look, I'm not aware.  I'm not in
15 every conversation.  I mean, and I'm just --
16 again, I'm sitting at home.  It is the end of
17 the year.  Again, I'm not aware.
18     Q.   That is a perfectly legitimate
19 answer.  I don't know why -- why you think
20 otherwise.
21         Okay.  Just give me one second to
22 compose my thoughts.
23     MS. DEITSCH-PEREZ:  While you're
24     taking your one second, why don't we take
25     three minutes.  I will be right back.

Page 349

WATERHOUSE - 10-19-21

1
2     VIDEOGRAPHER:  Do we want to go off
3 the record?
4     MR. RUKAVINA:  Yes.
5     VIDEOGRAPHER:  All right.  We're
6 going off the record at 6:27 p.m.
7 (Recess taken 6:27 p.m. to 6:30 p.m.)
8     VIDEOGRAPHER:  We are back on the
9 record at 6:30 p.m.
10     MR. HORN:  Is Deb back?
11     MS. DANDENEAU:  Are you asking about
12 me?  I'm here.
13     MR. HORN:  Oh, okay.  I don't see
14 you, sorry.
15     Q.   Actually, yeah, Mr. Waterhouse, so
16 when you had --
17     MS. DANDENEAU:  Are you asking about
18 Deb Dandeneau or Deborah?  I mean, there
19 are a lot -- as we talked about, a lot of
20 Debs.  I'm here.
21     MS. DEITSCH-PEREZ:  I'm here.
22     MR. HORN:  Yes, I was asking about
23 DDP.
24     MS. DEITSCH-PEREZ:  Oh, DDP is here.
25     MR. HORN:  Okay.  Here we go.  I'm

Page 350

WATERHOUSE - 10-19-21

1 going back on mute.
2 MS. DANDENEAU: Get the right
3 nomenclature.
4 Q. Mr. Waterhouse, on January 12th,
5 2021, when you had those talks with Mr. Dondero
6 about the $1.4 million payment, did you have a
7 communication or a conversation with Mr. Seery
8 about that payment after January 12th, 2021?
9 A. I don't recall.
10 Q. Well, in response to Mr. Dondero
11 reaching out to you, do you recall on that day,
12 January 12th, talking to Mr. Seery or anyone at
13 Highland other than the email chain we just saw
14 about Mr. Dondero's call with you?
15 A. Did I talk to -- I spoke with
16 Kristin -- I don't know if I spoke to her. I
17 likely spoke to Kristin Hendrix because we had
18 to get the wire on NexPoint's behalf to make
19 the payment to Highland.
20 Q. So it is true, then, that -- that
21 employees of the debtor did actually cause that
22 payment to be made when it was made after
23 January 12th?
24 A. Yes, I mean, we -- we -- as I

Page 351

WATERHOUSE - 10-19-21

1 testified earlier, we provided that accounting
2 finance treasury function as -- under the
3 shared services agreement. And so once I
4 got the -- I talked to Jim, got the approval to
5 make this payment, we have to then make the
6 payment, or the team does, and so the payment
7 was made.
8 Q. Okay. But -- okay. And -- and
9 sitting here right now, after Jim called you,
10 you don't remember talking to anyone other than
11 the -- the couple of people you mentioned,
12 talking to anyone about something to the effect
13 that, hey, Jim wants to make this payment now?
14 MR. MORRIS: Objection to the form
15 of the question.
16 A. I don't -- I don't recall.
17 Q. And does that include legal counsel?
18 Without going into any detail, on
19 January 12th or before that payment was made,
20 did you consult with legal counsel about
21 anything having to do with the $1.4 million
22 payment?
23 A. I don't recall.
24 Q. Okay. Thank you, sir, for your

Page 352

WATERHOUSE - 10-19-21

1 time.
2 MR. RUKAVINA: Pass the witness.
3 MR. MORRIS: I just have a few
4 questions, if I may.
5 MS. DEITSCH-PEREZ: Don't you go at
6 the end?
7 MR. MORRIS: Oh, I apologize. He is
8 your witness. I'm surprised you want to
9 ask him questions, but go right ahead.
10 MS. DEITSCH-PEREZ: Just have a
11 couple of things.
12 MR. RUKAVINA: And I will just
13 object to that, that he's our witness.
14 That's not --
15 MR. MORRIS: I'm not talking to you.
16 I'm not talking to you.
17 MS. DANDENEAU: Also, Mr. Morris, it
18 is -- it is --
19 MS. DEITSCH-PEREZ: He is not my
20 witness. He's been subpoenaed by you.
21 Okay?
22 That is no offense, Mr. Waterhouse,
23 I'm -- I'm not -- okay. Anyway.
24 EXAMINATION

Page 353

WATERHOUSE - 10-19-21

1 BY MS. DEITSCH-PEREZ:
2 Q. Good evening. I'm very sorry to be
3 going last and I know you have had a long and
4 taxing day, so I thank you for indulging me.
5 The kinds of services that you
6 describe that the -- that Highland provided for
7 NexPoint, did Highland also provide similar
8 services to that to HCRE and HCMS?
9 A. Yes.
10 MR. MORRIS: Objection to the form
11 of the question.
12 Q. What kind of services did Highland
13 provide to HCRE and HCMS?
14 MR. MORRIS: Objection to the form
15 of the question.
16 MS. DEITSCH-PEREZ: What is your
17 objection, John?
18 MR. MORRIS: It is vague and
19 ambiguous. Unlike the advisors and
20 NexPoint, they actually had shared services
21 agreements.
22 MS. DEITSCH-PEREZ: I got -- I
23 understand your objection. That is fine.
24 Q. Let's take them one at a time.

Appx. 00288

Page 354

WATERHOUSE - 10-19-21

1       What kinds of services did Highland
2   provide to HCRE?
3           MR. MORRIS:  Objection to the form
4   of the question.
5       A.   HCMS, Highland employees provided
6   accounting services, treasury management
7   services, potentially legal services.  I
8   don't – but I wouldn't have been directly
9   involved in that.  But as far as the teams that
10  I manage, it was accounting, treasury, things
11  of that nature.
12      Q.   Okay.  And that was for HCM, LLP –
13      A.   And – and, sorry, it would also be
14  any asset valuation if needed as well.
15      Q.   Okay.  We went back and forth on
16  each other and I apologize, so just to clarify.
17          You were talking about the services
18  that Highland Capital Management provided to
19  HCMS; is that right?
20      A.   HCMS.  So, again, yes.  And
21  accounting, treasury, valuation, and also tax
22  services too.
23      Q.   Okay.
24      A.   Tax services.  Look, I'm expanding

Page 355

WATERHOUSE - 10-19-21

1   this, their HR services as well.
2       Q.   Okay.  And did that include bill
3   paying?
4           MR. MORRIS:  Objection to the form
5   of the question.
6       Q.   Did the services that HCM provided
7   to HCMS include bill paying?
8           MR. MORRIS:  Objection to the form
9   of the question.
10      A.   Yes.
11      Q.   And did the services that HCMLP
12  provided to HCMS include scheduling upcoming
13  bills?
14          MR. MORRIS:  Objection to the form
15  of the question.
16      A.   Yes.
17      Q.   And did HCMLP regularly pay – cause
18  to be paid the payments on loans HCMS had from
19  HCMLP?
20          MR. MORRIS:  Objection to the form
21  of the question.
22      A.   Yes.
23      Q.   Typically – if there is a
24  typically, how far in advance of due dates did

Page 356

WATERHOUSE - 10-19-21

1   HCMLP cause HCMS to pay its bills?
2           MR. MORRIS:  Objection to the form
3   of the question.
4       A.   I mean, it – it – it depend – it
5   depended on the nature of the payment and the
6   vendor, but, you know, if there were – if
7   there were larger scheduled payments, you know,
8   I would like to give at least 30 days notice.
9           And that is – that is kind of my
10  rule of thumb so no one is surprised.
11      Q.   Okay.  And was it generally HCMLP's
12  practice to timely pay HCMS' bills?
13          MR. MORRIS:  Objection to the form
14  of the question.
15      A.   It – it – it – that depended on
16  the nature of the payment.
17      Q.   Okay.  And can you explain what you
18  mean by that?
19      A.   Yeah, I mean if – if it was – I
20  mean – if there was some professional fees
21  that weren't – you know, they were due but
22  they weren't urgent, those fees may not be paid
23  as timely as others that have a due date or –
24  or things like that.

Page 357

WATERHOUSE - 10-19-21

1       Q.   Okay.  Are loan payments the kinds
2   of thing that HCMLP would pay on time because
3   of potential consequences of not paying on
4   time?
5           MR. MORRIS:  Objection to the form
6   of the question.
7       A.   Yes.  As I testified earlier, we
8   would want to give, you know, notice on – on
9   – on larger payments and – and things of that
10  nature so we didn't miss due dates.
11      Q.   Okay.  And over the course of time,
12  did HCMLP generally pay HCMS' loan payments in
13  a timely fashion?
14          MR. MORRIS:  Objection to the form
15  of the question.
16      A.   I can't remember specifically, but
17  generally, yes.
18      Q.   Okay.  Now, did HCMLP provide
19  similar services to HCRE that you have
20  described it provided to HCMS?
21          MR. MORRIS:  Objection to the form
22  of the question.
23      A.   Yes, but I don't think it – it
24  provided – I don't think it provided HR

Page 358

WATERHOUSE - 10-19-21

1    services.
2    Q.    Can you describe the accounting and
3    treasury services that HCMLP provided for HCRE?
4    A.    Yeah, it -- it would provide
5    bookkeeping services on a -- on a periodic
6    basis.  It would make payments, you know, as
7    needed.
8    Q.    Okay.  So did it provide --
9    A.    And -- and I believe it -- it -- it
10   provided tax services as well.
11   Q.    Okay.  And so did it provide the
12   same kind of bill -- did HCMLP provide the same
13   kind of bill-paying services for HCRE that it
14   provided for HCMS and NexPoint?
15        MR. MORRIS:  Objection to the form
16   of the question.
17   A.    Yes.
18   Q.    And over the course of time, did
19   HCMLP generally cause to be made the loan
20   payments that HCRE owed to HCMLP?
21        MR. MORRIS:  Objection to the form
22   of the question.
23   A.    Yes.
24   Q.    Did HCMLP make loan payment -- the
25

Page 359

WATERHOUSE - 10-19-21

1    loan payment that was due from HCMS to HCMLP in
2    December of 2020?
3        MR. MORRIS:  Objection to the form
4    of the question.
5    A.    I don't believe that payment --
6    payment was made.
7    Q.    Okay.  And when HCMLP caused HCMS in
8    the past to make loan payments, whose money did
9    it use to make those payments?
10        MR. MORRIS:  Objection to the form
11   of the question.
12   A.    It was the -- the money in HCMS's
13   operating account would be made to that --
14   those moneys would be used to make payment to
15   Highland Capital Management.
16   Q.    Okay.  And Highland -- is it correct
17   that Highland Capital Management personnel had
18   the access to HCMS's accounts to be able to
19   cause such payments to be made?
20   A.    Yes, Highland personnel had access
21   to those accounts.
22   Q.    Okay.  And so now for HCRE, whose
23   money was used when HCMLP caused HCRE
24   payments -- loan payments to Highland to be
25

Page 360

WATERHOUSE - 10-19-21

1    made?
2        MR. MORRIS:  Objection to the form
3    of the question.
4    A.    It was -- it was cash in HCRE's bank
5    account that would be used to make payments to
6    Highland Capital Management.
7    Q.    Okay.  And so did Highland Capital
8    Management have access to HCRE's funds in order
9    to be able to make such payments?
10        MR. MORRIS:  Objection to the form
11   of the question.
12   A.    Personnel at Highland Capital
13   Management had access to HCRE's bank account to
14   effectuate the payments.
15   Q.    Okay.  And was the payment due from
16   HCRE to HCMLP due in December of 2020 made?
17   A.    It --
18   Q.    In December of 2020.
19   A.    It was not.
20   Q.    Okay.  And was there money in HCRE's
21   account that would have enabled the payment to
22   be made had HCM personnel attempted to make the
23   payment?
24        MR. MORRIS:  Objection to the form
25

Page 361

WATERHOUSE - 10-19-21

1    of the question.
2    A.    I -- I don't recall.
3    Q.    Do you have any reason to believe
4    that either HCRE or HCMS simply didn't have the
5    funds on hand to make the December 2020
6    payments?
7    A.    I don't know.
8    Q.    I guess I'm asking, do you have any
9    reason to believe that they didn't have the
10   funds?
11   A.    We managed cash for so many
12   different entities and funds, and I don't
13   recall, you know, where the cash position was
14   for HCRE and HCMS at 12/31/2020.
15   Q.    Okay.
16   A.    I just don't recall, and I don't --
17   and I don't remember what the loan payment
18   obligations were from HCRE to Highland, and
19   from HCMS to Highland.  I don't recall.  I
20   don't recall, I mean...
21   Q.    Let me come at it a different way.
22   Were the -- were the payments that would
23   otherwise have been due in December of 2020
24   made in January of 2021 for HCMS and HCRE?

Page 362

WATERHOUSE - 10-19-21

1
2    A.   I believe the HCRE payment was made
3    in January of 2021.  I don't recall any
4    payments being made from HCMS to Highland.
5    Q.   If it -- how is it the HCRE payment
6    came to be made?  Why did you make it -- why
7    did HCM make the payment in January of 2021?
8    A.   Jim -- Jim called me and instructed
9    me to -- to make the payment on behalf of HCRE,
10   Jim Dondero -- Jim Dondero.
11   Q.   Did he seem upset that -- that the
12   payment had not been made?
13   A.   Yeah.  On the note that was, you
14   know, that was the term note, yes, he -- he was
15   displeased that the -- that the payment had not
16   been made by year-end.
17   Q.   Okay.  And did you make the -- cause
18   the payment to be made as -- as requested?
19   A.   Yes.
20   Q.   And did anyone else from HCM
21   participate with you in causing the payment to
22   be made to -- on the HCRE loan?
23   A.   Yes.  It would have been Kristin
24   Hendrix.  I -- again, I don't -- as I testified
25   earlier, I'm not an officer of HCRE.  I don't

Page 363

WATERHOUSE - 10-19-21

1
2    believe I'm an authorized signer.  So I
3    can't -- other personnel have to make payment
4    from HCRE to -- to -- to Highland.
5    Q.   Okay.  And in the conversation
6    that -- that you had with Mr. Dondero when he
7    requested the payment to be made, did you say
8    to him words to the effect, Jim, this loan is
9    going to stay in default, what are you making
10   the payment for, anything like that?
11   A.   No.
12   Q.   In fact, did you have the impression
13   from him that he thought that the loan would
14   be -- the default would be cured by making the
15   payment?
16        MR. MORRIS:  Objection to the form
17   of the question.
18   A.   Did I get the impression from Jim
19   Dondero that the loan would be cured if the
20   payment from HCRE --
21   Q.   Yeah, if that is what he thought.
22        MR. MORRIS:  Objection to the form
23   of the question.
24   A.   I didn't get any impression from him
25   on that at the time.

Page 364

WATERHOUSE - 10-19-21

1
2    Q.   Do you know whether there was an
3    HCMS term loan that had a payment due in
4    December of 2020?
5    A.   I don't recall.
6    Q.   Okay.  And so the reason you don't
7    recall whether or not there was a payment in
8    January of 2021 is because you just don't
9    remember whether there was such a loan at all?
10        MR. MORRIS:  Objection to the form
11   of the question.
12   A.   I don't remember.  There is -- there
13   is so many notes, and I mean, demands, and I
14   don't -- I don't remember.  It's a lot to keep
15   track in your head.
16   Q.   I understand, and -- and I hear your
17   frustration when you have explained that the
18   debtor has your documents and you don't, and so
19   I fully appreciate it, and this is no knock on
20   you.  It's a knock on somebody else on this
21   call.
22        MR. MORRIS:  I move to strike.  That
23   was pretty obnoxious, but go ahead.
24   Q.   Okay.  But so, Mr. Waterhouse, if --
25   if a payment on the HCMS loan was made in

Page 365

WATERHOUSE - 10-19-21

1
2    January of 2021, do you think it was part of
3    the same conversation where Jim Dondero said,
4    hey, why didn't that get paid, please make
5    that -- get that payment done?
6        MR. MORRIS:  I object to the form of
7    the question.
8    A.   Yes.  Likely it would have been -- I
9    mean, again, I don't recall a payment being
10   made, but, you know, again, I don't remember
11   everything.
12   Q.   Okay.  Did -- at the time you were
13   communicating with Kristin Hendrix about the
14   payment being made, whichever payments were
15   made in January, did she say anything to you
16   about the payments not curing the loan
17   defaults?
18   A.   No.
19   Q.   Okay.  All right.  So I'm going to
20   take you back to very early in the deposition
21   when Mr. Morris was asking you about the --
22   the -- the -- the agreement with respect to
23   the -- the forgiveness element of the loans, so
24   that is just to orient you.
25        Do you remember that there was a

Page 366

1           WATERHOUSE - 10-19-21
2   time that you and Mr. Dondero were
3   communicating about potential means of
4   resolving the Highland bankruptcy by what was
5   colloquially referred to as a pot plan?
6       A.   Yes.
7       Q.   Okay.  And can you tell me generally
8   when that was?
9       A.   Like mid -- mid 2020, sometime in
10  2020, mid 2020.
11      Q.   Okay.  And did the process of trying
12  to figure out what the numbers should be
13  involve looking at what one should pay for the
14  Highland assets?
15          MR. MORRIS:  Objection to the form
16      of the question.
17      A.   Yes.
18      Q.   Okay.  And did there come a time
19  when you were proposing some potential numbers
20  and Mr. Dondero said something to you like,
21  well, why are you including payment for the
22  related party notes, those, you know, were
23  likely to be forgiven as part of my deferred
24  executive compensation?
25          MR. MORRIS:  Objection to the form

Page 367

1           WATERHOUSE - 10-19-21
2   of the question.
3       A.   Yes, we did have that conversation.
4       Q.   Okay.  Was that conversation in
5   connection with trying to figure out the right
6   numbers for a pot plan?
7       A.   Yeah.  I mean, it was -- it was -- I
8   mean, Jim -- Jim would ask for, you know,
9   most -- most recent asset values, you know, for
10  Highland, and -- and myself and the team
11  provided those to him, so it was in that
12  context.
13      Q.   Okay.  And does that refresh your
14  recollection that these communications were in
15  2020 rather than 2021?
16          MR. MORRIS:  Objection to the form
17      of the question.
18      A.   The -- the -- the executive
19  compensation discussions were definitely in
20  2020.
21      Q.   Okay.  Now, did you ever make
22  proposals that took into account Jim's comment
23  that the notes were likely to end up forgiven
24  as part of his compensation?
25          MR. MORRIS:  Objection to the form

Page 368

1           WATERHOUSE - 10-19-21
2   of the question.
3       A.   Yes, we -- the team and myself put
4   together, you know, asset summaries of Highland
5   at various times for all the assets of
6   Highland, and not including the notes.
7       Q.   Okay.  And were those presentations
8   communicated to -- to Mr. Seery?
9       A.   No.  Well, look, I didn't tell -- I
10  didn't tell Mr. Seery.  I don't know what
11  Mr. Dondero did with the information.
12      Q.   Okay.
13      A.   I did not have conversations with
14  Mr. Seery.
15      Q.   Okay.  Do you know who saw the
16  presentations that you put together that didn't
17  include the value of the related party notes?
18      A.   We're talking presentations -- these
19  are -- these are Excel spreadsheets?
20      Q.   Uh-huh.
21      A.   I don't know who -- these were given
22  to -- to Jim Dondero.  I don't know what was
23  done with them after that.
24      Q.   Okay.  You also mentioned earlier
25  that sometime during your tenure at Highland

Page 369

1           WATERHOUSE - 10-19-21
2   you knew of the practice of giving forgivable
3   loans to executives.
4           MR. MORRIS:  Objection to the form
5       of the question.
6       Q.   Can you -- can you tell me what you
7   recall about that practice?
8           MR. MORRIS:  Objection to the form
9       of the question.
10      A.   Yes, so there were -- there were --
11  during my tenure at Highland, there were loans
12  or -- given to employees that were later
13  forgiven at a future date and time.
14      Q.   Okay.  And when the loans were
15  given, did the notes, to your recollection, say
16  anything about the potential forgiveness term?
17          MR. MORRIS:  Objection to the form
18      of the question.
19      A.   When you say "did the notes," did
20  the promissory notes detail the forgiveness?
21      Q.   Yes.
22      A.   Not that I recall.
23      Q.   And until such time as whatever was
24  to trigger the forgiveness occurred, were the
25  notes bona fide notes as far as you were

Page 370

```
1            WATERHOUSE - 10-19-21
2   concerned?
3        MR. MORRIS:  Objection to the form
4   of the question.
5        A.   Yes, similar to -- yes.
6        Q.   Okay.  You were going to say similar
7   to what?
8        A.   Mr. Morris earlier today showed
9   notes of the financial statements about various
10  affiliate loans.  I -- I -- I do recall these
11  notes because I -- at that time personally
12  worked on the -- the financial statements of
13  Highland.  That was, you know, in my role as a
14  corporate accountant.
15        And there were -- those loans
16  were -- to the partners were detailed in the
17  notes to the financial statements, similar to
18  what we went through earlier today in the prior
19  testimony about what we saw with Highland
20  and -- and -- and the -- and HCMFA.
21        Q.   Is it fair to say that on Highland's
22  balance sheet there were any number of assets
23  that the value of which could be affected by
24  subsequent events?
25        MR. MORRIS:  Objection to the form
```

Page 371

```
1            WATERHOUSE - 10-19-21
2   of the question.
3        A.   Yes.  I mean, yes, that -- there
4   are.  And that is -- yes.
5        Q.   Okay.  And is it typical accounting
6   practice that until there is some certainty
7   about those potential future events, that asset
8   value listed on -- on the books doesn't take
9   into account those potential future events?
10        MR. MORRIS:  Objection to the form
11  of the question.
12        A.   Yeah, if those -- yes.  If -- if
13  those future events, you know, at the time of
14  issuance are not known or knowable, like I
15  discussed earlier with, like, market practice,
16  asset dislocation, or, you know, I mean, things
17  like that, you -- I mean, it -- it could affect
18  its fair value --
19        Q.   Okay.
20        A.   -- in the future.
21        Q.   And am I correct you wouldn't feel
22  compelled to footnote in every possible change
23  in -- in an asset when those possibilities are
24  still remote?
25        MR. MORRIS:  Objection to the form
```

Page 372

```
1            WATERHOUSE - 10-19-21
2   of the question.
3        A.   The accounting standard is you have
4   to estimate to the best -- you know, to -- to
5   the best of your ability, the fair value of an
6   asset as of the balance sheet date under --
7   under GAAP.
8        Q.   Did -- strike that.
9        Okay.  Give me a minute.  I'm
10  close -- I'm close to done.  Let me just go off
11  and look at my notes for a second.  So take two
12  minutes.
13        VIDEOGRAPHER:  We're going off the
14  record at 7:02 p.m.
15        (Recess taken 7:02 p.m. to 7:03 p.m.)
16        VIDEOGRAPHER:  We are back on the
17  record at 7:03 p.m.
18        Q.   Mr. Waterhouse, is it generally your
19  understanding that people you work with now
20  have been asking the debtor for full and
21  unfetterred access to their own former files?
22        MR. MORRIS:  Objection to the form
23  of the question.
24        A.   Yes, I am -- I am generally aware.
25        Q.   Okay.  And do you think you could
```

Page 373

```
1            WATERHOUSE - 10-19-21
2   have been better prepared for this deposition
3   if the debtor had complied with those requests?
4        MR. MORRIS:  Objection to the form
5   of the question.
6        A.   I -- I -- I most certainly -- yes.
7   I mean, again, these are multiple years,
8   multiple years ago, lots and lots of
9   transactions.
10        You know, we asked about NAV errors
11  and, you know, things like that and these
12  are -- it would make this process a lot more --
13  a lot easier and if we had -- if we had access
14  to that.
15        Q.   Okay.  And has the debtor -- is the
16  debtor suing you right now?
17        A.   Yes.
18        Q.   And is the debtor trying to renege
19  on deals that it had previously made with you?
20        MR. MORRIS:  Objection to the form
21  of the question.
22        A.   Sorry, I need to -- it is my
23  understanding that the litigation trust is
24  suing me.  And not being a lawyer, I don't
25  know -- is that the debtor?
```

Page 374

```
1           WATERHOUSE - 10-19-21
2           Is that -- I don't know the
3    relationship.  So, again, I'm not the lawyers.
4    I've said many times.  But my understanding is
5    the litigation trust is suing me.  I could be
6    wrong there.  I don't know.
7       Q.   Okay.  I understand.
8           Someone with some connection to the
9    Highland debtor has brought a claim against
10   you; is that fair?
11          MR. MORRIS:  Objection to the form
12   of the question.
13      A.   Yes.
14      Q.   Okay.  And is there also some motion
15   practice in the bankruptcy where the debtor or
16   someone associated with the debtor is
17   attempting to undo something that was
18   previously resolved with you?
19      A.   Yes.
20      Q.   And so in one action somebody is
21   associated with the debtors trying to --
22   threatening you with trying to take money from
23   you, and then in the other -- and trying to --
24   and in the other they are threatening not to
25   pay you things that had previously been agreed;
```

Page 375

```
1           WATERHOUSE - 10-19-21
2    is that correct?
3           MR. MORRIS:  Objection to the form
4    of the question.
5       A.   I want to be -- yes, I -- there
6    is -- I'm being sued, again, on -- on something
7    that was agreed to with Mr. Seery and myself.
8    I don't -- I don't -- I don't own that claim.
9       Q.   Okay.
10      A.   To be transparent, I don't own that
11   claim.  So it is not my personal property.
12      Q.   Okay.
13      A.   And -- and being the nonlawyer, I
14   don't know how I can get sued for something
15   that I don't owe or, like, I don't own
16   anything.  I'm not the lawyer.  But, I mean, if
17   that is -- if I'm understanding the facts
18   correctly.
19      Q.   Okay.  And the lawsuit that was
20   filed that names you, that was just filed
21   this -- this past week; is that right?
22          MS. DANDENEAU:  Ms. Deitsch-Perez, I
23   do want to interrupt at this point because
24   just as I told Mr. Morris, that this is a
25   deposition about the noticed litigation.
```

Page 376

```
1           WATERHOUSE - 10-19-21
2           I really don't want to go -- go
3    afield --
4           MS. DEITSCH-PEREZ:  Yeah.
5           MS. DANDENEAU:  -- and open up a
6    whole new line of inquiry about the lawsuit
7    or the -- the motion and the bankruptcy
8    court.  We will be here all night.
9           MS. DEITSCH-PEREZ:  And I
10   understand.
11      Q.   My -- my point is:  Do you feel
12   like -- like there is some effort by these
13   parties related to the debtor to intimidate
14   you -- not that you -- I'm not saying you are
15   or you aren't.
16          But do you feel like there is some
17   effort to intimidate you and maybe an effort to
18   deter you from being as prepared as you might
19   be in this deposition?
20          MR. MORRIS:  Objection to the form
21   of the question.
22      A.   I was -- I was surprised by the
23   lawsuit, by me being named, because, again, I
24   don't own the asset and things like that.
25   Yeah, I just -- I want to move forward with my
```

Page 377

```
1           WATERHOUSE - 10-19-21
2    life at Skyview.
3           MS. DEITSCH-PEREZ:  Thank you.
4           THE WITNESS:  Thank you.
5           FURTHER EXAMINATION
6    BY MR. MORRIS:
7       Q.   If I may, I just have a few
8    questions.
9           Mr. Waterhouse, we saw a number of
10   documents that Mr. Rukavina put up on the
11   screen where Ms. Hendrix would send you a
12   schedule of payments that were due on behalf of
13   certain Highland affiliates.
14          Do you remember that?
15      A.   Yes.
16      Q.   And in each instance she asked for
17   your approval to make the payments; is that
18   right?
19      A.   Yes, she did.
20      Q.   And was that the -- was that the
21   practice in the second half of 2020 whereby
22   Ms. Hendrix would prepare a list of payments
23   that were due on behalf of Highland associates
24   and ask for approval?
25      A.   Yes.
```

Page 378

WATERHOUSE - 10-19-21

1
2    Q.   And I think you said that there was
3    a – a –
4        A.   It was – I think I testified to
5    this earlier when we talked about procedures
6    and policy, you know, again, I want to be
7    informed of – of – of – of – of any
8    payments that are going out.  I want to be made
9    aware of these payments, and that was just a
10   general policy, not just for 2020.
11   Q.   Okay.  So it went beyond 2020?
12   A.   Yes.
13   Q.   Is that right?
14   A.   Yes.
15   Q.   Okay.  And the corporate accounting
16   group would prepare a calendar that would set
17   forth all of the payments that were anticipated
18   in the – in the three weeks ahead; is that
19   right?
20   A.   I – like I testified earlier, we
21   had a corporate calendar that was set up, you
22   know, to – to provide reminders or, you know,
23   of anything of any nature, whether it is
24   payments or – or financial statements or, you
25   know, whatever it is, you know, to meet

Page 379

WATERHOUSE - 10-19-21

1
2    deadlines.
3        I don't know how, as I testified
4    earlier, how much they were using that
5    calendar.
6    Q.   Okay.  But – but you did get notice
7    and a request to approve the payments that were
8    coming due on behalf of Highland's affiliates.
9    Do I have that right?
10       MS. DANDENEAU:  Objection to form.
11   A.   I mean, generally, yes.  I mean, you
12   know, as we saw with these emails, generally, I
13   mean, did that encompass everything, no.
14   Q.   Okay.  Do you know why the
15   payment – do you know why there was no payment
16   made by NexPoint at the end of 2020?
17   A.   Yes.  There was – there was – we
18   talked about these agreements between the
19   advisors and Highland, the shared services and
20   the cost reimbursement agreement.
21       And in late 2020, there were
22   overpayments, large overpayments that had been
23   made over the years on these agreements, and it
24   was my understanding that the advisors were –
25   were talking with – like Jim Seery and others

Page 380

WATERHOUSE - 10-19-21

1
2    to offset any obligations that the advisors
3    owed to Highland as offset to the overpayments
4    on these agreements.
5    Q.   Okay.  Did you participate in any of
6    those conversations?
7    A.   I did not.
8    Q.   Okay.  Do you know – do you recall
9    that the – at the end of November, the debtor
10   did notice to the advisors of their intent to
11   terminate the shared services agreements?
12   A.   Like I testified earlier, there
13   was – the agreements weren't identical, from
14   what I recall, and there is one that had a
15   longer notice period, which I think had a
16   60-day notice period.  I don't recall which one
17   that was, so not all of them were – notice
18   hadn't been given as of November 30th, for all
19   of the agreements.
20   Q.   Upon the receipt of the – the
21   termination notices that you recall, do you
22   know if the advisors decided at that point not
23   to make any further payments of any kind to
24   Highland?
25       MR. RUKAVINA:  Objection, form.

Page 381

WATERHOUSE - 10-19-21

1
2    A.   No.  The advisors – the advisors
3    had stopped making payments prior to that
4    notice.
5    Q.   Okay.  And how do you know that the
6    advisors stopped making – making payments
7    prior to the notice?
8    A.   I had – I had a conversation
9    with – with Jim Dondero.
10   Q.   And did Mr. Dondero tell you that
11   the advisors would no longer make payments to
12   Highland?
13       MS. DEITSCH-PEREZ:  Object to the
14   form.
15   A.   Yes, he – he – again, he said
16   they – they – the advisors have overpaid on
17   these agreements, to not make any future
18   payments, and that there needs to be offsets,
19   and they're working on getting offsets to these
20   overpayment.
21   Q.   Do you know if anybody ever
22   instructed Highland's employees to make the
23   payment that was due by NexPoint at the end of
24   the year?
25   A.   Did anyone instruct Highland's

Page 382

WATERHOUSE - 10-19-21

1    employees to make that payment?
2    Q.   Correct.
3    A.   Anyone – not that I'm aware.
4    Q.   Were any of Highland's employees
5    authorized to make the payments on behalf of
6    its affiliates – withdrawn.
7         Was any of Highland's employees
8    authorized to effectuate the payment on behalf
9    of NexPoint that was due at the end of the year
10   without getting approval from either you or
11   Mr. Dondero?
12   A.   They had the -- they had the ability
13   to make the payment, but they didn't -- you
14   know, that -- that payment needed to be
15   approved.
16   Q.   Okay.  And it needed to be approved
17   by you or Mr. Dondero; is that right?
18   A.   I mean, I'm not going to make the
19   unilateral decision.
20   Q.   Is that a decision that you
21   understood had to be made by Mr. Dondero?
22   A.   Yes.  Sitting back in December of
23   2020, the -- that -- there was this off --
24   offset negotiation that -- that was happening,

Page 383

WATERHOUSE - 10-19-21

1    so I mean, until those negotiations were
2    resolved, you know, there wasn't any
3    payments – there weren't any payments.
4    Q.   And – and there were no payments
5    until the negotiations were resolved because
6    that was the directive that you received from
7    Mr. Dondero; correct?
8    A.   I don't think he said -- I mean, I
9    think -- yeah, I mean -- I'm trying to recall
10   the conversation.  It was -- you know, there
11   is -- there is these negotiations.  There's --
12   there needs to be these offsets.  They're
13   talking with the debtor.  So, you know, until
14   this is resolved, right, I mean, depending on
15   how, whatever that resolution was, were we to
16   take any action.
17   Q.   Okay.  How about with respect to
18   HCMS, did HCMS have a term payment due at the
19   end of the year?
20   A.   Again, I don't -- I don't recall.
21   Q.   You discussed briefly two
22   payments that were made in January of 2021, one
23   on behalf of NexPoint, and one on behalf of
24   HCMS.  Do I have that right?

Page 384

WATERHOUSE - 10-19-21

1    A.   No.  The two payments I recall were
2    NexPoint and HCRE.
3    Q.   Okay.  And those two payments --
4    thank you for the correction.  And those two
5    payments were made because Mr. Dondero
6    authorized those payments to be made; correct?
7    A.   Yes.
8    Q.   And they hadn't been made before
9    that because Mr. Dondero had not authorized
10   them to be made?
11        MS. DEITSCH-PEREZ:  Object to the
12   form.
13   A.   Yes, because of these negotiations.
14   Q.   Okay.  Just a couple of more
15   questions.
16        Did anybody, to the best of your
17   knowledge, on behalf of HCMFA, ever tell the
18   SEC that HCMLP was responsible for the mistakes
19   that were made on the TerreStar valuation?
20   A.   Did anyone from Highland on HCMFA's
21   behalf tell the SEC that Highland -- that
22   Highland was responsible for there -- I just
23   want to make sure --
24   Q.   It was a little bit different, so

Page 385

WATERHOUSE - 10-19-21

1    let me try again.
2    A.   These are very long questions, John.
3    I'm not trying to be --
4    Q.   That is good.  Do you know whether
5    anybody -- do you know whether anybody on
6    behalf of HCMS -- HCMFA ever told the SEC that
7    Highland was the responsible party for the
8    TerreStar valuation error?
9    A.   Not that I'm aware.
10   Q.   Okay.  Did anybody on behalf of
11   the -- on behalf of HCMFA ever tell the retail
12   board that Highland was responsible for the
13   TerreStar valuation error?
14   A.   Not that I'm aware.
15   Q.   Do you know if HCMFA made an
16   insurance claim with respect to the damages
17   that were incurred in relation to the TerreStar
18   valuation error?
19   A.   Yes.
20   Q.   And do you know why they made that
21   insurance claim?
22   A.   Because there was an error.  I
23   mean --
24   Q.   Was the insured's claim made -- was

**Appx. 00296**

WATERHOUSE - 10-19-21

1            WATERHOUSE - 10-19-21
2  the insurance claim made under HCMFA's policy?
3     A.  Yes.
4     Q.  Did HCMFA at any time prior to the
5  petition date -- withdrawn.
6         You were asked a couple of questions
7  where -- where you said that Mr. Dondero told
8  you that he was ascribing zero value to the
9  notes as part of a pot plan because he believed
10  that the notes were part of executive
11  compensation.
12         Do I have that right?
13         MS. DEITSCH-PEREZ:  Object to the
14    form.
15     A.  Yes.
16     Q.  Okay.  Have you ever heard that
17  before the time that Mr. Dondero told you that
18  in the conversation about the pot plan?
19     A.  Had I heard that prior to my
20  conversation with Mr. Dondero?
21     Q.  Yes.
22     A.  No, I had not heard that prior.
23     Q.  Okay.  And that was in the context
24  of his formulation of the settlement proposal;
25  is that right?

1            WATERHOUSE - 10-19-21
2     A.  I mean, generally, yes.  You know,
3  we were asked to provide asset values, right,
4  and he was having settlement discussions.
5  Again, I don't know who those went to
6  ultimately.  I don't recall.
7         MR. MORRIS:  I have no further
8  questions.  Thank you very much for your
9  patience.  I apologize for the late hour.
10         MS. DEITSCH-PEREZ:  John, you stay
11  on about your email when --
12         MR. RUKAVINA:  Hold on, I'm not
13  done.
14         MS. DEITSCH-PEREZ:  Oh, okay.  Davor
15  still has questions.  Sorry.  I was going
16  to say both John and Davor, could you stay
17  on afterwards just to talk about the
18  requests.
19         FURTHER EXAMINATION
20  BY MR. RUKAVINA:
21     Q.  Mr. Waterhouse, you were just now
22  testifying about a discussion you had with
23  Mr. Dondero where he said something like no
24  more payments.
25         Do you remember that testimony?

1            WATERHOUSE - 10-19-21
2     A.  Yes.
3     Q.  Okay.  And was that late November or
4  early December of 2020?
5     A.  It was, I would say, first or second
6  week of November.
7     Q.  Okay.  Do you recall whether --
8  whenever you had that discussion, whether
9  Mr. Dondero had already been fired by the
10  debtor?
11     A.  Yes, I -- I believe he was not an
12  employee of the debtor anymore at that time.
13     Q.  And when you were discussing this
14  with Mr. Dondero and he said no more payments,
15  you were discussing the two shared services
16  agreements and employee reimbursement
17  agreements we testified -- you testified about
18  before; is that correct?
19         MR. MORRIS:  Objection to the form
20  of the question.
21     A.  That is correct.
22     Q.  And had your office or you -- and we
23  will talk at a future deposition about the
24  administrative claim.
25         But had -- by that time that you

1            WATERHOUSE - 10-19-21
2  talked to Mr. Dondero, had your office or you
3  done any estimate of what the alleged
4  overpayments were?
5         MR. MORRIS:  Objection to the form
6  of the question.
7     A.  Yes, we had -- there was a -- there
8  was a detailed analysis that was put together
9  by David Klos at the time.
10     Q.  And do you recall just generally
11  what the total amount for both advisors of the
12  overpayments was?
13     A.  It was in excess of $10 million.
14     Q.  Was it in excess of $14 million?
15         MR. MORRIS:  Objection to the form
16  of the question.
17     A.  I -- I remember it was an
18  eight-figure number.  I don't remember
19  specifically.
20     Q.  Okay.  And did you convey that
21  number to Mr. Dondero when you had that
22  conversation?
23     A.  Yes.
24     Q.  What was his reaction?
25     A.  I mean, he wasn't happy.

Page 390

WATERHOUSE - 10-19-21

1
2    Q.   Is it fair to say he was upset?
3    A.   Yes.
4    Q.   Did Mr. Dondero ever expressly tell
5    you to not have NexPoint make the required
6    December 31, 2020, payment?
7    A.   Yes, I recall him saying don't make
8    the payment because it was being negotiated, as
9    I discussed with Mr. Morris, this offset
10   concept.  So there were obligations due by the
11   advisors to Highland, they should be offset
12   that -- you know, those obligations should be
13   offset by this -- by this overpayment.
14   Q.   And when did he tell you that?
15   A.   I would say -- I would say around --
16   probably December -- December-ish.
17   Q.   Early December, late December?
18   A.   I don't recall with as much
19   specificity as -- as -- as -- as stopping the
20   shared services payments, because we had
21   actually made one shared services payment in
22   November.  So that is why I need to remember
23   that one more clearly.  I don't remember where
24   exactly in December that conversation occurred.
25   Q.   Did Mr. Dondero expressly use the

Page 391

WATERHOUSE - 10-19-21

1
2    word "NexPoint" when he was saying don't make
3    these payments?
4         MR. MORRIS:  Objection to the form
5         of the question, asked and answered.
6    A.   Yeah, we were -- we were discussing
7    advisor obligations.  So it was -- you know, it
8    was just obligations from the advisors.
9         And -- and he specifically talked
10   about the NexPoint payment as well.
11   Q.   Okay.  And it is your testimony that
12   he expressly told you not to make that NexPoint
13   December 31 payment?
14        MR. MORRIS:  Objection, asked and
15        answered twice.
16   A.   Yes, he -- he did, during that
17   conversation.
18   Q.   And did you ever follow up with him
19   after that about whether NexPoint should or
20   shouldn't make that payment?
21   A.   I did not.
22   Q.   Did you ever, on or about
23   December 31, 2020, remind him and say, hey,
24   this payment is due, what shall I -- what
25   should I do?

Page 392

WATERHOUSE - 10-19-21

1
2    A.   I did not.
3    Q.   So sitting here today, you -- you
4    remember distinctly that Dondero in December of
5    2020 expressly told you not to have NexPoint
6    make that payment?
7         MR. MORRIS:  Objection, asked and
8         answered three times.
9    A.   Yes.
10   Q.   Can you say categorically it wasn't
11   just some general discussion where he told you
12   not to make payments?
13        MR. MORRIS:  Objection, asked and
14        answer four times.
15        MR. HORN:  Four times now.  Go for
16        five.
17   A.   Yes.
18   Q.   Did you tell Mr. Seery that?
19   A.   I don't believe I did.  I don't
20   recall.
21   Q.   And was this an in-person discussion
22   or telephone or email?  Do you remember?
23   A.   This was a phone -- a phone
24   conversation.
25   Q.   Okay.  Would you have a record of --

Page 393

WATERHOUSE - 10-19-21

1
2    on your cell phone of when that conversation
3    might have taken place?
4    I'm sorry, strike that.
5    Was that by cell phone?
6    A.   I believe -- yes, because we -- I
7    was at home.  I mean, I don't have a landline.
8    All I have is my cell phone.
9    Q.   Do you know whether your cell phone
10   still has records of conversations from
11   December 2020 on it?
12   A.   My call log doesn't go back that
13   far.
14   Q.   Okay.  Thank you.
15        MR. RUKAVINA:  I will pass the
16   witness.
17        MS. DEITSCH-PEREZ:  Just a couple
18        quick questions.
19             FURTHER EXAMINATION
20   BY MS. DEITSCH-PEREZ:
21   Q.   With respect to HCRE and HCMS, am I
22   correct there was -- there was no direction not
23   to pay those loan payments?
24        MR. MORRIS:  Objection to the form
25        of the question.

Page 394

WATERHOUSE - 10-19-21

1
2    A.   Yes, I don't recall having
3    conversations about, you know, those -- those
4    entities.
5        Q.   And, in fact, what was the tone that
6    Mr. Dondero had when he talked to you about the
7    fact that HCRE and HCMS payments hadn't been
8    made when he found out that they hadn't been
9    paid?
10       MS. DANDENEAU:  Objection to form.
11       MR. MORRIS:  Objection to form.
12       Q.   What was the tone he took with you?
13       A.   Oh, it was -- it was -- it was -- it
14   was very negative.  I mean, I think he cursed
15   at me and he doesn't usually curse.
16       Q.   Okay.  And in your mind, is that
17   consistent with the fact that he was surprised
18   that those payments hadn't been made?
19       MR. MORRIS:  Objection to the form
20   of the question.
21   A.   Yes.
22   Q.   Okay.  Thank you.
23       MR. MORRIS:  I have nothing further.
24   Thank you so much, Mr. Waterhouse.
25       MR. HORN:  I have no questions.

Page 395

WATERHOUSE - 10-19-21

1
2    Thank you, Mr. Waterhouse.  We appreciate
3    your time.  I am logging off the discussion
4    and I will talk to y'all tomorrow.
5        MR. MORRIS:  Super.
6        VIDEOGRAPHER:  If there are no
7    further questions, this ends the
8    deposition -- excuse me.  This ends the
9    deposition, and we are going off the record
10   at 7:30 p.m.
11   (Deposition concluded at 7:30 p.m.)
12
13   _____
14       FRANK WATERHOUSE
15
16   Subscribed and sworn to before me
17   this     day of        2021.
18
19   _____
20
21
22
23
24
25

Page 396

WATERHOUSE - 10-19-21

1
2        C E R T I F I C A T E
3
4        I, SUSAN S. KLINGER, a certified shorthand
5    reporter within and for the State of Texas, do
6    hereby certify:
7        That FRANK WATERHOUSE, the witness whose
8    deposition is hereinbefore set forth, was duly
9    sworn by me and that such deposition is a true
10   record of the testimony given by such witness.
11       I further certify that I am not related to
12   any of the parties to this action by blood or
13   marriage; and that I am in no way interested in
14   the outcome of this matter.
15       IN WITNESS WHEREOF, I have hereunto set my
16   hand this 19th of October, 2021.
17
18   _____
19       Susan S. Klinger, RMR-CRR, CSR
20       Texas CSR# 6531
21
22
23
24
25

Page 397

WATERHOUSE - 10-19-21

1
2    NAME OF CASE:  In re:  Highland Capital
3    DATE OF DEPOSITION:  October 19, 2021
4    NAME OF WITNESS:  Frank Waterhouse
5    Reason Codes:
6        1.  To clarify the record.
7        2.  To conform to the facts.
8        3.  To correct transcription errors.
9    Page____Line_____Reason_____
10   From_____to_____
11   Page____Line_____Reason_____
12   From_____to_____
13   Page____Line_____Reason_____
14   From_____to_____
15   Page____Line_____Reason_____
16   From_____to_____
17   Page____Line_____Reason_____
18   From_____to_____
19   Page____Line_____Reason_____
20   From_____to_____
21   Page____Line_____Reason_____
22   From_____to_____
23   Page____Line_____Reason_____
24   From_____to_____
25

**$**

**$1,406,000** 343:10

**$1,406,112** 343:13

**$1.04** 109:15

**$1.4** 344:5 345:11 350:7 351:22

**$1.5** 223:17

**$1.7** 92:22

**$10** 389:13

**$10.5** 308:16

**$12.7** 311:2 317:10

**$13** 310:23

**$14** 389:14

**$150** 239:10

**$173,398,000** 107:7

**$2.4** 140:14 141:9,18 270:20 271:7,16 272:8 283:18 315:13

**$23** 220:24

**$24** 178:19

**$24.5** 309:25

**$30** 161:25 220:13,20 223:7 224:2 334:7,19 336:13,23 337:25 339:4 340:10 341:23

**$30.7** 216:17

**$325,000** 331:14 332:16,24

**$400** 239:24

**$410** 238:9 239:12

**$5** 142:19 270:20 271:6 272:7 283:18 315:13

**$5.3** 119:23 310:17

**$7** 217:16,19 221:7 277:11,20

**$7.2** 302:22

**$7.4** 131:13 132:8 138:12 143:12 144:6, 17,23 272:16 273:6

287:15 288:6,20 303:6,18,24 304:11, 20 305:23 306:2 307:7 308:20 310:17 317:6 318:14

**$7.8** 278:6,7

**$8** 277:16

**1**

**1** 8:9 35:17 139:22 140:12,13 215:25 216:3,7,12 238:8 260:20,23 261:15 328:10,11,12 343:19

**1/12** 6:9

**10** 5:6 197:4,7,9,15 198:2 266:20 267:3 302:7

**10-19-21** 3:1 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1

129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1

297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1 388:1 389:1 390:1 391:1 392:1 393:1 394:1 395:1

**10.5** 308:22

**100** 108:23 298:15

**10010** 4:21

**10017** 3:10

**10:08** 36:15,16

**10:11** 36:16,18

**11/25** 6:7

**11/30** 332:24

**11:02** 72:25 73:2,5,6

**11:15** 73:3 342:14

**11:20** 73:6,8

**11:40** 344:14

**11th** 152:18,25

**12/1** 332:10

**12/19** 5:25

**12/31** 6:8

**12/31/18** 117:12 122:12 135:21 261:22

**12/31/19** 219:16

**12/31/2018** 93:15

**12/31/2019** 260:13

**12/31/2020** 361:15

**12th** 341:18 344:3 350:5,9,13,24 351:20

**135** 6:2

**14-ish** 286:21

**142** 5:15

**15** 73:3 200:4 202:13, 23 203:3 210:6 213:18 221:23

**15(c)** 5:21 160:11 169:21,23 170:4,8,10 171:6 175:3,9 176:23 179:20 184:5 195:9 210:12,21

**150** 239:24

**150,331,222** 243:23

**151** 5:20

**15th** 203:15

**16** 224:5

**17** 89:16 109:19 110:8 137:24

**170** 5:21

**173** 110:14

**18** 89:16

**1900** 3:15

**19th** 8:19 21:7

**1:04** 150:24,25

**1:49** 150:25 151:3

**1c** 238:12

**1st** 14:8

**2**

**2** 5:15 35:18 140:18 142:15,16,22 171:10

172:8 174:13 179:4
195:11,14 215:22,23
216:3,4,5,8,25
338:12

**2.4** 268:23 282:15

**2/18** 5:22

**20** 15:25 271:14

**2006** 18:15

**2011** 19:2,4,22

**2012** 19:2,4 95:25

**2013** 52:7

**2014** 20:2

**2016** 23:19 25:13
87:8,20,24 89:15,16

**2017** 126:12 161:23
165:22 216:16
220:14 222:10 223:7
224:2,12

**2018** 105:19 109:14,
20 119:21 165:18
186:25 202:19 203:9
228:3,23 242:18,23
243:12 244:14,18
262:5,15 279:12

**2019** 6:4 21:7 98:17
99:25 103:2 125:18
126:2 131:10 132:6,
21 133:12 134:5,17,
23 137:6 138:12,20
139:18 140:14 141:5
142:18 152:18,25
165:15 180:24 181:4,
9,16,23 182:8,16
200:4,7 201:22
202:13,23 203:3,15
204:10 210:7 213:9,
19 218:21 219:7,12,
24 220:19,22 221:6
222:4,12 223:4,14
242:23 258:21
262:17 263:13,14,20,
24 265:3 269:5,24
270:12,18 271:3,14
272:4,15 273:4
279:12 280:10,20
282:23 287:4 293:19
299:4 301:2,8,16,18
313:3 314:13,23
315:19 316:14 321:6

**2020** 59:7,9 68:15
70:17 160:7,14,22
165:14 169:17,20
171:19 173:24 175:8
176:10 179:24 183:7,
14 186:12,14 189:13
195:20 196:3,17
200:24 204:20
207:16 221:11,16,21
258:20 265:6,11
307:24 314:21
316:16 323:10 326:4,
12,14 327:5,9 328:16
330:15 334:23 335:7
336:11,20 337:12
338:15,24 341:9
343:2 346:10 359:3
360:17,19 361:6,24
364:4 366:9,10
367:15,20 377:21
378:10,11 379:16,21
382:24 388:4 390:6
391:23 392:5 393:11

**2021** 8:19 14:8 19:5
37:2,10,19 38:2
70:21 71:3,5,12
121:13,22 122:19,24
163:2,7,8 165:5,9
166:2 173:18 176:24
187:3 198:21 199:7,
12,20 200:14 201:2
203:4,21 210:2,23
212:19 219:11,13,17
226:4 301:24 314:8
315:21 316:7,19
326:9 340:21 341:6
350:6,9 361:25
362:3,7 364:8 365:2
367:15 383:23
395:17

**20th** 160:5

**21** 78:3

**21-03000-SGI** 8:15

**21-3004** 197:18
215:4

**215** 106:2

**218** 6:4

**226** 5:22

**228** 8:22

**23** 178:19

**236** 5:23

**241** 110:23

**25** 260:12 328:16
329:14

**25-year** 347:7

**251** 129:16,22

**256** 5:7

**258** 5:25

**25th** 329:19

**297** 6:10

**2nd** 132:20 141:5
213:9 315:18

---

**3**

**3** 220:2

**30** 7:19 16:3 186:16
356:9

**302** 6:12

**307** 6:11

**309** 6:13

**30th** 176:10,24
331:12 332:3 380:18

**31** 122:19 197:20,24
198:7,9 199:7,12
200:24 201:2 203:4
301:18,24 307:24
326:4 338:15,24
341:9 346:9,21 390:6
391:13,23

**3102** 4:7

**31st** 105:18 109:14
119:21 121:13
122:23 199:20
200:14 202:19 203:9,
21 212:19 216:16
218:21 219:7 221:15,
21 242:18 258:20
263:14 326:8,12,14
334:15

**328** 6:7

**33** 5:16 91:20,21

**33416** 100:10

**338** 6:8

**34** 5:18 104:23,24

**341** 6:9

**35** 5:20 15:20,22
100:10 151:20,21

**352** 5:8

**35D** 101:10,19

**36** 5:21 102:18
170:18,19 177:18
313:9 317:12

**377** 5:9

**387** 5:10

**39** 5:22 226:23,24
236:17

**393** 5:11

**3:26** 224:20,23,24

**3:39** 224:24 225:2

**3:40** 224:21

**3rd** 92:2 98:17 99:25
103:2 132:20,25
135:2 137:6 142:18
200:7 213:9 242:23
262:17 263:13 265:3
315:19

---

**4**

**40** 5:23 236:22,23
237:19

**406** 343:19

**41** 5:25 258:16,18

**419** 103:11

**45** 6:2 135:12,14,15

**45th** 8:23

**46** 6:4 218:16,17

**4:30** 265:25

**4:31** 266:5,6

**4:40** 266:2

**4:43** 266:6,8

**4th** 135:2

---

**5**

**5** 268:22 271:15
282:14

**5.3** 121:3,6 124:17
308:21 311:4

**500** 3:23

**51** 4:20

**5:52** 172:4 174:6

**5:53** 325:7,8

**5:59** 325:8,10

---

**6**

**6** 183:7 186:14
217:16,19 314:20
316:16 341:13

**6/3/19** 5:16

**6/30** 176:8,16

**60-day** 380:16

**650** 4:13

**6:27** 349:6,7

**6:30** 349:7,9

**6th** 172:4 174:6
186:11 189:13

---

**7**

**7** 277:15,16 297:20
305:5

**7.4** 132:2 311:4

**7.8** 277:12

**70130** 4:14

**71** 238:20

**71A** 6:13

**75** 18:2

**75201** 3:16

**75201-6659** 3:24

**75219** 4:8

**780** 3:9

**7:02** 372:14,15

**7:03** 372:15,17

**7:30** 395:10,11

---

**8**

**8/31** 6:11

**850** 100:25 101:2,4,9

---

**9**

**9** 307:18,19,20

**90** 18:4

**91** 5:16

**94** 5:18

**99** 86:14

**9:32** 8:20

**9th** 70:16

---

**A**

**a.m.** 8:20 36:15,16,18 73:5,6,8 342:14 344:14

**A1** 6:7 328:13

**A10** 6:12 302:7,8

**A11** 6:13 309:4,5,6

**A2** 6:8 338:13

**A6** 6:9 341:14

**A7** 6:10 297:20,23

**A9** 6:11 307:20,21

**abilities** 265:12

**ability** 20:17 42:6 124:3 204:15 272:6 327:16 372:5 382:13

**absolute** 109:2

**accelerate** 340:10, 14

**accelerated** 339:4 347:7

**acceleration** 339:6, 10,15 340:13,17,24

**accept** 16:17 152:23 188:19

**accepted** 241:14 277:19

**accepting** 153:16

**accepts** 8:6

**access** 294:24 359:19,21 360:9,14 372:21 373:13

**accordance** 241:13, 25 242:4 254:10 256:21

**account** 287:17 328:6,9 359:14 360:6,14,22 367:22 371:9

**accountant** 21:17 25:20 116:12 370:14

**accountants** 147:22

**accounting** 26:2,4, 7,17 28:16 38:24 87:12,14,17 112:10, 11 148:23 149:2,14 150:14,19 188:11 200:17 230:16,18,21 240:19 241:14 257:22,24,25 258:12, 13 280:6 290:13 326:18,21 337:2,7 351:2 354:7,11,22 358:3 371:5 372:3 378:15

**accounts** 244:9 327:10,12,17,21 329:17 330:10,12,20 331:4 333:7 359:19, 22

**accuracy** 113:17 114:17 115:2

**accurate** 88:7,11,17 89:13,23 90:2,6 110:16 112:19 133:5 176:17 204:4 238:4 256:10 257:4 284:24 286:6 330:20,24

**accurately** 240:9,14

**accusations** 157:18

**acknowledgment**

6:12 201:13,25 213:6,17 314:21

**acting** 23:23 24:2,3,8 28:5,8,12,18,20 29:5, 9,11 30:14,16,24 31:2,3,5 155:6,9,14 156:4,12 158:3,9,11

**action** 374:20 383:17

**actions** 9:7 347:25

**actively** 337:11,12 346:19,25

**actual** 115:21 311:25 312:12

**add** 183:23

**added** 183:24

**addition** 333:7

**additional** 171:6

**adequately** 335:24

**adjustment** 242:7 263:4

**adjustments** 36:4 240:21 241:18 243:5 244:19 245:20

**administrative** 321:17 388:24

**admissible** 7:17

**admitted** 276:24

**advance** 57:21 60:21 61:5,10 62:21 63:5 267:8 355:25

**adversary** 197:18

**advice** 172:7 205:7 257:2

**advisor** 125:8,15 192:25 193:15 205:10 273:23 281:6 282:5 311:25 312:5,6 328:7 331:22,23 391:7

**advisor's** 337:17

**advisors** 3:17,18 9:21,22 22:22 27:10 29:10,12 32:18,20,25 33:24 39:2 42:21,22 44:6,7 58:8,14,15,18

125:3 126:10,13,16 127:10 152:14 160:10 167:13 168:19 171:14 172:18 175:7,13 178:11 179:18,21 183:7,18 184:15,19, 22 189:23 190:9,12, 19 191:2 192:25 193:8,19 194:3,21 195:10 196:8,22 205:7,12,23 206:14 208:4,7 210:5 213:22 215:14 235:9 267:24 268:16 279:19 280:2 286:18 308:4 325:15, 21,22 328:7,25 329:3 332:14 333:23 335:15 336:7 337:14 353:20 379:19,24 380:2,10,22 381:2,6, 11,16 389:11 390:11 391:8

**advisors'** 168:9 179:8,25 180:9 184:3 194:17 218:19 328:9

**advisory** 32:21 33:24

**affect** 371:17

**affected** 265:12 277:20 370:23

**affidavit** 164:10

**affiliate** 41:18 42:2,4 44:12,16 47:25 48:9, 22 49:5,6,10 51:17 54:17 57:19 58:3 60:14,21 61:4 62:9, 20 63:3,15,22 64:6, 10,16,24 65:18 78:18 93:21 94:6 100:25 105:8 107:2,13,21 108:3,7 109:10 131:2 171:14 220:6 225:6, 14,21 239:4 254:2 259:24 262:11 263:5 307:24 309:16,24 310:9 312:2,11,14,25 370:10

**affiliated** 134:6 285:17

**affiliates** 41:2,5,8,10, 13,14 44:4,11,15,25

45:13 46:3,9 47:18 48:7,13 54:2,11,13, 20,21,25 55:6,11,18 56:2,16,23 61:20 62:2 63:11 65:4 66:8 82:16,20 91:3 100:22 101:16 106:22 107:3 108:14,18 109:8,18 110:7 111:2,6,9,13, 23 112:18,24 113:19 115:4 117:24 118:7 119:4 120:20 121:4 176:9 233:9,23 234:10,16,21 235:4, 22 236:8 238:25 241:7 242:8 243:8 259:19 260:11 262:6 309:19 312:2,13 377:13 379:8 382:7

**affirmative** 96:15

**afield** 16:22 376:3

**afternoon** 344:17

**aggregate** 131:13 132:7 138:11 217:15, 19

**agree** 77:5 306:13,22 307:5,10

**agreed** 16:17 75:20 121:16,20 198:20 199:5,11,19 200:13 209:25 210:6 314:11 374:25 375:7

**agreement** 17:9 59:24 65:19,16,23 66:2,6 67:3,7,8,12, 16,22 68:4,9,12,17, 24 69:15,19,22 70:2, 7,11,16,20 71:18,24 72:4,7,10,13 75:4,5, 9,14,16,23,24 76:3,6, 7,10,14 77:6 78:15, 21,25 79:8,10,17,18, 24 80:5,6,11,16,20 81:6 82:9,17,22 83:7, 10,14,17,20,23 99:15,24 100:2,6 102:3,6 104:13,17,19 122:5 123:22 124:4 134:12 186:24 187:2, 16 189:2 200:13 210:22 212:17 278:23 279:18,20,24,

25 314:7 316:5,8,9,
13 326:3,13 332:8
351:4 365:22 379:20

**agreements** 58:16
77:24 83:4 168:9
186:10 279:4,6
325:24 353:22
379:18,23 380:4,11,
13,19 381:17 388:16,
17

**agrees** 243:25

**ahead** 68:22 82:6
156:20 164:10
212:25 248:12
295:12 329:11
352:10 364:23
378:18

**Aigen** 4:5 9:24 214:4
251:23

**Akard** 3:23

**allegations** 208:17

**alleged** 389:3

**Allocation** 35:19,21
125:2 273:17 281:8,
23

**allowed** 62:8 81:23,
25

**alpha** 297:20 302:7
307:19 328:10
338:11 341:13

**alter** 187:16

**ambiguous** 353:20

**amended** 5:15
214:18

**amortizing** 334:13

**amount** 49:10,11
50:23,24 57:6 119:7
131:13 132:8 138:11
142:18 144:5,16
161:19,25 195:16
196:16 216:17
217:15 220:23
222:11 239:5 240:9
244:3 271:11 277:7
283:18 288:6 308:22
342:10 343:5,15,17
389:11

**amounts** 106:21,25
108:14 109:7,18
110:6 111:2,5,8,12,
23 112:18,24 113:18
114:19 115:3 119:3
120:20 121:4,11
125:8 126:6 161:8
168:3 171:12 174:15,
22 175:11 176:9
181:15 199:12 202:7,
22 203:7,13,19
204:11,16,25 205:12
211:11 212:10,18
217:19,21 222:3,11
234:23 235:3 275:13
282:8 283:2 285:10
288:3 311:4 335:12

**analyses** 241:11

**analysis** 240:20,24
241:3,6 261:11 262:3
265:7,8,17,18,19
389:8

**and/or** 42:8,16 43:3,
14 59:14

**annual** 26:10 84:17,
23 85:2,24 96:7
168:10 170:5,9 184:5
217:2 228:16 334:8
335:9 336:12

**answering** 248:7,8
262:23

**answers** 12:2 16:25
26:15

**anticipated** 311:20
378:17

**anymore** 294:24
388:12

**apologize** 30:10
40:22 78:14 99:22
104:12 125:21,24
139:2 170:2 192:14
197:19 226:17
227:17 304:14 352:8
354:17 387:9

**appearances** 3:3

**appeared** 337:16,19

**appearing** 8:18

**appears** 224:8

**Apple** 281:21

**application** 165:10

**applied** 55:16,24
56:6 59:17 60:12
162:5 168:4 294:13
316:14

**apply** 213:7 314:12,
22

**appointed** 18:21,24
24:14,19,25 25:8
29:11,15 270:4
323:9,16

**appointment** 152:24
153:4,16

**appointments**
227:14

**appoints** 183:9

**appreciated** 74:16

**approaching** 310:23

**approval** 57:13 62:5,
10 63:12,17,23
144:24 170:14 206:5,
16 271:17,22 272:13,
14 281:7 332:16
351:5 377:17,24
382:11

**approve** 56:21 57:2,
3,20 61:5,9 231:21
273:6 379:7

**approved** 57:5 60:20
231:14 271:12
294:21 295:6,18
333:4 382:16,17

**approximate** 17:22
23:15 27:24 30:19
36:23 38:15 120:15
161:24 216:17 277:7
310:5

**approximately** 8:20
15:13,20 19:23
109:15,19 110:7
119:23 126:12 169:7
173:14,15 178:19
220:12,24 221:3,7
238:9 277:10,15
278:6

**approximates**
118:13 121:6

**April** 152:18,25 200:4
202:13,23 203:3,15
204:10 210:6 213:18
301:16 314:21 323:6

**areas** 26:5

**Argumentative**
156:10

**arise** 288:3

**arithmetic** 260:10

**armchair** 153:11

**ASC** 100:25 101:2,4,
9

**ascribing** 386:8

**Asia** 4:24 92:14
118:3 129:16 135:10
177:14 218:14

**asks** 97:12 171:10
172:6 174:21

**aspect** 26:18 116:20

**asset** 107:25 108:6,
24 109:14 118:23
225:16,23 265:9
354:15 367:9 368:4
371:7,16,23 372:6
376:24 387:3

**assets** 5:23 107:14
108:10,13 109:20
110:8 122:3,8 137:14
190:3 194:2 195:17,
20 196:3,9,17 204:19
211:3 225:8 235:11,
15 237:20,23 239:13,
19 240:15 241:4,18
242:13 250:18
253:16,24 259:18
260:8,11,13 301:9
303:9 307:9 309:2
311:10 317:7 366:14
368:5 370:22

**assistant** 295:2
298:25 320:23 321:9

**assistant's** 321:5

**assistants** 321:18

**assisted** 326:22

**assisting** 333:8

**associate** 268:10
297:25

**associates** 377:23

**association** 7:5 8:25

**assume** 22:15
133:24 297:13

**assumed** 285:4,11
287:6

**assuming** 288:22

**assure** 105:4

**assured** 257:3

**astute** 320:12

**attach** 320:22 321:2

**attached** 307:23

**attaching** 171:5

**attachment** 307:25

**attempted** 360:23

**attempting** 374:17

**attorney** 153:11
172:12

**attorneys** 3:4,11,17
4:2,10,16 147:21
187:6,11,15 188:3,7,
24,25

**attributable** 132:3
276:11 283:2

**audit** 26:11 48:5
52:23 85:24,25 86:9,
23 88:2,6,13,14,16
89:10,11,22 91:11,14
93:4,14 95:6 96:7,10
97:22 98:19 103:25
104:4 106:7,16,17
109:24 110:25
111:20 112:7,24
113:17 114:2,7
115:2,20 116:5
117:2,20 119:19
131:5 132:9,24 135:6
137:5,7,10,12,21
138:18 142:9,11
148:25 149:4 199:23,
25 200:6 218:7
219:4,5,12,15
221:11,14,20 243:12
244:18 263:24 264:8

**audited** 6:4 41:7
47:25 84:16,23 85:3,
19 90:2 93:24 95:14

98:6 102:7,10 104:21
107:22 113:7 114:18
133:22 138:3,4,9
143:8 186:25 196:21
200:9,12 201:7 211:6
217:24 218:4,12,24
241:24 242:2,3,15,16
261:20

**auditing** 264:2

**auditor** 84:21 97:12
113:11 136:6

**auditors** 46:8 47:17
48:7,10 52:11,20
53:4,11,13 84:10
86:10 88:9 91:12
113:8 136:16 137:3
149:13 211:16
212:15 264:16

**audits** 149:12 246:11

**authority** 63:9,21
270:19 271:5

**authorized** 57:8
139:4 143:13,22
144:7,18 150:4
152:11 158:4,13,18
159:4,15,23 160:15,
24 181:3 320:16
363:2 382:6,9 384:7,
10

**availability** 121:12

**Avenue** 3:9 4:7,20

**aware** 12:14 21:6
32:7 43:22 45:12
48:8,11 49:4,8 50:20,
25 51:5,8,13,18
53:24 57:6 61:7,19,
23 65:3,5 66:21 78:5,
15,22 83:15 85:10
93:8 102:5,14,16,22
103:5,16 107:20,23,
24 108:6 133:15,19
148:5 161:2,6,22,23
162:2,3,8 167:18,19,
24,25 168:7 181:6,7,
12,13,17,24,25
182:4,9,10,13,14,18
198:16 199:9,13,17
202:11,17,21 213:5,
13,15 220:17 223:3
226:3,6,7 261:3,5,7
263:12 267:7 295:23

338:22,25 339:3,5,6
343:18 347:5,8,25
348:6,13,14,17
372:24 378:9 382:4
385:10,15

**B**

**back** 20:14 36:17
40:22 50:2 61:24
71:11 73:2,7 75:17
89:17 91:10 92:9
93:11 95:18,20
125:19 140:14
141:12 151:2 160:6
174:20 183:8 185:19
192:23 202:3 205:19
207:2,5 209:6,13
215:20 224:20,25
226:18 243:22
263:23 265:5,15
266:7 273:21 280:3,5
282:13 283:22
285:16,21 286:20,24
292:23 293:19 299:4
301:21 302:23
305:16,20 306:3
313:3 324:6,12 325:9
326:15 332:13 333:9
343:6,16 344:18
347:3,4 348:25
349:8,10 350:2
354:16 365:20
372:16 382:23
393:12

**backed** 50:22 123:5

**background** 13:22
16:13

**backing** 189:9,15
190:10,12,19 191:3
193:20 194:20 205:8,
14,24 206:14,23
208:5 321:15

**bad** 134:9

**badly** 81:18

**Baker** 3:14 9:9

**balance** 106:19
107:14,22,25 108:11
109:6 110:4,5 111:11
112:4 120:23 175:2,
8,14 179:17 196:25
220:2 222:21 228:22

229:3,8,16 230:5
243:7 251:14 253:22
370:22 372:6

**ballpark** 196:15
277:17 278:11

**bank** 142:12 261:23
306:5 327:10,12,17
328:6,9 360:5,14

**bankruptcy** 8:13
21:7 45:24 187:15
188:25 219:23
236:24 237:2,14,24
240:8 244:6,21
245:17 247:9,17,23
248:14,24 254:12
263:18,19 264:3,15
311:11 317:11 366:4
374:15 376:7

**base** 109:14

**based** 71:16 78:25
101:13 108:21,23
111:15 146:8,23
204:22 274:4 278:4
315:4 337:22

**bases** 228:13

**basically** 122:19
145:15 152:10
199:14,23 200:23
252:9 254:16,19
327:20 348:4

**basis** 16:18 19:4
47:10 84:18 110:3,
10,17,18 137:16
151:14 154:6 170:15
190:13 226:11 227:5,
20,25 228:13,16
241:17 266:22
288:12 358:7

**batch** 330:3

**Bates** 129:16,21
137:25 177:16

**bear** 17:5

**began** 20:8,13,17,23
266:21

**begin** 11:22 12:2
266:18

**beginning** 202:5
249:9

**begins** 12:15 170:23
197:25 341:17

**behalf** 58:11 122:22
139:18 180:22 181:2,
7,13 182:17 201:13,
15 210:5 211:9 212:8
213:8 270:21 271:5
273:4 289:18,23
327:17 336:21
350:19 362:9 377:12,
23 379:8 382:6,9
383:24 384:18,22
385:7,11,12

**belief** 98:17 346:15

**believed** 143:22
161:7,17 175:22
246:22 250:9 386:9

**believing** 144:17

**benefit** 17:19 304:19

**bigger** 89:5

**bill** 117:9 355:3,8
358:13

**bill-paying** 358:14

**billion** 109:15 110:14
253:21

**billions** 253:24

**bills** 326:23 355:14
356:2,13

**binder** 91:23 216:10

**binders** 216:5

**bit** 16:22 96:4 117:22
152:17 171:2,25
201:12 222:25
313:11 384:25

**BK** 187:6

**blah** 248:18

**Blank** 170:24

**blend** 250:5

**blessing** 319:21

**block** 152:21 320:22
321:3

**board** 33:5,12 34:4
166:23 168:18,21,23
169:10,12,14,20
170:12,13 171:7

175:3,8,15 176:22
178:7,13,17,23
179:8,12,15,19,25
180:8,23 182:6,15
184:4,8 185:14
189:7,14,19 190:4,
14,18,21 191:2,8,13,
16,20 192:3,8 193:3,
18 194:12 204:18,23
205:6,22 206:12,13
209:16,19,21,24
210:6,20,22 233:7,
13,16 281:7 323:8,16
348:3 385:13

**board's** 174:13
175:23 176:18 179:3
194:17 195:10
210:11

**boards** 33:8 160:8
171:19 181:2,8,14,
19,21 182:2,11

**bona** 369:25

**book** 140:15

**bookkeeping** 358:6

**books** 225:8,15,23
235:16 237:15
240:11,14 257:21
258:5 286:23 371:8

**born** 284:10

**borrowed** 127:15,24
128:5,23 129:2,5

**borrower** 272:7
273:5 340:2,7

**borrowers** 44:15,19

**bottom** 92:16 106:5
129:25 143:3 170:21
221:24 224:4 329:5
330:7

**box** 294:20

**Boyce** 21:5

**Brad** 249:21

**break** 36:6 72:17,20
73:10 74:4,14 139:25
150:22 151:5 224:19
265:24 266:2 324:22,
25 327:3

**briefly** 383:22

**bring** 73:16 154:20

**bringing** 249:21

**broke** 221:12

**broker-dealer** 332:6

**brought** 73:17
248:13 374:9

**build** 107:7 108:22
260:5 311:17

**bulk** 89:9

**burdening** 81:12

**business** 226:10
229:22 332:10,11

———————

**C**

**calculate** 275:11
276:22

**calculated** 335:11

**calculation** 278:12

**calculations** 276:19

**calculator** 110:12

**calendar** 337:7
378:16,21 379:5

**call** 46:14 55:2 68:6
70:3 154:8 167:4
191:14,15,24 192:2
290:19,25 350:15
364:21 393:12

**called** 16:10 22:21
27:10 29:25 31:8
32:4 81:9 115:3
130:3 227:2,19
228:21 273:18
278:22,24 315:20
342:8,24 343:2,16
351:10 362:8

**calling** 344:18

**calls** 45:17 46:10
55:21 107:5 126:4
268:6 324:2,9 344:22

**camera** 36:2

**Canty** 4:24 105:2,23
129:18,23 135:12,16
177:10,21,25 218:15

**capable** 86:12 88:20

**capacity** 11:3 19:25
21:3 24:17 26:22
65:10 97:15 143:25
174:3 232:4 258:25
270:25 285:24
295:18

**Capital** 3:4,18 8:11
9:6,22 10:22 11:7
15:16,23 18:7 22:21
30:2 41:18 42:10,18,
21 43:11,16 44:6
58:15,17,20 70:21
109:23 110:9 125:3
127:12 133:10
152:13 172:14
215:14,17 271:3
279:18,19 280:2,3
308:4 325:22,24
330:16 354:19
359:16,18 360:7,8,13

**capture** 107:10
130:15 203:11

**captured** 131:3

**career** 286:21

**careers** 89:6

**carefully** 40:14,18
47:9 114:14 144:14
223:12

**carried** 107:14,18,21
109:6,11 233:5 243:6

**carrying** 118:13,25
120:2,4,12,14 262:8
263:7,16 265:2

**case** 7:21 8:14
208:15 248:15
301:14 339:25

**cash** 57:3,4 121:12
335:17,18,22,23
336:7 337:13,14,16,
17 360:5 361:12,14

**categorically**
392:10

**categorize** 257:10

**categorizing** 316:18

**category** 107:24
109:6

**caused** 263:3,14
277:3,19 280:12
359:8,24

**causing** 362:21

**CCO** 192:25 193:8,14

**cease** 173:15

**ceased** 71:6 173:12

**cell** 393:2,5,8,9

**CEO** 14:16

**certainty** 371:6

**certificate** 5:20 22:3
152:2,5,10,13 159:19
183:11 270:4

**certificates** 21:21
154:20

**certification** 22:3

**certifications** 22:13

**certified** 7:5 21:17

**cetera** 164:10

**CF-** 25:2

**CFO** 14:14 18:10,17,
21,24 19:3,14,25
21:3 39:10,15,19,21,
23 40:3,4,9,12,25
42:5 43:10,23 44:25
46:7 47:16,24 49:17
50:10 51:10,15,20,25
53:9 55:16 60:23
61:21 62:4,8 84:20
85:12 86:3,19,24
88:10,15 90:15 94:4,
23 95:7,15 100:17
107:11 111:16 114:5
133:7,10,16 176:14
202:11 203:25
225:17,20 226:8
227:6 229:23 230:14,
18 240:7,14 243:4
247:7,23 248:24
255:7 269:2 285:24
287:14 288:7 295:19
339:24

**chain** 341:17 342:7
350:14

**challenges** 12:21

**change** 28:7,11,17
93:7 187:7,16 189:2

229:11 240:6 248:17
261:24,25 262:2
264:3 265:10 343:20
371:22

**changed** 20:6 28:11
189:10 194:13
206:24 207:6,7,9
208:2,3 263:18
264:17 323:2

**characterized**
247:12

**chat** 81:25 92:12
105:2,5 135:17
177:7,18

**check** 86:8 306:4

**chicken** 298:13

**chief** 14:12 26:24
27:5 120:8 184:22,24
258:25 270:9,13
271:2 302:19

**Chisum** 321:7

**chose** 113:25

**circumstances**
71:15 231:6 240:6
241:10 261:23,24
262:2 265:9 274:13

**Civil** 7:20

**claim** 167:9,13,25
374:9 375:8,11
385:17,22,25 386:2
388:24

**claims** 208:23

**clarify** 354:17

**clear** 40:15,16 54:22
55:5 75:16 81:2
156:2 188:21 214:17
238:17 302:6

**client** 74:5,10 75:19
269:9,13

**clients** 195:8 209:2

**Cliff** 276:2

**clock** 46:25

**CLOS** 253:19

**close** 229:10,19,21
230:2,23 232:8,20
233:3 298:2,12

308:24 372:10

**close-end** 275:6

**closed** 281:3

**closed-end** 281:10,
15 282:7

**co-invest** 127:13,16

**co-obligor** 305:22

**code** 101:21

**collect** 54:3

**collectability** 253:18

**collectively** 33:2
54:12

**colloquially** 366:5

**combined** 233:18

**comfort** 159:22
193:25

**comfortable** 90:9

**command** 297:25

**commenced** 53:25
54:11 181:22

**commencing**
203:20

**comment** 252:23
367:22

**common** 299:4,5

**communicate** 64:3

**communicated**
114:9 211:15,20
254:21 292:17
319:19 368:8

**communicating**
365:13 366:3

**communication**
87:6 207:23 350:8

**communications**
66:19 71:13,14
116:16 322:7 367:14

**comp** 78:10

**companies** 42:7
285:17

**company** 27:9 29:25
31:7 247:8 273:18,

20,21

**compared** 12:21

**comparing** 118:24

**compelled** 81:8 371:22

**compensation** 125:14 281:3 318:14 366:24 367:19,24 386:11

**competent** 88:20

**complaint** 5:15 140:4 208:17,22

**complaints** 322:2,4, 8,20

**complete** 112:19 208:16 221:10,13,18, 19,20

**completed** 132:24 178:8 200:7 219:7, 10,13,16

**completely** 13:4,7 205:5

**completeness** 97:22 98:5

**complex** 253:19

**compliance** 148:3,4 184:22,24 193:17 280:8 294:18 295:21 296:4

**complied** 373:3

**component** 119:17 120:22

**compose** 348:22

**conceived** 232:17

**concept** 52:24 201:20 390:10

**concern** 105:8 122:13

**concerned** 35:25 112:23 235:20,24 241:22 370:2

**concerns** 112:15 113:3 114:6,25 117:23 236:2

**conclude** 108:17 310:9

**concluded** 395:11

**conclusion** 42:20 43:9 44:18 45:5,9,17 46:11 47:21 48:4,17 49:2,14 55:21 107:5 126:4 142:7 143:16 153:13 154:9 157:8 212:25 263:5

**conduct** 85:24 169:10

**conducted** 86:14

**conference** 8:17 323:24 343:23,24 344:11,13

**conferred** 98:8

**confers** 143:20

**confirm** 96:14 98:16 108:23 141:13 143:4 214:3 270:6 319:3,20

**confirmation** 103:21

**confirming** 98:23

**confused** 78:11 317:13

**connection** 16:11, 16,19 48:15,23 50:15 93:13,14 95:5 96:9 125:25 149:3 160:11 175:9 179:19 184:5 199:22 367:5 374:8

**consequences** 357:4

**consideration** 306:18

**considered** 274:9

**consisted** 59:21

**consistent** 394:17

**consolidated** 5:18 6:2 105:17 110:2,5,9, 17 113:13 135:20 137:16 218:19 253:21

**constitute** 110:7

**constituted** 109:19

**consult** 94:12,17 351:21

**consultation** 318:12

**consulted** 274:9

**contend** 65:6 168:4

**contends** 168:3

**context** 41:21,22 58:13 124:18 136:21 168:20 170:4,9 189:18 367:12 386:23

**contexts** 41:15

**continue** 209:4

**continuing** 203:20

**continuous** 19:4

**contract** 278:15,22

**contracted** 330:18

**contracts** 15:9,11 249:22 288:17 325:12,14,17 326:6

**control** 90:3,5,9,14, 20,25 101:4,9,24 113:6 137:17,20 207:21

**controlled** 15:6 16:8 17:24 42:8,16,25 43:3,14 101:16

**controller** 291:13

**controls** 43:5,6 112:16

**conversation** 58:23 59:5 73:18 74:2 78:9 113:16 114:16 124:8 145:7,14,21 148:17, 20 164:23 166:2,9, 11,19,23 187:14 190:23 194:8 207:13 233:21 234:25 235:13,18 246:14,18 252:10,12 255:14 282:25 283:4 296:3,4 318:9 319:16 342:4, 20 348:15 350:8 363:5 365:3 367:3,4 381:8 383:11 386:18, 20 389:22 390:24 391:17 392:24 393:2

**conversations** 66:16 74:21 113:22 115:9 124:11 206:11 233:25 289:4 368:13 380:6 393:10 394:3

**conversion** 125:12, 14 131:23

**convert** 281:9 282:6

**converting** 275:5

**convey** 208:6 389:20

**conveyed** 343:15,25 344:4

**conveys** 193:15

**copied** 183:3

**copies** 13:11,16 142:12 149:8 298:7

**copious** 324:16

**copy** 92:13 148:24 197:23 200:18

**corner** 198:6

**corporate** 41:2,5 54:25 87:11,14,16 112:10,11 116:12 148:23 149:2,14 150:14,19 172:20 188:11 200:17 230:16,17,21 257:22, 24,25 258:11,13 337:7 370:14 378:15, 21

**correct** 11:16 18:10 19:8 22:16 24:7 29:3, 8 32:4,22 33:5 39:4, 12 41:3 43:24 45:2 50:24 55:19 59:18 69:24 74:12 79:24 84:11,18 91:23,24 93:15 95:7 100:4 109:17 110:19 112:8 115:4 117:17 120:21 132:8,24 133:7,11 137:3,8,22 142:5 143:9,14 149:4 150:9,16 155:7 156:13 160:17 161:9, 20,25 165:16,19,23 166:15 167:16 168:11 175:24 179:9 185:23 186:5,6

187:3,4 201:4,9 204:20 205:24 206:6 211:25 214:21,24 218:4 223:7 242:18, 23 243:2 256:2,5,10 257:5,19 258:2,6,8, 14 259:2,6,7 262:8, 17 263:7,10 264:20 269:25 270:14 290:8 301:9 307:12 310:18 311:3 316:10,19,22 332:18,19 346:2 359:17 371:21 375:2 382:3 383:8 384:7 388:18,21 393:22

**correction** 384:5

**correctly** 138:7 175:20 289:17 305:14 375:18

**cost** 279:17 325:23 379:20

**counsel** 9:2 66:17 73:13,14 74:15,21 140:10 150:2 164:7, 16,20 187:22,23 254:18 322:7,9,12, 19,22 351:18,21

**counsel's** 151:16

**Counselors** 7:4

**couple** 17:5 100:9 314:6 351:12 352:12 384:15 386:6 393:17

**court** 8:13,24 10:10 12:10 209:5 213:23 215:13 226:16 237:2, 24 244:6 245:22 254:16 256:21 268:8, 18 301:20 311:11 313:3 343:3 376:8

**courtroom** 7:18 156:19 157:23

**cover** 105:16 294:12, 24

**cover-to-cover** 208:22

**covered** 67:4 189:7 191:13

**COVID** 207:16,17 219:19 299:6 321:2

323:2,3,5

**COVID-19** 7:7 8:18

**CPA** 22:13

**crafted** 178:6

**crash** 265:11

**craziest** 157:5

**crazy** 264:2

**create** 257:18

**created** 199:10

**creditworthiness**
303:19

**Crescent** 294:10

**CRO** 254:13,14
256:25 257:7

**cross** 305:17,21

**crossing** 295:24

**culmination** 145:8
250:4 274:20

**cure** 345:4

**cured** 363:14,19

**curing** 365:16

**current** 86:13 158:9

**curse** 394:15

**cursed** 394:14

---

**D**

**D.C.** 162:20 164:6

**daily** 219:20

**Dallas** 3:16,24 4:8
8:14 9:20

**damages** 385:17

**Dandeneau** 3:12
7:23 9:8 13:10 14:25
16:9 17:7,18 20:4,20
22:14 25:15 31:16,
20,24 33:9 34:20
36:8,12 40:10 41:4,
12,24 42:11 43:17
46:18 47:3,7,12 50:7
52:8 53:18 54:8
55:10 56:11,25 58:25
59:19,25 60:7,15

61:12 62:11 63:13,24
64:19 65:12 66:14,24
67:17 69:5 72:15
73:12,21,24 74:8,12,
17 75:6,10,13 77:9,
14,21 79:4,14,20
80:12 82:5,11,24
83:25 85:15 86:2
91:4,8,22 92:11 94:3
96:11,20 99:17
104:25 107:15 108:5
110:11 111:24
112:20 113:20
114:20 115:5 117:6,
18 119:12 120:16
122:10,16 124:6,23
127:19 132:16 134:8
135:8,18 143:10
144:8 146:20 149:5
150:10,17 151:13
153:18 154:14
155:11,18,20,23
156:10,16 157:2,6,
11,15,24 158:15
159:17 160:3,12,18
163:24 167:5 168:8
177:15,20 178:20
180:3,11 181:5,11
183:15 184:6,20
185:2,18,24 193:21
194:5 195:21 196:13,
18 200:20 203:23
205:3,15,25 206:21
208:10 210:24 211:4,
13 212:22 213:11
216:2,9 220:10,15
222:13 225:10,24
228:9 229:24 231:18
234:6 235:23 236:10,
18 239:3,14,22
240:16 242:24
246:19,25 247:14
250:11,22 251:3,12
253:12 254:6 255:12
257:6,20 260:14
263:8 265:4 266:3
269:10 285:23 286:7
295:11 298:6 299:15
302:25 305:10 307:2
312:18 317:23
333:20 336:14 338:5
339:20 341:2 347:21
348:11 349:11,17,18
350:3 352:18 375:22
376:5 379:10 394:10

**data** 311:24

**date** 18:13,18,20
21:10 56:18 70:12
84:11 98:18 103:14
104:4 106:4 131:11
133:2,12 136:10
186:15 226:7 235:10,
14 239:17 241:20
262:15 263:20
310:15 314:22 315:6,
7 323:8 326:8 329:18
332:2 356:24 369:13
372:6 386:5

**dated** 92:2 106:10
132:20 142:18
152:17 200:3 203:2
213:18 216:16
220:14 228:3,23
258:20 262:23

**dates** 30:17 178:8
321:14 326:7 355:25
357:11

**Dave** 87:20 172:6
230:19 292:3,4,11

**David** 124:9 275:23
389:9

**Davor** 3:20 9:19
178:10 266:15,17
304:8 336:15 387:14,
16

**day** 106:10,13,16
134:20 187:8 226:4
321:23 329:21,23
332:4,10,11 342:16
343:24 350:12 353:5
395:17

**days** 71:12 356:9

**DDP** 349:23,24

**de-accelerate**
344:24

**de-accelerated**
345:18

**deadlines** 86:9
379:2

**deal** 74:25 219:18
224:14 286:11

**deals** 373:19

**Deb** 151:7 349:10,18

**Deborah** 4:4,18 9:8,
12 10:2,3 349:18

**Debra** 3:12

**Debs** 349:20

**debt** 333:9

**debtor** 240:8 245:15,
25 255:17 270:14,21
271:2,6 278:16,17
279:6 280:21 310:18
325:13,14 326:14,22
327:15,20 331:3
333:7,15 335:2,8
336:22,25 350:22
364:18 372:20 373:3,
15,16,18,25 374:9,
15,16 376:13 380:9
383:14 388:10,12

**debtor's** 233:7
239:12,19 240:15

**debtors** 374:21

**debtors'** 337:24

**debts** 302:23

**decade** 95:19 231:22

**decades** 95:21

**December** 59:9,12
105:18 109:14
119:21 202:19 203:8
218:21 219:7 221:15,
21 242:17 258:21
263:14 326:4,11,12,
14 327:4,9 330:15
332:11 334:15
338:15,24 341:9
343:2 346:9,21 359:3
360:17,19 361:6,24
364:4 382:23 388:4
390:6,16,17,24
391:13,23 392:4
393:11

**December-ish**
390:16

**decide** 254:25

**decided** 245:5
318:13 380:22

**deciding** 56:13,17

**decision** 121:24
122:2,21,22 245:2,8
340:9 382:20,21

**decisionmaking**
254:14

**declared** 182:7,12

**deduce** 309:23,24
310:6

**deemed** 53:2 94:19
109:9,10 113:11
131:6 244:16 245:24
246:6,16,24

**default** 182:7,12
341:6,7,10 345:5
346:9,20 347:6
363:9,14

**defaults** 365:17

**defendant's** 214:18

**defendants** 81:14

**defended** 11:14

**deferral** 200:23
201:4,7,21

**deferred** 203:3
366:23

**define** 32:9 33:21
101:6

**defined** 33:13 45:13
51:17 53:13 54:2
99:15 173:2

**defining** 44:16 69:8
109:21

**definition** 42:24 43:2
53:16 54:18 69:15
75:20 77:6 100:25
101:9,13 104:6

**degree** 245:20

**degrees** 22:7

**Deitsch-perez** 4:4
5:8,11 9:12,13 10:2
17:8,13 29:20 42:12
46:12 50:5 60:16,24
64:17 65:19 66:10
67:9,24 69:6,10,13
76:15,17,21,24 78:19
79:25 81:16,20,22,24
97:4 107:16 115:6
117:7 119:13 120:17
144:25 146:12 147:4,
11 148:12 149:21
153:19,25 154:7

159:25 160:19 177:6, 17 178:3 180:4,12 191:4,22 194:6,22 195:22 196:4,11 202:24 205:16 206:7 208:11 209:8 212:12, 20 214:9,13,16,22 215:5,11 216:11 220:25 227:21 231:8 232:9 238:10 239:20 242:25 247:15 248:2, 8 249:4,17 251:10 252:6,9,20,25 254:7 255:10,22 256:17 262:18 301:19 324:24 336:15 348:9, 23 349:21,24 352:6, 11,20 353:2,17,23 375:22 376:4,9 377:3 381:13 384:12 386:13 387:10,14 393:17,20

**Delaware** 254:16

**delegating** 254:13

**deliver** 50:14 230:22

**delivered** 178:7 235:20

**delved** 251:19

**demand** 121:11,17, 21 122:4,7,9,15,19, 23 123:23 124:4 134:13 140:17 142:21 182:15 186:18 187:3,17 198:21 199:6,11,19 200:14 202:18,22 205:19 209:25 210:7, 23 212:18 301:17 313:16 314:8 315:2,8 316:6,17,18

**demandable** 316:19

**demands** 122:14 364:13

**department** 146:10 147:3,10

**depend** 356:5

**depended** 356:6,16

**depending** 87:4 164:4 383:15

**depends** 41:20 57:15 279:2

**depo** 260:16

**deposed** 11:9,12

**deposition** 7:11 8:10,16 11:2,15,18 12:7,15,22 16:15,23 33:23 72:21,23 73:10,15,20 74:6 76:8 77:12 81:3 123:17 151:6,9 215:6 227:15 266:21 267:4, 13 365:20 373:2 375:25 376:19 388:23 395:8,9,11

**depositions** 11:19 12:19

**derived** 16:6 17:23

**describe** 56:4 84:3 111:21 326:15 353:7 358:3

**describing** 125:17 126:2

**description** 108:21, 24

**desk** 293:9,10 295:25

**detail** 107:7 120:25 153:8 159:20 222:22 229:14 278:11 300:6 311:18 351:19 369:20

**detailed** 122:20 132:12 179:23 224:9 230:7 260:5 276:18 370:16 389:8

**detailing** 294:14

**details** 77:24 78:7,12 80:8 84:7 104:16 131:25 286:3,22 299:12 300:8 342:12 343:7

**deter** 376:18

**determination** 41:25 42:4 261:18,19

**determine** 53:19 82:19 83:6

**determined** 261:16

274:7 276:7

**detrimental** 275:11

**development** 347:13,18

**deviate** 264:25

**dictate** 90:10

**differ** 263:15

**differentiate** 268:14

**differently** 96:5

**difficult** 145:12 205:19 207:18 222:25

**diligence** 85:5,8,13 169:11

**direct** 113:22 253:6 304:19 322:10

**directed** 57:17

**direction** 237:6 254:25 258:2 393:22

**directive** 383:7

**directly** 15:5 16:7 17:23 19:8 42:7,15 43:14 88:2 177:11 219:2 354:9

**director** 23:6 32:15 39:25

**directors** 15:22 72:7

**disagree** 318:5,16, 21 319:2

**disclosable** 131:7

**disclose** 46:7 47:17 52:11 53:10 88:13 91:12 94:6 99:14,20, 23 103:2 111:21 112:3 113:8 179:12 210:12,15 242:21

**disclosed** 48:7,9 52:19 53:4 93:24 94:18 102:3,7,13,18 103:8,10 113:12 117:13 130:10 133:21 134:3 138:8 190:25 212:4

**disclosure** 100:12 134:12,16 185:15

191:20 211:21,23 262:11

**disclosures** 91:2 94:16

**discovery** 81:4 196:21

**discuss** 99:3 124:2 148:18 201:18,20 322:14 342:7 343:22 345:7

**discussed** 26:18 73:23 74:11 80:14 107:9 114:25 192:12 193:23 227:12 234:4 272:20,23 275:3,4 294:5 300:11,13 371:15 383:22 390:9

**discussing** 117:25 148:22 180:8 191:6 217:18 234:9,15 300:17 319:7 341:6, 8,22 346:4 388:13,15 391:6

**discussion** 164:4,9, 12,17 180:19 191:9 217:21 246:4 249:24 251:20 282:18,21 290:6 319:13 342:15 387:22 388:8 392:11, 21 395:3

**discussions** 58:20 233:6,15 249:11 250:4 251:13,19 253:17,20,25 263:25 264:14 274:5 275:17 280:18 367:19 387:4

**dislocation** 371:16

**displeased** 362:15

**dispute** 61:7,10,13, 16

**disputes** 16:16

**distancing** 7:9

**distinction** 23:25 52:3 164:19

**distinctions** 33:17

**distinctly** 392:4

**District** 8:13

**diversion** 208:16

**divided** 110:14 239:24

**Division** 8:14

**docket** 215:4 255:18

**document** 13:3,6 91:19 92:5 96:3 103:18 104:23 105:5, 10,16 136:11 139:22 140:8,12 141:4,10,16 144:3 147:16 151:22 153:6,15,22,23,24 154:5,11,18,24 155:3 156:24 159:21 197:13,14,16,17,25 198:12,15,17,23 199:3,4,10,14,17,25 200:3,18,22 201:3,6, 15,18 202:4 203:2 209:14,16,22 210:12, 15 211:24 212:4 213:21 214:3,6,12, 15,17,20,24 215:7,13 216:7 226:10,25 227:8,19 228:6 236:16,19 237:18 239:17 244:5 256:5,9 293:21,22 301:16 302:12 303:7 305:12, 21 320:14,16 338:14

**documents** 12:24 13:12,14,16,19 25:5 123:15,17 126:19 140:10 143:24 147:20,25 149:12 153:8 159:15 197:2 227:13 235:19 236:25 266:19 267:3, 7,9,14,18 291:9 294:2,4,6,8,11,14,17 296:21,22 322:11 364:18 377:10

**dollar** 253:21 288:12

**dollars** 253:24 260:19

**Don-** 68:19

**Dondero** 4:2 9:14 15:6 16:8 17:24 19:8, 12,25 20:9,13,18,24 21:4 42:9,17 43:15, 24 44:3,5 50:11,14,

21,25 51:6,12 54:15,
17 55:2,7,11,19 56:2,
16,24 57:20,24 58:9
59:6 60:11,14,20
61:4,5,8,21 62:3,9,20
63:4,7,11 64:4,7,9,
10,13,16,21 65:3,5,9,
10,17,18 66:6,7,8
67:7,23 68:19,25
71:13 75:25 78:16,18
80:15 82:16,21,23
91:3 92:5 94:20 98:8
99:4,6,10,13,20,23
101:17 107:3,13,21
108:3,19 117:25
118:7 123:3 124:2
145:5,7,14 148:9,14
189:9,16 190:10,13,
17,25 191:3,9 193:20
194:19 201:14,21
205:9,14,24 206:6,
11,15,24 208:5,8
225:7,14,21 232:18
233:9,24 234:11,16,
22 235:5,7,9,22
236:9 239:2,5 241:8
242:8 243:8 262:6
263:6 271:25 273:2,5
275:25 280:19
282:16,22,25 283:14
284:4,18 285:3 287:5
288:24 289:4 290:6
300:11,24 301:16
303:16 317:5 318:3,
9,11,16 319:4,8,20
320:3 335:17,23
336:6 341:7,9 342:15
343:15,22 344:2,12,
22 350:6,11 362:10
363:6,19 365:3
366:2,20 368:11,22
381:9,10 382:12,18,
22 383:8 384:6,10
386:7,17,20 387:23
388:9,14 389:2,21
390:4,25 392:4 394:6

**Dondero's** 57:13
62:4,10 63:23 144:23
206:15 217:11
350:15

**doubtful** 244:9,17
245:25 246:7,17,23,
24 247:12,25 249:2
250:10,14 251:8,22
253:10 254:3 255:8,

15

**draft** 145:25 146:4
147:10,20 149:17
176:4 182:24 213:17
290:7,12,16 291:4,9
294:17 305:11,14
319:14

**drafted** 145:23
146:10 147:2,25
290:24 305:13
319:18

**drafting** 115:20
116:5 146:7 213:12,
13

**drafts** 230:22 322:3,8

**dramatically** 264:17

**Draper** 4:12 9:17

**driver's** 21:25

**dropped** 294:8,11,14
295:4

**DSI** 72:3 166:12
237:9,12 245:9,21
247:4 249:10 250:8
251:7 252:10 253:10
254:5,11,16,19,22
255:8,14,25 257:15,
18 259:12 309:21
312:7,11,21,23 313:5
348:3

**DSI's** 256:6

**Dubel** 233:21

**due** 7:7 8:18 50:3
55:17 56:18 58:2
59:15 63:10 106:21,
25 108:14 109:7,18
110:6 111:2,5,9,12,
23 112:18,24 113:19
114:19 115:3 119:3,
10,22 120:20 121:4
161:9 162:6 163:22
165:11 167:11 168:5
171:12 174:15
175:12 176:9 190:6
194:4 203:19 204:12,
16 205:2,13 208:8
211:12 212:10,11
220:23 223:6 234:23
240:10 259:19
260:11 262:7 266:24
271:21 274:14 275:7

335:12 337:3,25
338:24 347:8 355:25
356:22,24 357:11
359:2 360:16,17
361:24 364:3 377:12,
23 379:8 381:23
382:10 383:19
390:10 391:24

**Dugaboy** 4:10 9:18
42:23 43:6 65:11
100:18

**duly** 10:12

**dump** 267:3

**Dustin** 183:2,23
184:7

**Dustin's** 183:10

**duties** 25:17,19,22,
25 28:10 30:25 31:4
38:20 219:20 292:4

**E**

**e.g** 171:13

**earlier** 84:5 86:18
93:12 100:3,5 119:3
130:9 131:18 134:11
136:2 148:21 155:5
162:14 179:7,16
183:12 195:24
206:18 211:15
217:14 218:8 222:19
243:10 259:10
261:21 263:21
269:24 282:24 283:6
289:4,15,20 290:12
302:11 309:11,20
312:20 316:10,13
318:8 325:12 334:6,
14,20 337:18 351:2
357:8 362:25 368:24
370:8,18 371:15
378:5,20 379:4
380:12

**earliest** 314:8 316:6

**early** 19:5 173:17
231:22 254:20 323:6
340:21 341:5 344:17
365:20 388:4 390:17

**earth** 251:23

**easier** 305:5 373:13

**East** 8:23

**easy** 265:15

**educate** 204:9

**educated** 120:10

**education** 21:23
22:7

**effect** 282:16 294:25
344:23 345:4,17
346:11 351:13 363:8

**effective** 152:18,24

**effectively** 329:25

**effectuate** 57:8,12
63:22 360:15 382:9

**effort** 83:5 376:12,17

**efforts** 188:16

**eight-figure** 389:18

**elaborate** 26:12
281:4

**electronic** 299:2
320:15

**electronically**
298:21 299:2
320:14,17,23

**element** 365:23

**Ellington** 14:20,22

**email** 5:21 6:11 68:6
70:3 170:23 171:3,22
172:3 174:5 182:20
183:3,22 185:25
187:20 194:10
198:18 206:9,23
207:2,4,5,25 290:19,
25 291:4 292:16
293:14,22 294:2
307:23 311:11
316:22 320:24 321:3
329:6 330:7,13
331:11 332:3 341:17
342:3,7,13,23 350:14
387:11 392:22

**emails** 6:7,8,9
227:13 236:13
299:25 300:7,9
328:15 379:12

**Emanuel** 4:19 10:4

**employed** 14:2,6
23:3 27:15 30:7
32:10 34:7 89:21
240:25 322:9 330:14

**employee** 24:4
28:20,22 51:22 52:6,
17 70:24 71:7 72:12
115:22 172:17
184:21 325:19
388:12,16

**employees** 15:15,
19,23 39:12,19 40:6,
8,12 51:24 52:14,25
57:8,17 86:13 93:22
167:2 237:12 327:15
331:2 333:7,16
334:25 335:8 337:24
346:25 350:22 354:6
369:12 381:22 382:2,
5,8

**employment** 71:19
165:2,3 166:4 167:3
285:25

**enabled** 360:22

**encompass** 379:13

**encourage** 13:18
17:12

**end** 46:19,20 86:17
103:12,13 104:5
109:20 118:10 131:4
145:13 148:13 187:8
203:7 214:12 220:19,
22 221:6 222:12
223:4,14,17 224:13
242:23 262:15 265:3
293:3 326:11 329:18
348:16 352:7 367:23
379:16 380:9 381:23
382:10 383:20

**ending** 93:14 105:18
135:21 218:21 219:7,
16 221:15,21 242:17
258:21

**ends** 395:7,8

**enforced** 231:12

**English** 284:11

**ensure** 98:4 330:19
331:3 333:16 346:12

348:4

**ensuring** 327:20

**enter** 122:21

**entered** 67:7 68:25 104:14,19 122:6 124:5

**entire** 19:7 192:13 253:19 264:4

**entirety** 130:12,15

**entities** 16:7 17:23 43:13 44:3 54:21,25 55:4 101:8,15 189:8 278:2 289:19 330:13 361:13 394:4

**entities'** 265:12

**entitled** 41:8 82:7 110:25 157:16

**entity** 15:5 22:20,25 27:18 31:11,23 32:3, 6,11 42:14 109:24 137:13 272:3 289:23 302:22 307:8

**entries** 240:19

**entry** 131:10 308:3, 14 311:9 332:23

**environment** 90:3,5, 9,14,20 113:6 137:18,20

**environments** 207:21

**equal** 49:11 50:23 262:7

**equaled** 263:7

**equals** 119:6,9

**equity** 273:18 281:25 282:3

**erroneously** 197:22

**error** 125:6,9 131:17, 24 132:3 145:8 165:9 213:12,14 214:5 273:11,14 275:14 276:8,25 277:5 278:5,15 280:12,22 283:3 289:6 318:15 385:9,14,19,23

**errors** 163:21 167:14 373:10

**Esq** 3:6,7,12,13,20, 21 4:4,5,11,18

**established** 94:2 285:14,20 300:25 301:7 310:16

**estate** 31:12,17 235:11,15

**estimate** 20:12 372:4 389:3

**et al** 5:15

**evaluate** 170:12,14

**evaluated** 244:10

**evening** 353:3

**event** 131:2 134:22 138:9 143:9

**events** 103:13 125:16,25 130:4,10, 21 133:8 138:5 242:22 262:14 263:4 370:24 371:7,9,13

**exact** 15:24 17:25 18:13,18,19,22 20:5 30:17 131:20 156:21 274:13 277:17 278:10

**EXAMINATION** 5:6, 7,8,9,10,11 10:14 266:13 352:25 377:5 387:19 393:19

**examined** 298:19

**exceed** 121:12 190:2 195:19 196:3

**exceeded** 93:25 194:2 196:9,17 204:19 211:3 301:9 303:9 307:9

**Excel** 368:19

**exceptions** 231:2

**excerpts** 238:16

**excess** 94:6 121:12 389:13,14

**exchange** 45:15 212:17 281:17,23

**exchanged** 45:21

**exchanges** 281:17

**excuse** 14:25 35:23 201:2 249:18 280:9 323:13 395:8

**execute** 48:14,22

**executed** 49:21 142:10 161:12 221:6 274:2 293:14 303:7

**executing** 317:16

**execution** 181:9 300:14

**executive** 35:10,11, 16 36:20,24 37:5,18 38:3,4,9,14,16,21 39:3 78:10 366:24 367:18 386:10

**executives** 369:3

**exhibit** 5:15,16,18, 20,21,22,23,25 6:2,4, 7,8,9,10,11,12,13 13:13 91:20,21 104:23,24 135:8,14, 15 140:12,13 142:15, 16 151:20,21 170:18, 19 197:3,9,15 198:2 214:7 215:22,23,25 216:3,4,5,7,8,12 218:13,16,17 226:23, 24 236:16,23 237:19 258:18 297:23 302:7, 8 303:14 305:5 306:7 307:18,21 309:2,6 313:9 317:12 328:10, 12,13 338:13,21 341:13,14

**exhibits** 267:10,11 268:9

**exist** 15:12 16:17 114:22

**existence** 67:15 69:18 80:16 81:6 99:14,20,24 102:3

**exists** 278:13

**expanding** 354:25

**expect** 247:19 293:19 333:15

**exchanged** 45:21

**exchanges** 281:17

**expectation** 231:5

**expected** 200:17,21 293:21

**expects** 203:18 212:9

**experience** 101:14 111:16 116:14 169:10 256:25 257:8 259:13 315:5 337:22

**experienced** 47:13

**expert** 43:5 143:19 153:7 183:9 257:14

**explain** 356:18

**explained** 364:17

**explaining** 163:15

**explanation** 308:20 311:8

**expressly** 390:4,25 391:12 392:5

**extended** 301:17 308:21 314:22

**extension** 307:8

**extent** 45:17 55:21 66:15 107:5 126:4 208:6 244:15 296:6 322:6

**extra** 219:23

**F**

**face** 50:23 120:11 144:16 244:3

**face-to-face** 293:8 294:5

**facilitated** 321:10

**fact** 62:7 192:20 236:21 264:24 266:25 275:7 298:4 301:15 313:19 334:22 338:23 341:10 343:19 363:12 394:5,7,17

**facts** 111:22 240:6 261:25 265:8 375:17

**factual** 164:9

**fail** 12:3 348:5

**failed** 338:23 340:2

**fair** 11:23 19:24 44:14 49:7 52:4 93:17 99:13 110:21 118:11, 21,24 119:6,8,9 120:3,15 121:5 126:8,21 141:18 143:23 149:20 224:6 239:16 240:18,21 241:17 242:6 243:5 244:13,20 245:19 260:10 261:15 262:7 263:5,15 264:25 287:21 370:21 371:18 372:5 374:10 390:2

**faith** 189:8,15 190:9, 12,19 191:3 193:19 194:20 205:8,14,23 206:14,23 208:5

**familiar** 22:20 31:22 32:3 54:6,9 226:13 227:8,18 274:6

**fashion** 86:11 276:16 357:14

**fault** 229:17 276:24 277:19

**favor** 60:6 62:19 139:17 161:24 261:9

**feature** 301:17 315:8

**February** 70:21 226:3,4 228:3,23 323:9

**Federal** 7:19

**feel** 81:8,18 176:25 273:13 287:16 371:21 376:11,16

**fees** 332:12 356:21, 23

**fide** 369:25

**figure** 343:10 366:12 367:5

**file** 167:8,13 297:2,10 337:8

**filed** 21:6 197:17 208:18 213:23 215:13 219:23

226:16 237:2,24
238:4 244:5 255:17
263:17,19 311:10
322:2,4,16,21 375:20

**files** 312:23 372:21

**filing** 45:25 240:4,17
246:3 249:9 256:20
264:15

**filings** 237:14

**filled** 257:13

**finalized** 88:7 89:12
230:23

**finance** 25:21 26:2,4,
8,17 28:15 38:23
127:25 128:16 129:6
280:7 290:14 351:3

**financial** 5:18 6:2
14:12 26:24 27:5
41:7 48:2 84:17,23
85:3,13,19 88:11
90:2,7 93:24 95:14
96:7 100:12 102:7,
10,12 104:21 105:17
107:22 112:2 113:7,
14 114:18 120:8,18
122:11 130:23
133:22,25 135:20
138:3,4,9 143:8
176:21,24 179:16,23
180:15 196:22 201:8
211:7,21 217:24
218:3,19,24 219:6
221:14 222:24
224:10 235:17
241:24 242:3,15,16
254:9 258:25 260:3
261:20 262:5 264:11,
13 270:10,14 271:2
286:18 301:11
302:19 306:4 311:25
312:5,6 370:9,12,17
378:24

**financials** 6:5
137:16 168:19 176:8,
16 179:8 186:15,16
187:2 189:23,25
200:10,12 218:12
241:13,15,21 242:2
246:9 247:5

**find** 53:23 268:10
283:17 315:4

**fine** 36:8,9 45:10 84:8
154:12 269:16 287:2
353:24

**finish** 11:21 12:2
76:18,24 249:19
295:11

**fired** 388:9

**firm** 10:21

**fiscal** 103:14 104:6
131:4

**fit** 42:24

**flip** 331:8 332:20

**fluctuate** 93:10

**fluctuates** 94:10

**focus** 242:14 313:3

**folks** 46:15,24 87:25
152:10 197:23 293:5
321:15

**follow** 61:17 151:15
391:18

**follow-up** 171:7

**footnote** 244:8
260:20,23 261:15,17
371:22

**footnotes** 261:17
263:11

**forbearance** 134:5,
16

**forgave** 49:23 51:23
52:12 93:20

**forgivable** 369:2

**forgive** 51:10,15,20
52:5 284:9

**forgiven** 52:18 53:11
94:11 366:23 367:23
369:13

**forgiveness** 52:22
93:23 94:8 365:23
369:16,20,24

**forgot** 282:8

**form** 20:4,20 22:14
25:15 29:21 31:16
33:9 34:20 40:10
41:4,12,24 42:11,12

43:17 50:6,7 52:8
53:18 54:8 55:10
56:11,25 58:25
59:19,25 60:7,15,17,
25 61:12 62:11
63:13,24 64:18,19
65:12,20 66:11,24
67:10,17,25 69:7
75:6,10 78:20 79:4,
14,20 80:2,12 82:24
83:25 85:15 86:2
91:4 94:3 96:11,20
97:5 99:17 107:15,16
108:5 110:11 111:24
112:20 113:20
114:20 115:5,7
117:6,18 119:12,13
120:16,17 122:10,16
124:6,23 127:19
132:16 133:23 134:8
142:5,7 143:10 144:8
145:2 146:13 147:5,
12 149:5,22 150:10,
17 153:18,19 154:2,4
155:11 156:17
158:15 159:17 160:2,
3,12,18,20 167:5
168:8 178:21 180:3,
5,11,13 181:5,11
183:15 184:6,20
185:2,18,24 191:5,23
193:21 194:5,6,23
195:21,22 196:5,12,
13,18 200:20 201:25
202:25 203:23
204:14,23 205:3,9,
11,15,16,25 206:8,21
208:10,12 209:9
210:24 211:4,13
212:13,21,22 213:11,
25 220:10,15 221:2
222:13 225:10,24
227:22 228:9 229:24
231:9,18 232:10
234:6 235:23 236:10
238:11 239:3,14,21,
22 240:16,23 242:24,
25 246:19,25 247:14,
15,16 248:4 249:5
250:11,22 251:11
253:12 254:6,7
255:11,23 256:18
257:6,11,15,20
260:14 262:19 263:9
265:4 269:7 270:15,
22 271:8,18 272:9,17

273:7 277:22 278:19
279:8 280:15,23
283:19 284:7,14
285:7,23 286:8,9
287:9,18,24 288:8,25
289:12 290:9,21
291:23 292:19
293:15,23 296:13
297:6 298:22 299:15
300:15 302:2,25
303:2,10,20 305:10
306:15,24 307:3,13
310:2,11,19,24
311:12 312:16,19
314:14 315:9,23
316:23 317:17,24
318:6,17,23 319:23
320:6,18 322:5,23
326:24 327:6,24
330:21 331:5 333:10,
18,20 334:10 335:4
336:14 338:3,5
339:16 340:18 341:3
342:21 345:12,19
346:22 347:14,19,21
348:10,11,12 351:15
353:11,15 354:4
355:5,9,15,21 356:3,
14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10 365:6
366:15,25 367:16,25
369:4,8,17 370:3,25
371:10,25 372:22
373:4,20 374:11
375:3 376:20 379:10
380:25 381:14
384:13 386:14
388:19 389:5,15
391:4 393:24 394:10,
11,19

**formal** 231:20

**format** 293:14

**forms** 257:13

**formulating** 184:3

**formulation** 386:24

**forthcoming** 335:18

**forward** 79:17
376:25

**found** 53:17 66:12
125:6 140:15 394:8

**Frank** 5:5 8:10 9:11
10:11,18 271:4 305:8
395:14

**frankly** 232:2

**Fred** 249:21

**Friday** 208:18
329:18,25

**front** 110:12 122:12
140:16 279:21 281:7
294:9 301:11 302:9
305:4 309:7 343:6

**frozen** 144:9

**frustration** 364:17

**full** 189:8,15 190:9,
12,19 191:2 193:19
194:19 205:8,14,23
206:14,23 208:5
241:15 372:20

**fully** 13:4,7 17:4
364:19

**fulsome** 265:8

**function** 26:8,20
28:16 87:3 89:4
351:3

**fund** 3:18 9:22 22:21
33:23 35:2,6,18,19,
21 39:7 42:22 44:7
58:15 125:2,3,6,7,10,
11 127:10,13 145:16
152:14 176:18
202:14 203:14
215:14 273:17,23
274:16 275:2,4,6,8,
10,13 276:7,9,10
277:5,9,21 279:19
280:2 281:2,9,10,11,
12,13,15,20,23,25
282:7 283:23 308:4
325:22

**fund's** 274:23

**funding** 202:8

**funds** 32:22,25 33:2,
4,8,12,15,16,18,22
34:5,8,13,18,23
35:12,15,17,18
36:21,25 37:4,9,17
38:2,5,10,17,22 39:4
145:15 160:8 168:10
171:15 173:2,6,10,

13,16,20,23 184:11
192:16,24 193:4,6,
11,16 253:19 277:4,8
281:15 284:5 285:3
286:17 287:5 328:5
332:7,12 360:9
361:6,11,13

**future** 171:12 174:16
175:13 185:17 337:4
369:13 371:7,9,13,20
381:17 388:23

---

**G**

**GAAP** 94:15 101:5,
16 109:10 130:21
131:23 241:13,15,20,
25 242:4,11 246:9
254:10 256:23
264:10 372:7

**gaming** 239:9

**garbling** 46:14

**gave** 45:14 57:11
149:2 197:23 205:6
215:10 312:21 343:9,
17

**gears** 321:25 324:20

**gen** 85:16

**general** 11:17 32:20
57:5 84:25 88:18
97:15,17 128:9,25
152:4,6,7,8 170:7
180:7 195:15 251:13
258:10 292:10 297:4
378:10 392:11

**generally** 54:9 61:2
62:14 64:2 80:23
84:24 87:6 89:7 95:8,
10,25 97:7 128:7,8,
19,24 129:8,13
162:2,3,8 170:6
180:14 187:19
189:20 192:11 194:8,
9,14 195:4 226:13
234:14 241:13
253:14,16,23 278:22,
24 279:3 290:2
297:16 311:3 333:25
334:2 337:4 356:12
357:13,18 358:20
366:7 372:18,24

379:11,12 387:2
389:10

**give** 12:25 20:11
35:5,9 38:15 45:4
49:6 51:7 86:15
96:15 97:17 116:14
117:4 123:12,13
150:8 159:22 163:17
193:25 235:25 236:6
267:8 300:8 348:21
356:9 357:9 372:9

**giving** 16:19 26:14
51:3 150:11 194:20
312:22 369:2

**Global** 35:18,20
124:25 273:17 281:8,
22

**go-ahead** 293:2

**goal** 295:19

**God** 156:19

**good** 7:3 10:19 72:16
118:5 156:19 248:11
251:3 324:22 353:3
385:5

**governed** 33:4

**great** 32:8 105:3
183:5 300:6 325:5

**ground** 11:17

**group** 14:5,7,24
15:4,14 16:14 29:23
146:5 148:24 149:2
150:15 154:19
172:13 258:13
290:16 291:9 292:2
294:18 295:9,13,22
378:16

**groups** 295:21

**grow** 88:23 89:4,9

**guess** 73:3 169:22
170:20 204:17
225:25 263:22
315:25 361:9

**guidance** 94:12,17
257:7,9,14

**guy** 25:21 81:19
88:25

**guys** 77:3 157:3

268:12

---

**H**

**half** 72:16 145:10
280:20 324:23
377:21

**halfway** 48:18

**hand** 361:6

**handle** 291:14

**handled** 147:18

**happen** 141:14
156:15 165:2,15,18,
22 168:25 248:21
265:14 284:13

**happened** 87:23
156:22 165:17
174:19 247:3,5
273:15 286:4 294:3
320:10

**happening** 165:21
231:6 242:10 382:25

**happy** 117:4 188:19
200:10 215:7 389:25

**hard** 13:11,16 104:11
123:16 197:23
286:19

**HARDD** 3:22

**Hardt** 3:22 9:20

**harmed** 276:16
278:5

**Harr** 9:20

**Hartmann** 3:13 9:10

**hat** 336:4

**Hatch** 7:4 8:21

**Hayley** 3:7

**HCFD** 332:6

**HCM** 42:22 45:5
156:12 354:13 355:7
360:23 362:7,20

**HCMA** 186:18

**HCMF** 30:10 43:12
180:22 303:18

**HCMF's** 303:18

**HCMFA** 5:20 6:2
22:25 23:3,6,11,16,
22,24 24:6,9,11,13,
15,21 25:2,8,14,18,
24 26:3,5,8,22,24
27:4,5 29:3,6 31:5
32:18 43:12 54:14
100:23 122:2,7,13
124:14,21 131:11
132:6 133:12,21
134:11,14 135:6,21,
23 137:22 138:8,14
139:18 140:4,21
141:9,16 142:2,24
143:18 144:22
152:24 153:17 155:7,
10 156:4,13 158:4,12
161:7,17 171:13
172:20 176:14
178:12 179:13
180:22,23 181:2,8,
14,15 182:8,17
184:25 186:9,18
187:3,17 189:14,24
195:19 198:21 199:6,
12,14,19 201:15
202:7,12,14 203:14,
18 204:2,11,24
205:7,19 210:2,7
211:10 212:9,18
213:8 218:8 221:20
241:23 242:6 267:24
268:21 269:2,5,25
272:5,6,15,24 273:5
275:16 276:23 277:3,
18 278:16,18 279:7
280:11,21 284:5
301:9 303:6 305:25
308:14,20 310:10,16
313:15 314:7 316:6
318:14 322:3 325:12,
18 331:13 332:5,17
370:20 384:18 385:7,
12,16 386:4

**HCMFA's** 26:10
121:12,21 122:11
124:3 137:3,10
138:3,19 143:8
196:16 202:14
204:15,19 211:2
303:8 384:21 386:2

**HCMLP** 5:18,22 6:12,
13 171:13 176:9

185:16 314:7 316:5
317:6 341:19 355:12,
18,20 356:2 357:3,
13,19 358:4,13,20,
21,25 359:2,8,24
360:17 384:19

**HCMLP's** 228:22
356:12

**HCMS** 4:3 9:15 30:4,
6,7,10,13,16,20,22,
24 31:3 43:12 44:8,9
54:14 65:6 100:24
128:23 129:2,4
353:9,14 354:6,20,21
355:8,13,19 356:2
357:21 358:15 359:2,
8 361:5,15,20,25
362:4 364:3,25
383:19,25 385:7
393:21 394:7

**HCMS'** 356:13
357:13

**HCMS's** 359:13,19

**HCRA** 4:2 9:15

**HCRE** 31:8,14,15
32:4,7,10,12,15
43:18 44:7 54:14
65:6 100:24 128:4,5,
11,14 353:9,14 354:3
357:20 358:4,14,21
359:23,24 360:17
361:5,15,19,25
362:2,5,9,22,25
363:4,20 384:3
393:21 394:7

**HCRE's** 360:5,9,14,
21

**head** 87:13,16 278:3
364:15

**headquartered** 8:22

**hear** 46:13,20 148:12
304:3 364:16

**heard** 27:9 29:25
31:7 74:22 77:25
78:21,23 79:6,7 80:4,
5,7,22 100:6 268:5
285:3 324:15 386:16,
19,22

**held** 8:16 27:20 30:9,
12 37:8 107:12

172:25 173:5 174:3
183:6 244:4

**Heller** 4:12 9:16

**Hendrix** 172:7
186:21 230:20 292:3
328:17,20 329:13
330:14 332:15
341:18,24 350:18
362:24 365:13
377:11,22

**hey** 45:3 188:6
266:17 312:24
351:14 365:4 391:23

**high** 126:25 238:2
279:11

**higher** 110:19

**Highland** 3:4,18 8:11
9:6,22 10:22 11:6
15:16,23 18:6,7,12,
25 20:3 21:6 22:21
30:2 35:17,18 39:10,
15,19,23,24,25 40:3,
4,7,25 41:18 42:6,10,
18,21 43:11,16,23
44:6 45:2,14,25 46:7
47:16 48:6,14,24
49:5,10,17,23 50:4,
10,14,16,21 51:6,10,
15,20,23 52:5,11,18
53:9,10,24 54:11
55:23 58:15,16,20
60:6 61:20 62:8,19
63:8,20 64:7 70:20,
24 71:7,10,18 72:13
78:18 84:22 85:2
86:13,22 87:8,18
93:20 94:5 95:13
96:7 103:2 105:17
107:12 109:22,23
110:8 112:8 115:21
116:4 118:23 120:8
121:16,20 122:23
123:21 124:13,20,25
125:3 126:11,23
127:2,16,25 128:5,
10,15,20,23 129:2,6
132:5 133:10,16,20
134:13 136:2 137:7,
11,21 138:8,11
140:21 141:9,18,23
142:25 143:7 144:23
145:17,19 146:5
149:19 152:13

160:10 161:8,24
165:7 167:3,9,14,15
172:14,17 175:13
176:15 178:19,23
179:13,22 180:2,9
181:21 182:2,6,11,15
186:9,11 198:20
199:5,11,18 200:13
201:15 202:7,12,13
203:13 204:12,16,25
205:13 209:25 210:6
211:9,11 212:8,11,16
215:14,17 216:22
218:8 219:21 220:19
222:2,17 223:5,24
225:9,21 226:2,3,9
227:5,20 228:8
229:2,6,9,21 230:3,
10 232:22 233:24
234:17 237:12,16
240:7 241:2,7 242:6,
9 243:4 244:4,22,25
245:5 247:7 248:23
253:18 258:10 259:2
260:4 261:9 263:17
264:18 267:7 271:2,
15,23 272:20 273:4,
16 275:16,21 279:18,
19,25 280:2,12,14,20
281:8,22 282:17,23
283:5,17 284:5
285:18 286:21 287:6,
15 288:7 289:7,8
290:16 297:3,16
299:24 302:20,24
303:6,17 307:7 308:4
313:6 318:10,13
319:11 320:4 322:10
323:8 325:22,24
329:3 330:16,19
333:22 338:17 339:3,
11,13,25 346:11,19,
24 347:12,17 348:2,4
350:14,20 353:7,8,13
354:2,6,19 359:16,
17,18,21,25 360:7,8,
13 361:19,20 362:4
363:4 366:4,14
367:10 368:4,6,25
369:11 370:13,19
374:9 377:13,23
379:19 380:3,24
381:12 384:21,22,23
385:8,13 390:11

**Highland's** 18:10,17
19:3 39:10,15 40:25

41:7 44:24 46:6
47:16,24,25 50:19
51:10,15,20 52:19
55:16 57:8,17 72:6
84:10,17 86:23 89:22
94:22 95:6 102:7,10
107:14,22,25 109:20
113:9 115:23 116:2,3
137:15 138:3 139:17
146:10 165:2,3 166:4
167:3 187:2 210:22
222:24 225:8,15,23
230:5 241:24 242:15
243:4 247:22 255:7
258:5 260:12 262:5
266:19 370:21 379:8
381:22,25 382:5,8

**hindsight** 265:6,11,
15

**hint** 346:15

**hit** 86:9

**hold** 21:12,16 23:5,8
25:13 27:17 34:15
37:3,15,16,21 39:6
163:12,25 167:12
184:9 192:15 193:9
199:13 212:24 308:5
329:10 387:12

**holding** 37:25

**holds** 184:14,18

**holidays** 329:23

**home** 191:17 207:15,
19 219:19 299:6,9
342:25 343:2 348:16
393:7

**honest** 144:3

**honestly** 78:4
198:22

**hope** 82:2 262:22

**hoping** 300:7

**Horn** 4:11,12 7:22
9:16,17 349:10,13,
22,25 392:15 394:25

**Houlihan** 273:23
274:3,10,25

**hour** 46:24 72:16
324:23 387:9

**hours** 249:24 260:17

**HR** 280:7 355:2
357:25

**Hunter** 244:23 245:2,
6 247:11 260:22

**I**

**idea** 150:2 154:21
156:23 201:24
232:14

**Ideally** 211:17

**identical** 298:11,13
299:20 380:13

**identified** 36:21
37:5,10 38:6,11,18
45:2 47:19 81:14
229:2,7 259:5,23

**identify** 35:14 42:14
52:17 57:23 58:6
60:10 61:3 62:25
188:24 191:18,25
264:24

**identity** 102:19 103:3

**imagine** 136:3

**immaterial** 53:3
94:19

**immediately** 347:8

**impact** 275:9,11,12

**impacted** 229:8
230:4

**impacting** 228:21
229:3

**impairment** 240:21,
24 241:3,5,11

**important** 11:21,25
12:25

**impossible** 299:7

**impression** 363:12,
18,24

**in-** 294:9

**in-house** 164:7

**in-person** 12:22
191:15 283:9,12
290:20 292:16 323:4,

12,18 342:23 392:21

**inability** 299:12

**inaccurate** 112:25
116:21 117:2,17
136:18 138:20,24
256:16

**inaudible** 48:14
148:10

**include** 26:9 106:25
189:7 230:3 259:24
263:3 305:7 351:18
355:3,8,13 368:17

**included** 54:17 81:4
108:4,7,19 175:13
176:23 183:21
194:18 200:12
213:22 217:23 222:2
232:14 239:11
243:12 251:15
252:12 312:12 315:8,
21 326:18 336:22

**includes** 172:3

**including** 132:11
178:15 200:12
335:21 366:21 368:6

**income** 35:18 179:17

**incomplete** 112:25
116:22 117:2

**incorporated** 153:9

**incumbency** 5:20
151:25 152:5,9,13
154:20 159:19
183:11 270:3

**incurred** 336:12
385:18

**independent** 72:7
166:22 233:7,12,15
348:3

**indirectly** 15:6 16:7
17:24 42:8,16 43:14
88:3

**individual** 11:3
271:24 272:25
300:10,12

**individually** 9:11
16:10

**individuals** 15:15

276:21 285:18

**indulging** 353:5

**inform** 190:18 210:19 211:2 335:16 336:6 337:24

**information** 16:14 80:19 86:10 88:13 91:12 112:5,17 117:14,15 169:11,13 171:20 176:8,15,22 179:16,17,18 188:8 206:3,5 218:20 230:3 236:7 237:13 257:18 274:4 312:10,24 344:19 368:11

**informed** 69:18 178:17 190:24 210:5 211:9 212:8 288:15 335:16,23 378:7

**informing** 64:13 181:25 182:11 330:5

**initially** 132:17 185:5 247:3

**initiated** 58:10

**initiating** 58:12

**initiative** 290:5

**ink** 296:22,25 298:4

**ink-signed** 297:3,10

**inquiries** 160:9

**inquiry** 210:12 274:16,17 376:6

**inside** 187:22

**insolvent** 302:22

**installment** 217:2

**instance** 52:12 57:16 60:10 377:16

**instances** 335:25

**instruct** 133:6 164:3 210:10,13,19 381:25

**instructed** 77:15 147:8,9,23 241:19 291:7,8 315:7 362:8 381:22

**instruction** 8:6 57:11 74:14,23

**instructions** 256:7 347:25

**insufficient** 122:8

**insurance** 385:17,22 386:2

**insured's** 385:25

**intend** 208:6

**intended** 111:21 214:19 288:23 315:5, 19

**intending** 16:25 146:16

**intent** 306:14 318:20, 25 380:10

**intention** 81:11 307:11

**interest** 50:3 55:25 56:22 57:18 58:2 59:14,17 60:13 62:18 63:2,10 64:5,15,22 119:10,16,21 120:22 162:6 163:22 164:25 165:11 167:11 168:5 217:17 223:18 273:18 334:9

**interests** 55:17

**internal** 271:17

**internally** 275:16 329:2

**interpret** 119:8

**interpreted** 74:20

**interrupt** 375:23

**interrupted** 76:25

**interrupting** 77:16, 18

**interviewed** 322:18, 22

**intimately** 292:6,13

**intimidate** 376:13,17

**introduce** 9:2

**invalid** 136:24 235:5

**investigations** 275:17

**investment** 4:10 9:18 32:21 65:11 127:17,24,25 128:12, 14,16 129:3 244:23 245:3,6 247:11 273:24 274:15 279:21

**investments** 128:17 129:5,6 249:23

**investors** 275:10 276:12 277:4,8,21 281:18

**invoices** 185:10

**involve** 366:13

**involved** 237:10 245:2 264:17 274:14 275:15,21 276:21 288:4 292:6,13 293:6 354:10

**issuance** 131:5 138:10,18 371:14

**issue** 54:7 178:14 191:13 201:25 204:10 208:24

**issued** 56:16 60:5 62:19 65:8,18 66:8 81:13 82:15,20 93:13 107:13,20 108:2 131:11 132:6 133:12 161:23 162:5 180:10 218:25 223:7,17 233:8 234:10,15 235:4,9,21 236:8 242:8 243:7 261:9 262:6 263:6

**issues** 113:5 248:14 306:19

**item** 108:19 111:11, 18 112:4 119:2,16 123:6 185:21 220:5 238:20 259:18,24

**items** 53:3 97:21 100:9 112:3 131:21 149:8 228:21 229:3,7 230:4,7 249:22 260:6

---

**J**

**James** 234:11 271:25 273:2

**investment** 4:10

**January** 70:16 163:7,8 219:11,13,17 258:20 326:8 341:6, 18 344:2 350:5,9,13, 24 351:20 361:25 362:3,7 364:8 365:2, 15 383:23

**Jason** 185:3 275:24

**Jim** 4:2 9:14 15:6 16:8 19:8 43:15,24 44:5 50:11,25 65:16 67:6,22 68:18 71:23 72:7 75:24 78:9,16 82:22 123:3,20 189:9,16 190:10,13, 15 205:9 206:23 232:18 273:2 280:19 342:5,7 351:5,10,14 362:8,10 363:8,18 365:3 367:8 368:22 379:25 381:9

**Jim's** 367:22

**job** 25:19,25 42:3 219:20 313:2

**John** 3:6 7:24 9:4 10:20 45:3 46:13,18 69:13 74:8 76:15,17 77:10 95:17 105:23 129:18 146:13 154:7 155:18 157:6 177:6 192:18 208:13 216:2 222:14 236:18 267:18 304:6 308:7 353:18 385:3 387:10, 16

**join** 18:12 317:25

**Jones** 3:8 9:5 10:21 72:10

**July** 307:24 317:9

**jumping** 234:18

**June** 92:2 98:17 99:25 103:2 132:25 135:2 137:6 176:10, 24 186:16 200:7 242:23 262:16,24 263:13 265:3

---

**K**

**Karesa** 249:21

**key** 275:20

**kidding** 330:23

**kind** 168:2 188:12 221:12 222:23 245:22 250:5 274:16 276:4 323:6 329:22, 23 337:8 353:13 356:10 358:13,14 380:23

**kinds** 353:6 354:2 357:2

**Kirschner** 4:16 10:5

**Klinger** 7:12 8:24

**Klos** 87:20 124:9 172:6 230:19 275:23 292:3,18 389:9

**knew** 68:18 103:9,10 369:2

**knock** 364:19,20

**knowable** 371:14

**knowledge** 43:10 46:5 47:23 48:12,21 49:9 50:13 52:5,10 53:10 62:5 63:12,16, 21,23 79:23 80:10 81:5 82:7,8 89:23 93:23 95:3 98:17 101:13,19 102:2,25 106:25 111:16 112:6 138:16 144:24 147:8 153:13 167:8,22 184:10 188:15 189:9 194:13 206:5 207:8 208:2 225:5,12 226:21 232:21,23,24 237:11 243:4 259:22 322:19 324:17 384:18

**Kopf** 3:22 9:20

**Kristin** 172:7 186:21 230:20 292:3,12 328:17 342:11 343:8 350:17,18 362:23 365:13

---

**L**

**L.P.** 3:19 8:12 9:6,23 10:22 11:7 15:16,23

Index: La..made

18:7 41:19 42:10,18
43:16 58:17,21
109:23 110:9 152:14
172:15 271:3 279:20
325:25 329:3

**La** 4:24 104:25 118:3
129:16 135:10
177:14 218:14

**labeled** 8:9

**laborious** 145:12

**laid** 56:6

**landline** 393:7

**language** 101:4
315:21 316:2,3

**large** 287:22 379:22

**largely** 11:18

**larger** 356:8 357:10

**late** 323:6 379:21
387:9 388:3 390:17

**launching** 127:10

**Lauren** 171:4 183:24
192:5,12 275:24

**Lauren's** 185:9

**law** 12:11 306:9,11,
20

**Lawn** 4:7

**lawsuit** 55:8 164:13
181:22 375:19 376:6,
23

**lawsuits** 53:25 54:7,
10,12 322:15

**lawyer** 73:19 154:15
157:7 164:5 266:16
373:24 375:16

**lawyers** 147:20
374:3

**lead** 269:15

**leading** 269:8

**learn** 65:15 67:15
89:4,9 104:13

**learned** 66:16 68:3,8,
11 69:25 70:6,10,15,
19,23 71:17 76:2
80:19 90:19 340:17

**learning** 75:3 83:23

**leave** 157:23 321:13,
15,20

**led** 342:7 348:4

**ledger** 258:10

**leeway** 16:13 208:14

**left** 20:2 70:20 71:10,
18 87:8,18 164:25
165:3 166:4 167:3
226:2,3 232:22
296:17

**legal** 7:5 8:21 25:5
29:23 42:19 43:5,7,8
44:17,21 45:4,9,17
46:11 47:20 48:3,16,
25 49:13 55:21 107:5
126:4 127:11 142:6
143:15,19 146:5,10
147:3,9,24 148:2,4,5
149:7,11,15,24,25
150:20 153:2,7,8,12
154:8,19 155:12,13,
15,23 156:2,6 157:8
164:12 167:20
172:13 183:9 193:16
212:25 280:8 290:16
291:9,13,16 294:18,
20 295:5,8,13,22
296:4 322:18,22
351:18,21 354:8

**legitimate** 348:18

**lender** 273:4

**lending** 127:2 302:21
303:17

**lengthy** 105:15

**letter** 91:16 92:2
93:13 95:5,16 96:9
98:23 99:2,3,7,11,16,
21,25 103:7,14,18,23
104:8 106:11,15
130:8 135:25 136:7,
17 262:16,22,25

**letters** 94:21 95:11
96:19,22 97:3,8,13,
19,25 98:9 136:14

**level** 22:11 53:7
92:25 93:5,25 238:2
279:11 287:23 288:4

**levels** 274:2

**liabilities** 5:24
175:17,22 190:2,6
194:2 195:19 196:2,
8,17 204:19 211:3
220:4 237:20,23
242:12 301:8 303:9
307:9 317:8

**liability** 175:14
217:24 276:24
277:19 280:21

**liable** 306:12,21
307:11 317:21

**license** 21:22,25
22:2,8,9

**licenses** 21:13,16,21
22:12,16

**life** 377:2

**light** 293:2 299:11

**lighting** 35:25

**list** 83:12 100:9
243:17 245:16,24
246:6,23 247:10,25
249:2 250:10 251:22
254:3 317:9 377:22

**listed** 214:6 238:8
311:10 312:3 330:13
371:8

**listen** 40:14 47:8
114:13 144:14
223:12

**listening** 40:18
252:7

**lists** 152:10

**litigation** 4:17 10:5,6
16:12,20 17:3 267:15
373:23 374:5 375:25

**LLC** 31:8 32:4

**LLP** 9:13 354:13

**loan** 40:7 42:18 43:16
45:21 48:8,15,23
49:4,10,17,24 50:4,
15,20,24 51:2,5,16,
21 52:6,13,17,22
53:11 60:21 61:3,10,
19,22,23 62:9 63:10,
15,22 64:10 93:20

94:10 126:16,17
128:15 142:5 145:6
203:13 225:13,20
254:3 270:20 271:5,
15 272:7,8,16,21
284:5 285:5,6,11
303:6 318:15 331:14
332:9,14,17,24 333:3
335:12 357:2,13
358:20,25 359:2,9,25
361:18 362:22 363:8,
13,19 364:3,9,25
365:16 393:23

**loaned** 39:11,16,19
41:2 43:23 48:14
50:10 124:14,17,20
126:23 128:10 202:7

**loaning** 39:24 307:7
317:6

**loans** 40:4 41:8,23
42:9 44:10,12,16
45:15 46:8 47:18,25
48:6 51:11,23 52:22,
25 61:9,25 91:2 94:6,
8 105:8 125:24
126:10,11 128:15
129:10 131:2 202:14,
17 225:6,7 255:8,14
259:24 271:11,20
273:6 287:7,8
288:22,23 317:6
318:4 331:22 333:12,
14 335:13 355:19
365:23 369:3,11,14
370:10,15

**log** 393:12

**logging** 395:3

**logical** 291:20
309:23 315:4

**logically** 310:9

**logistically** 331:10

**Lokey** 273:23 274:3,
10,25

**long** 192:8 233:4
333:14 353:4 385:3

**long-term** 333:17

**longer** 282:2 380:15
381:11

**looked** 101:2 111:12,

18 134:6 136:2
158:5,14,19,24
159:5,10,16,24
160:17,25 198:19
201:8 220:9,13 222:5
224:2 262:8 265:8
316:10,13

**loop** 148:3 294:19

**Lord** 248:11

**losses** 276:7,11

**lot** 55:4 143:24
147:16 162:15 188:3
208:13 225:4 245:21
248:16 249:11 278:2
286:22 289:24
307:15 320:9 349:19
364:14 373:12,13

**lots** 169:12,13 373:8

**Louisiana** 4:14

**love** 252:17

**lower** 274:2

**LP** 3:17 9:21

**lunch** 139:25 150:22
158:6,14,20,25
159:6,11,16,24

**lured** 231:4

─────

**M**

**Madam** 268:8

**made** 15:14 46:8
47:18 48:6,9 49:24
51:11,16,21 52:6,13
56:8,14,22 57:6,25
58:4,11 60:21 61:4,
11,19,22 62:2,4,18
63:2 64:5,9,14,22
78:5 98:19 121:24
122:2,9,15,21,22
124:4 125:25 127:21,
24 128:14 129:12
130:9 131:4 134:17
139:9,13,16 148:5
159:9 161:4 162:10,
11,18 163:6,10,21
165:10 168:2 182:15
190:14 195:10 202:6,
13 203:14 217:14
225:7 242:6 245:8,9

261:19 262:24
271:21 288:21
295:17,23 299:7
306:12 314:2 315:15
316:21 317:15
327:16 328:5,8
334:22 335:3 343:19
345:11 350:23 351:8,
20 358:20 359:7,14,
20 360:2,17,23
361:25 362:2,4,6,12,
16,18,22 363:7
364:25 365:10,14,15
373:19 378:8 379:16,
23 382:22 383:23
384:6,7,9,11,20
385:16,21,25 386:2
390:21 394:8,18

**Madison** 4:20

**maintain** 90:5

**maintaining** 258:5

**make** 36:4 41:25 42:3
57:17 63:9,14 74:3
83:2,5 86:8 88:16
89:21 96:14 112:16
117:10 123:23
127:16,18,21 129:5
136:16,23 145:6
157:17 164:19
176:19 177:7,12
187:3,17 198:20
199:19 200:14
209:25 210:7,16,23
243:5 272:21 277:24
285:9 288:10,13
294:18 295:20 296:5
297:8 303:4 315:11
317:5 318:4 324:14
325:2 331:22 332:7
334:8 338:23 340:2
342:9 344:20 346:12,
20,25 348:5 350:19
351:6,14 358:7,25
359:9,10,15 360:6,
10,23 361:6 362:6,7,
9,17 363:3 365:4
367:21 373:12
377:17 380:23
381:11,17,22 382:2,
6,14,19 384:24
390:5,7 391:2,12,20
392:6,12

**maker** 140:20 142:25

216:19 305:18

**makes** 123:16 153:3,
22 345:17

**making** 40:7 41:22
88:6 160:9 282:22
293:4 335:9 337:20
343:4 344:23 345:4
363:9,14 381:3,6

**manage** 26:7,17
28:15 38:23 116:11
354:11

**managed** 113:24
125:2 332:13 361:12

**management** 3:5,18
5:16 8:12 9:6,22
10:22 11:7 15:16,23
18:7 22:21 26:20
30:2 41:19 42:10,18,
22 43:11,16 44:6
58:15,17,20 70:21
90:21 91:16 94:21
95:4,16 96:8,18,21,
23 97:2,8,12,19,24
98:9,25 103:17,22
104:8 106:11,15
109:23 110:9 125:3
128:20 130:8 135:24
136:6,13 152:14
172:14 215:14,17
232:13,15 262:16,21,
22,25 271:3 279:18,
19,22 280:2,3 308:4
325:22,24 330:16
332:12 354:7,19
359:16,18 360:7,9,14

**manager** 116:9
230:16,22 291:12

**managers** 88:23,24
230:18 274:5 292:2

**managing** 88:21
292:5

**Marc** 4:16 10:5

**March** 14:8 323:6

**mark** 49:18,21
232:18 268:15

**marked** 91:21 104:24
135:13,15 142:16
151:21 170:19 197:9
215:23 216:7 218:17
226:24 236:23

237:18 258:18
297:23 302:8 307:21
309:6 328:13 338:13
341:14

**market** 119:6,9
120:15 240:21
241:17 242:7 243:5
265:11 274:2 371:15

**matching** 222:22

**material** 53:12 104:5
111:22 112:3 113:11
131:6 133:25 171:11
174:14 185:15,21
274:15

**materiality** 52:24
53:7,16,20 92:18,20
93:2,5,8 94:2,7,9
98:15 104:7 117:11,
13

**materially** 274:23

**materials** 175:4

**maternity** 321:12,14,
20

**math** 109:17 110:13
221:8 239:24 260:15
311:7

**matter** 236:21 260:9

**matters** 313:5

**maturity** 314:22
315:6,7

**Mckenzie** 3:14 9:9

**meaning** 231:3
274:18 276:12
290:13 296:4

**meanings** 41:14

**means** 33:23 41:11
118:17 284:16,22
329:19 366:3

**meant** 186:8 301:24

**measurement**
240:18

**mechanic** 155:13,16

**media** 8:9

**meet** 194:3 323:3
378:25

**meeting** 68:5 70:2
168:21,23 169:15
189:7 192:9 206:12
231:20 283:9,10
290:20 300:23
323:11

**meetings** 184:8
323:20

**members** 89:2
166:23 191:21 192:3
233:16 237:7,9
323:16

**memorialized** 75:9

**memory** 95:23
133:2,5 224:11,16
314:20 319:17
331:17

**mental** 260:15

**mentioned** 131:17,
20 273:10 281:2
282:12,15 289:15
351:12 368:24

**met** 268:3

**methodology**
274:18

**Michael** 4:5 9:24

**Michelle** 3:13 9:9
151:7

**micromanage** 337:6

**micromanaging**
89:3

**mid** 341:5 366:9,10

**middle** 119:19 121:8,
9 152:21

**milestones** 66:3,9,
12,22 69:2 76:3 79:2,
9 84:4

**million** 92:22 119:23
121:3,6 124:17
131:13 132:2,8
138:12 140:14 141:9,
18 142:19 143:12
144:6,17,23 161:25
178:19 216:17
217:16,19 220:3,20,
24 221:7 223:7,17
224:2 238:9 239:10,
12,24 268:22,23

270:20 271:6,7,15,16
272:7,8,16 273:6
277:11,12,16,20
278:6,7 282:14,15
283:18 287:15 288:6,
20 302:22 303:6,18,
24 304:11,20 305:23
306:2 307:7 308:16,
20,21,22 309:25
310:17,23 311:2
315:13 317:6,10
318:14 334:7,19
336:13,23 337:25
339:4 340:10 341:23
343:19 344:5 345:11
350:7 351:22 389:13,
14

**million-plus** 289:22

**millions** 260:19

**mind** 19:20 59:23
60:4 160:6 161:17
198:18 305:17,21
394:16

**mine** 268:15

**minimal** 86:4,5,17

**minute** 129:19 174:8
372:9

**minutes** 53:23
139:24 174:21 176:4
182:23 266:20 267:3
325:3,4 348:25
372:12

**misapplication**
163:15

**misremembering**
229:13

**missed** 339:12,14
340:7

**misspeak** 301:23

**misspoke** 301:21
336:16

**mistake** 61:17 139:9,
13,16 159:9 161:4
162:11,19 165:9
181:10 306:23 314:2
316:22 317:15,22

**mistaken** 304:14

**mistakenly** 167:10

168:4 214:11

**mistakes** 384:19

**mode** 283:9

**model** 274:3

**moment** 117:4 198:10 222:5 224:3 276:5 307:22

**money** 39:11,16,24 41:2 43:24 49:11,17 50:10 62:9 124:14,20 126:6,23 127:3,15,25 128:5,10,23 129:2,5 145:16,18 186:10 276:13 282:8 283:5 285:18 318:10 319:11 320:4 359:9, 13,24 360:21 374:22

**moneys** 39:19 162:5 167:9 277:8 282:17 283:16,22 289:5 359:15

**month** 59:11 132:23 226:16 229:15 258:21 332:4

**month-and-a-half** 323:10

**monthly** 5:25 226:11,14 227:5,20, 25 228:12 229:10,19, 21 230:2,11,22 231:14 232:6,8,13, 19,20 255:18 256:14, 19 259:9,12,14

**months** 261:21 292:25

**morning** 7:3 10:19 342:16,18 344:12,14, 16

**Morris** 3:6 5:6,9 7:24 9:4 10:7,15,20 13:10, 17 16:9,24 17:11,14, 19,20 22:16,18 31:18,19,21,25 35:24 36:5,11 45:6,10 46:15,23 47:4,6,11 55:4 69:8,11 72:15, 18,25 74:3,9,13,18, 24 75:11,15,19 76:19,23 77:2,11,19, 22 81:16,18,21,23

82:10,13 91:8,18,22, 24 92:9,11,14 95:9 105:4,25 110:22 114:11 118:2 129:15, 21,24 130:14,18 135:5,10,13 136:9 137:24 139:20 140:11,23 142:14 146:17 150:21 151:19 154:3,13,16 155:19,22,25 156:18, 25 157:3,10,13,21 170:17,20,25 171:24 174:18 177:9,14,16, 19,23 178:10 195:6 196:20 197:6,21 201:11 202:3 207:15 208:20 209:13 214:4, 8,10,14,21 215:3,10, 21,24 216:4,13 217:5,8 218:11 219:25 221:23 222:16 224:18 226:22 228:18 236:15,20 243:15 246:13 247:21 248:5, 11,22 249:18 250:6 251:23 252:4,8,16,24 253:4 254:17 258:16 259:16 265:23 266:9, 17,24 267:14,20 268:14 269:7,12,18 270:15,22 271:8,18 272:9,17 273:7,10 277:22 278:19 279:8 280:15,23 282:12,18 283:19 284:7,14 285:7 286:9 287:9, 18,24 288:8,25 289:12 290:9,21 291:19,23 292:19 293:15,23 295:12 296:13 297:6 298:22 300:15 301:13 302:2, 11,15 303:2,10,20 304:3,7,12 306:15,24 307:13 308:5,8,13 309:10,12 310:2,11, 19,24 311:12 312:16 313:13 314:12,14 315:9,23 316:23 317:17,25 318:6,17, 23 319:23 320:6,18 322:5,23 326:24 327:6,24 329:10 330:21 331:5 333:10,

18 334:6,10,21 335:4 338:3 339:16 340:18 342:21 345:12,19 346:22 347:14,19 348:12 351:15 352:4, 8,16,18 353:11,15,19 354:4 355:5,9,15,21 356:3,14 357:6,15,22 358:16,22 359:4,11 360:3,11,25 363:16, 22 364:10,22 365:6, 21 366:15,25 367:16, 25 369:4,8,17 370:3, 8,25 371:10,25 372:22 373:4,20 374:11 375:3,24 376:20 377:6 387:7 388:19 389:5,15 390:9 391:4,14 392:7,13 393:24 394:11,19,23 395:5

**Morris'** 313:9

**MORS** 256:3

**motion** 374:14 376:7

**Mountain** 244:23 245:3,6 247:11 260:22

**mouthpiece** 206:2

**move** 69:11,12 114:11 208:19 246:13 247:21 248:22 250:6 252:23 307:17 364:22 376:25

**moved** 126:6

**moving** 248:5

**muffled** 48:19

**multi-month** 145:11

**multiple** 279:3 320:25 321:2 373:7,8

**Munsch** 3:22 9:20

**mute** 36:10 350:2

**myriad** 248:14 249:11

───────────

**N**

───────────

**N-A-V** 273:11

**naively** 263:23

**named** 44:3 376:23

**names** 229:11 300:8 309:19 311:25 312:4, 13 375:20

**Nancy** 4:2 9:14 65:9, 17 66:7 67:6,22 68:19,25 75:25 78:16 82:22

**Naomi** 321:7

**narrative** 111:17

**nature** 84:4 85:6 144:2 147:17,18 180:20 230:8 240:22 253:18 259:15 271:20 276:10 279:22 280:9 292:22 294:22 325:19 329:24 333:13 354:12 356:6,17 357:11 378:23

**NAV** 125:6,9 131:17, 24 132:3 145:8 273:11,14 274:23 275:8 277:5 278:15 280:12,22 281:13 289:6 318:15 373:10

**needed** 155:2 250:17 257:13 271:21 289:6 318:13 354:15 358:8 382:15,17

**needle** 118:4

**negative** 7:25 394:14

**negotiated** 390:8

**negotiation** 382:25

**negotiations** 58:19 383:2,6,12 384:14

**Nelms** 233:21

**Newman** 4:18 10:3

**Nexpoint** 3:17 6:4 9:21 27:10,12,15,18, 21,25 28:4,6,16 29:7, 10,12,16,24 31:3,11, 17 32:17 42:21 43:12 44:6 54:14 58:7,11, 14 60:5 65:6 100:23 126:9,13,16,23 127:3,10,11,15,18,24

161:23 162:5,7,11,18 163:23 164:6 165:11 167:7,8,13,15 168:2, 6 171:13 172:21 176:14 178:12,17,18, 22 179:13 182:3,12 184:21,23 186:9,21 189:15 196:3,23,24 216:20 217:14,23 218:3,19 219:15,22 220:18 221:6,10,13, 25 223:5,24 241:23 242:6 260:4 267:24 309:24 322:3 325:14, 18,21 326:16,23 327:4,10,17,20 328:6,7,8,25 329:3 330:11,18,19 331:2 332:14,17 333:8,15, 16 334:5,8,22 335:3, 9 336:13 337:13,23, 24 338:23 341:19 342:9 343:18 345:17 346:12,16,20 348:4 353:8,21 358:15 379:16 381:23 382:10 383:24 384:3 390:5 391:2,10,12,19 392:5

**Nexpoint's** 59:18 218:6,12 219:6 331:3 336:22 350:19

**Nguyen** 3:21 268:10 297:19 298:9 302:5 303:14 305:3 306:7 307:19 308:11,25 309:3,4 311:22 313:8 317:3 331:9 332:21 338:12,21 341:15 343:11 345:23

**night** 376:8

**nomenclature** 350:4

**non-american** 284:10

**non-orderly** 274:8

**nonlawyer** 375:13

**nonsense** 156:6

**Norris** 183:3,6 184:2, 7,9 192:15,23 193:5

**North** 3:15,23

**Northern** 8:13

**note** 13:11 45:14,21
48:15,22 49:6,12
50:15,22 51:7 56:7
57:4,19 59:18 60:5,
13 62:19 63:3 64:6,
15,23 78:17 107:20
117:9,12 120:18
122:4 126:12 134:6
140:14,17,20 141:22,
24 142:2,4,18,22
147:15 149:17 150:4
161:24 162:4,7,18
163:23 165:12
167:11,15 168:6
182:3,12 186:18,22
187:17 213:16 214:4
216:16,20 217:2,13,
23 220:5,8,13,18,20,
23 221:5 222:4,10
223:4,7 224:2,9,12
233:22 234:10
243:17 244:23 245:3,
7,13,16,23 260:22,25
261:9 306:11,18
309:16,24 310:9
312:2,14,15,24,25
313:15,16 315:13,14,
16 316:17,18 319:12,
14 324:16 334:6,13,
18,19,23 335:21
336:13,23 338:2,17
339:4 340:10,14
341:19,23 342:9
343:4 344:25 345:18
347:7 362:13,14

**noted** 185:5 186:17

**notes** 6:10 44:20
45:2 46:2 49:21
50:18 54:3,6 55:7,18,
25 56:10,15,23 58:2
65:7,14,18 66:7 67:3
68:14,17 76:2 82:15,
20 83:6,10,13 106:21
107:2,12 108:2,14,18
109:5,7,17 110:6,25
111:5,8,12,22,25
112:18,23 113:9,10,
13,18 114:19 115:3
118:12,13,25 119:3,
6,9,11,22 120:19
121:3,21 122:8,15
123:6 124:3,15
130:23 131:12,16

132:7,10,14,20
133:13,21 134:5,14,
17,23 138:11,20
139:5,10,17,21
142:10 143:6,7,14,
21,23 144:5,12,16,22
145:4,23 146:2,4,7,
11,14,25 147:10
148:15,18,24 149:2
150:5,8,15 158:5,13,
19,24 159:5,10,23
160:16,25 161:5,9,
10,19 162:11 171:13
175:16 178:14,15
179:14,21 180:2,10,
24 181:4,9,16,22
182:8,16 205:19
209:2 210:8 213:7,8
222:2,17 223:13,16,
19,23 224:9 233:8
234:15,23 235:4,9,
14,21 236:3,7
238:20,25 239:4,5,
11,18 240:10,20
241:6 242:7 243:6,
11,18 244:4,15
246:6,15,22 247:10,
24 248:25 250:9
251:8,15,21 252:12
253:10 261:12,16
262:6,11 263:6,15
264:19 268:21,24
282:14 284:19
285:15,17 288:21
289:10,16,18,22
290:8,13,16,24 291:5
293:13 296:9 297:4,
5,11,17,21 298:17
299:11,14,18 300:13
301:18 304:19,24
305:2,18,22 306:21,
23 307:12,24 310:17
312:11 313:20
314:13,23,25 315:2,
20,22 316:2,14
317:10,16,21 319:5,
9,15,18,22 322:20
323:20,25 333:17
338:7 364:13 366:22
367:23 368:6,17
369:15,19,20,25
370:9,11,17 372:11
386:9,10

**notice** 7:25 356:9
357:9 379:6 380:10,
15,16,17 381:4,7

**noticed** 16:12,20
248:6 375:25

**notices** 380:21

**November** 59:12
328:16 329:14,19
330:15 331:12 332:3
380:9,18 388:3,6
390:22

**NPA** 5:15 189:24
328:21,22 331:13

**NTA** 338:16

**number** 8:9,14 13:13
15:24 17:25 93:7,10
100:10 108:9 111:7
126:10 135:10
137:25 139:22
170:24 177:15,16
179:4 197:4,7 218:13
222:21 236:21
239:25 240:9 277:17
282:9 285:15,16
286:5 343:25 344:5
370:22 377:9 389:18,
21

**numbers** 240:5,6,23
268:13 278:10 343:5
366:12,19 367:6

---

**O**

**Oak** 4:7

**object** 29:20 45:7,8,9
47:4 60:24 65:19
66:10,15 67:9,24
69:6 73:24 77:13
78:19 79:20,25 97:4
107:16 115:5 119:12
144:25 146:12 147:4,
11 149:21 151:13
156:7,16 159:25
164:2 180:4,11,12
191:4,22 194:6,22
202:24 206:7 208:10,
11 211:4 212:12,20,
22,24 213:25 220:25
225:10 227:21 231:8
232:9 239:20,22
248:3 249:4 250:11
251:10 253:12 254:7
255:10 256:17
262:18 269:7,14,17
347:21 348:11,12

352:14 365:6 381:13
384:12 386:13

**objecting** 154:3

**objection** 8:4 17:9,
10 20:4,20 22:14
25:15 31:16 33:9
34:20 40:10 41:4,12,
24 42:11,12,19 43:17
44:17 45:4,16 46:10
47:20 48:3,16,25
49:13 50:5,7 52:8
53:18 54:8 55:10,20
55:25 58:25
59:19,25 60:7,15,16
61:12 62:11 63:13,24
64:17,19 65:12 66:24
67:17 69:5,9,10 75:6,
10 79:4,14 80:12
82:24 83:25 85:15
86:2 91:4 94:3 96:11,
20 99:17 107:4,15
108:5 110:11 111:24
112:20 113:20
114:20 115:6 117:6,
18 119:13 120:16,17
122:10,16 124:6,23
126:3 127:19 132:16
133:23 134:8 142:6
143:10,15 144:8
149:5 150:10,17
151:16 153:18,19,25
154:6 155:11 157:2
158:15 159:17 160:3,
12,18,19 167:5 168:8
178:20 180:3 181:5,
11 183:15 184:6,20
185:2,18,24 193:21
194:5 195:21,22
196:4,11,18 200:20
203:23 205:3,15,25
206:21 210:24
211:13 213:11
220:10,15 222:13
225:24 228:9 229:24
231:18 234:6 235:23
236:10 238:10 239:3,
14 240:16 242:24
246:19,25 247:14
250:22 251:12 254:6
255:12,22 257:6,20
260:14 263:8 265:4
266:19,23 267:21
270:15,22 271:8,18
272:9,17 273:7
277:22 278:19 279:8

280:15,23 283:19
284:7,14 285:7,23
286:7,9 287:9,18,24
288:8,25 289:12
290:9,21 291:19,23
292:19 293:15,23
296:13 297:6 298:22
299:15 300:15 302:2,
25 303:2,10,20
305:10 306:15,24
307:2,13 310:2,11,
19,24 311:12 312:16,
18 314:14 315:9,23
316:23 317:17,23
318:6,17,23 319:23
320:6,18 322:5,23
326:24 327:6,24
330:21 331:5 333:10,
18,20 334:10 335:4
336:14 338:3,5
339:16 340:18 341:2
342:21 345:12,19
346:22 347:14,19
348:9 351:15 353:11,
15,18,24 354:4
355:5,9,15,21 356:3,
14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10 366:15,25
367:16,25 369:4,8,17
370:3,25 371:10,25
372:22 373:4,20
374:11 375:3 376:20
379:10 380:25
388:19 389:5,15
391:4,14 392:7,13
393:24 394:10,11,19

**objections** 209:9

**obligated** 161:18
262:13 304:23 334:8

**obligating** 144:22

**obligation** 234:22
242:20

**obligations** 160:9
178:15 179:12 180:2,
9,23 185:15 194:4
208:8 327:13,21
328:8 332:5,8 333:17
335:17 336:6,7,10
361:19 380:2 390:10,
12 391:7,8

**obligor** 264:18

**obnoxious** 364:23

**obstacles** 90:23

**obtain** 57:12

**obtained** 48:23 49:5 50:4,16 51:6 126:10 128:15 176:16

**obtaining** 62:10

**occur** 169:6 280:13 331:21

**occurred** 103:13 104:5 125:17 126:2 263:13 278:15 299:25 331:24 339:7 369:24 390:24

**October** 8:19 21:7 160:5,7,14,21 169:17,24 171:19 172:4 173:24 174:6 183:7,14 186:11,13 189:13 207:16 219:24 263:19 314:20 316:16

**odd** 303:12 307:6

**offense** 352:23

**offhand** 342:11

**office** 279:21 280:3,5 294:4,10 323:13,14 326:15 388:22 389:2

**officer** 14:12 23:6 26:25 27:6 28:24 29:2,7 32:14 35:10, 12,16 36:20,24 37:6, 18 38:3,5,10,16,22 39:3,24 51:22 52:6, 17 120:8 143:18 173:7,9,13,16,20,23 174:3 184:23,24 258:25 269:5,24 270:10,14 271:2 302:19 362:25

**officers** 15:22 29:24 39:11 40:5,8,12 51:23 52:13 93:21 153:9

**offset** 380:2,3 382:25 390:9,11,13

**offsets** 58:21 381:18, 19 383:13

**Okada** 49:18,21,24 50:2 118:3 232:18

**omitted** 309:19

**one-day** 331:14 332:9,17

**one-third** 239:18

**one-word** 174:9

**ongoing** 125:11 202:8,14 203:14

**open** 36:13 376:5

**open-end-to-close-end** 125:12

**open-ended** 125:7 275:4,8 276:10 281:9,11 282:7

**operating** 5:22,25 90:10 226:11,14 227:2,4,19 228:7 255:18 256:14,20 259:9,12,14 359:14

**operational** 143:25 147:17

**operational-type** 291:11

**operations** 202:8,15 203:14

**opinion** 120:6,7,10 204:8 205:9 247:17

**opinions** 204:15

**opportunity** 13:2

**oral** 65:8,16

**order** 13:3,7 105:11 128:16 129:6 288:21 360:9

**ordinary** 226:9 229:22 293:18

**organizational** 112:13

**orient** 365:24

**original** 223:25 232:11 274:24 277:14

**originally** 177:21 232:16

**originals** 297:4,11, 16

**Orleans** 4:14 9:17

**outboxes** 294:9

**output** 90:6

**outstanding** 118:12 119:22 142:10 171:11 174:15 175:12 185:10,23 186:8 202:6,18,23 203:7,8,13 220:18 222:3,12 223:4,14, 19,24 224:13,17 235:10,14 244:16

**overpaid** 58:16 381:16

**overpayment** 381:20 390:13

**overpayments** 58:22 379:22 380:3 389:4,12

**overruled** 17:15

**overseeing** 26:10 86:22 230:11

**oversight** 257:15

**overspeak** 115:16 252:3

**owe** 375:15

**owed** 125:8 160:10 161:8 178:18,23 185:6,16 186:9 199:12 204:12,25 205:13 212:18 275:13 297:17 308:20 310:17 358:21 380:3

**owing** 50:3 211:11 212:10 223:6 234:23 285:18

**owned** 15:6 16:7 17:24 42:8,16,24 43:3,13 273:17

**owner** 272:24 281:25 282:3

## P

**p.m.** 150:24,25 151:3 174:6 224:23,24 225:2 266:5,6,8 325:7,8,10 349:6,7,9 372:14,15,17 395:10, 11

**Pachulski** 3:8 9:4 10:20 72:9 166:19

**package** 229:10,20, 22 230:2,12,23 232:6,8 233:3

**packages** 231:15 232:20

**pages** 214:11,17

**paid** 50:2 56:18 167:10 221:7 277:4, 8,20 283:23 327:22 330:19 331:4 333:16 336:9,11 355:19 356:23 365:4 394:9

**paper** 288:21 293:13, 20 296:12,16

**paragraph** 92:17 118:11 119:20 121:9 124:15 126:9 134:11 140:18 142:22 203:6 216:25 221:24 222:7, 9,10,14,16,18 223:9, 15

**paragraphs** 117:23 118:6

**part** 42:9,17 43:15 50:18 51:11,16,21 52:12,19,23 53:12 58:17 85:5 88:12,14, 22 90:21 91:14 93:22 103:22 105:9 116:13 117:20 125:12 142:9, 11 148:4 149:12 156:24 169:14,19 175:3 176:23 179:11 193:17 200:16 210:21 213:16 214:19 238:8 240:17 245:19 254:20 274:17 282:4 286:2 288:19 326:21 330:17 365:2 366:23

**participants** 8:17

**participate** 168:13 218:23 219:2 362:21 380:5

**participated** 87:25 137:20

**participating** 191:9 259:8

**participation** 86:23

**parties** 7:15 9:25 85:7,12 100:14,22 101:6,23 103:4 376:13

**partner** 9:9

**partners** 31:8,12,15, 18 32:4 370:16

**partnership** 121:11 122:6 131:12 132:7

**partnership's** 102:19 103:3 118:12

**party** 17:10 100:19 101:18 102:20 103:4 321:4 366:22 368:17 385:8

**pass** 352:3 393:15

**passing** 78:8

**past** 190:16 226:7 359:9 375:21

**patience** 387:9

**Patrick** 21:5

**pause** 295:10

**pay** 65:7 122:4 144:22 161:18 181:15 205:10,19 209:3 234:22 282:8, 16 302:23 318:14 327:13 332:6,13 344:19 355:18 356:2, 13 357:3,13 366:13 374:25 393:23

**payable** 171:12 174:15 190:6 202:18, 22 220:5 222:2,17 327:21 329:17 330:10,12,20 331:4

367:24 386:9,10

333:7 334:14

**payee** 140:21 142:25
216:22

**paying** 288:14,16
326:23 333:9 338:17
346:21 355:4,8 357:4

**payment** 56:5,21
57:4,6,12,18,25 58:6,
10,12 59:14,16,20,22
60:3,4,9,11 62:17,25
63:9,15 64:4,9,22
121:11,17,21 122:7,
19,23 162:13,16,17
163:4,6,10,14 164:24
182:16 199:6,11
212:18 331:20
332:24 334:9 335:9
336:12 337:3,25
338:24 339:12,14
340:2,7 342:9 343:4,
20 344:20,24 345:4,
11,17 346:13 348:5
350:7,9,20,23 351:6,
7,14,20,23 356:6,17
358:25 359:2,6,7,15
360:16,22,24 361:18
362:2,5,7,9,12,15,18,
21 363:3,7,10,15,20
364:3,7,25 365:5,9,
14 366:21 379:15
381:23 382:2,9,14,15
383:19 390:6,8,21
391:10,13,20,24
392:6

**payments** 55:16,24
56:8,14 57:2,9 64:14
162:10,24 163:16,21
165:10 167:14
217:15 282:22
288:11,12 328:4
329:16 330:3,4,6,8
334:23 335:3,19,21,
22 336:23 337:9,15,
21 355:19 356:8
357:2,10,13 358:7,21
359:9,10,20,25
360:6,10,15 361:7,23
362:4 365:14,16
377:12,17,22 378:8,
9,17,24 379:7 380:23
381:3,6,11,18 382:6
383:4,5,23 384:2,4,6,
7 387:24 388:14
390:20 391:3 392:12

393:23 394:7,18

**PDF** 293:22

**Pearl** 3:15

**pen** 296:22,25

**pending** 7:21 16:16

**people** 33:7,11 34:4
89:3 146:4 170:24
237:5 275:9,20,21
279:23 291:21 293:7
294:3 319:16 351:12
372:19

**percent** 18:2,4 86:15
108:23 109:19 110:8
260:12

**percentage** 110:19

**percentages** 86:16

**perfect** 90:17 118:5
130:19 189:4 197:19
268:19 298:8

**perfectly** 144:3
223:2 348:18

**performed** 48:5
246:11

**performing** 114:7
219:4

**period** 25:12 39:9,14
40:24 90:15 93:14
95:15 105:18 120:9
135:21 169:5 203:20
218:21 219:6,16
221:15 226:18
231:15 242:17
243:13 247:22 265:2
321:22 380:15,16

**periodic** 228:13
241:17 288:12 358:6

**periodically** 337:14

**persist** 157:9

**person** 26:2,4 43:7
44:21 57:7 79:9
86:21 87:6,7 114:2,4
116:14 155:16
167:20 191:18
259:22 291:21
292:22

**personal** 79:22
80:10 97:15 375:11

**personally** 62:20
64:3 85:23 89:11
95:4 97:9 101:22
237:4 255:20,24
275:15 296:21
303:23 304:18,22
306:12 317:21
370:11

**personnel** 237:16
318:12 333:22
359:18,21 360:13,23
363:3

**pertaining** 65:17

**petition** 21:9 70:11
84:11 235:10,14
241:20 263:20
310:15 386:5

**phone** 68:6 70:3
290:25 392:23 393:2,
5,8,9

**phonetic** 249:21

**phrase** 41:10 229:19

**physically** 191:16
294:4 296:12,16
299:17,21

**pick** 101:6

**picked** 101:10,12

**piece** 203:11

**pile** 139:23

**place** 58:24 59:6
112:16 122:18 166:2
260:7 272:13 278:16
297:14,16 326:4,10,
12 393:3

**plaintiff** 9:7

**plan** 335:24 337:20
366:5 367:6 386:9,18

**play** 85:23 153:11
168:16 184:2 340:9

**played** 86:3,6,17
335:2

**playing** 239:9

**pleading** 213:22

**pleased** 347:12,16,
17

**plural** 314:3

**point** 78:9 87:2,6,7
114:2,4 157:16 166:9
190:16 254:11 255:3,
7 261:6 313:7,20
321:13 326:6 337:12
344:9 375:23 376:11
380:22

**pointing** 254:23

**points** 282:9,10

**policy** 378:6,10
386:2

**poor** 207:22

**poorly** 104:10

**portfolio** 274:5

**portion** 13:2,6 16:5
17:22 19:13,16,19
112:23

**portions** 12:10

**position** 37:9 122:3
184:14 193:3,6,9
274:15 280:11
361:14

**positions** 38:24
172:25 173:5 183:6
184:10,18 192:16

**possession** 45:25
113:9 132:11

**possibilities** 29:19
371:23

**possibly** 213:7
314:12

**post** 92:12 184:13,
14,18 192:15,24
193:7,8 275:24

**pot** 366:5 367:6
386:9,18

**potential** 250:20
357:4 366:3,19
369:16 371:7,9

**potentially** 113:5
249:6 250:12,13,14,
16,21 354:8

**Poydras** 4:13

**practice** 7:8 64:13
89:20,24,25 90:4

91:11 97:7 98:7,12
106:14 146:9,24
150:13 230:25 231:2,
3,22,24 233:5 299:4,
5 337:4 356:13
369:2,7 371:6,15
374:15 377:21

**pre-petition** 226:18

**precisely** 205:21
298:16

**prefix** 268:15

**premarked** 91:19
104:23 197:15 216:5
236:16

**preparation** 137:21
230:11 259:9

**prepare** 123:17
204:23 226:9 229:6,
21 235:19 236:25
237:3,5,13 241:11
255:24 377:22
378:16

**prepared** 227:5,20,
24 228:15 229:2,4,9
230:3 232:20 237:8
239:17 241:25 242:3
255:20 284:19
317:14 319:5 373:2
376:18

**preparer** 256:4
259:4,5,23

**preparing** 137:10
164:9 232:5,7
241:12,15,16 254:9
264:10

**prerogative** 253:7

**present** 4:23 90:23
180:15 191:19
283:14

**presentations**
368:7,16,18

**presented** 86:10
113:14 117:10
161:11 296:11,16

**presents** 12:20

**president** 14:16
271:23 272:24

**presume** 207:13

**pretty** 105:15 364:23

**prevented** 231:6

**previously** 18:9 24:4
80:13 225:22 246:8
373:19 374:18,25

**Pricewaterhouseco
opers** 84:9,13,16,20
106:7 113:23 132:5
137:2 141:24 142:3
149:3 150:9,12,16
211:10 212:9 242:21
263:3 274:10

**primarily** 267:18,20

**principal** 35:10,11,
15 36:20,24 37:5,18
38:3,4,9,13,16,21
39:3 49:11 50:3,23
55:17,25 56:22
57:18,25 59:14,17
60:12 62:18 63:2,9
64:5,14,22 119:7,10,
22 142:4 144:5
161:8,19 162:6
163:11,22 164:24
165:11 167:10 168:5
217:16,19 220:23
222:11 223:6,18,25
334:9

**principals** 274:6

**principles** 241:14

**prior** 20:14 26:12
37:10,18 54:21 56:18
57:13 62:4,10 63:23
74:14 84:10 87:17
99:16,24 121:13
131:5 138:17 144:24
163:15 164:25 165:9
189:13 193:23 199:6
206:15 212:19
217:20 227:15
243:23,24 267:12
300:13,20 301:17
331:12 333:4 334:23
335:3,7 336:11,20
337:11 339:10 346:9
370:18 381:3,7
386:4,19,22

**private** 273:19,21

**privilege** 151:14

**privileged** 66:18
74:2

**probe** 82:7

**problem** 8:3 214:14
260:18

**procedure** 271:17
291:12

**procedures** 7:20
114:8 207:21 378:5

**Proceed** 267:22

**proceeding** 197:18

**process** 52:23 55:23
56:4,5 58:18 90:21,
25 91:14 116:13
131:24 137:9,11
145:10,11 148:25
156:21,24 168:14,17,
25 169:6,9,15,17,19
170:5,9,14 176:23
179:11,20 189:2
200:16 210:21 218:6,
7,23 237:10 245:19
272:14,19 274:21
292:6 324:13 366:11
373:12

**processes** 207:21

**processing** 286:13

**produce** 178:12
195:8 210:14 235:24

**produced** 132:10
183:11 228:12,13
266:20 267:7,15,19

**producing** 241:20

**professional** 21:12,
15,20,22 22:15
356:21

**proficiency** 22:11

**project** 292:25

**projections** 335:18
337:17

**promise** 346:6

**promissory** 6:10
45:14,21 46:2 48:15,
22 49:6,12,20 50:15,
18,22 51:7 54:3 55:7
56:6,9 60:5,13 67:3
75:25 78:17 82:15,20

83:6,10,13 107:20
108:2 109:5 119:22
131:12 132:6,10,14
133:13 138:10 139:5,
10,17,21 140:14
142:9,17 144:5,12,
16,22 146:7 158:5,
13,19,24 159:5,10,23
160:16 161:10
178:14 179:14 209:2
210:8 216:16 217:13,
23 233:8,22 234:10,
15 235:8,21 240:20
241:6 243:6 244:4
282:14 284:19
285:15,17 288:21
289:10,16,18,21
290:7,12 291:5
293:13 297:4,5,11,
17,21 299:11 300:13
306:10 307:12
310:16 315:20,22
317:16,21 319:5,9
322:20 338:2,17
339:4 340:10 344:25
369:20

**prompted** 81:7
342:2

**proof** 167:8,13

**proper** 100:11
229:18

**properties** 146:15
238:8

**property** 375:11

**proposal** 125:13
281:7 282:4,6 386:24

**proposals** 367:22

**proposed** 136:18
178:5

**proposing** 366:19

**prosecution** 208:23

**provide** 15:4 28:24
174:22 175:7 267:12
295:20 299:8 311:17
333:22 353:8,14
354:3 357:19 358:5,
9,12,13 378:22 387:3

**provided** 32:20
112:8,9,17 114:18
127:12 142:8 146:15

175:3 176:22 179:19
182:23 194:25
200:18 274:25
311:24 312:4,10
327:20 332:9 335:14
351:2 353:7 354:6,19
355:7,13 357:21,25
358:4,11,15 367:11

**providing** 88:11
219:21 278:17 279:6
280:14 309:21
326:14

**provision** 103:17
132:15

**provisions** 105:7

**prudent** 302:20
303:5

**public** 21:17

**publicly-traded**
281:16

**pull** 200:10 215:6
297:20 302:7 305:2
307:18 308:25 313:9
317:2 328:10 334:4
338:11,20 341:12

**purely** 240:22

**purporting** 228:7

**purpose** 16:23 17:2
36:6 53:17 112:2
126:7 232:5,7,11
294:15

**purposes** 16:11
33:22 85:8 92:21
93:4 101:18 128:13
129:3 197:12

**pursuant** 15:8 122:6
148:25 199:10,18
200:13 256:6 275:13
278:16 279:5 280:13
281:6 288:17 290:19,
24 326:13

**put** 12:23 36:9 61:24
71:11 81:10 89:25
91:18 104:22 105:2,5
122:2 124:18 135:5,
16 139:22 151:19
170:17 177:8,10,13
197:7 207:2,5,14
215:21 218:11,18

226:22 235:15
236:15 240:4 257:10
258:16 259:10,12
266:18 281:7 292:23
326:9 345:22 368:3,
16 377:10 389:8

**putting** 144:19
197:11 240:23 265:5
273:21 306:19 316:2
330:2

**Pwc** 84:14 92:25 93:5
94:2 96:17,25 97:10
102:4 103:2,21 104:3
114:6 142:8 200:19
211:2 262:14 263:24,
25

**Pwc's** 85:24 86:23
97:6 105:22

---

**Q**

**qualified** 194:11
206:19

**qualify** 101:18
136:14

**quantify** 276:22

**question** 11:22 12:3
13:4,8 17:17 22:17
26:13 35:4 38:8
40:15 45:11,22
46:19,20 48:19 51:4
68:20,21 93:12 96:4
99:19 104:11 114:14
132:4 139:14 144:15
146:18 148:13 150:7
154:4,17 155:24
156:9 157:20 158:8
164:22 171:10
174:13 175:19,23
176:18,20 178:18,24
179:3 185:9 188:18
192:21 194:18
195:11,14,24 209:6,
10 210:20 212:23
213:2 223:13 224:6
226:2 229:5 236:5
243:9 248:7,9
251:24,25 253:4
262:23 269:8,19
270:16,23 271:9,19
272:3,10,18 273:8
277:23,25 278:20

279:9 280:16,24
283:20 284:8,15
285:8 286:10 287:3,
10,19,25 288:3,9
289:2,13 290:10,22
291:24 292:20
293:16,24 296:14
297:7,9 298:23
300:16 302:3,18
303:3,11,21 304:4,7,
13,16,17 305:7
306:16,25 307:14
310:3,12,20,25
311:13,20 312:8,17
314:15,18 315:10,24
316:24 317:18 318:7,
18,24 319:24 320:7,
19 322:6,24 326:25
327:7,25 330:22
331:6 333:11,19
334:11 335:5 336:17,
18 338:4 339:17,21
340:19 341:3 342:22
345:13,20 346:7,23
347:20 351:16
353:12,16 354:5
355:6,10,16,22
356:4,15 357:7,16,23
358:17,23 359:5,12
360:4,12 361:2
363:17,23 364:11
365:7 366:16 367:2,
17 368:2 369:5,9,18
370:4 371:2,11
372:2,23 373:5,21
374:12 375:4 376:21
388:20 389:6,16
391:5 393:25 394:20

questioned 274:17

questions 11:20
17:2,4 26:15 40:19,
21,23 47:9 77:13
79:13 81:17 82:6,12
99:7,10 105:7,13
156:2 157:12 169:21,
24 171:7 177:2
180:16,17 184:4
209:5 266:10 300:6
352:5,10 377:8
384:16 385:3 386:6
387:8,15 393:18
394:25 395:7

quick 393:18

quicker 324:14

quickly 139:21

Quinn 4:19 10:4

quo 248:18

quote 118:11 189:6

---

R

ran 88:2

range 287:22 289:22

rarely 320:13

ratification 319:21

reached 66:4,9 69:3
76:3 79:2,9 342:11
343:8

reaching 350:12

reacted 347:23

reaction 389:24

read 101:21,25
102:12 172:8 198:10
208:21 209:6,7
301:20,22 316:4

reading 120:11
138:7

Real 31:11,17

realtime 265:16

reason 81:13 85:2
96:6 101:11 109:4
114:23 116:25
117:16 127:2 141:21
150:3 159:14 160:15,
23 161:3 205:21
235:3,5 238:5 247:9,
24 248:25 256:11,13
286:2 301:4 318:16,
21 346:18 361:4,10
364:6

reasonable 108:17
333:15 337:23

reasons 161:13

recalculate 275:8

recall 15:3 18:13,18,
20,22 19:17,20 20:8,
10,21,22 23:4,12,20
24:23 25:16 27:16

29:13,17 30:17,18
32:16 36:22,23 37:7,
12,22,23,25 38:19
39:8,20 40:2 49:19,
22,25 50:2,8,9 52:9,
21 53:8,15,16 57:22
59:2,3,11,20 60:18
61:25 62:6,17,23
63:6 65:2 67:19 68:2,
3,7,8,11 69:17,20,21,
25 70:5 71:6,21,22,
23 78:5 79:15 80:17,
18,21 89:14,19 90:13
91:5,6,9,13 95:2,9,
13,17,21 96:13 99:5,
6,8,9,12 100:20
102:6 112:21,22
113:15 114:3,15,21
115:8,14,17,18
116:15,18,19,23
119:15 122:17 123:5
124:7,10,12 126:5,9,
16,20,25 127:2,5,8,
21 131:25 132:13,17,
19 134:10,18 135:3
136:4,5 138:21,25
139:7,19 141:6,8,11
144:12 145:3,4,16,
20,22 148:16,17,20,
22 150:11 155:4
158:16,21 159:2,7,12
160:7,13 165:4,5,13,
17,20,24 166:13,16,
18,20,21,25 167:6
168:24 169:16
171:18,21 173:7,8,21
178:5 179:6,24
180:6,14,18,19,20
183:16,20 188:19
189:3,21 190:22,24
191:6,10,12,19,24
192:10,19 194:16
196:19 200:9,11
201:23 202:2 209:17,
20,23 210:3,9,18,25
211:19 212:3,14
217:18,20 219:5,9
220:21 223:10
225:13,18,20 228:25
233:10,20,25 234:8,
9,12,14,20,24 235:6,
12,18 236:11 237:22,
25 241:9 242:5,10
243:10 244:22
245:14,18 246:20,21
247:2,6 248:15,19

249:13 250:24
251:13,18,20 252:13
255:5,15,17 259:8
262:4 265:21,22
268:24 269:3 270:11
276:4,6,23 277:2,3,7
280:11,17,25 282:14,
24 283:8,11,13,15
284:6,11,20,22
289:6,21 290:2,3
291:3,6 292:9 293:17
296:18 298:24
299:16,18,21,22,24
300:17,24 301:3,12,
15,18,25 303:15,22
313:12 314:24,25
315:25 316:8 318:9
319:10,11,13,25
320:10 321:13,16,18
322:17,25 323:22,23
324:3 331:19 334:4,
18,21 339:9,18
340:8,12,15,16,23
341:4,5,8,11 342:2,
19 343:14 345:21,25
350:10,12 351:17,24
361:3,14,17,20,21
362:3 364:5,7 365:9
369:7,22 370:10
380:8,14,16,21
383:10,21 384:2
387:6 388:7 389:10
390:7,18 392:20
394:2

receipt 380:20

receivable 118:12,
14 238:21,25 239:11,
18 240:10 243:18
245:24 246:6,15,22
247:10 249:2 250:9
251:8,16

receive 11:6 22:10
141:17 303:23
304:18 305:23
332:11

received 42:9,17
43:15 85:12 123:21
125:14 141:17 142:3
212:16 293:20,21
304:10 305:25 383:7

receives 179:16

recent 367:9

recess 36:16 73:6
150:25 224:24 266:6
325:8 349:7 372:15

reckoning 310:22

recognize 217:10
320:13

recollection 24:25
29:14 39:22 40:6
67:21 71:5 105:12
115:12 124:19
126:22 127:23
128:10,22,25 131:16
166:15 173:22 180:7
183:19 187:24
192:20 221:5 223:23
225:6 227:10 228:14
229:7 246:3 251:6
252:19 253:9 269:4
270:8 275:22 282:21
283:7 290:5,18
309:18 344:11
367:14 369:15

record 7:10 10:17
36:3,15,18 73:5,8
150:24 151:3 209:7
224:23 225:2 266:5,
8,18 267:9 301:22
302:6 320:15 325:7,
10 349:3,6,9 372:14,
17 392:25 395:9

recorded 8:10 225:7,
15,22

recording 7:16
100:11

records 50:19 225:8,
15 227:13 235:17
237:15 240:12,14
257:21 258:5 286:23
300:2,4 306:5 312:22
393:10

recover 167:9 168:3
181:22 182:3

redacting 312:23
313:6

redeem 281:12

redeemed 276:13

redeeming 281:20

refer 13:13 18:6 21:9
22:24 27:12 30:4

31:14 32:7,17,24
33:19 44:2,10 54:10,
24 68:24 79:17 84:13
95:11 175:2 186:24
203:6 279:24 329:3

**reference** 92:17
103:12 200:12 202:6
222:3,10 223:9
238:20,24 260:21

**referenced** 132:14
186:25

**referred** 84:4 91:15
123:24 143:7 169:21
186:7,20 223:15
279:20 366:5

**referring** 33:16
50:17 75:24 76:6
118:8 163:5 187:11
199:25 223:11
226:15 281:5 314:2
316:3

**refers** 170:4

**reflected** 13:14 75:5
175:16 181:15 235:4
240:9

**refresh** 24:24 105:12
131:15 192:20 221:4
223:22 227:10
367:13

**refuse** 74:9,10 209:2

**regard** 133:5

**regret** 81:10

**regularly** 355:18

**reimburse** 145:15

**reimbursement**
279:17 325:19,23
379:20 388:16

**relate** 130:6

**related** 59:23 60:4
90:25 100:13,19,22
101:6,18,23 102:19,
20 103:3,4 105:7
131:17 138:5,10
145:9 167:14 208:25
280:22 281:3 284:2
366:22 368:17
376:13

**relates** 76:14 113:6,
18 130:11 211:24

**relating** 131:2
138:19

**relation** 27:21 30:10,
13 35:6 41:18 58:21
112:3 125:9 163:21
172:25 176:17
184:11,18 191:16
264:13 385:18

**relationship** 374:3

**relationships**
100:13 102:20,21
103:4

**relative** 192:16

**relayed** 188:8 206:4
342:12

**relaying** 206:3
207:24 344:18

**release** 329:6 330:8

**relevant** 88:13
208:15

**reliable** 113:2

**relied** 305:13

**rely** 85:14,18 96:3
237:12 331:2 337:23

**relying** 85:20

**remained** 202:18,23
203:8

**remaining** 119:10
223:25

**remember** 59:8 70:9
71:2,3 80:22,23,24
87:23 95:19 102:9
122:25 123:2,19
124:16,24 127:6,14
128:6,7 129:11
131:19 147:15
162:22,24 163:4
165:6 166:3,7 172:17
174:4 187:13,19,21
188:15 189:18 194:7,
15,24 195:4 200:6,15
234:4 236:12 250:3
253:13,14,23 254:15,
17 274:12 277:16
282:17 284:12,17,23
286:3,22 291:21

293:12 296:9 299:12
300:10,12 302:16
309:11 313:22 316:3
317:5 319:4,7 320:2,
5 323:7 324:4,8
326:6 333:25 339:8
340:21 342:14
344:15,18 345:25
346:3,4 351:11
357:17 361:18 364:9,
12,14 365:10,25
377:14 387:25
389:17,18 390:22,23
392:4,22

**remembering**
289:17

**remind** 72:19 77:17
391:23

**reminded** 132:18

**reminder** 337:3

**reminders** 378:22

**remote** 7:16 371:24

**remotely** 7:11,14
8:18 12:20 299:6,9

**rendered** 204:5
233:23

**renege** 373:18

**renew** 196:25

**renewal** 168:10,14,
16,25 169:6 170:5,9

**reorganized** 3:4 9:5

**rep** 95:11 136:17

**repaid** 57:4

**repay** 203:19 204:11,
15,25 205:12 211:11
212:10 304:23

**repeat** 17:19 38:7
45:11 46:21 48:20
146:21,22 249:25
269:21 270:24
336:17,18 339:21

**report** 5:25 14:13,21
19:12 26:21 88:2,6,
16 89:12 98:18 105:8
106:4,8,16 110:25
111:21 112:7,12,25
115:20 116:5,17,21

117:2 119:19 131:5,
11 133:12 134:7
135:6 137:5,7,10,12,
25 138:3,4,9,13,19
166:8,11 178:13
219:13,15 226:19
227:4 228:7 229:2,4
232:12 256:15 257:4
258:20,24 259:5,23

**reported** 19:7,10,17,
21,25 20:23 21:2
119:17 120:23
226:10 240:15
258:14

**reporter** 7:12 8:24
10:10 209:6 268:8,18
301:20

**reporting** 7:6 8:22,
25 20:9,13,17,23
21:4 87:22 91:2
114:17 230:12
231:14 232:6,19

**reports** 89:22 113:18
115:2 143:8 171:5
196:22 226:14,16
229:6 255:18 256:20
257:19 259:9,13,14

**represent** 9:25 10:4,
22 133:4 267:23

**representation** 5:17
91:16 94:21 95:5,16
96:9,18,22 97:2,8,13,
19,25 98:9 99:2
103:7,17,23 104:8
106:11,15 130:8,9
135:25 136:6,14
214:23 215:9 262:16,
22,25 295:17

**representations**
92:21 98:19,24
136:16,23,24 262:24

**representing** 9:11,
14,17,21

**represents** 310:10

**reproducing** 171:6

**request** 87:4 103:25
172:8 196:25 291:15
379:7

**requested** 196:21
362:18 363:7

**requests** 85:18
373:3 387:18

**require** 63:16

**required** 56:9 94:5
96:17 97:19,20,21,25
98:3 127:18,20 340:2
390:5

**requires** 96:25

**reserve** 245:2,6
260:24 261:4,8

**reserved** 244:22
245:13,16

**reserving** 46:17

**reside** 257:21

**resolution** 383:16

**resolved** 374:18
383:3,6,15

**resolving** 366:4

**respect** 27:18 34:13,
18,23 35:2 37:4 39:7
56:15 112:17 134:17
182:7 212:5 261:8,16
273:12 333:8 335:9
339:12 340:6 365:22
383:18 385:17
393:21

**respond** 174:25

**responded** 174:8
182:22

**responding** 210:11

**responds** 176:3

**response** 8:5 83:24
174:8,13 176:4
178:6,18 182:20,24
185:5 189:6 190:8
194:17,18 195:9,13
205:6 210:20 267:22
350:11

**responses** 81:4
184:3

**responsibilities**
25:18,23 28:10 31:2,
4 38:21 219:20

**responsibility** 26:6,
10 88:5,9 115:23
116:2,3 258:11

287:16

**responsible** 56:13, 17 86:22 89:8,9 115:19,22 116:4 146:6 230:10 258:4,7 384:19,23 385:8,13

**responsive** 175:23 176:17,25 185:8

**rest** 214:23

**restate** 75:17

**restrictions** 8:19

**restroom** 324:22,25

**result** 276:8 347:6

**results** 5:22 226:11 227:2,5,19 228:7

**retail** 32:21,24 33:2, 4,8,12,14,15,18,22, 23 34:5,8,13,18,23 35:2,6,12,14 36:21 37:17 38:2,5,10,17, 22 39:4,7 160:8 168:10,18 169:20 170:12 171:19 172:25 173:5,10,13, 16,20,23 174:13 175:15,23 176:18,22 178:7,13,17,23 179:3,8,12,15,19,25 180:8,22 181:2,8,14, 19,21 182:2,6,11,15 184:4,11 185:14 189:14,19 190:4,14, 18,20 191:2 192:16, 24 193:3,4,6,11,15, 18 194:11,17 204:18, 23 205:6,22,23 206:13 209:16,19,21, 24 210:5,11,20,22 385:12

**retain** 149:8,9

**retract** 39:17

**return** 49:7 51:7 123:22 306:18

**reveal** 66:17,18

**revenue** 16:6 17:22

**review** 11:5,6 13:2 89:11 160:11 175:9 184:5 288:11 295:3,

15

**reviewed** 231:13 232:13 233:3 294:21 295:5,18 322:11 334:14,20

**reviewing** 198:12 233:2 237:22,25

**right-hand** 198:6

**rights** 340:6

**ring** 277:13

**rise** 287:22

**role** 14:14 31:5 85:23 86:4,5,17 168:16 184:2,8 335:2,7 340:9 370:13

**roll-up** 126:17

**rolled** 126:11

**Rome** 170:24

**room** 7:9,13 9:10 105:3,5

**rope** 88:24

**roughly** 120:14

**Rukavina** 3:20 5:7, 10 9:19 42:19 44:17 45:3,8,16 46:10 47:20 48:3,16,25 49:13 55:20 107:4 126:3 133:23 142:6 143:15 163:25 195:7 212:24 213:24 266:11,14,15,22 267:6,17 268:8,19 269:16 297:19 298:6, 8 301:23 302:5 303:13 304:5,9,15 305:2 306:6 307:16 308:7,10,24 309:5,14 311:21 313:8 317:2 325:2 329:12 331:8 332:21 338:11,20 339:21 341:12,15 343:11 345:22 349:4 352:3,13 377:10 380:25 387:12,20 393:15

**rule** 7:19 267:8 356:11

**rules** 7:19,20 11:17

**run** 46:24 188:6 329:17

**running** 45:4 254:19 256:25

---

## S

**satisfied** 89:21

**satisfy** 89:12 122:8, 14 124:3 208:7

**Sauter** 162:20,21 163:20 164:7,8,24 166:20,24 167:4 168:4

**scenario** 264:4

**scenarios** 276:20

**schedule** 6:13 117:10 222:23 244:3 309:2 311:10,17 337:2 377:12

**scheduled** 336:9,11 356:8

**schedules** 129:10 308:25 311:15 317:11

**scheduling** 355:13

**school** 22:5

**scope** 136:18

**Scott** 7:4 8:21 14:20

**scratch** 298:14

**screen** 12:24 91:19 104:22 135:6 140:6 151:20 170:18 197:7, 12 215:22 216:14 226:23 230:7 237:17 308:9 377:11

**scroll** 106:18 117:22 130:14 136:9 140:23 152:16 170:25 171:24 174:7,18 176:2 182:21 201:11 202:3 217:3,5,8 238:17 297:25 331:10 332:22 341:16 343:12

**SEC** 274:13,16,19 275:18 384:19,22 385:7

**secret** 338:8

**secretary** 172:20

**section** 41:8 101:5, 19,22,25 110:24 111:17,20 112:7 113:12,17 115:2 116:5,17,21,25 117:17 130:3,15 131:3 134:7,22 138:4 170:10 175:14 192:6 215:16 220:5 294:20

**sections** 143:9 192:7

**seek** 12:9 199:6

**seeking** 332:16

**Seery** 71:23 72:2 166:9 233:20 234:11, 17,21 235:2,8,20,25 236:6 322:15 323:4, 16,19,24 324:8,16 340:12 346:10 348:2 350:8,13 368:8,10,14 375:7 379:25 392:18

**sell** 118:23 282:2

**send** 13:20 342:3 377:11

**sends** 174:5

**senior** 232:13,15 275:20 318:12

**sense** 57:5 88:19

**sentence** 98:14,15, 20 118:20 120:13 121:7,10,18 130:7 133:17 138:19,23 139:6,11 187:9 189:6 199:5 203:18 211:24 212:5

**sentences** 314:6

**separate** 54:24

**September** 169:7

**series** 11:20 328:14

**serve** 19:3 24:15,21 29:2 32:14 33:7,12 34:4 35:11,15 37:17 38:25 39:2

**served** 11:7 18:10 19:13 32:25 39:9,14 40:9,24 46:6 47:16 49:16 51:9,14,19 84:9 90:15 94:22 95:6 137:2 155:6 172:19 227:6 229:23 248:24 255:6

**serves** 133:2

**service** 185:10

**services** 15:5 28:25 30:2 32:21 33:25 42:22 59:23 128:21 129:9 171:15 185:6, 23 186:8,10 219:22 278:17,23 279:7,12, 21,24 280:3,5,6,13 325:20,23 326:2,15, 19,22 327:19 330:17 335:15 336:20 351:4 353:6,9,13,21 354:2, 7,8,18,23,25 355:2,7, 12 357:20 358:2,4,6, 11,14 379:19 380:11 388:15 390:20,21

**serving** 247:23

**set** 89:24 92:25 93:5 112:6 256:21 315:6,7 378:16,21

**settlement** 348:8 386:24 387:4

**seven-month** 265:2

**severity** 7:7

**shades** 36:13

**share** 209:18 262:14

**shared** 59:23 185:6, 10,22 186:7,10 209:16 278:23 279:24 325:19,23 326:2 351:4 353:21 379:19 380:11 388:15 390:20,21

**shareholders** 125:13 278:5 281:8, 12,18 282:5 293:4

**shares** 276:15 281:20,22 282:2

**Sharp** 249:21

**sheet** 106:19 107:25 108:11 109:6 110:4,5 111:11 112:4 120:23 175:2,14 179:17 220:2 222:21 228:22 229:3,8,16 230:5 243:7 251:14 253:22 294:12,24 370:22 372:6

**sheets** 107:14,22 175:8

**short** 266:2 279:16 332:7

**short-terms** 331:22

**shortfalls** 335:22,24

**show** 126:20 189:25 226:20 257:2

**showed** 119:2 370:8

**shown** 322:8

**shows** 293:9

**sign** 50:14 91:15 94:20 95:16,22 96:8, 18 97:2 106:14 135:24 136:6,22,25 139:4 141:4,21 143:14,23 144:11 150:4 153:24 154:5, 10,18,22 155:3 158:4,13,18 159:4, 15,23 160:16,25 181:3 213:16 289:9, 11,16 293:25 306:17 320:14

**signature** 92:3,7 105:22 106:9 130:7 136:20 140:25 141:2, 7 143:4,21 144:20 152:20,21 217:9,11 256:3,15 262:21 294:5,12 298:14 299:2,19 305:6 320:22 321:3

**signatures** 298:3,10 299:8,20

**signed** 46:2 55:7,12 92:5 94:25 95:2,4,11 96:22 98:10,23,25 99:4,7,10,16,25 103:18 106:7,16 107:2 123:4 132:13

137:6 139:10,16 141:10,15 143:24 144:4,13,15,21 148:15 153:14 158:23 159:9 161:5, 20 180:24 181:16,23 182:8,16 201:12,14 213:7,9 256:2,4,8,12 257:5,15 258:24 262:15,20 289:23 293:25 296:20,21 298:4,21 299:13 301:16 305:16,20 306:10,22 315:2 316:14 319:19 320:16

**signer** 103:7 363:2

**signers** 152:11 159:20

**significant** 228:21 229:3,7 230:4

**signing** 141:6 152:23 156:23 296:9 299:17, 22,23 319:21

**similar** 135:25 218:7, 9 272:3,19 311:9 325:17 331:11 338:14 353:8 357:20 370:5,6,17

**simple** 156:8

**simply** 188:23 361:5

**single** 62:13,24 89:15 93:9 95:9 129:11

**singular** 314:3

**sir** 13:23 21:13 22:17 43:9 68:17 69:14 80:11 115:12 130:17 140:3 141:2 144:4 146:18 151:23 154:18 156:8,20 158:2 167:23 209:12 218:18 266:15 278:8 301:25 302:12 304:4 307:22 317:14 328:18 331:15 332:20,25 333:6 334:17 336:19 341:20 351:25

**sit** 102:13 114:24

116:24 138:22 141:12 159:13 231:20

**sitting** 149:24 270:7 284:22 310:8 314:19 320:3 348:16 351:10 382:23 392:3

**size** 271:21 309:25

**skip** 55:13

**Skyview** 14:5,7,9,17, 24 15:4,14,19 16:6, 14 24:4 28:20,22 377:2

**Skyview's** 16:6 17:22

**smaller** 288:12

**smart-ass** 306:9

**social** 7:8

**sold** 276:15

**solely** 132:3 208:25

**someplace** 278:13

**sort** 142:13 208:15, 16

**sorts** 288:11

**source** 80:18 257:17

**speak** 62:13 63:25 72:20 73:9,14 74:15, 19 94:24 103:6 151:4 233:12 284:10

**speaking** 95:8 179:24

**specialist** 8:21

**specialized** 94:16

**specific** 25:22 40:19, 23 97:7 120:19 124:8 198:15 199:3 224:16 235:12,18 253:15 323:8

**specifically** 29:13 40:21 57:22 59:2,11 68:10 70:9 71:21 85:17 87:10 117:24 121:19 124:16 126:5 128:6 131:25 141:6, 11 145:5 146:3 162:23 180:6 187:19

192:10 194:8,25 196:20 233:11 234:2, 5,13 247:6 248:20 249:13 250:24 251:18 252:13 253:13 255:5,16 277:2 292:9 296:9 297:5 298:25 299:16 313:22 314:24 321:16,19 334:2 339:8 340:22 357:17 389:19 391:9

**specificity** 163:18 239:9 390:19

**specifics** 345:15

**speculate** 20:5 188:21 301:5

**speculation** 142:7

**speed** 247:4 249:10, 22 313:5

**spilled** 169:17

**spoke** 62:14 74:5 151:7 188:9 249:20 350:16,17,18

**spreadsheets** 368:19

**spring** 125:17 201:21 280:10

**stable** 90:5

**stack** 197:4

**staff** 116:9

**stamp** 296:23

**stand** 328:24

**stand-behind-you** 88:25

**standard** 231:22 233:4 335:13 372:3

**standards** 256:21,24

**Stang** 3:8 9:5 10:20 72:10 166:19

**stapled** 197:22 214:12

**stare** 298:11

**start** 8:9 41:9 170:21 214:18 248:14

268:21 304:16

**started** 21:3 36:7 125:19 207:15 231:10 304:15

**state** 8:4 10:16 47:2 161:16

**state's** 7:20

**stated** 8:3 24:5 179:15 206:9 246:8 249:8 290:12 294:16

**statement** 114:18 118:24 120:19 121:5, 10 133:7,13 134:4 179:17 190:14 194:18 204:3 205:18 224:10 228:20 262:5

**statements** 5:19 6:3 41:7 48:2 84:17,23 85:3,13,19 88:11 90:3,7 93:25 95:14 100:12 102:8,11,12 104:22 105:18 112:2 113:7,14 122:12 130:23 133:22 134:2 135:20 142:12 176:24 179:23 180:15 201:8 211:7, 22 217:25 218:4,20, 24 219:6 221:15 222:24 235:17 241:24 242:3,15,17 254:10 260:3 261:20 264:11,13 286:19 301:11 306:5 370:9, 12,17 378:24

**states** 8:12 98:16 118:11 119:20 200:23 201:3,6

**status** 248:18

**stay** 248:19 363:9 387:10,16

**step** 347:3,4

**steps** 88:16

**stick** 20:7

**sticking** 203:5 277:13

**Stinson** 4:6 9:13,25

**stipulate** 7:15

**stipulation** 8:6

**Stock** 281:16

**stonewall** 157:18

**stood** 328:22

**Stoops** 276:2

**stop** 76:19,20,21,23 77:11,22 81:21,22 106:2 155:19,22 157:14 215:6 220:2

**stopped** 231:16 294:3 381:3,6

**stopping** 390:19

**strategy** 164:12

**Street** 3:15,23 4:13 8:23

**stressful** 292:24

**strike** 114:12 246:13 247:21 248:5,22 250:6 252:23 272:13 291:2 307:16 310:7 343:24 346:16 364:22 372:8 393:4

**string** 5:21 172:3 183:22

**structure** 87:22 112:13

**stuff** 156:6 157:5 252:11 295:6

**subevent** 130:24

**subject** 55:8 65:8 82:16,21 83:6,10,14 109:24,25 124:14 139:5,11 168:10 277:5

**subpoena** 11:6 16:18 81:13

**subpoenaed** 352:21

**subscribe** 281:12

**subscribed** 276:14 395:16

**subscribing** 281:19

**subsequent** 130:3, 10,21 131:2 133:8 134:19,22 138:5,9

143:9 242:22 262:14 263:4 274:12 370:24

**subsequently** 244:22

**substance** 72:22 73:15,19 74:6 151:5, 8 185:7 209:22

**substantively** 12:15

**substitute** 16:15

**succeeded** 31:22 32:11

**successor** 32:8,15

**sued** 182:2 375:6,14

**suffered** 276:7

**sufficient** 122:3

**suggest** 277:12

**suggesting** 338:9

**suggests** 253:2

**suing** 373:16,24 374:5

**SULLIVAN** 4:19

**sum** 250:4 335:20

**summaries** 368:4

**summarize** 273:14 279:12 280:4 296:8

**summarized** 274:21

**summarizing** 188:13

**summary** 5:23 237:19,23 279:16

**Suntrust** 4:17 10:6

**Super** 395:5

**supplemental** 218:20

**supporting** 311:15

**supposed** 315:14

**Surgent** 171:4 275:23

**surprised** 352:9 356:11 376:22 394:17

**Susan** 7:12 8:24

**sustained** 17:14

**swear** 7:13 10:10

**swearing** 7:17

**Switching** 321:25 324:20

**sworn** 10:12 395:16

**sync** 296:6

**system** 330:9

---

**T**

**Tab** 328:11

**taker** 324:16

**taking** 81:12 110:14 120:12 176:7 208:16 226:17 239:23 240:23 323:19 348:24

**talk** 89:2 157:16 164:15,20 233:19 279:2 293:7 325:13 350:16 387:17 388:23 395:4

**talked** 100:3 113:4 130:8 151:11 162:14, 15 187:21,23 188:4,7 190:15 217:14 222:23 249:14 253:16 268:3 292:11 311:15 349:19 351:5 378:5 379:18 389:2 391:9 394:6

**talking** 40:5 59:13,16 75:14 76:20,23 77:12,22 89:15 101:23 157:14 162:16 208:24 222:6, 8 231:19 259:25 264:19 323:6 341:23 350:13 351:11,13 352:16,17 354:18 368:18 379:25 383:14

**talks** 58:19 100:11 350:6

**task** 291:14

**tax** 280:7 354:22,25 358:11

**taxing** 353:5

**team** 53:4 86:8,12 87:12,14,22 88:21,23 89:2,8 112:10,12 113:8,24 116:7 137:18,20 147:14,18, 19,24 148:2,4,5 149:7,11,14,15,24 150:19,20 188:4,6 200:17 219:3 237:7 255:25 257:8,12,17, 23,25 258:4,7,12 259:11 272:23 290:11,13,14,15 291:8,17 292:5 309:21 311:24 312:13 335:11 351:7 367:10 368:3

**teams** 116:10 337:6 354:10

**tech** 320:20

**technologically** 320:12

**telephone** 191:15 290:19 342:23 344:12,14 392:22

**telling** 71:23 79:10 125:4 166:18 181:8, 14 182:14 207:24 246:21 251:4 253:9 285:5 287:8 317:5

**tendered** 45:2 55:18 57:19 58:3 60:13 63:3 64:6,15,23

**tenure** 39:20 40:2 86:3 94:4 102:11 114:5 230:14,18 368:25 369:11

**term** 28:19 33:13 41:17 44:16 45:14 51:17 53:13 54:2 58:14 69:8 71:20 75:23 79:8 99:16 170:8 173:2 186:21 315:14,15 333:14 362:14 364:3 369:16 383:19

**terminate** 380:11

**terminated** 326:5

**termination** 326:7,8, 9 380:21

**terms** 33:21 65:23 66:2,6 69:22 75:8 76:2 78:25 79:23 80:11 83:16,20 319:8,12,14 336:7

**Terrestar** 145:9 273:12,18,19 274:7 384:20 385:9,14,18

**testified** 12:10 68:18 80:7 155:5 156:11 179:7 201:23 206:10, 18 211:14 253:2 256:24 259:10 261:10 269:23 270:2, 13 282:24 283:6 289:3 309:20 312:20 313:3 314:16 318:8 319:10 320:8 351:2 357:8 362:24 378:4, 20 379:3 380:12 388:17

**testifies** 318:3,11

**testify** 252:18

**testifying** 252:22 302:14 387:22

**testimony** 16:11,19 20:7,15 29:5 72:22 289:17 301:13 318:5 370:19 387:25 391:11

**Texas** 3:16,24 4:8 8:14

**Thanksgiving** 329:20,22

**Thedford** 171:4 172:3,11,24 173:5 174:20 176:3,16 178:6 182:23 186:20 192:5 198:19 210:10, 13 275:24

**Thedford's** 182:20

**theme** 324:21

**thing** 129:4 187:5 199:23 215:17 320:2 357:3

**things** 61:14 85:6
89:5 136:19 142:13
147:17 153:10
162:15 248:16
249:12 254:24
257:10 259:14
261:23,24 263:18
264:3,17 265:14
279:22 280:8,9
288:14,16,17 292:22
295:21 329:4,24
333:21 352:12
354:11 356:25
357:10 371:16
373:11 374:25
376:24

**thinking** 22:18
324:11,12

**Thomas** 171:4
275:23

**thought** 37:14 40:11
54:20 127:9 188:25
235:8 252:2 263:23
304:12 363:13,21

**thoughts** 348:22

**thousands** 224:14
286:11,16

**thread** 118:4

**threatening** 374:22,
24

**thumb** 356:11

**tickler** 337:8

**tie** 222:25

**ties** 111:18 243:20

**till** 200:24

**time** 12:23 17:15
19:7,13,16,19 20:2
24:16,18,20,21 25:3,
12 37:18 38:25
39:10,15,18,23 40:8,
25 42:2 43:22,23
45:9,24 46:6 47:15
49:16 50:10 51:9,14,
19,25 55:15 56:8
58:19 60:22 61:10,
21,25 62:3 64:4
72:17 73:2,3 75:21
76:7 77:8 81:12
84:19 85:4,9 86:19,

24 87:3,8,17 93:7
99:16,24 100:6 101:3
113:16 114:16
116:16,20 120:9
122:5 124:4 127:16
135:24 136:15,16
137:12,22 138:15,18
139:4,9,16 141:10
148:19,21 154:21
158:11,18,23 159:4,9
160:8,24 162:4
163:10 164:25
166:12 168:24 169:2,
4,5 186:4 191:7
192:13 204:4,14
205:20 206:12
207:20 212:13,21
221:5 225:17,19
227:6 229:12,23
230:14,15 231:7,15,
16,23 232:21 233:4,
13,14,15 238:4
240:3,25 241:19
244:5,16 246:5 247:8
248:3,23 250:7 253:5
254:18 255:6 259:14
261:25 264:15 265:6,
9,24,25 266:2,25
269:14 270:8 273:17,
19,25 274:11 278:14
283:25 294:15 299:3
303:8 313:20 321:19,
22 322:13 323:4
331:25 337:20 339:7
343:23 352:2 353:25
357:3,5,12 358:19
363:25 365:12 366:2,
18 369:13,23 370:11
371:13 386:4,17
388:12,25 389:9
395:3

**timeframe** 169:8

**timeline** 40:20

**timely** 86:11 330:19
331:4 333:16 356:13,
24 357:14

**times** 11:11,13 25:7
62:12 90:17,18,19
207:17 249:8 250:2
252:2 298:15 320:8,
25 321:2 324:8 368:5
374:4 392:8,14,15

**title** 14:9,11,12 23:6,8

25:13 27:17 28:7,11,
17 34:12,22,25 35:5,
8 37:3,9,16 39:6
51:25 111:10 173:8
174:2 183:13,17
192:23 227:3,11
269:6 270:9,11 305:8

**titled** 237:19

**titles** 27:20 30:9,12
34:15,17 37:15,21,
22,23,25

**today** 11:2 13:20
23:22,23 24:7,13
28:4 30:23 31:11
51:17 73:15 81:11
93:12 102:14 116:24
118:8 141:12 162:14,
16 173:10 203:20
267:12,19 268:4,9
270:7 273:20 284:22,
23 286:4 291:22
310:8 314:19 317:15
320:3 370:8,18 392:3

**told** 47:8 58:18 60:11
67:19,21 69:21 78:3
81:6 116:19 132:5
138:23 139:3 145:18
154:10 162:17
163:20 165:8 174:4
180:22 181:2,19,21
182:6 189:14,19
190:20,25 191:8
203:9 204:18 205:22
211:5 234:20 246:9
248:17 250:13,16,20
251:7 254:4 257:16
282:5,16 283:16
287:5 318:4 375:24
385:7 386:7,17
391:12 392:5,11

**tomorrow** 395:4

**tone** 394:5,12

**top** 92:10 111:4,8
198:5 219:19 313:10

**topic** 114:19 234:3,
15 251:21 253:15

**total** 109:13 110:8
119:21 238:7 239:12
240:9 260:12 335:20
389:11

**totaled** 143:11

**totaling** 223:17

**Totally** 269:16

**touching** 264:5

**track** 337:9 364:15

**trade** 281:23

**trades** 273:25 274:8

**trail** 288:22

**transactions** 85:6,8,
14 100:13 102:21
103:5 148:6 224:15
285:21 286:5,12,13,
17 289:25 295:24
373:9

**transfer** 141:20
287:5 288:6 332:16

**transferred** 141:9
285:4,10

**transfers** 283:24
285:21 327:16

**transmitted** 340:25

**transparency**
295:20

**transparent** 313:4
375:10

**treasurer** 23:9,10,
16,22,23 24:2,3,6,8,
10,13,15,21 25:2,8,
14,18,23 26:19,22
27:4,22,23,25 28:3,5,
8,12,18,20 29:5,9,12,
15 30:14,15,16,20,
22,24 31:2,3,5 39:2
135:23 138:14
152:24 153:3,16,22
155:7,10,14,21
156:4,12 158:3,9,12
176:14 202:12 204:2
269:6,12,13 270:3,5,
9 272:4 305:8 327:4
336:4

**treasury** 335:15
336:25 351:3 354:7,
11,22 358:4

**treatment** 242:12

**trick** 348:7

**trigger** 369:24

**triggered** 274:16

**true** 74:18 89:22
186:4 204:4 269:11
277:13 333:6 350:21

**trust** 4:10 9:18 65:11
244:23 245:3,7
247:11 373:23 374:5

**trusted** 257:7

**trustee** 4:16 10:5
65:10

**truth** 252:18,20

**truthfully** 252:22
253:3

**TSG** 7:6 8:22,25

**Tuesday** 8:19 172:4

**tunnel** 293:3

**turn** 100:8 105:25
110:22 149:12
259:16 261:13

**turning** 197:12,16

**turns** 317:20

**two-month** 323:11

**type** 88:25 94:21
130:23,25 227:9
253:25

**types** 148:6

**typical** 103:25
106:17 371:5

**typically** 144:11
168:22 169:10
192:12 230:16
289:16 296:22
329:16 355:24,25

---

U

**Uh-huh** 69:4 210:17
237:21 368:20

**ultimately** 125:6
178:17 274:22 387:6

**unable** 122:14
203:18 204:24 208:7
211:10 212:10

**unaware** 64:24

**uncollectible** 244:9, 17 245:25 246:7,17, 24 247:13,25 249:3 250:10,15 251:9,22 253:11 254:4 255:9, 15

**uncomfortable** 90:14,20,24 91:9

**unconsolidated** 110:2,18

**undergoing** 207:20 241:16

**underlying** 246:11 311:24 332:12

**understand** 10:21, 25 12:6,9 13:24 17:3 31:10 41:13 45:22 53:22 55:9 68:20 74:4 75:22 76:5 78:24 79:16 98:22 99:18 104:2 127:7 133:9 153:15 158:7 176:20 203:12 222:9 225:25 267:25 268:17 273:3 288:2, 13 296:19 297:9 300:21 312:6 313:24 315:12 316:12 338:9, 25 353:24 364:16 374:7 376:10

**understanding** 41:10,17 53:6 65:22, 25 66:5 84:25 85:11 96:25 97:11,16,18,24 100:18 103:20 104:3 111:15 118:16,19 146:25 152:4,6,7,9 153:14,21 156:3 170:3,8 173:4 175:19 184:17 195:15 242:19 256:19 259:22 270:19 277:25 311:9 326:3 372:19 373:23 374:4 375:17 379:24

**understood** 69:2 155:6 203:10 382:22

**undo** 374:17

**unfettered** 372:21

**unilateral** 382:20

**unilaterally** 270:20 271:4 272:5

**unique** 12:21

**United** 8:12

**unlike** 12:18 353:20

**unpaid** 119:10 161:8, 18

**untested** 207:22

**upcoming** 336:8,11 337:25 355:13

**updated** 154:22

**upset** 362:11 390:2

**urgent** 356:23

**URQUHART** 4:19

**USD** 331:14

---

**V**

**vacation** 321:23 329:23

**vague** 353:19

**valid** 159:18 161:12, 16

**validity** 7:16

**valuation** 274:9,18, 24 280:7,13 292:5 354:15,22 384:20 385:9,14,19

**values** 251:5 253:17 264:2 265:9 367:9 387:3

**varied** 230:15

**varies** 87:2,3 230:14

**vendor** 288:17 356:7

**verify** 97:22

**verifying** 215:2

**versions** 136:13 146:14

**versus** 292:12

**video** 7:16 8:10,17, 21 323:23 324:3

**videotape** 12:10

**view** 204:24 205:11 292:14 301:8

**voice** 268:6

**vote** 282:5

**voted** 125:13

---

**W**

**wait** 156:18 157:4,5, 22 249:17

**waiting** 196:24

**walk** 180:17

**walk-through** 168:19

**walked** 179:7 294:4

**walking** 189:22

**wanted** 89:8 104:3 129:4 271:15 342:9 343:3,7 345:10

**Warren** 4:11 9:16

**Waterhouse** 3:1 4:1 5:1,5 6:1 7:1 8:1,11 9:1,11 10:1,11,18,19 11:1 12:1,24 13:1,15 14:1 15:1 16:1,10 17:1,16 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1,19 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1,7,15 48:1 49:1 50:1 51:1,4 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,19 73:1,9 74:1 75:1,3,22 76:1 77:1 78:1,14 79:1 80:1,25 81:1 82:1,4,14 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1,25 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1

100:1 101:1 102:1 103:1 104:1 105:1,9 106:1,6 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1,2 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1,23 147:1 148:1 149:1 150:1 151:1,4 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1,5 165:1 166:1 167:1 168:1 169:1 170:1,21 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1,25 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1,17 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1,5 198:1, 3 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1,15 210:1 211:1 212:1 213:1 214:1 215:1 216:1,15 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1,3 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1,25 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1,12 249:1 250:1 251:1 252:1 253:1,8 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1,12

267:1,23 268:1,20 269:1,20 270:1 271:1,5 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1,12 294:1 295:1 296:1 297:1, 22,24 298:1,7,19 299:1,11 300:1 301:1 302:1,10,19 303:1 304:1 305:1,5,9 306:1,8 307:1 308:1 309:1,8 310:1 311:1 312:1,9 313:1 314:1 315:1,18 316:1 317:1,4 318:1 319:1 320:1 321:1 322:1 323:1 324:1,15 325:1,11 326:1 327:1 328:1,15 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1,22 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1,15 350:1,5 351:1 352:1,23 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1,24 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,18 373:1 374:1 375:1 376:1 377:1,9 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1,21 388:1 389:1 390:1 391:1 392:1 393:1 394:1,24 395:1,2,14

**Waterhouse's** 140:24

**ways** 257:11

**wearing** 336:3

**Webex** 191:14

**Wednesday** 329:19

**week** 267:11 329:17, 25 330:3,5 375:21 388:6

**weekend** 329:20

**weekly** 330:4

**weeks** 302:21 303:7 307:8 378:18

**wet** 299:8

**whatsoever** 251:6

**whichever** 365:14

**wholly** 233:17

**window** 323:11

**Winograd** 3:7

**wire** 330:8 350:19

**withdraw** 35:4 134:9

**withdrawn** 19:11 34:16,21 38:14 57:23 59:15 62:16 63:7 65:4 93:18 98:13 119:7 133:20 141:25 148:8 157:3 160:5 163:18,19 180:24 181:19 191:11 195:16,18 201:19 203:25 220:11 232:6, 19 382:7 386:5

**witness'** 36:2 156:3

**word** 68:23 76:7 146:13 293:21 307:6 391:2

**worded** 104:10

**words** 79:5 342:16 346:10 348:7 363:8

**work** 113:8 204:22 219:23 233:18 291:8 299:5 346:25 372:19

**worked** 116:7,12 237:8 259:12 290:15 309:21 370:12

**working** 90:22 147:13 207:19 219:18 291:13 292:24 298:8 342:25 381:19

**works** 269:9

**worried** 241:22 246:12

**worry** 215:18

**wrapping** 293:3

**write** 187:6

**write-up** 278:12

**writes** 174:20 328:21 329:5

**writing** 67:13 75:5 79:11 273:12 316:17 341:18

**written** 15:9 83:17,20 186:3 195:9 323:20, 25

**wrong** 77:3,4 133:18 138:20,24 215:16 374:6

**wrote** 313:15,17 314:5,6,9

---

## Y

**y'all** 139:23 395:4

**year** 18:14,16,20,22 19:23 20:6,12 23:13, 14,15 27:24 30:19 36:23 38:15 59:3,5 68:11 80:9 84:23 85:3 87:3 90:12 93:5, 9 94:10,22 95:6,10, 14 100:7 103:14 104:6 131:4 145:10 160:7 161:4,7,17 162:25 166:6 168:14 169:2,4,6 170:12 220:19 221:21 223:16,18 224:13,15 244:14 265:3 286:21 326:11 334:15 348:17 381:24 382:10 383:20

**year-end** 222:4 244:10,14 262:7 362:16

**year-ended** 263:24

**yearly** 170:15

**years** 18:23 62:13,22 86:18 87:17 89:16

91:10 115:10 123:23 231:11 257:10 285:22 286:4,17,25 289:25 320:9 333:24 334:23 335:7 373:7,8 379:23

**years-plus** 89:18

**yellow** 178:8

**yesterday** 8:2 66:13 140:10 322:11

**York** 3:10 4:21 8:23 281:16

**you-all** 329:2

---

## Z

**zeros** 286:15

**Ziehl** 3:8 9:5 10:21 72:10

**zoom** 3:3 191:14 309:15 313:11 323:23 324:2,4,9

# EXHIBIT 192

Page 1

1        IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION

3   In re:                    )Chapter 11
                              )
4   HIGHLAND CAPITAL MANAGEMENT, LP, )
                              )Case No.
5        Debtor.             )19-34054-SGJ-11
    _____)_____
6   HIGHLAND CAPITAL MANAGEMENT, LP, )
                              )
7        Plaintiff,           )
                              )
8   vs.                       )Advisory Proceeding No.
                              )21-03004
9   NEXPOINT ADVISORS, LP; JAMES    )
    DONDERO; NANCY DONDERO; and THE  )
10  DUGABOY INVESTMENT TRUST,       )
                              )
11       Defendants.          )

12
         ************************************
13              REMOTE DEPOSITION OF
                   DUSTIN NORRIS
14               December 1, 2021
         ************************************
15

16       DUSTIN NORRIS, produced as a witness at the

17  instance of the Highland Capital Management, was

18  duly sworn and deposed in the above-styled and

19  numbered cause on December 1, 2021, from

20  10:01 a.m. CST to 3:25 p.m. CST, stenographically

21  reported, pursuant to the Federal Rules of Civil

22  Procedure and the provisions stated on the record.

23   Job Number:   203362
     Reported by:   Rebecca A. Graziano, CSR, RMR, CRR
24            Texas CSR 9306
              California CSR 14407
25            Illinois CSR 084.004659

Page 2

```
1          A P P E A R A N C E S
2  (all attendees appearing via remote videoconference)
3
4  REPRESENTING HIGHLAND CAPITAL MANAGEMENT, LP:
5   John Morris, Esq.
    Hayley Winograd, Esq.
6  PACHULSKI STANG ZIEHL & JONES LLP
    780 Third Avenue
7  New York City, New York  10017
8
9
10  REPRESENTING NEXPOINT ADVISORS, LP:
11   Davor Rukavina, Esq.
    MUNSCH HARDT KOPF & HARR, PC
12   500 North Akard Street
    Dallas, Texas  75201
13
14
15  REPRESENTING JAMES DONDERO, NANCY DONDERO, HCRE,
    and HCMS:
16
    Michael Aigen, Esq.
17   STINSON LLP
    3102 Oak Lawn Avenue
18   Dallas, Texas  75219
19
20
21  ALSO PRESENT:
22   La Asia Canty, Paralegal,
    Pachulski Stang Ziehl & Jones
23
24
25
```

Page 3

INDEX

```
                        PAGE
2
3  EXAMINATION BY MR. MORRIS...................  5
4
5
6          EXHIBITS
7  NUMBER        DESCRIPTION              PAGE
8  Exhibit 185  Plaintiff's Third Amended Notice of
9              Rule 30(b)(6) Deposition to
10              Highland Capital Management Fund
11              Advisors............................  7
12
13
14          PREVIOUSLY MARKED EXHIBITS
15  NUMBER        DESCRIPTION              PAGE
16  Exhibit 1    Complaint for (I) Breach of
17              Contract and (II) Turnover of
18              Property of the Debtor's Estate......  38
19  Exhibit 5    Defendant's Original Answer..........  29
20  Exhibit 13   Defendant's Amended Answer...........  158
21  Exhibit 36   Email Chain; Bates D-HCMFA290880
22              through 290883........................  87
23
24
25
```

Page 4

```
1          PREVIOUSLY MARKED EXHIBITS
2  NUMBER        DESCRIPTION              PAGE
3  Exhibit 45   Highland Capital Management Fund
4              Advisors, LP, Consolidated
5              Financial Statements and
6              Supplemental Information, 12/31/18;
7              Bates D-CNL-002273 through 002296....  46
8  Exhibit 59   Supplemental 15(c) Info Request;
9              Bates HCMFAS 000025 through 000031....  71
10  Exhibit 147  BBVA Compass Bank Statement, Date
11              Ending 5/31/19  (no Bates range).....  51
12  Exhibit 182  Memo Dated 5/28/19 (no Bates range)..  119
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1          PROCEEDINGS
2      (On the record at 10:01 a.m. CST)
3          (Witness duly sworn.)
4          DUSTIN NORRIS,
5  being first duly sworn, testified as follows:
6          EXAMINATION
7  BY MR. MORRIS:
8   Q    Good morning, Mr. Norris.  As you may
9  recall, my name is John Morris.  I'm an attorney
10  at Pachulski Stang Ziehl & Jones, and we're
11  counsel to the reorganized debtor known as
12  Highland Capital Management, LP, and we're here
13  for your deposition today.
14       Do you understand that?
15   A    Yes, sir.
16   Q    And do you understand that you're being
17  deposed today in your capacity as what's called a
18  Rule 30(b)(6) witness on behalf of Highland
19  Capital Management Fund Advisors, LP?
20   A    I do.
21   Q    Can we refer to Highland Capital
22  Management Fund Advisors, LP, as "HCMFA"?
23   A    Yes, that works.
24   Q    And can we refer to Highland Capital
25  Management, LP, as either "Highland" or "HCMLP"?
```

Dustin Norris

1
2   A      Yes.
3   Q      Okay.  Are you aware that your answers
4   today will bind HCMFA?
5   A      Generally, yes.
6   Q      Okay.  Have you seen the notice that was
7   served by Highland on HCMFA in connection with
8   this deposition?
9   A      I have.
10  Q      Okay.  I've -- I've examined you before;
11  right?
12  A      Yes.
13  Q      Okay.  So the rules are the exact same,
14  and they are very simple.  If I ask a question, I
15  would ask you to refrain from answering until I've
16  completed my question; is that fair?
17  A      Yes, it is.  Thank you.
18  Q      And if I begin a question or respond
19  before you've completed your answer, will you let
20  me know that?
21  A      Yes.
22  Q      We're going to be putting documents up on
23  the screen from time to time today.  If at any
24  time you believe you need to see other portions of
25  the document in order to give complete and

Dustin Norris

1
2   accurate answers, will you let me know that?
3   A      Yes.
4   Q      If you need a break at any time, will you
5   let me know that as well?
6   A      I will.
7   Q      Okay.
8           MR. MORRIS:  I would ask my
9   colleague, Ms. Canty, to put up on the
10  screen the Rule 30(b)(6) deposition
11  notice.
12          (Norris Exhibit 185 marked.)
13          (Reporter discussion off the record.)
14          MR. MORRIS:  Okay.  Asia, what
15  exhibit number should we put on this
16  document?
17          MS. CANTY:  185.
18          MR. MORRIS:  Okay.  Davor and
19  Michael, this will be Exhibit 185.
20          And if we can scroll down and show
21  it to Mr. Norris.
22  BY MR. MORRIS:
23  Q      Do you see that this is the plaintiff's
24  third amended notice of deposition for today?
25          MR. RUKAVINA:  And just so you

Dustin Norris

1
2   know, John and Dustin, I did not send this
3   to you, Dustin.  All that it does is
4   changes the time of today's deposition.
5   It's identical to the last one that you
6   did get.
7           THE WITNESS:  Okay.  And I have the
8   last one here with me as well.
9   BY MR. MORRIS:
10  Q      Okay.  So there's no -- I'll represent to
11  you that there's no difference between the one
12  that's on the screen and the one you have except
13  that the one on the screen says "Third Amended
14  Notice," and it was scheduled for 9:00 today.
15  It's scheduled for 10:00 today, the -- the time
16  that we're beginning.
17          Do you have any other documents in
18  front of you other than the deposition notice?
19  A      I do.
20  Q      What -- what other documents do you have
21  before you?
22  A      Yeah.  I have the original complaint I
23  believe it's called -- forgive me if I call them
24  the wrong items --
25  Q      Uh-huh.

Dustin Norris

1
2   A      -- but the original complaint from HCMLP.
3   I have the original answer response from HCMFA.  I
4   have the amended response.  I have the declaration
5   from Mr. Sauter.  I have copies of the promissory
6   notes.  I have the shared services agreement.  I
7   have a -- incumbency certificates, which will help
8   me respond to one of your questions in the
9   30(b)(6) notice.  And I have a board to the
10  memo [sic] regarding NAV error, and I have the
11  "Defendant's Second Motion for Leave to Amend
12  Answer and Brief in Support Thereof" that was
13  filed yesterday.
14          So a number of documents that -- and I
15  also have up in my screen your exhibits that I
16  believe we'll be going through in one of the --
17  let me check here -- Topic Number 5.  So I have
18  open, you know, a 650-page document that was filed
19  in Docket 35 on May 24th, I believe, is the
20  correct document.  So those are the materials that
21  I have.
22  Q      Excellent.  I appreciate that.
23          So you've seen -- you've seen at least
24  the plaintiff's second amended notice of
25  Rule 30(b)(6) deposition before today.  Do I have

Page 10

Dustin Norris

1 that right?

2 A    That's correct.

3 Q    And you have that with you; right?

4 A    I do.

5 Q    Okay.  Are you prepared to testify on

6 behalf of HCMFA today on -- in connection with

7 each of the topics in the deposition notice?

8 A    Yes, I am.

9 Q    All right.

10       MR. MORRIS:  Let's just, for the

11    record, scroll down to make sure that the

12    topics are the same as the -- the one that

13    Mr. Norris has in front of him.

14 BY MR. MORRIS:

15 Q    Do you see the first five topics on the

16 screen?

17 A    I do.

18 Q    All right.  Can you confirm that they're

19 the same topics that you have in the second

20 amended notice of deposition?

21 A    Yes.  I'm looking now.

22       Yes, they all are the same.

23 Q    Okay.  And if we can continue to scroll

24 down, you see Topics 6, 7, and 8 up on the screen,

Page 11

Dustin Norris

1 and 9.  Are they the same as what you have?

2 A    Can you scroll down for 9?

3 A    Uh-huh.

4 A    They look to be the same, yes.

5 Q    Okay.  And let's just look at the last

6 few.  How about 10 through 14?  Are they the same

7 as the topics that are in your second amended

8 notice?

9 A    They look to be the same, yes.

10 Q    Okay.  And did you do anything to prepare

11 for today's deposition?

12 A    I did.

13 Q    What did you do?

14 A    I reviewed all of the pleadings.  I

15 reviewed all of the -- the documents that were, I

16 believe, responsive to -- to help me to respond to

17 this, look through your exhibits.  I had met with

18 Mr. Rukavina as counsel.  I met and spoke with

19 Mr. Dondero.  I spoke with Jason Post.

20       I spoke with -- I reviewed my

21 documents internally and emails, things that I

22 might have had, confirmed with our IT group that

23 they have provided all documents responsive to

24 your discovery requests.

Page 12

Dustin Norris

1       I reviewed the depositions of

2 Mr. Seery, of Frank Waterhouse, Dave Klos, and

3 Kristin Hendrix.  I met in person and by Zoom with

4 Mr. Rukavina over the last few weeks, and -- so

5 that -- that's the general -- you know, there may

6 have been other things, but that's the general

7 overview of the things that I did --

8 Q    I appreciate --

9 A    -- to understand the company's position.

10 Q    I appreciate that.

11       So just focusing in on the people that

12 you spoke with in connection with your

13 preparation, one was Davor; right?

14 A    Correct.

15       And I -- I may have -- I don't know if

16 I said it or not, but DC Sauter as well I also

17 spoke with.

18 Q    Okay.  So the other people are DC Sauter,

19 Jason Post, and Mr. Dondero.  Do I have that

20 right?

21 A    Correct.

22 Q    Did you speak with Frank Waterhouse at

23 all?

24 A    No, I did not.

Page 13

Dustin Norris

1 Q    Is there any particular reason you didn't

2 speak with Mr. Waterhouse?

3 A    Yes.

4 Q    And what -- why didn't you speak with

5 Mr. Waterhouse?

6 A    My -- my -- yeah, sorry.

7       My understanding is his counsel did

8 not allow us to speak with him regarding this,

9 because HCMLP had sued him for various things, and

10 so we weren't allowed to talk with him.

11       You'll -- you'll note that DC, earlier

12 on, had spoken to him.  I believe that was back in

13 April, if you look back and I'd refer you to

14 Mr. Sauter's declaration.  But in preparation for

15 this, we did not speak with him.  We needed to

16 wait for his deposition based on his attorney's

17 instructions.

18 Q    How many times did you speak with

19 Mr. Dondero about today's deposition?

20 A    Multiple times over the last few weeks.

21 Q    And was Mr. Rukavina present for those

22 discussions?

23 A    He was not.

24 Q    Can you tell me what you discussed with

Page 14

Dustin Norris

1
2  Mr. Dondero about today's deposition?
3  A    Yeah.  Discussed with him general view of
4  the company from his perspective.  We discussed
5  particularly around – and we'll get into more
6  details on this – but around the purpose and
7  transfer of cash, the seven-and-a-half million
8  dollars.  And I guess there were two transactions.
9        Discussed with him what he remembered
10 in discussions with Frank Waterhouse when he
11 instructed him to transfer the cash, and any
12 recollection he had regarding the notes or the –
13 the – the promissory notes.
14       And so those were the general topics.
15       And we did talk about –
16 Q    Did Mr. –
17 A    Sorry.  Go ahead.
18 Q    Yeah, I don't mean to step on your words.
19 A    No, no.
20       We talked about the NAV error, we
21 talked about responsibility for the NAV error and
22 those aspects as well.
23 Q    Did – did Mr. Dondero tell you when he
24 first learned of the existence of the notes?
25 A    No.

Page 15

Dustin Norris

1
2  Q    Did you ask him in connection with your
3  preparation for today's deposition?
4  A    What I did ask, I asked him – I said,
5  "Did you tell Frank Waterhouse that there should
6  be – that this should be a loan?"
7        And his response was, "No, that I
8  never told Frank it should be a loan, and Frank
9  never asked if it should be a loan."  And that the
10 intent – and the reason for the transfer was
11 compensation for the NAV error.
12       And so that was – he did not know –
13 and if I – if I remember correctly, looking at
14 his deposition, I believe he did not know about
15 the notes at that time and found out about them
16 much later.
17 Q    I know, and I'm trying to understand from
18 you if you can tell me, as HCMFA's 30(b)(6)
19 representative, whether you can share with me when
20 Mr. Dondero first learned of the existence of the
21 notes.
22 A    It – it would have been – I believe, if
23 my understanding is correct, it would have been
24 after they were demanded.
25 Q    After they were?

Page 16

Dustin Norris

1
2  A    Demanded.
3  Q    Okay.  How about your conversations with
4  Mr. Post?  Did the subject of when he learned
5  about the existence of the notes come up?
6  A    No.  That was not – a discussion with
7  Jason Post – Post – talking with Jason was more
8  around the NAV error, the events surrounding the
9  NAV error, facts and circumstances around the NAV
10 error.
11 Q    Okay.  And were your discussions with
12 Mr. Sauter limited to the investigation that he
13 undertook earlier this year that's reflected in
14 his declaration?
15 A    I would say it's not limited to that.
16 Q    What other topics did you discuss with
17 Mr. Sauter beyond the investigation that he
18 undertook that's reflected in his declaration?
19       MR. RUKAVINA:  And I would just
20 caution you, Dustin, that to the extent
21 that you and Mr. Sauter discussed factual
22 matters, that's fair game.
23       But as far as if you discussed
24 litigation strategy, that's not fair game.
25 So be careful with your answer, please,

Page 17

Dustin Norris

1
2  and tell Mr. Morris what you can and can't
3  answer.
4        THE WITNESS:  Yeah.
5        So early on with Mr. Sauter,
6  discussions were around if I had any
7  knowledge of the note, if he had any
8  knowledge of the note, trying to discover
9  what the notes were, what they were
10 related to, and neither of us had
11 knowledge related to notes.
12       And then discussions around more
13 generally – I'm trying to think back.
14 There were many discussions with
15 Mr. Sauter on the topic.
16       General facts and circumstances of
17 what he was learning from his
18 investigation in which – all of which I
19 would refer you to his declaration.
20       And then subsequent, talking with
21 him regarding the – I'm trying to
22 recollect the – the key components.
23       But it was general overview of –
24 of the notes and NAV error and the
25 process.  He wasn't here during much of

**Appx. 00335**

Page 18

Dustin Norris

1
2      that time period or involved, and so we
3      were talking together based on what he was
4      doing.
5   BY MR. MORRIS:
6   Q      Who are you employed by today?
7   A      NexPoint Advisors.
8   Q      Do you hold any position or title with
9   HCMFA?
10  A      I do.
11  Q      And what's your position or title with
12  HCMFA?
13  A      Executive vice president is my officer
14  role.
15  Q      And when did you become an officer of
16  HCMFA?
17  A      So I -- I was originally secretary -- and
18  I can't remember if I was assistant secretary, but
19  I've been involved with HCMFA since 2012. I don't
20  know if I was added as an assistant secretary at
21  that time; but for many -- for several years, I've
22  been an officer of HCMFA.
23  Q      And you were an officer in 2018 and 2019;
24  is that right?
25  A      Correct. I was secretary in 2018, and --

Page 19

Dustin Norris

1
2   I'm looking at the incumbency certificates here --
3   and in 2019 in April became executive vice
4   president. So from January to -- January 2018 to
5   April 2019, I was secretary and then became
6   executive vice president.
7   Q      When did you first learn of the existence
8   of the notes?
9   A      So it was after they were demanded, and it
10  was -- so I believe the demand came in in early
11  2020 -- 2021. So January-ish 2021.
12  Q      Do you have any role or any title with any
13  of the funds that are managed by either NexPoint
14  or HCMFA?
15  A      I do.
16  Q      Can you describe those roles or titles for
17  me, please?
18  A      Yeah. I'm -- I'm the executive vice
19  president of the funds, and my role more broadly
20  is I am the head of distribution and chief product
21  strategist. And so in that role, I lead the sales
22  and business development and marketing for the
23  funds, more broadly.
24  Q      And what is your title with NexPoint
25  Advisors, LP?

Page 20

Dustin Norris

1
2   A      I am executive vice president in the
3   officer capacity, and my role is -- as an employee
4   is head of distribution and chief product
5   strategist.
6   Q      Okay. So just to summarize, you're the
7   executive vice president of NexPoint Advisors, LP;
8   correct?
9   A      Correct.
10  Q      And that's an officer position; correct?
11  A      It is.
12  Q      And when did you attain that title?
13  A      Probably -- I don't have the incumbency
14  certificates, but it was probably the same time as
15  HCMFA.
16  Q      Is it fair to say that it was sometime
17  before January 1st, 2018?
18  A      No.
19  Q      Can you give me an estimate of when that
20  was? Feel free --
21  A      Yeah. The time- -- the timeline for HCMFA
22  was April 2019. I was secretary before that, and
23  I don't recall if NexPoint Advisors changed at the
24  same time.
25  Q      Okay. Can I refer to HCMFA and NexPoint

Page 21

Dustin Norris

1
2   Advisors, LP, together as "the advisers"?
3   A      That's fine.
4   Q      Okay. So is it fair to say that you were
5   the executive vice president, which was an officer
6   position, for each of the advisers as of April
7   2019?
8   A      Yes.
9   Q      Okay. And --
10  A      I believe that's correct.
11  Q      And you also serve as the executive vice
12  president of the funds that each of the advisers
13  manages. Do I have that right?
14  A      Yes. Currently.
15  Q      And have you held the --
16  A      Yes, currently.
17  Q      And when did you become the executive vice
18  president of the funds?
19  A      I don't remember the exact date, if that
20  was around the same time, but I was the secretary
21  before that and assistant secretary before that,
22  dating back to 2012.
23  Q      So you've been -- is it fair to say that
24  you've been an officer of the funds managed by the
25  advisers since at least 2013?

Page 22

Dustin Norris

1
2  A   I believe so.  I'd have to go back and
3  look for sure, but I believe.  There may have been
4  periods of time where I was not, but yes.
5  Q    Okay.  Were any of those periods of time
6  when you were not, at any point since 2018 to the
7  present?
8  A   I don't believe so.
9  Q    Okay.  So to the best of your
10  recollection, you've served as an executive vice
11  president of each of the funds managed by the
12  advisers since at least the beginning of 2018; is
13  that fair?
14  A   No.  That's – that's different than my
15  prior testimony that – I was secretary until
16  April –
17  Q    I apologize.  Let me restate the question.
18       You've been an officer of – of the
19  funds managed by the advisers on a continuous
20  basis since at least the beginning of 2018; fair?
21  A   I believe that's correct, yes.
22  Q    Thank you for the question – for – for
23  the correction.
24       So as I think you pointed out earlier,
25  one of the topics on the 30(b)(6) notice is the

Page 23

Dustin Norris

1
2  identity of officers, directors, and employees of
3  HCMFA?
4  A   Uh-huh.
5  Q    Do you want to take a look at that topic
6  on the document that you have in front of you?
7  A   Yes.
8  Q    Okay.
9  A   That is – which topic?
10  Q    13.
11  A   13, yes.
12  Q    Okay.  So let's focus on 13 for a moment.
13       Can you – can you identify for me
14  HCMFA's officers from January 1st, 2018, to the
15  present –
16  A   Yes.
17  Q    – including names and titles?
18  A   Yes.
19  Q    Okay.
20  A   So from January 1st, 2018 – and I don't
21  have – I – I'm assuming that the dates that I
22  have on the incumbency certificates are complete,
23  but I'm not certain, and – if there was one in
24  between, but I'm assuming this is – that the
25  dates I have changing is – is effective when they

Page 24

Dustin Norris

1
2  changed.
3       But Brad Ross was president of HCMFA
4  from January 1st, 2018, until, I believe,
5  February 2018 – sorry – yeah, until
6  February 2018.
7       In that same time period, Brad Ross,
8  president; Trey Parker, executive vice president;
9  Frank Waterhouse, treasurer; Dustin Norris,
10  secretary.
11       And effective 26th of February –
12  Q    I apologize.  What is Mr. Parker's title?
13  A   Executive vice president.
14  Q    Thank you.
15  A   And beginning February 26th, 2018, Trey
16  Parker, executive vice president; Frank
17  Waterhouse, treasurer; and Dustin Norris,
18  secretary; and no longer president, Brad Ross.
19  There's no president on the lineup.
20       So continuing on, April 11th, 2019,
21  Dustin Norris, executive vice president; Frank
22  Waterhouse, Lauren Thedford, secretary.
23  Q    And Trey Parker was no longer an officer
24  as of that time?
25  A   He was no longer an officer.

Page 25

Dustin Norris

1
2  Q    Okay.
3  A   And February 18th, 2021, Dustin Norris,
4  executive vice president; Frank Waterhouse,
5  treasurer; Brian Mitts, assistant treasurer; David
6  Willmore, secretary.  So Lauren Thedford, no
7  longer secretary.
8  Q    And have there been any changes since
9  February 2021?
10  A   Yes.  You have April 8, 2021, Dustin
11  Norris, executive vice president; Frank Waterhouse,
12  treasurer; Will Mabry, assistant treasurer; and
13  Stephanie Vitiello, secretary.
14       Again, I – I don't have – this is
15  based on what was provided to me with effective
16  dates.  I don't know if there was any that were
17  missing, if that's complete, but I – I believe
18  those are accurate.
19  Q    Is it fair to say that you're relying on
20  exclusively on the incumbency certificates to
21  identify the officers of HCMFA since January 1st,
22  2018?
23  A   For this purpose, yes.
24  Q    Do you have any other information that you
25  can share with me regarding the identity of any

Appx. 00337

Page 26

```
1            Dustin Norris
2  officers of HCMFA since January 1st, 2018?
3  A    I don't, no.
4  Q    Okay.  Can you identify for me HCMFA's
5  direct and indirect owners since January 1st,
6  2018?
7  A    I can, yes.  Generally Jim Dondero and
8  Mark Okada are the indirect owners through trusts.
9  They own approximately two-thirds, Jim Dondero, a
10 little less than a third, Mark Okada, with a
11 general partner that is -- that owns 1 percent.
12 Q    And who is the general partner?
13 A    It's a Strand entity that I believe is
14 owned 100 percent by Mr. Dondero.
15 Q    So Mr. Dondero controls the general
16 partner --
17 A    Right.
18 Q    -- of HCMFA?
19 A    Correct, and owns approximately two-thirds
20 of the equity.
21 Q    And is that a controlling interest to the
22 best of your knowledge?
23 A    Yes, I believe so.
24 Q    Okay.  Does HCMFA have any directors?
25 A    It does not.  It has a sole director
```

Page 27

```
1            Dustin Norris
2  through the general partners.  So HCMFA does
3  not -- Strand -- whatever the Strand entity does,
4  Jim Dondero is the sole director.
5  Q    Okay.  And what about employees?  Does
6  HCMFA have any employees?
7  A    It does have some front-office employees,
8  trading professionals.
9  Q    Are there any employees who perform any
10 services other than trading services?
11 A    Trading in front-office investment
12 analysts, portfolio managers, generally that's
13 been the structure with HCMFA, is they held --
14 they had employees that performed front-office
15 functions, and we, as I believe you're aware,
16 outsourced the back-office accounting, compliance,
17 and legal services to Highland Capital Management,
18 LP, during this time period.
19 Q    Let's go to Topic Number 12.
20 A    Okay.
21 Q    And Topic Number 12 asks for a witness who
22 can testify as to all communications that HCMFA
23 "made in the bankruptcy case concerning the notes,
24 including any pleadings, court filing, or
25 argument."
```

Page 28

```
1            Dustin Norris
2        Do you see that?
3  A    I do.
4  Q    Are you prepared to answer questions on
5  that topic?
6  A    I am.
7  Q    All right.  You're aware that obviously
8  Highland has commenced an adversary proceeding
9  against HCMFA to collect on two promissory notes;
10 right?
11 A    I am, yes, and I believe this right here
12 is the complaint filed January 22nd.
13 Q    Okay.  And you're aware that the notes
14 that are the subject of the lawsuit were dated
15 May 2nd and May 3rd, 2019, respectively; right?
16 A    Sorry.  Can you repeat that?
17 Q    You're aware that the notes that are the
18 subject of the lawsuit are dated May 2nd and
19 May 3rd, 2019, respectively; correct?
20 A    Yes.  The notes that are attached to the
21 complaint, May 2nd and May 3rd.
22 Q    Okay.  And can we refer to those two
23 notes -- those two promissory notes for the rest
24 of this deposition collectively as "the notes"?
25 A    Yes.
```

Page 29

```
1            Dustin Norris
2  Q    Okay.  And you're aware that after
3  Highland commenced this action, HCMFA filed its
4  original answer; correct?
5  A    That's correct.
6  Q    Okay.  And Topic Number 1 on your list, in
7  fact, is the answer, correct, the original answer?
8  A    That's correct.  It's Topic Number 1.
9        MR. MORRIS:  Okay.  Can we put
10 Deposition Exhibit 5 up on the screen?
11 We're going to look at the original
12 answer.
13       (Exhibit 5 tendered.)
14 BY MR. MORRIS:
15 Q    And, again, feel free to let me know if
16 there's any portion of this document that you need
17 to see.  But looking at the first page -- and
18 perhaps we can continue to scroll through it -- is
19 this the original answer that was filed on behalf
20 of HCMFA on March 1st, 2021?
21 A    I'll take your representation that it is.
22 It looks to be, yeah.
23 Q    Okay.
24 A    I was not involved in the filing of it,
25 but...
```

Page 30

Dustin Norris

1
2  Q    Okay.  Is the copy that you have with you
3  dated March 1st, 2021?
4  A    Yes, it is.
5  Q    And if you can turn to Page 6 of 7, does
6  it appear to be the exact same as what appears on
7  the screen, showing the March 1st, 2021, date?
8  A    It does.
9  Q    And do you refer to the March 1st, 2021,
10  date, as "the answer date"?
11  A    Yes.
12  Q    Okay.  HCMFA did not assert any
13  affirmative defenses in this pleading; correct?
14  A    That's my understanding.
15  Q    Okay.  And HCMFA had full access to you as
16  of March 1st, 2021; correct?
17  A    Yes.
18  Q    And HCMFA had full access to Mr. Dondero
19  as of March 1st, 2021; correct?
20  A    In the term "full access," they could have
21  talked to him, yes.
22  Q    Right.  And there was no restriction from
23  the bankruptcy court or otherwise on HCMFA's
24  ability to communicate with Mr. Dondero that you
25  know of; correct?

Page 31

Dustin Norris

1
2  A    None that I know of.
3  Q    And there was no restriction or limitation
4  on HCMFA's ability to speak with you at or prior
5  to March 1st, 2021; correct?
6  A    That's correct.
7  Q    How about Ms. Thedford?  Are you aware of
8  any restriction or limitation on HCMFA's ability
9  to speak with her prior to March 1st, 2021?
10  A    Yes.
11  Q    Okay.  And what restriction was that?
12  A    Yeah.  So she was part of the Highland
13  legal team.  She was an employee of HCMLP.  And
14  during this time period, we had outsourced our
15  legal and compliance functions to them.  And if --
16  I would refer you to Mr. Sauter's declaration and
17  the attachments and schedules.  There's a very
18  strict direction from Mr. Seery that
19  individuals -- particularly on the legal team --
20  could not work on anything that would be inimical
21  to the debtor.
22  Q    Okay.
23  A    And so Ms. Thedford, on multiple
24  occasions, told us she was unable to work on
25  things, and that began back in fall of 2000- --

Page 32

Dustin Norris

1
2  fall of 2020 -- late summer 2020, actually.  And
3  so she was not accessible for things like this.
4  Q    How about Mr. Post?  Do you know who
5  Mr. Post was employed by in 2018 and 2019?
6  A    2018 and '19, he was employed by Highland
7  Capital Management, LP.
8  Q    Do you know whether, in your conversations
9  with him, does he have any personal knowledge
10  regarding the NAV error?
11  A    Yes.
12  Q    Was he involved in any of the issues
13  surrounding the NAV error?
14  A    He was knowledgeable -- as he was
15  chief -- chief compliance officer of the retail
16  advisers at that time, and interacted with the
17  HCMLP employees and the board regarding the NAV
18  error, he also -- in your schedules, you'll notice
19  in one of the memos, he participated in calls with
20  the SEC, and so he was -- he was involved in the
21  process of the NAV error and understood and worked
22  with the other HCMLP employees, which naturally
23  they would.  We had outsourced valuation services
24  to HCMLP.  We had outsourced legal and compliance
25  to HCMLP, and as such, that was all part of what

Page 33

Dustin Norris

1
2  they were working on.
3  Q    Did -- did -- were there any restrictions
4  or limitations on HCMFA's ability to speak with
5  Mr. Post prior to March 1st, 2021?
6  A    So once -- so Jason -- one important
7  component here is Jason Post did leave the debtor,
8  and working with Mr. Seery, I believe, to then
9  leave and become an employee of NexPoint Advisors,
10  and that was at the request of our retail board,
11  as there were restrictions on Mr. Post at that
12  time.
13        And as chief compliance officer of the
14  funds, the board had become very uncomfortable
15  that they had restrictions on Mr. Post.  And so it
16  was in everybody's interest to allow him to become
17  an employee of NexPoint Advisors, and so that was
18  late 2020, I believe.  I don't know the exact
19  date.  And at that time, there were certain things
20  that Jason was able to then help the adviser with,
21  but there were still restrictions.  And he had
22  limited access to his prior data.  He left the
23  debtor, but he didn't have -- I believe he had
24  restrictions on what he could access in the
25  information.

**Appx. 00339**

Page 34

Dustin Norris

1
2   Q     Okay.  But it is fair to say that between
3   January 21st, 2021, the day that the complaint was
4   filed, and March 1st, 2021, the date that HCMFA
5   filed its original answer, HCMFA had complete and
6   unfettered access to you, to Mr. Dondero, and
7   Mr. Post; correct?
8   A     Again, the complete and unfettered access
9   on the Jason Post aspect, they could have talked
10  to him.  I'm not sure if there were any other
11  restrictions related to what he had or information
12  he had or based on his prior role of the debtor,
13  he was restricted on what he could or couldn't
14  talk about, if he had any lease agreement.  I'm
15  not certain on that.  But, yes, we could talk
16  to – or HCMFA could talk to Mr. Post.
17  Q     Okay.  And the topics that you just raised
18  are speculation on your part; correct?
19  A     It is.
20  Q     You're not aware of any restriction of –
21  you don't have any knowledge of any restriction or
22  limitation placed on HCMFA in respect of its
23  ability to communicate with Mr. Post between
24  January 21st, 2021, and March 1st, 2021; correct?
25  A     Based on my personal knowledge, no.  There

Page 35

Dustin Norris

1
2   could have been something, but –
3   Q     Okay.  I'm just asking about your
4   knowledge, not what could have been.
5         All right.  So we're going to use
6   March 1st, 2021, as the answer date.
7         Are you aware of any document that
8   HCMFA filed with the bankruptcy court prior to the
9   answer date that concerns or relates in any way to
10  the notes?
11  A     I'm thinking if I'm aware.
12        Not that I'm aware of.
13  Q     Are you aware – withdrawn.
14        Do you know what a "pleading" is, if I
15  use that phrase?
16  A     I believe so.  These are the answers that
17  we gave.  The first answer, the amended answer,
18  and the second amended answer, that – I believe
19  those are the two pleadings.  Is that correct?
20  Q     You know what?  I think my first question
21  was broad enough, because I just used the word
22  "document," so I'm going to let that sit.
23        Are you aware of any argument that
24  anybody ever made on behalf of HCMFA prior to the
25  answer date that concerned or related to any of

Page 36

Dustin Norris

1
2   the notes?
3   A     And you mean an argument to the Court?
4   Q     Yes.
5   A     Not that I'm aware of.
6   Q     Okay.  Are you aware of any statement of
7   any kind that was made to the bankruptcy court
8   prior to the answer date that concerned or related
9   in any way to the notes?
10  A     Not that I can remember.  But there's
11  obviously been a lot of documents with the Court,
12  but not that I'm aware of.
13  Q     Right.  But you – did you do anything to
14  prepare yourself to answer questions on Topic 12?
15  A     Yes.
16  Q     And do you believe that you're able to
17  competently answer my questions relating to
18  Topic 12 as HCMFA's 30(b)(6) witness?
19  A     I am.  But I guess in this regard you're
20  asking to my knowledge.  And so, I guess, that –
21  are you asking my personal knowledge or as my
22  knowledge as a representative of the company?
23  Q     All right.  I appreciate that.
24        I am only examining you today in your
25  capacity as a 30(b)(6) witness.

Page 37

Dustin Norris

1
2   A     Okay.  That makes sense.  Okay.
3   Q     And so if I use the phrase "you," just as
4   we did in the deposition notice, I'm really
5   referring to HCMFA; is that fair?
6   A     That's fair.
7   Q     Okay.  So let me just ask the questions
8   again with that clarification.
9         Are you aware, in your capacity as the
10  30(b)(6) witness today, of any document that was
11  ever filed on behalf of HCMFA prior to the answer
12  date that concerns or relates to the notes?
13  A     No.
14  Q     Are you aware, in your capacity as the
15  HCMFA 30(b)(6) witness, of any argument that was
16  ever made to the Court prior to the answer date
17  that concerns or relates in any way to the notes?
18  A     No.
19  Q     Are you aware of – again, when I use the
20  phrase "you," I'm referring to HCMFA, just to
21  shorten these questions a little bit.
22        Are you aware of any statement that
23  was ever made on your behalf to the bankruptcy
24  court prior to the answer date that concerns or
25  relates in any way to the notes?

Page 38

1          Dustin Norris
2   A    Not that I recall.
3   Q    Okay.  When did HCMFA first learn of the
4   existence of the notes?
5   A    So HCMFA's position is that they learned
6   of them when they were demanded, or after they
7   were demanded.  I don't even know that when we
8   received -- or who they were sent to, but it was
9   after they were demanded.
10  Q    Okay.  And do you recall when they were
11  demanded?
12  A    I don't have the exact date.  If you could
13  remind me or show a document, that might be
14  helpful.  I don't know if you have the demand, or
15  if that's one of the documents, but I don't
16  remember the specific date.
17        MR. MORRIS:  Can we put Exhibit 1
18  up on the screen?
19        It's actually the complaint -- the
20  original complaint, sir.
21        (Exhibit 1 tendered.)
22  BY MR. MORRIS:
23  Q    If you go to Exhibit 3, do you see there's
24  a demand letter there?
25  A    Yes.

Page 39

1          Dustin Norris
2   Q    And you've seen that before; right?
3   A    I have.
4   Q    Okay.  And are you -- do you see that it
5   was sent to Mr. Waterhouse?
6   A    Yes.
7   Q    And Mr. Waterhouse was the treasurer of
8   HCMFA on December 3rd, 2020; correct?
9   A    Correct.
10  Q    Okay.  So is it fair to say that HCMFA
11  knew of the existence of the notes on
12  December 3rd, 2020?
13  A    It's safe to say that Frank Waterhouse
14  received this.  I'm not sure the date exactly
15  when -- when the company became aware.  Frank,
16  yes, is an officer.  He's also -- the irony here,
17  he's CFO of the debtor who is demanding this, so
18  he's demanding it from himself.  I know it's
19  coming from -- from who is sending it, but at this
20  time, I don't know when Mr. Dondero or other
21  officers became aware of it.  Sometime after
22  December 3rd.
23  Q    Okay.  Do you know if HCMFA ever responded
24  to this demand letter prior to the time the
25  complaint was filed on January 21st, 2021?

Page 40

1          Dustin Norris
2   A    I don't believe they did.
3   Q    So it's fair to say that nobody on behalf
4   of HCMFA ever told any representative of Highland
5   that it was previously unaware of the existence of
6   the notes?
7   A    Sorry.  Can you repeat that one more time?
8   Q    HCMFA never responded to this letter prior
9   to the commencement of the lawsuit; right?
10  A    Not to my knowledge, didn't respond to
11  HCMLP on this.
12  Q    Is there a reason why they didn't reach
13  out to Highland to let Highland know that it
14  disputed the existence of these notes?
15  A    I don't know if there's a reason, but I do
16  know, during this time period, you'll recall,
17  December and January, leading up to the actual
18  demand -- or the initial complaint, there was a
19  lot going on.  We were almost in daily depositions
20  and court hearings.  There was a hearing
21  injunction handed out against Jim.  There was a
22  restraining order.  There -- TRO.  There were
23  lawsuits against the advisers.  And so there was a
24  lot going on, and I think this was put back in the
25  priority line.

Page 41

1          Dustin Norris
2        Again, all of the compliance and legal
3   functions at this time, December 2020, were being
4   outsourced to HCMLP, and we were told they were
5   unable to help with anything that was inimical to
6   the debtor.  And so there were no employees of
7   HCMFA that were legal compliance professionals,
8   and so this -- this was -- I guess -- this is my
9   speculation -- was put in the back of the line, or
10  further back from the actual litigation that they
11  were defending or working against the daily
12  depositions and coordinating.
13  Q    Do you have any reason to believe, as you
14  sit here right now, that Mr. Waterhouse did not
15  receive this demand letter on or about
16  December 3rd, 2020?
17  A    I don't know.  I don't have any reason to
18  believe that, but I don't know.
19  Q    Okay.
20  A    And I don't recall what he testified to in
21  regard to receiving the demand, but we see here it
22  was sent to him.  We can assume it got sent to
23  him.
24  Q    Okay.  Let me ask the question again, and
25  I would appreciate you listening carefully to my

Page 42

Dustin Norris

1    question.

2         As HCMFA's 30(b)(6) witness today,

3    does HCMFA contend that this letter was not

4    received by Mr. Waterhouse on or about

5    December 3rd, 2020?

6         MR. RUKAVINA:  Well, that's not our

7    contention.  We agree that it was received

8    on or about that date.

9         MR. MORRIS:  Okay.

10        THE WITNESS:  Yeah.  That's --

11   yeah.

12   BY MR. MORRIS:

13   Q    Okay.  HCMFA actually knew about the notes

14   just weeks after they were signed; correct?

15        MR. RUKAVINA:  Objection; form.

16        THE WITNESS:  So the debtor

17   employees who created the notes knew about

18   them, but it was not knowledge of HCMFA.

19   Those were all Highland Capital

20   Management, LP, employees.

21   BY MR. MORRIS:

22   Q    So it's your testimony that HCMFA had no

23   knowledge of the existence of the notes in

24   June 2019; is that correct?

Page 43

Dustin Norris

1    A    June 2019.

2         Correct.

3    Q    As the executive vice president of HCMFA,

4    have you ever reviewed HCMFA's audited financial

5    statements?

6    A    I have not.

7    Q    Is there anybody on behalf of HCMFA who is

8    charged with the responsibility of reading HCMFA's

9    audited financial statements?

10   A    Yeah.  We -- again, the key here is we

11   outsourced finance, accounting, back-office

12   functions.  It includes financial statement

13   preparation.  The treasurer of HCMFA is an HCMLP

14   employee, Frank Waterhouse, at that time, and at

15   all times that we're talking about.  And so with

16   we -- and Frank is a professional, and his team

17   are professionals, right?  We outsource to an

18   accounting group to prepare and oversee, work with

19   the auditors in preparation of those financials.

20   And so they were tasked with that.  And we relied

21   on them.  And there was not a specialist during

22   this time period that did that.

23   Q    Does Frank Waterhouse have any

24   responsibility, as the treasurer of HCMFA, to make

25

Page 44

Dustin Norris

1    sure that HCMFA's audited financial statements are

2    true, accurate, and reliable?

3    A    Him and his team, yeah.  We actually --

4    that's what we rely on them for.

5    Q    And did you rely on him not only in his

6    capacity as an employee of Highland, but in his

7    capacity as the treasurer of HCMFA?

8    A    Yeah, he was -- let's take the first --

9    as a -- in his capacity under the shared services

10   agreement, okay, doing accounting, books and

11   records, audited -- audit support, yes, we relied

12   on him in that capacity.  And he also, as an HCMLP

13   employee, served as a treasurer of HCMFA.  In that

14   role, we would expect him to oversee the

15   financials.

16        MR. MORRIS:  Okay.  And move to

17   strike.

18   BY MR. MORRIS:

19   Q    And I'm going to ask you very

20   specifically:  As HCMFA's representative today,

21   did Frank Waterhouse have a duty as the treasurer

22   of HCMFA to make sure that HCMFA's audited

23   financial statements were true and accurate?

24   A    That -- very specific from the treasurer

Page 45

Dustin Norris

1    role, I would say the treasurer role was to

2    oversee the financial aspects of the advisers.

3    Q    And was one of those aspects HCMFA's

4    audited financial statements?

5    A    As -- yeah.  And he was -- again, I'll

6    reiterate, he was the CFO of Highland who was

7    tasked with creating the financial statements for

8    the advisers.

9         MR. MORRIS:  Okay.  I'm again going

10   to move to strike.

11   BY MR. MORRIS:

12   Q    I'm not asking about his role as CFO of

13   Highland.  I'm limiting it strictly to his role as

14   the treasurer of HCMFA.

15   A    And I don't have --

16   Q    Did Frank -- let me ask my question.

17        Is any officer of HCMFA responsible

18   for making sure that HCMFA's audited financial

19   statements are true and accurate?

20   A    I don't know, but I would assume -- and I

21   don't want to make assumptions here as the

22   representative -- but I would assume that the

23   treasurer would have that role.

24   Q    Okay.  And what is your assumption based

Dustin Norris

1    on?
2    A    Based on the understanding of what a
3    treasurer role would be.  But I -- I don't have
4    any -- I don't have any knowledge, I'm not
5    representing that we have any roles and
6    responsibilities or defined procedures that the
7    treasurer does this, that, or the other.
8    Q    Okay.  Have you -- as you sit here right
9    now, have you ever seen HCMFA's audited financial
10   statements for the period ending December 31st,
11   2018?
12   A    I saw them in the materials that were
13   provided in your schedules, I believe.
14   Q    Okay.  Let's --
15   A    That was the first time.
16   Q    Let's take a quick look at it.
17        MR. MORRIS:  If we could put up on
18   the screen the document that's been marked
19   Exhibit 45.
20        (Exhibit 45 tendered.)
21   BY MR. MORRIS:
22   Q    Okay.  And do you see that this is the
23   first page of HCMFA's audited financial statements
24   for the period ending December 31st, 2018?

Dustin Norris

1    A    I do.
2        MR. MORRIS:  Okay.  And if we could
3    just scroll, I think, to the third page.
4    BY MR. MORRIS:
5    Q    Do you see that it's signed by
6    PricewaterhouseCoopers on June 3rd, 2019?
7    A    I see that the audit opinion is signed by
8    them, yes.
9    Q    Correct.  And -- and you're aware that
10   PricewaterhouseCoopers was the outside auditor
11   retained by HCMFA to conduct the audit of HCMFA's
12   financial statements; correct?
13   A    Given that they gave an opinion, yes.
14   Q    Okay.  And you have no reason to believe
15   that the document that's up on the screen is
16   anything other than HCMFA's audited financial
17   statements for the period ending December 31st,
18   2018, do you?
19        And we're happy -- I'm happy to scroll
20   through whatever you need to see.
21   A    Yeah.  And there they're distinguishing --
22   you have an audit opinion and having audited
23   financials, I assume that you have all that is
24   here.  You showed me the first page of the

Dustin Norris

1    financials, which --
2    Q    Yeah.  Yeah.  Let's --
3    A    So I'm assuming that's the --
4    Q    Let's scroll down just a little bit.
5        You can see that the next page is
6    HCMFA's balance sheet.  Do you see that?
7    A    I do.
8    Q    Okay.
9        MR. MORRIS:  Can we go to
10   "Subsequent Events"?  I think it's
11   Page 17.
12   BY MR. MORRIS:
13   Q    Have you seen this page of HCMFA's audited
14   financial statements before?
15   A    Just in preparation for this.
16   Q    Do you understand that in the "Subsequent
17   Events" section, the notes are described in the
18   audited financial statements?
19   A    There is a reference to promissory notes
20   in aggregate of $7.4 million, yes.
21   Q    And those are the two notes that Highland
22   is suing on; correct?
23   A    I would assume that's the case, because
24   the dollar amounts line up.  But I don't have the

Dustin Norris

1    backup, but I would assume that's the case.
2    Q    And not only do the dollar amounts line
3    up, but do you see that the statement in
4    "Subsequent Events" specifically identifies the
5    notes as having been issued in the year 2019?
6    A    Yes.
7    Q    And are you aware of any notes that
8    anybody in the world contends were signed by HCMFA
9    between January 1st, 2019, and June 3rd, 2019,
10   other than the two notes that Highland is suing
11   on?
12   A    No.
13   Q    Okay.  So can you conclude, as HCMFA's
14   30(b)(6) witness, that the notes that are
15   described in the subsequent events are the very
16   notes that are the subject of the pending lawsuit?
17   A    That appears to be the case.
18   Q    Okay.  And so it's also fair to say, then,
19   that HCMFA does not dispute that its own audited
20   financial statements that were the subject of a
21   June 3rd, 2019, opinion by PricewaterhouseCoopers
22   disclosed the existence of the notes at issue;
23   correct?
24   A    No.  We don't dispute that that was

**Appx. 00343**

Dustin Norris

1  included in the financial statements.  You know,
2  I – I think we're going to get into it in our
3  affirmative defenses, but we dispute that the
4  notes were actually valid notes, and we would say
5  that this was an error.  These should not have
6  been included, but were included in good faith by
7  the accounting team who thought that they were
8  valid notes.
9  Q    Okay.
10 A    So –
11        MR. MORRIS:  I move to strike
12    everything other than the first portion of
13    your answer that was responsive to my
14    question.
15 BY MR. MORRIS:
16 Q    HCMFA does not dispute that it received
17 $2.4 million from Highland on May 2nd, does it?
18 A    No.
19 Q    HCMFA does not dispute that it received
20 $5 million on May 3rd, 2019, does it?
21 A    No.
22 Q    Let's just confirm that, if we can.
23        MR. MORRIS:  Can we put on the
24    screen a document that's been marked as

Dustin Norris

1  Exhibit 147?
2        (Exhibit 147 tendered.)
3  BY MR. MORRIS:
4  Q    Okay.  Do you see that this is – or at
5  least this appears to be a bank account statement?
6  A    Yes.  BBVA Compass is a bank, so I'll take
7  your representation it's a statement.
8        MR. MORRIS:  All right.  And if we
9    can just scroll down.
10        All right.  Stop right there.
11 BY MR. MORRIS:
12 Q    Do you see that there's a reference on
13 May 2nd to a 2.4-million-dollar transfer?
14 A    I do.
15 Q    Okay.  And is that consistent with your
16 testimony just now that on May 2nd, Highland
17 transferred $2.4 million to HCMFA?
18 A    That's correct.
19 Q    And lower on the page, the statement shows
20 a transfer of $5 million on May 3rd; correct?
21 A    Yes.
22 Q    And that's the payment that HCMFA
23 acknowledged – acknowledges receiving from
24 Highland on that day; correct?

Dustin Norris

1  A    Is this HCMFA's bank statement or is this
2  HCMLP's?
3  Q    No.  It's HCMLP's.
4  A    Okay.  It just says "Highland Capital
5  Management," and I'm assuming it lines up – I'm
6  assuming this is the transfer, but –
7  Q    Okay.
8  A    – I can't confirm an entity.  But we're
9  not denying that there was cash received those
10 dates from HCMLP.
11 Q    Okay.  And are you aware –
12        MR. MORRIS:  We can take this down
13    now.
14 BY MR. MORRIS:
15 Q    Do you recall that Topic Number 10 asks
16 for a witness who can testify about the accounting
17 of these transfers?
18 A    Uh-huh.  Yup.
19 Q    Are you prepared to testify on Topic
20 Number 10?
21 A    Yes.
22 Q    Can you tell me how HCMFA accounted for
23 these payments on its books and records?
24 A    I can, yeah.

Dustin Norris

1        So my understanding of the company's
2  position is that – and – and it may be helpful
3  to provide some additional color leading up to the
4  accounting.  I don't know if we want to address
5  that later in our affirmative defenses, if you
6  have a preference there.
7  Q    I'd just like you to – maybe it's my
8  question, but I just want you to focus on my
9  question.
10 A    Uh-huh.
11 Q    And that is:  First, do you know how HCMFA
12 accounted for these two payments in its books and
13 records?
14 A    Yeah.  So the HCMLP employees who were
15 tasked with creating books and records of the
16 adviser, the accounting team recorded, we – we –
17 our position is that is an incorrect recording of
18 a payable to HCMLP.  And so there was a payable
19 booked on the balance sheet of HCMFA by the HCMLP
20 accounting team.
21        MR. MORRIS:  Okay.  I'm going to
22    move to strike.
23 BY MR. MORRIS:
24 Q    I – I'd appreciate not having the

Page 54

Dustin Norris

1    commentary.  Your counsel can ask those questions
2    or if it's responsive to a question.  I'm just
3    asking a very simple question.
4    A    Yup.
5    Q    How – how did HCMFA record these payments
6    on its books and records?
7    A    Yeah.  My understanding is they recorded a
8    payable to HCMLP, a liability.
9    Q    And do you know when HCMFA first
10   discovered that the payments were booked on its
11   books and records as a liability?
12   A    Our position is that that was revealed
13   through after the – sorry – after the demand.
14   And as we began to get additional information –
15   particularly, and I would refer you to
16   Mr. Sauter's declaration, our amended response,
17   and our second amended response that was filed
18   yesterday regarding each of those time periods.
19   But it was after the demand we found out how it
20   was booked.
21   Q    Okay.  So just to simplify this:  HCMFA's
22   books and records recorded the transfers on
23   May 2nd and May 3rd as liabilities from HCMFA to
24   Highland; correct?
25

Page 55

Dustin Norris

1    A    So my understanding is the audited
2    financials recorded in a subsequent event – you
3    showed me that – they recorded a subsequent
4    event.  The balance sheet as of 12/31/2018 wasn't
5    amended because it was a subsequent event.  But on
6    their books and records at that time, or
7    subsequent to that, they recorded a liability.
8    Q    And – and do you know if that liability
9    was recorded contemporaneously in May of 2019?
10   A    I don't know.
11   Q    But it's – it's HCMFA's position that,
12   notwithstanding the recording of the liability on
13   it's books and records, that HCMFA didn't learn of
14   that fact until after the demand letter was sent
15   in December of 2020.
16       Do I have that right?
17   A    Correct.
18   Q    Okay.  Have there been any changes in
19   HCMFA's books and records since it learned of the
20   promise – of the existence of the promise –
21   withdrawn.
22       Has – has HCMFA changed its books and
23   records after learning that the payments were
24   recorded as liabilities?

Page 56

Dustin Norris

1    A    I'm not aware of how it's been treated
2    since then.
3    Q    Okay.
4        MR. RUKAVINA:  And, John, no
5    urgency, but find some time in the near
6    future for the restroom break.  The
7    morning coffee is working its magic.
8        MR. MORRIS:  Happy to do it right
9    now, Davor.
10       THE WITNESS:  I can use that, too.
11   I'm almost through my water bottle.
12       MR. MORRIS:  All right.  So, look,
13   it's 12:05.  Let's just come back at 12:15
14   or 11:15.
15       THE WITNESS:  Thank you.
16       MR. MORRIS:  Thanks so much.
17   (Recess from 11:05 a.m. to 11:16 a.m. CST)
18   BY MR. MORRIS:
19   Q    To the best of your knowledge, has HCMFA
20   ever changed its books and records in order to
21   reverse the booking of the payments that were made
22   by Highland in May from liabilities to something
23   else?
24   A    I'm not aware of how the accounting
25

Page 57

Dustin Norris

1    entries have been done since then, but – yeah,
2    I'm not aware.
3    Q    Okay.  But you'll – you'll agree that the
4    accounting for these two payments was among the
5    30(b)(6) topics, correct, Number 11 – Number 10?
6    A    Yes.
7    Q    And as the 30(b)(6) witness for HCMFA, can
8    you confirm that, to the best of your knowledge,
9    those payments were booked as liabilities and the
10   booking of those payments as – as liabilities has
11   not changed?
12   A    To the best of my knowledge, they were
13   booked as liabilities, and I don't know how they
14   have been treated.  There's not been a year-end
15   audit for 2021, and I'm sure the accountants and
16   auditors will determine based on current facts and
17   circumstances how those will be reported.
18   Q    Okay.  But as of today, you have no
19   knowledge that the booking of those payments as
20   liabilities has ever been changed; correct?
21   A    Those – there's no financial statements
22   that are prepared, I believe, intra-year, during
23   the year, for audited purposes.  And so, you know,
24   that – that would be, I'm sure, determined based

Appx. 00345

Page 58

Dustin Norris

1 on any audit needs.

2 Q    Does HCMFA maintain an accounts payable

3 ledger?

4 A    I'm sure it does.

5 Q    Did you do anything to try to ascertain

6 whether or not these notes appear as liabilities

7 on the accounts payable ledger?

8 A    As current accounts payable ledger?

9 Q    Yeah.

10 A    No.

11 Q    Did you -- other than the audited

12 financial statements, did you take any steps to

13 ascertain how these payments were recorded in

14 HCMFA's books and records, or is -- or is it only

15 on the audited financial statements?

16 A    So at the time that they were recorded, we

17 know they were recorded as liabilities on the

18 books and records.

19 Q    And when you say that it was recorded as a

20 liability in the books and records, where in the

21 books and records was it recorded as a liability?

22 A    Meaning on the balance sheet?

23 Q    Okay.  So the balance sheet is one place;

24 is that right?

---

Page 59

Dustin Norris

1 A    Yes.  We record liabilities on the balance

2 sheet.

3 Q    Okay.  Did HCMFA complete its audit for

4 2019?

5 A    I don't -- not that I'm aware of.  I don't

6 believe they had an audit for 2019.

7 Q    Okay.  Now, HCMFA contends that the

8 payments were -- should have not been booked as a

9 loan because they were supposed to be compensation

10 for the error that Highland made in connection

11 with the NAV error; correct?

12 A    Correct.

13 Q    Okay.  Did HCMFA ever issue an invoice or

14 a bill of any kind to Highland?

15 A    Not that I'm aware of.

16 Q    Okay.  Is there anything in HCMFA's books

17 and records that reflects its position that the

18 payments should not have been billed as

19 liabilities, but they should have been billed as

20 income?

21 A    As compensation?

22 Q    Yeah.

23 A    Yes.

24       Anything in their records?

---

Page 60

Dustin Norris

1 Q    Yes.

2 A    I -- I would refer you to the testimony of

3 Mr. Dondero and Mr. Waterhouse, who both testified

4 to this; Mr. Dondero that it was compensation, and

5 that Frank testified in his deposition that he

6 don't -- didn't remember Mr. Dondero saying it was

7 a loan, and that Mr. Dondero told him to get the

8 money from Highland.  And so it's -- it's -- that

9 is on the record and in the record.

10       But in HCMFA's other records, we have

11 the president of HCMLP, Jim Dondero, who made that

12 transfer and has said that that is for

13 compensation.

14       So there is -- but there is -- I

15 wouldn't -- I would be surprised to see some kind

16 of a settlement agreement or invoice with -- to

17 affiliates.

18       MR. MORRIS:  Okay.  I move to

19 strike.

20 BY MR. MORRIS:

21 Q    And my answer -- my question is really

22 simple.

23       Is there anything in HCMFA's books and

24 records that reflects its position that these

---

Page 61

Dustin Norris

1 payments were supposed to be made as compensation

2 rather than in the form of loans?

3 A    I -- I would say that the pleadings are a

4 part of our books and records now.  I would say

5 depositions.  And within that, it is well

6 documented.

7 Q    Okay.  Let me ask a different question

8 then.

9       Remember we were using the answer date

10 as being March 1st, 2021.

11 A    Correct.

12 Q    Is there anything in HCMFA's books and

13 records that was created prior to March 1st, 2021,

14 that corroborates HCMFA's position that the

15 payments were intended to be compensation and not

16 in the form of a loan?

17 A    Yeah, and I would, again, refer you to

18 DC's -- what do you call it -- declaration.  That

19 prior to that, we didn't have access to -- to,

20 largely, our books and records as that was

21 outsourced to Highland Capital Management, LP, and

22 its employees, legal, compliance, and

23 accounting.  So our position is we did not have

24 anything at that point related to this agreement.

Page 62

Dustin Norris

1
2      MR. MORRIS: Okay. I move to
3   strike.
4  BY MR. MORRIS:
5   Q     And listen carefully to my question.
6       Is HCMFA aware of anything that was
7  created prior to the answer date that corroborates
8  its position today that the payments were intended
9  to be treated as compensation rather than a loan?
10   A     I – I think as far as books and records
11  go, we have NAV error memos, we have communication
12  with the SEC. Right?
13       There's – there is a lot of
14  information related to the services that were
15  performed under the shared services agreement,
16  were for valuation purposes that Highland had
17  created and was responsible for the valuation
18  process, and that is a host of documents that are
19  in the record, yes.
20       MR. MORRIS: Okay. I – I move to
21   strike.
22  BY MR. MORRIS:
23   Q     I'm asking about accounting. Maybe it's
24  my fault. Okay? I'll – I'll take responsibility
25  for this. I'm asking as a matter of accounting.

Page 63

Dustin Norris

1
2  I'm still on 30(b)(6) Topic Number 10.
3       Is there anything in HCMFA's books and
4  records that was created before the answer date
5  that shows that the payment should have been
6  accounted for as compensation rather than as a
7  loan?
8   A     As far as an accounting record, I wouldn't
9  expect there to be, because the accountant
10  function was outsourced to HCMLP, and – and I
11  would refer you to our latest response and our
12  amended response of – of what was discovered and
13  found throughout the process here.
14       The accountants recorded a liability
15  and they thought it should be liability. And so,
16  no, there wasn't anything, to my knowledge, prior
17  to that that was in the accounting books and
18  records. And I – you know, I'm not surprised
19  there wasn't, because of the facts that you'll –
20  you'll see in our amended answers.
21   Q     Okay. Do you know whether, if it was
22  intended to be compensation, that HCMFA's income
23  statement should have shown the inflow of the
24  $7.4 million?
25   A     I don't know how it would be reported for

Page 64

Dustin Norris

1
2  accounting purposes. I – I do have an accounting
3  background, but I haven't done accounting in a
4  long time. And I'm not an expert in adviser
5  financial statements. So I would say I don't
6  have – and I guess – I guess that – stepping
7  back and answering on behalf of the company here,
8  I don't have a knowledge of how that would be
9  recorded for income statement purposes.
10   Q     Okay.
11   A     But it would – it would be compensation
12  that would be reported –
13   Q     Okay.
14   A     – somewhere in the financial statements.
15   Q     So it's your testimony today, as HCMFA's
16  30(b)(6) witness, that HCMFA was unaware that its
17  audited financial statements disclosed these notes
18  until after the lawsuit was commenced.
19       Do I have that right?
20   A     That's correct.
21   Q     And it's your position today, as HCMFA's
22  30(b)(6) witness, that HCMFA was unaware that the
23  payments that were made by Highland were booked as
24  liabilities until sometime after the lawsuit was
25  commenced; correct?

Page 65

Dustin Norris

1
2   A     Yes, that's correct. The accounting
3  function was outsourced to HCMLP.
4   Q     Okay. And there's – was there anybody –
5  was there any officer of HCMFA who had
6  responsibility for reviewing HCMFA's balance
7  sheet?
8   A     I believe I already answered this earlier.
9   Q     I actually asked the question on the
10  audited financial statements.
11   A     Okay.
12   Q     Now I'm going to ask specifically. Is
13  there anybody who served as an officer of HCMFA
14  who had the responsibility of making sure that
15  HCMFA's balance sheets were true and accurate?
16   A     Yes. So Frank Waterhouse and his team,
17  Frank was the named treasurer of HCMFA, and his
18  role at HCMLP, as a service provider, would have
19  had that responsibility along with his team.
20   Q     Okay. Let's go to the next topic,
21  Topic 11. Do you see Topic 11 refers to
22  "communications in 2020 with any retail board –
23   A     Yes.
24   Q     – concerning the amounts due and owing to
25  Highland"?

Dustin Norris

1
2  A    Yes, I do.
3  Q    Okay.  HCMFA is a financial advisory firm;
4  correct?
5  A    It is.
6  Q    And it provides advisory services to
7  certain funds; correct?
8  A    It does.
9  Q    And those advisory services are provided
10 pursuant to written agreements; correct?
11 A    They are.
12 Q    And those agreements are subject to annual
13 review; correct?
14 A    They are.
15 Q    And those agreements the principal source
16 of HCMFA's revenue?
17 A    Yes, I believe so.
18 Q    Okay.  It's among the most important
19 contracts HCMFA has; correct?
20 A    Yes.
21 Q    In fact, it's the reason for HCMFA's
22 existence, is that fair, is to serve the funds?
23 A    Largely, yes.
24 Q    And the funds are managed by boards;
25 correct?

Dustin Norris

1
2  A    Correct.
3  Q    And can we refer to the boards that manage
4  the funds that served by the advisers as "the
5  retail board"?
6  A    Yes.
7  Q    Okay.  Did you participate -- are you
8  aware that in the fall of 2020 the retail board
9  conducted a review in connection with the
10 determination as to whether or not to renew
11 HCMFA's contracts?
12 A    I am aware, yes.
13 Q    Did you participate in that process?
14 A    I did, in some -- in some parts, yes.
15 Q    What parts did you participate in?
16 A    Yeah, so I attended the board meetings in
17 relation to -- we call this the 15(c) analysis.
18 And so it's Section 15(c) of the 1940 Act requires
19 the board to determine and renew the contracts on
20 an annual basis.  And so they look at a number of
21 factors.  And there's, I believe, certain case law
22 that dictates the things that they should look at:
23 Quality of services, performance, fees.
24          And so my aspect -- the biggest part
25 of my contribution is to talk about the

Dustin Norris

1
2  performance of the funds, how they performed
3  during the year.  We hire an outside third party
4  to come in and talk about performance and fees.  I
5  help provide insight, talk about -- as I oversee
6  the sales and business development of the firm, I
7  talk about inflows and outflows, which help --
8  helps impact the economies of scale funds.  We
9  have certain funds that are shrinking, some that
10 are growing.  So talking about future, talking
11 about mergers, talking about different aspects of
12 that.
13          And so my -- mine is more of the sales
14 business development function and regarding the
15 services.  One of the things that we do as the
16 adviser is we, again -- they have to determine
17 that the quality of services we're providing are
18 sufficient, and so they have to get comfortable
19 with the various functions.
20 Q    Okay.  Who else on behalf of HCMFA
21 participated in the 15(c) analysis that you've
22 just described?
23 A    Yeah, so as -- again, going back to the
24 shared services agreement, I point you to the
25 services that are provided by HCMLP.  In large

Dustin Norris

1
2  part, this process is managed and run by the HCMLP
3  employees as part of that shared services.  Legal
4  and compliance help draft the memos.  They are --
5  Q    And I'm going to interrupt you, and I
6  really apologize for doing that.  I'm not asking
7  about HCMLP.
8  A    Yeah.
9  Q    These are -- these are HCMFA's contracts;
10 correct?
11 A    They are.
12 Q    And they're the most important contracts
13 that HCMFA has; correct?
14 A    Correct.
15 Q    Okay.  So who -- which officers of HCMFA
16 are involved in the 15(c) analysis?
17 A    Yeah, one -- going back to -- to clarify
18 on your -- you know, this is the most important
19 thing, you know, that we have, it is, and as such
20 we have -- a lot of those functions, and to talk
21 about HCMFA's role, we have front-office
22 investment professionals who join those meetings
23 to talk about the funds and performance.  The
24 aspects of the adviser that we provide and source
25 is the management of the funds:  The performance,

Page 70

Dustin Norris

1    the investment selection. And then we bring in
2    HCMLP to provide the various other services. And
3    so they are a huge part of that. To say that –
4    yeah, it's not – they are legal, compliance,
5    accounting, finance, back office, settlement.
6    Those are all functions that they're providing.
7    Q    I know – I appreciate that they're
8    functions that they play under the shared services
9    agreement.
10   A    Yup.
11   Q    Let me – let me move on.
12   A    Okay. Go ahead.
13   Q    In October 2020, HCMFA informed the retail
14   board that HCMFA was obligated to pay Highland the
15   outstanding principal amount due under the notes;
16   correct?
17        MR. RUKAVINA: Objection; form.
18        THE WITNESS: Yeah, the
19        obligated – I would – sorry. Can you
20        ask the question again?
21   BY MR. MORRIS:
22   Q    Sure.
23        In October 2020, HCMFA informed the
24   retail board of the existence of the notes;
25

Page 71

Dustin Norris

1    correct?
2    A    Not that I'm aware of. If you have
3    something you could – you know, a document or
4    something that you're thinking of?
5    Q    So you participated in the 15(c) process,
6    and you have no knowledge of HCMFA informing the
7    retail board of the existence of the notes?
8    A    Of these notes? No. And I would say that
9    there was a question from the retail board posed
10   to the advisers, which we passed along to HCMLP,
11   which included Lauren Thedford as an HCMLP
12   employee and Frank Waterhouse, is: Were there any
13   liabilities to – owed to Highland?
14   Q    So let's take a look – I'm sorry. Go
15   ahead.
16   A    No, go ahead.
17   Q    I was going to say, let's take a look at
18   that.
19        MR. MORRIS: So if we could put up
20        on the screen Exhibit 59.
21        (Exhibit 59 tendered.)
22   BY MR. MORRIS:
23   Q    Have you seen this document before, sir?
24   A    I have.

Page 72

Dustin Norris

1    Q    And this is the report that the advisers
2    gave to the retail board in October 2020 as part
3    of the 15(c) analysis; correct?
4    A    Yes, working closely with HCMLP in the
5    accounting, compliance, and legal function did
6    draft this.
7    Q    Okay. And who – who on behalf of the
8    advisers authorized the sending of this memo?
9    A    I don't know that there's a formal
10   authorization. Lauren Thedford, who was the
11   secretary of the advisers and an HCMLP employee,
12   helped prepare the memo along with the rest of the
13   legal and compliance team. Thomas Surgent was
14   probably involved.
15        MR. MORRIS: Okay. I'm going to
16        move to strike.
17   BY MR. MORRIS:
18   Q    I don't want to know who was probably
19   involved. I actually asked a very specific
20   question, and if you don't know, please just say
21   you don't know.
22        Who on behalf of the advisers
23   authorized the sending of this memo to the retail
24   board?

Page 73

Dustin Norris

1    A    I don't know.
2    Q    Did anybody on behalf of the advisers ever
3    suggest that this memo was wrong or inaccurate in
4    any way to the best of your knowledge?
5    A    At that time? Is that what you mean?
6    Q    Yes.
7    A    No, not – not to my knowledge.
8    Q    Okay. When did you see this memo for the
9    first time?
10   A    I may have been copied on it at the time.
11   I don't remember if I read it, but I did review
12   it – and actually, I didn't review the whole
13   memo. I reviewed the one email that was related
14   to the note payable in this. So I don't know that
15   I read the whole memo.
16   Q    So – so –
17        MR. MORRIS: Can we see how long
18        the memo is?
19   BY MR. MORRIS:
20   Q    So it's two pages, and it's got some
21   charts; is that fair?
22   A    That's fair.
23   Q    And in October 2020, you were the
24   executive vice president of every single entity

**Appx. 00349**

Page 74

Dustin Norris

1          Dustin Norris
2    that this email is being sent to and from;
3    correct?
4    A    I'm looking at the entities.
5         I'm executive vice president of most
6    of the entities.
7    Q    Okay.  You're the executive vice president
8    of each of the entities that are sending this
9    memo; correct?
10   A    No.  Not NexPoint Securities.
11   Q    I appreciate that.  Thank you for the
12   clarification.
13        Did you review this before it was
14   sent?
15   A    I don't remember.
16   Q    Did you take any steps to make sure that
17   it was accurate?
18   A    Probably not.  And that wouldn't have been
19   my function.  We had a legal and compliance team
20   that was – through the shared services agreement
21   that prepared memos.  This is going to the board.
22   That would have all obviously gone through legal
23   and compliance.  It wouldn't have been my
24   function.
25   Q    Did anybody who served as an officer or

Page 75

Dustin Norris

1          Dustin Norris
2    employee of HCMFA have any responsibility to make
3    sure that this memo was true and accurate before
4    it was sent to the retail board?
5    A    Lauren Thedford was the secretary of the
6    advisers and the funds, and I believe this has to
7    do with – and depending on the material, I think
8    this has to do with the note, and other things.
9    So the finance team, Frank Waterhouse and his team
10   at HCMLP, would have been supplying those answers.
11   Q    Okay.  And why do you keep saying Frank
12   Waterhouse at HCMLP instead of Frank Waterhouse as
13   the treasurer of the entity that's sending this
14   memo?
15   A    Because Frank was the CFO of Highland who
16   was responsible for the accounting, finance,
17   back-office functions of these funds.  And the
18   answer – the adviser did not have that
19   information, and intentionally hired HCMLP to
20   provide that function.  And so that is how it was
21   viewed.  Those were HCMLP employees, and that was
22   under the shared services agreement.
23   Q    Is it your testimony as the HCMFA 30(b)(6)
24   witness that Frank Waterhouse did not have any
25   responsibility in his capacity as the treasurer of

Page 76

Dustin Norris

1          Dustin Norris
2    HCMFA to make sure that this report was true and
3    accurate before it was sent to the retail board?
4    A    I don't know of any function or
5    requirement of his role as treasurer of HCMFA that
6    he was responsible for reviewing 15(c) memos prior
7    to going to the board.
8    Q    And other than Lauren Thedford, you can't
9    identify any officer or employee of HCMFA who had
10   any responsibility to make sure that this report
11   was true and accurate before it was sent; is that
12   correct?
13   A    No.  And I can't – and I would, again, go
14   back to legal.  And this is a memo that is going
15   to the board and would have a legal and compliance
16   function that would have been provided services by
17   HCMLP.  And that was always the case.  Those
18   employees, for years, have provided the
19   legal/compliance support of memos of the 15(c)
20   process and the support for everything that went
21   into it.
22        MR. MORRIS:  Okay.  Move to strike.
23   BY MR. MORRIS:
24   Q    Do you know if Jim Dondero reviewed this
25   before it was sent?

Page 77

Dustin Norris

1          Dustin Norris
2    A    I don't know for sure, but I highly doubt.
3    He was never, to my knowledge, involved in
4    drafting or reviewing 15(c) memos.
5    Q    Okay.  You'll agree that this memo was
6    sent by the advisers in response to the retail
7    board's questions; correct?
8    A    Correct.
9    Q    And you'll agree –
10   A    And actually, let me – let me correct
11   that.
12        It was from the advisers.  I believe
13   that HCMLP employees sent it, getting back to –
14   it was sent by – technicality, but I believe
15   Lauren Thedford would have sent this.
16   Q    And why do you say that she sent it in her
17   capacity as an HCMLP employee rather than as the
18   secretary of the entity that's actually the author
19   of the memo?
20   A    Because that was the function that they
21   were providing as part of the shared services
22   agreement.  And I – yeah.  That was what – she's
23   part of the legal team at HCMLP, and that was the
24   service she was providing.  We didn't have a legal
25   and compliance function at HCMFA.

Page 78

Dustin Norris

1                Dustin Norris

2   Q    Okay.

3        MR. MORRIS:  Can we scroll down to

4   Question 2, please?

5   BY MR. MORRIS:

6   Q    Have you seen Question 2 before?

7   A    Yes.

8   Q    Do you have an understanding of what was

9   being requested by the retail board in Question

10   Number 2?

11   A    Yes.  They are asking for amounts

12   currently payable or due in the future to HCMLP by

13   HCMFA or NexPoint Advisors.

14   Q    And -- and did the advisers report to the

15   retail board in October 2020 that, quote,

16   "$12,286,000 remains outstanding to HCMLP from

17   HCMFA"?

18   A    It says it right there.  That's in the

19   memo.

20   Q    Okay.

21   A    And I would note that came from Frank

22   Waterhouse and his team, that information, the

23   accounting department at HCMLP.

24        MR. MORRIS:  Okay.  I move to

25   strike everything after the portion of

Page 79

Dustin Norris

1   your answer that was responsive to my

2   question.

3        MR. MORRIS:

4   BY MR. MORRIS:

5   Q    As HCMFA's 30(b)(6) witness today, have

6   you done anything to determine whether or not the

7   $12.286 million number includes the principal

8   amount of the notes?

9   A    Looking at it, we can't tell.  Because it

10   doesn't line up exactly with those notes.  There

11   were other notes that had been recorded in the

12   books for several years before.  And if you add

13   those two together, it doesn't add up.  So it's

14   not clear.

15   Q    Did you read the testimony of Mr. Klos and

16   Ms. Hendrix?  I think you said you did; right?

17   A    I did.

18   Q    Did you read the portion of their

19   testimony where they said that this number

20   includes the notes as well as certain other

21   amounts that were due and owing to certain

22   Highland affiliates?

23   A    I did -- I didn't read every single line,

24   and there were, between the two of them -- I don't

25   know -- 600 pages.  So if it's in there and you

Page 80

Dustin Norris

1   can point to it, then I can take your

2   representation.  But I don't remember that.

3   Q    All right.  So did anybody acting on

4   behalf of HCMFA -- withdrawn.

5        Did any officer of -- or employee of

6   HCMFA do anything to make sure the information in

7   this response was true and accurate before it was

8   sent to the retail board?

9   A    We received it from the individuals

10   responsible.  And there was no -- you know, there

11   was no reason to doubt that it was incorrect.

12   Right?  These were professionals.  We were relying

13   on them.  This is Frank Waterhouse, Dave Klos,

14   Kristen.  We anticipated this would be accurate.

15   Q    Okay.  You anticipated it.  But it's your

16   testimony that no officer or employee of HCMFA did

17   anything independently to make sure that it was

18   accurate; that they completely and 100 percent

19   just deferred and relied on somebody else under a

20   contract?

21   A    Frank Waterhouse was the treasurer.  You

22   said any -- any officer.  He was -- in his role,

23   he provided this information.  And I don't know

24   his extent of how he looked into it, but if you

Page 81

Dustin Norris

1   look at the email chain, it didn't look too

2   extensive.  And if you even look at this, he's

3   saying that the earliest the note between HCMLP

4   and HCMFA can come due is May 21st.  He himself

5   seems to be confused here, because as we found out

6   through discovery and in the testimony of what has

7   come out, there was an agreement -- that was a

8   separate agreement.  That wasn't related to the

9   notes at issue in this case.

10        And so I don't know the extent that

11   was gone into this, but it -- it -- there's

12   confusion even in the response.

13        MR. MORRIS:  Okay.  I move to

14   strike.

15   BY MR. MORRIS:

16   Q    Again, I was just asking about the

17   identity of anybody who was charged with the

18   responsibility of making sure that this was true

19   and accurate.

20        Is there any officer or employee of

21   HCMFA who was charged with the responsibility of

22   making sure this response was true and accurate?

23   A    Yeah.  It was sent to -- the request went

24   to Frank Waterhouse because he and his team would

Page 82

Dustin Norris

1    have this information.  That's -- that's where we
2    would get this information.
3
4    Q    Okay.  Thank you.
5         MR. RUKAVINA:  Hey, John, let me
6    just interject for a little.  Let's go off
7    the record for just a minute.
8         (Discussion off the record.)
9    BY MR. MORRIS:
10   Q    Do you know, as HCMFA's 30(b)(6)
11   representative, whether the $12.286 million
12   includes the $7.5 million -- withdrawn.
13        Do you know if the 12. -- withdrawn.
14        As HCMFA's 30(b)(6) witness, do you
15   know whether the $12.286 million referenced in
16   Response Number 2 includes the $7.4 million in
17   principal amount on the notes?
18   A    I don't.
19   Q    Okay.  Did you do anything to try to
20   answer that question before appearing for today's
21   deposition?
22   A    Yeah.  We discussed this with counsel.  We
23   don't have underlying backup.  We couldn't talk to
24   Frank Waterhouse on this in preparation, but the
25   numbers just don't match up to principal amounts

Page 83

Dustin Norris

1    and what is owing.  We don't have information on
2    the other notes.  So discussed it with counsel,
3    but I -- we don't have any backup to support or --
4    Q    Did you make -- did you make any attempt
5    to speak with Ms. Thedford?
6    A    No, I didn't.  And she wouldn't have that
7    information.  She's an attorney and was involved
8    in the legal field, and she's no longer employed
9    there or at Skyview.
10        MR. MORRIS:  I move to strike.
11   BY MR. MORRIS:
12   Q    Okay.  And so you don't know what the
13   component parts of this $12.286 million number
14   are; correct?
15   A    I don't.
16   Q    Okay.  Do you see the last sentence of
17   this response that says, quote:  "The adviser
18   notes that both entities have the full faith and
19   support of Jim Dondero," close quote?
20   A    I do.
21   Q    Do you know what that means?
22   A    Other than what Frank Waterhouse
23   testified -- and I, again, refer you to his
24   deposition -- that -- I believe that wording came

Page 84

Dustin Norris

1    from him, and he emailed that.  So I would refer
2    you to his testimony.
3    Q    Well, as the 30(b)(6) witness, you were
4    asked to be prepared about communications to the
5    retail board; correct?
6    A    Yes.
7    Q    Okay.  Did you do anything to try to
8    figure out what that sentence meant -- that
9    sentence meant, other than reading Frank
10   Waterhouse's deposition transcript?
11   A    Knowing that it came from Frank, and Frank
12   elaborated, I didn't do any additional research.
13   Q    Did you ask Mr. Dondero if he was aware
14   that that statement was included in the report to
15   the retail board?
16   A    I did not.
17   Q    Do you know why this statement was
18   included in the report to the retail board?
19   A    I could speculate, but I don't know
20   specifically.
21   Q    Do you know if Mr. Dondero authorized the
22   advisers to inform the retail board, in October
23   of 2020, that the advisers had the full faith and
24   support of Mr. Dondero?

Page 85

Dustin Norris

1    A    I'm not aware, and if you look at Frank's
2    testimony, I believe he testified that he -- he
3    didn't have that authority either, but I'm not
4    sure.  I would refer you to his -- I don't have
5    any other knowledge.
6    Q    Okay.  So it's HCMFA's position that the
7    statement in the last sentence of Response
8    Number 2 was unauthorized.  Do I have that
9    correctly?
10   A    I don't know that we're taking that
11   position either way.  It wasn't something
12   that -- that we're -- was -- even part of the -- our
13   arguments.
14   Q    I'm not asking if it's part of your
15   arguments.  I'm just asking you, as a factual
16   matter, does HCMFA contend that that sentence was
17   included without authorization?
18   A    I don't have the knowledge of that.
19   That's -- I'm not going to contend that.
20   Q    Okay.
21   A    It may have been.  I don't know.
22   Q    Okay.  So this letter was sent over a year
23   ago.  Do I have that right?
24   A    What's the date on it?

Dustin Norris

1
2     MR. MORRIS:  If we can go back to
3  the top.
4     THE WITNESS:  Yup.
5  BY MR. MORRIS:
6  Q    Okay.  Has – have the advisers ever told
7  the retail board that the response to Question
8  Number 2 was inaccurate in any way?
9  A    Specifically saying, "Hey, let me tell you
10  this memo, Question 2, let me go back, it was
11  inaccurate," no, that was never a specific
12  disclosure of the retail board.
13        However, the retail board is aware of
14  all of the facts and circumstances surrounding the
15  notes, and so they're aware of our position.
16  They're aware of – they've been demanded.
17  There's been a lawsuit involved on both notes.
18        And – and – but, no, this specific
19  Number 2 is incorrect, no.  But they're aware of
20  our position and what we found out since then.
21  Q    Okay.  Earlier in 2020, before this memo
22  was sent to the retail board, HCMFA had provided
23  to the retail board its financial statements for
24  the period ending June 30, 2020; correct?
25  A    I believe that's typical in our August

Dustin Norris

1
2  meeting as part of the 15(c) process, but – I
3  don't know if you have that in hand, but I believe
4  that was supplied.  I'm not certain.  Sometimes it
5  was 12/31 balance sheets, sometimes it was a
6  June 30th balance sheet.
7  Q    Okay.  Can we – are you aware – have you
8  seen an email exchange that preceded the – the
9  finalization of this memo to the retail board?
10  A    I believe it was part of your exhibits.
11  Q    All right.
12        MR. MORRIS:  So let's put that up
13  on the screen, Exhibit 36.
14        (Exhibit 36 tendered.)
15  BY MR. MORRIS:
16  Q    So is this the document that you've seen
17  before?
18  A    Yes.
19  Q    Okay.
20        MR. MORRIS:  And can we start at
21  the bottom of the document?
22  BY MR. MORRIS:
23  Q    Okay.  And do you know who Stacy from
24  Blank Rome is?
25  A    I do.

Dustin Norris

1
2  Q    And who is that?
3  A    She is independent counsel for the retail
4  board, the independent directors.
5  Q    And did she provide to the people on this
6  email string certain questions that the retail
7  board had in connection with its annual 15(c)
8  review?
9  A    Yes.  These were follow-up requests.  So
10  they have a memo that she provides early on with
11  an extensive list of questions, and these were the
12  follow-up questions from the board.
13  Q    Okay.  And so it was sent to you,
14  actually; correct?
15  A    To me and Lauren.
16        MR. MORRIS:  Can we scroll up a
17  little bit, please?  Keep going.
18  BY MR. MORRIS:
19  Q    And then Lauren forwards it to certain
20  people, including you; correct?
21  A    She forwards it to Thomas and copies me.
22  Q    Uh-huh.  And – and she includes the
23  questions that are being asked by the retail
24  board; correct?
25  A    I don't know if – I don't know if that's

Dustin Norris

1
2  all of them.  I don't know if you have the memo.
3  If you represent that is all the questions,
4  then –
5  Q    Yeah.
6  A    – then I'll take that representation,
7  but –
8  Q    And – and Question Number 2 is the same
9  Question Number 2 that we just looked at in the
10  report that was given to the retail board;
11  correct?
12  A    I don't know if it's exact, but – I don't
13  know if you want to pull that up.
14  Q    Don't you have a copy of it with you right
15  there?
16  A    I don't know if I have a copy of that.
17  Oh, I have the exhibits.  What exhibit was that?
18  I have it in PDF.
19  Q    Yeah, that's – that was 59.
20  A    I'm scrolling.  There are 650 pages here.
21        Sorry.  Which exhibit again?
22  Q    You know, let's just move on.
23        Is it fair to say that Ms. Thedford
24  forwarded to Mr. Surgent, you, and others,
25  questions that had been presented by Stacy, the

Dustin Norris

1           Dustin Norris
2   retail board's outside counsel?
3   A      Just one correction there.  She forwarded
4   it to Mr. Surgent and copied me.
5   Q      Fair enough.
6   A      I'm not on the "To" line.  That would
7   be –
8           MR. MORRIS:  Let's scroll down,
9   please.  Let's scroll.
10  BY MR. MORRIS:
11  Q      And then – and then she forwards it
12  further to Mr. Waterhouse, Mr. Klos, and
13  Ms. Hendrix.
14          Do you see that?
15  A      I do.
16  Q      And you're still copied on it; correct?
17  A      I am.
18  Q      And do you see that she's asking Frank,
19  Mr. Klos, and Kristin to respond to Question
20  Number 2 that concerns material outstanding
21  amounts currently payable or due in the future to
22  Highland or its affiliates by either of the
23  advisers?
24  A      Yes, it – HCMLP will take that as a typo.
25  But yes.  And that would be standard.  Lauren

Dustin Norris

1           Dustin Norris
2   would go to them as the source for that
3   information.
4           Okay.
5           MR. MORRIS:  And let's scroll up
6   and see the response.
7   BY MR. MORRIS:
8   Q      And do you see Mr. Waterhouse responded
9   with one word:  "Yes"?
10  A      Yes, I see that.
11  Q      And then Ms. Thedford asked if
12  Mr. Waterhouse could provide the amounts.
13          Do you see that?
14  A      I do.
15  Q      And you're still copied on this email
16  chain; correct?
17  A      I am.
18  Q      So –
19  A      Which, again, is not unusual to copy me on
20  some things I wish they wouldn't.  But I was
21  copied on board items fairly regularly.
22          MR. MORRIS:  Okay.  I move to
23  strike.
24  BY MR. MORRIS:
25  Q      I appreciate your wishes, but the question

Dustin Norris

1           Dustin Norris
2   was simply whether or not, you know, you would
3   acknowledge that you were copied on this email.
4   A      Yup, that's my email.
5   Q      Okay.  And let's see what the next
6   response is.
7           And do you see Mr. Waterhouse
8   responds – can you read Mr. Waterhouse's
9   response?
10  A      I can.  He said:  "It's on the balance
11  sheet that was provided the board as part of the
12  15(c) materials."
13  Q      Okay.  So everybody to whom Mr. Waterhouse
14  has sent – withdrawn.
15          So you don't dispute, as HCMFA's
16  30(b)(6) witness, that Mr. Waterhouse informed all
17  of the recipients of his email on Tuesday,
18  October 6th, 2020, at 6:05 p.m. that the answer to
19  the retail board's Question Number 2 could be
20  found in HCMFA's balance sheet; correct?
21  A      Correct.
22  Q      Okay.  Let's go –
23  A      Actually, can you go back down to the
24  answer – the exact question?
25  Q      Of course.

Dustin Norris

1           Dustin Norris
2           Okay.
3   A      "Are there material outstanding amounts
4   currently payable or due to the future by HCMLP to
5   HCMFA" – yeah – "or any other affiliate?"
6           Okay.
7   Q      Having read that, does that change your
8   answer at all?
9   A      And so – go back to your original
10  question on whether his –
11  Q      Right.  So Mr. –
12          MR. MORRIS:  Can we scroll back up
13  to Mr. Waterhouse's response?
14  BY MR. MORRIS:
15  Q      Thank you for your patience, Mr. Norris.
16  A      Uh-huh.
17  Q      You'll see that Mr. Waterhouse responds at
18  6:05 p.m. on October 6th, and my question is a
19  simple one:  Does HCMFA dispute that in
20  Mr. Waterhouse's email that he is telling the
21  recipients that the answer to the retail board's
22  Question Number 2 can be found in HCMFA's balance
23  sheet?
24  A      I would say the answer – his – his
25  response is the answer to the retail board not

Page 94

Dustin Norris

1 completely accurate, because there was – there's
2 not enough there to be responsive. I think what
3 he's saying here is to Lauren, "Hey, it's on the
4 balance sheet. Can you look at it and figure it
5 out?"
6
7        And I – I think they go back and
8 forth, "Well, can you give us more information?"
9 And so it's – this is not responsive to the
10 question and isn't what was provided to the board,
11 but that's –
12   Q    Well, let – let's see what Ms. Thedford
13 does. Ms. Thedford's the lawyer; right?
14   A    She is.
15   Q    Yeah. But she's also the secretary of
16 HCMFA; correct?
17   A    At this time, I believe so, yes.
18   Q    And you wouldn't dispute that she is
19 taking the lead on formulating the advisers'
20 response to the retail board; correct?
21   A    I would not dispute that.
22   Q    Okay. And do you see that she reports to
23 you and everybody else in her email that she has
24 taken information from the 6/30 financials?
25   A    Yes, I see the below from the 6/30

Page 95

Dustin Norris

1 financials. And, again, to correct to me, I'm
2 CC'd. It's a nuance, but she's representing to
3 Frank and Dave and Kristin and a CC to me.
4   Q    Okay. Does HCMFA acknowledge that the
5 information contained in the October 23rd, 2020,
6 report to the retail board with respect to
7 Question Number 2 was derived from HCMFA's
8 June 30th, 2020, financials?
9   A    Sorry. One more time?
10   Q    Will you agree, as HCMFA's 30(b)(6)
11 witness, that the information provided to the
12 retail board in October 2020 in response to
13 Question Number 2 was taken directly from HCMFA's
14 financial statements for the period ending
15 June 30th, 2020?
16   A    Yeah. The unaudited financials, yes.
17   Q    Okay. And so – so as HCMFA's 30(b)(6)
18 witness, you will agree the $12,286,000
19 figure that was included in the former response to
20 the retail board was obtained from HCMFA's
21 unaudited financial statements for the period
22 ending June 30th, 2020; correct?
23   A    It appears that way.
24
25        And I – I think – and, again, we're

Page 96

Dustin Norris

1 looking at a draft answer here. I don't have the
2 final answer. But it looks as work product that
3 she's pulling numbers from the unaudited balance
4 sheet and plugging them in here.
5   Q    Okay. And we can look at the final if you
6 want, but that $12,286,000 number that was due to
7 HCMLP as of June 30th 2020, that's the exact
8 figure that was given to the retail board in the
9 final report; correct?
10   A    "Final report," meaning the final memo –
11 final memos?
12   Q    Yes.
13   A    Yes. Yes, I believe so.
14   Q    Okay.
15        MR. MORRIS: Can you scroll back up
16     to the last email?
17 BY MR. MORRIS:
18   Q    So this is Mr. Waterhouse's response to
19 Ms. Thedford. And, again, Mr. Waterhouse is
20 Highland's CFO and the advisers' treasurer;
21 correct?
22   A    Correct.
23   Q    And at this time, Ms. Thedford is an
24 attorney at Highland, but she also serves as the

Page 97

Dustin Norris

1 secretary for the advisers; correct?
2   A    That's correct.
3   Q    And you are the executive vice president
4 for the advisers; correct?
5   A    As of this date, yes.
6   Q    And you had no position with Highland;
7 correct?
8   A    At this time?
9   Q    Correct.
10   A    No position with Highland, no.
11   Q    Okay. How about Mr. Post? Had he
12 transitioned from Highland to the advisers as of
13 October 6th?
14   A    I don't believe so.
15   Q    Okay. It happened in October, though;
16 right?
17   A    I – I don't know.
18   Q    Okay.
19   A    Late October/November. It was late in the
20 year.
21   Q    Okay. And do you know if anybody ever
22 told Mr. Waterhouse in October 2020 that there was
23 any aspect of his email that was incorrect?
24   A    Not at that time, no, that I'm – not that

**Appx. 00355**

Page 98

```
                 Dustin Norris
1
2   I'm aware of.
3   Q     Okay.
4   A     And -- and would we have reason to doubt
5   him?  This -- he was the source of the
6   information.
7   Q     Okay.  And do you see that the last
8   sentence of his email actually refers to the last
9   sentence of Response Number 2 that was given to
10  the retail board later in October 2020?
11  A     I do.
12  Q     Did you ever ask Mr. Waterhouse anything
13  about that last sentence?
14  A     I don't believe so.
15  Q     Do you see that he says, quote:  "The
16  response should include, as I covered in the board
17  meeting, that both entities have the full faith
18  and backing from Jim Dondero, and to my knowledge
19  that hasn't changed"?
20        Do you see that?
21  A     I do.
22  Q     Do you know what board meeting he's
23  referring to?
24  A     "The response should include, as I covered
25  in the board meeting, that both entities have a
```

Page 99

```
                 Dustin Norris
1
2   full faith and backing."
3        So I don't know the exact board
4   meeting.  However, we do have an August board
5   meeting related to 15(c).  There's typically an
6   in-person or telephonic meeting in August, and
7   then there's a September board meeting that is
8   devoted almost exclusively to the 15(c) process.
9        And after that, there is follow-up
10  meetings -- multiple sometimes, particularly in
11  2020 during the bankruptcy proceedings that --
12  where the board was getting comfortable.  So it
13  would have been one of those meetings, but I don't
14  know which one.
15  Q     And -- and did you personally participate
16  in a board meeting where Mr. Waterhouse covered
17  the topic of the advisers having the full faith
18  and backing from Mr. Dondero?
19  A     I -- I probably would have been in most or
20  all of those board meetings, but I don't remember
21  that specifically.
22  Q     Okay.  Do you know -- do you know whether
23  anybody who's copied on this email ever questioned
24  any aspect of the last sentence of
25  Mr. Waterhouse's email at any time prior to the
```

Page 100

```
                 Dustin Norris
1
2   sending of the final memo on October 23rd?
3   A     Not that I'm aware of.
4   Q     You didn't; isn't that right?
5   A     I don't know that I read it, but I didn't
6   question it.  If I -- I either didn't read it or I
7   didn't question it.
8   Q     Okay.  So you have no recollection of ever
9   asking Mr. Waterhouse what he meant by the last
10  sentence of this email; correct?
11  A     No, I have no recollection.
12  Q     And you have no recollection of any
13  recipient of this email asking Mr. Waterhouse what
14  he meant by that last sentence; correct?
15  A     I don't remember.
16  Q     And you never told Mr. Waterhouse that you
17  had no knowledge of him having covered this issue
18  before the board?
19  A     You're wondering if I ever told him I had
20  no knowledge?
21  Q     Yeah.
22  A     No, I never talked to him about that.
23  Q     And to the best of your knowledge, no
24  recipient of this email ever challenged
25  Mr. Waterhouse's statement in this last sentence;
```

Page 101

```
                 Dustin Norris
1
2   correct?
3   A     I don't know what the conversations were
4   had between the others, but I have no knowledge of
5   that.
6   Q     Okay.
7   A     And -- and you've got -- sorry.  Go ahead.
8   Q     This email string is -- is an email string
9   devoted for the sole purpose of addressing
10  questions posed by the retail board in connection
11  with the 15(c) review; correct?
12  A     I believe so.
13  Q     Okay.  Have you ever seen HCMFA's
14  unaudited financial statements for June 30th,
15  2020?
16  A     Yes.
17  Q     And do you know if those audited --
18  unaudited financial statements included the
19  amounts due and payable under the notes?
20  A     I -- I think that -- I -- I don't
21  remember, but I think our position is it's
22  unclear, because the amounts don't agree to
23  the -- again, we have prior notes, we have these
24  notes.  The amounts don't line up.
25        So it's -- it's -- the underlying
```

**Appx. 00356**

Dustin Norris

1    backing is not provided.  There's no footnotes.
2    It's just a number that says due to HCMLP.
3    Q    Do you know -- do you know -- do you have
4    any recollection as to the totality of HCMFA's
5    liabilities as of June 30th, 2020?
6    A    Including this note?  Or just this note?
7    Q    All -- all liabilities.  What's the bottom
8    of the balance sheet?
9    A    I don't know.  Do you have it?  Do you
10   want to pull it up?
11   Q    I don't.
12   A    Yeah, I don't remember.
13       MR. RUKAVINA:  Hey, John, it's
14   approaching 12:15.  Just whenever, you
15   know --
16       MR. MORRIS:  Yeah.  You know what?
17   I was just about to change topics, so this
18   is a good time.
19       MR. RUKAVINA:  Okay.
20       MR. MORRIS:  Why don't we stop
21   here, and we'll come back at the top of
22   the hour.
23       MR. RUKAVINA:  Excellent.  Thank
24   you.

Dustin Norris

1    (Recess from 12:11 p.m. to 1:06 p.m. CST)
2    BY MR. MORRIS:
3    Q    Mr. Norris, Topic Number 9 relates to
4    consent fees.
5        Do you understand that?
6    A    I do.
7    Q    Do you have an understanding of what a
8    "consent fee" is?
9    A    I do.
10   Q    Did you do anything to prepare for this
11   particular topic?
12   A    I did.
13   Q    What did you do to prepare for this topic?
14   A    I discussed the consent fee with
15   Mr. Dondero, with Mr. Rukavina, and with
16   Mr. Sauter.
17   Q    Okay.  Mr. Sauter has no personal
18   knowledge of any consent fee that was paid in the
19   spring of 2019; correct?
20   A    No.
21   Q    Okay.  What's your understanding of what a
22   "consent fee" is?
23   A    Generally or the specific consent fee
24   in -- that --

Dustin Norris

1    Q    Let's start generally.
2    A    Yeah.  So a "consent fee" is a fee paid to
3    a -- paid to someone who's agreeing to amend terms
4    or change the structure of the -- of a document or
5    a loan.  In -- in bank loan world, or loan world,
6    if you are going to amend or extend or change the
7    terms, typically there was a consent fee paid to
8    those willing to consent.
9        Those that have voted or consented
10   receive a fee.
11   Q    Okay.  And did HCMFA pay any consent fees
12   in or around April or May 2019?
13   A    It began to pay consent fees in May
14   of 2019, I believe.
15   Q    Okay.  Are you looking at something as you
16   prepare your answer?
17   A    Yeah.  I'm looking at Topic Number 9 that
18   says consent fee in April or May 2019.
19   Q    Okay.  Thank you so much.
20       And -- and I think you testified that
21   they began paying consent fees at around that
22   time?
23   A    That's right.
24   Q    What do you mean by that?

Dustin Norris

1    A    Yeah.  So the consent fee was related to
2    the global allocation fund that converted from an
3    open-end fund to a closed-end fund, and there was
4    a 3 percent fee that would be paid to investors
5    that, one, consented to the conversion from an
6    open-end fund to a closed-end fund, but also held
7    their investment through the conversion.
8        The conversion was finalized in
9    February of 2019, and the consent fee was an
10   operational challenge because you had to determine
11   who the investors were that voted yes and that
12   held on to the conversion.
13       So with that, the -- the amounts that
14   were paid, there was an operational challenge to
15   determine who -- who needed to be paid, and so
16   they were deposited and then paid out over a
17   couple-month period.
18   Q    And who made the decision to pay the
19   consent fee?
20   A    So the consent fee was a collaborative
21   decision of senior management.  Jim Dondero and
22   myself were involved in the decision, the
23   discussion to -- and it was a novel idea in terms
24   of converting from an open-end fund to a

Page 106

Dustin Norris

2  closed-end fund, and it was submitted to
3  investors. It went through SEC review as a proxy
4  statement, and it went out to shareholders who
5  needed to vote for the proposal.
6  Q    And who paid the consent fee? HCMFA?
7  A    My understanding is HCMFA as the adviser
8  of the global allocation fund paid the consent fee
9  to investors.
10  Q    And whose idea was it to seek consent to
11  change from an open fund to a closed-end fund?
12  A    I – I would say it was collaborative of
13  senior management. Jim Dondero, myself, legal
14  compliance was involved. It was, you know, Mark
15  Okada, who was a partner at the time. There was a
16  lot of discussion involved.
17  Q    And when the decision was made to seek
18  consent to change from an open-end fund to a
19  closed-end fund, did HCMFA understand that there
20  would be costs, fees, and expenses associated with
21  that decision?
22  A    Being cost fees as in the consent fee?
23  Q    Correct.
24  A    Yes.
25  Q    And did it undertake any analysis to

Page 107

Dustin Norris

2  determine what the likely total fee would be?
3  A    Yeah. I'm sure they did.
4  Q    Do you know what the total fee
5  paid – what the total consent fee paid was?
6  A    I don't have the exact amount, but it was
7  over $5 million.
8  Q    Okay. And over what period of time were
9  the consent fees paid?
10  A    I know they were paid in May and June, and
11  there may be a portion that were paid thereafter,
12  but at least May and June of 2019. There were
13  certain broker-dealers that reported later, and
14  when those were reported and verified, they were
15  paid out. I don't remember the final date of the
16  last distribution.
17  Q    Okay. And forgive me. It's not my
18  business. But were the consent fees paid to the
19  fund's shareholders?
20  A    They were paid to the shareholders.
21  That's correct.
22  Q    Okay.
23  A    That's consented. The shareholders had to
24  vote, and they had to be a shareholder on
25  conversion date.

Page 108

Dustin Norris

2  Q    Okay. And the decision to seek and obtain
3  consent, was that a voluntary decision by HCMFA?
4  A    To seek consent to move to a closed-end
5  fund?
6  Q    Yes. That's not something that any
7  regulator required, was it?
8  A    No.
9  Q    It's not something that any rule or
10  anybody mandated; correct?
11  A    Not that I believe.
12  Q    Okay. How did HCMFA fund the payment of
13  the total consent fee of over $5 million?
14  A    Yeah, from cash that it had on the balance
15  sheet.
16  Q    And where did it get the cash that was on
17  the balance sheet?
18  A    The cash came from the transaction that we
19  discussed earlier – and you showed the capital
20  coming in from Highland – which was compensation
21  for the NAV error.
22  Q    So it used the money that it received in
23  the transfers that we talked about to pay the
24  consent fee. Do I have that right? Or at least
25  some of it?

Page 109

Dustin Norris

2  A    Yes.
3  Q    And, in fact, it used approximately
4  $5 million of the moneys paid in May 2019 to pay
5  the consent fee of approximately $5 million; is
6  that fair?
7  A    At least $5 million.
8  Q    Okay. Do you know the exact number?
9  Of the consent fee?
10  Q    Withdrawn.
11       Do you have a better or more precise
12  estimate of the total consent fee other than
13  $5 million?
14  A    It was over $5 million. I don't remember
15  the exact amount, whether it was 5.6 or 5.2 –
16  Q    All right.
17  A    – because it was paid over time.
18  Q    Let's talk about the TerreStar valuation
19  issue for a few minutes, if we can.
20  A    Okay.
21  Q    Just generally, in 2018/2019, HCMFA spent
22  a fair amount of time addressing the consequences
23  of a valuation error concerning TerreStar. Do I
24  have that right?
25  A    There was a lot in there, but there was,

Page 110

Dustin Norris

1
2 during that time, a lot of discussions with
3 TerreStar over the concerns of a valuation error
4 in 2018 and '19.
5 Q    And did it ultimately turn out that there
6 was a valuation error involving TerreStar?
7 A    There was.
8 Q    Okay.  And had HCMFA retained Houlihan
9 Lokey in connection with doing the TerreStar
10 valuation?
11 A    Houlihan Lokey was involved in the
12 valuation, yes.
13 Q    And who retained Houlihan Lokey?
14 A    I don't know.
15 Q    As you sit here right now, you can't tell
16 me who retained Houlihan Lokey?
17 A    I don't know if it was HCMLP or HCMFA
18 or -- I don't know.
19 Q    Okay.  Are you familiar with the firm
20 Houlihan Lokey?
21 A    I am.
22 Q    And do you know what services they
23 provided in connection with the TerreStar
24 valuation?
25 A    I do.

Page 111

Dustin Norris

1
2 Q    Can you describe for me the services that
3 were provided by Houlihan Lokey in connection with
4 the TerreStar --
5 A    And I would say I do generally.  I was not
6 involved in the individual details.  That was all
7 the HCMLP employees.
8        So all of the Highland employees that
9 were involved in the shared services agreement,
10 the valuation committee, valuation services were
11 the responsibility of HCMLP.  Key inputs were
12 provided by HCMLP.  Key estimates and
13 interpretations to Houlihan, and they used their
14 models to calculate a valuation that was then
15 approved by the valuation committee at HCMLP.
16        And so that's my general understanding
17 of the valuation process.
18 Q    Do you know how much Houlihan Lokey was
19 paid for its work?
20 A    I don't.
21 Q    Do you know if there's an engagement
22 letter pursuant to which Houlihan Lokey provided
23 these services?
24 A    I'm not aware.
25 Q    Would you dispute that HCMFA is the entity

Page 112

Dustin Norris

1
2 that retained Houlihan Lokey?
3 A    I don't know.
4 Q    Would you agree that Houlihan Lokey is
5 fairly described as an independent third-party
6 valuation consultant?
7 A    Yes, generally.
8 Q    Okay.  And do you know when Houlihan Lokey
9 was retained?
10 A    I don't.
11 Q    Houlihan Lokey's retention was approved by
12 the retail board, wasn't it?
13 A    I'm not sure.
14 Q    Have you ever seen any of the work product
15 of Houlihan Lokey in connection with the TerreStar
16 valuation?
17 A    Yeah.  I remember seeing the valuation
18 model.
19 Q    So Houlihan Lokey did prepare the
20 valuation model that is the subject of the
21 TerreStar valuation issue; is that fair?
22 A    Working very closely with the HCMLP
23 employees with the inputs, yes.
24 Q    Did HCMFA rely on the Houlihan Lokey
25 valuation model?

Page 113

Dustin Norris

1
2 A    I'm not sure.
3 Q    Does HCMFA contend that Houlihan Lokey
4 made any mistakes in connection with its valuation
5 services?
6 A    I'm not sure.
7 Q    Does HCMFA have a position as to whether
8 or not Houlihan Lokey made any mistakes in any of
9 the services that it performed in connection with
10 the TerreStar valuation?
11 A    I think they don't have details and would
12 retain their rights to understand what their role
13 and -- sorry.  What was the original question?
14 Q    Just whether HCMFA has a position as to
15 whether or not Houlihan Lokey made any mistakes in
16 the work that it did in connection with the
17 TerreStar valuation?
18 A    Yeah.  I think they're retaining their
19 rights to understand that better.
20 Q    Is there any agreement with Houlihan Lokey
21 that would give HCMFA the time to do that?  Is
22 there a tolling agreement or anything like that?
23 A    Not that I'm aware of.
24 Q    Is HCMFA undertaking any analysis to
25 determine whether or not Houlihan Lokey made any

Page 114

Dustin Norris

1  mistakes in connection with the work that it did
2  on the TerreStar valuation?
3  A    Sorry.  One more time.
4  Q    Is HCMFA undertaking any analysis or
5  investigation to try to determine whether Houlihan
6  Lokey made any mistakes?
7  A    There are -- I don't know.  I don't know.
8  Q    You have no knowledge, as you sit here
9  today, as to whether HCMFA is undertaking any
10  analysis or investigation to try to determine
11  whether Houlihan Lokey did anything wrong in
12  connection with its valuation services; correct?
13  A    And I wasn't prepared -- I don't think
14  this is one of the topics -- you know, Houlihan
15  Lokey's, you know, involvement, and so I wasn't
16  prepared to answer that one.
17  Q    Okay.  Well, the defense -- HCMFA's
18  defense is that Highland is responsible for the
19  TerreStar valuation issue; correct?
20  A    Yes.
21  Q    And there's no question that Houlihan
22  Lokey provided services in connection with that
23  valuation; correct?
24  A    Correct.

Page 115

Dustin Norris

1  Q    But HCMFA has not undertaken any analysis
2  or investigation, to the best of your knowledge,
3  to try to determine if Houlihan Lokey was the
4  responsible party; fair?
5  A    We don't know if there is a contract or
6  not.  At this point, we're talking about the
7  defense of Highland's responsibility.  There's no
8  question they were responsible for the valuations.
9  They were outsource provider of the valuation
10  committee.  Every individual working and
11  coordinating with Houlihan Lokey was an HCMFA
12  employee.  All the data and information that was
13  provided to them came from HCMLP.  There's no
14  question that Highland was responsible for the NAV
15  error.  No one ever questioned that.  That was
16  always known.  It was all the employees that were
17  involved.
18  MR. RUKAVINA:  John, I'll just
19  reiterate that we did not understand your
20  topics to include Houlihan Lokey.  If you
21  need more information about that or if we
22  need to have a supplemental deposition,
23  that's fine.  But this is just not
24  something that we reasonably anticipated

Page 116

Dustin Norris

1  you asking about.
2  MR. MORRIS:  I think it's -- I
3  think I have the answer that I need and
4  that the executive vice president and
5  30(b)(6) witness has no knowledge of any
6  investigation or analysis that has been
7  undertaken by HCMFA to try to even
8  determine whether Houlihan Lokey is at
9  fault.
10  BY MR. MORRIS:
11  Q    Do I have that right, Mr. Norris?
12  MR. RUKAVINA:  Well, I will just
13  object that that was not your prior
14  question.
15  MR. MORRIS:  All right.  Well,
16  that's my question now.
17  BY MR. MORRIS:
18  Q    Is that correct, Mr. Norris?
19  A    I know there's been discussion with
20  counsel.
21  MR. RUKAVINA:  Well, I will
22  represent to you that we have looked for a
23  Houlihan Lokey contract and have not been
24  able to find one.  Otherwise, we would

Page 117

Dustin Norris

1  have produced it to you.  So if you have
2  anything like that, we'd love to see it.
3  We do not even know whether we had a
4  contract with Houlihan Lokey or not.  So
5  we'll try to find you information, John.
6  We just -- we just don't have it.
7  MR. MORRIS:  We'll get to that in a
8  moment.
9  BY MR. MORRIS:
10  Q    Has HCMFA -- withdrawn.
11  Has HCMFA ever told Houlihan Lokey
12  that it believed it made any mistake or error of
13  any kind in connection with its work on the
14  TerreStar valuation?
15  A    Again, I -- this is not a topic that we
16  reviewed, so I don't know.
17  Q    Okay.  You're not aware of anything today;
18  correct?
19  A    Again, the employees working with Houlihan
20  Lokey were the HCMLP employees.  So I don't know
21  if the debtor employees have that conversation,
22  but --
23  MR. MORRIS:  Yeah, I'm going to
24  move to strike.

**Appx. 00360**

Page 118

1            Dustin Norris
2  BY MR. MORRIS:
3  Q     And I'm asking about HCMFA.
4            Did -- has HCMFA ever informed
5  Houlihan Lokey that HCMFA believes that Houlihan
6  Lokey made a mistake or error in the work that it
7  did?
8  A     There were ongoing discussions extensively
9  throughout this with Houlihan Lokey and the debtor
10 employees regarding the error and what the causes
11 were.  It was extensive discussions.
12           MR. MORRIS:  Okay.  Move to strike.
13 BY MR. MORRIS:
14 Q     Has HCMFA ever told Houlihan Lokey that
15 HCMFA believes that Houlihan Lokey made a mistake
16 or an error in connection with its valuation
17 services?
18 A     It may have, but I'm not aware.
19 Q     Thank you.
20           Are you familiar with the report that
21 HCMFA prepared and sent to the Global Allocation
22 Fund concerning the TerreStar valuation issues?
23 A     They sent to the fund?
24 Q     Uh-huh.
25 A     What do you mean "they sent to the fund"?

Page 119

1            Dustin Norris
2  Q     They sent to the board of the fund?
3  A     Oh, the board of the fund.
4            There were a number of memos and
5  presentations.  If you have one you want to pull
6  up, you can -- we can refer to it.
7  Q     Sure.
8            MR. MORRIS:  Let's put up what
9  we've marked as Exhibit 182.
10           (Exhibit 182 tendered.)
11 BY MR. MORRIS:
12 Q     And while we're doing that, have you ever
13 seen a single document anywhere at any time in
14 which any representative of HCMFA took Highland to
15 task for the work that it did in connection with
16 the TerreStar valuation?
17 A     "Took them to task"?  Define "take them to
18 task."
19 Q     Told them that they were the source and
20 cause of the NAV error.
21 A     The irony of all of the reporting to the
22 board, all of the valuation knowledge was from
23 HCMLP's employees.  We -- we outsourced that to
24 them.  There was -- there was no question that
25 they were at fault, and that's -- every employee

Page 120

1            Dustin Norris
2  involved was an HCMLP employee.
3            MR. MORRIS:  I move to strike.
4  BY MR. MORRIS:
5  Q     And I'm going to ask you, sir, to listen
6  carefully to my question.
7            Have you ever seen a document that
8  HCMFA sent to Highland in which HCMFA accused
9  Highland of being the cause of the NAV error?
10 A     I have not.
11 Q     Thank you.
12           Do you see the document that's on the
13 screen?
14 A     I do.
15 Q     Before I get to that, so the NAV error
16 occurred sometime prior to May 2019; correct?
17 A     Beginning -- I don't know the specific
18 dates.  I believe it began in May of 2019 --
19 sorry.  May 2019 --
20 Q     That's when it ended; right?
21 A     What's that?
22 Q     That's when it ended; right?  That's --
23 A     Yeah, it was before May 2019.
24 Q     Okay.  So during the entire time that the
25 TerreStar NAV error was being discussed and

Page 121

1            Dustin Norris
2  analyzed and debated and communications with the
3  SEC, during that entire period, Jim Dondero was in
4  control of both HCMFA and Highland; correct?
5  A     Yes, I believe so.
6  Q     Okay.  Can you identify any employee of
7  Highland who was fired as a result of any of the
8  mistakes that were made in connection with the
9  TerreStar valuation?
10 A     No.
11 Q     Can you identify --
12 A     Not that I can remember.
13 Q     Can you identify any steps that
14 Mr. Dondero took against any employee who was
15 allegedly involved in the NAV error?
16 A     That would have been an HCMLP matter.  I
17 don't have any knowledge of HCMLP's hiring or
18 firing practices.
19 Q     Okay.  So at no time did anybody ever tell
20 you that any disciplinary measures were imposed
21 upon any Highland employee as a result of the NAV
22 error that Highland allegedly caused; correct?
23 A     Any firing practice?  Is that what you
24 said?
25 Q     Disciplinary.  Firing.  Anything.

Page 122

Dustin Norris

1
2  A    There was a remediation process that had
3  to go into effect, which was improvement of
4  controls, and they maybe even hired additional
5  people. But it was – and I don't – I'm not
6  aware of any disciplinary, but there could have
7  been.
8  Q    Okay. But that would just be speculation
9  on your part; correct?
10  A    Yeah.
11  Q    So have you seen the document that's up on
12  the screen?
13  A    I have.
14  Q    Did you read it before it was sent?
15  A    I don't think so.
16  Q    Did anybody – did any officer or employee
17  take responsibility for making sure that –
18  withdrawn.
19       What is this document?
20  A    It is titled "Resolution of the Funds Net
21  Asset Value Error."
22  Q    And was – is it your understanding that
23  the purpose of this document was to enable HCMFA
24  to explain to the Global Allocation Fund how the
25  resolution of the NAV error was being conducted?

Page 123

Dustin Norris

1
2  A    Not to the Global Allocation Fund. This
3  is a memo to the board.
4  Q    Thank you for the clarification.
5       Subject to that clarification, is my
6  description otherwise correct?
7  A    I believe so. There had been a number of
8  communications with the board, and this is the
9  resolution of the whole process, or most of the
10  process.
11  Q    This was a pretty big issue for HCMFA,
12  wasn't it?
13  A    There was a lot of people involved. It
14  was – there was a lot of involvement from –
15  mostly Highland Capital Management, LP, employees,
16  but it was – there was a lot involved.
17  Q    And who – what outside counsel was
18  retained?
19  A    Adviser counsel is counsel – is – I
20  believe it was K&L Gates for HCMFA.
21  Q    And who was Highland's counsel?
22  A    I don't know.
23  Q    Do you know if Highland had counsel?
24  A    I don't know.
25  Q    Do you –

Page 124

Dustin Norris

1
2  A    I know they had counsel they referred to
3  for SEC matters, and I don't know if they utilized
4  them here or not. They were all Highland
5  employees that worked on this. So I'm sure you
6  probably have that in your records.
7  Q    Sir, can you identify any outside counsel
8  that was retained by Highland to advise it in
9  connection with the TerreStar valuation issues
10  that were the subject of an SEC investigation?
11  A    I have – I have no knowledge of that.
12  Q    Okay. Did you see this memo that's up on
13  the screen that's been marked as Exhibit 182 prior
14  to the time that it was sent?
15  A    I don't recall.
16  Q    The NAV error was the subject of an SEC
17  investigation; correct?
18  A    Correct.
19  Q    Do you know if HCMFA ever told the SEC
20  orally, in writing, or otherwise that Highland
21  Capital Management, LP, was the cause of the NAV
22  error?
23  A    Not that I'm aware of, but they were
24  concerned about the ultimate correction of the NAV
25  error. I don't think they were concerned about

Page 125

Dustin Norris

1
2  the responsible party.
3       But I would say every single person
4  that interacted with the SEC, I believe, were
5  HCMLP employees. We can see that on the other
6  memo that they have to the SEC following up on a
7  call; all HCMLP employees. So whether they told
8  them or not, they were all HCMLP employees.
9       MR. MORRIS: Okay. Move to strike
10  after the very first portion of the answer
11  that was responsive.
12  BY MR. MORRIS:
13  Q    Did anybody – did any officer or employee
14  of HCMFA ever inform the SEC that Highland Capital
15  Management, LP, was the responsible party for the
16  NAV error?
17  A    Specifically, not that I'm aware of.
18  Q    Okay. Was any HCMFA officer or employee
19  responsible for making sure that the memorandum up
20  on the screen that's been marked as 182 was true
21  and accurate before it was sent to the board of
22  the Highland Global Allocation Fund?
23  A    I don't know that there is a – there's a
24  specific requirement of an officer to verify the
25  accuracy.

Page 126

Dustin Norris

1
2    Q     Okay.  But my question was a little bit
3    broader, and that was whether there was any
4    officer or employee who was given the
5    responsibility of making sure this document was
6    true and accurate before it was sent to the board
7    of the GAF.
8    A     I don't even know who drafted this.  It
9    would have come from Highland's compliance legal
10   and accounting team with all the expertise around
11   the NAV error and all of those that were involved.
12   Q     So did you see this document at or around
13   the time it was sent to the GAF board?
14   A     I probably did.
15   Q     Do you recall telling anybody at that time
16   that you believed there were any errors in the
17   document?
18   A     I think, as I testified before, I
19   don't -- I don't remember reading it.  But I
20   didn't -- I didn't say there were errors in the
21   document, no.
22   Q     Prior to the answer date of March 1st,
23   2021, did anybody acting on behalf of HCMFA ever
24   tell anybody in the world at any time that there
25   was any error in this memorandum?

Page 127

Dustin Norris

1
2    A     Not that I'm aware of.
3    Q     Did HCMFA send this memorandum --
4    withdrawn.
5         Did HCMFA intend this -- withdrawn.
6         Did HCMFA expect the GAF board to rely
7    on this memorandum?
8    A     I don't know what the intention was.
9    Q     You don't know what HCMFA's intention was
10   in sending this memorandum?
11   A     If it's addressed to the board, it could
12   be to educate.  But I'm sure that the board
13   would -- would rely on or expect that that memo
14   would be accurate.
15   Q     Okay.  And this is dated after all of the
16   payments have been made that we've been talking
17   about, the May 2nd and the May 3rd payments;
18   correct?
19   A     Correct.
20   Q     Take a look at the second paragraph.
21   A     Yup.
22   Q     Do you see the first sentence refers to
23   two initial determinations that were made by the
24   adviser and Houlihan Lokey?
25   A     Sorry.  Which part?  Just the first

Page 128

Dustin Norris

1
2    sentence of the second paragraph?
3    Q     Yeah.  First of all, do you see that the
4    second paragraph refers to the adviser and
5    Houlihan Lokey?
6    A     It does.
7    Q     And do you see that the reference to
8    Houlihan Lokey includes a reference to Houlihan
9    Lokey having been approved by the board?
10   A     Yes.
11   Q     And do you understand that that means the
12   board of GAF?
13   A     Yes.
14   Q     Does that refresh your recollection that
15   the GAF board approved of the retention of
16   Houlihan Lokey as an independent third-party
17   expert valuation consultant?
18   A     It doesn't refresh my recollection, but it
19   says it there.  I don't know that I have a
20   document saying they -- I haven't seen the
21   approval, the agreement.
22   Q     But you don't dispute that this memo was
23   sent to the GAF board on or about May 28th, 2019;
24   correct?
25   A     Correct.

Page 129

Dustin Norris

1
2    Q     Okay.  And HCMFA told the GAF board at
3    that time that HCMFA and Houlihan Lokey, quote,
4    "initially determined that the March transactions
5    were non-orderly and should be given zero
6    weighting for purposes of fair value."
7         Is that correct?
8    A     The HCMLP, as part of the valuation -- or
9    as the outsource valuation provider, were the
10   employees that made that determination.  The
11   adviser ultimately has the responsibility, but it
12   was outsourced.  And those were HCMLP employees,
13   along with Houlihan Lokey, that determined the
14   March transactions were non-orderly.
15        MR. MORRIS:  I'm going to move to
16   strike.
17   BY MR. MORRIS:
18   Q     And I'm going to ask you to listen
19   carefully to my question.
20        I'm asking you what HCMFA told the GAF
21   board.  Did HCMFA tell the GAF board on May 28th,
22   2019, that HCMFA and Houlihan Lokey, quote,
23   "initially determined that the March transactions
24   were non-orderly and should be given zero
25   weighting for purposes of determining fair value."

**Appx. 00363**

Page 130

Dustin Norris

1          Dustin Norris
2          Is that correct?
3     A     The -- in the memo, it says that on this
4   date, there were many other conversations probably
5   around this date and on this date discussing the
6   determinations and non-orderly and that it was the
7   HCMLP employees, and the board knew that.  They
8   were very aware that it was the -- the valuation
9   control environment of HCMLP that determined these
10  were non-orderly transactions.
11    Q     So this -- so this report is inaccurate,
12  according to you?
13    A     No.  There's -- there's just -- your
14  question was did they tell the board.  There is a
15  lot that we told the board outside of this memo.
16  This memo does say advised from Houlihan Lokey.
17  The adviser is ultimately responsible.  But there
18  was a lot of communication with the board --
19    Q     Okay.
20    A     -- around this, that they knew exactly who
21  was responsible for valuation as the board
22  determining that these were market transactions
23  and orderly or non-orderly.
24    Q     Okay.  I want to focus on this memo,
25  because this is the one that I have.  And you'll

Page 131

Dustin Norris

1   agree with me that there's no reference to
2   Highland Capital Management, LP, anywhere in this
3   report; correct?
4     A     No, there's not, but the board knew that
5   HCMLP was preparing the valuations.
6          MR. MORRIS:  All right.  I move to
7   strike after the word "no."
8   BY MR. MORRIS:
9     Q     And it was the determination concerning
10  whether or not it was orderly or non-orderly, and
11  whether or not to use zero weighting that were the
12  two causes of the NAV error; correct?
13    A     Those were key portions.
14    Q     In the last sentence, in fact, that's the
15  only portions; isn't that fair?
16    A     "Initially determined" -- well, it doesn't
17  say that there's not other factors.  They're the
18  only ones mentioned.
19    Q     Let me -- let me -- let me read the last
20  sentence.
21          Quote:  "The orderly determination and
22  adoption of the weighted fair value methodology
23  resulted in NAV errors in the fund," and that's
24  what it's defining as the NAV error.

Page 132

Dustin Norris

1          Dustin Norris
2          Have I read that correctly?
3     A     You did.
4     Q     And so would you agree with me, as HCMFA's
5   30(b)(6) witness, that on May 28th, 2019, HCMFA
6   told the GAF board that the two causes of the NAV
7   error were the orderly determination and the
8   adoption of the weighted fair value methodology --
9   fair value -- fair valuation methodology?
10    A     Those were -- it doesn't say those are
11  exclusively the only factors, but those are
12  mentioned here.
13    Q     It says those two factors resulted in the
14  NAV error; correct?
15    A     Those -- no, it didn't say "the NAV
16  error."  It said "in NAV errors."
17    Q     Which it's defining as the NAV error;
18  correct?
19    A     Defines as "the NAV error."
20    Q     Okay.  Does HCMFA contend that there's
21  anything in this paragraph that is inaccurate?
22    A     Again, I -- I don't know that Houlihan
23  Lokey was approved by the board, but I don't know
24  of any other contention.
25    Q     Okay.  And you don't -- and HCMFA doesn't

Page 133

Dustin Norris

1   dispute that Houlihan Lokey was approved by the
2   board.  You're just telling me that, as you sit
3   here today, that's the one fact that you've not
4   been able to confirm; is that fair?
5     A     As far as I know, yeah.
6     Q     Okay.  Let's go on to the next paragraph.
7          MR. MORRIS:  If we could just
8   scroll up a little bit.
9   BY MR. MORRIS:
10    Q     I'm going to try and summarize here, but
11  if you don't think it's a fair summary, of course
12  I would encourage you to let me know.
13          Is it fair to say that, as a general
14  matter, the next paragraph describes a total loss
15  from the NAV error as being approximately
16  $7.5 million?
17    A     Yeah, including processing costs and
18  rebates and offsets, yes.
19    Q     Right.  That's what the parenthetical
20  says, a total loss --
21    A     Yup.
22    Q     -- of approximately $7.5 million?
23    A     Correct.
24    Q     And the next paragraph states that that

**Appx. 00364**

Page 134

Dustin Norris

1
2  loss was funded with two payments. Do I have that
3  correct in the first sentence?
4  A    Correct.
5  Q    Okay. Did HCMFA pay approximately
6  $5.186 million on or around February 15, 2019, in
7  connection with the NAV error?
8  A    I believe so.
9        And if we go to the next page, it has
10  dates and payments. I think it's represented
11  there.
12  Q    Okay. Where did HCMFA get the money to
13  make that payment?
14  A    A combination of insurance proceeds and
15  cash that it had. And, again, that's detailed, I
16  believe, on the next page.
17  Q    HCMFA contends that the $7.4 million
18  transferred by Highland to HCMFA was mistakenly
19  recorded as a loan; correct?
20  A    There's -- there's two different amounts
21  that we contend were recorded as a note, a
22  combined 7.4 million, yes.
23  Q    Okay. And HCMFA contends that the
24  $7.4 million in payments was not to be a loan, but
25  was supposed to be compensation for Highland's

Page 135

Dustin Norris

1
2  negligent valuation services in connection with
3  the NAV error; correct?
4  A    Sorry. One more time.
5  Q    HCMFA contends that the $7.4 million in
6  payments was supposed to be compensation resulting
7  from Highland's negligent valuation services;
8  correct?
9  A    Yes, subject to all of our defenses that
10  we've laid out in our pleadings.
11  Q    Okay. When did HCMFA reach the conclusion
12  that Highland was the cause of the NAV error?
13  A    The -- there was never -- I don't think
14  there was ever a question. It was always known
15  that HCMLP employees were the ones creating the
16  valuation, overseeing the valuation, working with
17  the value -- you know, everything that was done
18  was outsourced to HCMLP.
19        And so it was discussed with the
20  board. It was discussed in-depth internally. The
21  employees were all HCMLP employees. So I can't
22  pinpoint a date, but there -- it was a known
23  factor that HCMLP was responsible.
24        MR. MORRIS: Okay. I move to
25  strike.

Page 136

Dustin Norris

1
2  BY MR. MORRIS:
3  Q    The only thing I'm asking you for is a
4  date. And if you don't know, the answer is "I
5  don't know." So let me try one more time.
6        Do you know when HCMFA first
7  determined that Highland was negligent?
8  A    I don't know the first date.
9  Q    Do you know if it was in 2018 or 2019?
10  A    I don't know.
11  Q    Do you know when the NAV error first --
12  was first identified?
13  A    I believe the NAV error was determined in
14  early 2019.
15  Q    Was it before or after -- I mean, the --
16  the NAV error must have been identified before
17  February 15, 2019; correct?
18  A    Correct.
19  Q    Okay.
20  A    Well, I should say whether there -- I
21  don't know. I don't remember -- we'll have to
22  look through the documents -- what the actual --
23  oh, you're saying before February 15th. Yes,
24  that's when the paid insurance proceeds came in.
25  So yes.

Page 137

Dustin Norris

1
2  Q    No question -- no question that HCMFA knew
3  before February 15, 2019, that there was a NAV
4  error; correct?
5  A    Correct.
6  Q    No question that HCMFA knew before
7  February 15, 2019, that the NAV error was caused
8  by Highland; correct?
9  A    Yeah. Like I said, it was always known
10  that these were Highland employees that were
11  outsourced through the valuation, and they were
12  the ones at fault.
13  Q    Okay. Do you know if -- if HCMFA ever
14  demanded compensation from Highland for any errors
15  or mistakes it may have made in connection with
16  the TerreStar valuation?
17  A    Yeah. Mr. Dondero told Frank to make the
18  payments to compensate for the NAV error.
19  Q    And did he do that in his capacity as the
20  person in control of HCMFA, or did he do that in
21  his capacity as the person in control of Highland?
22  A    I would imagine it would have been both.
23  Further supported, he transferred money of his
24  own money to HCMLP to then pay HCMFA. And so
25  he -- yes, he was on both sides of it, but he had

**Appx. 00365**

Page 138

Dustin Norris

1   the authority on both sides to make that decision.
2   Q    Okay.  And so Mr. Dondero reached an
3   agreement with himself pursuant to which HCMFA
4   demanded and Highland agreed to pay the
5   $7.4 million as a consequence of Highland's
6   negligent conduct in the performance of its
7   valuation services.  Do I have that right?
8   A    Sounds like there's a legal determination
9   there that needs to be made.  I --
10  Q    It's a factual one, I promise.
11  A    Entering -- whether entering into an
12  agreement or not, I -- that seems like a legal
13  determination.  But maybe ask the question again.
14  Q    Did somebody on behalf of Highland agree
15  to pay HCMFA $7.4 million in order to compensate
16  HCMFA for Highland's negligent services in
17  connection with the TerreStar valuation?
18  A    Yes.  Mr. Dondero.
19  Q    Thank you.
20       Is there any document anywhere that
21  you have ever seen that reflects Highland's
22  agreement to pay $7.4 million as compensation to
23  HCMFA?
24  A    I haven't seen a settlement agreement or

Page 139

Dustin Norris

1   an agreement to that effect, no.
2   Q    You haven't seen anything; correct?
3   A    No.
4   Q    Have you looked?
5   A    We have.  I actually wouldn't be
6   surprised -- I would be surprised to see one.  And
7   it's -- my understanding is -- and the company's
8   position is that there doesn't need to be an
9   agreement.  Right?  We --
10  Q    I'm not asking -- I'm going to interrupt
11  you again.  I'm not asking you --
12       MR. RUKAVINA:  Well, John --
13       MR. MORRIS:  -- anything like that.
14  I need him to answer my questions or we're
15  going to be here all night.
16       MR. RUKAVINA:  John, hold on.
17  BY MR. MORRIS:
18  Q    Have you ever -- have you ever seen
19  anything --
20       MR. RUKAVINA:  John, hold on.  Hold
21  on.
22       MR. MORRIS:  No, no.  Davor,
23  please -- please --
24       MR. RUKAVINA:  John, it is not our

Page 140

Dustin Norris

1   position -- it is not -- it is our
2   position that there is no settlement
3   agreement.
4        MR. MORRIS:  Thank you very much.
5   BY MR. MORRIS:
6   Q    Is it your position that there is any
7   document of any kind that reflects Highland's
8   agreement to pay $7.4 million as compensation?
9   A    No.  Subject to our defenses, but there's
10  none.
11  Q    Did Mr. Dondero tell Mr. Waterhouse that
12  the money that he was asking to be transferred
13  from Highland to HCMFA be transferred as
14  compensation for the NAV error?
15  A    Our position is that this was compensation
16  for the NAV error, and that was discussed.
17  Mr. Dondero told Frank.  And I believe Frank even
18  testified to that, and Mr. Dondero testified to
19  that in their depositions.
20  Q    Okay.  Now, you said that the February
21  payment of over $5 million was funded through
22  insurance proceeds and cash.
23       Do I have that right?
24  A    Yes.

Page 141

Dustin Norris

1   Q    And the cash portion was really just the
2   deductible?
3   A    If you want to go to Page 2, we can look
4   at the details.
5   Q    Sure.  Sure.
6   A    I don't have it all by memory.
7   Q    That's fair.
8        MR. MORRIS:  Let's go to the next
9   page.
10  BY MR. MORRIS:
11  Q    Looking at this, do the third and fourth
12  lines refresh your recollection --
13  A    Yes.
14  Q    -- that the February payment was funded
15  through insurance proceeds and an insurance
16  deductible paid by the adviser?
17  A    Yes, I believe that's correct.
18  Q    Okay.  And Topic Number 8 on the 30(b)(6)
19  notice relates to the insurance claim; right?
20  A    Uh-huh.
21  Q    Okay.  Did you do anything to familiarize
22  yourself with the insurance claim?
23  A    I did.
24  Q    And what did you do to familiarize

Dustin Norris

1  yourself with the insurance claim?
2  A    I discussed with DC and Davor the
3  company's position on the insurance claim.
4  Q    Okay. I don't want to know what the
5  company's position is. I want to know what the
6  facts are.
7        Did you learn any facts in connection
8  with your diligence and your preparation to answer
9  topic – questions on Topic Number 8?
10 A    Yeah. The HCMFA policy was – was – the
11 HCMFA – HCMFA had an insurance policy with ICI
12 Mutual; and based on the NAV error, the policy
13 was – I don't know what the word is – was used
14 to seek reimbursement for the NAV error.
15 Q    Okay. So –
16       (Reporter discussion off the record.)
17 BY MR. MORRIS:
18 Q    So did HCMFA file a claim for insurance
19 coverage with ICI Mutual in connection with the
20 NAV error?
21 A    The HCMLP employees, I believe, through
22 Frank Waterhouse and his team, did that. They –
23 they managed the insurance as part of the shared
24 services agreement, and they filed with the

*(lines numbered 2–25; note line 1 is the header "Dustin Norris")*

Dustin Norris

1  insurance company –
2  Q    And – and the filing –
3  A    – on behalf of HCMFA.
4  Q    And the filing that was made, was that a
5  claim that was made on behalf of HCMFA?
6  A    I believe so, yes.
7  Q    And did HCMFA authorize the filing of that
8  claim?
9  A    Our position is that that – that is a
10 valid claim from HCMFA.
11 Q    All right. Did HCMFA authorize the filing
12 of the insurance claim?
13 A    I – I don't know.
14 Q    Did – has HCMFA ever told anybody at any
15 time that the insurance claim was not authorized
16 by HCMFA?
17 A    No.
18 Q    And HCMFA received almost $5 million on
19 account of the claim; right?
20 A    Correct.
21 Q    And HCMFA wanted to recover on its
22 insurance claim; correct?
23 A    Yes.
24 Q    Did the claim – was the claim made in

Dustin Norris

1  writing?
2  A    I believe so.
3  Q    Have you seen the claim?
4  A    I don't – I don't recall seeing the
5  claim.
6  Q    In connection with the defense of this
7  lawsuit and the preparation, have you made any
8  efforts to identify the actual claim that was
9  filed on behalf of HCMFA?
10       MR. RUKAVINA:  Let me interject –
11       let – let me interject. And we can talk
12       about this offline. We searched for that
13       and could not find it. We suspect it
14       might be in HCMLP's legal documents that
15       we don't have access to, but we have and
16       we continue to actively search for the
17       claim itself. We have not been able to
18       find it.
19 BY MR. MORRIS:
20 Q    Does HCMFA use an insurance broker?
21 A    I don't believe so that I think. I think it's
22 directly with ICI Mutual. And it – we – there's
23 no broker, but it goes through HCMLP's employees.
24 Frank Waterhouse would have been the one probably

Dustin Norris

1  interacting with ICI Mutual.
2  Q    HCMFA and HCMLP broke up at the end of
3  February; is that fair?
4  A    That's correct.
5  Q    At any time since the end of February, has
6  HCMFA made any effort to obtain any information
7  concerning this insurance claim from ICI Mutual?
8  A    I don't know where we got the source of –
9  of the documents, but there – there was – they
10 were searching for the ICI documents. I don't
11 know if it came from ICI or another source.
12 Q    Anybody –
13 A    I don't –
14 Q    Anybody from HCMFA reach out to ICI Mutual
15 for information relating to this insurance claim
16 at any time?
17 A    I don't – not that I'm aware of.
18 Q    Okay.
19 A    They may have, but I don't know.
20 Q    Do you know when the claim was filed?
21 A    I don't. I – I don't. I – I think it
22 may have been late 2018, but I'm not sure.
23 Q    And at the time HCMFA filed the claim for
24 insurance, it had already formed the opinion that

Page 146

Dustin Norris

1
2  Highland Capital Management, LP, was the
3  responsible party; correct?
4  A    I believe so, yes.
5  Q    Did HCMFA tell the insurance company that
6  Highland Capital Management was the responsible
7  party?
8  A    I'm not sure.  Again, this was Highland
9  employees that filled out the materials and was
10  working with ICI.  So I don't know if your
11  employees notified them.
12  Q    So the total estimated loss was
13  approximately $7.5 million; right?  That's the top
14  number on the right?
15  A    Yes.
16  Q    Okay.  And roughly two-thirds of that was
17  financed through insurance proceeds that were
18  received in February of 2019; correct?
19  A    Correct.
20  Q    And thereafter, it's HCMFA's contention
21  that Highland paid it another $7.4 million for
22  purposes of providing compensation in connection
23  with its negligent work on the — on the TerreStar
24  valuation error; correct?
25  A    Yes, that's correct.  And that lines up,

Page 147

Dustin Norris

1
2  7.4 million, with the net — net loss that's shown
3  there, estimated loss.
4  Q    Right.  So it's fair to say, then, from —
5  that it's HCMFA's position that it received
6  $7.4 million from Highland as compensation, and
7  approximately $5 million from the insurance
8  carrier as compensation for total receipts of
9  $12.4 million in connection with the NAV star —
10  with the TerreStar valuation error?
11  A    Correct.
12  Q    Okay.  Why would H- — why does HCMFA
13  contend that its entitled to $12.4 million from
14  Highland and the insurance company when the total
15  loss was only $7.4 million?
16  A    Yeah, it's — it's our position that the
17  collateral — and I'm not an attorney.  But
18  understanding our position here, that under Texas
19  law, the collateral source rule would permit you
20  to recover value from the insurance company and to
21  the individual or the — the company that created
22  the — or caused you harm.
23  Q    So you're — would you agree that HCMFA
24  has profited by about $5 million as a result of
25  the NAV error under that theory?

Page 148

Dustin Norris

1
2  A    I — I don't know that — how the theory
3  relates to profits, but we've — we've paid — and
4  say, "What's the logic for this?"  We paid in
5  insurance premiums for years, significant
6  insurance premiums.  And so there's been a loss
7  for years and years for the insurance, and then
8  we're now hitting that insurance to say there's a
9  gain of $5 million, whatever number you threw out.
10  I would disagree with that.
11          But, yes, there was proceeds of
12  12-and-a-half million, but we've been paying in
13  insurance proceeds or premiums for a long time.
14  We're going to continue, and likely, I would
15  imagine, those premiums will go up because of the
16  claim.
17          So I — I'm, again, not a lawyer.  I
18  don't understand all the reasons why it's
19  permitted.  But our position is that the
20  collateral source rule under Texas law permits you
21  to receive from the insurance — your insurance
22  provider and from the party that did you harm.
23  And as you said, here we believe it's negligence.
24  It may be breach of contract, but we believe it's
25  negligence.

Page 149

Dustin Norris

1
2  Q    Okay.  I just want to make this really
3  clean.
4          The estimated net loss from the NAV
5  error is $7.442 million; correct?
6  A    The estimated loss from the NAV error,
7  yes.
8  Q    Okay.  And notwithstanding that HCMFA
9  believed that Highland was the responsible party,
10  HCMFA, nevertheless, filed a claim for insurance
11  coverage with ICI Mutual; correct?
12  A    That's correct.
13  Q    And ICI Mutual paid almost $5 million in
14  connection with that claim; correct?
15  A    Correct.
16  Q    And in addition to that almost $5 million,
17  it's HCMFA's position that it received and was
18  entitled to receive an additional $7.4 million
19  from Highland as compensation for its error;
20  correct?
21  A    Correct.
22  Q    So that notwithstanding the fact that the
23  estimated net loss was $7.44 million, HCMFA
24  received and contends that it's entitled to keep
25  $12.4 million; correct?

**Appx. 00368**

Page 150

Dustin Norris

1
2  A    That's correct, subject to our defenses.
3  Q    Okay.  Did -- has -- has HCMFA ever
4  informed ICI Mutual that it received $7.4 million
5  from Highland on account of the NAV error?
6  A    Not that I'm aware of.
7  Q    Has HCMFA ever told ICI Mutual that
8  Highland was at fault?
9  A    Again, I think I already answered that.  I
10 don't know.  Communication with ICI was done by
11 the HCMLP employees as part of the shared services
12 agreement, and I'm not sure if they communicated
13 that.
14      MR. MORRIS:  Okay.  I move to
15 strike.
16 BY MR. MORRIS:
17 Q    I just -- I'm just asking for your
18 knowledge, not speculation.
19      Do you have any knowledge that anyone
20 on behalf of HCMFA ever informed ICI Mutual that
21 Highland was the cause of the NAV error?
22 A    I have no knowledge.
23      MR. MORRIS:  Let's take a short
24 break.  The time now is 3:06 -- or 2:06.
25 Let's just come back at 3:20.

Page 151

Dustin Norris

1
2      (Recess from 2:07 p.m. to 2:21 p.m. CST)
3  BY MR. MORRIS:
4  Q    So we were talking a bit about the
5  insurance payment that was received in February
6  of 2019.  Do you remember that?
7  A    Yes.
8  Q    And there was a claim that was filed on
9  behalf of HCMFA that resulted in that insurance
10 proceed payment; correct?
11 A    Correct.
12 Q    And do you recall if that insurance claim
13 was filed in 2018 or 2019?
14 A    I don't recall, but I believe it was late
15 2018.  But I don't know.
16 Q    Yeah.
17 A    And as we testified, we don't have that
18 claim.  We've searched for it.  It's probably on
19 your server, as I -- Frank Waterhouse and his team
20 would have submitted that.
21 Q    Yeah.  But you haven't made any effort to
22 get it from the carrier; right?
23 A    No, not that I know of.
24 Q    Okay.  And would you agree with me that
25 it's probably extremely unlikely that an insurance

Page 152

Dustin Norris

1
2  carrier would have processed a claim of that
3  magnitude in six weeks?
4  A    I know they expedited it and they
5  specialize in -- sorry.  I'll step back.
6      I have no knowledge of how quick
7  carriers make these claims --
8  Q    All right.  Do you know --
9  A    Other than hail on my house -- hail damage
10 on my roof, I don't have personal knowledge of
11 insurance claims.
12      MR. MORRIS:  You know, I apologize,
13 but can I ask Ms. Canty to put back up on
14 the screen that last exhibit that we had?
15 I don't have the exhibit number.
16      All right.  And go to the prior
17 page.  And go to the bottom of that page.
18 BY MR. MORRIS:
19 Q    So we've put back up on the screen, I
20 think --
21      MS. CANTY:  182.
22      MR. MORRIS:  182.
23 BY MR. MORRIS:
24 Q    All right.  And do you see in the next to
25 the last paragraph, Mr. Norris, there's a

Page 153

Dustin Norris

1
2  reference to a period from March 18, 2018, to
3  January 19, 2019?
4  A    Yes.
5  Q    That's what they've defined as the NAV
6  restatement period.  Do you see that?
7  A    Yes, I do.
8  Q    Okay.  Looking at that period, does that
9  refresh your recollection at all as to when in
10 2018 HCMFA first learned about the NAV error?
11 A    No, because that was -- that was the
12 period of time when the market -- the off-market
13 or on-market transactions happened, March 18th.
14 Q    Okay.
15 A    It was sometime in between that they found
16 out that there was an error.
17 Q    Okay.  And do you know if it was the first
18 half of 2018 or the second half?
19 A    The midyear audits of some of our funds, I
20 believe, is when it first came up.
21 Q    And --
22 A    So 6/30 audits that were due 60 days
23 later.  So second half -- I believe second half of
24 2018.
25 Q    So is it fair to say sometime in August or

Page 154

Dustin Norris

1          Dustin Norris
2   September is when HCMFA first learned about it?
3   A      About -- define "it." Is that the NAV
4   error.
5   Q      I apologize. Let me ask the question
6   again.
7          Is it fair to say, based on the timing
8   of the audit, 60 days after June 30th would take
9   us to approximately August 31st; right?
10  A   It does.
11  Q      And so is it fair to say, then, that HCMFA
12  first learned about the NAV error sometime in
13  August of 2018 while it was preparing the
14  financials for the period ending June 30th?
15  A   No. I don't think there was a
16  determination of whether there was a NAV error or
17  not at that point. I think the reason they have
18  going all the way to January 19 -- 2019 is it
19  wasn't determined -- finalized if there is an
20  error or not.
21         There was a lot of discussion with the
22  SEC and auditors over whether there was or wasn't
23  an error, what the amount was, what the proper
24  valuation should be. There was consultation with
25  the SEC, and that process lasted, I believe,

Page 155

Dustin Norris

1          Dustin Norris
2   several weeks, if not months.
3          So that is not when they found out
4   about a NAV error, but the questions over
5   valuation, yes.
6   Q      Okay. So then let me state the question
7   differently then.
8          Is it fair to say that HCMFA first
9   learned in or about August 2018 of the valuation
10  issues?
11  A   The "about" is key here. I don't know the
12  specific date, but around that time or earlier --
13  Q      Okay.
14  A   -- or later. On or around that time.
15  Q      And did HCMFA conclude, at the same time
16  it learned of the valuation issues, that HCMFA was
17  the responsible party? Or was there a gap between
18  learning about the valuation issues and making the
19  determination that Highland was the responsible
20  party?
21  A   Yeah, first you said HCMFA was the
22  responsible party, and then you said Highland.
23  Q      I apologize. Let me try and restate that.
24         Did HCMFA conclude that Highland was
25  the responsible party at or around the same time

Page 156

Dustin Norris

1          Dustin Norris
2   that it learned of the valuation issues, or was
3   there a period during which it knew about the
4   valuation issues, but not -- had not yet formed
5   the conclusion that Highland was the responsible
6   party?
7   A   From the beginning, everybody knew who the
8   responsible party was for the valuation. Those
9   reporting the issues, those responding to
10  auditors, those responding to SEC and the board
11  were all HCMLP employees from the beginning. But
12  I don't have a specific date.
13         Again, as you look here, it doesn't
14  say when the NAV error was determined, but from
15  the beginning, it was the knowledge that HCMLP was
16  responsible for the valuations.
17  Q      Okay. Do you know when HCMFA first
18  determined that the estimated loss was
19  approximately $7.4 million?
20  A   I don't, no. I don't have specifics, but
21  it was after there was a determination there was
22  actually a NAV error. And it may be in some of
23  the documents that you have. I believe it may be
24  in, you know, a memo to the board or the SEC, but
25  I don't know offhand.

Page 157

Dustin Norris

1          Dustin Norris
2   Q      Do you know when there was a determination
3   that there was a NAV error?
4   A   I don't know the specific time, no.
5   Q      Do you know if it was in 2019 or 2018?
6   A   I don't remember.
7   Q      Is it fair to say that it was before
8   May of 2019?
9   A   That there was a determination there was a
10  NAV error? Yes.
11  Q      And is it fair to say that HCMFA had
12  concluded that the loss of that NAV error was
13  going to be more than a million dollars prior to
14  May 2019?
15  A   More than a million? Probably -- yes.
16  Q      Okay. Is there a reason that HCMFA waited
17  until May to have Highland pay it for the
18  compensation?
19  A   I think that the whole process -- as you
20  see, the resolution memo is in May to the board.
21  That was the conclusion of the overall process.
22  So our stance would be that that was when it was
23  the right time and everything was -- the right
24  time to be sent.
25         MR. MORRIS: Okay. Can we put up

Page 158

Dustin Norris

1
2  on the screen a document that's been
3  marked as, I think, as Exhibit 13? I
4  don't know if you're able to get that,
5  La Asia.
6      MS. CANTY: Yup, I got it.
7      MR. MORRIS: Thank you.
8      (Exhibit 13 tendered.)
9  BY MR. MORRIS:
10 Q   Are you aware, sir, that there came a
11 point in time when HCMFA amended its answer?
12 A   Yes.
13 Q   And I think topic –
14 A   Topic 2 is our amended answer.
15 Q   Okay.  So that's the document that's in
16 front of you?
17 A   Yes.
18 Q   And you've seen that before; correct?
19 A   Yes.
20 Q   Okay.
21      MR. MORRIS: Can we turn to Page 5
22 of 9, please?
23      And if we can scroll to the bottom.
24 BY MR. MORRIS:
25 Q   These are HCMFA's affirmative defenses; is

Page 159

Dustin Norris

1  that right?
2
3  A   On the second amended answer, yes.
4  Q   Yes.
5  A   I'm sorry.  The first amended answer, yes.
6  Q   And as of today, is it your understanding
7  that this is HCMFA's operative pleading?
8  A   No.
9  Q   Has it been amended after this time?
10 A   Yeah, we –
11      MR. RUKAVINA: Well, he doesn't
12 know what "operative pleading" means.
13      THE WITNESS: Oh.
14      MR. RUKAVINA: Yes, it is our
15 operative pleading, Dustin.
16      THE WITNESS: It is our operative
17 pleading then.
18 BY MR. MORRIS:
19 Q   And I didn't mean to trick you.  I
20 apologize.  I just meant to say that this has not
21 been amended as of today; correct?
22 A   We filed a – wait.  Let me see what it's
23 called.
24 Q   You filed a motion for permission to amend
25 it further –

Page 160

Dustin Norris

1
2  A   Yes.
3  Q   – but that motion hasn't been granted;
4  right?
5  A   To my understanding, no.
6  Q   Okay.  And you understand that your – the
7  answer that's up on the screen can't be amended
8  unless the Court grants the motion; right?
9  A   I – if you tell me that that's the
10 process, I'll take that for what it's worth.  I'm
11 not an attorney.  I don't know the process.
12 Q   Okay.  So let's just look at this
13 document.
14      Is it fair to say that Paragraph 38
15 through 45 deals with –
16 A   I'm going to grab the –
17 Q   Yeah.
18 A   – thing here so I can see it on my desk,
19 too.
20 Q   Sure.
21 A   Okay.
22      38?
23 Q   Right.
24 A   Okay.
25 Q   Now – actually, a little background.

Page 161

Dustin Norris

1
2      This amended complaint was prepared
3  after DC Sauter conducted an investigation
4  concerning the circumstances surrounding the two
5  notes that Highland was suing on; right?
6  A   Yes.  My understanding is it is after
7  he – so background, when he – we filed our
8  initial response, we didn't have access to the
9  HCMLP employees during that time period.  They
10 were not permitted to talk to us about things like
11 this.  And so he did the best he could to prepare
12 a response.  But once they were mostly all fired
13 by HCMLP and formed their own company called
14 Skyview, he was able to talk to them on
15 particulars.  As you note in his statement,
16 he was able to talk to Frank Waterhouse, where he
17 wasn't before, on this topic.
18 Q   Right.  So by the time this document has
19 been prepared, HCMFA had copies of the notes that
20 Highland was suing on for six months; right?
21 Because the lawsuit was commenced in January, and
22 the notes were attached as exhibits to the
23 complaint; right?
24 A   Yes.  This is July 6th this is filed.
25 Q   Right.  Okay.  So this is filed almost six

Page 162

Dustin Norris

1          Dustin Norris
2   months after the complaint is filed; right?
3   A    More like a five-month -- five months and
4   a week, but yeah.
5   Q    All right. I won't quarrel with you.
6   A    Or five and a half -- five and a half
7   months, yeah.
8   Q    Okay.
9   A    Whether you consider that --
10  Q    Okay.
11  A    -- six full months or not.
12  Q    So --
13  A    We know the dates January 22nd and
14  July 6th.
15  Q    Okay. So for that entire time period of
16  time, there's no dispute that HCMFA had in its
17  possession copies of the notes that Highland was
18  suing on; correct?
19  A    I'm looking at the original -- you said
20  they were attached, but I --
21  Q    Yeah.
22  A    If you want to show me the original notes
23  on the original filing.
24  Q    Well, I asked you to look at the original
25  complaint. I think -- was the original complaint

Page 163

Dustin Norris

1          Dustin Norris
2   Topic Number 1? No. It's just the answer.
3          In looking at the answer, did you look
4   at the original complaint?
5   A    Yes.
6   Q    Do you recall seeing that the notes were
7   attached to the original complaint?
8   A    I looked at thousands of pages in
9   preparation, so I just -- I could take your word
10  for it if you say it's in there, or if you want to
11  show it to me, we can look at it.
12         MR. RUKAVINA: They are, Dustin.
13  They are.
14         MR. MORRIS: Yeah. I think you'll
15  have to take my word for it. Thank you,
16  Davor, for confirming my word.
17  BY MR. MORRIS:
18  Q    So let me just try this again to make it
19  clean.
20         Based on my representation, that
21  Mr. Rukavina has agreed with, that the notes that
22  Highland are suing on were attached to its
23  complaint in January, you would agree with me that
24  HCMFA had the notes in its possession from at
25  least the time the complaint was filed until the

Page 164

Dustin Norris

1          Dustin Norris
2   time HCMFA filed this amended answer on July 6th;
3   correct?
4   A    Yes.
5   Q    And this amended answer was filed because
6   HCMFA had a -- had previously made a motion to the
7   Court for leave to amend its answer; correct?
8          MR. RUKAVINA: That's correct,
9   Dustin.
10         He wouldn't know about that, but
11  that's all correct.
12  BY MR. MORRIS:
13  Q    Okay. Well, you're familiar with the
14  Sauter declaration; right?
15  A    I am.
16  Q    And the Sauter declaration purports to
17  describe an investigation that Mr. Sauter
18  undertook to determine the circumstances
19  surrounding the notes; is that fair?
20  A    I don't know if I'd characterize it
21  investigation, but he was tasked with -- and I've
22  got it right here. I would refer you to the
23  agreement on -- or his -- to his declaration on --
24  Q    How would you -- how would you
25  characterize the work that he did? An

Page 165

Dustin Norris

1          Dustin Norris
2   investigation? An analysis? What word do
3   you -- would you use? Due diligence? How would
4   you characterize the work that Mr. Sauter did
5   that's set forth in his declaration?
6   A    I -- I'm looking here. I want to see how
7   he characterizes it.
8          I think he does a very good job of
9   explaining.
10         My investigation would be of the
11  following. So he calls it an investigation.
12  Q    Okay. So HCMFA would agree that after
13  Mr. Waterhouse left the employ of Highland, that
14  DC Sauter conducted an investigation into the
15  circumstances surrounding the notes that Highland
16  was suing on; correct?
17  A    Correct.
18  Q    And as part of that investigation, he
19  spoke with Mr. Waterhouse; correct?
20  A    Yes.
21  Q    And as part of that investigation, he
22  spoke with Mr. Dondero; correct?
23  A    I believe so, but let me -- let me confirm
24  in his statement.
25         Because I believe in -- yeah.

Page 166

Dustin Norris

2  Q    Is that correct, that he spoke with
3  Mr. Dondero in connection with his investigation?
4  A    I'm -- I'm seeing what he rep'ed to in his
5  statement.
6  Q    And does his statement say that? I don't
7  have it in front of me.
8  A    I don't know. That's what I'm looking at.
9  Q    And you don't know, independently of the
10 document, whether Mr. Sauter spoke with
11 Mr. Dondero as part of his investigation?
12 A    I know he did. I know he talked
13 throughout from when we received the original
14 complaint on. I just -- you're asking about the
15 time frame between filing the original filing.
16 And I think he may have spoken with him before
17 that, too, but I -- I just want to take a...
18     So at the time -- this is on
19 March 1st, filed the defendant's original answer.
20 At that -- at the time the debtor filed a
21 complaint, I promptly undertook an internal review
22 of the background facts concerning the notes. I
23 had no knowledge of them since I had not been
24 employed by HCMFA. And a few employees of HCMLP
25 had no knowledge of notes. I also discussed the

Page 167

Dustin Norris

2  notes of James Dondero, formerly the CEO of the
3  debtor, Mr. Dondero.
4      So this is March 1st when that first
5  filing was made. So he did speak with Mr. Dondero
6  prior, and then I believe the source of the
7  additional information was being able to speak
8  with Frank Waterhouse and Will Mabry.
9  Q    Okay. And is it fair to say that the
10 amended complaint is based on Mr. Sauter's
11 investigation?
12 A    Yes, I believe so.
13 Q    Yeah.
14 A    Yes.
15 Q    That's why HCMFA amended its complaint.
16 It's because Mr. Sauter had undertaken this
17 investigation, and he learned what he believed
18 were relevant facts, and those facts are described
19 in his declaration, and they formed the basis of
20 the affirmative defenses that we're looking at now
21 in the amended answer; fair?
22 A    Let me pull up the amended answer just
23 to --
24 Q    It's up on the screen, but if you have a
25 hard copy, that's fine.

Page 168

Dustin Norris

2  A    Yeah. I have a hard copy here, although I
3  may have mixed my documents.
4      Yeah, it was based on additional facts
5  that weren't available at the time of the original
6  response.
7  Q    Okay. And is it fair to say that
8  Paragraphs 38 through 45 relate to the affirmative
9  defense that Highland was responsible for the NAV
10 error, and the $7.4 million payment was intended
11 to be compensation for Highland's negligent work?
12 A    Sorry. Can you ask that one more time?
13 There was a couple parts there.
14 Q    No problem.
15     Is it fair to say that
16 Paragraphs 35 -- withdrawn.
17     Is it fair to say that Paragraphs 38
18 to 45 relate to HCMFA's affirmative defense that
19 the $7.4 million that was transferred from
20 Highland to HCMFA in May 2019 was intended to be
21 compensation for Highland's negligent work in
22 connection with the NAV error and not in the form
23 of a loan?
24 A    You said 38 to 42?
25 Q    38 to 45.

Page 169

Dustin Norris

2  A    38 to 45.
3      Yeah, it -- the NAV error items are
4  included in there as one of our defenses.
5  Q    Right.
6  A    43 and 44 and 45 discuss additional
7  defenses related to the note and who may or may
8  not have signed the note and who had authority to
9  sign the note.
10 Q    Okay.
11     MR. MORRIS: Can you -- can we turn
12 to Paragraph 42?
13     THE WITNESS: Yes.
14 BY MR. MORRIS:
15 Q    Do you see the first four -- first few
16 words in Paragraph 42 are, quote: "The defendant
17 accepted responsibility for the NAV error"?
18 A    Yes.
19 Q    Okay. "Defendant" there refers to
20 Highland Capital Management, LP; correct?
21 A    No. I believe --
22 Q    Oh, I apologize. I apologize.
23 A    Thank you.
24 Q    It's HCMFA; right?
25 A    HCMFA.

Appx. 00373

Dustin Norris

2  Q     Okay.  And is -- did -- did HCMFA accept
3  responsibility for the NAV error?
4  A     They did.  They -- they are the adviser,
5  and there's already -- in the next sentence, HCMLP
6  then accepted that they had a contract with and
7  accepted responsibility.
8  Q     Okay.  And so when did the plaintiff
9  accept responsibility for having caused the NAV
10 error?
11 A     Again, going back to -- this was always
12 known and communicated that it was HCMLP
13 employees.  It was the valuation services they
14 were performing.  The legal and compliance team
15 was all outsourced in the shared services
16 agreement.
17        And that was -- again, there's not a
18 singular determination; but Jim Dondero, as
19 president, I would say effectuated that with the
20 payment of the NAV -- for the NAV error.
21 Q     So you can't tell me when the plaintiff
22 accepted responsibility for having caused the NAV
23 error; correct?
24 A     Not a specific date.
25 Q     Okay.  And it's HCMFA's position that Jim

Dustin Norris

2  Dondero, in his capacity as the president of
3  Highland Capital Management, LP, accepted
4  responsibility on behalf of Highland Capital
5  Management, LP, for having caused the NAV error?
6  A     He, and in addition all of the employees
7  involved.  Right?  The valuation team members,
8  Frank Waterhouse was CFO, Dave Klos overseeing the
9  valuation process, they were all Highland
10 employees, and Jim Dondero as well as president
11 recognized that based on all the communications
12 and conversations they would have had.
13        MR. MORRIS:  Okay.  I'm going to --
14        I'm going to move to strike.
15 BY MR. MORRIS:
16 Q     And I'm going to ask you to listen
17 carefully to my question.
18        Who had the authority to accept, on
19 behalf of plaintiff, the responsibility for having
20 caused the NAV error?
21 A     Ultimately Jim Dondero, as president here,
22 had that authority.
23 Q     Okay.  And then it says, quote:  "The
24 plaintiff ultimately, whether through insurance or
25 its own funds, compensated the defendant."

Dustin Norris

2       Do you see that?
3  A     Yes.
4  Q     Is that statement accurate?
5        MR. RUKAVINA:  I'll object to
6        vagueness, given the different points in
7        time.
8  BY MR. MORRIS:
9  Q     Does HCMFA believe that that statement is
10 accurate today?
11 A     We know now.  It's come out in discovery
12 that -- and it was represented that Mr. Dondero
13 transferred money to Highland who transferred it
14 to HCMFA.  And I don't know -- and it says "or,"
15 "or its own funds."  So it's accurate whether
16 through insurance or its own funds.
17        But at the time of this writing, we
18 didn't have all the details and have firmed up
19 those details, and I would refer you to
20 depositions and the pleadings and our additional
21 statement regarding cash and movement.
22 Q     Did Highland file an insurance claim, to
23 the best of your knowledge?
24 A     Not that I know of.
25 Q     Did you ever ask anybody, in preparation

Dustin Norris

2  for today's deposition, about that sentence in
3  Paragraph 42 and whether or not Highland had ever
4  filed an insurance claim?
5  A     I didn't ask about that sentence, but we
6  did discuss whether Highland had filed an
7  insurance claim.  And to our knowledge, we don't
8  know that they have.  I'd, again, ask you as their
9  attorney.  That would be a question for you.
10 Q     Well, with all due respect, you have
11 complete and unfettered access to the former
12 president and CFO of Highland; correct?
13 A     I do, but -- I'm sorry.  You said
14 president and CEO?
15 Q     The former president and CFO.
16 A     President and -- I don't have unfettered
17 access to the former CFO.
18        MR. RUKAVINA:  I'll -- I'll object
19        to that.  We have been prohibited by
20        Waterhouse's attorney from discussing the
21        matter with him.
22 BY MR. MORRIS:
23 Q     You're -- you're not allowed -- did -- did
24 you -- did HCMFA ask Mr. Waterhouse at any time
25 whether Highland had filed an insurance claim?

Page 174

Dustin Norris

1
2  A    Not -- not that I know of.  However, we've
3  been not permitted to talk to him related to this,
4  based on his attorney.  So --
5  Q    Well, when did --
6  A    We never really discussed -- go ahead.
7  Q    I'm sorry.
8  A    Go ahead.  You were --
9  Q    I was just going to ask:  When did that
10 prohibition go into effect?
11       MR. RUKAVINA:  John, the witness
12 wouldn't know that.  It's about three
13 months ago that the lady from Baker
14 McKenzie, Deb -- I don't know her last
15 name -- got angry at me because I tried to
16 talk to Frank and she said, "Absolutely
17 not.  You're forbidden, and you're
18 violating your ethical rules if you do."
19       MR. MORRIS:  So sometime in
20 September?
21       MR. RUKAVINA:  I would say August
22 or September.
23       MR. MORRIS:  Okay.
24 BY MR. MORRIS:
25 Q    But sometime -- but you had -- HCMFA had

Page 175

Dustin Norris

1
2  complete, unfettered access to Mr. Waterhouse from
3  the time he left Highland in early March 2021
4  until at least the end of July 2021; right?
5  A    Yeah.  And I would add a point to
6  Mr. Sauter's declaration and our pleadings and the
7  depositions for the various details of what we've
8  discovered since.  However, the unfettered access
9  was also inhibited -- or or Mr. Sauter
10 represented this.  There was a lot going on in
11 March, April, May of 2021.
12 Q    Yeah.
13 A    And we were trying to lift out an entire
14 business and keep everything afloat, and -- as
15 you're very aware.  And so there was a lot going
16 on.
17 Q    Right.  Right.
18       Do you see -- can we go to
19 Paragraph 43, please?
20 A    Yes.
21       MR. MORRIS:  If we could just
22 scroll down to Paragraph 43, please.
23 Thank you.
24 BY MR. MORRIS:
25 Q    Now, again, this amended complaint is

Page 176

Dustin Norris

1
2  filed is July 2006; correct?
3  A    July 6th, not July 2006.
4  Q    I apologize.  Let me ask the question
5  again.
6       This amended answer was filed on
7  July 6th, 2021; correct?
8  A    Correct.
9  Q    And it was filed after Mr. Sauter
10 conducted his investigation to determine the
11 circumstances surrounding the note; correct?
12 A    Uh-huh, correct.
13 Q    And it was filed after HCMFA had had
14 its possession since January copies of the notes
15 that Highland was suing on; correct?
16 A    Correct.
17 Q    And it was filed at a time before any
18 limitation or prohibition was placed on HCMFA's
19 ability to communicate with Mr. Waterhouse since
20 the time he had left Highland; correct?
21 A    Sorry.  You want to repeat the first part
22 of that?
23 Q    Sure.
24       It was filed at a time after
25 Mr. Waterhouse left the employ of Highland but

Page 177

Dustin Norris

1
2  before there was any limitation or restriction
3  imposed on HCMFA's ability to communicate with
4  Mr. Waterhouse?
5  A    Yes.  Once he left in March of 2021 is
6  when that happened.  And, again, in March, we
7  were, on both sides, the creation of Skyview, as
8  well as our employees, trying as -- doing
9  everything we could do to transition the
10 businesses and services.  And so that was an
11 important time.
12       MR. MORRIS:  Okay.  Move to strike.
13 BY MR. MORRIS:
14 Q    I just want to confirm that HCMFA had
15 unfettered access to Mr. Waterhouse between the
16 time he left Highland and the time this amended
17 answer was filed in July.
18 A    We had access to him to ask him what we
19 needed.  Unfettered in the sense of, "Hey, we can
20 access you whenever we need," no, because there
21 was a lot involved in launching and -- launching
22 of Skyview and creating all the services needed
23 for our funds since we -- HCMLP is sharing
24 services provided --
25 Q    Does Mr. Sauter have a role with HCMFA?

Page 178

Dustin Norris

1
2   A   I don't believe so.
3   Q   Do you know who authorized him to conduct
4   this investigation?
5   A   Yeah.  It would have been management,
6   Mr. Dondero, and probably our outside counsel.  At
7   the time, we had been utilizing Highland's
8   services as legal services, all the way up until
9   the end of February.
10       There were legal and compliance
11   services that were part of the shared services
12   agreement.  There was an entire legal team, entire
13   team of litigators who were unable to work on
14   this.
15       Mr. Sauter was a real estate attorney
16   for us, and he picked up the slack and was
17   assigned by Mr. Dondero to help in these causes
18   working with outside counsel, because HCMLP was
19   not providing or no longer able to provide those
20   legal services based on their – their view, even
21   though they were contracted to do those.
22   Q   That contract ended at the end of
23   February; isn't that right?
24   A   That's correct.
25   Q   And with the exception of a couple of

Page 179

Dustin Norris

1
2   people, Highland's legal team migrated to Skyview
3   in early 2021; is that fair?
4   A   Yes.
5   Q   Okay.  And among the people who migrated
6   were Stephanie Vitiello; correct?
7   A   Yes.
8   Q   And Isaac Leventon; correct?
9   A   Correct.
10   Q   And he's the chief litigation guy at
11   Highland prior to the bankruptcy; right?
12   A   I – I don't know if that was Isaac or if
13   it was Scott Ellington.  I don't know.
14   Q   And Scott – Scott Ellington also
15   migrated; right?
16   A   Correct.
17   Q   So you had access to those folks for the
18   first six months of 2021; right?
19   A   No.  I would – our position is that those
20   individuals were unable to work on – even though
21   they had left, they were unable to work on
22   something of this nature.
23       I – I believe there was also a
24   preliminary injunction still in place where Jim or
25   his employees could not talk to Scott or Isaac.  I

Page 180

Dustin Norris

1
2   don't remember all the specific details, but the
3   legal team at Highland – or at Skyview was not
4   working on this.
5   Q   Okay.
6   A   It was probably professional – I don't
7   know the standards, but they were unable to work
8   on – on this.
9   Q   All right.  But you would agree that at
10   the time HCMFA asked the court for permission to
11   amend its answer, it did so based on Mr. Sauter's
12   investigation; correct?
13   A   Yes, and I would caveat that subject to
14   our – our pleadings.
15   Q   Right.  And I think I moved to strike your
16   earlier answer, so let me try and ask the question
17   again.
18       Did Mr. Dondero authorize Mr. Sauter
19   to conduct the investigation?
20   A   I don't have specific knowledge of that.
21   Q   All right.  I think you used the phrase
22   "management."  Did management authorize Mr. Sauter
23   to conduct this investigation on behalf of HCMFA?
24   A   I don't know specifically who – who would
25   have asked him to do the – Jim and – Jim Dondero

Page 181

Dustin Norris

1
2   asked him to help with the – the legal items, and
3   stepped in and help in the absence of HCMLP's
4   help.
5   Q   Okay.  And based on that investigation
6   looking at Paragraph 43, HCMFA took the position,
7   quote:  "Waterhouse signed the two promissory
8   notes the subject of the complaint," close quote;
9   correct?
10   A   That's right.  It's our position that
11   at – and I'd refer you to our amended pleading
12   with additional information, but it's – it's our
13   position that Mr. Waterhouse saw the notes, was
14   confronted, discussed with DC and said, "Look,
15   that's my signature.  I signed them."
16   Q   Okay.  So that's – and it was on the
17   basis of Mr. Waterhouse's conversation with
18   Mr. Sauter that HCMFA wrote that sentence; is that
19   fair?
20   A   I believe so.  And I would refer you to
21   Mr. Sauter's declaration as well, which goes into
22   details on that.
23   Q   And Mr. Sauter specifically said that
24   Mr. Waterhouse signed the notes; correct?
25   A   We can look at Mr. Sauter's declaration.

Page 182

Dustin Norris

1        Dustin Norris
2  I – I believe he said he was – Mr. Waterhouse
3  told him he signed, but –
4    Q    Right. And, in fact, HCMFA's position
5  throughout this entire case was that
6  Mr. Waterhouse signed the notes, but he did so by
7  mistake and without authority; correct?
8    A    That's right. And if you look at the
9  depositions, he testified of that, that he didn't
10  remember signing them, and he didn't have a
11  recollection, and Mr. Dondero never told him to
12  sign it, and he never asked him whether – or
13  he – Mr. Dondero told him never – told him
14  shouldn't be – didn't – Mr. Dondero didn't tell
15  him it was a note, and he never asked if it should
16  be a note.
17        With this – this amended pleading,
18  the thought was he mistakenly thought it was a
19  note, because that was the practice for other
20  notes or other – other transfers of this
21  nature – not of this nature, but other transfers
22  between companies, and so he had papered it up as
23  a note.
24        But if you look at the depositions,
25  you'll see that additional details came out that

Page 183

Dustin Norris

1        Dustin Norris
2  he told his controller, Mr. Klos, to transfer the
3  funds, and Mr. Klos then turned around and asked
4  Kristin to paper it up as a note, and to transfer
5  the cash. And Ms. Hendrix – Kristin Hendrix then
6  added Mr. Waterhouse's JPEG signature to the Word
7  document, which then was filed away.
8        So we – we, through the process of
9  depositions and discovery, were able to find more
10  information that Frank Waterhouse did not
11  remember. He didn't remember signing but said his
12  signature is on there, so he must have signed it.
13        MR. MORRIS: All right. I move to
14    strike. My question is really, really
15    simple.
16  BY MR. MORRIS:
17    Q    Up until the time that you filed the
18  motion last night, HCMFA's publicly stated
19  position has always been that Frank Waterhouse
20  signed the notes, and that he did so by mistake
21  and without authority; correct?
22    A    Correct. It says it here:
23  "Mr. Waterhouse made a mistake in preparing and
24  signing the notes for the defendant."
25    Q    Okay. Good enough.

Page 184

Dustin Norris

1        Dustin Norris
2    A    And then it says: "Upon information" –
3    Q    That's –
4    A    – "and belief, Waterhouse was not aware
5  that the payment from the plaintiff to defendant
6  were to compensate the defendant for the NAV
7  error."
8    Q    I'm sorry. Where are you reading from?
9  Oh, that's 44?
10    A    That's in number 44.
11    Q    Okay.
12    A    Yeah. "Waterhouse made a mistake in
13  preparing and signing the notes for the
14  defendant."
15    Q    Right. Okay.
16    A    But, again, I'll refer you to the
17  depositions and the evidence –
18        MR. MORRIS: Move to strike. It's
19    not responsive to my question.
20  BY MR. MORRIS:
21    Q    Do you see in Paragraph 47 there's a
22  reference to "lack of consideration"?
23    A    Yes.
24    Q    Okay. What does that mean?
25    A    My understanding is that there was no

Page 185

Dustin Norris

1        Dustin Norris
2  consideration. We – there were notes, but there
3  was no payment for those notes. The payment was
4  for compensation related to the NAV error, so
5  there was no payment – or no compensation for
6  notes that had been drafted.
7    Q    Okay. And the next defense there in
8  Paragraph 47 is "mutual mistake."
9        Do you see that?
10    A    Correct.
11    Q    Do you have any facts that support that,
12  that the mistake was mutual?
13    A    Yeah. I – I would look to the
14  depositions. And if you go to the testimony of
15  Frank and Jim Dondero and David Klos and Kristin,
16  it was a clear path and a clear record of mutual
17  mistake.
18        Jim told Frank to transfer the money
19  for the NAV error. Frank then goes, tells
20  Mr. Klos, the controller, to go and transfer the
21  money, who tells Kristin to transfer the money –
22  or to make the transfer and to paper it up.
23  Kristin then papers it up, following the process
24  that she's always followed or she said she's
25  followed for many other notes.

Page 186

Dustin Norris

2 She lacked the authority to do so.
3 Mr. Klos lacked the authority. Mr. Waterhouse was
4 never told to make a note, and so the note itself
5 is drafted by an accountant without authority to
6 do so with a maker and a counterparty that is on
7 both sides of this, representing supposedly both
8 sides.
9 And our position is that the maker of
10 this -- even if you look at the document, Frank
11 Waterhouse signs as maker, not as his position.
12 He's signing as the maker.
13 And so there's various aspects of this
14 that had errors on both sides, the -- the position
15 of HCMFA where they thought they had authority and
16 the position of HCMLP.
17 Q Anything else, sir?
18 A I -- I would refer you to the -- again,
19 the depositions and our pleadings. But there's --
20 there's a host of support there.
21 Q Other than the deposition transcripts and
22 the -- and HCMFA's pleadings, are you aware of any
23 document anywhere in the world that corroborates
24 the defense of mutual mistake?
25 A Other than the documents, the pleadings,

Page 187

Dustin Norris

2 and any schedules and other forms that are filed
3 with the court, there's -- there's plenty there.
4 Q Okay. What schedules are you referring
5 to?
6 A I would say all of your supporting
7 schedules, all of your documentation, the notes
8 themselves, the -- the Word documents that we
9 received as well in discovery that have the
10 metadata showing that Kristin Hendrix applied
11 Frank Waterhouse's JPEG signature.
12 Q Okay.
13 A All of those items as well as, again,
14 depositions all -- of all those individuals.
15 Q So -- so I just want to make sure that I
16 have this clear.
17 So you've got the JPEG documents.
18 You've got the deposition transcripts. You know
19 what? Let me restate the question.
20 You've identified the JPEG documents.
21 Other than the JPEG documents, are you aware of
22 any document in the world that was created before
23 the answer date that supports or corroborates the
24 defense of mutual mistake?
25 A I'm -- again, I -- I'd point to the --

Page 188

Dustin Norris

2 let -- let me take a look here again.
3 Q What is it you're looking at?
4 A This is the amended complaint.
5 Q Okay.
6 A Which paragraph was that again?
7 Q It's 47.
8 A 47.
9 Q Yeah. There's -- it's a -- there's --
10 A Mutual mistake.
11 Q -- one of the defenses there. It's up on
12 the screen.
13 A Yeah.
14 Q There's "mutual mistake," and I just want
15 you to identify for me every document that HCMFA
16 is aware of that was created before the answer
17 date of March 1st, 2001 [sic], other than the JPEG
18 documents --
19 A I would -- I would refer you to --
20 Q -- that support or corroborate -- that
21 support or corroborate the defense of mutual
22 mistake?
23 A Yeah. And I'd also point you to DC
24 Sauter's declaration.
25 Q Okay. That wasn't created before the

Page 189

Dustin Norris

2 answer date; correct?
3 A Well, you're saying -- you -- it was
4 before the answer date.
5 Q Pardon me?
6 A The answer date being when we did the
7 amended answer?
8 Q No. Let me ask the question again.
9 A Yes, please. Sorry.
10 Q Can you identify any document in the
11 world, other than the JPEG documents, that support
12 or corroborate the defense of mutual mistake that
13 was created before March 1st, 2021?
14 A I got you.
15 The JPEG documents is the Word
16 documents with the metadata.
17 Q Correct.
18 A There were emails that went between the
19 accounting team on how to paper it up. That is in
20 your -- your documentation as well, and I would
21 say any other document that's in the court
22 filings.
23 Q Can you identify them? That's kind of --
24 that's not really helpful to me.
25 A Yeah. I -- there's the -- there's an

Page 190

Dustin Norris

1          Dustin Norris
2  email – and this was used in depositions.
3  There's an email that went – was David Klos
4  instructing the group – or instructing Kristin to
5  send the cash and to record a note.
6  Q     And you believe that – and it's HCMFA's
7  contention that that document supports their
8  position of mutual mistake.  Do I have that right?
9  A     Again, I'm not an attorney, so tying the
10  definition as little M, little M, I'm going to
11  have to say I don't know.
12  Q     Okay.  Other than the emails, the two
13  emails that you referenced and the JPEG documents,
14  can you identify any other document created before
15  May 1st – March 1st, 2021, that supports or
16  corroborates the defense of mutual mistake?
17  A     There may be a document.  I – I don't
18  know.
19  Q     Okay.
20  A     And, again, as you've seen, there's a lot
21  of stuff that's come out in discovery, and it's
22  important that testimony of – of those witnesses
23  is taken into account.
24          MR. MORRIS:  Okay.  Move to strike
25  the last portion of that answer.

Page 191

Dustin Norris

1          Dustin Norris
2          Let's take a short break.  I may be
3  done.  It's 4:09.  Can we just come back
4  in six minutes?
5          THE WITNESS:  Yes.  Thank you.
6          MR. RUKAVINA:  Sure.
7          MR. MORRIS:  Thank you.
8          (Recess from 3:09 p.m. to 3:19 p.m. CST)
9  BY MR. MORRIS:
10  Q     Just a couple more questions, Mr. Norris.
11          If you can take a look again at
12  Paragraph 47 of the amended answer.
13  A     Yes.
14  Q     Do you see there's also a reference to,
15  quote, "the lack of authority from the defendant
16  to Waterhouse," close quote?
17  A     Yes.
18  Q     HCMFA does not dispute that Mr. Waterhouse
19  was an officer of HCMFA in May of 2019, does it?
20  A     No, we don't dispute that.
21  Q     And HCMFA doesn't dispute that
22  Mr. Waterhouse, in fact, served as the treasurer
23  of HCMFA in May 2019; correct?
24  A     We don't, no.
25  Q     Okay.  Is the sole basis for the assertion

Page 192

Dustin Norris

1          Dustin Norris
2  that Mr. Waterhouse lacked authority was that
3  Mr. Dondero did not specifically approve it?
4  A     By nature, just the size of this note and
5  the nature of it would have required Mr. Dondero's
6  authority.  And both Mr. Waterhouse and
7  Mr. Dondero testified to that in their deposition.
8  So I'd refer you to that.  They both testified he
9  did not have the authority.
10          MR. MORRIS:  I'm not sure that he
11          did, so I'm going to move to strike.
12          The testimony will be what the testimony will
13          be, not your characterization of it.
14  BY MR. MORRIS:
15  Q     But what about the size of the notes
16  causes HCMFA to contend that Mr. Waterhouse didn't
17  have authority?
18  A     A seven and a half million dollar note is
19  large enough to rise that Jim Dondero would have,
20  in any instance, authorized or needed to authorize
21  this, and he did not.
22  Q     And is that because a $7.4 million note is
23  a substantial obligation for HCMFA?
24  A     You know, substantial – define
25  "substantial."  It's sizeable.  Right?  It's seven

Page 193

Dustin Norris

1          Dustin Norris
2  and a half million dollars.  Overall from the
3  operating business, it was meaningful.  But seven
4  and a half million dollars in any entity would
5  have required Jim Dondero's approval.
6  Q     And so can you explain to me why, if it
7  would have required his approval, nobody at HCMFA
8  noticed that was carried on HCMFA's books and
9  records as a liability since May of 2019?
10  A     Yeah.  I think it's a simple mistake.
11  There were other notes of a similar nature in
12  size.  And as Mr. Dondero testified, he wasn't
13  reviewing these regularly, the balance sheet.
14  Frank Waterhouse was.  The accounting team was.
15  And so the HCMFA side, there was other notes of
16  similar size and nature.  It didn't occur to them
17  that there was new notes.  The accounting team, as
18  we've – which is our position, created the notes,
19  added the signature of Mr. Waterhouse, and then
20  they continued to record those as liabilities on
21  the balance sheet.  And –
22  Q     Is –
23  A     – that was – you had – and, again, I'd
24  refer you to our pleadings and our amended
25  pleadings and the recent pleading yesterday that

**Appx. 00379**

Page 194

Dustin Norris

1

2  we discovered in the discovery process.  But
3  Kristin Hendrix and Dave Klos and Frank Waterhouse
4  made it very clear what the process -- and I would
5  say why -- in answer to your question, it was
6  probably a little sloppy.  It may have cut
7  corners.  They should have received Mr. Dondero's
8  authorization, and they didn't.  And so
9  that's -- that's our position.
10  Q     Does --
11  A     And I would say these are all
12  professionals.  These are good people.  I don't
13  think they were dishonest.  I think they made a
14  mistake.  Professionals make mistakes, but this
15  was a costly mistake.
16  Q     Did -- does -- does HCMFA contest that
17  Frank Waterhouse knew, on May 2nd and May 3rd,
18  2019, that the corporate accounting group was
19  going to paper these transactions as loans?
20  A     Again, I would refer you to the actual
21  depositions and pleadings -- and our pleadings.
22  But our position is -- sorry.  One more time, do
23  you want to ask the question?
24  Q     Yeah.  I think you need to -- I want to
25  try to finish up, and I really appreciate your

Page 195

Dustin Norris

1

2  patience.
3       MR. RUKAVINA:  And I'll just say,
4  John, that was a bit of a confusing
5  question.
6       MR. MORRIS:  Okay.  And that's
7  fair.  Let me try again.
8  BY MR. MORRIS:
9  Q     Does HCMFA contest that Frank Waterhouse
10  knew, on May 2nd and May 3rd, 2019, that the
11  corporate accounting group was going to paper the
12  transfers from Highland as loans?
13  A     Did we contest that he knew that?
14  Q     Correct.
15  A     I think his testimony speaks -- I'll refer
16  you to his testimony.  I think he testified that
17  he didn't know, right?  He didn't know that
18  they -- yes, he was copied on an email, but he
19  didn't have any recollection that they were
20  papered up as a loan.
21  Q     Okay.  And on the basis of that testimony,
22  does HCMFA now contend that Mr. Waterhouse didn't
23  know, in May of 2019, that these transfers were
24  papered as loans?
25  A     I would say that's part of it.  I would,

Page 196

Dustin Norris

1

2  again, refer you to all the pleadings, our
3  pleadings and depositions that -- of these
4  individuals.  There's -- there's a lot of support
5  there.
6  Q     Right.
7       Have you seen the emails from May 2nd
8  and May 3rd?
9  A     I can't remember if they were included in
10  your exhibits, but I know they were discussed in
11  detail in the depositions from Dave Klos and
12  Kristin and Frank.
13  Q     Right.  Okay.
14       MR. MORRIS:  I have no further
15  questions.  This is not particularly
16  helpful.  Thanks.
17       MR. RUKAVINA:  Okay.  I'll reserve
18  questions.  Thank you.
19       MR. MORRIS:  Okay.  Thanks a lot.
20       MR. RUKAVINA:  Thank you.
21       (Off the record at 3:25 p.m. CST)
22
23
24
25

Page 197

1        IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2               DALLAS DIVISION
3  In re:            )Chapter 11
                     )
4  HIGHLAND CAPITAL MANAGEMENT, LP, )
                     )Case No.
5       Debtor.       )19-34054-SGJ-11
   _____)
6  HIGHLAND CAPITAL MANAGEMENT, LP, )
                     )
7       Plaintiff,    )
                     )
8  vs.               )Advisory Proceeding No.
                     )21-03004
9  NEXPOINT ADVISORS, LP; JAMES    )
   DONDERO; NANCY DONDERO; and THE )
10 DUGABOY INVESTMENT TRUST,       )
                     )
11      Defendants.   )
12
        REPORTER'S CERTIFICATION
13      REMOTE DEPOSITION OF
          DUSTIN NORRIS
14        December 1, 2021
15      I, Rebecca A. Graziano, Certified Shorthand
16 Reporter in and for the State of Texas, hereby
17 certify to the following:
18      That the witness, DUSTIN NORRIS, was duly
19 sworn and that the transcript of the oral
20 deposition is a true record of the testimony given
21 by the witness;
22      I further certify that pursuant to FRCP Rule
23 30(f)(1) that the signature of the deponent:
24      ____ was requested by the deponent or a
25 party before the completion of the deposition and

Page 198

1  returned within 30 days from date of receipt of
2  the transcript.  If returned, the attached Changes
3  and Signature Page contains any changes and the
4  reasons therefor.
5      _____ was not requested by the deponent or a
6  party before the completion of the deposition.
7      I further certify that I am neither attorney
8  nor counsel for, related to, nor employed by any
9  of the parties to the action in which this
10  testimony was taken.
11      Further, I am not a relative or employee of
12  any attorney of record in this cause, nor do I
13  have a financial interest in the action.
14      Subscribed and sworn to on this 1st day of
15  December, 2021.
16
17
18
19
20      _____
        Rebecca A. Graziano, CSR, RMR, CRR
21      Texas CSR 9306
        Expiration:  07/31/22
22      California CSR 14407
        Expiration:  09/30/22
23      Illinois CSR 084.004659
        Expiration: 05/31/23
24
25

Page 199

1              ERRATA SHEET
2  Case Name:
3  Deposition Date:
4  Deponent:
5  Pg.  No. Now Reads    Should Read  Reason
6  ___  ___ _____   _____   _____
7  ___  ___ _____   _____   _____
8  ___  ___ _____   _____   _____
9  ___  ___ _____   _____   _____
10  ___  ___ _____   _____   _____
11  ___  ___ _____   _____   _____
12  ___  ___ _____   _____   _____
13  ___  ___ _____   _____   _____
14  ___  ___ _____   _____   _____
15  ___  ___ _____   _____   _____
16  ___  ___ _____   _____   _____
17  ___  ___ _____   _____   _____
18  ___  ___ _____   _____   _____
19  ___  ___ _____   _____   _____
20
21          _____
22          Signature of Deponent
   SUBSCRIBED AND SWORN BEFORE ME
23  THIS _____ DAY OF _____, 2021.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____

**$**

**$12,286,000** 78:16 95:19 96:7

**$12.286** 79:7 82:11, 15 83:14

**$12.4** 147:9,13 149:25

**$2.4** 50:18 51:18

**$5** 50:21 51:21 107:7 108:13 109:4,5,7,13, 14 140:22 143:19 147:7,24 148:9 149:13,16

**$5.186** 134:6

**$7.4** 48:21 63:24 82:16 134:17,24 135:5 138:6,16,23 140:9 146:21 147:6, 15 149:18 150:4 156:19 168:10,19 192:22

**$7.44** 149:23

**$7.442** 149:5

**$7.5** 82:12 133:17,23 146:13

**1**

**1** 26:11 29:6,8 38:17, 21 163:2

**10** 11:7 52:16,21 57:6 63:2

**100** 26:14 80:19

**10:00** 8:15

**10:01** 5:2

**11** 57:6 65:21

**11:05** 56:18

**11:15** 56:15

**11:16** 56:18

**11th** 24:20

**12** 27:19,21 36:14,18 82:13

**12-and-a-half** 148:12

**12/31** 87:5

**12/31/2018** 55:5

**12:05** 56:14

**12:11** 103:2

**12:15** 56:14 102:15

**13** 23:10,11,12 158:3, 8

**14** 11:7

**147** 51:2,3

**15** 134:6 136:17 137:3,7

**15(c)** 67:17,18 68:21 69:16 71:6 72:4 76:6, 19 77:4 87:2 88:7 92:12 99:5,8 101:11

**15th** 136:23

**17** 48:12

**18** 153:2

**182** 119:9,10 124:13 125:20 152:21,22

**185** 7:12,17,19

**18th** 25:3 153:13

**19** 32:6 110:4 153:3 154:18

**1940** 67:18

**1:06** 103:2

**1st** 20:17 23:14,20 24:4 25:21 26:2,5 29:20 30:3,7,9,16,19 31:5,9 33:5 34:4,24 35:6 49:10 61:11,14 126:22 166:19 167:4 188:17 189:13 190:15

**2**

**2** 78:4,6,10 82:16 85:9 86:8,10,19 89:8,9 90:20 92:19 93:22 95:8,14 98:9 141:4 158:14

**2.4-million-dollar** 51:14

**2000-** 31:25

**2001** 188:17

**2006** 176:2,3

**2012** 18:19 21:22

**2013** 21:25

**2018** 18:23,25 19:4 20:17 22:6,12,20 23:14,20 24:4,5,6,15 25:22 26:2,6 32:5,6 46:12,25 47:19 110:4 136:9 145:23 151:13, 15 153:2,10,18,24 154:13 155:9 157:5

**2018/2019** 109:21

**2019** 18:23 19:3,5 20:22 21:7 24:20 28:15,19 32:5 42:25 43:2 47:7 49:6,10,22 50:21 55:10 59:5,7 103:20 104:13,15,19 105:10 107:12 109:4 120:16,18,19,23 128:23 129:22 132:5 134:6 136:9,14,17 137:3,7 146:18 151:6,13 153:3 154:18 157:5,8,14 168:20 191:19,23 193:9 194:18 195:10, 23

**2020** 19:11 32:2 33:18 39:8,12 41:3, 16 42:6 55:16 65:22 67:8 70:14,24 72:3 73:24 78:15 84:24 86:21,24 92:18 95:6, 9,13,16,23 96:8 97:23 98:10 99:11 101:15 102:6

**2021** 19:11 25:3,9,10 29:20 30:3,7,9,16,19 31:5,9 33:5 34:3,4,24 35:6 39:25 57:16 61:11,14 126:23 175:3,4,11 176:7 177:5 179:3,18 189:13 190:15

**21st** 34:3,24 39:25

**81:5**

**22nd** 28:12 162:13

**23rd** 95:6 100:2

**24th** 9:19

**26th** 24:11,15

**28th** 128:23 129:21 132:5

**2:06** 150:24

**2:07** 151:2

**2:21** 151:2

**2nd** 28:15,18,21 50:18 51:14,17 54:24 127:17 194:17 195:10 196:7

**3**

**3** 38:23 105:5

**30** 86:24

**30(b)(6)** 5:18 7:10 9:9,25 15:18 22:25 36:18,25 37:10,15 42:3 49:15 57:6,8 63:2 64:16,22 75:23 79:5 82:10,14 84:4 92:16 95:11,18 116:6 132:5 141:19

**30th** 87:6 95:9,16,23 96:8 101:14 102:6 154:8,14

**31st** 46:11,25 47:18 154:9

**35** 9:19 168:16

**36** 87:13,14

**38** 160:14,22 168:8, 17,24,25 169:2

**3:06** 150:24

**3:09** 191:8

**3:19** 191:8

**3:20** 150:25

**3:25** 196:21

**3rd** 28:15,19,21 39:8, 12,22 41:16 42:6 47:7 49:10,22 50:21

**51:21 54:24 127:17 194:17 195:10 196:8**

**4**

**42** 168:24 169:12,16 173:3

**43** 169:6 175:19,22 181:6

**44** 169:6 184:9,10

**45** 46:20,21 160:15 168:8,18,25 169:2,6

**47** 184:21 185:8 188:7,8 191:12

**4:09** 191:3

**5**

**5** 9:17 29:10,13 158:21

**5.2** 109:15

**5.6** 109:15

**59** 71:21,22 89:19

**6**

**6** 10:25 30:5

**6/30** 94:24,25 153:22

**60** 153:22 154:8

**600** 79:25

**650** 89:20

**650-page** 9:18

**6:05** 92:18 93:18

**6th** 92:18 93:18 97:14 161:24 162:14 164:2 176:3,7

**7**

**7** 10:25 30:5

**7.4** 134:22 147:2

**8**

**8** 10:25 25:10 141:19 142:10

**9**

**9** 11:2,3 103:4 104:18 158:22

**9:00** 8:14

**A**

**a.m.** 5:2 56:18

**ability** 30:24 31:4,8 33:4 34:23 176:19 177:3

**absence** 181:3

**Absolutely** 174:16

**accept** 170:2,9 171:18

**accepted** 169:17 170:6,7,22 171:3

**access** 30:15,18,20 33:22,24 34:6,8 61:20 144:16 161:8 173:11,17 175:2,8 177:15,18,20 179:17

**accessible** 32:3

**account** 51:6 143:20 150:5 190:23

**accountant** 63:9 186:5

**accountants** 57:16 63:14

**accounted** 52:23 53:13 63:6

**accounting** 27:16 43:12,19 44:11 50:8 52:17 53:5,17,21 56:25 57:5 61:24 62:23,25 63:8,17 64:2,3 65:2 70:6 72:6 75:16 78:23 126:10 189:19 193:14,17 194:18 195:11

**accounts** 58:3,8,9

**accuracy** 125:25

**accurate** 7:2 25:18 44:3,24 45:20 65:15 74:17 75:3 76:3,11 80:8,15,19 81:20,23 94:2 125:21 126:6 127:14 172:4,10,15

**accused** 120:8

**acknowledge** 92:3 95:5

**acknowledged** 51:24

**acknowledges** 51:24

**Act** 67:18

**acting** 80:4 126:23

**action** 29:3

**actively** 144:17

**actual** 40:17 41:10 136:22 144:9 194:20

**add** 79:12,13 175:5

**added** 18:20 183:6 193:19

**addition** 149:16 171:6

**additional** 53:4 54:15 84:13 122:4 149:18 167:7 168:4 169:6 172:20 181:12 182:25

**address** 53:5

**addressed** 127:11

**addressing** 101:9 109:22

**adoption** 131:23 132:8

**adversary** 28:8

**advise** 124:8

**advised** 130:16

**adviser** 33:20 53:17 64:4 68:16 69:24 75:18 83:18 106:7 123:19 127:24 128:4

**advisers** 21:2,6,12, 25 22:12,19 32:16 40:23 45:3,9 67:4 71:11 72:2,9,12,23 73:3 75:6 77:6,12 78:14 84:23,24 86:6 90:23 97:2,5,13 99:17

**advisers'** 94:19 96:21

**Advisors** 5:19,22 18:7 19:25 20:7,23 21:2 33:9,17 78:13

**advisory** 66:3,6,9

**affiliate** 93:5

**affiliates** 60:18 79:22 90:22

**affirmative** 30:13 50:4 53:6 158:25 167:20 168:8,18

**afloat** 175:14

**aggregate** 48:21

**agree** 42:8 57:4 77:5, 9 95:11,19 101:22 112:4 131:2 132:4 138:15 147:23 151:24 163:23 165:12 180:9

**agreed** 138:5 163:21

**agreeing** 104:4

**agreement** 9:6 34:14 44:11 60:17 61:25 62:15 68:24 70:10 74:20 75:22 77:22 81:8,9 111:9 113:20, 22 128:21 138:4,13, 23,25 139:2,10 140:4,9 142:25 150:12 164:23 170:16 178:12

**agreements** 66:10, 12,15

**ahead** 14:17 70:13 71:16,17 101:7 174:6,8

**allegedly** 121:15,22

**allocation** 105:3 106:8 118:21 122:24 123:2 125:22

**allowed** 13:11 173:23

**amend** 9:11 104:4,7 159:24 164:7 180:11

**amended** 7:24 8:13 9:4,24 10:21 11:8 35:17,18 54:17,18 55:6 63:12,20 158:11,14 159:3,5,9, 21 160:7 161:2 164:2,5 167:10,15, 21,22 175:25 176:6 177:16 181:11 182:17 188:4 189:7 191:12 193:24

**amount** 70:16 79:8 82:17 107:6 109:15, 22 154:23

**amounts** 48:25 49:3 65:24 78:11 79:21 82:25 90:21 91:12 93:3 101:19,22,24 105:14 134:20

**analysis** 67:17 68:21 69:16 72:4 106:25 113:24 114:5,11 115:2 116:7 165:2

**analysts** 27:12

**analyzed** 121:2

**angry** 174:15

**annual** 66:12 67:20 88:7

**answering** 6:15 64:7

**answers** 6:3 7:2 35:16 63:20 75:10

**anticipated** 80:15,16 115:25

**apologize** 22:17 24:12 69:6 152:12 154:5 155:23 159:20 169:22 176:4

**appearing** 82:20

**appears** 30:6 49:18

**applied** 187:10

**approaching** 102:15

**approval** 128:21 193:5,7

**approve** 192:3

**approved** 111:15 112:11 128:9,15 132:23 133:2

**approximately** 26:9, 19 109:3,5 133:16,23 134:5 146:13 147:7 154:9 156:19

**April** 13:14 19:3,5 20:22 21:6 22:16 24:20 25:10 104:13, 19 175:11

**argument** 27:25 35:23 36:3 37:15

**arguments** 85:14,16

**ascertain** 58:6,14

**Asia** 7:14 158:5

**asks** 27:21 52:16

**aspect** 34:9 67:24 97:24 99:24

**aspects** 14:22 45:3,4 68:11 69:24 186:13

**assert** 30:12

**assertion** 191:25

**Asset** 122:21

**assigned** 178:17

**assistant** 18:18,20 21:21 25:5,12

**assume** 41:22 45:21, 23 47:24 48:24 49:2

**assuming** 23:21,24 48:4 52:6,7

**assumption** 45:25

**assumptions** 45:22

**attached** 28:20 161:22 162:20 163:7, 22

**attachments** 31:17

**attain** 20:12

**attempt** 83:5

**attended** 67:16

**attorney** 5:9 83:8 96:25 147:17 160:11 173:9,20 174:4 178:15 190:9

**attorney's** 13:17

**audit** 44:12 47:8,12, 23 57:16 58:2 59:4,7 154:8

**audited** 43:5,10 44:2, 12,23 45:5,19 46:10, 24 47:17,23 48:14,19 49:20 55:2 57:24 58:12,16 64:17 65:10 101:17

**auditor** 47:11

**auditors** 43:20 57:17 154:22 156:10

**audits** 153:19,22

**August** 86:25 99:4,6 153:25 154:9,13 155:9 174:21

**author** 77:18

**authority** 85:4 138:2 169:8 171:18,22 182:7 183:21 186:2, 3,5,15 191:15 192:2, 6,9,17

**authorization** 72:11 85:18 194:8

**authorize** 143:8,12 180:18,22 192:20

**authorized** 72:9,24 84:22 143:16 178:3 192:20

**aware** 6:3 27:15 28:7,13,17 29:2 31:7 34:20 35:7,11,12,13, 23 36:5,6,12 37:9,14, 19,22 39:15,21 47:10 49:8 52:12 56:2,25 57:3 59:6,16 62:6 67:8,12 71:3 84:14 85:2 86:13,15,16,19

87:7 98:2 100:3 111:24 113:23 117:18 118:18 122:6 124:23 125:17 127:2 130:8 145:18 150:6 158:10 175:15 184:4 186:22 187:21 188:16

---

**B**

**back** 13:13,14 17:13 21:22 22:2 31:25 40:24 41:9,10 56:14 64:7 68:23 69:17 70:6 76:14 77:13 86:2,10 92:23 93:9, 12 94:7 96:16 102:22 150:25 152:5,13,19 170:11 191:3

**back-office** 27:16 43:12 75:17

**background** 64:3 160:25 161:7 166:22

**backing** 98:18 99:2, 18 102:2

**backup** 49:2 82:23 83:4

**Baker** 174:13

**balance** 48:7 53:20 55:5 58:23,24 59:2 65:6,15 87:5,6 92:10, 20 93:22 94:5 96:4 102:9 108:14,17 193:13,21

**bank** 51:6,7 52:2 104:6

**bankruptcy** 27:23 30:23 35:8 36:7 37:23 99:11 179:11

**based** 13:17 18:3 25:15 34:12,25 45:25 46:3 57:17,25 142:13 154:7 163:20 167:10 168:4 171:11 174:4 178:20 180:11 181:5

**basis** 22:20 67:20 167:19 181:17 191:25 195:21

**BBVA** 51:7

**began** 31:25 54:15 104:14,22 120:18

**begin** 6:18

**beginning** 8:16 22:12,20 24:15 120:17 156:7,11,15

**behalf** 5:18 10:7 29:19 35:24 37:11,23 40:3 43:8 64:7 68:20 72:8,23 73:3 80:5 126:23 138:15 143:4, 6 144:10 150:20 151:9 171:4,19 180:23

**belief** 184:4

**believed** 117:13 126:16 149:9 167:17

**believes** 118:5,15

**big** 123:11

**biggest** 67:24

**bill** 59:15

**billed** 59:19,20

**bind** 6:4

**bit** 37:21 48:5 88:17 126:2 133:9 151:4 195:4

**Blank** 87:24

**board** 9:9 32:17 33:10,14 65:22 67:5, 8,16,19 70:15,25 71:8,10 72:3,25 74:21 75:4 76:3,7,15 78:9,15 80:9 84:6,16, 19,23 86:7,12,13,22, 23 87:9 88:4,7,12,24 89:10 91:21 92:11 93:25 94:10,20 95:7, 13,21 96:9 98:10,16, 22,25 99:3,4,7,12,16, 20 100:18 101:10 112:12 119:2,3,22 123:3,8 125:21 126:6,13 127:6,11,12 128:9,12,15,23 129:2,21 130:7,14, 15,18,21 131:5 132:6,23 133:3

135:20 156:10,24 157:20

**board's** 77:7 90:2 92:19 93:21

**boards** 66:24 67:3

**booked** 53:20 54:11, 21 57:10,14 59:9 64:23

**booking** 56:22 57:11,20

**books** 44:11 52:24 53:13,16 54:7,12,23 55:7,14,20,23 56:21 58:15,19,21,22 59:17 60:24 61:5,13,21 62:10 63:3,17 79:12 193:8

**bottle** 56:12

**bottom** 87:21 102:8 152:17 158:23

**Brad** 24:3,7,18

**breach** 148:24

**break** 7:4 56:7 150:24 191:2

**Brian** 25:5

**bring** 70:2

**broad** 35:21

**broader** 126:3

**broadly** 19:19,23

**broke** 145:3

**broker** 144:21,24

**broker-dealers** 107:13

**business** 19:22 68:6,14 107:18 175:14 193:3

**businesses** 177:10

---

**C**

**calculate** 111:14

**call** 8:23 61:19 67:17 125:7

**called** 5:17 8:23 159:23 161:13

**calls** 32:19 165:11

**Canty** 7:9,17 152:13, 21 158:6

**capacity** 5:17 20:3 36:25 37:9,14 44:7,8, 10,13 75:25 77:17 137:19,21 171:2

**capital** 5:12,19,21,24 27:17 32:7 42:20 52:5 61:22 108:19 123:15 124:21 125:14 131:3 146:2,6 169:20 171:3,4

**careful** 16:25

**carefully** 41:25 62:5 120:6 129:19 171:17

**carried** 193:8

**carrier** 147:8 151:22 152:2

**carriers** 152:7

**case** 27:23 48:24 49:2,18 67:21 76:17 81:10 182:5

**cash** 14:7,11 52:10 108:14,16,18 134:15 140:23 141:2 172:21 183:5 190:5

**caused** 121:22 137:7 147:22 170:9,22 171:5,20

**caution** 16:20

**caveat** 180:13

**CC'D** 95:3

**CEO** 167:2 173:14

**certificates** 9:7 19:2 20:14 23:22 25:20

**CFO** 39:17 45:7,13 75:15 96:21 171:8 173:12,15,17

**chain** 81:2 91:16

**challenge** 105:11,15

**challenged** 100:24

**change** 93:7 102:18 104:5,7 106:11,18

**changed** 20:23 24:2 55:23 56:21 57:12,21 98:19

**changing** 23:25

**characterization** 192:13

**characterize** 164:20,25 165:4

**characterizes** 165:7

**charged** 43:9 81:18, 22

**charts** 73:22

**check** 9:17

**chief** 19:20 20:4 32:15 33:13 179:10

**circumstances** 16:9 17:16 57:18 86:14 161:4 164:18 165:15 176:11

**claim** 141:20,23 142:2,4,19 143:6,9, 11,13,16,20,23,25 144:4,6,9,18 145:8, 16,21,24 148:16 149:10,14 151:8,12, 18 152:2 172:22 173:4,7,25

**claims** 152:7,11

**clarification** 37:8 74:12 123:4,5

**clarify** 69:17

**clean** 149:3 163:19

**clear** 79:14 185:16 187:16 194:4

**close** 83:20 181:8 191:16

**closed-end** 105:4,7 106:2,11,19 108:4

**closely** 72:5 112:22

**coffee** 56:8

**collaborative** 105:21 106:12

**collateral** 147:17,19 148:20

**colleague** 7:9

**collect** 28:9

**collectively** 28:24

**color** 53:4

**combination** 134:14

**combined** 134:22

**comfortable** 68:18 99:12

**commenced** 28:8 29:3 64:18,25 161:21

**commencement** 40:9

**commentary** 54:2

**committee** 111:10, 15 115:11

**communicate** 30:24 34:23 176:19 177:3

**communicated** 150:12 170:12

**communication** 62:11 130:18 150:10

**communications** 27:22 65:22 84:5 121:2 123:8 171:11

**companies** 182:22

**company** 14:4 36:22 39:15 64:7 143:2 146:5 147:14,20,21 161:13

**company's** 12:10 53:2 139:8 142:4,6

**Compass** 51:7

**compensate** 137:18 138:16 184:6

**compensated** 171:25

**compensation** 15:11 59:10,22 60:5, 14 61:2,16 62:9 63:6, 22 64:11 108:20 134:25 135:6 137:14 138:23 140:9,15,16

**146:22 147:6,8 149:19 157:18 168:11,21 185:4,5

**competently** 36:17

**complaint** 8:22 9:2 28:12,21 34:3 38:19, 20 39:25 40:18 161:2,23 162:2,25 163:4,7,23,25 166:14,21 167:10,15 175:25 181:8 188:4

**complete** 6:25 23:22 25:17 34:5,8 59:4 173:11 175:2

**completed** 6:16,19

**completely** 80:19 94:2

**compliance** 27:16 31:15 32:15,24 33:13 41:2,7 61:23 69:4 70:5 72:6,14 74:19, 23 76:15 77:25 106:14 126:9 170:14 178:10

**component** 33:7 83:14

**components** 17:22

**concerned** 35:25 36:8 124:24,25

**concerns** 35:9 37:12,17,24 90:20 110:3

**conclude** 49:14 155:15,24

**concluded** 157:12

**conclusion** 135:11 156:5 157:21

**conduct** 47:12 138:7 178:3 180:19,23

**conducted** 67:9 122:25 161:3 165:14 176:10

**confirm** 10:19 50:23 52:9 57:9 133:5 165:23 177:14

**confirmed** 11:23

**confirming** 163:16

**confronted** 181:14

**confused** 81:6

**confusing** 195:4

**confusion** 81:13

**connection** 6:7 10:7 12:13 15:2 59:11 67:9 88:7 101:10 110:9,23 111:3 112:15 113:4,9,16 114:2,13,23 117:14 118:16 119:15 121:8 124:9 134:7 135:2 137:15 138:18 142:8, 20 144:7 146:22 147:9 149:14 166:3 168:22

**consent** 103:5,9,15, 19,23,24 104:3,8,9, 12,14,19,22 105:2, 10,20,21 106:6,8,10, 18,22 107:5,9,18 108:3,4,13,24 109:5, 9,12

**consented** 104:10 105:6 107:23

**consequence** 138:6

**consequences** 109:22

**consideration** 184:22 185:2

**consistent** 51:16

**consultant** 112:6 128:17

**consultation** 154:24

**contained** 95:6

**contemporaneously** 55:10

**contend** 42:4 85:17, 20 113:3 132:20 134:21 147:13 192:16 195:22

**contends** 49:9 59:8 134:17,23 135:5 149:24

**contention** 42:8 132:24 146:20 190:7

**contest** 194:16 195:9,13

**continue** 10:24 29:18 144:17 148:14

**continued** 193:20

**continuing** 24:20

**continuous** 22:19

**contract** 80:21 115:6 116:24 117:5 148:24 170:6 178:22

**contracted** 178:21

**contracts** 66:19 67:11,19 69:9,12

**contribution** 67:25

**control** 121:4 130:9 137:20,21

**controller** 183:2 185:20

**controlling** 26:21

**controls** 26:15 122:4

**conversation** 117:22 181:17

**conversations** 16:3 32:8 101:3 130:4 171:12

**conversion** 105:6,8, 9,13 107:25

**converted** 105:3

**converting** 105:25

**coordinating** 41:12 115:12

**copied** 73:11 90:4,16 91:15,21 92:3 99:23 195:18

**copies** 9:5 88:21 161:19 162:17 176:14

**copy** 30:2 89:14,16 91:19 167:25 168:2

**corners** 194:7

**corporate** 194:18 195:11

**correct** 9:20 10:3

12:15,22 15:23 18:25
20:8,9,10 21:10
22:21 26:19 28:19
29:4,5,7,8 30:13,16,
19,25 31:5,6 34:7,18,
24 35:19 39:8,9
42:15,25 43:3 47:10,
13 48:23 49:24
51:19,21,25 54:25
55:18 57:6,21 59:12,
13 61:12 64:20,25
65:2 66:4,7,10,13,19,
25 67:2 69:10,13,14
70:17 71:2 72:4 74:3,
9 76:12 77:7,8,10
83:15 84:6 86:24
88:14,20,24 89:11
90:16 91:16 92:20,21
94:16,20 95:2,23
96:10,22,23 97:2,3,5,
8,10 100:10,14
101:2,11 103:20
106:23 107:21
108:10 114:13,20,24,
25 116:19 117:19
120:16 121:4,22
122:9 123:6 124:17,
18 127:18,19 128:24,
25 129:7 130:2
131:4,13 132:14,18
133:24 134:3,4,19
135:3,8 136:17,18
137:4,5,8 139:3
141:18 143:21,23
145:5 146:3,18,19,
24,25 147:11 149:5,
11,12,14,15,20,21,25
150:2 151:10,11
158:18 159:21
162:18 164:3,7,8,11
165:16,17,19,22
166:2 169:20 170:23
173:12 176:2,7,8,11,
12,15,16,20 178:24
179:6,8,9,16 180:12
181:9,24 182:7
183:21,22 185:10
189:2,17 191:23
195:14

**correction** 22:23
90:3 124:24

**correctly** 15:13
85:10 132:2

**corroborate** 188:20,

21 189:12

**corroborates** 61:15
62:7 186:23 187:23
190:16

**cost** 106:22

**costly** 194:15

**costs** 106:20 133:18

**counsel** 5:11 11:19
13:8 54:2 82:22 83:3
88:3 90:2 116:21
123:17,19,21,23
124:2,7 178:6,18

**counterparty** 186:6

**couple** 168:13
178:25 191:10

**couple-month**
105:18

**court** 27:24 30:23
35:8 36:3,7,11 37:16,
24 40:20 160:8 164:7
180:10 187:3 189:21

**coverage** 142:20
149:11

**covered** 98:16,24
99:16 100:17

**created** 42:18 61:14
62:7,17 63:4 147:21
187:22 188:16,25
189:13 190:14
193:18

**creating** 45:8 53:16
135:15 177:22

**creation** 177:7

**CST** 5:2 56:18 103:2
151:2 191:8 196:21

**current** 57:17 58:9

**cut** 194:6

---

**D**

**daily** 40:19 41:11

**damage** 152:9

**data** 33:22 115:13

**date** 21:19 30:7,10
33:19 34:4 35:6,9,25

36:8 37:12,16,24
38:12,16 39:14 42:9
61:10 62:7 63:4
85:25 97:6 107:15,25
126:22 130:4,5
135:22 136:4,8
155:12 156:12
170:24 187:23
188:17 189:2,4,6

**dated** 28:14,18 30:3
127:15

**dates** 23:21,25 25:16
52:11 120:18 134:10
162:13

**dating** 21:22

**Dave** 12:3 80:14 95:4
171:8 194:3 196:11

**David** 25:5 185:15
190:3

**Davor** 7:18 12:14
56:10 139:23 142:3
163:16

**day** 34:3 51:25

**days** 153:22 154:8

**DC** 12:17,19 13:12
142:3 161:3 165:14
181:14 188:23

**DC's** 61:19

**deals** 160:15

**Deb** 174:14

**debated** 121:2

**debtor** 5:11 31:21
33:7,23 34:12 39:17
41:6 42:17 117:22
118:9 166:20 167:3

**December** 39:8,12,
22 40:17 41:3,16
42:6 46:11,25 47:18
55:16

**decision** 105:19,22,
23 106:17,21 108:2,3
138:2

**declaration** 9:4
13:15 16:14,18 17:19
31:16 54:17 61:19
164:14,16,23 165:5
167:19 175:6 181:21,

25 188:24

**deductible** 141:3,17

**defendant** 169:16,19
171:25 183:24 184:5,
6,14 191:15

**defendant's** 9:11
166:19

**defending** 41:11

**defense** 114:18,19
115:8 144:7 168:9,18
185:7 186:24 187:24
188:21 189:12
190:16

**defenses** 30:13 50:4
53:6 135:9 140:10
150:2 158:25 167:20
169:4,7 188:11

**deferred** 80:20

**define** 119:17 154:3
192:24

**defined** 46:7 153:5

**Defines** 132:19

**defining** 131:25
132:17

**definition** 190:10

**demand** 19:10
38:14,24 39:24 40:18
41:15,21 54:14,20
55:15

**demanded** 15:24
16:2 19:9 38:6,7,9,11
86:16 137:14 138:5

**demanding** 39:17,
18

**denying** 52:10

**department** 78:23

**depending** 75:7

**deposed** 5:17

**deposited** 105:17

**deposition** 5:13 6:8
7:10,24 8:4,18 9:25
10:8,21 11:12 13:17,
20 14:2 15:3,14
28:24 29:10 37:4
60:6 82:21 83:25

25 188:24

**depositions** 12:2
40:19 41:12 61:6
140:20 172:20 175:7
182:9,24 183:9
184:17 185:14
186:19 187:14 190:2
194:21 196:3,11

**derived** 95:8

**describe** 19:16
111:2 164:17

**describes** 133:15

**description** 123:6

**desk** 160:18

**detail** 196:11

**detailed** 134:15

**details** 14:6 111:6
113:11 141:5 172:18,
19 175:7 180:2
181:22 182:25

**determination**
67:10 129:10 131:10,
22 132:7 138:9,14
154:16 155:19
156:21 157:2,9
170:18

**determinations**
127:23 130:6

**determine** 57:17
67:19 68:16 79:6
105:11,16 107:2
113:25 114:6,11
115:4 116:9 164:18
176:10

**determined** 57:25
129:4,13,23 130:9
131:17 136:7,13
154:19 156:14,18

**determining** 129:25
130:22

**development** 19:22
68:6,14

**devoted** 99:8 101:9

**dictates** 67:22

**difference** 8:11

**84:11 115:23 173:2**
186:21 187:18 192:7

Index: differently..entire

**differently** 155:7

**diligence** 142:9
165:3

**direct** 26:5

**direction** 31:18

**directly** 95:14 144:23

**director** 26:25 27:4

**directors** 23:2 26:24
88:4

**disagree** 148:10

**disciplinary** 121:20,
25 122:6

**disclosed** 49:23
64:17

**disclosure** 86:12

**discover** 17:8

**discovered** 54:11
63:12 175:8 194:2

**discovery** 11:25
81:7 172:11 183:9
187:9 190:21 194:2

**discuss** 16:16 169:6
173:6

**discussed** 13:25
14:3,4,9 16:21,23
82:22 83:3 103:15
108:19 120:25
135:19,20 140:17
142:3 166:25 174:6
181:14 196:10

**discussing** 130:5
173:20

**discussion** 7:13
16:6 82:8 105:24
106:16 116:20
142:17 154:21

**discussions** 13:23
14:10 16:11 17:6,12,
14 110:2 118:8,11

**dishonest** 194:13

**dispute** 49:20,25
50:4,17,20 92:15
93:19 94:18,21
111:25 128:22 133:2
162:16 191:18,20,21

**disputed** 40:14

**distinguishing**
47:22

**distribution** 19:20
20:4 107:16

**Docket** 9:19

**document** 6:25 7:16
9:18,20 23:6 29:16
35:7,22 37:10 38:13
46:19 47:16 50:25
71:4,24 87:16,21
104:5 119:13 120:7,
12 122:11,19,23
126:5,12,17,21
128:20 138:21 140:8
158:2,15 160:13
161:18 166:10 183:7
186:10,23 187:22
188:15 189:10,21
190:7,14,17

**documentation**
187:7 189:20

**documented** 61:7

**documents** 6:22
8:17,20 9:14 11:16,
22,24 36:11 38:15
62:18 136:22 144:15
145:10,11 156:23
168:3 186:25 187:8,
17,20,21 188:18
189:11,15,16 190:13

**dollar** 48:25 49:3
192:18

**dollars** 14:8 157:13
193:2,4

**Dondero** 11:20
12:20 13:20 14:2,23
15:20 26:7,9,14,15
27:4 30:18,24 34:6
39:20 60:4,5,7,8,12
76:24 83:20 84:14,
22,25 98:18 99:18
103:16 105:22
106:13 121:3,14
137:17 138:3,19
140:12,18,19 165:22
166:3,11 167:2,3,5
170:18 171:2,10,21
172:12 178:6,17
180:18,25 182:11,13,
14 185:15 192:3,7,19

193:12

**Dondero's** 192:5
193:5 194:7

**doubt** 77:2 80:12
98:4

**draft** 69:4 72:7 96:2

**drafted** 126:8 185:6
186:5

**drafting** 77:4

**due** 65:24 70:16
78:12 79:21 81:5
90:21 93:4 96:7
101:19 102:3 153:22
165:3 173:10

**duly** 5:3,5

**Dustin** 5:4 6:1 7:1
8:1,2,3 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1,20 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1,9,17,21
25:1,3,10 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1

136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1,15
160:1 161:1 162:1
163:1,12 164:1,9
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1

**duty** 44:22

---

**E**

**earlier** 13:12 16:13
22:24 65:8 86:21
108:19 155:12
180:16

**earliest** 81:4

**early** 17:5 19:10
88:10 136:14 175:3
179:3

**economies** 68:8

**educate** 127:12

**effect** 122:3 139:2
174:10

**effective** 23:25 24:11
25:15

**effectuated** 170:19

**effort** 145:7 151:21

**efforts** 144:9

**elaborated** 84:13

**Ellington** 179:13,14

**email** 73:14 74:2 81:2
87:8 88:6 91:15 92:3,
4,17 93:20 94:23
96:17 97:24 98:8

99:23,25 100:10,13,
24 101:8 190:2,3
195:18

**emailed** 84:2

**emails** 11:22 189:18
190:12,13 196:7

**employ** 165:13
176:25

**employed** 18:6 32:5,
6 83:9 166:24

**employee** 20:3
31:13 33:9,17 43:15
44:7,14 71:13 72:12
75:2 76:9 77:17 80:6,
17 81:21 115:13
119:25 120:2 121:6,
14,21 122:16 125:13,
18 126:4

**employees** 23:2
27:5,6,7,9,14 32:17,
22 41:6 42:18,21
53:15 61:23 69:3
75:21 76:18 77:13
111:7,8 112:23
115:17 117:20,21,22
118:10 119:23
123:15 124:5 125:5,
7,8 129:10,12 130:7
135:15,21 137:10
142:22 144:24 146:9,
11 150:11 156:11
161:9 166:24 170:13
171:6,10 177:8
179:25

**enable** 122:23

**encourage** 133:13

**end** 145:3,6 175:4
178:9,22

**ended** 120:20,22
178:22

**ending** 46:11,25
47:18 86:24 95:15,23
154:14

**engagement** 111:21

**entering** 138:12

**entire** 120:24 121:3
162:15 175:13
178:12 182:5

**entities** 74:4,6,8
83:19 98:17,25

**entitled** 147:13
149:18,24

**entity** 26:13 27:3
52:9 73:25 75:13
77:18 111:25 193:4

**entries** 57:2

**environment** 130:9

**equity** 26:20

**error** 9:10 14:20,21
15:11 16:8,9,10
17:24 32:10,13,18,21
50:6 59:11,12 62:11
108:21 109:23 110:3,
6 115:16 117:13
118:6,10,16 119:20
120:9,15,25 121:15,
22 122:1,25 124:16,
22,25 125:16 126:11,
25 131:13,25 132:7,
14,16,17,19 133:16
134:7 135:3,12
136:11,13,16 137:4,
7,18 140:15,17
142:13,15,21 146:24
147:10,25 149:5,6,19
150:5,21 153:10,16
154:4,12,16,20,23
155:4 156:14,22
157:3,10,12 168:10,
22 169:3,17 170:3,
10,20,23 171:5,20
184:7 185:4,19

**errors** 126:16,20
131:24 132:16
137:14 186:14

**estate** 178:15

**estimate** 20:19
109:12

**estimated** 146:12
147:3 149:4,6,23
156:18

**estimates** 111:12

**ethical** 174:18

**event** 55:3,5,6

**events** 16:8 48:11,18
49:5,16

**everybody's** 33:16

**evidence** 184:17

**exact** 6:13 21:19 30:6
33:18 38:12 89:12
92:24 96:8 99:3
107:6 109:8,15

**EXAMINATION** 5:6

**examined** 6:10

**examining** 36:24

**Excellent** 9:22
102:24

**exception** 178:25

**exchange** 87:8

**exclusively** 25:20
99:8 132:11

**executive** 18:13
19:3,6,18 20:2,7
21:5,11,17 22:10
24:8,13,16,21 25:4,
11 43:4 73:25 74:5,7
97:4 116:5

**exhibit** 7:12,15,19
29:10,13 38:17,21,23
40:20,21 51:2,3
71:21,22 87:13,14
89:17,21 119:9,10
124:13 152:14,15
158:3,8

**exhibits** 9:15 11:18
87:10 89:17 161:22
196:10

**existence** 14:24
15:20 16:5 19:7 38:4
39:11 40:5,14 42:24
49:23 55:21 66:22
70:25 71:8

**expect** 44:15 63:9
127:6,13

**expedited** 152:4

**expenses** 106:20

**expert** 64:4 128:17

**expertise** 126:10

**explain** 122:24 193:6

**explaining** 165:9

**extend** 104:7

**extensive** 81:3 88:11
118:11

**extensively** 118:8

**extent** 16:20 80:25
81:11

**extremely** 151:25

___

**F**

**fact** 29:7 55:15 66:21
109:3 131:15 133:4
149:22 182:4 191:22

**factor** 135:23

**factors** 67:21 131:18
132:11,13

**facts** 16:9 17:16
57:17 63:19 86:14
142:7,8 166:22
167:18 168:4 185:11

**factual** 16:21 85:16
138:11

**fair** 6:16 16:22,24
20:16 21:4,23 22:13,
20 25:19 34:2 37:5,6
39:10 40:3 49:19
66:22 73:22,23 89:23
90:5 109:6,22 112:21
115:5 129:6,25
131:16,23 132:8,9
133:5,12,14 141:8
145:4 147:4 153:25
154:7,11 155:8
157:7,11 160:14
164:19 167:9,21
168:7,15,17 179:3
181:19 195:7

**fairly** 91:21 112:5

**faith** 50:7 83:19
84:24 98:17 99:2,17

**fall** 31:25 32:2 67:8

**familiar** 110:19
118:20 164:13

**familiarize** 141:22,
25

**fault** 62:24 116:10
119:25 137:12 150:8

**February** 24:5,6,11,

15 25:3,9 105:10
134:6 136:17,23
137:3,7 140:21
141:15 145:4,6
146:18 151:5 178:9,
23

**fee** 103:9,15,19,23,24
104:3,8,11,19 105:2,
5,10,20,21 106:6,8,
22 107:2,4,5 108:13,
24 109:5,9,12

**feel** 20:20 29:15

**fees** 67:23 68:4 103:5
104:12,14,22 106:20,
22 107:9,18

**field** 83:9

**figure** 84:9 94:5
95:20 96:9

**file** 142:19 172:22

**filed** 9:13,18 28:12
29:3,19 34:4,5 35:8
37:11 39:25 54:18
142:25 144:10
145:21,24 149:10
151:8,13 159:22,24
161:7,24,25 162:2
163:25 164:2,5
166:19,20 173:4,6,25
176:2,6,9,13,17,24
177:17 183:7,17
187:2

**filing** 27:24 29:24
143:3,5,8,12 162:23
166:15 167:5

**filings** 189:22

**filled** 146:9

**final** 96:3,6,10,11,12
100:2 107:15

**finalization** 87:9

**finalized** 105:9
154:19

**finance** 43:12 70:6
75:9,16

**financed** 146:17

**financial** 43:5,10,13
44:2,24 45:3,5,8,19
46:10,24 47:13,17
48:15,19 49:21 50:2

57:22 58:13,16 64:5,
14,17 65:10 66:3
86:23 95:15,22
101:14,18

**financials** 43:20
44:16 47:24 48:2
55:3 94:24 95:2,9,17
154:14

**find** 56:6 116:25
117:6 144:14,19
183:9

**fine** 21:3 115:24
167:25

**finish** 194:25

**fired** 121:7 161:12

**firing** 121:18,23,25

**firm** 66:3 68:6 110:19

**firmed** 172:18

**five-month** 162:3

**focus** 23:12 53:9
130:24

**focusing** 12:12

**folks** 179:17

**follow-up** 88:9,12
99:9

**footnotes** 102:2

**forbidden** 174:17

**forgive** 8:23 107:17

**form** 42:16 61:3,17
70:18 168:22

**formal** 72:10

**formed** 145:25 156:4
161:13 167:19

**forms** 187:2

**formulating** 94:19

**forwarded** 89:24
90:3

**forwards** 88:19,21
90:11

**found** 15:15 54:20
63:13 81:6 86:20
92:20 93:22 153:15
155:3

**fourth** 141:12

**frame** 166:15

**Frank** 12:3,23 14:10
15:5,8 24:9,16,21
25:4,11 39:13,15
43:15,17,24 44:22
45:17 60:6 65:16,17
71:13 75:9,11,12,15,
24 78:21 80:14,22
81:25 82:24 83:23
84:10,12 90:18 95:4
137:17 140:18
142:23 144:25
151:19 161:16 167:8
171:8 174:16 183:10,
19 185:15,18,19
186:10 187:11
193:14 194:3,17
195:9 196:12

**Frank's** 85:2

**free** 20:20 29:15

**front** 8:18 10:14 23:6
158:16 166:7

**front-office** 27:7,11,
14 69:21

**full** 30:15,18,20 83:19
84:24 98:17 99:2,17
162:11

**function** 63:10 65:3
68:14 72:6 74:19,24
75:20 76:4,16 77:20,
25

**functions** 27:15
31:15 41:3 43:13
68:19 69:20 70:7,9
75:17

**fund** 5:19,22 105:3,4,
7,25 106:2,8,11,18,
19 108:5,12 118:22,
23,25 119:2,3 122:24
123:2 125:22 131:24

**fund's** 107:19

**funded** 134:2 140:22
141:15

**funds** 19:13,19,23
21:12,18,24 22:11,19
33:14 66:7,22,24
67:4 68:2,8,9 69:23,
25 75:6,17 122:20

153:19 171:25
172:15,16 177:23
183:3

**future** 56:7 68:10
78:12 90:21 93:4

---

## G

**GAF** 126:7,13 127:6
128:12,15,23 129:2,
20,21 132:6

**gain** 148:9

**game** 16:22,24

**gap** 155:17

**Gates** 123:20

**gave** 35:17 47:14
72:3

**general** 12:6,7 14:3,
14 17:16,23 26:11,
12,15 27:2 111:16
133:14

**generally** 6:5 17:13
26:7 27:12 103:24
104:2 109:21 111:5
112:7

**give** 6:25 20:19 94:8
113:21

**global** 105:3 106:8
118:21 122:24 123:2
125:22

**good** 5:8 50:7 102:19
165:8 183:25 194:12

**grab** 160:16

**granted** 160:3

**grants** 160:8

**group** 11:23 43:19
190:4 194:18 195:11

**growing** 68:10

**guess** 14:8 36:19,20
41:8 64:6

**guy** 179:10

---

## H

**H-** 147:12

**hail** 152:9

**half** 153:18,23 162:6
192:18 193:2,4

**hand** 87:3

**handed** 40:21

**happened** 97:16
153:13 177:6

**happy** 47:20 56:9

**hard** 167:25 168:2

**harm** 147:22 148:22

**HCMFA** 5:22 6:4,7
9:3 10:7 18:9,12,16,
19,22 19:14 20:15,
21,25 23:3 24:3
25:21 26:2,18,24
27:2,6,13,22 28:9
29:3,20 30:12,15,18
34:4,5,16,22 35:8,24
37:5,11,15,20 38:3
39:8,10,23 40:4,8
41:7 42:4,14,19,23
43:4,8,14,25 44:8,14,
23 45:15,18 47:12
49:9,20 50:17,20
51:18,23 52:23
53:12,20 54:6,10,24
55:14,23 56:20 57:8
58:3 59:4,8,14 62:6
64:16,22 65:5,13,17
66:3,19 68:20 69:13,
15 70:14,15,24 71:7
75:2,23 76:2,5,9
77:25 78:13,17 80:5,
7,17 81:5,22 85:17
86:22 93:5,19 94:16
95:5 104:12 106:6,7,
19 108:3,12 109:21
110:8,17 111:25
112:24 113:3,7,14,
21,24 114:5,10
115:2,12 116:8
117:11,12 118:3,4,5,
14,15,21 119:14
120:8 121:4 122:23
123:11,20 124:19
125:14,18 126:23
127:3,5,6 129:2,3,20,
21,22 132:5,20,25
134:5,12,17,18,23
135:5,11 136:6
137:2,6,13,20,24
138:4,16,17,24

140:14 142:11,12,19
143:4,6,8,11,12,15,
17,19,22 144:10,21
145:3,7,15,24 146:5
147:12,23 149:8,10,
23 150:3,7,20 151:9
153:10 154:2,11
155:8,15,16,21,24
156:17 157:11,16
158:11 161:19
162:16 163:24 164:2,
6 165:12 166:24
167:15 168:20
169:24,25 170:2
172:9,14 173:24
174:25 176:13
177:14,25 180:10,23
181:6,18 186:15
188:15 191:18,19,21,
23 192:16,23 193:7,
15 194:16 195:9,22

**HCMFA's** 15:18
23:14 26:4 30:23
31:4,8 33:4 36:18
38:5 42:3 43:5,9
44:2,21,23 45:4,19
46:10,24 47:12,17
48:7,14 49:14 52:2
54:22 55:12,20 58:15
59:17 60:11,24
61:13,15 63:3,22
64:15,21 65:6,15
66:16,21 67:11 69:9,
21 79:5 82:10,14
85:7 92:15,20 93:22
95:8,11,14,18,21
101:13 102:5 114:18
127:9 132:4 146:20
147:5 149:17 158:25
159:7 168:18 170:25
176:18 177:3 182:4
183:18 186:22 190:6
193:8

**HCMLP** 5:25 9:2
13:10 31:13 32:17,
22,24,25 40:11 41:4
43:14 44:13 52:11
53:15,19,20 54:9
60:12 63:10 65:3,18
68:25 69:2,7 70:3
71:11,12 72:5,12
75:10,12,19,21 76:17
77:13,17,23 78:12,
16,23 81:4 90:24
93:4 96:8 102:3

110:17 111:7,11,12,
15 112:22 115:14
117:21 120:2 121:16
125:5,7,8 129:8,12
130:7,9 131:6
135:15,18,21,23
137:24 142:22 145:3
150:11 156:11,15
161:9,13 166:24
170:5,12 177:23
178:18 186:16

**HCMLP's** 52:3,4
119:23 121:17
144:15,24 181:3

**head** 19:20 20:4

**hearing** 40:20

**hearings** 40:20

**held** 21:15 27:13
105:7,13

**helped** 72:13

**helpful** 38:14 53:3
189:24 196:16

**helps** 68:8

**Hendrix** 12:4 79:16
90:13 183:5 187:10
194:3

**Hey** 82:5 86:9 94:4
102:14 177:19

**Highland** 5:12,18,21,
24,25 6:7 27:17 28:8
29:3 31:12 32:6 40:4,
13 42:20 44:7 45:7,
14 48:22 49:11 50:18
51:17,25 52:5 54:25
56:23 59:11,15 60:9
61:22 62:16 64:23
65:25 70:15 71:14
75:15 79:22 90:22
96:25 97:7,11,13
108:20 111:8 114:19
115:15 119:14 120:8,
9 121:4,7,21,22
123:15,23 124:4,8,20
125:14,22 131:3
134:18 135:12 136:7
137:8,10,14,21
138:5,15 140:14
146:2,6,8,21 147:6,
14 149:9,19 150:5,8,
21 155:19,22,24

156:5 157:17 161:5,
20 162:17 163:22
165:13,15 168:9,20
169:20 171:3,4,9
172:13,22 173:3,6,
12,25 175:3 176:15,
20,25 177:16 179:11
180:3 195:12

**Highland's** 96:21
115:8 123:21 126:9
134:25 135:7 138:6,
17,22 140:8 168:11,
21 178:7 179:2

**highly** 77:2

**hire** 68:3

**hired** 75:19 122:4

**hiring** 121:17

**hitting** 148:8

**hold** 18:8 139:17,21

**host** 62:18 186:20

**Houlihan** 110:8,11,
13,16,20 111:3,13,
18,22 112:2,4,8,11,
15,19,24 113:3,8,15,
20,25 114:6,12,15,22
115:4,12,21 116:9,24
117:5,12,20 118:5,9,
14,15 127:24 128:5,
8,16 129:3,13,22
130:16 132:22 133:2

**hour** 102:23

**house** 152:9

**huge** 70:4

**I**

**ICI** 142:12,20 144:23
145:2,8,11,12,15
146:10 149:11,13
150:4,7,10,20

**idea** 105:24 106:10

**identical** 8:5

**identified** 136:12,16
187:20

**identifies** 49:5

**identify** 23:13 25:21

26:4 76:9 121:6,11,
13 124:7 144:9
188:15 189:10,23
190:14

**identity** 23:2 25:25
81:18

**imagine** 137:22
148:15

**impact** 68:8

**important** 33:6
66:18 69:12,18
177:11 190:22

**imposed** 121:20
177:3

**improvement** 122:3

**in-depth** 135:20

**in-person** 99:6

**inaccurate** 73:4
86:8,11 130:11
132:21

**include** 98:16,24
115:21

**included** 50:2,7
71:12 84:15,19 85:18
95:20 101:18 169:4
196:9

**includes** 43:13 79:7,
20 82:12,16 88:22
128:8

**including** 23:17
27:24 88:20 102:7
133:18

**income** 59:21 63:22
64:9

**incorrect** 53:18
80:12 86:19 97:24

**incumbency** 9:7
19:2 20:13 23:22
25:20

**independent** 88:3,4
112:5 128:16

**independently**
80:18 166:9

**indirect** 26:5,8

**individual** 111:6
115:11 147:21

**individuals** 31:19
80:10 179:20 187:14
196:4

**inflow** 63:23

**inflows** 68:7

**inform** 84:23 125:14

**information** 25:24
33:25 34:11 54:15
62:14 75:19 78:22
80:7,24 82:2,3 83:2,8
91:3 94:8,24 95:6,12
98:6 115:13,22 117:6
145:7,16 167:7
181:12 183:10 184:2

**informed** 70:14,24
92:16 118:4 150:4,20

**informing** 71:7

**inhibited** 175:9

**inimical** 31:20 41:5

**initial** 40:18 127:23
161:8

**initially** 129:4,23
131:17

**injunction** 40:21
179:24

**inputs** 111:11 112:23

**insight** 68:5

**instance** 192:20

**instructed** 14:11

**instructing** 190:4

**instructions** 13:18

**insurance** 134:14
136:24 140:23
141:16,20,23 142:2,
4,12,19,24 143:2,13,
16,23 144:21 145:8,
16,25 146:5,17
147:7,14,20 148:5,6,
7,8,13,21 149:10
151:5,9,12,25 152:11
171:24 172:16,22
173:4,7,25

**intend** 127:5

**intended** 61:16 62:8
63:22 168:10,20

**intent** 15:10

**intention** 127:8,9

**intentionally** 75:19

**interacted** 32:16
125:4

**interacting** 145:2

**interest** 26:21 33:16

**interject** 82:6
144:11,12

**internal** 166:21

**internally** 11:22
135:20

**interpretations**
111:13

**interrupt** 69:5
139:11

**intra-year** 57:23

**investigation** 16:12,
17 17:18 114:6,11
115:3 116:7 124:10,
17 161:3 164:17,21
165:2,10,11,14,18,21
166:3,11 167:11,17
176:10 178:4 180:12,
19,23 181:5

**investment** 27:11
69:22 70:2 105:8

**investors** 105:5,12
106:3,9

**invoice** 59:14 60:17

**involved** 18:2,19
29:24 32:12,20 69:16
72:15,20 77:3 83:8
86:17 105:23 106:14,
16 110:11 111:6,9
115:18 120:2 121:15
123:13,16 126:11
171:7 177:21

**involvement** 114:16
123:14

**involving** 110:6

**irony** 39:16 119:21

**Isaac** 179:8,12,25

**issue** 49:23 59:14
81:10 100:17 109:19

112:21 114:20
123:11

**issued** 49:6

**issues** 32:12 118:22
124:9 155:10,16,18
156:2,4,9

**items** 8:24 91:21
169:3 181:2 187:13

**J**

**James** 167:2

**January** 19:4 20:17
23:14,20 24:4 25:21
26:2,5 28:12 34:3,24
39:25 40:17 49:10
153:3 154:18 161:21
162:13 163:23
176:14

**January-ish** 19:11

**Jason** 11:20 12:20
16:7 33:6,7,20 34:9

**Jim** 26:7,9 27:4 40:21
60:12 76:24 83:20
98:18 105:22 106:13
121:3 170:18,25
171:10,21 179:24
180:25 185:15,18
192:19 193:5

**job** 165:8

**John** 5:9 8:2 56:5
82:5 102:14 115:19
117:6 139:13,17,21,
25 174:11 195:4

**join** 69:22

**Jones** 5:10

**JPEG** 183:6 187:11,
17,20,21 188:17
189:11,15 190:13

**July** 161:24 162:14
164:2 175:4 176:2,3,
7 177:17

**June** 42:25 43:2 47:7
49:10,22 86:24 87:6
95:9,16,23 96:8
101:14 102:6 107:10,
12 154:8,14

## K

**K&I** 123:20

**key** 17:22 43:11 111:11,12 131:14 155:11

**kind** 36:7 59:15 60:16 117:14 140:8 189:23

**Klos** 12:3 79:15 80:14 90:12,19 171:8 183:2,3 185:15,20 186:3 190:3 194:3 196:11

**knew** 39:11 42:14,18 130:7,20 131:5 137:2,6 156:3,7 194:17 195:10,13

**Knowing** 84:12

**knowledge** 17:7,8, 11 26:22 32:9 34:21, 25 35:4 36:20,21,22 40:10 42:19,24 46:5 56:20 57:9,13,20 63:16 64:8 71:7 73:5, 8 77:3 85:6,19 98:18 100:17,20,23 101:4 103:19 114:9 115:3 116:6 119:22 121:17 124:11 150:18,19,22 152:6,10 156:15 166:23,25 172:23 173:7 180:20

**knowledgeable** 32:14

**Kristen** 80:15

**Kristin** 12:4 90:19 95:4 183:4,5 185:15, 21,23 187:10 190:4 194:3 196:12

## L

**La** 158:5

**lack** 184:22 191:15

**lacked** 186:2,3 192:2

**lady** 174:13

**laid** 135:10

**large** 68:25 192:19

**largely** 61:21 66:23

**lasted** 154:25

**late** 32:2 33:18 97:20 145:23 151:14

**latest** 63:11

**launching** 177:21

**Lauren** 24:22 25:6 71:12 72:11 75:5 76:8 77:15 88:15,19 90:25 94:4

**law** 67:21 147:19 148:20

**lawsuit** 28:14,18 40:9 49:17 64:18,24 86:17 144:8 161:21

**lawsuits** 40:23

**lawyer** 94:13 148:17

**lead** 19:21 94:19

**leading** 40:17 53:4

**learn** 19:7 38:3 55:14 142:8

**learned** 14:24 15:20 16:4 38:5 55:20 153:10 154:2,12 155:9,16 156:2 167:17

**learning** 17:17 55:24 155:18

**lease** 34:14

**leave** 9:11 33:7,9 164:7

**ledger** 58:4,8,9

**left** 33:22 165:13 175:3 176:20,25 177:5,16 179:21

**legal** 27:17 31:13,15, 19 32:24 41:2,7 61:23 69:3 70:5 72:6, 14 74:19,22 76:14,15 77:23,24 83:9 106:13 126:9 138:9,13 144:15 170:14 178:8, 10,12,20 179:2 180:3 181:2

**legal/compliance** 76:19

**letter** 38:24 39:24 40:8 41:15 42:4 55:15 85:23 111:22

**Leventon** 179:8

**liabilities** 54:24 55:25 56:23 57:10, 11,14,21 58:7,18 59:2,20 64:24 71:14 102:6,8 193:20

**liability** 54:9,12 55:8, 9,13 58:21,22 63:14, 15 193:9

**lift** 175:13

**limitation** 31:3,8 34:22 176:18 177:2

**limitations** 33:4

**limited** 16:12,15 33:22

**limiting** 45:14

**lines** 52:6 141:13 146:25

**lineup** 24:19

**list** 29:6 88:11

**listen** 62:5 120:5 129:18 171:16

**listening** 41:25

**litigation** 16:24 41:10 179:10

**litigators** 178:13

**loan** 15:6,8,9 59:10 60:8 61:17 62:9 63:7 104:6 134:19,24 168:23 195:20

**loans** 61:3 194:19 195:12,24

**logic** 148:4

**Lokey** 110:9,11,13, 16,20 111:3,18,22 112:2,4,8,15,19,24 113:3,8,15,20,25 114:7,12,23 115:4, 12,21 116:9,24 117:5,12,21 118:5,6, 9,14,15 127:24

**legal/compliance** column continued

**128:5,8,9,16** 129:3, 13,22 130:16 132:23 133:2

**Lokey's** 112:11 114:16

**long** 64:4 73:18 148:13

**longer** 24:18,23,25 25:7 83:9 178:19

**looked** 80:25 89:9 116:23 139:5 163:8

**loss** 133:15,21 134:2 146:12 147:2,3,15 148:6 149:4,6,23 156:18 157:12

**lot** 36:11 40:19,24 62:13 69:20 106:16 109:25 110:2 123:13, 14,16 130:15,18 154:21 175:10,15 177:21 190:20 196:4, 19

**love** 117:3

**lower** 51:20

**LP** 5:12,19,22,25 19:25 20:7 21:2 27:18 32:7 42:21 61:22 123:15 124:21 125:15 131:3 146:2 169:20 171:3,5

## M

**Mabry** 25:12 167:8

**made** 27:23 35:24 36:7 37:16,23 56:22 59:11 60:12 61:2 64:23 105:19 106:17 113:4,8,15,25 114:7 117:13 118:6,15 121:8 127:16,23 129:10 137:15 138:10 143:5,6,25 144:8 145:7 151:21 164:6 167:5 183:23 184:12 194:4,13

**magic** 56:8

**magnitude** 152:3

**maintain** 58:3

**make** 10:12 43:25 44:23 45:22 74:16 75:2 76:2,10 80:7,18 83:5 134:13 137:17 138:2 149:2 152:7 163:18 185:22 186:4 187:15 194:14

**maker** 186:6,9,11,12

**makes** 37:2

**making** 45:19 65:14 81:19,23 122:17 125:19 126:5 155:18

**manage** 67:3

**managed** 19:13 21:24 22:11,19 66:24 69:2 142:24

**management** 5:12, 19,22,25 27:17 32:7 42:21 52:6 61:22 69:25 105:22 106:13 123:15 124:21 125:15 131:3 146:2,6 169:20 171:3,5 178:5 180:22

**managers** 27:12

**manages** 21:13

**mandated** 108:10

**March** 29:20 30:3,7, 9,16,19 31:5,9 33:5 34:4,24 35:6 61:11, 14 126:22 129:4,14, 23 153:2,13 166:19 167:4 175:3,11 177:5,6 188:17 189:13 190:15

**Mark** 26:8,10 106:14

**marked** 7:12 46:19 50:25 119:9 124:13 125:20 158:3

**market** 130:22 153:12

**marketing** 19:22

**match** 82:25

**material** 75:7 90:20 93:3

**materials** 9:20 46:13 92:12 146:9

**matter** 62:25 85:17 121:16 133:15 173:21

**matters** 16:22 124:3

**Mckenzie** 174:14

**meaning** 58:23 96:11

**meaningful** 193:3

**means** 83:22 128:11 159:12

**meant** 84:9,10 100:9, 14 159:20

**measures** 121:20

**meeting** 87:2 98:17, 22,25 99:4,5,6,7,16

**meetings** 67:16 69:22 99:10,13,20

**members** 171:7

**memo** 9:10 72:9,13, 24 73:4,9,14,16,19 74:9 75:3,14 76:14 77:5,19 78:19 86:10, 21 87:9 88:10 89:2 96:11 100:2 123:3 124:12 125:6 127:13 128:22 130:3,15,16, 24 156:24 157:20

**memorandum** 125:19 126:25 127:3, 7,10

**memory** 141:7

**memos** 32:19 62:11 69:4 74:21 76:6,19 77:4 96:12 119:4

**mentioned** 131:19 132:12

**mergers** 68:11

**met** 11:18,19 12:4

**metadata** 187:10 189:16

**methodology** 131:23 132:8,9

**Michael** 7:19

**midyear** 153:19

**migrated** 179:2,5,15

**million** 14:7 48:21 50:18,21 51:18,21 63:24 79:7 82:11,12, 15,16 83:14 107:7 108:13 109:4,5,7,13, 14 133:17,23 134:6, 17,22,24 135:5 138:6,16,23 140:9,22 143:19 146:13,21 147:2,6,7,9,13,15,24 148:9,12 149:5,13, 16,18,23,25 150:4 156:19 157:13,15 168:10,19 192:18,22 193:2,4

**mine** 68:13

**minute** 82:7

**minutes** 109:19 191:4

**missing** 25:17

**mistake** 117:13 118:6,15 182:7 183:20,23 184:12 185:8,12,17 186:24 187:24 188:10,14,22 189:12 190:8,16 193:10 194:14,15

**mistakenly** 134:18 182:18

**mistakes** 113:4,8,15 114:2,7 121:8 137:15 194:14

**Mitts** 25:5

**mixed** 168:3

**model** 112:18,20,25

**models** 111:14

**moment** 23:12 117:9

**money** 60:9 108:22 134:12 137:23,24 140:13 172:13 185:18,21

**moneys** 109:4

**months** 155:2 161:20 162:2,3,7,11 174:13 179:18

**morning** 5:8 56:8

**Morris** 5:7,9 7:8,14, 18,22 8:9 10:11,15 17:2 18:5 29:9,14 38:17,22 42:10,13,22 44:17,19 45:10,12 46:18,22 47:3,5 48:10,13 50:12,16,24 51:4,9,12 52:13,15 53:22,24 56:9,13,17, 19 60:19,21 62:2,4, 20,22 70:22 71:20,23 72:16,18 73:18,20 76:22,23 78:3,5,24 79:4 81:14,16 82:9 83:11,12 86:2,5 87:12,15,20,22 88:16,18 90:8,10 91:5,7,22,24 93:12, 14 96:16,18 102:17, 21 103:3 116:3,11, 16,18 117:8,10,24 118:2,12,13 119:8,11 120:3,4 125:9,12 129:15,17 131:7,9 133:8,10 135:24 136:2 139:14,18,23 140:5,6 141:9,11 142:18 144:20 150:14,16,23 151:3 152:12,18,22,23 157:25 158:7,9,21,24 159:18 163:14,17 164:12 169:11,14 171:13,15 172:8 173:22 174:19,23,24 175:21,24 177:12,13 183:13,16 184:18,20 190:24 191:7,9 192:10,14 195:6,8 196:14,19

**motion** 9:11 159:24 160:3,8 164:6 183:18

**move** 44:17 45:11 50:12 53:23 60:19 62:2,20 70:12 72:17 76:22 78:24 81:14 83:11 89:22 91:22 108:4 117:25 118:12 120:3 125:9 129:15 131:7 135:24 150:14 171:14 177:12 183:13 184:18 190:24 192:11

**moved** 180:15

**movement** 172:21

**multiple** 13:21 31:23 99:10

**mutual** 142:13,20 144:23 145:2,8,15 149:11,13 150:4,7,20 185:8,12,16 186:24 187:24 188:10,14,21 189:12 190:8,16

---

**N**

**named** 65:17

**names** 23:17

**naturally** 32:22

**nature** 179:22 182:21 192:4,5 193:11,16

**NAV** 9:10 14:20,21 15:11 16:8,9 17:24 32:10,13,17,21 59:12 62:11 108:21 115:15 119:20 120:9,15,25 121:15,21 122:25 124:16,21,24 125:16 126:11 131:13,24,25 132:6,14,15,16,17,19 133:16 134:7 135:3, 12 136:11,13,16 137:3,7,18 140:15,17 142:13,15,21 147:9, 25 149:4,6 150:5,21 153:5,10 154:3,12,16 155:4 156:14,22 157:3,10,12 168:9,22 169:3,17 170:3,9,20, 22 171:5,20 184:6 185:4,19

**needed** 13:16 105:16 106:5 177:19,22 192:20

**negligence** 148:23, 25

**negligent** 135:2,7 136:7 138:7,17 146:23 168:11,21

**net** 122:20 147:2 149:4,23

**Nexpoint** 18:7 19:13, 24 20:7,23,25 33:9, 17 74:10 78:13

**night** 139:16 183:18

**non-orderly** 129:5, 14,24 130:6,10,23 131:11

**norris** 5:4,8 6:1 7:1, 12,21 8:1 9:1 10:1,14 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1,9,17,21 25:1,3,11 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1,15 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1,4 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1, 12,19 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1,25 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1

164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1,10 192:1 193:1
194:1 195:1 196:1

**note** 13:12 17:7,8
73:15 75:8 78:21
81:4 102:7 134:21
161:15 169:7,8,9
176:11 182:15,16,19,
23 183:4 186:4 190:5
192:4,18,22

**notes** 9:6 14:12,13,
24 15:15,21 16:5
17:9,11,24 19:8
27:23 28:9,13,17,20,
23,24 35:10 36:2,9
37:12,17,25 38:4
39:11 40:6,14 42:14,
18,24 48:18,20,22
49:6,8,11,15,17,23
50:5,9 58:7 64:17
70:16,25 71:8,9 79:8,
10,11,20 81:10 82:17
83:3,19 86:15,17
101:19,23,24 161:5,
19,22 162:17,22
163:6,21,24 164:19
165:15 166:22,25
167:2 176:14 181:8,
13,24 182:6,20
183:20,24 184:13
185:2,3,6,25 187:7
192:15 193:11,15,17,
18

**notice** 6:6 7:11,24
8:14,18 9:9,24 10:8,
21 11:9 22:25 32:18
37:4 141:20

**noticed** 193:8

**notified** 146:11

**notwithstanding**
55:13 149:8,22

**nuance** 95:3

**number** 7:15 9:14,17
27:19,21 29:6,8

52:16,21 57:6 63:2
67:20 78:10 79:7,19
82:16 83:14 85:9
86:8,19 89:8,9 90:20
92:19 93:22 95:8,14
96:7 98:9 102:3
103:4 104:18 109:8
119:4 123:7 141:19
142:10 146:14 148:9
152:15 163:2 184:10

**numbers** 82:25 96:4

___

**O**

**object** 116:14 172:5
173:18

**Objection** 42:16
70:18

**obligated** 70:15,20

**obligation** 192:23

**obtain** 108:2 145:7

**obtained** 95:21

**occasions** 31:24

**occur** 193:16

**occurred** 120:16

**October** 70:14,24
72:3 73:24 78:15
84:23 92:18 93:18
95:6,13 97:14,16,23
98:10 100:2

**October/november**
97:20

**off-market** 153:12

**offhand** 156:25

**office** 70:6

**officer** 18:13,15,22,
23 20:3,10 21:5,24
22:18 24:23,25 32:15
33:13 39:16 45:18
65:5,13 74:25 76:9
80:6,17,23 81:21
122:16 125:13,18,24
126:4 191:19

**officers** 23:2,14
25:21 26:2 39:21
69:15

**offline** 144:13

**offsets** 133:19

**Okada** 26:8,10
106:15

**on-market** 153:13

**ongoing** 118:8

**open** 9:18 106:11

**open-end** 105:4,7,25
106:18

**operating** 193:3

**operational** 105:11,
15

**operative** 159:7,12,
15,16

**opinion** 47:8,14,23
49:22 145:25

**orally** 124:20

**order** 6:25 40:22
56:21 138:16

**orderly** 130:23
131:11,22 132:7

**original** 8:22 9:2,3
29:4,7,11,19 34:5
38:20 93:9 113:13
162:19,22,23,24,25
163:4,7 166:13,15,19
168:5

**originally** 18:17

**outflows** 68:7

**outsource** 43:18
115:10 129:9

**outsourced** 27:16
31:14 32:23,24 41:4
43:12 61:22 63:10
65:3 119:23 129:12
135:18 137:11
170:15

**outstanding** 70:16
78:16 90:20 93:3

**oversee** 43:19 44:15
45:3 68:5

**overseeing** 135:16
171:8

**overview** 12:8 17:23

**owed** 71:14

**owing** 65:24 79:21
83:2

**owned** 26:14

**owners** 26:5,8

**owns** 26:11,19

___

**P**

**p.m.** 92:18 93:18
103:2 151:2 191:8
196:21

**Pachulski** 5:10

**pages** 73:21 79:25
89:20 163:8

**paid** 103:19 104:3,4,8
105:5,15,16,17
106:6,8 107:5,9,10,
11,15,18,20 109:4,17
111:19 136:24
141:17 146:21 148:3,
4 149:13

**paper** 183:4 185:22
189:19 194:19
195:11

**papered** 182:22
195:20,24

**papers** 185:23

**paragraph** 127:20
128:2,4 132:21
133:7,15,25 152:25
160:14 169:12,16
173:3 175:19,22
181:6 184:21 185:8
188:6 191:12

**Paragraphs** 168:8,
16,17

**Pardon** 189:5

**parenthetical**
133:20

**Parker** 24:8,16,23

**Parker's** 24:12

**part** 31:12 32:25
34:18 61:5 67:24
69:2,3 70:4 72:3
77:21,23 85:13,15

**owed** 71:14

**87**:2,10 92:11 122:9
127:25 129:8 142:24
150:11 165:18,21
166:11 176:21
178:11 195:25

**participate** 67:7,13,
15 99:15

**participated** 32:19
68:21 71:6

**particulars** 161:15

**partner** 26:11,12,16
106:15

**partners** 27:2

**parts** 67:14,15 83:14
168:13

**party** 68:3 115:5
125:2,15 146:3,7
148:22 149:9 155:17,
20,22,25 156:6,8

**passed** 71:11

**path** 185:16

**patience** 93:15 195:2

**pay** 70:15 104:12,14
105:19 108:23 109:4
134:5 137:24 138:5,
16,23 140:9 157:17

**payable** 53:19 54:9
58:3,8,9 73:15 78:12
90:21 93:4 101:19

**paying** 104:22
148:12

**payment** 51:23 63:5
108:12 134:13
140:22 141:15 151:5,
10 168:10 170:20
184:5 185:3,5

**payments** 52:24
53:13 54:6,11 55:24
56:22 57:5,10,11,20
58:14 59:9,19 61:2,
16 62:8 64:23
127:16,17 134:2,10,
24 135:6 137:18

**PDF** 89:18

**pending** 49:17

**people** 12:12,19
88:5,20 122:5 123:13

179:2,5 194:12

**percent** 26:11,14
80:19 105:5

**perform** 27:9

**performance** 67:23
68:2,4 69:23,25
138:7

**performed** 27:14
62:15 68:2 113:9

**performing** 170:14

**period** 18:2 24:7
27:18 31:14 40:16
43:23 46:11,25 47:18
86:24 95:15,22
105:18 107:8 121:3
153:2,6,8,12 154:14
156:3 161:9 162:15

**periods** 22:4,5 54:19

**permission** 159:24
180:10

**permit** 147:19

**permits** 148:20

**permitted** 148:19
161:10 174:3

**person** 12:4 125:3
137:20,21

**personal** 32:9 34:25
36:21 103:18 152:10

**personally** 99:15

**perspective** 14:4

**phrase** 35:15 37:3,20
180:21

**picked** 178:16

**pinpoint** 135:22

**place** 58:24 179:24

**plaintiff** 170:8,21
171:19,24 184:5

**plaintiff's** 7:23 9:24

**play** 70:9

**pleading** 30:13
35:14 159:7,12,15,17
181:11 182:17
193:25

**pleadings** 11:15
27:24 35:19 61:4
135:10 172:20 175:6
180:14 186:19,22,25
193:24,25 194:21
196:2,3

**precise** 109:11

**preference** 53:7

**preliminary** 179:24

**premiums** 148:5,6,
13,15

**preparation** 12:14
13:15 15:3 43:14,20
48:16 82:24 142:9
144:8 163:9 172:25

**prepare** 11:11 36:14
43:19 72:13 103:11,
14 104:17 112:19
161:11

**prepared** 10:6 28:4
52:20 57:23 74:21
84:5 114:14,17
118:21 161:2,19

**preparing** 131:6
154:13 183:23
184:13

**present** 13:22 22:7
23:15

**presentations** 119:5

**presented** 89:25

**president** 18:13
19:4,6,19 20:2,7
21:5,12,18 22:11
24:3,8,13,16,18,19,
21 25:4,11 43:4
60:12 73:25 74:5,7
97:4 116:5 170:19
171:2,10,21 173:12,
14,15,16

**pretty** 123:11

**previously** 40:5
164:6

**Pricewaterhousecoo
pers** 47:7,11 49:22

**principal** 66:15
70:16 79:7 82:17,25

**prior** 22:15 31:4,9
33:5,22 34:12 35:8,
24 36:8 37:11,16,24
39:24 40:8 61:14,20
62:7 63:16 76:6
99:25 101:23 116:14
120:16 124:13
126:22 152:16

**plenty** 187:3

**plugging** 96:5

**point** 22:6 61:25
68:24 80:2 115:7
154:17 158:11 175:5
187:25 188:23

**pointed** 22:24

**points** 172:6

**policy** 142:11,12,13

**portfolio** 27:12

**portion** 29:16 50:13
78:25 79:18 107:11
125:10 141:2 190:25

**portions** 6:24
131:14,16

**posed** 71:10 101:10

**position** 12:10 18:8,
11 20:10 21:6 38:5
53:3,18 54:13 55:12
59:18 60:25 61:15,24
62:8 64:21 85:7,12
86:15,20 97:7,11
101:21 113:7,14
139:9 140:2,3,7,16
142:4,6 143:10
147:5,16,18 148:19
149:17 170:25
179:19 181:6,10,13
182:4 183:19 186:9,
11,14,16 190:8
193:18 194:9,22

**possession** 162:17
163:24 176:14

**Post** 11:20 12:20
16:4,7 32:4,5 33:5,7,
11,15 34:7,9,16,23
97:12

**practice** 121:23
182:19

**practices** 121:18

**preceded** 87:8

157:13 167:6 179:11

**priority** 40:25

**problem** 168:14

**procedures** 46:7

**proceed** 151:10

**proceeding** 28:8

**proceedings** 5:1
99:11

**proceeds** 134:14
136:24 140:23
141:16 146:17
148:11,13

**process** 17:25 32:21
62:18 63:13 67:13
69:2 71:6 76:20 87:2
99:8 111:17 122:2
123:9,10 154:25
157:19,21 160:10,11
171:9 183:8 185:23
194:2,4

**processed** 152:2

**processing** 133:18

**produced** 117:2

**product** 19:20 20:4
96:3 112:14

**professional** 43:17
180:6

**professionals** 27:8
41:7 43:18 69:22
80:13 194:12,14

**profited** 147:24

**profits** 148:3

**prohibited** 173:19

**prohibition** 174:10
176:18

**promise** 55:21
138:11

**promissory** 9:5
14:13 28:9,23 48:20
181:7

**promptly** 166:21

**proper** 154:23

**proposal** 106:5

**provide** 53:4 68:5
69:24 70:3 75:20
88:5 91:12 178:19

**provided** 11:24
25:15 46:14 66:9
68:25 76:16,18 80:24
86:22 92:11 94:10
95:12 102:2 110:23
111:3,12,22 114:23
115:14 177:24

**provider** 65:18
115:10 129:9 148:22

**providing** 68:17 70:7
77:21,24 146:22
178:19

**proxy** 106:3

**publicly** 183:18

**pull** 89:13 102:11
119:5 167:22

**pulling** 96:4

**purports** 164:16

**purpose** 14:6 25:23
101:9 122:23

**purposes** 57:24
62:16 64:2,9 129:6,
25 146:22

**pursuant** 66:10
111:22 138:4

**put** 7:9,15 29:9 38:17
40:24 41:9 46:18
50:24 71:20 87:12
119:8 152:13,19
157:25

**putting** 6:22

---

**Q**

**quality** 67:23 68:17

**quarrel** 162:5

**question** 6:14,16,18
22:17,22 35:20 41:24
42:2 45:17 50:15
53:9,10 54:3,4 60:22
61:8 62:5 65:9 70:21
71:10 72:21 78:4,6,9
79:3 82:20 86:7,10
89:8,9 90:19 91:25

92:19,24 93:10,18,22
94:10 95:8,14 100:6,
7 113:13 114:22
115:9,15 116:15,17
119:24 120:6 126:2
129:19 130:14
135:14 137:2,6
138:14 154:5 155:6
171:17 173:9 176:4
180:16 183:14
184:19 187:19 189:8
194:5,23 195:5

**questioned** 99:23
115:16

**questions** 9:8 28:4
36:14,17 37:7,21
54:2 77:7 88:6,11,12,
23 89:3,25 101:10
139:15 142:10 155:4
191:10 196:15,18

**quick** 46:17 152:6

**quote** 78:15 83:18,20
98:15 129:3,22
131:22 169:16
171:23 181:7,8
191:15,16

—————————
        **R**
—————————

**raised** 34:17

**reach** 40:12 135:11
145:15

**reached** 138:3

**read** 73:12,16 79:15,
18,23 92:8 93:7
100:5,6 122:14
131:20 132:2

**reading** 43:9 84:10
126:19 184:8

**real** 178:15

**reason** 13:2 15:10
40:12,15 41:13,17
47:15 66:21 80:12
98:4 154:17 157:16

**reasons** 148:18

**rebates** 133:19

**recall** 5:9 20:23 38:2,
10 40:16 41:20 52:16

124:15 126:15 144:5
151:12,14 163:6

**receipts** 147:8

**receive** 41:15 104:11
148:21 149:18

**received** 38:8 39:14
42:5,8 50:17,20
52:10 80:10 108:22
143:19 146:18 147:5
149:17,24 150:4
151:5 166:13 187:9
194:7

**receiving** 41:21
51:24

**recent** 193:25

**recess** 56:18 103:2
151:2 191:8

**recipient** 100:13,24

**recipients** 92:17
93:21

**recognized** 171:11

**recollect** 17:22

**recollection** 14:12
22:10 100:8,11,12
102:5 128:14,18
141:13 153:9 182:11
195:19

**record** 5:2 7:13
10:12 54:6 59:2
60:10 62:19 63:8
82:7,8 142:17 185:16
190:5 193:20 196:21

**recorded** 53:17 54:8,
23 55:3,4,8,10,25
58:14,17,18,20,22
63:14 64:9 79:11
134:19,21

**recording** 53:18
55:13

**records** 44:12 52:24
53:14,16 54:7,12,23
55:7,14,20,24 56:21
58:15,19,21,22
59:18,25 60:11,25
61:5,14,21 62:10
63:4,18 124:6 193:9

**recover** 143:22
147:20

**refer** 5:21,24 13:14
17:19 20:25 28:22
30:9 31:16 54:16
60:3 61:18 63:11
67:3 83:24 84:2 85:5
119:6 164:22 172:19
181:11,20 184:16
186:18 188:19 192:8
193:24 194:20
195:15 196:2

**reference** 48:20
51:13 128:7,8 131:2
153:2 184:22 191:14

**referenced** 82:15
190:13

**referred** 124:2

**referring** 37:5,20
98:23 187:4

**refers** 65:21 98:8
127:22 128:4 169:19

**reflected** 16:13,18

**reflects** 59:18 60:25
138:22 140:8

**refrain** 6:15

**refresh** 128:14,18
141:13 153:9

**regard** 36:19 41:21

**regularly** 91:21
193:13

**regulator** 108:7

**reimbursement**
142:15

**reiterate** 45:7 115:20

**relate** 168:8,18

**related** 17:10,11
34:11 35:25 36:8
61:25 62:14 73:14
81:9 99:5 105:2
169:7 174:3 185:4

**relates** 35:9 37:12,
17,25 103:4 141:20
148:3

**relating** 36:17
145:16

**relation** 67:17

**relevant** 167:18

**reliable** 44:3

**relied** 43:21 44:12
80:20

**rely** 44:5,6 112:24
127:6,13

**relying** 25:19 80:13

**remains** 78:16

**remediation** 122:2

**remember** 15:13
18:18 21:19 36:10
38:16 60:7 61:10
73:12 74:15 80:3
99:20 100:15 101:21
102:13 107:15
109:14 112:17
121:12 126:19
136:21 151:6 157:6
180:2 182:10 183:11
196:9

**remembered** 14:9

**remind** 38:13

**renew** 67:10,19

**reorganized** 5:11

**rep'ed** 166:4

**repeat** 28:16 40:7
176:21

**report** 72:2 76:2,10
78:14 84:15,19 89:10
95:7 96:10,11 118:20
130:11 131:4

**reported** 57:18 63:25
64:12 107:13,14

**reporter** 7:13 142:17

**reporting** 119:21
156:9

**reports** 94:22

**represent** 8:10 89:3
116:23

**representation**
29:21 51:8 80:3 89:6
163:20

**representative**
15:19 36:22 40:4
44:21 45:23 82:11

119:14

**represented** 134:10
172:12 175:10

**representing** 46:6
95:3 186:7

**request** 33:10 81:24

**requested** 78:9

**requests** 11:25 88:9

**required** 108:7 192:5
193:5,7

**requirement** 76:5
125:24

**requires** 67:18

**research** 84:13

**reserve** 196:17

**resolution** 122:20,
25 123:9 157:20

**respect** 34:22 95:7
173:10

**respond** 6:18 9:8
11:17 40:10 90:19

**responded** 39:23
40:8 91:8

**responding** 156:9,
10

**responds** 92:8 93:17

**response** 9:3,4 15:7
54:17,18 63:11,12
77:6 80:8 81:13,23
82:16 83:18 85:8
86:7 91:6 92:6,9
93:13,25 94:20
95:13,25 96:19 98:9,
16,24 161:8,12 168:6

**responsibilities**
46:7

**responsibility** 14:21
43:9,25 62:24 65:6,
14,19 75:2,25 76:10
81:19,22 111:11
115:8 122:17 126:5
129:11 169:17 170:3,
7,9,22 171:4,19

**responsible** 45:18
62:17 75:16 76:6
80:11 114:19 115:5,

Index: responsive..simple

9,15 125:2,15,19
130:17,21 135:23
146:3,6 149:9
155:17,19,22,25
156:5,8,16 168:9

**responsive** 11:17,24
50:14 54:3 79:2 94:3,
9 125:11 184:19

**rest** 28:23 72:13

**restate** 22:17 155:23
187:19

**restatement** 153:6

**restraining** 40:22

**restricted** 34:13

**restriction** 30:22
31:3,8,11 34:20,21
177:2

**restrictions** 33:3,11,
15,21,24 34:11

**restroom** 56:7

**result** 121:7,21
147:24

**resulted** 131:24
132:13 151:9

**resulting** 135:6

**retail** 32:15 33:10
65:22 67:5,8 70:14,
25 71:8,10 72:3,24
75:4 76:3 77:6 78:9,
15 80:9 84:6,16,19,
23 86:7,12,13,22,23
87:9 88:3,6,23 89:10
90:2 92:19 93:21,25
94:20 95:7,13,21
96:9 98:10 101:10
112:12

**retain** 113:12

**retained** 47:12
110:8,13,16 112:2,9
123:18 124:8

**retaining** 113:18

**retention** 112:11
128:15

**revealed** 54:13

**revenue** 66:16

**reverse** 56:22

**review** 66:13 67:9
73:12,13 74:13 88:8
101:11 106:3 166:21

**reviewed** 11:15,16,
21 12:2 43:5 73:14
76:24 117:17

**reviewing** 65:6 76:6
77:4 193:13

**rights** 113:12,19

**rise** 192:19

**role** 18:14 19:12,19,
21 20:3 34:12 44:15
45:2,13,14,24 46:4
65:18 69:21 76:5
80:23 113:12 177:25

**roles** 19:16 46:6

**Rome** 87:24

**roof** 152:10

**Ross** 24:3,7,18

**roughly** 146:16

**Rukavina** 7:25 11:19
12:5 13:22 16:19
42:7,16 56:5 70:18
82:5 102:14,20,24
103:16 115:19
116:13,22 139:13,17,
21,25 144:11 159:11,
14 163:12,21 164:8
172:5 173:18 174:11,
21 191:6 195:3
196:17,20

**rule** 5:18 7:10 9:25
108:9 147:19 148:20

**rules** 6:13 174:18

**run** 69:2

---

**S**

**safe** 39:13

**sales** 19:21 68:6,13

**Sauter** 9:5 12:17,19
16:12,17,21 17:5,15
103:17,18 161:3
164:14,16,17 165:4,
14 166:10 167:16

**175:9** 176:9 177:25
178:15 180:18,22
181:18,23

**Sauter's** 13:15 31:16
54:17 167:10 175:6
180:11 181:21,25
188:24

**scale** 68:8

**scheduled** 8:14,15

**schedules** 31:17
32:18 46:14 187:2,4,
7

**Scott** 179:13,14,25

**screen** 6:23 7:10
8:12,13 9:15 10:17,
25 29:10 30:7 38:18
46:19 47:16 50:25
71:21 87:13 120:13
122:12 124:13
125:20 152:14,19
158:2 160:7 167:24
188:12

**scroll** 7:20 10:12,24
11:3 29:18 47:4,20
48:5 51:10 78:3
88:16 90:8,9 91:5
93:12 96:16 133:9
158:23 175:22

**scrolling** 89:20

**search** 144:17

**searched** 144:13
151:18

**searching** 145:11

**SEC** 32:20 62:12
106:3 121:3 124:3,
10,16,19 125:4,6,14
154:22,25 156:10,24

**secretary** 18:17,18,
20,25 19:5 20:22
21:20,21 22:15
24:10,18,22 25:6,7,
13 72:12 75:5 77:18
94:15 97:2

**section** 48:18 67:18

**Securities** 74:10

**seek** 106:10,17
108:2,4 142:15

**Seery** 12:3 31:18
33:8

**selection** 70:2

**send** 8:2 127:3 190:5

**sending** 39:19 72:9,
24 74:8 75:13 100:2
127:10

**senior** 105:22 106:13

**sense** 37:2 177:19

**sentence** 83:17
84:9,10 85:8,17 98:8,
9,13 99:24 100:10,
14,25 127:22 128:2
131:15,21 134:3
170:5 173:2,5 181:18

**separate** 81:9

**September** 99:7
154:2 174:20,22

**serve** 21:11 66:22

**served** 6:7 22:10
44:14 65:13 67:4
74:25 191:22

**server** 151:19

**serves** 96:25

**service** 65:18 77:24

**services** 9:6 27:10,
17 32:23 44:10
62:14,15 66:6,9
67:23 68:15,17,24,25
69:3 70:3,9 74:20
75:22 76:16 77:21
110:22 111:2,9,10,23
113:5,9 114:13,23
118:17 135:2,7
138:8,17 142:25
150:11 170:13,15
177:10,22,24 178:8,
11,20

**set** 165:5

**settlement** 60:17
70:6 138:25 140:3

**seven-and-a-half**
14:7

**share** 15:19 25:25

**shared** 9:6 44:10
62:15 68:24 69:3

**70:9** 74:20 75:22
77:21 111:9 142:24
150:11 170:15
178:11

**shareholder** 107:24

**shareholders** 106:4
107:19,20,23

**sharing** 177:23

**sheet** 48:7 53:20
55:5 58:23,24 59:3
65:7 87:6 92:11,20
93:23 94:5 96:5
102:9 108:15,17
193:13,21

**sheets** 65:15 87:5

**short** 150:23 191:2

**shorten** 37:21

**show** 7:20 38:13
162:22 163:11

**showed** 47:25 55:4
108:19

**showing** 30:7 187:10

**shown** 63:23 147:2

**shows** 51:20 63:5

**shrinking** 68:9

**sic** 9:10 188:17

**side** 193:15

**sides** 137:25 138:2
177:7 186:7,8,14

**sign** 169:9 182:12

**signature** 181:15
183:6,12 187:11
193:19

**signed** 42:15 47:6,8
49:9 169:8 181:7,15,
24 182:3,6 183:12,20

**significant** 148:5

**signing** 182:10
183:11,24 184:13
186:12

**signs** 186:11

**similar** 193:11,16

**simple** 6:14 54:4

60:23 93:19 183:15
193:10

**simplify** 54:22

**simply** 92:2

**single** 73:25 79:23
119:13 125:3

**singular** 170:18

**sir** 5:15 38:20 71:24
120:5 124:7 158:10
186:17

**sit** 35:22 41:14 46:9
110:15 114:9 133:3

**size** 192:4,15 193:12,
16

**sizeable** 192:25

**Skyview** 83:10
161:14 177:7,22
179:2 180:3

**slack** 178:16

**sloppy** 194:6

**sole** 26:25 27:4 101:9
191:25

**Sounds** 138:9

**source** 66:15 69:24
91:2 98:5 119:19
145:9,12 147:19
148:20 167:6

**speak** 12:23 13:3,5,
9,16,19 31:4,9 33:4
83:6 167:5,7

**speaks** 195:15

**specialist** 43:22

**specialize** 152:5

**specific** 38:16 44:25
72:20 86:11,18
103:24 120:17
125:24 155:12
156:12 157:4 170:24
180:2,20

**specifically** 44:21
49:5 65:12 84:21
86:9 99:21 125:17
180:24 181:23 192:3

**specifics** 156:20

**speculate** 84:20

**speculation** 34:18
41:9 122:8 150:18

**spent** 109:21

**spoke** 11:19,20,21
12:13,18 165:19,22
166:2,10

**spoken** 13:13 166:16

**spring** 103:20

**Stacy** 87:23 89:25

**stance** 157:22

**standard** 90:25

**standards** 180:7

**Stang** 5:10

**star** 147:9

**start** 87:20 104:2

**state** 155:6

**stated** 183:18

**statement** 36:6
37:22 43:13 49:4
51:6,8,20 52:2 63:23
64:9 84:15,18 85:8
100:25 106:4 161:15
165:24 166:5,6
172:4,9,21

**statements** 43:6,10
44:2,24 45:5,8,20
46:11,24 47:13,18
48:15,19 49:21 50:2
57:22 58:13,16 64:5,
14,17 65:10 86:23
95:15,22 101:14,18

**states** 133:25

**step** 14:18 152:5

**Stephanie** 25:13
179:6

**stepped** 181:3

**stepping** 64:6

**steps** 58:13 74:16
121:13

**stop** 51:11 102:21

**Strand** 26:13 27:3

**strategist** 19:21 20:5

**strategy** 16:24

**strict** 31:18

**strictly** 45:14

**strike** 44:18 45:11
50:12 53:23 60:20
62:3,21 72:17 76:22
78:25 81:15 83:11
91:23 117:25 118:12
120:3 125:9 129:16
131:8 135:25 150:15
171:14 177:12
180:15 183:14
184:18 190:24
192:11

**string** 88:6 101:8

**structure** 27:13
104:5

**stuff** 190:21

**subject** 16:4 28:14,
18 49:17,21 66:12
112:20 123:5 124:10,
16 135:9 140:10
150:2 180:13 181:8

**submitted** 106:2
151:20

**subsequent** 17:20
48:11,17 49:5,16
55:3,4,6,8

**substantial** 192:23,
24,25

**sued** 13:10

**sufficient** 68:18

**suggest** 73:4

**suing** 48:23 49:11
161:5,20 162:18
163:22 165:16
176:15

**summarize** 20:6
133:11

**summary** 133:12

**summer** 32:2

**supplemental**
115:23

**supplied** 87:4

**supplying** 75:10

**support** 9:12 44:12
76:19,20 83:4,20
84:25 185:11 186:20
188:20,21 189:11
196:4

**supported** 137:23

**supporting** 187:6

**supports** 187:23
190:7,15

**supposed** 59:10
61:2 134:25 135:6

**supposedly** 186:7

**Surgent** 72:14 89:24
90:4

**surprised** 60:16
63:18 139:7

**surrounding** 16:8
32:13 86:14 161:4
164:19 165:15
176:11

**suspect** 144:14

**sworn** 5:3,5

---

**T**

**taking** 85:11 94:19

**talk** 13:11 14:15
34:14,15,16 67:25
68:4,5,7 69:20,23
82:23 109:18 144:12
161:10,14,16 174:3,
16 179:25

**talked** 14:20,21
30:21 34:9 100:22
108:23 166:12

**talking** 16:7 17:20
18:3 43:16 68:10,11
115:7 127:16 151:4

**task** 119:15,17,18

**tasked** 43:21 45:8
53:16 164:21

**team** 31:13,19 43:17
44:4 50:8 53:17,21
65:16,19 72:14 74:19
75:9 77:23 78:22

**81:25 126:10 142:23
151:19 170:14 171:7
178:12,13 179:2
180:3 189:19 193:14,
17**

**technicality** 77:14

**telephonic** 99:6

**telling** 93:20 126:15
133:3

**tells** 185:19,21

**tendered** 29:13
38:21 46:21 51:3
71:22 87:14 119:10
158:8

**term** 30:20

**terms** 104:4,8 105:24

**Terrestar** 109:18,23
110:3,6,9,23 111:4
115:21 113:10,17
114:3,20 117:15
118:22 119:16
120:25 121:9 124:9
137:16 138:18
146:23 147:10

**testified** 5:5 41:20
60:4,6 83:24 85:3
104:21 126:18
140:19 151:17 182:9
192:7,8 193:12
195:16

**testify** 10:6 27:22
52:17,20

**testimony** 22:15
42:23 51:17 60:3
64:15 75:23 79:15,19
80:17 81:7 84:3 85:3
185:14 190:22
192:12 195:15,16,21

**Texas** 147:18 148:20

**Thedford** 24:22 25:6
31:7,23 71:12 72:11
75:5 76:8 77:15 83:6
89:23 91:11 94:12
96:20,24

**Thedford's** 94:13

**theory** 147:25 148:2

**Thereof** 9:12

**thing** 69:19 136:3 160:18

**things** 11:22 12:7,8 13:10 31:25 32:3 33:19 67:22 68:15 75:8 91:20 161:10

**thinking** 35:11 71:5

**third-party** 112:5 128:16

**Thomas** 72:14 88:21

**thought** 50:8 63:15 182:18 186:15

**thousands** 163:8

**threw** 148:9

**time** 6:23,24 7:4 8:4, 15 15:15 18:2,21 20:14,24 21:20 22:4, 5 24:7,24 27:18 31:14 32:16 33:12,19 39:20,24 40:7,16 41:3 43:15,23 46:16 54:19 55:7 56:6 58:17 64:4 73:6,10, 11 94:17 95:10 96:24 97:9,25 99:25 102:19 104:23 106:15 107:8 109:17,22 110:2 113:21 114:4 119:13 120:24 121:19 124:14 126:13,15,24 129:3 135:4 136:5 143:16 145:6,17,24 148:13 150:24 153:12 155:12,14,15, 25 157:4,23,24 158:11 159:9 161:9, 18 162:15,16 163:25 164:2 166:15,18,20 168:5,12 172:7,17 173:24 175:3 176:17, 20,24 177:11,16 178:7 180:10 183:17 194:22

**time-** 20:21

**timeline** 20:21

**times** 13:19,21 43:16

**timing** 154:7

**title** 18:8,11 19:12,24 20:12 24:12

**titled** 122:20

**titles** 19:16 23:17

**today** 5:13,17 6:4,23 7:24 8:14,15 9:25 10:7 18:6 36:24 37:10 42:3 44:21 57:19 62:8 64:15,21 79:5 114:10 117:18 133:4 159:6,21 172:10

**today's** 8:4 11:12 13:20 14:2 15:3 82:20 173:2

**told** 15:8 31:24 40:4 41:4 60:8 86:6 97:23 100:16,19 117:12 118:14 119:19 124:19 125:7 129:2, 20 130:15 132:6 137:17 140:18 143:15 150:7 182:3, 11,13 183:2 185:18 186:4

**tolling** 113:22

**top** 86:3 102:22 146:13

**topic** 9:17 17:15 23:5,9 27:19,21 28:5 29:6,8 36:14,18 52:16,20 63:2 65:20, 21 99:17 103:4,12,14 104:18 117:16 141:19 142:10 158:13,14 161:17 163:2

**topics** 10:8,13,16,20, 25 11:8 14:14 16:16 22:25 34:17 57:6 102:18 114:15 115:21

**total** 107:2,4,5 108:13 109:12 133:15,21 146:12 147:8,14

**totality** 102:5

**trading** 27:8,10,11

**transaction** 108:18

**transactions** 14:8 129:4,14,23 130:10,

22 153:13 194:19

**transcript** 84:11

**transcripts** 186:21 187:18

**transfer** 14:7,11 15:10 51:14,21 52:7 60:13 183:2,4 185:18,20,21,22

**transferred** 51:18 134:18 137:23 140:13,14 168:19 172:13

**transfers** 52:18 54:23 108:23 182:20, 21 195:12,23

**transition** 177:9

**transitioned** 97:13

**treasurer** 24:9,17,22 25:5,12 39:7 43:14, 25 44:8,14,22,25 45:2,15,24 46:4,8 65:17 75:13,25 76:5 80:22 96:21 191:22

**treated** 56:2 57:15 62:9

**Trey** 24:8,15,23

**trick** 159:19

**TRO** 40:22

**true** 44:3,24 45:20 65:15 75:3 76:2,11 80:8 81:19,23 125:20 126:6

**trusts** 26:8

**Tuesday** 92:17

**turn** 30:5 110:5 158:21 169:11

**turned** 183:3

**two-thirds** 26:9,19 146:16

**tying** 190:9

**typical** 86:25

**typically** 99:5 104:8

**typo** 90:24

## U

**Uh-huh** 8:25 11:4 23:4 52:19 53:11 88:22 93:16 118:24 141:21 176:12

**ultimate** 124:24

**ultimately** 110:5 129:11 130:17 171:21,24

**unable** 31:24 41:5 178:13 179:20,21 180:7

**unaudited** 95:17,22 96:4 101:14,18

**unauthorized** 85:9

**unaware** 40:5 64:16, 22

**unclear** 101:22

**uncomfortable** 33:14

**underlying** 82:23 101:25

**understand** 5:14,16 12:10 15:17 48:17 103:6 106:19 113:12, 19 115:20 128:11 148:18 160:6

**understanding** 13:8 15:23 30:14 46:3 53:2 54:8 55:2 78:8 103:8,22 106:7 111:16 122:22 139:8 147:18 159:6 160:5 161:6 184:25

**understood** 32:21

**undertake** 106:25

**undertaken** 115:2 116:8 167:16

**undertaking** 113:24 114:5,10

**undertook** 16:13,18 164:18 166:21

**unfettered** 34:6,8 173:11,16 175:2,8 177:15,19

**unusual** 91:19

**urgency** 56:6

**utilized** 124:3

**utilizing** 178:7

## V

**vagueness** 172:6

**valid** 50:5,9 143:11

**valuation** 32:23 62:16,17 109:18,23 110:3,6,10,12,24 111:10,14,15,17 112:6,16,17,20,21,25 113:4,10,17 114:3, 13,20,24 115:10 117:15 118:16,22 119:16,22 121:9 124:9 128:17 129:8,9 130:8,21 132:9 135:2,7,16 137:11,16 138:8,18 146:24 147:10 154:24 155:5, 9,16,18 156:2,4,8 170:13 171:7,9

**valuations** 115:9 131:6 156:16

**verified** 107:14

**verify** 125:24

**vice** 18:13 19:3,6,18 20:2,7 21:5,11,17 22:10 24:8,13,16,21 25:4 43:4 73:25 74:5, 7 97:4 116:5

**view** 14:3 178:20

**viewed** 75:21

**violating** 174:18

**Vitiello** 25:13 179:6

**voluntary** 108:3

**vote** 106:5 107:24

**voted** 104:10 105:12

## W

**wait** 13:17 159:22

**waited** 157:16

**wanted** 143:22

**water** 56:12

**Waterhouse** 12:3,23
13:3,6 14:10 15:5
24:9,17,22 25:4,11
39:5,7,13 41:14 42:5
43:15,24 44:22 60:4
65:16 71:13 75:9,12,
24 78:22 80:14,22
81:25 82:24 83:23
90:12 91:8,12 92:7,
13,16 93:17 96:20
97:23 98:12 99:16
100:9,13,16 140:12
142:23 144:25
151:19 161:16
165:13,19 167:8
171:8 173:24 175:2
176:19,25 177:4,15
181:7,13,24 182:2,6
183:10,19,23 184:4,
12 186:3,11 191:16,
18,22 192:2,6,16
193:14,19 194:3,17
195:9,22

**Waterhouse's** 84:11
92:8 93:13,20 96:19
99:25 100:25 173:20
181:17 183:6 187:11

**week** 162:4

**weeks** 12:5 13:21
42:15 152:3 155:2

**weighted** 131:23
132:8

**weighting** 129:6,25
131:12

**Willmore** 25:6

**wishes** 91:25

**withdrawn** 35:13
55:22 80:5 82:12,13
92:14 109:10 117:11
122:18 127:4,5
168:16

**witnesses** 190:22

**wondering** 100:19

**word** 35:21 91:9
131:8 142:14 163:9,
15,16 165:2 183:6

187:8 189:15

**wording** 83:25

**words** 14:18 169:16

**work** 31:20,24 43:19
96:3 111:19 112:14
113:16 114:2 117:14
118:6 119:15 146:23
164:25 165:4 168:11,
21 178:13 179:20,21
180:7

**worked** 32:21 124:5

**working** 33:2,8
41:11 56:8 72:5
112:22 115:11
117:20 135:16
146:10 178:18 180:4

**works** 5:23

**world** 49:9 104:6
126:24 186:23
187:22 189:11

**worth** 160:10

**writing** 124:20 144:2
172:17

**written** 66:10

**wrong** 8:24 73:4
114:12

**wrote** 181:18

_____

**Y**

_____

**year** 16:13 49:6 57:24
68:3 85:23 97:21

**year-end** 57:15

**years** 18:21 76:18
79:12 148:5,7

**yesterday** 9:13
54:19 193:25

**Yup** 52:19 54:5 70:11
86:4 92:4 127:21
133:22 158:6

_____

**Z**

_____

**Ziehl** 5:10

**Zoom** 12:4

# EXHIBIT 194

**Kristin Hendrix - October 27, 2021**

---

**1**

```
 1           IN THE UNITED STATES BANKRUPTCY COURT
 2           FOR THE NORTHERN DISTRICT OF TEXAS
 3                     DALLAS DIVISION
 4                       --o0o--
 5
 6 HIGHLAND CAPITAL MANAGEMENT,     )
   L.P.,                           )
 7                                 )
               Plaintiff,          )
 8                                 )
           vs.                     ) No. 21-03004-sgj
 9                                 )
   HIGHLAND CAPITAL MANAGEMENT FUND )
10 ADVISORS, L.P.,                 )
                                   )
11           Defendants.           )
12 _____
13              DEPOSITION OF
14              KRISTIN HENDRIX
15             October 27, 2021
16 _____
17
18        DEPOSITION OF KRISTIN HENDRIX, produced as a
19 witness, duly sworn by me via videoconference at the
20 instance of the DEFENDANTS, was taken in the
21 above-styled and numbered cause on October 27, 2021,
22 from 10:11 A.M. to 1:19 P.M., before BRANDON D. COMBS,
23 CSR, RPR, in and for the State of Texas, reported by
24 computerized machine shorthand, at 500 North Akard
25 Street, 38th Floor, Dallas, Texas.
```

---

**2**

```
 1                    APPEARANCES
 2
 3        MUNSCH, HARDT, KOPF & HARR, PC, 500 North
 4 Akard Street, Suite 3800, Dallas, TX 75201, represented
 5 by DAVOR RUKAVINA, Attorney at Law, appeared as counsel
 6 on behalf of the Defendants.
 7        Email: drukavina@munsch.com
 8
 9
10        PACHULSKI, STANG, ZIEHL & JONES, 780 Third
11 Avenue, 34th Floor, New York, NY 10017-2024, represented
12 by JOHN A. MORRIS, Attorney at Law, appeared as counsel
13 on behalf of the Plaintiff.
14        Email: jmorris@pszjlaw.com
15
16
17        STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777,
18 Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney
19 at Law, appeared via videoconference as counsel on
20 behalf of the Defendants Jim Dondero, HCMS and HCRE
21 Partners.
22        Email: michael.aigen@stinson.com
23
24
25
```

---

**3**

```
 1                      INDEX
 2                                              PAGE
 3   Examination by MR. RUKAVINA                    6
 4   Examination by MR. AIGEN                      94
 5   Further Examination by MR. RUKAVINA          110
 6   Examination by MR. MORRIS                    111
 7
 8 EXHIBITS                                      PAGE
 9
10 Exhibit 1   Promissory Note, 5M, May 3          30
11
12 Exhibit 2   Promissory Note, 2.4M, May 2        30
13
14 Exhibit 3   Email from David Klos, May 2, 2019, 31
15             HCMLP to HCMFA loan
16
17 Exhibit 4   Promissory Note, 5M, May 3          42
18
19 Exhibit 5   Promissory Note, 2.4M, May 2        42
20
21 Exhibit 6   Promissory Note, 5M, May 3          43
22
23 Exhibit 7   Promissory Note, 2.4M, May 2        43
24
25 Exhibit 8   Info, HCMF loan 05.03.2019          56
```

---

**4**

```
 1 Exhibit 9   Info, HCMF loan 05.02.2019          56
 2
 3 Exhibit 10  Email from Scott Ellington, Dec 2,  59
 4             2020, HCM - HCMFA financial
 5             statements
 6
 7 Exhibit 11  Email from John Morris to           62
 8             James Seery, Jan 6, 2021,
 9             HCM information request
10
11 Exhibit 12  Letter, Dec 3, 2020, Demand on      65
12             Promissory Notes
13
14 Exhibit 13  Promissory Note, $30,746,812.33,    72
15             May 31
16
17 Exhibit 14  NPA $30.7M                          76
18
19 Exhibit 15  HCMLP Notes Receivable              83
20
21 Exhibit 16  Email from Frank Waterhouse to      85
22             Lauren Thedford, Oct 6, 2020, 15(c)
23             follow-up
24
25
```

---

Kristin Hendrix - October 27, 2021

---

**5**

1  Exhibit 17  Email from James Seery to           88
2         James Dondero, Jan 7, 2021, demand
3         on promissory note
4
5  Exhibit 18  Email from Kristin Hendrix, Jan 12,     90
6         2021, NexPoint Note to HCMLP
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**6**

1              KRISTIN HENDRIX,
2     having been first duly sworn, testified as follows:
3              EXAMINATION
4     Q.  (BY MR. RUKAVINA)  Good morning.  If you'll
5  state your name.
6     A.  Kristin Hendrix.
7     Q.  We're doing this both ways.  You're on the
8  Zoom remotely and they can see you, but I would ask
9  that you and I maintain eye contact.  Of course, if
10  someone is asking you on the Zoom, then maintain
11  contact with them, if that's okay with you.
12     A.  Sure.
13     Q.  Have you been deposed before?
14     A.  No.
15     Q.  So I'm sure your counsel explained to you,
16  but very quickly, you understand that you're testifying
17  under oath and penalty of perjury as though you were in
18  a court of law?
19     A.  Yes.
20     Q.  And you understand my job is to ask clear
21  questions that you understand?
22     A.  Yes.
23     Q.  And if for whatever reason you don't
24  understand my questions, please let me know or ask me
25  to rephrase; otherwise, I'm going to assume that you

---

**7**

1  understood my question; okay?
2     A.  Yeah.
3        MR. MORRIS:  Objection.
4     Q.  (BY MR. RUKAVINA)  Sometimes Counsel will
5  make objections.  Unless he instructs you not to
6  answer, you're still required to answer my questions.
7     A.  Okay.
8     Q.  Now, in preparation for this deposition, did
9  you read the deposition transcript or any part of it of
10  Frank Waterhouse?
11     A.  I did not.
12     Q.  Did anyone provide you a synopsis or summary
13  of it?
14     A.  Maybe a few bits and pieces, but...
15        MR. RUKAVINA:  Off the record for a second.
16        (Off the record.)
17     Q.  (BY MR. RUKAVINA)  What do you mean bits and
18  pieces?
19     A.  I don't recall anything specific that was
20  said, other than it was very long.
21     Q.  Did you talk to Frank Waterhouse about it?
22     A.  Did not.
23     Q.  Other than Highland's legal counsel, did you
24  talk to anyone else about -- or -- strike that.
25        Other than Highland's legal counsel, did you

---

**8**

1  talk to anyone about Frank Waterhouse's deposition from
2  last week?
3     A.  I did not.
4     Q.  Did you review -- strike that.
5        Did you see any of the video of
6  Mr. Waterhouse's deposition?
7     A.  Nope.
8     Q.  Same questions now for Mr. Seery, S-e-e-r-y.
9        Did you read any portion or the whole of
10  Mr. Seery's deposition from last week?
11     A.  I did not.
12     Q.  See any of the video?
13     A.  No.
14     Q.  Did you see any synopsis or summary of his
15  deposition?
16     A.  No.
17     Q.  Did you talk to him about his deposition?
18     A.  I did not.
19     Q.  Other than talking to Highland's counsel, did
20  you talk to anyone about Mr. Seery's deposition?
21     A.  No.
22     Q.  Other than talking to Highland's counsel, did
23  you talk to anyone about your deposition today?
24     A.  Just John Morris and Dave Klos.
25     Q.  When did you talk to Mr. Klos, K-l-o-s?

---

Kristin Hendrix - October 27, 2021

**9**

1    A.  First time about this was last Friday.  And
2 then again Monday this week.  And yesterday.  And this
3 morning.
4    Q.  Friday was there any lawyer present during
5 your discussion with Mr. Klos?
6    A.  Yes, every time Mr. Morris was present.
7    MR. RUKAVINA:  Is it your position that those
8 four discussions would be privileged, Counsel?
9    MR. MORRIS:  Yes.
10    MR. RUKAVINA:  Then we'll move on.
11    Q.  (BY MR. RUKAVINA)  So we've established the
12 four times you talked to Mr. Klos with counsel present.
13 Did you do anything else related to or in preparation
14 for today's deposition?
15    A.  Yes, probably went through and reviewed some
16 emails, documentation that I may have had that I need
17 to refresh memory on.
18    Q.  These documents and emails that you might
19 have reviewed, did you supplementally provide them to
20 counsel or anyone else?
21    A.  Yes.
22    Q.  This would have been in the last week or
23 10 days?
24    A.  Yes.
25    Q.  Prior to the last week or 10 days, are you

**10**

1 aware that my office served requests for production on
2 Highland?
3    A.  Yes.
4    Q.  And did you do anything prior to the last
5 week or 10 days to try to search both your personal
6 records and corporate records for any responsive
7 documents?
8    A.  Not that I recall.
9    Q.  Is that something that you understand legal
10 counsel was charged with?
11    A.  Yes.
12    Q.  Let's go briefly now about your background,
13 please.
14    Where do you live?
15    A.  I live in Denton, Texas.
16    Q.  And what is your date of birth, please?
17    A.  January 26, 1982.
18    Q.  And walk me through your educational
19 background, starting with any postsecondary, if any,
20 schooling or college or anything like that.
21    A.  Sure.  Graduated in 2004 from the University
22 of North Texas with a degree in finance.  Went on to
23 get my MBA from SMU in 2009.  And then went further and
24 got my CPA license I believe in 2015.
25    Q.  In the state of Texas?

**11**

1    A.  Yes.
2    Q.  And has your CPA license been current since
3 then?
4    A.  Sure has.
5    Q.  Have you faced any kind of disciplinary
6 action as a CPA?
7    A.  I have not.
8    Q.  Now, please walk me through your work
9 history.  Let's say starting with after you graduated
10 college.
11    A.  Sure.  December of 2005, which was shortly --
12 sorry, 2004, shortly after I graduated from
13 North Texas, I started at Highland.  It was my first
14 real job out of college.  I have been there ever since,
15 almost 17 years now.
16    I have worked in the corporate accounting
17 department the entire time.  Started off as the AP
18 associate, and worked my way up over the years and
19 currently am the controller.
20    Q.  So even when you were getting your MBA and
21 CPA you were employed by Highland?
22    A.  Yes.
23    Q.  Impressive.  You're the controller today you
24 mentioned?
25    A.  Yes.

**12**

1    Q.  That's -- when did you become the controller,
2 sometime February or March of this year?
3    A.  Yes.
4    Q.  Before you became the controller, what was
5 your role at Highland?
6    A.  Right before that I was assistant controller.
7 That was I believe April of 2020.  Before that, the
8 senior accounting manager, and I held that position for
9 years.
10    Q.  So in May of 2019 would you have been the
11 senior -- you said senior account?
12    A.  Senior accounting manager I believe was my
13 title.
14    Q.  And would that have been your title in May of
15 2017?
16    A.  Yes, I believe so.
17    Q.  And let's focus now on May 2019 as the senior
18 accounting manager.  How would you describe your role
19 at Highland in May of 2019?  What were your duties?
20    A.  Sure.  I helped with treasury management
21 function, cash forecasts and things like that.  And
22 oversaw the financial reporting from the last batch of
23 AP all the way to financials and reporting on
24 audits.
25    Q.  Who did you report to in May of 2019?

Kristin Hendrix - October 27, 2021

**13**

1    A.  David Klos.
2    Q.  What was Mr. Klos' title to your
3  understanding back then?
4    A.  I believe he was the controller.
5    Q.  And do you have an understanding as to who
6  Mr. Klos reported to back then?
7    A.  Yes, Frank Waterhouse.
8    Q.  Frank Waterhouse.  Who was he in May of 2019?
9    A.  The CFO.
10   Q.  Is Mr. Klos still with Highland today?
11   A.  He is.
12   Q.  What is his role now?
13   A.  He's now CFO.
14   Q.  You mentioned treasury management as of 2019,
15  May.  What do you mean by treasury management?  What is
16  that?
17   A.  Generally speaking, we -- it's not just me as
18  one person.  We have checks and balances.
19      My team would be in charge of sending out
20  payments, reconciling bank statements, making sure
21  money is in the right accounts, creating cash forecasts
22  and reporting on those every week with the CFO and
23  oftentimes the CEO.
24      Generally that's everything that fell under
25  the umbrella.

**14**

1    Q.  And would your description of treasury
2  management be the same for the December 2020 period?
3    A.  Yes.
4    Q.  Who at Highland or which group at Highland in
5  December of 2020 would have been responsible for noting
6  that there are certain bills that need to be paid in
7  the near or subsequent future.
8      By way of, let's say, accounts payable or
9  promissory notes or taxes or anything like that?
10   A.  Can you repeat your question.
11   Q.  Sure.  So obviously, Highland was a pretty
12  sophisticated business; correct?
13   A.  Yeah.
14      MR. MORRIS:  Objection to the form.
15   Q.  (BY MR. RUKAVINA)  And had various accounts
16  payable; right?
17   A.  Yes.
18   Q.  And it had maybe, let's just say, certain
19  note obligations that it had to pay from time to time;
20  correct?
21      MR. MORRIS:  Objection to the form of the
22  question.  Do you mean Highland Capital?
23      MR. RUKAVINA:  I mean Highland Capital
24  Management; correct, I'm sorry.  The debtor.
25   Q.  (BY MR. RUKAVINA)  Can we say the debtor?

**15**

1    A.  Yes, you can say the debtor.
2    Q.  So when I say the debtor and you say the
3  debtor we understand each other to mean Highland
4  Capital Management, comma, LP; correct?
5    A.  Correct.
6    Q.  I apologize.  In the December 2020 period, I
7  would imagine that the debtor had its own -- that
8  was -- strike that.
9      We'll cut to the chase.
10      In December of 2020, the debtor was providing
11  services to various other entities affiliated with
12  Mr. Dondero; correct?
13   A.  Correct.
14   Q.  That would have included NexPoint Advisors,
15  LP?
16   A.  Correct.
17   Q.  And you're aware that NexPoint Advisors was
18  the obligor on at least one promissory note to the
19  debtor; correct?
20   A.  Correct.
21   Q.  And did the debtor in December 2020 provide
22  so-called treasury management services to NexPoint
23  Advisors?
24      MR. MORRIS:  Objection to the form of the
25  question.

**16**

1      THE WITNESS:  Yes.
2    Q.  (BY MR. RUKAVINA)  As part of that, in
3  December 2020, would it have been employees of the
4  debtor that would have scheduled for potential payment,
5  subject to approval by NexPoint, NexPoint's future
6  obligations as they were coming due?
7    A.  Yes, we would have scheduled, only with
8  approval.
9    Q.  And would that have included NexPoint's
10  obligations on the promissory note to Highland?
11   A.  Yes.
12   Q.  Back to your background briefly.
13      Do you have any legal training at all?
14   A.  I do not.
15   Q.  Do you have any courses, have you taken any
16  courses in drafting promissory notes?
17   A.  No.
18   Q.  Do you believe that your expertise as a
19  certified public accountant gives you any greater
20  qualification than anyone else to prepare a promissory
21  note?
22      MR. MORRIS:  Objection to the form of the
23  question.
24      THE WITNESS:  No.
25   Q.  (BY MR. RUKAVINA)  Have you ever prepared or

Dickman Davenport, Inc
214.855.5100     www.dickmandavenport.com     800.445.9548

Kristin Hendrix - October 27, 2021

---

**17**

1 drafted a promissory note?
2     A.  That term is probably used loosely.  I have
3 not completely drafted a promissory note from scratch,
4 no.
5     Q.  And we'll go into the details.  Fair to say
6 that you have taken a form promissory note and revised
7 it?
8     A.  Absolutely.
9     Q.  Was this part of your job in May of 2019 at
10 Highland?
11     A.  Yes.
12     Q.  Going back to the May 2019 time frame, were
13 you part of a particular group at Highland, like
14 accounting or legal or compliance?
15     A.  Yes, corporate accounting.
16     Q.  Corporate accounting.  That's what you
17 described before about treasury management and
18 projections and forecasts?
19     A.  Yes.
20     Q.  In May of 2019, was it the practice at
21 Highland that corporate accounting would be responsible
22 for drafting intercompany promissory notes?
23     A.  Not necessarily drafting, but updating a
24 draft that had been previously produced and provided by
25 our legal team, yes.

---

**18**

1     Q.  And Highland in May -- the debtor in May of
2 2019 did have a legal department?
3     A.  Yes.
4     Q.  Kind of like the corporate accounting, there
5 was a separate legal department; correct?
6     A.  Correct.
7     Q.  And who would have been in charge of that
8 department in May of 2019?
9     A.  Scott Ellington, E-l-l-i-n-g-t-o-n.
10     Q.  In May of 2019 or by May of 2019 was there
11 any practice at Highland as to whether its legal
12 department would be involved with the drafting or
13 execution of any intercompany promissory notes?
14     MR. MORRIS:  Objection to the form of the
15 question.
16     THE WITNESS:  It depends on the note.
17     Q.  (BY MR. RUKAVINA)  What did it depend on?
18     A.  Our typical practice is if we have a loan
19 with certain affiliates that it's a demand note.  We
20 have a template that we have used for years that was
21 created by either our internal legal team or an outside
22 law firm, I'm not sure which.
23     The typical practice is always updating a few
24 things on that template, getting it executed, and
25 filing it in our audit folders.

---

**19**

1     Q.  By updating, what do you mean?
2     A.  There's a few things that would need
3 updating, the date.
4     Q.  Maker?
5     A.  Maker.
6     Q.  Amount?
7     A.  The dollar amount, the interest rate.
8     Q.  And is it your testimony that the corporate
9 accounting group would do these things on its own
10 without necessarily the involvement of the legal group?
11     MR. MORRIS:  Objection to the form of the
12 question.
13     THE WITNESS:  Generally, yes.
14     Q.  (BY MR. RUKAVINA)  Do you have any memory in
15 or before May of 2019 if the corporate -- I'm sorry, if
16 the legal group became involved in drafting or
17 executing any prior intercompany promissory notes?
18     A.  Yes.
19     Q.  Explain to me what you remember about that.
20     A.  I do know that they were involved with
21 drafting restructured notes.  So taking demand notes
22 and turning them into a 30-year amort note.
23     That was in 2017.  I know for sure that they
24 were involved in that because it was something
25 different.  We weren't just updating a demand note.

---

**20**

1     Q.  Is it your testimony that to the best of your
2 recollection by May of 2019 and in May of 2019 it would
3 have been the corporate accounting group that would
4 have handled routine intercompany demand notes?
5     A.  Yes.
6     Q.  And you can think of more than one instance
7 on which that happened?
8     A.  Yes.
9     Q.  And this is not a memory test, but going back
10 in time can you try to give an estimate of what year
11 that first started happening, that the corporate
12 accounting would handle the drafting or execution of
13 intercompany demand notes?
14     A.  As far as I can remember.
15     Q.  Is it your testimony that as -- maybe even
16 going back as far as 2005 there were intercompany
17 demand notes?
18     A.  Yes.
19     Q.  I don't know how to ask this question, but
20 was this a significant thing in corporate accounting or
21 just another routine deal when you handled demand
22 notes?
23     MR. MORRIS:  Objection to the form of the
24 question.
25     THE WITNESS:  This is a routine job duty that

---

Kristin Hendrix - October 27, 2021

---

**21**

1  we routinely did.
2      Q.  (BY MR. RUKAVINA)  Between 2005 and 2019, do
3  you remember any maker on these intercompany demand
4  notes actually being required to pay a demand note, in
5  other words, Highland making demand?
6      A.  Not that I can specifically recall.
7      Q.  Do you have any recollection as to what
8  happened to these intercompany demand notes over the
9  years between 2005 and 2019?
10     A.  Yeah.  Typically anytime specifically Jim
11 Dondero would need to move money between related
12 parties, he would pay down -- when I say him, he would
13 have us in corporate accounting move money around, pay
14 off notes, reissue new notes somewhere else.
15         So a way to move money around between his
16 entities.
17     Q.  So let's use just hypotheticals here so that
18 I'm not trying to pin you down to any specific fact.
19         But between 2005 and 2019, is it fair to say
20 that if some Dondero entity that's not the debtor
21 needed money and the debtor had money, then Dondero
22 would have the debtor lend money to that entity on a
23 demand note basis?
24     A.  So long as they have the cash available to do
25 so.

---

**22**

1      Q.  "They" being the debtor?
2      A.  Debtor, yes.
3      Q.  And is it fair to say, then, again
4  hypothetically without any specifics, that if the
5  debtor maybe from time to time needed money and one of
6  these other entities had cash, then Dondero would cause
7  that other entity to pay down the demand note?
8      MR. MORRIS:  Objection to the form of the
9  question.
10     THE WITNESS:  Can you repeat that.
11     Q.  (BY MR. RUKAVINA)  Sure.  So I think you
12 mentioned that from time to time these entities would
13 pay down these demand notes?
14     A.  To the debtor?
15     Q.  To the debtor.
16     A.  Yes.
17     Q.  And is that, hypothetically again, is that
18 because on occasion the debtor might have needed cash
19 and these entities had the cash, so Dondero would have
20 them pay back the note?
21     MR. MORRIS:  Objection to the form of the
22 question.
23     THE WITNESS:  Yes, that could be a reason.
24     Q.  (BY MR. RUKAVINA)  Can you think of any other
25 reason in those 14 years?

---

**23**

1      A.  If the debtor needed cash to lend to another
2  entity.
3      Q.  I see.  So again, it's all one big happy
4  family, and whoever needed cash, the cash moved around;
5  correct?
6      A.  Correct.
7      Q.  Was it Mr. Dondero that basically was the
8  only deciding person in each instance that you're aware
9  of in those 14 years as to when a note would be made or
10 repaid?
11     A.  I can't answer specifically to that.  Most of
12 my direction came from our CFO at the time,
13 Frank Waterhouse.  So what conversations he would have
14 with Jim Dondero, I can't answer to that.  But I would
15 suspect so, yes.
16     Q.  And in May of 2019 or by May of 2019, did you
17 communicate personally, by email or telephone, in
18 person, periodically with Jim Dondero?
19     A.  I can't say periodically, no.
20     Q.  Well, I'm not trying to put words in your
21 mouth.  Is it fair to say that you kind of -- your
22 communications stopped with Mr. Waterhouse and
23 Waterhouse communicated with Dondero, as opposed to you
24 regularly communicating with Dondero?
25     A.  That's typical, yes.

---

**24**

1      Q.  Can you think of any instances in which
2  Mr. Dondero gave you any instructions or you came to
3  him seeking any instructions, without some intermediary
4  between the two of you?
5      A.  No, usually Frank was present.
6      Q.  Would you categorize Mr. Waterhouse as kind
7  of guarding with jealousy his access to Mr. Dondero?
8      MR. MORRIS:  Objection to the form of the
9  question.
10     THE WITNESS:  No.
11     Q.  (BY MR. RUKAVINA)  What kind of boss was he
12 in May of 2019?  Was he laid back, or was he a jerk?
13 Was he demanding?  How would you characterize him in
14 May of 2019?
15     MR. MORRIS:  Objection to the form of the
16 question.
17     THE WITNESS:  I would say he was a good boss.
18     Q.  (BY MR. RUKAVINA)  You think he was competent
19 as far as his job went?
20     A.  Yes, very competent.
21     Q.  Do you think he was competent as far as his
22 job went in December of 2020?
23     A.  Yes.
24     Q.  January 2021?
25     A.  Yes.

---

Kristin Hendrix - October 27, 2021

---

25

1    Q.  Was he patient and understanding as a boss?
2    A.  Yes.
3    Q.  Okay.  Was he ever condescending or rude to
4  anyone in your presence?
5    A.  No.
6    Q.  So you're the controller today at Highland,
7  the debtor, the reorganized debtor; right?
8    A.  Yes.
9    Q.  And who do you report to?  You mentioned
10  Mr. Klos is the CFO?
11    A.  Yes.
12    Q.  And do you also report to Mr. Seery?
13    A.  Yes, I think everybody does.
14    Q.  And I don't need to know details, but I take
15  it you're on a salary from reorganized Highland?
16    A.  Yes.
17    Q.  Is any part of your compensation merit or
18  bonus based?
19    A.  It could potentially be.
20    Q.  Have you had any discussions with Mr. Seery
21  or Mr. Klos about some sort of bonus compensation?
22    A.  Yes.
23    Q.  Has anything been agreed to?
24    A.  Yes.
25    Q.  And again, I don't need to know the exact

---

26

1  numbers.  What would your bonus compensation consist
2  of?  How would it be decided?
3    A.  It's actually -- was decided when I agreed to
4  stay on the Highland team back in February 2021, so
5  it's in my employment agreement.
6    Q.  So what's your bonus compensation?
7    A.  I'm not sure I understand what you're asking.
8    Q.  So is the bonus discretionary on the part of
9  Highland?
10    A.  No, it's a set amount.
11    Q.  And what triggers it or governs the set
12  amount?
13    A.  Just it gets paid out on a certain date of
14  the year.  It's very straightforward, set out in my
15  employment agreement.
16    Q.  Is it irrespective of the performance of the
17  reorganized debtor?
18    A.  Yes.
19    Q.  So why do you call it a bonus instead of base
20  compensation?
21    A.  That's what it's called in my agreement.
22    Q.  So your base compensation and your bonus,
23  it's your testimony, you're going to earn it
24  irrespective of whether reorganized Highland does good
25  or bad with respect to its profitability?

---

27

1    A.  Correct.
2    Q.  And how Highland, reorganized Highland
3  collects these promissory notes is going to play no
4  part in your base and bonus compensation to your
5  understanding; is that correct?
6    A.  To my knowledge, yes.
7    Q.  So you have no direct or indirect stake in
8  the outcome of these litigations?
9    A.  No.
10    Q.  And you understand that I represent HCMFA and
11  NexPoint?
12    A.  Yes.
13    Q.  And these court reporters are not familiar
14  with some of our terminology.  NAP [verbatim], if we
15  say that, that means NexPoint; right?
16    A.  Uh-huh.
17    Q.  You have to say yes or no.
18    A.  Yes, NPA, NexPoint.
19    Q.  NPA.  And when we say NexPoint, you and I are
20  meaning NexPoint Advisors, LP; right?
21    A.  Yes.
22    Q.  And when we say HCMFA, we're meaning Highland
23  Capital Management Fund Advisors, LP, yes?
24    A.  Yes.
25    Q.  What is your understanding of the two

---

28

1  lawsuits, the one against HCMFA and the one against
2  NexPoint, that you're being deposed on today?
3      MR. MORRIS:  Objection to the form of the
4  question.
5    Q.  (BY MR. RUKAVINA)  Who is suing who and for
6  what?
7    A.  I don't know all the details.
8    Q.  So we've established that you've discussed
9  these lawsuits in the last week or a little bit more
10  with legal counsel.  I don't want to talk about that.
11      Prior to these recent discussions, did you
12  have any discussions with anyone at Highland about its
13  lawsuits against HCMFA and NexPoint on promissory
14  notes?
15    A.  Repeat that again.
16    Q.  Sure.  So remember we're excluding the recent
17  discussions in the last week or 10 days with counsel;
18  right?
19    A.  Okay.
20    Q.  Are you aware that in January of 2021 the
21  debtor sued NexPoint to collect on a promissory note?
22    A.  I'm aware that demand notices were sent.
23    Q.  So until recently you weren't aware that a
24  lawsuit had been filed?
25    A.  There's a lot of lawsuits filed.  I can't

---

Kristin Hendrix - October 27, 2021

**29**

1 keep track of what is what or what we're talking about
2 at certain times.
3      Q.  But you have no distinct memory of that?
4      A.  Correct.
5      Q.  And same question for the lawsuit that the
6 debtor filed against HCMFA in January.
7          Do you have any specific memory of that
8 lawsuit having been filed?
9      A.  Not specifically.
10      Q.  You mentioned that you're aware that on or
11 before January 2021, demand letters had been sent?
12      A.  Yes.
13      Q.  Did you play any role in either drafting
14 those demand letters or the decision to send them?
15      A.  No.
16      Q.  So going back to my question about these
17 lawsuits, do you have any memory of anyone asking
18 you -- again, excluding the last week or two.
19          Do you have any memory of anyone asking you
20 to do anything with respect to either or both of these
21 lawsuits?
22      A.  No.
23      Q.  You have no memory of Mr. Waterhouse,
24 Mr. Klos, Mr. Surgent, or Mr. Seery asking for any
25 background information or your input at all on these

**30**

1 two lawsuits?
2          MR. MORRIS:  Better not have been --
3          THE WITNESS:  No.
4      Q.  (BY MR. RUKAVINA)  Who did I say?  Did I
5 misspeak?  Okay.
6          Now we're going to have some exhibits here.
7          And do you have the labels?
8          Let's take a minute break off the record.
9          (Off the record.)
10      Q.  (BY MR. RUKAVINA)  Ms. Hendrix, I'm going to
11 provide to you a promissory note in the original
12 principal amount of $5 million from HCMFA.  This is the
13 PDF version of this as filed with the Court for
14 collection.  It's going to be Exhibit 1.
15          (Whereupon, Exhibit 1 was marked for
16          identification.)
17      Q.  (BY MR. RUKAVINA)  Before you look at
18 Exhibit 1, I'm going to do the same thing for
19 Exhibit 2, which is a promissory note from HCMFA for
20 $2.4 million, dated May 2, 2019.
21          (Whereupon, Exhibit 2 was marked for
22          identification.)
23      Q.  (BY MR. RUKAVINA)  Again, Ms. Hendrix, these
24 are the PDF versions of these notes as filed with the
25 Court.  Sitting here today, do you remember anything

**31**

1 about either or both of these two promissory notes?
2      A.  Sure, yes.
3      Q.  What do you remember?
4      A.  I remember seeing them because I've recently
5 looked at them.  I see them all the time in our loan
6 tracking spreadsheets.  My team would have been
7 responsible for the whole process that I explained
8 before when it comes to a promissory note.
9      Q.  And --
10          MR. MORRIS:  Are you finished?
11          THE WITNESS:  Yes.
12      Q.  (BY MR. RUKAVINA)  And we have an email here
13 that might give some more context to that if I can find
14 it here.
15          This will be Exhibit 3.  This is an email
16 from David Klos to corporate accounting dated May 2,
17 2019.
18          (Whereupon, Exhibit 3 was marked for
19          identification.)
20      Q.  (BY MR. RUKAVINA)  Do you see this email,
21 ma'am?
22      A.  Yes.
23      Q.  Okay.  Corporate accounting, would that email
24 group have included you?
25      A.  Yes.

**32**

1      Q.  And this email says, Kristin, can you or
2 Hayley.  Do you think that Kristin was you?
3      A.  I do.
4      Q.  Do you remember receiving this email?
5      A.  Not explicitly.
6      Q.  So it says Blair.  Who would Blair be?
7      A.  Blair was our AP assistant.
8      Q.  What is her last name?
9      A.  At this time it would have been Roeber,
10 R-o-e-b-e-r.
11      Q.  Okay.  And did it subsequently change?
12      A.  Yes, it's now Hillis, H-i-l-l-i-s.
13      Q.  Please send $2.4 million from HCMLP to HCMFA.
14 This is a new interco loan.  Kristin, can you or Hayley
15 please prep a note for execution.  I'll have further
16 instructions later today, but please process this
17 payment as soon as possible.
18          Did I read that correctly?
19      A.  Yes.
20      Q.  Do you have any memory of whether this email
21 relates to Exhibit 2, the $2.4 million promissory note?
22      A.  It seems like it does, same date, same
23 amount.
24      Q.  Do you have any memory, or in reviewing your
25 files did you see any similar email or document that

Kristin Hendrix - October 27, 2021

33

1  would have related to Exhibit 1, the $5 million
2  promissory note?
3      A.  Yes.  I believe there's another email for
4  that one.
5      Q.  And do you believe that you provided that to
6  counsel?
7      A.  Yes.
8      Q.  Recently or some time ago?
9      A.  Well, I don't think I provided it, so I'm not
10  sure when they got it.  I know it has been provided.
11      Q.  You know that it has?
12      A.  Uh-huh.
13      Q.  How do you know?
14      A.  Because I've seen it.
15      Q.  In the production that was produced to me?
16      A.  Yes.
17      Q.  And also from a David Klos?
18      A.  This one, or on the -- when I say this one,
19  on the $2.4 million or the 5-?
20      Q.  On the $5 million note.
21      A.  I'm not sure.
22      Q.  Okay.  Let me make sure I understand you
23  correctly.
24          Sitting here today you believe that there is
25  another email referencing the $5 million loan that has

34

1  been produced to my office?
2      A.  Yes.  I believe so.
3      Q.  Okay.  And going off memory, did it kind of
4  say the same thing as this Exhibit 3 except that it
5  referenced $5 million?
6          MR. MORRIS:  Objection to the form of the
7  question.
8          THE WITNESS:  Generally, should have said the
9  similar situation, yeah.
10      Q.  (BY MR. RUKAVINA)  So Mr. Klos says, this is
11  a new interco loan, for Exhibit 3.  Other than what he
12  told you, that this is an intercompany loan, did anyone
13  else tell you or did you have any other information on
14  May 2, 2019 that this was a loan?
15      A.  I don't specifically recall these
16  conversations, but I can tell you our normal practice
17  would be we would either likely be in a cash meeting --
18  and I say "we."  Would have been myself, Dave Klos,
19  Frank Waterhouse, potentially even Jim Dondero.
20          But I don't recall conversations on this
21  specific date.  But general practice is we would talk
22  about it.
23          Oftentimes, Frank would either call Dave or I
24  or stop by and tell us that, we need to send money to
25  an affiliate, paper up a new loan, let's get a wire out

35

1  the door, is typically how this works.
2      Q.  Is the answer generally the same for the
3  $5 million note?
4      A.  Yes.
5      Q.  So is it fair to say that typically,
6  obviously not every time, but typically your corporate
7  accounting group when it would see intercompany
8  transfers in large amounts would believe that they were
9  loans?
10          MR. MORRIS:  Objection to the form of the
11  question.
12          THE WITNESS:  Typically they were loans.
13  There's not really another way to get money from one
14  entity to another.  And if they were papered as a loan,
15  that means we were told to set it up that way.
16      Q.  (BY MR. RUKAVINA)  What do you mean papered
17  as a loan?  Aren't you papering it as a loan when
18  someone makes the promissory note?
19      A.  Yes, because we're told by somebody to do
20  that.
21      Q.  And in this instance, Mr. Klos on Exhibit 3
22  told the group that this was a loan; right?
23      A.  Correct.  But he would have spoken with
24  Frank Waterhouse or Jim Dondero prior to that, before
25  telling anybody to do that.

36

1      Q.  Okay.  And do you have any knowledge that he
2  did speak to Mr. Waterhouse or Mr. Dondero before
3  sending this email?
4      A.  Again, I don't have specific knowledge on the
5  exact conversations, but that's always how it has
6  worked.
7      Q.  That's how it was for 14 or 15 years;
8  correct?
9      A.  Yes.
10      Q.  But you're logically assuming that it
11  happened here.  You don't know that it happened here;
12  correct?
13          MR. MORRIS:  Objection to the form of the
14  question.
15          THE WITNESS:  I would have to be fairly
16  certain that it did, even though I can't recall
17  specific conversations.
18      Q.  (BY MR. RUKAVINA)  Did you ask Mr. Klos about
19  who told him that this is a new intercompany loan on
20  Exhibit 3?
21      A.  No.  It's quite possible I was involved in
22  the conversation.  I reported to him.  I wouldn't
23  question his authority.
24      Q.  Did you ask Mr. Klos who told him that the
25  $5 million deal was also an intercompany loan?

**37**

1     A.  I did not ask that specific question that I
2 can recall.
3     Q.  Did you ask Mr. Waterhouse whether either of
4 these transactions were loans?
5     A.  I'm sure Mr. Waterhouse is the one that told
6 us they were loans.  We wouldn't just paper up a loan,
7 send money out and call it a loan and account for it
8 that way, unless somebody specifically told us.
9     Q.  Do you have any memory of Mr. Waterhouse
10 orally or in writing or email or in any way, shape, or
11 form on or about May 2 or 3, 2019 telling you that the
12 2.4 million or $5 million transfers were intercompany
13 loans?
14     A.  No specific knowledge of exact conversations,
15 but I'm certain that those conversations were had
16 because that's the only way that we would have papered
17 up a loan, sent money out as a loan, had them on our
18 financials for two years.
19     Q.  So you're saying that this email, Exhibit 3,
20 from Mr. Klos was not enough, that there would have
21 been other things that happened to make you and other
22 people in your group confident that these were loans?
23     A.  Yes.
24     Q.  And these other things would have been in
25 person or by email?

**38**

1     A.  Most likely in person via phone call.
2     Q.  Okay.  So again, you have no specific memory
3 of it, but based on the 14-year pattern and conduct you
4 believe that you would have discussed these two
5 transfers with Mr. Waterhouse and he would have told
6 you these are loans?
7     MR. MORRIS:  Objection to the form of the
8 question.
9     THE WITNESS:  Correct.
10     Q.  (BY MR. RUKAVINA)  And then would he have
11 told you to take care of the promissory notes, or was
12 that Mr. Klos here in Exhibit 3?
13     A.  It could have been both.  It's clearly Dave
14 in this email, but Frank could have also said that to
15 me.
16     Q.  Now, do you -- strike that.
17     In May of 2019, did you know or were you told
18 why these $7.4 million were being transferred from the
19 debtor to HCMFA?
20     A.  Yes.  I do have recollection that -- I do
21 know that there were two big events in May 2019.
22 2.4 million was related to a TerreStar NAV error, with
23 one of the funds advised by HCMFA.  That's Global
24 Allocation Fund.
25     Similar with the $5 million loan.  There was

**39**

1 a consent fee that the advisor of the Global Allocation
2 Fund had promised to pay to shareholders of that fund,
3 and it was in the amount of $5 million roughly.
4     So both of these loans were for those
5 purposes respectfully.
6     Q.  And were you in May of 2019 also aware that
7 in addition to the $2.4 million, there was another more
8 than $5 million paid to that fund by HCMFA's insurer as
9 compensation for the NAV error?
10     A.  By the insurance company, yes.
11     Q.  So the $7.4 million, you understood then was
12 a loan as opposed to compensation to HCMFA?
13     A.  Yes.
14     Q.  Okay.  Did you understand in May of 2019 that
15 it had been the debtor and its valuation team that
16 caused that NAV error?
17     MR. MORRIS:  Objection to the form of the
18 question.
19     THE WITNESS:  I can't answer that.  I was not
20 involved with the activities leading up to the NAV
21 error.
22     Q.  (BY MR. RUKAVINA)  How do you know that the
23 $7.4 million were being transferred for the NAV error
24 and consent fee?
25     A.  Because I do know about both of those

**40**

1 instances and I do know that HCMFA needed to pay these
2 dollar amounts for both of those.
3     Q.  And you knew that in May of 2019?
4     A.  Yes.
5     Q.  How did you know that in May of 2019?
6     A.  It was lots of discussions had been going on
7 around both of those issues for months.  These weren't
8 surprises to anybody.
9     Q.  So although you weren't involved directly
10 with the NAV error issues, it was more or less common
11 knowledge in your accounting group?
12     A.  Correct.
13     Q.  Do you have any knowledge at all as to
14 whether Mr. Dondero decided to transfer these
15 $7.4 million not as a loan, but to compensate HCMFA for
16 the debtor's alleged liability?
17     A.  Have not heard of that.
18     Q.  Ever?
19     A.  Never.
20     Q.  But you also never heard Mr. Dondero say that
21 these $7.4 million were a loan; correct?
22     A.  That was not told to me directly.
23     Q.  Again, you're logically assuming that based
24 on many instances of intercompany transfers in the
25 14 years prior to that?

Kristin Hendrix - October 27, 2021

---

**41**

1        MR. MORRIS:  Objection to the form of the
2   question.  Mischaracterizes the testimony.
3        THE WITNESS:  Correct.
4        Q.  (BY MR. RUKAVINA)  I think you answered
5   correct?
6        A.  Correct.
7        Q.  And you mentioned that after these notes, you
8   saw them on internal financials and that reinforces
9   your view that these were loans?
10       A.  Correct.
11       Q.  But as of May 2 and 3, 2019, no one had told
12   you directly that these are loans?
13       MR. MORRIS:  Objection to the form of the
14   question.  It's in writing.
15       THE WITNESS:  That's not what I'm saying at
16   all.
17       Q.  (BY MR. RUKAVINA)  Other than Mr. Klos' email
18   or emails, no one told you on May 2 or May 3, 2019 that
19   you remember today that these were loans?
20       A.  It quite possibly could have been told to me
21   in addition to this email.
22       Q.  I understand.  You just have no memory of
23   that today; correct?
24       A.  Correct.
25       Q.  Is there anything that you can think of

---

**42**

1   sitting here today to refresh your memory on that
2   point?
3        A.  I do not think so.  I'm sure there was
4   conversation that unfortunately would not be in an
5   email.
6        Q.  Now, we have the Word documents, the Word
7   version of these two promissory notes, and you're going
8   to have rely on me that I printed these out as
9   Mr. Morris sent to me.  If I'm misleading you on that,
10   then I'm in trouble and your answers don't count.
11       So please assume that I didn't doctor these
12   and that I printed them out as they were prepared to
13   me; okay?
14       A.  Yes.
15       Q.  So Exhibit 4 will be the $5 million note and
16   Exhibit 5 will be the 2.4 million.
17       (Whereupon, Exhibits 4 & 5 were marked for
18        identification.)
19       Q.  (BY MR. RUKAVINA)  Before I ask about 4 and
20   5, to be fair to you and refresh your memory, I'm going
21   to provide you printouts of the metadata, metadata --
22   I'm not sure how to better say that -- for both notes.
23       And again I'm representing to you that I
24   printed out the metadata without doctoring it, so
25   please assume that's true, and if it's not, your

---

**43**

1   answers don't count and I'm in trouble.
2        6 will be the $5 million note, and 7 will be
3   the $2.4 million note.
4        (Whereupon, Exhibits 6 & 7 were marked for
5        identification.)
6        Q.  (BY MR. RUKAVINA)  Okay.  So Exhibit 4 and 5
7   are the Word documents.  Do you have any memory of you
8   doing anything with respect to these two Word
9   documents?
10       A.  I don't have specific memory, but generally
11   speaking, it was my job to update promissory note
12   templates and create promissory notes.
13       Q.  So do you believe that -- we discussed
14   earlier that your group would have used a template and
15   that it would have made changes reflecting the maker,
16   amount, date, interest rate.
17       Do you believe you were the one with respect
18   to 4 and 5 that updated that template to create 4
19   and 5?
20       A.  I'm sure that I was, yes.
21       Q.  Well, Exhibit 6 -- do you know what metadata
22   is?
23       A.  Sort of.
24       Q.  What's your understanding of what metadata
25   is?

---

**44**

1        A.  Just in context from speaking on it recently,
2   it's going to tell you who made changes to the
3   documents, is what I would assume.
4        MR. RUKAVINA:  Go off the record for one
5   second.
6        (Off the record.)
7        Q.  (BY MR. RUKAVINA)  So a little bit of error
8   on my part.  We'll have some more metadata, but we can
9   still talk about 6 and 7.
10       It says the author JFORSHEE, J-F-O-R-S-H-E-E.
11   Do you recall or do you know who that person was?
12       A.  I recognize the name, and it makes sense.
13   This says Strasburger is the company.  I think he was
14   one of the lawyers that we had used at some point in
15   time.
16       Q.  Strasburger is a law firm?
17       A.  Yes.
18       Q.  And then it says, so Exhibit 6 created May 3,
19   Exhibit 7 created May 2, modified, accessed.  Does that
20   to the best of your understanding comport with when
21   Exhibits 4 and 5 were actually created?
22       A.  Can you repeat that.
23       Q.  Yeah.  We'll wait for the rest of the
24   metadata.  But let's go back to 4 and 5.
25       In and by May 2019 I think you mentioned that

---

Kristin Hendrix - October 27, 2021

45

1  it was your job to, I think you said update promissory
2  notes?
3          MR. MORRIS:  Objection to the form of the
4  question.
5      Q.  (BY MR. RUKAVINA)  Let me take that question
6  back.
7          You testified earlier that your group would
8  have taken a template and used it to create or prepare
9  a new promissory note; right?
10     A.  Right.
11     Q.  How would you call that process?  What word
12 would you use for that process?
13     A.  Let's call it papering the loan.
14     Q.  In May of 2019, was it your job to paper the
15 loan?
16     A.  Yes.
17     Q.  Would anyone else at the corporate accounting
18 group have been responsible to paper a loan?
19     A.  At that time, I don't think so.  I think I
20 was the one doing it.
21     Q.  I think you mentioned that you think you
22 papered the loan, respecting Exhibits 4 and 5; correct?
23     A.  Correct.
24     Q.  You have no distinct present memory of
25 papering 4 and 5; correct?

46

1      A.  Correct.
2      Q.  Can you think of anyone else at the corporate
3  accounting group that would have papered 4 and 5?
4          MR. MORRIS:  Objection to the form of the
5  question.
6          THE WITNESS:  The only other person that
7  could have worked either be Dave Klos or Hayley Eliason.
8      Q.  (BY MR. RUKAVINA)  What was Hayley's role in
9  May of 2019?
10     A.  She was the accountant.  I can't recall her
11 specific title.
12     Q.  Now, in May of 2019 when you papered a loan,
13 would you have consulted with either internal or
14 external legal before finishing that loan or presenting
15 it for signature or anything else?
16     A.  Not if it was just our standard demand note
17 that we already had a template on.
18     Q.  So would it have been your general course in
19 May of 2019, if you prepared Exhibits 4 and 5, not to
20 seek advice from internal or legal before proceeding
21 with these notes?
22     A.  With these two specific notes?
23     Q.  Yes.
24     A.  Yes.
25     Q.  If we flip the page, I'll represent to you

47

1  that Mr. Waterhouse's signature there appears on the
2  Word document as an image.
3      A.  Uh-huh.
4      Q.  Do you have any memory of whether there was
5  an image that someone would have affixed of
6  Mr. Waterhouse's signature to promissory notes?
7      A.  Yes.  We typically always -- he was
8  completely fine with having documentations -- sorry,
9  having documents signed or executed with his
10 e-signature.
11     Q.  Would these pictures of his signature have
12 been his e-signature in May of 2019?
13     A.  Yes.
14     Q.  So let's just clarify that because I don't
15 want there to be any confusion.
16         I know there's some computer programs out
17 there that are restrictive and have passwords before
18 any signature is printed.  And then there's some people
19 that use a stamp or an image; right?
20         MR. MORRIS:  Objection to the form of the
21 question.
22     Q.  (BY MR. RUKAVINA)  Are you following me?
23     A.  I follow you.
24     Q.  In May of 2019, did Mr. Waterhouse have any
25 specific program that would have to -- you would have

48

1  to go through before it would spit out his e-signature,
2  or was he fine with you and his staff using an image
3  like this?
4      A.  He was fine with using his e-signature, and
5  what is on these documents was that exact e-signature.
6  So I don't know if he had -- I don't know how it was
7  created originally.
8      Q.  The e-signature?
9      A.  E-signature.
10     Q.  Do you have any memory with respect to
11 Exhibits 4 and 5 of getting Mr. Waterhouse's specific
12 approval to use his e-signature?
13     A.  I don't have exact specific memory, same as
14 conversations on these loans.  But he would have had to
15 approve this loan in the dollar amount, the day.
16         He would have been the one directing us to
17 create these loans.  In past practice he has always
18 approved using his e-signature to execute documents.
19     Q.  How would he have approved Exhibits 4 and 5?
20 By that, I mean by email or memorandum?  How would he
21 have approved it in May of 2019?
22         MR. MORRIS:  Objection to the form of the
23 question.
24         THE WITNESS:  I would assume that, as I've
25 stated previously, these directions were coming

Kristin Hendrix - October 27, 2021

---

**49**

1  directly from him to paper a loan. These changes that
2  are made are only to the dollar amount. Interest rate
3  is pulled right off the IRS website.
4       That is his approval to paper a loan and in
5  fact execute or approve the loan.
6       Q.  (BY MR. RUKAVINA)  In May of 2019, would
7  Mr. Waterhouse -- what was his practice as far as using
8  an ink signature on documents as opposed to an
9  e-signature?  Did he have a practice?
10      MR. MORRIS:  Objection to the form of the
11  question.
12      THE WITNESS:  He has never specifically said,
13  on certain documents I would like to ink it with my
14  signature.  Probably at this time, 99 percent of the
15  stuff my team got his signature on was his e-signature.
16  I think it just depended on the group and what it was.
17      Q.  (BY MR. RUKAVINA)  So how would he authorize
18  you or your team to use his e-signature for any given
19  document in May of 2019?
20      MR. MORRIS:  Objection to the form of the
21  question.
22      THE WITNESS:  Through the conversations that
23  would have been had before these emails went out saying
24  paper loan.
25      Q.  (BY MR. RUKAVINA)  And -- okay.  So, and

---

**50**

1  after his e-signature was used either on these notes or
2  other documents in May of 2019, would you have brought
3  the documents back to him for any kind of verification?
4       MR. MORRIS:  Objection to the form of the
5  question.
6       THE WITNESS:  Probably not.  These are all
7  very standard.  We've papered hundreds of loans.  So I
8  think he trusted that we can handle updating a date and
9  a dollar amount on these loan templates.
10      Q.  (BY MR. RUKAVINA)  Do you know or believe, or
11  your recent review of documents, did it reveal an email
12  from Mr. Waterhouse to you specifically authorizing his
13  e-signature on Exhibits 4 and/or 5?
14      A.  Not that I recall seeing, no.
15      Q.  Sitting here today, do you have any memory of
16  Mr. Waterhouse orally or otherwise specifically
17  authorizing you to affix his e-signature to Exhibits 4
18  and/or 5?
19      A.  Specifically on these loans, no, I don't
20  recall those conversations.  But, again, our practice
21  has always been we have this discussion, he's under the
22  understanding that we're going to paper the loans, he's
23  always comfortable with using his e-signature.
24      This is not something me or my team would
25  have done without that authority and approval from him.

---

**51**

1       Q.  But you have no memory of that authority or
2  approval, specifically for 4 and 5?
3       MR. MORRIS:  Objection.  Asked and answered
4  about five times.
5       THE WITNESS:  Same as my answer I just gave.
6       Q.  (BY MR. RUKAVINA)  And I think you mentioned
7  that in your years at Highland your team papered
8  hundreds of loans?
9       A.  Yeah.
10      Q.  In your time at Highland, is it your
11  testimony that the accounting -- corporate accounting
12  department never made a mistake with respect to
13  anything that it did?
14      MR. MORRIS:  Objection to the form of the
15  question.
16      THE WITNESS:  No, I did not say that.
17      Q.  (BY MR. RUKAVINA)  Do you recall any mistakes
18  in your time at the corporate accounting group at
19  Highland that had been made, any significant mistakes?
20      MR. MORRIS:  Objection to the form of the
21  question.
22      THE WITNESS:  Significant mistakes, not that
23  I can recall.
24      Q.  (BY MR. RUKAVINA)  No accounts payable
25  mistakenly paid?

---

**52**

1       MR. MORRIS:  Objection to the form of the
2  question.
3       THE WITNESS:  I cannot specifically answer
4  that question with 17 years of work to recall, sorry.
5       MR. RUKAVINA:  Just take a quick break.  If
6  you need a restroom -- off the record.
7       (Off the record.)
8       Q.  (BY MR. RUKAVINA)  Going back to Exhibits 4
9  and 5.
10      Mr. Waterhouse signed these promissory notes.
11  Is there any particular reason why he signed them as
12  opposed to Dondero or someone else?
13      A.  No particular reason.  He's an officer for
14  both companies.  He's a signatory.
15      Q.  Who decided, if anyone, to your knowledge,
16  that he would be the one signing the notes, these two
17  notes?
18      A.  I don't know who would have decided that, but
19  typically if Frank specifically wanted Jim Dondero to
20  sign it, he would say, take it to Jim to sign.
21      Q.  Do you have a recollection of
22  Mr. Dondero -- strike that.
23      Do you have a recollection of Mr. Waterhouse
24  signing other promissory notes?
25      A.  Yes.  I know for sure he has signed other

---

Dickman Davenport, Inc
214.855.5100    www.dickmandavenport.com    800.445.9548

Kristin Hendrix - October 27, 2021

---

53

1  promissory notes. I can't tell you explicitly which
2  ones.
3      (Off the record.)
4      Q.  (BY MR. RUKAVINA)  Are you saying that in May
5  of 2019 -- strike that.
6      By May of 2019, was it not the standard
7  practice at the debtor that Mr. Dondero would sign
8  intercompany promissory notes?
9      MR. MORRIS:  Objection to the form of the
10 question.
11     THE WITNESS:  No, that's not standard
12 practice.  Just needed to be somebody -- somebody who
13 is a signer for the entity on the incumbency
14 certificate.
15     Q.  (BY MR. RUKAVINA)  Was there a standard
16 practice, or did you just describe that standard
17 practice that it was someone on the incumbency
18 certificate?
19     A.  That's correct, somebody on the incumbency
20 certificate.  Frank is a great prospect to sign, with
21 giving direction to set loans up, send money out.  Why
22 wouldn't he sign it.
23     Q.  Do you have any memory sitting here today of
24 Mr. Waterhouse telling you or agreeing that he would be
25 signing these two promissory notes for HCMFA?

---

54

1      A.  Not specifically, but he didn't need to tell
2  me.  He typically would tell me if he wanted Jim to
3  sign them.
4      Q.  Sitting here today, do you have any memory of
5  giving Mr. Waterhouse these two promissory notes after
6  they were prepared?
7      A.  I specifically don't remember walking into
8  his office and providing it to him, but he could have
9  found it on our shared drive if he wanted to.
10     Q.  Do you have any memory or in your recent
11 review of documents did you see any email to the effect
12 of you sending either or both of these promissory notes
13 to Mr. Waterhouse after they were papered up?
14     A.  I don't have any specific recollection,
15 again, but he had access to look at them.
16     Q.  On the shared drive?
17     A.  Yes.
18     Q.  In May -- I'm going to ask this question
19 multiple different ways, so let's start with kind of
20 the general.
21     In May or by May of 2019, was there a
22 repository, electronic or paper, where the debtor kept
23 original promissory notes that were owed -- where money
24 was owed to it?
25     A.  Original meaning paper?

---

55

1      Q.  Well, let's go back a little bit in time.
2      Would you agree that at some point prior to
3  2019 the standard course was that paper notes were ink
4  signed?
5      MR. MORRIS:  Objection to the form of the
6  question.
7      THE WITNESS:  I could not tell you
8  specifically when notes were or were not ink signed.
9      Q.  (BY MR. RUKAVINA)  Was there any repository,
10 to the best of your recollection, as of May 2019 where
11 any ink-signed original promissory notes were kept by
12 the debtor?
13     A.  No.  We always would scan them, save them
14 on our shared drive.  Never had paper copies.
15     Q.  So that's -- fixing to ask that question
16 next.
17     So Exhibits 4 and 5, would they even have
18 been printed after they were papered up?
19     MR. MORRIS:  Objection to the form of the
20 question.
21     THE WITNESS:  Possibly.  Somebody could have
22 printed them.
23     Q.  (BY MR. RUKAVINA)  Do you remember printing
24 Exhibits 4 or 5 sitting here today?
25     A.  I don't recall printing them myself, no.

---

56

1      Q.  Would there have been a reason to print them
2  out if, as you said, the notes were stored
3  electronically?
4      MR. MORRIS:  Objection to the form of the
5  question.
6      THE WITNESS:  There could be a reason.  I
7  don't recall that I for any reason printed these
8  particular notes.
9      Q.  (BY MR. RUKAVINA)  So as of May 2019, is it
10 your testimony that notes that were papered up by the
11 corporate accounting group would have been saved
12 electronically on the system and not kept by way of
13 paper copies in some file?
14     A.  Correct.  That's right.
15     Q.  This is additional metadata.  And you
16 understand I have a bit of an accent.
17     What are we on?
18     (Off the record.)
19     Q.  (BY MR. RUKAVINA)  Ms. Hendrix, Exhibit 8 is
20 going to be additional metadata for the May 3, 2019,
21 note that we've been looking at, and Exhibit 9 will be
22 the same thing for the May 2 note that we've been
23 looking at.
24     That's 8.  That's 9.
25     (Whereupon, Exhibits 8 & 9 were marked for

---

Kristin Hendrix - October 27, 2021

---

57

1    identification.)
2    Q.  (BY MR. RUKAVINA)  Ms. Hendrix, I'm going to
3  represent to you again that my office has faithfully
4  printed this metadata out without doctoring or changing
5  anything, and I ask you to assume that.  If I'm wrong
6  on that, then your answers don't count.
7       Ma'am, as I look at these two documents, it
8  says last modified by Kristin Hendrix.
9       Do you see that?
10   A.  Yes.
11   Q.  And that would have -- that could have only
12  been you; correct, in that department?
13   A.  I hope so, yes.
14   Q.  Seeing these two documents, can you agree
15  with me now that it was in fact you that papered up
16  Exhibits 4 and 5?
17      MR. MORRIS:  Objection.  Asked and answered.
18      THE WITNESS:  I would assume so since my name
19  is on it, yes.
20   Q.  (BY MR. RUKAVINA)  Both of these documents
21  say last printed -- I'm sorry.  If you see related
22  dates, it says last printed May 2, 2019, 11:27 A.M.  Do
23  you have any memory or any understanding as to why that
24  date would be there or what last printed might mean?
25   A.  I don't know why it says last printed the day

---

58

1  before it was created.  That doesn't make sense.  I
2  have no idea.
3       Unless, the only thing I could think of is if
4  we changed this template.  When I say "this," the
5  $2.4 million loan, which was papered on the 2nd, and
6  then used it for the next day for the template to
7  update the date, possibly.  I have no idea.
8    Q.  Well, it may be -- and I understand that you
9  don't have any memory; we're speculating a little bit.
10      It may be, looking at Exhibits 8 and 9, that
11  the $2.4 million note was printed on May 2, and then
12  after having been used as the template for the
13  $5 million note, the $5 million note would not have
14  been printed.
15      Does that sound possible?
16      MR. MORRIS:  Objection to the form of the
17  question.
18      THE WITNESS:  Sure, it could be possible.
19    Q.  (BY MR. RUKAVINA)  But you don't have any
20  memory either way?
21    A.  No.  And when these were printed they're
22  printed to PDF, I believe, is probably what that means.
23    Q.  Okay.
24      We're going to switch gears a little bit now,
25  if you want to make a pile of those exhibits.

---

59

1  Obviously, you're welcome to use them anytime you need
2  to, but I think we're done with those notes.
3       Going to hand you what we're going to mark as
4  Exhibit 10, which is an email chain produced by the
5  debtor.
6       And I don't know how anyone on the video will
7  see it.  I apologize.  I'll have to send it to you
8  later.
9       (Whereupon, Exhibit 10 was marked for
10      identification.)
11   Q.  (BY MR. RUKAVINA)  Now, if you start with
12  this email chain, it starts on November 19, 2020 from
13  Jack Donohue to you, copying Mr. Seery and various
14  others.
15      Do you see that?
16   A.  Yes.
17   Q.  And Mr. Donohue is asking you to provide him
18  the financial records of HCMFA due to the funds owed
19  the debtor.
20      Do you see that?
21   A.  Yes.
22   Q.  Do you recall that email from Mr. Donohue to
23  you?
24   A.  Yes.
25   Q.  Do you recall any context or subsequent

---

60

1  discussions or how that email came to be, or do you
2  just recall getting that email?
3    A.  I just recall getting the email.
4    Q.  You write back, hi Jack, Scott Ellington is
5  going to follow up with the board on this request.
6       Do you see that?
7    A.  Yes.
8    Q.  Do you recall why you told Jack that
9  Mr. Ellington was going to follow up?
10   A.  From what I recall, I had asked Frank
11  Waterhouse if it was okay to send these financials
12  over, and he wanted me to check with Scott Ellington
13  and that was Scott's response.
14   Q.  And did he tell you why he wanted you to
15  check with Scott Ellington?
16   A.  Just to make sure that there were no issues
17  with sending them over.
18   Q.  Mr. Seery writes back, can I get this ASAP.
19  HCMFA is way overdue.
20      Do you see that?
21   A.  Yes.
22   Q.  And Mr. Seery writes again, it's about a week
23  later, and he says, this is an explicit direction from
24  me as CEO of HCMLP.  But it looks like you are the
25  recipient of that December 2 email; correct?

---

Kristin Hendrix - October 27, 2021

**61**

1   A. Yes.
2   Q. Do you remember him sending you that email
3 and copying those people?
4   A. Yes.
5   Q. Do you remember anything happening in that
6 week between his November 25 and December 2 email along
7 the same discussion lines?
8   A. I don't remember anything. I think I was
9 probably left out of any discussions, and if there were
10 any, it was with Scott Ellington and whomever he had
11 discussions with.
12   Q. Then subsequent, on December 2, Mr. Seery
13 writes, all, Scott and I have spoken and agree that the
14 information should be provided to James immediately.
15      Would that have been James Romey, do you
16 think?
17   A. Yes.
18   Q. And who was James Romey?
19   A. He also worked for DSI.
20   Q. And then he writes, Kristin, please proceed
21 with James. If anyone has any questions or issues,
22 please call me.
23      Do you see that?
24   A. Yes.
25   Q. Did you proceed with James Romey?

**62**

1   A. I further made sure that Scott was okay, to
2 confirm. He said yes, please do, and I did send them
3 to James Romey.
4   Q. So Mr. Seery has some of it in this email
5 chain, but do you have any understanding as to why
6 either DSI or Mr. Seery in November of 2020 was asking
7 for the financial records of HCMFA?
8   A. I do not, other than what's in this email.
9   Q. Did you discuss with either DSI or Mr. Seery
10 or Mr. Waterhouse in November or December 2020 whether
11 the demand notes from HCMFA should be demanded, should
12 be called?
13   A. I did not have discussions.
14   Q. Next exhibit is Exhibit 11. This is another
15 email chain.
16      And I apologize to the folks on the video.
17 I'll have to get it to you during some break.
18   MR. MORRIS: Hold on one second.
19   MR. RUKAVINA: Sure. Off the record.
20   (Off the record.)
21   (Whereupon, Exhibit 11 was marked for
22   identification.)
23   Q. (BY MR. RUKAVINA) Exhibit 11, Ms. Hendrix,
24 if you'll go to the beginning of this email chain, is
25 an email on January 6, 2021, again from Mr. Donohue to

**63**

1 you, copying Waterhouse, Seery, a bunch of others.
2      Where it says, at the direction of Jim Seery,
3 please provide DSI with the requested information for
4 each entity below.
5      And you'll see the entity includes both of my
6 clients, NexPoint Advisors and HCMFA. And the
7 information includes bank statements, income
8 statements, balance sheets, cash flows.
9      Do you see that?
10   A. Yes.
11   Q. Do you recall this email?
12   A. Vaguely, yes.
13   Q. Did you have any concerns when you received
14 this email?
15   A. Concerns about the email, no. I probably
16 checked with -- I would have checked with Frank to make
17 sure it was okay to send this first.
18   Q. Frank Waterhouse?
19   A. Yes.
20   Q. Do you have any understanding as to why
21 Mr. Donohue requested bank statements, income
22 statements, balance sheets for NexPoint and/or HCMFA?
23   A. I do not.
24   Q. Did he or anyone at DSI tell you why they
25 were requesting that?

**64**

1   A. Not that I can recall.
2   Q. If we go forward in time, you'll see that
3 Mr. Waterhouse is writing back to Mr. Donohue. And
4 then Mr. Seery interjects and says, these are HCMLP
5 business records. Please provide them as requested by
6 Jack ASAP.
7      Do you see that?
8   A. Yes.
9   Q. And it looks like you were not privy to
10 subsequent communications where Frank and Jim were
11 talking back and forth about this. You were not privy
12 to those, like you weren't blind copied or anything to
13 your recollection?
14   A. No.
15   Q. Did you in fact on or after January 6, 2021,
16 provide Mr. Donohue or anyone on his team the
17 information that he had requested as it relates to
18 NexPoint and/or HCMFA?
19   A. Without going back to check, I couldn't
20 answer yes or no for certain.
21   Q. So I think you mentioned when you received
22 the email from Mr. Donohue you would have checked with
23 Frank. And what do you remember asking Frank or
24 checking with him about?
25   A. I don't remember asking him specifically. In

Kristin Hendrix - October 27, 2021

65

1  fact, it's possible that Frank just responded on his
2  own here to Jack.  Again, would have been a
3  conversation that I can't specifically recall.
4      Q.  Sure.  And you don't specifically remember
5  today providing Mr. Donohue any of that information;
6  right?
7      A.  Right.
8      Q.  You don't specifically remember today having
9  a discussion with Mr. Donohue or Seery or anyone else
10 at or about that time as to why they were wanting this
11 information?
12     A.  Correct.
13     Q.  Exhibit 12, Ms. Hendrix, is going to be the
14 December 3, 2020, letter by which Highland called the
15 notes.
16     MR. MORRIS:  Objection to the form of the
17 question if there was one.
18     (Whereupon, Exhibit 12 was marked for
19     identification.)
20     Q.  (BY MR. RUKAVINA)  Are you familiar with
21 Exhibit 12, Ms. Hendrix?
22     A.  No, I haven't seen this.
23     Q.  Prior to today, you don't remember seeing
24 this?
25     A.  No.

66

1      Q.  I think you're answering no?
2      A.  No, sorry, no.
3      Q.  On or before December 3, 2020, did anyone
4  discuss with you whether Highland should call the
5  demand notes that were outstanding by HCMFA?
6      A.  No.
7      Q.  Do you recall in December 2020 any discussion
8  with anyone at the debtor about the NexPoint
9  $30.7 million term note?
10     A.  Repeat your question again, please.
11     Q.  Sure.  So you're familiar, and we'll talk
12 about it in some detail, with the NexPoint
13 $30.7 million note?
14     A.  Yes.
15     Q.  And again, we'll talk about it, but at that
16 point in time that was a term note; correct?
17     A.  Correct.
18     Q.  Do you remember in the December 2020 or
19 November 2020 time frame discussing with anyone at the
20 debtor the status of that NexPoint note?
21     A.  Yes, we would have discussed this on a weekly
22 basis in our cash meetings that we would have had, as
23 identifying that there are payments due on these loans
24 in December.
25     Q.  What weekly cash meetings are you referring

67

1  to?
2      A.  We had a standing weekly cash meeting with
3  Frank Waterhouse, myself, Jim Seery.  I can't recall
4  everyone on it.  Some of the DSI folks.  We go through
5  cash forecasts.  It's a 13-week cash forecast.  We go
6  through it every week.
7      It's going to lay out incoming and outgoing
8  payments that are forecasted, of which these term loans
9  were in those forecasts, so they were discussed.
10     Q.  And Mr. Morris produced some of those to me
11 this morning.  I haven't had time to go through them.
12     But it is your recollection in November and
13 December of 2020 the fact of the NexPoint term note
14 being out there was known to Mr. Seery?
15     A.  Yes.
16     Q.  And the fact of an upcoming December 31,
17 2020, payment was known to Mr. Seery?
18     A.  Yes.
19     Q.  So with that background, in November and
20 December of 2020, do you remember discussing with
21 anyone anything to the effect of, oh, it really would
22 be better if NexPoint defaulted on that note so we
23 could call it?
24     A.  No.
25     Q.  Did Mr. Seery ever state to you anything in

68

1  November or December of 2020 about how the debtor might
2  monetize that NexPoint note?
3      A.  No.
4      Q.  Did he discuss with you any potential sale of
5  that promissory note?
6      A.  No.
7      Q.  Did DSI ever discuss with you in November or
8  December 2020 any potential sale of that note?
9      A.  No.
10     Q.  Or how to monetize that note?
11     A.  No.
12     Q.  So -- well, strike that.
13     Did Mr. Seery or anyone at DSI, or anyone at
14 all, in November or December of 2020 state any words to
15 you to the effect that they were hoping that NexPoint
16 would default on that note?
17     A.  Never.
18     Q.  Or that it would be in the debtor's interest
19 for NexPoint to default on that note?
20     A.  No.
21     Q.  In November or December of 2020, do you
22 recall having any discussions with Mr. Seery or anyone
23 at DSI as to the collectibility of that note?  And by
24 that I mean whether NexPoint can pay the note?
25     A.  I don't specifically recall.  It most likely

Kristin Hendrix - October 27, 2021

---

**69**

1  came up in cash conversations.
2      Q.  I think you were assistant controller back
3  then?
4      A.  Yes.
5      Q.  Would a discussion of a borrower's ability to
6  repay have been something within your general sphere of
7  responsibility in that time frame?
8          MR. MORRIS:  Objection to the form of the
9  question.
10         THE WITNESS:  It depends on who the borrower
11 is, and at that time we did -- we had knowledge over
12 that information, so yes.
13     Q.  (BY MR. RUKAVINA)  Well, you've seen some
14 instructions or requests from Mr. Seery to you and DSI
15 to you for financial information of NexPoint and HCMFA.
16 We've gone through those documents; right?
17     A.  Yes.
18     Q.  Does that refresh your memory that there was
19 any internal discussion that you were privy to about
20 the ability of HCMFA and/or NexPoint to pay these
21 notes?
22     A.  I don't recall that specifically being asked.
23 It could have.
24     Q.  Did you ever at any point in time have any
25 employment or officer or any title or role with

---

**70**

1  NexPoint Advisors, LP?
2      A.  No.
3      Q.  Were you ever the controller or assistant
4  controller for NexPoint Advisors LP?
5      A.  No.
6      Q.  Did you ever at any point in time have any
7  employment, officer or any title or role at HCMFA?
8      A.  No.
9      Q.  Were you ever the controller or assistant
10 controller of HCMFA?
11     A.  No.
12     Q.  So you might have indirectly provided
13 services to those two as part of shared services, but
14 never directly; is that fair?
15         MR. MORRIS:  Objection to the form of the
16 question.
17         THE WITNESS:  When you say never directly,
18 meaning I was not employed by those entities?
19     Q.  (BY MR. RUKAVINA)  Correct.
20     A.  That's correct.
21     Q.  Do you have any understanding -- first of
22 all, NexPoint did not make a payment on December 31,
23 2020; correct?
24     A.  Correct.
25     Q.  Okay.  Do you have any understanding of why

---

**71**

1  not?
2      A.  Yes.
3      Q.  What's your understanding?
4      A.  Either November 30 or December 1, 2020, I
5  received a phone call from Frank Waterhouse that said,
6  no payments are going from any of the Advisors to
7  Highland.
8      Q.  Can you be more specific with what he said?
9      A.  That's what he said.
10     Q.  So he said no payments from the Advisors to
11 Highland?
12     A.  Yes.
13     Q.  Did he reference the promissory note
14 expressly?
15     A.  No.
16     Q.  But no payments means?
17     A.  Nothing.
18     Q.  That would logically in your mind include the
19 promissory note?
20     A.  Yes.
21     Q.  Did you ask him why?
22     A.  No.
23     Q.  Did he tell you why?
24     A.  No.
25     Q.  Did you, prior to January 1, 2021, did you

---

**72**

1  hear from anyone as to why Mr. Waterhouse gave that
2  instruction?
3      A.  Not that I recall.
4      Q.  Did you, after that November 30 or December 1
5  phone call, did you follow up with him or anyone else
6  about the upcoming note payment?
7      A.  I didn't have any reason to.
8      Q.  I'm going to -- let me find you a document
9  for a moment.
10         Just so the record is complete, let's include
11 this promissory note.  It's going to be Exhibit 13.
12 This is the NexPoint promissory note.
13         (Whereupon, Exhibit 13 was marked for
14         identification.)
15     Q.  (BY MR. RUKAVINA)  I take it you've seen this
16 promissory note, Exhibit 13?
17     A.  Yes.
18     Q.  And I think you testified about this before,
19 but just to summarize to save time.
20         This would have been a note that you would
21 not have papered but would have gone through legal
22 because it was a roll-up.  Is that generally accurate?
23     A.  Yes.
24     Q.  And do you have any memory at all of having
25 anything to do with papering up this loan?

---

Kristin Hendrix - October 27, 2021

73

1    A.  Not that I recall.
2    Q.  Would you have had, after 2017 and before
3  2021, any role with respect to any payments or upcoming
4  payments on this note, any role at all?
5    A.  Yes.
6    Q.  What would have been your role or roles?
7    A.  That would have been taking direction from
8  Frank Waterhouse or possibly Jim Dondero saying, go
9  ahead and make these payments that are due on these
10  term notes.
11    Q.  Would you have recorded on any books or
12  records payments that actually were made?
13    A.  Not me personally.
14    Q.  Who would have?
15    A.  Our accountant, which could have been one of
16  two different people, depending on the time frame.
17    Q.  Would you have had any role with respect to
18  recording those payments or is that just something that
19  your group would have done?
20    MR. MORRIS:  Objection to the form of the
21  question.
22    THE WITNESS:  I would not have had a role.
23  My group would have.
24    Q.  (BY MR. RUKAVINA)  What about calculating
25  amortization and/or interest payments that are due or

74

1  upcoming?  Who would have done that, you or someone
2  else?
3    A.  Our accountant.
4    Q.  Do you have any memory of doing that?
5    MR. MORRIS:  Objection to the form of the
6  question.
7    THE WITNESS:  Not during 2017 through 2019.
8    Q.  (BY MR. RUKAVINA)  What about 2020?
9    A.  No.
10    Q.  Going back to that November 30 or December 1
11  telephone call, do you recall who initiated the call?
12    A.  To me?
13    Q.  The one between you and Mr. Waterhouse.
14    A.  Frank called me.
15    Q.  Frank called you.
16    And was it just to discuss -- or just to give
17  you that instruction, no payments from the Advisors, or
18  was there other things discussed?
19    A.  I could not tell you if something else was
20  discussed on that phone call.
21    Q.  Do you remember if it was a long phone call
22  or short?
23    A.  Couldn't tell you.
24    Q.  Do you remember where you were when he called
25  you?

75

1    A.  At my house.
2    Q.  Did you answer on a cell phone or landline?
3    A.  My cell phone.
4    Q.  Is there any chance in hell that your cell
5  phone would still have a record of that phone call,
6  like what time it was and how long it lasted?
7    MR. MORRIS:  Objection to the form of the
8  question.
9    Q.  (BY MR. RUKAVINA)  I apologize for using
10  hell.
11    MR. MORRIS:  And to foundation.
12    THE WITNESS:  I have no idea.
13    Q.  (BY MR. RUKAVINA)  Do you have your cell
14  phone with you right now?
15    A.  In the other room.
16    Q.  I might ask you during the break to just --
17  we'll take a short break before I'm done, and I'll ask
18  you if you've had a chance to look for November and
19  December 2020 phone logs between you and
20  Mr. Waterhouse.  I would ask you to do that, please.
21    A.  Sure.
22    Q.  And I apologize, I think you said you thought
23  it was a short telephone call?
24    A.  I have no idea.
25    Q.  Did the telephone call or Mr. Waterhouse's

76

1  instructions surprise you in any way?
2    A.  Nothing surprises me anymore, so no.
3    Q.  Did it surprise you back in November or
4  December of 2020?
5    A.  No.
6    Q.  Did it pique your curiosity?
7    A.  Nope.
8    Q.  Just another instruction from your boss?
9    A.  Yep.
10    Q.  Exhibit 14 is going to be a document that
11  we're not sure what it is and we're not sure who
12  prepared it.  It appears to be a ledger of charges
13  against and payments on this promissory note.
14    I'm just saying that so the people on the
15  phone know what it is, but you don't have to take what
16  I said as correct.
17    (Whereupon, Exhibit 14 was marked for
18  identification.)
19    Q.  (BY MR. RUKAVINA)  So Ms. Hendrix, Exhibit 14
20  was produced by the debtor.  And I'm going to ask you,
21  do you know what this is or have you seen it before?
22  Can you help us state what it is?
23    A.  This looks like it is an amortization
24  schedule of the NexPoint Advisors term loan.
25    Q.  Would this have been something that it

Kristin Hendrix - October 27, 2021

---

77

1  appears to you would have been maintained internally by
2  the debtor, or does it look like it might have been
3  prepared by DSI or someone else for some other reason?
4      A.  It looks like the debtor's amortization
5  schedule that they kept.
6      Q.  Did the debtor keep an amortization schedule
7  for the NexPoint promissory note, to your knowledge?
8      A.  Yes.
9      Q.  Did the debtor keep amortization schedules
10  for other term promissory notes?
11      A.  Yes.
12      Q.  In what format, like Excel spreadsheets or
13  Word documents?  What is your recollection for NexPoint
14  specifically?
15      A.  Excel.
16      Q.  Would that have been on the shared system or
17  something?
18      A.  Yes.
19      Q.  And who would have been responsible on an
20  ongoing basis to update the NexPoint amortization
21  schedule?
22      MR. MORRIS:  Objection to the form of the
23  question.
24      THE WITNESS:  Depends on what time you're
25  asking.

---

78

1      Q.  (BY MR. RUKAVINA)  Let's talk about the year
2  of 2020.
3      A.  That would have been Hayley Eliason, our
4  accountant at that time.
5      Q.  What about the year 2019?
6      A.  Still Hayley.
7      MR. RUKAVINA:  I'm going to just ask, to
8  preserve the record, Mr. Morris, if he hasn't already,
9  to produce any such Excel spreadsheet in the native
10  form.
11      Q.  (BY MR. RUKAVINA)  If we look at this,
12  Ms. Hendrix -- and I'm a little confused as to what
13  these entries mean.  Maybe you could help me.  But
14  columns that say interest paid, principal paid, total
15  paid, do you know what those columns mean?
16      A.  Exactly as they state.  These are interest
17  and principal payments made on the date that's listed,
18  and then you've got a total.
19      Q.  And then they're in brackets because they're
20  negative numbers?
21      A.  Correct.
22      Q.  So here's what I'm not understanding.  Go to
23  the second page.
24      You see there's an entry under interest paid
25  12/30/29 [verbatim] that says negative 530,000 and

---

79

1  change but it doesn't use brackets?
2      A.  It's a negative number.  It's just a
3  formatting issue.
4      Q.  What about also on that same page in the
5  other column, principal paid, 5/31/2020, it's a
6  positive number, 575,550.
7      MR. MORRIS:  Where are you?
8      MR. RUKAVINA:  On page 2 of this exhibit.
9      MR. MORRIS:  What date?
10      MR. RUKAVINA:  May 31, 2020.  And it's the
11  column over, principal paid.  It's a positive number,
12  575,000 and change.
13      MR. MORRIS:  Got it, thank you.
14      Q.  (BY MR. RUKAVINA)  Do you see that,
15  Ms. Hendrix?
16      A.  Yes.
17      Q.  Do you have an understanding of why that
18  number would be positive?
19      A.  Actually, I think this looks like an entry to
20  me where the interest is what we call picking.  So on
21  the anniversary date of this loan, which is May, from
22  what I can tell, the accrued interest total, which is
23  that 575-, is being rolled into principal.
24      That's what I can tell from looking at it.
25      Q.  Okay.  Do you have any understanding as to

---

80

1  why that would have been done or why that would have
2  been done on that day?
3      MR. MORRIS:  Objection to the form of the
4  question.
5      THE WITNESS:  Because that's the anniversary
6  date of the loan.  I would assume that that's how the
7  loan is written.
8      Q.  (BY MR. RUKAVINA)  And I think that that
9  Section 1 of the promissory note does say, the unpaid
10  principal balance of this note from time to time
11  outstanding shall bear interest.
12      At the rate of 6 percent per annum from the
13  date hereof until maturity date, compounded annually on
14  the anniversary of the date of this note.
15      Do you see that?
16      MR. MORRIS:  Objection to the form of the
17  question.
18      THE WITNESS:  Yeah, I see that.
19      Q.  (BY MR. RUKAVINA)  Assuming that this is the
20  correct amortization schedule for the NexPoint note,
21  and that the numbers in here are correct, if you look
22  at the second page under the column total paid there
23  are a number of entries for 2019.
24      Do you see that, the far right column?
25      A.  At the top, yes.

---

Kristin Hendrix - October 27, 2021

---

81

1    Q.  For example, 1.3 million, 2.1 million,
2  1.3 million.
3      Do you see that?
4    A.  Yes.
5    Q.  Assuming that that's correct, do you have any
6  memory or understanding whether in the year 2019, or
7  why NexPoint was making these payments on this
8  promissory note?
9    A.  Without going back and reading through emails
10  I can only assume that, from looking at this, Highland,
11  the debtor, would have needed cash, and so this is one
12  way of getting cash to the debtor.
13    Q.  This is kind of like what we discussed in the
14  beginning, that Mr. Dondero on a cash needed basis
15  would just transfer money between entities?
16    A.  Yes.
17    Q.  Do you have any memory in the first half of
18  2019 whether Highland, the debtor, had any particular
19  need for cash money at that time?
20    A.  We generally always had a need for cash, so
21  yes.
22    Q.  And so if NexPoint was transferring money
23  back to Highland on this note because Highland needed
24  the money, would those have been recorded as
25  prepayments by the debtor?

---

82

1      MR. MORRIS:  Objection to the form of the
2  question.
3      THE WITNESS:  Yes.
4    Q.  (BY MR. RUKAVINA)  Sitting here today, do you
5  have any reason to believe based on the formatting or
6  anything on Exhibit 14 that it's not the amortization
7  schedule as it was maintained by the debtor?
8    A.  I don't have any reason to not believe that
9  it was.
10    Q.  Going to show you a few documents that I'm
11  hopefully going to burn through, but you're certainly
12  entitled to take all the time that you need.
13      So first is going to be a document that
14  Mr. Morris produced this morning.  It's not Bates
15  labeled.  I don't know why.
16      MR. MORRIS:  As I said in my email, my
17  paralegal is sick and so I wanted you to have the
18  documents.  We'll Bates stamp them later, but we have a
19  written record from my email of what we produced to
20  you.
21      MR. RUKAVINA:  You're assuming that I read my
22  emails.
23      MR. MORRIS:  Sorry about that.  I confess,
24  sometimes I don't as well.
25    Q.  (BY MR. RUKAVINA)  So I'm going to hand you

---

83

1  Exhibit 15 and I'm going to represent to you that it's
2  the email that Mr. Morris sent to me today and I've not
3  doctored it in any way.
4      (Whereupon, Exhibit 15 was marked for
5      identification.)
6      MR. MORRIS:  Do you have the email that it
7  was attached to?
8      MR. RUKAVINA:  Somewhere.  I can find it at a
9  break.
10      MR. MORRIS:  I'll let the witness testify.
11  This was attached to an email.  Not my email, but
12  another email.  But I'll let the witness testify.
13      MR. RUKAVINA:  Off the record.
14      (Off the record.)
15    Q.  (BY MR. RUKAVINA)  So you have Exhibit 15.
16      And during the break we established, I don't
17  have a copy of it right now, but you sent Exhibit 15 on
18  August 29, 2020, by email, copying
19  Mr. Waterhouse, as well as a couple of other
20  attachments; is that correct?
21    A.  Correct.
22    Q.  Do you recall what prompted you to send that
23  email and this attachment?
24    A.  Yes.
25    Q.  What?

---

84

1    A.  Frank Waterhouse called me on August 29, and
2  requested that I do so.
3    Q.  Did he tell you why?
4    A.  From what I recall, this was a time when Jim
5  was trying to come up with his bargain or pop land,
6  whatever he referenced it as.  This was all information
7  that Frank said he wanted.
8    Q.  Okay.  So going back to Exhibit 15, what I'm
9  interested in is NexPoint Advisors, the 23,846,000 and
10  change number.
11      Do you see that?
12    A.  Yes.
13    Q.  Where did this number -- or where did this
14  Exhibit 15 come from, if you understand my question?
15    A.  Sure.  These numbers should all be balances
16  off of the corresponding notes that each entity owed to
17  the debtor.
18    Q.  Did you or someone prepare Exhibit 15
19  specifically for that email?  Or was Exhibit 15 already
20  existing somewhere on the system?
21    A.  I believe that we prepared it specifically
22  for this request.
23    Q.  Do you recall who?
24    A.  It was either myself or our accountant.  I
25  don't recall who put it together.

---

Kristin Hendrix - October 27, 2021

85

1    Q.  Okay.  And where would that 23 million and
2  change number for NexPoint have come from, an
3  amortization schedule?
4    A.  Yes.
5    Q.  And what about Highland Capital Management
6  Fund Advisors?  You see $10.5 million and change demand
7  on Exhibit 15?
8    A.  Yes.
9    Q.  Where would that $10.5 million number have
10 come from, do you remember?
11   A.  The same.  It would have come off of the
12 amortization schedules for all of their notes.
13   Q.  How was there an amortization schedule for a
14 demand note?
15   A.  Because it's accruing interest.
16   Q.  So sitting here today, you expect there would
17 be some amortization schedule like Exhibit 14 but for
18 HCMFA?
19   A.  Yes.
20   Q.  Now we're going to have an exhibit [verbatim]
21 chain that's going to be marked as Exhibit 16.
22      (Whereupon, Exhibit 16 was marked for
23      identification.)
24   MR. RUKAVINA:  For the folks on the video,
25 Exhibit 16 is the email chain that Mr. Morris used last

86

1  week regarding the Section 15(c) document.
2    Q.  (BY MR. RUKAVINA)  Are you familiar with this
3  Exhibit 16 email chain, Ms. Hendrix?
4    A.  Yes.
5    Q.  Why are you familiar with it?
6    A.  Well, I'm copied on it, and I saw it
7  yesterday.
8    Q.  Do you have any memory -- well, that's a
9  stupid question.  But prior to yesterday, did you have
10 any memory of this?
11   A.  Yes.
12   Q.  And do you recall the context or the purpose
13 of this exhibit, or this email chain?
14   A.  From what I remember this is the time where
15 information was being prepared for the retail board to
16 re-up the debtor's shared services.
17   Q.  So, here -- you're certainly welcome to read
18 it in its entirety and if you feel like you want to or
19 need to, that's fine.  But I only have one question.
20 Well, one question with two subparts.
21      I'm looking at Ms. Lauren Thedford's,
22 T-h-e-d-f-o-r-d's, email October 6, 2000 [verbatim]
23 where she says, I see the below from the 6/30
24 financials.  NPA, due to HCMLP and affiliates as of
25 June 30, 2020.

87

1      Do you see that, ma'am?
2    A.  Yes.
3    Q.  23 million 683?
4    A.  Yes.
5    Q.  And you see, HCMFA due to HCMLP as of
6  June 30, 2020, 12,286,000?
7    MR. MORRIS:  Objection to the form of the
8  question.
9    Q.  (BY MR. RUKAVINA)  Strike that.
10      It says 12,286.  What do you take that 12,286
11 to mean?
12   A.  I think that's a typo and it should have
13 said -- well, there's several things wrong with this,
14 from looking at it.
15      She left off three zeros on the end of it.
16 Should have said 12,286,000.  Secondly, that amount is
17 our due to affiliates on HCMFA's books, not just due to
18 HCMLP.
19   Q.  That was going to be my question, why that
20 12,286,000 number didn't jive with the 10,530,000
21 number on Exhibit 15?
22   A.  Yes, there's another loan due to a different
23 affiliate.
24   Q.  So that $12,286,000 amount doesn't mean that
25 it's all due to Highland; is that correct?

88

1    A.  Correct.
2    Q.  Exhibit 17 is going to be the January 7, 2021
3  notice from the debtor to NexPoint about the default.
4      (Whereupon, Exhibit 17 was marked for
5      identification.)
6    Q.  (BY MR. RUKAVINA)  You've been handed
7  Exhibit 17.  Have you seen this document before?
8    A.  Not that I believe.
9    Q.  And I think we've asked this before, but just
10 to clarify.
11      Did anyone at the debtor, including Mr. Seery
12 or DSI, discuss with you after December 31, 2020 that
13 the payment had not been made and what, if anything,
14 the debtor should do about that?
15   MR. MORRIS:  Objection to the form of the
16 question.
17      THE WITNESS:  I can't recall specific
18 conversations that may or may not have been had around
19 that topic.
20   Q.  (BY MR. RUKAVINA)  Would -- so back then you
21 were the assistant controller, on January 7; right?
22   A.  Yes.
23   Q.  Do you think that back then Mr. Seery or DSI
24 would have sought your advice or input as to what they
25 should do about the missed payment?

Kristin Hendrix - October 27, 2021

89

1    A.  No.
2        MR. MORRIS:  Objection to the form of the
3    question.
4        THE WITNESS:  No.
5    Q.  (BY MR. RUKAVINA)  That would have been
6    outside of your purview?
7    A.  Yes.
8    Q.  And you see in this notice in the middle, it
9    says an amount due as of January 8 in the $24,471,000
10   range.
11       Do you see that?
12   A.  Yes.
13   Q.  Do you have any idea, I take it you don't,
14   where that number came from?
15       MR. MORRIS:  Objection to the form of the
16   question.
17       THE WITNESS:  I don't know who provided that
18   number or where it came from.
19   Q.  (BY MR. RUKAVINA)  Do you have any
20   understanding as to why that number is higher than the
21   number on Exhibit 15?
22   A.  My guess would be that Exhibit 15 is just
23   principal balances.
24   Q.  Okay.
25       Exhibit 18, please.

90

1        (Whereupon, Exhibit 18 was marked for
2        identification.)
3    Q.  (BY MR. RUKAVINA)  Exhibit 18, Ms. Hendrix,
4    is an email chain between you and Mr. Waterhouse on
5    January 12, 2021.  Do you remember this email chain?
6    A.  No.
7    Q.  Do you remember on January 12 Mr. Waterhouse
8    emailing you, asking when the last amort payment due
9    and what the amount was for NexPoint?
10   A.  No.
11   Q.  When was the last time -- well, strike that.
12       Do you remember ever seeing this email
13   between then and today?
14   A.  No.
15   Q.  Do you have any present memory of any
16   communications with Mr. Waterhouse on or about
17   January 12, 2021 regarding the NexPoint default or
18   note?
19   A.  Not specific, no.
20   Q.  Any general memory?
21   A.  Not that I can pinpoint, no.
22   Q.  Were you aware that on or about January 14
23   NexPoint transferred about $1.4 million and change to
24   the debtor?
25   A.  Yes.

91

1    Q.  Were you aware of it then?
2    A.  Was I aware of what?
3    Q.  That transfer of $1.4 million and change.
4    A.  On January 14?
5    Q.  Yes.
6    A.  Yes.
7    Q.  Did you facilitate that transfer?
8    A.  Yes.
9    Q.  Who told you to make that transfer?
10   A.  Frank Waterhouse.
11   Q.  Did he tell you why?
12   A.  Nope.
13   Q.  He just said make the transfer?
14   A.  Yes.
15   Q.  Did he tell you that it was on account of the
16   NexPoint note?
17   A.  Yes.
18   Q.  Did he tell you how to, if at all, to credit
19   that note for that amount?
20   A.  No.
21   Q.  Sitting here today, you have no memory other
22   than that Frank Waterhouse told you to transfer some
23   $1.4 million on the NexPoint note?
24   A.  Right.
25   Q.  And do you recall, was that oral or written

92

1    or how would that have been?
2    A.  That was a phone call.
3    Q.  Do you recall who initiated the phone call?
4    A.  Frank called me.
5    Q.  Was that the only topic discussed in that
6    phone call to your memory?
7    A.  Yes.
8    Q.  Did you ask him why the payment or
9    anything -- did you ask him anything at all?
10   A.  No.
11   Q.  And after you made the payment -- or I'm
12   sorry, after you caused the payment to be made, did you
13   take any further steps with respect to the NexPoint
14   note?
15   A.  I forwarded the payment confirmation, showing
16   that the money was sent from NexPoint Advisors to
17   Highland, forwarded that payment confirmation from the
18   bank to Jack Donohue at DSI, letting him know.
19   Q.  Did you let Mr. Donohue or anyone at DSI know
20   about the transfer before the transfer was made?
21   A.  No.
22   Q.  And you sent that by email to Mr. Donohue?
23   A.  Yes.
24   Q.  Did Mr. Donohue thereafter have any
25   discussion with you about that in any way?

Kristin Hendrix - October 27, 2021

93

1     A.  I have no idea.
2     Q.  He didn't ask what this was for or anything
3  like that?
4     A.  He may have asked what the amount
5  represented.  I can't specifically recall.  But it's
6  possible.
7     Q.  Okay.  Do you recall any discussion about
8  that time, January 14, with Mr. Donohue or
9  Mr. Waterhouse or anyone as to whether that payment
10  would in any way relieve NexPoint of the default or
11  would not relieve NexPoint of the default?
12     A.  No.
13     Q.  Ms. Hendrix, I believe that I am done.  I
14  would like you, however, because it's important, to
15  check your phone.  Would you like a short, five-minute
16  restroom break and just check --
17     A.  Yeah, and I might need help figuring out how
18  to do that.
19     Q.  I'm not saying that it's possible, but I'm
20  going to ask you on the record to look for that
21  November 30 or December 1, 2020 phone call.
22         MR. MORRIS:  We're happy to do that.
23     Q.  (BY MR. RUKAVINA)  But what I would like if
24  you find it, I would like you to tell me the time, the
25  date and the length of that call.

94

1     A.  Okay.
2     Q.  Thank you.
3         We'll be back in five minutes.
4         (Off the record.)
5     Q.  (BY MR. RUKAVINA)  Ms. Hendrix, during the
6  break did you look at your phone?
7     A.  I did.
8     Q.  Did you find anything?
9     A.  Sadly, it only goes back to October 5 of
10  2021.
11     Q.  Not surprised.  Thank you.
12         Have I been courteous to you today?
13     A.  Yes.
14         MR. RUKAVINA:  I pass the witness.
15         MR. MORRIS:  Thank you.
16         MR. AIGEN:  Are we ready to move forward?
17         MR. MORRIS:  Yes.  You're a little dark
18  there.
19         MR. RUKAVINA:  Can we increase the volume on
20  that thing?
21         (Off the record.)
22             EXAMINATION
23     Q.  (BY MR. AIGEN)  Good afternoon, Ms. Hendrix.
24  My name is Michael Aigen.  I represent Mr. Dondero,
25  HCMS and HCRE Partners in several of the adversary

95

1  proceedings today.
2         I'm going to try to ask you some questions
3  about these adversary proceedings.  I'll try to make it
4  as quick as possible so we don't keep you here.
5         You understand that you're still under oath;
6  is that correct?
7     A.  Correct.
8     Q.  First topic I want to ask you about is one of
9  the defenses in this case related to an oral agreement.
10  Let me start off with this question.
11         Are you aware that some of the defendants in
12  these adversary proceedings have raised a defense that
13  there was a subsequent oral agreement allowing the
14  notes at issue to be potentially forgiven if certain
15  events occurred?
16     A.  I've recently been made aware that this came
17  up, yes.
18     Q.  When you say recently, approximately when?
19     A.  Within the last week.
20     Q.  And where did you learn that from?
21     A.  In my speakings with John Morris just
22  preparing for today.
23         MR. AIGEN:  And John, I'm going to assume
24  that those conversations are privileged?
25         MR. MORRIS:  That's a very fair assumption.

96

1     Q.  (BY MR. AIGEN)  Other than the conversation
2  you just referred to with Mr. Morris, have you ever had
3  any other conversations with anyone about this alleged
4  oral agreement that Defendants are contending occurred?
5     A.  No.
6     Q.  So prior to that conversation with Mr. Morris
7  you weren't even aware of this alleged defense related
8  to an oral agreement.  Is that fair to say?
9     A.  That's right.
10     Q.  This is a similar question but slightly
11  different, just to sort of finish this topic.  I'm not
12  asking about this oral agreement as a defense, I'm just
13  asking more generally.
14         Other than this conversation, were you aware
15  generally of any conversations that anyone had where
16  the notes at issue might be forgiven if certain events
17  occurred?
18         MR. MORRIS:  Objection to the form of the
19  question.
20         THE WITNESS:  No.
21     Q.  (BY MR. AIGEN)  Is it fair to say that you
22  haven't had any conversations about this subsequent
23  oral agreement with anyone other than Mr. Morris?
24     A.  That's fair.
25     Q.  You never discussed it with Mr. Seery?

Dickman Davenport, Inc
214.855.5100   www.dickmandavenport.com   800.445.9548

Kristin Hendrix - October 27, 2021

97

1    A.  No.
2    Q.  Never discussed it with Mr. Klos?
3    A.  No.  Well, sorry, Mr. Klos was present when
4   John and I talked about it.  But that's it.
5    Q.  Have you ever made any investigation or
6   effort in order to determine if this oral agreement
7   actually occurred?
8    A.  No.
9    Q.  If there was such an oral agreement to
10   potentially forgive the notes, do you believe that you
11   would have known about such an oral agreement as part
12   of your duties and responsibilities?
13    A.  Yes, I would hope so.
14    Q.  Why do you say that?
15    A.  That's something that should be disclosed in
16   audited financial statements, and me and my team are
17   responsible for preparing those financial statements
18   and presenting them to the auditors as fair and
19   accurate.
20    Q.  And is it fair to say that this oral
21   agreement should have been disclosed to PwC if it was
22   determined that it was material?
23    A.  Yes.
24    Q.  And have you done any sort of analysis to
25   determine whether the oral agreement at issue here

98

1   would have been material for purposes of a PwC audit?
2    A.  I've not done any work, just finding out
3   about it, but from what it sounds like, it would be
4   material.
5    Q.  That's your opinion, that it would have been
6   material; is that fair to say?
7    A.  Fair.
8    Q.  Have you had any discussions with anyone else
9   about whether the oral agreement would have been
10   material?
11    A.  No.
12    Q.  Changing topics a little bit here, are you
13   aware --
14        (Off the record.)
15    Q.  (BY MR. AIGEN)  Are you aware that a few of
16   the loans at issue here, specifically related to HCMS
17   and HCRE, were term loans as opposed to demand loans?
18    A.  Yes.
19    Q.  And are you aware that for those particular
20   loans, there were payments that were supposed to be
21   made but weren't on December 31, 2020?
22    A.  Yes.
23    Q.  Do you have any understanding as to why those
24   payments weren't made with respect to the HCMS and HCRE
25   term loans on December 31, 2020?

99

1    A.  Yes.
2    Q.  Can you tell me why?
3    A.  Sure.  It goes along with the same statement
4   as HCMFA and NPA and the phone call that I got from
5   Frank Waterhouse saying there's no payments coming from
6   any of the affiliates to the debtor.
7    Q.  I may have written that down wrong when you
8   talked about that before, but I believe your earlier
9   testimony when you described that conversation was that
10   there was no more payments coming from the Advisors,
11   not affiliates.
12        Let me ask you then, what was the
13   conversation?  Was it no more payments from affiliates
14   or Advisors?
15    A.  It could have been either.  I probably did
16   say Advisors.  But regardless, those payments would
17   have been directed to me to be made, either by Frank
18   Waterhouse or Jim Dondero.
19        And I would assume that nobody directed me to
20   make those payments because we weren't making any
21   payments from Jim's related parties.  I don't know for
22   a fact, but that's what I would assume.  Those were all
23   under the same umbrella.
24    Q.  And again, let's back up a second.
25        When you refer to Advisors, fair to say that

100

1   that does not include HCMS and HCRE; is that correct?
2    A.  When I say Advisors, I am referring to HCMFA
3   and NPA.
4    Q.  And when you use the term "affiliates,"
5   you're referring to all four; is that correct?
6    A.  Correct.
7    Q.  Just want to make sure we're on the same
8   page.
9        When you answered the previous question you
10   started to get into assumptions and things like that.
11   Let me start off with what your specific recollection
12   of that phone call was.  Tell me as best as you can
13   what you remember Frank telling you?
14    A.  I remember it as being no payments from the
15   Advisors to the debtor.
16    Q.  So you don't remember the instruction being,
17   don't make payments from the affiliates.  It was, don't
18   make payments from the Advisors; is that correct?
19    A.  Correct.
20    Q.  So is it fair to say that you don't remember
21   any instructions telling you not to make any payments
22   from HCMS or HCRE?
23    A.  That's fair.
24    Q.  So if that is the case, why weren't payments
25   made from HCMS or HCRE for December 31, 2020, payment?

Kristin Hendrix - October 27, 2021

---

101

1    A.  Sure.  Typically what would have happened is
2  Frank would be talking to Jim Dondero about making
3  these payments and getting his approval to do so,
4  because Jim Dondero is, you know, directing payments
5  out of these entities.
6        I have never -- had never been given the
7  direction to effectuate those payments by anybody.
8    Q.  Is it fair to say, then, that you're not
9  aware of any instructions from anyone saying that the
10  HCMS and HCRE payments should not be made on
11  December 31, 2020?
12    A.  That's fair.
13    Q.  So the reason the payments weren't made is
14  because you never got an affirmative instruction to
15  actually make that payment; is that correct?
16    A.  Correct.
17    Q.  And you're not aware of Mr. Dondero
18  instructing anyone that HCMS and HCRE should not have
19  made the December 31, 2020, payments; is that correct?
20    A.  I'm not aware personally, no.  Correct.
21    Q.  You say personally.  In any way are you aware
22  of such a specific instruction?
23    A.  No.
24    Q.  If that payment was to be made, who at the
25  debtor would have been responsible for making those

---

102

1  payments on behalf of HCMS and HCRE?
2        MR. MORRIS:  Objection to the form of the
3  question.
4        THE WITNESS:  The corporate accounting team.
5    Q.  (BY MR. AIGEN)  And that included you?
6    A.  Yes.
7    Q.  And in December of 2020, were you aware that
8  those payments were due on December 31, 2020?
9    A.  Yes.
10    Q.  Did you make any attempts or efforts to
11  determine whether Mr. Dondero wanted those payments to
12  be made?
13    A.  I did not, no.
14    Q.  Why not?
15    A.  That would have been something that Frank
16  Waterhouse would have done directly with Jim Dondero
17  himself.
18    Q.  Did you have any conversations with anyone
19  about whether the December 31 payments for HCMS and
20  HCRE would be made in December of 2020?
21    A.  Not that I can recall.
22    Q.  And you didn't think it was your
23  responsibility to check on those payments and find out
24  if they should have been made?
25    A.  Right, correct.

---

103

1    Q.  And is that because it's only your job to
2  make payments that you're told to specifically make; is
3  that correct?
4    A.  Yes, in this case, that is correct.
5    Q.  Is it fair to say then that as part of your
6  job responsibilities you've never made a payment to
7  anyone without being specifically told by Mr. Dondero
8  and Mr. Waterhouse?
9    A.  Sorry, say that again.
10    Q.  As part of your job responsibilities, have
11  you ever made a payment to anyone without the specific
12  instruction of Mr. Waterhouse or Mr. Dondero?
13        MR. MORRIS:  Objection to the form of the
14  question.
15        THE WITNESS:  Yes, we make payments all the
16  time.
17    Q.  (BY MR. AIGEN)  So why is this different in
18  that this payment was not made without the specific
19  instructions from Mr. Waterhouse and Mr. Dondero, even
20  though you believed the payment was due on December 31,
21  2020?
22    A.  The difference between making a loan payment
23  and making normal course -- sorry, normal, ordinary
24  course, you know, overhead expense payments is that
25  something like that is not necessarily what we would

---

104

1  take to Jim Dondero to approve.
2        He doesn't have time to approve every single
3  overhead payment that we're making out of every single
4  entity.  That's what Frank is for.
5        Something that's once a year that's more
6  material in amount, such as a loan payment, that is
7  something that needs to get approved by Jim Dondero.
8    Q.  You say needs to get approved.  What's your
9  basis for that, something in a policy manual, something
10  someone told you?
11    A.  It's a policy that my team followed.  I don't
12  think that it's written in an actual manual anywhere,
13  but anything that's not ordinary course needs to get
14  approved by Jim Dondero.
15    Q.  Is that something that's written in a policy
16  anywhere?
17    A.  Not that I know of.
18    Q.  Were you ever told that payments in the
19  ordinary course can be made without Mr. Dondero's
20  approval but loan payments cannot?
21    A.  Yes, I do recall years ago that Frank and I,
22  possibly Jim, this was years ago, had a conversation
23  that anything ordinary course is up to Frank to
24  approve.  And this is, quite frankly, up to Frank.
25        Whatever he felt Jim needed to sign off on,

---

Kristin Hendrix - October 27, 2021

105

1 that's what Jim would sign off on. This was not my
2 responsibility to make that decision.
3      Q.  And in December -- prior to the December 31,
4 2020, due date you didn't have any conversations with
5 anyone about whether this -- these payments that were
6 due should be made; is that correct?
7      A.  Correct.
8      Q.  And you didn't try to check with anyone to
9 see whether anyone wanted these payments to be made; is
10 that correct?
11     A.  Correct.
12     Q.  Subsequent to the payment being missed, did
13 you ever have any conversations with anyone about why
14 the payment was not made?
15     A.  Not that I recall.
16     Q.  So is it fair to say that sitting here today
17 you have no idea why the payments were not made for
18 HCMS and HCRE on December 31, 2020?
19         MR. MORRIS:  Objection to the form of the
20 question.
21         THE WITNESS:  I don't have any specific
22 evidence telling me why they weren't.  I can make
23 assumptions but that's not going to help.
24     Q.  (BY MR. AIGEN)  Well, did you ever have any
25 conversations with anyone about why those payments were

106

1 not made?
2      A.  No.
3      Q.  You have no idea why they weren't made other
4 than just speculation; is that fair to say?
5      A.  Correct.
6         MR. MORRIS:  Objection.  Asked and answered.
7         THE WITNESS:  Correct.
8      Q.  (BY MR. AIGEN)  And are you aware that with
9 respect to those two loans, some payments were actually
10 made in the next month, in January of 2021?
11     A.  Yes.
12     Q.  What role, if any, did you have with respect
13 to those payments?
14     A.  Frank Waterhouse would call me and tell me to
15 have my team effectuate a wire.
16     Q.  And you say would call you.  Do you remember
17 this conversation or are you just assuming it occurred?
18         MR. MORRIS:  Objection to the form of the
19 question.
20         THE WITNESS:  If we sent a payment out, Frank
21 would have told me to do it.  I would not have done it
22 on my own.
23     Q.  (BY MR. AIGEN)  Sitting here today, do you
24 have a specific recollection of the conversation where
25 someone told you to make the January 2021 payments?

107

1      A.  I can't tell you the exact date, but, yes, I
2 do have a recollection of Frank calling or emailing me
3 to have, I believe it was the HCRE wire sent out for
4 their payment.
5      Q.  What about the HCMS payment?
6      A.  I don't recall that one as much.
7      Q.  Other than the payment being made, do you
8 have any recollection of any other conversations about
9 why the payment was being made?
10     A.  No.
11     Q.  Are you aware of any conversations that
12 anyone had regarding whether these payments would
13 deaccelerate loans?
14     A.  No.
15     Q.  Is that something you would normally be part
16 of, conversations like that?
17     A.  No.
18     Q.  Changing topics here.  Not sure if this is an
19 area that you know anything about.
20         Are you familiar with the term, as it's used
21 at Highland, NAV ratio trigger period?
22     A.  No.
23     Q.  This may go very quick.  If I represent to
24 you that it's a term that's used in the -- in the
25 fourth amended limited partnership agreement for

108

1 Highland Capital Management, would that refresh your
2 recollection at all?
3      A.  No.
4      Q.  Fair to say, then, that you have no knowledge
5 as to whether NAV ratio trigger period was ever reached
6 at any time prior to bankruptcy buyouts?
7      A.  No, I don't know.
8      Q.  Have you ever had any conversations with
9 Nancy Dondero?
10     A.  I have not.
11     Q.  Never met her?
12     A.  No.  I may have exchanged an email with her
13 on an invoice, but that's the extent of it.  No
14 conversations.
15     Q.  In the years leading up to the bankruptcy of
16 Highland Capital, was there any time period where
17 Highland was unable to pay its salaries?
18     A.  Salaries?
19     Q.  Salaries of its employees?
20     A.  No.
21     Q.  In the time leading up to the Highland
22 bankruptcy, was there any time period where Highland
23 wasn't able to pay bonuses owed to any of its
24 employees?
25     A.  Not that I know of.  Not that I can recall.

Kristin Hendrix - October 27, 2021

---

**109**

1    Q.  Are you aware of any time period leading up
2    to the Highland bankruptcy where Highland was unable to
3    pay its bills?
4        A.  There's times where we would be in a cash
5    flow crunch and we would stretch our AP, but eventually
6    it would get paid.
7        Q.  And I think this is the last topic and we can
8    probably move through this pretty quickly.
9            Are you aware of any loans made by Highland
10   to any of its employees or officers that were forgiven
11   in part or all?
12       A.  Yes.
13       Q.  Which officers or employees are you aware of?
14       A.  I recall there were two employees.  I can't
15   remember one of them, but I believe another, the second
16   one, was Paul Adkins.  Again, I'm just recalling this
17   was years ago.
18       Q.  And these two are the only ones you're aware
19   of?
20       A.  Or I'm sorry, not Paul Adkins, Tim Lawler.
21   It's possible Paul Adkins was the other one, but I
22   can't tell you for sure.
23       Q.  Tim Lawler and some other employee that you
24   can't remember the name of are the only two that you're
25   aware of?

---

**110**

1        A.  Yes.
2        Q.  This other employee, I know you don't
3    remember the name.  Is there any other description that
4    you can give me, what their position was, how long they
5    worked, or is it just you remember those loans?
6        A.  I just remember we had two employee loans.
7        Q.  Approximately when was this?
8        A.  I couldn't even tell you.  All the years just
9    commingle together.
10       Q.  More than five years ago?
11       A.  Yes.
12       Q.  More than 10 years ago?
13       A.  I couldn't say.
14           MR. AIGEN:  Why don't we take a five-minute
15   break and then I'll either be done or have just a few
16   wrap-up questions.
17           MR. RUKAVINA:  Okay.
18           (Off the record.)
19           FURTHER EXAMINATION
20       Q.  (BY MR. RUKAVINA)  Ms. Hendrix, in May of
21   2019, would you on behalf of Highland alone,
22   unilaterally, have the authority to lend to HCMFA 2.4-
23   and/or $5.0 million?
24       A.  No.
25       Q.  And would you have had any authority on

---

**111**

1    behalf of HCMFA in May of 2019 to bind HCMFA to such
2    notes?
3        A.  No.
4        Q.  Thank you, ma'am.
5            EXAMINATION
6        Q.  (BY MR. MORRIS)  Ms. Hendrix, can you get out
7    of your pile, Exhibit Number 3.
8            And this is the email from Dave Klos to
9    corporate accounting on May 2nd concerning the
10   $2.4 million that was going to be transferred from
11   HCMLP to HCMFA?
12       A.  Yes.
13       Q.  And how did Mr. Klos characterize that
14   transfer?
15       A.  He called it a new intercompany loan.
16       Q.  What does a new intercompany loan mean to
17   you?
18       A.  That means we are creating a new loan
19   document, sending money out, tracking it as a
20   brand-new, fresh loan.
21       Q.  And he sent this email to an email group
22   called corporateaccounting@hcmlp.com.  Do I have that
23   right?
24       A.  Yes.
25       Q.  Were you included in that email group?

---

**112**

1        A.  I was.
2        Q.  Can you identify everybody else who you
3    recall being in that email group?
4        A.  Yes.
5        Q.  Who else was in that email group?
6        A.  Dave Klos, Frank Waterhouse, myself, Hayley
7    Eliason, and Blair Roeber.
8        Q.  Okay.  Did Mr. Waterhouse ever tell anybody,
9    to the best of your knowledge, in May 2019 that the
10   transaction should not be booked as a loan?
11       A.  No, not to my knowledge.
12       Q.  You testified earlier that there was, you
13   recall, a similar email the next day with respect to a
14   $5 million transaction.
15           Do you recall that?
16       A.  Yes.
17       Q.  Do you recall if that email also went to
18   corporate accounting?
19       A.  I believe so, yes.
20       Q.  And to the best of your knowledge, would
21   Mr. Waterhouse have been informed on May 3, 2019, that
22   the transaction was being booked by the corporate
23   accounting department as a loan?
24       A.  Yes.
25       Q.  Did Mr. Waterhouse tell you at that time or

---

Kristin Hendrix - October 27, 2021

---

113

1  at any time thereafter that it was a mistake to book it
2  as a loan?
3      A.  No.
4      Q.  Did Mr. Waterhouse tell you at that time or
5  at any time thereafter that he didn't intend to sign
6  the promissory notes?
7      A.  No.
8      MR. RUKAVINA:  Objection.  To the last
9  question, objection to form.
10     Go ahead.
11     Q.  (BY MR. MORRIS)  Okay.  The promissory notes,
12  to be clear, are the two promissory notes that you
13  testified to earlier that have been marked as exhibits
14  in this deposition for $5 million and $2.4 million
15  respectively.
16         With that definition as promissory notes, did
17  Mr. Waterhouse ever tell you at any time that it was a
18  mistake to sign those notes?
19     MR. RUKAVINA:  I'll object to the form.
20     Go ahead.
21     THE WITNESS:  No.
22     Q.  (BY MR. MORRIS)  Did Mr. Waterhouse or
23  anybody -- withdrawn.  I'll go back to the first
24  question.
25         Did Mr. Waterhouse or anybody in the world

---

114

1  ever tell you at any time since May of 2019 that it was
2  a mistake to issue the promissory notes as we've
3  defined them?
4      A.  No.
5      Q.  Did Mr. Waterhouse or anybody in the world
6  tell you that Mr. Waterhouse wasn't authorized to affix
7  his signature to those promissory notes?
8      MR. RUKAVINA:  And I'll object.  Assumes
9  facts not in evidence, i.e., the signature.  That's
10  what I've been objecting to.
11         But go ahead and answer.
12     THE WITNESS:  Say it again.
13     Q.  (BY MR. MORRIS)  Did Mr. Waterhouse or
14  anybody in the world tell you at any time that he
15  wasn't authorized to have his signature affixed to the
16  promissory notes?
17     MR. RUKAVINA:  Same objection.
18     THE WITNESS:  No.
19     Q.  (BY MR. MORRIS)  Did you have anything to do
20  with Highland's annual audit?
21     A.  Yes.
22     Q.  What role did you play with respect to
23  Highland's annual audit?
24     A.  I personally was in charge of completely
25  writing the entire audit report for the debtor and for

---

115

1  HCMFA.  I oversaw all other aspects of the audit my
2  team carried out.
3         Any requests from the auditors, emails with
4  questions, any issues that arose, all of that went
5  through me.
6      Q.  And did Mr. Waterhouse play a role in
7  relation to the annual audit?
8      A.  Yes.
9      Q.  What is your understanding of
10  Mr. Waterhouse's role?
11     A.  Let's see.  He was in charge of reviewing the
12  financial statements as they were done, so he saw the
13  end product.  He would sign off on the management rep
14  letter.  He signed engagement letters.
15         If there were any big issues, those got --
16  those would be brought to Frank's attention for sure.
17     Q.  Okay.  And are you a CPA?
18     A.  Yes.
19     Q.  And are you familiar with management rep
20  letters?
21     A.  Yes.
22     Q.  What is your understanding of what a
23  management rep letter is?
24     A.  That's basically telling the auditors that
25  everything in the audited financial report is accurate

---

116

1  to the best of their knowledge, they've presented
2  everything that they have fair and accurately, they're
3  not withholding any information.
4      Q.  And do you recall that the -- Highland's 2018
5  audit was completed in early June 2019?
6      A.  Yes.
7      Q.  And did you cause the two promissory notes
8  that we're talking about here to be delivered to
9  PricewaterhouseCoopers in connection with the audit?
10     A.  Yes.
11     Q.  And were those two promissory notes delivered
12  to PricewaterhouseCoopers because they constituted
13  subsequent events?
14     A.  Yes.
15     Q.  Do you recall whether those promissory notes
16  were described in Highland's 2018 audited financial
17  statements?
18     A.  Yes.
19     Q.  And did Mr. Waterhouse or Mr. Dondero ever
20  tell you at any time that there was a mistake in the
21  audited financial statements?
22     A.  No.
23     Q.  Did they ever tell you -- did Mr. Waterhouse
24  or Mr. Dondero or anybody in the world ever tell you at
25  any time that the two notes were mischaracterized in

---

Kristin Hendrix - October 27, 2021

---

117

1  the 2018 audited financial statements of Highland
2  Capital?
3      A.  No.
4      Q.  Do you know whether HCMFA also had its annual
5  financial statements audited by PricewaterhouseCoopers?
6      A.  Yes.
7      Q.  Did you play any role in connection with that
8  audit?
9      A.  Yes.
10     Q.  What role did you play in connection with
11  HCMFA's audit of the 2018 financial statements?
12     A.  Same exact role as with the debtors --
13     Q.  And --
14     A.  -- writing the audit report, overseeing all
15  other audit functions.
16     Q.  And did you and your group cause HCMFA to
17  deliver to PricewaterhouseCoopers the two promissory
18  notes that we've been discussing from May 2019?
19     A.  Yes.
20     Q.  Did Mr. Waterhouse or Mr. Dondero or anybody
21  in the world ever tell you that it was a mistake to
22  deliver those promissory notes to PwC in connection
23  with HCMFA's 2018 audit?
24     A.  No.
25     Q.  Were those notes delivered -- withdrawn.

---

118

1          Were those notes delivered to
2  PricewaterhouseCoopers because they constituted
3  subsequent events in connection with the 2018 audit?
4      A.  Yes.
5      Q.  Do you recall whether PricewaterhouseCoopers
6  included as a liability on HCMFA's balance sheet the
7  obligations reflected in the two promissory notes at
8  issue?
9          MR. RUKAVINA:  Objection.  Best evidence.
10  Answer.
11         THE WITNESS:  On the 2018 financials?
12     Q.  (BY MR. MORRIS)  Correct.
13     A.  Those would not have been included as
14  liabilities in the 2018 financials.
15     Q.  Do you know if HCMFA completed their audit
16  for 2019?
17     A.  No.
18     Q.  Okay.  Did the notes appear in HCMFA's 2018
19  audited financials under the subsequent events section?
20     A.  Yes.
21         MR. RUKAVINA:  Objection.  Best evidence.
22  Go ahead.
23     Q.  (BY MR. MORRIS)  Did Mr. Dondero or -- did
24  Mr. Waterhouse or Mr. Dondero or anybody in the world
25  ever tell you that it was a mistake to include

---

119

1  reference to these notes in HCMFA's 2018 audited
2  financial statements?
3          MR. RUKAVINA:  Same objection.
4          THE WITNESS:  No.
5      Q.  (BY MR. MORRIS)  Okay.  Do you recall, did
6  anybody in the world ever tell you that the
7  transactions described in Exhibit 3 and the other
8  document that you recall should never have been booked
9  as a loan?
10     A.  No.
11     Q.  Did anybody in the world tell you that you
12  made a mistake when you created those promissory notes?
13     A.  No.
14     Q.  Can you pull out what was marked as
15  Exhibit 16.
16         Do you understand that the Advisors provide
17  services to certain retail funds?
18     A.  Yes.
19     Q.  And do you recall that the services are
20  subject to an agreement that's subject to annual
21  review?
22     A.  Yes.
23     Q.  So looking at Exhibit 16, did you understand
24  that the retail board had asked Highland to disclose --
25  I'll just read it from the document on page 2,

---

120

1  Bates number ending 881.
2          There's an email from Ms. Thedford that says,
3  quote, are there any material amounts -- withdrawn.
4          Are there any material outstanding amounts
5  currently payable or due in the future, open paren,
6  e.g., notes, close paren, to HCMLP by HCMFA or NexPoint
7  Advisors or any other affiliate that provides services
8  to the funds?
9          Do you see that?
10     A.  Yes.
11     Q.  And were you generally aware that that was
12  part of the annual renewal process?
13     A.  Yes.
14     Q.  And you made some comments earlier about
15  Ms. Thedford's response on the first page.
16         Do you recall that?
17     A.  Yes.
18     Q.  And you actually were able to correct certain
19  mistakes that you perceived in her response.
20         Do I have that right?
21     A.  Correct.
22     Q.  Do you know -- do you see where it says,
23  HCMFA due to HCMLP as of June 30, 2020, let's just call
24  it $12.3 million.
25         Do you see that?

---

Kristin Hendrix - October 27, 2021

121

1    A.  Yes.
2    Q.  And above that there is a reference to the
3  6/30 financials.
4       Do you see that?
5    A.  I do.
6    Q.  Do you know what the reference to the 6/30
7  financials is?
8    A.  Yes.
9    Q.  And what is that reference?
10    A.  That is referencing the amounts on the
11 balance sheet at 6/30 that we provided for the 15(c)
12 materials to the board.
13    Q.  Okay.  And does that $12.3 million include,
14 to the best of your knowledge, the principal amount of
15 the two notes that we were talking about?
16    A.  Yes.
17       MR. RUKAVINA:  Objection.  Best evidence.
18       THE WITNESS:  Yes.
19    Q.  (BY MR. MORRIS)  And how do you know that?
20    A.  Because I kept their financials, I know for a
21 fact that it included all of their outstanding notes
22 and it most certainly included these two notes that
23 we've been talking about today.
24    Q.  And to the best of your recollection did
25 HCMFA provide the 6/30 financials to the retail board?

122

1    A.  Yes.
2    Q.  And to the best of your knowledge did
3  Mr. Dondero or Mr. Waterhouse or anybody in the world
4  ever tell you that the financial statements that were
5  provided to the retail board were erroneous in any way?
6    A.  No.
7    Q.  Did Mr. Dondero or Mr. Waterhouse or anybody
8  in the world ever tell you that the 6/30 financials
9  that were given to the retail board should not have
10 included the $7.4 million principal amount on the two
11 promissory notes?
12       MR. RUKAVINA:  Objection.  Best evidence.
13       Answer.
14       THE WITNESS:  No.
15    Q.  (BY MR. MORRIS)  Do you know whether -- are
16 you at all familiar with the Advisors' actual response
17 to the retail board in October 2020?
18    A.  Say that again, please.
19    Q.  So this email string is October 2020; right?
20    A.  Right.
21    Q.  And do you understand that this is kind of a
22 discussion between Mr. Waterhouse and Ms. Thedford as
23 to how to respond?
24    A.  Yes.
25    Q.  Have you ever seen the actual response that

123

1  was given to the retail board?
2    A.  I likely did.  I can't tell you for certain
3  that I was on the correspondence.
4    Q.  Do you recall any discussion at any time that
5  the $12.3 million number in Ms. Thedford's email should
6  be changed in the final report to the retail board?
7    A.  I don't believe so.
8    Q.  Did anybody ever tell you at any time that
9  the $12.3 million number was incorrect?
10    A.  No.
11    Q.  Did anybody ever tell you at any time that
12 that number wrongly included the $7.4 million reflected
13 in the two notes?
14    A.  No.
15    Q.  Okay.  Do you recall that earlier that
16 summer -- we looked at Exhibit 15?
17    A.  Yep.
18    Q.  And that was an attachment to an email that
19 you personally sent to Mr. Dondero.  We saw that
20 before?
21    A.  Right.
22    Q.  And this Exhibit 15, which was attached to
23 your email, identifies amounts due and owing from
24 NexPoint Advisors; right?
25    A.  Right.

124

1    Q.  And it identifies amounts due and owing for a
2  number of different entities, including HCMFA; right?
3    A.  Correct.
4    Q.  Do you know whether the amount included for
5  HCMFA on Exhibit 15 included the principal amount due
6  on the two promissory notes?
7    A.  It does.
8    Q.  Did Mr. Dondero or Mr. Waterhouse ever ask
9  you why -- withdrawn.
10       Did Mr. Dondero or Mr. Waterhouse ever ask
11 you how the $10.5 million number was calculated?
12    A.  No.
13    Q.  Did Mr. Dondero or Mr. Waterhouse ever
14 suggest to you that the number was incorrect?
15    A.  No.
16    Q.  Did Mr. Dondero or Mr. Waterhouse or anybody
17 in the world ever question the number that you gave to
18 Mr. Dondero in the summer of 2020 concerning the
19 principal amount due by HCMFA to HCMLP?
20    A.  No.
21    Q.  Have you ever made a payment -- withdrawn.
22       Have you ever caused a payment to be made in
23 connection with an intercompany loan without receiving
24 the prior approval from either Frank Waterhouse or
25 Mr. Dondero?

Kristin Hendrix - October 27, 2021

125

1    A. No.
2    Q. Has anybody ever said to you that you made a
3  mistake in applying a payment against principal or
4  interest due on an intercompany loan?
5    A. No.
6    Q. We saw this morning, and we produced to
7  Mr. Rukavina and he mentioned earlier, 13-week
8  forecasts?  Do you understand that?
9    A. Yes.
10    Q. Did you review the 13-week forecasts
11  recently?
12    A. Yes.
13    Q. And we're talking specifically about the
14  13-week forecasts for the November/December 2020 time
15  period.  Do you understand that?
16    A. Yes.
17    Q. Based on your review of those forecasts, did
18  those forecasts specifically identify the principal and
19  interest that were due on the three term notes as of
20  December 28, 2020?
21    A. Yes.
22    Q. And what was the purpose of creating the
23  13-week forecasts?
24    A. Sure.  That was to keep everybody informed
25  who was on the cash call, Frank Waterhouse, Jim Seery

126

1  and others, keep everybody informed of upcoming
2  payments that were due on term loans well in advance.
3      Everybody knew about it.  It was out there
4  for everybody to see that was on these cash calls.
5    Q. Now, is it your understanding that
6  Mr. Waterhouse -- withdrawn.
7      Did you email these forecasts -- withdrawn.
8      Did anybody email these forecasts to the best
9  of your recollection in late 2020?
10    A. Yes.
11    Q. And was it sent to the corporate accounting
12  group that we saw earlier?
13    A. It was probably sent to Frank, Seery, the DSI
14  guys that were involved with the cash call.
15    Q. Okay.  And so did you participate in the
16  creation of the 13-week forecasts?
17    A. Yes.
18    Q. What role did you play in the creation of the
19  13-week forecasts?
20    A. I was responsible for creating the entire
21  thing.
22    Q. Okay.  And based on the work that you did,
23  was one of the purposes to make sure that
24  Mr. Waterhouse was aware of all payments that were
25  coming due under the intercompany notes?

127

1    A. Yes.
2    Q. And was that information that was included on
3  the reports to Mr. Waterhouse?
4    A. Yes.
5    Q. And do you recall whether there were any
6  specific discussions in November or December of 2020
7  concerning those payments -- withdrawn.  That wasn't a
8  good question.
9      Did Mr. Waterhouse or -- withdrawn.
10      Did anybody on behalf of HCMS or HCRE ever
11  instruct you to make the payments that were due under
12  their term notes?
13    A. No.
14    Q. Did anybody on behalf of NexPoint ever
15  instruct you to make a payment that was due at year end
16  with respect to the NexPoint term note?
17    A. No.
18    Q. Were you authorized to make those payments
19  without the prior approval of either Mr. Waterhouse or
20  Mr. Dondero?
21    A. No.
22    Q. I think you testified that there were certain
23  payments that were made in January 2001 under each of
24  the three term notes.
25      Do I have that right?

128

1    A. Correct.
2      MR. RUKAVINA: 2021.
3      MR. MORRIS:  Thank you very much.
4    Q. (BY MR. MORRIS)  With that amendment, do you
5  understand my question?
6    A. Yes.
7    Q. Do you know why the three payments were made
8  in January of 2021 on each of three term notes?
9    A. Because Frank Waterhouse instructed me to do
10  so.
11    Q. And he had not instructed you to make those
12  payments prior to that time?
13    A. Correct.
14    Q. Did you have to prompt Frank Waterhouse in
15  January of 2021 to make those payments?
16    A. No.
17    Q. So based on the 13-week forecast that you
18  prepared and delivered to Mr. Waterhouse, is it your
19  understanding that Mr. Waterhouse knew as early as mid
20  November 2020 that payments would be due under the
21  three term notes at the end of the year?
22    A. Yes.
23    Q. And, in fact, did HCMS and HCRE and NexPoint
24  timely make their installment payments that were due at
25  year end 2018?

Kristin Hendrix - October 27, 2021

---

129

1    A.  Yes.
2    Q.  And was that done because HCMLP received the
3  instructions of somebody authorized to give the
4  instruction on behalf of those entities?
5    A.  Yes.
6    Q.  Did HCMS and HCRE and NexPoint timely make
7  the installment payments that were due at year end
8  2019?
9    A.  Yes.
10   Q.  And why did they make those payments?
11   A.  Because we were provided instruction and
12 authorization to do so.
13   Q.  Okay.  And is the only reason that the
14 payment wasn't made at year end 2020 because nobody on
15 behalf of the Advisors -- withdrawn.
16   Is the only reason that no payment was made
17 at the end of 2020 is because no one on behalf of
18 NexPoint, HCRE, or HCMS directed HCMLP to make those
19 payments?
20   A.  Correct.
21   MR. AIGEN:  Objection.  Form.
22   Q.  (BY MR. MORRIS)  And you testified earlier to
23 a call that you had with Mr. Waterhouse.  I think you
24 said it was either November 30 or December 1.
25   Do you recall that?

---

130

1    A.  Yes.
2    Q.  And did you personally continue to prepare
3  the 13-week forecasts after your conversation with
4  Mr. Waterhouse?
5    A.  Yes.
6    Q.  And did those 13-week forecasts continue to
7  include the payments that were due under the three term
8  notes at the year end?
9    A.  Yes.
10   Q.  And that's information that you gave to
11 Mr. Waterhouse; is that right?
12   A.  Right.
13   Q.  Mr. Rukavina elicited from you the fact that
14 payments of principal hadn't been made on demand notes
15 that were executed in favor of Mr. Dondero's
16 affiliates.
17   Do you recall that?
18   A.  Yes.
19   Q.  Okay.  Was that a topic of conversation with
20 PricewaterhouseCoopers at any time?
21   A.  Yes.
22   Q.  Can you tell me about that conversation?
23   A.  Sure.  As part of our annual audit, the
24 auditors would, you know, make sure that our
25 receivables are collectible.  And if they thought for

---

131

1  any reason they weren't, then they were going to raise
2  an issue, a going concern issue.
3    That came up several years in a row with
4  HCMFA.
5    Q.  Do you recall that the three term notes at
6  issue here were all signed on May 31, 2017?
7    A.  Yes.
8    Q.  And all of those term notes involved a
9  roll-up of previously issued demand notes; is that
10 right?
11   A.  Correct.
12   Q.  Do you know why in -- at the end of May 2017
13 NexPoint, HCRE, and HCMS rolled up their demand notes
14 into individualized term notes?
15   A.  Yes.
16   Q.  What is your understanding as to why that
17 happened?
18   A.  That would get the auditors a little bit more
19 comfort over our outstanding loans, ensuring that we
20 have an amortization schedule, an underlying contract,
21 showing that payments will be coming in every year on
22 these outstanding receivables.
23   Q.  Okay.  As the person responsible for
24 preparing Highland's audit, did anybody ever tell you
25 at any time that any of the notes were not valid

---

132

1  obligations of the maker?
2    A.  No.
3    Q.  As the person responsible for Highland's
4  audit, did anybody ever tell you at any time that any
5  of the notes at issue should not have been signed?
6    A.  No.
7    Q.  As the person responsible for Highland's
8  audit, did anybody ever tell you at any time that any
9  of the notes at issue were signed by mistake?
10   A.  No.
11   Q.  Did anybody ever tell you at any time that --
12 withdrawn.
13   As the person responsible for Highland's
14 audit, did anybody ever tell you at any time that
15 Mr. Dondero didn't approve of any of the notes?
16   A.  No.
17   Q.  As the person responsible for Highland's
18 audit, did anybody ever tell you at any time that
19 the -- any of the notes at issue were subject to an
20 oral agreement?
21   A.  No.
22   Q.  As the person responsible for Highland's
23 audit, did anybody ever tell you at any time that any
24 of the notes were amended?
25   A.  No.

---

Kristin Hendrix - October 27, 2021

**133**

1  Q. As the person responsible for Highland's
2  audit, did anybody ever tell you at any time that any
3  of the notes would be forgiven?
4  A. No.
5  Q. During your 15 years at Highland, has an
6  intercompany loan ever been forgiven in whole or in
7  part?
8  A. No.
9  Q. During your -- withdrawn.
10  Can you recall any note that Highland ever
11  held as the payee that was forgiven in whole or in part
12  in the five years prior to bankruptcy, go back to 2014?
13  A. No.
14  Q. Is it your understanding as the person
15  responsible for Highland's audit that the forgiveness
16  of notes, if they were in a material amount, would have
17  had to have been disclosed in the audited financial
18  statements?
19  A. Yes.
20  Q. So is it fair to say that any evidence of the
21  forgiveness of material amounts would have been
22  disclosed in Highland's financial statements?
23  A. Yes.
24  MR. MORRIS: I have no further questions.
25  MR. RUKAVINA: I have none.

**134**

1  MR. AIGEN: None.
2  MR. RUKAVINA: Okay. Thank you very much.
3  (Whereupon, the deposition adjourned at
4  1:19 P.M.)
5  --oOo--
6  I declare under penalty of perjury that the
7  foregoing is true and correct. Subscribed at
8  _____, Texas, this _____ day of
9  _____, 2021.
10
11
12  _____
13  KRISTIN HENDRIX
14
15
16
17
18
19
20
21
22
23
24
25

**135**

1  CERTIFICATE OF REPORTER
2  I, BRANDON D. COMBS, a Certified Shorthand
3  Reporter, hereby certify that the witness in the
4  foregoing deposition was by me duly sworn to tell the
5  truth, the whole truth, and nothing but the truth in the
6  within-entitled cause;
7  That said deposition was taken in shorthand by
8  me, a disinterested person, at the time and place
9  therein stated, and that the testimony of the said
10  witness was thereafter reduced to typewriting, by
11  computer, under my direction and supervision;
12  That before completion of the deposition,
13  review of the transcript was not requested. If
14  requested, any changes made by the deponent (and
15  provided to the reporter) during the period allowed are
16  appended hereto.
17  I further certify that I am not of counsel or
18  attorney for either or any of the parties to the said
19  deposition, nor in any way interested in the event of
20  this cause, and that I am not related to any of the
21  parties thereto.
22  DATED: November 1, 2021
23
24  _____
25  Brandon Combs, Certified Shorthand

**136**

1  State of Texas
   Dickman Davenport, Inc. Cert 312
2  4228 North Central Expressway
   Suite 101, Dallas, TX 75206
3  (214) 855-5100  (800) 445-9548
   Email: info@dickmandavenport.com
4  www.dickmandavenport.com
   My commission expires 1-31-23
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Kristin Hendrix - October 27, 2021

**A**

**A.M** 1:22 57:22
**ability** 69:5,20
**able** 108:23
    120:18
**above-styled**
    1:21
**Absolutely** 17:8
**accent** 56:16
**access** 24:7 54:15
**accessed** 44:19
**account** 12:11
    37:7 91:15
**accountant** 16:19
    46:10 73:15
    74:3 78:4 84:24
**accounting** 11:16
    12:8,12,18
    17:14,15,16,21
    18:4 19:9 20:3
    20:12,20 21:13
    31:16,23 35:7
    40:11 45:17
    46:3 51:11,11
    51:18 56:11
    102:4 111:9
    112:18,23
    126:11
**accounts** 13:21
    14:8,15 51:24
**accrued** 79:22
**accruing** 85:15
**accurate** 72:22
    97:19 115:25
**accurately** 116:2
**action** 11:6
**activities** 39:20
**actual** 104:12
    122:16,25
**addition** 39:7
    41:21
**additional** 56:15
    56:20
**adjourned** 134:3
**Adkins** 109:16

109:20,21
**advance** 126:2
**adversary** 94:25
    95:3,12
**advice** 46:20
    88:24
**advised** 38:23
**advisor** 39:1
**Advisors** 1:10
    15:14,17,23
    27:20,23 63:6
    70:1,4 71:6,10
    74:17 76:24
    84:9 85:6 92:16
    99:10,14,16,25
    100:2,15,18
    119:16 120:7
    123:24 129:15
**Advisors'** 122:16
**affiliate** 34:25
    87:23 120:7
**affiliated** 15:11
**affiliates** 18:19
    86:24 87:17
    99:6,11,13
    100:4,17
    130:16
**affirmative**
    101:14
**affix** 50:17 114:6
**affixed** 47:5
    114:15
**afternoon** 94:23
**ago** 33:8 104:21
    104:22 109:17
    110:10,12
**agree** 55:2 57:14
    61:13
**agreed** 25:23
    26:3
**agreeing** 53:24
**agreement** 26:5
    26:15,21 95:9
    95:13 96:4,8,12
    96:23 97:6,9,11

97:21,25 98:9
    107:25 119:20
    132:20
**ahead** 73:9
    113:10,20
    114:11 118:22
**Aigen** 2:18 3:4
    94:16,23,24
    95:23 96:1,21
    98:15 102:5
    103:17 105:24
    106:8,23
    110:14 129:21
    134:1
**Akard** 1:24 2:4
**alleged** 40:16
    96:3,7
**Allocation** 38:24
    39:1
**allowed** 135:15
**allowing** 95:13
**amended** 107:25
    132:24
**amendment**
    128:4
**amort** 19:22 90:8
**amortization**
    73:25 76:23
    77:4,6,9,20
    80:20 82:6 85:3
    85:12,13,17
    131:20
**amount** 19:6,7
    26:10,12 30:12
    32:23 39:3
    43:16 48:15
    49:2 50:9 87:16
    87:24 89:9 90:9
    91:19 93:4
    104:6 121:14
    122:10 124:4,5
    124:19 133:16
**amounts** 35:8
    40:2 120:3,4
    121:10 123:23

124:1 133:21
**analysis** 97:24
**and/or** 50:13,18
    63:22 64:18
    69:20 73:25
    110:23
**anniversary**
    79:21 80:5,14
**annual** 114:20,23
    115:7 117:4
    119:20 120:12
    130:23
**annually** 80:13
**annum** 80:12
**answer** 7:6,6
    23:11,14 35:2
    39:19 51:5 52:3
    64:20 75:2
    114:11 118:10
    122:13
**answered** 41:4
    51:3 57:17
    100:9 106:6
**answering** 66:1
**answers** 42:10
    43:1 57:6
**anybody** 35:25
    40:8 101:7
    112:8 113:23
    113:25 114:5
    114:14 116:24
    117:20 118:24
    119:6,11 122:3
    122:7 123:8,11
    124:16 125:2
    126:8 127:10
    127:14 131:24
    132:4,8,11,14
    132:18,23
    133:2
**anymore** 76:2
**anytime** 21:10
    59:1
**AP** 11:17 12:23
    32:7 109:5

**apologize** 15:6
    59:7 62:16 75:9
    75:22
**appear** 118:18
**APPEARANC...**
    2:1
**appeared** 2:5,12
    2:19
**appears** 47:1
    76:12 77:1
**appended** 135:16
**applying** 125:3
**approval** 16:5,8
    48:12 49:4
    50:25 51:2
    101:3 104:20
    124:24 127:19
**approve** 48:15
    49:5 104:1,2,24
    132:15
**approved** 48:18
    48:19,21 104:7
    104:8,14
**approximately**
    95:18 110:7
**April** 12:7
**area** 107:19
**arose** 115:4
**ASAP** 60:18 64:6
**asked** 51:3 57:17
    60:10 69:22
    88:9 93:4 106:6
    119:24
**asking** 6:10 26:7
    29:17,19,24
    59:17 62:6
    64:23,25 77:25
    90:8 96:12,13
**aspects** 115:1
**assistant** 12:6
    69:2 70:3,9
    88:21
**associate** 11:18
    32:7
**assume** 6:25

Kristin Hendrix - October 27, 2021

42:11,25 44:3
48:24 57:5,18
80:6 81:10
95:23 99:19,22
**Assumes** 114:8
**assuming** 36:10
40:23 80:19
81:5 82:21
106:17
**assumption**
95:25
**assumptions**
100:10 105:23
**attached** 83:7,11
123:22
**attachment**
83:23 123:18
**attachments**
83:20
**attempts** 102:10
**attention** 115:16
**attorney** 2:5,12
2:18 135:18
**audit** 18:25 98:1
114:20,23,25
115:1,7 116:5,9
117:8,11,14,15
117:23 118:3
118:15 130:23
131:24 132:4,8
132:14,18,23
133:2,15
**audited** 97:16
115:25 116:16
116:21 117:1,5
118:19 119:1
133:17
**auditors** 97:18
115:3,24
130:24 131:18
**audits** 12:24
**August** 83:18
84:1
**author** 44:10
**authority** 36:23

50:25 51:1
110:22,25
**authorization**
129:12
**authorize** 49:17
**authorized** 114:6
114:15 127:18
129:3
**authorizing**
50:12,17
**available** 21:24
**Avenue** 2:11,17
**aware** 10:1 15:17
23:8 28:20,22
28:23 29:10
39:6 90:22 91:1
91:2 95:11,16
96:7,14 98:13
98:15,19 101:9
101:17,20,21
102:7 106:8
107:11 109:1,9
109:13,18,25
120:11 126:24

___

**B**
**back** 13:3,6
16:12 17:12
20:9,16 22:20
24:12 26:4
29:16 44:24
45:6 50:3 52:8
55:1 60:4,18
64:3,11,19 69:2
74:10 76:3 81:9
81:23 84:8
88:20,23 94:3,9
99:24 113:23
133:12
**background**
10:12,19 16:12
29:25 67:19
**bad** 26:25
**balance** 63:8,22
80:10 118:6

121:11
**balances** 13:18
84:15 89:23
**bank** 13:20 63:7
63:21 92:18
**bankruptcy** 1:1
108:6,15,22
109:2 133:12
**bargain** 84:5
**base** 26:19,22
27:4
**based** 25:18 38:3
40:23 82:5
125:17 126:22
128:17
**basically** 23:7
115:24
**basis** 21:23 66:22
77:20 81:14
104:9
**batch** 12:22
**Bates** 82:14,18
120:1
**bear** 80:11
**beginning** 62:24
81:14
**behalf** 2:6,13,20
102:1 110:21
111:1 127:10
127:14 129:4
129:15,17
**believe** 10:24
12:7,12,16 13:4
16:18 33:3,5,24
34:2 35:8 38:4
43:13,17 50:10
58:22 82:5,8
84:21 88:8
93:13 97:10
99:8 107:3
109:15 112:19
123:7
**believed** 103:20
**best** 20:1 44:20
55:10 100:12

112:9,20 116:1
118:9,21
121:14,17,24
122:2,12 126:8
**better** 30:2 42:22
67:22
**big** 23:3 38:21
115:15
**bills** 14:6 109:3
**bind** 111:1
**birth** 10:16
**bit** 28:9 44:7 55:1
56:16 58:9,24
98:12 131:18
**bits** 7:14,17
**Blair** 32:6,6,7
112:7
**blind** 64:12
**board** 60:5 86:15
119:24 121:12
121:25 122:5,9
122:17 123:1,6
**bonus** 25:18,21
26:1,6,8,19,22
27:4
**bonuses** 108:23
**book** 113:1
**booked** 112:10
112:22 119:8
**books** 73:11
87:17
**borrower** 69:10
**borrower's** 69:5
**boss** 24:11,17
25:1 76:8
**brackets** 78:19
79:1
**brand-new**
111:20
**Brandon** 1:22
135:2,25
**break** 30:8 52:5
62:17 75:16,17
83:9,16 93:16
94:6 110:15

**briefly** 10:12
16:12
**brought** 50:2
115:16
**bunch** 63:1
**burn** 82:11
**business** 14:12
64:5
**buyouts** 108:6

___

**C**
**calculated**
124:11
**calculating** 73:24
**call** 26:19 34:23
37:7 38:1 45:11
45:13 61:22
66:4 67:23 71:5
72:5 74:11,11
74:20,21 75:5
75:23,25 79:20
92:2,3,6 93:21
93:25 99:4
100:12 106:14
106:16 120:23
125:25 126:14
129:23
**called** 26:21
62:12 65:14
74:14,15,24
84:1 92:4
111:15,22
**calling** 107:2
**calls** 126:4
**Capital** 1:6,9
14:22,23 15:4
27:23 85:5
108:1,16 117:2
**care** 38:11
**carried** 115:2
**case** 95:9 100:24
103:4
**cash** 12:21 13:21
21:24 22:6,18
22:19 23:1,4,4

34:17 63:8
66:22,25 67:2,5
67:5 69:1 81:11
81:12,14,19,20
109:4 125:25
126:4,14
**categorize** 24:6
**cause** 1:21 22:6
116:7 117:16
135:6,20
**caused** 39:16
92:12 124:22
**cell** 75:2,3,4,13
**Central** 136:2
**CEO** 13:23 60:24
**Cert** 136:1
**certain** 14:6,18
18:19 26:13
29:2 36:16
37:15 49:13
64:20 95:14
96:16 119:17
120:18 123:2
127:22
**certainly** 82:11
86:17 121:22
**certificate** 53:14
53:18,20 135:1
**certified** 16:19
135:2,25
**certify** 135:3,17
**CFO** 13:9,13,22
23:12 25:10
**chain** 59:4,12
62:5,15,24
85:21,25 86:3
86:13 90:4,5
**chance** 75:4,18
**change** 32:11
79:1,12 84:10
85:2,6 90:23
91:3
**changed** 58:4
123:6
**changes** 43:15

44:2 49:1
135:14
**changing** 57:4
98:12 107:18
**characterize**
24:13 111:13
**charge** 13:19
18:7 114:24
115:11
**charged** 10:10
**charges** 76:12
**chase** 15:9
**check** 60:12,15
64:19 93:15,16
102:23 105:8
**checked** 63:16,16
64:22
**checking** 64:24
**checks** 13:18
**clarify** 47:14
88:10
**clear** 6:20 113:12
**clearly** 38:13
**clients** 63:6
**close** 120:6
**collect** 28:21
**collectibility**
68:23
**collectible** 130:25
**collection** 30:14
**collects** 27:3
**college** 10:20
11:10,14
**column** 79:5,11
80:22,24
**columns** 78:14,15
**Combs** 1:22
135:2,25
**come** 84:5,14
85:2,10,11
**comes** 31:8
**comfort** 131:19
**comfortable**
50:23
**coming** 16:6

48:25 99:5,10
126:25 131:21
**comma** 15:4
**comments** 120:14
**commingle** 110:9
**commission**
136:4
**common** 40:10
**communicate**
23:17
**communicated**
23:23
**communicating**
23:24
**communications**
23:22 64:10
90:16
**companies** 52:14
**company** 39:10
44:13
**compensate**
40:15
**compensation**
25:17,21 26:1,6
26:20,22 27:4
39:9,12
**competent** 24:18
24:20,21
**complete** 72:10
**completed** 116:5
118:15
**completely** 17:3
47:8 114:24
**completion**
135:12
**compliance**
17:14
**comport** 44:20
**compounded**
80:13
**computer** 47:16
135:11
**computerized**
1:24
**concern** 131:2

**concerning** 111:9
124:18 127:7
**concerns** 63:13
63:15
**condescending**
25:3
**conduct** 38:3
**confess** 82:23
**confident** 37:22
**confirm** 62:2
**confirmation**
92:15,17
**confused** 78:12
**confusion** 47:15
**connection** 116:9
117:7,10,22
118:3 124:23
**consent** 39:1,24
**consist** 26:1
**constituted**
116:12 118:2
**consulted** 46:13
**contact** 6:9,11
**contending** 96:4
**context** 31:13
44:1 59:25
86:12
**continue** 130:2,6
**contract** 131:20
**controller** 11:19
11:23 12:1,4,6
13:4 25:6 69:2
70:3,4,9,10
88:21
**conversation**
36:22 42:4 65:3
96:1,6,14 99:9
99:13 104:22
106:17,24
130:3,19,22
**conversations**
23:13 34:16,20
36:5,17 37:14
37:15 48:14
49:22 50:20

69:1 88:18
95:24 96:3,15
96:22 102:18
105:4,13,25
107:8,11,16
108:8,14
**copied** 64:12
86:6
**copies** 55:14
56:13
**copy** 83:17
**copying** 59:13
61:3 63:1 83:18
**corporate** 10:6
11:16 17:15,16
17:21 18:4 19:8
19:15 20:3,11
20:20 21:13
31:16,23 35:6
45:17 46:2
51:11,18 56:11
102:4 111:9
112:18,22
126:11
**corporateacco...**
111:22
**correct** 14:12,20
14:24 15:4,5,12
15:13,16,19,20
18:5,6 23:5,6
27:1,5 29:4
35:23 36:8,12
38:9 40:12,21
41:3,5,6,10,23
41:24 45:22,23
45:25 46:1
53:19 56:14
57:12 60:25
65:12 66:16,17
70:19,20,23,24
76:16 78:21
80:20,21 81:5
83:20,21 87:25
88:1 95:6,7
100:1,5,6,18,19

Kristin Hendrix - October 27, 2021

101:15,16,19
101:20 102:25
103:3,4 105:6,7
105:10,11
106:5,7 118:12
120:18,21
124:3 128:1,13
129:20 131:11
134:7
**correctly** 32:18
33:23
**correspondence**
123:3
**corresponding**
84:16
**counsel** 2:5,12,19
6:15 7:4,23,25
8:19,22 9:8,12
9:20 10:10
28:10,17 33:6
135:17
**count** 42:10 43:1
57:6
**couple** 83:19
**course** 6:9 46:18
55:3 103:23,24
104:13,19,23
**courses** 16:15,16
**court** 1:1 6:18
27:13 30:13,25
**courteous** 94:12
**CPA** 10:24 11:2
11:6,21 115:17
**create** 43:12,18
45:8 48:17
**created** 18:21
44:18,19,21
48:7 58:1
119:12
**creating** 13:21
111:18 125:22
126:20
**creation** 126:16
126:18
**credit** 91:18

**crunch** 109:5
**CSR** 1:23
**curiosity** 76:6
**current** 11:2
**currently** 11:19
120:5
**cut** 15:9

**D**

**D** 1:22 135:2
**Dallas** 1:3,25 2:4
2:18 136:2
**dark** 94:17
**date** 10:16 19:3
26:13 32:22
34:21 43:16
50:8 57:24 58:7
78:17 79:9,21
80:6,13,13,14
93:25 105:4
107:1
**dated** 30:20
31:16 135:22
**dates** 57:22
**Dave** 8:24 34:18
34:23 38:13
46:7 111:8
112:6
**Davenport** 136:1
**David** 3:14 13:1
31:16 33:17
**DAVOR** 2:5
**day** 48:15 57:25
58:6 80:2
112:13 134:8
**days** 9:23,25 10:5
28:17
**deaccelerate**
107:13
**deal** 20:21 36:25
**debtor** 14:24,25
15:1,2,3,7,10
15:19,21 16:4
18:1 21:20,21
21:22 22:1,2,5

22:14,15,18
23:1 25:7,7
26:17 28:21
29:6 38:19
39:15 53:7
54:22 55:12
59:5,19 66:8,20
68:1 76:20 77:2
77:6,9 81:11,12
81:18,25 82:7
84:17 88:3,11
88:14 90:24
99:6 100:15
101:25 114:25
**debtor's** 40:16
68:18 77:4
86:16
**debtors** 117:12
**Dec** 4:3,11
**December** 11:11
14:2,5 15:6,10
15:21 16:3
24:22 60:25
61:6,12 62:10
65:14 66:3,7,18
66:24 67:13,16
67:20 68:1,8,14
68:21 70:22
71:4 72:4 74:10
75:19 76:4
88:12 93:21
98:21,25
100:25 101:11
101:19 102:7,8
102:19,20
103:20 105:3,3
105:18 125:20
127:6 129:24
**decided** 26:2,3
40:14 52:15,18
**deciding** 23:8
**decision** 29:14
105:2
**declare** 134:6
**default** 68:16,19

88:3 90:17
93:10,11
**defaulted** 67:22
**defendants** 1:11
1:20 2:6,20
95:11 96:4
**defense** 95:12
96:7,12
**defenses** 95:9
**defined** 114:3
**definition** 113:16
**degree** 10:22
**deliver** 117:17,22
**delivered** 116:8
116:11 117:25
118:1 128:18
**demand** 4:11 5:2
18:19 19:21,25
20:4,13,17,21
21:3,4,5,8,23
22:7,13 28:22
29:11,14 46:16
62:11 66:5 85:6
85:14 98:17
130:14 131:9
131:13
**demanded** 62:11
**demanding** 24:13
**Denton** 10:15
**department**
11:17 18:2,5,8
18:12 51:12
57:12 112:23
**depend** 18:17
**depended** 49:16
**depending** 73:16
**depends** 18:16
69:10 77:24
**deponent** 135:14
**deposed** 6:13
28:2
**deposition** 1:13
1:18 7:8,9 8:1,6
8:10,15,17,20
8:23 9:14

113:14 134:3
135:4,7,12,19
**describe** 12:18
53:16
**described** 17:17
99:9 116:16
119:7
**description** 14:1
110:3
**detail** 66:12
**details** 17:5
25:14 28:7
**determine** 97:6
97:25 102:11
**determined**
97:22
**Dickman** 136:1
**difference** 103:22
**different** 19:25
54:19 73:16
87:22 96:11
103:17 124:2
**direct** 27:7
**directed** 99:17,19
129:18
**directing** 48:16
101:4
**direction** 23:12
53:21 60:23
63:2 73:7 101:7
135:11
**directions** 48:25
**directly** 40:9,22
41:12 49:1
70:14,17
102:16
**disciplinary** 11:5
**disclose** 119:24
**disclosed** 97:15
97:21 133:17
133:22
**discretionary**
26:8
**discuss** 62:9 66:4
68:4,7 74:16

88:12
**discussed** 28:8
  38:4 43:13
  66:21 67:9
  74:18,20 81:13
  92:5 96:25 97:2
**discussing** 66:19
  67:20 117:18
**discussion** 9:5
  50:21 61:7 65:9
  66:7 69:5,19
  92:25 93:7
  122:22 123:4
**discussions** 9:8
  25:20 28:11,12
  28:17 40:6 60:1
  61:9,11 62:13
  68:22 98:8
  127:6
**disinterested**
  135:8
**distinct** 29:3
  45:24
**DISTRICT** 1:2
**DIVISION** 1:3
**doctor** 42:11
**doctored** 83:3
**doctoring** 42:24
  57:4
**document** 32:25
  47:2 49:19 72:8
  76:10 82:13
  86:1 88:7
  111:19 119:8
  119:25
**documentation**
  9:16
**documentations**
  47:8
**documents** 9:18
  10:7 42:6 43:7
  43:9 44:3 47:9
  48:5,18 49:8,13
  50:2,3,11 54:11
  57:7,14,20

69:16 77:13
  82:10,18
**doing** 6:7 43:8
  45:20 74:4
**dollar** 19:7 40:2
  48:15 49:2 50:9
**Dondero** 2:20 5:2
  15:12 21:11,20
  21:21 22:6,19
  23:7,14,18,23
  23:24 24:2,7
  34:19 35:24
  36:2 40:14,20
  52:12,19,22
  53:7 73:8 81:14
  83:18 94:24
  99:18 101:2,4
  101:17 102:11
  102:16 103:7
  103:12,19
  104:1,7,14
  108:9 116:19
  116:24 117:20
  118:23,24
  122:3,7 123:19
  124:8,10,13,16
  124:18,25
  127:20 132:15
**Dondero's**
  104:19 130:15
**Donohue** 59:13
  59:17,22 62:25
  63:21 64:3,16
  64:22 65:5,9
  92:18,19,22,24
  93:8
**door** 35:1
**draft** 17:24
**drafted** 17:1,3
**drafting** 16:16
  17:22,23 18:12
  19:16,21 20:12
  29:13
**drive** 54:9,16
  55:14

drukavina@m...
  2:7
**DSI** 61:19 62:6,9
  63:3,24 67:4
  68:7,13,23
  69:14 77:3
  88:12,23 92:18
  92:19 126:13
**due** 16:6 59:18
  66:23 73:9,25
  86:24 87:5,17
  87:17,22,25
  89:9 90:8 102:8
  103:20 105:4,6
  120:5,23
  123:23 124:1,5
  124:19 125:4
  125:19 126:2
  126:25 127:11
  127:15 128:20
  128:24 129:7
  130:7
**duly** 1:19 6:2
  135:4
**duties** 12:19
  97:12
**duty** 20:25

───────────
         **E**
───────────
**E-l-l-i-n-g-t-o-n**
  18:9
**e-signature** 47:10
  47:12 48:1,4,5
  48:8,9,12,18
  49:9,15,18 50:1
  50:13,17,23
**e.g** 120:6
**earlier** 43:14
  45:7 99:8
  112:12 113:13
  120:14 123:15
  125:7 126:12
  129:22
**early** 116:5
  128:19

**earn** 26:23
**educational**
  10:18
**effect** 54:11
  67:21 68:15
**effectuate** 101:7
  106:15
**effort** 97:6
**efforts** 102:10
**either** 18:21
  29:13,20 31:1
  34:17,23 37:3
  46:7,13 50:1
  54:12 58:20
  62:6,9 71:4
  84:24 99:15,17
  110:15 124:24
  127:19 129:24
  135:18
**electronic** 54:22
**electronically**
  56:3,12
**Eliason** 46:7 78:3
  112:7
**elicited** 130:13
**Ellington** 4:3
  18:9 60:4,9,12
  60:15 61:10
**email** 2:7,14,22
  3:14 4:3,7,21
  5:1,5 23:17
  31:12,15,20,23
  32:1,4,20,25
  33:3,25 36:3
  37:10,19,25
  38:14 41:17,21
  42:5 48:20
  50:11 54:11
  59:4,12,22 60:1
  60:2,3,25 61:2
  61:6 62:4,8,15
  62:24,25 63:11
  63:14,15 64:22
  82:16,19 83:2,6
  83:11,11,12,18

83:23 84:19
  85:25 86:3,13
  86:22 90:4,5,12
  92:22 108:12
  111:8,21,21,25
  112:3,5,13,17
  120:2 122:19
  123:5,18,23
  126:7,8 136:3
**emailing** 90:8
  107:2
**emails** 9:16,18
  41:18 49:23
  81:9 82:22
  115:3
**employed** 11:21
  70:18
**employee** 109:23
  110:2,6
**employees** 16:3
  108:19,24
  109:10,13,14
**employment** 26:5
  26:15 69:25
  70:7
**engagement**
  115:14
**ensuring** 131:19
**entire** 11:17
  114:25 126:20
**entirety** 86:18
**entities** 15:11
  21:16 22:6,12
  22:19 70:18
  81:15 101:5
  124:2 129:4
**entitled** 82:12
**entity** 21:20,22
  22:7 23:2 35:14
  53:13 63:4,5
  84:16 104:4
**entries** 78:13
  80:23
**entry** 78:24 79:19
**erroneous** 122:5

Kristin Hendrix - October 27, 2021

error 38:22 39:9
  39:16,21,23
  40:10 44:7
established 9:11
  28:8 83:16
estimate 20:10
event 135:19
events 38:21
  95:15 96:16
  116:13 118:3
  118:19
eventually 109:5
everybody 25:13
  112:2 125:24
  126:1,3,4
evidence 105:22
  114:9 118:9,21
  121:17 122:12
  133:20
exact 25:25 36:5
  37:14 48:5,13
  107:1 117:12
Exactly 78:16
Examination 3:3
  3:4,5,6 6:3
  94:22 110:19
  111:5
example 81:1
Excel 77:12,15
  78:9
exchanged
  108:12
excluding 28:16
  29:18
execute 48:18
  49:5
executed 18:24
  47:9 130:15
executing 19:17
execution 18:13
  20:12 32:15
exhibit 3:10,12
  3:14,17,19,21
  3:23,25 4:1,3,7
  4:11,14,17,19

4:21 5:1,5
  30:14,15,18,19
  30:21 31:15,18
  32:21 33:1 34:4
  34:11 35:21
  36:20 37:19
  38:12 42:15,16
  43:6,21 44:18
  44:19 56:19,21
  59:4,9 62:14,14
  62:21,23 65:13
  65:18,21 72:11
  72:13,16 76:10
  76:17,19 79:8
  82:6 83:1,4,15
  83:17 84:8,14
  84:18,19 85:7
  85:17,20,21,22
  85:25 86:3,13
  87:21 88:2,4,7
  89:21,22,25
  90:1,3 111:7
  119:7,15,23
  123:16,22
  124:5
exhibits 3:8 30:6
  42:17 43:4
  44:21 45:22
  46:19 48:11,19
  50:13,17 52:8
  55:17,24 56:25
  57:16 58:10,25
  113:13
existing 84:20
expect 85:16
expense 103:24
expertise 16:18
expires 136:4
Explain 19:19
explained 6:15
  31:7
explicit 60:23
explicitly 32:5
  53:1
expressly 71:14

Expressway
  136:2
extent 108:13
external 46:14
eye 6:9

_____

F
faced 11:5
facilitate 91:7
fact 21:18 49:5
  57:15 64:15
  65:1 67:13,16
  99:22 121:21
  128:23 130:13
facts 114:9
fair 17:5 21:19
  22:3 23:21 35:5
  42:20 70:14
  95:25 96:8,21
  96:24 97:18,20
  98:6,7 99:25
  100:20,23
  101:8,12 103:5
  105:16 106:4
  108:4 116:2
  133:20
fairly 36:15
faithfully 57:3
familiar 27:13
  65:20 66:11
  86:2,5 107:20
  115:19 122:16
family 23:4
far 20:14,16
  24:19,21 49:7
  80:24
favor 130:15
February 12:2
  26:4
fee 39:1,24
feel 86:18
fell 13:24
felt 104:25
figuring 93:17
file 56:13

filed 28:24,25
  29:6,8 30:13,24
files 32:25
filing 18:25
final 123:6
finance 10:22
financial 4:4
  12:22 59:18
  62:7 69:15
  97:16,17
  115:12,25
  116:16,21
  117:1,5,11
  119:2 122:4
  133:17,22
financials 12:23
  37:18 41:8
  60:11 86:24
  118:11,14,19
  121:3,7,20,25
  122:8
find 31:13 72:8
  83:8 93:24 94:8
  102:23
finding 98:2
fine 47:8 48:2,4
  86:19
finish 96:11
finished 31:10
finishing 46:14
firm 18:22 44:16
first 6:2 9:1
  11:13 20:11
  63:17 70:21
  81:17 82:13
  95:8 113:23
  120:15
five 51:4 94:3
  110:10 133:12
five-minute
  93:15 110:14
fixing 55:15
flip 46:25
Floor 1:25 2:11
flow 109:5

flows 63:8
focus 12:17
folders 18:25
folks 62:16 67:4
  85:24
follow 47:23 60:5
  60:9 72:5
follow-up 4:23
followed 104:11
following 47:22
follows 6:2
forecast 67:5
  128:17
forecasted 67:8
forecasts 12:21
  13:21 17:18
  67:5,9 125:8,10
  125:14,17,18
  125:23 126:7,8
  126:16,19
  130:3,6
foregoing 134:7
  135:4
forgive 97:10
forgiven 95:14
  96:16 109:10
  133:3,6,11
forgiveness
  133:15,21
form 14:14,21
  15:24 16:22
  17:6 18:14
  19:11 20:23
  22:8,21 24:8,15
  28:3 34:6 35:10
  36:13 37:11
  38:7 39:17 41:1
  41:13 45:3 46:4
  47:20 48:22
  49:10,20 50:4
  51:14,20 52:1
  53:9 55:5,19
  56:4 58:16
  65:16 69:8
  70:15 73:20

Kristin Hendrix - October 27, 2021

74:5 75:7 77:22
78:10 80:3,16
82:1 87:7 88:15
89:2,15 96:18
102:2 103:13
105:19 106:18
113:9,19
129:21
**format** 77:12
**formatting** 79:3
82:5
**forth** 64:11
**forward** 64:2
94:16
**forwarded** 92:15
92:17
**found** 54:9
**foundation** 75:11
**four** 9:8,12 100:5
**fourth** 107:25
**frame** 17:12
66:19 69:7
73:16
**Frank** 4:21 7:10
7:21 8:1 13:7,8
23:13 24:5
34:19,23 35:24
38:14 52:19
53:20 60:10
63:16,18 64:10
64:23,23 65:1
67:3 71:5 73:8
74:14,15 84:1,7
91:10,22 92:4
99:5,17 100:13
101:2 102:15
104:4,21,23,24
106:14,20
107:2 112:6
124:24 125:25
126:13 128:9
128:14
**Frank's** 115:16
**frankly** 104:24
**fresh** 111:20

**Friday** 9:1,4
**function** 12:21
**functions** 117:15
**fund** 1:9 27:23
38:24 39:2,2,8
85:6
**funds** 38:23
59:18 119:17
120:8
**further** 3:5 10:23
32:15 62:1
92:13 110:19
133:24 135:17
**future** 14:7 16:5
120:5

**G**
**gears** 58:24
**general** 34:21
46:18 54:20
69:6 90:20
**generally** 13:17
13:24 19:13
34:8 35:2 43:10
72:22 81:20
96:13,15
120:11
**getting** 11:20
18:24 48:11
60:2,3 81:12
101:3
**give** 20:10 31:13
74:16 110:4
129:3
**given** 49:18
101:6 122:9
123:1
**gives** 16:19
**giving** 53:21 54:5
**Global** 38:23
39:1
**go** 10:12 17:5
44:4,24 48:1
55:1 62:24 64:2
67:4,5,11 73:8

78:22 107:23
113:10,20,23
114:11 118:22
133:12
**goes** 94:9 99:3
**going** 6:25 17:12
20:9,16 26:23
27:3 29:16 30:6
30:10,14,18
34:3 40:6 42:7
42:20 44:2
50:22 52:8
54:18 56:20
57:2 58:24 59:3
59:3 60:5,9
64:19 65:13
67:7 71:6 72:8
72:11 74:10
76:10,20 78:7
81:9 82:10,11
82:13,25 83:1
84:8 85:20,21
87:19 88:2
93:20 95:2,23
105:23 111:10
131:1,2
**good** 6:4 24:17
26:24 94:23
127:8
**governs** 26:11
**graduated** 10:21
11:9,12
**great** 53:20
**greater** 16:19
**group** 14:4 17:13
19:9,10,16 20:3
31:24 35:7,22
37:22 40:11
43:14 45:7,18
46:3 49:16
51:18 56:11
73:19,23
111:21,25
112:3,5 117:16
126:12

**guarding** 24:7
**guess** 89:22
**guys** 126:14

**H**
**H-i-l-l-i-s** 32:12
**half** 81:17
**hand** 59:3 82:25
**handed** 88:6
**handle** 20:12
50:8
**handled** 20:4,21
**happened** 20:7
21:8 36:11,11
37:21 101:1
131:17
**happening** 20:11
61:5
**happy** 23:3 93:22
**HARDT** 2:3
**HARR** 2:3
**Hayley** 32:2,14
46:7 78:3,6
112:6
**Hayley's** 46:8
**HCM** 4:4,9
**HCMF** 3:25 4:1
**HCMFA** 3:15 4:4
27:10,22 28:1
28:13 29:6
30:12,19 32:13
38:19,23 39:12
40:1,15 53:25
59:18 60:19
62:7,11 63:6,22
64:18 66:5
69:15,20 70:7
70:10 85:18
87:5 99:4 100:2
110:22 111:1,1
111:11 115:1
117:4,16
118:15 120:6
120:23 121:25
124:2,5,19

131:4
**HCMFA's** 39:8
87:17 117:11
117:23 118:6
118:18 119:1
**HCMLP** 3:15
4:19 5:6 32:13
60:24 64:4
86:24 87:5,18
111:11 120:6
120:23 124:19
129:2,18
**HCMS** 2:20
94:25 98:16,24
100:1,22,25
101:10,18
102:1,19
105:18 107:5
127:10 128:23
129:6,18
131:13
**HCRE** 2:20
94:25 98:17,24
100:1,22,25
101:10,18
102:1,20
105:18 107:3
127:10 128:23
129:6,18
131:13
**hear** 72:1
**heard** 40:17,20
**held** 12:8 133:11
**hell** 75:4,10
**help** 76:22 78:13
93:17 105:23
**helped** 12:20
**Hendrix** 1:14,18
5:5 6:1,6 30:10
30:23 56:19
57:2,8 62:23
65:13,21 76:19
78:12 79:15
86:3 90:3 93:13
94:5,23 110:20

111:6 134:13
**hereof** 80:13
**hereto** 135:16
**hi** 60:4
**higher** 89:20
**Highland** 1:6,9
  10:2 11:13,21
  12:5,19 13:10
  14:4,4,11,22,23
  15:3 16:10
  17:10,13,21
  18:1,11 21:5
  25:6,15 26:4,9
  26:24 27:2,2,22
  28:12 51:7,10
  51:19 65:14
  66:4 71:7,11
  81:10,18,23,23
  85:5 87:25
  92:17 107:21
  108:1,16,17,21
  108:22 109:2,2
  109:9 110:21
  117:1 119:24
  133:5,10
**Highland's** 7:23
  7:25 8:19,22
  114:20,23
  116:4,16
  131:24 132:3,7
  132:13,17,22
  133:1,15,22
**Hillis** 32:12
**history** 11:9
**Hold** 62:18
**hope** 57:13 97:13
**hopefully** 82:11
**hoping** 68:15
**house** 75:1
**hundreds** 50:7
  51:8
**hypothetically**
  22:4,17
**hypotheticals**
  21:17

## I
**i.e** 114:9
**idea** 58:2,7 75:12
  75:24 89:13
  93:1 105:17
  106:3
**identification**
  30:16,22 31:19
  42:18 43:5 57:1
  59:10 62:22
  65:19 72:14
  76:18 83:5
  85:23 88:5 90:2
**identifies** 123:23
  124:1
**identify** 112:2
  125:18
**identifying** 66:23
**image** 47:2,5,19
  48:2
**imagine** 15:7
**immediately**
  61:14
**important** 93:14
**Impressive** 11:23
**include** 71:18
  72:10 100:1
  118:25 121:13
  130:7
**included** 15:14
  16:9 31:24
  102:5 111:25
  118:6,13
  121:21,22
  122:10 123:12
  124:4,5 127:2
**includes** 63:5,7
**including** 88:11
  124:2
**income** 63:7,21
**incoming** 67:7
**incorrect** 123:9
  124:14
**increase** 94:19
**incumbency**

53:13,17,19
**INDEX** 3:1
**indirect** 27:7
**indirectly** 70:12
**individualized**
  131:14
**Info** 3:25 4:1
**info@dickman...**
  136:3
**information** 4:9
  29:25 34:13
  61:14 63:3,7
  64:17 65:5,11
  69:12,15 84:6
  86:15 116:3
  127:2 130:10
**informed** 112:21
  125:24 126:1
**initiated** 74:11
  92:3
**ink** 49:8,13 55:3
  55:8
**ink-signed** 55:11
**input** 29:25
  88:24
**installment**
  128:24 129:7
**instance** 1:20
  20:6 23:8 35:21
**instances** 24:1
  40:1,24
**instruct** 127:11
  127:15
**instructed** 128:9
  128:11
**instructing**
  101:18
**instruction** 72:2
  74:17 76:8
  100:16 101:14
  101:22 103:12
  129:4,11
**instructions** 24:2
  24:3 32:16
  69:14 76:1

100:21 101:9
  103:19 129:3
**instructs** 7:5
**insurance** 39:10
**insurer** 39:8
**intend** 113:5
**interco** 32:14
  34:11
**intercompany**
  17:22 18:13
  19:17 20:4,13
  20:16 21:3,8
  34:12 35:7
  36:19,25 37:12
  40:24 53:8
  111:15,16
  124:23 125:4
  126:25 133:6
**interest** 19:7
  43:16 49:2
  68:18 73:25
  78:14,16,24
  79:20,22 80:11
  85:15 125:4,19
**interested** 84:9
  135:19
**interjects** 64:4
**intermediary**
  24:3
**internal** 18:21
  41:8 46:13,20
  69:19
**internally** 77:1
**investigation**
  97:5
**invoice** 108:13
**involved** 18:12
  19:16,20,24
  36:21 39:20
  40:9 126:14
  131:8
**involvement**
  19:10
**irrespective**
  26:16,24

**IRS** 49:3
**issue** 79:3 95:14
  96:16 97:25
  98:16 114:2
  118:8 131:2,2,6
  132:5,9,19
**issued** 131:9
**issues** 40:7,10
  60:16 61:21
  115:4,15

## J
**J-F-O-R-S-H-...**
  44:10
**Jack** 59:13 60:4,8
  64:6 65:2 92:18
**James** 4:8 5:1,2
  61:14,15,18,21
  61:25 62:3
**Jan** 4:8 5:2,5
**January** 10:17
  24:24 28:20
  29:6,11 62:25
  64:15 71:25
  88:2,21 89:9
  90:5,7,17,22
  91:4 93:8
  106:10,25
  127:23 128:8
  128:15
**jealousy** 24:7
**jerk** 24:12
**JFORSHEE**
  44:10
**Jim** 2:20 21:10
  23:14,18 34:19
  35:24 52:19,20
  54:2 63:2 64:10
  67:3 73:8 84:4
  99:18 101:2,4
  102:16 104:1,7
  104:14,22,25
  105:1 125:25
**Jim's** 99:21
**jive** 87:20

Kristin Hendrix - October 27, 2021

jmorris@pszjl...
  2:14
job 6:20 11:14
  17:9 20:25
  24:19,22 43:11
  45:1,14 103:1,6
  103:10
John 2:12 4:7
  8:24 95:21,23
  97:4
JONES 2:10
June 86:25 87:6
  116:5 120:23

**K**

K-l-o-s 8:25
keep 29:1 77:6,9
  95:4 125:24
  126:1
kept 54:22 55:11
  56:12 77:5
  121:20
kind 11:5 18:4
  23:21 24:6,11
  34:3 50:3 54:19
  81:13 122:21
Klos 3:14 8:24,25
  9:5,12 13:1,6
  13:10 25:10,21
  29:24 31:16
  33:17 34:10,18
  35:21 36:18,24
  37:20 38:12
  46:7 97:2,3
  111:8,13 112:6
Klos' 13:2 41:17
knew 40:3 126:3
  128:19
know 6:24 19:20
  19:23 20:19
  25:14,25 28:7
  33:10,11,13
  36:11 38:17,21
  39:22,25 40:1,5
  43:21 44:11

47:16 48:6,6
50:10 52:18,25
57:25 59:6
76:15,21 78:15
82:15 89:17
92:18,19 99:21
101:4 103:24
104:17 107:19
108:7,25 110:2
117:4 118:15
120:22 121:6
121:19,20
122:15 124:4
128:7 130:24
131:12
knowledge 27:6
  36:1,4 37:14
  40:11,13 52:15
  69:11 77:7
  108:4 112:9,11
  112:20 116:1
  121:14 122:2
known 67:14,17
  97:11
KOPF 2:3
Kristin 1:14,18
  5:5 6:1,6 32:1,2
  32:14 57:8
  61:20 134:13

**L**

L.P 1:6,10
labeled 82:15
labels 30:7
laid 24:12
land 84:5
landline 75:2
large 35:8
lasted 75:6
late 126:9
Lauren 4:22
  86:21
law 2:5,12,19
  6:18 18:22
  44:16

Lawler 109:20
  109:23
Lawn 2:17
lawsuit 28:24
  29:5,8
lawsuits 28:1,9
  28:13,25 29:17
  29:21 30:1
lawyer 9:4
lawyers 44:14
lay 67:7
leading 39:20
  108:15,21
  109:1
learn 95:20
ledger 76:12
left 61:9 87:15
legal 7:23,25 10:9
  16:13 17:14,25
  18:2,5,11,21
  19:10,16 28:10
  46:14,20 72:21
lend 21:22 23:1
  110:22
length 93:25
let's 10:12 11:9
  12:17 14:8,18
  21:17 30:8
  34:25 44:24
  45:13 47:14
  54:19 55:1
  72:10 78:1
  99:24 115:11
  120:23
letter 4:11 65:14
  115:14,23
letters 29:11,14
  115:14,20
letting 92:18
liabilities 118:14
liability 40:16
  118:6
license 10:24
  11:2
limited 107:25

lines 61:7
listed 78:17
litigations 27:8
little 28:9 44:7
  55:1 58:9,24
  78:12 94:17
  98:12 131:18
live 10:14,15
LLP 2:17
loan 3:15,25 4:1
  18:18 31:5
  32:14 33:25
  34:11,12,14,25
  35:14,17,17,22
  36:19,25 37:6,7
  37:17,17 38:25
  39:12 40:15,21
  45:13,15,18,22
  46:12,14 48:15
  49:1,4,5,24
  50:9 58:5 72:25
  76:24 79:21
  80:6,7 87:22
  103:22 104:6
  104:20 111:15
  111:16,18,20
  112:10,23
  113:2 119:9
  124:23 125:4
  133:6
loans 35:9,12
  37:4,6,13,22
  38:6 39:4 41:9
  41:12,19 48:14
  48:17 50:7,19
  50:22 51:8
  53:21 66:23
  67:8 98:16,17
  98:17,20,25
  106:9 107:13
  109:9 110:5,6
  126:2 131:19
logically 36:10
  40:23 71:18
logs 75:19

long 7:20 21:24
  74:21 75:6
  110:4
look 30:17 54:15
  57:7 75:18 77:2
  78:11 80:21
  93:20 94:6
looked 31:5
  123:16
looking 56:21,23
  58:10 79:24
  81:10 86:21
  87:14 119:23
looks 60:24 64:9
  76:23 77:4
  79:19
loosely 17:2
lot 28:25
lots 40:6
LP 15:4,15 27:20
  27:23 70:1,4

**M**

ma'am 31:21
  57:7 87:1 111:4
machine 1:24
maintain 6:9,10
maintained 77:1
  82:7
maker 19:4,5
  21:3 43:15
  132:1
making 13:20
  21:5 81:7 99:20
  101:2,25
  103:22,23
  104:3
management 1:6
  1:9 12:20 13:14
  13:15 14:2,24
  15:4,22 17:17
  27:23 85:5
  108:1 115:13
  115:19,23
manager 12:8,12

Kristin Hendrix - October 27, 2021

12:18
**manual** 104:9,12
**March** 12:2
**mark** 59:3
**marked** 30:15,21
   31:18 42:17
   43:4 56:25 59:9
   62:21 65:18
   72:13 76:17
   83:4 85:21,22
   88:4 90:1
   113:13 119:14
**material** 97:22
   98:1,4,6,10
   104:6 120:3,4
   133:16,21
**materials** 121:12
**maturity** 80:13
**MBA** 10:23
   11:20
**mean** 7:17 13:15
   14:22,23 15:3
   19:1 35:16
   48:20 57:24
   68:24 78:13,15
   87:11,24
   111:16
**meaning** 27:20
   27:22 54:25
   70:18
**means** 27:15
   35:15 58:22
   71:16 111:18
**meeting** 34:17
   67:2
**meetings** 66:22
   66:25
**memorandum**
   48:20
**memory** 9:17
   19:14 20:9 29:3
   29:7,17,19,23
   32:20,24 34:3
   37:9 38:2 41:22
   42:1,20 43:7,10

45:24 47:4
48:10,13 50:15
51:1 53:23 54:4
54:10 57:23
58:9,20 69:18
72:24 74:4 81:6
81:17 86:8,10
90:15,20 91:21
92:6
**mentioned** 11:24
   13:14 22:12
   25:9 29:10 41:7
   44:25 45:21
   51:6 64:21
   125:7
**merit** 25:17
**met** 108:11
**metadata** 42:21
   42:21,24 43:21
   43:24 44:8,24
   56:15,20 57:4
**Michael** 2:18
   94:24
**michael.aigen...**
   2:22
**mid** 128:19
**middle** 89:8
**million** 30:12,20
   32:13,21 33:1
   33:19,20,25
   34:5 35:3 36:25
   37:12,12 38:18
   38:22,25 39:3,7
   39:8,11,23
   40:15,21 42:15
   42:16 43:2,3
   58:5,11,13,13
   66:9,13 81:1,1
   81:2 85:1,6,9
   87:3 90:23 91:3
   91:23 110:23
   111:10 112:14
   113:14,14
   120:24 121:13
   122:10 123:5,9

123:12 124:11
**mind** 71:18
**minute** 30:8
**minutes** 94:3
**mischaracteriz...**
   116:25
**Mischaracterizes**
   41:2
**misleading** 42:9
**missed** 88:25
   105:12
**misspeak** 30:5
**mistake** 51:12
   113:1,18 114:2
   116:20 117:21
   118:25 119:12
   125:3 132:9
**mistakenly** 51:25
**mistakes** 51:17
   51:19,22
   120:19
**modified** 44:19
   57:8
**moment** 72:9
**Monday** 9:2
**monetize** 68:2,10
**money** 13:21
   21:11,13,15,21
   21:21,22 22:5
   34:24 35:13
   37:7,17 53:21
   54:23 81:15,19
   81:22,24 92:16
   111:19
**month** 106:10
**months** 40:7
**morning** 6:4 9:3
   67:11 82:14
   125:6
**Morris** 2:12 3:6
   4:7 7:3 8:24 9:6
   9:9 14:14,21
   15:24 16:22
   18:14 19:11
   20:23 22:8,21

24:8,15 28:3
30:2 31:10 34:6
35:10 36:13
38:7 39:17 41:1
41:13 42:9 45:3
46:4 47:20
48:22 49:10,20
50:4 51:3,14,20
52:1 53:9 55:5
55:19 56:4
57:17 58:16
62:18 65:16
67:10 69:8
70:15 73:20
74:5 75:7,11
77:22 78:8 79:7
79:9,13 80:3,16
82:1,14,16,23
83:2,6,10 85:25
87:7 88:15 89:2
89:15 93:22
94:15,17 95:21
95:25 96:2,6,18
96:23 102:2
103:13 105:19
106:6,18 111:6
113:11,22
114:13,19
118:12,23
119:5 121:19
122:15 128:3,4
129:22 133:24
**mouth** 23:21
**move** 9:10 21:11
   21:13,15 94:16
   109:8
**moved** 23:4
**multiple** 54:19
**MUNSCH** 2:3

─────── N ───────

**name** 6:5 32:8
   44:12 57:18
   94:24 109:24
   110:3

**Nancy** 108:9
**NAP** 27:14
**native** 78:9
**NAV** 38:22 39:9
   39:16,20,23
   40:10 107:21
   108:5
**near** 14:7
**necessarily** 17:23
   19:10 103:25
**need** 9:16 14:6
   19:2 21:11
   25:14,25 34:24
   52:6 54:1 59:1
   81:19,20 82:12
   86:19 93:17
**needed** 21:21
   22:5,18 23:1,4
   40:1 53:12
   81:11,14,23
   104:25
**needs** 104:7,8,13
**negative** 78:20,25
   79:2
**never** 40:19,20
   49:12 51:12
   55:14 68:17
   70:14,17 96:25
   97:2 101:6,6,14
   103:6 108:11
   119:8
**new** 2:11 21:14
   32:14 34:11,25
   36:19 45:9
   111:15,16,18
**NexPoint** 5:6
   15:14,17,22
   16:5 27:11,15
   27:18,19,20
   28:2,13,21 63:6
   63:22 64:18
   66:8,12,20
   67:13,22 68:2
   68:15,19,24
   69:15,20 70:1,4

Kristin Hendrix - October 27, 2021

70:22 72:12
76:24 77:7,13
77:20 80:20
81:7,22 84:9
85:2 88:3 90:9
90:17,23 91:16
91:23 92:13,16
93:10,11 120:6
123:24 127:14
127:16 128:23
129:6,18
131:13
**NexPoint's** 16:5
16:9
**Nope** 8:7 76:7
91:12
**normal** 34:16
103:23,23
**normally** 107:15
**North** 1:24 2:3
10:22 11:13
136:2
**NORTHERN** 1:2
**note** 3:10,12,17
3:19,21,23 4:14
5:3,6 14:19
15:18 16:10,21
17:1,3,6 18:16
18:19 19:22,25
21:4,23 22:7,20
23:9 28:21
30:11,19 31:8
32:15,21 33:2
33:20 35:3,18
42:15 43:2,3,11
45:9 46:16
56:21,22 58:11
58:13,13 66:9
66:13,16,20
67:13,22 68:2,5
68:8,10,16,19
68:23,24 71:13
71:19 72:6,11
72:12,16,20
73:4 76:13 77:7

80:9,10,14,20
81:8,23 85:14
90:18 91:16,19
91:23 92:14
127:16 133:10
**notes** 4:12,19
14:9 16:16
17:22 18:13
19:17,21,21
20:4,13,17,22
21:4,8,14,14
22:13 27:3
28:14 30:24
31:1 38:11 41:7
42:7,22 43:12
45:2 46:21,22
47:6 50:1 52:10
52:16,17,24
53:1,8,25 54:5
54:12,23 55:3,8
55:11 56:2,8,10
59:2 62:11
65:15 66:5
69:21 73:10
77:10 84:16
85:12 95:14
96:16 97:10
111:2 113:6,11
113:12,16,18
114:2,7,16
116:7,11,15,25
117:18,22,25
118:1,7,18
119:1,12 120:6
121:15,21,22
122:11 123:13
124:6 125:19
126:25 127:12
127:24 128:8
128:21 130:8
130:14 131:5,8
131:9,13,14,25
132:5,9,15,19
132:24 133:3
133:16

**notice** 88:3 89:8
**notices** 28:22
**noting** 14:5
**November** 59:12
61:6 62:6,10
66:19 67:12,19
68:1,7,14,21
71:4 72:4 74:10
75:18 76:3
93:21 127:6
128:20 129:24
135:22
**November/Dec...**
125:14
**NPA** 4:17 27:18
27:19 86:24
99:4 100:3
**number** 79:2,6
79:11,18 80:23
84:10,13 85:2,9
87:20,21 89:14
89:18,20,21
111:7 120:1
123:5,9,12
124:2,11,14,17
**numbered** 1:21
**numbers** 26:1
78:20 80:21
84:15
**NY** 2:11

---

**O**
**o0o--** 1:4
**Oak** 2:17
**oath** 6:17 95:5
**object** 113:19
114:8
**objecting** 114:10
**objection** 7:3
14:14,21 15:24
16:22 18:14
19:11 20:23
22:8,21 24:8,15
28:3 34:6 35:10
36:13 38:7

39:17 41:1,13
45:3 46:4 47:20
48:22 49:10,20
50:4 51:3,14,20
52:1 53:9 55:5
55:19 56:4
57:17 58:16
65:16 69:8
70:15 73:20
74:5 75:7 77:22
80:3,16 82:1
87:7 88:15 89:2
89:15 96:18
102:2 103:13
105:19 106:6
106:18 113:8,9
114:17 118:9
118:21 119:3
121:17 122:12
129:21
**objections** 7:5
**obligations** 14:19
16:6,10 118:7
132:1
**obligor** 15:18
**obviously** 14:11
35:6 59:1
**occasion** 22:18
**occurred** 95:15
96:4,17 97:7
106:17
**Oct** 4:22
**October** 1:15,21
86:22 94:9
122:17,19
**office** 10:1 34:1
54:8 57:3
**officer** 52:13
69:25 70:7
**officers** 109:10
109:13
**oftentimes** 13:23
34:23
**oh** 67:21
**okay** 6:11 7:1,7

25:3 28:19 30:5
31:23 32:11
33:22 34:3 36:1
38:2 39:14
42:13 43:6
49:25 58:23
60:11 62:1
63:17 70:25
79:25 84:8 85:1
89:24 93:7 94:1
110:17 112:8
113:11 115:17
118:18 119:5
121:13 123:15
126:15,22
129:13 130:19
131:23 134:2
**once** 104:5
**ones** 53:2 109:18
**ongoing** 77:20
**oOo--** 134:5
**open** 120:5
**opinion** 98:5
**opposed** 23:23
39:12 49:8
52:12 98:17
**oral** 91:25 95:9
95:13 96:4,8,12
96:23 97:6,9,11
97:20,25 98:9
132:20
**orally** 37:10
50:16
**order** 97:6
**ordinary** 103:23
104:13,19,23
**original** 30:11
54:23,25 55:11
**originally** 48:7
**outcome** 27:8
**outgoing** 67:7
**outside** 18:21
89:6
**outstanding** 66:5
80:11 120:4

Kristin Hendrix - October 27, 2021

121:21 131:19
131:22
**overdue** 60:19
**overhead** 103:24
104:3
**oversaw** 12:22
115:1
**overseeing**
117:14
**owed** 54:23,24
59:18 84:16
108:23
**owing** 123:23
124:1

**P**
**P.M** 1:22 134:4
**PACHULSKI**
2:10
**page** 3:2,8 46:25
78:23 79:4,8
80:22 100:8
119:25 120:15
**paid** 14:6 26:13
39:8 51:25
78:14,14,15,24
79:5,11 80:22
109:6
**paper** 34:25 37:6
45:14,18 49:1,4
49:24 50:22
54:22,25 55:3
55:14 56:13
**papered** 35:14,16
37:16 45:22
46:3,12 50:7
51:7 54:13
55:18 56:10
57:15 58:5
72:21
**papering** 35:17
45:13,25 72:25
**paralegal** 82:17
**paren** 120:5,6
**part** 7:9 16:2

17:9,13 25:17
26:8 27:4 44:8
70:13 97:11
103:5,10
107:15 109:11
120:12 130:23
133:7,11
**participate**
126:15
**particular** 17:13
52:11,13 56:8
81:18 98:19
**parties** 21:12
99:21 135:18
135:21
**Partners** 2:21
94:25
**partnership**
107:25
**pass** 94:14
**passwords** 47:17
**patient** 25:1
**pattern** 38:3
**Paul** 109:16,20
109:21
**pay** 14:19 21:4
21:12,13 22:7
22:13,20 39:2
40:1 68:24
69:20 108:17
108:23 109:3
**payable** 14:8,16
51:24 120:5
**payee** 133:11
**payment** 16:4
32:17 67:17
70:22 72:6
88:13,25 90:8
92:8,11,12,15
92:17 93:9
100:25 101:15
101:24 103:6
103:11,18,20
103:22 104:3,6
105:12,14

106:20 107:4,5
107:7,9 124:21
124:22 125:3
127:15 129:14
129:16
**payments** 13:20
66:23 67:8 71:6
71:10,16 73:3,4
73:9,12,18,25
74:17 76:13
78:17 81:7
98:20,24 99:5
99:10,13,16,20
99:21 100:14
100:17,18,21
100:24 101:3,4
101:7,10,13,19
102:1,8,11,19
102:23 103:2
103:15,24
104:18,20
105:5,9,17,25
106:9,13,25
107:12 126:2
126:24 127:7
127:11,18,23
128:7,12,15,20
128:24 129:7
129:10,19
130:7,14
131:21
**PC** 2:3
**PDF** 30:13,24
58:22
**penalty** 6:17
134:6
**people** 37:22
47:18 61:3
73:16 76:14
**perceived** 120:19
**percent** 49:14
80:12
**performance**
26:16
**period** 14:2 15:6

107:21 108:5
108:16,22
109:1 125:15
135:15
**periodically**
23:18,19
**perjury** 6:17
134:6
**person** 13:18
23:8,18 37:25
38:1 44:11 46:6
131:23 132:3,7
132:13,17,22
133:1,14 135:8
**personal** 10:5
**personally** 23:17
73:13 101:20
101:21 114:24
123:19 130:2
**phone** 38:1 71:5
72:5 74:20,21
75:2,3,5,5,14
75:19 76:15
92:2,3,6 93:15
93:21 94:6 99:4
100:12
**picking** 79:20
**pictures** 47:11
**pieces** 7:14,18
**pile** 58:25 111:7
**pin** 21:18
**pinpoint** 90:21
**pique** 76:6
**place** 135:8
**Plaintiff** 1:7 2:13
**play** 27:3 29:13
114:22 115:6
117:7,10
126:18
**please** 6:24 10:13
10:16 11:8
32:13,15,16
42:11,25 61:20
61:22 62:2 63:3
64:5 66:10

75:20 89:25
122:18
**point** 42:2 44:14
55:2 66:16
69:24 70:6
**policy** 104:9,11
104:15
**pop** 84:5
**portion** 8:9
**position** 9:7 12:8
110:4
**positive** 79:6,11
79:18
**possible** 32:17
36:21 58:15,18
65:1 93:6,19
95:4 109:21
**possibly** 41:20
55:21 58:7 73:8
104:22
**postsecondary**
10:19
**potential** 16:4
68:4,8
**potentially** 25:19
34:19 95:14
97:10
**practice** 17:20
18:11,18,23
34:16,21 48:17
49:7,9 50:20
53:7,12,16,17
**prep** 32:15
**preparation** 7:8
9:13
**prepare** 16:20
45:8 84:18
130:2
**prepared** 16:25
42:12 46:19
54:6 76:12 77:3
84:21 86:15
128:18
**preparing** 95:22
97:17 131:24

Kristin Hendrix - October 27, 2021

prepayments
81:25
presence 25:4
present 9:4,6,12
24:5 45:24
90:15 97:3
presented 116:1
presenting 46:14
97:18
preserve 78:8
pretty 14:11
109:8
previous 100:9
previously 17:24
48:25 131:9
Pricewaterhou...
116:9,12 117:5
117:17 118:2,5
130:20
principal 30:12
78:14,17 79:5
79:11,23 80:10
89:23 121:14
122:10 124:5
124:19 125:3
125:18 130:14
print 56:1
printed 42:8,12
42:24 47:18
55:18,22 56:7
57:4,21,22,24
57:25 58:11,14
58:21,22
printing 55:23,25
printouts 42:21
prior 9:25 10:4
19:17 28:11
35:24 40:25
55:2 65:23
71:25 86:9 96:6
105:3 108:6
124:24 127:19
128:12 133:12
privileged 9:8
95:24

privy 64:9,11
69:19
probably 9:15
17:2 49:14 50:6
58:22 61:9
63:15 99:15
109:8 126:13
proceed 61:20,25
proceeding 46:20
proceedings 95:1
95:3,12
process 31:7
32:16 45:11,12
120:12
produce 78:9
produced 1:18
17:24 33:15
34:1 59:4 67:10
76:20 82:14,19
125:6
product 115:13
production 10:1
33:15
profitability
26:25
program 47:25
programs 47:16
projections 17:18
promised 39:2
promissory 3:10
3:12,17,19,21
3:23 4:12,14
5:3 14:9 15:18
16:10,16,20
17:1,3,6,22
18:13 19:17
27:3 28:13,21
30:11,19 31:1,8
32:21 33:2
35:18 38:11
42:7 43:11,12
45:1,9 47:6
52:10,24 53:1,8
53:25 54:5,12
54:23 55:11

68:5 71:13,19
72:11,12,16
76:13 77:7,10
80:9 81:8 113:6
113:11,12,16
114:2,7,16
116:7,11,15
117:17,22
118:7 119:12
122:11 124:6
prompt 128:14
prompted 83:22
prospect 53:20
provide 7:12
9:19 15:21
30:11 42:21
59:17 63:3 64:5
64:16 119:16
121:25
provided 17:24
33:5,9,10 61:14
70:12 89:17
121:11 122:5
129:11 135:15
provides 120:7
providing 15:10
54:8 65:5
public 16:19
pull 119:14
pulled 49:3
purpose 86:12
125:22
purposes 39:5
98:1 126:23
purview 89:6
put 23:20 84:25
PwC 97:21 98:1
117:22

_____
Q
_____
qualification
16:20
question 7:1
14:10,22 15:25
16:23 18:15

19:12 20:19,24
22:9,22 24:9,16
28:4 29:5,16
34:7 35:11
36:14,23 37:1
38:8 39:18 41:2
41:14 45:4,5
46:5 47:21
48:23 49:11,21
50:5 51:15,21
52:2,4 53:10
54:18 55:6,15
55:20 56:5
58:17 65:17
66:10 69:9
70:16 73:21
74:6 75:8 77:23
80:4,17 82:2
84:14 86:9,19
86:20 87:8,19
88:16 89:3,16
95:10 96:10,19
100:9 102:3
103:14 105:20
106:19 113:9
113:24 124:17
127:8 128:5
questions 6:21,24
7:6 8:6 61:21
95:2 110:16
115:4 133:24
quick 52:5 95:4
107:23
quickly 6:16
109:8
quite 36:21 41:20
104:24
quote 120:3

_____
R
_____
R-o-e-b-e-r 32:10
raise 131:1
raised 95:12
range 89:10
rate 19:7 43:16

49:2 80:12
ratio 107:21
108:5
re-up 86:16
reached 108:5
read 7:9 8:9
32:18 82:21
86:17 119:25
reading 81:9
ready 94:16
real 11:14
really 35:13
67:21
reason 6:23
22:23,25 52:11
52:13 56:1,6,7
72:7 77:3 82:5
82:8 101:13
129:13,16
131:1
recall 7:19 10:8
21:6 34:15,20
36:16 37:2
44:11 46:10
50:14,20 51:17
51:23 52:4
55:25 56:7
59:22,25 60:2,3
60:8,10 63:11
64:1 65:3 66:7
67:3 68:22,25
69:22 72:3 73:1
74:11 83:22
84:4,23,25
86:12 88:17
91:25 92:3 93:5
93:7 102:21
104:21 105:15
107:6 108:25
109:14 112:3
112:13,15,17
116:4,15 118:5
119:5,8,19
120:16 123:4
123:15 127:5

Kristin Hendrix - October 27, 2021

129:25 130:17
131:5 133:10
**recalling** 109:16
**Receivable** 4:19
**receivables**
130:25 131:22
**received** 63:13
64:21 71:5
129:2
**receiving** 32:4
124:23
**recipient** 60:25
**recognize** 44:12
**recollection** 20:2
21:7 38:20
52:21,23 54:14
55:10 64:13
67:12 77:13
100:11 106:24
107:2,8 108:2
121:24 126:9
**reconciling** 13:20
**record** 7:15,16
30:8,9 44:4,6
52:6,7 53:3
56:18 62:19,20
72:10 75:5 78:8
82:19 83:13,14
93:20 94:4,21
98:14 110:18
**recorded** 73:11
81:24
**recording** 73:18
**records** 10:6,6
59:18 62:7 64:5
73:12
**reduced** 135:10
**refer** 99:25
**reference** 71:13
119:1 121:2,6,9
**referenced** 34:5
84:6
**referencing**
33:25 121:10
**referred** 96:2

**referring** 66:25
100:2,5
**reflected** 118:7
123:12
**reflecting** 43:15
**refresh** 9:17 42:1
42:20 69:18
108:1
**regarding** 86:1
90:17 107:12
**regardless** 99:16
**regularly** 23:24
**reinforces** 41:8
**reissue** 21:14
**related** 9:13
21:11 33:1
38:22 57:21
95:9 96:7 98:16
99:21 135:20
**relates** 32:21
64:17
**relation** 115:7
**relieve** 93:10,11
**rely** 42:8
**remember** 19:19
20:14 21:3
28:16 30:25
31:3,4 32:4
41:19 54:7
55:23 61:2,5,8
64:23,25 65:4,8
65:23 66:18
67:20 74:21,24
85:10 86:14
90:5,7,12
100:13,14,16
100:20 106:16
109:15,24
110:3,5,6
**remotely** 6:8
**renewal** 120:12
**reorganized** 25:7
25:15 26:17,24
27:2
**rep** 115:13,19,23

**repaid** 23:10
**repay** 69:6
**repeat** 14:10
22:10 28:15
44:22 66:10
**rephrase** 6:25
**report** 12:25 25:9
25:12 114:25
115:25 117:14
123:6
**reported** 1:23
13:6 36:22
**reporter** 135:1,3
135:15
**reporters** 27:13
**reporting** 12:22
12:23 13:22
**reports** 127:3
**repository** 54:22
55:9
**represent** 27:10
46:25 57:3 83:1
94:24 107:23
**represented** 2:4
2:11,18 93:5
**representing**
42:23
**request** 4:9 60:5
84:22
**requested** 63:3
63:21 64:5,17
84:2 135:13,14
**requesting** 63:25
**requests** 10:1
69:14 115:3
**required** 7:6 21:4
**respect** 26:25
29:20 43:8,17
48:10 51:12
73:3,17 92:13
98:24 106:9,12
112:13 114:22
127:16
**respectfully** 39:5
**respecting** 45:22

**respectively**
113:15
**respond** 122:23
**responded** 65:1
**response** 60:13
120:15,19
122:16,25
**responsibilities**
97:12 103:6,10
**responsibility**
69:7 102:23
105:2
**responsible** 14:5
17:21 31:7
45:18 77:19
97:17 101:25
126:20 131:23
132:3,7,13,17
132:22 133:1
133:15
**responsive** 10:6
**rest** 44:23
**restrictive** 47:17
**restroom** 52:6
93:16
**restructured**
19:21
**retail** 86:15
119:17,24
121:25 122:5,9
122:17 123:1,6
**reveal** 50:11
**review** 8:4 50:11
54:11 119:21
125:10,17
135:13
**reviewed** 9:15,19
**reviewing** 32:24
115:11
**revised** 17:6
**right** 12:6 13:21
14:16 25:7
27:15,20 28:18
35:22 45:9,10
47:19 49:3

56:14 65:6,7
69:16 75:14
80:24 83:17
88:21 91:24
96:9 102:25
111:23 120:20
122:19,20
123:21,24,25
124:2 127:25
130:11,12
131:10
**Roeber** 32:9
112:7
**role** 12:5,18
13:12 29:13
46:8 69:25 70:7
73:3,4,6,17,22
106:12 114:22
115:6,10 117:7
117:10,12
126:18
**roles** 73:6
**roll-up** 72:22
131:9
**rolled** 79:23
131:13
**Romey** 61:15,18
61:25 62:3
**room** 75:15
**roughly** 39:3
**routine** 20:4,21
20:25
**routinely** 21:1
**row** 131:3
**RPR** 1:23
**rude** 25:3
**Rukavina** 2:5 3:3
3:5 6:4 7:4,15
7:17 9:7,10,11
14:15,23,25
16:2,25 18:17
19:14 21:2
22:11,24 24:11
24:18 28:5 30:4
30:10,17,23

Kristin Hendrix - October 27, 2021

31:12,20 34:10
35:16 36:18
38:10 39:22
41:4,17 42:19
43:6 44:4,7
45:5 46:8 47:22
49:6,17,25
50:10 51:6,17
51:24 52:5,8
53:4,15 55:9,23
56:9,19 57:2,20
58:19 59:11
62:19,23 65:20
69:13 70:19
72:15 73:24
74:8 75:9,13
76:19 78:1,7,11
79:8,10,14 80:8
80:19 82:4,21
82:25 83:8,13
83:15 85:24
86:2 87:9 88:6
88:20 89:5,19
90:3 93:23 94:5
94:14,19
110:17,20
113:8,19 114:8
114:17 118:9
118:21 119:3
121:17 122:12
125:7 128:2
130:13 133:25
134:2

**S**

**S-e-e-r-y** 8:8
**Sadly** 94:9
**salaries** 108:17
    108:18,19
**salary** 25:15
**sale** 68:4,8
**save** 55:13 72:19
**saved** 56:11
**saw** 41:8 86:6
    115:12 123:19

125:6 126:12
**saying** 37:19
    41:15 49:23
    53:4 73:8 76:14
    93:19 99:5
    101:9
**says** 32:1,6 34:10
    44:10,13,18
    57:8,22,25
    60:23 63:2 64:4
    78:25 86:23
    87:10 89:9
    120:2,22
**scan** 55:13
**schedule** 76:24
    77:5,6,21 80:20
    82:7 85:3,13,17
    131:20
**scheduled** 16:4,7
**schedules** 77:9
    85:12
**schooling** 10:20
**Scott** 4:3 18:9
    60:4,12,15
    61:10,13 62:1
**Scott's** 60:13
**scratch** 17:3
**search** 10:5
**second** 7:15 44:5
    62:18 78:23
    80:22 99:24
    109:15
**Secondly** 87:16
**section** 80:9 86:1
    118:19
**see** 6:8 8:5,12,14
    23:3 31:5,20
    32:25 35:7
    54:11 57:9,21
    59:7,15,20 60:6
    60:20 61:23
    63:5,9 64:2,7
    78:24 79:14
    80:15,18,24
    81:3 84:11 85:6

86:23 87:1,5
    89:8,11 105:9
    115:11 120:9
    120:22,25
    121:4 126:4
**seeing** 31:4 50:14
    57:14 65:23
    90:12
**seek** 46:20
**seeking** 24:3
**seen** 33:14 65:22
    69:13 72:15
    76:21 88:7
    122:25
**Seery** 4:8 5:1 8:8
    25:12,20 29:24
    59:13 60:18,22
    61:12 62:4,6,9
    63:1,2 64:4
    65:9 67:3,14,17
    67:25 68:13,22
    69:14 88:11,23
    96:25 125:25
    126:13
**Seery's** 8:10,20
**send** 29:14 32:13
    34:24 37:7
    53:21 59:7
    60:11 62:2
    63:17 83:22
**sending** 13:19
    36:3 54:12
    60:17 61:2
    111:19
**senior** 12:8,11,11
    12:12,17
**sense** 44:12 58:1
**sent** 28:22 29:11
    37:17 42:9 83:2
    83:17 92:16,22
    106:20 107:3
    111:21 123:19
    126:11,13
**separate** 18:5
**served** 10:1

**services** 15:11,22
    70:13,13 86:16
    119:17,19
    120:7
**set** 26:10,11,14
    35:15 53:21
**shape** 37:10
**shared** 54:9,16
    55:14 70:13
    77:16 86:16
**shareholders**
    39:2
**sheet** 118:6
    121:11
**sheets** 63:8,22
**short** 74:22 75:17
    75:23 93:15
**shorthand** 1:24
    135:2,7,25
**shortly** 11:11,12
**show** 82:10
**showing** 92:15
    131:21
**sick** 82:17
**sign** 52:20,20
    53:7,20,22 54:3
    104:25 105:1
    113:5,18
    115:13
**signatory** 52:14
**signature** 46:15
    47:1,6,11,18
    49:8,14,15
    114:7,9,15
**signed** 47:9 52:10
    52:11,25 55:4,8
    115:14 131:6
    132:5,9
**signer** 53:13
**significant** 20:20
    51:19,22
**signing** 52:16,24
    53:25
**similar** 32:25
    34:9 38:25

96:10 112:13
**single** 104:2,3
**sitting** 30:25
    33:24 42:1
    50:15 53:23
    54:4 55:24 82:4
    85:16 91:21
    105:16 106:23
**situation** 34:9
**slightly** 96:10
**SMU** 10:23
**so-called** 15:22
**somebody** 35:19
    37:8 53:12,12
    53:19 55:21
    129:3
**soon** 32:17
**sophisticated**
    14:12
**sorry** 11:12 14:24
    19:15 47:8 52:4
    57:21 66:2
    82:23 92:12
    97:3 103:9,23
    109:20
**sort** 25:21 43:23
    96:11 97:24
**sought** 88:24
**sound** 58:15
**sounds** 98:3
**speak** 36:2
**speaking** 13:17
    43:11 44:1
**speakings** 95:21
**specific** 7:19
    21:18 29:7
    34:21 36:4,17
    37:1,14 38:2
    43:10 46:11,22
    47:25 48:11,13
    54:14 71:8
    88:17 90:19
    100:11 101:22
    103:11,18
    105:21 106:24

127:6
**specifically** 21:6
21:10 23:11
29:9 34:15 37:8
49:12 50:12,16
50:19 51:2 52:3
52:19 54:1,7
55:8 64:25 65:3
65:4,8 68:25
69:22 77:14
84:19,21 93:5
98:16 103:2,7
125:13,18
**specifics** 22:4
**speculating** 58:9
**speculation**
106:4
**sphere** 69:6
**spit** 48:1
**spoken** 35:23
61:13
**spreadsheet** 78:9
**spreadsheets**
31:6 77:12
**staff** 48:2
**stake** 27:7
**stamp** 47:19
82:18
**standard** 46:16
50:7 53:6,11,15
53:16 55:3
**standing** 67:2
**STANG** 2:10
**start** 54:19 59:11
95:10 100:11
**started** 11:13,17
20:11 100:10
**starting** 10:19
11:9
**starts** 59:12
**state** 1:23 6:5
10:25 67:25
68:14 76:22
78:16 136:1
**stated** 48:25

135:9
**statement** 99:3
**statements** 4:5
13:20 63:7,8,21
63:22 97:16,17
115:12 116:17
116:21 117:1,5
117:11 119:2
122:4 133:18
133:22
**STATES** 1:1
**status** 66:20
**stay** 26:4
**steps** 92:13
**STINSON** 2:17
**stop** 34:24
**stopped** 23:22
**stored** 56:2
**straightforward**
26:14
**Strasburger**
44:13,16
**Street** 1:25 2:4
**stretch** 109:5
**strike** 7:24 8:4
15:8 38:16
52:22 53:5
68:12 87:9
90:11
**string** 122:19
**stuff** 49:15
**stupid** 86:9
**subject** 16:5
119:20,20
132:19
**subparts** 86:20
**Subscribed** 134:7
**subsequent** 14:7
59:25 61:12
64:10 95:13
96:22 105:12
116:13 118:3
118:19
**subsequently**
32:11

**sued** 28:21
**suggest** 124:14
**suing** 28:5
**Suite** 2:4,17
136:2
**summarize** 72:19
**summary** 7:12
8:14
**summer** 123:16
124:18
**supervision**
135:11
**supplementally**
9:19
**supposed** 98:20
**sure** 6:12,15
10:21 11:4,11
12:20 13:20
14:11 18:22
19:23 22:11
26:7 28:16 31:2
33:10,21,22
37:5 42:3,22
43:20 52:25
58:18 60:16
62:1,19 63:17
65:4 66:11
75:21 76:11,11
84:15 99:3
100:7 101:1
107:18 109:22
115:16 125:24
126:23 130:23
130:24
**Surgent** 29:24
**surprise** 76:1,3
**surprised** 94:11
**surprises** 40:8
76:2
**suspect** 23:15
**switch** 58:24
**sworn** 1:19 6:2
135:4
**synopsis** 7:12
8:14

**system** 56:12
77:16 84:20

———————
**T**
**T-h-e-d-f-o-r-d's**
86:22
**take** 25:14 30:8
38:11 45:5 52:5
52:20 72:15
75:17 76:15
82:12 87:10
89:13 92:13
104:1 110:14
**taken** 1:20 16:15
17:6 45:8 135:7
**talk** 7:21,24 8:1
8:17,20,23,25
28:10 34:21
44:9 66:11,15
78:1
**talked** 9:12 97:4
99:8
**talking** 8:19,22
29:1 64:11
101:2 116:8
121:15,23
125:13
**taxes** 14:9
**team** 13:19 17:25
18:21 26:4 31:6
39:15 49:15,18
50:24 51:7
64:16 97:16
102:4 104:11
106:15 115:2
**telephone** 23:17
74:11 75:23,25
**tell** 34:13,16,24
44:2 53:1 54:1
54:2 55:7 60:14
63:24 71:23
74:19,23 79:22
79:24 84:3
91:11,15,18
93:24 99:2

100:12 106:14
107:1 109:22
110:8 112:8,25
113:4,17 114:1
114:6,14
116:20,23,24
117:21 118:25
119:6,11 122:4
122:8 123:2,8
123:11 130:22
131:24 132:4,8
132:11,14,18
132:23 133:2
135:4
**telling** 35:25
37:11 53:24
100:13,21
105:22 115:24
**template** 18:20
18:24 43:14,18
45:8 46:17 58:4
58:6,12
**templates** 43:12
50:9
**term** 17:2 66:9
66:16 67:8,13
73:10 76:24
77:10 98:17,25
100:4 107:20
107:24 125:19
126:2 127:12
127:16,24
128:8,21 130:7
131:5,8,14
**terminology**
27:14
**TerreStar** 38:22
**test** 20:9
**testified** 6:2 45:7
72:18 112:12
113:13 127:22
129:22
**testify** 83:10,12
**testifying** 6:16
**testimony** 19:8

Kristin Hendrix - October 27, 2021

20:1,15 26:23
41:2 51:11
56:10 99:9
135:9
**Texas** 1:2,23,25
10:15,22,25
11:13 134:8
136:1
**thank** 79:13 94:2
94:11,15 111:4
128:3 134:2
**Thedford** 4:22
120:2 122:22
**Thedford's** 86:21
120:15 123:5
**thereto** 135:21
**thing** 20:20 30:18
34:4 56:22 58:3
94:20 126:21
**things** 12:21
18:24 19:2,9
37:21,24 74:18
87:13 100:10
**think** 20:6 22:11
22:24 24:1,18
24:21 25:13
32:2 33:9 41:4
41:25 42:3
44:13,25 45:1
45:19,19,21,21
46:2 49:16 50:8
51:6 58:3 59:2
61:8,16 64:21
66:1 69:2 72:18
75:22 79:19
80:8 87:12 88:9
88:23 102:22
104:12 109:7
127:22 129:23
**Third** 2:10
**thought** 75:22
130:25
**three** 87:15
125:19 127:24
128:7,8,21

130:7 131:5
**Tim** 109:20,23
**time** 9:1,6 11:17
14:19,19 17:12
20:10 22:5,5,12
22:12 23:12
31:5 32:9 33:8
35:6 44:15
45:19 49:14
51:10,18 55:1
64:2 65:10
66:16,19 67:11
69:7,11,24 70:6
72:19 73:16
75:6 77:24 78:4
80:10,10 81:19
82:12 84:4
86:14 90:11
93:8,24 103:16
104:2 108:6,16
108:21,22
109:1 112:25
113:1,4,5,17
114:1,14
116:20,25
123:4,8,11
125:14 128:12
130:20 131:25
132:4,8,11,14
132:18,23
133:2 135:8
**timely** 128:24
129:6
**times** 9:12 29:2
51:4 109:4
**title** 12:13,14
13:2 46:11
69:25 70:7
**today** 8:23 11:23
13:10 25:6 28:2
30:25 32:16
33:24 41:19,23
42:1 50:15
53:23 54:4
55:24 65:5,8,23

82:4 83:2 85:16
90:13 91:21
94:12 95:1,22
105:16 106:23
121:23
**today's** 9:14
**told** 34:12 35:15
35:19,22 36:19
36:24 37:5,8
38:5,11,17
40:22 41:11,18
41:20 60:8 91:9
91:22 103:2,7
104:10,18
106:21,25
**top** 80:25
**topic** 88:19 92:5
95:8 96:11
109:7 130:19
**topics** 98:12
107:18
**total** 78:14,18
79:22 80:22
**track** 29:1
**tracking** 31:6
111:19
**training** 16:13
**transaction**
112:10,14,22
**transactions** 37:4
119:7
**transcript** 7:9
135:13
**transfer** 40:14
81:15 91:3,7,9
91:13,22 92:20
92:20 111:14
**transferred**
38:18 39:23
90:23 111:10
**transferring**
81:22
**transfers** 35:8
37:12 38:5
40:24

treasury 12:20
13:14,15 14:1
15:22 17:17
**trigger** 107:21
108:5
**triggers** 26:11
**trouble** 42:10
43:1
**true** 42:25 134:7
**trusted** 50:8
**truth** 135:5,5,5
**try** 10:5 20:10
95:2,3 105:8
**trying** 21:18
23:20 84:5
**turning** 19:22
**two** 24:4 27:25
29:18 30:1 31:1
37:18 38:4,21
42:7 43:8 46:22
52:16 53:25
54:5 57:7,14
70:13 73:16
86:20 106:9
109:14,18,24
110:6 113:12
116:7,11,25
117:17 118:7
121:15,22
122:10 123:13
124:6
**TX** 2:4,18 136:2
**typewriting**
135:10
**typical** 18:18,23
23:25
**typically** 21:10
35:1,5,6,12
47:7 52:19 54:2
101:1
**typo** 87:12

_____
**U**
**Uh-huh** 27:16
33:12 47:3

**umbrella** 13:25
99:23
**unable** 108:17
109:2
**underlying**
131:20
**understand** 6:16
6:20,21,24 10:9
15:3 26:7 27:10
33:22 39:14
41:22 56:16
58:8 84:14 95:5
119:16,23
122:21 125:8
125:15 128:5
**understanding**
13:3,5 25:1
27:5,25 43:24
44:20 50:22
57:23 62:5
63:20 70:21,25
71:3 78:22
79:17,25 81:6
89:20 98:23
115:9,22 126:5
128:19 131:16
133:14
**understood** 7:1
39:11
**unfortunately**
42:4
**unilaterally**
110:22
**UNITED** 1:1
**University** 10:21
**unpaid** 80:9
**upcoming** 67:16
72:6 73:3 74:1
126:1
**update** 43:11
45:1 58:7 77:20
**updated** 43:18
**updating** 17:23
18:23 19:1,3,25
50:8

Kristin Hendrix - October 27, 2021

**use** 21:17 45:12
  47:19 48:12
  49:18 59:1 79:1
  100:4
**usually** 24:5

---

**V**

**Vaguely** 63:12
**valid** 131:25
**valuation** 39:15
**various** 14:15
  15:11 59:13
**verbatim** 27:14
  78:25 85:20
  86:22
**verification** 50:3
**version** 30:13
  42:7
**versions** 30:24
**video** 8:5,12 59:6
  62:16 85:24
**videoconference**
  1:19 2:19
**view** 41:9
**volume** 94:19
**vs** 1:8

---

**W**

**wait** 44:23
**walk** 10:18 11:8
**walking** 54:7
**want** 28:10 47:15
  58:25 86:18
  95:8 100:7
**wanted** 52:19
  54:2,9 60:12,14
  82:17 84:7
  102:11 105:9
**wanting** 65:10
**wasn't** 108:23
  114:6,15 127:7
  129:14
**Waterhouse** 4:21
  7:10,21 13:7,8
  23:13,22,23

24:6 29:23
34:19 35:24
36:2 37:3,5,9
38:5 47:24 49:7
50:12,16 52:10
52:23 53:24
54:5,13 60:11
62:10 63:1,18
64:3 67:3 71:5
72:1 73:8 74:13
75:20 83:19
84:1 90:4,7,16
91:10,22 93:9
99:5,18 102:16
103:8,12,19
106:14 112:6,8
112:21,25
113:4,17,22,25
114:5,6,13
115:6 116:19
116:23 117:20
118:24 122:3,7
122:22 124:8
124:10,13,16
124:24 125:25
126:6,24 127:3
127:9,19 128:9
128:14,18,19
129:23 130:4
130:11
**Waterhouse's**
  8:1,6 47:1,6
  48:11 75:25
  115:10
**way** 11:18 12:23
  14:8 21:15
  35:13,15 37:8
  37:10,16 56:12
  58:20 60:19
  76:1 81:12 83:3
  92:25 93:10
  101:21 122:5
  135:19
**ways** 6:7 54:19
**we'll** 9:10 15:9

17:5 44:8,23
66:11,15 75:17
82:18 94:3
**we're** 6:7 27:22
28:16 29:1 30:6
35:19 50:22
58:9,24 59:2,3
76:11,11 85:20
93:22 100:7
104:3 116:8
125:13
**we've** 9:11 28:8
50:7 56:21,22
69:16 88:9
114:2 117:18
121:23
**website** 49:3
**week** 8:2,10 9:2
9:22,25 10:5
13:22 28:9,17
29:18 60:22
61:6 67:6 86:1
95:19
**weekly** 66:21,25
67:2
**welcome** 59:1
86:17
**went** 9:15 10:22
10:23 24:19,22
49:23 112:17
115:4
**weren't** 19:25
28:23 40:7,9
64:12 96:7
98:21,24 99:20
100:24 101:13
105:22 106:3
131:1
**wire** 34:25
106:15 107:3
**withdrawn**
113:23 117:25
120:3 124:9,21
126:6,7 127:7,9
129:15 132:12

133:9
**withholding**
116:3
**within-entitled**
135:6
**witness** 1:19 16:1
16:24 18:16
19:13 20:25
22:10,23 24:10
24:17 30:3
31:11 34:8
35:12 36:15
38:9 39:19 41:3
41:15 46:6
48:24 49:12,22
50:6 51:5,16,22
52:3 53:11 55:7
55:21 56:6
57:18 58:18
69:10 70:17
73:22 74:7
75:12 77:24
80:5,18 82:3
83:10,12 88:17
89:4,17 94:14
96:20 102:4
103:15 105:21
106:7,20
113:21 114:12
114:18 118:11
119:4 121:18
122:14 135:3
135:10
**word** 42:6,6 43:7
43:8 45:11 47:2
77:13
**words** 21:5 23:20
68:14
**work** 11:8 52:4
98:2 126:22
**worked** 11:16,18
36:6 61:19
110:5
**works** 35:1
**world** 113:25

114:5,14
116:24 117:21
118:24 119:6
119:11 122:3,8
124:17
**wouldn't** 36:22
37:6 53:22
**wrap-up** 110:16
**write** 60:4
**writes** 60:18,22
61:13,20
**writing** 37:10
41:14 64:3
114:25 117:14
**written** 80:7
82:19 91:25
99:7 104:12,15
**wrong** 57:5 87:13
99:7
**wrongly** 123:12
**www.dickman...**
136:4

---

**X**

---

**Y**

**yeah** 7:2 14:13
21:10 34:9
44:23 51:9
80:18 93:17
**year** 12:2 20:10
26:14 78:1,5
81:6 104:5
127:15 128:21
128:25 129:7
129:14 130:8
131:21
**years** 11:15,18
12:9 18:20 21:9
22:25 23:9 36:7
37:18 40:25
51:7 52:4
104:21,22
108:15 109:17
110:8,10,12

Kristin Hendrix - October 27, 2021

131:3 133:5,12
**Yep** 76:9 123:17
**yesterday** 9:2
   86:7,9
**York** 2:11

---

**Z**

**zeros** 87:15
**ZIEHL** 2:10
**Zoom** 6:8,10

---

**0**

**05.02.2019** 4:1
**05.03.2019** 3:25

---

**1**

**1** 3:10 30:14,15
   30:18 33:1 71:4
   71:25 72:4
   74:10 80:9
   93:21 129:24
   135:22
**1-31-23** 136:4
**1.3** 81:1,2
**1.4** 90:23 91:3,23
**1:19** 1:22 134:4
**10** 4:3 9:23,25
   10:5 28:17 59:4
   59:9 110:12
**10,530,000** 87:20
**10.5** 85:6,9
   124:11
**10:11** 1:22
**10017-2024** 2:11
**101** 136:2
**11** 4:7 62:14,21
   62:23
**11:27** 57:22
**110** 3:5
**111** 3:6
**12** 4:11 5:5 65:13
   65:18,21 90:5,7
   90:17
**12,286** 87:10,10
**12,286,000** 87:6
   87:16,20,24

**12.3** 120:24
   121:13 123:5,9
**12/30/29** 78:25
**13** 4:14 72:11,13
   72:16
**13-week** 67:5
   125:7,10,14,23
   126:16,19
   128:17 130:3,6
**14** 4:17 22:25
   23:9 36:7 40:25
   76:10,17,19
   82:6 85:17
   90:22 91:4 93:8
**14-year** 38:3
**15** 4:19 36:7 83:1
   83:4,15,17 84:8
   84:14,18,19
   85:7 87:21
   89:21,22
   123:16,22
   124:5 133:5
**15(c)** 4:22 86:1
   121:11
**16** 4:21 85:21,22
   85:25 86:3
   119:15,23
**17** 5:1 11:15 52:4
   88:2,4,7
**18** 5:5 89:25 90:1
   90:3
**19** 59:12
**1982** 10:17

---

**2**

**2** 3:12,12,14,19
   3:23 4:3 30:19
   30:20,21 31:16
   32:21 34:14
   37:11 41:11,18
   44:19 56:22
   57:22 58:11
   60:25 61:6,12
   79:8 119:25
**2.1** 81:1

**2.4** 30:20 32:13
   32:21 33:19
   37:12 38:22
   39:7 42:16 43:3
   58:5,11 111:10
   113:14
**2.4-** 110:22
**2.4M** 3:12,19,23
**2000** 86:22
**2001** 127:23
**2004** 10:21 11:12
**2005** 11:11 20:16
   21:2,9,19
**2009** 10:23
**2014** 133:12
**2015** 10:24
**2017** 12:15 19:23
   73:2 74:7 131:6
   131:12
**2018** 116:4,16
   117:1,11,23
   118:3,11,14,18
   119:1 128:25
**2019** 3:14 12:10
   12:17,19,25
   13:8,14 17:9,12
   17:20 18:2,8,10
   18:10 19:15
   20:2,2 21:2,9
   21:19 23:16,16
   24:12,14 30:20
   31:17 34:14
   37:11 38:17,21
   39:6,14 40:3,5
   41:11,18 44:25
   45:14 46:9,12
   46:19 47:12,24
   48:21 49:6,19
   50:2 53:5,6
   54:21 55:3,10
   56:9,20 57:22
   74:7 78:5 80:23
   81:6,18 110:21
   111:1 112:9,21
   114:1 116:5

117:18 118:16
   129:8
**2020** 4:4,11,22
   12:7 14:2,5
   15:6,10,21 16:3
   24:22 59:12
   62:6,10 65:14
   66:3,7,18,19
   67:13,17,20
   68:1,8,14,21
   70:23 71:4 74:8
   75:19 76:4 78:2
   79:10 83:18
   86:25 87:6
   88:12 93:21
   98:21,25
   100:25 101:11
   101:19 102:7,8
   102:20 103:21
   105:4,18
   120:23 122:17
   122:19 124:18
   125:14,20
   126:9 127:6
   128:20 129:14
   129:17
**2021** 1:15,21 4:8
   5:2,6 24:24
   26:4 28:20
   29:11 62:25
   64:15 71:25
   73:3 88:2 90:5
   90:17 94:10
   106:10,25
   128:2,8,15
   134:9 135:22
**21-03004-sgj** 1:8
**214** 136:3
**23** 85:1 87:3
**23,846,000** 84:9
**24,471,000** 89:9
**25** 61:6
**26** 10:17
**27** 1:15,21
**28** 125:20

**29** 83:18 84:1
**2nd** 58:5 111:9

---

**3**

**3** 3:10,14,17,21
   4:11 31:15,18
   34:4,11 35:21
   36:20 37:11,19
   38:12 41:11,18
   44:18 56:20
   65:14 66:3
   111:7 112:21
   119:7
**30** 3:10,12 71:4
   72:4 74:10
   86:25 87:6
   93:21 120:23
   129:24
**30-year** 19:22
**30,746,812.33**
   4:14
**30.7** 66:9,13
**30.7M** 4:17
**31** 3:14 4:15
   67:16 70:22
   79:10 88:12
   98:21,25
   100:25 101:11
   101:19 102:8
   102:19 103:21
   105:3,18 131:6
**3102** 2:17
**312** 136:1
**34th** 2:11
**3800** 2:4
**38th** 1:25

---

**4**

**4** 3:17 42:15,17
   42:19 43:6,18
   43:18 44:21,24
   45:22,25 46:3
   46:19 48:11,19
   50:13,17 51:2
   52:8 55:17,24

Kristin Hendrix - October 27, 2021

57:16
**42** 3:17,19
**4228** 136:2
**43** 3:21,23
**445-9548** 136:3

---
**5**
---
**5** 3:19 30:12 33:1
33:20,25 34:5
35:3 36:25
37:12 38:25
39:3,8 42:15,16
42:17,20 43:2,6
43:18,19 44:21
44:24 45:22,25
46:3,19 48:11
48:19 50:13,18
51:2 52:9 55:17
55:24 57:16
58:13,13 94:9
112:14 113:14
**5-** 33:19
**5.0** 110:23
**5/31/2020** 79:5
**500** 1:24 2:3
**530,000** 78:25
**56** 3:25 4:1
**575-** 79:23
**575,000** 79:12
**575,550** 79:6
**59** 4:3
**5M** 3:10,17,21

---
**6**
---
**6** 3:3,21 4:8,22
43:2,4,21 44:9
44:18 62:25
64:15 80:12
86:22
**6/30** 86:23 121:3
121:6,11,25
122:8
**62** 4:7
**65** 4:11
**683** 87:3

---
**7**
---
**7** 3:23 5:2 43:2,4
44:9,19 88:2,21
**7.4** 38:18 39:11
39:23 40:15,21
122:10 123:12
**72** 4:14
**75201** 2:4
**75206** 136:2
**75219** 2:18
**76** 4:17
**777** 2:17
**780** 2:10

---
**8**
---
**8** 3:25 56:19,24
56:25 58:10
89:9
**800** 136:3
**83** 4:19
**85** 4:21
**855-5100** 136:3
**88** 5:1
**881** 120:1

---
**9**
---
**9** 4:1 56:21,24,25
58:10
**90** 5:5
**94** 3:4
**99** 49:14

# EXHIBIT 195

**1**

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
 2           FOR THE NORTHERN DISTRICT OF TEXAS
 3                     DALLAS DIVISION
 4                       --o0o--
 5
 6 HIGHLAND CAPITAL MANAGEMENT,    )
   L.P.,                          )
 7                                )
                                  )
                 Plaintiff,       )
 8                                )
           vs.                    )  No. 21-03004-sgj
 9                                )
   HIGHLAND CAPITAL MANAGEMENT FUND )
10 ADVISORS, L.P.,                )
                                  )
11            Defendants.         )
12 _____
13                   DEPOSITION OF
14                    DAVID KLOS
15                 October 27, 2021
16 _____
17
18         DEPOSITION OF DAVID KLOS, produced as a
19 witness, duly sworn by me via videoconference at the
20 instance of the DEFENDANTS, was taken in the
21 above-styled and numbered cause on October 27, 2021,
22 from 2:30 P.M. to 5:14 P.M., before BRANDON D. COMBS,
23 CSR, RPR, in and for the State of Texas, reported by
24 computerized machine shorthand, at 500 North Akard
25 Street, 38th Floor, Dallas, Texas.
```

**2**

```
 1                    APPEARANCES
 2
 3         MUNSCH, HARDT, KOPF & HARR, PC, 500 North
 4 Akard Street, Suite 3800, Dallas, TX 75201, represented
 5 by DAVOR RUKAVINA, Attorney at Law, appeared via
 6 videoconference as counsel on behalf of the Defendants.
 7         Email: drukavina@munsch.com
 8
 9
10         PACHULSKI, STANG, ZIEHL & JONES, 780 Third
11 Avenue, 34th Floor, New York, NY 10017-2024, represented
12 by JOHN A. MORRIS, Attorney at Law, appeared via
13 videoconference as counsel on behalf of the Plaintiff.
14         Email: jmorris@pszjlaw.com
15
16
17         STINSON, LLP, 3102 Oak Lawn Avenue, Suite 777,
18 Dallas, TX 75219, represented by MICHAEL AIGEN, Attorney
19 at Law, appeared via videoconference as counsel on
20 behalf of the Defendants Jim Dondero, HCMS and HCRE
21 Partners.
22         Email: michael.aigen@stinson.com
23
24
25
```

**3**

```
 1                       INDEX
 2                                              PAGE
 3 Examination by MR. RUKAVINA                    4
 4 Examination by MR. AIGEN                      95
 5 Examination by MR. MORRIS                    109
 6 Further Examination by MR. RUKAVINA          127
 7
 8
 9
10       (No exhibits marked.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1              DAVID KLOS,
 2 having been first duly sworn, testified as follows:
 3                 EXAMINATION
 4      Q.  (BY MR. RUKAVINA)  Sir, state your name for
 5 the record, please.
 6      A.  David Klos.
 7      Q.  K-l-o-s?
 8      A.  K-l-o-s.
 9      Q.  What's your date of birth?
10      A.  May 6, 1982.
11      Q.  And where do you live?
12      A.  I live in Dallas.
13      Q.  What's your educational background?
14      A.  Undergraduate and graduate degrees.  I went
15 to undergrad at Boston College, graduate school at SMU,
16 with a degree in, Master's of Science in accounting and
17 MBA from SMU.
18      Q.  Do you hold any professional licenses?
19      A.  CPA in the state of Texas and, I don't know
20 if it's technically a license, but Series 27 from
21 FINRA.
22      Q.  And when did you get your CPA license?
23      A.  I don't recall specifically, but it would
24 have been probably in the '08, '09 time frame.
25      Q.  Is it current?
```

David Klos - October 27, 2021

**5**

1    A.  As far as I know.
2    Q.  Have you ever been disciplined or threatened
3  with disciplinary proceedings?
4    A.  No.
5    Q.  And your relevant work experience, please,
6  starting with college and afterwards?
7    A.  Sure.  Out of grad school I started working
8  at Deloitte in Boston.  I worked at Deloitte for
9  approximately three and a half years, between the
10  Boston office and the Dallas office.
11      And then I began working at Highland Capital
12  Management in March of 2009 and I've been at Highland
13  since then.
14    Q.  And when you joined Highland in March of
15  2009, what was your title or your role at that time?
16    A.  My title, if I remember correctly, was
17  valuation senior analyst.  I'm not certain if that was
18  exactly it, but it was something along those lines.
19    Q.  Was it in the valuation group?
20    A.  Yes.
21    Q.  And then give me your -- today you're the CFO
22  of Highland; correct?
23    A.  Correct.
24    Q.  So give me the progression from valuation
25  analyst to CFO with, to the best of your recollection,

**6**

1  the approximate year that you were promoted, et cetera?
2    A.  Sure.  I was in the valuation role from
3  basically March of 2009 to end of 2009.
4      I was then brought over to what we call the
5  corporate accounting team, so doing the accounting for
6  Highland Capital Management, LP and of the other
7  advisor-type entities, where I was primarily focused on
8  budgeting and forecasting, credit facility compliance.
9      That took from roughly 2010 until I think
10  middle of 2011, at which point I was moved over to the
11  fund accounting group, so doing hedge fund accounting,
12  which was a short role, really, for probably three or
13  four months.
14      At which point I was brought back to the
15  corporate team and also put in charge of the valuation
16  group.  I held that role in some way, shape, or form
17  more or less continuously for the next several years,
18  although certainly my role evolved and changed.
19      But in terms of the groups that I had
20  oversight over, those were the groups.  Like I said, my
21  role definitely evolved over time from 2011.
22    Q.  So by 2017 what was your title?
23    A.  So, yeah, by that time, I was, I believe,
24  controller.  I might have still been assistant
25  controller.

**7**

1      There were a few title changes in between
2  there.  I think at one point I was manager, at one
3  point I was senior manager, at one point I was
4  assistant controller and at one point I was controller.
5      I can't remember the exact times of all of
6  those break points.
7    Q.  Let me pause you.  When you were assistant
8  controller, who was the controller?
9    A.  There was quite a bit of time where I was
10  assistant controller and we didn't have a controller.
11  I couldn't tell you the exact time frame, but there was
12  definitely an extended time frame.
13      And then in April of 2020, our existing chief
14  accounting officer left and I assumed his
15  responsibilities at that time.
16    Q.  Let me pause you.  That's a new term for me.
17  Chief accounting officer?
18    A.  Uh-huh.
19    Q.  Who was that person?
20    A.  The person that left?
21    Q.  The person that was the chief accounting
22  officer until April 2020.
23    A.  Cliff Stoops.
24    Q.  And do you have any idea or knowledge whether
25  at Highland that was like an officer-level position?

**8**

1    A.  It was not.  It was more of a term of art, I
2  would describe it.  So it -- so, yeah --
3    Q.  To the best of your recollection, when did
4  you become the controller at Highland Capital
5  Management, LP?
6    A.  I couldn't pin down a specific date.  Like I
7  said, the responsibilities were very similar.  I would
8  guess the change from assistant controller to
9  controller was probably in the, most likely in the '16,
10  '17, maybe '18 time frame.
11    Q.  Can we agree that as of May 1, 2019, you were
12  the controller at Highland?
13    A.  Yes.
14    Q.  So let's focus on that time frame, May 2019,
15  and you're the controller.  Who do you report to at
16  Highland?
17    A.  Frank Waterhouse.
18    Q.  The CFO?
19    A.  Correct.
20    Q.  No one in between you and him?
21    A.  Correct.
22    Q.  So what -- explain to me the role between the
23  chief accounting officer and the chief financial
24  officer in that time frame, '19, '20?
25      MR. MORRIS:  Objection to the form of the

David Klos - October 27, 2021

**9**

1  question.
2      THE WITNESS: Very little. Like I said,
3  chief accounting officer was more of a term of art.
4  What that role actually had oversight of was our retail
5  fund accounting, institutional fund accounting,
6  operations, so loan settlement and treasury.
7      And probably another department or two that
8  I'm forgetting, but it did not have any oversight over
9  the corporate accounting group.
10      Q. (BY MR. RUKAVINA) And in May of 2019, as the
11  controller, what were -- what was your role or what
12  were your duties?
13      A. In May of 2019 I was at that point still
14  overseeing the valuation group. I was overseeing the
15  corporate accounting group, which my primary direct
16  report there was Kristin Hendrix, who really was the
17  day-to-day person. But I certainly oversaw her.
18      Q. By that you mean the person that answers to
19  you?
20      A. Correct. Sorry. If I flipped that, I
21  apologize. So I was overseeing that group, which had,
22  you know, fairly broad responsibilities.
23      In terms of, you know, accounting for the
24  Advisor, doing forecasts when they were called for,
25  performing the audit every year, managing cash,

**10**

1  processing payroll, things of that nature.
2      And then at that time I was also put in
3  charge of one of the public REITs that was launching at
4  the time under the NexPoint flag. And getting that
5  team started.
6      Q. Did you mention that in May of 2019 you were
7  still involved with the valuation group?
8      A. I did.
9      Q. Did you have a title at the valuation group?
10      A. Nothing distinct from my overall controller
11  title. These titles were often, like I said, terms of
12  art, whether it was controller or chief accounting
13  officer.
14      Q. What did the valuation group at Highland do?
15      A. Well, valuation group was really a liaison
16  with both third-party pricing providers, pricing
17  services, brokers on the street, front office, members
18  at Highland.
19      To, you know, to work on valuing the
20  securities held across the platform, both for Highland
21  HCMLP managed funds as well as affiliated managed
22  funds.
23      Q. So who did -- did you report to anyone at the
24  valuation group? In other words, did it have its own
25  separate hierarchy kind of?

**11**

1      A. Frank Waterhouse.
2      Q. And were --
3      A. I should clarify too, that the valuation team
4  isn't ultimately responsible for the valuations
5  themselves, but they do act in this liaison role.
6      Q. Perhaps that's my confusion. Is there a
7  separate group that handles just valuation?
8      A. No.
9      Q. Is there an outside consultancy that handled
10  that in May of 2019?
11      A. I don't know if I would call it consultancy,
12  but there was a third-party valuation service provider
13  that would do certain of the, call it illiquid, harder
14  to value securities.
15      Q. So would you say that you were pretty busy in
16  April, May 2019?
17      MR. MORRIS: Objection to the form of the
18  question.
19      THE WITNESS: I've been busy throughout my
20  career.
21      Q. (BY MR. RUKAVINA) In April, May, June 2019,
22  how many hours a month do you estimate you worked for
23  Highland?
24      MR. MORRIS: Objection to the form of the
25  question.

**12**

1      THE WITNESS: I don't remember. A
2  significant number.
3      Q. (BY MR. RUKAVINA) Certainly full-time?
4      A. Absolutely.
5      Q. Would you say that you were working more than
6  200 hours a month in that time frame for Highland?
7      A. I don't know how many hours. I should
8  clarify, we're using Highland very liberally. When I
9  say Highland, supporting the entire apparatus,
10  platform. Significant number of hours at that time,
11  and before and after.
12      Q. And let's explore that a little bit. You
13  mentioned one of the funds for NexPoint. I'd like to
14  talk about NexPoint Advisors, LP, just NexPoint
15  Advisors, LP.
16      Did you ever have an official role or title
17  with NexPoint Advisors, LP?
18      A. Not that I can remember.
19      Q. Do you know if you were ever the controller
20  for that entity?
21      A. I'm not certain. I'm not certain.
22      Q. But I take it that pursuant to the shared
23  services agreement you, as an employee of Highland,
24  were providing services on behalf of NexPoint?
25      MR. MORRIS: Objection to the form of the

David Klos - October 27, 2021

---

**13**

1  question.
2       THE WITNESS:  I provided many of the same
3  services for NexPoint Advisors that I provided for
4  Highland, similar types of services.
5       Q.  (BY MR. RUKAVINA)  And briefly about Highland
6  Capital Management Fund Advisors, LP, HCMFA, did you
7  ever have like an official title or role with that
8  entity, to your knowledge?
9       A.  Again, not that I can remember.
10      Q.  Not to your knowledge, the controller ever of
11  that entity?
12      A.  I'm not certain whether I was or not.
13      Q.  But you provided services to that entity as
14  part of your role at Highland pursuant to shared
15  services?
16      A.  Similar to NexPoint as I described.
17      Q.  When you were controller of Highland, was
18  that an officer-level position at Highland?
19      A.  No.
20      Q.  When did you become the chief financial
21  officer of Highland?
22      A.  Chief financial officer?
23      Q.  Uh-huh.
24      A.  2021, March.
25      Q.  After Mr. Waterhouse was gone?

---

**14**

1       A.  Yes.
2       Q.  And I'm going to ask you a little bit about
3  your compensation today at Highland.
4       You don't have to give me specific numbers
5  unless I ask you, please, but I take it you have a base
6  compensation?
7       A.  Yes, I have a base.
8       Q.  Do you have any bonus structure compensation?
9       A.  Yes, I have a bonus.
10      Q.  And what is that bonus number or whether it's
11  paid out based upon or contingent upon?
12      MR. MORRIS:  Objection to the form of the
13  question.
14      THE WITNESS:  As I understand, it's based on
15  my offer letter.
16      Q.  (BY MR. RUKAVINA)  On your what?
17      A.  My letter for extending an offer.
18      Q.  Tell me, what is your -- without having to
19  use express numbers, what is your bonus compensation?
20  When is it paid, et cetera?
21      A.  Yeah, so it's not too dissimilar from the
22  prior Highland plan that has semiannual installments
23  payable.  And then there's a, kind of an end of plan
24  bonus when -- I don't remember the specifics on exactly
25  what triggers that, but it's back-ended in the plan.

---

**15**

1       Q.  Do you have an expectation as to when the
2  winding down and monetization of Highland and its
3  assets will be complete?
4       A.  That's very hard to speculate, especially
5  given the amount of litigation that's going on because
6  I don't know when that's going to play out and that's a
7  material asset.
8       Q.  Have you discussed with Mr. Seery how long
9  that might be?
10      A.  Not that I can specifically remember.
11      Q.  Do you believe it will be at least probably
12  two years, from today?
13      A.  I don't know.
14      Q.  This bonus compensation, does it or any
15  amount of it depend on how well Highland or the
16  claimant trust, how well they do vis-a-vis collecting
17  money from creditors?
18      A.  Not that I can think of.  I'd have to
19  probably go back and look and understand the back-end
20  piece to say definitively.
21      Q.  And back-end piece, does that mean whenever
22  the winding down is completed?
23      A.  Yeah, like I said, I'm not exactly -- I'm not
24  completely facile with the exact timing, if it's
25  completed 100 percent or 80 percent, what kind of

---

**16**

1  qualitative considerations go into that.  But
2  substantially completed.
3       Q.  Sitting here today, do you think or believe
4  that any portion of your compensation over the next
5  however long it takes to wind down Highland depends on
6  how much Highland recovers from the litigation
7  regarding promissory notes?
8       A.  I really take exception to that question
9  because the insinuation is that it's going to somehow
10  change my answers here, and it's absolutely not.
11      How litigation, it may or may not affect my
12  ultimate compensation, but that's not going to affect
13  one iota of the answers I give you today or at any
14  time, whether I'm on or off the record.
15      Q.  Fair enough.  So you're going to testify
16  today truthfully regardless of your compensation.  I
17  got you; right?  Correct?
18      A.  I didn't follow what you just asked me.
19      Q.  You're going to testify today truthfully
20  regardless of how these events may or may not affect
21  your compensation; right?
22      A.  It's such a loaded question I can't even
23  begin to answer that.
24      Q.  So sitting here today -- I want to ask you
25  the same question I did before, and your answer to me

---

David Klos - October 27, 2021

**17**

1  was that you took exception to the insinuation.  Now
2  I'd like you to answer my question.
3        Which is, sitting here today, do you believe
4  that any part of your compensation in the future,
5  however long it takes to wind down Highland, is going
6  to depend on how well Highland does in these
7  litigations concerning the notes?
8        A.  I believe my ultimate compensation will
9  depend on how long this process takes, which I don't
10  know, and ultimate recoveries to trust beneficiaries
11  under the plan.
12        And so I do expect that it will vary, but I
13  would reiterate my earlier comment.
14        Q.  So sitting here today, you understand that if
15  the trust beneficiaries recover more, then you might be
16  compensated more?
17        A.  That's possible.
18        Q.  Well, sir, I'm not trying to be a smart ass,
19  but --
20        MR. MORRIS:  Actually, you're coming awfully
21  close, just to be clear, so be careful, because I'm
22  offended as well.  But continue.
23        MR. RUKAVINA:  I'm entitled to ask the man
24  about his compensation.
25        MR. MORRIS:  Right.  And your clients have

**18**

1  $75 million, hard dollars at stake in this litigation,
2  so we should never believe anything that he says?  Is
3  that where we are now?
4        Q.  (BY MR. RUKAVINA)  Sir, again, what is your
5  bonus compensation as it relates to how well the
6  claimant trust does?  Do you remember or not?
7        A.  I don't know that that's even something that
8  I could know at this point.
9        Q.  In preparing for this deposition, I take it
10  you spoke to legal counsel, and I'm not entitled to
11  know that and I'm not asking that.
12        But did you talk to anyone else?
13        A.  I've spoken in general terms to Mr. Seery.
14        Q.  Okay.  Anyone else?
15        A.  I've spoken, again in general terms, to
16  Kristin Hendrix.
17        Q.  Anyone else?
18        A.  Not that I can think of.
19        Q.  Now, I understand you spoke to Ms. Hendrix
20  when legal counsel was present; right?
21        A.  Yes.
22        Q.  So let's exclude that conversation.
23        Did you have any conversations with
24  Ms. Hendrix regarding this deposition or this
25  litigation at which counsel was not present?

**19**

1        A.  Not in any substance.
2        Q.  And when do you recall you might have had
3  those discussions with her?
4        A.  I'm not even sure.
5        Q.  Would it have been recently or like 9,
6  10 months ago?
7        A.  No, it would have been recently.
8        Q.  And with Mr. Seery, when did you have a
9  general conversation with Mr. Seery?
10        A.  I've had, you know, one or more general
11  conversations with Mr. Seery.  It's my understanding
12  that he was the 30(b)(6) witness, and he had questions
13  in preparation for his role in that.
14        Q.  So that would have been before last Thursday
15  that you talked to him?  I'll represent to you that
16  that's when his deposition was.
17        A.  Yeah, if I'm accepting that representation,
18  yes, prior to.
19        Q.  Other than that conversation with respect to
20  him preparing for the 30(b)(6), did you have a
21  discussion with him about this litigation as it might
22  relate to your deposition?
23        A.  I don't believe so in terms of relating to
24  this deposition.  We've talked at length about the
25  notes more generally.

**20**

1        Q.  And we'll go through that I'm sure.
2        So other than the conversations with
3  Ms. Hendrix and Mr. Seery and, of course, with counsel
4  that I'm not entitled to know about, did you discuss
5  this deposition or what you might be asked today with
6  anyone else?
7        A.  No.
8        Q.  Okay.  Did you read all or any portions of
9  the deposition of Frank Waterhouse?
10        A.  Certainly didn't read all of it.  I have a
11  general understanding of the topics that were -- that's
12  a bad way to frame it.
13        I have a general understanding of a few
14  points that were covered in his deposition.
15        Q.  Were you provided -- were you provided the
16  exact pages of any of his deposition?
17        MR. MORRIS:  Objection.  Direct him not to
18  answer.
19        MR. RUKAVINA:  You're going to direct him not
20  to answer whether he read --
21        MR. MORRIS:  If you're asking him whether I
22  directed him to particular --
23        MR. RUKAVINA:  I didn't ask that.
24        MR. MORRIS:  Rephrase your question.
25        Q.  (BY MR. RUKAVINA)  Did you read any pages

David Klos - October 27, 2021

---

**21**

1  from Mr. Waterhouse's deposition?
2      MR. MORRIS:  Objection.  Asked and answered.
3      You can answer again.
4      THE WITNESS:  I don't recall -- I don't
5  recall reading it.
6      Q.  (BY MR. RUKAVINA)  So were you provided a
7  summary of his deposition?
8      A.  I have had discussions with Mr. Morris in
9  preparation for this deposition.
10      Q.  That's fine.  And we can stop there.
11          Did you read or -- did you read the whole or
12  any portion of Mr. Seery's deposition?
13      A.  No, I don't believe I -- no, I don't believe
14  so.
15      Q.  Is it the same answer, that whatever you
16  discussed would have been through counsel?
17      A.  Yes.
18      Q.  Did you see any of the videotape of either
19  Mr. Waterhouse's or Mr. Seery's deposition?
20      A.  No.
21      Q.  So let's talk about the NexPoint
22  $30.7 million note.
23          You're familiar with that note; right?
24      MR. MORRIS:  Objection to the form of the
25  question.

---

**22**

1      THE WITNESS:  Before I answer that, I'd like
2  to see the note.
3      Q.  (BY MR. RUKAVINA)  It's in here.  I'm looking
4  for the exhibit number.  It's in here somewhere.
5      A.  Yes, I'm familiar with this note.
6      Q.  Are you familiar with anything having to do
7  with the negotiation or execution of this note?
8      MR. MORRIS:  Objection to the form of the
9  question.
10      THE WITNESS:  Can you repeat.
11      Q.  (BY MR. RUKAVINA)  Yes.  Let me rephrase it.
12          Did you have anything to do, back on or about
13  May 31, 2017, with the negotiation or execution of this
14  promissory note?
15      MR. MORRIS:  Objection to the form of the
16  question.
17      THE WITNESS:  Nothing with respect to the
18  negotiation --
19      Q.  (BY MR. RUKAVINA)  I'm sorry.
20      A.  In terms of the execution, I believe I
21  coordinated with internal counsel, who drafted the
22  note, and I can't remember -- I can't recall one way or
23  the other if I assisted in actually physically
24  receiving signatures.  I just don't remember.
25      Q.  Do you remember who that internal counsel

---

**23**

1  was?
2      A.  Yeah, it was Lauren Thedford, who is Highland
3  in-house counsel.
4      Q.  She's a lawyer?
5      A.  Yes.
6      Q.  Do you recall from that -- strike that.
7          Did you know on or about May 31, 2017 what
8  the purpose or reason behind Exhibit 13, this
9  promissory note, was?
10      MR. MORRIS:  Objection to the form of the
11  question.
12      THE WITNESS:  The purpose was to take
13  existing notes, which I believe were exclusively demand
14  notes, I'm not a hundred percent certain on that, and
15  roll them into a single note that would have a 30-year
16  amortization period.
17      Q.  (BY MR. RUKAVINA)  Do you know why that was
18  done?
19      A.  I believe it was done probably for a number
20  of reasons, one of which was to ensure some level of
21  cash flow back to Highland, when I say Highland,
22  Highland Capital Management, LP, on an annual basis.
23      Q.  Was that a concern at Highland Capital
24  Management, that it wasn't getting any level of cash
25  flow back?

---

**24**

1      A.  It wasn't a concern of mine.  I don't know if
2  it was a concern of others.
3      Q.  Do you recall whether any auditor ever raised
4  that concern?
5      A.  The auditors did raise that in conjunction
6  with the audit that was concluding around this time.
7  So yes, they did raise it, you know, probably in the
8  May of 2017 time frame.
9      Q.  Do you know who decided that it would be a
10  30-year term note?  By that I mean 30 years.
11      A.  Jim Dondero.
12      Q.  Do you know if he decided that in connection
13  with discussions with anybody or, to your knowledge, he
14  just decided?
15      A.  As far as I know he just decided it.  I
16  believe there was a draft at one point that was for
17  20 years, and he wanted to do 30.
18      Q.  So this note is executed in May 31, 2017.
19  Did you have any further role prior to, let's say,
20  December 1, 2020 with respect to anything to do with
21  this promissory note?
22      A.  Sorry, tell me the date again.
23      Q.  From execution of the note until December 1,
24  2020?
25      A.  And the question was?

---

David Klos - October 27, 2021

---

25

1    Q.  Did you have any role in that time frame with
2  respect to this promissory note on behalf of Highland?
3        MR. MORRIS:  Objection to the form of the
4  question.
5        THE WITNESS:  I don't know how to answer
6  that, it's such an open-ended question.  I just don't
7  know how to respond to that.
8    Q.  (BY MR. RUKAVINA)  If payments were made on
9  this note, would you have any duty to record or credit
10  those payments?
11        MR. MORRIS:  Objection to the form of the
12  question.
13        THE WITNESS:  I wouldn't have personally in
14  my role, but my team would have been involved in the
15  recording of those.
16    Q.  (BY MR. RUKAVINA)  And when payments were due
17  on this note, did you personally have any role with
18  respect to doing anything to facilitate those payments?
19    A.  When payments were due did I have anything --
20  yes.
21    Q.  What was your role?
22    A.  So my role, as part of the corporate team,
23  part of our role is managing cash at the various
24  entities.  So I was involved in weekly cash meetings,
25  where things like upcoming, whether it's an obligation

---

26

1  or a receipt, would be put on people's radars.
2        And we would, in connection with the 30-year
3  notes such as this one from NexPoint, we would either
4  confer with Jim or -- certainly Jim.  Also likely his
5  accountant.
6        In terms of teeing them up to make sure that
7  they were prepared from a cash flow statement to make
8  the payment.
9    Q.  What do you mean by his accountant?
10    A.  Melissa Schroth.
11    Q.  What do you mean by his?  That's a new name
12  to me.  Who is Melissa Schroth?
13    A.  I find it hard to believe that she's a new
14  name to you.  But I think her title was executive
15  accountant, and she was the keeper of Jim's -- many of
16  Jim's trusts and personal entities.
17    Q.  Was she a Highland employee?
18    A.  She was.  And when I say Highland, I should
19  be clear, Highland Capital Management, LP.
20    Q.  So when you say Jim's accountant, she was
21  still a debtor employee, just that she handled
22  primarily Jim's personal matters?
23    A.  She was still a Highland Capital Management,
24  LP employee but she did Jim's personal matters.
25    Q.  Did you have any role at either Highland

---

27

1  Capital Management or NexPoint Advisors as to a
2  decision as to whether any prepayments on this note
3  would ever be made?
4        MR. MORRIS:  Objection to the form of the
5  question.
6        THE WITNESS:  Can you repeat.
7    Q.  (BY MR. RUKAVINA)  Let's start from scratch.
8        Do you have any memory of any payments being
9  made on this note, Exhibit 13, prior to their scheduled
10  dates of payment?
11    A.  There were payments on -- and to be clear,
12  we're talking about the original 30.7- NexPoint
13  promissory note?  There were payments that I recall
14  happening throughout 2019 on this note.
15    Q.  And we can look at Exhibit 14.
16        MR. MORRIS:  What number?
17        MR. RUKAVINA:  14, 1-4.
18    Q.  (BY MR. RUKAVINA)  And those are only
19  numbered because Ms. Hendrix, they were used for her
20  deposition.
21    A.  Sure.  Just trying to keep these in order, I
22  apologize.  Got it.
23    Q.  Do you recognize Exhibit 14?
24    A.  Generally.  I can't say that I can verify
25  that this is completely accurate.  But it looks

---

28

1  familiar to a loan amortization schedule.
2    Q.  Would it have been maintained by Highland?
3    A.  Yes.
4    Q.  And I'll tell you that no one has yet to
5  authenticate this with a hundred percent precision, so
6  I'm not asking you to ratify these numbers, but let's
7  assume that they are what they are.
8        This does purport to show on the second page
9  a number of transfers in 2019, which goes along with
10  your recent answer.
11        Do you see those, sir?
12    A.  I do.
13    Q.  In particular, 750,000, then 1.3 million,
14  300,000, 2.1 million, 630,000, 1.3 million.
15        You see all those, sir?
16    A.  Yes, I see every one.
17    Q.  Do you have any memory, without going into
18  those transfers of those dates to the dollar, do you
19  have any memory that those transfers were made?
20    A.  Yes.  Again, not a specific recollection of
21  where I was at the time, but yes, I know that these
22  transfers were made.
23    Q.  Do you know why they were made in those
24  amounts and on those dates?
25    A.  No, not without speculating.

---

David Klos - October 27, 2021

---

**29**

1    Q.  What would be your speculation if you were to
2  speculate?
3    A.  My speculation would be that it would be for
4  liquidity needs at HCMLP, Highland Capital Management,
5  LP, needing liquidity to operate.  Again, that's
6  speculation.  I don't know for a fact that that's true,
7  but that's what I would assume.
8    Q.  Who would have made those decisions in 2019
9  to transfer those funds?
10     MR. MORRIS:  Objection to the form of the
11  question.
12     THE WITNESS:  Yeah, it would have been either
13  Frank or Jim.  I can't say with certainty, but one of
14  the two.  When I say Jim, I should be clear,
15  Mr. Dondero.
16    Q.  (BY MR. RUKAVINA)  Between January and
17  July 2019, do you have any recollection that there was
18  any particular liquidity issue or need at Highland
19  Capital Management?
20    A.  Yeah, Highland was dealing with liquidity
21  problems throughout 2019.  Maybe not every single day
22  of the year, but we were continuously needing to bridge
23  liquidity.
24    Q.  And you joined Highland in 2009.  From that
25  point in time, 2009, through 2019, was there any

---

**30**

1  practice at the enterprise of those businesses to
2  transfer funds between each other on a basis of when
3  one needed it and one had it?
4    A.  Yes, that was a fairly, generally speaking,
5  that was a fairly common practice, of using different
6  entities within the overall structure to bridge
7  liquidity.
8    Q.  Would that have been Mr. Dondero who, in the
9  final analysis, would have made those decisions?
10    A.  Maybe not a hundred percent, but I'd say
11  the -- if not a hundred percent, certainly most.
12    Q.  And who else might have participated,
13  Mr. Waterhouse?
14    A.  Potentially Mr. Waterhouse.  And the reason I
15  hedge on that a little bit is I don't think Frank would
16  have made any of these decisions on his own either.
17  But I may have heard them from Frank via Jim.
18    Q.  So in those same years, were you ever asked
19  by Mr. Dondero or Mr. Waterhouse as to whether funds
20  should be transferred from one entity to another for
21  liquidity purposes?
22    A.  Can you ask that again, please.
23    Q.  Yes.  Trying to understand, were you part of
24  those discussions as to whether these transfers should
25  be made, or did you just learn that a decision to make

---

**31**

1  them had been made and you executed them?
2    A.  Both, depending on the circumstances.
3    Q.  So sometimes you would be brought into a
4  discussion?
5    A.  Yes.
6    Q.  And can you think of any particular example?
7    A.  Of when I was brought into the discussion of
8  whether to transfer?  I can't think of an individual
9  example but we met quite regularly with Jim on cash.
10     So to the extent that either he needed cash
11  on one of his entities, he might let us know that.  Or
12  to the extent that Highland needed cash, we might let
13  him know that and ask for basically his assistance in
14  helping us to meet our own cash needs.
15    Q.  And did he usually find a way to facilitate
16  the cash need either at one of his entities or at
17  Highland?
18    A.  I suppose until October 16 of 2019.
19    Q.  Yes.  Prior to bankruptcy, do you recall any
20  instance where one entity wasn't able to transfer funds
21  to another for liquidity purposes?
22    A.  I can't think of a specific situation.  But
23  I'm sure there were situations where -- you know, cash
24  was always something that was being juggled, so I don't
25  know that necessarily liquidity could be met the same

---

**32**

1  day.
2     But eventually we were able to manage through
3  those situations, you know, oftentimes through some of
4  these loans.
5    Q.  In instances that you may remember when
6  Highland Capital Management needed liquidity, do you
7  know how Mr. Dondero decided from which other entity to
8  transfer the cash?
9    A.  I can't step into his brain and think about
10  his decision-making process, but if I was going to
11  oversimplify it I would speculate that it would be
12  based on who has cash in that moment.
13    Q.  Would he ask you or someone on your team who
14  had cash?
15    A.  At times, depending on which entity we're
16  talking about.  Because my team certainly didn't have
17  responsibility for every single entity in the
18  enterprise, but we did have responsibility for some.
19    Q.  And if your team -- so -- strike that.
20     So over the general -- talking about
21  generally now, over those 10 years when there were
22  these intercompany transfers for liquidity purposes,
23  how were they booked by the debtor, by Highland Capital
24  Management?
25     MR. MORRIS:  Objection to the form of the

---

David Klos - October 27, 2021

---

**33**

1 question.
2        THE WITNESS:  Help me on the direction.  So
3 this is money that Highland is receiving or money that
4 Highland is sending?
5        Q.  (BY MR. RUKAVINA)  Sending out.
6        A.  Sending out.  So this is -- in the scenario
7 that you're describing, this money that Highland is
8 sending out to meet some other corporate obligor's
9 liquidity needs?
10       Q.  Yes, sir.
11       A.  So those would be booked as a loan.  I
12 would -- I need to hedge a little bit because I'm not
13 a hundred percent certain, but I would say if not
14 exclusively via loans close to exclusively.
15       Q.  And would they -- strike that.
16           Would they usually be papered up with a
17 promissory note?
18       A.  Yes.
19       Q.  Now, why was that the general course during
20 10 years?  Was there a policy and procedure in place,
21 or would Dondero say book it as a loan, or was that
22 just the right thing to do from an accounting
23 perspective?
24       MR. MORRIS:  Objection to the form of the
25 question.

---

**34**

1        THE WITNESS:  At the end of the day it's at
2 the direction of Jim Dondero, so I can't tell you
3 exactly why he wanted it to be done that way.  But that
4 was certainly the practice of how it was done in those
5 situations.
6        Q.  (BY MR. RUKAVINA)  To your knowledge, did Jim
7 Dondero ever tell you or anyone else that when Highland
8 is transferring funds to one of his affiliated entities
9 that it should always be booked as a loan?
10       A.  So remembering 10 years' worth of
11 conversations, I can't remember a specific instance
12 where he would have said, always book every single
13 transaction I direct you to do as a loan.  However,
14 that was the practice.
15       Q.  Different question.
16           Do you remember that in each instance, and
17 again, that might be unfair over 10 years, but do you
18 remember in each instance when Mr. Dondero said
19 transfer money from Highland to this other entity for
20 liquidity needs that he said book it as a loan?
21       MR. MORRIS:  Objection to the form of the
22 question.
23       THE WITNESS:  I can't recall with any
24 specificity what he may or may not have specifically
25 said so long ago.

---

**35**

1        Q.  (BY MR. RUKAVINA)  To your knowledge, was
2 there any written policy or procedure in place at
3 Highland Capital Management with respect to how
4 transfers from Highland to an affiliated entity should
5 be booked or treated?
6        A.  No written policy or procedure that I'm aware
7 of.
8        Q.  Is it fair to say that by May 2019, the
9 corporate accounting group had handled so many of these
10 transfers that it believed that if Highland was
11 transferring funds to another affiliated entity, it's
12 probably a loan?
13       MR. MORRIS:  Objection to the form of the
14 question.
15       THE WITNESS:  Yeah, I don't know that I can
16 answer that in terms of the corporate accounting team.
17 That just feels way too broad.
18           It was certainly the practice that when
19 somebody needed liquidity and it was appropriate from an
20 accounting perspective, that's how it would be booked.
21           And there was no reason to doubt that that was
22 the appropriate way to do it, particularly with
23 direction from either Frank or Jim.
24       Q.  (BY MR. RUKAVINA)  Is it your testimony that
25 in each instance that happened, that either Frank or

---

**36**

1 Jim said, this is a loan, the "this" being the transfer
2 from Highland to an affiliated entity for liquidity
3 purposes?
4        MR. MORRIS:  Objection to the form of the
5 question.
6        THE WITNESS:  I can't recall with that level
7 of specificity if those words came out of Jim's mouth.
8 But with 0 percent doubt in my mind, every single one
9 of those loans was done with the authority of Jim or
10 Frank, or both.
11       Q.  (BY MR. RUKAVINA)  So going back to this
12 Exhibit 14, now I'm going to ask you about these
13 payments coming in.
14           Assuming that these payments were actually
15 made in 2019 --
16           And I think, John, you sent me this morning,
17 or maybe last night, some bank statements?
18       MR. MORRIS:  I actually sent all of the
19 backup for all payments made, I think, under the notes
20 at issue a week or two ago.
21       Q.  (BY MR. RUKAVINA)  How would -- so assuming
22 that these payments in 2019 that NexPoint made didn't
23 technically have to be made at that point in time, how
24 would Highland have booked these payments?
25       A.  So I can't tell the column headers, so you'll

---

David Klos - October 27, 2021

**37**

1 have to excuse me if I flip them.
2    Q.  They'll be on the first page.  Rip the page
3 off if you need to.
4    A.  First one is interest, second one is
5 principal.  On the far right is the actual amount of
6 the payment.  So, for example, March 29, 750,000.
7       And the -- the column that has the negative
8 411,000 is the application of interest and the 338- is
9 the application of principal.
10    Q.  So again, if Highland -- strike that.
11       If NexPoint made a payment that was not
12 technically due at that point in time, it would be
13 recorded as payments on principal and interest?
14    A.  It would be recorded as it's reflected in the
15 schedule.  So there's an application of interest and an
16 application of principal.
17    Q.  So based on your understanding and
18 experience, if that payment wasn't due at that time,
19 would it have been a prepayment by NexPoint?
20       MR. MORRIS:  Objection to the form of the
21 question.
22       THE WITNESS:  Yeah, I'm not sure that it's a
23 prepayment or not.  It's certainly a payment.  It's
24 certainly voluntary.  It's not spelled out under the
25 schedule.  I don't know that it's a per se, capital P,

**38**

1 prepayment.  I'm just not certain.
2    Q.  (BY MR. RUKAVINA)  Well, maybe without
3 respect to these specific transfers.
4       Generally, generally, if one of the Dondero
5 affiliates made a payment that wasn't scheduled, how
6 would the debtor have accounted for that payment?
7    A.  It would have recorded the payment as a
8 reduction to either or both outstanding accrued
9 interest or principal.
10    Q.  You wouldn't call those prepayments?
11    A.  I don't know the definition of prepayment.
12 It's a payment.  It's off schedule, but I don't know
13 whether it's a per se prepayment.
14    Q.  Would that be something in your experience
15 that we would look at the promissory note to maybe
16 determine?
17       MR. MORRIS:  Objection to the form of the
18 question.
19       THE WITNESS:  I don't know.
20    Q.  (BY MR. RUKAVINA)  Well, remember, I'm asking
21 you the same question just in different ways.
22       Who decides at the debtor, or how does the
23 debtor decide, if an unscheduled payment is made, how
24 to apply it?
25       MR. MORRIS:  Objection to the form of the

**39**

1 question.
2    Q.  (BY MR. RUKAVINA)  And his objection is
3 valid.  And just to give you a little bit of a fine
4 point, does someone look at the promissory note to
5 decide that?  Or is there some other rule or procedure
6 that someone looks at?
7       MR. MORRIS:  Objection to the form of the
8 question.
9       THE WITNESS:  So the person -- I don't know
10 that I can specifically name a person because the role
11 probably changed over time.
12       But either our corporate accountant, or the
13 corporate accountant's boss, which was Kristin Hendrix
14 for years, would have been responsible for recording and
15 tracking those payments.
16       So some combination of the corporate
17 accountant and Kristin would have applied those
18 payments, and that rolls up through my and Frank's
19 review ultimately.
20    Q.  (BY MR. RUKAVINA)  So if I can round off this
21 discussion, I think you told me a few minutes ago that
22 in each instance that Highland was transferring money
23 out to an affiliate.
24       Whether or not you remember Dondero or
25 Waterhouse saying it's a loan, it would have been a

**40**

1 loan because that's how it always was and it was always
2 authorized.  Generally correct?
3       MR. MORRIS:  Objection to the form of the
4 question.
5       THE WITNESS:  There were a few "always" and
6 "generallys" in there.  And like I said, when it came
7 to liquidity needs, my recollection is that these would
8 be handled via loans.
9    Q.  (BY MR. RUKAVINA)  And in reverse, if a
10 Dondero entity made a payment prior to a scheduled
11 payment on a note, generally there would be credit
12 against principal and/or interest provided on that
13 note?
14       MR. MORRIS:  Objection to the form of the
15 question.
16       THE WITNESS:  Generally speaking, yes, if the
17 payment was for payment on the note.
18    Q.  (BY MR. RUKAVINA)  Well, that goes back to my
19 question.
20       Do you know how these payments on Exhibit 14
21 in 2019 were determined to be payments on these notes,
22 as opposed to a transfer from NexPoint to Highland for
23 some other reason?
24    A.  What other reason would it be, if I can be so
25 bold.

Dickman Davenport, Inc
214.855.5100    www.dickmandavenport.com    800.445.9548

David Klos - October 27, 2021

**41**

1    Q.  Can you think of any other reason in 2019?
2    A.  Well, Highland had -- Highland had shared
3  services and intercompany agreements with NexPoint, at
4  this time.
5        But these were not payments that could
6  possibly be confused with those payments.  These are
7  off cycle, they're larger amounts, and there's nothing
8  that they could be other than payments against the
9  loan.
10    Q.  So I asked you before, and I think you said
11  that you were speculating with respect to these
12  payments, that Highland needed money at that time.
13        Do you recall in 2019 any discussions with
14  anyone, Dondero or Waterhouse, to the effect that
15  NexPoint has excess cash so maybe NexPoint should
16  transfer some money to Highland?
17    MR. MORRIS:  Objection.  Asked and answered.
18    THE WITNESS:  Do I still answer?
19    Q.  (BY MR. RUKAVINA)  Yes.
20    MR. MORRIS:  Yes.
21    THE WITNESS:  And sorry, I got lost there.
22    Q.  (BY MR. RUKAVINA)  Yes.  So my predicate was
23  you testified before that you were assuming that these
24  payments were because of a cash need at Highland;
25  right?

**42**

1    A.  Correct.
2    Q.  So with that predicate my question is, do you
3  recall discussing with Dondero or Waterhouse or with
4  anyone as to why NexPoint would be transferring money
5  to Highland at that time?
6    A.  Yes, I would have had conversations with
7  Mr. Dondero or Mr. Waterhouse.
8    Q.  And do you remember specifically in 2019 why
9  these transfers were made from NexPoint as opposed to
10  some other Dondero entity?
11    A.  Not with specificity, but certainly NexPoint
12  was generating cash at that time, and had the ability
13  to assist with Highland's liquidity.
14    Q.  So sitting here today, you've told me
15  generally and logically that you have no specific
16  memory why between January 2019 and August 2019, any of
17  these payments on Exhibit 14 were made by NexPoint?
18    A.  I have no specific memory, but I would say
19  with certainty that most or all of this was driven by
20  Highland HCMLP liquidity needs.
21    Q.  And most or all of this would have been
22  Highland in the first instance going to NexPoint and
23  saying, hey, can you send us some cash?
24    MR. MORRIS:  Objection to the form of the
25  question.

**43**

1    THE WITNESS:  Yeah, the premise of that,
2  given that Mr. Dondero is in control of both sides,
3  it's a faulty premise.
4    Q.  (BY MR. RUKAVINA)  But you told me not that
5  long ago that in these weekly cash meetings that it
6  would be your team at Highland who would go to
7  Mr. Dondero and say Highland has a liquidity issue.
8        So wouldn't that liquidity issue have
9  originated with the Highland team?
10    A.  Mr. Dondero is the president of Highland.
11  He's the president of NexPoint.  We're employees of
12  Highland.  We're also shared services providers for
13  NexPoint.
14        The waters are very muddy in terms of who is
15  wearing what hat in that conversation.
16    Q.  But Mr. Dondero doesn't know that Highland
17  has a liquidity issue unless someone from the corporate
18  accounting group tells him, does he?
19    MR. MORRIS:  Objection to the form of the
20  question.  I hope that's not the case.
21    THE WITNESS:  He has the ability to know what
22  our cash position is at any given time, at that time.
23    Q.  (BY MR. RUKAVINA)  So why would you have
24  these weekly cash meetings with Mr. Waterhouse and
25  sometimes Mr. Dondero?

**44**

1    A.  So these were cash forecasts, looking at
2  outlook.  I can tell you almost without exception,
3  maybe -- with maybe without exception, be speculating,
4  but those forecasts would be showing negative numbers
5  at Highland, virtually nonstop.
6        And so it was important, my opinion, but it
7  was probably important to Frank to make sure that he
8  was getting in front of Jim to make sure that those
9  needs were being addressed timely.
10    Q.  So I've asked that question.  I want to ask
11  you a different question.
12        For any of these payments between
13  January 2019 and August 2019 reflected on Exhibit 14,
14  do you have any personal knowledge as to whether they
15  were intended to be prepayments or not?
16    MR. MORRIS:  Objection to the form of the
17  question.
18    THE WITNESS:  I don't know whether they were
19  intended to be prepayments at that time.
20    Q.  (BY MR. RUKAVINA)  Sitting here today, seeing
21  this document as a CPA and as a sophisticated person,
22  do you read this Exhibit 14 to indicate that those
23  payments were booked as prepayments?
24    MR. MORRIS:  Objection to the form of the
25  question.

David Klos - October 27, 2021

---

**45**

1    THE WITNESS:  Again, the term "prepayments"
2  is the one I'm struggling with.  I can ascertain that
3  there are payments and they're off schedule.  But I
4  don't know that I can ascertain that they're
5  prepayments.
6    Q.  (BY MR. RUKAVINA)  Well, if a borrower makes
7  a payment that's ahead of schedule, how would that
8  generally be accounted for?
9    MR. MORRIS:  Objection to the form of the
10  question.
11    THE WITNESS:  It would be accounted for as a
12  reduction of principal or interest or some combination
13  of the two.
14    Q.  (BY MR. RUKAVINA)  Which would relieve the
15  borrower of having to make that at some point in the
16  future; right?
17    MR. MORRIS:  Objection to the form of the
18  question.
19    THE WITNESS:  No.  The borrower still owes
20  the money.  This is showing 23-point -- pick a date.
21  May 31, 23.034-.  That there's significant obligations
22  that are still outstanding.
23    Q.  (BY MR. RUKAVINA)  So on June 4, 2019 -- I'm
24  sorry, on June 19, 2019, the borrower made a
25  $2.1 million payment.  That's what this shows; correct?

---

**46**

1    A.  I see that.
2    Q.  You're not saying that the borrower would
3  ever have to make that same $2.1 million payment again,
4  are you?
5    A.  No.  What I'm saying is, based on that 2.1-
6  payment -- and this is reading this cold.
7    But based on that 2.1- payment, 66,000 was
8  applied to interest, which left zero accrued interest
9  outstanding.  2.03- applied to principal, which left
10  24.7- and change still outstanding.
11    Q.  Well, I'm going to ask you about the
12  promissory note then, Exhibit 13, in particular
13  Section 3, where it says prepayment allowed.
14    And the first sentence says, may or -- pardon
15  me, maker may prepay in whole or in part the unpaid
16  principal or accrued interest of this note.
17    Do you see that, sir?
18    A.  Yes, I see that.
19    Q.  In your experience, can someone prepay
20  accrued interest?
21    MR. MORRIS:  Objection to the form of the
22  question.
23    THE WITNESS:  The document reads, maker may
24  prepay in whole or in part the unpaid principal or
25  accrued interest of this note.  So I read that to say

---

**47**

1  that the maker may pay outstanding accrued interest, or
2  unpaid principal.
3    Q.  (BY MR. RUKAVINA)  But my question is, as I
4  understand accrued interest, it means interest that has
5  already occurred or accrued as of the date, like
6  today's date; right?
7    A.  Uh-huh.
8    MR. MORRIS:  Objection to the form of the
9  question.
10    Q.  (BY MR. RUKAVINA)  Do you agree with that?
11    Do you agree with that?  Accrued interest
12  means interest that has already come due, that has
13  actually happened because interest happens over time.
14    A.  Accrued interest --
15    MR. MORRIS:  Objection to the form of the
16  question.
17    Q.  (BY MR. RUKAVINA)  Why don't you start.  Why
18  don't you define for me accrued interest.
19    A.  Sure.  Accrued interest would be outstanding
20  and unpaid interest that -- sorry, it's hard to define
21  it without using the term.  But it's interest that's
22  accumulated in respect of a principal amount through a
23  given date.
24    Q.  So how do you prepay accrued interest?
25    A.  How do you prepay accrued interest.  Again,

---

**48**

1  that's a little bit of a mental jumble.
2    Q.  Exactly.
3    A.  Well, what I'm...
4    Q.  To me one pays accrued interest.  But this
5  note says you can prepay accrued interest.  So I'm just
6  seeing whether you as a CPA, CFO and controller for
7  years agrees that one can prepay accrued interest?
8    MR. MORRIS:  Objection to the form of the
9  question.
10    THE WITNESS:  Frankly, I don't know if it's
11  possible.  That's not how I'm seeing it applied here,
12  based on the quick review of Exhibit 14.
13    Q.  (BY MR. RUKAVINA)  Well, the next sentence
14  says, any payments on this note shall be applied first
15  to unpaid accrued interest hereon, and then to unpaid
16  principal hereof.
17    Do you see that, sir?
18    A.  I see that.
19    Q.  Do you have any understanding based either on
20  your personal knowledge or in your expertise as a CPA
21  and a CFO as to what that sentence means?
22    MR. MORRIS:  Objection to the form of the
23  question.
24    THE WITNESS:  The way that I would read that
25  would be that for a payment, for example, pick a date,

---

David Klos - October 27, 2021

---

**49**

1 Exhibit 14 again, the $2.1 million payment on or about
2 June 19. I see that a payment was made.
3        And it was -- it appears that there was
4 accrued and unpaid interest at that time of 66,000. And
5 so the first 66,000 was applied to outstanding accrued
6 interest, to bring the balance to zero.
7        And the difference between that 66,000 and the
8 2.1 million was applied to principal.
9    **Q.  (BY MR. RUKAVINA) Do you believe, whether**
10 **from personal knowledge from this note, Exhibit 13, or**
11 **your experience at Highland or as a CPA, that one can**
12 **say that interest, accrued interest will be due on a**
13 **future date, it will accrue by that date, but I'm going**
14 **to pay it earlier as of that date?**
15        MR. MORRIS: Objection to the form of the
16 question.
17        THE WITNESS: If I can rephrase back to you
18 just so I make sure I'm understanding the question.
19 You're saying could someone say, I would like to prepay
20 interest into the future. It hasn't accrued yet, but
21 it will be accrued by end of year.
22        And I would like to be prepaid effectively
23 with respect to that interest, and then have the
24 remainder used to pay down principal.
25        The question is, can someone do that?

---

**50**

1    **Q.  (BY MR. RUKAVINA) Yes.**
2        MR. MORRIS: I object to the question.
3        THE WITNESS: I suppose it's possible, but
4 that certainly wasn't the practice if that makes sense.
5    **Q.  (BY MR. RUKAVINA) That does make sense. I'm**
6 **still struggling, and again, I'm not trying to be a**
7 **smart aleck. I'm still struggling with the first**
8 **sentence of paragraph 3, that maker may prepay accrued**
9 **interest.**
10        And it sounds like to me like you don't
11 necessarily have a definitive answer as to what that
12 might have meant either.
13        MR. MORRIS: Objection to the form of the
14 question.
15        THE WITNESS: I think the document speaks for
16 itself in that sentence.
17    **Q.  (BY MR. RUKAVINA) But have you seen**
18 **something like this, to your recollection, in other**
19 **Highland promissory notes?**
20    **A.  Something like what?**
21    **Q.  Prepaying accrued interest.**
22    **A.  Yes, I have seen that.**
23    **Q.  What's your memory? Where have you seen**
24 **that?**
25    **A.  I can't remember a specific note, but I**

---

**51**

1 believe that has been done in a specific circumstance.
2    **Q.  So at least at Highland, you would believe**
3 **that that phrase, prepaying accrued interest, had some**
4 **established meaning at Highland?**
5        MR. MORRIS: Objection to the form of the
6 question.
7        THE WITNESS: No, I don't agree with that.
8    **Q.  (BY MR. RUKAVINA) Okay. You understand, of**
9 **course, that it's Highland's position that with respect**
10 **to this note, a payment was due on December 31 of 2020**
11 **that wasn't made; correct?**
12    **A.  Yes, it's my understanding -- if I can state**
13 **it back just so I make sure I'm getting it correctly.**
14 **It's my understanding that there was a payment due on**
15 **December 31, 2020, that wasn't made timely, yes.**
16    **Q.  Okay. Do you know why that payment wasn't**
17 **made timely?**
18    **A.  By recollection, because Mr. Dondero had**
19 **directed people not to process payments from Highland**
20 **affiliates to Highland.**
21    **Q.  When did you learn of that?**
22    **A.  Early December 2020.**
23    **Q.  How did you learn of that?**
24    **A.  I don't specifically remember the**
25 **conversation, but I know I had conversations with both**

---

**52**

1 Kristin and Frank. I can't remember if those were
2 individual or collective, but we understood that to be
3 the marching orders.
4    **Q.  Did you hear Mr. Dondero say anything like**
5 **that?**
6    **A.  I did not.**
7    **Q.  Did Mr. Waterhouse tell you that Mr. Dondero**
8 **said something like that to him?**
9    **A.  Yes.**
10    **Q.  Okay. Separately, do you remember whether**
11 **Ms. Hendrix told you that Mr. Waterhouse told her that,**
12 **or would it have been kind of at the same meeting?**
13    **A.  I don't remember specifically. It would have**
14 **been all around the same time.**
15    **Q.  And to the best of your recollection, what**
16 **words -- strike that.**
17        To the best of your recollection, did
18 Mr. Waterhouse include a reference to promissory notes
19 and the Advisors when he said that Dondero told him not
20 to make payments?
21        MR. MORRIS: Objection to the form of the
22 question.
23        THE WITNESS: I don't remember the specific
24 words that Mr. Waterhouse used. My clear impression
25 was that it was a very global instruction.

---

David Klos - October 27, 2021

---

53

1         And I should clarify also that, you know, at
2  this time, I think as we covered in my background.
3         At this point I had assumed the chief
4  accounting officer role, so I wasn't necessarily in
5  the -- in as much of the chain of command as I had been
6  previously to taking that role, where that sort of thing
7  might have come from Frank, to me, to Kristin.
8         By this time, Frank and Kristin were
9  communicating and I was sometimes in the loop, sometimes
10 not.
11    Q.  (BY MR. RUKAVINA) Did Mr. Waterhouse tell
12 you why Dondero had told him that?
13    A.  I don't remember with any specificity.
14 However, my perception at the time was that at this
15 time the relationship between Mr. Dondero and Mr. Seery
16 was hopelessly broken, and that this was Jim Dondero,
17 you know, gearing up for a fight in the future.
18    Q.  Prior to December of 2020, had you prepared a
19 report showing potential overpayments that NexPoint and
20 HCMFA had made on account of shared services and
21 payroll reimbursement?
22    MR. MORRIS:  Objection to the form of the
23 question.
24         You can answer.
25    THE WITNESS:  I know the analysis that you're

---

54

1  talking about.  I would not characterize it the way
2  that you characterized it.
3     Q.  (BY MR. RUKAVINA) And we'll talk about this
4  more in November, so I really don't want to go into any
5  detail, unless you feel the need to.
6         But, so you did not prepare that analysis?
7     MR. MORRIS:  Objection to the form of the
8  question.
9     THE WITNESS:  I prepared an analysis that
10 differed from how you described it.
11    Q.  (BY MR. RUKAVINA) How would you describe it,
12 in a nutshell?
13    A.  I would describe it as I was asked to refresh
14 a spreadsheet using certain assumptions, based on the
15 direction of Frank Waterhouse, and I updated and I sent
16 him an email.
17    Q.  Do you have any understanding that that
18 analysis was then shared with Mr. Dondero by
19 Mr. Waterhouse?
20    A.  I know that now.  I didn't know that at the
21 time.
22    Q.  Do you have any understanding -- strike that.
23         Did you have any understanding that as of
24 early December 2020 the reason why Mr. Dondero said
25 what he said to Mr. Waterhouse was because that

---

55

1  analysis, right or wrong, suggested that the Advisors
2  had made large overpayments?
3     MR. MORRIS:  Objection to the form of the
4  question.
5     THE WITNESS:  No, that's incorrect.
6     Q.  (BY MR. RUKAVINA) Why is that incorrect?
7     A.  Because by recollection, to the best of my
8  recollection, that analysis didn't occur until after
9  Dondero had told Frank no more payments.
10    Q.  Is that the only reason why you might suspect
11 that what I just said was incorrect?
12    MR. MORRIS:  Objection to the form of the
13 question.
14    THE WITNESS:  Yeah, I don't know how to
15 answer that.
16    Q.  (BY MR. RUKAVINA) I'm going back, when I
17 asked you, did Waterhouse tell you why Dondero gave the
18 direction, you said no.
19    MR. MORRIS:  Objection to the form of the
20 question.
21    THE WITNESS:  Sorry, I'm not sure.  If I
22 could have the question asked again, I'd be happy to
23 answer.
24    Q.  (BY MR. RUKAVINA) I'll ask it again.
25         Mr. Waterhouse tells you that Mr. Dondero

---

56

1  basically said no more payments; right?
2     A.  Yes.
3     Q.  And, but he did not tell you why Mr. Dondero
4  said that?
5     A.  Not that I can recall.
6     Q.  So he might have?
7     A.  He might have.  I don't specifically
8  remember.
9     Q.  Do you recall asking him or anyone else why
10 Dondero would have said that?
11    MR. MORRIS:  Objection.  Asked and answered.
12    THE WITNESS:  I don't recall specifically
13 asking.
14    Q.  (BY MR. RUKAVINA) Do you recall telling
15 Mr. Seery that Dondero said anything like that?
16    A.  At what point in time?
17    Q.  Prior to December 31, 2020.
18    A.  No, I did not.  I did not say that to
19 Mr. Seery.
20    Q.  In your mind was there any present
21 understanding or concern that NexPoint therefore
22 wouldn't make a scheduled December 31, 2020, payment?
23    A.  Was there any concern that they wouldn't?
24    Q.  Yeah.
25    A.  I would never use the word "concern."  At

---

David Klos - October 27, 2021

---

**57**

1  that point I wasn't even on the team anymore, so I hate
2  to say it's other people's problem, but I had my hands
3  full with plenty of other things. It wasn't something
4  I was thinking about.
5      Q.  Do you remember here today that prior to
6  December 31, 2020, you believed that NexPoint would not
7  make the scheduled payment?
8          MR. MORRIS:  Objection to the form of the
9  question.
10         THE WITNESS:  I had no idea whether NexPoint
11  was going to make the payment.
12     Q.  (BY MR. RUKAVINA)  Were you asked prior to
13  December 31, 2020 by Mr. Seery or anyone else as to
14  whether NexPoint was going to make that payment?
15     A.  Was I asked by Mr. Seery?  Not that I can
16  remember.
17     Q.  Prior to December 31, 2020, do you recall any
18  discussion with Mr. Seery about the NexPoint note?
19         MR. MORRIS:  I'm sorry, can I have the
20  question again.
21     Q.  (BY MR. RUKAVINA)  Prior to December 31,
22  2020, do you recall any discussion that you had with
23  Mr. Seery about this NexPoint note?
24     A.  Not that I can remember.  If there was, it
25  would have been in a cash meeting, but I don't remember

---

**58**

1  at all.
2      Q.  So it might have been some detail as part of
3  a larger discussion, but you don't remember any
4  specific discussion just around this note?
5      A.  No.
6      Q.  When did you learn or how did you learn that
7  the December 31 payment had not been made?
8      A.  I'm not sure, but certainly after
9  December 31.
10     Q.  Do you recall if it was before or after
11  January 7?
12     A.  I think it was after.
13     Q.  The default letter from Highland is in here,
14  if you need to see it. I'm just telling you it's the
15  January 7.
16         Do you recall having any role with respect to
17  drafting the default letter that went out to NexPoint
18  after the failed payment?
19     A.  No, none that I can remember.
20     Q.  How do you recall learning that the note had
21  been called by Highland?
22     A.  I honestly don't remember. I think after the
23  fact. I couldn't tell you how far after the fact.
24     Q.  Are you aware that on or about July -- I'm
25  sorry, January 14, 2021 NexPoint made a $1.4 million

---

**59**

1  and change payment?
2      A.  Yeah, I'm aware that that payment happened.
3      Q.  When did you become aware of that payment?
4      A.  I think after it happened.
5      Q.  Can you tell us, was it days, weeks, months
6  later?
7      A.  It was that day.  And if I can expand, I
8  recall getting an email, seeing a large inflow to
9  Highland, to MLP because I was on an email distribution
10  list that had those payments.
11         And I think I emailed or called Kristin and
12  asked her, is this the NexPoint note, because it was a
13  large amount of money.  And she said yes.
14     Q.  Did she tell you anything more about that
15  payment, when it had been made, why, who authorized it?
16     A.  I had that information of when it had been
17  sent. I had a wire confirm.
18     Q.  Only important thing to you is where did that
19  money come from?
20     A.  It wasn't important to me.  It was more
21  curiosity.
22     Q.  Did you have any discussions with anyone on
23  or about that time, January 14, 2021, as to why
24  NexPoint made that payment?
25     A.  Not that I can remember.

---

**60**

1      Q.  Did you have any discussion with anybody on
2  or about that time, January 14, 2021, as to how HCMLP
3  should account for that payment?
4      A.  No.
5      Q.  Did you have any discussion with Mr. Seery at
6  all about whether that payment should or shouldn't
7  reinstate the note?
8      A.  No discussion that I can remember.
9      Q.  Is it fair to say that any of those
10  considerations would have been at that point in time
11  above your paygrade?
12         MR. MORRIS:  Objection to the form of the
13  question.
14         THE WITNESS:  Yeah, paygrade, I don't know
15  how to respond to that.  Like I said before, I wasn't
16  on the team at that point.  I wouldn't have been
17  involved in that determination regardless of my
18  compensation.
19     Q.  (BY MR. RUKAVINA)  So you know and you
20  remember that in early December 2020 Frank Waterhouse
21  told you that Dondero had directed no more payments by
22  the Advisors.  And you know that a payment was made on
23  January 14.
24         And that's pretty much the extent of your
25  knowledge about the missed December 31 payment?

---

David Klos - October 27, 2021

---

**61**

1    MR. MORRIS: Objection to the form of the
2 question.
3    THE WITNESS: Yeah, it's a very broad
4 question. In general terms, yes.
5    Q. (BY MR. RUKAVINA) Well, I'm not asking what
6 you learned since then.
7    I'm asking that as of, let's say, January 15,
8 2021 that would have been the extent of what you would
9 have known?
10    A. Correct. And if I can just restate and make
11 sure I understand what I'm saying.
12    It would have been my understanding that we
13 had had an instruction -- when I say "we," Kristin and
14 Frank and by default the whole corporate team -- not to
15 make payments from these affiliated entities.
16    To my knowledge, none of those payments had
17 occurred since that point. And then on or about
18 January 14, such a payment was made and I found out
19 about that by seeing a wire confirm.
20    Q. Well, you mentioned a couple times that you,
21 in December 2020, you weren't part of that group
22 anymore. So do you have any understanding as to why
23 Mr. Waterhouse would have told you in particular, you
24 being Mr. Klos, about that instruction from Dondero?
25    A. Sure. I still was participating in cash

---

**62**

1 meetings, even if it was almost in a nominal role,
2 because of some of my history that I had. So I was
3 still participating in those meetings.
4    I've worked closely with Kristin for a long
5 time, so I may have caught up with her informally. But
6 as far as day-to-day duties, I wasn't part of that team
7 anymore.
8    Q. And is it your, did I understand you
9 correctly, is it your testimony that Mr. Waterhouse
10 informed the whole accounting group there, the
11 corporate accounting group, of Mr. Dondero's
12 instruction?
13    A. I don't know specifically who he told, if he
14 told every single member of the team, but he certainly
15 told Kristin and Kristin was the head of the team.
16    Q. And you don't recall anyone, after you heard
17 about that instruction, raising any concern to the
18 effect that NexPoint is going to default and be in
19 trouble if that payment isn't made?
20    A. I don't remember any discussion to that
21 effect.
22    Q. Do you remember anyone suggesting that they
23 ought to try to dissuade Mr. Dondero from that
24 direction?
25    A. Not that I can remember.

---

**63**

1    Q. Do you remember any discussion at that
2 approximate point in time for your cash meetings or
3 anything else as to whether NexPoint had made any
4 prepayments on the promissory note?
5    MR. MORRIS: Objection to the form of the
6 question.
7    THE WITNESS: Yeah, it's very hard to -- by
8 the way, I've said yeah a few times. I want to make
9 clear that that's just --
10    Q. (BY MR. RUKAVINA) That's not a yes?
11    A. I apologize for that.
12    Q. Understood. Yeah means, it's not a yes.
13    MR. MORRIS: It's a pause; it's an um.
14    Q. (BY MR. RUKAVINA) Germans call it flavoring
15 particle.
16    A. Sorry, I got lost there. If you can ask
17 again.
18    Q. Yeah. Do you recall in November or
19 December 2020 in your weekly meetings or anything else,
20 any discussion whatsoever concerning whether NexPoint
21 had made any prepayments on its note?
22    A. No discussions of whether or not there had
23 been a prepayment that I can remember, no.
24    Q. To the best of your knowledge sitting here
25 today -- strike that.

---

**64**

1    For my next question, again we're assuming
2 that Exhibit 14 is what it appears to be.
3    A. Sure, sure.
4    Q. So with that qualification, to the best of
5 your knowledge, other than what's on Exhibit 14, can
6 you think of any other record or source or document
7 that would address whether any unscheduled payments by
8 NexPoint would or wouldn't be prepayments on the note?
9    MR. MORRIS: Objection to the form of the
10 question.
11    THE WITNESS: Again, with the struggle of the
12 prepayment, this is the document that I would expect to
13 explain how the payment was applied.
14    Q. (BY MR. RUKAVINA) But you yourself did not
15 play any role in deciding how the payment would be
16 applied?
17    A. I'd hesitate to say no role, because the team
18 ultimately rolls up to me.
19    Q. You personally?
20    A. Me personally, I wouldn't have prepared these
21 schedules.
22    Q. Or decided, you personally, as Mr. Klos, how
23 any unscheduled payments should be accounted for by
24 Highland?
25    A. Correct, not without some -- some

---

David Klos - October 27, 2021

**65**

1 authoritative direction on how they should be applied.
2     Q.  And that authoritative direction would have
3 come from Mr. Waterhouse or Mr. Dondero?
4     A.  That's what I would expect.
5     Q.  Could it have come from anyone else that you
6 can think of here today?
7     A.  Not that I can think of.
8     Q.  Now we're going to switch gears and I think
9 we're going to stop discussing the NexPoint note, and
10 we're going to focus on the HCMFA two promissory notes.
11     A.  Sure.
12     Q.  So we're going to go back in time to
13 May 2019; okay?
14     A.  Sure.
15     Q.  And is it fair to say by -- that by May 2019
16 there were at least dozens if not hundreds of instances
17 of intercompany loans in the years leading up there
18 from Highland to one of the other entities?
19     MR. MORRIS:  Objection to the form of the
20 question.
21     THE WITNESS:  From Highland to one of the
22 other entities.  Can you help with other entities.
23     Q.  (BY MR. RUKAVINA)  Advisors, the trusts, any
24 of the Dondero entities?
25     MR. MORRIS:  Objection to the form of the

**66**

1 question.
2     THE WITNESS:  Yes, there would have been many
3 loans over the years.
4     Q.  (BY MR. RUKAVINA)  And do I understand that
5 most, if not all, of those loans should have been
6 papered up with a written promissory note?
7     MR. MORRIS:  Objection to the form of the
8 question.
9     THE WITNESS:  Should have been.  To the
10 extent that they were for a promissory note, then yes.
11     Q.  (BY MR. RUKAVINA)  So in the May 2019 time
12 frame, was there a regular pattern or course or
13 procedure in place as to how a promissory note would be
14 physically prepared and presented for approval?
15     MR. MORRIS:  Objection to the form of the
16 question.
17     THE WITNESS:  Yeah, when you say a process,
18 can you please clarify that for me.
19     Q.  (BY MR. RUKAVINA)  Sure.  Let's look at these
20 two promissory notes and maybe that will help frame the
21 question.  And I apologize for not having them right
22 here.
23     A.  It might be --
24     MR. MORRIS:  1 and 2.
25     MR. RUKAVINA:  Yes.

**67**

1     Q.  (BY MR. RUKAVINA)  Are you familiar with
2 Exhibits 1 and 2, sir?
3     A.  Yes, I am.
4     Q.  Do you remember them from back -- strike
5 that.
6     Did you have any role, to your knowledge,
7 with the preparation of Exhibits 1 and/or 2?
8     A.  With the preparation of the documents?
9     Q.  Yeah.
10     A.  No.
11     Q.  But you did have some role with these
12 promissory notes?
13     A.  Yes.
14     Q.  And I'm trying to find that email as well.
15 There's an email here from you.  I'll have it in a
16 moment.  That will help frame the question.
17     MR. MORRIS:  Exhibit 3.
18     Q.  (BY MR. RUKAVINA)  Do you recall that email,
19 sir?
20     A.  Not specifically, but it's right in front of
21 me.  I'm certain that I wrote this email.
22     Q.  You have no reason to deny or reject its
23 authenticity?
24     A.  I have no reason to reject it or question it.
25     Q.  Just give me a second.  I don't understand

**68**

1 what's going on with my exhibits.  I just don't
2 understand this.
3     (Off the record.)
4     Q.  (BY MR. RUKAVINA)  You have Exhibit 3 in
5 front of you?
6     A.  I do.
7     Q.  And it says, please send 2.4 million from
8 HCMLP to HCMFA.  This is a new interco.
9     Meaning intercompany; right?
10     A.  Correct.
11     Q.  This is a new intercompany loan.
12     Who told you that this was an intercompany
13 loan?
14     A.  Either Frank or Jim.  I would suspect Frank.
15     Q.  Do you have any present memory of him telling
16 you that with respect to this particular loan?
17     A.  I don't have a specific recollection, but
18 with a hundred percent certainty he or Jim would have
19 directed that.
20     Q.  Would they have directed the payment, or
21 would they have directed that it be papered as a loan,
22 or both?
23     A.  Both.
24     Q.  So in each instance -- well, let's take a
25 step back.

David Klos - October 27, 2021

**69**

1      So certainly either Jim or Frank directed you
2 to transfer the $2.4 million; correct?
3      A.  Either Jim or Frank would have directed, yes.
4 There's 0 percent chance I would have sent this email
5 if I didn't feel a hundred percent confident that this
6 was authorized in the way that I described in the
7 email.
8      Q.  But can you also say with certainty that
9 either Dondero or Waterhouse also told you that this
10 transfer is an intercompany loan?
11      A.  With a hundred percent certainty, yes.  I
12 can't say that necessarily with respect to Dondero,
13 because I don't remember if I would have talked to him
14 specifically about it.  But, yes, this would have been
15 clear that it's a loan.
16      Q.  You say clear.  Did someone tell you that
17 it's a loan, or are you just, because of the prior
18 10 years of course and conduct, logically deciding that
19 it has to be a loan?
20      MR. MORRIS:  Objection to the form of the
21 question.
22      THE WITNESS:  So this is -- this is not just
23 a situation of past practice.  I would have known with
24 certainty that this was a loan and that's what was
25 authorized.

**70**

1      Q.  (BY MR. RUKAVINA)  How would you have known
2 with certainty that it was a loan?
3      A.  I'll say in part because of past practice,
4 but also because of the nature of what the money was
5 going to be used for, and the background behind it.
6      Q.  So you knew that nature and that background?
7      A.  The nature and background of the 2.4 million,
8 yes.
9      Q.  So you've told me that in part -- I asked you
10 how did you know it was a loan.  You said in part past
11 practices, in part you knew the nature.  Anything else?
12      A.  I'm certain that given that I wrote this
13 email, which Frank is on, that I would have had a
14 conversation with Frank about what this was.
15      Q.  Was Jim Dondero in the corporate accounting
16 email?
17      A.  No, he wasn't.
18      Q.  So what is your understanding as to what this
19 $2.4 million was for?
20      A.  This related to -- well, to separate the
21 transaction, the 2.4- itself relates to a promissory
22 note.  That's what was executed.
23      HCMFA's use of the 2.4 million was to
24 reimburse a fund that it managed called Highland Global
25 Allocation Fund for a NAV error that had occurred

**71**

1 within that fund.
2      Q.  Who made that NAV error?
3      MR. MORRIS:  Objection to the form of the
4 question.
5      THE WITNESS:  Yeah, it's hard to answer that.
6 So the Highland Capital Management Fund Advisors is the
7 advisor to the fund, so they're the responsible party
8 for making the fund whole in the instances of NAV
9 errors.
10      Q.  (BY MR. RUKAVINA)  And did HCMFA contract out
11 with Highland for valuation services?
12      MR. MORRIS:  Objection to the form of the
13 question.
14      THE WITNESS:  I don't specifically remember
15 if they contracted for valuation services, but if you
16 tell me that they did, I'll take that at face value.
17 So yes, HCMFA utilized HCMLP for valuation services.
18      Q.  (BY MR. RUKAVINA)  Do you have any memory of
19 what human being or beings made that NAV error?
20      MR. MORRIS:  Objection to the form of the
21 question.
22      THE WITNESS:  It's -- in respect to people,
23 not particularly.  In respect to parties, Houlihan
24 Lokey was the service provider that performed the
25 valuation that resulted in the NAV error.

**72**

1      And as I described before, the valuation
2 function was housed at HCMLP by HCMLP employees
3 supporting that through, among other people, front
4 office, compliance, other parts of the organization as
5 well.
6      Q.  (BY MR. RUKAVINA)  So it was your
7 understanding that Highland was loaning $2.4 million to
8 HCMFA for HCMFA to compensate that fund?
9      A.  Yes.
10      Q.  Did you have any understanding that Highland
11 might have been, instead of loaning that money,
12 actually paying that money to HCMFA to compensate HCMFA
13 for Highland's valuation error?
14      A.  First, not Highland's valuation error.  But
15 second, no, there's no way that that would have been
16 what that payment was for.
17      Q.  Why can you say that there's no way that that
18 would have been what that payment was for?
19      A.  First, this wasn't the first NAV error that
20 ever occurred.  There had been other NAV errors.  There
21 were other NAV errors with respect to this valuation
22 that pertain to NexPoint Advisors.
23      There was no reimbursement from HCMLP to
24 NexPoint or HCMFA, regardless of any individual being
25 identified as the person.  That had just never occurred

David Klos - October 27, 2021

73

1  to my knowledge.
2        Second, the amount was to meet the liquidity
3  need of HCMFA. It wasn't to -- it wasn't to
4  dollar-for-dollar make up for the NAV error. It was
5  that's how much money HCMFA needed.
6        Third, it was definitely Dondero's practice
7  and preference to have expenses at HCMFA for tax
8  purposes. So if this was compensation, he would
9  ultimately not really be benefiting from the deduction
10 so.
11       That would have been a strong preference of
12 his against having it be compensation.
13       So it would have been excruciatingly clear
14 that this was a loan for liquidity for HCMFA to make
15 the fund whole, just like it had in the past NAV
16 errors.
17   Q. How did you know that HCMFA needed
18 $2.4 million for liquidity?
19   A. At that point I was still part of the
20 corporate team, so I had a good sense of how much cash
21 HCMFA would have had at any given moment. And at that
22 given moment it would not have had -- I'd be shocked if
23 it had even 2.4-.
24       Probably would have had probably between
25 a million and 2 million if I had to speculate.

74

1  Q. Okay. So you've given the reasons why this
2  was clearly a loan.
3        But you never heard Mr. Dondero say that this
4  was a loan, did you?
5  A. I don't remember. It's possible I did, but I
6  don't specifically remember.
7  Q. Okay. What about the $5 million loan on the
8  day after? What was that $5 million for?
9  A. That was similar but different. So again,
10 HCMFA needed liquidity. This time this was for --
11 related to that same fund.
12       So Highland Global Allocation Fund had
13 converted from an open-end fund, mutual fund, to a
14 closed-end mutual fund.
15       And pursuant to that conversion there was a,
16 I believe it was called a consent fee, for any
17 investors of that fund who consented to the conversion,
18 that they would receive a 3 percent fee payable by the
19 investment advisor.
20       And so at this time the bill came due on that
21 because the conversion had been completed, and the
22 accounting for how much that 3 percent was going to be
23 was complete.
24       HCMFA sure as hell didn't have 5 million
25 bucks. Excuse my language. Highland needed to pay

75

1  HCMFA for the liquidity. HCMFA made the payment to the
2  fund. It wasn't dollar for dollar. I think it was
3  like 5,019,000, or some such number.
4        But 5 million was the number that would allow
5  it to make that payment effectively to the investors of
6  Global Allocation Fund.
7  Q. Do you have any understanding as to why
8  Highland, as opposed to some other entity, was
9  transferring $7.4 million?
10  A. Highland as opposed to some other entity?
11  Q. Uh-huh.
12  A. Because Highland had the money.
13  Q. But I think we've established earlier that in
14 the first seven months of 2019, Highland was having
15 constant liquidity issues?
16  A. It was.
17  Q. And that's part of the reason that NexPoint
18 was making unscheduled payments on its note; right?
19  A. That's part of the reason NexPoint was making
20 unscheduled payments on its note, yes.
21  Q. So your recollection is that HCMFA needed
22 $2.4 million for liquidity purposes and about
23 $5 million for the consent fee. And Highland
24 transferred those funds because Highland had the funds?
25  A. Yes. And I should clarify that Highland only

76

1  had the funds because Mr. Dondero repaid personal notes
2  to HCMLP on the same days.
3        So he paid 2.4 million on May 2, which
4  Highland turned around and reloaned. And he paid 4.4-
5  on May 3, and Highland sent out 5-, so there's a
6  $600,000 difference. And my recollection, he paid the
7  other 600,000 via note repayment within a few days.
8  Q. So this would have been part of some broader
9  transaction in Mr. Dondero's mind?
10  A. I would not characterize it that way.
11  Q. You established that HCMFA needed money. You
12 established that Highland temporarily had money because
13 Dondero provided it with money.
14       But you still don't know, sir, as a fact as
15 to whether that transfer was a loan or some other
16 payment from HCMFA -- I'm sorry from HCM, from debtor
17 to HCMFA?
18       MR. MORRIS: Objection to the form of the
19 question. Asked and answered a million times. It's in
20 the documents you're showing him.
21       THE WITNESS: It was a loan.
22       MR. MORRIS: Come on, Davor. With all due
23 respect, it's in the document. It's on the document.
24  Q. (BY MR. RUKAVINA) I'm being courteous and
25 respectful to you and I'd ask the same in return; okay?

David Klos - October 27, 2021

---

**77**

1    A.  Absolutely.  I apologize if I haven't been.
2    Q.  Mr. Dondero, would you agree, was the only
3  person that had the authority at the debtor to
4  authorize a transfer of 2.4- and then $5 million?
5    A.  At the debtor?
6        MR. MORRIS:  Objection to the form of the
7  question.
8    Q.  (BY MR. RUKAVINA)  Yes, at the debtor.
9    A.  No.
10   Q.  Who else could have transferred 2.4 million
11 or $5 million?
12   A.  Those are two different questions.  But if
13 you're asking who had the authority, certainly Frank
14 did as well.
15   Q.  So Frank had the authority.  Perhaps my
16 question was inartful.
17       Do you believe that Mr. Waterhouse would have
18 decided to transfer $2.4 million or $5 million without
19 Mr. Dondero's approval?
20       MR. MORRIS:  Objection to the form of the
21 question.
22       THE WITNESS:  Generally speaking, no, but I
23 don't know exactly what the form of the approval.  But
24 he certainly wouldn't have done that on his own without
25 discussing with Dondero.

---

**78**

1    Q.  (BY MR. RUKAVINA)  Do you believe that
2  Mr. Waterhouse had the ability on behalf of the debtor
3  to loan $5 million without Mr. Dondero's approval?
4        MR. MORRIS:  Objection to the form of the
5  question.
6        THE WITNESS:  I think he had the technical
7  authority to.  However, I don't believe in practice
8  that he ever would.
9    Q.  (BY MR. RUKAVINA)  Same question, $2.4
10 million?
11   A.  Same answer.
12   Q.  We've established that you never really had a
13 direct employment or types of a role for NexPoint --
14 I'm sorry, for HCMFA; right?
15   A.  Again --
16   Q.  To the best of your recollection?
17   A.  Best of my recollection I can't remember how
18 the titles transferred over or whatever, but I don't
19 believe I did.
20   Q.  Do you know whether Mr. Waterhouse in 2019
21 had the authority, without Mr. Dondero's approval, to
22 borrow $7.4 million on behalf of HCMFA?
23       MR. MORRIS:  Objection to the form of the
24 question.
25       THE WITNESS:  He had the authority to enter

---

**79**

1  into the note on behalf of HCMFA, yes.
2    Q.  (BY MR. RUKAVINA)  Was that something that he
3  would have done without Mr. Dondero's approval to your
4  understanding and practice at that time?
5        MR. MORRIS:  Objection to the form of the
6  question.
7        THE WITNESS:  Same answer that I gave before
8  with respect to Highland.
9    Q.  (BY MR. RUKAVINA)  So here's where I'm going
10 with all this.
11       Mr. Dondero's position, and tomorrow his
12 testimony will be, that he caused the $7.4 million to
13 be transferred not as a loan to HCMFA, but to
14 compensate HCMFA for various things including that NAV
15 error.
16       Other than perhaps you think he's lying,
17 would you have any knowledge, hearsay, document,
18 anything, to contradict Mr. Dondero's position?
19       MR. MORRIS:  Objection to the form of the
20 question.
21       THE WITNESS:  Yes.  I would point to the fact
22 that as it pertains to the $5 million note, if we're
23 separating issues, there's no other possibility of what
24 that money could be other than either a loan or equity.
25       It's not compensation.  Highland is under --

---

**80**

1  HCMLP has absolutely zero obligation in respect to that
2  consent fee.  So when Highland sends $5 million to HCMFA
3  there's nothing else that it can be.  That's Point 1.
4        Point 2, we're right in the middle of an audit
5  at this point.  Jim signs rep letters at this point.
6  He's being provided balance sheets throughout 2019 that
7  indicate the loans that Highland has on its books.
8        Balance sheets are being prepared in respect
9  of annual approvals for 15(c) for retail funds in the
10 fall.  Schedules are being created for bankruptcy after
11 we file in October.
12       Nobody says this is a mistake.  Frank is on
13 all of these emails.  Frank never questions it.
14       There's absolutely no evidence from that point
15 in time to whenever this defense got raised that would
16 indicate that anybody said that these weren't exactly
17 what they say they are.
18   Q.  (BY MR. RUKAVINA)  Are you aware that in
19 February or March 2019 some $5.2 million was paid from
20 insurance that HCMFA had to the fund for the NAV error?
21   A.  The amount sounds unfamiliar, but I'm aware
22 that insurance proceeds were paid from HCMFA to the
23 fund.
24   Q.  And do you think that it's impossible for a
25 sane, rational person to conclude that HCMFA had a

---

Dickman Davenport, Inc
214.855.5100     www.dickmandavenport.com     800.445.9548

David Klos - October 27, 2021

---

**81**

1 claim against the debtor related to that NAV error?
2     MR. MORRIS: Objection to the form of the
3 question.
4     THE WITNESS: If it did, I don't know how
5 that's not insurance fraud for basically double
6 collecting insurance proceeds and then collecting it
7 again.
8     Q. (BY MR. RUKAVINA) So you believe, sir, that
9 if insurance pays a claim you have no more right to go
10 against a person who caused the fault?
11     MR. MORRIS: Objection to the form of the
12 question.
13     THE WITNESS: We can speak specifically here.
14 This is about a NAV error that an insurance company
15 reimbursed HCMFA for, which it then turned around and
16 paid for the fund.
17     So if it went to collect that same, let's use
18 round numbers, $5 million from Highland that it's
19 already collected from insurance, that sounds
20 inappropriate to me.
21     Q. (BY MR. RUKAVINA) Okay. But you don't know
22 whether that's allowed in Texas law or not, do you?
23     MR. MORRIS: Objection to the form of the
24 question.
25     THE WITNESS: No, I don't know whether it's

---

**82**

1 allowed under Texas law.
2     Q. (BY MR. RUKAVINA) So you don't know that if
3 you're hit by someone on the street and your medical
4 insurance pays your bills, you don't know that he still
5 has to pay you for the same bills?
6     MR. MORRIS: Objection to the form of the
7 question. I hope I don't miss my plane.
8     Q. (BY MR. RUKAVINA) You don't know that under
9 Texas law if someone hits you with their car and causes
10 you medical bills and your medical insurance pays those
11 bills, that you can still sue them for the same
12 damages?
13     MR. MORRIS: Objection to the form of the
14 question.
15     THE WITNESS: I'm not familiar at any level
16 of specificity with Texas law.
17     Q. (BY MR. RUKAVINA) Again, it just sounds
18 wrong to you that you could go after someone after
19 insurance pays, but you don't know legally one way or
20 the other?
21     A. Correct. I'm not a lawyer or expert in Texas
22 law. It feels wrong, yes.
23     Q. Okay. Going back to this email of yours,
24 Exhibit 3, do you recall whether there was a similar
25 email with respect to the $5 million note?

---

**83**

1     A. Yes, I am. I believe Kristin sent that one.
2     Q. Kristin sent that one?
3     A. I believe so.
4     Q. To whom?
5     A. Likely the same distribution group, but
6 that's speculation.
7     Q. Did you see such an email in the last week or
8 two?
9     A. I'm not certain, but probably. I have seen
10 email communication on or around May 3, but I don't
11 know specifically who all was on the email. I'm going
12 off what I would expect to see.
13     MR. MORRIS: If you're really interested,
14 it's right here. It was produced to you with
15 Bates 3763. And if you'd like to question the witness.
16     MR. RUKAVINA: When was it produced?
17     MR. MORRIS: I can't tell you. It's part of
18 the same package.
19     Q. (BY MR. RUKAVINA) So going back to this
20 Exhibit 3, sir, why did you ask Kristin, can you or
21 Hayley please prep a note for execution? Why them?
22     Remember, I was asking about what the course
23 or procedure was at that point in time.
24     A. Yeah, so nomenclature, procedure, process.
25     I would say the informal process for these

---

**84**

1 types of loans, they were frequent in nature, would be
2 for someone on the corporate accounting team to prepare
3 a note and have it executed.
4     Q. Okay. That was the standard course back
5 then?
6     A. Again, I don't know what standard course
7 means. That was fairly typical.
8     Q. Why would you not have asked someone in the
9 Highland legal department to prepare a note?
10     A. Because this was a legally reviewed document
11 as far as the form of the agreement. It's a one-page,
12 two-paragraph form that had been used for a long time.
13     So the only thing that would change with
14 respect to these notes would be the date, the amount,
15 likely the rate. I can't think of anything else
16 offhand that would have changed from note to note.
17     Q. After you asked Ms. Hendrix to prepare this
18 note, did you have any further role with respect to the
19 papering, preparation, or execution of that note?
20     A. Not that I can remember.
21     Q. Would you have had any role in having either
22 or both of the notes actually signed electronically or
23 by ink by Mr. Waterhouse?
24     A. Likely not, no.
25     Q. Do you know who decided to have

---

David Klos - October 27, 2021

---

**85**

1 Mr. Waterhouse as opposed to Mr. Dondero sign these two
2 promissory notes?
3     A. I don't.
4     Q. On the $5 million note, do you remember if
5 you had any role with respect to its physical papering
6 or execution?
7     A. Not that I recall.
8     Q. To the best of your memory, your role would
9 have been done by instructing your team, hey, here is
10 these new loans, go paper it up; is that accurate?
11     A. On the upfront side. I suppose my role would
12 have also included on the back end making sure that the
13 actual payment had occurred. But that would have been
14 doing that realtime, seeing the funds went out, and
15 that, most importantly, that the consent fee had been
16 paid from HCMFA to the transfer agent.
17     Q. How did you or anyone on your team know -- so
18 obviously, you know it's a $2.4 million loan because
19 that's what Waterhouse or Dondero told you; right?
20         How did you know it was a $2.4 million loan?
21     MR. MORRIS: Objection. Asked and answered.
22     THE WITNESS: I knew that the NAV error was
23 2 million, I think it was 398,000, somewhere in that
24 ballpark. And that 2.4- had been authorized for that
25 purpose.

---

**86**

1     Q. (BY MR. RUKAVINA) Do you know who decided
2 what the interest rate in this note would be, or that
3 it would be a demand note as opposed to a term note?
4     A. I don't specifically know who made that
5 decision. However, the common practice for fund
6 advisors was to put -- was for the rate to equal the, I
7 forget if it was the short-term or long-term AFR.
8         And for the note to be demand, that was just
9 the standard -- that was the standard.
10     Q. And I think I asked this, but just if I
11 didn't.
12         For either or both of these two notes, the
13 2.4- and $5 million note, did you have any role with
14 respect to Mr. Waterhouse signing them?
15     A. No, not that I can remember. I don't think I
16 did.
17     Q. And you don't remember doing anything to get
18 his signatures?
19     A. Not that I recall.
20     Q. Nor would that have been something that you
21 would expect that you would have a role with?
22     A. Certainly not in this instance. Maybe to the
23 extent that nobody else was around and it was time
24 sensitive, but that wouldn't have been the case with
25 these, I don't believe.

---

**87**

1     Q. Did you have any understanding in early May
2 of 2019 as to whether HCMFA was solvent or insolvent?
3     MR. MORRIS: Objection to the form of the
4 question.
5     THE WITNESS: Whether HCMFA was solvent or
6 insolvent? I'm not a solvency expert, so I don't know
7 that I could even attempt to answer that.
8     Q. (BY MR. RUKAVINA) Did you have an
9 understanding as far as HCMFA goes on May 2, 2019, that
10 its liabilities exceeded its assets?
11     A. I don't remember specifically where it stood
12 on assets versus liabilities.
13     Q. Do you have any memory that by May 2, 2019,
14 the debtor had taken a couple prior demand notes from
15 HCMFA and made them not collectible prior to May 31,
16 2021?
17     A. I know what you're referring to. I wouldn't
18 characterize it that way.
19     Q. How would you characterize it?
20     A. I recall that there was a financial support
21 acknowledgment, I think it was the name of the
22 acknowledgment.
23         That described -- I can't remember if it
24 described those two notes specifically or just referred
25 to them, that there would not be collection sought on

---

**88**

1 those until May 31 of 2021.
2     Q. Do you remember why that document was done?
3     A. My recollection, and it could have been done
4 for other reasons, but my recollection of it was that
5 it was primarily audit-driven.
6         For the auditors to be comfortable that these
7 notes weren't going to be just called and FA not have
8 the ability to pay them right away.
9     Q. Because it's true in April or May of 2019
10 HCMFA didn't have the ability to pay those notes;
11 correct?
12     A. It didn't have enough cash to pay those.
13     Q. And I think you mentioned before that in
14 May 2019 the auditors at the Highland level were
15 talking about rolling up prior demand notes into term
16 notes so the debtor would at least get some regular
17 cash flow; correct?
18     MR. MORRIS: Objection to the form of the
19 question.
20     THE WITNESS: No.
21     Q. (BY MR. RUKAVINA) So you recall that -- I'm
22 sorry, that was 2017. I was wrong; right?
23     A. Correct.
24     Q. So I guess here is my question, and I'm
25 struggling to understand this.

---

David Klos - October 27, 2021

---

**89**

1      So why would Highland be loaning an
2  additional $7.4 million in early May of 2019 to HCMFA
3  when HCMFA already was then unable to repay its debts
4  to Highland?
5      MR. MORRIS:  Objection to the form of the
6  question.
7      THE WITNESS:  Yeah, I kind of reject the
8  premise of the question, and these are all controlled
9  by Jim.  And it's completely within his power at any
10  point in time to make any payment on any of the loans,
11  depending on where priorities sit.
12      So the idea that HCMFA -- that Highland would
13  be doing a credit analysis on HCMFA, determining that it
14  was unable to make that payment and, therefore, this is
15  a bad note, is a completely foreign, preposterous
16  concept at that time.
17      Q.  (BY MR. RUKAVINA)  And in May of 2019 isn't
18  it also, sir, the case that Mr. Dondero could have,
19  right or wrong, agree or disagree, said, that 7.4- is
20  going to compensate HCMFA for the NAV error as opposed
21  to being a loan?
22      A.  No.
23      Q.  That's not possible?
24      A.  No.
25      Q.  And why is that not possible?

---

**90**

1      A.  As we discussed, the 5-, there's absolutely
2  no construct where that can be compensation for an NAV
3  error.  It's not a NAV error.  It's a consent fee.
4  Highland has absolutely no responsibility for that.
5      Highland also has no responsibility for the
6  2.4-, but if you want to assume that it did, that's
7  completely not the practice.  It was Jim's preference
8  to do these via loans, and that's how it was booked.
9      Q.  You're saying on the one hand Mr. Dondero can
10  absolutely control that one entity make a loan to
11  another, irrespective of credit worthiness, but he
12  can't decide that a transfer is compensation as opposed
13  to a loan?
14      MR. MORRIS:  Objection to the form of the
15  question.  Argumentative.
16      THE WITNESS:  If he wants to call
17  $7.4 million compensation to himself or to HCMFA, I
18  just don't know how he does that.  This is me being an
19  accountant.  I don't know how that's possible.
20      If he wants to pay himself a $7.4 million
21  bonus from HCMFA, fine, he has the power to do that.  If
22  he wants Highland to inject 7.4 million of equity into
23  HCMFA, he has the power to do that.
24      But sending the 7.4 million and calling it
25  something else, I don't know how he could do that.

---

**91**

1      Q.  (BY MR. RUKAVINA)  So it had to have been a
2  loan; correct?
3      MR. MORRIS:  Objection to the form of the
4  question.
5      THE WITNESS:  In these instances I know it to
6  have been a loan.
7      Q.  (BY MR. RUKAVINA)  Because of what
8  Mr. Waterhouse told you?
9      MR. MORRIS:  Objection to the form of the
10  question.  Asked and answered.
11      THE WITNESS:  Yeah, it was my understanding
12  that these were loans.
13      Q.  (BY MR. RUKAVINA)  You know these 7.4- to be
14  loans even though you never heard Mr. Dondero say that
15  to you?
16      A.  Yes, although to be fair, I don't know
17  whether I ever heard Mr. Dondero.  It's possible he did
18  say it.
19      MR. MORRIS:  Objection.  Withdrawn.
20      Q.  (BY MR. RUKAVINA)  You have no memory that on
21  or before May 4, 2019 you heard Mr. Dondero say that
22  the $2.4 million transfer and/or the $5 million
23  transfer to HCMFA were loans?
24      A.  I have no specific recollection, but such a
25  conversation is just off the reservation impossible.

---

**92**

1  That there's no way -- there's no way -- there's no way
2  that it would have been described that way and there's
3  a hundred percent that it's loan.
4      Q.  Do you have any memory discussing prior --
5      MR. MORRIS:  Objection.  Asked and answered.
6  He's answered this a thousand times.
7      Q.  (BY MR. RUKAVINA)  Do you have any memory on
8  or before May 2, 2019 discussing the $2.4 million
9  transfer with Mr. Dondero at all?
10      A.  I do recall, I don't remember the time, but I
11  do remember discussing the NAV error in general terms
12  and the potential magnitude of that.  I don't remember
13  specifically when that occurred.
14      Q.  At least in your discussion with Mr. Dondero,
15  the $2.4 million loan or note was somehow linked to the
16  NAV error?
17      A.  Linked to the NAV error is strong.  It
18  related to the NAV error from the standpoint that
19  that's what Highland was loaning HCMFA the money for,
20  because HCMFA couldn't otherwise make the payment
21  itself.
22      Q.  You just said Highland was loaning the money
23  for.  Are you remembering now Mr. Dondero saying that
24  or are you just extrapolating?
25      A.  No, I'm explaining rationally what the

---

David Klos - October 27, 2021

93

1  situation was.
2      Q.  Do you remember on or before May 3, 2019
3  discussing the $5 million transfer with Mr. Dondero?
4      A.  Again, in general terms.  I couldn't tell you
5  a time period, but this was something that, between
6  Frank and I, we had put on Jim's radar that this would
7  be a cash need in the future.  I couldn't specify
8  specifically when that happened.
9      Q.  Okay.  You have no present memory of
10 discussing that issue with Mr. Dondero on or before
11 May 3, 2019?  It must have happened but you have no
12 memory?
13     MR. MORRIS:  Objection to the form of the
14 question.
15     THE WITNESS:  We discussed that there would
16 be a consent fee payable from HCMFA.  We would have
17 discussed -- and again, I don't remember where I was,
18 what day it was, the specifics around the conversation.
19     But I know that we had conversations
20 pertaining to cash, because this was a large need for --
21 cash need for HCMFA to satisfy this, and this was an
22 important payment.
23     And neither HCMFA nor Highland had the
24 wherewithal to make that payment.  The only way that
25 those could make the payment was by Jim Dondero repaying

94

1  loans that he owed to HCMLP.  So we absolutely discussed
2  that with Jim Dondero.
3      Q.  (BY MR. RUKAVINA)  And with respect to
4  everything that we just talked about and your
5  recollection, you still don't remember Mr. Dondero
6  saying to you or Mr. Waterhouse one way or the other
7  that one or both of these transfers were loans?
8      MR. MORRIS:  Objection to the form of the
9  question.  Asked and answered.
10     THE WITNESS:  Yeah, again --
11     Q.  (BY MR. RUKAVINA)  Just yes or no.  This is a
12 yes-or-no question.
13     MR. MORRIS:  Let him answer the question.
14     MR. RUKAVINA:  If he'll answer the question
15 I'll stop asking him --
16     MR. MORRIS:  He's allowed --
17     Q.  (BY MR. RUKAVINA)  The answer [verbatim] is,
18 do you remember --
19     A.  I don't remember Jim's exact words two and a
20 half years ago in respect to authorizing these
21 payments.  So to answer your question, no, I don't
22 specifically remember him saying these are loans.
23     But every other fact around this tells me
24 that we did have that conversation and that was the
25 conclusion and that was the direction.

95

1      Q.  So it's possible that Mr. Dondero told no one
2  that these were loans but because y'all have been doing
3  it this way for 10 years, that everyone, all of you
4  CPAs, understood that it had to be a loan?
5      MR. MORRIS:  Objection to the form of the
6  question.
7      Q.  (BY MR. RUKAVINA)  My question is, is that
8  possible?
9      A.  I really don't think it's possible.  I
10 suppose people say anything is possible.  Again, two
11 and a half years ago, I'm certain that that was the
12 intent at the time and I'm sure it was communicated as
13 such.  I just don't have a specific recollection.
14     MR. RUKAVINA:  Thank you.
15     I'll pass the witness.
16     MR. MORRIS:  Michael, do you have any
17 questions?
18     MR. AIGEN:  I do.  I assume you want me to
19 start now to do my best to be done at 5:00?
20     MR. MORRIS:  Yes, please.
21     EXAMINATION
22     Q.  (BY MR. AIGEN)  Good afternoon, Mr. Klos.  My
23 name is Michael Aigen with the Stinson law firm.  I
24 represent Mr. Dondero, HCMS, and HCRE.
25     How are you today?

96

1      A.  I'm very good, thank you.
2      Q.  First topic I wanted to ask you about is the
3  defense raised by some of the defendants related to an
4  oral agreement and condition subsequent.
5      So my question for you generally is, are you
6  aware that some of the defendants in these proceedings
7  have raised a defense that there was a subsequent oral
8  agreement allowing notes to be potentially forgiven if
9  certain events occur?
10     A.  Yeah, I'm generally aware of the defenses
11 sitting here today.
12     Q.  And how are you generally aware of this
13 defense?
14     A.  I don't know with specificity.  Potentially
15 through just document flow on the bankruptcy side,
16 potentially with conversations internally or with
17 counsel.  But I generally understand them to have been
18 raised, the defenses that is.
19     Q.  And I don't want to get into conversations
20 with counsel.  I'm not allowed to do that.
21     Let me ask you, have you had any
22 conversations with anyone other than counsel about this
23 subsequent oral agreement defense?
24     A.  I have had general conversations with
25 Mr. Seery about it.  And other than that, nothing

David Klos - October 27, 2021

97

1 substantive.
2     Q.  And what did you discuss about this with
3 Mr. Seery?
4     A.  I've discussed with him, I hate to phrase it
5 this way, the ridiculousness of the defense.  Under
6 oath.  I've discussed my general understanding of what
7 is being asserted as a defense.
8         Which is that there was some sort of an oral
9 agreement between Jim and his sister at some point in
10 the past pertaining to forgiveness of certain
11 promissory notes that was conditional upon Highland
12 monetizing any of three PE assets for any amount above
13 cost.
14     Q.  And is it fair to say that prior to these
15 lawsuits being brought, you weren't aware of any oral
16 agreements related to the promissory notes related to
17 potential forgiveness?
18     A.  That's correct.  Not that I can remember, and
19 I think I would remember.
20     Q.  And other than your conversations with
21 Mr. Seery and counsel, you haven't had any
22 conversations with anyone else about these alleged oral
23 agreements; is that fair to say?
24     A.  I'm not sure I understand the question.
25     Q.  You told me you may have had questions with

98

1 counsel about these oral agreements defense, and you
2 told me about conversations with Mr. Seery, so I'm
3 trying to close that topic.
4         Was there anyone else you had any
5 conversations with about this alleged oral agreement?
6     A.  Like I said before, nothing of substance.
7 I've probably mentioned it in passing to other
8 employees, this is what I understand is being asserted
9 in this, but nothing of substance.
10     Q.  Do you have any personal knowledge as to
11 whether Mr. Dondero or Ms. Dondero entered into any
12 type of oral agreement prior to the bankruptcy?
13     A.  No, not other than what's been pled, or
14 whatever the terminology is.
15     Q.  I want to talk a little bit about, you
16 touched on earlier, you gave some testimony about how
17 in -- there were certain term loans that had payments
18 due in December or on or about December 31, 2020.
19         Do you remember talking about that?
20     A.  Yeah, generally.
21     Q.  And I don't know if you're specifically
22 referring to these loans, but is it also your
23 understanding that HCMS and HCRE also had payments that
24 were due on December 31, 2020?
25     A.  Yes.

99

1     Q.  Is it fair to say that if those payments were
2 to be made, it would have been Ms. Hendrix that would
3 have gone and effectuated those payments?
4         MR. MORRIS:  Objection to the form of the
5 question.
6         THE WITNESS:  Can you remind me the entities
7 again.
8     Q.  (BY MR. AIGEN)  Sorry.  HCMS and HCRE
9 Partners.
10     A.  HCMS, yes.  HCRE, I'm not sure, maybe.
11     Q.  Why might it have been different?
12     A.  I just don't recall who had the, you know,
13 kind of bank access to effectuate that payment.  I
14 think Kristin did but I'm not certain.
15     Q.  It wouldn't have been you; is that fair to
16 say?
17     A.  Correct.  It would not have been me.
18     Q.  And if Ms. Hendrix testified that the
19 instruction she received in December 2020 about not
20 making payments related only to the Advisors and not to
21 HMS or HCRE, would you have any reason to disagree with
22 her?
23         MR. MORRIS:  Objection to the form of the
24 question.
25         THE WITNESS:  Yeah, I was struggling with

100

1 that question.  There was a lot to it.  If you don't
2 mind.
3     Q.  (BY MR. AIGEN)  Okay.  I'll repeat it.  Maybe
4 that will help.
5         MR. MORRIS:  Why don't you ask him about his
6 knowledge, instead of Kristin's.  You had her as a
7 witness.
8         I'll continue to object.  I don't know why
9 you're asking him about her knowledge.
10         MR. AIGEN:  Do you want to keep coaching him?
11         MR. MORRIS:  No, I'm trying to coach you.
12         MR. AIGEN:  Oh, thanks.  That's good.
13 Appreciate if you stop coaching your witness.
14     Q.  (BY MR. AIGEN)  If Ms. Hendrix testified that
15 the instructions she received in December 2020
16 regarding not making any more payments related only to
17 the Advisors and not to HMS or HCRE, would you have any
18 reason to disagree with her?
19         MR. MORRIS:  Objection to the form of the
20 question.
21         THE WITNESS:  I have no reason to question
22 Kristin's testimony.  I'm sure she gave truthful
23 testimony.
24     Q.  (BY MR. AIGEN)  Are you aware of or not of
25 whether Ms. Hendrix was told by Mr. Waterhouse not to

David Klos - October 27, 2021

---

**101**

1 make payments from certain entities in December of
2 2020?
3       MR. MORRIS: Objection to the form of the
4 question.
5       THE WITNESS: Yeah, I'm aware, and I think I
6 spoke to that earlier of the instruction that had come
7 down from Dondero through Frank to Kristin, and I was
8 certainly aware of it.
9       And I'm -- and I think I spoke to the fact
10 that, you know, certainly hearing it from a person who,
11 as I said before, wasn't really on the team at that
12 point, it was certainly my understanding that that was a
13 global instruction at the time.
14       Q.  (BY MR. AIGEN)  And I want to get into what
15 was actually said and what you remember, so let me ask
16 you this.
17       This instruction that came down started from
18 Jim and went to Frank.  Is that your understanding?
19       A.  That's my understanding.
20       Q.  You weren't there during that discussion I
21 assume; is that correct?
22       A.  Correct, I was not.
23       Q.  And then Frank gave an instruction to
24 Kristin; is that your recollection?
25       MR. MORRIS: Objection to the form of the

---

**102**

1 question.
2       THE WITNESS: Yeah, it's my understanding
3 that Frank informed Kristin of that instruction.
4       Q.  (BY MR. AIGEN)  Were you there when Frank
5 provided this instruction to Kristin?
6       A.  I don't believe I was.
7       Q.  Then can I ask, how did you become aware that
8 Frank had given this instruction to Kristin?
9       A.  Through subsequent conversations with Frank
10 and Kristin.  As I said before, I don't recall if it
11 was the three of us or me and Frank or me and Kristin.
12 But subsequent conversations.
13       Q.  Are we talking about conversations back in
14 2020 or after the bankruptcy?
15       MR. MORRIS: Objection to the form of the
16 question.
17       THE WITNESS: During 2020, December of 2020.
18       Q.  (BY MR. AIGEN)  Sitting here today, can you
19 say with a hundred percent certainty that the
20 instruction related to all of the entities as opposed
21 to just Advisors?
22       A.  So as you pointed out, I was not party to the
23 direction, so I have no way of knowing with any sort of
24 specificity what the direction actually was.  I just
25 know how it was conveyed to me and how I understood it.

---

**103**

1       Q.  When you say it was conveyed to you, are you
2 talking about subsequent discussions that you had with
3 Ms. Hendrix and Mr. Waterhouse after they talked to
4 each other?
5       A.  Yes.
6       Q.  Sitting here today, can you tell me for sure
7 that one of them told you that this instruction related
8 to all of the entities, as opposed to just the
9 Advisors?
10       A.  No, I can't say that with certainty, but I
11 think that that was the case.  But, again, I can't say
12 with certainty.
13       Q.  Would you defer to Mr. Waterhouse and
14 Ms. Hendrix over what the specific instructions were?
15       MR. MORRIS: Objection to the form of the
16 question.
17       THE WITNESS: Like I said, I wasn't part of
18 the conversation, so I would defer to people who
19 received the directions more directly.
20       Q.  (BY MR. AIGEN)  And you're not aware of
21 anything in writing or anything that reflects these
22 instructions on whether to pay or not to pay certain
23 payments in December of 2020?
24       A.  No, I'm not aware of anything in writing.
25       Q.  And let's change topics for a second here.

---

**104**

1       I want to throw out a term.  Are you familiar
2 with the term "NAV ratio trigger period" as it was used
3 in --
4       A.  In a very, very general sense, yes.
5       Q.  And in a general sense what does that term
6 mean to you?
7       A.  It's a term I recognize from the limited
8 partnership agreement of HCMLP.  It's a defined term in
9 that agreement.
10       Q.  To your knowledge, was the NAV ratio trigger
11 period ever reached or triggered prior to the Highland
12 bankruptcy?
13       A.  I don't know the definition, so I don't know
14 based on the definition whether it had or hadn't.
15       Q.  Sitting here today, though, it's not your
16 belief, based on your experience, that it was
17 triggered; is that fair to say?
18       MR. MORRIS: Objection to the form of the
19 question.
20       THE WITNESS: I don't know the consequence of
21 being in a trigger period, I guess is what -- how I'm
22 trying to answer your question.
23       Q.  (BY MR. AIGEN)  Have you ever had any
24 conversations with Nancy Dondero?
25       A.  Yes.

---

David Klos - October 27, 2021

---

105

1    Q.  Generally, how many and what was the
2  reasoning?
3    A.  Probably less than five.  I think maybe only
4  one or two that I can really remember.
5    Q.  At a high level what were those conversations
6  about?
7    A.  From my recollection of my conversations with
8  her, they pertained to the DRIP, which is a dividend
9  reinvestment program that I helped.
10    Q.  And approximately when were these
11  conversations?
12    A.  I don't know.  Sometime between 2017 and
13  probably 2019.  I couldn't tell you with any
14  specificity.  These were very informal.
15    Q.  Fair to say that you've never had any
16  conversations with Nancy Dondero about any of the loans
17  at issue in this case?
18    A.  No, no, no, I've never had a conversation
19  with her like that.
20    Q.  And fair to say that you've never had any
21  conversations with Nancy Dondero about compensation for
22  Jim or any other officers at Highland?
23    A.  Correct.
24    MR. AIGEN:  Why don't we go off the record
25  for two minutes.  I think I'm either done or about

---

106

1  done.
2    (Off the record.)
3    Q.  (BY MR. AIGEN)  You understand you're still
4  under oath?
5    A.  Yes.
6    Q.  Are you aware of any loans that Highland has
7  made to any employees or officers that were forgiven in
8  all or in part?
9    A.  Yes.
10    Q.  Can you tell me who?
11    A.  I don't know that this will be a complete
12  list, but there were a few employees in the kind of
13  late aughts, maybe 2010, 2011 frame.
14    Q.  Do you know the names?
15    A.  One was Jack Yang.  Another, I'm not sure if
16  it was forgiven or not, that's why I'm hesitating, but
17  it was Tim Lawler.  I think his was forgiven in part or
18  in full, but I'm not a hundred percent certain.
19    Q.  And any other individuals that received loans
20  that were forgiven in part that you're aware of?
21    A.  Not that I recall, but there could be others.
22  Some of this is very, very old.
23    Q.  Changing topics here a little bit, I'm going
24  to combine two entities to try to speed this up.  If
25  you need to separate, that's fine.

---

107

1    Can you just generally explain to me what
2  services Highland Capital Management provided for
3  HCMS and HCRE?
4    A.  For HCMS -- I do need to separate these a
5  little bit.  For HCMS, really full-service accounting,
6  tax, treasury, cash payments.  I said tax.  Valuation.
7  Nothing personnel-wise because they didn't have any
8  employees.
9    That's all I can think of right off the top
10  of my head, but I could be missing some.
11    Q.  And what about HCRE?  How is that different?
12    A.  Similar, except different types of assets.
13  So more real estate, so less heavy.
14    Maybe not necessarily differences in terms of
15  the types of services, but services would have, I'd
16  say, more cash activity, more variety of investments,
17  which triggers different types of activities going on
18  at those entities.
19    But similar in terms of tax operations,
20  making payments.  HCRE didn't have employees, so no
21  payroll.  So these would be the broad areas that I
22  would think about.
23    Q.  And you mentioned making payments.  Would one
24  of those services that Highland provided for these two
25  entities include making loan payments on the term loans

---

108

1  like the term loans at issue in these proceedings?
2    MR. MORRIS:  Objection to the form of the
3  question.
4    THE WITNESS:  I think I mentioned before, I
5  couldn't remember whether or not Kristin was authorized
6  to make payments with respect to HCRE.  I think she
7  probably was, but I don't know that with certainty.
8    But, you know, for services, certainly Kristin
9  and her team would be responsible for making those
10  payments, subject to the proper authorization.
11    Q.  (BY MR. AIGEN)  And I'm sorry if I asked this
12  before.  If it wasn't Kristin for HCRE, do you have an
13  idea who it would have been?
14    A.  If not Kristin, it would have been Melissa
15  Schroth.
16    Q.  And how were those responsibilities split up?
17  What entities was Melissa Schroth responsible for?
18    A.  Generally speaking, Melissa was more
19  responsible for entities that were really, like -- I'm
20  going to use this in the most general sense, like Jim
21  entities, Jim's trusts, Jim personally.
22    And for HCRE it was kind of in the middle.
23  When it started out it kind of was more Jim world and
24  then over time it got more complex.
25    And as entities got more complex over time

---

David Klos - October 27, 2021

**109**

1  they tend to get transitioned from Melissa to corporate
2  accounting. And when they got really complex over to
3  another group of fund accountants.
4      So this is one that was, at its beginning,
5  Melissa was the, called primary accountant. And at
6  some point in time that transitioned to the corporate
7  accounting team. I can't remember when the cash
8  process kind of cut over.
9      Q. Is there a list somewhere saying Melissa is
10  responsible for these, Kristin for the others, or is it
11  just more of a pattern or matter of practice?
12     A. More of a matter of practice. If you're
13  responsible for an entity, you're responsible. If
14  you're not, then you're not.
15         MR. AIGEN: That's all the questions I have.
16  Thank you for your time.
17         THE WITNESS: Thank you.
18             EXAMINATION
19     Q. (BY MR. MORRIS) Just a few, Mr. Klos. Let's
20  pick up where Mr. Aigen left off.
21         To the best of your knowledge, did HCMS have
22  a shared services agreement with Highland?
23     A. No, it didn't that I'm aware of.
24     Q. But you described certain services that HCMLP
25  provided to HCMS; is that right?

**110**

1     A. Yes.
2     Q. Do you know whether HCMFA ever compensated --
3  do you know whether HCMS ever compensated HCMLP for any
4  of those services that HCMLP provided?
5     A. No, it didn't.
6     Q. You mentioned HCRE. To the best of your
7  knowledge, did HCRE have a shared services agreement
8  with Highland Capital Management, LP?
9     A. No, it didn't.
10     Q. Did HCRE provide the services that --
11  withdrawn.
12         Did HCMLP provide the services to HCRE that
13  you just described?
14     A. Yes.
15     Q. Did HCRE ever compensate HCMLP for any of the
16  services that HCMLP provided?
17     A. No.
18     Q. Okay. Mr. Rukavina asked you some questions
19  about payments that were made on the NexPoint loan in
20  the first half of 2019.
21         Do you remember that?
22     A. Yes, generally.
23     Q. Okay. Notwithstanding those payments, did
24  your group continue to carry on its books and records
25  NexPoint's obligation to make the installment payment

**111**

1  that was due at the end of the year?
2     A. Yes, we continued to track it through our
3  interest schedules and through cash.
4     Q. So in the debtor's books and records is there
5  any evidence that the payments that were made in early
6  2019 were intended to relieve NexPoint's obligation to
7  make the installment payment due at the end of the
8  year?
9         MR. RUKAVINA: Objection. Best evidence.
10         THE WITNESS: No, I don't believe so.
11     Q. (BY MR. MORRIS) Did you have a conversation
12  with anybody at any time in the year 2019 about whether
13  the payments made earlier in the year on behalf of
14  NexPoint would eliminate or suspend its obligation --
15  withdrawn.
16         Did you have any conversation with anybody --
17  I think I screwed up the dates. Going to have to start
18  over.
19         Let me ask better questions.
20         You looked with Mr. Rukavina at certain
21  payments that were made in early 2019 with respect to
22  the NexPoint note.
23         Do I have that right?
24     A. Yes.
25     Q. Notwithstanding those payments, did NexPoint

**112**

1  make the installment payment that was due at the end of
2  2019?
3         MR. RUKAVINA: Objection. Calls for a legal
4  conclusion.
5         THE WITNESS: It did make the payment that
6  was due at the end of 2019.
7     Q. (BY MR. MORRIS) And the payment that it made
8  at the end of 2019, was that the annual installment
9  payment that was called for in the note itself?
10         MR. RUKAVINA: Objection. Legal conclusion.
11         THE WITNESS: Yes, it was a payment pursuant
12  to the note.
13     Q. (BY MR. MORRIS) Did anybody ever tell you at
14  any time prior to the commencement of this lawsuit that
15  any prior payment by or on behalf of NexPoint relieved
16  it of any obligation to pay the installment payment due
17  at the end of 2020?
18     A. No.
19     Q. And did in fact -- is it your understanding
20  that Mr. Dondero specifically authorized Highland to
21  effectuate a payment on NexPoint's behalf in mid
22  January 2021?
23     A. I don't have specific knowledge, but I know
24  that to have occurred.
25     Q. Okay. Did anybody ever tell you in 2021 --

David Klos - October 27, 2021

---

**113**

1  withdrawn.
2      Did anybody tell you in December 2020 or
3  December -- or January 2021 that NexPoint didn't have
4  to make the installment payment at year end 2020
5  because of some prior prepayment?
6      A.  No.
7      Q.  Can you think of any reason -- withdrawn.
8      Did you ever hear Mr. Dondero -- withdrawn.
9      Did you ever see anything in writing where
10 NexPoint ever contended, prior to February 1, 2021,
11 that it had no obligation to make the payment due at
12 the end of 2020 because of some prepayment issue?
13     A.  No, not that I remember.
14     Q.  Can you think of any reason why Mr. Dondero
15 would have authorized a payment by NexPoint to HCMLP on
16 account of the note in January of 2021 if he actually
17 believed at that time that no obligation was due
18 because of a prior prepayment?
19     MR. RUKAVINA:  Objection.  Speculation, lacks
20 foundation.
21     THE WITNESS:  No.
22     Q.  (BY MR. MORRIS)  Does it make any sense to
23 you as an accountant that you would pay a seven-figure
24 sum of money that you didn't think was due and owing?
25     A.  No, that does not make sense to me.

---

**114**

1      Q.  Can you get Exhibit 13, please.
2      A.  Got it.
3      Q.  You were asked some questions about
4  paragraph 3.
5      Do you see that?
6      A.  Yes.
7      Q.  Does paragraph 3 mention annual installment
8  payments at all?
9      A.  No, I'm not seeing it.
10     Q.  Does paragraph 3 state in any way that a
11 prepayment as described in that paragraph would relieve
12 the maker of the obligation to make annual installment
13 payments?
14     A.  No.
15     Q.  Can you turn to the next page and look at
16 paragraph 5.
17     Are you familiar with that paragraph at all?
18     A.  No.  I mean, I've seen it before, but this
19 is, as I said before, this is a provision that probably
20 would have been in most, if not all, of these types of
21 notes.
22     Q.  Can you get Exhibit 3, please.  This is your
23 email dated May 2, 2019.
24     Do I have that right?
25     A.  Yes.

---

**115**

1      Q.  And you sent it to the corporate accounting
2  email group; is that right?
3      A.  I did.
4      Q.  And to the best of your recollection, was
5  Mr. Waterhouse included in that email group?
6      A.  Yes, absolutely.
7      Q.  And did you instruct the corporate accounting
8  team to transfer $2.4 million from HCMLP to HCMFA on
9  May 2, 2019?
10     A.  Yes, specifically Blair, but yes, for the
11 team as well.
12     Q.  The whole team was aware of this?
13     A.  The whole team is on the email, and I'm
14 sending to Blair, who is the AP person, to please set
15 up the payment.
16     Q.  Is it fair to say that you're being
17 completely transparent here by including the entire
18 corporate accounting group on this email?
19     A.  Yes.
20     Q.  And did you tell the entire corporate
21 accounting group that this transaction would be a,
22 quote, new interco loan?
23     A.  Yes, that's what the email says.
24     Q.  Do you have any reason to believe that
25 Mr. Waterhouse didn't get this?

---

**116**

1      A.  No, he got this.
2      Q.  And did Mr. Waterhouse tell you at any time
3  in the history of the world that this $2.4 million
4  should not have been booked as a loan?
5      A.  No.
6      Q.  Did Mr. Dondero tell you at any moment in the
7  history of the world that this transaction should not
8  have been booked as a loan?
9      A.  No.
10     Q.  You mentioned that there was an audit that
11 followed shortly thereafter?
12     A.  Yes.
13     Q.  Are you familiar with the debtor's audited
14 financial statements for the period ending 2018?
15     A.  Yes, generally.  Not total recall, but yes.
16     Q.  Are you aware that this loan was included as
17 a subsequent event in the debtor's audited financial
18 statements?
19     A.  Yes.
20     MR. RUKAVINA:  Objection.  Best evidence.
21     Q.  (BY MR. MORRIS)  Did Mr. Dondero or
22 Mr. Waterhouse or anybody ever tell you that the debtor
23 should not have included this $2.4 million loan in its
24 audited financial statements?
25     MR. RUKAVINA:  Objection.  Best evidence.

---

David Klos - October 27, 2021

**117**

1      THE WITNESS:  No.
2      Q.  (BY MR. MORRIS)  Okay.  And the next day
3  there was another loan; right?
4      A.  Yes.
5      Q.  I'm going to show you here a document that's
6  been produced.
7      MR. RUKAVINA:  Would you email it to me and I
8  can print it out for the court reporter.
9      MR. MORRIS:  You want to come over here and
10  look --
11      MR. RUKAVINA:  I know it.  I'm just thinking
12  that we can append it to the record right now.
13      MR. MORRIS:  It's eight pages, so it's part
14  of a whole production.
15      MR. RUKAVINA:  But it's just one email?
16      MR. MORRIS:  Just one email that I'm talking
17  about.  So we're looking at Bates stamp D-CNL003763.
18      And I'll email it to you when we're done here.
19  And you're welcome to come over here if you'd like to
20  see it.
21      Q.  (BY MR. MORRIS)  Mr. Klos, can you take a
22  look at the email that I have on my screen.
23      A.  Yes.
24      Q.  And do you see that it's an email from
25  Kristin Hendrix to the corporate accounting group on

**118**

1  Friday, May 3?
2      A.  Yes.
3      Q.  And were you also included in the corporate
4  accounting email string?
5      A.  Yes.
6      Q.  Can you read the email out loud, please.
7      A.  It says, Blair, please set up a wire from
8  HCMLP to HCMFA for 5 million as a new loan,
9  parentheses, 4.4 million should be coming in from Jim
10  soon.  Hayley, please add this to your loan tracker.  I
11  will paper the loan.
12      Q.  So based on that email, did you understand on
13  May 3 that HCMLP was going to loan $5 million to HCMFA?
14      A.  Yes, HCMFA.
15      Q.  And did you understand that Kristin
16  specifically told the corporate accounting group that
17  she would take responsibility for papering the loan?
18      A.  Yes, that's what she says.
19      Q.  Do you recall whether Mr. Waterhouse ever
20  objected to any aspect of Kristin's email?
21      A.  He didn't.
22      Q.  Do you recall in the history of the world
23  whether Mr. Waterhouse ever told you that this
24  $5 million transaction should not have been booked as a
25  loan?

**119**

1      A.  No.
2      Q.  Did anybody in the history of the world ever
3  raise a question to you as to whether or not Kristin
4  was authorized to paper the loan, as she describes it
5  in this particular email?
6      A.  No.
7      Q.  Do you know if this $5 million loan was also
8  included in the debtor's audited financial statements?
9      MR. RUKAVINA:  Objection.  Best evidence.
10      THE WITNESS:  Yes.  Again, subsequent event.
11      Q.  (BY MR. MORRIS)  Okay.  And did anybody in
12  the history of the world ever tell you that Highland
13  should not have included as a subsequent event in its
14  2018 audited financial statement this $5 million loan?
15      A.  No.
16      MR. RUKAVINA:  Objection.  Best evidence.
17      THE WITNESS:  No.
18      Q.  (BY MR. MORRIS)  Do you know if HCMFA had its
19  financial statements audited?
20      A.  It did.
21      Q.  And are you generally familiar with those
22  financial statements?
23      A.  Yes.
24      Q.  Are you aware that these two loans totaling
25  $7.4 million were included in HCMFA's audited financial

**120**

1  statements as a subsequent event for the period ended
2  December 31, 2018?
3      A.  Yes.
4      MR. RUKAVINA:  Objection.  Best evidence.
5      Q.  (BY MR. MORRIS)  Did anybody in the history
6  of the world ever tell you that HCMFA should not have
7  included as a subsequent event the borrowing of the
8  money reflected in these loans?
9      MR. RUKAVINA:  Objection.  Best evidence.
10      THE WITNESS:  No, no one said that.
11      Q.  (BY MR. MORRIS)  Do you know if HCMFA
12  included these loans as a liability on its balance
13  sheet?
14      A.  It did.
15      MR. RUKAVINA:  Objection.  Move to strike.
16  Best evidence.
17      Q.  (BY MR. MORRIS)  Did anyone in the history of
18  the world ever tell you that HCMFA should not have
19  included these loans as a liability on its balance
20  sheet?
21      MR. RUKAVINA:  Objection.  Best evidence.
22      THE WITNESS:  No.
23      Q.  (BY MR. MORRIS)  Okay.  Do you recall that in
24  October of 2020 HCMFA and NexPoint made a report to the
25  retail board?

David Klos - October 27, 2021

---

121

1   A. Yes.
2   Q. And are you aware that that's part of the
3 annual review process?
4   A. Yes, it's the 15(c) process.
5   Q. By the way, as we're talking about these
6 issues, did Mr. Waterhouse have -- was he an officer of
7 HCMFA in 2019 and 2020?
8   A. Yes.
9   Q. And what's your understanding as to the
10 office he held?
11   A. Treasurer, I believe.
12   Q. And do you know if Mr. Dondero held an
13 officer position with respect to each of the Advisors?
14   A. He did.
15   Q. What position did he hold?
16   A. I don't recall with certainty, but I believe
17 president.
18   Q. As officers of those two entities, do you
19 have any knowledge as to whether they participated in
20 the communications with the retail board in the fall of
21 2020?
22   A. I believe Jim and Frank both did.
23   Q. And do you know whether the retail board
24 asked the Advisors for a report on all obligations due
25 and owing to HCMLP and affiliates?

---

122

1   A. They asked for financials, I believe as of
2 6/30 as part of that process.
3   Q. And are you aware as to whether or not the
4 financials that were provided to the retail board
5 included, among other things, the $7.4 million in notes
6 that were -- that we're talking about here?
7   A. Yes, those financials would have included
8 those amounts as liabilities to HCMLP.
9   Q. Did Mr. Dondero or Mr. Waterhouse ever tell
10 you or anybody to your knowledge that the Advisors
11 should not have told the retail boards that they were
12 obligated to pay under those two notes?
13   A. No.
14   Q. Let's talk about loan forgiveness for a
15 moment.
16      How long have you been with the company?
17   A. March of 2009.
18   Q. At any time since you've been employed by
19 Highland, has Highland ever forgiven a promissory note
20 that it held where the maker was a corporate affiliate?
21   A. Not that I can recall.
22   Q. Have you ever heard prior -- has anybody ever
23 told you that before you joined the company, Highland
24 had ever forgiven in whole or in part any note that it
25 held where the maker was a corporate affiliate?

---

123

1   A. Not that I'm aware of.
2   Q. You referred to a couple of loans that were
3 given to individuals earlier.
4      Do you remember that?
5   A. Yes.
6   Q. What's the biggest loan that you can recall
7 Highland ever forgiving?
8   A. The largest one that I can remember was
9 a half-million dollars, 500,000.
10   Q. So you have no knowledge of any loan ever
11 being forgiven where the principal amount forgiven
12 exceeded $500,000; is that right?
13   A. Not that I'm aware of.
14   Q. And when is the last loan that Highland
15 forgave in whole or in part to one of its officers or
16 employees that you can recall?
17   A. I don't know a specific year, but it would
18 have been in the 2010, 2011 time frame. Maybe 2012,
19 but I suspect '10 or '11.
20   Q. So is it fair to say to the best of your
21 recollection and knowledge that Highland did not
22 forgive a single loan made to an officer or employee
23 for at least seven years prior to the petition date?
24   A. There's none that I can think of.
25   Q. Let's just turn our attention to

---

124

1 December 2020.
2      Do you recall that you testified at length
3 about your understanding of the conversations with
4 Mr. Waterhouse and Ms. Hendrix?
5      Do you remember that?
6   A. Yes.
7   Q. Okay. Are you aware of any instruction ever
8 made by Mr. Dondero or Mr. Waterhouse in November or
9 December 2020 in order to make the payments that were
10 due under the three term notes -- withdrawn.
11      There were three term notes that were due --
12 withdrawn.
13      There are three term notes at issue in this
14 case. Do you understand that?
15   A. Yeah, that's my understanding.
16   Q. And one of them was issued by NexBank; is
17 that right?
18   A. NexPoint Advisors.
19   Q. Thank you for the clarification.
20      One was by HCRE?
21   A. Correct.
22   Q. And one was from HCMS; do I have that right?
23   A. Yes.
24   Q. And all three of those notes were executed as
25 of May 31, 2017; right?

---

David Klos - October 27, 2021

125

1    A.  Yeah, that was the effective date on all
2   three.
3    Q.  And they all rolled up previously outstanding
4   notes that were due and payable to Highland.
5    Do I have that right?
6    A.  Correct.  To the best of my recollection.
7    Q.  So we'll refer to those notes as the term
8   notes.  Is that okay?
9    A.  Sure.
10    Q.  Do you have any knowledge that Mr. Dondero or
11   Mr. Waterhouse ever instructed HCMLP to make the
12   installment payments that were due at the end of 2020
13   with respect to any of those term notes?
14    A.  No, I don't believe they provided that
15   instruction to make those payments.
16    MR. RUKAVINA:  Objection.  Move to strike.
17   Lacks foundation.
18    MR. MORRIS:  I'm asking him if he ever heard.
19    MR. RUKAVINA:  But he answered a different
20   question.  He answered a different question.
21    Q.  (BY MR. MORRIS)  Did you ever see anything in
22   writing where either Mr. Dondero or Mr. Waterhouse
23   directed HCMLP to make the annual installment payments
24   that were due at the end of 2020 with respect to any of
25   the term notes?

126

1    A.  No.
2    Q.  Okay.  But to the best of your recollection,
3   in the 13-week forecast, those forecasts included the
4   installment payments that were due at the end of the
5   year; is that right?
6    A.  They did.
7    Q.  Did anybody ever tell you prior to
8   February 1, 2021, that your group had made a mistake by
9   not making the payment -- any of the payments that were
10   due under the term notes at the end of 2020?
11    A.  Not that I'm aware of.
12    Q.  Did anybody tell you prior to February 1,
13   2021, that the makers of the term notes expected
14   Highland to effectuate the payments that were due at
15   the end of the year without approval by Mr. Waterhouse
16   or Mr. Dondero?
17    A.  No.
18    Q.  Have you seen any protest in writing prior to
19   the commencement of the litigation by any of the makers
20   of the notes about a failure on the part of HCMLP to
21   perform its duties and make that payment at the end of
22   the year?
23    A.  No.
24    MR. MORRIS:  I have no further questions.
25    MR. RUKAVINA:  I have five minutes.

127

1    FURTHER EXAMINATION
2    Q.  (BY MR. RUKAVINA)  Go to Exhibit 16, please,
3   1-6.
4    A.  Sure.
5    Q.  Sir, this is an email string regarding that
6   Rule 15(c) that you were talking about.  I'm just going
7   to ask you about the top email, but you're welcome to
8   read the whole.
9    A.  Uh-huh.
10    Q.  You're copied on Mr. Waterhouse's email there
11   October 6, 2020; right?
12    A.  Yes, I'm on the email.
13    Q.  And Mr. Waterhouse writes, the HCMFA note is
14   a demand note.  You would have read that; right?
15    A.  Yes.
16    Q.  Did you ever correct Mr. Waterhouse when he
17   says the HCMFA note, as opposed to notes?
18    A.  No, that's not something I would have
19   corrected from Frank.
20    Q.  Do you recall right now that you might have,
21   when you read this, realized that he made a mistake?
22    A.  It would have been such a de minimus,
23   inconsequential mistake that I don't know that I would
24   have addressed it.
25    Q.  What about two sentences over, there was an

128

1   agreement between HCMLP and HCMFA the earliest they
2   could demand is May 2021.
3    Did you ever write to him and say that too
4   was a mistake?
5    A.  I didn't write to him.
6    Q.  Did you realize back then when you read it
7   that he had made a mistake?
8    A.  I'm not certain.
9    Q.  Did you -- and I'm not suggesting that you
10   should have.  You're a busy man.  But did you attach
11   any significance outside of the ordinary to this email
12   exchange?
13    MR. MORRIS:  Objection to the form of the
14   question.
15    THE WITNESS:  I struggle with how to answer
16   that.  I saw that this note was in response to retail
17   15(c) follow-up on the Advisors.
18    At this point my role was different, where I
19   was dealing with really the retail funds primarily.  So
20   the fact that I'm even on this email is somewhat
21   incidental.
22    Q.  (BY MR. RUKAVINA)  But surely on October 6,
23   2020 you knew that there were four HCMFA demand notes,
24   didn't you?
25    A.  I'm sure I would have had access to that

David Klos - October 27, 2021

**129**

1 information. I'm not sure that I was keeping track of
2 how many were outstanding at any given point in time.
3     Q.  And surely on October 6, 2020 you knew that
4 only two of them couldn't be demanded by May of 2021,
5 didn't you?
6     A.  Again, I don't know that I was even really
7 thinking about these notes at that time.
8     Q.  Even though you were preparing weekly cash
9 forecasts for Mr. Seery?
10     A.  I wasn't preparing a weekly cash forecast for
11 Mr. Seery.
12     Q.  Going to Exhibit 13, please.  Mr. Morris
13 asked you a couple questions about this.
14     A.  I'm sorry, 13?
15     Q.  Yes, sir.  And again, that paragraph 3 that
16 talks about prepayment.
17         Can you find anything in here, sir, that says
18 that a prepayment does not relieve the maker of any
19 regularly scheduled payment?
20     A.  Sorry, that's a lot to comprehend.  If you
21 could ask again.
22     Q.  Is there any provision that you can see here
23 that's to the effect that a prepayment will not relieve
24 the maker of any regularly scheduled payment?
25     A.  I don't see that specific provision.  I just

**130**

1 read it for what is on the page.
2     Q.  Isn't it, sir, in your experience the case
3 that a promissory note, if it intended not to relieve
4 the borrower of regularly scheduled payments would say
5 that a prepayment does not relieve the borrower of
6 regularly scheduled payments?
7     MR. MORRIS:  Objection to the form of the
8 question.
9     THE WITNESS:  That's a legal question.  I
10 can't -- I don't know the answer.
11     Q.  (BY MR. RUKAVINA) Do you remember seeing
12 promissory notes that say something like that?
13     A.  Not that I can recall.
14     Q.  You'd be surprised if that's what promissory
15 notes say?
16     MR. MORRIS:  Objection to the form of the
17 question.
18     THE WITNESS:  I don't know.
19     Q.  (BY MR. RUKAVINA) And Mr. Morris asked you
20 about this.  I'm trying to burn through this so the man
21 can make his plane.
22         Section 2.1 talks about 30 equal annual
23 payments, annual installments.
24         You see that?
25     A.  Yes, I see that.

**131**

1     Q.  And Mr. Morris asked you whether you see
2 anything in here that says that a prepayment relieves
3 an annual installment.
4         Do you remember that question?
5     MR. MORRIS:  Objection.  That's not what I
6 asked.
7     THE WITNESS:  I don't remember that question.
8     Q.  (BY MR. RUKAVINA) Reading Section 2.1 and 3
9 together, what would a prepayment apply to other than
10 an annual installment?  Do you have a view on that?
11     MR. MORRIS:  Objection to the form of the
12 question.
13     THE WITNESS:  Again, I struggle with
14 prepayment.  But as I read Section 3, it would be
15 applied first to unpaid accrued interest and then to
16 unpaid principal.
17     Q.  (BY MR. RUKAVINA) Have you ever in your
18 personal life prepaid a promissory note before -- have
19 you ever in your personal life prepaid a promissory
20 note prior to its maturity?
21     MR. MORRIS:  Objection to the form of the
22 question.
23     THE WITNESS:  I don't know.
24     Q.  (BY MR. RUKAVINA) Sitting here today, with
25 your CPA, your MBA and you're a CFO of a large entity,

**132**

1 you don't understand what a prepayment means?
2     MR. MORRIS:  Objection.  Argumentative.
3     I direct you not to answer.
4     You're going to have ask a different question.
5 That's an argumentative question and it's insulting.
6     MR. RUKAVINA:  What's the privilege on which
7 you're directing him not to answer?
8     MR. MORRIS:  I just said it's argumentative.
9     MR. RUKAVINA:  I'm trying to let you get to
10 your flight.
11     MR. MORRIS:  Ask a proper question.  Don't
12 make this about me.
13     Q.  (BY MR. RUKAVINA) You were going to answer
14 my question, sir?
15     MR. MORRIS:  No, I'm directing him not to
16 answer.
17     MR. RUKAVINA:  Then we'll end this deposition
18 with a motion to compel.
19     MR. MORRIS:  Okay.  You do that.
20     MR. RUKAVINA:  I'm making a motion to compel.
21 We'll call the judge as soon as we land in New York
22 tomorrow.
23     MR. MORRIS:  You have to read the whole
24 question.  You can ask the question without the
25 verbiage; right?

David Klos - October 27, 2021

**133**

1      MR. RUKAVINA:  And I asked you on the basis
2  of what privilege are you instructing your --
3      MR. MORRIS:  Argumentative.
4      MR. RUKAVINA:  That's not a privilege.
5      MR. MORRIS:  Sir, you can rephrase your
6  question and end this right now by not being insulting
7  to my client.
8      Q.  (BY MR. RUKAVINA)  I was not trying to be
9  insulting, sir.
10      I'm asking you again, you do not, sitting
11  here today, have an understanding of what the word
12  "prepayment" for a promissory note means?
13      MR. MORRIS:  Objection to the form of the
14  question.
15      You can answer that one.
16      THE WITNESS:  In the context that you're
17  asking the question --
18      Q.  (BY MR. RUKAVINA)  No, I'm not asking any
19  context.  Sitting here today, do you have an
20  understanding of what the word "prepayment" means when
21  it comes to a borrower/lender relationship?
22      MR. MORRIS:  Objection to the form of the
23  question.
24      THE WITNESS:  Yes, I have a general
25  understanding.

**134**

1      Q.  (BY MR. RUKAVINA)  What is your
2  understanding?
3      A.  That -- you can look at the note.
4      Q.  I'm not asking about the note.  We got to go
5  step by step.
6      What is your general understanding as to what
7  a prepayment means?
8      MR. MORRIS:  Objection to the form of the
9  question.
10      THE WITNESS:  It depends on the context and
11  it's going to depend on what the note says about
12  prepayments.  So I have a hard time answering that
13  question.
14      Q.  (BY MR. RUKAVINA)  So you would agree with me
15  that you have to look at the note before you can answer
16  that question?
17      MR. MORRIS:  Objection to the form of the
18  question.
19      THE WITNESS:  I would want to look at the
20  note before I answer the question, because prepayment
21  is a term that can be used as a defined term or in a
22  casual sense, and those two can sometimes get confused
23  and misconstrued.
24      Q.  (BY MR. RUKAVINA)  Would you agree with me
25  that in any and all circumstances a prepayment is a

**135**

1  payment made prior to the time that it's due?
2      MR. MORRIS:  Objection to the form of the
3  question.
4      THE WITNESS:  Yes, in the most general sense
5  a prepayment, the prefix "pre" indicates that it's
6  before some other event.  So from that standpoint,
7  prepayment means it was to some extent paid early.
8      MR. RUKAVINA:  Thank you.
9      Pass the witness.
10      MR. MORRIS:  No further questions.
11      Michael?
12      MR. AIGEN:  No questions.
13      THE REPORTER:  Mr. Morris, do you want a copy
14  of the transcript?
15      MR. MORRIS:  I sure do.
16      THE REPORTER:  Mr. Aigen, do you want a copy
17  of the transcript?
18      MR. AIGEN:  Yes, we would also like a copy.
19      MR. MORRIS:  Yeah, and I'd like that rush.
20      (Whereupon, the deposition adjourned at
21      5:14 P.M.)
22           --oOo--
23      I declare under penalty of perjury that the
24  foregoing is true and correct.  Subscribed at
25  _____, Texas, this ____ day  of

**136**

1  _____, 2021.
2
3
4  _____
5  DAVID KLOS
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

David Klos - October 27, 2021

**137**

1          CERTIFICATE OF REPORTER
2          I, BRANDON D. COMBS, a Certified Shorthand
3   Reporter, hereby certify that the witness in the
4   foregoing deposition was by me duly sworn to tell the
5   truth, the whole truth, and nothing but the truth in the
6   within-entitled cause;
7          That said deposition was taken in shorthand by
8   me, a disinterested person, at the time and place
9   therein stated, and that the testimony of the said
10  witness was thereafter reduced to typewriting, by
11  computer, under my direction and supervision;
12         That before completion of the deposition,
13  review of the transcript was not requested.  If
14  requested, any changes made by the deponent (and
15  provided to the reporter) during the period allowed are
16  appended hereto.
17         I further certify that I am not of counsel or
18  attorney for either or any of the parties to the said
19  deposition, nor in any way interested in the event of
20  this cause, and that I am not related to any of the
21  parties thereto.
22         **DATED:** November 1, 2021
23
24         _____
25         Brandon Combs, Certified Shorthand

**138**

1   State of Texas
    Dickman Davenport, Inc. Cert 312
2   4228 North Central Expressway
    Suite 101, Dallas, TX 75206
3   (214) 855-5100   (800) 445-9548
    Email: info@dickmandavenport.com
4   www.dickmandavenport.com
    My commission expires 1-31-23
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

David Klos - October 27, 2021

**A**

ability 42:12
  43:21 78:2 88:8
  88:10
able 31:20 32:2
above-styled
  1:21
absolutely 12:4
  16:10 77:1 80:1
  80:14 90:1,4,10
  94:1 115:6
accepting 19:17
access 99:13
  128:25
account 53:20
  60:3 113:16
accountant 26:5
  26:9,15,20
  39:12,17 90:19
  109:5 113:23
accountant's
  39:13
accountants
  109:3
accounted 38:6
  45:8,11 64:23
accounting 4:16
  6:5,5,11,11
  7:14,17,21 8:23
  9:3,5,5,9,15,23
  10:12 33:22
  35:9,16,20
  43:18 53:4
  62:10,11 70:15
  74:22 84:2
  107:5 109:2,7
  115:1,7,18,21
  117:25 118:4
  118:16
accrue 49:13
accrued 38:8
  46:8,16,20,25
  47:1,4,5,11,14
  47:18,19,24,25
  48:4,5,7,15

49:4,5,12,20,21
  50:8,21 51:3
  131:15
accumulated
  47:22
accurate 27:25
  85:10
acknowledgment
  87:21,22
act 11:5
activities 107:17
activity 107:16
actual 37:5 85:13
add 118:10
additional 89:2
address 64:7
addressed 44:9
  127:24
adjourned
  135:20
advisor 9:24 71:7
  74:19
advisor-type 6:7
advisors 1:10
  12:14,15,17
  13:3,6 27:1
  52:19 55:1
  60:22 65:23
  71:6 72:22 86:6
  99:20 100:17
  102:21 103:9
  121:13,24
  122:10 124:18
  128:17
affect 16:11,12
  16:20
affiliate 39:23
  122:20,25
affiliated 10:21
  34:8 35:4,11
  36:2 61:15
affiliates 38:5
  51:20 121:25
AFR 86:7
afternoon 95:22

agent 85:16
ago 19:6 34:25
  36:20 39:21
  43:5 94:20
  95:11
agree 8:11 47:10
  47:11 51:7 77:2
  89:19 134:14
  134:24
agreement 12:23
  84:11 96:4,8,23
  97:9 98:5,12
  104:8,9 109:22
  110:7 128:1
agreements 41:3
  97:16,23 98:1
agrees 48:7
ahead 45:7
Aigen 2:18 3:4
  95:18,22,23
  99:8 100:3,10
  100:12,14,24
  101:14 102:4
  102:18 103:20
  104:23 105:24
  106:3 108:11
  109:15,20
  135:12,16,18
Akard 1:24 2:4
aleck 50:7
alleged 97:22
  98:5
Allocation 70:25
  74:12 75:6
allow 75:4
allowed 46:13
  81:22 82:1
  94:16 96:20
  137:15
allowing 96:8
amortization
  23:16 28:1
amount 15:5,15
  37:5 47:22
  59:13 73:2

80:21 84:14
  97:12 123:11
amounts 28:24
  41:7 122:8
analysis 30:9
  53:25 54:6,9,18
  55:1,8 89:13
analyst 5:17,25
and/or 40:12
  67:7 91:22
annual 23:22
  80:9 112:8
  114:7,12 121:3
  125:23 130:22
  130:23 131:3
  131:10
answer 16:23,25
  17:2 20:18,20
  21:3,15 22:1
  25:5 28:10
  35:16 41:18
  50:11 53:24
  55:15,23 71:5
  78:11 79:7 87:7
  94:13,14,17,21
  104:22 128:15
  130:10 132:3,7
  132:13,16
  133:15 134:15
  134:20
answered 21:2
  41:17 56:11
  76:19 85:21
  91:10 92:5,6
  94:9 125:19,20
answering
  134:12
answers 9:18
  16:10,13
anybody 24:13
  60:1 80:16
  111:12,16
  112:13,25
  113:2 116:22
  119:2,11 120:5

122:10,22
  126:7,12
anymore 57:1
  61:22 62:7
AP 115:14
apologize 9:21
  27:22 63:11
  66:21 77:1
apparatus 12:9
APPEARANC...
  2:1
appeared 2:5,12
  2:19
appears 49:3
  64:2
append 117:12
appended 137:16
application 37:8
  37:9,15,16
applied 39:17
  46:8,9 48:11,14
  49:5,8 64:13,16
  65:1 131:15
apply 38:24
  131:9
Appreciate
  100:13
appropriate
  35:19,22
approval 66:14
  77:19,23 78:3
  78:21 79:3
  126:15
approvals 80:9
approximate 6:1
  63:2
approximately
  5:9 105:10
April 7:13,22
  11:16,21 88:9
areas 107:21
argumentative
  90:15 132:2,5,8
  133:3
art 8:1 9:3 10:12

David Klos - October 27, 2021

ascertain 45:2,4
asked 16:18 20:5
21:2 30:18
41:10,17 44:10
54:13 55:17,22
56:11 57:12,15
59:12 70:9
76:19 84:8,17
85:21 86:10
91:10 92:5 94:9
108:11 110:18
114:3 121:24
122:1 129:13
130:19 131:1,6
133:1
asking 18:11
20:21 28:6
38:20 56:9,13
61:5,7 77:13
83:22 94:15
100:9 125:18
133:10,17,18
134:4
aspect 118:20
ass 17:18
asserted 97:7
98:8
asset 15:7
assets 15:3 87:10
87:12 97:12
107:12
assist 42:13
assistance 31:13
assistant 6:24 7:4
7:7,10 8:8
assisted 22:23
assume 28:7 29:7
90:6 95:18
101:21
assumed 7:14
53:3
assuming 36:14
36:21 41:23
64:1
assumptions

54:14
attach 128:10
attempt 87:7
attention 123:25
attorney 2:5,12
2:18 137:18
audit 9:25 24:6
80:4 116:10
audit-driven
88:5
audited 116:13
116:17,24
119:8,14,19,25
auditor 24:3
auditors 24:5
88:6,14
aughts 106:13
August 42:16
44:13
authenticate 28:5
authenticity
67:23
authoritative
65:1,2
authority 36:9
77:3,13,15 78:7
78:21,25
authorization
108:10
authorize 77:4
authorized 40:2
59:15 69:6,25
85:24 108:5
112:20 113:15
119:4
authorizing
94:20
Avenue 2:11,17
aware 35:6 58:24
59:2,3 80:18,21
96:6,10,12
97:15 100:24
101:5,8 102:7
103:20,24
106:6,20

109:23 115:12
116:16 119:24
121:2 122:3
123:1,13 124:7
126:11
awfully 17:20

**B**
back 6:14 15:19
22:12 23:21,25
36:11 40:18
49:17 51:13
55:16 65:12
67:4 68:25
82:23 83:19
84:4 85:12
102:13 128:6
back-end 15:19
15:21
back-ended
14:25
background 4:13
53:2 70:5,6,7
backup 36:19
bad 20:12 89:15
balance 49:6
80:6,8 120:12
120:19
ballpark 85:24
bank 36:17 99:13
bankruptcy 1:1
31:19 80:10
96:15 98:12
102:14 104:12
base 14:5,7
based 14:11,14
32:12 37:17
46:5,7 48:12,19
54:14 104:14
104:16 118:12
basically 6:3
31:13 56:1 81:5
basis 23:22 30:2
133:1
Bates 83:15

117:17
began 5:11
beginning 109:4
behalf 2:6,13,20
12:24 25:2 78:2
78:22 79:1
111:13 112:15
112:21
beings 71:19
belief 104:16
believe 6:23
15:11 16:3 17:3
17:8 18:2 19:23
21:13,13 22:20
23:13,19 24:16
26:13 49:9 51:1
51:2 74:16
77:17 78:1,7,19
81:8 83:1,3
86:25 102:6
111:10 115:24
121:11,16,22
122:1 125:14
believed 35:10
57:6 113:17
beneficiaries
17:10,15
benefiting 73:9
best 5:25 8:3
52:15,17 55:7
63:24 64:4
78:16,17 85:8
95:19 109:21
110:6 111:9
115:4 116:20
116:25 119:9
119:16 120:4,9
120:16,21
123:20 125:6
126:2
better 111:19
biggest 123:6
bill 74:20
bills 82:4,5,10,11
birth 4:9

bit 7:9 12:12 14:2
30:15 33:12
39:3 48:1 98:15
106:23 107:5
Blair 115:10,14
118:7
board 120:25
121:20,23
122:4
boards 122:11
bold 40:25
bonus 14:8,9,10
14:19,24 15:14
18:5 90:21
book 33:21 34:12
34:20
booked 32:23
33:11 34:9 35:5
35:20 36:24
44:23 90:8
116:4,8 118:24
books 80:7
110:24 111:4
borrow 78:22
borrower 45:6,15
45:19,24 46:2
130:4,5
borrower/lender
133:21
borrowing 120:7
boss 39:13
Boston 4:15 5:8
5:10
brain 32:9
Brandon 1:22
137:2,25
break 7:6
bridge 29:22
30:6
briefly 13:5
bring 49:6
broad 9:22 35:17
61:3 107:21
broader 76:8
broken 53:16

David Klos - October 27, 2021

brokers 10:17
brought 6:4,14
  31:3,7 97:15
bucks 74:25
budgeting 6:8
burn 130:20
businesses 30:1
busy 11:15,19
  128:10

**C**
call 6:4 11:11,13
  38:10 63:14
  90:16 132:21
called 9:24 58:21
  59:11 70:24
  74:16 88:7
  109:5 112:9
calling 90:24
Calls 112:3
capital 1:6,9 5:11
  6:6 8:4 13:6
  23:22,23 26:19
  26:23 27:1 29:4
  29:19 32:6,23
  35:3 37:25 71:6
  107:2 110:8
car 82:9
career 11:20
careful 17:21
carry 110:24
case 43:20 86:24
  89:18 103:11
  105:17 124:14
  130:2
cash 9:25 23:21
  23:24 25:23,24
  26:7 31:9,10,12
  31:14,16,23
  32:8,12,14
  41:15,24 42:12
  42:23 43:5,22
  43:24 44:1
  57:25 61:25
  63:2 73:20

88:12,17 93:7
  93:20,21 107:6
  107:16 109:7
  111:3 129:8,10
casual 134:22
caught 62:5
cause 1:21 137:6
  137:20
caused 79:12
  81:10
causes 82:9
Central 138:2
Cert 138:1
certain 5:17
  11:13 12:21,21
  13:12 23:14
  33:13 38:1
  54:14 67:21
  70:12 83:9
  95:11 96:9
  97:10 98:17
  99:14 101:1
  103:22 106:18
  109:24 111:20
  128:8
certainly 6:18
  9:17 12:3 20:10
  26:4 30:11
  32:16 34:4
  35:18 37:23,24
  42:11 50:4 58:8
  62:14 69:1
  77:13,24 86:22
  101:8,10,12
  108:8
certainty 29:13
  42:19 68:18
  69:8,11,24 70:2
  102:19 103:10
  103:12 108:7
  121:16
CERTIFICATE
  137:1
Certified 137:2
  137:25

certify 137:3,17
cetera 6:1 14:20
CFO 5:21,25
  8:18 48:6,21
  131:25
chain 53:5
chance 69:4
change 8:8 16:10
  46:10 59:1
  84:13 103:25
changed 6:18
  39:11 84:16
changes 7:1
  137:14
Changing 106:23
characterize 54:1
  76:10 87:18,19
characterized
  54:2
charge 6:15 10:3
chief 7:13,17,21
  8:23,23 9:3
  10:12 13:20,22
  53:3
circumstance
  51:1
circumstances
  31:2 134:25
claim 81:1,9
claimant 15:16
  18:6
clarification
  124:19
clarify 11:3 12:8
  53:1 66:18
  75:25
clear 17:21 26:19
  27:11 29:14
  52:24 63:9
  69:15,16 73:13
clearly 74:2
client 133:7
clients 17:25
Cliff 7:23
close 17:21 33:14

98:3
closed-end 74:14
closely 62:4
coach 100:11
coaching 100:10
  100:13
cold 46:6
collect 81:17
collected 81:19
collectible 87:15
collecting 15:16
  81:6,6
collection 87:25
collective 52:2
college 4:15 5:6
column 36:25
  37:7
combination
  39:16 45:12
combine 106:24
Combs 1:22
  137:2,25
come 47:12 53:7
  59:19 65:3,5
  76:22 101:6
  117:9,19
comes 133:21
comfortable 88:6
coming 17:20
  36:13 118:9
command 53:5
commencement
  112:14 126:19
comment 17:13
commission
  138:4
common 30:5
  86:5
communicated
  95:12
communicating
  53:9
communication
  83:10
communications

121:20
company 81:14
  122:16,23
compel 132:18,20
compensate 72:8
  72:12 79:14
  89:20 110:15
compensated
  17:16 110:2,3
compensation
  14:3,6,8,19
  15:14 16:4,12
  16:16,21 17:4,8
  17:24 18:5
  60:18 73:8,12
  79:25 90:2,12
  90:17 105:21
complete 15:3
  74:23 106:11
completed 15:22
  15:25 16:2
  74:21
completely 15:24
  27:25 89:9,15
  90:7 115:17
completion
  137:12
complex 108:24
  108:25 109:2
compliance 6:8
  72:4
comprehend
  129:20
computer 137:11
computerized
  1:24
concept 89:16
concern 23:23
  24:1,2,4 56:21
  56:23,25 62:17
concerning 17:7
  63:20
conclude 80:25
concluding 24:6
conclusion 94:25

David Klos - October 27, 2021

112:4,10
condition 96:4
conditional 97:11
conduct 69:18
confer 26:4
confident 69:5
confirm 59:17
   61:19
confused 41:6
   134:22
confusion 11:6
conjunction 24:5
connection 24:12
   26:2
consent 74:16
   75:23 80:2
   85:15 90:3
   93:16
consented 74:17
consequence
   104:20
considerations
   16:1 60:10
constant 75:15
construct 90:2
consultancy 11:9
   11:11
contended
   113:10
context 133:16
   133:19 134:10
contingent 14:11
continue 17:22
   100:8 110:24
continued 111:2
continuously
   6:17 29:22
contract 71:10
contracted 71:15
contradict 79:18
control 43:2
   90:10
controlled 89:8
controller 6:24
   6:25 7:4,4,8,8

7:10,10 8:4,8,9
8:12,15 9:11
10:10,12 12:19
13:10,17 48:6
conversation
18:22 19:9,19
43:15 51:25
70:14 91:25
93:18 94:24
103:18 105:18
111:11,16
conversations
18:23 19:11
20:2 34:11 42:6
51:25 93:19
96:16,19,22,24
97:20,22 98:2,5
102:9,12,13
104:24 105:5,7
105:11,16,21
124:3
conversion 74:15
74:17,21
converted 74:13
conveyed 102:25
103:1
coordinated
22:21
copied 127:10
copy 135:13,16
135:18
corporate 6:5,15
9:9,15 25:22
33:8 35:9,16
39:12,13,16
43:17 61:14
62:11 70:15
73:20 84:2
109:1,6 115:1,7
115:18,20
117:25 118:3
118:16 122:20
122:25
correct 5:22,23
8:19,21 9:20

16:17 40:2 42:1
45:25 51:11
61:10 64:25
68:10 69:2
82:21 88:11,17
88:23 91:2
97:18 99:17
101:21,22
105:23 124:21
125:6 127:16
135:24
corrected 127:19
correctly 5:16
51:13 62:9
cost 97:13
counsel 2:6,13,19
18:10,20,25
20:3 21:16
22:21,25 23:3
96:17,20,22
97:21 98:1
137:17
couple 61:20
87:14 123:2
129:13
course 20:3 33:19
51:9 66:12
69:18 83:22
84:4,6
court 1:1 117:8
courteous 76:24
covered 20:14
53:2
CPA 4:19,22
44:21 48:6,20
49:11 131:25
CPAs 95:4
created 80:10
credit 6:8 25:9
40:11 89:13
90:11
creditors 15:17
CSR 1:23
curiosity 59:21
current 4:25

cut 109:8
cycle 41:7

**D**

D 1:22 137:2
D-CNL003763
   117:17
Dallas 1:3,25 2:4
   2:18 4:12 5:10
   138:2
damages 82:12
date 4:9 8:6
   24:22 45:20
   47:5,6,23 48:25
   49:13,13,14
   84:14 123:23
   125:1
dated 114:23
   137:22
dates 27:10 28:18
   28:24 111:17
Davenport 138:1
David 1:14,18
   4:1,6 136:5
Davor 2:5 76:22
day 29:21 32:1
   34:1 59:7 74:8
   93:18 117:2
   135:25
day-to-day 9:17
   62:6
days 59:5 76:2,7
de 127:22
dealing 29:20
   128:19
debtor 26:21
   32:23 38:6,22
   38:23 76:16
   77:3,5,8 78:2
   81:1 87:14
   88:16 116:22
debtor's 111:4
   116:13,17
   119:8
debts 89:3

December 24:20
24:23 51:10,15
51:22 53:18
54:24 56:17,22
57:6,13,17,21
58:7,9 60:20,25
61:21 63:19
98:18,18,24
99:19 100:15
101:1 102:17
103:23 113:2,3
120:2 124:1,9
decide 38:23 39:5
90:12
decided 24:9,12
24:14,15 32:7
64:22 77:18
84:25 86:1
decides 38:22
deciding 64:15
69:18
decision 27:2
30:25 86:5
decision-making
32:10
decisions 29:8
30:9,16
declare 135:23
deduction 73:9
default 58:13,17
61:14 62:18
defendants 1:11
1:20 2:6,20
96:3,6
defense 80:15
96:3,7,13,23
97:5,7 98:1
defenses 96:10
96:18
defer 103:13,18
define 47:18,20
defined 104:8
134:21
definitely 6:21
7:12 73:6

David Klos - October 27, 2021

**definition** 38:11
104:13,14
**definitive** 50:11
**definitively** 15:20
**degree** 4:16
**degrees** 4:14
**Deloitte** 5:8,8
**demand** 23:13
86:3,8 87:14
88:15 127:14
128:2,23
**demanded** 129:4
**deny** 67:22
**department** 9:7
84:9
**depend** 15:15
17:6,9 134:11
**depending** 31:2
32:15 89:11
**depends** 16:5
134:10
**deponent** 137:14
**deposition** 1:13
1:18 18:9,24
19:16,22,24
20:5,9,14,16
21:1,7,9,12,19
27:20 132:17
135:20 137:4,7
137:12,19
**describe** 8:2
54:11,13
**described** 13:16
54:10 69:6 72:1
87:23,24 92:2
109:24 110:13
114:11
**describes** 119:4
**describing** 33:7
**detail** 54:5 58:2
**determination**
60:17
**determine** 38:16
**determined**
40:21

**determining**
89:13
**Dickman** 138:1
**differed** 54:10
**difference** 49:7
76:6
**differences**
107:14
**different** 30:5
34:15 38:21
44:11 74:9
77:12 99:11
107:11,12,17
125:19,20
128:18 132:4
**direct** 9:15 20:17
20:19 34:13
78:13 132:3
**directed** 20:22
51:19 60:21
68:19,20,21
69:1,3 125:23
**directing** 132:7
132:15
**direction** 33:2
34:2 35:23
54:15 55:18
62:24 65:1,2
94:25 102:23
102:24 137:11
**directions** 103:19
**directly** 103:19
**disagree** 89:19
99:21 100:18
**disciplinary** 5:3
**disciplined** 5:2
**discuss** 20:4 97:2
**discussed** 15:8
21:16 90:1
93:15,17 94:1
97:4,6
**discussing** 42:3
65:9 77:25 92:4
92:8,11 93:3,10
**discussion** 19:21

31:4,7 39:21
57:18,22 58:3,4
60:1,5,8 62:20
63:1,20 92:14
101:20
**discussions** 19:3
21:8 24:13
30:24 41:13
59:22 63:22
103:2
**disinterested**
137:8
**dissimilar** 14:21
**dissuade** 62:23
**distinct** 10:10
**distribution** 59:9
83:5
**DISTRICT** 1:2
**dividend** 105:8
**DIVISION** 1:3
**document** 44:21
46:23 50:15
64:6,12 76:23
76:23 79:17
84:10 88:2
96:15 117:5
**documents** 67:8
76:20
**doing** 6:5,11 9:24
25:18 85:14
86:17 89:13
95:2
**dollar** 28:18 75:2
75:2
**dollar-for-dollar**
73:4
**dollars** 18:1
123:9
**Dondero** 2:20
24:11 29:15
30:8,19 32:7
33:21 34:2,7,18
38:4 39:24
40:10 41:14
42:3,7,10 43:2

43:7,10,16,25
51:18 52:4,7,19
53:12,15,16
54:18,24 55:9
55:17,25 56:3
56:10,15 60:21
61:24 62:23
65:3,24 69:9,12
70:15 74:3 76:1
76:13 77:2,25
85:1,19 89:18
90:9 91:14,17
91:21 92:9,14
92:23 93:3,10
93:25 94:2,5
95:1,24 98:11
98:11 101:7
104:24 105:16
105:21 112:20
113:8,14 116:6
116:21 121:12
122:9 124:8
125:10,22
126:16
**Dondero's** 62:11
73:6 76:9 77:19
78:3,21 79:3,11
79:18
**double** 81:5
**doubt** 35:21 36:8
**dozens** 65:16
**draft** 24:16
**drafted** 22:21
**drafting** 58:17
**DRIP** 105:8
**driven** 42:19
**drukavina@m...**
2:7
**due** 25:16,19
37:12,18 47:12
49:12 51:10,14
74:20 76:22
98:18,24 111:1
111:7 112:1,6
112:16 113:11

113:17,24
121:24 124:10
124:11 125:4
125:12,24
126:4,10,14
135:1
**duly** 1:19 4:2
137:4
**duties** 9:12 62:6
126:21
**duty** 25:9

**E**
**earlier** 17:13
49:14 75:13
98:16 101:6
111:13 123:3
**earliest** 128:1
**early** 51:22 54:24
60:20 87:1 89:2
111:5,21 135:7
**educational** 4:13
**effect** 41:14
62:18,21
129:23
**effective** 125:1
**effectively** 49:22
75:5
**effectuate** 99:13
112:21 126:14
**effectuated** 99:3
**eight** 117:13
**either** 21:18 26:3
26:25 29:12
30:16 31:10,16
35:23,25 38:8
39:12 48:19
50:12 68:14
69:1,3,9 79:24
84:21 86:12
105:25 125:22
137:18
**electronically**
84:22
**eliminate** 111:14

David Klos - October 27, 2021

email 2:7,14,22
  54:16 59:8,9
  67:14,15,18,21
  69:4,7 70:13,16
  82:23,25 83:7
  83:10,11
  114:23 115:2,5
  115:13,18,23
  117:7,15,16,18
  117:22,24
  118:4,6,12,20
  119:5 127:5,7
  127:10,12
  128:11,20
  138:3
emailed 59:11
emails 80:13
employed 122:18
employee 12:23
  26:17,21,24
  123:22
employees 43:11
  72:2 98:8 106:7
  106:12 107:8
  107:20 123:16
employment
  78:13
ended 120:1
ensure 23:20
enter 78:25
entered 98:11
enterprise 30:1
  32:18
entire 12:9
  115:17,20
entities 6:7 25:24
  26:16 30:6
  31:11,16 34:8
  61:15 65:18,22
  65:22,24 99:6
  101:1 102:20
  103:8 106:24
  107:18,25
  108:17,19,21
  108:25 121:18

entitled 17:23
  18:10 20:4
entity 12:20 13:8
  13:11,13 30:20
  31:20 32:7,15
  32:17 34:19
  35:4,11 36:2
  40:10 42:10
  75:8,10 90:10
  109:13 131:25
equal 86:6
  130:22
equity 79:24
  90:22
error 70:25 71:2
  71:19,25 72:13
  72:14,19 73:4
  79:15 80:20
  81:1,14 85:22
  89:20 90:3,3
  92:11,16,17,18
errors 71:9 72:20
  72:21 73:16
especially 15:4
established 51:4
  75:13 76:11,12
  78:12
estate 107:13
estimate 11:22
et 6:1 14:20
event 116:17
  119:10,13
  120:1,7 135:6
  137:19
events 16:20 96:9
eventually 32:2
evidence 80:14
  111:5,9 116:20
  116:25 119:9
  119:16 120:4,9
  120:16,21
evolved 6:18,21
exact 7:5,11
  15:24 20:16
  94:19

exactly 5:18
  14:24 15:23
  34:3 48:2 77:23
  80:16
Examination 3:3
  3:4,5,6 4:3
  95:21 109:18
  127:1
example 31:6,9
  37:6 48:25
exceeded 87:10
  123:12
exception 16:8
  17:1 44:2,3
excess 41:15
exchange 128:12
exclude 18:22
exclusively 23:13
  33:14,14
excruciatingly
  73:13
excuse 37:1 74:25
executed 24:18
  31:1 70:22 84:3
  124:24
execution 22:7,13
  22:20 24:23
  83:21 84:19
  85:6
executive 26:14
exhibit 22:4 23:8
  27:9,15,23
  36:12 40:20
  42:17 44:13,22
  46:12 48:12
  49:1,10 64:2,5
  67:17 68:4
  82:24 83:20
  114:1,22 127:2
  129:12
exhibits 3:10
  67:2,7 68:1
existing 7:13
  23:13
expand 59:7

expect 17:12
  64:12 65:4
  83:12 86:21
expectation 15:1
expected 126:13
expenses 73:7
experience 5:5
  37:18 38:14
  46:19 49:11
  104:16 130:2
expert 82:21 87:6
expertise 48:20
expires 138:4
explain 8:22
  64:13 107:1
explaining 92:25
explore 12:12
express 14:19
Expressway
  138:2
extended 7:12
extending 14:17
extent 31:10,12
  60:24 61:8
  66:10 86:23
  135:7
extrapolating
  92:24

_____

**F**

FA 88:7
face 71:16
facile 15:24
facilitate 25:18
  31:15
facility 6:8
fact 29:6 58:23
  58:23 76:14
  79:21 94:23
  101:9 112:19
  128:20
failed 58:18
failure 126:20
fair 16:15 35:8
  60:9 65:15

91:16 97:14,23
  99:1,15 104:17
  105:15,20
  115:16 123:20
fairly 9:22 30:4,5
  84:7
fall 80:10 121:20
familiar 21:23
  22:5,6 28:1
  67:1 82:15
  104:1 114:17
  116:13 119:21
far 5:1 24:15
  37:5 58:23 62:6
  84:11 87:9
fault 81:10
faulty 43:3
February 80:19
  113:10 126:8
  126:12
fee 74:16,18
  75:23 80:2
  85:15 90:3
  93:16
feel 54:5 69:5
feels 35:17 82:22
fight 53:17
file 80:11
final 30:9
financial 8:23
  13:20,22 87:20
  116:14,17,24
  119:8,14,19,22
  119:25
financials 122:1
  122:4,7
find 26:13 31:15
  67:14 129:17
fine 21:10 39:3
  90:21 106:25
FINRA 4:21
firm 95:23
first 4:2 37:2,4
  42:22 46:14
  48:14 49:5 50:7

David Klos - October 27, 2021

72:14,19,19
75:14 96:2
110:20 131:15
**five** 105:3 126:25
**flag** 10:4
**flavoring** 63:14
**flight** 132:10
**flip** 37:1
**flipped** 9:20
**Floor** 1:25 2:11
**flow** 23:21,25
26:7 88:17
96:15
**focus** 8:14 65:10
**focused** 6:7
**follow** 16:18
**follow-up** 128:17
**followed** 116:11
**follows** 4:2
**forecast** 126:3
129:10
**forecasting** 6:8
**forecasts** 9:24
44:1,4 126:3
129:9
**foregoing** 135:24
137:4
**foreign** 89:15
**forgave** 123:15
**forget** 86:7
**forgetting** 9:8
**forgive** 123:22
**forgiven** 96:8
106:7,16,17,20
122:19,24
123:11,11
**forgiveness** 97:10
97:17 122:14
**forgiving** 123:7
**form** 6:16 8:25
11:17,24 12:25
14:12 21:24
22:8,15 23:10
25:3,11 27:4
29:10 32:25

33:24 34:21
35:13 36:4
37:20 38:17,25
39:7 40:3,14
42:24 43:19
44:16,24 45:9
45:17 46:21
47:8,15 48:8,22
49:15 50:13
51:5 52:21
53:22 54:7 55:3
55:12,19 57:8
60:12 61:1 63:5
64:9 65:19,25
66:7,15 69:20
71:3,12,20
76:18 77:6,20
77:23 78:4,23
79:5,19 81:2,11
81:23 82:6,13
84:11,12 87:3
88:18 89:5
90:14 91:3,9
93:13 94:8 95:5
99:4,23 100:19
101:3,25
102:15 103:15
104:18 108:2
128:13 130:7
130:16 131:11
131:21 133:13
133:22 134:8
134:17 135:2
**found** 61:18
**foundation**
113:20 125:17
**four** 6:13 128:23
**frame** 4:24 7:11
7:12 8:10,14,24
12:6 20:12 24:8
25:1 66:12,20
67:16 106:13
123:18
**Frank** 8:17 11:1
20:9 29:13

30:15,17 35:23
35:25 36:10
44:7 52:1 53:7
53:8 54:15 55:9
60:20 61:14
68:14,14 69:1,3
70:13,14 77:13
77:15 80:12,13
93:6 101:7,18
101:23 102:3,4
102:8,9,11
121:22 127:19
**Frank's** 39:18
**Frankly** 48:10
**fraud** 81:5
**frequent** 84:1
**Friday** 118:1
**front** 10:17 44:8
67:20 68:5 72:3
**full** 57:3 106:18
**full-service** 107:5
**full-time** 12:3
**function** 72:2
**fund** 1:9 6:11,11
9:5,5 13:6
70:24,25 71:1,6
71:7,8 72:8
73:15 74:11,12
74:13,13,14,17
75:2,6 80:20,23
81:16 86:5
109:3
**funds** 10:21,22
12:13 29:9 30:2
30:19 31:20
34:8 35:11
75:24,24 76:1
80:9 85:14
128:19
**further** 3:6 24:19
84:18 126:24
127:1 135:10
137:17
**future** 17:4 45:16
49:13,20 53:17

93:7

**G**

**gearing** 53:17
**gears** 65:8
**general** 18:13,15
19:9,10 20:11
20:13 32:20
33:19 61:4
92:11 93:4
96:24 97:6
104:4,5 108:20
133:24 134:6
135:4
**generally** 19:25
27:24 30:4
32:21 38:4,4
40:2,11,16
42:15 45:8
77:22 96:5,10
96:12,17 98:20
105:1 107:1
108:18 110:22
116:15 119:21
**generallys** 40:6
**generating** 42:12
**Germans** 63:14
**getting** 10:4
32:9 44:8
51:13 59:8
**give** 5:21,24 14:4
16:13 39:3
67:25
**given** 15:5 43:2
43:22 47:23
70:12 73:21,22
74:1 102:8
123:3 129:2
**global** 52:25
70:24 74:12
75:6 101:13
**go** 15:19 16:1
20:1 43:6 54:4
65:12 81:9
82:18 85:10

105:24 127:2
134:4
**goes** 28:9 40:18
87:9
**going** 14:2 15:5,6
16:9,12,15,19
17:5 20:19
28:17 32:10
36:11,12 42:22
46:11 49:13
55:16 57:11,14
62:18 65:8,9,10
65:12 68:1 70:5
74:22 79:9
82:23 83:11,19
88:7 89:20
106:23 107:17
108:20 111:17
117:5 118:13
127:6 129:12
132:4,13
134:11
**good** 73:20 95:22
96:1 100:12
**grad** 5:7
**graduate** 4:14,15
**group** 5:19 6:11
6:16 9:9,14,15
9:21 10:7,9,14
10:15,24 11:7
35:9 43:18
61:21 62:10,11
83:5 109:3
110:24 115:2,5
115:18,21
117:25 118:16
126:8
**groups** 6:19,20
**guess** 8:8 88:24
104:21

**H**

**half** 5:9 94:20
95:11 110:20
**half-million**

123:9
**hand** 90:9
**handled** 11:9
26:21 35:9 40:8
**handles** 11:7
**hands** 57:2
**happened** 35:25
47:13 59:2,4
93:8,11
**happening** 27:14
**happens** 47:13
**happy** 55:22
**hard** 15:4 18:1
26:13 47:20
63:7 71:5
134:12
**harder** 11:13
**HARDT** 2:3
**HARR** 2:3
**hat** 43:15
**hate** 57:1 97:4
**Hayley** 83:21
118:10
**HCM** 76:16
**HCMFA** 13:6
53:20 65:10
68:8 71:10,17
72:8,8,12,12,24
73:3,5,7,14,17
73:21 74:10,24
75:1,1,21 76:11
76:16,17 78:14
78:22 79:1,13
79:14 80:2,20
80:22,25 81:15
85:16 87:2,5,9
87:15 88:10
89:2,3,12,13,20
90:17,21,23
91:23 92:19,20
93:16,21,23
110:2 115:8
118:8,13,14
119:18 120:6
120:11,18,24

121:7 127:13
127:17 128:1
128:23
**HCMFA's** 70:23
119:25
**HCMLP** 10:21
29:4 42:20 60:2
68:8 71:17 72:2
72:2,23 76:2
80:1 94:1 104:8
109:24 110:3,4
110:12,15,16
113:15 115:8
118:8,13
121:25 122:8
125:11,23
126:20 128:1
**HCMS** 2:20
95:24 98:23
99:8,10 107:3,4
107:5 109:21
109:25 110:3
124:22
**HCRE** 2:20
95:24 98:23
99:8,10,21
100:17 107:3
107:11,20
108:6,12,22
110:6,7,10,12
110:15 124:20
**he'll** 94:14
**head** 62:15
107:10
**headers** 36:25
**hear** 52:4 113:8
**heard** 30:17
62:16 74:3
91:14,17,21
122:22 125:18
**hearing** 101:10
**hearsay** 79:17
**heavy** 107:13
**hedge** 6:11 30:15
33:12

**held** 6:16 10:20
121:10,12
122:20,25
**hell** 74:24
**help** 33:2 65:22
66:20 67:16
100:4
**helped** 105:9
**helping** 31:14
**Hendrix** 9:16
18:16,19,24
20:3 27:19
39:13 52:11
84:17 99:2,18
100:14,25
103:3,14
117:25 124:4
**hereof** 48:16
**hereon** 48:15
**hereto** 137:16
**hesitate** 64:17
**hesitating** 106:16
**hey** 42:23 85:9
**hierarchy** 10:25
**high** 105:5
**Highland** 1:6,9
5:11,12,14,22
6:6 7:25 8:4,12
8:16 10:14,18
10:20 11:23
12:6,8,9,23
13:4,5,14,17,18
13:21 14:3,22
15:2,15 16:5,6
17:5,6 23:2,21
23:21,22,23
25:2 26:17,18
26:19,23,25
28:2 29:4,18,20
29:24 31:12,17
32:6,23 33:3,4
33:7 34:7,19
35:3,4,10 36:2
36:24 37:10
39:22 40:22

41:2,2,12,16,24
42:5,20,22 43:6
43:7,9,10,12,16
44:5 49:11
50:19 51:2,4,19
51:20 58:13,21
59:9 64:24
65:18,21 70:24
71:6,11 72:7,10
74:12,25 75:8
75:10,12,14,23
75:24,25 76:4,5
76:12 79:8,25
80:2,7 81:18
84:9 88:14 89:1
89:4,12 90:4,5
90:22 92:19,22
93:23 97:11
104:11 105:22
106:6 107:2,24
109:22 110:8
112:20 119:12
122:19,19,23
123:7,14,21
125:4 126:14
**Highland's** 42:13
51:9 72:13,14
**history** 62:2
116:3,7 118:22
119:2,12 120:5
120:17
**hit** 82:3
**hits** 82:9
**HMS** 99:21
100:17
**hold** 4:18 121:15
**honestly** 58:22
**hope** 43:20 82:7
**hopelessly** 53:16
**Houlihan** 71:23
**hours** 11:22 12:6
12:7,10
**housed** 72:2
**human** 71:19
**hundred** 23:14

28:5 30:10,11
33:13 68:18
69:5,11 92:3
102:19 106:18
**hundreds** 65:16

**I**

**idea** 7:24 57:10
89:12 108:13
**identified** 72:25
**illiquid** 11:13
**important** 44:6,7
59:18,20 93:22
**importantly**
85:15
**impossible** 80:24
91:25
**impression** 52:24
**in-house** 23:3
**inappropriate**
81:20
**inartful** 77:16
**incidental** 128:21
**include** 52:18
107:25
**included** 85:12
115:5 116:16
116:23 118:3
119:8,13,25
120:7,12,19
122:5,7 126:3
**including** 79:14
115:17
**inconsequential**
127:23
**incorrect** 55:5,6
55:11
**INDEX** 3:1
**indicate** 44:22
80:7,16
**indicates** 135:5
**individual** 31:8
52:2 72:24
**individuals**
106:19 123:3

David Klos - October 27, 2021

inflow 59:8
info@dickman...
  138:3
informal 83:25
  105:14
informally 62:5
information
  59:16 129:1
informed 62:10
  102:3
inject 90:22
ink 84:23
insinuation 16:9
  17:1
insolvent 87:2,6
installment
  110:25 111:7
  112:1,8,16
  113:4 114:7,12
  125:12,23
  126:4 131:3,10
installments
  14:22 130:23
instance 1:20
  31:20 34:11,16
  34:18 35:25
  39:22 42:22
  68:24 86:22
instances 32:5
  65:16 71:8 91:5
institutional 9:5
instruct 115:7
instructed
  125:11
instructing 85:9
  133:2
instruction 52:25
  61:13,24 62:12
  62:17 99:19
  101:6,13,17,23
  102:3,5,8,20
  103:7 124:7
  125:15
instructions
  100:15 103:14

103:22
insulting 132:5
  133:6,9
insurance 80:20
  80:22 81:5,6,9
  81:14,19 82:4
  82:10,19
intended 44:15
  44:19 111:6
  130:3
intent 95:12
interco 68:8
  115:22
intercompany
  32:22 41:3
  65:17 68:9,11
  68:12 69:10
interest 37:4,8,13
  37:15 38:9
  40:12 45:12
  46:8,8,16,20,25
  47:1,4,4,11,12
  47:13,14,18,19
  47:20,21,24,25
  48:4,5,7,15
  49:4,6,12,12,20
  49:23 50:9,21
  51:3 86:2 111:3
  131:15
interested 83:13
  137:19
internal 22:21,25
internally 96:16
investment 74:19
investments
  107:16
investors 74:17
  75:5
involved 10:7
  25:14,24 60:17
iota 16:13
irrespective
  90:11
issue 29:18 36:20
  43:7,8,17 93:10

105:17 108:1
  113:12 124:13
issued 124:16
issues 75:15
  79:23 121:6

___ J ___

Jack 106:15
January 29:16
  42:16 44:13
  58:11,15,25
  59:23 60:2,23
  61:7,18 112:22
  113:3,16
Jim 2:20 24:11
  26:4,4 29:13,14
  30:17 31:9 34:2
  34:6 35:23 36:1
  36:9 44:8 53:16
  68:14,18 69:1,3
  70:15 80:5 89:9
  93:25 94:2 97:9
  101:18 105:22
  108:20,21,23
  118:9 121:22
Jim's 26:15,16,20
  26:22,24 36:7
  90:7 93:6 94:19
  108:21
jmorris@pszjl...
  2:14
John 2:12 36:16
joined 5:14 29:24
  122:23
JONES 2:10
judge 132:21
juggled 31:24
July 29:17 58:24
jumble 48:1
June 11:21 45:23
  45:24 49:2

___ K ___

K-l-o-s 4:7,8
keep 27:21

100:10
keeper 26:15
keeping 129:1
kind 10:25 14:23
  15:25 52:12
  89:7 99:13
  106:12 108:22
  108:23 109:8
Klos 1:14,18 4:1
  4:6 61:24 64:22
  95:22 109:19
  117:21 136:5
knew 70:6,11
  85:22 128:23
  129:3
know 4:19 5:1
  9:22,23 10:19
  11:11 12:7,19
  15:6,13 17:10
  18:7,8,11 19:10
  20:4 23:7,17
  24:1,7,9,12,15
  25:5,7 28:21,23
  29:6 31:11,13
  31:23,25 32:3,7
  35:15 37:25
  38:11,12,19
  39:9 40:20
  43:16,21 44:18
  45:4 48:10
  51:16,25 53:1
  53:17,25 54:20
  54:20 55:14
  60:14,19,22
  62:13 70:10
  73:17 76:14
  77:23 78:20
  81:4,21,25 82:2
  82:4,8,19 83:11
  84:6,25 85:17
  85:18,20 86:1,4
  87:6,17 90:18
  90:19,25 91:5
  91:13,16 93:19
  96:14 98:21

99:12 100:8
  101:10 102:25
  104:13,13,20
  105:12 106:11
  106:14 108:7,8
  110:2,3 112:23
  117:11 119:7
  119:18 120:11
  121:12,23
  123:17 127:23
  129:6 130:10
  130:18 131:23
knowing 102:23
knowledge 7:24
  13:8,10 24:13
  34:6 35:1 44:14
  48:20 49:10
  60:25 61:16
  63:24 64:5 67:6
  73:1 79:17
  98:10 100:6,9
  104:10 109:21
  110:7 112:23
  121:19 122:10
  123:10,21
  125:10
known 61:9
  69:23 70:1
KOPF 2:3
Kristin 9:16
  18:16 39:13,17
  52:1 53:7,8
  59:11 61:13
  62:4,15,15 83:1
  83:2,20 99:14
  101:7,24 102:3
  102:5,8,10,11
  108:5,8,12,14
  109:10 117:25
  118:15 119:3
Kristin's 100:6
  100:22 118:20

___ L ___

L.P 1:6,10

David Klos - October 27, 2021

**lacks** 113:19
   125:17
**land** 132:21
**language** 74:25
**large** 55:2 59:8
   59:13 93:20
   131:25
**larger** 41:7 58:3
**largest** 123:8
**late** 106:13
**launching** 10:3
**Lauren** 23:2
**law** 2:5,12,19
   81:22 82:1,9,16
   82:22 95:23
**Lawler** 106:17
**Lawn** 2:17
**lawsuit** 112:14
**lawsuits** 97:15
**lawyer** 23:4
   82:21
**leading** 65:17
**learn** 30:25 51:21
   51:23 58:6,6
**learned** 61:6
**learning** 58:20
**left** 7:14,20 46:8
   46:9 109:20
**legal** 18:10,20
   84:9 112:3,10
   130:9
**legally** 82:19
   84:10
**length** 19:24
   124:2
**let's** 8:14 12:12
   18:22 21:21
   24:19 27:7 28:6
   61:7 66:19
   68:24 81:17
   103:25 109:19
   122:14 123:25
**letter** 14:15,17
   58:13,17
**letters** 80:5

**level** 23:20,24
   36:6 82:15
   88:14 105:5
**liabilities** 87:10
   87:12 122:8
**liability** 120:12
   120:19
**liaison** 10:15
   11:5
**liberally** 12:8
**license** 4:20,22
**licenses** 4:18
**life** 131:18,19
**limited** 104:7
**lines** 5:18
**linked** 92:15,17
**liquidity** 29:4,5
   29:18,20,23
   30:7,21 31:21
   31:25 32:6,22
   33:9 34:20
   35:19 36:2 40:7
   42:13,20 43:7,8
   43:17 73:2,14
   73:18 74:10
   75:1,15,22
**list** 59:10 106:12
   109:9
**litigation** 15:5
   16:6,11 18:1,25
   19:21 126:19
**litigations** 17:7
**little** 9:2 12:12
   14:2 30:15
   33:12 39:3 48:1
   98:15 106:23
   107:5
**live** 4:11,12
**LLP** 2:17
**loaded** 16:22
**loan** 9:6 28:1
   33:11,21 34:9
   34:13,20 35:12
   36:1 39:25 40:1
   41:9 68:11,13

68:16,21 69:10
69:15,17,19,24
70:2,10 73:14
74:2,4,7 76:15
76:21 78:3
79:13,24 85:18
85:20 89:21
90:10,13 91:2,6
92:3,15 95:4
107:25 110:19
115:22 116:4,8
116:16,23
117:3 118:8,10
118:11,13,17
118:25 119:4,7
119:14 122:14
123:6,10,14,22
**loaning** 72:7,11
89:1 92:19,22
**loans** 32:4 33:14
36:9 40:8 65:17
66:3,5 80:7
84:1 85:10
89:10 90:8
91:12,14,23
94:1,7,22 95:2
98:17,22
105:16 106:6
106:19 107:25
108:1 119:24
120:8,12,19
123:2
**logically** 42:15
69:18
**Lokey** 71:24
**long** 15:8 16:5
17:5,9 34:25
43:5 62:4 84:12
122:16
**long-term** 86:7
**look** 15:19 27:15
38:15 39:4
66:19 114:15
117:10,22
134:3,15,19

**looked** 111:20
**looking** 22:3 44:1
117:17
**looks** 27:25 39:6
**loop** 53:9
**lost** 41:21 63:16
**lot** 100:1 129:20
**loud** 118:6
**LP** 6:6 8:5 12:14
12:15,17 13:6
23:22 26:19,24
29:5 110:8
**lying** 79:16

_____

**M**
**machine** 1:24
**magnitude** 92:12
**maintained** 28:2
**maker** 46:15,23
47:1 50:8
114:12 122:20
122:25 129:18
129:24
**makers** 126:13
126:19
**making** 71:8
75:18,19 85:12
99:20 100:16
107:20,23,25
108:9 126:9
132:20
**man** 17:23
128:10 130:20
**manage** 32:2
**managed** 10:21
10:21 70:24
**Management** 1:6
1:9 5:12 6:6 8:5
13:6 23:22,24
26:19,23 27:1
29:4,19 32:6,24
35:3 71:6 107:2
110:8
**manager** 7:2,3
**managing** 9:25

25:23
**March** 5:12,14
6:3 13:24 37:6
80:19 122:17
**marching** 52:3
**marked** 3:10
**Master's** 4:16
**material** 15:7
**matter** 109:11,12
**matters** 26:22,24
**maturity** 131:20
**MBA** 4:17
131:25
**mean** 9:18 15:21
24:10 26:9,11
104:6 114:18
**meaning** 51:4
68:9
**means** 47:4,12
48:21 63:12
84:7 132:1
133:12,20
134:7 135:7
**meant** 50:12
**medical** 82:3,10
82:10
**meet** 31:14 33:8
73:2
**meeting** 52:12
57:25
**meetings** 25:24
43:5,24 62:1,3
63:2,19
**Melissa** 26:10,12
108:14,17,18
109:1,5,9
**member** 62:14
**members** 10:17
**memory** 27:8
28:17,19 42:16
42:18 50:23
68:15 71:18
85:8 87:13
91:20 92:4,7
93:9,12

David Klos - October 27, 2021

mental 48:1
mention 10:6
  114:7
mentioned 12:13
  61:20 88:13
  98:7 107:23
  108:4 110:6
  116:10
met 31:9,25
Michael 2:18
  95:16,23
  135:11
michael.aigen...
  2:22
mid 112:21
middle 6:10 80:4
  108:22
million 18:1
  21:22 28:13,14
  28:14 45:25
  46:3 49:1,8
  58:25 68:7 69:2
  70:7,19,23 72:7
  73:18,25,25
  74:7,8,24 75:4
  75:9,22,23 76:3
  76:19 77:4,10
  77:11,18,18
  78:3,10,22
  79:12,22 80:2
  80:19 81:18
  82:25 85:4,18
  85:20,23 86:13
  89:2 90:17,20
  90:22,24 91:22
  91:22 92:8,15
  93:3 115:8
  116:3,23 118:8
  118:9,13,24
  119:7,14,25
  122:5
mind 36:8 56:20
  76:9 100:2
mine 24:1
minimus 127:22

minutes 39:21
  105:25 126:25
misconstrued
  134:23
missed 60:25
missing 107:10
mistake 80:12
  126:8 127:21
  127:23 128:4,7
MLP 59:9
moment 32:12
  67:16 73:21,22
  116:6 122:15
monetization
  15:2
monetizing 97:12
money 15:17
  33:3,3,7 34:19
  39:22 41:12,16
  42:4 45:20
  59:13,19 70:4
  72:11,12 73:5
  75:12 76:11,12
  76:13 79:24
  92:19,22
  113:24 120:8
month 11:22 12:6
months 6:13 19:6
  59:5 75:14
morning 36:16
Morris 2:12 3:5
  8:25 11:17,24
  12:25 14:12
  17:20,25 20:17
  20:21,24 21:2,8
  21:24 22:8,15
  23:10 25:3,11
  27:4,16 29:10
  32:25 33:24
  34:21 35:13
  36:4,18 37:20
  38:17,25 39:7
  40:3,14 41:17
  41:20 42:24
  43:19 44:16,24

45:9,17 46:21
  47:8,15 48:8,22
  49:15 50:2,13
  51:5 52:21
  53:22 54:7 55:3
  55:12,19 56:11
  57:8,19 60:12
  61:1 63:5,13
  64:9 65:19,25
  66:7,15,24
  67:17 69:20
  71:3,12,20
  76:18,22 77:6
  77:20 78:4,23
  79:5,19 81:2,11
  81:23 82:6,13
  83:13,17 85:21
  87:3 88:18 89:5
  90:14 91:3,9,19
  92:5 93:13 94:8
  94:13,16 95:5
  95:16,20 99:4
  99:23 100:5,11
  100:19 101:3
  101:25 102:15
  103:15 104:18
  108:2 109:19
  111:11 112:7
  112:13 113:22
  116:21 117:2,9
  117:13,16,21
  119:11,18
  120:5,11,17,23
  125:18,21
  126:24 128:13
  129:12 130:7
  130:16,19
  131:1,5,11,21
  132:2,8,11,15
  132:19,23
  133:3,5,13,22
  134:8,17 135:2
  135:10,13,15
  135:19
motion 132:18,20

mouth 36:7
Move 120:15
  125:16
moved 6:10
muddy 43:14
MUNSCH 2:3
mutual 74:13,14

—————
N
name 4:4 26:11
  26:14 39:10
  87:21 95:23
names 106:14
Nancy 104:24
  105:16,21
nature 10:1 70:4
  70:6,7,11 84:1
NAV 70:25 71:2
  71:8,19,25
  72:19,20,21
  73:4,15 79:14
  80:20 81:1,14
  85:22 89:20
  90:2,3 92:11,16
  92:17,18 104:2
  104:10
necessarily 31:25
  50:11 53:4
  69:12 107:14
need 29:18 31:16
  33:12 37:3
  41:24 54:5
  58:14 73:3 93:7
  93:20,21
  106:25 107:4
needed 30:3
  31:10,12 32:6
  35:19 41:12
  73:5,17 74:10
  74:25 75:21
  76:11
needing 29:5,22
needs 29:4 31:14
  33:9 34:20 40:7
  42:20 44:9

negative 37:7
  44:4
negotiation 22:7
  22:13,18
neither 93:23
never 18:2 56:25
  72:25 74:3
  78:12 80:13
  91:14 105:15
  105:18,20
new 2:11 7:16
  26:11,13 68:8
  68:11 85:10
  115:22 118:8
  132:21
NexBank 124:16
NexPoint 10:4
  12:13,14,14,17
  12:24 13:3,16
  21:21 26:3 27:1
  27:12 36:22
  37:11,19 40:22
  41:3,15,15 42:4
  42:9,11,17,22
  43:11,13 53:19
  56:21 57:6,10
  57:14,18,23
  58:17,25 59:12
  59:24 62:18
  63:3,20 64:8
  65:9 72:22,24
  75:17,19 78:13
  110:19 111:14
  111:22,25
  112:15 113:3
  113:10,15
  120:24 124:18
NexPoint's
  110:25 111:6
  112:21
night 36:17
nomenclature
  83:24
nominal 62:1
nonstop 44:5

North 1:24 2:3 138:2
NORTHERN 1:2
note 21:22,23 22:2,5,7,14,22 23:9,15 24:10 24:18,21,23 25:2,9,17 27:2 27:9,13,14 33:17 38:15 39:4 40:11,13 40:17 46:12,16 46:25 48:5,14 49:10 50:25 51:10 57:18,23 58:4,20 59:12 60:7 63:4,21 64:8 65:9 66:6 66:10,13 70:22 75:18,20 76:7 79:1,22 82:25 83:21 84:3,9,16 84:16,18,19 85:4 86:2,3,3,8 86:13 89:15 92:15 111:22 112:9,12 113:16 122:19 122:24 127:13 127:14,17 128:16 130:3 131:18,20 133:12 134:3,4 134:11,15,20
notes 16:7 17:7 19:25 23:13,14 26:3 36:19 40:21 50:19 52:18 65:10 66:20 67:12 76:1 84:14,22 85:2 86:12 87:14,24 88:7 88:10,15,16 96:8 97:11,16

114:21 122:5 122:12 124:10 124:11,13,24 125:4,7,8,13,25 126:10,13,20 127:17 128:23 129:7 130:12 130:15
Notwithstanding 110:23 111:25
November 54:4 63:18 124:8 137:22
number 12:2,10 14:10 22:4 23:19 27:16 28:9 75:3,4
numbered 1:21 27:19
numbers 14:4,19 28:6 44:4 81:18
nutshell 54:12
NY 2:11

—— O ——
o0o-- 1:4
Oak 2:17
oath 97:6 106:4
object 50:2 100:8
objected 118:20
objection 8:25 11:17,24 12:25 14:12 20:17 21:2,24 22:8,15 23:10 25:3,11 27:4 29:10 32:25 33:24 34:21 35:13 36:4 37:20 38:17,25 39:2,7 40:3,14 41:17 42:24 43:19 44:16,24 45:9 45:17 46:21 47:8,15 48:8,22

49:15 50:13 51:5 52:21 53:22 54:7 55:3 55:12,19 56:11 57:8 60:12 61:1 63:5 64:9 65:19 65:25 66:7,15 69:20 71:3,12 71:20 76:18 77:6,20 78:4,23 79:5,19 81:2,11 81:23 82:6,13 85:21 87:3 88:18 89:5 90:14 91:3,9,19 92:5 93:13 94:8 95:5 99:4,23 100:19 101:3 101:25 102:15 103:15 104:18 108:2 111:9 112:3,10 113:19 116:20 116:25 119:9 119:16 120:4,9 120:15,21 125:16 128:13 130:7,16 131:5 131:11,21 132:2 133:13 133:22 134:8 134:17 135:2
obligated 122:12
obligation 25:25 80:1 110:25 111:6,14 112:16 113:11 113:17 114:12
obligations 45:21 121:24
obligor's 33:8
obviously 85:18
occur 55:8 96:9
occurred 47:5 61:17 70:25

72:20,25 85:13 92:13 112:24
October 1:15,21 31:18 80:11 120:24 127:11 128:22 129:3
offended 17:22
offer 14:15,17
offhand 84:16
office 5:10,10 10:17 72:4 121:10
officer 7:14,17,22 8:23,24 9:3 10:13 13:21,22 53:4 121:6,13 123:22
officer-level 7:25 13:18
officers 105:22 106:7 121:18 123:15
official 12:16 13:7
oftentimes 32:3
Oh 100:12
okay 18:14 20:8 51:8,16 52:10 65:13 74:1,7 76:25 81:21 82:23 84:4 93:9 100:3 110:18 110:23 112:25 117:2 119:11 120:23 124:7 125:8 126:2 132:19
old 106:22
one-page 84:11
oOo-- 135:22
open-end 74:13
open-ended 25:6
operate 29:5
operations 9:6 107:19

opinion 44:6
opposed 40:22 42:9 75:8,10 85:1 86:3 89:20 90:12 102:20 103:8 127:17
oral 96:4,7,23 97:8,15,22 98:1 98:5,12
order 27:21 124:9
orders 52:3
ordinary 128:11
organization 72:4
original 27:12
originated 43:9
ought 62:23
outlook 44:2
outside 11:9 128:11
outstanding 38:8 45:22 46:9,10 47:1,19 49:5 125:3 129:2
overall 10:10 30:6
overpayments 53:19 55:2
oversaw 9:17
overseeing 9:14 9:14,21
oversight 6:20 9:4,8
oversimplify 32:11
owed 94:1
owes 45:19
owing 113:24 121:25

—— P ——
P 37:25
P.M 1:22,22 135:21

David Klos - October 27, 2021

**PACHULSKI**
2:10
**package** 83:18
**page** 3:2 28:8
37:2,2 114:15
130:1
**pages** 20:16,25
117:13
**paid** 14:11,20
76:3,4,6 80:19
80:22 81:16
85:16 135:7
**paper** 85:10
118:11 119:4
**papered** 33:16
66:6 68:21
**papering** 84:19
85:5 118:17
**paragraph** 50:8
114:4,7,10,11
114:16,17
129:15
**pardon** 46:14
**parentheses**
118:9
**part** 13:14 17:4
25:22,23 30:23
46:15,24 58:2
61:21 62:5 70:3
70:9,10,11
73:19 75:17,19
76:8 83:17
103:17 106:8
106:17,20
117:13 121:2
122:2,24
123:15 126:20
**participated**
30:12 121:19
**participating**
61:25 62:3
**particle** 63:15
**particular** 20:22
28:13 29:18
31:6 46:12

61:23 68:16
119:5
**particularly**
35:22 71:23
**parties** 71:23
137:18,21
**Partners** 2:21
99:9
**partnership**
104:8
**parts** 72:4
**party** 71:7
102:22
**pass** 95:15 135:9
**passing** 98:7
**pattern** 66:12
109:11
**pause** 7:7,16
63:13
**pay** 47:1 49:14
49:24 74:25
82:5 88:8,10,12
90:20 103:22
103:22 112:16
113:23 122:12
**payable** 14:23
74:18 93:16
125:4
**paygrade** 60:11
60:14
**paying** 72:12
**payment** 26:8
27:10 37:6,11
37:18,23 38:5,6
38:7,12,23
40:10,11,17,17
45:7,25 46:3,6
46:7 48:25 49:1
49:2 51:10,14
51:16 56:22
57:7,11,14 58:7
58:18 59:1,2,3
59:15,24 60:3,6
60:22,25 61:18
62:19 64:13,15

68:20 72:16,18
75:1,5 76:16
85:13 89:10,14
92:20 93:22,24
93:25 99:13
110:25 111:7
112:1,5,7,9,11
112:15,16,21
113:4,11,15
115:15 126:9
126:21 129:19
129:24 135:1
**payments** 25:8
25:10,16,18,19
27:8,11,13
36:13,14,19,22
36:24 37:13
39:15,18 40:20
40:21 41:5,6,8
41:12,24 42:17
44:12,23 45:3
48:14 51:19
52:20 55:9 56:1
59:10 60:21
61:15,16 64:7
64:23 75:18,20
94:21 98:17,23
99:1,3,20
100:16 101:1
103:23 107:6
107:20,23,25
108:6,10
110:19,23
111:5,13,21,25
114:8,13 124:9
125:12,15,23
126:4,9,14
130:4,6,23
**payroll** 10:1
53:21 107:21
**pays** 48:4 81:9
82:4,10,19
**PC** 2:3
**PE** 97:12
**penalty** 135:23

**people** 51:19
71:22 72:3
95:10 103:18
**people's** 26:1
57:2
**percent** 15:25,25
23:14 28:5
30:10,11 33:13
36:8 68:18 69:4
69:5,11 74:18
74:22 92:3
102:19 106:18
**perception** 53:14
**perform** 126:21
**performed** 71:24
**performing** 9:25
**period** 23:16
93:5 104:2,11
104:21 116:14
120:1 137:15
**perjury** 135:23
**person** 7:19,20
7:21 9:17,18
39:9,10 44:21
72:25 77:3
80:25 81:10
101:10 115:14
137:8
**personal** 26:16
26:22,24 44:14
48:20 49:10
76:1 98:10
131:18,19
**personally** 25:13
25:17 64:19,20
64:22 108:21
**personnel-wise**
107:7
**perspective**
33:23 35:20
**pertain** 72:22
**pertained** 105:8
**pertaining** 93:20
97:10
**pertains** 79:22

**petition** 123:23
**phrase** 51:3 97:4
**physical** 85:5
**physically** 22:23
66:14
**pick** 45:20 48:25
109:20
**piece** 15:20,21
**pin** 8:6
**place** 33:20 35:2
66:13 137:8
**Plaintiff** 1:7 2:13
**plan** 14:22,23,25
17:11
**plane** 82:7
130:21
**platform** 10:20
12:10
**play** 15:6 64:15
**please** 4:5 5:5
14:5 30:22
66:18 68:7
83:21 95:20
114:1,22
115:14 118:6,7
118:10 127:2
129:12
**pled** 98:13
**plenty** 57:3
**point** 6:10,14 7:2
7:3,3,4 9:13
18:8 24:16
29:25 36:23
37:12 39:4
45:15 53:3
56:16 57:1
60:10,16 61:17
63:2 73:19
79:21 80:3,4,5
80:5,14 83:23
89:10 97:9
101:12 109:6
128:18 129:2
**pointed** 102:22
**points** 7:6 20:14

policy 33:20 35:2
  35:6
portion 16:4
  21:12
portions 20:8
position 7:25
  13:18 43:22
  51:9 79:11,18
  121:13,15
possibility 79:23
possible 17:17
  48:11 50:3 74:5
  89:23,25 90:19
  91:17 95:1,8,9
  95:10
possibly 41:6
potential 53:19
  92:12 97:17
potentially 30:14
  96:8,14,16
power 89:9 90:21
  90:23
practice 30:1,5
  34:4,14 35:18
  50:4 69:23 70:3
  73:6 78:7 79:4
  86:5 90:7
  109:11,12
practices 70:11
pre 135:5
precision 28:5
predicate 41:22
  42:2
preference 73:7
  73:11 90:7
prefix 135:5
premise 43:1,3
  89:8
prep 83:21
prepaid 49:22
  131:18,19
preparation
  19:13 21:9 67:7
  67:8 84:19
prepare 54:6

84:2,9,17
prepared 26:7
  53:18 54:9
  64:20 66:14
  80:8
preparing 18:9
  19:20 129:8,10
prepay 46:15,19
  46:24 47:24,25
  48:5,7 49:19
  50:8
prepaying 50:21
  51:3
prepayment
  37:19,23 38:1
  38:11,13 46:13
  63:23 64:12
  113:5,12,18
  114:11 129:16
  129:18,23
  130:5 131:2,9
  131:14 132:1
  133:12,20
  134:7,20,25
  135:5,7
prepayments
  27:2 38:10
  44:15,19,23
  45:1,5 63:4,21
  64:8 134:12
preposterous
  89:15
present 18:20,25
  56:20 68:15
  93:9
presented 66:14
president 43:10
  43:11 121:17
pretty 11:15
  60:24
previously 53:6
  125:3
pricing 10:16,16
primarily 6:7
  26:22 88:5

128:19
primary 9:15
  109:5
principal 37:5,9
  37:13,16 38:9
  40:12 45:12
  46:9,16,24 47:2
  47:22 48:16
  49:8,24 123:11
  131:16
print 117:8
prior 14:22 19:18
  24:19 27:9
  31:19 40:10
  53:18 56:17
  57:5,12,17,21
  69:17 87:14,15
  88:15 92:4
  97:14 98:12
  104:11 112:14
  112:15 113:5
  113:10,18
  122:22 123:23
  126:7,12,18
  131:20 135:1
priorities 89:11
privilege 132:6
  133:2,4
probably 4:24
  6:12 8:9 9:7
  15:11,19 23:19
  24:7 35:12
  39:11 44:7
  73:24,24 83:9
  98:7 105:3,13
  108:7 114:19
problem 57:2
problems 29:21
procedure 33:20
  35:2,6 39:5
  66:13 83:23,24
proceedings 5:3
  96:6 108:1
proceeds 80:22
  81:6

process 17:9
  32:10 51:19
  66:17 83:24,25
  109:8 121:3,4
  122:2
processing 10:1
produced 1:18
  83:14,16 117:6
production
  117:14
professional 4:18
program 105:9
progression 5:24
promissory 16:7
  22:14 23:9
  24:21 25:2
  27:13 33:17
  38:15 39:4
  46:12 50:19
  52:18 63:4
  65:10 66:6,10
  66:13,20 67:12
  70:21 85:2
  97:11,16
  122:19 130:3
  130:12,14
  131:18,19
  133:12
promoted 6:1
proper 108:10
  132:11
protest 126:18
provide 110:10
  110:12
provided 13:2,3
  13:13 20:15,15
  21:6 40:12
  76:13 80:6
  102:5 107:2,24
  109:25 110:4
  110:16 122:4
  125:14 137:15
provider 11:12
  71:24
providers 10:16

43:12
providing 12:24
provision 114:19
  129:22,25
public 10:3
purport 28:8
purpose 23:8,12
  85:25
purposes 30:21
  31:21 32:22
  36:3 73:8 75:22
pursuant 12:22
  13:14 74:15
  112:11
put 6:15 10:2
  26:1 86:6 93:6

_____

**Q**

qualification
  64:4
qualitative 16:1
question 9:1
  11:18,25 13:1
  14:13 16:8,22
  16:25 17:2
  20:24 21:25
  22:9,16 23:11
  24:25 25:4,6,12
  27:5 29:11 33:1
  33:25 34:15,22
  35:14 36:5
  37:21 38:18,21
  39:1,8 40:4,15
  40:19 42:2,25
  43:20 44:10,11
  44:17,25 45:10
  45:18 46:22
  47:3,9,16 48:9
  48:23 49:16,18
  49:25 50:2,14
  51:6 52:22
  53:23 54:8 55:4
  55:13,20,22
  57:9,20 60:13
  61:2,4 63:6

David Klos - October 27, 2021

64:1,10 65:20
66:1,8,16,21
67:16,24 69:21
71:4,13,21
76:19 77:7,16
77:21 78:5,9,24
79:6,20 81:3,12
81:24 82:7,14
83:15 87:4
88:19,24 89:6,8
90:15 91:4,10
93:14 94:9,12
94:13,14,21
95:6,7 96:5
97:24 99:5,24
100:1,20,21
101:4 102:1,16
103:16 104:19
104:22 108:3
119:3 125:20
125:20 128:14
130:8,9,17
131:4,7,12,22
132:4,5,11,14
132:24,24
133:6,14,17,23
134:9,13,16,18
134:20 135:3
**questions** 19:12
  77:12 80:13
  95:17 97:25
  109:15 110:18
  111:19 114:3
  126:24 129:13
  135:10,12
**quick** 48:12
**quite** 7:9 31:9
**quote** 115:22

———————
**R**
**radar** 93:6
**radars** 26:1
**raise** 24:5,7
  119:3
**raised** 24:3 80:15

96:3,7,18
**raising** 62:17
**rate** 84:15 86:2,6
**ratify** 28:6
**ratio** 104:2,10
**rational** 80:25
**rationally** 92:25
**reached** 104:11
**read** 20:8,10,20
  20:25 21:11,11
  44:22 46:25
  48:24 118:6
  127:8,14,21
  128:6 130:1
  131:14 132:23
**reading** 21:5
  46:6 131:8
**reads** 46:23
**real** 107:13
**realize** 128:6
**realized** 127:21
**really** 6:12 9:16
  10:15 16:8 54:4
  73:9 78:12
  83:13 95:9
  101:11 105:4
  107:5 108:19
  109:2 128:19
  129:6
**realtime** 85:14
**reason** 23:8
  30:14 35:21
  40:23,24 41:1
  54:24 55:10
  67:22,24 75:17
  75:19 99:21
  100:18,21
  113:7,14
  115:24
**reasoning** 105:2
**reasons** 23:20
  74:1 88:4
**recall** 4:23 19:2
  21:4,5 22:22
  23:6 24:3 27:13

31:19 34:23
36:6 41:13 42:3
56:5,9,12,14
57:17,22 58:10
58:16,20 59:8
62:16 63:18
67:18 82:24
85:7 86:19
87:20 88:21
92:10 99:12
102:10 106:21
116:15 118:19
118:22 120:23
121:16 122:21
123:6,16 124:2
127:20 130:13
**receipt** 26:1
**receive** 74:18
**received** 99:19
  100:15 103:19
  106:19
**receiving** 22:24
  33:3
**recognize** 27:23
  104:7
**recollection** 5:25
  8:3 28:20 29:17
  40:7 50:18
  51:18 52:15,17
  55:7,8 68:17
  75:21 76:6
  78:16,17 88:3,4
  91:24 94:5
  95:13 101:24
  105:7 115:4
  123:21 125:6
  126:2
**record** 4:5 16:14
  25:9 64:6 68:3
  105:24 106:2
  117:12
**recorded** 37:13
  37:14 38:7
**recording** 25:15
  39:14

**records** 110:24
  111:4
**recover** 17:15
**recoveries** 17:10
**recovers** 16:6
**reduced** 137:10
**reduction** 38:8
  45:12
**refer** 125:7
**reference** 52:18
**referred** 87:24
  123:2
**referring** 87:17
  98:22
**reflected** 37:14
  44:13 120:8
**reflects** 103:21
**refresh** 54:13
**regarding** 16:7
  18:24 100:16
  127:5
**regardless** 16:16
  16:20 60:17
  72:24
**regular** 66:12
  88:16
**regularly** 31:9
  129:19,24
  130:4,6
**reimburse** 70:24
**reimbursed**
  81:15
**reimbursement**
  53:21 72:23
**reinstate** 60:7
**reinvestment**
  105:9
**reiterate** 17:13
**REITs** 10:3
**reject** 67:22,24
  89:7
**relate** 19:22
**related** 70:20
  74:11 81:1
  92:18 96:3

97:16,16 99:20
100:16 102:20
103:7 137:20
**relates** 18:5
  70:21
**relating** 19:23
**relationship**
  53:15 133:21
**relevant** 5:5
**relieve** 45:14
  111:6 114:11
  129:18,23
  130:3,5
**relieved** 112:15
**relieves** 131:2
**reloaned** 76:4
**remainder** 49:24
**remember** 5:16
  7:5 12:1,18
  13:9 14:24
  15:10 18:6
  22:22,24,25
  32:5 34:11,16
  34:18 38:20
  39:24 42:8
  50:25 51:24
  52:1,10,13,23
  53:13 56:8 57:5
  57:16,24,25
  58:3,19,22
  59:25 60:8,20
  62:20,22,25
  63:1,23 67:4
  69:13 71:14
  74:5,6 78:17
  83:22 84:20
  85:4 86:15,17
  87:11,23 88:2
  92:10,11,12
  93:2,17 94:5,18
  94:19,22 97:18
  97:19 98:17
  101:15 105:4
  108:5 109:7
  110:21 113:13

David Klos - October 27, 2021

123:4,8 124:5
130:11 131:4,7
**remembering**
34:10 92:23
**remind** 99:6
**rep** 80:5
**repaid** 76:1
**repay** 89:3
**repaying** 93:25
**repayment** 76:7
**repeat** 22:10 27:6
100:3
**rephrase** 20:24
22:11 49:17
133:5
**report** 8:15 9:16
10:23 53:19
118:18 119:17
120:24 121:24
**reported** 1:23
**reporter** 117:8
135:13,16
137:1,3,15
**represent** 19:15
95:24
**representation**
19:17
**represented** 2:4
2:11,18
**requested** 137:13
137:14
**reservation**
91:25
**respect** 19:19
22:17 24:20
25:2,18 35:3
38:3 41:11
47:22 49:23
51:9 58:16
68:16 69:12
71:22,23 72:21
76:23 79:8 80:1
80:8 82:25
84:14,18 85:5
86:14 94:3,20
108:6 111:21

121:13 125:13
125:24
**respectful** 76:25
**respond** 25:7
60:15
**response** 128:16
**responsibilities**
7:15 8:7 9:22
108:16
**responsibility**
32:17,18 90:4,5
118:17
**responsible** 11:4
39:14 71:7
108:9,17,19
109:10,13,13
**restate** 61:10
**resulted** 71:25
**retail** 9:4 80:9
120:25 121:20
121:23 122:4
122:11 128:16
128:19
**return** 76:25
**reverse** 40:9
**review** 39:19
48:12 121:3
137:13
**reviewed** 84:10
**ridiculousness**
97:5
**right** 16:17,21
17:25 18:20
21:23 33:22
37:5 41:25
45:16 47:6 55:1
56:1 66:21
67:20 68:9
75:18 78:14
80:4 81:9 83:14
85:19 88:8,22
89:19 107:9
109:25 111:23
114:24 115:2
117:3,12

123:12 124:17
124:22,25
125:5 126:5
127:11,14,20
132:25 133:6
**Rip** 37:2
**role** 5:15 6:2,12
6:16,18,21 8:22
9:4,11 11:5
12:16 13:7,14
19:13 24:19
25:1,14,17,21
25:22,23 26:25
39:10 53:4,6
58:16 62:1
64:15,17 67:6
67:11 78:13
84:18,21 85:5,8
85:11 86:13,21
128:18
**roll** 23:15
**rolled** 125:3
**rolling** 88:15
**rolls** 39:18 64:18
**roughly** 6:9
**round** 39:20
81:18
**RPR** 1:23
**Rukavina** 2:5 3:3
3:6 4:4 9:10
11:21 12:3 13:5
14:16 17:23
18:4 20:19,23
20:25 21:6 22:3
22:11,19 23:17
25:8,16 27:7,17
27:18 29:16
33:5 34:6 35:1
35:24 36:11,21
38:2,20 39:2,20
40:9,18 41:19
41:22 43:4,23
44:20 45:6,14
45:23 47:3,10
47:17 48:13

49:9 50:1,5,17
51:8 53:11 54:3
54:11 55:6,16
55:24 56:14
57:12,21 60:19
61:5 63:10,14
64:14 65:23
66:4,11,19,25
67:1,18 68:4
70:1 71:10,18
72:6 76:24 77:8
78:1,9 79:2,9
80:18 81:8,21
82:2,8,17 83:16
83:19 86:1 87:8
88:21 89:17
91:1,7,13,20
92:7 94:3,11,14
94:17 95:7,14
110:18 111:9
111:20 112:3
112:10 113:19
116:20,25
117:7,11,15
119:9,16 120:4
120:9,15,21
125:16,19
126:25 127:2
128:22 130:11
130:19 131:8
131:17,24
132:6,9,13,17
132:20 133:1,4
133:8,18 134:1
134:14,24
135:8
**rule** 39:5 127:6
**rush** 135:19

——————
**S**
**sane** 80:25
**satisfy** 93:21
**saw** 128:16
**saying** 39:25
42:23 46:2,5

49:19 61:11
90:9 92:23 94:6
94:22 109:9
**says** 18:2 46:13
46:14 48:5,14
68:7 80:12
115:23 118:7
118:18 127:17
129:17 131:2
134:11
**scenario** 33:6
**schedule** 28:1
37:15,25 38:12
45:3,7
**scheduled** 27:9
38:5 40:10
56:22 57:7
129:19,24
130:4,6
**schedules** 64:21
80:10 111:3
**school** 4:15 5:7
**Schroth** 26:10,12
108:15,17
**Science** 4:16
**scratch** 27:7
**screen** 117:22
**screwed** 111:17
**se** 37:25 38:13
**second** 28:8 37:4
67:25 72:15
73:2 103:25
**Section** 46:13
130:22 131:8
131:14
**securities** 10:20
11:14
**see** 21:18 22:2
28:11,15,16
46:1,17,18
48:17,18 49:2
58:14 83:7,12
113:9 114:5
117:20,24
125:21 129:22

David Klos - October 27, 2021

129:25 130:24
130:25 131:1
seeing 44:20 48:6
48:11 59:8
61:19 85:14
114:9 130:11
seen 50:17,22,23
83:9 114:18
126:18
Seery 15:8 18:13
19:8,9,11 20:3
53:15 56:15,19
57:13,15,18,23
60:5 96:25 97:3
97:21 98:2
129:9,11
Seery's 21:12,19
semiannual
14:22
send 42:23 68:7
sending 33:4,5,6
33:8 90:24
115:14
sends 80:2
senior 5:17 7:3
sense 50:4,5
73:20 104:4,5
108:20 113:22
113:25 134:22
135:4
sensitive 86:24
sent 36:16,18
54:15 59:17
69:4 76:5 83:1
83:2 115:1
sentence 46:14
48:13,21 50:8
50:16
sentences 127:25
separate 10:25
11:7 70:20
106:25 107:4
Separately 52:10
separating 79:23
Series 4:20

service 11:12
71:24
services 10:17
12:23,24 13:3,4
13:13,15 41:3
43:12 53:20
71:11,15,17
107:2,15,15,24
108:8 109:22
109:24 110:4,7
110:10,12,16
set 115:14 118:7
settlement 9:6
seven 75:14
123:23
seven-figure
113:23
shape 6:16
shared 12:22
13:14 41:2
43:12 53:20
54:18 109:22
110:7
sheet 120:13,20
sheets 80:6,8
shocked 73:22
short 6:12
short-term 86:7
shorthand 1:24
137:2,7,25
shortly 116:11
show 28:8 117:5
showing 44:4
45:20 53:19
76:20
shows 45:25
side 85:11 96:15
sides 43:2
sign 85:1
signatures 22:24
86:18
signed 84:22
significance
128:11
significant 12:2

12:10 45:21
signing 86:14
signs 80:5
similar 8:7 13:4
13:16 74:9
82:24 107:12
107:19
single 23:15
29:21 32:17
34:12 36:8
62:14 123:22
sir 4:4 17:18 18:4
28:11,15 33:10
46:17 48:17
67:2,19 76:14
81:8 83:20
89:18 127:5
129:15,17
130:2 132:14
133:5,9
sister 97:9
sit 89:11
sitting 16:3,24
17:3,14 42:14
44:20 63:24
96:11 102:18
103:6 104:15
131:24 133:10
133:19
situation 31:22
69:23 93:1
situations 31:23
32:3 34:5
smart 17:18 50:7
SMU 4:15,17
solvency 87:6
solvent 87:2,5
somebody 35:19
somewhat 128:20
soon 118:10
132:21
sophisticated
44:21
sorry 9:20 22:19
24:22 41:21

45:24 47:20
55:21 57:19
58:25 63:16
76:16 78:14
88:22 99:8
108:11 129:14
129:20
sort 53:6 97:8
102:23
sought 87:25
sounds 50:10
80:21 81:19
82:17
source 64:6
speak 81:13
speaking 30:4
40:16 77:22
108:18
speaks 50:15
specific 8:6 14:4
28:20 31:22
34:11 38:3
42:15,18 50:25
51:1 52:23 58:4
68:17 91:24
95:13 103:14
112:23 123:17
129:25
specifically 4:23
15:10 34:24
39:10 42:8
51:24 52:13
56:7,12 62:13
67:20 69:14
71:14 74:6
81:13 83:11
86:4 87:11,24
92:13 93:8
94:22 98:21
112:20 115:10
118:16
specificity 34:24
36:7 42:11
53:13 82:16
96:14 102:24

105:14
specifics 14:24
93:18
specify 93:7
speculate 15:4
29:2 32:11
73:25
speculating
28:25 41:11
44:3
speculation 29:1
29:3,6 83:6
113:19
speed 106:24
spelled 37:24
split 108:16
spoke 18:10,19
101:6,9
spoken 18:13,15
spreadsheet
54:14
stake 18:1
stamp 117:17
standard 84:4,6
86:9,9
standpoint 92:18
135:6
STANG 2:10
start 27:7 47:17
95:19 111:17
started 5:7 10:5
101:17 108:23
starting 5:6
state 1:23 4:4,19
51:12 114:10
138:1
stated 137:9
statement 26:7
119:14
statements 36:17
116:14,18,24
119:8,19,22
120:1
STATES 1:1
step 32:9 68:25

134:5,5
**Stinson** 2:17
95:23
**stood** 87:11
**Stoops** 7:23
**stop** 21:10 65:9
94:15 100:13
**street** 1:25 2:4
10:17 82:3
**strike** 23:6 32:19
33:15 37:10
52:16 54:22
63:25 67:4
120:15 125:16
**string** 118:4
127:5
**strong** 73:11
92:17
**structure** 14:8
30:6
**struggle** 64:11
128:15 131:13
**struggling** 45:2
50:6,7 88:25
99:25
**subject** 108:10
**Subscribed**
135:24
**subsequent** 96:4
96:7,23 102:9
102:12 103:2
116:17 119:10
119:13 120:1,7
**substance** 19:1
98:6,9
**substantially**
16:2
**substantive** 97:1
**sue** 82:11
**suggested** 55:1
**suggesting** 62:22
128:9
**Suite** 2:4,17
138:2
**sum** 113:24

**summary** 21:7
**supervision**
137:11
**support** 87:20
**supporting** 12:9
72:3
**suppose** 31:18
50:3 85:11
95:10
**sure** 5:7 6:2 19:4
20:1 26:6 27:21
31:23 37:22
44:7,8 47:19
49:18 51:13
55:21 58:8
61:11,25 64:3,3
65:11,14 66:19
74:24 85:12
95:12 97:24
99:10 100:22
103:6 106:15
125:9 127:4
128:25 129:1
135:15
**surely** 128:22
129:3
**surprised** 130:14
**suspect** 55:10
68:14 123:19
**suspend** 111:14
**switch** 65:8
**sworn** 1:19 4:2
137:4

---

**T**

**take** 12:22 14:5
16:8 18:9 23:12
68:24 71:16
117:21 118:17
**taken** 1:20 87:14
137:7
**takes** 16:5 17:5,9
**talk** 12:14 18:12
21:21 54:3
98:15 122:14

**talked** 19:15,24
69:13 94:4
103:3
**talking** 27:12
32:16,20 54:1
88:15 98:19
102:13 103:2
117:16 121:5
122:6 127:6
**talks** 129:16
130:22
**tax** 73:7 107:6,6
107:19
**team** 6:5,15 10:5
11:3 25:14,22
32:13,16,19
35:16 43:6,9
57:1 60:16
61:14 62:6,14
62:15 64:17
73:20 84:2 85:9
85:17 101:11
108:9 109:7
115:8,11,12,13
**technical** 78:6
**technically** 4:20
36:23 37:12
**teeing** 26:6
**tell** 7:11 14:18
24:22 28:4 34:2
34:7 36:25 44:2
52:7 53:11
55:17 56:3
58:23 59:5,14
69:16 71:16
83:17 93:4
103:6 105:13
106:10 112:13
112:25 113:2
115:20 116:2,6
116:22 119:12
120:6,18 122:9
126:7,12 137:4
**telling** 56:14
58:14 68:15

**tells** 43:18 55:25
94:23
**temporarily**
76:12
**tend** 109:1
**term** 7:16 8:1 9:3
24:10 45:1
47:21 86:3
88:15 98:17
104:1,2,5,7,8
107:25 108:1
124:10,11,13
125:7,13,25
126:10,13
134:21,21
**terminology**
98:14
**terms** 6:19 9:23
10:11 18:13,15
19:23 22:20
26:6 35:16
43:14 61:4
92:11 93:4
107:14,19
**testified** 4:2
41:23 99:18
100:14 124:2
**testify** 16:15,19
**testimony** 35:24
62:9 79:12
98:16 100:22
100:23 137:9
**Texas** 1:2,23,25
4:19 81:22 82:1
82:9,16,21
135:25 138:1
**thank** 95:14 96:1
109:16,17
124:19 135:8
**thanks** 100:12
**Thedford** 23:2
**thereto** 137:21
**thing** 33:22 53:6
59:18 84:13
**things** 10:1 25:25

57:3 79:14
122:5
**think** 6:9 7:2
15:18 16:3
18:18 26:14
30:15 31:6,8,22
32:9 36:16,19
39:21 41:1,10
50:15 53:2
58:12,22 59:4
59:11 64:6 65:6
65:7,8 75:2,13
78:6 79:16
80:24 84:15
85:23 86:10,15
87:21 88:13
95:9 97:19
99:14 101:5,9
103:11 105:3
105:25 106:17
107:9,22 108:4
108:6 111:17
113:7,14,24
123:24
**thinking** 57:4
117:11 129:7
**Third** 2:10 73:6
**third-party**
10:16 11:12
**thousand** 92:6
**threatened** 5:2
**three** 5:9 6:12
97:12 102:11
124:10,11,13
124:24 125:2
**throw** 104:1
**Thursday** 19:14
**Tim** 106:17
**time** 4:24 5:15
6:21,23 7:9,11
7:12,15 8:10,14
8:24 10:2,4
12:6,10 16:14
24:6,8 25:1
28:21 29:25

David Klos - October 27, 2021

36:23 37:12,18
39:11 41:4,12
42:5,12 43:22
43:22 44:19
47:13 49:4
52:14 53:2,8,14
53:15 54:21
56:16 59:23
60:2,10 62:5
63:2 65:12
66:11 74:10,20
79:4 80:15
83:23 84:12
86:23 89:10,16
92:10 93:5
95:12 101:13
108:24,25
109:6,16
111:12 112:14
113:17 116:2
122:18 123:18
129:2,7 134:12
135:1 137:8
**timely** 44:9 51:15
  51:17
**times** 7:5 32:15
  61:20 63:8
  76:19 92:6
**timing** 15:24
**title** 5:15,16 6:22
  7:1 10:9,11
  12:16 13:7
  26:14
**titles** 10:11 78:18
**today** 5:21 14:3
  15:12 16:3,13
  16:16,19,24
  17:3,14 20:5
  42:14 44:20
  57:5 63:25 65:6
  95:25 96:11
  102:18 103:6
  104:15 131:24
  133:11,19
**today's** 47:6

**told** 39:21 42:14
  43:4 52:11,11
  52:19 53:12
  55:9 60:21
  61:23 62:13,14
  62:15 68:12
  69:9 70:9 85:19
  91:8 95:1 97:25
  98:2 100:25
  103:7 118:16
  118:23 122:11
  122:23
**tomorrow** 79:11
  132:22
**top** 107:9 127:7
**topic** 96:2 98:3
**topics** 20:11
  103:25 106:23
**total** 116:15
**totaling** 119:24
**touched** 98:16
**track** 111:2 129:1
**tracker** 118:10
**tracking** 39:15
**transaction**
  34:13 70:21
  76:9 115:21
  116:7 118:24
**transcript** 135:14
  135:17 137:13
**transfer** 29:9
  30:2 31:8,20
  32:8 34:19 36:1
  40:22 41:16
  69:2,10 76:15
  77:4,18 85:16
  90:12 91:22,23
  92:9 93:3 115:8
**transferred**
  30:20 75:24
  77:10 78:18
  79:13
**transferring** 34:8
  35:11 39:22
  42:4 75:9

**transfers** 28:9,18
  28:19,22 30:24
  32:22 35:4,10
  38:3 42:9 94:7
**transitioned**
  109:1,6
**transparent**
  115:17
**Treasurer**
  121:11
**treasury** 9:6
  107:6
**treated** 35:5
**trigger** 104:2,10
  104:21
**triggered** 104:11
  104:17
**triggers** 14:25
  107:17
**trouble** 62:19
**true** 29:6 88:9
  135:24
**trust** 15:16 17:10
  17:15 18:6
**trusts** 26:16
  65:23 108:21
**truth** 137:5,5,5
**truthful** 100:22
**truthfully** 16:16
  16:19
**try** 62:23 106:24
**trying** 17:18
  27:21 30:23
  50:6 67:14 98:3
  100:11 104:22
  130:20 132:9
  133:8
**turn** 114:15
  123:25
**turned** 76:4
  81:15
**two** 9:7 15:12
  29:14 36:20
  45:13 65:10
  66:20 77:12

83:8 85:1 86:12
  87:24 94:19
  95:10 105:4,25
  106:24 107:24
  119:24 121:18
  122:12 127:25
  129:4 134:22
**two-paragraph**
  84:12
**TX** 2:4,18 138:2
**type** 98:12
**types** 13:4 78:13
  84:1 107:12,15
  107:17 114:20
**typewriting**
  137:10
**typical** 84:7

**U**
**Uh-huh** 7:18
  13:23 47:7
  75:11 127:9
**ultimate** 16:12
  17:8,10
**ultimately** 11:4
  39:19 64:18
  73:9
**um** 63:13
**unable** 89:3,14
**undergrad** 4:15
**Undergraduate**
  4:14
**understand**
  14:14 15:19
  17:14 18:19
  30:23 47:4 51:8
  61:11 62:8 66:4
  67:25 68:2
  88:25 96:17
  97:24 98:8
  106:3 118:12
  118:15 124:14
  132:1
**understanding**
  19:11 20:11,13

37:17 48:19
  49:18 51:12,14
  54:17,22,23
  56:21 61:12,22
  70:18 72:7,10
  75:7 79:4 87:1
  87:9 91:11 97:6
  98:23 101:12
  101:18,19
  102:2 112:19
  121:9 124:3,15
  133:11,20,25
  134:2,6
**understood** 52:2
  63:12 95:4
  102:25
**unfair** 34:17
**unfamiliar** 80:21
**UNITED** 1:1
**unpaid** 46:15,24
  47:2,20 48:15
  48:15 49:4
  131:15,16
**unscheduled**
  38:23 64:7,23
  75:18,20
**upcoming** 25:25
**updated** 54:15
**upfront** 85:11
**use** 14:19 56:25
  70:23 81:17
  108:20
**usually** 31:15
  33:16
**utilized** 71:17

**V**
**valid** 39:3
**valuation** 5:17,19
  5:24 6:2,15
  9:14 10:7,9,14
  10:15,24 11:3,7
  11:12 71:11,15
  71:17,25 72:1
  72:13,14,21

David Klos - October 27, 2021

| | | | | |
|---|---|---|---|---|
| 107:6 | **Waterhouse** 8:17 | 121:5 122:6 | 51:7 52:23 | **worthiness** 90:11 |
| **valuations** 11:4 | 11:1 13:25 20:9 | **we've** 19:24 | 53:25 54:9 55:5 | **wouldn't** 25:13 |
| **value** 11:14 | 30:13,14,19 | 75:13 78:12 | 55:14,21 56:12 | 38:10 43:8 |
| 71:16 | 39:25 41:14 | **wearing** 43:15 | 57:10 60:14 | 56:22,23 60:16 |
| **valuing** 10:19 | 42:3,7 43:24 | **week** 36:20 83:7 | 61:3 63:7 64:11 | 64:8,20 77:24 |
| **variety** 107:16 | 52:7,11,18,24 | **weekly** 25:24 | 65:21 66:2,9,17 | 86:24 87:17 |
| **various** 25:23 | 53:11 54:15,19 | 43:5,24 63:19 | 69:22 71:5,14 | 99:15 |
| 79:14 | 54:25 55:17,25 | 129:8,10 | 71:22 76:21 | **write** 128:3,5 |
| **vary** 17:12 | 60:20 61:23 | **weeks** 59:5 | 77:22 78:6,25 | **writes** 127:13 |
| **verbatim** 94:17 | 62:9 65:3 69:9 | **welcome** 117:19 | 79:7,21 81:4,13 | **writing** 103:21 |
| **verbiage** 132:25 | 77:17 78:2,20 | 127:7 | 81:25 82:15 | 103:24 113:9 |
| **verify** 27:24 | 84:23 85:1,19 | **went** 4:14 58:17 | 83:15 85:22 | 125:22 126:18 |
| **versus** 87:12 | 86:14 91:8 94:6 | 81:17 85:14 | 87:5 88:20 89:7 | **written** 35:2,6 |
| **videoconference** | 100:25 103:3 | 101:18 | 90:16 91:5,11 | 66:6 |
| 1:19 2:6,13,19 | 103:13 115:5 | **weren't** 61:21 | 93:15 94:10 | **wrong** 55:1 82:18 |
| **videotape** 21:18 | 115:25 116:2 | 80:16 88:7 | 95:15 99:6,25 | 82:22 88:22 |
| **view** 131:10 | 116:22 118:19 | 97:15 101:20 | 100:7,13,21 | 89:19 |
| **virtually** 44:5 | 118:23 121:6 | **whatsoever** | 101:5 102:2,17 | **wrote** 67:21 |
| **vis-a-vis** 15:16 | 122:9 124:4,8 | 63:20 | 103:17 104:20 | 70:12 |
| **voluntary** 37:24 | 125:11,22 | **wherewithal** | 108:4 109:17 | **www.dickman...** |
| **vs** 1:8 | 126:15 127:13 | 93:24 | 111:10 112:5 | 138:4 |
| | 127:16 | **wind** 16:5 17:5 | 112:11 113:21 | |
| **W** | **Waterhouse's** | **winding** 15:2,22 | 117:1 119:10 | **X** |
| **want** 16:24 44:10 | 21:1,19 127:10 | **wire** 59:17 61:19 | 119:17 120:10 | |
| 54:4 63:8 90:6 | **waters** 43:14 | 118:7 | 120:22 128:15 | **Y** |
| 95:18 96:19 | **way** 6:16 20:12 | **withdrawn** 91:19 | 130:9,18 131:7 | **y'all** 95:2 |
| 98:15 100:10 | 22:22 31:15 | 110:11 111:15 | 131:13,23 | **Yang** 106:15 |
| 101:14 104:1 | 34:3 35:17,22 | 113:1,7,8 | 133:16,24 | **yeah** 6:23 8:2 |
| 117:9 134:19 | 48:24 54:1 63:8 | 124:10,12 | 134:10,19 | 14:21 15:23 |
| 135:13,16 | 69:6 72:15,17 | **within-entitled** | 135:4,9 137:3 | 19:17 23:2 |
| **wanted** 24:17 | 76:10 82:19 | 137:6 | 137:10 | 29:12,20 35:15 |
| 34:3 96:2 | 87:18 92:1,1,1 | **witness** 1:19 9:2 | **word** 56:25 | 37:22 43:1 |
| **wants** 90:16,20 | 92:2 93:24 94:6 | 11:19 12:1 13:2 | 133:11,20 | 55:14 56:24 |
| 90:22 | 95:3 97:5 | 14:14 19:12 | **words** 10:24 36:7 | 59:2 60:14 61:3 |
| **wasn't** 23:24 | 102:23 114:10 | 21:4 22:1,10,17 | 52:16,24 94:19 | 63:7,8,12,18 |
| 24:1 31:20 | 121:5 137:19 | 23:12 25:5,13 | **work** 5:5 10:19 | 66:17 67:9 71:5 |
| 37:18 38:5 50:4 | **ways** 38:21 | 27:6 29:12 33:2 | **worked** 5:8 11:22 | 83:24 89:7 |
| 51:11,15,16 | **we'll** 20:1 54:3 | 34:1,23 35:15 | 62:4 | 91:11 94:10 |
| 53:4 57:1,3 | 125:7 132:17 | 36:6 37:22 | **working** 5:7,11 | 96:10 98:20 |
| 59:20 60:15 | 132:21 | 38:19 39:9 40:5 | 12:5 | 99:25 101:5 |
| 62:6 70:17 | **we're** 12:8 27:12 | 40:16 41:18,21 | **world** 108:23 | 102:2 124:15 |
| 72:19 73:3,3 | 32:15 43:11,12 | 43:1,21 44:18 | 116:3,7 118:22 | 125:1 135:19 |
| 75:2 101:11 | 64:1 65:8,9,10 | 45:1,11,19 | 119:2,12 120:6 | **year** 6:1 9:25 |
| 103:17 108:12 | 65:12 79:22 | 46:23 48:10,24 | 120:18 | 29:22 49:21 |
| 129:10 | 80:4 117:17,18 | 49:17 50:3,15 | **worth** 34:10 | 111:1,8,12,13 |

David Klos - October 27, 2021

113:4 123:17
126:5,15,22
**years** 5:9 6:17
15:12 24:10,17
30:18 32:21
33:20 34:17
39:14 48:7
65:17 66:3
69:18 94:20
95:3,11 123:23
**years'** 34:10
**yes-or-no** 94:12
**York** 2:11 132:21

**Z**

**zero** 46:8 49:6
80:1
**ZIEHL** 2:10

**0**

**0** 36:8 69:4
**08** 4:24
**09** 4:24

**1**

**1** 8:11 24:20,23
66:24 67:2,7
80:3 113:10
126:8,12
137:22
**1-31-23** 138:4
**1-4** 27:17
**1-6** 127:3
**1.3** 28:13,14
**1.4** 58:25
**10** 19:6 32:21
33:20 34:10,17
69:18 95:3
123:19
**100** 15:25
**10017-2024** 2:11
**101** 138:2
**109** 3:5
**11** 123:19
**127** 3:6
**13** 23:8 27:9

46:12 49:10
114:1 129:12
129:14
**13-week** 126:3
**14** 27:15,17,23
36:12 40:20
42:17 44:13,22
48:12 49:1
58:25 59:23
60:2,23 61:18
64:2,5
**15** 61:7
**15(c)** 80:9 121:4
127:6 128:17
**16** 8:9 31:18
127:2
**17** 8:10
**18** 8:10
**19** 8:24 45:24
49:2
**1982** 4:10

**2**

**2** 66:24 67:2,7
73:25 76:3 80:4
85:23 87:9,13
92:8 114:23
115:9
**2.03-** 46:9
**2.1** 28:14 45:25
46:3 49:1,8
130:22 131:8
**2.1-** 46:5,7
**2.4** 68:7 69:2
70:7,19,23 72:7
73:18 75:22
76:3 77:10,18
78:9 85:18,20
91:22 92:8,15
115:8 116:3,23
**2.4-** 70:21 73:23
77:4 85:24
86:13 90:6
**2:30** 1:22
**20** 8:24 24:17

**200** 12:6
**2009** 5:12,15 6:3
6:3 29:24,25
122:17
**2010** 6:9 106:13
123:18
**2011** 6:10,21
106:13 123:18
**2012** 123:18
**2017** 6:22 22:13
23:7 24:8,18
88:22 105:12
124:25
**2018** 116:14
119:14 120:2
**2019** 8:11,14 9:10
9:13 10:6 11:10
11:16,21 27:14
28:9 29:8,17,21
29:25 31:18
35:8 36:15,22
40:21 41:1,13
42:8,16,16
44:13,13 45:23
45:24 65:13,15
66:11 75:14
78:20 80:6,19
87:2,9,13 88:9
88:14 89:2,17
91:21 92:8 93:2
93:11 105:13
110:20 111:6
111:12,21
112:2,6,8
114:23 115:9
121:7
**2020** 7:13,22
24:20,24 51:10
51:15,22 53:18
54:24 56:17,22
57:6,13,17,22
60:20 61:21
63:19 98:18,24
99:19 100:15
101:2 102:14

102:17,17
103:23 112:17
113:2,4,12
120:24 121:7
121:21 124:1,9
125:12,24
126:10 127:11
128:23 129:3
**2021** 1:15,21
13:24 58:25
59:23 60:2 61:8
87:16 88:1
112:22,25
113:3,10,16
126:8,13 128:2
129:4 136:1
137:22
**21-03004-sgj** 1:8
**214** 138:3
**23-point** 45:20
**23.034-** 45:21
**24.7-** 46:10
**27** 1:15,21 4:20
**29** 37:6

**3**

**3** 46:13 50:8
67:17 68:4
74:18,22 76:5
82:24 83:10,20
93:2,11 114:4,7
114:10,22
118:1,13
129:15 131:8
131:14
**30** 24:10,17
130:22
**30-year** 23:15
24:10 26:2
**30(b)(6)** 19:12,20
**30.7** 21:22
**30.7-** 27:12
**300,000** 28:14
**31** 22:13 23:7
24:18 45:21

51:10,15 56:17
56:22 57:6,13
57:17,21 58:7,9
60:25 87:15
88:1 98:18,24
120:2 124:25
**3102** 2:17
**312** 138:1
**338-** 37:8
**34th** 2:11
**3763** 83:15
**3800** 2:4
**38th** 1:25
**398,000** 85:23

**4**

**4** 3:3 45:23 91:21
**4.4** 118:9
**4.4-** 76:4
**411,000** 37:8
**4228** 138:2
**445-9548** 138:3

**5**

**5** 74:7,8,24 75:4
75:23 77:4,11
77:18 78:3
79:22 80:2
81:18 82:25
85:4 86:13
91:22 93:3
114:16 118:8
118:13,24
119:7,14
**5-** 76:5 90:1
**5,019,000** 75:3
**5.2** 80:19
**5:00** 95:19
**5:14** 1:22 135:21
**500** 1:24 2:3
**500,000** 123:9,12

**6**

**6** 4:10 127:11
128:22 129:3
**6/30** 122:2

David Klos - October 27, 2021

**600,000** 76:6,7
**630,000** 28:14
**66,000** 46:7 49:4
  49:5,7

---
**7**

**7** 58:11,15
**7.4** 75:9 78:22
  79:12 89:2
  90:17,20,22,24
  119:25 122:5
**7.4-** 89:19 91:13
**75** 18:1
**750,000** 28:13
  37:6
**75201** 2:4
**75206** 138:2
**75219** 2:18
**777** 2:17
**780** 2:10

---
**8**

**80** 15:25
**800** 138:3
**855-5100** 138:3

---
**9**

**9** 19:5
**95** 3:4

# EXHIBIT 199

**Loan Summary**

| HCMLP to HCMSI (GL 14530) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| HCMSI Restructure | 5/31/2017 | 6,572,061 |
| HCMSI #46 | 3/26/2018 | 158,777 |
| HCMSI #47 | 6/25/2018 | 212,403 |
| HCMSI #48 | 5/29/2019 | 409,586 |
| HCMSI #49 | 6/26/2019 | 153,565 |
| BW Salary Recievable | 12/31/2019 | 12,301 |
| | Sub-total | 7,518,692 |
| | | |
| Total HCMSI Debt to HCM Outstanding | | 7,518,692 |
| Total HCMSI Debt per GL | | 7,518,692 |
| | | |
| | Reconciled Total | 7,518,692 |
| | Unreconciled Difference | - |

| HCMLP to HCMFA (GL 14531) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| HCMFA #2 | 2/26/2014 | 2,092,825 |
| HCMFA #5 | 2/26/2016 | 965,395 |
| HCMFA #6 | 5/2/2019 | 2,457,517 |
| HCMFA #7 | 5/3/2019 | 5,119,827 |
| | Sub-total | 10,635,564 |
| | | |
| Total HCMFA Debt to HCM Outstanding | | 10,635,564 |
| Total HCMFA Debt per GL | | 10,635,564 |
| | | |
| | Reconciled Total | 10,635,564.44 |
| | Unreconciled Difference | - |

| HCMLP to NexPoint Advisors (GL 14532) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| NexPoint Restructure | 5/31/2017 | 23,034,644 |
| | Sub-total | 23,034,644 |
| | | |
| Total NexPoint Debt to HCM Outstanding | | 23,034,644 |
| Total NexPoint Debt per GL | | 23,034,644 |
| | | |
| | Reconciled Total | 23,034,644 |
| | Unreconciled Difference | 0.00 |

| HCMLP to HCRE (GL 14533) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| HCRE #9 | 11/27/2013 | - |
| HCRE Restructure | 5/31/2017 | 5,829,776 |
| HCRE #10 | 10/12/2017 | 3,149,919 |
| HCRE #11 | 10/15/2018 | 874,978 |
| HCRE #12 | 9/25/2019 | 750,279 |
| | Sub-total | 10,604,952 |
| | | |
| Total HCRE Debt to HCM Outstanding | | 10,604,952 |
| Total HCRE Debt per GL | | 10,604,952 |
| | | |
| | Reconciling Items Compound Interest | - |
| | | |
| | Reconciled Total | 10,604,951.61 |
| | Unreconciled Difference | 0.01 |

| HCMLP Partner Tax Loans (GL 14565) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| Dondero #4 | 2/2/2018 | 3,687,270 |
| Dondero #5 | 8/1/2018 | 2,619,929 |
| Dondero #6 | 8/13/2018 | 2,622,426 |
| | Sub-total | 8,929,625 |
| | | |
| Total Partner Debt to HCM Outstanding | | 8,929,625 |
| Total Partner Debt per GL | | 8,929,625 |
| Reconciling Items | | |
| | Reconciled Total | 8,929,624.74 |
| | Unreconciled Difference | - |

| Get Good Loan (GL 14750) - Outstanding Loans | Date | Principal Amount |
|---|---|---|
| Dugaboy Restructure | 5/31/2017 | 18,286,268 |
| | Sub-total | 18,286,268 |
| | | |
| Total Partner Debt to HCM Outstanding | | 18,286,268 |
| Total Partner Debt per GL | | 18,286,268 |
| Reconciling Items | | |
| | Reconciled Total | 18,286,268.16 |
| | Unreconciled Difference | - |

Appx. 00514

# EXHIBIT 210

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com


-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Adv. Proc. No. 21-03003-sgj |
| | § | |
| JAMES DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | Case No. 3:21-cv-01010-E |
| | § | |
| Defendants. | § | |
| | § | |

1934054211217000000000052

Appx. 00516

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., §<br>§<br>§<br>§<br>Plaintiff,        §<br>§<br>§<br>vs.                §<br>§<br>§<br>HIGHLAND CAPITAL MANAGEMENT FUND §<br>ADVISORS, L.P.,          §<br>§<br>§<br>§<br>Defendant.    §<br>§ | Adv. Proc. No. 21-3004<br><br>Case No. 3:21-cv-00881-X |
| HIGHLAND CAPITAL MANAGEMENT, L.P., §<br>§<br>§<br>Plaintiff,        §<br>§<br>§<br>vs.                §<br>§<br>§<br>NEXPOINT ADVISORS, L.P., JAMES §<br>DONDERO, NANCY DONDERO, AND §<br>THE DUGABOY INVESTMENT TRUST, §<br>§<br>§<br>Defendants.   § | Adv. Proc. No. 21-3005<br><br>Case No. 3:21-cv-00880-C |
| HIGHLAND CAPITAL MANAGEMENT, L.P., §<br>§<br>§<br>Plaintiff,        §<br>§<br>§<br>vs.                §<br>§<br>§<br>HIGHLAND CAPITAL MANAGEMENT §<br>SERVICES, INC., JAMES DONDERO, §<br>NANCY DONDERO, AND THE DUGABOY §<br>INVESTMENT TRUST, §<br>§<br>§<br>Defendants.   § | Adv. Proc. No. 21-3006<br><br>Case No. 3:21-cv-01378-N |

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., §<br>§<br>§<br>Plaintiff, §<br>§<br>vs. §<br>§<br>HCRE PARTNERS, LLC (n/k/a NexPoint §<br>Real Estate Partners, LLC), JAMES §<br>DONDERO, NANCY DONDERO, AND §<br>THE DUGABOY INVESTMENT TRUST, §<br>§<br>§<br>Defendants. §<br>§ | Adv. Proc. No. 21-3007<br><br>Case No. 3:21-cv-01379-X |

### DECLARATION OF DAVID KLOS IN SUPPORT OF
### HIGHLAND CAPITAL MANAGEMENT L.P.'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT IN NOTES ACTIONS

I, David Klos, pursuant to 28 U.S.C. § 1746, under penalty of perjury, declare as follows:

1.      I am the Chief Financial Officer ("CFO") of the reorganized Highland Capital Management, L.P. ("Highland"), and I submit this Declaration in support of *Highland Capital Management, L.P.'s Motion for Partial Summary Judgment in Notes Actions* (the "Motion"). This Declaration is based on my personal knowledge. I could and would testify to the facts and statements set forth herein if asked or required to do so.

2.      I joined Highland in 2009 and served as Controller from 2017 to 2020 and Chief Accounting Officer from 2020 to February 2021. At all relevant times, I reported to Frank Waterhouse until he left the company in February 2021. I was appointed CFO in March 2021 following confirmation of Highland's Plan.[1]

---

[1] Capitalized terms not defined herein shall have the meanings ascribed in the Motion.

A.    **NexPoint Advisors, LP's ("NexPoint") Prepayment Defense**

3.    I understand that NexPoint contends that it had no obligation to make the Annual Installment payment due on December 31, 2020 under the NexPoint Note because it "pre-paid." Two documents show that NexPoint is mistaken.

4.    The first document is the NexPoint Note, a true and correct copy of which is attached hereto as **Exhibit A**.[2]  Under the NexPoint Note, NexPoint was required to make "Annual Installment" payments on December 31 of each year equal to (i) all unpaid accrued interest, *plus* (ii) $1/30^{th}$ of the outstanding principal amount of the NexPoint Note.  **Exhibit A ¶2.1.**

5.    NexPoint was permitted to make "prepayments" under the NexPoint Note.  Section 3 of the NexPoint Note sets forth NexPoint's agreement concerning the treatment of "prepayments" and provides:

> 3.  Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  **Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.**

**Exhibit A ¶ 3** (emphasis added).

6.    The second relevant document is an amortization schedule (the "Amortization Schedule") that was prepared and maintained in the ordinary course of Highland's business, a true and correct copy of which is attached hereto as **Exhibit B**.[3]  I understand that the Amortization Schedule is the only document that NexPoint relies upon to support its "prepayment defense."

7.    The Amortization Schedule shows, among other things, the following:

---

[2] The NexPoint Note is also included as Highland's Ex. 2 (Exhibit 1),

[3] The Amortization Schedule is also included as Highland's Ex. 200.

**Appx. 00519**

- The "Interest Accrual" column shows the periodic interest that accrued under the NexPoint Note between the dates described in the "Date" column;

- The "Total Paid" column shows the amount NexPoint paid against the NexPoint Note[4]; and

- The "Interest Paid" and "Principal Paid" columns show how each payment was applied.

8.      As the Amortization Schedule shows, (a) between October 20, 2017 and August 13, 2019, NexPoint made twelve (12) payments that could broadly be characterized as unscheduled "prepayments" of principal and/or interest (the "Prepayments")[5], and (b) with one exception, each of the Prepayments was applied first to reduce or eliminate all accrued and outstanding interest and then to unpaid principal, as required by Section 3 of the NexPoint Note.[6]

9.      As can also be seen on the Amortization Schedule, ***notwithstanding the Prepayments***, NexPoint was still required to make additional payments against the NexPoint Note in December of 2017, 2018, and 2019, in order to reduce "Accrued Interest" to $0 as of December 31 in each year[7] as required by Section 2.1 of the NexPoint Note, which it did in each instance.

10.      Indeed, even though NexPoint made six (6) Prepayments totaling $6.38 million between March 29 and August 13, 2019, NexPoint was still required to pay $530,112.36 to fully

---

[4] Note that for the interest payment made December 30, 2019, interest of $530,112.36 was paid in cash and is reflected on the "Interest Paid" column. The amount is omitted from the "Total Paid" column but has no bearing on the actual calculations contained in the Amortization Schedule. For avoidance of doubt, $530,112.36 of interest was paid to Highland from NexPoint on December 30, 2019.

[5] For the avoidance of doubt, NexPoint made the Prepayments on October 20, 2017, April 10, 2018, May 1, 2018, May 9, 2018, September 5, 2019, September 21, 2019, March 29, 2019, April 16, 2019, June 4, 2019, June 19, 2019, July 9, 2019, and August 13, 2019. *See generally* Ex. B.

[6] The exception is the Prepayment made on May 9, 2018, which prepaid approximately six (6) months of future interest.

[7] NexPoint made payments against the NexPoint Note on December 5, 2017, December 18, 2018, and December 30, 2019, respectively, which reduced "Accrued Interest" to $0 as of December 31 in each of those years in order to comply with Section 2.1 of the NexPoint Note.

satisfy its obligation to make the unpaid interest portion of the Annual Installment payment due as of December 31, 2019, which it did.

11.     As the Amortization Schedule shows, NexPoint did not make any Prepayments on account of the NexPoint Note in 2020.  Thus, as of December 31, 2020, NexPoint was required to make an Annual Installment payment on December 31 equal to  (i) all unpaid accrued interest, *plus* (ii) $1/30^{\text{th}}$ of the outstanding principal amount of the NexPoint Note (the "2020 Annual Installment").  Exhibit A ¶2.1.

12.     NexPoint knew the 2020 Annual Installment was due on December 31, 2020 because it was included in a 13-week forecast that Highland's Corporate Accounting Group updated on a weekly basis and that was provided to (among others) Frank Waterhouse, NexPoint's Treasurer and then Highland's CFO.  *See*, *e.g.*, **Exhibit C** (a true and correct copy of a 13-week forecast prepared for the 13-week period commencing December 14, 2020) Exhibit C shows that Operating Receipts of $2.051 million was due on December 28, 2020 in connection with "Interest Receipts on notes receivable," an amount that included the Required Payment).[8]

13.     NexPoint failed to make the 2020 Annual Installment due on December 31, 2020 as required under Section 2.1 of the NexPoint Note.

14.     On January 14, 2021, after Highland sent notice of default, NexPoint paid Highland $1,406,111.92.  **Exhibit B** (entry dated 1/14/21).

**B.     Highland's Loan Summaries**

15.     Highland's accounting group has a regular practice of creating and maintaining "loan summaries" in the ordinary course of business (the "Loan Summaries").   The Loan

---

[8] This 13-week forecast is also included as Highland's Ex. 58 and is just an example.  For years, the accounting group prepared a 13-week forecast that was updated weekly so that everyone knew what payments and receipts were anticipated.

Appx. 00521

Summaries identify amounts owed to Highland under affiliate notes and are created by updating underlying schedules for activity and reconciling with Highland's general ledger.  Ex. 199 is an example of a Loan Summary.  The Loan Summaries identify each Obligor by reference to the "GL" number used in the general ledger.  *See* Ex. 199 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

16.     The Loan Summaries were used in connection with the PwC audits and to support accounting entries and year-end balances in the ordinary course of Highland's business.  For example, Ex. 199 ties exactly into Ex. 198, the "back up" to the "Due from affiliates" entry in the January 2021 MOR.  Docket No. 2020.[9]

## C.     The Notes

17.     In the ordinary course of business, Highland had (and continues to have) a regular practice of maintaining electronic copies of all promissory notes issued by any officer, employee, or corporate affiliate.

18.     Attached as **Exhibit D** is a true and correct copy of a promissory note dated February 2, 2018, executed by James Dondero, as the maker, in the original principal amount of $3,825,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "First Dondero Note").

---

[9] Colloquially, the Loan Summaries are the "back up" to the "back up."  To illustrate, and working backwards, the January 2021 MOR reported that $152,538,000 was "Due from affiliates."  Docket No. 2030 (balance sheet).  Ex. 198 is the "back up" to the January 2021 MOR and it shows that $152,537,622 was the "Total Due from Affiliates" (the January 2021 MOR rounded up to the nearest thousand).  Ex. 199, the Loan Summary, is the "back up" to the "back up," and is reconciled with Highland's general ledger.  As can be seen, the Loan Summary specifies the outstanding principal amounts due under each Note.  Interest on these notes is accrued in a single account (general ledger account 14010).

19.     Attached as **Exhibit E** is a true and correct copy of a promissory note dated August 1, 2018, executed by James Dondero, as the maker, in the original principal amount of $2,500,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Second Dondero Note").

20.     Attached as **Exhibit F** is a true and correct copy of a promissory note dated August 13, 2018, executed by James Dondero, as the maker, in the original principal amount of $2,500,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Third Dondero Note," and together with the First Dondero Note and Second Dondero Note, the "Dondero Notes").

21.     Attached as **Exhibit G** is a true and correct copy of a promissory note dated May 2, 2019, executed by HCMFA, as the maker, in the original principal amount of $2,400,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "First HCMFA Demand Note").

22.     Attached as **Exhibit H** is a true and correct copy of a promissory note dated May 3, 2019, executed by HCMFA, as the maker, in the original principal amount of $5,000,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Second HCMFA Demand Note," and together with the First HCMFA Note, the "HCMFA Demand Notes").

Appx. 00523

23.     Attached as **Exhibit I** is a true and correct copy of a promissory note dated March 28, 2018, executed by HCMS, as the maker, in the original principal amount of $150,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "First HCMS Demand Note").

24.     Attached as **Exhibit J** is a true and correct copy of a promissory note dated June 25, 2018, executed by HCMS, as the maker, in the original principal amount of $200,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Second HCMS Demand Note").

25.     Attached as **Exhibit K** is a true and correct copy of a promissory note dated May 29, 2019, executed by HCMS, as the maker, in the original principal amount of $400,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business (the "Third HCMS Demand Note").

26.     Attached as **Exhibit L** is a true and correct copy of a promissory note dated June 26, 2019, executed by HCMS, as the maker, in the original principal amount of $150,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business (the "Fourth HCMS Demand Note," and collectively with the First HCMS Demand Note, the Second HCMS Demand Note, and Third HCMS Demand Notes, the "HCMS Demand Notes").

27.     Attached as **Exhibit M** is a true and correct copy of a promissory note dated November 27, 2013, executed by HCRE, as the maker, in the original principal amount of $100,000 in favor of Highland that was and is maintained in Highland's books and records in the

ordinary course of business and that was provided to PwC in connection with its annual audits (the "First HCRE Demand Note").

28.     Attached as **Exhibit N** is a true and correct copy of a promissory note dated October 12, 2017, executed by HCRE, as the maker, in the original principal amount of $2,500,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Second HCRE Demand Note").

29.     Attached as **Exhibit O** is a true and correct copy of a promissory note dated October 15, 2018, executed by HCRE, as the maker, in the original principal amount of $750,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Third HCRE Demand Note").

30.     Attached as **Exhibit P** is a true and correct copy of a promissory note dated September 25, 2019, executed by HCRE, as the maker, in the original principal amount of $900,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business (the "Fourth HCRE Demand Note," and collectively with the First HCRE Demand Note, the Second HCRE Demand Note, and Third HCRE Demand Notes, the "HCRE Demand Notes," and together with the Dondero Demand Notes and the HCMS Demand Notes, the "Demand Notes").

31.     Attached as **Exhibit A** is a true and correct copy of a promissory note dated May 31, 2017, executed by NexPoint, as the maker, in the original principal amount of $30,746,812.23 in favor of Highland that was and is maintained in Highland's books and records in the ordinary

Appx. 00525

course of business and that was provided to PwC in connection with its annual audits (the "NexPoint Note").

32.     Attached as **Exhibit Q** is a true and correct copy of a promissory note dated May 31, 2017, executed by HCMS, as the maker, in the original principal amount of $20,247,628.02 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "HCMS Term Note").

33.     Attached as **Exhibit R** is a true and correct copy of a promissory note dated May 31, 2017, executed by HCRE, as the maker, in the original principal amount of $6,059,831.51 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "HCRE Term Note," and together with the NexPoint Term Note and the HCMS Term Note, the "Term Notes").

34.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the First Dondero Note was $3,708,273.71, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the First Dondero Note was $3,808,783.89.

35.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Second Dondero Note was $2,647,880.12, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Second Dondero Note was $2,727,300.55.

36.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Third Dondero Note was $2,647,859.55, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Third Dondero Note was $2,727,280.61.

37.    Thus, (a) as of December 11, 2020, the unpaid principal and accrued interest due under the Dondero Notes was $9,004,013.07, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Dondero Notes was $9,263,365.05.

38.    As of (a) December 11, 2020, the unpaid principal and accrued interest due under the First HCMFA Note was $2,493,401.61, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the First Dondero Note was $2,553,982.49.

39.    As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Second HCMFA Note was $5,194,251.45, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Second HCMFA Note was $5,320,453.60.

40.    Thus, as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMFA Notes was $7,687,653.06, and as of (b) December 17, 2020, the unpaid principal and accrued interest due under the HCMFA Notes was $7,874,436.09.

41.    As of (a) December 11, 2020, the unpaid principal and accrued interest due under the First HCMS Demand Note was $162,033.91, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the First HCMS Demand Note was $166,777.82.

42.    As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Second HCMS Demand Note was $215,402.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Second HCMS Demand Note was $222,082.34.

43.    As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Third HCMS Demand Note was $414,842.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Third HCMS Demand Note was $424,922.32.

44.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Fourth HCMS Demand Note was $155,239.90, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Fourth HCMS Demand Note was $158,980.33.

45.     Thus, as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81.

46.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the First HCRE Demand Note was $171,978.10, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the First HCRE Demand Note was $185,979.85.

47.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Second HCRE Demand Note was $3,191,342.72, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Second HCRE Demand Note was $3,380,385.47.

48.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Third HCRE Demand Note was $885,908.76, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Third HCRE Demand Note was $938,970.62.

49.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Fourth HCRE Demand Note was $762,941.38, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Fourth HCRE Demand Note was $825,042.29.

50.     Thus, as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23.

Appx. 00528

51.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.[10]

52.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31[11].

53.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[12]

        I declare under penalty of perjury that the forgoing is true and correct.

Dated: December 17, 2021                         _____/s/ David Klos_____
                                                  David Klos

---

[10] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[11] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[12] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

Appx. 00529

# EXHIBIT A

## PROMISSORY NOTE

**$30,746,812.33**                                                                     **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below.  All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify in writing from time to time.

      1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

      2.    Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

      2.1    Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

      2.2    Final Payment Date.      The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

      3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

     7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

     8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

     9.    <u>Prior Notes</u>.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

D-CNL002955

**Appx. 00532**

EXHIBIT A

PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|-----------|--------------------|--------------|--------------------------------------------------------|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

3

D-CNL002956
Appx. 00533

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 19 of 79

# EXHIBIT B

Appx. 00534

**NPA $30.7M**

| | | |
|---|---|---|
| Closing Date | | 5/31/2017 |
| Total Commitment | $ | 30,746,812 |
| Rate | | 6.000% |
| Maturity: | | 12/31/2047 |

| Date | Interest Accrual | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | Ending Prin Bal | Total Paid |
|---|---|---|---|---|---|---|---|
| 5/31/2017 | | | | | | $        30,746,812 | |
| 6/30/2017 | 151,628.12 | | 151,628.12 | 30,746,812.33 | | 30,746,812.33 | |
| 7/31/2017 | 156,682.39 | | 308,310.50 | 30,746,812.33 | | 30,746,812.33 | |
| 8/31/2017 | 156,682.39 | | 464,992.89 | 30,746,812.33 | | 30,746,812.33 | |
| 9/30/2017 | 151,628.12 | | 616,621.00 | 30,746,812.33 | | 30,746,812.33 | |
| 10/20/2017 | 101,085.41 | (717,706.41) | - | 30,746,812.33 | (82,293.59) | 30,664,518.74 | (800,000.00) |
| 10/31/2017 | 55,448.17 | | 55,448.17 | 30,664,518.74 | | 30,664,518.74 | |
| 11/30/2017 | 151,222.28 | | 206,670.46 | 30,664,518.74 | | 30,664,518.74 | |
| 12/5/2017 | 25,203.71 | (358,904.83) | (127,030.67) | 30,664,518.74 | (942,600.16) | 29,721,918.58 | (1,301,504.99) |
| 12/31/2017 | 127,030.67 | | (0.00) | 29,721,918.58 | | 29,721,918.58 | |
| 1/31/2018 | 151,459.64 | | 151,459.64 | 29,721,918.58 | | 29,721,918.58 | |
| 2/28/2018 | 136,802.26 | | 288,261.90 | 29,721,918.58 | | 29,721,918.58 | |
| 3/31/2018 | 151,459.64 | | 439,721.54 | 29,721,918.58 | | 29,721,918.58 | |
| 4/10/2018 | 48,857.95 | (439,721.54) | 48,857.95 | 29,721,918.58 | | 29,721,918.58 | (439,721.54) |
| 4/30/2018 | 97,715.90 | | 146,573.85 | 29,721,918.58 | | 29,721,918.58 | |
| 5/1/2018 | 4,885.79 | (146,573.85) | 4,885.79 | 29,721,918.58 | | 29,721,918.58 | (146,573.85) |
| 5/9/2018 | 39,086.36 | (879,927.65) | (835,955.50) | 29,721,918.58 | | 29,721,918.58 | (879,927.65) |
| 5/31/2018 | 107,487.49 | | (728,468.01) | 29,721,918.58 | | 29,721,918.58 | |
| 6/30/2018 | 146,573.85 | | (581,894.17) | 29,721,918.58 | | 29,721,918.58 | |
| 7/31/2018 | 151,459.64 | | (430,434.53) | 29,721,918.58 | | 29,721,918.58 | |
| 8/31/2018 | 151,459.64 | | (278,974.89) | 29,721,918.58 | | 29,721,918.58 | |
| 9/5/2018 | 24,428.97 | | (254,545.91) | 29,721,918.58 | (280,765.40) | 29,441,153.18 | (280,765.40) |
| 9/21/2018 | 77,434.27 | | (177,111.65) | 29,441,153.18 | (1,023,750.00) | 28,417,403.18 | (1,023,750.00) |
| 9/30/2018 | 42,042.19 | | (135,069.46) | 28,417,403.18 | | 28,417,403.18 | |
| 10/31/2018 | 144,811.97 | | 9,742.51 | 28,417,403.18 | | 28,417,403.18 | |
| 11/30/2018 | 140,140.62 | | 149,883.13 | 28,417,403.18 | | 28,417,403.18 | |
| 12/18/2018 | 84,084.37 | (294,695.10) | (60,727.60) | 28,417,403.18 | | 28,417,403.18 | (294,695.10) |
| 12/31/2018 | 60,727.60 | | (0.00) | 28,417,403.18 | | 28,417,403.18 | |

| 1/31/2019 | 144,811.97 | | 144,811.97 | 28,417,403.18 | | 28,417,403.18 | |
| 2/28/2019 | 130,797.91 | | 275,609.88 | 28,417,403.18 | | 28,417,403.18 | |
| 3/29/2019 | 135,469.26 | (411,079.15) | (0.00) | 28,417,403.18 | (338,920.85) | 28,078,482.33 | (750,000.00) |
| 3/31/2019 | 9,231.28 | | 9,231.28 | 28,078,482.33 | | 28,078,482.33 | |
| 4/16/2019 | 73,850.25 | (83,081.53) | 0.00 | 28,078,482.33 | (1,216,918.47) | 26,861,563.86 | (1,300,000.00) |
| 4/30/2019 | 61,818.39 | | 61,818.40 | 26,861,563.86 | | 26,861,563.86 | |
| 5/31/2019 | 136,883.59 | (198,701.98) | 0.00 | 26,861,563.86 | 198,701.98 | 27,060,265.84 | - |
| 6/4/2019 | 17,793.05 | (17,793.05) | 0.00 | 27,060,265.84 | (282,206.95) | 26,778,058.89 | (300,000.00) |
| 6/19/2019 | 66,028.09 | (66,028.10) | (0.00) | 26,778,058.89 | (2,033,971.90) | 24,744,086.99 | (2,100,000.00) |
| 6/30/2019 | 44,742.73 | | 44,742.73 | 24,744,086.99 | | 24,744,086.99 | |
| 7/9/2019 | 36,607.69 | (81,350.42) | (0.00) | 24,744,086.99 | (548,649.58) | 24,195,437.41 | (630,000.00) |
| 7/31/2019 | 87,501.31 | | 87,501.31 | 24,195,437.41 | | 24,195,437.41 | |
| 8/13/2019 | 51,705.32 | (139,206.62) | 0.00 | 24,195,437.41 | (1,160,793.38) | 23,034,644.03 | (1,300,000.00) |
| 8/31/2019 | 68,157.30 | | 68,157.31 | 23,034,644.03 | | 23,034,644.03 | |
| 9/30/2019 | 113,595.50 | | 181,752.81 | 23,034,644.03 | | 23,034,644.03 | |
| 10/15/2019 | 56,797.75 | | 238,550.56 | 23,034,644.03 | | 23,034,644.03 | |
| 10/31/2019 | 60,584.27 | | 299,134.83 | 23,034,644.03 | | 23,034,644.03 | |
| 11/30/2019 | 113,595.50 | | 412,730.34 | 23,034,644.03 | | 23,034,644.03 | |
| 12/30/2019 | 113,595.50 | -530,112.36 | (3,786.52) | 23,034,644.03 | | 23,034,644.03 | (530,112.36) |
| 12/31/2019 | 3,786.52 | | 0.00 | 23,034,644.03 | | 23,034,644.03 | |
| 1/31/2020 | 117,382.02 | | 117,382.02 | 23,034,644.03 | | 23,034,644.03 | |
| 2/29/2020 | 109,808.99 | | 227,191.01 | 23,034,644.03 | | 23,034,644.03 | |
| 3/31/2020 | 117,382.02 | | 344,573.03 | 23,034,644.03 | | 23,034,644.03 | |
| 4/30/2020 | 113,595.50 | | 458,168.54 | 23,034,644.03 | | 23,034,644.03 | |
| 5/31/2020 | 117,382.02 | (575,550.56) | (0.00) | 23,034,644.03 | 575,550.56 | 23,610,194.59 | |
| 6/30/2020 | 116,433.84 | | 116,433.83 | 23,610,194.59 | | 23,610,194.59 | |
| 7/31/2020 | 120,314.96 | | 236,748.80 | 23,610,194.59 | | 23,610,194.59 | |
| 8/31/2020 | 120,314.96 | | 357,063.76 | 23,610,194.59 | | 23,610,194.59 | |
| 9/30/2020 | 116,433.84 | | 473,497.60 | 23,610,194.59 | | 23,610,194.59 | |
| 10/31/2020 | 120,314.96 | | 593,812.56 | 23,610,194.59 | | 23,610,194.59 | |
| 11/30/2020 | 116,433.84 | | 710,246.40 | 23,610,194.59 | | 23,610,194.59 | |
| 12/31/2020 | 120,314.96 | | 830,561.36 | 23,610,194.59 | | 23,610,194.59 | |
| 1/14/2021 | 54,335.79 | (830,561.36) | 54,335.79 | 23,610,194.59 | (575,550.56) | 23,034,644.03 | (1,406,111.92) |
| 1/31/2021 | 64,370.79 | | 118,706.58 | 23,034,644.03 | | 23,034,644.03 | |
| 2/28/2021 | 106,022.47 | | 224,729.05 | 23,034,644.03 | | 23,034,644.03 | |
| 3/31/2021 | 117,382.02 | | 342,111.07 | 23,034,644.03 | | 23,034,644.03 | |
| 4/30/2021 | 113,595.50 | | 455,706.58 | 23,034,644.03 | | 23,034,644.03 | |
| 5/31/2021 | 117,382.02 | | 573,088.60 | 23,034,644.03 | | 23,034,644.03 | |

CONFIDENTIAL

| 6/30/2021 | 113,595.50 | 686,684.10 | 23,034,644.03 | 23,034,644.03 |
|---|---|---|---|---|
| 7/31/2021 | 117,382.02 | 804,066.13 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2021 | 117,382.02 | 921,448.15 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2021 | 113,595.50 | 1,035,043.65 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2021 | 117,382.02 | 1,152,425.67 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2021 | 113,595.50 | 1,266,021.18 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2021 | 117,382.02 | 1,383,403.20 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2022 | 117,382.02 | 1,500,785.22 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2022 | 106,022.47 | 1,606,807.69 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2022 | 117,382.02 | 1,724,189.72 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2022 | 113,595.50 | 1,837,785.22 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2022 | 117,382.02 | 1,955,167.24 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2022 | 113,595.50 | 2,068,762.75 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2022 | 117,382.02 | 2,186,144.77 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2022 | 117,382.02 | 2,303,526.79 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2022 | 113,595.50 | 2,417,122.29 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2022 | 117,382.02 | 2,534,504.32 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2022 | 113,595.50 | 2,648,099.82 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2022 | 117,382.02 | 2,765,481.84 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2023 | 117,382.02 | 2,882,863.86 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2023 | 106,022.47 | 2,988,886.34 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2023 | 117,382.02 | 3,106,268.36 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2023 | 113,595.50 | 3,219,863.86 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2023 | 117,382.02 | 3,337,245.88 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2023 | 113,595.50 | 3,450,841.39 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2023 | 117,382.02 | 3,568,223.41 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2023 | 117,382.02 | 3,685,605.43 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2023 | 113,595.50 | 3,799,200.94 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2023 | 117,382.02 | 3,916,582.96 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2023 | 113,595.50 | 4,030,178.46 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2023 | 117,382.02 | 4,147,560.48 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2024 | 117,382.02 | 4,264,942.51 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2024 | 109,808.99 | 4,374,751.49 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2024 | 117,382.02 | 4,492,133.52 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2024 | 113,595.50 | 4,605,729.02 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2024 | 117,382.02 | 4,723,111.04 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2024 | 113,595.50 | 4,836,706.55 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2024 | 117,382.02 | 4,954,088.57 | 23,034,644.03 | 23,034,644.03 |

| | | | |
|---|---|---|---|
| 8/31/2024 | 117,382.02 | 5,071,470.59 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2024 | 113,595.50 | 5,185,066.10 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2024 | 117,382.02 | 5,302,448.12 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2024 | 113,595.50 | 5,416,043.62 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2024 | 117,382.02 | 5,533,425.64 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2025 | 117,382.02 | 5,650,807.67 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2025 | 106,022.47 | 5,756,830.14 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2025 | 117,382.02 | 5,874,212.16 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2025 | 113,595.50 | 5,987,807.66 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2025 | 117,382.02 | 6,105,189.68 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2025 | 113,595.50 | 6,218,785.19 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2025 | 117,382.02 | 6,336,167.21 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2025 | 117,382.02 | 6,453,549.23 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2025 | 113,595.50 | 6,567,144.74 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2025 | 117,382.02 | 6,684,526.76 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2025 | 113,595.50 | 6,798,122.26 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2025 | 117,382.02 | 6,915,504.29 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2026 | 117,382.02 | 7,032,886.31 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2026 | 106,022.47 | 7,138,908.78 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2026 | 117,382.02 | 7,256,290.80 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2026 | 113,595.50 | 7,369,886.31 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2026 | 117,382.02 | 7,487,268.33 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2026 | 113,595.50 | 7,600,863.83 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2026 | 117,382.02 | 7,718,245.85 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2026 | 117,382.02 | 7,835,627.87 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2026 | 113,595.50 | 7,949,223.38 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2026 | 117,382.02 | 8,066,605.40 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2026 | 113,595.50 | 8,180,200.91 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2026 | 117,382.02 | 8,297,582.93 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2027 | 117,382.02 | 8,414,964.95 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2027 | 106,022.47 | 8,520,987.42 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2027 | 117,382.02 | 8,638,369.44 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2027 | 113,595.50 | 8,751,964.95 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2027 | 117,382.02 | 8,869,346.97 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2027 | 113,595.50 | 8,982,942.47 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2027 | 117,382.02 | 9,100,324.50 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2027 | 117,382.02 | 9,217,706.52 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2027 | 113,595.50 | 9,331,302.02 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 10/31/2027 | 117,382.02 | 9,448,684.04 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2027 | 113,595.50 | 9,562,279.55 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2027 | 117,382.02 | 9,679,661.57 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2028 | 117,382.02 | 9,797,043.59 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2028 | 109,808.99 | 9,906,852.58 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2028 | 117,382.02 | 10,024,234.60 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2028 | 113,595.50 | 10,137,830.11 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2028 | 117,382.02 | 10,255,212.13 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2028 | 113,595.50 | 10,368,807.63 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2028 | 117,382.02 | 10,486,189.65 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2028 | 117,382.02 | 10,603,571.68 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2028 | 113,595.50 | 10,717,167.18 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2028 | 117,382.02 | 10,834,549.20 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2028 | 113,595.50 | 10,948,144.71 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2028 | 117,382.02 | 11,065,526.73 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2029 | 117,382.02 | 11,182,908.75 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2029 | 106,022.47 | 11,288,931.22 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2029 | 117,382.02 | 11,406,313.24 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2029 | 113,595.50 | 11,519,908.75 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2029 | 117,382.02 | 11,637,290.77 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2029 | 113,595.50 | 11,750,886.27 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2029 | 117,382.02 | 11,868,268.30 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2029 | 117,382.02 | 11,985,650.32 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2029 | 113,595.50 | 12,099,245.82 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2029 | 117,382.02 | 12,216,627.84 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2029 | 113,595.50 | 12,330,223.35 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2029 | 117,382.02 | 12,447,605.37 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2030 | 117,382.02 | 12,564,987.39 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2030 | 106,022.47 | 12,671,009.86 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2030 | 117,382.02 | 12,788,391.89 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2030 | 113,595.50 | 12,901,987.39 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2030 | 117,382.02 | 13,019,369.41 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2030 | 113,595.50 | 13,132,964.92 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2030 | 117,382.02 | 13,250,346.94 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2030 | 117,382.02 | 13,367,728.96 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2030 | 113,595.50 | 13,481,324.46 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2030 | 117,382.02 | 13,598,706.49 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2030 | 113,595.50 | 13,712,301.99 | 23,034,644.03 | 23,034,644.03 |

| | | | |
|---|---|---|---|
| 12/31/2030 | 117,382.02 | 13,829,684.01 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2031 | 117,382.02 | 13,947,066.03 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2031 | 106,022.47 | 14,053,088.51 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2031 | 117,382.02 | 14,170,470.53 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2031 | 113,595.50 | 14,284,066.03 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2031 | 117,382.02 | 14,401,448.05 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2031 | 113,595.50 | 14,515,043.56 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2031 | 117,382.02 | 14,632,425.58 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2031 | 117,382.02 | 14,749,807.60 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2031 | 113,595.50 | 14,863,403.11 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2031 | 117,382.02 | 14,980,785.13 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2031 | 113,595.50 | 15,094,380.63 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2031 | 117,382.02 | 15,211,762.65 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2032 | 117,382.02 | 15,329,144.68 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2032 | 109,808.99 | 15,438,953.66 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2032 | 117,382.02 | 15,556,335.69 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2032 | 113,595.50 | 15,669,931.19 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2032 | 117,382.02 | 15,787,313.21 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2032 | 113,595.50 | 15,900,908.72 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2032 | 117,382.02 | 16,018,290.74 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2032 | 117,382.02 | 16,135,672.76 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2032 | 113,595.50 | 16,249,268.27 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2032 | 117,382.02 | 16,366,650.29 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2032 | 113,595.50 | 16,480,245.79 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2032 | 117,382.02 | 16,597,627.81 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2033 | 117,382.02 | 16,715,009.84 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2033 | 106,022.47 | 16,821,032.31 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2033 | 117,382.02 | 16,938,414.33 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2033 | 113,595.50 | 17,052,009.83 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2033 | 117,382.02 | 17,169,391.85 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2033 | 113,595.50 | 17,282,987.36 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2033 | 117,382.02 | 17,400,369.38 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2033 | 117,382.02 | 17,517,751.40 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2033 | 113,595.50 | 17,631,346.91 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2033 | 117,382.02 | 17,748,728.93 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2033 | 113,595.50 | 17,862,324.43 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2033 | 117,382.02 | 17,979,706.46 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2034 | 117,382.02 | 18,097,088.48 | 23,034,644.03 | 23,034,644.03 |

| | | | |
|---|---|---|---|
| 2/28/2034 | 106,022.47 | 18,203,110.95 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2034 | 117,382.02 | 18,320,492.97 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2034 | 113,595.50 | 18,434,088.47 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2034 | 117,382.02 | 18,551,470.50 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2034 | 113,595.50 | 18,665,066.00 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2034 | 117,382.02 | 18,782,448.02 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2034 | 117,382.02 | 18,899,830.04 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2034 | 113,595.50 | 19,013,425.55 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2034 | 117,382.02 | 19,130,807.57 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2034 | 113,595.50 | 19,244,403.08 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2034 | 117,382.02 | 19,361,785.10 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2035 | 117,382.02 | 19,479,167.12 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2035 | 106,022.47 | 19,585,189.59 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2035 | 117,382.02 | 19,702,571.61 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2035 | 113,595.50 | 19,816,167.12 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2035 | 117,382.02 | 19,933,549.14 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2035 | 113,595.50 | 20,047,144.64 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2035 | 117,382.02 | 20,164,526.67 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2035 | 117,382.02 | 20,281,908.69 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2035 | 113,595.50 | 20,395,504.19 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2035 | 117,382.02 | 20,512,886.21 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2035 | 113,595.50 | 20,626,481.72 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2035 | 117,382.02 | 20,743,863.74 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2036 | 117,382.02 | 20,861,245.76 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2036 | 109,808.99 | 20,971,054.75 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2036 | 117,382.02 | 21,088,436.77 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2036 | 113,595.50 | 21,202,032.28 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2036 | 117,382.02 | 21,319,414.30 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2036 | 113,595.50 | 21,433,009.80 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2036 | 117,382.02 | 21,550,391.82 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2036 | 117,382.02 | 21,667,773.85 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2036 | 113,595.50 | 21,781,369.35 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2036 | 117,382.02 | 21,898,751.37 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2036 | 113,595.50 | 22,012,346.88 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2036 | 117,382.02 | 22,129,728.90 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2037 | 117,382.02 | 22,247,110.92 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2037 | 106,022.47 | 22,353,133.39 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2037 | 117,382.02 | 22,470,515.41 | 23,034,644.03 | 23,034,644.03 |

| | | | |
|---|---|---|---|
| 4/30/2037 | 113,595.50 | 22,584,110.92 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2037 | 117,382.02 | 22,701,492.94 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2037 | 113,595.50 | 22,815,088.44 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2037 | 117,382.02 | 22,932,470.47 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2037 | 117,382.02 | 23,049,852.49 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2037 | 113,595.50 | 23,163,447.99 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2037 | 117,382.02 | 23,280,830.01 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2037 | 113,595.50 | 23,394,425.52 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2037 | 117,382.02 | 23,511,807.54 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2038 | 117,382.02 | 23,629,189.56 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2038 | 106,022.47 | 23,735,212.03 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2038 | 117,382.02 | 23,852,594.06 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2038 | 113,595.50 | 23,966,189.56 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2038 | 117,382.02 | 24,083,571.58 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2038 | 113,595.50 | 24,197,167.09 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2038 | 117,382.02 | 24,314,549.11 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2038 | 117,382.02 | 24,431,931.13 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2038 | 113,595.50 | 24,545,526.63 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2038 | 117,382.02 | 24,662,908.66 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2038 | 113,595.50 | 24,776,504.16 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2038 | 117,382.02 | 24,893,886.18 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2039 | 117,382.02 | 25,011,268.20 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2039 | 106,022.47 | 25,117,290.68 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2039 | 117,382.02 | 25,234,672.70 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2039 | 113,595.50 | 25,348,268.20 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2039 | 117,382.02 | 25,465,650.22 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2039 | 113,595.50 | 25,579,245.73 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2039 | 117,382.02 | 25,696,627.75 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2039 | 117,382.02 | 25,814,009.77 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2039 | 113,595.50 | 25,927,605.28 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2039 | 117,382.02 | 26,044,987.30 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2039 | 113,595.50 | 26,158,582.80 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2039 | 117,382.02 | 26,275,964.82 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2040 | 117,382.02 | 26,393,346.85 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2040 | 109,808.99 | 26,503,155.83 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2040 | 117,382.02 | 26,620,537.86 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2040 | 113,595.50 | 26,734,133.36 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2040 | 117,382.02 | 26,851,515.38 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 6/30/2040 | 113,595.50 | 26,965,110.89 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2040 | 117,382.02 | 27,082,492.91 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2040 | 117,382.02 | 27,199,874.93 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2040 | 113,595.50 | 27,313,470.44 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2040 | 117,382.02 | 27,430,852.46 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2040 | 113,595.50 | 27,544,447.96 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2040 | 117,382.02 | 27,661,829.98 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2041 | 117,382.02 | 27,779,212.01 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2041 | 106,022.47 | 27,885,234.48 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2041 | 117,382.02 | 28,002,616.50 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2041 | 113,595.50 | 28,116,212.00 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2041 | 117,382.02 | 28,233,594.02 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2041 | 113,595.50 | 28,347,189.53 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2041 | 117,382.02 | 28,464,571.55 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2041 | 117,382.02 | 28,581,953.57 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2041 | 113,595.50 | 28,695,549.08 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2041 | 117,382.02 | 28,812,931.10 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2041 | 113,595.50 | 28,926,526.60 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2041 | 117,382.02 | 29,043,908.63 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2042 | 117,382.02 | 29,161,290.65 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2042 | 106,022.47 | 29,267,313.12 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2042 | 117,382.02 | 29,384,695.14 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2042 | 113,595.50 | 29,498,290.64 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2042 | 117,382.02 | 29,615,672.67 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2042 | 113,595.50 | 29,729,268.17 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2042 | 117,382.02 | 29,846,650.19 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2042 | 117,382.02 | 29,964,032.21 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2042 | 113,595.50 | 30,077,627.72 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2042 | 117,382.02 | 30,195,009.74 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2042 | 113,595.50 | 30,308,605.25 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2042 | 117,382.02 | 30,425,987.27 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2043 | 117,382.02 | 30,543,369.29 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2043 | 106,022.47 | 30,649,391.76 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2043 | 117,382.02 | 30,766,773.78 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2043 | 113,595.50 | 30,880,369.29 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2043 | 117,382.02 | 30,997,751.31 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2043 | 113,595.50 | 31,111,346.81 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2043 | 117,382.02 | 31,228,728.84 | 23,034,644.03 | 23,034,644.03 |

| | | | | |
|---|---|---|---|---|
| 8/31/2043 | 117,382.02 | 31,346,110.86 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2043 | 113,595.50 | 31,459,706.36 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2043 | 117,382.02 | 31,577,088.38 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2043 | 113,595.50 | 31,690,683.89 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2043 | 117,382.02 | 31,808,065.91 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2044 | 117,382.02 | 31,925,447.93 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2044 | 109,808.99 | 32,035,256.92 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2044 | 117,382.02 | 32,152,638.94 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2044 | 113,595.50 | 32,266,234.45 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2044 | 117,382.02 | 32,383,616.47 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2044 | 113,595.50 | 32,497,211.97 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2044 | 117,382.02 | 32,614,593.99 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2044 | 117,382.02 | 32,731,976.02 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2044 | 113,595.50 | 32,845,571.52 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2044 | 117,382.02 | 32,962,953.54 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2044 | 113,595.50 | 33,076,549.05 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2044 | 117,382.02 | 33,193,931.07 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2045 | 117,382.02 | 33,311,313.09 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2045 | 106,022.47 | 33,417,335.56 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2045 | 117,382.02 | 33,534,717.58 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2045 | 113,595.50 | 33,648,313.09 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2045 | 117,382.02 | 33,765,695.11 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2045 | 113,595.50 | 33,879,290.61 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2045 | 117,382.02 | 33,996,672.64 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2045 | 117,382.02 | 34,114,054.66 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2045 | 113,595.50 | 34,227,650.16 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2045 | 117,382.02 | 34,345,032.18 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2045 | 113,595.50 | 34,458,627.69 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2045 | 117,382.02 | 34,576,009.71 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2046 | 117,382.02 | 34,693,391.73 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2046 | 106,022.47 | 34,799,414.20 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2046 | 117,382.02 | 34,916,796.23 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2046 | 113,595.50 | 35,030,391.73 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2046 | 117,382.02 | 35,147,773.75 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2046 | 113,595.50 | 35,261,369.26 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2046 | 117,382.02 | 35,378,751.28 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2046 | 117,382.02 | 35,496,133.30 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2046 | 113,595.50 | 35,609,728.80 | 23,034,644.03 | 23,034,644.03 |

| | | | | |
|---|---|---|---|---|
| 10/31/2046 | 117,382.02 | 35,727,110.83 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2046 | 113,595.50 | 35,840,706.33 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2046 | 117,382.02 | 35,958,088.35 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2047 | 117,382.02 | 36,075,470.37 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2047 | 106,022.47 | 36,181,492.85 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2047 | 117,382.02 | 36,298,874.87 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2047 | 113,595.50 | 36,412,470.37 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2047 | 117,382.02 | 36,529,852.39 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2047 | 113,595.50 | 36,643,447.90 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2047 | 117,382.02 | 36,760,829.92 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2047 | 117,382.02 | 36,878,211.94 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2047 | 113,595.50 | 36,991,807.45 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2047 | 117,382.02 | 37,109,189.47 | 23,034,644.03 | 23,034,644.03 |

D-NNL-029151

**Appx. 00545**

# EXHIBIT C

**Highland Capital Management, L.P. - Cash**
Next 13 Weeks Commencing December 14, 2020
*(in thousands)*
*CONFIDENTIAL DRAFT FOR ILLUSTRATIVE PURPOSES ONLY - NOT FINAL OR APPROVED FOR FURTHER DISTRIBUTION*

| | Actual | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week beginning | 12/7 | 12/14 | 12/21 | 12/28 | 1/4 | 1/11 | 1/18 | 1/25 | 2/1 | 2/8 | 2/15 | 2/22 | 3/1 | 3/8 |
| **Beginning unrestricted operating cash** | $ 12,537 | $ 11,948 | $ 10,684 | $ 11,051 | $ 11,771 | $ 11,048 | $ 11,188 | $ 11,353 | $ 10,486 | $ 11,445 | $ 10,860 | $ 10,279 | $ 8,145 | 8,381 |
| **Operating Receipts** | | | | | | | | | | | | | | |
| Management fees | | | | | | | | | | | | | | |
| CLOs | - | - | - | - | - | - | - | - | 676 | - | - | - | - | - |
| Hedge funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Private Equity, PetroCap, Port Co's | - | - | - | - | 63 | - | - | - | - | - | 270 | - | - | - |
| Separate accounts | - | - | 776 | - | - | - | - | 750 | 165 | - | 579 | - | - | - |
| Management fees - managed funds | $ - | $ - | $ 776 | $ - | $ 63 | $ - | $ - | $ 750 | $ 841 | $ - | $ 849 | $ - | $ - | $ - |
| | | | | | | | | | | | | | | |
| HCMFA / NPA investment support | - | - | 668 | - | - | 668 | - | - | 668 | - | - | - | 668 | - |
| Shared services receipts | 39 | - | 168 | 385 | - | 168 | 290 | 135 | - | 290 | 60 | 15 | - | - |
| Intercompany and shared services revenue | 39 | $ - | $ 836 | $ 385 | $ - | $ 836 | $ 290 | $ 135 | $ 668 | $ 290 | $ 60 | $ 15 | $ 668 | - |
| | | | | | | | | | | | | | | |
| Fund reimbursements | - | - | 60 | - | - | - | 100 | - | - | - | 100 | - | - | - |
| Interest receipts on notes receivable | - | - | - | 2,051 | - | - | - | - | - | - | - | - | - | - |
| Dividend receipts (unencumbered) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other miscellaneous receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total other receipts | $ - | $ - | $ 60 | $ 2,051 | $ - | $ - | $ 100 | $ - | $ - | $ - | $ 100 | $ - | $ - | - |
| | | | | | | | | | | | | | | |
| **Total operating receipts** | $ 39 | $ - | $ 1,672 | $ 2,436 | $ 63 | $ 836 | $ 390 | $ 885 | $ 1,509 | $ 290 | $ 1,009 | $ 15 | $ 668 | - |
| **Compensation and benefits** | | | | | | | | | | | | | | |
| Payroll, benefits, and taxes + exp reimb | (408) | (31) | - | (556) | - | (471) | - | (561) | - | (535) | - | (625) | - | (460) |
| Cash bonuses | - | - | - | - | - | - | - | - | - | - | - | (3,394) | - | - |
| **Total compensation and benefits** | $ (408) | $ (31) | $ - | $ (556) | $ - | $ (471) | $ - | $ (561) | $ - | $ (535) | $ - | $ (4,019) | $ - | (460) |
| **General overhead** | | | | | | | | | | | | | | |
| Outside legal (ordinary course) | (62) | - | (499) | - | (560) | - | - | (560) | - | - | - | (560) | - | - |
| Independent director fees | - | - | - | (210) | - | - | - | - | (210) | - | - | - | (210) | - |
| General overhead - critical vendors (pre-petition) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General overhead - post-petition vendors | (158) | (1,233) | (275) | (275) | (225) | (225) | (225) | (225) | (340) | (340) | (340) | (222) | (222) | (222) |
| **Total general overhead** | $ (220) | $ (1,233) | $ (774) | $ (485) | $ (785) | $ (225) | $ (225) | $ (785) | $ (550) | $ (340) | $ (340) | $ (900) | $ (432) | (222) |
| **Net change in cash due to operating activity** | (589) | (1,264) | 898 | 1,395 | (723) | 140 | 165 | (461) | 959 | (585) | 669 | (4,904) | 236 | (682) |
| **Re-org related - payments direct to professionals** | | | | | | | | | | | | | | |
| Debtor bankruptcy counsel | - | - | - | (300) | - | - | - | (720) | - | - | - | (720) | - | - |
| Debtor FA/CRO | - | - | - | - | - | - | - | (300) | - | - | - | (300) | - | - |
| Compensation consultant | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Committee counsel | - | - | (359) | (339) | - | - | - | (600) | - | - | - | (600) | - | - |
| Committee FA | - | - | (172) | (138) | - | - | - | (480) | - | - | - | (480) | - | - |
| Claims / noticing agent | - | - | - | - | - | - | - | (30) | - | - | - | (30) | - | - |
| Regulatory & compliance counsel | - | - | - | (100) | - | - | - | (100) | - | - | - | (100) | - | - |
| Mediation | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee | - | - | - | - | - | - | - | (175) | - | - | - | - | - | - |
| **Total re-org related** | $ - | $ - | $ (531) | $ (877) | $ - | $ - | $ - | $ (2,405) | $ - | $ - | $ - | $ (2,230) | $ - | - |
| **Net change in cash from ops + reorg costs** | (589) | (1,264) | 367 | 518 | (723) | 140 | 165 | (2,866) | 959 | (585) | 669 | (7,134) | 236 | (682) |
| **Investing cash flows (principal only on notes)** | | | | | | | | | | | | | | |
| Jefferies prime brokerage, net or Select Equity Fund funding | - | - | - | - | - | - | - | 2,000 | - | - | - | 5,000 | - | - |
| Third party fund capital call obligations | - | - | - | - | - | - | - | - | - | - | (1,650) | - | - | - |
| Third party fund expected distributions | - | - | - | - | - | - | - | - | - | - | 400 | - | - | - |
| Highland Capital Management Korea (capital call funding) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Multi Strategy Credit Fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Highland Capital Management Latin America | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Proceeds from outstanding notes | - | - | - | 202 | - | - | - | - | - | - | - | - | - | - |
| Divs, paydowns, misc from non-PB assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Purchases of investments (non-PB) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Proceeds from other investments (non-PB) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net change in cash due to investing activities** | - | - | - | 202 | - | - | - | 2,000 | - | - | (1,250) | 5,000 | - | - |
| **Financing cash flows** | | | | | | | | | | | | | | |
| Required equity distributions | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Equity contributions | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Existing debt paydowns | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net change in cash due to financing activities** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending unrestricted operating cash** | $ 11,948 | $ 10,684 | $ 11,051 | $ 11,771 | $ 11,048 | $ 11,188 | $ 11,353 | $ 10,486 | $ 11,445 | $ 10,860 | $ 10,279 | $ 8,145 | $ 8,381 | 7,699 |

# EXHIBIT D

## PROMISSORY NOTE

$3,825,000                                                              February 2, 2018

      FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of THREE MILLION, EIGHT HUNDRED AND TWENTY-FIVE THOUSAND and 00/100 Dollars ($3,825,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.66%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Tax Loan</u>. This Note is paid to the Maker to help satisfy any current tax obligations of a former partner or current partner.

      5.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      6.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      7.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other

**Exhibit 1**

amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

8.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

9.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

2

# EXHIBIT E

## PROMISSORY NOTE

$2,500,000                                                                    August 1, 2018

     FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**Exhibit 3**

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.    The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
JAMES DONDERO

2

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 39 of 79

# EXHIBIT F

Appx. 00554

# PROMISSORY NOTE

$2,500,000                                                              August 13, 2018

      FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**Exhibit 4**

7.     Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
JAMES DONDERO

2

# EXHIBIT G

**PROMISSORY NOTE**

$2,400,000.00                                                                                                   May 2, 2019

      FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

2

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 45 of 79

# EXHIBIT H

Appx. 00560

# PROMISSORY NOTE

$5,000,000.00                                                                                   May 3, 2019

      FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "*Note*").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

2

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 48 of 79

# EXHIBIT I

Appx. 00563

# PROMISSORY NOTE

$150,000.00                                                          March 28, 2018

     FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED AND FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.88 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

2

D-CNL003105
**Appx. 00565**

# EXHIBIT J

# PROMISSORY NOTE

$200,000.00                                                                                    June 25, 2018

     FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO HUNDRED THOUSAND and 00/100 Dollars ($200,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (3.05 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

Case 3:21-cv-00881-X   Document 46   Filed 02/17/22   Page 572 of 905   PageID 6837

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 53 of 79
Case 21-03006-sgj Doc 68-2 Filed 08/27/21   Entered 08/27/21 17:34:12   Page 3 of 3

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

2

D-CNL003108
**Appx. 00568**

# EXHIBIT K

**PROMISSORY NOTE**

$400,000                                                                                                    May 29, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FOUR HUNDRED THOUSAND and 00/100 Dollars ($400,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.    The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest.    The accrued interest and principal of this Note shall be due and payable on demand.

3.    Prepayment Allowed; Renegotiation Discretionary.    Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.    Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.    If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

2

D-CNL003111

Appx. 00571

# EXHIBIT L

# PROMISSORY NOTE

$150,000                                                                June 26, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. (“*Maker*”) promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP (“*Payee*”), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED AND FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the “*Note*”).  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term “*applicable federal rate*” (2.37%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand.

3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys’ Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys’ fees and expenses incurred by the holder hereof.

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

2

D-CNL003114

Appx. 00574

Case 21-03004-sgj Doc 92 Filed 12/17/21   Entered 12/17/21 23:27:25   Page 60 of 79

# EXHIBIT M

Appx. 00575

# PROMISSORY NOTE

$100,000                                                    November 27, 2013

     FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED THOUSAND and 00/100 Dollars ($100,000.00), together with interest, on the terms set forth below (the "*Note*").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

     7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

D-CNL003262

**Appx. 00576**

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

       8.    <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HCRE PARTNERS, LLC

2

D-CNL003263

**Appx. 00577**

# EXHIBIT N

Appx. 00578

## PROMISSORY NOTE

$2,500,000                                                          October 12, 2017

FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

    1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

    2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

    3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

    4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

    5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

    6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

    7.    <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

D-CNL003265

**Appx. 00579**

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

      8.    <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HCRE PARTNERS, LLC

2

D-CNL003266

**Appx. 00580**

# EXHIBIT O

# PROMISSORY NOTE

$750,000                                                                    October 15, 2018

FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of SEVEN HUNDRED FIFTY THOUSAND and 00/100 Dollars ($750,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.       Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.       Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.       Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.       Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.       Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.       Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.       Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

       8.   <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

HCRE PARTNERS, LLC

2

D-CNL003269

**Appx. 00583**

# EXHIBIT P

**PROMISSORY NOTE**

$900,000                                                                     September 25, 2019

      FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of NINE HUNDRED THOUSAND and 00/100 Dollars ($900,000.00), together with interest, on the terms set forth below (the "**Note**").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

      7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

       8.   <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

HCRE PARTNERS, LLC

2

D-CNL003272

**Appx. 00586**

# EXHIBIT Q

# PROMISSORY NOTE

**$20,247,628.02**                                                    **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from Highland Capital Management Services, Inc., as Maker and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of TWENTY MILLION, TWO HUNDRED FORTY SEVEN THOUSAND, SIX HUNDRED TWENTY EIGHT AND 02/100 DOLLARS ($20,247,628.02), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of two and seventy-five hundredths percent (2.75%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.    Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

2.1    Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2    Final Payment Date.        The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No

failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.      Prior Notes.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.

By:_____
Name:
Title:

2

D-CNL003121

**Appx. 00589**

## EXHIBIT A

### PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 5/29/15 | $500,000 | 2.30% | $523,095 |
| 10/1/15 | $350,000 | 2.58% | $315,500 |
| 10/2/15 | $310,000 | 2.58% | $323,301 |
| 10/27/15 | $200,000 | 2.58% | $208,228 |
| 10/28/15 | $200,000 | 2.58% | $208,214 |
| 10/30/15 | $100,000 | 2.58% | $104,093 |
| 11/23/15 | $100,000 | 2.57% | $103,908 |
| 11/24/15 | $250,000 | 2.57% | $259,752 |
| 2/10/16 | $2,000,000 | 2.62% | $ 83,390 |
| 2/11/16 | $250,000 | 2.62% | $258,524 |
| 4/5/16 | $6,000,000 | 2.25% | $6,155,712 |
| 5/4/16 | $2,700,000 | 2.24% | $2,764,954 |
| 7/1/16 | $30,000 | 2.18% | $30,598 |
| 8/5/16 | $525,000 | 2.18% | $534,375 |
| 8/22/16 | $250,000 | 2.18% | $254,465 |
| 9/22/16 | $185,000 | 2.18% | $187,773 |
| 12/12/16 | $7,700,000 | 2.26% | $7,781,050 |
| 3/31/17 | $150,000 | 2.78% | $150,697 |
| | $21,800,000 | | $20,247,628.02 |

3

D-CNL003122

Appx. 00590

# EXHIBIT R

# PROMISSORY NOTE

**$6,059,831.51**                                                    **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes their entirety each of those certain promissory notes described in Exhibit A hereto, from HCRE Partners, LLC, as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, HCREA PARTNERS, LLC ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of SIX MILLION, FIFTY NINE THOUSAND, EIGHT HUNDRED THIRTY ONE AND 51/100 DOLLARS ($6,059,831.51), together with interest, on the terms set forth below.  All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of eight percent (8.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

     2.    <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

     2.1    <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

     2.2    <u>Final Payment Date</u>.     The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

     3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.     <u>Prior Notes</u>.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

HCRE PARTNERS, LLC

By: _____
Name: James Dondero
Title:

2

D-CNL003279

**Appx. 00593**

**EXHIBIT A**

**PRIOR NOTES**

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 1/9/14 | $100,000.00 | 8.00% | $108,000.00 |
| 1/29/14 | $600,000.00 | 8.00% | $648,000.00 |
| 3/10/14 | $2,000,000.00 | 8.00% | $2,009,643.84 |
| 3/28/14 | $50,000.00 | 8.00% | $54,000.00 |
| 1/26/15 | $1,500,000.00 | 8.00% | $1,545,356.16 |
| 4/2/15 | $1,500,000.00 | 8.00% | $1,545,356 |
| | $5,750,000.00 | | $6,059,831.51 |

3

D-CNL003280

Appx. 00594

# EXHIBIT 213

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Ste. 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

## DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

COMES NOW Highland Capital Management Fund Advisors, L.P., the defendant (the "Defendant") in the above styled and numbered adversary proceeding (the "Adversary Proceeding"), and files this its *Defendant's Motion to Withdraw the Reference* (the "Motion"), respectfully stating as follows:

This Adversary Proceeding was automatically referred to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a) and District Court Miscellaneous Order No. 33, *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc*.

Pursuant to 28 U.S.C. § 157(d), and for the reasons given in the accompanying *Brief in Support of the Defendant's Motion to Withdraw the Reference*, as supported by the *Appendix In Support of Defendant's Motion to Withdraw the Reference*, filed contemporaneously herewith and all of which is incorporated herein by reference, the Defendant requests that the Court withdraw from the Bankruptcy Court the reference (*i.e.*, the referral) of the Adversary Proceeding, in which case the Adversary Proceeding will continue as a Civil Action in the District Court.

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully requests that the District Court enter an order: (i) granting the Motion; (ii) withdrawing from the Bankruptcy Court the reference of this Adversary Proceeding; and (iii) granting the Defendant such other and further relief to which it shows itself to be entitled.

RESPECTFULLY SUBMITTED this 13th day of April, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
        Davor Rukavina, Esq.
        Texas Bar No. 24030781
        Julian P. Vasek, Esq.
        Texas Bar No. 24070790
        3800 Ross Tower
        500 N. Akard Street
        Dallas, Texas  75201-6659
        Telephone: (214) 855-7500
        Facsimile: (214) 855-7584
        Email: drukavina@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that he discussed the relief requested herein with Jeff Pomerantz, Esq., counsel for record for the Plaintiff, who informed the undersigned that the Plaintiff opposes said relief.

/s/  Davor Rukavina
Davor Rukavina

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 13th day of April, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on the Plaintiff through its counsel of record.

/s/  Davor Rukavina
Davor Rukavina

# EXHIBIT 214



Docket #0050  Date Filed: 7/8/2021

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed July 8, 2021

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | CASE NO. 19-34054-SGJ-11 |
| L.P., | § | (CHAPTER 11) |
|     DEBTOR. | § | |
| _____ | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| L.P., | § | ADVERSARY NO. 21-03004 |
|     PLAINTIFF, | § | (CIV. ACTION #3:21-CV-00881-X) |
| | § | |
| VS. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P., | § | |
|     DEFENDANT. | § | |

_____
**REPORT AND RECOMMENDATION TO DISTRICT COURT PROPOSING THAT IT:
(A) GRANT DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE AT SUCH
TIME AS BANKRUPTCY COURT CERTIFIES THAT ACTION IS TRIAL READY;
AND (B) DEFER PRETRIAL MATTERS TO BANKRUPTCY COURT**
_____

1

1934054210708000000000014

## I.   INTRODUCTION

The above-referenced adversary proceeding (the "Adversary Proceeding") is related to the bankruptcy case of Highland Capital Management, L.P. (the "Bankruptcy Case").[1] Highland Capital Management, L.P. (the "Debtor" or "Highland") filed a voluntary Chapter 11 petition on October 16, 2019 in the United States Bankruptcy Court of Delaware.  That court subsequently entered an order transferring venue to the Northern District of Texas, Dallas Division, on December 4, 2019.  A Chapter 11 plan was confirmed by the bankruptcy court on February 22, 2021.  The chapter 11 plan has been appealed by the Defendant in this action, Highland Capital Management Fund Advisors ("HCMFA-Defendant"), and certain parties related to it. The appeal of the plan is now pending before the Fifth Circuit, but no stay pending appeal has been granted.

On January 22, 2021, shortly before its Chapter 11 plan was confirmed, the Debtor, as Plaintiff, brought this Adversary Proceeding against HCMFA-Defendant.  The Adversary Proceeding pertains to two promissory notes (collectively, the "Notes") executed by HCMFA-Defendant in favor of the Debtor in 2019. Each of the Notes were demand notes. On December 3, 2020, the Debtor sent HCMFA-Defendant a letter demanding payment by December 11, 2020, as allowed under the terms of the notes. Following HCMFA-Defendant's failure to pay on the Notes in response to the demand letter, the Debtor brought this action to collect on the Notes. The Debtor's Chapter 11 plan contemplates collection on these Notes (as well as several other notes of parties related to HCMFA-Defendant) as part of its funding to pay creditors.

---

[1] Bankruptcy Case No. 19-34054.

Under the United States District Court for the Northern District of Texas' standing order of reference[2], proceedings arising in, or related to, a case under Title 11 are automatically referred to the bankruptcy court.  HCMFA-Defendant submitted a *Motion for Withdrawal the Reference*[3] (the "Motion") and *Brief in Support of Motion to Withdraw the Reference*[4] (the "Brief in Support") seeking to have the reference withdrawn, such that this Adversary Proceeding would be adjudicated in the District Court. The bankruptcy court conducted a status conference concerning the Motion, pursuant to Local Bankruptcy Rule 5011-1, on May 25, 2021.

The bankruptcy court submits the following report and recommendation to the District Court, ultimately recommending that the Motion be granted, ***but only at such time as the bankruptcy court certifies to the District Court that the lawsuit is trial ready***. The bankruptcy court further recommends that the District Court ***defer to the bankruptcy court the handling of all pretrial matters***.

## II.    NATURE OF THE ADVERSARY PROCEEDING

### a.  The Complaint and Procedural History

The Debtor commenced this Adversary Proceeding by filing its *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate*[5] on January 22, 2021. The Debtor's Complaint asserts two causes of action: (1) a breach of contract claim ("Count 1") and (2) a turnover action under 11 U.S.C. § 542(b) for the amounts owed on the Notes ("Count 2"). The principal amounts and execution dates for each of the two Notes were: (i) $2,400,000, executed May 2, 2019, and (ii) $5,000,000, executed May 3, 2019. The Debtor now seeks monetary damages totaling $7,687,653.07, plus accrued but unpaid interest and cost of collection. Because

---

[2] Misc. Order No. 33.
[3] Adversary Case No. 21-03004, Dkt. 20.
[4] Adversary Case No. 21-03004, Dkt. 21.
[5] Adversary Case No. 21-03004, Dkt. 1.

the Debtor alleges the amounts due on the Notes are property of its estate, it argues that turnover pursuant to 11 U.S.C. § 542(b) is appropriate.

After being served with summons on January 25, 2021, HCMFA-Defendant filed its *Original Answer*[6] on March 1, 2021 before subsequently filing its *Amended Answer*[7] on July 6, 2021.

HCMFA-Defendant filed two proofs of claim in the Bankruptcy Case, Proof of Claim Nos. 95 and 119. Proof of Claim No. 95 was based on alleged overpayments made by HCMFA-Defendant to the Debtor under a shared services agreement. Proof of Claim No. 119 was based on alleged overpayments made by HCMFA-Defendant to the Debtor under a payroll reimbursement agreement. On October 9, 2020, the bankruptcy court entered a *First Supplemental Order Sustaining First Omnibus Claims Objection*[8], which disallowed both of HCMFA-Defendant's proofs of claim. The HCMFA-Defendant filed an application for an administrative expense claim on January 24, 2021, relating to services it alleges the Debtor did not perform under a shared services agreement. The Debtor has since filed an objection to the application and the matter is set for trial on September 28, 2021. The administrative expense claim ***does not directly relate to the causes of action for collection under the Notes***. Similarly, the disallowed ***proofs of claim did not relate to the Notes.***

### b. The Motion to Withdraw the Reference, Response Opposed, and Reply

On April 15, 2021, HCMFA-Defendant filed the Motion. As a result, the above-captioned civil action was created in the District Court. On May 4, 2021, the Debtor filed its *Response Opposed to Defendant's Motion to Withdraw the Reference*[9] (the "Response Opposed"). On May

---

[6] Adversary Case No. 21-03004, Dkt. 6.
[7] Adversary Case No. 21-03004, Dkt. 48.
[8] Bankruptcy Case No. 19-34054, Dkt. 1155.
[9] Adversary Case No. 21-03004, Dkt. 28.

18, 2021, HCMFA-Defendant filed its *Reply in Support of the Motion to Withdraw the Reference*[10] (the "Reply"). The bankruptcy court held a status conference, as required by Local Bankruptcy Rule 5011-1, on May 25, 2021, to assist in the bankruptcy court's preparation of this Report and Recommendation.

### i.   The Movant's Position

HCMFA-Defendant argues there is cause shown for permissive withdrawal of the reference because: (1) the contract claim is a purely state law, non-core claim; (2) the turnover claim, under the Bankruptcy Code, is wholly derivative of the contract claim, as the amount to be turned over is based on the resolution of the contract claim; and (3) efficiency, uniformity and forum shopping factors all favor withdrawal.[11]

Further, HCMFA-Defendant contends it has made a demand for a jury trial and has not consented, expressly or impliedly, to the equitable jurisdiction of the bankruptcy court to enter final orders in the Adversary Proceeding or hold a jury trial. HCMFA-Defendant further argues it has never filed a proof of claim related to the Notes, thus negating any argument it has consented to the bankruptcy court having jurisdiction over the litigation of the Notes.

Finally, HCMFA-Defendant alleges that permissive withdrawal as proper, because the turnover claim is being used as an to attempt to relabel a non-core breach of contract claim to place jurisdiction within the bankruptcy court.[12]

As far as timing, HCMFA-Defendant requests that the District Court immediately withdraw the reference and hear all pre-trial matters until the parties are trial-ready.

---

[10] Adversary Case No. 21-03004, Dkt. 30.
[11] Adversary Case No. 21-03004, Dkt. 21 at 5-11.
[12] *Id.* at 8-9; *see Granfinanciera, Granfinanciera. S.A. v. Nordberg*, 492 U.S. 33, 61 (1989).

Appx. 00604

ii.  *The Debtor-Plaintiff's Position*

The Debtor argues that there is no cause shown for permissive withdrawal because a turnover action under Section 542(b) of the Bankruptcy Code is an inherently core claim. The Notes, as argued, are already property of the bankruptcy estate, as matured and payable on December 11, 2020, and the turnover action only concerns federal bankruptcy law.[13] The Debtor argues that the defenses and disputes raised by HCMFA-Defendant do not restrict the Debtor's ability to collect property of the estate under 11 U.S.C. § 542(b).[14]

The Debtor does not directly, in its Response, address whether jury trial rights exist for HCMFA-Defendant. Rather, the Debtor focuses on the core nature of the turnover action and the forum shopping attempts by HCMFA-Defendant.

As far as timing, the Debtor argues that, if the court finds permissive withdrawal of the reference is appropriate, the reference should not be withdrawn until after the parties are trial-ready, and all pretrial matters should be handled by the bankruptcy court until such time.

## III.  THE BREACH OF CONTRACT CLAIMS AT THE CENTER OF THE ADVERSARY PROCEEDING ARE NONCORE CLAIMS, AND THE PENDING ADMINISTRATIVE EXPENSE CLAIM OF HCMFA-DEFENDANT IS UNRELATED TO THEM

Permissive withdrawal of the reference is described in 28 U.S.C. § 157(d) as follows: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." The Bankruptcy Code does not define "cause shown," but the United States Court of Appeal for the Fifth Circuit, interpreting

---

[13] *See Tow v. Park Lake Cmtys., LP*, 2018 U.S. Dist. LEXIS 1720, at *3-*5 (S.D. Tex. Jan. 4, 2018); *see also Porretto v. Nelson (In re Porretto)*, 2012 Bankr. LEXIS 4919, at *11-*12 (Bankr. S.D. Tex. Oct. 18, 2012); *see also Romo v. Monetmayor (In re Montemayor)*, 547 B.R. 684, 692 (Bankr. S.D. Tex. 2016) (bankruptcy court had authority under *Stern* to issue a final order in an action brought pursuant to Section 542(b), because an action "to turnover assets belonging to the bankruptcy estate [is] a matter which solely concerns federal bankruptcy law").

[14] *See Tow*, 2018 U.S. Dist. LEXIS 1720, at *3-*5; *see also Shaia v. Taylor (In re Connelly)*, 476 B.R. 223, 230 (Bankr. E.D. Va. 2012).

the Supreme Court case of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, has identified a number of factors for courts to consider in determining whether permissive withdrawal of the reference is appropriate: (1) whether the matter is core or noncore; (2) whether the matter involves a jury demand; (3) whether withdrawal would further uniformity in bankruptcy administration; (4) whether withdrawal would reduce forum-shopping and confusion; (5) whether withdrawal would foster economical use of debtors' and creditors' resources; and (6) whether withdrawal would expedite the bankruptcy process.[15] Courts in this District have placed an emphasis on the first two factors.[16]

As explained by the Supreme Court in *Stern v. Marshall*, Congress has divided bankruptcy ***proceedings*** (*i.e.,* adversary proceedings or contested matter within a bankruptcy case)—over which there is bankruptcy subject matter jurisdiction—into three different categories: (a) those that "aris[e] under" Title 11; (b) those that "aris[e] in" a Title 11 case; and (c) those that are "related to" a case under Title 11.[17]  Further, those that arise under Title 11 or arise in a Title 11 case are defined as "core" matters[18] and those that are merely "related to" a Title 11 case are defined as "noncore" matters. The significance of the "core"/"noncore" distinction is that bankruptcy courts may statutorily enter final judgments in "core" proceedings in a bankruptcy case, while in "noncore" proceedings, the bankruptcy courts instead may only (absent consent from all of the parties) submit proposed findings of fact and conclusions of law to the district court, for that court's review and issuance of final judgment. This is the statutory framework collectively set forth in 28 U.S.C. § 1334 and 28 U.S.C. § 157.  But while a proceeding may be "core" in nature, under 28

---

[15] *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-99 (5th Cir. 1985); *Mirant Corp. v. The Southern Co.*, 337 B.R. 107, 115-23 (N.D. Tex. 2006); 458 U.S. 50 (1982).
[16] See *Mirant*, 337 B.R. at 115-122.
[17] 28 U.S.C. § 1334(b); *Stern v. Marshall*, 564 U.S. 462, 473-474 (2011).
[18] *Stern*, 564 U.S. at 473-474.  Core proceedings include, but are not limited to, 16 different types of matters, including "counterclaims by [a debtor's] estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C).

Appx. 00606

U.S.C. § 157(b)(2), and the bankruptcy court, therefore, has the **statutory** power to enter a final judgment on the claim under 28 U.S.C. § 157(b)(1), *Stern* instructs that any district court, in evaluating whether a bankruptcy court has the ability to issue final orders and judgments, must resolve not only: (a) whether the bankruptcy court has the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment on a particular claim; but also (b) whether the conferring of that authority on an Article I bankruptcy court is **constitutional** (and this turns on whether "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process").[19]

With respect to the claims asserted against HCMFA-Defendant, it might be argued that both counts asserted against it are **statutorily** core in nature.[20] While Count 1 is a breach of contract claim for collection of amounts due under promissory notes—one of the simplest forms of a state law lawsuit—it might be argued that Count 1 is statutorily core under the catchall provision of 28 U.S.C. § 157(b)(2)(O), as the resolution of the claim would be "affecting the liquidation of the assets of the estate." However, this position would not pass constitutional muster. The cause of action does not stem from the bankruptcy itself (*i.e.,* it stems from alleged defaults on pre-petition notes) and would not be resolved through the claims allowance process (**since no pending proof of claim exists and the administrative expense claim is not directly related to the Notes**). In other words, the resolution of Count 1 is not so inextricably intertwined with the resolution of HCMFA-Defendant's still-remaining administrative expense claim so as to confer constitutional authority on the bankruptcy court to enter a final judgment on the breach of contract claims.

Count 2, the turnover cause of action, is brought pursuant to 11 U.S.C. § 542(b) and is listed as statutorily core under 28 U.S.C. § 157(b)(2)(E). If Count 2 were freestanding and the debts due

---

[19] *Stern*, 564 U.S. at 499.
[20] 28 U.S.C. § 157(b)(2)(E), (O).

under the Notes were undisputed, it is unrefuted by HCMFA-Defendant that a turnover action

under 11 U.S.C. § 542(b) would be both a statutory and constitutional core claim. ***The issue is***

***whether a turnover action to collect on a disputed pre-petition promissory note can be viewed as***

***a core claim***. There is a split in authority on this issue. The Debtor cites authority that a turnover

action is a core claim when collecting ***matured*** debts, as property of the estate, regardless of

whether the indebtedness is ***disputed***.[21] In contrast, HCMFA-Defendant cites authority that the

scope of turnover claims under the Bankruptcy Code should not be expanded to encompass debts

in dispute that arose outside of bankruptcy, including authority from this court.[22]

This court views the turnover claim as derivative of the breach of contract claims. The breach

of contract claims are clearly non-core, and the bankruptcy court lacks constitutional authority to

confer jurisdiction over them (absent consent—which does not exist here). A turnover action under

11 U.S.C. § 542(b) cannot be tacked onto a complaint so as to confer authority in the bankruptcy

court to adjudicate an otherwise non-core claim. To hold otherwise would run counter to the

dictates of the Supreme Court in *Marathon*.

In summary, this court believes that the turnover claim in the Complaint, to collect on a

disputed indebtedness under the Notes, "do[es] not fall within the scope of turnover actions as

---

[21] *Shaia*, 476 B.R. at 230 ("To properly constitute a core proceeding under § 157(b)(2)(E), the debt must be 'matured, payable on demand, or payable on order.' 'Matured' refers to 'debts that are presently payable, as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event.' …. While the Defendants assert they are not indebted to the Trustee, it is simply not relevant that the Defendants dispute liability on the instrument. The presence of a dispute does not preclude a debt from being matured. … A cause of action is a turnover proceeding under § 542(b) of the Bankruptcy Code where it seeks collection rather than creation or liquidation of a matured debt."); *see also In re Willington Convalescent Home, Inc.*, 850 F.2d at 52 n.2 ("The mere fact that Connecticut denies that it owes the matured debt for Willington's services because of a recoupment right 'does not take the trustee's action outside the scope of section 542(b)'").

[22] *In re Se. Materials, Inc.*, 467 B.R. 337, 354 (Bankr. M.D.N.C. 2012)( The distinction is when "an adversary proceeding presents a bona fide dispute as to liability, the matter cannot be viewed as a turnover proceeding"); *In re Satelco, Inc.*, 58 B.R. 781, 789 (Bankr. N.D. Tex. 1986) ("[T]his Court holds that actions to collect accounts receivable based upon state law contract principles do not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E), absent a final judgment from a court of competent jurisdiction, a stipulation, or some other binding determination of liability.").

contemplated by § 542 and § 157(b)(2)(E)," absent a judgment or stipulation resolving the dispute as to the indebtedness.[23]   Thus, the turnover claim, as brought, is not a core claim that the bankruptcy court can finally adjudicate, absent the consent of all parties.

## IV.   JURY TRIAL RIGHTS AND DEMAND

Pursuant to 28 U.S.C. § 157(e), if a litigant has the right to a jury trial under applicable non-bankruptcy law, a bankruptcy court may conduct the jury trial only if: (a) the matters to be finally adjudicated fall within the scope of bankruptcy subject matter jurisdiction; (b) the district court of which the bankruptcy court is a unit authorizes the bankruptcy court to do so; and (c) all of the parties consent.[24]

Starting first with whether a right to a jury trial even exists, the Seventh Amendment, of course, provides a jury trial right in cases in which the value in controversy exceeds twenty dollars and the cause of action is to enforce statutory rights that are at least analogous to rights that were tried at law in the late 18th century English courts.[25] Suits "at law" refers to "suits in which legal rights were to be ascertained and determined" as opposed to "those where equitable rights alone were recognized and equitable remedies were administered."[26] This analysis requires two steps: (1) a comparison of the "statutory action to 18th century actions brought in the courts of England prior to the merger of the courts of law and equity"; and (2) whether the remedy sought is "legal or equitable in nature . . . [t]he second stage of this analysis" being "more important than the first."[27]

---

[23] *Satelco*, 58 B.R. at 789.

[24] "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." 28 U.S.C. § 157(e) (West 2019).

[25] *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 708 (1999).

[26] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).

[27] *See Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 205 (S.D. Tex. 2008) (quoting *Granfinanciera*, 492 U.S. at 42).

It is well established that the act of filing a proof of claim can operate to deprive a creditor of a jury trial right, by subjecting a claim, that would otherwise sound only in law, to the equitable claims allowance process.[28] Thus, if both of HCMFA-Defendant's proofs of claims were **pending**, it would have consented to the bankruptcy court's equitable jurisdiction and waived its right to a jury trial as to the subject matter of the **pending** proofs of claim.[29]  However, as earlier noted, prior to the commencement of this Adversary Proceeding on January 22, 2021, HCMFA-Defendant had both of its proofs of claim disallowed on October 9, 2020.  The pending trial over the administrative expense claim sought by HCMFA-Defendant is separate from the collection under the Notes. Without a pending claim related to the Notes, the breach of contract claims is precisely the kind of action that would sound in law rather than in equity. By not having a filed proof of claim related to the Notes, HCMFA-Defendant never subjected the Notes to the claims allowance process of the bankruptcy court and preserved its right to a jury trial on the Notes.[30]

To reiterate, HCMFA-Defendant's remaining administrative expense claim is not directly related to the collection on the Notes, and it has not otherwise consented to the jurisdiction of the bankruptcy court for claims related to the Notes. HCMFA-Defendant has also not consented to the bankruptcy court conducting a jury trial pursuant to 11 U.S.C. § 157(e).

In summary, HCMFA-Defendant's lack of waiver of its jury trial rights, expressly or impliedly, is further reason why the bankruptcy court does not believe it can finally adjudicate the claims in the Adversary Proceeding.

---

[28] *See Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990).

[29] *Id.*

[30] *Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995) ("[T]he successful withdrawal of a claim pursuant to Fed. R. Bankr. P. 3006 prior to the trustee's initiation of an adversarial proceeding renders the withdrawn claim a legal nullity and leaves parties as if the claim had never been brought."); *In re Goldblatt's Bargain Stores, Inc.*, No. 05 C 03840, 2005 WL 8179250, at *5 (N.D. Ill. Dec. 6, 2005) (claims withdrawn before adversary proceeding are as if never filed); *see generally, In re Manchester, Inc.*, No. 08-30703-11-BJH, 2008 WL 5273289, at *3-6 (Bankr. N.D. Tex. Dec. 19, 2008) (permissible to withdraw a claim to preserve jury trial right).

## V.   PENDING MATTERS

No dispositive motions, or any other motions, remain pending at this time. The court has not granted a stay pending resolution of the Motion in the Adversary Proceeding.[31] At this point, the parties are not trial-ready.

## VI.   RECOMMENDATION

In light of: (a) the noncore, related-to claims in the Complaint; (b) the lack of a proof of claim or any other claim related to the Notes asserted by HCMFA-Defendant; and (c) the lack of any other consent by HCMFA-Defendant to the equitable jurisdiction of the bankruptcy court related to the Notes, the bankruptcy court recommends the District Court: refer all pre-trial matters to the bankruptcy court, and grant the Motion upon certification by the bankruptcy court that the parties are trial-ready.

With regard to such pretrial matters, the bankruptcy court further recommends that, to the extent a dispositive motion is brought that the bankruptcy court determines should be granted and would finally dispose of claims in this Adversary Proceeding, the bankruptcy court should submit a report and recommendation to the District Court for the District Court to adopt or reject.

**\*\*\*END OF REPORT AND RECOMMENDATION\*\*\***

---

[31] The court did grant a stay pending resolution of the motion to withdraw the reference in the related case of *Highland Capital Management, L.P.  v. Dondero* (Adversary Case No. 21-03003).

# EXHIBIT 215

Case 3:21-cv-00881-X   Document 46   Filed 02/17/22   Page 617 of 905   PageID 6882
Case 21-03004-sgj Doc 32 Filed 05/22/21   Entered 05/22/21 11:23:20   Page 1 of 10
Docket #0032  Date Filed: 5/22/2021

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S MOTION FOR LEAVE TO AMEND ANSWER**

TO THE HONORABLE COURT:

COMES NOW Highland Capital Management Fund Advisors, L.P., the defendant (the

"Defendant") in the above styled and numbered adversary proceeding (the "Adversary

Proceeding"), and files this its *Defendant's Motion for Leave to Amend Answer* (the "Motion"),

respectfully stating as follows:

DEFENDANT'S MOTION FOR LEAVE TO AMEND ANSWER—Page

Appx. 00613

## I.   <u>SUMMARY</u>

1.      This Adversary Proceeding concerns two promissory notes allegedly payable by the Defendant to Highland Capital Management, L.P. (the "<u>Plaintiff</u>") in the combined amounts of $7.4 million (the "<u>Notes</u>").  Now that the Defendant has access to former employees of the Plaintiff and to various books and records, the Defendant has learned that the Notes were unauthorized, represent a mutual mistake, and were never intended as debt, but rather that the Plaintiff was compensating the Defendant for the Plaintiff's own liability to the Defendant for causing a serious valuation error.  Accordingly, and not having learned of these facts until recently, the Defendant respectfully seeks leave to assert resulting affirmative defenses.

## II.   <u>PROCEDRUAL BACKGROUND</u>

2.      On January 22, 2021, the Plaintiff filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "<u>Complaint</u>"), thereby initiating this Adversary Proceeding.

3.      On March 1, 2021, the Defendant filed its *Defendant's Original Answer* (the "<u>Answer</u>").  The Answer does not contain any affirmative defenses.

4.      The agreed scheduling order entered in this Adversary Proceeding does not contain a deadline to amend operative pleadings.  *See* Docket No. 13.

5.      This Adversary Proceeding is non-core and the Defendant has not consented to the Bankruptcy Court's entry of final orders or judgment.  The Defendant has asserted a right to trial by jury.

6.      The Defendant has filed a motion for withdrawal of the reference, which motion remains pending, and this Motion is subject to, and without prejudice to, any and all arguments raised in support of the withdrawal of the reference.

DEFENDANT'S MOTION FOR LEAVE TO AMEND ANSWER—Page 2

### III.    <u>FACTUAL BACKGROUND</u>

7.    This Motion is supported by the Declaration of Dennis C. Sauter (the "<u>Sauter Declaration</u>"), attached hereto as Exhibit "A" and incorporated herein.

8.    The Defendant is a registered advisor under the Investment Advisors Act of 1940. Sauter Declaration at ¶ 4.  As such, the Defendant advises various independent funds which, in turn, are investment vehicles for a large number of investors.  *See id*.  One such fund was Highland Global Allocation Fund ("<u>HGAF</u>").  *Id.* at ¶ 24.

9.    Prior to the end of February, 2021, and during all times relevant to the Notes, the Plaintiff and the Defendant were parties to that certain *Second Amended and Restated Shared Services Agreement* dated February 8, 2013 (the "<u>Shared Services Agreement</u>").  *Id.* at ¶ 6.  This was standard business practices for the Plaintiff and various other affiliated companies, including other advisers, within the Plaintiff's "complex" of business: the Plaintiff would employ most of the employees and then share those employees with the Defendant and other "complex" entities, in exchange for payments by the Defendant and such other entities.  *Id.* at ¶ 7.  The Defendant otherwise had very few direct employees.  *Id.* at ¶ 5.  Thus, under the Shared Services Agreement, employees of the Plaintiff (many of whom were highly trained and specialized) provided many of the key services to the Defendant on an as-needed basis.  *Id.* at ¶ 8.  These services included legal, accounting, regulatory, compliance, IT, valuation, and tax services, among others.  *Id.* at ¶  8.  Additionally, under the Shared Services Agreement the Debtor provided critical electronic infrastructure to HCMFA and other "complex" entities, such that the books and records, and e-mail communications, of HCMFA were actually stored.  *Id.* at ¶ 8.

10.    In March, 2018, HGAF sold equity interests it held in TerreStar.  *Id.* at ¶ 24.  As part of this, it was necessary to calculate the "net asset value" ("<u>NAV</u>") of these securities and of

HGAF assets.  *Id.* at ¶ 24.  The Defendant was responsible for advising on the NAV.  In turn, pursuant to the Shared Services Agreement, the Plaintiff was responsible to the Defendant to calculate the NAV, and the Plaintiff had several employees charged with these and similar calculations as part of the Plaintiff's routine business services and as part of what the Plaintiff regularly provided to the Defendant and affiliated companies.  *Id.* at ¶ 24.

11.    The Plaintff made a mistake in calculating the NAV (the "<u>NAV Error</u>").  *Id.* at ¶ 25.  The NAV Error was discovered in early 2019 as HGAF was being converted from an open-ended fund to a closed-ended fund.  *Id.* at ¶ 25.  The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error.  *Id.* at ¶ 25.  Ultimately, and working with the SEC, the Plaintiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.  *Id.* at ¶ 26.

12.    The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019.  *Id.* at ¶ 27.  In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments.  *Id.* at ¶ 28.  The Defendant is unsure as to the flow of funds; *i.e.* whether the Plaintiff paid HGAF directly or through the Defendant, and is awaiting discovery from the Plaintiff on that point.  Either way, the Plaintiff accepted, and paid, approximately $7.5 million to compensate for the NAV Error that it caused.

13.     Frank Waterhouse ("Waterhouse") was the Chief Financial Officer of both the Plaintiff and the Defendant.  *Id.* at ¶ 29.  Waterhouse prepared and signed the Notes.  Interestingly, Waterhouse did not sign the Notes in a representative capacity for the Defendant, but rather as:

**MAKER:**

_____
FRANK WATERHOUSE

This was highly unusual and indicates that the Plaintiff's legal department did not prepare the Notes.  It is also highly unusual that the Notes were not signed by Jim Dondero or by the general partner of the Defendant.

14.     Waterhouse was not authorized to execute the Notes on behalf of the Defendant, and he was not authorized to lend funds by the Plaintiff.  *Id.* at ¶ 22.  It appears that what happened is that Waterhouse, either for some internal accounting purpose or because funds were flowing from the Plaintiff to the Defendant, believed that some document was necessary or that what was being funded was a loan, so he unilaterally, and in mistake, prepared and signed the Notes.  *Id.* at ¶ 30.  In short, Waterhouse made a mistake, there was no loan, there was no return consideration for any loan, and the Notes, if anything, are a mutual mistake and are void.  *Id.* at ¶ 30 & 32.

15.     The Defendant only learned of these facts in April, 2021, and was therefore unable to assert defenses and affirmative defenses based on these facts at the time that it filed its Answer.  *Id.* at ¶ 21.  This is because the Defendant's own employees had no knowledge of the facts and circumstances surrounding the Notes; the Plaintiff, through its CEO Mr. Seery, had prohibited employees of the Plaintiff from discussing matters with the Defendant that may relate to controversies or litigation under penalty of termination; the Defendant did not have access to all

of its books and records, as they were in the possession of the Plaintiff pursuant to the Shared

Services Agreement; and an injunction from the Bankruptcy Court prohibited Mr. Dondero from

"indirectly" communicating with the Plaintiff's employees (Mr. Dondero controls the Defendant).

*Id.* at ¶¶ 13-17.

16.     By mid-April, 2021, the Plaintiff has terminated most of its employees, those

employees formed their own company, and the Defendant retained that company to provide

services to the Defendant basically in continuation of the services provided by the Plaintiff

pursuant to the Shared Services Agreement.  *Id*. at ¶¶ 19-20.  Additionally, the Plaintiff provided

many, but not all, of the Defendant's books and records to the Defendant.  *See id*.  Thus, it was not

until then that the Defendant was meaningfully able to talk to persons with some knowledge

regarding the facts and circumstances surrounding the Notes and to review its books and records

to determine that the NAV Error had occurred and that the Plaintiff paying for the resulting

damages was compensation by the Plaintiff for its own error, as opposed to a loan from the Plaintiff

to the Defendant.  *Id*. at ¶¶ 21-22.

17.     The Defendant also notes that the Plaintiff, on its schedules, did not schedule the

Notes even though it scheduled various other promissory notes owed by its affiliates.  *See* Docket

No. 247 at 13 of 74.  Additionally, on April 15, 2019, the Plaintiff agreed to extend the date that

certain demand notes payable by the Defendant to the Plaintiff could be demanded to May 31,

2021, as the Defendant expected to be unable to pay those notes.  *See* Sauter Declaration at ¶ 31.

It is illogical and highly improbable that, notwithstanding that admission and acknowledgement,

the Plaintiff would nevertheless loan the Defendant $7.4 million some two weeks later.  Rather, as

the evidence suggests, Waterhouse made a mistake in not realizing that the funds being paid by

the Plaintiff to the Defendant were in compensation for the NAV Error and not a loan.

---

DEFENDANT'S MOTION FOR LEAVE TO AMEND ANSWER—Page 6

# IV.   <u>DISCUSSION</u>

18.     Attached hereto as Exhibit "B" is the Defendant's proposed Amended Answer, incorporating new defenses or affirmative defenses resulting from the knowledge of the facts above.

19.     Federal Rule of Civil Procedure 15, as made applicable to this Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7015, provides for leave to amend a pleading, which leave "[t]he court should freely give [] when justice so requires." FED. R. CIV. P. 15(a)(2).

20.     The Court must "possess a 'substantial reason' to deny a request for leave to amend." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004). The Fifth Circuit has outlined five "consideration" guiding the Rule 15 inquiry: "1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment." *Id.*

21.     <u>No Undue Delay</u>. There has been no undue delay. The Defendant filed its Answer only some seventy (80) days ago. This Adversary Proceeding has been pending for four (4) months. The Defendant has not filed a prior motion for leave to amend. And, most importantly, as evidenced by the Sauter Declaration, the Defendant had no way of knowing of these defenses and affirmative defenses until the termination of the Shared Services Agreement and the ability of the Defendant to communicate with former employees of the Plaintiff who, prior to that time, were under instructions to not discuss matters of a potential litigation nature with the Defendant under penalty of termination, and to have access to its books and records. Thus, it was not until April, 2021, that the Defendant was even able to learn of these defenses to the Notes or the facts and circumstances surrounding the Notes.

---

22.      <u>No Bad Faith or Dilatory Motive</u>.  There is no bad faith or dilatory motive for the same reasons as above; the Defendant only recently learned of its defenses, the Defendant moved for leave promptly after learning of them; and leave to amend is not sought to avoid summary judgment or continue trial.

23.      <u>No Repeated Failures to Cure By Prior Amendments</u>.  This is the Defendant's first motion to amend.

24.      <u>No Undue Prejudice</u>.  There is no undue prejudice to the Plaintiff.  Discovery is ongoing and depositions have not been scheduled.  The Defendant is agreeable to further extending discovery.  The Plaintiff will have every reasonable opportunity to test the new defenses, and all underlying witness and documents related to the same are available.

25.      <u>No Futility of the Amendment</u>.  The Defendant's defense is not futile:

(i)      it is supported by *prima facie* evidence by the Sauter Declaration;

(ii)     the amount of the Notes, one for $5 million and one for $2.4 million, is almost identical to the ultimate $5,186,496 payment by the Defendant on February 15, 2019 and the $2,398,842 May 21, 2019 payment by the Defendant;

(iii)    the fact that the Plaintiff did not schedule the Notes, while scheduling many others, is evidence that the Plaintiff itself did not consider the Notes legitimate (or know of their existence);

(iv)     the fact that Waterhouse signed the Notes, and not in a representative capacity for the Defendant, whereas all other notes are prepared by the Plaintiff's legal department and signed by other agents in representative capacities, is evidence that Waterhouse made a mistake or did not understand what was going on, and had no authority or clearance to bind the Defendant to the Notes, and that, perhaps, the

Notes were done for some draft, or accounting, or temporary purpose with no intention or expectation, even on the part of Waterhouse, that the Notes ever be legitimate.

26.     The Defendant is not suggesting that the merits of its defenses be tried through this Motion; only that its defenses and the Motion are not "futile."

27.     Accordingly, as no substantial reason exists to deny the amendment, the Court should "freely" grant leave to the Defendant to amend its Answer.

## V.     <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully requests that the Court enter an order: (i) granting this Motion; (ii) granting the Defendant leave to file the Amended Answer attached hereto as Exhibit "B"; and (iii) granting the Defendant such other and further relief to which it may be justly entitled.

RESPECTFULLY SUBMITTED this 22d day of May, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
  Davor Rukavina, Esq.
  Texas Bar No. 24030781
  Julian P. Vasek, Esq.
  Texas Bar No. 24070790
  3800 Ross Tower
  500 N. Akard Street
  Dallas, Texas  75201-6659
  Telephone: (214) 855-7500
  Facsimile: (214) 855-7584
  Email: drukavina@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that he discussed the relief requested herein with Jeff Pomerantz, Esq. and John Morris, Esq., on March 21, 2021, but that, as of the filing hereof, he has not heard back regarding whether the Plaintiff opposes said relief.

/s/  Davor Rukavina
Davor Rukavina

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 22d day of May, 2021, true and correct copies of this document and the exhibits hereto were electronically served by the Court's ECF system on parties entitled to notice thereof, including on the Plaintiff through its counsel of record.

/s/  Davor Rukavina
Davor Rukavina

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Chapter 11 |
| L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

**DECLARATION OF DENNIS C. SAUTER, JR.**

I, Dennis C. Sauter, Jr., hereby swear under oath and penalty of perjury pursuant to the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1.      My name is Dennis C. Sauter, Jr.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.  I have personal knowledge of the facts stated in this Declaration, or such facts are known to me from my review of the books and records of Highland Capital Management Fund Advisors, L.P. ("HCMFA").

2.      I am an attorney licensed to practice law in the State of Texas and have been such since 2001.

DECLARATION OF DENNIS C. SAUTER, JR.—Page 1

EXHIBIT "A"

Appx. 00623

3.      While I provided limited legal services to Highland Capital Management, L.P. (the "Debtor") and its affiliated entities as outside counsel before I became in-house counsel, those services were limited to real estate transactions having nothing to do with the facts discussed in this Declaration.

4.      HCMFA is a registered advisor under the Investment Advisors Act of 1940.  CITE. As such, HCMFA advises various independent funds, which, in turn, are investment vehicles for a large number of investors.

5.      HCMFA has always had very few employees.  During 2019, for example, HCMFA had only 7 to 9 employees.

6.      Instead, most of the services needed by HCMFA to transact its business were provided by the Debtor pursuant to that certain *Second Amended and Restated Shared Services Agreement* dated February 8, 2013 (the "Shared Services Agreement"), a true and correct copy of which is attached hereto as Exhibit 1.

7.      This was standard business practices for the Debtor and various other affiliated companies, including other advisers within the Debtor's and its affiliates "complex" of businesses: the Debtor would employ most of the employees and then share those employees with HCMFA and other "complex" entities in exchange for payments by HCMFA and such other entities.

8.      Thus, under the Shared Services Agreement, employees of the Debtor (many of whom were highly trained and specialized) provided many of the key services to HCMFA on an as-needed basis.  These services included legal, accounting, regulatory, compliance, IT, and tax services, among others.  Additionally, under the Shared Services Agreement the Debtor provided critical electronic infrastructure to HCMFA and other "complex" entities, such that the books and records, and e-mail communications, of HCMFA were actually stored on the Debtor's server.

9.      These facts are very important to the issues I will discuss below.

DECLARATION OF DENNIS C. SAUTER, JR.—Page 2

10.     On January 22, 2021, the Debtor filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "Complaint") against HCMFA, thereby initiating this Adversary Proceeding.

11.     The Complaint concerns two promissory notes each dated May 2, 2019 (the "Notes") that the Debtor seeks a judgment against HCMFA for: (i) a note for $5 million; and (ii) a note for $2.4 million.

12.     On March 1, 2021, HCMFA filed its *Defendant's Original Answer* (the "Answer").

13.     At the time that the Debtor filed the Complaint, I promptly undertook an internal review of the background facts concerning the Notes.  I had no knowledge of them since I had not been employed by HCMFA, and the few employees of HCMFA had no knowledge of the Notes.  I also discussed the Notes with James Dondero, formerly the CEO of the Debtor, and Mr. Dondero could not recall the genesis of the Notes.  My review of the limited books and records of HCMFA that were not in the possession of the Debtor did not reveal any background facts regarding the Notes or the existence of the Notes.

14.     Normally, I would have discussed the Notes with employees of the Debtor who also provided services to HCMFA pursuant to the Shared Services Agreement in order to assess what defenses or affirmative defenses to the Complaint existed.  However, in this instance I was precluded from doing so.

15.     First, attached hereto as Exhibit 2 is a true and correct copy of an e-mail exchange between me and Mr. James Seery dated September 17, 2020.  Mr. Seery was and remains the Chief Executive Officer of the Debtor.  As stated in Exhibit 2, Mr. Seery was informing me that Debtor employees had been instructed not to discuss with me anything that is "inimical" to the interests of the Debtor, and that they would be terminated if they did so.  This e-mail communication comports with other communications between myself and Mr. Seery and/or Debtor's counsel,

where I was cautioned not to discuss with Debtor employees matters that may be adverse to the Debtor.

16.     Second, by the time of the filing of the Complaint, the Court had entered a preliminary injunction against Mr. Dondero, a true and correct copy of which is attached hereto as Exhibit 3. That injunction prohibited Mr. Dondero from "directly or indirectly . . . communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided." As the information concerning the Notes was background information and not related to "services currently provided," I was concerned that, if I discussed the Notes with the Debtor's employees, the Debtor would argue that either Mr. Dondero or I violated the Court's injunction.

17.     In sum, after the Complaint was filed, no one at HCMFA knew anything about the Notes, and I was precluded from contacting the people that would have known something about the notes, *i.e.* the Debtor's employees, to discuss what they may have known.  I also had very limited access to HCMFA books and records and, even if I had had full access, I would not have known what relevant books and records to search for in the many millions of files without first obtaining a generalized background of the facts regarding the Notes from Debtor employees.

18.     I then worked with outside counsel at Munsch Hardt Kopf & Harr, P.C. to review the Complaint and prepare and file the Answer.  That original Answer did not contain any affirmative defenses because, as explained above, no one at HCMFA knew of any facts that might give rise to an affirmative defense.

19.     The situation changed by mid-April, 2021.  As of late February, 2021, the Debtor terminated the Shared Services Agreement and terminated most of its former employees.  Many of those employees then formed their own company, Skyview Group, which then contracted with HCMFA (and others) to continue providing essentially the same services that they had previously provided under the Shared Services Agreement.  Additionally, the Debtor provided access to

DECLARATION OF DENNIS C. SAUTER, JR.—Page 4

HCMFA of much of its books and records (although not all). Thus, as of March, 2021, I was able to communicate with most former Debtor employees and to access the books and records of HCMFA without fear of violating any court order.

20.     March, 2021, was exceedingly busy, to say the least. With the termination of the Shared Services Agreement, HCMFA, other entities that I am general counsel to, and I were preoccupied with transitioning the services that the Debtor had been providing for more than a decade to a new entity, using new infrastructure, new offices, new networks, etc., all for the primary goal of ensuring a smooth and uninterrupted continuity of business and services provided by HCMFA and others to third parties.

21.     By mid-April, 2021, the situation had calmed down to the point that I was able to discuss the Notes with former employees, most importantly Frank Waterhouse ("Waterhouse") and Will Mabry ("Mabry"). Mabry in particular was able to provide me internal documents and memorandums that I had not previously known about or had access to that helped with the factual background of the Notes.

22.     From these discussions and documents, I have been able to understand the factual background concerning the Notes, ultimately concluding that the Notes were signed by mistake by Waterhouse without authority from HCMFA and have no consideration and were never intended to be debt instruments of HCMFA.

23.     My investigation has revealed the following.

24.     One of the funds that HCMFA advises is Highland Global Allocation Fund ("GAF"). In March, 2018, GAF sold equity interests it held in TerreStar. As part of this, it was necessary to calculate the "net asset value" ("NAV") of these securities and of GAF assets. HCMFA was responsible for advising on the NAV. In turn, pursuant to the Shared Services Agreement and in accordance with applicable compliance and operating procedures, the Debtor

DECLARATION OF DENNIS C. SAUTER, JR.—Page 5

was responsible to HCMFA to calculate the NAV, and the Debtor had several employees charged with these and similar calculations as part of the Debtor's routine business services and as part of what the Debtor regularly provided to HCMFA and affiliated companies.

25.     The Debtor made a mistake in calculating the NAV (the "NAV Error"). The NAV Error was discovered in early 2019 as GAF was being converted from an open-ended fund to a closed-ended fund. The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Debtor, HCMFA, and GAF worked with the SEC to correct the error and to compensate GAF and the various investors in GAF harmed by the NAV Error.

26.     Ultimately, and working with the SEC, the Debtor determined that the losses from the NAV Error to GAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of GAF.

27.     HCMFA accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. I am not sure of the flow of funds, whether the funds flowed through HCMFA or were paid by the Debtor on behalf of HCMFA, and discovery will likely clear that up. Either way, however, the payments were of HCMFA funds and on behalf of HCMFA.

28.     In turn, the Debtor accepted responsibility to HCMFA for having caused the NAV Error, and the Debtor ultimately, whether through insurance or its own funds, compensated HCMFA for the above payments.

29.     Returning to the Notes, Waterhouse was the Chief Financial Officer of both the Debtor and HCMFA during the above events and at the time he signed the Notes.

DECLARATION OF DENNIS C. SAUTER, JR.—Page 6

30.     It appears clear that Waterhouse made a mistake in preparing and signing the Notes. First, , the Notes correspond very closely to the ultimate $5,186,496 and $2,398,842 payments. Second, it appears that Waterhouse assumed, incorrectly, that the funds being paid by the Debtor were a loan to HCMFA, instead of payments as compensation and restitution to HCMFA for the Debtor having caused the NAV Error.  Third, it therefore appears that Waterhouse prepared the Notes for some internal accounting or other purpose, but without there being actual consideration for the Notes and without any intention on the part of the Debtor and HCMFA that there be Notes or that there be a loan transaction.

31.     I also note that, as of May, 2019, HCMFA had executed other demand notes payable to the Debtor. On April 15, 2019, the Debtor executed that certain *Acknowledgement from HCMLP*, a true and correct copy of which is attached hereto as Exhibit 4.  By the same, the Debtor agreed not to demand payment of these notes prior to May 31, 2021, because HCMFA believed that it would not be able to repay those notes prior to that time.  It is illogical that, in light of the same, the Debtor would shortly thereafter lend an additional $7.4 million to HCMFA.  Rather, as my investigation has shown, the Debtor did not lend the funds to HCMFA but instead paid the funds, directly or indirectly, to compensate HCMFA for the NAV Error, which was the Debtor's error and therefore its obligation to correct and compensate for.

32.     Therefore, in light of having learned of these facts in mid to late-April, 2019, HCMFA now believes that it has affirmative defenses to the Notes in the nature of mutual mistake, void for lack of consideration, and no proper authority of Waterhouse to sign the Notes.

33.     Neither I, nor HCMFA, nor any of HCMFA's agents, have been less than diligent in investigating the Notes and the Complaint.

34.     HCMFA respectfully requests that it be granted leave to assert these affirmative defenses in the Adversary Proceeding.

Signed: May _____21_____, 2021

DENNIS C. SAUTER, JR.

## SECOND AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

THIS SECOND AMENDED AND RESTATED SHARED SERVICES AGREEMENT (this "***Agreement***") is entered into to be effective as of 8ᵗʰ day of February, 2013 (the "***Effective Date***") by and among Highland Capital Management, L.P., a Delaware limited partnership ("***HCMLP***"), and Highland Capital Management Fund Advisors, L.P., formerly known as Pyxis Capital, L.P., a Delaware limited partnership ("***HCMFA***"), and any affiliate of HCMFA that becomes a party hereto.  Each of the signatories hereto is individually a "***Party***" and collectively the "***Parties***".

RECITALS

A.      During the Term, HCMLP will provide to HCMFA certain services as more fully described herein and the Parties desire to allocate the costs incurred for such services and assets among them in accordance with the terms and conditions in this Agreement.

AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, as follows:

ARTICLE I
DEFINITIONS

"***Actual Cost***" means, with respect to any period hereunder, one hundred percent (100%) of the actual costs and expenses caused by, incurred or otherwise arising from or relating to (i) the Shared Services and (ii) the Shared Assets, in each case during such period.

"***Affiliate***" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person.  The term "***control***" (including, with correlative meanings, the terms "***controlled by***" and "***under common control with***") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"***Agreement***" has the meaning set forth in the preamble.

"***Allocation Percentage***" has the meaning set forth in Section 4.01.

"***Applicable Margin***" shall mean an additional amount equal to 5% of all costs allocated by Service Provider to the other parties hereto under Article IV; provided that the parties may agree on a different margin percentage as to any item or items to the extent the above margin percentage, together with the allocated cost of such item or service, would not reflect an arm's length value of the particular service or item allocated.

"***Change***" has the meaning set forth in Section 2.02(a).

"***Change Request***" has the meaning set forth in Section 2.02(b).

"***Code***" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

"*Effective Date*" has the meaning set forth in the preamble.

"*Governmental Entity*" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"*Liabilities*" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"*Loss*" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "*Loss*" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"*New Shared Service*" has the meaning set forth in Section 2.03.

"*Party*" or "*Parties*" has the meaning set forth in the preamble.

"*Person*" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"*Quarterly Report*" has the meaning set forth in Section 5.01.

"*Recipient*" means HCMFA and any of HCMFA's direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Shared Services and/or Shared Assets.

"*Service Provider*" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Shared Services or Shared Assets.

"*Service Standards*" has the meaning set forth in Section 6.01.

"*Shared Assets*" shall have the meaning set forth in Section 3.02.

"*Shared Services*" shall have the meaning set forth in Section 2.01.

"*Subsidiary*" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"*Tax*" or "*Taxes*" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Shared Services and the Shared Assets; and (ii) tax-related surcharges or fees that are related to the Shared Services and the Shared Assets identified and authorized by applicable tariffs.

"*Term*" has the meaning set forth in Section 7.01.

ARTICLE II
SHARED SERVICES

Section 2.01    Services.  During the Term, Service Provider will provide Recipient with Shared Services, including without limitation, all of the (i) finance and accounting services, (ii) human resources services, (iii) marketing services, (iv) legal services, (v) corporate services, (vi) information technology services, and (vii) operations services; each as requested by HCMFA and as described more fully on **Annex A** attached hereto, the "***Shared Services***"), it being understood that personnel providing Shared Services may be deemed to be employees of HCMFA to the extent necessary for purposes of the Investment Advisers Act of 1940, as amended.

Section 2.02    Changes to the Shared Services.

(a)    During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such Shared Service, including modifying the applicable fees for such Shared Service to reflect the then current fair market value of such service (a "***Change***").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Shared Service to Recipient.

(b)    The Party requesting a Change will deliver a description of the Change requested (a "***Change Request***") and no Party receiving a Change Request may unreasonably withhold, condition or delay its consent to the proposed Change.

(c)    Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Shared Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Shared Service in any material respect or increase Recipient's cost for such Shared Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Shared Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03    New Shared Services.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Shared Services not otherwise specifically listed in Section 2.01 (a "***New Shared Service***").  Any agreement between the Parties on the terms for a New Shared Service must be in accordance with the provisions of Article IV and Article V hereof, will be deemed to be an amendment to this Agreement and such New Shared Service will then be a "***Shared Service***" for all purposes of this Agreement.

Section 2.04    Subcontractors.  Nothing in this Agreement will prevent Service Provider from, with the consent of Recipient, using subcontractors, hired with due care, to perform all or any part of a Shared Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

ARTICLE III
SHARED ASSETS

Section 3.01    Shared IP Rights.  Each Service Provider hereby grants to Recipient a non-exclusive right and license to use the intellectual property and other rights granted or licensed, directly or indirectly, to such Service Provider (the "***Shared IP Rights***") pursuant to third party intellectual property Agreements ("***Third Party IP Agreements***"), provided that the rights granted to Recipient hereunder are subject to the terms and conditions of the applicable Third Party IP Agreement, and that such rights shall terminate, as applicable, upon the expiration or termination of the applicable Third Party IP Agreement. Recipient shall be licensed to use the Shared IP Rights only for so long as it remains an Affiliate of HCMLP.  In consideration of the foregoing licenses, Recipient agrees to take such further reasonable actions as a Service Provider deems to be necessary or desirable to comply with its obligations under the Third Party IP Agreements.

Section 3.02    Other Shared Assets.  Subject to Section 3.01, each Service Provider hereby grants Recipient the right, license or permission, as applicable, to use and access the benefits under the agreements, contracts and licenses that such Service Provider will purchase, acquire, become a party or beneficiary to or license on behalf of Recipient (the "***Future Shared Assets***" and collectively with the Shared IP Rights, the "***Shared Assets***").

ARTICLE IV
COST ALLOCATION

Section 4.01    Actual Cost Allocation Formula.  The Actual Cost of any item relating to any Shared Services or Shared Assets shall be allocated based on the Allocation Percentage.  For purposes of this Agreement, "***Allocation Percentage***" means:

(a)    To the extent 100% of such item is demonstrably attributable to HCMFA, 100% of the Actual Cost of such item shall be allocated to HCMFA as agreed by HCMFA;

(b)    To the extent a specific percentage of use of such item can be determined (e.g., 70% for HCMLP and 30% for HCMFA), that specific percentage of the Actual Cost of such item will be allocated to HCMLP or HCMFA, as applicable and as agreed by HCMFA; and

(c)    All other portions of the Actual Cost of any item that cannot be allocated pursuant to clause (a) or (b) above shall be allocated between HCMLP and HCMFA in such proportion as is agreed in good faith between the parties.

Section 4.02    Non-Cash Cost Allocation.  The actual, fully burdened cost of any item relating to any Shared Services or Shared Assets that does not result in a direct, out of pocket cash expense may be allocated to HCMLP and HCMFA for financial statement purposes only, as agreed by HCMFA, without any corresponding cash reimbursement required, in accordance with generally accepted accounting principles, based on the Allocation Percentage principles described in Section 4.01 hereof.

ARTICLE V
PAYMENT OF COST AND REVENUE SHARE; TAXES

Section 5.01    Quarterly Statements.  Within thirty (30) days following the end of each calendar quarter during the Term (or at such time as may be otherwise agreed by the parties), each Service Provider shall furnish the other Parties hereto with a written statement with respect to the Actual Cost paid by it in respect of Shared Services and Shared Assets provided by it, in each case, during such

4

period, setting forth (i) the cost allocation in accordance with Article IV hereof together with the Applicable Margin on such allocated amounts, and (ii) any amounts paid pursuant to Section 5.02 hereof, together with such other data and information necessary to complete the items described in Section 5.03 hereof (hereinafter referred to as the "***Quarterly Report***").

Section 5.02     Settlement Payments.    At any time during the Term, any Party may make payment of the amounts that are allocable to such Party together with the Applicable Margin related thereto, regardless of whether an invoice pursuant to Section 5.03 hereof has been issued with respect to such amounts.

Section 5.03     Determination and Payment of Cost and Revenue Share.

(a)     Within ten (10) days of the submission of the Quarterly Report described in Section 5.02 hereof (or at such other time as may be agreed by the parties), the Parties shall (i) agree on the cost share of each of the Parties and Applicable Margin as calculated pursuant to the provisions of this Agreement; and (ii) prepare and issue invoices for the cost share and Applicable Margin payments that are payable by any of the Parties.

(b)     Within ten (10) days of preparation of the agreement and the issuance of the invoice described in Section 5.03(a) (or at such other time as may be agreed by the parties), the Parties shall promptly make payment of the amounts that are set forth on such cost allocation invoice. Notwithstanding anything in this Agreement to the contrary, provision of the Shared Services shall commence from the Effective Date, but no fees shall be payable from Recipient or otherwise accrue with respect to such services provided during the month of December 2011.

Section 5.04     Taxes.

(a)     Recipient is responsible for and will pay all Taxes applicable to the Shared Services and the Shared Assets provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Shared Services and the Shared Assets as a result of such payment by Recipient. Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Shared Services and Shared Assets, costs for which such Taxes are levied. Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b)     Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider. In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name. Service Provider's authorization will not be unreasonably withheld. Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings. However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time. Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings. Any adverse consequences suffered by Recipient as a result of the withdrawal will be submitted to arbitration pursuant to Section 9.14. Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property. Recipient agrees to

Appx. 00635

indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

          (c)     The provisions of this Section 5.04 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

## ARTICLE VI
## SERVICE PROVIDER RESPONSIBILITIES

        Section 6.01    <u>Service Provider General Obligations</u>.  Service Provider will provide the Shared Services and the Shared Assets to Recipient on a non-discriminatory basis and will provide the Shared Services and the Shared Assets in the same manner as if it were providing such services and assets on its own account (the "***Service Standards***").  Service Provider will conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the Service Standards, including, for avoidance of doubt, laws and regulations relating to privacy of customer information.

        Section 6.02    <u>Books and Records; Access to Information</u>.  Service Provider will keep and maintain books and records on behalf of Recipient in accordance with past practices and internal control procedures.  Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Shared Services and Shared Assets, with respect to Service Provider's performance of its obligations hereunder.  This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider). Service Provider will promptly respond to any reasonable requests for information or access.  For the avoidance of doubt, all books and records kept and maintained by Service Provider on behalf of Recipient shall be the property of Recipient, and Service Provider will surrender promptly to Recipient any of such books or records upon Recipient's request (provided that Service Provider may retain a copy of such books or records) and shall make all such books and records available for inspection and use by the Securities and Exchange Commission or any person retained by Recipient at all reasonable times.  Such records shall be maintained by Service Provider for the periods and in the places required by laws and regulations applicable to Recipient.

        Section 6.03    <u>Return of Property and Equipment</u>.  Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

## ARTICLE VII
## TERM AND TERMINATION

        Section 7.01    <u>Term</u>.  The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "***Term***"), unless terminated earlier in accordance with Section 9.02.  The Term shall automatically renew for successive one year periods unless sooner terminated under Section 7.02.

Section 7.02    Termination.  Either Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term.

<div align="center">ARTICLE VIII<br/>LIMITED WARRANTY</div>

Section 8.01    Limited Warranty.  Service Provider will perform the Shared Services hereunder in accordance with the Service Standards.  Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Shared Services and the granting of the Shared Assets under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Shared Services and the Shared Assets for any purpose or use or purpose.  Service Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Shared Service and Shared Asset, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

<div align="center">ARTICLE IX<br/>MISCELLANEOUS</div>

Section 9.01    No Partnership or Joint Venture; Independent Contractor.  Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or HCMFA or their respective successors or assigns.  The Parties understand and agree that, with the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever.  With the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, no Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever.  The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Shared Services.

Section 9.02    Amendments; Waivers.  Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.03    Schedules and Exhibits; Integration.  Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 9.04    Further Assurances.  Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

<div align="center">7</div>

Section 9.05   <u>Governing Law</u>.  This Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 9.06   <u>Assignment</u>.  Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

Section 9.07   <u>Headings</u>.  The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 9.08   <u>Counterparts</u>.   This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts.  All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 9.09   <u>Successors and Assigns; No Third Party Beneficiaries</u>.   This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 9.10   <u>Notices</u>.   All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i)immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

If to HCMLP, addressed to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Fax:  (972) 628-4147

If to HCMFA, addressed to:

Highland Capital Management Fund Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Fax:  (972) 628-4147

Section 9.11   <u>Expenses</u>.  Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

Appx. 00638

Section 9.12    Waiver.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.13    Severability.  If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties.  All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

Section 9.14    Arbitration; Jurisdiction.  Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that either party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief.  The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service.  The arbitrator(s) shall be duly licensed to practice law in the State of Texas.  The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each.  Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.  The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules.  The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees.  All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

Section 9.15    General Rules of Construction.  For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or

9

reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By: _____

Name:  James Dondero
Title:    President


HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

By:    Strand Advisors XVI, Inc., its general partner

By: _____

Name:  Brian Mitts
Title:    Assistant Secretary

11

**Annex A**

**Shared Services**

Compliance
        General compliance
        Compliance systems
Facilities
        Equipment
        General Overhead
        Office Supplies
        Rent & Parking
Finance & Accounting
        Book keeping
        Cash management
        Cash forecasting
        Credit facility reporting
        Financial reporting
        Accounts payable
        Accounts receivable
        Expense reimbursement
        Vendor management
HR
        Drinks/snacks
        Lunches
        Recruiting
IT
        General support & maintenance (OMS, development, support)
        Telecom (cell, phones, broadband)
        WSO
Legal
        Corporate secretarial services
        Document review and preparation
        Litigation support
        Management of outside counsel
Marketing and PR
        Public relations
Tax
        Tax audit support
        Tax planning
        Tax prep and filing
Investments
        Investment research on an ad hoc basis as requested by HCMFA

Valuation Committee

Trading

Trading desk services

Operations

Trade settlement

Appx. 00643

**Rukavina, Davor**

| | |
|---|---|
| **From:** | James Seery  <jpseeryjr@gmail.com> |
| **Sent:** | Thursday, September 17, 2020 4:17 PM |
| **To:** | DC Sauter |
| **Cc:** | Gregory V. Demo |
| **Subject:** | Re: Acis Settlement |

DC

I believe your concerns regarding the release are misplaced as it does not bind entities that HCMLP does not control.  Greg can walk you through the language, but I do not believe it requires adjustment nor does it create any liability.  To the contrary, it reduces liability.

With regard to the HCMLP employee prohibitions, no employee whether legal or non-legal can work on any matter that is inimical to the interests of HCMLP.  I ,as CEO, and the Independent Board will make the determination as to whether an action violates the prohibition, and a breach of the prohibition will lead to termination for cause.  I believe that most of the employees have been informed of this requirement and are following the directive.

With regard to transactional matters, HCMLP employees will continue to work with you on those issues that do not run afoul of the prohibition above.  If there is a particular matter where you are taking a potentially adversarial action vis a vis HCMLP, please let me know what it is.  We can then consider whether a customized operating protocol for that issue is needed or whether you will simply be on your own.  I will make the determination with the advice of counsel.  We do not believe the Texas rules of professional responsibility apply in this situation.

Please let me know what matter you are considering with respect to the immediately preceding paragraph, and we will consider how to best address your concerns.

Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**From:** DC Sauter <DSauter@NexPointadvisors.com>
**Date:** Thursday, September 17, 2020 at 4:56 PM
**To:** Jim Seery <jpseeryjr@gmail.com>
**Cc:** Greg Demo <GDemo@pszjlaw.com>
**Subject:** RE: Acis Settlement

Jim/Greg, follow up on my email below.  I have a few items that have been placed on my plate, and I really need to understand who I can speak with and the extent to which they are permitted to share information with me.





EXHIBIT 2

Appx. 00644

O: 972.628.4117  |  C: 469.877.6440

---

**From:** DC Sauter
**Sent:** Tuesday, September 15, 2020 8:55 AM
**To:** 'James Seery' <jpseeryjr@gmail.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>
**Subject:** RE: Acis Settlement

My apologies for copying Isaac.  I was under the mistaken impression that he would have assisted in the settlement.

In my view, the requested clarification is beneficial to Strand, HCMLP, and the other "HCMLP Entities."  The documents purport to release ACIS from claims on behalf of, among others, any entity that is "managed" by HCMLP and "respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns" of any "HCMLP Entity."  Those "HCMLP Entities" lack the authority to bind a whole host of parties in that laundry list, which could result in claims against HCMLP, Strand, and the other "HCMLP Entities" by both the "ACIS Released Parties," who will claim they didn't receive the benefit of the bargain, and the parties on whose behalf the "HCMLP Parties" purported to release claims who didn't consent to the release.

Additionally, I'd like to visit with you all regarding the board's position that prohibits certain HCMLP personnel from working on certain matters.

First, I am unclear whether the prohibition applies to only HCMLP legal personnel or whether it applies to all HCMLP employees.  Please clarify.

Second, as you may know, virtually all of these matters are falling into my lap, and in most cases I lack any knowledge about them.  It would help me tremendously if current HCMLP employees, and particularly the legal personnel, could provide me with transactional background to assist in the transition of the matter.  While I understand the board's concern with Judge Jernigan's order, I don't believe that the Texas Disciplinary Rules of Professional Conduct mandate or even permit an attorney licensed in the State of Texas to refuse to cooperate with a former client in the transfer of a matter to a new attorney. Rule 1.15(d) states that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payments of fee that has not been earned." The comments to that rule provide additional clarity:  "In every instance of withdrawal and even if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the client." T.D.R.P.C. Rule 1.15, comment 9.  Proper steps may include providing information to new counsel or even continuing to represent the client for a limited time to meet impending deadlines. *Microsoft Corp. v. Commonwealth Sci. & Indus. Research Org.*, 2007 U.S. Dist. LEXIS 91550 *23-24 fn. 11 (E.D. Tex. Dec. 13, 2007).  Even if the board insists that the HCMLP legal personnel cannot continue to represent others in non-HCMLP matters or matters adverse to HCMLP (irrespective of any conflict of interest analysis of whether those attorneys may continue to represent HCMLP in those matters), the ethical rules require that the attorneys provide assistance in transferring those matters to me or others.

Finally, I routinely handle, and am routinely asked to handle, legal matters that relate to real estate for entities owned or controlled by HCMLP (Park West, the Arizona assets, the Maple Ave. property, to name a few).  I am not an HCMLP employee, and it's my understanding that NexPoint Advisors, L.P. is not compensated for the time I spend on HCMLP matters.  I'm not suggesting that this arrangement should change, but it feels from my perspective that the board's position is only working in one direction.  In other words, if I understand the board's position correctly, I can work on both NexPoint and HCMLP matters, but the HCMLP legal employees may only work on HCMLP-related matters.  It has also put a significant amount of additional work on my plate.  I would like to understand two things.  First, what is the scope of my authority in these matters, and what is the proper protocol vis-à-vis you, DSI, and the board?  I have tried to take the conservative approach in keeping you all informed and asking for consent or approval where I thoughts it

**Appx. 00645**

appropriate.  I assume this is how you'd like to continue to handle things, but I would like confirmation of that.  Second, I have heard that you all were working to transfer a couple of the legal personnel (perhaps Thedford and Post) to HCMFA so they could assist with the work load (particularly in the areas where I don't have a significant amount of experience).  I'd like to know where that stands and when relief can be expected.

I'm available most of today and tomorrow to discuss.

**D.C. Sauter**

**NEXPOINT**

O: 972.628.4117  |  C: 469.877.6440

---

**From:** James Seery <jpseeryjr@gmail.com>
**Sent:** Tuesday, September 15, 2020 7:01 AM
**To:** DC Sauter <DSauter@NexPointadvisors.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>; Isaac Leventon <ILeventon@HighlandCapital.com>
**Subject:** Re: Acis Settlement

DC.  We will discuss and revert to you.  Neither Isaac nor anyone else at HCMLP is permitted to work on any issues related to the settlement and release other than as directed by me.

Thanks

Sent from my iPad

> On Sep 14, 2020, at 7:08 PM, DC Sauter <DSauter@nexpointadvisors.com> wrote:

> Greg,

> I've been asked to review the attached release on behalf of HCMFA and the closed-end funds.  I'm concerned that the language below creates an ambiguity as to whether the closed-end funds and HCMFA have released claims against the ACIS parties:

> 1.    The release by Strand, which also serves as the general partner of HCMFA; and
> 2.    The release by each "HCMLP Entity" of its "respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns."

> We would like the final sentence in paragraph 1.a. of the Release to be revised to specifically identify HCMFA and the closed-end funds as parties not covered by the release.  Please let me know if you'd like to discuss in more detail.

> **D.C. Sauter | General Counsel, Real Estate**

> <image001.jpg>

> 300 Crescent Court  |  Suite 700  |  Dallas, Texas 75201
> O: 972.628.4117  |  C: 469.877.6440  |  F: 972.628.4147
> dsauter@nexpointadvisors.com  |  www.NexPointGroup.com

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

<Acis - Release (EXECUTION VERSION).pdf>

Appx. 00647

Docket #0059  Date Filed: 1/12/2021



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 11, 2021**

_____
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | No. 20-03190-sgj |
| | § | |
| JAMES D. DONDERO, | § | |
| | § | |
| Defendant. | § | |

### ORDER GRANTING DEBTOR'S MOTION FOR A PRELIMINARY INJUNCTION
### AGAINST JAMES DONDERO

This matter having come before the Court on *Plaintiff Highland Capital Management,*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

193405421011 **EXHIBIT 3**

**Appx. 00648**

*L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 2] (the "Motion"), filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"); and this Court having considered (a) the Motion, (b) *Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Injunctive Relief* [Adv. Pro. Docket No. 1] (the "Complaint"), (c) the arguments and law cited in the *Debtor's Amended Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 3] (the "Memorandum of Law," and together with the Motion and Complaint, the "Debtor's Papers"), (d) *James Dondero's Response in Opposition to Debtor's Motion for a Preliminary Injunction* [Adv. Pro. Docket No. 52] (the "Opposition") filed by James Dondero, (e) the testimonial and documentary evidence admitted into evidence during the hearing held on January 8, 2021 (the "Hearing"), including assessing the credibility of Mr. James Dondero, (f) the arguments made during the Hearing, and (g) all prior proceedings relating to the Motion, including the December 10, 2020 hearing on the *Debtor's Motion for a Temporary Restraining Order and Preliminary Injunction against James Dondero* [Adv. Pro. Docket No. 6] (the "TRO Hearing"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that injunctive relief is warranted under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest;

2

and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Debtor's Papers, and the evidence submitted in support thereof, establish good cause for the relief granted herein, and that (1) such relief is necessary to avoid immediate and irreparable harm to the Debtor's estate and reorganization process; (2) the Debtor is likely to succeed on the merits of its underlying claim for injunctive relief; (3) the balance of the equities tip in the Debtor's favor; and (4) such relief serves the public interest; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      James Dondero is preliminarily enjoined and restrained from (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents, in whatever capacity they are acting; (c) communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned, controlled or managed by the Debtor, and the pursuit of the Plan or any

alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct").[2]

3.      James Dondero is further preliminarily enjoined and restrained from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting with him or on his behalf, to, directly or indirectly, engage in any Prohibited Conduct.

4.      James Dondero is further preliminarily enjoined and restrained from communicating (in person, telephonically, by e-mail, text message or otherwise) with Scott Ellington and/or Isaac Leventon, unless otherwise ordered by the Court.

5.      James Dondero is further preliminarily enjoined and restrained from physically entering, or virtually entering through the Debtor's computer, email, or information systems, the Debtor's offices located at Crescent Court in Dallas, Texas, or any other offices or facilities owned or leased by the Debtor, regardless of any agreements, subleases, or otherwise, held by the Debtor's affiliates or entities owned or controlled by Mr. Dondero, without the prior written permission of Debtor's counsel made to Mr. Dondero's counsel.  If Mr. Dondero enters the Debtor's office or other facilities or systems without such permission, such entrance will constitute trespass.

6.      James Dondero is ordered to attend all future hearings in this Bankruptcy Case by Webex (or whatever other video platform is utilized by the Court), unless otherwise ordered by the Court.

7.      This Order shall remain in effect until the date that any plan of reorganization or liquidation resolving the Debtor's case becomes effective, unless otherwise ordered by the Court.

---

[2] For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from (1) seeking judicial relief upon proper notice or from objecting to any motion filed in this Bankruptcy Case, or (2) communicating with the committee of unsecured creditors (the "UCC") and its professionals regarding a pot plan.

DOCS_NY:41944.3 36027/002

8.      All objections to the Motion are overruled in their entirety.

9.      The Court shall retain exclusive jurisdiction with respect to all matters arising

from or relating to the implementation, interpretation, and enforcement of this Order.

### ### END OF ORDER ###

DOCS_NY:41944.3 36027/002

**Acknowledgement from HCMLP**

April 15, 2019

  Reference is hereby made to certain outstanding amounts loaned from HIGHLAND CAPITAL MANAGEMENT, L.P. ("HCMLP") to HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. ("HCMF") for funding of HCMF's ongoing operations, which are payable on demand and remained outstanding on December 31, 2018 and as of the date hereof.

  HCMF expects that it may be unable to repay such amounts should they become due, for the period commencing today and continuing through May 31, 2021.

  HCMLP hereby agrees to not demand payment on amounts owed by HCMF prior to May 31, 2021.

Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner

By: _____

**Acknowledged By:**

Highland Capital Management Fund Advisors, L.P.
By: Strand XVI, Inc., its general partner

By: _____

EXHIBIT 4

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S AMENDED ANSWER**

COMES NOW Highland Capital Management Fund Advisors, L.P. (the "Defendant"), the

defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding")

filed by Highland Capital Management, L.P. (the "Plaintiff"), and files this its *Defendant's*

*Amended Answer* (the "Answer"), responding to the *Complaint for (I) Breach of Contract and (II)*

*Turnover of Property of the Debtor's Estate* (the "Complaint").  Where an allegation in the

Complaint is not expressly admitted in this Answer, it is denied.

EXHIBIT "B"

Appx. 00654

## PRELIMINARY STATEMENT

1.      The first sentence of ¶ 1 sets forth the Plaintiff's objective in bringing the Complaint and does not require a response.  To the extent it contains factual allegations, they are denied.  The second sentence contains a legal conclusion that does not require a response.  To the extent it contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Case to adjudicate this dispute.  Any allegations in ¶ 3 not expressly admitted are denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding.  Any allegations in ¶ 4 not expressly admitted are denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt.  The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does not consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding.  Any allegations in ¶ 5 not expressly admitted are denied.

6.      The Defendant admits ¶ 6 of the Complaint.

## THE PARTIES

7.      The Defendant admits ¶ 7 of the Complaint.

---

8.      The Defendant admits ¶ 8 of the Complaint.

## CASE BACKGROUND

9.      The Defendant admits ¶ 9 of the Complaint.

10.      The Defendant admits ¶ 10 of the Complaint.

11.      The Defendant admits ¶ 11 of the Complaint.

12.      The Defendant admits ¶ 12 of the Complaint.

## STATEMENT OF FACTS

**A.      The HCMFA Notes**

13.      The Defendant admits that it has executed at least one promissory note under which the Debtor is the payee.  Any allegations in ¶ 13 not expressly admitted are denied.

14.      The Defendant denies ¶ 14 of the Complaint.

15.      The Defendant denies ¶ 15 of the Complaint.

16.      The Defendant denies ¶ 16 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 16 is not verbatim.

17.      The Defendant denies ¶ 17 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 17 is not verbatim.

18.      The Defendant admits ¶ 18 of the Complaint.

**B.      HCMFA's Default under Each Note**

19.      The Defendant admits that Exhibit 3 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent ¶ 19 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, ¶ 19 of the Complaint is denied.

20.      To the extent ¶ 20 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits ¶ 20 of the Complaint.

21.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 21 of the Complaint and therefore denies the same.

22.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 22 of the Complaint and therefore denies the same.

23.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 23 of the Complaint and therefore denies the same.

24.     The Defendant denies ¶ 24 of the Complaint.

### FIRST CLAIM FOR RELIEF
#### (For Breach of Contract)

25.     Paragraph 25 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

26.     Paragraph 26 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 26 of the Complaint.

27.     Paragraph 27 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 27 of the Complaint.

28.     Paragraph 28 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 28 of the Complaint.

29.     The Defendant denies ¶ 29 of the Complaint.

### SECOND CLAIM FOR RELIEF
#### (Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))

30.     Paragraph 30 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

31.     Paragraph 31 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 31 of the Complaint.

32.     Paragraph 32 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 32 of the Complaint.

33.     The Defendant denies ¶ 33 of the Complaint.

34.     Paragraph 34 of the Complaint states a legal conclusion that does not require a response.  The Defendant admits that the Plaintiff transmitted the Demand Letter.  To the extent ¶ 34 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 34 of the Complaint and therefore denies the same.

35.     The Defendant lacks knowledge or information sufficient to form a belief about the truth the allegations in ¶ 35 of the Complaint and therefore denies the same.

36.     Paragraph 36 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 36 of the Complaint.

37.     The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including parts (i), (ii), and (iii).

## <u>AFFIRMATIVE DEFENSES</u>

38.     At all material times to the Complaint, the Defendant, a registered advisor, advised various third-party funds as to their investments.  One such fund was Highland Global Allocation Fund ("<u>HGAF</u>").

---

DEFENDANT'S AMENDED ANSWER

39.    At all material times to the Complaint, the Defendant contracted with the Plaintiff whereby the Plaintiff, through its employees, would provide certain services to the Defendant, including with respect to the Defendant's advice to the third-party funds.  These services so provided included accounting, legal, regulatory, valuation, and compliance services.

40.    In March, 2018, HGAF sold equity interests it held in TerreStar.  As part of this, it was necessary to calculate the "net asset value" ("NAV") of these securities and of HGAF assets. The Defendant was responsible for advising on the NAV.  In turn, pursuant to the Shared Services Agreement in effect at that time between the Plaintiff and the Defendant, the Plaintiff was responsible to the Defendant to calculate the NAV, and the Plaintiff had several employees charged with these and similar calculations as part of the Plaintiff's routine business services and as part of what the Plaintiff regularly provided to the Defendant and affiliated companies.

41.    The Plaintff made a mistake in calculating the NAV (the "NAV Error").  The NAV Error was discovered in early 2019 as HGAF was being converted from an open-ended fund to a closed-ended fund.  The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error.  Ultimately, and working with the SEC, the Plantiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

42.    The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019.  In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments

by paying, or causing to be paid, approximately $7.5 million to the Defendant directly or indirectly to HGAF and its investors.

43.     At this time, Frank Waterhouse ("Waterhouse") was the Chief Financial Officer to both the Plaintiff and the Defendant.  Waterhouse signed the two promissory notes the subject of the Complaint (the "Notes").  He did not sign the Notes in any representative capacity for the Defendant.  The Defendant did not authorize Waterhouse to sign the Notes or to bind the Defendant in any way to the Note.

44.     Waterhouse made a mistake in preparing and signing the Notes for the Defendant. Upon information and belief, Waterhouse was not aware that payments from the Plaintiff to the Defendant were to compensate the Defendant for the NAV Error and resulting damages, instead assuming that the Notes were like prior notes between the Plaintiff and the Defendant.  Waterhouse failed to properly inquire into the underlying transaction and, either for unknown accounting or other purposes, Waterhouse prepared and signed the Notes on his own, without proper knowledge of the underlying facts and without actual authority from either the Plaintiff or the Defendant.

45.     In sum, neither the Plaintiff nor the Defendant intended that any funds paid by the Plaintiff to the Defendant be treated as debt but that they instead be treated as compensation by the Plaintiff to the Defendant for the NAV Error that the Plaintiff caused.  The Notes are an unauthorized mistake and a nullity, and are void for a lack of consideration.

46.     To the extent Waterhouse had apparent authority to bind the Defendant to the Notes, such apparently authority does not apply to the Notes because Waterhouse's lack of actual authority is imputed to the Plaintiff, as Waterhouse was the CFO for the Plaintiff.

47.     Accordingly, the Notes are void or unenforceable for lack of consideration, for mutual mistake, and for the lack of authority from the Defendant to Waterhouse to execute the same for the Defendant.

### JURY DEMAND

48.      The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38

of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy

Procedure.

49.      The Defendant does <u>not</u> consent to the Bankruptcy Court conducting a jury trial

and therefore demands a jury trial in the District Court.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that,

following a trial on the merits, the Court enter a judgment that the Plaintiff take noting on the

Complaint and provide the Defendant such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this _____ day of May, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
_____
     Davor Rukavina, Esq.
     Texas Bar No. 24030781
     Julian P. Vasek, Esq.
     Texas Bar No. 24070790
     500 N. Akard Street, Suite 3800
     Dallas, Texas  75202-2790
     Telephone: (214) 855-7500
     Facsimile: (214) 978-4375
     drukavina@munsch.com
     jvasek@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS,
L.P.**

# EXHIBIT 216

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

### DEFENDANT'S AMENDED ANSWER

COMES NOW Highland Capital Management Fund Advisors, L.P. (the "Defendant"), the defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), and files this its *Defendant's Amended Answer* (the "Answer"), responding to the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (the "Complaint").   Where an allegation in the Complaint is not expressly admitted in this Answer, it is denied.

---

DEFENDANT'S AMENDED ANSWER

Page **1** of **9**

## PRELIMINARY STATEMENT

1.      The first sentence of ¶ 1 sets forth the Plaintiff's objective in bringing the Complaint and does not require a response.  To the extent it contains factual allegations, they are denied.  The second sentence contains a legal conclusion that does not require a response.  To the extent it contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Case to adjudicate this dispute.  Any allegations in ¶ 3 not expressly admitted are denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding.  Any allegations in ¶ 4 not expressly admitted are denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt.  The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does <u>not</u> consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding.  Any allegations in ¶ 5 not expressly admitted are denied.

6.      The Defendant admits ¶ 6 of the Complaint.

## THE PARTIES

7.      The Defendant admits ¶ 7 of the Complaint.

---

DEFENDANT'S AMENDED ANSWER

8.      The Defendant admits ¶ 8 of the Complaint.

## CASE BACKGROUND

9.      The Defendant admits ¶ 9 of the Complaint.

10.     The Defendant admits ¶ 10 of the Complaint.

11.     The Defendant admits ¶ 11 of the Complaint.

12.     The Defendant admits ¶ 12 of the Complaint.

## STATEMENT OF FACTS

### A.      The HCMFA Notes

13.     The Defendant admits that it has executed at least one promissory note under which the Debtor is the payee.  Any allegations in ¶ 13 not expressly admitted are denied.

14.     The Defendant denies ¶ 14 of the Complaint.

15.     The Defendant denies ¶ 15 of the Complaint.

16.     The Defendant denies ¶ 16 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 16 is not verbatim.

17.     The Defendant denies ¶ 17 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 17 is not verbatim.

18.     The Defendant admits ¶ 18 of the Complaint.

### B.      HCMFA's Default under Each Note

19.     The Defendant admits that Exhibit 3 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent ¶ 19 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, ¶ 19 of the Complaint is denied.

20.     To the extent ¶ 20 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits ¶ 20 of the Complaint.

21.      The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 21 of the Complaint and therefore denies the same.

22.      The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 22 of the Complaint and therefore denies the same.

23.      The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 23 of the Complaint and therefore denies the same.

24.      The Defendant denies ¶ 24 of the Complaint.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

25.      Paragraph 25 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

26.      Paragraph 26 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 26 of the Complaint.

27.      Paragraph 27 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 27 of the Complaint.

28.      Paragraph 28 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 28 of the Complaint.

29.      The Defendant denies ¶ 29 of the Complaint.

## SECOND CLAIM FOR RELIEF
### (Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))

30.      Paragraph 30 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

31.     Paragraph 31 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 31 of the Complaint.

32.     Paragraph 32 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 32 of the Complaint.

33.     The Defendant denies ¶ 33 of the Complaint.

34.     Paragraph 34 of the Complaint states a legal conclusion that does not require a response.  The Defendant admits that the Plaintiff transmitted the Demand Letter.  To the extent ¶ 34 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 34 of the Complaint and therefore denies the same.

35.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 35 of the Complaint and therefore denies the same.

36.     Paragraph 36 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 36 of the Complaint.

37.     The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including parts (i), (ii), and (iii).

## AFFIRMATIVE DEFENSES

38.     At all material times to the Complaint, the Defendant, a registered advisor, advised various third-party funds as to their investments.  One such fund was Highland Global Allocation Fund ("HGAF").

39.     At all material times to the Complaint, the Defendant contracted with the Plaintiff whereby the Plaintiff, through its employees, would provide certain services to the Defendant,

including with respect to the Defendant's advice to the third-party funds.  These services so provided included accounting, legal, regulatory, valuation, and compliance services.

40.     In March, 2018, HGAF sold equity interests it held in TerreStar.  As part of this, it was necessary to calculate the "net asset value" ("NAV") of these securities and of HGAF assets. The Defendant was responsible for advising on the NAV.  In turn, pursuant to the Shared Services Agreement in effect at that time between the Plaintiff and the Defendant, the Plaintiff was responsible to the Defendant to calculate the NAV, and the Plaintiff had several employees charged with these and similar calculations as part of the Plaintiff's routine business services and as part of what the Plaintiff regularly provided to the Defendant and affiliated companies.

41.     The Plaintff made a mistake in calculating the NAV (the "NAV Error").  The NAV Error was discovered in early 2019 as HGAF was being converted from an open-ended fund to a closed-ended fund.  The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error.  Ultimately, and working with the SEC, the Plantiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

42.     The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019.  In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant directly or indirectly to HGAF and its investors.

43.     At this time, Frank Waterhouse ("Waterhouse") was the Chief Financial Officer to both the Plaintiff and the Defendant.  Waterhouse signed the two promissory notes the subject of the Complaint (the "Notes").  He did not sign the Notes in any representative capacity for the Defendant.  The Defendant did not authorize Waterhouse to sign the Notes or to bind the Defendant in any way to the Note.

44.     Waterhouse made a mistake in preparing and signing the Notes for the Defendant.  Upon information and belief, Waterhouse was not aware that payments from the Plaintiff to the Defendant were to compensate the Defendant for the NAV Error and resulting damages, instead assuming that the Notes were like prior notes between the Plaintiff and the Defendant.  Waterhouse failed to properly inquire into the underlying transaction and, either for unknown accounting or other purposes, Waterhouse prepared and signed the Notes on his own, without proper knowledge of the underlying facts and without actual authority from either the Plaintiff or the Defendant.

45.     In sum, neither the Plaintiff nor the Defendant intended that any funds paid by the Plaintiff to the Defendant be treated as debt but that they instead be treated as compensation by the Plaintiff to the Defendant for the NAV Error that the Plaintiff caused.  The Notes are an unauthorized mistake and a nullity, and are void for a lack of consideration.

46.     To the extent Waterhouse had apparent authority to bind the Defendant to the Notes, such apparently authority does not apply to the Notes because Waterhouse's lack of actual authority is imputed to the Plaintiff, as Waterhouse was the CFO for the Plaintiff.

47.     Accordingly, the Notes are void or unenforceable for lack of consideration, for mutual mistake, and for the lack of authority from the Defendant to Waterhouse to execute the same for the Defendant.

## JURY DEMAND

48.     The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38

of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy

Procedure.

49.     The Defendant does <u>not</u> consent to the Bankruptcy Court conducting a jury trial

and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that,

following a trial on the merits, the Court enter a judgment that the Plaintiff take noting on the

Complaint and provide the Defendant such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 6th day of July, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/  Davor Rukavina

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

<u>**CERTIFICATE OF SERVICE**</u>

  The undersigned hereby certifies that, on this the 6th day of July, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the plaintiff.

       By: /s/ Davor Rukavina
          Davor Rukavina, Esq.

Appx. 00671

# EXHIBIT 217

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S SECOND MOTION FOR LEAVE TO AMEND ANSWER
AND BRIEF IN SUPPORT THEREOF**

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

1934054211130000000000011

Appx. 00673

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. iii

I.      SUMMARY ...........................................................................................................1

II.     TIMING .................................................................................................................2

III.    BACKGROUND ....................................................................................................4

        A.      THE NOTES, THE ADVERSARY PROCEEDING, AND HCMFA'S DEFENSE...................4

        B.      WATERHOUSE'S DEPOSITION AND ADMISSION OF MISTAKE....................................6

        C.      MR. KLOS' DEPOSITION AND CREATION OF THE NOTES .........................................13

        D.      MS. HENDRIX'S DEPOSITION AND LACK OF AUTHORITY TO SIGN THE NOTES........15

IV.     ARGUMENTS AND AUTHORITIES............................................................................19

V.      PRAYER.................................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004)........................................................20, 21

<u>Statutes and Rules</u>

TEX. BUS. & COMM. CODE ANN.  3.308(a) ....................................................................................1

TEX. BUS. & COMM. CODE ANN. § 3.402(b) .................................................................................7

FED. R. CIV. P. 15(a)(2)...............................................................................................................20

### DEFENDANT'S SECOND MOTION FOR LEAVE TO AMEND ANSWER
### AND BRIEF IN SUPPORT THEREOF

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW Highland Capital Management Fund Advisors, L.P. ("HCMFA" or the "Defendant"), the defendant in the above styled and numbered adversary proceeding (the "Adversary Proceeding") commenced by Highland Capital Management, L.P. (the "Debtor"), and files this its *Defendant's Second Motion for Leave to Amend Answer and Brief In Support Thereof* (the "Motion"), respectfully stating as follows:

## I.   SUMMARY[1]

1.      By this Motion, HCMFA requests leave to amend its answer to expressly deny that the Notes were signed.  HCMFA does not concede that this relief is required, as it has already denied that it signed the notes—Mr. Waterhouse purportedly signed them as maker.  However, the Uniform Commercial Code ("U.C.C.") appears to require a more express denial of signature.[2]

2.      This is not an ordinary note case.  The way that the Notes were signed, the fact that they did not go through "legal," the absence of evidence that anyone involved was told that the underlying transfers were loans—accounting personnel *assumed* the transfers to be loans— and the fact that the Debtor was liable to HCMFA for causing a valuation error that led to $7.4 million in liabilities, which was the purpose of the transfers; *i.e.* compensation, all demonstrates that the Notes are a mistake created by Debtor employees in good faith based on their assumptions, and not the facts.  Indeed, it is now apparent that Mr. Waterhouse did not sign the Notes or authorize his electronic signature.

---

[1]      This Motion is supported by the *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer*, filed concurrently herewith, and cited to herein as HCMFA APP.

[2]      *See* TEX. BUS. & COMM. CODE ANN.  3.308(a).

3.      This case is an example of how one mistake and assumption snowballs and leads to another, which leads to another, and which leads to yet another, with a plaintiff now seeking to exploit these mistakes—its own mistakes, by the way—rather than looking at the actual facts:

Step 1.    Mr. Dondero went to Mr. Waterhouse and told Mr. Waterhouse to transfer $7.4 million to HCMFA.  Mr. Dondero never told Mr. Waterhouse that this was a loan; just to transfer the funds.  In fact, the transfers were compensation from the Debtor to HCMFA because the Debtor, through its negligence, created a $7.4 million liability of HCMFA to third parties.  Mr. Dondero never told Mr. Waterhouse that the transfers were loans.

Step 2.    Mr. Waterhouse did not have the authority to enter into a loan of this size either for HCMFA or the Debtor.  He simply told his controller to transfer the funds and put the matter out of his head.

Step 3.    That controller, pursuant to a multi-year course of conduct and many other inter-company promissory notes, asked a subordinate to paper the transfers as loans, assuming that they must be loans because intercompany transfers are usually booked as such and the auditors need paper notes.

Step 4.    The subordinate, who is not a lawyer, took a Word document form, years old, and populated it, instead of going through the legal department.  And, instead of asking Mr. Waterhouse to sign the notes, she affixed a .jpg image of his signature to the Notes, without authority from him.

Step 5.    Now that there are notes in the system, and even though none of them know anything about it, accountants and auditors do what they do: they record and report the Notes, thereby breathing life into something that should never have been.

Step 6.    Complicating matters, there were prior promissory notes from HCMFA to the Debtor in the amounts of $6.3 million—similar to $7.4 million—such that persons subsequently reviewing books and records would naturally have assumed that HCMFA's books, which carried the Notes, were referring to these old notes and not something new, such that the mistake was not caught until after this litigation commenced.

## II.    TIMING

4.      NexPoint will first address timing issues, since the Debtor is certain, as it always does, to allege that NexPoint somehow delayed in asserting a right, conveniently ignoring that it had NexPoint's documents, that it had secured an injunction preventing Mr. Dondero from talking

to Debtor employees, and that it had instructed its key employees not to communicate with HCMFA regarding this litigation.  HCMFA APP 3-6.  The following dates are key:

(i)     April, 2021.  Mr. Sauter interviews Mr. Waterhouse, who basically informs him that, as he did not use electronic signatures in May, 2019, if a note has his signature, then he must have signed it.  *Id*. 7 (¶ 23).  HCMFA at that time has no reason to question this.  *See id*.

(ii)    May 28, 2021.  HCMFA serves a request for production on the Debtor, which includes "[a]ll Microsoft Word copies of the Notes, including Metada."  *Id*. 819.

(iii)   The Debtor does not produce the same.  *Id*. 815 (¶ 5).  As late as October 19, 2021, as HCMFA is deposing Mr. Waterhouse—the person who purportedly signed the Notes—the Debtor is still refusing to produce the original Word documents of the Notes.[3]

(iv)    October 19, 2021.  The Debtor and HCMFA depose Mr. Waterhouse, who testifies that he does not remember signing the Notes and, if he authorized someone to affix his electronic signature to the Notes (even though he was not sure this was being done in May, 2019), then there would be an e-mail from him to an administrative assistant so authorizing.  *See* Discussion, *infra*, at pp. 12-16.

(v)     October 25, 2021.  The Debtor finally produces the original of the Notes.  HCMFA APP 815 (¶ 5).  This confirms that the signature of Mr. Waterhouse is not even an electronic signature, but rather a .jpg image of his signature affixed to the Word version (not even the .pdf version) of the Notes.  *See* Discussion, *infra*, at pp. 20-21.

(vi)    October 27, 2021.  HCMFA deposes Mr. Klos and Ms. Hendrix and learns that Ms. Hendrix affixed Mr. Waterhouse's signature to the Notes, apparently assuming that this was authorized, but without actual authority to do so.  No document authorizing Ms. Hendrix to so do has been produced.  *See* Discussion, *infra*, at pp. 19-23.  *See* HCMFA APP 815 (¶ 6).

5.     Through no fault of HCMFA, it was not until the completion of these depositions that HCMFA learned that Mr. Waterhouse did not sign the Notes and that he did not authorize his

---

[3]      "John, I also asked you for the Word versions of these notes so we could look at the properties, and you have not provided them.  Are you intending to?

MR. MORRIS:  No."

HCMFA APP 198 (146:12-17).

electronic signature to the Notes.  In that respect, discovery worked as it should, and HCMFA should now have the ability to amend its Answer accordingly.

### III.    BACKGROUND FACTS

**A.    THE NOTES, THE ADVERSARY PROCEEDING, AND HCMFA'S DEFENSE**

6.      On January 22, 2021, the Plaintiff filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "Complaint"), thereby initiating this Adversary Proceeding.  By the Complaint, the Debtor seeks to recover on two demand promissory notes allegedly issued by HCMFA (the "Notes") and signed by Frank Waterhouse ("Waterhouse"): (i) a note dated May 2, 2019 in the amount of $2.4 million; and (ii) a note dated May 3, 2019 in the amount of $5 million.

7.      Each of the Notes, in its body, defines "maker" as HCMFA.  On the signature pares, however, the Notes say:

**MAKER:**

_____
FRANK WATERHOUSE

8.      Mr. Waterhouse does not sign the Notes in any representative capacity, such as "Treasurer" or "Chief Financial Officer."  (Dkt. No. 1 at exh. 1 & 2).

9.      On May 22, 2021, HCMFA filed its *Defendant's Motion for Leave to Amend Answer* (Dkt. No. 32), and on July 2, 2021, the Court entered its *Order Granting Defendant's Motion to Amend* (Dkt. No. 45).  Accordingly, on July 6, 2021, HCMFA filed its *Defendant's Amended Answer* (Dkt. No. 48), asserting various affirmative defenses, including that Waterhouse did not have authority to execute the Notes on behalf of HCMFA and that, therefore, HCMFA did not sign the Notes.  (Dkt. No. 48 at pp. 5-7).

10.    The purpose of this prior amendment was to assert that the Notes were executed by mistake, which is also relevant to the present Motion.  Pursuant to a Shared Services Agreement, HCMFA contracted with the Debtor, for pay, for the Debtor to provide various valuation services to HCMFA as it advises various funds.  HCMFA APP 13-25.  The Debtor made a mistake relating to a valuation issue for one of those funds, Highland Global Allocation Fund, and specifically the valuation of TerreStar.  *Id*. 325-330 (273:10-278:13).  This mistake led to liability at HCMFA of $7.4 million.  *See id*.  It is HCMFA's position that this was the Debtor's liability under the Shared Services Agreement, as the Debtor breached the standard of care and its duties as specified in the agreement.  *See, e.g., id*. 18 (§ 6.01).  Soon thereafter, as HCMFA needed money (both to pay the remaining portion of that liability and to pay a $5 million consent fee to the investors of a fund), Highland transferred these sums ($7.4 million) to HCMFA.  *Id*. 334-35 (282:24-283:5).  This was done at the direction of Mr. Dondero, who believed that it was proper for Highland to transfer these funds to compensate HCMFA for Highland's valuation error, and not as a loan from the Debtor to HCMFA.[4]  HCMFA APP 334-35 (282:12-283:7).

11.    As detailed below, that is when the errors and assumptions began: The Debtor's (and HCMFA's) Chief Financial Officer, Frank Waterhouse ("Waterhouse"), perhaps assumed that, when Mr. Dondero told him to transfer the funds, it was a loan, even though Mr. Dondero never told him that it was a loan; the Debtor's controller, David Klos ("Klos"), when told to transfer the funds by Mr. Waterhouse, assumed that this was a loan and assumed that promissory notes should be prepared; and Kristin Hendrix ("Hendrix"), Mr. Klos' subordinate, prepared the Notes as instructed by Mr. Klos, and purported to electronically sign Mr. Waterhouse's name to

---

[4]    This is further evidenced because the source of the funds that the Debtor used to pay HCMFA came from funds paid into the Debtor by Mr. Dondero.  Clearly Mr. Dondero knew what was going on, and clearly he intended the subsequent transfer to be compensation.  Otherwise he could have just transferred funds to HCMFA directly.

DEFENDANT'S SECOND MOTION FOR LEAVE TO AMEND ANSWER AND BRIEF IN SUPPORT THEREOF—Page 5

the Notes.  All of these individuals, in the accounting group and not the legal group, simply assumed that funds flowing from the Debtor to HCMFA must be loans, and therefore that the loans must be "papered up" for accounting and audit purposes, as had been done many, many times in the prior fifteen years.

12.     The Debtor will point out instances where HCMFA carried the Notes as liabilities on its books and records.  There is evidence of that, but there is also evidence otherwise.  That is not conclusive, however, or even necessarily persuasive to the jury—of course the same accounting personnel who *assumed* that the transfers were loans would then carry the resulting (mistaken) Notes on the books and records.

**B.     WATERHOUSE'S DEPOSITION AND ADMISSION OF MISTAKE**

13.     As noted, Mr. Waterhouse signed the Notes as "maker."  Certainly, his signature does not indicate any representative capacity such as "treasurer" or as "CFO."  In the body of the Notes, "Maker" is defined as HCMFA.  Thus, there is ambiguity and, more importantly, *prima facie* liability for Mr. Waterhouse.

14.     Here, the Texas U.C.C. contemplates this potential and directly applies, providing as follows:

(1) If the form of the signature shows unambiguously that the signature is made on behalf of the represented person who is identified in the instrument, the representative is not liable on the instrument.

(2) Subject to Subsection (c), the representative is liable on the instrument to a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument if (i) the form of the signature does not show unambiguously that the signature is made in a representative capacity, or (ii) the represented person is not identified in the instrument. With respect to any other person, the representative is liable on the instrument unless the representative proves that the original parties did not intend the representative to be liable on the instrument.

TEX. BUS. & COMM. CODE ANN. § 3.402(b).   The comments to the U.C.C. explain with an

analogous situation:

> Case # 3. The name "Richard Roe" is written on the note and immediately below
> that name Doe signs "John Doe" without indicating that Doe signed as agent.
>
> In each case Doe is liable on the instrument to a holder in due course without notice
> that Doe was not intended to be liable. In none of the cases does Doe's signature
> unambiguously show that Doe was signing as agent for an identified principal. A
> holder in due course should be able to resolve any ambiguity against Doe.
>
> But the situation is different if a holder in due course is not involved. In each case
> Roe is liable on the note. Subsection (a). If the original parties to the note did not
> intend that Doe also be liable, imposing liability on Doe is a windfall to the person
> enforcing the note. Under subsection (b)(2) Doe is prima facie liable because his
> signature appears on the note and the form of the signature does not unambiguously
> refute personal liability. But Doe can escape liability by proving that the original
> parties did not intend that he be liable on the note. This is a change from former
> Section 3-403(2)(a).

U.C.C. cmt. 3.

    15.    Mr. Waterhouse was asked at length about his potential personal liability on the

Notes:

> Q.   Okay.  But back then when you signed this, did it ever cross your mind that
> you were the maker on these notes?
>
> A.   No.
>
> Q.   Back then when you signed this document, did it ever cross your mind that
> you could be a co-obligor on these notes?
>
> A.   No.  I didn't receive $7.4 million, I mean...
>
> <div align="center">*    *    *</div>
>
> Q.   So putting all other issues aside, if the law -- if the law says that you were
> liable for those notes because of how you signed them, then would you agree with
> me that these notes are a mistake?
>
> MR. MORRIS:  Objection to the form of the question.
>
> MS. DANDENEAU:  Objection to the form.

A.    Yes.

HCMFA APP 357-59 (305:16-307:4).

16.    Given that the law makes Mr. Waterhouse *prima facie* liable for the Notes, even though that was not his intention, the Notes are a mistake and Mr. Waterhouse admitted that they are a mistake.  More to the point however, Mr. Waterhouse testified extensively regarding whether he signed (or did not sign) the Notes.  This is important because, when HCMFA first interviewed Mr. Waterhouse regarding the Notes (once he was no longer prohibited by the Debtor from communicating with HCMFA regarding litigation matters), Mr. Waterhouse stated that, if the Notes bear his signatures, then he must have signed them as he did not use an electronic signature in May, 2019.  HCMFA APP 7 (¶ 23).  In other words, even though HCMFA had reason to believe that the Notes were a mistake, it had no reason at that time to believe that Mr. Waterhouse did not actually sign the Notes.

17.    This changed when HCMFA deposed Mr. Waterhouse on October 19, 2021.  The deposition began with Mr. Waterhouse repeatedly testifying that he did not recall signing the Notes, even though the signatures were his.  "I don't recall specifically signing this, but this is my signature."  HCMFA APP 193 (141:4-7).  In other words, as he had told HCMFA in April, 2021, given that the signature is his, he must have signed the Notes.  As detailed below, however, once Mr. Waterhouse reviewed the Notes and confirmed that they contain his electronic signatures, it became clear that he did not sign the Notes and, equally as importantly, that he did not authorize his electronic signature to the Notes.

18.    First, Mr. Waterhouse confirmed some background facts.  He confirmed that he, as the CFO for the Debtor and an officer of HCMFA, would not have had the authority on his own to cause the Debtor to lend, or HCMFA to borrow, $7.4 million [subject to objection].  Only Mr.

Dondero would have had that authority [subject to objection].  HCMFA APP 322-25 (270:18-273:9).  Mr. Waterhouse admitted that, as a result of the TerreStar valuation error, shareholders in funds advised by HCMFA had damages of between $7 and $8 million.  *Id*. 329-30  (277:7-278:13).  Mr. Waterhouse confirmed that Mr. Dondero told him to transfer funds from the Debtor to HCMFA:

> I testified earlier, that I had a conversation with Mr. Dondero for -- for these amounts attributable to – it was either the error -- you know, the error, and in that conversation he said, go get the money from Highland.

*Id*. 334-35 (282:24-283:5).

19.     Critically, Mr. Waterhouse could not remember if Mr. Dondero told him this was a loan.  *Id*. 336 (284:4-6).  Mr. Waterhouse did not remember if Mr. Dondero told him to have promissory notes prepared.  *Id*. 336 (284:18-20).   Regarding the genesis of the Notes, Mr. Waterhouse testified:

> Q. Okay. And would you have signed two promissory notes obligating HCMFA to pay Highland $7.4 million without Mr. Dondero's prior knowledge and approval?
>
> MS. DEITSCH-PEREZ:  Object to the form.
>
> A. You know, from -- from what I recall around these notes, you know, I don't recall specifically Mr. -- Mr. Dondero saying to – to make this a loan.  So my conversation with Mr. Dondero around the culmination of the NAV error as related to TerreStar which was a -- a – I think it was a year and a half process. I don't know, it was a multi-month process, very laborious, very difficult. When we got to the end, I had a conversation with Mr. Dondero on where to, you know, basically get the funds to reimburse the fund, and I recall him saying, get the money from Highland.
>
> Q. And so he told you to get the money from Highland; is that right?
>
> A. That is what I recall -- in my conversation with him, that is -- that is what I can recall.

HCMFA APP 196-97 (144:14-145:22).  Asked if he would disagree with Mr. Dondero that Mr. Dondero never told him to make the transfers loans, Mr. Waterhouse testified [subject to objection]: "all I recall is he said, get the money from Highland."  *Id*. 370 (318:3-10).  Continuing:

> And you don't remember discussing with Mr. Dondero what the terms of those two promissory notes should be?
>
> A. I don't recall -- I testified all I recall is he said, get the money from Highland. I don't -- the -- the terms of the note, I don't recall ever having a discussion around the terms of the note, but since I don't draft the notes, that -- there could have been a conversation with other people later.

*Id*. 371 (319:7-16).

20.     When asked whether it was possible that, "when Mr. Dondero told you to transfer the funds from Highland, you just assumed on your own that those would be loans without him actually telling you that those would be loans," Mr. Waterhouse testified [subject to objection] that "I don't know."  HCMFA APP 339 (287:4-13).  Asked again whether, seeing $7.4 million being transferred out of the Debtor, whether it is possible that he assumed this to be a loan, Mr. Waterhouse answered [subject to objection]:

> I don't know.  As I testified earlier, I had conversations with Mr. Dondero about - - about the -- the -- the moneys that were needed for the NAV error.  And I recall him saying go get it from Highland -- or get it from Highland.

*Id*. 340-41 (288:19-289:8).  In fact, Mr. Waterhouse confirmed that it was on his "initiative" to have the Notes drafted [subject to objection].  *Id*. 342 (290:4-16).  And, Mr. Waterhouse believed that the legal team would be involved with drafting the notes.  *Id*. 342 (290:15-16).

21.     Mr. Waterhouse did not recall if the Notes were presented to him on paper form to sign.  *Id*. 344-45 (292:14-293:17).  Mr. Waterhouse testified:

> I signed very few documents via email.  I can't say that it never happened, but people either stopped by my office and physically walked in documents for signature that we discussed face-to-face.

*Id*. 345-46 (293:25-294:5).  And, before signing documents, Mr. Waterhouse would usually have

the legal department or the compliance department sign off on the document.  *Id*. 346-348 (294:16-

296:7).  When asked again if he remembered signing the Notes, Mr. Waterhouse testified [subject

to objection]:

> They would -- they would have been presented physically on paper most likely or
> someone would have left it.  But, I mean, again, I don't -- I don't recall."

*Id*. 348 (296:8-18).  And, Mr. Waterhouse confirmed that, back then, he used an "ink pen" to sign

documents, as he told HCMFA in April, 2019.  *Id*. 348 (296:19-25).

   22.    When presented with the Notes and asked whether he believed that he ink-signed

them, Mr. Waterhouse answered:

> These -- these -- these signatures are identical, now that I stare at them, and I mean,
> they are so close -- I mean, they're identical that, I mean, even with my chicken
> scratch signature, I don't know if I can – you know, I do this 100 times, could I do
> that as -- as precisely as I see between the two notes.

*Id*. 350 (298:2-17).  Pressed further regarding whether he "actually signed either or both

notes":

> Is -- I don't -- I don't recall specifically.  As I said before, my assistant did have a
> -- an electronic signature, and that was used from time to time.  It wasn't as common
> practice back in 2019.  It definitely was more common practice when we had to
> work from home and remotely for COVID because it that made it almost impossible
> to, right, provide wet signatures since we're all working from home remotely.
>
> Q. Well, going just for these two promissory notes, Mr. Waterhouse, in light of
> your inability to remember any details, are you sure you actually signed either or
> both of those notes?
>
> MS. DANDENEAU: Objection to form.
>
> A. I don't recall specifically signing -- actually physically signing these notes.  As
> I said before, I don't recall doing that.  This -- this looks like my signature, but yet
> these two signatures are identical.
>
> Q. So you don't recall physically signing them, and I take it you don't recall
> electronically signing them either?

A. I don't recall.  You know, Highland has all my emails.  If that occurred, you know, you know, I don't have any of these records is what I'm saying.  I don' t have any of those records.

*Id*. 350-52 (298:300:4).

23.    Regarding the possibility that Mr. Waterhouse electronically signed the Notes, as

rare as that may have been in May, 2019, Mr. Waterhouse testified as follows:

And help me here.  I'm not very technologically astute.  When you -- and I – I recognize that you do it rarely, but when you sign a document electronically, do you believe that there is an electronic record of you having authorized or signed a document electronically?

MR. MORRIS:  Objection to the form of the question.

I -- I don't know the tech answer to that, but, you know, since I don't have – I don't ever attach my signature block electronically, my assistant would have done that, and if that is done over email like we did several times -- you know, multiple, multiple times over COVID, she would attach my signature block and then email it out to whatever party.

 Q.    What was your assistant's name in May 2019?

 A.    It was Naomi Chisum.

 Q.    Is she the only one?  I'm sorry, was she your only assistant that would have maybe facilitated logistically something like you just described?

A.    You know, she was out on maternity leave at some point.  I don't -- I don't recall those dates where she was out for maternity leave.  There was -- there were folks backing her up.  I don't recall specifically who those -- who those, you know, administrative assistants were, and I don't recall specifically if she was out during this time on maternity leave.

*Id*. 372-73 (320:11-321:20).

24.    Aside from providing valuable testimony regarding the genesis of the Notes, for

purposes of the present Motion Mr. Waterhouse testified: (i) that he does not remember signing

the Notes in person or electronically; (ii) he rarely signed documents in May, 2019 electronically;

(iii) he would have expected that documents he signed were approved by the legal department; (iv)

the Notes strongly appear to be signed electronically; and (v) if signed electronically, he would

have sent an e-mail authorizing the same.  Interestingly, he also testified that it would have been his "assistant" to sign his name electronically; not Ms. Hendrix, a mid-level manager and not an "administrative" assistant.

25.     No such e-mail authorizing Mr. Waterhouse's electronic signature has been produced by the Debtor.  HCMFA APP 815 (¶ 6).

**C.    MR. KLOS' DEPOSITION AND CREATION OF THE NOTES**

26.     HCMFA deposed Mr. Klos on October 27, 2021.  In May, 2021, Mr. Klos was the controller for the Debtor.  HCMFA APP 661 (8:11-13).  It is Mr. Klos who directed Ms. Hendrix to prepare the Notes.  *Id*. 721 (68:4-13).  Mr. Klos discussed how funds would be transferred from one affiliated entity to another as needed for liquidity:

> And you joined Highland in 2009. From that point in time, 2009, through 2019, was there any practice at the enterprise of those businesses to transfer funds between each other on a basis of when one needed it and one had it?
>
> A. Yes, that was a fairly, generally speaking, that was a fairly common practice, of using different entities within the overall structure to bridge liquidity.

*Id*. 682-83 (29:24-30:7).  Klos also testified as to the standard practice that, where the Debtor was transferring funds out, the transfer would be booked as a loan:

> So over the general -- talking about generally now, over those 10 years when there were these intercompany transfers for liquidity purposes, how were they booked by the debtor, by Highland Capital Management?
>
> MR. MORRIS: Objection to the form of the question.
>
> THE WITNESS: Help me on the direction. So this is money that Highland is receiving or money that Highland is sending?
>
> Q. (BY MR. RUKAVINA) Sending out.
>
> A. Sending out. So this is -- in the scenario that you're describing, this money that Highland is sending out to meet some other corporate obligor's liquidity needs?
>
> Q. Yes, sir.

A. So those would be booked as a loan. I would -- I need to hedge a little bit because I'm not a hundred percent certain, but I would say if not exclusively via loans close to exclusively.

Q. And would they -- strike that.  Would they usually be papered up with a promissory note?

A. Yes.

Q. Now, why was that the general course during 10 years? Was there a policy and procedure in place, or would Dondero say book it as a loan, or was that just the right thing to do from an accounting perspective?

MR. MORRIS: Objection to the form of the question.

THE WITNESS: At the end of the day it's at the direction of Jim Dondero, so I can't tell you exactly why he wanted it to be done that way. But that was certainly the practice of how it was done in those situations.

*Id*. 685-87 (32:20-34:5).

27.      Thus Mr. Klos believed that the underlying transfers were loans, in part because he believed that Mr. Waterhouse would have told him that (but could not recall for certain), and in part because of past practice.  *Id*. 722-23 (69:1-70:14).  Mr. Klos described the usual course at the Debtor with respect to papering intercompany loans:

Q. (BY MR. RUKAVINA) So going back to this Exhibit 3, sir, why did you ask Kristin, can you or Hayley please prep a note for execution? Why them? Remember, I was asking about what the course or procedure was at that point in time.

A. Yeah, so nomenclature, procedure, process. I would say the informal process for these types of loans, they were frequent in nature, would be for someone on the corporate accounting team to prepare a note and have it executed.

Q. Okay. That was the standard course back then?

A. Again, I don't know what standard course means. That was fairly typical.

Q. Why would you not have asked someone in the Highland legal department to prepare a note?

A. Because this was a legally reviewed document as far as the form of the agreement. It's a one-page, two-paragraph form that had been used for a long time.

So the only thing that would change with respect to these notes would be the date, the amount, likely the rate. I can't think of anything else offhand that would have changed from note to note.

Q. After you asked Ms. Hendrix to prepare this note, did you have any further role with respect to the papering, preparation, or execution of that note?

A. Not that I can remember.

Q. Would you have had any role in having either or both of the notes actually signed electronically or by ink by Mr. Waterhouse?

A. Likely not, no.

*Id*. 736-37 (83:19-84-24).

28.     The point is simple: when professional accountants at the Debtor saw funds flowing from the Debtor to an affiliate, such as HCMFA, they *assumed* that the funds were a loan and papered it as such, as this is how it had been done for many years on many occasions.

**D.     MS. HENDRIX'S DEPOSITION AND LACK OF AUTHORITY TO SIGN THE NOTES**

29.     HCMFA deposed Ms. Hendrix on October 27, 2021.  In May, 2019, Ms. Hendrix was the senior accounting manager at the Debtor.  HCMFA APP 461 (12:4-16).  At that time, she reported to Mr. Klos, who reported to Mr. Waterhouse.  *Id*. 461-62 (12:25-13:9).  While Ms. Hendrix never drafted a promissory note from scratch, in May, 2019, part of her job was taking a form note and revising it.  *Id*. 466 (17:5-11).  At that time, it was the corporate accounting group at the Debtor, not the legal group, that was responsible for updating draft promissory notes so as to create new ones.  *Id*. 466 (17:20-25).  As Ms. Hendrix testified:

Our typical practice is if we have a loan with certain affiliates that it's a demand note. We have a template that we have used for years that was created by either our internal legal team or an outside law firm, I'm not sure which.  The typical practice is always updating a few things on that template, getting it executed, and filing it in our audit folders.

*Id*. 467 (18:18-25).  The corporate accounting group, not the legal group, did this "updating."  *Id*. 468-69 (19:1-13; 20:1-5).  And Ms. Hendrix confirmed the general purpose of the intercompany notes:

> Typically anytime specifically Jim Dondero would need to move money between related parties, he would pay down -- when I say him, he would have us in corporate accounting move money around, pay off notes, reissue new notes somewhere else. So a way to move money around between his entities.

*Id*. 470 (21:10-16).  Stated differently, at that time "it's all one big happy family, and whoever needed cash, the cash moved around."  *Id*. 472 (23:3-6).

30.     In May, 2019, Mr. Klos sent one or two e-mails to Ms. Hendrix—emails on which Mr. Waterhouse but not Mr. Dondero or the legal department were copied—informing her that there were new intercompany loans and asking her to prepare notes for execution.  *Id*. 481-82 (32:13-33:4).  This instruction comported with the general practice:

> So is it fair to say that typically, obviously not every time, but typically your corporate accounting group when it would see intercompany transfers in large amounts would believe that they were loans?
>
> MR. MORRIS: Objection to the form of the question.
>
> THE WITNESS: Typically they were loans.  There's not really another way to get money from one entity to another.  And if they were papered as a loan, that means we were told to set it up that way.

*Id*. 484 (35:5-15).  That is "how it was for 14 or 15 years."  *Id*. 485 (36:7-9).

31.     Ms. Hendrix confirmed that the $2.4 million Note was "related to a TerreStar NAV error" and the $5 million Note was for the "consent fee."  *Id*. 487-88 (38:17-39:5).  Ms. Hendrix was never "told to [her] directly" that the funds were a loan, but she [subject to objection] "assum[ed] that based on many instances of intercompany transfers in the 14 years prior."  *Id*. 489 (40:20-25).

---

32.     Ms. Hendrix confirmed that she prepared the Notes from Word documents originally created by outside counsel.  *Id*. 491 (42:15-43:20).  However, Ms. Hendrix had no memory of papering the Notes.  *Id*. 494 (45:21-46:1).  It would have been her practice to not consult the legal group in preparing the Notes.  *Id*. 495 (46:12-24).  Ms. Hendrix confirmed that, to sign Mr. Waterhouse's name to the Notes, she used an electronic picture of his signature, which she then affixed to the Word documents, the same as the undersigned counsel does below:



33.     On the question of whether Mr. Waterhouse authorized Ms. Hendrix to affix his signature to the Notes, Ms. Hendrix testified "I don't have exact specific memory." *Id*. 497 (48:10-15).  Again, she appears to have assumed that Mr. Waterhouse must have approved the Notes and, therefore, her using his signature:

> He was fine with using his e-signature, and what is on these documents was that exact e-signature.

<center>*     *     *</center>

> But he would have had to approve this loan in the dollar amount, the day. He would have been the one directing us to create these loans.  In past practice he has always approved using his e-signature to execute documents.

*Id*. 497(48:4-18).  When pressed about *how* Mr. Waterhouse would have authorized his electronic signature to be used, Ms. Hendrix testified as follows [subject to objection]:

> I would assume that, as I've stated previously, these directions were coming directly from him to paper a loan.  These changes that are made are only to the dollar amount.  Interest rate is pulled right off the IRS website.  That is his approval to paper a loan and in fact execute or approve the loan.

*Id*. 497-98 (48:24-49:5).

---

34.     Then, when asked [subject to objection] "after his e-signature was used either on these notes or other documents in May of 2019, would you have brought the documents back to him for any kind of verification," Ms. Hendrix testified:

> Probably not.  These are all very standard.  We've papered hundreds of loans.  So I think he trusted that we can handle updating a date and a dollar amount on these loan templates.

*Id*. 499 (50:1-9).

35.     Ms. Hendrix also testified [subject to objection], differently from Mr. Waterhouse, that "[p]robably at this time, 99 percent of the stuff my team got his signature on was his e-signature."  *Id*. 498 (49:12-16).  And, the following exchange is significant:

> Q. (BY MR. RUKAVINA) Do you know or believe, or your recent review of documents, did it reveal an email from Mr. Waterhouse to you specifically authorizing his e-signature on Exhibits 4 and/or 5?
>
> A. Not that I recall seeing, no.
>
> Q. Sitting here today, do you have any memory of Mr. Waterhouse orally or otherwise specifically authorizing you to affix his e-signature to Exhibits 4 and/or 5?
>
> A. Specifically on these loans, no, I don't recall those conversations.  But, again, our practice has always been we have this discussion, he's under the understanding that we're going to paper the loans, he's always comfortable with using his e-signature.  This is not something me or my team would have done without that authority and approval from him.

*Id*. 499 (50:15-25).

36.     And, there is no evidence that Ms. Hendrix ever showed the Notes to Waterhouse after preparing them:

> Q. Sitting here today, do you have any memory of giving Mr. Waterhouse these two promissory notes after they were prepared?
>
> A. I specifically don't remember walking into his office and providing it to him, but he could have found it on our shared drive if he wanted to.

Q. Do you have any memory or in your recent review of documents did you see any email to the effect of you sending either or both of these promissory notes to Mr. Waterhouse after they were papered up?

A. I don't have any specific recollection, again, but he had access to look at them.

Q. On the shared drive?

A. Yes.

*Id*. 503 (54:4-17). Scanning in the Notes and then saving them to the system, is hardly a substitute for showing or giving them to the man who is personally liable on them to the tune of $7.4 million.

37.    Ms. Hendrix *assumed* that the transfers were loans and *assumed* that Mr. Waterhouse authorized her to affix his signature to the Notes because she *assumed* that he approved of the Notes.  But her testimony directly conflicts with his: whereas he testified that he rarely used electronic signatures in May, 2019, and would have had to send an e-mail authorizing the same, and would have expected that the legal department would approve a note prior to his signature, she testified that he routinely did this at that time pursuant to some generalized authority and that the accounting department routinely papered notes.

38.    The fact remains that, notwithstanding her good faith, Ms. Hendrix created erroneous notes (as they appear to make Mr. Waterhouse the "maker" and to make him jointly and severally liable), and she was not authorized—at least there is no evidence that she was authorized—to affix images of Mr. Waterhouse's signature to the Notes or, if there was some generalized authority that she believed Mr. Waterhouse gave her, then the condition precedent— that the legal department approve the Notes—was not satisfied.

## IV.    ARGUMENTS AND AUTHORITIES

39.    This Motion is necessarily driven by the facts; hence the lengthy discussion of recent discovery proceedings above.  From those facts, the following sequence emerges:

(i)     Mr. Dondero told Mr. Waterhouse to transfer the fuds, and Mr. Waterhouse does not recall Mr. Dondero telling him that this was a loan, perhaps assuming this to be the case.

(ii)    Mr. Waterhouse told Mr. Klos to process the transfers, and perhaps he also told him that the funds are a loan.  Either way, pursuant to standard practice, Mr. Klos believed that the funds were a loan and instructed others to paper up the Notes, without any instruction from Mr. Dondero that the transfers were a loan.

(iii)   Ms. Hendrix then, again pursuant to standard practice, took an old form for a note and populated it with new details and created the Notes.

(iv)    Mr. Waterhouse did not sign the Notes.  Instead, Ms. Hendrix affixed pictures of his signature on the Notes.  She did not then provide the Notes to him.

(v)     There is no evidence that Mr. Waterhouse authorized Ms. Hendrix to do so.  Neither Mr. Waterhouse nor Ms. Hendrix remembers any such express authorization. Moreover, Mr. Waterhouse confirmed that, if he authorized an electronic signature, he would have e-mailed such authority to his administrative assistant.  Ms. Hendrix was not his administrative assistant.  And, Mr. Waterhouse confirmed that he would only sign a note if the legal department approved the note, which did not occur here.

40.     HCMFA therefore submits that Ms. Hendrix, in good faith and acting pursuant to an established course and pattern, was not authorized to affix Mr. Waterhouse's signature to the Notes.  Instead, she *assumed* that, as Mr. Waterhouse had authorized the Notes, she was authorized to sign them for him.  And, despite Mr. Waterhouse's expectations, none of this went through the legal department.  Hence the result, where Mr. Waterhouse signed as "maker" and is *prima facie* jointly liable, something that he confirmed was a mistake.  But it is the same note—if that is a mistake, then so is the whole note.

41.     Importantly, the Scheduling Order does not provide for a deadline to seek leave to amend the operative pleadings.  *See* Docket No. 67.  This means that, unlike the heightened "good cause" standard under Rule 16, the more lenient standard of Rule 15 applies to this Motion.   That rule provides that "[t]he court should freely give [leave] when justice so requires."  FED. R. CIV. P. 15(a)(2).  The Court must "possess a 'substantial reason' to deny a request for leave to amend." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004).  The Fifth Circuit has outlined five

"considerations" guiding the Rule 15 inquiry: "1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment." *Id*.

42.     There has been no undue delay.  As discussed above and evidenced with the Appendix, HCMFA did not know that Mr. Waterhouse did not sign the Notes until his deposition, as he had previously told HCMFA that he assumed he must have signed the Notes since the Notes bear his signature.  It is the Debtor who delayed in producing the original Notes, requested in May, 2021, until late October, 2021, going so far as to even say that it would not produce the originals on October 19, 2021 (a decision which, to its credit, it subsequently reversed).  Had the Debtor produced the originals in May or June, as requested, it would have been obvious that the signatures were electronic signatures, and perhaps HCMFA would have reasonably questioned any authority to sign, but this did not happen due to the Debtor' delay.  And, it was not until HCMFA deposed Mr. Waterhouse, Ms. Hendrix, and Mr. Klos that the facts were learned.  There is nothing that HCMFA could have done to expedite this process.  On the contrary, discovery worked as it should have.

43.     There is no bad faith or dilatory motive.  All of HCMFA's defenses are made in good faith and are supported by the evidence.  That evidence may be subject to dispute and to contradictory evidence, but then that is the point of a trial.  Certainly, there is enough testimony and evidence to support the defense that Mr. Waterhouse did not sign the Notes or authorize their signing.  Nor is HCMFA trying to "weasel" its way out of a debt: the Debtor, through its negligence, caused a $7.4 million liability to HCMFA.  It was just and proper for the Debtor to compensate HCMFA, which it did.  None of this is "invented" after the fact or presented in bad faith.

44.     There are no repeated failures to cure deficiencies.  True, this is the second motion to amend the answer.  But, the first motion was necessitated by the simple fact that HCMFA did not have access to its books and records (then still under the control of the Debtor), and the Debtor had prohibited its employees, including Mr. Waterhouse, from discussing litigation matters with HCMFA.  In many ways, that first motion should not have to count against HCMFA.  Either way, for the same reasons as discussed above with respect to timing, HCMFA did not know and could not have known about this defense until the end of October, 2021, meaning that there was no prior "deficiency" to now cure.

45.     There is no undue prejudice to the Debtor.  Trial is not set.  All of the people with knowledge of the Notes have been deposed, and if the Debtor needs additional discovery, then it can readily take it.  The Debtor certainly believes that it already has strong arguments as to why HCMFA's defenses have no merit, as it will no doubt present in opposition to this Motion.  And, as the Debtor has had possession of the originals of the Notes all of this time, and as Ms. Hendrix and Mr. Klox are still the Debtor's employees, as was Mr. Waterhouse through February, 2021, none of what is stated in this Motion should come as a surprise to the Debtor, as much as the Debtor may disagree with HCMFA's position and arguments.

46.     Finally, the amendment is not futile.  Texas law provides for a recognized defense when a promissory note is not signed.  *See* TEX. BUS. & COMM. CODE ANN. § 3.401(a).

47.      Mr. Waterhouse, Mr. Klos, and Ms. Hendrix have each given testimony that raises serious doubt regarding whether Mr. Waterhouse actually signed the Notes or authorized his electronic signature—something that the Court cannot adjudicate at this stage.  The Debtor will have every opportunity to argue at trial why the defense is wrong, and it will have every opportunity to present its evidence.

---

DEFENDANT'S SECOND MOTION FOR LEAVE TO AMEND ANSWER AND BRIEF IN SUPPORT
THEREOF—Page 22

48.    Accordingly, as no substantial reason exists to deny the amendment, and the interests of justice support freely granting leave, the Court should grant leave to the Defendant to amend its Answer.

<div align="center">

**V.    PRAYER**

</div>

WHEREFORE, PREMISES CONSIDERED, HCMFA respectfully requests that the Court enter an order: (i) granting this Motion; (ii) granting HCMFA leave to file the Amended Answer attached hereto as Exhibit "A"; and (iii) granting HCMFA such other and further relief to which it may be justly entitled.

RESPECTFULLY SUBMITTED this 30th day of November, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that he discussed the relief requested herein with John Morris, Esq., counsel of record for the Debtor, who informed the undersigned that the Debtor opposes said relief.

/s/  Davor Rukavina
Davor Rukavina

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 30th day of November, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on the Plaintiff through its counsel of record.

/s/  Davor Rukavina
Davor Rukavina

# EXHIBIT 218

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03005 |
| | § | |
| NEXPOINT ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

## <u>DECLARATION OF DENNIS C. SAUTER, JR.</u>

I, Dennis C. Sauter, Jr., hereby swear under oath and penalty of perjury pursuant to the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

---

DECLARATION OF DENNIS C. SAUTER, JR.—Page 1

## I.   <u>INTRODUCTION</u>

1.      My name is Dennis C. Sauter, Jr.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.  I have personal knowledge of the facts stated in this Declaration, or such facts are known to me from my review of the books and records of Highland Capital Management Fund Advisors, L.P. ("<u>HCMFA</u>") and/or NexPoint Advisors, L.P. ("<u>NexPoint</u>").

2.      I am an attorney licensed to practice law in the State of Texas, and have been such since 2001.  I am in-house counsel for both HCMFA and NexPoint, and have been since at least January 1, 2021, which is why I am aware of both of these adversary proceedings.  I have been responsible for managing outside counsel in both of these adversary proceedings since their filing, and I remain so responsible.

3.      While I provided limited legal services to Highland Capital Management, L.P. (the "<u>Debtor</u>") and its affiliated entities as outside counsel before I became in-house counsel, those services were limited to real estate transactions having nothing to do with the facts discussed in this Declaration.

4.      I am executing this Declaration in Support of the motions of both HCMFA and NexPoint to amend their answers in the above styled and numbered adversary proceedings initiated by the Debtor.

5.      I am aware that both HCMFA and NexPoint previously sought and obtained permission to amend their answers in these adversary proceedings.  Nevertheless, due to very recent events and discovery, HCMFA and NexPoint have determined that it is advisable to again amend their answers to assert certain defenses or affirmative defenses, which should by now have become clear to the Debtor as a result of very recent discovery, in order that justice may be done, that they may assert all available defenses and affirmative defenses, and that the trier of fact in

DECLARATION OF DENNIS C. SAUTER, JR.—Page 2

these adversary proceedings will have all relevant claims, defenses, and facts before it. Specifically:

(i)     HCMFA seeks to explicitly assert that Frank Waterhouse ("Waterhouse") did not sign the two promissory notes that the Debtor has sued HCMFA on in adversary proceeding no. 21-03004; and

(ii)    NexPoint seeks to explicitly assert that it had prepaid the promissory note in question in adversary proceeding no. 21-03005 and that, accordingly, the December 31, 2020 payment had been satisfied by prepayment.

## II.     BACKGROUND

6.      HCMFA and NexPoint are registered advisors under the Investment Advisors Act of 1940.  As such, they advise various independent funds which, in turn, are investment vehicles for a large number of investors.

7.      HCMFA and NexPoint have always had very few employees.  During 2019, for example, HCMFA had only 7 to 9 employees.

8.      Instead, most of the services needed by HCMFA to transact its business were provided by the Debtor pursuant to that certain *Second Amended and Restated Shared Services Agreement* dated February 8, 2013 (the "HCMFA Agreement"), a true and correct copy of which is attached hereto as Exhibit 1, while most of the services needed by NexPoint to transact its business were provided by the Debtor pursuant to that certain *Amended and Restated Shared Services Agreement* dated January 1, 2018 (the "NexPoint Agreement," with the HCMFA Agreement, the "Shared Services Agreements"), a true and correct copy of which is attached hereto as Exhibit 2.

9.      This was standard business practice for the Debtor and various other affiliated companies, including other advisers, within the Debtor's "complex" of business: the Debtor would

DECLARATION OF DENNIS C. SAUTER, JR.—Page 3

HCMFA APP 0003

employ most of the employees and then share those employees with HCMFA, NexPoint, and other "complex" entities, in exchange for payments by such entities.

10.     Thus, under the Shared Services Agreements, employees of the Debtor (many of whom were highly trained and specialized) provided many key services to HCMFA and NexPoint on an as-needed basis.   These services included legal, accounting, treasury, regulatory, compliance, IT, and tax services, among others.   Additionally, under the Shared Services Agreements, the Debtor provided critical electronic infrastructure to HCMFA and other "complex" entities, such that the books and records, and e-mail communications, of HCMFA were actually stored on the Debtor's servers.

11.     On January 22, 2021, the Debtor filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "HCMFA Complaint") against HCMFA, seeking to recover on two alleged promissory notes, each dated May 2, 2019 (the "HCMFA Notes"): (i) a note for $5 million; and (ii) a note for $2.4 million.  HCMFA timely answered.

12.     On January 22, 2021, the Debtor also filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "NexPoint Complaint," with the HCMFA Complaint, the "Complaints") against NexPoint, seeking to recover on an alleged promissory note dated May 31, 2017 in the original principal amount of $30,746,812.33 (the "NexPoint Note," with the HCMFA Notes, the "Notes").  NexPoint timely answered.

13.     At the time that the Debtor filed the Complaints, I promptly undertook an internal review of the background facts concerning the Notes.  I had no knowledge of them, since I had not been employed by HCMFA or NexPoint at the time that they were allegedly executed, and the few direct employees of HCMFA and NexPoint likewise had limited knowledge of the Notes.  I also discussed the Notes with James Dondero, president of HCMFA and NexPoint, and formerly the CEO of the Debtor, and Mr. Dondero recalled only high-level details of the Notes.  My review of

---

DECLARATION OF DENNIS C. SAUTER, JR.—Page 4

the limited books and records of HCMFA and NexPoint that were not then in the possession of the Debtor did not reveal any background facts regarding the Notes.

14.     Normally, I would have discussed the Notes with employees of the Debtor who also provided services to HCMFA and NexPoint pursuant to the Shared Services Agreements in order to assess what defenses or affirmative defenses to the Complaint existed.  However, in this instance I was precluded from doing so.

15.     First, attached hereto as Exhibit 3 is a true and correct copy of an e-mail exchange between myself and Mr. James Seery dated September 17, 2020.  Mr. Seery was and remains the Chief Executive Officer of the Debtor.  As stated in Exhibit 2, Mr. Seery informed me that Debtor employees had been instructed not to discuss with me anything that is "inimical" to the interests of the Debtor, and that they would be terminated if they did so.  This e-mail communication comports with other communications between myself and Mr. Seery where he cautioned me not to discuss with Debtor employees matters that may be adverse to the Debtor.

16.     Second, by the time of the filing of the Complaints, the Court had entered a preliminary injunction against Mr. Dondero, a true and correct copy of which is attached hereto as Exhibit 4.  That injunction prohibited Mr. Dondero from "directly or indirectly . . . communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided."  As the information concerning the Notes was background information and not related to "services currently provided," I was concerned that, if I discussed the Notes with the Debtor's employees, the Debtor would argue that either Mr. Dondero or I was violating the Court's injunction.

17.     In sum, after the Complaints were filed, the employees of HCMFA or NexPoint knew very little about the Notes, and I was precluded from contacting the people that would have known information about the notes, *i.e.* the Debtor's employees, to discuss what they may have

---

DECLARATION OF DENNIS C. SAUTER, JR.—Page 5

known.  I also had very limited access to HCMFA's and NexPoint's books and records, and, even if I had had full access, I would not have known what relevant books and records to search for in the many millions of files without first obtaining a generalized background of the facts regarding the Notes from Debtor employees.

18.     The situation changed by mid-April, 2021.  As of late February, 2021, the Debtor terminated the Shared Services Agreements and terminated most of its former employees.  Many of those employees then formed their own company, Skyview Group, which then contracted with HCMFA and NexPoint to continue providing essentially the same services that they had previously provided under the Shared Services Agreements.  Additionally, the Debtor provided access to HCMFA and NexPoint to many of its books and records (although not all).  Thus, as of March, 2021, I was able to communicate with most former Debtor employees and to access many books and records without fear of violating any court order.

19.     March, 2021, was exceedingly busy, to say the least.  With the termination of the Shared Services Agreements, HCMFA, NexPoint, other entities for which I am in-house counsel, and I were preoccupied with transitioning the services that the Debtor had been providing for more than a decade to a new entity, using new infrastructure, moving into new offices, setting up new networks, etc., all for the primary goal of ensuring a smooth and uninterrupted continuity of business and services provided by HCMFA and NexPoint and others to third parties.

20.     By mid-April, 2021, the situation had calmed down to the point that I was able to discuss the Notes with former employees, most importantly Waterhouse and Will Mabry ("Mabry").  Mabry in particular was able to provide me internal documents and memoranda that I had not previously known about to that helped with the factual background of the Notes.

21.     From these discussions and documents, I was able to better understand the factual background concerning the HCMFA Notes, ultimately concluding at the time that the Notes were

signed by mistake by Waterhouse without authority from HCMFA, had no consideration, and were never intended to be debt instruments of HCMFA. I testified as to these matters before based on my understanding, and HCMFA obtained leave to amend its answer to assert these defenses.

### III.    FACTS PERTINENT TO HCMFA

22.    With respect to the HCMFA Notes, those notes appear to be signed by Waterhouse. At the time of those alleged Notes, Waterhouse was the Chief Financial Officer of the Debtor. At that time, he was also either the Chief Financial Officer, or Treasurer, of HCMFA (either way, an officer level position at HCMFA).

23.    In the April, 2021 timeframe, when I discussed the HCMFA Notes with Waterhouse, I asked him whether he had signed those two notes. At that time, he told me that he believed that he had, because he had not been electronically signing documents in May, 2019 and the signatures on the notes looked like they were his. Although he did not remember many, if any, of the facts and circumstances concerning the HCMFA Notes, given that he told me that he believed he signed those notes because the signatures looked like they were his and because he signed a lot of documents and could not remember each one particularly, I did not have reasonable grounds to believe that Waterhouse had not in fact signed the HCMFA Notes or authorized his signature to be affixed to the HCMFA Notes. And, I was not prepared to assert a defense in which I did not have a good faith belief.

24.    This changed in late October, 2021. On October 19, 2021, the Debtor and HCMFA deposed Waterhouse, including in connection with the HCMFA Notes. In that deposition, and among other things, Waterhouse testified that (and I am paraphrasing): (i) he did not remember signing the HCMFA Notes or giving anyone permission to sign his name to the same; (ii) his signatures on the HCMFA Notes appeared to be electronic signatures; and (iii) in May, 2019, he

---

DECLARATION OF DENNIS C. SAUTER, JR.—Page 7

sometimes signed documents electronically, but if he did so, he would have sent an e-mail to Kristen Hendrix ("Hendrix") authorizing and instructing her to sign his name to a document.

25.     Although I understand that HCMFA had requested the originals of the HCMFA Notes previously from the Debtor in discovery, I understand that those native documents were not produced until October 25, 2021.  I understand that, when produced, those originals showed that Waterhouse's signature was indeed an electronic signature on both of the HCMFA Notes and, unlike various electronic signatures that employ some control process or matrix certifying authenticity, here both signatures were merely pictures of his signatures.  Indeed, one can copy and paste that same picture on to any document without any control or approval needed by Waterhouse, as I do below (below is the picture copied from the HCMFA Notes, originally in Word with the signature picture in "picture" format, probably .jpg).

26.     Then, on October 27, 2021, HCMFA deposed Hendrix.  In that deposition, and among other things, Hendrix testified that (and I am paraphrasing): (i) she prepared the HCMFA Notes from a Word document template, by inputting various details into the document and adding Waterhouse's signature picture; (ii) she does not remember Waterhouse authorizing her to affix his signature, although she believes that this was likely the case; (iii) she does not remember printing out the documents and presenting them to Waterhouse for approval or signature; and (iv) she does not remember whether the HCMFA Notes were printed out at all or if they were simply saved in their original electronic format on the Debtor's system.

27.     Importantly, Hendrix remained an employee of the Debtor after the Debtor terminated most employees around February, 2021.  Thus, neither I nor anyone else with HCMFA or NexPoint was able to talk to her directly regarding the Notes, and neither I nor, to my

---

DECLARATION OF DENNIS C. SAUTER, JR.—Page 8

knowledge, anyone else working with or for HCMFA or NexPoint did so.  In other words, her deposition was the first time that HCMFA and NexPoint learned what she had to say of relevance to the Notes.

28.     Additionally, as noted above, Waterhouse testified that, if he had authorized Hendrix or someone else to electronically sign his name to a document, he would have done so through an e-mail.  I understand from Munsch Hardt that the Debtor has produced no such e-mail in discovery.

29.     Therefore, HCMFA now believes that Waterhouse never in fact signed the HCMFA Notes or authorized Hendrix or anyone else to sign his name to the HCMFA Notes, and HCMFA finds it advisable and appropriate to amend its answer to explicitly assert this defense.

30.     HCMFA did not know, and could not reasonably have known, about this defense until the end of October, 2021, after the Hendrix deposition transcript was prepared.  HCMFA did not delay in any way in seeking to assert this defense.  As noted above, had Waterhouse not told me in April, 2021 that he assumed that he signed the HCMFA Notes because the signatures looked like his, or had he given me any indication that he had not in fact signed the HCMFA Notes, then HCMFA would have asserted this defense sooner.  As is, however, it was not until discovery in late October, 2021 that HCMFA learned that Waterhouse apparently did not sign the HCMFA Notes or authorize his electronic signature, and HCMFA did not delay thereafter in promptly seeking to amend its answer.

31.     HCMFA therefore respectfully requests leave to amend its answer to expressly plead that the HCMFA Notes were never in fact signed.

## IV.    FACTS PERTINENT TO NEXPOINT

32.     The NexPoint note was in the original principal amount of $30,746,812.33.  The note required an annual payment of principal and interest.  By December 31, 2020, the amount due

---

DECLARATION OF DENNIS C. SAUTER, JR.—Page 9

on the NexPoint note was approximately $24,471,804.98.  Thus, even though the NexPoint Note was dated May 31, 2017 and had a thirty (30) year amortization, meaning that there should have been only three (3) annual payments by December 31, 2020 (2017, 2018, and 2019), the amount of the NexPoint Note was significantly lower than it should have been.

33.    This was one of the issues I discussed with Waterhouse in April, 2021 when I was able to finally discuss the Notes with him.  In particular, I asked him why the amount due on the NexPoint Note was significantly less than it appeared that it should have been based on its original principal amount and annual payments.  Waterhouse did not know the answer to that question, but informed me that the payment ledger kept by the Debtor for that note should have the answer.

34.    Like HCMFA, NexPoint deposed Hendrix on October 27, 2021.  During that deposition, it was learned that a document the Debtor produced, bates-labeled D-NNL-029141, was the internal Debtor-maintained payment ledger for the NexPoint Note.  The Debtor had produced this document before, in early June, 2021, but there were two problems: (i) NexPoint did not know that this document was *the* payment ledger for the NexPoint Note; and (ii) NexPoint had no context or ability to know what the entries on the document meant.

35.    Indeed, Mr. James Seery, at his deposition on October 19, 2021, while confirming that the Debtor did maintain a payment ledger for the NexPoint Note and that the Debtor had produced the same, was unable to state whether document D-NNL-029141 was that ledger and, in fact, testified as to his belief that this document "is something else."  If the CEO and CRO of the Debtor was unsure what document D-NNL-029141 was, then NexPoint cannot reasonably be expected to know that that document was the official payment ledger until the October 27, 2019 deposition of Hendrix.  Indeed, it was the Hendrix deposition that confirmed the existence of the prepayment defense because Hendrix testified that (I am paraphrasing): (i) if the Debtor needed

---

cash, then one of its affiliates, such as NexPoint, would transfer the Debtor funds; (ii) this occurred in 2019; and (iii) such transfers would have been recorded by the Debtor as prepayments.

36.     NexPoint believes that that ledger proves that NexPoint had in fact prepaid the December 31, 2020 obligation under the NexPoint Note, such that there was no failure by NexPoint to make that payment and therefore no grounds to accelerate the NexPoint Note.  That also explains why the principal amount of the NexPoint Note was significantly less than it would have been without prepayments.

37.     NexPoint did not delay in seeking to expressly assert this prepayment defense.  The payment ledger was a document of the Debtor that, prior to discovery, NexPoint did not have access to and, in fact, was prohibited by the Debtor from even trying to access.  Once that document was produced by the Debtor in discovery, NexPoint used it at the appropriate depositions which, for scheduling reasons and by the agreement of the parties, did not occur until late October, 2021. As soon as logistically possible thereafter, NexPoint sought to assert this defense.  While NexPoint questioned why the amount due on the NexPoint Note was significantly less, and while I personally sought an answer from Waterhouse (who did not know), that does not necessarily mean that the NexPoint Note was prepaid, as it could have been forgiven in part or otherwise treated, and NexPoint did not want to raise a defense without evidence to support the defense which, like I say above, did not come to light until late October, 2021, through discovery.

38.     NexPoint therefore respectfully requests that it be granted leave to amend its answer to assert an additional defense that the December 31, 2020 payment on the NexPoint Note had been prepaid and that there was therefore no default in the failure to make the same, and no right to accelerate the NexPoint Note.

HCMFA APP 0011

Signed: November 17, 2021

DENNIS C. SAUTER, JR.

## SECOND AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

THIS SECOND AMENDED AND RESTATED SHARED SERVICES AGREEMENT (this "**Agreement**") is entered into to be effective as of 8th day of February, 2013 (the "**Effective Date**") by and among Highland Capital Management, L.P., a Delaware limited partnership ("**HCMLP**"), and Highland Capital Management Fund Advisors, L.P., formerly known as Pyxis Capital, L.P., a Delaware limited partnership ("**HCMFA**"), and any affiliate of HCMFA that becomes a party hereto.  Each of the signatories hereto is individually a "**Party**" and collectively the "**Parties**".

RECITALS

A.     During the Term, HCMLP will provide to HCMFA certain services as more fully described herein and the Parties desire to allocate the costs incurred for such services and assets among them in accordance with the terms and conditions in this Agreement.

AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, as follows:

ARTICLE I
DEFINITIONS

"**Actual Cost**" means, with respect to any period hereunder, one hundred percent (100%) of the actual costs and expenses caused by, incurred or otherwise arising from or relating to (i) the Shared Services and (ii) the Shared Assets, in each case during such period.

"**Affiliate**" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person.  The term "**control**" (including, with correlative meanings, the terms "**controlled by**" and "**under common control with**") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Percentage**" has the meaning set forth in Section 4.01.

"**Applicable Margin**" shall mean an additional amount equal to 5% of all costs allocated by Service Provider to the other parties hereto under Article IV; provided that the parties may agree on a different margin percentage as to any item or items to the extent the above margin percentage, together with the allocated cost of such item or service, would not reflect an arm's length value of the particular service or item allocated.

"**Change**" has the meaning set forth in Section 2.02(a).

"**Change Request**" has the meaning set forth in Section 2.02(b).

"**Code**" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

EXHIBIT 1

"***Effective Date***" has the meaning set forth in the preamble.

"***Governmental Entity***" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"***Liabilities***" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"***Loss***" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "***Loss***" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"***New Shared Service***" has the meaning set forth in Section 2.03.

"***Party***" or "***Parties***" has the meaning set forth in the preamble.

"***Person***" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"***Quarterly Report***" has the meaning set forth in Section 5.01.

"***Recipient***" means HCMFA and any of HCMFA's direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Shared Services and/or Shared Assets.

"***Service Provider***" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Shared Services or Shared Assets.

"***Service Standards***" has the meaning set forth in Section 6.01.

"***Shared Assets***" shall have the meaning set forth in Section 3.02.

"***Shared Services***" shall have the meaning set forth in Section 2.01.

"***Subsidiary***" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"***Tax***" or "***Taxes***" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Shared Services and the Shared Assets; and (ii) tax-related surcharges or fees that are related to the Shared Services and the Shared Assets identified and authorized by applicable tariffs.

"***Term***" has the meaning set forth in Section 7.01.

HCMFA APP 0014

ARTICLE II
SHARED SERVICES

Section 2.01    <u>Services</u>.  During the Term, Service Provider will provide Recipient with Shared Services, including without limitation, all of the (i) finance and accounting services, (ii) human resources services, (iii) marketing services, (iv) legal services, (v) corporate services, (vi) information technology services, and (vii) operations services; each as requested by HCMFA and as described more fully on **Annex A** attached hereto, the "***Shared Services***"), it being understood that personnel providing Shared Services may be deemed to be employees of HCMFA to the extent necessary for purposes of the Investment Advisers Act of 1940, as amended.

Section 2.02    <u>Changes to the Shared Services</u>.

(a)    During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such Shared Service, including modifying the applicable fees for such Shared Service to reflect the then current fair market value of such service (a "***Change***").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Shared Service to Recipient.

(b)    The Party requesting a Change will deliver a description of the Change requested (a "***Change Request***") and no Party receiving a Change Request may unreasonably withhold, condition or delay its consent to the proposed Change.

(c)    Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Shared Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Shared Service in any material respect or increase Recipient's cost for such Shared Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Shared Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03    <u>New Shared Services</u>.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Shared Services not otherwise specifically listed in Section 2.01 (a "***New Shared Service***").  Any agreement between the Parties on the terms for a New Shared Service must be in accordance with the provisions of Article IV and Article V hereof, will be deemed to be an amendment to this Agreement and such New Shared Service will then be a "***Shared Service***" for all purposes of this Agreement.

Section 2.04    <u>Subcontractors</u>.  Nothing in this Agreement will prevent Service Provider from, with the consent of Recipient, using subcontractors, hired with due care, to perform all or any part of a Shared Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

3

HCMFA APP 0015

ARTICLE III
SHARED ASSETS

Section 3.01    <u>Shared IP Rights</u>.  Each Service Provider hereby grants to Recipient a non-exclusive right and license to use the intellectual property and other rights granted or licensed, directly or indirectly, to such Service Provider (the "***Shared IP Rights***") pursuant to third party intellectual property Agreements ("***Third Party IP Agreements***"), provided that the rights granted to Recipient hereunder are subject to the terms and conditions of the applicable Third Party IP Agreement, and that such rights shall terminate, as applicable, upon the expiration or termination of the applicable Third Party IP Agreement. Recipient shall be licensed to use the Shared IP Rights only for so long as it remains an Affiliate of HCMLP.  In consideration of the foregoing licenses, Recipient agrees to take such further reasonable actions as a Service Provider deems to be necessary or desirable to comply with its obligations under the Third Party IP Agreements.

Section 3.02    <u>Other Shared Assets</u>.  Subject to Section 3.01, each Service Provider hereby grants Recipient the right, license or permission, as applicable, to use and access the benefits under the agreements, contracts and licenses that such Service Provider will purchase, acquire, become a party or beneficiary to or license on behalf of Recipient (the "***Future Shared Assets***" and collectively with the Shared IP Rights, the "***Shared Assets***").

ARTICLE IV
COST ALLOCATION

Section 4.01    <u>Actual Cost Allocation Formula</u>.  The Actual Cost of any item relating to any Shared Services or Shared Assets shall be allocated based on the Allocation Percentage.  For purposes of this Agreement, "***Allocation Percentage***" means:

(a)    To the extent 100% of such item is demonstrably attributable to HCMFA, 100% of the Actual Cost of such item shall be allocated to HCMFA as agreed by HCMFA;

(b)    To the extent a specific percentage of use of such item can be determined (e.g., 70% for HCMLP and 30% for HCMFA), that specific percentage of the Actual Cost of such item will be allocated to HCMLP or HCMFA, as applicable and as agreed by HCMFA; and

(c)    All other portions of the Actual Cost of any item that cannot be allocated pursuant to clause (a) or (b) above shall be allocated between HCMLP and HCMFA in such proportion as is agreed in good faith between the parties.

Section 4.02    <u>Non-Cash Cost Allocation</u>.  The actual, fully burdened cost of any item relating to any Shared Services or Shared Assets that does not result in a direct, out of pocket cash expense may be allocated to HCMLP and HCMFA for financial statement purposes only, as agreed by HCMFA, without any corresponding cash reimbursement required, in accordance with generally accepted accounting principles, based on the Allocation Percentage principles described in Section 4.01 hereof.

ARTICLE V
PAYMENT OF COST AND REVENUE SHARE; TAXES

Section 5.01    <u>Quarterly Statements</u>.  Within thirty (30) days following the end of each calendar quarter during the Term (or at such time as may be otherwise agreed by the parties), each Service Provider shall furnish the other Parties hereto with a written statement with respect to the Actual Cost paid by it in respect of Shared Services and Shared Assets provided by it, in each case, during such

<div align="center">4</div>

HCMFA APP 0016

**Appx. 00716**

period, setting forth (i) the cost allocation in accordance with Article IV hereof together with the Applicable Margin on such allocated amounts, and (ii) any amounts paid pursuant to Section 5.02 hereof, together with such other data and information necessary to complete the items described in Section 5.03 hereof (hereinafter referred to as the "**Quarterly Report**").

Section 5.02   Settlement Payments.   At any time during the Term, any Party may make payment of the amounts that are allocable to such Party together with the Applicable Margin related thereto, regardless of whether an invoice pursuant to Section 5.03 hereof has been issued with respect to such amounts.

Section 5.03   Determination and Payment of Cost and Revenue Share.

(a)   Within ten (10) days of the submission of the Quarterly Report described in Section 5.02 hereof (or at such other time as may be agreed by the parties), the Parties shall (i) agree on the cost share of each of the Parties and Applicable Margin as calculated pursuant to the provisions of this Agreement; and (ii) prepare and issue invoices for the cost share and Applicable Margin payments that are payable by any of the Parties.

(b)   Within ten (10) days of preparation of the agreement and the issuance of the invoice described in Section 5.03(a) (or at such other time as may be agreed by the parties), the Parties shall promptly make payment of the amounts that are set forth on such cost allocation invoice. Notwithstanding anything in this Agreement to the contrary, provision of the Shared Services shall commence from the Effective Date, but no fees shall be payable from Recipient or otherwise accrue with respect to such services provided during the month of December 2011.

Section 5.04   Taxes.

(a)   Recipient is responsible for and will pay all Taxes applicable to the Shared Services and the Shared Assets provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Shared Services and the Shared Assets as a result of such payment by Recipient. Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Shared Services and Shared Assets, costs for which such Taxes are levied. Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b)   Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider. In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name. Service Provider's authorization will not be unreasonably withheld. Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings. However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time. Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings. Any adverse consequences suffered by Recipient as a result of the withdrawal will be submitted to arbitration pursuant to Section 9.14. Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property. Recipient agrees to

5

indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

(c)     The provisions of this Section 5.04 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

## ARTICLE VI
## SERVICE PROVIDER RESPONSIBILITIES

Section 6.01     <u>Service Provider General Obligations</u>.  Service Provider will provide the Shared Services and the Shared Assets to Recipient on a non-discriminatory basis and will provide the Shared Services and the Shared Assets in the same manner as if it were providing such services and assets on its own account (the "**Service Standards**").  Service Provider will conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the Service Standards, including, for avoidance of doubt, laws and regulations relating to privacy of customer information.

Section 6.02     <u>Books and Records; Access to Information</u>.  Service Provider will keep and maintain books and records on behalf of Recipient in accordance with past practices and internal control procedures.  Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Shared Services and Shared Assets, with respect to Service Provider's performance of its obligations hereunder.  This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider).  Service Provider will promptly respond to any reasonable requests for information or access.  For the avoidance of doubt, all books and records kept and maintained by Service Provider on behalf of Recipient shall be the property of Recipient, and Service Provider will surrender promptly to Recipient any of such books or records upon Recipient's request (provided that Service Provider may retain a copy of such books or records) and shall make all such books and records available for inspection and use by the Securities and Exchange Commission or any person retained by Recipient at all reasonable times.  Such records shall be maintained by Service Provider for the periods and in the places required by laws and regulations applicable to Recipient.

Section 6.03     <u>Return of Property and Equipment</u>.  Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

## ARTICLE VII
## TERM AND TERMINATION

Section 7.01     <u>Term</u>.  The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "**Term**"), unless terminated earlier in accordance with Section 9.02.  The Term shall automatically renew for successive one year periods unless sooner terminated under Section 7.02.

6

HCMFA APP 0018

Section 7.02    Termination.  Either Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term.

<div align="center">

ARTICLE VIII
LIMITED WARRANTY

</div>

Section 8.01    Limited Warranty.  Service Provider will perform the Shared Services hereunder in accordance with the Service Standards.  Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Shared Services and the granting of the Shared Assets under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Shared Services and the Shared Assets for any purpose or use or purpose.  Service Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Shared Service and Shared Asset, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

<div align="center">

ARTICLE IX
MISCELLANEOUS

</div>

Section 9.01    No Partnership or Joint Venture; Independent Contractor.  Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or HCMFA or their respective successors or assigns.  The Parties understand and agree that, with the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever.  With the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, no Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever.  The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Shared Services.

Section 9.02    Amendments; Waivers.  Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.03    Schedules and Exhibits; Integration.  Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 9.04    Further Assurances.  Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

<div align="center">7</div>

HCMFA APP 0019

**Appx. 00719**

Section 9.05    <u>Governing Law</u>.  This Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 9.06    <u>Assignment</u>.  Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

Section 9.07    <u>Headings</u>.  The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 9.08    <u>Counterparts</u>.  This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts.  All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 9.09    <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 9.10    <u>Notices</u>.    All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i) immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

If to HCMLP, addressed to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Fax:  (972) 628-4147

If to HCMFA, addressed to:

Highland Capital Management Fund Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Fax:  (972) 628-4147

Section 9.11    <u>Expenses</u>.  Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

8

Section 9.12     Waiver.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.13     Severability.  If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties.  All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

Section 9.14     Arbitration; Jurisdiction.  Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that either party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief.  The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service.  The arbitrator(s) shall be duly licensed to practice law in the State of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each.  Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.  The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules.  The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees.  All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

Section 9.15     General Rules of Construction.  For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein,""hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or

9

reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

HCMFA APP 0022

**Appx. 00722**

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:   Strand Advisors, Inc., its general partner

By: _____
Name:  James Dondero
Title:   President

HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

By:   Strand Advisors XVI, Inc., its general partner

By: _____
Name:  Brian Mitts
Title:   Assistant Secretary

11

HCMFA APP 0023

**Annex A**

**Shared Services**

Compliance

        General compliance

        Compliance systems

Facilities

        Equipment

        General Overhead

        Office Supplies

        Rent & Parking

Finance & Accounting

        Book keeping

        Cash management

        Cash forecasting

        Credit facility reporting

        Financial reporting

        Accounts payable

        Accounts receivable

        Expense reimbursement

        Vendor management

HR

        Drinks/snacks

        Lunches

        Recruiting

IT

        General support & maintenance (OMS, development, support)

        Telecom (cell, phones, broadband)

        WSO

Legal

        Corporate secretarial services

        Document review and preparation

        Litigation support

        Management of outside counsel

Marketing and PR

        Public relations

Tax

        Tax audit support

        Tax planning

        Tax prep and filing

Investments

        Investment research on an ad hoc basis as requested by HCMFA

Valuation Committee

<u>Trading</u>

Trading desk services

<u>Operations</u>

Trade settlement

HCMFA APP 0025

**Appx. 00725**

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows.

## ARTICLE I

## DEFINITIONS

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

HC   EXHIBIT 2

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

HCMFA APP 0027

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02   Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01   General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)     *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

3

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and WSO);

(b)   *Legal/Compliance/Risk Analysis*.  Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

(c)   *Tax*.  Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

(d)   *Management of Clients and Accounts*.  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

(e)   *Valuation*.  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(f)   *Execution and Documentation*.  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

(g)   *Marketing*.  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(h)   *Reporting*.  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

4

(i)    *Administrative Services.*   The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

(j)    *Shared Employees.*   To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of <u>Section 2.03</u> hereof;

(k)    *Ancillary Services.*   Assistance and advice on all things ancillary or incidental to the foregoing; and

(l)    *Other.*   Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Section 2.03    <u>Shared Employees</u>.

(a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

5

HCMFA APP 0030

(b)    Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)    Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)    The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)    The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)    The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

HCMFA APP 0031

(i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)     The Staff and Services Provider shall require that each Shared Employee:

(i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)     to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)     Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    Applicable Asset Criteria and Concentrations. The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    Compliance with Management Company Policies and Procedures. The Management Company will from time to time provide the Staff and Services Provider and the

HCMFA APP 0032

Appx. 00732

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06   Authority.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07   Third Parties.

(a)     The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)     In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08   Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09   Power of Attorney.  If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

8

HCMFA APP 0033

**Appx. 00733**

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).   Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01   <u>Consideration</u>. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "<u>Staff and Services Fee</u>"), payable monthly in advance on the first business day of each month.

Section 3.02   <u>Costs and Expenses</u>. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03   <u>Deferral</u>. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01   <u>Representations</u>. Each of the Parties hereto represents and warrants that:

(a)   It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)   this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)   no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)   neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

9

HCMFA APP 0034

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    <u>Compliance; Advisory Restrictions</u>.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof.  It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "<u>Advisory Restrictions</u>").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    <u>Records; Confidentiality</u>.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

<div align="center">10</div>

HCMFA APP 0035

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01  Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder. No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account. Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

HCMFA APP 0036

Section 6.02    Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03    Indemnification by the Management Company.    The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

12

HCMFA APP 0037

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04   Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

HCMFA APP 0038

Appx. 00738

Section 6.05   <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 6.03</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   <u>Reliance</u>. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

<div align="center">

**ARTICLE VII**

**TERMINATION**

</div>

Section 7.01   <u>Termination</u>. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

<div align="center">

**ARTICLE VIII**

**MISCELLANEOUS**

</div>

Section 8.01   <u>Amendments</u>. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   <u>Assignment and Delegation</u>.

(a)      Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)      Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)      The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

<div align="center">14</div>

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    Non-Recourse; Non-Petition.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive.  The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)    The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

HCMFA APP 0040

Appx. 00740

Section 8.04   <u>Governing Law</u>.

     (a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

     (b)     The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "<u>Proceedings</u>") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05   <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06   <u>Severability</u>. The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07   <u>No Waiver</u>. The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

16

Section 8.09   <u>Third Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   <u>Independent Contractor</u>.  Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12   <u>Written Disclosure Statement</u>.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13   <u>Headings</u>.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15   <u>Notices</u>.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

      (a)   If to the Management Company:

      NexPoint Advisors, L.P.
      200 Crescent Court
      Suite 700
      Dallas, TX 75201

HCMFA APP 0042

Appx. 00742

 

(b)     If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

18

HCMFA APP 0043

Appx. 00743

   IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.


                              **NEXPOINT ADVISORS, L.P.**

                              By:  NexPoint Advisors GP, LLC, its
                              General Partner

                              By:_____
                              Name: Frank Waterhouse
                              Title: Treasurer



                              **HIGHLAND CAPITAL
                              MANAGEMENT, L.P.**

                              By:  Strand Advisors, Inc., its General
                              Partner

                              By:_____
                              Name: Frank Waterhouse
                              Title: Treasurer

HCMFA APP 0044

**Appx. 00744**

**Rukavina, Davor**

| | |
|---|---|
| **From:** | James Seery  <jpseeryjr@gmail.com> |
| **Sent:** | Thursday, September 17, 2020 4:17 PM |
| **To:** | DC Sauter |
| **Cc:** | Gregory V. Demo |
| **Subject:** | Re: Acis Settlement |

DC

I believe your concerns regarding the release are misplaced as it does not bind entities that HCMLP does not control.  Greg can walk you through the language, but I do not believe it requires adjustment nor does it create any liability.  To the contrary, it reduces liability.

With regard to the HCMLP employee prohibitions, no employee whether legal or non-legal can work on any matter that is inimical to the interests of HCMLP.  I ,as CEO, and the Independent Board will make the determination as to whether an action violates the prohibition, and a breach of the prohibition will lead to termination for cause.  I believe that most of the employees have been informed of this requirement and are following the directive.

With regard to transactional matters, HCMLP employees will continue to work with you on those issues that do not run afoul of the prohibition above.  If there is a particular matter where you are taking a potentially adversarial action vis a vis HCMLP, please let me know what it is.  We can then consider whether a customized operating protocol for that issue is needed or whether you will simply be on your own.  I will make the determination with the advice of counsel.  We do not believe the Texas rules of professional responsibility apply in this situation.

Please let me know what matter you are considering with respect to the immediately preceding paragraph, and we will consider how to best address your concerns.

Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**From:** DC Sauter <DSauter@NexPointadvisors.com>
**Date:** Thursday, September 17, 2020 at 4:56 PM
**To:** Jim Seery <jpseeryjr@gmail.com>
**Cc:** Greg Demo <GDemo@pszjlaw.com>
**Subject:** RE: Acis Settlement

Jim/Greg, follow up on my email below.  I have a few items that have been placed on my plate, and I really need to understand who I can speak with and the extent to which they are permitted to share information with me.



EXHIBIT 3

**Appx. 00745**

O: 972.628.4117  |  C: 469.877.6440

**From:** DC Sauter
**Sent:** Tuesday, September 15, 2020 8:55 AM
**To:** 'James Seery' <jpseeryjr@gmail.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>
**Subject:** RE: Acis Settlement

My apologies for copying Isaac.  I was under the mistaken impression that he would have assisted in the settlement.

In my view, the requested clarification is beneficial to Strand, HCMLP, and the other "HCMLP Entities."  The documents purport to release ACIS from claims on behalf of, among others, any entity that is "managed" by HCMLP and "respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns" of any "HCMLP Entity."  Those "HCMLP Entities" lack the authority to bind a whole host of parties in that laundry list, which could result in claims against HCMLP, Strand, and the other "HCMLP Entities" by both the "ACIS Released Parties," who will claim they didn't receive the benefit of the bargain, and the parties on whose behalf the "HCMLP Parties" purported to release claims who didn't consent to the release.

Additionally, I'd like to visit with you all regarding the board's position that prohibits certain HCMLP personnel from working on certain matters.

First, I am unclear whether the prohibition applies to only HCMLP legal personnel or whether it applies to all HCMLP employees.  Please clarify.

Second, as you may know, virtually all of these matters are falling into my lap, and in most cases I lack any knowledge about them.  It would help me tremendously if current HCMLP employees, and particularly the legal personnel, could provide me with transactional background to assist in the transition of the matter.  While I understand the board's concern with Judge Jernigan's order, I don't believe that the Texas Disciplinary Rules of Professional Conduct mandate or even permit an attorney licensed in the State of Texas to refuse to cooperate with a former client in the transfer of a matter to a new attorney.  Rule 1.15(d) states that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payments of fee that has not been earned."  The comments to that rule provide additional clarity:  "In every instance of withdrawal and even if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the client."  T.D.R.P.C. Rule 1.15, comment 9.  Proper steps may include providing information to new counsel or even continuing to represent the client for a limited time to meet impending deadlines. *Microsoft Corp. v. Commonwealth Sci. & Indus. Research Org.*, 2007 U.S. Dist. LEXIS 91550 *23-24 fn. 11 (E.D. Tex. Dec. 13, 2007).  Even if the board insists that the HCMLP legal personnel cannot continue to represent others in non-HCMLP matters or matters adverse to HCMLP (irrespective of any conflict of interest analysis of whether those attorneys may continue to represent HCMLP in those matters), the ethical rules require that the attorneys provide assistance in transferring those matters to me or others.

Finally, I routinely handle, and am routinely asked to handle, legal matters that relate to real estate for entities owned or controlled by HCMLP (Park West, the Arizona assets, the Maple Ave. property, to name a few).  I am not an HCMLP employee, and it's my understanding that NexPoint Advisors, L.P. is not compensated for the time I spend on HCMLP matters.  I'm not suggesting that this arrangement should change, but it feels from my perspective that the board's position is only working in one direction.  In other words, if I understand the board's position correctly, I can work on both NexPoint and HCMLP matters, but the HCMLP legal employees may only work on HCMLP-related matters.  It has also put a significant amount of additional work on my plate.  I would like to understand two things.  First, what is the scope of my authority in these matters, and what is the proper protocol vis-à-vis you, DSI, and the board?  I have tried to take the conservative approach in keeping you all informed and asking for consent or approval where I thoughts it

HCMFA APP 0046

**Appx. 00746**

appropriate.  I assume this is how you'd like to continue to handle things, but I would like confirmation of that.  Second, I have heard that you all were working to transfer a couple of the legal personnel (perhaps Thedford and Post) to HCMFA so they could assist with the work load (particularly in the areas where I don't have a significant amount of experience).  I'd like to know where that stands and when relief can be expected.

I'm available most of today and tomorrow to discuss.

**D.C. Sauter**

# NEXPOINT

O: 972.628.4117  |  C: 469.877.6440

---

**From:** James Seery <jpseeryjr@gmail.com>
**Sent:** Tuesday, September 15, 2020 7:01 AM
**To:** DC Sauter <DSauter@NexPointadvisors.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>; Isaac Leventon <ILeventon@HighlandCapital.com>
**Subject:** Re: Acis Settlement

DC.  We will discuss and revert to you.  Neither Isaac nor anyone else at HCMLP is permitted to work on any issues related to the settlement and release other than as directed by me.

Thanks

Sent from my iPad

> On Sep 14, 2020, at 7:08 PM, DC Sauter <DSauter@nexpointadvisors.com> wrote:

> Greg,

> I've been asked to review the attached release on behalf of HCMFA and the closed-end funds.  I'm concerned that the language below creates an ambiguity as to whether the closed-end funds and HCMFA have released claims against the ACIS parties:

>    1.    The release by Strand, which also serves as the general partner of HCMFA; and
>    2.    The release by each "HCMLP Entity" of its "respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns."

> We would like the final sentence in paragraph 1.a. of the Release to be revised to specifically identify HCMFA and the closed-end funds as parties not covered by the release.  Please let me know if you'd like to discuss in more detail.

> **D.C. Sauter | General Counsel, Real Estate**

> <image001.jpg>

> 300 Crescent Court  |  Suite 700  |  Dallas, Texas 75201
> O: 972.628.4117  |  C: 469.877.6440  |  F: 972.628.4147
> dsauter@nexpointadvisors.com  |  www.NexPointGroup.com

HCMFA APP 0047

**Appx. 00747**

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

<Acis - Release (EXECUTION VERSION).pdf>

HCMFA APP 0048

**Appx. 00748**

Case 3:21-cv-00881-X   Document 46   Filed 02/17/22   Page 753 of 905   PageID 7018
Case 21-03004-sgj   Doc 83-1 Filed 03/02/21   Entered 11/30/21 16:45:57   Page 526 of 452
Docket #0059 Date Filed: 1/12/2021



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

Signed January 11, 2021

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | No. 20-03190-sgj |
| | § | |
| JAMES D. DONDERO, | § | |
| | § | |
| Defendant. | § | |

### ORDER GRANTING DEBTOR'S MOTION FOR A PRELIMINARY INJUNCTION
### AGAINST JAMES DONDERO

This matter having come before the Court on *Plaintiff Highland Capital Management,*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210111

**EXHIBIT 4**
**Appx. 00749**

*L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 2] (the "Motion"), filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"); and this Court having considered (a) the Motion, (b) *Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Injunctive Relief* [Adv. Pro. Docket No. 1] (the "Complaint"), (c) the arguments and law cited in the *Debtor's Amended Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 3] (the "Memorandum of Law," and together with the Motion and Complaint, the "Debtor's Papers"), (d) *James Dondero's Response in Opposition to Debtor's Motion for a Preliminary Injunction* [Adv. Pro. Docket No. 52] (the "Opposition") filed by James Dondero, (e) the testimonial and documentary evidence admitted into evidence during the hearing held on January 8, 2021 (the "Hearing"), including assessing the credibility of Mr. James Dondero, (f) the arguments made during the Hearing, and (g) all prior proceedings relating to the Motion, including the December 10, 2020 hearing on the *Debtor's Motion for a Temporary Restraining Order and Preliminary Injunction against James Dondero* [Adv. Pro. Docket No. 6] (the "TRO Hearing"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that injunctive relief is warranted under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest;

HCMFA APP 0050

**Appx. 00750**

and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Debtor's Papers, and the evidence submitted in support thereof, establish good cause for the relief granted herein, and that (1) such relief is necessary to avoid immediate and irreparable harm to the Debtor's estate and reorganization process; (2) the Debtor is likely to succeed on the merits of its underlying claim for injunctive relief; (3) the balance of the equities tip in the Debtor's favor; and (4) such relief serves the public interest; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      James Dondero is preliminarily enjoined and restrained from (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents, in whatever capacity they are acting; (c) communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned, controlled or managed by the Debtor, and the pursuit of the Plan or any

DOCS_NY:41944.3 36027/002

HCMFA APP 0051

**Appx. 00751**

alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct").[2]

3.      James Dondero is further preliminarily enjoined and restrained from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting with him or on his behalf, to, directly or indirectly, engage in any Prohibited Conduct.

4.      James Dondero is further preliminarily enjoined and restrained from communicating (in person, telephonically, by e-mail, text message or otherwise) with Scott Ellington and/or Isaac Leventon, unless otherwise ordered by the Court.

5.      James Dondero is further preliminarily enjoined and restrained from physically entering, or virtually entering through the Debtor's computer, email, or information systems, the Debtor's offices located at Crescent Court in Dallas, Texas, or any other offices or facilities owned or leased by the Debtor, regardless of any agreements, subleases, or otherwise, held by the Debtor's affiliates or entities owned or controlled by Mr. Dondero, without the prior written permission of Debtor's counsel made to Mr. Dondero's counsel.  If Mr. Dondero enters the Debtor's office or other facilities or systems without such permission, such entrance will constitute trespass.

6.      James Dondero is ordered to attend all future hearings in this Bankruptcy Case by Webex (or whatever other video platform is utilized by the Court), unless otherwise ordered by the Court.

7.      This Order shall remain in effect until the date that any plan of reorganization or liquidation resolving the Debtor's case becomes effective, unless otherwise ordered by the Court.

---

[2] For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from (1) seeking judicial relief upon proper notice or from objecting to any motion filed in this Bankruptcy Case, or (2) communicating with the committee of unsecured creditors (the "UCC") and its professionals regarding a pot plan.

4

HCMFA APP 0052

**Appx. 00752**

# EXHIBIT 219

```
                  IN THE UNITED STATES BANKRUPTCY COURT
1                   FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION
2
                                      )   Case No. 19-34054-sgj-11
3    In Re:                           )   Chapter 11
                                      )
4    HIGHLAND CAPITAL                 )   Dallas, Texas
     MANAGEMENT, L.P.,                )   Monday, January 10, 2022
5                                     )   9:30 a.m. Docket
            Debtor.                   )
6    ─────────────────────────────────)
                                      )
7    HIGHLAND CAPITAL                 )   Adversary Proceeding 21-3004-sgj
     MANAGEMENT, L.P.,                )
8                                     )
            Plaintiff,                )
9                                     )
     v.                               )   DEFENDANT'S SECOND MOTION TO
10                                    )   AMEND ANSWER [82]
     HIGHLAND CAPITAL MANAGEMENT      )
11   FUND ADVISORS, L.P.,             )
                                      )
12          Defendant.               )
     ─────────────────────────────────)
13
                       TRANSCRIPT OF PROCEEDINGS
14           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.
15
     WEBEX APPEARANCES:
16
     For the Debtor-Plaintiff:   John A. Morris
17                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 780 Third Avenue, 34th Floor
18                               New York, NY  10017-2024
                                 (212) 561-7700
19
     For the Defendant:          Davor Rukavina
20                               Julian Preston Vasek
                                 MUNSCH HARDT KOPF & HARR, P.C.
21                               500 N. Akard Street, Suite 3800
                                 Dallas, TX  75201-6659
22                               (214) 855-7587

23   Recorded by:                Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
24                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
25                               (214) 753-2062
```

2

```
 1   Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
 2                                Shady Shores, TX  76208
                                  (972) 786-3063
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
              Proceedings recorded by electronic sound recording;
24                transcript produced by transcription service.

25
```

3

1          DALLAS, TEXAS - JANUARY 10, 2022 - 10:19 A.M.

2          THE COURT:  I will now take appearances in the

3   Highland Capital Management versus HCMFA adversary.  This is

4   Adversary 21-3004.  We have Defendant's Second Motion to Amend

5   Answer.  Who do we have appearing for the Defendant?

6          MR. RUKAVINA:  Your Honor, good morning.  Davor

7   Rukavina and Julian Vasek for the Defendant.

8          THE COURT:  Good morning.  Who do we have appearing

9   for Highland?

10          MR. MORRIS:  Good morning, Your Honor.  This is John

11  Morris from Pachulski Stang Ziehl & Jones for Highland

12  Capital, for the Reorganized Debtor Highland Capital

13  Management, LP.

14          THE COURT:  All right.  Thank you.  I know we have

15  many observers.  Is there anyone else who wanted to appear?

16      (No response.)

17          THE COURT:  All right.  Well, we had lots of paper

18  filed on this matter.  Mr. Rukavina, how did you want to

19  proceed?

20          MR. RUKAVINA:  Your Honor, I'd like to give an

21  opening.  Well, I'd like to give my argumentation.  There is a

22  disagreement.  I understand Mr. Morris would like to call D.C.

23  Sauter as a witness.  It's my position that that's not

24  possible under the Local Rules.  But perhaps the Court wants

25  to rule on that matter first, because that would then affect

4

1   the manner of presentation.

2        THE COURT:  Okay.  So you say it's not allowed under

3   Local Rules for the Debtor to call a witness?  What Local Rule

4   do you mean?

5        MR. RUKAVINA:  Yes, Your Honor.  I'm referring to

6   the Local Rule 7007(g), which talks about that a party who

7   relies on exhibits, evidence, et cetera, does so through an

8   appendix.  In fact, the Debtor filed its appendix.  I filed my

9   appendix.

10       And I think certainly the Court has discretion, but I

11   think in twenty years of practicing before this Court, unless

12   it's a sanctions issue or unless it's a preliminary injunction

13   issue, it's been my understanding that motions are always

14   adjudicated based on the appendices.

15       And I believe that Your Honor has indicated or even stated

16   that the District Court rules should applies to this

17   proceeding, and the District Court rules, I think, are even

18   clearer, because they provide that there is not even a hearing

19   on the motion.  But, and they again require that any evidence

20   in support or opposition to a motion be by a declaration or by

21   deposition transcripts, again, in an appendix.

22       So I really have nothing more to add than that.  It's just

23   a matter of Local Rules.  Mr. Sauter is available should the

24   Court require him to be cross-examined.  And I'll -- I'll just

25   rely on Rule 7007(g).

5

1          MR. MORRIS:  If I may, Your Honor?

2          THE COURT:  Yes.  I'm pulling it up, since I don't

3    have every Local Rule memorized.  So, appendix requirement.

4    Isn't this just a rule whenever you have -- do an appendix,

5    here are the requirements?  I don't know.  What did you --

6          MR. RUKAVINA:  Well, Your Honor, --

7          THE COURT:  Go ahead.

8          MR. RUKAVINA:  It says a party who relies on

9    documentary or nondocumentary evidence to support or oppose a

10   motion shall include such evidence in an appendix.  I've

11   always taken that to mean that -- we don't have many hearings

12   with live testimony, with cross-examination, on pure motion

13   practice, especially procedural motion practice.

14      But I don't have a case for you.  I don't have, you know,

15   this isn't -- this isn't a U.S. Supreme Court matter.  This is

16   just a matter of local practice.

17         MR. MORRIS:  May I be heard, Your Honor?

18         THE COURT:  Okay.  Mr. Morris, go ahead.

19         MR. MORRIS:  Just briefly.  It's exactly why I raised

20   this issue last week.  I raised it with Mr. Rukavina.  He told

21   me his position.  He's never given me any authority that says

22   I can't do this.

23      We wrote to the Court.  We copied him.  The Court told the

24   parties last Thursday that it's the Court's practice to allow

25   litigants to cross-examine witnesses who put forth

6

1   declarations.  Mr. Sauter has put forth a substantive

2   declaration.  This is not an attorney's declaration that

3   attaches documents.  It's testimony.  And that testimony is

4   going to be put in the record to support a motion, and

5   Highland respectfully requests the opportunity to cross-

6   examine Mr. Sauter on his statements.

7              THE COURT:  Okay.  I remember the question coming to

8   me through the courtroom deputy last week, and so I understand

9   she communicated an answer.  This should be no surprise.  I

10  mean, we generally allow the opportunity for cross-examination

11  wherever there's a declarant submitting evidence.  And, I

12  mean, I see the rule you're talking about, Mr. Rukavina, but I

13  don't think there should have been any doubt because of the

14  communication through my courtroom deputy that I was going to

15  allow cross-examination for any declarant.

16      And, frankly, I mean, this is a pretty important motion.

17  You know, for crying out loud, it was an 800-page-plus

18  appendix, I think, with all the documentation.  I think that

19  was yours, Mr. Rukavina.  So the ruling is we will allow

20  cross-examination of Mr. Sauter.

21      All right.  Mr. Rukavina?

22              MR. RUKAVINA:  Then, Your Honor, then I'll propose --

23  I propose that I just give you my argumentation based on Mr.

24  Sauter's declaration as his direct testimony, and then, of

25  course, Mr. Morris will cross-examine him.  I don't know that

7

```
 1  we need an opening, evidence, then closing.
 2          MR. MORRIS:  I'd like the opportunity to make a brief
 3  opening, Your Honor.
 4          THE COURT:  Okay.  I'll --
 5          MR. MORRIS:  If Mr. Rukavina doesn't want to do that,
 6  that's fine.
 7          THE COURT:  I'll allow opening statements.  Again, I
 8  think this is a pretty big deal.  So I'll allow it if you want
 9  to make an opening statement.
10          MR. RUKAVINA:  Okay, Your Honor.  Thank you.
11          OPENING STATEMENT ON BEHALF OF THE DEFENDANT
12          MR. RUKAVINA:  So, as the Court is certainly aware,
13  this is our second motion to amend our answer.  The amended
14  answer would more specifically and expressly deny that Mr.
15  Waterhouse signed the two promissory notes at issue in this
16  lawsuit.
17      I don't think that we've had a contested hearing in this
18  adversary, Your Honor, although it is one of the note cases.
19  So I think it would help the Court just to give you a very
20  quick summary of what the issues in this adversary are.
21      We, the Defendant, deny that they are -- that there are
22  valid promissory notes here.  This isn't an issue where we
23  have the potential forgivable promissory notes.  This isn't an
24  issue where we have other defenses like in the other cases.
25  Here, our defense -- really, our only defense -- goes to the
```

8

1  core of whether there are enforceable contractual promises

2  here.

3      In May of 2019, it is true that the Debtor transferred

4  $7.4 million to HCMFA.  That is not disputed.  What is

5  disputed is whether that transfer was for compensation to

6  HCMFA or whether it was to be a loan to be repaid.

7      That defense has already been pled.  We're not here today

8  to try that defense.  We're not here to prove that defense.

9  But it is important context because how and why Mr. Waterhouse

10  would have or did sign these promissory notes goes to the core

11  of this mistake.

12      What the evidence is is that Mr. Dondero told Mr.

13  Waterhouse to transfer $7.4 million.  Mr. Dondero, in his

14  mind, was doing that because the Debtor caused a misstate

15  which cost $7.4 million of liability for HCMFA.  Mr. Dondero

16  never told Mr. Waterhouse to paper it up as a loan.  Mr.

17  Waterhouse doesn't remember being told to paper it up as a

18  loan.  Mr. Waterhouse told his team to transfer the funds.

19  That team then implemented its standard operating procedure,

20  which is that when it sees intercompany transfers going back

21  and forth it papers them as loans.

22      Mr. Waterhouse confirmed that only Mr. Dondero would have

23  had authority to create this loan.

24      In any event, Mr. Vasek, if you'll please share the

25  promissory note with the Court, one of them, Your Honor will

9

1  see what these notes look like.  And, again, I'm not here

2  today to try the underlying merits, but it's important to see

3  that everything regarding these notes is a mistake, really.

4      So here's one of these two promissory notes.  And

5  obviously, HCMFA is defined as the maker here, but Mr. Vasek,

6  if you'll scroll to the second page, you'll see, Your Honor,

7  that the note is signed by Frank Waterhouse.  And he's not

8  signing it as a CFO.  He's not signing it as a treasurer.  And

9  I know that Your Honor has extensive experience, both as a

10 judge and in private practice, with promissory notes and

11 corporate obligations.  The UCC is very clear.  When someone

12 signs a note like this, he is signing it in order to be

13 jointly and severally liable with the maker.

14     So immediately here, when this case was filed, we saw

15 something that you don't have in the other cases, you have

16 something that's very strange, you have maker Frank

17 Waterhouse.  Clearly, it was not the intent of the parties

18 that Frank Waterhouse would be personally liable for $7.4

19 million.  But it just shows how the mistakes kept happening.

20     So, Mr. Vasek, if you'll please share with the Court my

21 request for production.

22     Your Honor, what Mr. Vasek is going to show you is my May

23 28, 2021 request for production.  It's my second request for

24 production.

25     And if you'll scroll down, Mr. Vasek, I believe it's

10

1   Request #2.

2       Okay.  Your Honor -- oh, I'm sorry, it's Request #9.  Your

3   Honor can see I'm requesting all Microsoft Word copies of the

4   notes, including metadata.

5       So, again, the manner in which the note is signed

6   certainly -- certainly raised our eyebrows.  It certainly made

7   us think.  And we did what we are supposed to do.  We

8   requested through discovery the originals and metadata so that

9   we can see what happened.  Because Your Honor will see, and

10  I'm sure Mr. Sauter will testify about it, by this time Mr.

11  Sauter had asked Mr. Waterhouse, what are these notes?  Did

12  you sign these notes?  And Mr. Waterhouse told Mr. Sauter,

13  well, it looks like my signature so I must have signed them.

14  So, so as of this time in May, we still did not have any real

15  reason to say that Mr. Waterhouse didn't sign the notes except

16  we had a reasonable suspicion based on the way that the notes

17  are signed that something happened here.

18      Mr. Vasek, if you'll please share the Debtor's response to

19  the RFP.  And if you'll scroll down to the answer to RFP #9.

20      So, Your Honor, this is in July now.  I'm sorry, this is

21  in June.  And the Debtor makes a limited objection to Request

22  #9.  But the Debtor basically says it'll conduct a reasonable

23  search for and produce documents responsive to this request.

24      You can pull that down.

25      So, so I did not file a motion to compel.  There was no

1  need to file a motion to compel.  The Debtor's objection based

2  on metadata was limited.  And I expected that the Debtor would

3  produce the originals of the notes.

4      It didn't.  It didn't.  It did, in late July, produce some

5  Word documents that had all metadata scrubbed.  It was not

6  obvious what those were.  The Debtor is now saying that those

7  were the originals of the notes.  But that was not my

8  understanding.  There were not -- there was no metadata.  And

9  it wasn't the Debtor's understanding.  And I'll show you why

10  the Debtor also believed that it did not produce the originals

11  of the notes.

12      If you'll pull up the October 15th email, Mr. Vasek.

13      So, remember, Judge, we just stopped in late June when the

14  Debtor answers my RFPs.  Here we are now in mid-October.

15  We're about to go into two weeks of depositions.  Your Honor

16  knows who Ms. Deitsch-Perez is.  She's my co-counsel.

17      Scroll down a little bit, Julian, please, to my -- to Ms.

18  Deitsch-Perez's email.  So, stop right there.

19      So, Judge, this is a long email string.  The Court can

20  certainly look over it if it needs to.  The only relevant

21  portions are these top two emails, where Ms. Perez says, John,

22  please have Debtor produce the Word versions of all the notes

23  at issue.  We have searched and it does not appear that they

24  were produced.  Can you do that today?  Thanks.

25      And if you'll scroll up, Mr. Vasek, Mr. Morris writes

12

1    back, I'll look into it, Deborah.

2         You can -- you can close this document.

3         And, again, this is important because we're about to

4    depose Mr. Waterhouse.  Ms. Perez, Deitsch-Perez and I, we're

5    waiting for the notes.  We're waiting for the metadata.  I'm

6    starting to think, well, they can't find the notes, there are

7    no notes.  But we go forward.

8         And if you'll pull up the next -- the transcript, Mr.

9    Vasek.

10        So now, Your Honor, we are on October the 19th, 2021.  Now

11   we are deposing Mr. Waterhouse.  Mr. Waterhouse, recall, is

12   the person that purportedly signed these notes.  Mr.

13   Waterhouse is the key witness.  Only he and Mr. Dondero know

14   what was said.  And Ms. Deitsch-Perez, you can see here, she

15   asks on the record, John, I also asked you for the Word

16   versions of these notes so we can look at the properties and

17   you have not provided them.  Are you intending to?  Mr. Morris

18   answers, No.

19        So this is October 19th now.  This is during the

20   Waterhouse deposition.

21        You can close this document, Mr. Vasek, and pull up the

22   October 23rd email.

23        Now, after this, after this deposition, Mr. Morris and I

24   talk and we continue to negotiate.  And ultimately Mr. Morris

25   and I reach an agreement.  Mr. Morris wanted certain documents

13

1   of my clients that I'm sure he'll go through today.  They're

2   what we, I guess, call Rule 15(c).  Not Civil Practice Rules,

3   but SEC Rule 15(c)'s.  And I wanted these notes.  So, so this

4   is an October 23rd email.

5       Scroll down, Mr. Vasek.  Please scroll down some more.

6       And, again, the Court can read all this.  A lot of this

7   deals with ordinary discovery issues.

8       Stop right there.  Scroll down.  You have to scroll up

9   now.  Okay.  Stop right there.

10      Okay.  So this is Mr. Morris writing to me:  We also

11  expect to produce you the Word versions of each of the notes

12  in advance of the depositions.

13      And here, the depositions we're talking about are those of

14  Mr. Klos and Ms. Hendrix.

15      Please let us know whether we'll challenge the

16  authenticity, et cetera.  Highland has a potential expert, if

17  needed, et cetera.  And then you'll see Mr. Morris continues:

18  Davor, based on Highland's willingness to produce the Word

19  versions of the notes, please confirm that HCMFA and NexPoint

20  will produce those -- those 15(c) response.

21      So, again, this -- this is -- this is reflective of our

22  October 23rd agreement to produce these documents to each

23  other, remembering that I requested these notes in May.  And,

24  really, I don't understand why the Debtor would have not

25  produced those right away with all metadata.

14

 1      And then Mr. Vasek, if you'll please pull up the October
 2   26th email.
 3      And this, Your Honor -- and Mr. Morris, almost immediately
 4   after that, on October the 25th, sends me an email, copying my
 5   associate, with -- with the promissory notes.  But Mr. -- I
 6   think that Mr. Morris's email system, just like mine, it
 7   automatically scrubs metadata from attachments until you --
 8   unless you tell it not to.
 9      So if you'll scroll up, Mr. Vasek, so this is October the
10   25th.  Mr. Morris sends it.  My associate tells him, We still
11   don't have the metadata.  Please check.
12      Keep scrolling up.
13      And Mr. Morris says, in transit, he will respond.  And he
14   did respond.  He sent, on October the 26th, the promissory
15   notes in Word with all metadata intact.  So Mr. Morris did
16   what he said he would, he got it to us, and we had the
17   originals for the Klos, and far more importantly, the Hendrix
18   deposition.
19      You can close that, Mr. Vasek, please.  And pull up one of
20   the notes.
21      So now Mr. Vasek, Your Honor, is going to pull up for you
22   one of the promissory notes in its original Word.  And you
23   will see hopefully why this is of importance to me.  Only when
24   we got this did we see that these notes are electronically
25   signed.

15

1      Go ahead and show Her Honor how -- how you can move it

2   around.

3      You see, Your Honor?  So these are not even electronically

4   signed in the way that there's all these sophisticated systems

5   that have identification and receipts for when you've signed.

6   This is a picture of Mr. Waterhouse's signature that was

7   affixed to this promissory note.

8      More importantly -- if you'll go the metadata, Mr. Vasek

9   -- and I'm sure Your Honor knows what metadata is.  But now,

10  now we see, for the first time, we see that, in fact, this

11  document was created by Strasburger by a lawyer there named

12  Mr. Forsay (phonetic).  I don't know how to pronounce that; I

13  apologize.  But that Ms. Kristin Hendrix actually modified

14  this document and created the document and printed the

15  document on May 3rd and May 2nd, 2019.  In fact, she never

16  printed this document.  She just closed it onto the system,

17  affixing Mr. Waterhouse's picture of his -- of his signature.

18      So this is what spurred the motion.

19      You can close this now, Mr. Vasek.

20      So now we know for a fact, Your Honor, that Mr. Waterhouse

21  didn't sign these notes.  That's a fact.  The only question

22  is, did he authorize Ms. Hendrix to sign the notes for him?

23  And here, the evidence is contradictory.  Mr. Waterhouse --

24  you have it in my brief; I can walk you through the appendix

25  -- Mr. Waterhouse says that in May 2019, May 2019, he very

16

1  rarely authorized anyone to sign anything for him

2  electronically and that it would have been his administrative

3  assistant.  He testified that he would not have signed notes

4  like this unless they were approved by the Debtor's legal

5  department with a little piece of paper on the front and a

6  stamp that said, Approved by blah-blah-blah.  And he -- he

7  testified that if he were to authorize someone to sign a

8  document for him electronically, that he would have done so by

9  an email.

10      Ms. Hendrix testified the opposite.  Ms. Hendrix testified

11 that in May 2019 she was or Mr. Waterhouse was signing almost

12 everything electronically.  She testified that these notes

13 would have been created by her or someone in her department,

14 not by the Debtor's legal department.  And she testified that,

15 well, she would not have signed the notes for Mr. Waterhouse

16 if he had not authorized her to.  But neither she nor Mr.

17 Waterhouse could remember any such authorization.  Neither she

18 nor Mr. Waterhouse have any email communication to that

19 effect.  And the Debtor has not produced any emails such as

20 Mr. Waterhouse said would exist had he authorized this

21 electronic signature.

22      So it appears that Ms. Hendrix deduced or concluded that

23 she was authorized to sign Mr. Waterhouse's name because Mr.

24 Waterhouse, as part of many people in the accounting group,

25 was copied on emails by which she created these notes.  In

17

1  other words, she's told, transfer money from the Debtor to

2  HCMFA.  She does that.  Mr. Klos tells her -- Mr. Klos was her

3  boss then -- prepare notes, because that's standard operating

4  procedure.  And then when she prepares the notes, she

5  circulates them and copies Mr. Waterhouse.  And that's it.

6  From that, she believes that she was authorized to sign his

7  name.

8      Those are questions for the jury.  Those are questions for

9  the jury as to whether there is an estoppel issue, whether Ms.

10 Hendrix was right to conclude that she was authorized, whether

11 Mr. Waterhouse, through a course of conduct and pattern, had

12 authorized her.  I will just say that I analogize it in my

13 mind with our Local Rules and our practices and procedures.  I

14 frequently sign proposed orders for other lawyers, as they do

15 for me, with approval, and we are required to keep an email or

16 fax proof of that.

17     So, where this leaves us is that there is no question Mr.

18 Waterhouse didn't sign the notes.  There is a question as to

19 whether he authorized Ms. Hendrix to sign the notes.  That's a

20 question for the jury.  If in fact he did not sign the notes,

21 there is a material defense under the Uniform Commercial Code

22 that strips the notes of their prima facie validity.

23     We have denied in our prior answer that we signed the

24 notes.  That is potentially ambiguous.  We deny that we've

25 signed the notes because Mr. Waterhouse didn't sign them in a

18

 1   representative capacity.  We now want to more clearly assert

 2   that, in fact, the notes were not signed at all, because

 3   that's how we read the UCC requirement here.

 4       Your Honor, this is a Rule 15 motion.  This is not a Rule

 5   16 motion.  Leave should be freely given unless there's a

 6   substantial reason not to.  There has been no undue delay.

 7   Your Honor can see very clearly that it was not until late

 8   October that the notes were produced with metadata.  It was

 9   not until Mr. Waterhouse was deposed on October 19th that he

10   first raised the issue of, well, it looks like that's my

11   electronic signature.  These signatures are too perfect to be

12   made by me.  I think he used the word chicken scratch for his

13   writing.

14       So there is no undue delay.  I requested these very early

15   in this lawsuit.  For whatever reason, they were not produced

16   until late.

17       There is no futility, Your Honor.  The Debtor seeks to try

18   the actual merits of the defense.  As I've briefed, the Fifth

19   Circuit is very clear.  On a Rule 15 motion, you apply a

20   reverse 12(b)(6) analysis.  The Court does not look at the

21   merits.  The only question is, is the person seeking to amend

22   its answer asserting an affirmative defense that has a basis

23   in law?  It's a 12(b)(6) standard, and we have demonstrated

24   both legally that failure to sign a note is a defense and

25   we've demonstrated factually, to the extent that factual

1  demonstration is even required, that there is substantial

2  evidence, although it's disputed, admittedly, that the Debtor

3  -- I'm sorry, that HCMFA did not sign these notes nor

4  authorize their signature.  So there is no futility issue,

5  Your Honor.

6      There's no bad faith.  There's no dilatory -- there's no

7  -- nothing like that.  This is not going to delay any trial.

8  If they want more discovery, they can have it.  But Waterhouse

9  and Klos and Hendrix have been deposed about these very, very

10 issues.  And they were deposed at length.  This is -- but

11 ultimately, whenever trial is going to be, whenever the MSJ

12 rulings are going to be, none of this should have to delay any

13 of that, unless the Debtor wants to delay it.

14     And, again, if the Debtor wants more discovery -- it's

15 suggested it wants discovery of D.C. Sauter and James Dondero

16 and others -- it can have it.  But I'm telling you that only

17 Hendrix, who prepared these notes, only Klos, who instructed

18 her to prepare these notes, and only Waterhouse, who allegedly

19 signed them or authorized them to be signed, are relevant, and

20 they have been deposed at length.   And by the way, Your

21 Honor, Klos and Hendrix are still employed by the Debtor.  The

22 Debtor doesn't need to depose them to get whatever additional

23 information it may need.  And Your Honor, so there is no undue

24 prejudice.

25     And Your Honor, finally, there have not been repeated

20

1   failures to cure prior omissions.  Yes, this is our second

2   motion, that is true, but we did not have any cause or

3   reasonable cause to seek such relief before the end of

4   October.

5        And Your Honor, I think that we are entitled to a little

6   bit of understanding here, that it was not until several

7   months after we were sued that we were even allowed to talk to

8   our CFO about this lawsuit.  Your Honor has in the record

9   communications from Mr. Seery forbidding Mr. Waterhouse or us

10  -- perfectly rationally so; I'm not here to criticize Mr.

11  Seery -- but he forbade Mr. Waterhouse from discussing these

12  matters with us, and it was not until Mr. Waterhouse was

13  terminated, which would have been in March of this year, and

14  it wasn't until sometime later that we were actually able to

15  talk to our CFO and the person who purportedly signed these

16  notes.

17       So the fact that this is our second motion to amend really

18  should not bear any weight to these issues, especially under

19  the facts of this case.

20       Your Honor, that is both my opening, I guess, and my

21  closing.  I have -- I have nothing more except to, I guess,

22  address any issues that Mr. Morris raises.  And I'll rest,

23  really, on our appendices and my argumentation.

24           THE COURT:  Well, I'll ask you this question, since

25  you said that was your opening and closing:  I almost always

1   create a timeline in situations like this.  And you said it

2   was several months before your client could talk to Mr.

3   Waterhouse.  And my timeline shows that December 3, 2020,

4   Highland made a demand on these notes.  And then January 22,

5   2021, this adversary was filed to collect on the notes.  And

6   then in February, I don't have the exact date, sometime in

7   February Waterhouse was terminated from the Debtor.  And then

8   he said in his 400-page deposition that I read yesterday

9   afternoon March 1st was when he started with Skyview, which

10   obviously serves in the same role that Highland did as far as

11   shared services for HCMFA.

12       So my point is it wasn't really several months, right?  It

13   was just about a month --

14           MR. RUKAVINA:  Well, I think, Your Honor, --

15           THE COURT:  The original answer was filed on March

16   1st, I guess the same day Mr. Waterhouse started with his

17   employment.  And so it wasn't really months before your client

18   had access to Mr. Waterhouse, correct?

19           MR. RUKAVINA:  I think -- I think Your Honor is

20   correct on a technical reading of that, but Your Honor has to

21   take into context Mr. Sauter's declaration and the facts here

22   that on March 1 all of these employees were being

23   transitioned.  Mr. Waterhouse was the CFO.  He had a thousand

24   and one things going on, as did my clients, the Advisors here.

25   And yes, of course, having a lawsuit for $7.4 million filed

22

1    against you is important, and we took it seriously.  We didn't

2    -- we didn't fail to file an answer.  But it's not like this

3    lawsuit was first and foremost on Mr. Waterhouse's mind.

4        Mr. Sauter took a little bit of time before he got Mr.

5    Waterhouse's attention.  So I would say it was, according to

6    his declaration, would have probably been early April, if

7    memory serves -- I don't have it right in front of me --

8    before he was able to discuss the matters with Mr. Waterhouse,

9    which is why I said it was several months before we were able

10   to really talk to him.

11          THE COURT:  Okay.  Mr. Morris, your opening

12   statement?

13          OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

14          MR. MORRIS:  Good morning, Your Honor.  John Morris;

15   Pachulski Stang Ziehl & Jones; for the Reorganized Debtor.

16       Before I get to my prepared remarks, I do want to follow

17   up on the observation you just -- Your Honor just made with

18   respect to timeline.  Mr. Rukavina showed the document request

19   that set forth a demand that the Debtor produce the metadata.

20   And if you look at the last exhibit in the Movant's appendix,

21   you will find Highland's response.  And as he showed you,

22   Highland objected to the phrase metadata as vague.  And that

23   was back in June.

24       No motion to compel, no follow up in the month of July.

25   No motion to compel, no follow up in the month of August.  And

1    mind you, this is at a time that Mr. Rukavina has told you

2    that they knew -- they thought that there might be a problem

3    with the notes.

4         So they sit on their hands in July.  They sit on their

5    hands in August.  They sit on their hands in September.  They

6    sit on their hands in the first two weeks of October.  And

7    within ten days of the follow up request, we produced the

8    documents.

9         I think it's very important for the Court to consider the

10   almost hundred-day delay between the time the Defendant was

11   specifically told that the Debtor objected to the production

12   of metadata and the time they followed up.

13        I'd also like to put into context the notes in their

14   entirety.  These notes were created at a time -- and there is

15   no dispute about this -- that Mr. Dondero controlled both the

16   borrower and the lender.  He controlled both Highland as well

17   as the maker of the note.  There is no dispute about that.

18   This is not an arm's-length negotiation.  This is not a deal

19   between two strangers.  These are all people wearing multiple

20   hats, doing multiple things, at the same time, as Mr. Rukavina

21   just said, in the ordinary course of business.

22        And I think it's really important, when Your Honor hears

23   the technicalities that Mr. Rukavina is raising, to put them

24   in the context of who these people are.  Because as we've

25   cited in our brief, Mr. Dondero has signed notes on behalf of

24

1   Mr. Rukavina's clients in exactly the same way.  So is Mr.

2   Dondero now personally liable?  It's ridiculous.

3        There's also evidence in the record, unobjected to, there

4   are notes in other litigations that have Mr. Waterhouse's

5   electronic signature.  Silence from that Defendant.  Right?

6   These are all people who were working together under the same

7   roof for the same master.  I think the context is very

8   important.

9        Let me spend a moment on the elephant that is not in the

10  room.  You do not have any evidence in the form of testimony

11  or a declaration from anybody with personal knowledge.  Where

12  is Mr. Dondero's declaration?  Where is Mr. Waterhouse's

13  declaration?  He is still the treasurer of the Movant.  Where

14  is Dustin Norris?  Dustin Norris is the executive vice

15  president of the Movant.  Instead, we have two lawyers'

16  declarations, two people who have absolutely no personal

17  knowledge of any of the underlying facts.

18       You have a substantive investigation conducted by D.C.

19  Sauter.  Mr. Sauter has no official relationship to the

20  Movant.  He is not the general counsel.  He is not employed by

21  them.  He never has been.  He simply is the general counsel of

22  NexPoint.  And because the Movant is an affiliate of Mr.

23  Dondero's, he was told, do this.  And he's doing it.  And this

24  is what he did.

25       And we're going to spend a lot of time with Mr. Sauter on

25

1   what Mr. Waterhouse told him last spring that neither he nor

2   HCMFA told this Court.  And he missed the opportunity in the

3   spring and he missed the opportunity again when he submitted a

4   second declaration.  And what Mr. Waterhouse told Mr. Sauter

5   that he declined to share with you proves that this is just

6   nonsense.

7       There are three issues that we're going to address today,

8   two specifically with Mr. Sauter:  undue delay and futility.

9   And the evidence that we have put into the record goes to both

10  issues.  And I'd like to begin just to show you a couple of

11  documents, Your Honor.  And the first one would be Exhibit 7,

12  if we can put that on the screen.  And scroll down, please.

13      This is the genesis, Your Honor.  I think -- wants to

14  know, where did the notes come from?  This is the first note

15  that's created.  It was created on May 2, 2019.  There's no

16  dispute about that.  Nor is there any dispute that Highland

17  transferred to HCMFA $2.4 million on that day.  And this is an

18  email from David Klos to Corporate Accounting.  There will

19  never be a dispute that the corporate accounting group email

20  included Frank Waterhouse.

21      And Mr. Klos's email, look at the subject:  HCMLP to HCMFA

22  Loan.  And he instructs a member of his group to send $2.4

23  million from Highland to HCMFA.  And he says, "This is a new

24  interco loan."  And he asks Ms. Hendrix or another member of

25  the group to prepare a note for execution.

26

1        Mr. Water -- there is no dispute again.  These are just

2   undisputed facts, Your Honor.  Mr. Waterhouse is the treasurer

3   of HCMFA at the same time he's the CFO of Highland.  He wears

4   at least those two hats.  Those are the only two hats we have

5   to talk about today.  He's included on this email because he's

6   in the corporate accounting group.  And I agree with Mr.

7   Rukavina:  We don't have to resolve today what the discussion

8   between any of these people were, because we know it is an

9   undisputed fact that Frank Waterhouse and therefore HCMFA was

10  told on May 2, 2019 that this $2.4 million transfer was being

11  treated as a loan and that the accounting group was going to

12  prepare it.

13       Can we go to the next exhibit, please?  Number 8?

14       This is the next day.  This is the $5 million loan.  And

15  here's another email, this one from Ms. Hendrix.  She again

16  sends it to the corporate accounting group.  Again, Mr.

17  Waterhouse and therefore HCMFA are told by Ms. Hendrix that

18  there was going to be a new $5 million loan and that she

19  specifically says, I will paper the loan.  HCMFA knew on May

20  3, 2019 that Kristin Hendrix was going to prepare a promissory

21  note to support the transfer of $5 million from Highland to

22  HCMFA.  There is no dispute about any of these facts.

23       If Mr. Waterhouse had any question as to what she or Mr.

24  Klos were doing at this moment in time, if he believed that he

25  hadn't given the instruction, that was his moment to speak up.

27

1    Well, that was his first in dozens and dozens of moments to

2    speak up.  But he didn't.

3         Where is the evidence that Mr. Waterhouse -- because this

4    is all out in the open now.  He's still the treasurer of

5    HCMFA.  Where's the declaration from Mr. Waterhouse saying, I

6    didn't see that email?  It never occurred to me what they were

7    doing.  It'll -- there will never be that evidence, Your

8    Honor.

9         So this is just -- this is the beginning.  And, again,

10   this -- these emails, these two documents alone establish both

11   undue delay, because here you're on notice that those pesky

12   Highland accounting folks are running amok here and doing

13   something they shouldn't be doing.  That's what we're told.

14   They shouldn't have -- this was all a grave mistake.  HCMFA

15   knows it.  And you know what they do in less than 30 days?

16   They report these notes in their audited financial statements.

17   I don't want to go through all of my evidence right now, but

18   this is just such incredible evidence.

19        If we can go to the next document, which is the Highland

20   audited financial statements, Exhibit 3.  And this is dated

21   June 3, 2019.  It is literally one month after the notes are

22   executed.  And if we can just flip to Page 39, please.

23        Page 39, you may have seen this referenced in our papers,

24   Your Honor, is the Subsequent Events section.  I apologize.

25   If we could go just to the top of the section so the Court can

28

1   see the section of the financial statements.  Yeah.  Thank

2   you.

3        So, Section 15 is Subsequent Events.  And continued on to

4   the next page, it says, "Over the course of 2019 through the

5   report date, HCMFA issued promissory notes to the partnership

6   in the aggregate amount of $7.4 million."  And it notes the

7   interest rate.

8        So this notion of mutual mistake, it's contradicted by the

9   plain and unambiguous words of Highland's audited financial

10  statements.  And Mr. Sauter is going to confirm what the Court

11  probably already knows and that Mr. Waterhouse is responsible

12  for the oversight of the completion of the audit.

13       But it wasn't just Highland who disclosed the existence of

14  these notes.  HCMFA did it itself.

15       Can we go to Exhibit 6?

16       Now, Your Honor, Exhibit 6 was filed under seal.  We're

17  only going to put up the one piece of Exhibit 6 that relates

18  to the notes.  So on the screen now is the mirror image of the

19  Subsequent Events section, and this is -- Exhibit 6.  This is

20  HCMFA's notes.  Again, this audited financial statements, both

21  audited financial statements are audited by

22  PricewaterhouseCoopers at a time when Mr. Dondero is in

23  control of both entities, at a time when Mr. Waterhouse is

24  serving as both the chief financial officer of Highland as

25  well as the treasurer of HCMFA, and HCMFA's audited financial

29

1    statements also show the recording of these promissory notes.

2        HCMFA knew that the notes existed, and therefore could

3    have and should have began to investigate if they thought

4    those notes were mistakenly created.  But they did nothing.

5    There will never be any evidence to explain why HCMFA included

6    the notes in their audited financial statements and did

7    nothing.  There will never be an explanation for that.

8        There is so much more, Your Honor, that's set forth in our

9    papers.  I'll just summarize that Mr. Waterhouse, wearing both

10   hats, prepared dozens of monthly operating reports that he

11   filed with this Court in which these notes were included as an

12   asset of Highland's bankruptcy estate, that all creditors

13   relied upon those monthly operating reports.  The evidence is

14   going to be in the record now that Mr. Dondero was told

15   multiple times that HCMFA owed Highland over $10 million.  I

16   don't have to get into the details here, Your Honor, because

17   we know from the audited financial statements that the only

18   other obligations to Highland were the $5 plus million in

19   other notes.  The only way you get over $10 million is with

20   these notes.

21       Mr. Dondero -- there will never be any evidence that Mr.

22   Dondero said, hey, how come there's $10 million of notes

23   there?  I thought there was only five.  There will never be

24   any evidence that any of the officers of HCMFA said, hey, how

25   come we're reporting to the Retail Board that there's almost

30

1    $12 million in obligations to Highland?  I thought there was

2    only $5 million of notes.

3        They actually did that, Your Honor.  The Retail Board is a

4    critical piece of evidence here because, as Mr. Norris has

5    testified, it is the reason for the Advisors' existence.

6    These advisory agreements between the Advisors and the retail

7    funds are the reasons the Advisors exist.  And they're subject

8    to annual review.  And the Retail Board specifically asked the

9    Advisors, how much do you owe on notes?

10       And this has nothing to do with Highland employees at this

11   point.  The only people involved in this are HCMFA officers.

12   It's Lauren Thedford, who's the secretary of HCMFA, and it's

13   Frank Waterhouse, who's the treasurer of HCMFA.  And you've

14   got Mr. Norris who's copied on the email, and he's the

15   executive vice president.  And you've got Justin Post, who is

16   the chief compliance officer.  And they're all working --

17   they're Highland employees, including Klos and Kristin

18   Hendrix, frankly, who are copied on this stuff, but they say

19   nothing.  This is the Advisors' own officers who are relying

20   on HCMFA's own balance sheet to report to the Retail Board, in

21   response to their specific question, that these notes are

22   valid obligations.  And they're going to come to court to you

23   today and say they don't think they were signed properly?

24   Seriously?  It's not right.

25       There is no gotcha moment, Your Honor.  HCMFA has known

1    for years of the existence of these notes.  Mr. Rukavina may

2    be doing his investigation in October.  I don't know why it

3    wasn't done in May 2019.  I don't know why it wasn't done in

4    June 2019 when the audited financial statements are prepared.

5    I don't know why it's not done in October, November, December

6    of 2019, postpetition, when Mr. Dondero's entities are filing

7    documents with the Bankruptcy Court signed by Mr. Waterhouse

8    that say, these are valid notes.  Why aren't they

9    investigating?  They're not.  They're telling you and all of

10   the interested parties and all of the stakeholders these notes

11   are there.

12       It's not good faith, Your Honor.  It's bad faith.  And

13   what's worse, and we'll get to it in just a moment, is D.C.

14   Sauter.  Mr. Waterhouse told him exactly why the notes were

15   prepared.  He told it to him three different ways.  And he

16   didn't tell the Court that when he filed his first declaration

17   and he didn't tell the Court that when he filed his second

18   declaration.  Instead, what he actually told the Court is that

19   Frank Waterhouse knows little, if -- little, if anything,

20   about these notes.  And that's just not true.

21       So let's call Mr. Sauter, let's put his declaration into

22   evidence, and let's see what he has to say about what Mr.

23   Waterhouse actually told him that he never disclosed to the

24   Court.

25           THE COURT:  All right.  We'll go to the evidence now.

1   And as I understand, HCMFA is resting on the declaration for

2   the direct testimony.  So, Mr. Sauter, I need you to turn on

3   your audio and video so I can swear you in and we'll allow

4   cross-examination.  Could you say, "Testing, one, two,"

5   please?

6           MR. SAUTER:  Testing, one, two.

7           THE COURT:  All right.  Are others picking up the

8   video?  I don't see it yet, but my device is slower.

9           MR. RUKAVINA:  Yes, Your Honor.  I see Mr. Sauter.

10          THE COURT:  Okay.  All right.  Could you say

11  "Testing, one, two" one more time, Mr. Sauter?

12          MR. SAUTER:  Testing, one, two.

13          THE COURT:  All right.  Please raise your right hand.

14  Do you solemnly swear or affirm that the declaration as well

15  as the testimony you give today was and will be the truth, the

16  whole truth, and nothing but the truth, so help you God?  If

17  so, say, "I do."

18          THE WITNESS:  I do.

19          THE COURT:  All right.  Thank you.  Mr. Morris, you

20  may proceed.

21                      CROSS-EXAMINATION

22  BY MR. MORRIS:

23  Q    Good morning, Mr. Sauter.  Can you hear me okay?

24  A    Yes, sir.

25  Q    Okay.  You're an attorney admitted to practice law in the

Sauter - Cross                                33

1    State of Texas, correct?

2    A    Yes, sir.

3    Q    And you've held your license for about 20 years; is that

4    right?

5    A    Yes, sir.

6    Q    And from 2014 through February 2020, you were affiliated

7    with the law firm of Wick Phillips, correct?

8    A    Yes, sir.

9    Q    And while at Wick Phillips, you provided legal services to

10   NexPoint Advisors and its wholly-owned subsidiaries, correct?

11   A    Yes, sir.

12   Q    And in February 2020, you left Wick Phillips to become

13   NexPoint's general counsel of real estate, correct?

14   A    Not exactly.  I was hired at NexPoint.  I didn't become

15   general counsel until some point in 2021.  I think April,

16   probably.

17   Q    Okay.  I apologize.  But I -- this is difficulty, but I

18   appreciate the clarification, but my question was you became

19   the general counsel of real estate when you first joined

20   NexPoint; is that right?

21   A    That's correct.

22   Q    Okay.  And it wasn't until April or May 2021 that you were

23   promoted to general counsel at NexPoint, correct?

24   A    I was appointed general counsel in April or May, yes.

25   Q    Okay.  And you hold that position today, correct?

Sauter - Cross                              34

1    A    That's correct.

2    Q    And you submitted a declaration in support of Highland

3    Capital Management Fund Advisors' motion for leave to amend

4    their answer in this matter, correct?

5    A    Yes, sir.

6    Q    Okay.

7           MR. MORRIS:  Can we put on the screen Docket #83,

8    which is Exhibit 1, Mr. Sauter's declaration?

9    BY MR. MORRIS:

10   Q    If you'll recall, Mr. Sauter, when we did this in your

11   declaration, if at any time there's anything you need to see

12   in the document, will you let me know that?

13   A    I will.

14   Q    Okay.  And do you understand that this is the declaration

15   that you filed at the end of November in support of HCMFA's

16   motion for leave to amend its answer?

17   A    If that's what you say.  I would need to see the date, but

18   --

19   Q    Okay.

20   A    -- I'll take your --

21   Q    Can you see up top?

22   A    Yes.  Yes, sir.  That looks accurate.

23   Q    Okay.  Who wrote this document?

24           MR. RUKAVINA:  Objection, Your Honor.  It's attorney-

25   client privilege.

Sauter - Cross                                35

1        THE COURT:  Attorney-client privilege?

2   BY MR. MORRIS:

3   Q    Did you write this document, sir?

4        THE COURT:  Okay.  You can rephrase the question, Mr.

5   Morris.

6   BY MR. MORRIS:

7   Q    Did you write this document, sir?

8   A    I worked with my attorneys in drafting the document.

9   Q    Can you tell me which portions you wrote?

10  A    I can't recall exactly which portions I wrote.

11  Q    Can you recall any aspect of this document that reflects

12  your personal edits?

13  A    I did review and edit the document.  I don't recall

14  exactly which portion.

15  Q    Okay.  Did you receive a draft of the document in the

16  first instance?

17  A    Yes, I believe I did.

18  Q    And how many -- how many drafts of this document were

19  created before you signed your name to it?

20  A    I don't know.

21  Q    Was it more than two?

22  A    I don't recall.  I would think it's probably one.

23  Q    Okay.

24  A    After my review.

25  Q    Okay.  So you got the document, you provided some

1  comments, and then you have the final version.  Do I have that

2  right?  To the best of your recollection?

3  A    That's my recollection.  Yes, sir.

4  Q    Okay.  Can you identify any issue on which you provided

5  substantive comments to your declaration?

6  A    I don't recall what those substantive comments were at

7  this time.

8  Q    Okay.  In Paragraph 2 --

9          MR. MORRIS:  If we can go down to Paragraph 2.

10 BY MR. MORRIS:

11 Q    Do you see it says, "I am in-house counsel for both HCMFA

12 and NexPoint, and have been since at least January 1, 2001

13 [sic].  Do you see that?

14 A    Yes, sir.

15 Q    Have I read that accurately?

16 A    Yes, sir.

17 Q    That's not really a true statement, is it?

18 A    I -- I wouldn't have said it if I didn't agree with it.

19 Q    You're not the general counsel of HCMFA, are you?

20 A    I am not the general counsel of HCMFA.

21 Q    In fact, you don't have any official role with HCMFA;

22 isn't that correct?

23 A    I do not have any title with HCMFA.

24 Q    You're not an employee of HCMFA, correct?

25 A    That is correct.

 1  Q    And you never have been, right?

 2  A    That is correct.

 3  Q    You're not an officer of HCMFA, correct?

 4  A    That is correct.

 5  Q    And you never have been; isn't that right?

 6  A    That is correct.

 7  Q    You're not compensated by HCMFA, correct?

 8  A    That is correct.

 9  Q    And you never have been; isn't that right?

10  A    Yes, sir.

11  Q    Instead, you just perform work for HCMFA from time to

12  time, as requested.  Isn't that right?

13  A    That is correct.

14  Q    And that's because HCMFA is affiliated with Mr. Dondero,

15  correct?

16  A    I suppose that's part of the reason.

17  Q    Even though you're not employed -- withdrawn.  Even though

18  you're employed by NexPoint, you perform legal services for

19  other entities affiliated with Mr. Dondero whenever called

20  upon, even though you have no formal role.  Correct?

21  A    That's correct.

22  Q    And that's all you're doing here, correct?

23  A    That's correct.

24  Q    And you admit that for all intents and purposes Mr.

25  Dondero is the controlling person at both NexPoint and HCMFA,

Sauter - Cross                              38

1    correct?

2    A    That's correct.

3    Q    You're aware that about a year ago Highland commenced an

4    action against HCMFA to recover under two promissory notes

5    bearing Mr. Waterhouse's signature?

6    A    That's correct.

7    Q    Okay.  You have no personal knowledge about the origin of

8    those promissory notes, correct?

9    A    I do not.

10   Q    You have no personal -- you had no personal involvement in

11   the TerreStar matters referred to in your declarations,

12   correct?

13   A    I did not.

14   Q    And that's because you were working at Wick Phillips at

15   the time, right?

16   A    That's correct.

17   Q    And even though you had no formal affiliation with HCMFA

18   and no knowledge about any of the facts, you were asked to

19   investigate the origin of the notes that are the subject of

20   the lawsuits, correct?

21   A    That's correct.

22   Q    Who asked you to do that?

23   A    Outside counsel asked me to do an investigation and figure

24   out where the notes came from and what they were for.

25   Q    Is there any particular reason that you know of that

Sauter - Cross                                    39

```
 1  outside counsel didn't make those inquiries?
 2          MR. RUKAVINA:  Your Honor, I object to the extent
 3  that calls for the attorney-client privilege.  I don't know if
 4  Mr. Sauter can answer that without invading the privilege.
 5          THE COURT:  Mr. Sauter, no communications revealed
 6  between you and your lawyer.  If you can answer without doing
 7  that.
 8          THE WITNESS:  I don't know.
 9  BY MR. MORRIS:
10  Q   Okay.  After completing your investigation, you submitted
11  a declaration in support of HCMFA's first motion for leave to
12  amend, correct?
13  A   Yes, sir.
14  Q   Okay.  And your second declaration that you submitted in
15  support of this motion contains a fair portion of what was in
16  the first declaration; do I have that right?
17  A   I believe so.
18  Q   Okay.  Let's look at your first declaration, if we could.
19          MR. MORRIS:  It's -- yeah, there you go.  Exhibit 15.
20  And so if we could scroll down a little bit, perhaps, to the
21  date.
22  BY MR. MORRIS:
23  Q   Oh, actually, you can see at the top.  Do you see it's
24  from May 2021?
25  A   Yes, sir.
```

Sauter - Cross                              40

1    Q    Okay.  And is that around the time that you signed your

2    declaration?

3    A    I believe so.

4    Q    And your declaration set forth the factual basis for

5    HCMFA's motion for leave to amend its answer, correct?

6    A    Yes, sir.

7    Q    And your declaration describes two phases of your

8    investigation, correct?

9    A    I don't recall.

10   Q    Well, the first phase took place between the time the

11   complaint was filed and March 1, 2021, when HCMFA filed its

12   first original answer, right?

13   A    That's correct.

14   Q    Okay.  And during that first phase, you spoke with Mr.

15   Dondero, correct?

16   A    Yes.

17   Q    And Mr. Dondero told you that he couldn't recall the

18   genesis of the notes, correct?

19   A    That's my recollection.  Yes, sir.

20   Q    But he didn't say anything to you that caused you to

21   believe he was unaware of the notes, right?

22   A    Not that I recall.

23   Q    In fact, when you spoke to him, Mr. Dondero had high-level

24   details concerning the notes.  Isn't that right?

25   A    I mean, I think he generally knew what the notes were

Sauter - Cross                                41

1    about, yes.

2    Q    And so it's not like he -- it's not like he told you he

3    never heard of the notes?  He knew what they were about,

4    right?

5    A    He was aware of the notes.

6    Q    Okay.  And he suggested that you speak with Mr.

7    Waterhouse.  Do I have that correct?

8    A    That's correct.

9    Q    And you did that as part of the second phase of your

10   investigation, correct?

11   A    Yes, sir.

12   Q    We'll get to that shortly.  But your declaration --

13           MR. MORRIS:  If we can go to Paragraph 13, please.

14   Okay.

15   BY MR. MORRIS:

16   Q    The second sentence of Paragraph 13 says, "I had no

17   knowledge of them since I had not been employed by HCMFA, and

18   the few employees of HCMFA had no knowledge of the notes."

19   Have I read that correctly?

20   A    Yes, sir.

21   Q    And the people that you're referring to there specifically

22   are Dustin Norris and Jason Post, right?

23   A    They actually were not employees of HCMFA.  It would have

24   been Joe Sowin.  Joe was not aware of the notes.  And I can't

25   recall whether I spoke with any other HCMFA employees, but I

Sauter - Cross                                   42

1   did speak with Mr. Norris and Mr. Post about the notes as

2   well.

3   Q    Okay.  And when you used the phrase the employees at that

4   time you were referring to Norris and Post, correct?

5   A    I'm sorry.  Can you restate that question?

6   Q    Well, you knew Mr. Norris was a vice president of HCMFA;

7   isn't that right?

8   A    I believe he was, yes.

9   Q    Yeah.  And until he recently left, Mr. Post, to the best

10  of your knowledge, was the chief compliance officer for both

11  NexPoint and HCMFA, correct?

12  A    Yes, sir.

13  Q    Okay.  And those two gentlemen told you at that time

14  during Phase I that they didn't know the origin of the notes,

15  correct?

16  A    That's correct.

17  Q    So, because everybody associated with HCMFA at that time

18  told you you were -- they were unaware of the notes, HCMFA

19  served and filed an answer to the complaint that contained no

20  affirmative defenses; isn't that right?

21  A    I don't recall what the -- the answer said, but if you say

22  there were no affirmative defenses, I'll take your word for

23  it.

24  Q    Okay.  I don't want you to take my word for it.  Let's

25  take your word for it.

Sauter - Cross                        43

1              MR. MORRIS:  Can we go to Paragraph 18, please?
2       BY MR. MORRIS:
3       Q    Do you see you wrote in your declaration, or somebody
4       wrote in your declaration, "That original answer did not
5       contain any affirmative defenses because, as explained above,
6       no one at HCMFA knew any of the facts that might give rise to
7       an affirmative defense."
8              That's what you wrote, right?
9       A    Okay.  Yes, you are correct.  There were no affirmative
10      defenses asserted in our answer.
11      Q    All right.  And all of that changed in mid-April 2001
12      [sic]; isn't that right?
13      A    Yes, sir.
14      Q    And that's because Mr. Waterhouse and other former
15      employees of Highland had migrated over to Skyview so you had
16      access to them, correct?
17      A    That's correct.
18      Q    So Mr. Seery's instructions about not speaking to
19      Highland's employees in ways that were inimical to Highland's
20      interests and the Court's TRO were no longer impediments to
21      your ability to speak with Mr. Waterhouse, correct?
22      A    Yes and no.  But for the most part, I would agree with
23      that.
24      Q    You could ask them anything in the world you wanted at
25      that time.  Is that fair?

Sauter - Cross                        44

1   A    That's not entirely fair.

2   Q    Yeah.  Is there anything about the notes that you thought

3   you couldn't ask them?

4   A    Um, I suppose not.  I guess the better question is whether

5   they would be willing to answer.

6   Q    I -- okay.  Is there any question that Mr. Waterhouse ever

7   refused to answer?

8   A    I think he's referred me to his outside counsel when I've

9   asked him questions from time to time.

10  Q    Okay.  But that never occurred during the period when you

11  were doing your investigation, correct?

12  A    I think there may have been some hesitancy from Mr.

13  Waterhouse early on, and I think once he showed that hesitancy

14  -- I try to be respectful of his concerns.

15          MR. MORRIS:  Your Honor, I apologize for this, but my

16  transcript is in another room.  Can we just -- can you just

17  give me thirty seconds, please?

18          THE COURT:  Certainly.  Do you literally need thirty

19  seconds, or do we need to take a five-minute break?

20          MR. MORRIS:  Hopefully less than thirty.

21      (Pause.)

22          MR. MORRIS:  Okay.  Can you scroll down to Paragraph

23  19, please?  Okay.

24  BY MR. MORRIS:

25  Q    So, the last sentence of Paragraph 19, you wrote, "Thus,

1    as of March 2021, I was able to communicate with most former

2    Debtor employees and to access the books and records of

3    Highland -- of HCMFA without fear of violating any court

4    order."

5        Have I read that correctly?

6    A    Yes, sir.

7    Q    And there's nothing in your declaration -- there's nothing

8    in either declaration that suggests you were impeded in any

9    way in speaking to Mr. Waterhouse during your investigation in

10   the spring.  Correct?

11   A    I would say that I wasn't impeded by the court order.

12   That's correct.  And, yes, I -- I don't recall anything

13   specific in either declaration that mentions any impediment to

14   my discussions with Mr. Waterhouse.

15   Q    There's nothing general in either of your declarations

16   either; isn't that correct?

17   A    Yes, sir.  I don't think there is.

18   Q    Okay.  So you didn't think that it was important to tell

19   the Court that there was anything that you were unable to

20   learn from Mr. Waterhouse, correct?

21   A    That's fair.

22   Q    Okay.  And so, with access to Mr. Waterhouse and the other

23   employees and HCMFA's books and records, you conducted the

24   second phase of your investigation, correct?

25   A    Yes, sir.

Sauter - Cross                          46

1    Q    And during the second phase, you reviewed certain

2    documents relating to the TerreStar NAV error, correct?

3    A    Eventually, yes.

4    Q    And specifically, you reviewed three to five documents

5    that included a memo that was submitted to the board of the

6    retail fund as well as maybe some communications with the SEC,

7    correct?

8    A    Yes, sir.

9    Q    And those are the only documents that you were directed to

10   review, correct?

11   A    That's correct.

12   Q    And none of those documents stated that Highland was

13   responsible for the NAV error, correct?

14   A    That's correct.

15   Q    During the two-phased investigation that you conducted,

16   you never saw a document that stated that Highland Capital

17   Management, LP was responsible for the TerreStar NAV error,

18   correct?

19           MR. RUKAVINA:  Your Honor, I'll object.  This is

20   irrelevant.  The only relevance to this motion today is any

21   alleged delay in us asserting the defense that Mr. Waterhouse

22   did not sign the notes.  Counsel here is trying to try the

23   underlying merits, which we are not here to do today.  It's

24   inappropriate.  And frankly, it's trial by ambush.  The only

25   issue that Mr. Sauter is presenting evidence on today is that

Sauter - Cross                            47

1   in April or May Mr. Waterhouse told him that he signed the

2   notes.  That should be the only topic of legitimate

3   questioning.

4            THE COURT:  I overrule.

5            MR. MORRIS:  If I may, Your Honor?

6            THE COURT:  I overrule.

7            MR. MORRIS:  Oh.  Okay.

8   BY MR. MORRIS:

9   Q   So, my question, Mr. Sauter, is that during your two-

10  phased investigation you never saw any document that stated

11  that HCMLP was responsible for the TerreStar NAV error,

12  correct?

13  A   That's correct.  I never saw a document signed by HCMLP

14  that said, we are responsible.

15  Q   And so, notwithstanding your review of the first

16  declaration, you didn't tell the Court that there were no

17  documents that corroborated your conclusion that the payment

18  was supposed to be made on account of Highland's culpability

19  in connection with the NAV error, correct?

20           MR. RUKAVINA:  Your Honor, objection.  That's --

21  that's argumentative and that's not a fair question.  Why

22  would he tell the Court something like that?  It's an

23  argumentative question, not a question of fact.

24           THE COURT:  Mr. Morris?

25           MR. MORRIS:  Your Honor?

Sauter - Cross                          48

1              THE COURT:  Go ahead.  Response?

2              MR. MORRIS:  Yeah.  I would say that -- I would say

3     that we have a declaration on the screen, most of which is

4     mimicked in the current declaration on this motion, that

5     discusses in detail his investigation, his review of

6     documents, and his conclusion that the notes were -- were

7     prepared by mistake because the transfer of funds was supposed

8     to be made for the purpose of compensating HCMFA for

9     Highland's error.  This goes to everything from futility to

10    credibility.

11             THE COURT:  Okay.  I overrule the objection.

12    BY MR. MORRIS:

13    Q    You never disclosed to the Court that there were no

14    documents that supported your conclusion that the notes were

15    prepared by mistake because the payments were supposed to be a

16    form of compensation, correct?

17    A    I don't agree with that statement.

18    Q    Can you show me where in your declaration there's a

19    reference to any documents that support your conclusion that

20    the payment was intended to be compensation and not a loan?

21    A    Say that again, please.

22    Q    We can scroll through your declaration -- withdrawn.  Let

23    me start over, Mr. Sauter.  The question is whether you ever

24    told the Court that your investigation didn't uncover any

25    documentary -- any document -- withdrawn.  The question is

1   whether, during -- you ever disclosed to the Court whether

2   there was ever any documentary evidence that corroborated your

3   conclusion that the payment was intended as compensation and

4   not a loan.

5   A    I'm sorry, I'm having trouble because I think you're

6   asking me to affirmatively state a negative.  And if I can

7   expand, I'll tell you why I'm having trouble.  If you don't

8   want me to expand, then I won't.

9   Q    I appreciate that, Mr. Sauter, and I don't want you to

10  expand.  The only question is whether you need to review more

11  of your declaration than is on the screen.  The only question

12  is whether you ever told the Court that there were no

13  documents that corroborated your conclusion.

14  A    You're asking me to tell you whether there's anything in

15  my declaration that says there's no evidence to support my

16  conclusion, and I'm telling you I would not say that.

17  Q    Okay.  And that's not my question, so I'm sure that it's

18  my fault, Mr. Sauter, and I apologize.

19       Are you aware of anything in your declaration that

20  discloses to the Court that there is no document, that you

21  uncovered no document that stated that Highland Capital

22  Management was responsible for the TerreStar NAV error?

23  A    The only way I can answer it is -- is to answer the

24  question you asked me before, which is I am not aware of any

25  document where HCMLP said, I am responsible for the NAV error.

1  Q   Okay.  I appreciate that.  And in fact, that was true

2  during the investigation and it's true today, eight months

3  later, correct?

4  A   Correct.

5  Q   Okay.  During the second phase of your investigation, you

6  spoke with Mr. Waterhouse, right?

7  A   Yes, sir.

8  Q   And you knew that Mr. Waterhouse was the chief financial

9  officer or the treasurer of HCMFA, correct?

10  A   Yes, sir.

11  Q   And you spoke with a gentleman named Will Mabry.  Do I

12  have that right?

13  A   Yes, sir.

14  Q   And you spoke again with Mr. Norris and Mr. Post.

15  Correct?

16  A   Yes, sir.

17  Q   And based on those discussions and your review of the

18  three to five documents, you concluded "The notes were signed

19  by Mr. Waterhouse" -- withdrawn.

20        MR. MORRIS:  Can we go to Paragraph 22?

21  BY MR. MORRIS:

22  Q   You concluded that "The notes were signed by mistake by

23  Waterhouse and without authority from HCMFA."  That was your

24  conclusion based on your investigation, correct?

25  A   That's correct.

Sauter - Cross                          51

1          MR. MORRIS:  And if we can go to Paragraph 30.

2    BY MR. MORRIS:

3    Q    You also wrote in your declaration, towards the bottom,

4    "It therefore appears that Waterhouse prepared the notes for

5    some internal accounting or other purpose."

6         Did I read that correctly?

7    A    Yes, sir.

8    Q    And that was also part of the conclusions that you reached

9    after conducting this investigation, right?

10   A    Yes, sir.

11   Q    And you interviewed Mr. Waterhouse three times, correct?

12   A    I spoke with him three times, yes.

13   Q    And two of those interviews were face-to-face and one was

14   on the phone, correct?

15   A    Yes, sir.

16   Q    And nobody else participated in those discussions,

17   correct?

18   A    Correct.

19   Q    And you don't recall taking any notes of those interviews,

20   correct?

21   A    I don't.

22   Q    And you don't recall sending any emails summarizing your

23   discussions with Mr. Waterhouse, correct?

24   A    I would not have sent those to Mr. Waterhouse.  I may have

25   sent something to my counsel.

Sauter - Cross                                52

1   Q    Okay.

2   A    But I don't recall them.

3   Q    You don't recall taking -- you don't recall sending any

4   emails to anybody summarizing your discussions with Mr.

5   Waterhouse, correct?

6   A    I don't.

7   Q    Okay.  You don't recall actually showing the promissory

8   notes to Mr. Waterhouse, do you?

9   A    I don't recall.  You're correct.

10   Q    Okay.  But you had the notes with you at the time, right?

11   A    I don't know if I had the notes with me at the time.  I

12   may have.

13   Q    You certainly had access to them; is that fair?

14   A    That's fair.

15   Q    Nothing prevented you from showing the notes to Mr.

16   Waterhouse, right?

17   A    No, sir.

18   Q    You never asked Mr. Waterhouse to confirm his signature on

19   the notes, right?

20   A    I never presented him with the notes and asked him to

21   confirm that those signatures were his.

22   Q    Okay.  But if you had, he may have told you right then and

23   there that that was his electronic signature, correct?

24          MR. RUKAVINA:  Objection.

25          THE WITNESS:  I actually --

Sauter - Cross                                    53

1              MR. RUKAVINA:  Objection, Your Honor.  Speculation.

2              THE COURT:  Overruled.

3              THE WITNESS:  I actually asked him whether he signed

4     them and whether they were electronic signatures, and he

5     indicated that he would not have used an electronic signature

6     at that time, so if they were signed they were his signature.

7     BY MR. MORRIS:

8     Q   But you didn't show him the notes to let him make the

9     determination as to whether or not the signature was his ink

10    signature or whether it was an electronic signature?  He

11    didn't have that opportunity, correct?

12    A   I don't recall doing that.

13    Q   Okay.  And there's no -- but there's no reason you

14    couldn't have done that back in April or May, correct?

15    A   I suppose you're correct, yes.

16    Q   Okay.

17             MR. MORRIS:  Can we flip to the first declaration and

18    go to Paragraph 23?

19    BY MR. MORRIS:

20    Q   Okay.  So, in the middle of this Paragraph 23, it says --

21    it's referring to Mr. Waterhouse.  Do you see that?

22    A   Yes, sir.

23    Q   And you write, "Although he did not remember many, if any,

24    of the facts concerning -- of the facts and circumstances

25    concerning the HCMFA notes," -- do you see that there?

Sauter - Cross                                54

1   A    Yes, sir.

2   Q    That's not accurate, is it?

3   A    It's -- it's accurate.

4   Q    Mr. Waterhouse remembered a lot about the notes, didn't

5   he?

6   A    I suppose that's your opinion.  He didn't have a good

7   recollection of the notes and seemed to be guessing at what

8   had happened and why they were executed.

9   Q    All right.  Let's spend some time looking at what Mr.

10  Waterhouse told you.  Even though you did not show him the

11  promissory notes that are at issue, Mr. Waterhouse made it

12  perfectly clear to you that he was fully familiar with the

13  notes, correct?

14  A    Actually, in the previous sentence, it says the signatures

15  on the notes looked like they were his, so that would indicate

16  that I did show him copies of the notes and he indicated that

17  those were his signatures.

18  Q    That's what it says in this declaration.  That's not what

19  it said in your first declaration, correct?

20  A    I think --

21          MR. RUKAVINA:  That's argumentative.  That's a false

22  logical argument, and it's argument.  It's not a question.  He

23  can -- he can make these arguments in his closing.  Why would

24  Mr. Sauter in his first declaration go through every single

25  thing that he did or didn't do?

1           MR. MORRIS:  Your Honor, I'll just ask him --

2           THE COURT:  Response?

3           MR. MORRIS:  I'll just ask him the -- yeah.  I'll

4    just ask him the question again.

5    BY MR. MORRIS:

6    Q   At the time of your deposition, you had no recollection of

7    ever showing the promissory notes to Mr. Waterhouse, correct?

8    A   I -- it's correct that I don't recall whether I showed him

9    the notes.

10   Q   Okay.  That's all I needed.  Who wrote this declaration?

11   Did you write this declaration?

12   A   Isn't -- isn't this the first declaration?

13   Q   No.  This is the second one.  Who wrote the second

14   declaration?

15   A   It would have been the same process.

16   Q   Where it was presented to you in the initial draft?

17   A   Yes, sir.

18   Q   And how many -- how many drafts do you recall this one

19   going through?  One or more than one?

20   A   One, maybe two.  I don't recall exactly.

21   Q   Can you recall any substantive point in your declaration

22   that you provided a comment on?

23   A   I -- I did provide substantive comments.  I don't recall

24   exactly what they were.

25   Q   Can you identify one?

Sauter - Cross                          56

1   A    I really -- I don't recall.

2   Q    Okay.  So even though you did not -- you have no

3   recollection of showing the promissory notes to Mr.

4   Waterhouse, Mr. Waterhouse made it perfectly clear to you that

5   he was fully aware of the notes, correct?

6           MR. RUKAVINA:  Objection, Your Honor.  That assumes

7   facts not in evidence.

8           THE COURT:  Overruled.

9           THE WITNESS:  Would you repeat the question, Mr.

10  Morris?

11  BY MR. MORRIS:

12  Q    Even though you did not show Mr. -- withdrawn.  Even

13  though you have no recollection of showing Mr. Waterhouse the

14  notes, he made it clear to you that he knew exactly what you

15  were talking about when you referred to the notes, correct?

16  A    Yes, sir.

17  Q    The notes were not a surprise to him, right?

18  A    No, sir.

19  Q    Mr. Waterhouse never told you that he was unaware of the

20  existence of the notes, correct?

21  A    No, sir.

22  Q    You knew when you signed both of your declarations that

23  Mr. Waterhouse was HCMFA's CEO and/or treasurer at the time

24  his signature was put on the notes, correct?

25  A    Yes, sir.

1    Q    Now, notwithstanding your conclusions in your first

2    declaration, Mr. Waterhouse never admitted to signing the

3    notes by mistake, correct?

4    A    Meaning he never said that he signed the notes by mistake?

5    Q    Correct.  He never told you that, right?

6    A    Correct.

7    Q    And that's why there's no reference in either of your

8    declarations to Mr. Waterhouse admitting that he signed the

9    notes by mistake, correct?

10   A    That's right.

11   Q    There's nothing in either of your declarations that

12   suggests Mr. Waterhouse didn't sign or authorize the signing

13   of his signature on the notes, correct?

14   A    I don't think that that's accurate.

15   Q    Mr. Waterhouse did not ever tell you that he's sure he

16   didn't authorize the signing of the notes on his behalf,

17   correct?

18   A    He did not.

19   Q    And the declaration never says that Mr. Waterhouse

20   admitted to having his signature affixed without authority,

21   correct?

22   A    He never said that to me.

23   Q    Now, you specifically asked Mr. Waterhouse, who approved

24   the notes and what was the process?  Correct?

25   A    I did.

1    Q    And this is something that you asked him way back in April

2    or May, right?

3    A    That's correct.

4    Q    And Mr. Waterhouse was very clear to you back in April or

5    May that he couldn't describe the process.  Correct?

6    A    That's correct.  Correct.

7    Q    But he also told you, "The money was transferred, so we

8    signed the notes."  Correct?

9    A    I don't -- I don't know if those were his exact words, but

10   yes, conceptually, that was his statement.

11   Q    And that's how you personally recall his statement,

12   correct?

13   A    Yes.  I personally recall that he said if the money was

14   transferred there had to be a note to document the transfer of

15   funds.

16   Q    You didn't put that in your declaration, correct?

17   A    I -- I don't know that I did, but I don't know that I

18   didn't.  I don't have my declaration committed to memory.

19   Q    I'm sure if it's in there Mr. Rukavina will point it out.

20        So you knew back before HCMFA first sought leave to amend

21   its complaint that Mr. Waterhouse couldn't describe the

22   process by which the notes were created, correct?

23   A    That's correct.

24   Q    And even though you had no personal knowledge of the

25   circumstances surrounding the creation of the notes, you're

1    the only person in the world that you know of that told Mr.

2    Waterhouse he made a mistake in signing the notes.  Correct?

3    A    I'm sorry.  Say that again?

4    Q    Even though you have no personal knowledge of any of the

5    facts or circumstances surrounding the creation of the notes,

6    you told Mr. Waterhouse that he made a mistake when his

7    signature was put on them.  Correct?

8    A    I -- I don't think I ever said to Mr. Waterhouse, you made

9    a mistake.  I certainly asked him that question.

10   Q    Well, you recall during your investigation you told Mr.

11   Waterhouse that he made a mistake, correct?

12   A    I -- I asked him whether he made a mistake and whether it

13   had gone through legal and ethical (garbled) analysis.

14           MR. MORRIS:  Can we call up Mr. Sauter's deposition

15   transcript?  I'm sorry, La Asia, I forget what the deposition

16   -- what the exhibit number is.  And go to Page 57.  I'm sorry.

17   Page 56 at the bottom.

18   BY MR. MORRIS:

19   Q    Mr. Sauter, were you asked these questions and did you

20   give these answers, starting on Page 56, Line 24:

21        "Q    Okay.  But did you tell him that he made a

22        mistake?

23        "A    I think I implied it.

24        "Q    Do you have a recollection of actually telling

25        him that he made a mistake?

Sauter - Cross                          60

1        "A    That  would  be  my  recollection.   Obviously,  he

2        disagrees with me."

3        Were  you  asked  those  questions  and  did  you  give  those

4   answers in your deposition?

5   A    Yes, sir.

6   Q    Okay.  And you concluded that Mr. Waterhouse made a

7   mistake, even though you have no personal knowledge of

8   anything that happened in connection with the TerreStar

9   valuation issue.  Correct?

10  A    That's correct.

11  Q    And you concluded that Mr. Waterhouse made a mistake, even

12  though you were not involved in any of the decisions that were

13  made in connection with the TerreStar valuation issue,

14  correct?

15  A    I was not involved in the decisions.  That's -- that's

16  correct.

17  Q    And you concluded that Mr. Waterhouse made a mistake even

18  though you weren't involved and had no responsibility for

19  formulating HCMFA's response to the SEC, correct?

20  A    That's correct.

21  Q    And you concluded that Mr. Waterhouse made a mistake even

22  though you had no responsibility or involvement in the

23  decision as to how HCMFA was going to fund the NAV losses,

24  correct?

25  A    That's correct.

Sauter - Cross                              61

1    Q    And you concluded that Mr. Waterhouse made a mistake even

2    though you had no responsibility or involvement in formulating

3    HCMFA's report to GAF, the fund, the Global Allocation Fund.

4    Correct?

5    A    That's correct.

6    Q    And, again, despite not having any of that personal

7    knowledge, you told Mr. Waterhouse or you implied that he made

8    a mistake in executing the notes, correct?

9    A    That's correct.

10   Q    And Mr. Waterhouse obviously disagreed with you.  Correct?

11   A    That's correct.

12   Q    But you didn't inform the Court last spring that you

13   interviewed Mr. Waterhouse, the treasurer of HCMFA, the person

14   whose signature appears on the notes, you didn't tell the

15   Court that Mr. Waterhouse disagreed with your conclusion,

16   correct?

17   A    That was -- that would have been supposition on my part,

18   but no, I did not.

19   Q    What would be supposition?

20   A    Stating that Mr. Waterhouse disagrees with my conclusions.

21   Q    He obviously disagreed with your conclusions, correct?

22   Those are your words, correct?

23   A    I believe he disagreed with my conclusions, yes.

24   Q    But you didn't tell the Court that back in the spring, did

25   you?

Sauter - Cross                            62

1   A    No, sir, I did not.

2   Q    And Mr. Waterhouse didn't just disagree with you, did he?

3   A    I'm sorry?

4   Q    Mr. Waterhouse didn't just disagree with the notion that a

5   mistake was made, correct?  He actually told you exactly why

6   the notes were created.  Isn't that right?

7   A    I -- I don't agree with that.

8   Q    During these private interviews that you had with Mr.

9   Waterhouse, Mr. Waterhouse told you exactly why he believed

10  the notes were created, correct?

11  A    He told me why he believed the notes were created, yes.

12  Q    And so he did, in fact, remember the facts and

13  circumstances concerning the notes, correct?

14  A    I would stand by my earlier comment that he told me why he

15  believed the notes were signed.  I don't know that his memory

16  of the events is crystal clear.

17  Q    But it certainly was his belief, right?

18  A    Yes, sir.  I would agree with that.

19  Q    And he's the person whose signature appears on the notes,

20  correct?

21  A    Yes, sir.

22  Q    And he was the treasurer of HCMFA at the time the notes

23  were created, correct?

24  A    He was.

25  Q    Mr. Waterhouse specifically told you, "We transferred the

Sauter - Cross                    63

1   money so I executed the notes.  HCMFA didn't have the money to

2   pay GAF and so we transferred it from HCMLP and I executed the

3   notes."  That's what he told you, correct?

4   A    Something along those lines, yes.

5   Q    That's exactly what he told you, right?

6   A    I don't know that that's verbatim, but yes, that's my

7   recollection of what he said.

8   Q    And Mr. Waterhouse went even further in describing the

9   facts and circumstances concerning the notes, including an

10  explanation to you of why the notes were prepared.  Correct?

11  A    Could you expand on that?

12  Q    Sure.  Mr. Waterhouse specifically told you that the notes

13  were prepared for accounting purposes, right?

14  A    That was one of the reasons, yes.

15  Q    Uh-huh.  And he told you -- it's your specific

16  understanding that both HCMFA and Highland disclosed the

17  existence of the notes to their respective outside auditors

18  within thirty days of their execution, correct?

19  A    Yes, sir.

20  Q    In fact, it's your understanding that the notes were

21  prepared for the audit, correct?

22  A    I -- no, I don't know for certain that they were prepared

23  for the audit.  But I don't disagree that they were disclosed

24  to the auditors.

25          MR. MORRIS:  Can we go to Page 71, please?

Sauter - Cross                              64

1        Your Honor, there's an objection that Mr. Rukavina lodged

2   that I would ask the Court to rule on before I examine Mr.

3   Sauter once we put it up on the screen.  So, it's Page 71,

4   Lines 4 through 9.  Yes.

5            THE COURT:  Okay.  Overrule the objection.

6   BY MR. MORRIS:

7   Q    It's your understanding that the notes were prepared for

8   the audit, correct?

9   A    In reading my testimony, yes, I think that's -- that's

10  part of the reason that they were prepared.

11  Q    Okay.  And -- but you never told the Court that, right?

12  You never told the Court of your understanding as to the

13  purpose of the preparation of the notes?

14  A    I don't believe I mentioned the audit in my declaration.

15  No, sir.

16  Q    You didn't mention to the Court in either declaration that

17  it was your understanding that the notes were prepared for the

18  audit, correct?

19  A    I don't think I mentioned the audits in my declarations.

20  That's -- that's correct.

21  Q    Okay.  Now, the preparation of the audit, that is right in

22  Mr. Waterhouse's wheelhouse, correct?

23  A    Yes, sir.

24  Q    You know that Mr. Waterhouse is responsible for overseeing

25  the preparation of HCMFA's audited financial statements,

1  correct?

2  A    Yes, sir.

3  Q    And Mr. Waterhouse, the person responsible for the audit,

4  the person whose name appears on the notes, the person who was

5  the treasurer of HCMFA at the time, he specifically told you,

6  quote, if the money was transferred, he had to have a note to

7  go with it.  Correct?

8  A    Yes.  That's what he told me.

9  Q    And the money was transferred, correct?

10 A    That's my understanding.

11 Q    You don't -- you have no reason to believe -- in fact, Mr.

12 Rukavina, if you heard in his opening, acknowledged that the

13 money was transferred, correct?

14 A    Yeah.  I have no reason to deny that.

15 Q    But you did not inform the Court that the person whose

16 signature appears on the notes explained to you the purpose

17 and origin of them, correct?

18 A    I believe I did have some explanation for the purpose and

19 origin as it was conveyed to me by Mr. Waterhouse.

20 Q    Well, you told the Court in your declaration that's on

21 file right now that Mr. Waterhouse, "did not remember many, if

22 any, of the facts and circumstances concerning the HCMFA

23 notes."  Isn't that right?

24 A    I believe that's -- that's in my declaration.  Yes, sir.

25 Q    Okay.  And you signed that declaration and you filed it

1   with the Court, even though you knew that the notes were

2   prepared in connection with the audit, correct?

3   A    I believe that's one of the reasons the notes were

4   prepared.  Yes, sir.

5   Q    There are other statements in your declarations that Mr.

6   Waterhouse also specifically disagreed with, correct?

7   A    I don't know that I've ever spoken with Mr. Waterhouse

8   regarding my declaration.

9   Q    Okay.

10          MR. MORRIS:  If we can go back to the first

11   declaration, Paragraph 30.

12   BY MR. MORRIS:

13   Q    Okay.  Do you see the third point, towards the end of the

14   paragraph?  It says, "It therefore appears that Waterhouse

15   prepared the notes for some internal accounting or other

16   purpose."  Do you see that?

17   A    Yes, sir.

18   Q    And you raised that issue with Mr. Waterhouse, correct?

19   A    I'm sorry.  We discussed that the notes were prepared

20   because, as I said, the money was transferred and so Mr.

21   Waterhouse was of the opinion, if the money is transferred,

22   there had to be a note.

23   Q    Okay.  And then the second point that you make, --

24          MR. MORRIS:  If we could just go up a little bit.

25   BY MR. MORRIS:

1  Q    It says, "Second, it appears that Mr. Waterhouse assumed
2  incorrectly that the funds being paid by the Debtor were a
3  loan to HCMFA."  Did I read that part correctly?
4  A    You did.
5  Q    And you specifically raised that issue that I just raised
6  with Mr. Waterhouse.  Isn't that right?
7  A    I did.
8  Q    And Mr. Waterhouse would not agree that he made any
9  mistaken assumption, correct?
10  A    That's correct.
11  Q    Mr. Waterhouse refused to admit that he incorrectly
12  assumed that the funds being paid by the Debtor were a loan to
13  HCMFA.  Isn't that right?
14  A    I'm sorry, could you say that one more time?
15  Q    Mr. Waterhouse refused to admit that he made an incorrect
16  assumption concerning the funds being paid by the Debtor to
17  HCMFA.
18  A    Yes, sir.  That's correct.
19  Q    Okay.  And you didn't tell that to the Court in May
20  either, correct?
21  A    I did not.
22  Q    Let's talk about some things that you didn't cover during
23  your investigation that led you to conclude that Mr.
24  Waterhouse signed the notes by mistake and without authority.
25  You never asked Mr. Waterhouse how Highland treated the notes

Sauter - Cross                          68

1    on its books and records, correct?

2    A    That's correct.

3    Q    So when you concluded that the notes were signed based on

4    a mutual mistake, you were unaware that Highland carried the

5    notes at all times as assets on its balance sheet, correct?

6    A    That's correct.

7    Q    You never asked Mr. Waterhouse how HCMFA treated the notes

8    in its books and records, correct?

9    A    That's correct.

10   Q    So when you concluded that the notes were signed based on

11   a mutual mistake, you did not know that HCMFA carried those

12   notes at all times as liabilities on its balance sheet,

13   correct?

14   A    That's correct.

15   Q    We've talked about the audited financial statements, but

16   you never reviewed those as part of your investigation,

17   correct?

18   A    That's correct.

19   Q    So when you concluded that the notes were mistakenly

20   signed, you were unaware that HCMFA had disclosed the

21   existence of the notes in its own audited financial

22   statements, correct?

23   A    That's correct.

24   Q    But you know that now, right?

25   A    I do know that now.

Sauter - Cross                                    69

1   Q    And you can't tell me whether HCMFA made yet another

2   mistake by including the notes in its audited financial

3   statements, correct?

4   A    I'm sorry.  You said yet another mistake?

5   Q    Yeah.  You can't tell me that the inclusion of the notes

6   in the audited financial statements was a mistake.  Isn't that

7   right?

8   A    That -- that's correct.  That's not a decision that I

9   make.

10  Q    And you would agree that your assertion that the notion

11  that the notes were signed by mistake is contradicted by

12  HCMFA's own audited financial statements, correct?

13  A    I would agree that -- that the notes are shown on the

14  audited financial statements without any qualification.

15  Q    All right.  Let's talk about some other things that -- now

16  that you did know last spring, in addition to the stuff we

17  talked about.  In your first declaration, --

18          MR. MORRIS:  If we could go to the first declaration,

19  Paragraph 27.

20  BY MR. MORRIS:

21  Q    You told the Court that HCMFA accepted responsibility for

22  the NAV error and paid approximately $5.2 million on February

23  15, 2019.  Correct?

24  A    Yes, sir.

25  Q    But the money used to pay the Global Allocation Fund

Sauter - Cross                          70

1   didn't come from Highland, did it?

2   A    I don't know that.

3   Q    Well, the money came from insurance proceeds and HCMFA's

4   funding of their deductible, correct?

5   A    I believe that that's what's indicated in the memo that

6   I've read.

7   Q    And you read that memo before you submitted your first

8   declaration; isn't that right?

9   A    Yes, sir.  I believe so.

10  Q    And that memo -- and we'll look at it in a moment -- that

11  memo specifically discloses HCMFA's receipt of approximately

12  $5 million of insurance proceeds in connection with the NAV

13  error, correct?

14  A    Yes, sir.

15  Q    But you didn't tell the Court that you had a document in

16  your possession that showed that HCMFA received $5 million in

17  connection with the NAV error, did you?

18  A    I did not.

19  Q    Instead, you speculated that Highland may have tapped into

20  its insurance.  Isn't that right?

21  A    Yeah, I -- the fact of the matter is I don't know much

22  about the settlement of the insurance claim.

23  Q    Well, but before signing your declaration, you reviewed a

24  document that specifically described how the NAV losses were

25  being financed by HCMFA; isn't that right?

Sauter - Cross                            71

1   A    I don't know that I would say financed, but yes, the NAV

2   losses were being paid by HCMFA to Global Allocation Fund.

3   Yes, sir.

4   Q    Okay.

5        MR. MORRIS:  Can we put up Exhibit 31?

6   BY MR. MORRIS:

7   Q    All right.  This is a memo from HCMFA to the board of the

8   Highland Global Allocation Fund dated May 28, 2019.  Do you

9   see that?

10  A    Yes, sir.

11  Q    And what's the memo entitled?

12  A    Resolution of the Fund's Net Asset Value Error.

13  Q    Okay.  And this is one of the three to five memos that you

14  reviewed before signing your first declaration, correct?

15  A    Yes, sir.

16  Q    And this memo -- in this memo, HCMFA is describing for the

17  board the resolution of the NAV error, correct?

18  A    Yes, sir.

19  Q    Okay.

20       MR. MORRIS:  Before we get to the insurance issue,

21  can we just scroll down to the second paragraph?  Okay.

22  BY MR. MORRIS:

23  Q    And let me know if I'm reading this correctly.  The second

24  paragraph of the memo that HCMFA sent to the board of the

25  Highland Global Allocation Fund says, "The Advisor and

1    Houlihan Lokey, an independent third-party expert valuation

2    consultant approved by the board, initially determined that

3    the March transactions were non-orderly and should be given

4    zero weighting for purposes of determining fair value.  As

5    reflected in the consultation, the Advisor ultimately

6    determined that both March transactions should be classified

7    as orderly.  The fair valuation methodology adopted, as

8    addressed in the consultation, weights inputs -- weights

9    inputs and does not reflect last sales transaction pricing

10   exclusively in determining fair value.  The orderly

11   determination and adoption of the weighted fair value

12   methodology -- fair value -- fair valuation methodology

13   resulted in NAV errors in the Fund."  And they define that as

14   the NAV error.

15        Have I read that correctly?

16   A    Yes, sir.

17   Q    Okay.  Highland Capital Management, LP is not mentioned in

18   that paragraph, correct?

19   A    No, sir.

20   Q    In fact, there is nothing anywhere in this memo that tells

21   the board that Highland is responsible for the NAV error.

22   Correct?

23   A    That's correct.

24   Q    But Houlihan Lokey is mentioned, correct?

25   A    Yes.  Because Houlihan is -- was retained or authorized to

Sauter - Cross                              73

1   be retained in connection with valuation services by the
2   board.
3   Q    Okay.  They're a third-party valuation firm, right?
4   A    That's correct.
5   Q    And they were approved by the board, as you just
6   mentioned, correct?
7   A    Yes, sir.
8   Q    And it's your understanding that Houlihan Lokey did the
9   valuation of TerreStar, correct?
10  A    I think Houlihan Lokey would have had input on TerreStar
11  valuation, but they would have done so in conjunction with the
12  valuation team at Highland.
13  Q    It's your understanding that Houlihan Lokey did the
14  valuation of TerreStar, correct?
15  A    No, sir.  I think Houlihan Lokey would have worked in
16  conjunction with the valuation team at Highland to prepare the
17  valuation.
18  Q    Okay.
19       MR. MORRIS:  Can we go to Page 87 of Mr. Sauter's
20  transcript, please?
21       THE COURT:  Mr. Morris, after you're through with
22  this subject matter, we're going to have to take a break.  How
23  much more do you have on this particular line of questioning?
24       MR. MORRIS:  I would -- just a moment.  And I don't
25  think I have more than ten minutes after that.  But I'm happy

Sauter - Cross                    74

 1  to take a break, Your Honor.

 2          THE COURT:  Okay.  Let's take a ten-minute break.

 3  And I'll let you all know, I have a 1:30 matter, and it's

 4  about ten after 12:00 now.  So we need to be thinking about --

 5  when we come back, I need to know about how much more we need

 6  collectively, okay?

 7          MR. MORRIS:  Yes, Your Honor.

 8          THE CLERK:  All rise.

 9     (A recess ensued from 12:05 p.m. until 12:15 p.m.)

10          THE CLERK:  All rise.

11          THE COURT:  All right.  Please be seated.  All right.

12  We're back on the record in Highland.  Mr. Morris, you may

13  proceed with your questions of Mr. Sauter.  Mr. Sauter, you're

14  still under oath.

15          MR. MORRIS:  All right.  And in response to your

16  question, Your Honor, I don't think I'll have more than about

17  ten or twelve minutes.  And I don't expect to need more than

18  five or ten minutes in my closing.

19          THE COURT:  Okay.

20  BY MR. MORRIS:

21  Q   Mr. Sauter, if you could take a look, please, at Page 87,

22  Lines 2 through 9.  Were you asked these questions and did you

23  give these answers:

24      "Q   Okay.  Who's Houlihan Lokey?  Do you know who

25      Houlihan Lokey is?

Sauter - Cross                                    75

1      "A    It's a third-party valuation firm.

2      "Q    Do they have a good reputation?

3      "A    Yes.

4      "Q    And did they do the valuation of TerreStar?

5      "A    That's my understanding.

6      Did you give those answers to those questions, sir?

7  A    Yes, sir.

8  Q    Okay.  And you don't know if anyone's ever suggested that

9  Houlihan Lokey was responsible for the valuation error,

10  correct?

11  A    I don't know whether anybody ever suggested that or not.

12  Q    And that's because -- and that's because you never asked.

13  Fair?

14  A    I suppose that's fair.

15  Q    Okay.

16         MR. MORRIS:  Now, if we could go back to Exhibit 31,

17  please, that second paragraph.

18  BY MR. MORRIS:

19  Q    You would agree with me that the second paragraph, to the

20  best of your knowledge -- withdrawn.  You would agree with me

21  that in the second paragraph HCMFA accurately defined NAV

22  error for the GAF board, correct?

23  A    Based upon my understanding of the NAV error, yes, I would

24  say that is correct.

25  Q    In fact, at the time of your deposition, you had no reason

Sauter - Cross                         76

1    to believe that HCMFA had inaccurately defined NAV error for

2    the GAF board, correct?

3    A    That's correct.

4    Q    But when you signed your first declaration, you didn't use

5    HCMFA's definition of NAV error, did you?

6    A    I don't recall.  I mean, if you could show me, I think

7    that would help me.

8    Q    Sure.

9              MR. MORRIS:  Can we put back the first declaration

10   and go to Paragraph 25?

11   BY MR. MORRIS:

12   Q    In Paragraph 25, you define NAV error as, "The Debtor made

13   a mistake in calculating the NAV."

14       Have I read that correctly?

15   A    You did.

16   Q    That's pretty different than the way HCMFA described the

17   NAV error in its memo to the GAF board, correct?

18   A    I think we're talking about two different things.  But

19   yes, I would agree that they are different --

20   Q    And you knew --

21   A    -- definitions.

22   Q    And you knew when you signed this declaration that HCMFA

23   had defined NAV error in the manner set forth in its

24   memorandum to the GAF board, correct?

25   A    I suppose so.  But, again, I think we're talking about two

Sauter - Cross                          77

1   different things.

2   Q   Okay.  You didn't use HCMFA's definition of NAV error in

3   your declaration, correct?

4   A   I don't believe I described the nature of the NAV error.

5   No, I did not.

6   Q   And you didn't -- you didn't make the Court aware of

7   HCMFA's definition of NAV error at the time you submitted this

8   declaration, correct?

9   A   I did not.

10   Q   All right.  Let's go back to the insurance issue and the

11   source of funding.  You wrote in Paragraph 27 of your

12   declaration that the first payment was made in February 2019,

13   correct?

14          MR. MORRIS:  We can go back.  Yeah.  Right there at

15   the bottom.

16          THE WITNESS:  Yes.  Based upon the records that were

17   available to me, yes, I think that's accurate.

18   BY MR. MORRIS:

19   Q   And that was -- that was just over $5 million, right?

20   A   Correct.

21   Q   All right.  Now let's go back to the memo to the board

22   that you had in your possession at the time you signed your

23   declaration.  And if we could look at the second page.  This

24   second page is entitled, NAV Error Breakdown and Make Whole

25   Payments.  Do you see that?

Sauter - Cross                          78

1    A    Yes, sir.

2    Q    And you understand that the first row shows that the total

3    estimated net loss resulting from the NAV error was

4    approximately $7.44 million, correct?

5    A    Yes, sir.

6    Q    And you understood that the chart depicts the sources that

7    were going to be called upon to fund the $7.44 million payment

8    from HCMFA to the GAF, correct?

9    A    Yes.  That's what it purports to state.

10   Q    And you understood before you signed your declaration that

11   the GAF board was told in this chart that about $5 million of

12   the total loss was being funded through HCMFA's insurance,

13   correct?

14   A    I don't know whose insurance it was, but yes, it states

15   that there's $4.939 million in insurance proceeds.

16   Q    Did you ask anybody whose insurance proceeds those were?

17   A    I don't recall.

18   Q    But this also says that the deductible was paid by the

19   Advisor, correct?

20   A    That's what it says.  Yes, sir.

21   Q    Okay.  Does that lead you to conclude that it's the

22   Advisor's insurance?  If they were paying the deductible?

23   A    Not necessarily.

24   Q    Okay.  But despite having a document that showed $5

25   million coming from insurance, you didn't ask anybody about

1  whose insurance policy that was being tapped, right?

2  A    At the time, I did not.  No, sir.

3  Q    And you never disclosed to the Court, either last spring

4  or in connection with this motion, that there were insurance

5  proceeds of $5 million that were used to pay about two-thirds

6  of the total net loss for the NAV error, correct?

7  A    No, sir.

8  Q    You have no reason to believe that the source of the

9  funding of the $7.44 million was anything other than what's on

10  this page, correct?

11  A    No, sir, I don't -- I wouldn't know beyond what's on this

12  page.

13  Q    Okay.  And this memo was dated at the end of May 2019; is

14  that right?

15  A    I'll take your word for it, or you can show me, but --

16  Q    Yeah.  No problem, Mr. Sauter.

17          MR. MORRIS:  Let's go back to the top.

18  BY MR. MORRIS:

19  Q    Okay.  Do you see it's May 28, 2019?

20  A    Yes, sir.

21  Q    And that's --

22  A    I agree.  Yes.

23  Q    And that's weeks after Highland's transfer of the $7.4

24  million, correct?

25  A    Yes, sir, I believe so.

Sauter - Cross                          80

1    Q    Okay.  But there's nothing in this report to the board

2    that discloses that Highland made any payment towards the

3    funding of the net losses arising from the NAV error, correct?

4    A    No, nothing in this document indicates that Highland paid

5    for the net losses, the NAV error.

6    Q    And you don't know if HCMFA ever returned the insurance

7    proceeds to the carrier after receiving the $7.4 million from

8    Highland, correct?

9    A    I do not.

10   Q    And that's because you never asked, correct?

11   A    That -- correct.

12   Q    Okay.  Now, after completing your investigation last

13   spring, you learned that on May 3, 2019 HCMFA needed another

14   $5 million for a matter completely unrelated to the NAV error.

15   Correct?

16   A    I'm sorry.  Say that again?

17   Q    After your investigation was completed, you learned that

18   on May 3, 2019 HCMFA needed $5 million for a purpose

19   completely unrelated to the NAV error, correct?

20   A    I can't specify the date, but yes, I did learn that there

21   was a need for additional -- additional funding.

22   Q    And in fact, Mr. Norris told you that Highland transferred

23   $5 million on May 3, 2019 because HCMFA needed that money to

24   pay what is known as a consent fee.  Correct?

25   A    Again, I'm not sure about the exact dates, but yes, that's

Sauter - Cross                          81

1    correct.

2    Q    Your declaration -- neither of your declarations disclose

3    anything about the $5 million consent fee that Mr. Norris told

4    you about, correct?

5    A    No, sir.

6    Q    Neither of your declarations discloses that Mr. Norris

7    specifically told you that the $5 million transferred by

8    Highland on May 3rd was to enable HCMFA to pay a consent fee,

9    correct?

10   A    I don't know that Mr. Norris ever said that to me.

11   Q    Well, -- (pause).

12           MR. MORRIS:  Can we go to Page 104 of Mr. Sauter's

13   transcript, please?

14   BY MR. MORRIS:

15   Q    I'm going to read from Page 104, Line 19, through Page

16   105, Line 6.  Sir, were you asked these questions and did you

17   give these answers:

18       "Q    During  your  discussions  as  part  of  your

19       investigation  with  Mr. Norris  and  Mr. Post  and  Mr.

20       Dondero  and  Mr. Waterhouse,  did  anybody  tell  you  why

21       Highland paid HCMFA $5 million on May 3, 2019?

22       "A    Yes.

23       "Q    And why did -- what did they tell you?

24       "A    It was a payment for a consent fee.

25       "Q    All right.  Okay.  Who told you that?

Sauter - Cross                          82

1      "A    Mr. Norris."

2      Did you give those questions -- answers to my questions,

3   sir?

4   A    You read it correctly.

5   Q    Okay.  But you never told the Bankruptcy Court what Mr.

6   Norris told you about the -- about the May 3, 2019 payment,

7   correct?

8   A    No, sir.

9   Q    Before preparing your declaration, you spent time

10  reviewing the Debtor's bankruptcy filings, correct?

11  A    Yes, sir.

12  Q    And it's your understanding that the documents on the

13  docket are publicly available; is that right?

14  A    Yes, sir.

15  Q    And based on the documents on the docket, you were aware

16  that throughout the bankruptcy case the Debtor disclosed the

17  HCMFA promissory notes as assets of the bankruptcy estate,

18  correct?

19  A    Yes, sir.

20  Q    And you'll agree that Highland's view of the notes is

21  reflected in its audited financial statements, its books and

22  records, and its court filings, correct?

23  A    Yes, sir.

24  Q    One other thing you learned during your investigation is

25  that Mr. Waterhouse expressly told you that he did not prepare

Sauter - Cross                                83

1   the notes, correct?

2   A    That's correct.  He said he would not have prepared the

3   notes.

4   Q    So you didn't need metadata to know that Mr. Waterhouse

5   didn't prepare the notes because you knew that last spring,

6   correct?

7   A    I wouldn't necessarily agree with that statement.

8   Q    Well, the metadata may show you who prepared the notes,

9   but you didn't need the metadata to know that it wasn't Mr.

10  Waterhouse, correct?

11  A    That is correct.

12  Q    And Mr. Waterhouse also specifically told you that no

13  formal process was followed to create the notes, correct?

14  A    That's not accurate.  Or at least not entirely accurate.

15  Q    Mr. Waterhouse told you, in response to your question, he

16  couldn't -- he couldn't describe any process that was filed --

17  followed in creating the notes.  Correct?

18  A    He couldn't recall specifically what happened, but he told

19  me what he thought would have happened --

20  Q    Um, --

21  A    -- in the creation of the notes.

22  Q    During your conversations with Mr. Waterhouse, he also

23  told you that the legal department was not involved, correct?

24  A    That's not accurate.

25  Q    Okay.

Sauter - Cross                    84

1        MR. MORRIS:  Can we put up on the screen, please, Mr.
2    Sauter's testimony from Page 63?
3    BY MR. MORRIS:
4    Q   I'm reading from Line 12 through -- let's just go to Line
5    3 at Page 64 for the moment.
6        "Q   What's the basis for your statement that it
7        appeared the Debtor had no intention that there would
8        be notes or that there would be a loan transaction?
9        "A   If you're talking about a $7.4 million
10       obligation, I would assume there would be a process
11       internally on who was responsible for the payment of
12       the fees for the -- or the expenses for the NAV
13       error.    Based on my discussions with Frank
14       Waterhouse, there was no process or the legal
15       department was not involved in making a determination
16       as to whether there should be notes.  It was merely a
17       ministerial act that Accounting performed when they
18       transferred the funds to pay GAF."
19       Have I read that correctly?
20   A   Yes, sir.
21   Q   So you knew, based on your interviews with Mr. Waterhouse
22   last April and May, that Mr. Waterhouse couldn't describe any
23   process for the creation of the notes, correct?
24   A   I think you're asking a separate question.  So I can't say
25   yes or no to that answer without expanding upon it.

Sauter - Cross                    85

1   Q    Okay.  Mr. Waterhouse didn't describe for you any process
2   that was followed for the creation of the notes, correct?
3   A    Again, he couldn't tell me the exact process that
4   occurred, but he told me what he thought would have occurred.
5   Q    Okay.  And during your private conversations with Mr.
6   Waterhouse, he also told you that the legal department was not
7   involved, correct?
8   A    That's not accurate.
9   Q    Did he tell you that the legal department was involved?
10  A    His statement to me was that if the notes were drafted,
11  they would have been drafted by the legal department.
12  Q    So when he told you that, did you ever talk to anybody?
13  Did you talk to Mr. Leventon or Mr. Ellington or any of the
14  other lawyers who had migrated?  Did you follow up with them,
15  --
16  A    Yes, sir.
17  Q    -- ask them -- to ask them what they did?
18  A    Yes, sir.
19  Q    How come you don't mention that anywhere in any of your
20  declarations?
21  A    Because that didn't give me any clarity to what -- what
22  transpired with the notes.
23  Q    It's not -- sir, as you sit here right now, you don't know
24  whether the legal department is involved in all of the notes
25  that are signed by Mr. Dondero and his affiliates; isn't that

1   right?

2   A    In a note of this size, I would fully expect the legal

3   department to have reviewed and approved a note of -- of this

4   nature.

5   Q    And that's just your opinion; isn't that right?

6   A    Yes.  Based upon having worked at NexPoint for the last

7   three years, yes, sir.

8   Q    Yeah.  It's your testimony -- but you cannot tell me, as

9   the general counsel of NexPoint, that the law department or

10  the legal department is involved in every note that's executed

11  by one of Highland's affiliates, correct?

12  A    I can't say definitively one way or another.  That's

13  correct.

14  Q    Okay.  Thank you very much.

15        MR. MORRIS:  Your Honor, I have no further questions.

16        THE COURT:  All right.  Redirect?

17        MR. RUKAVINA:  Yes.

18     Mr. Vasek, please pull up Mr. Waterhouse's deposition

19  transcript.  Go to Page 145.  Do you want to zoom in a little

20  bit, Julian?  Scroll down to the bottom.  Okay.

21                    REDIRECT EXAMINATION

22  BY MR. RUKAVINA:

23  Q    Now, Mr. Sauter, you are familiar with Mr. Waterhouse's

24  deposition transcript?

25  A    Actually, I've never read it.

Sauter - Redirect                          87

1   Q   Okay.  Well, then this might be interesting to you.  So,
2   at the bottom here on 25, I start asking, "Did you ask someone
3   to draft" --
4           MR. RUKAVINA:  Please scroll down.
5   BY MR. RUKAVINA:
6   Q   -- "draft notes?"  And Mr. Waterhouse answers, "I don't
7   specifically ask people to draft notes, really.  I mean,
8   again, you know, the legal group at Highland is responsible
9   and has always been responsible for drafting promissory
10  notes."
11      So did you -- did you not know that that's how Mr.
12  Waterhouse testified until today?
13          MR. MORRIS:  Objection to the form of the question,
14  Your Honor.  He just said that he hasn't read the transcript.
15          THE COURT:  Sustained.
16          MR. MORRIS:  If Mr. --
17          MR. RUKAVINA:  Okay.
18          MR. MORRIS:  If Mr. --
19  BY MR. RUKAVINA:
20  Q   Well, does what Mr. Waterhouse testified to in this
21  transcript that you haven't read comport almost exactly with
22  what he told you in April or May of that year?
23  A   Yes.  That's exactly what he told me, is he would not have
24  signed a promissory note if it had not been prepared and
25  signed off by Legal.

Sauter - Redirect                         88

1  Q    Okay.

2         MR. RUKAVINA:  And scroll down a little bit more,

3  Julian, please.

4  BY MR. RUKAVINA:

5  Q    So, so I ask --

6         MR. RUKAVINA:  Sure.  We'll go to 22.  So I'm asked

7  to re-ask the question, Your Honor.  And I ask the question of

8  Mr. Waterhouse:  "Sure, Mr. Waterhouse.  Based on the practice

9  that you have described in your understanding, do you believe

10  that these notes would have been drafted by someone in the

11  legal department?"  And there's an objection from my co-

12  counsel, which I'll withdraw.  And Mr. Waterhouse answers yes.

13  BY MR. RUKAVINA:

14  Q    Does that also, Mr. Sauter, comport with what Mr.

15  Waterhouse told you when you interviewed him in April or May?

16         MR. MORRIS:  Objection to the form of the question,

17  Your Honor.  He hasn't seen the transcript.  Mr. Rukavina is

18  free to make this argument in his closing, but he shouldn't be

19  crossing his own witness with testimony that his witness has

20  never seen.  He's free to make the argument.  I'm not trying

21  to preclude him from making the argument.  But what I don't

22  want is an evidentiary record created by a witness with no

23  knowledge.

24         MR. RUKAVINA:  Your Honor, this transcript is in the

25  record from both of us.  And Mr. Morris was given great leeway

Sauter - Redirect                         89

1  to take this witness through all kinds of questions,
2  insinuating that this witness was wrong or that he was
3  fabricating issues.  And I think it's perfectly legitimate for
4  me to present him with the actual person's testimony and ask
5  whether that testimony comports with what that person told Mr.
6  Waterhouse earlier in the year.
7           THE COURT:  I overrule the objection.
8  BY MR. RUKAVINA:
9  Q   Mr. Sauter, you just saw Mr. Waterhouse's answer.  Does
10 that answer comport with what Mr. Waterhouse told you last
11 spring about these notes?
12 A   Yes, it does.
13 Q   Okay.  So when you talked in your declarations about Mr.
14 Waterhouse's expectation that things would have gone through
15 Legal, that wasn't just supposition or, I'm sorry, speculation
16 on your part, was it?
17 A   No.  That's -- that's what he told me would have happened,
18 although he again indicated that he doesn't have any specific
19 recollection of the drafting of the notes or any emails --
20          MR. MORRIS:  Your Honor, I renew my objection.  Why
21 isn't the witness here?  He is an officer of HCMFA.  Why isn't
22 he here?  I didn't -- I would have had an opportunity now to
23 cross-examine him on these new issues.
24          THE COURT:  Okay.
25          MR. RUKAVINA:  Your Honor, he's not here because --

1          MR. MORRIS:  So I'm objecting based on the best

2     evidence rule.

3          MR. RUKAVINA:  He's not here, Your Honor, because

4     we're not trying the merits of the underlying lawsuit.  We're

5     trying the sole question of why we took ten months to assert

6     this defense.  That's why I objected earlier when Mr. Morris

7     took this witness on a two-hour trip down cross-examination on

8     irrelevant facts.

9          THE COURT:  Okay.

10         MR. RUKAVINA:  And I think he's opened the door --

11         THE COURT:  I overrule the objection.  Continue.

12         MR. RUKAVINA:  Thank you.

13    BY MR. RUKAVINA:

14    Q    Do you recall my question, sir?

15    A    I'm sorry.  Could you repeat it?

16    Q    Actually, I think you were just answering the question

17    when Mr. Morris objected.

18         MR. RUKAVINA:  Mr. Vasek, go to Page -- oh, hold on a

19    sec, Mr. Vasek.

20    BY MR. RUKAVINA:

21    Q    Mr. Sauter, when you spoke to Mr. Waterhouse in April or

22    May, did you ask him whether he signed these notes?

23    A    I did.

24    Q    And what did he say?

25    A    He said, if my signature's on it, I would have signed it,

Sauter - Redirect                               91

1   because at the time I was not using electronic signatures.

2   Q    Okay.  Thank you.

3   A    And he was unequivocal on that.

4   Q    Okay.

5        MR. RUKAVINA:  Go to Page 139, please, Mr. Vasek.

6   BY MR. RUKAVINA:

7   Q    Did you discuss with Mr. Waterhouse whether he would have

8   been -- strike that.  Did you discuss with Mr. Waterhouse who

9   in the organization would have had the authority to bind

10  anyone on notes of this size?

11  A    I did.

12  Q    Okay.  How did he respond?

13  A    He said that he would not have signed any promissory notes

14  unless they'd been signed off by Legal and signed off by Mr.

15  Dondero.

16  Q    Okay.  Now, when Mr. Morris was asking you some questions,

17  he asked you about whether you ever told Mr. Waterhouse that

18  he had made a mistake.  I think the implication was that, who

19  are you after the fact to tell him that he made a mistake?

20  So, so we'll look very quickly here on Page 139.  I'm asking

21  Mr. Waterhouse, I apologize if I asked you this already, but

22  has anyone ever told you at any time that you were not

23  authorized to sign the promissory notes that are the subject

24  of the sentence we're looking at?  And you see his answer is,

25  Not that I recall.

Sauter - Redirect                               92

1            MR. RUKAVINA:  Yeah.  And scroll down a little bit.

2    And Your Honor can read it for herself, but it goes on:  Let

3    me ask the question again.  Did anybody ever tell you at any

4    time that you made a mistake?

5         Scroll down a little bit.

6         Not that I recall.

7         And I apologize, Your Honor.  That was not me asking those

8    questions.  That was Mr. Morris asking those questions.

9    BY MR. RUKAVINA:

10   Q    So does that refresh your memory, Mr. Sauter, as to

11   whether you actually ever told Mr. Waterhouse that he made a

12   mistake?

13   A    Yeah.  I -- apparently, I never stated to Mr. Waterhouse

14   that -- that he made a mistake in executing the notes.

15   Q    Can you think of any reason why you -- why you would have

16   told him that?

17   A    No.  I -- I wouldn't.

18   Q    Okay.

19           MR. RUKAVINA:  Go to Page 317, please, Julian.

20   Scroll down a little bit.

21        Your Honor, actually, we will pull this down.  I'll argue

22   it at closing.  Go ahead, Mr. Vasek, pull that down, just to

23   hurry this up.  Okay.  Mr. Vasek, please pull up that SEC

24   memorandum.

25   BY MR. RUKAVINA:

Sauter - Redirect                                93

1   Q   Mr. Sauter, are you familiar with this memorandum to the
2   SEC --
3           THE COURT:  Can you say for the record what we're
4   looking at, what exhibit?
5           MR. RUKAVINA:  Your Honor, yes.  I have not
6   introduced this one into evidence yet, so I want him to
7   authenticate it first.
8           THE COURT:  Okay.
9   BY MR. RUKAVINA:
10  Q   Are you familiar with this document, Mr. Sauter?
11  A   I am.
12  Q   Okay.  Is this a document that you relied on in giving Her
13  Honor your first and your second declarations?
14  A   Yes.  It's one of the documents I reviewed.
15  Q   Okay.
16          MR. RUKAVINA:  Your Honor, I'd move to admit this
17  document.  I have not filed an exhibit list because, again,
18  we're proceeding with appendices, so I don't know how to
19  describe it.  Maybe Rebuttal A.
20          THE COURT:  Is it on the docket attached to your
21  appendix?
22          MR. RUKAVINA:  No, Your Honor.  We'll have to --
23  we'll have to upload it or file it after this hearing.
24          THE COURT:  Well, okay.  I first ask, do we have an
25  objection to this because it wasn't disclosed?

Sauter - Redirect                    94

1          MR. MORRIS:  I do, for that very reason.  I don't --
2    I don't understand -- I don't -- I don't understand what's
3    happening.  It's his witness.  It's his motion.  He put forth
4    his evidence.  I don't know --
5          MR. RUKAVINA:  Your Honor, all that I can say is
6    that, again, this motion relates to whether Mr. Waterhouse
7    signed these notes.  Mr. Morris took this witness through
8    question upon question about this NAV error.  Mr. Morris did
9    not present -- just as he accuses this witness of not giving
10   the Court all the relevant information -- he has not presented
11   the Court with this relevant information, which is a document
12   where the Debtor's own employees, the Debtor's employees, are
13   saying we are responsible for this NAV error.  So I think that
14   it is a proper rebuttal.  It's -- I know it's weird to offer
15   an exhibit to rebut my own witness, but this is being done in
16   response to what Mr. Morris was asking him about earlier
17   today.
18         THE COURT:  All right.  Well, if it really indicates
19   what you --
20         MR. MORRIS:  Go ahead.
21         THE COURT:  -- say it indicates, then I guess it
22   would be rebuttal evidence.  So, --
23         MR. MORRIS:  Go right ahead, Your Honor.  No -- no
24   objection.
25         THE COURT:  Okay.  It'll be admitted.  And I guess we

Sauter - Redirect                          95

1  need to call this -- we're going to call it HCMFA's R-1 for

2  Rebuttal 1.  Okay.  File it on the docket that way.

3           MR. RUKAVINA:  Thank you, Your Honor.

4      (HCMFA's Rebuttal Exhibit 1 is received into evidence.)

5           THE COURT:  Go ahead.

6           MR. RUKAVINA:  Scroll down a little bit, Julian,

7  please.  Okay.  Stop there.

8  BY MR. RUKAVINA:

9  Q   So you see, Mr. Sauter, where it says the Advisor

10 representatives, Thomas Surgent, Frank Waterhouse, Jason Post,

11 and Lauren Thedford?  Do you see that?

12 A   Yes, sir.

13 Q   Whose employees were those at that time?

14 A   They were all employees of Highland Capital Management,

15 LP.

16 Q   Okay.

17          MR. RUKAVINA:  Scroll down a little bit more, please.

18 Do you see -- stop there.

19 BY MR. RUKAVINA:

20 Q   Do you see where NAV error is defined?

21 A   Yes, sir.

22 Q   Okay.  So obviously it speaks for itself, but define --

23 tell the Judge how you understood NAV error to be defined when

24 you were undertaking your investigation and when you were

25 preparing your declarations.

Sauter - Redirect                          96

1    A    In preparing my declaration, I was simply referring to the

2    mistake that occurred.  The NAV error resulted from some

3    trades that occurred that I would call, you know, outside of

4    the ordinary course of business or -- or not necessarily at

5    arm's length, and so they were determined to be, quote, non-

6    orderly.

7         I think when the SEC became involved, they made a

8    determination that they believed that the excluded trades were

9    orderly and should have been included in the calculation of

10   the NAV, which ultimately resulted in the NAV error.

11   Q    And is it fair to -- or, did the valuation of the

12   underlying fund have -- or its assets have any role in that?

13   A    No.  It would have been Houlihan Lokey and then the

14   valuation committee and I think the individuals listed above

15   and maybe a few others were on the valuation committee, but

16   it's my understanding that all of the employees on the

17   valuation committee were Highland Capital Management

18   employees.

19   Q    Okay.

20        MR. RUKAVINA:  Mr. Vasek, please pull up the shared

21   services agreement.

22        Your Honor, this agreement is in the record as part of Mr.

23   Sauter's declaration.  This is the HCMFA shared services

24   agreement.

25   BY MR. RUKAVINA:

Sauter - Redirect                                    97

1    Q    Are you familiar with this document?

2    A    Yes, sir.

3    Q    Okay.  And is this a document that you would have

4    consulted as well in reaching your conclusion?

5    A    Yes, sir.

6    Q    Okay.

7         MR. RUKAVINA:  And if you'll scroll to the bottom two

8    pages, Mr. Vasek.

9         Your Honor, this is Annex A.  This shows the services that

10   the Debtor was to be providing.

11        Zoom in a little bit.

12   BY MR. RUKAVINA:

13   Q    Do you see Compliance, General Compliance?  Do you see

14   that, sir?

15   A    Yes, sir.

16        MR. RUKAVINA:  And scroll down, Mr. Vasek.  The top

17   of the next page.

18   BY MR. RUKAVINA:

19   Q    Do you see Valuation Committee?  Do you see that, Mr.

20   Sauter?

21   A    Yes, sir.  Yes, sir.

22   Q    Were compliance and valuation committee, as part of your

23   understanding and investigation, did those services have

24   anything to do with the NAV error?

25   A    Yes, it does.  The Valuation Committee was primarily

Sauter - Redirect                                98

1   responsible for setting the valuation, with the input of

2   Houlihan Lokey, and that's what ultimately resulted in the NAV

3   error.

4   Q    Did you discuss this NAV error with Mr. Dondero?

5   A    I'm sure I did at some point.

6   Q    Okay.  Well, did you -- did you discuss with Mr. Dondero

7   why he told Mr. Waterhouse to transfer $7.4 million to HCMFA?

8   A    I did, after the fact, after discussing it with Mr.

9   Waterhouse.

10  Q    Okay.  And did -- what did Mr. Dondero tell you?

11  A    I mean, generally speaking, you know, he wouldn't have

12  been involved in the determination of the NAV error.  And, you

13  know, I don't know that he recalled any authorization to

14  execute notes from HCMFA to HCMLP in connection with the --

15  with the NAV error.

16  Q    But did he tell you that this was intended by him to be a

17  loan?

18  A    I don't know that he ever said that.

19  Q    Did he indicate to you any surprise that this was carried

20  as a loan?

21  A    I don't know that he would have indicated any surprise.  I

22  think he relied upon Accounting and Legal to make these

23  determinations and provide input to him.

24  Q    Okay.

25          MR. RUKAVINA:  Mr. Vasek, if you'll pull up, please,

1   the Debtor's -- in the Debtor's appendix, it's Exhibit 59.

2   Zoom in, please.  All right.

3   BY MR. RUKAVINA:

4   Q    Are you familiar with this document?

5   A    Yes, sir.

6   Q    And what is this document?

7   A    It's a memo from what I call the Advisors and the broker-

8   dealer to the retail funds, the boards of the retail funds.

9          MR. RUKAVINA:  Mr. Vasek, can you go to the second

10  page, Question 2, where it says, Response?  Okay.

11  BY MR. RUKAVINA:

12  Q    So, in the middle there, Mr. Sauter, it says the earliest

13  the note between HCMLP and HCMFA could come due is in May

14  2021.  Did I read that correctly?

15  A    Yes.  Yes, sir.

16         MR. MORRIS:  Objection to the form of the question.

17  Have we established any foundation that Mr. Sauter saw this

18  memo in connection with his review of the -- with -- in

19  connection with his investigation?

20         THE COURT:  I don't think we have.  So, --

21         MR. RUKAVINA:  Well, Your Honor, this exhibit --

22         MR. MORRIS:  So I object, Your Honor.

23         THE COURT:  Sustained.

24         MR. RUKAVINA:  Again, Your Honor, I apologize.  This

25  is an exhibit introduced by the Debtor in its appendix.  Is

Sauter - Redirect                          100

1   the Court telling me that every exhibit in the appendix has to

2   be individually offered and admitted as though it was a trial?

3         THE COURT:  Well, I don't know if it was foundation

4   or a personal knowledge objection that was being asserted.

5   Mr. Morris, maybe I was hearing something you weren't saying.

6         MR. MORRIS:  Yeah, no, it -- it was both.  I mean,

7   Mr. Rukavina is right.  We -- we have offered this document

8   into evidence.  But there is no -- there is no personal

9   knowledge.  Let him, if he can, let him testify that he's ever

10  seen this before.

11     You know, these are leading questions.  I haven't been

12  objecting.

13     Again, Mr. Rukavina can make whatever arguments he wants,

14  but I'm very wary about just spoon-feeding them to a witness

15  when there's been absolutely no -- and you'll hear this on my

16  recross, when there's been no foundation established that this

17  witness has any knowledge about this document.

18         THE COURT:  Okay.  Well, I sustained -- Mr. Rukavina,

19  you're going to have to establish some personal knowledge on

20  the part of the witness before you start questioning him about

21  it.

22  BY MR. RUKAVINA:

23  Q   Well, let me ask you this, Mr. Sauter.  Obviously, it's

24  our position today that Mr. Waterhouse didn't sign these

25  notes, correct?

Sauter - Redirect                              101

1   A    Yes, sir.

2   Q    Before we filed this motion, had you seen this document?

3   A    I -- I have seen this document.  I can't say for certain

4   when I first saw it.

5   Q    Do you recall whether -- whether this is one of those

6   documents that you would have reviewed in concluding that

7   perhaps Mr. Waterhouse didn't sign the notes?

8   A    I don't recall that.

9   Q    Okay.

10        MR. RUKAVINA:  Well, let's -- let's try a different

11  exhibit here, Julian.  It'll be the Debtor's Exhibit 36.

12  Scroll down a little bit.  Zoom in.

13  BY MR. RUKAVINA:

14  Q    Have you seen this email exchange?  I know you're not on

15  it, but have you seen this email exchange in the course of

16  this litigation?

17  A    I -- I don't recall specifically seeing this, the email

18  communication.  No, I don't.

19  Q    Okay.

20        MR. RUKAVINA:  Very well, then, Your Honor.  I'll

21  move on and I'll just argue these matters at closing.

22        MR. MORRIS:  Just very short recross, Your Honor.

23        THE COURT:  All right.

24        MR. RUKAVINA:  Oh, I'm not -- I'm not done.

25        THE COURT:  Oh, he hasn't passed the witness.

Sauter - Redirect                                102

1          MR. MORRIS:  Oh, I apologize.

2          MR. RUKAVINA:  Just -- just this exhibit, Your Honor.

3          THE COURT:  Okay.

4          MR. RUKAVINA:  In light of the Court's --

5          THE COURT:  Just for my staff and my planning

6    purposes, how much longer do we think this is going to go?

7    This was a one-hour time estimate, and we're now three hours

8    or so into this.  How much longer?  Because I have a 1:30

9    docket and other things this afternoon, including a conference

10   call at 3:00 and -- et cetera, et cetera.

11         MR. RUKAVINA:  I'm almost done, Your Honor, with this

12   witness.  And as I mentioned, I have no other evidence other

13   than what's in my appendix.

14         THE COURT:  Okay.  I'll take "almost done" to being

15   ten minutes or so.

16         MR. RUKAVINA:  Yeah.  I'll beat that, Your Honor.

17      Mr. Vasek, please pull up the Sauter -- Mr. Sauter's

18   deposition.  Go to Page 63.

19         MR. MORRIS:  Your Honor, I don't understand.  He's

20   going to cross his own witness with his own transcript when

21   he's -- is he impeaching him?

22         MR. RUKAVINA:  No.  No.  You would not let him answer

23   a question, and I want to ask him to answer the question.

24         MR. MORRIS:  Well, why don't you just ask him the

25   question?

Sauter - Redirect                          103

1          MR. RUKAVINA:  Please pull up Mr. Sauter's deposition

2     to Page 63.

3          THE COURT:  Oh, --

4          MR. MORRIS:  I object.

5          THE COURT:  -- okay.  Well, I object.  I sustained

6     the objection.  You can use, you know, prior inconsistent

7     statements in a depo or, you know, or a depo to refresh, but

8     you've got the live witness here, so what are we doing?

9     BY MR. RUKAVINA:

10    Q    Do you recall, Mr. Sauter, Mr. Morris just a little bit

11    about taking you through your deposition testimony where he

12    was asking you about whether Mr. Waterhouse told you that the

13    note would have to go through Legal or not?

14    A    I do.

15    Q    Okay.  And I believe you testified something like there

16    were two different things that were being discussed there.

17    A    Correct.

18    Q    Okay.  I would like to give it up -- put up the document

19    so you can read it, but we can't do that, so explain why Mr.

20    Morris was wrong in implying that Mr. Waterhouse was telling

21    you about the promissory notes.

22         MR. MORRIS:  Objection to the form of the question.

23         MR. RUKAVINA:  Well, again, Your Honor, I can't -- I

24    can't present -- he was just asked about this testimony, he

25    said I have an explanation but it's not a yes or no answer,

Sauter - Redirect                    104

1    and I want -- I have the right --

2              THE COURT:  Okay.  Overruled.  He can answer.

3              THE WITNESS:  Thank you, Your Honor.  There were two

4    issues with the notes.  Mr. Waterhouse was adamant that the

5    notes had been prepared by Legal.  I worked with Tim Cournoyer

6    and Lauren Thedford.  They're both good lawyers, and they

7    would not have prepared a note that listed Mr. Waterhouse

8    individually as the maker on the note.  It's an incorrect

9    signature block, and I just didn't believe that they would

10   have done that.

11        But the real issue was whether there was any actual

12   determination of who was responsible for the payment of the

13   NAV error to the GAF, and I asked specifically whether there

14   was a process that involved Mr. Surgent, Mr. Waterhouse, Mr.

15   Dondero, and Mr. Cournoyer in determining who was responsible

16   for that -- that payment.

17        And so those were the two issues.  Mr. Waterhouse was

18   adamant that it had gone through Legal.  So, yes, he did say

19   it had gone through Legal.  But he did not ever say that there

20   was any process in making a determination as to who was

21   responsible for the NAV error vis-à-vis Highland Capital

22   Management and Highland Capital Management Fund Advisors.

23             MR. RUKAVINA:  And Mr. Vasek, will you please pull up

24   Page 162 from the Debtor's appendix?  It's Appendix 162.

25   There it is.  Zoom in a little bit.

Sauter - Redirect                                    105

1   BY MR. RUKAVINA:

2   Q    Mr. Sauter, you were asked about this email before, the

3   one from Mr. Klos.  And do you see, sir, where it says:  This

4   is a new interco loan.  Kristin, can you or Hailey please prep

5   a note for execution?

6        Do you see that, sir?

7             MR. MORRIS:  Object --

8             THE WITNESS:  I do.

9             MR. MORRIS:  -- to the form of the question, Your

10  Honor.  I did not examine this witness with this document.  I

11  used it in my opening, but I certainly did not examine this

12  witness with this document.

13            THE COURT:  Wait, wait.  What is the objection?  I do

14  remember this exhibit and him being asked questions.

15            THE WITNESS:  Correct.

16            THE COURT:  What are you saying?

17            MR. MORRIS:  I'm just saying Mr. Rukavina's lead-in,

18  I mean, --

19            MR. RUKAVINA:  I might be wrong.  I might be wrong.

20            MR. MORRIS:  I used -- I used this document in my

21  opening, Your Honor, but this contradicts everything Mr.

22  Sauter has ever said in his life about these matters, and I

23  don't recall ever cross-examining him with this document.

24            THE COURT:  Okay.

25            MR. MORRIS:  If he's ever seen it before, he can --

Sauter - Redirect                         106

1    he can testify, but --

2           THE COURT:  Okay.

3           MR. MORRIS:  But I don't think there's any

4    foundation.

5           THE COURT:  I don't remember specifically whether it

6    was your opening or in questioning; I just remember seeing it

7    here on my screen.  So if you could rephrase the question.

8           MR. RUKAVINA:  Sure.  No, my only first -- first,

9    just to set up the question, I just asked the witness whether

10   he just read the same thing that I did.  I can't imagine that

11   being objectionable.

12   BY MR. RUKAVINA:

13   Q   Now, Mr. Sauter, my question is, as a transactional lawyer

14   of over twenty years, what does prepare a note for execution,

15   what does execution mean?

16          MR. MORRIS:  Objection to the form of the question.

17   He's not here as an expert.  He -- there's no foundation that

18   he ever saw this document.  If he had, I think it would be

19   even worse for him --

20          THE COURT:  Okay.  Sustained.

21          MR. MORRIS:  -- than it is right now.

22          THE COURT:  Sustained.

23          MR. RUKAVINA:  Okay.  I'll pass the witness, Your

24   Honor.  Thank you.

25          THE COURT:  Recross?

Sauter - Recross                                  107

1          MR. MORRIS:  Just a couple of very brief questions.

2          THE COURT:  Okay.

3                         RECROSS-EXAMINATION

4    BY MR. MORRIS:

5    Q    Mr. Sauter, you made reference to the shared services

6    agreement before, right?

7    A    Yes, sir.

8    Q    You didn't describe that as one of the documents you ever

9    reviewed in your deposition, correct?

10   A    Perhaps I didn't, but I've reviewed it a number of times.

11   Q    And you didn't review it in connection with your

12   investigation, correct?

13   A    I actually reviewed it extensively from January until

14   March with the transition of shared services.

15   Q    There's no argument in your first declaration that relates

16   to the shared services agreement, correct?

17   A    I -- no, I did not mention --

18          MR. RUKAVINA:  Objection, Your Honor.  Let's put up

19   the -- let's put up the document.  I don't remember it being

20   in there.  I don't remember it being attached as an exhibit.

21          MR. MORRIS:  All right.  I stand corrected.

22          THE COURT:  Okay.

23          MR. MORRIS:  I'll move on.  Um, --

24          THE COURT:  Do we want to pull it up, or no?

25          MR. MORRIS:  No, we'll pass.  I'll take Mr.

Sauter - Recross                              108

1  Rukavina's word for it.

2  BY MR. MORRIS:

3  Q    But when you -- when you testified in your deposition, you

4  weren't able to recall having ever looked at that, correct?

5  A    I don't know that I was asked that question.  I'm a

6  hundred percent certain that I probably reviewed it --

7  Q    Okay.

8  A    -- a dozen times --

9  Q    And --

10  A    -- before that declaration.

11  Q    And I think you testified that you don't recall, you --

12  based on what Mr. Waterhouse said, you now want to retract

13  your testimony that you told Mr. Waterhouse he made a mistake,

14  correct?

15  A    I think my initial statement was it was implied, and I

16  think eventually I said that, yes, I probably said something

17  to him that it was a mistake.

18  Q    Okay.  So Mr. Waterhouse's transcript didn't refresh your

19  recollection at all?  That's what you truly believe, correct?

20  A    Truly believe what, sir?

21  Q    That he made a mistake.  Correct?

22  A    I do.  Yes.

23  Q    And whether implicitly or explicitly, you conveyed that

24  message to Mr. Waterhouse, correct?

25  A    That was my view, yes.

Sauter - Recross                               109

1  Q    And it's certainly what you said in your declaration

2  multiple times, correct?

3  A    What's that?

4  Q    That he made a mistake.

5  A    Correct.

6  Q    And you said in your declaration multiple times that he

7  signed the notes, correct?

8  A    Correct.

9  Q    Okay.

10         MR. MORRIS:  I have no further questions, Your Honor.

11         THE COURT:  All right.  Thank you, Mr. Sauter.  That

12  concludes your testimony.

13         THE WITNESS:  Thank you, Your Honor.

14      (The witness is excused.)

15         THE COURT:  What evidence do you all want to have in

16  the record here?

17         MR. RUKAVINA:  Well, Your Honor, again, in reliance

18  on the Local Rules, I filed an appendix.  I think Your Honor

19  mentioned it's an extensive appendix.  It has -- I filed a

20  redacted version, but it's not redacted much.  It has the

21  declaration of Mr. Sauter, which has the shared services

22  agreements, an email from Mr. Seery forbidding communications

23  with the Debtor's employees.  It has the depositions of Mr.

24  Waterhouse, Hendrix, and Klos.  And it has my declaration

25  authenticating certain documents.

110

1      Then I filed a supplemental declaration on Friday in my

2   reply authenticating certain other documents.

3      I believe that those are part of the record under our

4   Local Rules as being in the appendix, but if they're not then

5   I guess I'll move for their admission.

6           THE COURT:  All right.  Let's talk about where on the

7   docket they appear.

8           MR. RUKAVINA:  Okay.  Mr. Vasek might have to help me

9   here.  The redacted appendix -- you see, I don't have an ECF

10  number on the top for some reason.  Sometimes that happens

11  when I'm downloading documents.  Mr. Vasek, maybe you can

12  quickly tell the Court what docket my appendix is at.

13          THE COURT:  Okay.

14          MR. VASEK:  Sure.  It's 87.

15          THE COURT:  86 or 87.  The unredacted is 87.  Okay.

16  This --

17          MR. VASEK:  87.

18          THE COURT:  Say again?

19          MR. VASEK:  Yes, Your Honor.  87.

20          THE COURT:  Okay.  Mr. Morris?

21          MR. RUKAVINA:  That's right.  I'm remembering now,

22  Your Honor -- yeah.  I'm remembering now, Your Honor, that Mr.

23  Morris and I agreed I could file it publicly in unredacted

24  form, so it's 87.  And then my supplemental declaration is at

25  112/1.

111

 1          THE COURT:  Okay.  Is there any objection to that

 2   being in the record, Mr. Morris?

 3          MR. MORRIS:  Yes, Your Honor.  I move to strike from

 4   Mr. Sauter's declaration Paragraphs 6 through 10 and 22 to 31

 5   as lacking any basis in personal knowledge.  Highland

 6   otherwise has no objection to the admission into evidence of

 7   the balance of the Movant's exhibits.

 8          THE COURT:  Okay.  So --

 9          MR. RUKAVINA:  Your Honor, I'll --

10          THE COURT:  -- all those 800-plus pages attached, you

11   have no objection to?

12          MR. MORRIS:  Only -- only if they are described in

13   one of the -- I mean, I can do it that way, Your Honor, if

14   you'll just give me a moment.  But, again, we've got -- we've

15   got a witness here who has no personal knowledge of the shared

16   services agreement he's --

17          MR. RUKAVINA:  John, can you repeat for me the

18   paragraphs that you mentioned you're objecting to?

19          MR. MORRIS:  Yes.  6 through 10 and 22 to 31.

20      (Pause.)

21          MR. RUKAVINA:  Is the Court prepared for my response?

22          THE COURT:  I'm prepared.  I'm looking at it.

23          MR. RUKAVINA:  I don't think that 6 through 10

24   matter.  The rest does matter because it goes exactly to Mr.

25   Sauter's investigation and the reason for why this motion was

112

1   not filed until it was filed.

2       So I think that, again, that these are -- these -- this --

3   he doesn't need -- what are we talking about here?  Are we

4   talking about the underlying facts, that he does not have

5   personal knowledge of?  That's true.  These are not offered

6   for the truth of the underlying facts.  Or are we talking

7   about his investigation and hence the reason why this motion

8   wasn't filed back in April or May?  He does have personal

9   knowledge of that.  He does have personal knowledge of what he

10  relied on.

11          THE COURT:  Okay.  I overrule the objection.  I think

12  this goes to weight, not admissibility.  So, --

13          MR. MORRIS:  All right.  I --

14          THE COURT:  -- everything is admitted.

15          MR. MORRIS:  Just to preserve my record real quick,

16  Your Honor?

17          THE COURT:  Okay.

18          MR. MORRIS:  I'm sorry.  Like, Paragraph 24 is a

19  paraphrase of deposition testimony.  Paragraph 26 is a

20  paraphrasing of deposition testimony.  It has nothing to do

21  with the investigation.  And Highland objects to the inclusion

22  of that stuff in the record.

23          THE COURT:  Okay.  Again, I think this goes to --

24          MR. RUKAVINA:  I don't --

25          THE COURT:  -- weight.

113

1          MR. RUKAVINA:  I don't see --

2          THE COURT:  I admit it.

3          MR. RUKAVINA:  Okay.

4          THE COURT:  I admit it.  Okay.  What else am I going

5    to put in the record here?

6          MR. MORRIS:  I think -- I think, subject to that

7    objection -- is the Movant withdrawing Paragraphs 6 through

8    10?

9          MR. RUKAVINA:  That's fine.

10          MR. MORRIS:  Okay.

11          THE COURT:  Okay.  Well, --

12          MR. MORRIS:  And my -- my --

13          THE COURT:  -- then that is excluded.

14          MR. MORRIS:  -- other objection will be overruled?

15          THE COURT:  I think the only exhibits referenced were

16    the shared services agreements, right, in that bundle of

17    paragraphs?

18          MR. MORRIS:  Yes.

19          THE COURT:  Okay.

20       (Defendant's exhibits contained in Dockets 87 and 112/1

21    are received into evidence as specified.)

22          THE COURT:  So, --

23          MR. MORRIS:  And then, Your Honor -- I'm sorry.

24          THE COURT:  -- as far as Debtor's exhibits?

25          MR. MORRIS:  They appear on Docket #111 as amended by

114

1  113.  They were noted on the witness and exhibit list as

2  Exhibits 1 through 31, although they can also be found on the

3  appendixes at Exhibit 109 -- at Docket #109.  And the Debtor

4  would respectfully move into evidence all 31 exhibits

5  appearing on those three docket entries.

6          THE COURT:  Any objection?

7          MR. RUKAVINA:  Your Honor, so long as it's clear that

8  we're not agreeing that these are admissible at trial and that

9  they're limited to this hearing, no objection.

10          THE COURT:  All right.

11          MR. MORRIS:  As long as it goes both ways, I'm good

12  with that, Your Honor.

13          MR. RUKAVINA:  Yeah.  That's fine.

14          THE COURT:  With that proviso, --

15          MR. RUKAVINA:  I understand.

16          THE COURT:  -- they're admitted.

17      (Plaintiff's Exhibits 1 through 31 are received into

18  evidence.)

19          THE COURT:  All right.  Closing arguments?

20          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

21          MR. RUKAVINA:  I'll be very brief, Your Honor, again.

22  We're here on whether Waterhouse signed the note.  We're not

23  here on whether the underlying NAV error occurred.  We're not

24  here on whether that's what the money was for.  We're here on

25  whether Waterhouse signed the note.  He did not.  He did not

115

 1  sign the notes and we did not learn that until October the

 2  26th of this year.

 3      The question of whether the notes were authorized to be

 4  signed, guess what, that's all Debtor employees.  They messed

 5  it up.  And now the Debtor wants to blame my client because

 6  its own employees can't have a clear trail of where a note is

 7  authorized to be signed.

 8      So what does the Debtor do?  It calls my in-house counsel

 9  and spends an hour and a half trying to character-assassinate

10  him, when, again, the only issue is whether Waterhouse signed

11  these notes, which he did not.

12      There was no undue delay.  The defense is valid under the

13  law, so it's not futile.  The Court cannot try the underlying

14  facts.  It's a 12(b)(6) standard.  There is no dilatory or bad

15  faith motive.

16      This is a Rule 15 motion.  Relief should be freely granted

17  unless there is substantial reason not to grant it.  The

18  Debtor has given you no substantial reason to deny this

19  motion.  The only reason the Debtor gives you to deny this

20  motion, Your Honor, is its view that our defense has no merit,

21  that the mistake, the mutual mistake defense has no merit.

22  And that cannot be tried in the context of this motion.

23      The only other thing that I've heard today, Your Honor,

24  that has any weight under Rule 15 is Mr. Morris's statement

25  that, well, I objected to your request for this promissory

116

1   note.  I objected to it; therefore, you know, you sat -- I
2   think he said exactly that I sat on my hands and did nothing,
3   and I think he took you through June and July and August and
4   September.

5       But look at that objection, Your Honor.  His objection is
6   as follows:  The Debtor objects to the extent the term
7   metadata is vague.  Subject to the general objections and this
8   objection, the Debtor will conduct a reasonable search for and
9   produce documents responsive to this request.

10      The Debtor never says we're not going to produce that.
11  The Debtor never says the term metadata is vague.  The Debtor
12  says that, to the extent it's vague, we object.  That's
13  gamesmanship, Your Honor.  Don't let them get away with such
14  gamesmanship.

15      If I came here with a motion to compel a day after I got
16  served with this, Your Honor would laugh me out of court and
17  Your Honor would sanction me, because Your Honor would say,
18  well, it's just a form objection to the extent something is
19  vague.  And Mr. Morris would come in here and say, oh, whoa,
20  whoa, whoa, whoa, whoa, Davor is completely wrong, of course
21  we're going to -- we're just preserving our rights.  We're
22  going to -- we're going to produce this promissory note.

23      Don't let them get away with that after-the-fact
24  gamesmanship.  That's not a valid objection.  They said they
25  would produce the note with metadata, and they did, in late

117

1   October.  And that's their fault and their fault alone.

2       Your Honor, there is no substantial reason to deny this

3   motion, the one and half hours of cross-examination of my in-

4   house counsel notwithstanding.  We ask that you grant this

5   motion.  Thank you.

6           THE COURT:  All right.  Let me ask you a couple of

7   questions that go to the undue delay factor that courts are

8   supposed to consider in this context.  I'm looking at May 22,

9   2021, when HCMFA filed its first motion for leave to amend

10  answer.  And on May 22nd, Paragraph 1 of that motion states,

11  "Now that the Defendant has access to former employees of the

12  Plaintiff and to various books and records, the Defendant has

13  learned that the notes were unauthorized, represent a mutual

14  mistake, and were never intended as debt, but rather that the

15  Plaintiff was compensating the Defendant for the Plaintiff's

16  own liability to the Defendant for causing a serious valuation

17  error."  And then, "Accordingly, we seek leave to assert this

18  affirmative defense," et cetera, et cetera.

19      Paragraph 14 states, "Waterhouse was not authorized to

20  execute the notes on behalf of the Defendant and he was not

21  authorized to lend funds by the Plaintiff."

22      And then we have Paragraph 22, similar:  It appears that

23  what happened is that Waterhouse, either for some internal

24  accounting purpose or because funds were flowing from the

25  Plaintiff to the Defendant, believed that some document was

118

1  necessary or that what was being funded was a loan, so he

2  unilaterally and in mistake prepared and signed the notes.  In

3  short, Waterhouse made a mistake.  There was no loan.  There

4  was no return consideration for the loan.  And the notes, if

5  anything, are mutual mistakes.  Void.

6      Paragraph 29 says, Waterhouse was CFO of both Debtor and

7  HCMFA at the time he signed the notes.

8      Okay.  So the Court grants leave to HCMFA to file the

9  amended answer.  The Court ruled on July 2, 2021.  The amended

10 answer was filed July 6, 2021.  And the amended answer that

11 was filed on July 6, 2021, Paragraph 43:  At this time, Frank

12 Waterhouse was the chief financial officer to both the

13 Plaintiff and the Defendant.  Waterhouse signed the two

14 promissory notes.  He did not sign the notes in any

15 representative capacity for the Defendant.  The Defendant did

16 not authorize Waterhouse to sign the notes or to bind the

17 Defendant in any way to the note.  Waterhouse made a mistake,

18 da, da, da, in signing the notes.

19     I guess what I'm getting at is I'm seeing that, as early

20 as May, this theory of the case, if you will, had evolved, and

21 it seems like a heck of a long time, five months later, to

22 say, oh, everything we said, yeah, except he didn't even sign

23 the notes.  That feels like what we have here.

24         MR. RUKAVINA:  Well, Your Honor, respectfully, I

25 disagree.  I disagree entirely.  Because whether he physically

119

 1   signed the note or whether he was authorized to sign the note

 2   are two different things.  We've always said he's not

 3   authorized to sign the note.  We've always said that.  And

 4   that's going to be perhaps a question of fact.  But that's

 5   separate from whether he actually signed the note or

 6   authorized Ms. Hendrix to sign the note.  That was not learned

 7   until late October.  That is a separate defense under the UCC.

 8   And, again, that's -- that flows from him telling Mr. Sauter

 9   -- basically; I'm paraphrasing -- well, if it's got my

10   signature, I must have signed it.

11        Not until we saw that these were electronically signed and

12   not until we saw that Ms. Hendrix signed them in late October

13   did we realize that not only was there a mistake all around,

14   but the notes weren't even signed, which makes all the more

15   sense because there was a mistake all around.  Even that

16   smoking gun email from Mr. Morris where Mr. Waterhouse is

17   copied that he referenced in his argument, it says, prepare

18   the notes for execution.  Well, they were not -- they were not

19   executed.

20        So, respectfully, Your Honor, it is wrong to suggest that

21   we knew or should have known about this failure-to-sign

22   argument in May.  That's separate from whether he was

23   authorized to sign.

24             THE COURT:  All right.  My last question is this.

25   Well, maybe it's my last question.  I'm troubled we don't have

120

1    Mr. Waterhouse here today.  As I said in the beginning, this

2    is a very serious motion.  And if it's not obvious, the reason

3    why I say it's a very serious motion is basically what you're

4    telling me is that HCMFA and Mr. Waterhouse and maybe Debtor

5    officers and directors -- I think it all boils down to Mr.

6    Waterhouse, really -- they either lied or made a mistake in

7    about 42 filed documents, including audited financial

8    statements, the 15(c) report, and the monthly operating

9    reports.  I mean, that's about as serious as it gets, right?

10   And Mr. Waterhouse isn't here to say, look, Judge, here's what

11   happened, to the best of my memory.  Here's what happened.

12   Why isn't he here?

13          MR. RUKAVINA:  Your Honor, that's two questions and

14   two answers.  He's not here because, again, I had understood

15   and the practice was always that we don't have live testimony

16   on motions.  If the Court believes that his testimony for

17   whatever reason is necessary, I'll subpoena him.

18          THE COURT:  You don't have a declaration.  You had

19   800 pages worth of testimony --

20          MR. RUKAVINA:  But Your Honor, I had his --

21          THE COURT:  -- and documents.

22          MR. RUKAVINA:  I had his deposition.  I had his eight

23   hours of deposition.  What would be better than his deposition

24   cross-examining under oath in which he -- again, and let's --

25   let me make it clear.  I am not alleging that he or anyone

121

1    lied.  I am not alleging that Debtor representatives lied.  I

2    thought I made it very clear in my motion that all of these

3    mistakes are the result of an initial good faith mistake, a

4    good faith assumption.  So, so I think it's very -- and

5    recall, it's in my motion, --

6              THE COURT:  But --

7              MR. RUKAVINA:  -- recall, Your Honor, --

8              THE COURT:  -- the mistake has resulted in dozens of

9    erroneous reports to stakeholders.

10             MR. RUKAVINA:  That may be.  That may be.  You know,

11   but that is -- that is something that the jury will decide

12   whether it's erroneous or not.

13             THE COURT:  Well, it may go beyond a jury trial just

14   in this adversary, right?  It's pretty serious stuff.

15             MR. RUKAVINA:  It -- it is pretty serious stuff, Your

16   Honor.  The fact -- but, again, I think -- I think all of us

17   -- and I'm being -- please understand, I'm being very

18   respectful and humble here.  I think all of us are going far

19   farther than the narrow actual issue before the Court right

20   now, which is whether Frank Waterhouse signed these notes.

21   All of these issues of mistake, all of these other issues, we

22   don't have evidence on today because we're not trying that

23   today.  I'm sure Mr. Waterhouse, Ms. Hendrix, Mr. Klos, they

24   all acted in good faith.  I am sure.  And as Mr. Klos and as

25   Ms. Hendrix confirmed, over the years they would get hundreds

122

1    of these notes, hundreds of these transfers.  And it was a

2    standard practice to paper them up as a promissory note.  And

3    then of course they'd be carried on books and records as

4    promissory notes.

5        The people that made the initial error, by assumption --

6    not by bad faith; by assumption, or misassumption -- would

7    carry it as an asset on the books and records.  But only Mr.

8    Dondero and perhaps only Mr. Waterhouse know or could have

9    known what the actual purpose of the $7.4 million transfers

10   was.

11       And recall, Your Honor, there were two other promissory

12   notes at about the same time in very similar amounts.  Those

13   promissory notes are valid.  They are valid.  But that, that's

14   why I wanted to walk you through -- it's actually been

15   admitted into evidence now -- Mr. Waterhouse's own emails and

16   Mr. Waterhouse's own Rule 15(c) statement -- it's in my reply

17   brief, Your Honor -- when Mr. Waterhouse refers to these notes

18   as the note and where he says -- Your Honor, it's -- this is

19   his language -- the HCMFA note is a demand note.  There was an

20   agreement between HCMLP and HCMFA the earliest they could

21   demand is May 2021.

22       I say that because again it's clear that everyone was

23   confused about this.  How can the CFO be talking about one

24   note that's not collectable until May 2021, how can he be

25   talking about that unless he truly didn't know about these

123

1  notes and was confused about them?  In good faith?  Because

2  his employees, his -- what's the polite word?  His subservient

3  employees created these notes based on a mistaken assumption

4  and never gave the notes to him to sign.  He never signed

5  them.  And when he or Mr. Dondero would see financials

6  disclosing promissory notes payable by HCML -- HCMFA to HCMLP,

7  they would assume that it's those prior notes that had been

8  extended.

9        THE COURT:  Okay.  Well, --

10       MR. RUKAVINA:  That -- that's -- that's how all this

11 -- Mr. Waterhouse is not lying about not having signed these

12 notes.  Because we have that.  He didn't sign them, the notes.

13 Mr. Waterhouse is not lying, nor is Ms. Hendrix lying, about

14 whether he authorized her to sign these notes for him.  No one

15 is lying to the Court.  The fact is he didn't sign the notes

16 and the fact is the Debtor has no evidence that he authorized

17 --

18       THE COURT:  He didn't -- he didn't ink-sign the

19 notes.  But we have --

20       MR. RUKAVINA:  Right.

21       THE COURT:  -- a dispute, you will acknowledge, about

22 authority.

23       MR. RUKAVINA:  Absolutely.  That is a -- that is a

24 legitimate bona fide dispute, where I understand that there is

25 evidence against me on that.  There's also evidence for me on

124

1  that.

2          THE COURT:  All right.  Mr. Morris, your closing?

3          CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

4          MR. MORRIS:  Your Honor, I think this discussion just

5  highlights the absurdity of all of this.  Mr. Rukavina keeps

6  ignoring the overwhelming evidence here of undue delay,

7  futility, and prejudice.  These notes were described for the

8  treasurer of HCMFA at the moment they were created.  He was

9  told they were being created by the accounting department, he

10  was told that the transactions were being booked as a loan,

11  and he didn't say boo.

12      A month later, they're on HCMFA's audited financial

13  statements.  That is the -- the undue delay clock started on

14  May 2nd and May 3rd, 2019.  How do you have $7.5 million of

15  notes sitting on your balance sheet and nobody asks a

16  question?  Mr. Rukavina says, oh, they thought they were the

17  old notes.  Not possible.  It's an assumption that he's

18  making.  There's no evidence to support it.  And it makes

19  absolutely no sense.

20      How do we know that?  Because those prior notes were $5

21  million.  So how come every single time HCMFA's obligations

22  reported to Highland are more than $10 million?  Where's the

23  evidence to explain that?  They do it to the Retail Board.

24  Mr. Dondero is personally told multiple times during the case,

25  when he's trying -- with his pot plan, it's more than $10

125

1   million.  And you're right, Mr. Waterhouse signed monthly
2   operating reports both before and after Mr. Dondero ceded
3   control that had more than $10 million of assets.

4      For them now to try to run away from that, to try to get
5   to a jury to believe it, is a waste of everybody's time and a
6   waste of everybody's money.  They could have conducted this
7   investigation two and half years ago.  They could have
8   conducted this investigation in June of '19.  They could have
9   conducted the investigation when they were preparing their
10  schedules and their monthly operating reports at the
11  commencement of the case.  They could have conducted this
12  investigation in the fall of 2020 when the Retail Board asks
13  the question, tell me all of the notes that you own.  And the
14  officers of HCMFA tell them it's more than $10 million.  How
15  are you confusing the old notes when you're telling your
16  patron that there's $12 million of notes outstanding, and they
17  tell this Bankruptcy Court dozens of times and they tell
18  stakeholders dozens of times?

19     This is not right, Your Honor.  It's both undue delay --
20  every single time they sign another document, every single
21  time they tell their auditors, every single time they put it
22  on their balance sheet, every single time they tell the Retail
23  Board is an opportunity to say, hey, wait a minute, why are
24  these notes there?  And they never do it.

25     It doesn't even start with Mr. Sauter.  All of this

126

1    happens before Mr. Sauter ever has anything to do with this.

2    Where was the leadership?

3        Mr. Rukavina has the audacity to blame the Debtor's

4    employees?  I have news for him.  The Debtor's employees were

5    under the direction and control of Mr. Dondero and Mr.

6    Waterhouse at all times when this happened.  At all times.

7        This is gaslighting, Your Honor.  It is really not right.

8    The prejudice would be overwhelming.  Mr. Rukavina says I have

9    the transcript.  I didn't know what he was doing.  I didn't

10   know he was trying to create some new record of a defense that

11   had never been pleaded.  That transcript, I would -- I would

12   welcome the opportunity, and I'm going to have it, we can

13   revisit these issues in the context of the existing defenses,

14   but they shouldn't be -- how many bites at the apple can they

15   get?  How many times do they get to try to make it right?

16   They're now trying to convince the Court that they should have

17   the opportunity to do exactly the opposite of what Mr. Sauter

18   found.  He wrote in his declaration that he filed under oath

19   with this Court that Mr. Waterhouse signed the notes and that

20   he did so on mistake, and now he wants to say he didn't sign

21   the notes.  He never put it in front of Mr. Waterhouse.

22       And all of this is really just -- it's just irrelevant,

23   because the one -- the most important evidence that the Court

24   should consider today, the most important evidence that the

25   Court should consider is that Mr. Waterhouse told Mr. Sauter

127

1  multiple times why the notes were created.

2       So we can sit here and talk about metadata if you want,

3  but Mr. Sauter knew, he just didn't tell the Court, he knew in

4  April and May that Mr. Waterhouse told him multiple times that

5  he needed the notes to paper the transfer.  There's no dispute

6  the transfer was made.  He told Mr. Sauter multiple times he

7  needed the notes for the auditors.  There's no dispute about

8  why Mr. Waterhouse -- why he knows the notes were created.

9  It's undisputed.

10      And I just want to finish with this notion that somehow,

11 somehow this is my fault.  It's offensive.  When somebody

12 sends me a document request and I send an objection, you need

13 to follow up.  I'm not -- I don't care what you think.  You

14 wouldn't -- Mr. Rukavina wouldn't have gotten sanctioned if he

15 made a motion, unless he did it without meet-and-conferring.

16 But you know what happened?  When they finally got around to

17 asking for the stuff, not in -- not in May, not in June, not

18 in July, not in August, not in September, but within ten days

19 of his asking I produced them.

20      The one piece of evidence that's missing from this whole

21 frolic and detour is one follow up between May and October:

22 Hey, I haven't gotten the metadata.  Or, hey, you objected,

23 you said the metadata was vague, what do you mean by that?

24 Can we meet and confer?

25      They dropped the ball, Your Honor, and my client shouldn't

128

1   have to pay the price for their negligence.

2       I have nothing further.

3           THE COURT:  I want to ask another question about

4   prejudice.  You know, that's another factor courts are

5   supposed to consider.  I know there's this dispute about

6   motion for summary judgment, was it filed before or after this

7   motion to amend answer?  And I know the obvious answer you're

8   going to tell me is we're ready to go forward on our motion

9   for summary judgment.  If you grant leave to amend, you know,

10  maybe we're going to have to take new discovery, slow down

11  that train.

12      Let me ask you something more -- well, it's nagging at me.

13  I don't know if I want to say it's troubling.  If HCMFA's

14  theory of the case is correct that these notes were not

15  supposed to be created, this was not supposed to be a loan,

16  this was a transfer intended to compensate HCMFA for the

17  losses it incurred that were Highland's fault, blah, blah,

18  blah, okay, this happened in May 2019.  The bankruptcy was

19  October 2019.  To me, that's a -- it's a bombshell morphing of

20  the case, because if that is the reality, then it sets things

21  up for the Plaintiff to argue, well, that was an insider

22  preference, then.  Right?  I don't know.  Am I going down the

23  wrong trail?  It seems like the obvious way this would morph.

24  Except, I guess, the 546 deadline for that ran October 19,

25  2021, which, by the way, is when all of this all kind of came

129

1   out that we went to.  And then to say he didn't sign it, null

2   and void notes.

3      Anyway, am I going down a crazy trail here?  I guess I'm

4   thinking prejudice to the Debtor.  The Debtor has been

5   deprived of the opportunity to assert a preference -- what

6   would seem like an obvious insider preference cause of action

7   if this theory of the case is true.  Am I all wet on that?

8        MR. RUKAVINA:  Your Honor, I'm not going to say those

9   words.  I'm going to say that Your Honor is wrong because the

10   Debtor knew about this defense since May.

11      Now, the primary defense here is that the payment was

12   compensation.  Whether Waterhouse signed the notes or not

13   doesn't matter to that defense.  That defense has been around

14   since May.  Or if I'm -- if I'm wrong, I apologize.  It's

15   whenever I filed the motion to amend.  We just looked that

16   that motion, and I don't have it in front of me right now.

17        THE COURT:  May 22nd.

18        MR. RUKAVINA:  My memory was -- May 22nd.  Since May

19   22nd, the Debtor has known -- and recall the other cases where

20   other Defendants said, well, the notes were forgivable.  And

21   I'm not involved with that, so my knowledge might be a little

22   bit off.  But as I understand it, the Court said, okay, well,

23   I'm going to grant you leave to state that the notes are

24   forgivable, but I'm going to grant the Plaintiff leave to

25   assert a 548.

1    As soon -- as soon as I filed this motion here, the Debtor

2    knew that, if I'm right, then these notes are illegitimate and

3    the $7.4 million in transfers was compensation to a creditor.

4    The Debtor could have likewise said, Judge, as part of giving

5    Mr. Rukavina leave, give us leave to assert an insider

6    preference, and the Court would have certainly granted it.

7    So, and honestly, the thought had not crossed my mind, I

8    doubt it crossed the Debtor's mind, about the potential 546(e)

9    and the 547(b) issues until the Court mentioned them.

10   So I do think that the Court is -- and I don't know,

11   again, what being all wet means, but I think the Court is

12   being a little bit over-paranoid in thinking that somehow the

13   Defendant here delayed to let limitations run.  That was

14   absolutely not the case.

15           MR. MORRIS:  If I may, Your Honor?

16           THE COURT:  You may.

17           MR. MORRIS:  Just briefly.  This is going to be *part*

18   *deux*.  Right?  We had litigations for six months, and then we

19   were presented with the condition subsequent defense that all

20   of the obligors instead of HCMFA asserted, and therefore we

21   had to amend our complaint to add new causes of action and we

22   had another three month delay.

23   If they're permitted to do this, we will again have to

24   amend our pleading to assert breach of fiduciary duty causes

25   of action against Mr. Dondero and Mr. Waterhouse, at a

131

1   minimum.  Okay?  This is going to open up yet another can of

2   worms.

3        And there is no basis for it.  I do not understand how

4   HCMFA has the audacity to run away from notes that they

5   carried on their own balance sheet, that they reported to

6   their own auditors, that they told the Retail Board that they

7   owed, that their treasurer signed and certified to this Court

8   that they were valid obligations for the benefit of the

9   Debtor.  I don't understand how they have the audacity to even

10  do this.

11            MR. RUKAVINA:  But Your Honor, Your Honor, what Mr.

12  Morris says again goes to the merits of a defense that's been

13  on file since May.  If the Court grants the current motion,

14  it's not going to slow down summary judgment proceedings.

15  Whether the note was signed or not does not change the

16  question of whether the note is valid or not, of whether there

17  was a mutual mistake or not.

18       So it's not going to slow down the MSJ proceedings.  And,

19  again, the Debtor has had since May to amend its complaint to

20  assert breach of fiduciary duty, to assert insider preference,

21  to assert whatever it wants.  Frankly, the Debtor could have

22  sued Mr. Waterhouse, having signed the note.  It hasn't.

23       Mr. Morris is arguing that this motion is this qualitative

24  difference in this case.  It's not.  The qualitative

25  difference was when we asserted our primary affirmative

132

1   defense in May.  And since then, the Debtor has done nothing.

2           MR. MORRIS:  I have nothing further, Your Honor.

3           THE COURT:  Let me ask you one last question.  I

4   think this really is the last one, Mr. Rukavina.  Whether I

5   allow the amendment or not, even under the existing amended

6   answer, the fact-finder is going to have to get into details

7   about the shared services agreement, correct?

8           MR. RUKAVINA:  I believe so.  Yes, Your Honor.

9           THE COURT:  So here's something else nagging at me.

10  Back when I did the Report and Recommendation to the District

11  Court on the Motion to Withdraw the Reference -- which I

12  notice from the docket they still have not -- the District

13  Court still has not ruled on.  Correct?  Is anyone seeing it?

14  I'm not seeing it.

15          MR. MORRIS:  Your Honor, I think all four -- I think

16  four out of the five have been signed and approved.  I think

17  the only one that has not is the one that was originally in

18  the adversary with Mr. Dondero.

19          THE COURT:  Really?

20          MR. RUKAVINA:  Your Honor, I think Mr. Morse is

21  right.  For some reason, the District Court's orders in some

22  of these adversaries have not been filed on the bankruptcy

23  docket.  I don't understand why, but I've had to go to the

24  District Court docket to see the orders.

25          THE COURT:  Okay.  Well, I'm just getting a little

133

1    bugged that it was represented to me in the motion to withdraw

2    the reference, which I accepted and put in my report, that not

3    only did the note litigation not have anything to do with the

4    proofs of claim or any claims asserted by HCMFA, but "The

5    proofs of claim involve two wholly separate nonintegrated

6    agreements."  That is, the shared service agreement and sub

7    advisory agreement.  Any consideration of the notes is

8    irrelevant to proofs of claim.  They'd already been

9    disallowed.  Here, the Plaintiff's claims arise under a

10   promissory note.  The Defendant's disallowed claims arose

11   under separate contracts having nothing to do with the notes.

12   The two sets of claims share no common set of facts, and

13   resolution of one is not necessary legally, factually, or

14   logically to the resolution of the other.

15       Anyway, what my monologue up here is aiming at:  I made a

16   representation, HCMFA made a representation that the basis for

17   our claims that we filed in the Bankruptcy Court are these

18   shared services agreements, they have nothing to do with

19   notes, they're not inextricably intertwined, which, you know,

20   you have to find that for there to be constitutional authority

21   to adjudicate a matter.

22       This is kind of not the case, right?  As the case has

23   evolved, we actually have -- I mean, I don't know.  I don't

24   know when the administrative expense claim is set for trial,

25   but it kind of feels like we're going to get all wrapped up

134

1  into performance and interpretations under those agreements,
2  just like apparently we are now under the new theory of the
3  case.

4      What do you have to say to that?

5          MR. RUKAVINA:  Your Honor, I think, respectfully,
6  Your Honor is wrong.  This is not a new theory of the case.
7  This theory of the case was around since May 22nd.  The Court
8  entered its Report and Recommendation on July the 8th.  The
9  Debtor didn't point out at that time the matter that Your
10 Honor is now thinking should have mattered, and it doesn't
11 matter, because the fact of the shared services agreement is
12 --

13         THE COURT:  Well, I'm just, I'm going to split hairs
14 with you on the dates.  I had the hearing on the motion to
15 withdraw the reference May 25th.  Okay?  So I was looking at
16 the original answer at that point in time.  And then,
17 actually, you had filed the motion to amend the answer three
18 days before that hearing, on May 22nd, but I didn't have a
19 hearing on that until July, and I think it was agreed at that
20 point.

21     So, my point is, at the point in time that I was thinking
22 about this, hearing the lawyers' arguments, and I think I even
23 announced orally my ruling, and then we just papered it up
24 with the Report and Recommendation, the case hadn't really
25 evolved.  And I'm just wondering if that is a problem now.

135

1          MR. RUKAVINA:  Your Honor, I don't -- I don't think

2    it's a problem.  If the Debtor wants to try to change those

3    orders, it can.  But let me remind Your Honor that under the

4    -- the claim that my client has under the shared services

5    agreement and the claim that the Debtor has going back, which

6    are set for trial reasonably soon, are purely postpetition

7    matters for postpetition amounts.  Anything that has to do

8    with the shared services agreement as relates to this

9    adversary proceeding would have related to prepetition

10   actions.

11       Nor is my client seeking a claim under the -- a

12   prepetition claim, a general unsecured claim, against the

13   Debtor for having caused the TerreStar NAV error.

14       So I don't agree with Your Honor that the facts here are

15   inextricably intertwined.  There's a promissory note, and the

16   only question is, was the promissory note intended to be a

17   loan or was it intended to be compensation?

18       And yes, the fact-finder will have to understand the

19   existence of the shared services agreement, but the fact-

20   finder will not be asked to construe the shared services

21   agreement.  It won't be asked to quantify any monies under the

22   shared services agreement.  Again, the only question will be

23   what was the intent, a loan or a compensation?

24       That is not a core matter, especially because all this

25   happened prepetition.

136

1              MR. MORRIS:  If I may, briefly, Your Honor?

2              THE COURT:  Okay.

3              MR. MORRIS:  The notion that this is not a new theory

4    of the case is mindboggling.  If it weren't, there would be no

5    need for a motion.

6        The issue that was presented and that we were prepared to

7    try is whether or not these were loans or compensation.  Now

8    we're told that somehow the debt -- the -- HCMFA isn't going

9    to be obligated.  Well, let me tell you, if they took our

10   money and Mr. Waterhouse and Mr. Dondero want to take the

11   stand and swear that all of this was a gross mistake and that

12   the two of them, when they were in control, filed dozens of

13   documents with the Court that were wrong, that they should

14   have investigated and they didn't, it will require us to

15   assert new claims for breach of fiduciary duty.

16       I do not know how the person in control of an enterprise

17   and the treasurer and the CFO of a debtor in bankruptcy, I

18   don't know how they can in good faith at this point assert

19   that they -- that the notes are not binding on their company.

20   I just don't know how they can do that.  It is an entirely new

21   theory of the case.  It will require not just discovery but an

22   amendment of our complaint, because we will go after Mr.

23   Waterhouse, we will go after Mr. Dondero with new claims.  And

24   that's part of the prejudice that would result.

25             THE COURT:  All right.  Well, let me say right off

137

1    the bat that this went a lot longer than any hearing I have
2    ever had on a Rule 15 motion to amend.

3        My law clerk warned me last Thursday, oh, this is a little
4    bit more involved than maybe you were anticipating, which
5    means I ended up spending a great part of my weekend, among
6    other things, looking at the deposition of Frank Waterhouse,
7    which Mr. Sauter had not reviewed.  That alone was 400 pages.
8    That was my Sunday afternoon activity.  So that sounds like
9    whining.  I suppose it is, a little bit.  But my point is this
10   is not your garden-variety motion to amend under Rule 15
11   because never have I had a hearing on such a motion that went
12   on for four hours and that each side submitted 800 pages of
13   evidence.  But such is life in this unique case of Highland, I
14   suppose.

15       As I've said a couple of times today, I do consider this a
16   very serious matter, which I suppose is one reason why I
17   indulged so much evidence and argument.  Because, again, as I
18   interpret the arguments and what's been presented in the
19   record, the proposed second amended answer would essentially
20   mean HCMFA is arguing that Frank Waterhouse and perhaps others
21   within both the Highland and HCMFA organization either lied or
22   made a $7.4 million mistake in dozens of reports to interested
23   stakeholders.

24       Again, we have monthly operating reports, signed at least
25   electronically, purportedly, by Frank Waterhouse.  We have the

138

 1   15(c) reports.  We have audited financial statements.  Okay.
 2   So that's why I say this is really serious and this was worth
 3   indulging a lot of evidence and argument, because, wow, this
 4   is really a bombshell.  You're saying all of this information
 5   that certain individuals floated out there, allowed to be
 6   floated out there, had reason to know was floating out there,
 7   was erroneous.
 8       Shocking to me, but I heard what I heard.  And what I
 9   heard was somewhat surprising.  They didn't have Mr.
10   Waterhouse coming in here saying, as treasurer of HCMFA -- of
11   course, the pleadings at one time said he was CFO -- CFO of
12   Debtor and treasurer of HCMFA, I realize now I, you know, I
13   made a huge mistake.  We didn't have him falling on his sword
14   saying that.  And in fact, in the 400-page deposition that I
15   spent all Sunday afternoon reading, he's -- I would say the
16   closest he comes to being supportive of this theory that HCMFA
17   is now asserting is "I don't recall," "I don't recall," "I
18   think it would have been this way," "I think this," "I think
19   probably that."  But he basically -- again, sophisticated
20   individual, CFO of a billion-dollar company, treasurer of
21   HCMFA, you know, a lot of -- I had a lot of documents that
22   were put in front of me on any daily basis.  I just can't
23   recall.
24       The person, the so-called subordinate who would have been
25   responsible, I think it's agreed, for obtaining Frank

139

1    Waterhouse's authorization to sign the document, she appears,
2    according to what I saw in the appendix, to be a CPA, who was
3    an accounting major, you know, not a first-year administrative
4    assistant.
5        So these are, again, disturbing things to have presented
6    to me, especially when no documents have been shown to me to
7    support the new theory of the case.  So, well, I guess you can
8    argue about responsive documents, but I certainly don't have
9    anything in the nature of a compromise and settlement
10   agreement, we agree Highland is liable for this and is
11   therefore compensating, reimbursing HCMFA.  We don't have
12   anything of that nature.
13       So, anyway, I think I've made it very clear that I'm very
14   disturbed about the evolving theory of the case.  But the
15   issue before me, of course, is Rule 15.  And what does the
16   case law say about Rule 15?  We all know very well that the
17   Court "should freely give leave when justice so requires."
18   And Rule 15 "evinces a bias in favor of granting leave to
19   amend."
20       The five considerations that the Fifth Circuit has
21   outlined in making this evaluation under Rule 15 is, is there
22   undue delay?  Is there bad faith or dilatory motive?  Is there
23   a repeated failure to cure deficiencies by previous
24   amendments, undue prejudice to the opposing parties, and
25   futility of the amendment?

1    I cannot help but conclude there is unreasonable, undue

2    delay when I look at this timeline.  It's a long timeline.

3    But, again, we have a transaction -- transactions, plural --

4    the notes that were or were not authorized to be signed by Mr.

5    Waterhouse.  They were executed May 2nd and May 3rd, or they

6    were purportedly executed May 2nd and May 3rd, 2019.  Not

7    forever ago, about five months before the Highland bankruptcy.

8         We had Highland making demand on the notes December 3,

9    2020, saying, pay up by December 11, 2020.  It didn't happen.

10   January 22, 2021 was when the adversary was filed to collect

11   on the notes.

12        At some point in February, Mr. Waterhouse and numerous

13   other Highland employees ended their employment or were

14   terminated with Highland.  And so, as far as I can tell, even

15   under the terms of prior injunctions of this Court at that

16   point, very shortly after the complaint was filed, HCMFA was

17   free to talk to Mr. Waterhouse as much as they wanted.  But in

18   any event, he testified, Mr. Waterhouse, in his deposition

19   that March 1, 2021 he began working at Skyview with the former

20   Highland employees who now were providing services to HCMFA,

21   and that was the same day as the original answer was filed.

22        And then May 22, 2021, HCMFA files its motion to amend its

23   answer with this evolving theory of the case, that these notes

24   were not supposed to be created, a loan was not intended, and

25   questioning irregularities, I think was the word used, with

141

 1   regard to Mr. Waterhouse's signature.  And, again, it was not

 2   until it looks like October 28th HCMFA told Debtor it will

 3   assert a defense of non-signature.  And then November 30,

 4   2021, the second motion to amend answer was filed.

 5       I'm being clear for the Court of Appeals which is no doubt

 6   going to look at this one day.  I've spent hours looking at

 7   this.  Okay?  Again, not a garden-variety motion to amend

 8   under Rule 15.  I read a 400-page deposition of Frank

 9   Waterhouse.  I looked at other items in each 800-page

10   appendix.  And under the totality of what has been submitted

11   here, I find undue delay.  It is an evolving theory of the

12   case, and I'm not a hundred percent clear on why, when these

13   notes, copies of the notes were attached to the original

14   complaint filed on January 22nd.  I mean, the Defendant would

15   have been on notice day one, here are the documents that we're

16   suing under, and yet ten months later they want to argue for

17   the first time he didn't actually sign them.  And, again, I

18   guess they're saying he didn't ink-sign them.  There still

19   would remain a question, which was raised in the previous

20   amended answer, as far as his authority.

21       So undue delay.  I do find prejudice.  We're many, many,

22   many, many, many months down the road in what started over a

23   year ago, making a demand under these notes.  I've got motions

24   for summary judgment teed up.

25       You know, I'm a little bit troubled, as I said, that I did

142

1  a Report and Recommendation to the District Court based on a

2  simpler lawsuit, and maybe even under the first amended answer

3  I should be looking at this a little differently.

4      And again, I'm just, I'm thinking out loud on that.  I

5  have an old opinion that may or may not be relevant, but it

6  was in a case called *Margaux Ventures* and it dealt with the

7  ability to raise a preference defensively if a preference

8  recipient is making a claim against the estate, and even if

9  the bar date, the 546 bar date has passed for affirmatively

10  filing a preference action.  I think that was even an insider

11  preference in *Margaux Ventures*.  The Plaintiff can still argue

12  defensively preference liability.  And what I can't remember

13  for sure is, in *Margaux Ventures*, if it was an administrative

14  expense claim that the preference target was asserting, or was

15  it a prepetition claim.  It might make more sense if it was a

16  prepetition claim.

17      But anyway, all this to say I'm mentioning this because it

18  factors into the undue delay and the prejudice.  I mean, the

19  lawsuit is just going to keep morphing.  I've already heard

20  that it would morph into a breach of fiduciary duty against

21  Mr. Waterhouse and others, but I think it could morph in other

22  ways.  And I've got to go back and look at that *Margaux*

23  *Ventures* case to see if I think this is intertwining -- well,

24  anyway, I don't need to go back and look because I'm denying

25  the motion.  But it's just, it's just way too late to make an

143

1   argument that should have been apparent many months ago if in
2   fact it's a legitimate argument.

3       And I guess the last thing I want to say is having a
4   witness today that is the general counsel for NexPoint,
5   another entity -- not HCMFA, not the Debtor -- someone who
6   didn't have personal knowledge that was contemporaneous with
7   the actions involved, someone who just after the fact for
8   NexPoint goes back and looks at the evidence, this has been a
9   significant factor here for me today.  The witness just seems
10  like someone who could not make a compelling case regarding
11  the bona fides, shall we say, of the amendment, which in my
12  mind links to the futility of the amendment.

13      All right.  Mr. Morris, please upload an order.  And we
14  are adjourned.  And for the people on WebEx who are here for
15  the 1:30 hearing, we need a short break.  I'll be back in ten
16  minutes.

17          THE CLERK:  All rise.

18          MR. MORRIS:  Thank you very much.

19      (Proceedings concluded at 2:01 p.m.)

20                      --oOo--

21                    CERTIFICATE

22      I certify that the foregoing is a correct transcript from the
    electronic sound recording of the proceedings in the above-entitled matter.
23
     **/s/ Kathy Rehling**                              **01/13/2022**
24
    _____          _____
25  Kathy Rehling, CETD-444                              Date
    Certified Electronic Court Transcriber

144

<div align="center">INDEX</div>

PROCEEDINGS                                                3

OPENING STATEMENTS

- By Mr. Rukavina                                          7
- By Mr. Morris                                          22

WITNESSES

Defendant/Movant's Witnesses

Dennis C. "D.C." Sauter, Jr.
- Direct Testimony by Declaration                        32
- Cross-Examination by Mr. Morris                        32
- Redirect Examination by Mr. Rukavina                   86
- Recross-Examination by Mr. Morris                     107

EXHIBITS

HCMFA's Rebuttal Exhibit 1                       Received  94
Defendant's Exhibits (Dockets 87, 112/1)        Received 113
Plaintiff's Exhibits 1 through 31               Received 114
   (Dockets 111, 113)

CLOSING ARGUMENTS

- By Mr. Rukavina                                       114
- By Mr. Morris                                         124

RULINGS                                                136

END OF PROCEEDINGS                                     143

INDEX                                                  144

# EXHIBIT 220

Docket #0123 Date Filed: 1/14/2022



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 14, 2022**

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
|  | § | |
| Reorganized Debtor. | § | |
|  | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
|  | § | |
| Plaintiff, | § | Adversary Proceeding No. |
|  | § | |
| vs. | § | 21-3004-sgj |
|  | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
|  | § | |
| Defendant. | § | |
|  | § | |

_____

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.



## ORDER DENYING
## DEFENDANT'S SECOND MOTION FOR LEAVE TO AMEND ANSWER

This matter having come before the Court on the *Defendant's Second Motion for Leave to Amend Answer and Brief in Support Thereof* [Docket No. 82] (the "<u>Motion</u>") filed by Highland Capital Management Fund Advisors, L.P. ("<u>HCMFA</u>"); and this Court having considered (i) the Motion; (ii) *Defendant's Appendix in Support of Second Motion for Leave to Amend Answer* [Docket Nos. 83 and 87] ("<u>Defendant's Appendix</u>")[2]; (iii) *Highland Capital Management, L.P.'s Response in Opposition to Defendant's Second Motion for Leave to Amend Answer* [Docket No. 107]; (iv) *Highland Capital Management, L.P.'s Memorandum of Law in Opposition to Defendant's Second Motion for Leave to Amend Answer* [Docket No. 108]; (v) the *Appendix in Support of Highland Capital Management, L.P.'s Opposition to Defendant's Second Motion for Leave to Amend Answer* [Docket No. 109] ("<u>Highland's Appendix</u>"); (vi) *Defendant's Reply in Support of Its Second Motion for Leave to Amend Answer* [Docket No. 112]; and (vii) the testimonial and documentary evidence admitted at, and the arguments made during, the January 10, 2022 hearing (the "<u>Hearing</u>")[3] on the Motion, including assessing the credibility of Mr. Sauter; and after due deliberation on all of the foregoing, and for the reasons set forth in the record of the Hearing on the Motion, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.      The Motion is **DENIED**.

---

[2] At the January 10, 2022 hearing on the Motion, the Court admitted into evidence HCMFA's rebuttal exhibit identified as exhibit no. HCMFA-R1 ("<u>Exhibit HCMFA-R1</u>"). Exhibit HCMFA-R1 appears at docket no. 118 and is deemed to be included in Defendant's Appendix for purposes of any appeal that may be taken of this Order.

[3] On January 6, 2022, Highland Capital Management, L.P. ("<u>Highland</u>") filed a witness and exhibit list that (a) included as exhibits all documents that were included in Highland's Appendix, and (b) identified Dennis C. Sauter, Jr. ("<u>Mr. Sauter</u>"), as a witness to be examined at the Hearing. [Docket No. 111] (the "<u>W&E List</u>"). On January 10, 2022, Highland amended its witness and exhibit list to include one document (identified as Exhibit 31) not included in Highland's Appendix ("<u>Exhibit 31</u>"). [Docket No. 113]. During the Hearing, the Court admitted Exhibit 31 into evidence without objection, and Exhibit 31 deemed to be included in Highland's Appendix for purposes of any appeal that may be taken of this Order.

Appx. 00900

2.      This Court retains jurisdiction with respect to all matters arising from or related to

the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###