PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-03003-sgj |
| vs. | § § § | |
| JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § | Case No. 3:21-cv-00881-X |
| Defendants. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-03004-sgj |
| vs. | § § § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § | Case No. 3:21-cv-00881-X |
| Defendant. | § § § | |

```
----------------------------------------------
HIGHLAND CAPITAL MANAGEMENT, L.P.,      §
                                        §
                         Plaintiff,     §
                                        §    Adv. Proc. No. 21-03005-sgj
vs.                                     §
                                        §
NEXPOINT ADVISORS, L.P., JAMES          §    Case No. 3:21-cv-00881-X
DONDERO, NANCY DONDERO, AND             §
THE DUGABOY INVESTMENT TRUST,           §
                                        §
                                        §
                        Defendants.     §
----------------------------------------------
HIGHLAND CAPITAL MANAGEMENT, L.P.,      §
                                        §
                         Plaintiff,     §
                                        §    Adv. Proc. No. 21-03006-sgj
vs.                                     §
                                        §
HIGHLAND CAPITAL MANAGEMENT             §
SERVICES, INC., JAMES DONDERO,          §    Case No. 3:21-cv-00881-X
NANCY DONDERO, AND THE DUGABOY          §
INVESTMENT TRUST,                       §
                                        §
                        Defendants.     §
----------------------------------------------
HIGHLAND CAPITAL MANAGEMENT, L.P.,      §
                                        §
                                        §
                         Plaintiff,     §    Adv. Proc. No. 21-03007-sgj
                                        §
vs.                                     §
                                        §    Case No. 3:21-cv-00881-X
HCRE PARTNERS, LLC (n/k/a NexPoint      §
Real Estate Partners, LLC), JAMES       §
DONDERO, NANCY DONDERO, AND             §
THE DUGABOY INVESTMENT TRUST,           §
                                        §
                        Defendants.     §
----------------------------------------------
```

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ................................................................... 1

II.     RELEVANT PROCEDURAL HISTORY ..................................................... 3

      1.    Commencement of the Adversary Proceedings ............................. 3

      2.    The Note Actions are Consolidated for Discovery and Withdrawn to the District Court for Trial ........................................ 3

      3.    Plaintiff Files the Amended Complaints ....................................... 4

      4.    Plaintiff Moves for Summary Judgment Against Defendants and the Bankruptcy Court Issues its Report and Recommendation ................ 5

      5.    Plaintiff Commences the Second HCMFA Action in November 2021 ............................................................................. 5

III.    STATEMENT OF UNDISPUTED MATERIAL FACTS ............................ 6

    A.    The Undisputed Facts Supporting Plaintiff's Prima Facie Case ............................ 6

      1.    The Demand Notes ........................................................................ 7

      2.    The Term Notes ............................................................................. 7

    B.    The Bankruptcy Court Found that Substantial, Undisputed Evidence Corroborates that Mr. Dondero and the Entities he Controlled Continuously Treated the Notes as Valid, Enforceable Obligations, not Subject to Discount or Defense ................................ 8

    C.    Recovery on the Notes Was A Significant Component of the Debtor's Plan Yet the Obligors Remained Silent On the Point Despite Lodging Other Objections ................................ 10

    D.    The Obligors' Affirmative Defenses ........................................... 12

      1.    The Undisputed Evidence Shows that the Alleged Agreement Defense Was Fabricated ................................ 12

         i.     The Allegations Materially Changed Over Time ......................... 13

         ii.    The Overwhelming Evidence Contradicts Any Notion of the Alleged Agreement ................................ 16

      2.    HCMFA's "Mutual Mistake" Defense .......................................... 22

      3.    The "Shared Services" Defense .................................................... 27

      4.    Other Defenses .............................................................................. 30

    E.    Defendants Object to the R&R ..................................................... 32

IV.     ARGUMENT ............................................................................................. 33

i

A. Legal Standard .................................................................................... 33

B. The Bankruptcy Court Correctly Found that Defendants Fail to Rebut Highland's Prima Facie Case for Summary Judgment ......................... 35

    1. The Bankruptcy Court Correctly Found that Defendants Fail to Create a Genuine Issue of Material Fact Concerning the Non-Existence of the Alleged Agreement ........................................ 35

        i. Mr. Dondero's Self-Serving Statements in his Declaration Identifying the Notes Fail to Create a Genuine Dispute of Material Fact in Support of the Alleged Agreements .................................. 35

        ii. Defendants' Contention that Jim Dondero was Not Required to Declare the Notes Forgiven Upon the Sale of MGM Stock Fails to Create a Genuine Dispute of Material Fact Supporting the Alleged Agreement Defense .................................................................. 38

        iii. Defendants' Contention that Whether Ms. Dondero Ever Saw a Note Is "Irrelevant" Fails to Rebut Highland's Prima Facie Case 39

        iv. Defendants' Contention that the Alleged Agreements were "Disclosed" is False and Fails to Rebut Highland's Prima Facie Case .......................................................................................... 40

        v. Defendants' Contention that Oral Agreements Need to be Memorialized in Writing Fails to Rebut Highland's Prima Facie Case .......................................................................................... 42

        vi. The Bankruptcy Court Correctly Found that Highland Does Not Have a History of Loan Forgiveness ............................................. 43

        vii. The Bankruptcy Court Correctly Found that No reasonable Jury Could Find that the Alleged Agreements Exist Based on the Donderos' Self-Serving Statements and Did Not "Ignore" Such Evidence ....................................................................................... 45

        viii. Defendants' Contention that the Bankruptcy Court "Ignored" Evidence of Consideration Should be Overruled .......................... 49

        ix. Defendants' Contention that the Bankruptcy Court "Ignored" Evidence that there was a "Meeting of the Minds" Should be Overruled ..................................................................................... 52

        x. Defendants' Contention that Nancy Dondero was "Competent" to Enter into the Alleged Agreements' is Without Merit and Fails to Create any Dispute of Material Fact Regarding the Existence of the Alleged Agreement ...................................................................... 54

    2. The Bankruptcy Court Correctly Found that Defendants Failed to Create a Genuine Dispute of Material Fact Regarding their Affirmative Defense that Highland was "Responsible for Making Payments on the NexPoint, HCRE, and HCMS Notes" .......................... 57

DOCS_NY:46451.10 36027/002

i.      Defendants Fail to Create a Genuine Dispute of Material Fact in Support of their Contention that Highland was Required to Make Payments on the Notes on Behalf of NexPoint............................ 57

ii.     Defendants Fail to Create a Genuine Dispute of Material Fact in Support of their Contention that Highland was Required to Make Payments on Behalf of HCRE and HCMS .................................. 63

3.      The Bankruptcy Court Correctly Found that Defendants Failed to Create a Genuine Dispute of Material Fact Regarding their "Prepayment" Defense ................................................................. 64

C.      The Bankruptcy Court Correctly Found That HCMFA Failed To Rebut Highland's Prima Facie Case For Summary Judgment ....................................... 66

1.      The Bankruptcy Court Correctly Found that HCMFA Failed to Raise a Genuine Issue of Material Fact Regarding Mr. Waterhouse's Authority to Execute the HCMFA Notes........................... 66

2.      The Bankruptcy Court Correctly Found that HCMFA Failed to Create a Genuine Dispute of Material Fact Regarding their "Mutual Mistake" Defense ...................................................... 71

i.      HCMFA's "Mutual Mistake" Defense Fails as a Matter of Law . 71

ii.     HCMFA's Contentions that the HCMFA Notes Must have Gone Through Legal are Unsubstantiated ............................................... 76

iii.    Proof of Claim 188 Directly Contradicts HCMFA's Mutual Mistake Defense.................................................................................. 78

iv.     HCMFA's Contention that the "Note" Referenced in the Letter to the Retail Board did not include the HCMFA Notes is Contradicted by Documentary Evidence .......................................... 79

CONCLUSION..................................................................................................................81

iii

## TABLE OF AUTHORITIES

**CASES**

*Addicks Services, Inc. v. GGP-Bridgeland, LP*,
    596 F.3d 286 (5th Cir. 2010) ........................................................................ 58

*Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.*,
    MO:19-CV-173-DC, 2021 WL 2772808 (W.D. Tex. Apr. 28, 2021) ............... 72, 76

*Al-Saud v. Youtoo Media, L.P.*,
    3:15-CV-3074-C, 2017 WL 3841197 (N.D. Tex. March 15, 2017) ...................... 45

*Alton v. Texas A&M University*,
    168 F.3d 196 (5th Cir. 1999) ..................................................................... 33, 34

*Anderson Bros. Corp. v. O'Meara*,
    306 F.2d 672 (5th Cir. 1962) ........................................................................ 56

*Armstrong v. City of Dallas*,
    997 F.2d 62 (5th Cir.1993) ........................................................................... 34

*BMG Music v. Martinez*,
    74 F.3d 87 (5th Cir.1996) ....................................................................... 45, 72

*Buxani v. Nussbaum*,
    940 S.W.2d 350 (Tex. App.—San Antonio 1997, no writ) ............................... 46

*City of Alexandria v. Brown*,
    740 F.3d 339, 350 (5th Cir. 2014) ................................................................. 70

*Commercial Capital Holding Corp. v. Team Ace Joint Venture*,
    No. CIV. A. 99-3040, 2000 WL 726880 (E.D.La. June 2, 2000) .................. 67, 68

*Corsaro v. Columbia Hosp. at Med. City Dallas Subsidiary, LP*,
    No. 3:21-CV-01748-N, 2021 WL 6135342 (N.D. Tex., Dec. 29, 2021) ............... 56

*Craig Sessions, M.D., P.A. v. TH Healthcare, Ltd.*,
    412 S.W.3d 738 (Tex. App. 2013) ................................................................. 59

*Davis v. Bank of Am., N.A.*,
    No. H–13–1306, 2014 WL 1401677 (S.D.Tex. Apr. 10, 2014) ..................... 68, 69

*Del Bosque v. AT&T Adver., L.P.*,
    441 Fed. Appx. 258 (5th Cir. Sept. 16, 2011) ................................................ 56

*DIRECTV, Inc. v. Budden*,
    420 F.3d 521 (5th Cir. 2005) ................................................................... 47, 73

*Eason v. Thaler*,
    73 F.3d 1322 (5th Cir. 1996) ................................................................... 48, 80

*FDIC v. Cardinal Oil Well Servicing Co.*,
    837 F.2d 1369 (5th Cir.1988) ....................................................................... 33

iv

*Fisher v. Blue Cross and Blue Shield of Tex., Inc.*,
   3:10-CV-2652-L, 2015 WL 5603711 (N.D. Tex. Sept. 23, 2015) ......................................... 46

*Gaines v. Kelly*,
   235 S.W.3d 179 (Tex. 2007).............................................................................................. 70

*Garcia v. Lumacorp, Inc.*,
   No. CIV.A. 3:02-CV-2426-, 2004 WL 1686635 (N.D. Tex. July 27, 2004),
   aff'd, 429 F.3d 549 (5th Cir. 2005) ...................................................................... 51, 52

*Ginther-Davis Ctr., Ltd. v. Houston Nat. Bank*,
   600 S.W.2d 856, 861 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e) ............... 56

*Hall v. Branch Banking*,
   No. H-13-328, 2014 WL 12539728 (S.D.Tex. Apr. 30, 2014)................................................ 34

*Hallmark v. Hand*,
   885 S.W.2d 471 (Tex. App.—El Paso 1994, writ denied) ....................................................... 54

*Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding*,
   480 S.W.2d 607 (Tex. 1972)............................................................................................. 45

*Honore v. Douglas*,
   833 F.2d 565 (5th Cir. 1987) ........................................................................................... 46

*In re Hinsley*,
   201 F.3d 638 (5th Cir. 2000) ...................................................................................... 47, 73

*In re Magna Cum Latte, Inc.*,
   07-31814, 2007 WL 3231633 (Bankr. S.D. Tex. Oct. 30, 2007) ....................................... 33, 34

*In re Palms at Water's Edge, L.P.*,
   334 B.R. 853 (Bankr. W.D. Tex. 2005)................................................................................. 45

*Kariuki v. Tarango*,
   709 F.3d 495 (5th Cir. 2013) ...................................................................................... 45, 72

*Kirkindoll v. Nat'l Credit Union Admin. Bd.*,
   3:11-CV-1921-D, 2015 WL 1636534 (N.D. Tex. Apr. 13, 2015)..................................... 70, 71

*Latimer v. Smithkline & French Laboratories*,
   919 F.2d 301 (5th Cir.1990) .................................................................................. 33, 34, 54

*Lavergne v. Jefferson County, Tex.*,
   164 F.R.D. 441 (E.D. Tex. 1995) .................................................................................. 47, 73

*Looney v. Irvine Sensors Corp.*,
   CIV.A.309-CV-0840-G, 2010 WL 532431 (N.D. Tex. Feb. 15, 2010) ................ 33, 34, 72, 75

*Lowery v. Bank of Am., N.A.*,
   04-12-00729-CV, 2013 WL 5762227Tex. App. Oct. 23, 2013) ........................................... 69

*Main Street Bank v. Unisen, Inc.*,
   No. H-06-3776, 2008 WL 11483415 (S.D.Tex. Feb. 15, 2008)........................................ 48, 80

*Martinez v. Pilgrim's Pride Corp.*,
   3:16-CV-3043-D, 2017 WL 6372385 (N.D. Tex Dec. 13, 2017)............................................ 53

*Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*,
   40 F.3d 698 (5th Cir. 1994) ........................................................................................................ 34

*O'Connor v. United States*,
   479 U.S. 27 (1986 .................................................................................................................... 59

*Polland & Cook v. Lehmann*,
   832 S.W.2d 729 (Tex. App. 1992)........................................................................................ 66, 68

*Pryor v. Everhome Mortg. Co.*,
   No. 3:13–CV–2963–D, 2014 WL 5802716 (N.D.Tex. Nov. 7, 2014) .................................... 69

*Resolution Tr. Corp. v. Starkey*,
   41 F.3d 1018 (5th Cir. 1995) ................................................................................................ 33, 34

*Roark v. Stallworth Oil and Gas, Inc.*,
   813 S.W.2d 492 (Tex. 1991)..................................................................................................... 52

*Salama v. W. Wind Energy Corp.*,
   2013 WL 6079548, No. 4:12–cv–03535 (S.D.Tex. Nov. 19, 2013)............................ 48, 51, 80

*Sanchez v. Dallas/Fort Worth Int'l Airport Bd.*,
   438 Fed. Appx. 343 (5th Cir. 2011)...................................................................................... 47, 73

*Scott v. Harris*,
   550 U.S. 372 (2007)............................................................................................................. 48, 80

*Sinclair Oil Corp. v. Heights Energy Corp.*
   4:05-CV-825-Y 2007 WL 9718223 (N.D. Tex. Nov. 13 2007) ............................................. 53

*Tiede v. Salazar*,
   518 F. Supp. 3d 955 (W.D. Tex. 2021) .................................................................................. 70

*Truck Repair & Parts, Inc. v. First Air Express, Inc.*,
   03-07-00498-CV, 2008 WL 2387630 (Tex. App.— Austin June 11, 2008, no pet.).............. 46

*Turner v. Baylor Richardson Med. Ctr.*,
   476 F.3d 337 (5th Cir. 2007) ................................................................................................... 34

*Tyler v. Cedar Hill Indep. Sch. Dist.*,
   426 Fed.Appx. 306 (5th Cir. 2011)....................................................................................... 47, 73

*United States v. Lawrence*,
   276 F.3d 193 (5th Cir. 2001) ................................................................................................ 45, 72

*United States v. Succession of Siddon*,
   812 F. Supp. 674 (W.D. La. 1993) .......................................................................................... 69

*Warfield v. Byron*,
   436 F.3d 551 (5th Cir. 2006) ................................................................................................... 33

*Whitney Nat. Bank v. Med. Plaza Surgical Center L.L.P.*,
   No. H-06-1492, 2007 WL 3145798 (S.D.Tex. Oct. 27. 2007) .......................................... 72, 75

vi

**OTHER AUTHORITIES**

Tex. Bus. & Comm. Code § 3.402(a) ............................................................... 70

Tex. Bus. & Comm. Code § 3.403 .................................................................... 70

**RULES**

Fed. R. Bankr. P. 56(c) ..................................................................................... 33

**BRIEF IN SUPPORT OF HIGHLAND CAPITAL MANAGEMENT, L.P.'S RESPONSE
TO DEFENDANTS' REVISED OBJECTION TO THE BANKRUPTCY COURT'S
REPORT AND RECOMMENDATION TO THE DISTRICT COURT PROPOSING
THAT IT GRANT SUMMARY JUDGMENT IN FAVOR OF THE PLAINTIFF**

Highland Capital Management, L.P., the reorganized debtor and the plaintiff in the above-captioned adversary proceedings ("Highland" or "Plaintiff"), hereby files this brief in support of its response (the "Response") to *Defendants' Revised Objection to the Bankruptcy Court's Report and Recommendation to the District Court Proposing that it Grant Summary Judgment in Favor of the Plaintiff* [Docket No. 63][1] (the "Objection").[2]  In support of its Response, Highland states as follows:

## I.    PRELIMINARY STATEMENT[3]

1.    In laboring to create a counterfactual world, Defendants force Plaintiff and the fact-finders (*i.e.*, first the Bankruptcy Court, now this Court, and, if Defendants had their way, a jury during a lengthy trial) to entertain one fiction after another.  But a fair review of the evidence establishes that Defendants have fabricated a series of untenable defenses that no reasonable jury could ever accept and that there is no genuine dispute of material fact precluding the entry of summary judgment in Plaintiff's favor.  The Bankruptcy Court's R&R is based on an extensive evidentiary record, firm case law, and sound legal analysis and should be adopted in full. Judgments should be entered against each Defendant for all unpaid principal and interest and costs of collection.

---

[1] Unless noted otherwise, references to "Docket No. __" are to the docket entries maintained in Case No. 3:21-cv-00881-X pending in the United States District Court for the Northern District of Texas (the "Court").

[2] *See, e.g., Appendix in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment in Notes Actions* [Adv. Pro. No. 21-03003-sgj, Docket No. 135] (the "Appendix"). Citations to the Appendix are notated as follows: Ex. #, Appx. #.  The Appendix was filed in each of the Adversary Proceedings.

[3] Capitalized terms in this Preliminary Statement shall have the meanings ascribed to them below or in the list of *Parties, Witnesses, and Definitions* attached hereto as **Exhibit A**.

2.      Highland seeks to collect on over $50 million of promissory notes issued by Mr. Dondero and certain entities controlled by him.  There is no dispute that these affiliate Notes were tendered in exchange for hard dollars at times when Mr. Dondero controlled both the borrower and the lender.  There is no dispute that payment has been properly demanded.  And there is no dispute that Mr. Dondero refuses to make good on his promises to repay the money he and his affiliates borrowed.

3.      As the Bankruptcy Court correctly found, Highland has made out its *prima facie* case for summary judgment for Defendants' breach of the Notes.  The uncontroverted documentary evidence shows that the Notes are (a) valid, (b) executed by Defendants and in favor of Highland, and (c) there is a balance due and owing under the Notes.  Defendants fail to rebut Plaintiff's *prima facie* case because Defendants fail to create a genuine issue of material fact regarding their breach.  There is a complete absence of evidence to support each of Defendants' affirmative defenses.[4]

4.      In support of their own fabricated stories, Defendants attempt to dispute virtually every fact and erect countless strawmen—while ignoring or minimizing the undisputed evidence against them adduced in response to their never-ending game of Whack-A-Mole.  But as the Bankruptcy Court found, no evidence exists to corroborate the Defendants' contentions in support of their defenses and rebut Highland's *prima facie* case for summary judgment, other than

---

[4] Reluctantly, Plaintiff cautions the Court to examine the evidence cited by Defendants before accepting any of their arguments.  By way of example only, Defendants contest the Bankruptcy Court's finding that the Alleged Agreements were never disclosed to anyone.  *See* Objection ¶¶ 14-16.  But a quick review of the limited evidence relied on by Defendants (Mr. Dondero's testimony concerning a conversation he purportedly had with Mr. Waterhouse; a letter written by Mr. Dondero's attorney after the commencement of litigation; and a proof of claim filed by Mr. Dondero) shows that none of it described an "agreement" of any kind, let alone an agreement that was entered into with his sister (supposedly, and without authority, acting on Highland's behalf) pursuant to which tens of millions of dollars of Notes would be forgiven upon the satisfaction of certain "conditions subsequent."  And that makes sense because, as described in detail below, the Alleged Agreement defense "evolved" during the first nine months of litigation. Regrettably, this is just one example of the dissonance between Defendants' arguments and the actual evidence.

self-serving, conclusory, and unsubstantiated allegations. By contrast, Highland's claims are both simple and buttressed by a mountain of undisputed evidence including contemporaneous written communications, audited financial statements, Defendants' informed statements made to third parties, books and records, dozens of bankruptcy filings, and the plain words of the Defendants and their officers. Highland's evidence is so overwhelming, and Defendants' stories are so weak, that the Court should overrule Defendants' Objections to the R&R, adopt the Bankruptcy Court's R&R, and grant the Motion for Summary Judgment on each of the Notes.

## II.   RELEVANT PROCEDURAL HISTORY

### 1.   Commencement of the Adversary Proceedings

5.     On January 22, 2021, Plaintiff commenced an adversary proceeding (collectively, the "Adversary Proceedings") by filing a *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* against each of the Obligors.[5]  In its Original Complaints, Plaintiff asserted claims for (a) breach of contract for each Defendant's breach of its respective obligations under the Notes and (b) turnover by each Defendant for all accrued and unpaid principal and interest due under the Notes until the date of payment, plus Plaintiff's cost of collection and reasonable attorney's fees (as expressly provided for under each of the Notes).

### 2.   The Note Actions Are Consolidated for Discovery and Withdrawn to the District Court for Trial

6.     Between April and June 2021, the Obligors moved to withdraw the reference (the "Motions to Withdraw"). In July 2021, the Bankruptcy Court issued Reports and

---

[5] *See* Adv. Pro. No. 21-03003 (the "Dondero Action"), Docket No. 1 (the "Dondero Original Complaint"); Adv. Proc. No. 21-03004 (the "First HCFMA Action"), Docket No. 1 (the "HCMFA Original Complaint"); Adv. Pro. No. 21-03005 (the "NexPoint Action"), Docket No. 1 (the "NexPoint Original Complaint"); Adv. Proc. No. 21-03006 (the "HCMS Action"), Docket No. 1 (the "HCMS Original Complaint"); and Adv. Pro. No. 21-03007 (the "HCRE Action," and collectively, with the Dondero Action, the First HCMFA Action, the NextPoint Action, and the HCMS Action, the "Main Notes Litigation"), Docket No. 1 (the "HCRE Original Complaint"). The forgoing are collectively referred to as the "Original Complaints."

Recommendations (the "Reference R&Rs") to the District Court recommending that the Motions to Withdraw be granted, but that the Bankruptcy Court retain the cases for all pre-trial matters, including the consideration (but not determination) of any dispositive motions. The applicable District Court adopted the Reference R&Rs, and each of the Note Actions was referred to the Bankruptcy Court for pre-trial purposes, to be withdrawn to the District Court when trial-ready, under lead case No. 3:21-cv-00881-X (the "Lead District Court Note Action"). The Parties subsequently agreed to consolidate discovery pursuant to the *Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* dated August 17, 2021, approved by the Bankruptcy Court on September 6, 2021, and entered in each respective Adversary Proceeding.

### 3. Plaintiff Files the Amended Complaints

7. Throughout the spring of 2021, Defendants all sought and obtained leave to amend their Answers to assert newly-fabricated defenses, including, for example, that Mr. Dondero and his sister, purportedly acting as the Trustee of Mr. Dondero's "family trust," had entered into a series of oral agreements to forgive all of the Notes.

8. To address the latest defenses, Highland amended its Original Complaints against Mr. Dondero (Ex. 32, Appx. 658-728), NexPoint (Ex. 2, Appx. 22-95), HCMS (Ex. 3, Appx. 96-179), and HCRE (Ex. 4, Appx. 180-263) to add new claims and new defendants.[6] In particular, Plaintiff (a) added as defendants (i) Ms. Dondero; (ii) Dugaboy; and (iii) Mr. Dondero, in his capacity as an "aider and abetter" to Dugaboy (collectively, the "Duty Defendants") and (b) asserted claims against the Duty Defendants for (i) declaratory relief; (ii) breach of fiduciary duty;

---

[6] All of the amendments were in response to the Obligors' belated assertion of the Alleged Agreement defense. Plaintiff did not amend its complaint against HCMFA because that entity did not assert the Alleged Agreement defense with the respect to the First HCMFA Action, although it did so in connection with the Second HCMFA Action described below.

and (iii) aiding and abetting a breach of fiduciary duty, arising from the Duty Defendants' unlawful entry into the Alleged Agreements.[7]

> **4.** **Plaintiff Moves for Summary Judgment Against Defendants and the Bankruptcy Court Issues Its Report and Recommendation**

9.     On December 17, 2021, Plaintiff moved for summary judgment against HCMFA in the First HCMFA Action, and for partial summary judgment against the remaining Obligors, on its breach of contract and turnover claims.  *See* Adv. Proc. Nos. 21-03003-sgj at Docket No. 132; 21-03004-sgj at Docket No. 93; Nos. 21-03005-sgj at Docket No. 131; Nos. 21-03006-sgj at Docket No. 129; Nos. 21-03007-sgj at Docket No. 124 (collectively referred to as the "Motion for Summary Judgment").[8]  Oral argument on the Motion for Summary Judgment was held on April 20, 2022.

10.     On July 20, 2022, the Bankruptcy Court issued its *Report and Recommendation to the District Court: Court Should Grant Plaintiff's Motion for Partial Summary Judgment Against All Five Note Maker Defendants (With Respect to All Sixteen Promissory Notes) in the Above-Referenced Consolidated Note Actions* [Docket No. 50-1] (the "R&R"), in which it recommended that this Court grant the Motion for Summary Judgment against the Obligors in the Main Notes Litigation.

> **5.** **Plaintiff Commences the Second HCMFA Action in November 2021**

11.     On November 9, 2021, Plaintiff commenced a second adversary proceeding against HCMFA arising from HCMFA's breach of two additional promissory notes by filing the *Complaint for (I) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [Adv.

---

[7] Plaintiff also added claims for actual fraudulent transfer against Mr. Dondero, NexPoint, HCRE, and HCMS because their respective Notes were purportedly all subject to the Alleged Agreement defense.

[8] If the Court denies Plaintiff's Motion for Summary Judgment, then all claims against all Defendants will be tried before a jury, including for example, Plaintiff's breach of fiduciary duty claims against Mr. Dondero and his sister arising from their conduct in connection with the entry into the Alleged Agreements.

Pro. No. 21-03082-sgj, Docket No. 1] (the "Second HCMFA Complaint").[9]  Like its Original Complaints, Plaintiff's Second HCMFA Complaint asserts claims for breach of contract, turnover, and for Plaintiff's cost of collection (the "Second HCMFA Action").  The Second HCMFA Action was subsequently consolidated with the Lead District Court Note Action for trial purposes.  *See* Case No. 3:21-cv-00881-X, at Docket No. 49.  On May 27, 2022, Plaintiff filed its *Motion for Summary Judgment against HCMFA* in the Second HCMFA Action [*see* Adv. Pro. No. 21-03082, Docket No. 45] (the "Second Motion for Summary Judgment").  The Bankruptcy held a hearing on the Second Motion for Summary Judgment on July 27, 2022 [*see* Adv. Pro. No. 21-03082, Docket No. 70], where it remains under advisement.

### III.   STATEMENT OF UNDISPUTED MATERIAL FACTS

#### A.   The Undisputed Facts Supporting Plaintiff's *Prima Facie* Case

12.   The Bankruptcy Court found that Highland proved its *prima facie* case for summary judgment on the grounds that: (a) each of the Notes were valid, signed by each Obligor in Highland's favor, and had an outstanding principal and accrued but unpaid interest due under the thereunder; (b) each Obligor breached their obligations under their respective Notes by failing to pay Highland all amounts due and owing; and (c) Highland has been damaged by such breach. *See* R&R at 8, 36-38.  Based on the undisputed evidence summarized below, the Bankruptcy Court's findings should be adopted in full.

---

[9] The promissory notes subject to the Second HCMFA Complaint were not included in the HCMFA Original Complaint because of a pre-bankruptcy petition forbearance-type agreement that Mr. Dondero signed precluding enforcement until May 2021, five months after the Original Complaints were filed.  *See* Second HCMFA Complaint ¶ 21.  Importantly, HCMFA has asserted the Alleged Agreement defense in the Second HCMFA Action and the Parties have agreed that all evidence adduced in the Main Notes Litigation could be used in the Second HCMFA Action.

1.      **The Demand Notes**

13.     Citing substantial evidence, the Bankruptcy Court found that from 2013 through 2019, Mr. Dondero, HCMFA, HCMS, and HCRE each executed certain demand notes, as makers, in favor of Highland (collectively, the "Demand Notes") in exchange for contemporaneous loans.  R&R at 9-12.

14.     The Bankruptcy Court further found that (a) except for the date, the amount, the maker, and the interest rate, each of the Demand Notes is identical, (b) on December 3, 2020, "with its Chapter 11 plan coming up for confirmation and its need of funding to pay its millions of dollars' of debt owed to creditors," Plaintiff made separate, written demands for payment of all obligations due under the Demand Notes, (c) the Obligors under the Demand Notes defaulted by failing to make the required payment or otherwise respond to Plaintiff's demands, and (d) Plaintiff was owed in excess of $23 million on the Demand Notes at the time of default, exclusive of costs of collection. *Id*. at 12-14 (citing evidence).

15.     Defendants do not dispute any of these facts.

2.      **The Term Notes**

16.     Separately, and again citing to substantial evidence, the Bankruptcy Court found that on May 31, 2017, Mr. Dondero executed a separate 30-year term note on behalf of NexPoint (the "NexPoint Term Note"), HCMS (the "HCMS Term Note"), and HCRE (the "HCRE Term Note"), respectively, each as a maker, all in favor of Highland (collectively, the "Term Notes").  Each of the Term Notes "rolled up obligations of the makers under prior notes" that were tendered in exchange for loans to "enable [the borrowers] to make investments."  *Id*. at 14-15 (citing evidence).

17.     The Bankruptcy Court further found that (a) except for the date, the amount, the maker, and the interest rate, each of the Term Notes is identical, (b) the Obligors under the

Term Notes defaulted by failing to make their Annual Installment Payment when due on December 31, 2020, and (c) Plaintiff was owed in excess of $36 million on the Term Notes at the time of default, exclusive of costs of collection. *Id*. at 15-17 (citing evidence).

18.    Defendants do not dispute any of these facts.

**B.**    **The Bankruptcy Court Found that Substantial, Undisputed Evidence Corroborates that Mr. Dondero and the Entities He Controlled Continuously Treated the Notes as Valid, Enforceable Obligations, Not Subject to Discount or Defense**

19.    In addition to the undisputed evidence supporting Plaintiff's *prima facie* case, the Bankruptcy Court also considered the "undisputed corroborating evidence regarding" the existence, validity, and enforceability of the Notes, including that: (a) the Notes were all disclosed multiple times on Highland's audited financial statements, R&R at 17-20 (citing evidence): (b) just three months before the Adversary Proceedings were commenced, HCMFA and NexPoint informed the Retail Board that oversees their respective advised funds of their obligations under their respective Notes, *id.* at 20-21 (citing evidence); and (c) before and during the Highland Bankruptcy Case, the Notes were reflected in Highland's books, records, and bankruptcy filings, as assets without discounts, *id.* at 22-23 (citing evidence).

20.    Specifically, the Bankruptcy Court made the following findings corroborating that Mr. Dondero and the entities he controlled were aware of all of the Notes (including the HCMFA Notes), and treated them as valid, enforceable obligations of the respective Obligors:

- All of the Notes were (a) provided to PwC, Highland's long-time outside auditors, (b) specifically described in Highland's audited financial statements; and (c) carried as assets on Highland's balance

sheet with values equal to the accrued and unpaid principal and interest, without any offset or reservation of any kind (R&R at 17-20);[10]

- Plaintiff's audited financial statements were prepared based on management representation letters provided to PwC by Mr. Dondero and Mr. Waterhouse, neither of whom ever disclosed the Alleged Agreements, HCMFA's Mistake Defense, or any other defense to PwC despite having an affirmative obligation to do so under generally accepted accounting principles (*Id.*);

- HCMFA and NexPoint jointly reported to the Retail Board in October 2020 (the "Retail Board Report") that they were obligated to pay Plaintiff the amounts due under the HCMFA and NexPoint Notes, without any setoff or reservation of any kind (*Id.* at 20-21);

- The portions of the Retail Board Report showing that the HCMFA and NexPoint Notes were valid obligations due and owing to Plaintiff were prepared by Mr. Waterhouse (the Advisors' CFO) and Lauren Thedford (an attorney who then served as the Advisors' Secretary);[11]

- Without exception, Plaintiff's contemporaneous books and records recorded the Notes (including the HCMFA Notes) as debts due and owing by each of the Obligors to Plaintiff (R&R at 22-23); and

- Without exception, throughout Plaintiff's bankruptcy (including during the period from the petition date through January 9, 2020, when Mr. Dondero indisputably controlled Plaintiff), Plaintiff's bankruptcy filings (nearly all of which were prepared or signed by Mr. Waterhouse) reported the Notes (including the HCMFA Notes) as being assets of the Debtor's estate, without any setoff or reservation of any kind (*Id.*)[12]

---

[10] Even the HCMFA Notes (which HCMFA now contends were "signed by mistake" and "without authority") executed in May 2019, were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018. Ex. 34 at 39, Appx. 782. Because the HCMFA Notes were executed after the end of the 2018 fiscal year, they were ***not*** included as "assets" for 2018, and Highland never completed its 2019 audit. Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its ***own*** 2018 audited financial statements and (b) carried the HCMFA Notes as liabilities on its ***own*** balance sheet. Ex. 45 at 17; Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59:3, Appx. 3028-3029.

[11] See Ex. 35, Appx. 788-789; Ex. 36 at 1, Appx. 791; Ex. 37, Appx. 795-796; Ex. 36 at 3, Appx. 792-3.

[12] To prevent the appointment of a Chapter 11 Trustee, Mr. Dondero voluntarily ceded ultimate control of the Plaintiff to a bankruptcy court appointed independent board on January 9, 2020. *See* Bankr. Docket No. 339.

**C.      Recovery on the Notes Was a Significant Component of the Debtor's
Plan, Yet the Obligors Remained Silent on the Point Despite Lodging
Other Objections**

21.     If the foregoing were not enough (and it is), the conduct of Mr. Dondero
and his affiliates during the bankruptcy case further establishes that their defenses were recently
fabricated because they failed to disclose *any* of them despite having numerous opportunities, and
every incentive, to do so.   Their collective failure to disclose was not caused by any
misunderstanding: Highland transparently put the world on notice that collection on the Notes was
a key component of its proposed plan of reorganization and yet the only substantive issue the
Obligors ever raised—while lodging of numerous other objections—was "collectability."

22.     Highland's disclosure statement (filed about two months before the
Adversary Proceedings were commenced [Bankr. Docket No. 1473]) included financial
projections and a detailed liquidation analysis (the "Projections") intended to enable creditors to
assess potential outcomes under the Debtors' proposed plan of reorganization.  Ex. 90, Appx.
1497-1505. The Projections expressly assumed, among other things, that "[a]ll demand notes are
collected in the year 2021."  *Id.* at 173 of 178, Appx. 1500 (Assumption C).  Thus, even though
Highland had not yet called the Demand Notes, the Obligors and all other parties in interest were
on notice in November 2020, that the Debtor's Projections assumed all Demand Notes would be
collected the following year.

23.     The Obligors under the Term Notes defaulted on December 31, 2020 when
they each failed to make the required Annual Installment payments.  *See generally* Original
Complaints.  By early February 2021, Highland had commenced the Adversary Proceedings to
collect on *all* of the Notes so it amended the Projections [Bankr. Docket No. 1875-1] and modified
the assumption concerning the Notes to state "[a]ll demand notes are collected in the year 2021; 3
term notes defaulted and have been demanded based on default provisions; payment estimated in

10

2021." Ex. 91 at 2, Appx. 1508 (Assumption C) (the "Assumption"). Thus, on the eve of confirmation, the Obligors and all parties in interest knew the Debtor's Projections, as amended, assumed that all amounts due under the Notes would be collected as part of the Plan.

24.      At the confirmation hearing, James P. Seery, Jr., Highland's court approved Chief Executive Officer, testified as to (a) why the Debtor believed the Assumption was reasonable, and (b) how the commencement of the Adversary Proceedings impacted the Projections. Mr. Dondero's counsel asked certain questions on cross-examination concerning the Notes but never mentioned any defenses. Ex. 206 at 123:23-124:23, Appx. 4305-4306, 128:23-129:21, Appx. 4310-4311, 185:8-15, Appx. 4367.

25.      In his closing argument, Mr. Dondero's counsel discussed the Notes and (a) vaguely suggested that there may be "arguments" against the Debtor's assertion that the Term Notes are due and payable and (b) observed that the Notes were not discounted for "collectability issues," but made no mention of the Alleged Agreements, HCMFA's Mutual Mistake defense, or any other defense:

> First, there's the notes; and second, there's the assets. The notes are either long-term or demand notes. Those long-term notes, Mr. Seery will tell you some have been validly accelerated and therefore are now due and payable. I think there's arguments to the contrary. But those long-term notes probably have some both time value of money and collection costs. And then, of course, you have to discount them by collectability issues, too.
>
> I don't believe any analysis went into it, or at least the Court was not provided any data or analysis as to what discounts were applied to those notes. And, therefore, I don't think that this Court can make any determination that the best interests of the creditors have been met.

Ex. 207 at 223:22-224:14, Appx. 4701-4702.

26.      Mr. Dondero and his affiliates had every incentive to put their cards on the table at the confirmation hearing and disclose all of their defenses. They were doing everything

possible to torpedo the Plan.[13]  The Adversary Proceedings had already been commenced.  And

they knew the Debtor's Plan assumed that all of the Notes would be collected in 2021.  These facts

are undisputed.  The only plausible explanation for the Obligors' collective failure to disclose any

of the defenses they now press is that those defenses had not yet been fabricated.

D.      **The Obligors' Affirmative Defenses**

27.      In the face of this overwhelming evidence, the "Note Maker Defendants are

essentially trying to manufacture chaos by attempting to create fact issues with bizarre (if not

preposterous) defenses."  R&R at 8.

1.      **The Undisputed Evidence Shows that the Alleged Agreement Defense Was
Fabricated**

28.      Mr. Dondero cobbled together an affirmative defense premised on a series

of alleged oral agreements that he supposedly entered into first with himself, and then with his

sister pursuant to which all of the Notes would be forgiven based on certain "conditions

subsequent" or if certain assets were sold by a third party.  After months of wrangling,

Mr. Dondero finally settled on the contours of that defense and all of the Obligors (including

HCMFA, albeit in the Second HCMFA Action) thereafter amended their pleadings to adopt the

same newly created affirmative defense.

29.      The Bankruptcy Court explained "***there are numerous reasons why this***

***court believes no reasonable jury could find that there was truly an "oral agreement" to forgive***

***these loans to the Alleged Agreement Defendants***," noting that the 'oral agreement' defense does

not pass the 'straight face' test for a myriad of reasons." R&R at 25 (emphasis in original).  The

---

[13] Mr. Dondero (Bankr. Docket No. 1661), Dugaboy (the actual party that supposedly entered into the Alleged
Agreements) (Bankr. Docket No. 1667), and HCMFA and NexPoint (Bankr. Docket No. 1670), each filed extensive
objections to the Debtor's proposed plan of reorganization – yet none objected to the Assumption that it would collect
on all of the affiliate Notes as part of the Plan.

Bankruptcy Court found "there was a complete lack of evidence for" the Alleged Agreement defense, other than "conclusory statements of Mr. Dondero and, to a lesser extent, Sister Dondero."[14] *Id.* at 38.  The Bankruptcy Court's observations and conclusions are supported by the evidence and should be adopted without deviation.

### i.    <u>The Allegations Materially Changed Over Time</u>

30.    The manner in which the Alleged Agreement Defense was stitched together over the nine-month period following the commencement of the Adversary Proceedings—in response to Plaintiff's discovery demands and arguments—is set forth below and constitutes further evidence that it was fabricated for litigation purposes.  *See* R&R at 23-24 ("To be clear, the defense actually evolved over time.").

31.    In his Original Answer, Mr. Dondero asserted as his first affirmative defense that "Plaintiff's claims should be barred because it was previously agreed that Plaintiff would not collect on the Notes."  Ex. 80 ¶40, Appx. 1380 (the "<u>Alleged Agreement</u>").  ***None*** of the Corporate Obligors asserted the Alleged Agreement defense or any similar defense in their respective Original Answers.[15]

32.    In late March 2021, Plaintiff asked Mr. Dondero to admit, among other things, that he had not paid taxes on the amounts Plaintiff loaned to him but allegedly agreed not to collect.  Ex. 81 (Responses to RFAs 4, 8, and 12), Appx. 1387-1389. Having been alerted to a fatal flaw in his defense, Mr. Dondero amended his Alleged Agreement defense to state that: "Plaintiff's claims should be barred because it was previously agreed that Plaintiff would not

---

[14] "Sister Dondero" refers to Nancy Dondero.   The two names are used interchangeably throughout this document.

[15] *Compare* Dondero Action, Docket No. 6 (the "<u>Dondero Original Answer</u>") *with* HCFMA Action, Docket No. 6 (the "<u>HCMFA Original Answer</u>"); NexPoint Action, Docket No. 6 (the "<u>NexPoint Original Answer</u>"); HCMS Action, Docket No. 6 (the "<u>HCMS Original Answer</u>"); and HCRE Action, Docket No. 7 (the "<u>HCRE Original Answer</u>").

collect on the Notes *upon fulfillment of conditions subsequent*." Ex. 83 ("Amended Answer") ¶40, Appx. 1403.

33.     On April 15, 2021, about ten days after serving his Amended Answer, Mr. Dondero served his *Rule 26 Initial Disclosures.*  Ex. 184, Appx. 2982-2990 (the "Rule 26 Disclosures").  In his Rule 26 Disclosures, Mr. Dondero specifically identified fifteen (15) "individuals likely to have discoverable information," *but his sister, Ms. Dondero, was not among them*.  *Id.* at 2-5, Appx. 2984-2987.

34.     On April 26, 2021, Mr. Dondero served his sworn *Objections and Answers to Highland Capital Management L.P.'s First Set of Interrogatories*.  Ex. 82, Appx. 1390-1396. In response to an interrogatory that required Mr. Dondero to identify, with respect to each Note, "the person who entered into each [Alleged] Agreement on behalf of the Debtor," Mr. Dondero answered that "[t]he [Alleged] Agreements were entered into on behalf of the Debtor *by James Dondero* subsequent to the time each note was executed."  *Id*. at 4, Appx. 1394 (Answer to Interrogatory No. 1) (emphasis added).

35.     In response to an interrogatory that required Mr. Dondero to identify "every person who James Dondero believes has actual knowledge of each [Alleged] Agreement," Mr. Dondero identified five (5) individuals, including himself, but—like the Rule 26 Disclosures--*Mr. Dondero's sister was not among them*.  *Id.*, Appx. 1394 (Answer to Interrogatory No. 2).  In sum, Mr. Dondero's first crack at an affirmative defense claimed that he agreed with himself in his mind that Plaintiff would not collect the notes on a the happening of a condition subsequent.

36.     It was not until later in discovery that Mr. Dondero suddenly identified his sister—someone he failed to include as a person likely to have discoverable information or

14

someone he believed had actual knowledge of each Alleged Agreement—as the person who allegedly bound Plaintiff to the Alleged Agreements, rather than himself.[16]

37.     In the weeks that followed, each of the Obligors (except for HCMFA, at least until the Second HCMFA Action) sought leave from the Court to amend its respective Answer to adopt Mr. Dondero's Alleged Agreement defense, contending that it is not liable under any of the Notes because Plaintiff (bound by Ms. Dondero, acting as the Dugaboy Trustee) previously entered into a series of oral agreements pursuant to which it promised not to collect on the Notes "upon fulfillment of conditions subsequent as a form of compensation to Mr. Dondero."[17]

38.     But Mr. Dondero was not finished.  After months of maneuvering, and the prospect of Mr. Dondero re-asserting control over the Debtor slipping away, Mr. Dondero, HCMS, HCRE, and NexPoint finally settled on a version of the Alleged Agreement with one, final substantive change:

> Plaintiff's claims are barred … because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent.  Specifically, sometime between December of the year in which each note was made and February of the following year, [] Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost ***or on a basis outside of Defendant James Dondero's control***.  The purpose of this agreement was to provide compensation to Defendant James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP and in the industry.  This agreement setting

---

[16] Ms. Dondero was allegedly acting in her capacity as the Trustee of Dugaboy, a family trust in which Mr. Dondero is the sole beneficiary during his lifetime and that purportedly held a majority of certain of the limited partner interests in Highland.  *See* Ex. 31 ¶82, Appx. 655.

[17] *See* Ex. 11, Appx. 384-393 (NexPoint's Motion for Leave to Amend); Ex. 14 (NexPoint's First Amended Answer) ¶42, Appx. 421-422; Ex. 8, Appx. 292-312 (HCMS's Motion for Leave to Amend); Ex. 12 (HCMS's First Amended Answer) ¶56, Appx. 402; Ex. 9 (HCRE's Motion for Leave to Amend), Appx. 313-333; Ex. 17 (HCRE's Amended Answer) ¶99, Appx. 468.

forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant [ ] believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer") (emphasis added).[18]

39.    In an important, new twist, Defendants added that the Notes would be forgiven not only upon the satisfaction of "conditions subsequent," but also if "certain portfolio companies" were sold "on a basis outside of James Dondero's control."  This new language was inserted because, by the time it was tendered, the "portfolio companies" were certain to be sold "outside of James Dondero's control" (*i.e.*, by the Reorganized Debtor under the Debtor's confirmed Plan).  In addition to being absurd on its face, as discussed further below, such an agreement (if it actually existed, which it clearly did not) would be unenforceable due to a lack of consideration.

     ii.    **The Overwhelming Evidence Contradicts Any Notion of the Alleged Agreement**

40.    As the Bankruptcy Court properly found based on the undisputed evidence, no reasonable trier of fact can find that the Alleged Agreement ever existed.

41.    As a threshold matter (and notwithstanding Defendants' unsupported arguments to the contrary), "***no document was ever uncovered or produced in discovery to establish, memorialize, or reflect the existence or terms of the alleged 'oral agreement'***."  R&R at 25 (emphasis in original).  Among other things, the undisputed evidence showed the following:

- Neither Dugaboy nor Ms. Dondero (a) ever made a list of the promissory notes that are the subject of the Alleged Agreements; or (b) is otherwise aware of anything in writing that identifies the promissory

---

[18] *See also* Ex. 15 ¶83, Appx. 435-436 ("NexPoint's Answer"); Ex. 16 ¶97, Appx. 451-452 ("HCMS's Answer"); and Ex. 17 ¶99, Appx. 468 ("HCRE's Answer").

notes that are the subject of each Alleged Agreement.  Ex. 100 at 178:25-180:7, 180:24-181:6, Appx. 1919.

- The terms of the Alleged Agreement were never reduced to writing. Ex. 25 (Responses to RFAs 7-8, Appx. 539, Responses to Interrogatories 3-4, Appx. 542); Ex. 26 (Responses to RFAs 7-8, Appx. 555, Responses to Interrogatories 3-4, Appx. 558); Ex. 100 at 217:2-17, Appx. 1928.

- Mr. Dondero has admitted that (a) he never wrote down a list of the Notes that are subject to the Alleged Agreements; (b) he is unaware of any document that was created prior to the commencement of the Adversary Proceedings that identifies the Notes subject to the Alleged Agreements; and (c) no document was created prior to the commencement of the Adversary Proceeding that reflects or memorializes the terms of the Alleged Agreements. Ex. 24, Appx. 522 (Response to RFA 7); Ex. 99 at 28:24-29:12, Appx. 1819.

42.     Mr. Dondero Could Not Identify Material Terms of the Alleged Agreements.  In his deposition, Mr. Dondero was unable to describe material terms of the Alleged Agreements without relying on a document prepared by his counsel.  Specifically, without a list prepared by counsel, Mr. Dondero could not identify any of the Notes subject to the Alleged Agreements nor could he recall (a) the number of Notes subject to each Alleged Agreement, (b) the maker of each Note subject to each Alleged Agreement, (c) the date of each Note subject to each Alleged Agreement, or (d) the principal amount of any Note subject to the Alleged Agreements.  R&R at 25 (citing to Ex. 99 at 13:4-28:22, Appx. 1815-1819).[19]

43.     Mr. Dondero Personally Caused MGM Stock to Be Sold in November 2019 and Failed to Declare the Notes Forgiven.  According to Mr. and Ms. Dondero, and the newly created Alleged Agreement defense, all of the Notes would be forgiven if Mr. Dondero sold one

---

[19] Mr. Dondero's inability to identify the notes subject to the Alleged Agreements is important because he and HCMFA had other notes outstanding at the same time certain of the Alleged Agreements were supposedly entered into.  *See, e.g.,* Ex. 43, Appx. 836-838 (January 18, 2018 note executed by Mr. Dondero in the principal amount of $7.9 million); Adv. Pro. 21-03082, Docket No. 1 (Exhibit 1, February 26, 2014 note executed by HCMFA in the principal amount of $4 million) (Exhibit 2, a February 26, 2016 note executed by HCMFA in the principal amount of $2.3 million).

of three portfolio companies -- Trussway, Cornerstone, or MGM -- above cost.  *See* Ex. 31 ¶82, Appx. 655.  In November 2019 (following the petition date), Mr. Dondero caused the sale of a substantial interest in MGM for $123.25 million (an amount above cost), a portion of which was for the Debtor's interest in a fund, but failed to declare all of the Notes forgiven, and remained silent about the Alleged Agreements altogether.  *See* Ex. 201 ¶ 29-30, Appx. 3270-3271; Ex. 202 ¶ 14, Appx. 4135; Ex. 203 ¶ 1, Appx. 4143; Ex. 204 at 5 n. 5, Appx. 4156.

      44.    <u>Ms. Dondero Was Not Capable of Entering into the Alleged Agreements</u>.

Under the circumstances, Ms. Dondero was not capable of entering into the Alleged Agreements, and she made no effort to educate herself before purportedly binding Highland.  R&R at 26-28. Among other things, Ms. Dondero:

- had no meaningful knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry, (c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was "underpaid compared to reasonable compensation levels in the industry" (Ex. 100 at 42:22-43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928);[20]

- never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date (*Id.* at 61:25-63:13, Appx. 1889-1890);

- did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Ms. Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies

---

[20] The only information Ms. Dondero had concerning Mr. Dondero's compensation from Highland was that he "was not highly paid" and that in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark."  Ex. 100 at 51:11-22, Appx. 1887.  This information was false.  Ex. 68, Appx. 1129-1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Ex. 50, Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of $4,194,925); and Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

(*Id*. at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927);

- never saw a promissory note signed by James Dondero, any other officer or employee of Highland, or any "affiliate" of Highland (*Id*. at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919);

- learned (falsely, as shown below) from her brother that Highland allegedly had a "common practice" of forgiving loans, but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement (*Id*. 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900);

- had no knowledge of NexPoint, HCMS, or HCRE (the Corporate Obligors whose Notes are purportedly subject to the Alleged Agreement), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland, and their use of the proceeds (*Id*. at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909).

- had no authority under the HCMLP partnership agreement to negotiate and enter into binding agreements on behalf of HCMLP Ex. 2 (Exhibit 4), Appx. 57-93.

45. If, for whatever reason, the Court declined to adopt the Bankruptcy Court's R&R and sent this case to a jury, Ms. Dondero would be forced to admit to the foregoing facts in defense of the alternative breach of fiduciary duty claim lodged against her.[21]

46. The Alleged Agreements Were Kept Secret and Were Never Disclosed.

The Alleged Agreements were never disclosed by Mr. Dondero or Ms. Dondero (R&R at 28-29):

---

[21] Mr. Dondero retained Alan Johnson as an executive compensation expert. Mr. Johnson has experience advising boards, compensation committees, and other parties on issues concerning loan forgiveness transactions. Based on his expertise, Mr. Johnson would very likely concur that Ms. Dondero was not competent to enter into the Alleged Agreements on behalf of Highland. Ex. 101 at 12:3-73:17, Appx. 1961-1976.

- Other than Mr. and Ms. Dondero, no one participated in the discussions that led to each Alleged Agreement.  Ex. 100 at 190:16-191:17, Appx. 1922;

- Ms. Dondero and Dugaboy have admitted that (a) neither ever disclosed the existence or terms of the Alleged Agreements to *anyone*, including PwC, Mr. Waterhouse, or Mr. Okada, and (b) neither ever caused Highland to disclose the existence or terms of the Alleged Agreements to the Bankruptcy Court.  Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 538-542; Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 554-558); and

- Mr. Dondero admitted that he (a) never disclosed the existence or terms of the Alleged Agreements to PwC, Mr. Okada (his founding partner), or the Bankruptcy Court; and (2) never caused Highland to disclose the existence or terms of the Alleged Agreement to the Bankruptcy Court. Ex. 24 (Responses to RFAs 1-2, 5-7, 11-17, Appx. 521-524).[22]

47.    Even if the Alleged Agreements Existed, They Are Unenforceable for Lack of Consideration.  Mr. Dondero is the founder of Highland and Highland was the platform he used to support his other businesses, including the Advisors, HCRE, and HCMS.  No reasonable trier of fact could conclude that Highland (a) needed to enter into the Alleged Agreements to retain or motivate Mr. Dondero or (b) that Highland received anything of value in exchange for agreeing to forgive over $50 million in valid promissory notes if either (i) Mr. Dondero sold one of the three portfolio companies at a dollar above cost or (ii) the portfolio companies were sold by a third party.  Yet, according to Ms. Dondero, "motivating" Mr. Dondero to sell one of three assets at a dollar above cost is all that Highland received.  *See, e.g.,* Ex. 100 at 221:2-225:7, Appx. 1929-1930.

48.    Most importantly here, Ms. Dondero admitted that she did not know, and had no reason to expect, that Highland would benefit from the sale of the portfolio companies by a third party.  She also acknowledged that (a) Highland would not benefit from the Alleged

---

[22] Mr. Dondero asserts that he informed Mr. Waterhouse about the Alleged Agreement. Ex. 24, Appx. 521 (Responses to RFAs 3 and 4).  But Mr. Waterhouse testified that he did not learn of the Alleged Agreement until 2021 and even now only claims he knows that it was subject to "milestones" that he cannot identify. Ex. 105 at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

Agreements if a third party sold the portfolio companies at less than cost, and (b) under the Alleged Agreements, the Notes would be forgiven even if a third party sold the "portfolio companies" at a price "substantially below cost."  Ex. 100 at 201:24-203:11, Appx. 1924-1925; 227:17-229:14, Appx. 1931.

49.    <u>Mr. Dondero Fixed the Terms of the Alleged Agreements without Negotiation</u>.  No aspect of the Alleged Agreement was the subject of negotiation and Ms. Dondero made no counterproposal of any kind.  The undisputed facts show that Ms. Dondero never (a) made a counterproposal; (b) negotiated any aspect of the Alleged Agreements; (c) asked Mr. Dondero how he selected the portfolio companies; (d) inquired as to whether Mr. Dondero already had a duty to maximize value; (e) rejected any aspect of Mr. Dondero's proposal; or (f) rejected or pushed back on Mr. Dondero's proposal that all of the Notes would be forgiven if any of the portfolio companies were sold by a third party.  Ex. 100 at 194:16-19, Appx. 1923, 195:14-199:15, Appx. 1923-1924.

50.    <u>There Is No History of Loans Being Forgiven at Highland</u>.  Mr. Dondero, NexPoint, HCMS, and HCRE contend that the use of "forgivable loans" was a "practice that was standard at [Highland]."  *See, e.g.,* Ex. 31 ¶82, Appx. 655.  As the Bankruptcy Court found, this contention is false.  R&R at 24, n. 23.

51.    Mr. Dondero has admitted that Highland disclosed to its auditors all loans of a material amount that Highland ever forgave.  Ex. 98 at 426:8-427:15, Appx. 1777.  During his deposition, Mr. Johnson, Mr. Dondero's executive compensation expert, reviewed Highland's audited financial statements for each year from 2008 through 2018 (Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland has not forgiven a loan to anyone in the world since 2009, (b) the largest loan Highland has forgiven since 2008 was $500,000, (c) Highland has

not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland has never forgiven in whole or in part any loan that it extended to any affiliate. *Id.* at 189:24-192:10, Appx. 2005-2006. *See also* Ex. 98 at 422:18-428:14, Appx. 1776-1778.

52.     In sum, the Bankruptcy Court found that in light of the "undisputed corroborating evidence regarding the [ ] Notes," "[n]o genuine issue of material fact has been raised here such that a reasonable jury might find an alleged 'oral agreement.'" R&R at 17, 39. Notably, the Bankruptcy Court found that even if the Alleged Agreement existed, it "would be unenforceable as a matter of law for lack of: (a) consideration, (b) definiteness, and (c) a meeting of the minds." *Id.* at 39.

### 2.     HCMFA's "Mutual Mistake" Defense

53.     HCMFA's primary affirmative defense is that the HCMFA Notes are "void" or "unenforceable" for "lack of consideration," "mutual mistake," and for the "lack of authority from the Defendant to Waterhouse to executive the same for the Defendant." Ex. 13 ¶ 47, Appx. 412.  The Bankruptcy Court properly found that this defense "is farfetched, to say the least, especially in the context of a multi-billion company with perhaps the world's most iconic and well-known public accounting firm serving as its auditors . . . this court does not believe any reasonable jury could reach a verdict in favor of HCMFA on the 'Mutual Mistake' defense." R&R at 29.

54.     There is no dispute that Frank Waterhouse—the person whose signature appears on the HCMFA Notes—wore "many hats," including simultaneously serving as an officer for Highland (Chief Financial Officer) and HCMFA (Treasurer).  *Id*.  In support of its defense, HCMFA asserts that Mr. Waterhouse signed the HCMFA Notes by mistake and without authority ("HCMFA's Mistake Defense"), and that Highland's transfer of $7.4 million on May 2 and May 3, 2019 should have been treated "as compensation by the Plaintiff to the Defendant." Ex. 13 ¶ 45, Appx. 412.

55.     HCMFA specifically contends that, in March 2019, Highland made a "mistake in calculating" the net asset value ("NAV") of certain securities Highland Global Allocation Fund ("HGAF") held in Terrestar (the "NAV Error").  HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error. Ultimately, and working with the SEC, the Plaintiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.
>
> The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant directly or indirectly to HGAF and its investors.

Ex. 13 ¶¶ 41-42, Appx. 411.

56.     Regrettably, as HCMFA's contemporaneous writings prove, the assertions in the second paragraph are demonstrably false.  For example, on May 28, 2019, HCMFA sent a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV Error.  In its memorandum, HCMFA made no reference to Highland but admitted that it (and Houlihan Lokey) caused the NAV error:

> The Adviser and Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, initially determined that the March Transactions were "non-orderly" and should be given "zero weighting" for purposes of determining fair value.   As reflected in the consultation, the Adviser ultimately determined that both March Transactions should be classified as "orderly."  The fair valuation methodology adopted, as addressed in the consultation, weights inputs and does not reflect last sales transaction pricing

exclusively in determining fair value.  The "orderly" determination and adoption of the weighted fair valuation methodology resulted in NAV errors in the Fund (the "<u>NAV Error</u>").

Ex. 182, Appx. 2978-2980.

57.     HCMFA's arguments and Mr. Dondero's self-serving assertions notwithstanding, ***there is no evidence in the record*** establishing that (a) HCMFA ever informed the Securities and Exchange Commission that Highland was responsible for the NAV Error; (b) HCMFA ever informed the HGAF Board that anyone other than HCMFA and Houlihan Lokey was responsible for the NAV Error; or that (c) Highland ever "accepted responsibility" or otherwise agreed to "compensate" HCMFA for any mistake concerning the NAV error.  *See* Ex. 192 at 140:7-11, Appx. 3049.  *See also* R&R at 30-31.  Moreover, HCMFA concedes that ***nothing*** in its books and records corroborates HCMFA's contention that the payments from Highland to HCMFA were intended to be "compensation" rather than loans.  Ex. 192 at 59:8-63:20, Appx. 3029-3030.

58.     HCMFA's suggestion that Highland may have used "insurance" proceeds to fund the payment to HCMFA (Ex. 13 ¶ 42, Appx. 411) is not only false – but ***ignores the undisputed fact that HCMFA (not Highland) actually recovered $5 million from insurance to compensate HGAF for the NAV error***.  Again, HCMFA's own, contemporaneous writings are dispositive.  HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123.  Ex. 182 at 2, Appx. 2980.  HCMFA admits that it received almost $5 million in the form of insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss.[23]  Despite having received approximately

---

[23] Specifically, HCMFA reported that it (a) received $4,939,520 as insurance proceeds, (b) paid a deductible of $246,976, and (c) after accounting for other sources of capital and expenses, needed an additional payment of $2,398,842 to fully fund the loss.  Ex. 182 at 2, Appx. 2980.

24

$5 million in insurance proceeds (representing more than two-third of the total loss), HCMFA insists that (a) Highland's subsequent payment of $7.4 million was "compensation" for its negligence and (b) HCMFA was entitled to receive *both* $5 million in insurance proceeds *and* $7.4 million in "compensation" from Highland even though the total loss was only $7.4 million.  "It is undisputed that HCMFA never told its insurance carrier, ICI Mutual, that Highland was at fault or that Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered." R&R at 31 (citing Ex. 192 at 133:14-150:22, Appx. 3047-3052).

59.     After HCMFA filed its claim with ICI Mutual, HCMFA received the $7.4 million from Highland in connection with the Notes. Ex. 192 at 146:20-25, Appx. 3051.  Thus, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for the total receipts of $12.4 million in connection with the [NAV Error]." Ex. 192 at 147:4-11, Appx. 3051.

60.     HCMFA was forced to admit that it is unaware of anyone on behalf of HCMFA ever informing ICI Mutual that HCMFA (a) received $7.4 million from Highland on account of the NAV Error (Ex. 192 at 150:3-6, Appx. 3052), or (b) believed Highland was the cause of the NAV Error, Ex. 192 at 150:19-22, Appx. 3052.  In other words, HCMFA admits that it never told ICI Mutual that Highland made HCMFA "whole" or otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

61.     While not expressly relied upon by the Bankruptcy Court, additional, undisputed evidence exists that further establishes that HCMFA's Mistake defense was fabricated after the commencement of the Adversary Proceedings.

62.   Mr. Waterhouse Had Contemporaneous Knowledge that the Transfers to HCMFA Were Being Treated as Intercompany Loans.  Highland maintained an e-mail group called "Corporate Accounting" that included Mr. Waterhouse, among others. *See, e.g.,* Ex. 194 at 111:6-112:7, Appx. 3154.

63.   On May 2, 2019, David Klos, Highland's Controller, sent an e-mail to the Corporate Accounting group entitled "HCMLP to HCMFA loan" that said:

> Blair, Please send $2,400,000 from HCMLP to HCMFA.  This is a new interco loan.  Kristin, can you or Hayley please prep a note for execution.  I'll have further instructions later today, but please process this payment as soon as possible.

Ex. 54, Appx. 870-873.

64.   Thus, on May 2, 2019, Mr. Waterhouse was informed that (a) HCMLP was transferring $2.4 million to HCMFA, and (b) Ms. Hendrix and another HCMLP employee were asked to prepare a promissory note.

65.   The next day, on May 3, 2019, Ms. Hendrix sent an e-mail to the Corporate Accounting group that said:

> Blair, Please set up a wire from HCMLP to HCMFA for $5M as a new loan ($4.4M should be coming in from Jim [Dondero] soon).
>
> Hayley, please add this to your loan tracker.  I will paper the loan.

Ex. 56, Appx. 876-877.

66.   Thus, on May 3, 2019, Mr. Waterhouse was informed that (a) HCMLP was going to make a "new loan" to HCMFA in the amount of $5 million, and (b) Ms. Hendrix was going to "paper the loan."  And that's exactly what happened.

67.   HCMFA Represented to Third Parties that the HCMFA Notes Were Liabilities.  As discussed above, HCMFA represented to the Retail Board in October 2020 as part of the critical annual 15(c) Review that as of June 30, 2020, the HCMFA Notes were liabilities of

26

HCMFA.  *See* Ex. 59 at 2, Appx. 885.  Before filing its Original Answer, HCMFA never told anyone that was there was an error in the letter to the Retail Board.  Ex. 192 at 125:18-127:2, Appx. 3045-3046.

68.     The HCMFA Notes Are Carried as Liabilities on HCMFA's Balance Sheet and Included in Its Audited Financial Statements.  HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its 2018 audited financial statements and (b) carried the HCMFA Notes as liabilities on its balance sheet.  R&R at 32 (citing Ex. 45 at 17; Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029).

69.     Highland's Bankruptcy Court Filings Contradict HCMFA's Mistake Defense.  As discussed *supra*, Highland's contemporaneous books and records recorded the HCMFA Notes as valid debts due and owing by each of the Obligors to Plaintiff.  Thus, if Mr. Waterhouse "made a mistake" in preparing and executing the HCMFA Notes, then he compounded the mistake at least twenty (20) times when he, as Highland's chief accounting officer, (a) signed off on Highland's and HCMFA's audited financial statements, (b) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (c) prepared each of the Debtor's MORs and other court filings.  *See* R&R at 32-33.

3.     **The "Shared Services" Defense**

70.     NexPoint, HCRE, and HCMS contend that Highland caused their defaults because Highland was allegedly obligated to make payments under the Notes on their behalf.  Objection ¶¶ 88-111; *see also* Ex. 15 ¶ 80, Appx. 435; Ex. 12 ¶¶ 54-55, Appx. 402; Ex. 17 ¶¶ 97-98, Appx. 467.  The Bankruptcy Court determined that this defense is untenable as a matter of law.  R&R at 34, n. 30.  The Bankruptcy Court's analysis was as simple as it is sound.

71.     While NexPoint and Highland entered into that certain written *Amended and Restated Shared Services Agreement* effective as of January 1, 2018 (the "NexPoint SSA").

27

Ex. 205, Appx. 4162-4181, HCRE or HCMS are forced to admit, as the Bankruptcy Court found, that they had no such written agreement with Highland. Instead, they contend that they had an "oral agreement" and that Highland was obligated to work for them based on a "course of conduct." Objection ¶ 28.[24] For the reasons set forth below, these defenses fail as a matter of law and, in any event, no reasonable jury could credit them for at least the following reasons:

- Highland's audited financial statements included a section called "Services Performed by or on Behalf of an Affiliate" that identified numerous agreements that Highland had with various affiliates, including the NexPoint SSA, but no agreement with HCRE or HCMS was ever disclosed (see, e.g., Pl. Ex. 34 at 29-31, Appx. 772-74);[25]

- At no time during the bankruptcy case did Mr. Dondero, Mr. Waterhouse, or anyone acting on behalf of HCRE or HCMS cause Highland to disclose the existence of these alleged "oral agreements";

- Regardless of what may have occurred prior to the petition date when Mr. Dondero controlled all the entities, Mr. Dondero's decision to cause Highland to file for bankruptcy changed the nature of the parties' relationship because Highland was now a debtor in bankruptcy and could no longer be called upon to whimsically provide services for Mr. Dondero's non-debtor entities;

- The NexPoint SSA that HCRE and HCMS seek to adopt required NexPoint to pay Highland $168,000 per month for services, but there is no evidence—and there will never be any evidence—that HCRE or HCMS ever paid anything to Highland in exchange for the obligations those entities belatedly seek to thrust on Highland, let alone $168,000 per month;[26] and

---

[24] Neither HCRE nor HCMS offer any evidence to support their contention that an "oral agreement" exists, including the date of the alleged agreement, the terms of the alleged agreement, the consideration Highland was to receive for providing services, the persons who entered into the alleged agreement on behalf of each of the parties.

[25] Notably, under his management representation letter to PwC, Mr. Dondero was required to disclose all related party relationships and transactions, but nothing concerning a "oral shared services" agreement with HCRE or HCMS was ever disclosed. See Pl. Ex. 33 ¶¶ 35(d), 36, Appx. 00735-36.

[26] See Pl. Ex. 205 § 3.01, Appx. 04171. HCRE and HCMS coyly assert that they had shared services agreements with Highland that were "similar" to the NexPoint SSA. Objection ¶ 28. Presumably, one way that the alleged agreements were dissimilar is that HCRE and HCMS received services for free while NexPoint had to pay for them. In the end, HCRE and HCMS fail to cite to a single document to support their contention that an "oral agreement" existed between them and Highland (a regulated investment advisor), and the only person who affirmatively claims that such an agreement exists is—not surprisingly—Mr. Dondero.

- At the time of the defaults under the Term Notes, Mr. Dondero was already subject to a temporary restraining order imposed by the Bankruptcy Court (Adv. Pro. No. 21-03190-sgj, Docket No. 10), making any claim of reliance even more unreasonable under the circumstances.

72.     For these reasons, and those described below, the Bankruptcy Court found that neither HCRE nor HCMS had an enforceable agreement with Highland that authorized or required Highland to make payments on their Notes.

73.     NexPoint fares no better.  While it had a Shared Services agreement for the provision or middle and back office services, the Bankruptcy Court properly found that "no provision authorized or obligated Highland to control NexPoint's bank accounts or to effectuate payments without instruction or direction from an authorized representative."  R&R at 34, n. 30.

74.     Article II of the NexPoint SSA required Highland to provide "assistance and advice" with respect to certain specified services.  None of the services authorized Highland to control NexPoint's bank accounts or required Highland to effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint.  In fact, Article II of the SSA expressly provided that "for the avoidance of doubt   . . . [Highland] shall ***not*** provide any advice to [NexPoint] or perform any duties on behalf of [NexPoint], other than the back- and middle office services contemplated herein, with respect to (a) the general management of [NexPoint], its business or activities . . . ."  Ex. 205 at § 2.02, Appx. 4165-4167 (emphasis added).

75.     To emphasize the point further, the SSA expressly curtailed Highland's authority to act on NexPoint's behalf:

> Section 2.06 Authority.  [Highland's] scope of assistance and advice hereunder is ***limited to the services specifically provided for in this Agreement.  [Highland] shall not assume or be deemed to assume any rights or obligations of [NexPoint] under any other document or agreement to which [NexPoint] is a party***. . . . [Highland] shall

> not have any duties or obligations to [NexPoint] unless those duties
> and obligations are specifically provided for in this Agreement (or
> in any amendment, modification or novation hereto or hereof to
> which [NexPoint] is a party.

*Id*. § 2.06, Appx. 4170 (emphasis added).

76.     There is no dispute that Highland was never directed or instructed to make the Annual Installment payments due on December 31, 2020. Ex. 98 at 462:16-463:9, Appx. 1786; Ex. 105 at 381:21-382:16, Appx. 2144-2145. And while Ms. Hendrix certainly admitted that she made *de minimis*, overhead-type payments on behalf of NexPoint in the ordinary course of business, she never "caused a payment to be made in connection with an intercompany loan without receiving the prior approval from either Frank Waterhouse or Mr. Dondero." Pl. Ex. 194 at 103:10-104: 14; 124:22-125:1, Appx. 3152, 3157.

77.     Finally, Defendants' assertion that "[n]o one at HCMS or HCRE— including Jim Dondero—directed any person to miss or skip the payments on these Notes," Objection ¶ 31, does not support their defense. As Defendants know, Mr. Waterhouse— Highland's CFO—testified five different times that no payments were made for any reason in December 2020 on the express instruction of Mr. Dondero. Pl. Ex. 105 at 390:4-392:16, Appx. 02147.

### 4.     Other Defenses

78.      Mr. Dondero could not identify any facts to support his affirmative defenses of waiver, estoppel, or lack of consideration. Ex. 98 at 357:24-360:14, Appx. 1760-1761.

79.     For their part, NexPoint and HCMS also assert that they did not default by failing to make the December 31, 2020 Annual Installment payment because they "prepaid." Objection ¶¶ 32-37. But the Bankruptcy Court properly found that the "unrefuted summary judgment evidence of Plaintiff is that clearly dispels any argument that prepayments may have

averted defaults" (citing *Declaration of David Klos in Support of Highland Capital Management's Motion for Summary Judgment*, Adv. Pro. No. 21-03003-sgj, Docket No. 133 ("Klos Dec.") ¶¶ 3-16; Pl. Ex. 198 (Loan Summary), Appx. 3244.

80.     Moreover, the Notes are clear and unambiguous on this point.  There is no dispute that the makers (a) were required to make Annual Installments and (b) had the right to make "prepayments."  *See, e.g.,* Klos Dec. Ex. A § 2.1, 3.  The only question is how "prepayments" were to be applied.  Section 3 of the Term Notes provides the answer:

> 3.  Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  **Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.**

*Id.*

81.     This section unambiguously provides that (a) "Prepayment[s] [are] Allowed;" (b) "Renegotiation [is] Discretionary;" (c) prepayments of "unpaid principal or accrued interest" are permitted; and (d) payments "shall be applied first to unpaid accrued interest hereon, and then to unpaid principal."

82.     Defendants' attempt to create an ambiguity out of the words "accrued interest" fails for the simple reason that it is used in the past tense; it cannot possibly be interpreted to apply to future interest.  And while the parties' prior conduct is consistent with Section 3, see Objection ¶ 37, it cannot serve as an "amendment" to the plain terms of the Notes – particularly after the Petition Date when Mr. Dondero ceded control to an Independent Board, Highland was no longer formally affiliated with NexPoint, HCRE, or HCMS, and there is no evidence that any understanding was reached on these matters.[27]

---

[27] NexPoint adduces no admissible evidence to support its defense but it does create multiple strawmen.  Highland does not dispute that Prepayments are possible, nor does it dispute that at year end 2017, 2018, and 2019, Highland

83.     HCMS fares no better.   When Mr. Dondero controlled both HCMS and Highland, he exercised the right under Section 3 to "renegotiate" the application of prepayments. But even then, **under his watch**, HCMS **still** made its interest payment at year end 2019 -- even though HCMS had paid off millions of dollars in principal just months earlier.

84.     If Mr. Dondero and HCMS truly believed that HCMS's pre-payments applied to eliminate **all** future obligations of principal and interest, they never would have paid Highland in January 2021 after receiving notice of default (in a transparent but futile attempt to "cure," for which they had no right rather than assert the "prepayment" defense.  See R&R at 33.[28]

E.     **Defendants Object to the R&R**

85.     On August 23, 2022, Defendants filed the Objection to the R&R, in which Defendants maintain that, *inter alia*, (a) the Bankruptcy Court improperly "condemns" the Donderos' declarations as "self-serving and conclusory," and "ignored" such evidence, Objection ¶¶ 102-105); (b) the Bankruptcy Court "dismissed" evidence showing that Highland was responsible for making payments on the NexPoint, HCRE, and HCMS Notes, notwithstanding the clear and unambiguous terms of the Shared Services Agreement to the contrary, (*see id.* ¶¶ 88-90); (c) the Bankruptcy Court improperly "fails to address" the issue of "prepayment," *id.* ¶ 128; and (d) the Bankruptcy Court erred in denying HCMFA's defense that Mr. Waterhouse lacked authority to sign the HCMFA Notes since "both Waterhouse and Dondero confirmed" that he had no such authority, (*see id.* ¶¶ 134-136).  As the Bankruptcy Court correctly found, Defendants fail

---

[27] never declared the note to be in default.  *See* Objection ¶ 37.  The question is why NexPoint made any payment at all. And the answer is simple: applying the unambiguous terms of Section 3, NexPoint's prepayments were "applied first to unpaid accrued interest thereon, and then to unpaid principal."  Thus, the payments made in December of each year equaled all interest that *accrued* between the date each prepayment was made and year end.  That is the indisputable course of dealing; neither NexPoint nor HCMS had any basis to believe that it could forego paying interest.

[28] "These Note Maker Defendants had no right to cure in the loan documents.  Thus, this defense fails as a matter of law."  R&R at 36.

to rebut Highland's *prima facie* case for summary judgment.  Accordingly, Defendants' objections should be overruled, and the Court should adopt the Bankruptcy Court's R&R.

## IV.   ARGUMENT

### A.   Legal Standard

86.     "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law") (quoting FED. R. CIV. P. 56(c)).  "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party." *Alton v. Texas A&M University*, 168 F.3d 196, 199 (5th Cir. 1999).  The moving party meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Laboratories,* 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.*, 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact.").

87.     "Ordinarily, suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir.1988)); *see also Looney v. Irvine Sensors Corp.*, CIV.A.309-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary

33

judgment."). To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (a) the note in question, (b) that the non-movant signed the note, (c) that the movant was the legal owner and holder thereof, and (d) that a certain balance was due and owing on the note. *See Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL 3231633, at *15.

88.    "If the moving party carries [their] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.3d at 303; *see also Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial."). "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.3d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D. Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("The nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence") (internal quotations omitted). Thus, "[w]here critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton*, 168 F.3d at 199; *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n 12 (5th Cir. 1993) ("We no longer ask whether literally little evidence, *i.e.,* a scintilla or less, exists

but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.")

**B.      The Bankruptcy Court Correctly Found that Defendants Fail to Rebut Highland's *Prima Facie* Case for Summary Judgment**

> **1.      The Bankruptcy Court Correctly Found that Defendants Fail to Create a Genuine Issue of Material Fact Concerning the Non-Existence of the Alleged Agreement**

>> **i.      Mr. Dondero's Self-Serving Statements in His Declaration Identifying the Notes Fail to Create a Genuine Dispute of Material Fact in Support of the Alleged Agreements**

89.      Defendants contend that the Bankruptcy Court "ignore[d]" Mr. Dondero's declaration in which he "identified the material terms of the [Alleged] Agreements" and otherwise "paid no credence to Jim Dondero's deposition testimony" where he testified that "all the loans at issue in this litigation were subject to the [Alleged] Agreements."  Objection ¶¶ 44-45 (citing to J. Dondero Dec., ¶¶ 5-18).  The Bankruptcy Court did no such thing.

90.      In fact, the Bankruptcy Court relied on extensive deposition testimony in which "Mr. Dondero could not describe any material terms of the alleged 'oral agreement' without relying on a document prepared by counsel."  Indeed, without counsel's list,

> Mr. Dondero could not identify any of the Notes subject to the alleged 'oral agreement' nor could he recall (i) the number of Notes subject to each alleged 'oral agreement,' (ii) the maker of each Note subject to each alleged 'oral agreement,'(iii) the date of each Note subject to each alleged "oral agreement," or (iv) the principal amount of any Note subject to the alleged 'oral agreement.'

R&R at 25 (citing Pl. Ex. 99 at 13:4-28:22, Appx. 1815-1819).

91.      A fair review of the cited deposition testimony fully supports the Bankruptcy Court's findings.  Moreover, Mr. Dondero's failure to recall was significant because (a) "no document was ever uncovered or produced in discovery to establish, memorialize, or reflect

the existence or terms of the alleged 'oral agreement,'" and (b) other notes existed that were not the subject of the then-pending Adversary Proceedings (*see supra* at ¶ 2, n. 18).

92.    Mr. Dondero's "conclusory statements" (R&R at 38) set forth in his declaration could not cure his complete failure to recall any of the material terms of the Alleged Agreements during his deposition.

93.    In finding that Defendants could not rebut Highland's *prima facie* case for summary judgment, the Bankruptcy Court found that "there was a complete lack of evidence" in support of the Alleged Agreement defense, other than "conclusory statements of" Mr. and Ms. Dondero.  R&R at 38.  The Bankruptcy Court explained that, *inter alia*, "Mr. Dondero could not identify any material terms of the [Alleged Agreements] …" *id.*, noting that the Donderos "cannot even agree whether Mr. Dondero identified the Notes subject to the [Alleged Agreements]." *id.* at 38-39.  Thus, the Bankruptcy Court considered these facts, among "***numerous reasons***," in ultimately concluding that there was a complete absence of evidence in support of the Alleged Agreement defense. *See* R&R at 25-29 (citing evidence).  The Bankruptcy Court did not suggest, as Defendants misrepresent, that no reasonable trier of fact could find the Alleged Agreements existed simply "because Jim Dondero would have preferred to use a list of the Notes to refresh his recollection regarding the Agreement." Objection ¶¶ 20, 45.  Again, that Mr. Dondero "could not identify any material terms of the alleged 'oral agreement'" was just one fact, among many others, that the Bankruptcy Court found to undermine the Alleged Agreement defense.  *See* R&R at 38.

94.    As the Bankruptcy Court correctly found, Mr. Dondero's self-serving testimony in his declaration "itemizing the Notes subject to the Agreements," Objection ¶ 44 n. 134 (citing J Dondero Dec., ¶¶ 5-18), is insufficient to raise a genuine dispute of fact regarding the non-existence of the Alleged Agreement in light of the overwhelming evidence to the contrary.

36

95.     For these same reasons, Defendants' contention that the Bankruptcy Court'

"ignored" evidence showing that Mr. Dondero and Ms. Dondero do not disagree about whether

Mr. Dondero identified the Notes is without merit, and the evidence cited in support thereof does

not rebut Highland's *prima facie* case. Objection ¶ 46 (citing to Def. Ex. 1, J Dondero Dec. ¶¶ 25-

26, Def. Appx. 14-15 (Mr. Dondero declared that "[d]espite unclear questioning at my deposition

… I specifically remember discussing and identifying the Notes to Nancy Dondero").  Mr.

Dondero's attempt to "correct the record" with his self-serving testimony should be rejected.  The

relevant question and answer are unambiguous:

> Q:     Mr. Dondero, during your discussions with the Dugaboy
> Trustee, did you identify the Promissory Notes that were going to
> be the subject of each Agreement?
>
> MS. DEITSCH-PEREZ: Object to the form.
>
> A:     No, not that I recall.

Ex. 99 at 79:6-12, Appx. 1832.

96.     Under continued questioning, Mr. Dondero ***never*** testified that he identified

the Notes subject to the Alleged Agreements.  *Id.* at 80:8-17, Appx. 1832 ("She was aware that

they were notes due to Highland from a variety of entities"), 81:11-23, Appx. 1832  ("I can't sit

here as I remember – as I sit here today and remember whether or not I specifically identified

HCRE or not, you know; but she knew they were related entities.").  Mr. Dondero's testimony

speaks for itself.  His inability to provide unequivocal testimony on this issue is fatal given the

undisputed facts that (a) Nancy Dondero never saw any Note signed by her brother or on behalf of

an affiliate, (b) no writing exists memorializing the terms of the Alleged Agreements, and (c) no

one contemporaneously created a list of the Notes subject to the Alleged Agreements.

97.     Thus, the Bankruptcy Court did not, as the Note Maker Defendants suggest,

"ignore" evidence contained in Mr. Dondero's declaration. *See* objection ¶ 44.  Rather, it found

that such self-serving and conclusory statements were insufficient to convince a reasonable jury that there existed an Alleged Agreement in light of the overwhelming and probative evidence to the contrary.  Mr. Dondero's conclusory assertions in his declaration fail to rebut Highland's *prima facie* case, and Defendants' objection on this ground should be overruled.

ii.   **Defendants' Contention that Jim Dondero Was Not Required to Declare the Notes Forgiven Upon the Sale of MGM Stock Fails to Create a Genuine Dispute of Material Fact Supporting the Alleged Agreement Defense**

98.     According to Defendants, all of the Notes would be forgiven if Mr. Dondero sold one of three "portfolio companies" (including MGM) above cost.  Pl. Ex. 31 ¶ 82, Appx. 655. The Bankruptcy Court found that in November 2019 "Mr. Dondero (while still in control of Highland) caused the sale of a substantial interest in MGM for $123.25 million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the Notes forgiven, and remained silent about the alleged 'oral agreement' altogether."  R&R at 25-26 (citing evidence).

99.     Defendants do not dispute *any* of the Bankruptcy Court's factual findings on this issue, but contend that Mr. Dondero had no duty to disclose the existence of the Alleged Agreements at that time, and that his failure to do so was legally irrelevant.  Objection ¶¶ 47-49. Defendants misconstrue the import of the issue and their contentions fail to create a genuine dispute of material fact in any event.

100.    Mr. Dondero should have been highly incentivized to at least disclose the existence of the Alleged Agreements in November 2019 because the sale of a substantial portion of MGM implicated one of the alleged "conditions subsequent" and was the subject of contentious debate in the bankruptcy case.[29]  Thus, regardless of whether Mr. Dondero had a legal duty to

---

[29] Mr. Dondero's sale of MGM securities in November 2019 occurred after he caused Highland to file for bankruptcy but while he remained in control of the Debtor.  The transaction was the subject of motion practice and faced objections by the Official Committee of Unsecured Creditors and others.  *See* Ex. 201 ¶29-30, Appx. 3270-3271; Ex. 202 ¶14,

disclose, no reasonable jury could find it plausible that Mr. Dondero remained silent under the circumstances.[30]

### iii. Defendants' Contention that Whether Ms. Dondero Ever Saw a Note Is "Irrelevant" Fails to Rebut Highland's *Prima Facie* Case

101.    Among the extensive evidence the Bankruptcy Court relied upon in concluding that no reasonable jury could find that the Alleged Agreements actually exist is that "Sister Dondero, the counter-party to the alleged agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland . . . ." R&R at 39.  Defendants fail to dispute the Bankruptcy Court's factual finding but contend that the finding is "completely irrelevant" because it supposedly has no "bearing on the existence of the [Alleged] Agreements."  Objection ¶ 50.  This contention is disingenuous.

102.    Ms. Dondero's admission that she never saw any of the Notes is plainly relevant because Defendants will never be able to credibly explain to a jury how Ms. Dondero (a) could have competently entered into a series of oral agreements worth tens of millions of dollars without ever seeing the Notes or knowing their terms (*i.e.*, the original principal amounts, the remaining principal then due, the varying interest rates, whether they were Term or Demand Notes, the dates of maturity, etc.), or (b) could possibly recall what Notes were subject to which Alleged Agreement since she never saw any of them.[31]

---

Appx. 4135; Ex. 203 ¶1, Appx. 4143; Ex. 204 at 5 n. 5, Appx. 4156.  In this context, Mr. Dondero's failure to disclose was either a fraud on the bankruptcy court or is more indicia that the entire Alleged Agreement defense was fabricated for litigation purposes.

[30] Defendants' argument that Highland is somehow "estopped" from making this argument, Objection ¶ 48, is equally without merit, and also does not rebut Highland's *prima facie* case.  The undisputed fact is that in November 2019, Mr. Dondero caused the sale of a substantial interest in MGM for $123.25 million, a portion of which was for the Debtor's interest in a fund.  *See supra* ¶¶ *43, 89* (citing evidence)

[31] Notably, between December 2017 and December 2019 (when Mr. Dondero and his sister supposedly entered into the Alleged Agreements), Mr. Dondero and two of his affiliates, NexPoint and HCMS, paid Highland nearly $40,000,000 on account of certain of the Notes at issue and other notes that Mr. Dondero tendered to Highland in exchange for loans.  *See* Ex. 38, Appx. 798, Ex. 73, Appx. 1337.  *See also* Exs. 106-112, 117-123 (showing payments

39

103.    In any event, Defendants' attempt to deem this issue "irrelevant" does not create a genuine dispute of material fact or otherwise rebut Plaintiff's *prima facie* case.

### iv.    Defendants' Contention that the Alleged Agreements Were "Disclosed" Is False and Fails to Rebut Highland's *Prima Facie* Case

104.    Based on substantial evidence in the record, the Bankruptcy Court properly concluded that the "existence or terms of the alleged agreements were never disclosed by Mr. Dondero or Sister Dondero to anyone, including PwC, Mr. Waterhouse, or the bankruptcy court." R&R at 39.    Defendants contend that the Bankruptcy Court "blindly followed" Plaintiff's argument; that evidence exists showing that the Alleged Agreements were disclosed; and that the issue is "irrelevant."  Objection ¶¶ 14-16, 51.  Each of Defendants' contentions are meritless.

105.    *First*, Defendants' contention that the Bankruptcy Court "blindly followed" Plaintiff is not only insulting, but plainly wrong.  The Bankruptcy Court cited to *extensive evidence* (largely Defendants' own admissions) establishing that Mr. Dondero, Ms. Dondero, and Dugaboy all failed to disclose the existence or terms of the Alleged Agreements prior to the commencement of the Adversary Proceedings.  *See* R&R at 28.

106.    *Second*, although Defendants cite to three pieces of evidence in support of their contention that the Alleged Agreements were disclosed, a fair review of the evidence shows that this contention is false because none of the cited evidence includes the words "agreement," "forgiveness," "contingency," "conditions subsequent," "Nancy," or "Dugaboy."[32]    And this

---

made under certain of the Notes at issue and other notes not subject to the Adversary Proceeding).  There is no evidence that Ms. Dondero knew how much was due and owing on each Note at the times she supposedly entered into each Alleged Agreement.

[32] Defendants claim that the Alleged Agreements were disclosed (a) by Mr. Dondero during a post-petition conversation with Mr. Waterhouse concerning settlement issues (Pl. Ex. 99 at 167:10-16, Pl. Appx. 01854; Def. Ex. 1, J Dondero Dec. ¶ 28, Def. Appx. 15); (b) in a letter sent by Mr. Dondero's counsel after the commencement of litigation that expressed Mr. Dondero's "views" that the Notes were given "in lieu of compensation" (Def. Ex. 1-D, Def. Appx. 74); and (c) in a proof of claim filed by Mr. Dondero (Defendants request that the Court take "judicial notice" of the proof of claim ("Proof of Claim 188"); Plaintiff has no objection).  Objection ¶ 14.  Plaintiff does not

makes sense because the Alleged Agreement defense "evolved" over the nine-month period following the commencement of the Adversary Proceedings.  *See supra* at ¶¶ 30-39.

107.    ***Finally***, Defendant's contention that their failure to disclose a verbal contract has no "bearing on whether a contract does or does not exist" defies common sense. Objection ¶ 51.  Defendants again confuse the burden of proof and the Bankruptcy Court's findings.  In order to rebut Highland's *prima facie* case, Defendants bear the burden of proving the essential elements of their affirmative defense, namely, the existence of the Alleged Agreement. As the Bankruptcy Court properly found, no reasonable jury could find that the Alleged Agreement existed because, among other reasons, the parties to the Alleged Agreements never disclosed their existence to anyone, including PwC, the Bankruptcy Court, Mark Okada (Mr. Dondero's then-partner) or any officer, director, or employee of Highland or any of the Makers.

108.    Obviously, Mr. Dondero and his sister would have been strongly incentivized to disclose the existence of the Alleged Agreements, particularly during the 15-month period between the petition date (October 16, 2019) and the commencement of the Adversary Proceedings on January 22, 2021; Defendants will never be able to credibly explain to a jury why they acted against their own self-interest by failing to do so.  Defendants' generalized contention that the non-disclosure of an oral agreement may not render that agreement non-existent does not

---

dispute that Mr. Dondero always resisted making good on the obligations under the Notes, but the fact that Mr. Dondero contended that the Notes were tendered "in lieu of compensation" is not remotely akin to disclosing the existence or terms of the Alleged Agreements.  Indeed, if anything, Mr. Dondero's self-serving statements further demonstrate that the Alleged Agreement defense was fabricated after the commencement of litigation; that is the only plausible explanation for Mr. Dondero's complete failure to disclose the existence or terms of the Alleged Agreements in his conversation with Mr. Waterhouse, or in his attorney's post-commencement letter, or in Proof of Claim 188, or anywhere else.

41

lend any support for Defendants' Alleged Agreement defense, and therefore, does not rebut Highland's *prima facie* case for summary judgment.[33]

**v.    Defendants' Contention that Oral Agreements Need to Be Memorialized in Writing Fails to Rebut Highland's *Prima Facie* Case**

109.    Defendants further disparage the Bankruptcy Court by blatantly mischaracterizing its findings concerning the absence of documentary evidence corroborating the existence of the Alleged Agreements.  The Bankruptcy Court did not "blindly follow[]" Plaintiff and conclude that "oral contracts must be written to be believed by a jury."  *See* Objection ¶ 52.[34]  Rather, the Bankruptcy Court considered this fact as one of many to support its finding that Defendants failed to adduce evidence sufficient to convince a reasonable jury of the Alleged Agreement's existence.  *See* R&R at 25 (finding that "[t]he 'oral agreement' defense does not pass the 'straight face' test for a myriad of reasons," including that "***no document was ever uncovered or produced in discovery to establish, memorialize, or reflect the existence or terms of the alleged "oral agreement"***") (emphasis in original).[35]  Defendants' vague contention that an oral agreement

---

[33] Plaintiff notes that Proof of Claim 188 was not part of the evidentiary record in the Main Notes Litigation and Defendants did not cite to or rely upon it in opposition to the Summary Judgment Motion.  Instead, HCMFA offered the document into evidence in support of its Alleged Agreement defense asserted in the Second HCMFA Action. Again, Plaintiff has no objection to the Court considering Proof of Claims 188 at this time but emphasizes that (a) it says nothing about the Alleged Agreements but (b) if the Court concluded otherwise, then the entire Alleged Agreement defense must be dismissed because Proof of Claim 188 was withdrawn *with prejudice*.  *See* Objection ¶ 14 (misleadingly suggesting that Proof of Claim No. 188 was "withdrawn" rather than honestly disclosing that it was "withdrawn with prejudice" (*see* Bankr. Docket No. 1502 ¶ 1)).  Defendants' last-second reliance on Proof of Claim 188 is a particularly risky and desperate maneuver because it directly conflicts with several sworn statements tendered by Mr. Dondero.  *See, e.g.*, Ex. 24, Appx. 522 (responses to Requests for Admission 7 and 8 in which Mr. Dondero unconditionally admitted that ***no document was created*** prior to the commencement of the Adversary Proceeding concerning the existence of the Alleged Agreements); Ex. 24, Appx. 523 (responses to Requests for Admission 11 and 12 in which Mr. Dondero unconditionally admitted that ***he never disclosed*** the terms or existence of the Alleged Agreements to the Bankruptcy Court); Ex. 99 at 168:10-169:17, Appx. 1854 (Mr. Dondero was specifically asked under oath to identify any documents created prior to the commencement of the Adversary Proceedings concerning the existence of the Alleged Agreements, and he failed to mention Proof of Claim 188).

[34] Again, Defendants do not dispute the Bankruptcy Court's factual finding that no documentary evidence exists that establishes, memorializes, or reflects the existence or terms of the Alleged Agreements.

[35] Defendants will never be able to plausibly explain to a jury why no document or written communication exists reflecting the existence or terms of the Alleged Agreement.  According to Mr. Dondero's expert, Alan Johnson,

42

need not be reduced to writing in order to be valid does not create a genuine dispute of material fact regarding the Alleged Agreement's existence, and otherwise does not lend any support for the Alleged Agreement defense.

### vi. The Bankruptcy Court Correctly Found that Highland Does Not Have a History of Loan Forgiveness

110.  Defendants quibble with the Bankruptcy Court's findings concerning the Highland's lack of a "practice" of forgiving loans and contend that the findings are "rebutted by the record." Objection ¶ 53.  Again, the facts are not in dispute, only the characterization of the facts.  And the undisputed facts show the following:

- According to Mr. Dondero, Highland disclosed to its auditors all loans of a material amount that Highland ever forgave (Ex. 98 at 426:8-427:15, Appx. 1777);

- During his deposition, Mr. Dondero's executive compensation expert reviewed Highland's audited financial statements for each year from 2008 through 2018 (Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland has not forgiven a loan to anyone in the world since 2009, (b) the largest loan Highland has forgiven since 2008 was $500,000, (c) Highland has not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland has never forgiven in whole or in part any loan that it extended to any affiliate.

---

Highland paid Mr. Dondero approximately $1.7 million during the three-year period 2017-19 as Highland was hurtling towards bankruptcy.  Def. Ex. G at 19, Def. Appx. at 255.  During that same period, the Defendants tendered to Highland promissory notes with an aggregate face amount of more than $70 million in exchange for loans of equal value, all of which are purportedly subject to the Alleged Agreements entered into for the supposed purpose of motivating and potentially compensating Highland's allegedly underpaid executive, Mr. Dondero.  Dondero Dec. ¶¶ 5-18, Def. Appx. at 4-12; N. Dondero Dec. ¶ 10, Def. Appx. at 81-83. Thus, the face amount of the Notes subject to the Alleged Agreements was more than *40 times* Mr. Dondero's direct cash compensation from Highland.  Given the enormity of Mr. Dondero's personal stake in the Alleged Agreements, a jury would reasonably expect Mr. Dondero to have (i) contemporaneously taken steps to make sure those Alleged Agreements were documented and disclosed to remove any impediment to enforcement, and (ii) immediately and accurately recited the relevant facts if enforcement was ever questioned. Ms. Dondero and Dugaboy should have also been motivated to memorialize and disclose the terms and existence of the Alleged Agreements in order to protect themselves from second-guessing or claims of breach of fiduciary duty; to ensure that all stakeholders were aware of Highland's alleged obligations; and to increase the likelihood that Ms. Dondero's brother would reap the benefits of the alleged bargain.  But there is no dispute that Ms. Dondero *never* put anything in writing and *never* told a soul about the Alleged Agreements.  *See, e.g.*, Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 538-542); Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 554-558).

(*Id.* at 189:24-192:10, Appx. 2005-2006. *See also* Ex. 98 at 422:18-428:14, Appx. 1776-1778); and

- Mr. Dondero went even further than his expert and flatly admitted that (a) Highland never gave him a loan that was actually forgiven (Ex. 24, Appx. 524 (response to RFA 15), and (b) he could not identify a single intercompany loan that was ever forgiven as part of compensation (Ex. 98 at 423:9-14, Appx. 1776).

111.    Neither Plaintiff nor the Bankruptcy Court ever suggested that Highland *never* forgave any loans.  Rather, based on the undisputed facts, the modest loans that Highland forgave a decade or more before the petition date do not constitute a "practice that was standard at HCMLP" or provide a precedent for an undisclosed loan forgiveness program worth over $50 million, much of which is in the form of loans that were extended to affiliates for investment purposes.[36]

112.    In sum, Defendants' contention that the Bankruptcy Court's findings on this issue are "erroneous" and "rebutted by the record," is without merit.

---

[36] Defendants' reliance on snippets of deposition testimony does not support their argument.  *See* Objection ¶ 9 (citing Def. Ex. 3-A (James P. Seery, Jr.) at 177:19-178:5, Def. Appx. 141-142) (Mr. Seery testified that no loans were forgiven by Highland to senior executives that exceeded $500,000, and that such forgiveness occurred more than a decade ago); *see also* Ex. 194 (Kristin Hendrix) at 133:5-23, Appx. 3160 (to Ms. Hendrix's knowledge going back fifteen years, Highland has ***never*** forgiven an affiliate loan; and any forgiven loan was ***required*** to be disclosed in HCMLP's audited financial statements); Ex. 195 (David Klos) at 122:18-123:24, Appx. 3212 (to Mr. Klos' knowledge, Highland has ***never*** forgiven an affiliate loan; ***no*** loan has been forgiven for at least seven (7) years; and ***no*** loan was forgiven for more than $500,000); Ex. 101 (Alan Johnson (Expert)) at 120:21-121:14; 123:7-12, Pl. Appx. 01988-01989 (Mr. Johnson testified that Highland's 2008 and 2009 audited financial statements reflected modest loans that were forgiven to employees); *see also* Ex. 98 (Mr. Dondero) at 423:9-14, Appx. 1776 (Mr. Dondero could not identify a single intercompany loan that was ever forgiven as part of compensation).  Defendants otherwise cite to no evidence supporting their contention other than Mr. Dondero's conclusory and self-serving assertions that, at Highland, "it was common practice to compensate executives with forgivable loans" and "several of Plaintiff's executives received loans that were forgiven." *See* Objection ¶ 9 (citing J. Dondero Dec. ¶ 23, Def. Appx. at 13-14; Pl. Ex. 98 at 424:4-8, Pl. Appx. 01777).  Mr. Dondero's assertions are unsubstantiated and blatantly contradicted by the overwhelming evidence.

**vii.** **The Bankruptcy Court Correctly Found that No reasonable Jury Could Find that the Alleged Agreements Exist Based on the Donderos' Self-Serving Statements and Did Not "Ignore" Such Evidence**

113.    Defendants assert that the Bankruptcy Court "ignored" evidence that Jim and Nancy Dondero's "consistently testified" the Alleged Agreements "took place, exist, and are valid,", and that such evidence creates a genuine issue of material fact. *See* Objection ¶¶ 19, 54-59.

114.    These self-serving and uncorroborated statements are not the type of "probative evidence required" to defeat summary judgment, especially "in the face of conflicting probative evidence." *Kariuki v. Tarango*, 709 F.3d 495, 505 (5th Cir. 2013); *see also BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir.1996) (affirming summary judgement for plaintiffs where "the only evidence in support of the defendants' theory is a conclusory, self-serving statement by the defendant"); *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (affirming summary judgment for recovery of promissory note, where defendant's only evidence to rebut plaintiff's *prima facie* case consisted of "self-serving allegations," which "are not the type of significant probative evidence required to defeat summary judgment") (internal quotations omitted).

115.    Defendants argue that its "summary judgment evidence is more than sufficient to provide proof that the Agreements exist" since it "present[s] testimony from both sides to the Agreements while Texas law only requires testimony from one." Objection ¶ 54.  The cases Defendants rely on in support of this argument are easily distinguishable from the present facts.[37]   Here, unlike in those cases, Defendants offer no probative evidence, other than the

---

[37] *See In re Palms at Water's Edge, L.P.*, 334 B.R. 853, 858 (Bankr. W.D. Tex. 2005) (a meeting of the minds "can be inferred from the parties' conduct and their course of dealing"); *Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding*, 480 S.W.2d 607 (Tex. 1972) (existence of contract can be "inferred from the circumstances" based on the "conduct of one party"); *Al-Saud v. Youtoo Media, L.P.*, 3:15-CV-3074-C, 2017 WL 3841197 (N.D. Tex. March 15, 2017) (corroborating evidence offered to support defense to breach of contract claim); *Fisher v. Blue Cross*

Donderos' self-serving statements, to corroborate the existence of the Alleged Agreements.  In other words, Defendants fail to adduce *any* evidence from which the existence of the Alleged Agreements can be "inferred from the circumstances" or the parties' "course of dealing."[38]  For example, the undisputed facts establish that:

- No contemporaneous writing exists that reflects the existence or terms of the Alleged Agreements;

- Neither Mr. Dondero nor his sister ever sent a written communication that reflected the existence or terms of the Alleged Agreements;

- Nothing in Highland's books and records reflects the existence or terms of the Alleged Agreements;

- Nothing in Defendants' books and records reflects the existence or terms of the Alleged Agreements

- Neither Mr. Dondero nor any of his affiliates disclosed the existence or terms of the Alleged Agreements to PwC;

- Neither Mr. Dondero nor any of his affiliates disclosed the existence (let alone terms) of the Alleged Agreements to the Retail Board;

- Neither Mr. Dondero nor any of his affiliates disclosed the existence or terms of the Alleged Agreements to the Bankruptcy Court in connection with confirmation even though Highland assumed full recovery on all of the Notes; and

- No one without the last name "Dondero" (including Mr. Waterhouse) has ever testified to knowing about the existence or terms of the Alleged Agreements prior to the commencement of the Adversary Proceedings.

---

*and Blue Shield of Tex., Inc.*, 3:10-CV-2652-L, 2015 WL 5603711 at 10 (N.D. Tex. Sept. 23, 2015) (denying summary judgment where evidence of the parties' course of dealing might enable a find-finder to infer the existence of an implied contract); *Honore v. Douglas*, 833 F.2d 565 (5th Cir. 1987) (denying summary judgment where non-movant offered corroborating evidence including party admissions and other testimonial evidence);

[38] Defendants' other case cites in support of this argument are also inapplicable because the relevant issue here is not about the terms of the alleged contract, *see 271 Truck Repair & Parts, Inc. v. First Air Express, Inc.*, 03-07-00498-CV, 2008 WL 2387630 (Tex. App.— Austin June 11, 2008, no pet.), or whether the "meeting of the minds" element is satisfied, *see Buxani v. Nussbaum*, 940 S.W.2d 350 (Tex. App.—San Antonio 1997, no writ)).

116.    Thus, no corroborating evidence exists to support Defendants' Alleged Agreement defense.    By contrast, the undisputed documentary evidence overwhelmingly demonstrates the enforceability of the Notes and Defendants' breach thereunder while exposing the Alleged Agreement defense to be fictitious.    *See supra* ¶¶ 23-25, 41-42, 46 (citing evidence).

117.    Defendants have not cited to any case where a court has denied summary judgment based on the self-serving, conclusory, and uncorroborated testimony of two family members, one of whom (*i.e.*, Ms. Dondero) has no pecuniary interest in the subject matter but who is aligned with the non-movant.    As discussed *supra*, these self-serving statements are insufficient to defeat summary judgment in the face of the substantial, undisputed, and conflicting probative evidence. *See Tyler v. Cedar Hill Indep. Sch. Dist.*, 426 Fed. Appx. 306, 309 (5th Cir. 2011) (affirming summary judgment, where "[a]fter closely reviewing the record ... the only document [party] provides to support her claim" is her conclusory, self-serving affidavit, noting "[w]e have repeatedly held that self- serving affidavits, without more, will not defeat a motion for summary judgment."); *Sanchez v. Dallas/Fort Worth Int'l Airport Bd.*, 438 Fed. Appx. 343, 346–47 (5th Cir. 2011) (affirming summary judgment where party attempting to rebut summary judgment relies on "her own self- serving affidavit," noting "a self-serving affidavit, without more evidence, will not defeat summary judgment"); *Lavergne v. Jefferson County, Tex.*, 164 F.R.D. 441, 443 (E.D. Tex. 1995) ("When an affidavit in response to a summary judgment motion contains "nothing more than a recital of unsupported allegations, conclusory in nature," the motion for summary judgment should be granted"); *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 531 (5th Cir. 2005) (affirming summary judgment where defendant's "attempt to create a fact issue ... by relying on a conclusory and self-serving affidavit is on unsteady ground"); *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000) (affirming summary judgment, and finding that "party's self-serving and

unsupported" affidavit regarding her "intent" is "not sufficient to defeat summary judgment where the evidence otherwise supports a finding of fraud").

118.    Thus, the Bankruptcy Court, did not "ignore" or "dismiss[]" the Donderos' statements. *See* Objection ¶ 57.   Rather, it found there was a "complete lack of evidence" supporting the Alleged Agreement defense, other than "conclusory statements of Mr. Dondero and, to a lesser extent, Sister Dondero." R&R at 38.

119.    Defendants' "Alleged Agreement" defense is a fabricated story blatantly contradicted by the summary judgment record, and no reasonable jury could believe it. *See Salama v. W. Wind Energy Corp.*, 2013 WL 6079548, at *5, No. 4:12–cv–03535 (S.D. Tex. Nov. 19, 2013) ("As the Supreme Court has noted, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment'") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) (mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment); *Main Street Bank v. Unisen, Inc.*, No. H-06-3776, 2008 WL 11483415, at *7 (S.D. Tex. Feb. 15, 2008) ("The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment").

120.    In sum, the Dondero's self-serving statements are insufficient to defeat Highland's *prima facie* case for summary judgment.   Accordingly, the Bankruptcy Court's findings that such conclusory statements are insufficient, in light of the overwhelming evidence to the contrary, to convince a reasonable jury of the Alleged Agreements, should be adopted.

DOCS_NY:46451.10 36027/002

### viii.   Defendants' Contention that the Bankruptcy Court "Ignored" Evidence of Consideration Should Be Overruled

121.   Defendants contend that the Bankruptcy Court "ignored evidence" when concluding that even if a fact-finder determined that the Alleged Agreements existed, they would be unenforceable as a matter of law for lack of consideration.  *Compare* R&R at 39 *with* Objection ¶¶ 13, 60-62.  But it is Defendants, not the Bankruptcy Court, who ignores the undisputed evidence.

122.   According to Defendants, pursuant to the Alleged Agreements, all of the Notes were to be forgiven if either (a) Mr. Dondero sold one of three "portfolio" companies "for greater than cost" (the "Dondero Sale Contingency") or (b) the portfolio companies were sold "on a basis outside of Defendant James Dondero's control" (the "Third Party Contingency").  *See, e.g.*, Ex. 31 ¶ 82, Appx. 655.[39]  There is no dispute that the Dondero Sale Contingency has not and will never occur.  Thus, the Alleged Agreements could only be enforced upon the satisfaction of the Third Party Contingency.

123.   But there is *no* evidence in the record establishing that Highland will receive anything of value under a Third Party Contingency sale.  Indeed, Ms. Dondero testified as follows:

> Q:   Did you expect Highland to benefit if the portfolio companies were sold on a basis outside of Mr. Dondero's control?
>
> A:   I have no idea, John.
>
> Q:   Did you have any idea – did you or Dugaboy have any idea when you entered into the agreement if Highland would benefit from

---

[39] The Defendants contend that Highland "benefitted from the Agreements by not paying Jim Dondero higher base compensation, something Jim Dondero thought was 'great for the [Plaintiff] at the time,'" and "reduces other compensation [that he would have otherwise taken]."  Opposition ¶ 10.  Defendants have it exactly backwards.  The loans benefitted Mr. Dondero because they ostensibly allowed him to take all of the money while deferring the realization of income and the concomitant payment of personal income taxes.  Highland, on the hand, was harmed because it transferred over $70 million in capital in the form of loans and consequently was forced to defer the realization of the expenses that would have reduced its taxable income.  This whole scheme benefitted Mr. Dondero and his affiliates and no one else.  And now, to add insult to injury, they shamelessly want to "take the money and run" while reneging on all of the promises of repayment reflected in the Notes.

the sale of the portfolio companies on a basis outside of Mr. Dondero's control?

A:      I wouldn't know that.

Ex. 100 at 203:7-18, Appx. 1925.

124.    Defendants have failed to come forward with ***any*** admissible evidence showing the consideration Highland received in exchange for forgiving over $50 million in Notes when the portfolio companies are sold in accordance with Highland's confirmed Plan of Reorganization (*i.e.*, the Third Party Contingency) (because there is no conceivable benefit).

125.    Indeed, Mr. Dondero's expert, Mr. Johnson, supports Highland's position that the Alleged Agreements lack consideration.  Mr. Johnson initially concluded that for the seven-year period from 2013 through 2019, Mr. Dondero's alleged "compensation shortfall" was approximately $21 million – or only about (i) 30% of the original aggregate face amount of the Notes ($70 million) or (ii) 40% of the current principal due on the Notes ($50 million).  *See* Def. Ex. G at 19, Def. Appx. 255.[40]  But even Mr. Johnson's initial conclusion was grossly overstated because Mr. Dondero failed to disclose to Mr. Johnson millions of dollars in compensation he received from the Highland, largely in the form of stock options.  Defendants offer no evidence showing that Highland received consideration in forgiving $50-70 million in loans when Mr. Dondero's own expert calculated that his alleged compensation "shortfall" was only between $10-20 million.

---

[40] Mr. Johnson prepared his report in the spring of 2021 before Mr. Dondero decided to extend the Alleged Agreement defense to his affiliates.  As a result, Mr. Johnson was never told that the affiliate notes were part of the Alleged Agreements.  Mr. Johnson's report thus provides further confirmation that the Alleged Agreements are fictitious because Defendants will never be able to plausibly explain to a jury (a) why they failed to disclose the affiliate loans to Mr. Johnson, or (b) why there is a gap of tens of millions of dollars between the face value of the Notes subject to the Alleged Agreements (*i.e.*, more than $70 million when issued) and Mr. Johnson's conclusion that Mr. Dondero was undercompensated by $21 million (let alone after his conclusion is properly adjusted downwards by the millions of dollars of compensation Mr. Dondero failed to disclose to him).

126.     Defendants' case cites do not support their argument.  *Salama v. W. Wind Energy Corp.*, No. 4:12-cv-03535, 2013 WL 6079548 (S.D. Tex. Nov. 19, 2013), aff'd, 586 Fed. Appx. 183 (5th Cir. 2014) is entirely inapposite to the present facts.  There, the court held there was consideration in a settlement agreement where the terms of the agreement provided plaintiff with a cash advance so that he could exercise stock options that had been previously granted to him.  The court reasoned that because "plaintiff did not have to pay any of his own money to exercise his options," plaintiff's "argument that the [] stock was 'something to which he was already entitled' simply ignores that he was not 'entitled' to the stock at no cost *Id.* at *7.  Here, by contrast, Mr. Dondero's conclusory assertion that he had a "legal right" to increase his own salary prior to the Alleged Agreement, and that it was somehow created as an "incentive" to motivate Jim Dondero to work "diligently," does not support the notion that there was any consideration for the forgiveness of $50-70 million in loans.  It also ignores the undisputed fact that ***the affiliate loans were extended to "enable those entities to make investments"*** -- something that would have been impossible had Mr. Dondero taken the $50-70 million as compensation.[41]

127.     *Garcia v. Lumacorp, Inc.*, No. CIV.A. 3:02-CV-2426-, 2004 WL 1686635, at *11 (N.D. Tex. July 27, 2004), aff'd, 429 F.3d 549 (5th Cir. 2005) is equally distinguishable.  There, the court held there was consideration exchanged under a settlement agreement which provided that plaintiff would waive and release all of this rights and claims against that employer in exchange for the employer agreeing to pay plaintiff's outstanding medical bills and an additional $10,000.  The court reasoned that "[w]hat Plaintiffs really complain about is the *adequacy of consideration*" and that "[n]ormally, a court will not inquire into the adequacy of consideration supporting a contract; however, in the interest of equity, a court may inquire into the adequacy of

---

[41] R&R at 15 (citing Pl. Ex. 105 at 126:21-129:3, Appx. 2081).

a contract if there is such a gross disparity in the relative values exchanged as to show unconscionability, bad faith, or fraud." 2004 WL 1686635, at *11. Again, here, unlike in *Garcia*, Defendants fail to point to *any* consideration supporting the Alleged Agreement (to the extent a factfinder would find it existed in the first place). Even if there were somehow consideration, however, it is grossly inadequate for the reasons discussed *supra*.

128.    In *Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492 (Tex. 1991), the court held that the question of whether there was consideration was a fact issue where, *inter alia*, the terms of an agreement were "ambiguous" as to whether there was a bargained for exchange and where certain admissions "do not conclusively prove that there was no consideration." *Id.* at 496. Here, by contrast, the terms of the Alleged Agreement, on their face, conclusively demonstrative that the Alleged Agreement was not the result of a bargained for exchange. Moreover, whether the Court concludes based on the evidence that Highland received "no consideration" or "grossly inadequate" consideration is beside the point: the Reorganized Debtor is selling all of its assets pursuant to a confirmed asset monetization plan and Defendants have failed to offer a scintilla of evidence as to how the estate would benefit from forgiving over $50 million in loans under the circumstances.

### ix.    Defendants' Contention that the Bankruptcy Court "Ignored" Evidence that There Was a "Meeting of the Minds" Should Be Overruled

129.    Defendants object to the Bankruptcy Court's finding that even if the Alleged Agreement were found to exist, it would be unenforceable because Defendants fail to prove the element of "meeting of the minds." *See* R&R at 39. In support thereof, Defendants rely on the same conclusory assertions that Jim Dondero "did identify the Notes" and that the Donderos "understood the terms of the [Alleged] Agreements," *see* Objection ¶ 77, and the same conclusory and self-serving statements in the Donderos' declarations and irrelevant snippets of their

52

deposition testimony, *see id.* ¶¶ 17-18 (citing Def. Ex. 2, N Dondero Dec., ¶ 8, Def. Appx. 81-83; Pl. Ex. 99, James Dondero 11/4/21 Tr. 79:20-80:5, Pl. Appx. 01832; Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 186:7-12, Pl. Appx. 01921).  For the reasons discussed *supra*, the Bankruptcy Court correctly found that the Donderos could not "even agree whether Mr. Dondero identified the Notes subject to the [A]lleged [A]greement."

130.    Defendants' case cites are inapposite.  In *Sinclair Oil Corp. v. Heights Energy Corp.* 4:05-CV-825-Y 2007 WL 9718223 (N.D. Tex. Nov. 13 2007), the court held that there could be no summary judgment on the question of whether there was a "meeting of the minds" where the nonmoving party "points out the fact issues" that "undermines [the] argument that there is no binding contract," including that, *inter alia*, there was "partial performance" under the subject agreement.  *Id.* at *3.   Here, by contrast, Defendants point to no evidence, other than the Donderos' unsubstantiated, conclusory assertions, supporting their argument that the Alleged Agreement exists.  Under *Sinclair*, and all other case law cited *supra*, this is exactly the type of "scintilla of evidence" that is insufficient to defeat summary judgment.  *See id.* at *3 (explaining that the nonmoving party's burden to defeat a *prima facie* case for summary judgment is "not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions or by only a scintilla of evidence," noting "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted.").  Here, unlike in *Sinclair*, Defendants have failed to come forward with any probative evidence sufficient to show the "existence of each of the elements of their affirmative defenses" to rebut Highland's *prima facie* case for partial summary judgment.

131.    *Martinez v. Pilgrim's Pride Corp.*, 3:16-CV-3043-D, 2017 WL 6372385 (N.D. Tex Dec. 13, 2017) is likewise distinguishable.  There, the court found that "the undisputed

53

summary judgment evidence establishes as a matter of law that there was a meeting of the minds with respect to the waiver and release provision of" an agreement where, among other things, the party signed a clear and unambiguous "waiver and release" provision, and admitted that she signed such provision. *Id.* at *4. Here, Highland does not admit to entering into any oral agreement to forgive the Notes, and there is no clear provision of any contract demonstrating the existence thereof. Defendants offer no evidence to support any elements of their affirmative Alleged Agreement defense, and Highland offers overwhelming evidence debunking any notion of such Agreement. In *Hallmark v. Hand*, 885 S.W.2d 471 (Tex. App.—El Paso 1994, writ denied), the question of whether there was a "meeting of the minds" was submitted to the jury where there was conflicting probative evidence supporting both parties' contentions. *See id.* at 477. Defendants' contention that the element of "meeting of the minds" should always be submitted to a jury ignores the fact that fact that to be submitted to a jury, Defendants must submit more than a mere scintilla of evidence in support of their affirmative defense. *See Latimer*, 919 F.3d at 303.

132. Accordingly, as the Bankruptcy Court held, Defendants fail to adduce more than a scintilla of evidence in support of their affirmative Alleged Agreement defense, and no reasonable jury could believe such Agreement existed.

### x. Defendants' Contention that Nancy Dondero Was "Competent" to Enter into the Alleged Agreements' Is Without Merit and Fails to Create Any Dispute of Material Fact Regarding the Existence of the Alleged Agreement

133. As discussed *supra*, the Bankruptcy Court found there were "***numerous reasons***" that no reasonable jury could find that the Alleged Agreement existed, including, *inter alia,* that "Sister Dondero was simply not capable of entering into any alleged 'oral agreement' on behalf of Highland." The Bankruptcy Court cited an extensive list of evidence to support its

findings.  *See* R&R at 26-28.  While Defendants dispute the Bankruptcy Court's characterization of the facts, they do not genuinely dispute any of them.

134.    Instead, Defendants attempt to minimize the issue, contending that Ms. Dondero had the "information she needed" to enter into the Alleged Agreements, relying on Ms. Dondero's thread-bare Declaration, *see* Objection ¶¶ 81-85 (citing N. Dondero Dec. ¶¶ 2, 4, 9-12, Def. Appx. 80-84), in which Ms. Dondero purports to disclose ***everything*** her brother told her, *see* N. Dondero Dec. ¶ 4, Def. Appx. at 80-81, and ***everything*** she otherwise knew, *see id.* ¶¶ 9-10, Def. Appx. at 83-84).  As the Bankruptcy Court fairly found, no reasonable jury could ever be convinced from these conclusory contentions, in light of the overwhelming conflicting evidence, that Ms. Dondero was sufficiently informed to enter into Alleged Agreements worth over $70 million.[42]

135.    Defendants' contention that the Bankruptcy Court's somehow found or even implied that the Alleged Agreements are "unenforceable" because they were the product of a unilateral mistake by Nancy Dondero," Objection ¶¶ 78, 84-85, misstates the Bankruptcy Court's finding.  The Bankruptcy Court did not find that that Nancy Dondero's lack of knowledge of the circumstances surrounding the Alleged Agreement would have resulted in some "unilateral" mistake.  Rather, it found that such evidence was one reason, among many, contradicting any notion of the existence of an Alleged Agreement.  *See* R&R at 26-29.  Defendants' cite to *Anderson*

---

[42] If Ms. Dondero had done ***any*** due diligence, she would have learned, among other things, that (a) each of the three "portfolio companies" was already "***in the money***" when she supposedly entered into the Alleged Agreements thereby eliminating the supposed "motivation" that constituted the "consideration" Highland allegedly received; (b) Highland did not have a "standard practice" of forgiving loans; had not forgiven any loan in almost a decade; had never forgiven an affiliate loan; and had never forgiven a loan of more than $500,000; (c) Mr. Dondero earned millions of dollars per year from the Highland enterprise even though only a portion was allocated to Highland; and (d) had she consulted a compensation expert such as Mr. Johnson, Mr. Dondero was allegedly "undercompensated" by only $10-20 million for the seven-year period 2013-2019 (Def. Ex. G at 19, Def. Appx. at 255) rendering ***completely gratuitous*** a loan forgiveness program worth (at the time of entry) over $70 million.  This is in addition to the indisputable fact that Ms. Dondero simply did not have the authority to bind Highland.

*Bros. Corp. v. O'Meara*, 306 F.2d 672 (5th Cir. 1962) is inapplicable. That case dealt with whether a party could be relieved from a transaction on grounds of "mistake." *Id.* at 677. Here, the question is not whether Highland can prove there was some "unilateral mistake" sufficient to avoid the enforcement of the Alleged Agreement; rather, the question is whether Defendants can adduce sufficient evidence to convince a reasonable jury that the Alleged Agreements actually exist. Here, the Bankruptcy Court considered Nancy Dondero's lack of knowledge as one factor among many in ultimately determining that no reasonable trier of fact could find that the Alleged Agreements existed.

136.    Defendants' generalized assertion that Nancy Dondero's lack of financial details has no "bearing" on the validity of the Alleged Agreements, *see* Objection ¶ 83, likewise fails to rebut Highland's *prima facie* case for summary judgment regarding the non-existence of the Alleged Agreements. Defendants have failed to create a genuine dispute of material fact and would never be able to convince a reasonable jury that anyone in Ms. Dondero's position could have or would have entered into a series of agreements worth over $70 million under the circumstances – particularly where Ms. Dondero had no direct relationship to Highland.

137.    Defendants' vague recitation of the law on "capacity" again misses the point, [43] and fails to create a genuine dispute of material fact concerning the existence of the Alleged Agreements. *See* Objection ¶ 86. As discussed *supra*, the Bankruptcy Court did not hold, as Defendants suggest, that the Alleged Agreements did not exist because Ms. Dondero was legally

---

[43] *See Ginther-Davis Ctr., Ltd. v. Houston Nat. Bank*, 600 S.W.2d 856, 861 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e) (dealing with whether a contract was the result of fraud, finding that "appellants must be held to have ratified the contracts and waived any defense of fraud" where they "clearly were aware" of certain facts relating to contracts); *Corsaro v. Columbia Hosp. at Med. City Dallas Subsidiary, LP*, No. 3:21-CV-01748-N, 2021 WL 6135342, at *1 (N.D. Tex., Dec. 29, 2021) (dealing with whether a party could "overcome the presumption of mental capacity to contract" due to cognitive disability); *Del Bosque v. AT&T Adver., L.P.*, 441 Fed. Appx. 258, 262 (5th Cir. Sept. 16, 2011) (same).

56

incompetent.  Rather, the Bankruptcy Court concluded that Ms. Dondero's undisputed lack of knowledge and utter failure to inquire were additional factors supporting its conclusion that no reasonable jury could find that the Alleged Agreements actually existed.

138.    In sum, the issue is not "legal competence" but whether a reasonable jury could plausibly conclude that the Alleged Agreements actually existed given, among other things, the undisputed evidence that Ms. Dondero had no information other than what her brother supposedly gave her and made no effort to educate herself on any relevant issue.  The Bankruptcy Court's conclusion in this regard is amply supported by the evidentiary record and should be adopted by the Court.

**2.     The Bankruptcy Court Correctly Found that Defendants Failed to Create a Genuine Dispute of Material Fact Regarding Their Affirmative Defense that Highland Was "Responsible for Making Payments on the NexPoint, HCRE, and HCMS Notes"**

**i.     Defendants Fail to Create a Genuine Dispute of Material Fact in Support of Their Contention that Highland Was Required to Make Payments on the Notes on Behalf of NexPoint**

139.    As the Bankruptcy Court found, the undisputed evidence establishes that (a) under its plain and unambiguous terms, the NexPoint SSA did not authorize, let alone require, Highland to make payments under the NexPoint Term Note without receiving instruction or direction from an authorized representative of NexPoint, and (b) Highland never received and such instruction or direction in December 2020.  *See supra* ¶¶ 72-73 (citing evidence).

140.    Nevertheless, NexPoint falsely insists that "there is ample evidence that Plaintiff had duties under the SSA to at least remind NexPoint of any upcoming payment on the NexPoint Note." Objection ¶ 97.  NexPoint maintains, without any support, that there is a "genuine issue of material fact regarding" whether "assistance" and "advice" with respect to "accounts payable," and all things "ancillary" or "incidental," under Section 2.02 of the SSA, included

Highland "assisting and advising NexPoint with respect to the alleged December 2020 annual payment." Objection ¶ 93.  However, as the Bankruptcy Court found, Defendants fail to point to any provision in the NexPoint SSA that obligated or even authorized Highland to control NexPoint's bank accounts or to effectuate payments without instruction or direction from an authorized representative.  As discussed *supra*, Section 2.02 specifically provided that "for the avoidance of doubt . . . [Highland] shall not provide any advice to [NexPoint] to perform any duties on behalf of [NexPoint], other than back- and middle-office services contemplated herein." Section 2.06 also clearly provided that Highland's "scope of assistance and advice" under the SSA as "***limited to the services specifically provided for in this Agreement.  [Highland] shall not assume or be deemed to assume any rights or obligations of [NexPoint] under any other document or agreement to which [NexPoint] is a party***." *Id*. § 2.06, Appx. 4170 (emphasis added). Thus, as the Bankruptcy Court correctly found, the NexPoint SSA clearly and unambiguously does not authorize or require Highland to make payments on the Notes on behalf of NexPoint, and this defense fails as a matter of law.  *See Addicks Services, Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 294 (5th Cir. 2010) ("Whether a contract is ambiguous is a question of law").

141.    NexPoint also improperly relies on the "parties' prior course of dealing." Objection ¶¶ 93-94.  However, extrinsic evidence is not warranted here since the plain and unambiguous terms of the NexPoint SSA govern.  *See Addicks*, 596 F.3d at 294 ("When parties disagree over the meaning of an unambiguous contract, '[t]he intent of the parties must be taken from the agreement itself, not from the parties' present interpretation, and the agreement must be enforced as it is written") (internal quotations omitted).  In other words, where, as here, the contract at issue is unambiguous on its face, the Bankruptcy Court was confined to the four corners of the NexPoint SSA and could not look to extrinsic evidence to create an ambiguity. *See id.*  Defendants'

introduction of parol evidence is, therefore, improper here. *See id.* ("Parol evidence—such as the parties' course of performance—may be used to ascertain the intent of the parties only if the contract is first found to be ambiguous.")

142.    Defendants' cites to *Craig Sessions, M.D., P.A. v. TH Healthcare, Ltd.*, 412 S.W.3d 738, 745 (Tex. App. 2013) and *O'Connor v. United States*, 479 U.S. 27, 33 (1986), do not support the introduction of parol evidence here.  In *Craig Sessions*, the court precluded evidence of prior course of dealing, and of a party's oral statements and understanding of the contract terms, which varied the "plain terms of the contract," where that contract was "unambiguous." 412 S.W.3d at 745.  Here, just as in *Craig Sessions*, extrinsic evidence is improper to vary the plain and unambiguous terms of the SSA.  In *O'Connor*, the Supreme Court granted certiorari to petitioners, United States citizen employees of the Panama Canal Commission and their spouses, seeking refunds of income taxes collected on salaries paid by the Commission between 1979 and 1981 to "resolve conflicting appellate interpretations of an international agreement." 479 U.S. at 28.  In an attempt to resolve such conflicting interpretations, the Court considered the "negotiating history," ultimately finding that such evidence "does not favor the taxpayers' position sufficiently to affect our view of the text."  *Id.* at 35.  *O'Connor* is thus entirely irrelevant to the present facts, which certainly do not involve "conflicting appellate interpretations" of a complex international agreement.

143.    Even if the terms of NexPoint SSA were ambiguous with respect to whether Highland had an affirmative duty to make payments on the NexPoint Note on behalf of NexPoint without NexPoint's authorization (and they are not), Defendants still fail to adduce any extrinsic evidence in support of this defense.  For instance, Defendants rely on Mr. Dondero's conclusory and self-serving assertions and snippets of deposition testimony that lend no support for the notion

that Highland had an affirmative duty under the NexPoint SSA to cause payments to be made under the NexPoint Note without NexPoint's authorization.  Mr. Waterhouse's testimony that in prior years, Highland had a "role" in making NexPoint's annual payments including "calculating amounts due," and "informing Jim Dondero of any cash obligations that were forthcoming," *see* Objection ¶ 94 (citing to Pl. Ex. 105 at 333:15-25, Pl. Appx. 02132; 335:10-336:9, Pl. Appx. 02133) provides no support for the contention that Highland had an affirmative duty under the NexPoint SSA to make annual installment payments on behalf of NexPoint without NexPoint's authorization.  Mr. Waterhouse's testimony that it would have been "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note," *id.* (citing Pl. Ex. 105 at 333:14-338:8, Pl. Appx. 02132-02134), likewise does not support for the notion that Highland was required or even authorized to effectuate payments on the NexPoint Note on behalf of NexPoint without NexPoint's authority.  Defendants' citation to snippets of Ms. Hendrix's testimony also does not support Defendants.  *See id.* ¶ 95 (citing Pl. Ex. 194 at 13:19-22, Pl. Appx. 03130) (Hendrix's testimony that Highland's "duties" included "sending out payments, reconciling bank statements, making sure money is in the right accounts...").  Defendants ignore Ms. Hendrix's unequivocal testimony that payments in the "ordinary course," such as "overhead," needed approval by Mr. Waterhouse and not Mr. Dondero, but that "[s]omething that's once a year that's more material in amount, such as a loan payment, that is something that needs to get approved by Jim Dondero." Pl. Ex. 194 at 103:5-105:2, Pl. Appx. 03152-3153. In fact, Ms. Hendrix testified that she ***never*** caused a payment to be made in connection with an intercompany loan without the prior approval of Mr. Waterhouse or Mr. Dondero.  *Id.* at 124:22-125:22, Appx. 03171.

60

144.    Defendants also rely on Mr. Dondero's self-serving, unsubstantiated, and baseless assertions that the reason NexPoint did not make its annual installment payment under the NexPoint Note is because "there was a reliance on Highland" to do so.  *Id.* ¶ 96 (citing Pl. Ex. 98 at 458:11-463:25, Pl. Appx. 01785-01786); see also id. ¶ 27 (citing to J. Dondero Dec. at ¶ 35, Def. Appx. 17-18), and that it was prior practice for Highland to make payments for NexPoint without "any specific authorization, direction, or permission from either Jim Dondero or any other NexPoint executive," *id.* ¶ 26 (citing Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03248-03249; Def. Ex. 1, J Dondero Dec., ¶ 34, Def. Appx. 17).

145.    The overwhelming, undisputed evidences shows that Mr. Dondero's "reliance" on Highland to make this payment is entirely contradicted by the record.  Ms. Hendrix specifically testified that she was instructed from Mr. Waterhouse—NexPoint's Treasurer—not to make any annual installment payments from the Advisors to Highland. *See* Pl. Ex. 194 at 71:3-20, Pl. Appx. 03144.  Defendants' entire defense thus rests upon the notion that Highland was negligent under the NexPoint SSA because Highland "never reached out in writing" to Mr. Dondero or anyone at NexPoint to inquire about whether "Frank Waterhouse's instruction was a mistake…." Objection ¶ 25.   Defendants' argument that Highland was negligent under the NexPoint SSA for not reaching out to NexPoint to confirm with NexPoint that its direction to Highland not to effectuate the Annual Installment Payment was not a "mistake" is entirely without merit.  The undisputed facts show that: (a) the Term Note Defendants have yet to identify any provision under the NexPoint SSA that required (or even authorized) Highland to make the payments required under the Term Notes; (b) Mr. Waterhouse was NexPoint's Treasurer who also oversaw Highland's accounting department, yet he offers nothing on the topic and remains gainfully employed on behalf of Mr. Dondero's enterprise; (c) Ms. Hendrix testified without

qualification that while she made "overhead" payments in the ordinary course, she would never effectuate an intercompany transfer without direction or instruction from Mr. Dondero or Mr. Waterhouse; and (d) Ms. Hendrix was clearly instructed by NexPoint's treasurer not to make any payments from the Advisors to Highland.

146.     Among the clearest pieces of evidence that Mr. Dondero's statements of "reliance" are false is Highland's contemporaneous conduct.  On December 3, 2020, Highland sent letters demanding that HCMS, HCRE, and HCMFA pay, in the aggregate, over $13.5 million under the applicable Demand Notes.  Ex. 1 (Exhibit 3), Appx. 16-19; Ex. 3 (Exhibit 5), Appx. 129-132; and Ex. 4 (Exhibit 5), Appx. 213-216.  If Highland believed that it had the right, let alone the obligation, to make payments on behalf of the Term Note Defendants, *it surely would have grabbed the money while it could*.  And had it done so, Mr. Dondero surely would have protested loudly.  But none of that occurred because Highland did not have the right, let alone the obligation, to take money for itself without direction or instruction from the maker.

147.     Nor could any professed reliance ever be deemed reasonable under the circumstances.  By December 30, 2020, (a) Mr. Dondero had been terminated from Highland, (b) Highland had obtained a TRO against Mr. Dondero, (c) Highland was managed by an Independent Board and was no longer affiliated with NexPoint, HCRE, or HCMS, (d) Highland had already made demands under all of its Demand Notes, and (e) Highland had given notice of termination of the Shared Services Agreements.  Given that the Term Notes Defendants cannot identify any provision in the Shared Services Agreement requiring Highland to effectuate the payments under the Term Notes, no jury could reasonably credit Mr. Dondero's "expectations" that Highland would do anything more than required under the circumstances.

62

148.     Based on the clear and unambiguous terms of the NexPoint SSA, NexPoint's defense fails as matter of law.  Even if the Court permitted extrinsic evidence on this issue, such evidence lends no support for Nexpoint's defense.  Accordingly, Defendants' objection to the Bankruptcy Court's finding on the grounds that it is "contradicted by the summary judgment evidence … that Plaintiff was required to make payments" under the NexPoint SSA, Objection ¶ 109, should be overruled.

ii.     **Defendants Fail to Create a Genuine Dispute of Material Fact in Support of Their Contention that Highland Was Required to Make Payments on Behalf of HCRE and HCMS**

149.     Defendants' contention that Highland is "responsible" for HCMS's and HCRE's missed payments under, Objection ¶ 110, is even more frivolous than the one above.  As the Bankruptcy Court correctly found, "there was no admissible evidence that HCMS and HCRE had a shared service agreement with [Plaintiff]." R&R at 34 n. 30.  Defendants' argument that the HCRE and HCMS SSA "were both established by oral agreement and course of conduct," is entirely unsubstantiated.  *See* Objection ¶ 28 (citing Def. Appx. 18-19, which are conclusory and self-serving assertions contained in Dondero Declaration).  Defendants' reliance on Ms. Hendrix's and Mr. Waterhouse's testimony likewise do not constitute evidence that HCMS and HCRE ever had a shared services agreement with Highland.  *See id.*  ¶¶ 29-30 (citing Pl. Ex. 105 at 353:3-354:12, Pl. Appx. 02137-02138, Mr. Waterhouse's testimony that Highland provided "accounting services, treasury management services, [and] potentially legal services" to HCRE and HCMS; and Pl. Ex. 194 at 100:20-23, Pl. Appx. 03151, Ms. Hendrix's testimony that she never received instruction to make the payments on behalf of HCRE and HCMS).  Such testimony simply does not support Defendants' assertion that there was ever a shared services agreement between Highland and HCRE or HCMS.  Defendants' cite to Mr. Hendrix's testimony that Highland "make[s] payments all the time" without Mr. Dondero's or Mr. Waterhouse's instruction, (citing

*id.* at (103:10-16), Pl. Appx. 03152), is a gross misstatement of such testimony.  Ms. Hendrix unequivocally testified that "something that's once a year that's more material in amount, such as a loan payment is something that needs to get approved by Jim Dondero." Pl. Ex. 194 at 103:5-105:2, Pl. Appx. 03152-3153.

150.   There is no evidence that HCMS and HCRE ever had a shared services agreement with Highland.  Thus, Defendants fail to create a genuine dispute of material fact regarding their defense that these missed payments were the result of Highland's negligence under shared services agreements.  Defendants' objection to the R&R on this ground should be overruled.

### 3.   The Bankruptcy Court Correctly Found that Defendants Failed to Create a Genuine Dispute of Material Fact Regarding Their "Prepayment" Defense

151.   Defendants object to the Bankruptcy Court's findings that there is no genuine dispute regarding their "prepayment" defense, arguing that "there is abundant evidence to support NexPoint and HCMS's prepayment defense," that "NexPoint and HCMS paid more than was owed in prior years," and that "the only dispute is whether those payments were prepayments." Objection ¶ 112.  Defendant's argument is without merit.  As the Bankruptcy Court found, the "unrefuted summary judgment evidence … clearly dispels any argument that prepayments may have averted any defaults," R&R at 33 (citing Klos Dec. pp. 3-6; Pl. Ex. 198 (Loan Summaries)), the clear terms of the Notes also do not provide Defendants any right to cure defaults, see *id.*

152.   As discussed supra ¶ 80, there is no dispute that the makers (a) were required to make Annual Installments and (b) had the right to make "prepayments." *See, e.g.,* Klos Dec. Ex. A § 2.1, 3.  The only question is how "prepayments" were to be applied.  Section 3 of the Term Notes provides the answer:

> 3.   Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  **Any payments on this Note shall be applied**

> first to unpaid accrued interest hereon, and then to unpaid
> principal hereof.

*Id.*

153.     This section unambiguously provides that (a) "Prepayment[s] [are] Allowed;" (b) "Renegotiation [is] Discretionary;" (c) prepayments of "unpaid principal or accrued interest" are permitted; and (d) payments "shall be applied first to unpaid accrued interest hereon, and then to unpaid principal."

154.     NexPoint's attempt to create an ambiguity out of the words "accrued interest" fails for the simple reason that it is used in the past tense; it cannot possibly be interpreted to apply to future interest.[44]  NexPoint's "pre-payments" were previously addressed by Mr. Klos (Klos Dec. ¶¶ 8-14), and NexPoint comes forward with _no_ evidence to rebut his sworn and admissible Declaration.[45]

155.     HCMS fares no better.  When Mr. Dondero controlled both HCMS and Highland, he exercised the right under Section 3 to "renegotiate" the application of prepayments. But even then, ***under his watch***, HCMS ***still*** made its interest payment at year end 2019 -- even though HCMS had paid off millions of dollars in principal just months earlier.

156.     If Mr. Dondero and HCMS truly believed that HCMS's pre-payments applied to eliminate ***all*** future obligations of principal and interest, they never would have paid (a) $65,360.49 on 12/31/19 (when Mr. Dondero was in control of both entities), (b) $181,226.83

---

[44] Because there is no ambiguity, the litany of cases cited by NexPoint are simply inapplicable.

[45] NexPoint has no admissible evidence to support its defense but it does create multiple strawmen.  Highland does not dispute that Prepayments are possible, nor does it dispute that at year end 2017, 2018, and 2019, NexPoint "never made the full" Annual Installment payment in December.  Opposition ¶ 106.  The question is why NexPoint made any payment at all.  And the answer is simple: applying the unambiguous terms of Section 3, NexPoint's prepayments were "applied first to unpaid accrued interest thereon, and then to unpaid principal."  Thus, the payments made in December of each year equaled all interest that *accrued* between the date each prepayment was made and year end. That is the indisputable course of dealing; neither NexPoint nor HCMS had any basis to believe that it could forego paying interest.

on January 21, 2021 (in an effort to "cure" the default even though the HCMS Term Note provides no cure rights); or (c) the payment due at year end 2021 (Klos Reply Dec. ¶¶ 1-7).

157.    Defendants' reliance on Mr. Dondero's conclusory assertions in support of the argument that "they were prepayments since the Plaintiff needed money and asked NexPoint to transfer it funds for liquidity purposes," Objection ¶ 34 (citing Def. Ex. 1, J Dondero Dec., ¶ 42, Def. Appx. 21), does not change the clear and unambiguous terms of the Notes, which do not give Defendants the right to cure.   Defendants' reliance on Ms. Hendrix's testimony is likewise unhelpful to the prepayment defense.  *See id.* (citing to Pl. Ex. 194, Kristen Hendrix 10/27/21 Tr. 81:13-82:3, Pl. 03147).  For instance, Ms. Hendrix's statement that if NexPoint was transferring money to Highland on the Note because "Highland needed the money" then such payment would have been recorded as "prepayment," *see id.*, does not change the fact that, based on the undisputed evidence, the payments at issue here do not constitute prepayments on the Notes.

**C.**     **The Bankruptcy Court Correctly Found that HCMFA Failed to Rebut Highland's *Prima Facie* Case for Summary Judgment**

   **1.**     **The Bankruptcy Court Correctly Found that HCMFA Failed to Raise a Genuine Issue of Material Fact Regarding Mr. Waterhouse's Authority to Execute the HCMFA Notes**

158.    HCMFA contends the Bankruptcy Court's finding that there is no genuine dispute of material fact that Mr. Waterhouse was authorized to sign the HCMFA Notes was "error as a matter of law." Objection ¶ 134.  HCMFA's objection is refuted by the record and is, as a matter of law, without merit.

159.    There can be no credible dispute regarding Mr. Waterhouse's authority to execute the Notes on behalf of HCMFA.  "The term 'actual authority' denotes that authority that a principal intentionally confers upon an agent or intentionally allows the agent to believe himself to possess."  *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 738 (Tex. App. 1992).  Apparent

66

authority arises when the "principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority." *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, No. CIV. A. 99-3040, 2000 WL 726880, at \*5 (E.D. La. June 2, 2000).  The undisputed evidence establishes that Mr. Waterhouse had both actual and apparent authority to sign the Notes.

        160.    At the time Mr. Waterhouse executed the Notes on behalf of HCMFA, Mr. Waterhouse was the Treasurer of HCMFA. *See* Incumbency Certificate (Ex. 35, Appx. 789).  As Treasurer, he was authorized to, *inter alia*, "execute any and all agreements on behalf of the General Partner [of HCMFA] in its capacity as the general partner of [HCMFA]." *Id.*  In this role, Mr. Waterhouse managed the accounting and finance for HCMFA. (Ex. 105 at 25:22-26:3, Appx. 2055-2056).  Mr. Waterhouse testified that he "signed a lot of documents in [his] capacity" as Treasurer, and believed he was authorized to sign the HCMFA Notes.  *Id.* at 143:24-25, Appx. 2085.  To Mr. Waterhouse, the Notes were "just another document." *Id.* at 144:2-3, Appx. 2085. No one at HCMFA ever told Mr. Waterhouse that, as the Treasurer of HCMFA, he did not possess such authority.  *Id.* at 158:2-16, Appx. 2089.  At the time he signed the Notes on behalf of HCMFA, Mr. Waterhouse had no reason to believe he was not authorized to do so. *Id.* at 160:23-161:2, Appx. 2089.  Mr. Waterhouse would not have signed the Notes on behalf of HCMFA if he did not believe he possessed such authority. *Id.* at 144:4-20, Appx. 2085.  The Incumbency Certificate, which named Mr. Waterhouse as the Treasurer of HCMFA, gave Mr. Waterhouse "comfort" that he was authorized to sign the Notes. *Id.* at 159:13-160:4, Appx. 2089.  HCMFA's own findings regarding the origin of the Notes further support Mr. Waterhouse's authority to bind HCMFA.  Mr. Waterhouse affirmatively stated to Mr. Sauter that "money was transferred, and so we signed the notes." (Ex. 193 at 56:19-23, Appx. 3098.

67

161.    Mr. Waterhouse's authority to execute agreements on behalf of HCMFA in his capacity as an officer is further corroborated by the fact that he signed other similar intercompany agreements on behalf of Dondero affiliates.  *See* Ex. 3 (Exhibits 3 and 4), Appx. 123-128 (Mr. Waterhouse, as officer of HCMS, executing HCMS Notes on behalf of HCMS); Ex. 205, Appx. 4162-4181 (Mr. Waterhouse signing NexPoint's Shared Services Agreement on behalf of NexPoint in his capacity as "Treasurer").

162.    There can be no genuine dispute for a jury regarding Mr. Waterhouse's authority to execute the Notes on behalf of HCMFA. *See Davis v. Bank of Am., N.A.*, No. H–13–1306, 2014 WL 1401677, at *3 (S.D. Tex. Apr. 10, 2014) (finding lack of actual authority defense is refuted by record where "the plain language of the" instrument establishes agent's authority); *Polland*, 832 S.W.2d at 738 (agent had actual authority where agent's acts were "within the scope of his" express authority and were "related to matters over which such authority extends"); *Commercial Capital*, 2000 WL 726880, at *5 (finding "the evidence presented clearly shows that [agents] were vested with apparent authority" to represent that invoices would be paid by company where agents held title of project manager, generally approved invoices and checks, and where principal gave third party "a reasonable belief that [agents] had authority to act on behalf of [principal]," who relied on such representations in entering into transaction).

163.    HCMFA's argument that Mr. Waterhouse "confirmed" he lacked the authority to bind HCMFA, Objection ¶ 135 (citing Ex. 105 at 270:25-273:9, Appx. 2117), misrepresents the context of Mr. Waterhouse's testimony.  Mr. Waterhouse testified that in order to cause HCMFA to become the borrower of the Notes, he would have had to get approval from Mr. Dondero.  *See id.* at 272:19-24, Appx. 2117.  At no point did Mr. Waterhouse testify that he did not have such approval, or that, as HCMFA suggests, that he did not believe he possessed

authority to execute the Notes.  As discussed *supra*, Mr. Waterhouse had authority to bind HCMFA to the Notes, and no one from HCMFA ever told him otherwise.

164.    HCMFA also cites to Mr. Dondero's self-serving affidavit for the conclusory assertion that Mr. Dondero also "confirmed" that Mr. Waterhouse lacked such authority. *See* Objection ¶ 135 (citing *Defendant's Appendix In Opposition to Plaintiff's Motion for Summary Judgment*, filed at docket no. 128 in Adversary Proceeding No. 21-03004-sgj (the "HCMFA App."), at 1-2 (¶¶ 2-3) & 4 (¶ 9) (Dondero's threadbare assertions that he is "not aware of any corporate governance documents authorizing Waterhouse to incur millions of dollars of debt on behalf of HCMFA," and that Dondero "never said anything to cause him to reach such an understanding.")  Such a scintilla of evidence is not the type sufficient to create a genuine issue of fact regarding Mr. Waterhouse's authority to sign the HCMFA Notes, especially in the face of the overwhelming conflicting evidence. *See Lowery v. Bank of Am., N.A.*, 04-12-00729-CV, 2013 WL 5762227, at *3 (Tex. App. Oct. 23, 2013) (affirming summary judgment where plaintiff's "scintilla of evidence"  failed to support defense that party was not authorized to sign promissory note); *Davis*, 2014 WL 1401677, at *3 (rejecting lack of authority defense where party "has failed to present evidence that raises a genuine issue of material fact regarding the [] agent's authority or lack thereof"); *Pryor v. Everhome Mortg. Co.*, No. 3:13–CV–2963–D, 2014 WL 5802716, at *3 (N.D. Tex. Nov. 7, 2014) (granting summary judgment where party presented evidence that is "insufficient to permit a reasonable jury to find that [agent] was not an authorized signatory").

165.    HCMFA's unsubstantiated, conclusory statements in support of their assertion that the Notes were executed without authority cannot defeat Highland's *prima facie* case for summary judgment.  *See United States v. Succession of Siddon*, 812 F. Supp. 674, 675 (W.D. La. 1993) (granting summary judgment on promissory note, noting "[m]ere

69

conclusory rebuttals by the nonmoving party will not defeat a motion for summary judgment"); *Tiede v. Salazar*, 518 F. Supp. 3d 955, 965 (W.D. Tex. 2021) (granting summary judgment, noting that "allegations are insufficient to defeat summary judgment if they are nothing more than 'conclusory allegations, 'unsubstantiated assertions,' or constitute 'only a scintilla of evidence'"); *City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014) (affirming summary judgment, noting that a genuine issue of fact does not exist "if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

166.    HCMFA offers no support for of its vague contention that there is somehow "no 'apparent' authority when the same individual is on both sides of the transaction and he knows that he lacks 'actual authority,'" Objection ¶ 135, other than through conclusory recitals of the law on unauthorized signatures and cites to inapposite case law. *See id.* ¶ 135 n. 323 (citing to TEX. BUS. & COMM. CODE § 3.402(a) (which states when a represented person is bound on an instrument if the instrument is signed by a representative); and § 3.403 (which provides that unauthorized signature is ineffective except as signature of unauthorized signer in favor of person who pays the instrument in good faith); (citing *Kirkindoll v. Nat'l Credit Union Admin. Bd.*, 3:11-CV-1921-D, 2015 WL 1636534, at *9 (N.D. Tex. Apr. 13, 2015)) (finding that nonmovant failed to raise genuine issue of material fact concerning party's authority where they "failed to produce any evidence … beyond his own unsupported and conclusory allegations" rebutting the movant's case); (citing *Gaines v. Kelly*, 235 S.W.3d 179, 183-84 (Tex. 2007)) (finding that the summary judgment evidence failed to create a fact issue about whether agent mortgage broker's "agency" included the authority to commit the funds of a lender or obligate lender to terms other than those agreed to in the parties' contract, where, *inter alia*, while agent brought the parties together and facilitated the paperwork for the loan, there was no evidence that agent had any role in the

negotiations, and instead, he "acted merely as a middleman after negotiations had been completed"). Here, just as in *Kirkindoll*, HCMFA fails to adduce any evidence, beyond unsupported and conclusory allegations, to rebut Highland's case for summary judgment.

167.    HCMFA's objection to the R&R on this ground should be overruled.

## 2.    The Bankruptcy Court Correctly Found that HCMFA Failed to Create a Genuine Dispute of Material Fact Regarding Their "Mutual Mistake" Defense

168.    The Bankruptcy Court correctly found that HCMFA failed to create a genuine dispute of material fact concerning their "Mutual Mistake" defense.  There is no material dispute that (i) HCMFA executed, through its treasurer, Mr. Waterhouse, the Notes in favor of Highland; (ii) there is an outstanding balance on the Notes; and (iii) a demand for payment has been made on HCMFA and refused. See R&R at 7-9.

### i.    HCMFA's "Mutual Mistake" Defense Fails as a Matter of Law

169.    HCMFA's Mutual Mistake defense fails as a matter of law.  HCMFA fails to adduce any evidence showing that HCMFA and Highland had a common intention in executing the Notes and that the Notes do not reflect such intention due to a "shared mistake."

170.    In support of its Objection, HCMFA argues that HCMFA "introduced substantial evidence of the underlying mistake," Objection ¶ 141, namely, that "Plaintiff transferred $7.4 million to HCMFA as compensation and not as a loan, but lower-level employees, assuming that this was a loan and acting pursuant to historical practices, papered up the transfers as loans," *id.*  HCMFA argues that Notes were the result of a "mutual mistake" because (i) "Dondero believed and understood that Plaintiff was liable to HCMFA for causing the NAV Error," Objection ¶ 144 (citing Dondero Dec., HCMFA Appx. at 1 & 3); (ii) the "purpose of the transfers from Plaintiff to HCMFA was" for Plaintiff to "compensate HCMFA for the damages HCMFA paid in connection with the NAV error," *id.* ¶ 145 (citing Dondero Dec., HCMFA Appx.

71

at 3-4; Appx. at 03048); (iii) "Dondero instructed Waterhouse … to make the transfers, and "never instructed or suggested to Waterhouse that the transfers were loans nor to book them that way," id. ¶ 146 (citing Dondero Dec., Def. Ex. 1, HCMFA Appx. at 4).  Such conclusory assertions, even if credited, are legally insufficient to constitute the defense of "mutual mistake."

171.   "Mutual mistake" nullifies an agreement only where both parties to the agreement have a "common intention," but the written agreement incorrectly reflects that common intention due to a mutual mistake. *See Whitney Nat. Bank v. Med. Plaza Surgical Center L.L.P.*, No. H-06-1492, 2007 WL 3145798, at \*6 (S.D. Tex. Oct. 27. 2007) (citing Texas law); *Looney*, 2010 WL 532431, at \*5 (for "mutual mistake" to nullify a promissory note, the evidence must show that "both parties to the note were acting under the same misunderstanding of the same material fact"); *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.*, MO:19-CV-173-DC, 2021 WL 2772808, at \*9 (W.D. Tex. Apr. 28, 2021) ("When mutual mistake is alleged, the party seeking relief must show what the parties' true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake").

172.   HCMFA has failed to present any evidence supporting the notion that both parties to the HCMFA Notes were acting under a shared misunderstanding of the same material fact.  As discussed *supra*, Mr. Dondero's conclusory, "self-serving allegations" in his affidavit are not the type of significant "probative evidence required" to defeat summary judgment, especially "in the face of conflicting probative evidence." *Kariuki v. Tarango*, 709 F.3d 495, 505 (5th Cir. 2013); *see also BMG Music v. Martinez,* 74 F.3d 87, 91 (5th Cir.1996) (affirming for plaintiffs where "the only evidence in support of the defendants' theory is a conclusory, self-serving statement by the defendant"); *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (affirming summary judgment for recovery of promissory note, where defendant's only evidence

72

to rebut plaintiff's *prima facie* case consisted of "self-serving allegations," which "are not the type of significant probative evidence required to defeat summary judgment" (internal quotation marks and citation omitted)); *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 531 (5th Cir. 2005) (affirming summary judgment where defendant's "attempt to create a fact issue … by relying on a conclusory and self-serving affidavit is on unsteady ground"); *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000) (affirming summary judgment, and finding that "party's self-serving and unsupported" affidavit regarding her "intent" is "not sufficient to defeat summary judgment where the evidence otherwise supports a finding of fraud."); *Tyler v. Cedar Hill Indep. Sch. Dist.*, 426 Fed. Appx. 306, 309 (5th Cir. 2011) (affirming summary judgment, where "[a]fter closely reviewing the record … the only document [party] provides to support her claim" is her conclusory, self-serving affidavit, noting "[w]e have repeatedly held that self-serving affidavits, without more, will not defeat a motion for summary judgment."); *Sanchez v. Dallas/Fort Worth Int'l Airport Bd.*, 438 Fed. Appx. 343, 346–47 (5th Cir. 2011) (affirming summary judgment where party attempting to rebut summary judgment relies on "her own self-serving affidavit," noting "a self-serving affidavit, without more evidence, will not defeat summary judgment"); *Lavergne v. Jefferson County, Tex.*, 164 F.R.D. 441, 443 (E.D. Tex. 1995) ("When an affidavit in response to a summary judgment motion contains "nothing more than a recital of unsupported allegations, conclusory in nature," the motion for summary judgment should be granted").

173.    By contrast, the undisputed documentary evidence overwhelmingly demonstrates that Highland and HCMFA both intended the Notes to be treated as loans:  (a) Mr. Waterhouse, HCMFA's Treasurer, knew the money Highland transferred to HCMFA in exchange for the Notes was being treated as an "intercompany loan," (Ex. 194 at 111:6-112:7, Appx. 3154; Ex. 54, Appx. 870-873; Ex. 56, Appx. 876-877); (b) the Notes have always been recorded as

liabilities in HCMFA's audited financial statements and balance sheets, (Ex. 45 at 17; Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029); (c) the Notes were reflected as assets in Highland's books and records, audited financial statements, and bankruptcy filings, (Ex. 34 at 39, Appx. 782); and (d) HCMFA represented the Notes as "liabilities" to third parties (Ex. 59 at 2, Appx. 885).   Highland's audited financial statements, which reflect the existence of the Notes, expressly rely upon the management representation letters signed by both Mr. Dondero and Mr. Waterhouse, HCMFA's President and Treasurer. (*See* Ex. 33, Appx. 729-740) (Mr. Dondero and Mr. Waterhouse representing to PwC that all "subsequent events" were disclosed); (Ex. 34 at 38-39, Appx. 781-782) (Note 15 to Highland's 2018 audited financial statement disclosing HCMFA Notes as "subsequent events," stating that "[o]ver the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of 7.4 million").

174.    HCMFA's Mutual Mistake defense is further undermined by HCMFA's own internal investigation into the genesis of the Notes.  After the Adversary Proceeding was commenced, HCMFA purportedly launched an internal "investigation to understand the origin of the" HCMFA Notes. Dennis Sauter, an attorney and NexPoint's general counsel who also does work for Mr. Dondero's other affiliates, led the investigation. (Ex. 193 at 6:3-16, 7:10-13, Appx. 3086, 12:10-13:3, Appx. 3087, 24:18-25:12, Appx. 3090).  Despite having no personal knowledge of any of the underlying facts, Mr. Sauter told Mr. Waterhouse that he made a mistake by signing the HCMFA Notes and had no authority to do so.  Mr. Waterhouse "obviously disagreed" that any mistake was made, telling Mr. Sauter that "we transferred the money, so I executed the notes. HCMFA didn't have the money to pay GAF, and so we transferred it from HCMLP and I executed

the notes." Mr. Waterhouse *never* admitted to making a mistake. *Id*. at 52:15-59:16, Appx. 3097-3099. Indeed, Mr. Waterhouse bluntly told Mr. Sauter about the purpose of the HCMFA Notes:

> Q:    So did Mr. Waterhouse tell you that he prepared the notes for some internal accounting or other purpose?
>
> A:    Yes.
>
> Q:    And did he tell you what the purpose of the notes was?
>
> A:    Yes.  He said if he transferred money he had to have a note to go with it.

*Id*. at 61:7-24, Appx. 3099; *see also id*. at 56:8-23, Appx. 3098 (Mr. Waterhouse could not describe "any process.  He said the money was transferred, and so we signed the notes"), 71:4-20, Appx. 3102 (Mr. Waterhouse told Mr. Sauter that he needed a note for HCMFA's auditors to "document the transfer of funds").   Thus, HCMFA's own findings regarding the origin of the Notes demonstrate that the Notes were "loans," and not, in any way, shape, or form, the result of a "mistake."

175.    The Mutual Mistake defense, therefore, fails as a matter of law. *Whitney*, 2007 WL 3145798, at *6 (finding mutual mistake defense "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney*, 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note"); *Hitachi,* 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a *mutual mistake* was made in the [agreement,]" and where

75

"the fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense) (emphasis in original); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake" defense is inapplicable as a matter of law, because, even if [defendant's] assumption regarding the [ ] contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake … ").

### ii. HCMFA's Contentions that the HCMFA Notes Must Have Gone Through Legal Are Unsubstantiated

176. HCMFA also adduces no evidence in support of its contention that "internal policies and procedures would have required the notes to go through Plaintiff's legal department," that the HCMFA Notes "did not go through Plaintiff's legal department," and instead were "erroneously booked" as loans by Highland's "lower level employees." Objection ¶¶ 141, 147, 151. Contrary to HCFMA's baseless contention, no "process" ever existed requiring legal department review or approval of intercompany demand notes. The documentary evidence shows that there was nothing unusual about the Corporate Accounting department preparing intercompany demand notes without "legal department" approval. *See supra* ¶¶ 76,143.

177. Even Mr. Dondero admits as much. When asked to identify who drafted the promissory notes that he executed, Mr. Dondero stated that he "does not know who specifically who drafted the [n]otes, however, he believes *they were drafted by an individual in either the Highland legal or finance department*." Ex. 85, Appx. 1412-1419. And as the e-mail communications prove, the Corporate Accounting department prepared Mr. Dondero's notes and followed virtually the same protocol as that followed in the preparation of the HCMFA Notes. *Compare* Ex. 188, Appx. 3001-3002 and Ex. 190, Appx. 3005-3006 (e-mails between and among

76

the accounting group concerning the preparation of notes for Mr. Dondero) *with* Ex. 54, Appx. 870-873 and Ex. 56, Appx. 876-877 (e-mails between and among the accounting group concerning the preparation of the HCMFA Notes). HCMFA offers no evidence in support of the notion that such transfers would have needed to go through the legal department other than Mr. Dondero's self-serving conclusory assertions and Mr. Waterhouse's unsubstantiated assertions. *See* Objection ¶¶ 155 (citing Dondero Dec., HCMFA Appx. at 4, and Appx. at 02122, 290:15-16).

178.    In addition to the documentary evidence above that rebuts HCMFA's speculative argument, Ms. Hendrix—the actual drafter of the HCMFA Notes—testified that it was Corporate Accounting's "general course" in May 2019 not to seek advice from Highland's legal department before preparing "our standard demand note that we already had a template on," including with respect to the HCMFA Notes, and that Mr. Waterhouse "was completely fine with having [] documents signed or executed" with pictures of his e-signature. Ex. 194 at 46:12-24, 47:4-13, Appx. 3138. Although Ms. Hendrix does not remember the "specific" conversation she had with Mr. Waterhouse, she is "certain that those conversations were had because that's the only way that [she] would have papered up a loan, sent money out as a loan, had them on our financials for two  years." *Id.* at 37:3-18, Appx. 3136. The Corporate Accounting group "wouldn't just paper up a loan, send money out and call it a loan and account for it that way, unless somebody specifically told them to." *Id.* at 37:5-8, Appx. 3136. Thus, HCMFA's assertions that Ms. Hendrix and Mr. Klos, "two-lower level employees, simply assumed that the transfers were loans and unilaterally decided to document them as such" without Mr. Waterhouse's or Mr. Dondero's authorization, Objection ¶¶ 157, grossly misrepresents Ms. Hendrix's testimony.[46]

---

[46] To the extent HCMFA includes evidence and argument in support of the defense that was barred by the Bankruptcy Court, (the "Barred Defense"), *see* Adv. Proc. 21-3004, Docket No. 123, *Order Denying Defendants' Second Motion for Leave to Amend Answer*, which is now subject to the *Objection of Highland Capital Management Fund Advisors, L.P. to Order Denying Motion to Amend Answer* [Docket No. 34], Highland incorporates by reference the argument

### iii. Proof of Claim 188 Directly Contradicts HCMFA's Mutual Mistake Defense

179.    As the Bankruptcy Court observed, the foundation of the Mutual Mistake defense is that "Mr. Dondero (as the person in charge of both Highland and HCMFA) *did not intend* for $7.4 million of funds that were transferred from the Debtor to HCMFA in May 2019 to be loans—rather the money was intended to be *compensation to HCMA from Highland*" to account for errors Highland allegedly made.  R&R at 29-30 (emphasis in original).

180.    Proof of Claim 188 is conclusive, direct evidence that the "Mutual Mistake" defense was completely fabricated because it proves that Mr. Dondero knew that the $7.4 million that Highland transferred to HCMFA in May 2019 was in the form of a loan and not as "compensation" for anything.

181.    Specifically, in Schedule A to Proof of Claim 188, *Mr. Dondero admitted that HCMFA owed Highland $10,458,219.89 as of March 31, 2020*.  Mr. Dondero could not have made that admission without including the outstanding principal then due under *both* the HCMFA Notes issued in 2019 (which had an original face amount of $7.4M in the aggregate) *and* the Pre-2019 Notes (which were for an aggregate, original principal amount of $6.3 million, but for which only about $3 million remained outstanding when this action was commenced).  There cannot be a genuine dispute of material fact that $7.4 million + $3 million = $10.4 million, roughly the amount that Mr. Dondero included in Proof of Claim 188.  Basic arithmetic proves that there is no conceivable way to show that Proof of Claim 188 *excluded* the amounts owed by HCMFA to Highland under the HCMFA Notes issued in 2019.

---

set forth in its *Memorandum of Law in Opposition to Defendant's Second Motion for Leave to Amend Answer* [Adv. Proc. 21-3004, Docket No. 108]; *see also* Adv. Proc. 21-3004, Docket No. 159, at 4, Exhibit B (order striking the Barred Defense); Docket No. 63-1 (Davor Rukavina's letter to Court advising of filing of the "Revised Objection" to strike portions of Barred Defense).

182.    By voluntarily including the HCMFA Notes executed in 2019 in Proof of Claim 188 (as HCMFA points out, before any litigation was commenced), Mr. Dondero (a) baldly admitted that he knew those Notes existed and were valid and enforceable obligations of HCMFA, (b) tried to avoid collection on those Notes by asserting that they "***were issued by him for funds advanced in lieu of compensation,***" and (c) therefore completely contradicted ***all*** of HCMFA's affirmative defenses in the Main Notes litigation.

183.    There is no way to reconcile the "Mutual Mistake" defense where HCMFA and Mr. Dondero contend that HCMFA Notes were issued by mistake, without authority, and contrary to Mr. Dondero's intent with Mr. Dondero's voluntary decision to include the HCMFA Notes in Proof of Claim 188 and assert as a defense to collection that they were issued "in lieu of compensation."

### iv.    HCMFA's Contention that the "Note" Referenced in the Letter to the Retail Board Did Not Include the HCMFA Notes Is Contradicted by Documentary Evidence

184.    HCMFA also argues that it did not report the existence of the HCMFA Notes to the Retail Board.  In support thereof, HCMFA contends that in their letter to the Retail Board, HCMFA "was not referring to the notes in question but instead to a different note whose maturity had been extended," Objection ¶ 138, and that this "confirms there was a mistake," *id.* This contention is rebutted by the documentary evidence.

185.    As discussed *supra*, HCMFA reported to the Retail Board that "$12,286,000 remains outstanding to HCMLP [Highland] from HCMFA. . . The earliest the Note between HCMLP [Highland] and HCMFA could come due is in May 2021." Ex. 59 at 2, Appx. 885.  As directed by Mr. Waterhouse, Ms. Thedford helped prepare this report and (a) obtained the relevant information from the Advisors' June 30, 2020 financial statements and (b) drafted a

response that she shared with, among others, Mr. Waterhouse, Mr. Norris (the Advisors' Executive Vice President), and Mr. Post (the Advisors' Chief Compliance Officer). Ex. 35; Ex. 37.

186.   Based on HCMFA's June 30, 2020 financial statements, Ms. Thedford sent her draft response to Mr. Waterhouse, Mr. Norris, Mr. Post, and others and reported that "$12,286,000 remains outstanding to HCMLP from HCMFA." Ex. 36 at 1.   This amount necessarily included the amounts due under the HCMFA Notes because, as HCMFA has admitted, HCMFA carried the HCMFA Notes as liabilities on its balance sheet and the balance sheet was Ms. Thedford's source of information. Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59:3; Ex. 194 at 117:16-122:15; Ex. 195 at 120:23-122:13.   Based on the foregoing, there is no dispute that the Advisors -- with the full knowledge of each of their officers and based on HCMFA's own balance sheet -- informed the Retail Board in October 2020 of their unmitigated obligations under the HCMFA Notes.

187.   HCMFA's Mutual Mistake defense constitutes a fabricated story blatantly contradicted by the record.   HCMFA's conclusory assertions in support of such a story are insufficient to defeat Highland's *prima facie* case for summary judgment.  *See Salama v. W. Wind Energy Corp.*, 2013 WL 6079548, at *5, No. 4:12–cv–03535 (S.D.Tex. Nov. 19, 2013) ("As the Supreme Court has noted, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment'") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) (mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment); *Main Street Bank v. Unisen, Inc.*, No. H-06-3776, 2008 WL 11483415, at *7 (S.D.Tex. Feb. 15, 2008) ("The non-movant's bare

assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment"). HCMFA has failed to set forth any facts sufficient to lead a "reasonable jury" to find that the Notes were a result of "mutual mistake." Accordingly, Highland is entitled to summary judgment on HCMFA's Mutual Mistake defense.

## <u>CONCLUSION</u>

WHEREFORE, Highland respectfully requests that the Court (i) grant its Motion, (ii) hold Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, including the costs of collection and reasonable attorneys' fees in an amount to be determined and (iii) grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

Dated:  September 27, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:  MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com


*Counsel for Highland Capital Management, L.P.*

# **<u>EXHIBIT A</u>**

DOCS_NY:46451.10 36027/002

## PARTIES, WITNESSES, AND DEFINITIONS

1.      "Advisors" refers to HCMFA and NexPoint, together.   The Advisors provide investment advisors services to certain retail funds and are effectively owned or controlled by Mr. Dondero.  Ex. 96 at 228:11-19; Ex. 105 at 32:17-23.[47]

2.      "Corporate Obligors" refers to HCMFA, NexPoint, HCMS, and HCRE in their capacities as makers under their respective Notes.

3.      "Dugaboy" refers to The Dugaboy Investment Trust, a trust formed in 2010 to purportedly provide for the living maintenance, education, health, and lifestyle of its beneficiaries. Mr. Dondero is the sole beneficiary of Dugaboy during his lifetime; his children and subsequent generations shall become the beneficiaries following his demise.

4.      "HCMFA" refers to Highland Capital Management Advisors, L.P.  HCMFA is an entity that provides investment advisory services to certain retail funds. Ex. 105 at 32:17-23. HCMFA is directly or indirectly owned and controlled by Mr. Dondero. Ex. 96 at 228:11-15.

5.      "NexPoint" refers to NexPoint Advisors, L.P.  NexPoint is an entity that provides investment advisory services to certain retail funds. Ex. 105 at 32:17-23.  HCMFA is directly or indirectly owned and controlled by Mr. Dondero. Ex. 96 at 228:16-19.

6.      "HCRE" refers to HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC), and is an entity that is directly or indirectly owned by Mr. Dondero. Ex. 96 at 228:20-23.

7.      "HCMS" refers to Highland Capital Management Services, Inc., and is an entity that is directly or indirectly owned or controlled by Mr. Dondero. Ex. 96 at 228:24-229:4.

---

[47] All citations herein to "Appx." refer to the *Appendix in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment in Notes Actions*.

8.      "Klos Dec." refers to the *Declaration of David Klos In Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, filed simultaneously with the Motion.

9.      "Mr. Dondero" refers to an individual named James Dondero.  Mr. Dondero is the founder and former president and Chief Executive Officer of Highland.  Ex. 96 at 248:3-6.  Mr. Dondero served as Highland's president from 1994 until January 9, 2020. Ex. 98 at 291:6-292:16.  At all relevant times, Mr. Dondero also served as President of HCMFA and directly or indirectly owned or controlled each of the Corporate Obligors.  Ex. 37; Ex. 96 at 228:6-229.

10.     "Ms. Dondero" refers to an individual named Nancy Dondero.  Ms. Dondero is Mr. Dondero's sister.  At Mr. Dondero's request, Ms. Dondero became the sole Trustee of Dugaboy in October 2015 and has served in that capacity since that time.  Ex. 96 at 174:21-25; Ex. 100 at 166:19-169:5.

11.     "Mr. Norris" refers to an individual named Dustin Norris.  Mr. Norris has been an officer of HCMFA since 2012, and currently serves as the Executive Vice President of HCMFA.  Ex. 35; Ex. 192 at 18:11-25.

12.     "Mr. Post" refers to an individual named Jason Post. Mr. Post was employed by Highland in 2018 and 2019, and then became an employee of HCMFA and served as the Chief Compliance Officer for each of the Advisors.  Ex. 105 at 184:13-185:3; Ex. 192 at 32:6-33:25.

13.     "Mr. Sauter" refers to an individual named Dennis C. Sauter.  Mr. Sauter served as Highland's general counsel of real estate from approximately February 2020 until April 2021, and has served as the general counsel of NexPoint from April 2021 to the present.  Ex. 193 at: 7:16-9:12.

14.     "Ms. Thedford" refers to an individual named Lauren Thedford.  Ms. Thedford is an attorney who was previously employed by Highland while simultaneously serving as an officer

of HCMFA and NexPoint, holding the title of Secretary.  Ms. Thedford also served as an officer of the retail funds managed by the Advisors until early 2021.  Ex. 35; Ex. 37; Ex. 105 at 172:10-173:25.

15.    "<u>Mr. Waterhouse</u>" refers to an individual named Frank Waterhouse.  Mr. Waterhouse is a Certified Public Accountant who joined Highland Capital Management, L.P. in 2006 and served as Highland's Chief Financial Officer ("<u>CFO</u>") on a continuous basis from approximately 2011 or 2012 until early 2021.  While serving as Highland's CFO, Mr. Waterhouse simultaneously served as (1) an officer of HCMFA, NexPoint, and HCMS, holding the title of Treasurer and (2) Principal Executive Officer of certain retail funds managed by the Advisors.  As Treasurer and Principal Executive Officer of these entities, Mr. Waterhouse was responsible for managing the Advisor's accounting and finance functions.  Ex. 35; Ex. 37; Ex. 105 at 18:6-15, 18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19, 38:20-39:5.

16.    "<u>Notes</u>" refers to the Demand Notes and the Term Notes, as those terms are defined below.

17.    "<u>Obligors</u>" refers to Mr. Dondero and the Corporate Obligors in their capacities as makers under the Notes.

18.    "<u>PwC</u>" refers to Pricewaterhouse Coopers, firm that served as Highland's outside auditors from 2003 through at least June 3, 2019.  Ex. 34; Exs. 63-66; Exs. 69-72; Ex. 87 at 9 (Item 26b.1).