# EXHIBIT 6

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,                        :
                                          :
                  Plaintiff,              :
                                          :
         v                                :  C. A. No.
                                          :  2017-0488-MTZ
HIGHLAND CAPITAL MANAGEMENT, L.P.,        :
HIGHLAND EMPLOYEE RETENTION ASSETS        :
LLC, HIGHLAND ERA MANAGEMENT LLC, and     :
JAMES DONDERO,                            :
                                          :
                  Defendants,             :
                                          :
         and                              :
                                          :
HIGHLAND EMPLOYEE RETENTION ASSETS        :
LLC,                                      :
                                          :
                  Nominal Defendant.      :

                         - - -

                   Chancery Courtroom No. 12D
                   Leonard L. Williams Justice Center
                   500 North King Street
                   Wilmington, Delaware
                   Friday, May 17, 2019
                   1:30 p.m.

                         - - -

BEFORE:  HON. MORGAN T. ZURN, Vice Chancellor

                         - - -

RULINGS OF THE COURT ON PLAINTIFF'S MOTION TO COMPEL
         AND MOTIONS FOR COMMISSIONS
ORAL ARGUMENT AND RULINGS OF THE COURT ON PLAINTIFF'S
MOTION FOR STATUS QUO ORDER AND DEFENDANTS' MOTION TO
DISMISS COUNT IX OF SECOND AMENDED VERIFIED COMPLAINT
-------------------------------------------------------
              CHANCERY COURT REPORTERS
          Leonard L. Williams Justice Center
          500 North King Street - Suite 11400
              Wilmington, Delaware 19801
                   (302) 255-0533

2

1    APPEARANCES:

2         THOMAS A. UEBLER, ESQ.
          JOSEPH L. CHRISTENSEN, ESQ.
3         McCollom D'Emilio Smith Uebler LLC
            for Plaintiff
4

5         JOHN L. REED, ESQ.
          DLA Piper LLP (US)
6              -and-
          MARC D. KATZ, ESQ.
7         of the Texas Bar
          DLA Piper LLP (US)
8           for Defendants

9

10                            - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

**Appx. 00309**

3

1                    THE COURT:  Good afternoon.  Please be

2    seated.

3                    First I wanted to acknowledge, we have

4    an honored guest with us today.  We have the Honorable

5    Essam Yahyaoui, who is a judge from Tunisia.  He

6    presides over the commercial chamber of Tunisia's

7    First Instance Court.  So he's here to observe with

8    his colleagues.

9                    Welcome, sir.

10                    All right.  I'm going to start with

11   the motion to compel, and then we'll move on to the

12   motion for commission.  And then there may be

13   questions, and maybe take a break and regroup and we

14   can move on with the other motions.

15                    I'm going to grant Daugherty's motion

16   to compel in part.  For simplicity, I'm going to refer

17   to Abrams & Bayliss as A&B.  And I see four categories

18   of documents at issue here.  The first is regarding

19   the initiation, negotiation, and establishment of A&B

20   as Highland's escrow agent.  The second is regarding

21   A&B's legal work during the pendency of the Texas

22   action to determine whether and how Daugherty might

23   access the escrowed assets.  The third is A&B's work

24   responding to the Texas subpoena.  And the fourth is

4

1   documents regarding A&B's resignation as Highland's

2   escrow agent.

3               I grant the motion to compel as to

4   Categories 1, 2, and 4 for one of two reasons.

5               The first reason is unfortunately my

6   *in camera* review confirmed Daugherty's fear that

7   Highland is improperly withholding documents in

8   Categories 1 and 4 illustrating A&B's service and

9   resignation as escrow agent, which are nonprivileged

10  materials.

11              In a hearing on September 18, 2018,

12  concerning an earlier subpoena, Vice Chancellor

13  Glasscock stated that "... information regarding the

14  actions of Abrams & Bayliss in connection with its

15  operation of the escrow as agents of Highland, HERA,

16  those documents, that information is relevant, and it

17  doesn't appear to me to be generally privileged."

18  That's a quote from the transcript.

19              Highland has been adamant that it was

20  only withholding documents that implicated its role as

21  legal counsel, and not in its role as escrow agent.

22  For example, on page 28 of the transcript from the

23  April 12th argument, Highland's counsel stated that,

24  "We do not assert any privilege based solely on Abrams

CHANCERY COURT REPORTERS

5

1    & Bayliss's roles as escrow agents.  It's purely

2    because they have the dual roles both as escrow agents

3    and also legal counsel, that when they were in the

4    capacity of legal counsel, those communications were

5    privileged."

6                    At that argument, I requested the

7    documents and stated I would review them *in camera*.  I

8    expressed my frustration that I had already given

9    Highland multiple chances, and invited it to redo its

10   privilege log for a final time.

11                   In reviewing the documents, I

12   concluded that more than 70 documents that were

13   withheld based on claims of privilege or work product

14   protection were improperly withheld.  Those documents

15   were Privilege Log No. 1 through 25, 27 through 29,

16   35, 36, 41, 54, 56, 62, 85 through 87, and 336 through

17   372.

18                   This represents nearly 20 percent of

19   the 372 documents in the log.  But even that doesn't

20   tell the full story, because more than 200 of the

21   listed documents were simply attachments to e-mails

22   collecting documents in response to the Texas

23   subpoena.  Excluding those, more than 50 percent of

24   the documents listed were improperly withheld as

6

1  privileged.

2          Documents regarding A&B's nonlegal

3  work and resignation as escrow agent are not

4  privileged or work product because when A&B agreed to

5  be an escrow agent, it stepped into a nonlegal role

6  despite its status as a law firm.

7          The cases are clear on that point.

8  *Northeast Credit Union v. CUMIS*: "It is well

9  understood ... that the services of an escrow agent,

10 even when that escrow agent is an attorney, are not

11 legal services."  *CCS Associates v. Altman*: "[C]ourts

12 have specifically held that an attorney in the role of

13 escrow agent does not transform communications

14 pertaining to the administration of the escrow account

15 into privileged documents."  The first case is from

16 the District of New Hampshire, and the second one is

17 from the Eastern District of Pennsylvania.

18         These non-Delaware decisions more

19 specifically enunciate a principle common in our own

20 law.  Including an attorney, or having an attorney

21 perform nonlegal work, does not attach the privilege

22 to the communications or the work.  That is because

23 "... the attorney-client privilege protects legal

24 advice only, [and] not business or personal advice."

Appx. 00313

7

1   That's a quote from *MPEG v. Dell* from this court in

2   2013.

3               And as Vice Chancellor Laster said in

4   the *Facebook Class C Reclassification* litigation,

5   "Making the lawyer the point person creates a pretext

6   for invoking the attorney-client privilege, but it is

7   only a pretext."  That's from his December 12th, 2016

8   order in Case No. 12286-VCL.

9               Categories 1 and 4 reflect

10  communications between A&B and Highland concerning the

11  start of the escrow relationship, or A&B resigning as

12  escrow agent.  To be sure, there were legal

13  ramifications and issues regarding the work A&B was

14  doing in setting up and then ending the escrow

15  relationship.  But any legal component of A&B's

16  escrow-related work was secondary to the role as

17  escrow agent.  A&B was a contractual counterparty with

18  Highland under the escrow agreement, and each had

19  obligations under that agreement.

20              A&B did perform legal work on the

21  escrow issue.  For example, A&B attorneys analyzed

22  what document 351 on the log calls the "HERA

23  Strategy."  But that legal advice was not for the

24  benefit of Highland, who was A&B's contractual

8

1    counterparty.  A&B could potentially claim that its

2    attorneys were providing legal services to A&B as

3    escrow agent.  But that is not what is before me; A&B

4    has claimed no privilege.  The only issue is whether

5    Highland can claim a privilege and withhold the

6    communications containing A&B's legal analysis

7    regarding its service as escrow agent.

8              I think an example here might be

9    helpful.  If Highland had retained a bank or other

10   repository to act as escrow agent rather than a law

11   firm, the result would be more clear.  If the

12   employees of that non-law firm escrow agent

13   communicated internally about the relationship or the

14   contract, it would not be privileged.

15             If those employees received legal

16   advice from attorneys about how to structure the

17   escrow, what the terms of the escrow agreement meant,

18   or how it could fulfill Highland's request to unwind

19   the escrow and transfer the assets back, Highland

20   could not claim that the in-house or outside counsel

21   retained by the escrow agent was providing legal

22   advice for Highland's benefit.  It would be much

23   clearer that the attorneys were providing legal advice

24   to, and for the benefit of, the escrow agent, not its

Appx. 00315

9

1   contractual counterparty, Highland.

2                The facts here are more muddied

3   because there are only lawyers involved because

4   Highland selected a law firm, that otherwise

5   represented Highland, to act as escrow agent.  But the

6   result should be the same.  A&B's privilege over its

7   in-house advice regarding its conduct under the escrow

8   agreement does not belong to Highland just because A&B

9   is itself Highland's attorney.

10                The next question is one of remedy for

11   improperly withholding so many of the documents as

12   privileged.  Waiver "... has been characterized as a

13   'harsh result' typically only justified 'in cases of

14   the most egregious conduct by the party claiming the

15   privilege.'"  That's from *TCV v. TradingScreen*.

16                "If a party falls substantially short

17   of the well-established requirements, then waiver is

18   an appropriate consequence that helps dissuade parties

19   from engaging in dilatory tactics."  That's from

20   *Mechel Bluestone v. James C. Justice Companies.*

21                Daugherty has been dogged in his

22   pursuit of these documents, and Highland was just as

23   resolute in refusing to produce them.  Vice Chancellor

24   Glasscock said last September these types of documents

10

1    are not privileged.  I gave Highland multiple

2    opportunities to address this.  Because Highland stuck

3    by its position and continued to assert such a large

4    percentage of improper privilege assertions while

5    claiming it was producing documents concerning A&B's

6    role as escrow agent, any privilege related to that

7    topic is waived, and a full waiver of Highland's

8    privilege could be an appropriate consequence.

9                  But I am reluctant to go that far

10   because Categories 2 and 3 were properly withheld and

11   logged adequately.  Category 2 relates to a memorandum

12   A&B prepared analyzing avenues available for Daugherty

13   to pursue the escrowed assets.  This work started in

14   February 2014.  Category 3 relates to efforts to

15   collect documents in response to the subpoena for the

16   Texas case.  I conclude Highland's unjustified

17   withholding of other documents related to the escrow

18   was not so egregious as to waive any privilege over

19   these two sets of documents.

20                  This brings me to the crime-fraud

21   exception.  If Categories 1 and 4 were privileged, I

22   would conclude that the crime-fraud exception applies

23   and so A&B should produce those documents regardless.

24   I reach the same conclusion for Category 2, the subset

11

1  of documents related to A&B's 2014 memorandum that

2  were privileged and properly logged.

3              Rule of Evidence 502(d)(1) says that

4  "There is no privilege ... If the services of the

5  lawyer were sought or obtained to enable or aid anyone

6  to commit or plan to commit what the client knew or

7  reasonably should have known to be a crime or fraud."

8              To fall within this exception, "... a

9  mere allegation of fraud is not sufficient; there must

10  be a prima facie showing that a reasonable basis

11  exists to believe a fraud has been perpetrated or

12  attempted."  That's from *Princeton Insurance Company*

13  *v. Vergano.*  That case also explains that "... when a

14  client seeks out an attorney for the purpose of

15  obtaining advice that will aid the client in carrying

16  out a crime or a fraudulent scheme, the client has

17  abused the attorney-client relationship and stripped

18  that relationship of its confidential status."

19              The client must intend the

20  communications to be used as a bases for the fraud.

21  "The advice must advance, or the client must intend

22  the advice to advance the client's ... fraudulent

23  purpose."  That's from *Buttonwood Tree Partners v.*

24  *R.L. Polk.*

12

1         As Chief Justice Strine wrote while

2  Vice Chancellor in *Princeton Insurance v. Vergano*,

3  "The quintessential circumstance [when this exception

4  applies] is when the client obtains the advice of the

5  lawyer in order to help shape a future course of

6  criminal or fraudulent activity.  This is the classic

7  situation when the privilege gives way, as the

8  societal purpose of the confidential relationship has

9  been entirely subverted, with the client seeking the

10  expertise of someone learned in the law not so as to

11  comply with the law or mitigate legitimately the

12  consequences of his prior behavior, but to craft a

13  course of future unlawful behavior in the most

14  insidiously effective manner."

15         Here, there is a reasonable basis to

16  believe a fraud has been perpetrated.  Daugherty's

17  claim for fraudulent conveyance survived a motion to

18  dismiss, and I will refer the parties to Vice

19  Chancellor Glasscock's January 16, 2018 opinion on

20  that point.

21         The question is whether Highland

22  sought the services of attorneys to enable or aid it

23  in furtherance of that fraud.  I believe there is a

24  reasonable basis to believe that as well.  Highland's

CHANCERY COURT REPORTERS

13

1    attorney at Andrews Kurth contacted A&B almost

2    immediately after the Texas judgment became final and

3    nonappealable.  That's at Exhibit K.

4              Highland claims A&B then provided it

5    legal advice interpreting the escrow agreement, and

6    A&B resigned as escrow agent intending to cause, and

7    in fact causing, the assets to return to

8    Highland/HERA.  That is the transfer that Daugherty

9    claims was fraudulent.

10             This was not the first legal work A&B

11   performed in pursuit of keeping the escrowed assets

12   from Daugherty.  Starting in February 2014, it

13   analyzed Daugherty's ability to get at the assets

14   while the appeal was pending.  Because that appears to

15   be the beginning of the efforts that culminated in the

16   allegedly fraudulent acts, the crime-fraud exception

17   strips the privilege from these documents.

18             Daugherty has made a *prima facie*

19   showing that a reasonable basis exists to believe that

20   a fraud has been perpetrated, and that Highland sought

21   A&B to serve as escrow agent and to provide legal

22   analysis in furtherance of that fraud; specifically,

23   to protect the escrowed assets from Daugherty while

24   the Texas case was pending, and then to transfer them

14

1    back to Highland after the Texas verdict was

2    finalized.  I conclude any privilege Highland claims

3    over A&B's legal advice regarding the escrow

4    arrangement and A&B's resignation has been stripped

5    under the crime-fraud exception.

6                 I want to be clear on what I am not

7    saying.  I am not saying that a fraud claim merely

8    surviving a motion to dismiss permits the supposed

9    victim to invade the defendant's privilege for any

10   legal advice the defendant received in regards to the

11   underlying transaction or act.  This is a unique case

12   in which it presently appears that the law firm that

13   provided the legal advice, one, was a contractual

14   counterparty to the defendant in the very contract

15   under which the fraudulent transfer was allegedly

16   made; two, provided legal advice interpreting that

17   agreement and charting the course for the transfer;

18   and, three, implemented its own advice to effectuate

19   the transfer.

20                 On these allegations, which are

21   supported by the documents I have reviewed, it appears

22   the defendant sought the firm's legal advice to

23   further the alleged fraud based on the terms of the

24   contract to which the defendant and the firm were

Appx. 00321

15

1  parties.  Based on these uncommon facts, the

2  crime-fraud exception applies here.

3              Accordingly, the privilege is either

4  nonexistent or waived as I just described for

5  Categories 1, 2, 4; in other words, all documents

6  regarding A&B's service as escrow agent.  The

7  crime-fraud exception also applies to documents in

8  these categories designated as work product, under

9  *Playtex v. Columbia* out of the Superior Court.

10              I find that Category 3, regarding the

11  Texas subpoena, was properly logged as privileged, and

12  that the crime-fraud exception does not reach those

13  documents.  Daugherty has not alleged that the

14  subpoena response was in furtherance of the fraud.

15  Category 3 comprises the families associated with

16  lines 91 through 327, which are the parent e-mails

17  attaching documents collected in response to a

18  subpoena.

19              Mr. Katz, is any of that unclear?

20              MR. KATZ:  No, Your Honor.  It's

21  clear.

22              THE COURT:  Mr. Uebler, any questions?

23              MR. UEBLER:  No questions, Your Honor.

24  Thank you.

CHANCERY COURT REPORTERS

**Appx. 00322**

16

1          THE COURT:  Thank you.

2          We'll turn to the motion for

3     commissions.

4          Daugherty seeks commissions to take

5     the depositions of James C. Bookhout and Marc D. Katz,

6     both of DLA Piper.  I will refer to Mr. Bookhout and

7     Mr. Katz collectively as "the requested deponents."

8     Both requested deponents represented Highland in its

9     dispute with Daugherty in Texas, beginning in 2012,

10    and Mr. Katz and his colleagues at DLA represent

11    Highland in this action as well.  Daugherty seeks fact

12    testimony from the requested deponents on five topics,

13    all pertaining to the events surrounding the escrow as

14    alleged in Daugherty's operative complaint.

15         The discovery Daugherty seeks is

16    clearly within the bounds of Court of Chancery

17    Rule 26.  And, based on the privilege log Highland

18    produced for the escrow-related documents, the

19    requested deponents have personal knowledge of at

20    least some of the escrow events.

21         The parties disagree on the threshold

22    standard for evaluating whether counsel can be

23    deposed.  Highland contends this court has adopted the

24    *Shelton* test, while Daugherty points to a series of

17

1   standards from *Rainbow Navigation, Sealy Mattress,*

2   *Kaplan & Wyatt*, and *Dart*.

3                    I note that in a transcript ruling

4   from 2018 in *LendUS, LLC v. Goede*, Vice Chancellor

5   Glasscock considered in the first instance whether it

6   was necessary to gather the evidence sought from

7   counsel, given the risk of disqualification.  I agree

8   this is a threshold consideration present in all the

9   cases the parties have cited.  And I conclude, like

10  Vice Chancellor Glasscock did in *LendUS*, that

11  Daugherty has not made a sufficient showing that he

12  needs to depose Mr. Bookhout and Mr. Katz at this

13  juncture.

14                   As I just explained in my ruling on

15  Daugherty's motion to compel, Daugherty will receive

16  A&B's documents regarding the escrow.  Daugherty can

17  also depose the escrow agents.  He can depose the

18  Highland principals who were involved.  And I do not

19  see that any of this has happened yet.  He should

20  pursue those avenues before pursuing one that

21  jeopardizes Highland's choice of counsel.  His motions

22  for commission for the proposed deponents are denied

23  without prejudice.

24                   I am mindful that trial is scheduled

CHANCERY COURT REPORTERS

18

1   for September, and that -- if Daugherty renews his

2   motions after taking the rest of the fact discovery --

3   the risk of disqualification carries more prejudice to

4   Highland the closer we get to trial.  I also note that

5   the discovery cutoff in this case is June 28, 2019.  I

6   am, therefore, interspersing an intermediate discovery

7   cutoff.

8               Escrow discovery, including

9   depositions of fact witnesses other than the requested

10  deponents, must be complete by June 14th, 2019, and

11  Daugherty must make any renewed motion for commission

12  by June 17, 2019, with briefing on that motion to be

13  expedited.

14              The burden this timeframe places on

15  both parties I think is appropriate in light of the

16  requested deponents' apparent knowledge of significant

17  aspects of Daugherty's allegations, and in light of

18  the desire to protect Highland's choice of counsel.

19  Any renewed motion by Daugherty must demonstrate what

20  gaps in the record he needs to fill, and why he

21  believes the requested deponents can fill those gaps.

22              Mr. Uebler, is any of that unclear?

23              MR. UEBLER:  Your Honor, nothing is

24  unclear about that ruling, but I do have a question

19

1  about the escrow agent depositions.  Can the parties

2  assume that the ruling that the Court has made with

3  respect to the documents will also apply to deposition

4  testimony? in other words, categories that may be

5  subject to privilege such as the subpoena response,

6  but all other escrow-related categories would

7  presumably be fair game and not subject to privilege

8  in a deposition?

9          THE COURT:  That's correct, at least

10  as to A&B.  I note that we haven't really tested the

11  boundaries of where my ruling might go with regard to

12  DLA.  And I think that's probably another conversation

13  we would need to have.

14          MR. UEBLER:  Understood.  Thank you.

15          THE COURT:  Thank you.

16          Mr. Katz, is any of that unclear?

17          MR. KATZ:  No, Your Honor.  That's

18  clear.

19          THE COURT:  I'll give you-all maybe

20  ten minutes to kind of regroup a little bit, and then

21  I'll hear the motion for status quo order first.

22          We're in recess.

23      (Recess taken from 1:53 p.m. until 2:00 p.m.)

24          THE COURT:  Mr. Uebler?

1          MR. UEBLER:  Your Honor, my colleague,

2   Mr. Christensen, is going to argue the status quo

3   motion.  But I'd just like to point out, we had an

4   issue with our File & Serve converting Word documents

5   to pdf, and it would drop the occasional citation in

6   footnotes.  I don't know if it's our system or theirs.

7   But, in any event, we've brought revised copies of our

8   papers with all the citations for the Court.

9          THE COURT:  Thank you.

10          MR. UEBLER:  You're welcome.

11          MR. CHRISTENSEN:  Good afternoon, Your

12   Honor.  Joseph Christensen from McCollom D'Emilio for

13   the plaintiff, Pat Daugherty.

14          I just want to start very briefly with

15   how we got here.  Your Honor is familiar with the

16   facts, so I won't go over that in too much detail.

17   But I do want to highlight some of the additional

18   points that we included in our briefing related to

19   what Highland was saying about these assets during the

20   Texas action.

21          So Thomas Surgent, during the Texas

22   action, he was the chief compliance officer of

23   Highland.  During the Texas action, he testified that

24   the assets listed in the escrow agreement were being

21

1  held for Pat's benefit for his interest in HERA.

2  These are all from Exhibit V.  That one is at page 15

3  of 53.

4                Jim Dondero, the head of Highland,

5  testified that Pat's share of all the assets,

6  including the cash, is in escrow.  He also testified

7  that Pat's *pro rata* share of all the assets, including

8  the cash, are all sitting in escrow.  There's been

9  nothing deducted or removed from Pat's account.  And

10  he also said that the escrow agreement was to protect

11  Pat Daugherty.

12                The point of all these statements was

13  to convince everybody who would listen that these

14  assets were being held for Pat Daugherty, and that if

15  he prevailed in the Texas action, he would obtain

16  those assets.  And we haven't done anything with them.

17  We haven't offset any legal expenses, which is also

18  noted in our reply brief.

19                Coupled with the statements that Pat

20  continued to hold the HERA units, this was a clear

21  expression that Highland was trying to convince people

22  that they intended to hold onto these assets but give

23  them to Pat if he prevailed in the Texas action.

24                In HERA's closing argument its counsel

Appx. 00328

22

1   said, "If Pat Daugherty happens to prevail in his

2   lawsuit against Lane, Patrick and HERA you heard Jim

3   Dondero testify he gets his interest, which is

4   currently escrowed in the third-party escrow account,

5   all of it."

6           And the jury clearly believed that the

7   escrow meant to preserve Daugherty's interest.  One of

8   the questions the jury sent back to the judge in the

9   Texas action referred to his -- that is Pat's -- HERA

10  units currently in escrow.  That's the third to the

11  last page in Exhibit U.

12          The defendants now say, "Well, sure,

13  Pat continued to be an owner of HERA, but there was

14  never anything in HERA, at least during the Texas

15  action and before the Texas action."  Which reminds me

16  of a scene from my life at a movie theater with my two

17  sons, where the younger one was complaining that his

18  brother wouldn't give him the box of candy.  He asked

19  me to intervene, and I told him to give him the box of

20  candy, at which point the older brother emptied the

21  candy into his popcorn and gave him the empty box.

22          That's exactly what happened here.

23  When they told everyone they were holding assets for

24  Pat's benefit, they would now have you believe that

23

1    what they really meant was that he was just entitled

2    to an empty box, and they had no intention -- and Pat

3    should have known that they never had any intention of

4    ever letting him have them.

5              There are two possibilities to explain

6    the contrast between what they said during the Texas

7    action and what they're saying now.  One is that they

8    knew at the time that they were never going to give

9    them back.  The other is that they believed at the

10   time and were sincere in saying that they would give

11   them back, but they later changed their mind.

12             Under either of those circumstances,

13   Daugherty prevails on at least one of his claims.  If

14   they changed their mind but initially intended it, his

15   promissory estoppel claim is very strong.  If they

16   never intended from the beginning to give them to him,

17   then his fraud and unjust enrichment claims are

18   equally strong.  The status quo order should be

19   entered to make sure that they can't do either of

20   those things this time.

21             I think that's all the background we

22   need, except for a clarification on what Daugherty is

23   seeking.  He is seeking those assets.  His relief --

24   Your Honor will note that we did not include in our

24

1   briefing any discussion of our claims for

2   indemnification.  Our indemnification claim is

3   effectively a monetary relief sort of claim.  But we

4   did discuss promissory estoppel, unjust enrichment,

5   and fraudulent transfer.  Each one of those theories

6   includes potential relief divesting those assets from

7   whoever holds them, which brings me to the next point,

8   which is that we do not know where these assets are.

9           We have asked the defendants where

10  these assets are; were they ever transferred after

11  December 2016.  They told us they would not provide

12  any information on those requests.  And that's at our

13  Exhibit L, Request No. 8 and 11, and Exhibit W, our

14  Request No. 34 and 37.

15          THE COURT:  I'm certainly not inviting

16  more or different motions.  But isn't the remedy for

17  that a motion to compel instead of a motion for a

18  status quo order?

19          MR. CHRISTENSEN:  It would be.  And we

20  are not seeking through this status quo order

21  effectively a back door to answering these requests

22  for documents and interrogatories.  But the fact that

23  they will not tell us where these assets are is

24  consistent with the prior behavior in the Texas action

CHANCERY COURT REPORTERS

25

1  and gives us a lot of pause about waiting until the

2  end of this trial.

3           So we started out this case with -- I

4  guess I should first turn to the defendants' argument

5  that the Court doesn't have power to enter this status

6  quo order.  Clearly it does.  The kind of relief that

7  we're seeking is in aid of the ultimate relief that we

8  are seeking.  Because we are trying to obtain or move

9  particular assets, we are seeking the status quo order

10  to make sure those assets are still available for the

11  court to issue an effective ruling at the end of this

12  case.

13           THE COURT:  And how do you get around

14  the *Hillsboro* and *HEM* cases that discourage

15  intermediate injunctive relief for the purpose of

16  preserving assets?

17           MR. CHRISTENSEN:  Well, I think

18  generally the cases are referring to when you're

19  seeking monetary relief.  And that's not what we're

20  doing in this case.  And I think the history is

21  probably the most important point in this situation.

22           One simply cannot ignore that the very

23  assets and the very parties in this litigation -- the

24  reason we're here is because we were chasing after

26

1    these assets that we believe we obtained the right to

2    in the previous action.  So it's a unique situation.

3    None of the cases involve the same parties and the

4    same assets.

5              And the cases -- even the cases that

6    have history as a basis for granting the status quo

7    order, none of them have this kind of sort of clear

8    evidence that there was a fraud and moving of assets

9    to defeat a judgment in an earlier iteration of the

10   dispute between the parties.

11             THE COURT:  And how does that sort of

12   long history or long series of allegations of fraud

13   and hiding assets, how does that square up with the

14   requirement that the harm to be prevented by the

15   status quo order be imminent?

16             MR. CHRISTENSEN:  The imminence, Your

17   Honor, to be frank, is probably the most difficult

18   aspect of our situation to square with the law.

19   Because -- in part because they haven't told us

20   whether things have been transferred, where things

21   are, we cannot give Your Honor very many facts about

22   some imminent action that is going to take place.

23             But at the same time, we -- again, we

24   started as a frog in a pot at a very high temperature

27

having come out of the experience in Texas.  Then
adding to that was the fact that they will not tell us
where these assets are.  They will not tell us whether
they are currently in a solvent entity or not.  They
will not really just come out and say whether those
assets are still in Highland or not.  There's a
suggestion in their brief that can be read as a
representation that they are in the Highland and never
have left, but they also make the argument in their
brief that the assets never went over to Abrams &
Bayliss; that during the whole time that Abrams &
Bayliss was holding the assets, that really Highland
held the assets, retained legal title, and Abrams &
Bayliss was simply holding onto them in trust.  We
don't know if something like that is happening in this
case either.

          On top of that, we had -- and what
spurred us to action was the affidavit of Highland
saying that they did not have current assets to
satisfy the judgment in the *Crusader Redeemer* action.
So that's on the front end of that judgment.  We, at
this point, don't know what Highland is going to look
like from a solvency standpoint on the back end of
that after those assets have gone out the door, and so

28

1    at some point we have to act.  We need to act before

2    the end of this case.

3              We didn't believe that we had enough

4    imminence at the beginning of this case that we would

5    get a status quo order or a preliminary injunction.

6    But when they filed that affidavit saying that in a

7    cash flow basis they were insolvent for purposes of

8    satisfying a judgment, against the backdrop of all the

9    history, it starts to look like we're doing a replay

10   of what happened in Texas.

11             Your Honor referred to, I think, a

12   memo from Abrams & Bayliss talking about the HERA

13   strategy.  And what we're afraid of is that there is a

14   HERA Strategy Version 2 that we do not know about

15   right now and they just won't tell us.  So at some

16   point, in order to avoid them doing the same thing

17   again, we have to act.  We can't, unfortunately,

18   identify when they're going to do that in the same

19   clean kind of way that one often can in a status quo

20   or preliminary injunction case.  But the danger, I

21   would submit, is just as high as in those cases.

22             I've talked some about the history.

23   And the defendants do talk about three of the cases

24   that we talked about regarding the history.  They

29

1    address the *Crusader Redeemer* action that Your Honor

2    is familiar with, the *UBS* litigation, and the *Acis*.

3    The ones that they don't mention are *Trussway*, for

4    example.

5                    *Trussway*, in this court under Vice

6    Chancellor Glasscock, he actually already found that

7    the kind of history that one would have to establish

8    to obtain a status quo order was found with respect to

9    these principals.  He said he took into account the

10   "... prior history of the controllers of the entities

11   in examining equitable matters that come before us."

12   And true to the way he is, he said, "... I would just

13   as soon not list all the reasons I have that make me

14   suspicious that a remedy will not be available here

15   ...."  "But I think it suffices to say that I have

16   experience with other cases involving the principals

17   here."  And he went on.  That's from page 40 of

18   Exhibit S, which is the transcript in the *Trussway*

19   action.

20                    On the next page he said that, "...

21   given ... some of the factors that I've mentioned,

22   including the Acis bankruptcy and my other experiences

23   with the principals here ... there is a reasonable

24   probability that without some action, any victory will

30

1  be a Pyrrhic victory."

2           THE COURT:  It sounds like what you're

3  suggesting is that given the track record of Highland

4  in this action and in other actions, that you're

5  suggesting that the imminence requirements be

6  dispensed with because of what's going on here.

7           MR. CHRISTENSEN:  I don't think I

8  would say that, Your Honor.  I would say that given

9  the caginess on discovery, we are not able to identify

10 the moment of imminence.  But we are, through the

11 history, able to establish the same point as

12 imminence.

13           Imminence is this -- the point of

14 addressing imminence is that if you don't address

15 this, it is going to happen, and it's going to happen

16 very soon.  We can't tell you that it's going to

17 happen very soon, but we can tell you that there's

18 every reason to believe that it will happen before the

19 end of this trial.

20           THE COURT:  But what about the -- I

21 think many times when one is considering imminence,

22 there's sort of a *laches*-esque element that comes into

23 it.  And this case was filed in 2017.  So this "it"

24 that we're discussing very well may have already

31

1   happened.

2              And so I wonder what the justification

3   is for sort of after the fact -- maybe, I don't

4   know -- after the fact then seizing up Highland simply

5   based on the way that things have played out in other

6   cases.

7              MR. CHRISTENSEN:  So I think I can

8   explain why we didn't act earlier, and why it wouldn't

9   have been justified to act earlier, and so why we

10  shouldn't be subject to *laches* on this argument.

11             When we started, we had no reason to

12  believe that those assets had gone anywhere other than

13  Highland.  Then the Acis bankruptcy discussed that

14  Dondero was moving out tens of millions of dollars to

15  his charitable foundation.  That was another brick in

16  the wall.  Then we got the discovery responses that

17  were not responsive.

18             And to be clear, we have not given up

19  on that.  We had a meet-and-confer as recently as this

20  morning, and one on Friday of last week, in which we

21  are trying to get these documents.  It doesn't appear

22  that we're going to have much success on our own.  But

23  we are absolutely pursuing that and have pursued those

24  documents as vigorously as we pursued the Abrams &

32

1   Bayliss documents.

2                To mix the metaphors, the straw that

3   broke the camel's back was the *Crusader Redeemer*

4   action where Highland said:  We cannot pay this

5   judgment right now.  We have more assets than

6   liabilities, but we cannot pay this right now.

7                And it's also important to remember

8   that it's not just large judgments that Highland has a

9   history of not paying, and it's not only Daugherty's

10  relatively small judgment that they refused to pay.

11  But in the Acis bankruptcy, it was an $8 million claim

12  at issue, and they made him go through -- or are still

13  going through involuntary bankruptcy.

14               So I think we acted when it was

15  prudent to act.  And before that occurred, I don't

16  think any member of this court would have been likely

17  to give us relief without something to point to, a

18  reason to believe that Highland wouldn't pay apart

19  from the history.

20               THE COURT:  And the reason is that

21  affidavit in the *Redeemer* case stating that Highland

22  doesn't have the liquid assets to pay the $175 million

23  judgment?  That's what you're interpreting to say that

24  they will not pay or will somehow manage to avoid

Appx. 00339

33

1    paying Mr. Daugherty's -- what is allegedly owed to

2    him?

3                    MR. CHRISTENSEN:  We aren't sure about

4    the damages, but effectively, yes.  That Highland --

5    which is, we assume, the most solvent of any of the

6    entities -- now has a cash flow solvency issue.  And

7    so at that point we felt we needed to act.

8                    THE COURT:  Understand.

9                    MR. CHRISTENSEN:  The other thing that

10   I think Your Honor should consider, it doesn't fit

11   exactly within the three factors of a status quo or a

12   preliminary injunction standard; but I think Your

13   Honor should also take into account that it may not be

14   a question of whether or not Highland is able to

15   satisfy the judgment, but whether it will, even if it

16   is able.

17                   THE COURT:  That's what I'm wondering.

18   That's the part that I'm wondering how that's being

19   derived from the affidavit in the *Redeemer* case, if

20   that's the precipitating factor.  Am I understanding

21   you to read that affidavit only to inform solvency and

22   not intent?

23                   MR. CHRISTENSEN:  It is consistent

24   with an intent to make people work for their

34

1    judgments, but I mostly consider it separately.  And

2    what I'm really referring to, the short name for it is

3    spite.  It appears, if you look, not only at the

4    previous action in Texas, but also the Josh Terry

5    situation, that a major factor motivating whether or

6    not Highland pays judgments is how Highland feels or

7    how Jim Dondero feels about the people who are trying

8    to collect that judgment.

9                And so you have the court in the

10   bankruptcy case in *Acis* said that the expenditures

11   were out of whack versus what's at stake.  Or in the

12   *Credit Strategies Fund* case -- which the defendants

13   did not address -- the factual findings there refer to

14   some notes from a call between those parties and

15   Dondero.  Those notes read, "Dondero directly

16   threatens Concord and Brant personally.  We are very

17   good at being spiteful."

18               And so that spite doesn't -- it's not

19   one of the factors normally considered on a status quo

20   motion or a preliminary injunction.  I do think, as a

21   matter of equity, Your Honor ought to consider that.

22   And I think it's consistent with, and maybe grows out

23   of the kind of considerations that Vice Chancellor

24   Glasscock was taking into account in the *Trussway*

35

1   action.

2                  I think I'll skip to likelihood of

3   success on the merits.  We do think the likelihood of

4   success on the merits prong of this analysis is fairly

5   straightforward.  At a big-picture level, Daugherty

6   had a claim on these assets, either directly or

7   through HERA.  He was entitled to that compensation,

8   he earned it, and it was taken from him after he

9   proved his entitlement not only to damages -- which he

10  received in the amount of 2.6 million and has never

11  seen, but also the underlying assets.

12                 So for fraudulent transfer purposes,

13  we think actual intent to hinder, delay, or defraud

14  based on the documents that we have seen so far is

15  compelling evidence that there was actual intent to

16  hinder, delay, or defraud.

17                 Your Honor only has to find that we

18  have a reasonable probability of success on one of our

19  claims.  You do not have to decide that we have a

20  reasonable probability of success on all of them.  And

21  that comes out of the *Destra Targeted Income* case.

22                 But we also think our other claims are

23  quite strong, the alternative bases under fraudulent

24  transfer law.  We do not believe that HERA got

36

1   equivalent value, for example, in the transfer.

2   Unjust enrichment, it's an equitable doctrine, so in

3   some sense you back away and look at what really

4   happened, what's the substance.

5             And again, what happened was Daugherty

6   earned compensation, he proved his entitlement to it,

7   and then it was taken from him.  That enriched

8   Highland; it impoverished Daugherty to the extent that

9   he was entitled to it.  There was obviously a

10  connection between those two results.

11            And as far as their defense of

12  justification, the evidence doesn't seem to show that.

13  I take their justification argument to mean that they

14  were justified in taking the money because of the

15  legal expenses.  But the bills that we have seen so

16  far do not support that HERA was receiving the benefit

17  of those legal expenses.

18            And just briefly on the promissory

19  estoppel claim -- I'm not going to spend much time on

20  that; you'll hear a lot about that in a minute.  But I

21  do want to refer to those quotations from the Texas

22  trial as additional reasons that support our

23  probability of success on the merits of that claim.

24  They demonstrate that throughout the trial, the

37

1    strategy appears to have been to convince the jury

2    that Highland was the good guy because they were --

3    don't worry, they're going to hold on to the assets

4    for Pat.  Pat is going to get those assets if he

5    proves his entitlement to them.  But -- you know, so

6    don't think we're bad for taking them.  Tell us that

7    we win now and we don't have to give them to him.

8                    The narrowest way to grant the motion,

9    I think, is based on probability of success of the

10   fraudulent transfer claim for actual intent to hinder,

11   delay, or defraud.  And Your Honor only needs to find

12   that to issue the status quo order.

13                   On the balance of equities, also seems

14   very clear to us.  On the one hand, our client would

15   go through potentially another half a decade or decade

16   of litigation if he has to chase these assets again.

17   And it would be a real shame to have to do that twice.

18   On the other hand, the defendants, the harm that they

19   identify on their side is that it would lower the bar

20   for future plaintiffs against Highland that are

21   seeking monetary damages to obtain a status quo order.

22   And on that point, I just have to point out, again,

23   that it is not only monetary damages that we are

24   seeking, but seeking to move the escrow assets.

38

1              The other harm that they identify is

2    the harm to their reputation if they're required to

3    freeze these assets for what I take them to perceive

4    as a very small claim.  But again, we're not only

5    seeking monetary assets, so this is not just, as they

6    characterize it, a $3 million claim but a claim on

7    specific assets.  And their history of paying small

8    claims is not great.  So we think the balance of

9    equity also favors Daugherty.

10              Unless Your Honor has any other

11    questions, that's all I have.

12              THE COURT:  I don't.  Not at this

13    time.  Thank you.

14              MR. REED:  Good afternoon, Your Honor.

15    John Reed from DLA Piper for the defendants.

16              First of all, I want to apologize for

17    what happened at the last hearing.  We were only into

18    the case for like two days.  I had no idea that the

19    lawyer that was going to present was not going to be

20    able to answer Your Honor's questions.  I was not

21    happy about that, probably much more unhappy than the

22    Court was and the Court was very unhappy.

23              Mr. Katz is the lawyer most familiar

24    with everything in this case.  And he's here today to

1  present the arguments and should be able to answer all

2  of Your Honor's questions.

3           THE COURT:  I appreciate your comment.

4  Thank you.

5           MR. KATZ:  Your Honor, may I approach?

6           THE COURT:  Yes.

7           MR. KATZ:  Thank you for letting me be

8  heard today.

9           And as Mr. Reed said, I echo his

10 apologies for the last hearing.  I apologize that I

11 was not able to be here at that last hearing.  But if

12 Your Honor does have questions about -- I understand

13 Your Honor's ruling, but if Your Honor does have

14 questions about any of those matters, I'm happy to

15 address those as well.

16          THE COURT:  Thank you.

17          MR. KATZ:  With respect to the status

18 quo motion.  Obviously, the Court is aware of the

19 legal standard.  I'm not going to go into that.  I

20 just want to address a few of the points that counsel

21 addressed.

22          And I'd like to start with the

23 irreparable harm element, which is one of the required

24 elements.  And counsel said a number of times that

40

1   they're seeking the assets, not just monetary relief.

2   And I presume that that argument is being proffered

3   because they recognize, otherwise, the issue with

4   irreparable harm component that they have to show.

5               And I note, just by way of background,

6   is that the Texas award was not in favor of

7   Mr. Daugherty vis-a-vis HERA.  It was not for specific

8   assets; it was a monetary award.  And, moreover,

9   Mr. Daugherty never had ownership of -- direct

10  ownership of any assets in HERA.  Mr. Daugherty was a

11  shareholder in an LLC and the LLC owned some assets.

12              So if their lawsuit is now seeking

13  recovery of specific assets as opposed to monetary

14  relief, I note that there's a host of procedural and

15  substantive issues with that which I think goes well

16  to the likelihood of success on the merits.

17              But the point for us today, Your

18  Honor, is that a monetary award would certainly be

19  sufficient to recompense Mr. Daugherty if he were to

20  prevail on any of his claims in this case.  And

21  there's no evidence -- and maybe more importantly,

22  there's no evidence that's been offered to the Court

23  in support of the status quo motion that would

24  demonstrate otherwise.  And when I say "demonstrate

Appx. 00347

41

1   otherwise," demonstrate that there are assets that

2   were in HERA that can't be valued, or some other basis

3   to show some sort of irreparable harm.  That issue is

4   not even addressed.

5                  We're -- this is, I think, very

6   apparently a case that -- where there is no

7   irreparable harm.  And money can certainly compensate

8   for any harm that Mr. Daugherty may be able to prove

9   ultimately that he suffered.  The only evidence on

10  that issue, I think as Your Honor correctly pointed

11  out, was the affidavit of Scott Ellington.  And that

12  affidavit says to the contrary.  It says, "... the

13  value of Highland's assets exceed[s] the amount of the

14  ... Award."

15                 There's absolutely no evidence in

16  connection with the status quo motion that would show

17  that there is irreparable harm or there is insolvency.

18  In fact, what a good counsel wants to do is make

19  allegations of what they believe is inappropriate

20  conduct some by Highland, some by Highland's

21  affiliates.  And I note that the conduct that they've

22  cited to in their motion are allegations taken from

23  pleadings in other cases, as opposed to direct

24  evidence of anything that has been done by Highland.

42

1   And most of it, again, is not directly Highland

2   allegations to any extent.

3                    There is -- and then also as Your

4   Honor appropriately, I believe, questioned counsel

5   about, there's no evidence of anything imminent on the

6   horizon that might give rise to any potential concern

7   that would support the status quo order.  And what

8   they're seeking is really, truly an extraordinary

9   remedy.  And I don't believe that they've pointed to

10  any concrete basis which they can meet the high

11  standard that they need to show to justify a status

12  quo order.

13                   THE COURT:  How do you justify the

14  situation here from the one in *Trussway*?

15                   MR. KATZ:  Well, I guess, Your Honor,

16  in two ways.  One, in *Trussway*, there's allegations of

17  specific conduct.  Where here, we've got -- there's no

18  allegations of any conduct that they believe is about

19  to occur or evidence to support that.

20                   THE COURT:  I suspect they would say

21  that's because you haven't answered their questions,

22  but I don't know.

23                   MR. KATZ:  Well, but, Your Honor, I

24  guess that it would also go back to the irreparable

43

1    harm issue that, you know, there's nothing that --

2    even the allegations, that if they were able to

3    provide some supportive allegations in this case as

4    opposed to relying on allegations in other cases,

5    there would still be -- they still have not shown that

6    there's any risk of insolvency or potential

7    irreparable harm.

8                    And the *Mitsubishi* case that they

9    cited in their brief I think is very on point.  And on

10   this issue where they had -- the Court noted that

11   there was an allegation -- actually more than an

12   allegation -- there actually was a prior incident that

13   the Court had very serious concerns about but that on

14   its own wasn't enough.  It was -- the Court

15   specifically found that the defendant in that case was

16   insolvent.  And they also found that there was a sale

17   being negotiated, actual evidence of a sale, where the

18   assets were going to be transferred.  But we don't

19   have that type of evidence with us in this case, Your

20   Honor.

21                   On the likelihood of success on the

22   merits, Counsel spent a little bit of time on that

23   issue.  But I think it's important, Your Honor, again,

24   that this is an extraordinary remedy they're seeking

44

1    that has a heightened standard.  And their motion on

2    the likelihood of success on the merits simply has

3    conclusory allegations, that they believe they're

4    going to be able to prevail on the merits without

5    addressing the specific elements and what evidence

6    they've got to show the specific elements.

7                    I note, you know, Counsel, in a number

8    of pleadings has -- and I know Your Honor has noted

9    this as well -- that Judge Glasscock had expressed his

10   skepticism about when he was trying to determine what

11   the nature of the escrow agreement was.  And I note

12   that Judge Glasscock, when he was doing that, also

13   when he was talking about the formation of the escrow

14   agreement, he was not talking about the resignation of

15   Abrams & Bayliss or the -- what happened to the assets

16   that formerly were held by HERA.

17                   And, in fact, even Judge Glasscock

18   indicated at that time that it may be that this

19   fraudulent transfer claim was appropriate for summary

20   judgment.  I think his direct quote -- I know I wrote

21   it down.  His direct quote was that it wasn't

22   prepared -- on page 79 and 80 of the transcript, that,

23   "It may be ... perfectly fit ... for a motion for

24   summary judgment.  I'm just not convinced I can get

45

1   rid of it on a motion to dismiss ...."  That was his

2   quote.

3                But I think that has been turned on

4   its head a little bit to say that because he didn't

5   understand the purpose of the escrow agreement and why

6   that was formed, that somehow that shows that the

7   fraudulent transfer claim is a sure-fire winner.  In

8   fact, I also note that Judge Glasscock dismissed the

9   same fraudulent transfer claim against Mr. Dondero in

10  the motion to dismiss.

11               So we think there's a number of

12  problems with each of the claims.  And I know we're

13  going to get to the promissory estoppel claim.  But I

14  think a couple of issues with that is that we've

15  got -- that claim is predicated on two statements that

16  were by individuals that I don't believe were clear

17  and unequivocal type of statements that could support

18  a promissory estoppel claim.  But moreover, they went

19  to the representation of what was in the terms of the

20  escrow agreement.

21               And I believe the law is fairly clear

22  that if there is a contract provision that addresses

23  the issue at hand, then you cannot have a promissory

24  estoppel claim based on a representation about that

46

1   contract claim.  And Mr. Daugherty is absolutely

2   seeking relief pursuant to the provisions in the

3   escrow agreement.  And that, in and of itself, would

4   knock out his promissory estoppel claim.

5                   And then -- and maybe the biggest

6   problem -- I think he's got a number of problems with

7   the promissory estoppel claim, but maybe the biggest

8   one is reasonable reliance.  Again, Mr. Daugherty

9   hasn't even alleged that any of the statements were

10  made for the purpose of causing Mr. Daugherty to

11  reasonably -- to rely, and that it would be reasonable

12  to expect him to do so.

13                  But Mr. Daugherty's conduct -- he

14  alleges that he would not have paid the judgment and

15  that he would have sought to invalidate the escrow

16  agreement at trial.  And I think both of those are --

17  they're also, again, conclusory allegations that he's

18  made without sufficient -- he has not made allegations

19  in his complaint in this action sufficient to

20  withstand, I believe, a motion to dismiss, and

21  certainly not to show a likelihood of success on the

22  merits for the status quo motion.

23                  But what he's really said and what he

24  explained in the briefing that he meant by that is

47

1  that he would have sought offset.  The problem that

2  Mr. Daugherty has there is he -- offset is an

3  affirmative defense.

4             THE COURT:  I mean, we're all about to

5  get into that very deeply, so ...

6             MR. KATZ:  Okay, Your Honor.  Thank

7  you, I appreciate that.

8             But the likelihood of success on the

9  merits on the promissory estoppel claim, I think, is

10  very low.  He's got similar issues on the unjust

11  enrichment claim because of the representations and

12  because of the equivalent value that HERA received in

13  exchange for the assets.

14             On the fraudulent transfer claim, we

15  don't believe that there was a transfer and there's

16  been evidence of a transfer.  And Counsel may respond

17  to that and say, "Well, that's because Highland hasn't

18  shown where the assets are."  I'm anticipating that to

19  be their response on that.

20             But I think Your Honor identified the

21  point that that's not why you get a status quo motion.

22  If they think there's evidence that they need, you

23  know, there's a motion to compel.  But for purposes of

24  their motion, they have not produced any -- have not

48

1   cited to any evidence, have not even made the

2   allegation that -- other than a conclusory

3   allegation -- that they have a likelihood to succeed

4   on the merits.

5                    And then finally, Your Honor, I think

6   they have the same -- the last element, that with the

7   harm to him, the harm to Mr. Daugherty would outweigh

8   the harm to Highland.  They simply have a conclusory

9   allegation in their motion without providing any

10  support for that, Your Honor.

11                   And again, I just -- I'm happy to talk

12  about that issue further, but I think on a motion of

13  this seriousness with the heightened standard, that

14  they need to show that conclusory allegations are not

15  sufficient.

16                   THE COURT:  Thank you.

17                   MR. KATZ:  Thank you, Your Honor.

18                   MR. CHRISTENSEN:  Just briefly, Your

19  Honor.

20                   I suppose it's an interesting

21  philosophy of language, a question of what counts as

22  something being conclusory.  But we have certainly

23  done more than offer a conclusion.  We have laid out a

24  timeline of actual intent to delay or defraud with

49

1  respect to the fraudulent transfer claim.

2              And just the items that are attached

3  to our motion at Exhibit N, O, P, and Q, are a series

4  of e-mails and events that I think anybody bringing a

5  fraudulent transfer claim might characterize any one

6  of them as a smoking gun.  That is more than a

7  conclusion.  Our conclusion that this transfer was

8  done with actual intent to defraud is based on very

9  particular, very detailed, minute-by-minute documents.

10 So it is certainly not conclusory.  It's sort of

11 conclusory to call that conclusory.

12             And it's important, also, to remember

13 that when Vice Chancellor Glasscock suggested that

14 potentially the fraudulent transfer claim could be fit

15 for summary judgment disposition, he also said things

16 like "Maybe there's a perfectly reasonable explanation

17 for this."  I think discovery has shown that there is

18 not a perfectly reasonable explanation for this.  And

19 he did not have access to those documents, nor did we

20 at the time that he made that statement.

21             As far as seeking this relief rather

22 than simply monetary damages, that has been in our

23 complaint since the beginning.

24             THE COURT:  What is the -- can you

50

1 address the point that the Texas award is monetary and

2 not for the specific assets that are mentioned now in

3 your briefing?

4                    MR. CHRISTENSEN:  Sure.  I can.

5                    I'll address that by saying, quoting

6 again HERA's closing argument in the Texas trial.

7 "... [I]f Pat Daugherty happens to prevail in his

8 lawsuit against Lane, Patrick and HERA you heard Jim

9 Dondero testify, he gets his interest, which is

10 currently escrowed in the third-party escrow account,

11 all of it."

12                    We have made a claim for promissory

13 estoppel that statements like that with codefendants

14 show clear evidence of a promissory estoppel claim.

15 That kind of statement shows how the statement was

16 meant to be perceived, it shows how people did

17 perceive it.

18                    And I want to go to the jury question

19 because we actually have -- unlike many cases where

20 the idea of an objective standard, what would a

21 reasonable person do, is sort of an academic question.

22 But in this case we have a jury, which is sort of the

23 quintessential reasonable person, writing back to the

24 judge, "If we assign a dollar value to 'Fair Market

51

1   Value of Daugherty's HERA units' in Question 18" --

2   that's the question that awarded him $2.6 million --

3   "is this in exchange for his HERA units currently in

4   escrow, or in addition to them?"  The judge instructed

5   back, "Do not discuss or consider the effect your

6   answers will have."

7                   And then the final judgment made clear

8   that it was not in exchange for those assets in

9   escrow, that it was in addition to them.  And there

10  was appellate litigation about that issue, and it was

11  settled that it was not a replacement for those units.

12  But my point really is:  We have very clear evidence

13  that the Texas judgment and the people making the

14  Texas judgment believed that those assets were being

15  held in escrow for Pat Daugherty, which is exactly

16  what the defendants tried to tell the jury to believe

17  in their closing arguments.

18                  So the fact that the Texas judgment

19  was purely monetary is, A, not entirely true; and, B,

20  it's not -- does not defeat the promises that they

21  made throughout that trial, nor the fact that they

22  transferred the assets once the judgment came through.

23                  Let's see.  On the promissory estoppel

24  claim, it's just not what they said at trial, that Pat

52

1  Daugherty had an interest in this LLC but, by the way,

2  there's nothing in it.  So if you award him anything,

3  it's going to be completely valueless.

4                    I want to respond just briefly to the

5  point that these assets can be valued.  And they can

6  be.  This court is very experienced in appraisals.

7  But the easiest and most efficient way to deal with

8  this, the value, is to give the assets themselves

9  rather than require, effectively, a -- more than one

10 appraisal inside of this case, because there are

11 assets held by a private equity fund, and those assets

12 include private companies.  So we would have to have a

13 sort of quasi-appraisal action contained inside of

14 this, instead of doing what is much easier for the

15 parties and the Court and just addressing those assets

16 in an equitable manner and providing an equitable

17 remedy.

18                    The affidavit does say that they are

19 solvent.  I believe the affidavit was also given by

20 the same person that the -- it was either the

21 arbitration panel in *Credit Strategies Fund* or the

22 Bankruptcy Court in *Acis* said that Isaac Levinson's

23 statements were not credible and that his statements

24 contradicted documentary evidence in a clear way.

53

1           In addition, they don't say by how
2   much they are solvent.  It could be the case, based on
3   the face of that affidavit, that they are solvent by a
4   million dollars.  We simply don't know.  And again,
5   the question of solvency as it relates to irreparable
6   harm in most of these cases is in a sort of antiseptic
7   environment where it really is just a matter of:  Does
8   this party have sufficient assets?
9           And again, that's not the only
10  question in this case.  The question in this case is:
11  If the Court does nothing, what is the risk that
12  Highland will do exactly what it has done to these
13  assets vis-a-vis this litigant before?
14          That's all I have, Your Honor.
15          THE COURT:  Thank you.
16          My intention is to hear the status quo
17  order and the motion to dismiss and then take a break
18  and see if I can get something together to share my
19  thoughts.  So let's move on to the motion to dismiss,
20  unless folks want to take a short break.
21          MR. KATZ:  I'm prepared to proceed,
22  unless Counsel wants a break.
23          MR. UEBLER:  I'm prepared to go
24  forward.

54

1          THE COURT:  All right.  You may

2 proceed.

3          MR. KATZ:  Thank you, Your Honor.

4          So I won't belabor the procedural

5 background, because I know Your Honor is familiar with

6 it, other than to say that after Judge Glasscock had

7 dismissed a large number of Mr. Daugherty's claims,

8 there was -- a promissory estoppel claim was then

9 added.  And we filed the motion to dismiss as to that

10 claim, and that's the motion that we're here for

11 today.

12          To prevail on a promissory estoppel

13 claim, Mr. Daugherty has to allege a conceivable set

14 of circumstances that would allow a showing that there

15 was a promise that was made, that it was reasonable,

16 that the expectation of the promisor was to induce the

17 action of forbearance on the part of the promisee,

18 that the promisee reasonably relied on the promise and

19 took action to his detriment, and such promise is

20 binding because injustice can be avoided only by

21 enforcement of the promise.

22          And I do want to -- I will be

23 efficient, but I want to address each of these

24 elements, Your Honor.  And the -- I want to start with

55

1    the reasonable reliance.  As I mentioned a moment ago

2    in connection with the status quo order, that

3    Mr. Daugherty is really claiming that he would have

4    sought offset had Mr. Dondero -- actually, I

5    apologize, I want to take a quick step back.

6              Although Counsel's pointed to a

7    closing argument of HERA, that I believe he attributed

8    to Highland's counsel, I just want to be clear for the

9    record that the statement that Counsel just read from

10   the closing argument was for HERA, not for Highland,

11   and there was separate counsel.

12             THE COURT:  Hasn't there separately

13   been an assertion of a common interest?

14             MR. KATZ:  There was, Your Honor.  But

15   I just believe Counsel -- I'm sure it was

16   inadvertent -- said "Highland."  And I just want to be

17   clear for the record that that statement was on behalf

18   of HERA at closing argument.

19             But, more importantly, in the

20   complaint they only allege two statements: a statement

21   by Jim Dondero at trial and a statement by Mr. Klos in

22   a declaration made several months after the final

23   judgment.  And so when Mr. Daugherty claims that his

24   reasonable reliance was not seeking offset at the

56

1  trial, the second statement can't be a basis of that;

2  and the issue that Mr. Daugherty has, that there can't

3  be a reasonably conceivable set of circumstances to

4  show reasonable reliance for a couple of reasons.

5              One, the date that Mr. Daugherty filed

6  his counterclaims with his claims, he had -- the LLC

7  agreement with Highland's offset provision against the

8  value of HERA was in that document.  In fact, that was

9  the basis of one of Mr. Daugherty's claims, that there

10  was going to be -- there was the risk of this improper

11  offset.  He was challenging those provisions.

12              But yet he never pled offset as a

13  defense.  And it is a required affirmative defense

14  under Texas law.  And it is clear that when the final

15  judgment was entered, that's *res judicata*, that issue

16  was barred.

17              So Mr. Daugherty is saying that now

18  had Jim Dondero not testified as he did on the stand,

19  that he would have filed the declaratory judgment

20  action to offset the judgment that Highland obtained

21  against him from the judgment he obtained against HERA

22  cannot serve as the basis for a promissory estoppel

23  claim in this action because he would be barred as a

24  matter of law.

57

1                    THE COURT:  Is that a little too

2    technical?  I mean, is the point a little more

3    abstract than that, which is that had Dondero not

4    testified as he did and assured everyone in the

5    courtroom that the escrow was there for Daugherty's

6    satisfaction down the road, that there are plenty of

7    different options he could have taken?  I mean, any

8    sort of resistance or leverage or anything like that

9    in regards to paying his own judgment, whether or not

10   a technical offset was procedurally available to him,

11   seems to be kind of reducing this a little bit too far

12   down into the technicalities.

13                    MR. KATZ:  Well, I don't believe so,

14   for two reasons.  But the most important one being

15   there's no reasonably conceivable set of circumstances

16   where he could have taken action.  And I'll address

17   that momentarily.

18                    But to the point, that was his

19   response.  That's what's in his pleading, both in his

20   complaint and in response to the motion to dismiss.

21   That's what he said he would have done.  And that

22   wasn't available to him.

23                    And it wasn't just filing a

24   declaratory judgment action for offset that he would

Appx. 00364

58

1   have been barred from doing.  He had two years to

2   plead offset as a defense or to plead facts in the

3   Texas action that arguably could have given rise to

4   some reliance claim.

5                   THE COURT:  It seems odd to claim that

6   there was no reliance because he didn't do something

7   before the act in question happened.

8                   MR. KATZ:  Well, Your Honor, in fact,

9   quite the opposite.  As Mr. Daugherty said in his

10  reply brief to the status quo motion -- and this is on

11  page 2 and 3 of Daugherty's reply brief -- "In fact,

12  during the trial and before Daugherty won his

13  judgment, Defendants stressed that Daugherty was an

14  owner of HERA units."  Then he puts in a footnote, "At

15  the same time, Defendants took the position that

16  Daugherty held no economic interest in HERA.

17  Accordingly, Daugherty did not take the purported

18  admissions at face value and litigated for a judgment

19  that he retained his HERA units."

20                  And the significance of that, Your

21  Honor -- it's the same significance as what I was

22  trying to say a moment ago and I probably did not say

23  it very clearly -- is from the moment he filed this

24  claim, he was aware that, as he says here, that his

59

1  value -- the value of his shares in HERA were

2  valueless, as Highland was saying they were.  Because

3  that was one of his claims in the lawsuit.  And he did

4  not do anything to try to protect that vis-a-vis a

5  judgment that Highland might get against him at any

6  time during the trial.

7           So to think that, "Oh, well, he was

8  about to do it" after two years, knowing everything

9  that he knew, the LLC agreement allowing the offset,

10 Highland taking the position that his units were

11 valueless even though he was suing for it, that

12 somehow he was going to try to offset his claim

13 against HERA against Highland's claim against him, and

14 he just didn't do it because Jim made the statement he

15 did on the stand is not a reasonably credible

16 position.  It's not something that could have a -- or

17 there could be a reasonably conceivable set of

18 circumstances to show a reasonable and detrimental

19 reliance.

20           And I think -- and, Your Honor, if you

21 also look at the whole circumstances around

22 Mr. Dondero's statement on the stand, was not -- in

23 fact, the question -- it was by HERA's counsel that

24 was questioning him at the time.  And the question

60

1    was:  The assets that are being escrowed, or the money

2    that's being escrowed right now, what happens to them?

3    And I think it's significant for a couple of reasons.

4                  One, right now they're talking about

5    the day that the question was asked.  They're not

6    talking about a day in the future.  And I think it's

7    also significant that that was --

8                  THE COURT:  Maybe that was the

9    question, but the answer was, "In the future they will

10   go to him."

11                 MR. KATZ:  That's -- Your Honor,

12   respectfully, that's not the way I read it.  But I

13   think the point is -- two points, Your Honor.  One,

14   that was a question by HERA's counsel; that was not a

15   question by Daugherty's counsel.

16                 If this was so important that

17   Daugherty was going to forego seeking to invalidate

18   the escrow agreement or trying to do trial amendment

19   and get a new claim in, there was no action by his

20   counsel to follow up and say:  Let's be clear.  Let's

21   not talk about right now, let's talk about in the

22   future.  And again -- or ask about what about the

23   resignation provisions, what about the termination

24   provisions.

61

1            There's a whole host of conditional

2   circumstances that show that Mr. Daugherty,

3   purportedly relying on that statement to not try to

4   bring a declaratory judgment action for offset or to

5   seek to invalidate the escrow agreement would have

6   been reasonable reliance.  Again -- because, in fact,

7   up until that point, Mr. Daugherty not only waited two

8   years, he waited past the amended pleading deadlines.

9   In the face of what he says, I'm being told by

10  Highland that my assets are valueless.  You know, and

11  to the extent they say that I'm still owning HERA

12  units, I never believed that there was anything there.

13  But yet he didn't do anything about it before

14  Mr. Dondero made the statement to HERA's counsel.

15            So, again, all of those, all of that

16  goes to whether he could have -- show any circumstance

17  where he could have reasonably relied.

18            Similarly, I think if you look -- and

19  I bring in these things to show Your Honor what is not

20  in the complaint or not in the response to the motion

21  to dismiss.  After the judgment, he claims that he was

22  entitled to this offset, but yet he paid his full

23  judgment.  He could have just paid the difference in

24  the judgment.

62

1              THE COURT:  That's the point, is that
2    he paid the whole judgment; right?  Kind of chipperly
3    wrote the check and thought it was all going to work
4    out in the end.
5              MR. KATZ:  Right.  Well, without --
6    but with the whole circumstances and you look at his
7    allegations, if his allegations are to be believed,
8    it's not reasonable to believe that somebody who was
9    going to do what he did but for Jim Dondero's
10   statement would have, again, waited for two years, not
11   filed -- not done -- taken the legal actions that he's
12   now claiming he would have taken.
13             He did seek to amend his pleadings
14   right before trial.  These were not in there.  That
15   was, again, before these statements.  Again, it's not
16   credible to believe that he reasonably relied.  And he
17   hasn't alleged anything.
18             Again -- and so that was why I said
19   initially to Your Honor's question, there are two
20   points.  One, when you look at the totality of what he
21   didn't allege and what he didn't do, that there can be
22   no set of circumstances where he reasonably relied,
23   but then when you look at what he says he would have
24   done, which is the offset.  And he would have been

63

1   legally barred from doing that because he waived it.

2   Also because -- and the law is cited in our motion,

3   that because Highland and HERA are separate entities,

4   there wouldn't have been an offset between those

5   judgments anyway.

6               So the two things he says that he

7   would have done was seek to invalidate the escrow;

8   which, again, he was aware of that escrow agreement

9   before trial.  He sought to amend his pleadings before

10  trial but did not address that escrow agreement at

11  all.

12              He has shown that he believes that

13  his -- before Mr. Dondero made that statement, he

14  didn't -- he thought his HERA units had been rendered

15  valueless and that's how he was litigating the case.

16  But he didn't try to "invalidate" the escrow

17  agreement.  He also doesn't explain or provide any

18  allegation of what that means, to invalidate the

19  escrow settlement.

20              He doesn't provide any legal theory or

21  allegation of evidence to support a legal theory that

22  would show that had he sought to invalidate the escrow

23  agreement that the court would have allowed that

24  amendment and it would have changed the outcome.

64

1          The next element I want to talk about

2     was that a promise was made.  And, again, he's

3     identified two promises: one by David Klos, one by Jim

4     Dondero.  There's -- the one by Mr. Klos, again, was

5     done several months after trial.  The one by

6     Mr. Dondero is obviously during trial.  But both of

7     those statements, when you look at them, are not

8     unequivocal statements of -- there was no set of

9     circumstances where Mr. Daugherty will not be paid

10    this money on a final, nonappealable judgment.  And --

11    which is what --

12          THE COURT:  Why is that not exactly

13    what Mr. Dondero said?

14          MR. KATZ:  Well, Your Honor,

15    Mr. Dondero was being asked a question about the

16    language in the escrow agreement, that specific

17    provision.  And he was being asked based on

18    circumstances right now.  And perhaps if I give you an

19    analogy.  If I hire an employee and I'm paying the

20    employee $50,000 a year and they're an at-will

21    employee, and somebody asks me, "Well, how much does

22    that employee make?" I'm not likely going to say,

23    "Well, annually $50,000 a year, but I can terminate

24    them at any time."  Or "$50,000 a year, but less

Appx. 00371

65

1    withholding," or other caveats.

2                    And the question that was asked to

3    Mr. Dondero is the -- right now the assets that are --

4    and I apologize, I don't -- I can grab the quotation.

5    I don't have it right in front of me.  But the key

6    part was that it was predicated on right now, what

7    happens right now if there's a final judgment.

8                    So -- and, again, this is Mr. Dondero

9    who's an individual defendant who is not being

10   questioned as a representative of Highland.  And what

11   they want to do is take that statement and say this is

12   an unequivocal statement that was binding Highland.

13   And it just doesn't rise to that level under the legal

14   standard.

15                   And, you know -- but, moreover --

16   again, because what -- Mr. Dondero was reading the

17   escrow agreement on the stand as a layman, but that's

18   really more significantly the point, is that if the

19   alleged promises are subject to termination by a

20   contract -- I know this is in our pleading, the

21   *TrueBlue HRS Holding* case -- promissory estoppel does

22   not apply where a fully integrated and enforceable

23   contract governs the promise at issue.

24                   And that's the issue, is the contract

66

1   is the contract; it means what it means.  And the --

2   unless there -- I don't believe, Your Honor, that they

3   even alleged that there is some promise, unequivocal

4   promise, that Mr. Dondero or Mr. Klos made that was

5   not subsumed by the escrow agreement.  And that's

6   really the basis of their claim here.

7                    They also have to show that the claim

8   is necessary to avoid injustice.  And obviously, they

9   have brought a fraudulent transfer claim and an unjust

10  enrichment claim arising out of the same course of

11  conduct, that they claim these representations are

12  related to those claims.  And I think the case law is

13  fairly clear on this, that this is exactly the type of

14  situation where a promissory estoppel claim is not

15  necessary to avoid injustice.

16                    THE COURT:  But is the conclusion to

17  be taken from your argument that nothing can ever be

18  pled in the alternative to a promissory estoppel

19  claim?

20                    MR. KATZ:  No, not at all.  But I

21  believe that you would have to have a set of

22  circumstances where there wasn't a fully integrated

23  enforceable contract, and that the underlying promises

24  weren't about the interpretation of that contract.

67

1          And then, finally, Your Honor, I'm
2  going to use the word "conclusory" again, that they --
3  well, actually not even conclusory, Your Honor.  They
4  didn't even plead that Highland intended to induce
5  reliance or that Highland should have reasonably
6  expected to induce reliance by Mr. Daugherty.
7          And I don't think that's necessarily
8  an accident.  I think that's because the statements
9  that they're relying on were not statements that were
10 made on behalf of Highland.  They're individual
11 statements.  And I think that it would be fairly
12 tortured to say otherwise.
13         So, Your Honor, again, for each of
14 those reasons, we don't think that they have pled any
15 reasonably conceivable set of circumstances that could
16 support the promissory estoppel claim.
17              THE COURT:  Thank you.
18              MR. KATZ:  Thank you, Your Honor.
19              MR. UEBLER:  Good afternoon again,
20 Your Honor.
21              THE COURT:  Good afternoon.
22              MR. UEBLER:  I'll start with the
23 promise that was made.  And before I do, I think I
24 heard Mr. Katz talking about the standard to prevail

68

1    on a claim.  And I understand we're a little bit late

2    in the game of this lawsuit.  But this is a 12(b)(6)

3    motion and the standard is reasonably conceivable.

4                So I just want to reset where we are

5    on this motion and talk about the promise that was

6    made, briefly.  So what was the promise?  The promise

7    was Jim Dondero testifying at trial, under oath, that

8    Mr. Daugherty's assets would be held in escrow and

9    released to him through HERA if he won in Texas.  I

10   mean, it was as simple as that.

11               You may have been left with the

12   impression from Mr. Katz's presentation that the line

13   of questioning was about the terms of the escrow

14   agreement.  I can save all of us and just refer to the

15   pages of the testimony, or I'd be glad to read the

16   preceding three or four questions to set that up.  But

17   it was not interpreting the escrow agreement.  And

18   Mr. Katz didn't have the testimony on hand, but I do.

19   And the question was:

20               "Question:  Okay, so -- so if

21   Mr. Daugherty somehow prevails in his lawsuit against

22   Patrick Boyce and Lane Britian and HERA, what happens

23   to Mr. Daugherty's interest that's being escrowed

24   right now with a third-party escrow agent?

69

1                    "Answer:   They go to him.

2                    "Question:   I'm sorry?

3                    "Answer:   They go to him via to HERA

4      and then to him."

5                    Is that promise consistent with the

6      escrow agreement?  Yes.  Is that promise separate and

7      apart from the escrow agreement?  Yes.  Mr. Dondero

8      wasn't there interpreting a contract.  He was there

9      making a promise to Daugherty and to the jury.

10                   And just as we allege in paragraph 131

11     of our complaint, it was the reasonable expectation of

12     Highland, when that promise was made, that it was

13     going to be relied on.

14                   THE COURT:  Tell me more how the

15     statement was separate and apart from the contract.

16                   MR. UEBLER:  The statement is separate

17     and apart from the contract because I think --

18     Mr. Katz would be the first one to tell you that

19     Mr. Daugherty was not a party to the escrow agreement.

20     Mr. Daugherty, on the face of it, has no rights under

21     that escrow agreement.

22                   So this idea that Highland proposes

23     that because there's a contract out there that also

24     addresses the subject matter of the promise, the

70

1    promisee is, therefore, precluded from relying on that

2    promise, it just -- it doesn't hold water.  They

3    don't -- they didn't cite any cases.

4              We said it's not the law of Delaware

5    and never should be.  Highland shouldn't be allowed to

6    contract with Abrams & Bayliss and then use that

7    contract to say that a promise made to Daugherty that

8    Daugherty seeks to enforce, that is -- you know,

9    follows the terms of that contract but doesn't

10   expressly give any rights to Daugherty, that's just --

11   that's not an argument that the Court should accept,

12   in our view.  So that's why I say it's separate from

13   the contract.

14             And that also gets into the

15   alternative claim argument, too.  Are we entitled to

16   bring promissory estoppel and a fraudulent transfer

17   claim and an unjust enrichment claim?  I think the

18   *Chrysler* case in the Supreme Court settled that

19   question a long time ago.  And I think Rule 8 of this

20   court does, too.

21             So, of course, there's overlap in what

22   was promised and what's in the escrow.  Although, I

23   will point out, the escrow -- Mr. Katz said something

24   like -- he referred to a host of conditional

71

1   circumstances in the escrow agreement.  And I think

2   his point was paragraph 5 and paragraph 10 that they

3   had relied on when Abrams & Bayliss resigned.  Well,

4   you won't find any of that in the promise that was

5   made by Jim Dondero under oath to Pat Daugherty and

6   the jury.  So whatever conditional circumstances may

7   be in that contract, they're not in that promise.

8               And the notion that Jim Dondero was

9   testifying in his individual capacity, I think we

10  debunked that in Exhibit A to our answering brief --

11  which was Highland's own witness list -- that provided

12  an entire paragraph of what Mr. Dondero would be

13  testifying about, including testimony in support of

14  Highland's and Cornerstone's claims against Daugherty

15  and the damages suffered and the third-party

16  defendants' defenses to claims asserted against them.

17              So Jim Dondero is Highland.  He is

18  HERA.  He's HERA ERA management.  He controls them

19  all.  Mr. Katz pointed out that the closing argument

20  by HERA's lawyer in Texas was just HERA's lawyer.

21  Well, Jim Dondero controls HERA, just as he controls

22  Highland.  So I view that as a distinction without a

23  difference.

24              But what that closing argument did was

72

1   reaffirm the promise -- I thought I had it here.  So

2   what was said on closing argument by HERA's counsel,

3   just after Jim Dondero made the promise, was "... if

4   Pat Daugherty happens to prevail in his lawsuit

5   against Lane, Patrick and HERA you heard Jim Dondero

6   testify he gets his interest, which is currently

7   escrowed in the third-party escrow account, all of

8   it."

9                   Then we had the other promise, which

10   was that September -- September of 2014, the Klos

11   affidavit.  It restated the promise.  This gets to the

12   reasonableness of the reliance of Daugherty's

13   promise -- the promise to Daugherty.  He kept hearing

14   this.

15                   And the idea that Daugherty should

16   have somehow foreseen in either the six weeks between

17   when Highland sprung the escrow agreement on him

18   before trial or when Dondero testified or when Klos

19   submitted his affidavit -- by the way, as the senior

20   finance of Highland Capital -- that Daugherty should

21   have foreseen two years from now when he went to pay

22   the judgment that Highland was going to break that

23   promise.

24                   So the idea that Daugherty should have

73

1   done something between December 2013 and December of

2   2016, I think entirely misses the point of our claim.

3   The reliance that we allege -- and it's paragraph 133

4   of our complaint -- is "In further reliance on the

5   promises of Highland Capital and its agents, on

6   December 14, 2016, nine days after Highland Capital

7   secretly obtained the Escrow funds, Daugherty wired

8   approximately $3.2 million in cash to Highland Capital

9   in satisfaction of its award of attorneys' fees in the

10  Texas Action."

11                That was the reliance.  What could

12  have been done, other than a cash payment, Daugherty

13  could have just engaged in self-help.  He could have

14  paid the difference between the 2.6 and the 2.8 of the

15  judgments.  He could have not paid anything at all.

16  He at least should have had the chance to go to court

17  like the petitioner did in the *Bonham Bank* case that

18  we cite from Texas to explain to a judge why, under

19  these circumstances, even though there are three

20  different litigants involved, these claims should be

21  offset.  But he didn't even get that chance because he

22  relied on Highland's promises and he wired the full

23  amount.  They took away that chance from him.

24                We don't have to prove today whether

74

1    he would have won on that setoff claim in Texas or

2    anywhere else.  We just have to prove that it's

3    reasonably conceivable that he was deprived of that

4    chance because he reasonably relied, to his detriment,

5    on a promise that was made under oath and repeated.

6                    In their opening brief, the defendants

7    stated that "Injustice can (and should) be avoided

8    through collection efforts in the Texas Action, which

9    Daugherty has not even attempted to pursue, making

10   this claim premature."

11                    I just wanted to point out, this was

12   in Exhibit B to Highland's own opening brief.  They

13   attached Mr. Daugherty's interrogatory responses.  And

14   if you look at Interrogatory 36 on page 25,

15   Mr. Daugherty stated that "... apart from filing this

16   action to collect his Texas judgment, he filed for a

17   writ of execution in Texas on July 7, 2017, which was

18   unsuccessful because Highland Capital claimed HERA had

19   no assets.  The return of service was dated

20   September 26, 2017."

21                    I think that's totally irrelevant to

22   the questions before the Court, but I wanted to point

23   out that Mr. Daugherty did, in fact, attempt some

24   collection efforts in Texas and those were

75

1   unsuccessful.

2                   I'd also like to point out that in

3   addition to being able to plead alternative claims,

4   this is one of those cases where injustice can only be

5   avoided through the enforcement of this promise,

6   notwithstanding the other claims out there.  The

7   injustice to be avoided is allowing Highland Capital

8   to walk away with both judgments from the Texas

9   action.  They got Daugherty's 3.2 million, and they

10  got his HERA assets.  And that's the injustice to be

11  avoided.

12                  When you and Mr. Katz were discussing

13  this element, he referred to a fully integrated

14  contract.  Again, he would be the first to tell you,

15  I'm sure, that Daugherty has no rights under that

16  fully integrated contract.  So the fact that there is

17  a similar contract out there is not relevant to the

18  analysis.

19                  That's all I have, Your Honor.

20                  THE COURT:  Thank you.

21                  MR. UEBLER:  Thank you.

22                  MR. KATZ:  Your Honor, can I just

23  address a couple points?

24                  THE COURT:  Yes.

76

1                MR. KATZ:  For clarity purposes,

2       Counsel -- this is the second time they've read the

3       statement from HERA's counsel during the closing

4       argument.  That was not part of the statements that

5       were alleged to be part of the detrimental reliance in

6       either the complaint or in the response to the motion

7       to dismiss.

8                And I think that's significant, again,

9       because Counsel is certainly correct that what they

10      say is that Daugherty would not have paid the judgment

11      against him by Highland.  But their explanation of

12      what that means is that he would have sought offset or

13      sought to invalidate the escrow agreement, both of

14      which could only have been done, been sought, during

15      trial.  I suspect that's why they are not relying on

16      the statement that was made at closing argument where

17      it would have been too late for them to make those

18      allegations.

19               Highland had a judgment, a fully

20      perfected final judgment, collectible judgment that

21      Mr. Daugherty paid.  And from the motion to dismiss

22      perspective, claiming that he would have filed either

23      or both of two things that were barred by *res judicata*

24      does not provide the basis to avoid -- where there's a

Appx. 00383

77

1   reasonably conceivable set of circumstances that those

2   allegations could support to avoid a motion to

3   dismiss.

4              And, again, we're really just talking

5   about Jim Dondero's statement because, as Counsel

6   recognized, the Klos statement was made, I believe,

7   roughly five months after the -- four or five months

8   after the final judgment was entered.

9              And then, finally, lastly, I just want

10  to touch on the escrow agreement.  Of course we

11  recognize Mr. Daugherty is not a party to that

12  agreement.  But Mr. Daugherty's case is that he is

13  asserting rights under that escrow agreement.  He is

14  certainly saying that there was a transfer under that

15  agreement and that that agreement required the assets,

16  the money being held pursuant to that escrow

17  agreement, to go to HERA, which then Mr. Daugherty as

18  the shareholder of HERA would have had rights to.

19             And, you know, we disagree with some

20  of the underlying factual basis.  We don't agree that

21  there was a transfer.  But I think counsel for

22  Mr. Daugherty would certainly not say that there's not

23  a fully enforceable promise in that escrow agreement

24  that they are seeking relief under.

78

1              And that's -- and just as importantly,

2    Mr. Dondero's statement was exclusively an

3    interpretation of that promise.  And that's why -- and

4    I think that's exactly what the *TrueBlue* case is

5    referring to.  And there's a fully integrated contract

6    that has the promise that legally and factually

7    determines what the rights under that contract are.

8              And Mr. Dondero's interpretation of

9    that contract -- even if it's the exact same as the

10   contract or even if it's different than the

11   contract -- doesn't change that the claim is pursuant

12   to the contract and not for promissory estoppel.

13             THE COURT:  What is your understanding

14   of Mr. Daugherty's ability to sue to enforce the

15   escrow agreement in a way that benefits him?

16             MR. KATZ:  Well, he is a shareholder

17   of HERA.  And as a shareholder of HERA -- I mean, I'd

18   have to think through all the *res judicata*, collateral

19   estoppel, statute of limitations issues that all have

20   come out about all the issues that have been

21   litigated.

22             THE COURT:  I just mean from the terms

23   of the contract.

24             MR. KATZ:  I don't believe that

79

1    Mr. Daugherty is a third-party beneficiary of the

2    contract, if that's Your Honor's question.  He's

3    certainly not a direct party to the contract, but he

4    is a shareholder of HERA.  And their allegations are

5    that Highland was contractually obligated to send

6    money to HERA under that agreement.

7                    I think there are potentially

8    technical legal issues under that.  That's, of course,

9    not the claim that Mr. Daugherty has brought.  And --

10   but if Mr. Daugherty had any rights, it would be

11   through HERA.

12                    THE COURT:  So is it your

13   understanding that the point of the doctrine that

14   you're relying on, that there can't be both a contract

15   and a claim for promissory estoppel, is that those

16   rights substantially overlap?

17                    MR. KATZ:  I would suspect that's

18   probably the policy reason behind those decisions.

19                    THE COURT:  So if Mr. Daugherty

20   doesn't have contractual rights under the escrow

21   agreement, why does that knock out his promissory

22   estoppel claim?

23                    MR. KATZ:  Because it's the same --

24   because whatever rights he has under the contract,

Appx. 00386

80

1  whether he has rights or not, are no different than

2  any rights he would have vis-a-vis Mr. Dondero's

3  interpretation of what that contract said, what that

4  contractual language says.

5              THE COURT:  Go ahead.

6              MR. KATZ:  I think that the policy is

7  is not to create quasi-contractual claims when there

8  is a contract, regardless of who's the party to the

9  contract.

10             And, actually, I think it's even --

11 there's no wiggle room around this situation because

12 it's not -- Mr. Dondero was -- I mean, I think the

13 quote was, "They go to Mr. Daugherty through HERA" is

14 the quote.  He wasn't saying something -- there's not

15 been an allegation, for example, that Mr. Dondero's

16 statement or Mr. Klos' statement created a separate

17 contract between Mr. Dondero or Mr. Daugherty.

18             I mean -- and that's not what -- I

19 mean, there hasn't been an allegation that that's what

20 they were saying -- that Mr. Dondero was saying that

21 or Mr. Klos was saying that.  The allegation is they

22 were saying that's what the contract, the escrow

23 agreement, means.  And that's why you can't have a

24 separate claim, because the contract means what it is

81

1   and the contract determines the rights.

2                    THE COURT:  I understand.

3                    MR. KATZ:  Thank you, Your Honor.

4                    THE COURT:  Thank you.

5                    MR. UEBLER:  May I, briefly?

6                    THE COURT:  Briefly.

7                    MR. UEBLER:  Just to be clear, Your

8   Honor, we very much rely on the Klos statement as a

9   separate promise on behalf of Highland in the

10  affidavit.  We think it also supports the

11  reasonableness of the reliance on Mr. Dondero's

12  promise on behalf of Highland.  But we view the Klos

13  affidavit as part of the promise generally.

14                   With respect to the closing argument

15  by HERA, we didn't use it sooner because we just --

16  actually, I have to give credit where credit is due --

17  my colleague, Mr. Christensen just found it.  We

18  didn't try the Texas case, so we did find it in the

19  record.

20                   And fortunately for us, Highland

21  agrees on pages 13 and 14 of their own motion to

22  dismiss that the Court can "[consider] additional

23  materials from related litigation that were not

24  attached to the complaint if the plaintiff relied on

82

1  those materials in casting his complaint, as Daugherty

2  has done with regard to the Texas Action."

3                 The last paragraph on page 14 goes on

4  to say, "To the extent the Court finds that the Texas

5  Action materials are not already subject to

6  consideration based on Daugherty's extensive reliance

7  on them, Defendants respectfully request that the

8  Court take judicial notice of the documents under

9  Delaware Rule of Evidence 202(d)(2)."

10                 So we submit that the Court certainly

11  can consider the trial transcript from the Texas

12  action as further support for the reasonableness of

13  Mr. Daugherty's reliance.

14                 And my final point with respect to the

15  escrow agreement and the notion -- I think that what

16  Mr. Katz said is that Daugherty, in his view, has no

17  direct rights under that agreement.  The only real

18  direct relevance of the escrow agreement with respect

19  to the promissory estoppel claim is that it's even

20  more evidence of the reasonableness of Mr. Daugherty's

21  reliance on the promise because it's consistent with

22  that promise.

23                 Thank you, Your Honor.

24                 THE COURT:  Thank you.

83

1          Anything to -- Mr. Katz, I'll give you
2    the last word.
3          MR. KATZ:  No, Your Honor.
4          Just to address Counsel's last point
5    about just finding the statement.  You know, again, I
6    think that the issue is what did Mr. Daugherty
7    actually rely on.  Their claim is that when he wired
8    $3.2 million -- not what statements Counsel has found
9    in the record recently that could be retroactively
10   applied that way.
11         And Counsel's -- again, the complaint
12   that is in front of Your Honor that has the
13   allegations rely on the two statements and is very
14   clear that -- it is explained in their briefing --
15   that the remedies -- that the detrimental reliance was
16   forbearance from taking action in the Texas lawsuit.
17         So anything that occurred anytime
18   after they could raise issues in a Texas lawsuit could
19   not have been a basis for detrimental reliance.
20         THE COURT:  Thank you.
21         I'm going to take a recess.  It will
22   be at least 20 minutes.  So stretch your legs, do
23   whatever.  It'll probably be longer than that.  But --
24   thanks for your patience, but it's faster this way in

84

1    the short term.

2                    So we are in recess.

3        (Recess taken from 3:35 p.m. until 4:18 p.m.)

4                    THE COURT:  Thank you for your

5    patience.

6                    I'm going to start with the motion for

7    a status quo order.  It is denied.  We have some time

8    constraints this afternoon, so I will cut to the

9    chase.  Daugherty has not established a threat of

10   imminent irreparable harm as he must.  It is clear

11   that Daugherty is pursuing this relief now based on

12   what happened in the *Redeemer* case.  This complaint

13   was filed in July 2017, and he did not seek the relief

14   that he's now seeking until after the papers on the

15   status quo order dispute were filed in the *Redeemer*

16   case.  And Daugherty cites Highland's submissions in

17   that case in his brief.

18                   I disagree with Daugherty's reading of

19   the *Redeemer* papers as indicating that Highland is in

20   "severe financial distress" and is "unable to satisfy"

21   the arbitration judgment at issue there.  And the

22   facts are very different as between the two cases.

23   Before going to arbitration, there were issues

24   involving control over assets that led to Highland

Appx. 00391

85

1  making representations to the Court in the *Redeemer*

2  case.   And in the more recent request for a status quo

3  order related to confirming an arbitration judgment,

4  there was no separate claim that this court needed to

5  adjudicate, like Daugherty's fraudulent transfer claim

6  here.

7            And, finally, the *Redeemer* parties

8  ultimately stipulated to a status quo order.  So I

9  don't think that anything that this court did in

10  entering the agreed-upon status quo order is helpful

11  in deciding whether to issue one in this case.

12            Daugherty says that Highland has a

13  pattern of avoiding judgments, but has given me no

14  reason to think that Highland is going to do something

15  between now and a post-trial opinion that would make

16  it incapable of satisfying a judgment, nor is there

17  anything in the *Redeemer* case that leads me to believe

18  that.

19            Quite frankly, if Highland is as good

20  at avoiding judgments as Daugherty claims, Highland

21  would have already moved the assets.  Daugherty, in

22  his reply, touches on that point and raises concerns

23  about whether the assets have already been

24  transferred.  He used a metaphor about the straw

86

1    breaking the camel's back.  I'm going to use a

2    different ungulate.  He's provided no reason to

3    believe the horse is not already out of the barn or

4    that the horse is going to imminently flee the barn.

5                    So I fully appreciate that Daugherty

6    says that this is what happened to him in Texas, and

7    I've indicated before that I agree with Vice

8    Chancellor Glasscock's sentiment that what happened

9    here fails more than the smell test.  But that doesn't

10   mean that there is a sufficient imminent threat that

11   it's going to happen here with Highland.

12                   I also distinguish this case from Vice

13   Chancellor Glasscock's entry of a status quo order in

14   the *Trussway* matter, which admittedly was, in part,

15   based on Highland's "prior history."  In that ruling,

16   Vice Chancellor Glasscock noted the unique appraisal

17   remedy that was at issue there, and distinguished that

18   property right -- which is meant to substitute for a

19   stockholder's ability to insist on unanimity in a

20   merger -- from recovery in a tort or contract case.

21   Daugherty is seeking the more common sort of recovery

22   here, so I do not find *Trussway* instructive.

23                   So, in sum, because Daugherty's motion

24   for a status quo order is based on a recent

87

1    development that does not support a conclusion that

2    Daugherty faces imminent irreparable harm, the motion

3    for a status quo order is denied.

4              Mr. Christensen, do you have any

5    questions about that?

6              MR. CHRISTENSEN:  No, I do not.

7              THE COURT:  Okay.  Anything from DLA?

8              MR. KATZ:  No, Your Honor.

9              THE COURT:  Thank you.

10             Moving on to the motion to dismiss.

11   Highland's motion to dismiss Count IX of the amended

12   complaint is denied.  Count IX is a claim for a

13   promissory estoppel.  And to state a claim for

14   promissory estoppel, a plaintiff must plead four

15   elements.

16             The first is that a promise was made.

17   The second is that it was the reasonable expectation

18   of the promisor to induce action or forbearance on the

19   part of the promisee.  The third is the promisee

20   reasonably relied on the promise and took action to

21   his detriment.  The fourth is that the promise is

22   binding because injustice can be avoided only by

23   enforcement of the promise.  That's all from the

24   *Chrysler* case out of the Supreme Court in 2003.

88

1            On Highland's motion to dismiss, I

2   applied a reasonable conceivability standard of

3   Rule 12(b)(6).  Under that standard, I must accept all

4   well-pleaded factual allegations as true, accept even

5   vague allegations in the complaint as well-pleaded if

6   they provide the defendant notice, draw all reasonable

7   inferences in favor of the plaintiff, and deny the

8   motion unless the plaintiff could not recover under

9   any reasonably conceivable set of circumstances

10  susceptible of proof.  That familiar standard is from

11  *Century Mortgage Company v. Morgan Stanley.*

12           Applying this standard, plaintiff has

13  adequately pled the four elements.  First, Highland

14  made promises through representations it and its

15  agents made in the Texas action.  Highland, through

16  testimony, explained that Daugherty would receive the

17  escrowed assets upon a judgment being finalized.

18           Daugherty cites testimony from James

19  Dondero, Highland's cofounder and president.  On

20  direct examination, Dondero was asked what would

21  happen to Daugherty's interest that was being held in

22  escrow, and Dondero stated that it would go to

23  Daugherty via HERA if he won.  This testimony is cited

24  in paragraphs 43 and 129 of the complaint.

CHANCERY COURT REPORTERS

89

1          Highland tries to distance itself from

2     Dondero, but it cannot do so at this stage.  Highland

3     says Dondero was testifying in a personal capacity.

4     But the witness list Highland filed in the Texas

5     action shows that is not the case.  That is Exhibit A

6     to Daugherty's answering brief.  Highland had no

7     response to this in its reply brief, beyond

8     reiterating its original argument that Dondero was not

9     speaking on Highland's behalf.

10          Based on the allegations of the

11     complaint, including Dondero's role, it is reasonably

12     conceivable he was speaking on behalf of Highland.

13          Other support for the alleged promise

14     comes from an affidavit attached as Exhibit I to the

15     complaint from David Klos.  Klos submitted the

16     affidavit and stated he had "... personal knowledge of

17     the facts stated in this affidavit as the Senior

18     Manager of Finance for Highland Capital ..." and

19     because he oversaw accounting relating to HERA.  Klos

20     reiterated in his affidavit what the escrow agreement

21     says, and Dondero testified to, which is that after a

22     final nonappealable judgment, A&B, as the escrow

23     agent, would transfer the deposit assets to HERA.

24          Highland also tries to distance itself

90

1    from Klos.  And it cannot do so, as the document

2    presented to the Texas court states Klos was providing

3    the affidavit in his capacity as Highland's Senior

4    Manager of Finance.  At this stage, that is

5    sufficient.

6                   Together, these allegations are

7    sufficient to establish that Highland made a promise

8    that the assets would be held in escrow and released

9    to Daugherty, via HERA, if Daugherty won in Texas.

10                  Second, the reasonable expectation of

11   Highland as the promisor was to induce action or

12   forbearance on the part of Daugherty as promisee.

13                  In briefing, Highland says the

14   statements were not directed to Daugherty, "... but

15   rather [to] the jury, the judge, legal counsel, the

16   public, and so forth."  That's a quote from page 20 of

17   Highland's reply.  It simply makes no sense to say

18   that the statements were directed to everyone else

19   involved in the legal proceeding -- indeed, in the

20   world by virtue of including "the public" -- but not

21   Daugherty, who had the greatest interest in that

22   proceeding.  It is reasonably conceivable the

23   reasonable expectation of someone discussing the

24   escrow agreement, as Highland did, would have been to

Appx. 00397

91

1  induce action or forbearance by their adversary in the

2  litigation.

3            Third, it is reasonably conceivable

4  that Daugherty reasonably relied on the promise and

5  took action to his detriment.

6            Daugherty could have pursued other

7  strategies if the escrow was not in place.  Daugherty

8  paid a judgment in the same case to Highland, which he

9  alleges was in the amount of $3.2 million.  If

10 Daugherty knew what would happen with the escrow, he

11 could have fought tooth and nail for an offset of the

12 judgment amounts.

13           Highland focuses on the availability

14 of a triangular offset in this situation, asserting

15 that even if HERA owed Daugherty money, Daugherty was

16 legally unable to offset the judgment he owed Highland

17 by what he was owed from HERA.  I think that misses

18 the point, which is that Daugherty forewent even

19 trying to obtain the offset, and bringing the issue to

20 the attention of the Texas court.

21           He could have argued for other

22 provisions in the final judgment, but he didn't.  He

23 paid his judgment and expected HERA and Highland would

24 do the same as set forth in the escrow agreement.

92

1              Other members of this court have

2    adopted a "no-chumps policy," meaning that good guys

3    should not feel like chumps for following the rules.

4    Daugherty played the game straight, and alleges

5    Highland and HERA didn't.  It is at least reasonably

6    conceivable that Daugherty pursued the strategy he did

7    because of the promises Highland made during the

8    course of the litigation.

9              And that reliance was reasonable.

10   Highland says Daugherty should have expected the worst

11   because the language of the escrow agreement allowed

12   the escrow agent to resign at any time, and so it was

13   never a sure thing that the assets would be available

14   to Daugherty.

15             In its reply, Highland says there was

16   never any promise "... that the Escrow Agreement would

17   never be terminated or that the Deposit Assets would

18   never be transferred back to Highland ...."  That

19   reflects a dim view of the world, the way adversaries

20   should evaluate the representations and promises made

21   during litigation, and how the people making those

22   promises should conduct themselves.  Daugherty has

23   adequately pled it was reasonable for him to rely on

24   the statements he's identified.

CHANCERY COURT REPORTERS

Appx. 00399

93

1              Fourth and finally, it is reasonably

2    conceivable that the promise is binding because

3    injustice can be avoided only by enforcement of the

4    promise.

5              Daugherty has made the point that

6    Highland walked away from the Texas litigation with

7    the benefit of both judgments.  It received the assets

8    supposedly held in escrow to satisfy the judgment for

9    Daugherty, and it received payment from Daugherty to

10   satisfy the judgment against him.

11             Black's Law Dictionary defines

12   "injustice" as "an unjust state of affairs;

13   unfairness."  As myself and Vice Chancellor Glasscock

14   have indicated, Daugherty's allegations raise serious

15   concerns over the fairness of how things played out in

16   Texas.  It may be that the only way to avoid injustice

17   is to enforce the promises.

18             It is not fatal to Daugherty that he

19   has pled alternative theories of relief.  Our Rule 8

20   allows it, and our Supreme Court has blessed doing so

21   for promissory estoppel in the *Chrysler v. Chaplake*

22   *Holdings* case.  At the pleadings stage, those

23   alternative theories of relief can go forward.

24             Highland also claims promissory

**Appx. 00400**

94

1  estoppel is not needed to prevent injustice because

2  the alleged promises are incorporated within the

3  escrow agreement, an enforceable contract.  But

4  Daugherty is not a party or a third-party beneficiary,

5  and so cannot sue under the contract's terms.  For

6  those reasons, the motion to dismiss is denied.

7                      Mr. Katz, any questions?

8                      MR. KATZ:  No, Your Honor.

9                      THE COURT:  Anything from you,

10  Mr. Uebler?

11                      MR. UEBLER:  No, Your Honor.

12                      THE COURT:  I'd like to, then, talk

13  about how we're going to get the summary judgment

14  briefing done in time for trial and in time for me to

15  have a minute to think about it.

16                      MR. KATZ:  Your Honor, we conferred --

17  my colleague conferred with Mr. Uebler this morning.

18  I think we've worked out a schedule.

19                      THE COURT:  How long does that

20  schedule leave me to think about it?

21                      MR. UEBLER:  Let me take a stab at

22  this, Your Honor, and see if it makes any sense to

23  you.  So it's my understanding that the defendants are

24  going to cross-move, or Highland -- it's a claim

95

1    against Highland.  Highland will cross-move for

2    summary judgment, and we will receive an answering

3    brief/opening brief by June 14th.  We'll reply by

4    June 28th.  And then looks like July 17th will be the

5    final brief.

6                    And I'm sure I speak for all the

7    parties when I say we have no intention of imposing a

8    burden on the Court to resolve that motion prior to

9    trial.  I think -- at least my view, and Mr. Katz and

10   Mr. Reed can chime in -- we don't necessarily need to

11   resolve the summary judgment/indemnification claim

12   before trial because there's really not that much, if

13   any, issue of fact to try regarding indemnification.

14                   I would propose that we resolve on the

15   papers, when the Court's able to do so, the issue of

16   entitlement.  And then, to the extent there's an issue

17   of allocation or reasonableness, we can get together

18   and propose something similar to Vice Chancellor

19   Laster's *Fitracks* opinion.  That was an advancement

20   case, but I would envision something similar here.

21                   So we're working in parallel and not

22   burdening anybody prior to trial on those issues.

23                   THE COURT:  Anything to add?

24                   MR. KATZ:  No, Your Honor.

96

1                    THE COURT:  All right.  That works for
2    me, then, especially with the logical conclusion that
3    this can just kind of float in parallel to the real
4    merits issues to be handled at trial.
5                    Anything else that we need to discuss
6    today while we're all together?
7                    MR. KATZ:  Not from our side.
8                    THE COURT:  We pretty much handled
9    every aspect of the case today.  Thank you, all, for
10   your presentations, they were helpful.  And we'll be
11   in touch.
12                   We're adjourned.
13                   (Court adjourned at 4:33 p.m.)
14                        -  -  -
15
16
17
18
19
20
21
22
23
24

97

```
 1                      CERTIFICATE

 2

 3              I, KAREN L. SIEDLECKI, Official Court

 4  Reporter for the Court of Chancery of the State of

 5  Delaware, Registered Merit Reporter, and Certified

 6  Realtime Reporter, do hereby certify that the

 7  foregoing pages numbered 3 through 96 contain a true

 8  and correct transcription of the proceedings as

 9  stenographically reported by me at the hearing in the

10  above cause before the Vice Chancellor of the State of

11  Delaware, on the date therein indicated, except for

12  the rulings at pages 3 through 19 and 84 through 94

13  which were revised by the Vice Chancellor.

14              IN WITNESS WHEREOF I have hereunto set

15  my hand at Wilmington, this 22nd day of May, 2019.

16

17

18

19                      /s/ Karen L. Siedlecki
20              ------------------------------
                      Karen L. Siedlecki
21                  Official Court Reporter
                   Registered Merit Reporter
22                 Certified Realtime Reporter

23

24
```

CHANCERY COURT REPORTERS