# EXHIBIT 9

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                 FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
 2
                              )    Case No. 19-34054-sgj-11
 3    In Re:                   )    Chapter 11
                              )
 4    HIGHLAND CAPITAL         )    Dallas, Texas
      MANAGEMENT, L.P.,        )    Monday, August 8, 2022
 5                             )    9:30 a.m. Docket
                              )
 6            Debtor.          )
      _____ )
 7                             )
      UBS SECURITIES, LLC, et. )    Adversary Proceeding 21-3020-sgj
 8    al.,                     )
                              )    HIGHLAND CAPITAL MANAGEMENT,
 9            Plaintiffs,      )    L.P.'S MOTION TO WITHDRAW ITS
                              )    ANSWER AND CONSENT TO JUDGMENT
10    v.                       )    FOR PERMANENT INJUNCTIVE
                              )    RELIEF [169]
11    HIGHLAND CAPITAL         )
      MANAGEMENT, LP,          )
12                             )
              Defendant.       )
13    _____ )

14                      TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
15                  UNITED STATES BANKRUPTCY JUDGE.

16    APPEARANCES:

17    For Plaintiff UBS          Andrew Clubok
      Securities, LLC:           Shannon Elizabeth McLaughlin
18                               LATHAM & WATKINS, LLP
                                 555 Eleventh Street, NW,
19                                 Suite 1000
                                 Washington, DC  20004-1304
20                               (202) 637-2335

21    For Plaintiff UBS          Kathryn (Katie) George
      Securities, LLC:           LATHAM & WATKINS, LLP
22                               330 North Wabash Avenue,
                                   Suite 2800
23                               Chicago, IL  60611
                                 (312) 876-6567
24

25
```

2

APPEARANCES, cont'd.:

For the Defendant:          John Morris
                            Gregory V. Demo
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700

For the Defendant:          Jeffrey Nathan Pomerantz
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                             13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910

For Former Employees:       Eric A. Soderlund
                            ROSS & SMITH, P.C.
                            Plaza of the Americas
                            700 N. Pearl Street, Suite 1610
                            Dallas, TX  75201
                            (214) 377-7879

Recorded by:                Caitlynne Smith
                            UNITED STATES BANKRUPTCY COURT
                            1100 Commerce Street, 12th Floor
                            Dallas, TX  75242
                            (214) 753-2088

Transcribed by:             Kathy Rehling
                            311 Paradise Cove
                            Shady Shores, TX  76208
                            (972) 786-3063

          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.

3

1          DALLAS, TEXAS - AUGUST 8, 2022 - 9:47 A.M.

2          THE COURT:  21-3020.  Mr. Clubok, I saw you out there

3    earlier.  Are you appearing for UBS?

4          MR. CLUBOK:  Yes.  Good morning, Your Honor.  Andrew

5    Clubok; Latham & Watkins; on behalf of UBS.  And I'm here also

6    with my colleagues Kathryn George and Shannon McLaughlin.

7          THE COURT:  Okay.  Thank you.

8       All right.  For the Debtor, Mr. Morris, are you appearing?

9          MR. MORRIS:  Yes.  Good morning, Your Honor.  John

10   Morris; Pachulski Stang Ziehl & Jones.  I'm joined by my

11   colleagues Jeffrey Pomerantz and Greg Demo for the reorganized

12   Highland Capital Management, LP.  And we have today with us

13   Mr. Seery, who will present some live testimony today.

14         THE COURT:  Okay.  Good morning to all.

15      All right.  The Committee was an intervenor, I believe, in

16   this adversary.  Is there any appearance by the Committee?  Or

17   I should -- well, --

18         MR. MORRIS:  I think that was before the effective

19   date, Your Honor.

20         THE COURT:  That was --

21         MR. MORRIS:  Yeah.

22         THE COURT:  I guess we have no Committee anymore.

23   The Liquidating Trustee.  I don't know if the Liquidating

24   Trustee stepped in the shoes of the Committee.

25      (No response.)

4

1          THE COURT:  Okay.  Anybody I've missed?

2          MR. SODERLUND:  Your Honor, this is -- good morning,

3    Your Honor.  This is Eric Soderlund with Ross & Smith.  We

4    represent nonparties to this adversary:  Scott Ellington,

5    Isaac Leventon, Katie Lucas, J.P. Sevilla, Matt DiOrio, and

6    Stephanie Vitiello.  We're just monitoring the hearing, but I

7    did want to make an appearance and let the Court know we're

8    here.

9          THE COURT:  Okay.  Thank you.

10       All right.  Well, if there are no other appearances, Mr.

11   Clubok, you may proceed.

12         MR. CLUBOK:  Thank you, Your Honor.  Technically, I

13   think --

14         THE COURT:  Oh, actually, let me -- it's Highland's

15   motion to withdraw --

16         MR. CLUBOK:  Yeah.

17         THE COURT:  -- its answer, so I was thinking

18   Plaintiff go first, but actually it makes more sense for

19   Highland to go first.  So, go ahead.

20         MR. CLUBOK:  Yes.

21         MR. MORRIS:  Thank you, Your Honor.  Again, John

22   Morris from Pachulski Stang for Highland.

23       We're here today on Highland's motion to withdraw its

24   answer and to consent to the judgment that has been requested

25   by UBS.

5

1      We thought it was very important, Your Honor, to create an

2   evidentiary record to enable the Court to rule on that motion.

3      As Your Honor will recall, at the time this adversary

4   proceeding was commenced, Highland had just recently

5   discovered and had shared with UBS certain facts that it had

6   identified with respect to the transfer of certain assets that

7   appeared to belong to entities against which UBS had obtained

8   a judgment.

9      And at the time the action was commenced, the Reorganized

10  Debtor -- I guess at that time it was really still the Debtor

11  -- did not feel that it had sufficient personal knowledge in

12  order to address the merits of the allegations that were made.

13  And so we specifically told the Court and all parties in

14  interest that we felt we needed a fulsome evidentiary record.

15  And having concluded that, Mr. Seery on behalf of the

16  Reorganized Debtor seeks to terminate this litigation and

17  confess to judgment.

18      I've got a brief opening statement that I'd like to make,

19  but before I do that, Your Honor, there has been one

20  meaningful development since we last met with the Court that

21  I'm going to defer to Mr. Clubok to report at this time.

22          THE COURT:  All right.  Mr. Clubok?

23          MR. CLUBOK:  Yes, Your Honor.  Sometimes we --

24  development is a euphemism for something bad, but in this case

25  it's something good.  And that is we, on Friday morning,

6

1    reached a memorandum of understanding with Sentinel that we

2    believe will ultimately result in several papers that we will

3    be -- that will be submitted to the Court I believe through

4    the 9019 process, hopefully in a matter of weeks.

5        Now, that's going to resolve a large portion of what we're

6    doing here today, but really it sort of highlights the fact

7    that what UBS has always wanted in this proceeding is for the

8    Court to issue a permanent injunction so that all of these

9    assets are frozen, the ones we know about now and probably the

10   ones we keep finding.  Every time we turn around, we find a

11   new one.  By permanent, we mean until a court orders the

12   disposition through a proceeding or pursuant to a settlement.

13       So this new news from Friday is good, and it really sets

14   the table for this proceeding so that we can do this once and

15   for all, ideally, where the Court hopefully agrees with what

16   apparently Highland agrees, there should be an injunction,

17   that we've met the standard, assuming we can present the

18   evidence to you.  And I would note that public interest is a

19   factor, too, so that's another reason why we just want to make

20   sure we have a full evidentiary record.

21       We will not then need to repeat this record, we can then

22   use the same record and refer to it for the expected 9019

23   process, and we can be very efficient.

24       Also, in light of that and in light of other stipulations

25   we've reached, I just wanted to advise the Court we do think

7

1  we can have a relatively streamlined process here.  For

2  example, I am going to defer my opening statement and just let

3  Mr. Morris make his opening statement and his presentation,

4  and I'll defer until the back half.

5      We've also agreed to stipulate to I believe all of the

6  exhibits on each other's lists.  If Your Honor would like me

7  to specifically read out the numbers, I can do that for

8  housekeeping.  If it's more convenient, just very quickly I

9  can identify the exhibits, at least on UBS's list, and then

10  Mr. Morris can add his as well, so we don't have to keep doing

11  that as Mr. Seery testifies.

12          THE COURT:  All right.  Thank you for that report.

13  Let's go ahead and get the exhibits on the record before we do

14  anything else.

15      Mr. Morris, it looks like you had, at Docket No. 176,

16  Exhibits 1 through 10 designated.  Is that correct?

17          MR. MORRIS:  That's correct.  And with Mr. Seery

18  available to testify, we'd also respectfully move into

19  evidence his declaration, which can be found at Docket No.

20  170.

21          THE COURT:  All right.  So I'm hearing, Mr. Clubok,

22  no objection to that?

23          MR. CLUBOK:  No objection, Your Honor.

24          THE COURT:  So the declaration at 170, as well as the

25  10 exhibits at 176, will be admitted.

8

1      (Defendant's Exhibits 1 through 10 and the declaration of

2   James Seery are received into evidence.)

3           THE COURT:  And then turning to UBS's exhibit list,

4   UBS at Docket 177 had it looks like 41 or 42 exhibits,

5   including the declaration of Mr. Seery.  There's no objection,

6   Mr. Morris, to all of those coming in?

7           MR. CLUBOK:  Your Honor, briefly, we did file an

8   amended --

9           THE COURT:  Oh.

10          MR. CLUBOK:  -- exhibit list this morning that we

11  have -- that we have provided in advance to Mr. Morris.  It's

12  obviously not made its way to you yet.  It's Docket No. 179.

13  And we -- if you haven't gotten hard copies yet, you won't

14  need them for the purpose of this hearing, but you'll have

15  them shortly if you don't have them yet.  We have extra for

16  the relevant exhibits that we'll put up on the screen each

17  time we refer to them.

18          THE COURT:  All right.  So, are they filed on the

19  docket or did you deliver hard copies?

20          MR. CLUBOK:  Yes.  I believe both, Your Honor.  It's

21  179.  I have Docket 179.

22          THE COURT:  Okay.  I'm pulling it up.

23          MR. CLUBOK:  And the hard copies, I guess -- maybe

24  the hard copies haven't yet been delivered, but they're on

25  their way and you should get them by -- by the end of the

9

1   hearing.

2           THE COURT:  Okay.

3           MR. CLUBOK:  Or shortly thereafter.

4           THE COURT:  Bear with me.

5      (Pause.)

6           THE COURT:  Okay.  There they are.  179.  Okay.  It

7   looks like you've added some exhibits, so we're now up through

8   51 exhibits.  Is that correct?

9           MR. CLUBOK:  I believe that's right, Your Honor.  I

10  can -- just because there's a couple of gaps, maybe if it

11  would help I can just read the numbers of the ones that we

12  wish to move into -- for the record, so the record's clean,

13  I'll just read off the numbers?

14          THE COURT:  Okay.

15          MR. CLUBOK:  So, we -- UBS would like to move into

16  evidence Exhibits 1 through 12, Exhibits 14 through 23,

17  Exhibits 25 through 35, Exhibits 37 through 53.  And with the

18  one caveat being, Your Honor, that some of those exhibits are

19  deposition transcripts.  For those, we have designated the

20  portions that we'd like to move into evidence through

21  highlighting.  And you'll, if you haven't already, you'll be

22  receiving those as well.  And so it's the -- for the

23  deposition transcripts of those exhibits I just identified,

24  it's the highlighted or designated portions.

25          THE COURT:  Okay.

10

```
 1         MR. CLUBOK:  And all this has been shared with
 2    Highland.
 3         THE COURT:  Very good.  And Mr. Morris, do you
 4    confirm you're okay with those coming in?
 5         MR. MORRIS:  I do.  I just want to make a very brief
 6    note that the reason we have no objections to the exhibits
 7    today isn't because we don't have views as to the evidentiary
 8    rules.  We actually exchanged exhibit lists on Thursday before
 9    they were filed with the Court.  Highland did object to a
10    number of exhibits that were on UBS's proposed exhibit list
11    and they withdrew them.  And so that's really the reason why
12    there is no objection today, is because we actually took the
13    time to meet and confer and to go through any evidentiary
14    concerns prior to today.
15       So, with that background, Highland has no objection.
16         THE COURT:  Okay.  So these UBS exhibits named will
17    be admitted.
18       (UBS Securities, LLC's Exhibits 1 through 12, 14 through
19    23, 25 through 35, and 37 through 53 are received into
20    evidence.)
21         THE COURT:  All right.  Well, are we ready for
22    opening statements?  Mr. Morris?
23         MR. MORRIS:  Yes, Your Honor.
24         THE COURT:  You may proceed.
25         MR. MORRIS:  Thank you very much.
```

**Appx. 00502**

1              OPENING STATEMENT ON BEHALF OF THE DEFENDANT

2              MR. MORRIS:  Good morning, Your Honor.  John Morris;

3    Pachulski Stang; for Highland.

4       We're here today on Highland's motion to withdraw its

5    answer and to confess to judgment.  And I want to just cover

6    certain facts that we believe will be reflected in the record

7    and to share with Your Honor certain perspectives that we

8    have.

9       The facts here I think are largely not in dispute.  They

10   concern the August 2017 transfer of assets from certain funds

11   that were under the control of James Dondero to a Cayman

12   Islands putative insurance company that was owned by Mr.

13   Dondero and Mr. Ellington.

14      The evidence will show that the funds that transferred

15   their assets to Mr. Dondero's -- at Mr. Dondero's direction

16   were defendants in a lawsuit that was brought by UBS in New

17   York and that the transfers were effectuated immediately after

18   the New York court denied the Highland entities' motion for

19   summary judgment.

20      The evidence will show that the Debtor's independent board

21   was unaware of these transfers until they were uncovered in

22   late January and early February 2021, and that the reason for

23   the transfers was unknown until that time by the independent

24   board precisely because certain former Highland employees

25   actively and intentionally worked to conceal them.

1        I don't have a PowerPoint presentation today, Your Honor.

2   I want to just look at three documents.  The first one is an

3   insurance policy.  And the reason for the transfers ostensibly

4   was to purchase what is called after-the-fact insurance.  And

5   what's on the screen now is Highland's Exhibit 1.  And if we

6   can go to the first page, you'll see that it's an email from

7   Isaac Leventon to someone named Chris Dunn.  It's dated

8   October 2017.  So this is just a few months after the court in

9   New York has denied summary judgment, and it follows on the

10  heels of an analysis that was prepared that I think is at UBS

11  Exhibit No. 7, an analysis of settlement options and

12  optionality following that decision.

13       Mr. Leventon attaches an insurance policy.  He labels it

14  privileged.  He says that all communications related to the

15  project are privileged.

16       You know, Your Honor, he's attaching an insurance policy.

17  I know of no basis to assert any privilege of any kind, but

18  this is the litigation team, if Your Honor will recall, that

19  was found to be subject to the crime fraud exception in

20  Delaware.  It's the team that was found by the arbitration

21  panel in Redeemer, the Redeemer arbitration, to have engaged

22  in misleading conduct.

23       Again, it's troubling to find this document.  And here's

24  the thing, Your Honor.  You may be aware that UBS took

25  numerous depositions in this case.  This particular document

13

1   wasn't uncovered -- actually, no, I'm confusing it with a
2   different document.  So this document is sent by Mr.
3   Ellington, and he attaches the insurance policy.
4        If we could go to Page 19 of 20 of the PDF, and let's just
5   see exactly what this policy is.  It's to insure certain
6   funds.  These are the funds that are the Defendants in the UBS
7   action.  The appointed representative is Paul Lackey, an
8   attorney now with the Stinson firm.  Mr. Lackey is the
9   representative here.  It's a policy that was effective as of
10  August 1, 2017.  And it specifically covers the UBS action.
11       You'll see below, Your Honor, that it's supposed to be for
12  a $100 million policy with a premium of $25,000.  $25 million.
13  So think about it.  The New York court comes out with its
14  decision.  They transfer all the assets from the Defendants
15  other than Highland to Mr. Dondero's captive insurance company
16  in the Cayman Islands.  And they don't tell anybody.
17       And if we can go to the next page, you can just see Mr.
18  Dondero's signature on behalf of the various entities.  And
19  the important point for us here, Your Honor, as the Debtors,
20  the former Debtors, the reorganized Highland, is that Highland
21  CDO Opportunity Master Fund is one of the insureds here, and
22  they're signing the document -- it's being signed by Highland
23  CDO Opportunity Fund GP, its general partner; Highland CDO
24  Opportunity GP, LLC, its general partner; and Highland Capital
25  Management, LP, its sole member.

14

1    So the acts that are being undertaken here, unbeknownst to

2  the independent board, Mr. Seery, and the postpetition

3  professionals, is that there was a transaction back in August

4  of 2017 in which the assets of the Defendants were put beyond

5  the reach of UBS.

6    The $25 million insurance payment premium was funded at

7  the same time, if we can go to Exhibit 2, with what's called a

8  purchase agreement.  This purchase agreement, you can see,

9  Your Honor, is dated as of August 7, 2017.  It's between

10 Sentinel Reinsurance and the two funds that were Defendants.

11 It is through this agreement that the funds transferred their

12 assets to Sentinel.

13    Sentinel is, I think I mentioned, a Cayman -- right, no

14 dispute about these facts -- is a Cayman Islands entity owned

15 by Mr. Dondero and Mr. Leventon.

16    And if we could go to Pages 4 and 5, we'll see again Mr.

17 Dondero signing on behalf of all of the Highland entities.

18         MR. SODERLUND:  Your Honor, this is Eric Soderlund.

19 I just want to interrupt here.  I think Mr. Morris said that

20 Sentinel was owned by Mr. Leventon.

21         THE COURT:  Actually, I heard the same --

22         MR. SODERLUND:  I don't think that's true.

23         THE COURT:  I heard the same thing.  Did you mean

24 Ellington?

25         MR. MORRIS:  Right.  Thank you.  I did mean

15

1   Ellington.

2          THE COURT:  Okay.

3          MR. MORRIS:  Thank you so much.

4          THE COURT:  Thank you.

5          MR. MORRIS:  Appreciate the clarification.  We -- I

6   do need to get this right.

7       So, you can see that Mr. Dondero is signing on behalf of

8   all of the Highland entities on Pages 4 and 5.

9       And if we can go down to Pages 7 and 8, you'll see

10  attached is a schedule.  And what's really interesting, Your

11  Honor, is that if you add up the assets that are being

12  transferred to Sentinel, they don't equal $25 million.  They

13  equal something approaching $300 million.  And there will be

14  other evidence in the record that shows the fair market value

15  at the time was over $100 million.

16      In other words, the Defendants in the UBS action, the

17  evidence, and there really can never be a dispute about this,

18  transferred what appears to be all of their assets, with a

19  value in excess of what the benefit is under the so-called

20  insurance policy.

21      Why are these issues -- we can take this down now.  Why

22  are these issues important, Your Honor?  At Mr. Dondero's

23  direction, the funds were left judgment-proof.  The only

24  assets it apparently had was this insurance policy.

25      This became critical in the spring of 2020, postpetition,

1   when the New York court entered judgments against the two

2   funds in amounts in excess of $500 million each.  So those

3   judgments early in 2020 were for over a billion dollars.  But

4   these transfers by these Defendants were never disclosed to

5   the board.

6       The evidence will show and Mr. Seery will testify and the

7   documents will corroborate his testimony that the transfers

8   were not only never disclosed, but that the independent board

9   relied specifically on Scott Ellington and Isaac Leventon to

10  learn about the UBS claim, to determine the defenses that the

11  Debtor asserted.  And as Your Honor will recall, in 2020 the

12  Debtor spent enormous time, money, and effort, as the Court

13  did, defending against the claims against Highland.  We took

14  -- we didn't really have an interest in the claims against

15  these two funds, but as to Highland at that point we had no

16  reason to believe that Highland had been engaged in any

17  wrongdoing, and we litigated accordingly.  That's why this is

18  all so terribly important, Your Honor.

19      The evidence will show that, at the independent board's

20  direction, the Debtor's professionals pressed the Debtor's

21  employees for information relating to the funds' assets, only

22  to be effectively stonewalled.

23      I don't want to take the time to go through all of the

24  emails, but at Exhibits 5, 6, and 7 there is evidence in the

25  record that will show the Court -- to me, it just, you know,

1  it jumps out -- the answers that were given, you know, to Mr.

2  Demo and DSI's dogged and persistent inquiries.  And you'll

3  see, Your Honor, that these employees did nothing but

4  obfuscate, engage in misdirection, and feign ignorance as to

5  basic matters.  We just had a judgment entered for over a

6  billion dollars, and nobody told us about the transfer of

7  these assets in 2017, or the existence of the insurance

8  policy.

9      And we think that we know why.  Because -- and this is the

10  document that we uncovered after the depositions, so nobody

11  has ever been asked about this -- but we found a document late

12  last year that's called an indemnification agreement.  It's a

13  secret indemnification agreement between these employees and

14  Sentinel, and it was dated June 18, 2020.  It is hard to think

15  of a document that could convey a consciousness of guilt more

16  than an indemnification agreement entered into weeks after the

17  New York court enters a billion-dollar judgment against

18  Defendants who have transferred all of their assets to the

19  indemnitor.  Hard to imagine.

20      Mr. Dondero does not act alone.  We've spent two years

21  talking about Mr. Dondero.  Mr. Dondero does not act alone.

22  He is assisted by a group of loyalists who do his bidding in

23  exchange for substantial compensation and protection.

24      June 2020.  At the very moment that Mr. Dondero is making

25  those $10 million of payments that he admitted to in open

18

1    court back in April, his insurance company is also

2    indemnifying Highland employees.  And the source of the

3    indemnity are the assets that have been -- that were

4    transferred in 2017 from these Defendants to Sentinel.

5        Let's look at the indemnity agreement.  It's Exhibit 9 on

6    the Debtor's exhibit list.  And you'll see, Your Honor, in

7    Exhibit 9, if we could just scroll down, you can see that it's

8    sent to an entity called SAS Asset Recovery.  You'll see in

9    the emails that I cited to earlier that Mr. Demo and DSI asked

10   numerous questions of the indemnitees, unknown to them at the

11   time, about what SAS was, and they all said they had no idea.

12   And yet this is an agreement dated June 18, 2020, on behalf of

13   Sentinel Reinsurance, where they -- where Sentinel indemnifies

14   six individuals.

15       And the language is startling, Your Honor, because while

16   Mr. Ellington has an ownership interest and Matthew DiOrio is

17   a director of Sentinel, the other signatories to this

18   indemnity agreement, to the best of our knowledge, have

19   absolutely no formal relationship with Sentinel in any way,

20   shape, or form, and yet Sentinel is thanking them for their

21   efforts, including as an agent in connection with the

22   preparation of documents and reports and, quote, other

23   activities as requested by Sentinel.

24       Postpetition, undisclosed, and it's issued at the time

25   huge payments of money are being made after the New York court

19

1   has issued its judgment and as Mr. Demo and DSI began -- begin

2   making very substantial inquiries as to the location of these

3   assets.

4        If we could go to Page 5, please.  I want the Court to be

5   aware of the names of the signatories to this indemnity

6   agreement.  We have Matthew DiOrio.  Next page.  Stephanie

7   Vitiello.  Next page.  Katie Irving.  Next page.  Isaac

8   Leventon.  Next page.  Scott Ellington.  Next page.  J.P.

9   Sevilla.

10       Your Honor, those six individuals are all over Exhibits 5,

11  6, and 7, the emails where Mr. Demo and DSI and Mr. Seery are

12  trying their hardest to find out whatever information they can

13  about SAS, Sentinel, and the assets of these two funds.  These

14  are the six people who signed the indemnity, and they're the

15  six people are responding to the inquiries with no meaningful

16  factual information.

17       The transfers and the cover-ups have substantially harmed

18  the Debtor.  The actions taken in 2017, in our view, were

19  plainly wrongful.  They left Defendants judgment-proof.  They

20  transferred assets to the Cayman Islands.  They supposedly

21  paid over a hundred million dollars for a hundred-million-

22  dollar policy.

23       The Debtors spent significant time, money, and efforts,

24  substantial resources.  They stand accused all the time of, oh

25  my god, they're spending so much money.  Think about what --

20

1    and Mr. Seery is going to testify to this -- about how much

2    time, money, and effort went to defending against UBS's claim

3    against Highland.  The mediation where we didn't have this

4    information.  The motion for partial summary judgment.  The

5    3018 proceeding.  Right?  And we finally got to a settlement

6    with them without this information.

7         The damage caused to the Debtor and the independent board.

8    We sat there and we made representations to the Court.  You

9    know, in hindsight, they were not accurate.  They just

10   weren't.  And they weren't accurate.  They weren't accurate to

11   UBS, they weren't accurate to the mediators, they weren't

12   accurate to the Court, because we just didn't know.  We didn't

13   know anything about the policy.  We didn't know anything about

14   the asset transfers.  Substantial damage.  Chasing nothing.

15        Most critically, Your Honor, it deprived the Debtor of

16   currency to settle its claim with UBS on favorable terms, and

17   that is the greatest damage of all.  Highland was forced to

18   renegotiate its settlement with UBS because, based on Mr.

19   Dondero's signature under the Highland Capital name back in

20   2017, and based on the conduct of those six employees,

21   Highland had liability where it believed there was none.  And

22   consequently, it had to -- had to increase very substantially,

23   by tens of millions of dollars, the allowed claim with UBS.

24   And then -- and then stand as a Defendant in these

25   proceedings.

21

1      We've been damaged hard.  This is not -- this is not the

2  way the process is supposed to work.  The massive transfer of

3  assets that leave Defendants judgment-proof.  Undisclosed and

4  secret indemnity agreements that in and of itself constitutes

5  a massive breach of duty.  The cover-up that immediately

6  followed the execution of the indemnity agreement.

7      We are just bankruptcy lawyers, Your Honor.  Our duty is

8  only to maximize recovery for creditors.  We're not

9  prosecutors.  We're not the SEC.  We're not the U.S. Trustee's

10 Office.  We're not the Texas Committee of Attorney Discipline.

11 There's only so much that we can do.  We'll continue to do our

12 jobs, and we're not presenting everything that we have here

13 today, and our investigation continues.  But if nobody is held

14 accountable for this type of conduct, then the system is

15 broken.  And I hope that's not the case.

16     So, we had expected Sentinel and its owners to intervene

17 and defend their conduct in this matter, but they chose not

18 to, although I'm grateful that their attorney or at least the

19 attorney of the individuals are here.

20     I do want to point out just one clarification.  And Mr.

21 Clubok or Mr. Seery may correct me.  But the directors at

22 Sentinel today who authorized the entry into the MOU are new

23 directors, and Mr. DiOrio and the others resigned as the heat

24 was being turned up last spring.  They were replaced by new

25 directors.  And that's, in our opinion -- this is not fact --

22

 1   in our opinion, that's what enabled Sentinel to reach this

 2   agreement that Mr. Clubok described.

 3       But make no mistake.  We don't pretend that we know where

 4   all assets are.  We don't pretend that we know the value of

 5   the assets that may have been transferred.  But based on the

 6   evidence that Mr. Clubok and his team adduced during this

 7   adversary proceeding, the Debtor, Highland, does not believe

 8   it can defend against the claim, and therefore is prepared to

 9   withdraw its answer and confess to the permanent injunction

10   that was sought by UBS.

11       That's all I have.

12           THE COURT:  All right.  Well, Mr. Clubok, I

13   understood you were waiving your opening statement, correct?

14           MR. CLUBOK:  Yes, Your Honor.

15           THE COURT:  Okay.

16           MR. CLUBOK:  I'll defer it to my presentation.

17           THE COURT:  All right.  Mr. Morris, you may call your

18   first witness.

19           MR. MORRIS:  With that, we'll call James Seery.

20           THE COURT:  All right.  Welcome back, Mr. Seery.

21           MR. SEERY:  Good morning, Your Honor.

22           THE COURT:  Please raise your right hand.

23       (The witness is sworn.)

24           THE COURT:  All right.  Thank you.  Mr. Morris?

25             JAMES SEERY, DEFENDANT'S WITNESS, SWORN

1                       DIRECT EXAMINATION

2    BY MR. MORRIS:

3    Q    Good morning, Mr. Seery.  Can you hear me okay?

4    A    I can, yes.

5    Q    Okay.

6    A    Apologies on my end.  There is some construction in the

7    background.  If it interferes, please let me know.  I'll try

8    to speak loudly.

9    Q    Okay.

10            MR. MORRIS:  Your Honor, we're not going through

11   every fact, and I actually don't even plan to share with Mr.

12   Seery any particular exhibits, so that we can try to get

13   through this fairly quickly.  But if Your Honor has any

14   particular questions, of course, feel free to interrupt.

15   BY MR. MORRIS:

16   Q    Mr. Seery, can you please just describe at a general level

17   your involvement with the Highland bankruptcy, including the

18   timing and titles that you've obtained?

19   A    Yes.  In the beginning of 2020, January 9th, I was

20   appointed as an independent director by the Court.  Prior to

21   that, I didn't have any involvement with Highland.  Prior to

22   2008, the business I ran at Lehman did business with Highland,

23   but between 2008 and 2020 I had no involvement whatsoever with

24   Highland.  Was appointed as an independent director on January

25   9th, working with John Dubel and Russ Nelms, who were also

Seery - Direct                           24

1   appointed as independent directors.  And then in July, I

2   believe, of 2020, I was appointed by the Court as the interim

3   CEO and CRO of Highland Capital.

4   Q    Okay.  Did there come a time that you learned of the UBS

5   claim in this case?

6   A    Yes.  I learned of the UBS claim before I was even

7   appointed as an independent director.  UBS had gotten a

8   decision prior to judgment in I believe November of 2019.

9   Prior to my apartment, I did diligence, and one of the

10  diligence items was to read that decision.

11       Subsequently, in I believe it was February of 2020, UBS

12  obtained an actual judgment against the two subsidiaries, both

13  indirect, but CDO Funds, which was a little bit more direct

14  subsidiary fund of Highland's, managed by Highland, and SOHC,

15  which was a direct subsidiary of HFP, which is Highland

16  Financial Partners, an indirect subsidiary of Highland.

17  Q    And after being appointed, did the independent board do

18  any work to try to understand, you know, the merits and

19  potential defenses of the UBS claim?

20  A    Absolutely.  This was one of the critical issues in the

21  case.  This, as I said, was a billion-dollar judgment against

22  subsidiaries, and the question was, was Highland liable?

23  There was really no question that the subsidiaries were

24  liable.  There was already a decision and a judgment in

25  February.  But was Highland going to be liable for that

Seery - Direct                                25

```
 1  decision?
 2       UBS had theories, and we -- me, specifically -- did
 3  hundreds of hours' worth of research and work around the
 4  claims, and I'm sure my fellow directors read and analyzed
 5  documents similar to the way that I did.
 6  Q    And did Mr. Leventon and Mr. Ellington make any
 7  presentations to the board concerning the UBS claim?
 8  A    Yes.  Mr. Leventon was the point person at Highland
 9  managing the UBS litigation.  He had been, as he described to
10  me directly on my first day, one of his chief jobs and one of
11  the reasons he was hired was to help manage the UBS
12  litigation.  He reported directly to Mr. Ellington, who was
13  the general counsel and an officer of the general partner of
14  Highland.  Mr. Ellington described himself as the person
15  chiefly responsible for all negotiations with UBS.
16       So, everything to do with the underlying transaction, the
17  ten years of litigation, and the various stops and starts in
18  potential settlements was encompassed by the knowledge held by
19  Mr. Ellington and Mr. Leventon.
20  Q    Can you describe for the Court kind of your understanding
21  of the structure of the Highland legal department, the
22  hierarchy and who reported to whom and who was there?
23  A    Yes.  The legal department at Highland was a large group,
24  headed by Mr. Ellington as general counsel.
25       Mr. Leventon was responsible for all litigation.
```

1       Mr. Sevilla was a senior attorney who handled

2  predominantly transactions.

3       Mr. DiOrio was not an attorney but worked in the legal

4  department.

5       Ms. Irving was not an attorney but worked in the legal

6  department.

7       In addition, tangentially, or dotted-line, I think,

8  basically report, the CCO, Thomas Surgent, was connected to

9  the legal department.

10      And Tim Cournoyer was a transaction lawyer in the legal

11 department.

12      Other lawyers had come in and out, and there was a

13 paralegal, Helen Kim.

14      Stephanie Vitiello was also an attorney in the legal

15 department.

16      But that was the core group when I became an independent

17 director.

18 Q   And I think you mentioned this at a very high level, but

19 how did the board educate -- how did the board interact with

20 the Highland legal group to educate itself on the merits of

21 the UBS claim against Highland, the potential defenses that

22 there was?  Just give us a sense of, you know, what the

23 interaction was and what the interface was.

24 A   Well, day-to-day -- and right at the beginning of the

25 case, as I say, a critical issue -- a ton of time spent with

Seery - Direct                                    27

1    Mr. Leventon going through every aspect of the case.

2        In addition, as I mentioned earlier, I read every document

3    related to the transaction and every one of the court

4    decisions that had been previously issued.  Many of those

5    raised questions, and I'd address those generally to Mr.

6    Leventon as the point person.

7        There came a time in January or early February, pre-COVID,

8    so on the premises of Highland, that there was at least one,

9    possibly two, multi-hour meetings about the UBS litigation.

10   Mr. Leventon led those discussions, really educating myself as

11   the lead director, but also Mr. Nelms and Mr. Dubel as

12   independent directors about this critical issue.

13       Very specifically, Mr. Leventon provided a detailed

14   PowerPoint deck which he went through.  And I recall it

15   because it'll come up later on with another deck that we found

16   from 2017 that had an unusual font, one that you typically

17   don't seem in PowerPoints.  So Mr. Leventon presented that and

18   walked through every step of the transaction, what in his

19   view, or at least what he communicated to us, had happened,

20   how the subsidiaries were set up, his statements that they

21   were special purpose entities and that they had no assets, and

22   how the litigation then unfolded after the default in 2000 --

23   late 2008, early 2009.

24   Q   And based on the review that you've described and your own

25   due diligence, based on the facts that you had at the time,

**Appx. 00519**

Seery - Direct                                      28

1    did the independent board form a view as to its perception of

2    the merits of UBS's claim against Highland Capital Management,

3    LP?

4    A    Yes.  I and the rest of the board, based upon the -- both

5    the documents we reviewed and the description of the

6    circumstances and the litigation provided to us by Mr.

7    Leventon primarily and Mr. Ellington and the other people in

8    the legal department -- and I should just, as an aside, say

9    the ones in that meeting are Sevilla, DiOrio, Irving,

10   Ellington, Leventon, nobody else.  I don't recall Stephanie

11   Vitiello being in that particular meeting or meetings.  But

12   our view that we developed from those -- from that work and

13   from the independent work we did was that Highland didn't have

14   any liability for the UBS judgments.  It was clear that the

15   subsidiaries did, and the underlying documents made clear that

16   they were responsible to UBS.  But our perspective from that

17   work and the information we received from the legal department

18   was that UBS was reaching, its claims were only against subs

19   that never had any assets, and that Highland should not be

20   held responsible for any of the damages from the transaction.

21   Q    And do you recall, at around the time of the mediation in

22   the summer of 2020, did UBS press their informational requests

23   for documents concerning the assets of the funds?  Do you

24   recall that at all?

25   A    Yes, they did.  They actually started earlier, and we took

Seery - Direct                                29

1   the perspective initially that we didn't need to provide any

2   documents to them because we were going to really move for

3   summary judgment.  We took a very aggressive posture in

4   respect of that position.

5       When we came to the mediation, there was a slightly

6   different structure and relationship in that you're trying to

7   work towards an understanding, so you really weren't able,

8   between the parties and the mediators, you know, you weren't

9   really able to say, we're not going to give you anything, so

10  we took the perspective that we should just turn over

11  everything because we've got nothing to hide.

12      And UBS took that very directly and made pretty

13  substantial discovery requests on us with respect to their

14  claim and the mediation, particularly with respect to the

15  underlying assets that they claimed that the CDO Fund and SOHC

16  had and wanted to know what happened to them.  And the

17  Highland legal department, as previously described, led by

18  Leventon, said they didn't exist and there were no assets.

19  Q    Did they in fact, though, identify, I think, two assets?

20  A    Ultimately, --

21  Q    (overspoken) and the Multi-Strat?

22  A    Ultimately, they identified, and this was Mr. Leventon,

23  cash that had been used for -- purportedly used for legal

24  fees.  And it was a significant amount.  And that was a bit

25  startling, because previously we'd been told there was no --

Seery - Direct                                30

1   there were no assets there, so it was startling that all of a

2   sudden, well, there was cash, but it was spent.  And we

3   pressed Mr. Leventon on that.

4       In addition, they identified interests in -- potential

5   interests in an entity called Greenbrier.  And that was a very

6   confusing description from Mr. Leventon, and it didn't make a

7   lot of sense.  But if there was an asset in CDO Fund or SOHC

8   that was owned and had value, then it should have been

9   incumbent on Highland to discover that asset and use that

10  asset in settlement, because, from our perspective, if there

11  was anything in those subsidiaries, we should turn it over to

12  UBS and try to use that to settle the litigation, because it

13  would never come to Highland since these entities had

14  judgments in excess of a billion dollars against them.

15  Q   All right.

16          MR. MORRIS:  Your Honor, just so the record is clear,

17  the emails that relate to these issues can be found at

18  Exhibits 5 and 6.  They're from August 2020.

19          THE COURT:  Okay.

20  BY MR. MORRIS:

21  Q   And do you recall, in the fall, based on the information

22  that the independent board had at the time, that the Debtor

23  proceeded with their motion for summary judgment and their

24  3018 hearing with UBS?

25  A   Yes.  And previous to that, we'd gone through the

Seery - Direct                                    31

1   mediation with two experienced mediators.  It was a very

2   intense experience.  Aggressive from both our side and UBS's

3   side.  So we had gone through that mediation.

4       We had endeavored during the mediation to provide

5   discovery around this Greenbrier and any other assets.  Both

6   Mr. Leventon and Mr. Ellington made very specific

7   representations to me and to the board and to our counsel

8   regarding lack of assets and the ability to find any assets

9   and that there was really nothing there.

10      So we went through the mediation and were unable to

11  resolve anything with UBS.  The parties were incredibly far

12  apart.  And we decided to move for summary judgment.  And that

13  became a very tall order because of the complexity of the

14  claims and the complexity of the underlying litigation.

15      We dug in really hard on that, and ultimately had a

16  hearing both with respect to summary judgment -- partial

17  summary judgment as well as with respect to estimating UBS's

18  claim.

19  Q   And as the calendar rolled towards the end of the year, do

20  you recall that the Debtor was preparing for confirmation?

21  A   Yes.  We had developed the monetization plan in the late

22  fall of 2020.  We were at the same time trying to structure

23  potential settlements with the creditors.  We took the

24  perspective with respect to UBS that it was unlikely we were

25  going to get a settlement.  And so as we moved forward with

1  the plan, when looking at it, can see there's a lot of

2  mechanisms that basically assumed that we won't be settled

3  with UBS.  They'll be on an oversight board, but that

4  ultimately we're going to be litigating with them to determine

5  what their claim could be.

6  Q   I'm not testifying, but I do remember there was an awful

7  lot going on in January 2021.  Did you and the independent

8  board ultimately reach an agreement in principle with UBS on

9  the resolution of their claim?

10 A   Yes.  And coming into -- your statement about January 2021

11 is absolutely correct.  But it really went through the fourth

12 quarter and then January 2021.

13     As the Court will recall, we had a number of hearings in

14 December of 2020 that were intense:  contempt, injunction,

15 preliminary to the plan process, disclosure statement.  There

16 were depositions.  There were challenges -- there were

17 significant challenges to Highland's management of both its

18 assets and managed fund assets.

19     We discovered some significant problems with what we

20 thought was going on in the legal department at that juncture,

21 which led to the termination of Mr. Ellington and Mr. Leventon

22 on January 5, 2021.  And then January 2021 was chockful of

23 hearings from contempt to HarbourVest to preliminary

24 injunction, and ultimately confirmation at the beginning of

25 February.

Seery - Direct                          33

1   Q    Did the termination of Mr. Leventon in particular have any

2   impact on the independent board and management's ability to

3   access information?

4   A    Well, both Mr. Leventon and Mr. Ellington then opened up

5   -- which we probably could have done before -- but opened up

6   our access to their email accounts.  And in respect of Mr.

7   Leventon, an interesting thing happened when I went to send

8   him his termination notice.  Microsoft Outlook thankfully

9   filled an entity called SAS Management into the address bar.

10  And I didn't know what SAS Management was.  I had no

11  familiarity with it.  It wasn't something I'd seen.  So I

12  tasked outside counsel, Mr. Demo, as well as DSI, Mr. Romey,

13  to figure out what SAS was and why that was showing up for Mr.

14  Leventon.  That led us to do reviews of their email, and

15  particularly Mr. Leventon, a significant amount of information

16  that we developed over the next several months.

17  Q    And did you instruct my colleague, Mr. Demo, and DSI to

18  continue to pursue, you know, any information relating to SAS?

19  A    Absolutely.  What we did was we -- at the same time we

20  were doing this, we were trying to settle with UBS.  One of my

21  fellow directors was really leading that.  I didn't think

22  there was much chance of settling with them, primarily because

23  I thought there was no way to bridge the gap.  And frankly, I

24  was of the firm, firm view that Highland shouldn't have any

25  liability because the allegations that Highland had prevented

Seery - Direct                          34

1    UBS from recovering on its judgments really didn't have any

2    basis based on the facts that I had at the time.

3        But as we continued to look at what SAS might be and

4    whether that was an asset of the Debtor and what it meant to

5    the Debtor, whether Debtor employees were involved, we started

6    finding more and more information about other assets and other

7    dealings with respect to UBS.

8        We did find that this SAS entity had been around for quite

9    some time.  It was, in essence, a secret entity.  The legal

10   department -- Ellington, Leventon, Sevilla, Vitiello, I

11   believe, Irving, DiOrio -- all had SAS, my recollection is all

12   had SAS Management emails.  They were stored on a separate

13   server so we couldn't uncover those.  We could only find

14   things that were sent to the SAS server.

15   Q    And did any of those individuals share with you or the

16   Debtor's professionals any substantive information concerning

17   SAS at the time?

18   A    None at all.  What we did do, though, is because we could

19   then use SAS to search through the entire Highland databank,

20   we did find -- let's see how to describe it; we have a

21   colloquial term that I won't use -- but charts that showed the

22   ownership of SAS and the -- and that led to the ownership of

23   Sentinel.  And we didn't know what Sentinel was, but one of

24   our outside professionals recalled Sentinel is a redeemer out

25   of the Multi-Strat fund.  So that got us looking at who is

Seery - Direct                          35

1   Sentinel and who owns Sentinel.

2       The records were ultimate beneficial owner, what they call

3   UBOs, but because of the requirements of the Cayman

4   authorities, ultimately Mr. Ellington and Mr. Leventon -- Mr.

5   Dondero had to produce their passports and information to show

6   the ultimate beneficial owners, but they're never actually

7   listed as Mr. Ellington and Mr. Dondero.  They're only listed

8   on the charts as UBO 1 and UBO 2.

9       And that shows a whole bunch of different entities,

10  including SAS.  And apparently, Ms. Irving worked on a lot of

11  this stuff in the Caymans for either SAS or for these other

12  entities, notwithstanding being a full-time employee of

13  Highland in the legal department.

14  Q   Was -- do you recall if Matt DiOrio was involved in

15  responding to the requests of you and your team in January and

16  early February 2021?

17  A   Yes.  So, after Mr. Leventon's termination, Mr. DiOrio was

18  tasked by Mr. Demo and Mr. Romey to help figure out what SAS

19  was, what Sentinel was, and any information regarding these

20  Cayman entities.

21      He professed ignorance.  We now know that he was a

22  director at the time of his protestations of no knowledge.

23  And in addition, he, with respect to other people on the email

24  chain, texted some and said, I've got this, notwithstanding

25  that he didn't produce any information, even though he had

Seery - Direct                                36

1    been directly asked for it.

2    Q    When you say that --

3              MR. MORRIS:  Ms. Canty, can you put up Exhibit 10?

4    It's just a text message.  I just want to make sure the Court

5    understands the context for Mr. Seery's testimony.

6         But Your Honor, while she's doing that, I would just point

7    the Court to Highland's Exhibits 7 and 8, which are other

8    lengthy email strings from late January 2021 where, at Mr.

9    Seery's direction, the Debtor's professionals were seeking

10   information about these matters.

11        And if we could just scroll down here, what's on the

12   screen now is Exhibit 10, Your Honor.

13   BY MR. MORRIS:

14   Q   Mr. Seery, can you just describe for the Court what your

15   understanding of this text message is?

16   A   See if I can see it.  This is a text message from DiOrio

17   to Thomas Surgent.  Thomas, as I said, is in the legal

18   department tangentially, but is really the CCO.  This is Mr.

19   DiOrio telling Mr. Surgent, I've got the request, you don't

20   have to worry about it.

21        And so that led to a number of obfuscating emails as well

22   as a failure to respond and significant delays.  Ultimately,

23   when -- and I'm not sure if this was before Mr. DiOrio was

24   terminated or after he was terminated, as soon as we went to

25   Mr. Surgent directly, he quickly provided the documents --

Seery - Direct                        37

1  searched for them and found the documents that we needed on

2  the Highland system.

3  Q    Okay.  So let's --

4           MR. MORRIS:  We can take that down now.  Thank you

5  very much.

6  BY MR. MORRIS:

7  Q    Let's just go to the next step.  What does the independent

8  board learn in late January or early February -- withdrawn.

9  Did there come a time when the independent board made a

10 disclosure to UBS?

11 A    Yes.  So, as we were doing this work in January and early

12 February -- and remember, as I said earlier, this is while

13 there's probably five to ten hearings going on that are

14 crucial in the case.  I'm giving multiple depositions.  We're

15 trying to figure out assets.  We're terminating employees.

16 We're negotiating or attempting to negotiate a transition

17 agreement for the businesses.  It was incredibly busy.

18      But we came across this Sentinel entity, and we came

19 across the fact that it was a redeemer in Multi-Street, and

20 then ultimately led us to find the after-the-event insurance

21 policy, this ATE policy, which I'm not an insurance expert but

22 I know enough that it's not really a thing.  There's after-

23 the-event policies that typically cover attorneys' fees in a

24 loser-pays jurisdiction.  There's no such thing as a policy

25 where you go to an insurance company and take $100 million

Seery - Direct                               38

1   worth of assets and buy $100 million worth of coverage.  It

2   doesn't provide you any benefit.  It's not a thing.

3   Q    So, we did --

4   A    But my point -- sorry, John, I digressed.  We have -- we

5   have the contempt, we have all these different things going

6   on, and we're finding different information.  And we find out

7   about this policy as negotiations at the same time is going on

8   with UBS to try to reach a settlement on their claim.  And

9   that was directed by one of the other directors as this was

10  going on.

11       And recall that the policy was purchased by CDO Fund and

12  SOHC.  As I said, SOHC is an indirect subsidiary.  So is CDO

13  Fund.  But CDO Fund was controlled by Highland.  Highland

14  controlled the GP.  Highland controlled SOHC.  That policy was

15  the only asset -- I mean, CDO Fund.  That's the only asset of

16  CDO Fund.  Highland's control of that is a valuable asset of

17  Highland, but it's been hidden from Highland.  Completely

18  hidden.

19       We discover it.  We had reached a settlement with UBS

20  while we were doing this work, but we didn't -- we hadn't

21  discovered this, all of this information.  I think we

22  announced the settlement with UBS at the -- at the

23  confirmation hearing.  I think it was on February 2nd.  And

24  later on in the month, as we were working on documenting that

25  settlement -- and documenting a settlement with UBS and the

Seery - Direct                                39

1   Latham team is not an easy thing.  Not because they're not

2   good to their word; they're just (audio gap), as maybe I am.

3   And so that getting that deal documented was taking a while.

4   And we discovered this information, and I couldn't go forward

5   with a deal with UBS, knowing the information I had without

6   sharing that information with them, because it would have been

7   fraudulent, in my opinion.

8        And so we told them we're not going to enter the

9   settlement agreement.  They were a bit shocked.  And we told

10  them, well, we need to tell you why.  And then we laid out the

11  information to them, which initially set them back to figuring

12  out what they wanted to do, and then ultimately came back to

13  the table to renegotiate the settlement agreement with them.

14  Q   And as a result of the information that the Debtor shared

15  with UBS, did UBS and the Debtor renegotiate the deal that

16  they had presented to the Court at the confirmation hearing?

17  A   We did.  And the dates on that are March 21 into April.

18  So we've got a decent amount of information.  Not everything,

19  but we've got a decent amount of information that maybe some

20  of their allegations about Highland interfering with their

21  judgment activities was true.  And we renegotiated that

22  settlement, upping the claims by about $50 million, the

23  allowed claims that they would get.

24  Q   Why did the independent board decide to share this

25  information with UBS at the time that it did?  Why not just

Appx. 00531

1  take the deal that you had?

2  A   Well, number one, first and foremost, we're fiduciaries.

3  And we're fiduciaries to the estate.  Our job is not to

4  defraud the creditors.  It's to fight hard to make sure that

5  legitimate claims are allowed but that illegitimate claims are

6  kept out.  And we thought, both myself and the other

7  directors, that we couldn't enter into a settlement in good

8  faith when we have knowledge that the underlying facts that

9  the counterparty were relying on were untrue and that we'd

10  provided a lot of that information to them.  We had

11  represented to them that there were no assets based upon the

12  information we had been given by Leventon and Ellington in

13  particular.

14  Q   Do you recall that right around the time the parties

15  presented their proposed settlement to the Court UBS also

16  commenced this action?

17  A   Yeah.  I think it was -- it was probably the next day.

18  Q   Uh-huh.

19  A   And recall that all of this is while the transfer took

20  place two years prior to filing.  All of this cover-up.  All

21  of this misdirection.  All of the expenditure and the

22  additional damages that Highland suffers is postpetition by

23  officers and attorneys at Highland.  In-house senior attorneys

24  on the payroll full-time at Highland.

25  Q   After the action was commenced -- withdrawn.  Did the --

Seery - Direct                                    41

1   did Highland agree to temporary and preliminary injunctive
2   relief?
3   A    I believe we agreed to the temporary preliminary
4   injunction.  But we had not yet settled the action completely.
5   Q    And why is that?  Why did the Debtor agree to the
6   temporary relief but not the permanent relief?
7   A    Well, the information that we had certainly justified at
8   least a preliminary injunction, in our opinions, because there
9   were -- we didn't have all the information, but it was very
10  clear that there had been material asset transfers and that
11  funds were going to continue to run through the assets that
12  either Highland had or Highland managed that would continue to
13  flow to this Cayman entity.
14      And those funds had flowed during the case.  And in fact,
15  during the case, some of these same individuals, during the
16  bankruptcy case, moved assets around in the Caymans.  It
17  wasn't as if they'd forgotten about them.
18      So we felt that at least a preliminary injunction to keep
19  the status quo and prevent further leakage of assets and
20  protect potentially liability for Highland was appropriate.
21  That subsequently led us to do additional work, and we really
22  didn't have enough at that time to just agree to consent to
23  the judgment.
24  Q    And with respect to discovery, are you aware of any
25  additional documents that were uncovered after the action was

Seery - Direct                                    42

1  commenced?

2  A     Yes.  UBS commenced discovery, both document discovery and

3  depositions.  And while discovery in the Caymans is not

4  usually that easy, or any foreign jurisdiction, in my

5  experience, the manager, the accounting manager for Sentinel

6  was actually a U.S. entity called Beecher Carlson.  And UBS

7  and Latham did a significant amount of discovery with respect

8  to those entities, both depositions and documents, many of

9  which we've seen, one of which you alluded to today which we

10 didn't know about prior to that, which is this indemnification

11 agreement from June 2020.

12     And by the way, that indemnification agreement has been

13 used.  Sentinel paid Baker & McKenzie fees, Sentinel paid Ross

14 & Smith fees, from what we've seen and what we've seen in the

15 depositions.  I think it was prior to the indemnification,

16 there's hundreds of thousands of dollars of hit to the policy

17 from personal expenses of Scott Ellington postpetition run

18 through Sentinel.

19     So we learned about the indemnification.  We learned about

20 the payments.  We learned about more of the transfers.  We

21 learned about attempts during the case to move assets out of

22 Sentinel, calling them worthless.  And it became very clear

23 that this was a really organized, orchestrated attempt to hide

24 these assets from the estate and prevent Highland as the

25 Debtor from controlling a CDO Fund asset that really would

Seery - Direct                          43

1   have changed the dynamic of the case completely.  We wouldn't

2   have been spending tens of millions of dollars fighting with

3   UBS, thousands of hours fighting with UBS, if we could have

4   used an insurance policy or the assets to help arrange a

5   settlement.

6   Q    There was a suggestion early on after this adversary

7   proceeding was commenced, I think it was in the context of a

8   motion to quash, that maybe this is a friendly litigation and

9   it's not really adversarial.  Do you have a view as to whether

10  or not this has been an arm's length adversary proceeding?

11  A    Everything with UBS and with Latham & Watkins is very

12  arm's length.  This is a pretty aggressive group.  And I say

13  that respectfully.  I don't say that in a negative way at all.

14  It's been that way from the start.  And even in this

15  litigation post our settlement with UBS, we have a number of

16  material disputes regarding costs, regarding the breadth of

17  the depositions and the discovery they want from us.  They're

18  pretty exhaustive.  And we have worked through a number of

19  those disputes, but it has not been easy.  It's certainly

20  arm's length.

21  Q    All right.  Finally, Mr. Seery, why are we making this or

22  why is the Reorganized Debtor making this motion now?

23  A    We have spent a tremendous amount of time and money on

24  disputes with UBS, both prior to settlement and with respect

25  to this lawsuit.  From what we see now -- and I'm sure we

**Appx. 00535**

Seery - Direct                              44

1   don't know everything; we continue to do work -- there is no

2   benefit to the estate, the reorganized entity, from continuing

3   to fight this dispute.  I don't think we have a good faith

4   basis to do so.

5       And to the extent that the injunction, a permanent

6   injunction subsequent -- subject to a resolution can help

7   finally resolve the issues with Sentinel -- as you mentioned,

8   Mr. Morris, the directors at Sentinel are new directors.

9   There has -- we've spent a lot of time working with the

10  parties with respect to our claims from CDO Fund under the

11  policy, a mediation in that action as well.  And if that

12  resolution can get done, that'll be of benefit to Highland and

13  all of the respective parties.

14          MR. MORRIS:  I have nothing further, Your Honor.

15          THE COURT:  All right.  Mr. Clubok, any questions?

16          MR. CLUBOK:  A very brief follow-up, Your Honor, just

17  to clarify a couple of points.

18          THE COURT:  Okay.

19          MR. CLUBOK:  May I proceed?

20          THE COURT:  You may

21          MR. CLUBOK:  Okay.

22                      CROSS-EXAMINATION

23  BY MR. CLUBOK:

24  Q   Mr. Seery, I want to take you back to the document

25  requests that UBS made once we had gotten to the point where

1  you had made it clear to both UBS and to your team that you

2  were going to provide whatever information you had.

3  A    This was around the summer of 2020, prior to the

4  mediation, or as we were going through the mediation?

5  Q    Exactly.

6  A    Okay.

7  Q    Exactly.  Okay.  And just to orient you, I would like to

8  put up what we've marked as Exhibit 57.  Exhibit 57 was not

9  previously marked explicitly, but it is a deposition exhibit.

10 You'll recognize it, Mr. Seery and Mr. Morris.  It was

11 Deposition Exhibit 69 to your deposition, Mr. Seery.  And we'd

12 like to mark it, for the purpose of this hearing, Exhibit 57.

13 This was UBS's first request for production of documents to

14 Debtor Highland Capital Management, which is I think what

15 you're referring to.  Do you recognize that document?

16 A    I do, yes.

17 Q    Okay.  And I'm going to specifically turn your attention

18 to Request No. 8.  Request No. 8 asked for all documents

19 pertaining to the assets and liabilities of HFP, CDO Fund, and

20 SOHC, including but not limited to -- and then there's a

21 number of subparts.  Do you see that?

22 A    Yes.

23 Q    And if we can turn -- and, actually, in the very first

24 one, A, you can see it talks about consolidating standalone

25 financial statements from December 2007 through December 2019,

Seery - Cross                              46

1    or the most recent period available.  Do you see that?

2    A    Yes.

3    Q    And there's a number of other requests, but --

4             THE COURT:  Mr. Clubok, let me interrupt a minute.

5    Do you have an exhibit up on the screen?  I am not seeing it.

6    But I can pull it up off the docket if you tell me again which

7    one it is.

8             MR. CLUBOK:  I'm sorry.  Exhibit 57.  It's showing up

9    on my screen.  Ms. George has put it up.  Does it not show up

10   on your screen, Your Honor?  Oh.

11            THE COURT:  No.  Do you know what -- just a moment.

12       (Pause.)

13            MR. CLUBOK:  If I may, Mr. Morris, can you see it?

14            THE COURT:  Okay.  Yes.  We're -- the court reporter

15   informs me we have --

16            MR. MORRIS:  I can.

17            THE COURT:  -- something frozen on -- where we're

18   supposed to get the document.  She's called IT.  But I can

19   pull it up on the ECF, I hope.  So, you said 57?  No?

20            MR. CLUBOK:  Well, unfortunately, Your Honor, this is

21   the one exhibit that we didn't explicitly mark in our amended

22   179.  It is referred to because it was an exhibit to the

23   deposition of Mr. Seery.

24            THE COURT:  Okay.

25            MR. CLUBOK:  So we didn't individually mark this one.

Seery - Cross                            47

1  So I'll just narrate it.  I don't think you need to see it.

2          THE COURT:  Okay.  Okay.

3          MR. CLUBOK:  You can confirm later.

4          THE COURT:  Okay.

5          MR. CLUBOK:  It is -- Exhibit 57 is the -- is UBS's

6  first request for production of documents to Debtor Highland

7  Capital Management.  And it is a series of requests -- I'm

8  sorry, is the first official request, or I should say the

9  first document request, but I think even before this we had

10 exchanged information requests as well.

11 BY MR. CLUBOK:

12 Q   Is that correct, Mr. Seery?

13 A   That's correct.  Do you recall the date on this document,

14 Mr. Clubok?

15 Q   This particular document is dated September 28, 2020.  So

16 this would have been the formal document request that

17 encapsulated our discussions that were either communicated

18 more informally or as information requests.

19 A   That's my recollection.  I think this would have been

20 during the mediation.  I think the first session had already

21 happened, and there was discussion informally or during the

22 mediation that this would have been a document request.  My

23 recollection is it's more from UBS to more formally

24 crystallize requests that had been made during the mediation

25 -- during and before the mediation.

Seery - Cross                        48

1   Q    All right.

2             MR. CLUBOK:  And by the way, Your Honor, I do see

3   that this is Bankruptcy Docket 1345, I believe, if that's

4   helpful.

5             THE COURT:  Okay.  Could you repeat the number again?

6             MR. CLUBOK:  1345.

7             THE COURT:  Okay.

8   BY MR. CLUBOK:

9   Q    Mr. Seery, I just want to -- I want to direct your

10  attention to, in particular, Subparts I and J.  And this, in

11  Subpart I, if we can hopefully get it on the screen, but if

12  not I'll read it, it asks for a monthly roll-forward of the

13  itemized asset listing and corresponding values requested

14  above from December 31, 2007 through August 31, 2020 or the

15  most recent period available.  Here we go.  And we now have it

16  on the screen, hopefully, and I just read part of Subpart I.

17  Up on the screen.

18       Also, Subpart J asked for all activity associated with the

19  itemized assets requested in Items H and I.  For each one, a

20  transaction listing of all related parties or affiliated

21  transactions, including date and amount of transaction, et

22  cetera.

23       Do you see that?

24  A    Yes.

25  Q    In a nutshell, these requests and the prior requests that

Seery - Cross                                49

1  we had been discussing for the months leading up to that, in

2  sum and substance is it fair to say that you understood that

3  what UBS was looking for was the complete financial picture of

4  the assets that these funds -- namely, HFP, CDO, and SOHC --

5  had from the time of the original dispute through the present?

6  A    Yeah.  I think that's fair.

7  Q    And that was, in fact, very clear to you, that that's what

8  UBS was asking for in a paraphrased nutshell?

9  A    Yes.

10 Q    Okay.  And it's true that you tasked your in-house legal

11 team with coming up with a substantive -- or, identifying the

12 information that could form the response to these requests?

13 A    Yeah, that's true, with -- with outside counsel as well.

14 Q    Right.  But you in particular tasked Mr. Leventon and Mr.

15 Ellington in the first instance for identifying that

16 information to provide to your outside counsel to be provided

17 to UBS, correct?

18 A    Yeah.  I think that's fair.  They were working together,

19 though.  It was going to be -- Ellington and Leventon had

20 access to the systems and the ability to get the information.

21 How to present it and making sure that it was compliant with

22 discovery requests would have been more of an outside counsel

23 task.

24 Q    Now, prior to getting these requests, even, or maybe when

25 you initially got these requests, Mr. Ellington and Leventon

**Appx. 00541**

Seery - Cross                        50

1    had advised you, in words or substance -- I'm not quoting

2    them, but I want to get the gist of what they said -- that, in

3    fact, these entities had lost all of their value during the

4    financial crisis of 2008 and the years thereafter, correct?

5    A    That's correct.

6    Q    And they told you that these entities had basically no

7    remaining value at all, no assets left at all.  Correct?

8    A    That's correct.  Even more than that, initially, these

9    were described to us as shell entities.  The only assets they

10   would have had were assets that were moving in and out of the

11   UBS warehouse.  So it was -- they weren't going to be entities

12   that ever were, as described to us, asset -- entities that

13   held any sort of material assets at all.

14        And then subsequent to the financial crisis, the

15   information they gave us was that there was no -- there was no

16   -- there were no assets there.

17   Q    Yes.  It wasn't just that there was a net negative value;

18   it was that there were no assets at all, supposedly.  Correct?

19   A    Correct.

20   Q    And yet when UBS pressed harder for information about

21   assets, eventually Mr. Leventon started to disclose that in

22   fact there were at least some assets in these entities, and

23   specifically CDO Fund.  Correct?

24   A    That's correct.  As I mentioned earlier, he showed us a

25   spreadsheet with expenditures, millions of dollars of

Seery - Cross                                51

1   expenditures for legal fees, which was surprising based upon

2   the fact that if these -- the prior statements that these

3   assets had no value, or these entities had no value, how,

4   then, did they have cash to spend millions of dollars on legal

5   fees?

6   Q    But even when he -- and by the way, it came as a surprise

7   to you to learn that, in fact, instead of zero assets, there

8   were at least some assets remaining, correct?

9   A    That's correct.

10  Q    And then even when Mr. Ellington disclosed that additional

11  information, he never disclosed anything about the hundreds of

12  millions of face value in assets that had been transferred out

13  of these funds just a few years prior.  Correct?

14  A    That's right.  Yes.  It was never disclosed to either me

15  or my independent -- fellow independent board members, or, to

16  my knowledge, to counsel or outside consultants.

17  Q    Okay.  Mr. Seery, I just want to end with a clarification

18  of your role and why this injunction is proper.  It's correct

19  to say that Highland is the portfolio manager of an entity

20  we've been calling Multi-Strat, correct?

21  A    That's correct.  I'm not sure if under the docs it's

22  called portfolio manager or collateral manager, but Highland

23  is that entity, yes.

24  Q    And as the CEO, you are responsible for directing the

25  efforts of Highland with respect to its role as the manager of

Seery - Cross                                52

1  Multi-Strat, correct?

2  A    That's correct, yes.

3  Q    And just -- I think the Court has heard these names below

4  -- the entity that we're calling Multi-Strat has also been

5  called Credit Opportunities in the past?  That's

6  interchangeable for purposes of this proceeding; is that

7  correct?

8  A    Yeah.  But there's a number of different Credit

9  Opportunity-type funds that Highland has had over the years,

10 but you'll see that in a number of the documents before the

11 name was changed to Multi-Strat.

12 Q    Okay.  And with respect to CDO Fund, it is fair to say

13 that Highland Capital Management had control of CDO Fund as a

14 director and as a direct owner of the CDO Funds through its

15 general partner, correct?

16 A    Yeah, through the general partner interest, yes.  So,

17 Highland owns CDO Funds GP, which can direct CDO Fund.  I

18 believe we had LP units as well, but there were also third-

19 party limited partners in that entity pre-financial crisis.

20 Q    And with respect to Multi-Strat, in addition to acting as

21 Multi-Strat's investment manager, Highland Capital also is the

22 indirect hundred-percent owner of Multi-Strat's general

23 partner as well, correct?

24 A    Of the GP, that's correct, and we own about roughly 55 to

25 60 percent of the LP interests.

Appx. 00544

Seery - Cross                          53

1    Q    And finally, Mr. Seery, you knows there's a TRO or

2    temporary restraining order already issued by the Court in

3    connection with this proceeding?

4    A    Yes.  And we've adhered to that order.

5    Q    But absent having that order, you would have had -- you

6    would have felt obligated previously to transfer funds that

7    are currently being restrained by this order, correct?

8    A    That's correct.  Our perspective of the documents and the

9    role of the collateral manager is that, at least with respect

10   to Multi-Strat, but also with respect to funds that we turn

11   over to trustees on certain CLOs, which then flow to -- could

12   flow to Sentinel without the TRO, those would have flowed,

13   those funds.

14   Q    Okay.  Thank you, Mr. Seery.

15              MR. CLUBOK:  I have nothing further.

16              THE COURT:  All right.

17              MR. MORRIS:  No redirect, Your Honor.

18              THE COURT:  Okay.  Then I have a couple of questions.

19                     EXAMINATION BY THE COURT

20              THE COURT:  I just want to make sure I understand the

21   relevance of this line of questioning about Multi-Strat.  I

22   remember Multi-Strat.  There was an adversary proceeding that

23   I just had in front of me last week, a motion to dismiss.  So

24   I remember what it is.  It was a fund that, among other

25   things, or maybe it mainly owned the viaticals.  But I'm

Seery - Examination by the Court                54

1   trying to understand the significance of Multi-Strat to these

2   two funds we're talking about right now.

3          THE WITNESS:  So, I'll be happy to walk you through,

4   Your Honor.  Multi-Strat, when the case started, owned certain

5   life policies.

6          THE COURT:  Right.

7          THE WITNESS:  It owned some other assets as well, and

8   it owned a lot of MGM.  The life policies -- and it's not fair

9   to call them a portfolio.  They are -- they were eleven

10  policies on eight lives.  When the case started, the premiums

11  on those policies were substantial, and we didn't have the

12  funds to make payments.  Multi-Strat didn't, and Highland

13  didn't, with the Committee's involvement, other than an

14  initial payment and to keep the policies alive, didn't have

15  the funds to invest in Multi-Strat.

16     So Multi-Strat ran an auction and sold those policies

17  above the market value.  So it was a full, open auction, it

18  was a successful auction, and it was sold for more than the

19  values that had been maintained by Highland prior to the

20  filing.

21     As an aside, or there's two asides, one is part of the

22  reason you had to get rid of the -- or sell the Multi-Strat

23  policies was that they were security for a loan to NexBank.

24  And so that loan had to get paid off to free up value to

25  Multi-Strat.  Multi-Strat is a separate fund that Highland

Seery - Examination by the Court          55

1   manages that, in addition, fast forward, no one -- there

2   hasn't been an event on those policies since we sold them in

3   the first quarter of 2020.  That means no one passed away up

4   until at least a month or so ago, and premiums would have been

5   in excess of $22 million by now, which Multi-Strat didn't

6   have.  So that's the life policy part of that.

7        In addition, as I said, Multi-Strat owned other assets,

8   including MGM.  Also, some of that was secured or provide

9   security to NexBank for a loan that Multi-Strat had taken out

10  previously.

11       The reason Multi-Strat took out a loan, my recollection

12  is, a number of investors in Multi-Strat had tried to redeem.

13  Most of those were offshore investors in either Australia or

14  Japan, and basically Highland told them, Thanks for your

15  redemption, but we're not paying you.  We're not closing the

16  fund down.  And the documents allowed those redeemed interests

17  to sit out there, and they basically functioned like non-

18  cumulative preferred, meaning they didn't increase in interest

19  rate but they had a fixed claim.

20       Amongst those redeemers was Sentinel.  And so when we

21  learned about the Sentinel involvement, we didn't really know

22  who Sentinel was, one of our outside advisors said, They're

23  one of the redeemers in Multi-Strat.  That got us looking even

24  further.

25       But Multi-Strat's involvement in this litigation, or the

Appx. 00547

1  UBS litigation, relates to some fraudulent conveyances that

2  UBS alleged that happened back in 2009, 2008-2009, where

3  Multi-Strat and other funds were making contributions in to

4  try to support the UBS transaction from the Highland

5  perspective, and then when it looked like that transaction

6  wasn't going to work out, a bunch of those assets went back

7  out.

8      There was a so-called -- it was very oddly named -- but

9  basically a note transaction.  A bunch of assets went in,

10  Multi-Strat and other entities got a note, and then there was

11  basically -- I forget what they called it, but it wasn't a --

12  they didn't call it satisfaction.  It was basically they

13  ripped up the trade and gave the assets back.  And UBS had

14  issues with that.

15      So when we sold the life policies, it was actually very

16  difficult, because one of the buying entities had done their

17  diligence and they saw that UBS had a claim against Multi-

18  Strat, and unless we could get a stipulation with UBS we

19  weren't going to be able to sell those policies.  If we

20  weren't able to sell those policies, we didn't have the money

21  to pay the premiums, they would have expired worthless.  So we

22  cut an initial deal with UBS.

23      So they -- they've been in and around the Multi-Strat for

24  14 years.  And ultimately Multi-Strat settled with UBS for

25  $18-1/2 million.  That was in the original UBS settlement.

Seery - Examination by the Court                    57

1          THE COURT:  Okay.

2          THE WITNESS:  When we learned of all the Sentinel

3   issues and these transfers, UBS took the position that we

4   should start over and we took the position that, no, based on

5   what we see, we've -- Multi-Strat has settled, but these other

6   allegations relate more to Highland liability, CDO and SOHC

7   liability, not to Multi-Strat liability.

8      So that $18-1/2 million piece didn't change.  The extra

9   $50 million in claims was just claims against Highland, not

10  against Multi-Strat.  And Multi-Strat has subsequently settled

11  its issues with UBS by paying the $18-1/2 million.  It had

12  previously sold the life policies, freeing up the liens from

13  NexBank and paid off NexBank.  And it subsequently made

14  distributions and redeemed all of the redeemers save Sentinel.

15  That money is set aside because of the TRO.

16     And some day there will be more about Multi-Strat and the

17  attempts to, according to the Multi-Strat investors, rip them

18  off for their interests, redeemed interests.  And we do have

19  signed documents evidencing that.  But we'll get to that

20  another day.

21          THE COURT:  All right.

22          MR. MORRIS:  Your Honor, if I may, can I just ask a

23  --

24          THE COURT:  Go ahead.

25          MR. MORRIS:  -- question or two, a follow-up

Seery - Redirect                                58

1   question?

2                        REDIRECT EXAMINATION

3   BY MR. MORRIS:

4   Q    Mr. Seery, just to make this clean, does Sentinel have a

5   redemption interest in Multi-Strat?

6   A    Yes.

7   Q    And does Highland control Multi-Strat?

8   A    Yes.

9   Q    And is the TRO or now the permanent injunction designed to

10  prevent Highland from paying anything to Sentinel on account

11  of its redemption interest?

12  A    That's my understanding, yes.

13  Q    Okay.

14          MR. MORRIS:  Your Honor, does that clear it up for

15  you?

16          THE COURT:  It does.  And I think probably some of

17  this was explained to me way back when I --

18          MR. MORRIS:  Yeah.

19          THE COURT:  -- was presented with the 9019 settlement

20  with UBS.  But, shockingly, I'm a little -- I was a little

21  fuzzy on the Multi-Strat part of that.

22          MR. MORRIS:  There's a lot.

23          THE COURT:  Mr. Seery, --

24          MR. CLUBOK:  Your Honor, may I ask just one -- may I

25  ask just one follow-up question, just to tie this up in a bow,

Seery - Recross                           59

1    to make it extra clear?  There's one other element to this --

2            THE COURT:  All --

3            MR. CLUBOK:  -- that I just want to make sure is

4    clean.

5            THE COURT:  All right.  You may.

6                        RECROSS-EXAMINATION

7    BY MR. CLUBOK:

8    Q    And Mr. Seery, that redemption interest that is currently

9    on the books as being in favor of Sentinel, that is one of the

10   assets that was transferred by CDO Fund to purportedly buy

11   this so-called insurance policy, correct?

12   A    Part of that is.  It has multiple parts.  It's all covered

13   in the memorandum of understanding.  But the big piece of it

14   is, yes.

15   Q    Thank you.

16           THE COURT:  All right.  And another loose end I want

17   to tie up.

18                   EXAMINATION BY THE COURT

19           THE COURT:  I just want to be clear on the $100

20   million of market value of transferred assets.  I think I

21   heard that they were not all transferred in August 2017.

22   There had even been some transfer of value postpetition.  Is

23   that correct?

24           THE WITNESS:  So, the transaction was structured so

25   that all of the assets would transfer in 2017.  The value --

Seery - Examination by the Court          60

1  the face amount of those is north of $300 million.  The fair

2  market value, according to a Highland tax memorandum, we

3  didn't value it in 2 -- as of -- we didn't retroactively look

4  back and try to put a value on it.  But according to a

5  Highland tax memorandum written by one Shawn Raver, is north

6  of $100 million.

7       The -- all of the assets didn't -- didn't effectively

8  transfer.  It looks like certificates were lost in transit,

9  which just doesn't happen very often, but in this case it

10 seems to.  So some of the assets didn't transfer.

11      So, pre- and postpetition, while that was going on,

12 Highland employees were advising the trustees for those assets

13 -- these are Highland-managed CLOs where there's a trustee in

14 place, and the assets are preferred shares in the CLOs -- when

15 those preferred shares were due cash, they would go to the

16 trustee.  The trustee would see that CDO Fund still owned the

17 asset because the transfer didn't make it all the way to

18 Sentinel, and the trustee would deposit those into a CDO Fund

19 account.  Highland employees were directing that those pre-

20 and some postpetition, that those assets -- those accounts be

21 swept to Sentinel.

22           MR. MORRIS:  Your Honor, if I may, I think that --

23 Mr. Clubok, it would be helpful here.  I think some of the

24 documents that they have admitted into evidence relates to

25 these postpetition transfers.  So Mr. Seery can correct me if

Seery - Examination by the Court          61

1   I'm wrong -- and I'll call this argument -- that there are

2   certain assets, including Greenbrier, that didn't make their

3   way, even though they were intended to make their way to

4   Sentinel, did not because their certificates were lost.  And

5   as, you know, that assets and any other that didn't actually

6   make its way as intended, as they generated income, it was the

7   income and other dividends or distributions that those

8   interests received that were then transferred to Sentinel.  Do

9   I have that right, Mr. Seery?

10            THE WITNESS:  Yes, you have.  That's correct.

11            MR. MORRIS:  Yeah.

12            THE COURT:  Okay.  That's all the follow-up I had.

13   Anything else of Mr. Seery?

14            MR. MORRIS:  No, Your Honor.  Highland at this point

15   rests.

16            THE COURT:  Okay.  Thank you, Mr. Seery.

17            MR. MORRIS:  I'll turn the podium over to Mr. Clubok.

18   Yeah.

19            THE WITNESS:  Thank you, Your Honor.

20            THE COURT:  Thank you.

21       (The witness is excused.)

22            THE COURT:  Mr. Clubok, any more evidence from UBS?

23            MR. CLUBOK:  Yes, Your Honor.  We do have evidence.

24   This is where we have probably a good 45 minutes.  I don't

25   know if you want to take a break or if you want me to just

62

1  launch into it.

2          THE COURT:  Oh, okay.  I appreciate getting that time

3  estimate.  We will go ahead and take -- let's make it a 10-

4  minute break, please.

5          THE CLERK:  All rise.

6      (A recess ensued from 11:18 a.m. until 11:31 a.m.)

7          THE CLERK:  All rise.

8          THE COURT:  All right.  Please be seated.  Thank you.

9  We're back on the record in UBS v. Highland, Adversary 21-

10  3020.  Mr. Clubok, are you ready to proceed?

11      (No response.)

12          THE COURT:  All right.  You must be on mute.

13          MR. CLUBOK:  Sorry.  Thank you.

14          THE COURT:  Okay.  Gotcha.

15          MR. CLUBOK:  Your Honor, can you see the title page

16  of the presentation we're about to walk through?

17          THE COURT:  I can.  Thank you.

18          MR. CLUBOK:  Terrific.  Okay.  I will be -- you know,

19  again, for efficiency's sake, we can call the first few

20  minutes the opening, if you'd like.  But really I just want to

21  get right to presenting the evidence for our part of this

22  proceeding.

23          OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

24          MR. CLUBOK:  Your Honor, again, Andrew Clubok, Latham

25  & Watkins, on behalf of UBS.

63

1      Your Honor, we start with how did we get here.  And you've
2  heard this before.  But UBS had a $1 billion judgment.  And
3  very specifically, the judgment that I spent so much time that
4  Mr. Seery has alluded to that really was the impetus of a lot
5  of discovery initially was specifically against two entities,
6  approximately 50 percent to each.  About $531 million, the
7  judgments against Defendant Highland CDO Opportunity Master
8  Fund, which we've often shorthanded as CDO Fund, and about
9  $510 million against Defendant Highland Special Opportunities
10 Holding Company, which we often call SOHC.
11     These judgments were the product of a so-called Phase I of
12 the New York litigation that UBS instituted back in 2009
13 against Highland Capital Management and some of these other
14 funds.
15     Phase II was supposed to take on Highland Capital
16 Management and the other Defendants' liabilities, but
17 restructuring intervened, and as a result those proceedings
18 were stayed and Your Honor knows the rest.
19     We have, as Your Honor knows, settled with most of the
20 Defendants, but there was one important Defendant remaining,
21 and that was the parent company of Highland Special
22 Opportunities Holdco.  That SOHC is a hundred-percent
23 subsidiary of Highland Financial Partners.
24     And just recently, after a damages inquest and other
25 proceedings in New York -- well, this was the total judgment,

64

1    the $1.042 [billion] that Your Honor is familiar with, before

2    additional interest -- but recently we obtained a judgment in

3    the so-called Phase II portion of what remains in New York,

4    and amongst other judgments, most importantly for the purpose

5    of today, is that we have now obtained a judgment against

6    Highland Financial Partners as an alter ego of the Defendant

7    SOHC.  So HFP is responsible for that same $510 million, plus

8    additional interest.

9        And I'm getting a request to annotate, but I guess I have

10   to hit approve, too.  Which is fine with me.

11       In any event, the HFP alter ego judgment is now also

12   completed.

13       As was well known, and you'll see that, in particular, Mr.

14   Dondero, Mr. Ellington, and their associates all have

15   anticipated for years that one day SOC's liabilities, SOHC's

16   liabilities, would also be HFP's liabilities, as they now

17   officially are.

18       Sorry.  I've got this request to annotate that has created

19   some curious issues here.

20       (Pause.)

21           MR. CLUBOK:  A moment, Your Honor.

22       (Pause.)

23           MR. CLUBOK:  Well, unfortunately, I -- someone asked

24   me if I could annotate.  I'm going to try to annotate.  Okay.

25   There we go.

65

1          In any event, we start with the judgments.  Then the next

2     thing to know about, as you've heard a little bit, is there

3     was this so-called ATE, or after-the-event policy.  And

4     Exhibit 1 is a copy of this so-called policy.  As you can see,

5     the insurer is Sentinel Reinsurance.  The legal action that

6     this policy was aimed at, the only one identified in the

7     policy, is the New York action, the *UBS Securities v.*

8     *Highland Capital Management* and others.  The limit of

9     indemnity was intended to be $100 million.  And the premium

10    was identified as $25 million.

11         Well, Your Honor, you heard a lot about how the ultimate

12    consideration for this policy exceeded even the coverage

13    limits of $100 million.  But, of course, that's -- you don't

14    pay for an insurance policy with the coverage limits, you pay

15    for it with a premium, and this premium was supposedly set at

16    $25 million.  So the transfer of assets, which you've heard

17    already testimony exceeded $100 million and had a face value

18    of $300 million, far exceeded the so-called premium limit.

19    And, of course, exceeded the limit of indemnity itself.

20         The policy is fairly straightforward, fairly simple.  It

21    said that the insurer agrees to indemnify the insured in

22    respect to any legal liability occurring during the period of

23    insurance, up to and including but not exceeding the limit of

24    indemnity, provided that either the Court or any Appellate

25    Court makes an order of liability relating to the legal action

1   that's insured.  Notably, also if there was a settlement would

2   be another way that the policy would be triggered.

3       As you've seen, this policy was signed by James Dondero in

4   his -- what has become the typical fashion that we've seen in

5   which he signs on behalf of every relevant Highland-related

6   entity.  Here, he signs for all the insureds, which are

7   identified as CDO Opportunity Master Fund, Highland CDO

8   Holding Company, which we'll come back to, and then Highland

9   Special Opportunities Holding Company.

10      At the same time, there was an asset transfer, a so-called

11  purchase agreement whereby all of these funds, and other funds

12  at Highland, pooled their assets and transferred them all to

13  Sentinel, supposedly so that Sentinel could purchase them, so

14  that in turn these Highland funds could then pay the supposed

15  $25 million premium.

16      And then the premium, as set forth in Exhibit 2, was

17  agreed to be all of the assets listed in Schedule A hereto as

18  a hundred percent payment of the premium.  And Schedule A,

19  which you saw briefly during Mr. Morris's presentation,

20  identified every single asset from CDO Fund, from SOHC, from

21  HFP, and also from some other entities that we'll talk more

22  about in a moment.

23      One thing of note of these assets, and I'll just point out

24  because Your Honor asked about it, is that there is the so-

25  called Multi-Strat asset.  Remember, Multi-Strat was then

67

1   called Credit Opportunities CDO Limited Partnership Interest.

2   You can see that CDO Fund, this is the Highland CDO

3   Opportunity Master Fund asset, so CDO Fund, which is the

4   entity -- one of the entities that we have over a half-

5   billion-dollar judgment directly against now, had this

6   interest in what was then called Credit Opportunities but is

7   now known as Multi-Strat.  That is the interest that is now

8   currently the subject of the restraining order, and had not

9   the restraining order entered, those monies would have

10  already, as Mr. Seery testified, been distributed on to

11  Sentinel.

12       Just like with the insurance policy, with the asset

13  transfer agreement, Mr. Dondero just signs on behalf of

14  everybody.  You will see all the transferors he signs on

15  behalf of.

16       It turns out, or as known from the get-go, that this was a

17  massive overpayment.  Remember, the aggregate purchase price

18  paid by Sentinel for these assets was $25 million.  That was

19  what the premium supposedly was set for -- was set as at the

20  outset.

21       At this time, and this is according to a tax memo that

22  Shawn Raver wrote, you know, about a year later when he's

23  trying to evaluate the tax consequences of the Sentinel

24  acquisition of -- notably of HFP/CDO Opportunity Assets,

25  you'll note even internally they describe this not as SOHC and

68

1    CDO Fund assets but as HFP CDO Fund assets.  This is when they

2    were challenging alter ego at that time, and they continued to

3    challenge alter ego right up until we got the judgment.  But

4    you can see that internally they certainly treated it as an

5    HFP liability, not an SOHC liability.

6        In any event, you'll note that the purchase price for the

7    assets was $25 million, but the aggregate fair market value of

8    the assets on the date of the transaction was $105 million and

9    change.  So, from the get go, they're paying, you know, more

10   than quadruple the premium price, and more even than the

11   limits of coverage.

12       As you noted, as Mr. Seery testified already, this was

13   from his deposition, we're here because Highland Capital

14   Management controls Multi-Strat in two ways, both as indirect

15   hundred-percent owner, also as investment manager, and also

16   controlled CDO Fund.

17       And then we're here because Your Honor, having entered a

18   TRO, otherwise it may have already been too late to stop a lot

19   of this.

20       So, what now?  What now is that UBS asks for what it's

21   always asked for, is an ultimate -- a permanent injunction.

22   And we set forth in our response to this motion -- and,

23   really, this is what we've asked for from the get go -- this

24   requires a slightly different form of order than what Highland

25   submitted, but I hope that after they hear the rest of this

69

```
 1   evidence they will agree that our form of order is
 2   appropriate.
 3       By permanent, as you can see in our order, it means not
 4   permanent for the rest of time, but permanent until either a
 5   court adjudication of what actually happened here or a
 6   settlement agreement.  And we now hope that the latter will be
 7   what triggers it, at least for the assets that we now know
 8   about.
 9       So, what are the factors?  Obviously, success on the
10   merits.  Irreparable injury.  Weighing of harms.  And the
11   public interest.  And these are the familiar factors recently
12   articulated in the Environmental Texas Citizen Lobby case from
13   the Fifth Circuit, 824 F.3d 507.
14       So, let's talk about success on the merits.  Why will UBS
15   win?  Not just likely to, but will win on the merits if we
16   proceed?
17       There's really two ways for UBS to prevail here.  You
18   could look at it either way.  Either the policy was just pure
19   fraud and everything needs to be unwound.  Or the policy was
20   valid, valid, but there was about an $80 million
21   (indecipherable) overpayment.  In other words, it may well be
22   fair that a $25 million ATE policy could have purchased a $100
23   million -- a $100 million after-the-event coverage at that
24   time.  As we've seen, they didn't pay $25 million.  They paid
25   $105 million.
```

70

1          So these are two different theories that both result in

2     effectively the same place.

3          Now, we're not claiming simply constructive fraud, or we

4     wouldn't be claiming simply constructive fraud at the end of

5     the day.  This is -- this goes into actual fraud.  And as a

6     result, we're going to go through the factors, the so-called

7     badges of fraud.  And these badges are from New York

8     precedent.  And they are from the *Matter of Gard Enter. v.*

9     *Block*, most recently articulated, 2012 N.Y. Misc. LEXIS 4175.

10    But they very much overlap with the badges of actual fraud

11    that Texas and the Fifth Circuit have identified very recently

12    in the *Matter of Alabama & Dunlavy*, 983 F.3d 766.  That's a

13    Fifth Circuit 2020 case.

14         These particular ones that we have on the screen on Slide

15    12 are the actual ones identified from -- by New York, and we

16    think New York law applies because the fraud was conducted

17    through the Bank of New York and was directed at the New York

18    proceedings.  However, you could also argue that Texas law

19    applies because clearly the continuing fraud that continued

20    even after the restructuring has affected this bankruptcy.

21         So, under either way of looking at it -- and normally you

22    don't need to, of course, show each one of these; you show

23    some of these -- you'll see that literally every one of these,

24    and every one to the extent it's slightly articulated

25    differently in Texas, have all been demonstrated by the

71

1    evidence that we've obtained.   So we're going to briefly walk

2    through those.

3         We begin with knowledge of the claim.   This is obvious.

4    That the timing -- and by the way, a lot of these factors

5    overlap, because it's like one factor is whether you had

6    knowledge of a claim in anticipation of a transfer.   Another

7    is suspicious timing of a transfer.   So some of these, as you

8    can see, overlap.

9         But certainly knowledge of the claim.   In March of 2017,

10   UBS had defeated all or virtually all of Highland and the

11   Funds' arguments on summary judgments.   And they had a host of

12   supposed defenses on liability that they claimed they were

13   going to win on summary judgment.   They were, I believe, all

14   or virtually all overruled.   That ultimately was appealed, and

15   in New York you can take interlocutory appeals much more

16   liberally than other jurisdictions, so they were able to delay

17   the trial for another year through interlocutory appeal of the

18   denial of summary judgments.

19        This is the world they were facing in March of 2017.   In a

20   very thorough opinion, Justice Friedman and the Supreme Court

21   of New York had overruled their -- rejected their summary

22   judgment claims.

23        So remember that date, March -- that's March 2017.

24        So we asked Mr. Leventon, let's start with liability and

25   then we'll talk about damages.   Did you ever give a

72

1    recommendation that UBS was likely to win on its breach of

2    contract claim against CDO Fund and SOHC in Phase I?

3         Answer, Yes, I did.

4         Question, What was that recommendation?

5         Answer, That liability was likely to be found.

6         Question, Who did you make that to?

7         Answer, I don't recall.  It certainly would have been --

8    well, I don't recall who it was.

9         Question, You said certainly would have been.

10        And then he answered, No, I believe it probably was Mr.

11   Ellington and Mr. Dondero.

12        Later in his deposition he was asked, How many times did

13   you have discussions with Mr. Dondero in which you expressed

14   your view that liability was likely to be determined against

15   CDO Fund and SOHC?  He claimed he didn't recall.  And then he

16   said, Well, it would have been more than one and probably less

17   than five.

18        Likewise, Mr. Ellington testified.  We asked him, You said

19   a number of times that it didn't surprise you at all about the

20   size or the magnitude of the damages verdict, correct?

21        He answered, Correct.

22        Question, And you had warned Mr. Dondero, in words or

23   substance, that this was likely to occur before the verdict

24   came, correct?

25        Answer, Yes.

1       So, not only did they obviously know about the claim, but

2   they had, you know, the individuals, Mr. Ellington and Mr.

3   Leventon, who were tasked with responding to the claim and

4   running the litigation in-house, had formed opinions about the

5   likely loss and had shared those with each other and certainly

6   with Mr. Dondero.

7       In the course of purchasing this after-event, you know,

8   so-called after-the-event policy, they were asked by Beecher

9   Carlson -- you're going to find out that Beecher Carlson is

10  the managing -- insurance managing agent for Sentinel.  And

11  they were asked at some point, well, you know, what's up with

12  these claims?  Or can you give us an analysis of them?  And

13  there's an email exchange between Mr. Leventon and then Mr.

14  Sevilla, who at the time was another former assistant general

15  counsel in the Highland legal department.  And in that

16  exchange, which they prepared to be able to send on to

17  Sentinel's representative, Mr. Leventon notes, The claims

18  against CDO Fund and HFP and affiliates are very strong.  They

19  are guaranty claims.  The Defendants' primary responsibility

20  will be to contest the amount of damages.

21      And they note that it's $686 million at that time from

22  February of 2009, accumulating interest.  And obviously the

23  billion-dollar judgment, much of it is interest.  And they

24  noted how CDO Fund was a guarantor of 49 percent.  And, again,

25  by the way, HFP/Affiliates are 51 percent guarantors.

74

1      At this time, they were insisting, demanding, putting on

2  evidence in court that supposedly HFP and SOHC were not at all

3  alter egos, that they were not related, they shouldn't be

4  treated as one.  But internally, when they wanted to pool the

5  assets of HFP and SOHC to purchase this so-called policy, and

6  then when they wanted to justify it to Beecher, they're always

7  talking about it as if -- as if it's HFP, as one unified alter

8  ego.

9      So that's just a -- one of the many sort of side let's

10  just say issues that are uncovered by this whole series of

11  events.

12      In any event, that's our main story.  At that point, and

13  the next thing to see or badge of fraud is the transferor's

14  inability to pay.

15      Well, at this time, these funds, the HFP and CDO Funds,

16  who are the main Defendants, HFP through its alter ego, SOHC,

17  at that time, were insolvent.  And they were insolvent -- at

18  least, they had declared to their investors they were

19  insolvent back in 2009.  And check -- and look at this.  This

20  is the HFP letter that went to its investors in 2009:  Due to

21  events and circumstances described in this letter, we've

22  concluded that as of December 31, 2008, it's likely that all

23  future inflows of cash to HFP will be used to pay creditors

24  and there is no prospect of return to holders of HFP.

25      So, first of all, they're telling their holders of HFP,

1    hey, all we've got left are creditors.  And by the way, other

2    documents, and we've submitted them into the record

3    (indecipherable) and they're talked about in the depositions,

4    the only major creditor left is UBS.  If UBS's claim had

5    really been denied or if they had prevailed, HFP would have

6    actually finished in the black, not in the red.

7        So they're telling their investors, hey, we can't pay you,

8    we're insolvent because we have this giant claim to UBS.  Of

9    course, they've never paid a single penny to UBS.  HFP has not

10   directly.

11       Meanwhile, CDO Fund, the same thing.  They're telling

12   their investors, yes, we're also insolvent.  And explained to

13   their investors, of, look, all of the Fund's available assets

14   will be distributed to the Fund's remaining (indecipherable)

15   and counterparties and other senior and trade creditors in an

16   orderly liquidation.

17       Of course, that doesn't happen.  None of CDO Funds -- and

18   you've seen the CDO Funds that were belatedly identified to

19   Mr. Seery in 2020, and you've also seen that lengthy list of

20   funds or assets that CDO Fund had back in 2017.  They

21   obviously had this post-2009.  They have told their investors,

22   hey, everything we've got left is going to be distributed to

23   our creditors, but instead we know now that they've funneled

24   it to Mr. Dondero and Mr. Ellington's Cayman entity.

25       Another badge of fraud.  Suspicious timing in anticipation

76

1    of litigation.  This plan was all hatched -- remember, March

2    '17 is when they lost summary judgment.  This plan is hatched

3    just a few weeks later, in April of '17.  And this is the so-

4    called settlement analysis that sort of lays out the scheme.

5    And this is a document that I believe was prepared by Mr.

6    Leventon and Ms. Vitiello, at Mr. Ellington's direction, I

7    believe.  And it's Exhibit 7 in the record.

8        And it notes -- this is why they were trying to justify

9    why they should do this ATE policy.  And they say, well, if

10   UBS wins, Highland is going to lose all the assets again in

11   HFP and CDO Fund.

12       And by the way, of particular note, the one asset they

13   made particular note of:  HFP assets include a $32 million DAF

14   note payable.  Put a pin in that.  And remember, why are they

15   so intently concerned?  Of all the $300 million of face value

16   assets, the one that gets particular attention in this

17   presentation is a $32 million DAF note payable.

18       That note, by the way, we now have come to learn, is an

19   entity which Your Honor is familiar with, I think it's been

20   called CLO Holdco or CLO entity, and it's also known as the

21   DAF.  That note was owed to CDO Fund because of a prior

22   transfer, probab... you know, of -- or I do know that we're --

23   I'm sure we'll dig into.  And so they're holding this $32

24   million note that the DAF owes them, and they note that, if

25   Highland doesn't settle, Highland is going to lose all the

1    assets, including that particular $32 million DAF note.

2        It's also noted that Highland will face years of

3    fraudulent transfer claims through the Highland structure, and

4    HCMLP will face clawback of $9 million and liability to

5    backstop HFP CDO Fund for up to $1.2 billion.

6        This was the view of the legal department.  Obviously,

7    never shared with us during the litigation, but we've come to

8    understand never shared with Mr. Seery or with Mr. Morris,

9    right?  Their team, right?  This is -- this is all -- this

10   document is uncovered after Mr. DiOrio is fired, after

11   everyone is fired, I believe, related to this, and then they

12   happen to find this document either on a desk or through that

13   email search that you heard about.

14       Side note.  If Highland were to win, you can see below,

15   then it would show that HFP is solvent.  That would have

16   reduced -- reversed the tax write-off and would have perhaps

17   exposed them to tax fraud or to at least a massive payment for

18   prior taxes.

19       So, a lot going on here.  But, again, let's get back to

20   the direct impact on UBS and then, later, Highland.

21       So, this is the settlement analysis that was prepared to

22   support this whole ATE scheme.  And here's the structure

23   that's laid out.  Okay.  And this is before the actuaries have

24   gone to work.  This is before they've put together the actual

25   documents.  This is April of 2017, when the scheme is first

78

1   hatched.  And it says, Step 1.  HFP -- once again, HFP, CDO

2   Fund -- will buy a $100 million ATE policy from Sentinel.  The

3   ATE premium will be all assets in HFP CDO Fund.

4       It doesn't say, gee, we'll go find out what the premium

5   is, or we'll go check with an actuary and see what it should

6   be, or we'll price this thing out and find out what the

7   likelihood is of buying such a helpful insurance policy at

8   this time.  Nope.  It's just, The premium is going to be

9   whatever assets are left that we can round up.  That's the

10   plan from the get go.  And it's suspiciously timed right after

11   summary judgment has been lost in anticipation of trial.

12       The close relationship amongst the parties who devised

13   this plan.  Mr. Ellington -- that's putting it mildly.  Mr.

14   Ellington is the one who devised the plan.  Says the idea --

15   we asked him, Who had the idea?  He said, I had that initial

16   conversation with Mr. Leventon because it was my idea.

17       Question, It was your idea to have Sentinel issue an

18   insurance policy with respect to the UBS litigation that was

19   then pending in New York, correct?

20       Answer, Yes.

21       This is from Mr. Leventon's deposition transcript, 86:21

22   through 87:6, which has been marked and included as part of

23   the designations for Mr. Ellington.

24       Mr. Leventon was then asked, Who made the decision to

25   obtain the policy?  So, Mr. Ellington had come up with the

1   idea, but of course, we all know who's the ultimate decider at

2   Highland.

3       Mr. Leventon says, My understanding is that it was Mr.

4   Dondero who made that decision.

5       What's that understanding based on?

6       That was communicated to him by Mr. Ellington.

7       When?

8       Back around the time, probably right after the policy was

9   implemented.

10      Of course, there is a very close relationship, because

11  Dondero and Ellington own several.  This is Mr. Ellington.

12  This is a -- this is an org chart for Sentinel.  And you can

13  see it was notarized -- this was produced to Sentinel back in

14  -- or provided, I believe, to the regulators in the Caymans in

15  January of 2018.

16      So this is the way things looked back at the end of '17

17  when these actions were taken.  And you can see that Mr.

18  Ellington has a 30 percent ownership interest in Sentinel,

19  although he was only given a 9 percent vote.  Mr. Dondero had

20  a 70 percent ownership interest ultimately through a bunch of,

21  you know, intermediary entities, but yet a 91 percent vote in

22  how Sentinel would be operated.

23      And that's it.  These are the two so-called UBOs or

24  ultimate beneficial owners.  Sometimes they're listed on org

25  charts as UBO 1 and UBO 2.  But UBO 1 and UBO 2 are simply Mr.

80

 1  Ellington and Mr. Dondero, who collectively own a hundred

 2  percent of Sentinel.

 3       Remember, this is the scheme.  We're going to pool all of

 4  HFP and CDO Fund's assets, whatever they amount to, send them

 5  off to Sentinel, supposedly for this hundred-million-dollar

 6  ATE policy.

 7       And this was Beecher Carlson.  Again, it's Sentinel's

 8  insurance manager.  He was deposed in these proceedings.  And

 9  we asked, Was it common that employees of Highland Capital

10  would do things on behalf of Sentinel?  This goes, again, to

11  whether there's a close relationship between HCM and Sentinel.

12  Mr. Carlson -- or Mr. Adamczak, who is the representative, the

13  corporate representative of Beecher Carlson, says, Well, a

14  captive insurance company does not generally have any

15  employees, so all of the employees are typically from a

16  sponsoring organization.  In this case, it was Highland

17  Capital that was the sponsoring organization.

18       Now, when you look at the deposition transcripts, you can

19  see that, one by one, the former Highland employees denied to

20  various degrees their involvement with Sentinel.  Meanwhile,

21  though, Sentinel has no employees, and it was these Highland

22  former employees who did everything for Sentinel while they

23  were being paid by Highland.

24       But, again, this just -- for purposes of this factor, this

25  just goes to the close relationship between HCM and Sentinel.

81

1    Obviously, Mr. Dondero, who ultimately controls HCM, also

2    ultimately controlled Sentinel.  You've got Mr. Ellington.

3    And then you've got all of the Highland former employees doing

4    the work of Sentinel.

5        Here is an example of each of the key figures who were at

6    Highland who've now been fired.  Mr. DiOrio.  He was the

7    former managing director of Sentinel, but he was also a

8    Sentinel director.  And that included right up until after

9    even he was fired by Highland and finally tendered his

10   resignation.  But he was made a director in the wake of this

11   transaction.

12       Mr. Sevilla.  He was the former assistant general counsel

13   at Highland.  And he was described by Mr. DiOrio as the point

14   person, I guess, for things that had to happen with Sentinel.

15   He helped with the formation.  He, as I understand it, he was

16   part of the team.  And he's also described as the point person

17   by everybody except for Mr. Sevilla, who disavows the same

18   kind of involvement that everyone else said he had and that

19   the documents show he had.

20       Then you've got Mr. Leventon.  He was another former

21   assistant general counsel.

22       By the way, all these folks are in the legal department.

23   They have fiduciary duties.  They're all in the legal

24   department, and they presumably have fiduciary duties

25   throughout, and they're all, as you can see, right in the

**Appx. 00573**

82

1   thick of this.

2       Mr. -- the corporate representative of Beecher Carlson

3   talked about how Mr. Leventon, each year-end, would work with

4   Sentinel's actuaries to determine the scenarios for the

5   outcome of the case -- he's talking about the UBS litigation

6   -- with the end goal being to determine what the loss,

7   ultimate loss would end up being that Sentinel would record in

8   their financial statements.

9       So Mr. Leventon is working hand-in-glove with Sentinel

10  from the time the policy is issued -- even before; you know,

11  he was one of the drafters of that memo -- but certainly for

12  years after, including after the restructuring.  Of course,

13  with never a word to Mr. Seery or his outside counsel.

14      And then you have Katie Irving.  She was a former managing

15  director.  She's, again, one of these people who, in her

16  deposition, tried to effectively say she really didn't have

17  much to do with Sentinel.  But at the Beecher deposition, they

18  noted that she was someone who had been knowledgeable of all

19  the activities centered around Sentinel, and she attended

20  multiple meetings between Sentinel and CIMA, which is the

21  regulatory authority in the Caymans.  She had traveled to the

22  Cayman Islands several times for these meetings, yet somehow

23  it's all apparently slipped her mind when she was being

24  examined or asked about this kind of information directly or

25  indirectly by Mr. Seery and his team.

83

1        Back to the Beecher Carlson representative.  In terms of

2   the unusualness of the transaction, Beecher has lots of

3   insurance companies that they help manage.  We asked if they

4   have any other clients that issue ATE policies.  Answer is no.

5   Sentinel is the only one.

6        Just how many ATE policies did Sentinel actually produce?

7        Just the one.

8        Just the one we're looking at here?

9        Correct.

10       So this is very outside the ordinary course of business.

11   And here's why.  At the time of the transaction -- this is the

12   financials at the end of 2016.  Remember, the transaction is

13   summer of 2017.  Things haven't changed much for Sentinel in

14   those few months.

15       (Interruption.)

16           MR. CLUBOK:  That's -- the total assets are $19

17   million.  Okay?

18           A VOICE:  Sorry.  I didn't mean to get --

19           THE COURT:  I'm sorry.  Who's speaking?

20           MR. CLUBOK:  Okay.

21           THE COURT:  Who is that voice?

22           MR. MORRIS:  I think that was one of ours, Chris, I

23   think you went off mute.

24           THE COURT:  Okay.

25           MR. CLUBOK:  That's okay.

84

1          THE COURT:  Continue.

2          MR. CLUBOK:  That's fine.  Back on Slide 30.  Slide

3     30 is UBS Exhibit 9, and that's from Sentinel's financial

4     statements year end of 2016.  And you can see that as December

5     2016 Sentinel's total assets were only about $19 million.  So

6     how are they issuing a $100 million ATE policy in good faith?

7          Well, the only way to even try to justify it is if you get

8     more than $100 million in transfers, which we know they

9     ultimately did.  But, again, this just shows how unusual and

10    outside the ordinary course of business this whole transaction

11    was, even for Sentinel, even if someone were to try to portray

12    it as just a, you know, normal insurance company, just your

13    everyday normal captive insurance company in Highland run by

14    Mr. Dondero and Mr. Ellington.

15         You can see the total cash was only about $5.8 million.

16    And of course, the policy doesn't -- isn't supposed to pay off

17    the claim in cash and prizes.  It's supposed to pay just cash.

18    But they only had about less than $6 million on the balance

19    sheet at the time.

20         Unusualness of the case, case, is another factor that

21    indicates fraud.  And of course, we asked -- this is the

22    former chief accounting officer, Mr. Stoops.  At Mr. Sevilla's

23    instructions, did you transfer all the assets of the relevant

24    funds?

25         Answer, Yes.  That is my recollection.

1    And in that instruction, he wanted all funds or all assets

2 transferred, regardless of the value of those assets?

3    Yes.  That's right.

4    Mr. Ringheimer, who was the former management or manager

5 of operations, I guess, is his title at Highland, he was

6 asked, To the extent there's a transfer of all of the funds of

7 a particular entity, would you say it was common while you

8 were at Highland for Highland to transfer all of the assets

9 out of a Highland entity?

10    Answer, I don't believe I -- so, I have seen funds wind

11 down before, but I don't believe I've seen another transfer

12 like this before.

13    Then we asked, Do you recall what the urgency was for

14 executing a transfer that day?

15    Answer, I do not.

16    Never communicated to you why it was urgent?

17    Answer, If they did, I don't remember.

18    And remember, you've already heard testimony that it was

19 done in such haste that some of the assets weren't even

20 properly transferred.

21    Use of dummies.  This is a -- you know, it's always hard

22 to unpack how Highland -- entities.  But if you look at

23 Exhibit 1, you will note three insureds.  CDO Fund and SOHC,

24 which you would expect, but also, oddly, CDO Holding Company.

25 When you look at the Defendants, though, you don't see CDO

1  Holding Company.  That was not one of the Defendants in the

2  litigation, and yet somehow they're becoming an insured

3  pursuant to this policy.  That's curious.

4      Meanwhile, who paid for the insurance?  There are six

5  entities who paid for the insurance, and three of them are the

6  insureds.  That's double-curious, right?

7      And so all of this just adds to the suspiciousness of this

8  whole transaction.

9      So, what about the consideration?  Well, obviously, you've

10  heard a lot.  It was inadequate.  This was, going back to that

11  settlement analysis that was done, you know, hastily a few

12  weeks after summary judgment was lost, out there it was

13  identified that HFP CDO Fund would send all their assets, and

14  they said, parentheses, $94 million, as the ATE premium, and

15  that would let them write a $100 million ATE policy for UBS

16  liability.  They had roughly estimated that there was about

17  $94 million left between HFP and CDO Fund, and that would

18  justify this $100 million policy.

19      Well, it turns out that the aggregate purchase price paid

20  was actually $25 million.  Okay?  So the premium gets set at

21  $25 million, for other curious reasons.  And meanwhile, the

22  aggregate fair market value of all the assets -- because the

23  plan was always to transfer all the assets, regardless of the

24  value -- turns out to be $105 million.  So that original plan,

25  transfer all the assets to get us $100 million, that never

1   changed, even though it turned out the assets were worth more

2   than $100 million and the so-called premium had to be set at

3   $25 million.

4        Now, the Cayman Islands Monetary Authority, CIMA, found

5   this suspicious.  And they asked about it.  And here you'll

6   see, they catch Sentinel in a complete lie.  This is a report

7   that was done May 19th, when they're saying -- they're asking

8   for information about what happened here.  And they say, Those

9   changed with Licensee's governance could not explain the basis

10  upon which the investments had been valued on or about August

11  20 -- August 1, 2017 for the purpose of premium settlement.

12  And this is Page 78819, Bates label, that is, of UBS Exhibit

13  11.  Sort of a question/answer.  It's like CIMA will say,

14  Well, here's the question we raised, and then they will say,

15  Well, how did management respond?  And this is how management

16  responded when CIMA raised this question.  They said, you

17  know, basically, how'd you set the policy?  How'd you set the

18  premium?  And management -- this is management's comments, was

19  that, At the time the ATE policy was drafted, premium had been

20  established at $25 million based on a pricing study conducted

21  by Licensee's actuary.

22        So they told CIMA, Hey, no problem, we had an actuary set

23  the price, and $25 million was the price.  Let alone the

24  overage of payment, but at least $25 million was supposedly

25  the premium price pursuant to this actuary.

88

1    Well, CIMA didn't just take their word for it.  They

2    continued their investigation, and this is how CIMA in this

3    report, Exhibit 11, responds to this management comment.  They

4    say, Well, on April 4, 2019, the Authority held a telephone

5    interview with Mr. Jason Stubbs of Risk International, the

6    Licensee's actuary.  During the interview, Mr. Stubbs informed

7    the Authority he was not involved in the determination of

8    premium pricing for the Licensee to any extent at all.

9        It goes on to say, The Authority notes with concern that

10   the management's assertion that the ATE policy premium of $25

11   million was established based on a pricing study conducted by

12   the Licensee's actuary contradicts the actuary's position.

13       So the actuary is basically outing them for having just

14   simply lied to CIMA.

15       But you still -- even all that is suspicious, but the

16   problem is we know the assets were worth way more than $25

17   million.  And by June of 2018, there was already questions

18   being raised.  And Mr. Adamczak at Beecher Carlson had written

19   an email to J.P. Sevilla and Matt DiOrio, copied one of his

20   colleagues, and he said, Look, the problem is the premium was

21   only $25 million, creating a ding on the transaction.  This is

22   from Exhibit 12.  Because there is no return of overpayment of

23   premium, it gives rise to the question, is this an arm's

24   length transaction?

25       This is the managing agent for Sentinel raising these

89

1   concerns.

2       So what do they do?  They change -- they change the

3   policy.  And this is -- this is way after the fact.  This ends

4   up being in 2018.  This is like June of 2018.  Remember, this

5   is about a year after the policy which was -- it was issued in

6   2017.

7       And what they do is they just say, you know what, let's

8   just adjust the premium.  Now let's say the premium is $68

9   million.  Okay?  And now let's say that the limit of indemnity

10  is down to $91 million.  Okay?  Remember, previously, they had

11  a fair market value of $105 million.  They've now got the fair

12  market value supposedly down to $68 million.  P.S., because

13  they're now treating that note from DAF as worthless, amongst

14  other things.

15      But they say, Well, the premium is $68 million.  We had

16  said if it was a $25 million premium, we at Sentinel would

17  have to take a gain on that difference.  Well, what if we just

18  after-the-fact changed the premium up to match exactly the

19  supposed new fair market value, and then lower the limit of

20  indemnity at the same time down to $91 million?

21      So they cook up this scheme, they do it.  Of course, they

22  forget to have the insureds sign it, which is, again, a series

23  of, I would say, fully unusual transactions.  And this is, you

24  know, again, a year after.  So they're just continuing to do

25  things to dig deeper into this hole.

90

1      We asked Mr. Adamczak, Is this something you've done
2  before in other policies, changed the premium to reflect
3  assets transferred?
4      Answer, This is the first situation like this we've seen
5  where there are assets that were taken in as opposed to cash.
6      And have you ever seen anything like it since?
7      I have not.
8      Beecher Carlson is a nationally renowned, you know, large
9  entity that works with insurance companies, I believe, you
10 know, all over the world, I think, but certainly they have
11 many clients.  They've never seen anything like this.  And
12 certainly it has never been done before by Sentinel.
13     So, again, this goes to how it's an unusual transaction,
14 and also it goes to the fact that this is not just one mistake
15 or one event but a whole series of things in a pattern.
16     By the way, he was asked, Did any one of the insureds
17 actually agree with the policy premium increasing by three
18 times without increasing the coverage amount?
19     He said, I'm not aware if that was presented to the
20 insureds.
21     Now, we know that a couple of those individuals at
22 Highland Capital Management were in the mix on this, but it
23 was never formally presented, I guess, to the insureds.
24 Somebody at Highland just said, Yeah, go ahead and do this.
25     Then, in 2019 -- and note, this is Exhibit 15, the date of

1   this is December 31, 2019, months after the bankruptcy in this
2   case has opened.  And then what happens?  There's an asset
3   transfer agreement because Sentinel had this collection of
4   assets that they want to get out of even Sentinel and
5   basically to transfer all these assets to another Dondero/
6   Ellington-affiliated entity -- I believe it was to Sebastian
7   Clark, allegedly -- all of these assets for $3.  That's in
8   December of 2019.
9        Now, this is -- you know, they've already moved the assets
10  from CDO Fund, HFP, and Sentinel in 2017.  They disposed of
11  some of them in other ways, but some they still have in the
12  Caymans.  And what they do is they hustle or try to hustle and
13  get them out after the restructuring to an entity connected or
14  owned by Ellington for $3.
15       You'll note that amongst these assets there's that $32
16  million CLO Holdco also known as the DAF note.  Remember the
17  one that they had so much emphasis on when they originally
18  hatched the scheme, that they were really worried that this
19  note could ultimately end up in the hands of UBS if UBS were
20  to prevail?  Well, they now try to double-transfer it away.
21       After, by the way -- here's another asset.  Aberdeen.
22  This is an interest in a CLO.  We now know this is -- millions
23  of dollars, I believe, are currently restrained in connection
24  with this Aberdeen asset by the New York court.  But, again,
25  they're just transferring all these assets, supposedly for $3.

1      Why?  Well, Mr. Adamczak said they were told they were

2  worthless.  And we asked, Who told you they were worthless?

3  And he said, That direction would have come from Matt DiOrio.

4  This is December of '19, after the bankruptcy.

5      Then we asked, Well, as part of the valuation service the

6  Valuation and Research Corp. had done, had they determined

7  these assets were worthless?  Had this VRC group, this -- the

8  group that previously they had used to try to give them at

9  least some argument of fair market value.  Mr. Adamczak said,

10  Well, they -- VRC had not been engaged to perform valuations

11  on those investments, and it was discussed that if those

12  investments were worthless there's no point in obtaining a

13  valuation.

14      So just think about that.  And this is his deposition at

15  276, Line 17, through 277, Line 6.

16      Basically, Matt DiOrio says, Hey, these assets are

17  worthless.  Transfer them to this entity for $3.  And they

18  say, Well, shouldn't we have VRC value them?  And DiOrio

19  basically says, No need to value them.  I told you they're

20  worthless.  Why spend money valuing them when I've already

21  told you they're worthless?  Even though they include a $32

22  million note payable by the DAF and they include at least

23  other assets that we know are worth millions of dollars.  We

24  asked if Beecher had done anything independent, and they

25  explained that had no way of confirming anything.

1      Now, luckily, those assets had been transferred back to

2  Sentinel.  And, luckily, the current directors, I believe, did

3  listen to our arguments, and also had, I think, some pretty

4  sharp instructions from CIMA.  And as a result, those assets

5  or those purported transfers have been unwound and those

6  assets have been returned to Sentinel.

7      But this just shows the danger and risk that at every --

8  every opportunity, these individuals will try to keep moving

9  these assets and try to keep evading them from judgment.

10     And by the way, this has happened before.  Mr. Seery was

11 testifying a little bit about what started all this.  This --

12 Slide 43 just has a compilation from UBS Exhibit 52, which

13 just showed the asset transfer or the fraudulent transfer that

14 we alleged back in 2009.

15     And for UBS, this is just déjà vu all over again, because

16 what we alleged in the New York case was, at the time, there

17 was a whole bunch of assets that were pooled into HFP and then

18 distributed to the winds right after default was declared in

19 the contract and at the outset of this litigation.

20     Actually, after UBS had sued Highland, a couple months

21 later they did this, you know, then face value of a couple

22 hundred million dollars in assets that we had argued was

23 fraudulently transferred.

24     What we see now happened in 2017 was basically the follow-

25 on to that, like, everything that was left, let's put it all

94

1  together and send all that to Sentinel.  So, to us, it is a

2  pattern.  And it is, as I said, déjà vu all over again.

3      And back then, just like in 2017, of course, Mr. Dondero

4  signed on behalf of everybody.  That's the typical pattern.

5  That's the series of continued fraudulent transfers that had

6  been -- UBS, but also really speak to what we've seen from

7  Highland in connection with many of the creditors.

8      Sentinel again looked at all of this -- later, and they

9  say, with respect to some of the other practices, they say

10 that, Those charged with the Licensee and licensing at

11 Sentinel governance could not explain the basis upon which the

12 investments have been valued in August 2017.

13     They also couldn't explain the reason why the information

14 that was relied on to value the investments for the purpose of

15 premium couldn't be readily provided to the auditors upon

16 request, considering that the policy inception and the

17 financial statements on it was only a few months apart.

18     CIMA also noted, and this is Exhibit 11 at Bates 78819,

19 that those charged with governance could not explain why the

20 premium was adjusted without a commensurate adjustment to the

21 indemnity limit provided or why the initial pricing was

22 subsequently deemed not sufficient.

23     And they say, In addition, in any case, to amend an

24 insurance policy to artificially inflate the premium amount to

25 equal the value of investments transferred to the licensee

95

1    without any justifiable business purpose and economic

2    substance is, at the very least, questionable.

3        In sum, the above matters cast significant doubt on the

4    economic substance and business purpose of the transactions

5    relating to the ATE coverage.

6        According to CIMA, it was Sentinel's own lawyers.  They

7    hired a lawyer in Cayman to look at this, and they tried to

8    get some help -- this was back in 2017 -- to just effectuate

9    this plan once it had been cooked up.  And even back then the

10   Cayman lawyer noted, Has any thought been given as to the

11   legal validity of such a transfer, bearing in mind that these

12   assets will then be put beyond the reach of the Plaintiffs in

13   the U.S. litigation against the Fund.  Obviously, the last

14   thing you want to find is that the "premium" has to be

15   returned or set aside as some unlawful preference or similar.

16   Obviously, an issue for U.S. counsel, but just thought I

17   should raise it.  Well, you can imagine U.S. counsel at the

18   time in 2017 did nothing, but this was obviously flagged by

19   their Cayman counsel.

20       So, one factor that I skipped over but you've heard a lot

21   about is the secrecy.  And, really, the secrecy is a -- just

22   sort of it wraps everything up.  You know, we know the

23   bankruptcy was in October 2019.  We know that we got a

24   decision that notified the world or at least notified Highland

25   and Mr. Dondero and even Mr. Seery before he became a director

96

1    that there was this looming $1 billion judgment.

2        It was first issued as a decision.  It was not made public

3    so that the parties could have some time to try to negotiate

4    settlement, which we -- you heard testimony in other

5    proceedings that we started to with Mr. Ellington.

6        So Highland obviously had received it from the Court and

7    knew all about the billion-dollar judgment.

8        February 10th, it -- I'm sorry, the billion-dollar then-

9    decision.

10       By February 10, 2020, it is reduced to a judgment for

11   Phase I.  And yet from 2019 until the beginning of 2021,

12   everyone -- all these ex-employees of Highland now who knew

13   about this actively concealed it.

14       And of course, we start with Mr. Dondero.  This is Mr.

15   Ellington saying, Did you ever tell Mr. Dondero that there was

16   an insurance policy issued by Sentinel that could potentially

17   satisfy the judgment?

18       That was kind of an obvious question.

19       Ellington said, Well, I didn't need to tell Mr. Dondero.

20   He was aware of it since the inception.

21       And, of course, Mr. Dondero signed it.  So it just goes

22   without saying Exhibit 1 shows that Dondero knew about it.

23   And, of course, Mr. Dondero never said anything about it

24   throughout, as you can see by his deposition.

25       Meanwhile, though, Mr. Sevilla also covered it up.  We

97

1  asked Mr. DiOrio about Mr. Sevilla's role, and as we noted, he

2  was the point person for things that happened on Sentinel.  He

3  knew everything about Sentinel.

4       We asked Mr. Sevilla, in his deposition transcript, 278,

5  Line 20, to 279, Line 3:  So, between the time the independent

6  board was appointed and your departure from the company, did

7  you ever disclose to any of the members of the independent

8  board that you were aware the existence of a Sentinel

9  insurance policy ostensibly provided for coverage for the loss

10 of the UBS litigation?

11      Answer, no.

12      Mr. Leventon.  Mr. Leventon doesn't just omit information,

13 he -- well, you'll see for yourself.  This is one of the

14 documents where he had been tasked with tracking the assets

15 through on SOHC.  He says, this is Exhibit 16, and in one of

16 his emails to Mr. Seery and to Mr. Demo and others, he claims

17 he had been tracking the assets through an SOHC and CDO Fund.

18 He was putting together a report with supporting

19 documentation.  And he claims that there's just this small

20 account of cash and a few worthless securities.

21      Now, he's claiming he's tracking the assets through.

22 Okay.  He knows what happened to the assets of SOHC and CDO

23 Funds.  He helped devise the scheme to transfer them in 2017

24 to Sentinel.  He has also been, every year, talking to

25 Sentinel or their actuaries about the prospects of the

98

1  litigation.  And yet when Mr. Seery, Mr. Demo, and others task

2  him with tracking the assets, he just, you know, says what's

3  there, doesn't ever mention this.  You know, this would be, at

4  a minimum, a material omission.

5      I think if you read the documents and you look in Exhibit

6  16, you'll see things that are even more concerning.  This is

7  not an accidental omission.

8      This is the list he provides, without identifying at all

9  that there is, in fact, all of this other -- all these other

10  assets that were transferred and a $10 million supposed

11  insurance policy just available for the asking.

12      And he was asked, Well, you knew there was a schedule that

13  showed Sentinel having an interest in Multi-Strat that

14  specifically said, parentheses, from Highland CDO Fund.  There

15  was a schedule that showed that.

16      And he said, Well, I think that's fair.  December 2017, I

17  think that's fair.

18      And we asked, Well, when you were tasked with helping

19  trace the assets of CDO Fund and HFP, you even talked to Mr.

20  Ellington, in words or substance, about whether or not you

21  should mention Sentinel, correct?

22      And this is an email exchange that Mr. Ellington had had

23  with Mr. Leventon back in December of 2017.  This is Exhibit

24  46.  This showed -- this is of Highland Credit Opportunities.

25  In other words, the Multi-Strat list of -- of interests in

99

1   Multi-Strat.

2       And you can see, back in the end of 2017, it was

3   identified, the first one on the list is an interest of

4   Sentinel in Credit Opportunities, also called Multi-Strat.

5   Okay.  That's the interest that right now is being restrained

6   by Your Honor's order.  And this interest was being -- was on

7   the books as being settled but it said right in their

8   document, parentheses, from Highland CDO Fund, because it had

9   only been transferred a few months ago, in August.  Right?

10      So Leventon and Ellington know this.  They know that

11  Sentinel has an asset that came from CDO Fund.  Of course, not

12  just because of this document.  This is just one of many.  But

13  back then -- and, again, if you look at those documents, Mr.

14  Leventon was asked, You never told anyone at the Pachulski

15  firm that assets of CDO Fund held with respect to Multi-Strat

16  may have been transferred to Sentinel, correct?  And he says

17  yes, that's correct.  Just never -- never mentioned it.

18      We asked, What was the information you had about the

19  assets of SOHC and CDO Fund from March of 2009 to the present

20  that you chose not to provide to the Pachulski firm?  He says,

21  Answer, I knew that there had been a transaction in 2017

22  sometime with respect to an after-the-event insurance policy

23  with Sentinel.

24      Then we asked, Did you ever disclose the existence of this

25  policy to any of the independent directors?

100

1       Answer, I never discussed with them one way or the other.

2       This is all while he has been tasked with, as Mr. Seery

3    put it, generally speaking, to trace the assets from 2009

4    through the present.

5       Mr. Ellington goes even further.  He really tries to

6    divert things.  And you'll see in an email exchange where he

7    jumps in and tries to cloud the issue by using a phrase he's

8    used over and over again as he explains so-called ghost funds.

9    This is an August 15, 2020 exchange that's got Mr. Ellington,

10   Mr. Demo, Mr. Leventon, Mr. Seery, and others on it.  And this

11   is Exhibit 17.

12      Mr. Ellington jumps in.  If you read the Exhibit 17,

13   you'll see how he jumps in and he says, Look, stop, stop all

14   this.  You know, basically, he says, There's not much more to

15   do.

16      He goes, I have personally discussed at length this

17   situation with the head of KPMG Cayman Islands and he

18   expressed to me there are currently more than 6,000 ghost

19   funds such as these target entities -- the target entities, of

20   course, are not just random funds out of the so-called 6,000

21   ghost funds, but CDO, SOHC, HFP -- stemming from the 2008

22   crisis that do not have directors, custodians, administrators,

23   bank accounts, et cetera, that sit dormant, and, capital, NO

24   ONE, capital letters, knows what they truly retain, et cetera.

25      He then said, I know that UBS is aware of the situation,

101

1    and I know Andy Clubok -- that's me -- knows of this

2    situation, the so-called situation of everything being ghost

3    funds because I've personally discussed it with him several

4    dozen times, including as recently as this year.

5        He goes on to say, Oh, this process is a Herculean task.

6    He and I just spent 100 hours, or excess of 100 hours, trying

7    to piece together everything they can to create a true and

8    accurate document record, based record, of what happened with

9    these target entities.

10       He is affirmatively telling Mr. Seery, Mr. Demo, and

11   others that, you know, not just waiving those funds and trying

12   to trick them with that, but claiming that he is doing

13   everything with Leventon to piece together everything they can

14   to create a true and accurate document, at least record of

15   what happened to these entities.  And the simple thing that

16   happened to those entities, the most important thing, frankly,

17   the only really relevant thing, is that all of their assets

18   were transferred or tried to be transferred in 2017 to

19   Sentinel.

20       Now, by the way, some of those assets weren't transferred.

21   So CDO Fund still had some accounts and still did have some

22   assets, even when Mr. Ellington is claiming this.  So the

23   whole thing is, you know, inaccurate, but, frankly, just a

24   downright -- well, I won't characterize it.  I think it speaks

25   for itself.

102

1       We deposed Mr. Ellington in this proceeding.  This is at

2   Deposition Transcript 83, Line 15, to 84:24.  I asked him, Did

3   you ever tell me that there was an insurance policy issued by

4   Sentinel that potentially could satisfy that judgment?

5       Answer, No.

6       Did you ever tell Mr. Seery anything at all about the

7   insurance policy that was issued by Sentinel with respect to

8   the UBS litigation in New York?

9       Answer, No.

10      Question, Did you tell Mr. Nelms, Judge Nelms, anything at

11  all about the insurance policy that was issued by Sentinel

12  with respect to the UBS litigation in New York?

13      Answer, No.

14      Mr. Leventon was asked, Well, did you, in words or

15  substance, ever ask Mr. Ellington whether you should disclose

16  the policy?

17      And we got kind of a hard-to-understand answer, but it's

18  Leventon Deposition Transcript 154, 217.  The gist of it is

19  Ellington told him not to.

20      The answer specifically says, So, the conversation was, is

21  the policy relevant to the task I'm working on?  And the

22  answer, Mr. Ellington said he didn't believe that it was and

23  therefore didn't need to be included as material because part

24  of that past.

25      And then I asked, You know, you've been in conversations

103

1   with Mr. Seery.  I don't talk to Mr. Seery hardly ever.  So is

2   there any other thing that any other -- anything else that I

3   should know of or -- or any other reason, you know, outside of

4   my task that I should include in the materials, and Scott said

5   no.  Okay?

6       Basically, this is a very narrowly defined -- it's an

7   effort by Mr. Leventon to somehow define his task down so

8   narrowly that he and Mr. Ellington could somehow have a

9   conversation and believe in good faith, while they are lawyers

10  working for the estate that's in bankruptcy, that somehow this

11  is something they should affirmatively not disclose to Mr.

12  Seery and his team.

13      And then we get to Mr. DiOrio.  And Mr. DiOrio tried and

14  tried to hide it, but ultimately I believe it was his

15  documents that left -- were left behind or that were found

16  that helped unravel the scheme.  But back in January of '21,

17  when he was still here, he repeatedly lied to Highland

18  Capital.

19      This is an email exchange from January 28, '21.  Remember,

20  Mr. DiOrio is a Sentinel director at that time.  Okay?  He's

21  getting paid exclusively by Highland Capital Management, but

22  on Highland Capital Management time he has this side gig of

23  being a Sentinel director.  And he's asked -- he was asked to

24  figure out what are the -- what are the assets that didn't

25  make its way to actually be transferred.  There's an asset

104

1   that's called Greenbrier.  It's an interest in a CLO.  And

2   with respect to that particular asset, he claims he was

3   working to reissue physical certificates, he'll keep everyone

4   in the loop on the timing.  Does not appear to be a swift

5   process, but we're moving forward.  The shares are still

6   registered to Hare & Co., with CDO Opportunity Fund as

7   beneficial owner.

8       So this is one of those assets where they, just because of

9   the haste, had not -- not competently effectuated the transfer

10  as they tried to do.

11      He talks about how BONY has a custody account in CDO

12  Opportunity Fund's name, and been receiving past waterfall

13  payments.

14      By the way, I think this has amounted to over $10 million,

15  and these have been ultimately now paid to UBS and we're

16  continuing to get it as part of the prior settlement

17  agreement, but, you know, obviously only because it was

18  identified at the last minute.

19      Anyway, Mr. DiOrio says, Well, these certificates were

20  transferred in error in 2017 by Carter Chisholm, who no longer

21  works at HCM.  Now, Mr. DiOrio knows exactly what happened

22  with these transfers, okay, but he just kind of gives this

23  weird answer, it was transferred in error.

24      And then Mr. Demo says, Okay, but do we have any

25  visibility into who Sentinel Reinsurance is?  Who owns them?

105

1   What do they do?  Et cetera.

2       Because this is about the time, as Mr. Seery testified,

3   that it's all kind of starting to unravel.  They've seen a

4   ledger that showed that Sentinel actually had some interest in

5   Multi-Strat, and that's kind of weird, and it sparked some

6   memory, and certainly they really start fussing Mr. DiOrio,

7   who is a director of Sentinel.  And Mr. Demo asks him this

8   January 27, 2021.  This is Exhibit 18.  What does Mr. DiOrio

9   say?  He says, It's a nondebtor, non-affiliate reinsurance

10  company, but I do not know who or how it's owned.  That's what

11  he tells Mr. Demo and the others.  Okay?

12      Now, we asked him about that, and we said, Well, you knew

13  it was owned in part by Dondero?

14      Yes.

15      And you knew it was owned at least in part by Mr.

16  Ellington?

17      This is when he gets under oath.  His deposition

18  transcript at Page 336, Lines 3, to 338, Line 1.

19      He said, yeah, he knew it when he told them that he

20  didn't.

21      And we say, Well, he asked -- talking about Mr. Demo --

22  who owns Sentinel Reinsurance, right?

23      Answer, Yes.

24      Okay.  And you didn't tell him Mr. Dondero and Mr.

25  Ellington owned part of it, right?

1    Right.

2    Question, Well, why didn't you just explain this to Mr.

3  Demo?

4    Answer, I wanted as little to do with Pachulski as

5  possible, so I answered the questions and waited for the next

6  one.

7    Okay?  Now, to be sure, he wasn't under oath in Exhibit

8  18, I guess.  But he's a member of the legal department, he's

9  a Sentinel director, he's working for the bankruptcy estate at

10  that time, and he just flat lies.  There's no getting around

11  it.  And then when we're talking under oath, he admits the lie

12  and, you know, basically just didn't want to -- didn't want to

13  have anything to do with Pachulski, I guess.

14    Well, that's when luckily Mr. Seery now stepped in.  And

15  seeing all of this, I think he fires the last of these

16  individuals who were still there.  And then just, you know,

17  weeks later makes a claim on behalf of CDO Fund to Sentinel

18  for that $100,000 million, which, of course, he clearly would

19  have done, and his deposition testimony reflects this, from

20  the get go had he known about it, since we had a judgment and

21  the insurance policy was intended to benefit UBS.

22    So that's secrecy.

23    Turning back to the factors, I'll run through the rest of

24  these quickly.  Transfers retain control.  Well, of course.

25  It is the case that Beecher had been servicing Sentinel --

107

1   throughout the time that Beecher worked for Sentinel, Dondero

2   and Ellington were the ultimate beneficial owners, called

3   UBOs.  Mr. Adamczak testified to that on Pages 22, 24, and 25

4   of his deposition.

5       He was asked, What's the role of the ultimate beneficial

6   owner?  And as he understood it, the ultimate person would

7   call the shots for the captive.  And we asked him if that was

8   true with respect to Dondero and Ellington, that they were the

9   ones ultimately calling the shots.  He said, To the best of

10  our knowledge, that's correct.

11      Everything that was done -- remember, Sentinel doesn't

12  have employees, so everything is either done by a Highland

13  employee working for Sentinel or being executed by Beecher,

14  which is sort of the agent that executes stuff.  And they just

15  did everything that Dondero and Ellington told them.

16      So, with all of that, where has this money gone?  Okay?

17  At least the money that has not been restrained.  Where has

18  some of the other money gone?  And you heard a little bit

19  about this, but I am sure you can't -- will not believe some

20  of this.

21      Basically, the transferors, and that's Dondero and

22  Ellington, retained control and have used that money that they

23  transferred out of CDO Fund and HFP and all the others as

24  their own personal piggybank.  Here is just a sampling of some

25  of the expenses that have been approved since that transfer.

Appx. 00599

108

1    And by the way, these are post-bankruptcy, November of 2019

2    through January of 2020 expenses that, unbeknownst to Mr.

3    Seery and our understanding is unbeknownst to the Pachulski

4    firm, were just being authorized by Mr. DiOrio and others

5    post-bankruptcy with money out of Sentinel that should have

6    been used to pay UBS's judgment.

7        First of all, here's an expense report from January 15,

8    2020 through January 19, 2020.  It's UBS Exhibit 19.  And in

9    there you will see Ellington expenses for a London and Paris

10   trip of over $78,000.  At least one of these trips, I think

11   it's this one, or maybe others, he went with his girlfriend.

12   There are some emails that we have submitted that are in the

13   records that show her, like, talk about which restaurants she

14   wants to dine at, what hotels they want to stay in.  All

15   that's in the exhibits to the depositions.  One of the -- one

16   of the visits they did was a place called Sexy Fish.  Sounds

17   good.  This is all being charged to Sentinel, okay?

18       Then there's another expense report to Toronto, $97,000.

19   Interesting.  There, they spent about $12,000 at the Rebel

20   nightclub.  Okay?  Again, this is all instead of using the

21   money to satisfy the judgment.

22       Meanwhile, there's another one.  This is December of 2019.

23   Scott Ellington.  A $318,000 expense report.  Okay.  Now, this

24   is before Mr. Seery has been appointed but post-bankruptcy.

25   And I'm sure that the Pachulski firm had no idea about this.

109

1  A huge expense on this one was the Sapphire.  This is a trip

2  to Las Vegas.  Somehow they spent $318,000 in Las Vegas.  And

3  there's five entries that total, you know, something like

4  almost $50,000 or something to Sapphire.  So we said, Well,

5  what's Sapphire?  This is Sapphire.  And you can see inside

6  72, there's a picture, and we've hidden strategically some of

7  it.

8      But we asked Mr. Adamczak, the corporate representative of

9  Beecher Carlson, at Page 101, Lines 15, to 102, What did you

10 understand Sapphire to be?

11     He answered, A typical Las Vegas strip club.

12     Question, Did you look at that at the time when they

13 submitted $318,000 in expenses?

14     Answer, Yes.

15     And did you ask Mr. DiOrio specifically about that?

16     Answer, I did.

17     Question, And his answer was that it was business

18 development?

19     Answer, They were all business development.  This is how

20 they do business.

21     Question, They being who?

22     Answer, Highland Capital.

23     Okay?  By the way, the business is, on one day, or one

24 evening, December 16, 2019, as you can see, $9,800, $9,800,

25 $9,000, all being supposedly conducted at the Sapphire strip

110

1    club.

2        Back in the day, this was looked at.  And you can see on

3    some of these emails.  Remember, you heard about this SAS

4    Management server that's apparently been hidden from the

5    Highland -- from the Debtor?  Sarah Goldsmith to Matt DiOrio

6    says that she was submitting the attached expense

7    reimbursement on behalf of Scott Ellington.  Ms. Goldsmith, I

8    think, was his assistant.  Subject to an approval by the

9    directors, please instruct reimbursement to Scott Ellington

10   for this total travel expenses of $318,000.

11       Mr. DiOrio forwards that on to Beecher Carlson and just

12   says, Hey, guys, Please submit the attached expenses for

13   approval and reimbursement.

14       By the way, as a heads up, settlement talks are cranking

15   up, but okay.

16       Internally at Beecher Carlson -- and this finally gets

17   their attention.  They mostly just do what they're told, but

18   internally Mr. Adamczak emails with his colleague and says,

19   Nice.  What the hell is going on with these expenses?  I

20   question how much, quote, business development is actually

21   being done.  Did you look at this?

22       Well, we asked, What raises concern?  He said, The fact

23   there was $318,000 worth of expenses at first, but there was a

24   significant amount of that that seemed to be club-related.  We

25   asked if the directors approved it.  He said, Ultimately, but

1    they also questioned it.

2         Oh, by the way, these are not the current directors.  As

3    Mr. Morris noted, the current directors are new, and those are

4    the ones we're dealing with now.  These were Mr. DiOrio and

5    his two other colleagues back then.

6         They were asked -- they requested the nature of these

7    expenses and then specifically inquired whether all or both of

8    the UBOs would be okay with running these expenses through the

9    captive as business development.  That was their only

10   question.  Are the UBOs -- that is, Dondero and Ellington --

11   going to be okay with running these expenses through the

12   captive?

13        Who did they ask?  Matt DiOrio.  What did he answer?  That

14   it was appropriate.

15        And I just clarified, So he was saying it's appropriate

16   because the UBOs said it was appropriate?

17        Answer, To my knowledge, yes.

18        No justification other than, Hey, if Dondero and Ellington

19   said it's okay, at least according to DiOrio, it must be okay.

20        That's not it, though.  It wasn't just a mod... you know,

21   relatively, I guess, when you consider the total amount of

22   expenses.  There's also dividend payments.  And on Slide 77,

23   you see that we've uncovered at least a total of $8.9 million

24   dividend payments that were paid to Mr. Dondero and Mr.

25   Ellington's entities that they owned, that they're the

112

1    intermediaries to them as the ultimate beneficial owners.

2        Here is an example of a payment that was made in April of

3    2020 -- again, unbeknownst I think at the time, I'm sure at

4    the time, to Mr. Seery.  And this is out of Sentinel's money.

5    It's supposed to be -- you know, they don't even have a

6    hundred million in cash at that time, and yet they're

7    dividending up to Mr. Dondero and Mr. Ellington.  There is an

8    approval of the payment, of course.  It's done by Matt DiOrio

9    and his -- and then two colleagues, as the Sentinel director

10   at the time, in April 24, 2020.  This is Exhibit 47.  A total

11   of $6.4 million.  And you can see it's divided up.  About $4.4

12   million goes to Main Spring, Limited.  This is Exhibit 21.

13   That's a Dondero entity.  And you can see there's -- Exhibit

14   22 shows the wire transfer to another entity called Montage of

15   about $1.9 million.  That's the Ellington-affiliated entity.

16       So, the grand total of about $6.4 million gets distributed

17   70/30, as we've seen in the ownership interest, to entities

18   controlled, respectively, by Mr. Dondero and Mr. Ellington, as

19   set forth in Exhibits 21 and 22.

20       That's not all, of course.  Even in 2021, in January of

21   2020 -- sort of the last gasp before they get found out,

22   there's another dividend payment.  Again, approved by Mr.

23   DiOrio.  January 11, 2021.  This is -- this is all during a

24   time when they're not telling anything to Mr. Seery or Mr.

25   Demo or the others about Sentinel.  And yet Mr. DiOrio is

113

1    hustling dividend payments up to Dondero and Ellington.  And

2    you can see Exhibits 48 and 23 show how the money ultimately

3    gets transferred, you know, even, you know, as late as the

4    spring of 2021.

5         Finally, Sentinel money.  Mr. Morris talked about this.

6    And I guess there's a lawyer on the -- on the -- in the

7    proceedings today that maybe intends to try to benefit from

8    Sentinel's money as well.

9         In June 2021, Beecher Carlson was given a request for

10   expense approval for Ross & Smith of about $75,000.  This,

11   according to Mr. DiOrio, was all in order and should be

12   settled.  Mr. DiOrio represents -- this is June of 2021, after

13   he's been fired by Highland.  He says, The company identified

14   a group of former employees, my -- former employees, okay?

15   Sentinel had no employees.  And by the way, many of these

16   people testified under oath that not only were they not

17   employees, but they hardly did anything at all with Sentinel.

18   Yet Mr. DiOrio is claiming that the company had identified a

19   group of former employees, myself included -- presumably, he's

20   talking about former Sentinel employees; there's no reason why

21   Sentinel would be indemnifying former Highland employees.  But

22   in any event, he says, It relates to our defense with today's

23   hearing that I mentioned.

24        Now, they're not a part of this hearing.  To the extent

25   Sentinel -- Sentinel insurance doesn't go to Mr. DiOrio for

114

1   trying to avoid deposition testimony or something, and that's,
2   by the way, what that hearing was.

3       Your Honor may not remember that date.  We do.  It was
4   June 24, 2021.  This is an entry that shows that that hearing
5   that day was the motion we had to make to compel the
6   deposition testimony, because at the time all of these former
7   Highland employees were fighting having to come provide all of
8   this testimony you've now seen.  You would never have seen
9   much of what we presented today had this motion to compel not
10  been granted.  And they charged $75,000 to fight it.

11      Now, we asked for fees at the time.  And we understand why
12  Your Honor didn't award fees, but -- we can understand that.
13  But it sort of put us flat.  Not only did they not pay our
14  fees for having to move to compel, they depleted Sentinel
15  further, which owes us, at the time, owes us quite a bit of
16  money, for the privilege of trying to stop us from finding out
17  all of the evidence here.

18      So, and I say that it's UBS's money at Sentinel because
19  the New York courts say so.  The New York courts have held
20  that insurance policies may constitute debts against which a
21  money judgment may be enforced under Article 52 of the New
22  York CPLR, and a judgment debtor can enforce the subject debt
23  arising from the court's final judgment against the judgment
24  debtor's insurer, pursuant to Article 52 of the CPLR.  So,
25  really, this money really ultimately should go to UBS.  It

115

1  should not be allowed to continue to be paid for this

2  indemnification or for any other purpose, et cetera.

3      At the end of the day, even if the policy were valued, or

4  valid, UBS would be owed at least $100 million, even if it was

5  a totally valid thing.  But in fact, UBS is owed the $100

6  million plus the $80 million for the fraudulent transfer, for

7  a total of over $180 million.

8      So that's how we get to success on the merits.  The

9  others, I really don't need to go much through.

10     I think, you know, irreparable injury.  In brief, there's

11 case law that makes it clear that the irreparable injury

12 element is satisfied when the defendants would dissipate the

13 frozen assets, and if the defendants were to dissipate or

14 transfer these assets out of the jurisdiction, the District

15 Court would not be able to grant the effective remedy.  That's

16 from the Fifth Circuit, *Janvey v. Alguire*, 647 F.3d 585.

17 There's similar law in the Ninth Circuit:  *Johnson v.*

18 *Couturier*, 572 F.3d 1067.

19     And, again, Mr. Seery, as you heard him testify live, but

20 this is from his deposition, made it clear that he really had

21 no choice.  Without the TRO, this money probably would have

22 been already transferred to Sentinel and gosh knows what would

23 have happened.

24     The weighing of harms.  Well, this adversary proceeding,

25 of course, as Mr. Morris said, we kind of expected maybe

116

1    Sentinel or maybe Mr. DiOrio or someone to intervene.  No one

2    did.  So the proceeding is between UBS and Highland.  There is

3    huge harm to UBS if the injunction is not granted.

4        The other party is Highland, because Highland -- you know,

5    there's certainly no benefit to Highland, and instead what

6    Highland will face is more litigation, costs, and a fraud,

7    which, of course, Highland doesn't want.  And that's why I

8    think Highland -- not only is there no harm to Highland to

9    granting the relief, but Highland wants to cut these

10   proceedings short.  And that's fine with us, as long as we

11   were able to present this evidence, as long as it doesn't cut

12   short the ability to get the full order that we've requested.

13   So, I think the weighing of harms is easy.

14       And finally I end with the public interest.  Your Honor,

15   there is no harm to the public interest if the Court does

16   enjoin fraudulent behavior.  That is the only way that we can

17   prevent harm to the public interest.  You have seen a pattern,

18   a series, you know, it's tacked on to other things you've seen

19   in connection with these proceedings.  But the prevention of

20   unjust enrichment by means of fraud or misappropriation, even

21   if it was affecting "only private entities," is in the general

22   public interest.

23       Of course, here, all of these things impact not just UBS,

24   it affects the other creditors of the estate.  It affects the

25   Court's time.  And certainly, I think as Mr. Morris put it,

117

1  it's just the signal that it sends to allow this to go

2  unchecked would be terrible.

3      So it's many issues of concern that we haven't even dived

4  into as much as we could, including testimony that is

5  questionable, I'll say, at best, and various transfers and

6  information that was not provided to the Court and its

7  representatives.  And, of course, these proceedings, I suspect

8  there will be issues for someone else for another day to deal

9  with.

10     But for us, we just ask that the Court enter the

11  injunction as we have suggested with the minor edits to the

12  version that Mr. Morris and his colleagues submitted.  The

13  public interest will be served by that.

14     And I'll end with, you know, why are we still here?  We're

15  still here because UBS still has that over billion-dollar

16  judgement.  And, in fact, because of interest, that judgment

17  has grown by about $116 million, okay, while we've been

18  dealing with all of this.  While we could've maybe gotten a

19  significant portion, maybe could've settled, et cetera, but

20  it's now up to over $1.1 billion.

21     And how much total has UBS been paid by the judgment

22  debtors?  About $14 million.  By the way, the $14 million is

23  those assets that we caught at the last second that were

24  ineffectually tried to -- transferred, even though they tried

25  to be.  But that's all that UBS has recovered from the actual

118

1   judgment debtors.  And that's why we're still here, that's why

2   we have to stay here, and that's why we should be entitled to

3   continue to make sure that this Court's injunctive power

4   protects UBS's ability to continue in its efforts.

5       Thank you for your patience.  I appreciate it.

6           THE COURT:  All right.  I'm going to ask you a couple

7   of follow-up questions.  I've heard today that once Highland's

8   independent directors, Strand's, discovered all of this, the

9   Sentinel policy and the transfer of assets, they immediately

10  notified UBS.  And one of the results was the settlement that

11  had originally been struck between UBS and Highland was

12  increased with $50 million more to go to UBS.  Could you just

13  elaborate on that?  Before this was all discovered, the

14  settlement that had been negotiated that was going to be

15  presented to the Bankruptcy Court involved how much of an

16  allowed claim that would be paid out of the estate and any

17  other relevant components?

18          MR. MORRIS:  Mr. Clubok, I have those numbers if you

19  don't have them handy.

20          THE COURT:  Okay.  Or Mr. Morris.

21          MR. CLUBOK:  Thank you.  I was just going to -- so I

22  would appreciate that.

23          MS. MORRIS:  So, at the confirmation hearing, the

24  proposed settlement was a Class 8 general unsecured claim for

25  $50 million, a $25 million Class 9 subordinated general

119

1    unsecured claim, and a cash payment of $18-1/2 million from

2    Multi-Strat.

3         After the disclosure of this information, the Class 8

4    claim was increased by $15 million, from $50 to $65 million,

5    and the Class 9 subordinated general unsecured claim was

6    increased by $35 million, from $25 to $60 million.  And the

7    Multi-Strat cash payment remained the same.

8         So, just to summarize, the Class 8 claim went up by $15

9    million and the Class 9 claim went up by $35 million.

10            THE COURT:  Okay.  And just another refresher of my

11   memory.  The global mediation that happened in this case, it

12   was summer 2020, the global mediation before former Judge

13   Gropper and Sylvia Mayer.  So I know UBS technically did not

14   settle during that mediation, but it came about, you know, a

15   few weeks or months after.  But there had been participation

16   by UBS and the Debtor in that mediation.  And, again, this was

17   summer 2020, before anyone knew about this Sentinel insurance

18   policy, correct?

19            MR. CLUBOK:  That's correct, Your Honor, but also, as

20   you note, the mediation started in the summer of 2020.  We

21   were, prior to doing that mediation, in anticipation of that

22   mediation, asking for all this financial information.  To Mr.

23   Seery's credit, as he testified, he said, Hey, we'll get it to

24   you.  We -- that's fair.  And he said, I'll tell my folks to

25   get whatever you need, or words to that effect.

120

1        We didn't settle in the first round when some others did,

2   but we had continuing mediation sessions into the fall.  And I

3   believe, I don't have the exact dates, but I believe UBS then

4   had follow-on continuing discussions with Judge Gropper or Ms.

5   Mayer in, you know, I want to say October, September/October

6   time frame.  And that's when we're still in the mediation, we

7   believe or we've been told at that time, oh, you've got all

8   the information about the assets now, because in the first

9   mediation we didn't have it, so that's why I said, hey, we

10  can't settle.  By the time we had that second set of sessions

11  with Judge Gropper and Ms. Mayer, then we had been given all

12  the information, as we now know, because Mr. Leventon, Mr.

13  Ellington, and others told Mr. Seery and Mr. Morris and his

14  team, hey, this is everything.

15       So, with that in hand, that's when we reached this initial

16  settlement that Mr. Morris described to you.  And then, you

17  know, as we're working through it and we'd gotten that -- I

18  think we finally got to that settlement by the end of the

19  year, by the end of 2020.  But then, luckily, as we continued

20  to press for information, and then in January a lot of this

21  gets uncovered.  In fact, before we had finalized that

22  settlement per those discussions, this was all uncovered.  And

23  so that's what caused us to, then, say, well, --

24            THE COURT:  I'm just mainly trying to be clear.  And

25  I'm just thinking through all the time and attorneys' fees

121

1   that were incurred related to this UBS claim and what was a

2   fair and equitable settlement, without anyone having the

3   benefit of the knowledge about this Sentinel transaction.

4           MR. CLUBOK:  For sure.  And my point is it started

5   August, but we worked all the way -- I think maybe it was even

6   close to Christmas.  I feel like it was very much at the end

7   of the year when we finally got a settlement, and all that was

8   on the fiction of the belated production of some of the

9   assets, which then we get to January and it's like ah, gee, we

10  have to start over again.  And you know, it's all those months

11  of attorneys' fees and time and et cetera, all because or

12  largely because this information was hidden from Mr. Seery,

13  Mr. Morris, and his colleagues.

14          THE COURT:  Okay.  My last question for you.  We

15  heard a little bit of testimony from Mr. Seery about the

16  after-the-fact insurance policy and whether that's a thing or

17  not.  That's our new phrase in this case, "Is this really a

18  thing or not?" it seems like.

19      What is your view of this?  I mean, I'm certainly

20  generally aware.  I think Mr. Seery said, you know, in

21  jurisdictions where there's a loser-pay concept as opposed to

22  the American rule there is a concept such as this, I guess, to

23  at least pay defense costs.  But what is your take on this,

24  you know, fake or real insurance policy?

25          MR. CLUBOK:  So, so a slightly different take.  It's

122

1    a little more nuanced.  There is certainly something called an

2    after-the-event insurance policy that is not -- it would be

3    common for some insurers to issue those policies.  Sometimes

4    it's call judgment insurance.  And basically what happens is

5    that, you know, let's say your company gets hit with some

6    lawsuit, maybe it's an environmental potential liability, so

7    it's now known that, you know, you are alleged to have leaked

8    chemicals onto somebody's property.  So, a claim is filed.

9    Normally, obviously, you can't buy insurance to insure against

10   something right after you find out about it, but there are

11   companies, I understand, insurers, that will say, okay, you've

12   already been sued; I'm going to now insure you against the

13   judgment.  Now, the premium might be very high, and we have

14   to, you know, price it the right way.  But, you know, you have

15   a, you know, if you have a billion dollar claim, if you want a

16   billion dollar judgment, the premium might be, you know, $250

17   million, or you have a $100 million claim, you know, it could

18   be a $100 million claim, and so maybe the premium could be $25

19   [million].  Let's look at the strengths and weaknesses, we'll

20   price it out, et cetera.

21        There is a market that I'm very loosely describing.  I'm

22   not an insurance expert.  I'm not testifying here.  But my

23   understanding is that is a market and you could theoretically

24   get it.

25        What is in the record here is that these guys came up with

123

1   this idea that -- probably because they had heard there's

2   something like this -- and they start with the proposition,

3   okay, all the assets, hundred million coverage, let's backdoor

4   figure out how to work it out.

5      They then ask Beecher Carlson to "shop it" to see if they

6   could get a policy.  And Beecher Carlson, there's extensive

7   testimony in this, I'm not sure we submitted every bit, but we

8   could if we needed to, basically said, yeah, we shopped around

9   and no -- no insurance would have done it for anything like

10   that.  There would have been a very different premium.  They

11   would have had to do lots of due diligence.  It would have

12   been a whole different process.

13      They said some of them agreed to just look into it as a

14   favor to Beecher Carlson, but they were never going to write a

15   policy.  And so there was some -- something suspect.  Some of

16   the individuals said, oh, this looks very legitimate.  We

17   priced it around.  Now, one of -- some of them said, oh, we

18   priced it around.  There's other testimony that some of it's

19   been designated by us that I didn't cover today for purpose of

20   time that say, yeah, but no other insurer would -- no other

21   insurer would do it at this price.  Right?

22      Which just shows it's not -- even if it's a thing,

23   theoretically, this particular transaction is not arm's

24   length.  Obviously, they grossly overpaid.  They did it in a

25   way that was very highly irregular for any insurance company.

124

1   And they -- and for Sentinel, it was the one and only ATE
2   policy they ever tried to issue.
3       So, yes, it's a thing.  That's why they -- there's enough
4   there that they, in some of their deposition testimony, can
5   sort of say, this is a legitimate thing.  And that's why, you
6   know, if we take them at their word, it's perfectly legitimate
7   to have a hundred -- you know, had they told us, hey, we spent
8   $25 million and we got in a $100 million insurance policy, we
9   probably would have said, that sounds okay.  You know.
10      Had they told us we shipped away $300 million face-value
11  assets that were worth at least $105 million and then we're
12  going to buy $100 million policies and we're going to hide it
13  from you and never pay out on it, that wouldn't be so good.
14  And that's the difference between a thing that's legit and a
15  thing that is let's just say highly irregular.
16          THE COURT:  Okay.  All right.  I just wanted to be
17  educated on that point.  I realize what the real beef is here,
18  the nondisclosure.
19          MR. CLUBOK:  Did I give you the information you
20  needed?
21          THE COURT:  What?
22          MR. CLUBOK:  I'm sorry.  Did I give you what you
23  needed --
24          THE COURT:  Yes, you did.
25          MR. CLUBOK:  -- on that?

125

1            THE COURT:  All right.  Thank you.

2            MR. CLUBOK:  Okay.

3            THE COURT:  Was there anything else?  I think you

4    rested, correct?

5            MR. CLUBOK:  I assume Mr. Morris -- I don't know if

6    there's going to be "closing arguments."  I don't need any if

7    Mr. Morris is comfortable with standing on the record, unless

8    there's final --

9            MR. MORRIS:  I've got about three minutes, Your

10   Honor, if I may.

11           THE COURT:  All right.  Go ahead, Mr. Morris.

12           CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

13           MR. MORRIS:  Number one, I don't think anybody could

14   fairly call this insurance policy a legitimate thing, and you

15   know that from two undisputed facts.  Number one, it was never

16   disclosed, and number two, nobody ever made a claim until Jim

17   Seery did.  So nobody ever tried to recover the assets and

18   nobody ever disclosed the existence of the policy.  It is not

19   a thing.

20      Number two, at Slide 79 of Mr. Clubok's presentation,

21   you'll see a transfer of $6.4 million to an entity called Main

22   Spring.  You'll see that that transfer was made in the spring

23   of 2020, and we believe, Your Honor, that that $6.4 million

24   was part of the $10 million that Mr. Dondero referred to in

25   April in open court when he testified that he had caused $10

126

1   million to be paid to Highland's insiders.

2       So, think about that.  They transfer the money to

3   Sentinel.  That money was from the Defendants that UBS was

4   suing.  And then they use that money to pay the insiders at

5   the same time they're signing the indemnity agreement.  At the

6   exact same moment.

7       Your Honor, I told you that Mr. Seery and the Debtor and

8   the independent board agreed to the preliminary injunction but

9   could not agree to a permanent injunction because they didn't

10  have personal knowledge of all the facts.  We knew of the

11  existence of the policy, but Mr. Clubok's presentation and the

12  work done by his team show exactly the justification, the

13  rationale, and the common sense that Mr. Seery and the

14  independent board showed in not rushing to a conclusion here.

15      The evidence that Mr. Clubok presented today was unknown

16  to the Debtor, was unknown to the independent board, and we

17  thank them for their diligence and for their work.

18      At the end of the day, Your Honor, to borrow a phrase the

19  Court has used before, this is not a garden-variety commercial

20  dispute.  This is not a garden-variety fraudulent transfer

21  action.  This is not a garden-variety breach of fiduciary

22  duty.  This is fraud, plain and simple, compounded by the

23  failure, the intentional -- knowing, intentional failure to

24  disclose post-bankruptcy.

25      We'd respectfully request that the Court grant the motion.

Appx. 00618

127

1          THE COURT:  All right.

2          MR. CLUBOK:  Your Honor, if I may.

3          THE COURT:  You may.

4          MR. CLUBOK:  Very briefly.  I just --

5          THE COURT:  Go ahead.

6          CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

7          MR. CLUBOK:  Sorry.  Yeah, as a housekeeping matter,

8   I would like to offer our presentation as a demonstrative

9   exhibit reflective of the evidence.  We will provide you with

10  a hard copy.  It refers to, obviously, many of the exhibits

11  that we submitted, and it'll be up to the Court's convenience,

12  I think.  I think we've -- we've given a copy to Mr. Morris

13  ahead of time.  I think there's no objection to that being

14  submitted to Your Honor.

15      I would just like to, you know, end by saying, you know,

16  we started the proceedings, we appreciate, we understand

17  certainly why Highland wanted to stop the bleeding and stop

18  spending money on this proceeding, and so that -- we have no

19  issue with that.

20      We would ask that -- we provided a redline that makes mild

21  edits that I think -- dare I hope, Mr. Morris, that, per

22  agreement, can and should be made to the proposed order.  They

23  submitted one and we submitted a slightly proposed -- one

24  which also referred to a consideration of the evidence that we

25  anticipated being able to present today, and most importantly,

Appx. 00619

128

1  now that we've presented that evidence today, I think that

2  justifies a modest change in the order along the lines to that

3  effect.

4      I see Mr. Morris nodding, so hopefully that means he

5  agrees.

6          MR. MORRIS:  It does.  We hadn't heard the evidence

7  before, Your Honor.  I'd never seen Mr. Clubok's presentation.

8  I didn't know quite what he was going to do today.  And that's

9  the reason why we had a slight dispute over some of the

10  language.

11      But based on the evidence that I heard, you know, if we

12  could take one last review of it and confirm, but I have no

13  reason to believe that we'll have any objection.

14          THE COURT:  All right.  And you have no objection to

15  the PowerPoint being part of the record, Mr. Morris?

16          MR. MORRIS:  Not as -- not as a demonstrative

17  exhibit, Your Honor, --

18          THE COURT:  Okay.

19          MR. MORRIS:  -- which is, I think, what Mr. Clubok

20  said.

21          THE COURT:  All right.  Well, Mr. Clubok, if you

22  could send it to Traci Ellison, with copy to counsel, I will

23  make that part of the record.  It's always, I think, easier to

24  understand a transcript, if anyone's looking at it after the

25  fact, if they have the PowerPoint in the Court file to cross-

129

 1   reference.

 2       Well, it's been, for lack of a better term, an amazing day

 3   of evidence.  The Court believes the evidence is overwhelming

 4   to justify the granting of an injunction here.  And as was

 5   stated early on, it's been phrased in terms of it being a

 6   permanent injunction, but as I understand it, the injunction

 7   sought would be to enjoin disbursement, disposition of the so-

 8   called transferred assets until a further order of a court of

 9   competent jurisdiction with regard to fraudulent transfer

10   litigation or other litigation over the Sentinel matters or a

11   settlement with Sentinel.

12       Certainly, the four prongs for an injunction have been met

13   here.

14       I believe the relief is necessary to avoid immediate and

15   irreparable harm to the UBS entities.

16       I believe UBS has made a very strong showing of likely

17   success on the merits here with regard to these transfers of

18   assets being fraudulent and with regard to a potential showing

19   of insolvency or inability of the transferors to pay debts as

20   they become due, and as a result of the transfers,

21   consideration for the transfers appears to have been

22   inadequate.

23       Secrecy of the transaction.

24       Certainly, there are all of these indicia of fraud

25   suggesting UBS would succeed on the merits.

1       The balance of equities certainly tip in favor of UBS

2    here.  Injury to it would appear to outweigh any damages that

3    the injunction would cause Highland.  And such relief would

4    serve the public interest.

5       So, the Court reserves the right to supplement in a more

6    fulsome form of order, but, again, the motion of the Debtor to

7    withdraw its answer disputing this relief is granted, and I

8    think judgment for this injunctive relief is also appropriate

9    at this juncture.

10      I said that it's been an amazing day of evidence.  It's

11   been amazing.  It's been exhausting.  It's been troubling.

12   You know, I think it was, Mr. Morris, you who said at the

13   beginning today that, you know, Debtor-in-Possession counsel

14   is not a prosecutor, it's not the SEC, it's not the State Bar

15   disciplinary agency.  And, you know, your goal for your client

16   is always to maximize value for creditors and get a good

17   overall result for all parties in interest affected by the

18   bankruptcy.

19      I could say something similar right now that I, you know,

20   I oversee these things.  I apply the Bankruptcy Code to

21   motions filed and different relief sought and grant relief

22   where appropriate that is designed to help companies or people

23   get a fresh start and help creditors get paid what they're

24   justly owed.

25      But this evidence today, I am, unfortunately, duty-bound

1    to do more than just sign the judgment and order that's

2    submitted to me and forget about it.  I'm just letting you

3    know that referrals will likely be made to the State Bar

4    disciplinary agencies regarding the attorneys' activities that

5    I've heard about.  And, you know, it's not a good day in court

6    when I'm looking at 18 U.S.C. during the middle of evidence,

7    but I'm just going to let observers who -- I don't who all is

8    on the WebEx today.  I don't have all the little boxes on my

9    screen to know.  But 18 U.S.C. Section 3057:  Any judge having

10   reasonable grounds for believing that violation of laws of the

11   United Stated relating to insolvent debtors has been committed

12   or that an investigation should be had in connection therewith

13   shall report to the appropriate United States Attorney all the

14   facts and circumstances of the case, the names of the

15   witnesses, and the offense or offenses believed to have been

16   committed.  And there are different provisions of Title 18

17   that I'm very, very concerned may be implicated.

18        So, I'm duty-bound to go back and carefully look at some

19   of the exhibits that have been submitted today.  And, again,

20   I'm not the U.S. Attorney and I'm not a criminal judge.  I

21   don't plan on combing over everything as, you know, a grand

22   jury would do.  But if I think there is enough there, I will

23   be making a referral to the U.S. Attorney.

24        Again, the nondisclosure, the potential cover-up here is

25   beyond troubling.  And, you know, I'm duty-bound to do what

132

1   I've got to do if the exhibits look as damning as, you know,

2   on further reflection in chambers, as they did sitting here on

3   the bench today.

4       So, you know, I regret, I regret this greatly, but, you

5   know, I'm just letting people know that it's a potential

6   consequence of what I've heard today.

7       All right.  Anything else?  All right.

8           MR. MORRIS:  No, Your Honor.  Thank you.

9           THE COURT:  Thank you.  We stand adjourned.

10      (Proceedings concluded at 1:16 p.m.)

11                          --oOo--

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                      **08/10/2022**

24  _____       _____
    Kathy Rehling, CETD-444                      Date
25  Certified Electronic Court Transcriber

**Appx. 00624**

133

INDEX

PROCEEDINGS                                               3

OPENING STATEMENTS

- By Mr. Morris                                          11
- By Mr. Clubok                                          62

WITNESSES

Defendant's Witnesses

James Seery
- Direct Examination by Mr. Morris                      23
- Cross-Examination by Mr. Clubok                       44
- Examination by the Court                              53
- Redirect Examination by Mr. Morris                    58
- Recross-Examination by Mr. Clubok                     59
- Examination by the Court                              59

EXHIBITS

Defendant's Exhibits 1 through 10          Received  7
Declaration of James Seery (#170)          Received  7

UBS Securities, LLC's Exhibits 1 through 12,   Received 10
14 through 23, 25 through 35, and 37 through 53

CLOSING ARGUMENTS

- By Mr. Morris                                        125
- By Mr. Clubok                                        127

RULINGS                                                128

END OF PROCEEDINGS                                     132

INDEX                                                  133