# EXHIBIT 21

Claim #108  Date Filed: 4/8/2020

| **Fill in this information to identify the case:** |
|---|

Debtor ____Highland Capital Management, L.P.____

United States Bankruptcy Court for the: ___Northern___   District of __Texas__
(State)

Case number ___19-34054___

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| **Part 1:** | **Identify the Claim** |
|---|---|

| 1. | **Who is the current creditor?** | NexPoint Advisors, L.P. |
|---|---|---|
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| 2. | **Has this claim been acquired from someone else?** | ☑ No |
|---|---|---|
| | | ☐ Yes.   From whom? _____ |

| 3. | **Where should notices and payments to the creditor be sent?** | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|---|
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | NexPoint Advisors, L.P. 300 Crescent Court, Ste. 700 Dallas, TX 75201 | |
| | | Contact phone  9726284100 | Contact phone _____ |
| | | Contact email  See summary page | Contact email _____ |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | | __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | |

| 4. | **Does this claim amend one already filed?** | ☑ No |
|---|---|---|
| | | ☐ Yes.   Claim number on court claims registry (if known) _____   Filed on _____ MM / DD / YYYY |

| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
|---|---|---|
| | | ☐ Yes. Who made the earlier filing? _____ |

Official Form 410                          **Proof of Claim**                          page 1

**Appx. 00722**

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | | |
|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No |
| | | ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

| | | |
|---|---|---|
| 7. | **How much is the claim?** | $ <u>See attached Exhibit "A"</u>.   **Does this amount include interest or other charges?** |
| | | ☑ No |
| | | ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | | |
|---|---|---|
| 8. | **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. |
| | | Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). |
| | | Limit disclosing information that is entitled to privacy, such as health care information. |
| | | <u>See attached Exhibit "A"</u> |

| | | |
|---|---|---|
| 9. | **Is all or part of the claim secured?** | ☑ No |
| | | ☐ Yes.  The claim is secured by a lien on property. |
| | | **Nature or property:** |
| | | ☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*. |
| | | ☐ Motor vehicle |
| | | ☐ Other. Describe: _____ |
| | | **Basis for perfection:** _____ |
| | | Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.) |
| | | **Value of property:** $_____ |
| | | **Amount of the claim that is secured:** $_____ |
| | | **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.) |
| | | **Amount necessary to cure any default as of the date of the petition:** $_____ |
| | | **Annual Interest Rate** (when case was filed)_____% |
| | | ☐ Fixed |
| | | ☐ Variable |

| | | |
|---|---|---|
| 10. | **Is this claim based on a lease?** | ☑ No |
| | | ☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____ |

| | | |
|---|---|---|
| 11. | **Is this claim subject to a right of setoff?** | ☑ No |
| | | ☐ Yes. Identify the property: _____ |

**Appx. 00723**

| | | | Amount entitled to priority |
|---|---|---|---|
| **12.** **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | |
| | ☐ Yes. *Check all that apply:* | | |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |

| | |
|---|---|
| **13.** **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No |
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. |
| | $_____ |

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/08/2020
                   MM / DD / YYYY

/s/Frank George Waterhouse
_____
Signature

Print the name of the person who is completing and signing this claim:

Name      Frank George Waterhouse
          First name          Middle name          Last name

Title     Authorized Agent

Company   NexPoint Advisors, L.P.
          Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone   _____

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| NexPoint Advisors, L.P. | Yes, supporting documentation successfully uploaded |
| | **Related Document Statement:** |
| 300 Crescent Court, Ste. 700 | |
| | |
| Dallas, TX, 75201 | **Has Related Claim:** |
| **Phone:** | No |
| 9726284100 | **Related Claim Filed By:** |
| **Phone 2:** | |
| **Fax:** | **Filing Party:** |
| | Authorized agent |
| **Email:** | |
| fwaterhouse@highlandcapital.com | |
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See attached Exhibit "A" | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See attached Exhibit "A" | No | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | | |
| No | **Annual Interest Rate:** | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | | |
| **Subject to Right of Setoff:** | **Basis for Perfection:** | |
| No | **Amount Unsecured:** | |
| **Submitted By:** | | |
| Frank George Waterhouse on 08-Apr-2020 3:13:31 p.m. Eastern Time | | |
| **Title:** | | |
| Authorized Agent | | |
| **Company:** | | |
| NexPoint Advisors, L.P. | | |

Appx. 00725

**Exhibit A**

This Exhibit "A" is being filed by NexPoint Advisors, L.P. ("Claimant") pursuant to the Amended and Restated Shared Services Agreement dated to be effective as of January 1, 2018 and the Sub-Advisory Agreement dated to be effective as of June 1, 2018. Claimant has previously incurred and paid for obligations under both agreements and is entitled to reimbursement from the Debtor. Claimant has requested information from the Debtor to ascertain the exact amount of the claim. This process is on-going. Additionally, this process has been delayed due to the outbreak of the Coronavirus. Claimant is continuing to work to ascertain the exact amount of its claim and will update its claim in the next ninety days. A true and correct copy of these agreements is attached hereto.

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "<u>Agreement</u>"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "<u>Management Company</u>"), and Highland Capital Management, L.P., a Delaware limited partnership ("<u>Highland</u>"), as the staff and services provider hereunder (in such capacity, the "<u>Staff and Services Provider</u>" and together with the Management Company, the "<u>Parties</u>").

## R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "<u>Advisers Act</u>");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "<u>Original Agreement</u>");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "<u>Shared Employee</u>"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows.

## ARTICLE I

## DEFINITIONS

Section 1.01   <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

Appx. 00728

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02   Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01   General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment. The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)   *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

3

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

      (b)    *Legal/Compliance/Risk Analysis.* Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

      (c)    *Tax.* Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

      (d)    *Management of Clients and Accounts.* Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

      (e)    *Valuation.* Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

      (f)    *Execution and Documentation.* Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

      (g)    *Marketing.* Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

      (h)    *Reporting.* Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

Appx. 00730

(i)      *Administrative Services.*   The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

(j)      *Shared Employees.*   To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

(k)      *Ancillary Services.*   Assistance and advice on all things ancillary or incidental to the foregoing; and

(l)      *Other.*   Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Section 2.03    Shared Employees.

(a)      The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

Appx. 00731

(b)     Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.   To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

Appx. 00732

(i)      The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)      The Staff and Services Provider shall require that each Shared Employee:

(i)      certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)      be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)      provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)      provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)      to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)      act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)      Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    Applicable Asset Criteria and Concentrations. The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    Compliance with Management Company Policies and Procedures. The Management Company will from time to time provide the Staff and Services Provider and the

7

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06   Authority. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement. The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party. Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time. The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07   Third Parties.

(a)      The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)      In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08   Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09   Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

8

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments). Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02    Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03    Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    Representations. Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

9

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    Compliance; Advisory Restrictions.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby, and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

Appx. 00736

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01   Standard of Care.   Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Appx. 00737

Section 6.02   <u>Exculpation</u>.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "<u>Disabling Conduct</u>") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03   <u>Indemnification by the Management Company</u>.   The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

12

Appx. 00738

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Appx. 00739

Section 6.05   Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

**ARTICLE VII**

**TERMINATION**

Section 7.01   Termination.  Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

**ARTICLE VIII**

**MISCELLANEOUS**

Section 8.01   Amendments.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   Assignment and Delegation.

(a)   Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this Section 8.02, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)   Except as otherwise provided in this Section 8.02, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)   The Staff and Services Provider may, without satisfying any of the conditions of Section 8.02(a) other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

14

Appx. 00740

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    Non-Recourse; Non-Petition.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive.  The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)    The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Appx. 00741

Section 8.04   Governing Law.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)     The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05   WAIVER OF JURY TRIAL.   EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06   Severability.   The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07   No Waiver.   The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08   Counterparts.   This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Appx. 00742

Section 8.09   Third Party Beneficiaries.  This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   No Partnership or Joint Venture.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   Independent Contractor.  Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12   Written Disclosure Statement.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13   Headings.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14   Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15   Notices.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)     If to the Management Company:

NexPoint Advisors, L.P.
200 Crescent Court
Suite 700
Dallas, TX 75201

Appx. 00743

(b)    If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

18

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

**NEXPOINT ADVISORS, L.P.**

By:  NexPoint Advisors GP, LLC, its
General Partner

By:_____
Name: Frank Waterhouse
Title: Treasurer


**HIGHLAND CAPITAL
MANAGEMENT, L.P.**

By:  Strand Advisors, Inc., its General
Partner

By:_____
Name: Frank Waterhouse
Title: Treasurer

## SUB-ADVISORY AGREEMENT

This Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts (any such fund or account, an "Account", and the assets comprising the portfolio of such Account, a "Portfolio"); and

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows.

1.      Appointment; Limited Scope of Services.

(a)      Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of Section 8, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

(b)      Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

(i)      make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes,

including recommendations as to the specific assets to be purchased, retained or sold by any such Account;

(ii)     place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

(iii)     identify, evaluate and recommend to the Management Company, in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

(iv)     assist the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account in performing due diligence on prospective Portfolio investments by such Account;

(v)     provide information to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account;

(vi)     assist and advise the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

(vii)     assist the Management Company in performing any of its other obligations or duties as portfolio manager, investment manager or any similar capacity for any applicable Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "Services."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company. Furthermore, the parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company, including, but not limited to, administrative, management or similar services.

(c)     The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein. The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements.

2

In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.      Compensation.

(a)      As compensation for its performance of its obligations as Sub-Advisor under this Agreement, the Sub-Advisor will be entitled to receive a monthly fee in the amount of Two Hundred Fifty-Two Thousand and 00/100 Dollars ($252,000.00) (the "Sub-Advisory Fee"). The Sub-Advisory Fee shall be payable monthly in advance.

(b)      Each party shall bear its own expenses.

(c)      Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

3.      Representations and Warranties.

(a)      Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)      it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(ii)      this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)      no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)      neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract,

3

lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)     The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)     The Management Company acknowledges that it has received Part 2 of the Sub-Advisor's Form ADV filed with the Securities and Exchange Commission. The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.     Standard of Care; Liability; Indemnification.

(a)     Sub-Advisor Standard of Care. Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the Related Agreements. To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)     Exculpation. To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or

4

any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages. To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement. The exculpations set forth in this Section 4(b) shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

(c)     Indemnification. The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated, whether currently existing or accruing in the future ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"),

5

whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 4(c) regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 4(c) shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 4(c) to the fullest extent permitted by law

     (d)    Other Sources of Recovery etc. The indemnification rights set forth in Section 4(c) are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any Account has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

     (e)    Rights of Heirs, Successors and Assigns.  The indemnification rights provided by Section 4(c) shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

Appx. 00751

(f)    Reliance.  A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge.  Each Covered Person may act directly or through his, her or its agents or attorneys.

(g)    Rights Under Management Agreements and Related Agreements.  The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and Related Agreements within the scope of this Agreement pursuant to Section 8 if such indemnification and exculpation rights are not reasonably acceptable to it.

5.    Limitations on Employment of the Sub-Advisor; Conflicts of Interest.

(a)    The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

(b)    So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.  The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder.  It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees, partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)    The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in Appendix B hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such Appendix B, as amended from time to time with mutual consent of the Parties.

7

Appx. 00752

6.      Termination; Survival.

(a)     This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)     This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements.  Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and Appendix A hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)     All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.      Cooperation with Management Company.  The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor.  Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.      Management Agreements and Related Agreements.  The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement.  The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company.  No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

8

Appx. 00753

9.    <u>Amendments; Assignments</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in <u>clauses (b)</u> and <u>(c)</u> of this <u>Section 9</u>, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b)    Except as otherwise provided in this <u>Section 9</u>, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c)    The Sub-Advisor may, without satisfying any of the conditions of <u>Section 9(a)</u> other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10.    <u>Advisory Restrictions</u>. This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof. It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "<u>Advisory Restrictions</u>"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

11.    <u>Records; Confidentiality</u>.

(a)    The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon

9

Appx. 00754

not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

        (b)    The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by an Account or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business. Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

        12.    <u>Notice</u>. Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

10

(a)   If to the Management Company:

      NexPoint Advisors, L.P.
      200 Crescent Court
      Suite 700
      Dallas, TX 75201

(b)   If to the Sub-Advisor:

      Highland Capital Management, L.P.
      300 Crescent Court
      Suite 700
      Dallas, TX 75201

13.   <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.   <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.   <u>Severability</u>.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.   <u>No Waiver</u>.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

17.   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

Appx. 00756

18.   <u>Third Party Beneficiaries</u>.   Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.   Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.   <u>No Partnership or Joint Venture</u>.   Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.   Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.   <u>Entire Agreement</u>.   This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

12

**Appx. 00757**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By: _____

Name: Frank Waterhouse
Title:   Treasurer


**NEXPOINT ADVISORS, L.P.,**
as the Management Company

By: NexPoint Advisors GP, LLC, its General Partner

By: _____

Name: Frank Waterhouse
Title: Treasurer

*Sub-Advisory Agreement*

**Appx. 00758**

### Appendix A

| Fund or Account | Management Agreement | Related Agreements | Date of Management Agreement |
|---|---|---|---|
| [__] | [__] | [__] | [__] |
| [__] | [__] | [__] | [__] |

**APPENDIX B**

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its clients, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account. Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise. Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a)     serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b)     receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c)     be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d)     be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio asset or any affiliate thereof;

(e)     sell any Portfolio asset to, or purchase or acquire any Portfolio asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f)     underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio asset;

B-1

(g)     serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio asset; or

(h)     act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio assets and performing the Services under this Agreement.  Each of such ownership and other relationships may result in securities laws restrictions on Transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account.  The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions.  The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement.  As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a Transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect Transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that a Portfolio investment complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, the Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio assets or other securities or obligations of the obligors or issuers of the Portfolio assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

make recommendations to others, or effect Transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu,* senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

Defined Terms

     For purposes of this Appendix B, the following defined terms shall have the meanings set forth below:

     "Portfolio" shall mean, with respect to any Account, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction, whether or not for the benefit of the related secured parties, securing the obligations of such Account.

Appx. 00762

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio asset or other assets received in respect thereof in the open market or otherwise by the Account.

Appx. 00763