# EXHIBIT 63

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

IN RE:                        .   Case No. 19-34054-11(SGJ)
                              .
HIGHLAND CAPITAL              .   Earle Cabell Federal Building
MANAGEMENT, L.P.,             .   1100 Commerce Street
                              .   Dallas, Texas  75242
          Debtor.            .
. . . . . . . . . . . . . .   .
                              .   Adv. No. 21-AP-3010(SGJ)
HIGHLAND CAPITAL              .
MANAGEMENT, L.P.,             .
                              .
          Plaintiff,         .
                              .
       v.                     .
                              .
HIGHLAND CAPITAL,             .
MANAGEMENT, FUND              .
ADVISORS, L.P., et al.,       .
                              .
          Defendant.         .   Wednesday, April 13, 2022
. . . . . . . . . . . . . .   .   1:09 p.m.

                          TRANSCRIPT OF TRIAL
                             PM SESSION
                   BEFORE HONORABLE STACEY G. JERNIGAN
                   UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Plaintiff Highland    Pachulski Stang Ziehl & Jones LLP
Capital Management        BY:  JOHN MORRIS, ESQ.
L.P.:                     780 3rd Avenue, 34th Floor
                          New York, NY 10017


For Defendant Highland    Munsch, Hardt, Kopf & Harr
Capital Management        By:  DAVOR RUKAVINA, ESQ.
Fund Advisors, L.P.:      500 N. Akard Street, Ste 3800
                          Dallas, TX 75201

Audio Operator:           Michael F. Edmond

 Proceedings recorded by electronic sound recording, transcript
                produced by a transcript service.
```

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail:  DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

2

**INDEX**

|  | **PAGE** |
|---|---|
| **WITNESSES** | |
| **FOR THE PLAINTIFF:** | |
| James Dondero | |
| Direct Examination by Mr. Morris | 4 |
| Cross-Examination by Mr. Rukavina | 47 |
| Redirect Examination by Mr. Morris | 73 |
| Dustin Norris | |
| Direct Examination by Mr. Morris | 83 |
| Cross-Examination by Mr. Rukavina | 102 |
| Redirect Examination by Mr. Morris | 156 |
| Recross-Examination by Mr. Rukavina | 171 |
| Examination by the Court | 174 |
| **FOR THE DEFENDANT:** | |
| (None) | |

| **EXHIBITS** | **ID** | **EVD** |
|---|---|---|
| **FOR THE PLAINTIFF:** | | |
| (None) | | |
| **FOR THE DEFENDANT:** | | |
| Exhibit EE | 4 | 4 |
| Exhibit G | 98 | 98 |
| Exhibit H | 98 | 98 |

**WWW.LIBERTYTRANSCRIPTS.COM**

Appx. 01227

```
                            Dondero - Direct                        3
 1        (Proceedings resumed after the lunch recess at 1:09 p.m.)
 2             THE CLERK:  All rise.
 3             THE COURT:  Please be seated.
 4             All right.  We're back on the record in the Highland
 5   trial.  Mr. Morris, Mr. Rukavina, what do you have?
 6             MR. MORRIS:  Just before we proceed with the next
 7   witness, I think Mr. Rukavina just wants to present the exhibit
 8   that he used on --
 9             MR. RUKAVINA:  Yes, Your Honor.
10             THE COURT:  Okay.
11             MR. MORRIS:  -- with Mr. Seery.
12             MR. RUKAVINA:  As I promised, we do have paper copies
13   couriered.  I've marked it as EE.
14             THE COURT:  Okay.
15             MR. RUKAVINA:  If I may approach and move for the
16   admission of EE as an impeachment exhibit.
17             THE COURT:  Okay.  And there's no objection?
18             MR. MORRIS:  No objection.
19             THE COURT:  Okay.  You may approach.
20             Thank you.  EE will be admitted.
21        (Defendant's Exhibit EE admitted into evidence)
22             MR. MORRIS:  I do want to note that -- maybe I spoke
23   too fast.  I object to the extent it's being offered for the
24   truth of the matter asserted.  Mr. Rukavina specifically said
25   it was for impeachment, and I have no objection to its use for
```

**Appx. 01228**

                              Dondero - Direct                          4
 1  that purpose.

 2          THE COURT:  Okay.  So impeachment in an attempt to

 3  impeach Mr. Seery saying he had never heard anything --

 4          MR. MORRIS:  Correct.

 5          THE COURT:  -- until January 2021 --

 6          MR. MORRIS:  Correct.

 7          THE COURT:  -- about the alleged overpayments.  Okay.

 8          MR. RUKAVINA:  Yeah.  That's all it's offered for,

 9  Your Honor.

10          THE COURT:  It's admitted for that purpose.

11          MR. RUKAVINA:  That's fine by me.  That's all I'm

12  offering it for.

13          THE COURT:  Okay.

14          MR. MORRIS:  Okay.  So Highland's next witness is Mr.

15  James Dondero.

16          THE COURT:  All right.  Mr. Dondero, if you could

17  approach the witness box, I will swear you in.

18          Please raise your right hand.

19           JAMES DONDERO, PLAINTIFF'S WITNESS, SWORN

20          THE COURT:  All right.  Please be seated.

21                        DIRECT EXAMINATION

22  BY MR. MORRIS:

23  Q    Good afternoon, Mr. Dondero.

24  A    Good afternoon.

25  Q    Let me know when you're comfortable.

                    **WWW.LIBERTYTRANSCRIPTS.COM**

1  A    Good afternoon.

2  Q    Are you okay there?

3  A    Yes.

4  Q    Okay.  So there's three binders in front of you.  From

5  time to time, I may ask you to look at a particular document.

6  There's water there if you need it.  I don't expect my

7  examination of you to be very long.  We'll see what happens.

8       But are you ready to proceed?

9  A    Yes.

10 Q    Okay.  Frank Waterhouse is the treasurer of the Advisors.

11 Correct?

12 A    I -- I don't know his title specifically.  I think he's

13 the CFLA.  I don't know.

14 Q    He's an officer of the Advisors.  Correct?

15 A    Yes.

16 Q    And when I use the phrase Advisors, you understand I mean

17 NexPoint Advisors LP and Highland Capital Management Fund

18 Advisors L.P.  Is that fair?

19 A    I don't know specifically.

20      I believe HFAM.  I don't know about NexPoint.  I think

21 NexPoint has its own CFO now.  I don't know if he's treasurer.

22 I -- I don't know these things.  I know these things -- I know

23 these things on a current basis, but I want to be refreshed.

24 Q    You don't -- do you know if Mr. -- let's take it one at a

25 time.  Do you know if Mr. Waterhouse serves as an officer of

                        Dondero - Direct                        6
1  NexPoint Advisors, LP today?

2  A    I don't know for sure.

3       I believe so, but I -- I don't know.  But Nexpoint has its

4  own -- excuse me -- it's own CFO and it has its own C-Suite in

5  the various (indiscernible) separate from Frank.  But I don't

6  know the corporate ownership of NexPoint.

7  Q    Okay.

8  A    I don't believe so.

9  Q    I'm not asking you about ownership.  I don't mean to

10 interrupt.  I'm not asking about ownership.  I'm just asking

11 specifically whether Mr. Waterhouse has a role or a title at

12 NexPoint today?

13 A    I -- I don't know.

14 Q    Okay.  Do you know if Mr. Waterhouse has a role or a title

15 today at HCMFA?

16 A    I -- I don't know post the restructuring with Skyview, et

17 cetera.  I -- I don't know.  I believe so, but I don't know.

18 Q    Okay.  Let's focus on the period January 1st, 2018 until

19 the end of 2020, that three-year period, okay.  So 2018, 2019,

20 and 2020.  I'm going to refer to that as the relevant period.

21 Are you with me?

22 A    Yes.

23 Q    Do you recall if Mr. Waterhouse had a role or a title at

24 NexPoint during the relevant period?

25 A    I -- I believe he was an officer of all the major entities

Dondero - Direct                                    7

1  during that period.

2  Q    And when you use the phrase "all the major entities," what

3  are you referring to when you use that phrase?

4  A    Highland, Strand, NexPoint, HFAM.  I believe he was an

5  officer of all the -- all the major operating entities.

6  Q    And do you recall that he served as either the treasurer

7  or the CFO of the Advisors at all times during the relevant

8  period?

9  A    I believe so.

10  Q    And do you have an understanding of what Mr. Waterhouse's

11  duties and responsibilities were as the treasurer or the CFO of

12  the Advisors during the relevant period?

13  A    Yes.

14  Q    Can you describe for the Court your understanding of what

15  Mr. Waterhouse's duties and responsibilities were in that

16  capacity at that time?

17  A    To be the chief financial accounting officer above

18  corporate accountants, above the tax accountants, above

19  anything accounting and regulatory-wise other than compliance

20  reporting.  Other -- other than compliance didn't report to

21  him.

22  Q    And did you understand that as an officer that

23  Mr. Waterhouse was a fiduciary of the Advisors during the

24  relevant period?

25  A    I -- I don't want to broadly answer that question

Dondero - Direct                                        8

1 generally, but it varies depends on -- depending on the level

2 of fiduciary responsibility, depends on whether it's a public

3 entity or a listed fund or a -- or a private entity.

4 Q    Okay.  I appreciate that distinction, and I just want you

5 to focus on the two advisors, NexPoint Fund Advisors, L.P., and

6 NexPoint -- Highland Capital Management Fund Advisors.

7      Is it your understanding as the person in control of those

8 entities that Mr. Waterhouse owed those entities a fiduciary

9 duty during the relevant period?

10 A    Yes.

11 Q    Okay.  And was one of his duties as the treasurer or the

12 chief financial officer of the Advisors, was that to make sure

13 that the Advisors only paid the amounts that they owed under

14 the contracts that they had?

15 A    I would describe it more generally as to administer

16 contracts according to the contracts, the spirits of the

17 contracts and best industry practices.

18 Q    Okay.  And to the best of your knowledge, did

19 Mr. Waterhouse fulfill the responsibility of administering

20 contracts in accordance with their terms during the relevant

21 period?

22 A    I -- I don't know and I can't make a blanket statement.

23 Q    Do you have any knowledge about any failure on

24 Mr. Waterhouse's part to fulfill his responsibility of

25 administering contracts in accordance with their terms during

Dondero - Direct                                    9

1  the relevant period?

2  A    When does the relevant period end again?

3  Q    December 31st, 2020.

4  A    I think there are a lot of issues in the last year or in

5  that 2020 year.

6       I think his employment was -- or his responsibilities or

7  who reported to him changed materially in that year.  And what

8  other people performed or responsibilities or DSI had, I don't

9  know.  I -- yeah,  I don't know how long he had responsibility

10 or control.

11 Q    Is it your understanding that DSI had any responsibility

12 whatsoever for anything having to do with either of the

13 Advisors after the petition date?

14 A    I'm just saying as Frank got neutered and

15 compartmentalized and we moved from various different roles,

16 somebody else filled them, and I don't know who.  But I -- I

17 can't say that Frank was responsible if he wasn't in his same

18 position of responsibility and authority.

19 Q    Did Frank Waterhouse fail to administer the contracts that

20 the Advisors entered into with Highland after the petition

21 date?

22 A    I -- I think there was a failure by Highland to administer

23 the contracts.  Whether it was Frank's responsibility or

24 somebody else's, I don't know.

25 Q    Who on behalf of the Advisors was charged with the

Appx. 01234

Dondero - Direct                              10

1  responsibility of making sure that the contracts that the

2  Advisors were party to were properly administered after the

3  petition date?  Who is the person?

4  A    There -- there's almost nobody at the Advisors, period.

5       The Advisors were paid a fee for Highland to administer

6  the contracts.  Highland had all the accountants, compliance,

7  and lawyers.  The Advisors had either no employees or they had

8  a portfolio manager or trader or somebody who is front office

9  focused on the investor funds.  So there wouldn't have been

10 anybody to make sure or double check or be persistent if

11 Highland wasn't doing it.

12 Q    So did Frank Waterhouse have the duty and the obligation

13 to administer contracts in accordance with their terms on

14 behalf of the Advisors or did he not?

15 A    It depends on the time frame.  Pre -- pre-bankruptcy,

16 sure.  And any of his group were doing it for everybody, and

17 they were doing it well.  But by the time 2020 came along, his

18 authority and responsibilities changed materially along the

19 way.

20 Q    Who changed his authority?

21 A    Seery.

22 Q    Jim Seery changed Frank Waterhouse's authority with

23 respect to the Advisors?

24 A    With respect to everything in his role at Highland, which

25 is -- his role at Highland was administering -- one of his

Appx. 01235

Dondero - Direct                    11

1  roles at Highland or his group's roles were administering the
2  contracts with NexPoint and HFAM.
3  Q    And it's your testimony that Jim Seery told Frank
4  Waterhouse that he couldn't do the exact same thing with
5  respect to the administration of these contracts after he got
6  appointed than he was before he got appointed?
7  A    I'm saying by middle of '20 when Seery kind of started
8  betraying the estate and moving for his own self-interest, he
9  started making material changes to the employee and
10 responsibility base of the Highland employees, and one of those
11 people were Frank Waterhouse.  And Frank Waterhouse's authority
12 and functions changed materially.
13     And I don't know -- I -- I wasn't privy to a lot of that,
14 and some of it was negotiating part of a settlement or a lease
15 with him and some other stuff.  But his -- his responsibilities
16 and his role changed materially.  I'm not sure how it changed.
17 I wasn't privy to it, but I can't broad-brush Frank as being
18 responsible or liable for the fact that the Advisors were
19 overbilled by Highland.
20 Q    Did Frank Waterhouse tell you at any time that he was no
21 longer able to continue to perform the function of
22 administering the Advisors' contracts in accordance with their
23 terms?  Did he tell you that?
24 A    Not specifically.
25 Q    Did anybody in the world ever tell you you're not going to

Appx. 01236

Dondero - Direct                    12

1  believe what Seery did, Seery told Frank cut it out, you're not
2  allowed to administer the contracts on behalf of the Advisors
3  anymore?  Anybody say that?
4  A    No.
5       But no one said he still could in his reduced, diminished,
6  changed role, either.  I wasn't -- I wasn't aware.  But I
7  assumed Highland was still performing the functions that it was
8  getting paid for.
9  Q    Can you tell Judge Jernigan your understanding of exactly
10 what Frank Waterhouse was allowed and not allowed to do with
11 respect to the administration of the Advisors' contracts?  What
12 was he not allowed to do?
13 A    I wasn't privy to those reductions of his responsibility.
14 I was really handed to a portfolio management position that was
15 not managerial, and Seery was cutting side deals and bribing
16 people and doing all kinds of crap.
17         MR. MORRIS:  I move to strike, Your Honor.
18         THE COURT:  You move to strike the words "bribe?"
19         MR. MORRIS:  Yes.  Yes.  The entirety of the last
20 portion because the question was about Frank Waterhouse.
21         THE COURT:  Okay.  Sustained.
22 BY MR. MORRIS:
23 Q    This would go a lot smoother if you'd just stick to the
24 issues.
25      What is the basis for your testimony that Frank Waterhouse

Appx. 01237

Dondero - Direct                    13

1  was not permitted to administer the contracts on behalf of the
2  Advisors in the exact same way after the Independent Board was
3  appointed as he did before the Independent Board was appointed?
4  What's the basis for that?
5  A    His role was changed.
6       His responsibility -- responsibilities and people who
7  reported to him diminished and changed at least a couple of
8  times starting in the summer of '20.  I can't represent that he
9  was told not to administer contracts, but I also can't
10 represent that he was still administering contracts and didn't
11 do them.  I'm just saying it's not logical -- it's not logical
12 for me to be able to represent any of that.
13 Q    Okay.  When did you learn this?
14 A    I don't want to say contemporaneously, you know, because
15 there was always -- again, I wasn't privy to it.  I wasn't
16 supposed to be part of management.  I would hear it with a
17 delay either at water-cooler conversations or from lawyers.
18 But I don't even -- I don't remember who.
19 Q    So you don't remember who told you this and you don't
20 remember when you learned it.  Is that fair?
21 A    I'm saying a lot of the times it happened in second half
22 of '20.
23 Q    So you learned about it in the second half.  What did you
24 do when you heard this?  Did you try to make sure that there
25 was somebody who was going to look out to make sure that the

Appx. 01238

Dondero - Direct                          14

1  contracts for the Advisors were properly administered when you

2  learned that Frank couldn't do it?  What did you do?

3  A    In the early, early summer of '20, nothing because I

4  assumed that with the monies we were paying from TSI and with

5  the staff -- accounting staff that was still at Highland, that

6  they would be administering and providing the services that we

7  were paying for.  I didn't do anything until I found out we had

8  overpaid by $14 million and that the overpayments were continue

9  -- or they were continuing.  That's the only time I did

10  something which was a couple -- three or four months later.

11  Q    Do you know how that $14 million was calculated?

12  A    It was -- part of the contracts with Highland were for

13  people, and I think people plus a five or ten percent

14  processing surcharge.  And a lot of the people have left or the

15  percentage of time that they were spending on our stuff changed

16  such that we had been billed as if people were still there and

17  as if people were still working on our accounts when they

18  weren't.

19  Q    So you controlled the Advisors.  Correct?

20  A    Yes.

21  Q    And you learned sometime early in the summer of 2020 that

22  Frank Waterhouse was no longer going to be able to perform his

23  function of administering the contracts on behalf of the

24  Advisors.  You learned that in the early part of the -- in the

25  summer?

                              Dondero - Direct                    15
1   A    No.  That's not what I've said.
2   Q    So when did you -- I thought you said early summer.  When
3   did you learn it?
4   A    I said his roles were diminished, but I didn't know what
5   his roles were diminished to, nor did I make the assumption
6   that in his diminished roles, no one would pick up the contract
7   administration if he wasn't.
8   Q    Did you --
9   A    But he might still have been.
10  Q    Did you ask Frank how did your role change?
11  A    No.
12  Q    Did you ask anybody in the world how did Frank's role
13  change?
14  A    I wasn't supposed to be part of management.  I wasn't
15  supposed to talk to anybody.  Do you remember all the stupid
16  shit you put through?
17          MR. MORRIS:  I move to strike, Your Honor.
18          THE COURT:  I will strike, and I'll ask you, Mr.
19  Dondero, to refrain from the profanity.
20          THE WITNESS:  Excuse me.  I apologize for that.
21          THE COURT:  Okay.
22  BY MR. MORRIS:
23  Q    You and I didn't have a court experience together until
24  December of 2020.  Right?
25          MR. RUKAVINA:  Your Honor, this really now is just a

Dondero - Direct                                16

1  point of badgering and repetitiveness.  He has his answer and

2  now he's just haragging [sic] this witness just to intimidate

3  him on an irrelevant topic.

4          MR. MORRIS:  I wish I had the ability to intimidate

5  Mr. Dondero, but the fact of the matter is I don't have an

6  answer yet as to who was responsible for administering the

7  contracts in accordance with their terms on behalf of the

8  Advisors after the Independent Board was appointed.

9          MR. RUKAVINA:  He does.

10         MR. MORRIS:  And that's what I'm trying to get to.

11         MR. RUKAVINA:  He has his answer.  Mr. Dondero

12 testified that it was Highland's responsibility.

13 Mr. Waterhouse was here yesterday.  He could have asked Mr.

14 Waterhouse these questions.

15         MR. MORRIS:  And --

16         MR. RUKAVINA:  He didn't.

17         THE COURT:  All right.  I'll overrule and give you a

18 little bit more latitude.

19         MR. MORRIS:  Thank you.

20         THE COURT:  But I think he's --

21 BY MR. MORRIS:

22 Q    Did you make sure that there was a fiduciary for the

23 Advisors who was looking out for the Advisors' interest after

24 the time that you learned that Mr. Waterhouse's wings had been

25 clipped?

Dondero - Direct                                17

1  A     Not until 2021.  Not until later.

2  Q     Did you do anything to make sure that Highland was

3  actually doing what you now claim you expected?  Did you do

4  anything to satisfy yourself that Highland was going to

5  administer the Advisors' contracts in accordance with their

6  terms or did you just assume that that was going to happen?

7  A     I assumed Highland would honor the contracts we were

8  paying for --

9  Q     But --

10  A     -- and they were paying for.

11  Q     But you didn't do anything other than make that

12  assumption.  Right?  You didn't have your lawyers write a

13  letter, you didn't pick up the phone and call anybody.  You

14  were still in open communication with Mr. Seery at this time,

15  right, in the summer of 2020?

16  A     It ended in the summer of 2020.

17  Q     There was no prohibition for you to pick up the phone and

18  call Mr. Seery and say, hey, what's happening with Waterhouse,

19  are you guys going to just make sure you're doing this right?

20  A     I don't know when the prohibition of talking to him

21  started.  I don't remember.

22  Q     But you're not relying on that prohibition to excuse your

23  failure to call Mr. Seery to complain about this change.

24  Right?

25          MR. RUKAVINA:  Your Honor, it's been almost 30

Dondero - Direct                    18

1   minutes on the same topic which he has answered repeatedly.

2   That Mr. Morris might not agree with that answer, doesn't

3   matter.  And this is a matter for closing arguments, not to

4   take this witness for a two-hour road as to what Mr.

5   Waterhouse's clipped wings meant when he said he doesn't know.

6          THE COURT:  Well, it hasn't been 30 minutes,

7   technically, but what is your response?

8          MR. MORRIS:  I think this is an incredibly important

9   topic because our position, among many others, is that Mr.

10  Waterhouse did exactly the same thing after the petition date

11  as he did before the petition date.  In fact, he testified to

12  it yesterday.  Mr. Waterhouse testified very clearly that a new

13  process was put in place after the petition date where,

14  generally, he would have to approve all of the payments that

15  were made on behalf of the Advisors under these contracts.

16         And now I have a witness here who is completely

17  contradicting the witness himself, Mr. Waterhouse.  And I don't

18  understand -- I don't understand the basis for this testimony.

19  We haven't heard anything about who told him, when he learned

20  of this, what he did in response.  I just -- I'll move on.

21         MR. RUKAVINA:  But the point is --

22         MR. MORRIS:   I'll move on, Mr. Rukavina, okay?

23         MR. RUKAVINA:  The point is, Your Honor, that

24  Mr. Waterhouse is the best evidence of what Mr. Waterhouse did.

25  And Mr. Morris opened a door to this just for the purpose of

 1 | trying to badger my witness.

 2 |         MR. MORRIS:  That's not fair.  Mr. Dondero controls

 3 | these entities.

 4 |         THE COURT:  Okay.

 5 |         MR. MORRIS:  He should know that there is somebody

 6 | looking out for the interests of these entities.  He should

 7 | know that.

 8 |         THE COURT:  Okay.  I overrule the objection.

 9 |         MR. MORRIS:  But I will move on.

10 |         THE COURT:  Okay.

11 | BY MR. MORRIS:

12 | Q    Mr. Dondero, in 2020, entities directly or indirectly

13 | owned by you and Mr. Ellington made payments to Mr. Ellington,

14 | Mr. Waterhouse, Mr. Surgent, and Mr. Leventon.  Correct?

15 | A    Yes.

16 | Q    And did you decide to have those payments made to those

17 | individuals in 2020?

18 | A    Yes.

19 | Q    How much was paid to them in the aggregate?

20 | A    An amount equal to exactly what they would have been

21 | entitled to if they had been rooked by Highland.

22 | Q    Do you understand that Highland made a motion to try to

23 | have those bonuses paid to those individuals?

24 | A    Highland could have paid it at any time.

25 | Q    Didn't it need the Court's permission to do that?  Are you

Dondero - Direct                    20

1  aware of that?

2  A     Not -- not in my opinion.  Not for prior-year bonuses and

3  not for prior -- and not for earned bonuses and -- and not for

4  amounts that Seery told everybody he was going to pay them.

5  Q     So you don't have a recollection of Highland under Mr.

6  Seery's direction making a motion to this Court to have those

7  very bonuses paid?  You don't remember that?

8  A     No.

9  Q     Do you remember that every single person in the Highland

10  complex had their bonus paid except for those four individuals?

11  A     No.  That's not true.

12  Q     Okay.  So you paid them.  And how much were the bonuses

13  that Mr. Seery stiffed them off?

14  A     It's all in -- it's all in the Highland servers, the exact

15  amounts.  I believe it was close to ten million bucks.

16  Q     Okay.

17  A     You -- you guys have all this information.

18  Q     Okay.  But your recollection is that you caused entities

19  owned and controlled by you and Mr. Ellington to pay something

20  around $10 million to Mr. Waterhouse and Highland's most senior

21  legal and compliance officers.  Correct?

22  A     What was the first part of the question, please?  I didn't

23  --

24  Q     You caused entities owned and controlled by -- directly or

25  indirectly by you and Mr. Ellington to pay somewhere

                          Dondero - Direct                    21
 1  approximately $10 million in 2020 to Mr. Waterhouse and
 2  Highland's senior legal and compliance officers --
 3  Mr. Ellington, Mr. Leventon, and Mr. Surgent.  Is that right?
 4  A    Yes.
 5       So I just want to emphasize it wasn't a targeted amount.
 6  It was an amount meant to be exactly what they would have been
 7  paid if Highland had not been in bankruptcy and just paid
 8  normal bonuses in the normal course.
 9  Q    So --
10  A    It's exactly that amount.
11  Q    So -- and you didn't disclose that to the Court, did you?
12  Those payments?
13           MR. RUKAVINA:  Your Honor, I object to the
14  implication that Mr. Dondero had any requirement to disclose
15  anything to this Court.  It would have been those individuals'
16  obligations.  So that is an unfair question.  Why would Mr.
17  Dondero have to disclose to this Court that he's paying
18  bonuses?
19           MR. MORRIS:  If Your Honor thinks it's an irrelevant
20  question --
21           MR. RUKAVINA:  I didn't say it's about relevant.  I
22  said that the question was improperly phrased as assuming that
23  he had any legal obligation to inform the Court.
24           MR. MORRIS:  I --
25           THE COURT:  Overruled.


                    **WWW.LIBERTYTRANSCRIPTS.COM**

Dondero - Direct                    22

1  BY MR. MORRIS:

2  Q    Mr. Dondero, did you or anybody on your behalf ever inform

3  the Court that entities owned, directly or indirectly, by you

4  and Mr. Ellington were going to pay approximately $10 million

5  to Mr. Waterhouse, Mr. Leventon, Mr. Ellington, and

6  Mr. Surgent?

7  A    I know we were counseled.  I know counsel told us we had

8  no obligation.

9  Q    Okay.  Did you tell Mr. Seery?

10 A    Seery knew.  But I didn't tell him.

11 Q    Okay.  That's my question.  My only --

12        MR. MORRIS:  -- and I move to strike, Your Honor.  He

13 ought to answer my question.

14 BY MR. MORRIS:

15 Q    Did you tell Mr. Seery?  That's the only question there

16 is.

17 A    No.

18        THE COURT:  Okay.  Strike what you asked.

19        MR. MORRIS:  Thank you.

20 BY MR. MORRIS:

21 Q    Do you know if anybody told Mr. Seery about these payments

22 at the time they were made?

23 A    I know -- I know he knew from either Frank or from Thomas

24 Surgent.  But I don't know from which party.

25 Q    Did Thomas Surgent tell you that he had informed Mr. Seery

**WWW.LIBERTYTRANSCRIPTS.COM**

Appx. 01247

Dondero - Direct                          23

1  of these payments?

2  A    No.

3  Q    Did Frank Waterhouse ever tell you that he had informed

4  Mr. Seery of these payments?

5  A    I -- I can't recall specifically.

6       And I -- I want to use that as the same answer on Thomas

7  Surgent.  I can't recall specifically.  But I know -- I know

8  one of the -- one of the two of them contemporaneously

9  discussed it with Seery.

10 Q    How did you learn that?

11 A    From one or the other.  I just can't specifically remember

12 --

13 Q    Did they --

14 A    -- a conversation.

15 Q    Did they report to you what Mr. Seery said?

16 A    No.

17 Q    Each of these individuals subsequently filed a proof of

18 claim in the bankruptcy court for their bonus.  Isn't that

19 correct?

20 A    Yes.

21 Q    And those claims were subsequently assigned to entities

22 owned, directly or indirectly, by you or Mr. Ellington.

23 Correct?

24 A    Yes.

25 Q    Sir, you personally knew how much the Advisors were going

1  to pay Highland under the Payroll Reimbursement Agreement and

2  the Shared Services Agreement.  Correct?

3  A    No.

4  Q    Did you ever ask?

5  A    No.

6  Q    You determined in late 2017 that NexPoint would pay

7  Highland $6 million per year for subadvisory and shared

8  services effective January 1st, 2018.  Correct?

9  A    I -- I don't know the specific agreements from each year.

10     There was an agreement each year.  The agreements changed

11  from being a flat fee to a back-service -- back-office fee plus

12  a reimbursement of employees fee sometime more recently.  But I

13  -- I don't know the exact dates on -- of specific contract.

14  Q    Do you recall in late 2017 speaking with Mr. Klos and

15  Mr. Waterhouse about having to get more money from the Advisors

16  to Highland because Highland was losing a lot of money?

17  A    No.

18  Q    Do you recall discussing with them that Highland should

19  receive $6 million from NexPoint for services rendered?

20  A    The -- no.  All the efforts were to be fair and accurate

21  and compliant from a regulatory and tax standpoint.  All the

22  centralized cost allocation things.

23  Q    Was your personal tax liability ever a factor in

24  determining how much money would be paid from the Advisors to

25  Highland?

                          Dondero - Direct                    25

1  A    No.

2  Q    Do you recall that there was a substantial change in the

3  method and amount of money that was paid from the Advisors to

4  Highland on account for services rendered at the beginning of

5  2018?

6  A    I recall there was an old agreement from '13, which was

7  neither best practices nor compliant from a regulatory or tax

8  standpoint, that had to be improved and made more specific.

9  And a team from accounting, legal, and compliance re-crafted

10 the Shared Services Agreement and front-office allocation

11 appropriately in that 2017-'18 time period.

12 Q    Are you aware that Frank Waterhouse signed the Payroll

13 Reimbursement Agreements, the Sub-Advisory Agreements, and the

14 New NexPoint Shared Services Agreement in 2018, in the first

15 half of 2018?

16 A    I'm not specifically aware.  It doesn't surprise me.

17 Q    Did you ever review any of those agreements?

18 A    No.  Yeah, no.

19 Q    Okay.  You didn't participate in the drafting of those

20 documents.  Correct?

21 A    No.

22     It was a typical shared services of a complicated

23 financial services firm that centralizes functions.  It was a

24 -- it was a typical agreement that would be put together and

25 administered by accounting.


                    **WWW.LIBERTYTRANSCRIPTS.COM**

Dondero - Direct                    26

1  Q    But people like Frank Waterhouse actually wore multiple

2  hats.  Correct?

3  A    Sure.

4  Q    And he wore the hats of the Advisors and he wore the hats

5  of Highland at the exact same time.  Right?

6  A    Sure.  It's possible to be fair doing that.

7  Q    And you're the one who decided that he should wear these

8  multiple hats.  Right?  You're the one who appointed him to

9  these positions?

10 A    Yes.

11 Q    Okay.  Do you recall that you participated in annual

12 review meetings with Mr. Waterhouse and Mr. Klos and Mr. Okada?

13 A    Yes.

14      It would be multiple, generally.  Sometimes there were tax

15 ones, sometimes there were budgeting, sometimes it was

16 performance reviews.  Yeah.  Yes.

17 Q    You know, I just want to go back to that issue of taxes

18 for just a moment.  Do you recall that in 2017 and 2018, the

19 Advisors earned millions of dollars of income?

20 A    Not specifically, but --

21 Q    Do you recall that they earned positive income in those

22 years?

23 A    I believe so.

24 Q    And do you recall that Highland had negative income in

25 those years?

Dondero - Direct                    27

1  A    I don't know.

2      Highland's a giant solvent pool of assets.  So the

3  liquidity, it varies from year to year.  But -- and, also, the

4  mark-to-marketing of those assets varied from year to year.  So

5  whether or not Highland made money in a given year, I don't

6  know.  There's some years it makes a lot but has limited cash

7  flow; other years, it has material cash flow and makes a lot.

8  Some years it has material cash flow and loses a lot.

9  Q    All right.  Let me just focus on operating profits.  On an

10 operating basis, Highland lost a lot of money in 2017 and 2018.

11 Correct?

12 A    I don't know.

13 Q    Okay.  Can you grab your book there, please?

14 A    Sure.

15 Q    And turn to Exhibit 86.  I think it's in Volume 2 of 2.

16     Mr. Dondero, if there's any portion of the book that you

17 in particular want to read, just let me know.  But I'd ask you

18 to just turn to Page 2.

19 A    Page -- I'm on Page 2.

20 Q    Okay.  And do you see near the top, it says, quote,

21 overall operating income projected at $900,000, but there's a

22 $12 million loss for HCMLP which doesn't account for some other

23 items?  Do you see that?

24 A    Yes.

25 Q    Does that refresh your recollection that Highland was

Dondero - Direct                          28

1  projected to lose $12 million in 2018?

2  A    Well, it actually refreshes my recollection on what I

3  said.

4       And there's substantial underlies in expected investment

5  and investment commitments.  There's a balance sheet that's

6  moving around that dwarfs the $12 million, which is what my

7  point was.

8  Q    I'm not talking about assets, sir.  I'm talking about

9  operating income, the ability to pay your bills.

10 A    Right.

11      What I'm talking about is if you have 650 million of

12 assets, which we still have today, you have more than enough

13 solvency to cover 12.

14 Q    So this wasn't a problem from your perspective?

15 A    Correct.

16 Q    Okay.

17 A    It never had been.

18 Q    Okay.  Let's go to Slide 29, please.

19 A    In the same book?

20 Q    Yeah.

21          THE COURT:  I'm sorry, you said 29?

22          MR. MORRIS:  29, yeah.

23 BY MR. MORRIS:

24 Q    And if you could just -- I'm just going to ask you quickly

25 29, 30, 31, 32, that's all information about human resources.

Dondero - Direct                    29

1  Correct?

2  A    I'm sorry.  Exhibit 29, the Shared Services Agreement?

3  Q    No, no.  I'm sorry.  In 86, just Page 29.

4  A    Oh, okay.

5  Q    Yeah.

6  A    Page 29, yes.

7  Q    Okay.  So if you look at 29, 30, 31, 32, you're given a

8  lot of -- this deck was presented to you by Mr. Waterhouse and

9  Mr. Klos.  Right?  If you look at the front?

10 A    Okay.  I don't know.  I assume so.

11 Q    Okay.  So on that assumption, if you look at 29, 30, 31,

12 whether this is the exact book or not, you would agree that you

13 were presented with a lot of information about the Highland

14 platform's employees.  Correct?

15 A    Yes.

16 Q    And did you personally have to approve everybody who was

17 hired?

18 A    No.

19 Q    But you were informed of everybody who was hired.

20 Correct?

21 A    Generally.

22 Q    And you were generally informed about everybody who was

23 fired.  Correct?

24 A    Generally.

25 Q    And everybody who was terminated?  If you look at 32, for

                              Dondero - Direct                      30

 1  example, they tell you exactly the number of people who were
 2  terminated and they identified by name the names of the
 3  individuals who were terminated.
 4      Do you see that?  If you look at 32.
 5  A   Sure.  Okay.
 6  Q   So there's no question that you were given that
 7  information.  Right?
 8  A   Once a year at the end of the year.  Is that what you're
 9  asking me?
10  Q   In this deck.
11  A   Right.
12  Q   And you met with Brian Collins from time to time to
13  discuss personnel matters.  Right?
14  A   Yes.
15  Q   And you're the person who set the compensation for
16  everybody who worked for Highland.  Right?
17  A   No.  Just generally.
18  Q   Nobody got a raise without your approval.  Did they?
19  A   Yes.  I mean I get told about it afterwards or something.
20  Q   Who had the authority to give raises without your prior
21  approval?  Who in the organization had the ability to hand out
22  money without your approval?
23  A   Well, if it was a large amount, they would seek my
24  approval.  But I'm saying small amounts, unit heads would have
25  that ability.

                    **WWW.LIBERTYTRANSCRIPTS.COM**

Dondero - Direct                                 31

1  Q    Okay.  So you had to approve -- let's -- can we use the
2  word "material?"
3  A    Yeah.
4  Q    Okay.  You had the authority and the responsibility for
5  approving all material changes in compensation for Highland's
6  employees.  Right?
7  A    Yes.
8  Q    Okay.  Go to Slide 36, please.
9       Do you remember that these annual reviews included
10 forecasts?
11 A    Yes.
12 Q    And those forecasts would contain assumptions, right?
13 A    Yes.
14 Q    And in this particular forecast, if you look at the top,
15 you were told to assume that the material inter-company
16 arrangements remained unchanged and it specifically said that
17 NexPoint and its subsidiaries would pay $6 million per year for
18 subadvisory and shared services.  Do you see that?
19 A    Yes.
20 Q    Where did that number, six million, come from?
21 A    I assume it was -- I don't know.
22      It was -- these are the assumptions they're using.  They
23 probably flatlined prior years.  There were probably prior
24 years where five or six or based on growth, you know, of prior
25 years five.  There's maybe a mixture of six.  I don't -- I

                              Dondero - Direct                    32

1  don't know the answer.

2  Q    Did you play any role in determining how much money would

3  be paid by the Advisors to Highland for services?

4  A    No.  It was done via the shared services contracts that

5  are meant to be for a variety of regulatory and tax purposes

6  appropriate and fair.

7          MR. MORRIS:  All right.  I move to strike.  I'm just

8  asking him about what he did.

9          THE COURT:  Sustained.

10  BY MR. MORRIS:

11  Q    Did you play any role in establishing the fees that were

12  paid by the Advisors to Highland under any of the inter-company

13  agreements?

14  A    Not the specifics, just the general direction to be

15  compliant in best practices.

16  Q    Okay.  But you were told here -- right?  We don't really

17  have to debate the point.  You were told, you will admit, in

18  the beginning of 2018 that the assumption was that NexPoint and

19  their subsidiaries would be paying $6 million a year for

20  subadvisory and shared services.  Correct?

21  A    Yes.  That -- I was told here that they had to make an

22  assumption, and they made an assumption.

23  Q    Okay.  Can you turn to Page 46, please?

24      Do you see that that's the NexPoint three-year profit and

25  loss forecast?

                    WWW.LIBERTYTRANSCRIPTS.COM

1  A     Yes.

2  Q     And do you see that in the middle of the page, there's a

3  reference to subadvisor fees and shared service expenses?

4  A     Yes.

5  Q     And do you see that if you add those two numbers up for

6  any of the years, it equals $6 million?

7  A     Yes.

8  Q     So, again, the projections that you were given showed that

9  NexPoint would be paying Highland exactly $6 million for these

10 services for each of those three years.  Is that right?

11 A     That's the assumption in this forecast.

12       They -- they missed the bankruptcy.  They missed the fact

13 that the revenue wouldn't change, but they had to make some

14 assumptions that, you know -- whatever.  But they don't know

15 what they don't know.  But they had to make some assumptions,

16 so they -- they put a flatline assumption in there.

17 Q     Well, do you know that with the exception for -- with the

18 exception of December 2020, that assumption proved 100 percent

19 correct?  That's exactly what NexPoint paid for the first 35

20 out of the 36 months on that forecast?

21 A     We didn't have a lot of turnover before the bankruptcy,

22 and it was based on head count and it was based on percentages

23 of people.  So, yeah, the assumption probably played out until

24 people started moving in and out and until the assets under

25 management changed.  But, yeah, that makes sense.

Dondero - Direct                    34

1  Q    This is what you were told they would pay, and this is
2  exactly what, in fact, they did pay with the exception of
3  December 2020.  Do you know that?
4  A    I don't know that except for you're telling me that and
5  showing me that here.
6       And I'm reluctant to give any credence to a projected
7  (indiscernible) forecast based on a lot of assumptions having
8  to have been -- happened to have been right in a year or two
9  somehow overrides the contracts that's very specific and very
10 clear.
11 Q    Well, if you take $6 million a year and you divide it by
12 12, that's $500,000 a month.  Right?  Simple math.
13 A    Roughly, sure.
14 Q    Not even roughly.  Exactly.  Right?
15 A    Okay.  It's not exactly six million, but yes.  Okay.
16 Q    Well, if you add 3,024,000 plus 2,976,000, you actually
17 come to exactly 6,000,000.  Right?
18 A    Okay.  Yeah, then it's exactly 500,000.
19 Q    It is.
20 A    Yes.
21 Q    And you were told in April of 2020 that NexPoint would pay
22 exactly $500,000 for each and every month through the end of
23 the year.  Isn't that correct?
24 A    No.  No.
25      And all I'm saying is there's a responsibility to

Dondero - Direct                          35

1  administer a contract beyond the assumptions in a -- in a pro
2  forma. This is meant to be an overall year-end review.  It's
3  not meant to be a detailed review of all contracts.  It's --
4  it's meant to be approximate.  It's summarizes everything to
5  six, seven line items instead of a hundred line items.  It's
6  not a -- it's for planning purposes.  That's -- that's what
7  this document is.
8  Q    Are you aware that the corporate accounting group prepared
9  in the ordinary course of business 13-week forecasts?
10 A    Yes.
11 Q    And do you understand that those 13-week forecasts
12 included the amount of money that the Advisors were going to
13 pay to Highland for the services?
14 A    We have similar assumptions on a variety of things, also,
15 yes.
16 Q    And were those forecasts given to you?
17 A    Sometimes we -- we went over them periodically.
18 Q    And when you say "we would go over them," you went over
19 the 13-week forecasts with Mr. Waterhouse and Mr. Klos.
20 Correct?
21 A    Generally.
22 Q    And you continued to get forecasts after the bankruptcy.
23 Correct?
24 A    Not much.  A little bit.  I -- things changed with the
25 bankruptcy.

Dondero - Direct                                    36

1   Q     All right.   So before the bankruptcy, there is no question

2   before the bankruptcy, you got the 13-week forecasts that

3   showed exactly how much the Advisors were projected to pay

4   under their contracts with Highland.   Right?

5   A     Yes.

6   Q     And after the bankruptcy filing, certainly before the

7   Independent Board was appointed, you continued to get the

8   13-week forecast.   Right?

9   A     There was only a few weeks in between there.   I don't know

10  if I saw anything in that few weeks.

11  Q     And Highland filed disclosures on the docket showing how

12  much revenue they generated and the sources of their revenue.

13  Right?

14  A     Scant -- scant detail.   But yes, a little bit regarding

15  revenue.

16  Q     And even after Mr. Seery was appointed, Mr. Waterhouse and

17  Ms. Hendrix would still give you information about NexPoint and

18  the advisors and their projections.   Right?

19  A     I did get information on the advisors after the

20  bankruptcy, the advisors and entities that weren't part of the

21  bankruptcy.

22  Q     Can you go to Exhibit 150, please, sir?

23        And do you see that this is an email that Ms. Hendrix sent

24  to you in April 2020, where she attached a NexPoint cash

25  forecast?

Dondero - Direct                              37

1  A    Yes.

2  Q    And do you see that she invited you to discuss the

3  forecast if you had any questions?

4  A    Yes.

5  Q    And do you see the forecast is not a big document.  Right?

6  It's just a one pager?

7  A    Yes.

8  Q    It's a cash forecast?

9  A    Yes.

10 Q    And it shows that for every single month from May 2020

11 until December 2020, NexPoint was projected to pay Highland how

12 much?

13 A    (No audible response)

14 Q    $500,000.  Right?

15 A    Yes.

16 Q    So, here they are in April 2020 repeating exactly what

17 they told you was going to happen, what they projected to

18 happen, back in January of 2018.  Right?

19 A    Okay.  Those are projected numbers.  They're not

20 reconciled.  They're not trued up.  They're part of contracts

21 that need to be administered.  The fact that they're putting in

22 a flat line with an expectation to reconcile it later is not a

23 surprise.

24    People don't reconcile things on a daily basis or minute-

25 by-minute basis.  It happens in due course when it's efficient.

Dondero - Direct                    38

1  I don't know if -- I don't know when they normally reconcile,

2  if it's quarterly or monthly or yearly, but those are questions

3  for Frank and Klos.  But you would never have a specific

4  contract that isn't reconciled when it has a lot of variables

5  in it.

6  Q    At this point, Frank Waterhouse's wings had not been

7  clipped.  Right?  It's April.

8  A    Correct.

9  Q    And so he's still the person who is responsible for

10  administering the contracts in accordance with their terms.

11  Right?

12  A    He's the one -- he and his group are responsible for

13  administering the contract, due course, best practices, yes.

14  Q    And he is telling you in April 2020 exactly what he told

15  you in January of 2018, and that is the cost of NexPoint's

16  contracts with Highland would be $500,000 a month.  Correct?

17  A    That was his -- for cash flow purposes, that was his

18  assumption, yes.

19  Q    Okay.  And do you understand, do you know that for every

20  single month from January 2018 until the end of November 2020,

21  NexPoint paid exactly $500,000?

22  A    I don't know exactly when he told me to stop paying, but

23  hopefully they stopped paying when I told them to stop paying.

24  Q    Well, you told them to stop paying after you got notice of

25  termination of the shared services agreements.  Correct?

Dondero - Direct                                  39

1  A    No.  I told them to stop paying once we realized we were

2  being over billed.

3  Q    And that occurred after you got notice of termination of

4  the shared services agreements.  Correct?

5  A    I don't know.  I have no recollection of that.

6  Q    All right.  We'll deal with Mr. Norris on that topic.

7       But there's no question -- you don't have any reason to

8  question the assertion that NexPoint paid exactly $500,000

9  every single month for 35 months until the end of November 2020

10 when you directed Mr. Waterhouse not to make any further

11 payments, fair?

12 A    Yeah.  I've no reason to know that they didn't.

13 Q    All right.  Okay.  I want to go back in time a little bit.

14      Are you aware that in January 2018, Frank Waterhouse

15 signed a sub-advisory agreement on behalf of both advisors?

16      Do you know that?

17 A    Not specifically.  And, again, I knew there was a task

18 force that changed and improved it to be compliant.  And I

19 assume that's what you're referring to.

20 Q    It's not.

21      Can you grab Volume 1 of 2, please, and go to Exhibit 5.

22      Do you see that's a sub-advisory agreement?

23 A    Yes.

24 Q    And do you see, if you look at the end, that Mr. -- and

25 his signatures appear on the page ending in Bates Number 580.

Dondero - Direct                                      40

1      Do you see Mr. Waterhouse signed this sub-advisory

2   agreement on behalf of both NexPoint and Highland?

3   A    Yes.

4   Q    Did you authorize him to do that?

5   A    Not specifically.

6   Q    No.

7      Do you have any knowledge that Mr. Waterhouse signed a

8   sub-advisory agreement effective as of January 1, 2018, on

9   behalf of both Highland and NexPoint?

10  A    I have general awareness there was a tax legal compliance

11  accounting task force to make this agreement as accurate and

12  proper and best practices as possible.  And this is their work

13  product that Frank, as leading the group signed, and I'm fine

14  with him signing it.  But I was not specifically involved and I

15  don't have direct recollection.

16  Q    Okay.  That's fair.

17     Can you just turn to Page 3?

18  A    3 of this contract?

19  Q    Yes.

20     Do you see it required a monthly fee of $252,000 in

21  Section 2(a)?

22  A    I'm sorry.  Section 2(a)?

23  Q    Yes.

24  A    Two dot zero one.  Is that -- I'm sorry.  Maybe I'm in the

25  wrong --

Appx. 01265

                          Dondero - Direct                    41

1  Q    We're in Exhibit 5.  It's Exhibit 5, Page 3.

2  A    Hang on.  I'm sorry.  I was in Exhibit 6.

3  Q    Take your time.

4  A    Exhibit 6, Page 2.  Okay.

5  Q    Yeah, we're at Exhibit 5, Page 3.

6  A    Page 3.  Okay.

7  Q    Do you see the compensation there is $252,000 a month?

8  A    Yeah.

9  Q    And do you see that it's a fixed fee?

10 A    Yes.

11 Q    And it doesn't have anything to do with costs, does it?

12 A    Hold on a second.

13 Q    Take your time.

14 A    I think what's happening here is I think there's two

15 agreements.  There's one for back-office people, or back office

16 function, in general, which has a fixed fee to it which is

17 probably what this is.

18     And then, there's one that looks like the other one we

19 were looking at that has a list of people in the back and the

20 percentages of their time.  And that's the one that's cost plus

21 and reimbursement.

22     And this -- this one I believe was more fixed based on

23 just general services provided.

24 Q    Okay.  So would you agree that sub-advisory services are

25 what's commonly known as front-office services?  They're

                    **WWW.LIBERTYTRANSCRIPTS.COM**

Dondero - Direct                                    42

1 investment advisory services.

2 A    Everybody uses different names.  The front-office one is

3 generally a people-oriented one and, then, the other one is

4 generally a more fixed overhead.

5 Q    Are you aware that this sub-advisory agreement was

6 replaced with the payroll reimbursement agreement five months

7 later?  Do you know that?

8 A    Well, that's what I had said earlier, that from 2013 on,

9 there was a general fixed structure one that wasn't best

10 practices, wasn't compliant from a regulatory or tax

11 standpoint, that was with a task force made to be compliant and

12 split into two.  And if it happened six months after this one

13 was signed, I don't have specific knowledge, but I know the

14 compliant improved, enhanced one. Was enforced in '18.

15 Q    All right.  I'm really not trying to trick you.

16 A    Well, that's how it feels.

17 Q    So I want to clear this up because that's exactly what I'm

18 not trying to do.  I'm trying to get your best recollection.

19 And if you don't recall, you don't recall.

20     But if you look at Exhibit 3, you'll see that's the shared

21 services agreement for NexPoint as of January 1, 2018.  And

22 that's a fixed fee contract.

23     Take your time and look at it.  I don't mean to rush you.

24 A    Right.

25 Q    But if you take a look at -- right.  That's the amended

Dondero - Direct                                    43

1  and restated NexPoint agreement.  It's a fixed fee agreement.

2  If you take a look at Page 9, the consideration, its says "flat

3  fee of $168,000 per month."

4  A    Yes.  Okay.  I understand what you're doing now.

5  Q    Okay.

6  A    NexPoint had the front-office people working at NexPoint

7  because we had public greets, people or officers there.  There

8  were investment professionals there.  NexPoint didn't have

9  investment professionals at Highland.

10 Q    So you created a new sub-advisory agreement for that

11 purpose?

12 A    Well, what I'm saying is the sub-advisory agreement should

13 be different for the -- or should be somewhat different, either

14 in amounts or mechanism, between Hfam and NexPoint.  And I

15 don't know if that's --

16 Q    No.  I'm just not --

17 A    And, again, I know you're trying to trick me, but if --

18 Q    I'm not.

19 A    -- you're saying there's one agreement here, and ah ha,

20 there's two agreements with Hfam, they're different entities.

21 Q    I'm not even talking about HCMFA.

22 A    Okay.

23 Q    I'm really just focused on NexPoint.

24      Are you aware that on January 1, 2018, NexPoint entered

25 into two new agreements with Highland, one of which was a

Dondero - Direct                                      44

1  shared service agreement for back and middle office services

2  and one was a sub-advisory agreement for investment advisory

3  services.  Do you know that?

4  A    My general understanding is they both, Hfam and NexPoint,

5  signed two that were better and more accurate, appropriate to

6  reconcile, proper split, not art, more science-based on, on

7  formula, and they both did.

8       I was just -- I thought you were trying to go down a path

9  and only one of them did, or one of them was different than the

10 other.

11      I wasn't that involved in the process, but there were

12 great efforts made by the people involved to make them

13 appropriate and complaint.

14 Q    Okay.  And, in fact, HCMFA did not sign the sub-advisory

15 agreement at the beginning of 2018.  Are you aware of that?

16 A    No.

17 Q    One was prepared, but they didn't sign it.

18      Do you know that?

19 A    No.  I have no awareness of that.

20 Q    And are you aware that the sub-advisory agreement that was

21 signed by Mr. Waterhouse on behalf of NexPoint and the sub-

22 advisory agreement that was prepared for HCMFA but not signed

23 by anybody, were actually replaced by these payroll

24 reimbursement agreements.

25      Do you have any recollection of any of that or any

Dondero - Direct                           45

1  knowledge?

2  A    Frank would be your person.

3  Q    Okay.

4  A    If the timing was so close, they might've held off on one

5  agreement because they knew it was coming.  Maybe they signed

6  one in due course because an auditor needed it.

7  Q    I don't want you to speculate.

8  A    You know, I mean, I have no idea, but you ask him.

9  Q    You're the person in control, so I'm asking you.  If you

10 don't know, just say I don't know.

11 A    I don't know.  I have no idea.

12 Q    Okay.  Did you ever read the Payroll Reimbursement

13 Agreement before it was signed?

14 A    No.

15 Q    Have you read it today?

16 A    No.

17 Q    Do you ever look at that Exhibit A that was attached to it

18 cause you referred to it?  Do you ever look at that Exhibit A?

19 A    I saw it, but it was exactly what I expected, a list of

20 people and percentages.

21 Q    Are you aware that some of those people had been

22 terminated from Highland before the agreement was even signed?

23 A    The day I became aware of that, and we were still paying

24 for them, is the day we stop paying.

25 Q    Oh, that's when you first learned?

Dondero - Direct                          46

1  A    No.  I mean, I knew -- I mean, I knew people had left the
2  company, but the day I first knew that we were still paying for
3  people who had left the company was the day we stopped paying.
4  Q    Ah, okay.  But there's no question that you knew when the
5  people on that Exhibit A left the company.  You knew that.
6  Right?
7  A    Sure.
8  Q    Sure.  Okay.
9       Was it your understanding that when one of the individuals
10 listed on Exhibit A was terminated that the amount of money
11 that NexPoint would pay to Highland would be reduced?
12      Was that your understanding?
13           MR. RUKAVINA:  Your Honor, I'll object on
14 speculation.  The witness said he did not read that payroll
15 reimbursement agreement, negotiate it, so this is all based on
16 speculation.
17           THE COURT:  Overruled.
18           THE WITNESS:  Absolutely.  But when it was
19 reconciled, I don't know.  I wasn't, you know --
20 BY MR. MORRIS:
21 Q    So it's your understanding that every time a dual employee
22 left Highland, that NexPoint should have gotten a reduction in
23 the amount of money it paid under the payroll reimbursement
24 agreement.  Do I have your understanding correctly?
25      Is that fair?

Dondero - Cross                                    47

1  A    Yeah.  Absolutely.  Why would you have a list of people

2  and percentages otherwise?

3  Q    Okay.

4  A    You wouldn't have it.

5  Q    Okay.  And did you ever take any steps to make sure that

6  when dual employees left, there was a reduction in the amount

7  of money that NexPoint was paying to Highland?

8  A    We relied on Highland for that in the fees we were paying

9  Highland.  We didn't have the staff to do it in our entities.

10 Q    Well, in fact, I think you testified, and I'll just ask

11 you to confirm, that until the summer of 2020, Frank

12 Waterhouse, as the treasurer or the CFO of the advisors, who

13 had a fiduciary duty, one of his responsibilities was to

14 administer the contracts in accordance with their terms.

15     Do I have that understanding correct?  He was the one,

16 until the summer of '20, until Mr. Seery did what you contend

17 Mr. Seery did, until that moment, he is the one on behalf of

18 the advisors who had the responsibility of administering

19 contracts.  Right?

20 A    Yes.  Administering.

21           MR. MORRIS:  I have no further questions, Your Honor.

22           THE COURT:  All right.  Pass the witness.

23                      CROSS-EXAMINATION

24 BY MR. RUKAVINA:

25 Q    Mr. Dondero, what was your title at Highland in 2018 and

**WWW.LIBERTYTRANSCRIPTS.COM**

Dondero - Cross/Rukavina                          48

1  2019?

2  A    President.

3  Q    Okay.  Were you at the top?

4  A    Yes.

5  Q    For the record, what was the size of Highland at that

6  time, revenue, assets under management, employees?

7  A    Very similar to today, really, in terms of asset size.

8  About 650 million in assets.

9  Q    Owned assets.

10 A    Owned assets.

11 Q    What about managed assets?

12 A    Well, I can't -- I know it was bigger.  The CLOs were

13 bigger.

14 Q    Are we talking about billions?

15 A    Yeah.  It was --

16 Q    And approximately how many employees in 2018?

17 A    Boy, maybe 40, 50 more than today.

18 Q    So how many in total?

19 A    150 maybe.

20 Q    Okay.  And just approximate annual revenue back then?

21 A    I don't know.

22 Q    Well, let me ask you this.

23 A    Yeah, sure.

24 Q    As the president of an entity that had hundreds of

25 millions of dollars in assets, billions of dollars under

Dondero - Cross/Rukavina                              49

1  management, and hundreds of employees, would you expect that

2  you would know every detail about every contract or every

3  negotiation?

4  A     No.  No, we had a good accounting staff.  We had a good

5  compliance staff.  We had a good legal staff.  And they did

6  their jobs respectively to administer things appropriately, the

7  way we were operating, which was typical of other asset

8  management firms.

9  Q     So I take it you would get advice from subordinates from

10 time to time.

11 A     Yeah, sometimes.  Yeah, it --

12 Q     Would you act on that advice?

13 A     Yeah.  And it was --

14 Q     Would you receive instructions?

15        MR. MORRIS:  Objection.  Leading.

16        THE COURT:  Overruled.

17 BY MR. RUKAVINA:

18 Q     Would you receive instructions?

19 A     Yes.  And --

20 Q     And who would execute those instructions?

21 A     It would depend on the area.  But, you know --

22 Q     Would it be you?

23 A     No, I wouldn't execute it.  But, it would depend on the

24 area.  If it, you know -- we would -- we act very quickly to

25 anything coming from compliance that was a concern.  Anything

Dondero - Cross/Rukavina                    50

1  from tax would also be a priority.  And then, you know, the

2  accounting or GAAP accounting kind of caught up around the --

3  Q    And let me interrupt you.

4  A    -- annual audit.

5  Q    Let me interrupt you because --

6  A    Sure.

7  Q    -- I really do want to move on.

8       And Mr. Waterhouse, he was a senior executive like

9  yourself.  Is that accurate?

10 A    Yes.

11 Q    Would you have expected Mr. Waterhouse to know the details

12 of all contracts and all transactions?

13 A    He had a staff, and he needed to have a significant staff.

14 They were the --

15 Q    Why did he need to have a significant staff?

16 A    There were a lot of audits.  There were a lot of public

17 company responsibilities.  There were a lot of private equity

18 company expenses.

19 Q    Were their contracts to manage?

20 A    Yeah, there was lots of things.  Everything from personnel

21 to --

22 Q    Would you have expected --

23 A    -- contracts to tax, you know.

24 Q    Would you have expected Mr. Waterhouse to personally

25 manage or administer contracts?

**Appx. 01275**

1  A    No.  He would have mechanisms set up for it.  And, again,

2  you can't administer contracts every 15 minutes.  You would

3  have some cost benefit to when you administered them or

4  reconciled them.

5  Q    So how would you expect Mr. Waterhouse to learn of a

6  potential problem with administering a contract?

7  A    Either one of his people would alert him to it or one of

8  the groups that were paying it would alert it to him -- alert

9  him to it or he would notice.

10 Q    Would you have expected him to notice for each contract

11 being administered if there were hundreds of contracts?

12 A    I mean, eventually.

13     I mean, a lot of things catch up at year-end or at the

14 audit.  But eventually, he or his team would -- or are

15 responsible for administering contracts.  It's rare it's a

16 major gaff and it's not good for people's career if -- let's

17 say you have a lease contract that's supposed to escalate every

18 year and someone forgets to escalate the rents for five years.

19     You know, it's -- that's -- that would be a bad reflection

20 on a lot of people because then it's a project to go back and

21 try and get it and argue it and whatever.

22 Q    Didn't Mr. Waterhouse, in fact, at some point in time,

23 inform you that he had learned of the overpayments.

24          MR. MORRIS:  Objection.  Leading.  I just --

25          THE COURT:  I didn't even hear the question --

Dondero - Cross/Rukavina                        52

1          MR. RUKAVINA:  I'm sorry, Your Honor.

2          THE COURT:  --  to be honest.

3  BY MR. RUKAVINA:

4  Q     Did Mr. Waterhouse, at some point in time, inform you that

5  he had learned of the overpayments?

6  A     Yeah.  That was in --

7          THE COURT:  Oh, overruled.  He can answer.

8          THE WITNESS:  -- November or December of '20?

9  BY MR. RUKAVINA:

10  Q    And was that -- and just to confirm, was that the first

11  time you learned of the overpayments?

12  A    Yeah, the first time I had learned that there were

13  overpayments that weren't reconciled or that we weren't getting

14  credit for.

15  Q    What do you mean by reconciled?

16  A    Well, that there wasn't a -- either a reduction in future

17  payments or something for overpayments in the past.  There's

18  lots of ways to --

19  Q    Was there a -- but --

20  A    -- satisfy a --

21  Q    Was there a general --

22  A    -- deficiency.

23  Q    Was there -- and I'm sorry to keep interrupting you, sir.

24  We just want to try to get done today.

25      Was there a general practice at Highland as far as

**WWW.LIBERTYTRANSCRIPTS.COM**

Appx. 01277

Dondero - Cross/Rukavina                          53

1  reconciling or chewing up contracts?

2  A    Not that I'm aware of.  I'm sure they had one, but not

3  that I'm aware of.

4  Q    Okay.  Are you aware that the two payroll reimbursement

5  agreements were amended to provide $2.5 million of additional

6  cash from the advisors to Highland?

7  A    In what year was that?  Or that was --

8  Q    At the end of 2018?

9  A    Yeah.  I believe there was a reconciliation of some sort

10  there, yes.

11  Q    That's what I'm asking you.

12  A    Yes.

13  Q    What do you understand, if anything, about that

14  reconciliation?

15  A    That they did the proper true-up in the accounting and,

16  whether it was based on assets under management, work, or

17  people, they made the proper adjustments.

18  Q    Is that the only true-up to your understanding?  Because I

19  asked you about a general practice, and you said that there was

20  not.

21  A    I said I didn't know if there was.  If they did it at

22  year-end and you're telling me they did it year-end '18, it

23  sounds like it was a year-end process.

24  Q    Do you remember authorizing the advisors to pay $2.5

25  million in additional payroll reimbursement expenses at the end

Dondero - Cross/Rukavina                                54

1  of 2018?

2  A    I don't remember.  I don't know if I would've had to

3  authorize it if it was part of the true-up process.

4  Q    And you were also asked whether, in light of what you

5  described as Mr. Waterhouse's diminished role or clipped wings

6  -- whatever words were used -- you expected someone else to

7  administer the contracts with the advisors.  I want to follow

8  up on that.

9       Do you know who Dustin Norris is?

10 A    Yes.

11 Q    And what's your understanding of who he is for the

12 advisors?

13 A    That's a good question.  I don't want to -- I don't want

14 to fumble this one.

15 Q    Let me ask you this.  Is he an officer?

16 A    The broker-dealer, in some of the entities, yes.  I don't

17 know if all of the entities.

18 Q    Did you ask Mr. Norris to involve himself in any way with

19 these overpayments and these contracts?

20 A    Well, we were trying to do an amicable split.  After we

21 found out about the overpayments, Dustin was front and center

22 trying to have a soft landing instead of having everybody

23 kicked out of the building and then coming back and all that

24 nonsense.

25      But my recollection is in that November-December time

Dondero - Cross/Rukavina                      55

1  frame, hearing about it from Frank, and then stopping excess

2  payments until we were trued up.

3  Q    And also, you were asked about Frank's official titles

4  with the advisors.  To your understanding, who was actually --

5  who actually employees Frank?  What company is his employer?

6  A    In the time frame we're talking about?

7  Q    No.  Today, sir.  When you were asked about today.

8  A    Today, he works for a Skyview.

9  Q    And what's Skyview?

10 A    Skyview is an amalgamation of the accounting staff and

11 legal staff in a separate entity.

12 Q    Former Highland employees?

13 A    Yes.

14 Q    And is that why you're not technically sure as to whether

15 he's an officer because he's an employee of Skyview?

16 A    That's right.

17 Q    Okay.  I think you've testified that whatever his role is,

18 he is in charge of accounting for the advisors?

19 A    Yes.

20 Q    Okay.  Today?

21 A    Yes.

22 Q    Okay.  And just for the record, the Court may or may not

23 know, but when you refer to Hfam, are you referring to HCMFA?

24 A    Uh-huh.  Yes.

25 Q    Okay.  Now, I don't think there's any point in showing you

Dondero - Cross/Rukavina                                56

1  the payroll reimbursement agreements since I think you

2  testified you never read them.  But there are amounts in those

3  agreements and those amounts total up to certain amounts per

4  year.  Are you following me so far?

5  A    Yes.

6  Q    Do you know how those yearly amounts were determined for

7  the two payroll reimbursement agreements?

8  A    Some of the fixed numbers are relevant to what's the fixed

9  expense base and then divided based on --

10 Q    Well, let me pause you.  Let me pause you.  I apologize.

11      I'm talking about just the payroll reimbursement now, not

12 the shared services.

13 A    Oh, the payroll --

14 Q    The payroll of --

15 A    Yeah.

16 Q    -- the employees.

17 A    Yeah, the payroll of the employees and they're, and I

18 don't want to call them unallocated, but some of the employees

19 are employees that represent various entities.  And then,

20 there's a percentage allocation of their time.

21 Q    And all that rolls up into a number.

22      Are you following me so far?

23 A    That's right because the percentage of their time is then

24 a percentage of their total comp.

25 Q    So what I'm asking you is, did you determine -- so

1  remember, all those percentages and all that rolls up into a

2  number, okay?  Let's call that number X.  Are you with me?

3  A    Yes.

4  Q    Did you set or determine what X would be?

5  A    No.

6  Q    Do you know how X was determined?

7  A    By having the relevant people on the list and that the

8  less would hopefully be comprehensive and complete.  And the --

9  Q    Do you know who prepared --

10 A    And then, the percentage allocations would be appropriate.

11 Q    Do you know who prepared X?  X, again, being the number

12 that all this roles up into?

13 A    Yeah.  The starting -- the starting appendix with all

14 those people on it was that task force of legal, compliance,

15 and accounting to provide the starting point.  And those

16 documents that are based on people and percentages are living

17 documents that change over time.

18 Q    Do you know whose idea it was originally to have those

19 payroll reimbursement agreements?  In other words, you talked

20 about how the prior agreements were changed for best practices.

21       Do you know whose idea that was?

22 A    I believe it came from the auditors which came from -- the

23 auditors from a tax and a regulatory standpoint.  You can't

24 just have whimsical numbers.  There has to be a basis for the

25 allocations.  And the more directly you can tie it to people

                    Dondero - Cross/Rukavina                    58

1  and contribution and a percentage of overhead, the better.  And
2  that's -- that's why the new contracts were presented best
3  practices.
4  Q    Because they have to withstand regulatory and tax
5  scrutiny?
6  A    Yeah.
7  Q    Okay.
8  A    Yeah -- or yeah, that's right.  Scrutiny or challenge if
9  --
10 Q    So if someone suggests that you pulled numbers out of thin
11 air, $5 million for HCMFA, on an annual basis, and $6 million
12 for NexPoint on an annual basis, would you agree with that?
13 A    No.
14 Q    Okay.  And if someone suggests that you pulled those
15 numbers for a reason involving trying to get liquidity into
16 Highland, would you agree with that?
17 A    No.  I would say --
18 Q    And if someone -- hold on, sir.
19 A    Yeah.
20 Q    And if someone suggested that you pulled those numbers in
21 order to get tax deductions for the Advisors, would you agree
22 with that?
23 A    No.
24 Q    Okay.
25 A    Yeah.

1 Q    What were you going to say, sir?  You were going to

2 explain.

3 A    I was going to say that the purpose of best practices was

4 to avoid any assertions by regulatory or GAAP accountants or

5 tax accountants that it was tax fraud.

6      What you're describing is tax fraud, which means the

7 people who did it, instead of -- if they did it and they said

8 they did it, and they said they did it because I told them,

9 then they committed tax fraud, and their defense is they didn't

10 do anything about it.  Or --

11 Q    That's the Nuremberg Defense I think, sir.  But let me --

12 A    -- or complained.  And instead they just --

13 Q    Let me --

14 A    -- their defense is going to be I told them?

15 Q    Let me interrupt you again.  Let's assume it's the

16 Nuremberg Defense.  How long have you known David Klos?

17 A    Several -- you know, a bunch of years.  Ten years,

18 probably.

19 Q    Do you have an opinion of his professionalism?

20 A    He's --

21 Q    Prior to this litigation.

22 A    Prior to him being co-opted by --

23 Q    Yes.

24 A    Okay.

25         MR. MORRIS:  Move to strike, Your Honor.

Dondero - Cross/Rukavina                    60

1          THE COURT:  Sustained.

2   BY MR. RUKAVINA:

3   Q    Prior to the confirmation of the bankruptcy plan, did you

4   have an opinion of Mr. Klos' professionalism?

5   A    I would divide it into two portions.  It was before he was

6   enticed --

7   Q    Well, let me --

8   A    -- to work for the --

9   Q    Because we're going to have motions to strike.  Let me ask

10  a different question.

11         MR. MORRIS:  I move to strike the word enticed.

12         THE COURT:  Sustained.

13  BY MR. RUKAVINA:

14  Q    Let me ask a different question.  In 2018, would you have

15  believed that David Klos could be -- could possibly create

16  deceptive documents for tax fraud or tax cheat purposes?

17  A    No.

18  Q    What about Mr. Waterhouse?

19  A    No.

20  Q    What about Ms., and I apologize, I count pronounce her

21  name, Thedford.  You know who I'm talking about, Lauren.

22  A    Right.  No.

23  Q    Okay.  Anyone at Highland?

24  A    No.  We were a very compliant organization.

25  Q    What about at the end of 2018 when the $2.5 million was

**WWW.LIBERTYTRANSCRIPTS.COM**

Dondero - Cross/Rukavina                              61

1  paid as additional money under the payroll agreements.  Can you

2  imagine of anyone at Highland that would have done that for

3  some kind of tax cheat or tax fraud purposes?

4  A    No.

5  Q    And if someone testified here that the whole purpose of

6  these contracts was for the Advisors to suck money out of

7  Highland, would you have an answer to that?

8  A    I would say they're not telling the truth, and they're

9  incentivized to not tell the truth.

10 Q    And before Mr. Klos -- well, before -- through the year

11 2020, would you have expected Mr. Klos to flag any potentially

12 deceptive or potentially unlawful activities or documents to

13 you?

14 A    Yes.

15 Q    You met with Mr. Klos, you met with him regularly, didn't

16 you back then?

17 A    Yes.

18 Q    Would you have expected Mr. Waterhouse to flag or raise

19 issues with you if there was anything deceptive or potentially

20 fraudulent?

21 A    Yes.

22 Q    And did either of those ever raise any issue to you, or a

23 red flag with respect to the Shared Services Agreements or

24 Payroll Reimbursement Agreements?

25 A    Not to me, not to the auditors, not to compliance, not to

**Appx. 01286**

1  HR, not to anybody.

2  Q    Were you surprised when you learned towards the end of

3  2020 about the overpayments?

4  A    Yes.

5  Q    Were you angry?

6  A    Yeah.

7  Q    Why?

8  A    Why.  This has been a most unusual bankruptcy.  Right?

9  You have an initial assessment that after getting rid of a

10 couple people the first few months, that everybody else is

11 critical and needs to stay around.  And then you work everybody

12 extremely hard, particularly legal and accountants, to really

13 do all the work that Pachulski and DSA filed, and take tens of

14 millions of dollars of fees out.  But most of it was prepared

15 by our guys.

16      And then you get to the second half of '20, and the

17 decision is made that not only is there not going to be any

18 kind of key employee retention, but there's going to be an

19 attack on the employees, and they're not going to get paid

20 their '18 or '19 bonuses, or amounts for '20 either.  And then

21 some people who were most critical for preserving the estate

22 get fired for cause.  I mean, it's just crazy town.

23 Q    But --

24 A    So that's the backdrop.

25 Q    That's the back drop.  So --

Dondero - Cross/Rukavina                      63

1  A    So people were being paid and then --

2  Q    Are you aware, sir --

3  A    I have --

4  Q    Pardon me.  Pardon me.  Pause.

5  A    Sure.

6  Q    Are you aware, sir, that during all that time, the

7  Advisors were actually paying to Highland bonuses for these

8  employees that didn't get bonuses?

9  A    That's right.  And so --

10  Q    So were you angry about that?

11  A    So I was angry we were -- we were overpaying.  We were

12  having to make up rightful compensation to people from other

13  pockets to just keep people flat.  And at the same time, we're

14  getting overpaid, or we're getting overcharged for the services

15  we are using from Highland.

16  Q    Who are we being overcharged by?

17  A    Highland.

18  Q    And who was supposed to be monitoring our contracts for

19  appropriateness before we paid an invoice?

20  A    Highland.

21  Q    And who has maligned you for the last year and a half in

22  this court and everywhere else?

23          MR. MORRIS:  Objection to the form of the question.

24  This is just --

25          THE COURT:  Sustained.

Dondero - Cross/Rukavina                          64

1  BY MR. RUKAVINA:

2  Q    We'll move on.  You were asked about the I think you said

3  upwards of about $10 million of payments to the senior

4  executives?

5  A    Yes.

6  Q    And you were asked whether you authorized those, and you

7  said yes?

8  A    Yes.

9  Q    Why did you authorize those?

10 A    Those were deferred payments that they were due.  In any

11 other bankruptcy in any normal court, they would have been paid

12 multiples of that.

13 Q    Well, whose idea was it to have those payments made?

14 A    Whose idea?  It was -- it was the employees who were

15 short-shifted.

16 Q    Did they talk to you --

17 A    I agree with -- yes.  They did.

18 Q    Okay.  And did they make any representations to you as to

19 whether such payments would be above-board or not?

20 A    We had legal -- like I said, we did check with legal --

21 Q    Okay.

22 A    -- counsel.

23 Q    Well, let's not get too --

24 A    Yeah.

25 Q    -- far into that.  Okay.  And you mentioned that you

1  believe that Mr. Surgent or Mr. Waterhouse informed Mr. Seery

2  of those payments?

3  A    Yes.

4  Q    And what is the basis of your understanding on that?

5  A    They were both having -- at that time, both having

6  negotiations with Mr. Seery regarding liability, severance, and

7  potentially staying on with Highland.  So I know it was part of

8  those conversations.

9  Q    Were those senior employees the core of your team at

10 Highland?

11 A    Yeah.  Part of it, for sure.  Yeah.

12 Q    Were you concerned about them disbursing to the wind, so

13 to speak?

14 A    Well, I was concerned that they would be treated unfairly,

15 unprecedented in bankruptcy really, in terms of being deprived

16 of prior bonuses by an estate that's twice as solvent as its

17 debts.  You know?

18 Q    And Isaac Leventon was one of those people.  Right?

19 A    Yes.

20 Q    And without going into a long sob story, did he have some

21 health issues with his children?

22 A    Yeah.  He's got a handicapped kid and a wife in a

23 wheelchair.  And somehow they wanted to screw him out of his

24 '18 and '19 bonuses.

25        MR. MORRIS:  I move to strike, Your Honor.  This is

Dondero - Cross/Rukavina                          66

1  just -- this is so irrelevant, and it's so --

2          MR. RUKAVINA:  And Mr. Morris opened the door.

3  Mr. Morris opened the door.

4          MR. MORRIS:  To what?

5          MR. RUKAVINA:  To the $10 million of bonuses.

6          THE COURT:  Okay.  Well, that is not the family

7  situation of Mr. Leventon.

8          MR. RUKAVINA:  I'm developing the answers as to why

9  he authorized those bonuses.  Mr. Seery was allowed, Your

10 Honor, respectfully, to pontificate for a long time.  This

11 gentleman needs to have the ability to tell his story.  People

12 are coming to your court saying that he paid $10 million under

13 the table in some nefarious plot to basically have moles and

14 cheats at Highland.  Even though Mr. Surgent is still there, I

15 remind you.  So I'm giving the man a chance to explain why he

16 authorized that.  I'm not allowed to lead, which is why I'm

17 asking it this way.

18          THE COURT:  I'll allow a little more on this topic,

19 that's it.

20 BY MR. RUKAVINA:

21 Q   Did other of these senior executives also have issues such

22 that they needed money?

23 A   Isaac's was the most acute.  And --

24 Q   But did that form a part of your reasoning for authorizing

25 the payments?

Dondero - Cross/Rukavina                    67

1  A    Yeah, absolutely.  But again, they were entitled to it.
2  They worked hard, they had maximized value in the estate, and
3  then the professionals in the estate decided to take the
4  estate.
5  Q    Okay.  And you mentioned a solvency, and twice the
6  solvency of the estate and liquidity.  What did you mean?  And
7  if you can, explain because you were also asked about whether
8  Highland was making or losing money in '18 or '19.  Explain
9  what you meant when Mr. Morris was asking you those questions.
10 A    The value of Highland estate today is $650 million.  And
11 it's sitting on 200 million in cash.  The Highland estate
12 really has not changed that much in terms of value.  It's
13 really just gone up over the last two years.  Okay?  There were
14 great efforts to hide and deceive the value of, and not
15 disclose the value of relevant assets.  But the value today is
16 650.
17 Q    What was the value in 2018, 2019, to the best of your
18 recollection?
19 A    Probably a low of 500.  Maybe 550.
20 Q    What prompted the bankruptcy filing?
21 A    We one arbitration award that we wanted to term out in
22 Delaware.  We wanted to term it out for -- into a one- or
23 two- year note.  And then that's it.  But we had --
24 Q    Was there --
25 A    We had a settlement with UBS four months, five months

Dondero - Cross/Rukavina                              68

1  before we -- before we filed for $7 million and 10 million of
2  future business.  And HarbourVest was never really a liability.
3  Q    Did Highland file because of solvency issues?
4  A    No.
5  Q    Did Highland file because of liquidity issues?
6  A    No.  Well, liquidity issues, we -- we had -- we needed
7  time to raise the money for the -- we needed time to raise --
8  Q    And --
9  A    -- the money for the arbitration award.
10 Q    And sir, you're aware of certain promissory notes that
11 various affiliates and you have with Highland?  Are you
12 generally aware of those?
13 A    Yes.
14 Q    And prior to bankruptcy, on occasion would Highland come
15 to you and ask that some of those notes be prepaid for
16 liquidity purposes?
17 A    Yes.  Often.  And we generally did.  Yeah.
18 Q    Was that the primary way that if Highland needed to have a
19 pinch in a liquidity issue, it would raise money?
20 A    Yes.  I think once we were down to 50, 60 million.  At one
21 point they were as high as 90.  I think I paid 9 million in
22 notes in '19.  Yeah.
23 Q    Well, the point being can you think of why someone would
24 say that these contracts and the amendments, the 5, 6, and 2.5
25 million were used to finance Highland if Highland would come to

Dondero - Cross/Rukavina                          69

1  you to prepay notes?

2  A    They were incentivized.  I have no idea why they would say

3  that.

4  Q    Mr. Seery testified earlier, you weren't here, he

5  testified about negotiations in the -- now we can't talk about

6  what happened in mediation.  Are you with me there?

7  A    Sure.

8  Q    But he testified generally that the mediation led to a

9  couple deals with the creditors.  But as far as you and your

10 businesses, it didn't really go well.  Without talking about

11 what was going on at the mediation, did you participate in

12 negotiations on a global or plot (phonetic) plan?

13 A    Sure.

14 Q    Did you participate in those discussions with the

15 principle creditors, the committee members?

16 A    I tried.  But the committee members had sold their claims

17 without telling the Court.  And we didn't find that out until

18 later.

19 Q    So in fact, they did file at some point in time notices of

20 transfer of their claim.  Right?

21 A    About eight months later.

22 Q    What do you know about those transfers?

23         MR. MORRIS:  Your Honor, I guess, like, it's his

24 witness, he can ask.  But I'm just going to object on relevance

25 grounds.  What on Earth does anything that he's testified to

1 for the last 20 minutes have to do with overpays?

2          MR. RUKAVINA:  Your Honor, Mr. Morris and Mr. Seery

3 went on at length about how all these were contrived contracts

4 to suck value out of Highland from their creditors.  If you

5 look at their proposed findings, they're asking you for

6 findings on that, extraneous findings that will be used in

7 collateral litigation by the way.

8          So I think that just as that came in, even though I

9 objected on narrative, I objected on relevance, I think he has

10 the right for me to put on some evidence to rebut that.  Or if

11 Mr. Morris agrees that all of this is irrelevant, then

12 Mr. Seery's testimony should be struck in toto.

13          MR. MORRIS:  No, number one.  Number two, I have

14 nothing to do with any litigation that's being prosecuted by

15 Mr. Kirschner.  Let me make that very clear to the Court.  I

16 don't communicate with them about what I do.  They don't

17 communicate with me about what they do.  Like, I don't know

18 what he's doing, but this is a waste of time.

19          THE COURT:  Okay.  Well, I think some of it has been

20 arguably responsive to Seery testimony.  But things like the

21 claimants sold their claims and didn't disclose it for eight

22 months, I mean, clearly we're going down irrelevant trails

23 there.

24          MR. RUKAVINA:  Okay.  Well, we'll wrap it up.

25          THE COURT:  Okay.

Dondero - Cross/Rukavina                    71

1  BY MR. RUKAVINA:

2  Q    You mentioned that the assets of Highland are 600 million

3  today, including 200 mil in cash.  What's the debt against

4  Highland today?

5  A    There's just the claims.  There's --

6  Q    How much?  How much in total?

7  A    There's 260 million in class eight that were projected to

8  get 60 cents.

9  Q    Just tell me how much in total.

10  A    And there's another 85 of class nine.  So it was about 370

11  of claims.  There's 650 advance, there's 200 cash on the

12  balance sheet today.  All the claims traded to Fairlawn and

13  Stonehill (phonetic) for $155 million.  They were happy to buy

14  them because it was representative they were going to get

15  three --

16  Q    We'll stop --

17  A    -- plus others.

18  Q    We'll stop there.

19  A    Yes.

20  Q    We'll stop there.

21  A    Okay.

22  Q    We'll stop right there.  But the point is that to your

23  understanding, there's more than enough assets at Highland

24  today to pay all creditors in full?

25  A    Yes.  And by the way --

**Appx. 01296**

                        Dondero - Cross/Rukavina                        72

1  Q    Let's talk --

2  A    -- Highland could have paid the 150 million, retired all

3  the claims, and given us the keys.

4  Q    I understand.

5  A    Seery gave the claims to his friends that he used to work

6  for and with --

7            MR. MORRIS:  You know, Your Honor, I'm just moving to

8  strike.  This is ridiculous.

9            THE COURT:  Sustained.

10           THE WITNESS:  It's all going to be in the trustee

11 letter.

12 BY MR. RUKAVINA:

13 Q    Mr. Dondero, it will all come up --

14 A    It's what we were --

15 Q    Hold on.  Hold on.

16 A    We're doing every recusal --

17 Q    Please stop.  Please stop.

18 A    We're doing every --

19 Q    Mr. Dondero, please stop.

20 A    Okay.

21 Q    All this will come out --

22 A    Okay.

23           MR. RUKAVINA:  -- into the light at the appropriate

24 time.  Thank you, Your Honor.  I'll pass the witness.

25           THE COURT:  Okay.  Redirect?

Dondero - Redirect                                73

REDIRECT EXAMINATION

1

2  BY MR. MORRIS:

3  Q    You're really angry, aren't you?  You're really, really

4  angry, aren't you?

5  A    No.  I'm trying to weigh the what should have been a

6  normal bankruptcy and it's turned into a financial mugging.  We

7  had 50 million.  Your firm was going to make 100 million.

8  Q    I work pretty hard.

9  A    Not enough.

10       MR. RUKAVINA:  This is ridiculous, Your Honor.  He's

11 taunting my witness.  I mean, you're really, really angry.

12 This is badgering, Your Honor.  This has gone the point of

13 professionalism.

14       THE COURT:  Okay.  Sustained.

15 BY MR. MORRIS:

16 Q    Frank Waterhouse told you about the overpayments?

17 A    That's my --

18 Q    That's how you learned.  Right?

19 A    That's my recollection.

20 Q    Frank told you.  Right?

21 A    That's my recollection.

22 Q    And when did he tell you?

23 A    November, December.

24 Q    He actually told you after December 8th, 2020.  Correct?

25 A    That's my recollection, yes.

**WWW.LIBERTYTRANSCRIPTS.COM**

                         Dondero - Redirect                    74

1  Q    Okay.  Take a look in the Advisor's binder, Exhibit Q.
2  A    Exhibit which one?
3  Q    Q.  Do you see that's an email from Dave Klos to Frank
4  Waterhouse?
5  A    Yes.
6  Q    And attached to it is the analysis that purports to show
7  the overpayment?
8  A    Yes.
9  Q    So would you agree with me that you learned from
10 Mr. Waterhouse about the overpayment on or after
11 December 8th, 2020?
12 A    No.
13 Q    No?  Even though Mr. Waterhouse is just receiving the
14 analysis as of this time?
15 A    You're assuming this is the first analysis that was done,
16 and this is the first time Frank knew.  I don't know those
17 things.  My recollection is November, December.
18 Q    So it's possible that it was on or after December 8th.
19 It's at least possible, right, that it's December.
20 A    I don't want to speculate.
21 Q    What did he tell you?
22 A    That we had been over billed for people that no longer
23 worked at the company.
24 Q    Did he tell you when he learned that these people no
25 longer worked at the company?

                    WWW.LIBERTYTRANSCRIPTS.COM

```
                        Dondero - Redirect                    75
 1  A    No.
 2  Q    Did he share that analysis with you?
 3  A    No.  Not that I recall.  I don't remember seeing that
 4  before.
 5  Q    Had you ever learned of this analysis?
 6  A    I know that detailed analyses were prepared.  I just -- I
 7  just don't recall receiving that one.
 8  Q    Did you speak with Mr. Waterhouse on the phone or in
 9  person, or by email?  How did he tell you?  Do you recall?
10  A    I don't remember.
11  Q    Do you recall if anybody else was present when he told
12  you?
13  A    I don't recall.
14  Q    And is it your understanding that the basis for the
15  overpayment is that the Advisors were being charged for
16  employees who were no longer on the list that was attached to
17  the agreement?
18  A    Yeah, I think that was the bulk of it.  And then probably
19  percentages changed also.
20  Q    Okay.  Do you know how many people on the list were
21  terminated before the petition date?
22  A    No.
23  Q    Do you know -- so you were in control of both Highland and
24  the Advisors from January 1st, 2018 until the end of 2019.
25  Correct?
```

                              Dondero - Redirect                    76

1  A    Yes.

2  Q    And Mr. Waterhouse was responsible during that period for

3  overseeing the administration of the Advisors' contracts.  Is

4  that right?

5  A    Yes.

6  Q    And it's your -- the reason why you're so mad is because

7  the Advisors were paying for employees who were on that list

8  who had been terminated.  Is that right?

9  A    No.  I'm mad because Seery's trying to steal the company

10 for his friends.

11 Q    Listen.  You're mad because -- I just want to focus on the

12 overpayments, okay?  On the overpayments, you're mad because

13 Highland has charged the Advisors for employees that you

14 believe they shouldn't be doing because they've been

15 terminated.  Right?

16 A    I answered this question already.  I was potentially angry

17 with the overpayments because the debtor decided not to pay

18 bonuses for people for '18 and '19, decided not to pay any

19 bonuses for senior people, and then rough handled and sued

20 hardworking employees that did most of your work out the door.

21 Q    Can you open your exhibit binder please, sir, to Exhibit

22 14?  And go to Page 12 of 18.

23 A    Page 12 of 18?

24 Q    Yes.

25 A    Exhibit 18?

Dondero - Redirect                                    77

1  Q    It's Exhibit 14, Page 12 of 18.

2  A    Exhibit 14.  Page 12, yes.

3  Q    Okay.  Do you see there's a list of people there, and it

4  continues to the top of the next page with Scott Wilson?

5  A    Sure.

6  Q    Okay.  Are you familiar with the concept of dual

7  employees?

8  A    Yes.

9  Q    And do you understand that the dual employees were listed

10  on the exhibits attached to the payroll reimbursement

11  agreement?

12  A    If that's what it says.  I'm not -- I know what dual

13  employees are.  I don't know how this contract worked.

14  Q    Okay.  Do you see -- so you don't know how the contract

15  worked?  But yet you think that there's overpayments.  Right?

16  A    I know generally how it works.  I don't know specifically

17  on dual employees.  But there are people who are allocated and

18  it's based on generally a percentage of time.

19  Q    Okay.  So I just want to really get your understanding and

20  to the heart of your allegation that there's an overpayment

21  here.  Do you see that the interrogatory asked, and I'll

22  represent to you that these are interrogatories that were

23  answered by the Advisors.  Okay?

24     We asked identify the date you believe each form of dual

25  employee identified on the exhibits to the Payroll

Dondero - Redirect                                78

1  Reimbursement Agreements departed the debtor.  And do you see

2  that they've listed each of the dual employees with the dates

3  of departure?

4  A    Yes.

5  Q    Okay.  And do you see for example that -- I want to pick

6  the right one here -- Michael Phillips (phonetic).  Do you see

7  Michael Phillips was terminated in February 20, 2018?

8  A    I don't know if he was terminated.  But yeah, that's the

9  date.  Right?

10 Q    That's the date he left.  Right?

11 A    Yes.

12 Q    And that's the date the Advisors admit knowing that he

13 left.  Right?

14 A    It appears so, yes.

15 Q    And if you look at interrogatory number four on the next

16 page, it says the Advisors were generally aware of the

17 employee's terminations and departures as they occurred.  Okay?

18 So would you agree with me that the Advisors were generally

19 aware of Michael Phillips' departure on February 20th, 2018?

20 A    Yes.

21 Q    And is it your testimony that if the Advisors paid for

22 Mr. Phillips in March of 2018 there was an overpayment?  Is

23 that the overpayment you're talking about that they shouldn't

24 have paid for Mr. Phillips in March because he had been

25 terminated?

Dondero - Redirect                                79

1  A    I assume this is the last day that they were getting paid.

2  Right?  So I don't want to quibble on whether this was their

3  exit date and they got paid for severance or something else.

4  But I think what the overpayment is is that most of these

5  people were continuing to be factored into the number nine,

6  ten, twelve months later.

7  Q    They were factored into the number for every single month

8  in 2018 and 2019 when you were in control of the entities.  Are

9  you aware of that?

10 A    But then there should have been a true-up.

11 Q    And Frank Waterhouse was responsible for that.  Correct?

12 A    Him and his group, yeah.  There should have been a true-

13 up.  Correct.

14 Q    And do you know if a true-up was required by the contract?

15 A    There always is in living, breathing contracts.

16 Q    Let's turn to the contract and you point me to the

17 provision where you believe that there's an obligation --

18        MR. RUKAVINA:  Your Honor, this is nonsense.  He's

19 said that he's never read these contracts, that he has no

20 personal knowledge.  He's badgering and it leads to legal

21 conclusions.

22        MR. MORRIS:  Your Honor, he is testifying that he

23 believes that there is a contractual obligation to do a true-

24 up.  If he wants to say that I'm not aware of anything but I

25 just assumed that one would happen, I'm happy to live with

                          Dondero - Redirect                    80

 1  that.  If that's --
 2            THE WITNESS:  I'm not aware, but I assume there would
 3  be a true-up.
 4  BY MR. MORRIS:
 5  Q    Okay.  So you assumed that there would be a true-up.
 6  Right?
 7  A    Yes.
 8  Q    Did anybody ever tell you there was a true-up?
 9  A    I would assume there would be a true-up.  No one told me
10  until November, December of '20.
11  Q    Okay.  Did you ever ask anybody at the end of 2018 if
12  there was a true-up?
13  A    No, I never asked.
14  Q    Did anybody tell you at the end of 2018 that there was a
15  true-up?
16  A    I don't know if it was material.  It might have been just
17  this one kid that left.  I have no idea.
18  Q    We can look at the whole list if you want to do that.
19  Okay?
20  A    No.  But I don't know.  And no one told me there was a
21  true-up.
22  Q    That's my only question.
23  A    Or no one told me there wasn't, either.  I'm not aware.
24  Q    Okay.  So you didn't ask if there was a true-up, and
25  nobody told you there was a true-up at the end of 2018.


                    **WWW.LIBERTYTRANSCRIPTS.COM**

Dondero - Redirect                          81

1  Correct?

2  A     Correct.

3  Q     You didn't ask if there was a true-up, and nobody told you

4  that there was a true-up at the end of 2019.  Correct?

5  A     I don't know.

6  Q     Okay.  In fact, you have no knowledge that there was ever

7  a true-up of any kind done with respect to the payroll

8  reimbursement agreements.  Correct?

9  A     I don't know.  I don't know if it was material.  You guys

10 were both implying a few minutes ago that there was a two and a

11 half million dollar true-up one year, an additional payment for

12 something.

13 Q     Let --

14 A     So, but I don't know the specifics.  All I know is when

15 they alerted me at the end of 2020 that oh my God, we've been

16 overpaying, it's not reconciled, they're not cutting back the

17 payment, they had an expectation in the way they told me such

18 that I'd stop paying because we were paying over.  They had an

19 expectation that there was some kind of true-up or they

20 wouldn't have told it to me to get a stop paying this

21 immediately out of me --

22 Q     Who's they?

23 A     -- which is what happened.

24 Q     Who's they?

25 A     Frank.

Norris - Direct                                82

1  Q    Frank is they?

2  A    Yeah, Frank is they.  Yeah.

3  Q    And did Frank tell you that the way that the methodology

4  for his decision that there was an overpayment was to say that

5  we were paying for employees who were no longer at Highland?

6  A    We were overpaying based on the contract, based on largely

7  people weren't there.  Now whether or not we were also paying

8  for people who the percentage was wrong, I don't know.  But he

9  -- he expressed it with Umbridge (phonetic), and with Awe

10 (phonetic).  Umbridge and Awe and that's where --

11 Q    Umbridge --

12 A    -- that's where we stopped paying.

13 Q    Okay.  And -- but is it fair to say at least your

14 understanding is that the bulk of the claim is that you were

15 paying for employees who were no longer employed at Highland?

16 Is that basically it?

17 A    My understanding is largely that.

18          MR. MORRIS:  Okay.  No further questions, Your Honor.

19          THE COURT:  Recross?

20          MR. RUKAVINA:  I have no follow up, Your Honor.

21          THE COURT:  All right.  You're excused from the

22 witness stand, Mr. Dondero.

23          THE WITNESS:  Thank you.

24    (Witness excused)

25          THE COURT:  All right.  Shall we take a break and

                              Norris - Direct                     83

1  then --

2              MR. MORRIS:  Yes, Your Honor.  Yes.

3              THE COURT:  Let's take a ten-minute break, please.

4        (Recess at 2:58 p.m./Reconvened at 3:09 p.m.)

5              THE CLERK:  All rise.

6              THE COURT:  Please be seated.   We're back on the

7  record in Highland.

8              Mr. Morris, what do you have?

9              MR. MORRIS:  Last witness.

10             THE COURT:  Okay.

11             MR. MORRIS:  Mr. Norris.  I just need a second to

12 find my questions.

13             THE COURT:  Okay, we'll go ahead and get Mr. Norris

14 up here and sworn in.

15             Please raise your right hand.

16              DUSTIN NORRIS, PLAINTIFF'S WITNESS, SWORN

17             THE COURT:  All right.  Please be seated.

18                       DIRECT EXAMINATION

19 BY MR. MORRIS:

20 Q    Good afternoon, Mr. Norris.

21 A    Good afternoon.

22 Q    You've been here for the last couple of days.  Right?

23 A    I have.

24 Q    I hope this is a little bit more low-key than the last

25 witness.

Norris - Direct                          84

1  A    I hope so, too.

2  Q    Okay.  I don't expect this examination to be particularly

3  lengthy.  So I would just ask you to listen carefully to my

4  questions.  Do the best you can to -- to answer them.

5       From 2000 and -- are you -- are you currently employed by

6  either of the Advisors?

7  A    I'm employed by NexPoint Advisors.

8  Q    And what's your title today?

9  A    The title of the -- my operating title is Head of

10 Distribution and Chief Product Strategist.

11 Q    Okay.  And do you have a roll with HCMFA?

12 A    I am an officer of HCMFA.

13 Q    And do you have a title?

14 A    Yes.  Executive Vice-President.

15 Q    Okay.  And were you affiliated with those two entities as

16 of January 1st, 2018?

17 A    I was.

18 Q    And in what capacity did you serve for NexPoint as of

19 January 1st, 2018?

20 A    The same capacity as I serve today.

21 Q    And did you serve in the same capacity for HCMFA as of

22 that time?

23 A    I believe so, yes.

24 Q    Okay.  So your role hasn't changed; your titles haven't

25 changed in the three or four years since 2018.  Is that fair?

Norris - Direct                           85

1  A    I don't believe so.

2  Q    Okay.  You didn't -- you've listened to the testimony in

3  this trial so far?

4  A    I have.

5  Q    Okay.  I'm just asking that question to try to speed this

6  up a little bit.

7       You're aware that in late 2017 through May of 2018, there

8  were a number of new contracts and changes made in the way that

9  the Advisors compensated Highland for services.  Is that right?

10 A    Yes.  I'm aware.

11 Q    Okay.  But you didn't personally participate in any of the

12 discussions during that time period about the changes that were

13 made and the methods and amounts that were going to be paid for

14 services.  Fair?

15 A    No.  I did not participate.

16 Q    Okay.  And you played no role in formulating, drafting, or

17 administering the sub-advisory agreements that were prepared

18 for NexPoint and HCMFA in March of 2018.  Correct?

19 A    Correct.

20 Q    In fact, were you even aware that sub-advisory agreements

21 were prepared for those two entities at that time?

22 A    I don't remember being involved or having any -- any

23 awareness.

24 Q    Okay.

25 A    At that time.

Norris - Direct                                    86

1  Q    Okay. And you played no role in the replacement of those

2  sub-advisory agreements with the payroll reimbursement

3  agreements as of May 1st, 2018.  Right?

4  A    I -- I played no role.

5  Q    So you didn't -- you didn't participate in discussions

6  about what that document was intended to do.  Correct?

7  A    That's correct.

8  Q    And you didn't participate in any review of the language

9  that was going to be used in the document.  Correct?

10 A    Correct.

11 Q    And you didn't review Exhibit -- the Exhibits A that I

12 think you're familiar with, that were attached to those

13 agreements.  Correct?

14 A    Not at that time.

15 Q    And you had no basis of knowing whether the allocations

16 that were used as of May 28th -- as of January 1st 2018 were

17 accurate in any way.  Right?

18 A    Well, based on my working knowledge and my interaction

19 with employees at HCMLP and the Advisors, I can see the

20 allocations and have assumption on the reasonableness.  But I

21 was not involved at that time in assessing the reasonableness.

22 Q    When did you learn that Exhibit -- Exhibits A existed?

23 A    Over -- I don't remember exactly.

24 Q    Do you remember what year it was?

25 A    Probably '19 or '20.

Norris - Direct                                    87

1  Q    Okay.   And do you know -- kind of --

2  A    Maybe '18.  It was sometime after it was drafted.

3  Q    Okay.

4  A    And signed.

5  Q    All right.  So we've used the definition called "relevant

6  time period" to mean from January 1st, 2018 until the end of

7  2020.  Okay.  Is that fair?

8  A    Yes.

9  Q    Okay.  Do you remember at all where within the relevant

10 time period you first learned that these Exhibit As existed?

11 A    I don't remember the exact time, no.

12 Q    Do you remember if it was before or after the bankruptcy?

13 A    I don't remember.

14 Q    Do you remember if it was before or after the Independent

15 Board was appointed?

16 A    I don't remember.

17 Q    Okay.  Did you form an understanding at some point -- no,

18 withdrawn.  We'll get there.

19      So you didn't participate in any discussions at any time

20 in the spring of 2018 about what the Payroll Reimbursement

21 Agreements were intended to accomplish.  Correct?

22 A    I did not.

23 Q    And you didn't play -- are you aware that NexPoint entered

24 into a new Shared Services Agreement as of January 1st, 2018?

25 A    At that time was I aware --

**Appx. 01312**

Norris - Direct                                        88

1  Q     Yes.

2  A     -- or am I aware now?

3  Q     Were you aware at the time?

4  A     I was not.

5  Q     And you didn't play any role in the drafting, in the

6  formulation, or the administration of the NexPoint Shared

7  Services Agreement.  Correct?

8  A     No, I did not.

9  Q     And even though it wasn't signed at that time, you played

10 no role in the drafting or the formulation or the

11 administration of the HCMFA Shared Services Agreement.

12 Correct?

13 A     That's correct.

14 Q     Okay.  Do you know now that there were amendments to the

15 Payroll Reimbursement Agreements at the end of 2018?

16 A     I do.

17 Q     You didn't play any role in drafting, or administering, or

18 making any decisions in connection with those amendments.

19 Correct?

20 A     No.  I have no personal knowledge.

21 Q     And so you have no personal knowledge as to how those

22 amounts were calculated.  Correct?

23 A     Correct.

24 Q     You have no personal knowledge that any true-up was done

25 that formed the basis of the numbers in those amendments.

Norris - Direct                          89

1  Correct?

2  A    At that time, no.  But I was told there was a true-up that

3  was done.

4  Q    Okay.  But you have no personal knowledge that a true-up

5  was done.  Right?  Somebody told you that?

6  A    Somebody told me there was a true-up, yes.

7  Q    And who told you that?

8  A    Mr. Klos.

9  Q    And when did Mr. Klos tell you that?

10 A    December -- December 2020.

11 Q    So you were speaking with Mr. Klos --

12 A    Uh-huh.

13 Q    -- in December 2020.  And it's your testimony that he said

14 that the amendments that were done in 2018 were the result of a

15 true-up?

16 A    He didn't tell me about the amendments.  He told me that a

17 true-up had been done in 2018, but we didn't discuss the

18 specific amendments.

19 Q    Okay.  Do you have an understanding of what a true-up is

20 in that context?

21 A    I do.

22 Q    And what's your understanding of what a true-up is?

23 A    Well, based on the conversation we were having, which was

24 around the actual payments and the employees that were on

25 Schedule A, all right, we saw the emails earlier that Mr. --

Norris - Direct                                    90

1  Mr. Klos discussed.

2      We were talking about those overpayments.  And as we were

3  -- you know, Mr. Sauter and I were trying to discover what had

4  actually happened.  He told us there was a true-up done in

5  2018.  There was no similar true-up done in 2019 or 2020

6  because of the bankruptcy filing in October 2019.

7  Q     Okay.  Are you aware that as of the date of the

8  amendments, I think the number is nine of the employees, the

9  dual employees on the Exhibit A were terminated?

10 A     I'm aware that there are employees that as of that date

11 that have been terminated.

12 Q     Can you tell Judge Jernigan why you believe that with the

13 loss of approximately a third of the dual employees why you

14 think a true-up would result not in the diminution in the

15 amounts owed, but an increase by $2.5 million in amounts owed;

16 how does that make sense?

17 A     Yeah, I don't have any personal knowledge, as I mentioned

18 on what the calculations, how they were done, what went into

19 it.  I would just be speculating if I said here is how or why.

20 I know Mr. Klos testified that percentages aren't of time spent

21 aren't perfect.

22     There could be compensation.  Right.  That one person

23 received due to Fund performance.  Again, I'm -- I would be

24 speculating. I don't know.

25 Q     So it's possible that even though employees left, that

Norris - Direct                               91

1  Highland would be entitled to even more money if the people who

2  remained pick up the slack.  Is that fair?  And got paid more.

3  That's possible.  Right?   That's what he told you.

4  A    Do you want to repeat the question?

5  Q    You want to repeat the question?

6  A    He told you, if I understand you correctly, that even

7  though almost a third of the employees left, Highland was still

8  entitled to get millions of dollars more money because the

9  services that had been provided by those dual employees, were

10 just picked up by other people?

11 A    No.

12      He didn't tell me that. He said a true-up was done. He did

13 say it resulted in a slight payment to Highland.  But he didn't

14 go into any of the calculations or the why.

15 Q    Okay.  But you do understand that more than -- that

16 approximately a third of the employees had been terminated

17 before this -- these amendments were entered into.  Correct?

18 A    I'd have to see the specific names, but there were a

19 number of them had been terminated, yes.

20 Q    Okay.  And even though the number of employees went down,

21 the payments when up by $2.5 million.  Correct?

22 A    I have no reason to question the amendments or the wording

23 in the amendments.

24 Q    Okay.  You had access to headcount information at all

25 times.  Correct?

                              Norris - Direct                    92

1  A    Not at all times, but I would receive a monthly report
2  that's been shown in the emails.
3  Q    And we looked at that, and you got that headcount report
4  every single month for the three year period that we're talking
5  about.  Right?
6  A    I believe so.  And I don't know for sure that I -- when I
7  was added, I was added at some point over the last few years,
8  but I did receive it.
9  Q    We're certainly not going to look at every one of them.
10 Let's see if --
11 A    If you go to January 2018, that's probably the quickest
12 way to rule it out.  Because I never got removed once I was
13 added.
14         MR. MORRIS:  Just one moment, Your Honor.  I
15 apologize.
16         THE WITNESS:  Is there an exhibit I should be looking
17 at?
18         MR. MORRIS:  Not yet.
19         THE WITNESS:  Okay.
20 BY MR. MORRIS:
21 Q    So if you can go to Exhibit 88.  Do you see that this is
22 the headcount report that was delivered on February 1st for the
23 month of January 2018?
24 A    It is.
25 Q    And your name is on it.  Right?

Norris - Direct                              93

1  A    It is.

2  Q    And so your understanding is that for every month covering

3  the headcount report, from January 2018 until the end of 2020,

4  those are headcount reports that would have been delivered to

5  you.  Right?

6  A    That's correct.

7  Q    So you're not sure when you learned of the existence of

8  Exhibit As, but whenever that was, you could have figured out

9  yourself, who on Exhibit A was no longer employed at Highland.

10 Right?

11 A    Absolutely.

12      And -- but the key assumption was that we were reimbursing

13 for only employees that were still employed.  And that was

14 always my expectation, once I learned about Exhibit A.

15 Q    Did you talk about that with Frank?

16 A    What part?

17 Q    Did you tell Frank -- when did you develop that

18 expectation?  In December 2020?

19 A    No.

20      At some point between the actual creation of the

21 agreement, when I first saw it, and understood it was a payroll

22 reimbursement agreement.  And there was an exhibit that had

23 percentage allocation of employees that were one, serving as

24 dual employees, and two, providing investment advisory

25 services.  That was the actual purpose of the agreement, right,

Norris - Direct                                    94

1  was for reimbursement.

2  Q     Did you ask Frank, Frank, how come you kept paying the

3  money when all these people left.

4  A     I did.

5  Q     What did he say?

6  A     He told me there was nothing he could do because of the

7  automatic stay.  He and Dave Klos were in a meeting.  That was

8  the first time I had heard the word automatic stay.

9  Q     Uh-huh.

10  A     And that he had brought it.  They -- they had

11  calculations.  And that he had brought it to the attention of

12  DSI.  And the told him -- and he said inside and outside

13  counsel.  And there was nothing he could do because of the

14  automatic stay.

15  Q     He did not say outside counsel.

16  A     He did.  Well, I should say in his December -- in our

17  December meeting he said counsel.  We talked again over

18  multiple times.  And at the end of January on a call, he said

19  inside and outside counsel.

20  Q     January of 2021?

21  A     Yes, I --

22  Q     Did you hear him testify yesterday that he never told me

23  or anybody in my firm?

24  A     I did, yes.

25  Q     So -- so maybe you misheard him?

Norris - Direct                                            95

1  A    I may have misheard him, but I --

2  Q    Okay.

3  A    -- I -- I did take -- after that call I did take notes.

4  And I wrote down inside and outside counsel.  I could have mis-

5  remembered.  But I had written that down.

6  Q    Did you ask him why he didn't make any change from January

7  18 until the petition date?

8  A    January 18th of which --

9  Q    Let me restate the question.  Did you say hey, Frank,

10 okay, you've given me your answer after DSI comes along.  But

11 what about the two years before that?  Why didn't you make any

12 adjustments for the two years before that, when nobody ever

13 heard of Fred Caruso or Jim Seery.

14 A    Yeah.

15      They told me there was a true-up done in December of 2018.

16 And then I actually was trying to figure out, make any sense of

17 the fact that there were employees had been -- many of them,

18 like 20 employees that were no longer there.  And so discussing

19 this with Dave and Frank, I -- I realized and learned from them

20 they were in a tough situation.  Why didn't they do anything.

21 Well, when they told me, it made sense.  They said December

22 2018 there was an annual true-up.

23      Fast forward to the bankruptcy filing in October 2019 and

24 to this point I wasn't really involved in all of the bankruptcy

25 time lines or process.  I'm separately running my business.  So

Norris - Direct                                96

1  they tell me that okay, October it was filed.  There was put in

2  place something they couldn't change in the agreements.

3  Because of the automatic stay.

4      Again, I'm not an attorney.  It's the first time I'm

5  learning of the bankruptcy law.  But in 2019 there was no true-

6  up done.  Nor in 2020.  Right.  So there was something done,

7  and it would have been done at the end of '19 and '20, had

8  there not been a bankruptcy in place.

9      So -- and to me -- and the reason I remember that

10 specifically is a light bulb went off to me and said that makes

11 sense.  Okay.  They were trying to do what was right.  They

12 understood it.  They would have made a true-up or an

13 adjustment.  Whatever you want to call it for the proper people

14 that were serving under these agreement.

15     But they were told that they couldn't.  And at that point

16 we had to, you know, go our way of actually filing an admin

17 claim for that.

18 Q   Did you hear Frank Waterhouse testify yesterday that he's

19 not aware of any true-up?

20 A   I don't remember specifically.  But it was David Klos that

21 told me about the true-up.  Told me and Mr. Sauter.

22 Q   Did you hear him testify yesterday that there was no

23 analysis of any kind done to support the $2.5 million?

24 A   I don't know  if he said he didn't -- there wasn't an

25 analysis, or if he said he didn't recall.  Because I know a lot

1  during that he didn't recall.

2  Q    He actually said that Jim Dondero said the number.  Does

3  that refresh your recollection?

4            MR. RUKAVINA:  Your Honor.

5            THE WITNESS:  I think that was Mr. Klos.

6            MR. RUKAVINA:  Your Honor, I'm --

7  BY MR. MORRIS:

8  Q    That -- that is who I'm talking about.

9  A    You said Mr. Waterhouse.

10 Q    Oh, I apologize.

11 A    Did he not?

12           MR. RUKAVINA:  Yes, he did.

13           THE WITNESS:  Okay, sorry.

14           MR. MORRIS:  Okay.  Thank you.

15           THE COURT:  Let's ask again and make sure we're

16 clear.

17           MR. MORRIS:  Sure.

18 BY MR. MORRIS:

19 Q    Okay, so it's your testimony that -- was it just Mr. Klos

20 or was it Mr. Klos and Mr. Waterhouse who told you that there

21 was a true-up at the end of 2018?

22 A    Mr. -- it came from Mr. Klos.  I believe Mr. Waterhouse

23 was there.  Mr. Sauter, as well was told, along with me.  By

24 Mr. Klos.

25 Q    Okay.  You did a damage calculation for purposes of this

                              Norris - Direct                    98

1  case.  Right?

2  A    I did.

3  Q    And what you did is you took the amounts paid and reduced

4  it by --

5           MR. RUKAVINA:  Your Honor, let me just object now.

6  Are you going to agree to the admission of the damage

7  calculation?

8           MR. MORRIS:  Sure, I'll agree.

9           MR. RUKAVINA:  Okay.  Your Honor, that's going to be

10 -- Thomas is that H and I?  It  is what it is.  Your Honor, it's

11 Exhibit G is the PDF printout.  That's the one we had the

12 stipulation on yesterday about the math.  Is that right?

13          MR. MORRIS:  Yes.

14          MR. RUKAVINA:  And then the electronic version is H.

15 Is H.  So I'll move to admit G and H.

16          THE COURT:  And you agree to it?

17          MR. MORRIS:  Yeah.

18          THE COURT:  Okay, they're admitted.

19    (Defendants' Exhibits G and H admitted into evidence.)

20 BY MR. MORRIS:

21 Q    There's no expertise.  There's no special skill that you

22 brought to that analysis.  Right?

23 A    It's simple math.

24 Q    It's simple math.  Right?  And I think that's what you

25 told me in the deposition.  All you did was you took the money

Norris - Direct                                99

1  that was paid, and you reduced it by the compensation for the

2  dual employees who were terminated.  Fair?

3  A    I -- I took month by month the employees that were

4  employed.

5  Q    Uh-huh.

6  A    And their total compensation multiplied by the allocation

7  percentages.  And as employees dropped off, so did the

8  compensation.

9  Q    Okay.  And once --

10 A    Or the reimbursement, I would say.

11 Q    And once you had the data, how long does it take you to

12 run them all?

13 A    If I -- say if I wanted to change assumptions?

14 Q    Sure.

15 A    You could do it fairly easily if you know Excel.

16 Q    Five minutes?

17 A    To make sure that it's accurate, maybe longer.  I mean it

18 --

19 Q    Maybe ten.

20 A    Not -- again, the math part is easy.

21 Q    Okay.

22 A    It's --

23 Q    And so is there any reason that anybody on behalf of the

24 advisors, couldn't have done that analysis on February 1st,

25 2018 to take into account the employee who left in January of

Norris - Direct                                100

1  2018?  Any reason at all that they couldn't have done it then?

2  A    We had relied and outsourced that to Highland.

3  Q    Okay.

4       Okay.  And the person who would have overseen what you

5  assumed would have happened -- right?  Because you assumed that

6  Highland was making these changes.  Right?

7       That's your testimony.  Your testimony is that you sat

8  back for three years and you assumed Highland was only charging

9  what you thought they should charge.  Right?

10 A    Yeah.

11      And a key component of that -- if there's payroll data

12 involved, we didn't have access to that.  There was a very

13 limited number of people.  Highland employees only.  That's an

14 important component of this.  So yeah, we had relied on

15 Highland.  We didn't have an accounting function.

16      Why was I -- I say it's simple math.  I had to create the

17 spreadsheet.  I'm a CPA.  I worked at a big four accounting

18 firm.  I worked in Highland's back office when I started as a

19 fund accountant.  I managed.  I was a senior accounting

20 manager.

21 Q    You have-huh.

22 A    So -- so but that was -- ended in 2013.  So there's a

23 number of Excel skills.  We didn't maintain that.  I shifted

24 roles. Focused more on the growth and marketing.  But we -- we

25 outsourced those functions to Highland.

Norris - Direct                                101

1  Q    How long did it take you to create the model?  A day or

2  two?  Less?  Once you had the data.

3  A    Yeah, it was just a couple few days.

4  Q    So why didn't the advisors just create a contact that said

5  every time a dual employee left, let's just reduce the amount

6  that's paid by their compensation, in real time?  You could

7  have created the model, and in five minutes, instead of doing

8  this true-up at the end of the year, why didn't they do that?

9  A    The people that helped create the contract were Highland

10 employees.  The ones that knew about the calculations.  The

11 ones that had access to the data.  We didn't have a separate

12 team saying well, let's shadow everything that Highland is

13 doing, for contracts.  That is what they were doing.  That was

14 their function.

15 Q    And they all reported to Frank Waterhouse.  Correct?

16 A    Yes.

17 Q    Can you identify one person who you assumed would be

18 administering the contract, who didn't report to Frank

19 Waterhouse?

20 A    No.

21 Q    Thank you.

22        MR. MORRIS:  I have no further questions, Your Honor.

23        THE COURT:  All right.  Pass the witness.

24                     CROSS EXAMINATION

25 BY MR. RUKAVINA:

**WWW.LIBERTYTRANSCRIPTS.COM**

Norris - Cross                                              102

1  Q    This might be a bit, so if you need some water, let me

2  know.

3  A    I got -- I still have some.  Thank you.

4  Q    So I think Mr. Morris has gone through some of these

5  issues.  But do tell the Judge, please about your educational

6  background.  On a high level.

7  A    Yeah, I have a master's degree in accounting from Brigham

8  Young University and a bachelor's degree in accounting and I

9  have a CPA license.

10  Q    Okay.  Any other professional licenses?

11  A    Yeah, I have a FINRA Series 7, 63 and 24 licenses.

12  Q    How old are you?

13  A    38 years old.

14  Q    Have you ever been disciplined professionally with respect

15  to any of these licenses?

16  A    Never.

17  Q    Okay.  Are you a family man?

18  A    I am.

19  Q    Are you a religious man?

20  A    I am.

21  Q    Do you swear?

22  A    I don't.

23  Q    Do you drink?

24  A    I never have.

25  Q    Any trouble with the law?

Norris - Cross                                        103

1  A    No.

2  Q    When did you first join Highland?

3  A    2010, June of 2010.

4  Q    Before that you mentioned you were with some other

5  accounting --

6  A    I was at Deloitte and Touche.

7  Q    What did you do there?

8  A    I was an auditor, an outside auditor, auditing large

9  corporations.

10  Q    And when you joined Highland, what was your role?

11  A    I was a fund accountant in the Hedge Fund and Private

12  Equity Fund Accounting Group.

13  Q    And tell me about your progression at Highland and how you

14  ended up coming to the Advisors and when?  Again, at a high

15  level.

16  A    Yeah.  So when I joined Highland, I started out overseeing

17  accounting and operations, cash management for several of the

18  large hedge funds, private equity funds, and separate accounts.

19  Worked there for two years, got great training, and was given

20  the opportunity to then manage for our retail complex, the

21  accounting and operations team.

22     So I moved employers to Highland Capital Management Fund

23  Advisors around July of 2012.  At that time Highland HCMLP, the

24  hedge fund side of the business or institutional had a separate

25  accounting and operations team than the retail side.  And so I

Norris - Cross                                    104

1  moved over and I was managing accounting, operations, trade

2  settlement, cash management, as well as the broader accounting

3  functions for about 22 mutual fund and closed-end funds.

4      I did that for a little while and then transitioned into

5  what we call product strategy or product development.  So

6  developing new funds, merging funds, acquiring funds, launching

7  training sales people and, at that time, somewhat transitioned

8  the services from our retail funds to the Highland's back

9  office, merging those in.  And my employees moved over, and

10 became employed by HCMLP, as well.

11     So, yeah, I have had experience in several different parts

12 of the business.  Then from there I -- I worked on our

13 closed-end funds and continued to manage, became director of

14 product strategy, and then chief product strategist, and then

15 took over our sales team and became the president or

16 broker/dealer managing all of the marketing and relationship

17 management --

18 Q    This is still while at Highland?

19 A    -- inside sales.  This is all at Highland Capital

20 Management Fund Advisors/NexPoint.

21 Q    Okay.

22 A    From 2012 until the present day.

23 Q    Okay.  And in those ten years, I take it, you've

24 interacted with Highland Capital Management LLP, repeatedly?

25 A    Yes, extensive.

Norris - Cross                                      105

1  Q    At a high level in '18, '19, '20, what did the debtor do?

2  What was the debtor's business?

3  A    '18, '19 and '20?  The debtor's business?

4  Q    Yes.

5  A    Largely -- obviously, they had a services business where

6  they provided shared services.  But that was a function of,

7  they were providing it for various advisory entities.  They

8  managed assets, largely credit, private equity, some at-public

9  equities and included providing services to our advisors.

10 Q    And in that same time frame, '18, '19 and '20, what did

11 the advisors do?  I mean what was their core business and did

12 it change at all over that time?

13 A    Yeah.

14     So when I moved over to the advisors in 2012, we were

15 largely focused on public equities and credit, which was a

16 specialty of Highland.  And so we relied heavily on those

17 services from a back-office and front-office perspective over

18 the coming years.

19     But we started -- in -- in 2012 our advisors had almost no

20 real estate assets. And as we shifted from 2012 into '15 to

21 '18, the real estate business grew significantly.  And so we

22 just started developing a real estate business in-house. Our

23 investment professionals.

24     And if you look at the assets today, approximately maybe

25 three-quarters are real estate assets.  Where less than a

Norris - Cross                                        106

1  quarter are credit and equity and private equity.

2  Q    And on that point, you heard Mr. Powell, and we talked

3  about the retail board some this morning, the $3 billion.  Did

4  you hear all that?

5  A    I did.

6  Q    Generally, what percentage of either the advisor's

7  business or assets under management, whatever the appropriate

8  metric is --

9  A    Uh-huh.

10 Q    -- you tell us.  How much of that whole pie do those

11 retail funds represent?

12 A    Yeah.

13      So we today, NexPoint Advisors and HCMFA manage

14 approximately $11 billion in assets.  And the retail funds as

15 Ethan testified are approximately 3 billion.  So less than 30

16 percent.

17 Q    Would that also be fair to say that that's about how much

18 of your internal time -- the Advisors time an employee is?

19 Servicing the funds is 25 or 30 percent?  Or would the fraction

20 be different?

21 A    Meaning the Advisor employees?

22 Q    Yes.

23 A    It depends.

24      There's some of them that spend 100 percent in non-retail

25 products.  But a number of people do spend -- maybe it's an

Norris - Cross                                        107

1   approximate amount of time, yeah.  So we have you know publicly

2   listed reads; we have private reads; we have 1031 exchange

3   vehicles.  So there's -- there's a lot of other businesses

4   outside of that.

5   Q    You know, we've heard talk about so-called front office.

6   How do you, in your mind define or how do you understand front-

7   office personnel to mean or to be?

8   A    Yeah.  So it is someone providing investment advisory

9   services.

10  Q    Are the front-office employees different back ten years

11  ago when the Advisors were doing more debt and equity than they

12  would be today, when they're doing more real estate?

13  A    Actual employees at the Advisors?

14  Q    Or -- of the actual professionals that would be providing

15  those front-office services.

16  A    Yes.

17       Historically we did rely a lot more on Highland.  Right.

18  Given their credit expertise.  Given the assets that we

19  managed.  And that's part of the, you know, payroll

20  reimbursement agreements.

21       Today, you know, from call it maybe 2018 to today, we've

22  gone from maybe 5 NexPoint, for example, investment

23  professionals to around 25.  And that has been -- and those are

24  almost all real estate focused individuals.

25  Q    So let's zero in on that.  Turn to Exhibit A.  That's one

Norris - Cross                                    108

1  of the Payroll Reimbursement Agreements.

2          MR. RUKAVINA:  And, Your Honor, they have the same

3  Exhibit A.  It's just different percentages.

4  BY MR. MORRIS:

5  Q   So are you familiar with these 25 people here?

6  A   I am.

7  Q   Okay.  I'm going to avoid that first name.  I tried and I

8  did not do a good job.

9          MR. MORRIS:  Mr. Rukavina, I apologize.  Which

10 exhibit are you?

11         MR. RUKAVINA:  I'm sorry.  My Exhibit A and Exhibit A

12 to my Exhibit A. Which is the list of employees.

13         MR. MORRIS:  And is it NexPoint or is it -- because I

14 don't think I have it.  You may have the --

15         MR. RUKAVINA:  I'm sorry.  It's HCMFA.

16         MR. MORRIS:  Okay, thank you.

17 BY MR. RUKAVINA:

18 Q   Did you at one point in time know all of those 25 people?

19 A   Yes.

20 Q   Did you know what they did?

21 A   Yes.

22 Q   And tell us either on a high level or zero in how many --

23 or group in how many of them did the debt and equity front-

24 office services vis-a-vis real estate services.

25 A   Sohan was the credit guy.  Cameron being the private

Norris - Cross                                    109

1  equity --

2  Q    And private equity is that -- did you include that when

3  you're talking about debt and equity.  Is that the same thing

4  as equity?

5  A    Equity and private equity. Yes.

6  Q    Keep going.  Keep going.

7  A    Mete (phonetic) Burns, credit.  He's a credit expert.

8  Hunter Covitz, CLOs, which is collateralized loan obligations,

9  made up of credit.  Neil, another CLO guy. Jim, as you know.

10  Eric Fedorshin (phonetic), worked on the credit team; Matthew

11  Gray was a credit analyst; Sanjay Gulati 100 percent of his

12  time was allocated to HCMFA.  He was 100 percent associated

13  with our main clone, ETF, which was a credit fund that was

14  around 5 or $5 million at one point, and is $30 million today.

15        Chris Hayes (phonetic) was a loan or credit trader;

16  Bobby Hill (phonetic) bounced between teams.  Brendan McFarland

17  (phonetic) was on the credit research team.  Carl Moore

18  (phonetic) with Private Equity; Igor (phonetic) was credit.

19  David Owens (phonetic) I believe was a credit trader.

20        Trey Parker (phonetic) was head of credit research

21  and then became co-CIO and ran the credit and equity investment

22  process.

23  Q    CIO, chief investment officer?

24  A    Chief investment officer.  Andrew Parmenter (phonetic) was

25  brought in.  He started in around 2017.  Was a partner of the

Norris - Cross                                110

1  firm.  Michael Phillips (phonetic) was a credit guy.  John
2  Pavlish (phonetic) was head of credit research after -- after
3  Trey Parker was promoted to co-CIO.
4      Philip Ryder (phonetic) I believe he was -- yeah, I don't
5  know  the specific, either credit trader or credit.  Kunal was
6  a credit.  Allen Smallwood ( phonetic) was a credit guy.  Mara
7  (phonetic) was public equities, maybe private equity.
8      Jake Tomlin (phonetic) was managing director on the credit
9  team.  Ann Seager (phonetic), I believe, was a par credit
10 analyst who ran credit.
11 Q    And you mentioned that in that same period of time -- '18,
12 '19, '20 -- the advisors went from having 5 in-house investment
13 employees to, what did you say, 25 or 27?
14 A    Approximately, yes.
15 Q    Okay.  And were -- so the delta is whatever, 20, let's
16 just say.  That increase?
17 A    Yes.
18 Q    Okay.  Were those new employees -- were any of those new
19 employees any of these employees?
20 A    As speaking today number of employees?
21 Q    Yeah.
22 A    So one of them did come over when -- actually two.  But
23 he's no longer there.  Hunter Covitz after February 2021 and
24 Sohan.
25     I don't believe any of the others.  Most of them were gone

Appx. 01335

Norris - Cross                             111

1  by then.  I think there may have only been five come February.

2  Q    Well, that's my question.

3  A    Yeah.

4  Q    That's my next question.  Did it matter to the Advisors

5  for purposes of their business that 20 of these employees over

6  a period of time were no longer there?

7  A    It didn't.

8       As our business had morphed into much more real estate

9  focused.  We did rely some on them.  Right.  We still had the

10 five or six that were still there.  But it -- it wasn't a -- a

11 big part of our business at that point.

12 Q    Because there's been some implication made by Mr. Klos

13 that as these employees fell off, Highland made up for them

14 with other employees.  Do you agree with any such assertion?

15 A    I don't.  I -- I -- I believe they hired one front-office

16 investment professional.  The existing professionals may have

17 pitched in some.  But a lot of those functions were at our

18 advisors.  And I -- I mentioned the real estate professionals.

19 But there were -- there were a couple other in professional

20 HCMFA, Joe Sowin who became co-CIO when -- when Trey Parker was

21 promoted to co -- head of private equity.

22      He was an HCMFA employee.  When Mark O'Connell (phonetic)

23 left and then Trey Parker left, Joe Sowin and Jim Dondero were

24 co-CIO's.  Both employees of our Advisors.

25 Q    So I think it's important for Your Honor to understand the

Appx. 01336

Norris - Cross                          112

1  relationship between the PRAs and the shared services

2  agreements.

3       So still looking at this Exhibit A, were these the only

4  Highland employees that provided services to the Advisors?

5  A    Any services or front-office services?

6  Q    Any services.

7  A    No.

8  Q    There were a number of Highland employees providing

9  back-office and middle-office services.  Is that correct?

10  A   That's correct.

11  Q   And do you have an understanding pursuant to what

12  agreement those employees were being used?

13  A   That was according to shared services agreements.

14  Q   So is it important to clearly delineate between the two

15  types of agreements?

16  A   It is.

17  Q   If we want to find out what services were being provided?

18  A   Yes.

19  Q   Okay.  And just while we're on here, so that Her Honor

20  understands the rest of our discussion, go to Page 1 of this

21  exhibit, Exhibit A.  And Section 2.01.

22  A   Yes.

23  Q   I think you mentioned earlier, Mr. Morris was asking you

24  that it shouldn't just be a dual employee, but needs to be

25  providing investment services.  Do you remember mentioning

Norris - Cross                                      113

1  something like that?

2  A     Yes.  They -- they need to be a dual employee --

3  Q     So that's --

4  A     -- and then they must be able to provide advice to any

5  investment company, investment related service, I think how I

6  explained it in -- provide advice to any investment company.

7  Q     So if some Highland back-office employee or middle-office

8  employee is providing services to the Advisors, would you

9  consider them to fall within this contract?

10  A     If they're providing any services, or if they're providing

11  --

12  Q     No, if they're --

13  A     -- advice?

14         MR. MORRIS:  Your Honor, I object to this whole line

15  of questioning.  He's asking a witness to interpret contracts

16  that he has no personal knowledge of.  And this is what I

17  warned the Court about in my opening statement yesterday.  The

18  witness must testify about personal knowledge and should not be

19  here to interpret contracts that he didn't negotiate, he didn't

20  participate in drafting, and that he never read until recently.

21         THE COURT:  Response?

22         MR. RUKAVINA:  Your Honor, he's not interpreting a

23  contract.  We're trying to explain -- first of all, we're going

24  to work to his damages model.  So his understanding of what an

25  employee falls in here.  He's not -- he's reading the language

Appx. 01338

1  and he's going to tell you which employee provided that

2  investment advice.  He's not going to tell you what this

3  contract means.  So --

4          MR. MORRIS:  He -- with all due respect, Your Honor.

5  That's exactly what he's doing.  Because now he's saying that

6  even though people who were dual employees were providing these

7  services, Highland's entitled to no compensation because they

8  just were providing the services under the shared services

9  agreement.  He can't do that.

10         MR. RUKAVINA:  That's not what I'm asking.  That's

11 not what -- and Your Honor will decide these contracts as a

12 matter of law.  I'm asking for him -- for his understanding of

13 what human being that provided services, for that human being,

14 whether that human being would fall under the payroll

15 reimbursement agreement or the shared services agreement.

16         And all he has to do is to read simple English and

17 then he'll tell you as a question of fact what he thinks.  And

18 you'll decide as a question of law if that's correct.

19         MR. MORRIS:  I'm just going to try one more time.

20         MR. RUKAVINA:  It's a --

21         MR. MORRIS:  It's not fair because the example that

22 I'm going to give and we saw six different exhibits yesterday,

23 where people's titles changed in order to give them the

24 responsibility for doing exactly this service.  And they're now

25 going to take the position that because they were in the legal

Norris - Cross                        115

1  department and they paid for legal services that's it.  We get

2  nothing more.  We're providing the exact same service.  This is

3  an argument he can make in closing, but he can't use a witness

4  to do this.

5           THE COURT:  All right.  I sustain.  He can't testify

6  about what terms of the agreement mean.

7  BY MR. MORRIS:

8  Q    Okay, so let's talk about shared services a little bit.

9       You heard Mr. Powell testify and you've heard a lot of

10 people testify.  Are the Advisors complaining to this Court

11 that they did not get the services contracted for under the

12 shared services agreements?

13 A    Generally, no, with the exception of legal compliant

14 services.

15 Q    Are the Advisors complaining that they did not get the

16 employees that they were paying for under the payroll

17 reimbursement agreements?

18 A    Yes.  We're -- we're -- we're saying we're reimbursing for

19 employees that were no longer there and we were not receiving

20 the services that were being paid for.

21 Q    So we looked at a lot of those board minutes, meetings,

22 and you've heard Mr. Powell, he said, "Can one conclude that if

23 we say we are getting the services we contracted for, can one

24 conclude from that, that we're somehow waiving rights under the

25 payroll reimbursement agreements?"

                          Norris - Cross                          116

1             MR. MORRIS:  Objection, legal conclusion.

2             MR. RUKAVINA:  It's not a legal conclusion.

3             THE COURT:  Sustained.

4   BY MR. RUKAVINA:

5   Q    Okay.  So let's talk about those back- and middle-office

6   services.

7        Prior to the bankruptcy, did the Advisors have their own

8   employees who provided back and middle office services?

9   A    Not the services that we contracted for with Highland.

10  Q    Okay.  And do your understanding, what were the services

11  that Highland should have been providing pursuant to the shared

12  services agreement?

13  A    Yeah, in the shared services agreement --

14            MR. MORRIS:  Objection. The witness has no knowledge

15  of the contracts.  I don't understand how he gets to testify as

16  to what services we were supposed to be providing when he has

17  no knowledge of the contract.

18            MR. RUKAVINA:  Your Honor, the fact that he didn't

19  negotiate the contract doesn't mean that he can't read it and

20  apply its statements.  It's the same as if the contract says

21  I'm buying a Mercedes and he's telling you whether that car is

22  a Mercedes or a Nissan.

23            He's not interpreting the contract, he's giving the

24  Court facts in which the Court will ultimately determine

25  whether the contract fits or not.

Norris - Cross                         117

1            THE COURT:  Okay.  I don't -- I can read the

2    contracts.

3            MR. RUKAVINA:  Okay.

4            THE COURT:  I can read the contracts.  So how is this

5    necessary?

6            MR. RUKAVINA:  Very well.

7            THE COURT:  Okay.

8            MR. RUKAVINA:  One moment, Your Honor.

9            THE COURT:  Okay.

10   BY MR. RUKAVINA:

11   Q    Go to Exhibit 36, please.  It's in the big binders.

12   A    36?

13   Q    Yes, sir.

14   A    Uh-huh.

15   Q    So this is to Mary Irving.  Are you familiar with a Mary

16   Irving?

17   A    I know who she is, yes.

18   Q    Okay.  Does she provide any services in any capacity to

19   the Advisors?

20           MR. MORRIS:  Objection.  Just time frame.

21           THE COURT:  Object -- I'm sorry. Objection, time

22   frame?

23           MR. MORRIS:  Yeah, the question was just vague

24   because as -- as of time frame.

25           THE COURT:  Okay.

Norris - Cross                              118

1        MR. MORRIS:  He just said does she provide.

2        THE COURT:  If you could be more specific, Mr.

3   Rukavina?

4        MR. RUKAVINA:  I will.

5   BY MR. RUKAVINA:

6   Q    Did Mary Irving ever provide any services to the Advisors?

7   A    I had very little interaction with her.

8   Q    Okay.

9   A    Over the last decade.

10  Q    Okay.  Mary Irving, we can look at it, but she's not on

11  the payroll reimbursement agreements.

12  A    She's not.

13  Q    Okay.

14  A    She's part of the legal team.

15  Q    Did Mary Irving ever provide front-office or investment

16  advice services to the Advisors?

17  A    Not that I'm aware of.

18  Q    Okay.  Let's go look at 37.  Are you familiar with

19  Stephanie Vitialo (phonetic)?

20  A    I am.

21  Q    Did Ms. Vitialo ever provide any services to the Advisors?

22  A    She provided some legal services.

23  Q    Okay.  Is she on the payroll reimbursement agreements?

24  A    She's not.

25  Q    Does she provide any so-called front-office or investment

Norris - Cross                                            119

1  advice -- advisory services?

2  A    Over what time frame?

3  Q    At any point -- well, post-petition.

4  A    None that I'm aware of.

5  Q    Okay.  Exhibit 38.  Are you familiar with Matthew Diorio

6  (phonetic)?

7  A    I am.

8  Q    Is he on Exhibit A to the payroll reimbursement

9  agreements?

10 A    He is not.

11 Q    Okay.  Did he ever provide any services at any point in

12 time to the Advisors?

13 A    Not that I'm aware of.

14 Q    Okay.  Do you know what Mr. Diorio did at Highland?

15 A    He worked on the Legal and Compliance Team. I don't think

16 he's an attorney.  Something with business development, which I

17 never interacted with Matthew.

18 Q    Did he ever provide any investment advisory or front-

19 office services to the Advisors?

20 A    Not that I'm aware of.

21 Q    Post petition?

22 A    Not that I'm aware of.

23 Q    Would you be aware of that post petition, since you're the

24 head of Business Development?

25 A    Well, I frequently interact with the investment

                              Norris - Cross                    120

1  professionals.  I sit in on investment committee meetings.  And

2  then the weekly global investment committee meeting.  As part

3  of my role as Chief Product Strategist, I'm a liaison between

4  investors and the investment team.  And so I interacted daily

5  with investment professionals to determine what they're doing,

6  why they're doing it.  So --

7  Q    So you wouldn't --

8  A    -- I'm not going to say I would have knowledge of every

9  single person providing investment services.  But I generally

10 had an idea particularly related to our advisors.

11 Q    Okay.  Well, that's all I'm asking about our advisors.

12 A    Yeah, I --

13 Q    The next one, Exhibit 39, Mr. Leventon.  I think we all

14 know Mr. Leventon.  But just for the record, Mr. Leventon, is

15 he on the payroll reimbursement agreements?

16 A    He's not.

17 Q    And what kind of services, or what did he do at Highland?

18 A    He was an attorney.

19 Q    Okay.

20 A    Worked on litigation and other legal things.

21 Q    Did he ever, to your understanding provide any front-

22 office or advisory services to the Advisors?

23 A    Not that I'm aware of.

24 Q    Okay.  So we've just gone -- well, let's do Exhibit 42.

25 With Timothy -- how do you pronounce that?  Canorlier

Norris - Cross                                          121

1   (phonetic)?

2   A    I wish I knew.  Canorlier -- I've never been able to

3   pronounce it.

4            MR. MORRIS:  Canorlier.

5            THE WITNESS:  Canorlier, yes.  I know I've heard it

6   many times.

7   MR. RUKAVINA:

8   Q    Was Mr. Canorlier on the payroll reimbursement agreements?

9   A    He's not.

10  Q    Okay.  Do you know what he did at Highland?

11  A    He -- he was an attorney on the legal team.

12  Q    Did he ever provide any investment advisory or front-

13  office services to the Advisors post petition?

14  A    Not that I'm aware of.

15  Q    Okay.  So if there's an argument made -- I think we've

16  gone through five or six employees, if there's an argument made

17  that these five or six employees replaced dual employees that

18  were dropped over time, would you agree with that argument?

19  A    I wouldn't have any basis to agree with that.  I -- I

20  don't have -- I didn't have interaction with them providing

21  those services.

22  Q    Because, again, we looked at the contract, and the

23  contract has two elements.  Correct?

24  A    That's right.  They need to be dual employees and they

25  need to be providing advice to registered investment companies.

Norris - Cross                              122

1  Q    Okay.  Now some of these employees, if they provided
2  services to the Advisors, would that have been pursuant to the
3  shared services agreements?  Like legal?
4           MR. MORRIS:  Objection.  Same -- exact same.  He
5  shouldn't be telling the Court what contract people were
6  providing services pursuant to.
7           THE COURT:  Response?
8           MR. RUKAVINA:  I'll move on.
9           THE COURT:  Okay.
10 BY MR. RUKAVINA:
11 Q    The list of employees on Exhibit A on the payroll
12 agreements, do you have any understanding as to whether any of
13 those employees, once they were terminated by Highland, were
14 replaced by Highland, with respect to their roles for the
15 Advisors?
16 A    I --
17 Q    I think you might have mentioned one earlier.  I don't
18 know if you put it in the record, the name.  It's in the small
19 binder, Dustin.  The smaller binder to your right.
20 A    Oh, yes.
21 Q    Just Exhibit A.
22 A    So I know there was one individual who was hired to help
23 with healthcare, but he helped with the private equity fund,
24 that wasn't related to our Advisors in HCMLP owned fund.  And
25 he did a little bit for our Advisors. His name was Michael

Norris - Cross                          123

1   Jueng (phonetic).  And I think he was hired in 2019.  So he was

2   the only front-office person that I'm aware of that -- that was

3   hired.

4        Now, yet, there -- when some left there was, you know,

5   some reallocation of duties.  However, at that point, as I

6   mentioned our assets in credit and private equity had been

7   diminishing significantly over the last several years.  So many

8   of these people left, but they had seen the writing on the

9   wall.  Right.

10        They knew we weren't focused on credit.  They knew we had

11  growth in real estate and that wasn't their expertise.  And you

12  know, they're a lot of good people and they went and started

13  other businesses.  They went to other companies.

14  Q    Would you have offered them employment for the Advisors

15  upon them leaving Highland, had the Advisors a need for them?

16  A    If we had a need, I -- we made an offer to those that --

17  and there were some even that were left to us, we didn't extend

18  an offer to, for various reasons.

19  Q    Okay.

20  A    We didn't need them.  You know, and -- and at this point

21  our assets are very different.  We don't need the large credit

22  team.

23        MR. RUKAVINA:  Your Honor, I think the clock is one

24  hour off, but that's no big deal.

25        THE COURT:  It's two minutes to 4:00.  I don't know

Norris - Cross                                    124

1  what that says.

2            MR. RUKAVINA:  It says two minutes to 3:00.  Mr.

3  Berdman (phonetic) if you'll please put Exhibit CC up?  Your

4  Honor, CC is an Excel spreadsheet.  This is the underlying data

5  that rolls up into the David Klos December chart, if you

6  recall.

7            THE COURT:  Okay.

8            MR. RUKAVINA:  So Your Honor will recall that Exhibit

9  Q.  Exhibit Q is the PDF of the summary.

10           THE COURT:  Okay.

11           MR. RUKAVINA:  And Exhibit CC, the way we look at

12  Exhibit CC is unfortunately on the -- on the screen.

13           THE COURT:  Okay.

14           MR. RUKAVINA:  So that's what Mr. Berdman is trying

15  to pull up.  He says it's loading.  And Mr. Berdman, if you'll

16  go to the employee listing.

17           Your Honor, one moment.  So Your Honor, we're just

18  trying to figure out why the screen is so blurry here.  So can

19  you see Mr. Norris, or is it --

20           THE WITNESS:  I can see it.

21           MR. RUKAVINA:  -- again my eyes.

22  BY MR. RUKAVINA:

23  Q    Okay, so this is Mr. Klos's analysis.  And I'd just like

24  to talk about some of these employees here.  So let's look at

25  Chris Rice (phonetic).

                              Norris - Cross                         125

1  A    Yes.

2  Q    See 2019 hired.  Do you see that?

3  A    I do.

4  Q    Did Chris Rice provide so-called front-office investment

5  office services to the Advisors?

6  A    No.  He's in the accounting department.

7  Q    Okay.

8  A    As it says there accounting, finance and back office.

9  Q    So rather than me go through each one of these, you just

10  go through them and tell the Court -- so start at line, what is

11  that, 60?

12  A    Uh-huh.

13  Q    And go down.  Those are the new hires that Mr. Klos

14  included.  Tell the Court, for each one of those, whether they

15  would or would not be providing investment services front-

16  office services to the Advisors.

17  A    Yeah, Chris Rice, no.  It's accounting and back-office

18  services.

19  Q    Joey?

20  A    No, it was accounting and finance --

21  Q    Just say yes or no.  Just say yes or no.

22  A    Yeah.  No, no on Kelly.  Michael Young, yes.  Brad McKay,

23  no.  Andrew, no.  Brendan, no.  Tina, no.  Bridget, no.  Sarah,

24  no.  Michael, no.  Austin, no.  Erberto (phonetic), no.

25          MR. RUKAVINA:  Okay.  You can close that, Mr. Berman

                        **WWW.LIBERTYTRANSCRIPTS.COM**

Norris - Cross                                    126

1  (phonetic).

2  BY MR. RUKAVINA:

3  Q    So if Mr. Klos used those employees as far as the

4  profitability of the payroll reimbursement agreements in his

5  analysis, would you disagree that those employees should have

6  been included?

7             MR. MORRIS:  Objection to the extent it calls for

8  legal conclusion.

9             THE COURT:  Overruled.

10            THE WITNESS:  So if he -- say it one more time.  If

11  he included in the payroll reimbursement --

12  BY MR. RUKAVINA:

13  Q    Yeah.

14  A    With Michael, or a percentage allocation, I wouldn't

15  necessarily disagree.  The others I would disagree because they

16  would be captured as a back-office employee that was not duly

17  employed in providing investment advice to our registered

18  investment --

19  Q    Okay.

20  A    -- companies.

21  Q    And I think we've discussed this before, and Mr. Morris

22  asked you.  But you were generally aware, more or less

23  contemporaneously with when certain employees left Highland.

24  Is that accurate?

25  A    I was.

**WWW.LIBERTYTRANSCRIPTS.COM**

Norris - Cross                              127

1  Q    Okay.  So why didn't you or someone else immediately pound
2  the table and say we've got to stop paying for that employee?
3  A    Well, I had no knowledge that we were continuing to pay or
4  reimburse for their bonuses, comp, and benefits when they were
5  no longer employed.  Had I know that, I would have reacted the
6  same way when I found that out.
7  Q    What did you think -- pardon me, I'm having a hard time
8  phrasing this.
9       Who did you think should have been doing that job?  Or as
10 an officer of the Advisors, who did you expect would be doing
11 that job?
12 A    Yeah, so we -- we outsourced agreement review, payments,
13 payment processing to Highland and they -- they actually had a
14 very robust process.  And it was actually challenging to get
15 agreements through them, and invoices.  If there wasn't an
16 agreement tied to an invoice, they would ask for the agreement.
17 If the agreement didn't match the invoice, they would let us
18 know.
19      And they would go back and either tell the vendor or
20 renegotiate.  So there was a very thorough process that I had
21 dealt with for a decade with them.  And -- and that's who we
22 relied on to administer our agreements and payments across the
23 board.
24 Q    Okay.  Now before we flip to your damages --
25 A    And I don't know  if it's helpful.  There was an accounts

Norris - Cross                                128

1  payable person.  There was a corporate accounting team --

2  Q    Whose --

3  A    -- who handled this.

4  Q    -- whose employee was accounts payable?

5  A    Who was the employee?

6  Q    No, whose --

7  A    It was Highland Capital Management, L.P.

8  Q    And everyone else that you mentioned?

9  A    And all the other corporate accounts, or HCMLP.

10 Q    So let's look at Exhibit G.

11        MR. RUKAVINA:  Your Honor, Exhibit G, I don't think

12 we've looked at yet, at least not in detail.  Exhibit G is a

13 PDF printout of Mr. Norris's damages calculation.  And Exhibit

14 H is, again, the native form Excel spreadsheet.

15 BY MR. RUKAVINA:

16 Q    Mr. Norris, will you please tell us if you need the native

17 file pulled up for any reason, okay?

18 A    Okay.

19 Q    What -- tell the Court what you're trying to do here in

20 Exhibit G?

21 A    Yeah.

22     So what I do is very simple.  I know there's a lot of

23 numbers on the page, but just to simplify it is I took what are

24 the actual payments made, which we have heard --

25 Q    Payments made from whom to whom?

1  A    Payments made by Highland on our behalf to HCMLP from our

2  Advisor accounts for --

3  Q    So, so, so just hold on.

4  A    Yeah.

5  Q    So payments from the Advisors to Highland.

6  A    My Advisors to Highland.

7  Q    Only that Highland was processing the advisor.

8  A    That's correct.

9  Q    Okay.

10 A    Regarding the payroll reimbursement agreements.  So there

11 was each month $252,000 for NexPoint Advisors and $416,000 for

12 Highland Capital Management Advisors, Fund Advisors, that was

13 paid each month.  And we've heard all about how those amounts,

14 the actual payments didn't change.  And so, that $9 million

15 represents the period from the court filing to the end of

16 November.  Nine million dollars is what was actually paid.

17 Q    Why did you stop at the end of November?

18 A    Because that's when payments stopped as we heard from

19 Frank and Mr. Dondero.

20 Q    Okay.  So the $9 million, 9 million 18, that's just the

21 cumulative of HCMFA and NPA.  Right?

22 A    That's correct.

23 Q    Okay.  The next line is cost of dual employees --

24 A    That's right.

25 Q    -- as stated in the original agreement from 2018.

Norris - Cross                          130

1  A    That's right.  So here's the simple math.  I took the

2  total compensation numbers which came from Highland and

3  combined and multiplied them going month by month.  I took each

4  employee that was still employed.  I utilized their termination

5  dates from the filings as well as the monthly -- compared to

6  the monthly termination sheet.  So I went month by month and

7  said who was still employed, multiplied their total

8  compensation times the percentage allocation, and that's where

9  it's broken out between NexPoint Advisors and HCMFA.

10      So, assuming these employees were still employed and

11  providing investment advisory services and a new employee, the

12  $2.8 million during that period is what we would have

13  reimbursed, actual costs of those employees, actual

14  reimbursement costs.

15  Q    Okay.  So just so we're clear, we saw from Mr. Klos

16  yesterday that his analysis was a snapshot point and time

17  December 2020.  Correct?

18  A    Correct.

19  Q    Is yours also a snapshot of a given point and time?

20  A    It's not.  The allocation percentages are because in the

21  beginning --

22  Q    So I was going to -- I was going to ask you that.  Which

23  allocation percentages did you use?

24  A    I used the ones from scheduling.

25  Q    Why?

Norris - Cross                        131

1  A    There was obviously a lot of thought.  It was at that
2  point -- I didn't want to make assumptions here.  Right?  I'm
3  taking the math that was provided on Schedule A.  And then
4  looking at them, you know, they appeared reasonable or should
5  have been lower.  To be conservative, I took the exact same
6  percentages and ran them through the calculation.
7  Q    Okay.  Now just so that the Court is understanding this,
8  if an employee is no longer there, does his or her allocated
9  percentage matter?
10 A    It doesn't.
11 Q    It only matters --
12 A    If there is -- if it's 100 percent of 0, it's 0.  So
13 that's why, yeah, it doesn't matter.
14 Q    So for 20 of the 25 employees, would it matter what
15 allocated percentage they had?
16 A    Allocated percentages doesn't matter.  Compensation
17 doesn't matter.  And you'll see in my second tab that that is
18 NA.  I didn't even need to put their compensation numbers
19 because if they weren't employed as of the bankruptcy filing,
20 they didn't matter.
21 Q    Because we're paying for someone that doesn't exist.
22 A    Or reimbursing for some compensation that was never paid.
23 Q    Just so again the Court is clear, we're talking about the
24 snapshot.  You did a walk forward on a post petition month by
25 month basis?

Norris - Cross                          132

1  A     Correct.  And I divided that into three segments.

2  Q     Well, let me pause you there.

3  A     Yeah.

4  Q     So if there was an employee that was employed some point

5  and time post petition, but then fell off, how did you treat

6  that employee?

7  A     Yeah.  So the month -- I had them the month that they

8  stayed.  The month later, I dropped them off.  And you can see

9  that on the third and fourth pages.  I can draw your attention

10 to, for example, John Poglich (phonetic), simple on the third

11 page.  John Poglich, you see a monthly allocation and --

12 Q     On 53,066?

13 A     On 53,000.  And the first month is half of that because

14 the petition date or the bankruptcy filing date was the 15th of

15 October, I believe.  And then he was here through September and

16 he drops off.  Right?  You wouldn't expect to be paying for

17 someone that's no longer there.  And you can see that through

18 various other employees.  Mr. Dondero, I kept him on there.  He

19 was a -- he was there until he became a non-paid employee of

20 Highland.  You see Morrow (phonetic), Stall Tarry (phonetic).

21 Same thing.  He was employed until December 2020, and then he

22 drops off.  Same thing, Mr. Parker, until February 2020, and he

23 drops off.  And in all these with zeroes, they just were not

24 employed on the bankruptcy filing date and so they're zeroes.

25 Q     So what is your conclusion from the petition date through

Norris - Cross                           133

1  the date that we stopped paying as to how much we paid, or

2  rather, reimbursed Highland for employees who were no longer

3  there?

4  A    The difference is the $6.2 million right here.

5  Q    So that's even a little less than Mr. Klos' 6.6, isn't it?

6  A    It is.

7  Q    Okay.  Now, what about the next block there?  You say

8  additional two months billed by HCMLP, et cetera, for December

9  '20 through January '21.  Why did you include those additional

10 two months?

11 A    I included those because the services should -- the

12 agreements had not been terminated, right.  So we were paying.

13 And I broke them out separately because the Advisors were no

14 longer paying.  And so this can't be -- this first line isn't

15 total amount reimbursed or paid.  It's what the billings were.

16 And they're -- I think in their damages claim is that the

17 amount is equal to the amount listed in the agreement for those

18 two months, which I put in that top line.  That's simply the

19 amount the --

20 Q    So the top line, the 1336, where are we paying according

21 to their damages, that's how much we would have paid?

22 A    I believe so.  It's $252,000 a month for NexPoint Advisors

23 and $416,000 a month for NPA.

24 Q    And according to your calculation for those months at that

25 point and time, how much should we have paid if the Court

Norris - Cross                                    134

1  accepts our view of this case?

2  A    $264,000 should have been what we paid with a million

3  dollar difference for that two months.

4  Q    So if the Court agrees with us, then the damages just on

5  these two contracts, not shared services, for those two months

6  should be how much?  How much should we have to pay for those

7  two months if the Court agrees with our theory of the case?

8  A    Two hundred and sixty-four thousand dollars, nine eighty-

9  eight based on this calculation.

10 Q    And you mentioned that the payroll termination agreements

11 weren't terminated.  Did you ever discuss that with Mr. Klos or

12 Waterhouse or Seery?

13 A    I did.

14 Q    What did they tell you?

15 A    We had an email exchange with Mr. Klos and Mr. Waterhouse

16 and  they didn't know.  This is like when we found out and Mr.

17 --

18 Q    So let's go back.

19 A    Uh-huh.

20 Q    November 30th we get termination notices, 60-day clock

21 ticking on the search services.  Right?

22 A    Correct.

23 Q    Did we get termination notices for payroll reimbursement?

24 A    We did not.

25 Q    Did that surprise you or?

Norris - Cross                     135

1  A    It did.

2  Q    What did it cause you to do?

3  A    It caused us to ask why because we knew we were --

4  Q    Well, what was the ultimate answer that you got from

5  either Mr. Klos, Waterhouse, or Seery?

6  A    Mr. Waterhouse said maybe it was overlooked.  That's all

7  we got.

8  Q    Okay.  No discussion about that why would we terminate if

9  it's still profitable?

10 A    Well, I was --

11        MR. MORRIS:  Your Honor, that's the kind of leading

12 question that he used to -- he asked him the question, he got

13 an answer, and now he's fishing for the answer he wants by

14 suggesting the answer in his question.  Exactly what he took me

15 to task for.

16        THE COURT:  Sustained.

17 BY MR. RUKAVINA:

18 Q    Did you ever discuss the profitability or lack thereof of

19 the payroll reimbursement agreements with Mr. Klos?

20 A    The profitability of them, yes.

21 Q    Yes.  What did you discuss with Mr. Klos?

22 A    Yeah.  So, and maybe I should back up to that November

23 30th date we received the notices.  December 1st, I had been,

24 along with Mr. Sauter, tasked with transitioning the services,

25 even prior to that, making sure there was a smooth transition.

Norris - Cross                        136

1  But at that point there was still the understanding or hope

2  that things would come to a peaceful resolution.

3      At that point we knew, all right, we need to make sure the

4  businesses can continue, that we can continue the shared

5  services through another entity or hiring those employees.

6  What agreements were there that we needed?  And so the shared

7  services and payroll reimbursement agreements were two of

8  those.  D.C. Sauter and I had been discussing them over the

9  previous month or two, but then when this happened, we went to

10  Dave Klos and Frank and said -- I sent Dave Klos an email and

11  said, hey, I need to understand these amounts.  What are we

12  paying?  What are we paying for?

13      And there was a response from Mr. Klos and that email was

14  -- went through with Mr. Klos where I said, you know, hey, what

15  are these the proper amounts?  He came back.  Maybe we can go

16  through the email, but his response was that they had continued

17  to pay the same amounts.  And I had pointed out several

18  employees that were large dollar amounts that were no longer

19  employed and was asking, are we still paying for these or

20  reimbursing these employees that are no longer employed?  And

21  his answer is the amounts had not changed.

22      And so after that conversation, we had a call with Mr.

23  Klos and Mr. Waterhouse and we dug into the why, the how much,

24  the profitability.  Mr. Waterhouse was very aware that we were

25  overpaying, used the word overpayment.  That's when I learned

**Appx. 01361**

Norris - Cross                          137

1  about the automatic stay.  I think I discussed that.  Mr. Klos

2  had -- was involved in that discussion as well.  So we had a

3  couple of discussions.  Mr. Klos called me separately.  We had

4  another conversation with Mr. Waterhouse.  That was in early

5  December.  I don't know if you want me to keep going on that,

6  but.

7  Q    Sure.  Yes.  What other discussions did you have with Mr.

8  Klos about the problem?

9  A    Yeah.  So at that time too, I asked Mr. Klos and Mr.

10 Waterhouse.  They told me there was a schedule that laid out

11 the payments and the overpayments.  And me and Mr. Sauter asked

12 for it.  We said, give it to us.  And I learned a little bit

13 more about the hesitancy that they had in doing anything that

14 would harm or cause damage to the Debtor.

15 Q    Did Mr. Klos tell you anything about that in particular?

16 A    Mr. Klos and Mr. Waterhouse both did.

17 Q    What did they say?

18 A    They had said, and this is the first I had learned about

19 it, that they had been warned that if they did anything that

20 was -- that would harm or be adverse to the Debtor that they

21 would be fired on the spot, and that they would be held

22 personally liable.  And they were -- I mean, they were trying

23 to do what was right in both regards, right.  We know Mr.

24 Waterhouse was wearing two hats, but -- and they expressed

25 their concern.  And so --

Norris - Cross                          138

1  Q    So their concerned about being fired?

2  A    Fired on the spot and held personally liable.

3  Q    Did they share -- did they share that analysis you

4  mentioned with you?

5  A    So Mr. Klos said, I'll check, but I don't think Seery will

6  allow it.

7  Q    Okay.

8  A    So fast forward, we ask multiple times to Frank and Dave.

9  We never got it.  In mid December, it's an important time

10 period, Jim got hit with a temporary restraining order.  And so

11 as we were starting to have these conversations with Dave and

12 Frank, now all the sudden, you know, I for the first time was

13 involved in the court.  That was the first time I ever appeared

14 in court.  We had this restraining order for Jim.  And so we

15 were all very cautious about what we could and couldn't say to

16 any employees.  And so this negotiating or discussion we had

17 had with Dave and Frank kind of paused for several weeks and

18 the discussions then just went with counsel.  Fast forward to

19 around January 13th or so, maybe 12th.

20 Q    Of 2021?

21 A    Of 2021.  Dave Klos, Frank Waterhouse, JP Sivvy

22 (phonetic), and Brian Collins called me and said, Mr. Seery has

23 allowed us to talk to you about the transition of services

24 because both sides --

25 Q    Who was JP Sivvy?

                         Norris - Cross                    139

1  A    JP Sivvy was part of the legal team at HCMLP.

2  Q    And who was Mr. Collins?

3  A    Mr. Collins is HR, was a HR director at -- so he chose --

4  and up to that point, we had -- I, in particular, I didn't want

5  to get involved in a restraining order.  So very little

6  discussion, especially around this.  So only around funds,

7  operations.

8  Q    And just again so the Court understands, what were you

9  trying to discuss or negotiate at that point and time?

10 A    Yeah.  Starting January 13th was let's divide the

11 agreements.  Let's divide the services.  Let's have a peaceful

12 transition.  We were receiving a number of back-office

13 functions that were critical to our business.  And so, you

14 know, we also had dated information stored on their systems, on

15 their servers.  We were in their office still.

16 Q    So as part of these -- and the Court may remember.  We had

17 an emergency trial on a mandatory injunction February 16th or

18 something like that.  Ultimately, was there a transition of

19 services done?

20 A    We had the permanent injunction.  Ultimately, the shared

21 services agreements ended.  They were extended.  Highland

22 worked with us for an extension of around three weeks.

23 Q    But that's my question.

24 A    Yeah.

25 Q    As of what -- as of actually what period of time, what

Norris - Cross                                    140

1  day?  How do I put this?  As of what day were the shared

2  services agreements actually terminated to your understanding

3  after these extensions?

4  A    Yeah.  I believe it was February 20th.

5  Q    Okay.

6  A    Maybe 19th.

7  Q    February 28th or 20th?

8  A    Twentieth.

9  Q    Twentieth.

10 A    And the employees were terminated on the 28th of February.

11 And there was a difference and they moved the date of

12 termination of employees back a week --

13 Q    And then --

14 A    -- beyond each of our termination dates, so we had this

15 issue.

16 Q    What happened?  What happened to the employee?  I mean,

17 did the Advisors do anything with the employees that were

18 terminated?

19 A    So we hired a few of the actual terminated employees and

20 then most of them went to Skyview Group, which had a different

21 name at the time, which we entered into shared services

22 agreements for those, with those entities.

23 Q    So during those extensions that we discussed did the

24 Advisors pay the debtor for those extensions in January and

25 February 2021?

1 A    We did.  And that's that third box here, the third section
2 of the damages.  It's $453,286 is what was paid for the payroll
3 reimbursement.  And that's just the -- it was based on the
4 exact dollar amounts and --
5 Q    Why did we pay the exact dollar amounts if we knew that we
6 were overpaying?
7 A    Yeah.
8     So we had discussions on this.  And backing up to the
9 first extension, my conversations with this group of four
10 Highland employees starting January 13th was let's work
11 together.  Let's get a real -- let's get a great solution.  We
12 don't want any disruption in the business.
13     To that point, no one had talked to me about you need to
14 pay these past due amounts or the amounts that they were
15 claiming we owed until January 28th.  I got an email that said,
16 these amounts are -- all these, Highland or NexPoint and HCMFA
17 related entities or Jim-related entities, some were -- I had no
18 relationship to -- will need to be paid.
19     And at this point we had already negotiated and agreed on
20 most of the material terms related to the transition of
21 services.  And so we were waiting on a term sheet at that
22 point.  And they said, these have to be paid or we're pulling
23 the plug on everything you have.  And so then I had a call with
24 JP Sivvy, Frank Waterhouse, and Dave Klos.
25     Again, I reiterated this, you know, asking for the

Norris - Cross                                    142

1  schedules related to the payroll reimbursement agreements.  But

2  at that point in time, they gave us an ultimatum of you're

3  going to pay the extension fee or you're going to have the plug

4  pulled on you.  And at that point, we weren't ready for that.

5  And so we said we're going to -- we will pay it, but we'll

6  reserve all our rights.

7  Q    And did Highland agree to that?

8  A    They did.

9  Q    Okay.

10 A    And we put the -- that in our actual signed agreement.

11 And when we did -- made our second extension, had multiple

12 conversations, same thing.  We would reserve our rights.

13 Q    And just an order of magnitude, how much did we pay

14 Highland for those two extensions, just ballpark?

15 A    The payroll reimbursement agreement amount was $453,000.

16 The shared services was maybe $2-, or $300,000, so $7-, or

17 $800,000 for 20 days.

18 Q    Okay.  So --

19 A    I may not be perfect on my math, but that's --

20 Q    So if the Court agrees with our theory of the case, how

21 much are we saying we should get back from those extension fees

22 we paid Highland there in February 2021?

23 A    Yeah.  So related to the payroll reimbursement agreements,

24 it's $453,286, is what was paid.  If you take the same

25 calculation I had been doing on all the other months, $81,000

Norris - Cross                                    143

1  is the appropriate, the actual employees that were employed

2  providing advisory services, so that the difference is

3  $372,000.  That's the overpayment amount.

4  Q    So you mentioned that Mr. Klos used a word overpayment

5  when having the discussions with you.  Is that correct?

6  A    Well, I know that was a word that Frank Waterhouse used.

7  Q    Okay.

8  A    Dave may have, but he frequently used it as you were

9  paying for employees that were no longer employed or

10 reimbursing for employees that were no longer employed.

11 Q    So Mr. Klos said you were reimbursing for employees you no

12 longer had?

13 A    Again, I don't remember the specific wording, but it was

14 very clear that the payments were more than what we were

15 contractually obligated.

16 Q    Did he say it to you more than once?

17 A    He did.

18 Q    Did Mr. Waterhouse say it to you more than once?

19 A    He did.

20 Q    Did any other employee or agent of Highland ever say that

21 to you?

22 A    Yes.

23 Q    Who?

24 A    On a call with JP Sivvy and Frank Waterhouse and Dave

25 Klos.  JP Sivvy also acknowledged it.

Norris - Cross                              144

1  Q    Okay.  Anyone else?

2  A    I had conversations with Fred Caruso where we -- I brought

3  this up in January and asked for the schedule, what we were

4  paying.  He said, I know what you're talking about, but let me

5  check on it.  He did acknowledge.  Same thing in early February

6  with Mr. Sharp, Bradley Sharp.  We brought up the discussion.

7  There were attorneys on the line as well.  We had a phone call.

8  I asked for the schedule.  He said -- I told him we knew that

9  we were paying for employees that were no longer there.

10      There had been an analysis provided.  We've asked for it

11  on multiple occasions.  And he said, I'll check.  I don't know

12  that we can provide that.  And I said, I'm not asking.  I'm not

13  asking for something unreasonable.  We're asking to pay for the

14  employees that are currently here.  And he said, well, I'm --

15  you know, I'm a representative of the Debtor and we have an

16  obligation to the Debtor.

17  Q    And when you said schedule, were you referring to the

18  David Klos analysis?

19  A    Well, I don't know if it was that.  I didn't see this

20  analysis from Dave Klos, the ones that have been in the Court,

21  until discovery.  We had been asking for it.  I didn't see it

22  until February.  Actually, I think after my deposition.  We saw

23  the main schedule.  We hadn't received the Excel files.  And so

24  I'm assuming because Dave and Frank had told me there had been

25  calculations, I'm connecting an assumption here that that is

Norris - Cross                                    145

1  the schedule, but I don't know.  I don't know if they had

2  another one.  They didn't provide it.

3  Q    Is that something we requested in discovery?

4  A    It is.

5  Q    So if they didn't provide it, can we conclude that there

6  is no other one?

7          MR. MORRIS:  Objection to the form of the question.

8  I mean, this is just -- this is -- you can't -- I object.  It

9  is not -- it's complete speculation.  How about that?

10         MR. RUKAVINA:  Well, let me rephrase the question.

11         THE COURT:  Sustained.  Uh-huh.

12 BY MR. RUKAVINA:

13 Q    We requested all internal calculations of profitability.

14 Correct?

15 A    We did.

16 Q    And did we receive from the Debtor anything other than Mr.

17 Klos' December 2020 and December 2019 analysis?

18 A    We did not.

19 Q    Okay.  Well, and I'm sorry.  There were two in late 2019,

20 so let me just clarify.  I think there --

21 A    There were two iterations.

22 Q    Two iterations.  So --

23 A    I think I only saw one of them, but yeah.

24 Q    So technically we might have gotten three, but they would

25 have been the ones from December 2019 and December 2020?

                          Norris - Cross                    146

1   A    Correct.

2   Q    Okay.  Now let's -- let me just ask you something while we

3   are still on your Exhibit G.  So, at the end of the day there

4   were only a handful of the original employees left from Exhibit

5   A.  Correct?

6   A    Correct.

7   Q    Now what would happen to your damages model if instead of

8   using the original percentage allocations you bumped it to 100

9   percent such that 100 percent of those five employees would be

10  reimbursed by their Advisors?  What's the resulting number?

11  A    Yeah.  So using these existing plays, I actually plugged

12  this in at 100 percent and it's, I believe, approximately $4.4

13  million would still be the damages.

14  Q    So --

15  A    Applying 100 percent of their time.

16  Q    So if the Court agrees with our theory of the case but

17  says that we should have done a separate analysis of the

18  allocated percentages, even if we bumped that up to 100 instead

19  of 18 percent of 42 percent or whatever, it still results in

20  how much in damages?  Overpayments.

21  A    $4.4 million.

22  Q    Okay.

23  A    Approximately.

24  Q    If you'll flip to Exhibit P, please, as in Paul.  Is this

25  the email exchange that you just referenced with Mr. Klos where

1 you were asking for data and et cetera, et cetera?

2 A    Yes.

3 Q    Okay.  And in the bottom email there where he's writing to

4 you on December 1st at 9:12 a.m. he says that given the changes

5 in head count and along with not paying insider bonus

6 compensation, that has increased the profitability of the

7 contracts.  Do you see that?

8 A    I do.

9 Q    Did you ever separately from this discuss the

10 profitability of the contracts with Mr. Klos other than your

11 communications that there were -- we were paying for employees

12 we didn't have?

13 A    We had a phone call with just he and I.  We had a phone

14 call with he and Frank, multiple discussions, again in January

15 as we were talking about transition of services, discussed it

16 again on a call with the group at the end of January, so there

17 were multiple conversations.

18 Q    Okay.  Did the Debtor ever terminate, to your

19 understanding, the payroll reimbursement agreements?

20 A    Yes, I believe so.

21 Q    And was -- why do you -- did you do anything, to your

22 memory, to prod the Debtor to do so?

23 A    Yes.

24 Q    What did you do?

25 A    So we asked DC Sauter and our team work with their legal

Norris - Cross                              148

1  team, hey, is this going to be -- we wanted to ensure that we

2  weren't continuing to overpay for employees that were no longer

3  there.  And so DC, as a condition of signing, I believe signing

4  the transition services agreement, they made us terminate the -

5  - we asked them to terminate the payroll reimbursement

6  agreement.

7  Q    So we didn't terminate the payroll reimbursement

8  agreements.  The Debtor did.

9  A    I believe so, yeah.

10 Q    Okay.

11 A    Yeah.

12 Q    Because we require that as a condition.

13 A    Yes.

14 Q    Okay.  Other than that, were you aware of any attempts by

15 the Debtor to terminate the payroll reimbursement agreements?

16 A    I'm not.

17 Q    Okay.  Can you think of any reason why the Debtor wouldn't

18 have done that?

19 A    Yes.

20 Q    What?

21         MR. MORRIS:  Objection, Your Honor.  He can't

22 speculate as to the Debtor's motivations here.

23         THE COURT:  Speculation.  Response?

24         MR. RUKAVINA:  I'll withdraw the question.

25         THE COURT:  Okay.

Norris - Cross                                  149

1  BY MR. RUKAVINA:

2  Q    And just to clarify what Mr. Morris was asking you, did

3  Mr. Klos use the word true up when he described what happened

4  at the end of 2018?

5  A    He did.

6  Q    Did he tell you whether money changed hands as a result of

7  that "true up"?

8  A    He did.

9  Q    What do you remember about that?

10 A    He said there had been a -- I don't remember if it was

11 small or immaterial -- it wasn't immaterial, but a small -- a

12 payment actually resulted in paying to Highland from both

13 Advisors.

14 Q    Okay.  Did -- and you mentioned that he didn't --

15 A    And actually, I don't think he said he both Advisors.  He

16 said the Advisors, but didn't specify how much of each.

17 Q    But did he actually tell you about the fact of the

18 amendments?

19 A    No.

20 Q    So just the result.

21 A    Yes.

22 Q    Okay.  Did Mr. Klos ever -- first of all, do you have an

23 opinion on Mr. Klos' -- prior to this litigation, Mr. Klos'

24 ethics and professionalism?

25 A    I do.  Yeah.

1  Q    And what was your opinion?

2  A    I thought highly of him.  I worked with him for over a

3  decade.  His work product was always fantastic.  He was

4  thorough.  I went to him for a lot.  I trusted he would put out

5  an accurate and honest analysis.  He worked closely on board

6  matters, fund matters, advisor matters, and yeah, I thought

7  highly of him.

8  Q    And he was trusted enough to be presented to the retail

9  board?

10 A    Absolutely.

11 Q    Did Mr. Klos, in all of your discussions, ever tell you

12 anything like, geez, Dustin, there's something fishy about

13 these payroll reimbursement agreements or amendments or shared

14 services agreements?

15 A    The way he went about it, he was concerned, right.  And

16 the way he prefaced our conversations was with concern.

17 Q    How so?

18 A    He said we're being -- he didn't say threatened, warned,

19 almost daily that we can't do anything to damage or provide

20 something that would hurt the Debtor.  And so, yeah.  He

21 basically was like kind of you're on your own in figuring out,

22 but I -- he knew the numbers.

23 Q    I don't think you understood my question.  Did Mr. Klos

24 ever tell you that there was -- did he ever flag for you any of

25 the issues?  Well, strike that.  Were you here when Mr. Klos

                          Norris - Cross                    151

1  testified yesterday?

2  A    I was.

3  Q    And he testified as to what he thought the $2.5 million

4  number came from and other things.  Remember that?

5  A    Uh-huh.

6  Q    Did he ever tell you anything like that before?

7  A    No.

8  Q    Did he ever tell you anything -- that there was anything

9  potentially deceptive or suspicious about the payroll

10 reimbursement agreements?

11 A    Got it.  No.

12 Q    Did he ever tell you anything, that there was anything

13 suspicious or deceptive about the amendments to the payroll

14 agreements?

15 A    No.

16 Q    What about the shared services agreements?

17 A    No.

18 Q    What about potential tax -- I don't want to use the word

19 fraud because I'm not a tax lawyer -- potential tax

20 shenanigans?

21 A    No.

22 Q    Potential Mr. Dondero trying to get tax questions for

23 himself?

24 A    No, he didn't.

25 Q    Potential that these were used as a method of financing

                         Norris - Cross                      152
 1  how --
 2  A     No.
 3  Q     That the payroll reimbursement agreements were intended to
 4  be monthly fees regardless of actual cost?
 5  A     No.
 6  Q     Let's go to Exhibit OO real quick.  We're almost done.
 7  And I really -- I really need to go to the optometrist.
 8        Do you know what Exhibit AA is?  There's a bunch of
 9  individual ones.
10  A     Yes.
11  Q     Okay.  What are these?
12  A     These are the shared services invoices that, as required
13  by the shared services agreement for Highland Capital
14  Management Fund Advisors are to be provided, as this is a cost
15  plus 5 percent agreement.  So they're laying out, if you look
16  in column, the number column 1, it has --
17  Q     Well, let me pause you.
18  A     Yeah.
19  Q     Just so that the Court follows.  We've heard before that -
20  -
21  A     Yeah.
22  Q     -- under certain services NexPoint paid a different
23  methodology than HCMFA.  Right?
24  A     They did.
25  Q     NexPoint was just a flat monthly fee.  Right?

Norris - Cross                              153

1   A    Correct.

2   Q    And HCMFA was a bit of a work up.

3   A    Cost plus 5 percent.

4   Q    So who prepared these invoices on Exhibit AA?

5   A    Highland, Highland's accounting back-office group.

6   Q    And would they then send us these invoices?

7   A    I didn't see these invoices until discovery.

8   Q    Okay.  You heard Mr. Morris talk about how -- how it was

9   only $10,000 a month for legal.  Did you hear that?

10  A    I did.

11  Q    You see there it says legal, $10,000.  Right?

12        MR. MORRIS:  Excuse me, Your Honor.  I didn't testify

13  to that.  Mr. Klos did.

14        MR. RUKAVINA:  Well, I apologize.  I just remember

15  someone talk -- I apologize, Mr. Morris.

16  BY MR. RUKAVINA:

17  Q    You heard something about that yesterday.  Right?

18  A    I did.

19  Q    Okay.  Is that the whole picture?

20  A    It's not.

21  Q    Why not?

22  A    When you peel back to what is underlying these numbers,

23  $10,000 was a standard legal services.  However, in the

24  compliance bucket, it says general compliance.  If you look to

25  the schedules, that includes Thomas Surgent, an attorney,

Norris - Cross                        154

1   including his base and bonus and benefits and Lauren Thedford,

2   who is an attorney, providing officer and other functions for

3   us.  So that $92,000 a month -- this is a monthly invoice --

4   includes those two adjacent posts, which is two out of the

5   three attorneys.

6   Q    What about retail operations and finance and accounting?

7   A    Retail operations and finance and accounting includes --

8   it doesn't include attorneys.  It includes back-office

9   accountants.  Frank Waterhouse, I assume did Klos.  We have --

10  we have the Excel spreadsheets that break it out --

11  Q    We do.

12  A    -- by individual, but --

13  Q    But can you tell me how it is that Highland could

14  calculate and bill us for the services of these employees if

15  Mr. Klos testified correctly yesterday that there is no way in

16  the world to do so?

17  A    Yeah.  On a monthly basis, they would calculate the

18  employees and the percent of time that they spent related to

19  Highland Capital Management Fund Advisors.  They had a schedule

20  attached to that spreadsheet.

21  Q    Yep.

22  A    Which then detailed their total comp, salary, bonus,

23  taxes.  There's several columns.  And their percentage

24  allocation.  That was updated monthly.  I looked at the

25  schedules they provided in discovery and they -- when there was

Norris - Redirect                          155

1  a new employee added, they would add that employee.  When an

2  employee left, they would take the employee away.

3  Q    And the --

4  A    There was approximately 20 people underlying --

5  Q    And we paid --

6  A    -- this schedule.

7  Q    And we paid these invoices, well, other than late in the

8  game.  Right?

9  A    Yes.

10 Q    The Advisors or HCMFA paid those invoices.

11 A    Yes.  Highland submitted the payments on behalf of our

12 Advisors.

13 Q    Okay.  So can you conclude from that that there must have

14 been some methodology to allocate employee time per advisor?

15 A    They managed to do it.

16 Q    Or is it -- or is it a fraud?

17         MR. MORRIS:  Your Honor, this is really --

18         MR. RUKAVINA:  Is there any alternative?

19         MR. MORRIS:  He's leading.

20         MR. RUKAVINA:  Is there any alternative, sir?

21         THE COURT:  Sustained.

22 BY MR. RUKAVINA:

23 Q    Is there any alternative?  I'll strike that, Your Honor.

24 I'll just deal with it in closing.  Thank you, Mr. Norris.

25         THE COURT:  All right.  Pass the witness.  Mr.

**WWW.LIBERTYTRANSCRIPTS.COM**

                          Norris - Redirect                    156
 1 Morris.

 2          MR. MORRIS:  I just have a few follow-up.

 3          THE WITNESS:  A few is three.  Right?

 4          MR. MORRIS:  No.

 5          THE WITNESS:  Oh, okay.

 6          MR. MORRIS:  No.

 7                    REDIRECT EXAMINATION

 8 BY MR. MORRIS:

 9 Q    You understand that we completely disagree that you -- the

10 Advisors are entitled to any damages.  Right?

11     You understand that that's the position that we've taken

12 in this case.  Right?

13 A    I believe so, yes.

14 Q    Okay.  Can you turn to Exhibit G, please?

15 A    Yes.

16 Q    Okay.  Do you see -- so you understand that we don't agree

17 you're entitled to anything.  Right?

18     You understand that's our position.  Correct?

19 A    If you represent that, I'll take your word for it.

20 Q    I do.  And you've got the million -- so with that

21 understanding though, you've got the $1,336,000 for the

22 December 20th -- December '20 and January 2021 on your chart.

23 Do you see that?

24 A    Yes.

25 Q    And it's your testimony that your recollection is that the

Norris - Redirect                    157

1  Advisors actually paid the amounts that were due under the

2  payroll reimbursement agreement subject to a reservation of

3  rights in connection with the extensions?

4  A    No.  Not the January and December payments.  We paid in

5  February.  Yeah.

6  Q    Did the Advisors ever make the December and January

7  payments?

8  A    I don't believe so.

9  Q    So why is that number here?  Why are you suffering damages

10 that you didn't even pay?

11 A    Yeah.

12      So I think the reason for including it is it says

13 additional two months billed.  We know that we've been billed

14 those.  We're not arguing that there shouldn't be anything

15 paid.  You're saying we actually owe the full amount.  Here is

16 the amount we owe.  So the difference is the million dollars,

17 right.  So you're claiming we owe you the full 1.3.  We're

18 saying it's 264.

19 Q    But you're seeking damages for the difference.  Aren't

20 you?

21      MR. RUKAVINA:  Your Honor, that's not -- that wasn't

22 the testimony, you know.

23      MR. MORRIS:  Just look at -- I'm just asking.  This

24 is math, right.  It's your analysis.

25      MR. RUKAVINA:  It says total over billing.  Our

Norris - Redirect                          158

1  damages, Your Honor, are the $6.2 million, as he testified, and

2  then the $372,000.

3          MR. MORRIS:  Then how could --

4          THE COURT:  Overruled.  He can ask question about it.

5  BY MR. MORRIS:

6  Q    Those two numbers don't add up to $7.6 million, do they?

7  A    Yeah.  And I don't know the legal ramifications here, but

8  the math is you're asking for -- I can't remember the number --

9  three million.  We're saying here is this.  The three million

10 should be offset by million dollars.

11 Q    Sir?  Sir, let's just take this one piece at a time

12 because I --

13 A    Uh-huh.

14 Q    -- I just want to make sure this isn't inflated.  You

15 agree that the Advisors paid zero for December and January

16 under the payroll reimbursement agreement.  Correct?

17 A    Well --

18 Q    Just simple question.

19 A    The argument I think Jim made was we've overpaid.  There

20 should be a true up to those amounts.

21         MR. MORRIS:  I move to strike.  Can you please -- I

22 want to get this done.

23 BY MR. MORRIS:

24 Q    You admit that the Advisors paid zero in December 2020 and

25 January 2021 under the payroll reimbursement agreement.

                          Norris - Redirect                    159

1  Correct?

2  A    We made no payments in January --

3  Q    Okay.

4  A    -- or December.

5  Q    But your analysis that you did says that if you were to

6  pay something it would be $264,998.  Right?

7  A    Correct.

8  Q    But instead of adding that number to the $6.2 million, you

9  added the difference between that number and what we've

10 invoiced as the damage calculation.  Is that -- that's a

11 mistake.  Right?

12 A    We wouldn't add the 264 as additional damages.

13 Q    So what's the damage --

14 A    That's the amount we would have paid.

15 Q    That's the amount.  So --

16 A    Versus what was billed.  You billed us $1.336 million and

17 --

18 Q    Okay.  So would the proper damages here be 6.206, 891.

19 I'm just trying to do it from your perspective.

20 A    Uh-huh.

21 Q    Plus the $372,040 in the bottom.  Right?  372?  Do you

22 agree with that?  Those two were parts of your damage

23 calculation.

24 A    Those are part damages, correct.

25 Q    And you would add those two together and then you would

                       WWW.LIBERTYTRANSCRIPTS.COM

                                                              Appx. 01384

Norris - Redirect                           160

1  deduct $264,000.  Right?

2  A    No.

3  Q    Because that's the value that you should have paid that

4  you didn't.

5  A    I wouldn't necessarily say you'd deduct it from that.  It

6  would be offset from whatever you're seeking from us, right.

7  That's separate.

8  Q    No.

9        If you win this case, and again, right, it's an assumption

10  that I positively don't agree with.  But I you were to win this

11  case, right, your theory is that you would be entitled to 6.2

12  plus $372,000, right, because that's the overpayment.  And then

13  the 264 is what you should have paid under your theory, so that

14  should be deducted because you didn't pay it.

15  A    Yeah.  Assuming that your three million goes to zero as

16  well or it was reduced.  It's the same way at getting at the

17  same answer.

18  Q    Okay.  Right?  Because -- are we in agreement?  It's if

19  you want to know under your theory if you win under the

20  methodology you've adopted, it would be 6.2 plus 372 minus 264.

21  Right?  Because the 264 is your valuation that you didn't pay.

22  A    Yeah.  And assuming that your numbers are also go away,

23  that there's no -- there's no damages there.

24  Q    I'm going to lose under this hypothetical.

25  A    Yeah.  Yeah.

Norris - Redirect                           161

1  Q    Right?  So it's not $7.6 million.  Right?  It's something

2  closer to 6.  Again, just using your numbers.  I'm just trying

3  to correct the mistake that I think you made.

4  A    I don't think it's necessary a mistake.  I think it's just

5  thinking at it holistically.

6  Q    Okay.  Can you go to Exhibit 27 in Binder Number 1?  And

7  this is that email that you just looked at with Mr. Rukavina.

8  Right?

9  A    Correct.

10 Q    And if we start on the right page, the one with Bates

11 number 730, do you see that you wrote to Mr. Sauter at 7:08

12 p.m. on November 30th and said, time for a call?

13 A    No.  That --

14 Q    At the bottom of the page.

15 A    Oh, at the bottom.  On October 6th, time -- it was time

16 for a call.

17 Q    Right.  But at the bottom of Page 730, there's an email

18 from you to Mr. Norris on November 30th at 7:08 p.m. where

19 you're forwarding the same email.

20 A    Yes.

21 Q    And that's the title of the email.  Right?

22 A    Yes.

23 Q    And you sent that because you just learned that Highland

24 had terminated -- given notice of termination of the shared

25 services agreements.  Right?

Norris - Redirect                    162

1  A    I believe so, but I'm not certain.

2  Q    And then you walked into the office early the next morning

3  and started to think about what all of this meant.  Right?

4  A    Yes.

5  Q    And so, at 8:53 a.m., you sent an email to DC, to Frank,

6  and to Klos about the topic of the intercompany agreements.

7  Right?

8  A    Yes.

9  Q    And you gave them the amount of money that was paid under

10 all of the agreements between the companies.  Correct?

11 A    I took from the income statement, which isn't necessarily

12 a cash flow statement, but it's the actual amount bill or

13 recorded as expenses.

14 Q    So the Advisors own books and records reflected all of the

15 payments that were made by the Advisors to Highland under the

16 various intercompany agreements.  Right?

17 A    The HCMLP employees were the ones that prepared these very

18 numbers.

19        MR. MORRIS:  I move to strike, Your Honor.

20        THE COURT:  Sustained.

21 BY MR. MORRIS:

22 Q    Okay.  I'll ask my question again.  The Advisors books and

23 records reflected all payments that they made to Highland on

24 account of the intercompany agreements.  Correct?

25 A    Sorry.  One more time.

Norris - Redirect                               163

1  Q    The Advisors books and records reflect every payment they

2  ever made to Highland under the intercompany agreements during

3  the relevant period.  Correct?

4  A    I believe so, yes.

5  Q    And you were able to go in there and to get the

6  information about the amounts that were paid.  Right?  You got

7  it.  You got it.  It's in your email.  Right?

8  A    I got it from the board materials, yes.

9  Q    From the board materials.  So even the board was given the

10 details about the amounts that were being paid.  Who gave it to

11 the board?

12 A    And I'd say not details, but one line, right.  There's no

13 underlying details.

14 Q    But the board was told how much the Advisors paid under

15 the intercompany agreements on an annualized basis.  Is that

16 fair?

17 A    Yes.

18 Q    And that information came form the Advisors own books and

19 records.  Correct?

20 A    From the Highland employees, yes.

21           MR. MORRIS:  I move to strike.

22           THE COURT:  Sustained.

23 BY MR. MORRIS:

24 Q    That information came from the Advisors books and records.

25 Correct?

Appx. 01388

Norris - Redirect                      164

1  A    Yes.

2  Q    Thank you.

3        And you told -- you told Mr. Sauter and

4  Mr. Waterhouse and Mr. Klos, among other things, that you need

5  to make sure these agreements are fully understood in the

6  context of the notices, in the context of the termination

7  notices.  Do you see that?

8  A    I do.

9  Q    So after you receive notice of termination, that's when

10 you decided that you thought it was the appropriate time to

11 make sure the agreements were fully understood in the context

12 of HCMLP's termination notices.  Right?

13 A    That was a continuation.

14       If you go back in the email of October 6th, there's an

15 email asking for a conversation on shared services and other

16 agreements.  I had an attachment with those agreements, then

17 sent them on October 6th to DC Sauter.  This is when I started

18 to be involved more in the transition of services and was

19 already trying to kind of understand what was going on.  And

20 there wasn't a need at that point to do anything specific.

21 Q    Okay.  So it was after?  Can you just agree with me that

22 what you wrote on the day after you found out that there was a

23 termination notices, that you need -- that you "need to make

24 sure these agreements are fully understood in the context of

25 HCMLP's termination notices for the shared services agreement".

Norris - Redirect                                      165

1  Did you see that?

2  A    I did.

3  Q    When you use the phrase, shared services right there, you

4  also meant the payroll reimbursement agreement.  Right?

5  A    I may have, but I don't -- I don't know.

6  Q    Well, that's what sub advisory fees are.  Right?  The

7  column that you have there under sub advisory fees, it doesn't

8  say payroll reimbursement agreement.  It says sub advisory

9  fees.  Correct?

10  A    It says sub advisory fees, yes.

11  Q    And those are the amounts that were paid not under the sub

12  advisory agreements, but the contract that is now called the

13  payroll reimbursement agreement.  Correct?

14  A    Yes.

15  Q    And what you wanted to do is not make sure you fully

16  understood the shared services agreements.  What you wanted to

17  do on December 1st is make sure you fully understood the shared

18  services agreements and the payroll reimbursement agreements.

19  Correct?

20  A    Worth noting the sub advisory fees were higher than the

21  shared services fees, so need to make sure these agreements are

22  fully understood in the -- well, here -- they only terminated

23  the shared services agreement, so and going back my previous, I

24  wasn't sure.

25      They only sent shared services agreement terminations.


**WWW.LIBERTYTRANSCRIPTS.COM**

Norris - Redirect                              166

1  And so you needed to understand the shared services agreements,

2  the sub advisory agreements.  Yeah.  We wanted to understand

3  them, but they hadn't terminated them.  So this specifically

4  was related to the shared services agreement.

5  Q    Sir, the rest of the email train that you're relying on is

6  about the sub advisory fees.  Do you see Mr. Klos' response to

7  you?

8  A    Yeah.

9  Q    It's only about sub advisory fees.  Correct?

10 A    What's only about sub advisory fees?

11 Q    The first paragraph is about sub advisory fees.

12 A    Yeah.  Because he -- he clarified.  I was learning at this

13 point.

14 Q    Uh-huh.

15 A    And he clarified and then it went into a deeper discussion

16 about the sub advisory fees.

17 Q    And is it fair to say that you also needed to fully

18 understand the payroll reimbursement agreements at that time?

19 A    Absolutely.  We should.  Yeah.

20 Q    At that time.  Right?

21 A    Because they didn't terminate them.

22 Q    That's right.  And you hadn't undertaken that exercise at

23 any time before this time.  Is that fair?

24 A    Other than my discussions with outside counsel and DC

25 Sauter that are laid out in the email below about which we had

Norris - Redirect                    167

1  had discussions, but we didn't dive into all the details.

2  Q    You're telling me that back in October this email that

3  says nothing doesn't mention payroll reimbursement agreement.

4  Right?

5  A    It says shared services and other agreements with HCMLP.

6  Q    And what was the issue at that time?  Did you know back in

7  October?

8  A    Did I know what back in October?

9  Q    About the alleged overpayments.

10  A    I didn't.

11  Q    Were you looking at the agreements in October?

12  A    We were.

13  Q    So you had the agreement in your hand in October and you

14  didn't make any conclusions about overpayment at that time.

15  Right?

16  A    I looked at the schedule and saw that there's a percentage

17  allocation of employees and assumed that Highland is -- let me

18  step back.  We relied on Highland and were assuming that they

19  were making payments in accordance with the agreement.

20  Q    In the two months before you sent this email to Mr. Sauter

21  and Mr. Waterhouse, did you make any effort to try to figure

22  out if your assumption was accurate?

23  A    No.

24  Q    And you looked at Exhibit A and you said, well, there's a

25  lot of employees who have been terminated, but I just assumed

Norris - Redirect                          168

1  Highland is doing the right thing.

2  A    Yeah.

3  Q    Okay.  You said that you were not aware of the

4  overpayments, but I believe you said Mr. Waterhouse was very

5  aware of the overpayments.  Do I have that right?

6  A    He was.

7  Q    And did he tell you when he first learned of the

8  overpayments?

9  A    Well, in our discussion in December, he said -- he didn't

10 say when he had learned, but in our call at the end of January,

11 which I had taken notes on, he had said -- and I was surprised

12 by this because I thought it was newer knowledge to him in

13 December, but he had said over a year ago he had discussions

14 with Counsel and DSI.  So he had told me it had been over a

15 year.

16 Q    And did -- and that's when he told you?  So other than

17 what Mr. Waterhouse told you about his conversation with Isaac

18 Leventon, Scott Wellington, and Fred Caruso, are you aware of

19 any other conversation that ever took place before November 30,

20 2020, concerning whether or not there should be any

21 modification to the amounts being paid under the payroll

22 reimbursement agreements?

23 A    So I'll correct the -- you said other than him telling his

24 conversation with Fred Caruso and Isaac.  Other than their

25 testimony, he didn't tell me that at the time.  He said he had

Norris - Redirect                        169

1  spoke to DSI and to -- to counsel.  So just --

2  Q    Meaning that he didn't identify who the counsel was.

3  A    He didn't identify who counsel was.

4  Q    Fair enough.

5  A    I didn't know who Fred Caruso was at the time.

6  Q    Okay.

7  A    Again, I wasn't involved.  So he told me general.  So

8  that's the first part of the question, so didn't want to agree

9  to that part by answering.  So then you said was there any

10 other discussion that they should be amended prior to November

11 30th.  Not with me.

12 Q    Okay.  And you're not aware of any.  Correct?

13 A    Other than -- I'm not aware of any, no.

14 Q    Thank you.

15      Nobody's ever told you -- other than this one conversation

16 that Frank had with Fred Caruso and counsel, nobody has ever

17 informed you of any discussion of any kind where the Advisors

18 asked to modify the amounts that were being paid under the

19 payroll reimbursement agreements.  Correct?

20 A    I mean, other than my conversations where I asked for the

21 scheduled, demanded that they be done the right way, but you're

22 saying that --

23 Q    Let me rephrase the question.

24 A    Yeah.

25 Q    Because I want to use that November 30th timeline.

Norris - Redirect                                170

1  A    Yeah.

2  Q    Other than the conversation that Mr. Waterhouse told you

3  he had with Fred Caruso and counsel, you have no knowledge of

4  any request to modify the amounts that were charged under the

5  payroll reimbursement agreement at any time prior to November

6  30, 2020.  Correct?

7  A    I don't.

8  Q    Thank you.

9       You went through a whole lot of testimony with Mr.

10 Rukavina about the change in the advisor's business model.  Do

11 I have that right?

12 A    Correct.

13 Q    And none of those changes ever caused the Advisors to make

14 a request to modify the amounts that were being paid under the

15 payroll reimbursement agreement.  Correct?

16 A    They should have.  And again, Highland -- we thought

17 Highland was doing that, but there's -- yeah.  The people

18 changed.  It should have resulted in a modification.

19 Q    Okay.  And every -- it was the last question I asked and I

20 just want to emphasize the point.

21 A    Uh-huh.

22 Q    Every single person that you believe should have

23 unilaterally made this change reports to Frank Waterhouse.

24 Right?

25 A    Those that had knowledge of this, yes.

                          Norris - Recross                    171

1  Q    Okay.

2  A    And you said unilaterally, I think the contract is clear

3  and says that if either party, right, will negotiate in good

4  faith.

5          MR. MORRIS:  I'm going to move to strike that part

6  because the contract speaks for itself and --

7          THE COURT:  Sustained.

8          MR. MORRIS:  -- you have no knowledge of what that

9  means.

10          May I just have one moment, Your Honor?

11          THE COURT:  You may.

12          MR. MORRIS:  I have nothing further here.

13          THE COURT:  All right.  Any recross?

14          MR. RUKAVINA:  Briefly, Your Honor.

15          THE COURT:  Okay.

16                        RECROSS-EXAMINATION

17  BY MR. RUKAVINA:

18  Q    Briefly because I think Mr. Morris might make his flight.

19  Exhibit W.  Is that the notes that you referenced to yourself,

20  just so that I can use it in closing?

21  A    Yes.  Those are them.

22  Q    Okay.  And were those kept contemporaneously or right

23  after by you?

24  A    I started typing them up shortly after the call ended.

25  Q    It's Exhibit W.  I think it's been admitted.


                    **WWW.LIBERTYTRANSCRIPTS.COM**


                                                        **Appx. 01396**

                          Norris - Recross                    172

1  A    And it was sent -- the call happened that evening and I

2  sent it later that night after I had wrapped up work.  I sent

3  it to myself.

4  Q    Going back to your damages analysis, where did you get the

5  dates of termination of the employees from?

6  A    So I received them from the interrogatories.

7  Q    So let me point you.  Exhibit I.  Exhibit I, Page 9.

8  Yeah.  You might not know what an interrogatory is.  Exhibit I,

9  Page 9.  Your Honor, these are the Debtors' responses to my

10 interrogatories.  Do you see that, sir?

11 A    I do.

12 Q    Okay.  Is that the source information for dates of

13 termination?

14 A    It is.  And I also compared that to the schedule from HR

15 at Highland Kelly Stevens.

16 Q    And just to round off this discussion of damages, back to

17 your Exhibit G.

18 A    Yes.

19 Q    We're claiming the 6.2 million.  Correct?  Go back to

20 Exhibit G.

21 A    Yes.

22 Q    We're claiming the 372,000.  Correct?

23 A    Yes.

24 Q    Then we're claiming -- I'll discuss it in closing -- some

25 $1.3 million from the David Klos analysis for the shared

Norris - Recross                        173

1  services agreements.  Right?

2  A    Yeah.  And that's different than this 1.3.  It's 1.3 in

3  shared services.

4  Q    That's what I wanted to clarify.

5  A    Yes.  Yes.

6  Q    You did not --

7  A    Additional damages.

8  Q    You did not calculate the underlying overcharges under the

9  shared services.  We're just going with Mr. Klos' analysis --

10 A    Going off --

11 Q    -- if the Court agrees with us.

12 A    That's correct.

13 Q    And then 425,000 in cover damages.

14 A    That's correct.

15 Q    And that's for Robert Harris and Jason Post?

16 A    Correct.

17         MR. RUKAVINA:  Your Honor, thank you.

18         THE COURT:  All right.  Mr. Norris, before I excuse

19 you, I have two or three questions.

20         THE WITNESS:  Yes.  Yes.

21         THE COURT:  Okay.  That was it.  That was recross.

22         MR. MORRIS:  Oh, I had a couple -- I have a couple of

23 questions on that.

24         THE COURT:  But that was it.  We went you, you, you,

25 you.

**WWW.LIBERTYTRANSCRIPTS.COM**

Norris - Examination/Court                    174

1          MR. MORRIS:  Right.  But can I cross now on the very

2   limited testimony?  It's limited to the questions that he just

3   asked.

4          THE COURT:  Okay.  Well, don't --

5          MR. MORRIS:  If you don't want me to, it's fine.

6          THE COURT:  Yeah.  I don't want you to.

7          MR. MORRIS:  Okay.

8                          EXAMINATION

9   BY THE COURT:

10  Q    All right.  My brain thinks in timelines.  And so I just

11  -- I want to be reminded of a couple of things.  NexPoint, NPA,

12  was formed when?

13  A    Yeah.  NexPoint Advisors was formed in 2011 or 2012.  I

14  believe it was 2011.

15  Q    Okay.  So after you started at the Highland complex.  And

16  the other one, HCMFA.  It was --

17  A    Yes.

18       It was formed somewhere between 2007 and 2009 as Highland

19  Funds Asset Management.  That's where Jim got the H fam from

20  and has carried it.  It then became Axis Capital.  And then it

21  changed its name again to Highland Capital Management Fund

22  Advisors in, I believe, February 2013.

23  Q    Okay.  So when did each of these entities begin hiring

24  their own employees?  I'm not 100 percent clear.  I think I

25  heard the answer, but you tell me.

Norris - Examination/Court                    175

1  A    Yeah.  So they have -- they had their own employees

2  throughout the whole time period, but --

3  Q    Since 2011, since 2007?

4  A    That's right.  And the -- they have -- and I mentioned the

5  shared services agreements.  When I started working for

6  Highland Capital Management Fund Advisors, there were a lot of

7  those in house services that were actually at the Advisors.

8  Q    Right.  Yeah.

9  A    So part of the transitioning those services was with my

10 moving to a different role in around 2013 or so where we merged

11 those services.  We were receiving some services from Highland,

12 back-office services, maybe some --

13 Q    Okay.  I'm more interested in front office.

14 A    Yeah.  Front-office services.

15 Q    Uh-huh.

16 A    So the Retail Advisors have always had front-office

17 personnel.  And we did rely and we had the payroll

18 reimbursement agreements for certain investment professionals.

19 Prior to the 2018 agreement, I believe the shared services

20 agreement had investment advisory services in it.

21      So -- but there was -- you know, we have had investment

22 professionals the whole time.  However, as I mentioned, the

23 shift from being real -- from credit focused to real estate

24 focused really started in 2015, '16, '17, '18, and really into

25 '19 and '20.  So our real estate assets in 2012 or '13 were

176

1  close to zero and today it's around nine or ten billion.

2  Q    Okay.

3  A    And I think if you go back to 2008, it was almost

4  primarily credit and a long-short equity fund from our advisors

5  and a mostly credit focused funds.

6           THE COURT:  Okay.  Thank you.

7           THE WITNESS:  Yes.

8           THE COURT:  You're excused.

9           THE WITNESS:  Thank you.

10      (Witness excused)

11           THE COURT:  All right.  That concludes our witnesses.

12  Right?

13           MR. RUKAVINA:  It does, Your Honor.  And Mr. Morris

14  and I discussed a proposal.

15           MR. MORRIS:  Yeah.  Let me just confer with my client

16  --

17           MR. RUKAVINA:  Sure.  Sure.

18           THE COURT:  Okay.

19           MR. MORRIS:  -- to make sure my client is okay with

20  this.

21           All right.  You can --

22           MR. RUKAVINA:  You're okay?

23           Your Honor, we were -- if agreeable to the Court

24  since they could then make their flights and we're all tired,

25  we can do closing by Webex at the Court's convenience rather

177

1  than go now until probably quite -- we're not going to have, I
2  don't think, huge, long closings, but we're going to have quite
3  some time.

4          THE COURT:  You had an hour opening.

5          MR. MORRIS:  Yeah.  I mean, I actually --

6          MR. RUKAVINA:  I was a lot less than an hour.

7          THE COURT:  Okay.

8          MR. MORRIS:  I don't want to impose my will at all.
9  I'd like to do it consensually, but I think it might be
10 appropriate to just set some time limits and find a day.  We do
11 have a pretty big day next week for the summary judgment motion
12 on the Notes (phonetic) litigation.

13         But at the Court's convenience, I think it would be
14 helpful to review the record because it's been a busy couple of
15 days and I know personally I'd like to read actually the
16 testimony instead of just telling the Court what I think
17 witnesses testified to because people get a little loose with
18 that sometimes.

19         THE COURT:  Okay.  So we'll let you do closing by
20 WebEx.  We'll limit you to an hour each.  We'll do it some day
21 next week, but I need to check with Traci.  I don't have my
22 final calendar for next week --

23         MR. RUKAVINA:  MSJ is the 20th?

24         THE COURT:  -- to know when the best day is.

25         MR. MORRIS:  It is the 20th, yeah.

178

1          THE COURT:  What day is your Note?

2          MR. MORRIS:  I think it's the 20th.  Yeah.

3          MR. RUKAVINA:  That would be a week from today.

4  Right?

5          MR. MORRIS:  Yeah.  You know, and it may not be

6  feasible to do it next week.  It may wait until the week after.

7          THE COURT:  Okay.

8          MR. MORRIS:  I'll do it whenever the Court wants, but

9  --

10          THE COURT:  Okay.  We'll do it either next week or

11  the following week, okay?

12          MR. MORRIS:  Yeah.  Fair enough.  Fair enough.

13          THE COURT:  Yeah.  I just need to get with Traci --

14          MR. MORRIS:  Yeah.

15          THE COURT:  -- and see what is the best day.  So

16  she'll reach out to you tomorrow.

17          MR. MORRIS:  Perfect.

18          THE COURT:  And let you know.

19          MR. MORRIS:  Perfect.

20          THE COURT:  Okay.

21          MR. MORRIS:  Thanks so much, Your Honor.

22          THE COURT:  All right.

23          MR. RUKAVINA:  So just, I guess, to be clear.

24  Plaintiff has closed.  I have closed because we did it

25  simultaneously, and the evidence is concluded.

179

1          THE COURT:  The evidence is closed.

2          MR. RUKAVINA:  Thank you.

3          MR. MORRIS:  Thank you.

4          THE COURT:  I'm not listening to anything else.  And

5    the briefing is closed, as well.  So we'll just have closing

6    oral arguments again next week or the following week.  Traci

7    will reach out tomorrow.

8          MR. MORRIS: Okie doke.

9        (Proceedings concluded at 5:04 p.m.)

10                        *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

180

1                    **C E R T I F I C A T I O N**

2            We, DIPTI PATEL, KAREN WATSON, MICHELLE ROGAN, PATTIE

3 MITCHELL, and, CRYSTAL THOMAS, court approved transcribers,

4 certify that the foregoing is a correct transcript from the

5 official electronic sound recording of the proceedings in the

6 above-entitled matter, and to the best of our ability.

7

8 /s/ Dipti Patel                    /s/ Crystal Thomas

9 DIPTI PATEL, CET-997               CRYSTAL THOMAS, CET-654

10

11 /s/ Karen K. Watson               /s/ Pattie Mitchell

12 KAREN K. WATSON, CET-1039         PATTIE MITCHELL

13

14 /s/ MICHELLE ROGAN

15 MICHELLE ROGAN

16 LIBERTY TRANSCRIPTS          DATE: April 14, 2022

17

18

19

20

21

22

23

24

25

181

Appx. 01406