# EXHIBIT 68

```
 1              GRANT SCOTT - 1/21/2021

 2        IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
 3                 DALLAS DIVISION

 4   IN RE:                       )
                                  )       Chapter 11
 5   HIGHLAND CAPITAL MANAGEMENT, )
     L.P.                         )       Case No.
 6                               )   19-34054-sgj11
                    Debtor.       )
 7   --------------------------   )
     HIGHLAND CAPITAL MANAGEMENT, )
 8   L.P.,                        )
                    Plaintiff,    )
 9                               )       Adversary
        vs.                       )   Proceeding No.
10                               )    21-03000-sgj
     HIGHLAND CAPITAL MANAGEMENT  )
11   FUND ADVISORS, L.P.; NEXPOINT )
     ADVISORS, L.P.; HIGHLAND     )
12   INCOME FUND; NEXPOINT        )
     STRATEGIC OPPORTUNITIES FUND; )
13   NEXPOINT CAPITAL, INC.; and  )
     CLO HoldCo, LTD.,            )
14                               )
                    Defendants.   )
15   ------------------------------

16

17    VIDEOCONFERENCE DEPOSITION OF Grant SCOTT

18         Thursday, 21st of January, 2021

19

20

21

22

23   Reported by: Lisa A. Wheeler, RPR, CRR

24   Job No: 188910

25
```

```
                                    Page 2
 1            GRANT SCOTT - 1/21/2021
 2               January 21, 2021
 3                  2:02 p.m.
 4
 5
 6        Videoconference deposition of Grant
 7   SCOTT, pursuant to the Federal Rules of
 8   Civil Procedure before Lisa A. Wheeler,
 9   RPR, CRR, a Notary Public of the State of
10   North Carolina.  The court reporter
11   reported the proceeding remotely and the
12   witness was present via videoconference.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                    Page 3
 1            GRANT SCOTT - 1/21/2021
 2   REMOTE APPEARANCES:
 3      PACHULSKI STANG ZIEHL & JONES
 4      Attorneys for Debtor
 5          780 Third Avenue
 6          New York, NY 10017
 7      BY:   JOHN MORRIS, ESQ.
 8
 9      LATHAM & WATKINS
10      Attorneys for UBS
11          885 Third Avenue
12          New York, NY 10022
13      BY:   SHANNON McLAUGHLIN, ESQ.
14
15      SIDLEY AUSTIN
16      Attorneys for the Creditors Committee
17          2021 McKinney Avenue
18          Dallas, TX 75201
19      BY:   PENNY REID, ESQ.
20            ALYSSA RUSSELL, ESQ.
21            PAIGE MONTGOMERY, ESQ.
22
23
24
25
```

```
                                    Page 4
 1            GRANT SCOTT - 1/21/2021
 2   REMOTE APPEARANCES:  (Continued)
 3      KING & SPALDING
 4      Attorneys for Highland CLO Funding, Ltd.
 5          500 West 2nd Street
 6          Austin, TX 78701
 7      BY:   REBECCA MATSUMURA, ESQ.
 8
 9      K&L GATES
10      Attorneys for Highland Capital Management
11      Fund Advisors, L.P., et al.
12          4350 Lassiter at North Hills Avenue
13          Raleigh, NC 27609
14      BY:   A. LEE HOGEWOOD, III, ESQ.
15            EMILY MATHER, ESQ.
16
17      HELLER DRAPER & HORN
18      Attorneys for The Dugaboy Investment Trust
19      and The Get Good Trust
20          650 Poydras Street
21          New Orleans, LA 70130
22      BY:   MICHAEL LANDIS, ESQ.
23
24
25
```

```
                                    Page 5
 1            GRANT SCOTT - 1/21/2021
 2   REMOTE APPEARANCES:  (Continued)
 3      KANE RUSSELL COLEMAN & LOGAN
 4      Attorneys for Defendant CLO HoldCo Limited
 5          Bank of America Plaza
 6          901 Main Street
 7          Dallas, TX 75202
 8      BY:   BRIAN CLARK, ESQ.
 9            JOHN KANE, ESQ.
10
11   ALSO PRESENT:  La Asia Canty
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

GRANT SCOTT - 1/21/2021

1     G R A N T   S C O T T,
2          called as a witness, having been duly sworn
3          by a Notary Public, was examined and
4          testified as follows:
5          MR. MORRIS:  Good afternoon.  My
6     name is John Morris.  I'm an attorney with
7     Pachulski Stang Ziehl & Jones, a law firm
8     who represents the debtor in the bankruptcy
9     known as In Re: Highland Capital
10    Management, L.P., and we're here today for
11    the deposition of Grant Scott.
12         Before I begin, I would just like to
13    have confirmation on the record that
14    everybody here who's representing their
15    respective parties agrees that this
16    deposition can be used in evidence in any
17    subsequent hearing, notwithstanding the
18    fact that it's being conducted remotely,
19    and that the witness is not in the same
20    room as the court reporter.
21         Does anybody have an objection to
22    the admissibility of the transcript subject
23    to any reservation of -- of actual
24    objections on the record to using this

Page 7

GRANT SCOTT - 1/21/2021

1     transcript going forward?
2          Okay.  Nobody's spoken up, so I --
3     I'd like to begin.
4                    EXAMINATION
5     BY MR. MORRIS:
6     Q.     Good afternoon, Mr. Scott.  As I
7     mentioned, my name is John Morris, and we're
8     here for your deposition today.  Have you ever
9     been deposed before?
10    A.     On two occasions.
11    Q.     And -- and when did the -- when did
12    those depositions take place?
13    A.     This past October and maybe six to
14    eight years ago.
15    Q.     Okay.  Can you just tell me
16    generally what the subject matter was of the
17    deposition this past October.
18    A.     It was relating to Jim Dondero's --
19    it was a family law issue in -- in -- with
20    respect to Jim Dondero.
21    Q.     Okay.  And did you testify in a
22    courtroom, or was it a deposition like this?
23    A.     I -- right here, actually.
24    Q.     Okay.  Super.  And -- and what about

Page 8

GRANT SCOTT - 1/21/2021

1     the -- the deposition six to eight years ago,
2     do you have a recollection as to what that was
3     about?
4     A.     Yeah.  It was a -- it was a patent I
5     wrote for Samsung Electronics.
6     Q.     Okay.
7     A.     And as being the person that I --
8     that wrote it and the patent was in litigation,
9     not -- not being handled by me, but by virtue
10    of having written the patent, I was -- I was
11    deposed --
12    Q.     Okay.  So you --
13    A.     -- on the -- on the patent.
14    Q.     Okay.  So you've had a little bit of
15    experience with depositions.  But just
16    generally speaking, I'm going to ask you a
17    series of questions.  It's very important that
18    you allow me to finish my question before you
19    begin your answer.
20         Is that fair?
21    A.     Absolutely.
22    Q.     And I will certainly try to extend
23    the same courtesy to you, but if I -- if I step
24    on your words, will you let me know that?

Page 9

GRANT SCOTT - 1/21/2021

1     A.     Okay.
2     Q.     And if there's anything that I ask
3     that you don't understand, will you let me know
4     that as well?
5     A.     Yes.  I'll try -- I'll do my best.
6     Q.     Okay.  So this is a virtual
7     deposition.  We're not in the same room.  I am
8     going to be showing you documents today.  The
9     documents will be put up on the screen.  This
10    isn't a -- a trick of any kind.  If at any time
11    you see a document up on the screen and either
12    you believe or you have any reason to want to
13    read other portions of the document, will you
14    let me know that?
15    A.     Yes, I -- yes, I will.  Uh-huh.
16    Q.     With respect to the Dondero family
17    matter, I really don't want to go into the
18    substance of that, but I do want to know
19    whether you testified voluntarily in that
20    matter or whether you -- whether you testified
21    pursuant to subpoena.
22    A.     I would have done that, but the
23    first time I found out about it was a -- was a
24    subpoena that I received.  I wasn't given the

Page 10

GRANT SCOTT - 1/21/2021

1  choice.
2      Q.   Okay.  And do you recall who served
3  the subpoena on you?  Actually, let me ask a
4  different question because I'm really not
5  interested in the -- in the details.
6           Did Mr. Dondero serve that subpoena
7  on you or did somebody else?
8      A.   His counsel for his ex-wife.
9      Q.   Mr. -- so -- so the lawyer acting on
10 behalf of Mr. Dondero's ex-wife served you with
11 the subpoena?
12     A.   Correct.
13     Q.   Okay.  You're familiar with an
14 entity called CLO HoldCo Limited; is that
15 right?
16     A.   Yes.
17     Q.   Do you know what that entity is?
18     A.   Yes.
19     Q.   What -- what -- can you describe for
20 me what CLO HoldCo Limited is.
21     A.   It's a holding company of assets
22 including collateralized loan obligation-type
23 assets.  That's a portion of the overall
24 portfolio.  It's an organization that is

Page 11

GRANT SCOTT - 1/21/2021

1  integrated with other entities as part of a
2  charitable -- loosely what we -- what we refer
3  to as a charitable foundation equivalent.
4  Yeah.
5      Q.   All right.  We'll -- we'll get into
6  some detail about the corporate structure in a
7  moment.  Do you personally play any role at CLO
8  HoldCo Limited?
9      A.   Yes.  My technical title is
10 director, but I -- I don't necessarily know
11 specifically what that title means other than I
12 act, as I understand it, as -- as a trustee for
13 those -- for those assets.
14     Q.   And where did you get that
15 understanding?
16     A.   Approximately ten years ago from the
17 group that -- that set up the hierarchy.
18     Q.   And which group set up the
19 hierarchy?
20     A.   Employees at Jim Don- -- as I
21 understand it, employees of Highland along with
22 outside counsel, as I understand it, and also,
23 I guess, input from -- from Jim Dondero.
24     Q.   At the time that you assumed the

Page 12

GRANT SCOTT - 1/21/2021

1  role of director of CLO HoldCo Limited, was
2  that entity already in existence?
3      A.   I believe so.  I'm not certain.  I'm
4  not certain.
5      Q.   What are your duties and
6  responsibilities as a director of CLO HoldCo
7  Limited?
8      A.   Well, my day-to-day responsibilities
9  are to interface with -- with the manager of
10 the -- of the assets of CLO.  I do have some
11 role in -- with respect to some of the entities
12 that are -- I -- I have a limited role with
13 respect to a subset of the charitable
14 foundations that receive money from the CLO
15 HoldCo structure, which is commonly referred to
16 as the DAF.  There's -- sometimes those are
17 used interchangeably.
18     Q.   What terms are used interchangeably?
19     A.   Well, the DAF and CLO HoldCo are
20 frequently -- by -- by other people they're --
21 it's the short -- it's the -- I guess it's
22 easier to use the acronym DAF than CLO HoldCo
23 Limited, so I'm frequently having to -- there
24 is a DAF entity so -- that's above -- above CLO

Page 13

GRANT SCOTT - 1/21/2021

1  in terms of the management, and so it's
2  frequently confusing and I'm having to clarify
3  at times which entity we're talking about,
4  but -- but other parties frequently use those
5  terms interchangeably.
6      Q.   Okay.
7          MR. MORRIS:  Lisa, when we use the
8      phrase DAF, because you'll hear that a lot,
9      it's all caps, D-A-F.
10 BY MR. MORRIS:
11     Q.   You mentioned that you interface
12 with the manager of assets of CLOs.  Do I have
13 that right?
14     A.   Well, of all the assets.
15     Q.   Okay.  Who is the manager of the
16 assets that you're referring to?
17     A.   Highland Capital Management.
18     Q.   Highland Capital Management manages
19 all of the assets -- withdrawn.
20          Is it your understanding that
21 Highland Capital Management manages all the
22 assets that are owned by CLO HoldCo Limited?
23     A.   Yes.
24     Q.   Who makes the investment decisions

GRANT SCOTT - 1/21/2021

1  on behalf of CLO HoldCo Limited?
2      A.    Highland -- those managers that you
3  mentioned.
4      Q.    Okay.  I didn't mention anybody in
5  particular.
6      A.    Oh, I'm sorry.  The -- the -- the
7  money manager -- could you repeat that
8  question?  I'm sorry.  I'm so sorry.
9      Q.    Can you just -- can you just
10 identify for me the person who makes investment
11 decisions on behalf of CLO HoldCo Limited.
12     A.    It's -- well, it's -- it's persons
13 as I understand it.  I inter-- -- interface with
14 a -- with a group, but it's -- it's Highland
15 Capital employee -- Highland Capital Management
16 employees.
17     Q.    Okay.  Can you just name any of
18 them, please.
19     A.    Hunter Covitz, Jim Dondero.  Mark
20 Okada's no longer there, but I believe he was
21 involved, and there are others that I interface
22 with.
23     Q.    Can you -- can you recall the name
24 of anybody other than Mr. Okada and Mr. Dondero

GRANT SCOTT - 1/21/2021

1  and Mr. Covitz?
2      A.    Yeah.  Over the years I've worked
3  with Tim Cournoyer, Thomas Surgent, but I
4  think -- I think that's the core -- the core
5  group.
6      Q.    All right.  And is there anybody
7  within that core group who has the final
8  decision-making authority concerning the
9  investments in CLO HoldCo Limited?
10     A.    I don't -- I don't know.  I'm sorry.
11 Say that again.  I just want to -- I'm sorry.
12 I'm trying to be -- I'm not trying to -- I'm
13 trying to be --
14     Q.    I understand.  And --
15     A.    Sorry.  If you could just repeat it.
16     Q.    Sure.  Is there any particular
17 person who has the final decision-making
18 authority for investments that are being made
19 on behalf of CLO HoldCo Limited?
20     A.    Amongst that group I am -- I am not
21 sure.
22     Q.    Okay.  So are there any other
23 directors of CLO HoldCo besides yourself?
24     A.    No.

GRANT SCOTT - 1/21/2021

1      Q.    Is it fair to say that you do not
2  make decisions, investment decisions, on behalf
3  of CLO HoldCo Limited?
4      A.    Yes.
5      Q.    Does CLO HoldCo Limited have any
6  employees that you know of?
7      A.    No.
8      Q.    Does CLO HoldCo have any --
9  withdrawn.
10     Does CLO HoldCo Limited have any
11 officers that you know of?
12     A.    No.
13     Q.    So am I correct that you're the only
14 representative in the world of CLO HoldCo in
15 terms of being a director, officer, or
16 employee?
17     A.    Yes.
18     Q.    Do you receive any compensation from
19 CLO HoldCo for your services as the director?
20     A.    I do now.
21     Q.    When did that begin?
22     A.    I believe in the middle of 2012.
23     Q.    Okay.  And had you served as a
24 director prior to that time without

GRANT SCOTT - 1/21/2021

1  compensation?
2      A.    Yes.
3      Q.    And have you been the sole director
4  of CLO HoldCo Limited since the time of your
5  appointment approximately ten years ago?
6      A.    Yes.
7      Q.    Nobody else has served in that
8  capacity; is that right?
9      A.    That is correct.
10     Q.    There have been no employees or
11 officers of that entity during the time that
12 you've served as director, correct?
13     A.    Yes.
14     Q.    Do you know who formed CLO HoldCo
15 Limited?
16     A.    I do not.
17     Q.    Do you know why CLO HoldCo Limited
18 was formed?
19     A.    I believe so.
20     Q.    Can you explain to me why -- your
21 understanding as to why CLO HoldCo was formed.
22     A.    So as I understand things, Jim
23 Dondero wanted to create a charitable
24 foundation-like entity or entities, and tax

GRANT SCOTT - 1/21/2021

1  people particularly, I guess, finance people,
2  lawyers, they created this network of entities
3  to carry out that charitable goal.  At one
4  point, I thought it was a novel type of
5  institution, if you want to call it, or a
6  novel -- novel type of group of entities, but
7  over time, I came to understand that although
8  not cookie cutter, it -- it follows a general
9  arrangement of entities for legal and tax
10  purposes, compliance purposes, IRS purposes,
11  various insulating purposes to maintain -- or
12  to meet the necessary requisites to carry out
13  that charitable function.
14      Q.    When did you come to that
15  understanding?
16      A.    Over the last couple of years.  I
17  periodically have to refresh my recollection.
18  It's -- it's fairly complex.
19      Q.    Okay.  In your capacity as the sole
20  director of CLO HoldCo Limited, do you report
21  to anybody?
22      A.    No.
23      Q.    Other than interfacing with the
24  manager of the assets of the CLO, do you have

GRANT SCOTT - 1/21/2021

1  any other duties and responsibilities as a
2  director of CLO HoldCo Limited?
3      A.    Yes.  Sorry.  My mouth is a little
4  dry.
5      Q.    By the way, if you ever need to take
6  a break, just let me know.
7      A.    Okay.  Thank you.  Now I forgot your
8  question.  The -- the -- the --
9      Q.    I understand.
10      A.    The answer -- the -- the answer is
11  yes.  I -- why don't you ask -- ask your
12  question again.  I'm sorry.
13      Q.    Sure.  Other than interfacing with
14  the manager of the assets of the CLO, do you
15  have any other duties and responsibilities as
16  the sole director of CLO HoldCo Limited?
17      A.    Yes.  So Highland Capital because of
18  its -- the way it's set up to manage or service
19  CLO HoldCo and the DAF, it has a relatively
20  large group of people that I have to interface
21  with to do everything from -- everything from
22  soup to nuts.  Finances and the money
23  management is one aspect, but most of my
24  time -- on a day-to-day or week-to-week basis,

GRANT SCOTT - 1/21/2021

1  most of my time is spent working with the
2  various compliance and other people for
3  addressing issues of get- -- you know, getting
4  taxes filed.  It runs -- it runs the gamut of
5  every aspect of the organization being -- being
6  handled by Highland.
7      Q.    Okay.
8      A.    You know, unlike -- unlike my
9  financial -- unlike a financial planner that
10  might, you know, manage assets, they -- they do
11  it all, and I interface with them regularly to
12  maintain -- mostly to deal with compliance
13  issues.
14      Q.    Who's the com- -- is there a person
15  who's in charge of compliance?
16      A.    I believe Thomas Surgent.  I
17  mentioned him.  I believe he also has that
18  role, but it's -- you know, they do have
19  turnover, I guess, in that.  It's -- I guess
20  they refer to it as the back office.  I've
21  heard that term be used, but -- basically, it's
22  a large number of people that have changed over
23  time, but it's -- it's more -- I believe it's
24  more than one collectively.

GRANT SCOTT - 1/21/2021

1      Q.    How much time do you devote -- you
2  know, can you estimate either on a weekly or a
3  monthly basis how many -- how much time do you
4  devote to serving as the director of CLO HoldCo
5  Limited?
6      A.    I thought about that.  Well, let --
7  let's put it this way:  There was the
8  prebankruptcy time I spent per day, and then
9  there was the postbankruptcy time I've spent
10  per -- per -- or per week -- excuse me, or
11  per -- I've estimated it as probably a day --
12  it's so intermittent it's -- it's hard, okay?
13  It's -- I don't dedicate my Mondays to only
14  doing that and then Tuesday through Friday I
15  don't, right?  I -- it's -- I have to piece
16  together everything that occurs during the
17  week.  There might be some weeks where I don't
18  have any contact.  There might be every day of
19  the week I have multiple contact.  There may be
20  days where from morning to night there is so
21  much contact, it precludes me from doing
22  anything else meaningfully.  So -- but I would
23  estimate it's probably three or four -- maybe
24  three days, four days a month when things are

Page 22

GRANT SCOTT - 1/21/2021

1  going well.
2      Q.    And -- and I think you -- you
3  testified just now that there was kind of a
4  difference between prebankruptcy and
5  postbankruptcy.  Do I have that right?
6      A.    Yes.
7      Q.    And can you tell me -- is it fair to
8  say that before the bankruptcy, you didn't
9  devote much time to CLO HoldCo, or do I have
10  that wrong?
11      A.    Well, I -- just the time that --
12  that I mentioned just -- I'm sorry.  The -- the
13  time I just mentioned now when you asked me,
14  that was the pre period.  Excuse me.  I haven't
15  talked about the postbankruptcy period.
16      Q.    So are you -- are you -- are you
17  devoting more time or less time since the
18  bankruptcy?
19      A.    Much more.
20      Q.    Much more since the bankruptcy
21  filing?
22      A.    Yes.
23      Q.    And so why did the bankruptcy filing
24  cause you to spend more time as a director of
25

Page 23

GRANT SCOTT - 1/21/2021

1  CLO HoldCo Limited?
2      A.    Well, initially, and this would
3  be -- this would be late 2019, it was --
4  aft- -- after the bankruptcy was -- was filed
5  and I obtained counsel, who are on the phone
6  now -- or in this deposition now, excuse me,
7  that was -- that transition occurred because
8  CLO was a debtor -- excuse me, a creditor to --
9  to the debtor and had to take steps to
10  establish its -- its claim.  So if I understand
11  the -- things correctly, the -- the debtor
12  identified as part of the filing -- I don't
13  know how bankruptcy works, but if I under- --
14  if my recollection is correct, there's a
15  hierarchy from biggest to smallest, and we were
16  relatively high up.  And when I say we or I,
17  I -- I just mean CLO was relatively high up.
18  And so initially, for the first period of so
19  many months, the -- the exclusive focus was on
20  our position as a creditor -- a creditor having
21  a certain claim against a debtor.
22      Q.    Can you describe for me your
23  understanding of the nature of the claim
24  against the debtor.
25

Page 24

GRANT SCOTT - 1/21/2021

1      A.    It was various obligations that were
2  owed to -- to CLO, things that had been
3  previously donated or -- or agreements that had
4  been set up that transferred certain assets,
5  and it was basically the -- the -- the amounts
6  were derived from those sorts of transactions.
7      Q.    Okay.  You're a patent lawyer; is
8  that right?
9      A.    I -- I'm exclusively a patent
10  attorney, yes.
11      Q.    Have you been a patent lawyer on an
12  exclusive basis since the time you graduated
13  from law school?
14      A.    From law school, yes.
15      Q.    Can you just describe for me
16  generally your educational background.
17      A.    So I'm an electrical engineer by
18  training.  I graduated from the University of
19  Virginia in 1984.  I then went to graduate
20  school at the University of Illinois.  I
21  received my master's degree in 1986, and then I
22  immediately joined IBM Research at the Thomas
23  Watson Institute in New York where I was a --
24  my title was research scientist, but I was -- I
25

Page 25

GRANT SCOTT - 1/21/2021

1  guess I was more of a research engineer, if
2  that matters.  And I did that until I
3  transitioned -- or I began law school in the
4  fall of 1988, and then I graduated law school
5  in May of 1991.
6      Q.    And where did you go to law school?
7      A.    University of North Carolina.
8      Q.    Do you have any formal training in
9  investing or finance?
10      A.    I do not.
11      Q.    Do you hold yourself out as an
12  expert in any field of investment?
13      A.    None -- none at all.
14      Q.    Have you had any formal training
15  with respect to compliance issues?  You
16  mentioned compliance issues earlier.
17      A.    No.
18      Q.    Now, do you have any knowledge about
19  compliance rules or regulations?
20      A.    Minimal that I've -- that have
21  occurred organically but -- but generally, no.
22      Q.    You don't hold yourself out as an
23  expert in com- -- in the area of compliance,
24  correct?
25

Page 26

GRANT SCOTT - 1/21/2021

1
2     A.    No.  No.  I'm -- no.
3     Q.    Do you have any particular
4  investment philosophy or strategy?
5           MR. CLARK:  I'm going to object to
6        the form of the question.  And, John,
7        can -- can we get an agreement that -- I
8        know you were objecting just simply on the
9        form basis yesterday -- that objection to
10       form is sufficient today?
11          MR. MORRIS:  Sure.
12          MR. CLARK:  Okay.  And I object to
13       form.  Grant, you can answer to the extent
14       you can.
15          THE WITNESS:  I forget the question
16       now that you interrupted.  I'm sorry.
17  BY MR. MORRIS:
18       Q.    So -- so -- and I'm going to ask a
19  different question because in hindsight, that's
20  a good objection.
21             In your capacity as the director
22  of -- withdrawn.
23             Do the employees of Highland that
24  you identified earlier, do they make investment
25  decisions on behalf of CLO HoldCo Limited

Page 27

GRANT SCOTT - 1/21/2021

1
2  without your prior knowledge on occasion?
3       A.    On occasion, they do.
4       Q.    So there's no rule that your prior
5  approval is needed before investments are made,
6  right?
7       A.    I don't know whether they have an
8  internal guideline as to the amount that
9  triggers when they get in touch with me or
10  whether it's a new -- a change, something new,
11  or -- versus recurring.  So I don't -- I don't
12  know what they use internally for that metric.
13       Q.    Okay.  Are you aware of any
14  guideline that was ever used by the Highland
15  employees whereby they were required to obtain
16  your consent prior to effectuating transactions
17  on behalf of CLO HoldCo Limited?
18       A.    I understand there was one or more,
19  but I do not know that.
20       Q.    Okay.  Did you ever see such a
21  policy or list of rules that would require your
22  prior consent before the Highland employees
23  effectuated transactions on behalf of CLO
24  HoldCo Limited?
25       A.    Possibly some time ago, but I -- I

Page 28

GRANT SCOTT - 1/21/2021

1
2  don't recall.
3       Q.    Okay.  So -- withdrawn.  I'll --
4  I'll go on.
5             How did you come to be the director
6  of CLO HoldCo?
7       A.    I was asked either by Jim Dondero
8  or -- directly or indirectly by -- by Jim
9  Dondero.
10       Q.    And who is Jim Dondero?
11       A.    Well, at the time, he was the head
12  or one of the heads of Highland Capital
13  Management, a friend of mine.
14       Q.    How long have you known Mr. Dondero?
15       A.    Since high school so that -- 1976.
16       Q.    Where did you and Mr. Dondero grow
17  up?
18       A.    In northern New Jersey.
19       Q.    Do you consider him among the
20  closest friends you have?
21       A.    I think he is my closest friend.
22       Q.    Did you two go to college together?
23       A.    We actually -- for the last -- last
24  two years I was at UVA, University of Virginia,
25  excuse me, he and I were -- were at UVA.  So we

Page 29

GRANT SCOTT - 1/21/2021

1
2  did not start out at UVA initially, but -- but
3  we both transferred -- I transferred my
4  sophomore year.  I was actually a chemical
5  engineer at the University of Delaware when I
6  transferred in, and then he transferred in his
7  junior year.  So we were there at college for
8  two years.
9       Q.    And -- and based on your
10  relationship with him, is it your understanding
11  that one of the reasons he chose to transfer to
12  UVA is -- is to -- because you were there?
13       A.    Oh, no.  He transferred -- he --
14  he -- he transferred there because of the -- so
15  he went to the University of -- he -- he went
16  to Virginia Tech University, which is more
17  known as being an engineering school, which I
18  might have wanted to go to, and less a finance
19  business school.  And if I understand things
20  correctly, and I believe I do, he transferred
21  to UVA because of the well-known
22  business/finance program, accounting program.
23       Q.    And did you -- did you and
24  Mr. Dondero become roommates at UVA?
25       A.    We weren't roommates, but we lived

Page 30

GRANT SCOTT - 1/21/2021

1   in the -- we were housemates.  I'm sorry.  We
2   were housemates.
3       Q.    So you shared a house together.  How
4   would you describe your relationship with
5   Mr. Dondero today?
6       A.    It's -- it's been strained a while,
7   for some time, but -- but generally, very good.
8   Good to very good.
9       Q.    Without -- without getting personal
10  here, can you just generally identify the
11  source of the strain that you described.
12      A.    This -- I think it would be fair to
13  say that this bankruptcy, particularly events
14  in 2020 so some months after the bankruptcy was
15  declared, things have become -- we -- we still
16  have a close friendship, but -- but things
17  are -- are a bit -- are a bit more difficult.
18      Q.    Were you ever married?
19      A.    I've never been married.
20      Q.    Did you serve as Mr. Dondero's best
21  man at his wedding?
22      A.    I did.
23      Q.    Is it fair to say that -- that
24  Mr. Dondero trusts you?

Page 31

GRANT SCOTT - 1/21/2021

1       MR. CLARK:  Objection, form.
2   BY MR. MORRIS:
3       Q.    Withdrawn.
4             Do you believe that Mr. Dondero
5   trusts you?
6       A.    I do.
7       Q.    Over the years, is it fair to say
8   that Mr. Dondero has confided in you?
9       MR. CLARK:  Objection, form.
10  BY MR. MORRIS:
11      Q.    You can answer if you understand it.
12      A.    I think so.
13      Q.    I -- I -- what's your answer?  You
14  think so?
15      A.    Maybe you can de- -- I think of
16  confide as -- could you define confide, please.
17      Q.    Sure.  Is it -- is it fair to say
18  that over the -- let me -- you've known
19  Mr. Dondero for almost 45 years, right?
20      A.    Yes.
21      Q.    And you consider him to be your
22  closest friend in the world, right?
23      A.    Yes.
24      Q.    And is it fair to say over the

Page 32

GRANT SCOTT - 1/21/2021

1   course of those 45 years, Mr. Dondero has
2   shared confidential information with you that
3   he didn't want you to reveal publicly to other
4   people?
5       A.    Yes.
6       Q.    And is it your understanding that
7   because of the nature of your relationship with
8   him, he asked you to serve as the director of
9   CLO HoldCo Limited?
10      A.    Yes.  I believe it's because he --
11  he trusted -- trusted me with -- with assets
12  relating to his charitable vision.  I -- I --
13  yeah.  Yes.
14      Q.    And is it your understanding that he
15  thought you would help him execute his
16  charitable vision?
17      A.    That was the point of attraction
18  initially.  It wasn't for money.  I wasn't
19  being paid.  That was -- the charitable mission
20  was the attraction.
21      Q.    Does Mr. Dondero play any role in
22  the management of the CLO HoldCo Limited asset
23  pool?
24      MR. CLARK:  Objection, form.

Page 33

GRANT SCOTT - 1/21/2021

1       A.    I'm sorry.  Could you repeat that?
2   My -- my screen went small and then big again.
3   I was distracted.
4       Q.    What role does Mr. Dondero play with
5   respect to the management of the CLO HoldCo
6   Limited asset pool?
7       MR. CLARK:  Objection, form.
8       A.    He is with the company that manages
9   that asset pool.  He's one of the people I
10  named previously as managing those assets.
11      Q.    He is -- he -- he is the -- do you
12  understand that he has the final
13  decision-making power with respect to the
14  management of the assets that are held by CLO
15  HoldCo Limited?
16      MR. CLARK:  Objection, form.
17      A.    I believe I ansel -- answered that
18  previously.  I -- I don't know who has -- for
19  certainty I do not know who has that within
20  that company.  I don't.  If -- if -- if -- I
21  don't know, consistent with my prior answer.
22      Q.    Did you ever ask anybody who had the
23  final decision-making authority for investments
24  on behalf of CLO HoldCo Limited?

Page 34

```
              GRANT SCOTT - 1/21/2021
1
2      A.   I -- I did not.
3      Q.   Did you ever make a decision on
4  behalf of -- withdrawn.
5           In your capacity as a director --
6  withdrawn.
7           In your capacity as the sole
8  director of CLO HoldCo Limited, can you think
9  of any decision that you've ever made that
10 Mr. Dondero disagreed with?
11     A.   Since -- prior to the bankruptcy,
12 no, not that I'm aware of.
13     Q.   And since the bankruptcy?
14     A.   There are decisions that I've made
15 that he's disagreed with.
16     Q.   Can you identify them?
17     A.   Yes.
18     Q.   Please do so.
19     A.   Okay.  So the reason I'm pausing is
20 I'm trying to put these in chronological order
21 and, at the same time, identify maybe some of
22 the more important ones versus the lesser
23 important ones.  One of the decisions I made
24 related to a request that I received from the
25 independent board of Highland.  I don't know
```

Page 35

```
              GRANT SCOTT - 1/21/2021
1
2  how the request was transmitted to me, but I
3  believe the way it played out is as follows:  I
4  believe I was asked to call Jim Seery, and the
5  other -- and Russell Nelms, and the third
6  independent director, I believe his name is
7  John.  I -- I forget right now what his last
8  name is.  They were in New York, said they were
9  in a conference room.  I called in.  They were
10 very pleasant.  They identified who they were,
11 and they had a request, and the request was
12 that I agree to a transfer -- or that I -- that
13 I agree to allow certain assets that were not
14 Highland's assets but they were CLO's as- --
15 assets -- apparently, there was no dispute
16 about that at any point in time, but that I
17 agree to allow certain assets that were due CLO
18 to be transferred to the registry of the
19 bankruptcy court.  And either on that call I
20 immediately agreed or ended the call, called my
21 attorney, and then immediately agreed.  It was
22 a very -- I accommodated the request quickly.
23     Q.   Okay.  And can you just tell me at
24 what point in time you spoke with Mr. Dondero,
25 and what did he say that you recall?
```

Page 36

```
              GRANT SCOTT - 1/21/2021
1
2      A.   I don't know when he became aware of
3  that decision.  I'm not sure I ever volunteered
4  that the decision was even made, but at some
5  point, it became an issue because he found out
6  through -- if I understand the sequence of
7  events correctly, he found out possibly through
8  his counsel because there was ultimately
9  litigation about that issue.  It became known
10 to everyone at some point what I had done, I --
11 I think.  And subsequent to that, it became an
12 issue because of CLO HoldCo having fairly
13 significant cash flow issues with respect to
14 its expenses and obligations, including payment
15 of management fees as well as some of the
16 scheduled charitable giving that was -- that
17 was by contract already predefined.  My
18 decision to tuck that money -- or to agree
19 to -- my agreement to let that money be tucked
20 away created some -- created some -- created
21 some problems --
22     Q.   And -- and --
23     A.   -- for CLO HoldCo.
24     Q.   Okay.  And I just want you to focus
25 specifically on my question, and that is, what
```

Page 37

```
              GRANT SCOTT - 1/21/2021
1
2  did Mr. Dondero say to you that -- that causes
3  you to testify as you did, that this is one
4  issue that he didn't agree with?
5      A.   I believe his concern was that
6  because it was money that was undisputably to
7  flow to CLO HoldCo that -- which had many, many
8  other nonliquid assets -- this was a form of a
9  liquid asset.  It was cash in effect, proceeds.
10 -- that the money should have been allowed to
11 flow to be available for obligations.  He
12 didn't under-- I -- I -- I don't know what he
13 was thinking, but the -- the issue was that the
14 decision to put it into escrow was -- was --
15 was in- -- incorrect, that there was no basis
16 for it.
17     Q.   That -- that's an issue where after
18 learning of your decision, he didn't agree with
19 it; is that fair?
20     A.   That's right.
21     Q.   Okay.  Can you think of any decision
22 that you've ever made on behalf of CLO HoldCo
23 Limited where Mr. Dondero had advance knowledge
24 of what you were going to do and he objected to
25 it, but you nevertheless overruled his
```

Page 38

GRANT SCOTT - 1/21/2021

2  objection and went ahead and did what -- did
3  what you thought was right?
4        A.    Okay.  Let me -- let me -- I have --
5  I'm sorry.
6        Q.    We're here.
7        A.    Oh, I'm sorry.  I'm having some
8  issues with my screen.  So that may have
9  occurred with respect to the original proof of
10 claim.  Then there was a subsequent amendment
11 to the proof of claim, and I -- I believe it --
12 I believe that he might have been aware of both
13 of those and was in disagreement with -- with
14 those.  But after working with my attorney, we
15 just -- you know, we did what we thought was
16 right, and I still think what we did was right.
17 There was an issue with respect to Har- --
18 HarbourVest that occurred relatively recently
19 where he objected to a decision that I had
20 made.  As I understand it, I could have
21 contacted my attorney and changed the decision,
22 but I didn't, and I still think that was the
23 right decision.
24            We have filed plan objections.  I
25 can't say if he has any -- in that regard, I

Page 39

GRANT SCOTT - 1/21/2021

1  I -- I don't know what his thoughts are on
2  objections.  They would not have been
3  communicated with -- by me to him, but my
4  attorney might have consulted with his
5  attorney, and there -- they may know what that
6  difference is, but I -- that was just another
7  big decision.  I -- I -- maybe that --
8        Q.    All right.  Let me see if I can --
9  let me see if I can summarize this.  So two
10 proofs of claim.  Is it fair to say that
11 Mr. Dondero saw those proofs of claim before
12 they were filed?
13            MR. CLARK:  Objection, form.
14 BY MR. MORRIS:
15       Q.    Withdrawn.
16       A.    It --
17       Q.    Do -- do you know whether
18 Mr. Dondero saw the proofs of claim before they
19 were filed?
20       A.    I don't believe he did.
21       Q.    What -- what steps in filing the
22 proofs of claim did he object to that you
23 overruled?  Did he think there was -- something
24 should be different about them?

Page 40

GRANT SCOTT - 1/21/2021

2        A.    So we had to interface with Highland
3  employees at some point to get information to
4  support our proof of claim, and my guess, and
5  it's just a guess, is that he was aware of
6  those inquiries.  I -- I'm sorry.  I shouldn't
7  speculate.  I don't know.  But he -- with
8  respect to the original proof of claim, I'm --
9  I'm not aware of what specifically he was
10 objecting to or was -- thought should have been
11 different, but the -- with respect to the
12 amended proof of claim, which reduced the
13 original proof of claim to zero, I think that's
14 where he had a -- an issue.
15       Q.    And did you speak with him about
16 that topic prior to the time the amended claim
17 was filed, or did you only speak with him after
18 it was filed?
19       A.    I'm not sure the timing of that.
20       Q.    And with respect to HarbourVest, did
21 he ask you to object to the settlement on
22 behalf of CLO HoldCo Limited, and is that
23 something that you declined to do?
24            MR. CLARK:  Objection, form.
25       A.    I'm -- I'm sorry.  I was confused

Page 41

GRANT SCOTT - 1/21/2021

1  with the word.  Could you please repeat that?
3        Q.    Yes.  You mentioned HarbourVest
4  before, right?
5        A.    Yes.
6        Q.    And you mentioned that there was an
7  issue with Mr. Dondero and you concerning
8  HarbourVest; is that right?
9        A.    Yes.
10       Q.    And did that have to do with whether
11 or not CLO HoldCo Limited would -- would object
12 to the debtor's motion to get the HarbourVest
13 settlement approved?
14       A.    Would -- would get the
15 HarbourVest --
16       Q.    Settlement approved by the court.
17       A.    I'm not trying to be difficult.
18 I'm -- I'm -- could you just repeat that one
19 more time?  I'm --
20       Q.    What was -- what was --
21       A.    There was --
22       Q.    Let me try again.
23       A.    Okay.
24       Q.    What was the issue with respect to
25 HarbourVest that he objected to and -- and you

Page 42

GRANT SCOTT - 1/21/2021

1   overrode his objection and did what you thought
2   was right anyway?
3       A.   Okay.  Okay.  That's -- that's
4   easier for me to understand.  I'm sorry.  So I
5   had worked with my attorney or he did the work
6   and consulted with -- we consulted, but we had
7   filed an objection, motion objecting to the
8   settlement, if I understand the terminology and
9   nomenclature correctly.  Okay.  He had -- we
10  had come to an agreement that we had a very
11  valid argument.  That argument was evidenced
12  by, I guess it was, our motion that was
13  submitted to the court.  On the day of the
14  hearing to resolve this issue, we pulled our
15  request, and that was because I believed it did
16  not have a good-faith basis in law to move
17  forward on.
18      Q.   And did you discuss that issue with
19  Mr. Dondero before informing the court that CLO
20  HoldCo Limited was withdrawing its objection,
21  or did he learn about that for the first time
22  during the hearing --
23           MR. CLARK:  Objection, form.
24  BY MR. MORRIS:

Page 43

GRANT SCOTT - 1/21/2021

1       Q.   -- if you know?
2       A.   I -- I understand that he learned it
3   during the hearing.  I don't know the -- I -- I
4   don't know the -- whether there was any -- I --
5   I don't know for certain on the second half of
6   your question.
7       Q.   Let me -- let me try it -- let me
8   try it this way:  Did you speak with
9   Mr. Dondero about your decision to withdraw the
10  objection to the HarbourVest settlement prior
11  to the time your counsel made the announcement
12  in court?
13      A.   I don't -- I don't believe so.  No.
14  No.  No.  I'm sorry.  No.
15      Q.   And did --
16      A.   Okay.  No.  Here -- here's where
17  I'm -- I can clarify, okay?  I'm sorry.  I can
18  clarify.
19      Q.   That's all right.
20      A.   I gave the decision to my
21  attorney -- I -- I agreed with the
22  recommendation of my attorney, okay?  It wasn't
23  my --
24      Q.   Did you have a good --

Page 44

GRANT SCOTT - 1/21/2021

1       A.   -- thought, okay?
2           THE REPORTER:  I didn't --
3       A.   Okay.  So he --
4       Q.   It was a recommendation.
5       A.   Yeah.  So he -- he called me with a
6   recommendation.  It was highly urgent.  You
7   know, I was coming out of the men's room, had
8   my phone with me.  I got the call.
9           MR. CLARK:  Hey, Grant, I -- Grant,
10          I just want to caution you not to -- to --
11          and I don't think counsel is looking for
12          this but not to disclose the -- the
13          substance of any of your communications
14          with counsel, okay?
15          THE WITNESS:  Thank you.
16      A.   So --
17          THE WITNESS:  Thank you.  I'm -- I'm
18      sorry.
19  BY MR. MORRIS:
20      Q.   It's -- it's really a very simple
21  question.  Do you recall --
22      A.   He made a recommendation.  I -- I --
23  I think I can answer your question without
24  going off tangent.  I'm sorry.  So he -- my

Page 45

GRANT SCOTT - 1/21/2021

1   attorney made a recommendation.  I agreed with
2   it.  We with- -- I -- I told him to withdraw --
3   or I authorized him to withdraw.
4       Q.   Okay.
5       A.   Then I received a communication, and
6   I -- I guess the most likely scenario is the
7   motion had been withdrawn by the time Jim
8   Dondero found out.
9       Q.   And -- and did he write to you, or
10  did he call you?  Did he send you a text?
11      A.   He called me.
12      Q.   What did he say?
13      A.   He was asking why, and I explained,
14  and I said I agreed with the decision and I was
15  sticking with the decision.
16      Q.   Let's just -- let's just move on to
17  a new topic, and let's talk about the structure
18  of -- of CLO HoldCo.  Are you generally
19  familiar with the ownership structure of CLO
20  HoldCo?
21      A.   Yeah.  I mean, in terms --
22      Q.   Are -- are you -- are you generally
23  familiar with it?  It's not a test.  I'm just
24  asking do you have a general familiarity --

Page 46

GRANT SCOTT - 1/21/2021

2  A.  With CLO HoldCo or the entities
3  associated with CLO HoldCo?
4  Q.  The latter.
5  A.  Yes, I believe so.
6  Q.  All right.  I've prepared what's
7  called a demonstrative exhibit.  It's just --
8  A.  Yes.
9  Q.  -- just -- it's a document that, I
10 think, reflects facts, but I want to ask you
11 about it.
12      MR. MORRIS:  La Asia, can we please
13      put up Exhibit 1.
14      (SCOTT EXHIBIT 1, Organizational
15      Structure:  CLO HoldCo, Ltd., was marked
16      for identification.)
17 BY MR. MORRIS:
18 Q.  Okay.  Can you see that, Mr. Scott?
19 A.  Yes, I can.
20 Q.  Okay.  So I think I took the
21 information from resolutions that were attached
22 to the CLO HoldCo proof of claim, and that's
23 why you got that little footnote there at the
24 bottom of the page.  But let's start in the
25 lower right-hand corner and see if this chart

Page 47

GRANT SCOTT - 1/21/2021

2  comports with your understanding of the facts.
3      Do you know that CLO HoldCo Limited
4  was formed in the Cayman Islands?
5  A.  Yes.
6  Q.  And to the best of your knowledge,
7  is CLO HoldCo Limited 100 percent owned by the
8  Charitable DAF Fund, L.P.?  If you're not sure,
9  just say you're not sure if you don't know.
10 It's not a test.
11 A.  So the -- the -- the familiarity
12 I -- I'm -- I'm familiar with the different --
13 I'm confused with the arrangement of the boxes
14 and the ownership interest versus managerial
15 interest.  I believe that's -- that's right.
16 Q.  Okay.  And -- and you're the sole
17 director of CLO HoldCo Limited, right?
18 A.  Yes.
19 Q.  And this whole structure was -- the
20 idea for this structure, to the best of your
21 knowledge, was to implement Mr. Dondero's plan
22 for charitable giving; is that fair?
23 A.  Yes.  Ultimately, yes.
24 Q.  And is it fair to say then that
25 he -- he made the decision to establish this

Page 48

GRANT SCOTT - 1/21/2021

2  particular structure, to the best of your
3  knowledge?
4  A.  I -- I didn't -- I'm sorry.  I
5  didn't hear you very well.
6  Q.  To the best of your knowledge, did
7  Mr. Dondero make the decisions to establish the
8  structure that's reflected on this page?
9  A.  Oh, I don't know if he made the
10 decision to establish this structure, although
11 it's -- it's -- I'm sorry.  Strike that.  I --
12 if -- if what you're saying is did he approve
13 of this structure, to my knowledge, yes.
14 Q.  Okay.  Do you hold any position with
15 respect to Charitable DAF Fund, L.P.?
16 A.  I -- I -- your chart says no.  I --
17 I -- I thought I had a role there, too.
18 Q.  I don't know.  I don't have
19 information on that.  That's why I'm asking the
20 question.
21 A.  I -- I -- I believe -- yes, I
22 believe I have the same role as I do in -- in
23 CLO HoldCo.
24 Q.  And that would be director?
25 A.  Yes.

Page 49

GRANT SCOTT - 1/21/2021

2  Q.  And to the best of your knowledge,
3  is the Charitable DAF GP, LLC, the general
4  partner of Charitable DAF Fund, L.P.?
5  A.  Yes.
6  Q.  And is it your understanding that
7  you are the managing member of Charitable DAF
8  GP, LLC?
9  A.  Yes.
10 Q.  Does Charitable DAF GP, LLC, have
11 any employees?
12 A.  No.
13 Q.  Does Charitable DAF GP, LLC, have
14 any officers or directors?
15 A.  No.
16 Q.  Are you the only person affiliated
17 with Charitable DAF GP, LLC, to the best of
18 your --
19 A.  I believe so.
20 Q.  Do you receive any compensation for
21 serving as the managing member of Charitable
22 DAF GP, LLC?
23 A.  No.  The -- I don't interact with it
24 very often.  It's -- no, I don't receive any
25 compensation.

Page 50

GRANT SCOTT - 1/21/2021

1
2    Q.    Can you tell me in your capacity as
3  the managing member of Charitable DAF GP, LLC,
4  what's the nature of that entity's business?
5    A.    It -- it doesn't perform any
6  day-to-day operations.  My understanding is --
7  is that it's -- it's there for purposes of
8  compliance.  I can't recall the last time I had
9  any activity with respect to that.
10    Q.    How about the Charitable DAF Fund,
11  L.P.?  I apologize if I've asked you these
12  questions.
13    A.    It -- it's the same.  I -- I -- my
14  activity is almost exclusively CLO HoldCo.
15    Q.    All right.  Let me just ask the
16  questions nevertheless.  Does Charitable DAF
17  Fund, L.P., have any employees?
18    A.    Employees?  No.
19    Q.    Does it have any officers and
20  directors?
21    A.    No.
22    Q.    Are you the sole director of
23  Charitable DAF Fund, L.P.?
24    A.    Yes, I believe so.
25    Q.    So if we -- if we put under

Page 51

GRANT SCOTT - 1/21/2021

1
2  Charitable DAF Fund, L.P., Grant Scott,
3  director, and we put under CLO HoldCo Limited
4  Grant Scott, director, would everything on the
5  right side of that page be accurate, to the
6  best of your --
7    A.    I believe so.
8    Q.    Well, let's move to the left side of
9  the page.  Have you heard of the entity
10  Charitable DAF HoldCo Limited?
11    A.    Yes.
12    Q.    Are you the sole director of
13  Charitable DAF HoldCo Limited?
14    A.    Yes.
15    Q.    How did you become -- how did you
16  come to be the char- -- the sole director of
17  Charitable DAF HoldCo Limited?
18    A.    That was when it was established.
19    Q.    And did Mr. Dondero ask you to serve
20  in that capacity?
21    A.    Yes.
22    Q.    And did Mr. Dondero ask you to serve
23  as the managing member of Charitable DA- -- DAF
24  GP, LLC?
25    A.    Yes.

Page 52

GRANT SCOTT - 1/21/2021

1
2    Q.    And did Mr. Dondero ask you to serve
3  as the director of Charitable DAF, L.P. --
4  withdrawn.
5         Did Mr. Dondero ask you to serve as
6  director of Charitable DAF, L.P.?
7    A.    Yes.
8    Q.    To the best of your knowledge, does
9  Charitable DAF HoldCo Limited own 99 percent of
10  the limited partnership interests in Charitable
11  DAF, L.P.?
12    A.    Yes.  The -- the feed -- the -- the
13  feeds -- the -- the three horizontal blocks
14  there that identify Highland Dallas Foundation,
15  Kansas City, Santa Barbara -- there's a fourth
16  of -- relatively de minimus in terms of
17  participation.  There's a fourth entity that's
18  missing.  It's Dallas -- I forget the name.
19  That -- that -- that structure is -- is a bit
20  dated --
21    Q.    Okay.
22    A.    -- as it -- as is shown.
23    Q.    Okay.  So I will tell you and we can
24  look the documents if you want, but attached to
25  CLO HoldCo Limited's claim are a number of

Page 53

GRANT SCOTT - 1/21/2021

1
2  resolutions, and there's one that I have in
3  mind that shows Charitable DAF HoldCo Limited
4  holding 99 percent of the limited partnership
5  interests of Charitable DAF Fund, L.P., and
6  there's another that shows it being a hundred
7  percent.  Do you -- do you know which is
8  accurate at least at this time?
9    A.    There's a 1 percent/99 percent
10  division, and I am -- I believe it's the 99
11  percent, but I'm -- I'm getting confused by
12  the -- by the arrangement.  I'm so used to
13  another arrangement.  I -- I believe the 99
14  percent is correct.
15    Q.    Okay.  Do you have any understanding
16  as to who owns the other 1 percent of the
17  limited partnership interests of Charitable DAF
18  Fund, L.P.?
19    A.    No.  This -- this is confusing to
20  me.  No.
21    Q.    Okay.  There are, at least on this
22  page, three foundations that I think you've
23  identified.  Are those three foundations
24  together with the fourth that you mentioned the
25  owners of the Charitable DAF HoldCo Limited?

Page 54

```
 1            GRANT SCOTT - 1/21/2021
 2     A.    Owners?
 3     Q.    Yes.
 4           MR. CLARK:  Objection, form.
 5     A.    They -- they only participate in the
 6 money that flows up to them.
 7     Q.    And what does that mean exactly?
 8     A.    What's that?
 9     Q.    What does that -- what do you mean
10 by that?  Do the foundations fund Charitable
11 DAF Fund HoldCo Limited?
12     A.    Initially.  Initially, as I
13 understand it, the money flows downward into
14 the Charitable DAF HoldCo Limited before it
15 ultimately makes its way to CLO HoldCo, and
16 then each of these three entities, the various
17 foundations, obtain participation interest in
18 the money that flows back to them.
19     Q.    And -- and is that par- -- are those
20 participation interests in Charitable -- you
21 know what, let -- let me just pull up one
22 document and see if that helps.
23           MR. MORRIS:  Can we put up -- I
24     think it's Exhibit Number 5.
25           (SCOTT EXHIBIT 2, Unanimous Written
```

Page 55

```
 1           GRANT SCOTT - 1/21/2021
 2     Consent of Directors In Lieu of Meeting,
 3     was marked for identification.)
 4           MR. MORRIS:  I apologize.  Let's go
 5     to --
 6           MS. CANTY:  I'm sorry, John.  I
 7     can't hear you.  Was that not the exhibit?
 8           MR. MORRIS:  4.
 9           MS. CANTY:  Okay.
10           THE REPORTER:  And Mr. Morris, you
11     are -- Mr. Morris, you are breaking up just
12     a little bit at the end of your questions.
13 BY MR. MORRIS:
14     Q.    Okay.  Do you see the document on
15 the screen, sir?
16     A.    Yes, I do.
17     Q.    Okay.  And so this is a unanimous
18 written consent of the directors of the
19 Highland Dallas Foundation.  That's one of the
20 entities that was on the chart.
21           MR. MORRIS:  Can we scroll down to
22     the -- the bottom of the document where the
23     signature lines are.  Right there.
24 BY MR. MORRIS:
25     Q.    Are you a director of the Highland
```

Page 56

```
 1           GRANT SCOTT - 1/21/2021
 2 Dallas Foundation?
 3     A.    Yes, selected by them.
 4     Q.    Selected by whom?
 5     A.    By that foundation.
 6     Q.    Are you -- are you a director of all
 7 of the four foundations that feed into the
 8 Charitable DAF HoldCo Limited entities that --
 9     A.    No.
10     Q.    Which of the four foundations are
11 you a director of?
12     A.    This and the Santa Barbara -- I'm
13 sorry, Santa Barbara and Kansas City.
14     Q.    So is -- there's one that you're not
15 a director of; is that right?
16     A.    Yes.
17     Q.    And which one is that?
18     A.    The -- could you go back to the --
19     Q.    Yeah.
20           MR. MORRIS:  Go back to the
21     demonstrative.
22     A.    It's the Highland Dallas Foundation
23 and Santa Barbara Foundation.
24     Q.    Those are the two that you're a
25 director of?
```

Page 57

```
 1           GRANT SCOTT - 1/21/2021
 2     A.    Yes.
 3     Q.    To the best of your knowledge, does
 4 Mr. Dondero serve as the president for each of
 5 the foundations that we're talking about?
 6     A.    Yes.
 7     Q.    To the best of your knowledge, is
 8 Mr. Dondero a director of each of the
 9 foundations that we're talking about?
10     A.    Say that again.  I'm sorry.
11     Q.    Is he also a director of each of the
12 foundations?
13     A.    Yes.
14     Q.    Do you know whether any of the
15 foundations has any employees?
16     A.    I believe they do, but I -- I --
17 can't say for certain.
18     Q.    Does -- withdrawn.
19           Do you know if there are any
20 officers of any of the four foundations other
21 than Mr. Dondero's service as president?
22     A.    I'm sorry.  Say that one more time,
23 please.
24     Q.    Yes.  Do you know whether any of the
25 four foundations has any officers other than
```

Page 58

GRANT SCOTT - 1/21/2021

1  Mr. Dondero's service as president?
2     A.   No.
3     Q.   You don't know, or they do not?
4     A.   I -- I don't believe anyone else
5  has.  I -- actually, I should say I don't -- I
6  don't recall.  I -- I don't know.  I don't --
7  don't know.
8     Q.   As a director of the Dallas and
9  Santa Barbara foundations, are you aware of any
10  officers serving for either of those
11  foundations other than Mr. Dondero?
12     A.   No.
13     Q.   Do you know who the beneficial owner
14  of the Charitable DAF HoldCo Limited entity is?
15     A.   The beneficial owner?
16     Q.   Correct.
17     A.   The various -- various trusts that
18  were used to -- that were the vehicles by which
19  the money originally was established within --
20  within -- within CLO HoldCo.
21     Q.   Would that be -- would one of them
22  be the Get Good Nonexempt Trust?
23     A.   Yes.
24     Q.   And you're a trustee of the Get Good

Page 59

GRANT SCOTT - 1/21/2021

1  Nonexempt Trust, right?
2     A.   Yes.
3     Q.   When did you become a trustee of the
4  Get Good Nonexempt Trust?
5     A.   Many years ago.  I -- I don't
6  remember.
7     Q.   Are there any other trustees of the
8  Get Good Nonexempt Trust?
9     A.   No.
10     Q.   Does the Get Good Nonexempt Trust
11  have any officers, directors, or employees?
12     A.   No.
13        MR. CLARK:  Objection, form.  Sorry.
14  BY MR. MORRIS:
15     Q.   Withdrawn.
16        Do you know whether the Get Good
17  Nonexempt Trust has any officers, directors, or
18  employees?
19     A.   It does not.
20     Q.   And I apologize if I asked this, but
21  are you the only trustee of the Get Good
22  Nonexempt Trust?
23     A.   Yes.
24     Q.   Is the Dugaboy Investment Trust also

Page 60

GRANT SCOTT - 1/21/2021

1  one of the trusts that has an interest in
2  Charitable DAF HoldCo Limited?
3     A.   Yes.
4     Q.   Are you a trustee of the Dugaboy
5  Investment Trust?
6     A.   I am not.
7     Q.   Do you know who is?
8     A.   I believe it's his sister.
9     Q.   And is that -- you're referring to
10  Mr. Dondero's sister?
11     A.   I'm sorry.  Yes.
12     Q.   And what's the basis for your
13  understanding that Mr. Dondero's siv-- sister
14  serves as the trustee of the Dugaboy Investment
15  Trust?
16     A.   Many years ago there was a -- there
17  was a clerical error that identified me as the
18  trustee of the Dugaboy.  That error was present
19  for approximately two weeks or a week and a
20  half before it was detected and corrected, and
21  so I know from that correction that it's Nancy
22  Dondero.
23     Q.   Are there any other trusts that have
24  an interest in Charitable DAF HoldCo Limited

Page 61

GRANT SCOTT - 1/21/2021

1  besides those trusts, to the best of your
2  knowledge?
3     A.   No.
4     Q.   Is it your understanding based on
5  what we've just talked about that the Get Good
6  Nonexempt Trust and the Dugaboy Investment
7  Trust are the indirect beneficiaries of CLO
8  HoldCo Limited?
9     A.   Yes.
10     Q.   Can you tell me who the
11  beneficiaries are of the Get Good trust?
12     A.   I mean, Jim Dondero.
13     Q.   And -- and what is that -- is that
14  based on the trust agreement -- your knowledge
15  of the trust agreement?
16     A.   Yes.
17     Q.   Do you have an understanding of who
18  the beneficiary is of the Dugaboy Investment
19  Trust?
20     A.   I don't know anything about that
21  trust.
22        MR. MORRIS:  Okay.  All right.
23  Let's take a short break and reconvene at
24  3:30 Eastern Time.  We've been going for a

```
                GRANT SCOTT - 1/21/2021
1           while.
2                MR. CLARK:  Thank you.
3                MR. MORRIS:  Okay.  Thank you.
4                (Whereupon, there was a recess in
5           the proceedings from 3:20 p.m. to
6           3:31 p.m.)
7      BY MR. MORRIS:
8           Q.    Mr. Scott, earlier I think you
9      testified that you interfaced with the folks at
10     Highland in connection with your duties as the
11     director of CLO HoldCo Limited, right?
12          A.    Yes.
13          Q.    Are you aware of any written
14     agreement between Highland Capital Management
15     and CLO HoldCo Limited?
16          A.    Yes, the various servicer
17     agreements.
18          Q.    Okay.  Are you aware that
19     Mr. Dondero resigned from his position at
20     Highland Capital Management sometime in
21     October?
22          A.    No.
23          Q.    Have you communicated with anybody
24     at Highland Capital Management about the
25
```

```
                GRANT SCOTT - 1/21/2021
1      affairs of CLO HoldCo Limited at any time since
2      October?
3           A.    Yes.
4           Q.    Anybody other than Jim Seery?
5           A.    Yes.
6           Q.    Okay.  Let's start with Mr. Seery.
7      You've spoken with him before, right?
8           A.    Yes.
9           Q.    Do you have his phone number?
10          A.    Yes.
11          Q.    How many times have you spoken with
12     Mr. Seery, to the best of your recollection,
13     just generally?  It's not a test.
14          A.    Three, maybe four times.
15          Q.    Okay.  Can you identify by name
16     anybody else at Highland that you've spoken
17     with since -- in the last two or three months?
18          A.    I spoke to Jim Dondero.  I've spoken
19     with Mike Throckmorton.  The usual suspects, so
20     to speak.  Mark Patrick, Mel- -- Melissa
21     Schroth.
22          Q.    Can you recall anybody else?
23          A.    No.  No.  Sorry.
24          Q.    Did you -- did you -- withdrawn.
25
```

```
                GRANT SCOTT - 1/21/2021
1           Do you recall the subject matter of
2      your discussions with Mr. Throckmorton?
3                MR. CLARK:  Objection, form.
4      BY MR. MORRIS:
5           Q.    Withdrawn.
6           Do you recall your -- the subject
7      matter of your communications with
8      Mr. Throckmorton?
9                MR. CLARK:  Objection, form.
10     BY MR. MORRIS:
11          Q.    You can answer.
12          A.    I -- I regularly interface with
13     Mr. Throckmorton regarding approvals of
14     expenses, and he's my sort of -- he's my point
15     person for approving wire transfers and things
16     of that nature.
17          Q.    How about Mr. Patrick, what -- what
18     area of responsibility does he have with
19     respect to CLO HoldCo Limited?
20          A.    He -- he doesn't, to my knowledge.
21          Q.    Do you recall the nature of the
22     substance of any communications that you've had
23     with Mr. Patrick since -- you know, the last
24     two or three months?
25
```

```
                GRANT SCOTT - 1/21/2021
1           A.    Yes.  Or -- yes.
2           Q.    And what -- what are the nature of
3      those conversations or the substance?
4           A.    He was -- he was one of the
5      individuals that helped to establish the
6      hierarchy for the -- what I keep referring to
7      as the charitable foundation.
8           Q.    And -- and do you recall why you
9      spoke to him in the last -- or -- withdrawn.
10          Do you recall the nature of your
11     communications in the last two or three months
12     with Mr. Patrick?
13          A.    I --
14               MR. CLARK:  And hold on, Grant.  I'm
15          going to caution -- my understanding -- I
16          believe Mr. Patrick's an attorney, and so
17          I'm going to caution you that you shouldn't
18          disclose the substance of -- of those
19          communications based on the attorney-client
20          privilege.
21               MR. MORRIS:  Well, I'm -- I -- I am
22          the lawyer for the company so -- I guess
23          there are other people on the phone and I
24          appreciate that, but let's see if we can --
25
```

Page 66

GRANT SCOTT - 1/21/2021

1      I don't mean to be contentious here, so it
2  wouldn't -- I -- I'd be part of the
3  privilege anyway.
4  BY MR. MORRIS:
5     Q.   But in any event, can you tell me
6  generally -- I'm just looking for general
7  subject matter of your conversations with
8  Mr. Patrick.
9     A.   I asked him how I would go about
10  re- -- resigning my position.
11     Q.   And when did that conversation take
12  place?
13     A.   Within the last two weeks.
14     Q.   Have you made a decision to resign?
15     A.   No.
16     Q.   I think you mentioned Melissa
17  Schroth.  Do I have that right?
18     A.   Yes.
19     Q.   Can you describe generally the
20  communications you had with Ms. Schroth in the
21  last few months.
22     A.   They -- she has e-mailed me certain
23  documents that I needed to sign.  I had a
24  conversation with her about -- about some

---

Page 67

GRANT SCOTT - 1/21/2021

1  home -- home improvements, home construction
2  with respect to Jim Dondero's home in Colorado,
3  and that's -- I -- I think that's -- that's it.
4     Q.   Okay.  Do you recall communicating
5  with anybody at Highland in the last three
6  months other than Mr. Dondero,
7  Mr. Throckmorton, Mr. Patrick, and Ms. Schroth?
8     A.   I -- I spoke with Jim Seery this
9  week.
10     Q.   Anybody else?
11     A.   I don't -- I don't know.
12     Q.   Okay.
13     A.   I don't think so.
14     Q.   In your communications with
15  Mr. Seery, did you two ever discuss his reasons
16  for making any trade on behalf of any CLO?
17     A.   No.
18     Q.   In your discussions with Mr. Seery,
19  did you ever tell him that you believed that
20  Highland Capital Management had breached any
21  agreement in relation to any CLO?
22     A.   Have I had that discussion with Jim
23  Seery?
24     Q.   Yes.

---

Page 68

GRANT SCOTT - 1/21/2021

1     A.   No.
2     Q.   In your discussions with Mr. Seery,
3  did you ever tell him that you thought Highland
4  Capital Management was in default under any
5  agreement in relation to the CLOs?
6     A.   No.
7     Q.   I want to focus in particular on the
8  shared services agreement.  In -- in your
9  discussions with Mr. Seery, did you ever tell
10  him that you believed that Highland Capital
11  Management was in default or in breach of its
12  shared services agreement with CLO HoldCo
13  Limited?
14     A.   No.
15     Q.   In your communications with
16  Mr. Seery, did you ever indicate any concern on
17  the part of CLO HoldCo Limited with respect to
18  Highland Capital's Man- -- Highland Capital
19  Management's performance under the shared
20  services agreement?
21     A.   No.
22     Q.   As you sit here today, do you have
23  any reason to believe that Highland Capital
24  Management has done anything wrong in

---

Page 69

GRANT SCOTT - 1/21/2021

1  connection with its performance as the
2  portfolio manager of the CLOs in which CLO
3  HoldCo Limited has invested?
4     MR. CLARK:  Object to form.
5     A.   In terms of the -- are you saying --
6  please say that again.  I'm sorry.
7     Q.   That's okay.  I ask long questions
8  sometimes so forgive me, but I'm trying to
9  get -- I'm trying to be precise so that's why
10  it's difficult sometimes.  But let me try
11  again.
12     Does CLO HoldCo Limited contend that
13  Highland Capital Management has done anything
14  wrong in the performance of its duties as
15  portfolio manager of the CLOs in which CLO
16  HoldCo has invested?
17     MR. CLARK:  Objection, form.
18     A.   Yes.  It's -- it's outlined in our
19  objections to -- to the plan.
20     Q.   Okay.  Any -- are you aware of
21  anything that's not contained within CLO Holdco
22  Limited's objection to the plan?
23     MR. CLARK:  Objection, form.
24     A.   I don't know if this is responsive

---

Page 70

GRANT SCOTT - 1/21/2021

1  to your quest -- request, but two -- two
2  issues, I believe, also pose an in-- -- a
3  problem for CLO HoldCo.  One is we are paying
4  for services.  I think I referred to the
5  services as being soup to nuts, but we are not
6  getting the full services.  We haven't been for
7  some time.  So we're likely overpaying.  There
8  was a Highland Select Equity issue, 11-month
9  payment that was delayed which I was unaware of
10 was due.  Normally, I would have interfaced
11 with someone at Highland about that, but my
12 attorney -- but my -- my attorney had to make a
13 request for payment, and that payment was
14 ultimately made.  I -- other than that, I -- I
15 don't -- I don't know.  I don't believe so.
16     Q.    I want to distinguish between the
17 shared services agreement between Highland
18 Capital Management and CLO HoldCo Limited on
19 the one hand and on the other hand the
20 management agreements pursuant to which
21 Highland Capital Management manages certain
22 CLOs that CLO HoldCo invests in.
23            You understand the distinction that
24 I'm making?
25

Page 71

GRANT SCOTT - 1/21/2021

1     A.    Now I do.  I'm sorry.  I didn't
2  appreciate that.
3     Q.    Okay.  So let's just take each of
4  those pieces one at a time.  You mentioned your
5  concern about services.  That's a concern that
6  arises under the shared services agreement,
7  right?
8     A.    Yes.
9     Q.    And you mentioned something about a
10 delayed payment having to do with Highland
11 Select.  Do I have that generally right?
12    A.    Correct.
13    Q.    And is that a concern that you have
14 that arises under the shared services
15 agreement?
16    A.    It's not the agreement with respect
17 to the CLOs as I understand it.
18    Q.    Okay.  So then let's turn to that
19 second bucket.  You were aware -- you are
20 aware, are you not, that Highland Capital
21 Management has certain agreements with CLOs
22 pursuant to which it manages the assets that
23 are owned by the CLOs?
24    A.    I'm so sorry.  Could you please --
25

Page 72

GRANT SCOTT - 1/21/2021

1     Q.    I'll try again.
2     A.    I'm just -- I'm sorry.  I was
3  distracted and -- and I -- I'm sorry for asking
4  you to repeat it again.  Please --
5     Q.    Okay.
6     A.    Please re- --
7     Q.    Are you aware that CLO HoldCo
8  Limited has made investments in certain CLOs?
9     A.    Oh, yes, certainly.
10    Q.    And are you aware that those CLOs
11 are managed by Highland Capital Management?
12    A.    Yes.  As the -- as the servicer,
13 yes.
14    Q.    Okay.  Have you ever seen any of the
15 agreements pursuant to which Highland Capital
16 Management acts as a servicer?
17    A.    I've seen a few, yes.
18    Q.    Does CLO HoldCo Limited contend that
19 it is a party to any agreement between Highland
20 Capital Management and the CLOs?
21           MR. CLARK:  Object to form.  And I
22    just want to note for the record that
23    Mr. Scott is here testifying in his
24    individual capacity, I believe, not as a

Page 73

GRANT SCOTT - 1/21/2021

1  corporate representative.
2           MR. MORRIS:  Fair enough.  But he is
3    the only representative so...
4           MR. CLARK:  Fair enough.  I just
5    want that made -- stated for the record,
6    but I also object as to form.
7           MR. MORRIS:  Got it.
8     A.    It's a third-party beneficiary under
9  the agreements.
10    Q.    And is that because of something you
11 read in the document, or is that just your
12 belief and understanding?
13    A.    My belief and understanding.
14    Q.    And is that belief and understanding
15 based on anything other than conversations with
16 counsel?
17    A.    In -- in -- recently it has, but I
18 don't recall from previous interactions over
19 the years how we discussed that or how I came
20 to -- to understand that.
21    Q.    Does HCLO [sic] HoldCo -- did -- in
22 your capacity as the sole director of HCLO
23 HoldCo Limited, are you aware of anything that
24 Highland Capital Management has done wrong in

Page 74

GRANT SCOTT - 1/21/2021

1  connection with the services provided under the
2  CLO management agreements?
3          MR. CLARK:  Objection, form.
4      A.    I -- I don't -- I don't -- I
5  don't -- your answer's no.
6      Q.    In your capacity as the director of
7  CLO HoldCo Limited, are you aware of any
8  default or breach under the CLO management
9  agreements that -- that Highland Capital
10  Management has caused?
11          MR. CLARK:  Objection, form.
12      A.    We have raised the issue about
13  ongoing sales in various -- I'm not sure
14  whether they represent a technical breach,
15  though.
16      Q.    Okay.  Are you aware of any
17  technical breach?
18          MR. CLARK:  Objection, form.
19      A.    No.
20      Q.    I'm sorry.  You said, no, sir?
21      A.    My answer's no.
22      Q.    Thank you.  Do you know who made the
23  decision to cause the CLO HoldCo Limited entity
24  to invest in the CLOs that are managed by

Page 75

GRANT SCOTT - 1/21/2021

1  Highland Capital?
2      A.    The select -- ultimately, I had to.
3      Q.    I thought you testified earlier that
4  you didn't make decisions as to investment.  Do
5  I have that wrong?
6      A.    The selection.
7      Q.    Okay.
8      A.    I -- I'm --
9      Q.    So -- so explain to me --
10      A.    I have to approve -- I have to
11  approve the selection.  I'm sorry.  But the
12  people making -- I was putting that in the camp
13  of the people that make the selection.
14      Q.    Okay.  Do you know if -- do you know
15  if there are CLOs in the world that exist that
16  aren't managed by Highland Capital Management?
17          MR. CLARK:  Objection, form.
18      A.    Are there CLOs in the -- in the
19  world that are not --
20      Q.    Yes.
21      A.    Yes.  It's -- it's a well-known --
22  it's a well-known --
23      Q.    In your capacity as the director of
24  CLO HoldCo Limited, did you ever consider

Page 76

GRANT SCOTT - 1/21/2021

1  making an investment in a CLO that wasn't
2  managed by Highland?
3      A.    No.
4      Q.    Is there any particular reason why
5  you haven't given that any consideration?
6      A.    That hasn't been my role.  That's
7  not my expertise.  That's been something
8  Highland has done and, quite frankly, over the
9  years brilliantly so, no.
10      Q.    You're aware that HCM, L.P., has
11  filed for bankruptcy, right?
12      A.    Yes.
13      Q.    When did you learn that Highland had
14  filed for bankruptcy?
15      A.    After the fact sometime in late --
16  late 2019.
17      Q.    Since the bankruptcy filing, have
18  you made any attempt to sell CLO HoldCo
19  Limited's position in any of the CLOs that are
20  managed by Highland?
21      A.    No.
22      Q.    So notwithstanding the bankruptcy
23  filing, you as the director haven't made any
24  attempt to transfer out of the CLOs that are

Page 77

GRANT SCOTT - 1/21/2021

1  managed by Highland, correct?
2      A.    Correct.
3      Q.    Did you ever give any thought to
4  exiting the CLO vehicles that were managed by
5  Highland in light of its bankruptcy filing?
6      A.    No.
7      Q.    Have you ever discussed with
8  Mr. Seery anything having to do with the
9  management -- withdrawn.
10          Have you ever discussed with
11  Mr. Seery any aspect of the debtor's management
12  of the CLOs in which CLO HoldCo Limited is
13  invested?
14      A.    No.
15      Q.    You mentioned earlier a request to
16  stop trading.  Do I have that right?
17      A.    Yes.
18      Q.    Okay.  And are you aware that a
19  letter was written purportedly on behalf of CLO
20  HoldCo Limited in which a request to stop
21  trading was made?
22      A.    As a cos- -- yeah.  Yes.
23      Q.    Okay.  Have you ever seen that
24  letter before?

Page 78

GRANT SCOTT - 1/21/2021

1
2     A.    Yes.
3           MR. MORRIS:  Can we put up on the
4     screen -- I think it's now Exhibit 6.  It's
5     Exhibit DDDD.
6           (SCOTT EXHIBIT 3, Letter to James A.
7     Wright, III, et al., from Gregory Demo,
8     December 24, 2020, with Exhibit A
9     Attachment, was marked for identification.)
10          MR. MORRIS:  Can we scroll down to,
11    I guess, what's Exhibit A.  Ri- -- right
12    there.
13 BY MR. MORRIS:
14    Q.    You see this is a letter Dece- --
15 dated December 22nd?
16    A.    Yes.
17    Q.    In the first paragraph there there's
18 a reference to the entities on whose behalf
19 this letter is being sent.
20          Do you see that?
21    A.    Yes.
22    Q.    Okay.  So this letter was sent on
23 December 22nd.  Did you see a copy of it before
24 it was sent?
25    A.    A -- a draft -- an earlier draft of

Page 79

GRANT SCOTT - 1/21/2021

1 this I did.
2    Q.    Okay.  Did you provide any comments
3 to it?
4    A.    I did.
5          MR. CLARK:  Well, hold on.  Grant,
6     let me caution you.  To the extent you
7     provided comments to counsel, we're going
8     to assert the attorney-client privilege on
9     those comments.
10          MR. MORRIS:  It's just a yes-or-no
11    question.  I'm not looking for the
12    specifics.
13          MR. CLARK:  Thank you.
14    A.    Yes.
15    Q.    Are you aware that earlier letters
16 were -- withdrawn.
17          Are you aware that prior to December
18 22nd, the entities other than CLO HoldCo
19 Limited that are listed in this pers- -- first
20 paragraph had sent a letter making the same
21 request?
22    A.    With respect to a letter, no.  No,
23 I -- I did not.
24    Q.    Are you aware as you sit here now

Page 80

GRANT SCOTT - 1/21/2021

1
2 that the entities other than CLO HoldCo Limited
3 that are listed in the first paragraph made a
4 motion in the court asking the court for an
5 order that would have prevented Highland from
6 making any transactions for a limited period of
7 time?
8    A.    Yes.
9    Q.    Did you know that motion was being
10 made prior to the time that it was made?
11    A.    I'm not sure.
12    Q.    Did you ever think about whether CLO
13 HoldCo Limited should join that particular
14 motion?
15    A.    I believe we were -- my attorney was
16 aware of it.  I don't recall our discussion
17 about it.  We were aware -- when I say we, I
18 mean collectively -- and did not join it.
19    Q.    Okay.  Can you tell me why you did
20 not join it.
21          MR. CLARK:  And, again, Grant, to --
22    to the extent it's based on communications
23    with counsel, you're free to say that
24    but -- but not to disclose any substance of
25    communications with counsel.

Page 81

GRANT SCOTT - 1/21/2021

1    A.    The subject of this letter on the
2 22nd which yielded the original letter you
3 briefly showed me on the 24th as well as an
4 additional letter on the 28th identified two
5 points as I understand it.  The first point is
6 what I believe is the somewhat innocuous
7 request to halt sales, not a demand in any way.
8 And the second more substantive issue has to do
9 with steps to remove Highland or a subsequent
10 derived entity from Highland from the various
11 services agreements that you had previously --
12 we had previously discussed.  Neither of those
13 issues met the require- -- neither of those
14 issues led us to believe that a motion such as
15 what you've just mentioned was -- was right --
16    Q.    Okay.
17    A.    -- because no -- no decision has
18 been made on that.
19    Q.    Okay.
20          MR. MORRIS:  So I want to go back to
21    my question and move to strike as
22    nonresponsive, and I'll just ask my
23    question again.
24 BY MR. MORRIS:

Page 82

GRANT SCOTT - 1/21/2021

1
2      Q.     Why did CLO HoldCo Limited decide
3  not to participate in the earlier motion that
4  was brought by the other entities that are
5  identified in Paragraph 1 that asked the court
6  to stop Highland from engaging in trades?
7      A.     John, I'm so sorry.  There was a
8  feedback loop that came up when you started to
9  re- -- re- -- recite -- restate your question.
10  I'm sorry.
11      Q.     That's okay.  Why did CLO HoldCo
12  Limited decide not to join in the earlier
13  motion where the entities listed in Paragraph 1
14  asked the court to order Highland not to make
15  any further trades?  Why did they not join that
16  motion?
17      A.     The -- the issue didn't rise to
18  the -- I don't believe we had formulated a
19  legal basis sufficient to justify such steps.
20  We hadn't laid the foundation necessary to --
21  to do that.
22      Q.     Are you aware of what the court
23  decided?
24      A.     By virtue of the original letter you
25  sent me dated the -- or show -- showed

Page 83

GRANT SCOTT - 1/21/2021

1  initially dated the 24th, I have a general
2  understanding of what they decided.
3      Q.     Did you -- did you ever review the
4  transcript of the hearing where the other
5  parties asked the court to stop Highland from
6  engaging in any further trades on the CLOs?
7      A.     I did not.
8      Q.     Is there anything different about
9  the request in this letter, to the best of your
10  knowledge, from the request that was made of
11  the court just six days earlier?
12              MR. CLARK:   Objection, form.
13      A.     Yes.  There's a -- in -- in my -- my
14  view there's a substantial difference between
15  filing an action converting a request into
16  essentially a demand versus a gentle request
17  with multiple caveats, that that request is not
18  a demand.
19      Q.     Okay.  Let me ask you this:  Are you
20  aware -- what -- when did you first learn that
21  Highland was making trades in its capacity as
22  the servicer of the CLOs?  When -- when did you
23  first learn that Highland was doing that?  Ten
24  years ago, right?  I mean --

Page 84

GRANT SCOTT - 1/21/2021

1
2      A.     Oh.  Oh.  Oh, I'm -- yeah.  Yeah.
3  Oh, yes.  I'm sorry.  Of course.
4      Q.     Right?  I mean, Highland has been
5  making trades on behalf of CLOs for years,
6  right?
7      A.     Yes.
8      Q.     And Highland was making trades on
9  behalf of CLOs throughout 2020, to the best of
10  your knowledge, right?
11      A.     Yes.
12      Q.     And you know when Jim Dondero was
13  still with Highland, he was making trades on
14  behalf of CLO -- on behalf of the CLOs, right?
15      A.     Yes.
16      Q.     And you never objected when Jim
17  Dondero was doing it; is that right?
18      A.     That is correct.
19      Q.     Okay.  So what changed that caused
20  you in your capacity as the director of CLO
21  HoldCo to request a full stoppage of trading?
22      A.     It was my understanding that because
23  of the bankruptcy and the removal of Jim
24  Dondero that the replacement decision-makers
25  did not have the expertise where I felt

Page 85

GRANT SCOTT - 1/21/2021

1
2  comfortable with them making those decisions,
3  but...
4      Q.     I thought you testified earlier that
5  you weren't aware that Mr. Dondero left
6  Highland.  Am I mistaken in my recollection?
7      A.     I think you said in October, and
8  I -- as I -- there's some con- -- I have
9  confusion about when he left versus when he was
10  still there but other -- but he was not making
11  those trades.
12      Q.     Okay.  Fair enough.  The bankruptcy
13  has nothing to do with your desire to stop
14  trading, right, because Highland traded for a
15  year after the bankruptcy and never took any
16  action to try to stop Highland from trading on
17  behalf of the CLOs, fair?
18      A.     The -- Highland as of right now
19  isn't the same entity it was -- well, the
20  decision-making team -- the -- the financial
21  decision-making team for CLO Holdco's is no
22  longer the team I have worked with, and upon
23  discussion with counsel, we agreed -- I agreed
24  to this letter, which I did, to just maintain
25  the status quo.

Page 86

GRANT SCOTT - 1/21/2021

1
2      Q.    How did you form your opinion that
3   the debtor doesn't have the expertise to
4   execute trades on behalf of the CLOs today?
5   What's the basis for that belief?
6      A.    I -- as I understood it, the -- the
7   people historically making that decision were
8   no longer making that decision.
9      Q.    Who besides Mr. Dondero --
10  withdrawn.
11         Who are you referring to?
12     A.    Well, Mr. Dondero is one.  I don't
13  know the names, but I -- I understood it to
14  mean that the group previously responsible, for
15  exam-- -- for example, Hunter Covitz, including
16  Hun- -- him, were no longer involved in the
17  decision-making process, but...
18     Q.    How did you -- how -- how -- who
19  gave you the information that led you to
20  conclude that Hunter Covitz was no longer
21  involved in the decision-making process?
22     A.    Specifically him and that name being
23  mentioned, I -- I -- I wasn't informed of his
24  speci- -- him -- him being removed.  I was
25  under the impression that the team that had

Page 87

GRANT SCOTT - 1/21/2021

1
2   previously been doing that was no longer doing
3   it.
4      Q.    And what gave you that impression?
5      A.    Was communications I had with my
6   attorney.
7      Q.    Okay.  Is there any source for your
8   information that led you to conclude that the
9   team was no longer there that was able to
10  engage in the trades on behalf of the CLOs
11  other than your attorneys?
12     A.    Well, this -- this letter -- I -- I
13  think the answer is no.
14     Q.    Thank you.  Do you know if Jim -- do
15  you have an opinion or a view as to whether Jim
16  Seery is qualified to make trades?
17     A.    This --
18         MR. CLARK:  Objection, form.
19     A.    I don't know -- I spoke to Jim Seery
20  earlier this week.  You -- you asked me whether
21  I had his number.  I said I did.  That's only
22  because he called me.  My phone rang with his
23  number.  It was a number I did not recognize,
24  it was not in my contacts, but he left me a
25  voice mail so I called him back.  Then I

Page 88

GRANT SCOTT - 1/21/2021

1
2   updated my contacts to -- to add his name so
3   now I have his name.  And during that
4   conversation he informed me that he did have
5   that expertise --
6      Q.    And --
7      A.    -- without me making any inquiry.
8   He volunteered that.
9      Q.    But you hadn't made any inquiry
10  prior to the time that you authorized the
11  sending of this letter; is that fair?
12     A.    That's correct.
13     Q.    Do you know whether Mr. Seery, in
14  fact, engaged in transactions on behalf of the
15  debtor since he was appointed back in January?
16     A.    I do not.
17     Q.    Did you ask that question prior to
18  the time you authorized the sending of this
19  letter?
20     A.    I did not.
21     Q.    Can you identify a single
22  transaction that Jim Seery has ever made that
23  you disagree with?
24     A.    No.
25     Q.    Can you identify any transaction

Page 89

GRANT SCOTT - 1/21/2021

1
2   that the debtor made on behalf of any of the
3   CLOs since the time that you understand
4   Mr. Dondero left Highland that you disagree
5   with?
6      A.    No.
7      Q.    Did you have any discussion with any
8   representative of any of the entities listed on
9   this document where they told you they believe
10  Jim Seery didn't have the expertise to engage
11  in transactions on behalf of the whole -- of
12  the CLOs?
13     A.    You -- your question -- I'm -- I'm
14  sorry.  I'm trying to be -- I'm trying to be a
15  hundred perc- -- I'm trying to be accurate
16  here.
17     Q.    Let me interrupt you and just say,
18  I'm very grateful for your testimony.  I know
19  this is not easy, and I do believe that you're
20  earnestly and honestly trying to answer the
21  questions the best you can.  So no apologies
22  necessary anymore.  If you need me to repeat
23  the question or rephrase it, just say that,
24  okay?
25     A.    Please -- yes.

```
 1              GRANT SCOTT - 1/21/2021
 2      Q.    Okay.
 3      A.    Please -- please repeat that.
 4      Q.    Did you ever communicate with any
 5  employee, officer, director, representative of
 6  any of the entities that are on this page
 7  concerning the debtor's ability to service the
 8  CLOs?
 9      A.    I believe so.
10      Q.    And can you identify the person or
11  persons?
12      A.    I think it's Jim Dondero.
13      Q.    Anybody else other than Mr. Dondero?
14      A.    No.
15      Q.    When did you have that conversation
16  or those conversations with Mr. Dondero?
17      A.    This letter is dated the 22nd --
18      Q.    Correct.
19      A.    -- right?
20      Q.    Yes.
21      A.    I believe that's the Tuesday before
22  Christmas, and this would have been on the
23  21st, the Monday.
24      Q.    What do you recall about your
25  conversation on the 21st regarding the
```

```
 1  substance of this particular letter?
 2      A.    Jim Dondero described why he
 3  believed sales being made on an ongoing basis
 4  after a request was made to stop was im- --
 5  improper.
 6      Q.    Do you -- do you rely on what
 7  Mr. Dondero said to you during that phone call
 8  on December 21st in -- in deciding to join in
 9  this particular letter?
10      A.    No.
11      Q.    Did you only then rely on the
12  information you obtained from counsel?
13      A.    Yes.  I -- I -- I -- I considered
14  this letter to be nearly the most gentle
15  request imaginable amongst lawyers to maintain
16  the status quo.
17      Q.    And the request that's made in this
18  letter is perfectly consistent with what
19  Mr. Dondero told you on the 21st of December,
20  correct?
21      A.    I don't -- no.
22      Q.    How --
23            MR. MORRIS:  Can we go to the end of
24      this letter, please.  All right.  Right
```

```
 1              GRANT SCOTT - 1/21/2021
 2  there.
 3  BY MR. MORRIS:
 4      Q.    Do you see the request that's in the
 5  last sentence?
 6      A.    Yes.
 7      Q.    Is that the same thing that
 8  Mr. Dondero told you should happen, that --
 9  that there should be no further CLO
10  transactions at least until the issues raised
11  and addressed by the debtor's plan were
12  resolved substantively?
13      A.    Yes.
14      Q.    Is there anything that he said
15  that's inconsistent with the request that's
16  made here?
17            MR. CLARK:  Objection, form.
18      A.    This -- and can you -- can you show
19  me earlier parts?
20      Q.    Of course.  You know what, I'll
21  withdraw the question.
22            And let me see if I can do it this
23  way:  In your discussion with Mr. Dondero, did
24  he indicate that he had seen a draft of this
25  letter?
```

```
 1              GRANT SCOTT - 1/21/2021
 2      A.    No.  And I didn't -- I didn't have a
 3  discussion with him.  I -- I merely listened to
 4  him.  There was no -- I -- I had no input to
 5  the conversation.
 6      Q.    Okay.  I -- I did -- I didn't --
 7  I -- I appreciate that.  So he called you; is
 8  that right?
 9      A.    We -- we called in.
10      Q.    Oh, was it --
11      A.    I --
12      Q.    Was it --
13      A.    I don't know --
14      Q.    Was it --
15      A.    I don't know the sequence of the
16  calls.  I'm sorry.
17      Q.    Was there anybody on the call other
18  than you and Mr. Dondero, the call that you're
19  describing on December 21st?
20      A.    Yes, my attorney and an attorney --
21  I believe the attorney that signed this letter.
22      Q.    Okay.  And I just want to focus on
23  what Mr. Dondero said.  Did he -- did he say
24  during the call that Highland should not be
25  engaging in any further CLO transactions?
```

Page 94

GRANT SCOTT - 1/21/2021

1       A.   He took a more -- if I can
2  characterize his mental -- I looked at the
3  issue of maintaining the status quo since there
4  was somebody that was complaining about it,
5  that that -- because it -- it isn't assets of
6  Highland, it doesn't adversely affect Highland.
7  If -- if stopping the sales -- you know, my --
8  my thought was -- is if stopping the sales
9  reduces the likelihood of litigation
10 disputes -- you already saw that there was the
11 one from middle of December.  I -- I thought
12 that would be the more appropriate way to go.
13 I didn't think there'd be any harm.
14      Q.   And was that your --
15      A.   I think -- I think Jim Dondero had a
16 more legalistic view of its impro- -- im- --
17 improper nature.
18      Q.   And did he share that view with you?
19      A.   On Monday, yes.
20      Q.   Can you describe for me your
21 recollection of what he said about the
22 legalistic view?
23      A.   Just the mention of -- all I recall
24 is in terms of -- the law associated with it

Page 95

GRANT SCOTT - 1/21/2021

1  was -- the Advisers Act was mentioned --
2       Q.   Did you have --
3       A.   -- but I don't -- I don't know what
4  that is.  You know, I don't know what that is.
5       Q.   And you -- and -- and you never --
6  it never occurred to you to pick up the phone
7  and -- and to speak with Mr. Seery to see why
8  it was he thought he should be engaging in
9  transactions?
10      A.   No.  And -- but I -- my lack of
11 volunteering a phone call to Jim Seery isn't --
12 it's -- it's because of -- I -- I thought any
13 phone call by me to Jim Seery would be
14 inappropriate because he's represented by
15 counsel.  I mean, we were working on claims
16 against him --
17      Q.   Okay.
18      A.   -- right, so...
19      Q.   Did you -- did you -- did you think
20 to instruct your lawyers to reach out to
21 Mr. Seery to actually speak to him instead of
22 just sending a letter like this and to -- and
23 to ask -- and to maybe inquire as to why he
24 thought it was appropriate to engage in

Page 96

GRANT SCOTT - 1/21/2021

1  transactions before they made a request six
2  days after the court threw out their suit as
3  frivolous?  I'll withdraw that.  That's too
4  much.
5            A few days later did you authorize
6  the sending of another letter to the debtor in
7  which you suggested that the -- the entities on
8  behoove -- on -- on whose behalf the letter was
9  sent might take steps to terminate the CLO
10 management agreements?
11      A.   I did not see -- so there is a --
12 there is a December 28th letter.
13      MR. MORRIS:  Let's just go to the
14      next letter, and -- and let's just call
15      that up.
16 BY MR. MORRIS:
17      Q.   I think it's -- I think it's
18 actually dated December 23rd.  It was the next
19 day.
20      A.   Yes.
21            (SCOTT EXHIBIT 4, Letter to James A.
22      Wright, III, et al., from Gregory Demo,
23      December 24, 2020, with Exhibit A
24      Attachment, was marked for identification.)

Page 97

GRANT SCOTT - 1/21/2021

1  BY MR. MORRIS:
2       Q.   And do you recall that the next day
3  CLO HoldCo Limited joined in another letter to
4  the debtors?  Do you have that recollection?
5       A.   Yes.  Not -- not be- -- yes, I do,
6  but -- yes, I do.
7       Q.   Did you see this letter before it
8  was sent?
9       A.   I don't believe so.
10      Q.   Did you authorize the sending of
11 this letter?
12      A.   I gave -- I relied on my attorney to
13 guide me through this process.
14      Q.   I appreciate that.
15      A.   I let him make that call on this
16 letter, which is -- copies most of the prior
17 letter and then adds another issue.
18      Q.   Okay.  Do you have an understanding
19 of what that issue is?
20      A.   Yes.
21      Q.   And what is your understanding of
22 what that additional issue is?
23      A.   Somewhere in this letter of the 23rd
24 there's an -- there's an -- an inclusion of

Page 98

GRANT SCOTT - 1/21/2021

1  a -- a statement of an -- a future intent.
2      Q.    A future intent to do what?
3      A.    To remove Highland as the servicer
4  of the agreements you talked to me about
5  previously.
6      Q.    Can you tell me whether there's a
7  factual basis on which CLO HoldCo Limited
8  believes that the debtor should be removed as
9  the servicer of the portfolio manager of the
10  CLOs?
11      A.    Yes.  There are -- there are
12  multiple bases to consider subject to all the
13  other conditional language in the request of
14  these letters to consider that going forward
15  but no decision.  That intent is an intent to
16  evaluate, not an intent to take any action.  I
17  haven't authorized any action.  I don't feel
18  comfortable with my knowledge base at this
19  time, but it's something being explored.
20      Q.    So knowing everything that you know
21  as of today, you have not yet formed a decision
22  as to whether CLO HoldCo Limited will take any
23  steps to terminate Highland's portfolio
24  management agreements, correct?
25

Page 99

GRANT SCOTT - 1/21/2021

1      A.    I don't -- I don't want to be
2  difficult, but I'm -- I'm confused yet again
3  with your question.  But I have not -- there --
4  there are a number of cr- -- a number of issues
5  that with my nonfinance background would
6  suggest to me that they -- they may be bases
7  for -- for cause, to -- to assert a cause.  And
8  I've been conferring with my attorney about
9  that, but it's very preliminary and no -- no
10  decision has been made.  I -- no decision is
11  being made.
12      Q.    So what -- what are the factors that
13  are causing you to consider possibly seeking to
14  begin the process of terminating the CLO
15  management agreements?
16      A.    Well, I guess I would break them
17  down into maybe two categories, maybe more.
18  The one that resonates most with me -- I don't
19  know -- maybe because even though I'm a patent
20  attorney, I guess at one point I was an
21  attorney.  But the thing that resonates most
22  with me --
23      Q.    You are an attorney.
24      A.    -- at the moment -- well, now you
25

Page 100

GRANT SCOTT - 1/21/2021

1  know why I'm a patent attorney and not one of
2  you guys.  But the thing that resonates with me
3  the most from a legal substantive, black letter
4  law sort of issue is the plan for
5  reorganization, which we've objected to.  I've
6  re- -- I've reviewed the objection, and that
7  sets forth our -- that sets forth my position,
8  and I consider that to be quite material.  The
9  others are issues of practical effects of
10  what's happened thus far with the bankruptcy,
11  the termination of the experts with a long
12  track record of success, the soon-to-be
13  termination of all employees, the cancellation
14  of various representation agreements, things of
15  that nature looked at from an additive sort of
16  perspective.
17      Q.    You know that -- can we refer to the
18  counterparties under the CLO management
19  agreements as the issuers?  Are you familiar
20  with that term?
21      A.    I -- I am familiar with the term
22  issuers, yes.
23      Q.    Okay.  And do you understand --
24      A.    There's an agreement between the --
25

Page 101

GRANT SCOTT - 1/21/2021

1  I'm sorry.
2      Q.    There's an agreement between the
3  issuers and Highland pursuant to which Highland
4  manages the CLO assets, right?
5      A.    With res- -- yes.
6      Q.    Okay.  And do you understand what's
7  going to happen to those management contracts
8  in connection with the plan of reorganization?
9      A.    Partially.
10      Q.    What's your partial understanding?
11      A.    Well, I -- I wouldn't want to
12  characterize it as a partial understanding.  I
13  mean, with respect to part of the agreement.
14      Q.    Okay.
15      A.    Okay.  Our plan objection lays out
16  our basis for objecting to steps that Highland
17  is actively taking to preclude us from the full
18  rights that we have as third-party
19  beneficiaries under that agreement, and they're
20  not de minimus.  They're quite material.  They
21  relate to cause issues and no-cause issues, for
22  example, as out- -- as outlined in our --
23  our -- our objections.
24      Q.    Okay.  Did you ever make any attempt
25

Page 102

GRANT SCOTT - 1/21/2021

1  to speak with any issuer concerning Highland's
2  performance under the CLO management
3  agreements?
4      A.   No.
5      Q.   Why not?
6      A.   I -- I don't have any facts --
7  understand I -- I get all of the reports
8  periodically from Highland -- from Highland.
9  I -- I don't have a basis that I'm aware of to
10 complain about performance issues.  This is a
11 legal issue that I'm talking about.
12     Q.   So you have no basis to suggest that
13 Highland hasn't performed under the CLO
14 management agreements, correct?
15     A.   Well, Highland as of right now,
16 the -- the issue really is as -- as to what's
17 next, not -- not -- I -- I don't -- I don't
18 believe I have facts that support a com- --
19 a -- an issue right now.  It's -- it's --
20 it's -- it's going forward that is the problem.
21     Q.   I --
22     A.   That's -- you know, that's --
23     Q.   Have you given any thought to
24 speaking with the issuers to try to get their

Page 103

GRANT SCOTT - 1/21/2021

1  views as to what they think is going to happen
2  in the future?
3      A.   No.
4      Q.   They're the -- they're the actual
5  direct beneficiaries under the CLO management
6  agreements, to the best of your understanding,
7  right?
8      A.   Yes.  Their rights may not be
9  impacted; it's CLO Holdco's rights that are
10 going to be adversely impacted.  So it's -- I
11 don't know that our view is in alignment with
12 their view.  But to answer your question, no,
13 we did not contact them.
14     Q.   Do you have any knowledge or
15 information as to any assertion by the issuers
16 that Highland is in breach of any of the CLO
17 management agreements?
18     A.   No.
19     Q.   Do you have any knowledge or
20 information as to whether or not any of the
21 issuers believe that Highland is in default
22 under the CLO management agreements?
23     A.   No, I don't have any of those facts.
24     Q.   Are you aware that the issuers are

Page 104

GRANT SCOTT - 1/21/2021

1  negotiating with Highland to permit Highland to
2  assume the CLO management agreements and to
3  continue operating under them?
4      A.   I believe so --
5      Q.   Is that --
6      A.   -- but they're --
7      Q.   Go ahead.  I'm sorry.
8      A.   As I understand it, Highland
9  wants -- Highland or its subsidiary -- or
10 its -- its -- its postbankruptcy relative --
11 post- -- excuse me, that Highland
12 postbankruptcy -- or postplan confirmation
13 wants to move forward, substitute itself for
14 the prior issuer -- no, sorry, substitute
15 itself for the prior servicer under those
16 agreements to assume those agreements but in
17 the process of assuming those agreements,
18 carving out a bunch of provisions that from a
19 legal standpoint and a potentially future
20 practical and monetary standpoint are quite
21 substantial, and that has to relate to the
22 removal rights based on cause and without
23 cause.  As I understand it, that's all set
24 forth in our plan objection.

Page 105

GRANT SCOTT - 1/21/2021

1      Q.   Okay.  Are you aware of a third
2  letter that was sent to Highland on behalf of
3  CLO HoldCo and the other entities that are
4  listed in this document?
5      A.   The December 28th letter, is that
6  what you mean?
7      Q.   It's actually December 31st, if I
8  can refresh your recollection.
9          MR. MORRIS:  Can we put up Exhibit
10     F?
11         (SCOTT EXHIBIT 5, Letter to Jeffrey
12     N. Pomerantz from R. Charles Miller,
13     December 31, 2020, was marked for
14     identification.)
15 BY MR. MORRIS:
16     Q.   You remember that there was a letter
17 dated on or about December 31st that was
18 sent -- oh, actually, you know, I apologize.
19 If we scroll down to the -- to the next -- to
20 the first box, there actually is no mention of
21 CLO HoldCo.
22         Are you aware that Mr. Dondero was
23 evicted from Highland's offices as of the end
24 of the year?

Page 106

```
 1              GRANT SCOTT - 1/21/2021
 2       A.    I -- I didn't know the time, but I
 3  understand he's no longer there.
 4       Q.    Does CLO HoldCo Limited contend that
 5  it was damaged in any way by Mr. Dondero's
 6  eviction from the Highland suite of offices?
 7            MR. CLARK:  Objection, form.
 8       A.    I -- I don't have any information to
 9  support that as of this time.
10       Q.    It's not -- it's not a belief that
11  you hold today?
12       A.    I don't have a belief of that, yes.
13            MR. MORRIS:  All right.  Let's take
14       a short break.  I may be done.  I -- I'm
15       grateful, Mr. Scott, and don't want to
16       abuse your time.  Give me -- let -- just
17       let -- let's come back at 4:50, just eight
18       minutes, and if I have anything further, it
19       will be brief.
20            (Whereupon, there was a recess in
21       the proceedings from 4:42 p.m. to
22       4:49 p.m.)
23            MR. MORRIS:  Okay.  Mr. Scott, thank
24       you very much for your time.  I have no
25       further questions.
```

Page 107

```
 1              GRANT SCOTT - 1/21/2021
 2            THE WITNESS:  Thank you.
 3            MR. CLARK:  We will reserve our
 4       questions.
 5            THE WITNESS:  I appreciate it, John.
 6            MR. MORRIS:  Take care.  Thanks for
 7       your time and your -- and your diligence.
 8       I do appreciate it.  Take care, guys.
 9            THE REPORTER:  Okay.
10            MR. CLARK:  Thank you.
11            MR. HOGEWOOD:  No questions from us.
12            (Time Noted:  4:50 p.m.)
13
14
15            ---------------------
16                 GRANT SCOTT
17
18  Subscribed and sworn to before me
19  this      day of           2021.
20
21  -------------------------------------
22
23
24
25
```

Page 108

```
 1              GRANT SCOTT - 1/21/2021
 2            C E R T I F I C A T E
 3  STATE OF NORTH CAROLINA  )
 4                           ) ss.:
 5  COUNTY OF WAKE           )
 6
 7            I, LISA A. WHEELER, RPR, CRR, a
 8  Notary Public within and for the State of New
 9  York, do hereby certify:
10            That GRANT SCOTT, the witness whose
11  deposition is hereinbefore set forth, having
12  produced satisfactory evidence of
13  identification and having been first duly sworn
14  by me, according to the emergency video
15  notarization requirements contained in G.S.
16  10B-25, and that such deposition is a true
17  record of the testimony given by such witness.
18            I further certify that I am not
19  related to any of the parties to this action by
20  blood or marriage; and that I am in no way
21  interested in the outcome of this matter.
22            IN WITNESS WHEREOF, I have hereunto
23  set my hand this 21st day of January, 2021.
24            -----Lisa Wheeler-----
25            LISA A. WHEELER, RPR, CRR
```

Page 109

```
 1              GRANT SCOTT - 1/21/2021
 2  -------------------I N D E X-----------------
 3                                      PAGE
 4  EXAMINATION BY MR. MORRIS            7
 5
 6
 7  ------------------EXHIBITS-------------------
 8                                      PAGE
 9  EXHIBIT 1  Organizational Structure:   46
10            CLO HoldCo, Ltd.
            EXHIBIT 2  Unanimous Written Consent of   54
11            Directors In Lieu of Meeting
12  EXHIBIT 3  Letter to James A. Wright,   78
            III, et al., from Gregory
13            Demo, December 24, 2020, with
            Exhibit A Attachment
14  EXHIBIT 4  Letter to James A. Wright,   96
            III, et al. From Gregory
15            Demo, December 24, 2020, with
            Exhibit A Attachment
16
   EXHIBIT 5  Letter to Jeffrey N.         105
17            Pomerantz from R. Charles
            Miller, December 31, 2020
18
19
20
21
22
23
24
25
```

Appx. 01821

Index: 1..aware

**1**

**1** 46:13,14 53:9,16 82:5,13

**1/21/2021** 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1

**100** 47:7

**11-month** 70:9

**1976** 28:15

**1984** 24:20

**1986** 24:22

**1988** 25:5

**1991** 25:6

**2**

**2** 54:25

**2012** 16:23

**2019** 23:4 76:17

**2020** 30:15 78:8 84:9 96:24 105:14

**2021** 107:19

**21st** 90:23,25 91:9,20 93:19

**22nd** 78:15,23 79:19 81:3 90:17

**23rd** 96:19 97:24

**24** 78:8 96:24

**24th** 81:4 83:2

**28th** 81:5 96:13 105:6

**3**

**3** 78:6

**31** 105:14

**31st** 105:8,18

**3:20** 62:6

**3:30** 61:25

**3:31** 62:7

**4**

**4** 55:8 96:22

**45** 31:20 32:2

**4:42** 106:21

**4:49** 106:22

**4:50** 106:17 107:12

**5**

**5** 54:24 105:12

**6**

**6** 78:4

**9**

**99** 52:9 53:4,10,13

**A**

**ability** 90:7

**Absolutely** 8:22

**abuse** 106:16

**accommodated** 35:22

**accounting** 29:22

**accurate** 51:5 53:8 89:15

**acronym** 12:23

**act** 11:13 95:2

**acting** 10:10

**action** 83:16 85:16 98:17,18

**actively** 101:18

**activity** 50:9,14

**acts** 72:17

**actual** 6:24 103:5

**add** 88:2

**additional** 81:5 97:23

**additive** 100:16

**addressed** 92:11

**addressing** 20:4

**adds** 97:18

**admissibility** 6:23

**advance** 37:23

**adversely** 94:7 103:11

**Advisers** 95:2

**affairs** 63:2

**affect** 94:7

**affiliated** 49:16

**aft-** 23:5

**afternoon** 6:6 7:7

**agree** 35:12,13,17 36:18 37:4,18

**agreed** 35:20,21 43:22 45:2,15 85:23

**agreement** 26:7 36:19 42:11 61:15,16 62:15 67:22 68:6,9, 13,21 70:18 71:7,16, 17 72:20 100:25 101:3,14,20

**agreements** 24:4 62:18 70:21 71:22 72:16 73:10 74:3,10 81:12 96:11 98:5,25 99:16 100:15,20 102:4,15 103:7,18,23 104:3,17,18

**agrees** 6:16

**ahead** 38:2 104:8

**alignment** 103:12

**allowed** 37:10

**amended** 40:12,16

**amendment** 38:10

**amount** 27:8

**amounts** 24:6

**announcement** 43:12

**ansel** 33:18

**answer's** 74:6,22

**anymore** 89:22

**apologies** 89:21

**apologize** 50:11 55:4 59:21 105:19

**apparently** 35:15

**appointed** 88:15

**appointment** 17:6

**approval** 27:5

**approvals** 64:14

**approve** 48:12 75:11,12

**approved** 41:13,16

**approving** 64:16

**approximately** 11:17 17:6 60:20

**area** 25:24 64:19

**argument** 42:12

**arises** 71:7,15

**arrangement** 18:10 47:13 53:12,13

**as-** 35:14

**Asia** 46:12

**aspect** 19:24 20:6 77:12

**assert** 79:9 99:8

**assertion** 103:16

**asset** 32:23 33:7,10 37:9

**assets** 10:22,24 11:14 12:11 13:13, 15,17,20,23 18:25 19:15 20:11 24:5 32:12 33:11,15 35:13,14,15,17 37:8 71:23 94:6 101:5

**assume** 104:3,17

**assumed** 11:25

**assuming** 104:18

**attached** 46:21 52:24

**Attachment** 78:9 96:25

**attempt** 76:19,25 101:25

**attorney** 6:7 24:11 35:21 38:14,21 39:5, 6 42:6 43:22,23 45:2 65:17 70:13 80:15 87:6 93:20,21 97:13 99:9,21,22,24 100:2

**attorney-client** 65:20 79:9

**attorneys** 87:11

**attraction** 32:18,21

**authority** 15:9,19 33:24

**authorize** 96:6 97:11

**authorized** 45:4 88:10,18 98:18

**aware** 27:13 34:12 36:2 38:12 40:5,9 58:10 62:14,19 69:21 71:20,21 72:8,11 73:24 74:8,17 76:11 77:19 79:16,18,25 80:16,17 82:22 83:21 85:5 102:10 103:25

Appx. 01822

105:2,23

**B**

**back** 20:21 54:18
56:18,20 81:21 87:25
88:15 106:17

**background** 24:17
99:6

**bankruptcy** 6:9
22:9,19,21,24 23:5,
14 30:14,15 34:11,13
35:19 76:12,15,18,23
77:6 84:23 85:12,15
100:11

**Barbara** 52:15 56:12,
13,23 58:10

**base** 98:19

**based** 29:9 61:5,15
65:20 73:16 80:22
104:23

**bases** 98:13 99:7

**basically** 20:22 24:6

**basis** 19:25 21:4
24:13 26:9 37:15
42:17 60:13 82:19
86:5 91:4 98:8
101:17 102:10,13

**be-** 97:6

**began** 25:4

**begin** 6:13 7:4 8:20
16:22 99:15

**behalf** 10:11 14:2,12
15:20 16:3 26:25
27:17,23 33:25 34:4
37:22 40:22 67:17
77:20 78:18 84:5,9,
14 85:17 86:4 87:10
88:14 89:2,11 96:9
105:3

**behoove** 96:9

**belief** 73:13,14,15
86:5 106:10,12

**believed** 42:16 67:20
68:11 91:4

**believes** 98:9

**beneficial** 58:14,16

**beneficiaries** 61:8,
12 101:20 103:6

**beneficiary** 61:19
73:9

**big** 33:3 39:8

**biggest** 23:16

**bit** 8:15 30:18 52:19
55:12

**black** 100:4

**blocks** 52:13

**board** 34:25

**bottom** 46:24 55:22

**box** 105:21

**boxes** 47:13

**breach** 68:12 74:9,
15,18 103:17

**breached** 67:21

**break** 19:7 61:24
99:17 106:14

**breaking** 55:11

**briefly** 81:4

**brilliantly** 76:10

**brought** 82:4

**bucket** 71:20

**bunch** 104:19

**business** 29:19 50:4

**business/finance**
29:22

**C**

**call** 18:6 35:4,19,20
44:9 45:11 91:8
93:17,18,24 95:12,14
96:15 97:16

**called** 6:3 10:15
35:9,20 44:6 45:12
46:7 87:22,25 93:7,9

**calls** 93:16

**camp** 75:13

**cancellation** 100:14

**CANTY** 55:6,9

**capacity** 17:9 18:20
26:21 34:5,7 50:2
51:20 72:25 73:23
74:7 75:24 83:22
84:20

**Capital** 6:10 13:18,
19,22 14:16 19:18
28:12 62:15,21,25
67:21 68:5,11,19,24
69:14 70:19,22 71:21
72:12,16,21 73:25
74:10 75:2,17

**Capital's** 68:19

**caps** 13:10

**care** 107:6,8

**Carolina** 25:8

**carry** 18:4,13

**carving** 104:19

**cash** 36:13 37:9

**categories** 99:18

**caused** 74:11 84:19

**causing** 99:14

**caution** 44:11 65:16,
18 79:7

**caveats** 83:18

**Cayman** 47:4

**certainty** 33:20

**change** 27:10

**changed** 20:23
38:21 84:19

**char-** 51:16

**characterize** 94:3
101:13

**charge** 20:16

**charitable** 11:3,4
12:14 17:24 18:4,14
32:13,17,20 36:16
47:8,22 48:15 49:3,4,
7,10,13,17,21 50:3,
10,16,23 51:2,10,13,
17,23 52:3,6,9,10
53:3,5,17,25 54:10,

14,20 56:8 58:15
60:3,25 65:8

**Charles** 105:13

**chart** 46:25 48:16
55:20

**chemical** 29:4

**choice** 10:2

**chose** 29:11

**Christmas** 90:22

**chronological** 34:20

**City** 52:15 56:13

**claim** 23:11,22,24
38:10,11 39:11,12,
19,23 40:4,8,12,13,
16 46:22 52:25

**claims** 95:16

**clarify** 13:3 43:18,19

**CLARK** 26:5,12 31:2,
10 32:25 33:8,17
39:14 40:24 42:24
44:10 54:4 59:14
62:3 64:4,10 65:15
69:5,18,24 72:22
73:5 74:4,12,19
75:18 79:6,14 80:21
83:13 87:18 92:17
106:7 107:3,10

**clerical** 60:18

**CLO** 10:15,21 11:8
12:2,7,11,15,20,23,
25 13:23 14:2,12
15:10,20,24 16:4,6,9,
11,15,20 17:5,15,18,
22 18:21,25 19:3,15,
17,20 21:5 22:10
23:2,9,18 24:3 26:25
27:17,23 28:6 32:10,
23 33:6,15,25 34:8
35:17 36:12,23 37:7,
22 40:22 41:11 42:20
45:19,20 46:2,3,15,
22 47:3,7,17 48:23
50:14 51:3 52:25
54:15 58:21 61:8
62:12,16 63:2 64:20
67:17,22 68:13,18
69:3,13,16,22 70:4,
19,23 72:8,19 74:3,8,
9,24 75:25 76:2,19

14,20 56:8 58:15

**14,20 56:8 58:15**

77:5,13,20 79:19
80:2,12 82:2,11
84:14,20 85:21 92:9
93:25 96:10 97:4
98:8,23 99:15 100:19
101:5 102:3,14
103:6,10,17,23 104:3
105:4,22 106:4

**CLO's** 35:14

**CLOS** 13:13 68:6
69:3,16 70:23 71:18,
22,24 72:9,11,21
74:25 75:16,19
76:20,25 77:13 83:7,
23 84:5,9,14 85:17
86:4 87:10 89:3,12
90:8 98:11

**close** 30:17

**closest** 28:20,21
31:23

**collateralized** 10:23

**collectively** 20:25
80:18

**college** 28:22 29:7

**Colorado** 67:3

**com-** 20:15 25:24
102:19

**comfortable** 85:2
98:19

**comments** 79:3,8,10

**commonly** 12:16

**communicate** 90:4

**communicated** 39:4
62:24

**communicating**
67:5

**communication**
45:6

**communications**
44:14 64:8,23 65:12,
20 66:21 67:15 68:16
80:22,25 87:5

**company** 10:22
33:9,21 65:23

**compensation**
16:19 17:2 49:20,25

Index: complain..discussion

**complain** 102:11

**complaining** 94:5

**complex** 18:19

**compliance** 18:11
20:3,13,16 25:16,17,
20,24 50:8

**comports** 47:2

**con-** 85:8

**concern** 37:5 68:17
71:6,14

**conclude** 86:20 87:8

**conditional** 98:14

**conducted** 6:19

**conference** 35:9

**conferring** 99:9

**confide** 31:17

**confided** 31:9

**confidential** 32:3

**confirmation** 6:14
104:13

**confused** 40:25
47:13 53:11 99:3

**confusing** 13:3
53:19

**confusion** 85:9

**connection** 62:11
69:2 74:2 101:9

**consent** 27:16,22
55:2,18

**consideration** 76:6

**considered** 91:14

**consistent** 33:22
91:19

**construction** 67:2

**consulted** 39:5 42:7

**contact** 21:19,20,22
103:14

**contacted** 38:21

**contacts** 87:24 88:2

**contained** 69:22

**contend** 69:13 72:19
106:4

**contentious** 66:2

**continue** 104:4

**contract** 36:17

**contracts** 101:8

**conversation** 66:12,
25 88:4 90:15,25
93:5

**conversations** 65:4
66:8 73:16 90:16

**converting** 83:16

**cookie** 18:9

**copies** 97:17

**copy** 78:23

**core** 15:5,8

**corner** 46:25

**corporate** 11:7 73:2

**correct** 10:13 16:14
17:10,13 23:15 25:25
53:14 58:17 71:13
77:2,3 84:18 88:12
90:18 91:21 98:25
102:15

**corrected** 60:21

**correction** 60:22

**correctly** 23:12
29:20 36:7 42:10

**cos-** 77:23

**counsel** 10:9 11:23
23:6 36:8 43:12
44:12,15 73:17 79:8
80:23,25 85:23 91:13
95:16

**counterparties**
100:19

**couple** 18:17

**Cournoyer** 15:4

**court** 6:21 35:19
41:16 42:14,20 43:13
80:4 82:5,14,22 83:6,
12 96:3

**courtesy** 8:24

**courtroom** 7:23

**Covitz** 14:20 15:2
86:15,20

**cr-** 99:5

**create** 17:24

**created** 18:3 36:20

**creditor** 23:9,21

**cutter** 18:9

---

**D**

**D-A-F** 13:10

**DA-** 51:23

**DAF** 12:17,20,23,25
13:9 19:20 47:8
48:15 49:3,4,7,10,13,
17,22 50:3,10,16,23
51:2,10,13,17,23
52:3,6,9,11 53:3,5,
17,25 54:11,14 56:8
58:15 60:3,25

**Dallas** 52:14,18
55:19 56:2,22 58:9

**damaged** 106:5

**dated** 52:20 78:15
82:25 83:2 90:17
96:19 105:18

**day** 21:9,12,19 42:14
96:20 97:3 107:19

**day-to-day** 12:9
19:25 50:6

**days** 21:21,25 83:12
96:3,6

**DDDD** 78:5

**de** 52:16 101:21

**de-** 31:16

**deal** 20:13

**debtor** 6:9 23:9,10,
12,22,25 86:3 88:15
89:2 96:7 98:9

**debtor's** 41:12 77:12
90:7 92:11

**debtors** 97:5

**Dece-** 78:14

**December** 78:8,15,
23 79:18 91:9,20
93:19 94:12 96:13,
19,24 105:6,8,14,18

**decide** 82:2,12

**decided** 82:23 83:3

**deciding** 91:9

**decision** 34:3,9 36:3,
4,18 37:14,18,21
38:19,21,23 39:8
43:10,21 45:15,16
47:25 48:10 66:15
74:24 81:18 86:7,8
98:16,22 99:11

**decision-makers**
84:24

**decision-making**
15:9,18 33:14,24
85:20,21 86:17,21

**decisions** 13:25
14:12 16:3 26:25
34:14,23 48:7 75:5
85:2

**declared** 30:16

**declined** 40:23

**dedicate** 21:14

**default** 68:5,12 74:9
103:22

**define** 31:17

**degree** 24:22

**Delaware** 29:5

**delayed** 70:10 71:11

**demand** 81:8 83:17,
19

**Demo** 78:7 96:23

**demonstrative** 46:7
56:21

**deposed** 7:10 8:12

**deposition** 6:12,17
7:9,18,23 8:2 9:8
23:7

**depositions** 7:13
8:16

**derived** 24:7 81:11

**describe** 10:20
23:23 24:16 30:5
66:20 94:21

**describing** 93:19

**desire** 85:13

**detail** 11:7

**details** 10:6

**detected** 60:21

**devote** 21:2,5 22:10

**devoting** 22:18

**difference** 22:5 39:7
83:15

**difficult** 30:18 41:17
69:11 99:3

**diligence** 107:7

**direct** 103:6

**directly** 28:8

**director** 11:11 12:2,7
16:16,20,25 17:4,13
18:21 19:3,17 21:5
22:25 26:21 28:5
32:9 34:5,8 35:6
47:17 48:24 50:22
51:3,4,12,16 52:3,6
55:25 56:6,11,15,25
57:8,11 58:9 62:12
73:23 74:7 75:24
76:24 84:20 90:5

**directors** 15:24
49:14 50:20 55:2,18
59:12,18

**disagree** 88:23 89:4

**disagreed** 34:10,15

**disagreement** 38:13

**disclose** 44:13 65:19
80:24

**discuss** 42:19 67:16

**discussed** 73:20
77:8,11 81:13

**discussion** 67:23
80:16 85:23 89:7
92:23 93:3

Appx. 01824

**discussions** 64:3 67:19 68:3,10

**dispute** 35:15

**disputes** 94:11

**distinction** 70:24

**distinguish** 70:17

**distracted** 33:4 72:4

**division** 53:10

**document** 9:12,14 46:9 54:22 55:14,22 73:12 89:9 105:5

**documents** 9:9,10 52:24 66:24

**Don-** 11:21

**donated** 24:4

**Dondero** 7:21 9:17 10:7 11:24 14:20,25 17:24 28:7,9,10,14, 16 29:24 30:6,25 31:5,9,20 32:2,22 33:5 34:10 35:24 37:2,23 39:12,19 41:7 42:20 43:10 45:9 48:7 51:19,22 52:2,5 57:4,8 58:12 60:23 61:13 62:20 63:19 67:7 84:12,17, 24 85:5 86:9,12 89:4 90:12,13,16 91:3,8, 20 92:8,23 93:18,23 94:16 105:23

**Dondero's** 7:19 10:11 30:21 47:21 57:21 58:2 60:11,14 67:3 106:5

**downward** 54:13

**draft** 78:25 92:24

**dry** 19:5

**due** 35:17 70:11

**Dugaboy** 59:25 60:5, 15,19 61:7,19

**duly** 6:3

**duties** 12:6 19:2,16 62:11 69:15

---

**E**

**e-mailed** 66:23

**earlier** 25:17 26:24 62:9 75:4 77:16 78:25 79:16 82:3,12 83:12 85:4 87:20 92:19

**earnestly** 89:20

**easier** 12:23 42:5

**Eastern** 61:25

**easy** 89:19

**educational** 24:17

**effect** 37:9

**effects** 100:10

**effectuated** 27:23

**effectuating** 27:16

**electrical** 24:18

**Electronics** 8:6

**employee** 14:16 16:17 90:5

**employees** 11:21,22 14:17 16:7 17:11 26:23 27:15,22 40:3 49:11 50:17,18 57:15 59:12,19 100:14

**end** 55:12 91:24 105:24

**ended** 35:20

**engage** 87:10 89:10 95:25

**engaged** 88:14

**engaging** 82:6 83:7 93:25 95:9

**engineer** 24:18 25:2 29:5

**engineering** 29:17

**entities** 11:2 12:12 17:25 18:3,7,10 46:2 54:16 55:20 56:8 78:18 79:19 80:2 82:4,13 89:8 90:6 96:8 105:4

---

**entity** 10:15,18 12:3, 25 13:4 17:12,25 51:9 52:17 58:15 74:24 81:11 85:19

**entity's** 50:4

**Equity** 70:9

**equivalent** 11:4

**error** 60:18,19

**escrow** 37:14

**essentially** 83:17

**establish** 23:11 47:25 48:7,10 65:6

**established** 51:18 58:20

**estimate** 21:3,24

**estimated** 21:12

**et al** 78:7 96:23

**evaluate** 98:17

**event** 66:6

**events** 30:14 36:7

**evicted** 105:24

**eviction** 106:6

**evidence** 6:17

**evidenced** 42:12

**ex-wife** 10:9,11

**exam-** 86:11

**EXAMINATION** 7:5

**examined** 6:4

**exclusive** 23:20 702-9580 24:13

**exclusively** 24:10 50:14

**excuse** 21:11 22:15 23:7,9 28:25 104:12

**execute** 32:16 86:4

**exhibit** 46:7,13,14 54:24,25 55:7 78:4,5, 6,8,11 96:22,24 105:10,12

**exist** 75:16

---

**existence** 12:3

**exiting** 77:5

**expenses** 36:14 64:15

**experience** 8:16

**expert** 25:13,24

**expertise** 76:8 84:25 86:3 88:5 89:10

**experts** 100:12

**explain** 17:21 75:10

**explained** 45:14

**explored** 98:20

**extend** 8:23

**extent** 26:13 79:7 80:22

---

**F**

**fact** 6:19 76:16 88:14

**factors** 99:13

**facts** 46:10 47:2 102:7,19 103:24

**factual** 98:8

**fair** 8:21 16:2 22:8 30:13,24 31:8,18,25 37:19 39:11 47:22,24 73:3,5 85:12,17 88:11

**fairly** 18:19 36:12

**fall** 25:5

**familiar** 10:14 45:20, 24 47:12 100:20,22

**familiarity** 45:25 47:11

**family** 7:20 9:17

**feed** 52:12 56:7

**feedback** 82:8

**feeds** 52:13

**feel** 98:18

**fees** 36:15

**felt** 84:25

---

**field** 25:13

**filed** 20:5 23:5 38:24 39:13,20 40:17,18 42:8 76:12,15

**filing** 22:22,24 23:13 39:22 76:18,24 77:6 83:16

**final** 15:8,18 33:13,24

**finance** 18:2 25:10 29:18

**Finances** 19:23

**financial** 20:10 85:20

**finish** 8:19

**firm** 6:8

**flow** 36:13 37:7,11

**flows** 54:6,13,18

**focus** 23:20 36:24 68:8 93:22

**folks** 62:10

**footnote** 46:23

**forget** 26:15 35:7 52:18

**forgive** 69:9

**forgot** 19:8

**form** 26:6,9,10,13 31:2,10 32:25 33:8, 17 37:8 39:14 40:24 42:24 54:4 59:14 64:4,10 69:5,18,24 19 75:18 83:13 86:2 87:18 92:17 106:7

**formal** 25:9,15

**formed** 17:15,19,22 47:4 98:22

**formulated** 82:18

**forward** 7:2 42:18 98:15 102:21 104:14

**found** 9:24 36:5,7 45:9

**foundation** 11:4 52:14 55:19 56:2,5, 22,23 65:8 82:20

**foundation-like** 17:25

**foundations** 12:15 53:22,23 54:10,17 56:7,10 57:5,9,12,15, 20,25 58:10,12

**fourth** 52:15,17 53:24

**frankly** 76:9

**free** 80:23

**frequently** 12:21,24 13:3,5

**Friday** 21:15

**friend** 28:13,21 31:23

**friends** 28:20

**friendship** 30:17

**frivolous** 96:4

**full** 70:7 84:21 101:18

**function** 18:14

**fund** 47:8 48:15 49:4 50:10,17,23 51:2 52:6,11 53:5,18 54:10,11

**future** 98:2,3 103:3 104:20

**G**

**gamut** 20:5

**gave** 43:21 86:19 87:4 97:13

**general** 18:9 45:25 49:3 66:7 83:2

**generally** 7:17 8:17 24:17 25:22 30:8,11 45:19,23 63:14 66:7, 20 71:12

**gentle** 83:17 91:15

**get all** 102:8

**get-** 20:4

**give** 77:4 106:16

**giving** 36:16 47:22

**goal** 18:4

**good** 6:6 7:7 26:20 30:8,9 43:25 58:23, 25 59:5,9,11,17,22 61:6,12

**good-faith** 42:17

**GP** 49:3,8,10,13,17, 22 50:3 51:24

**graduate** 24:20

**graduated** 24:13,19 25:5

**Grant** 6:1,12 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1,13 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1,10 45:1 46:1 47:1 48:1 49:1 50:1 51:1,2,4 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1, 15 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,6 80:1,21 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1,16

**grateful** 89:18 106:15

**Gregory** 78:7 96:23

**group** 11:18,19 14:15 15:6,8,21 18:7 19:21 86:14

**grow** 28:16

**guess** 11:24 12:22 18:2 20:20 25:2 40:4, 5 42:13 45:7 65:23 78:11 99:17,21

**guide** 97:14

**guideline** 27:8,14

**guys** 100:3 107:8

**H**

**half** 43:6 60:21

**halt** 81:8

**hand** 70:20

**handled** 8:10 20:7

**happen** 92:8 101:8 103:2

**happened** 100:11

**Har-** 38:17

**Harbourvest** 38:18 40:20 41:3,8,12,15, 25 43:11

**hard** 21:13

**harm** 94:14

**HCLO** 73:22,23

**HCM** 76:11

**head** 28:11

**heads** 28:12

**hear** 13:9 48:5 55:7

**heard** 20:22 51:9

**hearing** 6:18 42:15, 23 43:4 83:5

**held** 33:15

**helped** 65:6

**helps** 54:22

**Hey** 44:10

**hierarchy** 11:18,20 23:16 65:7

**high** 23:17,18 28:15

**Highland** 6:10 11:22 13:18,19,22 14:3,15, 16 19:18 20:7 26:23 27:14,22 28:12 34:25 40:2 52:14 55:19,25 56:22 62:11,15,21,25 63:17 67:6,21 68:4, 11,19,24 69:14 70:9, 12,18,22 71:11,21 72:12,16,20 73:25

**74:10 75:2,17 76:3,9, 14,21 77:2,6 80:5 81:10,11 82:6,14 83:6,22,24 84:4,8,13 85:6,14,16,18 89:4 93:24 94:7 98:4 101:4,17 102:9,14,16 103:17,22 104:2,9, 10,12 105:3 106:6**

**Highland's** 35:14 98:24 102:2 105:24

**highly** 44:7

**hindsight** 26:19

**historically** 86:7

**HOGEWOOD** 107:11

**hold** 25:12,23 48:14 65:15 79:6 106:11

**Holdco** 10:15,21 11:9 12:2,7,16,20,23 13:23 14:2,12 15:10, 20,24 16:4,6,9,11,15, 20 17:5,15,18,22 18:21 19:3,17,20 21:5 22:10 23:2 26:25 27:17,24 28:6 32:10,23 33:6,16,25 34:8 36:12,23 37:7, 22 40:22 41:11 42:21 45:19,21 46:2,3,15, 22 47:3,7,17 48:23 50:14 51:3,10,13,17 52:9,25 53:3,25 54:11,14,15 56:8 58:15,21 60:3,25 61:9 62:12,16 63:2 64:20 68:13,18 69:4, 13,17,22 70:4,19,23 72:8,19 73:22,24 74:8,24 75:25 76:19 77:13,21 79:19 80:2, 13 82:2,11 84:21 97:4 98:8,23 105:4, 22 106:4**

**Holdco's** 85:21 103:10

**holding** 10:22 53:4

**home** 67:2,3

**honestly** 89:20

**horizontal** 52:13

**house** 30:4

**housemates** 30:2,3

**Hun-** 86:16

**hundred** 53:6 89:15

**Hunter** 14:20 86:15, 20

**I**

**IBM** 24:23

**idea** 47:20

**identification** 46:16 55:3 78:9 96:25 105:15

**identified** 23:13 26:24 35:10 53:23 60:18 81:5 82:5

**identify** 14:11 30:11 34:16,21 52:14 63:16 88:21,25 90:10

**III** 78:7 96:23

**Illinois** 24:21

**im-** 91:5 94:17

**imaginable** 91:16

**immediately** 24:23 35:20,21

**impacted** 103:10,11

**implement** 47:21

**important** 8:18 34:22,23

**impression** 86:25 87:4

**impro-** 94:17

**improper** 91:6 94:18

**improvements** 67:2

**in-** 37:15 70:3

**inappropriate** 95:15

**including** 10:23 36:14 86:15

**inclusion** 97:25

**inconsistent** 92:15

**incorrect** 37:15

**independent** 34:25 35:6

**indirect** 61:8

**indirectly** 28:8

**individual** 72:25

**individuals** 65:6

**information** 32:3 40:3 46:21 48:19 86:19 87:8 91:13 103:16,21 106:8

**informed** 86:23 88:4

**informing** 42:20

**initially** 23:3,19 29:2 32:19 54:12 83:2

**innocuous** 81:7

**input** 11:24 93:4

**inquire** 95:24

**inquiries** 40:6

**inquiry** 88:7,9

**Institute** 24:24

**institution** 18:6

**instruct** 95:21

**insulating** 18:12

**integrated** 11:2

**intent** 98:2,3,16,17

**inter-** 14:14

**interact** 49:23

**interactions** 73:19

**interchangeably** 12:18,19 13:6

**interest** 47:14,15 54:17 60:2,25

**interested** 10:6

**interests** 52:10 53:5, 17 54:20

**interface** 12:10 13:12 14:14,22 19:21 20:12 40:2 64:13

**interfaced** 62:10 70:11

**interfacing** 18:24 19:14

**intermittent** 21:13

**internal** 27:8

**internally** 27:12

**interrupt** 89:17

**interrupted** 26:16

**invest** 74:25

**invested** 69:4,17 77:14

**investing** 25:10

**investment** 13:25 14:11 16:3 25:13 26:4,24 59:25 60:6, 15 61:7,19 75:5 76:2

**investments** 15:10, 19 27:5 33:24 72:9

**invests** 70:23

**involved** 14:22 86:16,21

**IRS** 18:11

**Islands** 47:4

**issue** 7:20 36:5,9,12 37:4,13,17 38:17 40:14 41:7,24 42:15, 19 70:9 74:13 81:9 82:17 94:4 97:18,20, 23 100:5 102:12,17, 20

**issuer** 102:2 104:15

**issuers** 100:20,23 101:4 102:25 103:16, 22,25

**issues** 20:4,14 25:16,17 36:13 38:8 70:3 81:14,15 92:10 99:5 100:10 101:22 102:11

---

**J**

**James** 78:6 96:22

**January** 88:15

**Jeffrey** 105:12

**Jersey** 28:18

**Jim** 7:19,21 11:21,24 14:20 17:23 28:7,8, 10 35:4 45:8 61:13 63:5,19 67:3,9,23 84:12,16,23 87:14, 15,19 88:22 89:10 90:12 91:3 94:16 95:12,14

**John** 6:7 7:8 26:6 35:7 55:6 82:7 107:5

**join** 80:13,18,20 82:12,15 91:9

**joined** 24:23 97:4

**Jones** 6:8

**junior** 29:7

**justify** 82:19

---

**K**

**Kansas** 52:15 56:13

**kind** 9:11 22:4

**knowing** 98:21

**knowledge** 25:19 27:2 37:23 47:6,21 48:3,6,13 49:2 52:8 57:3,7 61:3,15 64:21 83:11 84:10 98:19 103:15,20

---

**L**

**L.P.** 6:11 47:8 48:15 49:4 50:11,17,23 51:2 52:3,6,11 53:5, 18 76:11

**La** 46:12

**lack** 95:11

**laid** 82:20

**language** 98:14

**large** 19:21 20:23

**late** 23:4 76:16,17

**law** 6:8 7:20 24:14,15 25:4,5,7 42:17 94:25 100:5

**lawyer** 10:10 24:8,12 65:23

**lawyers** 18:3 91:16 95:21

**lays** 101:16

**learn** 42:22 76:14 83:21,24

**learned** 43:3

**learning** 37:18

**led** 81:15 86:19 87:8

**left** 51:8 85:5,9 87:24 89:4

**legal** 18:10 82:19 100:4 102:12 104:20

**legalistic** 94:17,23

**lesser** 34:22

**letter** 77:20,25 78:6, 14,19,22 79:21,23 81:2,3,5 82:24 83:10 85:24 87:12 88:11,19 90:17 91:2,10,15,19, 25 92:25 93:21 95:23 96:7,9,13,15,22 97:4, 8,12,17,18,24 100:4 105:3,6,12,17

**letters** 79:16 98:15

**Lieu** 55:2

**light** 77:6

**likelihood** 94:10

**limited** 10:15,21 11:9 12:2,8,13,24 13:23 14:2,12 15:10,20 16:4,6,11 17:5,16,18 18:21 19:3,17 21:6 23:2 26:25 27:17,24 32:10,23 33:7,16,25 34:8 37:23 40:22 41:11 42:21 47:3,7, 17 51:3,10,13,17 52:9,10 53:3,4,17,25 54:11,14 56:8 58:15 60:3,25 61:9 62:12, 16 63:2 64:20 68:14, 18 69:4,13 70:19

**72:9,19** 73:24 74:8, 24 75:25 77:13,21 79:20 80:2,6,13 82:2, 12 97:4 98:8,23 106:4

**Limited's** 52:25 69:23 76:20

**lines** 55:23

**liquid** 37:9

**Lisa** 13:8

**list** 27:21

**listed** 79:20 80:3 82:13 89:8 105:5

**listened** 93:3

**litigation** 8:9 36:9 94:10

**lived** 29:25

**LLC** 49:3,8,10,13,17, 22 50:3 51:24

**loan** 10:23

**long** 28:14 69:8 100:12

**longer** 14:21 85:22 86:8,16,20 87:2,9 106:3

**looked** 94:3 100:16

**loop** 82:8

**loosely** 11:3

**lot** 13:9

**lower** 46:25

---

**M**

**made** 15:19 27:5 34:9,14,23 36:4 37:22 38:20 43:12 44:23 45:2 47:25 48:9 66:15 70:15 72:9 73:6 74:23 76:19,24 77:22 80:3, 10 81:19 83:11 88:9, 22 89:2 91:4,5,18 92:16 96:2 99:11,12

**mail** 87:25

Appx. 01827

Index: maintain..outlined

**maintain** 18:12
20:13 85:24 91:16

**maintaining** 94:4

**make** 16:3 26:24 34:3
48:7 70:13 75:5,14
82:14 87:16 97:16
101:25

**makes** 13:25 14:11
54:15

**making** 67:17 70:25
75:13 76:2 79:21
80:6 83:22 84:5,8,13
85:2,10 86:7,8 88:7

**man** 30:22

**Man-** 68:19

**manage** 19:19 20:11

**managed** 72:12
74:25 75:17 76:3,21
77:2,5

**management** 6:11
13:2,18,19,22 14:16
19:24 28:13 32:23
33:6,15 36:15 62:15,
21,25 67:21 68:5,12,
25 69:14 70:19,21,22
71:22 72:12,17,21
73:25 74:3,9,11
75:17 77:10,12 96:11
98:25 99:16 100:19
101:8 102:3,15
103:6,18,23 104:3

**Management's**
68:20

**manager** 12:10
13:13,16 14:8 18:25
19:15 69:3,16 98:10

**managerial** 47:14

**managers** 14:3

**manages** 13:19,22
33:9 70:22 71:23
101:5

**managing** 33:11
49:7,21 50:3 51:23

**Mark** 14:20 63:21

**marked** 46:15 55:3
78:9 96:25 105:14

**married** 30:19,20

**master's** 24:22

**material** 100:9
101:21

**matter** 7:17 9:18,21
64:2,8 66:8

**matters** 25:3

**meaningfully** 21:23

**means** 11:12

**meet** 18:13

**Meeting** 55:2

**Mel-** 63:21

**Melissa** 63:21 66:17

**member** 49:7,21
50:3 51:23

**men's** 44:8

**mental** 94:3

**mention** 14:5 94:24
105:21

**mentioned** 7:8 13:12
14:4 20:18 22:13,14
25:17 41:3,6 53:24
66:17 71:5,10 77:16
81:16 86:23 95:2

**met** 81:14

**metric** 27:12

**middle** 16:23 94:12

**Mike** 63:20

**Miller** 105:13

**mind** 53:3

**mine** 28:13

**Minimal** 25:21

**minimus** 52:16
101:21

**minutes** 106:18

**missing** 52:18

**mission** 32:20

**mistaken** 85:6

**moment** 11:8 99:25

**Monday** 90:23 94:20

**Mondays** 21:14

**monetary** 104:21

**money** 12:15 14:8
19:23 32:19 36:18,19
37:6,10 54:6,13,18
58:20

**month** 21:25

**monthly** 21:4

**months** 23:20 30:15
63:18 64:25 65:12
66:22 67:7

**morning** 21:21

**Morris** 6:6,7 7:6,8
13:8,11 26:11,17
31:3,11 39:15 42:25
44:20 46:12,17 54:23
55:4,8,10,11,13,21,
24 56:20 59:15 61:23
62:4,8 64:5,11 65:22
66:5 73:3,8 78:3,10,
13 79:11 81:21,25
91:24 92:3 96:14,17
97:2 105:10,16
106:13,23 107:6

**motion** 41:12 42:8,
13 45:8 80:4,9,14
81:15 82:3,13,16

**mouth** 19:4

**move** 42:17 45:17
51:8 81:22 104:14

**multiple** 21:20 83:18
98:13

**N**

**named** 33:11

**names** 86:13

**Nancy** 60:22

**nature** 23:24 32:8
50:4 64:17,22 65:3,
11 94:18 100:16

**necessarily** 11:11

**needed** 27:5 66:24

**negotiating** 104:2

**Nelms** 35:5

**network** 18:3

**night** 21:21

**no-cause** 101:22

**Nobody's** 7:3

**nomenclature** 42:10

**Nonexempt** 58:23
59:2,5,9,11,18,23
61:7

**nonfinance** 99:6

**nonliquid** 37:8

**nonresponsive**
81:23

**North** 25:8

**northern** 28:18

**Notary** 6:4

**note** 72:23

**Noted** 107:12

**notwithstanding**
6:18 76:23

**number** 20:23 52:25
54:24 63:10 87:21,23
99:5

**nuts** 19:23 70:6

**O**

**object** 26:5,12 39:23
40:21 41:11 69:5
72:22 73:7

**objected** 37:24
38:19 41:25 84:16
100:6

**objecting** 26:8 40:10
42:8 101:17

**objection** 6:22 26:9,
20 31:2,10 32:25
33:8,17 38:2 39:14
40:24 42:2,8,21,24
43:11 54:4 59:14
64:4,10 69:18,23,24
74:4,12,19 75:18
83:13 87:18 92:17
100:7 101:16 104:25
106:7

**objections** 6:25
38:24 39:3 69:20
101:24

**obligation-type**
10:23

**obligations** 24:2
36:14 37:11

**obtain** 27:15 54:17

**obtained** 23:6 91:13

**occasion** 27:2,3

**occasions** 7:11

**occurred** 23:8 25:22
38:9,18 95:7

**occurs** 21:17

**October** 7:14,18
62:22 63:3 85:7

**office** 20:21

**officer** 16:16 90:5

**officers** 16:12 17:12
49:14 50:19 57:20,25
58:11 59:12,18

**offices** 105:24 106:6

**Okada** 14:25

**Okada's** 14:21

**ongoing** 74:14 91:4

**operating** 104:4

**operations** 50:6

**opinion** 86:2 87:15

**order** 34:20 80:5
82:14

**organically** 25:22

**organization** 10:25
20:6

**Organizational**
46:14

**original** 38:9 40:8,13
81:3 82:24

**originally** 58:20

**out-** 101:23

**outlined** 69:19
101:23

Index: overpaying..recess

**overpaying** 70:8

**overrode** 42:2

**overruled** 37:25 39:24

**owed** 24:3

**owned** 13:23 47:7 71:24

**owner** 58:14,16

**owners** 53:25 54:2

**ownership** 45:20 47:14

**owns** 53:16

**P**

**p.m.** 62:6,7 106:21,22 107:12

**Pachulski** 6:8

**paid** 32:20

**par-** 54:19

**paragraph** 78:17 79:21 80:3 82:5,13

**part** 11:2 23:13 66:3 68:18 101:14

**partial** 101:11,13

**Partially** 101:10

**participate** 54:5 82:3

**participation** 52:17 54:17,20

**parties** 6:16 13:5 83:6

**partner** 49:4

**partnership** 52:10 53:4,17

**parts** 92:19

**party** 72:20

**past** 7:14,18

**patent** 8:5,9,11,14 24:8,10,12 99:20 100:2

**Patrick** 63:21 64:18, 24 65:13 66:9 67:8

**Patrick's** 65:17

**pausing** 34:19

**paying** 70:4

**payment** 36:14 70:10,14 71:11

**people** 12:21 18:2 19:21 20:3,23 32:5 33:10 65:24 75:13,14 86:7

**perc-** 89:15

**percent** 47:7 52:9 53:4,7,9,11,14,16

**percent/99** 53:9

**perfectly** 91:19

**perform** 50:5

**performance** 68:20 69:2,15 102:3,11

**performed** 102:14

**period** 22:15,16 23:19 80:6

**periodically** 18:18 102:9

**permit** 104:2

**pers-** 79:20

**person** 8:8 14:11 15:18 20:15 49:16 64:16 90:10

**personal** 30:10

**personally** 11:8

**persons** 14:13 90:11

**perspective** 100:17

**philosophy** 26:4

**phone** 23:6 44:9 63:10 65:24 87:22 91:8 95:7,12,14

**phrase** 13:9

**pick** 95:7

**piece** 21:16

**pieces** 71:5

**place** 7:13 66:13

**plan** 38:24 47:21

69:20,23 92:11 100:5 101:9,16 104:25

**planner** 20:10

**play** 11:8 32:22 33:5

**played** 35:3

**pleasant** 35:10

**point** 18:5 32:18 35:16,24 36:5,10 40:3 64:15 81:6 99:21

**points** 81:6

**policy** 27:21

**Pomerantz** 105:13

**pool** 32:24 33:7,10

**portfolio** 10:25 69:3, 16 98:10,24

**portion** 10:24

**portions** 9:14

**pose** 70:3

**position** 23:21 48:14 62:20 66:11 76:20 100:8

**possibly** 27:25 36:7 99:14

**post-** 104:12

**postbankruptcy** 21:10 22:6,16 104:11,13

**postplan** 104:13

**potentially** 104:20

**power** 33:14

**practical** 100:10 104:21

**pre** 22:15

**prebankruptcy** 21:9 22:5

**precise** 69:10

**preclude** 101:18

**precludes** 21:22

**predefined** 36:17

**preliminary** 99:10

**prepared** 46:6

**present** 60:19

**president** 57:4,21 58:2

**prevented** 80:5

**previous** 73:19

**previously** 24:4 33:11,19 81:12,13 86:14 87:2 98:6

**prior** 16:25 27:2,4,16, 22 33:22 34:11 40:16 43:11 79:18 80:10 88:10,17 97:17 104:15,16

**privilege** 65:21 66:4 79:9

**problem** 70:4 102:21

**problems** 36:21

**proceedings** 62:6 106:21

**proceeds** 37:9

**process** 86:17,21 97:14 99:15 104:18

**program** 29:22

**proof** 38:9,11 40:4,8, 12,13 46:22

**proofs** 39:11,12,19, 23

**provide** 79:3

**provided** 74:2 79:8

**provisions** 104:19

**Public** 6:4

**publicly** 32:4

**pull** 54:21

**pulled** 42:15

**purportedly** 77:20

**purposes** 18:11,12 50:7

**pursuant** 9:22 70:21 71:23 72:16 101:4

**put** 9:10 21:8 34:20 37:14 46:13 50:25

51:3 54:23 78:3 105:10

**putting** 75:13

**Q**

**qualified** 87:16

**quest** 70:2

**question** 8:19 10:5 14:9 19:9,13 26:6,15, 19 36:25 43:7 44:22, 24 48:20 79:12 81:22,24 82:9 88:17 89:13,23 92:21 99:4 103:13

**questions** 8:18 50:12,16 55:12 69:8 89:21 106:25 107:4, 11

**quickly** 35:22

**quo** 85:25 91:17 94:4

**R**

**raised** 74:13 92:10

**rang** 87:22

**re-** 66:11 72:7 82:9 100:7

**reach** 95:21

**read** 9:14 73:12

**reason** 9:13 34:19 68:24 76:5

**reasons** 29:11 67:16

**recall** 10:3 14:24 28:2 35:25 44:22 50:8 58:7 63:23 64:2, 7,22 65:9,11 67:5 73:19 80:16 90:24 94:24 97:3

**receive** 12:15 16:19 49:20,24

**received** 9:25 24:22 34:24 45:6

**recently** 38:18 73:18

**recess** 62:5 106:20

Appx. 01829

**recite** 82:9

**recognize** 87:23

**recollection** 8:3
18:18 23:15 63:13
85:6 94:22 97:5
105:9

**recommendation**
43:23 44:5,7,23 45:2

**reconvene** 61:24

**record** 6:14,25 72:23
73:6 100:13

**recurring** 27:11

**reduced** 40:12

**reduces** 94:10

**refer** 11:3 20:21
100:18

**reference** 78:18

**referred** 12:16 70:5

**referring** 13:17
60:10 65:7 86:11

**reflected** 48:8

**reflects** 46:10

**refresh** 18:18 105:9

**regard** 38:25

**registry** 35:18

**regularly** 20:12
64:13

**regulations** 25:20

**relate** 101:22 104:22

**related** 34:24

**relating** 7:19 32:13

**relation** 67:22 68:6

**relationship** 29:10
30:5 32:8

**relative** 104:11

**relied** 97:13

**rely** 91:7,12

**remember** 59:7
105:17

**remotely** 6:19

**removal** 84:23
104:23

**remove** 81:10 98:4

**removed** 86:24 98:9

**reorganization**
100:6 101:9

**repeat** 14:8 15:16
33:2 41:2,18 72:5
89:22 90:3

**rephrase** 89:23

**replacement** 84:24

**report** 18:21

**reporter** 6:21 44:3
55:10 107:9

**reports** 102:8

**represent** 74:15

**representation**
100:15

**representative**
16:15 73:2,4 89:8
90:5

**represented** 95:15

**representing** 6:15

**represents** 6:9

**request** 34:24 35:2,
11,22 42:16 70:2,14
77:16,21 79:22 81:8
83:10,11,16,17,18
84:21 91:5,16,18
92:4,15 96:2 98:14

**require** 27:21

**require-** 81:14

**required** 27:15

**requisites** 18:13

**res-** 101:6

**research** 24:23,25
25:2

**reservation** 6:24

**reserve** 107:3

**resign** 66:15

**resigned** 62:20

**resigning** 66:11

**resolutions** 46:21
53:2

**resolve** 42:15

**resolved** 92:12

**resonates** 99:19,22
100:3

**respect** 7:21 9:17
12:12,14 25:16 33:6,
14 36:13 38:9,17
40:8,11,20 41:24
48:15 50:9 64:20
67:3 68:18 71:17
79:23 101:14

**respective** 6:16

**responsibilities**
12:7,9 19:2,16

**responsibility** 64:19

**responsible** 86:14

**responsive** 69:25

**restate** 82:9

**reveal** 32:4

**review** 83:4

**reviewed** 100:7

**Ri-** 78:11

**right-hand** 46:25

**rights** 101:19 103:9,
10 104:23

**rise** 82:17

**role** 11:8 12:2,12,13
20:19 32:22 33:5
48:17,22 76:7

**room** 6:21 9:8 35:9
44:8

**roommates** 29:24,
25

**rule** 27:4

**rules** 25:20 27:21

**runs** 20:5

**Russell** 35:5

**S**

**sales** 74:14 81:8 91:4
94:8,9

**Samsung** 8:6

**Santa** 52:15 56:12,
13,23 58:10

**scenario** 45:7

**scheduled** 36:16

**school** 24:14,15,21
25:4,5,7 28:15 29:17,
19

**Schroth** 63:22 66:18,
21 67:8

**scientist** 24:25

**scott** 6:1,12 7:1,7 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1,14,18 47:1
48:1 49:1 50:1 51:1,
2,4 52:1 53:1 54:1,25
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1,9
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1,24 73:1
74:1 75:1 76:1 77:1
78:1,6 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1,22
97:1 98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1,12
106:1,15,23 107:1,16

**screen** 9:10,12 33:3
38:8 55:15 78:4

**scroll** 55:21 78:10
105:20

**seeking** 99:14

**Seery** 35:4 63:5,7,13
67:9,16,19,24 68:3,
10,17 77:9,12 87:16,
19 88:13,22 89:10
95:8,12,14,22

**select** 70:9 71:12
75:3

**selected** 56:3,4

**selection** 75:7,12,14

**sell** 76:19

**send** 45:11

**sending** 88:11,18
95:23 96:7 97:11

**sentence** 92:5

**sequence** 36:6
93:15

**series** 8:18

**serve** 10:7 30:21
32:9 51:19,22 52:2,5
57:4

**served** 10:3,11 16:24
17:8,13

**serves** 60:15

**service** 19:19 57:21
58:2 90:7

**servicer** 62:17
72:13,17 83:23 98:4,
10 104:16

**services** 16:20 68:9,
13,21 70:5,6,7,18
71:6,7,15 74:2 81:12

**serving** 21:5 49:21
58:11

**set** 11:18,19 19:19
24:5 104:24

**sets** 100:8

**settlement** 40:21
41:13,16 42:9 43:11

**share** 94:19

**shared** 30:4 32:3
68:9,13,20 70:18
71:7,15

**short** 12:22 61:24
106:14

Index: show..transferred

**show** 82:25 92:18

**showed** 81:4 82:25

**showing** 9:9

**shown** 52:22

**shows** 53:3,6

**sic** 73:22

**side** 51:5,8

**sign** 66:24

**signature** 55:23

**signed** 93:21

**significant** 36:13

**simple** 44:21

**simply** 26:8

**single** 88:21

**sir** 55:15 74:21

**sister** 60:9,11,14

**sit** 68:23 79:25

**siv-** 60:14

**small** 33:3

**smallest** 23:16

**sole** 17:4 18:20 19:17 34:7 47:16 50:22 51:12,16 73:23

**soon-to-be** 100:13

**sophomore** 29:4

**sort** 64:15 100:5,16

**sorts** 24:7

**soup** 19:23 70:6

**source** 30:12 87:7

**speak** 40:15,17 43:9 63:21 95:8,22 102:2

**speaking** 8:17 102:25

**speci-** 86:24

**specifically** 11:12 36:25 40:9 86:22

**specifics** 79:13

**speculate** 40:7

**spend** 22:25

**spent** 20:2 21:9,10

**spoke** 35:24 63:19 65:10 67:9 87:19

**spoken** 7:3 63:8,12, 17,19

**standpoint** 104:20, 21

**Stang** 6:8

**start** 29:2 46:24 63:7

**started** 82:8

**stated** 73:6

**statement** 98:2

**status** 85:25 91:17 94:4

**step** 8:24

**steps** 23:10 39:22 81:10 82:19 96:10 98:24 101:17

**sticking** 45:16

**stop** 77:17,21 82:6 83:6 85:13,16 91:5

**stoppage** 84:21

**stopping** 94:8,9

**strain** 30:12

**strained** 30:7

**strategy** 26:4

**strike** 48:11 81:22

**structure** 11:7 12:16 45:18,20 46:15 47:19,20 48:2,8,10, 13 52:19

**subject** 6:23 7:17 64:2,7 66:8 81:2 98:13

**submitted** 42:14

**subpoena** 9:22,25 10:4,7,12

**Subscribed** 107:18

**subsequent** 6:18 36:11 38:10 81:10

**subset** 12:14

**subsidiary** 104:10

**substance** 9:19 44:14 64:23 65:4,19 80:24 91:2

**substantial** 83:15 104:22

**substantive** 81:9 100:4

**substantively** 92:12

**substitute** 104:14,15

**success** 100:13

**sufficient** 26:10 82:19

**suggest** 99:7 102:13

**suggested** 96:8

**suit** 96:3

**suite** 106:6

**summarize** 39:10

**Super** 7:25

**support** 40:4 102:19 106:9

**Surgent** 15:4 20:17

**suspects** 63:20

**sworn** 6:3 107:18

——————

**T**

**taking** 101:18

**talk** 45:18

**talked** 22:16 61:6 98:5

**talking** 13:4 57:5,9 102:12

**tangent** 44:25

**tax** 17:25 18:10

**taxes** 20:5

**team** 85:20,21,22 86:25 87:9

**Tech** 29:16

**technical** 11:10

74:15,18

**ten** 11:17 17:6 83:24

**term** 20:22 100:21,22

**terminate** 96:10 98:24

**terminating** 99:15

**termination** 100:12, 14

**terminology** 42:9

**terms** 12:19 13:2,6 16:16 45:22 52:16 69:6 94:25

**test** 45:24 47:10 63:14

**testified** 6:5 9:20,21 22:4 62:10 75:4 85:4

**testify** 7:22 37:3

**testifying** 72:24

**testimony** 89:18

**text** 45:11

**there'd** 94:14

**thing** 92:7 99:22 100:3

**things** 17:23 21:25 23:12 24:3 29:19 30:16,17 64:16 100:15

**thinking** 37:13

**third-party** 73:9 101:19

**Thomas** 15:4 20:17 24:23

**thought** 18:5 21:7 32:16 38:3,15 40:10 42:2 44:2 48:17 68:4 75:4 77:4 85:4 94:9, 12 95:9,13,25 102:24

**thoughts** 39:2

**threw** 96:3

**Throckmorton** 63:20 64:3,9,14 67:8

**Tim** 15:4

**time** 9:11,24 11:25 16:25 17:5,12 18:8 19:25 20:2,24 21:2,4, 9,10 22:10,12,14,18, 25 24:13 27:25 28:11 30:8 34:21 35:16,24 40:16 41:19 42:22 43:12 45:8 50:8 53:8 57:22 61:25 63:2 70:8 71:5 80:7,10 88:10,18 89:3 98:20 106:2,9,16,24 107:7, 12

**times** 13:4 63:12,15

**timing** 40:19

**title** 11:10,12 24:25

**today** 6:11 7:9 9:9 26:10 30:6 68:23 86:4 98:22 106:11

**told** 45:3 89:9 91:20 92:8

**topic** 40:16 45:18

**touch** 27:9

**track** 100:13

**trade** 67:17

**traded** 85:14

**trades** 82:6,15 83:7, 22 84:5,8,13 85:11 86:4 87:10,16

**trading** 77:17,22 84:21 85:14,16

**training** 24:19 25:9, 15

**transaction** 88:22, 25

**transactions** 24:7 27:16,23 80:6 88:14 89:11 92:10 93:25 95:10 96:2

**transcript** 6:23 7:2 83:5

**transfer** 29:11 35:12 76:25

**transferred** 24:5 29:3,6,13,14,20 35:18

Appx. 01831

Index: transfers..Ziehl

**transfers** 64:16

**transition** 23:8

**transitioned** 25:4

**transmitted** 35:2

**trick** 9:11

**triggers** 27:9

**trust** 58:23 59:2,5,9, 11,18,23,25 60:6,16 61:7,8,12,15,16,20, 22

**trusted** 32:12

**trustee** 11:13 58:25 59:4,22 60:5,15,19

**trustees** 59:8

**trusts** 30:25 31:6 58:18 60:2,24 61:2

**tuck** 36:18

**tucked** 36:19

**Tuesday** 21:15 90:21

**turn** 71:19

**turnover** 20:20

**type** 18:5,7

**U**

**Uh-huh** 9:16

**ultimately** 36:8 47:23 54:15 70:15 75:3

**unanimous** 54:25 55:17

**unaware** 70:10

**under-** 23:14 37:12

**understand** 9:4 11:13,22,23 14:14 15:15 17:23 18:8 19:10 23:11 27:18 29:19 31:12 33:13 36:6 38:20 42:5,9 43:3 54:13 70:24 71:18 73:21 81:6 89:3 100:24 101:7 102:8 104:9,24 106:3

**understanding** 11:16 13:21 17:22 18:16 23:24 29:10 32:7,15 47:2 49:6 50:6 53:15 60:14 61:5,18 65:16 73:13, 14,15 83:3 84:22 97:19,22 101:11,13 103:7

**understood** 86:6,13

**undisputably** 37:6

**University** 24:19,21 25:8 28:24 29:5,15, 16

**unlike** 20:9,10

**updated** 88:2

**urgent** 44:7

**usual** 63:20

**UVA** 28:24,25 29:2, 12,21,24

**V**

**valid** 42:12

**vehicles** 58:19 77:5

**versus** 27:11 34:22 47:14 83:17 85:9

**view** 83:15 87:15 94:17,19,23 103:12, 13

**views** 103:2

**Virginia** 24:20 28:24 29:16

**virtual** 9:7

**virtue** 8:10 82:24

**vision** 32:13,17

**voice** 87:25

**voluntarily** 9:20

**volunteered** 36:3 88:8

**volunteering** 95:12

**W**

**wanted** 17:24 29:18

**Watson** 24:24

**wedding** 30:22

**week** 21:11,18,20 60:20 67:10 87:20

**week-to-week** 19:25

**weekly** 21:3

**weeks** 21:18 60:20 66:14

**well-known** 29:21 75:22,23

**wire** 64:16

**with-** 45:3

**withdraw** 43:10 45:3,4 92:21 96:4

**withdrawing** 42:21

**withdrawn** 13:20 16:10 26:22 28:3 31:4 34:4,6 39:16 45:8 52:4 57:18 59:16 63:25 64:6 65:10 77:10 79:17 86:10

**word** 41:2

**words** 8:25

**work** 42:6

**worked** 15:3 42:6 85:22

**working** 20:2 38:14 95:16

**works** 23:14

**world** 16:15 31:23 75:16,20

**Wright** 78:7 96:23

**write** 45:10

**written** 8:11 54:25 55:18 62:14 77:20

**wrong** 22:11 68:25 69:15 73:25 75:6

**wrote** 8:6,9

**Y**

**year** 29:4,7 85:15 105:25

**years** 7:15 8:2 11:17 15:3 17:6 18:17 28:24 29:8 31:8,20 32:2 59:6 60:17 73:20 76:10 83:25 84:5

**yes-or-no** 79:11

**yesterday** 26:9

**yielded** 81:3

**York** 24:24 35:8

**Z**

**Ziehl** 6:8

Appx. 01832