# EXHIBIT 76

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM     INDEX NO. 653654/2022

NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 10/04/2022

**IN THE SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-------------------------------------------------------------X

NEXPOINT DIVERSIFIED REAL
ESTATE TRUST,

|  |  |
|---|---|
| *Plaintiff,* | Index No. _____ |
| - against - | **ORIGINAL COMPLAINT** |

ACIS CAPITAL MANAGEMENT, L.P.,
JOSHUA N. TERRY, and BRIGADE CAPITAL
MANAGEMENT, LP

*Defendants.*

-------------------------------------------------------------X

Plaintiff NexPoint Diversified Real Estate Trust ("NexPoint" or "Plaintiff") respectfully

files this action seeking disgorgement of misappropriated moneys and to recover damages caused

by the gross malfeasance of Defendants Acis Capital Management, L.P. ("Acis"), Brigade

Capital Management, LP ("Brigade"), and Joshua N. Terry ("Terry"), as registered investment

advisors ("RIAs" or "Defendants" and each a "Defendant").[1] The Defendants are jointly and

severally liable for breaches of fiduciary duty with respect to the management of a fund of

collateralized loan obligations ("CLOs") that NexPoint invested in.

The acts and omissions which have come to light reveal a pattern of conduct that is in

breach of fiduciary duty both under New York law and as imposed by the Investment Advisers

Act of 1940, among other things, which have caused and/or likely will continue to cause Plaintiff

damages.

---

[1] This action is expressly intended to be predicated solely on claims that accrued after February
15, 2019, which is the effective date of Bankruptcy Court order exculpating Defendants from
liability as of that date and enjoining any lawsuit or action seeking to recover for liability accruing
on or prior to that date. Nothing in this Action is intended to violate said injunction or order.

**Appx. 02215**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM

NYSCEF DOC. NO. 1

INDEX NO. 653654/2022

RECEIVED NYSCEF: 10/04/2022

## SUMMARY OF THE ACTION

1.      Defendants managed and advised ACIS CLO-2014-2, Ltd. ("ACIS 2"), ACIS CLO-2014-3, Ltd. ("ACIS 3"), ACIS CLO-2014-4 Ltd. ("ACIS 4"), ACIS CLO-2014-5 Ltd. ("ACIS 5"), and ACIS CLO-2014-6, Ltd. ("ACIS 6") (any two or more, the "CLOs").

2.      In a classic "let's rob Peter to pay Paul" scheme, the RIAs have:

- Knowingly charged the CLOs exorbitant amounts of "expenses" without accountability or justification;

- Knowingly caused the CLOs to purchase loans that failed to meet credit quality tests and average life tests, and caused the entire portfolio to fail the applicable collateral quality tests;

- Knowingly caused the CLOs to sell valuable assets cheaply; and

- Knowingly breached industry standards for things like best execution when buying and selling assets of managed funds.

3.      To put it simply, since after February 16, 2019, through the combined effect of the above malfeasance, Defendants have wiped out millions in value from the CLOs and have hamstrung NexPoint from recouping its investment.

4.      The impact on NexPoint is substantial. It owns millions in equity of ACIS 6. Defendants have caused the net asset value of the ACIS 6 equity to plummet. Defendants have thus caused Plaintiff to suffer over millions in losses.

5.      These are not just ephemeral numbers. Plaintiff represents the interests of thousands of investors who rely on the promised security of these types of investments to provide cash flow and to fund things like retirements and college tuitions.

6.      Plaintiff invested in the CLOs because, if managed in the way provided for in the indentures and portfolio management agreements ("PMAs"), they are secure and relatively safe diversified investments.

**Original Complaint**                                                                                         **Page 2**

**Appx. 02216**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1
INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

7.     The economic purpose of investing in CLOs is obliterated where, as here, the RIAs manage the CLOs for their own ends, extending the life of the existing portfolio so as to maximize fees and prohibiting the noteholders from making redemptions. The Defendants are legally obligated fiduciaries who have to look out for the best interests of the advised funds, *i.e.*, the CLOs and their investors.

## **THE PARTIES**

8.     Plaintiff NexPoint Diversified Real Estate Trust, a Delaware statutory trust, is a publicly traded real estate investment trust. At the time of the events herein, it was denoted "NexPoint Strategic Opportunities Fund," a Delaware closed-end trust. Its principal place of business is in Dallas, Texas. Interests in NexPoint are owned by people nationwide and traded on the New York Stock Exchange (NYSE: NXDT).

9.     Joshua N. Terry is an individual resident of Dallas County, Texas, located at 3509 Princeton Avenue, Dallas, Texas, 75205, and is thus a citizen of Texas, who may be personally served wherever he may be found. Terry is the owner and President of Acis.

10.     Defendant Acis Capital Management, L.P. ("Acis") is a Delaware limited partnership. Acis may be served through its registered agent Capitol Services, Inc., located at 1675 S. State Street, Suite B, Dover, Delaware 19901, or wherever it may be found. Acis is a registered investment advisor.

11.     Defendant Brigade Capital Management, LP is a Delaware limited partnership registered to do business in and with its principal place of business in, the state of New York. Brigade may be served through Donald E. Morgan, III, 399 Park Avenue, 16th Floor, New York, New York, 10022, or wherever it may be found. Brigade is a registered investment advisor.

12.     Non-party U.S. Bank N.A. was the trustee for ACIS-6.

---

**Original Complaint**                                                                 **Page 3**

Appx. 02217

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM     INDEX NO. 653654/2022
NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 10/04/2022

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over each Defendant pursuant to CPLR § 301 and/or CPLR § 302.

14.     Personal jurisdiction and venue over Acis are proper because the governing documents—the indentures and portfolio management agreements—to which it is bound requires it to agree to submit to the jurisdiction of New York and to waive any objection to New York as a forum and venue. Acis is authorized to and regularly conducts business in the state of New York and is accused of torts directed at the state of New York, at least in part. Furthermore, the acts and/or omissions giving rise to the causes of action herein occurred in whole or in part in this county and affected property situated in this county.

15.     Jurisdiction and venue over Brigade are proper in this county because Brigade is registered to do business in New York, and the transactions and occurrences that are the subject of NexPoint's claims against Brigade, including certain advice, communications, and trading activity with brokers or dealers, took place in whole or in part in this county.

16.     Jurisdiction and venue over Terry are proper in this county because Terry is bound by the indenture clauses cited above, and he committed torts that are the subject of NexPoint's claims against him that occurred within or were directed to New York, including through certain trading activity with brokers or dealers within New York or to New York.

## FACTUAL BACKGROUND

### A.  A BRIEF PRIMER ON CLOs

17.     Collateralized loan obligations ("CLOs") are a specific type of structured financial transaction. CLOs are usually comprised of a mixture of publicly available, floating rate, senior-secured debt instruments issued by corporations (collectively, the "CLO Assets").

---

**Original Complaint**                                                      **Page 4**

**Appx. 02218**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM

NYSCEF DOC. NO. 1

INDEX NO. 653654/2022

RECEIVED NYSCEF: 10/04/2022

18.      These loans are pooled together and then funneled into a trust entity known as a special purpose vehicle ("SPV"). The pooled loans within an SPV constitute the assets of a CLO.

19.      To fund the purchases of these loans, SPVs raise equity funds from one or more equity investors, and then they raise additional cash in the form of debt, usually from the public markets by issuing notes to third-party investors (collectively, the "CLO Notes").

20.      It is standard for this debt to be arranged in tranches—the most senior debt is paid back first but bears the lowest expected yield (*i.e.*, smallest interest rate), whereas the most junior debt is paid back next-to-last but bears the highest expected yield (*i.e.*, largest interest rate). Characterized differently, the greater the seniority of the debt, the less relative risk the investor carries.

21.      After all debt, regardless of seniority, is paid out and all defaults have been taken on, the equity holders are paid. The character of incoming funds cascading down the tranches to pay the debt in descending seniority order, and then the equity holders last, is frequently referred to as the "payment waterfall."

22.      This general structure is depicted this way:



Appx. 02219

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

23.     The CLO assets are the source of cash flow that pay a CLO's expenses, followed by the principal and interest payments due on the CLO notes—which go to the CLO's noteholders. Any cash remaining at the end of each quarter was typically paid to the equity holders.

24.     In other words, equity holders take on the most risk of any investor in a CLO. The value of their equity increases as incoming cash flows from the CLO Assets pay the operating expenses and interest on the CLO Notes, and then pay down the principal on the debt tranches.

25.     As the principal of the debt tranches is paid down, as long as cash flows from the asset base continue in an amount that is greater than the cost of servicing the debt and the expenses, the equity will realize more and more of the benefits.

26.     Other than the investors themselves, the key parties to the success or failure of a CLO are (1) the portfolio manager, (2) the advisor, and (3) the indenture trustee.

27.     Each of these parties is bound together by a contract known as an "indenture." Indentures are governed by federal law—namely, the Trust Indenture Act of 1939 and the Trust Indenture Reform Act of 1990, as well as their enacting regulations.

28.     The portfolio manager's role is two-fold: The first is to identify and purchase the CLO Assets, doing so in a manner that creates the cash flow necessary to satisfy a CLO's debt-service requirements (*i.e.*, the payout, diversification, credit-quality, and average-life requirements) while not exposing the CLO to non-market risks. The second is to monitor the CLO Assets to ensure that over time the individual CLO Assets continue to meet various collateral-quality, which are designed to ensure a CLO can meet its debt-service requirements all the while producing income for equity holders. This latter task usually requires the portfolio manager to monitor each CLO asset to ensure that the CLO has a mix of assets in different

**Original Complaint**                                                                                                **Page 6**

**Appx. 02220**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM    INDEX NO. 653654/2022
NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 10/04/2022

industries or markets, with differing maturity dates within acceptable risk profiles, and within a variety of credit ratings. This aspect of the portfolio manager's job normally includes selling assets that are deteriorating and buying assets that are superior to assets in the portfolio—otherwise, investing too much of the portfolio in any one of these categories overexposes a CLO to risk and may well lead to losses.

29.     The portfolio manager is typically subject to a separate agreement called the portfolio management agreement ("PMA").

30.     The portfolio manager also often serves as the primary investment advisor and may also outsource or delegate certain functions to one or more sub-advisors.

31.     Advisors are required to be "Registered Investment Advisors" under federal law, which imposes robust non-waivable fiduciary duties, as discussed in greater detail below. One such duty is to maintain the best interest of the investors and to make investment decision that are suitable to the investors' assumption of risk.

32.     As compensation for the role with a CLO, portfolio managers receive a percentage of the "assets under management" ("AUM"), which is determined by the face value, also known as par value, of the CLO Assets.

33.     Because of this compensation structure, if left unchecked, portfolio managers can maximize their take-home pay by purchasing debt instruments with the highest par value, irrespective of the quality of these assets.

34.     Because lower-credit-quality debt instruments are cheaper than those of higher quality, portfolio managers can acquire a greater number of these lower-quality loans and pool them in the SPV to manipulate the CLO's fee structure to their own benefit.

35.     Doing so allows portfolio managers to achieve the largest par value in the

**Original Complaint**                                                      **Page 7**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM INDEX NO. 653654/2022

NYSCEF DOC. NO. 1                                                                                         RECEIVED NYSCEF: 10/04/2022

aggregate as possible and thereby charge the largest fees for themselves.

36.     Pursuing this investing strategy would allow portfolio managers to earn significantly more in fees over a longer period of time, even though doing so exposes a CLO (and, thereby, the noteholders and equity holders) to significantly more risk on account of the longer maturities and lower credit ratings of these lower-quality debt instruments.

37.     This is where indenture trustees play their part—they prevent portfolio managers from engaging in such behavior by monitoring changes in the CLO assets and in the portfolio's credit quality and maturity.

38.     Indenture trustees have various tools to monitor and protect the security and soundness of CLO assets, two of which are the weighted average rating factor ("WARF") and the weighted average life ("WAL").

39.     The WARF demonstrates the credit quality of a CLO's entire portfolio. WARF is calculated by taking the credit rating of each debt instrument in the CLO, determining the percentage of the CLO portfolio that each instrument constitutes, and aggregating those to a factor of the portfolio's notional balance. The better the WARF, the lower the risk to a CLO's investors.

40.     The WAL demonstrates average maturity of the debt instruments in the CLO, *i.e.*, the riskiness of the entire portfolio with respect to the time until the principal is repaid. Calculating the WAL yields the average number of years for which each dollar of unpaid principal on an investment remains outstanding. This metric is important because, in general, investors want to be paid back sooner rather than later. Longer payouts typically mean greater exposure to risk because of unforeseen circumstances, *e.g.*, inflation, default risk, etc. Therefore, the shorter the maturity dates, the better the WAL—and, accordingly, the lower the risk to a

**Original Complaint**                                                                                           **Page 8**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM

INDEX NO. 653654/2022

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 10/04/2022

CLO's investors.

41.     Together, the WARF and the WAL are effective gauges to evaluate whether CLO Assets are becoming too risky. Thus, indenture trustees have several tools to monitor and rein in portfolio managers in order to protect a CLO's noteholders and equity holders.

### B.  NEXPOINT INVESTS IN THE ACIS CLOs

42.     In this case, Acis was the portfolio manager. Mr. Terry is the president, owner, and primary advisor of Acis. Brigade is the sub-advisor to Terry and Acis.

43.     Between 2014 and 2016, NexPoint became a holder under the indenture dated April 16, 2015, among Acis CLO 2015-6 Ltd. and Acis CLO 2015-6 LLC (together "ACIS-6"). The value of the equity was approximately $7,500,000 at the time.

44.     NexPoint invested in the indenture for ACIS-6 (the "Acis Indenture") as part of its mission and as a secure and safe investment on behalf of its investors.

45.     U.S. Bank agreed to serve as the trustee for the Acis Indenture. Acis came onboard as the portfolio manager, and Highland Capital Management L.P. ("Highland") served as the sub-advisor.

46.     The Acis Indenture imposed several obligations on Acis as the portfolio manager and U.S. Bank as the trustee.

47.     Additionally, the PMAs for the Acis CLOs impose obligations on Acis as the portfolio manager, generally requiring Acis to "supervise and direct the investment and reinvestment of the Assets" and to "monitor the Assets."

48.     These PMAs also impose liability on U.S. Bank as a third-party beneficiary in its role as indenture trustee.

49.     When Terry took over Acis in August 2018, Acis continued to serve as portfolio manager to the Acis CLOs, but Terry became the advisor.

---

**Original Complaint**                                                                                         **Page 9**

**Appx. 02223**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
INDEX NO. 653654/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 10/04/2022

50.     As a result of having neither the labor force nor the wherewithal to manage the Acis CLOs on its own, Acis retained Brigade to assist the company and Terry to provide these portfolio management services as a sub-advisor.

51.     As RIAs, Acis, Terry, and Brigade are subject to the Investment Advisers Act of 1940 (the "Advisers Act").

52.     As part of the Acis bankruptcy proceeding (the "Acis Bankruptcy")[2] in which Terry became 100% owner of Acis (as well as its president and owner of its general partner), the United States Bankruptcy Court for the Northern District of Texas formally approved Acis's appointment of Brigade as sub-advisor and shared-services provider to Acis in connection with Acis's management of the Acis CLOs. At all pertinent times through the present, Brigade has provided these services.

53.     As a sub-advisor, Brigade is the agent of Acis and, therefore, of the Acis CLOs. Upon information and belief, Terry needed help managing the Acis CLOs, so he retained Brigade to provide advisory services, as well as back-and middle-office functions, including, but not limited to, accounting, payments, operations, technology, and finance, among other things, in connection with Acis's obligations under the PMAs.

54.     Terry additionally employed Brigade to assist in the negotiation and execution of all documents necessary to acquire or dispose of assets under the PMAs. He further delegated to Brigade certain tasks related to the Acis CLOs, including, but not limited to, identifying potential assets (and their buyers and sellers) and modeling ratings, default, and price scenarios as needed. In providing these critical portfolio management services for the Acis CLOs, Brigade works

---

[2] The two case numbers in the consolidated Bankruptcy Proceeding include Case Nos. 18-30264-SGJ-11 and 18-30265-SGJ-11.

**Original Complaint**                                                                 **Page 10**

Appx. 02224

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
INDEX NO. 653654/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 10/04/2022

directly with and for Terry. Terry testified in the Acis bankruptcy proceedings that he intended for this arrangement.

55.     Critically, although Terry effectively approves all trading activity for the Acis CLOs, Terry and Acis have no executive level employees aside from Terry, and, upon information and belief, they do not possess the ability to manage the CLO Assets effectively. As president and sole owner of Acis, Terry exercises complete dominion over the company and its activities. Absent a chain of command or support system, Terry answers to nothing other than his greed and self-interest.

56.     Given the far-reaching extent of Brigade's involvement in managing the CLOs' portfolios, Brigade's conduct—and by extension Acis's conduct through Terry's direction and control—severely and adversely impacted the portfolios of the Acis CLOs in which NexPoint is a noteholder and equity holder.

57.     Acis paid Brigade as though Brigade were another portfolio manager or advisor for its portfolio management services. As of February 20, 2019, Brigade had charged Acis fifteen basis points on the Acis CLOs' assets, a fee which Brigade represented to have been negotiated in good faith with Acis.

58.     Prior to the Acis Bankruptcy, Highland managed the Acis CLOs, serving as a sub-advisor to Acis. One of the original investment vehicles, Acis CLO-7, continued to be managed by Highland after the RIA Defendants took over control of the other Acis CLOs.

59.     Since August 2, 2018, the RIA Defendants have managed the Acis CLOs subject to the indentures and PMAs, which require them to "comply with all [applicable] terms and conditions of the [Acis Indenture]" and "perform [their] obligations . . . in good faith and with

**Original Complaint**                                                                    **Page 11**

**Appx. 02225**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

reasonable care." The Acis Indenture's applicable "terms and conditions" obligate the RIA Defendants to ensure compliance with collateral quality tests described above. [3]

60.    Moreover, Section 8 of the PMAs prohibits the portfolio manager—here, Terry, Acis, and Brigade—from "taking any action that would intentionally, or with reckless disregard . . . adversely affect the interest of the Holders in the Assets in any material respect,"[4] unless approved in writing by, among others, a majority of both the controlling class and the subordinate noteholders.

61.    The PMAs hold Acis liable for its acts or omissions, including, but not limited to, acting in bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations under the Acis Indenture.

62.    Notably, Section 11(a)(i) of the PMAs expressly holds Acis liable for any decrease in the value of the Acis CLOs as a result of bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations.

63.    As portfolio manager, advisor, and sub-advisor, respectively, Acis, Terry, and Brigade were aware that they performed services for the Acis CLOs for a particular purpose.

64.    The RIA Defendants also understood, and were fully aware, that investors in the Acis CLOs, like NexPoint, relied on them to perform services in furtherance of their collective duty to manage the portfolios of the Acis CLOs diligently.

---

[3] *See, e.g.*, Indenture 4 at p. 15 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 6 at p. 14 (*see* definition of "Collateral Quality Test"), p. 35 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12.

[4] *See* Portfolio Management Agreement between Acis CLO 2015-6 and Acis Capital Management, L.P. Section 8, page 15.

---

**Original Complaint**                                              **Page 12**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
INDEX NO. 653654/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 10/04/2022

65.     Despite the extra-contractual duties the RIA Defendants owe to NexPoint (and in furtherance of clear and impermissible conflicts of interest), from February 15, 2019[5] to the present, the RIA Defendants caused the Acis CLOs, including Acis 6, to incur astronomic, unprecedented expenses, which were well outside the Acis CLOs' historical expense patterns—and, as discussed in more detail below, very clearly outside market and industry norms.

66.     Further, U.S. Bank failed to uphold its duty as trustee to the Acis Indenture to ensure that every purchase and sale under the indenture maintained or improved any failing collateral quality test. U.S. Bank further failed in its fiduciary capacity by allowing transactions to be effectuated that do not maintain or improve the Acis Indenture's failing WAL metric.

67.     Moreover, Defendants attempted to offset transactions that the Acis Indenture prohibited by making same-day, bulk purchases of loans with non-failing WALs but that were overpriced or bad investments based on, among other factors, the loans' coupon return rates being lower than the expense to acquire them.

68.     Finally, to add insult to injury, the Bankruptcy Court Order, through Plan D, imposes several provisions that directly affect the Acis CLOs' investors. Among other restrictions, Plan D inhibits the ability of the noteholders and equity holders to make optional redemptions, which prohibits the beneficial trading (and free flow of the investors' capital) that would protect the pecuniary interests of the Acis CLOs' investors.

69.     Put differently, the capital of both the noteholders and equity holders have effectively been held hostage, allowing Acis to covet this capital belonging to the CLOs' investors.

---

[5] Effective February 15, 2019, the Bankruptcy Court issued an order (the "<u>BK Order</u>") that (1) released any claims against Acis or Terry that accrued prior to the effective date and (2) enjoined any lawsuit from being filed against Acis or Terry to recover on any claims that accrued prior to the effective date.

**Original Complaint**                                                                                            **Page 13**

**Appx. 02227**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

**C. HOW DID THE RIA DEFENDANTS DECIMATE THE ACIS CLOS' VALUE AND INTEGRITY?**

70.     Before Terry took the reins of Acis, the Acis CLOs, under Highland's management, had produced consistent distributions to equity holders over time.

71.     Since Terry assumed control of Acis, this is no longer the case. Payouts to Acis CLOs' equity holders have been far and few between, and these equity holders, by means of the BK Order, have been prevented from making redemptions to recoup the remaining value of their initial investments.

72.     Under Terry's management, Acis replaced shorter-term debt with longer-term loans, extending the WAL of the CLOs' portfolios.

73.     This course of conduct extended the average life of the CLO Assets and allowed prepayments to be avoided, which resulted in, among other things: (1) increased risk, (2) decreased residual principal value, and (3) longer artificially induced periods for interest accrual.

74.     Predictably, and as explained in greater detail below, Terry's tactics have decimated the value of the assets constituting the Acis CLOs. In the meanwhile, the revenue and profit to Acis and Terry have increased significantly due to artificially inflated fees, the exorbitant yet unexplained expenses foisted on the Acis CLOs, and the extended life of the CLOs.

75.     The value of the Acis CLOs' assets is understood through an assessment of net asset value ("NAV") of the CLOs' equity.

76.     Because any equity is junior to all debt, healthy equity signifies healthy debt. Unhealthy equity (or, worse yet, equity that has been wiped out) signifies potential default at least as to the junior debt tranches.

77.     The Acis CLOs' NAV over time (counting the distributions made to equity) can be seen via the following graphic illustration:

**Original Complaint**                                                                 **Page 14**

Appx. 02228

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022

RECEIVED NYSCEF: 10/04/2022



78.    The NAV of the ACIS-6 equity has been reduced to approximately thirty cents on the dollar as of April 1, 2021.

79.    This data makes it no small wonder that national CLO rankings place each Terry-managed CLO at the bottom of every list in terms of performance.

80.    Yet, despite beginning with similar profiles and investment goals as the other Acis CLOs, ACIS-7, which remains under Highland's management, has done remarkably well, returning almost one hundred cents on the dollar.

81.    Thus far, Plaintiff has discerned three primary ways that the RIA Defendants have eradicated the value of the Acis CLOs.

### 1.    <u>Mis-Accruing and Mis-Allocating Expenses</u>

82.    Prior to Terry and Brigade advising the Acis CLOs, the Acis CLOs paid out millions of distributions to the equity holders, and expenses, as a percentage of those distributions, were remarkably low.

---

**Original Complaint**                                                      **Page 15**

**Appx. 02229**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

83.    The expenses saddled on the Acis CLOs since February 15, 2019, have been nothing short of impressive. They literally inverted the relative cost-to-distributions ratio that had been in place for years prior.

84.    The following graphic depicts that inexplicable inversion:

**Expenses Paid before Highland was removed**

| Date | A3 | A4 | A5 | A6 | Total |
|---|---|---|---|---|---|
| 11/1/2017 | 53,366 | 74,533 | 75,099 | 97,077 | 300,075 |
| 2/1/2018 | 45,996 | 79,541 | 97,729 | 149,641 | 372,907 |
| 5/1/2018 | 32,194 | 15,635 | 11,723 | - | 59,552 |
| 8/1/2018 | - | 27,653 | 39,900 | 33,217 | 100,771 |
| **Total** | **131,557** | **197,363** | **224,450** | **279,935** | **833,305** |

**Equity Distirbutions Paid before Highland was removed**

| Date | A3 | A4 | A5 | A6 | Total |
|---|---|---|---|---|---|
| 11/1/2017 | 1,068,208 | 1,434,935 | 1,220,175 | 1,499,862 | 5,223,179 |
| 2/1/2018 | 471,645 | 898,027 | 640,095 | 870,666 | 2,880,433 |
| 5/1/2018 | 229,888 | 1,231,081 | 1,096,471 | 1,313,207 | 3,870,646 |
| 8/1/2018 | - | - | 166,472 | 651,402 | 817,874 |
| **Total** | **1,769,741** | **3,564,043** | **3,123,213** | **4,335,136** | **12,792,132** |

85.    The ratio was approximately $13 million in equity distributions to shareholders versus less than $900,000 in expenses, or 14.4 to 1 distributions to expenses.

86.    Since the RIA Defendants have taken over managing the Acis CLOs, the distributions-to-expense ratio has thus fallen from what it used to be, 14–1, to what it is now an anemic 0.25–1.

87.    Because of the way these CLOs have been managed, the expenses were distributed proportionately amongst the Acis CLOs, thereby impacting ACIS-6, *pro rata*.

88.    Assuming that remains true and given the amount of revenue that Acis is supposed to have earned, which was about $12 million, Acis has taken well over $24 million in revenue through its manipulation of the portfolio and expenses.

Appx. 02230

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
INDEX NO. 653654/2022

NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 10/04/2022

89.     Relevant to this case, from May 2019 through May 2020, the Acis CLOs (Acis 3 through 6) accrued over $22 million in revenue that has been apportioned:

| | | ACTUAL | | | | | | |
|---|---|---|---|---|---|---|---|---|
| DATE | TOTAL AUM | ACTUAL REV | ACTUAL EXP | LEG/ADM | ACTUAL NET | UNSEC DIST | CASH BEG | CASH END |
| 2/1/2019 | 1,890,604,000 | 2,172,029 | 959,039 | - | 1,212,990 | | 3,824,839 | 5,037,827 |
| 5/1/2019 | 1,885,797,000 | 2,532,027 | 960,950 | 1,022,062 | 549,015 | | 5,037,827 | 5,586,841 |
| 8/1/2019 | 1,861,154,000 | 4,251,742 | 745,071 | 327,111 | 3,179,560 | 21,260 | 5,586,841 | 8,745,140 |
| 11/1/2019 | 1,738,471,000 | 4,718,571 | 1,043,539 | 4,629,967 | (954,935) | 2,479,244 | 8,745,140 | 5,310,961 |
| 2/1/2020 | 1,600,692,519 | 3,925,389 | 1,076,914 | - | 2,848,475 | 40,494 | 5,310,961 | 8,118,942 |
| 5/1/2020 | 1,372,412,410 | 1,057,251 | 649,671 | - | 407,580 | | 8,118,942 | 8,526,522 |
| 8/1/2020 | 1,143,864,482 | 3,305,967 | 936,538 | - | 2,369,429 | 1,500,000 | 7,809,535 | 8,678,963 |
| 11/1/2020 | 1,015,929,000 | 2,321,662 | 1,778,177 | - | 543,485 | | 8,678,963 | 9,222,448 |
| 2/1/2021 | 814,796,995 | | | | - | | 9,222,448 | 9,222,448 |
| | | 24,284,638 | 8,149,900 | 5,979,140 | 10,155,598 | 4,040,998 | | |

90.     The Acis CLOs had never incurred such profoundly high expenses and fees to Acis. This includes roughly $2.3 million in extra profits to Acis, as well as substantial legal fees incurred by Acis itself (not by the CLOs, and not for the benefit of the CLOs).

91.     Acis periodically reported its expenses by using misleading descriptions and failing to come clean about what all the expenses actually are for.

92.     For it to all come at the expense of the investors in Acis CLOs is gob-smacking.

93.     That the expenses were incurred by the RIAs who are defendants in this case, only after they had secured bankruptcy protections for themselves against redemptions, gives rise to a strong inference that they are not properly allocated as Acis CLO expenses. Rather, they are something else.

94.     That Acis has represented these expenses as having been charged on behalf of or for the benefit of the managed Acis CLOs, and then unilaterally collected those expenses under the same pretense, gives rise to a strong inference that the RIA Defendants (as defined herein) knowingly misrepresented the nature and proper allocation of these expenses.

**Original Complaint**                                                                 **Page 17**

**Appx. 02231**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM INDEX NO. 653654/2022
NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 10/04/2022

95.     That the RIA Defendants have complete control over this information and have not disclosed it, while misrepresenting the nature of the fees and expenses, is a bad-faith manipulation of their duties and rights under the Acis Indentures and the PMAs.

## 2.  Failure to Buy Loans that Satisfy the WAL Threshold

96.     Considering the life cycle of a CLO, the Acis CLOs are currently outside the reinvestment period. As such, these CLOs are stuck with the collateral they have at this moment.

97.     Normally this may be fine, but such is not the case here. The issue here is that, prior to the close of the reinvestment period, Defendants caused the Acis CLOs to buy and hold collateral that failed the risk parameters delineated in the Acis Indenture and the PMAs.

98.     For instance, some loans have maturity dates further out than what is appropriate; others simply lacked the creditworthiness on their own to qualify under the applicable parameters. Defendants' purchase of these loans violated the PMAs, the course of performance, and good industry practices.

99.     Equally important, Defendants' purchase of these loans did not maintain or improve the credit quality of the Acis CLOs' portfolios, which violates the terms of the Acis Indenture and the PMAs.

100.    The purchase of these loans caused the Acis CLOs to suffer substantial losses.

101.    An analysis of these individual trades and purchases, made with U.S. Bank's approval, further underscores U.S. Bank's failure as trustee to adhere to the respective indenture's collateral quality requirements.

102.    For example, Acis-6 is required to provide monthly reports, which disclose, among other things, where the CLO remains in compliance with the WAL thresholds required by the

**Original Complaint**                                                                    **Page 18**

**Appx. 02232**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022

RECEIVED NYSCEF: 10/04/2022

indenture.[6]

103.    The WAL threshold for Acis-6 is 4.66.

104.    On August 21, 2018, Acis-6 registered a failing WAL of 4.78. According to the indenture's terms, failing the WAL threshold means that the fund cannot purchase any additional collateral unless said purchase improves the WAL of the CLO's portfolio.[7]

105.    Further, the portfolio manager is required to use commercially reasonable efforts to effect the sale of any collateral obligation that no longer meets the applicable criteria, including collateral causing the portfolio to fail the WAL threshold.[8]

106.    From a practical perspective, this means that (1) the portfolio manager needed to sell all collateral obligations that caused the CLO's portfolio to violate the WAL threshold, and (2) the portfolio manager could only purchase collateral that would effectuate a more favorable WAL.

107.    Despite these requirements, the RIA Defendants made multiple purchasers that did not improve the WAL, thereby violating the terms of the relevant indenture.

108.    Defendants may well argue that even though these acquisitions did not meet the WAL threshold, they bundled these purchases with loans that did satisfy the WAL threshold.

109.    According to their contention, Defendants purport to have met the requisite WAL threshold by packaging all of these loans together to average out to a satisfactory WAL under the indenture's terms.

110.    But Defendants' argument is illusory. Defendants bought loans with maturity dates that are more than two years apart, which the Acis Indenture do not allow. Once the less risk-laden

---

[6] See Article 10 Section 10.7 of Indenture.

[7] See Article 12 Section 12.2 of Indenture.

[8] See Article 12 Section 12.1(g) of the Indenture.

---

**Original Complaint**                                                                                  **Page 19**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM

NYSCEF DOC. NO. 1

INDEX NO. 653654/2022

RECEIVED NYSCEF: 10/04/2022

notes are paid off more quickly due to their shorter durations, the Acis CLOs' portfolios become disproportionately weighted with longer-term notes, no longer offset by the healthier notes.

111.     The result of this course of conduct taken by Defendants initially projects an impression (albeit false) that a portfolio's WAL threshold is under control, while, in reality, this is simply a mirage, soon to be vanquished by a predictably rapid ascension in the WAL due to the less risky debt being paid off.

112.     Pairing these loans of diverging quality circumvents the maintain/improve language engrained in the Acis Indenture's WAL thresholds.

113.     Defendants' actions saddle investors with long-dated collateral, escalating duration risk, and increasing debt levels in the CLOs' portfolios, which is particularly problematic because these CLOs should be decreasing in maturity time and deleveraging through the amortization of shorter-term loans.

### 3. __Buying Bad Investments__

114.     Upon information and belief, Defendants intentionally and purposefully purchased substandard assets.

115.     For instance, Defendants bought nineteen loans on a single day, likely in a scheme to circumvent the requisite WAL thresholds.

116.     These loans remain in the Acis CLOs' portfolios and, due to a continuing and apparently uncurable default, are currently valued at approximately twenty cents on the dollar— amounting to a roughly $1.5 million loss in value to the Acis CLOs.

117.     Defendants should have foreseen, and indeed foresaw, this risk because of the low credit ratings.

**Original Complaint**                                                    **Page 20**

**Appx. 02234**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM

NYSCEF DOC. NO. 1

INDEX NO. 653654/2022

RECEIVED NYSCEF: 10/04/2022

118.    Had Defendants abided by the requirements of the Acis Indenture and PMAs, not to mention prudent investing standards, these losses incurred by the Acis CLOs could have been avoided.

119.    There was no pro-investor justification for how Defendants managed this investment.

### 4. **Failure to Provide Best Execution**

120.    A third problem with certain of Defendants' loan purchases is that they were often executed on the same day at a time when the market was flying high. Single-day purchases tend to make assets more expensive to buy.

121.    These same-day purchases violated Defendants' duties of best execution.

122.    Additionally, many of the purchased assets were some of the cheapest on the market and were still overpriced nevertheless.

123.    At the time Defendants executed these purchases, loans were scarce, making the market conditions much more suitable for sellers than buyers.

124.    The prudent course would have been to remain in cash or identify investment opportunities that were more secure and of shorter duration. Defendants did not do so.

125.    Moreover, Defendants caused the Acis CLOs to sell certain collateral prematurely and on the cheap.

126.    As a result of Defendants' tactics and actions, the mix of assets constituting the Acis CLOs' assets is well short of the required WARF, and the maturity of the assets in the portfolios of these CLOs has pushed well past the required WAL.

127.    Both the Acis Indenture and the PMAs require Acis to seek best execution.[9]

---

[9] PMA Section 4(a); Indentures Section 12.2.

**Original Complaint**                                                                                    **Page 21**

Appx. 02235

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM    INDEX NO. 653654/2022

NYSCEF DOC. NO. 1                                              RECEIVED NYSCEF: 10/04/2022

D.     **No Accountability Without Judicial Intervention**

128.    All things considered, where was the adult in the room?

129.    The Acis Indenture provides that the Trustee, U.S. Bank, shall hold in trust, for the "benefit and security" of the investors, all "Collateral Obligations" that secure the financial obligations to the investors. However, the Trustee has successfully claimed complete contractual immunity from any responsibility to do anything other than take orders from the investment manager. Hence, Acis, Terry and Brigade are firmly on the hook and cannot blame the Trustee.

130.    Relatedly, the Acis Indenture also provides that, for future purchases and sales of collateral obligations, the RIAs shall only consummate transactions that satisfy certain investment criteria.

131.    One such criterion for all purchases is that either (A) each requirement or test, as the case may be, of the Concentration Limitations and the Collateral Quality Test will be satisfied, or (B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such requirement or test will be maintained or improved after giving effect to the reinvestment. *See, e.g.*, Indenture 5 § 12.2(a)(iv).

132.    The Acis Indenture defines "Collateral Quality Test" as:

> A test satisfied if, as of any date of determination . . . in the aggregate, the Collateral Obligations owned (or, for purposes of *pro forma* calculations in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer satisfy . . . the Maximum Moody's Rating Factor Test . . . [and the] Weighted Average Life Test.

133.    These tests are defined, in turn, as follows:

> "Maximum Moody's Rating Factor Test": The test that will be satisfied on any date of determination if the Weighted Average Adjusted Moody's

---

**Original Complaint**                                                      **Page 22**

**Appx. 02236**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM

NYSCEF DOC. NO. 1

INDEX NO. 653654/2022

RECEIVED NYSCEF: 10/04/2022

Rating Factor[10] of the Collateral Obligations is less than or equal to the lesser of (i) the sum of (A) the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Moody's Asset Quality Matrix, based upon the applicable "row/column combination" chosen by the Portfolio Manager with notice to the Collateral Administrator . . . plus the Excess Recovery Adjustment Amount.

"Weighted Average Life Test": A test that is satisfied if the Aggregate Weighted Average Life[11] on such date of determination is not later than November 18, 2022.

*See, e.g.*, Indenture 6 at 37-38, 64.

134.   These provisions of the Acis Indenture seek to maintain the integrity and continued performance of Acis CLOs' assets by requiring certain parties, including the portfolio manager and the trustee, to ensure that the collateral complies with the detailed,

---

[10] "Weighted Average Adjusted Moody's Rating Factor" means "[a]s of any date of determination, a number equal to the Weighted Average Moody's Rating Factor determined in the following manner: for purposes of this definition, the last paragraph of the definition of "Moody's Default Probability Rating," the second to last paragraph of the definition of "Moody's Rating" and the last paragraph of the definition of "Moody's Derived Rating" will be disregarded, and instead each applicable rating on credit watch by Moody's that is on (a) positive watch will be treated as having been upgraded by one rating subcategory, (b) negative watch will be treated as having been downgraded by two rating subcategories and (c) negative outlook will be treated as having been downgraded by one rating subcategory. *See, e.g.*, Indenture 5 at 64-65.

"Weighted Average Moody's Rating Factor" means "[t]he number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation (excluding Equity Securities) multiplied by (b) the Moody's Rating Factor of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such Collateral Obligations." *Id*.

[11] "Aggregate Weighted Average Life" means "[w]ith respect to all Collateral Obligations as of any date of determination is a date equal to (A) the actual number of years (…) following such date obtained by (i) *summing* the products obtained by *multiplying* the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance at such time of such Collateral Obligation and (ii) *dividing* such sum *by* the Aggregate Principal Balance at such time of all Collateral Obligations *plus* (B) such date of determination. *Id*. at 6.

---

**Original Complaint**                                                                 **Page 23**

**Appx. 02237**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

industry-recognized, bargained-for tests—the exact safeguards on which investors, like NexPoint, relied when investing in the Acis CLOs.

135.    Similar to those terms concerning collateral quality, these provisions aim to ensure the rights of any investor under the Acis Indenture, such as NexPoint, are not diluted.

136.    As previously set forth, the portfolio manager must ensure that the mix of assets in Acis funds satisfies the collateral quality tests, including the WAL threshold and the Minimum Weighted Average Moody's Recovery Rate Test ("WAM Test"), or maintains or improves any failing collateral quality tests.

137.    Defendants failed to satisfy these obligations.

138.    For one thing, the assets in the Acis funds failed the WAL threshold. Subsequent transactions have failed to maintain or improve a failing WAL threshold. For example, on several occasions during the relevant, actionable timeframe, Defendants have made multiple same-day purchases and consolidated the weighted average maturity date for these trades.

139.    Doing so created the false appearance that a CLO portfolio's WAL threshold had been maintained or improved upon. Absent this consolidation, the same-day purchases could not have maintained or improved the failing WAL thresholds on individual bases.

140.    Furthermore, the Portfolio Manager bears the obligation to seek best execution on trades reasonably available to the Acis CLOs. But Defendants greenlit many same-day trades, thereby ignoring its binding obligation under the Acis Indenture to ensure the maintenance or improvement of the collateral quality test as to each and every trade made in respect to the Acis CLOs.

141.    Therefore, absent judicial intervention, there is nothing to protect the investors.

**Original Complaint**                                                                                   **Page 24**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

## CAUSES OF ACTION

142.    All causes of action are limited to claims that accrued after the order of confirmation of the Acis Bankruptcy on February 15, 2020, forward.

### COUNT ONE
### Breach of Fiduciary Duty
### All Defendants

143.    Plaintiff incorporates the foregoing factual averments as if fully set forth herein.

144.    As registered investment advisors, the RIA Defendants are subject to the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (the "Advisers Act").

145.    The Advisers Act establishes an unwaivable fiduciary duty for investment advisers.[12]

146.    The RIA Defendants' fiduciary duties are broad and apply to the entire advisory relationship. The core of the fiduciary duty is to always act in the best interest of their investors— the adviser must put the ends of the client before its own ends or the ends of a third party. *See SEC v. Gruss*, 245 F. Supp. 3d 527, 591 (S.D.N.Y. 2017).

147.    The essence of these fiduciary duties is manifested in the duties of loyalty, transparency, and utmost care.

148.    These duties also signify that the RIA Defendants must follow the terms of any agreements and regulations that apply to the investment vehicles.

---

[12] *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("[Section] 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers." (citation omitted)); *SEC v. DiBella*, 587 F.3d 553, 568 (2d Cir. 2009) ("The 'legislative history of the Advisers Act leaves no doubt that Congress intended to impose enforceable fiduciary obligations' on investment advisors." (citation and brackets omitted)). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing Proxy Voting by Investment Advisers*, Investment Advisers Act Release No. IA-2106 (Jan. 31, 2003)).

---

**Original Complaint**                                                          **Page 25**

**Appx. 02239**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
INDEX NO. 653654/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 10/04/2022

149.    The fiduciary duties the RIA Defendants owed to Plaintiff are predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisers (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent RIAs from violating disclosure rules. 15 U.S.C. § 80b-4a; *see* 17 C.F.R. § 275.206(4)-7(a).

150.    Therefore, RIAs must disclose all aspects relevant to potential conflicts of interest and report their own malfeasance to investors.

151.    Specifically, for all conflicts of interest, RIAs must (1) disclose those conflicts to the clients verbally, in writing, on Form ADV,[13] and (2) obtain the client's written consent before proceeding with any transaction that could be deemed double dealing.[14]

152.    Where RIAs trade on their own behalf or place their interests above those of the advisee or investors, the Advisers Act holds such RIAs liable to the advisee and its investors for breaching their fiduciary duty.

---

[13] General Instruction 3 to Part 2 of Form ADV (stating that an adviser's disclosure obligation "requires that [the adviser] provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest [the adviser has] and the business practices in which [the adviser] engage[s], and can give informed consent to such conflicts or practices or reject them")

[14] Investment Advisors Act Release 3060, *supra*; General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your *clients* of all material facts relating to the advisory relationship. As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your *clients* that could affect the advisory relationship. This obligation requires that you provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest you have and the business practices in which you engage, and can give informed consent to such conflicts or practices or reject them."). *See also Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019) ("[R]egardless of what Form ADV requires, [investment advisers have] a fiduciary duty to fully and fairly reveal conflicts of interest to their clients.").

---

**Original Complaint**                                                                                  **Page 26**

**Appx. 02240**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

153.    Section 206 of the Advisers Act prohibits RIAs from employing "any device, scheme, or artifice to defraud any client or prospective client," "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client," or to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(1)–(2), (4).

154.    Section 206 of the Advisers Act focuses on the use of the unlawful means—its provisions do not require that the activity be in the offer or sale of any security, or in connection with a purchase or sale with the advisee. They do not require evidence of reliance or materiality.

155.    Because Advisers Act duties are the standard of care for investment advisors, under New York law, investment advisors owe fiduciary duties to their clients, and "may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties," since in "these instances, it is policy, not the parties' contract, that gives rise to a duty of care".[15]

156.    The RIAs violated their fiduciary duties by breaching the terms of the indenture, by self-dealing, and by converting property of the investors for themselves.

157.    Because of the life cycle of a CLO, the Acis CLOs are currently outside the period of reinvestment. Therefore, the CLOs are stuck with the collateral they have.

158.    The problem is that prior to the close of the reinvestment period, Defendants have caused the CLOs to buy and hold collateral that would not have qualified for the risk parameters delineated in the PMAs and indentures.

---

[15] *Sommer v Fed. Signal Corp.*, 79 N.Y.2d 540, 551-552 (1992); *see also Bullmore v Ernst & Young Cayman Islands*, 45 A.D.3d 461, 846 N.Y.S.2d 145 (1st Dept. 2007) (professional investment adviser had fiduciary duty to client in connection with hedge fund collapse notwithstanding whether a contractual duty exists).

**Original Complaint**                                                    **Page 27**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
INDEX NO. 653654/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 10/04/2022

159.     Certain loans have maturity dates further out than what is necessary or appropriate. Certain loans simply lacked the creditworthiness on their own to qualify. The purchase of these loans violated the PMAs, as well as the course of performance and good industry practices.

160.     Equally important, the purchase of these loans violated the requirements in the indentures and the PMAs that any trading should maintain or improve the credit quality of the portfolio.

161.     This has caused the Acis CLOs to suffer substantial losses. Several examples are shown here.

a.     <u>Chief Power.</u> Throughout the relevant time period, Defendants held the Chief Power loan which bore a very dismal Caa1/B- rating when Defendants initially purchased it. Critically, it had a December 2020 maturity date. The lack of creditworthiness of the loan is evidenced not only by its low credit rating, but also by the fact that it was not refinanced when it could have been in 2018-2019. The loan was then downgraded to Caa2/CCC in the fall of 2019. It was only then that Defendants went on to sell this loan at 51 cents on the dollar within a year, locking in $4.7mm of realized losses to the Acis CLOs. The manager had purchased this loan with a December 2020 (1+ year) maturity date on the same day Defendants bought multiple loans with 2025 (6+ year) and 2024 (5+ year) maturities. This is important because the 2025 and 2024 loans <u>do not</u> maintain or improve failing WAL Tests in existence at the time of purchase. However, the addition of Chief Power was plainly to generate the appearance of a *blended* WAL that did maintain or improve the failing WAL Test. This type of chicanery is not allowed nor is it in the spirit of the CLOs' indentures,

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM    INDEX NO. 653654/2022

NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 10/04/2022

and ended up directly leading to almost $5 million in losses to the Acis CLOs. There was no pro-investor justification for how Defendants managed this investment;

b.     Glass Mountain Pipeline. Defendants purchased $2 million of this loan in April 2019 on a single day (April 30, 2019). It had B3/B ratings at the time of purchase, indicating heightened credit risk, and also had a December 2024 maturity date, which was 5.5+ years from when it was purchased. The WAL Tests for the CLOs that bought this were failing at this time, meaning a loan purchased needed to maintain or improve the failing WAL Tests, which were all standing at 4.0 years or shorter. This was a purchase that, in addition to heightened credit risk and increasing the average maturity date of the portfolios, also violated the CLOs' indentures' credit quality requirements. Similar to other situations, Defendants bought nineteen loans on a single day, likely in a scheme to circumvent the WAL Test restrictions. The loan is currently still held in the portfolios and is quoted in the low 20s due to a continuing and apparently uncurable default, which is a $1.5 million loss to the Acis CLOs. Defendants should have known and foreseen this risk because of the low credit ratings. Had Defendants abided by the indenture and PMA requirements, as well as prudent investing standards, these losses to the Acis CLOs would have been avoided. There was no pro-investor justification for how Defendants managed this investment;

c.     KCA Deutag. Defendants purchased this loan with a Caa1/CCC+ rating at the time of its purchase in April through May 2019. There was no

---

**Original Complaint**                                                        **Page 29**

**Appx. 02243**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
INDEX NO. 653654/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 10/04/2022

justification to purchase loans with a Caa/CCC rating as the implied credit quality is far too risky for a levered CLO structure. The purchase price averaged 85 cents on the dollar (i.e., of the face value of the loan), which also implies significant credit risk. Defendants ended up selling this loan six months later on November 18, 2019, at 65 cents on the dollar, locking in $1.8 million in losses to the Acis CLOs. The low credit rating and the fact that the loan had a long maturity date would have warned the Defendants that the loan lacked the credit quality and would not maintain or improve the credit quality of the portfolio; in fact, it would have certainly dragged the credit quality down. There was no pro-investor justification for how Defendants managed this investment;

d.  <u>Libbey Glass.</u> This was being held by Acis for no apparent reason. Its B2/B credit was weak, which is why it had not refinanced/extended already during a very strong 2018-2019 market. Defendants inexplicably held on to the loan which was downgraded to B3 in November 2019 and again to Caa2/CCC in March 2020. The issuer corporation filed for bankruptcy, and the loan was restructured into reorganized equity, essentially wiping out all the value from the lenders. Defendants' decision to hold the loan throughout the entire downward process locked in $12.7 million of tangible losses to the Acis CLOs. There was no pro-investor justification for how Defendants managed this investment;

e.  <u>Carestream Health.</u> This loan had B3/B- ratings. The credit was very weak, which was reflected by the ratings, and is why it had not

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

refinanced/extended already during a very strong 2018-2019 market. Following an S&P downgrade from B- to CCC+ in February 2020 (plus, it remained on Creditwatch Negative), Defendants sold this loan across all portfolios on the same day (March 3, 2020) at 75 cents on the dollar, locking in $4.8 million of realized losses to the Acis CLOs.

f.  <u>Envision Healthcare.</u>  This loan had B2/B+ ratings at the time of purchase in April 2019, because the loan had been issued with a maturity date of October 2025.  The WAL of this loan was 6.5 years. The WAL Tests for the CLOs that bought this were failing at this time, meaning a loan purchased needed to main or improve the failing WAL Tests, which were all standing at less than 4.0 years or shorter. This was a purchase that clearly violated the CLOs' indentures. The loan would go on to be downgraded to its current Caa2/CCC ratings. The loan is currently still held in the Acis CLO portfolios at a $1.5 million loss thus far;

g.  <u>Doncasters.</u> This loan bore a B3/B- rating which means it was unlikely to be paid off or refinanced. While Defendants continued to hold the loan (which they should never have bought), Caa1/CCC- and the manager sold the loan around July 1, 2020, at an average price of 80.51, locking in $1.2 million of realized losses to the Acis CLOs in less than a year.

h.  <u>Lumileds (Bright Bidco).</u> This loan is being held in violation the CLOs' indentures. As of February 16, 2019, the loan had just recently been issued, carried B1/B ratings, and has a June 2024 maturity date, which was nearly six years from when it was bought in September 2018. The WAL Tests for

---

**Original Complaint**                                                    **Page 31**

Appx. 02245

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM

NYSCEF DOC. NO. 1

INDEX NO. 653654/2022

RECEIVED NYSCEF: 10/04/2022

the CLOs that bought this were failing at this time, meaning it failed to maintain or improve the failing WAL Tests, which were all standing at four years or shorter. In September 2019, the loan was downgraded to B3/CCC+, and in November 2019, the loan's ratings were downgraded again to Caa1/CCC+. The manager has not sold any of this loan to date. Today, the loan trades at 76-77, which is currently $2.2 million in losses to the Acis CLOs;

i.   <u>McGraw-Hill.</u> This loan had B2/B rating and was downgraded by Moody's to B3 in May 2019 and then again to Caa2 in August 2020. S&P downgraded the rating to B- in May 2020 and to CCC+ in September 2020. This was a loan with a very weak credit profile, but seemingly one that the manager believed in, as this was one of the largest positions put on by the manager. However, after purchasing over $36 million across four CLOs between August 2018 and December 2019, the manager decided to sell all of it on a single day--September 30, 2020—at a price of $82.75, foregoing any chance of a par recovery. This loan was then fully paid off at 100 cents on the dollar <u>roughly three months</u> later in January 2021. The sell at $82.75 cost the four CLOs a total of $5.9 million compared to the full paydown the CLOs would have received in January 2021 had the loans not been sold;

j.   <u>GIP III Stetson.</u> The GIP Stetson loan bore low credit ratings of Ba3/B+ and, more critically, was a loan that carried a 6+ year maturity (July 2025) that made purchasing it a violation of the indentures. The WAL Test of this loan did not maintain or improve the failing WAL Tests. By purchasing this

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

loan—in addition to all the others herein—the manager was engaging in a scheme or artifice to deceive by manipulating the metrics of the indenture in bad faith. The manager was buying risky loans that never should have been included in the collateral pool. The loan was subsequently downgraded to B1/B-, and the manager sold this loan at 66 cents on the dollar between May 2020 and August 2020, locking in $1.5 million in damages. It is also curious as to why the manager would then sell this loan down 34 points; not long after the loan was sold, the trading levels moved up materially and is now trading at 96 cents on the dollar.

k.   <u>Boardriders.</u>  Purchased in March 2019, the loan had B3/B- ratings at the time of purchase, indicating heightened credit risk, and it also had an April 2024 maturity date, which was 5+ years from when it was purchased. The WAL Tests for the CLOs that bought this were failing at this time, meaning a loan purchased needed to maintain or improve the failing WAL Tests, which were all standing at 4.0 years or shorter. This was a purchase that, in addition to heightened credit risk, also violated the CLOs' indentures. The loan is currently still held in the portfolios, has been downgraded to B3/CCC, and trades in the low-mid 90s--several points lower than where it was purchased--and reflects a loss of $442,193;

l.   <u>Premiere Brands (Nine West)</u>. This loan had B3/B- ratings at the time of purchase, including a Caa1 tranche rating on the loan, indicating heightened credit risk, and also had a March 2024 maturity date, which almost five years from when it was bought in April 2019. The WAL Tests for Acis 6,

---

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
INDEX NO. 653654/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 10/04/2022

the CLO that bought this, was failing at this time, meaning a loan purchased needed to maintain or improve the failing WAL Tests, stood at 4.15 years. This was a purchase that, in addition to heightened credit risk, also violated the CLOs' indentures. Similar to other situations, the manager bought sixteen items on a single day, which is a violation of the indenture and of best execution conventions. The loan has subsequently been downgraded to Caa2/CCC, is currently still held in the portfolios and is quoted in the mid-high 60s, which is more than a $600,000 unrealized loss.

This chart summarizes an estimate of the losses:

| Issuer | Commitment Bought | Loss on Investment |
|---|---|---|
| Libbey Glass | 12,750,000 | $ (12,660,000) |
| Chief Power | 10,894,048 | ( 4,724,826) |
| Lumileds Holding | 9,732,632 | ( 2,181,083) |
| KCA Deutag UK Finance PL | 8,992,443 | ( 1,781,329) |
| Glass Mountain Pipeline | 1,994,949 | ( 1,548,280) |
| Envision Healthcare | 13,994,987 | ( 1,470,094) |
| Doncasters | 9,730,000 | ( 1,190,979) |
| Premiere Brands | 2,000,000 | ( 635,000) |
| Boardriders | 6,569,202 | ( 448,763) |
| **Total** | **76,658,262** | **$ (26,640,333)** |

162.    Another problem with these purchases is that they were often executed on the same day (purchasing in a single day tends to make an asset more expensive to buy) and were executed at a time when the market was flying high.  This violated the best execution duties of the Defendants.[16]

---

[16] *See* PMA Section 4(a); Indentures Section 12.2.

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM    INDEX NO. 653654/2022

NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 10/04/2022

163.    Additionally, many of the purchased "bad" assets were some of the cheapest assets on the market—but they were actually still overpriced. The market at the time was a seller's market—loans were scarce.

164.    The most prudent course would have been to remain in cash or find far more secure short-term investments.

165.    Defendants have furthermore caused the CLOs to sell certain collateral cheaply and prematurely. In other words, the RIA Defendants took over advising and managing the Acis CLOs with several credit-worthy assets, or they themselves luckily bought several credit-worthy assets.

166.    The problem is that they then sold those assets, inexplicably, at a time when they knew they could not replace them with equal or improved assets.

167.    Given that the Defendants had no intention of redeeming the CLOs (allowing investors to take their money out) or resetting them (raising new debt and opening a new investment period), the investors of the CLOs would have been best served had these "good" assets been allowed to simply mature.

168.    These are illustrated here:

| Issuer | Commitment Sold | Lost Value |
|---|---|---|
| McGraw-Hill Global Education | $34,288,241 | ($  5,914,722) |
| Carestream Health | $20,644,508 | (  4,799,848) |
| Advantage Sales & Marketing 1L | $27,038,364 | (  3,622,316) |
| Advantage Sales & Marketing 2L | $10,688,828 | (  2,820,378) |
| Mohegan Tribal Gaming | $12,153,419 | (  1,830,609) |
| GIP III STETSON I | $5,169,653 | (  1,518,878) |
| Advantage Sales & Marketing 1L | $6,510,157 | (     890,963) |
| Party City | $8,826,376 | (     822,638) |
| **Total** | **$125,319,547** | **($22,220,350)** |

169.    There is no plausible pro-investor basis for such actions.

---

**Original Complaint**                                                **Page 35**

**Appx. 02249**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

170.    A more cynical person would be left to wonder who the purchasers of these assets were, and whether they were entities or persons related to Terry, or in which he had a hidden or surreptitious or beneficial interest.

171.    These assets were sold well after the start of COVID—in late 2020. And so they were sold *after* they had hit their "COVID lows"—but the market had already shown it was roaring back in the last quarter of 2020.

172.    The above assets were also sold on or about the same day—again, a breach of best execution practices.

173.    The mix of assets, because of these knowingly errant purchases and sales, falls well below the acceptable, reasonable WARF, and pushed maturity of the portfolio out past any acceptable, reasonable WAL.

174.    As shown, the RIAs sold qualified assets early without justification and without being able to replace them with the same or better quality assets; instead, they bought cheaper assets—and more of them, doing so using bundling, same day purchasing, and other deceptive means to mask the low quality and true life of the loans in violation of their best execution duties, and in violation of the collateral quality tests required by the Acis Indenture.

175.    The purpose of these transactions is obvious: purchasing more bad assets cheaper to inflate the notional value of Assets Under Management, thus inflating the fees the RIAs could charge, and extending their life as RIAs for this mountain of money. This operates as an artifice to deceive and/or defraud the investors.

176.    As if that weren't enough, the RIA Defendants have engaged in a practice or course of business consisting of passing off expenses, without disclosure or accountability, that were incurred by Acis—the portfolio manager—as though they were the expenses of the CLOs—

**Appx. 02250**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

the *advisees.* By doing so, the RIA Defendants affirmatively misrepresented the character and nature of those expenses and subsequently assessed their managed entities their pro rata share.

177.    The fiduciary duty that the RIA Defendants owed to investors like Plaintiff is predicated on trust and confidence and to not commit corporate waste.[17]

178.    The RIA Defendants have breached their fiduciary duties by committing corporate waste in two primary forms: (1) by incurring unnecessary expenses or improperly imposing expenses on the Acis CLOs without justification, and (2) by collecting fees based upon a knowingly inflated notional asset value.

179.    The RIA Defendants have breached their fiduciary duties of transparency by failing to fulsomely justify and document their investor-related activities. Failing to do so is a breach of the duty of loyalty because it is plainly a means to conceal the true extent of the malfeasance and damage done.

180.    The Advisers Act declares any contract void that is made in violation of the Advisers Act, or the performance of which involves the violation of, or the continuance of any relationship or practice in violation of the Advisers Act, or any rule, regulation, or order issued thereunder.

181.    Therefore, there are no contractual defenses or justifications for the violations of the Advisers Act's duties.

182.    The agreements between Acis and any third party in any transaction in violation of the Advisers Act is also void, and the RIA Defendants' rights under the indentures and PMAs are void due to the violations of the Advisers Act.

---

[17] *See Cap. Gains Rsch.*, 375 U.S. at 191–92 (stating that the Advisers Act was meant to "eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser — consciously or unconsciously — to render advise which was not disinterested").

**Original Complaint**                                                                                          **Page 37**

**Appx. 02251**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

183.    The RIA Defendants have further aided and abetted the breaches by their co-defendants, and/or conspired with their Co-Defendants, making them liable as principals for breach of fiduciary duty.

184.    The RIA Defendants are thus liable for damages, punitive damages, and all other relief to which Plaintiff is justly entitled. Plaintiff seeks all legal and equitable relief to which Plaintiff is justly entitled including but limited to restitution and disgorgement of all funds and moneys paid in violation of the Advisers Act after the effective date of the ACIS bankruptcy final plan order.

185.    To the extent the RIA Defendants must be served via derivative action, Plaintiff respectfully pleads this claim in the alternative as a derivative action on behalf of ACIS 6. Plaintiff alleges that any demand would have been futile because ACIS's control person, Mr. Terry, would not have sued himself, the sub-advisor, or any other person with whom he is plainly aligned. Also, in the alternative, Plaintiff pleads that Terry and Acis should be liable for breach of fiduciary duty (for, *inter alia*, self-dealing) for not bringing the claims in this case in the first instance.

### COUNT TWO
### Breach of Contract
### Against Acis

186.    Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

187.    Section 11(a)(i) of the PMAs expressly holds Acis liable for any decrease in the value of the CLOs that was accomplished by bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations.

188.    The PMAs further give Acis the discretion to allocate and manage the CLOs' assets and to incur expenses on behalf of the CLOs for services that benefit the CLOs.

**Original Complaint**                                                                                            **Page 38**

**Appx. 02252**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
INDEX NO. 653654/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 10/04/2022

189.    The Acis Indenture further requires that Acis manage the CLO Assets in a manner that maintains or improves the credit quality of the CLOs' portfolios, subject to the collateral quality tests defined above.

190.    By contract, New York law governs the PMAs and Acis Indenture; under New York law, every contract contains an implied duty of good faith and fair dealing. *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002).

191.    Acis has breached these agreements and caused the CLOs to incur expenses that, upon information and belief, go considerably beyond what is contractually permissible for the Acis CLOs.

192.    Nothing in the agreements permits Acis to collect fees it did not properly earn.

193.    Acis has breached these agreements and manipulated the CLOs' assets in a way that prolongs the CLOs and maximizes fees owed to Acis—all at the expense of NexPoint and other investors in the Acis CLOs.

194.    These breaches of contract caused NexPoint to incur damages.

195.    NexPoint alleges and avers that it may bring this breach of contract claim directly to the extent it and Acis are parties to the indentures, and to the extent that the indentures incorporate the PMAs and the duties therein.

196.    If NexPoint is required to bring this claim derivatively, it hereby does so and avers that any pre-suit demand would have been futile because asking Acis-6 to bring suit when it is controlled by the Defendants would have been futile. Plaintiff alleges that any demand would have been futile because ACIS's control-person, Mr. Terry, would not have sued himself, the sub-adviser and the Indenture Trustee, or any other person with whom he is plainly aligned.

197.    NexPoint thus seeks damages, attorneys' fees, restitution, disgorgement, and any

**Original Complaint**                                                          **Page 39**

**Appx. 02253**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

and all other remedies to which it is justly entitled.

## COUNT FOUR
### Negligence/Gross Negligence
### Against All Defendants

198.    Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

199.    To the extent any Defendant would be liable for any of the foregoing causes of action prior to their lack of sufficient intent or willful actions, Plaintiff pleads in the alternative that such Defendant's acts or omissions were negligent.

200.    Defendants owed NexPoint a duty of care in managing the investments of the CLOs and in discharging their duties under the Advisers Act, the Acis Indenture, and the PMAs.

201.    Defendants' acts and omissions in violation of the duties outlined herein have resulted in substantial losses to NexPoint, totaling $8,000,000 or more.

202.    Defendants' conduct was knowing and willful, and done in disregard of known and established safeguards implemented and created in the industry in order to avoid well-known, foreseeable risks.

203.    Defendants' acts and omissions were taken in reckless disregard of these known risks.

204.    Defendants are fiduciaries and are thus liable for negligence and gross negligence.

205.    If NexPoint is required to bring this claim derivatively, it hereby does so and avers that any pre-suit demand would have been futile because asking Acis 6 to bring suit when it is controlled by the Defendants would have been futile. Plaintiff alleges that any demand would have been futile because ACIS's control person, Mr. Terry, would not have sued himself, the sub-adviser and the Indenture Trustee, or any other person with whom he is plainly aligned.

206.    Plaintiff is thus entitled to damages, punitive damages, attorneys' fees, disgorgement, and costs as the law provides and to which it is justly entitled.

**Original Complaint**                                                                    **Page 40**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
INDEX NO. 653654/2022
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 10/04/2022

**COUNT FIVE**
**Conversion**
**Against Acis and Terry**

207.     Plaintiff incorporates the foregoing factual averments as if fully set forth herein.

208.     The Acis CLOs are obligated to pay specific and identifiable administrative expenses in addition to other costs and expenses. The payment of these expenses is pulled from a reserve of specific and identifiable equity, which includes funds belonging to NexPoint (to the extent it is an equity holder under the Acis CLOs).

209.     As both a noteholder and equity holder, NexPoint had ownership, and therefore a right, to the property used to pay the Acis CLOs' administrative expenses and costs before the property's conversion.

210.     In allowing the payment of inexplicably high expenses (near twenty times their historical amount), Terry, upon information and belief, wrongfully and improperly reimbursed Acis, and potentially himself, using Plaintiff's property designated for the payment of the Acis CLOs' administrative expenses and costs.

211.     Upon information and belief, Terry wrongfully and improperly reimbursed Acis and potentially himself by using Plaintiff's property designated for the payment of the Acis CLOs' administrative expenses and costs, and by allowing the payment of uncharacteristically high expenses upwards near 20 times their historical amount.

212.     Upon information and belief, Terry and Acis exercised a wrongful and unauthorized dominion over NexPoint's property designated for the payment of the Acis CLOs' administrative expenses and costs, to the alteration of its condition or to the exclusion of Plaintiff's rights.

213.     An action for the conversion of using Plaintiff's property designated for the

**Original Complaint**                                                                 **Page 41**

**Appx. 02255**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

payment of the Acis CLOs' administrative expenses and costs is based on this conduct. The property at issue is a specific, identifiable fund that has an obligation to be returned or otherwise treated in a particular manner.

### COUNT SIX
#### Unjust Enrichment/Assumpsit/Money had and Received
#### All Defendants

214.    Plaintiff incorporates the foregoing factual averments as if fully set forth herein.

215.    Plaintiff pleads in the alternative that the forgoing actions and omissions are wrongful, and that Plaintiff is entitled to disgorge the ill-gotten gains from Defendants under the theory of unjust enrichment, assumpsit or money had and received.

216.    If NexPoint is required to bring this claim derivatively, it hereby does so and avers that any pre-suit demand would have been futile because asking Acis-6 to bring suit when it is controlled by the Defendants would have been futile. Plaintiff alleges that any demand would have been futile because ACIS's control person, Mr. Terry, would not have sued himself, the sub-advisor and the Indenture Trustee, or any other person with whom he is plainly aligned.

### REQUEST TO PIERCE ACIS CAPITAL
### MANAGEMENT'S CORPORATE VEIL

217.    Plaintiff hereby alleges and incorporates the preceding allegations as if fully set forth herein.

218.    Terry has exercised complete dominion over Acis.

219.    As described herein, Terry used such control to commit fraud or wrongdoing that injured NexPoint. Terry abused his role within Acis to amass unprecedented expenses of the Acis CLOs, which, among other wrongs, amounted to twenty times the historical expense rate.

220.    These expenses and Acis's refusal to provide the accounting requested by certain noteholders under the Acis Indenture loudly imply impropriety. Further, the foregoing conduct

**Original Complaint**                                                                 **Page 42**

**Appx. 02256**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

raises an inference that expenses incurred under the Acis CLOs have been and are being improperly reimbursed.

221.    The circumstances described herein warrant the disregard of Acis's corporate form, particularly so because courts in this county will disregard the corporate form when necessary to prevent fraud or to achieve equity. *See, e.g.*, *LAKAH v. UBS AG*, No. 07-CV-2799, 2017 U.S. Dist. LEXIS 229131, at *255–59 (S.D.N.Y. 2017).

222.    Plaintiff respectfully requests that the Court pierce the corporate veil of Acis as to render Acis and Terry jointly and severally liable for the wrongful conduct described herein and to the extent that such conduct would otherwise be attributable to Acis alone.

## CONDITIONS PRECEDENT

223.    Plaintiff hereby pleads that all conditions precedent have occurred or been performed.

224.    To the extent any claim herein is more properly characterized as a derivative claim, Plaintiff submits that any condition precedent to such claim has been satisfied, and that any pre-suit demand would have been futile because Defendants control ACIS-6, and the Trustee who is empowered to bring suit failed to do so despite numerous written requests.

## DEMAND FOR ATTORNEYS' FEES

225.    Pursuant to Section 5.15 of the Acis Indenture, Plaintiff hereby makes a demand for the attorneys' fees and court costs it has sustained in bringing this action.

## PRAYER FOR RELIEF

226.    All requested relief is hereby expressly intended to be predicated solely on the alleged acts and omission accruing after the effective date of the final Bankruptcy Order in the Acis Bankruptcy.

**Original Complaint**                                                                                                      **Page 43**

**Appx. 02257**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM INDEX NO. 653654/2022

NYSCEF DOC. NO. 1                                                RECEIVED NYSCEF: 10/04/2022

227.    Plaintiff respectfully requests that judgment be entered in its favor and against

Defendants Acis, Terry, and Brigade as follows:

A.    Damages in an amount to be determined at trial;

B.    Punitive damages in an amount to be determined at trial;

C.    Disgorgement of wrongfully paid fees and expenses and restitution thereof in an amount to be determined at trial;

D.    Disgorgement of any and all ill-gotten gains in an amount to be determined at trial;

E.    Attorneys' fees and costs;

F.    Constructive trust, injunctive relief, and any other equitable relief necessary to prevent further injury;

G.    All other legal and equitable relief to which Plaintiff is justly entitled.

Dated:  October 3, 2022                        Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*
**Mazin A. Sbaiti**
New York Bar No. 4339057
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com

*Counsel for Plaintiff*

---

**Original Complaint**                                                      **Page 44**

Appx. 02258

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

**IN THE SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK**

-------------------------------------------------------------X
NEXPOINT DIVERSIFIED REAL
ESTATE TRUST,

|  |  |
|---|---|
| *Plaintiff,* | Index No. _____ |
| - against - | **SUMMONS** |
| ACIS CAPITAL MANAGEMENT, L.P.,<br>JOSHUA N. TERRY, and BRIGADE CAPITAL<br>MANAGEMENT, LP |  |
| *Defendants.* |  |

-------------------------------------------------------------X

To the Defendant:

Acis Capital Management, L.P., Through Its Registered Agent:
Capitol Services, Inc.
1675 S. State Street, Suite B
Dover, DE  19901

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue designated is New York County, New York, as it is the county of the primary place of business for one defendant within the State, the conduct giving rise to the claims herein occurred in whole or in part in New York, and the governing documents to which Defendant is bound requires that Defendant agree to and submit to the jurisdiction of New York.

Dated:  October 4, 2022

SBAITI & COMPANY PLLC

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti
New York Bar No. 4339057
2200 Ross Avenue, Suite 4900W
Dallas, TX  75201
T: (214) 432-2899
E: mas@sbaitilaw.com

Attorneys for Plaintiff

**Appx. 02259**

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 653654/2022
RECEIVED NYSCEF: 10/04/2022

**IN THE SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK**

--------------------------------------------------------X
NEXPOINT DIVERSIFIED REAL
ESTATE TRUST,

|  |  |
|---|---|
| *Plaintiff,* | Index No. _____ |

- against -                                          **SUMMONS**

ACIS CAPITAL MANAGEMENT, L.P.,
JOSHUA N. TERRY, and BRIGADE CAPITAL
MANAGEMENT, LP

*Defendants.*
--------------------------------------------------------X

To the Defendant:

Brigade Capital Management, LP,  Through Its Registered Agent:
Donald E. Morgan, III
399 Park Avenue, 16th Floor
New York, NY 10022

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue designated is New York County, New York, as it is the county of the primary place of business for one defendant within the State, the conduct giving rise to the claims herein occurred in whole or in part in New York, and the governing documents to which Defendant is bound requires that Defendant agree to and submit to the jurisdiction of New York.

Dated:  October 4, 2022                    SBAITI & COMPANY PLLC

                                        */s/ Mazin A. Sbaiti*
                                        Mazin A. Sbaiti
                                        New York Bar No. 4339057
                                        2200 Ross Avenue, Suite 4900W
                                        Dallas, TX  75201
                                        T: (214) 432-2899
                                        E: mas@sbaitilaw.com

                                        Attorneys for Plaintiff

Appx. 02260

FILED: NEW YORK COUNTY CLERK 10/03/2022 05:11 PM

NYSCEF DOC. NO. 1

INDEX NO. 653654/2022

RECEIVED NYSCEF: 10/04/2022

# IN THE SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

-------------------------------------------------------------X

NEXPOINT DIVERSIFIED REAL
ESTATE TRUST,

            *Plaintiff,*       Index No. _____

      - against -        **SUMMONS**

ACIS CAPITAL MANAGEMENT, L.P.,
JOSHUA N. TERRY, and BRIGADE CAPITAL
MANAGEMENT, LP

            *Defendants.*

-------------------------------------------------------------X

    To the Defendant:

    Joshua N. Terry
    3509 Princeton Avenue
    Dallas, TX  75205

    You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

    The basis of venue designated is New York County, New York, as it is the county of the primary place of business for one defendant within the State, the conduct giving rise to the claims herein occurred in whole or in part in New York, and the governing documents to which Defendant is bound requires that Defendant agree to and submit to the jurisdiction of New York.

Dated:  October 4, 2022       SBAITI & COMPANY PLLC

                 */s/ Mazin A. Sbaiti*_____
                 Mazin A. Sbaiti
                 New York Bar No. 4339057
                 2200 Ross Avenue, Suite 4900W
                 Dallas, TX  75201
                 T: (214) 432-2899
                 E: mas@sbaitilaw.com

                 Attorneys for Plaintiff

Appx. 02261