# EXHIBIT 77

**Ogier (Guernsey) LLP**
**Advocate Alex Horsbrugh-Porter**
**17 March 2023**

### IN THE ROYAL COURT OF GUERNSEY

### (ORDINARY DIVISION)

**BETWEEN:**

### CLO HOLDCO, LTD

**Applicant**

### -and-

### HIGHLAND CLO FUNDING, LTD

**Respondent**

---

### APPLICATION

---

CLO HoldCo, Ltd of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands and whose address for service is at Ogier (Guernsey) LLP, Redwood House, St Julian's Avenue, St Peter Port, Guernsey, GY1 1WA

### APPLIES TO THE COURT

**PURSUANT TO** Sections 349 and 350 of the Companies (Guernsey) Law 2008 (the **Companies Law**) and the inherent jurisdiction of the Court

**AND IN THE CIRCUMSTANCES** more particularly described in the First Affidavit of Paul Richard Murphy **AND AS FOLLOWS:**

1       The Applicant is a limited company incorporated under the laws of the Cayman Islands with registration number 249232, its registered office being situated at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.   This application is brought by the Applicant in its capacity as a shareholder in the Respondent.

2       The Respondent is a limited company incorporated under the laws of Guernsey with registration number 60120, its registered office being situated at 1st Floor, Royal Chambers St. Julian's Avenue St. Peter Port Guernsey GY1 3JX.

3       Respondent has issued 153,139,231 ordinary shares.  As shown, Applicant  owns 49.015% of shares outstanding at the date of this Application. At the date of this Application the 153,139,231 shares in issue are fully paid up.

106-25786898-1

**Appx. 02263**

4      The current shareholding of the Respondent is as follows:-

    (a)    The Applicant is the holder of 49.015% of the issued share capital in the Company (70,314,387.44 shares);

    (b)    HCMLP Investments, LLC (**HCMLP**) is the holder of 49.985% of the issued share capital in the Company;

    (c)    Highland Capital Management, L.P. (**HCM**) is the holder of 0.627% of the issued share capital in the Company; and

    (d)    The remaining shareholding in the Company of 0.373% is held by four individuals, namely Lee Blackwell Parker III, Hunter Covitz, Jon Poglitsch, and Neil Desai

    (collectively the **Shareholders**).

5      HCM and its affiliate, HCMLP, are the collective majority shareholders of the Company (the **HCM Shareholders**).  The Applicant has informed the HCM Shareholders that they are not necessary parties to this Application.

6      HCM is a limited partnership incorporated under the laws of Delaware with registration number 2770270, its registered office being situated at 100 Crescent Court, Suite 1850, Dallas, Texas, United States 75201.  HCMLP is a limited liability company incorporated under the laws of Delaware with registration number 5749764, its registered office being situated at 100 Crescent Court, Suite 1850, Dallas, Texas, United States 75201.

7      The Respondent has been formally notified of the filing of this Application and will be notified of the date, time and place of the hearing of the Application in accordance with section 349(4) of the Companies Law.

8      The Application arises out of the management of the Respondent in a manner which has caused ongoing unfair prejudice to the Applicant in its capacity as minority shareholder in the Respondent.  The unfair prejudice complained of by the Applicant as set out in the affidavit in support of this Application is mainly predicated upon the  Respondent's conduct in aligning its interests with the wider commercial interests of the HCM Shareholders (as the majority shareholder) to the detriment of the Applicant.

9      The purpose of the Application is to mitigate any further harm being caused to the Applicant's interests as shareholder by securing for the Applicant a direct interest in the underlying assets of the Respondent in proportion to its shareholding (through the Applicant Exit Proposals as defined and contained within the First Affidavit.  The Applicant has considered various options to achieve a mutual separation between it and the Respondent, and the relief sought in the Application is the most equitable solution to the unfair prejudice complained of.

10    Alternatively, as section 350(2)(b) of the Companies (Guernsey) Law, 2008 provides the Royal Court to "*require the company – . . . . . (ii) to do any act which the applicant has complained it has omitted to do,*" if the Court is not disposed to approve the Applicants Exit Proposals, the Applicant seeks as alternative relief provided for in Section 350(2)(c)  -  that the Court "*authorise civil proceedings to be brought in the name and on behalf of the*

2

**Appx. 02264**

*company by such persons and on such terms as the Court may direct*" such that Applicant can bring an action against US Bank for recovery of the "Redemption Proceeds" as defined in the First Affidavit.  As an additional alternative relief (if the Court does not approve the Applicant's Exit Proposals), the Applicant seeks relief under Section 350(2)(b)(ii), that the Court "*require the company (ii) to do any act which the applicant has complained it has omitted to do*" by ordering the Company to make full distributions to shareholders of unencumbered cash in an amount reflective of the Company's wind down status and absence of investment activities.

**THE APPLICANTS THEREFORE PRAY AS FOLLOWS:**

1.   That the Court make an order that:

    a.   The Respondent be ordered to undertake a transaction pursuant to section 350(2)(d) of the Companies Law pursuant to which:

        i.   the Applicant transfers to the Respondent its current shareholding held in the Respondent, in accordance with the Applicant Exit Proposals;

        ii.   as consideration for such shareholding, the Respondent transfers to the Applicant the full legal and beneficial title of all of the assets held by the Respondent in proportion to the Applicant's pro rata 49.015% equity share in the Respondent; and/ or

    b.   Such order as the Court thinks fit for giving relief in respect of the matters complained of, including without limitation the alternative relief set forth above.

This 6th day of March 2023

*Alex Horsbrugh-Porter*

……………………………………………….

**A Horsbrugh-Porter**
**Advocate for the Applicant**

106-25786898-1

**Appx. 02265**



# Royal Court of Guernsey

## SIGNIFICATION

to

**HIGHLAND CLO FUNDING, LTD**

of 1st Floor
Royal Chambers
St. Julian's Avenue
St. Peter Port
Guernsey
GY1 3JX

**The last date for service of this Signification is**

**10 March 2023**

---

Issued from the Office of
Ogier
Advocates
Redwood House, St Julian's Avenue, St Peter Port,
Guernsey, GY1 1WA

…………………………………
H.M. Sergeant

**Appx. 02266**

# Sergeant

**IN THE ROYAL COURT OF GUERNSEY**

**(ORDINARY DIVISION)**

**BETWEEN:**

**CLO HOLDCO, LTD**

**Applicant**

**and**

**HIGHLAND CLO FUNDING, LTD**

**Respondent**

**AT THE INSTANCE** of **CLO HOLDCO, LTD** (**Applicant**) of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands and whose address for service is at Ogier (Guernsey) LLP, Redwood House, St Julian's Avenue, St Peter Port, Guernsey, GY1 1WA

**HEREBY NOTIFIES**

**HIGHLAND CLO FUNDING, LTD** whose registered office is at 1st Floor, Royal Chambers, St. Julian's Avenue, St. Peter Port, Guernsey, GY1 3JX that an application in the form attached has been made to the Royal Court, returnable at 10h15am (or as soon as possible thereafter) on 17 March 2023.

*Alex Horsbrugh-Porter*

...........................................

**Advocate Alex Horsbrugh-Porter**
**Advocate for the Applicant**

Dated: 06 March 2023

Sworn by: PR Murphy
For: Applicant
Number: First
Exhibit: PRM1
Date sworn: 7 MARCH 2023

Ogier (Guernsey) LLP
Advocate Alex Horsbrugh-Porter

### IN THE ROYAL COURT OF GUERNSEY

### (ORDINARY DIVISION)

### IN THE MATTER OF PART XIX OF THE COMPANIES (GUERNSEY) LAW, 2008

BETWEEN:

### CLO HOLDCO, LTD

Applicant

### and

### HIGHLAND CLO FUNDING, LTD

Respondent

---

### FIRST AFFIDAVIT OF PAUL RICHARD MURPHY IN SUPPORT OF UNFAIR PREJUDICE APPLICATION

---

I, Paul Richard Murphy, of 67 Fort Street, George Town, Grand Cayman, Cayman Islands ky1-1007, having been duly sworn, being over 18 years of age, having personal knowledge of the facts sworn herein and being competent to testify as a witness, hereby say as follows:

**Introduction**

1  The Applicant, CLO HoldCo, Ltd, is a limited company incorporated under the laws of the Cayman Islands with registration number 249232 its registered office being situated at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.  This application is brought by the Applicant in its capacity as a shareholder in the Respondent.

2  I hold the position of Director in the Applicant and I am duly authorised by the Applicant to swear to this affidavit in support of an application by the Applicant pursuant to sections 349

106-25783891-4

and 350 of the Companies (Guernsey) Law 2008 (as amended) (the **Companies Law**) (the **Application**).

3      The Respondent, Highland CLO Funding, Ltd (the **Company**) is a limited company incorporated under the laws of Guernsey with registration number 60120, its registered office being situated at 1st Floor, Royal Chambers St. Julian's Avenue St. Peter Port Guernsey GY1 3JX.   The Company's stated investment objective is to provide its shareholders with stable and growing income returns and to grow the capital value of the investment portfolio through opportunistic exposure to senior secured loans and collateralized loan obligations (**CLOs**) on both a direct and indirect basis. The Company is beyond its investment period and currently in wind down, involving the process of liquidating its investment portfolio with a view to a complete return of capital to shareholders.

4      Highland Capital Management, L.P. (**HCM**) is a limited partnership incorporated under the laws of Delaware with registration number 2770270, its registered office being situated at 100 Crescent Court, Suite 1850, Dallas, Texas, United States 75201, and holds 0.627% of the issued share capital in the Company.

5      HCMLP Investments, LLC (**HCMLP Investments**) is a limited liability company incorporated under the laws of Delaware with registration number 5749764, its registered office being situated at 100 Crescent Court, Suite 1850, Dallas, Texas, United States 75201. HCMLP Investments is a solely owned subsidiary of HCM, having been created to hold 49.985% of the issued share capital in the Company. HCM and HCMLP Investments are hereinafter defined as the HCM Shareholders.  The Application is brought against the Company, though the HCM Shareholders have been given notice of the filing of this Application and of their right to seek to be parties to the Application, or alternatively to advise if they wish to present evidence and be heard in the hearings on and concerning the Application, and/or in accordance with Rule 37 (1)(b)(ii) of the The Royal Court Civil Rules, 2007.

6      On October 16, 2019, HCM filed for bankruptcy pursuant to Chapter 11 of the U.S. Bankruptcy Code in the Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court (the **Bankruptcy Court**). Within the bankruptcy proceedings the Bankruptcy Court entered an order (the **Confirmation Order**) confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) (the **Plan**), which include a gatekeeper order (the **Gatekeeper**) preventing certain parties, including Applicant, from commencing or pursuing litigation against HCM, its subsidiaries, and other parties (**Protected Parties**) without first obtaining leave of the Bankruptcy Court.

7      On 9 September 2022, CLO HoldCo filed a motion in the Bankruptcy Court (the **Bankruptcy Motion**) seeking a ruling from the Bankruptcy Court that the Company was not a Protected Party and not entitled to protection under the Gatekeeper.  In connection with the Bankruptcy Motion, CLO HoldCo provided the HCM shareholders with a copy of the Application and Affidavit and disclosed that the HCM Shareholders were not necessary parties to this action.

8      On 25 October 2022, the Bankruptcy Court entered an order (the **Bankruptcy Order**) confirming that the Company is not a Protected Party but making no ruling as to whether

106-25783891-4

**Appx. 02269**

delivering notice of this proceeding to the HCM Shareholders violated the Gatekeeper. The Bankruptcy Order also provides that the HCM Shareholders cannot be added as defendants in this action without leave of the Bankruptcy Court.

9       True and accurate copies of the Bankruptcy Order, the Confirmation Order, as may be amended, and the Plan, as may be amended, are at pages **29 to 246**.

10      I make this affidavit from facts and matters which I believe to be true and where matters are not within my knowledge, I have set out the source of that information. There is now produced and shown to me marked **"PRM1"**, a paginated bundle of true copy documents to which I shall refer in this affidavit. References to page numbers are to page numbers of that exhibit.

11      The Application arises out of the management of the Company by its directors (the **Directors**) which has caused unfair prejudice to the Applicant in its capacity as a minority shareholder in the Company. The unfair prejudice complained of by the Applicant is mainly predicated upon: (i) the inexplicable conduct of the affairs of the Company by the Directors regarding the failure of the Company to take action on behalf of the Company that would benefit all shareholders with respect to funds currently held by U.S. Bank; (ii) the refusal of the Company to make dividends/distributions that are warranted given the Company's wind down status, (iii) the action of the Company in making an indefensible share buy-back offer to Applicant that was comprised in great part of the Company seeking to obtain a 15% reduction in the cash amount attributable to the Applicant's interest, for the benefit of its majority shareholder (and which implied the threat of the Company's continuing refusal to maximize cash due the Company and provide fair dividends/distributions to Applicant of its share of Company cash if the "offer" was not accepted; (iv) the refusal of the Directors to cause the Company to respond sufficiently to information requests from Applicant as minority shareholder, (v) the failure of the Company to respond properly to Applicant's rejection of the aforementioned share buy-back proposal (only, "The various allegations made in that letter are wrong."), (vi) the Company's transparently self-serving dividend notice of only some 56% of unencumbered cash (despite the Company's purported willingness to use in excess of 85-90% of the Company's cash for the irrationally below market buy-back offer that required a 15% discount on cash), and (vii) the Company's rejection without legitimate basis of the Applicant Exit Proposals as defined below.

12      All of the foregoing, taken together with the inaction of the Company and the below described conduct of the Company and its representatives, is not defensible, but is clearly reflective of the Company's intention to continue with its unfair focus upon failing in its duties to Applicant as a minority shareholder.

**Purpose of Application**

13      The purpose of the Application is to mitigate further harm being caused to the Applicant and its shareholding in the Company.

14      As shown herein, the Applicant has made good faith proposals to rectify the unfair prejudice by making proposals to effect a distribution of the Company's assets to Applicant in an amount reflective of its ownership interest in the Company (the **Applicant Exit Proposals**). The Applicant has demanded the Company take action against US Bank to obtain withheld

106-25783891-4

**Appx. 02270**

funds that should be paid to the Company by US Bank (the **US Bank Redemption Proceeds Claim**) for distribution to shareholders of the Company. Finally, the recent actions of the Company in limiting dividends that should be payable to shareholders given the Company wind down status is another form of relief to which the Applicant is entitled. Currently, the Applicant is not seeking the right to bring a derivative action against the Directors, though all rights are reserved.

15    The Applicant seeks the relief set forth in the Application, and is entitled to such relief. The Company seeks approval by the Court of the Applicant Exit Proposals, which would provide the Applicant with its full share of assets attributable to its interest, including the right to pursue an action for its own account against US Bank, for recovery of funds wrongfully held by US Bank allocated to the interest of the Applicant. The Company has declared that US Bank is wrongfully withholding such funds of the Company, but has taken no action and will not disclose to the Applicant any plans for taking any action to recover Company funds that should be distributed to shareholders. Therefore approval of the Applicant Exit Proposals would allow the Company to maintain its current no-action policy, with respect to its remaining assets and shareholders, while providing the Applicant with an independent right to pursue US Bank for its own account.

16    Alternatively, as section 350(2)(b) of the Companies (Guernsey) Law, 2008 provides the Royal Court to "*require the company – . . . . . (ii) to do any act which the applicant has complained it has omitted to do,*" if the Court is not disposed to approve the Applicant Exit Proposals, the Applicant seeks as alternative relief provided for in Section 350(2)(c)  -  that the Court "*authorise civil proceedings to be brought in the name and on behalf of the company by such persons and on such terms as the Court may direct*" such that the Applicant can bring an action against US Bank for recovery of the "Redemption Proceeds" as defined below. As additional alternative relief (if the Court does not approve the Applicant Exit Proposals), the Applicant seeks relief under Section 350(2)(b)(ii), that the Court "*require the company (ii) to do any act which the applicant has complained it has omitted to do*" by ordering the Company to make full distributions to shareholders of unencumbered cash in an amount reflective of the Company's wind down status and absence of investment activities.

**Adverse Interests of Certain Parties to Applicant**

17    Acis Capital Management, L.P. (**Acis**), is the portfolio manager in respect of certain of the CLOs in which the Company has an investment and Highland HCF Advisor, Ltd is the Company's appointed general portfolio manager (the **Portfolio Manager**). HCM, Acis, the Portfolio Manager and the Company are a part of the same structure of entities, and HCM and Acis both have a close relationship with each other and with the Company for the following reasons:

17.1    The HCM Shareholders are collectively the majority shareholder in the Company;

17.2    HCM is the sole shareholder of the Portfolio Manager;

17.3    HCM is the sub-advisor to the Portfolio Manager;

106-25783891-4

**Appx. 02271**

17.4 HCM and Acis previously had common ownership, as Joshua N. Terry (**Terry**), who is now the President and the sole limited partner of Acis, is a former limited partner of HCM;

17.5 HCM and Acis have a close commercial relationship as Acis was founded as a subsidiary of HCM and managed HCM's portfolio of CLOs; and

17.6 Acis is a creditor in HCM's current bankruptcy proceedings in the Bankruptcy Court.

18 Acis also filed a bankruptcy case in the Bankruptcy Court, and within proceedings therein has brought a complaint in the Bankruptcy Court against Applicant, seeking judgment for several hundreds of thousands of dollars.

19 HCM, within its bankruptcy proceedings is adverse to Applicant regarding an amended proof of claim filed by Applicant against the bankruptcy estate of HCM.

20 Further, the alleged successor to HCM with respect to certain alleged claims held by HCM as of the bankruptcy petition date (a litigation sub-trust), has filed a complaint in the Bankruptcy Court against Applicant seeking judgment for approximately US $100 Million, which Applicant has in part sought dismissal as a matter of failure to state a claim, but the bankruptcy estate of HCM would be the ultimate beneficiary (along with the sub-trust trustee and its counsel) of any recovery.

21 In effect, therefore, both HCM and Acis have made litigation claims against Applicant within two bankruptcy cases.

22 As will be more fully set out below, the relationships between HCM, the Company and Acis have become improperly close and certain decisions and actions taken by the Company have clearly been made to promote the interests of the HCM Shareholders as the collective majority shareholder and Acis (in some cases the Company even effectively acting as the agent of HCM and/or Acis). This conduct has been to the detriment of the Applicant as minority shareholder and has caused unfair prejudice to the Applicant. The incidents of unfair prejudice which are explained more fully in this affidavit are summarised below.

22.1 The Company is beyond its investment period and is not being actively managed. As such, the Company serves as an unnecessary layer of complexity within the structure and does not have any objective purpose or commercial rationale that would interfere with the relief requested within the Application;

22.2 Due to the lack of need for active management, and as well because the Company has provided no explanation for its actions or information by which Applicant can determine that it is being fairly treated, Applicant has to draw its own conclusions, which include that the Company is being maintained and operated in such a way and for no reason other than to prefer other interests of its majority HCM Shareholders, with respect to claims of HCM that have been asserted against Applicant within the HCM bankruptcy process, and as well to favour Acis, which has also asserted claims against Applicant related to its own bankruptcy process;

106-25783891-4

22.3    The Company has mismanaged its assets by failing to take sufficient steps to resolve the unlawful withholding of funds by US Bank, the indentured trustee, which are due to be distributed to the Company;

22.4    The Company has invalidly sought to appoint a voting member to the advisory board of the Company to represent the HCM Shareholders' interests as collective majority shareholder; and

22.5    The Company has provided limited and insufficient responses to repeated information requests by the Applicant on important and pressing issues, thereby breaching the Applicant's shareholder rights to information.

23    Confirming that the Company is operating in a manner that appears intentionally prejudicing the interests of Applicant as minority shareholder, the Company, rather than take appropriate action against US Bank or issue fair and warranted dividends, has issued a buy-out proposal that severely undervalues the interests of Applicant, to such an extent that the Company seeks to obtain a 15% discount on cash that should be immediately distributed to Applicant. The threat implied by the buy-out proposal is that the Company will continue to withhold distributions to Applicant unless Applicant submits to an undervalued buy-out amount. This is irrefutable evidence of unfair prejudice and unwillingness of the Company to act in the best interest of Applicant as a minority shareholder.

24    Because the Company has refused to distribute available cash, for which it has no investment purpose and which is losing value every day due to inflation, the Applicant Exit Proposals would provide Applicant with immediate right to all available cash attributable to its interest in the Company, and as well immediate right to negotiate directly with US Bank for its share of the Redemption Proceeds and commence proceedings if necessary. Alternatively, it is necessary, for Applicant to be allowed to act on behalf of the Company to take action against US Bank for payment of Company funds that US Bank is unlawfully withholding. It would be unconscionable for the Court to direct the Company to take such action as it has consistently refused (without explanation) to engage US Bank for the Company's funds, and Applicant has good reason for its believe and conclusion that the Company would unfairly draw out any sort of proceedings, and as well maintain its stance of refusing to provide Applicant with information as to its engagement with USD Bank. Applicant as well seeks alternatively to have the Court compel fair distributions to all shareholders of available cash. I will now set out the background facts in relation to the Company, including the business, assets, shareholders, directors of the Company and the management of the Company's assets.

**Background**

*Shareholding of the Company*

25    The current shareholding of the Company is as follows:-

25.1    The Applicant is the holder of 49.015% of the issued share capital in the Company (70,314,387.44 shares);

6                                                    106-25783891-4

25.2   HCMLP Investments is the holder of 49.985% of the issued share capital in the Company;

25.3   HCM is the holder of 0.627% of the issued share capital in the Company; and

25.4   The remaining shareholding in the Company of 0.373% is held by four individuals, namely Lee Blackwell Parker III, Hunter Covitz, Jon Poglitsch, and Neil Desai

(collectively the **Shareholders**).

26   During 2015, the Applicant initially subscribed for an interest of 100% shareholding (143,454,001.00 ordinary shares) in the capital of the Company based upon the advice from HCM which was given to the Applicant's parent entity, Charitable DAF Fund L.P (**Charitable DAF**) initially, and then from Charitable DAF to Applicant.

27   The Applicant remained the sole shareholder of the Company up until 15 November 2017. Pursuant to a Subscription and Transfer Agreement dated 15 November 2017 (the **Subscription and Transfer Agreement**), the Applicant transferred and sold a total of 50.8% of its shareholding (73,139,613.56 ordinary shares) to several new shareholders, including 0.63% of its shareholding which was transferred to HCM. Following such transfer, the Applicant's shareholding in the Company was further reduced to its current shareholding of 49.015% (70,314,387.44 ordinary s/hares). A copy of the Subscription and Transfer Agreement is at pages **247 to 277**.

28   As of 15 November 2017, HCM held 0.63% of the issued share capital of the Company, and it then subsequently acquired an additional 49.98% (the **HarbourVest Shares**) of the issued share capital of the Company from HarbourVest Dover Street IX Investment L.P. (**Dover IX**), HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HV International VIII Secondary L.P. and HarbourVest Skew Base AIF L.P. (collectively, **HarbourVest**) (the **HarbourVest Share Purchase**).

29   As a result of the HarbourVest Share Purchase, HCM obtained a majority shareholding of 50.612% of the equity in the Company. On 14 January 2021 HCMLP Investments purchased 49.985% of the Company's ordinary shares.

30   HCM and HCMLP together hold the majority shareholding in the Company. By virtue of their affiliation, these entities act in concert as one and are treated as collective majority shareholders (the **HCM Shareholders**). The Company itself has confirmed in the Memorandum of Law dated 24 November 2021 at pages **278 to 299** filed in support of the Company's Motion to Intervene in certain proceedings (the **Motion to Intervene Submissions**) that HCM is "*directly and indirectly [the Company's largest shareholder…*" and therefore HCM is treated as a collective majority shareholder based on its affiliation with HCMLP (see page **287**). The Company's Guernsey advocates have also confirmed that HCM and HCMLP are treated as a collectively majority shareholder in a letter dated 14 April 2022 at pages **300 to 306** which states that "…*HCM and its affiliate, HCMLP Investments, LLC (collectively, the "HCM Shareholders") collectively own more than 50% of the Company's shares...*" (see page **306**).

106-25783891-4

*Business of the Company*

31      The Company (formerly known as Acis Loan Funding, Ltd) was incorporated in Guernsey on 30 March 2015 as a closed-ended registered collective investment scheme pursuant to The Protection of Investors (Bailiwick of Guernsey) Law, 1987 (the **POI Law**).   The Company commenced operations on 10 August 2015 and changed its name from Acis Loan Funding, Ltd. to Highland CLO Funding, Ltd. on October 27, 2017.  A copy of the Articles of Incorporation of the Company adopted by special resolution and passed on 15 November 2017 (the **Articles**) is at pages **307 to 344**.

32      The Members' Agreement relating to the Company dated 15 November 2017 (the **Members' Agreement**), regulates the relationship between the Shareholders and between the Shareholders and the Company itself, as well as the operation and management of the Company.  A copy of the Members' Agreement is at pages **345 to 372**.

33      Pursuant to clause 1 read together with Recital (B) of the Members' Agreement at page **347**, the Company's business is providing its investors with exposure to senior secured loans and CLOs, on both a direct and indirect basis, through the use of the investments described in the Company's Investment Policy (the **Business**).   Generally, the relevant loans are high yield and are deposited into a trust which issues notes that are sold to investors.

34      Clause 2.1 read together with clause 2.2 of the Members' Agreement at page **350** provides that the Shareholders and Company shall, so far as they are able (including without limitation by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company):-

34.1    procure that the Company's principal activities shall be the pursuit of carrying on the Business, conducted in accordance with the provisions of:

(a)      the Members' Agreement (referred to above);

(b)      the Offering Memorandum in relation to the Company, dated 15 November 2017, at pages **373 to 494** (the **Offering Memorandum**);

(c)      the Subscription and Transfer Agreement (referred to above) ; and

(d)      the Articles (referred to above); and

34.2    not take any action inconsistent with the provisions of the Offering Memorandum, including, without limitation the investment strategy set forth therein (the **Investment Policy**) at pages **429 to 433**.

35      The Offering Memorandum provides at page **429** that the Company's stated investment objective is to provide its shareholders with "*stable and growing income returns, and to grow the capital value of the [Company's] investment portfolio through opportunistic exposure to CLO Notes*" and other assets.

106-25783891-4

**Appx. 02275**

36    The most recent audited financial statements of the Company for the year ended 31 December 2021 (the **2021 Accounts)** at pages **495 to 526** reflect that the investment period of the Company ended on 30 April 2020 and that the term of the Company is due to end on 15 November 2027, after which the Company will be wound up and dissolved (see page **583**).

*Directors of the Company*

37    The current directors of the Company are Mr Richard Michael Boléat (**Mr Boléat**) and Mr Richard Mark Burwood (**Mr Burwood**) (together the **Directors**). The Directors, who are both independent non-executive directors, were elected and appointed on 7 July 2020.

38    The former directors of the Company are William Scott and Heather Bestwick, who resigned as directors on 7 July 2020.

39    The Offering Memorandum provides that the Directors are committed to maintaining high standards of corporate governance and that the Company complies with and will continue to comply with the Guernsey Financial Services Commission's Code of Corporate Governance issued on 30 September 2011 (the **Code**) (see pages **442 to 443**).

*Management of the Company assets and inter-relations between entities*

40    The Company's assets as at 31 December 2021 are listed and described more fully at pages **506 to 507** and **517 to 519** in the 2021 Accounts. The total net asset value of the Company as at 31 December 2021 was US$ 76,100,545. Of that amount the Company asserts that at least $38,000,000 is cash on hand.

41    Amongst the Company's investments are significant interests in the following CLOs which were all historically and are currently managed by Acis:

    41.1    ACIS CLO 2014-4 Ltd.;

    41.2    ACIS CLO 2014-5 Ltd.; and

    41.3    ACIS CLO 2014-6 Ltd.

    (the **ACIS CLOs**).

42    Charitable DAF was the original holder of the ACIS CLOs which were subsequently transferred to the Company as consideration for the Applicant's shareholding in the Company.

43    The Company has appointed and retained the current Portfolio Manager pursuant to a portfolio management agreement dated 15 November 2017 (the **PMA**), a copy of which is at pages **527 to 552**. Pursuant to clause 2 of the PMA, the Portfolio Manager acts as investment manager to the Company and manages the investment and reinvestment of the cash, subject to and in accordance with the investment policy as set forth in the Offering Memorandum (see pages **527 to 528**). The Portfolio Manager and/ or its affiliates have very wide authority in respect of engaging in transactions on behalf the Company, including the investment and reinvestment of the cash, financial instruments, and other properties

**Appx. 02276**

comprising the assets and liabilities of the Company, pursuant to clause 5 of the PMA (see pages **528 to 533** for the full description of such authority). The Portfolio Manager has broad discretion to select and manage the Company's portfolio of investments, including the ability to instruct the Company's custodian with respect to any acquisition, disposition or sale of investments and to provide certain support and assistance, personnel and credit and market research and analysis in connection with the investment and ongoing management of the Company's portfolio.

44      Pursuant to the terms of the PMA, the Portfolio Manager may act (either itself or through an affiliate) as the Portfolio Manager to the CLOs and is responsible for rendering discretionary investment advice to the Company and for ensuring the Company has the required personnel and credit research available to it to make necessary business decisions and carry on the day-to-day management of the Company's business and to implement its investment objective and policy. In addition, the Portfolio Manager (or one of its affiliates) may also manage the Company's CLOs pursuant to management agreements to be entered into from time to time (see page **501** for a description of the role of the Portfolio Manager in the 2021 Accounts).

45      In addition to being a collective majority shareholder in the Company (together with HCMLP), upon information and belief, HCM is also the sub-advisor to the Company (see 2021 Accounts at page **497**), and is sole shareholder of the Portfolio Manager (see page **553** in the settlement agreement concluded between HCM and other parties where it is confirmed that the Portfolio Manager is a subsidiary of HCM). Therefore, HCM is in a position to control the Portfolio Manager through its ability to exercise its majority voting power in the Portfolio Manager and its role as sub-advisor and General Manager. Both the Portfolio Manager (directly pursuant to the PMA) and HCM (directly or indirectly by virtue of its control of the Portfolio Manager) provide advisory and management services to the Company and therefore have a close relationship with the Company. In fact, the Company has confirmed in the Motion to Intervene Submissions that that HCM "*through another entity, acts as [the Company's] portfolio manager*" (see page **287**). Therefore effectively and for all intents and purposes, HCM is the Company's ultimate portfolio manager, and is now (for the first time in the Company's structural history) is both (along with HCMLP Investments) the majority shareholder while simultaneously suing Applicant.

46      The Company, Acis, HCM and the Portfolio Manager are all part of the same structure and have a close commercial relationship and economic ties with one another. The Company and HCM (through the Portfolio Manager) each hold an interest in a company known as Highland CLO Management, LLC (**Highland CLO Management**) (see Offering Memorandum at page **382**). The Company also has an investment amounting to 80.85% interest in ACIS CLO Management Holdings, L.P. (**ACMH**), an affiliated entity controlled by the Portfolio Manager (and therefore indirectly controlled by HCM) (see the 2021 Accounts at pages **507, 513, 517, 518 and 521**). Therefore the Company and HCM both have a financial interest in more than one of the same entities. The Company and Acis also each hold an interest in a company known as Acis CLO Management, LLC (**Acis CLO Management**). HCM controls the major economic decisions of Highland CLO Management and ACMH (through the Portfolio Manager) and Acis controls the major economic decisions of Acis CLO Management.

106-25783891-4

47      A structure diagram setting out some of the relevant entities is at page **562**.  While the structure diagram is not necessarily materially different from that from inception, or contrary to the Membership Agreement, the absence of ongoing advisory purpose, together with the fact that that now while HCM holds the power of Portfolio Manager along with majority shareholder (with HCMLP Investments), Applicant is adverse to both HCM and Acis within the Bankruptcy Court, highlights the unfair prejudice caused by the ongoing "operations" of the Company, which include refusal to distribute Applicant's share of material cash assets (of some $38 Million), refusal to take action against US Bank to obtain additional cash assets (approximately $33-35 Million), and finally, manifesting the intention to continue its unfair prejudice by making the buy-out offer which in primary part seeks to impose upon Applicant a 15% discount on cash.

48      Having outlined the background of the Company, its shareholders and asset managers, I now turn to the complaints and concerns in relation to unfair prejudice which the Applicant has in relation to the management of the Company, that underlie the request(s) made in the Application.

**Bankruptcy of Financial Advisors and conflict of interest**

49      As mentioned above, on 16 October 2019, HCM filed for Chapter 11 bankruptcy in the Delaware Bankruptcy Court, which was later transferred to the Bankruptcy Court of the Northern District of Texas (see the court order dated 4 December 2019 evidencing the HCM bankruptcy proceedings at pages **563 to 564**).  Prior to that, Acis had also filed for Chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas.  A copy of the Court Order confirming the Trustee's Plan in respect of the bankruptcy proceedings of Acis dated 31 January 2019 (the **Acis Bankruptcy Order**) is at pages **565 to 571**.

50      Pursuant to clause 9(a) of the PMA (see page **535 to 536**), the Portfolio Manager and HCM (as an affiliate of the Portfolio Manager) receive, in consideration for its services, a fee equivalent to all expenses incurred by the Portfolio Manager in the performance of its obligations related to the services set out in the PMA (defined as all Operating Expenses in the PMA).  This is confirmed at page **515** in the 2021 Accounts and pages **443 to 444** in the Offering Memorandum.

51      Pursuant to clause 9(c) of the PMA at page **536**, the Portfolio Manager will also receive certain distributions as set forth in the Dividend Policy (as defined in the terms of the Offering Memorandum at pages **396 to 397**).  In this regard, the Offering Memorandum provides that:

"*Following the Investment Period, after satisfaction of all expenses, debts, liabilities and obligations of the Company, any interest, proceeds from the realization of portfolio investments or other cash generated by the portfolio will be distributed by the Company to the Shareholders as a dividend on each Quarterly Dividend Date in accordance with the distribution priority as follows (the "Distribution Priority"):*

*First, 100% to the Shareholders pro rata based on the number of Shares held until each Shareholder has received (i) pursuant to this clause (i), aggregate distributions from the Company equal to all capital contributions made by such Shareholder plus (ii) an amount*

106-25783891-4

**Appx. 02278**

*necessary for such Shareholder to receive a cumulative rate of return of 8.0% per annum, compounded annually, on such Shareholder's aggregate capital contributions;*

*Second, 100% to the Portfolio Manager until the Portfolio Manager has received aggregate distributions from the Company equal to 20% of the sum of all distributions made in excess of aggregate capital contributions made by Shareholders;*

*Third, 80% to the Shareholders pro rata based on the number of Shares held and 20% to the Portfolio Manager until each Shareholder has received aggregate distributions from the Company equal to all capital contributions made by such Shareholder plus an amount necessary for such Shareholder to receive a cumulative rate of return of 16% per annum, compounded annually, on such Shareholder's aggregate capital contributions; and*

*Thereafter, 70% to the Shareholders pro rata based on the number of Shares held and 30% to the Portfolio Manager.*"

52      The Portfolio Manager and HCM as affiliate and Sub-Adviser to the Portfolio Manager could argue that they are entitled to substantial compensation from the Company for their services, and HCM also could assert that it is entitled to maintain the indirect benefit of the Portfolio Manager's compensation due to it being the sole shareholder in the Portfolio Manager.  Given the absence of continuing purpose, this described compensation structure unduly benefits HCM and Acis, to the prejudice of Applicant, and Applicant cannot assume that the Company will not dilute the Company assets further by making future payment of this compensation.

53      Most concerning to the Applicant is that this apparent conflict of interest (possibility of continuing compensation without corporate purpose), which because of the inappropriately close relationship the Company has with HCM, favours the interests of HCM and the HCM Shareholders as collective majority shareholder over the other shareholders in the Company. While it may be that HCMLP Investments does not benefit directly, its ownership objectively appears designed to provide HCM with the argument that the vast majority of the HCM Shareholders' interests receives no benefit so as to thwart an unfair prejudice action, when in fact it is the majority status collectively that maintains the ability of the Company to suggest that the maintenance of the HCM compensation structure is appropriate.

**Unlawful Redemption Withholding**

54      The indentured trustee of the ACIS CLOs is U.S. Bank N.A. (**U.S. Bank**).  On or around 12 May 2021, the Company submitted a redemption request to U.S Bank in relation to each of the ACIS CLOs (see Company's Interim Audited Financial Accounts dated 30 June 2021 at pages **572 to 595** (the **2021 Interim Accounts**) confirming this at page **574 to 575**).  On 14 May 2021, NexPoint Diversified Real Estate Trust (formerly known as NexPoint Strategic Opportunities Fund) (**NexPoint**) filed a complaint in the United States District Court for the Southern District of New York against Acis (in its capacity as the then portfolio manager of the Company), U.S. Bank (in its capacity as trustee of the Company), Terry (in his capacity as Acis' principal) and Brigade Capital Management, L.P. (in its capacity as sub-adviser to Acis) (the **NexPoint Litigation**).  The NexPoint Litigation was brought on the basis of inter alia the alleged breach of fiduciary duty in the management of certain CLOs in which

106-25783891-4

**Appx. 02279**

NexPoint invested, resulting in a loss to NexPoint.  A copy of the complaint filed by NexPoint in the NexPoint Litigation is at pages **596 to 645**.

55   On or around 23 June 2021, the Company's request for a redemption was satisfied and Acis and U.S. Bank liquidated nearly all of the ACIS CLOs and redeemed the secured notes, leaving only certain subordinated notes outstanding (the **Redemption**).  As a result, the ACIS CLOs were largely redeemed and the liquidation of the CLOs generated sufficient proceeds to make significant payments to the holders of subordinated notes (the **Redemption Proceeds**).

56   The Redemption Proceeds were supposed to be distributed to the various noteholders, including, principally, the Company in accordance with the rights of those noteholders (see pages **283, 284, 289 and 290** of the Motion to Intervene Submissions).  However, U.S. Bank, has  reserved the entire Redemption Proceeds to pay for their legal expenses and any potential liability in connection with the NexPoint Litigation (see pages **289 to 290** of the  Motion to Intervene Submissions).  The value of the cash holdings retained by U.S. Bank as of 21 March 2021 amounted to approximately US$39 million (as reflected in the 2021 Accounts at page **498**).

57   US Bank's contention is that its retention of the Redemption Proceeds is authorised by the relevant CLO indentures on the basis that it is required in order to protect US Bank (and perhaps Acis; Applicant has insufficient information to make an allegation here) from the effects of the NexPoint Litigation as well as its asserted concern over the perceived threat of litigation against the Company by the Applicant.  In this regard, see page **498** in the 2021 Accounts, page **670** in the letter from the Company to the Applicant dated 23 July 2021, and page **647 to 649** in the letter dated 26 October 2021 from Carey Olsen (Guernsey) LLP, the advocates for the Company (**Carey Olsen**), to Ogier (Guernsey) LLP, the advocates for the Applicant (**Ogier**) (the **October 2021 Letter**).

58   In the October 2021 Letter, it states that "*US Bank's stated justification for retaining the CLO redemption proceeds at issue is premised on certain threatened litigation from CLO Holdco and certain other presently-filed litigation by Nexpoint Strategic Opportunities Fund…including litigation in which the Company is cited as a nominal defendant*" (see pages **647 to 648**).  The Company has declared in pleadings that U.S. Bank has no legal right to withhold the Redemption Proceeds, and therefore has acknowledged that the supposed "perceived threat" of litigation grants U.S. Bank no basis to withhold.

59   CLOs are structured products with rated debt tranches, and therefore they are intended to operate automatically in accordance with cash waterfall provisions.  There is no discretion by U.S Bank to withhold the Redemption Proceeds for any reason, including to fund any litigation such as a hypothetical potential future claim based on a purported indemnity (which the Company agrees does give rise to a right on behalf of U.S. Bank to withhold the Redemption Proceeds). The withholding by U.S. Bank of the Redemption Proceeds is therefore unlawful (the **Unlawful Redemption Withholding**).  The Company agrees, despite its attempt to shirk duties by placing blame on Applicant, and its refusal to take sufficient action to recover the Redemption Proceeds.

60   As mentioned, the Company has in fact recorded its disagreement with U.S. Bank's treatment  of  the  Redemption  Proceeds  several  times.   In  the  Motion  to  Intervene

106-25783891-4

**Appx. 02280**

Submissions at pages **292 to 293** it states "*There is no basis in the Indenture or the law to reserve funds for Defendants' potential liability*" and in the 2021 Interim Accounts it states at page **575** that "*The Directors' view, on advice, is that the retention of cash by the indenture trustee is unlawful and is inconsistent with the terms of the relevant CLO indentures. Accordingly, the Directors are taking urgent and proportionate steps to secure unrestricted control over this cash and any as yet unliquidated securities. I will communicate further with all shareholders as this matter progresses.*"  This is reiterated in the 2021 Accounts at page **498** where it provides that it is the Directors' opinion that there is no proper basis in law for the withholding of the Company's assets by U.S. Bank.

61    In the October 2021 Letter it also states that "*US Bank has explained its position on this matter openly and consistently. The Company disagrees with that position and has communicated that disagreement to US Bank*" (see page **648**).

62    Due to the Unlawful Redemption Withholding, significant payments that the Company would otherwise receive from the liquidation of the ACIS CLOs have been delayed on an unlawful basis and the funds that make up a portion of the Applicant's shareholding in the Company continue to be depleted.  The Company has filed a motion seeking to intervene in the NexPoint Litigation purportedly in order to support the opposition to NexPoint's claim and therefore seek to minimise the funds used by U.S. Bank for its defence to the NexPoint Litigation (see email from Company dated 3 December 2021 at pages **650 to 651**). However the Company has taken insufficient steps to compel U.S. Bank to release the Redemption Proceeds and thereby fully remedy the Unlawful Redemption Withholding, that the Company itself has claimed to be unlawful.

63    The Company's intervention in the NexPoint Litigation will inevitably result in the Company incurring litigation costs, which the Company in seeking the intervention has acknowledged should be spent.  But the objective of the intervention is purportedly to accelerate the payment from U.S. Bank, by ending the litigation by NexPoint.  Notwithstanding its willingness to expend costs in litigating against NexPoint, the Company has been unwilling to expend necessary costs to obtain full payment of the withheld Redemption Proceeds, which would be simply litigation upon the Indenture documents against U.S. Bank, solely, and should have been explored as an action that could have been taken within the NexPoint litigation or otherwise (see below).

64    On 3 December 2021, the Company, acting through Mr Boléat, sent an email to the Applicant suggesting that, the easiest approach to receiving funds would be if the Applicant were able to "*procure a release from its affiliate NexPoint*".  A copy of this email is at pages **650 to 651**).

65    This communication evidences the prejudice being caused to Applicant.  Applicant is not an affiliate of NexPoint under any proper definition of the term, but the Company has assumed affiliate status and the power of Applicant to cause conduct on the part of NexPoint.  In fact, it is the case that HCM has within bankruptcy proceedings routinely (without evidence) asserted that Applicant is an affiliate of numerous parties with which it is not affiliated, so we assume that the Company representatives did not simply make up the suggestion, but that the "assumption" of affiliate status is coming from HCM.  This acceptance of assertions from HCM (without communication with Applicant) is the definition of prejudice.  The Company has already stated in its own intervention submissions that U.S.

106-25783891-4

**Appx. 02281**

Bank has no right to retain the proceeds related to Acis 6, despite the NexPoint litigation; so it cannot be heard to say that it should not commence action against U.S. Bank when in fact the only litigation regarding the other CLO's has been instituted by U.S. Bank, seeking an improper declaratory action that Applicant should not be able to sue U.S. Bank. It simply is improper for the Company to place any undue condition on the distribution of the Redemption Proceeds or fail to take sufficient action to compel U.S. Bank to distribute the Redemption Proceeds, under an incorrect assumption that Applicant can resolve litigation by a third party. The Company is entitled to the Redemption Proceeds. The Company should also, within the Intervention submissions, proposed that upon intervention it would act as plaintiff in counterclaim with a direct Claim against U.S. Bank for immediate distribution of the Acis 6 proceeds (together with any and all fees, costs, and damages to which the Company is entitled -- as opposed to attaching only a motion to dismiss the NexPoint complaint. Clearly the Company has exhibited an unwillingness to bring action against US Bank, as it withheld such action from inclusion in its Intervention Submissions, despite such an approach being proper, even if in the alternative.

66     The Company is clearly not fully committed to resolving the Unlawful Redemption Withholding and are even willing to use inappropriate suggestions to take advantage of the circumstances in order to secure a release from the NexPoint Litigation, for some inexplicable purpose, upon a groundless assertion of affiliate status; while at the same time the Company, though making clear that it has a viable claim against U.S. Bank for distribution of the Unlawful Redemption Withholding, refuses to take action to obtain that result. Therefore it is clear that while the Company has no concern for spending litigation expenses pursuing a release or withdrawal by NexPoint in respect of the NexPoint Litigation that is purely for the benefit of Acis, it simultaneously withholds the prospect of any direct action against U.S. Bank on its own proclaimed right to obtain from U.S. Bank the Redemption Proceeds.

67     As bad, by failing to take sufficient steps to resolve the Unlawful Redemption Withholding, the Company has chosen to implicitly support U.S. Bank's unlawful position to the detriment of the Applicant and has preferred the interests of Acis (in relation to its position in the NexPoint Litigation) over the interests and rights of shareholders, and in particular, Applicant as minority shareholder. This again raises a conflict of interest and instance of the Applicant being unfairly prejudiced by the conduct of the Company.

68     On 28 February 2023, the Applicant received a letter from the Company, a copy of which is at pages **657 to 658**, providing that pursuant to a settlement agreement, US Bank and Acis have agreed to release US$ 16.5 million of the Redemption Proceeds (approximately 40%), and that the parties have agreed to engage in "*further discussions regarding the release of the remaining funds upon the final disposition of the pending lawsuits*". Despite this, the majority of the Redemption Proceeds has not been released and the Unlawful Redemption Withholding remains in respect of that significant portion. The Company's failure to take sufficient steps to remedy the Unlawful Redemption Withholding as well as the apparent conflict of interest in relation to Acis, has caused and continues to cause loss and resultant unfair prejudice to the Applicant.

69     Despite several requests by the Applicant (described further below), the Company has also refused to provide the Applicant with any information relating to the Company's attempts to procure the release of the remaining Redemption Proceeds by US Bank, other than the

15                                        106-25783891-4

information provided in the letter of 28 February 2023.  The information provided in that letter is vague, and does not provide the Applicant with the required comfort that this issue is being seriously addressed by the Company and that the Company is attempting to remedy the unfair prejudice to the Applicant.

**Trading status of Company**

70      As mentioned above, the investment period of the Company ended on 30 April 2020 and the Company is currently in wind down mode, which is the process of dissolving a business by liquidating stock, paying off creditors, and distributing any remaining shareholder assets. In the case of the Company, the Acis CLOs are in runoff, meaning there is a decline in fixed-term investments due to the fact that the bulk of the Company's assets have been redeemed and the proceeds of such redemption are being held in cash by the Company US Bank in its capacity as indentured trustee (while such cash is declining in value by aggressive inflation).  The Company is in the process of liquidating its investment portfolio with a view to a complete return of capital to shareholders.  The Applicant Exit Proposals are simply an acceleration of the liquidation process with respect to Applicant, and the Company can thereafter take whatever actions upon which it and its remaining shareholders agree.

71      The "Business" of the Company as defined in the Members Agreement and the investment policy set out in the Offering Memorandum is to provide its shareholders with stable and growing income returns and to grow the capital value of the investment portfolio through opportunistic exposure to senior secured loans.  Due to the current trading status of the Company, it is not actively fulfilling the purpose for which it was intended and is no longer operating in accordance with the Business of the Company.

72      The Articles and the Members' Agreement clearly do not anticipate the current investment status of the Company where there are no more investable assets and the only remaining assets (the Acis CLOs) are in wind down mode.  The shareholders of the Company are not benefitting from an investment in the underlying CLO assets as they had anticipated when entering the structure, and the fact that the proceeds from the Redemption are apparently being unlawfully withheld by US Bank and that the Company has failed to take proper steps to remedy the position further supports the argument that the business of the Company is no longer operating in accordance with its stated investment objective.

73      Further, the Company may even be in breach of clause 2.1 read together with clause 2.2 of the Members' Agreement provides that the Shareholders and Company shall, so far as they are able procure that the Company's principal activities shall be the pursuit of carrying on the Business, which is currently not being carried out.

74      In these circumstances, the Applicant has a legitimate expectation that the remaining assets of the Company will be distributed to the shareholders and it is being unfairly prejudiced on an ongoing basis as long as these funds are not distributed.

**Invalid Appointment of Voting Member to Advisory Board**

75      Pursuant to clause 4.1 of the Members' Agreement at page **351**, the Company is required to establish an advisory board composed of two individuals, one of whom must be a representative of the Applicant (the **Advisory Board**).  On 2 November 2021, and pursuant

16                                        106-25783891-4

to the Applicant's rights under clause 4.1 of the Members' Agreement, the Applicant appointed me (being one of its directors) as its representative on the Advisory Board. Notice of my appointment was provided to the Company and its shareholders and the Company acknowledged such appointment by letter to me dated 6 January 2022. A copy of the notice of my appointment to the Advisory Board is at pages **659 to 660**. Pursuant to my appointment, I am the sole voting member of the Advisory Board.

76  Pursuant to clause 4.3 of the Members' Agreement at page **351 to 352**, the main function of the Advisory Board is to provide general advice to the Portfolio Manager or the Company with regard to Company activities and operations and other matters, and the Portfolio Manager may not act contrary to the advice of the Advisory Board.

77  Pursuant to clause 13 of the PMA at pages **544 to 546**, the Advisory Board has the unilateral right to terminate the PMA and remove the Portfolio Manager from its position independently of the Directors and the Company for cause, including where the Portfolio Manager breaches any terms of the PMA or the Offering Memorandum. Pursuant to clause 4(a)(xiv), the Portfolio Manager also may not cause the Company to engage in transactions, directly or indirectly, with the Portfolio Manager or its principals or affiliates without the consent of the Advisory Board of the Company. The functions and duties of the Advisory Board therefore include the review of the performance and decisions of the Portfolio Manager to ensure it complies with its duties, and to maintain checks and balances on transactions between the Company and the Portfolio manager/ its affiliates/ principals, including HCM as an affiliate of the Portfolio Manager.

78  The Applicant understands that HCM has appointed Mr Richard Katz (**Mr Katz**) to the Advisory Board as a second member by virtue of HCM's right as the successor in title to the interest in the Company previously held by Dover IX. Pursuant to clause 4.1 of the Members' Agreement at page **351**, no voting member of the Advisory Board shall be a controlled Affiliate of the Portfolio Manager. "Affiliate" is defined in the Members' Agreement at page **348** as "*(i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above.*"

79  Furthermore, pursuant to clause 4.4 of the Members' Agreement at page **352**, a member of the Advisory Board shall be deemed removed from the Advisory Board if "*...such member is no longer an officer, director, manager, trustee, employee, consultant or other representative of CLO Holdco or Dover IX [or their successors in title], as applicable, or their respective Affiliates and shall be replaced as soon as practicable with a representative of CLO Holdco or Dover IX, or their respective Affiliates, as applicable...*".

80  HCM is in control of the Portfolio Manager as its wholly-owned subsidiary, and by virtue of clause 4.4, Mr Katz, as the appointed representative of HCM on the Advisory Board, may only be appointed to the Advisory Board for so long as he is an Affiliate of HCM. Therefore it is clear that, although Mr Katz may be appointed to the Advisory Board, any attempt by Mr Katz to assert a right to vote on the matters to be considered by the Advisory Board will be a breach of the Members' Agreement.

106-25783891-4

81   Further pursuant to clause 4.2 of the Members' Agreement it provides that the quorum for a meeting of the Advisory Board shall be "*…all of its members **entitled to vote…**"* and that all actions of the Advisory Board shall be "*… (i) by a unanimous vote of all of the members of the Advisory Board in attendance in a meeting at which a quorum is present and **entitled to vote** and not abstaining from voting or (ii) by a written consent in lieu of a meeting signed by all of the members of the Advisory Board entitled to consent and not abstaining from consenting"* (see page <u>351)</u>.  Therefore, despite any assertions by the Directors on behalf of the Company that the Advisory Board could not be quorate or act if Mr Katz were a non-voting member, it is clear that I, acting by myself and as the sole voting member appointed to the Advisory Board, will constitute the quorum for the Advisory Board and will be able to approve all actions of the Advisory Board.

82   As a result, the Applicant asserts that, although it is willing to recognise the appointment of Mr Katz as a non-voting member of the Advisory Board, any action, vote or exercise of power by Mr Katz as a member of the Advisory Board shall be deemed invalid and will be challenged on the basis that it constitutes a breach to the Shareholders' Agreement and unfairly prejudices the Applicant's interests.

83   The Company refusing to take action to establish the status of Mr Katz as a non-voting member of the Advisory Board is yet further evidence of unfair prejudice against Applicant as a minority shareholder.

**Insufficient responses to Information Requests**

84   For the reasons outlined above, the Applicant has become increasingly concerned with regards to the value of its shareholding in the Company over time due to, *inter alia*:  (i) the refusal of the Company to distribute cash on hand and to take action against U.S. Bank: (ii) the apparent conflicts of interest of the Company with respect to Acis and the HCM Shareholders, made plain by (a) the Intervention Submissions (by which while the Company seeks to take action against NexPoint, it refuses to seek direct relief against U.S. Bank), and (b) the Buy-Back Proposal (defined and discussed more fully below), which sought to prefer the HCM Shareholders by the implicit threat to maintain a refusal to distribute cash assets unless Applicant would submit to a 15% discount on cash, which would inure to the benefit of the HCM Shareholders in an unwarranted amount approaching $6 Million (counting the Applicant's share of the Redemption Proceeds, which the Company would doubtless receive immediately upon Applicant agreeing to the Buy-Back Proposal);  and (iii) the Company's refusal to abide by the above described corporate documents regarding the non-advisory role of Mr. Katz.

85   As a result of the failure to take action against U.S. Bank, and as well the status of Mr. Katz (and for other reasons previously mentioned in other correspondence), the Applicant and I sent various requests for information to the Company (both directly and through Ogier (Guernsey) LLP (**Ogier**) as the Applicant's advocates) in order for the Applicant and I to make an accurate evaluation of the impact of the investment and management decisions of the Company (and their advisors) on (i) the Company and (ii) the value of the Applicant's investment in the Company.

86   This is by virtue of both the implied information rights attaching to the Advisory Board, which are required to allow the members of the Advisory Board to make informed decisions, and

106-25783891-4

**Appx. 02285**

the express rights provided by the further assurance provisions of the Members' Agreement as set out in clause 16.1 of that agreement at page **358**.

87      On the basis of the rights and powers afforded to the Applicant in its capacity as shareholder and me in my capacity as member of the Advisory Board, during the period 21 July 2021 to 20 January 2022, the Applicant and I made a number of requests for further information to the Directors in respect of the Company and its activities, including:

87.1    what advice the Company received to support their view that the withholding of the Redemption Proceeds by U.S. Bank is illegal;

87.2    what action the Company has taken to secure the release of the Redemption Proceeds by U.S. Bank;

87.3    which entities and/ or individuals are currently acting as advisor to the Company, if any; and

87.4    what action the Company intends taking to preserve the value of the Company and of the Applicant's interest therein.

(the **Information Requests**).

88      I will now set out a summary of the relevant inter parties correspondence exchanged in respect of the Applicant's various concerns in relation to the conduct of the affairs of the Company as set out above in this affidavit and the Information Requests:

88.1    On 22 July 2021, the Applicant sent a letter to the Company raising its concerns in relation to the Unlawful Redemption Withholding.  The Applicant requested information from the Company on what actions were being taken by it to release the Redemption Proceeds and requested the Company to take certain steps to resolve this issue (see a copy of this letter at pages **668 to 669**).

88.2    On 23 July 2021, the Company responded on a very limited basis to the Applicant's letter of 22 July 2021 providing that US Bank is holding reserves on account of pending and threatened litigation, including litigation filed by NexPoint and threatened litigation from the Applicant and Charitable DAF, and that it is "*currently consulting with legal advisor and the Fund's portfolio manager to determine the Fund's response to these events*" (see page **670**).  Certain of the Company's legal advisors are counsel to HCM within adversarial action against Applicant in the HCM bankruptcy case (with respect to objection to the Applicant's proof of claim).

88.3    On 27 July 2021, the Applicant sent a letter to the Company confirming that it has neither commenced litigation against any entity in connection with the Acis CLOs or threatened litigation against any entity in connection with the Acis CLOs, and that lumping the Applicant with any other unrelated litigation is improper and no basis for US Bank to withhold substantial distributions owed to the Company.  The Applicant added that even if such litigation was threatened (which it is not), this is still not basis for the Unlawful Redemption Withholding and also requested further details of the steps being taken by the Company to release the Unlawful Redemption Proceeds (see pages **671 to 672**).  Again, we note that the Company has taken the position, within

19                                        106-25783891-4

the Nexpoint litigation, that such litigation is not grounds for withholding Redemption Proceeds.

88.4  On 20 October 2021, Ogier, acting for the Applicant, sent an email to the Company making a further formal request for the information required by the Applicant for it to make an effective assessment as to how certain matters raised in the redemption reports for each of Acis CLO 2014-4, Ltd., Acis CLO 2014-5, Ltd. and Acis CLO 2014-6, Ltd. and 2021 Interim Accounts impacts its interest in the Company, and in particular, Ogier directed several detailed questions to the Company on the issue of the Unlawful Redemption Withholding (see pages **673 to 674**).

88.5  On 26 October 2021, Carey Olsen, acting for the Company, sent the October 2021 Letter referred to above (see pages **647 to 649**), providing inter alia that US Bank's stated justification for retaining the Redemption Proceeds is premised on certain threatened litigation from the Applicant and presently filed litigation by NexPoint as an apparent affiliate of the Applicant. This is despite the fact that the Applicant had already confirmed in its letter of 27 July 2021 that it has not commenced litigation against any entity in connection with the Acis CLOs or threatened litigation against any entity in connection with the Acis CLOs.  In the October 2021 letter Carey Olsen purported to provide responses to the questions posed by Ogier in its email of 20 October 2021, however it is clear that the responses provided were superficial, meaningless and evasive.

88.6  On 2 November 2021, (as mentioned above at para 75) the Applicant sent a letter to the Company and its other shareholders providing formal notice of my appointment as a voting member of the Advisory Board representing the Applicant pursuant to clause 4 of the Members' Agreement (see pages **659 to 660**).

88.7  Between 8 November 2021 and 3 December 2021, I on behalf of the Applicant made further concerted efforts to engage with the Directors of the Company and discuss the various issues, most importantly, the proposals in respect of the Applicant's exit from the Company.  The full chain of emails at pages **650 to 656**) reflects inter alia that:

(a)  On 9 November 2021 Mr Boléat responded to me on behalf of the Company providing that the Directors "*have nothing to add to the letter sent to Ogier on 26th October 2021*" (see pages **654 to 655**);

(b)  On 10 November 2021, I sent an email to Mr Boléat requesting information and again confirming that I was not aware of the Applicant having threatened litigation which could have a bearing on the Unlawful Redemption Withholding.  I also proposed an in specie distribution from the underlying assets of the Company to the Applicant in exchange for the Applicant's shareholding as a means to achieve the exit of the Applicant from the Company (defined below as the Redemption Proposal) (see pages **653 to 654**); and

(c)  Mr Boléat responded on 3 December 2021 indicating that the proposal for an in specie distribution was rejected.  The Applicant does not consider that any of the reasons advanced by the Company (dealt with below in the next section in respect

20                    106-25783891-4

**Appx. 02287**

of the Applicant's exit proposals) are sufficient to justify rejecting the in specie distribution (see pages **650 to 651**).

88.8    On 11 January 2022 at 05.14pm, I sent an email to the Company, both in his capacity as a voting member of the Advisory Board and on behalf of the Company, requesting information and documents from the Company in relation to the matters set out above, namely the invalid appointment of Richard Katz to the Advisory Board, the intervention by the Company in the NexPoint Litigation, and the Acis Settlement Agreement with no commercial rationale, among other things. I also put forward the proposal for either a redemption and in specie distribution of the Applicant's interests in the Acis CLOs, or alternatively an arm's length liquidation of the Acis CLOs, in order to extricate the Applicant from the Company (see pages **713 to 715**).

88.9    On 20 January 2022 the Company responded to my email of 11 January 2022 again with limited and insufficient responses (see pages **709 to 711**).

89      Despite the repeated Information Requests, to date the Applicant and I have received limited and insufficient information from the Company through its Directors.  Pursuant to clause 16 of the Members' Agreement (see page **358**), the Company will exercise all powers that it is able to procure that the provisions of the Members' Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of the agreement.  In breach of clause 16 of the Members' Agreement, the Company has refused to provide the necessary information to me and the Applicant in spite of my position as the sole voting member of the Advisory Board and the Applicant's rights as shareholder.

90      Therefore I cannot effectively fulfil my role on the Advisory Board as representative of the Applicant as shareholder and the Applicant is unable to make informed investment decisions relating to its shareholding in the Company.  In this way, the Company, acting through its Directors, has displayed both a lack of regard for the Applicant's rights and interests in the Company as shareholder as well as my role on the Advisory Board, which is a mandatory and important part of the checks and balances required for proper governance under the Articles.

91      Principle 8 of the Code indicates that the Directors should *"...ensure that satisfactory communication takes place with shareholders and is based on a mutual understanding of needs, objectives and concerns"* and that the Directors *"...should ensure the provision to shareholders of adequate information on which they may base informed decisions"*. Although the Directors have committed to complying with the Code, the actions of the Directors in failing to provide the Applicant with the information it seeks results in the Directors failing to comply with the Members' Agreement, and failing to meet the standards required by Principle 8 of the Code in relation to shareholder engagement.

92      It is especially unfair to the Applicant that the Company refuses to provide the Applicant with information in circumstances where that information has likely been made available to HCM due to its close relationship with the Company.  HCM is able to make informed investment decisions regarding its investment in the Company while the Applicant is unfairly not afforded the same rights.

106-25783891-4

**Appx. 02288**

**The Company's Share Buy Back Proposal Establishes Unfair Prejudice**

93      On June 28, 2022, HCLOF, through Chairman Boleat, sent a share buyback proposal (**Share Buyback Proposal**) to the shareholders (see pages **716 to 756**). In the Share Buyback Proposal, HCLOF referred to its policy for the previous two quarter-ends (December 2021 and March 2022) of returning excess cash from investment proceeds to shareholders by way of dividend. During the second quarter of 2022, HCLOF monetized its interests in MGM Studios equity, resulting in $38,274,397.88 of unencumbered cash. Citing to this cash, HCLOF stated that its board was able to offer shareholders the opportunity to sell their shareholdings back to HCLOF. While the cash was insufficient to buy back all outstanding shares, the HCM Shareholders had previously indicated to HCLOF that they would not enter into a buyback transaction.

94      Therefore, HCLOF offered to buy back all of CLO HoldCo's outstanding shares (on an all or nothing basis). HCLOF clarified that any offer would reflect the advantages conferred upon shareholders, the loss of use of funds by HCLOF, and removal of risk. To reflect this, the Share Buyback Proposal offered to buy all of CLO HoldCo's outstanding shares at 85% of the May 2022 NAV (55.53 cents per share), being 47.20 cents per share.

95      In response to the Share Buyback Proposal, on 7 July 2022, CLO HoldCo, through counsel, sent a Response to the Share Buyback Proposal (**Response**) (see pages **757 to 758**). In the Response, first, CLO HoldCo noted that the Share Buyback Proposal was discounting 15% on cash, and therefore, there was no material risks or uncertainties justifying discounts. Second, CLO HoldCo also cited the impropriety of holding such significant cash reserves where HCLOF is in wind down and not actively trading. Further, CLO HoldCo stated that it was clear from the Share Buyback Proposal that HCLOF had previously discussed the details of a proposed buyback with the HCM Shareholders in advance of making the Share Buyback Proposal to CLO HoldCo, which again evidences HCLOF's preference for the interests of HCM Shareholders over CLO HoldCo. Finally, in making the Share Buyback Proposal without consulting with CLO HoldCo, HCLOF improperly incurred administrative expenses.

96      As such, given HCLOF's improper holding of significant cash and seeking to impose the unwarranted and prejudicial 15% discount (on some $78 Million in cash either on hand or in the form of Redemption Proceeds); taking no action and refusing to disclose what action it has taken against US Bank; and having an inappropriately close relationship with the HCM Shareholders as evidenced by the assertions herein, and the culminating prejudicial Company Share Buy-Back Proposal, CLO HoldCo rejected the Share Buyback Proposal.

97      On 15 July 2022, Carey Olsen sent a letter to Ogier on behalf of the Respondent, responding to Ogier's letter of 7 July 2022, a copy of which is at page **759**. The Company's response was essentially non-responsive (as it had no real response to the mathematical certainly of the undervaluation of the Share Buy-Back Proposal). Unable to refute the rejection letter, the Company resorted only to a single sentence -- "*The various allegations made in that letter are wrong.*" The Company also relied on a logical fallacy by accusing the Applicant of inconsistency by expressing willingness to discuss reasonable proposals while simultaneously having no real alternative but institution of Unfair Prejudice proceedings. Of course, as established here the Company has been unwilling to even consider, much less discuss reasonable proposals. It has only been willing to engage in

106-25783891-4

**Appx. 02289**

refusal to provide information, refusal to take proper action to recover Company funds, refusal to make fair distributions; and it has been willing to traffic in the undervalued Share Buy-Back Proposal, requiring under threat of further unfair prejudice, a discount of 15% on cash for the benefit of the HCM Shareholders.

**Applicant's Alternative Exit Proposals**

98      Applicant has made alternative proposals, the Redemption Proposal and the Alternative Share Buy-Back Proposal (collectively the **Applicant Exit Proposals**), an outline of which, along with explanatory positions is attached at pages **760 to 764**.

99      The Redemption Proposal was previously advanced by the Applicant to the Company by written correspondence on 10 November 2021 at pages **653 to 654,** on 3 December 2021 at page **650 to 651** and again on 11 January 2022 at pages **713 to 714,** and was rejected each time by the Company for the following reasons:

(a)     The in specie distribution would result in the Company's position in respect of its intervention in the NexPoint Litigation being compromised;

(b)     It is not clear that the in specie distribution would be feasible as the CLO indentures would need to be reviewed to determine whether in-kind distributions to the relevant transferees are compatible with all relevant terms, and the Company would also need to ensure that each of the Company's shareholders are able both to receive and then hold the CLOs in question (either from a tax/regulatory perspective or based on the terms of the CLOs themselves);

(c)     The Company's structure has a history of hostile litigation that has had a serious impact on the Company's interests over the years, and the Company has concerns that any changes to the status quo might prompt further contentious activity, potentially involving the Company, that would be damaging and costly for all parties.

100     In response to the first reason, in the interests of resolving the ongoing disputes the Applicant would be amenable to agree to vote in conjunction with the Company in respect of the voting rights attaching to those CLOs represented in the assets distributed to the Applicant pursuant to the Redemption Proposal.

101     The Applicant does not agree that the Redemption or the Share Buyback would not be feasible as the transaction would be compatible with all relevant terms of the CLO Indentures.  In fact, the Applicant is willing upon direction of the Court to obtain an independent opinion from an established expert in the field of CLO structure management and operations that indicates that the Redemption Proposal would be administratively simple and would also not impact the value of the CLO positions of the Company as a whole or prejudice the remaining Shareholders.

102     On 30 March 2022, the Applicant's advocates, Ogier, sent a letter to the Company (see pages **765 to 776**) setting out the Applicant's concerns (in line with what is in this affidavit above) and proposing either of the Applicant Exit Proposals as a means to secure a mutual separation between the Applicant, HCM and the Company.  In sending the Applicant Exit Proposals, the Applicant aimed to encourage negotiations between the parties and the fact that the Applicant put forward more than one exit proposal in the Applicant Exit Proposals

106-25783891-4

**Appx. 02290**

reflects that it sought to be reasonable and flexible in its approach.  The Applicant is of the position that either of the Applicant Exit Proposals would be effective in resolving the disputes between the parties as both are fair, practical and reasonable and will not prejudice any party.

103    On 14 April 2022, the Company's advocates, Carey Olsen, sent a letter responding to the letter from Ogier dated 30 March 2022, a copy of which is at pages **300 to 306** (the **Response to the Applicant Exit Proposals**).  The Company has responded to each of the Applicant Exit Proposals as follows:

*"A redemption of shares in the manner proposed in your letter is not possible pursuant to the Company's articles of incorporation (the "Articles").  The Articles only permit a redemption pursuant to article 9 thereof, which permits the board to compulsorily redeem shares in accordance with the Members' Agreement (as defined therein).  The Members' Agreement only permits redemption in accordance with clause 5.5 which permits the Portfolio Manager, on behalf of the Company, to elect, upon notice to a Defaulting Member to redeem the Defaulting Member's shares in an amount equal to 50% of the outstanding amount existing as of the date of the default at a price of $0.0001 per Share (all capitalised terms as defined in the members' Agreement).*

*Pursuant to clause 3.2.3 of the Members' Agreement, any redemption other than pursuant to clause 5.5 requires the affirmative vote or prior written consent, as applicable, of the Members totalling in the aggregate more than seventy five percent (75%) of the Company.  It would also require an amendment to the Articles, which requires special resolution approval.*

*With respect to a buyback, which requires ordinary resolution approval of the terms of the relevant buyback contract, pursuant to section 314(5) of the Companies (Guernsey) Law, 2008 (as amended), your client is precluded from voting its shares.*

*…*

*In principle, the Directors would be willing to engage U.S. and Guernsey counsel to review those matters, provided that HCM and its affiliate, HCMLP Investments, LLC (collectively, the "HCM Shareholders"), who collectively own more than 50% of the Company's shares, are agreeable to voting for, or to considering voting for, either of your proposals. As you will appreciate, **if the HCM Shareholders are not agreeable to supporting one of those proposals, neither is viable** – and time and costs incurred in considering these matters further would be wasted. The Directors, having approached the HCM Shareholders to consider these options, can confirm that they are not agreeable to giving their support, or to giving further consideration to the same…."* [emphasis added]

104    The Company has not provided any proper or specific legal or technical basis for its refusal of either of the Applicant Exit Proposals.  There is also no indication that the Company has properly canvassed either of the Applicant Exit Proposals internally or with the HCM Shareholders, which would necessitate circulating a shareholders resolution to the HCM Shareholders with a formal request for approval of either of the Applicant Exit Proposals. This would be easy, inexpensive and not time-consuming.  The Company does, however,

106-25783891-4

make clear with the Share Buy-Back Proposal, its intention to further effect unfair prejudice upon Applicant.

105     It is apparent that the Directors of the Company have held discussions with the HCM Shareholders (without the Applicant's input) in respect of the Applicant Exit Proposals, and as well the Share Buy-Back Proposal (designed to promote the interests of the HCM Shareholders to the detriment of Applicant as minority shareholder). The interests of the HCM Shareholders as a collective majority shareholder are blatantly being preferred by the Company over the interests of the Applicant as minority shareholder (there is simply no conceivable justification for an offer requiring a 15% discount for cash).

106     As no counter proposal has been offered by the Company pursuant to its discussions with the HCM Shareholder, whether in the form of a proposed amendment to the terms of the Applicant Exit Proposals or otherwise, except for the unwarranted and unfairly prejudicial Share Buy-Back Proposal, it is clear that neither the Company nor the HCM Shareholders have bona fide intentions of trying to resolve the disputes and secure a solution for the Applicant's request to exit from the Company.

107     The Response to the Applicant Exit Proposals is the latest in a substantial amount of correspondence which the Applicant has directed to the Company in order to raise its concerns and seek to agree an amicable resolution through various proposed solutions. The Company has refused to engage in any constructive discussions regarding the exit of the Applicant from the Company despite the various proposals made to resolve the issues and therefore the Applicant, and therefore Applicant has been left with no option other than to approach the Royal Guernsey Court for the necessary relief.

108     In an attempt to appear reasonable, the Company on 15 July 2022 sent a letter advising that the Share Buy-Back Proposal had not been approved by the requisite percentage of shareholders (which was self-evident, as Applicant rejected it), and as well a notice of intention to issue a dividend to shareholders (see pages **777 to 778**).

109     The proposed dividend is $14.73 per share, despite the Company being willing to use in excess of $47.20 per Applicant share to pay the Share Buy-Out Proposal amount. This indicates an unfair retention of cash, as the Company was willing to part with close to 90% of its unencumbered cash for the Share Buy-Out Proposal, but now needs to retain in excess of 40% of unencumbered cash, for no discernible reason.

110     Applicant advised the Company of its intention to proceed with the Application in the Royal Guernsey Court for relief including that mentioned above at Sections 12 and 13, and otherwise described within the Application.

111     Applicant reserves all rights to amend, to seek additional relief to which it might be entitled, as could bring to resolution the continuing unfair prejudice being imposed upon Applicant as a minority shareholder.

**Conclusion**

112     For the reasons set out above, the actions of the Company are such that the Applicant's rights as shareholder are being ignored and the Applicant continues to be unfairly prejudiced as minority shareholder. The manner in which the Company is currently being

106-25783891-4

managed is not in the interests of all shareholders and in fact that the Company has engaged in conduct that is pointedly prejudicial to the interests of Applicant as minority shareholder. Applicant's shareholding in the Company has become untenable. This is unfairly prejudicial and necessitates court intervention in the form of the Application.

113     The Applicant has provided the Company with several opportunities to justify the various actions they have taken which are the subject of the Applicant's concerns, in order for it to better understand the Company's position and rationale. However the Company has largely refused to answer the requests for information and where information has been provided, it has been very limited and insufficient.

**Notice**

114     Required proceedings, if necessary, have been undertaken in the Bankruptcy Court.

115     The Company has been notified of the filing of the Application and will be notified of the date, time and place of the hearing of the Application in accordance with section 349(4) of the Companies Law. The HCM Shareholders have been provided a copy of this Affidavit and Application and notified that CLO HoldCo would be commencing this proceeding.

**Directions and Orders Sought**

116     I humbly request that the Court makes the directions and orders sought in the Application.

**SWORN** by the said
**PAUL RICHARD MURPHY**
At
on 7TH MARCH     2023

Before me,

..........................................
~~Solicitor~~/Notary Public

Anthony Partridge
Notary Public in and for the Cayman Islands.
My commission expires on January 31, 20 24
Date: 7 MARCH 2023

106-25783891-4

**Appx. 02293**

Sworn by: PR Murphy
For: Applicant
Number: First
Exhibit: PRM1

**Ogier (Guernsey) LLP**
**Advocate Alex Horsbrugh-Porter**

IN THE ROYAL COURT OF GUERNSEY

(ORDINARY DIVISION)

IN THE MATTER OF PART XIX OF THE COMPANIES (GUERNSEY) LAW, 2008

BETWEEN:

CLO HOLDCO, LTD

Applicant

and

HIGHLAND CLO FUNDING, LTD

Respondent

EXHIBIT PRM1

This is the Exhibit PRM1 to the First Affidavit of Paul Richard Murphy sworn on 7th MARCH 2023 consisting of 752 pages including this page

Before me,

.................................................

~~Solicitor~~/Notary Public/~~Advocate~~ of more than 5 years' call

**Anthony Partridge**
Notary Public in and for the Cayman Islands.
My commission expires on January 31, 2024
Date:  7 MARCH 2023

27

106-25783891-4

**Appx. 02294**