# EXHIBIT 79

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                      )      Case No. 19-34054-sgj-11
 3     In Re:                         )      Chapter 11
                                      )
 4     HIGHLAND CAPITAL               )      Dallas, Texas
       MANAGEMENT, L.P.,              )      Tuesday, February 23, 2021
 5                                    )      9:00 a.m. Docket
              Debtor.                 )
 6     _____)
                                      )
 7     HIGHLAND CAPITAL               )      Adversary Proceeding 20-3190-sgj
       MANAGEMENT, L.P.,              )
 8                                    )
              Plaintiff,              )      PLAINTIFF'S MOTION FOR ORDER
 9                                    )      REQUIRING JAMES DONDERO TO
       v.                             )      SHOW CAUSE WHY HE SHOULD NOT
10                                    )      BE HELD IN CIVIL CONTEMPT FOR
       JAMES D. DONDERO,              )      VIOLATING THE TRO [48]
11                                    )
              Defendant.              )
12     _____)
                                      )
13     HIGHLAND CAPITAL               )      Adversary Proceeding 21-3010-sgj
       MANAGEMENT, L.P.,              )
14                                    )
              Plaintiff,              )      DEBTOR'S EMERGENCY MOTION FOR
15                                    )      MANDATORY INJUNCTION REQUIRING
       v.                             )      THE ADVISORS TO ADOPT AND
16                                    )      IMPLEMENT A PLAN FOR THE
       HIGHLAND CAPITAL MANAGEMENT )         TRANSITION OF SERVICES BY
17     FUND ADVISORS, L.P.,           )      FEBRUARY 28, 2021 [2]
       et al.,                        )
18                                    )
              Defendants.             )
19     _____)

20                       TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
21                     UNITED STATES BANKRUPTCY JUDGE.

22     WEBEX/TELEPHONIC APPEARANCES:

23     For the Debtor/Plaintiff:    Jeffrey N. Pomerantz
                                    PACHULSKI STANG ZIEHL & JONES, LLP
24                                  10100 Santa Monica Blvd.,
                                     13th Floor
25                                  Los Angeles, CA  90067-4003
                                    (310) 277-6910
```

2

APPEARANCES, cont'd.:

For the Debtor/Plaintiff:     John A. Morris
                               PACHULSKI STANG ZIEHL & JONES, LLP
                               780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
                               (212) 561-7700

For the Official Committee    Matthew A. Clemente
of Unsecured Creditors:        SIDLEY AUSTIN, LLP
                               One South Dearborn Street
                               Chicago, IL  60603
                               (312) 853-7539

For the Advisor               Davor Rukavina
Defendants:                    Julian Vasek
                               MUNSCH HARDT KOPF & HARR, P.C.
                               500 N. Akard Street, Suite 3800
                               Dallas, TX  75201-6659
                               (214) 855-7554

For the Advisor               A. Lee Hogewood, III
Defendants:                    K&L GATES, LLP
                               4350 Lassiter at North Hills
                                 Avenue, Suite 300
                               Raleigh, NC  27609
                               (919) 743-7306

For Defendant James D.        John T. Wilson
Dondero:                       BONDS ELLIS EPPICH SCHAFER
                                 JONES, LLP
                               420 Throckmorton Street,
                                 Suite 1000
                               Fort Worth, TX  76102
                               (817) 405-6900

Recorded by:                  Michael F. Edmond, Sr.
                               UNITED STATES BANKRUPTCY COURT
                               1100 Commerce Street, 12th Floor
                               Dallas, TX  75242
                               (214) 753-2062

Transcribed by:               Kathy Rehling
                               311 Paradise Cove
                               Shady Shores, TX  76208
                               (972) 786-3063

        Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.

Appx. 02299

3

1          DALLAS, TEXAS - FEBRUARY 23, 2021 - 9:07 A.M.

2              THE COURT:  This is Judge Jernigan, and we have

3   Highland settings this morning.  We have a couple of settings

4   in adversary proceedings, one in Adversary 21-3010, Debtor's

5   Emergency Motion for a Mandatory Injunction Requiring the So-

6   Called Advisors to Adopt and Implement a Plan for Transition

7   of Services; and then, second, in Adversary 20-3190, a Motion

8   to Hold James Dondero in Contempt for Violating a Previous

9   TRO, allegedly.

10       So, let's go ahead and get our lawyer appearances.  First,

11  for the Debtor, Highland, who is appearing this morning?

12             MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

13  Pomerantz and John Morris of Pachulski Stang Ziehl & Jones.

14  Mr. Morris will be handling the hearings today.

15             THE COURT:  All right.  Thank you.

16       All right.  For the Advisors, who do we have appearing?

17             MR. RUKAVINA:  Davor Rukavina and my co-counsel, Lee

18  Hogewood.  We are appearing for the two Defendants in

19  Adversary Proceeding 21-03010.  We are not appearing in the

20  other adversary and contempt matter.

21             THE COURT:  All right.  For Mr. Dondero, who do we

22  have appearing this morning?

23             MR. WILSON:  Your Honor, John Wilson with the law

24  firm of Bonds Ellis Eppich Schafer Jones.  And with me is

25  Bryan Assink.

4

1     (Interruption.)

2          THE COURT:  All right.  I didn't hear what you said,

3     Mr. Wilson, after appearing for yourself and Mr. Assink.

4     Would you repeat that?

5          MR. WILSON:  That was all I said, Your Honor.  I

6     don't know what that other noise was.

7          THE COURT:  Oh, okay.

8     (Court confers with Clerk.)

9          THE COURT:  Okay.  Someone came in as a PC user, is

10    what my court reporter said.

11       All right.  Well, do we have the Committee appearing

12    today?

13         MR. CLEMENTE:  Yes.  Good morning, Your Honor.

14    Matthew Clemente; Sidley Austin; on behalf of the Committee.

15         THE COURT:  All right.  Thank you.

16       All right.  Well, that's all the appearances I will ask

17    for right now.  I know we have interested observers, parties

18    in interest observing today.

19       Mr. Morris, how did you want to proceed this morning?

20         MR. MORRIS:  John Morris; Pachulski Stang Ziehl &

21    Jones.

22       What I thought we'd do, Your Honor, is begin with the

23    Debtor's Motion for the Mandatory Injunction.  I thought it

24    would -- may make sense to begin with some opening statements

25    and proceed right to the evidence.  The Debtor has two

**Appx. 02301**

5

```
 1   witnesses to call, Mr. Seery and then Mr. Dondero.  And then
 2   we would rest after the admission into evidence of our
 3   exhibits.  The Advisors, you know, can certainly cross-examine
 4   Mr. Seery.  You know, and then we'll have closing statements
 5   and hopefully finish that part of the proceeding up.
 6       And then we'll move on to the contempt proceeding.  Mr.
 7   Dondero has a motion in limine to exclude certain evidence.
 8   The Debtor has agreed -- I don't know if I've seen an order
 9   from the Court -- but the Debtor has agreed to have that heard
10   today, if Your Honor would like to do that.  The Debtor is
11   certainly prepared to argue that motion prior to the
12   commencement of the contempt proceeding.  And then after that
13   motion is decided, we could just do the same drill:  Some
14   opening statements, hopefully hear from a few witnesses, put
15   in our evidence, and finish up.
16           THE COURT:  All right.  Well, that was the sequence I
17   had envisioned.  Since you're looking for an injunction, you
18   know, immediately, you're wanting to transition services by
19   February 28th, I thought that it made sense to take that one
20   up first.  So, with that, I'll hear your opening statement.
21           MR. MORRIS:  Okay.  Thank you, Your Honor.
22           MR. RUKAVINA:  Your Honor, Davor Rukavina, briefly.
23   I just would like for the record to be clear.  Are we having a
24   combined record for both adversaries, or is the -- first the
25   one and then the other, which would be my strong preference?
```

6

1          THE COURT:  No, I did not envision a combined record.

2          MR. RUKAVINA:  Okay.

3          THE COURT:  Mr. Morris, was that what you were

4   suggesting and I didn't understand?

5          MR. MORRIS:  No.

6          THE COURT:  No, he was not.

7          MR. MORRIS:  Not at all.

8          THE COURT:  Okay.  So we're just --

9          MR. RUKAVINA:  Okay.  Thank you.

10          THE COURT:  -- focusing on the Advisor-Debtor dispute

11   this morning with the evidence.  Okay.

12       Mr. Morris, go ahead.

13          MR. RUKAVINA:  Thank you, Your Honor.

14          OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

15          MR. MORRIS:  Okay.  Thank you, Your Honor.  John

16   Morris; Pachulski Stang Ziehl & Jones.

17       Before I begin, I just want to tell the Court that the

18   lawyers -- this has been a very difficult week.  We had three

19   depositions yesterday.  And I just, I think it's important for

20   the Court to know that the lawyers have cooperated really

21   quite well.  It's difficult circumstances.  Not every

22   conversation is polite and perfect.  But for Your Honor's

23   purposes, I do appreciate everybody's cooperation getting to

24   this point.

25          THE COURT:  Well, I'm glad you told me that, because

7

1  I was wrongly thinking I might hear this morning that you all

2  worked it out overnight.

3            MR. MORRIS:  No.

4            THE COURT:  I will let you know, I cannot for the

5  life of me figure out why this couldn't be worked out, but I'm

6  going to hear the evidence and argument and better understand

7  that, I guess.

8            MR. MORRIS:  You are.  And let me try to explain

9  that.  And what I'd like to do in my opening is just give you

10  some background as to how we got here, what the Debtor's

11  interest was in bringing the motion, and what the Debtor is

12  seeking from the Court today.  And I think, with that, perhaps

13  we'll fill in any of the blanks that may be appearing on your

14  page.

15            THE COURT:  Okay.

16            MR. MORRIS:  And I think the best place to start,

17  Your Honor, is just -- I know that the Court is familiar with

18  the relationship of the parties, but for the record in this

19  particular case I think that it's important to just put that

20  out there.  I've got a small demonstrative deck that I think

21  would be helpful, and I would just ask that we put up on the

22  screen --

23            THE COURT:  All right.

24            MR. MORRIS:  -- the first slide of the deck.

25            THE COURT:  Okay.

1           MR. MORRIS:  And this slide, Your Honor, you'll hear

2   testimony and I don't think there will be any dispute about

3   the substance of this particular slide.  But as Your Honor is

4   aware, HCMLP, the Debtor, has certain shared services

5   agreements with the two Defendants here that are the two

6   Advisors.  That's HCM Fund Advisors, NexPoint Advisors.

7   Pursuant to those shared services agreements, the Debtor

8   provided certain back- and middle-office services.  And the

9   shared services for purposes of this hearing contain some very

10  important termination clauses.

11      The evidence will show that the Advisors provide advisory

12  services to certain investment funds.  There's about ten or

13  twelve investment funds to which they provide advisory

14  services pursuant to these advisory service agreements.  Some

15  of those funds are publicly traded.  As Your Honor has heard

16  previously, some of those funds have thousands of individual

17  investors, mom-and-pop investors and retail investors.  So

18  that is the -- kind of the -- how this all fits together, and

19  we'd just like to keep that in context.

20      The agreements themselves, as I mentioned, have certain

21  termination clauses.

22      If we could just go to the next slide, please.

23      The agreement between the Debtor and Highland Capital

24  Management Fund Advisors had their shared services agreement,

25  and you can see in the footnote where I cite to the exhibit.

9

1  This is Debtor's Exhibit 2 that appears at the adversary

2  proceeding Docket No. 10.  It's a very straightforward

3  termination clause.  It's a clause that says the agreement is

4  for a period of a year, with automatic renewals.  And then

5  Section 7.02 provides that either party may terminate this

6  agreement with or without cause upon at least 60 days' written

7  notice.

8      If we could go to the next slide, you'll see that this is

9  the excerpt from the NexPoint Advisors shared services

10  agreement.  And this provision is slightly different because

11  it requires only 30-day written notice.  That -- and that

12  particular agreement can be found at Debtor's Exhibit No. 4.

13     So that's kind of the nature of the parties and that's the

14  important part of the agreement, at least from the Debtor's

15  perspective.

16     And how does this -- how is this all particularly relevant

17  today?  The Debtor filed for bankruptcy back in October of

18  2019.  As the Court is aware, Mr. Dondero was in control of

19  both the Debtor and the Advisors at that time.  The Advisors

20  had certainly prior notice that the Debtor would be filing for

21  bankruptcy.  And indeed, I think you'll hear some testimony

22  today from Dustin Norris that the Advisors had begun to think

23  about what would happen to the shared services agreements, you

24  know, a year and a half ago, prior to the bankruptcy filing.

25     Fast forward to August, August of 2020.  The Debtor had

10

 1  been in bankruptcy at that point for about ten months.  And if
 2  Your Honor will recall, at around that time the Debtor filed
 3  its first plan of reorganization.

 4      And if we could just go to the next slide, please.

 5      This was an important event for the Debtor at the time,
 6  because while the Debtor did not yet have the support of any
 7  meaningful constituency, it did make a public statement for
 8  the first time that unless executory contracts were assumed or
 9  otherwise treated in the manner provided in Article 5 of the
10  plan, they would be deemed rejected.  So, as of August 2020,
11  this was the marker that the Debtor laid.

12      And certainly, discussions continued about a potential
13  grand bargain.  You've heard a lot about that.  They morphed
14  later on into discussions about a pot plan.  But for purposes
15  of, you know, public disclosure, there is no question that by
16  August 2020 everybody should have been on notice that, in the
17  absence of an assumption of the executory contracts, they
18  would be deemed to be rejected.

19      You'll hear from Mr. Seery today.  Mr. Seery will testify
20  as to the events that took place in the weeks following the
21  filing of this document.  He'll -- he will describe for you at
22  a high level but just in general how the parties began
23  discussing the possibility of a transition of services
24  agreement, the form of which was not certain at the time.
25  There were a couple of possibilities, including a Dondero-

1  related entity taking it over.  There was the possibility of a

2  -- what's been referred to and what will be referred to as

3  Newco, which was going to be a new entity formed by some of

4  the Debtor's employees upon consummation of the plan.  I think

5  there was discussion about the possibility of just leaving

6  things in place if somehow a grand bargain could be achieved.

7  But discussions ensued in the fall.

8      And as Your Honor will also recall, you know, we had the

9  mediation.  The mediation wasn't successful in resolving the

10 grand bargain.  The mediation did result in the agreement with

11 Acis, and that's when, you know, tensions began to increase

12 with Mr. Dondero and the board.

13     Mr. Seery will testify that through the fall, while

14 discussions continued, you know, it became a little bit more

15 -- it became a little bit more difficult.  And Your Honor will

16 recall that in October the board asked for Mr. Dondero's

17 resignation, which he complied with, pursuant to the corporate

18 governance provisions.

19     But it was in this time that Mr. Seery will also testify

20 that Mr. Dondero made it clear, in a call that there were

21 numerous people on, that if, you know, we could get to a grand

22 bargain, that would be great, but if that we couldn't, nobody

23 should assume that the transition of services would be easy.

24     Now, you know, Mr. Seery will testify that he found that

25 interesting because the transition of services really should

12

1    have been more of the Advisors' concern than the Debtor's, but

2    it was a point that Mr. Seery noted, and he'll tell you about.

3        By November, the Debtor had reached a consensus with the

4    Creditors' Committee on the formulation of a plan.  If you'll

5    recall, in late October, there was a contested disclosure

6    statement hearing during which the Committee objected to the

7    releases and to certain corporate governance provisions.  And

8    those -- those objections led to negotiations, and those

9    negotiations led to an amended plan, which was the Third

10   Amended Plan.

11       And if we could go to the next slide, this is also, from

12   our perspective, an important marker in the narrative here,

13   because in mid-November, we'd gone beyond just saying that if

14   the contracts aren't assumed they would be deemed rejected to

15   making a public statement that shared services agreements are

16   not going to be assumed.  And they're not going to be assumed

17   because they're not cost-effective.  And Mr. Seery will

18   testify as to why the contracts were not cost-effective.  But

19   there was no doubt by mid-November that the contracts weren't

20   going to be assumed by the Debtor.

21       A couple of weeks later, to remove any doubt, the Debtor

22   exercised its right under the shared services agreement and

23   gave notice of termination.

24       If we can go to the next slide, please.  You'll see in

25   this, in this slide, you've got -- yeah, there you go.

13

1    There's a letter dated November 30th.  And this can be found,

2    this is Debtor's Exhibit 3.  There is a letter notifying the

3    Fund Advisors that the Debtor intended to terminate the shared

4    services agreement on January 31, 2021.  In other words, the

5    Debtor gave the 60-day notice that we just looked at under the

6    shared services agreement of its intention to terminate the

7    shared services agreement.

8         Can we go to the next slide, please?

9         On the same day, the Debtor also gave notice of its

10   intention to terminate the shared services agreement with

11   NexPoint Advisors.  And I would note that, notwithstanding the

12   fact that the shared services agreement with NexPoint Advisors

13   only required a 30-day notice period, the Debtor, in fact,

14   gave 60 days' notice, just to keep them on the same track.

15        And as Your Honor knows, in the subsequent weeks, the

16   Debtors pushed ahead with their plan of reorganization.  They

17   amended it a couple of times.  Those amendments didn't have

18   anything -- have any impact on the termination notices.

19   You'll hear no evidence today that the Debtor rescinded the

20   termination notices.  You'll hear no evidence today that the

21   Debtor ever considered rescinding the termination notices.

22        And so we fast-forward now a couple of months later to

23   January, and what's happening?  Mr. Seery will testify that,

24   you know, the Debtor really was using its best efforts to try

25   to engage, to try to finish this up.  And he'll tell you what

14

1    the Debtor's motivations were here.  While the Debtor doesn't

2    owe any obligations directly to the Funds, while the Debtor

3    doesn't owe any obligations directly to the retail fund

4    investors, the Debtor was very, very concerned that it be able

5    to implement its plan of reorganization.  And that plan of

6    reorganization, which Your Honor just approved very recently,

7    and in fact entered the order yesterday, pursuant to that plan

8    the Debtor is going to and has begun the process of downsizing

9    substantially.  And they were going to eliminate a lot of the

10   employees, and they knew in January that there was no way the

11   Debtor was ever going to have the ability to provide any

12   services at any time after February 28th.  I mean, they gave

13   notice of January 31st.

14        So, the Debtor wanted to make sure that it could proceed

15   in the future without any obligation, without any claim that

16   there's obligations.  So the Debtor was really focused on

17   trying to try to finish up this transition services agreement.

18   And the negotiations picked up a little bit in late January,

19   but here we were, with a January 31st deadline, and the Debtor

20   -- the Debtor [sic] asked for an extension of time.  And the

21   Debtor [sic] asked for an extension of time presumably because

22   they weren't prepared to assume the back-office and the

23   middle-office services that the Debtor was providing.

24        And so the Debtor agreed and the parties agreed, pursuant

25   to a written agreement, to extend the deadline by two more

15

1    weeks.  And the parties continued to negotiate during those

2    two weeks, but there were difficulties.  And threats were

3    made.  And Mr. Seery will testify that those threats caused

4    the Debtor to insist that the negotiations basically be

5    chaperoned by outside counsel.

6        It didn't last long.  It was really just for the purpose

7    of trying to get the temperatures down to a degree where

8    people could engage in a more cooperative fashion.  But that's

9    what we were dealing with in late January and early February.

10   We couldn't get to yes.

11       And parties negotiated.  Terms sheets went back and forth.

12   You're going to hear this testimony, not from Mr. Seery, but

13   you'll hear it, ironically, from the Advisors, that last week

14   an agreement was reached.  The only sticking point was Mr.

15   Dondero's insistence that he be permitted access to the

16   Debtor's offices.  It is the only thing that prevented the

17   parties from reaching an agreement.

18       And they say that the Debtor was unreasonable in not

19   allowing him into their offices.  And Mr. Seery will testify

20   that we'd already been through this process, that we'd already

21   obtained a TRO, that we'd already obtained a preliminary

22   injunction that bars him from the offices, and we just,

23   admittedly, we would not agree to that provision.  But we

24   would not be here today if the Advisors simply said, we'll

25   leave that for another day, we've been operating for two

16

1    months without Mr. Dondero in the offices, we've otherwise got

2    an agreement that accomplishes everything we need to do.

3    Instead, they said no.

4         And here's another interesting point.  You're going to

5    hear the testimony from Mr. Norris, and he's going to tell you

6    that the so-called independent boards of the funds, they were

7    fully supportive of the Advisors' position.  They thought that

8    it was a really smart idea to walk away from a fully-

9    negotiated transition services agreement because the Debtor

10   wouldn't let Mr. Dondero into the office.  They thought that

11   was a great idea and they fully supported it.  Nobody -- none

12   of the board members are going to be here today to testify to

13   that, but Mr. Norris is going to -- I'm going to make sure

14   that Mr. Norris informs the Court that that was the boards'

15   view.

16        And so, instead of saying yes, they said no.  And we had

17   told them last Tuesday, if you don't agree to this, we're

18   going to commence the lawsuit.  So they didn't agree to it, so

19   we commenced the lawsuit.

20        But negotiations continued.  And you know, I think the

21   lawyers for the Advisors acted in very good faith here, Your

22   Honor.  They did the best they could.  We continued to

23   negotiate.  On Friday, they presented to the Debtor two

24   options, Option A and Option B.  And at one point, they said,

25   we're not -- we may have to tweak Option B, so hold off for

17

1   now.  And you're going to see this in the emails.  It was just
2   black and white.  And we said okay, fine.  And then they came
3   back and they said no, no, no, Option B is good, Option B is
4   good, so tell us what you want to do.  And at 1:00 o'clock on
5   Friday, there was a phone call.  The Debtor informed the
6   Advisors' lawyers that they choose Option B.  We're done.  And
7   we started talking about wire transfers.  We started talking
8   about documenting this for the Court in a consensual order.
9   And we would be done.
10      And we had a call scheduled, I think at first at 3:30.
11  Again, this will be -- this will all be in the evidence.  This
12  is what the evidence is going to show.  We had a call at 3:30.
13  They asked for an extension of time.  Then they told us they
14  were trying to get the consent of the person whose consent
15  they needed.  They pushed it off further.  And then, you know,
16  then we got the bad email from Mr. Hogewood that said, we're
17  not going to have a group call, I'm just going to call by
18  myself.  And we knew what that meant.
19      And so he called up.  He informed the Debtor that Plan B
20  was off the table, the one that we had just accepted like for
21  the second time.  So Plan B was now off the table, and we
22  said, we're done.  I mean, we can't continue to negotiate
23  this.
24      A couple of hours later, they send an email and they say,
25  Plan B is back now on the table, but we're taking back the

18

1   million dollars that we had previously agreed to.  And we

2   said, no, thank you.

3       They continued to make offers over the weekend, Mr. Seery

4   will testify, offers pursuant to which they were seeking I

5   think what they called the *a la carte* services from the

6   Debtor.  And we weren't able to reach that agreement.  And,

7   again, I think what Mr. Dondero is going to tell you, Your

8   Honor, is that -- well, you're going to hear two different

9   stories, actually.  Mr. Dondero is going to tell you that when

10  we wouldn't let him back in the office on Tuesday, he

11  disengaged.  So he didn't -- he didn't really care.  He didn't

12  really have anything to do with it.  He doesn't know what plan

13  the Debtor has today.  He doesn't know how the services are

14  being transitioned.  He really doesn't know anything after

15  last Wednesday as regards to this matter.

16      But Mr. Norris will tell you that it was, in fact, Mr.

17  Dondero who pulled Plan B on Friday afternoon because he

18  didn't understand it.  There was a misunderstanding, they

19  said, even though Mr. Dondero will tell you that he

20  specifically authorized Mr. Norris and D.C. Sauter to

21  negotiate the agreement.  Okay?  That's a -- it's not a pretty

22  story.  I don't know that there's going to be a lot of dispute

23  about the facts, to be honest with you, because they're

24  reflected in documents.  This is as much a document case as it

25  is anything else.

19

1        So, you know, where does that leave us?  Because there are
2    certain developments that have happened in the last 24 hours,
3    you know, that I'll -- that guess I'll share with you now.  We
4    did take discovery yesterday.  As I mentioned, we did have a
5    number of depositions.  And during one of those depositions,
6    Mr. Norris disclosed that the Advisors do, in fact, have a
7    plan, or at least they assert that they have a plan.  And the
8    plan has, I think, what I would characterize as four legs to
9    it.

10        Number one is they hired yesterday on a contract basis
11   somebody to perform audit and accounting services.  I think
12   his name is Mr. Palmer.  And he started yesterday.

13        They took in-house the payroll issues and are utilizing --
14   to supplement that, they're now going to utilize a firm called
15   Paylocity.  And Paylocity is a firm that the parties use
16   regularly now.  So that's the second leg of their plan.

17        The third leg is an IT company called Siepe.  I think
18   Siepe is run by a former Highland employee.  And Siepe will
19   provide -- and I think Mr. Norris is going to testify -- has
20   been providing for a couple of weeks on a shadow basis certain
21   IT functions.

22        And, finally, they're still trying to negotiate with
23   Newco.  Newco would be the entity that would be formed with
24   some of the Highland employees.  But those negotiations aren't
25   finished.

20

1     So, I appreciated the objection that was filed yesterday.

2   They basically said that this is moot, that they've got a

3   plan, so there is nothing for the Court to do.  We still have

4   concerns.  I think Mr. Seery will testify as to those

5   concerns.

6     But it does -- it does go, you know, much further than we

7   thought, even though it was just adopted.  I mean, I guess the

8   lawsuit had its intended effect, and in the last 24, 48, 72

9   hours, they're -- they're engaging in the process of

10  transition.

11    So, you know, why are we here and what are we hoping to

12  accomplish now that we've gotten news of that development?  I

13  think it's pretty simple, Your Honor.  We simply want the

14  Court to make sure that the Debtor is protected here, that the

15  Debtor -- that there is a plan in place pursuant to which the

16  Debtor will not be obligated to provide any services and it

17  will be allowed to implement its plan in a way that not only

18  protects the Debtor but really will protect the public

19  marketplace, it will protect the funds and the investors, and,

20  frankly, the Advisors as well.

21    We wanted this to be a smooth transition.  We tried very

22  hard to make it a smooth transition.  Unfortunately, that

23  didn't come to pass.  But we do believe that the Debtor needs

24  the comfort of an order.

25    And the Advisors are simply wrong in their papers when

21

1    they say we're asking the Court to dictate terms.  I don't

2    care if they have an agreement with the Debtor.  I don't care

3    who they have an agreement with.  I don't care what the

4    agreement says.  I don't think the Court has to order any

5    particular terms.  We just want to make sure that they have a

6    plan in place and that plan is implemented before the end of

7    the month, because we will not be able to do anything for them

8    after that time.

9        Thank you very much, Your Honor.

10           THE COURT:  Thank you.  Mr. Rukavina?

11           MR. HOGEWOOD:  Good morning, Your Honor.  Lee

12   Hogewood.  I'm going to take on the opening statement, if the

13   Court please.

14           THE COURT:  All right.  Thank you.

15        OPENING STATEMENT ON BEHALF OF THE ADVISOR DEFENDANTS

16           MR. HOGEWOOD:  And let me, let me begin by saying

17   that I agree with Mr. Morris that counsel, I think, have

18   cooperated throughout this process.  And I also -- and in

19   particular thank them for asking that the hearing be pushed

20   back for 30 minutes, which was at my request, as an earlier

21   start.

22        One other housekeeping matter that I would like to request

23   is I will not have a further speaking role after the opening

24   statement, and if it would be permissible for me to listen to

25   the rest of the hearing by telephone, that would be much

22

1  appreciated, if there's not an objection to that.

2           THE COURT:  All right.  I assume there's no

3  objection.

4           MR. MORRIS:  No.

5           THE COURT:  All right.  Permission granted.

6           MR. HOGEWOOD:  Thank you, Your Honor.

7      I think the theme of perhaps this hearing is a theme of

8  divorce.  It's a divorce that is long overdue.  The lawsuit

9  filed last week, it seems to be an effort of one of the

10 divorcing parties, the Debtor, to employ the power of this

11 Court to be sure that the Debtor is absolved of all

12 consequences of the divorce.

13     Divorces are often messy.  This one is particularly so.

14 Presently, I think there are three or four other adversary

15 proceedings among these parties that will have to be sorted

16 out over the coming many months.

17     But on the issue before the Court today, the Advisors need

18 very little from the Debtor in this divorce in the final

19 analysis, other than access to data and books and records that

20 the Advisors own and which will remain on formerly-shared

21 systems.

22     To carry the divorce analogy further, like many divorcing

23 couples, there are so-called children at risk.  In this case,

24 the children are the employees of the Debtor, the Advisors,

25 the funds and their investors.

1      The Debtor's other purpose seems to be that they -- to be

2  absolved of responsibility for the children.  And just to be

3  clear, the Advisors need no child support from the Debtor for

4  the funds or others beyond the access to data, books and

5  records that belong to our client and remain comingled with

6  the Debtor's data.

7      But we didn't seek any relief.  We are merely defending

8  ourselves in this action.  And I think what I say about what

9  the evidence will show is not going to be altogether that

10  different from what Mr. Morris has said.  There's absolutely

11  no dispute that the parties failed to reach an agreement.  I

12  also think there's no dispute that the parties worked

13  diligently to reach one.  They overcame very -- a large number

14  of very difficult business issues to make the orderly

15  transition happen.  But in the end, they could not complete a

16  deal.

17      And for the Debtor, you know, the question of who drew the

18  hard line in the sand about no, I think we see it a little bit

19  differently.  For the Debtor, it would not agree for Mr.

20  Dondero to have access, even if and only after the Advisors

21  paid for the construction of a wall to segregate the remaining

22  Debtor employees from Advisor employees and even if the Debtor

23  employees had separate access to the Debtor's section of the

24  premises, where the Advisors would be essentially subleasing

25  the remainder of the space.

24

1     For the Advisors, the prospect of its leader, the leader

2    of the enterprise, being prohibited from working in the same

3    office as the employees of the Advisors made no business sense

4    and was likely to become an ongoing logistical nightmare.

5     The gap could not be bridged in time, and so the Advisors

6    moved out on the 19th, as directed by the Debtor.

7     As the Court knows, there's no provision in the Bankruptcy

8    Code or any other statute that required these parties to agree

9    on a transition of shared services.  There's no legal

10   obligation on either party to reach an agreement on how to

11   divorce and separate.  Neither can be compelled to reach an

12   agreement if an agreement is not ultimately in their mutual

13   respective business interests, as determined by each of them.

14    The Debtor claims to have terminated the contract pursuant

15   to its terms.  It amended the termination date twice in

16   exchange for agreed advance payments to try to reach a deal.

17    In the meantime, the Advisors had to be aware of the

18   possibility that a deal might not be reached, and so they

19   began working in earnest on an alternative plan to be able to

20   continue to service their clients, their funds and investors,

21   as needed after the services were terminated.

22    So it is not clear exactly what the Debtors really seek

23   here.  A mandatory injunction to do what?  To have a plan?

24   The evidence will show, I think as Mr. Morris suggested, that

25   our clients have a plan.  It was implemented -- it began to be

25

1   implemented this past weekend, but it had been worked on for

2   some time in advance.  It's -- based on this, there's no

3   jurisdiction for or purpose in a court order directing us to

4   do that which we are determined to do anyway and have -- and

5   have already done.

6       The evidence will show that there's no meaningful

7   irreparable harm to the Debtor based on the current

8   circumstances.  Mr. Seery would be expected to testify, based

9   on yesterday's deposition, of some vague notion of confusion

10  among the employees, but there was no meaningful discussion of

11  irreparable harm to the Debtor.

12      So the -- and, indeed, the confusion of the employees, in

13  the context of a Chapter 11 debtor that has just confirmed a

14  plan of liquidation, I think confusion could be -- the source

15  of confusion could be a large number of things, not merely the

16  transition issues.

17      To carry the divorce analogy further, the requested

18  mandatory injunction is somewhat like requiring a divorcing

19  spouse who has left the home to explain the details of his or

20  her post-divorce life.  And there's -- there's no purpose in

21  that.  In our papers, we've explained the lack of jurisdiction

22  over this matter as a core proceeding, and certainly even

23  under the related-to jurisdiction of the Court, as well as a

24  constitutional -- lack of a constitutional basis for

25  jurisdiction under *Stern v. Marshall*.  And I know Mr. Rukavina

26

1    will take those issues up in his closing arguments.

2        We've also indicated -- made an arbitration demand, which

3    is provided for under one of the two advisory agreements.  And

4    in the context of seeking, in this case, seeking a permanent

5    injunction, as we stated in our papers, there's really no --

6    there's no proper exception from the arbitration demand.

7        So there's really, as we sit here today, there's really no

8    case or controversy, and the timeline that Mr. Morris

9    described is pretty much not in dispute.  The evidence is

10   going to show that there was a developing consensus among the

11   business teams in January to meet a January 31 deadline with a

12   transition.  On January 27th, the -- 27, the Debtor demanded

13   as a condition of transition nearly $5 million in what they

14   allege to be postpetition underpayments under the shared

15   services agreement.  This was a new and difficult issue.  The

16   amounts, we're disputing.  And the Debtor had not circulated a

17   term sheet, only a proposed schedule of services.  The term

18   sheet came on the 28th.

19       On the 29th, we were able to agree to the first two-week

20   extension to allow these discussions over a 13- or 14-page

21   term sheet to be continued and discussed.  That extension

22   required the advance payment of an agreed amount to cover that

23   two-week period of extension of services.  Negotiations

24   continued, as discussed, and a further extension through the

25   19th was granted.

27

1    Negotiations broke down at the time a suit was filed, and

2   were renewed and ultimately broke down again, as Mr. Morris

3   described.

4    In the end, the Court should dismiss the proceeding for

5   lack of jurisdiction.  The bankruptcy court is not a divorce

6   court, nor is it a place where every perceived ill that the

7   Debtor may incur may be resolved by injunction.  The Court is,

8   after all, a court of limited jurisdiction.  If the Court does

9   proceed, we simply ask that the claims be rejected and

10   dismissed on the facts.

11    The Defendants have asked for nothing from the Debtor

12   other than continued access to data, books and records to

13   which they're entitled.  We've moved out of the house.  We

14   have plans that will allow us to continue to serve our

15   clients.  And we would ask that you not order us to do so.

16   Thank you.

17         THE COURT:  All right.  Well, I realize, you know,

18   legal arguments have been hinted at here, and of course were

19   briefed.  I want to hear the evidence, and then we'll talk

20   more about legal arguments at the close of the evidence.

21    All right.  Mr. Morris, you may call your witness.

22         MR. MORRIS:  All right.  Your Honor, before I call my

23   witness, I think just for efficiency purposes I would like to

24   move my documents into evidence so that we don't have to do

25   that on a document-by-document basis.

28

1          THE COURT:  All right.

2          MR. MORRIS:  And the Court will find -- unlike some

3    of the prior proceedings, there actually aren't an

4    overwhelming number.  But the Court will find Exhibits 1

5    through 16 at the adversary proceeding docket, Docket No. 10,

6    --

7          THE COURT:  Uh-huh.

8          MR. MORRIS:  -- the original witness and exhibit list

9    that the Debtors filed.  And then we added a few more

10   documents I think late yesterday.  There was a supplement that

11   included Exhibits 17 through 21, and that can be found at the

12   adversary proceeding Docket No. 19.

13      So the Debtor would respectfully move into evidence

14   Exhibits 1 through 21 on those lists.

15         THE COURT:  All right.  Any objection?

16         MR. RUKAVINA:  Your Honor, I believe Mr. -- well, not

17   necessarily an objection, Your Honor.  I believe Mr. Morris

18   and I have an agreement that my Exhibits A through N as in

19   Nancy will also be admitted.  And if that agreement holds,

20   then I have no objection to his exhibits.

21         MR. MORRIS:  And it does, Your Honor.

22         THE COURT:  Okay.  And --

23         MR. RUKAVINA:  Then I would -- I would move for

24   admission at this time as well, Your Honor.

25         THE COURT:  All right.  And let's make sure I know

Seery - Direct                                    29

1   where A through N appear.  It looks like they are -- are they

2   all at 18, Docket Entry 18?

3            MR. VASEK:  Correct, Your Honor.

4            THE COURT:  All right.  So I will admit 1 through 21

5   of the Debtor, which appear at Docket Entry No. 10 and 19, and

6   Exhibits A through N of the Advisors, which appear at Docket

7   Entry No. 18.  All right.

8       (Debtor's Exhibits 1 through 21 are received into

9   evidence.  Advisors' Exhibits A through N are received into

10  evidence.)

11           MR. MORRIS:  Okay.  And with that, the Debtor calls

12  James Seery as its first witness.

13           THE COURT:  All right.  Mr. Seery, I think I saw you

14  earlier on the video.  If you could --

15           MR. SEERY:  Good morning, Your Honor.

16           THE COURT:  Good morning.  All right.  Please raise

17  your right hand.

18       (The witness is sworn.)

19           THE COURT:  All right.  Thank you.  Mr. Morris?

20           MR. MORRIS:  Thank you, Your Honor.

21           JAMES P. SEERY, JR., DEBTOR'S WITNESS, SWORN

22                     DIRECT EXAMINATION

23  BY MR. MORRIS:

24  Q   Can you hear me okay, Mr. Seery?

25  A   I can.  Yes, sir.

Seery - Direct                               30

1    Q    Okay.  Let's just cut right to the chase.  Was the Debtor

2    party to certain shared services agreements with Highland

3    Capital Management Fund Advisors and NexPoint Fund Advisors?

4    A    Yes.

5    Q    And I'm going to refer to those two entities as the

6    Advisors; is that okay?

7    A    That's fine.  Thank you.

8    Q    And pursuant to the shared services agreements, did the

9    Debtor historically provide back- and middle-office services

10   to the Advisors?

11   A    Yes.

12   Q    Okay.  And is it your understanding that the Advisors

13   provide advisory services to certain investment funds?

14   A    That's my understanding, yes.

15   Q    Okay.  Do you have any understanding as to whether or not

16   the Advisors provide those services to the funds pursuant to

17   written agreements?

18   A    I believe they have agreements with each of the funds.

19   Q    Okay.  And do you understand that some of those investment

20   funds are publicly traded?

21   A    I believe most of those are, the -- those '40 Act funds

22   are retail funds, yes.

23   Q    And what does it mean, you know, in your -- in your world,

24   what does it mean to be a retail fund?

25   A    There are institutional-type investments which are only

1    available to institutional investors or credit investors,

2    depending on the type of investment it is, and there's

3    particular rules around what types of investors can engage in

4    certain types of investing activity, designed to, really, have

5    more sophisticated investors engage, if they desire, in more

6    risky endeavors and less who's believed to be sophisticated

7    investors engage in more what are referred to as retail

8    activities.

9        That's not saying that the retail activities aren't

10   sophisticated and risky.  They can be.  But there's a division

11   in how certain types of investors are able to access certain

12   types of investments, and retail funds typically are open to

13   any investor that wants to invest, and they can buy those on a

14   -- or sell them on a regular basis.

15   Q   Are you aware of any agreement of any kind between the

16   Debtor and any of the funds that are advised by the Advisors?

17   A   No, there are no -- no such agreements.

18   Q   Okay.  Let's turn our attention to August 2020.  Did there

19   come a time in August when the Debtor filed its initial plan

20   of reorganization?

21   A   Yes.

22   Q   And can you just describe generally for the Court what the

23   structure of that plan was?

24   A   As we've discussed before, that was the monetization plan.

25   It was at this point that the Debtor determined that it had to

Seery - Direct                                    32

1   file a monetization plan to effectively distribute the assets

2   to the stakeholders, depending on how their claims were

3   ultimately resolved.  And the monetization plan was the plan

4   we came up with.

5   Q   Okay.  And do you recall that that initial plan provided

6   for the treatment of certain executory contracts?

7   A   Yes.

8           MR. MORRIS:  Can we just put up on the screen Exhibit

9   12, please?  And if we could focus in on that first paragraph.

10  BY MR. MORRIS:

11  Q   Is it your understanding that the initial plan filed by

12  the Debtors provided that unless an executory contract was

13  subject to one of those provisions in the first paragraph,

14  that it would be deemed rejected?

15  A   Yes.  It was a pretty integral part of the plan, that we

16  were going to downsize the operations of the business

17  considerably, and many of the operating businesses, the

18  servicing of shared service counterparties, were going to be

19  eliminated, and we would either terminate those agreements

20  pursuant to their terms or they would be deemed rejected.

21  Q   Okay.  And what were the consequences for the shared

22  services agreements for a provision such as this?

23  A   Well, the counterparties would no longer have those

24  services and have to seek them, to the extent they needed

25  them, elsewhere.

Seery - Direct                                    33

1   Q    Okay.  Was this the only plan that the Debtor was pursuing

2   at this time?

3   A    It was the only plan that we filed.  We were considering

4   other options, which at that point was the so-called grand

5   bargain, which we were attempting to negotiate alongside the

6   monetization plan.

7   Q    Did the Debtor engage in any discussions with the Advisors

8   after filing this plan about a possible transition of

9   services?

10  A    Yes.

11  Q    Can you describe for the Court your recollection about

12  those discussions in the fall of 2020?

13  A    Well, initially, it started in the summer.  And knowing

14  that this was a significant possibility, I gathered the

15  Highland operating team, many of whom are responsible for

16  servicing the counterparties under the shared service

17  arrangements, and they knew that they were not going to be

18  part of the continuing Debtor if the monetization plan was

19  confirmed.  And I described that there's a corporate carve-

20  out, that there would be significant work that had to be done,

21  that that team would have to accomplish, you'd have to

22  allocate responsibilities and know exactly how you're going to

23  perform these services, indeed, if the counterparties wanted

24  those services performed post-confirmation.

25        And we started with a Zoom meeting in August and tried to

**Appx. 02330**

Seery - Direct                              34

1   replicate a similar meeting each week so that we stayed on a

2   timetable.

3       By the early fall, or mid-fall, I'm sorry, I guess it was

4   November 24th, I had a conversation directly with Mr. Dondero

5   by phone.  And on that phone call, I described very much to

6   him the same situation.

7       It was Mr. Dondero, Mr. Ellington, Mr. Lynn, Mr.

8   Pomerantz, Mr. Demo, and Mr. James Romey from DSI on the call.

9   And on that call, I know we went through several issues, and

10  some of them were becoming particularly heated, especially the

11  settlement with Acis, because that was problematic for Mr.

12  Dondero.

13      We advised Mr. Dondero that he would have to resign from

14  the board if he was going to take antagonistic -- not the

15  board, the portfolio manager position -- if he was going to

16  take antagonistic positions versus the Debtor.

17      Mr. Lynn indicated that he was going to depose me with

18  respect to the 9019 settlements and was -- wanted to be able

19  to object to those, as well as the Acis settlement as well as

20  the Redeemer settlement.

21      We also talked about the potential of the grand bargain

22  plan, and we talked very specifically about the filed plan,

23  the monetization plan, and the transition that would have to

24  be accomplished.  And I walked through, again, my comparison

25  to a corporate carve-out and the difficulty of achieving those

Seery - Direct                                35

1    kind of transactions even if all parties were working hard to
2    get them done and wanted to get them done.
3        And I recall very specifically Mr. Dondero telling me that
4    I should be prepared, if his grand bargain plan wasn't
5    accepted, that my transition plan wouldn't be very easy and he
6    would make it difficult.  And I recall very specifically
7    saying that I was a Boy Scout for a long time and that the
8    Debtor would, in fact, be prepared.  While we thought it was
9    going to be in his economic best interest to come to
10   agreement, that we would not be left unprepared and the Debtor
11   would move forward even if he didn't agree.
12   Q    During the negotiations that you're talking about, was the
13   form of -- just to focus on the transition part, was a form or
14   structure of a successor to the Debtor, at least in terms of a
15   provider of the back- and middle-office services, discussed?
16   A    Yes.
17   Q    And what was the -- what was the substance of those
18   discussions concerning the form of the successor?
19   A    The initial substance was that it would be some subsidiary
20   of NPA or a Dondero related-party entity.  I picked NPA just
21   as a -- because it was a registered investment advisor, it
22   would be an easy transition over, and that's where the
23   employees could go, that's where the services could be
24   provided from, it would be rather seamless, and they were
25   sharing certain services already -- for example, HR services

Seery - Direct                              36

1   like medical insurance, health insurance, et cetera.  And so I
2   thought that that would be the easiest entity.  It would
3   obviously require Mr. Dondero's agreement.
4        Subsequently, the idea of a Newco became an idea that was
5   developed originally by Mr. Ellington.  At least, his
6   representation to me was that the -- he and other employees
7   didn't want to work directly for Mr. Dondero because he's
8   already retraded them on the compensation.  Deferred
9   compensation.
10  Q   As time moved on, by November, was the Debtor gaining any
11  momentum with respect to its asset monetization plan?
12  A   Well, the asset monetization plan began to gain
13  considerable traction as the possibility of either a grand
14  bargain or a pot plan fell away.  There were significant
15  negotiations that we had already discussed in respect -- or,
16  at the confirmation hearing in respect of the terms of that
17  plan, and it began to gain significant momentum towards the
18  voting and the confirmation deadlines.
19  Q   And did the Debtor make a decision in November to
20  specifically disclose that it intended to reject all of the
21  shared services agreements?
22  A   Well, prior to that time, I had been in front of the
23  retail boards by phone a couple times and explained basically
24  the overview of the bankruptcy, what was happening.
25  Initially, the attempts at a grand bargain, then the filing of

Seery - Direct                                37

1  the monetization plan, and the -- and the possibility of a

2  grand bargain and the competition between the two and the

3  likely scenarios for each.

4      In addition, we talked about, if there wasn't a grand

5  bargain, what the transition would look like and my

6  expectation, as I described earlier, that it was in everyone's

7  economic best interest -- meaning NPA's, HCMFA's, as well as

8  the funds -- to transition these services from the Debtor,

9  because we weren't going to continue them, to a Dondero-

10 related entity to perform those services for the funds.

11     There were -- there came a time when the disputes with Mr.

12 Dondero became significant enough where the Advisors and the

13 funds were actually objecting to certain things that I and the

14 Debtor were doing in the case, and I told one of the retail

15 board members that I would no longer participate in any of

16 their calls.  And he understood why, and I was very specific

17 that it had to do with their antagonistic actions versus the

18 estate.

19     So, as we moved forward towards November, the monetization

20 plan became clear, it became more and more clear that the

21 monetization plan was the only plan on the table.  And by mid-

22 to late November, we had settled on terminating the shared

23 service agreements and send out termination notices at the end

24 of November.

25 Q   Before you send out the termination notices, do you recall

Seery - Direct                                38

1  the Debtor filed their Third Amended Plan --

2  A    Yes.

3  Q    -- in particular?

4          MR. MORRIS:  And can we just put up on the screen,

5  please, Exhibit 13?

6  BY MR. MORRIS:

7  Q    Do you recall if that's the plan that provided the notice

8  that the shared services agreements would be terminated?

9  A    That -- that -- well, the plan continued the position that

10 if agreements weren't specifically assumed they would be

11 deemed rejected.

12     It also made clear that we weren't going to continue to

13 provide any services for the Advisors and their managed funds.

14     And then we actually sent specific termination notices

15 under the agreements.  So those agreements were terminated

16 pursuant to their terms.  They didn't need to wait for the

17 confirmation of a plan to be deemed rejected.

18 Q    Okay.

19         MR. MORRIS:  Can we scroll down just a little bit?

20 Okay.  Keep going.  Yeah, right there.

21 BY MR. MORRIS:

22 Q    Do you see the provision beginning on the bottom of Page

23 24?  Again, this is Exhibit 13.  Continuing to the top of the

24 next page.  That's the provision that put the world on notice

25 that the Debtor was not going to assume or assume and assign

**Appx. 02335**

Seery - Direct                              39

1   the shared services agreements, right?

2   A    Well, this is another one of the provisions.  The original

3   plan made clear that that's what we were going to do, the

4   original filing that we did in August.

5   Q    Okay.

6   A    We were very clear that we would not be assuming these

7   agreements.

8        This filing made clear that we were, again, but with even

9   more specificity, not going to continue to provide these

10  services, and then subsequently we filed or delivered the

11  termination notices.

12  Q    Okay.  And I see the last sentence of the paragraph ending

13  at the top of Page 25 states that the contracts "will not be

14  cost-effective."  Do you see that?

15  A    Yes.

16  Q    What is that a reference to?

17  A    Well, I think we've had discussions before, around

18  confirmation and prior to that, those hearings, that the

19  Debtor was run at a loss.  And the more work we do, the more

20  losses we find.

21       Basically, the Debtor ran at an operating loss, and then

22  had to sell assets to pay deferred compensation or other

23  expenses.  The Debtor has been run that -- it appears the

24  Debtor has been run that way for a long time, and many of the

25  services that the Debtor provides to the shared services, the

Seery - Direct                          40

1  cost of those services exceed the amount that we receive under

2  those contracts.

3      In addition, there's other entities that services -- and

4  persons for whom significant services are provided and nobody

5  pays anything.  They're not even contracts.

6      So, these contracts, the Debtor as an operating entity was

7  run at a loss.  These contracts were negative.  And that

8  doesn't even deal with the fact that many times these entities

9  didn't pay what they did, in fact, owe under the contract.  So

10 there are significant receivables that are owed by these

11 entities that haven't been paid.

12     In addition, the Debtor advances funds on a regular basis

13 for effectively the operating expenses of the Advisors and is

14 often not repaid timely.

15 Q   Okay.  A couple of weeks -- I think you referred to

16 termination notices.  Did the Debtor send termination notices

17 to the Advisors shortly after filing this Third Amended Plan?

18 A   Yes.  They were sent at the end of November.

19 Q   Okay.  Let's just look at the termination provisions, and

20 then we'll quickly at the termination notices.

21         MR. MORRIS:  Can we put on the screen Trial Exhibit

22 2, which was part of the deck of my opening?

23 BY MR. MORRIS:

24 Q   Are you generally familiar, Mr. Seery, with the shared

25 services agreements with the Advisors?

Seery - Direct                        41

1   A    I am.

2   Q    And are you aware that the shared services agreements

3   contain termination clauses?

4   A    Yes.

5   Q    All right.  So this is -- what I've put on the screen is

6   the Debtor's Exhibit No. 2, and it's the shared services

7   agreement with Highland Capital Management Fund Advisors.  Do

8   you see that?

9   A    I do.

10           MR. MORRIS:  Can we just focus in on Section 7,

11   please?

12   BY MR. MORRIS:

13   Q    Okay.  And is it your understanding that's the termination

14   clause?

15   A    Yes.  There's the term.  It's in 7.01.  And the

16   termination provision is in 7.02.

17   Q    Okay.  And can you just describe for the Court your

18   understanding of how Article 7 works?

19   A    Article 7 works that the agreement will automatically

20   renew on an annual basis unless one or the other parties

21   terminates the agreement.  And so each party is entitled to

22   terminate the agreement on 60 days' advance written notice.

23   Q    All right.

24           MR. MORRIS:  If we can take that down and put up

25   Debtor's Exhibit No. 4, please.

Seery - Direct                                42

BY MR. MORRIS:

Q    And do you see this is the shared services agreement

between the Debtor and NexPoint Advisors, LP?

A    Yes.

Q    And are you generally familiar with this document?

A    I am.

        MR. MORRIS:  Can we go to Article 7, please?  Thank

you.

BY MR. MORRIS:

Q    Can you tell the Court your understanding of what Article

7 provides?

A    It's a little bit different than the last one.  This is a

later agreement.  The other one was a document that was

clearly cribbed from another agreement that wasn't exactly a

shared service arrangement.  But this one doesn't have the

automatic renewal.  It just puts the agreement into operation,

and then either party may terminate it at any time on 30 days'

written notice.

Q    And did the Debtor rely on the two Article 7 provisions

that we just looked at to give notice of termination of the

shared services agreements?

A    I'm sorry.  Somebody clicked in.  Did you say did the

Debtor rely on?

Q    Yes.

A    Yeah, those are the governing provisions that we relied

Seery - Direct                               43

1    on, yes.

2    Q    Okay.

3            MR. MORRIS:  So can we put up on the screen Exhibit

4    3, please?

5    BY MR. MORRIS:

6    Q    And is this the Debtor's written notice to Highland

7    Capital Management Fund Advisors of its termination of the

8    shared services agreement effective as of January 31, 2021?

9    A    Yes.  That's our notice of termination.

10   Q    Did the Debtor ever rescind this notice?

11   A    No.

12   Q    Okay.  Did the Debtor ever tell the Advisors, to the best

13   of your knowledge, that the Debtor was considering rescinding

14   this notice?

15   A    No.

16           MR. MORRIS:  Thank you.  Can you take that down and

17   put up Trial Exhibit No. 5, please?

18   BY MR. MORRIS:

19   Q    And is this the Debtor's written notice to NexPoint

20   Advisors dated November 30, 2020 that it was terminating the

21   shared services agreement as of January 31, 2021?

22   A    Yes.  That's the Debtor's termination notice to NPA.

23   Q    Did the Debtor ever rescind this notice?

24   A    No.

25   Q    To the best of your knowledge, did the Debtor ever tell

Seery - Direct                                    44

1   anybody at the Advisors that it was considering rescinding

2   this notice?

3   A     No.

4   Q     Okay.  The Debtor --

5            MR. MORRIS:  We can take that down now.  Thank you.

6   BY MR. MORRIS:

7   Q     The Debtor amended their plan of reorganization after

8   November; is that right?

9   A     Yes.  There were a couple of different amendments.

10  Q     To the best of your knowledge, did any amendment ever have

11  any impact at all on the Debtor's statement that it would not

12  be assuming or assuming and assigning the shared services

13  agreements?

14  A     No.  It goes beyond the best of my knowledge:  It didn't

15  happen, because it was an integral part of the plan.

16  Q     Okay.  And can you describe the Debtor's overall view of

17  the plan and the impact that it had or was expected to have on

18  the shared services agreements?

19  A     The basic nature of the plan, as I discussed earlier,

20  going back to August, but as refined, is that the Debtor will

21  no longer be in the business of providing shared services to

22  these Advisors.

23  Q     Okay.  So the notices are sent on November 30th.  They're

24  60-day notices.  What do you recall happening in December with

25  respect to negotiations over the transition of services, if

Seery - Direct                                45

1  anything?

2  A    The short answer is not much.  So, we did, as I said,

3  start the transition analysis and discussions and put together

4  detailed spreadsheets with the various agreements that might

5  be necessary for each side.  And some agreements would be

6  required for the Debtor to go forward, some contracts.  Other

7  contracts were not necessary for the Debtor but were deemed to

8  be necessary for the Advisors.  And we were working through

9  that analysis continually through the fall and through

10  December.  But there weren't -- at that point, there wasn't

11  very much going on with direct negotiations as to how this was

12  going to happen.  And my analogy for the Debtor was like

13  pushing on a string.

14      Frank Waterhouse in particular had been told by Jim

15  Dondero that he did not have authority to negotiate for him.

16  So once we had laid out what the contracts were, and we had an

17  original structure that the rent would be divided 75/25 and

18  paid by the Advisors, and then the costs of the contracts

19  would be divided 60/40, with the majority paid by the

20  Advisors, we really didn't get much traction other than trying

21  to put together that term -- that schedule so we knew what

22  those costs were, and then also to figure out what was unpaid

23  by the counterparties.

24      In addition, at that time, because it was pretty clear

25  that the monetization plan was going to go forward and go into

Seery - Direct                              46

1  the confirmation, right around that time, and it may have been

2  the beginning of January, the Advisors stopped paying on

3  certain of the notes, and then we accelerated those notes.

4  Q   And do you have an understanding as to who was the -- who

5  was the negotiating leader on behalf of the Advisors in the

6  December-January time period, if anybody?

7  A   Well, for the Advisors, it was a combination of the

8  Highland team that would transition over and their counsel.

9  And the -- meaning the counsel for the Advisors.

10 Q   So now, moving into -- withdrawn.  Were the Debtor's

11 professionals engaged in this process, not just you?

12 A   Oh.  Oh, yes.  Very deeply.  We spent literally hundreds

13 of hours with both DSI and your firm, the Pachulski firm,

14 negotiating provisions, the structure, how this would work,

15 what the transition would look like.

16      As I said earlier, corporate carve-out is very

17 complicated, and there are -- there are often transition

18 services that have to be carried through for a period of time

19 where both sides will use certain services.  And then there

20 are shared services which will be carried through for a longer

21 period of time.

22      We came up with a structure that we think worked really

23 well in light of the term of the lease or the tenor of the

24 lease, so that we knew how that would work between the

25 parties, as well as certain IT contracts specifically that

Seery - Direct                                47

1  were required for both parties to function and when their

2  renewals would come up and then how those businesses -- how

3  those functions would transition or be subject to renewal of

4  additional contracts.

5  Q   As the calendar turns into January and January 31st is

6  approaching, do you recall the tenor of discussions or what's

7  happening in the last two weeks of January, if anything, with

8  respect to --

9  A   Well, --

10 Q   -- the negotiations?

11 A   Yeah.  I mean, we started really pushing it, particularly

12 after confirmation, to try to get this done, because either

13 the funds and the Advisors had alternative arrangements or

14 they didn't.  And if they didn't, we thought that would be

15 very difficult for, obviously, for them and their funds, but

16 also for the Debtor, because we had kept their records

17 previously, we had done the work previously, we had sent in

18 terminations, and these are SEC-regulated funds.  So we became

19 very concerned that there was not going to be a responsible

20 transition.  And in fact, we had gotten very little feedback

21 -- no feedback, frankly, from the boards -- but very little

22 feedback from anybody as to whether they were going to accept

23 the terms that we had put forth or whether they were going to

24 find an alternative arrangement.

25 Q   As the calendar got closer to January 31st, was there a

Seery - Direct                          48

1  request by the Advisors for an extension of the termination

2  deadline?

3  A    It became clear that they did not and had not done

4  virtually anything.  I sent, I think, three or four letters

5  and emails directly to board members imploring them to pay

6  attention, to take action, and if they had an alternative

7  plan, to tell us.  By the end of January, it was clear that

8  they didn't have any alternative plan and needed more time.

9        MR. RUKAVINA:  Your Honor, I'll move to strike that.

10  Clear that they had no alternative plan.  There's no

11  foundation for him to make that statement.

12        THE COURT:  I overrule.

13  BY MR. MORRIS:

14  Q    You mentioned the SEC.  Was the Debtor concerned about the

15  SEC's position if the Debtor had simply terminated services

16  under the contracts as of January 31st?

17  A    Very much so.  So, my own personal experience, as well as

18  the experience of our fund counsel, is that while the SEC

19  keeps a close eye on a number of issues related to investing

20  and fund management, retail funds get particular focus because

21  of the individuals who can invest in those and at least the

22  perception that they may not be as able to defend their rights

23  as others.  So the SEC does keep a particularly close watch on

24  those kinds of funds.

25        We were concerned that, even though we had done everything

Seery - Direct                                    49

1    we believe correctly to terminate the agreements pursuant to

2    their terms, and in fact had negotiated for months in good

3    faith and spent millions of dollars trying to get a

4    transition, that if the funds were to simply stop providing

5    information to their investors or were to stop being able to

6    service their investors, that a SEC investigation would ensue

7    and that it would cost the Debtor time and considerable money

8    to deal with those issues.

9         Notwithstanding that, we felt it was important to notify

10   the SEC, and so we reached out through our counsel and advised

11   them of what we believed was going on and our view, based upon

12   the actual discussions and the request from the Advisors for

13   an extension, that nothing had been done up into the first

14   weeks of February.

15   Q    Thank you.  And ultimately, the Debtor and the Advisors

16   agreed to a two-week extension of time; do I have that right?

17   A    We agreed to a two-week extension in the first extension.

18   Q    Uh-huh.

19   A    And during that time, we tried to get, in particular, the

20   employees that would be transitioning and become the Newco to

21   really focus on trying to get an agreement nailed down.  And

22   so we had our -- our advisors take the agreement that was

23   largely structured in terms of knowing what the contracts were

24   and the costs that -- and work on trying to nail down the

25   final terms with respect to how the shared services would work

Seery - Direct                           50

1  over a period of time, including working with third-party
2  vendors.
3  Q    I just want to follow up on a couple of things that were
4  in your prior answer to make sure that the record is clear.
5  Does the Debtor have special fund counsel?
6  A    Yes.
7  Q    And who is the Debtor's fund counsel?
8  A    WilmerHale.
9  Q    And is it your understanding that they have the expertise
10 with respect to the securities and the management of funds of
11 the type that are at issue in this case?
12 A    Yes.  They're one of the top firms in the country in this
13 area.
14 Q    Okay.  And did -- well, I'll just leave it at that.  Do
15 you recall during this time if the Debtor informed the
16 Advisors that it would participate in negotiations only if
17 outside counsel were present?
18 A    Not negotiations.  I think we would always have been
19 willing to engage ourselves in negotiations.  What we were
20 concerned with were the employees who were forming Newco being
21 put in what we thought were untenable positions with respect
22 to negotiations involving certain members of the Advisors'
23 team and the board -- of the funds' boards of directors.  And
24 that came from very specific concerns that employees raised
25 with us about threatening conduct and statements from some of

Seery - Direct                              51

1   those folks.

2        There were a few employees that had shared service

3   responsibilities that were actually deemed employees or deemed

4   officers at some of the Advisors.  And so there was what I

5   will call a blame game going on, and the -- as soon as we came

6   to the end of January and there wasn't an ability to get a

7   deal done, certain members of the Advisor team or the fund

8   boards took very strident positions vis-à-vis those Debtor

9   employees.  And we were very concerned that, if there wasn't

10  someone there, counsel and taking notes, that those employees

11  would be at a disadvantage.

12       We also recommended that those employees resign those

13  positions because the negotiation and the positions of the

14  parties had separated such that we thought that having the

15  shared responsibility was untenable.

16       We made clear that we would have one of our counsel sit on

17  the phone and they would be there to listen and take notes and

18  nothing else.  And so that was something that I put in place

19  after advice of counsel that we were leaving our employees in

20  a very untenable space.

21  Q    And with respect to the notion of resigning, do you recall

22  if you gave the employees the option of resigning from one

23  entity or the other, or was it just from the Advisors?

24  A    From the Advisors.  But they obviously could have always

25  resigned from the Debtor.  We don't have any, with those

Seery - Direct                                52

1  employees, any contracts, and certainly it was -- I think I've

2  always made clear that if someone has a better opportunity,

3  they should go take it.

4  Q   And is it fair to say that during this two-week period,

5  notwithstanding some of the things that you described, the

6  parties did, in fact, make progress towards getting to a final

7  transition services agreement?

8  A   Yeah.  I think -- I think we made -- we made good

9  progress.  And even on the resignation issue, my understanding

10 -- and I didn't have these discussions directly -- was that

11 the Advisors agreed and I think the funds agreed that those

12 employees could resign, and if they ended up at Newco and

13 Newco was providing services, they could reassume those

14 positions post-termination from the Debtor.

15     So I think there was considerable progress around those

16 items.

17     The operational items, there was considerable progress

18 around.

19     There was already, I think, really good understanding and

20 agreement on the cost split.

21     And then there was considerable discussion around the

22 shared -- some of the shared items going forward, and then how

23 the transition mechanics would work in the event that one

24 party wanted to continue a contract and the other didn't.

25     So there was -- there was -- by the end of the two-week

Seery - Direct                                    53

1    period, we'd started to make enough progress that we -- we

2    thought we'd actually get there.  It really shouldn't have

3    taken as long as it did.  It was -- it was, you know, one step

4    forward, one and a half steps back, quite often.  But I think

5    we had a -- largely had an idea that we were very close

6    towards the end of that two-week period.

7    Q    And was that the reason why the Debtor agreed to a short

8    further extension of the termination deadline to February

9    19th?

10   A    Yes.  The original concept that I had come up with with

11   one of the employees who was negotiating for the Newco was

12   that there was no reason that we would have any -- we

13   shouldn't be able to get it done in two weeks, particularly

14   since the economics had largely been agreed to and deemed fair

15   by the financial staff as well as the operators in the

16   business.  That we would use the next week to cross T's and

17   dot I's and get in a position to transition the employee team.

18        We also at that time extended the time for the employees

19   by a week, to make sure that, just in case we didn't get a

20   deal done, we had the staff to be able to clean up, if you

21   will, if negotiations completely fell apart.

22        But we did, we did agree to an extension at that point.

23   The counterparties paid for that extension.  They paid the

24   costs, not fully loaded, but costs of the employees, to help

25   defray the costs that we were carrying for them.  And that we

Seery - Direct                                54

1    hoped we'd have it completed by that final week.

2    Q    Did you have concerns, as the CEO, that the employees have

3    sufficient time to transition and wind down other aspects of

4    the Debtor's business that were being adversely impacted by

5    this process?

6    A    Oh, absolutely.  And if the deal was done, then we would

7    have a shared service arrangement.  And just to be clear, the

8    way that typically works is that -- we'll use the actual

9    parties -- the Debtor would still stay in its space, use its

10   systems, have its contracts.  The Newco or NPA entity would

11   stay in its space and use its contracts, most of which are in

12   the Debtor's name, but under the same arrangement that we had

13   previously, and we would be sharing a lot of services, so that

14   the transition issues that the Debtor has we would be able to

15   accomplish because the team would still be with us but they

16   would be part of the Newco or NPA as a shared resource.

17        In the event that we weren't able to reach agreement, I

18   needed to make accommodation with those employees to continue

19   to provide those services in order for the Debtor to complete

20   its transition.

21   Q    All right.  So let's take -- let's take this back a week,

22   to last Tuesday.  As of that time, did the Debtor believe that

23   it had reached an agreement on all material terms with the

24   Advisors?  With one exception?

25   A    Cautiously, yes.  I think at that point we felt that we

Seery - Direct                                55

1  were -- we were close, but there was a material open issue

2  that we had in terms of trying to get the final agreement

3  done.

4       And frankly, we were very concerned -- and this is borne

5  by history, not just of my own but the other folks on our team

6  who've been around a lot longer -- that there was a

7  considerable risk that the deal that was agreed to wouldn't

8  actually be signed and it would be retraded as we went

9  forward.

10 Q   As of Tuesday, did the Debtor inform the lawyers for the

11 Advisors that it was prepared to sign a fully-negotiated term

12 sheet, or, in the absence of that, it would seek judicial

13 relief?

14 A   Well, I gave instruction to counsel -- and this was -- you

15 know, we had reviewed this with both your firm and with

16 Wilmer, the WilmerHale firm -- as to how we should go about

17 making sure that the estate was protected in the event that

18 there was either a retrade or we simply couldn't come to a

19 final agreement.  And we had -- I advised your firm to tell

20 counsel on the other side that the agreement was done, that we

21 were prepared to sign it, but if they were unwilling to sign

22 it we were going to seek Court intervention to make sure that

23 we had approval of what we had done to date, declaratory

24 judgments setting forth or approving what we had done with

25 respect to the negotiations.

Seery - Direct                              56

1   Q    Was there -- was -- was there one issue that was -- one

2   meaningful issue that dividing the parties at that point in

3   time?

4   A    Well, the new -- the new issue that was surfaced, and it

5   was a new issue, was this idea that, notwithstanding the

6   preliminary injunction and notwithstanding how the business

7   has been run for the last couple months, that Mr. Dondero

8   would be able to come back into the office.  It didn't seem,

9   frankly, like a real business issue, but it became a

10  significant sticking issue.  Because for the Debtor, it's a

11  very significant issue.

12  Q    Why didn't the Debtor just agree to allow Mr. Dondero back

13  into the offices?

14  A    Well, as the Court has heard before in prior hearings, Mr.

15  Dondero's conduct through the fall, once the monetization plan

16  had been put in place, has been extremely difficult, to say

17  the least.  Threatening email or texts to me.  Obstreperous

18  litigation, I would say vexatious litigation, with respect to

19  every aspect of the transition.  Numerous retrading of

20  provisions in this negotiation.  And statements and

21  effectively, I think, threats to other employees, including

22  while he was on the stand, you know, in the court.  And I

23  found, from my seat, that that would be really difficult to

24  bring employees back into the Debtor to help implement the

25  plan while Mr. Dondero was in that space.  There was really no

Seery - Direct                                          57

1  need for him to have to be in that space from an operational

2  perspective, as the funds and the Advisors had proved for the

3  prior two months.

4  Q   Is it your understanding that, but for the issue of Mr.

5  Dondero's access, the Advisors and the Debtor had otherwise

6  agreed to all material terms of a transition services

7  agreement as of last Tuesday evening?

8  A   Yes.

9  Q   Did the Advisors sign the term sheet that the Debtor had

10 tendered that reflected what you just described?

11 A   I don't recall if the Advisors did.  I certainly did.  But

12 there were -- there were additional changes.  So we -- we had

13 reached that agreement earlier in the week.  We didn't get

14 agreement on the final point of Mr. Dondero's access.  We

15 filed our pleadings in the Court, and I believe that was

16 Tuesday or Wednesday, and then moved forward towards this

17 hearing.

18      And during that time, the negotiations continued.  So

19 there were a number of different changes, but we -- we were

20 very clear that we had an arrangement, we had a deal that was

21 fully negotiated, we had a deal that we thought was extremely

22 beneficial to the Advisors, that it worked well for the

23 Debtor, that it worked well for the Debtor's employees, who

24 would then be Newco employees, or NPA employees, depending on

25 how they ended up splitting it, and that the flexibility of

Seery - Direct                          58

1    that agreement served all the parties' interests and we didn't

2    intend to change it.

3    Q    Did -- do you know whether the Debtor provided to the

4    Advisors' counsel a copy of the complaint and the motion that

5    it was intending to file prior to the time that it actually

6    filed the documents?

7    A    Yes, we did.

8    Q    Okay.  So the Debtor gave -- is it fair to say the Debtor

9    gave the Advisors specific notice, and, indeed, copies of the

10   documents before the action was commenced?

11   A    Well, I think we -- part of the strategy we'd come up with

12   with WilmerHale was that we should do everything we can to be

13   accommodative, within the reason -- within what we thought was

14   reasonable for the Debtor being able to implement its plan.

15   And I believe we did that.  And out of caution and

16   frustration, both with respect to the inability to get TS, if

17   you will, as well as the concern that you could have a

18   retrade, based on past experience, we told him if we didn't

19   have an agreement that was signed and that was binding, that

20   we would move forward with the court hearing.

21       The reason this is structured, by the way, as a binding

22   term sheet, it was a scramble in January to try to put it

23   together.  Otherwise, we would have had a binding agreement.

24   It actually reads more like an agreement than a term sheet,

25   and has a significant Schedule A on the back.  But the amount

Seery - Direct                                    59

1   of time that's been spent on this, it's probably not fair to

2   call it a term sheet.  It's an agreement.

3   Q    After the Debtor commenced the action, do you recall that

4   last Friday the Advisors made a written proposal through their

5   counsel with two options, an Option A and an Option B?

6   A    Yes, I do.

7   Q    Did the Debtor perceive at that time that the Advisors'

8   attorneys were authorized to make that offer?

9   A    Well, they represented that they were.  We were at a -- we

10  were at a crossroads.  We had spent so much time on this

11  agreement and trying to get to a final shared service

12  arrangement that the last day for employees, which was

13  scheduled to be the last day of the month, was coming on us

14  very quickly.  And if we weren't going to get this shared

15  arrangement done, we had to make significant decisions with

16  respect to how to transition, with whom to transition, and how

17  to move forward to implement the plan.  So we couldn't,

18  frankly, waste any more time on this agreement.  And I say

19  "waste" with thought, because we thought it was productive,

20  but the amount of time, literally months, is astounding for

21  something that is not that complicated.

22       We got to Friday, and the new arrangement or proposal from

23  the Debtor was -- was basically you can -- I mean, from the

24  funds, Advisors, was you can take A or B.  A was, in essence,

25  the same arrangement we had prior in the week, but Mr. Dondero

1    could come in the office.  We'd already told them that was

2    untenable, it didn't work.

3       B was you could -- we could do the same arrangement except

4    the Advisors would not be responsible for any of the rent.

5    Recall that I mentioned that this was a 75/25 split on the

6    rent.  Roughly, that's about a million dollars to the estate.

7       We spent time Friday morning with the IT folks and with

8    the operations folks on can this be done?  Can we actually

9    provide -- can you provide the services?  Can these funds be

10   run if they're not in the office?  And the answer was so long

11   as the operations people can have access to the office and so

12   long as the IT people can have access to the office, we could

13   largely run it.  So this was just really a retrade on

14   economics.

15      We determined that, fine, we'll take Option B, even though

16   it cost the estate.  We didn't have the luxury of being able

17   to continue to waste time and negotiate this with the

18   impending dates coming up.  So we agreed to Option B on

19   Friday.  I, in fact, sent my term sheet to counsel to deliver,

20   and it was scheduled, I think, as you mentioned earlier in

21   your opening, for the afternoon of Friday for a call to go

22   through wire transfers, which included an initial payment plus

23   a deferred payment, a monthly payment, plus the cost payments

24   that would be made under the agreement, and certain offsets

25   that we had previously agreed to.

Seery - Direct                              61

1   Q    And are you aware, did the Debtor, through counsel, inform
2   the Advisors, through counsel, that the Debtor had accepted
3   Option B?
4   A    Yes.  My counsel told me that they had sent over notice to
5   them, that the call to walk through the final points and to
6   assure that wires were being sent and to engage in the
7   exchange of signatures was set up and everything was agreed
8   to.
9   Q    And what happened later in the day?
10  A    I would say shockingly, but it wasn't, we were told that
11  the call was off.  Mr. Hogewood advised that, through email,
12  that there would no longer be a necessity of a call and he
13  would be reaching out directly to Debtor's counsel.
14  Q    And did you learn after -- after -- in the afternoon that
15  the Advisors had withdrawn Option B, the one that the Debtor
16  had accepted?
17  A    Initially, it was withdraw Option B, and then it was
18  accompanied I think with a basic statement that we don't
19  really need you anymore, which was surprising, only because it
20  --
21      (Interruption.)
22  A    -- a transition like this, you would -- you would run
23  systems side by side, make sure that your IT folks were
24  heavily involved.  You would assure that your -- your human
25  resources and operations folks were involved.  And none of

Seery - Direct                                    62

1  that had been done because it was assumed that the transition

2  would happen.

3  Q    Is it your understanding that the Advisors were still at

4  that time willing to do Option A, the one that would allow Mr.

5  Dondero back in the office?

6  A    I believe they were, yes.

7  Q    Do you know if the Advisors made any further offers in

8  respect of a transition of services over the weekend?

9  A    Well, that was one of the things that was odd and belied

10 their statement that they could operate without any assistance

11 from the Debtor, is that they left Option A on the table.  If

12 they had alternate arrangements, why was Option A still on the

13 table?  So that was puzzling, but counsel made the

14 representation to us and we took it.  And then other counsel

15 over the weekend just started lobbing in proposals.

16 Q    Did those proposals contemplate in any way the continued

17 provision of services by the Debtor to the Advisors?

18 A    That's -- that's what they were, yes.

19 Q    Okay.  All right.  Why did the Debtor commence this

20 lawsuit?

21 A    Well, I -- as I explained earlier, we believe that we've

22 done everything we were supposed to do or required to do under

23 the contracts, the shared service arrangements, in terms of

24 both operating under those agreements and terminating them

25 according to their terms.  We believe we've done everything

 1   that we'd be required to do under the Bankruptcy Code with

 2   respect to filing a plan, making clear what the provisions are

 3   with respect to executory contracts, and making that plan --

 4   making it even more clear what the provisions dealt with, how

 5   the provisions of the plan would impact executory contracts

 6   and how those contracts would be deemed rejected if they

 7   weren't explicitly accepted and assumed.  And we made clear,

 8   we wanted to make clear that we'd properly terminated the

 9   agreements in accordance with their terms.

10       So we filed this action because of the, frankly, the back-

11   and-forth negotiations as well as the accusations and threats

12   from earlier in the negotiations that I previously described,

13   where we're seeking now a declaration that the shared services

14   were properly terminated in accordance with their terms, that

15   the shared services were not assumed pursuant to the contract,

16   and although they'd been terminated, even if they had not been

17   terminated, they would -- they would be deemed rejected.  That

18   the Debtor is permitted, because of the terms of both the plan

19   and the contracts, which have been terminated, to cease all

20   access and support and has no further responsibility for

21   providing any services to the shared service counterparties

22   under those terminated agreements, and that the shared service

23   parties, the Advisors, come forth and tell the Court, tell the

24   world, tell the investors, and tell the SEC that they have an

25   alternative arrangement.

Seery - Direct                           64

1      And, again, our concern is while, yes, we are good

2   corporate citizens and we want to make sure that we don't

3   leave, if you will, a mess because of the actions that are

4   happening in the court, we're very concerned that our

5   counterparties may not be as concerned about the mess they

6   leave.

7      And we -- one of the reasons we reached out to the SEC was

8   to make sure that they were on notice of this proceeding and

9   the potential impact on retail investors, and we think that

10  it's something that the Court should require these Advisors,

11  who have been in antagonistically fighting the case, knowing

12  the specific provisions of the case, and not making

13  arrangements until the last 24-48 hours, we do -- we do

14  believe that, as corporate citizens and as responsible

15  fiduciaries in a bankruptcy, we have some responsibility to

16  make sure these terminations are handled correctly.  While we

17  may not be able to force them to do so, we should have them

18  tell us how they're doing it.

19  Q   Does -- did the Debtor have any concerns that the failure

20  of the Advisors to adopt and implement a transition plan, that

21  that might have negative impacts on the Debtor's ability to

22  implement its plan of reorganization?

23  A   Well, as I said earlier, the SEC, in our experience and

24  our counsel's experience, takes a particular focus on retail

25  funds.  And where those funds have blown up for various

1   reasons, whether they are unable to make a redemption or

2   they're caught in some kind of security that doesn't match the

3   investment parameters of the fund or whatever those are, the

4   SEC takes a particular focus, and investigations can take

5   significant time and have significant cost for all parties who

6   are anywhere near the retail funds.  And, clearly, as the

7   provider of shared services to the Advisors, while we didn't

8   have any agreement with the funds, if the SEC came in to

9   investigate or if they do come in to investigate what's gone

10  on here, there will be a significant cost, and it will, if not

11  derail, it will certainly slow down our implementation of our

12  plan.

13  Q    What exactly does the Debtor want the Court to -- what

14  relief is the Debtor seeking now that the Debtor has learned

15  of the four-legged plan that was described yesterday in the

16  deposition?

17  A    The declaratory relief that I just stated would be

18  essential for the Debtor.  One, that the contracts were

19  properly terminated, in accordance with their terms.  Two,

20  that they were not assumed pursuant to the plan.  And three,

21  that the Debtor is permitted to cease all services and all

22  access to the shared service counterparties.

23       To the extent that they need assistance, we'll help them

24  out, we'll give them information.  If they have third-party

25  professionals that they want to send over, we'll help them

Seery - Direct                                66

1   with data retrieval.  But we do have a plan to implement, and
2   we don't have necessarily the full staff to provide services
3   that they were otherwise receiving from us.  So we would like
4   a declaration that we do not owe them any of those prior
5   services from the terminated contracts.
6   Q    Did you hear in the opening Mr. Hogewood mention that the
7   Advisors do want continued access to the Debtor's books and
8   records?  Or to their, I guess, to their own books and
9   records?
10  A    They'll be able to get access, but that doesn't mean that
11  it's access 24 hours a day.  That doesn't mean they get to
12  continue to use the systems without paying for them.  That
13  doesn't mean they get to use employees without paying for
14  them.  If they have data requests, we would certainly get to
15  them, but we have to maintain and employ people to do that.
16  Q    And is part of the injunction that the Debtor seeks here
17  is to have the Court direct the Advisors to implement and
18  adopt a transition plan that would include taking -- taking
19  their books and records so that the Debtor isn't in that
20  position for a long-term -- on a long-term basis?
21  A    Well, we certainly don't want to be in that position for a
22  long-term basis.  We -- we're certainly not going to be the
23  party that has to maintain their records.  If they can lift
24  them off, we will do that.
25       The challenge has been, according to our IT professionals,

Seery - Direct                        67

1  who are quite good, separating the data is difficult.

2      Now, we know that the Advisors' employees were extracting

3  a lot of data off the system over the last week.  And whether

4  it was on thumb drives or direct transfers, we know that a lot

5  of data has been taken, which is fine.  We just don't -- we

6  don't know what else they might need and we're not in a

7  position to provide a full level of service to them at --

8  after today.

9  Q   Is the Debtor asking the Court to force the Advisors to

10  adopt any particular plan?

11  A   Not at all.  If they -- if their plan works, that's great.

12  If they went to a third-party service, some other fund --

13  outside fund advisors or shared service providers that can do

14  the job, that's fine.  We would like to just have the least

15  amount of burden on our estate going forward, and a

16  declaration that we have no responsibility to provide any

17  particular services, I think, is essential.

18  Q   And would the mandatory injunction that required the

19  Advisors to adopt and implement a transition services plan,

20  would that -- how does that advance the Debtor's goals?

21  A   Well, it sets forth exactly what the Advisors and the

22  funds think they need.  And if it's something other than that,

23  then they're going to have to come talk to us, and we'll

24  figure out whether we can provide it and then how it gets paid

25  for.

Seery - Cross                          68

1          MR. MORRIS:  Your Honor, I have no further questions

2     of Mr. Seery right now.

3          THE COURT:  All right.  Pass the witness.  Mr.

4     Rukavina?

5          MR. MORRIS:  Your Honor, may I just ask for a short

6     break?

7          THE COURT:  All right.  Does everyone need a break?

8          MR. RUKAVINA:  Your Honor, I won't -- Your Honor, I

9     won't have much for this witness, so I might suggest if Mr.

10    Morris can wait five or ten minutes.  But whatever is good for

11    the Court.

12         MR. MORRIS:  Go right ahead, sir.

13         THE COURT:  All right.

14         MR. MORRIS:  Thank you.

15         THE COURT:  Ten minutes.  If you take more than ten,

16    we're going to break.  Thank you.

17         MR. RUKAVINA:  Yes.

18                    CROSS-EXAMINATION

19    BY MR. RUKAVINA:

20    Q    Mr. Seery, very quickly, I just want to make sure that the

21    record here is complete.  You were discussing Option A and B

22    that was put on the table on Friday, and you were discussing

23    then how Option B was taken off.  Do you recall that?

24    A    Yes.

25    Q    And you did mention to the judge that Option A was that my

Seery - Cross                            69

1   clients would take all of the leasehold space, correct?

2   A    I don't think I mentioned that, no.

3   Q    Okay.  Well, I just want to make sure the judge

4   understands that Option A, my clients would have paid for a

5   hundred percent of the rent going forward.  Correct?

6   A    I don't believe that's how Option A worked, no.  I believe

7   that Option A was structured that, in essence, the Debtor

8   would get out and the shared -- the Advisors would keep all of

9   the space as well as all of the systems and all of the

10  records.

11  Q    Correct.  But the Advisors would pay a hundred percent --

12  okay.

13          MR. RUKAVINA:  Let's just pull up Exhibit 19, Mr.

14  Vasek, please.

15  BY MR. RUKAVINA:

16  q    And I just want the -- I just the record to be clear here,

17  Mr. Seery.

18          MR. RUKAVINA:  Mr. Vasek, are you there?  (Pause.)

19  And then scroll down to Page 5 of 7.  Okay.  Stop there.

20  BY MR. RUKAVINA:

21  Q    Mr. Seery, can you see this to refresh your memory?

22  A    Yes.  I didn't need it to be refreshed.  That's what I

23  said.

24  Q    Well, doesn't Option -- doesn't Option A here say NexPoint

25  parties take one hundred percent of the leased premises and

1   one hundred percent of the rental cost?

2   A    It does, but the key part of it is that the Debtor gets

3   out.

4   Q    I understand that.

5   A    It gives up control of that stuff.

6   Q    I understand that.  I was just trying to clarify for the

7   record, because you didn't mention it before, that NexPoint

8   would pay a hundred percent of the rent.  And I am correct

9   about that, right?

10  A    That's correct.

11  Q    Okay.  And Option B, you mentioned in your direct

12  testimony that in Option B my clients would pay no rent.  Do

13  you recall that?

14  A    Yes.

15  Q    But do you also recall that under Option B my clients

16  would vacate the premises?

17  A    I believe -- yes.  I think I said that, yes.

18  Q    Okay.  I believe you also mentioned that the Dondero

19  access issue was a last-second issue.  In fact, that had been

20  a lingering issue for weeks, had it not?

21  A    I don't believe so.  I don't think it came in until after

22  January 31st.

23  Q    Are you not aware that with each turn of the draft

24  agreement your lawyers would change it to make it clear that

25  Dondero couldn't have access while the Advisors' lawyers would

Seery - Cross                               71

1    change it to make clear that Dondero could have access?

2    A    I'm aware that those went on, but I believe that was after

3    January 31st.

4    Q    Okay.  I think I have very few questions, since Mr. Morris

5    really, I think, went over it in quite some detail.  Please

6    confirm for the Court that my clients' employees have vacated

7    the premises as of last Friday?

8    A    That's my understanding, but they still are accessing

9    services.

10   Q    Okay.  And please confirm for the Court that the Debtor

11   has not and will not provide any transition services after

12   last Friday, February 19th.

13   A    We actually have provided assistance, and certain of the

14   employees of the Debtor are doing things for the -- your

15   clients.

16        So, for example, trades were conducted yesterday by

17   clients of HCMLP for your clients.  Data was accessed by your

18   clients.  Equipment was taken from the office and used by your

19   clients.  The systems were maintained by the Debtor and

20   accessed by your clients.  It's a pretty extensive list.

21   Q    But that's because you have decided to allow that to

22   facilitate the transition, correct?

23   A    That's correct.

24   Q    Yeah.  You're not doing that because there's an agreement

25   in place; you're doing it out of good faith but not because

Seery - Cross                           72

1  there's any kind of requirement to do that, correct?

2  A    That's correct.

3  Q    Okay.  As of February 19th, the Debtor is no longer

4  required to provide any of the shared services, and it will

5  not, unless you on a one-by-one basis agree to permit it,

6  correct?

7  A    I haven't been doing it on a one-by-one basis.  We did it

8  on a blanket basis.

9  Q    Okay.  And as of the end of today, that's over, right?

10 A    I hope so.  We'll have an order that will give us the

11 declarations we desire and we can move forward.

12 Q    Well, let me clarify my question.  If the judge does not

13 enter a mandatory injunction, the Debtor has nevertheless told

14 the Advisors that any of the shared services are done as of

15 the end of the day, correct?

16 A    I don't believe that's the case.  We'll consult with our

17 counsel, both bankruptcy and regulatory.

18 Q    I think you mentioned this, but you can confirm for the

19 Court that some of the data held by the Debtor is actually the

20 property of the Advisors, correct?

21 A    I don't -- I don't know that it's the property of the

22 Advisors.  I think they're entitled to receive it, but we're

23 entitled to keep a copy.

24 Q    Okay.  Well, I'm not going to waste the Court's time by

25 reading the transition services agreement, but if that -- I'm

 1  sorry, the shared services agreement -- but if that agreement

 2  provides that my clients' data is its property, you wouldn't

 3  disagree with that, would you?

 4  A    No, I wouldn't --

 5          MR. MORRIS:  Objection.

 6          THE WITNESS:  If that's what it says, I wouldn't

 7  disagree with it.

 8  BY MR. RUKAVINA:

 9  Q    Okay.  And in fact, the Advisors have already copied a

10  large amount of data and have taken that copy for their own

11  use, correct?

12  A    That's what I've been advised.

13  Q    Okay.  And with respect to their own data, not the

14  Debtor's data, you will continue to, with reasonable access,

15  permit them to copy the balance of whatever their own data

16  remains, correct?

17  A    To the extent that we can, yes.

18  Q    Yeah.  Yeah.  Okay.  And just to confirm, other than the

19  employees that you determined will be retained by the

20  Reorganized Debtor, the remaining employees will be terminated

21  effective February 28th?

22  A    Not -- not all, no.  There's a -- there are some changes

23  to that.

24  Q    Okay.  Well, some employees are going to be terminated on

25  February 28th, correct?

Seery - Cross                           74

1  A    Yes.

2  Q    Okay.  And the Debtor doesn't have a problem with my

3  clients either directly or indirectly retaining those

4  employees, correct?

5  A    No problem at all.

6  Q    Okay.  Thank you.

7         MR. RUKAVINA:  Your Honor, I'll pass the witness.

8  Thank you.

9         THE COURT:  Any redirect?

10        MR. MORRIS:  I have no redirect, Your Honor.

11        THE COURT:  All right.  Thank you, Mr. Seery.

12     We'll take a ten-minute break.  It's 10:51 Central.  We'll

13  come back a minute or two after 11:00.

14        THE CLERK:  All rise.

15        MR. MORRIS:  Thank you, Your Honor.

16        MR. POMERANTZ:  Thank you, Your Honor.

17     (A recess ensued from 10:51 a.m. until 11:05 a.m.)

18        THE CLERK:  All rise.

19        THE COURT:  All right.  Please be seated.  All right.

20  We're back on the record in the Highland-Advisors matter.  Mr.

21  Morris, you may call your next witness.

22        MR. MORRIS:  Thank you, Your Honor.  The Debtor calls

23  (audio gap) Dondero.

24        THE COURT:  I'm sorry.  Did you say Mr. Dondero?

25        MR. MORRIS:  Yes.

75

1          THE COURT:  All right.  Mr. Dondero, could you speak

2     up?  Please say, "Testing, one, two" so we pick up your video.

3          MR. DONDERO:  Testing, one, two, three.

4       (Feedback.)

5          THE COURT:  All right.  Well, I heard you.  I don't

6     see the video yet.  There you are.  Okay.  We're going to hope

7     we've got some good audio.  I was hearing a little bit of

8     feedback.  Please raise your right hand.

9          MR. DONDERO:  Oops, I'm sorry.  I can't hear anybody.

10          THE COURT:  All right.  I need you to please raise

11     your right hand to be sworn in.  Well, this is a problem.  Mr.

12     Dondero, --

13          MR. DONDERO:  Take off the headphones?

14          MR. WILSON:  Judge, we're trying to get his

15     headphones to get the sound through them.  Should just be just

16     a second.

17       (Pause.)

18          THE COURT:  All right.  Do I need to be speaking to

19     see if they can hear me clearly?

20          A VOICE:  How's it going?

21          THE COURT:  All right.  What's going on?

22          MR. WILSON:  I can hear you, Judge.  We're just

23     working through a technical issue with Mr. Dondero's

24     headphones.

25          THE COURT:  All right.

Dondero - Direct                                76

1          MR. WILSON:  Hopefully we can resolve that

2     momentarily.  (Pause.)  We can try that.

3          (Pause.)

4          MR. WILSON:  Your Honor, we're going to move Mr.

5     Dondero to another room so that we can get this issue resolved

6     without the need for headphones.

7          (Pause.)

8          MR. DONDERO:  Testing, one, two, three.

9          THE COURT:  All right.  We got you.  Well, we've got

10    your sound.  Can you hear us okay, Mr. Dondero?

11         MR. DONDERO:  Yes.

12         THE COURT:  All right.  Please raise your right hand.

13         (The witness is sworn.)

14         THE COURT:  All right.  Mr. Morris, go ahead.

15         MR. MORRIS:  Thank you, Your Honor.  John Morris;

16    Pachulski, Stang, Ziehl & Jones; for the Debtor.

17             JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

18                       DIRECT EXAMINATION

19    BY MR. MORRIS:

20    Q    Can you hear me okay, Mr. Dondero?

21    A    Yes.

22    Q    Okay.  Just a few questions.  You were aware in November

23    that the Debtor had given notice of termination of the shared

24    services agreements with the Advisors, correct?

25    A    Yes.

Dondero - Direct                    77

1   Q    Okay.  And you understood that the Debtor was going to

2   terminate all shared services to the Advisors as of January

3   31, 2021, correct?

4   A    Yes.

5   Q    And were Dustin Norris and D.C. Sauter authorized by you

6   to try to negotiate with the Debtor the terms of a transition

7   services agreement?

8   A    Yes.

9   Q    And had the Debtor adopted a transition plan as of January

10  31, 2021 pursuant to which it would not need any services from

11  the Debtor?

12  A    I don't know.

13  Q    Okay.  You're not aware of the Advisors having a plan in

14  place as of the termination date that would have allowed the

15  Advisors to obtain back-office and middle-office services from

16  somebody other than the Debtor, correct?

17  A    I don't know.  They were always working on a Plan A and a

18  Plan B.

19  Q    Okay.  Are you -- did you become aware that the Debtor had

20  agreed to extend the termination deadline by a couple of

21  weeks?

22  A    Yes.

23  Q    And is it your understanding that that extension was

24  granted in order to give the Advisors more time to develop a

25  transition services plan?

Dondero - Direct                    78

1    A    I -- I think it was to continue negotiations.  I don't --

2    I don't know if the plan was part of the reason.

3    Q    Okay.  Did you learn at some point early last week that

4    the Debtor and the Advisors had reached an agreement on all

5    material terms of a transition services agreement but for your

6    access to the Debtor's offices?

7    A    Yes.  I believe over a thousand line items.

8    Q    Okay.  And did you learn that the Debtor had tendered a

9    term sheet that reflected the entirety of the parties'

10   agreement but for your access, with a demand that the

11   agreement get signed or the Debtor would commence a lawsuit?

12   A    I became aware of that Wednesday, in the middle of the ice

13   storm, middle of the day.

14   Q    Okay.  Let's pull up Exhibit 17 and see if I can refresh

15   your recollection as to the timing and the substance.

16          MR. MORRIS:  And if we could go to the bottom of the

17   email string.

18   BY MR. MORRIS:

19   Q    This is an email string between lawyers for the debtor

20   and the Advisors.  Do you see that there's an email from Mr.

21   Demo there dated Tuesday, February 16th?

22   A    Yes.

23   Q    Okay.  And the lawyers on this email from K&L Gates, those

24   were the lawyers who were representing the interests of the

25   Advisors; is that right?

Dondero - Direct                              79

1  A    Yes.

2  Q    And do you understand that Timothy Silva of WilmerHale and

3  my colleague, Mr. Demo, were representing the interests of the

4  Debtor?

5  A    Yes.

6  Q    And do you see in the first paragraph that Mr. Demo

7  informs Mr. Hogewood that the Debtor is prepared to sign the

8  attached term sheet, in the absence of which it would be

9  filing an adversary proceeding?

10 A    Yes.

11 Q    Okay.  And does that reflect your recollection that, in

12 fact, it was on Tuesday afternoon that the Debtor made the

13 demand to either sign the term sheet or there would be

14 litigation?

15 A    It doesn't change my testimony.  The first time I heard

16 about it was -- about a suit coming at 6:00 was on Wednesday.

17 Q    Okay.  Let's go up to the -- Mr. Hogewood's response.  Did

18 you learn that -- did you have any communications with anybody

19 on Tuesday about the possibility of the Debtor filing a

20 lawsuit?

21 A    No.

22 Q    Okay.  Can you go -- can you go to the email above?  Do

23 you see -- let me see if this refreshes your recollection.  Do

24 you see that Mr. Demo sent to Mr. Hogewood on Tuesday, just

25 before 5:00 p.m., drafts of the Debtor's adversary proceeding

Dondero - Direct                          80

1    papers?

2    A    Yeah, I've never -- except for I think you gave me these

3    emails yesterday, but until yesterday I've never seen these

4    emails before.

5    Q    So, so the lawyers who were representing the Advisors'

6    interests weren't keeping you informed last week about the

7    status of negotiations; is that your testimony?

8    A    Generally.  Again, I delegated it to Dustin and D.C. to

9    handle the details.

10   Q    Okay.

11            MR. MORRIS:  And scroll up to the -- to Mr.

12   Hogewood's response.

13   BY MR. MORRIS:

14   Q    Did you learn that Mr. Hogewood had asked for an extension

15   of the deadline from 6:00 p.m. to midnight at any time last

16   week?

17   A    No.

18            MR. MORRIS:  Let's go -- let's go -- let's go to Mr.

19   Silva's email, the next one up.

20   BY MR. MORRIS:

21   Q    Were you aware that the parties were negotiating and

22   trying to finish up the agreement last Tuesday as the Debtor's

23   deadline for filing a lawsuit was drawing near?

24   A    I knew they were in negotiations on Tuesday and Wednesday,

25   but I didn't know the deadline was growing near until

Dondero - Direct                         81

1   Wednesday.

2   Q    Did you learn -- did you learn what the open issue or open

3   issues were as of that time?

4   A    I believe there was only one open issue.  It was regarding

5   my occupancy.

6   Q    And what is your understanding of what the issue was as of

7   that time last week?

8   A    Since the beginning of the case, the Highland employees

9   have been told to work from home so that the estate didn't

10  have any COVID liability.  There hasn't been a Highland

11  employee in the office in a year except for occasional visits.

12  NexPoint employees have worked every day through COVID, full

13  staff every day.

14       With us taking over either a hundred percent or 75 percent

15  of the lease, and the supervisory leadership strategy that I

16  deserve, and on a regulatory basis have a responsibility to

17  provide for the RIAs, I needed to be in the office on a going-

18  forward basis.  And I believe grand efforts were made on the

19  part of Dustin and D.C. to create a wall for a section of the

20  office for the Highland employees -- who have never come in

21  for the last year, probably aren't coming in for the next year

22  -- but if they were to come in, they would have private egress

23  and ingress, and nobody else in the office, including myself,

24  would ever see them come and go.

25       And I know there were clear negotiating representations

Dondero - Direct                    82

1    made on their part, but there's never anything that I've been

2    accused of that's been in-person activity.  There have been a

3    couple texts, a couple emails, but nothing ever in-person.  So

4    the separation for employees who probably were never going to

5    come in the office, and as NexPoint was paying 75 or a hundred

6    percent of the lease, it made inordinate sense -- in fact, it

7    was only tenable -- if I was able to come in and provide

8    leadership and oversight to the (audio gap) Advisors.

9    Q   Did you testify last night that it was Judge Jernigan who

10   ordered the Debtor's employees to stay out of the office

11   because of COVID?

12   A   That's what I remember from early in the case, so that

13   there wouldn't be any COVID liabilities in the estate, but

14   that's why the Highland employees haven't been around for a

15   year.

16   Q   So it's your -- it's your memory that Highland employees

17   haven't been around for a year and that the reason for that is

18   because Judge Jernigan issued an order telling them to stay

19   out of the office because of the COVID risk; is that right?

20   A   That's -- that was my recollection.

21   Q   Okay.  You haven't been in the office in the calendar year

22   2021 except for the day that you went to give your deposition

23   early in January; is that right?

24   A   Yes.

25   Q   And have the Advisors functioned, notwithstanding your

Dondero - Direct                          83

1  absence from the office?

2  A    Yes.

3  Q    Okay.  And in fact, at the end of the day, notwithstanding

4  everything you just said, is it fair to say that the only

5  issue that you're aware of that separated the Debtor and the

6  Advisors as of last Wednesday was your access to the offices?

7  A    I believe that's the case.

8          MR. MORRIS:  And can we just scroll up a little bit

9  to Mr. Hogewood's -- the next email on the next page?  Yeah.

10  Right there.

11  BY MR. MORRIS:

12  Q    In fact, that's -- to put a fine point on it, the

13  Advisors' lawyer says specifically is keeping Jim Dondero away

14  from the office worth losing out on the financial advantages?

15  Is that the position that the Advisors took at that time?

16  A    Again, I've never seen these emails before and I'm not

17  aware of the specific back-and-forth negotiations.

18  Q    Okay.  But that's consistent with your understanding, that

19  the only issue that was outstanding as of that moment in time,

20  the only material issue, was your access to the office.

21  Right?

22  A    As of that moment in time, yes.

23  Q    And otherwise, the Advisors, but for your desire to have

24  access, the Advisors would have had a fully-negotiated

25  complete transition services agreement with the Debtor and

Dondero - Direct                                84

1   there would have been no lawsuit, fair?

2   A    I believe, yeah, I believe that's largely what -- the

3   status at that point.

4   Q    Okay.  And so -- and so, because you weren't given access,

5   the Advisors didn't agree to the proposal that was otherwise

6   acceptable, correct?

7   A    Yes.

8   Q    Okay.  And did you lose interest in the negotiations after

9   the Debtor made it clear that they wouldn't provide access to

10  you?

11  A    Lose interest?  Yeah, but I mean, the two parallel paths

12  for discretion I had given Dustin and D.C. to work on was

13  either complete the negotiated settlement that really would

14  have been, I think, the best transition for everybody and a

15  win-win for everybody, but if not, be prepared for us to go it

16  alone or the Advisors to be able to go it alone and operate

17  without Highland and without being in the space.

18  Q    And did you give that instruction last Thursday after the

19  -- after the Debtor refused to give you access?

20  A    Yeah.  They knew that that -- those were -- those were the

21  only two -- the only two -- the only two that I had approved.

22  They were the only two directions I had approved.

23  Q    Are you aware that on Friday -- withdrawn.  On Friday, the

24  lawyers at K&L Gates made a proposal to the Debtor that

25  contained two options; is that correct?

Dondero - Direct                    85

1    A    Yes.

2         MR. MORRIS:  Can we please put up on the screen

3    Exhibit #19, please?  And if we could go to the bottom.

4    BY MR. MORRIS:

5    Q    Mr. Hogewood wrote to my colleague, Mr. Demo, just before

6    noon on Friday, February 19th.  Do you see that?

7    A    Yes.

8    Q    And this -- Mr. Hogewood presented two options.  You were

9    -- were you aware on Friday morning that Mr. Hogewood was

10   going to be presenting two options?

11   A    I was generally aware, which I think is what I testified

12   to in my depo yesterday, that D.C. and Dustin were

13   enthusiastically trying to come up with a settlement.  They

14   believed it was close enough to try and get something done,

15   and they were going to work, you know, an A and a B, but

16   consistent with my direction that there was really only two

17   alternatives, but they were still optimistic, because, besides

18   it being a win-win for everybody, it would be less risk and

19   less work for the Advisors if something like the original

20   transaction could get done.

21   Q    Okay.  Do you see --

22         MR. MORRIS:  If we could take a look at Option B.

23   BY MR. MORRIS:

24   Q    Option B, as written by Mr. Hogewood, would have had the

25   Debtor assume the entire lease and have NexPoint vacate at the

Dondero - Direct                          86

1   end of the month.  Do you see that?

2   A    Yes.

3   Q    And that's an offer that was made by Mr. Hogewood on

4   behalf of the Advisors on Friday just around noontime; is that

5   fair?

6   A    I believe so.

7   Q    Okay.  Do you know --

8           MR. MORRIS:  Can we scroll up, please?

9   BY MR. MORRIS:

10  Q    And Mr. Demo responds just a few moments later by saying

11  that he would discuss the options, right?

12  A    Yes.

13  Q    Okay.  And then the very next moment, if you scroll to the

14  next one, Mr. Hogewood actually informs Mr. Demo that he had

15  been informed, "There may be an edit needed to Option B, so I

16  need to pull that back momentarily."  Do you see that?

17  A    Yes.

18  Q    Do you know what edit was being considered by the Advisors

19  early in the afternoon on Friday?

20  A    No.

21  Q    Okay.

22          MR. MORRIS:  Let's scroll up to the next email,

23  please.

24  BY MR. MORRIS:

25  Q    And Mr. Demo just responds and he says, "Understood."

Dondero - Direct                              87

1  Fair?

2  A    (garbled)

3  Q    Let's -- okay.  And then the next email from Mr. Hogewood

4  says, "I am authorized to put Option B back on the table as

5  stated below.  Both A and B are on the table for your

6  consideration."  Do you see that?

7  A    Yes.

8  Q    Do you believe that Mr. Hogewood was acting without

9  authority when he made that statement to the Debtor?

10 A    I don't know.

11 Q    Did you ever ask Mr. Sauter or Mr. Norris whether Mr.

12 Hogewood was acting outside the scope of his authority when he

13 made this offer?

14 A    No.

15         MR. MORRIS:  Can we scroll up to the email -- the

16 next email, please?

17 BY MR. MORRIS:

18 Q    Do you see that Mr. Silva on behalf of the Debtor was

19 looking for a time to discuss?

20 A    Yes.

21 Q    And then if we go to the next email in this string,

22 they're asking for dial-in.  Did you learn early in the

23 afternoon on Friday that the Debtor had accepted Option B as

24 presented by Mr. Hogewood on behalf of the Advisors?

25 A    I -- I don't know when I became aware of that.

Dondero - Direct                          88

1  Q    Did you learn --

2         MR. MORRIS:  Let's go ahead and take this down and go

3  to the next exhibit, please.  And start at the bottom.

4  BY MR. MORRIS:

5  Q    Do you see that Mr. Hogewood is writing to my colleagues

6  again, and in the middle paragraph he says, "As you know, the

7  term sheet preserves everyone's rights on various claims and

8  other litigation, and Davor suggested it would be appropriate

9  to track that language in the body of the agreed settlement

10 order in addition to attaching the term sheet to the order"?

11     Were you aware early Friday afternoon that the lawyers for

12 the parties were discussing the form of an agreed settlement

13 order that would embody the Option B approach?

14 A    No.

15 Q    Do you see in the next paragraph there's a question as to

16 whether John is preparing the order or an offer for the K&L

17 Gates firm to take that on?  Do you see that?

18 A    Yes.

19 Q    Were you aware that the law firm representing the Advisors

20 that you own and control were offering to prepare a settlement

21 offer -- a settlement order that would include the Option B

22 approach that had been accepted by the Debtor?

23 A    Nope.  I wasn't involved in any of these details, nor had

24 I seen any of these emails.

25 Q    Okay.  Let's go to the next email and see if you know

Dondero - Direct                                    89

1    anything about the facts or the assertions in that email.  Do

2    you see Mr. Demo responds, and at the end of his first

3    sentence, there is enough -- there's a reference to having

4    enough room on the wires.  Do you see that?

5    A    Yes.

6    Q    Are you aware -- were you aware on Friday afternoon that

7    the lawyers for the Advisors that you own and control and the

8    lawyers for the Debtor were having discussions about how to

9    timely effectuate a wire transfer?

10   A    No.

11          MR. MORRIS:  Can we go up to the 3:33 p.m. email?

12   BY MR. MORRIS:

13   Q    And just to move this along, did you learn that the

14   parties -- that lawyers for the parties were expecting to go

15   through the final draft of the document?

16   A    No.

17   Q    Were you aware that the lawyers representing the entities

18   that you own and control wanted more time to be able to do

19   that?

20   A    I wasn't involved in this at all.

21   Q    Okay.

22          MR. MORRIS:  Can we scroll up to the email at 3:43

23   p.m.?

24   BY MR. MORRIS:

25   Q    And do you see where Mr. Hogewood informs Mr. Demo that he

Dondero - Direct                                90

1    needs to push the call further because he is "having trouble
2    connecting with someone to be sure they are in a position to
3    review."  Do you see that?
4    A    Yes.
5    Q    Was Mr. Hogewood trying to reach you on the afternoon of
6    February 19th in order to make sure you had the opportunity to
7    review the term sheet that was about to be signed?
8    A    I don't know.
9    Q    Do you see, if you scroll up, Mr. Demo asks Mr. Hogewood
10   if he needs a little bit more time?
11   A    Yes.
12   Q    And then, finally, the last email in this deck, do you see
13   at 4:15 Mr. Hogewood says to Mr. Demo, "We should cancel this
14   call and I should just call you and John."  Do you see that?
15   A    Yes.
16   Q    And that's because the Advisors pulled Option B that the
17   Debtor had agreed to; is that right?
18   A    Yes.
19   Q    And it's your testimony that you had nothing to do with
20   that decision; is that right?
21   A    No.  It -- no.  I didn't say that.  Once I became fully
22   aware of what A and B were, I had no interest in A or B, and I
23   pointed the team back to the conversations we had had on
24   Wednesday regarding either it's the win-win scenario for
25   everybody and continuity and the office and me being in the

Dondero - Direct                                91

1    office or it's a -- it's a divorce.  And -- but I didn't have

2    an interest in A or B.

3    Q    And yet it is fair to say, though, that the Advisors'

4    outside counsel and the Debtor's counsel spent the whole day

5    on Friday pursuing Options A and B, including preparing

6    settlement orders and for wire transfers, right?

7    A    They'd been working tirelessly Wednesday, Thursday,

8    Friday, Saturday, Sunday, trying to strike a deal, trying to

9    be reasonable, but to no avail.  I think now it's --

10   everybody's comfortable with the divorce and being out of the

11   office.

12   Q    Did -- do you know whether the Advisors made any proposals

13   to the Debtor over the weekend for an *a la carte* menu of

14   services that might be considered?

15   A    Yes.  I believe -- yes.

16   Q    Okay.  Does the Debtor -- withdrawn.  Do the Advisors have

17   a plan pursuant to which it will obtain all of the back-office

18   and middle-office services that it needs that were previously

19   provided by the Debtor in order to fully perform under the

20   advisory agreements with the funds?

21   A    I believe they have a plan.

22   Q    And is that plan sufficient to enable the Advisors to

23   fully perform their services under the advisory agreements

24   with the funds?

25   A    I believe so.  The major gating item, which I think

**Appx. 02388**

Dondero - Direct                          92

1   changed over the weekend, was the historic data for the funds
2   was being held hostage, and I think over the weekend, for the
3   first time, it was agreed that the funds could have their
4   historic data that they were entitled to.  And I think that
5   improved the quality of their alternative plans.
6   Q   Does the -- do the Advisors need anything from the Debtor
7   today?
8   A   I believe very little, if nothing.  They just need data
9   and information and software that they're entitled to that
10  they've paid for, paid for in full over the years.
11  Q   And does the -- do the Advisors have a plan in place to
12  obtain that information that it contends it's entitled to?
13  A   I don't have the specific -- specifics.  Dustin is your
14  person there.
15  Q   Do you personally believe that the Debtor had the right to
16  terminate the shared services agreement as of last Friday?
17          MR. RUKAVINA:  Your Honor, I'll object to that
18  question as that calls for a legal conclusion.  And I will
19  note for the record that we are not trying today their
20  declaratory action Count One, and we do not consent to that
21  being tried.
22          THE COURT:  Okay.  I overrule.  He can answer if he
23  has an answer.
24          THE WITNESS:  I don't know.
25  BY MR. MORRIS:

Dondero - Direct                                93

1    Q    Do you believe that there is anything defective about the
2    termination notices that you testified being aware to as of
3    last November 30th?
4    A    I don't know.
5    Q    Do you have any reason to believe that those termination
6    notices are unenforceable?
7    A    I don't know.
8    Q    Do you have any reason to believe that the Debtor has any
9    continuing obligation to the Advisors following last Friday,
10   after last Friday?
11   A    I do believe there's an overall industry standard practice
12   in terms of transitioning.  I do think there's a
13   responsibility of all parties to do things in a regulatorily-
14   compliant way.  So I do believe that that overrides and
15   supersedes some of this contract dancing.
16   Q    How much -- what regulatory regime are you referring to?
17   A    The SEC.
18   Q    Are you aware of any particular rule that would require
19   the Debtor to provide services of any kind to the Advisors
20   after the termination of the shared services agreements?
21   A    No.  I'm going based on experience.
22   Q    Okay.  So you don't have anything specific in mind; is
23   that fair?
24   A    I have specific historic experience --
25   Q    All right.  I'm asking you --

Dondero - Direct                          94

1    A    -- of the --

2    Q    I'm sorry.

3    A    And then, I mean, I do have in mind, you know, based on

4    our historic experience, like when we moved from State Street

5    to SCI, I think it took nine months longer than anybody

6    expected, and there wasn't a hard break in anybody's

7    activities or attitudes toward each other.  It was -- it

8    delayed for issues that were -- some were beyond everybody's

9    control, some of them were faults of the different parties,

10   but in no case did anybody try and cause damage or allow

11   damage to happen to regulated funds.

12   Q    How long is the Debtor, in your view, how long is the

13   Debtor obligated to make the data available to the Advisors?

14   How long does this obligation stay in effect?

15   A    I don't have a specific timeline.  I did hear Seery say a

16   few minutes ago that you would give it all and they would just

17   keep a copy.  I think to the extent that that happened, that

18   cures quite a bit of it.  But, again, the data had been held

19   hostage as a negotiating point up until this weekend.

20   Q    Hmm.  Have the Advisors made arrangements to make the copy

21   of the data that you just referred to?

22   A    I don't know.

23   Q    Do you know if there is a monetary amount that the Debtor

24   is required to incur in order to continue to maintain the data

25   until the Advisors can get a copy?

Dondero - Direct                              95

1  A   I don't know, but I -- I don't believe it's material at
2  all.
3  Q   Okay.  Have you done any analysis to -- if you don't know
4  how long it's going to take to get the copy, how do you know
5  how much it's going to cost to maintain the copy until it's
6  retrieved?
7  A   I don't, but large files up on the cloud in general are
8  not that complicated to move around.
9  Q   But it's your view, as the owner and controller of the
10 Advisors, that the Debtor has a continuing obligation,
11 notwithstanding the termination of the shared services
12 agreement, to maintain the data for some indefinite period of
13 time until the Advisors obtain a copy.  Is that right?
14 A   I'm saying there needs to be reasonable business
15 transition in these circumstances.  And I don't -- I don't --
16 I'm not the systems person, I don't know the details, but I
17 know the costs are minimal.  The monthly storage charge and --
18 what, is the Debtor going to delete everything to save $100 of
19 storage charge on the cloud to intentionally harm investors?
20 I mean, that's -- that's an alternative, but none of that
21 makes any sense to me.
22 Q   Let me ask you this.  Under the shared -- under the
23 transition services agreement that was fully negotiated as of
24 last Tuesday or Wednesday, but for your access, was the whole
25 issue of data access addressed in that document?

Dondero - Direct                                96

1   A    I don't know.  I assume so.

2   Q    Okay.  And do you also assume that the data issue would

3   have been fully and completely addressed under the Option B

4   that the Debtor accepted on Friday afternoon?

5   A    I have no idea what was in Option -- I mean, I have no

6   idea what was in Option B regarding the data.

7   Q    Okay.

8            MR. MORRIS:  Your Honor, I have nothing further.

9            THE COURT:  All right.  Pass the witness.  Mr.

10  Wilson?

11           MR. RUKAVINA:  I think, actually, Your Honor, he's my

12  witness on this one, since we're the Defendants.

13           THE COURT:  Oh, I'm sorry.  He's in Mr. Wilson's

14  office.  I got confused.  Go ahead, Mr. Rukavina.

15           MR. RUKAVINA:  No problem.  No problem.

16      Mr. Vasek, if you'll please pull up Debtor Exhibit 2, and

17  if you'll please go to Section 6.02.  Well, make it so we can

18  see 6.03 as well.

19                      CROSS-EXAMINATION

20  BY MR. RUKAVINA:

21  Q    Okay.  Mr. Dondero, can you hear me?

22  A    Yes.

23  Q    Mr. Morris was asking you about data and return of data.

24  I'd like for you to read with me Section 6.02, the second

25  half, where it starts, "For the avoidance of doubt."  Can you

Dondero - Cross                            97

1   see that, sir?

2   A    Yes.

3   Q    (reading)  "For the avoidance of doubt, all books and

4   records kept and maintained by Service Provider on behalf of

5   Recipient shall be the property of Recipient, and Service

6   Provider will surrender promptly to Recipient any such books

7   or records upon Recipient's request."  And then there's a

8   parenthetical about retaining a copy.  Do you see that, sir?

9   A    Yes.

10  Q    Did I read that correctly?

11  A    Yes.

12  Q    Okay.  And Service Provider here is the Debtor, and

13  Recipient is one of the Advisors, correct?

14  A    Yes.

15  Q    Okay.  And now let's quickly read Section 6.03.  (reading)

16  "Upon expiration or termination of this agreement, Service

17  Provider will be obligated to return to Recipient as soon as

18  is reasonably practicable any equipment or other property or

19  material of Recipient that is in Service Provider's control or

20  possession."  Did I read that correctly?

21  A    Yes.

22  Q    Okay.  And are the Advisors relying on these provisions

23  when you mentioned in response to Mr. Morris that the Debtor

24  had some obligation to provide them their own data?

25  A    Yes.  I -- again, I'm not involved in the details or the

Dondero - Cross                                98

1    specifics, but that's a very standard clause you'd expect to

2    see in a service agreement, and I'm -- in some form or

3    fashion, I'm sure D.C. and Dustin are aware of that and have

4    negotiated accordingly.

5    Q    Well, let's talk about that briefly.  Mr. Morris asked you

6    several questions with respect to the negotiations in the last

7    few weeks on the transition services agreement and with

8    respect to the weekend's events, to which you responded that

9    you don't know the answer.  Do you recall those questions

10   generally?

11   A    Yes.

12   Q    And is that because you delegated those decisions to both

13   D.C. and Dustin and outside counsel, or is that because you're

14   incompetent?

15   A    I've found that I am mischaracterized whenever I talk to

16   Seery directly or deal with things directly, and there's too

17   much of an intent in this case to make this personalized about

18   me.  And there was over a thousand line items to negotiate.

19   Dustin and D.C. are very capable executives.  And again, to

20   avoid mischaracterization and personalization of this stuff, I

21   let them handle it.

22   Q    Okay.  And you were also asked by Mr. Morris about the

23   Advisors' current backup plan or divorce plan, whatever we

24   want to call it, and you didn't know some of those answers.

25   Is that also because you delegated that to Mr. Norris, Dustin

1  Norris?

2  A    Yes.

3  Q    Okay.  It's not because you don't take an interest in it;

4  it's because you delegated it to someone that you just called

5  a very capable executive, correct?

6  A    Yes.

7  Q    Okay.  And Mr. Morris asked you about certain events of

8  last Tuesday and Wednesday.  What was going on, sir, here in

9  North Texas last Tuesday and Wednesday?

10 A    Well, it was the ice storm.  I couldn't get in touch with

11 my lawyers on Wednesday, including yourself, you know, and

12 people didn't have electricity, they didn't have coverage.

13 Q    Is it fair to say, sir, --

14 A    I couldn't --

15 Q    Is it fair to say, sir, just to speed this up, that last

16 Tuesday, Wednesday, and Thursday, the Advisors and you and

17 outside counsel, primarily me, were having a very hard time

18 getting in touch, and in fact, we really couldn't get in

19 touch?

20        MR. MORRIS:  Objection to the form of the question.

21 I mean, if Mr. Rukavina wants to testify, he's welcome to do

22 that, but I think he's leading.

23        THE COURT:  I'll overrule.

24        THE WITNESS:  The answer is yes.  The world wasn't

25 functioning --

Dondero - Cross                          100

```
 1   BY MR. RUKAVINA:
 2   Q    Okay.
 3   A    -- in Dallas, Texas, or in my legal ecosystem.
 4   Q    Is it possible that, as a result of that, certain
 5   miscommunications between all of us took place?
 6   Misunderstandings?
 7   A    Lack of --
 8   Q    Misunderstandings?
 9   A    Yeah.  A lack of communication, period.
10   Q    And Mr. Morris discussed your physical presence on the
11   premises.  In fact, other than that one time that was
12   mentioned when you went to the office for the deposition, you
13   have not been at NexPoint or the other Advisor's corporate
14   offices for almost two months now; is that correct?
15   A    Correct.
16   Q    Has that caused disruption to the business of the
17   Advisors?
18   A    It's definitely affected the efficiency.  And again, I
19   don't think it's compliant on a long-term basis for a
20   registered investment advisor to not have its oversight
21   employees, you know, or oversight most senior employee on
22   staff.
23   Q    Thank you, Mr. Dondero.
24        MR. RUKAVINA:  Your Honor, I'll pass the witness.
25        THE COURT:  All right.  Mr. Morris?
```

1                        REDIRECT EXAMINATION
2    BY MR. MORRIS:
3    Q    Sir, notwithstanding last week's weather, you knew that
4    the lawyers for both the Advisors and the Debtor had reached
5    an agreement on every single material term except for your
6    access to the office, correct?
7    A    Yes.
8    Q    The weather doesn't change anything about that, right?
9    A    Correct.
10   Q    And the only reason that the Advisors refused to sign the
11   agreement and this lawsuit was commenced is because you
12   personally would not reach an agreement that didn't allow you
13   into the offices, correct?
14   A    I mean, yes, largely.
15   Q    Okay.
16        MR. MORRIS:  No further questions, Your Honor.
17        THE COURT:  Any --
18        MR. RUKAVINA:  Isn't it --
19        THE COURT:  -- recross?
20        MR. RUKAVINA:  Thank you, Your Honor.
21                        RECROSS-EXAMINATION
22   BY MR. RUKAVINA:
23   Q    Isn't it also true, Mr. Dondero, that the same can be said
24   about Mr. Seery, that the only reason why the Debtor didn't
25   enter into that agreement was because he would not permit you

Dondero - Recross                    102

1  to be on the premises for the next couple of years?

2  A    Yes.

3           MR. RUKAVINA:  Thank you, Your Honor.

4           THE COURT:  All right.  That concludes Mr. Dondero's

5  testimony for now.

6      Mr. Morris, any more witnesses?

7           MR. MORRIS:  No, Your Honor.  The Debtor rests.

8           THE COURT:  All right.  Mr. Rukavina, you may call

9  your first witness.

10          MR. RUKAVINA:  Your Honor, just to give you a heads

11 up, I'm probably going to have an hour, hour and a half with

12 Mr. Norris.  So I don't know what the Court's plan is for

13 working through lunch or not, but I'll just give you that so

14 that you can make the appropriate decision.

15          THE COURT:  All right.  Well, I would like to go

16 ahead and get started and get some of that accomplished before

17 lunch.  My situation is I'm hoping to get an update, but I

18 have another 1:30 matter that I think is going to be very,

19 very short, but I'm waiting to -- you know, my courtroom

20 deputy was going to reach out to the lawyers involved in that

21 matter.  So my point is I may have to break from this for a

22 few minutes at 1:30, so I'd like to time our lunch break so

23 that it occurs a little bit before 1:30.  I think that'll make

24 this easier.

25      So let's go ahead and get started.  You wanted to call Mr.

Norris - Direct                               103

1    Norris?

2           MR. RUKAVINA:  Yes, Your Honor.  Dustin with a D,

3    Norris.

4           THE COURT:  All right.  Dustin Norris, would you

5    please say, "Testing, one, two"?

6           MR. NORRIS:  Testing, one, two.

7           THE COURT:  All right.

8           MR. NORRIS:  Testing, one, two.

9           THE COURT:  I hear you loud and clear.  I'm not

10   seeing you yet.  Oh, there you are.  Okay.  Please raise your

11   right hand.

12          MR. NORRIS:  Hello.

13       (The witness is sworn.)

14          THE COURT:  All right.  Thank you.  Mr. Rukavina?

15            DUSTIN NORRIS, DEFENDANT'S WITNESS, SWORN

16                       DIRECT EXAMINATION

17   BY MR. RUKAVINA:

18   Q   Mr. Norris, can you hear me?

19   A   Yes, I can.

20   Q   Okay.  Are you able to close the blinds behind you or

21   somehow make that room a little darker?

22   A   Let me reposition.  Is that better?

23   Q   Yes, thank you.  For the record, sir, what is your name?

24   A   Dustin Norris.

25   Q   And what is your educational background?

Appx. 02400

Norris - Direct                           104

 1  A    I have a bachelor's and master's degree in accounting from
 2  Brigham Young University.
 3  Q    Okay.  Do you hold any professional licenses or
 4  certifications?
 5  A    Yes.  CPA license, as well as FINRA License Series 7, 63,
 6  and 24.
 7  Q    Have you ever been disciplined by any regulatory body with
 8  respect to your licenses?
 9  A    No.
10  Q    Have you ever had a crime, even a speeding ticket?
11  A    No, never -- never had a crime.  Not even a speeding
12  ticket.  For the record, I did get pulled over for not coming
13  to a complete stop at a stop sign, but was dismissed through
14  defensive driving.  This is actually my first experience or
15  interaction with a court other than the same interaction with
16  the Court in December of last year.
17  Q    Have you ever had your honesty or integrity challenged or
18  questioned?
19  A    No, I haven't.
20  Q    Okay.  And are you familiar with the two Advisors who are
21  my clients here today?
22  A    I am.
23  Q    And how are you or why are you familiar with them?
24  A    So, I am the executive vice president of each Advisor.
25  Q    Okay.

Norris - Direct                                    105

1   A    And --

2   Q    Go ahead.

3   A    I've been working for the Advisors since 2012.

4   Q    So you have been employed by the Advisors since 2012?

5   A    That's correct.

6   Q    Okay.  And what does your role as executive vice president

7   entail?

8   A    So, I oversee the marketing, sales, distribution, business

9   development for our investment products, private placements,

10  registered products, the funds that we've -- been talked about

11  in this, this hearing.

12  Q    Okay.  And who do you report to?

13  A    To Mr. Dondero.

14  Q    Okay.  And briefly, for the record, what is the business

15  of these two Advisors that are Defendants today?

16  A    Yeah.  So, they primarily provide investment advice and

17  management of various investment vehicles.  That's private

18  investment vehicles, it's public investment vehicles,

19  publicly-registered closed-end funds, REITs, BDC, ETFs, and

20  mutual funds.

21  Q    Can you give the judge an estimate of the order of

22  magnitude of all of the underlying investments managed or

23  advised through all these vehicles that you mentioned?

24  A    It's several billion dollars under management for NexPoint

25  and Highland Capital Management Fund Advisors.

Norris - Direct                              106

1    Q    And is Mr. Dondero the fund manager, the guy in charge for

2    all those investments?

3    A    Most of them, yes.

4    Q    Okay.  And do you understand yourself to be a fiduciary?

5    A    I do, both to the funds and to our Advisors.

6    Q    Okay.  What do you mean, the funds?  And in particular,

7    what -- what are the retail funds that Mr. Seery talked about

8    earlier?

9    A    Yeah.  So, we have a number of publicly-registered mutual

10   funds, closed-end funds, and ETF.  And those are, as Mr. Seery

11   pointed out, available to anyone that really wants to buy

12   them, anybody that has a brokerage account or the ability to

13   buy them through a financial advisor.  And so those are the

14   funds that I'm talking about.  Primarily, they're 1940 Act--

15   registered mutual funds and closed-end funds.

16   Q    Do any of those funds have their own boards?

17   A    Yes.  All of the '40 Act funds have their own board.  It's

18   an independent board of trustees.

19   Q    What do you mean by an independent board of trustees?

20   A    Yeah.  So the majority of the board members are

21   independent, and it's actually a -- 75 percent of the board

22   members are independent trustees, as defined by the rules and

23   regulations of the SEC.  And so they actually hire us as the

24   advisor.  On an annual basis, they review our advisory

25   agreements.  And they control the day-to-day operation -- not

Norris - Direct                              107

1   the daily operations, but control the oversight of those

2   funds.  And on an annual basis, they renew or choose not to

3   renew our advisory agreements.

4       And so it is an independent process and an independent

5   board.  And each one of them have independent legal counsel as

6   well that advises them on all matters that they incur,

7   including everything we're talking about today.

8   Q   Who is that independent legal counsel, if you know?

9   A   Yeah.  Blank Rome is the name of the law firm, and Stacy

10  Louizos is the partner that represents them.

11  Q   Does Mr. Dondero sit now, or since this bankruptcy case

12  was filed, has he sat on any of these independent boards?

13  A   He has not, no.

14  Q   Okay.  For these funds with independent boards, are you

15  also any kind of employee or officer of them?

16  A   Yeah.  So, the funds themselves don't have individual

17  employees.  They have officers that oversee the operations.

18  And I am executive vice president of each of the funds.

19  Q   Okay.  And as the executive vice president of each of

20  those funds, who do you report to?

21  A   So, I regularly report to the board on matters pertaining

22  to the funds.  I'm the liaison between the funds and the board

23  on a number of matters.  So I've been attending board meetings

24  since December 2012 for these funds.

25  Q   Okay.  Have those boards met and had meetings in the last

Norris - Direct                    108

1   couple of months regarding the shared services agreements and
2   any transition thereof?
3   A    Extensive meetings.  They've held eight meetings since the
4   beginning of the year, board meetings.  And those weren't just
5   short.  Some of them were very long.  Last year, there were 24
6   recorded board meetings, and a number of conversations in
7   between, a number of discussions with their legal counsel, a
8   number of discussions with the chairman of the board.  So it's
9   -- they've been extensively involved through the process.
10           MR. MORRIS:  Your Honor, I move to strike the hearsay
11  that we're hearing here about discussions that the boards had
12  with other folks.  If Mr. Norris has personal knowledge,
13  that's one thing, but I think he's gone well beyond that.
14           THE COURT:  Okay.  Response, Mr. Rukavina?
15           MR. RUKAVINA:  I'm not sure what testimony Mr. Morris
16  is talking about, third-party testimony.  I think the witness
17  just said that the board has met many, many times to discuss
18  the issues that are up for today.
19           THE COURT:  Okay.
20           MR. MORRIS:  And I think to the extent that the
21  witness participated in such meetings, that's fine, he can
22  specifically testify about that, but I don't think he should
23  be otherwise testifying about what other people did who aren't
24  here today to testify as to their own personal conduct.
25           THE COURT:  Okay.  Okay.

Norris - Direct                                    109

1          MR. RUKAVINA:  I can rephrase the question, Your

2    Honor.

3          THE COURT:  I sustain.  Rephrase.

4    BY MR. RUKAVINA:

5    Q    Have you personally participated in meetings of those

6    boards, Mr. Norris, at which those boards and you discussed

7    the transition services agreement potentially being negotiated

8    with the Debtor and the shared services agreements that were

9    being terminated by the Debtor?

10   A    Yes.  I participated in eight board meetings this year.

11   There's been five of them in February alone.  And there were

12   24 board meetings last year, and I was a participant in each

13   one of those meetings.

14   Q    Okay.  And did you advise those boards at some point in

15   time about the termination of the shared services agreements?

16   A    Yes, we did.

17   Q    When did you start advising those boards that that was

18   something that may happen or that has actually been noticed as

19   happening?

20   A    So, throughout the fall last year, I think the expectation

21   was that there would be a -- I mean, obviously, there had been

22   a plan filed with the Court.  That was discussed with the

23   board.  Mr. Seery testified that he joined the board meetings

24   in the fall and in the summer and talked about those.  The

25   discussions were around the transition of services.  There was

1   discussion about a new company.  And so the discussions were

2   ongoing.

3       When the filing actually -- from when the filing actually

4   happened, that was ongoing, of how would we be able to

5   continue the services.  And so, from the beginning, those were

6   discussions that were had.

7       We did notify the board when the termination occurred.  As

8   well, we had a board meeting, a one-and-a-half day board

9   meeting on December -- I think the dates were December 10th

10  and 11th -- where the termination was discussed in detail.

11  Q    Now, obviously, the Debtor sent notices of termination of

12  these shared services agreements in late November.  You're

13  obviously familiar with that, right?

14  A    Correct.

15  Q    Separate and apart from the Debtor's decision to terminate

16  these agreements, were you and the Advisors considering

17  terminating these agreements?

18  A    We were.  We had discussion --

19  Q    Let me ask -- let me ask the next question.  I appreciate

20  you answering, but let me -- let me do my job.  When were the

21  Advisors considering making such a move, and why?

22  A    This was in the October-November time frame of last fall,

23  as the -- particularly around the services we had been

24  receiving related to the shared services agreement and the

25  payroll reimbursement agreements.  We didn't think that the

Norris - Direct                          111

1   service was fulsome, we didn't think we were getting the

2   service that was under the agreements, and the service had

3   dropped off.

4        And in particular, the -- there was -- there were

5   conflicts involved between the Debtor and between the service

6   providers, particularly legal and compliance services, given

7   all that was going on.  And there were a number of matters

8   they couldn't participate on.  Historically used their legal

9   and compliance services significantly.

10       And that, in addition to discovering that there were a

11  number of employees we were reimbursing for in payroll

12  reimbursement agreements that were no longer employed by the

13  Debtor, yet we were paying for the full services.

14       So, with that, we had discussions internally about if and

15  when or how we could terminate them, and --

16  Q    Let me stop you.

17  A    -- termination --

18  Q    Let me stop you.  Ultimately, I take it, the Advisors

19  never tried to terminate these shared services agreements,

20  correct?

21  A    That's correct.

22  Q    Why?

23  A    There was an order specifically that Jim or anybody

24  related to Jim could not terminate an agreement with the

25  Debtor.  And he specifically pointed that out to us when we

Norris - Direct                     112

 1  discussed this, and so we knew we couldn't take action.  There
 2  was also -- counsel discussed that the stay with the Court --
 3  Q   Let's not -- let's not talk about counsel.  Let's not talk
 4  about counsel, --
 5  A   Sorry.
 6  Q   -- Mr. Norris.  Okay.  But the point is, at least as of
 7  last October, would you agree, that the notion that these
 8  agreements would be terminated by one or the other parties was
 9  known to you?
10  A   Yeah.  So, the -- we expected that at some point there
11  would need to be a termination.  I -- that was discussed.  And
12  there was a plan, and I'm sure we'll talk about it, but a plan
13  to transition the employees and the services to a new company
14  and to new service providers.  And I think both sides had been
15  working for quite a while to ensure there was a smooth
16  transition, and we expected that to happen.  But there would
17  need to be a termination of that agreement -- either a
18  transfer of that agreement or a termination to a new company
19  that would be providing new services, or transferred those
20  services directly to us.
21  Q   So I'd like you to pick what word you'd like to use, but
22  what I've called a backup plan in my objection or what Jim
23  called a divorce plan in his testimony, how -- what shall we
24  call this backup plan?
25  A   All-contingency plannings.  Or we'll call it backup plan.

Norris - Direct                          113

1  Q    Okay.

2  A    I think that works.

3  Q    So is it fair to conclude that since at least last

4  October, the Advisors have known about the possibility of

5  having to do a backup plan?

6  A    Yeah.  And I think even before then we knew there was a

7  possibility.  But the plan, the strong Plan A of everything

8  that had been communicated to us by the Debtor and their

9  employees was that the intent was to transfer all those

10 services to a new company, with the same individuals providing

11 the same services.  There was no significant indication to us

12 that that would be any different.

13      Yet we still had then begun planning, well, what if,

14 right, Plan B was implemented or began many months ago and in

15 recent weeks, in recent months, it's been expedited to be able

16 to ensure that we have a solid Plan B.  But yes, it's been

17 ongoing for months.

18 Q    So if there is an implication or allegation made that the

19 Advisors were negligent with respect to transitioning from the

20 shared services agreements because they didn't start taking it

21 seriously last August or September, would you agree or

22 disagree with that allegation?

23 A    I would disagree, because there were assurances or

24 discussions that made it very clear that everybody was working

25 together towards a Plan A.  Yet we were still discussing -- I

Norris - Direct                              114

1  know Mr. Seery mentioned he's a Boy Scout.  I agree in that.
2  Be prepared.  I'm an Eagle Scout.  And so we have been
3  preparing, but the preparations weren't needed in the manner
4  that we thought they were needed until in the last month,
5  right, and -- because everything was moving in the right
6  direction for a clean transition plan, and even up until last
7  week.
8      However, the last month and a half we've had to prepare in
9  earnest for Plan B, and that involved a tremendous amount of
10 effort.  And I'm happy to go into that now.  But yes, there's
11 -- there has been -- we have 80 employees across our Advisors,
12 and almost every single one of them have been involved in Plan
13 B, and a group of about 18 of us for several weeks, planning,
14 game-planning, and thinking through all the contingency plans.
15 Q   Well, let's round off the discussion about these boards.
16 Did you make the boards aware since last fall and into this
17 year about both the ideal plan, which was, I guess, you know,
18 an agreement with the Debtor, but also a backup plan, in case?
19 A   Yeah.  So, in -- in August, --
20 Q   When --
21 A   -- when the Court -- oh, sorry, yeah.
22 Q   No, no.  Well, go ahead.
23 A   Go ahead.
24 Q   I was going to ask you how and when, but you -- you -- go
25 ahead.

Norris - Direct                                115

1   A    Yeah.  Yeah.  So, up until August, there was, I think, a

2   view that there would be a negotiation, a negotiation reached.

3   Things had been pushing along.  We know that in August there

4   was a plan filed with the Court.  And Mr. Seery even joined

5   our board meeting.  And so in that meeting he discussed with

6   us, as well as the legal team of the Debtor, discussed with us

7   the Plan B at that point, which was defined with the Court.

8   That the goal and objective was a grand bargain, as he

9   explained it, and that he -- that was the Plan A.  But even

10  under either plan, there would be a transition of services.

11  He joined again, I believe, one or two more times, to

12  additional board calls that fall.  There was mediation we were

13  aware of and had discussed with the board to help resolve some

14  of these items.

15      And so, you know, just in the same time frame Mr. Seery

16  shared earlier, it corresponded with those discussions that we

17  were having.

18      In addition, D.C. Sauter and other individuals at our

19  firm, as well as individuals from the Debtor, were working

20  throughout the fall and into the winter on the various

21  discussions on transition.  And so that's --

22  Q    Did you hear Mr. Dondero testify about over a thousand

23  line items?

24  A    Yeah, I did.

25  Q    Do you know what -- what is he referring to, do you know?

Norris - Direct                              116

1  A    So, within the transition services agreement, there --
2  there's about 11 or 12 pages in an exhibit that are a number
3  of agreements.  That's -- that's the remaining agreements that
4  we've agreed that are needed.  He may have had a little
5  hyperbole in his thousand, but there is -- there were -- there
6  was at least a thousand points of discussion that had to be
7  resolved.  Most of them were minor, right, and we came to a
8  quick agreement on most of those, and there was only a handful
9  of things that needed to be resolved.  And because of that, I
10  felt comfortable and confident, particularly from the middle
11  of January on, where I became much more involved, that there
12  would be an orderly agreement on those points.
13  Q   Did you tell the boards that the Debtor would enter into
14  the agreement that had been negotiated only on the condition
15  that Mr. Dondero not be permitted to be on the premises?
16  A    Sorry.  You said the Debtor would enter into or -- oh,
17  that he wouldn't be permitted onto the premises?
18  Q    Well, we'll go more -- we'll go in detail later, but I
19  want to round off the board discussion here.  Obviously, you
20  heard from Mr. Seery and in my paper that we had an agreement
21  done except for one issue, right?
22  A    Yes.  Yes.
23  Q    And that issue was whether Mr. Dondero would be on the
24  premises or not, right?
25  A    Yes.

Norris - Direct                    117

1  Q    Did you discuss that with the board, that issue?

2  A    We did.  We --

3  Q    And did you get any instructions from the board that have

4  led you to do anything other than you've actually done?

5  A    No.  No, we -- they -- the board, as I mentioned, we've

6  had eight board meetings this year discussing in detail our

7  backup planning.  They understood the Jim access issue and

8  they felt comfortable with our backup planning.  But also, you

9  know, our view, and I think that they shared that, that he

10 should have access --

11 Q    Well, let's stop there.  Let's stop there.  Let's stop

12 there.  I'll ask -- I'll ask more of those questions later.  I

13 don't -- I don't want to invite Mr. Morris's objections here

14 based on you talking outside the scope --

15 A    Yeah.

16 Q    -- of my question.  Let's move on now to the shared

17 services agreements themselves.  You heard Mr. Seery's

18 characterization of them from a top level.  Would you agree

19 with his characterization, or how would you characterize what

20 the shared services agreements actually did?

21 A    Yeah.  I think he called them middle- and back-office

22 services.  I think, to add a little bit more to that, it's IT

23 services, including the systems and computers that we all use.

24 It's HR.  It is accounting and back-office services, many of

25 those for our advisors and some of them for our funds.  We do

Norris - Direct                          118

1   outsource a number of accounting functions to other service

2   providers, and have for years, and they provide an oversight

3   function for the accounting and the books and records for our

4   funds.   They also provide tax services and things like that

5   for our advisors and funds.

6   Q    Now, in --

7   A    And as well legal and compliance services.  Legal and

8   compliance services as well.

9   Q    In our exhibits that have been admitted are two employee

10  or payroll reimbursement agreements.  We don't have to go

11  through those in detail, but you're -- are you aware of those

12  agreements?

13  A    I am, yes.  And I would add that -- and those are in

14  addition to the services that are provided under the shared

15  services agreement.  Those are front-office or investment

16  services.

17  Q    Okay.  Now, did there come a time when a dispute arose

18  between the Debtor and the Advisors as to how much an amount

19  was owing by the Advisors to the Debtor under the shared

20  services agreement?

21  A    That's correct.

22  Q    What was the basis of that dispute?

23  A    Yeah.  So, in particular, as I mentioned earlier, certain

24  of the services we believe we are no longer receiving.  Many

25  of those related to legal and compliance.  We've had to shift

Norris - Direct                          119

1   a lot of those responsibilities in-house and to outside

2   counsel.

3       And particularly related to the payroll reimbursement

4   agreements, we hadn't realized that we were overpaying for

5   employees that -- and again, they're payroll reimbursement

6   agreements for employees that are dual-hat employees, dual

7   employees of the Debtor and our Advisors, providing investment

8   services.  And there's a list or exhibit that shows the number

9   -- the actual employees with their names and the allocations

10  of their time.  And so two-thirds of those employees, when we

11  realized or saw the list or received the list on the exhibit

12  in the agreement, which was around the end of November or

13  early December, two-thirds of them are no longer employed by

14  the Debtor.  And we continue -- and they continue to bill us

15  based on historical averages, not based on the actual amounts.

16      So we inquired of that, we asked for email --

17  Q   Let me -- let me pause you.

18  A   Oh, sorry.

19  Q   Let me pause you.

20  A   Yeah.

21  Q   Let me pause you.  So, during the negotiations with the

22  Debtor in December, January, and February, did you ask for any

23  kind of clarification or reconciliation of these amounts?

24  A   Yeah.  So, on multiple occasions, we asked for the detail

25  of what they were invoicing us for, and then, in particular,

Norris - Direct                    120

1    in late January and again a couple times in February, I asked

2    multiple employees for reconciliation.  Two reconciliations.

3    One was a reconciliation of the employees that they were

4    charging under the expense -- I'm sorry -- payroll

5    reimbursement agreement, to the actual amounts that they

6    charged us, and then separately I asked for a reconciliation

7    of amounts billed to us under the shared services agreement to

8    what they actually incurred on their end.

9        And the rationale for the latter was because the expense

10   reimbursement -- or, sorry, the shared services agreement for

11   Highland Capital Management Fund Advisors is actually a cost

12   plus a margin of five percent.  So they are to charge us what

13   their costs are plus a margin of five percent, yet they

14   continue to bill us the same amounts based on historical

15   averages.

16       And so the amounts in dispute were particularly in the

17   last few months, where those amounts hadn't changed and where

18   we raised this concern.

19   Q   Did you get a response or a reconciliation from the Debtor

20   on these overpayment issues?

21   A   No.

22   Q   Okay.  Now, when did you become -- well, you heard Mr.

23   Dondero say that he delegated the primary responsibility for a

24   transition of services to you, correct?

25   A   Yes.

Norris - Direct                                 121

1  Q    When was that?

2  A    Yeah.  So, January -- in mid-January, I became very

3  involved.  I had less of authorization prior to that.  I was

4  involved in some of the negotiations on contracts and things

5  like that in early December.  Had a meeting with Debtor

6  employees on that, and that they had been working on for

7  months, along with Mr. Sauter.  Mr. Sauter had taken more of

8  an active role prior, in December and October and even

9  September, and before -- before all that.

10       So, in January, mid-January, they actually came to me on

11  January 12th with permission from Mr. Seery to interact

12  directly with me and to negotiate the additional terms of the

13  transition with me.  And Jim authorized me at that time to

14  move forward.

15  Q    Okay.  Did you discuss with Mr. Seery whether you would be

16  permitted to talk to Debtor employees as part of this?

17  A    So, I did not talk to Mr. Seery, but I talked to J.P.

18  Sevilla, Brian Collins, David Klos, and Frank Waterhouse, who

19  they had told me explicitly that Mr. Seery had authorized them

20  to negotiate with me.

21  Q    Okay.  Was there some impediment prior to that

22  authorization to being able to discuss Newco issues with the

23  Debtor's employees?

24  A    So, there were a number of things.  And as this Court is

25  very well aware, that three weeks prior to that, there were a

Norris - Direct                                  122

1   number of events.  There was a TRO for Mr. Dondero and our

2   Advisors, there was a preliminary injunction for Mr. Dondero,

3   and there were claims of interference.  And we took a very

4   cautious approach and didn't want to interfere in any manner.

5   And so in these regards, and in many, I mean, everyone was

6   very cautious.  And so those were -- those were steps that it

7   was challenging.

8       In addition, I should note that Mr. Scott Ellington was

9   helping the Debtor and negotiating this transition agreement

10  before he was let go in early January.

11      And so with all those events, we had to take a more

12  cautious approach to communication.

13  Q   Okay.  And approximately when did Mr. -- did the Debtor,

14  to your satisfaction, authorize direct interaction with the

15  employees so that you could negotiate a more fulsome

16  agreement?

17  A   Yeah.  It was when they called me on January 12th --

18  Q   Okay.  And is it fair to say --

19  A   -- and notified me of that.

20  Q   Is it fair to say that that's the date when the

21  negotiations really got going?

22  A   Absolutely, yes.  Yeah.

23  Q   Okay.  Did you ever ask the Debtor for a draft agreement

24  or term sheet or whatever you want to call it as far as a

25  transition of services would be?

Norris - Direct                                    123

1    A    I did, on multiple occasions.

2    Q    When did you finally receive one?

3    A    So, it was on January 28th, which was the last business

4    day of the shared services agreement term.  Sorry, January

5    29th, a Friday.  And January 12th, we engaged, as I mentioned.

6    We came to quick resolution on various items.  And we began

7    asking for a term sheet.  I actually asked them whether they

8    -- who they wanted to draft it, their counsel or our counsel.

9    They checked with their counsel.  I thought it was a good idea

10   and agreed that it was a good idea for their counsel to draft

11   it, because, as they put it, this was their baby for many

12   months.  They had -- because the Debtor employees and DSI,

13   their consultants, had been very involved, in taking 15 months

14   to that point, in figuring out what contracts were needed,

15   analyzing what needed on a --

16   Q    Let me stop you.

17   A    -- go-forward basis --

18   Q    Let me stop you, --

19   A    Yeah.

20   Q    -- Mr. Norris.  The point being, it was agreed between you

21   and the Debtor that the Debtor would take the first stab at a

22   term sheet, and you received that on or about January 29th of

23   this year?

24   A    Correct.

25   Q    Okay.  Now, obviously, the Debtor extended the

Norris - Direct                               124

1    termination, first to February the 14th, and then, second, to

2    February 19.  Correct?

3    A    That is correct.

4    Q    Okay.  Did the Advisors pay the Debtor for those delays,

5    pay cash money to the Debtor for those delays?

6    A    We did.  And we -- yes, we did.

7    Q    Okay.  And without belaboring the point or taking any more

8    time than necessary, the numbers that I have in my objection

9    are that, for the first extension, we paid --

10   A    I believe it was around $560,000.

11   Q    Thank you.  Thank you.  And for the second extension, do

12   you recall?

13   A    Around two hundred -- just over $200,000.

14   Q    Okay.  Why were those extensions necessary?

15   A    They were necessary for multiple reasons, but it was

16   necessary to get a transition agreement completed, and that

17   was our goal and intent.  It was also necessary to protect our

18   funds and our investors, to have a smooth transition.  But

19   primarily, we were in a great spot until -- up until January

20   29th, we hadn't received a term sheet.  So we couldn't

21   negotiate a term sheet that was pages long, with schedules

22   that were 10 or 15 pages long, in a day, and so we asked, in

23   good faith, can we have an extension?  And they also were

24   agreeable to that, and it made sense for all parties.

25        Prior to that receiving the term sheet, though, there were

Norris - Direct                              125

1    concerns that we would lose those services.  They threatened

2    to pull those services.  However, at the end, all parties

3    agreed.

4        And then the extension, the second extension was needed in

5    order to continue those -- those agreements, negotiations as

6    well, as they had pushed the termination date of the employees

7    from the anticipated January 31st to January 19th, and so we

8    asked that they moved the termination date of the shared

9    services in line with the termination of the employees,

10   because our understanding was those employees would be

11   transitioning to a new company providing those same services.

12   Q    Okay.  Maybe I misunderstood something because of the

13   video nature of this, but you mentioned something like pushing

14   the termination of the employees from January 30th to January

15   19th.  Just for the record to be clear, because, again, I

16   might have misunderstood or misheard, but when was the Debtor

17   going to terminate nonessential employees originally and up to

18   what date was that pushed?

19   A    Yeah.  So our understanding is they were going to

20   terminate them on the 31st of January.  They did end up

21   receiving termination notices that said January 19th.  And so

22   that was pushed from what our understanding was, but that was

23   the first time I believe the employees received termination

24   notices for the 19th.  Thereafter, after we negotiated an

25   extension of our shared services agreement one more week

Norris - Direct                                    126

1    before the 14th, to the 19th, the very next day they extended

2    the termination dates to the 28th for all employees, which

3    would extend it one week beyond the negotiated termination

4    date for the shared services agreement.

5    Q    Well, here's my fundamental question.  To your knowledge,

6    was that the Debtor's separate business decision as to when to

7    terminate employees or did you request that the Debtor extend

8    it to February 28th?

9    A    That was their separate business decision.  Um, --

10   Q    That's fine.

11   A    That was -- that was their separate business decision to

12   extend it.  We didn't even anticipate them extending it --

13   Q    I just want the record to --

14   A    (overspoken)

15   Q    I just want the -- I just want the record to be clear, Mr.

16   Norris.  Let me direct you, please.

17   A    Yes.

18   Q    That that decision to extend the employee termination was

19   not at our request?

20   A    Correct.

21   Q    Now, let's talk about these negotiations a little bit.  To

22   go back to this agreement that we had other than the Dondero

23   access issue as of last Tuesday, you agree that there was an

24   agreement other than the Dondero access issue as of last

25   Tuesday, right?

Norris - Direct                              127

1  A    Yes, that's correct.

2  Q    Okay.  How, if at all, was the amount of money that we

3  owed to the Debtor issue resolved between you and your

4  counterparts at the Debtor?

5  A    Yeah.  So, they, at the end of January, demanded that --

6  and this was the first time that I was aware of the extent of

7  the amounts or that they were going to include payment of

8  past-due or disputed amounts as part of this agreement.  That

9  came in on, I believe, January 27th.  And they demanded we pay

10 it or they would cut off all shared services effective Friday,

11 the 29th.  And that included our access to the -- to our

12 websites, our domains, our emails.  It would include access to

13 the office.  And so that was a major item.

14      They demanded five point -- approximately $5.2 million in

15 payments from our Advisors and a number of other entities.

16 And so, as part of that, that was a -- that was a problem,

17 because we can't speak for the other entities.

18      In addition, now we were commingling a financial dispute

19 with the peaceful transition of services.  And so that was

20 resolved.  We agreed with the Debtor and ultimately agreed

21 that, okay, we would pay these disputed amounts as part of

22 this, reserving our rights for any additional -- any

23 additional argument of that for another time, but we would

24 agree to pay our portion, which is approximately $3 million,

25 our disputed portion of what they were billing, with $1

Norris - Direct                     128

1   million up front.  They wanted it all up front, but they were

2   willing to allow us to pay $1 million up front and the

3   remainder over 14 months.

4   Q   Okay.  Going back to this agreement save the one issue,

5   how was the employee issue resolved?

6   A   Yeah.  So, the employee issue was an important one, and it

7   had been.  These employees had been working hard providing

8   service for our funds and advisors for a very long time.  The

9   plan all along was to transition them, as Mr. Seery said, to a

10  new entity.  It would either by controlled by Mr. Dondero or

11  by the employees themselves.

12      And so we needed -- we need those services, right, in the

13  long run.  And so that was resolved in that there would be a

14  new company formed, which we've been calling Newco.  It would

15  be employee-owned.  Initially, would be providing services

16  exclusively to our Advisors, but then would have the ability

17  to go out and provide the same services to other companies.

18  And so we found that as -- from the beginning a great

19  solution.  And the principals of what would become Newco have

20  been interfacing with us and with Mr. Dondero regarding the

21  combination of those services.

22      So, as part of this agreement, the services would

23  transition directly to Newco, with the same people providing

24  the same services in the same seats.

25  Q   Okay.  What about -- just so that the record is clear,

Norris - Direct                                    129

1  there's a large corporate office over at Crescent Court here

2  in Uptown Dallas, right?

3  A    That's correct.

4  Q    And the lease, obviously, just to speed things up, the

5  lease is in the name of the Debtor, but for many years

6  NexPoint and other employees have been on premises, correct?

7  A    Yes.  We've been there since they opened the space.  I

8  believe it was February 2012 when we moved there.  Maybe

9  February 2011.  But our Advisors have been there in that space

10 since then.

11 Q    Okay.  So how was the future of this lease and resulting

12 lease payments resolved as part of this tentative agreement as

13 of last Tuesday?

14 A    Yeah.  So, it was a 75/25 split, where the Debtor would

15 pay 25 percent and we would pay 75 percent for the remaining

16 lease term, which was approximately 14 months.

17 Q    And approximately how much would our 75 percent over 14

18 months have amounted to?

19 A    I believe that's approximately one -- between $1-1/2 and

20 $2 million.

21 Q    Okay.  Now, we'll talk about this in some detail later,

22 but there are certain third-party software and information

23 providers -- Bloomberg, for example -- that the Debtor uses

24 that we have access to under the agreements but that the

25 Debtor must pay the third parties for, correct?

Norris - Direct                                    130

1           MR. MORRIS:  Your Honor, I just object.  Again, if

2     Mr. Rukavina wants to testify -- this is not a question.  This

3     is testimony.

4           MR. RUKAVINA:  Your Honor, --

5           MR. MORRIS:  I mean, there's no foundation.  There's

6     nothing.

7           THE COURT:  Sustained.

8           MR. RUKAVINA:  Okay.  Very well.

9     BY MR. RUKAVINA:

10    Q    Mr. Norris, does the Debtor -- or, did the Debtor provide,

11    pursuant to shared services agreements, access to third-party

12    software platforms?

13    A    Yes.  They did.  There was a number of agreements --

14    Q    Stop.  Stop.

15    A    -- that were --

16    Q    Stop.  Stop.  Stop.  Were these some of the things that

17    you were negotiating with the Debtor as you were negotiating

18    that transition of services?

19    A    Yes.

20    Q    Name a few of the most important of these third-party

21    service providers that you were negotiating with the Debtor.

22    A    Yeah.  Bloomberg, particularly the order management system

23    of Bloomberg.  Oracle, which is an accounting system, to name

24    a few.  Those were the most important ones.

25    Q    Describe with some more specificity, please, what the

Norris - Direct                         131

1    order management system is.  OMS.

2    A    Yeah.  An order management system is an operating system

3    that allows you to trade various funds and asset classes all

4    through one system.  And so we have a number of funds, we have

5    a number of asset classes we trade, which include loans,

6    bonds, and equities.  And so trading all of that through a

7    system that then sorts it, allocates it, and does it all in an

8    efficient manner -- in addition, it incorporates various rules

9    and metrics for trading and efficiency -- so it's very

10   customized, it's very customized for the rules related to our

11   funds, very customized for the rules related to what we trade

12   for our Advisors, and it's been used primarily by the traders

13   from our Advisors or employed by our Advisors.

14       So that's what the OMS is.  And it's Bloomberg that has

15   the software, and it's been customized directly with

16   Bloomberg.

17   Q    Okay.  Did you come to an agreement with the Debtor as to

18   how the future costs or license fees for these platforms and

19   services would be allocated between the Debtor and the

20   Advisors?

21   A    We did.  It would be, for most of them, which is

22   approximately a hundred contracts, is about -- is a 60/40

23   allocation.  We would pay 60 percent and they would pay 40

24   percent.  There are some of them that they said they didn't

25   use that we agreed we would pay a hundred percent of.  But

Norris - Direct                           132

1    most of them are a 60/40 split.

2    Q    Okay.  And did you calculate approximately how much in

3    payments pursuant to that formula we would make, the Advisors

4    would make in the future under the draft agreement?

5    A    Yeah.  So, it is approximately $240,000 per month,

6    inclusive of the lease.  So, exclusive of the lease, it was

7    about $120,000 per month.

8        In addition, there were one-time payments for annual

9    payments, which I think was around $200,000 or $300,000.

10       So it is a -- it's a couple million dollars over the life

11   of the contract.

12   Q    Okay.  And to fast forward to last Tuesday, the one issue

13   that had not been resolved was Mr. Dondero's physical presence

14   on the premises, correct?

15   A    That's right.  That's right.

16   Q    Was this a last-second issue or had this been discussed

17   for some time?

18   A    No, it wasn't a last-second issue.  We actually included

19   it in our first multiple drafts or responses to their term

20   sheet.  We got the term sheet on the 29th of January and it

21   did not include any specifics around Mr. Dondero's access, but

22   we added that in early drafts of the term sheet and it was

23   removed by their counsel and reinserted in the -- I know there

24   was discussion between counsel on various aspects of it.  It

25   was removed from what was their final version, and maybe even

Norris - Direct                                    133

1    the draft before that, but it was added in by us again as --

2    for all the reasons we mentioned before.  We thought it needed

3    to be stated explicitly in the agreement.  And the attorneys

4    had discussed that it could be handled --

5    Q    Let's not talk about -- yeah, let's not talk about the

6    attorney discussions.

7    A    Okay.

8    Q    You heard Mr. Seery say that the Debtor refused to permit

9    Mr. Dondero onto the premises and you heard him say why.  Did

10   the Advisors offer any compromise on this access issue?

11   A    We did.

12   Q    What was that offer?

13   A    So, we offered to -- and in all this, it's thinking, what

14   are the employees from the Debtor that are going to be using

15   this?  We haven't even really received a good understanding of

16   who that is.

17        However, we offered to take approximately 25 percent of

18   the office.  And there is a clear area where we could build a

19   wall.  They could have their own separate access, their own

20   separate restrooms, their own separate entrance, where they

21   wouldn't have any involvement or connection to us.  And so we

22   also offered with that, whenever you need access to the other

23   portion, let us know.  We can even have Jim Dondero leave, if

24   you're concerned.

25        And so that was one option.  We could build a wall.  And

Norris - Direct                              134

1   we even put that in the written agreement.  We will build a

2   wall at our expense.  That was the -- that was the -- what our

3   offer was.

4   Q    How did the Debtor respond to that offer?

5   A    They removed it from the agreement and they told us that

6   we had until 6:00 p.m. to sign their agreement with no Dondero

7   access or they would file a lawsuit.

8   Q    And this was last Tuesday?

9   A    This was Tuesday.

10  Q    Okay.  Were you able to respond by their deadline, which

11  they -- then they later moved to midnight of that same day?

12  A    I'm not sure if there was a response.  It was handled

13  between attorneys.  Our counsel.  I had -- just as Mr. Dondero

14  stated, I had rolling blackouts in my home from 2:00 a.m. on

15  Monday until Thursday.  I -- I and D.C. were aware of the

16  offer, as was our counsel, and I believe there was a -- and I

17  believe there was a response from our counsel in time, but I'm

18  not -- I wasn't certain at the time.  I knew that, as well,

19  there was an extension, but I didn't find out until the next

20  day because I did not have power.

21  Q    And ultimately, the Debtor either rejected that last offer

22  or let the offer expire by not accepting it.  It doesn't

23  matter which.  But is that accurate?

24            MR. MORRIS:  Objection to the form --

25            THE WITNESS:  Yes.

Norris - Direct                          135

1              MR. MORRIS:  -- of the question.

2              MR. RUKAVINA:  Your Honor, I'll ask it a different

3    way.

4              THE COURT:  Sustained.

5              MR. RUKAVINA:  I'll ask it a different way.

6    BY MR. RUKAVINA:

7    Q    Did the Advisors accept the Debtor's last offer made on

8    Tuesday of last week, the one you just referenced?

9    A    No.

10   Q    Why?

11   A    As explained, I think, clearly by Mr. Dondero as well, it

12   did not have the provisions that we thought necessary.  And

13   when you think about this, we were going to be required to pay

14   significant dollars for an office space where our president

15   and principal was not permitted.

16        We had an option to go other -- elsewhere, right?  Here,

17   we're in a separation experience.  This agreement that they

18   had, they had told us early on it was fill-or-kill.  They told

19   us early on that it was not *a la carte*.  When we pushed them

20   on that a couple weeks later, they said, well, the only thing

21   that's not negotiable is the office, right?  If you want

22   everything else, you've got to have the office.  That was in a

23   discussion with various attorneys on the phone.

24        And so, with this, we knew this was a kind of take-it-or-

25   leave-it offer, and we could have gone elsewhere.  And we had

Norris - Direct                          136

1   already been preparing, in the event that we couldn't have a

2   deal, to go elsewhere.  And so, with that, if they were not

3   going to permit -- which we thought was very reasonable,

4   specifically with all of the additions, you know, the

5   consideration -- sorry, my battery is about to die on my

6   computer.  I'm plugging in the charger here.

7        So, with all of those considerations, we couldn't sign

8   that deal, especially as -- without that key access.

9   Q    You personally, Dustin Norris, now, personally, as an

10  officer and a fiduciary, did you think that it was appropriate

11  or inappropriate that Mr. Dondero be allowed on the premises

12  in the future?

13  A    I thought it would be appropriate for him to be there.

14  Q    Why?

15  A    So, I've been working for Mr. Dondero for a long time.  I

16  know the way he operates, and I know that the way that he

17  manages his organization, which is a complex organization, he

18  needs to be there in person.  We haven't been in the office

19  because of a -- a disregard for COVID.  We are an essential

20  business, and we have been, as a financial services business.

21  But the way we operate is very in-person, and that's how Jim

22  operates.

23       In addition, I've never heard of a situation where the

24  principal or the control person of a company -- there's no

25  question that Mr. Dondero controls the organization -- cannot

Norris - Direct                           137

1  be there in person.

2      And so, from that perspective, given and knowing all of

3  our other plans, given the ability for many people to

4  relocate, given the abundance of office space elsewhere, if we

5  were forced to accept an agreement that did not allow Mr.

6  Dondero for the next 14 months to be there in person, it was

7  -- it was going to be a challenge for us from a business

8  perspective.

9  Q    Do customers or investors or prospective customers and

10 investors come to the offices historically to meet with the

11 Advisors and their personnel?

12 A    Pre-COVID, yes.  Regularly.

13 Q    Okay.  Would Mr. Dondero participate in those meetings?

14 A    He would, yes.

15 Q    Were you concerned that him being unable to participate in

16 those meetings would affect future business and profitability?

17 A    Yeah.  I think if you look at this -- key investors come

18 in and see this big cavernous open office and ask why the

19 manager of the funds is not even allowed to be in your office,

20 you know, or is that impacting the way you operate, then yes,

21 I think he needs to interact with people that are coming

22 through the office.

23 Q    He has not been in the office since about the beginning of

24 this year; is that correct?

25 A    Correct.

Norris - Direct                          138

1    Q    Do you feel like that has caused any harm or disruption to
2    the Advisors' business?
3    A    Yeah.  I don't know that I would characterize it as harm,
4    but it has been disruption, right?  I'm -- the way that we
5    operate, having Jim there, being able to have consistent,
6    regular meetings in person, which for me were multiple times
7    per day on a regular basis, and many others, it was
8    disruptive.  Being able to reach him, how to reach him.  Do I
9    need to get in my car and drive to another location where he's
10   at, which I did on many occasions.  We typically get people
11   together very quickly in groups:  Let's go talk to Jim.  And
12   that becomes a challenge to get things done quickly and in an
13   efficient manner.
14        So it has been a disruption, and it's not something that
15   we would desire to do, if we had the choice, for another 14
16   months.
17   Q    Okay.  Now let's talk about the backup plan, please.  I
18   guess let's start with:  What is our backup plan?  Well, let
19   me start with this.
20   A    Yeah.
21   Q    Do we have a backup plan?
22   A    And I think the key now, instead of calling it a backup
23   plan, is an operating plan.
24   Q    Okay.
25   A    For --

Norris - Direct                                139

1  Q    Do --

2  A    -- several weeks, --

3  Q    Let me -- let me -- that's a very good point.  Prior to a

4  few days ago, did we have a backup plan in place for what we

5  would do if we were not able to enter into a transition

6  services agreement with the Debtor?

7  A    We did, yes.  And --

8  Q    Since when -- let me -- let me direct you.  Let me direct

9  you.  Since when did we have that backup plan?

10  A    Yeah.  So, the backup plan -- the backup plan began many

11  months ago, but as I mentioned earlier, it began in earnest in

12  the end of January, right?  And over the last month

13  especially, we've been putting in place all of the required

14  systems and processes and procedures in order to continue

15  doing all the duties under our advisory agreements.  And that

16  includes all of the services that are provided for the Debtor

17  -- by the Debtor.

18      And our backup plan, a big part of that included the

19  transition, and it still includes the transition of those

20  employees to Newco.  We are in active negotiations and believe

21  that Newco, once those employees are terminated on the 28th,

22  they will be able to perform their same duties on March 1st of

23  this year.

24      And so we expect those services to happen.  In the

25  interim, we've prepared for and have contingency plans in

1   place in order to do all that we need to do.  We have systems

2   and servers that are set up in an SEC-compliant manner.  We

3   are operating on a new email system.  We have our files --

4   Q    Let's go --

5   A    -- that are essential.

6   Q    Let's go step by step here so that the judge --

7   A    Yeah.

8   Q    -- has a very clear picture of what all is involved.  So

9   I'm going to try to break it down.  I think both you and Mr.

10  Seery talked about back-office and middle-office services.

11  What are those?  What does that refer to in the industry?

12  A    Yeah.  So, back-office -- back-office and middle-office

13  includes HR, IT.  Accounting is a big part of that back-office

14  services.  And in regards to our funds, it is the oversight of

15  the accounting process on a day-to-day basis and on a monthly

16  and quarterly basis, for annual reports, for audits.  It's the

17  day-to-day valuation services that are provided to our funds.

18  And so those are the key functions.  It's legal and compliance

19  as well --

20  Q    So let's --

21  A    -- the Debtor has been providing for our funds.

22  Q    Let's go step by step.  So let's assume that I'm -- I want

23  to invest in your fund.  In a retail fund, pardon me.  Am I

24  able to pop up daily or almost instant information regarding

25  its assets, its valuations, et cetera?

Norris - Direct                    141

1   A    Yes.  So, most of our --

2   Q    Is that -- is that --

3   A    -- funds --

4   Q    Is that part of what you were just describing about

5   valuation and accounting services on a real-time basis?

6   A    Yes, it's part.  It's more of the oversight function.

7   Q    Okay.

8   A    We outsource the daily processing and NAV-striking, or the

9   actual accounting, day-to-day accounting, to an outside third

10  party called SEI.  And the Debtor had provided oversight

11  function as well as valuation services for that daily

12  accounting process.

13  Q    Okay.  So the Debtor, for accounting, wasn't actually

14  crunching the numbers every day; it'll -- supervising third

15  parties.  And that's been the historical norm, correct?

16  A    That's correct.  I actually --

17  Q    Now, let's --

18  A    -- years ago filled that function.

19  Q    Okay.  So let's -- so how are we, the Advisors, today,

20  compensating for the lack of the Debtor's back-office and

21  middle-office services, or how are we transitioning from that

22  today?

23  A    Yeah.  So, a key part of that is the transition to Newco,

24  right, and as well that is planned for next week.  However, in

25  the interim, we have very good plans and processes in place.

**Appx. 02438**

Norris - Direct                    142

1    We have -- on the accounting front, on a day-to-day basis, we

2    have added our key personnel, our accounting teams, which has

3    been actually bulked up in recent years.  We have a number of

4    publicly-traded REITS that have SOX-compliant processes and

5    procedures.

6        And the CFO of our real estate platform, Brian Mitts, used

7    to be the principal financial officer of all of these funds.

8    He continues to be and operates as the principal financial

9    officer for one of them, or had been throughout all of this

10   time, and is a participant in all of the board meetings and

11   regular valuation processes.  In addition, he has a team of

12   accountants.

13       And so they are now copied on all the day-to-day

14   accounting emails from our third-party providers.  They have

15   been for several days.

16       In addition, as a backup measure, we hired on a consulting

17   basis the former senior accounting manager who worked until

18   April of about two years ago for the Debtor, providing these

19   same services to our funds.  And so, on a contract basis, he's

20   there as needed.

21       In addition, we have received from the Debtor a list of

22   employees, if they're needed, that we could hire.  There's

23   about seven of them in the accounting and operations

24   functions.  They gave us permission last week to do so.  And

25   one for valuation.

Norris - Direct                      143

1      So, those functions, if they're needed in the interim

2    period before Newco is in place, we'll have those.

3      In addition, from an IT perspective, which is an important

4    part here, they maintain -- the Debtor maintained our systems

5    and servers.  We have contracted --

6    Q   Let's not -- let's not -- we'll talk --

7    A   Yeah.

8    Q   We'll talk about -- we'll talk about IT momentarily.

9    A   Yeah.

10   Q   You mentioned -- so you just discussed accounting.  What

11   about -- and I think you -- did your discussion right now

12   include transition of the valuation services?

13   A   Yeah.  So, in that regard, --

14   Q   Okay.  What about -- what about -- what about legal,

15   transition of legal services and compliance, regulatory

16   compliance?

17   A   Yeah.  That -- as I had mentioned before, the services we

18   had been receiving from the Debtor have slimmed down

19   dramatically, and particularly around legal services.  We

20   still had been receiving significant support from Lauren

21   Thedford, who is a very reliable team member of the Debtor.

22   She was also serving as an officer of the funds, of our funds,

23   until Friday, when she resigned.  But we have in place with

24   SEI, they provide admini... regulatory and legal admin

25   services to us, and have all along.  They're prepared to step

Norris - Direct                                              144

1   up in her absence.

2        And also K&L Gates, who already serves as advisor counsel

3   and fund counsel, is set and has been already picking up the

4   slack and prepared to do anything that Lauren was doing.  She

5   is a valuable team member.  We hope that as we transition to

6   Newco that she'll be able to, as mentioned earlier, step back

7   on as an officer of the funds.

8   Q   Now let's talk about IT, information technology.  What

9   services was the Debtor providing to the Advisors in the

10  nature of IT under the shared services agreements?

11  A   Yeah.  So, our IT equipment, our computers, our screens,

12  were their property, or at least that's -- that's the --

13  that's what -- it's in their name.  Not all of it, but some of

14  it.  In addition, they provide IT support.  So if we have an

15  IT problem, we need to call the IT guy, they provide that.

16  They provide support for the servers.  They own the servers.

17  They own the system.  Or at least that's what -- that's what

18  their -- their claim is.  And so they provide all of those

19  kind of IT functions for us, or had until this past weekend.

20  Q   Does that include email?

21  A   That's right.  They -- they --

22  Q   Does that include -- hold on.

23  A   We have a number of --

24  Q   Hold on.  Hold on.  Does that include Internet -- does

25  that include Internet connectivity?

Norris - Direct                    145

1    A    It included the Internet connections at work.  It included

2    the phones.  It included our emails and email servers and the

3    --

4    Q    What about --

5    A    -- domain that, even though they're in our names -- yeah.

6    Q    That's what I was going to ask next.  What about domain

7    names?  How are those handled?

8    A    They have claimed that those are theirs as well, that the

9    domains we use for our websites and for our emails are theirs.

10   Q    Okay.  And what about electronic data, just a wealth of

11   internal books and records, kind of corporate data?  Did the

12   Debtor provide --

13   A    Yeah.

14   Q    -- any services with respect to that?

15   A    Yeah.  So, they retain all of the data that we use on

16   their networks and servers, and all of that is stored on

17   shared drives and on their system or on the computers that are

18   owned by them.  And so even though they're our books and

19   records, I believe you read earlier the provisions of the data

20   provision, and so that is all stored on their systems.

21   Q    Okay.  So we just kind of discussed the universe of the IT

22   services that the Debtor provided.  Did we miss anything or is

23   that kind of the stuff that really matters?

24   A    I think that -- I think that covers the --

25   Q    Okay.

Norris - Direct                        146

 1   A    -- the main items.

 2   Q    How is that being handled by the Advisors today, or how is

 3   that -- or has it been transitioned from the Debtor?

 4   A    Yeah.  So, largely, we are handling it on our own and

 5   through a third-party provider.  So, we have bought and

 6   purchased our own domain names.  We've transitioned our emails

 7   to those new domain names.  We have made copies of our data,

 8   or a lot of our data.  There's still some stuff we need.  But

 9   our essential data.  And we have transitioned to a new server

10   and systems that are -- that are secured and perform through

11   this third party who does this for a number of asset managers,

12   for endowments.  And the way he has set it up is in an SEC-

13   compliant matter.  So, dual authentication.  All of the things

14   that you would expect from a security standpoint are in place.

15   And we are operating starting on -- we were mirroring for a

16   couple weeks, but on our own beginning on Saturday, when the

17   shared services were terminated, and have been sending those

18   emails from those -- the new systems and servers.

19   Q    So that was going to be my next question.  Is it that we

20   just did this (snaps fingers) Saturday like that, or did we

21   actually have a mirroring in place for quite some time?

22   A    Yeah, we have for -- been working on this for multiple

23   weeks with the outside IT service provider, and it's been done

24   in phases.  And so we've been -- we had a certain small

25   portion of the people start early, they tested it out, and

Appx. 02443

1  then we rolled it out more broadly over the last couple of

2  weeks.

3  Q    Who is that third-party IT provider?  What was that --

4  A    Siepe.

5  Q    Is that -- that's not proprietary information, is it?

6  A    It's not.

7  Q    Okay.  Who is the third-party provider?

8  A    It's Siepe.  And they're a outsource --

9  Q    Well, let me -- let me -- let me --

10 A    -- provider --

11 Q    Let me --

12 A    Yeah.

13 Q    Let me direct you.  Will you please spell Siepe?  I'm not

14 even sure how to spell it.  And then tell the Court what Siepe

15 is and what it does.

16 A    Siepe, it's S-I-E-P-E, and I believe it's Italian for

17 hedge, and they are an outsourced IT and IT development

18 provider.  And it was actually started by a former member of

19 -- a former employee of Highland about a decade ago, I

20 believe.  He spun out and created his own firm.  And they do

21 this for a number of asset managers, including for Highland.

22 So they understand our systems.  They understand their

23 systems.  They're intimately familiar with what we need.

24 They've been servicing our Advisors for years and have created

25 a lot of the connections that we have with outside service

Norris - Direct                                    148

1   providers.

2   Q    This ain't their first rodeo?

3   A    No.  I would think -- it would be -- have been challenging

4   to do it without Siepe, and -- but they were able to execute

5   very quickly because they knew and were already operating with

6   us for years.

7   Q    So can investors, clients, in these funds today get on the

8   Internet and get whatever information they were able to get a

9   week ago, can they still get that today regarding their

10  investments?

11  A    Yes, they can.  And I would add one other thing here,

12  important, is the investors, all of their books and records

13  and the data related to our advi... to our funds, the

14  accounting data and the client data, are held at third

15  parties.  So we have a third-party transfer agent that has all

16  of the information on client records.  That is -- they don't

17  come to us for their client statements.  They go to our

18  transfer agent.

19       In addition, our accounting functions, those data and

20  files are all on their systems.

21       And so as far as we're talking about data and what they

22  can come to us, they never come to us for their systems and

23  their data.  If they want to know what the value is, they can

24  go to  Morningstar.com or Yahoo Finance and see daily the

25  pricing of our funds, which are published daily, even

Norris - Direct                         149

1   yesterday, published there for them.  But their actual client

2   data is held at third-party administrators.

3   Q    The point being, do you, other than maybe a change in the

4   email address, the point being do you think that investors or

5   clients or customers are even aware of the transition away

6   from the Debtor in the last few days?

7   A    Based on business interaction --

8           MR. MORRIS:  Object to the form of the question.

9           THE COURT:  I'm sorry, was there an objection?

10          MR. MORRIS:  There is an objection.  To the extent

11  the question is asking for what other people think or believe

12  or perceive, I think that's improper.  No foundation.

13          THE COURT:  All right.  I sustain.

14  BY MR. RUKAVINA:

15  Q    Have you received any complaints from investors or

16  customers or clients in the last few days about their ability

17  to do anything with respect to their investments?

18  A    Not that I'm aware of, no.

19  Q    Okay.

20          THE COURT:  All right.  Mr. Rukavina, it's about

21  1:00.  How many more minutes do you have?

22          MR. RUKAVINA:  I don't think I have more than ten

23  minutes, Your Honor.  Fifteen minutes, tops.

24          THE COURT:  Okay.  Well, we need to take a lunch

25  break, so we're just going to break here.  It is 1:00 o'clock.

Norris - Direct                    150

1   I'm advised that my 1:30 matter is going to take maybe ten

2   minutes.  So we will convene -- let me get a clarification.

3       If we reconvene at 1:45, Mike, do we need to hang up?  Do

4   we need to terminate this and --

5               THE CLERK:  Yes.  We need to terminate this because

6   she's already gotten one set up at 1:30, the other one.

7               THE COURT:  Okay.

8               THE CLERK:  So they could probably just call in to

9   that one.  We just need to get them the information.  Let me

10  see if I can contract Traci, see what the best way.  Because,

11  like I said, we've already got one for them.

12              THE COURT:  Okay.

13              THE CLERK:  So this one is going to end.

14              THE COURT:  All right.  So just stay, I guess,

15  connected.  Is that what you're saying?

16              THE CLERK:  Yes, stay connected.

17              THE COURT:  Yes, stay connected.  We'll come back at

18  1:45.  And my staff will let you know if by chance we need to

19  terminate this and reconnect.  But I think you can just stay

20  connected.  Operate under that assumption for now.

21      All right.  So I will see you at 1:45.

22              MR. MORRIS:  Thank you, Your Honor.

23              THE CLERK:  All rise.

24              MR. POMERANTZ:  Thank you.

25      (A luncheon recess ensued from 1:01 p.m. to 2:14 p.m.)

1          THE COURT:  Mr. Rukavina was examining Mr. -- I was

2    about to say Dustin -- Mr. Norris.  So, are you ready to

3    proceed, Mr. Rukavina?  You said you had a few more minutes.

4          MR. RUKAVINA:  Your Honor?  Pardon me.  Your Honor,

5    I'm ready.  Mr. Norris, can you hear me?

6          THE WITNESS:  Yes, I can.  Thank you.

7          THE COURT:  All right.  Mr. Norris, I'll remind you

8    you are still under oath from your prior swearing in.

9       All right.  You may proceed.

10         THE WITNESS:  Thank you.

11                    DIRECT EXAMINATION, RESUMED

12   BY MR. RUKAVINA:

13   Q   Mr. Norris, I think before we broke we rounded off a

14   discussion about the previously backup/now-operational plan

15   for IT and electronic data.  I'd like to move on now to office

16   space.

17   A   Okay.

18   Q   What is the current status and plan for the Advisors to

19   have office space, both for their current employees and for

20   the Newco employees?

21   A   Yeah.  So, from our perspective, we've been in talks with

22   an organization that's willing to sublease a space that is

23   approximately -- close to our current space.  And that is the

24   current plan.

25       In the interim period, all of our employees are working

1  remotely, and are doing so without any major issues.  They're

2  able to -- in this COVID environment, fortunately, there are

3  systems and processes that have already been built out and

4  we've been able to transition to that without any issues.

5  Major issues.  Without any major issues.

6  Q   Is there any temporary office space available this week

7  for, you know, meetings or anything that might have to happen

8  in-person?

9  A   Yeah.  So, I'm actually sitting in a temporary office

10  space for a meeting.  A company we have a relationship with is

11  allowing -- and -- office space here.

12  Q   Okay.  What about hardware, like computers, routers, all

13  of that stuff you testified earlier, most of which was the

14  Debtor's property that I'm taking it we left on the Debtor's

15  premises when we vacated Friday?  What's the status of --

16       MR. MORRIS:  Your Honor, objection.  Again, I don't

17  know what the testimony is and the references to "we".

18  There's no -- there's no evidence in the record that anything

19  was left behind.  There's no evidence of any of this.

20       MR. RUKAVINA:  I'll start again, Your Honor.

21       THE COURT:  All right.  Sustained.

22  BY MR. RUKAVINA:

23  Q   Mr. Norris, you've heard Mr. Dondero testify or Mr. Seery

24  testify that the employees of the Advisors that were onsite at

25  Crescent Court vacated.  Did you hear that testimony?

Norris - Direct                                    153

1   A    Yes.

2   Q    Is that accurate testimony?

3   A    That is accurate.  We all moved out by the end of day on

4   Friday.

5   Q    That's Friday, the 19th of February?

6   A    Correct.

7   Q    Did any employees, to your knowledge, or did you see

8   anyone take any equipment, machinery, et cetera, that was not

9   property of the Advisors?

10  A    Yeah.  So, we were informed that we would have access to

11  the systems, as they testified to earlier, until today.  So we

12  held onto those.  They never told us they needed our laptops.

13  They never told us to leave our stuff, or their stuff.  And so

14  we're prepared to provide those and return those.  And we are

15  actually operating now independent of those IT resources,

16  being laptops, et cetera, and screens.

17       So, there were a number of laptops that were assigned to

18  us that we purchased just in the last few months, about 15 of

19  them.  A number of screens as well.  We took those, and those

20  continue to be used.

21       For essential personnel, we had, over the last several

22  weeks, purchased additional laptops.  As you know, laptops --

23  you may know laptops are in short supply, and so we ordered

24  them for the essential people that did not have a computer at

25  home, so that they could be operating.  Those were outfitted

1   and ready, many of them picked up last week, some picked up

2   this morning.  And those that didn't have a laptop ready, we

3   ensured that they had home access and are able to log in

4   through the cloud.  So, all of our systems are hosted by AWS,

5   which is an Amazon system, set up so that we can remote login

6   through a VPN connection.  So, our employees are able to

7   access their email and our systems through there.

8   Q    Okay.  To the extent any of the Advisors' employees are in

9   possession of computer equipment that belongs to the Debtor,

10  will that be returned promptly?

11  A    Yes.  As they request it, it will be, yes.

12  Q    Okay.  Have the Advisors offered to purchase for cash

13  money those used laptops and other equipment?

14  A    We have, yes.

15  Q    Did the Debtor accept?

16  A    It was part of our, as we referred to earlier, a slimmed-

17  down proposal over the weekend, which was very minimal, and it

18  included the laptops.  And we offered a sum for that, and the

19  OMS system.  The sum we offered was $300,000, and we also

20  offered to take one hundred percent of the OMS invoice going

21  forward, and offered the Debtor to continue using that, as we

22  know they -- we believe they may or may not need use for it.

23  But we offered that over the weekend, and they simply

24  responded with, We don't even know why you need this.  And the

25  answer was their offer was still on the table, with no access

Norris - Direct                                    155

1  to Jim, and the whole agreement.

2  Q   So, the Debtor wouldn't negotiate on an *a la carte*

3  purchase?

4  A   No.  We offered, actually, last Thursday as well, once we

5  had received the -- kind of the -- Wednesday or Thursday, I

6  can't remember the exact date, after the court filing had been

7  made, for a small, very slimmed-down, which was primarily the

8  OMS and certain data items, which they came back with some

9  counters which weren't workable.  And then again, throughout

10 the weekend, I worked all day Saturday.  They said they would

11 be willing to consider a slim-down, but send them an

12 agreement, and -- something that Jim Dondero had explicitly

13 agreed to.  And we spent all day, discussed with Jim, and sent

14 them to them Sunday morning, to which they -- they did not

15 agree to.

16 Q   Okay.  Did they counter, or did they just say no?

17 A   I think that the -- the counter was the offer from Friday,

18 and I can't remember which one it was.  But there was a

19 counter, but it was not what Jim had authorized.

20 Q   Okay.  Let's move onto the third-party software that we

21 discussed before, Bloomberg, OMS, or Oracle.  What is the

22 current status of that vis-à-vis our transition plan?

23 A   Yeah.  So, from a trading perspective, trading has been

24 done outside of OMS in the past, right?  And if you look at --

25 it's not as easy.  There's also -- so, we have a manual

Norris - Direct                        156

1  process in place that we're able to, and that we've tested,

2  that we're able to perform from a trading perspective, where

3  our traders interface directly with the brokers, where they're

4  able to manually input the trade.  They're able to be

5  communicated to our custodians and our accountants, and then

6  that is able to be settled manually.

7      So, that's not ideal.  We would like to have an order

8  management system.  That said, I know there's discussions with

9  the Debtor, more employees of DSI, about getting copies of

10 their OMS for the data that is ours within the OMS, or

11 allowing us to get that data in order to actually enter into

12 an agreement separately with Bloomberg, which we've been

13 discussing with Bloomberg.  And Bloomberg is willing, with

14 their approval, to get that copy and set it up without any

15 setup fees for us, and we would have a new instance of that

16 OMS.

17     Separately, there are some other free off-the-shelf OMS

18 solutions that our outside service providers have said they

19 can quickly implement.  And so it's just determining based on,

20 really, the events today, and the discussions going on on the

21 OMS, what our path forward is.  But we have a plan, which

22 we're executing on, to execute trades.

23     As the Debtor said, they are still providing access to our

24 -- their systems through the end of the case today.  And I

25 think, as Mr. Seery said, there's -- they still see trades

Norris - Direct                    157

1   going through the system.  That's at their goodwill, and I

2   think that's great.

3       But the OMS is an area of continued focus.  Again, we have

4   a plan to go forward or without it, but ideally we would have

5   a smooth transition there.

6   Q    So, if the OMS purchase -- the OMS system can't be

7   purchased from the Debtor, you mentioned a potential agreement

8   with Bloomberg where a new OMS system would be purchased or

9   built?  Or explain more what you mean by that.

10  A    Yeah.  So, Bloomberg has -- and this is their software,

11  the order management system through Bloomberg -- but it has

12  been highly customized over many years and has our historical

13  data in there, our rules, our Advisors' rules set up that we

14  use for trading.  And so it would take several months for us

15  to go in and code exactly how we would like it.  However, my

16  understanding is there's a backup where Bloomberg, with the

17  authorization from the Debtor, could transfer the underlying

18  data and setup.

19      Or alternatively, like I said, we offered over the weekend

20  to pay them a monetary sum to take over the Bloomberg

21  contract, and not just the OMS, but others that I think it was

22  approximately $450,000 a year in ongoing costs we would take

23  one hundred percent of and still provide them access.

24  Q    Access for a fee or access for free?

25  A    Free.  Free of charge.

Norris - Direct                          158

1    Q    Okay.  So just so that the judge knows, are we able to
2    execute trades today?
3    A    Yes.
4    Q    Will we be able to execute trades tomorrow?
5    A    Yes.
6    Q    Will we be able to execute trades into the future until we
7    either purchase or develop an OMS electronic system?
8    A    Yes.
9    Q    And in the meantime, it's being done manually, I think you
10   said?
11   A    Yep, manually.
12   Q    And do you have confidence that the manual system is going
13   to be safe and accurate?
14   A    I do.  There's -- there is multiple people involved.
15   They've actually run tests -- not test trades, but actual
16   trades, over the last couple of weeks through this system.
17   And our trader has been trading for over two decades, and this
18   is a system he used years ago before we put in place the OMS.
19   There is some --
20   Q    Stop, stop, stop, stop, stop.  What system did he use
21   years ago?  I want you to be specific.
22   A    This manual system --
23   Q    Okay.
24   A     -- that we're using today.  We call it manual. It's a
25   direct with -- with a process that we used previously.

Norris - Direct                159

1  Q   Okay.  Thank you.  I just wanted that clarification.

2      Do we have -- the Advisors, that is -- do the Advisors

3  have insurance in place for whatever it's called in your

4  business, but for basically messing up a trade?  Whether it's

5  professional negligence or O&E or whatever it is.  E&O.

6  A   Yes.  Our funds have insurance that is through ICI, which

7  is a -- they do this specifically for investment companies.

8  So, we have a -- I think it's an errors and omissions

9  insurance that covers, for example, if there was a NAV error.

10 A NAV error is if a fund made a mistake.  In addition, we have

11 NAV error correction policies, where, if it's the Advisors'

12 fault, then the Advisor would have to kick in.  But the

13 Advisor has insurance as well, as well, to cover things of

14 that nature.

15 Q   What's the policy limit?

16 A   I believe it's $5 million.  I'm not certain, but I believe

17 it's $5 million.

18 Q   Okay.  So, over the course of the last several questions,

19 I've gone through kind of various processes and services that

20 the Debtor used to provide.  Have I missed anything big-ticket

21 that you feel is of importance?

22 A   As far as essential items, no.  There are some smaller

23 items like HR, which is recruiting and hiring, those types of

24 smaller things.  Cash management, communicating with

25 custodians, where those are smaller, minor items, but aren't

Norris - Direct                    160

1    -- we're able to cover internally but you didn't mention in

2    particular.  But those are -- those are the big items.

3    Q   And do you have confidence or a lack of confidence that

4    your backup plan, now the operating plan, is going to succeed?

5    A   I do.  It's not the path that we all wanted to go down,

6    right, as we wanted to have a transition.  We wanted to have

7    all these systems and software, as evidenced by trying again

8    to have the Bloomberg OMS through the weekend.  It's not going

9    to be perfect, but I feel like we have everything in place to

10   do the job that we're required to do.

11       And we've tried to put in place, you know, controls to

12   mitigate risks wherever possible, and so I feel confident in

13   the plan.  I've spent weeks and weeks losing sleep,

14   coordinating, you know, stressing over these items as a backup

15   plan, in addition to trying to negotiate an agreement.  I've

16   had a team of senior people across our firm who are from each

17   area of our firm.  I have spoken with Debtor employees to

18   consider what additional risks do we need to consider.  And so

19   I think it's been very well-thought-out.  And I mentioned the

20   last several weeks, that was when, again, when it became an

21   earnest necessity to ensure we had something.

22       Prior to that, you know, in December and November, we

23   received a list of all agreements.  We reviewed a list of all

24   of our agreements, all the Debtor's agreements.  And so we

25   were thoughtful already then what we needed.  And so as we had

1   to then execute quickly, we knew exactly what was necessary

2   and what the Debtor was providing us.  And so, as well, with

3   this transition agreement, there's about a hundred or so

4   services in there, and discussing what were essential and what

5   were not, what we could enter into by ourselves and what we

6   couldn't.  And almost every one of them we could have entered

7   into ourselves.  We would have loved to -- and I think we

8   would have had a cost savings, and it would have been a

9   benefit to them -- to reach this broad agreement, but for the

10  one remaining issue that neither Jim would approve.

11      So, we tried.  We went through the, as I said earlier, a

12  thousand line items.  We negotiated, I believe, in good faith

13  all along the way.  Whenever -- an ultimatum was given to us

14  on Tuesday.  I continued pushing all the way through Friday,

15  all the way through the weekend, and this is what I wanted.

16  But along the way, we were preparing in every way for the

17  backup, because I have '40 Act registered mutual funds, I have

18  a board who's demanded it, and we were trying in every way to

19  be able to continue these services in the event that HCMLP

20  would no longer provide them.

21  Q   I think we've established that the Debtor will be

22  terminating the employees, some employees as of February the

23  28th.  Do you expect to hire those employees through Newco

24  come March 1?

25  A   Yeah.  So, to make an adjustment there, there are about

Norris - Direct                           162

1    eight to ten employees that are investment professionals that
2    we would need to hire directly at our Advisor.  Earlier on in
3    the process, there was a question of whether we hire all
4    employees directly, whether Newco hires them, whether Newco is
5    owned by Jim or whether it's an independent business.  The
6    current plan, which has been the last couple of months, is
7    that Newco would be independent, they'd be run by an
8    independent management team.  We would -- we would be --
9    provide -- providing them or entering into a shared services
10   agreement.
11        And so our full understanding and expectation is that
12   those employees for Newco will be hired or anticipated to be
13   hired after they're terminated on the 28th.  All of that, I
14   know, is in negotiations, but I believe that is what the
15   Debtor is willing to do, and that those eight or ten employees
16   will be hired by us once they're terminated.
17   Q   So, approximately how many employees, through Newco or
18   directly, do you expect to hire on or about March 1?
19   A   I think there's approximately fifty or so.  I know that
20   the Debtor is considering adding, I believe, somewhere around
21   five to ten employees, or taking those.  I think we have -- we
22   have not heard or been told.  We've been asked -- we've asked
23   several times.  They haven't told us who those employees are.
24   But I think we have a pretty good idea.
25        But at this point, we think that the majority of the

1    people providing services to us in the back office and middle

2    office, again, because they'll want -- I believe they'll want

3    or are going to be handful of front-office people that help

4    with private equity and winding down those assets.  But the

5    bulk, if not all, of the back-office personnel will transfer

6    over to Newco, with a handful of the investment professionals

7    to us.

8    Q    Do you have any concern or is there anything outstanding

9    that would give you concern that that will not happen on or

10   about March 1?

11   A    I sure hope it does, but one thing that may cause me --

12   maybe the only thing that may cause me concern is they have

13   twice moved back or maybe three times moved back the

14   termination dates.  Now clearly know that our plan is to

15   involve Newco and all those employees to continue providing

16   services.

17        In the event that happens, we're prepared to continue.

18   The items that we're covering in the interim period are the

19   essential items.  There's a number of services that -- that

20   Newco would provide that are not essential for the operations

21   of our funds.  They include things like tax services for our

22   advisor or the books and records of our advisor, like the HR

23   recruiting services.  You know, those could wait, or we could

24   contract them elsewhere.

25        And so -- but I do hope -- and our -- we don't anticipate

Norris - Direct                              164

1  any disruption here.  I know that they've said that Newco can

2  hire whoever they want.  I think that that's going to be

3  smooth and orderly.

4  Q    Well, so let me ask, let me ask -- I'm down to two or

5  three more questions, but let me ask a worst-case scenario

6  question.  Come tomorrow or come Friday, you realize that you

7  can't do OMS manually; for some reason, the Debtor doesn't

8  release its employees; all of your planning turns out to have

9  been inadequate, and essential functions are not able to get

10 done:  Are there third-party providers that could immediately

11 step in and provide basically every service that the Debtor is

12 currently providing to the Advisors in such an event?

13 A    There are.  I think the trading -- I think we have a good

14 plan.  But to your point, your promise, if we couldn't pull it

15 off or there were issues, you can outsource trading.  You can

16 outsource that.  It's not a turn-on-the-switch, but we do have

17 and have had discussions with service providers there.

18      In the end, if Newco didn't work out, there are other

19 service providers, which I know that people in our team and

20 the Debtor have talked to, to provide outsourced accounting

21 oversight.  There are -- there's multiple options.  We just

22 have not --

23 Q    So is it fair to say, is it fair to say that you have

24 currently a Plan B to your Plan B?

25 A    Yeah, well, there is, yes, but I feel very good about our

Appx. 02461

Norris - Direct                          165

1   current Plan B that we've implemented, to the extent I don't

2   think we're going to need that.  But if there is a lack of

3   cooperation for some reason, we do have other options to

4   outsource those services.

5   Q    Okay.  My final question --

6   A    Again, I don't anticipate -- I don't -- I don't -- I don't

7   think that's going to be the case, but --

8   Q    My final question, Mr. Norris.  This backup plan and now

9   the operational plan that you have, was it in any way

10  motivated, sped up, anything by the filing of this lawsuit?

11  A    No.  I think one thing the finalization -- the filing of

12  the lawsuit did was make us realize that the backup plan we

13  had been working on was absolutely needed.  I felt very good

14  about where we were at that point, and we were prepared to

15  move forward.

16       It did change that I, over the next six days, me and

17  several other of the critical employees that have been working

18  on the backup plan would be involved in preparing for this

19  exact situation.  Instead of continuing those discussions, I'd

20  rather be boots on the ground, dealing with my employees, the

21  senior management team and everyone else.  Luckily, you know,

22  after my deposition, before my deposition yesterday, I was

23  involved in how is everything going.  We had checkpoints and

24  touchpoints.  We had calls in the afternoon.

25       Fortunately, there were no significant issues, but there

Norris - Direct                                    166

 1  were a lot of minor issues.  There were things that needed to

 2  be approved or people had questions.  But that, I think, is

 3  the only thing that changed here.  It's -- we had to -- now we

 4  knew that, okay, they're going to pull the plug because of

 5  this.

 6      At that point, I was not expecting that really to happen

 7  at that point, that that would be the issue.

 8  Q   Well, Mr. Norris, --

 9  A   But luckily, we had planned for it.

10  Q   Mr. Norris, if an allegation is made that it was the

11  filing of this lawsuit that somehow spurred us into taking our

12  responsibilities seriously, would you agree with any such

13  allegation?

14  A   No.  I would disagree.

15  Q   Thank you.

16          MR. RUKAVINA:  I'll pass the witness.

17          THE COURT:  All right.  Mr. Morris?

18          THE WITNESS:  I can't hear you.  I think you might be

19  on mute, Mr. Morris.

20      (Pause.)

21                      CROSS-EXAMINATION

22  BY MR. MORRIS:

23  Q   Got it.  Can you hear me now?

24  A   I can, yes.

25  Q   Okay.  Super.  I have a few questions, sir.

Norris - Cross                                167

1  A     Yes.

2  Q     You spent a fair amount of time testifying about how

3  poorly the Debtor was performing under the shared services

4  agreements last October and November.  Do you remember that?

5  A     I remember I testified.  I wouldn't say it was some time,

6  but yes.

7  Q     You specifically mentioned the October and the November

8  time frame, right?

9  A     Correct.  I believe so.

10  Q     And you said that during that October and November time

11  frame, there were lots of conflicts of interest that were

12  arising; is that right?

13  A     I don't remember my specific wording, but if it's part of

14  the record, then yes.

15  Q     Uh-huh.  And you said that the Advisors weren't getting

16  the same level of services that they thought they were

17  entitled to; isn't that right?

18  A     That's correct.

19  Q     And you thought -- and the Advisors thought long and hard

20  about terminating, about taking the initiative and terminating

21  the shared services agreement, right?

22  A     I don't know if I used the word "long and hard", but yes,

23  we did consider and discuss the termination of the shared

24  services agreements.

25  Q     And the reason that you decided in October and November

Norris - Cross                              168

 1   not to do that is because you knew there was an order in place

 2   that prevented a Dondero-related entity from terminating an

 3   agreement.  Isn't that right?

 4   A    That's -- that's one of the reasons, yes.

 5   Q    That's the only reason you identified before; isn't that

 6   right?

 7   A    I believe so.

 8   Q    And that --

 9   A    That was a determining -- that was a make-or-break point,

10   yes.

11   Q    And it was a -- and that was false testimony; isn't that

12   right?

13   A    No.

14   Q    Well, just a month later, in December, the Advisors sent a

15   letter to the Debtor threatening to terminate the CLO

16   management agreement; isn't that right?

17           MR. RUKAVINA:  Your Honor, I'll object to that, it's

18   not in the evidence, and I'll object on the basis of the best

19   evidence rule.

20           THE COURT:  Response?

21           MR. MORRIS:  You can answer, sir.

22           THE COURT:  Response?

23           MR. RUKAVINA:  Your Honor, I didn't hear a response.

24           MR. MORRIS:  The witness is the executive vice

25   president of the Advisors.  The Advisors were the subject of a

Norris - Cross                            169

1    preliminary injunction proceeding.  During that proceeding,

2    against these very same Defendants, this letter was admitted

3    into evidence where they -- where the Advisors did exactly

4    what Mr. Norris said they would never do because they didn't

5    think they had the authority to do that.  Mr. Norris is the

6    best evidence right now, Your Honor.

7              THE COURT:  Okay.  I overrule the objection.

8              MR. MORRIS:  Your Honor, that's not --

9              THE COURT:  I overrule the objection.  I remember the

10   evidence from the December hearing.  So he can answer.

11             THE WITNESS:  Yeah, so can you repeat the question,

12   just so I make sure I answer appropriately?

13   BY MR. MORRIS:

14   Q    Sure.  In December, the funds and the Advisors for which

15   you serve as the executive vice president, on, I think,

16   December 23rd, sent a letter to the Debtor threatening to

17   terminate, right?  Threatening to use what authority they

18   thought they had to go in and terminate the CLO management

19   agreements.  Isn't that right?

20   A    I was not involved in the drafting of the letter, but my

21   understanding is there was no threat.  It was -- and I believe

22   the letter even said, subject to court approval or stay or

23   process.  I would love for -- if there is a letter, if you

24   want to bring it up, but I wasn't directly involved with the

25   letter.

1  Q    And the Advisors didn't send a letter to the Debtor in

2  October or November saying, We want to terminate the agreement

3  subject to whatever you just said.  In fact, you concluded

4  that you couldn't do it because of the injunction, right?

5  A    Correct.

6  Q    Yeah.  You've spent an awful lot of time talking about

7  this operational plan that the Advisors have today.  It was a

8  much more modest plan during your deposition yesterday; isn't

9  that right?

10 A    I wouldn't --

11              MR. RUKAVINA:  Your Honor, I'll object --

12              THE COURT:  I'm sorry?

13              MR. RUKAVINA:  I object to that characterization.

14              THE COURT:  You object to --

15              MR. RUKAVINA:  Your Honor, I'll --

16              THE COURT:  -- the charac...

17              MR. RUKAVINA:  I'll withdraw that.  I'll withdraw

18 that objection, Your Honor.

19              THE COURT:  All right.  Go ahead.

20              THE WITNESS:  No, I answered the questions in the

21 manner that you asked them in the deposition.  I don't think

22 that you asked for detailed descriptions.  In fact, I know you

23 didn't.  And so there was a lot more than what I discussed in

24 my deposition yesterday.

25 BY MR. MORRIS:

1  Q    Okay.

2  A    Nothing -- there's nothing that -- nothing that conflicts

3  with what I said yesterday.

4  Q    James Palmer was hired to provide accounting and audit

5  services yesterday on a contract basis, correct?

6  A    He was hired yesterday, yes.  And that was, yes, part of

7  the additional oversight for our accounting function.  We're

8  handling a lot of that internally, but Mr. Palmer was

9  experienced with our platform and with our funds, and we

10  thought it was prudent, in the -- if needed, to have somebody

11  on call.  And our board actually requested it.  And so that's

12  a -- you know, that is someone who we feel very comfortable

13  with providing those services.

14          MR. MORRIS:  I move to strike everything after "Yes,"

15  Your Honor.

16          THE COURT:  Sustained.

17  BY MR. MORRIS:

18  Q    Okay.  I'm going to ask you, sir.  This is cross-

19  examination.  I'm going to ask you leading questions that are

20  intended to elicit a yes or no answer.

21  A    Got it.

22  Q    Your counsel will have the opportunity to redirect if he

23  think it's necessary.

24      So, let me ask the question again.  Mr. Palmer was hired

25  by the Advisors to provide audit and accounting services

1    yesterday.  Isn't that correct?

2    A    No.

3    Q    Yesterday was his first day on the job.  Isn't that right?

4    A    He is a contract employee.  So we didn't hire him.

5    Q    Okay.  You did testify yesterday that yesterday was the

6    first day he was providing services that had been provided by

7    the Debtor.  Is that fair?

8    A    Yes.

9    Q    Okay.  And Siepe is another entity that the Debtor had a

10   -- that the Advisors had a prior relationship, right?

11   A    Correct.

12   Q    And you don't have an agreement with Newco today, do you?

13   A    Not yet.

14   Q    So, Newco is not providing any services today, right?

15   A    No.

16   Q    And you don't have office space today, right?

17   A    Not yet.

18   Q    Okay.  So, when the sun rose on Saturday morning, to use

19   the same analogy, I guess, you'd been kicked out of the house

20   and you had no place to go.  Is that fair?

21   A    No.

22   Q    Everybody's working remotely right now, right?

23   A    Yes.

24   Q    And the Advisors have no lease for any office space on a

25   long-term basis, right?

Norris - Cross                     173

1   A    No, but we've toured space and have a -- we are ready to

2   sign a sublease as soon as we're ready.

3   Q    Okay.  But you didn't have that as of Friday; is that

4   fair?

5   A    No.

6   Q    Okay.  And you -- and you're doing trading now on --

7   A    Actually, can I make a -- can I make a correction?  I --

8   you said you didn't have that.  I said we had done a tour, and

9   I had done a tour before Friday, and that we had a lot lined

10  up, and I had them asking us, Are you ready to execute, will

11  you be here Monday?

12       So, that was there.  Again, realizing we were going to be,

13  hopefully, the plan was to reach a full agreement with you,

14  but having that backup plan in place, not to sign a lease and

15  spend the money unless we knew we weren't going to be able to

16  be in the office space.  So that's why.

17  Q    All right.  So let me ask the question again.  As of

18  Friday, the Advisors had no place to go at the end of the

19  extended shared services period, correct?

20  A    I disagree with that.

21  Q    Okay.  They don't have an -- does the Advisors have an

22  address today?

23  A    We have an address, yes.

24  Q    Yeah?  Where is the address?

25  A    So, we -- we have been -- we have a -- so we have a -- our

Norris - Cross                            174

1   NexPoint Securities has an office on McKinney Avenue in

2   Dallas, which is where we -- we have an ability to send our

3   mail to and to have an office, which is where we intend to

4   actually be subleasing.

5   Q    Okay.  But you don't have a sublease today, and that

6   address isn't the address of the Advisors, right?

7   A    It is all but in place, waiting to not spend the

8   significant expenditure in the event that we could, which our

9   plan was to hope to reach an agreement.

10  Q    Okay.  And you're doing trades manually?  Do I have that

11  right?

12  A    It is -- we call it a manual process, but it involves like

13  -- there's a certain -- it doesn't involve the OMS system.

14  That's right.

15  Q    And when your operational plan is fully in place, would

16  you expect it to have an OMS system?

17  A    Yes.

18  Q    But your operational plan today doesn't have one of the

19  pieces that you expect it to have in the future; is that

20  right?

21  A    It has -- it has a usable option, but no.  We're close to

22  entering into an OMS, and that's not the long term.  Yeah.  We

23  aren't going to be doing a manual -- our manual process

24  forever.

25  Q    Yeah.  But you're very, very, very happy with your

Norris - Cross                                    175

1    operational plan, right?  You're very proud of it?

2    A    Given the constraints we were working under, I feel it's

3    -- it is a plan that works.  Would I think that the

4    alternative with what we were negotiating would be better?

5    Probably.  Would it be better to have access to our systems,

6    to our computers, without having to turn them back into you?

7    Yes, absolutely.

8        So I don't remember the word you just used, but I think

9    very happy or very pleased, I wouldn't say that.  I would say

10   it is functional, it helps us do our duty and our job, and

11   we're going to get back to that ideal.  And the reason I

12   negotiated all the way through the week and all the way

13   through the weeks and all the way through the weekend is

14   because there was a better alternative, which was a negotiated

15   settlement.

16   Q    All right.  We'll talk about that in a moment.  But

17   notwithstanding the fact that there may have been a better

18   alternative, as of today the Advisors have adopted and

19   implemented an operating plan for the provision of all of the

20   same back-office and middle-office services that the Debtor

21   previously provided, correct?

22   A    To cover -- and I would say they do, yes.

23   Q    Okay.

24   A    Yes.

25   Q    And as of today, the Advisors are fully able to perform

Norris - Cross                                176

1    under their shared -- under their advisory agreements with the

2    funds; is that correct?

3    A    Yes.

4    Q    There is nothing the Debtor has done that has prevented

5    the Advisors from fully performing under their advisory

6    committee -- advisory agreements with the funds, correct?

7    A    It took great effort over the last several months, but no,

8    not that I'm aware of.

9    Q    Okay.  Other than access to the data, there are no

10   services that the Advisors need from the Debtor.  Is that

11   correct?

12   A    No, but the peaceful transition of the data is important,

13   right?  We have, as you mentioned, we have most of the data we

14   need, but the peaceful transition of the data and the files in

15   the systems -- not the systems, but the data backups of the

16   systems -- will be critical, yes.

17   Q    Okay.  But other than data, there are no services that the

18   Debtor needs to provide to the Advisors as of today, correct?

19   A    Not that I know of.

20   Q    And having been as involved in the process as you've been,

21   you would know if there was a service that the Debtor had to

22   provide to the Advisors today; isn't that right?

23   A    Yes.

24   Q    Okay.  And you don't know of any service that the Debtor

25   needs to provide to the Advisors as of today, right?

Norris - Cross                          177

1  A    I don't.  We mentioned data.  I think one of those --

2  well, I'll leave it as yes.

3  Q    Okay.

4  A    Yeah.

5  Q    Did you have this plan in place, this operational plan,

6  was that -- were all of the pieces in place last Tuesday

7  night?  No.  Withdrawn.

8       Were all of those pieces in place as of January 31st,

9  2021?

10 A    No.

11 Q    So is it fair to say that the Debtor didn't -- that the

12 Advisors did not have an operational plan that would permit

13 them to obtain all of the same services that the Debtor had

14 been providing under the shared services agreement as of

15 October -- as of January 31st?

16 A    No.

17 Q    They did have a plan in place at that time to get those

18 services?  Is that what you're saying?

19 A    Yes.  There was a plan, a Plan B.  It wasn't nearly what

20 Plan B is today because we've -- we've had multiple additional

21 weeks to ensure that everything's in place, but we had Plan B.

22 But at the time -- maybe I'll leave it there.  But at the

23 time, there was good faith negotiations up to that point,

24 where Plan A looked like it was going to happen.  And so that

25 was the full expectation with a backup plan which was not as

Norris - Cross                                        178

1   intricate.

2   Q    Did the Advisors ever inform the Debtor at any time during

3   the negotiations that they had an operational plan pursuant to

4   which it could obtain the same middle- and back-office

5   services that the Debtor had been providing?

6   A    If you include your Debtor employees, then yes.

7   Q    Did you ever use it as a point of negotiation?  Did you

8   ever try to tell the Debtor, you know, if you guys don't agree

9   to our terms, we're going to walk away, because we've got this

10  fully-operational plan to get the same services that you guys

11  are providing?  You're not the only game in town?

12  A    I never used that kind of exact approach, no.

13  Q    Did you use any approach where you relied on the

14  operational plan as leverage to try to drive a better deal

15  with the Debtor?

16  A    No.  I don't think so.

17  Q    No?  Okay.  And fast-forward to that Tuesday night when

18  the Debtor said take the plan without Mr. Dondero or we're

19  going to sue you.  You remember that, right?

20  A    Yes.

21  Q    And every aspect of the agreement was in place except for

22  Mr. Dondero, right?

23  A    Except for his access to the office, --

24  Q    And the --

25  A    -- yes.

Norris - Cross                                179

1    Q    And the Debtor had told you time and time again, every

2    time it appeared in a document, they removed it, and they told

3    you every single time no access for Mr. Dondero, right?

4    A    No.

5    Q    Did you have any reason to believe that that was ever

6    going to change?

7    A    I did.  And I said no to your last question, right?  I

8    didn't say yes.  I said no to your last question, that --

9    Q    And did the Advisors make a decision to reject the

10   Debtor's offer for the sole reason that Mr. Dondero wouldn't

11   be permitted access?

12   A    That was the last point.  As mentioned, every other point

13   was agreed to.

14   Q    And why didn't the -- why didn't the Advisors -- did the

15   Advisors -- withdrawn.

16        Did the Advisors say to the Debtor, we get it, you're not

17   going to let Mr. Dondero in, but that's a line in the sand for

18   us?  But please, there's no need for a lawsuit.  We've got a

19   wonderful operating plan ready to go.  You're asking the Court

20   to force us to adopt and implement the plan, we have one right

21   here, so let's not litigate.  Let's just walk away and let

22   bygones be bygones.  Did you ever offer to get rid of the

23   lawsuit by showing the Debtor your plan?

24   A    We would have loved to have gotten rid of the lawsuit, but

25   I didn't see it until it was filed.  When the ultimatum was

Norris - Cross                          180

1   given, we had rolling blackouts.  My home didn't have

2   electricity rolling from 2:00 a.m. on Monday until Thursday.

3   And so by the time there was -- and everybody else, inclusive

4   of our attorney, Mr. Rukavina.  And so to say that I -- I

5   received it Thursday or Wednesday morning, when one of your

6   employees forwarded it to us.  I hadn't seen drafts.  Maybe

7   our counsel had.  But we didn't even have a chance to say, oh,

8   let us -- let us pull this because we read what your report

9   was.  The Advisors didn't even have a chance to respond.  At

10  least that is my understanding.  I never had a chance to

11  respond.  I never saw it.  Maybe counsel did.

12  Q    Well, you saw the lawsuit eventually, didn't you?

13  A    I did.

14  Q    Did you ever -- did the Advisors -- after you saw the

15  lawsuit, did the Advisors ever call up the Debtor and say,

16  hey, look, let's not litigate?  We have exactly what you want.

17  We've got this fully-operational plan that provides us with

18  everything we need.  You don't need to do anything further.

19  Did you ever say that to the Debtor?

20  A    No, because the back -- the -- we still wanted to reach an

21  agreement.  That was the goal.  And it was a surprise for us

22  to have a shock, we're going to pull this or we're going to

23  sue you on Tuesday evening.  And so, no, we still -- I -- and

24  that's why I negotiated and continued to work all the way

25  through the end of the week and through the weekend on

Norris - Cross                      181

1   something, because I still felt like that was the better plan

2   for everybody.

3        I don't know why we had to be sued, I don't know why it

4   had to be urgent, because at that point we had been working

5   for weeks and months.  And the weeks -- really good.  And the

6   only difference was Jim Dondero's access.  And it was Tuesday.

7   And they didn't even ask us, you know.

8        Anyway, so that was -- I just -- I just disagree with your

9   characterization of the process.

10            MR. MORRIS:  I move to strike, Your Honor.  It really

11   is a very simple question.

12            THE COURT:  Sustained.

13   BY MR. MORRIS:

14   Q    Did the Advisors, after the commencement of the lawsuit,

15   did the Advisors ever tell the Debtor that there was no need

16   for litigation because the Advisors had a fully-operational

17   plan that they had adopted and were prepared to implement,

18   which is exactly what the Debtor was seeking from the Court?

19   A    I don't know.

20   Q    You're not aware of that, right?

21   A    I'm not.

22   Q    You don't -- you never thought that maybe we could avoid

23   this whole thing by just sharing with the Debtor this

24   operational plan that you've described in great detail, right?

25   A    Well, on Friday, I know you put in, in a response to our

Norris - Cross                    182

1  board and Advisors, that you were made aware that we had a

2  plan that felt good, yet there was no consideration or

3  discussion on removing the lawsuit.

4      So, I'll leave that to what counsel happened, but I would

5  have loved to not be involved.  I'm not a legal expert.  There

6  were many attorneys involved.  I wish that if that were an

7  option, it would have been raised.  But here we are today.

8  Q   Sir, not only did the Advisors not tell the Debtor that

9  they had an operational plan that could avoid the lawsuit,

10 instead, the Advisors made proposals on Friday, one of which

11 did not even include having access to the office by Mr.

12 Dondero.  Isn't that right?

13         MR. RUKAVINA:  Your Honor, I object to that question

14 as it mischaracterizes the evidence.  The question began with

15 that the Advisors never told the Debtor that they had a backup

16 plan.  I think the witness --

17         MR. MORRIS:  Your Honor, --

18         THE COURT:  Okay.  Sustained.  Rephrase.

19         MR. MORRIS:  Yeah.  No problem.

20 BY MR. MORRIS:

21 Q   So, so to the best of your knowledge, the Advisors never

22 told the Debtor that they thought litigation could be avoided

23 because they had an operational plan.  Is that right?

24 A   That's my -- that -- yeah, that's right.

25 Q   Okay.  And instead, on Friday, the Advisors continued to

Norris - Cross                         183

1  try to pursue an agreement with the Debtor.  Is that right?

2  A    I don't know about the "instead."  But, yes, we tried to

3  continue reaching an agreement.

4  Q    And are you familiar with the offer that was made by the

5  Advisors to the Debtor on Friday morning?

6  A    I am.

7  Q    Did you authorize the sending of that offer to the Debtor?

8  A    The request, yes.  Me and D.C. Sauter were involved with

9  counsel, so we -- we did -- we did.

10          MR. MORRIS:  All right.  Can we please put up on the

11 screen Exhibit 19?  Can we start at the bottom, please?

12 BY MR. MORRIS:

13 Q    So, are these the Options A and B that were presented to

14 the Debtor on Friday morning?

15 A    Based on the email, yes.

16 Q    Okay.  And Option B contemplated that the Advisors would

17 completely vacate the space by the end of the month, right?

18 A    Correct.

19 Q    And that's an option that you and Mr. Sauter authorized

20 the lawyers to send to the Debtor, correct?

21 A    Yes.

22 Q    Okay.  And you had that authority from Mr. Dondero, right?

23 Mr. Dondero gave you the authority to negotiate; is that

24 correct?

25 A    He gave me the authority to negotiate in those final

Norris - Cross                          184

1    couple of days.  There were certain things he gave me

2    authority to negotiate on.  And specifically -- and to things

3    that shouldn't be included on this point, we discussed this

4    beforehand as well.  But we had authority to negotiate.

5    Q    And you had authority to make this proposal, right?

6    Option B?

7    A    Ultimately, no.

8    Q    At the time you made it, you thought you had it, right?

9    A    Yes.

10   Q    You weren't acting outside of what you knew to be your

11   scope of authority, were you?

12   A    No.

13   Q    Okay.  Did you discuss with Mr. Sauter these two options

14   before they were delivered by your lawyers to the Debtor?

15   A    Yes.

16          MR. RUKAVINA:  Your Honor?  Your Honor?  Hold on.

17      Your Honor, Mr. Sauter is an attorney.  He's in-house

18   counsel.  So I think that to the extent that they're

19   discussing business, that's not privileged.  To the extent

20   they're discussing legal strategy, that is privileged.  So I

21   would instruct the witness to be conscious of that --

22          THE COURT:  All right.

23          MR. RUKAVINA:  -- and to not disclose attorney-client

24   privileged communications.

25          THE COURT:  All right.

Norris - Cross                              185

1   BY MR. MORRIS:

2   Q    Sir, did you discuss these two proposals with Mr. Sauter

3   before it was delivered by your lawyers to the Debtor?

4   A    Yes.

5   Q    And did Mr. Sauter also agree with the substance of these

6   two offers that were being presented to the Debtor?

7           MR. RUKAVINA:  Mr. Norris, can you answer that

8   question without invading the attorney-client privilege?

9           MR. MORRIS:  I'm just asking about the offers.  I'm

10  not asking about any legal advice or anything.  I just want to

11  be that clear.

12          MR. RUKAVINA:  That's why I'm asking Mr. Norris.  If

13  they discussed business, I don't think we have a problem.  But

14  if they discussed legal strategy, I think it's a problem.  So

15  I think the witness just has to tell us whether --

16          THE WITNESS:  There --

17          MR. RUKAVINA:  -- they discussed business or legal.

18          THE WITNESS:  There -- there was a -- there was some

19  legal -- legal strategy as well, yeah.

20          MR. RUKAVINA:  Your Honor, I would -- I would ask

21  that that -- I would object to that question on that basis,

22  that it calls for the invasion of the attorney-client

23  privilege.

24          THE COURT:  All right.  I sustain.

25          MR. MORRIS:  I'll try -- I'll try and ask the

1   question again, then.

2   BY MR. MORRIS:

3   Q    Mr. Norris, did Mr. Sauter agree and authorize the sending

4   of these two proposals by the Advisors' lawyers to the Debtor

5   on Friday morning?

6   A    We both agreed with that approach.

7   Q    Okay.  And you both -- is it fair to say that you both

8   believed that you were acting within the scope of authority

9   that Mr. Dondero had given you?

10  A    We thought so, and -- well, I'm sure your questions will

11  lead me to the -- to the ultimate of what happened here, but

12  yes.

13  Q    Yeah.  And this proposal didn't permit Mr. Dondero back

14  into the Highland office space; is that right?

15  A    It didn't prevent him?  Is that what you said?

16  Q    Didn't permit him.  Didn't allow him.

17  A    Option A just above did and Option B did not.

18  Q    Okay.  So, you and Mr. Sauter, as the Advisors' designated

19  negotiators, authorized the Advisors' lawyer to present as

20  Option B an option that did not permit Mr. Dondero access to

21  the Debtor's offices, right?

22  A    Yes, but gave us full access to everything else.

23  Q    Okay.  It was really --

24       (Pause.)

25            THE COURT:  Uh-oh.

Norris - Cross                          187

1   BY MR. MORRIS:

2   Q    How does Option B -- how does Option B, if you know, --

3   A    Sorry, you froze.  You froze there for a minute, I think.

4            THE COURT:  Yes.  I think you did.

5            MR. MORRIS:  No, I think I just paused.

6            THE WITNESS:  Oh, you were just thinking?  Oh, that

7   was really talented.  Wow.

8   BY MR. MORRIS:

9   Q    No, it's -- it's not that good.  Do you know how Option B

10  differs from the term sheet that the Debtor provided on

11  Tuesday night?

12  A    It would not include the access -- it wouldn't include

13  access to the office for anybody.  The, as it says there, the

14  Debtor would take a hundred percent of the lease.

15  Q    Okay.  So, it was going to be complete walkaway?  The

16  Advisors were going to completely walk away at the end of the

17  month, right?

18  A    Correct.

19  Q    And that was -- that was an offer that you believed you

20  were authorized to make to the Debtor, right?

21  A    Yes.

22  Q    Okay.

23           MR. MORRIS:  Can we go two emails up to Mr.

24  Hogewood's?  Oh.  Yeah.  The one at 12:04.  Yeah.

25  BY MR. MORRIS:

**Appx. 02484**

1   Q    Were you aware that there came a time early in the

2   afternoon that the Debtor was informed that there may need to

3   be an edit to Option B, so they pulled that back for a bit?

4   A    I wasn't aware, no.

5   Q    No?  All right.  Do you have any knowledge as to what edit

6   Mr. Hogewood was referring to in his email there?

7   A    I don't.

8   Q    Okay.  Were you aware -- did you get a copy of Mr.

9   Hogewood's email?  Was it forwarded to you?  Do you know --

10  withdrawn.  Let me ask a better question.

11       Do you know if Mr. Hogewood delivered -- withdrawn.

12       Did you know on Friday morning that Mr. Hogewood had

13  delivered the two options, the two proposals, that you and Mr.

14  Sauter had authorized?

15  A    Yes.

16  Q    Okay.

17       MR. MORRIS:  Can we go up an email or two, please?

18  BY MR. MORRIS:

19  Q    And then Mr. Hogewood wrote back and he said that he was

20  authorized to put Option B back on the table, as stated above.

21  Do you see that?

22  A    I do.

23  Q    Do you know who authorized Mr. Hogewood to put Option B

24  back on the table?

25  A    I don't remember.  I don't know.  I wasn't on the chain.

Norris - Cross                              189

1   Q    Okay.  But it's fair to say at this point in time, midday

2   on Friday, as far as you knew, your lawyer had communicated

3   Option A and Option B to the Debtor, and they were authorized

4   to do that, right?

5   A    Yes.

6   Q    Okay.  And did you learn subsequently that there was a

7   phone call between the lawyers for the Advisors and the lawyer

8   for the Debtor during which the Debtor indicated that it was

9   prepared to accept Option B?

10  A    I don't know, no, I don't know about that.

11  Q    You were never told that?

12  A    No.  Not that there was a phone call.

13  Q    Uh-huh.  Did you learn at any point on Friday that the

14  Debtor had accepted Option B, the Option B that you and Mr.

15  Sauter had authorized the Advisors' lawyers to make?

16  A    Yes.

17  Q    Okay.  So, there did come a time when you knew that the

18  Debtor had accepted Option B, right?

19  A    Yes.

20  Q    And are you aware that, after accepting Option B, the

21  lawyers discussed turning the agreement into a settlement

22  order to resolve the litigation?

23  A    No.  I wasn't aware of that.

24  Q    Are you aware that the lawyers were discussing plans for

25  the transfer of -- by wire of cash that would be due under the

Norris - Cross                                    190

1  agreement?

2  A    I was not.

3  Q    Okay.  After the Debtor accepted Option B, the Advisors

4  withdrew it, correct?

5  A    I don't know if we with... we did withdraw it, yes.

6  Q    And after it was presented, Mr. Dondero said that he

7  hadn't personally approved it, correct?

8  A    In the terms of which -- the actual offer, yes, that's

9  correct.

10 Q    So, Mr. Dondero, having given you and Mr. Sauter the

11 authority to negotiate, learned that the Debtor had agreed to

12 your proposal pursuant to which he wouldn't be allowed access

13 to office space and he made the decision to withdraw the

14 offer, correct?

15 A    I wouldn't agree with exactly the phrasing, no.

16 Q    Sir, Mr. Dondero is the person who decided that he had not

17 approved of Option B, and that's why it was retracted,

18 correct?

19 A    That's right.

20 Q    So, on Tuesday night, the Advisors had a fully-negotiated

21 agreement for the provision -- for the transition of all of

22 the back-office and middle-office services, but for access to

23 Mr. Dondero, correct?

24 A    Correct.

25 Q    And the only reason that didn't get signed is because of

Norris - Cross                                        191

1   that issue, right?

2   A    That's my understanding, yes.

3   Q    And the Debtor continued to negotiate with the Advisors,

4   even after filing the lawsuit, correct?

5   A    Yes.

6   Q    The Debtor was never told that the Advisors had a fully-

7   operational plan pursuant to which it had an alternative to

8   obtain the same services, correct?

9   A    That's incorrect.

10  Q    After negotiations broke down, is that the moment that a

11  reference was made to alternative plans?

12  A    No.

13  Q    Sir, on Friday, you personally reached an agreement with

14  the Debtor on Plan B, right?  You authorized the making of an

15  offer that the Debtor accepted, correct?

16           MR. RUKAVINA:  Your Honor, I'm going to object at

17  this time based on a legal conclusion.  The witness is not a

18  lawyer and he's not qualified to opine on whether an

19  agreement, which to me suggests is something binding and

20  enforceable, was ever reached.

21           THE COURT:  Response?

22           MR. MORRIS:  Your Honor, I'm not looking to enforce

23  any agreement, so let me try and restate and --

24           THE COURT:  All right.  Sustained.

25           MR. MORRIS:  -- address Mr. Rukavina's --

1          THE COURT:  He'll rephrase.

2          MR. MORRIS:  Yeah.

3    BY MR. MORRIS:

4    Q    Even as late as Friday, after starting the lawsuit, you

5    had made an offer.  You had authorized the making of an offer

6    that the Debtor had agreed to again, correct?

7    A    I had auth... I had said we should -- yes, I had

8    authorized the offer and then your fax saying on the

9    acceptance.  I wasn't involved in the back-and-forth

10   communication among the attorneys.

11   Q    But you knew it was accepted, subject, let's say, subject

12   to the execution of definitive documentation.  How's that?

13   A    I was told that they were willing to take the offer.  And

14   so, yes.  And --

15   Q    And sometime later that day, it got pulled because of Mr.

16   Dondero, correct?

17   A    Correct.

18   Q    And even on Saturday, the Advisors made proposals on an *a

19   la carte* basis for the provision of services, correct?

20   A    Yes.  And we have made very similar *a la carte* provisions

21   on Thursday and Wednesday, which were also rejected by the

22   Debtor.

23   Q    And -- okay.  So it wouldn't have been the full kind of

24   deal that was contemplated in the term sheet; it would have

25   been a selection of very specific services.  Do I have that

Norris - Cross                                193

1  right?

2  A    That's right.  On Wednesday, it was Oracle and Bloomberg,

3  which was authorized by Mr. Dondero.  We were to offering to

4  continue with our offer to take over the lease and all the

5  other terms, or a slim-down, which would include no disputed

6  amounts or payments, which at that time I think we called Plan

7  B or Option B.  And that was -- I believe that was Thursday.

8  Or Wednesday night.  So, yes, those continued.  And then we

9  had a similar, very similar proposal again on Sunday, with the

10  same -- very similar services to what we asked for on

11  Wednesday night or Thursday.  And those were rejected both

12  times.

13  Q    And is it fair to say that the services that the Debtor

14  was seeking -- withdrawn.

15      Is it fair to say that the services of the Advisors were

16  seeking from the Debtor on Thursday, Friday, and Saturday were

17  services that the Advisors had not yet engaged anybody else to

18  provide?

19  A    The two -- we already talked about Bloomberg and where our

20  status is there.  And on Oracle, it would be a nice to have

21  instead of transitioning, and that is more for the Advisors'

22  books and records and would be nice to have.

23  Q    So, --

24  A    Yes.

25  Q    Okay.  You have a Plan B for the new operational plan.

Norris - Cross                                                    194

1  Did I hear that part right?

2  A    As I mentioned -- oh, I said our operating plan was a

3  hypothetical from -- from Mr. Rukavina, that in these other

4  events fall through, are there other people that you could

5  hire to do these services?  And I said yes.

6  Q    Okay.  So if any part of the operational plan fails, the

7  Advisors would look to third parties to provide, you know,

8  whatever service they wouldn't obtain and they wouldn't look

9  to the Debtor to provide any services, correct?

10  A    That's correct.

11  Q    Is it fair to say that, other than access to the data, the

12  Advisors will never seek any services of any kind from the

13  Debtor going forward?

14  A    As we sit here today, I believe your employees are set to

15  have three more operating business days and then will be

16  terminated, those -- the employees that services our accounts.

17  So, with the expectation that Newco will be formed, I have no

18  expectation we'll be asking for any significant services,

19  other than data, transfer of emails, et cetera.

20  Q    Well, that's a pretty qualified answer.  What do you mean

21  by no significant services?

22  A    Most of them -- well, the data, emails, et cetera, are all

23  minor items, and I think they're -- you say data, but I think

24  there's -- there's a handful of things that probably fall

25  under that data and books and records that are what I'm

1    talking about, yes.

2    Q    You know, one of the things that the Debtor is very

3    concerned about here is having no future obligation.  The

4    Debtor -- do you understand that the Debtor believes that it

5    has terminated the shared services agreements as of Friday?

6    A    I do, yes.

7    Q    Do you understand that, other than the data that it holds,

8    the Debtor wants the comfort of knowing that it has no future

9    obligations to the Advisors of any kind, other than to provide

10   access to the data?

11   A    Yeah, that's fair.  Yes, I understand that.

12   Q    As the executive vice president of the Defendants, as the

13   executive vice president of the Advisors, can you, under oath,

14   give the Debtor comfort that the Advisors will not look to the

15   Debtor for any services of any kind after today?  Other than

16   the access to the data?

17   A    Data and books and records, yes.

18   Q    Okay.  So access to data and books and records is the only

19   thing that the Advisors will look to the Debtor for at any

20   time in the future after today; is that fair?

21   A    I would say it's not fair, because to say there's not

22   other significant -- insignificant or minor items -- as Mr.

23   Dondero testified, there's usually a smooth transition.  I

24   don't anticipate there will be significant items that would

25   take a lot of your time or we need to invade you, but I would

Norris - Cross                              196

1  hope there would be a fair and orderly transition.  And I

2  can't predict the minor items, but I don't think -- I can't

3  envision anything significant.

4  Q    Do you believe, as the executive vice president of the

5  Advisors, that the Debtor has an obligation to perform any

6  services for the Advisors after today, other than giving

7  access to the data and the books and records?

8  A    No.

9  Q    What happens if Newco isn't formed?  Is there any scenario

10 that you're aware of where the Advisors would look to the

11 Debtor for any services in the event that Newco is not formed?

12 A    No.  Not that I'm aware of.  I don't know.  I don't think

13 so.

14 Q    I think you mentioned earlier about the transfer of data.

15 What does the Debtor need to do, from your perspective, in

16 order to transfer the data and the books and records?

17 A    We need the Debtor to authorize its IT director to

18 transfer the data.  We stand by ready.  I sent an email to

19 your IT team asking for him to get the required approvals on

20 Friday morning, and our -- CFA, the outsource team, stands by

21 ready, at our cost, to transfer any remaining data.

22      So we just need you and Mr. Seery and -- to authorize the

23 free transfer of data.  Not necessarily you, but Mr. Seery,

24 and then your IT team and your employees can feel comfort.

25 Because over the last few weeks they have not provided any

Norris - Cross                                    197

1  data or any assistance providing data because they're

2  concerned.  They're concerned about their liability, they're

3  concerned about things that the Debtor has told them.  And so

4  I just -- if you and Mr. Seery can tell them any data that is

5  -- I mean, yeah, we're prepared to send a request of what we

6  need, but they need Mr. Seery, because he has been holding

7  that over them.

8  Q    And what data are you referring to specifically?

9  A    Yeah.  We're talking about historical emails, emails that

10 are held in what's called the vault.  It is files in our

11 systems.  We've been able to copy, we think, most of what we

12 have, but there is a number of records.  We would like a copy

13 of the database that backs up home (phonetic).  We'd like a

14 copy of the Bloomberg OMS, which I mentioned before.  The data

15 that backs up our data.  Just a backup copy.

16     And there's a number of other items which we'll request,

17 but these are all very simple items that don't take very long.

18 I would imagine, with proper approval, and almost no work from

19 your end, maybe your one IT guy, these can be transferred in a

20 very efficient, effective, quick manner, most of it this week

21 or within a couple days.

22 Q    Okay.

23          MR. MORRIS:  I have no further questions, Your Honor.

24          THE COURT:  All right.  Redirect?

25          THE WITNESS:  Thank you, Mr. Morris.

Norris - Redirect                          198

1          MR. MORRIS:  Thank you.

2                    REDIRECT EXAMINATION

3  BY MR. RUKAVINA:

4  Q    Mr. Norris, you mentioned that Debtor employees knew of

5  our backup plan.  Give some more specificity, meaning how and

6  why you think they knew that and who did you talk to about

7  that and when.

8  A.   Yeah.  So, the individuals authorized to discuss with me

9  were David Klos, Frank Waterhouse, Brian Collins, and J.P.

10  Two of those individuals are members of the -- well, one's

11  still an officer, two or both were officers of our funds.  And

12  so in our discussions as well throughout, I mentioned, hey,

13  we're working on backup plans.  There were aspects of those

14  they couldn't be involved in because they were negotiating for

15  the other side.  But they were aware that we were working on

16  things.

17       In addition, Mr. Seery represented they knew we were

18  taking data off or copying data off the system, leaving it all

19  on their system, and that we were backing up emails and that

20  we were working on a backup plan.

21       So I don't think it was a surprise to anybody.  Their IT

22  team knew and was very aware.  We purchased new domains.  We

23  requested domains.  We even had requested if they would

24  forward domains to ours, which I think the answer was no.  If

25  they would forward emails.

**Appx. 02495**

Norris - Redirect                    199

1     And so I don't think there was any surprise that there was

2     backup planning going on.  And so there were discussions.  It

3     wasn't -- we didn't discuss the details.  We didn't discuss

4     the details because we were entered into a negotiation with

5     millions of dollars at stake, and if I show or we discuss all

6     of our alternative plans, then there is less ability to

7     negotiate.

8     Q    Okay.

9          MR. RUKAVINA:  Mr. Vasek, if you will please pull up

10    that letter that I sent you.

11    BY MR. RUKAVINA:

12    Q    Okay.  If we have to scroll down, Mr. Norris, we can, but

13    are you familiar with this letter from the Debtor's attorneys

14    to the boards and us the evening of February 19th, Friday?

15    A    I am.

16    Q    Okay.  Is this the letter that you referenced when Mr.

17    Morris was asking you about why we didn't just tell the Debtor

18    that we had a backup plan and therefore we could dismiss this

19    litigation?

20    A    I believe so, yes.

21    Q    Okay.

22         THE COURT:  Is this an exhibit?

23         MR. RUKAVINA:  No, Your Honor.  I'm about to move for

24    its admission.  Your Honor, I'd ask that this be admitted as

25    my Exhibit O.

Norris - Redirect                    200

1            THE COURT:  All right.  Any objections?

2            MR. MORRIS:  Sorry.  No, Your Honor.

3            THE COURT:  All right.  It'll be admitted.

4        (Advisors' Exhibit O is received into evidence.)

5            MR. RUKAVINA:  And Your Honor, we will --

6            THE COURT:  You'll have to supplement the docket with

7    it.

8            MR. RUKAVINA:  Thank you.  We will.

9            THE COURT:  Okay.

10            MR. RUKAVINA:  Mr. Vasek, if you'll please scroll

11    down to Page 3 of 4, the paragraph that begins, "During the

12    course of this conversation."  Actually, the next paragraph

13    that says, "We understand."

14    BY MR. RUKAVINA:

15    Q    Do you see that there, Mr. Norris?

16    A    Yes.

17    Q    Okay.

18            MR. RUKAVINA:  What is that there, Mr. Vasek?  I'm

19    seeing a square.  Okay.

20    BY MR. RUKAVINA:

21    Q    So that paragraph begins, "We understand, based on this

22    conversation, that HCMFA and NPA have made arrangements to

23    obtain the resources they need to provide the services on a

24    continuous and seamless basis to their clients, including the

25    registered investment companies to which they serve as

Norris - Redirect                         201

 1  investment advisor.  We plan to proceed with our request for a

 2  mandatory injunction at the February 23rd, '21 hearing."  And

 3  then it keeps going.

 4      Did I read that accurately?

 5          MR. MORRIS:  Can you please --

 6          THE WITNESS:  Yes.

 7          MR. MORRIS:  -- keep going, because I think it's

 8  important?

 9          MR. RUKAVINA:  Well, you get to ask him next.

10  BY MR. RUKAVINA:

11  Q   Did I read that accurately, Mr. Norris?

12  A   Yes.

13  Q   Okay.  So tell me, then --

14          MR. RUKAVINA:  Well, strike that.  I'll move on.

15      You can leave that up, Mr. Vasek, if Mr. Morris needs to

16  use it.

17  BY MR. RUKAVINA:

18  Q   Now, do you recall you were asked about that Option A and

19  Option B from last Friday, and Option B had been withdrawn?

20  Do you recall that?

21  A   Yes.

22  Q   And do you recall that, under that Option B that was

23  withdrawn, that the Debtor accepted that Mr. Dondero wouldn't

24  be on the premises, right?

25  A   Yes.

Norris - Recross                        202

1    Q    Okay.  But would NexPoint have been on the -- on the

2    premises?

3    A    No.  No.

4    Q    So, under both Option A and Option B, would Mr. Dondero

5    have been with his employees?

6    A    Yes.

7    Q    Okay.

8             MR. RUKAVINA:  I'll pass the witness.  Thank you.

9             THE COURT:  Recross?

10            MR. MORRIS:  Can we put that exhibit back up on the

11   screen, please?

12                       RECROSS-EXAMINATION

13   BY MR. MORRIS:

14   Q    First of all, sir, you have no idea what was discussed in

15   the conversation that's referenced in the first sentence,

16   correct?

17   A    I don't.  I was not a part of it.

18   Q    Okay.  Do you know if the Debtor in this instance was

19   trying to hold the Advisors' feet to the fire?

20   A    Again, I was not part of the conversation.

21   Q    So you don't know the motivation for sending this letter;

22   is that fair?

23   A    I don't.

24   Q    Can you read out loud the letter -- the --

25            MR. MORRIS:  I can't see it, actually.  Can you just

Norris - Recross                     203

1  push it down a little bit, because I've got the little box in

2  the upper right corner?  No, the other way.  I'm sorry.  Yeah.

3  Perfect.

4  BY MR. MORRIS:

5  Q    Do you see -- can you read out loud the sentence that

6  begins, "We plan to proceed"?

7  A    (reading)  "We plan to proceed with our request for a

8  mandatory injunction at the February 23rd, 2021 hearing and

9  hope that we can submit to the Bankruptcy Court a consensual

10  order incorporating HCMFA's and NPA's acknowledgment of

11  HCMLP's right to terminate services under the shared services

12  agreement as provided for herein and their commitment to

13  provide services to their clients on a go-forward basis."

14  Q    So in fact, as of -- do you know when this -- do you know

15  when on Friday this letter was sent?

16  A    I don't know the time.

17  Q    Okay.  It's -- it's -- based on what you just saw, the

18  reference to the conversation, is it fair to say that this

19  occurred after the Debtor was informed that the Advisors were

20  withdrawing Option B?

21  A    I believe so.

22  Q    Right.  And here, in fact, the Debtor is asking the

23  Advisors to join it in providing a consensual order that would

24  resolve this motion, right?

25  A    I don't know.  They're -- it said, "hope that we can

Norris - Recross                            204

1   submit a consensual order incorporating HCMFA's and NPA's."

2   This was sent to our counsel.  So it was hoping that counsel

3   would agree to that, yes.

4   Q    Well, counsel is not going to agree to anything without

5   the client's authorization; --

6   A    Correct.

7   Q    -- is that fair?

8   A    Correct.

9   Q    And did the Advisors ever authorize their counsel to try

10  to negotiate a consensual order?

11          MR. RUKAVINA:  Your Honor, I object to that.  That's

12  clearly attorney-client privilege.

13          THE COURT:  Sustained.

14          MR. MORRIS:  All right.  I'll ask a different

15  question.

16  BY MR. MORRIS:

17  Q    Did the Advisors ever engage in negotiations with the

18  Debtor over a consensual order, as was offered by the Debtor

19  in this letter?

20  A    I defer to legal counsel on that.

21  Q    Okay.  You're not aware of any such negotiations, right?

22  A    I know there were discussions, particularly around our

23  plans over the weekend, where there were offers of something

24  related to the lawsuit.  Removal or what -- I don't know the

25  specific terms, but there were offers made, and I deferred to

Norris - Recross                          205

1    counsel on that.

2    Q    But we're here today because there is no consensual order

3    pursuant to which the Advisors would present their plan to the

4    Court and state specifically that the Debtor had no further

5    obligation, correct?

6              MR. RUKAVINA:  Your Honor, that's an irrelevant

7    question.  And again, it's litigation strategy and attorney-

8    client privilege.  And we're here today on a mandatory

9    injunction.

10             THE COURT:  Sustained.

11             MR. RUKAVINA:  Not because --

12             THE COURT:  Sustained.

13             MR. MORRIS:  Withdrawn.  I have no further questions,

14   Your Honor.

15             THE COURT:  All right.  That concludes Mr. Norris's

16   testimony.  Thank you.

17             THE WITNESS:  Thank you, Your Honor.

18             THE COURT:  All right.  What else do you have, Mr.

19   Rukavina?  Your next witness?

20             MR. RUKAVINA:  I have nothing further, Your Honor.

21   The Defendants rest on this motion.

22             THE COURT:  All right.  Mr. Morris, anything further

23   from you?

24             MR. MORRIS:  No, Your Honor.  I'm prepared to proceed

25   to closing argument.

206

1          THE COURT:  All right.  I'll hear it.

2              CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

3          MR. MORRIS:  Okay.  Your Honor, thank you for taking

4     the time to listen today.  We regret that we had to come down

5     this path, but the Debtor felt that it had no choice at the

6     time that it filed the action.

7          We think the evidence conclusively establishes that the

8     Debtor had the contractual right to terminate the shared

9     services agreements.  It exercised that right.  It exercised

10    that right after putting the world on notice that it wouldn't

11    be providing shared services after a specified period of time.

12         The Court is fully familiar with the Debtor's plan of

13    reorganization, the asset monetization plan, the downsizing of

14    employees that was expected.  And it was the Debtor who had

15    concerns about the funds, the investors, the marketplace, and,

16    frankly, the Debtor's ability to implement its own plan of

17    reorganization, as Mr. Seery so fully testified to.

18         You know, trying to do the right thing here, the Debtors

19    extended the termination date by a couple of weeks.  They

20    engaged in earnest negotiations.  I don't think there is any

21    dispute at all that the parties actually reached an agreement

22    on every single business term, every single business term,

23    except Mr. Dondero's insistence for access to the Debtor's

24    offices.

25         I think the Court is familiar with the record in this

**Appx. 02503**

207

1  case.  There's already an injunction in place barring him from

2  the Debtor's offices.  The reasons for that are also familiar

3  to the Court.  I don't think the Debtor was at all

4  unreasonable in taking the position that it did.

5      They did what they could, but they came to a point where

6  they couldn't continue to provide services consistent with the

7  plan of reorganization that had been presented to the Court.

8  And in order to avoid the substantial risk of being impeded

9  from executing on its plan, in order to avoid the substantial

10 risk that would have occurred had it simply exercised its

11 right and walked away -- the risk of market disruption, the

12 risk of potential involvement by the SEC -- it had no choice

13 but to file this lawsuit.

14     And honestly, Your Honor, for the life of me, I don't know

15 why they didn't try to use this wonderful operating plan as

16 negotiating leverage.  I've never heard of such a thing.  But

17 that's their choice.  We're not here today because they failed

18 to do that.  But had they done that, this lawsuit wouldn't

19 exist.

20     Had Mr. Dondero not injected himself on Wednesday and

21 decided that his access was more important than the rest of

22 it, we wouldn't be here today.

23     Had the Advisors said, when we gave them the take-it-or-

24 leave-it option on Wednesday, we're leaving it, thanks for the

25 effort, we tried hard, this stuff means a whole lot to us, but

Appx. 02504

208

1  we have a great plan here, let's not litigate, there's no

2  reason to do this, we wouldn't be here today.

3      We wouldn't be here today had they not withdrawn Option B

4  on Friday.

5      I don't think -- again, this is summary judgment

6  territory.  There's no dispute about the facts.  There's no

7  dispute that, for the fourth time, the reason that we're here

8  is because Mr. Dondero completely undermined the people who he

9  had authorized to negotiate on behalf of the Advisors and the

10 lawyers who did diligent work, who tried very hard to bring

11 this to fruition, who were engaged in negotiations, as the

12 record shows, not just getting to a deal but going further and

13 preparing settlement documents, preparing wire transfers, only

14 to have the rug pulled out from under them again.

15     The Debtors had no knowledge of any plan whatsoever for

16 the transition of services.  I think -- I have respect for Mr.

17 Norris.  I think that he overstates things, but that's okay.

18 Everybody's allowed to -- their perspective.  But clearly,

19 there's a lot of pieces to that operating plan that aren't in

20 place.  But here, at the end of the day, Your Honor, we don't

21 care.

22     What we want to do is complete the divorce, as Mr.

23 Hogewood said.  And I've got a proposal now that, you know, I

24 hope will be acceptable to both the Court and to Mr. Rukavina.

25 And the proposal would be to allow us to submit to Your Honor

209

1   by the end of the day tomorrow a proposed form of order that

2   will contain a limited number of factual findings and will

3   render this motion moot.  And it would be moot because the

4   Advisors have now put into evidence an operational plan that

5   they have -- that they are committed to.  They have said on

6   the record that they no longer need any services of any kind

7   from the Debtor, except access to the data, and we would be

8   good with that.  We would be prepared to just say this is moot

9   because of the operational plan that Mr. Norris described in

10  such great detail.

11      I don't want to burden the Court with a lot more.  I think

12  that that's a way to just resolve this to the satisfaction,

13  really, of everybody.

14      I'll just briefly say on the jurisdictional issue and the

15  arbitration, because they are issues out there, it's

16  inconceivable that the Court doesn't have jurisdiction here.

17  This matter concerns the Debtor greatly.  You know, we're here

18  precisely because we need the relief that we requested

19  initially, and that -- and that, apparently, the -- that was

20  the adoption and the implementation of a plan so that the

21  Debtor knew it would have no further liability.  It was the

22  Debtor's plan of reorganization that was at issue here, its

23  ability to downsize in the way it told this Court and its

24  creditors that it would do.

25      So I don't think -- I don't think there's a question of

210

1  jurisdiction at all.

2       And with respect to arbitration, you know, I'll note,

3  firstly, of course, that the Advisors, they filed the claim

4  against the Debtor.  They didn't move to lift the stay.  They

5  haven't relied on the arbitration clause when -- when it's

6  good for them.

7       But more importantly, Your Honor, I don't think a motion

8  of this type in particular is the subject of any arbitration

9  provision.  It only applies to one of the agreements, as I

10  understand it, in any event.  But it's the arbitration clause.

11      This isn't about the interpretation of the agreement.  I

12  don't think there's any dispute about the Debtor's right to

13  terminate.  I don't think there's any dispute about any, you

14  know, language in the agreement.  There's no interpretive

15  provision of the agreement that we're talking about here.

16  What we're -- all we're talking about is making sure that, you

17  know, the Debtor wouldn't be taking on a potential liability.

18  And I've gotten comfort from Mr. Norris that we're not,

19  because, you know, Mr. Norris said that the Debtor -- that the

20  Advisors can fully perform under the advisory services

21  agreement, that there's nothing that the Debtor did to prevent

22  the Advisors from fully performing under the Advisors'

23  agreement, that they don't need any services from the Debtor

24  going forward.  And I think that's -- that really is what I

25  think appropriately does render this motion moot.

211

1      And what I would propose, again, just to be clear, is that
2    we could give a proposed order to Your Honor tomorrow at the
3    end of the day, give Mr. Rukavina until the end of the day
4    Thursday to make whatever edits he believes are appropriate,
5    and then Your Honor will do whatever Your Honor thinks is
6    best, as always.
7            THE COURT:  All right.  Well, while I like the
8    concept, and I haven't heard from Mr. Rukavina yet, I'm really
9    worried about false hope that you would prepare something, Mr.
10    Rukavina would be fine, and I'd simply sign it without much
11    time spent on it.
12      Let me start with this.  You said the order, it would be
13    something like an order resolving the motion.  It'll contain
14    certain findings of fact, you said, such as the Advisors have
15    an operating plan, the Advisors need no services from the
16    Debtor going forward except access to data.  Okay.  Would I
17    really get an order that has 14 additional findings, and if
18    so, what would those be?
19            MR. MORRIS:  I think we would just go through -- I
20    don't think that there's really any dispute as to these facts.
21    There would be no findings in there about, you know,
22    withdrawal of Plan B or we gave them an ultimatum or any --
23    there would be nothing like that, Your Honor.  It would simply
24    be:  The parties were signatories to shared services
25    agreements.  The Debtor exercised its right of termination.

212

1    The parties have agreed to extend the termination date twice.

2    The Debtor -- the Advisors have prevented -- I'm doing this

3    off the top of my head, of course -- but the Advisors have

4    prevented -- has -- have prevented -- presented uncontroverted

5    testimony that they have an operational plan pursuant to which

6    they will obtain all of the back-office and middle-office

7    services that were previously provided by the Debtor.  And in

8    case there's any failure in their plan, they have got

9    alternative arrangements with third parties and won't look to

10   the Debtor in the future for any services of any kind other

11   than the retrieval of their data.  I think that's about what

12   it would say.

13        THE COURT:  Okay.  My next question is this:  Are we

14   going to have a fight in a few days about the retrieval of the

15   data issue?  I mean, I just heard Mr. Norris say it was a no-

16   big-deal exercise, that the Debtor just needed to make its IT

17   director available and they would be standing ready to receive

18   it, and he made it sound like a no-big-deal task.

19        MR. MORRIS:  Yeah.  I guess my hope is that we would

20   be able to iron out that last wrinkle, but I think the

21   solution to that is to simply say, if the parties have a

22   dispute on that narrow issue, they come back to the Court,

23   that the Court has continuing jurisdiction to resolve any

24   dispute over -- I think it was the provision that Mr. Rukavina

25   had put up on the screen, I forget, I think it was with Mr.

213

1   Dondero, where the Debtor has some obligation with respect to

2   books and records.

3           THE COURT:  Well, and Mr. Seery said earlier today

4   that the Advisors can have access to the records and data, but

5   not 24 hours a day and not without a cost.  So is that going

6   to be an issue, the cost?

7           MR. MORRIS:  You know what, I have just I guess one

8   other alternative that I'm just thinking off the top of my

9   head.  Maybe put in some type of third-party neutral who can,

10  you know, to the extent that it's even necessary, and I hope

11  that it won't be because I think we've gotten a lot of

12  assurances about the lack of services that are needed going

13  forward, but perhaps we can -- perhaps the Court can appoint

14  some third party who would take the burden off of the Court of

15  any future dispute and try to resolve it that way, you know,

16  with the parties splitting the cost.  That's an alternative.

17          THE COURT:  All right.  Mr. Rukavina, what do you

18  say?

19          MR. RUKAVINA:  Your Honor, I'd like to give a

20  closing, please.

21          THE COURT:  Yes.

22           CLOSING ARGUMENT ON BEHALF OF THE ADVISORS

23          MR. RUKAVINA:  And please understand, Your Honor,

24  this is going to be a difficult closing for me to give because

25  I'm going to be rather blunt.  My bluntness should never,

214

1   never substitute my deep respect for this Court and for

2   bankruptcy courts and for bankruptcy jurisdiction.  I'm a

3   bankruptcy nerd.  Hopefully Your Honor knows that.  And my

4   closing is also going to be made a little bit more difficult

5   because I honestly don't understand why we're here today.

6       We are here in a lawsuit, not a negotiation before the

7   Court.  Mr. Morris and I had days to negotiate, we spoke, and

8   we didn't reach an agreement.  We are here on a six-day notice

9   mandatory injunction where now the Debtor wants to have some

10  order with some findings.  We are here today on a motion for a

11  mandatory injunction that compels my client to do something

12  where we're not told what it is to do.

13      We are not here today, Your Honor, on Count One, their

14  declaratory relief that they've terminated appropriately and

15  done nothing wrong.  We're not here today on that.  It is

16  inappropriate to make any findings on that.  That issue will

17  be resolved in due course.

18      We're not here today on any future duties.  I heard the

19  record, too.  I heard the evidence.  I can't imagine there

20  being any future duties.  But that is an advisory ruling that

21  we're not here on today.

22      So, again, we are here today on whether my client is going

23  to be enjoined to do something.  And the reason why we will

24  not agree to that --

25              THE COURT:  Can I stop you?  What I hear from the

215

1   Debtor is, in light of everything we have all heard the past

2   seven hours, and apparently things the Debtor was not

3   expecting to hear -- that is, we're ready to cut it off

4   tomorrow, today; all we need is the data -- he's happy to say,

5   okay, my request for an injunctive -- a mandatory injunction

6   is moot now.  I'm not asking the Court for that.

7       So, you know, I feel compelled to start with the pragmatic

8   possible resolution of this.  Why --

9           MR. RUKAVINA:  Your Honor?

10          THE COURT:  Why is that not an acceptable way of

11  resolving this?  He doesn't --

12          MR. RUKAVINA:  Because --

13          THE COURT:  He doesn't need an injunction, he says,

14  if we can have an order.

15          MR. RUKAVINA:  It's not -- Your Honor, I would then

16  humbly submit that why doesn't he withdraw his motion?  I

17  mean, the problem that I have, Your Honor, is that anything

18  that I agree to is going to submit my clients' internal

19  business affairs to this Court's oversight.

20      I think Your Honor asked very important questions.  What

21  happens in two or three days' time if something happens?  What

22  about these findings?  I am -- I think that this whole motion

23  is moot, but I am very worried that even a finding of mootness

24  is an exercise of jurisdiction over my clients' internal

25  affairs.

216

1       What I think the Court should do is dismiss this motion --
2   I'm sorry, deny this motion without commentary, without
3   findings, without conclusions.  There's still Count One and
4   Count Two which will be resolved in due course.  And you know
5   what?  If my client messes up somehow in this transition --
6   not to mention that my clients are highly reputable, they're
7   governed, they're regulated, there's other people looking at
8   this -- they can come back to Your Honor.

9       But please understand my perspective, please understand my
10  clients' perspective, because I think it's important.  We have
11  been hauled in front of this Court on allegations that we have
12  willfully failed and refused to adopt and effectuate a plan.
13  The allegations here are extreme.  They've been shared with
14  the creditors.  They've been shared with our boards, who knew
15  about this all along.  They've been shared with the SEC.
16  They've been shared publicly.

17      So I am glad that the record is now clear that these
18  allegations were baseless when made, but even if they were
19  made in good faith, they are baseless today.

20      But I don't even want the Court exonerating my clients'
21  plan.  I don't want the Court commenting on the wisdom of my
22  clients' plan.  Because we will not agree, as a nondebtor
23  party, with all respect, Your Honor, to have this Court take
24  any oversight over our affairs.  It'll lead to some future
25  dispute, some future contempt, some future sanctions, and

217

1    that's just not something that we as nondebtors are going to

2    consent to.

3        The Court doesn't have jurisdiction.  The Court doesn't

4    have core jurisdiction.

5        But let's put all that aside.  The four elements of an

6    injunction, Your Honor.  Where is any evidence of harm?  Mr.

7    Seery did not --

8              THE COURT:  You know what?  As long as we're not

9    going to have a consensual order here, we need to take the

10   issues you've raised, starting with subject matter

11   jurisdiction.  Okay?  If I don't have consensus, I've got to

12   examine my own subject matter jurisdiction.

13       So, on that point, do you say I apply the Fifth Circuit's

14   pre-confirmation test of bankruptcy subject matter

15   jurisdiction or post-confirmation test?

16             MR. RUKAVINA:  Your Honor, the plan has --

17             THE COURT:  Okay.  I signed the confirmation order,

18   but it's one day old.  It's still appealable.  And it's

19   nowhere close --

20             MR. RUKAVINA:  Your Honor?

21             THE COURT:  -- to going effective, I fear.  So, under

22   either test, tell me why I don't have subject matter

23   jurisdiction first.

24             MR. RUKAVINA:  I would like to argue that the pre-

25   confirmation -- that the post-confirmation test applies, but I

Appx. 02514

218

1   can't, in good faith.  The plan has not gotten -- gone

2   effective.  There still is an estate.  So, as of today, I

3   think Your Honor is dealing with the pre-confirmation

4   jurisdiction, --

5            THE COURT:  Okay.

6            MR. RUKAVINA:  -- which is definitely broader.

7            THE COURT:  Okay.

8            MR. RUKAVINA:  There is no jurisdiction, because you

9   have heard no evidence of any effect on this estate as a

10  result of this injunction being issued or not issued.  Mr.

11  Seery had every opportunity to be asked about harm,

12  interference, how does this affect the reorganization?  He did

13  not give you any.  This does not increase --

14           THE COURT:  Well, what I think I heard, and I may be

15  mixing up written pleadings, declarations, versus what he said

16  today, but what I know I heard in either the papers or his

17  oral testimony today was that the Debtor is worried about

18  exposure to liability from who knows who.

19           MR. RUKAVINA:  Okay.

20           THE COURT:  The investors in the private funds or

21  someone else for not having a smooth transition plan here and

22  cutting things off on February 28th without knowing there's a

23  plan.  Okay?  So if the estate is exposed to potential

24  liability, is that an impact on the estate being administered,

25  per *Wood v. Wood*?

219

1        MR. RUKAVINA:  Of course it is, Your Honor.  But we
2   have to go to evidence.  That's not in the evidence.  That's
3   in the brief that they filed.  It is not in Mr. Seery's
4   declaration.  It is conclusory.  It is not evidence.  There is
5   no evidence today of anyone that could sue the Debtor.  I have
6   no idea of anyone who could sue the Debtor -- pardon me --
7   regarding this.
8        THE COURT:  He did say in testimony he was worried
9   about the SEC if this was not done right.
10       MR. RUKAVINA:  Well, Your Honor, with due respect,
11  his worry is conclusory and his worry does not rise to an
12  effect.  He didn't tell you that the SEC has investigated or
13  is threatening anything.  It's a purely hypothetical worry.
14  So I do not think that Your Honor has even related-to
15  jurisdiction now that Your Honor has heard all of the
16  evidence.
17     Now, let me be clear.  Your Honor has jurisdiction over
18  Counts One and Counts Two in this lawsuit, subject to
19  arbitration, right?  That's the declaratory action as to
20  whether they terminated correctly.  That's a legitimate
21  exercise of jurisdiction.  And their monetary claim for unpaid
22  amounts:  Clearly, the Court has jurisdiction.  All I'm
23  talking about is whether the Court has jurisdiction to enjoin
24  a nondebtor party to do something.  Not -- not to not do
25  something, not a status quo injunction, but a mandatory

220

1  injunction.

2      And you have heard no evidence, Your Honor, no nexus as to

3  how the injunction that Your Honor has been asked to order is

4  going to affect the estate.  None.

5          THE COURT:  Okay.  But you say a nondebtor third

6  party.  It's not just any nondebtor third party.  Among other

7  things, it's a counterparty to executory contracts that the

8  Debtors say, you know, we either terminated these during the

9  case or they're deemed rejected, and we're wanting some

10 cooperation from the counterparty.

11     I mean, doesn't that give --

12         MR. RUKAVINA:  Okay.

13         THE COURT:  -- subject matter jurisdiction, because

14 we're talking about a counterparty to an agreement that would

15 have been governed by 365?

16         MR. RUKAVINA:  I think, Your Honor, if there is some

17 duty in those contracts or some duty in the law to act in a

18 particular manner upon termination or rejection, there would

19 be jurisdiction.

20     But just like when Your Honor ruled against us in December

21 -- Your Honor said, I find nothing in this contract that

22 provides for such a duty -- there's nothing in these contracts

23 that provides any obligation on my client.

24         THE COURT:  That is a different agreement.  That was

25 a different agreement, for the record.

221

1          MR. RUKAVINA:  Fair enough.

2          THE COURT:  That was --

3          MR. RUKAVINA:  Your Honor, fair enough.

4          THE COURT:  That was the CLO agreements that your

5     clients were not parties to.

6          MR. RUKAVINA:  But Your Honor asked the right

7     question then, and that's still the right question:  Point me

8     to some statutory or contractual right for what you want.

9     They have not pointed you to any.

10         So, yes, hypothetically, if these agreements -- let's just

11    assume that these agreements required post-termination good-

12    faith unwinding.  There would be jurisdiction.  But these

13    agreements don't provide any of that.  The only thing that's

14    provided is that, post-termination, the Debtor shall promptly

15    return to us our property.  And that -- there's no problem

16    with that.  We trust that the Debtor -- we heard Mr. Seery --

17    the Debtor's not going to mess that up.  It'll be done quickly

18    and painlessly, I hope.

19         That's not what they're asking for.  They're asking for

20    Your Honor to tell my client how to conduct its internal

21    business affairs, and there's nothing in these contractual

22    rights.

23         So, hypothetically, let's just assume that the Court has

24    some related-to jurisdiction.  Okay.  It's still not core

25    jurisdiction.  And these contracts have been terminated, Your

222

1   Honor.  There is no live contract.  No one has shown you any

2   statute or regulation that governs.  So, that's jurisdiction.

3       The same fact of no harm, the same fact of no right, goes

4   to the elements of an injunction, recalling that a mandatory

5   injunction requires a much greater, much clearer burden.

6   Again, Mr. Seery did not testify as to any harm.  He said he

7   was worried about the SEC and he said something like it might

8   make plan implementation more difficult.  Again, conclusory

9   allegations.  Those are not -- that's not evidence of

10  immediate and imminent injury.  It is certainly not evidence

11  of irreparable injury, and it is certainly not evidence of a

12  nonmonetary injury.

13      So, again, I ask -- I understand Your Honor has been in

14  this case for a long time.  I understand Your Honor has been

15  in the Acis case before that.  I understand from Your Honor's

16  confirmation ruling that you have formed certain opinions

17  about my clients, opinions that I think are unfair, quite

18  frankly, that basically conclude that we are a vexatious

19  litigant and that we are the tentacles of Mr. Dondero.  I ask

20  you to put all that aside.  Because that's what the Debtor

21  wants you -- the Debtor wants you to just reflexively conclude

22  that somehow we're nincompoops and incompetents and we need

23  court supervision.  Put all that aside, Your Honor, and just

24  ask yourself:  What am I being asked to do?  I'm being asked

25  to order a nondebtor as to how to conduct its own internal

223

1 business -- not even business related to the Debtor, but how

2 to conduct its own internal business -- even if we are the

3 biggest nincompoops, which absolutely is not borne out by the

4 record.

5     This is the wrong court for any such relief.  It's the

6 wrong court.

7     The reason why I showed you that letter from last Friday

8 was I thought it was -- I think Mr. Morris is an excellent

9 lawyer and I've worked very well with him, but I think that

10 the allegation is so fundamentally unfair, that somehow this

11 is our fault because we didn't tell them about a backup plan

12 and we wouldn't just consent to the entry of an order that

13 gives Your Honor jurisdiction over us.  That's unfair, Your

14 Honor.  This is an inquisition in that respect.  In that

15 respect, it's an inquisition.

16     We were sued.  We defended ourselves.  We're not -- this

17 is the fourth lawsuit, by the way, that the Debtor filed

18 against us, Your Honor.

19     And as I asked you at the confirmation hearing, what

20 evidence is there that we're vexatious?  Okay, we filed a

21 motion in front of Your Honor that was frivolous.  It

22 happened.  And we're glad that the Court didn't sanction us.

23 We're glad.  Perhaps the Court still will.  But that's it.

24 Nothing else that we've done.

25     We've been quiet in this case.  We've been minding our own

224

1    business.  We've been preparing a backup plan.  We've done

2    everything right.  And the Debtor comes to you shocked,

3    shocked, alleging that we don't have any plan, alleging that

4    the sky is falling.  And even when the Debtor learns that

5    that's not the case, we still had to go through today.

6        Why did we go through today, Your Honor?  Why did my

7    client -- why did my client have to sit here like someone that

8    had done something wrong, like a criminal defendant, and be

9    inquired as to all of its internal business practices, with

10   implications made that my client doesn't know what it's doing?

11   Why did we go through today just to have some order that's a

12   -- that provides for something?

13       They want a mandatory injunction, Your Honor.  You should

14   thumbs-up it or thumbs-down it.  And if you thumbs-up it,

15   it'll be without jurisdiction, without basis, and it'll be

16   extraordinary.

17       I can just keep talking and talking, but I'll repeating

18   the same points, Your Honor, so I thank you.

19           MR. MORRIS:  Can I just have five minutes, Your

20   Honor?

21           THE COURT:  You can.

22       REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23           MR. MORRIS:  You know, I think the Court can issue an

24   order finding that the motion is moot on its own accord.  It

25   doesn't need a consensual order to do that.  I think the Court

225

1  -- I would believe that the Court would have a factual finding

2  to support the finding of mootness.

3      But I don't really get the righteous indignation at all.

4  It's as if Mr. Rukavina didn't hear anything I said.  Because

5  we're most certainly not asking the Court -- we weren't even,

6  in the motion, asking the Court to do anything specific other

7  than direct the Advisors to adopt and implement a plan.  It

8  didn't have to be with us.  We didn't care who it was with.

9  We didn't care what the elements were.  The fact of the matter

10  is Mr. Seery testified extensively, not just about the

11  potential impact this would have on the Debtor's plan of

12  reorganization, but he testified that certain of the Debtor's

13  employees had received threats.  He testified, based on his

14  experience, that this is a highly-regulated industry, and if

15  there was -- if we walked away without any plan in place,

16  which is exactly why he said we filed this motion, that it

17  would be -- that it would be potentially catastrophic and that

18  undoubtedly the SEC would be involved.  And Mr. Rukavina

19  cannot give the Debtor any assurances that it would have no

20  liability.  Mr. Rukavina, I'm sure, is not going to allow his

21  client to indemnify the Debtor for any damages that may have

22  occurred in the future.

23      We're a little far afield here, Your Honor.  We simply

24  wanted to make sure that there was a plan in place to avoid a

25  catastrophe.  That was the irreparable harm that we were

1   looking at.  And at the end of the day, they came in -- you

2   know, I wish they had done it last week.  I wish they had told

3   us last Thursday.  I wish they had told us last Wednesday.  I

4   wish they had told us during the negotiations.  I wish they

5   had told us last Friday, instead of pulling Plan B.  I wish

6   they -- you know.  But it doesn't matter.  They don't have an

7   obligation to do that and I'm not, you know, I'm not going to

8   pretend that they do.  It would have been better if they had.

9   They didn't.  But they did, they did what the Debtor needed

10  them to do today, and that is present their plan to the Court.

11        And while we, you know, have questions about when it was

12  prepared, whether it's fulsome, they like it, and that's the

13  important part.  And they're not going to look to the Debtor

14  for any services in the future.  That's the important part.

15        The risk that Mr. Seery was concerned about has been

16  eliminated, and I, you know, appreciate that.  And that's why

17  I thought we came in here with a very rational and pragmatic

18  solution, to just -- to just -- you know, they've done what

19  we've asked for.  We've gotten the relief that we've asked

20  for.  The Advisors have sworn under oath that they have an

21  operating plan to obtain the essential services that the

22  Debtor used to provide.  That's the relief we were asking for.

23  I'm not quite sure what there is left here.

24        THE COURT:  Okay.  Thank you.

25     All right.  The first thing I'm going to say is that the

227

1   Court believes it has subject matter jurisdiction, bankruptcy

2   subject matter jurisdiction, over the requested relief.  If

3   it's a pre-confirmation test that I am supposed to apply here

4   -- that is, the *Wood v. Wood,* could this dispute have a

5   conceivable effect on an estate being administered -- I find

6   that that test is met.

7        I think the concern of potential liability and exposure on

8   the part of the Debtor is well-founded, even if it was not

9   articulated to the Advisors' satisfaction today.  I think,

10  based on the litigious history here between these parties and

11  the contentiousness, I should say, between these parties

12  during this case, there is certainly a well-founded concern,

13  and certainly I think the Debtor is just being prudent,

14  worried about the SEC, investors, the Advisors, the funds,

15  someone else pointing fingers at the way the Debtor did or did

16  not act in transitioning services over.  I think that is a

17  basis for subject matter jurisdiction under the pre-

18  confirmation test.

19       If the post-confirmation test applies here, we know that

20  Fifth Circuit cases such as *In re Craig's Stores*, *In re Case*,

21  *National Gypsum*, among others, articulate the test of

22  bankruptcy subject matter jurisdiction being could the outcome

23  of the dispute bear on the implementation, the execution, or

24  the interpretation of a confirmed plan?  I think that test is

25  likewise met here.

228

1    Obviously, the plan contemplated a separation, and this

2 request for relief appears to be basically seeking some

3 supplemental -- a supplemental order to supplement the

4 confirmation order, to supplement the Debtor's attempt at

5 divorcing these parties as part of the monetization plan.

6    So I think bankruptcy subject matter jurisdiction does

7 exist here.

8    I didn't hear in oral arguments, closing arguments,

9 anything about the arbitration, but I think there's a real

10 question here whether the Advisors may have waived their right

11 to invoke the arbitration clause that's in one of the shared

12 services agreements, not both of them, by filing pleadings so

13 often, participating in this bankruptcy case so often, without

14 invoking that.

15    But again, as I see it, this adversary proceeding is

16 largely -- essentially, I should say -- asking for an order

17 supplementing the confirmation order, and it doesn't really

18 seem like a dispute *per se* under the shared services

19 agreements that have already been terminated.

20    So I think an argument can be made that there's been

21 waiver here, but even if there's not, that this is core in

22 that it bears on the plan confirmation, certainly more than a

23 dispute arising under the literal terms of the shared services

24 agreement.

25    I reserve the right to supplement and amend this, if I

229

1    need to, in a more thorough written ruling.

2         But anyway, based on the Court determining it does have

3    subject matter jurisdiction here, I see it appropriate to

4    enter an order that, based on the Court's several hours of

5    testimony today from three different witnesses -- Mr. Seery,

6    Mr. Dondero, Mr. Norris -- and based on many documents that

7    have been submitted into the evidence, the Court finds that

8    the shared services agreements were already terminated

9    pursuant to their terms and can also be deemed rejected under

10   365 of the Code previously.

11        The Court will find that the Advisors do not need any

12   further services from the Debtor under these agreements as of

13   today's date, except access to data and records, which, based

14   on the testimony of Dustin Norris, can be easily effectuated,

15   Mr. Norris's testimony being that what the Debtor would need

16   to do to allow access to the data is authorize the Debtor's IT

17   director to transfer data and we stand ready to receive it.

18   And data would include historical emails, vault emails, files

19   in the system, and a number of other items, but, quote, there

20   would almost be no work from the Debtor's end.

21        So, believing that to be the case, I would order that the

22   Debtor stand ready between now and the 28th to provide that

23   access and that the Advisors stand ready to receive that

24   access.  And if the process extends beyond February 28th, then

25   it will have to be subject to further orders of this Court,

230

1  but the Court would expect there to be a cost if it extends

2  past February 28th.  And again, the Court would consider that

3  in a further hearing, how much cost should be imposed on the

4  Advisors.  But the advisors have represented to me through Mr.

5  Norris it's easy, it can be accomplished easily, so therefore

6  I would think it could happen between now and the 28th, and if

7  it does, no cost imposed on anyone.

8      I will further find that the Advisors have represented and

9  the Court therefore finds that there is an operating plan in

10  place for the Advisors to continue to operate uninterrupted

11  beyond today.  And again, the only thing I would envision that

12  needs to happen between today and February 28th is the access

13  to data.

14      So, having made these findings, the Court believes that

15  the request for a mandatory injunction is moot and is

16  therefore denied.

17      Are there any questions?  Mr. Morris, I want you to be the

18  scrivener, and, of course, run it by Mr. Rukavina.  But are

19  there any questions or concerns about what I've just

20  articulated?

21          MR. MORRIS:  I just have one, Your Honor.

22          THE COURT:  Uh-huh.

23          MR. MORRIS:  You made reference to rejection of the

24  contract.  From our perspective, it's not rejection.  We don't

25  want to open this up to a rejection claim of any kind.  It

231

1   really was just a termination of the agreement, in accordance

2   with the terms.  And I had put the provisions up before the

3   Court during my opening and walked Mr. Seery through.  That's

4   the basis for the --

5           THE COURT:  Okay.

6           MR. MORRIS:  -- termination of the agreement.  It's

7   not rejection at all.

8           THE COURT:  Fair point.

9           MR. RUKAVINA:  And Your Honor, there's no -- there's

10  no -- yeah, there's no problem.  There's no problem on that.

11  We do not disagree.  We do not disagree with Mr. Morris.

12          THE COURT:  Fair point.  I made the mistake of belts

13  and suspenders, trying to fill in any hole there might be.

14  But yes, I had the evidence that there was a termination of

15  both agreements on November 30th.  One of them had a 60-day

16  window before it became effective, the other a 30-day.  So

17  they are terminated.

18      All right.  Mr. Morris, anything else from you?

19          MR. MORRIS:  No.  We'll prepare a form of order.

20          THE COURT:  All right.  Mr. Rukavina, anything

21  further from you?

22          MR. RUKAVINA:  Your Honor, obviously, I have

23  questions.  I have reservations.  I need to look at whether

24  the Court's findings are going to be binding in this adversary

25  proceeding.  So, at this point in time, I'm just not prepared

232

1  to really say anything lest I get myself in trouble.  But I

2  thank you for your time today.

3        THE COURT:  All right.  Well, they are what they are,

4  and I hope we're not in an argument about that down the road.

5  But it seems like my hopes are always dashed when I want

6  things to be worked out.

7     I don't want you to think my calm demeanor means I am a

8  happy camper.  I am not.  I am beyond annoyed.  I mean, I

9  can't even begin to guesstimate how many wasted hours were

10  spent on the drafting Option A, Option B.  Wait.  Let me pull

11  up the exact words.  Mr. Norris confirming, We withdrew Option

12  B after the Debtor accepted it.

13     I mentioned fee-shifting once before in a different

14  context, and, of course, we haven't even gotten to the motion

15  for a show cause order declaring Mr. Dondero in contempt.  I

16  don't know if the lawyers fully appreciate how this looks.

17  Mr. Rukavina, you said that I have formed opinions that you

18  don't think are fair and made comments about vexatious

19  litigation and whatnot.  But while I continue, I promise you,

20  to have an open mind, it is days like this that make me come

21  out with statements that Mr. Dondero, repeating his own words,

22  apparently, he's going to burn the house down if he doesn't

23  get his baby back.

24     I mean, it seems so obviously transparent that he's just

25  driving the legal fees up.  It's as though he doesn't want the

233

1  creditors to get anything, is the way this looks.  If he wants

2  me to have a different impression, then he needs to start

3  behaving differently.  I mean, I can't even imagine how many

4  hundreds of thousands of dollars of legal fees were probably

5  spent the past two weeks on Option A, Option B, and all the

6  different sub-agreements and whatnot.  And as recently as

7  Friday afternoon, the K&L Gates lawyer saying we have a deal,

8  and then, oh, wait, maybe not, maybe we do, maybe we don't.

9  And then Mr. Dondero acting like he had no clue what the K&L

10  Gates lawyers were saying as far as we have a deal.  And Mr.

11  Norris distancing himself from having seen any of that, and I

12  didn't have power.  You know, I'm sure he had a cell phone,

13  like the rest of us, that gets emails.  I'm making a

14  supposition.  I shouldn't make that.  But it just feels like

15  sickening games.

16      And again, if this keeps on, if this keeps on, one day,

17  one day, there may be an enormous attorney fee-shifting order.

18  And, of course, I would have to find bad faith, and I wouldn't

19  be surprised at all if I get there.

20      So I don't know if Mr. Dondero is listening.  I suspect,

21  if he is, he doesn't care much.  But I am --

22          MR. DONDERO:  I'm on the line, Judge.

23          THE COURT:  Okay.

24          MR. DONDERO:  I'm on the line.

25          THE COURT:  I'm glad you're on the line.  I cannot

 1   overstate how very annoyed I am by hearing all these hours of

 2   testimony and to feel like none of it was necessary.  None of

 3   it was necessary.  Okay?  There could have been a consensual

 4   deal --

 5          MR. DONDERO:  Judge, you have to pay attention --

 6   Judge, you have to pay attention to what's going on, okay?

 7          THE COURT:  I am --

 8          MR. DONDERO:  When I was president of Highland, --

 9          THE COURT:  -- razor-sharp focused on what is going

10   on.  Okay?  I read every piece of paper.  I listen to every

11   sentence of testimony.  And what is going on --

12          MR. DONDERO:  Okay.  How about this, Your Honor?

13          THE COURT:  -- is an enormous waste of parties and

14   lawyer time and resources.  People need to get their eye on

15   the ball.  Well, certain people do have their eye on the ball,

16   but certain people do not.  Okay?  So we're done.  You've got

17   your divorce now.  Okay?  And if the operating plan is all

18   shored up, as Mr. Norris testified, it sounds like you're in

19   good shape.  All right?

20      Mr. Morris, I'll look for the order from you.

21          MR. MORRIS:  Thank you, Your Honor.

22          THE CLERK:  All rise.

23      (Pause.)

24          THE COURT:  Oh, Michael?

25      (Court confers with Clerk.)

235

1          THE CLERK:  Hello?  Hang on.  Mr. Morris?

2          THE COURT:  Is anyone still there?

3          THE CLERK:  Mr. Rukavina is still there.  Mr.

4    Rukavina, Mr. Morris, are you all still there?

5          MR. RUKAVINA:  Judge, this is Davor.

6          THE COURT:  All right.

7          MR. RUKAVINA:  I think we're all wondering whether

8    we're going to have the contempt hearing.

9          THE COURT:  Well, yes, that's why I came back in.

10         MR. RUKAVINA:  I can't hear you, Judge.  We can't

11   hear you.

12         THE COURT:  I realized I -- it's 4:19 Central time.

13   We are not starting the contempt hearing.

14      Mr. Morris, are you there now?

15         MR. MORRIS:  I am.  I did have one suggestion.

16         THE COURT:  All right.  I neglected to mention our

17   other setting, but we are not going to start at 4:19 Central

18   time.  Do we want to talk about scheduling on that?

19         MR. MORRIS:  I did, Your Honor.  And it's just an

20   idea, and I understand we've had a long day.  But I was going

21   to suggest if there was any way to just get their motion *in*

22   *limine* out of the way today, so that when we come back for the

23   evidentiary hearing parties are fully prepared.  If you don't

24   want to do it, that's fine.  Otherwise, I'm available at Your

25   Honor's convenience.

236

1          THE COURT:  All right.  I am going to have you all

2   communicate with Ms. Ellison about rescheduling that.  I have

3   no idea what my calendar looks like next week, but I'm not

4   going to do it this week.  I've got a backlog of other case

5   matters that I need to get to this week.

6          MR. MORRIS:  Okay.

7          THE COURT:  So, you know, maybe we'll do it next

8   week.  On the motion *in limine*, you've not filed a response?

9   It was just filed yesterday, so I'm guessing there's no

10  response.

11         MR. MORRIS:  Yeah.  I was going to do -- I was going

12  to do it orally.  I'm happy to do a written response, and I'm

13  happy to just proceed on the papers.  I just think it would be

14  helpful to have that, you know, or if we could put aside an

15  hour later this week to do that, because then preparing, if we

16  know the evidence is in or out, I think it'll just make the

17  trial a lot more smooth.

18         THE COURT:  All right.  I barely had time to pore

19  over it, so let me have Traci reach out to you all tomorrow

20  and let you know do I want a hearing on it or not.  I have an

21  initial reaction.  I don't know if Mr. Dondero's counsel is on

22  the phone.  I don't want to talk about this too much if he's

23  -- do we have Dondero's counsel?

24         MR. WILSON:  I'm present, Your Honor.  John Wilson.

25         THE COURT:  Okay.  I will tell you right now that,

237

1  having done a quick review of it, I didn't feel inclined to

2  grant it.  I'm going to have the TRO in front of me and I'm

3  going to hear the evidence of what happened, and it's either

4  going to match up as a violation of the provisions of the TRO

5  or not.  You know, I feel -- I'm not a jury.  I can decide

6  whether it is violative of the TRO or not.  The theme of it

7  was, oh, it's going to have a prejudicial effect.  I mean,

8  I've already heard about a lot of this.  So I'm inclined not

9  to grant it.  But, again, I did a very quick look at it at

10  5:00 o'clock last night.  And that's why I asked Mr. Morris,

11  was he going to have a response, because --

12         MR. MORRIS:  Yeah.  I was planning to do it orally

13  today, Your Honor.  If I may just have until 5:00 o'clock

14  tomorrow, I'll submit an opposition that won't exceed five

15  pages.

16         THE COURT:  Okay.  So that's what we'll do.  And then

17  once I've looked at the motion more carefully, as well as the

18  response, I'll decide if I need oral argument or if I'm just

19  going to rule on the pleadings, okay, and Traci will let you

20  all know.  All right?  And again, Traci will coordinate with

21  you tomorrow or sometime this week about a resetting on the

22  contempt motion.

23      All right.  Thank you.

24         MR. MORRIS:  Thank you, Your Honor.

25         MR. WILSON:  Thank you, Your Honor.

**Appx. 02534**

238

1          THE CLERK:  All rise.

2        (Proceedings concluded at 4:23 p.m.)

3                        --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21        I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                        **02/24/2021**

24   _____          _____
     Kathy Rehling, CETD-444                          Date
25   Certified Electronic Court Transcriber

**Appx. 02535**

239

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. Morris                                               6
- By Mr. Hogewood                                           21

WITNESSES

Debtor's Witnesses

James P. Seery, Jr.
- Direct Examination by Mr. Morris                         29
- Cross-Examination by Mr. Rukavina                        68

James D. Dondero
- Direct Examination by Mr. Morris                         76
- Cross-Examination by Mr. Rukavina                        96
- Redirect Examination by Mr. Morris                      101
- Recross-Examination by Mr. Rukavina                     101

Advisors' Witnesses

Dustin Norris
- Direct Examination by Mr. Rukavina                      103
- Cross-Examination by Mr. Morris                         166
- Redirect Examination by Mr. Rukavina                    198
- Recross-Examination by Mr. Morris                       202

EXHIBITS

Debtor's Exhibits 1 through 21              Received   29
Advisors' Exhibits A through N              Received   29
Advisors' Exhibit O                         Received  200

CLOSING ARGUMENTS

- By Mr. Morris                                          206
- By Mr. Rukavina                                        213
- By Mr. Morris                                          224

RULINGS                                                 226

END OF PROCEEDINGS                                      238

INDEX                                                   239