# EXHIBIT 80

Appx. 02537

```
                    IN THE UNITED STATES BANKRUPTCY COURT
1                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
2
                                     )    Case No. 19-34054-sgj-11
3    In Re:                          )    Chapter 11
                                     )
4    HIGHLAND CAPITAL                )    Dallas, Texas
     MANAGEMENT, L.P.,               )    June 8, 2023
5                                    )    9:30 a.m. Docket
                                     )
6         Reorganized Debtor.        )
                                     )    HMIT'S MOTION FOR LEAVE TO
7                                    )    FILE VERIFIED ADVERSARY
                                     )    PROCEEDING (3699)
8    _____)

9                         TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                  UNITED STATES BANKRUPTCY JUDGE.

11   APPEARANCES:

12   For the Reorganized        John A. Morris
     Debtor:                    Gregory V. Demo
13                              Hayley R. Winograd
                                PACHULSKI STANG ZIEHL & JONES, LLP
14                              780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
15                              (212) 561-7700

16   For the Reorganized        Jeffrey Nathan Pomerantz
     Debtor:                    PACHULSKI STANG ZIEHL & JONES, LLP
17                              10100 Santa Monica Blvd., 13th
                                  Floor
18                              Los Angeles, CA  90067
                                (310) 277-6910
19
20   For Hunter Mountain        Sawnie A. McEntire
     Investment Trust:          Timothy J. Miller
21                              PARSONS MCENTIRE MCCLEARY, PLLC
                                1700 Pacific Avenue, Suite 4400
22                              Dallas, TX  75201
                                (214) 237-4303
23
24   For Hunter Mountain        Roger L. McCleary
     Investment Trust:          PARSONS MCENTIRE MCCLEARY, PLLC
25                              One Riverway, Suite 1800
                                Houston, TX  77056
                                (713) 960-7305
```

2

APPEARANCES, cont'd.:

For Hunter Mountain              Deborah Deitsch-Perez
Investment Trust:                STINSON
                                 2200 Ross Avenue, Suite 2900
                                 Dallas, TX  75201
                                 (214) 560-2218

For Muck Holdings, et al.:  Brent Ryan McIlwain
                                 HOLLAND & KNIGHT, LLP
                                 300 Crescent Court, Suite 1100
                                 Dallas, TX  75201
                                 (214) 964-9481

For James P. Seery, Jr.:    Mark Stancil
                                 Joshua Seth Levy
                                 WILLKIE FARR & GALLAGHER, LLP
                                 1875 K Street, NW
                                 Washington, DC  20006
                                 (202) 303-1133

Recorded by:                     Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
                                 (214) 753-2062

Transcribed by:                  Kathy Rehling
                                 311 Paradise Cove
                                 Shady Shores, TX  76208
                                 (972) 786-3063

        Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.

Appx. 02539

3

<u>DALLAS, TEXAS - JUNE 8, 2023 - 9:42 A.M.</u>

1

2          THE CLERK:  All rise.  United States Bankruptcy Court

3  for the Northern District of Texas, Dallas Division, is now in

4  session, The Honorable Stacey Jernigan presiding.

5          THE COURT:  Good morning.  Please be seated.  All

6  right.  We are here this morning for a setting in Highland.

7  This is on a motion of Hunter Mountain for leave to file an

8  adversary proceeding.  I will start out by getting appearances

9  from lawyers in the courtroom.

10          MR. MCENTIRE:  Yes, Your Honor.  Sawnie McEntire

11  along with my partner Roger McCleary and Tim Miller on behalf

12  of Hunter Mountain Investment Trust, Ltd.

13          THE COURT:  Thank you.

14          MR. MORRIS:  Good morning, Your Honor.  John Morris,

15  Pachulski Stang Ziehl & Jones, for the Reorganized Highland,

16  for the Highland Claimant Trust.  I'm joined by Mr. Pomerantz,

17  Mr. Demo, and Ms. Winograd.

18          THE COURT:  Good morning.

19          MR. STANCIL:  Good morning, Your Honor.  Mark Stancil

20  from Willkie Farr & Gallagher for Mr. Seery.  I'm joined by my

21  colleague Josh Levy.

22          THE COURT:  Good morning.

23          MR. MCILWAIN:  Good morning, Your Honor.  Brent

24  McIlwain from Holland & Knight here for Muck Holding, LLC,

25  Jessup Holdings, LLC, Farallon Capital Management, LLC, and

4

1   Stonehill Capital Management, LLC.

2            THE COURT:  Thank you.  All right.  Is that all of

3   our lawyer appearances?  I know we have observers on the

4   WebEx, but I assume you are just observers.  We scheduled this

5   to be a live hearing for participants.

6       All right.  Well, we had some ground rules for how this

7   would go forward today.  We, of course, have had two -- I call

8   them hearings on what kind of hearing we're going to have.

9   We've had two status conferences.  And so our ground rules

10  were set.  Three hours of total presentation time for each the

11  Movant and the aggregate Respondents.  We also had an order

12  regarding what discovery would or would not be allowed.

13      And to my surprise, there were a flurry of pleadings.

14  We're a few minutes late getting out here because we were

15  trying to digest what was filed late yesterday and into the

16  night.

17      So I understand we have a controversy about a couple of

18  expert witnesses who were listed on Monday on the Movants'

19  exhibit and witness list.  And I've seen a motion to exclude

20  the expert witnesses' testimony.  And I think we need to

21  address that right off the bat.  I don't want to take too much

22  time on this, because, again, we're going to finish today, and

23  I won't let this housekeeping matter eat into our three hours,

24  but I want to get going.  So I'll hear from Movant, Mr.

25  McEntire.

5

1             MR. STANCIL:  Your Honor, may --

2             THE COURT:  Go ahead.

3             MR. STANCIL:  We moved to exclude, so I would propose

4    that my colleague, Mr. Levy, address this motion very briefly

5    if --

6             THE COURT:  Well, I guess --

7             MR. STANCIL:  Or I will do as --

8             THE COURT:  -- that actually makes sense.

9             MR. STANCIL:  Okay.

10            THE COURT:  I was thinking Mr. McEntire teed up the

11   issue, but I suppose you did with the motion to exclude.  So,

12   Counsel?

13            MR. LEVY:  Thank you, Your Honor.  Josh Levy on

14   behalf of Mr. Seery.

15       So, we think our papers largely speak for themselves, but

16   two additional points we'd like to raise.  In the response

17   filed by Hunter Mountain this morning, and this is Docket

18   Entry 3828, in Paragraph 11, they argue that this is a bench

19   hearing on colorability, not a trial where junk science is a

20   concern.  But junk science is precisely what they're trying to

21   introduce here.  They have raised two expert witnesses, one

22   who purports to be an expert in compensation but has no

23   experience whatsoever in evaluating compensation, and they

24   provide no methodology for their conclusion.

25       For example, they claim to have identified red flags.

6

1   They never explain what those red flags are, why they are red

2   flags, or how they determined they were red flags.  This is

3   junk science, precisely what the Federal Rules are designed to

4   exclude.

5       But that shouldn't detract from the broader procedural

6   point that this is the first time we're hearing about expert

7   witnesses, at 10:00 p.m. three days before the hearing.  This

8   is a trial by ambush.  This motion was filed in March, we've

9   been litigating this motion for over two months now, and this

10  is the first time we're hearing about any expert witnesses.

11      As Your Honor noted, we've had multiple conferences.

12  We've had rules setting the ground rules for this hearing.

13  We've had orders setting the scope of discovery.  But now

14  Hunter Mountain is trying to pull a bait-and-switch.  After

15  never mentioning any experts, after obtaining orders limiting

16  the scope of discovery, they then wait until right before the

17  hearing to disclose their experts, ensuring that these experts

18  are insulated from any kind of discovery and can ambush us at

19  the hearing.

20      I'm happy to answer any other questions, but we believe

21  they should be excluded and the accompanying exhibits should

22  also be excluded.

23          THE COURT:  All right.  Thank you.  And the

24  accompanying exhibits, I don't review exhibits before a trial

25  or a hearing because I don't know what's going to be objected

7

    1   to and admitted.  So do you want to point out, were there

    2   expert reports in the proposed exhibits?

    3          MR. LEVY:  These were charts and analyses prepared by

    4   their experts, not actual expert reports.

    5          THE COURT:  Okay.

    6          MR. LEVY:  In their witness and exhibit list, Hunter

    7   Mountain included several paragraphs that I guess serves as

    8   what would be their expert reports.  And then it would be

    9   Exhibits 39 through 52, which consist of CVs, materials

   10   reviewed, and then what they term "data charts" prepared by

   11   their experts.

   12          THE COURT:  39 through 52?  Oh, I'm looking at the

   13   wrong exhibit notebook.  Oh.

   14      (Pause.)

   15          THE COURT:  Okay.  Here we go.  All right.  No

   16   questions at this time.

   17      Mr. McEntire?

   18          MR. MCENTIRE:  Yes, Your Honor.  May I proceed?

   19          THE COURT:  You may.

   20          MR. MCENTIRE:  Again, my presentation and response is

   21   subject to our objection concerning that any evidence is being

   22   admitted for any purpose, other than what we believe is the

   23   proper standard of review.  So my response and our offer of

   24   these experts is subject to that objection.

   25      With that said, Mr. Levy's argument he just presented to

8

1    the Court presupposes that my client has a duty under 9014 to

2    provide a report, which we do not; to provide detailed

3    disclosures, which we do not, because 9014 is specifically

4    exempted from the scope of Rule 26.  What we did, we didn't

5    have to do.  What we did, and I made the decision to provide

6    them some disclosure and identification of who they were,

7    their backgrounds, and --

8              THE COURT:  Well, let me stop you.

9              MR. MCENTIRE:  Certainly.

10             THE COURT:  "What we did, we didn't have to do."  The

11   Local Rules, first of all, do require an exhibit and witness

12   list.  And --

13             MR. MCENTIRE:  We've provided that.

14             THE COURT:  I know.  I know.  But you -- I thought I

15   heard you --

16             MR. MCENTIRE:  No, no.

17             THE COURT:  -- saying you didn't have to do that.

18   You do have to do that.

19             MR. MCENTIRE:  No, no, no.

20             THE COURT:  But I guess what you're saying is --

21             MR. MCENTIRE:  What we provided was more than what

22   the Local Rules require.

23             THE COURT:  How so?

24             MR. MCENTIRE:  We provided CVs.  We provided their

25   backgrounds.  We disclosed in the actual witness description

9

1  who they were and the key components of their opinions.  And

2  we refer to their data charts.  That is not something that the

3  Local Rule requires.

4          THE COURT:  Okay.  Well, let me back up.  We have our

5  Local Rules, but then we had our two status conferences --

6          MR. MCENTIRE:  Yes.

7          THE COURT:  -- on what the format of the hearing --

8          MR. MCENTIRE:  Yes.

9          THE COURT:  -- would be.

10          MR. MCENTIRE:  Yes.

11          THE COURT:  And, of course, there was extensive

12  discussion, evidence or no evidence?  What did the legal

13  standard, colorability, require?

14          MR. MCENTIRE:  Yes.

15          THE COURT:  And I came out in the end and said, if

16  people want to put on witnesses, they're entitled to put on

17  witnesses.  I think there may be a mixture of a fact question

18  and law question on colorability.  So, and then I set a three-

19  hour time limit and I said, if someone wants to depose Mr.

20  Seery and Mr. Dondero, they can, but no more discovery other

21  than that.  Okay?

22          MR. MCENTIRE:  I understand.

23          THE COURT:  Why then did you not say, well, wait,

24  Judge, if it's going to be evidence, we're just letting you

25  know, in full disclosure, we might call a couple of experts,

1    and this may impact your decision on what kind of discovery

2    can happen.  And this may impact your decision on whether

3    three hours each side is enough.

4            MR. MCENTIRE:  Well, Your Honor, in fairness, I don't

5    think we had made a final decision to actually designate any

6    experts.  And at the time, the focus was on other witnesses.

7    But there was no exclusion, there was no limitation at all on

8    my right to bring an expert.  And the Rules are very clear.

9    And the Court's --

10           THE COURT:  But I specifically limited discovery, and

11   it was on your motion.  It was on your motion we set the

12   hearing on --

13           MR. MCENTIRE:  Actually, --

14           THE COURT:  You know, did you need a continuance,

15   because if we were going to have evidence, maybe you needed a

16   continuance.  And then there was a discovery issue raised.

17           MR. MCENTIRE:  To be clear, Your Honor, I'm looking

18   at your orders.

19           THE COURT:  Got them in front of me.

20           MR. MCENTIRE:  Your order of May 26, 2023.  You said,

21   You can put on your witnesses and the Court is going to rule.

22   You made no limitations as to who the witnesses would be.

23   Your order did not limit the scope of witnesses to simply Mr.

24   Seery or Mr. Dondero.  In fact, any suggestion that you did

25   limit the witnesses is contrary --

11

1           THE COURT:  Now, which order are you looking at?

2           MR. MCENTIRE:  I'm looking at the May 26, 2023 order,

3    Page 51, Lines 3 through 14.

4           THE COURT:  Okay.

5           MR. MCENTIRE:  You also stated --

6           THE COURT:  I have -- have I entered three orders on

7    this?  I've got a May 10th order.  I've got a May 22nd order.

8           MR. MCENTIRE:  And I would also point out, Your

9    Honor, --

10          THE COURT:  Could you answer my question?  I want to

11   look at what you're looking at.

12          MR. MCENTIRE:  Certainly.

13          THE COURT:  Here we -- this is the one.  Okay.  Aha.

14   Okay.  May 26.

15          MR. MCENTIRE:  Page 51, Lines 3 through 14.

16          THE COURT:  I've entered three orders on what kind of

17   hearing we're going to have.  Okay.  So you're looking where?

18          MR. MCENTIRE:  Page 51, Lines 3 through 14.  "You can

19   put on your witnesses."

20          THE COURT:  Page 51?

21          MR. MCENTIRE:  Yes, ma'am.

22          THE COURT:  Oh.  You're looking at a transcript, not

23   the order.

24          MR. MCENTIRE:  That's right.  I apologize.

25          THE COURT:  Okay.

12

1          MR. MCENTIRE:  Yeah, I'm looking at the transcript

2    from the hearing.

3          THE COURT:  Okay.  Well, I'm looking at my order.

4          MR. MCENTIRE:  And the order, the order also

5    specifies no limitation at all in connection with the -- the

6    --

7          THE COURT:  But my order was based on what was

8    discussed that day.

9          MR. MCENTIRE:  And what was --

10          THE COURT:  If you had said, hmm, Judge, if you're

11    going to allow evidence, we may call a couple of experts, then

12    there would have been a whole discussion about that and did I

13    need to limit the discovery, as I did.  And there would have

14    been a whole discussion of, well, three hours, three hours

15    each side, is that going to be enough if we have experts?

16          MR. MCENTIRE:  The discovery ruling that you made was

17    on my motion, and at the time I was not seeking to take any

18    expert depositions.  And you denied my request to take ample

19    discovery.  You limited my right to take only one deposition,

20    without documents.

21       The issue of taking expert discovery was not even on the

22    table.  However, you made it very --

23          THE COURT:  Well, that's my point precisely.  The

24    whole purpose of the hearing was, what kind of hearing are we

25    going to have on June 8th?

**Appx. 02549**

13

1            MR. MCENTIRE:  I understand.  And our position --

2            THE COURT:  We had already had one status conference

3     on argument only versus evidence.  And I allowed you all to

4     file some briefing, which you did.  And then I issued an order

5     after the briefing, saying, I think I should allow evidence on

6     the colorability question.  I'm not forcing anyone to put on

7     evidence, but if you want to put on evidence, you can.

8         And then you filed your motions and we had the next status

9     conference on what kind of hearing we're going to have.  And

10    there was more argument:  We don't think the evidence is

11    appropriate, but if evidence is appropriate, we want you to

12    continue the hearing to allow all kinds of discovery.  I don't

13    know what.  And it was right before Memorial Day, and I hated

14    the fact that a bunch of subpoenas were going to go out and

15    ruin people's holidays.  But there was no discussion then of,

16    okay, but just so you know, since you have made the ruling

17    that evidence can come in, we're going to have a couple of

18    experts.

19            MR. MCENTIRE:  As I've already mentioned, Your Honor,

20    we had not made a decision to call experts at that time.  We

21    made a decision to call the experts shortly before we filed

22    our designations.

23        The point here is this.  The Rules do not require me to

24    provide any more disclosure than I have.  I have gone over and

25    above the Local Rules.

14

1        If the Court believes that it would have allowed more time

2   for this hearing, I would advise the Court that opposing

3   counsel vehemently opposed any type of postponement or

4   continuance.  The discovery that I was requesting was

5   discovery from fact witnesses.  Experts were not at issue at

6   that time.  Experts are --

7            THE COURT:  Because --

8            MR. MCENTIRE:  -- at issue now.

9            THE COURT:  -- nobody knew that experts might be

10  called.

11           MR. MCENTIRE:  I have a right to call experts, Your

12  --

13           THE COURT:  It changes the whole complexion.

14           MR. MCENTIRE:  But I have a right to call experts,

15  under the Rules.  I have a right, a fundamental due process --

16  let me -- may I finish, Your Honor?  A fundamental due process

17  right to call experts.  Their attempt to charge some type of

18  *Daubert* challenge is nothing but a shotgun blast on the wall,

19  having no meaning at all.  At a minimum, I have a right to put

20  the witnesses on the stand and we'll have a *Daubert* hearing.

21       If they want more time, they need to ask for it.  They

22  didn't ask for it.  Their solution is to strike my experts,

23  which is improper.  It would be improper for this Court to

24  strike my experts when they have been properly tendered under

25  the Local Rules.  They have not cited an alternative remedy.

15

1  If they want the alternative remedy, they need to ask the

2  Court.

3          THE COURT:  My next question is:  How do you propose

4  to get this all done in only three hours?

5          MR. MCENTIRE:  We intend to move quickly.

6          THE COURT:  But, see, now they, I'm guessing,

7  prepared their case assuming there weren't going to be

8  experts.  And they, if they're good lawyers, which I know you

9  all are, they have their script of the kind of things they

10  were going to ask the witnesses.

11          MR. MCENTIRE:  Well, did they have a --

12          THE COURT:  And now they've got to carve out time for

13  two last-minute experts?

14          MR. MCENTIRE:  They had an option.  And one of the

15  options was they could have called me up on Tuesday and asked

16  for their depositions and I probably would have agreed.

17          THE COURT:  I already said no depositions except

18  Seery and Dondero.

19          MR. MCENTIRE:  Then they could have come and filed a

20  different kind of motion with the Court.

21      Their only remedy that they're seeking is a draconian one.

22  There are other options that are more consistent with the

23  implementation of due process here, Your Honor, not striking

24  my experts, which were properly identified under the Local

25  Rules.

1      If the Court is going to strike my experts, note our

2    objection.  We are tendering our experts.  We will put -- like

3    to put a proffer on for the Fifth Circuit or for the appellate

4    process.  But if the Court is going to strike our experts,

5    then it needs to do so.  We object because we have done

6    everything correctly.

7            THE COURT:  Okay.  Here's another problem.  I have

8    not had time to process their motion to exclude.  Beyond the

9    procedural issues, they are saying junk science, that there's

10   inadequate expertise on the part of I guess at least one of

11   them regarding executive compensation.  I haven't had -- they

12   filed their motion to exclude at 4:00-something yesterday.

13   Okay?

14           MR. MCENTIRE:  I understand.

15           THE COURT:  Now, yeah, I could have stayed up all

16   night.  I stayed up pretty late anyway, by the way.  But --

17           MR. MCENTIRE:  Well, first of all, --

18           THE COURT:  -- I haven't even had the time to process

19   and intelligently rule on their motion --

20           MR. MCENTIRE:  I appreciate that, and I'll respect --

21           THE COURT:  -- as far as the --

22           MR. MCENTIRE:  I'll respect the Court's statement.

23           THE COURT:  -- junk science argument.

24           MR. MCENTIRE:  I'll respect the Court's statement.

25   Their process and the procedure they've adopted is improper,

1   because if you're going to have a *Daubert* hearing, that's a

2   live hearing.  Or they're going to have to have evidence to

3   support their challenge.  This is simply a conclusory shotgun

4   blast on the wall, Your Honor.

5       If you even want to consider a *Daubert* challenge, the

6   proper procedure is to put the witnesses on the stand and have

7   an opportunity to have a proffer of evidence and a cross-

8   examination.  That's the proper procedure.  Throwing something

9   and innuendo and rhetoric and conclusions is not a proper

10  *Daubert* motion at all.  The Court could deny their *Daubert*

11  motion just on those grounds.

12          THE COURT:  I'm not going to rule on a motion that

13  I've barely had a chance to read, not to mention your response

14  that was filed at 8:00-something this morning.

15          MR. MORRIS:  It was.

16          MR. MCENTIRE:  It was.  Well, then the option is you

17  need to continue the proceeding to allow the experts to take

18  the stand.

19          THE COURT:  Well, I know you have thought on that,

20  but here is something I'm contemplating doing.  We'll go

21  forward with the hearing in the manner my order said we would

22  go forward with it.  My, I guess, Order #3 of my three orders.

23  And at the end of the evidence, you can argue in closing, each

24  of you, why we should keep the evidence open to come back

25  another day on only the experts.  But time matters.  If you've

1  all already used your three hours on each side, then are we

2  going to come back for five minutes on each of them?  I mean,

3  I don't know.

4      And then, of course, I would have to, if I ruled in that

5  way, I believe I would have to give them a chance to depose

6  these people.

7          MR. MCENTIRE:  I think that would be reasonable.

8          THE COURT:  Okay.  But you think you can get all of

9  your evidence in, other than your experts, and your opening

10  statement, if any, your closing argument, if any, in three

11  hours?

12          MR. MCENTIRE:  I'll do my best.

13          THE COURT:  Well, if you -- it's not a matter of --

14  I'm just saying this may all be an academic argument, because

15  I'm not increasing this to more than three hours each.  We've

16  fully vetted that.

17          MR. MCENTIRE:  Well, what the Court is then doing by

18  virtue of your ruling is that you're making me actually

19  present my evidence in a shortened form today, two hours, two

20  and a half hours, not knowing how -- whether or not you are

21  actually going to allow experts.

22      So, without the certainty, I will have to abbreviate my

23  entire presentation, giving them the advantage of putting more

24  evidence on than I, in an effort to anticipate a positive

25  ruling, which you're not prepared to provide yet.  And so I'm

19

1    actually being penalized.

2         THE COURT:  Counsel, we had two status conferences on

3    what kind of hearing we were going to have.

4         MR. MCENTIRE:  I understand.

5         THE COURT:  Now, the fact that you had not decided

6    your strategy for this hearing, that's not my fault.  Again,

7    we had two hearings on what kind of hearing we were going to

8    have today.  We could have fully vetted this.  I could have

9    heard about the experts, I could have decided if we were going

10   to continue the hearing past June 8th, could have decided if

11   we were going to allow more depositions.

12        MR. MCENTIRE:  Your Honor, --

13        THE COURT:  I could have fully studied the merits of

14   the motion to exclude and decided if this is junk science or

15   not.

16        MR. MCENTIRE:  I would request a ruling at this time,

17   Your Honor, on the experts.  If you are not inclined to

18   provide a ruling to me on the experts at this time, I would

19   effectively be penalized on my time limits.  I will have to

20   set aside enough time to put the experts on, not knowing, not

21   knowing whether you're going to give me the opportunity to do

22   so until the end of the day.  And that would be -- that would

23   be punishment.

24        THE COURT:  Isn't this going to be just preparing

25   your case you would have -- I mean, going forward with your

20

```
 1  case the way you would have?

 2          MR. MCENTIRE:  No, I don't -- really don't think so.

 3  I think there's --

 4          THE COURT:  I mean, --

 5          MR. MCENTIRE:  There's a difference.

 6          THE COURT:  -- you did not prepare your witnesses and

 7  your possible cross-examination with the expectation of I'll

 8  get my two experts in?

 9          MR. MCENTIRE:  My -- of course.  But the point is,

10  then I'm going to have to set aside a half an hour or maybe

11  even longer from my other witness preparations, not knowing

12  whether you'll even give me that time.

13          THE COURT:  Isn't the other side going to have to do

14  the very same thing?

15          MR. MCENTIRE:  No.

16          THE COURT:  Why not?  They don't know how I'm going

17  to rule.  I don't know how I'm going to rule.  I have not

18  studied the motion to exclude the way I should.

19          MR. MCENTIRE:  Okay.  Well, Your Honor, we request a

20  ruling now.  But if the Court is not inclined to do so, please

21  note our objection.

22          THE COURT:  All right.  I'll give the Movants the

23  last word.  And I say "Movants" plural.  I'm trying to

24  remember where I saw a joinder and when I did not.  Did I see

25  a joinder?  I can't remember.
```

1          MR. MORRIS:  Can we just have a moment, Your Honor?

2          THE COURT:  Okay.  Okay.

3          MR. MCILWAIN:  Your Honor, my clients did file a

4    joinder, but --

5          THE COURT:  Okay.

6          MR. MCILWAIN:  -- I'm going to let them handle this.

7          THE COURT:  Okay.

8       (Pause.)

9          THE COURT:  Counsel?

10         MR. LEVY:  Thank you, Your Honor.  Two brief points

11   we'd like to make.  The first is on the Rules.  So, Hunter

12   Mountain is focused on Rule 26(a) regarding reports.  However,

13   Rule 26(b) applies to contested matters under Rule 9014.  And

14   as we explain in Paragraph -- we explain in our brief, that --

15   or, in Paragraph 19 of our brief, that under Rule 26(b) we're

16   entitled to depose the experts.

17       And so we agree with Your Honor's suggestion that if

18   there's going to be any sort of experts, then we need the

19   opportunity to depose them.  This is Rule 26(b)(4)(A), which

20   expressly does apply to contested matters under Bankruptcy

21   Rule 9014(b).

22       The second point is we agree with the approach Your Honor

23   has proposed.  We think, for today, both sides can put on

24   their full cases without expert witnesses.  Both sides can

25   have the full three hours, which should address Hunter

1  Mountain's concern.  And if Your Honor decides at the

2  conclusion of the hearing that expert testimony would be

3  helpful, then we could take the opportunity to depose their

4  experts and then come back for an additional half-hour for

5  each side to address any expert testimony that Your Honor

6  believes would be helpful.

7        THE COURT:  Okay.  Is your proposal that you each

8  today would be limited to two and a half/two and a half?  Or

9  three/three, and then another hour, 30 minutes/30 minutes, if

10  I --

11        MR. LEVY:  Three/three.

12        THE COURT:  -- decide to allow any experts?

13        MR. LEVY:  Yeah.  Three.  Three and three for each

14  side, the hearing contemplated by Your Honor's orders, today.

15  And if Your Honor decides that expert testimony would be

16  helpful, we could come back for an hour, for half an hour on

17  each side, regarding experts.

18        THE COURT:  All right.  Mr. McEntire, what about

19  that?

20    Oh, I'm sorry, did you --

21        MR. STANCIL:  Oh, I'm sorry.  Just one additional

22  point, Your Honor.  We would ask that Your Honor's ruling on

23  the ultimate admissibility of this be limited to what they've

24  actually put in front of us.  The day for the hearing is

25  today, so I think I'd like -- I'd suspect Your Honor would

23

 1   like to avoid another raft of submissions.  So we would just

 2   ask that they live or die with what they've said in the way of

 3   methodology, disclosures, and the like.

 4          THE COURT:  Okay.  Mr. McEntire, this seems like the

 5   best of all worlds, maybe.

 6          MR. MCENTIRE:  Well, it may be the best of the worlds

 7   in which we're operating.

 8      My first position is that the experts are admissible,

 9   period.  And the Rules do not require anything more than what

10   we've already done.  In fact, we've done more than we were

11   supposed to.

12          THE COURT:  What is your argument about 26(b)(4),

13   which --

14          MR. MCCLEARY:  If they want to take a deposition,

15   they could have called me up and asked for it.

16          MR. STANCIL:  Your Honor, I was --

17          THE COURT:  Wait a second.  They were under a court

18   order.  Okay?

19          MR. MCENTIRE:  They could have -- they could have

20   sought --

21          THE COURT:  They were under my order.  Okay?  They

22   would have been violating my order if they had done it.

23          MR. STANCIL:  I was also, Your Honor, I was in a --

24          THE COURT:  Not to mention that it was --

25          MR. STANCIL:  I was in an airplane from 9:00 a.m.

24

 1   Tuesday until 9:00 p.m. Tuesday.

 2           THE COURT:  I'm surprised a lot of you got here, with

 3   the Martian atmosphere that I saw pictures of.

 4      Yes.  That's not realistic, to think that you disclose an

 5   expert on Monday for a Thursday hearing and they can call you

 6   up and --

 7           MR. MCENTIRE:  The other --

 8           THE COURT:  -- quickly put together a deposition.

 9   So, --

10           MR. MCENTIRE:  Sure.  The other option, --

11           THE COURT:  Uh-huh.

12           MR. MCENTIRE:  -- of course, Your Honor, as I

13   mentioned before, and I'm not going to repeat myself, is they

14   -- there's other forms of relief they could seek.  But under

15   the circumstances, and in light of your apparent leaning on

16   the issue, then this is the best under the circumstances that

17   they've suggested.  We'd like an hour each.

18      I would also point out that -- well, anyway, that's it,

19   Your Honor.  Thank you.

20           THE COURT:  All right.  So we are going to go forward

21   as planned, three hours/three hours.  No experts today.  In

22   making your closings -- well, this is kind of awkward.  I'm

23   trying to think if we really have closing arguments, when you

24   don't know if it's -- it doesn't seem to make sense.  Like, I

25   guess we could have closing arguments if you want, subject to

25

1    supplementing your closing arguments if we come back a second

2    day with the experts.  Okay?

3        And I'm not making a ruling today on the motion to

4    exclude.  I'm going to hear what I hear.  And maybe what we'll

5    do is I'll give you a placeholder hearing if we're going to

6    come back on the experts.  Then I'll go back and read the

7    motion, the response, and make my ruling on are we coming back

8    for another day of experts.  Okay?  Got it?

9        And with regard to the comment about not adding to, I

10   think that's a fair point.  You can't add new exhibits that

11   the expert might talk about or that you might want me to

12   consider between now and whenever the tentative day two is.

13            MR. MCENTIRE:  Understand.  We agree with that.

14            THE COURT:  Okay.

15            MR. MCCLEARY:  Your Honor, there is one -- one

16   exhibit that has a small typo transcription of a number on it.

17   So we would like to substitute for that.  It's a minor detail.

18   But I'll provide opposing counsel with that.  But it's very

19   minor.

20            THE COURT:  You have it today, I presume?

21            MR. MCCLEARY:  Yes, we have it.

22            THE COURT:  Okay.  So as long as you hand it to them

23   today.

24            MR. STANCIL:  No objection, Your Honor.  We do -- I

25   think someone is back at the office working on a short reply

1  on our motion, which I assume we could file in support of -- I

2  mean, we filed our motion.  They filed an opposition.  I

3  assume we would be entitled under the Rules to file a short

4  reply on the actual exclusion issue.

5          THE COURT:  That is fair, but let's talk about

6  timing.  You said someone is back at the office working on it.

7  Could you get it on file by Monday?

8          MR. STANCIL:  Yes, ma'am.

9          THE COURT:  Okay.  Then that'll be allowed if it's

10  filed by the end of the day Monday.

11          MR. MCCLEARY:  Your Honor, I'm providing a copy of

12  Exhibit 43 to opposing counsel, which is the substitute

13  exhibit.

14      And obviously, we'd like to have an opportunity to respond

15  to what their filing is on Monday.

16          THE COURT:  No.  I mean, motion, response, reply.

17  That's all our Rules permit.  Okay?  Motion, response, reply.

18  Okay.

19          MR. MCCLEARY:  Yes, Your Honor.

20          THE COURT:  All right.  Well, with that, do the

21  parties want to make opening statements?  If so, Mr. McEntire,

22  you go first.

23          MR. MCENTIRE:  Yes, Your Honor.  We have a PowerPoint

24  I would like to utilize, if I could.

25          THE COURT:  You may.

1        MR. MORRIS:  Your Honor, before we get to that, the

2   Plaintiff has objected to virtually every single exhibit that

3   we have.  Should we deal with the evidence first, because I

4   don't want to refer to documents or evidence in my opening

5   that they're objecting to.  They've literally objected to

6   every single exhibit except one, although I think they're

7   withdrawing certain of those objections.

8      I don't -- I don't know if the Court has had an

9   opportunity to see the objection that was filed to the

10  exhibits.

11       THE COURT:  That was what was filed like at 11:00

12  last night or so?

13       MR. MORRIS:  That's right.

14       THE COURT:  Okay.

15       MR. MORRIS:  And so at 2:00, 3:00, 4:00, 5:00 o'clock

16  this morning, I actually typed out a response that I'd like to

17  hand up to the Court.  But we've got to resolve the

18  evidentiary issues before we get to this.

19       THE COURT:  Okay.  Well, --

20       MR. MORRIS:  And I don't know what their position is

21  going to be --

22       THE COURT:  -- as a housekeeping matter, let's do

23  that first.  And let's start with the Movants' exhibits.  Do

24  we have any stipulations on admissibility of Movants'

25  exhibits?

1          MR. MORRIS:  So, if I understand correctly, Your

2     Honor, you'd like to know if we object to any of their

3     exhibits first?

4          THE COURT:  Yes.  And --

5          MR. MORRIS:  Okay.

6          THE COURT:  -- we'll hold --

7          MR. MORRIS:  Because we have very limited objections.

8          THE COURT:  Yes.  We're going to keep on hold for now

9     your exhibits to the expert-related, --

10         MR. MORRIS:  Yes.

11         THE COURT:  -- your objections to the expert-related

12    ones.

13         MR. MORRIS:  Right.  I think -- I think --

14         THE COURT:  So let's not talk about, for this moment,

15    --

16         MR. MORRIS:  39 --

17         THE COURT:  -- 39 through 52.

18         MR. MORRIS:  Okay.

19         THE COURT:  But as for 1 through 38 or 53 through 80,

20    do the Respondents have objections?

21         MR. LEVY:  Yes, Your Honor.  We have very limited

22    objections.

23         THE COURT:  Okay.

24         MR. LEVY:  So, the three to which we object in their

25    entirety are Exhibits 24, 25, and 76, all of which we object

```
 1   to on relevance grounds.

 2        Exhibits 24 and 25 are email correspondence between

 3   counsel in an unrelated state court matter where Mr. Seery is

 4   responding to a third-party subpoena regarding the

 5   preservation of his text messages on his iPhone.  This has

 6   absolutely nothing to do with whether or not the Movants have

 7   stated a colorable claim for breach of fiduciary duties.

 8        What this appears to be is related to an entirely separate

 9   motion raised by Dugaboy regarding the preservation of Mr.

10   Seery's iPhone.  So we object to Exhibits 24 and 25 because

11   they have simply nothing to do with the issues in this

12   hearing.

13        We also object to Exhibit 76, which is a filing from two

14   years ago in a different bankruptcy matter, from *Acis*,

15   regarding an injunction in place in that -- in that plan about

16   issues that -- that occurred before the bankruptcy was in

17   place.  So this is just an entirely different case from issues

18   that arose many, many years ago that, again, has nothing to do

19   with this case.

20            THE COURT:  This was whether the *Acis* plan injunction

21   barred some lawsuit?

22            MR. LEVY:  Exactly.

23            THE COURT:  Okay.  Okay.  Is that all?

24            MR. LEVY:  We also have limited objections to certain

25   exhibits that we think are admissible for the -- for the fact
```

30

1   they're said, but not the truth of the matter asserted.

2       For example, Exhibits 1 and 2 are complaints filed in

3   those actions.  We have no objection to those coming in, but

4   not for the truth of the matter asserted.  These are advocacy

5   pieces and pleadings.  They're not actually substantive

6   evidence.

7       And we would have similar -- similar objections to

8   Exhibits 4, 6, 11, --

9               THE COURT:  Wait.  4 is James Dondero Handwritten

10  Notes, May 2021.

11              MR. LEVY:  Yes.

12              THE COURT:  Okay.

13              MR. LEVY:  So, we have no objection to that coming

14  into evidence.

15              THE COURT:  Uh-huh.

16              MR. LEVY:  But there are -- those are hearsay.

17  They're not admissible standing by themselves for the truth of

18  the matter asserted.

19              THE COURT:  Okay.

20              MR. LEVY:  And Exhibit 6 are news articles.

21  Similarly, they're hearsay, but we have no objection to them

22  coming in.  They're admissible for the fact that they're

23  published, but not the truth of the matter asserted.

24              THE COURT:  Okay.

25              MR. LEVY:  Exhibit 11, which is a motion filed by the

31

1    Debtor.  Similarly, it's for -- we have no objection to

2    anything on the docket coming in, but anything that's an

3    advocacy piece, like a motion as opposed to an order, we think

4    is not admissible for the truth of the matter asserted.

5        And that would be a similar objection, then, for Exhibit

6    58, which is a complaint.

7        Exhibits 59, 60, and 61 are -- are letters by counsel for

8    Mr. Dondero to the U.S. Trustee's Office.  We similarly have

9    no objection to that coming in, but not for the truth of the

10   matter asserted.

11       And Exhibits 62 and 63, Exhibit 62 is an attorney

12   declaration attaching, similarly, documents that are -- that

13   are advocacy pieces.

14       And Exhibit 63 appears to be an asset chart prepared by

15   counsel.  So it would be a similar objection.

16       And Exhibit 66 also is a declaration attaching documents.

17       No objections to those coming in, but not for the truth of

18   the matter asserted.

19       Exhibits 72, 73, and 74 are all -- well, 72 are press

20   articles.  73 and 74 are briefs.  We don't object to that

21   coming in, but we object to it being admitted for the truth of

22   the matter asserted.

23       And similarly, Exhibit 80 is a pleading in an SDNY

24   bankruptcy.  We have no objection to that coming in, but not

25   for the truth of the matter asserted.

1      And finally, Exhibits 81, 82, 83 don't specify particular

2  documents.  They appear to largely be reservations of rights.

3  And so we would likewise reserve our right to object once we

4  see any specific documents --

5            THE COURT:  Okay.

6            MR. LEVY:  -- admitted under these exhibits.

7            THE COURT:  Okay.  Mr. --

8            MR. LEVY:  And I understand my colleague has an

9  objection to Exhibit 5.

10           MR. MORRIS:  Exhibit 5, which is the subject, I

11  believe, of an unopposed sealing motion.  That document has to

12  do with purported restrictions on certain securities.  Since

13  it's subject to a sealing motion, I don't want to say too much

14  more than that, other than that -- we don't think it should be

15  admitted, because you can just see from the information on the

16  document that it was created after the termination of a shared

17  services agreement.

18      However, I'm hopeful that we can resolve the issue by

19  simply stipulating that in December 2020 MGM was on a

20  restricted list.  What that means, what the consequences of

21  it, the rest of it can be the subject of discussion.  But if

22  they're trying to get that document in for that particular

23  fact, we would stipulate to it in order to resolve that

24  dispute.

25           THE COURT:  All right.  Well, that's lots to respond

33

1    to, Mr. McCleary.  Why don't we start with the outright

2    objections:  24, 25.  It's apparently text messages related to

3    Mr. Seery's iPhone.  I know we've got another motion pending

4    out there that's not set today regarding Mr. Seery's iPhone.

5              MR. MCCLEARY:  Yes, Your Honor.  Well, as the Court

6    is aware, we've attempted to get discovery from Mr. Seery in

7    relation to the allegations in this lawsuit.  And by the way,

8    all of our exhibits that we're tendering are subject to our

9    objections that this should not be an evidentiary hearing.  I

10   just want to make that clear.

11             THE COURT:  Understood.

12             MR. MCCLEARY:  Okay.  Thank you.  So, we're not

13   waiving that.

14      The Exhibits 24 and 25 are relevant to the fact that he's

15   -- he's not preserving information that is relevant to the

16   claims in this lawsuit.  And that also is something that is a

17   factor in the colorability of our claims in this case.

18             THE COURT:  How?

19             MR. MCCLEARY:  Well, there is an effort, we believe,

20   underway to not have information available for us to discover.

21   And it reflects that they have been involved in providing --

22   we think supports -- providing material nonpublic information

23   to other people that would be in his phone.  And we want him

24   to preserve it.  And we think the fact that he is not is

25   evidence that supports the colorability of our claims.

34

1          THE COURT:  So, --

2          MR. MCENTIRE:  Your Honor, this --

3          THE COURT:  No.  No.  I'm processing that.  You're

4    wanting the Court to receive into evidence a text that may say

5    something like, I delete messages periodically on my phone, to

6    support your claim that you have a colorable claim that some

7    sort of improper insider disclosure of information and insider

8    trading is going on?  He said he had an automatic delete

9    feature on his phone; therefore, he -- that must be evidence

10   of a colorable claim for insider trading.  That's the

11   argument?

12         MR. MCENTIRE:  May I add to it, supplement, Your

13   Honor?  Mr. Seery, in his deposition, indicated that he did

14   receive a text message that he had recently reviewed from

15   Stonehill in February of 2021.  To the extent, however, that

16   is inconsistent with the fact that he has an automatic delete

17   button, suggesting to me that certain text messages have been

18   selectively saved and some other messages have been not

19   selectively saved.

20         THE COURT:  We don't have that motion set today.

21         MR. MCENTIRE:  This is not -- that has nothing to do

22   with the motion.  It has to do with the fact that what is

23   being presented to the Court in response, the Respondents'

24   argument, is a selected window, a selected picture, that is --

25   distorts the reality of what we think has been destroyed

35

1    evidence.

2       Mr. Seery can't save one message that may be helpful to

3    them and not save others that may not be.  And it is

4    inconsistent with the notion that this automatic delete button

5    was already in effect, so why does he have one favorable

6    message?  That's why it's relevant.

7              THE COURT:  Maybe he stopped using the automatic

8    delete after --

9              MR. MCENTIRE:  No, he didn't at this time, Your

10   Honor.

11             THE COURT:  Well, --

12             MR. MCENTIRE:  That's the relevance.

13             THE COURT:  So, --

14             MR. MCCLEARY:  And he should never have used it, Your

15   Honor, given his role and responsibilities.

16             THE COURT:  We don't have that motion set today.

17   What is the content of these emails?  February 16th, March

18   10th, 2023?  What is the content, for me to really zero in --

19             MR. LEVY:  I have --

20             THE COURT:  -- on relevance or not.

21             MR. LEVY:  -- copies of the emails, if that would be

22   helpful --

23             THE COURT:  Okay.

24             MR. LEVY:  -- to Your Honor.

25             THE COURT:  Well, you know, now I'm seeing them, so I

36

1  don't know what the big deal is if --

2       MR. LEVY:  As Your Honor can see, these are emails

3  between counsel regarding preservation, which has nothing to

4  do with whether there are colorable claims for fiduciary

5  duties.

6    I'll add that -- and to show that this has nothing to do

7  with this case and it is an attempt to generate a fishing

8  expedition for documents in an entirely unrelated motion, we

9  had a meet-and-confer where we represented to the counsel

10  bringing that motion that we have been able to recover the

11  text messages from the iCloud.

12    And so this is really just a sideshow.  It has nothing to

13  do with the issues of the colorability of claims for breach of

14  fiduciary duties.  It should not be introduced into evidence

15  in this hearing.

16       THE COURT:  All right.  I'm going to sustain the

17  objection, but this is without prejudice to you re-urging

18  admission of these messages at the hearing on the motion

19  regarding Mr. Seery's phone.  Okay?  Now, --

20       MR. MCCLEARY:  That's as to 24 and 25, Your Honor?

21       THE COURT:  Correct.  And let's go now to the other

22  one, the Exhibit 76, the *Acis*-related document, the relevance

23  of that.  Statement of Interested Party in Response to Motion

24  of NexPoint to Confirm Discharge or Plan Injunction Does Not

25  Bar Suit, or Alternatively, for Relief from All Applicable

37

1   Injunctions.

2       What is the relevance for today's matter?

3           MR. MCCLEARY:  Your Honor, this is background of

4   pleadings and just background information generally to support

5   the allegations made in the case and the background.

6           THE COURT:  What do you mean, background?

7           MR. MCCLEARY:  Kind of the history relative to the

8   claims trading and relative to the claims of the use of

9   insider information.

10          THE COURT:  Okay.  Be more specific, because I

11  certainly have a background education on *Acis* litigation.

12      (Pause.)

13          MR. MCCLEARY:  Yeah.  Your Honor, this is a data

14  point that is referred to in one of our experts' data charts,

15  I believe, so --

16          THE COURT:  All right.  So let's just carry that to

17  --

18          MR. MCCLEARY:  Yes.

19          THE COURT:  I'm just going to mark it as carried

20  along with 39 through 62, related to the experts.

21      (HMIT's Exhibits 39 through 62 and Exhibit 76 carried.)

22          THE COURT:  Okay.  What about all of these objections

23  that we don't object *per se* but we want it clear that the

24  documents are not being offered for the truth of the matter

25  asserted because there's hearsay?

1           MR. MCENTIRE:  Your Honor, I'll let Mr. McCleary

2     address all of those.

3        I want to point out one exception, and that is Exhibit #4,

4     which are handwritten notes from Mr. Jim Dondero.  Those are

5     not -- they are being offered for the truth of the matter

6     asserted because it's an admission of a party opponent in

7     these proceedings, and that's Farallon.  They reflect

8     significant statements and admissions by Farallon, which are

9     not hearsay.  It's an exception to the hearsay rule.  And

10    they're being offered for more -- they are being offered for

11    the truth of the matter asserted, because -- and it's

12    admissible in that format.

13          THE COURT:  But are you referring to hearsay within

14    hearsay?  Because there would be, I guess -- I guess the

15    handwritten notes of Mr. Dondero are his hearsay, and then

16    you're saying there's --

17          MR. MCENTIRE:  So, this is reflecting statements made

18    to Mr. Dondero that are admissions of a party opponent.

19          MR. LEVY:  None of that has been established.  These

20    are not notes from anybody at Farallon or Stonehill which

21    could potentially be a party admission.  These are notes by

22    Mr. Dondero about what was purportedly said by somebody else,

23    and there's no evidence that these were kept in the regular

24    course of business.

25       This is hearsay and hearsay within hearsay.  And this

1  could be established in testimony, but it can't be admitted --

2  the document can't be admitted to speak on behalf of a third

3  person who's not here.

4        MR. MCENTIRE:  Well, first of all, I agree, we'd need

5  to lay a foundation.  But that's not the purpose of this

6  discussion right now.  I am simply advising the Court that

7  once I lay a foundation, it comes in for all purposes.  It

8  comes in as an admission of a party opponent.

9        MR. LEVY:  It is not an admission of a party

10  opponent.  It is not notes or statements by any actual

11  defendant.  These are notes by Mr. Dondero being introduced

12  for his own benefit.  It is not a party admission.

13        THE COURT:  Okay.  I'm going to carry that one.  If

14  one of the witnesses that's on the witness stand -- well,

15  presumably Mr. Dondero will be called -- we can get context at

16  that time and decide if it's appropriate to let it in and let

17  you cross-examine him on them if that's going to come in.  All

18  right?  So we'll carry this one.

19     Anything else, though, unique, or can we consider as a

20  batch all these other objections to -- most of them being

21  pleadings, not all of them but a lot of them -- that the

22  Respondents just want it clear that they're not being offered

23  for the truth of the matter asserted?  Your response?

24        MR. MCCLEARY:  They're, again, largely data points

25  relied on by experts in the course of coming up with their

40

 1    opinions and just setting the background and history of the

 2    claims trading.

 3             THE COURT:  Well, then which ones are data points?

 4    Because I just need to carry those, right?  If they're not

 5    being offered for any other reason.

 6             MR. MCCLEARY:  Well, I would have to -- we would have

 7    to refer to the charts of the experts, Your Honor, to

 8    determine that on all of them.

 9             MR. MCENTIRE:  In order to facilitate this, may I

10    make a suggestion, Your Honor?  We'll agree that if we're

11    going to offer anything that he's identified other than for

12    the purposes indicated, we will advise the Court.  Otherwise,

13    we'll accept the limitations imposed.  And as we go through,

14    if we offer an exhibit that is more than the truth -- if we

15    are offering it for the truth of the matter asserted, we will

16    advise the Court, and then we could take it up then.  I'm just

17    trying to get the ball rolling.

18             THE COURT:  Okay.  Well, that's still going to be a

19    time-consuming thing, maybe.  But, okay.  Just, when we start

20    the clock here -- very shortly, I hope -- I want people clear

21    that when you make objections, that counts against your three

22    hours.  Okay?  All right?

23             MR. LEVY:  Okay.  Understood, Your Honor.

24             MR. MCCLEARY:  Your Honor, we have certainly made

25    objection to some of their exhibits.

41

```
 1              THE COURT:  All right.  Well, shall we turn to those

 2     now?

 3              MR. MCCLEARY:  Yes, Your Honor.

 4              MR. MORRIS:  Your Honor, they objected to every

 5     single exhibit except one, so let's be clear.

 6              THE COURT:  Okay.

 7              MR. MORRIS:  If they're withdrawing them, that's

 8     fine.

 9              MR. MCCLEARY:  Well, --

10              MR. MORRIS:  But let's be clear.

11              MR. MCCLEARY:  -- we are not withdrawing our general

12     objection to all the evidence, of course.  Just --

13              THE COURT:  Okay.  Let me just say for the record

14     right now, I understand and you are preserving for all

15     purposes your ability to argue on appeal that it was error for

16     the Court to consider any evidence.  Okay?  You have not

17     waived that argument by --

18              MR. MCCLEARY:  Thank you.

19              THE COURT:  -- now --

20              MR. MCCLEARY:  Thank you.  We can have --

21              THE COURT:  -- agreeing to the admission of anybody's

22     exhibit or offering your own exhibits.

23              MR. MCCLEARY:  And we could have a running objection

24     on that basis, on relevance to all the witnesses and the

25     evidence that they offer on that basis.  I would request that.
```

42

1            THE COURT:  Well, okay, let me be clear.  Relevance.

2   Your argument is that no evidence is relevant because the

3   Court doesn't need to consider any evidence --

4            MR. MCCLEARY:  Yes, Your Honor.

5            THE COURT:  -- on the colorability issue.  You've got

6   a running objection.  It's not destroyed for appeal purposes.

7   Okay?

8            MR. MCCLEARY:  Thank you, Your Honor.  Then, subject

9   to that, in terms --

10           MR. MORRIS:  I'm sorry to interrupt, but --

11           MR. MCCLEARY:  Sure.

12           MR. MORRIS:  -- would it be helpful if I gave the

13  Court my list so she can see --

14           MR. MCCLEARY:  Sure.

15           MR. MORRIS:  -- what the --

16           MR. MCCLEARY:  Sure.

17           MR. MORRIS:  Okay.  May I approach, Your Honor?

18           THE COURT:  You may.  I'm not sure, if everything has

19  been objected to, I'm not sure how --

20           MR. MORRIS:  Because I've tried -- I've tried to

21  organize it in a way that would be helpful.

22           THE COURT:  Okay.

23      (Pause.)

24           MR. MCCLEARY:  Okay.  Your --

25           THE COURT:  I'm ready.

43

1          MR. MCCLEARY:  -- Honor, yes.

2          THE COURT:  Uh-huh.

3          MR. MCCLEARY:  So, we are withdrawing our objections,

4  other than the general objections to relevance based on the

5  evidentiary nature of the proceeding, to Exhibits 1 and 2.

6     With respect to 3, this is a verified petition to take

7  deposition for suit and seek documents filed on July 22, 2021.

8  We object on the grounds of relevance and hearsay to that.  Is

9  that --

10          THE COURT:  Well, --

11          MR. MORRIS:  I don't -- I don't understand this one.

12          THE COURT:  This --

13          MR. MCCLEARY:  Is that, I'm sorry, is that your #11?

14          MR. MORRIS:  Yeah.

15          MR. MCCLEARY:  All right.  We withdraw our objection

16  to #3, subject to our general objection.

17     On Exhibit 4, we object to relevance and hearsay on a

18  verified amended petition to take deposition before suit and

19  seek documents.

20          THE COURT:  Okay.  This is my time to hear your

21  argument.  And we're going to be here --

22          MR. MORRIS:  Can I -- can I do this here?  It's going

23  to be much quicker.

24          THE COURT:  What do you mean?  Do what here?

25          MR. MORRIS:  So, if you just follow the chart that I

44

1  gave the Court, --

2          THE COURT:  Uh-huh.

3          MR. MORRIS:  -- Section A is a list of exhibits that

4  they've objected to.  Those exhibits are in the right-hand

5  column.

6      At the same time, they are offering the exact same

7  exhibits into evidence on their exhibit list.  I don't

8  understand how they can offer their exhibits and object to

9  ours.

10         MR. MCCLEARY:  Counsel.  I'm sorry.  We've already

11  told them that, subject to our general objection, we'll

12  withdraw the objections to those exhibits.

13         MR. MORRIS:  Right.  So can we agree that all

14  objections to Section A are withdrawn?

15         MR. MCCLEARY:  Subject to the general objection, yes.

16         MR. MORRIS:  Thank you.

17         THE COURT:  Okay.  So, --

18         MR. MORRIS:  That's going to be much quicker.

19         THE COURT:  -- 11, 34, 2, 46, 42, 38, 41, 39, 40,

20  and various attachments to Highland Exhibits 5 are withdrawn.

21  So, admitted by stipulation.

22     (Debtors' Exhibits 2, 11, 34, 38, 39, 40, 41, 42, 46 are

23  received into evidence.  Certain attachments to Debtors'

24  Exhibit 5 are received into evidence.)

25         MR. MORRIS:  And to make this easy, Your Honor, at

45

1   some point I hope later today, but perhaps tomorrow, we'll

2   slap a caption on this, we'll file it on the docket, so that,

3   you know, an appellate court, if necessary, can follow along.

4   But I think that we've just stipulated that all of the

5   exhibits identified in Section A of this document are -- the

6   objections have been withdrawn.

7           THE COURT:  Okay.

8           MR. MCCLEARY:  Subject to the general objections.

9           MR. MORRIS:  Right.  That gets us -- I'm going to

10  jump to Section C, because I think the same is true.  Section

11  C identifies all exhibits that each party has taken from the

12  docket.  And you can see from Footnote 4, the Court can take

13  judicial notice under Federal Rule of Evidence 201, we've just

14  had the discussion about whether or not any of them would be

15  limited for purposes of the truth of the matter asserted, but

16  all of the exhibits identified in Section C I think the Court

17  can take judicial notice of because they're on a docket.

18          THE COURT:  Response?

19          MR. MORRIS:  And so I would respectfully request that

20  they withdraw their objections to anything in Section C.

21          THE COURT:  Response, Mr. McCleary?

22          MR. MCCLEARY:  I understand the Court can take

23  judicial notice of those, Your Honor, but they do contain

24  irrelevant and hearsay information also.

25          MR. MORRIS:  The hearsay, I think that we just had

46

1    the discussion.  I mean, if there's something that he wants to

2    really point out at this point that I can respond to.  But we

3    would agree that advocacy pieces shouldn't be offered for the

4    truth of the matter asserted.  Court orders, on the other

5    hand, are law of the case.

6            THE COURT:  So, I mean, it's the very same situation

7    we just addressed with your own exhibits.  You have a lot of

8    court filings.  And they didn't have a problem with it, as

9    long as everyone knew advocacy was not being accepted for the

10   truth of the matter asserted.

11           MR. MCCLEARY:  Well, --

12           THE COURT:  Isn't this the same thing?

13           MR. MCCLEARY:  -- they're not offering it for the

14   truth of the matter asserted.  That's one thing.  And

15   certainly the Court can take judicial notice.  We do object to

16   the extent they're offering Exhibits 6 through 10 for the

17   truth of the matter asserted.

18           MR. MORRIS:  Well, let me check those.

19           THE COURT:  Well, --

20           MR. MCCLEARY:  I'm sorry.  6, 7, uh -- (pause).

21           THE COURT:  Those are orders of --

22           MR. MORRIS:  Yeah.

23           THE COURT:  -- courts.

24           MR. MORRIS:  Yeah.  They're orders of the Court.

25           MR. MCCLEARY:  The orders are not relevant, Your

47

1    Honor.

2              THE COURT:  Explain.

3              MR. MCCLEARY:  Well, they have not demonstrated that

4    the orders that they seek to introduce are relevant.  They

5    have orders regarding, for example, the contempt proceedings

6    that are irrelevant to these proceedings.  And prejudicial

7    under 403.

8              THE COURT:  All right.  Shall I take a five- or ten-

9    minute break?  Let me -- I think I've been very generous by

10   not starting the clock yet on the three hours/three hours.

11             MR. MCCLEARY:  Appreciate that.

12             THE COURT:  But here's how we do things in bankruptcy

13   court.  And I don't mean to talk down to anyone.  I don't

14   know, you may appear in bankruptcy court every day of your

15   life.  But we expect counsel to get together ahead of time and

16   stipulate to the admissibility of as many exhibits as you can.

17   If there's a preservation of rights here and there, fine.  But

18   we --

19             MR. MCCLEARY:  Maybe if we take --

20             THE COURT:  You know, --

21             MR. MCCLEARY:  We can try to --

22             THE COURT:  -- helping everyone to understand, --

23             MR. MCCLEARY:  Sure.

24             THE COURT:  -- we have thousands of cases in our

25   court.

48

1          MR. MCCLEARY:  Sure.

2          THE COURT:  And this is just something we have to do

3   to give all parties their day in court when they need time.

4   And so --

5          MR. MCCLEARY:  If you'd like us to take ten minutes

6   and try to narrow this, we certainly --

7          THE COURT:  Okay.  With everybody understanding you

8   should have taken the ten minutes before we got here.  But,

9   again, when I say three hours, --

10         MR. MORRIS:  Yeah.

11         THE COURT:  -- that's what I meant.  Okay?

12         MR. MCCLEARY:  Yes, Your Honor.

13         THE COURT:  So we'll take a ten-minute break.

14         THE CLERK:  All rise.

15      (A recess ensued from 10:42 a.m. until 10:54 a.m.)

16         THE CLERK:  All rise.

17         THE COURT:  All right.  Please be seated.  Have we

18   reached agreements on some of these exhibits?

19         MR. MCCLEARY:  Your Honor, we have agreed on the ones

20   that we can agree on, and we announced that to the Court with

21   respect to the Paragraph A items that the Court's already

22   ruled on.

23      I would like to point out to the Court that we just got

24   their objections handed to us right before the hearing.  We

25   filed ours last night.  So we didn't --

49

1          THE COURT:  At 11:00-something, right?

2          MR. MCCLEARY:  Yes, Your Honor, but we did --

3          THE COURT:  Okay.  Well, okay.  So I guess your point

4    is you want to make sure I'm annoyed with everyone, not just

5    selective of you.

6          MR. MCCLEARY:  Well, --

7          THE COURT:  I mean, exhibit lists were filed Monday.

8    So I don't know why on Tuesday people were not on the phone

9    saying, you know, or Wednesday morning at the latest.

10          MR. MCCLEARY:  Sure.  And we haven't had much of an

11   opportunity, in fairness, to consider their objections and

12   respond because we just received them right at the time of the

13   hearing, just before the hearing started.

14        Your Honor, we would urge our objections to Exhibit #4.

15   We've objected to this petition to take deposition before suit

16   and seek documents on the basis of relevance and hearsay.

17   They have a number of pleadings in other matters that have

18   nothing to do with, frankly, the colorability standard in this

19   case.  And this is an example.

20          THE COURT:  Okay.  This is the time for me to hear

21   specific objections and what the basis is, and not just --

22          MR. MORRIS:  Can we go back --

23          THE COURT:  -- a category.

24          MR. MCCLEARY:  Yeah.

25          MR. MORRIS:  Can we go back to my way?  Because it's

50

1   just going to be much faster.  It really will be.  Right?  We

2   -- Category 1, A and C, we dealt with.  Category B, --

3           THE COURT:  Well, we dealt with A.

4           MR. MORRIS:  Right.  And --

5           THE COURT:  All of those are withdrawn, and they are

6   admitted by stipulation.

7           MR. MORRIS:  Right.

8           MR. MCCLEARY:  Subject to --

9           THE COURT:  Category C, --

10           MR. MCCLEARY:  -- the general objections.

11           THE COURT:  -- I'm not sure we're to closure on.

12           MR. MORRIS:  Um, --

13           THE COURT:  Are we to closure on C?  Are you

14   stipulating?

15           MR. MCCLEARY:  No.  We are not stipulating on C.

16           MR. MORRIS:  Let's do them one at a time.

17           MR. MCCLEARY:  I have not had an opportunity to -- to

18   --

19           MR. MORRIS:  Let's do them one at a time.

20           MR. MCCLEARY:  Have not had an opportunity to look at

21   each and every one of these, Your Honor.  Because we did just

22   get these.

23           THE COURT:  Okay.

24           MR. MCCLEARY:  But generally --

25           THE COURT:  If we have not wrapped this up in 15

51

1     minutes, we're just going to start, and you can object the

2     old-fashioned way.  But I'm telling all lawyers here,

3     objections count against your time.  Okay?

4              MR. MORRIS:  And I'd move for the admission of all of

5     our exhibits right now, then.

6              THE COURT:  Okay.

7              MR. MORRIS:  So let him -- let -- put him on the

8     clock and let's go.

9              THE COURT:  Okay.  So, 15 minutes.  Let start going

10    through everything except Category A.

11             MR. MORRIS:  Number 4?

12             MR. MCCLEARY:  Number 4, Your Honor, we object on the

13    basis of relevance and hearsay.

14             MR. MORRIS:  Okay.  My response to that, Your Honor,

15    and this will be my response -- this is in Section B of my

16    outline --

17             THE COURT:  Uh-huh.

18             MR. MORRIS:  Okay?  They object to Exhibits 3, 4, 5,

19    and 9.  These are Mr. Dondero's prior sworn statements.  You

20    just heard his lawyer stand here and tell the Court that

21    somehow his handwritten notes should be admissible as an

22    admission.  You know what he did?  He testified four different

23    times under oath.  That's Exhibits 3, 4, 5, and 9.  Sworn

24    statements.

25        They come into evidence not as hearsay but under Federal

**Appx. 02588**

52

1   Rule of Evidence 801(d)(1).  It's beyond -- the notion that

2   they can prove a colorable claim and that it's not relevant

3   that he's got diametrically different -- he's got four

4   different statements, now five with his notes, he's got five

5   different statements.  Doesn't that go to the colorability of

6   these claims?

7       We believe it does.  That's the basis for the introduction

8   of these documents into evidence.

9           THE COURT:  Okay.  Mr. McCleary, your response?

10          MR. MCCLEARY:  Well, it's a verified amended

11  petition, Your Honor, in another matter, to -- before suit to

12  seek documents.  Has nothing to do with the merits of this

13  case and our motion for leave.  So we object on the grounds of

14  relevance and hearsay.

15          THE COURT:  Well, since they're prior sworn

16  statements of Mr. Dondero, --

17          MR. MCCLEARY:  Well, then they might -- if they want

18  to use it later to impeach, they can try to do that, but they

19  have to lay the foundation.

20          THE COURT:  What about 801(d)(1)?

21          MR. MCCLEARY:  Again, relevance, Your Honor.

22          THE COURT:  Okay.  I overrule.  Those are --

23          MR. MCCLEARY:  And Mr. --

24          MR. MORRIS:  Okay.

25          THE COURT:  Those are going to be admitted.

1          MR. MCCLEARY:  By the way, on hearsay, Mr. Dondero is

2    not Hunter Mountain.  So when he argues that these are

3    admissions, they're not admissions by Hunter Mountain.

4          MR. MORRIS:  Your Honor, the only piece of evidence,

5    literally the only piece of evidence they have are the words

6    out of Mr. Dondero's mouth.  There is no evidence, there will

7    be no evidence of a *quid*, a *pro*, or a *quo*.  There will be no

8    evidence other than what Mr. Dondero testifies to --

9          MR. MCCLEARY:  Well, --

10         MR. MORRIS:  -- about what he was told.  There will

11   be no evidence that there was a meaningful relationship

12   between Mr. Seery and Ms. -- and Farallon and Stonehill.

13   There will be no evidence, none, that Farallon and Stonehill

14   rubber-stamped Mr. Seery's compensation package.  Nothing.

15   The only thing we have are going to be the words out of Mr.

16   Dondero's mouth and these notes that just showed up.  And

17   these statements --

18         MR. MCCLEARY:  Your Honor?

19         THE COURT:  Okay.  Counsel, I mean, it just feels

20   like --

21         MR. MORRIS:  It's --

22         THE COURT:  -- if notes get in, then sworn statements

23   of Mr. Dondero should get in.  Right?

24         MR. MCCLEARY:  Your Honor, he's making arguments,

25   closing arguments, opening arguments, trying to run out the

54

1   clock.  We objected to relevance, and we stand on our

2   objection.

3           THE COURT:  Okay.

4           MR. MCCLEARY:  And on hearsay.

5           THE COURT:  I'll admit 3, 4, 5, and 9.

6       (Debtors' Exhibits 3, 4, 5, and 9 are received into

7   evidence.)

8           MR. MORRIS:  Section E.

9           MR. MCCLEARY:  I'm sorry.  So our objections are

10  overruled?

11          THE COURT:  They are overruled.

12          MR. MCCLEARY:  On 3, 4, 5?

13          THE COURT:  And 9.

14          MR. MORRIS:  Section E of my outline.

15          MR. MCCLEARY:  What about 6?

16          THE COURT:  That's not --

17          MR. MORRIS:  Well, --

18          THE COURT:  Well, I don't --

19          MR. MORRIS:  -- it would -- it would --

20          THE COURT:  Let's go back to C.  I'm not clear if

21  we're to closure on Section C.

22          MR. MORRIS:  I'll let Counsel go through --

23          THE COURT:  And 6 is within Section C.

24          MR. MORRIS:  I'll let Counsel go through each one,

25  one at a time.

1           MR. MCCLEARY:  No.  That's all right.  If you want to

2    go through, you have them lumped in.  Yeah, I think it'd

3    probably be quickest if, frankly, we just go down the list,

4    Your Honor.  Frankly.

5           THE COURT:  Well, you've got ten minutes left.

6           MR. MCCLEARY:  Okay.  We object to #6, memorandum and

7    opinion order granting Dondero's motion to remand, on the

8    basis of relevance and hearsay.

9           THE COURT:  Overruled.  I can take judicial notice

10   under 201 of that.  So 6 is admitted.

11      (Debtors' Exhibit 6 is received into evidence.)

12          MR. MCCLEARY:   We object to Exhibits 7 and 8 on the

13   grounds of relevance.  7 on relevance and hearsay, and 8 on

14   relevance.

15          MR. MORRIS:  I'll take 7 first, Your Honor.

16          THE COURT:  Okay.

17          MR. MORRIS:  It's an order dismissing Mr. Dondero's

18   202 petition.  That 202 petition sought discovery on the basis

19   of the exact same so-called insider trading claims that Hunter

20   Mountain is asserting today.

21      I think it's not only relevant, it's almost dispositive

22   that a Texas state court heard the exact same -- or, actually,

23   not the exact same, because Mr. Dondero changed his story so

24   many times -- but heard a version, I think Versions 1, 2, and

25   3, of this insider trading and would not even give them

56

1  discovery.

2       So when the Court considers whether or not there's a

3  colorable claim here, I think it ought to think about what a

4  Texas state court decided on not whether or not they have

5  colorable claims, whether or not they're even entitled to

6  discovery.  I think it's very relevant.  Move for its

7  admission right now.

8            MR. MCCLEARY:  Your Honor, it's ironic, because at

9  that hearing counsel for the Respondents was arguing that it

10 ought to be this Court that considers what discovery is

11 appropriate.

12           THE COURT:  Okay.  Well, obviously, you can argue

13 about that, but, again, I think I can take judicial notice of

14 this.  Right?

15           MR. MCCLEARY:  Well, we argue that it's not relevant,

16 Your Honor, and it is the --

17           THE COURT:  Okay.

18           MR. MCCLEARY:  7 is not relevant and is hearsay.

19           THE COURT:  Okay.

20           MR. MORRIS:  Number 8, --

21           THE COURT:  Objection is overruled.

22           MR. MCCLEARY:  Overruled?

23           THE COURT:  And so 7 is admitted.

24      (Debtors' Exhibit 7 is received into evidence.)

25           MR. MCCLEARY:  8 is our verified petition.  And we

57

 1    object on the grounds of relevance.

 2            MR. MORRIS:  You know, Your Honor, if I really had

 3    the time and the patience to do this, I think I'd find this

 4    document attached to Mr. McEntire's affidavit that's on their

 5    exhibit list.

 6        But to speed this up just a little bit, how could their

 7    202 petition that sought discovery on the basis of the very

 8    same insider trading allegation not be relevant?  It's a

 9    judicial order.  You can take notice of it.  And it's

10    incredibly relevant that a second Texas state court heard the

11    same allegations that they're presenting to you as colorable

12    and said no, you're not getting discovery.

13            MR. MCCLEARY:  We don't know why they made that

14    order, Your Honor.  They could have simply accepted the

15    opposition's arguments that this Court had jurisdiction and

16    should consider what discovery ought to be done.

17            THE COURT:  Overruled.

18            MR. MCCLEARY:  It's not relevant to our --

19            THE COURT:  I admit 8.

20            MR. MORRIS:  Next?

21            MR. MCCLEARY:  Overruled?

22            THE COURT:  Yes.

23        (Debtors' Exhibit 8 is received into evidence.)

24            MR. MCCLEARY:  The declaration of James Dondero.  I

25    think we withdrew the Dondero --

Appx. 02594

58

 1          THE COURT:  Right.

 2          MR. MCCLEARY:  -- declarations.  If it --

 3          THE COURT:  It's --

 4          MR. MCCLEARY:  Numbered -- I'm sorry, #9.

 5          THE COURT:  9.  I've already checked it as admitted.

 6          MR. MCCLEARY:  If you want to -- if you want to offer

 7  #9, they can offer it.

 8          THE COURT:  It's admitted.  I've already --

 9          MR. MCCLEARY:  Okay.

10          THE COURT:  -- said.

11          MR. MCCLEARY:  Number 10.  It's an order denying our

12  second Rule 202 petition.  And we object to it on relevance,

13  Your Honor.

14          THE COURT:  Same objection.  It's overruled.  It's

15  admitted.

16      (Debtors' Exhibit 10 is received into evidence.)

17          MR. MCCLEARY:  Number 12, 13, and -- 12 and 13 are

18  correspondence regarding resignation letters.  We object on

19  grounds of relevance.

20          THE COURT:  Wait.  Did we skip 11 for a reason?

21          MR. MCCLEARY:  Pardon me?

22          THE COURT:  Did we skip 11 for a reason?

23          MR. MCCLEARY:  We only have it --

24          THE COURT:  Oh, wait.  It's already admitted by

25  stipulation.

59

```
 1            MR. MCCLEARY:  Yeah, and we have --
 2            MR. MORRIS:  That's the one --
 3            MR. MCCLEARY:  We have our general objection.
 4            MR. MORRIS:  That's the one exhibit that they didn't
 5   object to.
 6            THE COURT:  Okay.
 7            MR. MCCLEARY:  We only had our general objection with
 8   respect to that.
 9            THE COURT:  Okay.  Thank you.  Thank you.
10            MR. MCCLEARY:  On 12 --
11            THE COURT:  Uh-huh.
12            MR. MCCLEARY:  -- and 13, those are correspondence
13   regarding resignations.  We object on the grounds of
14   relevance.
15            MR. MORRIS:  So, the relevance of that, Your Honor,
16   is to show that when Mr. Dondero sent this email to Mr. Seery
17   in December 2020, he had absolutely no relationship to
18   Highland, had absolutely no duty to Highland, had absolutely
19   no reason to send this email to Highland.  He wasn't in
20   control of Highland.  He wasn't --
21       If they'll stipulate to this, that's fine.  He wasn't in
22   control.  He had no authority to do anything.  He couldn't
23   effectuate trades.  He wasn't there.  And that's what these
24   documents are intended to prove.
25            THE COURT:  Okay.  Why are we -- this is --
```

60

1           MR. MCCLEARY:  Because there are --

2           THE COURT:  Some of this stuff, I mean, --

3           MR. MCCLEARY:  There are other agreements.

4           THE COURT:  -- is no big deal.  Right?

5           MR. MCCLEARY:  Sub-advisory agreements, other

6   agreements that he had under which he had a responsibility to

7   make the communications regarding material nonpublic

8   information that he made.  So this is simply irrelevant, Your

9   Honor.

10          THE COURT:  I overrule.  I mean, again, I don't --

11          MR. MCCLEARY:  Okay.

12      (Debtors' Exhibits 12 and 13 are received into evidence.)

13          MR. MCCLEARY:   Number 14, --

14          THE COURT:  You're both giving me just a lot of

15  background that I already have, but of course a Court of

16  Appeals --

17          MR. MORRIS:  That's why we --

18          THE COURT:  -- isn't going to have it.

19          MR. MORRIS:  Yep.

20          MR. MCCLEARY:  Well, #14, Exhibit 14, we object on

21  the grounds of relevance and hearsay.

22          THE COURT:  Okay.  Wait a minute.  We skipped 13

23  because -- why?  Oh, wait, that was, I'm sorry, 12 and 13 --

24          MR. MORRIS:  Yes.

25          THE COURT:  -- where I've overruled the objection and

61

1    admitted.

2        Okay.  Go ahead.

3        MR. MCCLEARY:  14, we object on the grounds of

4    relevance and hearsay, Your Honor.

5        MR. MORRIS:  I'm just going to make this real quick,

6    Your Honor.  Here's the thing.  This Court knows it.  It's

7    actually facts that cannot be disputed because they're subject

8    of court orders.

9        As the Court will recall, beginning in late November 2020

10   continuing through late December 2020, Mr. Dondero was engaged

11   in a continuous pattern of interference with Highland's

12   business and trading.  It was the subject of the TRO, which is

13   why the TRO is relevant.

14       Your Honor will recall that at the end of November Mr.

15   Dondero attempted to stop Mr. Seery from trading in Avaya

16   stock.  On December 3rd is when he sent this threatening

17   email, text message, to Mr. Dondero [sic].  It caused us to

18   get the TRO.

19       Your Honor will recall on December 16, 2020, that's when

20   we had the hearing on Mr. Dondero's motion to try to stop Mr.

21   Seery from trading in the CLOs that the Court dismissed as

22   frivolous and granted the directed verdict of Highland.

23       So, that's December 16.  He sends this email about MGM on

24   December 17th.  And what happens on December 18th?  More

25   interference with Highland's business.  It's a matter of --

**Appx. 02598**

62

1   beyond dispute.  It's law of the case at this point because

2   that's the subject of the contempt order.  And the Court found

3   that, after -- after hours, on December 18th, Hunter Covitz

4   told Mr. Dondero that Mr. Seery was again trying to trade in

5   Avaya stock, and within a day or two Mr. Dondero was again

6   interfering it, and that's what led to the second -- to the

7   first contempt order.

8      So all of these documents are relevant to show motive and

9   what was happening.  This email was not sent for any

10   legitimate purpose.  The evidence is just overwhelming.  And

11   it's not -- it's not like, oh, that's an argument we're

12   making.  Between the TRO and the contempt order, it's law of

13   the case.  He was interfering with Highland's business nonstop

14   for thirty days, including the day before he sent this email

15   and the day after he sent the email.

16         THE COURT:  Okay.

17         MR. MCCLEARY:  Your Honor, this is a lawsuit or an

18   effort to file a lawsuit on behalf of Hunter Mountain

19   Investment Trust, not James Dondero.  And as much as Counsel

20   wants to make this about Jim Dondero and attack him, this is a

21   different case.  So this exhibit has nothing to do with the

22   claims in this lawsuit.  It's not relevant.  And hearsay.

23         MR. MORRIS:  The only evidence is Mr. Dondero.  It's

24   -- could not be more relevant.

25         THE COURT:  Okay.  I overrule.  I'm admitting this.

63

1  And so we're --

2          MR. MCCLEARY:  Uh, --

3          THE COURT:  It's 14.  It's -- how far?

4          MR. MCCLEARY:  14.  Exhibit 15 is where we are, Your

5  Honor.

6          THE COURT:  Okay.

7      (Debtors' Exhibit 14 is received into evidence.)

8          THE COURT:  15.

9          MR. MORRIS:  Oh, that's -- that's the contempt order.

10  And so these contain the judicial findings that are now beyond

11  dispute that Mr. Dondero was engaged in interfering with

12  Highland's business after the TRO was entered on December

13  10th.

14          THE COURT:  Okay.  Again, my own orders, --

15          MR. MCCLEARY:  Your Honor, it's not --

16          THE COURT:  -- I can take judicial notice of --

17          MR. MCCLEARY:  It's --

18          THE COURT:  -- under the Federal Rules of Evidence.

19          MR. MCCLEARY:  It's --

20          THE COURT:  201.

21          MR. MCCLEARY:  We simply object as not relevant.  We

22  object based on Federal Rule of Evidence 403.  Any possible

23  relevance is outweighed by the prejudice.  And we object on

24  the grounds of hearsay, Your Honor.

25          THE COURT:  Prejudice?  Prejudice?  They're orders I

64

1  issued.  I'm going to be prejudiced by my own orders?

2          MR. MCCLEARY:  Uh, well, --

3          THE COURT:  I don't --

4          MR. MCCLEARY:  -- Hunter Mountain will be.

5          THE COURT:  Okay.  I'll overrule.

6      (Debtors' Exhibit 15 is received into evidence.)

7          THE COURT:  I'll tell you what.  We're out of our --

8  well, we've get probably 30 seconds left.  Anything that we

9  can maybe knock out to not have eat into your three hours?

10 Both of you?

11         MR. MCCLEARY:  Your Honor, we filed written

12 objections to all of these exhibits.  We urge those

13 objections.  16.

14         THE COURT:  I know, but this is your chance to argue

15 why your objections have merit.  I can -- we can just --

16         MR. MCCLEARY:  Because, well, obviously, we're

17 talking about pleadings and filings in other matters.  The

18 evidence that they're trying to use to impugn Jim Dondero,

19 which has nothing to do with the merits of HMIT's claims and

20 allegations of insider trades.

21         THE COURT:  Okay.  A lot of this is articles.

22 Articles, articles, articles about MGM.

23         MR. MCCLEARY:  On the articles, Your Honor, subject

24 to our general objection, we'll withdraw the objections to the

25 articles if they'll agree to the articles that we've offered.

65

1        MR. MORRIS:  Your Honor, we didn't lodge an objection

2    to their articles.

3        MR. MCCLEARY:  Okay.

4        MR. MORRIS:  And just so, if anybody is keeping track

5    at home, this is Item B on the list that I created earlier

6    this morning.

7        THE COURT:  Okay.  So, 25 through 30 are articles.

8    Those are admitted by stipulation.  Nothing is about the truth

9    of the matter asserted.  They're just articles that were out

10   there for --

11       MR. MORRIS:  Right.  I would just --

12       MR. MCCLEARY:  Yes.

13       THE COURT:  -- the world.

14       MR. MORRIS:  Just so we're clear, it's Exhibits 25, 6

15   -- 25, 26, 27, 28, 29, and 30.

16       THE COURT:  Right.

17     (Debtors' Exhibits 25 through 30 are received into

18   evidence.)

19       MR. MORRIS:  And so, yes, those are all articles.

20   They have their articles.  Exhibit 72.

21       THE COURT:  Oh, and 34 is another one.  So that's

22   admitted as well.

23       MR. MORRIS:  Yes.

24       MR. MCCLEARY:  Yes, Your Honor.

25     (Debtors' Exhibit 34 is received into evidence.)

66

1          THE COURT:  Okay.  Well, we're out of time, so as for

2    the others, they can offer them the old-fashioned way if they

3    want to, you can object the old-fashioned way, and it eats

4    into both of your three hours.

5          MR. MCCLEARY:  Yes, Your Honor.

6          THE COURT:  Okay.  Let's hear opening statements.

7       And by the way, before we wrap up today, I'm going to say

8    out loud everything I've admitted so we're all crystal clear

9    on what's in the record.  This has been a bit chaotic.

10          MR. MCCLEARY:  Okay.  Understood.

11          THE COURT:  So, Caroline is going to be the keeper of

12    our time over here.  And if the judge ever interrupts you,

13    she's going to stop the timer.  Okay?

14          MR. MCENTIRE:  Thank you.

15          THE COURT:  I hope I won't any more, but you may

16    proceed.

17          MR. MCENTIRE:  No, I appreciate it.  Thank you.  Can

18    you see it, Your Honor?

19          THE COURT:  I can, yes.  Thanks.

20          MR. MCENTIRE:  Can opposing counsel see it?

21          MR. MORRIS:  Yes, sir.

22          MR. MCENTIRE:  All right.

23          THE COURT:  And I'm just going to ask everyone who

24    has a PowerPoint today, can I get a hard copy --

25          MR. MCENTIRE:  Certainly.

67

1          THE COURT:  -- before we close?

2          MR. MCENTIRE:  Certainly.

3          THE COURT:  Okay.  Thank you.

4     OPENING STATEMENT ON BEHALF OF HUNTER MOUNTAIN INVESTMENT

5                            TRUST

6          MR. MCENTIRE:  May it please the Court, Your Honor,

7     at this time I'll be providing the opening statement on behalf

8     of Hunter Mountain Investment Trust.  It is a Delaware trust.

9     Mark Patrick, who's in the courtroom, is the Administrator.

10    He will be one of the witnesses that you'll hear today.

11         Hunter Mountain Investment Trust is the former 99.5

12    percent equity holder, currently classified as a Class 10

13    contingent beneficiary under the Claimant Trust Agreement.  It

14    is active in supporting various entities that in turn support

15    charities throughout North Texas.

16         Your Honor, this is not an ordinary claims-trading case.

17    I know the Court made those references in one of the hearings,

18    and I wanted to more clearly respond.  This has different

19    indicia.  An ordinary claims-trading case is normally outside

20    the purview of the bankruptcy court.  What makes this

21    different is that we're involving, we believe and allege,

22    breaches of fiduciary duty of the Debtor-in-Possession's CEO

23    and the Trustee.

24         It involves also aiding and abetting by the entities that

25    actually acquired the claims.  And that falls into the

68

 1    category of willful misconduct.

 2        It also involves injury to the Reorganized Debtor and to

 3    the Claimant Trust.  Ordinarily, a claims trade would not

 4    involve injury to the estate or the reorganized debtor.  Here,

 5    we have alleged that it has.  And the injury takes the form of

 6    unearned excessive fees that Mr. Seery has garnered as a

 7    result of his relationship and arrangements, as we have

 8    alleged, with the Claims Purchasers.

 9        During the course of my presentation today, I'll be

10    referring to the Claims Purchasers as the collective of

11    Farallon, Stonehill, Muck, and Jessup.

12        I would like to briefly discuss some of the issues that

13    have already been presented to the Court, just to make sure

14    that this record is clear.

15        Can you please continue?

16        We don't believe the *Barton* Doctrine is applicable.  I

17    believe that precedent is very clear that the *Barton* Doctrine

18    deals with proceedings in other courts, and the various

19    standards and requirements of *Barton* do not apply if in fact

20    we're coming to the Court and filing the proceeding in the

21    court where the Trustee was actually appointed.

22        And so I think that the law is clear.  And this is Judge

23    Houser here in the Northern District of Texas in the case *In*

24    *re Provider Meds*.  And she makes very clear that the standard

25    for granting leave to sue here is actually less stringent than

69

1    a 12(b)(6) plausibility standard.  So if there is any issue as

2    to what standard this Court should be applying to the -- to

3    this process, we believe it's a 12(b)(6) standard, confined to

4    the four corners of the document.

5         If the Court wishes to consult the documents that are

6    referred to in the four corners of the petition or complaint,

7    it may do so.

8         But the standard here is even more flexible than a

9    standard plausibility.  Our evidence, though, achieves the

10   standard of plausibility as well.

11        The *In re Deepwater Horizon* case is another important

12   case.  That's a Fifth Circuit case.  A plaintiff's claim is

13   colorable if it can allege standing and the elements necessary

14   to state a claim on which relief could be granted.  Defining a

15   colorable claim as one with some possible validity.  I don't

16   have to prove my case today.  I didn't have to prove my case

17   in the prior hearings.  I have to prove sufficient

18   allegations, not evidence, but sufficient allegations to show

19   that it has some possible basis of validity.

20        Possible basis of validity.  We're not here talking about

21   likelihoods.  We're not here talking about *prima facie*

22   evidence.  We're not here talking about probabilities.  We're

23   talking about something less than plausibility.  But, again,

24   we achieve plausibility.

25        A colorable claim is defined as one which is plausible or

70

1    not without merit.  These are various cases from around the

2    country.  The colorable claim requirement is met if a

3    committee has asserted claims for relief that, on appropriate

4    proof, would allow recovery.  On appropriate proof.  We're not

5    required to put on that proof today, Your Honor.

6         Courts have determined that a court need not conduct an

7    evidentiary hearing, but must ensure that the claims do not

8    lack any merit whatsoever.  We submit that our claims have

9    substantial merit and deserve the opportunity to initiate our

10   proceedings, have an opportunity to conduct discovery.  And if

11   they want to file a 12(b)(6) motion before this judge, before

12   you, they can do so.  If they want to file a motion for

13   summary judgment, they can do so.  But at this juncture, they

14   cannot, and at this juncture this Court should not consider

15   evidence in making its determination.

16        Standing under Delaware law.  The Funds have collectively

17   really hit the standing issue hard.  I think it's easily

18   resolved.  First of all, it's clear that a beneficial owner

19   has standing to bring a derivative action.  Under Delaware

20   law, a beneficial owner has a right to bring a derivative

21   action on behalf of the -- against the trustee.

22        So the issue is, am I a beneficial owner?  As a contingent

23   beneficiary in Class 10, and that's the Court's inquiry here,

24   do I qualify as a beneficial owner?  And I think that Delaware

25   law is clear that, by not limiting it to only vested

71

1   interests, by not limiting it only to immediate beneficiaries,

2   they are not -- they are not extending the scope of the

3   statute to contingent beneficiaries.  And this is consistent

4   with the laws around the country, because even Texas

5   recognizes that an unvested contingent beneficiary has a

6   property right to protect.

7       Even Mr. Seery admitted in his deposition that a unvested

8   contingent interest is in the nature of a property right.  If

9   you have a property right, that property right can be abused.

10  If you have a property right, that property right, whether

11  it's inchoate or not, it can be abused, it can be

12  misappropriated, and you could become aggrieved.  And that is

13  the constitutional standard for standing:  Is Hunter Mountain

14  Investment Trust aggrieved?  And the answer is yes.

15      Contingent beneficiaries from around the country, in

16  addition to Mr. Seery's admission that we have a property

17  interest, contingent beneficiary has standing.  This is the

18  *Smith v. Clearwater* case on Slide 11.  Very clearly, they say

19  that even if it's subject to a future event.  Their argument

20  is that Mr. Seery has not certified Hunter Mountain as in the

21  money.  We believe we are in the money.  That's a different

22  issue.  We believe he should certify, in the discharge of his

23  duties.  That's a different issue.

24      But even assuming his case -- his argument for a moment,

25  their argument is that since he's not done that act, which we

72

 1   also challenge and criticize that he's not done that act, that

 2   we can't qualify to bring this case.  Well, that's not what

 3   the law is, that even an unvested interest, a contingent

 4   interest, has a right.

 5       Slide 12.  This is the State of Illinois.  Despite the

 6   fact that interest is contingent and may not vest in

 7   possession, you still have a right to protect what you have.

 8   And you have standing to bring a cause of action.

 9       The Claimant Trust Agreement, by the way, suggests that we

10   have no vested interest, and they'll likely argue that point.

11   But the point there is the law says that's irrelevant.  If

12   it's an inchoate interest, if it's potentially vested in the

13   future, that's what imbues you with standing.

14       And in any event, the Claimant Trust Agreement is subject

15   to Delaware trust law, and they can't get around that.  They

16   can say whatever they want to say in the agreement to try to

17   block us from participation, but it's still subject to

18   Delaware trust law, and Delaware trust law does not draw a

19   distinction between vested or unvested.

20       The State of Missouri:  There is no dispute in this case

21   that the future -- that future beneficiaries have standing to

22   bring an accounting action, whether they're vested or

23   contingent.  The *Bucksbaum* case.  Article III standing exists,

24   constitutional standing, including discretionary

25   beneficiaries, have long been permitted to bring suits to

1   redress trustees' breaches of trust.  This applies not only to

2   our standing as an individual plaintiff, which we've brought,

3   but also in our standing -- in our capacity seeking to bring a

4   derivative action to benefit the Claimant Trust of the

5   Reorganized Debtor.  Both are permitted under this law under

6   these cases.

7       An interest -- in the *Mayfield* case, an interest is any

8   interest, whether legal or equitable or both, vested,

9   contingent, defeasible, or indefeasible.  So the unilateral

10  self-serving wording of the Claimant Trust does not abrogate

11  our right to bring the claim.

12      I'd like to talk briefly about fiduciary duties.  We know

13  that Mr. Seery has fiduciary duties to the estate when he was

14  the CEO prior to the effective date.  We allege that he

15  breached those fiduciary duties, and that gives us standing to

16  bring the claim that we have brought for breaching fiduciary

17  duties, causing damages that are accruing post-effective date.

18      In the *Xtreme Power* case, again, the directors can either

19  appear on both sides of the transaction or expect to derive

20  any personal financial benefit.  We are alleging that Mr.

21  Seery engaged in self-dealing.  We allege that he engaged in

22  self-dealing by arriving at an understanding where he could

23  put business allies -- whether you call them friends, business

24  allies, close acquaintances -- on the committee, the Oversight

25  Board that would ultimately oversee his compensation, which,

74

1  in the context of this case, makes no sense and it is

2  excessive.

3      Muck is a specially -- special-purpose entity of Farallon.

4  Farallon acquired the claims, created Muck to do the job.

5  Muck is now on the Oversight Board.

6      Jessup.  Jessup is a special-purpose entity, a shell

7  created by Stonehill.  Stonehill bought the claims, funneled

8  the money through Jessup.  Jessup is now on the Oversight

9  Board.  Jessup and Muck -- and by the way, the principals in

10  Farallon are actually the representatives from Muck on the

11  Oversight Board.  So there's no suggestion that there's really

12  a distinct corporate relationship here.

13      Michael Linn, who is a principal at Farallon.  You'll hear

14  his name today, throughout today.  He actually is a

15  representative of the Oversight Board, dealing with Mr. Seery

16  and negotiating Mr. -- I put negotiation in quotes --

17  negotiating Mr. Seery's compensation.

18      I'd like to talk very briefly about background.  We took

19  Mr. Seery's deposition.  I was unaware of this.  I now know

20  it.  Perhaps the Court was already aware of it.  This is Mr.

21  Seery's first job as a CEO of any debtor.  This is the first

22  time Mr. Seery has ever been a chief restructuring officer.

23  This is the first time Mr. Seery has ever been the CEO of a

24  reorganized debtor.  This is the first time that he's served

25  as a trustee post-effective date.  However, his compensation

1   is excessive and not market-driven, and there's a reason for

2   that.  We believe and we allege that it's a *quid pro quo*

3   because of prior relationships with Farallon and Stonehill.

4        Farallon and Stonehill are hedge funds, Your Honor.  They

5   created their special-purpose entities on the eve of this

6   transaction simply to take the title to the claims, but the

7   money is going upstream.

8        Seery has a relationship with Farallon.  Do we know the

9   full extent of that relationship?  No.  We have been deprived

10  of discovery.  We attempted to get the discovery in the state

11  court 202 process.  We were denied for reasons not articulated

12  in the court's order.

13       We attempted to get the discovery here that the Court

14  refused under the last hearing about these relationships.

15       So what we do have begins to put the pieces of the puzzle

16  together.  And sufficient is more than plausible.  It is more

17  than colorable.

18       We know that Mr. Seery went on a meet-and-greet trip to

19  Farallon's offices in 2017.  Didn't have to.  He was trying to

20  cultivate a business relationship.  Farallon was important to

21  him.

22       We know that in 2019 he was no longer with Guggenheim

23  Securities.  He goes out to Farallon's offices for another

24  meet-and-greet and he specifically meets with the two

25  principals who are reflected in Mr. Dondero's notes, Raj Patel

76

1   and Michael Linn.

2        We know that in June 2020 Farallon emailed Seery.  This is

3   after Mr. Seery becomes the CEO.  He says, "Congratulations.

4   We're monitoring what you're doing."

5        Seery's relationship with Stonehill.  These are all --

6   this is all before what we believe to be the events that are

7   at issue in this case.  We believe that -- represented

8   Stonehill in the *Blockbuster* bankruptcy proceeding.  There was

9   an objection to a document.  Mr. Seery was involved in the

10  *Blockbuster* proceedings.  Stonehill was one of his many

11  clients on the committee that he represented.

12       We know that Stonehill is actively involved in one of Mr.

13  Seery's charities in New York.  We know that he sent text

14  messages to Mr. Seery in February of 2021, wanting to know how

15  to get involved in this bankruptcy.

16       Farallon and Stonehill were strangers to this bankruptcy.

17  They weren't creditors.  They were encouraged and they came

18  into this process.

19       Farallon and Stonehill have not denied any of our

20  allegations.  They are not putting any evidence on today.  We

21  allege that these relationships was based and founded upon a

22  *quid pro quo*.  I'll scratch your back; you scratch mine.  You

23  give me some information; I want to evaluate these claims.

24  And, by the way, we're going to be on the Oversight Board, or

25  you're going to put us on the Oversight Board, or by default

1   we'll be on the Oversight Board, and we'll work out your

2   compensation agreement.

3       Mr. Seery also has an established relationship with

4   Stonehill.

5       I like to have a timeline of certain events.  This is not

6   all of the relevant events, but this can give you a quick

7   picture.  We know that Mr. Dondero sent an email to Mr. Seery

8   in December of 2020 relating to MGM.  It is undisputed that

9   Mr. -- that Farallon emailed Seery, Mr. Seery, in January of

10  2021 if there was a path to get information regarding the

11  claims for sales.  Mr. Seery says he never responded to it,

12  but we know that this entity, Farallon, got deeply involved in

13  buying these claims shortly after this email.

14      We have the Claimant Trust Agreement suddenly being

15  amended to not have a base fee, but now we're going to

16  incorporate a success participation fee.  As part of a plan,

17  we're not criticizing that, but suddenly the vehicle for post-

18  effective date bonuses is being created.

19      The Debtors' analysis comes out in association with the

20  plan confirmation.  It projects a 71.32 percent recovery for

21  Class 8 and Class 9, and those are the principal classes we're

22  talking about.  95 percent -- 98 percent of all of the claims

23  here are in Class 8 and Class 9, until you get to us, Class

24  10.

25      71.32 percent of Class 8 means that Farallon and Stonehill

78

1   will get less than about a six percent internal rate return on
2   their $163 million investment, which they have never denied.
3   That is not a hedge fund investment goal.  Investment -- hedge
4   funds like these companies, they go for 38, 40, 50 percent of
5   returns.  Who would ever invest $163 million on a distressed
6   asset that's not collateralized with only an expectation of an
7   internal rate of turn of six percent?  But that's going to be
8   the evidence before the Court.  That does not make any
9   financial, rational wisdom at all.

10      The plan is confirmed.  It's undisputed that Stonehill
11  contacts Seery after the plan is confirmed to want to know how
12  to get involved.  They have phone calls after this text
13  message.  Muck is created on March 9.  We know from Mr.
14  Seery's deposition that Farallon told Seery that six days
15  later they bought the claims.  All the claims, by the way,
16  when I say bought the claims, it's everything except UBS.  To
17  our knowledge.  They may have negotiated the paperwork back
18  then, but the claims transfers did not occur until the summer.
19  All the other claims involved, the claims transfers were filed
20  with this Court in mid-April and at the end of April.

21      Tim Cournoyer removes MGM from the restricted list.  Tim
22  Cournoyer is an employee of Highland.  Well, it tells us that
23  MGM was on the restricted list and there should be no
24  discussion about MGM, but there was.  There was discussions
25  about MGM, and Mr. Dondero is going to testify to that.

**Appx. 02615**

1    And we also know that the HarbourVest settlement was
2    consummated during this period of time.  If it had been on the
3    restricted list, as it was, that transaction should never have
4    occurred.  But it did occur.  This Court ordered it.  It
5    approved it.  And I'm not challenging -- we're not challenging
6    that settlement.  It is done.  That is done.  What we are
7    challenging is the fact that Mr. Seery is actively involved in
8    using inside material nonpublic information.
9        Jessup Holdings is created shortly thereafter, on April
10   8th.  We have claims settling on April 30th.  The Acis claim
11   is transferred to Muck -- that's Farallon -- on April 16.  The
12   Redeemer and Crusader are all transferred on April 30th.
13       Stonehill and Farallon never deny that they did no due --
14   that they failed to do due diligence.  We allege that there
15   was no due diligence.  And that relies in significant part
16   upon Mr. Dondero.  But now, because we have Mr. Seery's
17   deposition, it also relies upon Mr. Seery's admissions in
18   deposition, because he says he never opened up a data room, he
19   doesn't know what due diligence they did.  Farallon says the
20   only due diligence they did is they talked to Jim Seery.  And
21   how do you invest $163 million, or $10 million or $50 million,
22   whatever the part is, with an internal rate of return six
23   percent, only on the advice of Mr. Seery, who's never been a
24   trustee or a CEO before, unless there's something going on?
25       Your Honor, public announcement of MGM on May 26th.  On

80

1  May 28th, two days later, Mr. Dondero calls Farallon.  It took
2  Mr. Dondero or his group a few days, a week or so, to even
3  understand who -- that Farallon was involved, because the
4  registrations for Muck and Jessup did not disclose their
5  principals, did not even disclose addresses.  They were shell
6  -- they were companies that came in in the last minute to buy
7  these claims incognito, frankly.

8      They found out that Farallon was involved.  They had a
9  call initially with Raj Patel, who is the principal of
10  Farallon.  He has three conversations total:  One with Mr.
11  Patel and two with Michael Linn.  Michael Linn was the one
12  responsible for these claim purchases.  Patel admitted that
13  Farallon relied exclusively on Seery and did no due diligence.
14  Linn rejected the premium to sell.  The evidence you'll hear
15  today, that Mr. Linn rejected a premium up to 40 percent to
16  sell the claims.  He actually said he would not sell at all
17  because he was told by Mr. Seery that the claims were too
18  valuable.

19      That is evidence of insider trading.  Specifically, they
20  said they were very optimistic about MGM and they were
21  unwilling to sell because Seery said too valuable.

22      We have -- these are the purchases.  This is where the
23  Class 9 claims fall.  And keep in mind -- Tim, go back -- that
24  $95 million of this upside potential is being told, at least
25  to the publicly available information, that you're never going

Appx. 02617

1  to get there.  Yet 95 -- $95 million is allocated to this

2  category.  So Class 8 is $275 million.  Class 9 is 29 -- $95

3  million.

4      Next.

5      So we have the evidence that you'll hear today.  Farallon

6  admitted the timing.  No due diligence, never denied by the

7  Claim Purchasers.  Based upon material nonpublic information.

8  That's our allegation.  Purchased over $160 million.  This is

9  never denied by the Claims Purchasers.  They purchased claims

10  when the return on investment was highly doubtful.  Maximum

11  expected annual rate of return, assuming publicly-available

12  information, was approximately six percent, and that is

13  totally atypical of what a hedge fund would seek.

14      Insider information.  We're not talking about just MGM.

15  The Respondents want to narrow the Court's inquiry.  This is

16  much larger than MGM.  MGM is a part of it, it's a big part of

17  it, but it's not the only part of it.  It's other assets.

18  Portfolio companies.  Other invested assets.  There's a lot of

19  money out there, and it was never disclosed during the

20  ordinary course of the bankruptcy, for reasons that the Court

21  already knows, in terms of asset values.  How does someone

22  come in and purchase distressed assets, claims, without any

23  understanding of what assets are backing those claims, when

24  there's no publicly-available information there to do it and

25  there's no evidence, no indication, no statement that actually

82

1  due diligence was done?

2      That right there, without anything else, makes our claims

3  plausible.  You don't have to prove insider trading by direct

4  evidence.  Nobody's going to admit that they did something

5  wrong.  You prove it circumstantially, and we've cited cases

6  and we'll give you cases to that effect.

7      Next.

8      We have material nonpublic information.  It is very clear

9  that Mr. Dondero on December 17th sent this email, not just to

10 Mr. Seery but to several other individuals, including lawyers.

11 It states that he'd just gotten off a board call.  A pre-board

12 call.  The update, he provides the update.  Active

13 diligencing.  It's probably a first-quarter event.  We can

14 scour all of the other media documents that are in evidence,

15 both from us and them, and you're not going to find any

16 indication anywhere that a board member has said, guys, gals,

17 it's going to be a probable first-quarter event.  That's

18 material nonpublic information.

19         THE COURT:  By the way, you all objected to this

20 exhibit.

21         MR. MCENTIRE:  No, this is my exhibit.

22         THE COURT:  We spent --

23         MR. MCENTIRE:  I did not.  They objected to this.

24         MR. MORRIS:  Your Honor, we didn't object to it, and

25 that is the one exhibit that they did not object to.

1          THE COURT:  Oh, it is?

2          MR. MORRIS:  Nobody objected to this exhibit.

3          MR. MCENTIRE:  I'm not going to object to this

4   exhibit, Your Honor.

5          THE COURT:  Okay.  It's a different version.

6          MR. MCENTIRE:  Fair enough.

7          THE COURT:  Okay.  It was a different email around

8   that same time frame.

9          MR. MCENTIRE:  So just --

10          THE COURT:  Apologies.  We stopped the clock.

11          MR. MCENTIRE:  This -- my next exhibit is simply a

12   demonstrative, but I just want the Court to understand that

13   MGM is no small matter here and Mr. Seery did testify in

14   deposition that it probably made up $450 million.  He was

15   pretty close.

16          MR. MORRIS:  Your Honor, I object to this

17   demonstrative.  There is no evidence in the record.  It's not

18   cited to anything.  We're not just going to start putting up

19   stuff on the screen that we like.

20          MR. MCENTIRE:  Excuse me.  I'm not offering this

21   document into evidence.

22          MR. MORRIS:  I don't care.  The Court shouldn't be

23   seeing a demonstrative exhibit that contains matters that are

24   never going to be in the record.

25          THE COURT:  Okay.

84

1          MR. MCENTIRE:  I disagree.  I can put the data in the

2     record.

3        May I proceed?

4          MR. MORRIS:  But you didn't.

5          THE COURT:  Okay.  I'm not considering the truth of

6     this until and unless I get evidence of this.

7          MR. MCENTIRE:  Fair enough.  But the point is this,

8     Mr. Seery has conceded in deposition that between the

9     institutional funds and the CLOs, there's a lot of MGM

10    securities and stock.  We're talking a lot of money.  We're

11    not talking about just Highland Capital's investment.

12       You can skip the next slide.  Skip.

13       So, rumors versus material nonpublic information.  They

14    can talk all day long, and if they want to use their time

15    doing this, they can.  There's a difference between rumor and

16    actual material nonpublic information.  Rumor from

17    undocumented sources, lack of clarity, lack of timing.  There

18    is no -- there's no debate that a lot of people knew that

19    maybe MGM might be for sale.  Maybe they wouldn't.  Sometimes

20    it falls apart, you know.  But the point is a board member is

21    telling someone that there's a probable event in the first

22    quarter of 2021.  That is definite, specific, and it comes

23    from the highest authority.  That is -- if that's not material

24    and public information, I don't know what could be.

25         Classic indications of insider trading.  You have to have

1    a tipper with access to MNPI.  Here, we know that Mr. Seery,

2    if he's the tipper, we allege he's the tipper -- and these are

3    words of art out of case law, by the way -- he has access to

4    information about MGM.  He has access about asset values,

5    projected values.  He has a relationship.  We believe he has a

6    very strong relationship.  It's more than just social

7    acquaintances.  He's giving congratulatory emails.  He's

8    getting solicitations.  He's solicited.  Benefits received.

9    We know what the benefits are.  They get the opportunity to

10   invest money with huge upside.

11       There was a point mentioned some time ago that, well, only

12   -- only the sellers really have the grievance.  Well, Your

13   Honor, we have a right to start our lawsuit and do some

14   discovery, because, frankly, a lot of sellers have big-boy

15   agreements.  They say, you don't sue me if I have MNPI.  I

16   don't sue you if you have MNPI.  We have mutual releases.

17   Let's go by our way.  Everybody's happy.  We're not going to

18   come back and see each other ever again.

19       That's one of the things we're being deprived of here.

20   But otherwise, what we have here is a colorable plan.  We've

21   asked for the communications with the sellers.  We can't get

22   it.  We have here an email.

23       Next.

24       We have here an email.  This actually -- you'll hear Mr.

25   Dondero say this actually reflects three communications.  Raj

86

Patel, Farallon, bought it because of Seery.  Mr. Dondero
contacted Mr. Patel and says, Raj Patel bought it because of
Seery.  50 to 70 percent's not compelling.  Class 8.  50
percent, 70 percent.  Give you a 30 percent to 40 percent
premium.  Not compelling.  I ain't going to sell.  Ask what
would be compelling.  Nothing.  No offer.  Bought in February/
March.  We now know the time frame.  We know that Stonehill is
communicating with them and we know that Farallon has been
just communicating with Mr. Seery.  Bought assets with claims.
It's not just the MGM.  It's not just the portfolio companies
and other assets.  It's also the claims.

     Well, what are the claims?  It's the claims against Mr.
Dondero.  Well, how would they know about all this if there's
no due diligence and there's no evidence of any due diligence
before you?  130 percent of costs, not compelling, no counter.
Mr. Dondero's angry.  Discovery is coming.

     Atypical behaviors are also circumstantial evidence of
insider trading.  We have strange behaviors here, Judge.  We
have a vast majority of the claim value is acquired by only
two entities post-confirmation.  Most significant claims are
only owned by two entities who were strangers to the whole
process.

     The removal of -- and Mr. Morris offered to stipulate.
The sudden removal of MGM from the compliance list in April of
2021 -- by the way, the removal doesn't cleanse the MNPI.  If

1   you have material nonpublic information because you received

2   it from Mr. Dondero, the fact that Mr. Dondero's no longer

3   employed by Highland Capital or no longer directly or formally

4   affiliated doesn't cleanse the MNPI.

5       We have no due diligence, regardless of the significant

6   nine-digit numbers, and we have no rational explanation of why

7   this kind of money would be invested when they're projecting

8   an actual loss, if -- a modest return at best for Class 8 and

9   a loss for Class 9.

10      Insider trading can be proved by circumstantial evidence,

11  Your Honor.  No fraudster, no person who's done wrong is going

12  to admit to it, so you look for the classic -- you look for

13  the classic elements.  And that's what we had here.  And we

14  have alleged all of this in our pleadings.  Not in extraneous

15  evidence.  Within the four corners of our pleadings.  And

16  that's why we have a plausible claim.

17      You know, I believe it's Rule 8, Rule 9 of the Federal --

18  you have to require specificity in a fraud claim.  Well, this

19  is not a fraud claim.  This is a different claim.  But we have

20  provided specificity that passes the smell test of

21  colorability.  We have provided specificity that would satisfy

22  even more stringent requirements under 12(b)(6).

23      The plan analysis.  This is a, I think, a document

24  admitted by everyone.  Mr. Seery has testified that this

25  projection of 71.32 percent for Class 8 came out in February

88

1    of 2021 and never changed, all the way up to the effective

2    date.

3        So this is what the public believed.  This is what the

4    public knew.  And if this was all that Farallon and if is all

5    that Stonehill had access to, that means that they were going

6    to lose their entire investment on Class 9.  They bought UBS

7    at a loss to begin with.  And on the other three investments,

8    they were going to get a very, very modest, minor return, six

9    percent over three years, or even less.  That is not what

10   hedge funds do.

11       Seery's excessive post-effective date compensation.  We

12   have obtained no discovery from Farallon or Stonehill in this

13   regard, but we know that he had no prior experience.  We know

14   that the award that was given him was not market-based, even

15   though the self-serving documents that have been produced and

16   that are attached to their exhibit list suggests a robust

17   negotiation.  Well, they were robust without any kind of

18   reality check in the real world about whether it was market-

19   supported.  None.  Mr. Seery has admitted to that.

20       It was not lowered.  He's making $1.8 million a year right

21   now, with most -- a lot of the assets already sold, the

22   reorganization done.  All they're doing now is monetizing

23   assets.  He's getting $1.8 million.  He's got 11 people

24   working for him.  And then he has a bonus, a bonus that is --

25   increases significantly with his ability to recover for Muck,

89

1   Jessup, Farallon, and Stonehill.

2       And in the absence of -- if we were really dealing with

3   uncertainty and risk, then that may be another issue, but here

4   we're dealing with entities that already know that they're

5   going to get a payday and they already have.  They've already

6   made about a $170 million return -- 170 percent return, excuse

7   me -- over and above the original investment, when they were

8   projected to actually lose money.

9       Just so you know, we have over $534 million of cash that

10  has been basically monetized, and out of that, $203 million in

11  total expenses -- $277 million to Class 8 and -- and -- 1

12  through 7, and Class 8 distributors.  Excuse me, creditors.

13  Even if you take -- if you take out the alleged obligations of

14  Mr. Dondero on the promissory note cases, that still leaves

15  over $100 million available, which puts us in the money.  Puts

16  us in the money.  And the fact that you have $203 million of

17  expenses in a case of this nature is part of our claim, is

18  that we have delay actions.  We have a situation where Mr.

19  Seery is continuing to receive $1.8 million a year on a slow

20  pace to monetize, paying other professionals, when this could

21  have been over a long time ago.  That's part of our

22  allegations.  It's not part of any valuation motion.  It's

23  actually in our allegations.

24      I'm going to reserve the rest.  I think that's my opening

25  statement, Your Honor.  I'm going to reserve the rest for my

90

 1   closing.  And let me see.  Yes, that's right.  And thank you

 2   for your time.

 3          THE COURT:  All right.  Caroline, how much time was

 4   that?

 5          THE CLERK:  Thirty-four minutes and 27 seconds.

 6          THE COURT:  Thirty-four minutes and 37 seconds.

 7   Okay.

 8          THE CLERK:  Twenty-seven.

 9          THE COURT:  Oh, 27.  Okay.

10          MR. MCENTIRE:  Thirty-four minutes?

11          MR. MCCLEARY:  Thirty-four minutes.

12          MR. MORRIS:  Your Honor, I do have hard copies of my

13   short slide presentation.

14          THE COURT:  All right.  You may approach.

15      And Mr. McEntire, are you going to give me your PowerPoint

16   later, hard copies later?

17          MR. MCENTIRE:  Yes, Your Honor.  I found one typo and

18   I'd like to fix one typo and then we'll give it to you.

19          THE COURT:  Okay.

20           OPENING STATEMENT ON BEHALF OF THE DEBTORS

21          MR. MORRIS:  Good morning, Your Honor.  John Morris,

22   Pachulski Stang Ziehl & Jones, for Highland Capital Management

23   and the Claimant Trust.

24      I want to be fairly brief because I really want to focus

25   on the evidence.  I look forward to Your Honor hearing from

91

1   Mr. Seery so that he could clear up a lot of the misleading

2   statements that were just made.

3       The Court is here today on a gatekeeper function, and

4   we're delighted that the gatekeeper exists.  We're delighted

5   that the Court will have an opportunity, after considering

6   evidence, to determine whether or not these claims are

7   actually colorable.

8       There's -- there were a lot of conclusory statements I

9   just heard.  There were a lot of assumptions that were made.

10  There were a lot of misleading statements that were made.  At

11  the end of the day, what the Court is going to be asked to do

12  is to decide whether, in light of the evidence, do these

13  claims stand up on their own?  And they do not.

14      And let me begin by saying that I made a mistake a couple

15  of weeks ago.  If we can go to Slide 1.  I told Your Honor

16  that you were the sixth body to consider these insider trading

17  claims.  Based on Hunter Mountain's exhibit list, there is

18  actually one more, and I'll get to that in a moment.  So

19  you're actually -- this is the seventh attempt to peddle these

20  claims to one body or another.

21      The first was Mr. Dondero's 202 petition.

22      Everything I have here, Your Honor, is footnoted to

23  evidence.  Okay?

24      So, Footnote 1, you can look in the paragraphs of Mr.

25  Dondero's petition, his amended petition, his declaration,

1    where he makes the same allegations.  Again, I misspeak.  Not

2    the same allegations.  Different versions of the allegations

3    that are being presented today concerning insider trading.

4         He did it three times.  The Texas state court said no

5    discovery.  In October of 2021, Douglas Draper wrote an

6    extensive letter to the U.S. Trustee, setting forth the same

7    allegations.  You can find them at our Exhibit 5.  It's

8    attachment Exhibit A, Pages 6 through 11.  Compare them to the

9    allegations that are being made by Hunter Mountain today.  The

10    U.S. Trustee's Office took no action.

11         Mr. Rukavina followed up with the same thing to the same

12    body in November of 2021.  You can see where his allegations

13    of insider trading are made and *quid pro quo* and all the rest

14    of it.  Again, they took no action.

15         The one that I don't have on this chart because I didn't

16    -- I made the chart last week and then was unavailable.  Mr.

17    Rukavina sent a second letter.  And you can find that at

18    Plaintiffs' Exhibit 61.  And in Plaintiffs' Exhibit 61, you'll

19    see that Mr. Rukavina sent yet another letter to the U.S.

20    Trustee's Office on May 11, 2022.

21         And these are all really important, right?  The U.S.

22    Trustee's Office has oversight responsibility for matters

23    including claims trading.  That's their job.  They took three

24    different swings at this.  And these are pages of allegations.

25    6 to 11.  9 to 13.  We think it's very important that the

93

1    Court look at what was told to the U.S. Trustee's Office.  And
2    you're going to hear Mr. Seery testify that Highland has never
3    heard from the U.S. Trustee's Office concerning any of these
4    allegations or any of the other allegations that are set forth
5    in Mr. Rukavina and Mr. Draper's letter.  Never.  Declined to
6    even initiate an investigation.

7        Hunter Mountain filed its own 202 petition.  It boggles my
8    mind that they try to create distance with Mr. Dondero,
9    because the whole petition, like this whole complaint, is
10   based on Mr. Dondero.  He submitted a declaration alleging the
11   same insider trading case, and a second Texas state court said
12   I'm not even giving you discovery.  We know that's the result.

13       But the best is the Texas State Securities Board.  I think
14   we're going to hear testimony that Mr. Dondero or somebody
15   under his control is the one who filed the complaint with the
16   Texas State Securities Board.  Who would be the better body to
17   assess whether or not there's insider trading than a
18   securities board?  I can't imagine there's a better body.
19   They did an investigation.  Mr. Dondero could have told them
20   anything he wanted.  I'm sure he did.  And they wrote in their
21   motion in Paragraph 37 one of the reasons they have colorable
22   claims is the investigation is ongoing.

23       Much to their dismay, I'm sure, two days before our
24   opposition was due, the Texas State Securities Board said,
25   we've looked at the complaint, we've done our investigation,

94

1  and we're not taking any action.  You can find that, Your

2  Honor, Footnoted 5 at Exhibit 33.

3      You are now the seventh body who's being asked -- and

4  you're being asked to do substantially more than any of the

5  other prior bodies were.  The Texas state courts were being

6  asked, just let them have discovery.  They said no.  The U.S.

7  Trustee's Office, charged with the responsibility of looking

8  at claims trading, said, I'm not going to investigate.  I know

9  what you've told me.  No.  The Texas State Securities Board.

10 Insider trading, insider trading.  I'm not doing an

11 investigation.  I'm not doing anything.  And now they want to

12 come here and engage in, you know, in expensive, long

13 litigation over the same claims nobody else would touch.

14     Can we go to the next slide?

15     Mr. Dondero's email.  Good golly.  "Amazon and Apple are

16 in the data room."  There's a hundred articles out there that

17 they're putting into evidence that say that.  "Both continue

18 to express material interest."  There's a hundred articles out

19 there that say that.  "Probably a first-quarter event.  Will

20 update as facts change."

21     There will not be any evidence that he ever updated

22 anybody, because that wasn't the purpose of this, as Your

23 Honor will recall.  He had an axe to grind.

24     And I direct your -- I don't direct the Court to do

25 anything -- I ask the Court to take a look at our opposition

95

1  to the motion, in Paragraphs 23 to 25, where we cite to

2  extensive evidence, all of which is now part of the record,

3  showing just what was happening, from the moment he got fired

4  on October 10th until the end of the year, with the

5  interference, with the interference, with the threats, with

6  the TRO.  It was nonstop.

7      Was this email sent in good faith by somebody who owed no

8  duty to anybody?  Or was it really just another attempt -- and

9  this is why the gatekeeper is so important, because I think

10  that's exactly what this Court is supposed to do:  Is this a

11  good-faith claim?  Is this a claim that's made in good faith?

12  It can't be.  And you know why?  You know what's -- you know

13  what's -- I'll just say it now.  I won't even save it for

14  cross.

15      Remember the HarbourVest settlement that they're making so

16  much, you know, about?  Mr. Dondero is the tipper.  According

17  to him, he gave Mr. Seery inside information.  According to

18  him, Mr. Seery abused it by engaging in the HarbourVest

19  transaction.  But Mr. Dondero filed an extensive objection to

20  the HarbourVest settlement and never said a word about this,

21  because that wasn't on his mind at the time.  The email was

22  sent in order to interfere.  And when that failed, he's trying

23  to play gotcha now.  It's ridiculous.

24      He owed no duty to Highland.  It would have been a breach

25  of his own duty to MGM to share that information at that

Appx. 02632

96

1   period of time.

2        The shared services agreement.  They don't help him.  Mr.

3   Dondero has nothing to do with that.  Highland is providing

4   services.  He's not providing services to Highland.  Highland

5   was providing.  We had already given notice of termination.

6   We had already had our plan and disclosure -- we had already

7   had our disclosure statement approved.  We were weeks away

8   from confirmation.  Please.

9        And the *Wall Street Journal* article on December 21st at

10  Exhibit 27, that's not your garden-variety *Wall Street Journal*

11  article, because it specifically says that investment bankers

12  were engaged to start a formal process.  The investment

13  bankers are identified by name.  Something has changed.

14  Anybody could see that.

15       Yes, there were rumors for a long time.  Nobody had ever

16  said there was a formal process.  Nobody had ever said

17  investment bankers had ever been hired.  Nobody had ever

18  identified those investment bankers.  Right?  I mean, just the

19  world changed.

20       If you can go to the next slide.

21       You know, before I get to the next slide in too much

22  detail, *quid pro quo*.  We look at it as *quid*.  Did he -- is

23  there any evidence that he actually gave anybody material

24  nonpublic inside information?  The answer is going to be no.

25  The *quo* is the relationship.  And I'm not going to spend too

97

1   much time on that now.  But wait until you hear Mr. Seery

2   testify as to the actual facts about his relationship.

3   Because some of what we just heard is mind-boggling, that

4   little -- that little page from the *Blockbuster* case, like, 14

5   years ago, where Farallon was one of a group of people who Jim

6   Seery never met.  Like, the stretch, what they're trying to do

7   is beyond the pale.  But I'm delighted to have Mr. Seery sit

8   in the box and answer all the questions they want to ask him

9   about his relationship with Farallon and Stonehill.

10       But getting to the point, the *quid pro quo*.  The *quo* is

11   they fixed his compensation?  Are you kidding me?  They

12   rubber-stamped his compensation?  Highland and Mr. Seery and

13   the board are alleged to have negotiated?  There's nothing

14   alleged.  There are facts.  There is evidence.  It is beyond

15   dispute.  If you look, just for example, right, they take

16   issue with his salary?  The salary was fixed by this Court in

17   2020.  Without objection.  He's getting the exact same salary

18   that he ever got.

19       You'll hear that it's a full-time job.  Your Honor knows

20   better than anybody in this courtroom, other than me, perhaps,

21   the litigation burden that's been placed on this man.  He has

22   no other income.  He doesn't do anything else.  This is a

23   full-time job.  It's the exact same job that he had when Your

24   Honor approved his compensation package three years ago,

25   without a raise.  They didn't give him a nickel more.  Not one

98

1  nickel.  It's outrageous.

2      The balance of his compensation, of which he has not yet

3  received a nickel, is exactly what this Court would want

4  somebody in Mr. Seery's position to do.  It aligns his

5  interests with his constituency.  Not with Stonehill.  Not

6  with Farallon.  With all creditors.  The greater the recovery,

7  the greater the bonus.  Outrageous, right?  Remarkable, isn't

8  it?  Only in their world.

9      If Your Honor can go back to Mr. Rukavina's letter,

10  because this is where it all -- that's where it all starts

11  from.  Like, excessive compensation.  Mr. Rukavina, I don't

12  know how he did this, why he did it, what it was based on.  He

13  actually told the U.S. Trustee's Office that they thought Mr.

14  Seery made $50 million.  It's in the letter.  $50 million,

15  they told the U.S. Trustee's Office he made.  It's footnoted,

16  so you can go find it.  It's right there, at Page 14.  Quote,

17  Seery's success fee could approximate $50 million.

18      $8.8 million is what he's making.  They think that's

19  excessive?  What do they think he should make?  Three?  Five?

20  We're not going to hear that.  But that's what this case is

21  about.  You just heard counsel in his opening statement.  He

22  literally said the only thing at issue is his compensation.

23  And that has to be the case, because if there was -- if there

24  was no claims trading, UBS and HarbourVest and Acis, right,

25  the Redeemer Committee, they would all still be holding these

99

1  claims today.

2      When Stonehill and Farallon acquired the claims, they were

3  all allowed.  There was no debate about what the claims were.

4  If they held the claims today, they would be worth the exact

5  same amount of money, only a different person would be

6  benefitting from it.

7      So the case actually is only about Mr. Seery's

8  compensation.  And they've moved the goalposts, as often

9  happens in this courtroom, from rubber-stamping -- I'll give

10 you what you want.  When I hear rubber-stamp, I hear, you make

11 a demand and I'll give it to you.  And now they realize, when

12 they see the negotiation -- because it's in evidence, it's

13 just the documents, you can see the board minutes -- what do

14 we, doctor the board minutes and they should get discovery

15 because we doctored the board minutes?  The board minutes show

16 a four-month negotiation with an Independent Board member

17 fully involved.  It's mind-boggling.  It's actually -- well,

18 I'll just leave it at that.

19     Next slide.  Last slide.  Let me finish up.  Three of the

20 four sellers were former Committee members.  Mr. Dondero

21 agreed that Committee members would have access to special

22 nonpublic inside information as part of the protocols, as part

23 of the corporate governance settlement.  He agreed to that.

24 These are the people who got abused?  These are the people who

25 didn't know what was happening?  Committee members and

100

1  HarbourVest, probably one of the biggest and most

2  sophisticated funds in the world, didn't know what was

3  happening?  They got abused?  Stonehill and Farallon took

4  advantage of them?

5      If you read their pleadings closely, they actually allege,

6  and I don't -- I don't know if there'll ever be any evidence

7  of this -- but they actually allege that -- I forget which --

8  oh, somebody is an investor in Stonehill and Farallon, and so

9  the theory is one of the sellers is an investor in Farallon.

10  So not only did they abuse, they abused one of their own

11  investors.  Like, this is not a colorable claim.  This is

12  ridiculous.

13      None of the claims sellers are here.  Sophisticated people

14  who -- who -- right?  Mr. Dondero could pick up the phone and

15  say, hey, guys, you got ripped off.  You sold your claims when

16  you shouldn't have.  They had an unfair advantage.

17      Nobody's here.  Where is anybody complaining?  They're not

18  going to because they cut a deal that they thought was good

19  for them at the time.  In hindsight, maybe they have regrets.

20  Right?  We all have regrets sometimes in hindsight.  But that

21  doesn't create a claim.

22      We've heard so much about what hedge funds would get and

23  how much and is this rational?  The fact of the matter is, at

24  the time Mr. Dondero had his phone call on May 28th, UBS had

25  not been purchased, although MGM had already been announced.

101

 1  So when they talk about MGM, maybe it's the fact -- and this

 2  is in evidence -- maybe it's the fact that, two days before,

 3  the MGM-Amazon deal actually was publicly announced.  It

 4  actually was.  So maybe when they say, hey, yeah, we like MGM,

 5  because, you know, that just -- that just got announced.

 6  Maybe that happened.

 7      But at the end of the day, the claims that they bought, if

 8  you just look at the claims that were purchased at the time he

 9  had the conversation, all Mr. Seery had to do was meet

10  projections and they were going to get $33 million in two

11  years.  A 30 percent return in two years.  I don't know.  That

12  doesn't -- that doesn't sound crazy to me.  Doesn't sound

13  crazy to me.  It certainly doesn't create a colorable claim,

14  just because they think that Farallon or Stonehill -- there's

15  not going to be any evidence of Farallon or Stonehill's risk

16  profile.  There's not going to be any evidence of Farallon or

17  Stonehill's, you know, expected returns.  There's not going to

18  be any evidence at all about what due diligence they did or

19  didn't do, other than what comes out of Mr. Dondero's mouth,

20  as usual.

21      Mr. Dondero -- and let's look at what's going to come out

22  of Mr. Dondero's mouth.  He has multiple sworn statements.

23  I'm going to take his notes and they're going to become mine.

24  I'll put him on notice right now.  Because those notes bear no

25  relationship to the evolution of his sworn statements over

1   time.

2        The first time he mentions MGM in a sworn statement is two

3   years after the fact in Version #5.  That's a colorable claim?

4   You want -- you want to oversee a litigation, or maybe it gets

5   removed to the district court, maybe I get lucky to be in

6   front of a jury, and I'll have Mr. Dondero explain how it took

7   him five tries before he could write down the letters MGM.

8   Not a colorable claim.  No evidence against Stonehill

9   whatsoever.  Zero.  Zero.  Never spoke to them.  There's no

10  colorable claim here, Your Honor.

11       I'm going to turn the podium over to Mr. Stancil to talk

12  about the law.

13            THE COURT:  Okay.

14        OPENING STATEMENT ON BEHALF OF JAMES P. SEERY, JR.

15            MR. STANCIL:  Thank you, Your Honor.  Mark Stancil,

16  counsel for Mr. Seery.  But I'm going to just very briefly

17  address a few legal points.  And I actually mean briefly.

18            THE COURT:  Okay.

19            MR. STANCIL:  I'll come back to a good bit of this in

20  closing as time permits.

21       I heard Mr. McEntire say *Barton* doesn't apply.  I would

22  encourage him to start with what the gatekeeping order

23  actually says.  Here it is.  This is in -- it's in the plan.

24  Your Honor has confirmed it.  The question we have in terms of

25  what standard applies is, what does this order mean?  Well, we

103

1    think that's going to be clear.  It's not what they think the

2    word "colorable" would mean in other contexts.  It's not what

3    they think they should have to satisfy now that they have a

4    theory.  It's, what does this mean?

5        And we'll get into some of the additional evidence from

6    Your Honor's order at the time, later in closing.

7        Next slide, please.

8        But let me just start to say I'm awfully surprised to hear

9    him say that he doesn't believe *Barton* applies, because the

10   order says that it does.  This is Paragraph 80 of the

11   confirmation order.  It says that the Court has statutory

12   authority to approve the gatekeeper provision under these

13   sections of the Bankruptcy Code.  The gatekeeper provision is

14   also within the spirit of the Supreme Court's *Barton* Doctrine.

15   The gatekeeper provision is also consistent with the notion of

16   a pre-filing injunction to deter vexatious litigants that has

17   been approved by the Fifth Circuit in such cases as *Baum v.*

18   *Blue Moon Ventures*.

19       So I think it is impossible, and respectfully, Your Honor,

20   it's law of the case.  This is what the order is based on.

21   The day for objecting to what's in the confirmation order is

22   long gone.

23       So let me come back, then -- first slide, please -- and

24   I'll just very briefly give you a little legal framework for

25   what we're going to be arguing to you later in closing.

1    So, *Barton* does require a *prima facie* showing.  That is

2    *Vistacare* and plenty of other cases.  That is more than a

3    12(b)(6) standard, Your Honor.  Numerous courts agree.  And in

4    fact, as you'll hear us discuss later, Judge Houser's opinion

5    is not to the contrary, because she said explicitly, I'm not

6    applying *Barton*.  So anything that they're relying on for what

7    *Barton* requires from that opinion is *dicta*.  But we can show

8    you case after case after case, and we will, to show that

9    *Barton* requires evidentiary hearings.

10    Here's a point, this third bullet here is something I have

11    not heard a single word in all of the briefing and ink that

12    has been spilled and in as long as we've been here this

13    morning, is what is a gatekeeping order doing if all it does

14    is reproduce a 12(b)(6) standard?  That's what they say.  In

15    fact, they're actually saying it's even lower.  Now I think I

16    heard them say it's even lower than a 12(b)(6) standard.

17    That makes no sense whatsoever.  We've just shown you that

18    this gatekeeping order was imposed consistent with *Barton* and

19    vexatious litigant principles.  Later I will walk Your Honor

20    through factual findings that you made detailing the vexatious

21    litigation, detailing the abuses.  The notion that the gate is

22    the same gate that every other litigant who hasn't

23    demonstrated that record of bad faith is absurd, and it serves

24    no purpose.

25    And as Mr. Morris described, Hunter Mountain woefully,

105

1    woefully violates any *prima facie* showing.  And we'll get into

2    a little bit more exactly how that works.

3        We are going to ask this Court, in addition to ruling that

4    *Barton* applies and that they've failed it, we're going to ask

5    this Court, respectfully, to please consider ruling on

6    multiple independent grounds as well.  We know there's a

7    penchant for appeals and appeals upon appeals.  So we will

8    argue to Your Honor, although we will largely spare you

9    another rehash of our briefs, but we will explain to Your

10   Honor why they do lack standing to bring this claim as a

11   matter of Delaware law.  And there was a lot of fuzzing up

12   about constitutional standing and Delaware law.  Not

13   necessary.

14       If -- we will be happy to rely on our pleadings here, but

15   on Page 27 of the Claimant Trust Agreement, that's what

16   defines their rights under Delaware law, and they were talking

17   about how beneficial owners under Delaware law have standing.

18   Well, are they beneficial owners?  They are not.  Equity

19   holders -- this is in Paragraph C, Page 27 of the Claimant

20   Trust Agreement -- Equity holders will only be deemed

21   beneficiaries under this agreement upon the filing of a

22   payment certification with the bankruptcy court, at which time

23   the contingent trust interests will vest and be deemed equity

24   trust interests.

25       They are not beneficial owners of squat.  That has not

 1  happened.

 2       And last, Your Honor, we will -- and I will organize this

 3  for Your Honor in closing as well -- we would ask you to rule

 4  on a straight-up 12(b)(6) standard as an alternative, because

 5  we know what's coming on appeal and we think their complaint

 6  collapses under its own weight.  You heard Mr. Morris

 7  detailing their own math shows significant returns.  You'll

 8  also hear us describe how they have nothing but mere

 9  conclusions and naked assertions upon information and belief

10  but unsupported.

11       *Iqbal* and *Twombly* would still apply under their 12(b)(6)

12  standard, especially, and perhaps even more with a heightened

13  standard under Rule 9(b), because they're essentially alleging

14  some version of fraud, it sounds like.

15       They're never going to get there, Your Honor.  All we

16  would ask is for a full record to take inevitably,

17  unfortunately, to the Court of Appeals.

18       And I think Mr. -- I'm not sure which of my colleagues

19  will be speaking briefly for Holland & Knight, but I'll just

20  turn it over to them.

21            THE COURT:  All right.  Mr. McIlwain?

22       OPENING STATEMENT ON BEHALF OF THE CLAIM PURCHASERS

23            MR. MCILWAIN:  Thank you, Your Honor.  I'll be even

24  briefer.  Brent McIlwain here for the Claim Purchasers.

25       Your Honor, Mr. McEntire stated to this Court that my

1  clients have never denied any of this.  In fact, in his reply,

2  he says, The Claim Purchasers do not deny that they invested

3  over $163 million.  We do not deny that we did not due

4  diligence, we do not deny that we refused to sell our claims

5  at any price, and we do not deny that we invested the claims

6  at what is, at best, a low ROI.

7      We had no duty to answer to HMIT or Mr. McEntire.  We had

8  no duty when we bought these claims to -- we had no duties to

9  any creditor.  We had -- it was a bilateral agreement with a

10  third party.  And frankly, Your Honor, it's not Mr. Dondero's

11  or HMIT's business what due diligence we did and what

12  information that we obtained.

13      But I will tell you right now, Your Honor, we were very

14  careful in our pleadings to not bring issues of fact, because

15  this -- HMIT has been chasing my clients, obviously, based on

16  the notes that were presented in the initial PowerPoint, it

17  was a -- it's retribution.  It's retribution for not agreeing

18  to sell the claims to Mr. Dondero when he offered to purchase

19  at a 40 percent premium.

20      And Your Honor, when I look at that note, it's

21  interesting, because I hadn't seen the note, obviously, until

22  it showed up on the exhibit list.  When you look at that note,

23  I think it's -- I think it's very interesting.  To the extent

24  it was contemporaneous, I don't know.  But what it shows, it

25  shows that if you're a hammer, everything's a nail.  And Mr.

108

1    Dondero is a vexatious litigator.  And what did he write down?
2    Discovery to follow.
3        But my question is this.  Who was trying to trade on
4    inside information?  Mr. Dondero was offering a 40 percent
5    premium, allegedly, on the cost.  What information did he
6    have?  Certainly, he had inside information.
7        My client owed no duty to Mr. Dondero.  My client owed no
8    duty to anybody in this estate at the time of these claims
9    purchase.
10       And Your Honor, we talk a lot about -- or, it's been
11   talked a lot of insider trading.  These are claims trades.  I
12   think the Court honed in on this from the very get-go.  The
13   Court does not have a role in claims trades.  There's a 3001
14   notice that's filed post-claims trade, but there's no
15   requirement that there's Court approval.
16       And these aren't securities.  It's not as if we're trading
17   claims and it could benefit or hurt you based on some equity
18   position that you're going to obtain.  We obtained claims that
19   had been settled, they were litigated heavily, and the most
20   that we can obtain is the amount of the claim.  And that is,
21   as Mr. Morris stated, all that changed was the name of the
22   claimant.  That's all.  Because the claims didn't increase in
23   value based on the trade.
24       Your Honor, our pleadings, I think, speak for themselves
25   in terms of you really -- you really don't have to consider

109

1    evidence, from our perspective, to determine that this

2    proposed complaint has no merit and is not plausible and

3    presents no colorable claims.

4        The gatekeeper provision, and we're going to talk a lot

5    about that today, obviously, right, requires that Mr. Dondero

6    establish a *prima facie* case that the claims have some

7    plausibility.  If you can simply write down allegations, file

8    a motion for leave and attach those allegations and say, Your

9    Honor, you have to take all these as true, the gatekeeper has

10   no meaning.  There's no point in having a gatekeeper

11   provision.

12       And in summary, Your Honor, what -- and I think Mr. Morris

13   honed in on this specifically -- this really comes down to

14   compensation.  Right?  Because this -- the allegation is that

15   my clients purchased claims, presumably at a discount, right,

16   based on some inside information, which we obviously deny, but

17   we don't have to put that at issue today.  For what purpose?

18   For what purpose?  So we got inside information from Mr. Seery

19   so that we could then scratch his back on compensation on the

20   back-end?

21       Your Honor, there is no reason that my clients need to be

22   involved in this litigation.  If HMIT thinks that this -- that

23   they have a claim against Mr. Seery for excessive

24   compensation, they can -- they could have brought such a

25   gatekeeper motion, or a motion for leave under the gatekeeper

110

1    provision, without including my clients.  Why did they include

2    my clients?  They included my clients because my clients did

3    not sell to Mr. Dondero when he called, unsolicited, to try to

4    get information.  It's retribution.  And that's what a

5    vexatious litigator does, and that's why the gatekeeper

6    provision is in place.

7        I'll reserve the rest for closing, Your Honor.

8            THE COURT:  All right.  Caroline, what was the

9    collective time of the Respondents?

10            THE CLERK:  Twenty-eight minutes and 37 seconds.

11            THE COURT:  Twenty-eight minutes, 37 seconds.

12        All right.  Well, let's talk about should we take a lunch

13    break now?  I'm thinking we should, because any witness is

14    going to be, I'm sure, more than an hour.  So can you all get

15    by with 30 minutes, or do you need 45 minutes?  I'll go with

16    the majority vote on this.

17        (Counsel confer.)

18            MR. MCENTIRE:  1:00 o'clock.  45 minutes.

19            MR. MORRIS:  40 minutes, whatever.  1:00 o'clock?

20            THE COURT:  We'll come back at 1:00 o'clock.

21            MR. MORRIS:  Thank you, Your Honor.

22            THE COURT:  Okay.  Thank you.

23            THE CLERK:  All rise.

24        (A luncheon recess ensued from 12:19 p.m. until 1:05 p.m.)

25            THE CLERK:  All rise.

1          THE COURT:  All right.  Please be seated.  We're

2    going back on the record in the Highland matter, the Hunter

3    Mountain motion for leave to file lawsuit.

4       I'll just let you know that at 1:30 we're going to take

5    probably what will be a five-minute break, maybe ten minutes

6    at the most, because I have a 1:30 motion to lift stay docket.

7    Just looking at the pleadings, I really think maybe one is

8    going to be resolved and it won't be more than five or ten

9    minutes.  So whoever is on witness stand can either just stay

10   there, because I think we won't be finished, or you can take a

11   bathroom break or whatever.  All right?  So, it's video, the

12   1:30 docket.

13      All right.  So, Mr. McEntire, are you ready to call your

14   first witness?

15          MR. MCENTIRE:  I am, Your Honor.

16          THE COURT:  Okay.

17          MR. MCENTIRE:  May I proceed?

18          THE COURT:  You may.

19          MR. MCENTIRE:  At this time, Hunter Mountain calls

20   Mr. James Dondero.

21          THE COURT:  All right.  Mr. Dondero, welcome.  If you

22   could find your way to the witness box, I will swear you in

23   once you're there.  It looks like you've got lots of notebooks

24   there.  Please raise your right hand.

25      (The witness is sworn.)

Dondero - Direct                                          112

1              THE COURT:  All right.  Thank you.  You may be

2      seated.

3              MR. MCENTIRE:  I'm not familiar with your procedure.

4      Should I approach the -- here to --

5              THE COURT:  If you would, unless you're having --

6              MR. MCENTIRE:  That's fine.

7              THE COURT:  -- any kind of --

8              MR. MCENTIRE:  That's fine.  I'm not.

9              THE COURT:  -- knee issues or, you know, sometimes

10     people want to stay seated for that reason.

11             MR. MCENTIRE:  Your Honor, again, my tender of Mr.

12     Dondero as a witness is subject to our running objection on

13     the evidentiary format.

14             THE COURT:  Understood.

15        JAMES DAVID DONDERO, HUNTER MOUNTAIN INVESTMENT TRUST'S

16                          WITNESS, SWORN

17                       DIRECT EXAMINATION

18     BY MR. MCENTIRE:

19     Q    Mr. Dondero, would you state your full name for the

20     record, please?

21     A    James David Dondero.

22     Q    With whom are you currently -- what company are you

23     currently affiliated with?

24     A    Founder and president of NexPoint.

25     Q    All right.  And I think the Court is well aware, but would

Dondero - Direct                          113

1  you just briefly describe your prior affiliation with -- was

2  it Highland Capital?

3  A    Yes.

4  Q    What was that affiliation?

5  A    President and founder for 30 years, and then to facilitate

6  an expeditious resolution of the estate I handed the reins to

7  three Independent Board members and I became a portfolio

8  manager until October of -- I was an unpaid portfolio manager

9  until October of '20.

10  Q    Thank you, sir.  Do you have any current official position

11  with Hunter Mountain Investment Trust?

12  A    No.

13  Q    Can you describe for us, sir, any actual or control you

14  attempt to exercise on the business affairs of Hunter Mountain

15  Investment Trust?

16  A    None.

17  Q    Are you -- do you have any official legal relationship

18  with Hunter Mountain Investment Trust where you can attempt to

19  exercise either direct or indirect control over Hunter

20  Mountain Investment Trust?

21  A    I do not.

22  Q    Did you participate -- personally participate in the

23  decision of whether or not to file the proceedings that are

24  currently pending before Judge Jernigan?

25  A    I did not.

Dondero - Direct                                114

1    Q    As the former CEO of Highland Capital, are you familiar

2    with the types of assets that Highland Capital owned?  On the

3    petition date?

4    A    Yes.

5    Q    And have you been monitoring these proceedings and the

6    disclosures in these proceedings since the petition date?

7    A    Yes.

8    Q    Okay.  Can you describe generally for me the types of

9    assets on the petition date that Highland Capital owned?  The

10   types of assets?  Describe the types of assets -- companies,

11   stocks, securities, whatever, whatever you -- however you

12   would describe it.

13   A    There were some securities, but it was primarily

14   investments in private equity companies and interests in

15   funds.

16   Q    Okay.  I've heard the term portfolio company.  What is a

17   portfolio company?

18   A    A portfolio company would be a private equity company that

19   we controlled a majority of the equity and appointed and held

20   accountable the management teams.

21   Q    Would there be separate management, separate boards, for

22   those portfolio companies?

23   A    Yes.

24   Q    All right.  How many portfolio companies were there on the

25   petition date, if you're aware?  If you recall?

1   A    Half a dozen, of different sizes.

2   Q    Can you identify the names, if you recall?

3   A    Yes.

4   Q    What are those names?

5   A    Trussway, Cornerstone, some small -- Carey International,

6   CFA, SSP Holdings.  Yeah, to a lesser extent, OmniCare.

7   Q    All right.

8   A    Or, um, --

9   Q    In addition to the portfolio --

10  A    Sorry.

11  Q    -- of companies in which Highland Capital would own

12  interests, did Highland also have interests in various funds?

13  A    Yes.  I said OmniCare.  I meant OmniMax, I think was the

14  name.

15  Q    What type of funds?

16  A    I'm sorry.  The funds were usually funds that we were

17  invested in or seeded or managed.  So they're things like

18  Multistrat, Restoration, a Korea fund, PetroCap.

19  Q    Are these managed funds by Highland Capital?  Or were

20  they?

21  A    Yes.  Pretty much, with the exception of PetroCap.  We

22  were a minority -- a minority -- a large -- a large minority

23  investor with a sub-advisor.

24  Q    Did Highland Capital Management on the petition date own

25  an interest, a direct security interest in MGM?

Dondero - Direct                    116

1   A    Yes.  And I -- yes.

2   Q    Did the various portfolio companies that you've

3   identified, did one or more of those portfolio companies also

4   own MGM stock?

5   A    Yes.

6   Q    Did the various funds that you've identified, did one or

7   more of those funds also own MGM stock?

8   A    Yes.  Between -- yes.  Between the CLOs, the funds,

9   Highland directly, it was about $500 million that eventually

10  got taken out for about a billion dollars.

11  Q    Okay.  $500 million is what you said?

12  A    Approximately.  Depending on what mark, what time frame.

13  But ultimately they got taken out for about a billion dollars.

14  Q    Okay.  And as a consequence of these investments,

15  significant investment -- first of all, how would you describe

16  that magnitude of investments?  Is that a significant

17  investment from the perspective of MGM?

18  A    Yes.

19  Q    As a consequence, what role, if any, did you play in terms

20  of MGM's governance?  Were you -- did you become a member of

21  the board of directors?

22  A    Yes.  I was a board member for approximately ten years,

23  and myself and the president of Anchorage, between our two

24  entities, we had a majority of the equity in MGM.

25  Q    Okay.  If there was a third party, not familiar with the

Dondero - Direct                          117

1    management of Highland Capital, who had been monitoring these

2    bankruptcy proceedings as you have, was there any way that a

3    third-party stranger to this bankruptcy proceeding could, from

4    your perspective, actually appreciate or identify the -- all

5    the details of the investments that Highland Capital had?

6              MR. MORRIS:  Objection to the form of the question.

7    It calls for speculation.  He's not here as an expert today.

8    He shouldn't be allowed to testify what a third party would or

9    wouldn't have thought or known.

10             MR. MCENTIRE:  Well, I'll --

11             THE COURT:  I'll overrule.

12   BY MR. MCENTIRE:

13   Q    Mr. Dondero?

14   A    The disclosures in the Highland bankruptcy were scant.  I

15   think there was six or eight line items listed, the

16   descriptions of which were limited.  But it didn't include --

17   it didn't include a broad listing of all the funds, and it

18   didn't include subsidiaries or any net value or any offsetting

19   liabilities or risks of any of the underlying companies or

20   investments, either.

21             MR. MCENTIRE:  Would you put up Exhibit 3, please?

22   BY MR. MCENTIRE:

23   Q    Mr. Dondero, we're going to -- do you have a screen in

24   front of you as well?

25   A    Yes.

Dondero - Direct                          118

1    Q    We're going to put up Exhibit 3, and I'm going to ask you

2    some questions about it.  First of all, would you identify

3    Exhibit 3?

4    A    It didn't come up on my screen yet.

5    Q    Still not up there?

6    A    Yes.  Now it is.

7    Q    Can you identify Exhibit 3, please?

8         (Discussion.)

9    Q    There we go.  Mr. Dondero, would you identify Exhibit 3,

10   please?

11   A    This was an email I sent to Compliance and relevant people

12   to put -- to put MGM on the restricted list.

13   Q    It indicates it was on December 17, 2020.  Did you

14   personally author this email?

15   A    Yes.

16   Q    You sent it to multiple individuals, including Mr.

17   Surgent.  Was Mr. Surgent an attorney at Highland Capital at

18   the time?

19   A    He was head of compliance for both organizations.

20   Q    Scott Ellington?  Is he an attorney?  Was he an attorney

21   at the time?

22   A    He's the general counsel of Highland.

23   Q    You also sent it to someone at NexPoint Advisors, Jason

24   Post.  Who is Mr. Post?

25   A    Mr. Post was head of compliance at NexPoint Advisors and a

Dondero - Direct                               119

1   subordinate of Thomas Surgent's.

2   Q    Jim Seery.  Mr. Seery, of course.  You also addressed it

3   to Mr. Seery?

4   A    Yes.

5   Q    It says, Trading Restrictions Re: MGM Material Nonpublic

6   Information.  What did you mean by the term "material

7   nonpublic information"?

8   A    Material nonpublic information is when you have material

9   nonpublic information that the public does not have, and it

10  essentially makes you an insider and restricts you from

11  trading.

12  Q    All right.  It says, Just got off a pre-board call.

13       First of all, you generated this in the ordinary course of

14  your business, did you not?

15  A    Um, --

16  Q    This email.

17  A    Yes.

18  Q    Okay.

19  A    Yes.

20  Q    And --

21  A    Any restricted list.  Restricted list items happen all the

22  time in the normal course of business.

23  Q    And you've maintained a copy of this email as well, have

24  you not?

25  A    I'm sure we have one.  I don't have it personally.

Dondero - Direct                        120

1  Q   Fair enough.  But you're -- you have -- you have access

2  and custody over emails, correct?

3  A   Not any of my Highland emails.

4  Q   But those were left.  Right?

5  A   Yes.  Yes.

6          MR. MORRIS:  Your Honor, I mean, he's leading the

7  witness at this point, so I'm just --

8          MR. MCENTIRE:  That's fine.

9          MR. MORRIS:  I'm just --

10          THE COURT:  Okay.  Sustained.

11          MR. MORRIS:  -- going to be sensitive to it.

12          THE COURT:  Sustained.

13  BY MR. MCENTIRE:

14  Q   Mr. -- this is a true and accurate copy of the email that

15  you sent, is it not?

16  A   It appears to be.

17          MR. MCENTIRE:  At this time, I would offer Exhibit 3

18  into evidence, Your Honor.

19          THE COURT:  Okay.  I'm looking through what we

20  admitted earlier.  Did we not --

21          MR. MCENTIRE:  This already may be in evidence.

22          THE COURT:  Yes.  I'm --

23          MR. MCENTIRE:  I don't --

24          THE COURT:  Was there any objection?

25          MR. MORRIS:  There wasn't.  I mean, --

Dondero - Direct                    121

1          THE COURT:  I think there was an objection that I

2     overruled.

3          MR. MORRIS:  No.  There wasn't.  I mean,

4     unfortunately, we've gotten the short end of the stick here,

5     because all of their documents are in evidence, and I got

6     caught short because I'm going to have to do it the old-

7     fashioned way.  But yes, this is in evidence.

8          MR. MCENTIRE:  Okay.  Fair enough.

9          MR. MORRIS:  Because -- actually got through all of

10    their documents.

11         MR. MCENTIRE:  Fair enough.

12         THE COURT:  Okay.  All right.

13    BY MR. MCENTIRE:

14    Q   So, Mr. --

15         THE COURT:  So it's in evidence.

16    BY MR. MCENTIRE:

17    Q   -- Dondero, going back to Exhibit 3, it says, Just got off

18    a pre-board call.

19         Is that the MGM board, a pre-board call?

20    A   Yes.

21    Q   What is a pre-board call?

22    A   It's a pre-board call that usually sets the agenda.  And,

23    again, myself and the Anchorage guys, we would move in

24    locksteps, in a coordinated fashion, generally, in terms of

25    agenda and company policy.

Dondero - Direct                                122

1   Q    It says, Update is as follows.  Amazon and Apple actively

2   diligencing in the data room.

3        What was your understanding of -- of -- what was your

4   intent in conveying that information to the recipients?

5   A    The intent was really in the last sentence, or second-to-

6   last sentence, that the transaction was likely to close.

7   Amazon had come back.  We had turned Amazon away earlier in

8   the year at $120 a share, and they said they wouldn't be

9   willing to pay more.  And --

10            THE COURT:  Is there an objection?

11            MR. MORRIS:  There is an objection.  None of this was

12   shared with Mr. Seery, all of this background that we're --

13   that we're doing.  He -- I would request that we stick with

14   the -- only the information that was given to Mr. Seery, like

15   -- like he's talking about his intent.  Like, who cares at

16   this point?

17            MR. MCENTIRE:  Well, --

18            MR. MORRIS:  This is what Mr. Seery got.

19            THE COURT:  Okay.  What is your response to that?

20            MR. MCENTIRE:  I have a response to -- well, they've

21   -- they've questioned his intent in sending this in his

22   opening statement.

23            MR. MORRIS:  Ah.

24            MR. MCENTIRE:  And I'm trying to make it clear what

25   his intent was.

1        MR. MORRIS:  So, you know what, Your Honor?  *Quid pro*

2   *quo.*  Now we're going to do a real *quid pro quo.*  He can ask

3   him about his intent, and then he can't object to all of the

4   other documents and exhibits that I say prove that this was

5   here only to interfere with Mr. Seery's trading activity.

6   I'll do that *quid pro quo.*

7        MR. MCENTIRE:  May I proceed, Your Honor?

8        THE COURT:  You may.  Objection is overruled.

9   BY MR. MCENTIRE:

10  Q    Mr. Dondero, what was your intent in communicating --

11  A    Okay.

12  Q    -- that probably a first-quarter event?  What was your

13  understanding?

14  A    After 30 years of compliance education:  Taint one, taint

15  all.  We were all sitting together.  I -- the trading desk was

16  right outside my desk.  All the employees of Highland that

17  would eventually move to NexPoint, all the ones that would

18  eventually move to Skyview, all the ones that eventually moved

19  to Jim Seery, were all within 30 feet of my desk.

20  Q    What do you mean by "Taint one, taint all"?

21  A    That's a compliance concept that, as a professional, you

22  have a responsibility, when you are in possession of material

23  nonpublic information, to put something on the restricted list

24  so that it's not traded.  Okay?  And you can't -- one person

25  can't sit in their cube and say they know something and not

Dondero - Direct                        124

1   tell anybody else, such that the rest of the organization

2   trades.  That's not the way compliance works.

3   Q   It says also no -- also, any sales are subject to a

4   shareholder agreement.

5       What was the meaning of that or the intent of that?

6   A   There was a stringent shareholder agreement, particularly

7   among the board members, that no shares could be bought or

8   sold without approval of the company.

9   Q   The company here being MGM?

10  A   MGM, yes.

11  Q   What is a restricted list?

12  A   A restricted list is when you believe as an investment

13  professional that you have material nonpublic information, you

14  notify Compliance, and then Compliance notifies the entire

15  organization and prevents any trading in that security.

16  Q   You mentioned the doctrine taint one, taint all.  If an

17  individual or -- if an individual within a company setting is

18  found to have traded on material nonpublic information, what

19  is the potential consequence or sanction?

20          MR. MORRIS:  Objection, Your Honor.  This is like a

21  legal conclusion.  He's not a law enforcement officer.  He's

22  not a securities officer.  What are we doing?

23          MR. MCENTIRE:  I can rephrase.

24          THE COURT:  Okay.  He's going to rephrase.

25  BY MR. MCENTIRE:

Dondero - Direct                          125

1    Q    Based upon your years -- based upon your years of

2    experience as a board member of MGM, based upon your years of

3    experience as a CEO of Highland Capital and an executive that

4    trades in securities and has sold securities, what is your

5    understanding, from a non-legal perspective, of what the risks

6    are associated with trading on material nonpublic information?

7    A    You could be -- you would be fired from the organization

8    if you did.  You could be banned from the securities industry.

9    The industry can shut down the -- or, the SEC can shut down

10   the advisor or they can fine the advisor.

11   Q    Do you know what a compliance log is?

12   A    Yes.

13   Q    Should MGM have been placed on a compliance log at

14   NexPoint?

15   A    Throughout the organization -- throughout the

16   organization, it should -- it should and it was on all -- at

17   all organizations, yes.

18   Q    Should it have been placed on a -- on a compliance log to

19   Highland Capital, from your perspective?

20   A    Yes.

21   Q    Can you give us any explanation of why, to your knowledge,

22   why MGM would be taken off the restricted list in April of

23   2021 at Highland Capital?

24   A    When an investment professional puts something on the

25   restricted list, in order for it to come off the restricted

**Appx. 02662**

Dondero - Direct                    126

1    list, the material nonpublic information has to be public.  So

2    there has to be a cleansing that occurs by the company.

3    Q    To the extent that you were no longer affiliated with

4    Highland Capital in the early portion, the first quarter of

5    2021, does that somehow cleanse the material nonpublic

6    information that you identified?

7    A    It does not.

8    Q    Why not?

9    A    Because the -- it -- the company hasn't -- the company

10   didn't come out and make public the information that we knew

11   from a private perspective that the transaction was about to

12   go through.

13   Q    You sat here during opening statements when Mr. Morris

14   referred to the various news coverage and media coverage

15   concerning MGM and the fact that people had expressed interest

16   in buying in the past?

17   A    Yes.  And at the board level, we had entertained numerous

18   ones.  There were rumors that had no basis in fact, and there

19   were negotiations we had with people that were never in the

20   news.  But none of them got to this degree of certainty where

21   it was going to close within a couple months.

22   Q    From your perspective as an investment professional, with

23   the years of experience that you described for the Court, what

24   is the difference between receiving an email from a board

25   member such as yourself and rumors or suggestions of possible

Dondero - Direct                              127

1    sale in the media?

2    A   I knew with certainty from the board level that Amazon had

3    hit our price, agreed to hit our price, and it was going to

4    close in the next couple months.

5    Q   That's not rumor or innuendo; that's hard information from

6    a member of the MGM board?

7    A   Correct.

8           MR. MCENTIRE:  All right.  You can take that down,

9    please, Tim.

10   BY MR. MCENTIRE:

11   Q   I want to talk a little bit about due diligence.  When you

12   were the chief executive officer of Highland Capital, --

13   A   Yes.

14   Q   -- can you tell us whether Highland Capital ever involved

15   itself in the acquisition of distressed assets?

16   A   Yes.  We did a fair amount of investing in distressed

17   assets.

18   Q   What is a distressed asset?

19   A   It's something that trades at a discount, where the

20   certainty and the timing of realizations or contractual

21   obligations is uncertain.

22   Q   Is a -- well, let me back up.  Has Highland -- did

23   Highland Capital ever invest in unsecured claims in connection

24   with bankruptcy proceedings?

25   A   Yes.

Dondero - Direct                    128

1   Q    And in terms of the -- on the spectrum of risk, where does
2   an unsecured creditor claim in a bankruptcy proceeding kind of
3   rank in terms of the uncertainties or risk, from your
4   perspective?
5   A    It's high risk.  It's a -- yeah, it would be highly-
6   distressed, generally.
7   Q    Explain to us -- I know the Court is very familiar with
8   claims trading.  Explain to us from your perspective as an
9   investment -- a seasoned investment expert or executive what
10  those risks are.  What types of risk are associated with such
11  an investment?
12  A    You have to evaluate the assets tied to the claim
13  specifically.  Or if it's an unsecured in general, the assets
14  in general in the estate.
15       You have to handicap the realization that a distressed
16  seller might not get full value for something.  You have to
17  handicap the likelihood around that.  And then you have to
18  handicap the timing, and then you have to handicap the
19  expenses and the other obligations of the estate, and then
20  handicap risk items that aren't known or that are difficult if
21  not impossible to underwrite, like unknown litigation or last-
22  minute litigation or claims or something.
23  Q    And all these handicapping, this handicapping process, how
24  does that impact the price or the investment that you're
25  willing to make?  Generally?

Dondero - Direct                           129

1   A    Generally, you put a much higher discount rate.  You know,

2   like if you would do debt at 10 percent and a normal public

3   equity at a 15 percent return, you would do distressed or

4   private equity investing at a 20, 25 percent return

5   expectation to offset the risk and the unknowns.

6   Q    In order to handicap an investment in an unsecured

7   creditor's claim appropriately to reach an informed decision,

8   what type of data would you need to have access to?

9         MR. MORRIS:  Objection to the form of the question.

10  He's not here as an expert.  He's here as a fact witness.  He

11  should -- he should limit himself to that instead of talking

12  about what investors should be doing.

13        MR. MCENTIRE:  Well, Your Honor, with all due

14  respect, he's here as the former CEO of Highland Capital.  He

15  has experience, firsthand knowledge experience, and he also

16  has expertise because of his education, his career, and

17  training.

18     And again, there's no limitation here under the Rules

19  about what type of information I can elicit from him in this

20  proceeding.  This is, whether you call it expert testimony, I

21  call it personal knowledge, but it has some expert aspects to

22  it, but I think that's fair and appropriate.

23        THE COURT:  Well, I think you can ask what kind of

24  data would you rely on, would Highland Capital or entities

25  he's been in charge of rely on, --

1          MR. MCENTIRE:  I understand.

2          THE COURT:  -- but not what would people rely on.  So

3   I sustain the objection partially.

4          MR. MCENTIRE:  All right.

5   BY MR. MCENTIRE:

6   Q    Mr. Dondero, I'll rephrase the question.  When you were

7   the chief executive officer of Highland Capital before Mr.

8   Seery took the reins, and you, your company, Highland Capital,

9   was investing in an unsecured creditor's claims, what due

10  diligence, what type of information would you expect your team

11  to explore and investigate?

12  A    Sure.  Distressed investment in a trade claim would be

13  among our thickest folders, it would be among our most

14  diligenced items, because you have those three buckets, the

15  value of the assets, again, and the ability and timing of

16  monetization of those as a not strong -- as a weak seller, and

17  then you would have the litigation or claims against those,

18  and then you would have to also have a third section of

19  analysis for the litigation risk of the estate overall.

20  Q    What type of legal analysis or legal due diligence would

21  you have required as the CEO of Highland Capital?

22  A    At Highland, we would have had third-party law firms, in

23  addition to our own legal staff, in addition to our own

24  business professionals, reviewing all the analysis and the

25  assumptions.

Dondero - Direct                         131

1   Q    With regard to a financial analysis, what types of

2   financial due diligence would you have required?

3   A    It would have been a detailed -- a detailed analysis of

4   all the cash flows on the particular underlying investments,

5   and an evaluation and valuation of what those companies or

6   investments were worth.

7   Q    Why is it important to look at the underlying value of the

8   asset?

9   A    Because that -- those are what will be monetized in order

10  to give you a return on the claims or securities that you buy

11  in a distressed situation.

12          MR. MCENTIRE:  Tim, would you please put up Exhibit

13  4?

14          MR. MORRIS:  Your Honor, I don't mean to be

15  monitoring your time, but we're at the 1:30 --

16          THE COURT:  I was just checking the clock here.

17  Let's do take a break.  So, --

18          MR. MCENTIRE:  All right.

19          MR. MORRIS:  Your Honor, can we have an instruction

20  to the witness not to --

21          THE COURT:  Yes.

22          MR. MORRIS:  -- look at his phone and not to confer

23  with anybody?  Because we had that incident once before.

24          THE COURT:  Okay.  Well, I don't --

25          THE WITNESS:  I don't have my phone.

Dondero - Direct                          132

1           THE COURT:  Okay.

2           THE WITNESS:  My phone's at the front desk.

3           THE COURT:  So, no discussions with your lawyers or

4   -- I guess he doesn't have his phone -- during this break.

5           MR. MORRIS:  Thank you, Your Honor.

6           THE COURT:  All right.  So, I really think this will

7   take five minutes, so don't go far.

8       (Off the record, 1:33 p.m. to 1:47 p.m.)

9           THE COURT:  Okay.  We will go back on the record,

10   then, in the Highland matter.

11          MR. MCENTIRE:  I'm just going to grab him right now.

12          THE COURT:  Okay.  We are, for the record, waiting on

13   Mr. Dondero to take his place again on the witness stand.

14       (Pause.)

15          THE COURT:  All right, Mr. Dondero.  We're ready for

16   you to resume your testimony.

17       All right.  Mr. McEntire, you may proceed.

18          MR. MCENTIRE:  Thank you, Your Honor.

19                    DIRECT EXAMINATION, RESUMED

20   BY MR. MCENTIRE:

21   Q   Mr. Dondero, when we left off, I was just putting up what

22   I requested as Exhibit 4.

23          MR. MCENTIRE:  And Tim, if you can put that back up,

24   please.

25   BY MR. MCENTIRE:

Dondero - Direct                    133

1  Q    Mr. Dondero, can you identify Exhibit #4, please?

2  A    Yes.  These are notes I took contemporaneous with three

3  conversations with guys at Farallon.

4  Q    I didn't quite hear you.  Did you say contemporaneous?

5  A    Yes.

6  Q    So, you say with three conversations.  Who were the

7  conversations with?

8  A    One was with Raj Patel that was fairly short, and he

9  deflected me to Mike Linn, who was the portfolio manager in

10 charge and had done the transactions.

11 Q    Which transactions?

12 A    The buying of the claim, the Highland claims.

13 Q    All right.  And what was your purpose in making these

14 notes?

15 A    We'd been trying nonstop to settle the case for two-plus

16 years.  We'd been counseled that it was a Kabuki dance that

17 would just, you know, all settle at the end, and it never

18 quite happened that way.  And when we heard the claims traded,

19 we realized there were new parties to potentially negotiate to

20 resolve the case.

21      The ownership was initially hidden, but we were able to

22 find out pretty quickly that Farallon was Muck.  So I reached

23 out the Farallon guys.

24 Q    All right.  And were you ever able at that time to

25 determine who was affiliated with Jessup, the other special-

Dondero - Direct                    134

1   purpose entity?

2   A    We -- initially, we thought Farallon was all of the

3   entities.  We didn't find out about Stonehill -- it was more

4   difficult and they had taken more efforts to hide the

5   ownership in Stonehill.  We didn't find out for two more

6   months.

7   Q    So your first conversation was with Mr. Patel?

8   A    Yes.

9   Q    And did you call him?

10  A    Yes.

11  Q    Your first entry, there's a 28 on the left-hand side.

12  What does that 28 refer to, if you recall?

13  A    That was the date, I believe.

14  Q    Do you believe it was May 28th?

15  A    Yes.

16  Q    What makes you believe that?

17  A    That's what it says.

18  Q    Okay.  Raj Patel --

19         THE COURT:  Is there a way you can show the words

20  that are cut off?

21         MR. MCENTIRE:  On this particular one, I can't, Your

22  Honor.  We tried, but we can't.  No.

23         THE COURT:  If I look in the notebook, can I see it?

24         MR. MCENTIRE:  I don't think so.  I think this is --

25  what you see is exactly what's in the notebook.  It's the same

Dondero - Direct                    135

1    document.  This is how -- how we -- this is how we have it.

2    BY MR. MCENTIRE:

3    Q    Mr. Patel.  Who is Mr. Patel?

4    A    He's Mike Linn's boss.  He's head of -- I believe head of

5    credit at Farallon.

6    Q    Okay.  And Farallon is based where, if you know?

7    A    San Francisco.

8    Q    And what kind of company is Farallon, if you know?

9    A    They -- they look a lot like Highland.  Well, they do real

10   estate.  They do hedge funds.  They do -- they don't do as

11   many 40 Act or retail funds, but they're -- they're an

12   investor.

13   Q    Mr. Patel.  What did he tell you during this phone call?

14   A    That he bought it because Seery told him to buy it and

15   they had made money with Seery before.

16   Q    All right.  And how long did the call last?

17   A    Not long.

18   Q    Okay.  You said he referred you to Mr. -- who was the

19   person?

20   A    To Mike Linn.

21   Q    Who is Mike Linn?

22   A    Mike Linn is a portfolio manager that works for Mr. Patel.

23   Q    And did you call Mr. Linn?

24   A    Yes.

25   Q    All right.  The notes here, do these reflect several

Dondero - Direct                               136

1    conversations?

2    A    The first one reflects a conversation with Raj Patel, and

3    then the rest of it reflects two conversations with Mike Linn.

4    Q    All right.  Where does the first conversation with Mike

5    Linn start and where does it end?

6    A    It ends -- it begins at the 50, 70 cents.  We knew that

7    they had -- that the claims had traded around 50 cents.  And I

8    said we'd be willing to pay 70 cents.  We'd like to prevent

9    the $5 million-a-month burn.  We'd like to buy your claims.

10   Q    Why 70 cents?  What was -- what was that all about?

11   A    I was trying to give them a compelling premium that was

12   still less than I had offered the UCC three months earlier.

13   Q    And so you have:  Not compelling, Class 8.  What does that

14   mean?

15   A    He said that was -- he just said 70 cents wasn't

16   compelling.

17   Q    There's a reference to:  Asked what would be compelling.

18   Was that a question you asked him?

19   A    Yes.

20   Q    And what was his response?

21   A    He said he had no offer.  And he -- we had heard he paid

22   50 cents and I offered him 70 cents and then -- but he was

23   clear to me that he wouldn't tell me what he paid.  And so the

24   next time I called him I -- I -- instead of just making it

25   cents on the dollar, I said I'd pay 130 percent of whatever he

Dondero - Direct                          137

1  did pay.  You don't have to tell me what you paid, but I'll
2  pay you 30 percent more than you paid, you know, a couple
3  months ago.  And -- or we thought they notified the Court when
4  they just bought it, but they had actually negotiated buying
5  it back in February.  January or February.  So --
6  Q    Who told you that they bought it in February or March time
7  frame?
8  A    He did.
9  Q    Okay.  Was this during the first or the second phone --
10         MR. MORRIS:  I apologize for interrupting.  Who's the
11  "he"?
12         MR. MCENTIRE:  Mike Linn.
13         THE WITNESS:  Mike Linn.
14         MR. MORRIS:  Thank you so much.
15         MR. MCENTIRE:  I'll make sure the record --
16  BY MR. MCENTIRE:
17  Q    Mike Linn --
18  A    Yes.
19  Q    -- told you that Farallon had bought their interest in the
20  claims back in the February or March time frame?
21  A    Yes.
22  Q    All right.  Bought assets with claims.  What does that
23  refer to?
24  A    He said it wasn't compelling because he said Seery told
25  him it would be worth a lot more.  He -- he confirmed what Raj

Dondero - Direct                    138

1    said, that -- I said, do you realize the estate is spending $5

2    million a month on legal fees?  That, you know, you should

3    want to sell this thing.  And he said Seery told him it was

4    worth a lot more and there were claims and litigation beyond

5    the asset value.

6    Q    You offered him 40 to 50 percent premium.  What is that?

7    A    That's what the 70 cents on the 50 cents represents.  And

8    then I changed the dialogue to I'll pay you 130 percent of

9    whatever your cost was.  And he said, not compelling.  And

10   then I, both -- both calls, I pressed him, what price would he

11   offer at?  And he said he had no offer, he wasn't willing to

12   sell.

13   Q    The 130 percent of cost, not compelling, was that in the

14   second or the third call with Mr. Linn?

15   A    It was at my third and final call with Farallon.  My

16   second call with Mike Linn was the 130 percent of cost.

17   Q    And he said not compelling?  You put it in quotation

18   marks?

19   A    Yep.

20   Q    And then you said, no counter.  What does that mean?

21   A    He wouldn't -- he wouldn't give an offer, he wouldn't give

22   a price at which he would sell.

23   Q    What did Mike Linn tell you, in effect, with regard to his

24   due diligence that Farallon had undertaken?

25   A    When I -- when I told him about the risks and the

Dondero - Direct                    139

1  litigation and the burn, he said he wasn't following the case,

2  he wasn't aware of it, he was depending on Jim Seery.

3  Q    What, if anything, did Michael Linn tell you about MGM?

4  A    That was more the initial Raj Patel call, where he said we

5  bought it because he was very optimistic regarding MGM.

6  Q    Okay.  Did you have any understanding when he first got

7  his optimism about MGM?

8  A    No.  He just said that's why they had bought it initially,

9  they were very optimistic about MGM.

10 Q    That's why they had bought it initially?

11 A    Yes.

12 Q    And they had bought it initially in the February-March

13 time frame?

14 A    Yes.

15 Q    And that -- would you -- does that predate the public

16 disclosure of the MGM sale to Amazon?

17 A    Yes.

18 Q    Substantially by a couple of months?

19 A    Yes.

20 Q    I'd like to turn your attention now to a different topic.

21           MR. MCENTIRE:  And Tim, if you could pull up Exhibit

22 8, please.

23      I believe this document is already in evidence, Your

24 Honor.

25           THE COURT:  8 is?

Dondero - Direct                              140

1          MR. MCENTIRE:  Oh, by the way, I offer Exhibit 4 into

2     evidence.

3     BY MR. MCENTIRE:

4     Q    Let me ask you a couple quick questions.

5          THE COURT:  Is there an objection?

6          MR. MORRIS:  Nope.

7          THE COURT:  Okay.  4 is admitted.

8          (Hunter Mountain Investment Trust's Exhibit 4 is received

9     into evidence.)

10    BY MR. MCENTIRE:

11    Q    Exhibit 8.

12         MR. MORRIS:  I apologize, Your Honor.  Just one

13    caveat.  It's not for the truth of the matter asserted; it's

14    for what his impressions were at the time.

15         MR. MCENTIRE:  Well, --

16         MR. MORRIS:  This is what he wrote down.  I don't --

17         MR. MCENTIRE:  I'm offering it for the truth of the

18    matter asserted.

19         MR. MORRIS:  Okay.  And I object to that extent.

20    This --

21         MR. MCENTIRE:  Let me --

22         MR. MORRIS:  Can I *voir dire*?  Can I *voir dire*?  May

23    I do --

24         MR. MCENTIRE:  May I finish my statement that I was

25    --

                                                   **Appx. 02677**

Dondero - Direct                    141

1           THE COURT:  Let him finish, and then --

2           MR. MCENTIRE:  Thank you.

3           THE COURT:  -- you can.

4           MR. MCENTIRE:  I am offering it for the truth of the

5    matter asserted because these are documents that were prepared

6    contemporaneously, it's an exception to the hearsay rule and

7    reflects admissions of a -- of an adverse party.  Admissions

8    that are adverse to their interests.  Declarations of interest

9    adverse to their interest and admissions of an adverse party

10   contemporaneously recorded.  And so that's why I'm offering

11   it.

12          MR. MORRIS:  For all purposes?

13          THE COURT:  Okay.  Let me have you point me to the

14   exact hearsay exception.  I understand this hearsay exception

15   you're arguing for the hearsay within the hearsay, the party

16   opponent exception.  But it's technically hearsay of Mr.

17   Dondero, even though he's here on the stand.

18          MR. MCENTIRE:  Well, I could lay a foundation, then.

19   BY MR. MCENTIRE:

20   Q   Mr. Dondero, --

21          THE COURT:  Well, no.  I'm asking for what your --

22          MR. MCENTIRE:  It's --

23          THE COURT:  -- rule reference is.

24          MR. MCENTIRE:  I don't have the Rules with me right

25   this second.  It's 803(1) --

Dondero - Direct                                142

1    (Discussion.)

2          MR. MCENTIRE:  All right.  Well, it's -- it's

3    admissible under several categories.  It's not hearsay because

4    it's an admission of a party opponent.  It's also an admission

5    under 803(1), present sense impression.  It's also admissible

6    --

7          THE COURT:  So you say it's Mr. Dondero's statement

8    describing or explaining an event --

9          MR. MCENTIRE:  Yes.

10         THE COURT:  -- or admission made while or immediately

11   after the declarant perceived it?

12         MR. MCENTIRE:  Yes.  It's also a record of a

13   regularly-conducted activity, which is 803(6).  And I think

14   it's also not technically hearsay because it's also an

15   admission of a party.  So, this --

16         THE COURT:  Well, that's the hearsay within the

17   hearsay.

18         MR. MORRIS:  Yeah.

19         THE COURT:  But I'm -- I'm --

20         MR. MORRIS:  That can't possibly be right.  I can't

21   go back to my hotel right now and write down that he told me

22   that he did a bad thing and come in here tomorrow and say he

23   admitted he did a bad thing because it's in my notes.

24         MR. MCENTIRE:  Well, --

25         MR. MORRIS:  That's can't possibly be the law.

Dondero - Direct                          143

1           MR. MCENTIRE:  Well, --

2           MR. MORRIS:  That's not the law.

3           MR. MCENTIRE:  There are two hearsay issues here.

4  One is whether this is a business record or otherwise

5  qualifies as an exception to the hearsay rule, and then

6  there's an internal hearsay issue of whether or not what Mr.

7  Patel and Mr. --

8           THE COURT:  You haven't established the business

9  record exception.  Okay?

10          MR. MCENTIRE:  I'm prepared to lay the foundation

11  right this second.  At this moment.

12          THE COURT:  You may proceed.

13  BY MR. MCENTIRE:

14  Q    Mr. Dondero, is this a document that was generated by you

15  in the ordinary course of your business?

16  A    Yes.

17  Q    Did you have personal knowledge when you recorded this

18  document?

19  A    Yes.

20  Q    You personally recorded this document, correct?

21  A    Yes.

22  Q    And you have had custody of this document.  Correct?

23  A    Yes.

24  Q    And this is --

25          MR. MCENTIRE:  That's a -- that's a business record,

Dondero - Voir Dire                          144

 1  Your Honor.

 2            MR. MORRIS:  May I, Your Honor?

 3            THE COURT:  You may.

 4            MR. MORRIS:  Okay.

 5                     VOIR DIRE EXAMINATION

 6  BY MR. MORRIS:

 7  Q    Where's the document now?  How come it's -- how come it's

 8  cut off?

 9  A    I don't know.

10  Q    Do you have the document today?  How come we're looking at

11  a document that's cut off?

12  A    I'm sure we have it somewhere.  I don't have it.

13            MR. MORRIS:  So, number one, Your Honor, we don't

14  have the actual document.  We have a partial document.

15       Number two, let's talk about it for a second.

16  BY MR. MORRIS:

17  Q    You say that you do this in the ordinary course of

18  business.  What's the purpose of taking these notes?

19  A    When I'm starting negotiation with somebody new on

20  something complicated and I don't know what their concerns or

21  rationale is going to be, I take little notes like this.

22  Q    And is it -- is it the purpose of it to capture the

23  important things that are going on in the conversation?

24  A    So I know next time how to address it differently, you

25  know.

                         Dondero - Voir Dire                    145

1  Q    That's not my question.  My question is, is the purpose of
2  taking notes so that you have a written record of the
3  important points that you discussed?
4  A    Yes, so I know how to address it the next time.
5  Q    Okay.  And among the important points that you never put
6  down on these notes was the letters MGM.  Is that correct?
7  A    Correct.
8  Q    Okay.  And you never put down here that Michael Linn told
9  you he wasn't following the case, correct?
10 A    No, I did not.
11 Q    Okay.
12 A    But it was --
13 Q    And --
14 A    Yeah.  But I --
15 Q    That --
16         MR. MORRIS:  Your Honor, if this is --
17         MR. MCENTIRE:  (faintly)  This is *voir dire* of the
18 witness for a business record exception.
19         MR. MORRIS:  No, because --
20         THE COURT:  Overruled.
21         MR. MORRIS:  Thank you.
22 BY MR. MORRIS:
23 Q    Mr. Patel wouldn't tell you how much he paid and that's
24 why you didn't write it down, right?
25 A    Mr. Patel told me he bought it because of Seery.  My

Dondero - Voir Dire                    146

1    conversation was very short with him.  That was one of the few
2    things he said.  Linn said he wouldn't sell it because he
3    didn't find it compelling.
4    Q    Okay.
5    A    And Linn was the one who wouldn't tell me --
6    Q    Okay.
7    A    -- the price.
8    Q    But -- but even though you took these notes to write down
9    things that you thought were important, you didn't write down
10   MGM.  Correct?
11   A    Yes.
12   Q    And you didn't write down that anybody was very optimistic
13   about MGM.  Correct?
14   A    No, I did not.
15   Q    And you didn't write down that Mr. Linn told you he wasn't
16   following the case.  Correct?
17   A    Well, he said the same thing Patel said about he bought it
18   because of Seery.  He did confirm that.  I didn't see any
19   reason to write that again.
20   Q    You didn't -- you never wrote it down.  Not once.  Not --
21   there's nothing about again, right.  You never wrote down that
22   --
23   A    No, I did write --
24   Q    -- anybody ever told you they weren't following the case.
25   Correct?

Dondero - Voir Dire                        147

1  A    Correct.

2  Q    Okay.

3  A    But I wrote down that he bought it because of Seery.

4  Q    Okay.

5          MR. MORRIS:  Your Honor, no objection.  It can go in.

6          MR. MCENTIRE:  Okay.

7          THE COURT:  Wait.  Did you just say no objections?

8          MR. MORRIS:  Except -- except for the hearsay on

9  hearsay.  It can't possibly be an admission.  It's his -- it's

10 his notes.  This is what he wrote.  It can come in for that

11 purpose.  It's -- it's a -- that's what he's testified to, and

12 I can't object to that.  But it can't possibly come in as an

13 admission against Farallon.

14         MR. MCENTIRE:  Well, I disagree.

15         MR. MORRIS:  That's the point.

16         MR. MCENTIRE:  Well, first of all, I disagree.  This

17 is otherwise admissible, and it can come.  I think that's

18 really, Your Honor, that's really the weight it's going to be

19 given.  It comes in.  He's not making an objection to its

20 admissibility.  And if he wants to argue the weight of the

21 document, that's a different issue.

22         MR. STANCIL:  Your Honor, if I may.

23         THE COURT:  You may.

24         MR. STANCIL:  The second layer of hearsay goes to

25 whether this is a statement by Farallon.  It is a statement by

Dondero - Direct                    148

1   Mr. Dondero of what he heard, what he says he heard Farallon

2   say.  801(d) refers to, when they're talking about an opposing

3   party statement, made by the party, not made by a listener who

4   says he heard the party.  This is classic hearsay within

5   hearsay.  It's not admissible for that purpose.

6             THE COURT:  Okay.  I sustain the objection, and --

7   but I'm still struggling to understand what the Respondents

8   have agreed to.  Because --

9             MR. MORRIS:  That -- that this is what he claims to

10  have written down.  I mean, right?  So, so --

11            THE COURT:  Okay.

12            MR. MORRIS:  -- a present sense impression.

13            THE COURT:  So, it is admitted as Mr. Dondero's

14  present sense impression, but it's not admitted as to the

15  truth of anything that Claims Purchasers may have said.

16            MR. MORRIS:  And -- and the --

17            THE COURT:  That's what you're saying?

18            MR. MORRIS:  Yes.  And the most important thing is

19  that he's testified that the purpose of the notes was to

20  capture the things that were important that he was told.  And

21  we've established what he wasn't told.

22            MR. MCENTIRE:  Okay.  I believe the document is in

23  evidence, Your Honor.

24            THE COURT:  Exhibit 4 is in evidence.  But, again,

25  there's no admission in here as to what Claims Purchasers

                        Dondero - Direct                    149

1   testified as to.

2           MR. MCENTIRE:  Well, they haven't testified yet

3   because --

4           THE COURT:  This is what he --

5           THE DEFENDANT:  I understand.  I understand.

6           THE COURT:  -- he says he remembers.

7           MR. MCENTIRE:  Okay.  So, --

8           THE COURT:  It's sort of an --

9           MR. STANCIL:  Your Honor, just so we're clear for our

10  record, this is not admitted for the truth of what Farallon is

11  purported to have said.

12          MR. MCENTIRE:  Correct.

13          THE COURT:  Correct.

14          MR. MCENTIRE:  This --

15          MR. STANCIL:  Thank you.

16          MR. MCENTIRE:  This is offered for the truth of what

17  Mr. -- Mr. Dondero recalls them saying.

18          THE COURT:  Okay.

19          MR. MCENTIRE:  In part.

20          THE COURT:  I think -- I think we're on the same page

21  now.  I think.  I think.

22      (Hunter Mountain Investment Trust's Exhibit 4 is received

23  into evidence.)

24          MR. MCENTIRE:  All right.  May I proceed, Your Honor?

25          THE COURT:  You may.

Dondero - Direct                    150

1          MR. MCENTIRE:  Can you please put up Exhibit 8,

2     please?  And I believe this document has been put into

3     evidence --

4          THE COURT:  It is.

5          MR. MCENTIRE:  Thank you.

6     BY MR. MCENTIRE:

7     Q    Mr. Dondero, this document is a -- part of a -- the

8     Court's docket.  It was filed on February 1, 2021, if you

9     could go to the top upper banner.  It's Debtors' Notice of

10    Filing of Plan Supplement of the Fifth Amended Plan of

11    Reorganization of Highland Capital Management, as Modified.

12        Do you see that?

13    A    Yes.

14    Q    I'll direct your attention, --

15         MR. MCENTIRE:  If you could go to Page 4, please, for

16    me, Tim.

17    BY MR. MCENTIRE:

18    Q    Page 4 has a schedule, a plan analysis and a liquidation

19    analysis.  Do you see that?

20    A    Yes.

21    Q    All right.  For Class 8, what does it identify that is

22    being projected for distributions to the general unsecured

23    claims for Class 8?

24    A    71.3 percent.

25    Q    What percentage is being identified that will be

                              Dondero - Direct                    151

1    distributed to Class 9?

2    A    9, no distribution.

3    Q    No distribution?  All right.  Mr. Dondero, in Paragraph --

4    I'm going to give you a piece of paper.

5           MR. MCENTIRE:  Can you just give me a piece of paper

6    real quick?

7    BY MR. MCENTIRE:

8    Q    I'm handing you a piece of paper and I'm --

9    A    Okay.  Thank you.

10   Q    Mr. Dondero, in our complaint in this case, the proposed

11   complaint in this case, we allege that Class 8 had a total of

12   $270 million, the claims that were purchased by Farallon and

13   Stonehill had a face value in Class 8 of $270 million.  Would

14   you write that number down?

15       And assuming that this was public information that was

16   available in February of 2021 at 71.32 percent, --

17           MR. MORRIS:  Objection, Your Honor.  That's an

18   assumption not in evidence.  He hasn't laid a foundation for

19   what was available in February in 2021.

20   BY MR. MCENTIRE:

21   Q    Mr. Dondero, according to --

22           THE COURT:  Wait.  Are you going to respond, or are

23   you just going to --

24           MR. MCENTIRE:  I'll rephrase the question.

25           THE COURT:  -- rephrase?  Okay.

Dondero - Direct                    152

1   BY MR. MCENTIRE:

2   Q    According to the document that is identified as Exhibit #8

3   that says that 71.32 percent is the anticipated projected

4   payout on Class 8 claims, what is 71.32 percent of the face

5   value of the claims that were purchased?

6   A    About $192 million.

7   Q    $192 million?  And assuming for a moment that, as alleged

8   by Hunter Mountain in this case, that $163 million was

9   actually used to purchase the Class 8 claims, what is the

10  difference?

11  A    About $30 million.

12  Q    A little less than that, isn't it?  Or is the number --

13  A    Yeah.  $28 million or whatever.

14  Q    $28 million?  And based upon your years of experience in

15  running Highland Capital, being involved in the purchase of

16  unsecured claims, being involved in investigating and

17  acquiring distressed assets, that return over a two-year

18  period, is that the kind of return that a hedge fund would

19  typically -- you would expect to receive?

20       MR. MORRIS:  I just want to make sure that -- because

21  the question changed a little bit in the middle.  If he wants

22  to ask him if he would have made the investment, that's fine.

23  But he should not be permitted to testify as to what any other

24  investor, including the ones who purchased these claims, would

25  have done.  Every -- there's different risk profiles.  He can

                         Dondero - Direct                    153

1    testify to whatever he wants about himself.

2              THE COURT:  Sustained.

3    BY MR. MCENTIRE:

4    Q    Go ahead.  Based upon your experience at Highland Capital,

5    would Highland Capital have ever acquired those claims based

6    upon that kind of return over two years?  For a distressed

7    asset such as this?

8    A    No.

9    Q    Why not?

10   A    It's below a debt level return that you could get on high-

11   rated assets with certainty.  It's --

12   Q    What do you mean by it's below -- below a debt return that

13   you could get on collateralized assets?  What do you mean by

14   that?

15   A    I think in this case the debt that the Debtor put in place

16   paid 12, 13 percent and was triple secured or whatever.  So no

17   one would buy the residual claims for an 8 percent compounded,

18   whatever that $28 million works out to.

19             MR. MORRIS:  I move to strike, Your Honor.  He

20   shouldn't be talking about or testifying to what other people

21   might do.

22             THE WITNESS:  Well, we --

23             THE COURT:  This is --

24             THE WITNESS:  We would never have done that.

25             THE COURT:  This is --

Dondero - Direct                              154

1          MR. MCENTIRE:  He would not have.

2          THE COURT:  -- Highland, not nobody.  Okay.

3   BY MR. MCENTIRE:

4   Q   Mr. Dondero, and what is it about the fact that these

5   claims are not collateralized that impacts the decision-

6   makers, from your perspective?

7   A   You have all the risk that the $205 million of expenses

8   this estate has currently paid grows to $300 or $400 million.

9   You know, you have the risk that other litigation regarding

10  Seery violating the Advisers Act --

11         MR. MORRIS:  I move to strike, Your Honor.

12         THE WITNESS:  -- results in --

13         THE COURT:  Sustained.

14         THE WITNESS:  -- expenses.

15  BY MR. MCENTIRE:

16  Q   Just respond to my question, sir.  What does the fact

17  about not being collateralized, how does that impact the

18  decision-maker's --

19  A   Well, I was trying to answer it.  You just have all kinds

20  of residual risk of bad acts that have happened at the estate

21  or expenses increasing or whatever.

22         MR. MORRIS:  I move to strike the phrase "bad acts,"

23  Your Honor.

24         THE COURT:  Overruled.

25  BY MR. MCENTIRE:

Dondero - Direct                    155

1   Q    What did you mean by that?  What did you mean by "bad

2   acts"?

3   A    We've highlighted it in a lot of complaints.  There's been

4   several violations of the Advisers Act.

5          MR. MORRIS:  Move to strike, Your Honor.  It's a

6   legal conclusion.

7          THE COURT:  Sustained.

8   BY MR. MCENTIRE:

9   Q    Mr. Dondero, are you familiar with an entity known as NHF?

10  A    Yes.

11  Q    What is NHF?

12  A    A NexPoint hedge fund.  It was a closed-in fund that we

13  manage still to this day at NexPoint.  The name has changed to

14  NXDT.

15  Q    Was NHF publicly traded?

16  A    It -- yeah, it's a publicly-traded equity.  It's a closed-

17  in fund, technically, but it's a publicly-traded security.

18  Q    What -- what is your affiliation with NHF?

19  A    I'm the portfolio manager.

20  Q    And, again, what are your responsibilities as the

21  portfolio manager?

22  A    To optimize the portfolio and hopefully exceed investor

23  expectations.

24  Q    Have you become aware that Stonehill was purchasing MGM

25  stock in the first quarter of 2021?  And NHF?

Dondero - Direct                    156

1   A    Yes.  We believe -- we're able to demonstrate from

2   Bloomberg records, on the Bloomberg terminal, they show up as

3   holders and purchasers in the -- in the first few months of

4   2021.

5   Q    What magnitude?

6   A    I think it was one of their top equity positions.  It was

7   about six million bucks.

8            MR. MCENTIRE:  Can you put up the chart?  This is for

9   demonstrative purposes only.

10       I'm not offering this chart into evidence, Your Honor.

11  It's simply a demonstration.  Or a demonstrative.

12           MR. MORRIS:  Your Honor, there's no such thing.

13           MR. MCENTIRE:  There is.

14           MR. MORRIS:  A demonstrative has to be based on

15  evidence.  A demonstrative is supposed to summarize evidence.

16  You don't put up a demonstrative until --

17           THE COURT:  All right.  What's your response to that?

18           MR. MCENTIRE:  That I'm about to walk through some

19  points where he can establish as a point of evidence, and then

20  we can talk about it.  Demonstratives, demonstratives are used

21  all the time, Your Honor.

22           MR. MORRIS:  It's to --

23           THE COURT:  Well, they summarize evidence.

24           MR. MORRIS:  It's to summarize evidence.

25           THE COURT:  Yes.  So, --

Dondero - Direct                    157

1           MR. MCENTIRE:  Well, this is --

2           THE COURT:  -- you can elicit the evidence, and then

3    if this chart seems to summarize whatever he testifies as to,

4    then --

5           MR. MCENTIRE:  All right.

6           THE COURT:  -- then I think maybe you can put it up.

7           MR. MCENTIRE:  Mr. -- you can take it down, Tim.

8    BY MR. MCENTIRE:

9    Q    Mr. Dondero, do you have an understanding of how much

10   total distributions have been paid to date in the Highland

11   bankruptcy?

12   A    I believe the Class 8 -- the 1 through 7 was only about

13   $10 million.  I believe Class 8 got $260 or $270 million so

14   far.

15   Q    All right.  And do you have an understanding of what the

16   total amount of expenses are?

17   A    Total expenses paid to date was $203 million.  $205

18   million.

19   Q    So the -- the -- there's a rough approximation between the

20   professional expenses and the actual all proofs of claim; is

21   that correct?

22   A    There is, yeah, a ratio, and -- yes.

23   Q    The total cash flow, if you add those two together, what

24   are they?  What are they approximately?

25   A    $470 million.

Dondero - Direct                          158

1    Q   $470 million?  And do you understand that the -- that the

2    Reorganized Debtor and the Claimant Trust would have more than

3    sufficient assets to reach Class 10 where Hunter Mountain is

4    currently located, even setting aside the claims against you?

5    A   Correct.  There's $57 million of cash on the balance

6    sheet, net of a couple million today, I guess.  And then

7    there's $100 million of other assets.

8              MR. MCENTIRE:  Reserve the rest of my questions.

9    Reserve the rest of my questions, Your Honor.

10             THE COURT:  Okay.  Pass the witness.

11             MR. MCENTIRE:  Could I have my time estimate?

12             THE COURT:  Yes.  Caroline?

13             THE CLERK:  (faintly)  As of right now, we are at 81

14   minutes, so --

15             MR. MCENTIRE:  Thank you.

16             THE COURT:  That was 81 minutes total?

17             THE CLERK:  Yes.

18             THE COURT:  Okay.

19             MR. MORRIS:  May I proceed, Your Honor?

20             THE COURT:  You may.

21                        CROSS-EXAMINATION

22   BY MR. MORRIS:

23   Q   Good afternoon, Mr. Dondero.

24   A   Good to see you.

25   Q   My pleasure.  Do you know an attorney named Ronak

Dondero - Cross                                 159

1    (phonetic) Patel?

2    A    Is that Rakhee that they call --

3    Q    Could be.  Do you know an attorney named Rakhee Patel?

4    A    There was a Rakhee Patel, I believe, early in the *Acis*

5    case.

6    Q    Let me try --

7    A    I'm not -- I've never met her.

8    Q    Let me try this differently.

9    A    Okay.

10   Q    Did you ever meet with the Texas State Securities Board?

11   A    No.

12   Q    Did anybody acting on your behalf ever file a complaint

13   with the Texas State Securities Board?

14   A    No.

15   Q    Do you know if anybody's filed a complaint with the Texas

16   State Securities Board?  About Highland?

17   A    I believe you covered it earlier.  Mark Patrick.

18   Q    Mark Patrick what?

19   A    I guess he did, or Hunter Mountain did, or the DAF did.  I

20   don't -- I don't know.

21   Q    Did you ever speak with Mark Patrick about a TSSB

22   investigation of Highland?

23   A    No.

24   Q    Okay.  Why do you think Mark Patrick knows about the TSSB

25   investigation of Highland?

1          MR. MCENTIRE:  Objection to form.  Calls for

2    speculation.  He's just established that he's never --

3          THE WITNESS:  I don't know.

4          MR. MCENTIRE:  -- talked to Mark Patrick.

5          MR. MORRIS:  Okay.

6          THE COURT:  Okay.  Sustained.

7          MR. MORRIS:  Okay.

8    BY MR. MORRIS:

9    Q    Have you ever seen the draft Hunter Mountain complaint in

10   this case?

11   A    No.

12   Q    Okay.  I think you testified a moment ago that Amazon had

13   hit MGM's price by December 17th.  Do I have that right?

14   A    Yes.

15   Q    Okay.  Then how come you didn't say that in your email to

16   Mr. Seery?

17   A    Your best practices and typical practices, when you put it

18   on the restricted list, is to just give as little information

19   as possible so that the inside information isn't promulgated

20   specifically throughout the organization and leaked --

21   Q    So, --

22   A    -- throughout the organization.

23   Q    So, even though your intent was to convey information to

24   Mr. Seery, you didn't actually tell him the truth, right?  You

25   didn't tell him that Amazon had actually hit the stock price.

Dondero - Cross                                    161

1   Right?

2   A    I wouldn't characterize it that way.

3   Q    Okay.  In fact, all you told him was that they were

4   interested.  Isn't that right?

5   A    I wasn't telling him anything.  I was telling Compliance,

6   as an investment professional, that it needed to be on the

7   restricted list because we were in possession of material

8   nonpublic information regarding a merger that was going to go

9   through shortly.  Or in the next few months.

10  Q    Is it your testimony that, as of December 17th, Amazon had

11  made an offer that was acceptable to MGM?

12  A    Yeah, we were going into -- that's what the board meeting

13  was.  We were going into exclusive negotiations to culminate

14  the merger with them.

15  Q    Okay.  I think you have a binder there of our exhibits.

16  If you can go to #11.

17  A    Which one?

18          MR. MORRIS:  May I approach?

19          THE WITNESS:  Sure.

20      (Pause.)

21  BY MR. MORRIS:

22  Q    That's your email, sir, right?

23  A    Yes.

24  Q    Okay.  It doesn't say anything about Amazon hitting the

25  price, right?

Dondero - Cross                          162

1   A    It doesn't need to.

2   Q    In fact, it still mentions Apple, doesn't it?  Why did you

3   feel the need to mention Apple if Amazon had already hit the

4   price?

5   A    The only way you generally get something done at

6   attractive levels in business is if two people are interested.

7   Q    But why weren't you -- why were you creating a story for

8   the Compliance Department when the whole idea was to be

9   transparent so they would understand what was happening?  Why

10  would you create a story that differed from the facts?

11  A    It didn't differ from the facts, and it's not a story.

12  It's a, we have material nonpublic information.  Please put

13  this on the restricted list.  And --

14  Q    But that -- but you said Amazon and Apple are actively

15  diligencing and they're in the data room.  Do you see that?

16  A    That's true.

17  Q    So, even though -- you know what, I'll move on.  But this

18  -- this doesn't say what you testified to earlier, that Apple

19  hit the -- that Amazon hit the price.  Right?  Can we just

20  agree on that?

21  A    Well, agree that it doesn't have to and it's not supposed

22  to.

23          MR. MORRIS:  I move to strike.  I just want --

24          THE COURT:  Sustained.

25  BY MR. MORRIS:

Dondero - Cross                    163

1  Q   -- you to -- I want you to just work with me here.  You

2  did not tell the Compliance Department that Apple -- that

3  Amazon had hit the strike price.  Right?  Isn't that correct?

4  That's not what this email says?

5  A   The -- you can pull up a hundred of these type emails.

6  They're not specific.

7       MR. MORRIS:  I'm going to move to strike and I'm just

8  going to ask you, --

9       THE COURT:  Sustained.

10 BY MR. MORRIS:

11 Q   -- because you testified to one thing, and I just want to

12 make clear that you told the Compliance Department something

13 different.  Can we just agree on that?

14      MR. MCENTIRE:  Well, Your Honor, may I respond to his

15 motions to strike?  I think he's becoming argumentative.

16      THE COURT:  Could you speak into the mic, --

17      MR. MCENTIRE:  I can.

18      THE COURT:  -- please.

19      THE COURT:  He's becoming argumentative.  And I think

20 it's very clear that, if he asks a question, the witness has a

21 right to respond.  I think his answers are totally responsive.

22 And I don't think anything should be struck.

23      THE COURT:  Okay.  Your question was you didn't put

24 in there anything about it hit the strike price --

25      MR. MORRIS:  He didn't --

```
                        Dondero - Cross                      164
```

1          THE COURT:  -- or whatever?

2          MR. MORRIS:  He didn't -- he didn't tell the

3   Compliance Department what he just testified to.  In fact, he

4   told the Compliance Department something very different.

5   That's all I'm asking.

6          THE COURT:  And I think that's just a yes or no.

7          MR. MORRIS:  Okay.

8   BY MR. MORRIS:

9   Q   Yes or no?  You told the Compliance Department something

10  different than what was actually happening?

11  A   That's not true.

12  Q   Oh.

13  A   Exactly what was here, what was happening.  I didn't give

14  more detail, which is more hearsay.

15  Q   Okay.  If somebody was filing -- following the Highland

16  bankruptcy, they would have known that MGM was very important,

17  right?

18  A   You'd have to show me where.  I don't -- I don't see it in

19  any of the bankruptcy --

20  Q   You don't think that that's true?

21  A   I didn't see it in any of the public filings.

22  Q   Do you remember we were here two years ago on this very

23  day, June 8, 2021, for the second contempt hearing?  You sat

24  in that very witness box during the second contempt hearing?

25  Remember that?  That was two years ago.

Dondero - Cross                           165

1    A    I remember sitting in the box.  What are you asking?

2    Q    And do you remember that that was just a few days after

3    MGM had announced its deal with Amazon?

4    A    I -- I don't remember -- I -- was that the day the judge

5    was hopeful that would lead to a resolution of the case?

6    Q    Exactly.  So, --

7    A    Okay.

8    Q    -- Judge Jernigan certainly knew that MGM was important.

9    Right?

10   A    Yes.

11   Q    And she's a bankruptcy judge, right?

12   A    Yes.

13   Q    And she was overseeing the bankruptcy case, right?

14   Correct?

15   A    Yes.

16   Q    And the very first thing when she walked in the door two

17   years ago on this day was, oh my goodness, MGM, they have a

18   deal, maybe we can finally get to a settlement.  Right?

19   A    And I wish she had pushed on that.

20   Q    Do you --

21   A    And I remember you guys dismissing it.

22   Q    Do you think she had material nonpublic inside

23   information?

24   A    No, I don't think so.

25   Q    She probably learned it in the bankruptcy case, right?

Dondero - Cross                               166

1  A    Yeah.

2  Q    Okay.  Do you believe Mr. Seery sold any MGM securities

3  between the day you sent your email and the day the Amazon

4  deal was announced on May 26th?

5  A    I don't know.

6  Q    Do you -- so you have no knowledge?  Let's do this a

7  different way.  You have no basis to say that Mr. Seery sold

8  any MGM securities between the moment you sent this email on

9  December 17th and the day the Amazon deal was announced on May

10 26th.  Correct?

11 A    I'm sorry.  Just to clarify, you're saying sold, not

12 bought, right?  You're not asking me if --

13 Q    I'll do either way.

14 A    Okay.

15 Q    Fair point.

16 A    Sure.

17 Q    Very fair point.

18 A    Okay.

19 Q    Do you believe that Mr. Seery engaged in any transactions

20 of MGM securities between those two relevant data points?

21 A    Yes.

22 Q    Okay.  What do you think he did?

23 A    The HarbourVest transaction.

24 Q    Okay.  So, you learned about the HarbourVest transaction

25 when?

**Appx. 02703**

Dondero - Cross                                          167

1   A    When it was filed.

2   Q    And that was on December 23rd.  Do you remember that?

3   A    Yes.

4   Q    It was just less than a week after you sent your email,

5   right?

6   A    Yes.

7   Q    And do you remember that you filed an objection to the

8   HarbourVest settlement?

9   A    Yes.

10  Q    And you're the one who gave Mr. Seery this material

11  nonpublic inside information, right?

12  A    Yes.

13  Q    Did you object to the HarbourVest settlement on the basis

14  that Mr. Seery was engaging in insider trading?

15  A    Not then, I don't think.  I believe --

16  Q    You didn't, right?  Even though it was happening at the

17  exact same moment, the very -- within a week of you giving him

18  this information.  He's announcing that he's doing this

19  settlement and you don't say a word.  Isn't that right?

20  A    Because I delegated the responsibility to Compliance by

21  notifying them of material nonpublic information, and

22  Compliance should hold the organization accountable.

23  Compliance is separate and discrete from management.

24  Compliance reports to the SEC.

25  Q    You filed a 15-page objection to the settlement, didn't

Dondero - Cross                                    168

1  you?

2  A    I don't -- I don't know.

3  Q    Did you tell Judge Jernigan that Mr. Seery was doing bad?

4  A    Not then.  I think a month later, two months later.

5  Q    Even though you knew what was happening, you didn't say

6  anything, right?

7  A    I -- I'm not responsible for all the filings.  I --

8  Q    Even though it's under your name?

9  A    Correct.

10 Q    How about -- how about CLO Holdco?  Did CLO Holdco file an

11 objection to the HarbourVest settlement?

12 A    I -- I don't know which entities did, but it -- whatever

13 entities that were in control that could did, eventually, when

14 they found out, you know, and -- but did -- did they, within a

15 week or contemporaneously?  No.  It was right around the

16 holidays.  A lot of people weren't paying attention.  You guys

17 were trying to rush the HarbourVest thing through.

18 Q    Sir, CLO Holdco filed an objection, claiming that it was

19 entitled to purchase the HarbourVest interests in HCLOF

20 because it had a right of first refusal, right?  Isn't that

21 right?

22 A    Okay.  I -- what ultimately governs the --

23 Q    Isn't that right?

24 A    I don't -- okay.

25 Q    It's really just yes or no.

Dondero - Cross                                169

1  A    I don't know.

2  Q    If you don't remember, that's fine.

3  A    I don't remember, yeah.

4           MR. MCENTIRE:  Your Honor, would he please give the

5  witness an opportunity to answer?  He's interrupted three

6  times in less than five seconds.  Give the witness an

7  opportunity to respond.

8           MR. MORRIS:  This is real easy stuff.

9           THE COURT:  Okay.

10          MR. MORRIS:  I'm trying to cross him here.

11          MR. MCENTIRE:  Your Honor, with all due respect, he's

12 making it very difficult because he's being very aggressive --

13          MR. MORRIS:  Nah.

14          MR. MCENTIRE:  -- and he's interrupting the witness.

15          MR. MORRIS:  I would never.

16          THE COURT:  Okay.  I don't feel the need to do that

17 right now, but I will -- I will consider your request.

18          THE WITNESS:  Can I give a complete answer to his

19 last question, or one that I'd like to be my answer on the

20 record?

21          THE COURT:  Go ahead.

22          THE WITNESS:  The governing responsibility as a

23 registered investment advisor is you're not allowed to buy

24 back from investors fund interests or investments unless you

25 offer it to everybody else, in writing, in that fund first.

Dondero - Cross                    170

1  That's the Investment Advisers Act as I understand it, and

2  that is what was improper in the HarbourVest transaction.  I

3  mean, besides the fact that the pricing was wrong, they misled

4  HarbourVest.  And I know HarbourVest hasn't complained, but

5  just because your investors don't complain doesn't mean you

6  can rip them off.

7          MR. MORRIS:  I'd really move to strike the entirety

8  of the answer, Your Honor.

9          THE COURT:  Granted.

10 BY MR. MORRIS:

11 Q    Mr. Dondero, HC --

12 A    I'm not going to -- I'm not answering any more questions

13 unless I can answer that question with that answer, --

14 Q    Mr. Dondero, do you --

15 A    -- because I believe it's responsive.

16 Q    Do you remember that CLO Holdco withdrew their objection?

17 A    I --

18 Q    To the HarbourVest settlement?

19 A    I don't remember.

20 Q    Do you remember that's really when Grant Scott left the

21 scene?

22 A    I don't --

23 Q    He thought it was inappropriate for them to withdraw,

24 right?

25 A    I don't remember all the details.  I know they made some

Dondero - Cross                    171

1   mistakes, and there's a tolling agreement against Kane's

2   (phonetic) firm for making mistakes, and, you know, whatever.

3   But I -- I don't remember all the details.

4   Q   And a couple of months later, you conspired with Mr.

5   Patrick to try to sue Mr. Seery in order to try to get that

6   very same interest in HCLOF, right?

7           MR. MCENTIRE:  Your Honor, I have to object.  There's

8   no foundation and it's also highly argumentative and I move to

9   object.  That's a -- that's a question asked in bad faith.

10          THE WITNESS:  I deny any conspiring.

11          MR. MORRIS:  Okay.

12          THE COURT:  Sustained.

13  BY MR. MORRIS:

14  Q   In April, Mr. Patrick filed a lawsuit on behalf of CLO

15  Holdco a couple of weeks after getting appointed as the head

16  of CLO Holdco and the DAF about the HarbourVest settlement.

17  Isn't that right?

18  A   I believe so.

19  Q   Okay.  And you worked with him on that, right?

20  A   I -- I did not work with him on that.  I was very just

21  tangentially aware.

22  Q   Okay.

23          MR. MORRIS:  I'm just going to refer the Court -- I'm

24  going to move for the admission into evidence of the second

25  contempt order.

Dondero - Cross                                    172

1              THE COURT:  Exhibit what?

2              MR. MORRIS:  Just one moment, Your Honor.

3         (Pause.)

4              MR. MORRIS:  You know what, I don't know that I have

5    it on the list.  I'm just going to ask the Court to take

6    judicial notice.  We had a hearing two years ago to this day,

7    and the Court found in the order that it entered at the

8    conclusion of that hearing that Mr. Patrick had abdicated his

9    responsibility to Mr. Seery.  It's one of the reasons why Mr.

10   Seery wasn't held in contempt of Court.  And I'd like -- I'd

11   like Counsel to address it now.

12             MR. MCENTIRE:  Yeah, I'll -- you said Seery, didn't

13   you?

14             MR. MORRIS:  Oh, sorry.  I said Seery.  I meant

15   Dondero.

16             MR. MCENTIRE:  (faintly)  Also, I believe it's

17   entirely irrelevant.  Judicial -- taking judicial --

18             THE COURT:  Would you speak in the microphone,

19   please?

20             MR. MCENTIRE:  I'm sorry.  Taking judicial notice of

21   something that is utterly irrelevant is not necessary, not

22   appropriate.  What this Court did two years ago roughly to the

23   day -- and I assume he's correct -- has no bearing on anything

24   before the Court today.  Nothing.  This has zero connection,

25   nexus, under any analysis, any fair scrutiny, dealing with the

Dondero - Cross                    173

1   colorability of the claim that Hunter Mountain, who was not

2   involved in those proceedings, is trying to advance here.  And

3   it would be -- it would be improper for this Court to even

4   take it under judicial notice.

5          THE COURT:  Okay.  Response?

6          MR. MORRIS:  Can I respond?

7          THE COURT:  Uh-huh.

8          MR. MORRIS:  Okay.  So, Your Honor, I'm going to move

9   for the introduction into evidence of Exhibit 45.  It is the

10  Charitable DAF complaint that was filed in the federal

11  district court on April 12, 2021, under the direction of Mark

12  Patrick, who today stands here as the representative of Hunter

13  Mountain.

14      This was the complaint, if Your Honor will recall, that

15  they tried to amend and we had a hearing here about the

16  circumstances, because that amendment was going to name Mr.

17  Seery personally, in violation of the gatekeeper order.

18  Right?

19          THE COURT:  Uh-huh.

20          MR. MORRIS:  And so it is all tied together.  If you

21  go to Paragraph 77 of this exhibit, it says, HCLOF holds

22  equity in MGM Studio.  This is the exact same transaction,

23  right?  So, so Mr. Dondero says, I gave Mr. Seery inside

24  information, he violated all of these things in the

25  HarbourVest transaction, even though he didn't say a word

Dondero - Cross                    174

1   then, and here, while it's still on the restricted list,

2   before the Amazon deal is announced, they're actually in court

3   saying that they should be entitled to acquire that same asset

4   that Mr. Seery supposedly acquired improperly.  He wants it

5   for himself.

6       I mean, are you kidding me?  It's not relevant?

7            THE COURT:  I overrule the relevance objection.  It's

8   admitted.

9            MR. MORRIS:  Thank you.  And 45 is admitted, Your

10  Honor?

11           THE COURT:  45 is admitted.

12           MR. MORRIS:  Okay.

13      (Debtors' Exhibit 45 is received into evidence.)

14           MR. MCENTIRE:  Just, Your Honor, I was identifying my

15  objection in connection with his original request that you

16  take something under --

17           THE COURT:  Would you speak in the microphone?

18  Again, we --

19           MR. MCENTIRE:  Yes.  My original objection was

20  addressing his request of you, Your Honor, to take something

21  under judicial notice.  I want to make sure my objection is

22  also lodged with regard to Exhibit 45, which I understand

23  you've overruled.

24           THE COURT:  Correct.

25           MR. MCENTIRE:  Okay.

Dondero - Cross                    175

1           THE COURT:  It is so noted.

2           MR. MORRIS:  Okay.

3           THE COURT:  You've objected and I've admitted it.

4           MR. MORRIS:  And I think I've said this already, but

5   the reason that we're requesting the Court take judicial

6   notice of its order on the second contempt proceeding is

7   because it shows that Mr. Dondero and Mr. Patrick worked

8   together, in violation of the gatekeeper, to try to suit Mr.

9   Seery to obtain the interest in HCLOF that he is sitting here

10  today saying somehow that Mr. Seery wrongfully acquired, even

11  though he didn't say a word at the time.

12          THE COURT:  Okay.  So now we're talking about not

13  Exhibit 45 --

14          MR. MORRIS:  Yes.

15          THE COURT:  -- but the order that was entered --

16          MR. MORRIS:  Correct.

17          THE COURT:  -- regarding the filing of Exhibit 45?

18          MR. MORRIS:  Exactly.

19          THE COURT:  Someone is going to need to give me a

20  docket entry number before we're done here.

21          MR. MORRIS:  Okay.

22          THE COURT:  I can and will take judicial notice of

23  that, but I need to have it --

24          MR. MCENTIRE:  So I assume, for the record, my

25  objection is overruled?

                          Dondero - Cross                    176

1              THE COURT:  Your objection is overruled.

2              MR. MCENTIRE:  Thank you.

3              MR. MORRIS:  All right.

4    BY MR. MORRIS:

5    Q    You mentioned something about, I think, was it NXDT or

6    NHF?

7    A    Yes.

8    Q    And just let me see if I can do it this way.  Right?  So

9    there used to be a fund known as the NexPoint Strategic

10   Opportunities Fund, right?

11   A    Yes.

12   Q    Okay.  And in 2020 that was a closed-in fund.  Correct?

13   A    Yes.

14   Q    And it traded under the ticker symbol NHF, correct?

15   A    Yes.

16   Q    And then late in 2021 the name of the fund was changed to

17   NexPoint Diversified Real Estate Trust, correct?

18   A    Yes.

19   Q    And the ticker symbol changed from NHF to NXDT, correct?

20   A    Yes.

21   Q    And then it became a REIT the following year, right?

22   A    Yes.

23   Q    And I'm just going to refer to these letters as the Fund;

24   is that fair?

25   A    That's fine.

Dondero - Cross                          177

1   Q    For purposes of these questions.  And you were the Fund's
2   portfolio manager, the president, the principal executive
3   officer, correct?
4   A    Yes.
5   Q    And another entity that you controlled, NexPoint Advisors,
6   provided advisory services to the Fund, correct?
7   A    Yes.
8   Q    And you controlled NexPoint Advisors at all times,
9   correct?
10  A    Yes.
11  Q    Okay.  And the Fund was publicly traded, right?
12  A    Yes.
13  Q    And the Fund owned shares of MGM at the end of 19 -- at
14  the end of 2020, correct?
15  A    Yes.
16  Q    In fact, as of December 2020, MGM was one of the Fund's
17  ten largest holdings, with -- valued at over $25 million.
18  Isn't that right?
19  A    Yes.
20  Q    And by the end of 2021, MGM was the Fund's fifth largest
21  holding, with assets -- with a value of over $40 million.
22  Correct?
23  A    Yes.
24  Q    And the Fund also held MGM common stock indirectly; isn't
25  that right?

Dondero - Cross                          178

1    A    Yes.
2    Q    In fact, when the Amazon deal closed at the -- in March of
3    2022, the Fund issued a press release disclosing that it stood
4    to receive over $125 million on the MGM shares that it held
5    directly and indirectly.  Correct?
6    A    We issued several press releases.  I don't remember --
7    Q    Okay.  Do you remember that, that as a result of the MGM
8    sale, the Fund was expected to receive approximately $126
9    million?
10   A    Yes.
11   Q    Okay.
12   A    Roughly.
13   Q    All right.  In October 2020, just a few weeks before you
14   sent your email, the Fund announced the commencement of a
15   tender offer to acquire outstanding shares at a certain price.
16   Correct?
17   A    Yeah, I believe so.
18   Q    And you authorized that, right?
19   A    Yes.
20   Q    And when a fund acquires shares and then retires them, the
21   shareholders who did not tender consequently own a larger
22   percentage of the fund than they did before the tender,
23   correct?
24   A    Yes.
25   Q    Okay.  And the tender was completed in January, in the

Dondero - Cross                           179

1  first week of January 2001 [sic], correct?

2  A    I don't remember when it was complete.

3  Q    It started at the end of October 2020, and it ended

4  sometime in January '21.  Is that fair?

5  A    Okay.  I don't remember.  Okay.

6  Q    Do you want me to refresh your recollection?

7  A    I'm just saying I don't remember.

8  Q    Yeah, okay.

9  A    I'm not dis...

10  Q    Okay.

11  A    -- denying it.  I just don't remember the exact dates.

12      (Discussion.)

13          MR. MORRIS:  Your Honor, can I mark for

14  identification purposes Plaintiffs' Exhibit -- I'm just going

15  to call it 100, to see if it refreshes the witness's

16  recollection?

17          THE COURT:  You may mark it.

18          MR. MORRIS:  Okay.

19          THE COURT:  We'll see where it goes from there.

20      (Debtors' Exhibit 100 is marked for identification.)

21  BY MR. MORRIS:

22  Q    So, I've put --

23          MR. MCENTIRE:  Hold it.  Your Honor, I think we're

24  now marking exhibits that we haven't put on an exhibit list.

25          MR. MORRIS:  I'm trying to refresh his recollection.

Dondero - Cross                              180

1              MR. MCENTIRE:  Okay.

2              MR. MORRIS:  Yeah.

3              MR. MCENTIRE:  Well, --

4              THE COURT:  Yes.

5              MR. MORRIS:  Okay?  I haven't offered it in -- I

6    haven't offered it --

7              THE COURT:  I've not admitted -- I don't know what it

8    is.  I haven't admitted it yet.  I'm waiting.

9              MR. MORRIS:  I haven't offered it into evidence.  He

10   said he doesn't remember, --

11             THE COURT:  Okay.

12             MR. MORRIS:  -- I've got an SEC document here, and

13   I'm going to try and refresh his recollection.

14             THE COURT:  Okay.

15   BY MR. MORRIS:

16   Q   You're familiar with these forms, right?

17   A   Generally.

18   Q   In fact, in fact, you sign them in your capacity as the

19   fund portfolio manager, right?  Your signature is put on it,

20   anyway?

21   A   Generally.

22   Q   Yeah.  And do you see that this is the Form N-CSR that was

23   filed with the SEC at the end of 2001 [sic] on behalf of

24   NexPoint Diversified Real Estate Trust?

25   A   Yes.

Dondero - Cross                                181

1   Q    Okay.  So if you just turn to Page 16.  And the numbers

2   are kind of at the bottom in the middle of the page.  You'll

3   see the notes to the consolidated financial statements.

4   A    Yes.

5   Q    Okay.  And Note 1 discusses the organization.  Do you see

6   that?

7   A    Yes.

8   Q    And at the bottom of the left-hand column, it says, On

9   January 8, 2021, the company announced the final result of its

10  exchange offer pursuant to which the company purchased the

11  company's outstanding -- the company's common shares in

12  exchange for certain consideration.

13       Do you see that?

14  A    Yes.

15  Q    That's a reference to the tender offer that you authorized

16  at the end of October, correct?

17  A    Yes.

18  Q    And then at the bottom it says, The company share --

19  company -- excuse me.  I strike that.  It says, quote, The

20  common shares at a price of $12 per common share, for an

21  aggregate purchase price of approximately $125 -- $105

22  million.  Upon retirement of the repurchased shares, the net

23  asset value was $152 million, or $17.41 million.

24       Do you see that?

25  A    Yes.

**Appx. 02718**

Dondero - Cross                    182

1  Q    Does that refresh your recollection that the tender offer

2  was completed at the beginning of January?

3  A    Yes.

4  Q    And that's with all of the MGM stock that the Fund still

5  owned at that time, right?

6  A    Yeah.  We -- we didn't -- we didn't violate --

7  Q    You didn't --

8  A    We didn't -- we didn't violate like Seery did.  We didn't

9  sell any shares or buy shares.

10  Q    Okay.

11           MR. MORRIS:  I'm going to move to strike that, Your

12  Honor.

13           THE COURT:  So granted.

14           MR. MCENTIRE:  Well, Your Honor, I've actually got a

15  response to his motion to strike.  This entire inquiry is

16  irrelevant.

17           MR. MORRIS:  Not --

18           MR. MCENTIRE:  This has no relevance at all in

19  connection with the allegations that we're making in this

20  case.

21           THE COURT:  Your response?

22           MR. MORRIS:  My response, Your Honor, if you ask me

23  -- let me just get a few more questions.  He personally owned

24  shares in the Fund.  The Fund owned shares in MGM.  And

25  notwithstanding the restricted material, this is the insider,

Dondero - Cross                          183

1   and he is benefiting from himself through the Fund's

2   repurchase of these shares in the tender offer, and he went

3   and he had substantial holdings.  I'll get to that in a

4   minute.

5       So he is actually doing something worse than what Mr.

6   Seery -- what he accuses Mr. Seery of, because he's buying

7   shares for his own personal benefit.  Right?  He's the

8   insider.  Right?  And the Fund owns the shares directly.

9   There's never going to be an allegation that HCLOF ever owned

10  any MGM stock.  Never.

11           THE COURT:  Okay.  I'm going to allow this.

12  Obviously, on redirect, you can further question on this --

13           MR. MCENTIRE:  Well, --

14           THE COURT:  -- to --

15           MR. MCENTIRE:  Well, first of all, his suggestions

16  and his accusations are purely argumentative.

17           THE COURT:  Would you please speak in the microphone?

18  We --

19           MR. MCENTIRE:  Well, he's standing in the way, Your

20  Honor.

21           THE COURT:  Well, --

22           MR. MCENTIRE:  It's irrelevant.

23           THE COURT:  There are two.  There's room for both of

24  you.

25       Continue.  Go ahead.

```
                        Dondero - Cross                    184
```

1        MR. MCENTIRE:  It's entirely irrelevant, and it's

2   argumentative.

3        THE COURT:  Okay.  Overruled.  You can continue.

4   BY MR. MORRIS:

5   Q    You did own an awful lot of the Fund's shares, didn't you?

6   A    I owned some.

7   Q    You owned some?  You owned millions, right?

8   A    Yes.

9   Q    Okay.  And as a result of the tender, you owned a greater

10  interest of the Fund, right?

11  A    Yes.

12  Q    And therefore you owned a greater number -- a greater

13  portion of the MGM stock, the $125 million of MGM stock that

14  was owned directly and indirectly by the Fund, correct?

15  A    You do know insiders weren't permitted to participate in

16  the tender, which would have kept my percentage the same.

17  Q    Sir, you benefitted -- you didn't stop the tender, right?

18  You didn't say, now I know what's going to happen, I should

19  stop it?  You benefitted from the tender.  Can we just agree

20  on that?

21  A    I did everything I was supposed to do, notifying

22  Compliance.  If they thought it was material, they would have

23  -- it was in their hands once I notified Compliance of the

24  material --

25  Q    Okay.

Dondero - Cross                          185

1    A    -- nonpublic information.

2    Q    I appreciate that.  I just want --

3    A    It wasn't my responsibility to do Compliance's job to call

4    you or call --

5    Q    Okay.

6    A    -- the SEC or call anybody else.

7    Q    But you will agree that, even though you had material

8    nonpublic inside information, you didn't take any steps to

9    stop the tender, correct?

10   A    The tender was for a relatively small amount of the stock.

11   But I did -- I would -- it would not be my responsibility to

12   change or adjust the tender --

13   Q    Okay.

14   A    -- or what was happening.

15   Q    Okay.  And then the last question is, you benefitted from

16   the tender because the Fund repurchased shares, which

17   increased your percentage ownership of the Fund, and therefore

18   your percentage ownership of the MGM shares that were held

19   directly and indirectly.  Is that fair?

20   A    Marginally, I guess.  Yes.

21   Q    Okay.  From the -- from the millions of shares, you would

22   describe it as marginal?  Okay.

23        Let me move on.  You've testified now that you spoke with

24   representatives of Farallon in the late spring, I guess

25   beginning on May 28th.  Right?

Dondero - Cross                                186

1    A    Yes.

2    Q    And that was two days after the MGM deal was publicly

3    announced, correct?

4    A    Yes.

5    Q    Okay.  And had you ever communicated with Mr. Patel before

6    that phone call?

7    A    I don't believe so.

8    Q    And then you spoke with Mr. Linn shortly after?

9    A    Yes.

10   Q    Had you ever spoken with Mr. Linn before that phone call

11   with Mr. Linn?

12   A    I don't believe so.

13   Q    So these phone calls were the very first time that you

14   ever spoke to either one of these gentlemen.  Is that right?

15   A    That I can remember.

16   Q    Okay.

17   A    If I ran into them at --

18   Q    Uh-huh.

19   A    -- a conference a decade ago, I don't know, but --

20   Q    And they told you that they bought the shares in the

21   February-March time frame, right?

22   A    Yes.

23   Q    And you have no reason to dispute that, correct?

24   A    Correct.

25   Q    Okay.  And you didn't know how much they had paid for the

Dondero - Cross                           187

1  claims as a result of these conversations, correct?

2  A    They did not admit a price.

3  Q    Okay.  And it's your testimony that there wasn't

4  sufficient information in the public for them to buy -- this

5  is your view -- that there wasn't sufficient information in

6  the public to justify their purchases.  Is that your view?

7  A    Correct.

8  Q    And even though you didn't think there was sufficient

9  information in the public, you were prepared to pay 30 percent

10 more than they did, right?

11 A    Yes.

12 Q    And is that because you were 30 percent more irrational

13 than them or because you had material nonpublic inside

14 information?

15        MR. MCENTIRE:  Objection.  Argumentative, Your Honor.

16        THE COURT:  Overruled.

17        THE WITNESS:  Even at a 30 percent premium, it was

18 less than I offered the UCC several months earlier, number

19 one.

20     Number two, I was still under the illusion there was a

21 desire to resolve the place, not burn it down.  You know,

22 there was -- all the original members were happy to sell at

23 $150 million.  It was a $500 or $600 million estate.  There

24 should be $400 or $500 million of residual value.  It

25 shouldn't all be going out the door to lawyers and others.

Dondero - Cross                    188

1  BY MR. MORRIS:

2  Q    You were willing to pay 30 percent more for an unknown

3  purchase price, 30 percent more of an unknown purchase price,

4  at a moment that you didn't believe there was sufficient

5  information to buy the claims, correct?

6  A    You have a couple misstatements in there.  The Grosvenor

7  piece was public.  The Grosvenor piece traded at $67 million.

8  So we knew that piece trade at around 50 cents.  We knew from

9  people in the marketplace the other pieces were trading right

10  around that level.

11      So I wasn't just offering 30 percent on any willy-nilly

12  number, 130 percent of any willy-nilly number.  I knew they

13  had paid around 50, 60 cents.  And so I was offering 30

14  percent more than that.  Thirty percent more than $150

15  million, call it $200 million.  I had offered $230 or $240

16  million to resolve the whole estate before the plan went

17  effective, and I got no response from the original UCC

18  members.

19  Q    So why didn't you just try to settle the case with them?

20  Why did you try to buy the claim?  Why, if you had these new

21  people, and your good intentions were to finally get to a

22  settlement of the case, why didn't you say, hey, guys, how do

23  we resolve the case?  Why did you want to buy the claims at a

24  30 percent premium over what they paid with no knowledge and

25  no diligence, according to you?  Can you explain that to Judge

Dondero - Cross                    189

1  Jernigan?

2  A    Because Seery told them to hold on, don't worry, they were

3  going to make $270 million.

4  Q    That doesn't answer my question.  Why didn't you try --

5  you had new owners.  Why didn't you try to settle with them?

6  A    When someone owns an asset, buying their asset is settling

7  with them.  What claim does Farallon have against us?  At that

8  point, they had no claims against us.

9  Q    It doesn't settle the case, does it?

10  A    But if we owned all the claims, it would settle the case.

11  Just like if Seery had objected to the claims trading that

12  they were supposed to give written notice to the Court, he had

13  enough cash on the balance sheet to buy and retire all the

14  claims.

15  Q    All right.  Let's go back, I apologize, to that Exhibit

16  11.  No, it's not Exhibit 11.  I think it's their Exhibit 4,

17  your notes.

18         MR. MORRIS:  Your Honor, may I have -- just have one

19  moment?

20         THE COURT:  You may.

21         MR. MORRIS:  Can you tell me how long I've been

22  going?  That's really my question.

23         THE CLERK:  So, on cross, --

24         MR. MORRIS:  Yeah.

25         THE CLERK:  -- you've been going for 32 minutes.

Dondero - Cross                          190

1          MR. MORRIS:  Okay.  Trying to speed this up.

2    BY MR. MORRIS:

3    Q   All right.  So, do we have your handwritten notes, which

4    are Exhibit 4, in this binder?  Oh.

5          THE COURT:  Do you want to put it up again on the

6    screen?

7          MR. MORRIS:  Ms. Canty, if you're listening and you

8    can do that, that would be great.  If not, --

9      (Discussion.)

10          MS. CANTY:  One second, John.

11          MR. MORRIS:  All right.  He -- he's got it.

12          THE COURT:  Okay.

13   BY MR. MORRIS:

14   Q   Okay.  So, I just -- I just want to make -- you know,

15   follow up on a few questions I asked you earlier on *voir dire*.

16   So, these are your notes, right, and you said you write down

17   the important stuff.  Correct?

18   A   I write down, yeah, the stuff I thought I would need for

19   the next call.

20   Q   Okay.  And, you know, again, just so we have it all in one

21   spot, it doesn't say anything about MGM.  Correct?

22   A   It does not.

23   Q   It doesn't say anything about a *quid pro quo*, correct?

24   A   *Quid pro*?  Uh, no, it does not.

25   Q   It doesn't say anything at all about Mr. Seery's

Dondero - Cross                          191

1    compensation, correct?

2    A    It does not.

3    Q    It doesn't say anything about the sharing of material

4    nonpublic inside information, correct?

5    A    When I told them discovery was coming, that was my

6    response to I knew they had traded on material nonpublic

7    information.

8    Q    Okay.  That -- you told them that?

9    A    Yes.

10   Q    Is that what you're saying now?

11   A    Yes.

12   Q    Oh, so that's what you told them?  They didn't tell you

13   that; that's what you told them?

14   A    Yes.

15   Q    And that's why you wanted discovery, right?

16   A    I thought it would be a lot easier to get discovery on a

17   situation like this than it has been for the last two years,

18   yes.

19   Q    Okay.  Um, --

20   A    In fact, I told them that it would be coming in the next

21   few weeks.  And this has been a couple years.

22   Q    And that's exactly what you did, right?

23   A    Well, we've been trying for two years to get --

24   Q    Right.

25   A    -- discovery in this.

**Appx. 02728**

Dondero - Cross                                192

1    Q    Okay.  So you filed your Texas 202, right?

2    A    I don't know who filed what.

3    Q    That was the one by Mr. Sbaiti that was filed under your

4    name?  Do you remember that?

5    A    Generally.

6    Q    Okay.  Let's take a quick look at that document.  It's #3

7    in our binder.

8    A    Binder #3?

9         (Discussion.)

10             MR. MORRIS:  Okay.  I think #3 is in evidence, Your

11    Honor.

12             THE WITNESS:  Number 3 is in evidence.

13             THE COURT:  Yes.

14             MR. MORRIS:  Okay.

15             THE COURT:  It is.

16    BY MR. MORRIS:

17    Q    And if you can turn to the last page, Mr. Dondero.  Page

18    8.

19    A    Yes.

20    Q    Okay.  And that's your signature, right?

21    A    Yes.

22    Q    And you verified that this document was true and correct

23    within the best of your personal knowledge, correct?

24    A    Yes.

25    Q    Did you read it before you signed it?

Dondero - Cross                                     193

1  A    Probably.

2  Q    You don't recall doing that?

3  A    Not at this moment.

4  Q    And you may not have.  Is that fair?

5  A    No, I probably did.  Do you have a question?

6  Q    I'm just wondering if you signed it or not.

7  A    I did sign it.

8  Q    Okay.  Good.  So, can you go to Paragraph 21?  Well, let's

9  start at Paragraph 20.  It says that Mr. Seery, quote, has an

10 age-old connection to Farallon, and upon information and

11 belief, advised Farallon to purchase the claims.

12      Do you see that?

13 A    Yes.

14 Q    And then the next paragraph you refer to the telephone

15 call that you had with Michael Linn, right?

16 A    Yes.

17 Q    It doesn't refer to any phone call with Mr. Patel,

18 correct?

19 A    It does not.

20 Q    And the only reason that you swore under oath you were

21 told that Farallon purchased the claims was because of

22 Farallon's, quote, prior dealings with Mr. Seery.  Correct?

23 In Paragraph 21, it says, Relying entirely on Mr. Seery's

24 advice solely because of their prior dealings?

25 A    Yes.

Dondero - Cross                    194

1  Q    Okay.  You didn't -- you didn't swear under oath at that

2  time that you were told that they bought the claims because of

3  MGM.  Right?

4  A    If you're asking if this is -- it seems like it's not

5  complete, if that's what you're asking me.

6  Q    I'm not asking you that.  I'm asking you what -- I'm

7  asking you to confirm that you swore under oath to the Texas

8  state court, just weeks after you had these conversations,

9  about what you were told concerning Farallon's purchase of the

10  claims.

11     I'm focused on Paragraph 21.  The only reason that you

12  gave, that you told the Texas state court under oath, was that

13  Farallon told you they bought their claims because of their

14  prior dealings with Seery.  Right?

15  A    Yeah.  And that's true.  And that's consistent with what

16  I've said.

17  Q    Okay.  You didn't say anything about MGM, correct?

18  A    Correct.

19  Q    You didn't say anything about a *quid pro quo*, correct?

20  A    Correct.

21  Q    You didn't say anything about Mr. Seery's compensation.

22  Correct?

23  A    I did not.

24  Q    You didn't say anything about the sharing of material

25  nonpublic inside information, correct?

Dondero - Cross                                   195

1    A    Different document, different purposes.

2    Q    Well, but that's now two documents.  You have your notes

3    and you had this document, neither one of which say any of

4    those things.  Fair?

5    A    Different documents, different purposes.  I don't know if

6    that's --

7    Q    Is it fair that neither one of those documents say any of

8    those things?

9    A    It's fair that they don't all match.

10   Q    Okay.  Okay.  Well, that's a fair statement.  Let's go to

11   the next one.  Do you remember the next year you filed an

12   amended petition?

13   A    What tab?

14   Q    That's -- I appreciate that.  It's Tab 4.  Do you see at

15   the last page you've again signed a verification?

16   A    Yep.

17   Q    And do you see this one's filed with the Texas state court

18   on May 2, 2022?

19   A    Yes.

20   Q    And you swore under oath that this statement was complete,

21   true, and accurate to the best of your knowledge, correct?

22   A    Yes.

23   Q    Okay.  Can you go to Page 5, please?

24   A    Yes.

25   Q    Directing your attention to Paragraph 23, do you see where

Dondero - Cross                          196

1  you say now that Farallon was relying, quote, on Mr. Seery's

2  say-so because they had made so much money in the past when

3  Mr. Seery told them to purchase claims.

4       Do you see that?

5  A    Yes.

6  Q    Again, you don't say anything about MGM, correct?

7  A    Correct.

8  Q    Again, you don't say anything about material nonpublic

9  inside information, correct?

10 A    Well, on 24 it does.  Right?  Mr. Seery had inside

11 information on the price and value of claims.  So, you've got

12 to look at all of the bullet points.

13 Q    But that's not the paragraph where you're talking --

14 that's -- it says, in other words.  That's not the paragraph

15 where you're describing your conversation with Farallon.

16 That's your interpretation of it, correct, just as you just

17 said?

18 A    (no immediate response)

19 Q    You told -- I'm sorry.  I should let you finish the

20 answer.  That's your interpretation of it, correct?

21 A    Well, I'm reading all the bullets in aggregate, and it's

22 -- it's a picture of material information shared by Seery, not

23 just MGM or one particular investment, but on all the other

24 assets that aren't detailed in any of the public filings,

25 also.

Dondero - Cross                                197

1  Q    The only -- the only point I want to make, I think we can
2  agree on this --
3  A    Okay.
4  Q    -- is that you believed that Mr. Seery gave them material
5  nonpublic inside information.  Farallon never told you that.
6  Isn't that true?  That's why you wanted discovery?
7  A    They said they relied on him and did no diligence of their
8  own.  They were very express -- explicit about that.
9  Q    Okay.  Can you answer my question now?
10 A    Which -- I thought -- that does, --
11 Q    You concluded --
12 A    -- yes.
13 Q    -- that Mr. Seery gave them material nonpublic inside
14 information.  They never told you that.  Fair?
15 A    They said they relied on -- solely on Seery, didn't buy it
16 for any other reason, and they did no due diligence of their
17 own.
18 Q    Okay.  Let's go to the next one.  Now, the no-due-
19 diligence part, that's not in any version we've seen, right?
20 That's something that you just --
21 A    No, no, --
22 Q    -- that you're just testifying to now?  That's not in your
23 notes, it's not in Version 1, and it's not in this version,
24 correct?
25 A    Well, let's go back to the Linn one, because when I was

1   going back and forth and he wouldn't give a price, he kept

2   saying, Seery told us it's worth a lot more.  And I kept

3   saying, you've got to look at the burn, you've got to look at

4   the professionals.  And --

5   Q    Okay.

6   A    -- that's --

7   Q    Shortly after this, you filed yet another declaration,

8   right?

9   A    Yes.

10  Q    Uh-huh.  Can you turn to #5?  And this is another version

11  of your recollection of what you were told, correct?  In

12  Paragraph 2?

13  A    These are all -- I don't know why you're saying they're

14  different.  They're all the same.  They're just slightly

15  different verbiage.  What's the major difference between any

16  of them?

17  Q    I'll ask, I'll ask you the question.  The question is, you

18  had never written in any of the prior versions that they

19  didn't do any due diligence; isn't that right?  You never --

20  you never talked about their due diligence in any prior

21  version, correct?

22  A    It's all -- it's all the same version.  I don't -- some

23  versions --

24  Q    Can you answer my question?

25  A    I don't know.  I don't know --

Dondero - Cross                               199

1   Q    Which --

2   A    -- which ones included which -- I don't --

3   Q    We've just looked at them.  Do you want to look at them

4   again?

5   A    I just looked at one page in the other one and it was five

6   pages.  I just looked at the one page and I found two or three

7   things --

8   Q    Your notes --

9   A    -- it didn't include, but --

10        MR. MORRIS:  You know what.  I don't want to argue.

11  They say what they say, Your Honor, and I would ask the Court

12  to look carefully at our objection to the motion because we

13  lay all of this out.

14      Your Honor can -- here's the point, because I do want to

15  finish up right now.  There are five different versions of

16  this conversation.  They're laid out in the brief.  And the

17  question that you have to ask yourself, Your Honor, is, if you

18  allow this case to go forward, how do they make a colorable

19  claim when the story keeps changing?

20      And I'll just leave it at that, because, you know, the

21  last version says MGM for the first time.  Like, it comes out

22  of nowhere.  This -- his notes don't say it, he hasn't

23  testified that that's what he was told, but somehow that's in

24  his sworn statement.

25      So I'm just going to rest on the papers, because this is

Dondero - Cross                        200

1  || -- I don't want to be argumentative.

2  ||           THE COURT:  Okay.

3  ||           MR. MCENTIRE:  Well, I'll object to the argument of

4  || counsel.  He's just doing another opening statement here, and

5  || it's inappropriate and not proper.

6  ||           THE COURT:  Okay.  I agree.  This is Q and A.

7  ||           MR. MORRIS:  Okay.

8  ||           THE COURT:  So, --

9  || BY MR. MORRIS:

10 || Q   Do you know -- do you have any knowledge or information as

11 || to how Mr. Seery's compensation was established?

12 || A   Uh, --

13 || Q   Withdrawn.  I'm talking now not in his capacity as an

14 || independent director or the CEO of the Debtor.  I'm only

15 || talking about in his capacity as the CEO of the Reorganized

16 || Debtor and the Claimant Trustee.  Do you have any personal

17 || knowledge as to how his compensation was established?

18 || A   The knowledge I have is that the Claimant Trust gives full

19 || latitude to change it at almost any time they want.  Add more

20 || to it, add more than that we've seen, double it in the future

21 || if reserves are reversed.  It can do anything it wants.  And I

22 || guess we've seen some redacted partial statements of his

23 || compensation, but that's all I know.

24 || Q   Okay.  You have no knowledge about how Mr. Seery's

25 || compensation package was determined, correct?

                         Dondero - Redirect                    201

 1  A    I was not involved.

 2  Q    Okay.  You've never -- I'll just leave it at that.

 3            MR. MORRIS:  I have nothing further, Your Honor.

 4            THE COURT:  Okay.  Pass the witness.  I'm sorry, I

 5  guess I should ask, do any of the other responding parties

 6  have examination?

 7            MR. STANCIL:  No, Your Honor.

 8            THE COURT:  No?  Okay.  Redirect?

 9            MR. MCENTIRE:  Just very briefly, Your Honor.

10            THE COURT:  Okay.

11            MR. MCENTIRE:  Thank you, Your Honor.

12                         REDIRECT EXAMINATION

13  BY MR. MCENTIRE:

14  Q    Mr. Dondero, you remember the questions about Judge

15  Jernigan walking into the courtroom on June 8 two years ago

16  saying, MGM is sold, maybe we can settle this case?  Do you

17  recall those questions?

18  A    Yes.

19  Q    And do you remember Mr. Morris's dramatic suggestion that,

20  well, how did Judge Jernigan know, or to that effect?

21  A    Yes.

22  Q    Well, that had already been announced, had it not,

23  publicly?

24  A    Yes.

25  Q    Several weeks before?

Dondero - Redirect                              202

1   A    Yes.

2   Q    I'd like to direct your attention -- do you still have

3   Exhibit 4 that he handed you?  Do you have Exhibit 4 there?

4   A    Uh, --

5   Q    His exhibit?

6   A    Is that the notes?

7   Q    No, it's -- Exhibit 4 is the verified amended petition to

8   take deposition before suit -- take -- in the state court.  To

9   -- deposition.

10  A    You've got to give me more of a clue.  I'm sorry.  There's

11  like six binders.

12          MR. MCENTIRE:  Mr. Morris, can you show us where the

13  exhibit --

14          MR. MORRIS:  Sure.  Which one is it?

15          MR. MCENTIRE:  It's Exhibit 4.  I'm going to talk to

16  him about Exhibit 4 (inaudible) that you've have used with

17  this witness.

18  BY MR. MCENTIRE:

19  Q    I assume -- Mr. Dondero, were you assuming from the tone

20  and the substantive content of his questions that Mr. Morris

21  is suggesting that your notes are not reliable?

22  A    He was trying to make it seem like the versions were

23  different.  They were all 90 percent the same.  Different --

24  it seemed like different emphasis for different purposes.  And

25  then you have to remember we learned more about Farallon and

Dondero - Redirect                    203

1   Stonehill over time.  Like, in the beginning, when I had --

2   when I -- we didn't even know Stonehill was involved when I --

3   Q    Sure.

4   A    -- first talked to -- when --

5   Q    Well, he made the big suggestion about you never talked

6   about due diligence before.  Turn to Exhibit 4, Paragraph 23,

7   which he did not address with you.  Can you turn to Paragraph

8   23 of Exhibit 4?  Mr. Morris omitted to refer you to this

9   particular paragraph.

10  A    23?  Go ahead.

11  Q    Would you read it into the record?

12  A    (reading)  On a telephone call between Petitioner and

13  Michael Linn, a representative of Farallon, Michael Linn

14  informed the Petitioner Farallon had purchased the claim

15  sight-unseen and with no due diligence, a hundred percent

16  relying on Mr. Seery's say-so, because they had made so much

17  in the past with Mr. -- when Mr. Seery had (overspoken).

18  Q    Now, since you've an opportunity to see other paragraphs

19  and other -- that he was otherwise not selecting, you did

20  refer to the -- to what Mr. Linn had told you about in May of

21  2021?

22  A    Yes.  I've been very consistent.  Listen, I believe

23  Farallon tapes all their conversations.  So, eventually, as

24  this goes further, I purposefully --

25  Q    Well, let's --

Appx. 02740

Dondero - Redirect                    204

1          MR. MORRIS:  I move to strike, Your Honor.

2          THE WITNESS:  Okay.

3          THE COURT:  Sustained.

4   BY MR. MCENTIRE:

5   Q   He also did not direct your attention or the Court's

6   attention to Paragraph 27 of Exhibit 4, selecting --

7   presumably strategically selecting not to refer to that

8   paragraph.  Do you see Paragraph 27?

9   A   Yes.

10  Q   Could you read that into the record, please?

11  A   (reading)  However, Mr. Seery is privy to material

12  nonpublic information, inside information of many of the

13  securities that Highland deals in, as well as the funds that

14  Mr. Seery manages through Highland.  One of these assets was a

15  publicly-traded security that Highland was an insider of, and

16  therefore should not have traded, whether directly or

17  indirectly, given its possession of insider information.

18  Q   Isn't that paragraph just basically addressing MGM?

19  A   Yeah, that's the only major position we had that that

20  would apply to.

21  Q   So the suggestion that you're just making this MGM stuff

22  up is not true.  It's consistent with what you've (inaudible)

23  in other courts as well, correct?

24  A   Yes.  I believe it's disingenuous to say that there's

25  different versions of my story.

Dondero - Redirect                    205

1   Q    Well, let's continue with Mr. Morris's strategy.  Go to

2   Exhibit 3, please.  Mr. Morris suggested that there's no

3   reference at all in any of these prior pleadings about Mr.

4   Seery's excess conversation.  Do you recall that series of

5   questions?

6   A    Yes.  Or his statements, yes.

7   Q    Yes.  And he did not direct your --

8          MR. MORRIS:  I move to strike.  I asked him if he had

9   any knowledge of the man's compensation package.  That's what

10  I asked him.

11         MR. MCENTIRE:  No, sir.  Your Honor, that's not what

12  he asked him.  That was one of the questions he asked.  The

13  other question was, there's nothing in here about

14  compensation.  That's what I'd like to address now.

15         MR. MORRIS:  Oh, go right ahead.

16         THE COURT:  Okay.

17  BY MR. MCENTIRE:

18  Q    Directing your attention --

19         THE COURT:  You can ask.  I'd have to go back and

20  check the record whether you had that second question you

21  mentioned.  I remember questions about does he have knowledge

22  of Seery's compensation.  I just can't remember if he asked,

23  --

24         MR. MCENTIRE:  Fair enough.

25         THE COURT:  -- were there references to it in the --

Appx. 02742

Dondero - Redirect                           206

1              MR. MCENTIRE:  Well, --

2              THE COURT:  -- prior pleadings.

3              MR. MCENTIRE:  -- for the record, we'll make it clear

4     that there is a reference.

5     BY MR. MCENTIRE:

6     Q   If I could direct your attention to Paragraph 23, Exhibit

7     -- as to --

8              MR. MORRIS:  What exhibit is it?

9              MR. MCENTIRE:  It's Exhibit 3.

10             MR. MORRIS:  Hold on one second.

11             MS. MUSGRAVE:  Your exhibit.

12             THE COURT:  Highland's Exhibit 3.

13             MR. MORRIS:  Give me a moment.

14             THE COURT:  Page what?

15             MR. MCENTIRE:  It's Paragraph 22 on Page 5.

16             THE WITNESS:  I'm sorry.  My Exhibit 3?

17    BY MR. MCENTIRE:

18    Q   Could you read for me, please, Mr. --

19             MR. MORRIS:  Hold on one second.  It's my Exhibit 3

20    or your exhibit?

21             MR. MCENTIRE:  It's your exhibit.  This is Hunter

22    Mountain's binder.

23             MR. MORRIS:  Ah, I apologize.

24             MR. MCENTIRE:  You were just using it.

25             MR. MORRIS:  Okay.  All right.  Go ahead.  What

Dondero - Redirect                              207

1  paragraph were you?

2  BY MR. MCENTIRE:

3  Q   I'd direct your attention, Mr. Dondero, to Paragraph 22.

4          MR. MORRIS:  Yeah.

5  BY MR. MCENTIRE:

6  Q   Would you read -- would you read Paragraph 22 into the

7  record, please?

8  A   (reading)  Mr. Seery had much to gain by brokering a sale

9  of the claim suggested to Muck, mainly his knowledge that

10 Farallon as a friendly investor would allow him to remain as

11 Highland's CEO with virtually unfettered discretion to

12 administer Highland.  In addition, Mr. Seery's written

13 compensation package incentivized him to continue the

14 bankruptcy for as long as possible.

15 Q   There was also a series of questions to you about a

16 transaction involving NexPoint -- NexPoint Diversified Real

17 Estate Trust.  Do you recall those questions?

18 A   Yeah.  Let's talk about that.

19 Q   All right.  Tell me what the transaction was.

20 A   I'm sorry.  The tender that he was asking about or --

21 Q   Yes, the tender.

22 A   There was -- investors wanted some shares retired, and we

23 didn't have enough cash on the balance sheets.  So we tendered

24 in the form of giving them Preferred, which was like equity

25 but a better dividend or a more secured dividend, and 20

Dondero - Redirect                    208

1  percent cash.  And then insiders weren't allowed to

2  participate.  But the whole tender was only for eight or ten

3  percent of the nominal amount outstanding.  And again, you've

4  got a package of securities, so you didn't get any -- you

5  didn't cash.  And although it reduced the share count, it also

6  increased the Preferred or the claims against the company.  So

7  it was marginally accretive, I guess.

8  Q    All right.

9  A    But, again, as far as inside information is concerned,

10 Compliance is a separate party organization that reports up to

11 the SEC.  Has a dotted line to me.  Reports to the SEC.  They

12 make sure everything we do is compliant.

13 Q    Mr. Dondero, --

14 A    Yeah.  Can --

15 Q    -- you didn't participate in the transaction, did you?

16 A    No.  Insiders weren't allowed to participate in the

17 transaction.

18           MR. MCENTIRE:  Reserve the rest of my questions, Your

19 Honor.

20           THE COURT:  Any recross?

21                         RECROSS-EXAMINATION

22 BY MR. MORRIS:

23 Q    The reference to the compensation that we just looked at,

24 that was your own personal view, not something that anybody

25 from Farallon ever told you, correct?  You can go back and

Dondero - Recross                                209

1   look.

2   A    Yeah, that --

3   Q    I mean, it's not a trick question.

4   A    Yeah, that was my pleading.

5   Q    Okay.  And that was your own speculation, if you will?  It

6   had nothing to do with anything Farallon ever told you,

7   correct?

8   A    I never discussed Seery's compensation with Farallon.

9   Q    Okay.  Thank you, sir, very much.  Just one last question.

10  The price of the tender --

11  A    Yes.

12  Q    -- was based in part on the value of the MGM stock,

13  correct?

14  A    The tender was based on market price --

15  Q    And --

16  A    -- of where the closed-in fund was trading.  It was

17  trading at a discount.  And the discount to NAV, the NAV

18  included MGM accurately marked at whatever time.

19  Q    I appreciate that.

20          MR. MORRIS:  No further questions, Your Honor.

21          THE COURT:  All right.  Mr. Dondero, that concludes

22  your testimony.

23          THE WITNESS:  Thank you.

24          THE COURT:  You are excused from the witness box.

25      (The witness steps down.)

210

1          THE COURT:  We probably should take a break, right?

2          MR. MORRIS:  Okay.

3          THE COURT:  Caroline, do you want to give them the

4     aggregate time used?

5          THE CLERK:  Yes.  The Defendants used 91 minutes

6     right now.  And the Respondents together, 86 minutes.

7          THE COURT:  Okay.  I thought it was going to be

8     higher than that.

9        (Laughter.)

10         MR. MCENTIRE:  That's what it feels like.

11         MR. MORRIS:  You were wishing.

12         THE COURT:  I was wishing.  Okay.  A ten-minute

13    break.

14         THE CLERK:  All rise.

15       (A recess ensued from 3:17 p.m. until 3:28 p.m.)

16         THE CLERK:  All rise.

17         THE COURT:  All right.  Please be seated.  We're back

18    on the record in the Highland matter.  Mr. McEntire, you may

19    call your next witness.

20         MR. MCENTIRE:  Your Honor, Hunter Mountain would call

21    Mr. Seery adversely.

22         MR. STANCIL:  Your Honor, we're waiting for Mr.

23    Morris for just 60 more seconds.  I think he's on his way back

24    to the courtroom.

25         THE COURT:  Okay.  I just noticed.

Seery - Direct                                    211

1        Did I hear you say you're going to call him virtually?

2              MR. MCENTIRE:  Adversely.

3              THE COURT:  Oh, adversely?  Okay.  I'm so used to

4     hearing the word "virtually" the past few years.

5        Oh, and there he is.  Okay.

6              MR. SEERY:  I'm sorry, Your Honor.

7              THE COURT:  Mr. Seery, welcome.

8              MR. SEERY:  Good afternoon, Your Honor.

9              THE COURT:  Please raise your right hand.

10       (The witness is sworn.)

11             THE WITNESS:  I do.

12             THE COURT:  All right.  You may be seated.

13        JAMES P. SEERY, JR., HUNTER MOUNTAIN INVESTMENT TRUST'S

14                      ADVERSE WITNESS, SWORN

15                        DIRECT EXAMINATION

16    BY MR. MCENTIRE:

17    Q   Mr. Seery, would you please state your full name for the

18    record?

19    A   James P. Seery, Jr.

20    Q   And you and I met for the first time I believe it was last

21    Friday in your deposition; is that correct?

22    A   You were by video.

23    Q   I mean, --

24    A   We didn't actually meet.

25    Q   Correct.  You are currently the CEO of the Reorganized

Seery - Direct                              212

1   Debtor?

2   A    That's correct.

3   Q    Prior to your appointment as the CEO of the Reorganized

4   Debtor, you've never served as a CEO of a reorganized debtor

5   in the past, have you?

6   A    I have not.

7   Q    You previously served as the chief executive officer of

8   Highland Capital as a Debtor-In-Possession.  Is that correct?

9   A    That's correct.

10  Q    And that was the first time you'd ever served in a

11  position such as that; is that correct?

12  A    As the CEO of a debtor, yes.

13  Q    Right.  You also now currently serve as a Trustee for the

14  Highland Claimant Trust, which was put into effect after the

15  effective date of the plan, correct?

16  A    Yes, I'm the Claimant Trustee.

17  Q    All right.  That's the first time --

18          THE COURT:  Mr. McEntire, we usually require standing

19  at the podium.  I mean, do you need --

20          MR. MCENTIRE:  That's fine.  I'm totally fine.

21          THE COURT:  Okay.  That's --

22          MR. MCENTIRE:  I forgot.

23          THE COURT:  Okay.  Thank you.

24  BY MR. MCENTIRE:

25  Q    That was -- and your capacity as the Trustee for the

Seery - Direct                                213

1    Claimant Trust, that's a first experience as well, correct?

2    A    As the Claimant Trustee, yes.

3    Q    All right.  And in these various capacities as a CEO of

4    the Reorganized Debtor, do you consider yourself to be subject

5    to the Investment Advisers Act?

6    A    No, I don't I'm subject to the Investment Advisers Act.  I

7    think Highland in certain capacities could be.

8    Q    All right.  But do you have any duties that -- that you

9    are required to fulfill under the Investment Advisers Act

10   accordingly?

11   A    Do I?

12   Q    Yes.

13   A    I believe Highland does.  I don't know that I have any

14   personal duties.

15   Q    All right, sir.  Let me now talk a little bit about your

16   duties that you did have at Highland.  You agree that when you

17   were at Highland you had fiduciary duties that you owed to the

18   estate?

19   A    Yes.

20   Q    What were those duties?

21   A    To generally treat the estate on an honest and fair

22   matter.

23   Q    Avoid conflicts of interest?

24   A    Yes.

25   Q    Not self-deal?

Seery - Direct                                      214

1   A    Yes.

2   Q    Do you agree with me that you would have a duty not to

3   trade on material inside -- material nonpublic information?

4   A    Generally, I would have a duty to not trade on material

5   nonpublic information, yes.

6   Q    Can you think of an exception?

7   A    There may be.  I just don't think of any one off the top

8   of my head.

9   Q    So, today, you would agree, for purposes of these

10  proceedings, that you would have an obligation as the CEO of

11  the Debtor-In-Possession not to participate in a transaction

12  involving material nonpublic information?  Agreed?

13  A    It would depend.  So, for example, if I was trading with

14  someone else who had material nonpublic information, that

15  might be a permissible transaction.

16  Q    The HarbourVest transaction, you were involved in

17  negotiating the HarbourVest settlement?

18  A    Yes, I was.

19  Q    Did that involve any component related to MGM stock?

20  A    No, it did not.

21  Q    There was no involvement at all concerning the transfer of

22  MGM stock to any entity as a result of that transaction?

23  A    None whatsoever.

24  Q    Okay.  And does HCLOF not have a participation at this

25  time in MGM stock?

Seery - Direct                                215

1   A    We call it H-C-L-O-F.

2   Q    Yes.

3   A    It does not own MGM stock, and as I far as I know, never

4   owned MGM stock.

5   Q    Okay.  You agree you received an email from Mr. Dondero in

6   December of 2020.  We've had it here before.  You've seen it

7   in the courtroom, correct?

8   A    Yes.

9   Q    Okay.  Did you ever send -- forward that email to anyone

10  else?

11  A    I'm sorry.  Could you repeat that?

12  Q    Did you forward that email on to anyone else?

13  A    I believe I did, yes.

14  Q    To whom?

15  A    I certainly discussed it with counsel.  I believe I

16  forwarded it to counsel, both the Pachulski firm and the

17  WilmerHale firm.  Thomas Surgent had gotten it.  He was on the

18  email.  And I also forwarded it, I believe -- certainly,

19  discussed it -- with the other independent directors.

20  Q    Okay.  I'm not going to talk about your conversations with

21  other lawyers in-house, okay, or your outside counsel.  Did

22  you take any steps yourself personally to make sure that MGM

23  stock was placed on a restricted list at Highland Capital

24  after you received that email?

25  A    No.  MGM was already on the restricted list at Highland

**Appx. 02752**

Seery - Direct                                216

1  Capital.

2  Q    Okay.  And is that because of Mr. Dondero's position on

3  the board of MGM?

4  A    It -- I believe that's the reason.  It was on before I got

5  to Highland.

6  Q    Okay.  And you agree, do you not, sir, that the email that

7  you received from Mr. Dondero also contained material

8  nonpublic information?

9  A    I don't think so, no.

10       MR. MCENTIRE:  Would you put up Exhibit -- our

11  Exhibit 4, please?

12       MR. MORRIS:  4?

13       MR. MCENTIRE:  4.

14  BY MR. MCENTIRE:

15  Q    Did H-C-L-O-F -- I'll refer to it as HCLOF, you refer to

16  it as H-C-L-O-F -- did that -- did HCLOF own any funds that

17  owned MGM stock?

18  A    HCLOF had interest in certain Highland-managed CLOs that

19  did own some.

20  Q    As a result of the Highland settlement -- excuse me, the

21  HarbourVest settlement, was there any impact on who owned some

22  of those CLO funds?

23  A    No.

24  Q    Okay.  How was the CLOs, the funds, handled, if at all, in

25  the -- in the HarbourVest settlement?

Seery - Direct                                   217

1   A    They didn't have any impact whatsoever on the HarbourVest

2   settlement.

3   Q    Looking at Exhibit 4 for a moment, please, did the

4   interests, did the interests in -- HarbourVest's interests in

5   any of those CLOs transfer?

6   A    No, they did not.

7   Q    Okay.  And did HCLOF acquire any interest in any of those

8   CLO's as a consequence of the HarbourVest settlement?

9   A    No, it did not.

10  Q    Looking at Exhibit 4.  Excuse me, Exhibit 3 is what I

11  meant to say.  Exhibit 3.

12           THE COURT:  Hunter Mountain Exhibit 3?

13           MR. MCENTIRE:  Yes, ma'am.

14           THE COURT:  Okay.

15           MR. MCENTIRE:  Yes, Your Honor.  Excuse me.

16  BY MR. MCENTIRE:

17  Q    This is the email that we were just referring to that you

18  received, correct?

19  A    Yes.

20  Q    And you don't think -- you knew that Mr. Dondero was on

21  the board of directors of MGM?

22  A    Yes.

23  Q    And he -- as a member of the board of directors, when you

24  received this, you see where he indicated that it was probably

25  a first-quarter event?  Do you see that?

Seery - Direct                                     218

1    A    I see what it says, yes.

2    Q    Okay.  And you did not think that that was material

3    nonpublic information?

4    A    No, I did not.

5    Q    When he indicated that Amazon and Apple were actively

6    diligencing -- are diligencing in the data room, both continue

7    to express material interest, coming from a member of the

8    board of directors of MGM, you did not think that was material

9    nonpublic information?

10   A    I did not, no.

11   Q    You know the difference between a newspaper article or a

12   media article that discusses rumors of a possible sale and the

13   difference between that and a member of the board of directors

14   saying that a sale is going to occur?  You understand the

15   difference between the two?

16   A    Between the two things you just outlined?

17   Q    Yes.

18   A    Yes.  One you said a sale is going to occur, and the other

19   you said a media report.  But it would depend on what's in the

20   media report.  Some media reports are pure speculation.

21   Others have a lot of detail, and they clearly came from an

22   inside source, and that's why the market moves on them.

23   Q    Okay.  So what you're suggesting to me, that there was

24   some indication in the media press before you received this

25   email suggesting that there was actually going to be a sale in

Seery - Direct                                   219

1    the first quarter of 2021?

2    A    I don't know if it had a first-quarter event in it, but

3    certainly it was clear from the media reports and the actual

4    quotes from Kevin Ulrich of Anchorage, who was the chairman at

5    MGM, that a transaction had to take place very quickly.  And

6    in fact, the transaction did not take place in the first

7    quarter.

8    Q    Okay.  So you -- when you received this particular email,

9    you did not think that it was requiring any additional

10   protection at -- in any way?  Is that what you're suggesting

11   to this Court?

12   A    That the email required additional protection?

13   Q    That you didn't take additional steps to make sure that it

14   was maintained on the restricted list.

15   A    It was already on the restricted list, so there was no

16   change.

17   Q    Was it --

18   A    I --

19           MR. MORRIS:  Hold on.  Let him finish.

20   BY MR. MCENTIRE:

21   A    I was suspicious when I got the email, but I didn't think

22   I had to do anything else than the steps I told you I just

23   took.

24   Q    Yeah, I'm not asking whether you were suspicious or not.

25   My question's a little bit different.  You understand that MGM

Seery - Direct                                    220

1  was taken off your restricted list in April of 2021?

2  A    I understand that that's what you've recently shown me.  I

3  wasn't aware of that fact or I didn't have a recollection of

4  that fact, but certainly April of 2021 would be beyond the

5  first quarter.  Mr. Dondero was not an employee, an affiliate,

6  subject to a contractual relationship.  He had no duty to

7  Highland and Highland had no duty to him.  And in fact, it was

8  quite antagonistic by that time.  So it would be appropriate

9  to take MGM off the restricted list at the end of that time.

10 Q    Well, hopefully you won't take this as argumentative, but

11 I object as nonresponsive.  That really wasn't my question.

12 Okay?  My question --

13           THE COURT:  Sustained.

14 BY MR. MCENTIRE:

15 Q    -- is a little bit different.  As far as you were

16 concerned, MGM was on the restricted list and stayed on the

17 restricted list all the way until the public announcement in

18 May of 2021?

19 A    That's not true.

20 Q    When did you first become aware it was taken off the

21 restricted list?

22 A    I didn't -- I wasn't aware that it had come off the

23 restricted list.  I would have assumed it would have been off

24 the restricted list once Mr. Dondero had been severed from

25 Highland.

Seery - Direct                              221

1  Q    I see.  Now, Mr. Dondero has relayed a conversation that

2  he had with Mr. Patel and Mr. Linn, suggesting that they were

3  particularly optimistic about MGM based upon what you told

4  them.

5  A    I --

6  Q    Let me finish.  If that occurred, are you suggesting that

7  that is a lie?

8  A    Two things.  One is I don't think he actually testified to

9  that.  I think he said he had a conversation with Mr. Patel.

10 Then he had a different conversation with Mr. Linn, and a

11 subsequent conversation with Mr. Linn.  So the way he laid it

12 out were multiple conversations.

13 Q    Agreed.

14 A    I don't -- I don't know which one you're talking about.

15 Q    Mr. Dondero testified that Mr. Patel was particularly

16 optimistic about the investment because of what he had learned

17 from Mr. -- from you about MGM.

18        MR. MORRIS:  I dispute that characterization.  Why

19 can't he just ask the question?

20        MR. MCENTIRE:  That is my question.  If that --

21        THE COURT:  What is the question?  I'm not sure I

22 hear the question.

23        MR. MCENTIRE:  I'm getting lost because I'm getting

24 interrupted.  I'll try to rephrase it again.

25        MR. MORRIS:  It's my first objection.

Seery - Direct                                222

1            MR. MCENTIRE:  And I --

2            THE COURT:  Go ahead.

3            MR. MCENTIRE:  I'm just going to rephrase, Your

4   Honor.

5            THE COURT:  Just rephrase your question.

6            MR. MCENTIRE:  Thank you.

7   BY MR. MCENTIRE:

8   Q    Mr. Dondero has testified that Farallon advised him in May

9   of 2021 that they were optimistic about MGM based upon what

10  you told them.  Assuming that to be the case, do you deny that

11  happened?

12  A    I do deny that happened.  Because I can't -- I don't know

13  what Farallon told him, but I never told Farallon anything.

14  And a conversation on May 28th, after the May 26th

15  announcement that MGM was going through, might make people

16  optimistic that it could go through, but there was a very

17  difficult FTC process that MGM would have to go through.

18  Q    And I'm referring to that.  If Farallon stated that they

19  were optimistic about MGM based upon what you had told them,

20  --

21  A    That would not be true.

22  Q    -- that would be false?

23  A    That would not be true.

24  Q    And is Mr. Dondero says that's what Farallon told them,

25  that would also be false?

Seery - Direct                                    223

1   A    That's correct.

2   Q    So we have your statement, we have what may be Farallon's

3   statement, and we have what Mr. Dondero believes may have been

4   Farallon's statement, and you're saying the latter two are

5   just not true?

6   A    I didn't have a conversation with Farallon about MGM that

7   -- that I recall --

8   Q    Well, you're on the witness stand.

9   A    -- virtually at any time.

10  Q    You're on the witness stand.

11  A    Oh, I'm aware of where I am sitting.

12  Q    Yeah.  Good.  We've got that cleared up.  Now, are you

13  suggesting that -- that you may not specifically recall this

14  conversation?

15  A    No, I am not saying that at all.  After May 26th, when the

16  MGM announcement was made and it was public, I may have had

17  conversations with a number of people about MGM.

18  Q    Well, let's make sure the record is clear.  Did you call

19  Farallon on May 26th and say, hey, did you know that MGM just

20  sold?

21  A    No, I don't recall any such conversation, and I wouldn't

22  have had to, since it was in the paper.

23  Q    I'm not talking about what's in the paper.  I'm talking

24  about conversations between you and Farallon.

25  A    Yeah.  I don't recall having a conversation with Farallon

**Appx. 02760**

Seery - Direct                                        224

1   on May 26th.

2   Q    How about May 27th?

3   A    Not that I recall, no.

4   Q    How about May 28th?

5   A    Not that I recall off the top of my head.

6   Q    And we understand that that's the day that Mr. Dondero

7   actually had his conversation that he's reported, at least,

8   with Farallon.  Do you recall that?

9   A    That's what he claims, yes.

10  Q    You were with a company called River -- you're a lawyer,

11  correct?

12  A    I am.  I'm in retired status.

13  Q    Okay.  I wish I was.

14  A    It's simply retiring your license and not having to take

15  the CLE.

16  Q    Understood.  Now, you were with a company called River

17  Birch?

18  A    Yes.

19  Q    And from River Birch, you went to Guggenheim Securities?

20  A    That's correct.

21  Q    At Guggenheim Securities, did you go to Farallon and meet

22  with Mr. Patel in their offices in San Francisco?

23  A    I believe we did, yes.

24  Q    You call it a meet-and-greet?

25  A    I do, yes.

Seery - Direct                                                225

1   Q    That was in 2017?

2   A    2017, 2018.  I'm not exactly sure when it was.

3   Q    And one of the purposes of meet-and-greet is to solicit

4   business or to see if a business opportunity -- see if it

5   exists?

6   A    That's not correct, no.

7   Q    What is a meet-and-greet for, then?

8   A    It's to meet the people at the fund and to greet the

9   people at the fund.  Introduce them to other people in your

10  firm.

11  Q    Just because it's going to be fun, or does it have a

12  business angle to it?

13  A    Oh, it hopefully will be fun, yes, but it's done in order

14  to build a relationship over time.  You're not in there

15  soliciting business.  If you do that, you won't do very well.

16  Q    Okay.  Fair enough.  So you're there trying to develop a

17  relationship with Farallon?

18  A    Guggenheim was, yes.

19  Q    And you were part of it?

20  A    That's correct.

21  Q    And what was your job at Guggenheim?

22  A    I was co-head of credit.

23  Q    Is that a fairly significant position at Guggenheim?

24  A    Not really, no.

25  Q    It's not significant at all?

Seery - Direct                                226

1   A    No.

2   Q    All right.

3   A    Which is why --

4   Q    Well, you left --

5   A    Which is why they don't have that business.

6   Q    Okay.  So is that why you left Guggenheim?

7   A    It -- I did, yeah.  It wasn't a good fit for either

8   Guggenheim or for me, because it really wasn't something --

9   Q    When did you --

10  A    -- that they were set up to do.

11  Q    -- leave Guggenheim?

12  A    In 2019.

13  Q    And then you went back to Farallon to meet with them

14  again, did you not?

15  A    I met with Farallon while I was in San Francisco with my

16  wife.

17  Q    Okay.  Did you call ahead to arrange the meeting, or was

18  it just a --

19  A    I --

20  Q    -- a blind call?

21  A    I did call ahead, yes.

22  Q    A cold call, I guess, is the word -- the phrase that they

23  use.  Okay.  So -- and was that a meet-and-greet?

24  A    That was again, yes.

25  Q    Again, what were you trying to do?  Develop a relationship

1    with Farallon?

2    A    I was trying to catch up with them after having met them

3    previously.  And that was just Raj Patel.  And this one I also

4    met Michael Linn.

5    Q    Okay.  What kind of business were you in when you met with

6    them the second time?

7    A    I wasn't doing anything.

8    Q    What were you hoping to do?

9    A    I was hoping to get back into the investing side of the

10   business, from running a credit-type lending business at

11   Guggenheim, which is what they tried to do and it didn't work

12   out.  And I wanted to get back to what I was doing more at

13   River Birch, but I was looking at other opportunities,

14   whatever came along.

15   Q    Well, what were the different options that you were

16   looking at?

17   A    I was looking at potentially getting back into investing,

18   joining potentially a restructuring firm, any options like

19   that.  I was not looking to become a lawyer again.

20   Q    And why would meeting and greeting with Farallon fit in

21   within that scenario, the strategic scenarios that you've just

22   discussed?

23   A    They're a giant hedge fund.

24   Q    A giant hedge fund?

25   A    Yes.

Seery - Direct                                    228

1   Q    And so it would be good to have a relationship with a

2   giant hedge fund, wouldn't it?

3   A    And to know what their thinking of the markets, where the

4   opportunity set might be, who they are dealing with and

5   interacting with.  Those are -- those are valuable things to

6   know over time.

7   Q    And --

8   A    And you need to maintain those relationships in order to

9   be --

10  Q    Sure.

11  A    -- part of any business.

12  Q    Sure.  These meet-and-greets can actually evolve and

13  provide relationship benefits, correct?

14  A    I don't -- I'm not sure what you mean by relationship

15  benefits.

16  Q    Sloppy words for -- on my part.  They can evolve into

17  something that is a meaningful relationship?

18  A    They could over time, yes.

19  Q    And we know that after you became the CEO of Highland

20  Capital that you received a call from, was it Farallon, to

21  congratulate you on your appointment?

22  A    It was an email.

23  Q    And that was in the summer of 2020, shortly after your

24  meet-and-greet out in San Francisco?

25  A    Your calendar's a bit off, but it was in June of 2020, so

Seery - Direct                                        229

 1  that would have been more than shortly after, but yes.

 2  Q    Okay.  And who contacted you to congratulate you on your

 3  appointment?

 4  A    This was my appointment as an independent director.  I had

 5  not yet been appointed as CEO or CRO.  This was in June of

 6  2020, and it was Michael Linn.

 7  Q    Michael Linn?  Was it a telephone call?

 8  A    I think 30 seconds ago I said it was an email.

 9  Q    Fair enough.  Do you still have that email?

10  A    I do, yes.

11  Q    Okay.  He contacted you again, "he" being Michael Linn, he

12  contacted you again in January of 2021, did he not?

13  A    That's correct, yes.

14  Q    He wanted to see if he could get involved somehow in the

15  Highland bankruptcy?

16  A    Well, he congratulated -- he didn't congratulate -- he

17  wished me a happy new year, and he basically said it looks

18  like you're -- again, he's following the case -- it looks like

19  you're doing good work.  Is there any way for us to get

20  involved?  We're interested in claims or buying assets.

21  Q    Okay.  And Stonehill.  Now, you know the founder of

22  Stonehill, do you not?

23  A    No, I don't know him.  I've met him several times.

24  Q    Doesn't he come by and stop in and talk with you when

25  you're in Stonehill's offices?  And that's happened recently?

Seery - Direct                    230

1    A    Your use of the plural is incorrect, and you know that

2    from the deposition.  I was in Stonehill's office one time,

3    and I was in a meeting with Mr. Stern.  We ended up having a

4    board meeting from Stonehill's office with the other

5    participants on video, and Mr. Motulsky came in and said

6    hello.

7    Q    All right.  And who's Mr. Motulsky?

8    A    He's the founder of Stonehill.

9    Q    I see.  And did you know Mr. Motulsky before that?

10   A    I'd interacted with Mr. Motulsky over the years at --

11   mostly at industry-type functions.

12   Q    Okay.  Now, Stonehill is also a hedge fund?

13   A    Yes.

14   Q    Are they different than Farallon in that regard, or

15   similar?

16   A    I don't know as much about what their business is.  They

17   certainly do a direct lending component, so I know that they

18   -- they will do some direct lending, which I don't think is

19   something Farallon really does.  Farallon is much bigger, as I

20   understand it, but I don't really know the size of Stonehill.

21   Q    Okay.

22   A    I know they're not a $50 billion fund like Farallon.

23   Q    And do you know Mr. Stern at Farallon?

24   A    I now know him, yes, because he was -- he's really the

25   representative on the -- no, he's not the representative on

Seery - Direct                        231

1   the board, but he is the one who manages the Stonehill and

2   Jessup positions for Stonehill.

3   Q   Well, we know that after you were CEO of Highland, you

4   also got a text message, correct, a text message from someone

5   at Stonehill, correct?

6   A   Mr. Stern sent me a text message reintroducing himself --

7   I don't know if it was re- or just introducing -- and sent me

8   his email and asked me to contact him about the case.  This

9   was at the end of February/beginning of March 2021, after the

10  confirmation order.

11  Q   Okay.  After the -- after the confirmation order?

12  A   Yes.

13  Q   I believe the confirmation order -- I may be wrong -- I

14  thought it was like the 21st, 22nd, somewhere in there.  Does

15  that sound right to you?

16  A   Yes.

17  Q   Okay.  So, shortly after confirmation, then, Farallon

18  calls you to congratulate you and wants to see how they can

19  get involved?

20  A   No.  There was no congratulations there.  Shortly after

21  the confirmation order, which I believe was at least a week to

22  ten days after confirmation, I got the communication from Mr.

23  Stern to try to connect about the case.

24  Q   All right.

25  A   He's at Stonehill, not Farallon.

Seery - Direct                          232

1   Q    Correct.  Now, --

2   A    You said Farallon.

3   Q    I misspoke, then.  Thank you for correcting me.  Let's

4   talk about -- you live in New York?

5   A    I do.

6   Q    You're involved with a charity called Team Rubicon?

7   A    Yes.

8   Q    And Team Rubicon is a -- is that a veterans-type charity?

9   A    Yeah.  It's a veteran-led organization, and what it does

10  is connects veterans to disasters.  And mostly in the U.S.,

11  but also all over.  So if there's a flood, if there's a

12  hurricane, if there's an earthquake, veterans who have been

13  trained in -- by the military in ready response and really

14  being able to handle themselves when things are bad are

15  deployed to help the communities that are hit.  So I think

16  that Team Rubicon likes to think, you know, on your worst day

17  they're your best friend.

18  Q    So you're -- are you on the board?

19  A    No, I'm not.

20  Q    You're on the Host Committee?

21  A    I was on the Host Committee last year, and I'll be on the

22  Host Committee this year.

23  Q    Okay.  And you have charity events?

24  A    We have a charity event, yes.

25  Q    Okay.  And the purpose of the charity event is to raise a

Seery - Direct                                233

1   bunch of money?

2   A    That's correct.

3   Q    Okay.  Have you been successful in the past?

4   A    I do my best.  Team Rubicon is a big organization.  It's

5   done very well raising money.  It doesn't have an endowment.

6   The founder's theory was that if people give us money, we're

7   supposed to spend it on helping other people.  And so each

8   year it has to raise more money.

9   Q    And Stonehill has been -- has contributed to your charity?

10  A    I believe Stonehill, one or two years, and I should know

11  this, and I didn't look it up after our deposition, gave

12  $10,000.

13  Q    Okay.  Maybe once, maybe twice?

14  A    Maybe twice.

15  Q    Okay.

16  A    I hope more.

17  Q    Okay.  And they also attend your -- your actual charity

18  events, do they not?

19  A    No.

20  Q    All right.  They just give money?

21  A    That's right.  And the Mike Stern who's on the board of

22  Team Rubicon is not the Mike Stern who is at Stonehill.  It's

23  an older gentleman who's in Texas who just happens to give a

24  lot of money to --

25  Q    All right.

**Appx. 02770**

Seery - Direct                                234

1   A    -- Team Rubicon.

2   Q    You also represented Blockbuster.  Take that back.  Were

3   you the lawyer or the attorney representing the Creditors

4   Committee, the UCC, in the *Blockbuster* bankruptcy?

5   A    No, I was not.

6   Q    Tell me what your capacity was.

7   A    I represented a group of bondholders, secured bondholders.

8   So I represented the group.

9   Q    And was Stonehill a member of that group?

10  A    Not that I recall, but your pleadings seem to indicate

11  that they were.  So if they were, they were a small

12  participant.  The largest participant was Carl Icahn, who

13  owned about 30 percent of it.  Then the others who were big

14  were DK, Davidson Kempner, Monarch, Owl Creek.  Those were the

15  big players.

16  Q    Well, --

17  A    When Carl Icahn is in your group, you remember that.

18  Q    Yeah, well, Carl Icahn is not here.  We're talking about

19  Stonehill right now.

20  A    And I said I don't remember them actually being a part of

21  it.  If they were, --

22  Q    Okay.  Well, let me -- let me give you what I'm going to

23  mark as Exhibit 80.  That's your name at the top, right?

24       (Hunter Mountain Investment Trust's Exhibit 80 is marked

25  for identification.)

Seery - Direct                                        235

1   A    That's correct, yes.

2   Q    You were at the time with Sidley & Austin?

3   A    That's correct, yes.

4   Q    This is *In re Blockbuster*.

5          MR. MCENTIRE:  Scroll down, please.

6   BY MR. MCENTIRE:

7   Q    And steering group of senior -- involves -- well, let's

8   count them.  Let's see.  One, two, three, four, five.  Five

9   entities comprising the backstop lenders.  Is that correct?

10  A    I think that's the steering group.  So, in order to

11  represent the group, you need to try to assemble a large-

12  enough group that it's material to the company.  And then the

13  company, if you're -- particularly if you're over 50 percent,

14  will pay the fees of the group.  And you don't represent any

15  individual member of the group.  I've never represented Carl

16  Icahn.  I represent the group.  And if folks want to stay in

17  the group, they can stay.  If they want to trade out of the

18  group, they do.  And the company will generally continue to

19  pay the fees, and you represent the group so long as you have

20  a controlling interest in the -- whatever the issue is.

21  Q    Well, that's interesting, because now what you're telling

22  me is that this group right here, this is kind of like the

23  executive committee of the group.

24  A    No, it's called the steering group, and it doesn't

25  necessarily --

Seery - Direct                                                236

1    Q    That's fine.

2    A    Well, it's not an executive committee.  It doesn't

3    necessarily include just the largest.  Some large holders

4    won't be on it.  The largest holders here by a long shot were

5    Icahn, who --

6    Q    I'm not talking about --

7    A    -- unloaded, as I say, over 30 percent.  Monarch, Owl

8    Creek, and I just don't recall Stonehill being a part of it.

9    Q    I'm not really interested in Carl Icahn.  I just want to

10   establish this is a steering group in which you were the lead

11   counsel and Blockbuster was on it.  Is that correct?

12   A    Yes.

13   Q    Excuse me.  Not Blockbuster.

14   A    I'm sorry.

15   Q    Stonehill.

16   A    No, it's the Blockbuster case in 2010, and Stonehill was

17   apparently on it, but I just don't have a recollection of

18   their involvement.

19   Q    All right.  So when Mr. -- who sent you the text message

20   in February of 2021 from Stonehill?

21   A    Michael Stern.

22   Q    And had you actually met him before?

23   A    I think I had, but we didn't know each --

24   Q    All right.

25   A    You know, we certainly didn't know each other, we'd never

Seery - Direct                          237

1   worked on anything together, but I --

2   Q    Do you have all your text messages from that period of

3   time, that first quarter of 2021?

4   A    I believe I do, yes.

5   Q    They're saved?

6   A    Yes.

7   Q    Okay.  When did the automatic delete button on your cell

8   phone start?

9        MR. STANCIL:  Your Honor, objection.  We've covered

10  this this morning.  I believe this is a motion coming down the

11  pike, and I thought we had -- thought we had had tabled this

12  preservation issue.

13       MR. MCENTIRE:  This has a direct bearing on his

14  communications with Farallon and Stonehill in this period of

15  time, Your Honor.  We have one text message that he's

16  identified, and I have a right to examine whether there are

17  others.  Or if not, why not.

18       MR. STANCIL:  Your Honor, he's --

19       MR. MCENTIRE:  That's a legitimate -- I'm not

20  finished.  That's a legitimate area of inquiry in this

21  examination.

22       MR. STANCIL:  He's testified he has them all.  Your

23  Honor did not order document discovery.  I think that's it for

24  purposes of today's hearing, Your Honor.

25       THE COURT:  Okay.  I sustain the objection.

**Appx. 02774**

Seery - Direct                                      238

BY MR. MCENTIRE:

Q    After this text message that you received from Stonehill
in February 2021, did you have any follow-up?

A    Well, his text message, I don't recall what it said other
than I was -- I do recall that he gave me his email address,
because I didn't have it.  And we just didn't know each other
well enough.  But we definitely had follow -up.  He wanted to
talk to me, and at some point we talked.

Q    And when did you talk?

A    I'm sorry?

Q    When did you talk?

A    When?  I -- it was at the, initially, end of February,
beginning of March.  So it would have been somewhere in that
-- in that time period.

Q    End of February, beginning of March?  And we also know
that you next talked to Farallon, according to your testimony,
and they advised you they had already purchased all their
claims as of March 15, correct?

A    On March 15th, they sent me an email that said they had
purchased an interest in claims, and --

Q    So -- go ahead.

A    I'm not finished.  And then at some point after that, we
arranged a quick discussion, because that was a curious --

Q    I want to assure you I will always let you finish.

A    Thank you very much.

Seery - Direct                                        239

1    Q    Unlike others.  So, with that said, Mr. Seery, can you

2    identify -- let me back up.  Was there a data room set up at

3    Highland Capital for claims investors to come in and look at

4    data?

5    A    No, there was not.

6    Q    Are you aware, sitting here today, that Farallon did any

7    due diligence in connection with its investment in the claims

8    it purchased that are at issue in this proceeding?

9    A    I have indication that they did some, yes.  I don't know

10   how much they did.

11   Q    What is the indication?

12   A    In the email in June of 2020, Mr. Linn said that he and

13   his associate were following the case, thought it was --

14   that's the one that congratulated me on being an independent

15   director, and that they were paying attention to the case.

16   And it -- I don't recall the exact other items in there, but

17   it was clear that they were following the Highland matter.

18   And then in the email in January 2021, he also indicated that

19   they'd been following the case further, and said, Looks like

20   you have things well in hand, or something to that effect.  So

21   --

22   Q    Do you have that email, too?  Have you saved that email?

23   A    They're all saved, yeah.

24   Q    Okay.  So let's talk about that.  But you had no data room

25   that would allow them to come in and actually investigate the

Seery - Direct                                    240

1    underlying assets.  Is that correct?

2    A    Not in respect of anybody trying to buy claims.  We did

3    have a data room with respect to financing.

4    Q    Please listen to my question.  I'll get to it.  Data room

5    for claims investors.  There was no data room set up on or

6    before March 15 to allow Farallon to come in and investigate

7    its investment in this claim?

8    A    That's correct.

9    Q    There was no data room set up prior to March 15 to allow

10   Stonehill to come in and investigate its investment in the

11   claims it purchased.  Is that correct?

12   A    That's correct.

13   Q    Can you identify any due diligence, sitting here today --

14   let me back up.  You heard Mr. Dondero's testimony about

15   portfolio companies, correct?

16   A    Yes.

17   Q    Portfolio companies are companies in which Highland

18   Capital has an interest that actually have separate and

19   distinct management.  Is that correct?

20   A    Generally.  And it -- I disagree with some of his

21   testimony, but generally that's correct, yes.

22   Q    Well, okay.  Let's just take on the part that you agree

23   with.  With regard to those portfolio companies, was there

24   anything that was disclosed in the Highland publicly-available

25   financials that would allowed a detailed analysis of

Appx. 02777

Seery - Direct                    241

1  Highland's investments in each of those portfolio companies?

2  A   I don't know.  Certainly, in the four or five sets of

3  projections that were filed, there were financial projections.

4  I'm not sure exactly what was included in each one or in the

5  disclosure statement.

6  Q   Fair enough.  Well, I'll represent to you I don't think

7  there's detailed information on each individual portfolio

8  company.

9        MR. MORRIS:  Your Honor, he's not here to testify.  I

10  move to strike.

11        MR. MCENTIRE:  Okay.

12        THE COURT:  Sustained.

13  BY MR. MCENTIRE:

14  Q   In that regard, Mr. Seery, can you identify what Farallon

15  did to investigate the underlying asset value of any of these

16  portfolio companies?

17  A   I don't have any knowledge as to what Farallon did before

18  it bought claims.

19  Q   Can you identify what due diligence Stonehill did to

20  investigate the underlying asset value in any of these

21  portfolio companies?

22  A   I don't -- I mean, in connection with claims purchasing, I

23  have no idea what Stonehill did.

24  Q   Now, I understand that you solicited -- perhaps I don't

25  recall correctly.  Did you solicit both Farallon and Stonehill

Seery - Direct                                242

1    to participate in a bid to provide exit financing?

2    A    I don't think that's fair.  I solicited Farallon because I

3    knew they already owned claims.  Stonehill reached out to me,

4    and that was one of the things they were interested in doing,

5    if there was financing needs.

6    Q    Okay.

7    A    And at the time they reached out, which was right after

8    confirmation -- right after confirmation and the confirmation

9    order, we didn't know what our needs would be.  We didn't

10   really, at the early stage, think we needed exit financing.

11   When we looked at some of the difficulty we were going to have

12   -- for example, collecting notes and realizing on assets -- we

13   realized that we were going to need some exit financing in

14   order to have enough money to support the enterprise to

15   monetize the assets.

16   Q    And I think you used the -- I think the phrase you used,

17   you are the straw man or a straw man bid?  Is that what you

18   called it the other day?

19   A    We did.  You set up a very typical competitive process to

20   do exit financing.

21   Q    And what was the --

22   A    And what -- well, I --

23   Q    -- suggest --

24   A    I was going to get to your straw man.  And one of the

25   things you do is you assess what the market's going to look

1  like, what you think the market looks like, what you think a

2  financing would be good for the enterprise, the flexibility

3  you need, how you'd structure it.  And then you put that out

4  to prospective lenders and say, Here's our straw man.  This is

5  what we'd like you to consider in terms of financing.  And

6  then they do their work and come back.  And they can either

7  say, that looks great, or we have a totally different idea of

8  what the financing might be, or some other combination of

9  those things.

10 Q   Mr. Seery, thank you for that answer, but I need to ask

11 you to do me a favor.  I'm on the clock, and so I'd just like

12 to get my questions out, if you'd try to respond.  Okay?

13 A   Uh-huh.

14 Q   Because your answers, as long as they may be, are

15 impacting me a little bit.

16     So let me ask this question.  In the straw man proposal

17 that you put out for bid, what was the suggested interest

18 rate?

19 A   You know, you asked me that the other day, and I think I

20 was slightly off.  So it -- and I -- but I did tell you that

21 it depended.  There was -- I don't recall what the rate was,

22 but it starts -- if everybody wants to put out money -- and I

23 apologize for the length of the answer -- they look and they

24 say, well, what if I get paid back in six months?  Nobody

25 wants to do that.  So, duration makes a difference.  So

Seery - Direct                                    244

1    there's an interest rate.  There's upfront fees.  There's

2    often exit fees.  And sometimes there's other amounts.  So,

3    our -- my recollection is that our straw man was somewhere in

4    the low teens on the high end, and then closer to high single-

5    digits on the low end.  Something in that range.

6    Q    And Farallon indicated to you they were not interested,

7    correct?

8    A    No, not exactly.  What Farallon said was they didn't --

9    they signed an NDA because we invited them in.  We invited in

10   six folks.  Five signed NDAs.  Two of the -- I invited in

11   Farallon.  I invited in Stonehill.  Well, Stonehill called me.

12   I invited in Contrarian because they had bought claims.  And

13   then two lenders that I knew.  And Farallon did the work and

14   came back and said, this isn't really what we do.  And the

15   other guys, you're telling me, which I was, that other people

16   are more competitive.  And so it's not really what we do, we

17   don't think the returns are good enough, but if you need us,

18   because now they're already invested in the claims, call us.

19   Q    Okay.

20        MR. MCENTIRE:  And again, I'll object as

21   nonresponsive.  Your Honor, that was a very long answer

22   talking about a lot of other entities.  My only question was

23   what the interest rate was.

24        MR. MORRIS:  Your Honor, we oppose the motion to

25   strike.  I think it's --

Seery - Direct                          245

1       MR. MCENTIRE:  No, I didn't strike it.  I said -- my

2   objection was nonresponsive.  I will now follow it up with a

3   motion to strike his answer.

4       THE COURT:  Overruled.  Okay.

5   BY MR. MCENTIRE:

6   Q   Mr. Seery, you just told us that the interest rate was in

7   the high single digits to in the 12 and 13 percent range.

8   A   No, I was giving you the all-in return for the lender.

9   That's a very different --

10  Q   All-in return?

11  A   -- thing for the -- than an interest rate.

12  Q   That's even better.

13  A   And it depended on the time.

14  Q   Fair enough.

15  Q   So if -- the shorter the duration, the higher the

16  effective return, because he's not getting the return for as

17  long a period of time.  If I have $100 million and I get 10

18  percent, I get just $10 million.  But if I have that out for

19  $3 million, I've earned $30 million.  So maybe that gets

20  squeezed in the longer it's out.

21  Q   And Farallon said that the interest rate or the return

22  rate was not what they were looking for?

23  A   They indicated two things.  I believe I've said this

24  several times.  One is they said, this isn't really what we

25  do, a $50-ish million dollar loan to do an exit.  But we're in

**Appx. 02782**

Seery - Direct                                    246

1    the case.  If you need us, call us.  Included in that was, it

2    doesn't look attractive enough to us because you're telling me

3    other guys are more competitive.

4    Q    Okay.  And do you know what kind of rate of return they

5    were going to get on the investment of the -- on the claims at

6    a 71 percent projected return rate?

7    A    If we only hit the plan, Farallon's two purchases, based

8    on the numbers you get -- you gave, over a two-year period,

9    would be 38.9 percent.

10   Q    Okay, but we're going to talk about that in a second.

11   Okay.  How much -- how much did Farallon actually invest?

12   A    I'd have to look back at your numbers.  They're in your

13   pleading.  I don't know what they actually paid.  I just have

14   it from your pleading.

15   Q    Okay.  And do you have paperwork that -- can you

16   (inaudible) calculation here?

17   A    I have a calculator that, when I looked at your numbers, I

18   ran that, and I --

19   Q    I see.  All right.

20   A    I'm able to remember certain things.

21   Q    So, so if it's projected that the internal rate of return

22   is only six percent, do you disagree with that?

23   A    A hundred percent disagree.  There's -- that's virtually

24   impossible.

25   Q    Okay.

1  A    And that's, by the way, for hitting the plan.

2  Q    I'm sorry?

3  A    That's for hitting the 70 -- the 71-and-change percent.

4  Q    I want to ask you a question about that.  The 71-percent-

5  and-change --

6  A    Uh-huh.

7  Q    -- that came out of the plan for Class 8, --

8  A    Yes.

9  Q    -- that was for Class 8, correct?

10 A    Correct.

11 Q    There was zero expected return to Class 9, correct?

12 A    That's correct.  They would only get upside, and I think

13 it says in the projections, based upon our view at the time,

14 litigation that could ensue, and that was part of the plan.

15 Q    And as I understand it, that 71-and-some-change --

16 A    Uh-huh.

17 Q    -- projected return rate never changed from the date of

18 confirmation all the way up to the effective date.  Am I

19 correct?

20 A    The -- we didn't change the projections that we'd filed

21 with the plan because the plan was confirmed.  We didn't need

22 to change the projections that were filed with the plan.

23 Q    The NDAs, as you understand it, can you tell me

24 specifically when the NDAs were signed?

25 A    I know it's the first week of April to the second week of

Seery - Direct                                    248

1    April.  Blue Torch may have signed -- who actually ended up

2    doing the financing -- they may have signed it a week or so

3    before.  They'd been around offering financing a number of

4    times in the past.

5    Q    Fair enough.  But we know that you understood as of March

6    15th that Farallon had already made their investments?  I

7    mean, claims?

8    A    That's what they told me in that email, yes.

9    Q    Okay.  When did Stonehill sign the NDA?

10   A    In and around the same time.

11   Q    But you don't know when Stonehill actually purchased their

12   claims?

13   A    I don't know exactly when.  I know generally that by the

14   end of April, early May, they were -- they were the holder of

15   the Redeemer claim.  And --

16        (Interruption.)

17   A    -- I can't remember whether it was from them or whether it

18   was from --

19   Q    Did you ever communicate with Stonehill during the time

20   that they were doing their due diligence on the exit

21   financing?

22   A    Yes.

23   Q    Okay.  Did they come to your offices?

24   A    I don't know if we were back yet.  I think we were back,

25   but I don't recall them coming to our offices.  I think it was

Seery - Direct                                    249

1    all virtual.  It's early '21, so there would have been

2    vaccines.  It would have been very -- very -- I don't recall

3    them coming to the offices at that time.

4    Q    But just to be clear, you don't know, you can't give the

5    Court a date when Stonehill actually completed their

6    investments in either Redeemer or HarbourVest?

7    A    No, I don't.  I don't know.  Did -- just --

8    Q    That was my question.

9    A    When you say Redeemer or HarbourVest, they never bought

10   HarbourVest.

11   Q    It was just Redeemer?

12   A    Correct.

13   Q    All right.  You understand that Muck is an entity, a

14   special-purpose entity created by Farallon?

15   A    That's my understanding, yes.

16   Q    And you understand Jessup is a special-purpose entity

17   created by Stonehill?

18   A    That's my understanding, yes.

19   Q    Muck and Jessup are both on the Oversight Committee?

20   A    They are.  They -- those entities are the --

21   Q    Is it the Oversight Committee or the Oversight Board?

22   A    Same thing.

23   Q    Fair enough.

24   A    I'll consider them the same.

25   Q    And there's a third member, too, correct?

Seery - Direct                                    250

1   A    That's correct.

2   Q    Okay.

3   A    Independent member.

4   Q    Okay.  So you have a three-person board; is that right?

5   A    That's correct.

6   Q    And one of their jobs is to make decisions concerning your

7   compensation?

8   A    The structure of the Claimant Trust Agreement provides

9   that I'm to negotiate with the -- either the Committee or the

10  Oversight Board.  And the compensation in the Claimant Trust

11  Agreement is a base salary of $150,000, which is -- a month,

12  which is the same as the one in the case, plus severance, plus

13  a success fee.  And it's very specific that that will be

14  negotiated by the -- either the Committee or then the

15  Oversight Board.

16  Q    And Michael Linn, who Mr. Dondero has referred to, he's

17  actually on the Oversight Board, is he not?

18  A    He's the Muck representative on the Oversight Board.

19  Q    All right.

20  A    Yes.

21  Q    If I understand it correctly, you are currently receiving,

22  as the Trustee, $150,000 a month.  Is that correct?

23  A    That's incorrect.

24  Q    What are you receiving?

25  A    I receive $150,000 a month as the Trustee and the CEO of

Seery - Direct                          251

1  Highland Capital.

2  Q    Well, --

3  A    So I have --

4  Q    -- fair enough.

5  A    I have both roles.  The Trustee, for example, doesn't

6  manage the team, they actually work for Highland Capital, and

7  I'm the CEO of Highland Capital.

8  Q    There was some suggestion that the $150,000 was something

9  that the Court had passed upon prior to the effective date or

10 part of the plan.  This is a separate negotiated item that you

11 -- that you allegedly negotiated that was awarded to you post-

12 effective date, correct?

13 A    That's false.

14 Q    Okay.  So the $150,000 had a discount that was supposed to

15 drop down to $75,000 after a period of time.  That never

16 happened, did it?

17 A    The -- you seem to be mixing concepts.  But the $150,000 a

18 month was set by the plan and the -- and the Claimant Trust

19 Agreement as the "base salary."  That wasn't going to move.

20 When we -- it never was supposed to move.

21      When I began negotiating with the Oversight Board for the

22 success fee, they pushed back and said, we would like that to

23 step down.  So in our -- I did not say, oh, that's a great

24 idea.  We ended up negotiating, and they included a provision

25 that we would renegotiate depending on the level of work.

Seery - Direct                                        252

1    That's one of the provisions.

2    Q    Okay.  But renegotiate down to $75,000 after a period of

3    time, but that never happened?

4    A    Initially, I believe it was supposed to step down to

5    $75,000 automatic, subject to renegotiation that it go back

6    up, not a structure that I particularly liked.  And since

7    then, we've negotiated on that point.

8    Q    So you currently are making $150,000 a month?

9    A    That's correct.

10   Q    How often do you come to Dallas?

11   A    Usually I'm here at least once a month.  Usually it's

12   between two and four days.

13   Q    Okay.  And you have a staff here in Dallas at Highland

14   Capital, correct?

15   A    Yes.

16   Q    How many people?

17   A    Eleven.

18   Q    Eleven people?

19   A    Uh-huh.

20   Q    Working full-time?

21   A    Yes.

22   Q    And you're still making $1.8 million a year?

23   A    Yes.

24   Q    You also have a bonus structure, correct?

25   A    That's correct.

Seery - Direct                              253

1   Q    And that's performance-based?

2   A    That's correct.

3          MR. MCENTIRE:  Can you pull up the agreement please?

4   Okay.

5      (Pause.)

6   BY MR. MCENTIRE:

7   Q   All right.  Do you see --

8          MR. MCENTIRE:  We're having technical difficulty

9   here.

10  BY MR. MCENTIRE:

11  Q   All right.  Can you identify this document?

12         MR. MCENTIRE:  What exhibit number is this?

13         MR. MILLER:  28.

14  BY MR. MCENTIRE:

15  Q   Exhibit 28.

16         MR. MCENTIRE:  I believe this is already in evidence.

17         THE COURT:  Hunter Mountain Exhibit 28?

18         MR. MCENTIRE:  Yes, Your Honor.

19         THE COURT:  Okay.

20  BY MR. MCENTIRE:

21  Q   This is the memorandum of agreement.  Do you see that?

22  A   Yes.

23  Q   On the third line, it says -- and your name is identified

24  here.  You're the Claimant Trustee, correct?

25  A   Claimant Trustee/CEO.

Seery - Direct                    254

1  Q    Engaged in robust, arm's length, and good-faith
2  negotiations regarding the incentive compensation program.
3      As part of this robust, arm's length, and good-faith
4  negotiation, did you personally conduct any independent search
5  in the marketplace?
6  A    I did -- what do you mean by search in the marketplace?
7  Q    Well, did you try to do a market study?  I asked that
8  question in your deposition.
9  A    I didn't know if you were asking a different question.
10 Q    Same question.
11 A    You mean market study on compensation?
12 Q    Yes.
13 A    No, I did not.
14 Q    Are you aware of whether or not any member of the
15 Oversight Board or Oversight Committee did a market study?
16 A    On compensation?
17 Q    On compensation.
18 A    I'm not aware that they did one, no.
19 Q    So this robust, arm's length, and good-faith negotiation,
20 as far as you know, is divorced from any market study database
21 or -- or methods.  Is that correct?
22 A    I don't believe that's correct, no.
23 Q    I see.  So did -- was any third-party consultant hired?
24 A    Not by me or Highland or the Trust, no.
25 Q    All right.

Seery - Direct                                  255

1        MR. MCENTIRE:  Can you scroll down a little bit,

2   please?

3   BY MR. MCENTIRE:

4   Q    You signed this agreement, correct?

5   A    Yes.

6   Q    And we have Michael Linn signing on behalf of Muck, who

7   also is with Farallon, correct?

8   A    That's correct.

9        MR. MCENTIRE:  Scroll down.

10  BY MR. MCENTIRE:

11  Q    And by the way, this is a heavily-redacted document.  The

12  redactions deal with what?

13  A    The redactions deal with the portion that would go to the

14  team as opposed to going to me.

15  Q    Are we talking about the 11-member team?

16  A    Correct.

17       MR. MCENTIRE:  Can you scroll down?  Stop.  Go back.

18  BY MR. MCENTIRE:

19  Q    So we have the assumed allowed claim amounts under Section

20  D.  Do you see that?

21  A    Yes.

22  Q    Class 9, $98 million and some change.  Class 8, $295

23  million and some change.  Then we go into the incentive

24  payment tiers.  Do you see that?

25  A    Yes.

Seery - Direct                                    256

1   Q    What's the purpose of the tiers?

2   A    The purpose of the tiers was to set additional

3   compensation so that, the more recovery, the higher the

4   compensation.  So, below Tier 1, there was really effectively

5   no bonus, is my recollection.  And then in each tier there

6   would be a percentage.

7        So the first tier is $10 million.  There would be a

8   percentage of that $10 million that could be allocated for

9   bonus.  Then in the next tier it would be $56 million.  A

10  portion of that would be allocated for bonus.  And it's

11  weighted more heavily to the higher-recovery tiers, meaning it

12  incentivizes both me and the team to try to reach deeper into

13  Class 8 and Class 9 and get higher recoveries.

14  Q    Okay.  So the idea is, the more difficult it is to get the

15  recoveries, the higher percentage you should get, because if

16  you're successful then you should be rewarded accordingly?  Is

17  that kind of how it works?

18  A    I'm not sure if difficult is the term, but it's a

19  combination of both expertise, difficulty, and time.

20            MR. MCENTIRE:  All right.  Can you scroll down,

21  please?  Next page.

22  BY MR. MCENTIRE:

23  Q    And here are your actual tier participations.  They go --

24  you said basically nothing Tier 1, up through 6 percent.  So

25  Tier 1 is the 71 percent, right?

Seery - Direct                                    257

1   A    It's .72 percent, and it's of the -- that's the first

2   piece.  You have to get to Tier 1.  So if we had not -- I

3   believe it's structured is if we don't get to Tier 1, for

4   example, we don't hit the plan, right around the plan number

5   of 71-and-change cents, then there wouldn't -- there wouldn't

6   be upside.

7       So it was very much structured in a way that you had to

8   perform.  And then the better the performance, the bigger the

9   percentages of the tier.

10  Q    So, in theory, Mr. Seery, by the time you get down to Tier

11  4 and Tier 5, it's a little bit less certain that you're ever

12  going to get there.  Is that right?

13  A    Well, out of the gate, going deeper was uncertain.  It's a

14  question of being able to execute well on the assets and being

15  able to control the costs and being able to make

16  distributions.  It wasn't based on what we just got for the

17  assets.  It's actually based on actual distributions --

18  Q    I understand that.

19  A    -- to Class 8 and 9 claimants.

20  Q    I understand that.  And the idea is, is that it take a lot

21  more effort -- the theory was it might take a lot more effort

22  to get all the way to the bottom of Tier 5 to pay all the

23  Class 9 claims, right?

24  A    And maybe a little luck.

25  Q    Yeah.  And Class 10 is not even factored into this, is it?

Seery - Direct                                258

1  A    No, it is not.

2  Q    And so you didn't consider Class 10.  You stopped at Tier

3  5?

4  A    That's correct.

5  Q    So your entitlement to a 6 percent return, or a 6 percent

6  bonus on the recoveries, you say it's there to incentivize

7  you.  You didn't expect that to actually happen, did you, when

8  you signed this?  Is that your testimony?

9         MR. STANCIL:  I object to the form of the question.

10  It mischaracterizes the agreement.

11  BY MR. MCENTIRE:

12  Q    You didn't expect it to happen, did you, sir?

13        THE WITNESS:  Well, the six --

14        THE COURT:  Wait.  I'm sorry.  Could you rephrase the

15  question?

16        MR. MCENTIRE:  Sure.

17  BY MR. MCENTIRE:

18  Q    Are you telling the judge that you really didn't expect

19  that to happen and that's why you were entitled to a higher

20  percentage?

21  A    No.  We didn't expect to reach Class 9 and go deep into

22  Class 9, but we certainly held out the possibility that we

23  could.  And it's not six percent.  It's six percent of the

24  increment.  These are cumulative.  So you get .72 of Tier 1.

25  You get 1.17 of Tier 2.  And you can add those, and you earn

Seery - Direct                              259

1  them when you've actually made the distribution, but you don't

2  get paid until you get all your distribution or we're

3  relatively done or there's a renegotiation.  Because the

4  Committee wanted to make sure that I didn't say, hey, I hit

5  Tier 3, time to go, I got a better job.

6  Q    So, Mr. Seery, if Farallon told Mr. Dondero that they

7  wouldn't sell basically at any price because you said it was

8  too valuable, and they rejected a 40 or 50 percent premium, if

9  they said that, is that -- is that a lie?

10 A    That I -- rephrase that, please.  I don't -- didn't quite

11 understand your question.

12 Q    Yeah.  You've heard the testimony that Farallon, Michael

13 Linn, told Mr. Dondero that they were not going to sell their

14 claim at any amount because you had told them it was too

15 valuable.  Is that a lie?

16 A    I think that's -- yeah, I don't think that's true.

17 Q    Okay.  And obviously, if they're not going to be willing

18 to sell at any amount, they must be pretty certain they're

19 going to hit Tier 5.  Would that just be a lie?

20 A    That -- that conversation was before this negotiation.

21 That -- there's no -- they could not have had any expectation,

22 either when they had that conversation in May or when we had

23 this discussion that I was going to hit Tier 5 and I hadn't

24 hit Tier 5.  And the idea that they wouldn't sell at any price

25 is complete utter nonsense, because they're capped on what

Appx. 02796

Seery - Direct                              260

1   they can get.

2   Q    So if -- sure.  Okay.  So, but if Farallon told --

3   A    But that's what you said.

4   Q    If Farallon told Mr. Dondero that they wouldn't even sell

5   at 130 percent of the purchase price because you told them it

6   would be too valuable, is that a lie?

7   A    I never told them it would be too valuable.  I don't -- I

8   don't know any of the other parts that you're saying, the 130

9   percent of an unknown number, some guess number that Mr.

10  Dondero had.  I never told them it would be too valuable.

11  That would be their own assessment of where we were at the end

12  of May 2021.

13  Q    If they said that you told them not to sell, that it was

14  too valuable, is that a lie?

15  A    That's untrue, yes.

16  Q    If they told him -- if they told him that he told you --

17  that you told them it was too valuable because of MGM, is that

18  a lie?

19  A    Yes.

20  Q    How many shares of stock did Highland Capital own?

21           MR. MCENTIRE:  Well, one second.  What is my time?

22  How much time do I have?

23           THE CLERK:  Right now you're at --

24           MR. MCENTIRE:  So I'm almost two and a half hours in?

25           THE CLERK:  Just about.  A little under.

Seery - Direct                              261

BY MR. MCENTIRE:

Q    I'm going to have to speed up here, Mr. Seery.

         THE COURT:  A little under two and a half, you said.

BY MR. MCENTIRE:

Q    Mr. Seery, I want to make sure.  Highland Capital owns
interests in the CLOs.  What is the CLOs' stake in the MGM
stock, or what was it?

A    Highland Capital does not own any interest in any of the
CLOs it manages.  It has a fee stream, and it can have certain
deferred fees that it can get, but it didn't own any interest
in any of the CLOs that it managed.

Q    Fair enough.  How about the portfolio companies?

A    Did Highland Capital own interests in the portfolio
companies?

Q    Yes.

A    Some of the ones Mr. Dondero listed, but they weren't
portfolio companies.  So he said OmniMax, but we didn't have
any management of OmniMax.  We just had debt that converted to
equity, but we didn't control the -- the thing.  That was
during the case, the company.

Q    Did Multistrat have an interest in MGM?

A    Multistrat owned MGM, yes.

Q    Okay.  And did your company, Highland Capital -- your
company -- Highland Capital have an interest in Multistrat?

A    Highland Capital owns 57 percent of Multistrat, yes.

Seery - Direct                                        262

1    Q    And did Highland Capital have an interest in any other

2    portfolio companies that have an interest in -- had a stake in

3    MGM?

4    A    RCP.  Restoration Capital Partners.

5    Q    And do you recall what the value of that was?

6    A    It shifted over time.  I don't -- I don't know what time

7    you're talking about.

8    Q    And isn't it true that 90 percent of all the securities

9    that Highland Capital owned at the time that the sale went

10   public was roughly 90 percent of all of Highland Capital's

11   securities?

12          MR. STANCIL:  Objection, Your Honor.  I don't know

13   what that question is asking.

14          THE COURT:  I don't understand it, either.

15      Could you rephrase?

16          MR. MCENTIRE:  I'll try to.

17   BY MR. MCENTIRE:

18   Q    At the time that the announcement was made about Amazon

19   buying MGM in May of 2021, what percentage of all the

20   securities did MGM comprise of the securities that were owned

21   by Highland Capital?

22   A    Of the securities that were directly owned by Highland

23   Capital, it may have been -- I'm thinking of public or semi-

24   public securities, the 150,000 or 170,000 that we had that

25   were subject to the Frontier lien.  Might have been almost all

Seery - Direct                          263

1  of the securities that we owned.  It wasn't -- it was a good

2  position, but it wasn't a huge driver for the directly-owned

3  shares.  There was more value in the Multistrat and the RCP.

4  Q    What percent of shares of all --

5            MR. STANCIL:  Your Honor, I'm sorry, I'm having

6  trouble hearing the end of Mr. Seery's answers.  So I know

7  it's not his --

8            THE WITNESS:  I'm sorry.

9            THE COURT:  Okay.  If you could make sure you speak

10  into the mic.

11            THE WITNESS:  Yeah.  I'm sorry.

12            MR. STANCIL:  I'm having trouble with Mr. McEntire

13  talking over the end of Mr. Seery's answers.

14            THE COURT:  Ah.

15            MR. STANCIL:  I'm having trouble following.

16            THE COURT:  Okay.

17            MR. STANCIL:  I apologize.

18            THE COURT:  Okay.  Could you --

19            MR. MCENTIRE:  I didn't know I was doing that.

20            THE COURT:  Well, --

21            MR. MCENTIRE:  I'll try to do better.

22  BY MR. MCENTIRE:

23  Q    Mr. Seery, of all the stock that Highland Capital owned in

24  May of 2021, what percentage of that was (inaudible) stock?

25  A    Hopefully this is clear.  Highland Capital did not own a

**Appx. 02800**

1    lot of stock.  Highland Capital did have a direct ownership

2    interest in MGM, so that might have been the vast majority of

3    the stock that Highland Capital owned.  It did own interest in

4    other entities, like its investment in RCP or its investment

5    in Multistrat.  But of the stock that it owned directly, that

6    was probably it, and that's the one that was liened up to

7    Frontier.

8    Q    Mr. Seery, did Highland Capital own approximately 170,000

9    shares of MGM stock in May of 2021?

10   A    Yes.  You -- I'm sorry.  You asked me what percentage, and

11   I think I said roughly that amount of stock liened up to

12   Frontier, and that that might have been almost all of the

13   stock we owned.

14   Q    Does Highland Capital own a direct interest in HCLOF?

15   A    In HC --

16   Q    HCLOF?

17   A    HCLOF?  Yes.  Highland Capital owns a small direct

18   interest, and a large indirect interest which we got through

19   the settlement with HarbourVest.

20   Q    And the entity in which you acquired the indirect

21   interest, what's the name of that entity?

22   A    I don't recall.  It's a -- it's a single-shell special-

23   purpose entity that we own all of it and it has no other

24   assets.

25   Q    And just to make sure that the record is clear, you deny

Seery - Direct                                              265

1  under oath that HCLOF has any interest -- or had any interest

2  in MGM stock?

3  A    HCLOF has never owned MGM stock and still doesn't own MGM

4  stock.  It's never owned it.

5  Q    Um, --

6  A    At least -- at least, as long as I've been in this case.

7          MR. MCENTIRE:  One second, Your Honor, please.

8       (Pause.)

9          MR. MCENTIRE:  I'm going to have to pass the witness

10  because of time sensitivities, Your Honor, so I'll pass the

11  witness at this time.

12          THE COURT:  Okay.  Cross?

13                         CROSS-EXAMINATION

14  BY MR. MORRIS:

15  Q    Mr. Seery?

16  A    Yes, sir.

17  Q    You just covered a lot of what we would have covered, so I

18  want to be really, really quick here.  Okay?  We're not

19  covering old ground.  Let's just start with the HarbourVest

20  settlement.  Do you recall that Mr. Dondero sent the email to

21  you on December 17th?

22  A    Yes.

23  Q    Okay.  When did you reach the agreement with HarbourVest

24  on the settlement?

25  A    December 10th.

Seery - Cross                                266

1  Q    Okay.

2           MR. MCENTIRE:  Your Honor, I'd like to move into

3  evidence Exhibit 31.  Actually, let me lay a foundation first.

4      Can you give the witness --

5           MR. MCENTIRE:  Is this a new exhibit?

6           MR. MORRIS:  No.  It's Exhibit 31.

7           MR. MCENTIRE:  Can I see it, Tim, please?

8           MR. MORRIS:  It's in your box.

9           MR. MCENTIRE:  Give me a minute.

10          MR. MORRIS:  Uh-huh.

11          THE COURT:  Okay.  We're about to focus on Highland

12  Exhibit what?

13          MR. MORRIS:  31.

14          THE COURT:  Okay.

15          MR. MORRIS:  Do you have it, Your Honor?

16          THE COURT:  I do.

17  BY MR. MORRIS:

18  Q    Do you have it, Mr. Seery?

19  A    I do, yes.

20          MR. MORRIS:  Do you have it, sir?

21          MR. MCENTIRE:  I do.  Thank you.

22          MR. MORRIS:  Okay.

23  BY MR. MORRIS:

24  Q    Can you just tell the Court what this is?

25  A    This is an email chain.  It starts from me to the other

Seery - Cross                                        267

1    independent directors, copying counsel, to outline the terms

2    of the HarbourVest settlement that I had just made the offer

3    to HarbourVest to settle on these terms on December 8th.  And

4    this was the product of a number of negotiations that had

5    taken place over the prior weeks, and this was the final offer

6    that I was making to them to settle.

7    Q    Directing your attention to the bottom of the first page,

8    the first email dated December 8, 2020 at 6:46 p.m., can you

9    just read the first sentence out loud.

10   A    I lost -- you lost me.

11   Q    That begins, "As discussed yesterday."

12   A    Oh.  "As discussed yesterday, after consultation with John

13   Morris" -- that would be you -- "regarding litigation risks,

14   this evening I made an offer" -- it says "and," but it should

15   have said "an" -- "offer to HarbourVest to settle their

16   claims.  The following are the proposed terms."

17   Q    Okay.  Just stop right there.  And you were -- this is the

18   report that you gave to the independent directors?

19   A    The other independent directors.

20   Q    Right.

21   A    I was also one.

22   Q    Right.  And did Mr. Dubel respond?

23   A    He did, yes.

24   Q    And can you just describe briefly what your understanding

25   was of his response?

Seery - Cross                    268

1  A    Dubel responds a couple hours after I sent the original
2  email:  "Jim, this basically looks like a $10 million -- net
3  $10 million payment to HV." That's HarbourVest.  "Is that
4  correct?  Does the 72-cent recovery include the $22-1/2
5  million that we get from the transfer of HCLOF interests?
6  Remind me again, post-effective date, who is managing HCLOF?"
7       So I think my understanding was Mr. Dubel was querying me
8  on some of the terms that I had set forth here, including that
9  the value of the claim in our estimation was going to be about
10 $9.9 million, meaning they would have a $45 million senior
11 claim, a $35 million junior claim, and we thought, based on
12 the values we had then, it was going to pay out about $9.9
13 million.
14 Q    Okay.  And was this offer accepted?
15 A    Yes, it was.
16 Q    When was it accepted?
17 A    I think I just said.  On -- on December 10th.
18 Q    Okay.  And did the terms that you described for the other
19 independent directors on December 8th, did they change in any
20 way at all from that reflected in this email until the time we
21 got to the 9019 hearing?
22 A    Not at all, no.
23 Q    Okay.  I see that you mention in here that you -- it says,
24 quote, "The interests have a marked value of $22-1/2 million,
25 according to Hunter Covitz."  Do you see that?

Seery - Cross                                    269

1  A    That's correct, yes.

2  Q    Who's Hunter Covitz?

3  A    Hunter Covitz was a Highland employee.  He ran the

4  structured products business.  So he was responsible for

5  making sure that the CLO we managed, which was AC7, was

6  compliant and was -- with the indentures.  He also was

7  responsible for monitoring the -- what we call the 1.0 CLOs,

8  even though they weren't really CLOs, they were more like

9  closed-in funds.  And he also kept track of the Acis -- CLOs

10 that HCLOF had an interest in that were managed by Acis.

11 Q    Okay.  And do you recall how he conveyed to you the NAV?

12 A    Well, I talked to him numerous times, so this wasn't our

13 -- I didn't just call him up at the end and say, what's the

14 NAV?  I had had discussions with him while I was negotiating

15 with HarbourVest.  And at some point, he or someone -- he told

16 me the amount, and at some point he gave me a NAV statement

17 that actually showed the NAV of HCLOF, which at 11/30 was

18 roughly $45 million.

19 Q    Okay.  Can you turn to Exhibit 31-A, the next document in

20 the binder?

21 A    Mine's completely blacked out.

22           THE COURT:  I'm sorry, what number?

23           MR. MORRIS:  31-A.

24           THE COURT:  Oh.

25           MR. MORRIS:  And the first two pages are redacted

Seery - Cross                                        270

1  just because they're not relevant and they're business
2  information.
3  BY MR. MORRIS:
4  Q    But can you turn to the last page, sir?
5  A    Yes.
6  Q    Can you tell the judge what this is?
7  A    So this is a net asset value statement from HCLOF.  That's
8  Highland CLO Funding, Limited.  That's the Guernsey entity
9  that -- that held these interests.  And this is a net asset
10  amount, and it shows what the net -- what the net asset value
11  is as of this time on a carryforward basis of $45.191 million.
12  Q    Okay.  And where did you get this document?
13  A    I believe I got it from Covitz.  It's generated by an
14  entity called Elysium, which is the fund administrator for
15  HCLOF, and I believe they're out of Guernsey.
16  Q    And did you rely on this document in setting the proposal
17  to HarbourVest?
18  A    Well, both the conversations with Covitz and the document.
19  And frankly, HarbourVest got the same documents because they
20  were -- they held a membership interest in HCLOF.  So he --
21  Michael Pugatch knew what the NAV was.
22  Q    And would Mr. Dondero or entities controlled by him who
23  also have interests in HCLOF, is it your understanding that
24  they would have also had this document available?
25  A    All members would --

Seery - Cross                                 271

1              MR. MCENTIRE:  Excuse me.  Excuse me.  I object to

2    that question, the question being "and the entities controlled

3    by Mr. Dondero."  There's no foundation for this witness to

4    answer a question like that.

5    BY MR. MORRIS:

6    Q    Who else owned --

7              THE COURT:  Sustained.

8    BY MR. MORRIS:

9    Q     -- an interest in HCLOF?

10             THE COURT:  Go ahead.

11             THE WITNESS:  It would have been DAF.

12   BY MR. MORRIS:

13   Q    The DAF?

14   A    Yeah.

15   Q    Okay.  Let's just ask this question.  Is it your

16   understanding that these NAV valuation reports were made to

17   all holders of interests in HCLOF?

18   A    Yes.  And that would include the DAF.  And I did leave off

19   that there were three former Highland employees long gone, or

20   at least not around at this point, who also owned very small

21   interests, and they would have gotten those statements as

22   well.

23   Q    And does HCLOF also produce audited financial statements?

24   A    It does, yes.

25   Q    Can you go to Exhibit 60, please?

Seery - Cross                                    272

1   A    Six zero?

2   Q    Yes, sir.  A couple of questions here.  Is this a document

3   that Highland would have received in the ordinary course of

4   business?

5   A    Yes, it is.

6   Q    Okay.  And what is the NAV depicted on this page as of the

7   end of the year 2020?

8   A    Well, you have to look through it, because this document

9   is actually dated 4/21/21, --

10  Q    Okay.

11  A    -- which you can see on Page 10 where it's signed.  And

12  that shows a net asset value of $50.4 million as of 12/31/21.

13  12/20.  I'm sorry.  And -- but it wasn't prepared until -- the

14  audits aren't done and we don't get this document until after

15  the directors sign off in April.

16  Q    Okay.

17       MR. MORRIS:  And Your Honor, I move for the admission

18  into evidence of these three HarbourVest-related documents,

19  30, 31-A, and 60.

20       MR. MCENTIRE:  No objection.

21       THE COURT:  They're admitted.

22       MR. MORRIS:  Okay.

23     (Debtors' Exhibits 30, 31-A, and 60 are received into

24  evidence.)

25  BY MR. MORRIS:

Seery - Cross                                273

1   Q    Okay.  Let me move on.  We've seen Mr. Dondero's email

2   today.  You've seen that before, correct?

3   A    Yes.

4   Q    Okay.  What was your reaction when you got it?

5   A    I was highly suspicious.

6   Q    Why is that?

7   A    Well, not to replow too much old ground, but this came

8   after he threatened me.  He threatened me in writing.  I'd

9   never been threatened in my career.  I've never heard of

10  anyone else in this business who's been threatened in their

11  career.  So anything I would get from him, I was going to be

12  highly suspicious.

13       It also followed the imposition of a TRO for interfering

14  with the business.  He knew what was in the TRO and he knew

15  what it applied to, and it restricted him from communicating

16  with me or any of the other independent directors without

17  Pachulski being on it.

18       Furthermore, Pachulski had advised Mr. Dondero's counsel

19  that not only could they not communicate with us, if they

20  wanted to communicate they had to prescreen the topics.

21       And how do we know that?  Because Dondero filed a motion

22  to modify the TRO.  And that was all before this email.

23       In addition, that followed the termination of the shared

24  service arrangements, the approval of the disclosure

25  statement, and the demand to collect on the demand notes that

Seery - Cross                                    274

1   Mr. Dondero and his entities were liable for.

2       So at that point, he'd been interfering with the business,

3   he had threatened me, he was subject to a TRO, and I got this

4   email and I was highly suspicious.

5   Q   Did you ever share this email with anybody at Farallon?

6   A   No.

7   Q   Did you ever share this email with anybody at Stonehill?

8   A   No.  And just to be clear, not just the email, the

9   contents.  Never discussed it with them.

10  Q   That was going to be my next question.  Did you ever share

11  any information about MGM with anybody?

12          MR. MCENTIRE:  Objection.  Leading.

13          MR. MORRIS:  I'm asking the question.

14          MR. MCENTIRE:  No, you're leading.

15          MR. MORRIS:  This is the whole --

16          MR. MCENTIRE:  You're leading the witness.

17          THE COURT:  Overruled.  Finish the question.

18  BY MR. MORRIS:

19  Q   Did you ever share any information concerning with MGM

20  with anybody at Stonehill before you learned that they had

21  purchased claims?

22          MR. MCENTIRE:  Objection.  Leading.

23          THE COURT:  Overruled.

24          THE WITNESS:  No.  No, I did not.

25  BY MR. MORRIS:

Seery - Cross                                    275

1   Q    Did you ever share any information with anybody at

2   Farallon concerning MGM before you learned that they purchased

3   their claims?

4            MR. MCENTIRE:  Objection.  Leading.

5            THE WITNESS:  No, I did not.

6            THE COURT:  Overruled.

7            THE WITNESS:  I'm sorry.

8       (Pause.)

9            THE WITNESS:  You know, you just asked me something

10  about Stonehill.

11           THE COURT:  No.

12           THE WITNESS:  I'm sorry.

13  BY MR. MORRIS:

14  Q    Yeah.  No question.

15  A    I wanted to clarify one.

16  Q    What did you want to clarify, sir?

17  A    Certainly didn't share anything about this email, any of

18  the contents of it.  I don't know if I ever -- I don't know

19  exactly when Stonehill bought their claims, and they were

20  subject to the NDA to do the financing process.  So I know

21  when Farallon told me they had bought their claims and I know

22  we never had any discussions at all before they acquired their

23  claims, and I don't know when Stonehill got those -- their

24  claims, so I don't know when -- what was in the data room or

25  what -- what might have been discussed about MGM while they

Seery - Cross                                  276

1    were under an NDA.

2    Q    Okay.

3    A    But certainly nothing -- I never shared the contents of

4    this email, the substance of this email, the email at all.

5    That's what I wanted to clarify.

6    Q    What data room are you talking about, sir?

7    A    This was the data room related to the exit financing where

8    we sought exit financing and ultimately got exit financing

9    from Blue Torch Capital.

10   Q    And who put together the data room?

11   A    DSI, which was our financial consultants, and our finance

12   team.

13   Q    And why did you -- did you delegate responsibility for

14   creating the data room to DSI and the members of your team you

15   just identified?

16   A    Yeah, of course.

17   Q    How come?

18   A    I don't really know how to put together a data room.

19   Q    Did you -- did you direct them to put anything in the data

20   room?

21   A    Not specifically.  We had a deck that we -- that certainly

22   I worked on and commented on, which would have been a general

23   overview of the -- of the post-reorganized Highland and the --

24   and the -- and the Claimant Trust.  So I certainly commented

25   on that.  But the specific information in the data room, I

Seery - Cross                                    277

1   don't -- I never looked at it.  I don't know what it is.

2   Q    How many -- how many entities who were participating in

3   the exit facility process wound up making bids or offers?

4   A    There were five that signed NDAs.  Three provided

5   substantive proposals.  One was verbal.  That was Bardin Hill,

6   who'd been contacting me throughout the case, and they do this

7   kind of financing, and they submitted a competitive bid.

8   Stonehill in writing, and then amended, a more aggressive one,

9   in writing.  And Blue Torch probably three, and the most

10  aggressive.

11  Q    And did you give the -- did you give the opportunity to

12  your age-old friends at Stonehill?

13  A    They're not my age-old friends.  And no, they lost.  They

14  were second, they were close, it was a good real proposal, but

15  they didn't win.

16  Q    So, --

17  A    Blue Torch won.

18  Q    So is it fair to say that you -- did you pick the best

19  proposal that you thought provided the best value for the

20  company that you were managing?

21          MR. MCENTIRE:  Your Honor, again, for the last ten

22  minutes, we've had nothing but leading questions.  And it just

23  is --

24          MR. MORRIS:  Fine.  Happy to --

25          THE COURT:  Sustained.  Rephrase.

Seery - Cross                                    278

1  BY MR. MORRIS:

2  Q    Why did you pick Stone -- why did you pick Blue -- Blue-?

3  A    Blue Torch.

4  Q    Blue Torch, over the other bids?

5  A    It was the best bid.  So, structurally, it was the least

6  expensive, although they were extremely close.  I had a lot of

7  confidence in Blue Torch because this type of financing is

8  what they do.  And while you can never have a hundred percent

9  confidence that if somebody goes through the -- this is an

10 LOI, right, so this is a letter of intent.  When they go

11 further, they may -- they may not complete it.  But I had a

12 high degree of confidence that they would get there, because,

13 again, that's what they do.  And they were the -- they were

14 just the better bid.

15 Q    Okay.  Do you recall that in Mr. Dondero's notes he wrote

16 down that he was told that Farallon had purchased their claims

17 in February or March?

18 A    I saw that on what he claimed, yes.

19 Q    And is that consistent with what you were told by Farallon

20 in March?

21 A    They told me they acquired the claims -- they had acquired

22 the claims on March 15th, by email.  I don't know if they

23 acquired them in February or March.  Or even January.  I know

24 they said they had them on March 15.

25 Q    Did you ever speak with Farallon about anything having to

Seery - Cross                                279

1  do with the purchase of their claims?

2          MR. MCENTIRE:  Objection.  Leading.

3          THE COURT:  Overruled.

4          THE WITNESS:  Not -- not before they sent me that

5  email.

6          MR. MORRIS:  I apologize.  Withdrawn.

7  BY MR. MORRIS:

8  Q    Before -- before learning of their purchase, had you had

9  any discussions with them about potential claim purchases?

10          MR. MCENTIRE:  Objection.

11          THE WITNESS:  No.

12          MR. MCENTIRE:  Leading.

13          THE WITNESS:  I'm sorry.

14          THE COURT:  Overruled.

15          THE WITNESS:  No, I didn't.

16  BY MR. MORRIS:

17  Q    Okay.  Before you learned that Stonehill had purchased

18  claims in the Highland bankruptcy, had you ever had any

19  conversation with them about the potential purchase of claims?

20          MR. MCENTIRE:  Objection.  Leading.

21          THE WITNESS:  No, I don't -- I don't --

22          THE COURT:  Overruled.

23          THE WITNESS:  I'm sorry.  I don't -- I don't believe

24  so, no.

25  BY MR. MORRIS:

Seery - Cross                          280

1  Q   Do you have any knowledge at all as to how the sellers

2  went about selling their claims?

3  A   I have some knowledge now, post-effective date, that I

4  believe I have some understanding, but not a great one.

5  Q   Did you ever communicate with any of the sellers about the

6  potential sale of their claims prior to the time their claims

7  were sold?

8            MR. MCENTIRE:  Objection.  Leading.

9            THE COURT:  Overruled.

10           THE WITNESS:  I did have a conversation with Eric

11  Felton who was the Redeemer representative on the Creditors'

12  Committee.  And it came out of one of the emails I got.  I

13  think it indicated that --

14           MR. MCENTIRE:  Objection, hearsay, Your Honor.  I

15  mean, hearsay, Your Honor.

16           THE COURT:  Okay.

17           MR. MCENTIRE:  It's hearsay.

18           THE COURT:  Okay.  He's about to say something that's

19  hearsay is the objection.  Any response?

20           MR. MORRIS:  I'm not offering it for the truth of the

21  matter asserted.  I'm offering it for Mr. Seery's state of

22  mind and the extent of his communications.  How about that?

23           MR. MCENTIRE:  I don't see how you could offer it for

24  anything other than for the truth of the matter asserted.

25  It's coming from a third party, so I object to hearsay.

Seery - Cross                                    281

1          MR. MORRIS:  Okay.  You know what?  We --
2    BY MR. MORRIS:
3    Q    Other than the one conversation --
4          THE COURT:  Are you withdrawing the question or do I
5    need --
6          MR. MORRIS:  Yeah.  This is just --
7          THE COURT:  Okay.  You're withdrawing the question.
8          MR. MORRIS:  I'll withdraw the question.
9          THE COURT:  Okay.
10   BY MR. MORRIS:
11   Q    Other than the one conversation with Mr. Felton, did you
12   ever have a conversation with any seller prior to the time you
13   learned that Farallon or Stonehill --
14         MR. MCENTIRE:  Objection.  Leading.
15   BY MR. MORRIS:
16   Q     -- purchased the claims?
17         THE COURT:  Overruled.
18         THE WITNESS:  No.
19   BY MR. MORRIS:
20   Q    Did you play any role in facilitating or recommending to
21   Farallon or Muck that it purchase claims?
22         MR. MCENTIRE:  Objection.  Leading.
23         THE COURT:  Overruled.
24         THE WITNESS:  No.  None whatsoever.
25   BY MR. MORRIS:

Seery - Cross                                    282

1  Q    Did you play any role in facilitating or recommending that
2  Stonehill or Jessup purchase claims?
3  A    No.
4              MR. MCENTIRE:  Objection.  Leading.
5              THE COURT:  Overruled.
6              THE WITNESS:  I'm sorry.
7  BY MR. MORRIS:
8  Q    All right.  Let's just finish up with compensation.  Can
9  you go to Exhibit 41, please?  Can you just identify that
10  document for the Court?
11  A    This is the -- it's a memorandum agreement that sits on
12  top of an outline.  It is the December 2 incentive
13  compensation agreed terms for Highland Capital --
14  Q    Okay.
15  A     -- and the Trust.
16  Q    And when was this signed?
17  A    It would have been -- the date is December 6th.
18  Q    And --
19  A    2021.  I'm sorry.
20  Q    Okay.  And when did you and the Committee members begin
21  discussing your compensation package?
22  A    Shortly after the effective date, which was August 11,
23  2021.
24  Q    And were there any negotiations during that intervening
25  three- or four-month period?

Seery - Cross                                283

1    A    Considerable negotiations during that period, yes.

2    Q    Can you go to the last page of Exhibit 41?  Can you

3    describe that for the Court?  I know it's hard to read, but --

4    A    I --

5    Q    -- the numbers don't matter so much as the infor... you

6    know, just, can you just describe --

7    A    Yeah.

8    Q     -- what's being conveyed?

9    A    So it's very hard to read, but it says -- because it's

10   small -- Seery Proposal 1, Oversight Counter 1, Seery Proposal

11   2, Oversight Counter 2, and then it continues down.  My

12   recollection is that we had four or five rounds of back-and-

13   forth that were meaningful.  But it -- but it even took a

14   detour in the middle, because it started with my proposal,

15   which was pretty robust, and their response to me that they

16   didn't like the structure or the amount, and so then we

17   started talking about that.  And then they -- after we were

18   kind of hitting numbers and structure at the same time, they

19   came back to me and said, stop, we've got to agree on the

20   structure before we agree on the amounts.

21        MR. MCENTIRE:  Your Honor, I'm going to object as

22   it's hearsay and move to strike.  This is -- he's not talking

23   about the document.  He's talking about something outside of

24   the four corners of the document.  I object to hearsay.

25        MR. MORRIS:  Hearsay?  There's no statement.

Seery - Cross                                284

1            THE COURT:  There was --

2            MR. MORRIS:  It's a description of what happened.

3            MR. MCENTIRE:  But he's actually referring to

4    statements in his substantive comments.

5            THE COURT:  Overruled.  Okay.

6            MR. MORRIS:  I move for the admission into evidence

7    of Exhibit 41.

8            THE COURT:  Any objection?

9            MR. MCENTIRE:  That's the memorandum agreement, Mr.

10   Morris?  Is that it?

11           MR. MORRIS:  Yes, sir.

12           MR. MCENTIRE:  No objection.

13           THE COURT:  Admitted.

14      (Debtors' Exhibit 41 is received into evidence.)

15   BY MR. MORRIS:

16   Q   Can we go backwards to Exhibit 39, please?  Can you

17   describe for the Court what that is?

18   A   This is a redacted copy of minutes of the board meeting on

19   August 21 -- 26, 2021.

20   Q   And there's a lot of stuff redacted there.  Do you have an

21   understanding as to why there is redactions?

22   A   It would have nothing to do with these issues that we're

23   discussing or the alleged *quid pro quo*.

24   Q   Okay.  Can you just read out loud the last portion that's

25   unredacted on the second page, beginning with "Mr. Seery

Seery - Cross                                    285

1   reviewed"?

2   A    It actually says, "Mr. Seery also presented the board with

3   an overview of his incentive compensation program proposal,

4   which would include not only Mr. Seery but the current HCMLP

5   team.  The terms and structure of the proposal had been

6   previewed with the board in prior operating models presented

7   by Mr. Seery.  Mr. Seery reviewed the proposal and stated his

8   view that the proposal was market-based and was designed to

9   align incentive between himself and the HCMLP team on the one

10  hand and the Claimant Trust beneficiaries on the other.  The

11  board asked questions regarding the proposal and determined

12  that it would consider the proposal and revert to Mr. Seery

13  with a counterproposal."

14  Q    All right.  When you were -- when you were shown one of

15  these documents before, you were asked to identify Mr. Linn,

16  but you weren't asked about the others.  Do you see Richard

17  Katz there?

18  A    Yes.

19  Q    Who's that?

20  A    He's the independent member.

21  Q    Did he play any role in the negotiation of your

22  compensation package?

23  A    Yes.  He was actively involved.

24  Q    Okay.  And how about Mr. Provost?  Who's he?

25  A    He is the Jessup person.  Jessup is the board member.

Seery - Cross                                    286

1    He's their representative on the board.

2    Q    Okay.

3            MR. MORRIS:  And I move for admission into evidence

4    of Exhibit 39.

5            MR. MCENTIRE:  No objection, Your Honor.

6            THE COURT:  Admitted.

7        (Debtors' Exhibit 39 is received into evidence.)

8    BY MR. MORRIS:

9    Q    Let's go to Exhibit 40, please.  Can you just describe for

10   the Court what that is?

11   A    This is a subsequent board meeting minutes, August 30,

12   2021.

13   Q    And can you just read into the record -- why are there

14   redactions?

15   A    Again, they would -- if there are redactions, it would

16   have nothing to do with the issues that are being brought up

17   in this motion.

18   Q    And can you just read into the record the paragraph

19   beginning, "Mr. Katz"?

20   A    "Mr. Katz began the meeting by walking the Oversight Board

21   and Mr. Seery through the Oversight Board's counterproposal to

22   the HCMLP incentive compensation proposal, including the

23   review of the spreadsheet and summary of the counterproposal.

24   Discussion was joined by Mr. Linn and Mr. Stern.  Mr. Seery

25   asked numerous questions and received detailed responses from

Seery - Cross                                    287

1    the Oversight Board.  Mr. Seery and the Oversight Board agreed

2    to continue the discussion and negotiations regarding the

3    proposed incentive compensation plan for the Claimant Trustee

4    and the -- and the HCMLP."

5    Q    So they didn't accept your original proposal that you made

6    in the earlier document?

7    A    They did not.

8    Q    Okay.  And did negotiations continue?

9    A    They did, yes.

10         MR. MORRIS:  Before we go on, I move for admission

11   into evidence Exhibit 40.

12         THE COURT:  Any --

13         MR. MCENTIRE:  No objection.

14         THE COURT:  It's admitted.

15      (Debtors' Exhibit 40 is received into evidence.)

16   BY MR. MORRIS:

17   Q    Can you go to Exhibit 59, please?  Can you describe for

18   the Court what this is?

19   A    This is an email string between me and the Oversight Board

20   regarding the compensation proposal.

21   Q    Okay.  And directing your attention to the bottom, I

22   guess, of the second page, there is an email from Mr. Katz

23   dated October 26.  Do you see that?

24   A    At the bottom of the second -- oh, yes, yes.

25   Q    Okay.  Can you just read the sentence at the bottom of the

Seery - Cross                                    288

1  page beginning "We propose"?

2          MR. MCENTIRE:  Well, Your Honor, I would, first of

3  all, object to him just reading from the document until it's

4  been put into evidence.

5          THE COURT:  I'm sorry, say again?

6          MR. MCENTIRE:  I would object to Exhibit --

7          THE COURT:  We can't pick things up on the record

8  when you don't speak in a mic.

9          MR. MCENTIRE:  I object to him simply reading from

10 the document before the document is offered into evidence.

11         MR. MORRIS:  Okay.

12         MR. MCENTIRE:  Accepted into evidence.

13         MR. MORRIS:  Sure.  I'd move it into evidence.

14         MR. MCENTIRE:  I object as hearsay.

15         MR. MORRIS:  This is a present sense recollection --

16 recorded.  It's a clear business record.  It's a negotiation

17 that's happening over time.  Mr. Seery is here to answer any

18 questions about authenticity.

19         MR. MCENTIRE:  Well, first of all, it's an email

20 string involving communications with third parties.  That's

21 hearsay in and of itself.  And it's not been established that

22 this is a business record.  And Mr. Morris's statements to

23 that effect, frankly, don't carry his burden.  There's

24 internal hearsay contained throughout the document, Your

25 Honor, even if it is a business record.

Seery - Cross                          289

1          MR. MORRIS:  Your Honor, just to be clear, let me

2    respond.

3          THE COURT:  Uh-huh.

4          MR. MORRIS:  Exceptions to hearsay rule.  803(1)

5    present sense impression; (2) -- (3) existing mental

6    impression, state of mind about motive, (5) recorded

7    recollection, (6) records of regularly-conducted activity, or

8    Federal Rule of Evidence 807, residual exception for

9    trustworthy and probative evidence.  I'll take any of them.

10         MR. MCENTIRE:  None of them apply.

11         MR. MORRIS:  Okay.

12         THE COURT:  Okay.  Overruled.

13         MR. MORRIS:  Thank you.

14         THE COURT:  I admit it.  59's admitted.

15      (Debtors' Exhibit 59 is received into evidence.)

16   BY MR. MORRIS:

17   Q   Can you just read that last sentence at the bottom of that

18   page?

19   A   This is from Rich Katz to me.

20   Q   Uh-huh.

21   A   (reading)  We propose doing this in two stages.  First,

22   we'd like to come to agreement on structural, underscored,

23   elements of the ICP.

24      ICP means incentive compensation program or plan.

25      Only after we'd done that, when the board had greater

Seery - Cross                                    290

1    understanding of what plan they were pricing, would we haggle

2    out the specific numbers, underscore, tier attachment points,

3    and percentage participation in each tier.

4    Q    Okay.  And going to the right-hand part of that, do you

5    see where it says, Salary J.S. Only?

6    A    Yes.

7    Q    Can you just, you know, generally describe for the Court

8    what the debate is or the negotiation that's happening on that

9    particular point?

10   A    Well, this was brought up earlier.  The salary was

11   $150,000 a month.  That was the same salary that I'd had

12   during the case that was approved by the Court.  It had been

13   approved by the Committee, approved by the other independent

14   members.  That was continuing.  It was also contained as an

15   actual base salary in the plan and the Claimant Trust

16   Agreement, and they were never amended.

17       The Committee came back to me and said, we'd like that to

18   step down.  And they'd like it to step down on a definitive

19   specific schedule, because they had a view that that would

20   incentivize me to work faster to make distributions before the

21   stepdown and that I wouldn't linger in the role.  And the

22   yellow --

23   Q    Can you just read the yellow out loud?

24   A    That's --

25   Q    Read the whole thing.

Seery - Cross                                291

1   A    That's my response.

2   Q    Read the whole thing.

3   A    (reading)  Based on the required expertise, volume, and

4   personal risk of the work today, I do not think that any

5   formulaic reduction in base comp is appropriate.  With the

6   complexity and amount of issues that I have to manage on a

7   daily basis, I currently do not have capacity to take on

8   significant outside work.  Of course, things can change.  If

9   they do, I am open to discussing reduction in the base.  I

10  have no interest in sitting around doing nothing, having no

11  risk, and collecting the full base compensation.  We can

12  include prefatory language and an agreement to revisit our

13  terms, but I do not see an avenue to set parameters to lock in

14  an agreement for the future at this time.

15       And then there's another paragraph on severance.

16  Q    You can stop there.

17            MR. MORRIS:  I have no further questions.

18            THE COURT:  All right.  Pass the witness.

19            MR. MCENTIRE:  Do you have any questions?

20            A VOICE:  No.

21            MR. MCENTIRE:  Okay.  How much time do I have,

22  please?

23            THE CLERK:  So, the limit is at two hours and 32

24  minutes.

25            MR. MCENTIRE:  All right.

Seery - Redirect                                292

1                         REDIRECT EXAMINATION

2   BY MR. MCENTIRE:

3   Q    Just a couple questions very quickly, Mr. Seery.  Highland

4   Capital Management paid HarbourVest cash as part of the

5   settlement, correct?

6   A    That's incorrect.

7   Q    There was no cash component at all?

8   A    There was not.

9   Q    And in connection with the HarbourVest settlement,

10  HarbourVest transferred an interest in HCLOF to Highland

11  Capital or an entity affiliated with Highland Capital; is that

12  not correct?

13  A    That's correct.

14  Q    And that -- that entity -- and HCLOF, and HCLOF had an

15  interest in various CLOs, correct?

16           MR. MORRIS:  Your Honor, I object.  This is beyond

17  the scope of my cross, or redirect, however you prefer.

18           MR. MCENTIRE:  Well, you spent a lot of time on

19  HarbourVest.  I'm just trying to clear it up.

20           MR. MORRIS:  I didn't say the word CLO.  I did not

21  say the word CLO.

22           THE COURT:  Overruled.  He can go there.

23       If you'd please move the mic towards your voice.

24  BY MR. MCENTIRE:

25  Q    And HCLOF had an interest in various CLOs, correct?

Seery - Redirect                              293

1   A    I believe it had an interest in five CLOs.  Oh, that's not

2   true.  It had an interest in five of the 1.0 CLOs.  It also

3   owned one hundred -- basically, somewhere between 87 and a

4   hundred percent of Acis 3, 4, 5, 6, and 7, which is about a

5   billion dollars of CLOs to 10 (inaudible) leveraged vehicles,

6   and they owned basically all the equity, so that was the

7   driver of the value.

8   Q    And various entities that were -- I mean, some of these

9   various CLOs had an interest in MGM stock, correct?

10  A    The 1. -- the Highland 1.0s did.  The value drivers I just

11  described -- Acis 3, 4, 5, 6, and 7 -- had no interest in MGM.

12  Q    But one of them did have an interest in MGM?

13  A    That's not correct.

14  Q    What did you just say?

15  A    3, 4, 5, 6, and 7 did not have any interest in MGM.

16  Q    Were there any CLOs that had an interest in MGM?

17  A    Some of the 1.0 CLOs did, --

18  Q    I see.

19  A    -- yes.

20          MR. MCENTIRE:  Pass the witness.

21          MR. MORRIS:  No further questions.

22          THE COURT:  Mr. Seery, I want to ask you one thing.

23          THE WITNESS:  Yes, Your Honor.

24                  EXAMINATION BY THE COURT

25          THE COURT:  We dance around it a lot.  The Highland

Seery - Examination by the Court                294

1   ownership of MGM stock.  If think -- if you could confirm I've

2   heard this correct -- you said Highland itself owned 170,000

3   shares that were subject to a Frontier Bank lien?

4              THE WITNESS:  Yes, Your Honor.  I believe that's the

5   right amount.  So, Highland directly owned about 170,000

6   shares.  Those were liened up to Frontier.  They were -- they

7   were never transferred.  Highland never sold any MGM stock.

8              THE COURT:  Okay.  So Frontier still holds it or

9   what?

10             THE WITNESS:  No.  In fact, post-effective -- I

11  believe it was post-effective date, and with cash generated,

12  we -- we paid off the Frontier loan, --

13             THE COURT:  Uh-huh.

14             THE WITNESS:  -- released that lien, and then we held

15  those shares in MGM until the merger was consummated.

16             THE COURT:  Okay.

17             THE WITNESS:  So we tendered our shares into the --

18  into the merger and got the merger consideration, which was

19  cash.

20             THE COURT:  Okay.  And so there was that.  But other

21  than that, you said Highland owned 50 percent of Multistrat,

22  which owned some MGM stock?

23             THE WITNESS:  Multistrat had a -- I don't recall the

24  amount, but a material amount of MGM stock.  That also -- so,

25  Highland owned 57 percent of Multistrat.  Is also the manager

Appx. 02831

                    Seery - Examination by the Court                295

1   of Multistrat.

2              THE COURT:  Uh-huh.

3              THE WITNESS:  Multistrat did not sell any MGM stock.

4   It also tendered them into the merger as well.

5              THE COURT:  Okay.  And then you said Highland owned

6   some percentage of Restoration --

7              THE WITNESS:  Restorations Capital Partners.

8              THE COURT:   -- Capital Partners, which owned some

9   MGM stock?

10             THE WITNESS:  Similarly, Highland is the manager of

11  what we call RCP.  RCP owned a material amount of MGM stock.

12  RCP did not sell any MGM stock.  However, in 2019, you'll

13  recall that Mr. Dondero sold $125 million of stock

14  postpetition out of RCP.  It was MGM stock.  He sold it back

15  to MGM.  We had a -- we had a hearing on it, because

16  subsequently the Independent Board learned about it, the

17  Committee learned about it, they had not -- it had not been

18  disclosed, but there was a -- what we thought was a binding

19  agreement with MGM, and MGM indicated that they were going to

20  hold us to it, and so we had a hearing about approving that

21  transaction.  The Committee was not happy.

22             THE COURT:  Okay.  I'm fuzzy on when that was.  You

23  said?

24             THE WITNESS:  That would have been in early 2020,

25  probably April-ish timeframe.

Seery - Examination by the Court                296

1          THE COURT:  Okay.

2          MR. MORRIS:  Your Honor?

3          THE WITNESS:  The transaction was in November, I

4    believe.

5          MR. MORRIS:  If it's helpful, Your Honor, you can

6    find it at Docket 487.

7          THE COURT:  Okay.

8          MR. MORRIS:  I think that's the objection from the

9    Committee where the issue was -- comes up at least at one

10   time.

11         THE COURT:  Okay.  And then I think this is the last

12   category I heard, that HCM and its specially-created sub owned

13   just over 50 percent of HCLOF, and it in turn owns interest in

14   a lot of CLOs, and a few of those, what you call the 1.0 CLOs,

15   did own some MGM stock?

16         THE WITNESS:  That's correct.  So if you look on the

17   audited financials that we had introduced into evidence,

18   you'll see actually every asset that HCLOF owns.  There's no

19   MGM in there.  It does own interest.  There were minority

20   interests in five or six of the 1.0 CLOs.  Grayson,

21   Greenbrier, Gleneagles, Brentwood, Liberty, and one other.

22   And it had interest in those, but it never owned any MGM stock

23   and it never traded any MGM stock.  It didn't own any.

24         THE COURT:  All right.  Did I cover the universe of

25   what MGM stock was owned by Highland or something Highland had

Seery - Examination by the Court                297

1    an interest in?

2             THE WITNESS:  Yeah.  So, the ones that HCLOF had an

3    interest in that I just listed, those -- Jasper was the other

4    one.  I apologize.  The -- they owned -- they owned MGM stock

5    among their other -- they had a lot of other assets.   The

6    other CLOs, the 1.0 CLOs that Highland had, every one of them

7    owned MGM stock.  None of them sold or bought any stock.

8    Those all tendered into the merger as well.  Highland did not

9    own any interest in any of those entities.

10            THE COURT:  Uh-huh.

11            THE WITNESS:  It just managed them.

12            THE COURT:  Okay.  And this is my last question.

13   Someone brought up or it came up today that exactly two years

14   ago today -- I didn't remember we were on an anniversary of

15   that -- but was when we had a hearing, and I think it was a

16   contempt hearing, but I had, I guess, read in the media, like

17   many other human beings, an article about the MGM-Amazon

18   transaction, and I had said I had hope in my heart and brain

19   that this could be an impetus or a triggering event for maybe

20   a settlement.  And that was kind of quickly pooh-poohed, if

21   you will.

22       Remind me why I was quickly persuaded, oh well, I guess

23   that's not going to happen.  I just can't remember what I

24   heard that day.

25            THE WITNESS:  Well, it was widely known that

Seery - Examination by the Court                298

1   Highland, meaning not the 171,000 --

2            THE COURT:  Uh-huh.

3            THE WITNESS:  -- but the entities that Highland or

4   related entities, including DAF, the other Dondero entities,

5   controlled a lot of Highland stock, as even Mr. Dondero said

6   between Anchorage --

7            THE COURT:  You mean MGM?

8            THE WITNESS:  MGM, I'm sorry.  Between -- there were

9   only five major holders.  There was the two we just mentioned

10   and Davidson Kempner and Monarch and Owl Creek, and just a few

11   other big holders.

12       And so Your Honor would have learned it from the case, but

13   you also would have learned it from the paper, that any time a

14   holder is mentioned, it's first Anchorage, because they owned

15   the biggest piece, and Kevin Ulrich, who was the chairman of

16   Anchorage, was also the chairman of MGM.  And then Highland

17   was always mentioned.

18       The reason that it didn't have some great amount of

19   capital that went on to Highland, although there was money

20   from RCP and there was money from MGM, is Highland doesn't own

21   the stock that's -- or interests in the 1.0 CLOs that owned

22   all of it.  We just manage it.

23            THE COURT:  Uh-huh.

24            THE WITNESS:  And that goes to various other

25   entities, including, in large part, to Dondero entities.  So

Seery - Examination by the Court                299

1   there wasn't a big windfall to Highland from that.

2       The possibility of some upside from HCLOF, because it

3   owned small interests in those five, there was some value in

4   that, but a lot of it got tied up in the litigation that other

5   entities, Dondero entities, are bringing against U.S. Bank and

6   Acis, which has tied up everything in that -- those

7   distributions.

8               THE COURT:  Okay.  All right.  Thank you.  You are

9   excused from the stand.

10              THE WITNESS:  Thank you, Your Honor.

11              MR. STANCIL:  I owe you a docket number, Your Honor.

12  You said don't let us leave before we give you a docket number

13  for that second contempt order.  We promised to come back.  It

14  was #2660.

15              THE COURT:  Okay.  Got it.

16              MR. STANCIL:  Which -- did we move that into

17  evidence?

18              MR. MORRIS:  No.  We asked the Court to take judicial

19  notice.

20              THE COURT:  I will take judicial notice of 2660, --

21              MR. STANCIL:  Thank you, Your Honor.

22              THE COURT:   -- I already said.  Thank you.

23              THE WITNESS:  Thank you, Your Honor.

24              THE COURT:  You're excused.

25      (The witness steps down.)

300

1          THE COURT:  All right.  Are you going to have any

2     other evidence, Mr. McEntire?

3          MR. MCENTIRE:  Your Honor, as I respond to your

4     question, I think we have 30 -- approximately 30 minutes left.

5          THE CLERK:  Twenty-six, yes.

6          MR. MCENTIRE:  Twenty-six.  We do have another

7     witness.  We also have a closing final argument.  And we also

8     have an opportunity -- we want to reserve an opportunity for

9     our experts that is still under advisement.

10        So my first action would be to ask for an extension of

11    time, or we would like to add to our time limit.  Instead of

12    just three hours, we'd like to increase the time so we can

13    accomplish all these things.

14        I mean, if the Court is unwilling to give us additional

15    time, then I will be forced not to call another witness.  I

16    will move to a very short final argument.  I need to preserve

17    some time for my experts, should you allow them to testify.

18          THE COURT:  Well, --

19          MR. MORRIS:  May I respond?

20          THE COURT:  -- you don't have to preserve time.  I'm

21    either going to allow you to put on your experts, and we said

22    30 minutes/30 minutes, --

23          MR. MORRIS:  That was what I was going to say, Your

24    Honor.

25          THE COURT:  Okay.

1          MR. MORRIS:  There's no prejudice here.  Nobody's

2   being harmed.  There's no appellate issue.  I thought we were

3   really clear.  Everybody gets their three hours today.  We

4   will file our reply brief on Monday.  The Court will determine

5   both whether it needs to hear expert testimony and whether or

6   not our motion should be sustained.  If the Court denies the

7   motion, we'll take a couple of depositions and each side will

8   get whatever period of time the Court orders.

9       But, you know, the attempts to create an appellate record

10  are just -- you know, that's not -- there's no issue here.  He

11  can -- he's got 26 minutes.  He can put on his witness, he can

12  make his closing in the 26 minutes that they've always had.

13          THE COURT:  All right.  Well, we have --

14          MR. MCENTIRE:  May I caucus?  May I caucus very

15  quickly, Your Honor?

16          THE COURT:  Okay.  Uh-huh.  And while you're

17  caucusing, we have our game plan on the experts.  We know how

18  that's going to happen.  And I'm not extending the three

19  hours.

20          MR. MORRIS:  (sotto voce)  We have 62 minutes?

21      (Pause.)

22          MR. MCENTIRE:  Your Honor, accordingly, I'll just --

23  we'll move into a final argument at this time.

24          THE COURT:  Okay.  So you rest?

25          MR. MCENTIRE:  I rest.

Patrick - Direct                                302

1            THE COURT:  All right.

2            MR. MORRIS:  We call Mark Patrick.

3            THE COURT:  All right.  Mr. Patrick, you've been

4    called to the witness stand.

5            MR. MORRIS:  I just need to find my examination

6    notes.  Just give me one moment, please.

7            THE COURT:  All right.  Please raise your right hand.

8    Could you remain standing, please.

9        (The witness is sworn.)

10           THE COURT:  All right.  You may be seated.

11             MARK PATRICK, DEBTORS' WITNESS, SWORN

12                      DIRECT EXAMINATION

13   BY MR. MORRIS:

14   Q   Hi, Mr. Patrick.

15   A   Hello.

16   Q   Did you ever meet with anybody at the Texas State

17   Securities Board?

18   A   No.

19   Q   Do you know if -- do you know anybody who ever met with

20   anybody at the Texas State Securities Board concerning

21   Highland?

22   A   Yes.

23   Q   And who met with the Texas State Securities Board

24   concerning Highland?

25   A   Ronnie (phonetic) Patel.

Patrick - Direct                                303

1  Q    And is that a lawyer?

2  A    Yes.

3  Q    Do you know who retained Mr. -- that lawyer?

4  A    Yes.

5  Q    Who retained that lawyer?

6  A    The DAF, the Charitable DAF Fund.  Or one of its entities.

7  Q    Okay.  And is it your understanding that the DAF Fund or

8  one of its charitable entities filed a complaint with the

9  Texas State Securities Board?

10  A    Yes.

11  Q    Okay.  Thank you very much.  Does Hunter Mountain owe any

12  money to Mr. Dondero?

13  A    No.

14  Q    Is there a promissory note that's outstanding that Mr.

15  Dondero has pursuant to which Hunter Mountain owes him $60-

16  plus million?

17  A    No.

18  Q    Who created Hunter Mountain?

19  A    Well, I don't recall specifically.  I just recall the

20  facts that, when Hunter Mountain was created, Thomas Surgent,

21  the chief compliance officer of Highland Capital Management,

22  who was representing the Dugaboy Investment Trust as well as

23  Highland Capital legally with respect to that transaction,

24  requested to Rand that the Hunter Mountain Investment Trust be

25  created for purposes of Highland filing its ADV with the SEC.

Patrick - Direct                    304

1   It was my understanding that when the ADV would be filed, sort
2   of the ownership change would -- chain would stop at Hunter
3   Mountain.
4   Q   Okay.  Dugaboy is Mr. Dondero's family trust, correct?
5   A   No.  But I'll help you along.  Just please use the full
6   name of the trust.
7   Q   If I refer to the Trust, will you know that that's -- is
8   that for the Hunter Mountain Investment Trust, or do you want
9   me to use trust --
10  A   There's no entity called Dugaboy.  Just Dugaboy.  There's
11  not.
12  Q   Okay.
13  A   It's a shorthand.  I'm --
14  Q   Okay.  I'll refer to Dugaboy then, okay?
15  A   What are we referring to?
16  Q   The trust known as Dugaboy.
17  A   Okay.  Fair enough.  Go ahead.
18  Q   Okay.  Did Dugaboy contribute a portion of its ownership
19  interest in Highland to the Highland -- to the Hunter Mountain
20  Investment Trust?
21  A   Contribute?  No.
22  Q   Did it transfer?
23  A   Yes.
24  Q   And did it receive in exchange a promissory note from
25  Hunter Mountain?

Patrick - Direct                          305

1   A    Yes, it did.

2   Q    Okay.  And Mr. Dondero is the lifetime beneficiary of

3   Dugaboy, correct?

4   A    Yes and no.  It's a placeholder -- a placeholder provision

5   that's never been used.

6          MR. MCCLEARY:  Your Honor, pardon me.  Pardon me.

7   Objection, relevance, Your Honor.

8          THE COURT:  Relevance?

9          MR. MORRIS:  This is -- we've been told so many times

10  that Mr. Dondero has no interest in this case, he has nothing

11  to do with Hunter Mountain.  He's the lifetime beneficiary of

12  Dugaboy.  And if I --

13         THE WITNESS:  That provision has never been invoked.

14  He's received no money through that provision.

15         THE COURT:  Okay.  Just wait.  We're resolving --

16         MR. MORRIS:  Right.

17         THE COURT:   -- an objection at the moment.

18  BY MR. MORRIS:

19  Q    Can we turn to Exhibit 51?

20         THE COURT:  I'm still working on the objection.

21         MR. MORRIS:  I'm going to try and lay a foundation.

22  Okay?

23         THE COURT:  Okay.  So he's withdrawing the question.

24         MR. MCCLEARY:  He's withdrawing the question?  Okay.

25         THE COURT:  Okay.

Patrick - Direct                          306

1   BY MR. MORRIS:

2   Q   You have a binder in front of you, sir.  Can you go to

3   Exhibit 51?

4            THE COURT:  And this is Highland's Exhibit 51?

5            MR. MORRIS:  Yeah.

6            THE COURT:  Okay.

7   BY MR. MORRIS:

8   Q   And is that a promissory note that was made --

9   A   Yes, it is.

10  Q   -- that was made by Hunter Mountain in favor of Dugaboy

11  back in 2015?

12           MR. MCCLEARY:  Objection, relevance, Your Honor.

13           MR. MORRIS:  I'm trying to connect Mr. Dondero to

14  Hunter Mountain.

15           THE COURT:  Okay.  Overruled.

16           THE WITNESS:  Yeah.  It's a secured promissory note

17  with the amount of approximately $62.6 million signed by

18  Beacon Mountain, LLC, --

19           MR. MORRIS:  Uh-huh.

20           THE WITNESS:  -- as administrator for Hunter Mountain

21  Investment Trust.

22  BY MR. MORRIS:

23  Q   Okay.  And as the -- what's your role with Hunter Mountain

24  today?

25  A   And it's in favor, just to answer your question, it's in

Patrick - Direct                                    307

1   favor of the Dugaboy Investment Trust.  That's where I was

2   just being a little stickler --

3   Q   I appreciate that.

4   A    -- previously.  Sorry.

5   Q   I do.

6   A   Okay.  What is your question?

7   Q   What's your role with Hunter Mountain today?

8   A   I am the administrator.

9   Q   When did you become the administrator?

10  A   On or about August of 2022.

11  Q   Okay.  How did you become the administrator?

12  A   Through the acquisition of Rand Advisors.

13  Q   And does Hunter Mountain have any employees?

14  A   No.

15  Q   Does it have any operations?

16  A   No.

17  Q   Does it generate any revenue?

18  A   Not -- not currently.

19  Q   Okay.  Did it generate any revenue in 2022?

20  A   No.

21  Q   Does it own any assets?

22  A   Yes.

23  Q   What does it own?

24  A   It has -- it's my understanding it has a contingent

25  beneficiary interest in the Claimants Trust.

Patrick - Direct                    308

1   Q    And that's the only asset it has, right?

2   A    Correct.

3   Q    So that if it -- if that interest has no value, then

4   Hunter Mountain has no ability to pay the Dugaboy note.  Fair?

5   A    (sotto voce) If that interest has no value?

6        That is correct.

7   Q    Okay.

8             MR. MORRIS:  I move Exhibit 51 into evidence.

9             MR. MCCLEARY:  Your Honor, relevance.  Objection.

10            THE COURT:  Your response?

11            MR. MORRIS:  Mr. Dondero desperately needs Hunter

12  Mountain to win in this lawsuit because otherwise his family

13  trust will get nothing on this $63 million note.

14            THE COURT:  Okay.  Overrule the objection.  It's

15  admitted.

16       (Debtors' Exhibit 51 is received into evidence.)

17  BY MR. MORRIS:

18  Q    Neither you or any representative of Hunter Mountain has

19  ever spoken with any representative of Farallon, correct?

20  A    Correct.

21  Q    Neither you nor any representative of Hunter Mountain has

22  ever spoken with anybody at Stonehill, correct?

23  A    Correct.

24  Q    You have -- neither you nor Hunter Mountain have any

25  personal knowledge about a *quid pro quo*, correct?

Patrick - Direct                                    309

1   A     (sotto voce)  Nor Hunter Mountain have any personal

2   knowledge about a *quid pro quo*.

3        Correct.

4   Q     Neither you nor anybody at Hunter Mountain have any

5   personal knowledge about how Mr. Seery's compensation package

6   was determined, correct?

7   A     Correct.

8   Q     Neither you nor anybody at Hunter Mountain had any

9   knowledge about the terms of Mr. Seery's compensation package

10  until the Highland parties voluntarily disclosed that in

11  opposition to the Hunter Mountain motion, correct?

12  A     No.  I --

13            MR. STANCIL:  Objection, relevance, Your Honor.

14            THE COURT:  Overruled.

15            THE WITNESS:  No.  I seem to -- I seem to have an

16  awareness that the performance fee was amended at a certain

17  time post-confirmation, or, you know, around the confirmation

18  time period.  And so that's with respect to the compensation.

19  I -- just myself.

20  BY MR. MORRIS:

21  Q     Can you tell Judge Jernigan everything you know or

22  everything you knew before receiving Highland's opposition to

23  this motion about Mr. Seery's compensation as the CEO of the

24  Reorganized Debtor at the Claimant Trustee?

25            MR. MCCLEARY:  Objection, Your Honor.  That's

**Appx. 02846**

1    overboard and an unclear question.

2            THE COURT:  Overruled.  He's gone through some

3    specific things now.  I guess he's just trying to encompass

4    anything we haven't covered.

5            THE WITNESS:  Yeah.  I had a -- I personally had a

6    general understanding that Mr. Seery's compensation changed

7    after the claims trading to put in a performance-based-type

8    measure.  But I do recall that it was always very -- it was

9    unclear exactly the terms.

10   BY MR. MORRIS:

11   Q    Okay.  Did you learn anything else?

12   A    Such as?

13   Q    Just, did you ever learn anything else about Mr. Seery's

14   compensation package that you haven't testified to yet?

15           MR. STANCIL:  Your Honor, objection.  Vague.

16           THE COURT:  Overruled.

17           THE WITNESS:  No.

18   BY MR. MORRIS:

19   Q    Okay.  Neither you nor Hunter Mountain has any personal

20   knowledge whatsoever about any due diligence that Stonehill

21   did in connection with the purchase of claims, correct?

22           MR. MCCLEARY:  Your Honor, he's getting into

23   allegations in the complaint which involve attorney work

24   product, so we object on the basis of invading the attorney

25   work product.

Patrick - Direct                    311

1          THE COURT:  Overruled.

2          THE WITNESS:  Can you restate the question again?

3  BY MR. MORRIS:

4  Q   Yes, sir.  Neither you nor Hunter Mountain have any

5  personal knowledge as to what due diligence Stonehill did

6  before purchasing its claims in this case, correct?

7          MR. MCCLEARY:  Objection.  Attorney work product.

8  Invasion of that.  Could I --

9          THE COURT:  I just ruled.

10          MR. MCCLEARY:  I understand.

11          THE COURT:  I just --

12          MR. MCCLEARY:  Could I have a running objection to

13  this line of questioning on that basis, Your Honor, invasion

14  of attorney work product?

15          THE COURT:  Why don't you explain why it's attorney

16  work product.  I'm missing --

17          MR. MCCLEARY:  Because they might -- he would have

18  knowledge from the efforts and investigation through attorneys

19  in the case.  I assume he's not asking -- you can't separate

20  that, potentially.  So he's getting into attorney work

21  product.

22          MR. MORRIS:  I'm asking for facts.

23          THE COURT:  He's asking for facts.  I overrule.

24  BY MR. MORRIS:

25  Q   Can you answer the question, sir?

Patrick - Direct                          312

1   A    Yeah.  I'm not aware -- I'm not personally aware of how
2   much work Farallon did, or Stonehill.
3   Q    You have no knowledge whatsoever about the diligence
4   Stonehill did before purchasing its claims, correct?
5   A    Well, I would generalize now is that they did nothing.
6   Q    And that's on the basis of Mr. Dondero's testimony,
7   correct?
8   A    I would just call it on a basis of our general inquiry,
9   which would be including, in part, Mr. Dondero's testimony.
10  Q    What else are you relying upon for your conclusion that
11  you just described other than Mr. Dondero's?  What other
12  facts?
13  A    Yeah, we -- yeah, we have not uncovered any facts that
14  indicated that they did conduct any due diligence of any sort.
15  Q    Okay.  And are you -- do you have any personal knowledge
16  as to what Farallon did in connection with its due diligence
17  prior to buying its claim?
18  A    Yeah.  We have not been able to find any facts that would
19  suggest that Farallon conducted any due diligence of any kind.
20  Q    Okay.
21         MR. MORRIS:  One second, Your Honor.
22      (Pause.)
23  BY MR. MORRIS:
24  Q    Who's paying Hunter Mountain's legal fees?
25  A    Hunter Mountain is paying -- is legally obligated and

Patrick - Direct                            313

1   paying its own legal fees.

2   Q    If it generates no income and its only assets is the

3   interest in Highland, where is it getting the funds to pay

4   legal fees?

5            MR. MCCLEARY:  Objection, Your Honor.  This is

6   irrelevant and invades the attorney-client privilege.

7            MR. STANCIL:  Your Honor, I'm happy to read a Fifth

8   Circuit case that says the identity of a third-party payer of

9   attorneys' fees is not privileged.  I would refer them to *In*

10  *re Grand Jury Subpoena*, 913 F.2d 1118, a 1990 Fifth Circuit

11  case.  I can read from Judge Jones' opinion, but you tell me

12  how much you want to hear on this.

13           THE COURT:  Okay.  I overrule your objection.  He can

14  answer.

15           THE WITNESS:  There is a settlement agreement by

16  Hunter Mountain Investment Trust as well as the Dugaboy

17  Investment Trust that provides for the payment of attorney

18  fees.

19           MR. MORRIS:  No further questions, Your Honor.

20           THE COURT:  Okay.  Cross?

21           MR. MCCLEARY:  Yes, Your Honor, briefly.

22                        CROSS-EXAMINATION

23  BY MR. MCCLEARY:

24  Q    Mr. Patrick, how would you describe Mr. Dondero's

25  relationship with Hunter Mountain Investment Trust today?

Patrick - Cross                           314

1   A    None.

2   Q    You were asked some -- let me ask you about litigation,

3   and litigation involving the sub-trust.  Has Hunter Mountain

4   been involved in litigation with Mr. Kirschner?

5   A    Yes.

6   Q    Okay.  And what is your understanding of Mr. Kirschner's

7   role?

8            MR. MORRIS:  Your Honor, while I would love for them

9   to continue --

10           MR. MCCLEARY:  He's the --

11           MR. MORRIS:   -- to use their time, I object that

12  it's beyond the scope of my examination.  They passed on the

13  witness.  They rested their case.  He should be limited to the

14  scope of my inquiry.

15           THE COURT:  Okay.  How does this tie to direct?

16           MR. MCCLEARY:  Your Honor, it -- just very generally.

17  This is --

18           THE COURT:  Okay.  I need to know how it ties to the

19  direct.

20           MR. MCCLEARY:  This doesn't tie directly to the

21  direct, Your Honor.

22           THE COURT:  Then it's beyond the scope, you

23  acknowledge?

24           MR. MCCLEARY:  Yes, Your Honor.

25           THE COURT:  Okay.  Sustained, then.

Patrick - Cross                          315

1          MR. MCCLEARY:  Okay.

2    BY MR. MCCLEARY:

3    Q    Mr. Patrick, has Hunter Mountain Investment filed any

4    litigation as a plaintiff other than its efforts to be a

5    plaintiff in this lawsuit and its action as a petitioner in

6    the Rule 201 matter earlier this year in Dallas state court?

7    A    The 202.

8    Q    202, yes.

9    A    No, it has not.

10   Q    All right.  And then it's -- has it been a party, then, to

11   any other litigation other than the efforts to file this

12   action, the Rule 202 action, and has it been a defendant in

13   any lawsuits?

14   A    To my understanding, no.

15   Q    Is it involved as a defendant in the Kirschner litigation?

16   A    Yes.

17   Q    Mr. Kirschner is suing Hunter Mountain; is that correct?

18   A    That is correct.

19   Q    Okay.  So, is Hunter Mountain a vexatious litigant?

20          MR. MORRIS:  Objection, Your Honor.  This is now

21   really beyond the scope.  We're not doing -- this is -- we're

22   not doing it.  I'm not letting -- because there's a vexatious

23   litigant motion pending now in the district court right now

24   before Judge Starr.  This has nothing to do with anything I

25   asked.

Patrick - Cross                                316

1          THE COURT:  Okay.

2          MR. MCCLEARY:  They're trying to draw --

3          THE COURT:  You've already asked him is it a party in

4  any other litigation besides the 202 and this attempted one,

5  so where are we going with this?

6          MR. MCCLEARY:  Well, they're just trying to draw Mr.

7  Dondero into this and -- this vexatious litigant argument, and

8  we're just developing the fact that obviously Hunter Mountain

9  has only filed -- attempting to file this action and a Rule

10  202 proceeding.  So they're not involved in a lot of

11  litigation and they're not a vexatious litigant.

12          THE COURT:  Okay.  I think I'll sustain that and we

13  can just move on.

14          MR. MCCLEARY:  Okay.  Then I'll pass the witness.

15  Thank you, Your Honor.

16          THE COURT:  Okay.  Any redirect?

17          MR. MORRIS:  No, thank you, Your Honor.

18          THE COURT:  All right.  You are excused, Mr. Patrick.

19      (The witness steps down.)

20          THE COURT:  Anything else?

21          MR. MORRIS:  Just a time check for both sides and

22  let's get to closings.

23          THE COURT:  Okay.  Caroline?

24          THE CLERK:  Movant has 23 minutes left and the

25  Respondents have 47.

317

1          THE COURT:  23 and 47.  Any other evidence from the

2  Respondents?

3          MR. MORRIS:  That is a fair question.

4      (Discussion.)

5          MR. MCCLEARY:  Your Honor, I just want to confirm

6  that all the exhibits that they did not object to have been

7  admitted into evidence.

8          THE COURT:  All right.  Well, let me --

9          MR. MCCLEARY:  We do offer them.

10          MR. MORRIS:  Oh.

11          THE COURT:  Hang on.

12          MR. MORRIS:  Did I get Exhibit 45, Your Honor?

13          THE COURT:  Just a moment.  I'm doing two things at

14  once here.  45 is in.

15          MR. MORRIS:  Okay.

16          THE COURT:  All right.  On HMIT's exhibits, okay,

17  first, as we all know, 29 through 52 are carried until -- if

18  we have another hearing with the experts.

19      (HMIT's Exhibits 29 through 52 carried.)

20          THE COURT:  I'm showing we have -- and speak up if

21  anyone questions this -- I show that we have Hunter Mountain

22  Exhibits 3 and 4, and then 7 through 10, 12 through 23, and 26

23  through 38, and 53 through 57, 64, 65, and then 67 through

24  seventy --

25      (HMIT's Exhibits 3, 4, 7-10, 12-23, 26-38, 53-57, 64, 65,

318

1    67-70 are received into evidence.)

2             MR. MCCLEARY:  Your Honor, I apologize.  From 36 --

3    26 to 32 are in?

4             THE COURT:  I believe that was part of the

5    stipulation, Mr. Morris, right?

6             MR. MCCLEARY:  Yes.

7             MR. MORRIS:  I think that's right.

8             THE COURT:  Okay.

9             MR. MORRIS:  We really didn't object to very many.

10            THE COURT:  Yes.

11            MR. MCCLEARY:  That would be 25, too.  That would

12   include 25?

13            MR. STANCIL:  No.  Objection.  25 is not --

14            THE COURT:  It's not admitted.

15            MR. STANCIL:  It's not in evidence.

16            THE COURT:  25 and 24 were not admitted.

17            MR. MORRIS:  Correct.  Those are my emails.

18            THE COURT:  Okay.  So --

19            MR. MCCLEARY:  25 is an article.

20            THE COURT:  Your 25 was John Morris Email Re: Text

21   Messages dated March 10, 2023.

22            MR. MCCLEARY:  Okay.

23            THE COURT:  Okay.  I can't remember where I left off.

24   I think I left off -- I'll just repeat after the expert

25   exhibits that are carried.  I've admitted 53 through 57.  I

1  have admitted 64, 65, 67 through 71.

2       (HMIT's Exhibit 71 is received into evidence.)

3       Now, I'm not sure if I ended up admitting 72.  That was

4  the articles.  I can't remember if you stipulated on that

5  finally.

6            MR. MORRIS:  I said they --

7            MR. MCCLEARY:  They had no objection.

8            MR. MORRIS:  -- they come in --

9            THE COURT:  Not for the truth of the matter asserted.

10           MR. MORRIS:  -- self -- exactly.

11           THE COURT:  Okay.

12           MR. MORRIS:  Self-authenticating.

13           THE COURT:  So 72 is in.

14           MR. MCCLEARY:  Okay.

15      (HMIT's Exhibit 72 is received into evidence.)

16           THE COURT:  Then we had some pleadings.  I think 73,

17  74, 75 are in, but again, not for the truth of the matter

18  asserted in any advocacy on 73 and 74.  And then 77, 78, 79

19  are in.  And that's it.

20      (HMIT's Exhibits 73, 74, 75, 77, 78, and 79 are received

21  into evidence.)

22           MS. DEITSCH-PEREZ:  Your Honor, I didn't make an

23  appearance, but I was taking notes (inaudible).

24           MR. MCCLEARY:  Your Honor, I believe 80 should be in.

25           MR. MORRIS:  No objection to 80.  It's on our -- it's

320

```
 1   part of our Exhibit 5.
 2           THE COURT:  Okay.  80 is in.  Admitted.
 3       (HMIT's exhibit 80 is received into evidence.)
 4           MR. MORRIS:  Yeah.  That's really Section A of that
 5   thing that I gave you this morning.
 6           THE COURT:  If Ms. Deitsch-Perez wants to consult
 7   with the Hunter Mountain lawyers, she can.  I don't know --
 8           MR. MORRIS:  Can I go through quickly mine, Your
 9   Honor?  Because we actually never had the opportunity to put
10   our exhibits in.
11           THE COURT:  Okay.  Let's make sure we're to --
12           MR. MORRIS:  Okay.  I'm sorry.  I'm sorry.
13           THE COURT:   -- closure on the Hunter Mountain
14   exhibits.
15           MR. MORRIS:  I'm sorry.
16           THE COURT:  Anything I said that you disagree with?
17   I don't think --
18       (Pause.)
19           THE COURT:  Okay.  Let's hurry up.  What is the
20   controversy?
21           A VOICE:  Roger?  The Court's addressing you.
22           MR. MCCLEARY:  Oh.  Excuse me, Your Honor.  So, just
23   a little unclear of whether you have Exhibits 21 through 25
24   admitted.
25           THE COURT:  I have 21, 22, and 23.  Not 24.  Not 25.
```

321

1   Okay.  Anything else?

2           MR. MCCLEARY:  Okay.  Then we do offer 24 and 25.

3           THE COURT:  You offered them.  I did not admit them.

4           MR. MCCLEARY:  Okay.  76.  I believe -- was that --

5   you're carrying?

6           MS. DEITSCH-PEREZ:  Carried.

7           MR. MCCLEARY:  You're carrying that?

8           THE COURT:  Okay.  I carried that and --

9           MR. MCCLEARY:  It's part of the expert issue.

10          THE COURT:  Okay.  Yes, part of the expert.  So it's

11  carried.

12      (HMIT's Exhibit 76 is carried.)

13      (Pause.)

14          MR. MCCLEARY:  I understand you've admitted 53

15  through 83, although some of them have now not been approved.

16          THE COURT:  All right.  Well, we need to clarify.  58

17  through 63, you think you offered them and I admitted them,

18  but not for the truth?  I remember that being discussed for 58

19  through 63.  Are you actually offering them?

20          MR. MCCLEARY:  Yes.  58 through 63.

21          THE COURT:  All right.  And Mr. Morris, you

22  ultimately agreed that yes, but not for the truth of the

23  matter asserted?

24          MR. MORRIS:  That's right, Your Honor.

25          THE COURT:  Okay.  So they are admitted.  Okay.

322

1        (HMIT's Exhibits 58 through 63 are received into

2   evidence.)

3            THE COURT:  And then there was an objection to the

4   Mark Patrick declaration for the same thing, not for the truth

5   of the matter asserted.

6            MR. MORRIS:  Exactly.

7            THE COURT:  But you agree as long as it's --

8            MR. MORRIS:  Correct.

9            THE COURT:  Okay.  So what that means is, to recap,

10  53 through 75 are admitted, although some of those are only --

11  they're not for the truth of the matter asserted.  And then 77

12  through 80 are admitted.  Okay?

13           MR. MCCLEARY:  And 76?  We offered 76.

14           THE COURT:  That's -- we carried it.  We carried it.

15  It relates to the expert.

16           MR. MCCLEARY:  Carried it.

17                          (Pause.)

18           MR. MCCLEARY:  Thank you, Your Honor.

19           THE COURT:  Okay.  Now let's straighten out

20  Highland's exhibits.  So, I'm showing 1 through 16 have been

21  admitted, and then 25 through 31-A?

22           MR. MORRIS:  25 through 31-A?

23           THE COURT:  I'm sorry.  Yes.  25 through 31-A.

24           MR. MORRIS:  Okay.

25           THE COURT:  And then 34.  And then 39, 40, 41, and

323

1  then 45.  51, 59, and 60.

2          MR. MORRIS:  Okay.  So I'm going to do my best not to

3  burden the Court.  I'm trying to focus.  We move for the

4  admission into evidence of Exhibit 32, which is Mr. Dondero's

5  objection to the HarbourVest settlement.  And the reason that

6  we're offering it is because he made no mention of any concern

7  at all that the settlement implicated material nonpublic

8  inside information.

9          THE COURT:  All right.  Any objection?

10         MR. MCCLEARY:  32?

11         THE COURT:  Uh-huh.

12         MR. MCCLEARY:  Yes, Your Honor.  Relevance and

13  hearsay.

14         THE COURT:  Overruled.  And I can take judicial

15  notice of it in any event.

16      (Debtors' Exhibit 32 is received into evidence.)

17         MR. MORRIS:  We move for the admission into evidence

18  of Exhibit 33, which is the recent letter from the Texas State

19  Securities Board declining to take any action after conducting

20  an investigation of the Dugaboy complaint.

21         THE COURT:  Okay.  Any objection?

22         MR. MCCLEARY:  We object on the grounds of relevance,

23  403, hearsay, and authenticity, Your Honor.

24      And I also, I think it's important that the decision by a

25  regulatory body has no bearing on this cause of action or the

324

1    colorability of this claim, and the Texas State Securities

2    Board will tell you that.  This is completely and utterly

3    irrelevant to your inquiry, Your Honor.

4              THE COURT:  Okay.  I overrule the relevance

5    objection.  Certainly, it goes to colorability.  It's some

6    evidence.  It's some evidence.  A regulatory body did not

7    choose to go forward --

8              MR. MCCLEARY:  But that could be for --

9              THE COURT:   -- on the complaint.

10             MR. MCCLEARY:  That could be for reasons entirely

11   unrelated.

12             THE COURT:  True, true.  It's some evidence.

13             MR. MORRIS:  That's speculation.

14             MR. MCCLEARY:  Not for this.

15             THE COURT:  But what is the authenticity objection?

16             MR. MCCLEARY:  Well, there's no demonstration.  I

17   don't believe they sponsored that with anyone.

18             THE COURT:  Pardon?  Say again?

19             MR. MCCLEARY:  They didn't sponsor that with anyone.

20             MR. MORRIS:  Your Honor, I actually -- if they really

21   put me to it, because I was reading the Rules of Evidence in

22   the wee hours of the morning, I am certain that there's an

23   exception for government documents and government statements

24   and government decisions.

25             MR. STANCIL:  Your Honor, as to its authenticity, I

325

1   could produce a witness from Highland who said they got it, if
2   that's really what we're doing.  That it's the letter, they
3   got it from the TSSB, if we're really doing authenticity.
4            MR. MCENTIRE:  Well, first of all, it's hearsay and
5   there is no authenticity issue and it's irrelevant.  I
6   understand --
7            MR. STANCIL:  What is the authenticity issue, Mr.
8   McEntire?
9            THE COURT:  I'm trying to understand the authenticity
10  issue.  You think this is a --
11           MR. STANCIL:  Do you think it's a real letter or a
12  fake letter?
13           MR. MCENTIRE:  Well, first of all, I'm going to
14  address the Court and not you, okay?
15      Your Honor, --
16           THE COURT:  Well, address by speaking in a --
17           MR. MCENTIRE:  Yeah.  Thank you.
18           THE COURT:  Okay.  I'm just saving the court reporter
19  from grief, okay?
20           MR. MCENTIRE:  It is hearsay, and it is hearsay that
21  is calculated to be misrepresented or mischaracterized because
22  it's utter speculation as to the basis for their decision.
23  And if it's -- utter speculation is the basis of your
24  decision, it has no reason to come in.  There's no --
25           THE COURT:  What you're telling me, it goes to the

326

1   weight of the evidence.  Okay?

2          MR. MCENTIRE:  Your Honor, --

3          THE COURT:  Okay.  You're not telling me it's

4   inadmissible hearsay.

5          MR. MCENTIRE:  Well, it is inadmissible hearsay.

6          MR. MORRIS:  Can I just, for one second?

7          THE COURT:  Please.

8          MR. MORRIS:  Paragraph 34 of their motion, Your

9   Honor.  Quote, "The Court also should be aware that the Texas

10  State Securities Board opened an investigation into the

11  subject matter of the insider tradings at issue, and this

12  investigation has not been closed.  The continuing nature of

13  this investigation underscores HMIT's position that the claims

14  described in the attached adversary proceeding are plausible

15  and certainly far more than merely colorable."

16     They used the investigation to try to convince you that

17  their claims are colorable, and now we have a letter saying

18  there's nothing.

19          THE COURT:  Okay.  You want to explain that to me?

20          MR. MCENTIRE:  Well, we put no evidence in, in this

21  proceeding --

22          THE COURT:  You put what?

23          MR. MCENTIRE:  We have put no evidence in, in this

24  proceeding, --

25          THE COURT:  You filed a pleading under Rule 11

327

1  suggesting this was highly relevant, right?

2          MR. MCENTIRE:  We filed a motion.  Yes, we did.

3          THE COURT:  Under Rule 11.

4          MR. MCENTIRE:  Yes.  Of course we did.

5          THE COURT:  Okay.

6          MR. MCENTIRE:  Of course we did.

7          THE COURT:  Suggesting this Texas State Securities

8  Board complaint and investigation was highly relevant.

9          MR. MCENTIRE:  The fact that it had opened an

10 investigation and was conducting an investigation is

11 irrelevant.  Its decision to stop the investigation without

12 further elaboration or clarification, this is why it calls for

13 utter speculation.

14         MR. MORRIS:  Your --

15         THE COURT:  Okay.  Do you have the hearsay exception

16 that applies?  I'm looking at my evidence rules right now for

17 the government record or public record.  Is it 803(8) that we

18 need to have addressed here?

19         MR. STANCIL:  803(8), Your Honor.

20         A VOICE:  Yeah, public records.

21         THE COURT:  Okay.

22         MR. STANCIL:  Public record.  Sets out --

23         THE COURT:  Public records, 803(8), hearsay

24 exception.  Moreover, you pled allegations suggesting this

25 investigation was really relevant.  So I overrule your

328

 1   objection, and so that means 33 is admitted.

 2        (Debtors' Exhibit 33 is received into evidence.)

 3            MR. MORRIS:  Thank you, Your Honor.  I continue.

 4   Exhibit 36 --

 5            MR. MCENTIRE:  Which one was that?

 6            MR. MORRIS:  That was 33.

 7        So now we're up to 36, Your Honor.  I'm going to skip some

 8   of these.

 9            THE COURT:  Okay.

10            MR. MORRIS:  But this is just the Court's order

11   approving Mr. Seery's original --

12            THE COURT:  I'm waiting for any objection for the

13   record.  Do we have an objection, Mr. McCleary?

14            MR. MCCLEARY:  36, relevance, Your Honor.

15            MR. MORRIS:  The relevance is that this Court

16   approved without objection Mr. Seery's compensation package in

17   an amount that included a base salary of $150,000, which the

18   Claimant Purchasers and the independent director saw fit to

19   continue.

20            THE COURT:  Objection overruled.  It's admitted.

21        (Debtors' Exhibit 36 is received into evidence.)

22            MR. MORRIS:  I think 38 may be on their list.  Yeah,

23   38 is in as their 26, right?  So that should be admitted.

24            THE COURT:  Admitted.

25        (Debtors' Exhibit 38 is received into evidence.)

329

1           MR. MCCLEARY:  If it's on our list, we agree.

2           THE COURT:  Okay.  It's admitted.

3           MR. MORRIS:  That's it, Your Honor.

4           THE COURT:  Okay.  Do you all need a five-minute

5    break before we do closing arguments?

6           MR. MORRIS:  I'd be grateful.

7           THE COURT:  Okay.

8           MR. MCCLEARY:  Yes, Your Honor.  Thank you.

9           THE COURT:  Will do.

10           THE CLERK:  All rise

11       (A recess ensued from 5:49 p.m. to 5:57 p.m.)

12           THE CLERK:  All rise.

13           THE COURT:  All right.  Please be seated.

14       We're back on the record in the Highland matter.  Closing

15    arguments.  Just for everyone's benefit, time -- you said 47

16    minutes and 23 minutes back several minutes ago, and then we

17    had all the housekeeping stuff.  So I'm not sure if that's

18    where we are right now or if --

19           MR. MCENTIRE:  I'm waiting for my monitor guy to be

20    here.

21           THE COURT:  Okay.  Okay.

22       So Caroline, is it still 47 and 23?

23           THE CLERK:  Yes.

24           THE COURT:  That's when we started the housekeeping

25    stuff.

330

1          MR. MCENTIRE:  So 27 minutes?

2          THE COURT:  Twenty-three.

3          THE CLERK:  Twenty-three.

4          MR. MCENTIRE:  Twenty-three?  Can I get a five-minute

5    warning, please?  Would you pull up the PowerPoint?  And let's

6    go to Slide 39.

7       May I proceed, Your Honor?

8          THE COURT:  You may.

9    CLOSING ARGUMENT ON BEHALF OF HUNTER MOUNTAIN INVESTMENT TRUST

10         MR. MCENTIRE:  So, before I go to the PowerPoint, I'd

11   like to kind of give a high-altitude overview of the situation

12   as I see it from the evidence perspective.  We don't believe

13   this should have been an evidentiary hearing.  Evidence has

14   been allowed.

15      We had a situation where, if you believe Mr. Dondero's

16   testimony as contrasted with Mr. Seery's testimony, you have a

17   credibility issue.  So the Court is now conducting an inquiry

18   presumably on the basis in part on the credibility of

19   witnesses.  And if you engage -- and if you want to indulge

20   that type of inquiry, the credibility of witnesses, without

21   allowing the Plaintiff in this case or the Movant in this case

22   to conduct some level of meaningful discovery, I would suggest

23   we have been deprived of due process, because without

24   documents to test Mr. Seery's statements, we are being

25   deprived of something that's basically very fundamental in our

1   judicial process.

2       And therefore, it underscores our argument and our

3   rationale why this shouldn't be an evidentiary hearing,

4   because I don't believe the Court can consider credibility

5   issues.

6       We have, on the one hand, unequivocal notes from Mr.

7   Dondero prepared contemporaneously that would suggest that

8   someone admitted to him and stated to him that they did in

9   fact obtain material nonpublic information.  Mr. Seery says

10  that didn't happen.  I specifically said, is that a lie?  Yes,

11  it's not true.  Well, that's a real problem, because that's

12  not the criteria that this Court should use for determining

13  whether we have a colorable claim.  A colorable claim is

14  whether there is some possibility.  It's something less, even

15  less stringent than a 12(b)(6) standard, plausibility.  We

16  have that.

17      If you look at our pleadings, we have set forth all of the

18  facts we need, all the elements we need to establish a trade

19  on material inside information, nonpublic information.  We

20  have evidence -- we have allegations that there was no due

21  diligence.  And Farallon's lawyer stood up here -- well, I'm

22  not going to really address that today.  But if there was any

23  day to address it, it was today.  We have no evidence to

24  suggest they did do due diligence.  Even Mr. Seery said, I

25  don't know what due diligence they did.  We have evidence to

332

1    suggest that the only due diligence they did was to talk to

2    Mr. Seery, who has told -- who told them that this is very

3    valuable, don't -- this is a really good -- a good investment

4    here, it's a lot better than the 71 percent that's on our

5    disclosures.

6        And Judge, that evidence supports the colorability of the

7    claim.  And if you go down the pathway of saying, well, I'm

8    not sure about Mr. Dondero because he had been held in

9    contempt two years ago, that's a real problem.  That's a

10   problem for this Court.  And I'm going to suggest that's why

11   this should have been a four-corners deliberation.  Even

12   Farallon and Stonehill suggest this should be a four-corners

13   deliberation.

14       We have evidence now of no due diligence.  We have

15   evidence before you that suggests that they did learn about

16   MGM before the announcement date.  We have evidence that Mr.

17   Seery did trade on -- did -- was aware and received

18   information of material nonpublic information.  And for him, a

19   CEO of his reputed stature, to sit here and say that was not

20   material and that was nonpublic defies common sense.  It

21   defies reasonableness.  That goes to credibility.

22       Mr. Dondero's notes speak volumes.  The trades themselves

23   speak volumes.  Mr. Dondero established that the interest --

24   return of interest here is to be less than one -- it's in the

25   one digits, and hedge funds trade in the 30, 40, 50 percent

333

1   range.  Well, if that's the case, we have Farallon walking

2   away from a return on the exit financing of 13 percent, and

3   that wasn't good enough for him.  How could six percent be

4   good enough for him?  There's something missing here.  There's

5   something not right.

6       And we're entitled to get our lawsuit on file and do some

7   discovery.  And if they want to do a 12(b)(6), they do a

8   12(b)(6).  If they want to do a Rule 56 after discovery, they

9   could do a Rule 56, all in this Court.  But to address this

10  threshold issue now based upon this, what happened here today,

11  is a fundamental denial of due process.

12      I'd like to go to my pleadings.

13      Can you go to Slide 39, please?

14      First of all, let there be no doubt -- 39.  Slide 39.  38.

15  38, please.

16      We can plead on information and belief.  We have a right

17  to plead on information and belief.  And the Fifth Circuit --

18  that is an acknowledged procedural practice in the Fifth

19  Circuit.  And if some of our allegations are based upon

20  information and belief, so be it.  The test here is not at

21  this stage.  The test here is whether I have sufficient

22  factual allegations, whether on information and belief or

23  otherwise, to satisfy at most a plausibility standard.  That's

24  it.

25      And if they want to challenge us at a later date, they

334

 1  can.  Rule 56.  12(b)(6).  Or standing.  But we have standing.

 2  We have standing.  We have standing under Delaware law.  We're

 3  a contingent beneficial interest that has standing under

 4  Delaware law and all other law.  All -- even Texas agrees that

 5  a contingent interest has standing, an inchoate interest as

 6  Mr. Seery described.  A property interest.  You have property

 7  interest, you have standing.

 8          THE COURT:  Let me ask you.

 9      And Caroline, turn the clock off when the Court

10  interrupts.

11      Just so you know, I mean, my analysis here is standing

12  first.  Does your client have standing?  Because we all know

13  that's a subject matter jurisdiction inquiry and I have to

14  explore that first.  And then I've said many times the legal

15  standard question for colorability.  That's kind of the second

16  place I go --

17          MR. MCENTIRE:  Sure.

18          THE COURT:  -- if I find there's standing.  But can

19  you tell me, have there been appellate decisions that are

20  relevant today on standing?  Contrary to what people may

21  expect, I don't follow every appellate decision from every

22  appeal in the Highland case.  Okay?  I wait until I get a

23  mandate --

24          MR. MCENTIRE:  Sure.

25          THE COURT:  -- to where I have to act on something.

335

1          MR. MCENTIRE:  Sure.

2          THE COURT:  So I feel like I've learned at some point

3    that some either district judge or Fifth Circuit said some

4    party didn't have standing.  And I don't know if it was Hunter

5    Mountain or some other trust.

6          MR. MCENTIRE:  Not --

7          THE COURT:  And is there anything they said that, if

8    it wasn't Hunter Mountain, could be relevant here?

9          MR. MCENTIRE:  I hope somebody kicks me if I'm wrong,

10   what I'm about to say.  I'm not aware of any such issue --

11         THE COURT:  Okay.

12         MR. MCENTIRE:  -- dealing with Hunter Mountain

13   Investment Trust.  I am not.

14         THE COURT:  But any other party that might somehow

15   bear on this case?

16         MR. MORRIS:  I apologize, Your Honor, I was

17   distracted.  For which issue?

18         THE COURT:  Standing.  Because I was saying my first

19   thing I've got to tackle in ruling on this is standing of

20   Hunter Mountain.  And I seem to remember learning that either

21   the district court on an appeal or the Fifth Circuit on some

22   appeal from Highland --

23         MR. MORRIS:  Correct.

24         THE COURT:  -- said some party didn't have standing.

25         MR. MORRIS:  Correct.

336

 1          THE COURT:  And I don't know if it was --

 2          MR. MORRIS:  Dugaboy on the 2015.3, for sure, was a

 3   Fifth Circuit standing decision.

 4          THE COURT:  Okay.

 5          MR. MORRIS:  I think there was a district court order

 6   that preceded that.

 7          THE COURT:  Okay.

 8          MR. MORRIS:  That was the subject of the appeal.

 9          THE COURT:  The Dugaboy --

10          MR. MORRIS:  2015.3.

11          THE COURT:  -- motion to require those --

12          MR. MORRIS:  Yeah.

13          THE COURT:  -- 2015.3 statements.  Okay.

14          MR. MCENTIRE:  So what we have here -- we can go back

15   on the clock if you'd like.

16          THE COURT:  Yes, please.

17          MR. MCENTIRE:  How much time do I have?

18          THE CLERK:  You have just under 16 minutes.

19          MR. MCENTIRE:  Sixteen?  Okay.  Give me a two-minute

20   warning.  Sorry.

21      Your Honor, what we have here --

22          THE COURT:  I don't think the U.S. Supreme Court

23   justices will give you a two-minute warning, but maybe I'm

24   wrong.

25          MR. MCENTIRE:  Would you give me a two-minute

337

1   warning, please?

2           THE COURT:  And I'm sure not a Supreme Court justice.

3           MR. MCENTIRE:  What we have here is we have a 99.5

4   percent equity interest that has now been relegated to a

5   category of contingent interest, which we don't believe we

6   should be, and that's part of our declaratory judgment relief

7   we're asking for, which we have standing to do that at a

8   minimum because we want to be treated like a Class 9.

9       If they want to treat us like a Class 10, I have an

10  argument for that, and it's more than colorable.  It's

11  persuasive.  It's -- it is a winning argument.  And that is we

12  do have standing in our individual capacity, and we have given

13  you a whole bunch of cases in our PowerPoint, or we will give

14  you a whole bunch of cases in our PowerPoint and in our

15  briefing to support that.

16      We also have given you Delaware case law that says we have

17  standing under Delaware trust law to bring a derivative action

18  against the Trustee.  We have done everything appropriate

19  here.

20      We have the -- a demand upon Seery obviously would be

21  futile to prosecute the claim.  A demand upon the Oversight

22  Board would be futile to make a demand on Muck and Jessup,

23  because they're Defendants and they're SPEs of Farallon and

24  Stonehill.  And a demand upon Mr. Kirschner would be futile.

25  They suggest that there's an assignment of some sort, but that

338

1  would be a modification -- of the claims over to the

2  Litigation Trust, but that would be a modification of the

3  plan.

4      There's been no assignment of this claim, or these claims,

5  to the Litigation Trust Trustee.  But even if there had been,

6  we pled that in the alternative as well.  And it would be

7  futile to make a demand on Mr. Kirschner because he's suing

8  Hunter Mountain.

9      So we are an appropriate party.  The only, then, issue

10  becomes whether or not we have standing under Delaware law to

11  bring a derivative action.  And we have briefed that and we --

12  and that's included in our PowerPoint.  The answer is yes.

13      I'd like to go briefly to Page -- next slide.

14      In our factual section, we set forth why this investment

15  would defy any kind of rational economic sense in the absence

16  of material nonpublic information as a factual allegation

17  supported by data, supported by dates, supported by time.

18      Based upon that, we also have allegations that are framed

19  around the admissions that Mr. Michael Linn provided.  We have

20  allegations that he turned down a 30 or 40 percent premium in

21  our petition.  We have allegations that they admitted that

22  they did no due diligence.  We have allegations that they

23  admitted that they got material -- basically information about

24  MGM.

25      And again, it's not all about MGM.  It's about the values

339

1  of all the portfolio companies.  They want to make it about

2  MGM.  If they do, we win.  But it's much broader than that.

3      And we have standing to bring this claim because if we're

4  right Mr. Seery will have to return excess compensation and

5  the Claims Purchasers will have to disgorge.  And that's going

6  to help not just Hunter Mountain.  That's going to help other

7  creditors who haven't been paid yet.

8      So this is not exclusively -- Hunter Mountain would

9  substantially benefit.  I'm not suggesting otherwise.  But it

10 also benefits innocent stakeholders other than Hunter

11 Mountain.  And that's why we are an appropriate party.  We

12 don't have a conflict of interest to bring this.  Everybody on

13 their side of the table does.  There's no one else who could

14 bring this.

15     Your Honor, it's very clear when the trades took place.

16 We give dates and times.  It's very clear that -- next slide,

17 40.  It's very clear that their investment was over $160

18 million.  If it isn't, I don't see any denials.  All we got

19 today was a lame statement from the lawyer saying we're not

20 here today to deny this.

21         MR. MORRIS:  I'm offended.

22         THE COURT:  He's offended by being called lame.

23         MR. MCENTIRE:  Not you lame personally.

24         MR. MORRIS:  Oh, thanks for the clarification.

25         THE COURT:  Okay.

1           MR. MCENTIRE:  A lame statement by you.  In fact, it

2     wasn't even you, so --

3        In any event, Your Honor, --

4           MR. MORRIS:  I've been called worse.

5           MR. MCENTIRE:  -- the point being is that there was

6     no -- there's not -- never been an attempt to deny the factual

7     allegations in our pleadings dealing with Farallon and

8     Stonehill.  None at all.

9        And so -- not that that's ultimately relevant, because

10    that's an evidentiary issue outside of the four corners of our

11    pleading, but it does -- it just stands out and screams.  It

12    screams.  And it screams volumes.

13       So right, now based upon our pleadings -- we even plead in

14    Paragraph 42, Paragraph 42, exactly what they invested.  This

15    is what you have before you.  No one has disputed it.  It's in

16    the four corners of our pleading.  We've got dates, times,

17    amounts.  We have admissions to Mr. -- well, we have

18    admissions from Michael Linn, Paragraph 47.  We have -- we do

19    plead upon information and belief the *quid pro quo* on

20    compensation.  And frankly, the evidence here today is that

21    the compensation is excessive.  And the experts will further

22    confirm that it is excessive.  $1.8 million with a bonus

23    program in place to pay him another $8, $9, $10 million, when

24    in fact the risks don't exist and there's no uncertainty and

25    therefore the percentages make no sense.  That's --

341

1          THE COURT:  What do you mean, the risks don't exist
2     and there is no uncertainty?
3          MR. MCENTIRE:  If Mr. Seery is telling Farallon and
4     Stonehill don't sell, this could be really valuable, it's
5     inconsistent with the notion that the schedule and the
6     performance -- performance schedule in the compensation
7     agreement is rationally justified.  Because if it's really
8     certain or it's likely you're going to make a lot of money,
9     there's no reason to give him six percent to incentivize him
10    because it's already a done deal.
11         And the whole point here is that I scratch your back, you
12    scratch mine.  They make a lot of money on their deal and he
13    gets a lot of money on the backside post-effective date.
14    Post-effective date.
15         Next slide, 49.
16         It would have been impossible, based upon the publicly-
17    available information in Paragraph 49, impossible for
18    Stonehill and Farallon, in the absence of inside information,
19    to forecast any significant profit when they made their
20    investments.  It's not possible.  Because given the amount of
21    the Claim 8 and Claim 9 claims -- they actually invested in
22    Claim 9 with a zero return.  It's projected to be a negative
23    result.  On Claim 8, even if you allocate their entire
24    purchase price to Claim 8, they're going to get something less
25    than a 10 percent return paid out over a couple years.  Nobody

1    invests that kind of money in an unsecured creditor asset that

2    hasn't been collateralized.  There's something wrong here.

3        And we have a right to have our day in court to show that.

4    We have our right to take a true deposition of Mr. Seery with

5    documents.  We have a right to take Farallon and Stonehill's

6    deposition with documents.  And we have tried to get

7    information and we have been turned down at every turn.  We

8    have a right to have our day in court, Your Honor.

9        We have allegations of excessive compensation.  I know Mr.

10   Morris suggested the other day that we didn't have any such

11   allegations.  They're here.  The whole idea here is that Mr.

12   Seery would really profit on the backside.  And, you know, he

13   actually testified, I believe -- I won't do that because

14   that's outside the four corners of our pleading.  But the --

15   there is a *quid pro quo*.  We allege there's a *quid pro quo*

16   upon information and belief.  And we also allege willfully and

17   knowingly, we allege conduct that falls clearly within the

18   exceptions.

19       None of this -- none of these claims were released.  Mr.

20   Seery's not an exculpated party in the context of how we --

21   proposing to sue him here.  None of the protected parties, to

22   the extent that Muck and Jessup claim to be protected parties,

23   they're not protected here, because all of the claims we're

24   making are on the basis of willful misconduct and bad faith,

25   which are the standards that they used and incorporated in the

343

1   plan and in the gatekeeper provisions.

2       How much time do I have?

3           THE CLERK:  Right now you have --

4           MR. MCENTIRE:  Thirty seconds?

5           THE CLERK:  -- seven minutes left.

6           MR. MCENTIRE:  Okay.  Next slide, please.

7       Mr. Seery has admitted that he has a duty to avoid self-

8   dealing.  We allege that he did self-deal.  There is clearly a

9   relationship.  We have a right to explore the depths of that

10  relationship.  Well, already we know there is a relationship.

11  We have investments in charities, contributions to charities,

12  meet-and-greets, congratulatory emails.  It's not as if

13  Farallon and Stonehill are strangers, or Mr. Seery's a

14  stranger to them.  It's not like that at all.  They contacted

15  him to get involved.

16      And by placing -- by acquiring these claims -- and by the

17  way, this is the most significant trading activity in your

18  bankruptcy, in this bankruptcy proceeding.  Post-confirmation.

19  Post-confirmation.  By acquiring these claims, they were

20  guaranteed to be put onto the Oversight Board.  By acquiring

21  these claims, they were guaranteed to be put in a position --

22  into a position where they would adjust, monitor, compensate

23  Mr. Seery.  That's the terms of the Claimant Trust.  Those are

24  the terms.

25      And it's interesting, because one of the amendments that's

344

1    in evidence to the plan, I think it's either the third or the

2    fourth amendment, that came out of nowhere right before

3    confirmation, they changed the structure of the Claimant Trust

4    to go off a standard base pay and added in a bonus structure

5    at the last minute.  That's evidence.

6        Mr. Seery has acknowledged, we have alleged he had duties

7    to avoid self-dealing, to always look out for the best

8    interests of the estate, to avoid conflicts of interest.

9    Well, here, to the extent that there is a *quid pro quo*, he is

10   self-dealing and he has injured the Reorganized Debtor and

11   he's injured the Claimant Trust, because that's just less

12   money.

13       And we also allege, Your Honor, it's also an allegation

14   that --

15            THE COURT:  And let me ask, the sole injury here is

16   compensation was more than it would have been if not for the

17   sale of the claims to Farallon and Stonehill --

18            MR. MCENTIRE:  That's one of the injuries.

19            THE COURT:  -- and therefore less money at the end of

20   the day for creditors and ultimately Hunter Mountain?

21            MR. MCENTIRE:  Yes.  And we also allege that, as part

22   of this arrangement, conspiracy, as we allege conspiracy, we

23   have seen over $200 million flow out of the coffers of this

24   estate in the form of --

25            THE COURT:  What do you mean, as a result of the

345

1   alleged conspiracy?  What do you mean?

2           MR. MCENTIRE:  A delay, a postponement, making long-

3   term payouts, keeping the litigation alive.  They actually

4   suggested to Mr. Linn, don't settle these claims, don't sell

5   out, because this is asset-backed, and we also have claims.

6   And so --

7           THE COURT:  Wait, what?  Say again?

8           MR. MCENTIRE:  One of the things that Mr. Linn told

9   Mr. Dondero, according to Mr. Dondero's notes, is we have --

10  this is very valuable, we're buying assets and we're buying

11  into claims, the litigation claims that are being asserted in

12  this bankruptcy proceeding.

13          THE COURT:  Yes.  Got it.

14          MR. MCENTIRE:  Yeah.  And so the whole idea here is,

15  is that people are funneling money in and taking money out of

16  the coffers of this estate to fuel future litigation in order

17  to have a bigger payday at the end for Class 8 and Class 9.

18  That's exactly what those notes suggest.

19          THE COURT:  I don't understand the correlation.  What

20  correlation are you making?  Because of the claims being

21  purchased, what?

22          MR. MCENTIRE:  The claims being purchased allow Muck

23  and Jessup to be in a position to award compensation.  We've

24  talked about that.

25          THE COURT:  I got that.

**Appx. 02882**

1           MR. MCENTIRE:  That's one type of injury.  The other

2     injury is, and we have alleged it, is the fact that these

3     claims become very valuable not only because they're asset-

4     backed but because also the litigation claims that Mr.

5     Kirschner is prosecuting.

6           THE COURT:  But how does the purchase of the claims

7     impact that?  They were allowed claims at certain amounts

8     before, and after the purchase they're still allowed claims.

9           MR. MCENTIRE:  Mr. Seery is telling them that,

10    basically, this is our plan, this is what we're doing, this is

11    --

12          THE COURT:  That was the plan of reorganization that

13    was confirmed by the Court.  I don't get how something

14    changed.  I'm trying to get to what are the injuries that your

15    client has suffered.  And I get the compensation argument

16    you're making, but I don't get the rest of it.

17          MR. MCENTIRE:  If Mr. Dondero had been in a position,

18    or one of his entities had been in a position, or even Hunter

19    Mountain, and I'm not sure why Hunter Mountain -- be in a

20    position to have acquired the claims, then we would -- this

21    bankruptcy wouldn't even be in existence anymore.  It'd be

22    over.  All creditors would be paid.  It would be done.  Be

23    over.  And that is an allegation we have made --

24          THE COURT:  How do I know that?

25          MR. MCENTIRE:  Because all the creditors would have

347

1   been paid off.

2          THE COURT:  How do I know, if he would have purchased

3   the claims, that's what would have happened?

4          MR. MCENTIRE:  Well, that's what he testified to

5   today here.  I don't want to get off on a rabbit trail.

6          THE COURT:  I'm trying to understand the injury, --

7          MR. MCENTIRE:  Sure.  I understand.

8          THE COURT:  -- because that's part of my analysis

9   here.

10         MR. MCENTIRE:  The focus, the focus is on the

11  compensation.  And once they aid and abet, once they aid and

12  abet a breach of fiduciary duties, they are subject to

13  disgorgement, and disgorgement of all of their ill-gotten

14  gains.  And the ill-gotten gains are now well over --

15  approaching over $100,000 million.

16         THE COURT:  How do you get to that number?

17         MR. MCENTIRE:  Easily.  We know how much they

18  purchased, which has never been denied.  We know how much has

19  been distributed to Class 8.  And we know what percentage of

20  Class 8 they own.  They own about 95 percent of all Class 8

21  claims.  So if $270,000 million has been distributed to Class

22  8, they got 90 percent of that, 95 percent of it has already

23  gone to them, Farallon and Stonehill.

24         THE COURT:  But it would have gone to the sellers of

25  the claims as well.  I'm trying to make the connection.

348

1          MR. MCENTIRE:  That's not the injury.  The injury is

2     what -- that is a consequence of their conduct.  The injury is

3     the compensation.  All right?  That's a distinct injury.  They

4     are subject to disgorgement as a consequence because they have

5     done wrong, and the law should not tolerate -- should not

6     tolerate and allow wrongdoers to get away.  And that's where

7     the unjust enrichment and disgorge --

8          THE COURT:  And what are your best cases for that,

9     that they would have to disgorge --

10          MR. MCENTIRE:  We have cited --

11          THE COURT:   -- the Purchasers would have to disgorge

12     --

13          MR. MCENTIRE:  We have cited cases in our brief.

14          THE COURT:  I'm asking you now to --

15          MR. MCENTIRE:  I don't have them in front of me right

16     this second.  But an aider and abettor --

17          THE COURT:  The *CVC* case, is that your best case?

18          MR. MCENTIRE:  I don't have the cases in front of me.

19     I can say this, that the case law is robust, and I can supply

20     you --

21          THE COURT:  It is not robust.  That's why I'm asking

22     you to zero in.  I read your *CVC* case from the Third Circuit,

23     and I'm wondering, is that your strongest case?

24          MR. MCENTIRE:  No.  I think we -- I think we have a

25     lot of strong cases.  I'm not sure that it is the strongest.

349

1          THE COURT:  Tell me which ones, so I --

2          MR. MCENTIRE:  Ma'am, I just said I don't have it in

3    front of me.  If you'll look --

4          THE COURT:  Okay.  Well, this is closing argument

5    where you present law in support of your position.

6          MR. MCENTIRE:  Well, actually, I'm arguing facts

7    right now.  But Your Honor, what I want to tell you is if

8    you'd like me to submit a letter brief on that, I will.

9          THE COURT:  No.

10         MR. MCENTIRE:  Okay.  Then I won't.  It's in my

11   brief.  All of our authorities are in the brief.

12      In conclusion, --

13         THE COURT:  Okay.  So that was the *CVC* case from the

14   Third Circuit which dealt with an insider who purchased

15   claims, statutory insider, a board member, a 28-percent equity

16   owner, who purchased claims during the case to be in a

17   position to file a competing plan and didn't disclose to the

18   board or file a 3001(e) notice.  Okay.  There was -- claims

19   shouldn't be allowed at more than what the purchaser paid for

20   it.

21         MR. MCENTIRE:  Okay.

22         THE COURT:  Okay.  I'm asking you, is that your best

23   case?  Because you also cited *Adelphia*, which seemed kind of

24   factually off the mark.  And so I really --

25         MR. MCENTIRE:  I -- I'm sorry, --

350

1            THE COURT:  I need to know, because I've made clear

2    from the beginning, --

3            MR. MCENTIRE:  Yes.

4            THE COURT:   -- I'm struggling with how is there a

5    cause of action related to claims trading.

6            MR. MCENTIRE:  (chuckles)

7            THE COURT:  I don't know why you're giggling.  This

8    is --

9            MR. MCENTIRE:  No, I'm not.  But --

10           THE COURT:   -- serious stuff.  Okay?

11           MR. MCENTIRE:  Agreed.  Agreed.

12           THE COURT:  A bankruptcy estate is being charged ka-

13   ching, ka-ching -- not bankruptcy estate -- the post-

14   confirmation trust.  Ka-ching, ka-ching, ka-ching.  So this is

15   serious stuff.

16           MR. MCENTIRE:  Agreed.

17           THE COURT:  I need to, you know, colorable claim.

18           MR. MCENTIRE:  Agreed.

19           THE COURT:   Colorable claim.

20           MR. MCENTIRE:  Agreed.

21           THE COURT:  Even if plausibility is the standard,

22   which I've expressed my doubt about that, how do you have a

23   plausible claim?  What is your best case?

24           MR. MCENTIRE:  Okay.  This --

25           THE COURT:  Just to recap what I'm focused on,

351

1  purchaser and seller, okay?  I can see where breach of

2  contract, maybe some sort of torts between those two.  Okay.

3  I can see where the U.S. Trustee, the SEC, I don't know, the

4  Texas State Securities Board, they might get concerned about

5  allegations of insider trading and there might be a regulatory

6  action.  But the estate?  Again, the post-confirmation trust

7  --

8          MR. MCENTIRE:  Okay.

9          THE COURT:  -- and a contingent beneficiary.  I'm

10 trying to understand what is the best legal authority that

11 might support a colorable claim.  And we talked about the *CVC*

12 case and *Adelphia*.  I'm trying to figure out what are other

13 cases you think I should really hone in on to understand this.

14         MR. MCENTIRE:  All right.  At the very beginning this

15 morning, during my opening statement, I had said this is not

16 your typical claims-handling case, because I recall from our

17 last conference you asked that question a couple of times.

18 This is not your typical claims-handling case.  And it's not a

19 typical claims-handling case because we have a fiduciary that

20 we claim breached his duties that were owed to the estate.

21 And he self-dealt.  And he -- this has nothing to do with the

22 plan.  This has something to do with what Mr. Seery did

23 outside the corners of the plan.  Perhaps he used the plan

24 expediently.  He self-dealt.

25      That's why this is not just between a seller and a buyer

352

1   of a claim.  That's number one.

2        We have been denied an opportunity to discover the

3   communications between the sellers and the buyers, and my

4   guess is we have big boy agreements that prevent the sellers

5   from ever coming back at anybody for fraud.  My expectation,

6   that's the case.  We should have a right to go explore that.

7   So that's why they're not here.

8              THE COURT:  Why?  I mean, what would that tell you?

9   What would that tell you?

10             MR. MCENTIRE:  That --

11             THE COURT:  If there's a big boy agreement, if

12  there's not, what --

13             MR. MCENTIRE:  It would tell us --

14             THE COURT:   -- consequence would that have for this

15  --

16             MR. MCENTIRE:  It would tell us --

17             THE COURT:   -- proposed lawsuit?

18             MR. MCENTIRE:  It would answer Mr. Morris's question

19  that he's raised several times, this is the seller's issue,

20  this is not -- this is not the Hunter Mountain's issue.  It is

21  Hunter Mountain's issue.  Hunter Mountain as an equity

22  interest-holder should be in a position to be certified as a

23  Class 9 beneficiary now pursuant to our declaratory judgment

24  action.  That's number one.

25        Number two.  As a contingent beneficiary, it is entitled

353

1   to protect its interests and bring suits if it sees that

2   something has happened that is incorrect and is a tort

3   involving the Reorganized Debtor and the Claimant Trust.  That

4   is the nature and the essence of our claim.

5       And as a consequence, the aiders and abettors should not

6   be allowed to walk away unharmed.  They should be required to

7   disgorge their ill-gotten profits.  And that calculation is

8   easily done, as I've just demonstrated.

9       Your Honor, that's all I have.  Thank you very much.

10          THE COURT:  Thank you.

11          MR. MCENTIRE:  And we talked -- we'd need an

12  opportunity to argue on the issue of experts, because --

13  whether you're just going to take it under advisement, I'm not

14  sure how you're going to handle that.

15          THE COURT:  I'm going to read the pleadings and then

16  I'm going to let you all know are we coming back for another

17  day.

18          MR. MCENTIRE:  Thank you.

19          THE COURT:  All right.  Who is making the closing

20  argument -- do we have three closing arguments?

21          MR. STANCIL:  Yes.

22          MR. MCILWAIN:  We're going to do it in reverse order.

23          MR. MORRIS:  Reverse order in.

24          THE COURT:  Okay.  Reverse order of --

25          MR. STANCIL:  Keep it interesting.

354

 1          MR. MORRIS:  I think I was last on the opening.

 2          THE COURT:  -- importance?

 3      (Laughter.)

 4          THE COURT:  No.  Just kidding.  Just kidding.

 5          MR. MORRIS:  We're assuming you remember what the

 6  original order was.

 7          MR. STANCIL:  Yeah, right, right.

 8          MR. MORRIS:  It was so many hours ago.

 9          THE COURT:  Okay.  Oh, so many hours ago.

10          MR. MCILWAIN:  I think I was referred to earlier as

11  the lame lawyer.

12          THE COURT:  Oh, you were.  I think --

13          MR. MCILWAIN:  So I'll start.  I think --

14          THE COURT:  I think you --

15          MR. MCILWAIN:  Or maybe it was the lame argument,

16  whatever.  Whatever.

17          THE COURT:  I think you were the lame one.

18       CLOSING ARGUMENT ON BEHALF OF THE CLAIM PURCHASERS

19          MR. MCILWAIN:  Your Honor, Brent McIlwain here for

20  the Claim Purchasers.

21      Let me start, I guess, by saying I understand now why

22  Hunter Mountain did not want to put on evidence, because the

23  evidence that they put on, frankly, made their case much

24  worse.

25      As we argued or we stated in the opening statement, our

355

1  position is that you can look within the four corners of this

2  document and determine that there is no plausible or colorable

3  claim.  What the evidence showed is that Mr. Dondero allegedly

4  had a call with one -- with Farallon, not with Stonehill, with

5  Farallon, Farallon wouldn't tell him what they paid, Farallon

6  did not accept an offer of 130 or 140 percent of whatever they

7  paid for the claim, and he thinks they did no due diligence,

8  right?  He had nothing in his notes about MGM.  So he can say

9  that he thought that they were positive because of MGM, but

10 it's certainly not -- I don't think the Court should take that

11 evidence with any credibility.

12     But interestingly, what Mr. Dondero says is, well, how do

13 you know how much they paid for these claims?  He goes, well,

14 there was a market for the claims, right?  They were all

15 trading at 50 or 60 cents.  But yet no one would ever buy

16 these claims without any due diligence because the projections

17 in the plan indicate that they wouldn't -- they wouldn't get a

18 return.

19     Well, if there's a market for the claims and he's willing

20 to pay 30 or 40 percent more than whatever someone purchased,

21 certainly there is a market for the claims.  And he is the

22 only one, frankly, that had inside information.  That's why he

23 was willing to maybe pay more.

24     Or, alternatively, the case that you were describing

25 before, Mr. Dondero maybe wanted to buy the claims so he could

356

1    control the case, right, so he could dismiss any litigation

2    that was pending against himself so he could avoid the ire of

3    the estate that is aimed at him.

4        It also -- the Court's inquiry as to what the injury is I

5    think is precisely on point.  The only injury offered at this

6    point really is that somehow my client's agreed-to higher

7    compensation that is reasonable or appropriate in return for

8    some inside information on claims that were allegedly trading

9    at 50 or 60 cents in any instance.  And what the evidence

10   showed is that, one, Mr. Dondero never had any information

11   about that, about the compensation that Seery is receiving

12   when this complaint was filed, when this motion for leave was

13   filed.

14       And so if you judge the complaint within the four corners,

15   there is no -- there is no *quid pro quo*, right?  Because he

16   says, well, there's obviously something up here because they

17   wouldn't have bought these claims without due diligence, and

18   they must have agreed to higher compensation, and that's why

19   it all happened.  And if we throw all this out here, then

20   we'll get to do the discovery that we wanted to do.

21       Importantly, if you look at his notes, right, the first

22   thing that's written down is discovery to follow, because

23   that's how he operates.  That's how a serial litigator

24   operates.  Discovery to follow so that I can pay you back for

25   not selling your claim to me.  Right?  So I can't control the

1  world, so I can't control this case, you're going to pay.  And

2  we're all paying.  Every one of us here.  Right?  There's 15

3  lawyers in the courtroom and probably 10 on the phone, right?

4  We're all paying.

5      And so when Mr. McEntire says I'm not getting my day in

6  court, we've had an entire day in court.  We've had three

7  hearings to decide what this hearing is going to be.  And he's

8  gotten more than his day in court for, frankly, what is word

9  salad.  This complaint doesn't pass any test, whether it's

10  12(b)(6) or under the *Barton* Doctrine.  It's simply

11  allegations that are thrown out there, and they're saying, so

12  that we can do more discovery to determine if we actually have

13  allegations.  Because they want to continue to harass people,

14  they want to continue to be a thorn in everyone's side, so

15  that perhaps they can avoid further litigation against Mr.

16  Dondero or they can convince somebody to settle with Mr.

17  Dondero.

18      It doesn't make any sense, Your Honor, and this is exactly

19  why there is a gatekeeper provision, right.  That's why the

20  Court imposed this.

21      And you ask yourself, why would someone sell these claims?

22  Obviously, the sellers of the claims have not shown up.

23  Whether they're big boy, it doesn't matter, because the Court

24  and this estate had nothing to do with those sales.  But they

25  haven't shown back up.  I can -- I can venture a guess why, if

358

1   I was involved with Mr. Dondero, I would sell my claim, right?

2   Because I wouldn't have to be here.  And that's exactly why

3   the Court should not authorize this complaint to be filed and

4   the gatekeeper provision of the order should prevent it.  And

5   frankly, this should be shut down and we should not have to

6   have continued litigation over experts, or anything else, for

7   that matter.  And frankly, we should just be able to go on and

8   let Mr. Seery do his job.

9       Because I think the evidence was pretty clear that his

10  compensation is reasonable and it was in line, frankly, with

11  what he was making before.  And candidly -- and maybe it's

12  because Mr. McEntire is not involved in bankruptcy cases, but

13  this is similar compensation that I see in numerous cases, and

14  it's tiered to incentivize Mr. Seery to do his job, and he's

15  doing his job.

16      So, with that, Your Honor, I'll cede the rest of the time

17  to the other parties.

18              THE COURT:  Okay.  Thank you.

19          CLOSING ARGUMENT ON BEHALF OF JAMES P. SEERY, JR.

20              MR. STANCIL:  Thank you, Your Honor.  I'm going to

21  focus -- and I'm going to put my little clock up so Mr. Morris

22  doesn't, you know, give me the hook here.

23              THE COURT:  Okay.

24              MR. STANCIL:  But first --

25              THE COURT:  Next time we're all here, maybe I'll have

Appx. 02895

359

```
1   one of those red, what do you call them, the buzzer.
2            MR. STANCIL:  Oh, the big light?
3            THE COURT:  The red light.
4            MR. STANCIL:  We used to joke that the judge I
5   clerked for wished he had a trapdoor and he could just pull
6   the lever when it was done.
7            THE COURT:  Okay.
8       (Laughter.)
9            MR. STANCIL:  Maybe I shouldn't have put that in your
10  head.
11           THE COURT:  Who was that?  Are we going to say who
12  that was?
13           MR. STANCIL:  So Your Honor, I'm going to try to set
14  the legal framework.  I'm going to ask you -- and I think we
15  have our -- we have the deck.  It's the little -- if we could
16  put that up and start on Slide 2.
17      I'd like to address what standard applies, and then I'd
18  like to spend a few minutes asking Your Honor again not only
19  to rule on multiple alternative grounds, but also I'd like to
20  walk through what if you did this on a pure 12(b)(6), because
21  it's going to collapse.
22      So, well, we'll just jump in.  I said at the beginning
23  that we know that the question here is not what does the word
24  colorable mean in isolation.  We wouldn't do that in any
25  context.  We would always look and see what the operative
```

360

1   language here is in the Court's confirmation order.  So the

2   question is, what did the Court mean, it must represent a

3   colorable claim?

4       So we mentioned before Paragraph 80 of the confirmation

5   order.  That cites *Barton*.  It cites the vexatious litigant

6   cases.  I've not heard one word from Mr. McEntire answering

7   how it can be that we're here on a sub-12(b)(6) standard he

8   now says when the Court articulated this legal authority and

9   this legal basis in the confirmation order.  If he believed

10  that, the time to make that argument was on the confirmation

11  appeal, and that's over.

12      But let me then say, how did we get, how did the Court get

13  to Paragraph 80?  Well, that came after a series of factual

14  findings in the confirmation order -- in fact, actually, Josh,

15  do you have the hard copy of this?

16          MR. LEVY:  Yeah.

17          MR. STANCIL:  If I could hand that to the Court.

18      May I approach, Your Honor?

19          THE COURT:  You may.  Thanks.

20          MR. STANCIL:  And I don't propose to go through every

21  slide, Your Honor.

22          THE COURT:  Okay.

23          MR. STANCIL:  But if you could turn to Slide #5.

24  This is Paragraph 77 of the Court's confirmation order.

25  Factual support for gatekeeper provision.

1        MR. MCENTIRE:  Excuse me.  May I have a copy?  I

2   can't see it.

3        THE COURT:  Oh.

4        MR. LEVY:  Oh, yeah, sure, sure.

5        MR. STANCIL:  And can we get a copy of yours as well,

6   --

7        MR. MCENTIRE:  Sure.

8        MR. STANCIL:  -- while we're at it?  Thanks.

9      The facts supporting the need for the gatekeeper provision

10  are as follows.  I will not read them all, but if you scroll

11  about eight lines down, it says, During the last several

12  months, Mr. Dondero and the Dondero-related entities have

13  harassed the Debtor, which has resulted in further

14  substantial, costly, and time-consuming litigation for the

15  Debtor.  And then there are six separate enumerated examples

16  of that.

17     Paragraph 78 on the next slide.  Findings regarding

18  Dondero postpetition litigation.  The Bankruptcy Court finds

19  that the Dondero postpetition litigation was a result of Mr.

20  Dondero failing to obtain creditor support for his plan

21  proposal and consistent with his comments, as set forth in Mr.

22  Seery's credible testimony, that if Mr. Dondero's plan

23  proposal was not accepted he would, quote, burn down the

24  place.

25     Next slide.  This is Paragraph 79.  Necessity of the

362

1    gatekeeper provision.  If you would just skim to the bottom of

2    that first column, it says, Approval of the gatekeeper

3    provision will prevent baseless litigation designed merely to

4    harass the post-confirmation entities charged with monetizing

5    the Debtors' assets for the benefit of its economic

6    constituents, will avoid abuse of the court system and preempt

7    the use of judicial time that properly could be used to

8    consider the meritorious claims of other litigants.

9         And then came Paragraph 80, which we've just discussed.

10   With respect, Your Honor, the question is, what is the meaning

11   of Paragraph 80?  And in context, following those paragraphs

12   regarding vexatious litigation and abuse of litigation, it is

13   simply implausible to suggest that colorability is a sub-

14   12(b)(6) standard.

15        And that is Mr. McEntire's contention today, that the

16   gatekeeping order is actually lower than the threshold that

17   every other litigant faces.  Everyone else has to file a

18   claim, pass a 12(b)(6), and on they go to get to discovery.

19   Mr. McEntire believes that the gatekeeping order imposes less

20   than that on him, and then he's treated just like everybody

21   else.  It makes no sense whatsoever.

22        So I'll skip Slides 8 and 9, Your Honor, but that's where

23   the Fifth Circuit described the gatekeeping orders, affirmed

24   them in relevant part, citing *Barton*.  There is no mystery

25   here.

 1      If you could flip, Your Honor, to Slide 10 very briefly.

 2   We've talked about this case a little bit in one of our status

 3   hearings, *In re Vistacare Group*.  This is the leading case

 4   that describes what it is that one does under a *Barton*

 5   analysis, and it says that the trustee must make a -- pardon

 6   me -- a party seeking leave to sue a trustee must make a *prima*

 7   *facie* case against the trustee, showing that its claim is not

 8   without foundation.  A *prima facie* case is more than a

 9   12(b)(6).

10      And I would direct Your Honor to the language in the third

11   bullet.  It involves a greater degree of flexibility than a

12   Rule 12(b)(6) motion to dismiss because the bankruptcy court,

13   which, given its familiarity with the underlying facts and the

14   parties, is uniquely situated to determine whether a claim

15   against the trustee has merit.  Boy howdy, are we -- I'm

16   sorry.  My kids are going to tease me for that.

17      But this -- no case has ever proved the wisdom of that

18   statement, Your Honor.  We are here, and the Court is all too

19   familiar with the facts and the parties of this case.  And

20   we're not here on an adversary proceeding.  We're here on a

21   contested matter.  And Your Honor has the authority on any

22   contested matter to take evidence, and a broad, broad

23   discretion as to what evidence is appropriate to meet that

24   standard.

25      So we have laid out briefly in Slide 11 what -- why we

364

1    believe that -- or how we believe that the *prima facie* showing

2    would work.  And in short -- and maybe this will help us going

3    forward -- we believe that if they make -- if a party seeking

4    relief under the gatekeeping order says things, we have the

5    right to rebut them, like in a burden-shifting or a burden of

6    production -- pardon me -- analysis.  So you can say that the

7    sun rises in the west, but we can bring in evidence to say it

8    doesn't, it rises in the east.  And that's the plausibility

9    threshold.

10        And here, and if Your Honor would flip to the next slide,

11   I'm not sure it's entirely fair to say, even after they have

12   purported to withdraw their evidence, that they've really done

13   so.  And we disagreed with Mr. McEntire, and advised him of

14   such leading up to this hearing, that we do not agree that his

15   redactions fully excise all of the evidentiary assertions from

16   his motion.

17        And I'll just pick one example here on Slide 12.  On the

18   left is Paragraph 32 of the motion for leave prior to the

19   purported withdrawal.  On the right is Paragraph 32 after the

20   withdrawal.  Your Honor will see all they've withdrawn are the

21   citations.  It's verbatim.  It's the same allegations.  And

22   they have argued various facts and put them in evidence.  So

23   even if it were true, and it's not, but even if it were true

24   that all you get here is a 12(b)(6) ruling in the ordinary

25   case if you put no evidence in dispute, they forfeited that

365

1    right by putting these facts and evidence in dispute in their

2    motion.

3        The fact that they have withdrawn evidentiary support for

4    their evidentiary assertions does not relieve them of the

5    reality that they have made all sorts of factual arguments in

6    their motion for leave, and as a contested matter we have the

7    right to address it.

8        I'm proposing, Your Honor, unless you have questions on

9    the cases on 13, 14, those are the cases where we have

10   described the hearings that have been held under *Vistacare* and

11   *Foster*, and I know more about the down-in-the-weeds of *Foster*

12   than I ever cared to, but I don't want to repeat what's in our

13   briefs.

14       If Your Honor is willing to flip to Page 15, this is an

15   argument I've alluded to briefly, but boy, we don't hear -- we

16   have not heard a single thing as to what function the

17   gatekeeper serves, particularly in context of Your Honor's

18   factual findings in the confirmation order, if all it means is

19   12(b)(6) or lower.  It just, it's an unanswerable point that

20   they just persist in ignoring.

21       But I'd like to address very briefly that third bullet,

22   because at various times and in their brief they have cited,

23   Hunter Mountain has cited, down here we call it *Louisiana*

24   *World*, I think in the Second Circuit we call it *STN*, but this

25   UCC derivative standing.  There are, in fact, two elements one

366

 1  has to pass for that, and that's a different context.  The
 2  first is colorability as it's used in that context, and that
 3  is often a 12(b)(6) standard in that context.  But still to
 4  have standing, to bring that claim on behalf of the estate,
 5  you have to show a cost-benefit analysis.  As we've heard
 6  today, we've probably spent more in legal fees today, or over
 7  the last three months, than the purportedly excessive
 8  compensation to Mr. Seery.  And so I would respectfully
 9  submit, if we were here on a *Louisiana World* or *STN* hearing,
10  this would be an open-and-shut case just as well.
11       So if I could, Your Honor, if you are willing to jump
12  ahead to Slide 17, I'd like to ask you -- and I do want to
13  address the standing jurisdictional question a little bit.
14            THE COURT:  Okay.
15            MR. STANCIL:  Not to get into the weeds of standing,
16  because I think we have briefed that out the wazoo in our
17  papers, and I read this morning -- I think it was this morning
18  -- from the Claimant Trust Agreement, which says they're not a
19  beneficial interest.
20       But my understanding is that Article III standing, whether
21  there is a theoretical injury in any way, that is -- that goes
22  to Your Honor's subject matter jurisdiction under Article III,
23  but that is not true of statutory standing under Delaware law
24  or prudential standing.  Those are -- those go to basically
25  whether they state a claim.

1    So, Your Honor, I believe, can -- and I've confessed to my

2    colleague that the only way I remember this is I screwed it up

3    really, really badly when I was clerking years ago -- but I

4    believe Your Honor can, and in this case should, rule on the

5    standing ground in the alternative.  Not on the Article III.

6    Article III is binary.  They either have it or they don't.

7    But on the statutory standing, you can say -- I think you can

8    hold that they do not have standing under Delaware law to

9    pursue the claim, but even if they do have standing, and then

10   reach the remainder.

11       And we know we're headed for appeal.  We've heard --

12   pretty much two-thirds of the time this morning has been

13   laying the groundwork for an appeal.  And we would only like

14   -- we would like to make sure that we give the Fifth Circuit a

15   fulsome record.

16       So I would like to ask Your Honor to flip to Page 19.  And

17   this is really the end of, I think, what we need to do.  So,

18   Your Honor, what if we were here just on 12(b)(6)?  So we've

19   got a *quid*, we've got a *pro*, we've got a *quo*.  They fail at

20   each turn.  Let me spend most of my time on the *quid*.  I'll

21   let the documents of which the Court can take judicial notice

22   speak for themselves.  I will let the bare-bones nature of the

23   assertion -- and it's okay to put in a complaint something on

24   information and belief, but you still have to pass *Iqbal* and

25   *Twombly*.  I can't say upon information and belief that I was

368

1    denied a starting position on the Knicks, right?  I would like

2    to believe that's the case, but it still has to be a plausible

3    allegation.

4        Let's look at this chart.  And this chart is taken right

5    out of our brief.  These are their numbers.  This is at the

6    bottom.  And I want to -- I would like to take head-on this

7    proposition that this is not a rational investment on their

8    numbers.

9        So let's take the Stonehill purchase of Redeemer.  They

10   paid $78 million to earn a projected profit, according to the

11   November 30 disclosure statement, of $19.71 million.  By my

12   arithmetic, that is a return of 25.27 percent.  Even by Mr.

13   Dondero's lights, that's a pretty good return.

14       I'm going to come back to why that's not the end of the

15   return, but let's look at the Farallon purchase of Acis.

16   Spent $8 million.  Projected profit, $8.4 million.  I'll take

17   105 percent return any day.

18       Let's look at the Farallon purchase of HarbourVest.

19   Purchase price, $27 million.  Projected profit, $5.09 million.

20   That is -- oh, I can't read my own writing anymore -- I think

21   that is 18.85 percent.  I would again gladly take that every

22   day of the week, whether it's a distressed asset or otherwise.

23       But let me make one really important point that Mr.

24   Dondero obfuscated, Mr. McEntire does not acknowledge, and it

25   is just a fact.  These are projected profits if all Mr. Seery

369

1  does is hit the plan.  November 30, 2021.  If he does no

2  better than what he thought these assets were worth then, this

3  is the expected return.  So for those trades that we've talked

4  about, that's a slam dunk even on that.

5      But let's look about -- we'll talk about upside.  Because,

6  as Your Honor knows from doing bankruptcy cases, upside, it's

7  all about upside for people who are purchasing claims.  So it

8  isn't just that their returns were capped at these already-

9  ample percentages.  If Class 8, for example, of Redeemer paid

10  out in full, they would be making not -- oh, gosh, I'm not

11  sure I should do this on the fly -- but they'd be recovering

12  $137 million on the Class 8 claim, not the $97.71 million.  So

13  there's another $40 million of upside.

14      Even if it's a low-probability event, that's a -- hedge

15  funds do that all day every day.

16      Same here with Acis.  Paid $8 million, expected $16.4

17  million, but they could get up to $23 million.

18      Now, we've heard so much about how Class 9 was worthless,

19  worthless, worthless.  No, it's not.  There's always the

20  potential for upside.  Paid $27 million.  Could recover $45

21  million just on Class 8.  Could recover another $35 million on

22  Class 9.  They could recover $80 million on a $27 million

23  purchase.  Now, the probability of that is complicated, but

24  it's not zero.  We know that it's not zero.  All we've heard

25  from them today is that Mr. Seery is -- could pay off 8 and 9

370

 1 | in full.  So I don't think that is even remotely plausible.

 2 |    Let's talk briefly about UBS.  They like to talk about UBS

 3 | for the projected profit of $3.61 million in loss.  But that

 4 | was -- that's in August, and that claim trades.

 5 |    So a couple of things that happened between the November

 6 | 30 disclosure statement setting that projected value and the

 7 | purchase of the UBS claim in August.  Number one is we are

 8 | nine, ten months past the worst of COVID.  And Your Honor

 9 | could take judicial notice of massive market movements just if

10 | you do nothing.

11 |    We don't need to get to that, because we talked all

12 | morning about MGM.  May 26th, it's announced publicly.  May

13 | 26, 2021.

14 |    So the notion that a purchaser of a UBS claim in the

15 | summer of 2021, after this MGM transaction is announced, would

16 | think, you know what, I think these claims are only worth what

17 | they were worth back in November, is not plausible.

18 |    And so this is why the comparisons to the debt, the exit

19 | financing, well, 12 percent.  That's a 12 percent capped

20 | return.  We're talking here about returns of 25 percent, 105

21 | percent, 18.85 percent, just based on projections at the --

22 | sort of in the darkest days post-COVID.

23 |    So it's not plausible.  If a court were looking at this

24 | just under the 12(b)(6) standard, we would be -- we'd be

25 | dismissing this claim as well.  And we really -- respectfully,

371

1    Your Honor, we need that ruling.  We think we need that ruling

2    so that whatever the -- whatever they may say the standard is

3    in the Fifth Circuit, we only have to go one time.  And we

4    really believe that we're entitled to that.

5        I'll let Your Honor -- I will just stand on the deck and

6    our briefs on the *pro* and the *quo*.  But meet-and-greets, these

7    are just conclusory allegations in the complaint.  He says

8    they worked -- that he worked for them 10 or 15 years ago,

9    which some of that's not even true, but even if it were all

10   true, if I were beholden to every client I've met at a

11   schmooze fest or everybody I worked for in a group 20 years

12   ago or 15 years ago, you know, I would be incapable of

13   operating without a conflict of interest.  And it's just not

14   plausible.  This is something that needs to go.

15       Unless the Court has questions, I will cede the remainder

16   of our time to Mr. Morris.

17           THE COURT:  No questions.  Thank you.

18        CLOSING ARGUMENT ON BEHALF OF THE REORGANIZED DEBTOR

19           MR. MORRIS:  Thank you so much, Your Honor, for your

20   patience.  It's been a very long day.  I am very grateful that

21   we're going to finish today.

22       As I said at the beginning, I believe this exercise, as

23   difficult as it may have been, is so important and so vital,

24   preserving this estate and what's left of it.

25       The gatekeeper exists for very important reasons.  Your

372

1   Honor made those findings in her order that has been upheld on

2   appeal.  And we're here to make sure that frivolous litigation

3   is not commenced against my clients, or, frankly, against

4   Stonehill and Farallon, given their capacity as Claimant

5   Oversight Board members.

6       Hunter Mountain confuses argument with facts.  There's no

7   facts here to support anything, and that's what the gatekeeper

8   is about.  The gatekeeper is making sure that there's a good-

9   faith basis to pursue claims.  And as Mr. Stancil points out,

10  it is certainly acceptable to state things upon information

11  and belief.  But the point of the gatekeeper is if somebody

12  says -- not somebody says -- somebody offers proof that those

13  beliefs are wrong, you no longer have a plausible claim.  And

14  that's why we thought it was so important to go through this

15  exercise today.  Because the facts show that their beliefs are

16  simply wrong, and the entire complaint is based on their

17  beliefs.

18      There is zero evidence concerning the compensation other

19  than their belief that the compensation is excessive.  The

20  case is over.  Like, you could stop there.  I'm going to go

21  through a bunch of things that -- you could stop there.

22      I want to actually begin backwards, though, in time, with

23  the HarbourVest settlement.  Right?  After two years of

24  litigation and re-litigation and re-litigation of the

25  HarbourVest settlement, the claims of insider trading, finally

373

1   the Court has before it admissible indisputable evidence that

2   Mr. Seery negotiated the terms of the HarbourVest settlement

3   before he ever got this notorious email from Mr. Dondero.

4   That should be a finding of fact in Your Honor's order and it

5   should never be -- nobody should ever make that allegation

6   again.  It's over.  You have the documents.  You have the

7   email from Mr. Seery to the board, here are the terms, and

8   those are the terms Your Honor approved.

9       And there's more.  Because this is so important for us,

10  because we're tired of being accused of wrongdoing.  We're

11  tired of being falsely accused of wrongdoing.

12      $22-1/2 million.  That's the valuation Mr. Seery put on

13  it.  You can see that he's doing it to his Independent Board

14  colleagues, copying his lawyers.  He's telling them where he

15  got it, from Hunter Covitz.  The evidence is now in the

16  record.  It came from a regularly-published NAV report from

17  November 30th.  It was seven days old.  It can never be

18  disputed again that $22.5 million was a fair value, not based

19  on some subjective view of Mr. Seery but based on the person

20  who gave him the report that everybody relies upon that Mr.

21  Dondero got.

22      And it was ratified yet again in the audited financial

23  statements that came out, and it shows for the period ending

24  -- this is Exhibit 60, I believe -- for the period ending

25  December 31, 2020, $50 million.  Okay, so it went up a few

374

1   million dollars in December.

2       This is their case?  This is the case?  Your Honor I know

3   is still working on the motion to dismiss.  That's Mark

4   Patrick, right?  That's the complaint that he brought.  That's

5   what this is about.  I don't mean to confuse the issue, but

6   it's time to put this stuff to rest, because it's wrong.  Mr.

7   Dondero has lost and he's got to get over it at some point.

8       But here's the best piece of evidence about this whole

9   shenanigans about MGM being inside information.  Mr. Dondero

10  filed a 15-page objection to the HarbourVest settlement and

11  didn't say a word about it.  How is that possible?  Six days

12  before the settlement, he sends this email.  Two weeks later,

13  in January, he files a 15-page objection and doesn't mention

14  anything about insider trading, MGM, or any wrongdoing by Mr.

15  Seery.  In fact, he argues the exact opposite, that Mr. Seery

16  cut a bad deal.  How is that possible?  This is a plausible

17  claim?

18      It gets better, or worse, depending on your point of view.

19  CLO Holdco filed an objection and they said they're entitled

20  to buy the asset.  This is Mr. Dondero's, you know, operating

21  arm of the DAF.  They lost -- they actually had an honorable

22  person who concluded, I don't really have that right.  But

23  these are the claims that Mr. Patrick is asserting, and he

24  asserted them on April -- in April, before the MGM deal was

25  announced.  Right?  And Your Honor found, and that's why it

375

1  was so important for the Court to take judicial notice of the
2  second contempt order, because Mr. Dondero was intimately
3  involved in bringing those claims and in bringing those claims
4  against -- or trying to bring those claims against Mr. Seery,
5  in violating of the gatekeeper.  This is all tied together.
6      I have to tell you, I don't know why we're not doing Rule
7  11.  Forget about colorable claims.  This is a fraud on the
8  Court.  It really is.  And I don't know when it's going to
9  stop.  I'd love to move on with my life, to be honest with
10  you.
11      The tender offer.  He's out there doing a tender offer
12  benefitting as the fund that he manages acquires more shares
13  and his interest goes up and the value goes up with all these
14  MGM holdings.  Really?  And he's going to accuse Mr. Seery of
15  wrongdoing?
16      There was one point of Mr. Dondero's testimony that made
17  my heart skip a beat.  It's when he referred to the need to
18  get discovery.  And why did it skip a beat?  Because he
19  actually had a moment of candor where he admitted that the
20  notion that Mr. Seery gave them material nonpublic inside
21  information was his thought.  It's not anything that Farallon
22  ever told him.  And then it spins and it spins and it spins,
23  and finally when he gets to the fifth version of his sworn
24  statement MGM suddenly appears.  It's not right.  Colorable
25  claims?  Fraudulent claims.

1    What's the undisputed evidence right now?  I'll take Mr.
2   Dondero at his word that Mr. Patel told him that Farallon
3   bought the claims in February or March.  How did they
4   reconcile that with the undisputed testimony that Mr. Seery
5   thereafter invited Farallon to participate in the exit
6   financing?  And they signed an NDA in early April.  Why would
7   you sign an NDA if you already got inside information?  Who
8   would do that?  What would be the purpose of that?
9    How do you reconcile the fact that, according to Mr.
10   Dondero, the claims were already in Farallon's pocket when
11   they signed an NDA to get information for an exit facility.
12   Is that plausible?
13    We've heard Mr. McEntire say a bunch of times it's much
14   broader than MGM.  Not only not a scintilla of evidence, but
15   no substantive allegation.  Again, confusing argument with
16   facts.  Because he had -- yes, Mr. Seery had access to inside
17   information relative to Highland.  He's the CEO.  But where is
18   the evidence that he shared anything with anybody?  There is
19   nothing.
20    Mr. Dondero admitted in his motion -- in a moment of
21   candor, he said that's what he concluded based on the fact
22   that Mr. Patel supposedly told him, I bought because Seery
23   told me to.  He made the inference.  No evidence.  Nothing.
24    They're bringing this case for the benefit of innocent
25   parties?  These people have told you time and again that

377

1   assets exceed liabilities.  What innocent parties?  Where are
2   they and how come they're not -- let's get to that point, too.
3   Because they're saying, oh, Mr. Seery is, like, just not
4   declaring the end of this.  Seriously?  How much do they think
5   Mr. Seery should reserve for indemnification claims as we do
6   trials like this with a mountain of lawyers billing $800,
7   $1,500 an hour?  Seriously?  Mr. Seery is somehow acting in
8   bad faith by not declaring the end of this case?  How much is
9   he supposed to reserve?  They keep skipping over that.  We'll
10  talk about that in the mediation motion.  We'll talk about
11  that in the Hunter Mountain motion in July.  Who's prosecuting
12  that?  Mr. Dondero's lawyer.  I know there's a really big
13  separation between Hunter Mountain and Mr. Dondero, but
14  Stinson is prosecuting that claim on behalf of Hunter Mountain
15  when they're seeking information.
16       And they complain about the legal fees?  We've put our
17  pens down.  Kirschner put his pens down.  We put down the
18  claim objection.  What we're doing is defense at this point.
19       We're awaiting the ruling on the notes litigation, and we
20  will very much prosecute the vexatious litigant motion if
21  Judge Starr grants the pending motion to exceed the page limit
22  that's been out there for months.  I'm not sure what's
23  happening there.  We'll do that for sure.  But otherwise,
24  we're just playing defense.
25       We're here today because they've made a motion, a motion

378

1   that lacks any good-faith basis whatsoever.  And that's why

2   today was so important, so the Court could hear the witnesses.

3   They could -- the Court -- I mean, think about it.  Texas

4   State Securities Board.  The audacity of saying that somehow a

5   letter from the Texas State Securities Board saying they're

6   taking no action after conducting an investigation of

7   Dugaboy's claim of insider trading is irrelevant?  Like, what?

8       I've told you before, all we do is play Whack-A-Mole.

9   Whack-A-Mole.  They make an argument, we prove it's frivolous,

10  so they just make a new argument.  Their pleading says their

11  claims are colorable because there's an open investigation.

12  Now there's no investigation and they say that's irrelevant.

13  How can they say that with a straight face?  I couldn't.

14      I want to talk about Mr. Seery.  I want to finish with my

15  Mr. Seery.  I may not use all my time.  We can go home early.

16      (Laughter.)

17          THE COURT:  It's past early.

18          MR. MORRIS:  But this guy has worked doggedly, Your

19  Honor, and I will defend him until the end of time.  He's a

20  man who has so far exceeded expectations.  And they're saying

21  he's not -- he's overpaid?  The guy is overpaid?  When he's

22  into Class 9?  When he's being pursued with these frivolous

23  claims?  Every day he's being attacked.  How much do they

24  think he should be paid?  I would have loved to -- I hope --

25  no, I don't hope.  I don't think there's any reason to hear

379

1    expert testimony.  I think Your Honor should exercise -- the

2    Court should exercise its discretion and say there's no need,

3    the Court doesn't need to hear expert testimony.

4        But if we do, I'll be delighted to hear their expert's

5    view on what Mr. Seery -- if it's not $8.8 million for all

6    these years, what should it be, after he takes an estate from

7    71 percent on the 8s to, according to them, assets exceed

8    liabilities, 9s are paid in full?

9        You know what?  If they put their pens down, maybe there

10   would be a conversation.  But as long as we keep doing this

11   ridiculous, baseless, frivolous litigation, Mr. Seery is going

12   to conserve resources, because he's got to pay people like me

13   to defend him and to defend the estate.  This is a preview of

14   what we'll talk about at the mediation motion.  He's doing a

15   great job.  He's devoting his life to it.  He has no other

16   income.  He's got no other job.  It's wrong.

17       The claims are not only not colorable, they are frivolous.

18   I ask the Court to stop this in its tracks right now.

19       Thank you very much.

20            THE COURT:  Thank you.

21       All right.  Is there any time for the Movant to have the

22   last word, which we usually give the Movant the last word.

23            THE CLERK:  The Movant, I think, has a little under

24   -- maybe about a minute left.

25            THE COURT:  Anything you want to say in a minute?

380

1       MR. MCENTIRE:  Yes, just I'll take 30 seconds.  How

2  is that?

3       THE COURT:  Okay.

4    REBUTTAL CLOSING ARGUMENT ON BEHALF OF HUNTER MOUNTAIN

5       MR. MCENTIRE:  I just want to direct your attention

6  to our reply brief, specific paragraphs that address your

7  question about authorities.  We do cite several cases on Page

8  41, 40 and 41, dealing with the issue of unjust enrichment.

9  That's it.

10    Thank you, Your Honor, very much.

11       THE COURT:  Okay.  Thank you.  Unjust enrichment?

12       MR. MCENTIRE:  Disgorgement.

13       THE COURT:  Okay.  But I was really, you know, claims

14  trading in the bankruptcy context, just your best --

15       MR. MCENTIRE:  Well, I think the cases that you

16  identified were our best cases.  The --

17       THE COURT:  Okay.

18       MR. MCENTIRE:  -- *Adelphia* and the other cases.

19       THE COURT:  All right.  Well, --

20       MR. MCENTIRE:  There are other cases, Your Honor, in

21  different contexts.  There's also the *Washington Mutual* case

22  dealing with equitable disallowance.  There's also the *Mobile*

23  *Steel* case, a Fifth Circuit --

24       THE COURT:  *Mobile Steel*?  Oh, my goodness.  Okay.

25       MR. MCENTIRE:  Okay.  All right.

381

```
 1              THE COURT:  1968?  Or no.  That doesn't mean it isn't
 2   still quoted often, but --
 3              MR. MCENTIRE:  Those would also be relevant.
 4              THE COURT:  Equitable subordination --
 5              MR. MCENTIRE:  Yes, ma'am.
 6              THE COURT:   -- when there's bad acts.
 7              MR. MCENTIRE:  And Footnote #10 in the Mobile Steel
 8   case.  That is relevant, too.  Just, --
 9              THE COURT:  Okay.
10              MR. MCENTIRE:  Thank you.
11              THE COURT:  All right.  So I gave a deadline of
12   Monday, right, --
13              MR. STANCIL:  Yes.
14              THE COURT:   -- to reply to the response to the
15   motion in limine?
16              MR. STANCIL:  Yes, Your Honor.  Do you want time
17   before you leave for the day?  I mean, it's not going to be
18   that long, so 4:00 o'clock Monday?  Does that work for you?
19              THE COURT:  I don't care.  I probably won't start
20   looking at it until the next day.
21              MR. STANCIL:  But I will -- I'll just reserve and so
22   I don't have my associates --
23              THE COURT:  Yes.  I think these days midnight, 11:59
24   p.m., is what lawyers tend to want.
25              MR. STANCIL:  Oh, not this lawyer.
```

382

```
 1            THE COURT:  Oh, well, okay.  Okay.  So I'll just have
 2    to look at this, and probably by Friday of next week I will
 3    reach out through Traci and let you know what my decision is
 4    on whether we're going to have another day of just 30 minutes,
 5    30 minutes of experts.
 6            MR. MCENTIRE:  Your Honor, another housekeeping
 7    matter.  You'd wanted a copy of our PowerPoint, --
 8            THE COURT:  Yes.
 9            MR. MCENTIRE:  -- which I'm pleased to give you.  We
10    found a typo that we can correct electronically on the version
11    I showed.
12            THE COURT:  Uh-huh.
13            MR. MCENTIRE:  I likely will send that to you and I
14    can copy opposing counsel.  Is that --
15            THE COURT:  Okay.  Send it to Traci Ellison, my
16    courtroom deputy.
17            MR. MCENTIRE:  All right.
18            THE COURT:  And she'll --
19            MR. MCENTIRE:  We'll do that first thing in the
20    morning.
21            THE COURT:  Okay.
22            MR. MCENTIRE:  So you'll have a copy --
23            MR. STANCIL:  Can we get the hard copy that -- from
24    today, though?
25            MR. MCENTIRE:  No, that had a typo on it.  I really
```

383

1   don't want to share it.  We fixed it.

2           THE COURT:  What?  I'm sorry, what?

3           MR. MORRIS:  That's fine.

4           MR. STANCIL:  Never mind.

5           THE COURT:  Do I not need to know?

6           MR. STANCIL:  Let's all go home.

7           THE COURT:  Okay.  And then my last question is --

8   and there was a mention of the CLO Holdco lawsuit, where

9   there's a pending motion to dismiss.  There's an opinion I'm

10  writing well underway.  I just keep getting sidetracked by

11  other things.  Imagine that.  So I know that people are

12  wanting to get an answer to that.  So, trust me, it's going to

13  get done here pretty soon.

14     You mentioned Brantley Starr.  I mean, it is not my role

15  to pick up the phone and call him and say hey, --

16          MR. MCENTIRE:  No, I wasn't suggesting that.

17          THE COURT:   -- District Judge, get busy on that.

18          MR. MCENTIRE:  Yeah.

19          THE COURT:  But I'll at least tell you, I know the

20  man seems to have more jury trials than any judge I've seen in

21  this building, so I suspect he's working late hours trying to

22  get things done.

23          MR. MCENTIRE:  Yeah.

24          THE COURT:  What do we have upcoming?  We have what

25  you called the mediation motion.  When is that set?

384

1          MR. MORRIS:  June 26.

2          THE COURT:  June 26th.  Be here before we know it.

3          MR. MORRIS:  Yeah.  And just to keep the Court

4    informed, the Movant's reply was due today.  We gave them a

5    week extension.  They asked earlier today.  I saw in my email

6    we gave them.  So I think you should expect the reply on the

7    15th.  The hearing is the 26th, and that's not in person.

8          THE COURT:  Okay.  Well, I'm very interested to dive

9    into those pleadings.  I knew the motion was coming because

10   one of the lawyers said at a prior hearing it would be coming.

11   So I haven't read any of those pleadings, but, well, I'm just

12   very interested to hear how this plays out.  I mean, I've said

13   it before.

14         MR. MORRIS:  Uh-huh.

15         THE COURT:  We had global mediation in summer of

16   2020.  We had two very fine mediators.  We had a heck of a lot

17   settled, to my amazement.  But we're now way down the road and

18   whole lot of money has been eaten up fighting lots of stuff.

19   I mean, it would have to be pens down.  There's an enormous

20   amount out there that would have to be part of it, and I just

21   don't know if everyone is fully appreciating that.  I hope

22   they are.  Anyone listening.  We're really, really far down

23   the road now, and there's just how many appeals?  Someone at

24   one time told me there were 26.  I bet it's more than that by

25   now.

385

```
 1          MR. MORRIS:  I think that's right.  I think we argued
 2  on Monday, what is it, the sixth of nine appeals in the Fifth
 3  Circuit.  And we've got, you know, a cert petition that we're
 4  waiting to hear from on the Supreme Court.  And yeah, there's
 5  still a couple dozen matters in the district court.
 6          THE COURT:  Okay.
 7          MR. MORRIS:  Not one of them, not one of them we're
 8  prosecuting, with the exception of waiting on the Court to
 9  rule on the Report and Recommendation on the notes litigation
10  and vexatious litigant.  We are not the plaintiff, movant, in
11  anything.
12          THE COURT:  We've got adversaries.  The Reports and
13  Recommendations.  That's just made everything go a lot slower.
14  But all right.  So we have that.  And anything else coming up?
15          MR. MORRIS:  I think on July 11th maybe there is a
16  hearing scheduled on Hunter Mountain.  If you recall, Hunter
17  Mountain had that valuation motion last year that you denied
18  on the grounds that they didn't have a legal right to
19  valuation information.  They made a motion earlier this year
20  for leave to file an adversary proceeding to assert an
21  equitable claim and some other declaratory relief, is my
22  recollection.
23      While we filed an opposition, we didn't oppose the relief
24  requested, so that motion got resolved.  They have filed an
25  adversary proceeding.  And I think, if I remember correctly,
```

386

1  our response to the complaint, maybe that's what due.  Oh, the
2  11th is a status conference.  It could be a status conference,
3  maybe to set a scheduling order.
4            THE COURT:  Okay.
5            MR. MORRIS:  But that's it.  I think that's the only
6  thing on the calendar.
7            THE COURT:  That's a lot.
8            MR. MCENTIRE:  Thank you.
9            THE COURT:  Anything else?  Okay.
10           MR. STANCIL:  Thank you, Your Honor.
11           MR. MORRIS:  Thank you, Your Honor.
12           THE CLERK:  All rise.
13      (Proceedings concluded at 7:18 p.m.)
14                          --oOo--
15
16
17
18
19                        CERTIFICATE
20      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
21  above-entitled matter.
22   **/s/ Kathy Rehling**                        06/12/2023
23  _____    _____
    Kathy Rehling, CETD-444                        Date
24  Certified Electronic Court Transcriber
25

**Appx. 02923**

387

                              INDEX

PROCEEDINGS                                                3

OPENING STATEMENTS

- By Mr. McEntire                                         67
- By Mr. Morris                                           90
- By Mr. Stancil                                         102
- By Mr. McIlwain                                        106

WITNESSES

Hunter Mountain Investment Trust's Witnesses

James David Dondero
- Direct Examination by Mr. McEntire                     112
  *Voir Dire* Examination by Mr. Morris                  144
- Cross-Examination by Mr. Morris                        158
- Redirect Examination by Mr. McEntire                   201
- Recross-Examination by Mr. Morris                      208

James P. Seery
- Direct Examination by Mr. McEntire                     211
- Cross-Examination by Mr. Morris                        265
- Redirect Examination by Mr. McEntire                   292
- Examination by the Court                               293

Debtors' Witnesses

Mark Patrick
- Direct Examination by Mr. Morris                       302
- Cross-Examination by Mr. McCleary                      313

EXHIBITS

HMIT's Exhibits

Certain Exhibits                               Received 33-40

HMIT's Exhibit 3                                 Received 317
HMIT's Exhibit 4                                 Received 317
HMIT's Exhibit 4                             Received 140/149
HMIT's Exhibits 7-10                             Received 317
HMIT's Exhibits 12-23                            Received 317
HMIT's Exhibits 26-38                            Received 317
HMIT's Exhibits 29-52                             Carried 317

388

1                                    INDEX
                                    Page 2
2

3    HMIT'S Exhibits, cont'd.

4    HMIT's Exhibits 39-62                              Carried 37
     HMIT's Exhibits 53-57                             Received 317
5    HMIT's Exhibits 58-63                             Received 321
     HMIT's Exhibit 64                                 Received 317
6    HMIT's Exhibit 65                                 Received 317
     HMIT's Exhibits 67-70                             Received 317
7    HMIT's Exhibit 71                                 Received 318
     HMIT's Exhibit 72                                 Received 319
8    HMIT's Exhibit 73                                 Received 319
     HMIT's Exhibit 74                                 Received 319
9    HMIT's Exhibit 75                                 Received 319
     HMIT's Exhibit 76                              Carried 37/321
10   HMIT's Exhibit 77                                 Received 319
     HMIT's Exhibit 78                                 Received 319
11   HMIT's Exhibit 79                                 Received 319
     HMIT's Exhibit 80                    Marked 234 Received 320
12

13   Debtors' Exhibits

14   Debtors' Exhibit 2                                 Received  44
     Debtors' Exhibit 3                                 Received  54
15   Debtors' Exhibit 4                                 Received  54
     Debtors' Exhibit 5                                 Received  54
16   Debtors' Exhibit 6                                 Received  55
     Debtors' Exhibit 7                                 Received  56
17   Debtors' Exhibit 8                                 Received  57
     Debtors' Exhibit 9                                 Received  54
18   Debtors' Exhibit 10                                Received  58
     Debtors' Exhibit 11                                Received  44
19   Debtors' Exhibit 12                                Received  60
     Debtors' Exhibit 13                                Received  60
20   Debtors' Exhibit 14                                Received  63
     Debtors' Exhibit 15                                Received  64
21   Debtors' Exhibits 25-30                            Received  65
     Debtors' Exhibit 30                                Received 272
22   Debtors' Exhibit 31-A                              Received 272
     Debtors' Exhibit 32                                Received 323
23   Debtors' Exhibit 33                                Received 327
     Debtors' Exhibit 34                              Received 44/65
24   Debtors' Exhibit 36                                Received 328
25

389

INDEX
Page 3

Debtors' Exhibits, cont'd.

Debtors' Exhibit 38                                    Received  44/328
Debtors' Exhibit 39                                    Received  44/286
Debtors' Exhibit 40                                    Received  44/287
Debtors' Exhibit 41                                    Received  44/284
Debtors' Exhibit 42                                        Received  44
Debtors' Exhibit 45                                        Received 174
Debtors' Exhibit 46                                        Received  44
Debtors' Exhibit 51                                        Received 308
Debtors' Exhibit 59                                        Received 289
Debtors' Exhibit 60                                        Received 272
Debtors' Exhibit 100                                        Marked 179

Judicial Notice to be Taken                                        175

CLOSING ARGUMENTS

- By Mr. McEntire                                                  329
- By Mr. McIlwain                                                  354
- By Mr. Stancil                                                   358
- By Mr. Morris                                                    371
- By Mr. McEntire                                                  379

RULINGS

HMIT's Motion for Leave to File Verified Adversary                382
Proceeding (3699) - *Taken Under Advisement*

END OF PROCEEDINGS                                                 386

INDEX                                                          387-389

Appx. 02926